KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Lauren Macksoud
Joshua Friedman

*Counsel to Consumer Unsecured Reperforming Loans
(CURL) PLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------------- X | |
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |
| ------------------------------------------------------------------- X | |

**LIMITED OBJECTION OF CONSUMER UNSECURED REPERFORMING
LOANS (CURL) PLC TO THE DEBTORS' PROPOSED ASSUMPTION
OF CERTAIN EXECUTORY CONTRACTS PURSUANT TO
DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION
PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Without submitting to this Court's jurisdiction, Consumer Unsecured

Reperforming Loans (CURL) PLC ("CURL"), by and through its undersigned counsel, hereby

submits this limited objection (the "Limited Objection") to the assumption by Lehman Brothers

Special Financing Inc. ("LBSF") of certain derivative contracts, as set forth in the Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

(the "Plan"), the Plan Supplement, dated October 25, 2011 (the "Plan Supplement"), and the

Notice of Proposed Assumption of Executory Contracts and Unexpired Leases Pursuant to the

Debtors' Third Amended Joint Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy

Code (the "<u>CURL Notice of Assumption</u>").  In support of this Objection, CURL respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.　　Despite efforts to seek additional information from the Debtors (as defined below), CURL simply lacks sufficient information regarding the Debtors' intentions with respect to the Master Agreement, their methodology for calculating the proposed cure amount and an understanding of what the cure amount represents.  Without submitting to this Court's jurisdiction, CURL therefore objects to assumption of the Master Agreement inasmuch as CURL requires more time and information to take an position on the Debtors' requested relief.

2.　　The Debtors' intention in seeking to assume the Master Agreement is a source of particular uncertainty to CURL because, from CURL's perspective, the Master Agreement lacks any economic value to the Debtors, irrespective of whether it is assumed or not. Any obligation by CURL to make payments to the Debtors – the only source of potential value to the Debtors arising from the Master Agreement – is suspended by the clear terms of the agreement itself, which provides that a bankruptcy filing by one party constitutes an event of default that suspends the non-bankrupt counterparty's obligations.  This provision is enforceable under English law, which governs the Master Agreement, and, CURL believes, will be upheld by English courts, to which the parties have granted exclusive jurisdiction.  For this reason, CURL reserves the right to argue before the English courts that CURL's obligation to make any payments that would otherwise be due to LBSF under the Master Agreement has been suspended—even if this Limited Objection is overruled and the Debtors assume the Master Agreement.

## **BACKGROUND**

3.     CURL is a public limited company incorporated in England and Wales on March 19, 2007 for the purpose, amongst other things, of issuing notes backed by unsecured reperforming loans.  CURL has no operations or significant contacts within the United States.

4.     CURL and LBSF entered into that certain ISDA Master Agreement, dated as of July 18, 2007 (including the Schedule to the 1992 ISDA Master Agreement dated as of July 18, 2007 (the "Schedule"), the Credit Support Annex to the Schedule to the ISDA Master Agreement dated as of July 18, 2007 (the "Credit Support Annex"), certain transaction confirmations dated July 18, 2007 (the "Confirmations"), and any amendments thereto, the "Master Agreement").  True and correct copies of the Master Agreement, Schedule, Credit Support Annex and Confirmations are attached, respectively as Exhibits A, B, C and D.[1]

5.     The Master Agreement provides that the agreement will be governed in accordance with the law specified in the Schedule. See Master Agreement ¶ 13(a).  The Schedule specifically provides that the agreement will be governed by the laws of England.  See ¶ 4(i). The Master Agreement further provides that the parties thereto submit to the jurisdiction of the English courts if the agreement is expressed to be governed by English law.  See Master Agreement ¶ 13(b) and ¶ 4(i) of the Schedule.

6.     Under the terms of the Master Agreement, the parties entered into multiple transactions (collectively, the "Transactions"), each with a specific termination date. Specifically, pursuant to the Master Agreement, the parties entered into four Transactions dated July 17, 2007, two of which reached their scheduled termination date on June 17, 2011 and September 17, 2011, respectively.  Each Transaction gives rise to payment obligations from one party to another, to be satisfied periodically before maturity.

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Master Agreement.

7.      Section 2(a)(i) of the Master Agreement provides that "Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."   This section is modified by Section 2(a)(iii), which provides that "Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

8.      Beginning on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc., LBSF and certain of their affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.   As the Debtors' bankruptcy filing constituted an Event of Default under Section 5(a)(vii) of the Master Agreement that "occurred and is continuing," by operation of Section 2(a)(iii), any payment obligations pursuant the Master Agreement by CURL were effectively extinguished.

9.      On or about September 22, 2009, CURL timely filed a proof of claim against LBSF (Claim No. 28739) seeking recovery under the Master Agreement in an unliquidated amount (the "CURL Claim").   The CURL Claim stated, among other things, that the respective claimant "does not submit to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim" and "expressly reserves the right to withdraw this Proof of Claim as if it had never been filed."

10.      Pursuant to the Order Approving the Disclosure Statement, the Court approved the Debtors' Notice of (i) Approval of Disclosure Statement; (ii) Establishment of

Record Date; (iii) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan; and (iv) Procedures and Deadline for Voting on the Plan dated September 9, 2011 (the "Confirmation Hearing Notice"). Pursuant to Section 9(a) of the Confirmation Hearing Notice, the Debtors obligated themselves to serve a notice of proposed cure amounts (the "Cure Amount Notice") to any counterparty to an executory contract to be assumed pursuant to the Plan.

11.     On September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627]. Pursuant to Section 11.1 of the Plan, upon Plan confirmation, and as of the Plan's effective date, all executory contracts existing between the Debtors and any counterparty will be deemed rejected, except for those executory contracts that are specifically designated as a contract to be assumed by the Debtors.

12.     On October 25, 2011, the Debtors filed the Plan Supplement [Docket No. 21254], which sets forth, in Exhibit 2, the Schedule of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Section 11.1 of the Plan (the "Assumption Schedule"). The Debtors list the Master Agreement as an executory contract to be assumed by the Debtors.

13.     On or about November 4, 2011, CURL received the Notice of Proposed Assumption of Executory Contracts and Unexpired Leases Pursuant to the Debtors' Third Amended Joint Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code (the "CURL Notice of Assumption"), which purported to notify CURL that the Debtors intended to assume all derivative contracts entered into between the Debtors and CURL. The Notice of Assumption was served on the trustee under the Master Agreement, BNY Melon Trustee Services Ltd., rather

than c/o Wilmington Trust SP Services (London) Limited, the proper notice party under both the Master Agreement and the CURL Claim.

14.    While the Debtors do not provide a cure amount in the Assumption Schedule, the CURL Notice of Assumption lists the cure amount proposed by the Debtors as £82,716.86.

15.    On or around the date hereof, CURL withdrew the CURL Claim.

## ARGUMENT

16.    Without more information from the Debtors, CURL is left speculating as to the Debtors' intention in seeking to assume the Master Agreement, and without guidance by the Debtors, CURL has no basis to evaluate or critique the Debtors' methodology.

17.    Without any guidance from the Debtors, CURL's unsupported suspicion is that the Debtors are seeking to assume the Master Agreement in an effort to somehow nullify the effect of Section 2(a)(iii) of the Master Agreement, pursuant to which CURL's payment obligations in respect of the Transactions have been suspended.  CURL is not requesting a ruling by this Court with respect to the operation of the Master Agreement, which, by its terms, is governed by English law and to be interpreted and upheld by English courts.  However, CURL objects to the Debtors' assumption of the Master Agreement to the extent that the Debtors will seek to rely on the assumption as having any impact on CURL's obligations under the Master Agreement.  Such an interpretation would be inconsistent with English law, pursuant to which contract provisions such as Section 2(a)(iii) that provide for the exercise of a party's contractual right triggered by the counterparty's bankruptcy filing are enforceable.  Assumption of the Master Agreement will not revive CURL's payment obligations under English law.  Assumption of the Master Agreement should only be approved by the Bankruptcy Court to the extent that it

will have no *res judicata* effect in a later proceeding (presumably before the English courts, which have exclusive jurisdiction over the Master Agreement and the parties thereto) regarding the parties' payment obligations under the Master Agreement.

## RESERVATION OF RIGHTS

18.    CURL does not submit to the jurisdiction of this Court for any reason but to assert this Limited Objection to the assumption of the Master Agreement.  CURL explicitly objects to the personal jurisdiction of the Court with regard to any motion, request for relief or adversary proceeding commenced against it by any party.

## CONCLUSION

WHEREFORE, for the foregoing reasons, CURL respectfully requests that the Court deny the Debtors' proposed assumption of the Master Agreement and the Debtors' proposed cure amounts.


Dated: New York, New York
November 16, 2011

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP

By:___ */s/* Lauren Macksoud_____
        Lauren Macksoud
        Joshua Friedman
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000

*Counsel to Consumer Unsecured Reperforming
Loans (CURL) PLC*

KL2 2724050.7

# EXHIBIT A

**EXECUTION VERSION**

(Multicurrency — Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ....18 July 2007................

| Lehman Brothers Special Financing Inc. | Consumer Unsecured Reperforming Loans |
| as ("Party A") | (CURL) PLC |
| ..................................................... and | ................................................................... |
| | as ("Party B") |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1. **Interpretation**

(a)     *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                                              ISDA® 1992

(ii) **Liability**. If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)      **Default Interest; Other Amounts**. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)      **Basic Representations**.

(i)      **Status**. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)      **Powers**. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)      **No Violation or Conflict**. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)      **Consents**. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)      **Obligations Binding**. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

      (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

      (ii)    any other documents specified in the Schedule or any Confirmation; and

      (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                    ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

  (i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

  (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

  (iii)    *Credit Support Default.*

      (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

      (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

      (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

  (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

  (v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

  (vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                                                    **ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)  *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

**6.    Early Termination**

(a)    ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event.***

(i)    ***Notice.*** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    ***Transfer to Avoid Termination Event.*** If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    ***Two Affected Parties.*** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    ***Right to Terminate.*** If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   **Calculations.**

(i)   **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                    **ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                                                                  ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

|  |  |
|---|---|
| Lehman Brothers Special Financing Inc. | Consumer Unsecured Reperforming Loans (CURL) PLC |
| (Name of Party) | (Name of Party) |
| By: ................................................... | By: ................................................... |
| Name: | Name: Robin Baker |
| Title: | Title: Director |
| Date: | Date: 13 | 07 | 2011 |

And for the purpose of receiving
notices in accordance with Sections 5 and 6

CITICORP TRUSTEE COMPANY LIMITED

By:  ...........................................................
    Name:
    Title:
    Date:

ISDA® 1992

UK/1196548/01

Office/OFFICE

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| Lehman Brothers Special Financing Inc. | Consumer Unsecured Reperforming Loans (CURL) PLC |
|---|---|
| (Name of Party) | (Name of Party) |
| By: _____ | By: _____ |
| Name: **Chiara Mapelli** | Name: **Robin Baker** |
| Title: **Authorised Signatory** | Title: **Director** |
| Date: 13/07/2007 | Date: 13/07/2007 |

And for the purpose of receiving
notices in accordance with Sections 5 and 6

CITICORP TRUSTEE COMPANY LIMITED

By: ....................................................
   Name:
   Title:
   Date:

18                                    ISDA® 1992

**EXHIBIT B**

Execution version

(Multicurrency-Cross Border)

## SCHEDULE

### to the

### 1992 ISDA

### MASTER AGREEMENT

### dated as of 18 July 2007

### between

### LEHMAN BROTHERS SPECIAL FINANCING INC.

### a corporation organised under the laws of the State of Delaware

### ("Party A")

### and

### CONSUMER UNSECURED REPERFORMING LOANS (CURL) PLC

### a corporation organised under the laws of the England and Wales Under Registered Number 6169729

### ("Party B")


**PART 1    TERMINATION PROVISIONS**

In this Agreement:-

(a)      *"Specified Entity"* means:

    (i)      in relation to Party A for the purpose of

        Section 5(a)(v) of this Agreement - not applicable

        Section 5(a)(vi) of this Agreement -not applicable

        Section 5(a)(vii) of this Agreement - not applicable

        Section 5(b)(iv) of this Agreement - not applicable

    (ii)      in relation to Party B for the purpose of

UK/1321471

Section 5(a)(v) of this Agreement - not applicable

Section 5(a)(vi) of this Agreement - not applicable

Section 5(a)(vii) of this Agreement - not applicable

Section 5(b)(iv) of this Agreement - not applicable

**(b)**    The "***Breach of Agreement***" provisions of Section 5(a)(ii) will apply to Party A and will not apply to Party B.

**(c)**    The "***Credit Support Default***" provisions of Section 5(a)(iii) will apply to Party A and will not apply to Party B.

**(d)**    The "***Misrepresentation***" provisions of Section 5(a)(iv) will apply to Party A but will not apply to Party B.

**(e)**    "***Specified Transaction***" will have the meaning specified in Section 14 and the "**Default Under Specified Transaction**" provisions of Section 5(a)(v) will not apply to Party A and will not apply to Party B.

**(f)**    The "***Cross Default***" provisions of Section 5(a)(vi) of this Agreement will not apply to Party B and will apply to Party A with a Threshold Amount equal to 3 per cent of the stockholders' equity of Lehman Brothers Holdings Inc..

**(g)**    The "***Bankruptcy***" provisions of Section 5 (a)(vii) will apply to Party A and will apply to Party B, provided that with respect to Party B only:

(i) Subsection 5(a)(vii)(2) is deleted

(ii) Section 5(a)(vii)(3) will not apply in respect of Party B to the extent it refers to any assignment, arrangement or composition that is effected by or pursuant to the Deed of Charge;

Section 5(a)(vii)(4) will not apply to the extent it refers to proceedings or petitions instituted or presented by Party A or any of its Affiliates;

(iii) Subsection 5(a)(vii)(6) does not apply with respect to the appointment of the Trustee under the Deed of Charge,

(iv) Subsection 5(a)(vii)(7) does not apply to taking possession by the Trustee pursuant to the Deed of Charge,

(v) Subsection 5(a)(vii)(9) is deleted in its entirety.

In any event, Subsection 5(a)(vii)(6) will only apply with the deletion of the words "***seeks or***" before the words "***becomes subject to***".

Section 5(a)(vii)(8) will apply to Party B only to the extent that it applies to Section 5(a)(vii)(1), (3), (4), (5), (6) and (7) as amended above.

(h)     The "*Merger without Assumption*" provisions of Section 5(a)(viii) will apply to Party A but will not apply to Party B.

(i)     The "*Illegality*" provisions of Section 5(b)(i) of this Agreement will apply to Party A and will apply to Party B, with both Party A and Party B as the Affected Parties.

(j)     The "*Tax Event*" provisions of Section 5(b)(ii) of this Agreement will apply to Party A and will apply to Party B, with both Party A and Party B as the Affected Parties.

(k)     The "*Credit Event Upon Merger*" provisions of Section 5(b)(iv) of this Agreement will not apply to Party A and will not apply to Party B.

(l)     The "*Tax Event Upon Merger*" provisions of Section 5(b)(iii) will not apply to Party A and will not apply to Party B, provided that Party A shall not be entitled to designate an Early Termination Date by reason of a Tax Event upon Merger in respect of which it is the Affected Party. Section 6(b)(ii) will apply, provided that the words "or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party" shall be deleted.

(m)     The "*Automatic Early Termination*" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(n)     *Payments on Early Termination*, for the purpose of Section 6(e):-

    (i)     Market Quotation will apply.

    (ii)     Second Method will apply.

(o)     "*Termination Currency*" means Sterling.

(p)     "*Additional Termination Event*"

The following shall constitute Additional Termination Events:

    (i)     **Redemption of the Notes in whole for taxation reasons.**  On the occurrence of a redemption of the Notes in whole for taxation reasons pursuant to the provisions of Condition 5(e) of the Notes.

    (ii)     **Early Redemption of the Notes in whole.**  On the occurrence of a redemption of the Notes in whole pursuant to Condition 5(d) of the Notes.

    (iii)     *Mandatory Redemption in Part of the Notes.*  An election to redeem the Notes in part has been validly made in accordance with Condition 5(b) (*Mandatory redemption in part of the Notes*) and immediately following such redemption the notional amount of the Relevant Transaction will exceed the aggregate principal amount outstanding under the Notes. Party B shall be the sole Affected Party. "**Relevant Transaction**" means the Fixed/Floating Swap Transaction.

    Where an Additional Termination Event occurs under Part 1(p)(iii) (after giving effect to any scheduled amortization of the notional amount due on such date), the Relevant Transaction shall be automatically split into two

Transactions. The notional amount with respect to one Transaction (a **"Continuing Transaction"**) shall be an amount equal to the Continuing Notional Amount and the notional amount with respect to the other Transaction (an **"Excess Transaction"**) shall be an amount equal to the original notional amount of the Relevant Transaction less the Continuing Notional Amount. Each of the Continuing Transaction and the Excess Transaction shall otherwise have the same terms as the Relevant Transaction. The Continuing Transaction shall from that moment onwards constitute the "Relevant Transaction" and the Excess Transaction shall be the Affected Transaction in respect of such Additional Termination Event. In no event will the Settlement Amount payable upon termination of the Excess Transaction exceed the sum of the Fixed Amounts payable under the terms of the Excess Transaction in respect of each Fixed Amount Payment Date scheduled to fall after the date of such termination.

For the purposes of this Part 1(p)(iii), **"Continuing Notional Amount"** shall mean an amount calculated by Party A as being the notional amount of the Relevant Transaction prior to the split referred to above (but after giving effect to any scheduled amortization of the notional amount due to occur on such day) multiplied by a fraction equal to (A) the aggregate principal amount outstanding under the Notes following the redemption referred to above pursuant to Condition 5(b) (*Mandatory Redemption in part of the Notes*) divided by (B) the aggregate principal amount outstanding under the Notes immediately prior to such redemption.

Notwithstanding Section 6(e) and Section 6(c)(ii), any payments under the Relevant Transaction which become due on the Early Termination Date hereunder will be made in full by both parties and shall not be included in the determination of the Settlement Amount or the Unpaid Amounts arising as a result of the termination of the Affected Transaction.

(iv)   **Enforcement of the Notes.** On the occurrence of a redemption of the Notes in whole pursuant to the occurrence of an Event of Default (as defined in Condition 9(a) of the Notes).

With respect to the Additional Termination Events set out above, Party B shall be the sole Affected Party. Notwithstanding any other provision in this Agreement, the Early Termination Date in respect of any Additional Termination Event set out above shall occur (without the need for notice and regardless of whether a notice is issued) on the due date for redemption and any amount payable pursuant to Section 6(e) of this Agreement as a result of the occurrence of such Additional Termination Event shall fall due contemporaneously with any amount payable on the Notes on the due date for redemption.

(iv)   **Additional Tax Representation.** The Additional Tax Representation in Part 2(c) below proves to have been incorrect or misleading in any material respect in relation to one or more Transactions (each an Affected Transaction for the purposes of this Additional Termination Event) when made or deemed to have been made or repeated. The sole Affected Party shall be Party A.

(v)   **Rating Events**

- 4 -

**(a)      S&P Rating Event**

It shall be an Additional Termination Event in relation to Party A (with Party A as the Affected Party) if:

(X)      (i)   Party A ceases to qualify as an S&P Eligible Entity; and

(ii) Party A fails to post collateral in accordance with its obligations under the Credit Support Annex within 10 days of the date on which it ceased to so qualify; or

(Y)      (i) an S&P Downgrade Event has occurred and is continuing; and

(ii) within 60 calendar days of the occurrence of such S&P Downgrade Event, Party A has not either:

(1) transferred its rights and obligations pursuant to Part 5(g); or

(2) procured an irrevocable guarantee (in a form which satisfies S&P's criteria in relation to such documents) from an S&P Eligible Entity.

For the purposes of this Agreement:

**"S&P"** Standard and Poor's Rating Services, a division of The McGraw-Hill Companies Inc. and includes any successors thereto.

**"S&P Downgrade Event"** means Party A's (or Party A's Credit Support Provider's) Short-term Debt is rated lower than A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than BBB+ to A by S&P).

**"Short-term Debt"** means short-term, unsecured and unsubordinated debt.

**"Long-term Debt"** means long-term, unsecured and unsubordinated debt.

**"S&P Eligible Entity"** means (i) an entity whose (or whose Credit Support Provider's) Short-term Debt is rated at least A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least A+ by S&P) or (ii) where such entity (or its Credit Support Provider) is deemed to be a financial institution by S&P, its Short-term Debt is rated at least A-2 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated at least BBB+ to A by S&P) and such entity undertakes to post collateral equal to 100% of the mark-to-market value of all

Transactions hereunder in accordance with the terms of the Credit Support Annex hereto).

**(b)    Moody's Rating Event**

(1)    Without prejudice to Party A's obligations under the Credit Support Annex, if, at any time none of the Relevant Entities have the First Trigger Required Ratings, Party A may:

at its own cost procure either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5(g).

(2)    Without prejudice to Party A's obligations under the Credit Support Annex, if at any time, none of the Relevant Entities have the Second Trigger Required Ratings, Party A will:

at its own cost use commercially reasonable efforts to procure, as soon as reasonably practicable, either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5(g).

(3)    Failure to comply with Credit Support Annex following a First Rating Trigger

Subject to (4) below, if:

(1)    none of the Relevant Entities has the First Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the First Trigger Required Ratings; and

(2)    Party A has failed to comply with or perform any of its obligations under the terms of the Credit Support Annex hereto,

such failure shall not constitute an Event of Default but shall constitute an Additional Termination Event in relation to all Transactions hereunder and Party A will be the sole Affected Party.

(4)    Failure to comply with Credit Support Annex following a Second Rating Trigger

If:

(1)    none of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings; and

(2)    Party A has failed to comply with or perform any of its obligations under the terms of the Credit Support Annex hereto and such failure is

- 6 -

not remedied on or before the third Local Business Day after notice of such failure is given to Party A,

such failure shall not constitute an Additional Termination Event but shall constitute an Event of Default in relation to all Transactions hereunder with Party A as the Defaulting Party.

(5)     Firm Bid received following the occurrence of a Second Rating Trigger

If:

(1)     none of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings; and

(2)     at least one Eligible Moody's Replacement has either provided a Firm Offer that would, assuming the occurrence of an Early Termination Date, qualify as a Market Quotation (on the basis that paragraphs (i) and (ii) of Part 5(s) below apply) and which remains capable of becoming legally binding upon acceptance,

an Additional Termination Event will be deemed to have occurred in relation to all Transactions hereunder and Party A will be the sole Affected Party.

For the avoidance of doubt:

the Settlement Amount payable under Section 6(e) of this Agreement following an Additional Termination Event under Part 1(p)(v)(b) above shall be calculated in accordance with the Market Quotation provisions set out herein (which may produce a Settlement Amount which is higher or lower than any payment contemplated in the Firm Offer referred to in (5) above).

(q)     **Part 1 Definitions**

Any terms not defined otherwise in this Agreement shall have the meaning specified in the Master Definitions Schedule or the Prospectus (as applicable).

"**Eligible Guarantee**" means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax and such opinion has been delivered to Moody's (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required or (C) in the event that any payment under such guarantee is made net of deduction or withholding for Tax, Party A is required, under Section 2(a)(i), to make such additional payment as is necessary to ensure that the net amount actually received by Party B from the

guarantor will equal the full amount Party B would have received had no such deduction or withholding been required.

"**Eligible Moody's Replacement**" means an entity who could lawfully perform the obligations owing to Party B under this Agreement or its replacement (as applicable) (A) with the First Trigger Required Ratings or the Second Trigger Required Ratings or (B) whose present and future obligations owing to Party B under this Agreement or its replacement (as applicable) are guaranteed pursuant to an Eligible Guarantee provided by a guarantor with the First Trigger Required Ratings and/or the Second Trigger Required Ratings.

"**Firm Offer**" means an offer which, when made, was capable of becoming legally binding upon acceptance.

"**First Trigger Required Ratings**" means (A) where the relevant entity is the subject of a Moody's Short-term Rating, such rating is "Prime-1" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

"**Moody's**" means Moody's Investors Service Limited and includes any successors thereto.

"**Moody's Short-term Rating**" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

"**Relevant Entities**" means Party A, any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement and, so long as Party A is Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc.

"**Second Trigger Required Ratings**" means (A) where such entity is the subject of a Moody's Short-term Rating, such rating is "Prime-2" or above or its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

"**Deed of Charge**" has the meaning ascribed thereto in the Master Definitions Schedule.

"**Long-term Rating**" means the long-term, unsecured and unsubordinated rating.

"**Master Definitions Schedule**" means the master definitions schedule set out in Schedule 1 (*Master Definitions Schedule*) of the Master Securitisation Agreement dated on or about 18 July 2007 relating to documents entered into in connection with a consumer loan securitisation involving Party B as the Issuer.

"**Prospectus**" means the Prospectus dated 11 July 2007 of Party B in connection with a consumer loan securitisation involving Party B as Issuer.

**"Notional Amount"** means, in respect of the Transaction hereunder, the amount defined as such in the Confirmation relating thereto.

**"Notes"** has the meaning ascribed thereto in the Master Definitions Schedule.

**"Short-term Rating"** means the short-term, unsecured and unsubordinated rating.

**"Suitable Collateral Agreement"** and **"Credit Support Annex"** mean a mark-to-market collateral agreement in a form and substance acceptable to Moody's (which may be based on the credit support documentation published by ISDA or otherwise, and relates to collateral in the form of cash or securities or both) in support of the obligations of Party A under this Agreement.

**"Trustee"** has the meaning ascribed thereto in the Master Definitions Schedule.

**"Valuation Date"** means each Local Business Day.

## PART 2    TAX REPRESENTATIONS

**(a)    Party A and Party B Payer Tax Representations**

For the purpose of Section 3(e), Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) to this Agreement and deliveries, transfers and payments to be made pursuant to the Credit Support Annex) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f), (ii) the satisfaction of the agreement contained in Sections 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Sections 4(a)(i) or 4(a)(iii) and (iii) the satisfaction of the agreement of the other party contained in Section 4(d), PROVIDED that it shall not be a breach of this representation where reliance is placed on sub-clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

**(b)    Payee Tax Representations**

For the purpose of Section 3(f), neither Party A nor Party B will make any representations.

**(c)    Additional Representation**

For the purpose of this Agreement, Party A represents to Party B in relation to each Transaction that:

"(i)    it is and will be throughout the course of the relevant Transaction resident in the United Kingdom for United Kingdom tax purposes; or

(ii)    it is and will be throughout the course of the relevant Transaction resident in a jurisdiction that has a double taxation convention or treaty with the United Kingdom under which provision, whether for relief or otherwise, in relation to interest (as defined in the relevant convention or treaty) is made; or

(iii)    it has entered into the relevant Transaction solely for the purposes of a trade or part of a trade carried on by it in the United Kingdom through a permanent establishment and will continue so to treat the relevant Transaction throughout the course of the relevant Transaction."

**PART 3    AGREEMENT TO DELIVER DOCUMENTS**

For the purposes of Sections 3(d), 4(a)(i) and (ii), each party agrees to supply the following documents:

**(a)**    Tax forms, documents or certificates to be delivered are:

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: |
|---|---|---|
| Party A, Party B and Party A's Credit Support Provider | Subject to Section 4(a)(iii), any document required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate. | Promptly upon the earlier of (i) reasonable demand by the other party and (ii) learning that the form or document is required. |

**(b)**    Other documents to be delivered are:

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| Party A and Party B | Either (1) a signature booklet, or where applicable, an extract of the commercial register containing secretary's certificate and resolutions (*"authorising resolutions"*) authorising the party to enter into this Agreement and any Confirmation or (2) a secretary's/director's/ other authorised person's certificate, authorising resolutions and incumbency certificate for such party and any Credit Support Provider of such party reasonably satisfactory in form and | Upon execution of this Agreement and the relevant Confirmation as applicable | Yes |

- 11 -

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| | substance to the other party. | | |
| Party A | A duly executed copy of the Guarantee of Lehman Brothers Holdings Inc. specified as a Credit Support Document in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party A | Written opinions of internal legal counsel to Party A and Party A's Credit Support Provider on the due capacity and authority of Party A and Party A's Credit Support Provider to enter into this Agreement and the Guarantee and on the enforceability and validity of its obligations thereunder. | Upon execution of this Agreement. | No |
| Party B | Certified copies of such party's Memorandum and Articles of Association. | Upon execution of this Agreement | Yes |
| Party B | A written opinion of English legal counsel to Party B reasonably satisfactory in form and substance to Party A to address capacity issues. | Upon execution of this Agreement | No |
| Party B | Executed copy of the Deed of Charge. | Upon execution of this Agreement | No |

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| Party A and Party A's Credit Support Provider | Annual and semi-annual Financial Statements for the duration of this Agreement. | Promptly upon reasonable demand by Party B | No |

O

.

O

.

.

## PART 4    MISCELLANEOUS

(a)    ***Addresses for Notices***.  For the purposes of Section 12(a):

    (i)    Notices or communications to Party A shall be sent to the address, telex number or facsimile specified below:

        Address:    Lehman Brothers Special Financing Inc.
                    Transaction Management
                    399 Park Avenue, 15th Floor
                    New York, NY 10022-4679

                    Attention:    Joseph Polizzotto
                    Telephone No:+1(212) 526-2648
                    Facsimile No: +1(212) 526-2726

    with a copy to:

        Address:    Lehman Brothers International (Europe)
                    Legal Transaction Management (FID)
                    25 Bank Street
                    London E14 5LE

                    Attention:    Legal - Fixed Income
                    Telephone No:    +44 207 102 7376
                    Facsimile No:    +44 207 067 8388

    (ii)    Address for notices or communications to Party B shall be sent to the address, telex number or facsimile number specified below:

        Address:    Consumer Unsecured Reperforming Loans (CURL) Plc
                    c/o Wilmington Trust SP Services (London) Limited
                    Tower 42 (Level 11), 25 Old Broad Street
                    London, EC2N 1HQ

        Facsimile:    +44 (0) 20 7614 1122
        Attention:    The Directors (copied to the Seller pursuant to the notice details below and the Cash/Bond Administrator pursuant to the notice details below)

    with a copy to:

        Name:    Zestdew plc (as Seller)
                    Bank Street, London E14 5LE

        Tel:    +44 (0) 20 7102 1000
        Attention:    The Directors

    with a copy to:

        Name:    The Bank of New York (as Cash/Bond Administrator)
                    One Canada Square, London E14 5AL

|  |  |
|---|---|
| Tel: | +44(0) 20 7570 1784 |
| Facsimile: | +44 (0) 20 7964 2533 |
| Attention: | Corporate Trust Administration |

**(b)** *Notices.* Section 12(a) is amended by adding in the third line thereof after the phrase "messaging system" and before the ")" the words, "; provided, however, any such notice or other communication may be given by facsimile transmission if telex is unavailable, no telex number is supplied to the party providing notice, or if answer back confirmation is not received from the party to whom the telex is sent.".

**(c)** *Process Agent.* For the purpose of Section 13(c):

Party A appoints as its Process Agent: Lehman Brothers International (Europe), Attention: Managing Director – Swaps, 25 Bank Street, London E14 5LE, England.

Party B appoints as its Process Agent: Not applicable.

**(d)** *Offices.* The provisions of Section 10(a) will apply to Party A and will apply to Party B.

**(e)** *Multibranch Party.* For the purpose of Section 10(c):

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

**(f)** *Calculation Agent.* "Calculation Agent" means Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

**(g)** *Credit Support Document.* Details of any Credit Support Document:

In relation to Party A: (i) so long as Party A is Lehman Brothers Special Financing Inc, a guarantee (the **"Guarantee"**) granted by Lehman Brothers Holdings Inc. of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule and (ii) any Eligible Guarantee.

In relation to Party B: The Deed of Charge.

**(h)** *Credit Support Provider.* Credit Support Provider means:

In relation to Party A: (i) so long as Party A is Lehman Brothers Special Financing Inc, Lehman Brothers Holdings Inc. and (ii) the guarantor under any Eligible Guarantee.

In relation to Party B: Not Applicable.

**(i)** *Governing Law; Jurisdiction.* This Agreement and the Confirmation will be governed by, and construed in accordance with the laws of England.

**(j)** *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement shall not apply in relation to the Limited Transactions.

- 15 -

(k)      "*Affiliate*" has the meaning specified in Section 14.

## PART 5   OTHER PROVISIONS

(a)   *Obligations*.  In Section 2(a)(iii) the words "or Potential Event of Default" shall be deleted in respect of Party B but not in respect of Party A, and that Section shall apply provided that Party A shall be obliged to perform its obligations under Section 2(a)(i) notwithstanding the occurrence of a Potential Event of Default with respect to Party B.

(b)   *Absence of Litigation, Absence of Certain Events*.  Section 3(c) is amended by the deletion of the words "or any of its Affiliates".  Section 3(b) is amended (in respect of Party B only) by the deletion of the words "or potential Event of Default".

(c)   *Change of Account*.  Section 2(b) is amended by the addition of the following:

(i) after the word **"delivery"** in the first line thereof:

"to another account in the same legal and tax jurisdiction as the original account".

(ii) after the full stop at the end of Section 2(b):

"The new account bank of Party B shall be rated at least as high as "A-1+" by S&P."

(d)   *Deduction or Withholding for Tax*.   A reference in the Agreement to an "Indemnifiable Tax" shall, with respect to payment by Party A be deemed to be a reference to any Tax and, with respect to payments by Party B shall be deemed to be a reference to no Tax.

(e)   *Security Interest*

Notwithstanding Section 7, Party A hereby consents and agrees to the assignment by way of security by Party B of its interests under this Agreement (without prejudice to, and after giving effect to, any contractual netting provision contained in this Agreement) to BNY Corporate Trustee Services Limited, as trustee (or any successor thereto) pursuant to and in accordance with the Deed of Charge and acknowledges notice of such assignment.

(f)   *No Set-off*.   Without prejudice to Part 4, paragraph (j) hereof, the respective obligations of Party A and Party B under this Agreement shall not be subject to any defence, counterclaim or right of set-off which either party may have against the other party under any other Agreement other than this Agreement.

(g)   *Transfers*.  Section 7 is deleted and replaced in its entirety with the following:

"(a)   **General**

Save as provided in Section 6(b)(ii) and Part 1(v) of the Schedule to this Agreement and paragraph (b) below, neither party may transfer its interest hereunder or under any Transaction to another party.

(b)   **Transfers by Party A**

- 17 -

Without prejudice to Section 6(b)(ii) and without prejudice to any other right or remedy under this Agreement, Party A may, upon providing five Local Business Days' prior written notice to the Trustee, S&P and Moody's, make a transfer of its interest and obligations in and under this Agreement to any other entity, provided that:

(1)     either;

      (A)     the Transferee of Party A enters into documentation with Party B identical to this Agreement at least in all respects other than (i) party names, (ii) dates relevant to the effective date of such transfer, (iii) tax representations made by the Transferee, (iv) representations regarding the status of the substitute Transferee, (v) notice information and account details, (vi) the applicability of Section 5(a)(vi) to the Transferee and (vii) the documents specified in Part 3; or

      (B)     the Transferee of Party A contracts with Party B on terms that (x) have the effect of preserving for Party B the economic equivalent of all payment and delivery obligations (whether absolute or contingent and assuming the satisfaction of each applicable condition precedent) under this Agreement immediately before such transfer and (y) are, in all material respects, no less beneficial for Party B than the terms of this Agreement immediately before such transfer, as determined by Party B;

(2)     as of the date of such transfer the Transferee will not, as a result of such transfer, be required to withhold or deduct on account of tax under this Agreement without being required to pay an additional amount in respect of such tax pursuant to Section 2(d)(4);

(3)     a Termination Event or an Event of Default does not occur under this Agreement as a result of such transfer;

(4)     no additional amount will be payable by Party B to Party A or the Transferee on the next succeeding Scheduled Payment Date as a result of such transfer; and

(5)     the Transferee is an Eligible Moody's Replacement and is S&P Eligible Entity.

In determining whether or not a transfer satisfies the condition in sub-paragraph (1)(B)(y) above, Party B shall act in a commercially reasonable manner.

(c)     **Transfers by Party B**

Neither this Agreement nor any interest in or under this Agreement or any Transaction may be transferred by Party B to any other entity save with Party A's prior written consent EXCEPT THAT such consent is not required in the case of a transfer, charge or assignment to the Trustee as contemplated in the Deed of Charge. For the avoidance of doubt, Party A hereby agrees and

consents to the assignment by way of security by Party B of its interests under this Agreement to the Trustee (or any successor thereto) pursuant to and in accordance with the Deed of Charge and acknowledges notice of such assignment. Party A and Party B acknowledge that the provisions of this Agreement and any Transaction hereunder will be subject to the priority of payments set out in the Deed of Charge, without regard to any subsequent amendments thereto."

Any transfer by Party B shall also be subject to the consent of the Trustee and S&P.

**(h)** *Limited Recourse.* Notwithstanding other provisions of this Agreement, the obligation of Party B to make any payment under this Agreement will be limited in accordance with the Priority of Payments and the Deed of Charge.

**(i)** *Non-Petition Covenant.* The provisions of Clauses 6.1 and 6.2 of the Deed of Charge will apply mutatis mutandis to this Agreement.

**(j)** *Interpretation.* Reference in this Agreement to the parties hereto or to Party A or Party B shall (for the avoidance of doubt) include, where appropriate, any permitted successor or assign thereof.

**(k)** *Limited Transactions.* The Parties agree that no Transactions shall be entered into under this Agreement, other than the Fixed/Floating Swap Transaction, the Fixed/Floating Cap Transaction, the Bullet Floor Transaction, and the Bullet Cap Transaction (together the "Limited Transactions").

**(l)** *Benefit of Agreement.* Any legal entity into which Party A is merged or converted or any legal entity resulting from any merger or conversion to which Party A is a party shall, to the extent permitted by applicable law, be a party to this Agreement in place of Party A without further act or formality.

**(m)** *Additional Representations.* Section 3 is hereby amended by adding at the end thereof the following sub-paragraphs:

"(g)   It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(h)   It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent, nominee or in any other capacity, fiduciary or otherwise)."

**(n)** *Relationship between the Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction) as follows:

**(i)**   *Non Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and

- 19 -

upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) **Status of Parties**. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(o) **Consent to Recording**. Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties in connection with this Agreement or the Transaction; (ii) agrees to give notice to such personnel of it that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on the ground that consent was not properly given.

(p) **Rights of Third Parties**. A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, *provided that* this shall not affect any rights of any third party which may be granted in respect of this Agreement pursuant to the terms of the Deed of Charge.

(q) **Definitions**

(i) This Agreement, each Confirmation, and each Transaction are subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. as amended, supplemented, updated, restated, and superseded from time to time (collectively the "**Definitions**"), and will be governed in all respects by the Definitions. The Definitions, as so modified are incorporated by reference in, and made part of, this Agreement and the Confirmation as if set forth in full in this Agreement and the Confirmation.

(ii) Words and expressions defined in the master definitions schedule set out in Schedule 1 (*Master Definitions Schedule*) of the Master Securitisation Agreement dated on or about 18 July 2007 (the "**Master Definitions Schedule**") between, among others, Party A and Party B, will, unless otherwise defined in this Agreement or as the context otherwise requires, have the same meaning in this Agreement. In the event of any inconsistency between the definitions in this Agreement and in the Master Definitions Schedule, the definitions in this Agreement will prevail. The rules of interpretation set out in the Master Definitions Schedule will apply to this Agreement.

- 20 -

(iii)    Words and expressions defined in the Prospectus of Party B dated 11 July 2007, will, unless otherwise defined in this Agreement or as the context otherwise requires, have the same meaning in this Agreement. In the event of any inconsistency between the definitions in this Agreement and in the Prospectus, the definitions in this Agreement will prevail.

(r)    *Counterparts*

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

(s)    **Calculations**

Notwithstanding Section 6 of this Agreement, if an Early Termination Date is designated at a time when Party A is (A) the Affected Party in respect of an Additional Termination Event or a Tax Event Upon Merger or (B) the Defaulting Party in respect of any Event of Default, paragraphs (i) to (vi) below shall apply:

(i)    The definition of "Market Quotation" shall be deleted in its entirety and replaced with the following:

"**Market Quotation**" means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) for an amount that would be paid to Party B (expressed as a negative number) or by Party B (expressed as a positive number) in consideration of an agreement between Party B and an Eligible Replacement to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transactions or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that Date, (2) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included and (3) made in respect of a Replacement Transaction with terms that are, in all material respects, no less beneficial for Party B than those of this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions), as determined by Party B. The party making the determination (or its agent) will request each Eligible Replacement to provide its Firm Offer to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after receiving such request. The day and time as of which those Firm Offers are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and after consulting with the other."

(ii)    In determining whether or not a Firm Offer satisfies the condition in sub-paragraph (3) of Market Quotation, Party B shall act in a commercially reasonable manner.

(iii) The definition of "Settlement Amount" shall be deleted in its entirety and replaced with the following:

**"Settlement Amount"** means, with respect to any Early Termination Date, an amount (as determined by Party B) equal to the Termination Currency Equivalent of the amount (whether positive or negative) of any Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions that is accepted by Party B so as to become legally binding, Provided that:

(1)    If, on the Early Termination Date, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions has been accepted by Party B so as to become legally binding and one or more Market Quotations have been communicated to Party B and remain capable of becoming legally binding upon acceptance by Party B, the Settlement Amount shall equal the lowest of such Market Quotations (for the avoidance of doubt, (i) a Market Quotation expressed as a negative number is lower than a Market Quotation expressed as a positive number and (ii) the lower of two Market Quotations expressed as negative numbers is the one with the largest absolute value; and

(2)    if, on the Early Termination Date, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by Party B so as to become legally binding and no Market Quotations have been communicated to Party B and remain capable of becoming legally binding upon acceptance by Party B, the Settlement Amount shall equal Party B's Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

(iv)    At any time on or before the Early Termination Date at which two or more Market Quotations have been communicated to Party B and remain capable of becoming legally binding upon acceptance by Party B, Party B shall be entitled to accept only the lowest of such Market Quotations (for the avoidance of doubt, (i) a Market Quotation expressed as a negative number is lower than a Market Quotation expressed as a positive number and (ii) the lower of two Market Quotations expressed as negative numbers is the one with the largest absolute value).

(v)    If Party B requests Party A in writing to obtain Market Quotations, Party A shall use its reasonable efforts to obtain at least four (4) firm Market Quotations and to do so before the Early Termination Date.

(vi)    If the Settlement Amount is a negative number, Section 6(e)(i)(3) of this Agreement shall be deleted in its entirety and replaced with the following:

**"Second Method and Market Quotation"**. If Second Method and Market Quotation apply, (1) Party B shall pay to Party A an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions, (2) Party B shall pay to Party A the Termination Currency Equivalent of the Unpaid Amounts owing to Party A and (3) Party A shall pay to Party B the Termination Currency Equivalent of the Unpaid Amounts owing to Party B, Provided that, (i) the amounts payable under (2) and (3) shall be subject to netting in accordance with Section 2(c) of this Agreement and (ii) notwithstanding any other provision of this Agreement, any amount payable by Party A under (3) shall not be netted-off against any amount payable by Party B under (1)."

**(t)    *Moody's Notifications***

- 22 -

Notwithstanding any other provision of this Agreement, this Agreement shall not be amended, no Early Termination Date shall be effectively designated by Party B, and no transfer of any rights or obligations under this Agreement shall be made unless Moody's has been given prior written notice of such amendment, designation or transfer.

(u)    **Additional Party A S&P Representations.**

(a) Party A hereby undertakes to post Eligible Collateral in accordance with the S&P Credit Support Amount provisions under the Credit Support Annex within 10 local business days of the occurrence of an S&P Downgrade Event. Failure to post such collateral in accordance with such provisions prior to the expiry of such Period will not constitute an Event of Default for the purposes of this Agreement.

(b) Party A additionally hereby undertakes to post further Eligible Collateral in accordance with the S&P Credit Support Amount provisions under the Credit Support Annex within 10 local business days of it no longer qualifying as an S&P Eligible Entity. Failure to post such additional Eligible Collateral prior to the expiry of such period will not constitute an Event of Default for the purposes of this Agreement.

(v)    *Tax Event.*    Section 5(b)(ii) shall be deleted in its entirety and replaced with the following:

Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Identifiable Tax under Section 2(d)(4) (except in each case in respect of interest under Section 2(e), 6(d)(ii) or 6(e) or deliveries, transfers or payments made pursuant to the Credit Support Annex to the Agreement) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in each case in respect of interest under Section 2(e), 6(d)(ii) or 6(e) or payments, transfers or deliveries made pursuant to the Credit Support Annex to the Agreement).

**IN WITNESS WHEREOF** the parties have executed this Schedule on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**By:** …………………………………………

Name:

Title:

Date:

**CONSUMER UNSECURED REPERFORMING (CURL) Plc**

**By:** …………………………………………

Name:        Robin Baker

Title:        **Director**

Date:        13 | 07 | 2007

UK1321471

24

**IN WITNESS WHEREOF** the parties have executed this Schedule on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: .................................................

Name:

Title:       Chiara Mapelli
             Authorised Signatory

Date:       13/07/2007

**CONSUMER UNSECURED REPERFORMING (CURL) Plc**

By: .................................................

Name:       Robin Baker

Title:       Director

Date:       13/07/2007

UK1321471

24

**EXHIBIT A**

**TO SCHEDULE**

**GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.**

LEHMAN BROTHERS SPECIAL FINANCING INC. ("**Party A**") and CONSUMER
UNSECURED REPERFORMING LOANS (CURL) PLC ("**Party B**") have entered into a
Master Agreement dated as of [•] 2007, as amended from time to time (the "Master
Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering
into one or more transactions (each a "Transaction"), the Confirmation of each of which
supplements, forms part of, and will be read and construed as one with, the Master
Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support
Document as contemplated in the Agreement. For value received, and in consideration of the
financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN
BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the
State of Delaware ("Swap Guarantor"), hereby agrees to the following:

(a)     the Swap Guarantor hereby unconditionally guarantees to Party B the due and
        punctual payment of all amounts payable by Party A in connection with each
        Transaction when and as Party A's obligations thereunder shall become due and
        payable in accordance with the terms of the Agreement (whether at maturity, by
        acceleration or otherwise). The Swap Guarantor hereby agrees, upon written demand
        by Party B, to pay or cause to be paid any such amounts punctually when and as the
        same shall become due and payable;

(b)     the Swap Guarantor hereby agrees that its obligations under this Guarantee constitute
        a guarantee of payment when due and not of collection;

(c)     the Swap Guarantor hereby agrees that its obligations under this Guarantee shall be
        unconditional, irrespective of the validity, regularity or enforceability of the
        Agreement against Party A (other than as a result of the unenforceability thereof
        against Party B), the absence of any action to enforce Party A's obligations under the
        Agreement, any waiver or consent by Party B with respect to any provisions thereof,
        the entry by Party A and Party B into any amendments to the Agreement, additional
        Transactions under the Agreement or any other circumstance which might otherwise
        constitute a legal or equitable discharge or defense of a guarantor (excluding the
        defense of payment or statute of limitations, neither of which is waived) provided,
        however, that the Swap Guarantor shall be entitled to exercise any right that Party A
        could have exercised under the Agreement to cure any default in respect of its
        obligations under the Agreement or to setoff, counterclaim or withhold payment in
        respect of any Event of Default or Potential Event of Default in respect of Party B or
        any Affiliate, but only to the extent such right is provided to Party A under the
        Agreement. The Swap Guarantor acknowledges that Party A and Party B may from
        time to time enter into one or more Transactions pursuant to the Agreement and
        agrees that the obligations of the Swap Guarantor under this Guarantee will upon the
        execution of any such Transaction by Party A and Party B extend to all such
        Transactions without the taking of further action by the Swap Guarantor;

(d)     this Guarantee shall remain in full force and effect until the first to occur of (i) receipt
        by Party B of a written notice of termination from the Swap Guarantor or (ii) none of

the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect the Swap Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof;

(e)    the Swap Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or the Swap Guarantor;

(f)    the Swap Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against the Swap Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, the Swap Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

- 26 -

**EXHIBIT C**

KL2 2724050.7

(Bilateral Form – Transfer)[1]          (ISDA Agreements Subject to English Law)[2]



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA Master Agreement

dated as of ...18. July. 2007..................

between

Lehman Brothers          Consumer Unsecured Reperforming
Special Refinancing Inc. and Loans (CURL) plc ...........
("Party A")                                  ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

**Paragraph 1. Interpretation**

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1]    This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2]    This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

provisions of this Annex, Paragraph 11 will prevail. For the avoidance of doubt, references to "transfer" in this Annex mean, in relation to cash, payment and, in relation to other assets, delivery.

**Paragraph 2. Credit Support Obligations**

(a)    *Delivery Amount.* Subject to Paragraphs 3 and 4, upon a demand made by the Transferee on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Transferor's Minimum Transfer Amount, then the Transferor will transfer to the Transferee Eligible Credit Support having a Value as of the date of transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 11(b)(iii)(D)). Unless otherwise specified in Paragraph 11(b), the "Delivery Amount" applicable to the Transferor for any Valuation Date will equal the amount by which:

    (i)    the Credit Support Amount

exceeds

    (ii)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

(b)    *Return Amount.*    Subject to Paragraphs 3 and 4, upon a demand made by the Transferor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Transferee's Minimum Transfer Amount, then the Transferee will transfer to the Transferor Equivalent Credit Support specified by the Transferor in that demand having a Value as of the date of transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 11(b)(iii)(D)) and the Credit Support Balance will, upon such transfer, be reduced accordingly. Unless otherwise specified in Paragraph 11(b), the "Return Amount" applicable to the Transferee for any Valuation Date will equal the amount by which:

    (i)    the Value as of that Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in either case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)

exceeds

    (ii)    the Credit Support Amount.

**Paragraph 3. Transfers, Calculations and Exchanges**

(a)    *Transfers.*    All transfers under this Annex of any Eligible Credit Support, Equivalent Credit Support, Interest Amount or Equivalent Distributions shall be made in accordance with the instructions of the Transferee or Transferor, as applicable, and shall be made:

    (i)    in the case of cash, by transfer into one or more bank accounts specified by the recipient;

2

ISDA® 1995

(ii)     in the case of certificated securities which cannot or which the parties have agreed will not be delivered by book-entry, by delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, transfer tax stamps and any other documents necessary to constitute a legally valid transfer of the transferring party's legal and beneficial title to the recipient; and

(iii)     in the case of securities which the parties have agreed will be delivered by book-entry, by the giving of written instructions (including, for the avoidance of doubt, instructions given by telex, facsimile transmission or electronic messaging system) to the relevant depository institution or other entity specified by the recipient, together with a written copy of the instructions to the recipient, sufficient, if complied with, to result in a legally effective transfer of the transferring party's legal and beneficial title to the recipient.

Subject to Paragraph 4 and unless otherwise specified, if a demand for the transfer of Eligible Credit Support or Equivalent Credit Support is received by the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the date such demand is received; if a demand is received after the Notification Time, then the relevant transfer will be made not later than the close of business on the Settlement Day relating to the day after the date such demand is received.

(b)     *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 2 and 4(a) will be made by the relevant Valuation Agent as of the relevant Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or, in the case of Paragraph 4(a), following the date of calculation).

(c)     *Exchanges.*

(i)     Unless otherwise specified in Paragraph 11, the Transferor may on any Local Business Day by notice inform the Transferee that it wishes to transfer to the Transferee Eligible Credit Support specified in that notice (the "New Credit Support") in exchange for certain Eligible Credit Support (the "Original Credit Support") specified in that notice comprised in the Transferor's Credit Support Balance.

(ii)     If the Transferee notifies the Transferor that it has consented to the proposed exchange, (A) the Transferor will be obliged to transfer the New Credit Support to the Transferee on the first Settlement Day following the date on which it receives notice (which may be oral telephonic notice) from the Transferee of its consent and (B) the Transferee will be obliged to transfer to the Transferor Equivalent Credit Support in respect of the Original Credit Support not later than the Settlement Day following the date on which the Transferee receives the New Credit Support, unless otherwise specified in Paragraph 11(d) (the "Exchange Date"); *provided* that the Transferee will only be obliged to transfer Equivalent Credit Support with a Value as of the date of transfer as close as practicable to, but in any event not more than, the Value of the New Credit Support as of that date.

3

ISDA® 1995

**Paragraph 4. Dispute Resolution**

(a)     ***Disputed Calculations or Valuations.*** If a party (a "Disputing Party") reasonably disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, then:

>    (1)     the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following, in the case of (I) above, the date that the demand is received under Paragraph 2 or, in the case of (II) above, the date of transfer;

>    (2)     in the case of (I) above, the appropriate party will transfer the undisputed amount to the other party not later than the close of business on the Settlement Day following the date that the demand is received under Paragraph 2;

>    (3)     the parties will consult with each other in an attempt to resolve the dispute; and

>    (4)     if they fail to resolve the dispute by the Resolution Time, then:

>>    (i)     in the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 11(c), the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

>>>    (A)     utilising any calculations of that part of the Exposure attributable to the Transactions that the parties have agreed are not in dispute;

>>>    (B)     calculating that part of the Exposure attributable to the Transactions in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction, then fewer than four quotations may be used for that Transaction, and if no quotations are available for a particular Transaction, then the Valuation Agent's original calculations will be used for the Transaction; and

>>>    (C)     utilising the procedures specified in Paragraph 11(e)(ii) for calculating the Value, if disputed, of the outstanding Credit Support Balance;

>>    (ii)    in the case of a dispute involving the Value of any transfer of Eligible Credit Support or Equivalent Credit Support, the Valuation Agent will recalculate the Value as of the date of transfer pursuant to Paragraph 11(e)(ii).

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) as soon as possible but in any event not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following such notice given by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraph 3(a), make the appropriate transfer.

ISDA® 1995

(b)     *No Event of Default.* The failure by a party to make a transfer of any amount which is the subject of a dispute to which Paragraph 4(a) applies will not constitute an Event of Default for as long as the procedures set out in this Paragraph 4 are being carried out. For the avoidance of doubt, upon completion of those procedures, Section 5(a)(i) of this Agreement will apply to any failure by a party to make a transfer required under the final sentence of Paragraph 4(a) on the relevant due date.

**Paragraph 5. Transfer of Title, No Security Interest, Distributions and Interest Amount**

(a)     *Transfer of Title.* Each party agrees that all right, title and interest in and to any Eligible Credit Support, Equivalent Credit Support, Equivalent Distributions or Interest Amount which it transfers to the other party under the terms of this Annex shall vest in the recipient free and clear of any liens, claims, charges or encumbrances or any other interest of the transferring party or of any third person (other than a lien routinely imposed on all securities in a relevant clearance system).

(b)     *No Security Interest.* Nothing in this Annex is intended to create or does create in favour of either party any mortgage, charge, lien, pledge, encumbrance or other security interest in any cash or other property transferred by one party to the other party under the terms of this Annex.

(c)     *Distributions and Interest Amount.*

(i)     *Distributions.* The Transferee will transfer to the Transferor not later than the Settlement Day following each Distributions Date cash, securities or other property of the same type, nominal value, description and amount as the relevant Distributions ("Equivalent Distributions") to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

(ii)     *Interest Amount.* Unless otherwise specified in Paragraph 11(f)(iii), the Transferee will transfer to the Transferor at the times specified in Paragraph 11(f)(ii) the relevant Interest Amount to the extent that a Delivery Amount would not be created or increased by the transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed a Valuation Date for this purpose).

**Paragraph 6. Default**

If an Early Termination Date is designated or deemed to occur as a result of an Event of Default in relation to a party, an amount equal to the Value of the Credit Support Balance, determined as though the Early Termination Date were a Valuation Date, will be deemed to be an Unpaid Amount due to the Transferor (which may or may not be the Defaulting Party) for purposes of Section 6(e). For the avoidance of doubt, if Market Quotation is the applicable payment measure for purposes of Section 6(e), then the Market Quotation determined under Section 6(e) in relation to the Transaction constituted by this Annex will be deemed to be zero, and, if Loss is the applicable payment measure for purposes of Section 6(e), then the Loss determined under Section 6(e) in relation to the Transaction will be limited to the Unpaid Amount representing the Value of the Credit Support Balance.

5

**Paragraph 7. Representation**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it transfers Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions) that it is the sole owner of or otherwise has the right to transfer all Eligible Credit Support, Equivalent Credit Support or Equivalent Distributions it transfers to the other party under this Annex, free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system).

**Paragraph 8. Expenses**

Each party will pay its own costs and expenses (including any stamp, transfer or similar transaction tax or duty payable on any transfer it is required to make under this Annex) in connection with performing its obligations under this Annex, and neither party will be liable for any such costs and expenses incurred by the other party.

**Paragraph 9. Miscellaneous**

(a)    *Default Interest.*    Other than in the case of an amount which is the subject of a dispute under Paragraph 4(a), if a Transferee fails to make, when due, any transfer of Equivalent Credit Support, Equivalent Distributions or the Interest Amount, it will be obliged to pay the Transferor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value on the relevant Valuation Date of the items of property that were required to be transferred, from (and including) the date that the Equivalent Credit Support, Equivalent Distributions or Interest Amount were required to be transferred to (but excluding) the date of transfer of the Equivalent Credit Support, Equivalent Distributions or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Good Faith and Commercially Reasonable Manner.*    Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(c)    *Demands and Notices.*    All demands and notices given by a party under this Annex will be given as specified in Section 12 of this Agreement.

(d)    *Specifications of Certain Matters.*    Anything referred to in this Annex as being specified in Paragraph 11 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 10. Definitions**

As used in this Annex:

*"Base Currency"* means the currency specified as such in Paragraph 11(a)(i).

6

ISDA® 1995

*"Base Currency Equivalent"* means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Valuation Agent for value on such Valuation Date.

*"Credit Support Amount"* means, with respect to a Transferor on a Valuation Date, (i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

*"Credit Support Balance"* means, with respect to a Transferor on a Valuation Date, the aggregate of all Eligible Credit Support that has been transferred to or received by the Transferee under this Annex, together with any Distributions and all proceeds of any such Eligible Credit Support or Distributions, as reduced pursuant to Paragraph 2(b), 3(c)(ii) or 6. Any Equivalent Distributions or Interest Amount (or portion of either) not transferred pursuant to Paragraph 5(c)(i) or (ii) will form part of the Credit Support Balance.

*"Delivery Amount"* has the meaning specified in Paragraph 2(a).

*"Disputing Party"* has the meaning specified in Paragraph 4.

*"Distributions"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property to which a holder of securities of the same type, nominal value, description and amount as such Eligible Credit Support would be entitled from time to time.

*"Distributions Date"* means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which a holder of such Eligible Credit Support is entitled to receive Distributions or, if that date is not a Local Business Day, the next following Local Business Day.

*"Eligible Credit Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 11(b)(ii) including, in relation to any securities, if applicable, the proceeds of any redemption in whole or in part of such securities by the relevant issuer.

*"Eligible Currency"* means each currency specified as such in Paragraph 11(a)(ii), if such currency is freely available.

*"Equivalent Credit Support"* means, in relation to any Eligible Credit Support comprised in the Credit Support Balance, Eligible Credit Support of the same type, nominal value, description and amount as that Eligible Credit Support.

*"Equivalent Distributions"* has the meaning specified in Paragraph 5(c)(i).

*"Exchange Date"* has the meaning specified in Paragraph 11(d).

7

*"Exposure"* means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if any, that would be payable to that party by the other party (expressed as a positive number) or by that party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of this Agreement if all Transactions (other than the Transaction constituted by this Annex) were being terminated as of the relevant Valuation Time, on the basis that (i) that party is not the Affected Party and (ii) the Base Currency is the Termination Currency; *provided* that Market Quotations will be determined by the Valuation Agent on behalf of that party using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11 (b)(iii)(A); if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the Base Currency Equivalents of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period on the principal amount of the portion of the Credit Support Balance comprised of cash in such currency, determined by the Valuation Agent for each such day as follows:

    (x)    the amount of cash in such currency on that day; multiplied by

    (y)    the relevant Interest Rate in effect for that day; divided by

    (z)    360 (or, in the case of pounds sterling, 365).

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Eligible Credit Support or Equivalent Credit Support in the form of cash was transferred to or received by the Transferee) to (but excluding) the Local Business Day on which the current Interest Amount is transferred.

*"Interest Rate"* means, with respect to an Eligible Currency, the rate specified in Paragraph 11(f)(i) for that currency.

*"Local Business Day"*, unless otherwise specified in Paragraph 11(h), means:

    (i)    in relation to a transfer of cash or other property (other than securities) under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment;

    (ii)    in relation to a transfer of securities under this Annex, a day on which the clearance system agreed between the parties for delivery of the securities is open for the acceptance and execution of settlement instructions or, if delivery of the securities is contemplated by other means, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place(s) agreed between the parties for this purpose;

ISDA® 1995

(iii)   in relation to a valuation under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place of location of the Valuation Agent and in the place(s) agreed between the parties for this purpose; and

(iv)   in relation to any notice or other communication under this Annex, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the place specified in the address for notice most recently provided by the recipient.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 11(b)(iii)(C); if no amount is specified, zero.

*"New Credit Support"* has the meaning specified in Paragraph 3(c)(i).

*"Notification Time"* has the meaning specified in Paragraph 11(c)(iv).

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 4; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 2 prior to the resolution of the dispute, then the *"Recalculation Date"* means the most recent Valuation Date under Paragraph 2.

*"Resolution Time"* has the meaning specified in Paragraph 11(c)(i).

*"Return Amount"* has the meaning specified in Paragraph 2(b).

*"Settlement Day"* means, in relation to a date, (i) with respect to a transfer of cash or other property (other than securities), the next Local Business Day and (ii) with respect to a transfer of securities, the first Local Business Day after such date on which settlement of a trade in the relevant securities, if effected on such date, would have been settled in accordance with customary practice when settling through the clearance system agreed between the parties for delivery of such securities or, otherwise, on the market in which such securities are principally traded (or, in either case, if there is no such customary practice, on the first Local Business Day after such date on which it is reasonably practicable to deliver such securities).

*"Threshold"* means, with respect to a party, the Base Currency Equivalent of the amount specified as such for that party in Paragraph 11(b)(iii)(B); if no amount is specified, zero.

*"Transferee"* means, in relation to each Valuation Date, the party in respect of which Exposure is a positive number and, in relation to a Credit Support Balance, the party which, subject to this Annex, owes such Credit Support Balance to the other party.

*"Transferor"* means, in relation to a Transferee, the other party.

*"Valuation Agent"* has the meaning specified in Paragraph 11(c)(i).

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 11(c)(ii).

9

ISDA® 1995

***"Valuation Percentage"*** means, for any item of Eligible Credit Support, the percentage specified in Paragraph 11(b)(ii).

***"Valuation Time"*** has the meaning specified in Paragraph 11(c)(iii).

***"Value"*** means, for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 4 in the case of a dispute, with respect to:

     (i)     Eligible Credit Support comprised in a Credit Support Balance that is:

          (A)     an amount of cash, the Base Currency Equivalent of such amount multiplied by the applicable Valuation Percentage, if any; and

          (B)     a security, the Base Currency Equivalent of the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any; and

     (ii)     items that are comprised in a Credit Support Balance and are not Eligible Credit Support, zero.

10

ISDA® 1995

Execution version

**CREDIT SUPPORT ANNEX**
to the Schedule to the
ISDA Master Agreement

dated as of 18 July 2007
between

| | | |
|---|---|---|
| **Lehman Brothers Special Financing Inc.** ("Party A") | And | **Consumer Unsecured Reperforming Loans (CURL) plc** ("Party B") |

O

C

**Paragraph 11. Elections and Variables**

(a)    **Base Currency and Eligible Currency.**

    (i)    **"Base Currency"** means Pounds Sterling.

    (ii)   **"Eligible Currency"** means the Base Currency and each other currency specified here: None.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount.**

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 2(a), as amended (I) by deleting the words "upon a demand made by the Transferee on or promptly following a Valuation Date" and inserting in lieu thereof the words "not later than the close of business on each Valuation Date" and (II) by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

        "The **"Delivery Amount"** applicable to the Transferor for any Valuation Date will equal the greatest of:

        (1)    the amount by which (a) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date exceeds (b) the Value (determined using the applicable Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount

and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date); and

(2)    the amount by which (a) the Credit Support Amount (calculated according to the S&P Criteria) for such Valuation Date exceeds (b) the Value (determined using the Valuation Percentages set out in Appendix A under "Standard & Poor's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date)."

Provided that if, in respect of any Valuation Date, the Delivery Amount is greater than zero and equals or exceeds the Transferor's Minimum Transfer Amount, the Transferor will transfer to the Transferee sufficient Eligible Credit Support to ensure that, immediately following such transfer, none of the amounts calculated under (1), (2) and (3) of this Paragraph 11(b)(i)(A) shall be greater than zero.

(B)    "**Return Amount**" has the meaning as specified in Paragraph 2(b), as amended by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

"The "**Return Amount**" applicable to the Transferee for any Valuation Date will equal the least of:

(1)    the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date; and

(2)    the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Standard & Poor's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and

for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to the S&P Criteria) for such Valuation Date"

Provided that in no event shall the Transferee be required to transfer any Equivalent Credit Support under Paragraph 2(b) if, immediately following such transfer, any of the amounts calculated under (1), (2) and (3) of Paragraph 11(b)(i)(A) would be greater than zero.

(C)   **"Credit Support Amount"** has the meaning specified under the relevant definition of Ratings Criteria.

(ii)   **Eligible Credit Support.** Eligible Credit Support and the applicable Valuation Percentages are indicated in the Appendix A.

**"S&P Valuation Percentages"** means, in respect of a Valuation Date in relation to each item of Eligible Credit Support listed in Part 2 of Appendix A hereto, (i) for so long as Party A or Party A's Credit Support Provider is an S&P Eligible Entity whose Short-term Debt is rated lower than A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt is rated lower than A+ by S&P) the corresponding percentage for such Eligible Credit Support in the column headed **"Un-stressed Collateral Posting"** or (ii) for so long as an S&P Downgrade Event has occurred and is continuing, the corresponding percentage for such Eligible Credit Support in the column headed **"Stressed Collateral Posting"**.

(iii)   **Thresholds.**

(A)   **"Independent Amount"** means, with respect to Party A and Party B, zero.

(B)   **"Threshold"** means, for Party A: infinity, provided that for so long as No Relevant Entity has the First Trigger Required Ratings and (i) at least 30 Local Business days have elapsed since the last time its ratings ceased to be equivalent to the First Trigger Required Ratings or (ii) no Relevant Entity has had the First Trigger Required Ratings since this Annex was executed, the Threshold with respect to Party A shall be zero.

**"Threshold"** means, with respect to Party B: infinity.

(C)   **"Minimum Transfer Amount"** means, with respect to Party A and Party B: GBP 100,000.

(D)   **"Rounding"**. The Delivery Amount will be rounded up to the nearest integral multiple of GBP 10,000 and the Return Amount will be rounded down to the nearest integral multiple of GBP 10,000.

(c)    **Valuation and Timing.**

    (i)    **"Valuation Agent"** means, Party A in all circumstances.

    (ii)    **"Valuation Date"** means each Local Business Day.

    (iii)    **"Valuation Time"** means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, provided that the calculations of Value and Credit Support Amount will, as far as practicable, be made as of approximately the same time on the same date.

    (iv)    **"Notification Time"** means by 4:00 p.m., London time, on a Local Business Day.

(d)    **Exchange Date.** "Exchange Date" has the meaning specified in paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

    (i)    **"Resolution Time"** means 4:00 p.m., London, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 4.

    (ii)    **"Value"** For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), on any date the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated as follows:

        (1)    with respect to any Eligible Credit Support or Equivalent Credit Support comprising securities ("**Securities**") the Base Currency Equivalent of the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the Transferor pursuant to Paragraph 5(c)(ii) or included in the applicable price referred to in subparagraph (a) above) as of such date; and

(2)    with respect to any Cash, the Base Currency Equivalent of the amount
thereof.

(iii)    **"Alternative"**. The provisions of Paragraph 4 will apply.

(f)    **Distribution and Interest Amount.**

(i)    *Interest Rate*. The *"Interest Rate"* will be the weighted average rate of
interest earned by the Transferee in respect of the portion of the Credit
Support Balance comprised of cash.

(ii)    *"Transfer of Interest Amount"*. The transfer of the Interest Amount will be
made on the second Local Business Day following the end of each calendar
month and on any other Local Business Day on which Equivalent Credit
Support in the form of cash is transferred to the Transferor pursuant to
Paragraph 2(b), in each case to the extent that a Delivery Amount would not
be created or increased by that transfer, *provided* that Party B shall not be
obliged to so transfer any Interest Amount unless and until it has earned and
received such interest.

(iii)    *"Alternative to Interest Amount"*. The provisions of Paragraph 5(c)(ii) will
apply.

(iv)    *"Distributions"* means, with respect to any Eligible Credit Support comprised
in the Credit Support Balance consisting of securities, all principal, interest
and other payments and distributions of cash or other property received by the
Transferee from time to time.

(v)    *"Distribution Date"* means, with respect to any Eligible Credit Support
comprised in the Credit Support Balance other than cash, each date on which
Distributions are received by the Transferee or, if that date is not a Local
Business Day, the next following Local Business Day.

(vi)    *"Interest Amount"* The definition of "Interest Amount" shall be deleted and
replaced with the following:

*"Interest Amount"* means, with respect to an Interest Period and each portion
of the Credit Support Balance comprised of cash in an Eligible Currency, the
sum of the amounts of interest determined for each relevant currency and
calculated for each day in that Interest Period by the Valuation Agent by
reference to the following calculation:

(x)    the amount of such currency comprised in the Credit Support Balance at
the close of business for general dealings in such currency on such day
(or, if such day is not a Local Business Day, on the immediately
preceding Local Business Day); *multiplied by*

(y)    the relevant Interest Rate for that day; divided by

(z)  365 (or in the case of any currency other than Pounds Sterling, 360).

(vii)  **Credit Support Balance:** The definition of Credit Support Balance shall be amended by inserting the words "received by Party B and" after "Any Equivalent Distributions or Interest Amount (or portion of either)".

(g)  **Addresses for Transfers.**

Party A: To be notified to Party B by Party A at the time of the request for the transfer.

Party B: To be notifies to Party A by Party B upon request by Party A.

(h)  **Other Provisions.**

(i)  *Transfer Timing*

The final paragraph of Paragraph 3(a) shall be deleted and replaced with the following:

"Subject to Paragraph 4, and unless otherwise specified, any transfer of Eligible Credit Support or Equivalent Credit Support (whether by the Transferor pursuant to Paragraph 2(a) or by the Transferee pursuant to Paragraph 2(b)) shall be made not later than the close of business on the Settlement Day, provided that, in the case of any transfer of Equivalent Credit Support by the Transferee pursuant to Paragraph 2(b), if the demand for the transfer of Equivalent Credit Support is received by the Transferee after the Notification Time, then such transfer will be made not later than the close of business on the Settlement Day relating to the day after such demand is received."

(ii)  *Early Termination*

The heading for Paragraph 6 shall be deleted and replaced with "Early Termination" and the following shall be added after the word "Default" in the first line of Paragraph 6, "in relation to all Transactions or a Termination Event in relation to all Transactions".

(iii)  *Costs of Transfer on Exchange*

Notwithstanding Paragraph 8, the Transferor will be responsible for, and will reimburse the Transferee for, all transfer and other taxes and other costs involved in the transfer of Eligible Credit Support either from the Transferor to the Transferee or from the Transferee to the Transferor pursuant to Paragraph 3(c).

(iv)  *Cumulative Rights*

The rights, powers and remedies of the Transferee under this Annex shall be in addition to all rights, powers and remedies given to the Transferee by the

Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Transferee in the Credit Support Balance created pursuant to this Annex.

(v)   ***Single Transferor and Single Transferee***

For the avoidance of doubt Party A shall always be the Transferor and Party B shall always be the Transferee.

(vi)   **"Exposure"** has the meaning specified in Paragraph 10, except that (1) after the word "Agreement" the words "(assuming, for this purpose only, that Part 5(s) of the Schedule is deleted)" shall be inserted and (2) at the end of the definition of Exposure, the words "without assuming that the terms of such Replacement Transactions are materially less beneficial for Party B than the terms of this Agreement" shall be added.

(vii)   ***Ratings Criteria***

**"Ratings Criteria"** means, the criteria as set out in the report by S&P dated 8 May 2007 and entitled *"Revised Framework for Applying Counterparty and Supporting Party Criteria"* (**"S&P Criteria"**), and the criteria used by Moody's (**"Moody's Criteria"**) each as specified below for the purposes of determining the amount of Eligible Credit Support that Party A is required to transfer hereunder .

***Moody's Criteria:***

**"Credit Support Amount"** means, for any Valuation Date:

(A)   if the Threshold for Party A is infinity, zero;

(B)   if the Threshold for Party A is zero and (1) at least one of the Relevant Entities has the Second Trigger Required Ratings or (2) less than 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings, the greater of:

(i)   zero; and

(ii)   the sum of (x) the Transferee's Exposure and (y) the aggregate of the Moody's First Trigger Additional Amounts in respect of such Valuation Date for all Transactions (other than the Transaction constituted by this Annex); and

(C)   if none of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings, the greater of:

(i)    zero;

(ii)    the aggregate amount of the Next Payments (each determined based on the rates prevailing on such Valuation Date) for all Next Payment Dates; and

(iii)    the sum of (x) the Transferee's Exposure and (y) the aggregate of the Moody's Second Trigger Additional Amounts in respect of such Valuation Date for all Transactions (other than the Transaction constituted by this Annex).

**"Moody's First Trigger Additional Amount"** means, for any Valuation Date:

(A)    in respect of any Transaction that is a cross-currency hedge, the lesser of (x) the sum of (1) the product of the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's First Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's First Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(B)    in respect of any Transaction that is not a cross-currency hedge, the lesser of (x) the product of the Moody's First Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's First Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

**"Moody's First Trigger Cross Currency DV01 Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 10 and (B) otherwise, 20.

**"Moody's First Trigger Cross Currency Notional Amount Higher Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 0.025 and (B) otherwise, 0.05.

**"Moody's First Trigger Cross Currency Notional Amount Lower Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 0.01 and (B) otherwise, 0.02.

**"Moody's First Trigger Single Currency DV01 Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

**"Moody's First Trigger Single Currency Notional Amount Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 0.02 and (B) otherwise, 0.04.

**"Moody's Second Trigger Additional Amount"** means, for any Valuation Date:

(A)     in respect of any Transaction that is both a cross-currency hedge and an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the product of the Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality) and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(B)     in respect of any Transaction that is a cross-currency hedge and is not an Optionality Hedge, the lesser of (x) the sum of (1) the product of Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date and the Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier and (2) the Moody's Second Trigger Cross Currency DV01 Multiplier and the Transaction Cross Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;

(C)     in respect of any Transaction that is not a cross-currency hedge and is an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier (Optionality) and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality) and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; and

(D)     in respect of any Transaction that is neither a cross-currency hedge nor an Optionality Hedge, the lesser of (x) the product of the Moody's Second Trigger Single Currency DV01 Multiplier and the Transaction Single Currency DV01 for such Transaction and (y) the product of the Moody's Second Trigger Single Currency Notional Amount Multiplier and the Transaction Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date.

"**Moody's Second Trigger Cross Currency DV01 Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 15 and (B) otherwise, 25.

"**Moody's Second Trigger Cross Currency DV01 Multiplier (Optionality)**" means, (A) if each Local Business Day is a Valuation Date, 30 and (B) otherwise, 40.

"**Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier**" means, (A) if each Local Business Day is a Valuation Date, 0.09 and (B) otherwise, 0.1.

**"Moody's Second Trigger Cross Currency Notional Amount Higher Multiplier (Optionality)"** means, (A) if each Local Business Day is a Valuation Date, 0.11 and (B) otherwise, 0.12.

**"Moody's Second Trigger Cross Currency Notional Amount Lower Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 0.06 and (B) otherwise, 0.07.

**"Moody's Second Trigger Single Currency DV01 Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 50 and (B) otherwise, 60.

**"Moody's Second Trigger Single Currency DV01 Multiplier (Optionality)"** means, (A) if each Local Business Day is a Valuation Date, 65 and (B) otherwise, 75.

**"Moody's Second Trigger Single Currency Notional Amount Multiplier"** means, (A) if each Local Business Day is a Valuation Date, 0.08 and (B) otherwise, 0.09.

**"Moody's Second Trigger Single Currency Notional Amount Multiplier (Optionality)"** means, (A) if each Local Business Day is a Valuation Date, 0.10 and (B) otherwise, 0.11.

**"Next Payment"** means, in respect of each Next Payment Date, the greater of (i) the Base Currency Equivalent of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less the Base Currency Equivalent of any payments due to be made by Party B under Section 2(a) on such Next Payment Date and (ii) zero.

**"Next Payment Date"** means each date on which the next scheduled payment under any Transaction (other than the Transaction constituted by this Annex) is due to be paid.

**"Optionality Hedge"** means any Transaction that is a cap, floor, swaption, or a Transaction-Specific Hedge.

**"Transaction Cross Currency DV01"** means, with respect to a Transaction and any date of determination, the greater of (i) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party A's payment obligations under such Transaction) on such date and (ii) the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve (denominated in the currency of Party B's payment obligations under such Transaction) on such date, in each case as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

**"Transaction Notional Amount"** means (A) in respect of any Transaction that is a cross currency hedge, the Base Currency Equivalent of the Currency Amount

applicable to Party A's payment obligations   and (B) in respect of any other Transaction, the Base Currency Equivalent of the Notional Amount.

"**Transaction Single Currency DV01**" means, with respect to a Transaction and any date of determination, the estimated change in the mid-market value with respect to such Transaction that would result from a one basis point change in the relevant swap curve on such date, as determined by the Valuation Agent in good faith and in a commercially reasonable manner in accordance with the relevant methodology customarily used by the Valuation Agent.

"**Transaction-Specific Hedge**" means any Transaction in respect of which the Transaction Notional Amount for each Calculation Period is "balance guaranteed" or otherwise not an amount that is fixed at the inception of the Transaction.

*S&P Criteria*:

"**Credit Support Amount**" (and "**S&P Credit Support Amount**") shall mean with respect to a Transferor on a Valuation Date:

(i)    if the Threshold is infinity, zero;

(ii)    if at least 10 Business Days have elapsed since Party A's Credit Support Provider's Short-term Debt was rated below A-1 by S&P (or where such debt is not subject to a short-term rating by S&P, its Long-term Debt was rated lower than A+ by S&P) and for so long as such ratings continue to be below such levels the greater of (i) the product of the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day and 100%, and (ii) 0; and

(iii)    for so long as an S&P Downgrade Event has occurred and is continuing, the greater of (i) the product of the mark-to-market value of the outstanding Transactions as determined by the Transferor in good faith on each Local Business Day and 125%, and (ii) 0.

(viii)    *Additional Definitions*

"**Moody's**" means Moody's Investors Service Limited and includes any successors thereto.

"**Rating Agencies**" means S&P and Moody's (each a "Rating Agency").

"**S&P**" Standard and Poor's Rating Services, a division of The McGraw-Hill Companies Inc. and includes any successors thereto.

(ix)    *Demands and Notices*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice shall be given to or made at the following addresses:

If to Party A:

| | |
|---|---|
| Name: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Inc. |
| | Transaction Management |
| | 745 Seventh Avenue, 28th Floor |
| | New York, New York 10019 |

| | |
|---|---|
| Telephone: | +44 (0) 207 011 7376 |
| Facsimile: | +44 (0) 207 260 1266 |

with a copy to:

| | |
|---|---|
| Address: | Lehman Brothers Holdings Inc. |
| | 399 Park Avenue |
| | 11th Floor |
| | New York, New York 10022 |

| | |
|---|---|
| Attention: | Corporate Counsel |
| Facsimile: | +1 212 520 0176 |

with a copy to:

| | |
|---|---|
| Address: | Lehman Brothers International (Europe) |
| | 25 Bank Street |
| | London |
| | E14 5LE |

| | |
|---|---|
| Attention: | Legal/Transaction Management |
| Telephone: | +44 (0) 207 011 7376 |
| Facsimile: | +44 (0) 207 260 1266 |

If to Party B:

| | |
|---|---|
| Name: | Consumer Unsecured Reperforming Loans (CURL) Plc |
| | c/o Wilmington Trust SP Services (London) Limited |
| | Tower 42 (Level 11), 25 Old Broad Street |
| | London, EC2N 1HQ |

| | |
|---|---|
| Facsimile: | +44 (0) 20 7614 1122 |
| Attention: | The Directors (copied to the Seller pursuant to the notice details below and the Cash/Bond Administrator pursuant to the notice details below) |

with a copy to:

Name:        Zestdew plc (as Seller)
             Bank Street, London E14 5LE

Tel:         +44 (0) 20 7102 1000
Attention:   The Directors

with a copy to:

Name:        The Bank of New York (as Cash/Bond Administrator)
             One Canada Square, London E14 5AL

Tel:         +44(0) 20 7570 1784
Facsimile:   +44 (0) 20 7964 2533
Attention:   Corporate Trust Administration

O

O

**LEHMAN BROTHERS SPECIAL
FINANCING INC.**

**CONSUMER UNSECURED
REPERFORMING LOANS (CURL) PLC**

..........................................
(Name of Party)

..........................................
(Name of Party)

By:    ...........................................

By:    ...........................................

Name:

Name:      Robin Baker

Title:

Title:     Director

Date:

Date:      13|07|2007

with a copy to:

Name:     Zestdew plc (as Seller)
           Bank Street, London E14 5LB

Tel:       +44 (0) 20 7102 1000
Attention:  The Directors

with a copy to:

Name:     The Bank of New York (as Cash/Bond Administrator)
           One Canada Square, London E14 5AL

Tel:       +44(0) 20 7570 1784
Facsimile:  +44 (0) 20 7964 2533
Attention:  Corporate Trust Administration

**LEHMAN BROTHERS SPECIAL**
**FINANCING INC.**

**CONSUMER UNSECURED**
**REPERFORMING LOANS (CURL) PLC**

.....................................
(Name of Party)

.....................................
(Name of Party)

By: .....................................

By: .....................................

Name:
Title:  Chiara Mapelli
       Authorised Signatory
Date:  13 / 07 / 2007

Name:   Robin Baker
Title:    Director
Date:  13 / 07 / 2007

# APPENDIX A

## Part 1

## Moody's Eligible Credit Support

| INSTRUMENT | FIRST TRIGGER<br>Posting Daily | SECOND TRIGGER<br>Posting Daily |
|---|---|---|
| Sterling Cash | 100% | 100% |
| Fixed-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department with Remaining Maturity | | |
| < 1 Year | 98% | 95% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 92% |
| 5 to 7 years | 98% | 91% |
| 7 to 10 years | 98% | 89% |
| 10 to 20 years | 98% | 86% |
| > 20 years | 98% | 84% |
| Floating-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department | | |
| All Maturities | 98% | 94% |
| Fixed-Rate U.S. Agency Debentures with Remaining Maturity | | |
| < 1 Year | 98% | 94% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 91% |
| 5 to 7 years | 98% | 90% |
| 7 to 10 years | 98% | 88% |
| 10 to 20 years | 98% | 85% |
| > 20 years | 98% | 83% |
| Floating-Rate U.S. Agency Debentures | | |
| All Maturities | 98% | 93% |

| Fixed-Rate Euro-Zone Government Bonds Rated Aa3 or Above with Remaining Maturity | | |
| --- | --- | --- |
| < 1 Year | 99% | 97% |
| 1 to 2 years | 99% | 96% |
| 2 to 3 years | 99% | 95% |
| 3 to 5 years | 99% | 93% |
| 5 to 7 years | 99% | 92% |
| 7 to 10 years | 99% | 91% |
| 10 to 20 years | 99% | 86% |
| > 20 years | 99% | 84% |
| Floating-Rate Euro-Zone Government Bonds Rated Aa3 or Above | | |
| All Maturities | 99% | 96% |
| Fixed-Rate United Kingdom Gilts with Remaining Maturity | | |
| < 1 Year | 100% | 99% |
| 1 to 2 years | 100% | 98% |
| 2 to 3 years | 100% | 97% |
| 3 to 5 years | 100% | 96% |
| 5 to 7 years | 100% | 95% |
| 7 to 10 years | 100% | 94% |
| 10 to 20 years | 100% | 90% |
| > 20 years | 100% | 88% |
| Floating-Rate United Kingdom Gilts | | |
| All Maturities | 100% | 99% |

For the purpose of the above table, (I) the column headed "Second Trigger" shall apply for as long as none of the Relevant Entities has the Second Trigger Required Ratings and at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the Second Trigger Required Ratings and (II) the column headed "First Trigger" shall apply at any other time.

## Part 2

### Standard & Poor's Eligible Credit Support

S&P Eligible Credit Support

| | S&P Valuation Percentages | | | |
| --- | --- | --- | --- | --- |
| | Un-stressed Collateral Posting Base Currency | Stressed Collateral Posting Base Currency | Un-stressed Collateral Posting Non-Base Currency | Stressed Collateral Posting Non-Base Currency |
| Cash in Sterling | 100% | 125% | N/A | N/A |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit card ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating)<br><br>Less than 5 years | 98.04% | 78.43% | 92.49% | 73.99% |
| U.S. treasuries (current coupon, constant maturity), AAA U.S. agencies, AAA covered bonds (floating), AAA sovereign bonds (floating), AAA, AA credit card ABS (floating), AAA, AA auto ABS (floating), and AAA U.S. student loan ABS (floating)<br><br>Greater than or equal to 5 years and less than or equal to 10 years | 92.59% | 74.07% | 87.35% | 69.88% |

| | | | | |
|---|---|---|---|---|
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA corporate bonds (fixed or floating) | 95.24% | 76.19% | 89.85% | 71.88% |
| Less than 5 years | | | | |
| AAA covered bond (fixed), AAA sovereign bonds (fixed), A credit card ABS (floating), A auto ABS (floating), AAA CMBS (floating), AAA CDO (floating), AA or A U.S. student loan ABS (floating), and AAA or AA U.S. and European corporate bonds (fixed or floating) | 86.96% | 69.57% | 82.03% | 65.63% |
| Greater than or equal to five years and less than or equal to 10 years | | | | |
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or floating) | 80.00% | 64.00% | 75.47% | 60.38% |
| Less than 5 years | | | | |
| BBB credit card ABS (floating), BBB auto ABS (floating), AA, A CDO (floating), BBB U.S. student loan ABS (floating), and A corporate bonds (fixed or | 71.43% | 57.14% | 67.39% | 53.91% |

floating)

Greater than or equal to five
years and less than or equal
to 10

# EXHIBIT D

# LEHMAN BROTHERS

## TRANSACTION

Date: _____ 18 July, 2007

To:      Consumer Unsecured Reperforming Loans (CURL) Plc
         Attention:      Documentation Unit

From:    Lehman Brothers Special Financing Inc.
         c/o Lehman Brothers Europe Limited
         Transaction Management Group
         Facsimile:      (+1) 646-885-9564 (United States of America)
         Phone:          (+4420) 7-102-7661 (United Kingdom)

Effort Id:    [ ]
Global Id:    [ ]

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consumer Unsecured Reperforming Loans (CURL) Plc ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 18 July 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

**General Terms:**

| | |
|---|---|
| Trade Date: | 18th July 2007 |
| Effective Date: | 17th September, 2007 |
| Termination Date: | 17th December, 2018, subject to adjustment in accordance with the Following Business Day Convention. |
| | For the avoidance of doubt, termination of the Transaction prior to the Termination Date may lead to charges to either Party A or Party B, (as the case may be) |
| Notional Amount: | See Appendix A |
| Closing Date: | 18th July, 2007 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 17th calendar day of each March, June, September and December, from and including 17th September, 2007 to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed) |
| Fixed Rate: | Defined as "Swap Rate" |
| Fixed Amounts: | On each Fixed Amount Payer Payment Date, Party B will pay to Party A the Swap Rate in respect of the then prevailing Outstanding Notional Amount. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 17th calendar day of each March, June, September and December, from and including 17th September, 2007 to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | With respect to each Calculation Period, as determined in accordance as follows: |
| | The Note Sterling LIBOR in respect of the corresponding Interest Period under the Notes |
| | Where: |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed/Float Transaction

|  | "Note Sterling LIBOR" shall be as defined in the Prospectus |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/365 (Fixed) |
| Floating Amount: | On each Floating Amount Payer Payment Date, Party A will pay Party B an amount equal to the Note sterling LIBOR in respect of the corresponding Interest Period under the Notes. |

**Business Days:**                 London

**Definitions:**

| Calculation for Interest Payment Date: | The Cash Bond Administrator will calculate on each Determination Date the following for application on the succeeding Fixed Amounts and Floating Amounts Payer Payment Date: |

    (a) Any net amount due and payable to Party B or Party A; and

    (b) Any termination amounts payable in connection with the termination of the Transaction

| Swap Rate | 6.02% |
| Determination Date: | The 14th Day of the calendar month in which the Interest Payment Date occurs (or if such day is not a Business Day, the next succeeding Business Day) |
| Prospectus: | Means the Prospectus of Party B as the Issuer dated dated 11th July 2007 issued and published in connection with the issue of the Notes |
| Cash Bond Administrator: | The Bank of New York |

**Miscellaneous:**

| Calculation Agent: | Lehman Brothers International (Europe) |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party. |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed/Float Transaction

UK\1344628\3                              Page 3 of 6

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                    Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**    **Consumer Unsecured Reperforming Loans (CURL) Plc**

By: _____
Name:    Robin Baker
Title:    **Director**

Execution time will be furnished upon Counterparty's written request.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed/Float Transaction

UK\1344628\3                    Page 4 of 6

Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America),
Attention: Documentation.

Yours sincerely,                                     Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**          **Consumer Unsecured Reperforming Loans
                                                    (CURL) Plc**

**Chiara Mapelli**                                  By:
**Authorised Signatory**                            Name:
                                                    Title:    Robin Baker
                                                              **Director**

Execution time will be furnished upon Counterparty's written request.

CURL : Fixed/Float Transaction    Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

UK\1344628\3                          Page 4 of 6

**Appendix A**

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 17th September, 2007 | 147,312,447 |
| 17th December, 2007 | 120,178,777 |
| 17th March, 2008 | 102,890,608 |
| 17th June, 2008 | 87,853,378 |
| 17th September, 2008 | 74,839,117 |
| 17th December, 2008 | 63,825,336 |
| 17th March, 2009 | 54,290,300 |
| 17th June, 2009 | 46,009,693 |
| 17th September, 2009 | 38,940,119 |
| 17th December, 2009 | 33,036,407 |
| 17th March, 2010 | 27,926,293 |
| 17th June, 2010 | 23,503,233 |
| 17th September, 2010 | 19,755,487 |
| 17th December, 2010 | 16,648,618 |
| 17th March, 2011 | 13,966,814 |
| 17th June, 2011 | 11,652,568 |
| 17th September, 2011 | 9,713,344 |
| 17th December, 2011 | 8,119,542 |
| 17th March, 2012 | 6,747,504 |
| 17th June, 2012 | 5,567,427 |
| 17th September, 2012 | 4,811,870 |
| 17th December, 2012 | 4,278,519 |
| 17th March, 2013 | 3,779,604 |
| 17th June, 2013 | 3,313,258 |
| 17th September, 2013 | 2,898,023 |
| 17th December, 2013 | 2,534,823 |
| 17th March, 2014 | 2,195,905 |
| 17th June, 2014 | 1,879,962 |
| 17th September, 2014 | 1,599,962 |
| 17th December, 2014 | 1,362,351 |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed/Float Transaction

**Appendix A**

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 17th March, 2015 | 1,141,262 |
| 17th June, 2015 | 935,854 |
| 17th September, 2015 | 764,736 |
| 17th December, 2015 | 623,158 |
| 17th March, 2016 | 491,857 |
| 17th June, 2016 | 370,556 |
| 17th September, 2016 | 273,588 |
| 17th December, 2016 | 204,881 |
| 17th March, 2017 | 141,365 |
| 17th June, 2017 | 82,704 |
| 17th September, 2017 | 52,683 |
| 17th December, 2017 | 37,341 |
| 17th March, 2018 | 23,428 |
| 17th June, 2018 | 10,544 |
| 17th September, 2018 | 1,365 |
| 17th December, 2018 | 329 |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed/Float Transaction

# LEHMAN BROTHERS



## TRANSACTION

Date:        18 July, 2007

To:          Consumer Unsecured Reperforming Loans (CURL) Plc
             Attention:    Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             c/o Lehman Brothers Europe Limited
             Transaction Management Group
             Facsimile:     (+1) 646-885-9564 (United States of America)
             Phone:         (+4420) 7-102-7661 (United Kingdom)

Effort Id:   [ ]
Global Id:   [ ]

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consumer Unsecured Reperforming Loans (CURL) Plc ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 18 July 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 18th July 2007 |
| Effective Date: | 17th September, 2007 |
| Termination Date: | 17th December, 2018, subject to adjustment in accordance with the Following Business Day Convention. |
| | For the avoidance of doubt, termination of the Transaction prior to the Termination Date may lead to charges to either Party A or Party B, (as the case may be) |
| Notional Amount: | See Appendix A |
| Closing Date: | 18th July, 2007 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The Closing Date, subject to adjustment in accordance with the Following Business Day Convention. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 17th calendar day of each March, June, September and December, from and including 17th September, 2007 to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | With respect to each Calculation Period, as determined in accordance as follows: |

If the Note Sterling LIBOR in respect of the corresponding Interest Period under the Notes is greater than the Fixed/Floating Cap Strike Rate, Party A shall pay Party B an amount as calculated by applying the difference between the Fixed/Floating Strike Rate and Note Sterling LIBOR to the Notional Amount (as shown in Appendix A)

Otherwise, zero

Where:

Fixed/Floating Cap Strike Rate is 6.02%

Note Sterling LIBOR_ shall be as defined in the

|  |  |
|---|---|
|  | Prospectus |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/365 (Fixed) |

**Business Days:** London

**Definitions:**

| Interest Determination and Notification: | The Cash Bond Administrator will calculate on each Determination Date the following for application on the succeeding Floating Amount Payer Payment Date: |
|---|---|

    (a) Any amount due and payable to Party B; and

    (b) Any termination amounts payable in connection with the termination of the Transaction

| Determination Date: | The 14th Day of the calendar month in which the Interest Payment Date occurs (or if such day is not a Business Day, the next succeeding Business Day) |
|---|---|
| Prospectus: | Means the Prospectus of Party B as the Issuer dated 11th July 2007 issued and published in connection with the issue of the Notes |
| Closing Date | As per the Prospectus |
| Cash Bond Administrator: | The Bank of New York |

**Miscellaneous:**

| Calculation Agent: | Lehman Brothers International (Europe) |
|---|---|
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                              Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**    **Consumer Unsecured Reperforming Loans (CURL) Plc**

By:
Name:          Robin Baker
Title:         **Director**

Execution time will be furnished upon Counterparty's written request.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed Floating Cap Transaction

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                                      Accepted and agreed to:

Lehman Brothers Special Financing Inc.                Consumer Unsecured Reperforming Loans
                                                      (CURL) Plc

Chiara Mapelli                                        By: _____
Authorised Signatory                                  Name:    Robin Baker
                                                      Title:   Director

Execution time will be furnished upon Counterparty's written request.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed Floating Cap Transaction

UK\1344571\3                          Page 4 of 6

**Appendix A**

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 17th September, 2007 | - |
| 17th December, 2007 | 20,069,803 |
| 17th March, 2008 | 31,966,765 |
| 17th June, 2008 | 41,484,294 |
| 17th September, 2008 | 48,911,426 |
| 17th December, 2008 | 54,578,418 |
| 17th March, 2009 | 58,729,997 |
| 17th June, 2009 | 61,551,273 |
| 17th September, 2009 | 63,280,422 |
| 17th December, 2009 | 64,175,174 |
| 17th March, 2010 | 64,240,880 |
| 17th June, 2010 | 63,580,962 |
| 17th September, 2010 | 62,394,667 |
| 17th December, 2010 | 60,886,299 |
| 17th March, 2011 | 58,931,210 |
| 17th June, 2011 | 56,582,441 |
| 17th September, 2011 | 54,062,526 |
| 17th December, 2011 | 51,539,645 |
| 17th March, 2012 | 48,782,503 |
| 17th June, 2012 | 45,819,658 |
| 17th September, 2012 | 43,091,847 |
| 17th December, 2012 | 40,650,384 |
| 17th March, 2013 | 38,084,872 |
| 17th June, 2013 | 35,394,780 |
| 17th September, 2013 | 32,809,339 |
| 17th December, 2013 | 30,401,316 |
| 17th March, 2014 | 27,890,179 |
| 17th June, 2014 | 25,275,507 |
| 17th September, 2014 | 22,755,379 |
| 17th December, 2014 | 20,475,259 |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Fixed Floating Cap Transaction

## Appendix A

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 17th March, 2015 | 18,109,563 |
| 17th June, 2015 | 15,658,209 |
| 17th September, 2015 | 13,476,662 |
| 17th December, 2015 | 11,532,980 |
| 17th March, 2016 | 9,524,095 |
| 17th June, 2016 | 7,452,003 |
| 17th September, 2016 | 5,680,998 |
| 17th December, 2016 | 4,398,412 |
| 17th March, 2017 | 3,078,431 |
| 17th June, 2017 | 1,720,303 |
| 17th September, 2017 | 1,081,464 |
| 17th December, 2017 | 816,493 |
| 17th March, 2018 | 549,873 |
| 17th June, 2018 | 278,137 |
| 17th September, 2018 | 52,461 |
| 17th December, 2018 | 13,301 |

*subject to adjustment in accordance with the relevant Business Day Convention.

# LEHMAN BROTHERS

## TRANSACTION

| | |
|---|---|
| Date: | 18 July, 2007 |
| To: | Consumer Unsecured Reperforming Loans (CURL) Plc |
| | Attention:    Documentation Unit |

L RSA

| | |
|---|---|
| From: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Europe Limited |
| | Transaction Management Group |
| | Facsimile:    (+1) 646-885-9564 (United States of America) |
| | Phone:    (+4420) 7-102-7661 (United Kingdom) |

| | |
|---|---|
| Effort Id: | [ ] |
| Global Id: | [ ] |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consumer Unsecured Reperforming Loans (CURL) Plc ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 18 July 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

**General Terms:**

| | |
|---|---|
| Trade Date: | 18th July 2007 |
| Effective Date: | 17th September, 2007 |
| Termination Date: | 17th June, 2011, subject to adjustment in accordance with the Following Business Day Convention. |

For the avoidance of doubt, termination of the Transaction prior to the Termination Date may lead to charges to either Party A or Party B, (as the case may be)

| | |
|---|---|
| Notional Amount: | 14,415,656 |
| Closing Date: | 18th July, 2007 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The Closing Date, subject to adjustment in accordance with the Following Business Day Convention |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 17th calendar day of each March, June, September and December, from and including 17th September, 2007 to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | If the Note Sterling LIBOR in respect of the corresponding Interest Period under the Notes is greater than the Strike Rate, Party A shall pay Party B an amount as calculated by applying the difference between the Strike Rate and Note Sterling LIBOR to the Notional Amount of 14,415,656. |

Otherwise, zero

Where:

"Strike Rate" is 9.00%

"Note Sterling LIBOR" shall be as defined in the Prospectus

| | |
|---|---|
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/365 (Fixed) |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Cap Transaction

| | |
|---|---|
| **Business Days:** | London |

**Definitions:**

| | |
|---|---|
| Interest Determination and Notification: | The Cash Bond Administrator will calculate on each Determination Date the following for application on the succeeding Interest Payment Date: |

    (a) Any amount due and payable to Party B; and

    (b) Any termination amounts payable in connection with the termination of the Transaction

| | |
|---|---|
| Interest Payment Date: | As per the Prospectus |
| Determination Date: | The 14th Day of the calendar month in which the Interest Payment Date occurs (or if such day is not a Business Day, the next succeeding Business Day) |
| Prospectus: | Means the prospectus of Party B as the Issuer dated 11th July 2007 issued and published in connection with the issue of the Notes |
| Closing Date | As per the Prospectus |
| Cash Bond Administrator: | The Bank of New York |

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | The Bank of New York |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                                    Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**          **Consumer Unsecured Reperforming Loans (CURL) Plc**

By:
Name:          Robin Baker
Title:         **Director**

Execution time will be furnished upon Counterparty's written request.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Cap Transaction

UK\1344494\3                                    Page 4 of 4

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,

Lehman Brothers Special Financing Inc.

Chiara Mapelli
**Authorised Signatory**

Execution time will be furnished upon Counterparty's written request.

Accepted and agreed to:

**Consumer Unsecured Reperforming Loans (CURL) Plc**

By:
Name:
Title:        Robin Baker
              **Director**

CURL : Bullet Cap Transaction

UK\1344494\3

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

Page 4 of 4

# LEHMAN BROTHERS

## TRANSACTION

Date:         18 July, 2007

To:           Consumer Unsecured Reperforming Loans (CURL) Plc
              Attention:      Documentation Unit

From:         Lehman Brothers Special Financing Inc.
              c/o Lehman Brothers Europe Limited
              Transaction Management Group
              Facsimile:      (+1) 646-885-9564 (United States of America)
              Phone:          (+4420) 7-102-7661 (United Kingdom)

Effort Id:    [ ]
Global Id:    [ ]

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consumer Unsecured Reperforming Loans (CURL) Plc ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 18 July 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Lehman Brothers Europe Limited ("LBEL") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

**General Terms:**

| | |
|---|---|
| Trade Date: | 18th July 2007 |
| Effective Date: | 17th September, 2007 |
| Termination Date: | 17th September, 2011, subject to adjustment in accordance with the Following Business Day Convention. |
| | For the avoidance of doubt, termination of the Transaction prior to the Termination Date may lead to charges to either Party A or Party B, (as the case may be) |
| Notional Amount: | As per Appendix A |
| Closing Date: | 18th July, 2007 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The Closing Date, subject to adjustment in accordance with the Following Business Day Convention |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 17th calendar day of each March, June, September and December, from and including 17th September, 2007 to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | With respect to each Calculation Period, as determined in accordance as follows: |
| | If the Note Sterling LIBOR in respect of the corresponding Interest Period under the Notes is less than the Bullet Floor Strike Rate, Party A shall pay Party B an amount as calculated by applying the difference between the Strike Rate and Note Sterling LIBOR to a Outstanding Notional Amount as shown in Appendix A |
| | Otherwise, zero |
| | Where: |
| | "Bullet Floor Strike Rate" as shown in Appendix B |
| | "Note Sterling LIBOR" shall be as defined in the |

Prospectus

| | |
|---|---|
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/365 (Fixed) |
| Reset Dates: | The first day of each Calculation Period |

**Business Days:** London

**Definitions:**

Interest Determination and Notification:

The Cash Bond Administrator will calculate on each Determination Date the following for application on the succeeding Interest Payment Date:

    (a) Any amount due and payable to Party B; and

    (b) Any termination amounts payable in connection with the termination of the Transaction

Determination Date:

The 14th Day of the calendar month in which the Interest Payment Date occurs (or if such day is not a Business Day, the next succeeding Business Day)

Prospectus:

Means the prospectus of Party B as the Issuer dated 11th July 2007 issued and published in connection with the issue of the Notes

Closing Date

As per the Prospectus

Cash Bond Administrator:

The Bank of New York

Interest Payment Date:

As per the Prospectus

**Miscellaneous:**

Calculation Agent:    Lehman Brothers International (Europe)

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Floor Transaction

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                                   Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**        **Consumer Unsecured Reperforming Loans (CURL) Plc**

By: _____

Name:    Robin Baker

Title:    **Director**

Execution time will be furnished upon Counterparty's written request.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Floor Transaction

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number 646-885-9564 (United States of America), Attention: Documentation.

Yours sincerely,                                  Accepted and agreed to:

Lehman Brothers Special Financing Inc.            Consumer Unsecured Reperforming Loans
                                                  (CURL) Plc

Chiara Mapelli                                    By:
**Authorised Signatory**                          Name:
                                                  Title:        Robin Baker

                                                                **Director**

Execution fees will be furnished upon Counterparty's written request.

                              Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]
CURL : Bullet Floor Transaction

                              Page 4 of 6

## Appendix A

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Outstanding Notional Amount: |
|---|---|
| 17th September, 2007 | 107,748,516 |
| 17th December, 2007 | 107,748,516 |
| 17th March, 2008 | 101,473,336 |
| 17th June, 2008 | 86,643,237 |
| 17th September, 2008 | 73,808,241 |
| 17th December, 2008 | 78,682,713 |
| 17th March, 2009 | 66,928,094 |
| 17th June, 2009 | 56,719,913 |
| 17th September, 2009 | 48,004,670 |
| 17th December, 2009 | 54,302,242 |
| 17th March, 2010 | 45,902,702 |
| 17th June, 2010 | 38,632,478 |
| 17th September, 2010 | 32,472,273 |
| 17th December, 2010 | 32,472,273 |
| 17th March, 2011 | 32,472,273 |
| 17th June, 2011 | 32,472,273 |
| 17th September, 2011 | 32,472,273 |

*subject to adjustment in accordance with the relevant Business Day Convention.

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Floor Transaction

### Appendix B

| *Calculation Periods up to but excluding the Period End Date scheduled to occur: | Fixed Amounts |
|---|---|
| 17th September, 2007 | 5.50% |
| 17th December, 2007 | 5.50% |
| 17th March, 2008 | 5.25% |
| 17th June, 2008 | 5.25% |
| 17th September, 2008 | 5.25% |
| 17th December, 2008 | 4.75% |
| 17th March, 2009 | 4.75% |
| 17th June, 2009 | 4.75% |
| 17th September, 2009 | 4.75% |
| 17th December, 2009 | 4.25% |
| 17th March, 2010 | 4.25% |
| 17th June, 2010 | 4.25% |
| 17th September, 2010 | 4.25% |
| 17th December, 2010 | 3.50% |
| 17th March, 2011 | 3.50% |
| 17th June, 2011 | 3.50% |
| 17th September, 2011 | 3.50% |

Risk ID: [ ] / Effort ID: [ ] / Global Deal ID: [ ]

CURL : Bullet Floor Transaction