KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Lauren Macksoud
Joshua Friedman

*Counsel to Eurosail-UK 2007-2NP PLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X
In re                                                      :    Chapter 11
                                                           :
      LEHMAN BROTHERS HOLDINGS INC., et al.,               :    Case No. 08-13555 (JMP)
                                                           :
                        Debtors.                           :    (Jointly Administered)
---------------------------------------------------------------------- X

**LIMITED OBJECTION OF EUROSAIL-UK 2007-2NP PLC**
**TO THE DEBTORS' PROPOSED ASSUMPTION**
**OF CERTAIN EXECUTORY CONTRACTS PURSUANT TO**
**DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION**
**PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Without submitting to this Court's jurisdiction, Eurosail-UK 2007-2NC PLC

("Eurosail"), by and through its undersigned counsel, hereby submits this limited objection (the

"Limited Objection") to the assumption by Lehman Brothers Special Financing Inc. ("LBSF") of

certain derivative contracts, as set forth in the Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"), the Plan Supplement, dated

October 25, 2011 (the "Plan Supplement"), and the Notice of Proposed Assumption of Executory

Contracts and Unexpired Leases Pursuant to the Debtors' Third Amended Joint Chapter 11 Plan

Pursuant to Section 1121 of the Bankruptcy Code (the "Eurosail Notice of Assumption").  In support of this Objection, Eurosail respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Despite efforts to seek additional information from the Debtors (as defined below), Eurosail simply lacks sufficient information regarding the Debtors' intentions with respect to the Master Agreement, their methodology for calculating the proposed cure amount and an understanding of what the cure amount represents.  Without submitting to this Court's jurisdiction, Eurosail therefore objects to assumption of the Master Agreement inasmuch as Eurosail requires more time and information to take an position on the Debtors' requested relief.

2.      The Debtors' intention in seeking to assume the Master Agreement is a source of particular uncertainty to Eurosail because, from Eurosail's perspective, the Master Agreement lacks any economic value to the Debtors, irrespective of whether it is assumed or not.  Any obligation by Eurosail to make payments to the Debtors – the only source of potential value to the Debtors arising from the Master Agreement – is suspended by the clear terms of the agreement itself, which provides that a bankruptcy filing by one party constitutes an event of default that suspends the non-bankrupt counterparty's obligations.  This provision is enforceable under English law, which governs the Master Agreement, and, Eurosail believes, will be upheld by English courts, to which the parties have granted exclusive jurisdiction.  For this reason, Eurosail reserves the right to argue before the English courts that Eurosail's obligation to make any payments that would otherwise be due to LBSF under the Master Agreement has been suspended—even if this Limited Objection is overruled and the Debtors assume the Master Agreement.

KL2 2724050.7

## BACKGROUND

3.      Eurosail is a public limited company incorporated in England and Wales on 13 February 2006 for the purpose of, amongst other things, issuing instruments backed by residential mortgage loans. Eurosail has no operations or significant contacts within the United States.

4.      Eurosail and LBSF entered into that certain ISDA Master Agreement, dated as of March 29, 2007 (including the Schedule to the 1992 ISDA Master Agreement dated as of March 29, 2007 (the "Schedule"), the Credit Support Annex to the Schedule to the ISDA Master Agreement dated as of March 29, 2007 (the "Credit Support Annex"), certain transaction confirmations dated March 29, 2007 (the "Confirmations"), and any amendments thereto, the "Master Agreement"). True and correct copies of the Master Agreement, Schedule, Credit Support Annex and Confirmations are attached, respectively as Exhibits A, B, C and D.[1]

5.      The Master Agreement provides that the agreement will be governed in accordance with the law specified in the Schedule. See Master Agreement ¶ 13(a). The Schedule specifically provides that the agreement will be governed by the laws of England. See ¶ 4(i). The Master Agreement further provides that the parties thereto submit to the jurisdiction of the English courts if the agreement is expressed to be governed by English law. See Master Agreement ¶ 13(b) and ¶ 4(i) of the Schedule.

6.      Under the terms of the Master Agreement, the parties entered into multiple transactions (collectively, the "Transactions"), each with a specific termination date. Specifically, pursuant to the Master Agreement, the parties entered into two Transactions dated March 29, 2007, one of which reached its scheduled termination date on June 13, 2011. Each

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Master Agreement.

Transaction gives rise to payment obligations from one party to another, to be satisfied periodically before maturity.

7.      Section 2(a)(i) of the Master Agreement provides that "Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."  This section is modified by Section 2(a)(iii), which provides that "Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

8.      Beginning on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc., LBSF and certain of their affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.  As the Debtors' bankruptcy filing constituted an Event of Default under Section 5(a)(vii) of the Master Agreement that "occurred and is continuing," by operation of Section 2(a)(iii), any payment obligations pursuant the Master Agreement by Eurosail were effectively extinguished.

9.      On or about September 22, 2009, Eurosail timely filed a proof of claim against LBSF (Claim No. 28807) seeking recovery under the Master Agreement in an unliquidated amount (the "Eurosail Claim").  The Eurosail Claim stated, among other things, that the respective claimant "does not submit to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim" and "expressly reserves the right to withdraw this Proof of Claim as if it had never been filed."

10.      Pursuant to the Order Approving the Disclosure Statement, the Court approved the Debtors' Notice of (i) Approval of Disclosure Statement; (ii) Establishment of Record Date; (iii) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan; and (iv) Procedures and Deadline for Voting on the Plan dated September 9, 2011 (the "Confirmation Hearing Notice").  Pursuant to Section 9(a) of the Confirmation Hearing Notice, the Debtors obligated themselves to serve a notice of proposed cure amounts (the "Cure Amount Notice") to any counterparty to an executory contract to be assumed pursuant to the Plan.

11.      On September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627]. Pursuant to Section 11.1 of the Plan, upon Plan confirmation, and as of the Plan's effective date, all executory contracts existing between the Debtors and any counterparty will be deemed rejected, except for those executory contracts that are specifically designated as a contract to be assumed by the Debtors.

12.      On October 25, 2011, the Debtors filed the Plan Supplement [Docket No. 21254], which sets forth, in Exhibit 2, the Schedule of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Section 11.1 of the Plan (the "Assumption Schedule").  The Debtors list the Master Agreement as an executory contract to be assumed by the Debtors.

13.      On or about November 4, 2011, Eurosail received the Notice of Proposed Assumption of Executory Contracts and Unexpired Leases Pursuant to the Debtors' Third Amended Joint Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code (the "Eurosail Notice of Assumption"), which purported to notify Eurosail that the Debtors intended to assume all derivative contracts entered into between the Debtors and Eurosail.  The Notice of

Assumption was served on the trustee under the Master Agreement, BNY Melon Trustee Services Ltd., rather than c/o Wilmington Trust SP Services (London) Limited, the proper notice party under both the Master Agreement and the Eurosail Claim.

14.    While the Debtors do not provide a cure amount in the Assumption Schedule, the Eurosail Notice of Assumption lists the cure amount proposed by the Debtors as £1,807,920.00.

15.    On or around the date hereof, Eurosail withdrew the Eurosail Claim.

### ARGUMENT

16.    Without more information from the Debtors, Eurosail is left speculating as to the Debtors' intention in seeking to assume the Master Agreement, and without guidance by the Debtors, Eurosail has no basis to evaluate or critique the Debtors' methodology.

17.    Without any guidance from the Debtors, Eurosail's unsupported suspicion is that the Debtors are seeking to assume the Master Agreement in an effort to somehow nullify the effect of Section 2(a)(iii) of the Master Agreement, pursuant to which Eurosail's payment obligations in respect of the Transactions have been suspended.  Eurosail is not requesting a ruling by this Court with respect to the operation of the Master Agreement, which, by its terms, is governed by English law and to be interpreted and upheld by English courts.  However, Eurosail objects to the Debtors' assumption of the Master Agreement to the extent that the Debtors will seek to rely on the assumption as having any impact on Eurosail's obligations under the Master Agreement.  Such an interpretation would be inconsistent with English law, pursuant to which contract provisions such as Section 2(a)(iii) that provide for the exercise of a party's contractual right triggered by the counterparty's bankruptcy filing are enforceable.  Assumption of the Master Agreement will not revive Eurosail's payment obligations under English law.

Assumption of the Master Agreement should only be approved by the Bankruptcy Court to the extent that it will have no *res judicata* effect in a later proceeding (presumably before the English courts, which have exclusive jurisdiction over the Master Agreement and the parties thereto) regarding the parties' payment obligations under the Master Agreement.

## RESERVATION OF RIGHTS

18.     Eurosail does not submit to the jurisdiction of this Court for any reason but to assert this Limited Objection to the assumption of the Master Agreement.  Eurosail explicitly objects to the personal jurisdiction of the Court with regard to any motion, request for relief or adversary proceeding commenced against it by any party.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Eurosail respectfully requests that the Court deny the Debtors' proposed assumption of the Master Agreement and the Debtors' proposed cure amounts.

Dated: New York, New York
November 16, 2011

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP

By:_____*/s/* Lauren Macksoud_____
        Lauren Macksoud
        Joshua Friedman
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000

*Counsel to Eurosail-UK 2007-2NP PLC*

KL2 2724050.7

**EXHIBIT A**

FIXED/FLOATING SWAP &
BBR SWAP AGREEMENT

(Multicurrency-Cross Border)



**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

### dated as of   29   March 2007

**LEHMAN BROTHERS SPECIAL        EUROSAIL-UK 2007 –2NP PLC
FINANCING    INC.**
and
(as Party A)                                (as Party B)

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:-

**1.        Interpretation**

(a)        **Definitions.** The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)        **Inconsistency.** In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)        **Single Agreement.** All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.        Obligations**

(a)        **General Conditions.**

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

**Copyright © 1992 by International Swaps and Derivatives Association, Inc.**

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

ISDA® 1992

(b)     *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting*. If on any date amounts would otherwise be payable:-

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:-

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:-

           (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability.* If:-

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  **Default Interest; Other Amounts.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.  **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)  **Basic Representations.**

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)      *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*.  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*.  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a)      *Furnish Specified Information*.  It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:-

> (i)  any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii)  any other documents specified in the Schedule or any Confirmation; and

> (iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*.  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*.  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-

(i)  *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)  *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)  *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.   The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:-

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:-

(i) *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):-

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    **Early Termination**

(a)    ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event.***

(i) *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) ***Transfer to Avoid Termination Event***. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) ***Two Affected Parties***. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) ***Right to Terminate***. If:-

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

9

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     ***Effect of Designation.***

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     ***Calculations.***

(i) ***Statement.*** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) ***Payment Date.*** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     ***Payments on Early Termination.*** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method"- or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) ***Events of Default.*** If the Early Termination Date results from an Event of Default:-

(1) ***First Method and Market Quotation.*** If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) ***First Method and Loss.*** If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) ***Second Method and Market Quotation.*** If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) **Termination Events**. If the Early Termination Date results from a Termination Event:-

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties:-

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) **Adjustment for Bankruptcy.** In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) **Pre-Estimate.** The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.      Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency*.  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency").  To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*.  To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.  The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*.  To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*.  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.     Notices

(a)     *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:-

　　　　(i)   if in writing and delivered in person or by courier, on the date it is delivered;

　　　　(ii)  if sent by telex, on the date the recipient's answerback is received;

　　　　(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

　　　　(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

　　　　(v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.     Governing Law and Jurisdiction

(a)     *Governing Law*.  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*.   With respect to any suit, action or proceedings relating to this Agreement ("Proceedings'), each party irrevocably:-

　　　　(i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

　　　　(ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings.  If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)        *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:-

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:-

(a)        in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)        in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)        in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)        in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**"*Defaulting Party*"** has the meaning specified in Section 6(a).

**"*Early Termination Date*"** means the date determined in accordance with Section 6(a) or 6(b)(iv).

**"*Event of Default*"** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

**"*Illegality*"** has the meaning specified in Section 5(b).

**"*Indemnifiable Tax*"** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

**"*law*"** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

**"*Local Business Day*"** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

**"*Loss*"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

**"*Market Quotation*"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"**Non-default Rate**" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"**Non-defaulting Party**" has the meaning specified in Section 6(a).

"**Office**" means a branch or office of a party, which may be such party's head or home office.

"**Potential Event of Default**" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"**Reference Market-makers**" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"**Relevant Jurisdiction**" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"**Scheduled Payment Date**" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"**Set-off**" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"**Settlement Amount**" means, with respect to a party and any Early Termination Date, the sum of:-

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"**Specified Entity**" has the meaning specified in the Schedule.

ISDA® 1992

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS  SPECIAL FINANCING INC.**

**EUROSAIL-UK 2007 – 2NP PLC**

By: _R. Sandilands_
Name: Richard Sandilands
Title: Authorised Signatory
Date:

By:
Name:
Wilmington Trust SP Services (London) Limited
Date:

19

ISDA® 1992

**EXHIBIT B**

**Fixed/Floating Swap and BBR Swap Agreement**

**(Multicurrency-Cross Border)**

## SCHEDULE

### to the

### 1992 ISDA

### MASTER AGREEMENT

### dated as of 29 March 2007

### between

### LEHMAN BROTHERS SPECIAL FINANCING INC.

### a corporation organised under the laws of the State of Delaware

### ("Party A")

### and

### EUROSAIL-UK 2007-2NP PLC

### a corporation organised under the laws of the England and Wales

### ("Party B")

## PART 1    TERMINATION PROVISIONS

In this Agreement:-

(a)      "*Specified Entity*" means:

     (i)      in relation to Party A for the purpose of

          Section 5(a)(v) of this Agreement - not applicable

          Section 5(a)(vi) of this Agreement -not applicable

          Section 5(a)(vii) of this Agreement - not applicable

          Section 5(b)(iv) of this Agreement - not applicable

     (ii)      in relation to Party B for the purpose of

          Section 5(a)(v) of this Agreement - not applicable

Section 5(a)(vi) of this Agreement - not applicable

Section 5(a)(vii) of this Agreement - not applicable

Section 5(b)(iv) of this Agreement - not applicable

**(b)**     The *"Breach of Agreement"* provisions of Section 5(a)(ii) will apply to Party A and will not apply to Party B.

**(c)**     The *"Credit Support Default"* provisions of Section 5(a)(iii) will apply to Party A and will not apply to Party B.

**(d)**     The *"Misrepresentation"* provisions of Section 5(a)(iv) will apply to Party A but will not apply to Party B.

**(e)**     *"Specified Transaction"* will have the meaning specified in Section 14 and the "**Default Under Specified Transaction**" provisions of Section 5(a)(v) will not apply to Party A and will not apply to Party B.

**(f)**     The *"Cross Default"* provisions of Section 5(a)(vi) of this Agreement will not apply to Party B and will apply to Party A with a Threshold Amount equal to 3 per cent of the Stockholders' Equity of Lehman Brothers Holdings Inc..

**(g)**     The *"Bankruptcy"* provisions of:

(i) Subsection 5(a)(vii)(2) is deleted (insofar as it applies to Party B)

(ii) Subsection 5(a)(vii)(6) do not apply with respect to the appointment of the Trustee under the Deed of Charge,

(iii) Subsection 5(a)(vii)(7) do not apply to taking possession by the Trustee pursuant to the Deed of Charge,

(iv) Subsection 5(a)(vii)(9) is deleted in its entirety.

In any event, Subsection 5(a)(vii)(6) will only apply with the deletion of the words "*seeks or*" before the words "*becomes subject to*".

**(h)**     The *"Merger without Assumption"* provisions of Section 5(a)(viii) will apply to Party A but will not apply to Party B.

**(i)**     The *"Illegality"* provisions of Section 5(b)(i) of this Agreement will apply to Party A and will apply to Party B, with both Party A and Party B as the Affected Parties.

**(j)**     The *"Tax Event"* provisions of Section 5(b)(ii) of this Agreement will apply to Party A and will apply to Party B, with both Party A and Party B as the Affected Parties.

**(k)**     The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) of this Agreement will not apply to Party A and will not apply to Party B.

**(l)**     The *"Tax Event Upon Merger"* provisions of Section 5(b)(iii) will not apply to Party A and will not apply to Party B, provided that Party A shall not be entitled to

2

designate an Early Termination Date by reason of a Tax Event upon Merger in respect of which it is the Affected Party.

**(m)**    The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

**(n)**    *Payments on Early Termination*, for the purpose of Section 6(e):-

    **(i)**    Market Quotation will apply.

    **(ii)**    Second Method will apply.

**(o)**    *"Termination Currency"* means Sterling.

**(p)**    *"Additional Termination Event"*

The following shall constitute Additional Termination Events:

    **(i)**    **Redemption of the Notes in whole for taxation reasons.**  On the occurrence of a redemption of the Notes in whole for taxation reasons pursuant to the provisions of Condition 5(f) of the Notes.

    **(ii)**    **Early Redemption of the Notes in whole.**  On the occurrence of a redemption of the Notes in whole pursuant to Condition 5(e) of the Notes.

    **(iii)**    **Enforcement of the Notes.**  On the occurrence of a redemption of the Notes in whole pursuant to the occurrence of an Event of Default (as defined in Condition 9(a) of the Notes).

With respect to the Additional Termination Events set out above, Party B shall be the sole Affected Party. The Early Termination Date in respect of any Additional Termination Event shall occur (without the need for notice and regardless of whether a notice is issued) on such day preceding the due date for redemption as shall be necessary to ensure that any amount payable pursuant to Section 6(e) of this Agreement falls due on the due date for redemption.

    **(iv)**    The Additional Tax Representation in Part 2(c) below proves to have been incorrect or misleading in any material respect in relation to one or more Transactions (each an Affected Transaction for the purposes of this Additional Termination Event) when made or deemed to have been made or repeated. The sole Affected Party shall be Party A.

    **(v)**    **Rating Events**

    **(a)**    **S&P Rating Event**

    **(1)**    In the event that the short-term senior, unsecured and unguaranteed debt obligations of Party A's Credit Support Provider (or its successor or assignee) cease to be rated at least as high as A-1 (an **"Initial S&P Downgrade Event"**) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (**"S&P"**), and as a result of such cessation, the then current rating of the relevant Notes is downgraded by S&P or placed under review for possible

downgrade by S&P (together with the Initial S&P Downgrade Event, an "**Initial S&P Rating Event**") then unless Party A, within 30 days of the occurrence of the Initial S&P Downgrade Event, at its own cost:

**(A)**    puts in place a mark-to-market collateral agreement (which may be based on the credit support documentation published by ISDA, or otherwise, and will relate to collateral in the form of cash or securities or both) in support of Party A's obligations under this Agreement on terms satisfactory to the Trustee (whose consent shall be given if S&P confirms that the provision of such collateral would maintain or restore the rating of the relevant Notes by S&P at/to the level it would have been at immediately prior to such Initial S&P Rating Event) and in accordance with the criteria set out and referred to in the article published by S&P on 17 December 2003 entitled "*Global Interest Rate and Currency Swaps Counterparty Rating Criteria Expanded*", provided that (x) S&P shall be deemed to have given the required confirmation if the amount of collateral agreed to be provided in the form of cash and/or securities (the "**Collateral Amount**") is determined on a basis which satisfies, but is no more onerous than, the criteria set out and referred to in the article published by S&P on 26 February 2004 entitled "*Global Interest Rate and Currency Swaps: Calculating the Collateral Required Amount*" which enables entities rated lower than a specified level to participate in structured finance transactions (the "**S&P Criteria**") (for the avoidance of doubt, "VB" will be calculated using the remaining average life of the Notes to which the relevant Transaction relates rather than the legal final maturity date of the Notes to maintain or restore the rating of the Notes by S&P at or to the level they would have been had such Initial S&P Rating Event not occurred provided that (1) Party A shall provide a legal opinion in a form satisfactory to S&P that provides comfort as to the ability of the Party B to terminate the Transactions under the Agreement and access the collateral free from interference or delay upon the bankruptcy of Party A; and (2) if the short-term, unsecured and unsubordinated debt obligations of Party A (or its successor) or any Credit Support Provider from time to time in respect of Party A cease to be rated at least as high as A-2 by S&P or the long-term, unsecured and unsubordinated debt obligations of Party A (or its successor) or any Credit Support Provider from time to time in respect of Party A cease to be rated at least as high as BBB+ by S&P, Party A shall obtain an external verification of its valuations of the Transactions on a monthly basis in accordance with the requirements of S&P; or

**(B)**    transfers all of its rights and obligations with respect to this Agreement to a replacement third party satisfactory to the Trustee (whose consent shall be given if S&P confirms that such transfer would maintain the ratings of the Notes by S&P at, or restore the rating of the Notes by S&P to, the level it would have been had such Initial S&P Rating Event not occurred) in accordance with Part 5(g); or

**(C)**    obtains a guarantee of its rights and obligations with respect to this Agreement from a third party satisfactory to the Trustee (whose consent shall be given if S&P confirms that such guarantee would maintain the rating of the Notes by S&P at, or restore the rating of the Notes by S&P to, the level it would have been had such Initial S&P Rating Event not occurred); or

**(D)**    take such other action as Party A may agree with S&P as will result in the rating of the Notes by S&P following the taking of such action being maintained at, or restored to, the level it would have been had such Initial S&P Rating Event not occurred,

an Additional Termination Event shall occur immediately following the expiry of such 30 day period, with Party A as the sole Affected Party.

If any of sub-paragraphs (v)(a)(1)(B), (v)(a)(1)(C) or (v)(a)(1)(D) above are satisfied at any time, all collateral (or the equivalent thereof, as appropriate) transferred by Party A pursuant to sub-paragraph (v)(a)(1)(A) will be transferred to Party A and Party A will not be required to transfer any additional collateral in respect of such Initial S&P Rating Event.

**(2)**    In the event that the rating of the long-term, unsecured and unsubordinated debt obligations of Party A's Credit Support Provider ceases to be rated at least as high as "BBB-" by S&P (a "**Subsequent S&P Rating Event**"), then unless Party A at its own cost and expense:

**(E)**    uses its reasonable endeavours to take the action set out in sub-paragraph (v)(a)(1)(B) above immediately upon the occurrence of such Subsequent S&P Rating Event; and

**(F)**    if, at the time such Subsequent Rating Event occurs, Party A has provided collateral pursuant to a mark-to-market collateral arrangement put in place pursuant to sub-paragraph (v)(a)(1)(A) above following an Initial S&P Rating Event, it shall continue to post collateral notwithstanding the occurrence of such Subsequent S&P Rating Event until such time as the action set out in sub-paragraph (v)(a)(2)(A) above has been taken,

an Additional Termination Event shall occur immediately following the expiry of such 10 day period, with Party A as the sole Affected Party.

If the action set out in sub-paragraph (v)(a)(2)(A) above is taken at any time, all collateral (or the equivalent thereof, as appropriate) transferred by Party A pursuant to sub-paragraph (v)(a)(1)(A) above will be transferred to Party A and Party A will not be required to transfer any additional collateral in respect of such Subsequent S&P Rating Event.

**(b)**    **Fitch Rating Event**

**(i)**    If at any time the Short-term Rating or Long-term Rating of Party A's Credit Support Provider's debt obligations are downgraded below F1 and A, as the

case may be, by Fitch Ratings Ltd ("**Fitch**") then Party A shall within 30 calendar days of the occurrence of such downgrade (a "**Fitch Downgrade Event**"):

**(A)**    procure the transfer all of its rights and obligations under this Agreement in accordance with Part 5(g) to an entity with the Required Ratings provided that a transfer to an entity incorporated and/or tax resident in a different jurisdiction to Party A shall only be permitted if the tax treatment of payments under this Agreement would not be adversely affected; or

**(B)**    procure that its obligations with respect to this Agreement are guaranteed by a third party (such guarantee to be in form and substance satisfactory to Party B and the Trustee) with the Required Ratings; or

**(C)**    put in place put in place a Suitable Collateral Agreement under the terms of which, the collateral to be posted will be in the form of cash or securities or both and for an amount in accordance with the following formula:

$$CA = \max [MV + VC \times 105\% \times N; 0]$$

each as defined and set out in the article entitled "*Counterparty Risk in Structured Finance Transactions: Swap Criteria*" dated 13 September 2004, as amended from time to time.

The Collateral Advance Rate will be dependent on the type of securities posted. For cash (denominated in Sterling) or cash equivalents the Collateral Advance Rate is 100%. For other collateral that may be subject to market value risk, an appropriate haircut will be agreed with Fitch for the determination of the Collateral Advance Rate.

The cost of putting in place each of the arrangements described in sub-paragraphs (v)(b)(i)(A), (B), and (C) shall be borne by Party A in each case.

**(ii)**    If at any time the Short-term Rating or Long term Rating of Party A's Credit Support Provider's debt obligations are downgraded below F2 and BBB+, as the case may be, by Fitch then Party A shall:

**(A)**    procure the transfer all of its rights and obligations under this Agreement in accordance with Part 5(g) to an entity with the Required Ratings provided that a transfer to an entity incorporated and/or tax resident in a different jurisdiction to Party A shall only be permitted if the tax treatment of payments under this Agreement would not be adversely affected; or

**(B)**    procure that its obligations with respect to this Agreement are guaranteed by a third party (such guarantee to be in form and substance satisfactory to Party B and the Trustee) with the Required Ratings; or

**(C)**    post the collateral amount in cash or securities or both determined in accordance with Fitch criteria ("**Counterparty Risk in Structured**

6

Finance Transactions: Swap Criteria" published on 13 September 2004 and, for the purposes of the relevant collateral amount calculation, as amended from time to time) and verified by an independent third party identified by Party A.

**(iii)**   If at any time the Short-term Rating or Long term Rating of Party A's Credit Support Provider's debt obligations are downgraded below F3 and BBB-, as the case may be, by Fitch then Party A shall:

    **(A)**   procure the transfer all of its rights and obligations under this Agreement in accordance with Part 5(g) to an entity with the Required Ratings provided that a transfer to an entity incorporated and/or tax resident in a different jurisdiction to Party A shall only be permitted if the tax treatment of payments under this Agreement would not be adversely affected; or

    **(B)**   procure that its obligations with respect to this Agreement are guaranteed by a third party (such guarantee to be in form and substance satisfactory to Party B and the Trustee) with the Required Ratings.

For the avoidance of doubt, if Party A does not take any of the measures described in sub-paragraphs (v)(b)(i), (ii) or (iii) above within 30 days of its downgrade, such failure shall constitute an Additional Termination Event with Party A as the sole Affected Party.

No measure or step taken pursuant to sub-paragraphs (v)(b)(i)(A), (v)(b)(ii)(A) or (v)(b)(iii)(A) above shall be effective and unconditional unless and until the assignee, successor or credit support provider (if applicable) has agreed to be bound by and adhered in manner and form acceptable to the Trustee, the Deed of Charge.

**(c)**   **Moody's Rating Event**

**(1)**   Without prejudice to Party A's obligations under the Credit Support Annex, if, at any time none of the Relevant Entities have the First Trigger Required Ratings, Party A may either:

    (A)   pursuant to the Credit Support Annex, provide collateral in support of its obligations under this Agreement; or

    (B)   at its own cost procure either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5(g).

**(2)**   If at any time, none of the Relevant Entities have the Second Trigger Required Ratings, Party A will:

    (A)   pursuant to the Credit Support Annex, provide collateral in support of its obligations under this Agreement; and

(B)      at its own cost use commercially reasonable efforts to procure, as soon as reasonably practicable, either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5(g).

(3)      *Failure to post collateral following a First Rating Trigger.*

If:

(A) Party A's Credit Support Provider's debt ceases to have ratings equivalent to the First Trigger Required Ratings; and

(B) Party A has failed to:

(i) procure either (i) an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement to be provided by an Eligible Moody's Replacement or (ii) a transfer in accordance with Part 5(g); and

(ii) comply with or perform any of its obligations under the terms of the Credit Support Annex hereto (after allowing for any applicable grace period)

an Additional Termination Event will be deemed to have occurred in relation to all Transactions hereunder and Party A will be the sole Affected Party.

(4)      *Firm Bid received following the occurrence of a Second Rating Trigger.*

If:

(A) Party A's Credit Support Provider's debt ceases to have ratings equivalent to the Second Trigger Required Ratings; and

(B) the event in (A) above has been in continuous existence for 21 or more Local Business Days; and

(C) at least one Eligible Moody's Replacement has either:

(i) made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer to be made in accordance with Part 5(g); and/or

(ii) made a Firm Offer (which remains capable of becoming legally binding upon acceptance by the offeree) to provide an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement

an Additional Termination Event will be deemed to have occurred in relation to all Transactions hereunder and Party A will be the sole Affected Party.

For the avoidance of doubt:

(I) the Settlement Amount payable under Section 6(e) of this Agreement following an Additional Termination Event under (4) above shall be calculated in accordance with the Market Quotation provisions set out herein (which may produce a Settlement

8

Amount which is higher or lower than any payment contemplated in the Firm Offer referred to in C(i) and C(ii) above); and

(II) Notwithstanding Sections 5(a)(i) and 5(a)(iii), any failure by Party A to comply with or perform any obligation to be complied with or performed by Party A under the Credit Support Annex shall not be an Event of Default unless (A) the Second Rating Trigger Requirements apply and at least 21 Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply and (B) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A.

**(q)**    *Part 1 Definitions*

Any terms not defined otherwise in this Agreement shall have the meaning specified in the Master Definitions Schedule.

"**Eligible Guarantee**" means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax or (B) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required.

"**Eligible Moody's Replacement**" means an entity (A) with the First Trigger Required Ratings or the Second Trigger Required Ratings or (B) whose present and future obligations owing to Party B are guaranteed pursuant to an Eligible Guarantee provided by a guarantor with the First Trigger Required Ratings and/or the Second Trigger Required Ratings.

"**First Trigger Required Ratings**" means (A) where the relevant entity is the subject of a Moody's Short-term Rating, such rating is "Prime-1" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

"**Firm Offer**" means an offer which, when made, was capable of becoming legally binding upon acceptance.

"**Moody's**" means Moody's Investors Service Limited.

"**Moody's Short-term Rating**" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

"**Relevant Entities**" means Party A, any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement and , so long as Party A's obligations are guaranteed pursuant to the Guarantee, Lehman Brothers Holdings Inc.

"**Second Trigger Required Ratings**" means (A) where such entity is the subject of a Moody's Short-term Rating, such rating is "Prime-2" or above or its long-term, unsecured and

9

unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's or (B) where such entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

"**Collateral Advance Rate**" means:

1.      in the case of cash collateral, the Collateral Advance Rate is 100%; or

2.      such other rate determined in accordance with Fitch criteria as set out in article "**Counterparty Risk in Structured Finance Transactions: Swap Criteria**" published on 13 September 2004, as amended from time to time.

"**Deed of Charge**" has the meaning ascribed thereto in the Master Definitions Schedule.

"**Long-term Rating**" means the long-term, unsecured and unsubordinated rating.

"**Master Definitions Schedule**" means the master definitions schedule set out in Schedule 1 (*Master Definitions Schedule*) of the Master Securitisation Agreement dated on or about 29 March 2007 relating to documents entered into in connection with a residential mortgage securitisation involving Party B as the Issuer.

"**Notional Amount**" means, in respect of the Transaction hereunder, the amount defined as such in the Confirmation relating thereto.

"**Required Ratings**" means a Short-term Rating of F-1 and a Long-term Rating of A from Fitch.

"**Notes**" has the meaning ascribed thereto in the Master Definitions Schedule.

"**Short-term Rating**" means the short-term, unsecured and unsubordinated rating.

"**Suitable Collateral Agreement**" and "**Credit Support Annex**" mean a mark-to-market collateral agreement in a form and substance acceptable to Moody's or Fitch, as the case may be, (which may be based on the credit support documentation published by ISDA or otherwise, and relates to collateral in the form of cash or securities or both) in support of the obligations of Party A under this Agreement.

"**Trustee**" has the meaning ascribed thereto in the Master Definitions Schedule.

"**Valuation Date**" means each Local Business Day.

10

**PART 2   TAX REPRESENTATIONS**

(a)   **Party A and Party B Payer Tax Representations**

For the purpose of Section 3(e), Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) to this Agreement) to be made by it to the other party under this Agreement.   In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f), (ii) the satisfaction of the agreement contained in Sections 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Sections 4(a)(i) or 4(a)(iii) and (iii) the satisfaction of the agreement of the other party contained in Section 4(d), PROVIDED that it shall not be a breach of this representation where reliance is placed on sub-clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   **Payee Tax Representations**

For the purpose of Section 3(f), neither Party A nor Party B will make any representations.

(c)   **Additional Representation**

For the purpose of this Agreement, Party A represents to Party B in relation to each Transaction that:

"(i)    it is and will be throughout the course of the relevant Transaction resident in the United Kingdom for United Kingdom tax purposes; or

(ii)    it is and will be throughout the course of the relevant Transaction resident in a jurisdiction that has a double taxation convention or treaty with the United Kingdom under which provision, whether for relief or otherwise, in relation to interest (as defined in the relevant convention or treaty) is made; or

(iii)   it has entered into the relevant Transaction solely for the purposes of a trade or part of a trade carried on by it in the United Kingdom through a branch or agency and will continue so to treat the relevant Transaction throughout the course of the relevant Transaction."

## PART 3    AGREEMENT TO DELIVER DOCUMENTS

For the purposes of Sections 3(d), 4(a)(i) and (ii), each party agrees to supply the following documents:

**(a)**    Tax forms, documents or certificates to be delivered are:

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: |
|---|---|---|
| Party A, Party B and Party A's Credit Support Provider | Subject to Section 4(a)(iii), any document required or reasonably requested to allow the other party to make payments under this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate. | Promptly upon the earlier of (i) reasonable demand by the other party and (ii) learning that the form or document is required. |

**(b)**    Other documents to be delivered are:

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| Party A and Party B | Either (1) a signature booklet, or where applicable, an extract of the commercial register containing secretary's certificate and resolutions ("*authorising resolutions*") authorising the party to enter into this Agreement and any Confirmation or (2) a secretary's/director's/ other authorised person's certificate, authorising resolutions and incumbency certificate for such party and any Credit Support Provider of such party reasonably satisfactory in form and | Upon execution of this Agreement and the relevant Confirmation as applicable | Yes |

12

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| | substance to the other party. | | |
| Party A | A duly executed copy of the Guarantee of Lehman Brothers Holdings Inc. specified as a Credit Support Document in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party A | Written opinions of internal legal counsel to Party A and Party A's Credit Support Provider on the due capacity and authority of Party A and Party A's Credit Support Provider to enter into this Agreement and the Guarantee and on the enforceability and validity of its obligations thereunder. | Upon execution of this Agreement. | No |
| Party B | Certified copies of such party's Memorandum and Articles of Association. | Upon execution of this Agreement | Yes |
| Party B | A written opinion of English legal counsel to Party B reasonably satisfactory in form and substance to Party A to address capacity issues. | Upon execution of this Agreement | No |
| Party B | Executed copy of the Deed of Charge. | Upon execution of this Agreement | No |

13

| PARTY REQUIRED TO DELIVER DOCUMENT: | FORM/ DOCUMENT/ CERTIFICATE: | DATE BY WHICH TO BE DELIVERED: | COVERED BY SECTION 3(D) REPRESENTATION |
|---|---|---|---|
| Party A and Party A's Credit Support Provider | Annual and semi-annual Financial Statements for the duration of this Agreement. | Promptly upon reasonable demand by Party B | No |

14

## PART 4    MISCELLANEOUS

**(a)**    *Addresses for Notices*.  For the purposes of Section 12(a):

    **(i)**    Notices or communications to Party A shall be sent to the address, telex number or facsimile specified below:

        Address:    Lehman Brothers Special Financing Inc.
                     Transaction Management
                     399 Park Avenue, 15th Floor
                     New York, NY 10022-4679

                     Attention:    Joseph Polizzotto
                     Telephone No:+1(212) 526-2648
                     Facsimile No: +1(212) 526-2726

    with a copy to:

        Address:    Lehman Brothers International (Europe)
                     Legal Transaction Management (FID)
                     25 Bank Street
                     London E14 5LE

                     Attention:        Legal - Fixed Income
                     Telephone No:    +44 207 102 7376
                     Facsimile No:    +44 207 067 8388

    **(ii)**    Address for notices or communications to Party B shall be sent to the address, telex number or facsimile number specified below:

        Address:    Eurosail-UK 2007-2NP PLC
                     c/o Wilmington Trust SP Services (London) Limited

                     Tower 42 (Level 11)
                     International Finance Centre
                     25 Old Broad Street
                     London EC2N 1HQ

                     Attention:    Robin Baker
                     Telephone no: 020 7614 1111
                     Facsimile no:  rbaker@wilmingtontrust.com

**(b)**    *Notices*. Section 12(a) is amended by adding in the third line thereof after the phrase "messaging system" and before the ")" the words, "; provided, however, any such notice or other communication may be given by facsimile transmission if telex is unavailable, no telex number is supplied to the party providing notice, or if answer back confirmation is not received from the party to whom the telex is sent.".

**(c)**    *Process Agent*.  For the purpose of Section 13(c):

Party A appoints as its Process Agent: Lehman Brothers International (Europe), Attention: Managing Director – Swaps, 25 Bank Street, London E14 5LE, England.

Party B appoints as its Process Agent: Not applicable.

**(d)** *Offices*.  The provisions of Section 10(a) will apply to Party A and will apply to Party B.

**(e)** *Multibranch Party*.  For the purpose of Section 10(c):

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

**(f)** *Calculation Agent*.  "Calculation Agent" means Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

**(g)** *Credit Support Document*.  Details of any Credit Support Document:

In relation to Party A:  A guarantee (the "**Guarantee**") granted by Lehman Brothers Holdings Inc. of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule and any Eligible Guarantee.

In relation to Party B:  The Deed of Charge.

**(h)** *Credit Support Provider*.  Credit Support Provider means:

In relation to Party A:  Lehman Brothers Holdings Inc. and the guarantor under any Eligible Guarantee.

In relation to Party B:  Not Applicable.

**(i)** *Governing Law; Jurisdiction*.  This Agreement and the Confirmation will be governed by, and construed in accordance with the laws of England.

**(j)** *Netting of Payments*.  Subparagraph (ii) of Section 2(c) of this Agreement shall not apply in relation to the Limited Transactions.

**(k)** "*Affiliate*" has the meaning specified in Section 14.

16

## PART 5    OTHER PROVISIONS

**(a)**    ***Obligations.***  In Section 2(a)(iii) the words "or Potential Event of Default" shall be deleted in respect of Party B but not in respect of Party A, and that Section shall apply provided that Party A shall be obliged to perform its obligations under Section 2(a)(i) notwithstanding the occurrence of a Potential Event of Default with respect to Party B.

**(b)**    ***Absence of Litigation, Absence of Certain Events.***  Section 3(c) is amended by the deletion of the words "or any of its Affiliates".  Section 3(b) is amended (in respect of Party B only) by the deletion of the words "or potential Event of Default".

**(c)**    ***Change of Account.***  Section 2(b) is amended by the addition of the following:

(i) after the word "**delivery**" in the first line thereof:

"to another account in the same legal and tax jurisdiction as the original account".

(ii)    after the full stop at the end of Section 2(b):

"The new account bank of Party B shall be rated at least as high as "A-1+" by S&P."

**(d)**    ***Deduction  or  Withholding  for  Tax.***    A  reference  in  the  Agreement  to  an "Indemnifiable Tax" shall, with respect to payment by Party A be deemed to be a reference to any Tax and, with respect to payments by Party B shall be deemed to be a reference to no Tax.

**(e)**    ***Security Interest***

Notwithstanding Section 7, Party A hereby consents and agrees to the assignment by way of security by Party B of its interests under this Agreement (without prejudice to, and  after  giving  effect  to,  any  contractual  netting  provision  contained  in  this Agreement) to BNY Corporate Trustee Services Limited, as trustee (or any successor thereto) pursuant to and in accordance with the Deed of Charge and acknowledges notice of such assignment.

**(f)**    ***No Set-off.***   Without prejudice to Part 4, paragraph (j) hereof, the respective obligations of Party A and Party B under this Agreement shall not be subject to any defence, counterclaim or right of set-off which either party may have against the other party under any other Agreement other than this Agreement.

**(g)**    ***Transfers.***  Section 7 is deleted and replaced in its entirety with the following:

"Party A may, with the prior written consent of Party B and the Trustee, make a transfer of this Agreement to any other entity (but without prejudice to any other right or remedy under this Agreement), *provided that* Party B and the Trustee shall not be entitled to withhold their consent if (1) upon, or as a result of, such transfer taking place Party B would not be required to pay an additional amount and the transferee would not be required to deduct or withhold on account of any Tax unless the Transferee is subject to a gross-up obligation, (2) any proposed transferee of Party A would  enter  into  documentation  identical  (or,  subject  to  the  Trustee'  consent, substantially identical) to this Agreement and the documents executed in connection

17

with this Agreement, (3) no Termination Event or Event of Default would occur as a direct result of such transfer, (4) each of S&P and Fitch has confirmed that such transfer would not result in a downgrade of the then current ratings of the Notes (5) S&P has assigned a rating of the short-term, unsecured and unsubordinated debt obligations of the transferee (or its successor) or any credit support provider from time to time in respect of transferee, of not lower than A-1 and (6) the transferee is an Eligible Replacement.

(h)     **Limited Recourse.**    Notwithstanding other provisions of this Agreement, the obligation of Party B to make any payment under this Agreement will be limited in accordance with the Priority of Payments and the Deed of Charge.

(i)     **Non-Petition Covenant.**  The provisions of Clauses 6.1 and 6.2 of the Deed of Charge will apply mutatis mutandis to this Agreement.

(j)     **Interpretation.** Reference in this Agreement to the parties hereto or to Party A or Party B shall (for the avoidance of doubt) include, where appropriate, any permitted successor or assign thereof.

(k)     **Limited Transactions.** The parties agree that no Transactions shall be entered into under this Agreement, other than the Fixed/Floating Swap Transaction and the BBR Swap Transaction (together the "Limited Transactions").

(l)     **Benefit of Agreement.**   Any legal entity into which Party A is merged or converted or any legal entity resulting from any merger or conversion to which Party A is a party shall, to the extent permitted by applicable law, be a party to this Agreement in place of Party A without further act or formality.

(m)     **Additional Representations.**  Section 3 is hereby amended by adding at the end thereof the following sub-paragraphs:

"(g)     It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(h)     It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise)."

(n)     **Relationship between the Parties.**  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction) as follows:

(i)     **Non Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into that transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that

information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    **(ii)**    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    **(iii)**    *Status of Parties.* The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

**(o)**    *Consent to Recording.* Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties in connection with this Agreement or the Transaction; (ii) agrees to give notice to such personnel of it that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on the ground that consent was not properly given.

**(p)**    *Rights of Third Parties.* A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, *provided that* this shall not affect any rights of any third party which may be granted in respect of this Agreement pursuant to the terms of the Deed of Charge.

**(q)**    *Definitions*

    **(i)**    This Agreement, each Confirmation, and each Transaction are subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. as amended, supplemented, updated, restated, and superseded from time to time (collectively the "**Definitions**"), and will be governed in all respects by the Definitions. The Definitions, as so modified are incorporated by reference in, and made part of, this Agreement and the Confirmation as if set forth in full in this Agreement and the Confirmation.

    **(ii)**    Words and expressions defined in the master definitions schedule set out in Schedule 1 (*Master Definitions Schedule*) of the Master Securitisation Agreement dated on or about [    ] (the "**Master Definitions Schedule**") between, among others, Party A and Party B, will, unless otherwise defined in this Agreement or as the context otherwise requires, have the same meaning in this Agreement. In the event of any inconsistency between the definitions in this Agreement and in the Master Definitions Schedule, the definitions in this Agreement will prevail. The rules of interpretation set out in the Master Definitions Schedule will apply to this Agreement.

**(r)**    *Counterparts*

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

19

(s)    **Calculations**

Notwithstanding Section 6 of this Agreement, so long as Party A is (A) the Affected Party in respect of an Additional Termination Event or a Tax Event Upon Merger or (B) the Defaulting Party in respect of any Event of Default, paragraphs (i) to (vi) below shall apply:

(i)    The definition of "Market Quotation" shall be deleted in its entirety and replaced with the following:

"**Market Quotation**" means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) for an amount that would be paid to Party B (expressed as a negative number) or by Party B (expressed as a positive number) in consideration of an agreement between Party B and such Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transactions or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that Date, (2) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included and (3) made in respect of a Replacement Transaction with terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions). The party making the determination (or its agent) will request each Reference Market-maker to provide its Firm Offer to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after receiving such request. The day and time as of which those Firm Offers are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and after consulting with the other."

(ii)    The definition of "Reference Market-makers" shall be deleted in its entirety and replaced with the following:

"**Reference Market-makers**" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers that are Eligible Replacements and (b) to the extent practicable, from among such dealers having an office in the same city.

(iii) The definition of "Settlement Amount" shall be deleted in its entirety and replaced with the following:

"**Settlement Amount**" means, with respect to any Early Termination Date, an amount (as determined by Party B) equal to the Termination Currency Equivalent of the amount (whether positive or negative) of any Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions that is accepted by Party B so as to become legally binding, Provided that:

(1)    If, on the day falling ten Local Business Days after the day on which the Early Termination Date is designated or such later day as Party B may specify in writing to Party

20

A (but in either case no later than the Early Termination Date) (such day the "Latest Settlement Amount Determination Day"), no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions has been accepted by Party B so as to become legally binding and one or more Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal the Termination Currency Equivalent of the amount (whether positive or negative) of the Market Quotation which is most beneficial to Party A in determining the Settlement Amount ; and

(2)    if, on the Latest Settlement Amount Determination Day, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by Party B so as to become legally binding and no Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal Party B's Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

(iv)    For the purpose of paragraph (4) of the definition of Market Quotation, Party B shall determine in its sole discretion, acting in a commercially reasonable manner, whether a Firm Offer is made in respect of a Replacement Transaction with terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions).

(iv)    At any time on or before the Latest Settlement Amount Determination Day at which two or more Market Quotations remain capable of becoming legally binding upon acceptance, Party B shall be entitled to accept only the Firm Offer which is most beneficial to Party A in determining the Settlement Amount.

(v)    If Party B requests Party A in writing to obtain Market Quotations, Party A shall use its reasonable efforts to do so before the Latest Settlement Amount Determination Day.

(vi)    If the Settlement Amount is a negative number, Section 6(e)(i)(3) of this Agreement shall be deleted in its entirety and replaced with the following:

"**Second Method and Market Quotation**". If Second Method and Market Quotation apply, (1) Party B shall pay to Party A an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions, (2) Party B shall pay to Party A the Termination Currency Equivalent of the Unpaid Amounts owing to Party A and (3) Party A shall pay to Party B the Termination Currency Equivalent of the Unpaid Amounts owing to Party B, Provided that, (i) the amounts payable under (2) and (3) shall be subject to netting in accordance with Section 2(c) of this Agreement and (ii) notwithstanding any other provision of this Agreement, any amount payable by Party A under (3) shall not be netted-off against any amount payable by Party B under (1)."

(t)    *Moody's Notifications*

Notwithstanding any other provision of this Agreement, this Agreement shall not be amended, no Early Termination Date shall be effectively designated by Party B, and

21

no transfer of any rights or obligations under this Agreement shall be made (other than a transfer of all of Party A's rights and obligations with respect to this Agreement in accordance with Part 5(p)(ii) above) unless Moody's has been given prior written notice of such amendment, designation or transfer.

IN WITNESS WHEREOF the parties have executed this Schedule on the respective dates specified below with effect from the date specified on the first page of this document.


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: *R. Sandilands*

Name: **Richard Sandilands**

Title: **Authorised Signatory**

Date:


EUROSAIL-UK 2007-2NP PLC

By: ...................................

Name: **Wilmington Trust SP Services (London) Limited**

Title:

Date:

23

# EXHIBIT A

## TO SCHEDULE

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and EUROSAIL-UK 2007-2NP PLC ("Party B") have entered into a Master Agreement dated as of 29 March 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: 

Name:    James J. Killerlane III

Title:    Vice President

Date:    29 March 2007

**EXHIBIT C**

Execution version

# CREDIT SUPPORT ANNEX

to the Schedule to the
ISDA Master Agreement

dated as of 28 February 2007
between

| | | |
|---|---|---|
| **Lehman Brothers Special Financing Inc.** ("Party A") | And | **Eurosail-UK 2007-1NC PLC** ("Party B") |

### BNY Corporate Trustee Services Limited

## Paragraph 11. Elections and Variables

(a)     **Base Currency and Eligible Currency.**

    (i)     **"Base Currency"** means Pounds Sterling.

    (ii)    **"Eligible Currency"** means the Base Currency and each other currency specified here: Euro.

(b)     **Credit Support Obligations.**

    (i)      **Delivery Amount, Return Amount and Credit Support Amount.**

        (A)  **"Delivery Amount"** has the meaning specified in Paragraph 2(a), as amended (I) by deleting the words "upon a demand made by the Transferee on or promptly following a Valuation Date" and inserting in lieu thereof the words "not later than the close of business on each Valuation Date" and (II) by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

The "**Delivery Amount**" applicable to the Transferor for any Valuation Date will equal the greatest of:

(1) the amount by which (a) the Credit Support Amount (calculated according to the Fitch Criteria) for such Valuation Date exceeds (b) the Value (determined using the Valuation Percentages set out in Appendix A under "Fitch Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date);

(2) the amount by which (a) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date exceeds (b) the Value (determined using the applicable Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date); and

(3) the amount by which (a) the Credit Support Amount (calculated according to the S&P Criteria) for such Valuation Date exceeds (b) the Value (determined using the Valuation Percentages set out in Appendix A under "Standard & Poor's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date).

Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(a) shall be calculated using the applicable Valuation Percentages for the rating agency whose criteria have resulted in the greatest amount under (1) and (2) above.

(B) "Return Amount" has the meaning as specified in Paragraph 2(b), as amended by deleting in its entirety the sentence beginning "Unless otherwise specified in Paragraph 11(b)" and inserting in lieu thereof the following:

The "**Return Amount**" applicable to the Transferee for any Valuation Date will equal the least of:

(1) the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Fitch Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to the Fitch Criteria) for such Valuation Date,

(2) the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Moody's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after

such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to Moody's Criteria) for such Valuation Date; and

    (3)  the amount by which (a) the Value (determined using the Valuation Percentages set out in Appendix A under "Standard & Poor's Eligible Credit Support") as of such Valuation Date of the Transferor's Credit Support Balance (adjusted to include any prior Delivery Amount and to exclude any prior Return Amount, the transfer of which, in each case, has not yet been completed and for which the relevant Settlement Day falls on or after such Valuation Date) exceeds (b) the Credit Support Amount (calculated according to the S&P Criteria) for such Valuation Date

Provided that, in respect of any Valuation Date, the Value of the Eligible Credit Support to be transferred under Paragraph 2(b) shall be calculated using the applicable Valuation Percentages for the rating agency whose criteria have resulted in the lowest amount under (1) and (2) above.

(C)  **"Credit Support Amount"** has the meaning specified under the relevant definition of Ratings Criteria.

(ii)    **Eligible Credit Support**. Eligible Credit Support and the applicable Valuation Percentages are indicated in Appendix.

(iii)   **Thresholds.**

    (A)  **"Independent Amount"** means, with respect to Party A and Party B, zero.

    (B)  **"Threshold"** means, for Party A: infinity, provided that for so long as No Relevant Entity has the First Trigger Required Ratings and (i) at least 30 Local Business days have elapsed since the last time its ratings ceased to be equivalent to the First Trigger Required Ratings or (ii) no Relevant Entity has had the First Trigger Required Ratings since this Annex was executed, the Threshold with respect to Party A shall be zero.

    **"Threshold"** means, with respect to Party B: infinity.

    (C)  **"Minimum Transfer Amount"** means, with respect to Party A and Party B: GBP 100,000.

(D) **"Rounding"**. The Delivery Amount will be rounded up to the nearest integral multiple of GBP 10,000 and the Return Amount will be rounded down to the nearest integral multiple of GBP 10,000.

(c) **Valuation and Timing.**

    (i)    **"Valuation Agent"** means, Party A in all circumstances.

    (ii)    **"Valuation Date"** means each Local Business Day.

    (iii)    **"Valuation Time"** means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, provided that the calculations of Value and Credit Support Amount will, as far as practicable, be made as of approximately the same time on the same date.

    (iv)    **"Notification Time"** means by 4:00 p.m., London time, on a Local Business Day.

(d) **Exchange Date.** "Exchange Date" has the meaning specified in paragraph 3(c)(ii).

(e) **Dispute Resolution.**

    (i)    **"Resolution Time"** means 4:00 p.m., London, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 4.

    (ii)    **"Value"**. For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), on any date the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated as follows:

        (A)    with respect to any Eligible Credit Support or Equivalent Credit Support comprising securities (**"Securities"**) the Base Currency Equivalent of the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the

Transferor pursuant to Paragraph 5(c)(ii) or included in the applicable price referred to in subparagraph (a) above) as of such date; and

(B)     with respect to any Cash, the Base Currency Equivalent of the amount thereof.

(iii)    "**Alternative**". The provisions of Paragraph 4 will apply.

(f)    **Distribution and Interest Amount**.

(i)    *Interest Rate*. The "*Interest Rate*" will be the weighted average rate of interest earned by the Transferee in respect of the portion of the Credit Support Balance comprised of cash.

(ii)    "*Transfer of Interest Amount*". The transfer of the Interest Amount will be made on the second Local Business Day following the end of each calendar month and on any other Local Business Day on which Equivalent Credit Support in the form of cash is transferred to the Transferor pursuant to Paragraph 2(b), in each case to the extent that a Delivery Amount would not be created or increased by that transfer, *provided* that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest.

(iii)    "*Alternative to Interest Amount*". The provisions of Paragraph 5(c)(ii) will apply.

(iv)    "*Distributions*" means, with respect to any Eligible Credit Support comprised in the Credit Support Balance consisting of securities, all principal, interest and other payments and distributions of cash or other property received by the Transferee from time to time.

(v)    "*Distribution Date*" means, with respect to any Eligible Credit Support comprised in the Credit Support Balance other than cash, each date on which Distributions are received by the Transferee or, if that date is not a Local Business Day, the next following Local Business Day.

(vi)    "*Interest Amount*" The definition of "Interest Amount" shall be deleted and replaced with the following:

"*Interest Amount*" means, with respect to an Interest Period and each portion of the Credit Support Balance comprised of cash in an Eligible Currency, the sum of the amounts of interest determined for each relevant currency and calculated for each day in that Interest Period by the Valuation Agent by reference to the following calculation:

(x)    the amount of such currency comprised in the Credit Support Balance at the close of business for general dealings in such currency on such day

(or, if such day is not a Local Business Day, on the immediately preceding Local Business Day); *multiplied by*

(y) the relevant Interest Rate for that day; divided by

(z) 365 (or in the case of any currency other than Pounds Sterling, 360).

(g) **Addresses for Transfers**.

Party A: To be notified to Party B by Party A at the time of the request for the transfer.

Party B: To be notifies to Party A by Party B upon request by Party A.

(h) **Other Provisions**.

(i) *Transfer Timing*

The final paragraph of Paragraph 3(a) shall be deleted and replaced with the following:

"Subject to Paragraph 4, and unless otherwise specified, any transfer of Eligible Credit Support or Equivalent Credit Support (whether by the Transferor pursuant to Paragraph 2(a) or by the Transferee pursuant to Paragraph 2(b)) shall be made not later than the close of business on the Settlement Day, provided that, in the case of any transfer of Equivalent Credit Support by the Transferee pursuant to Paragraph 2(b), if the demand for the transfer of Equivalent Credit Support is received by the Transferee after the Notification Time, then such transfer will be made not later than the close of business on the Settlement Day relating to the day after such demand is received."

(ii) *Early Termination*

The heading for Paragraph 6 shall be deleted and replaced with "Early Termination" and the following shall be added after the word "Default" in the first line of Paragraph 6, "in relation to all Transactions or a Termination Event in relation to all Transactions".

(iii) *Costs of Transfer on Exchange*

Notwithstanding Paragraph 8, the Transferor will be responsible for, and will reimburse the Transferee for, all transfer and other taxes and other costs involved in the transfer of Eligible Credit Support either from the Transferor to the Transferee or from the Transferee to the Transferor pursuant to Paragraph 3(c).

(iv) *Cumulative Rights*

The rights, powers and remedies of the Transferee under this Annex shall be in addition to all rights, powers and remedies given to the Transferee by the Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Transferee in the Credit Support Balance created pursuant to this Annex.

(v)     *Single Transferor and Single Transferee*

For the avoidance of doubt Party A shall always be the Transferor and Party B shall always be the Transferee.

(vi)    *Ratings Criteria*

"**Ratings Criteria**" means, the criteria used by S&P published on 17 December 2003 entitled "Standard & Poor's Global Interest Rate and Swap Counterparty Rating Criteria Expanded" and the criteria published on 26 February 2004 entitled "Global Interest Rate and Currency Swaps: Calculating the Collateral Required Amount" ("**S&P Criteria**"), the criteria used by Fitch published on 13 September 2004 and entitled "Counterparty Risk in Structured Finance Transactions: Swap Criteria" ("**Fitch Criteria**") and the criteria used by Moody's ("**Moody's Criteria**") each as specified below for the purposes of determining the amount of Eligible Credit Support that Party A is required to transfer hereunder .

*Moody's Criteria*:

"**Credit Support Amount**" shall be calculated in accordance with the meaning specified in Paragraph 10 provided however that the words "**Transferee's Exposure**" shall be replaced by the words "**Additional Collateral Amount**". For such purposes "**Additional Collateral Amount**" means with respect to the Transferor on a Valuation Date:

(i)     for as long as (1) the Second Rating Trigger Requirements do not apply; or (2) less than 30 Local Business Days have elapsed since the last time the Second Trigger Required Ratings did not apply, an amount equal to the greater of (a) zero and (b) the sum of the Transferee's Exposure and the aggregate of Moody's First Trigger Additional Collateralized Amounts for each Transaction; and

(ii)    for as long as the Second Rating Trigger Requirements do apply and 30 or more Local Business Days have elapsed since the Second Trigger Required Ratings did not apply, an amount equal to the greater of (a) zero, (b) the aggregate amount of the next payments due to be paid by Party A under all Transactions and (c) the sum of the Transferee's Exposure and the aggregate of Moody's Second Trigger Additional Collateralized Amounts for each Transaction.

**"Moody's First Trigger Additional Collateralized Amount"** means, with respect to any Transaction, the lesser of (x) the product of 15 and DV01 for such Transaction and (y) the product of 0.02 and the Notional Amount for such Transaction.

**"Moody's Second Trigger Additional Collateralized Amount"** means:

(A)    with respect to any Transaction that is not a Transaction-Specific Hedge, the lesser of (x) the product of 50 and DV01 for such Transaction and (y) the product of 8% and the Notional Amount for such Transaction; and

(B)    with respect to any Transaction that is a Transaction-Specific Hedge, the lesser of (x) the product of 65 and DV01 for such Transaction and (y) the product of 10% and the Notional Amount for such Transaction.

**"DV01"** means, with respect to a Transaction and any date of determination, the sum of the estimated change in the Secured Party's Exposure with respect to such Transaction that would result from a one basis point change in the relevant swap curve on such date, as determined by the Valuation Agent in good faith and in a commercially reasonable manner. The Valuation Agent shall, upon request of Party B, provide to Party B a statement showing in reasonable detail such calculation.

**"Transaction-Specific Hedge"** means any Transaction that is an interest rate cap, interest rate floor or interest rate swaption, or an interest rate swap in respect of which (x) the notional amount of the interest rate swap is "balance guaranteed" or (y) the notional amount of the interest rate swap for any Calculation Period otherwise is not a specific dollar amount that is fixed at the inception of the Transaction.

Party A will, upon receipt of reasonable notice from Moody's (which, for the avoidance of doubt, will be no less than 30 calendar days), demonstrate to Moody's the calculation by Party A of the Transferee's Exposure.


*S&P Criteria:*

**"Credit Support Amount"** shall mean, with respect to a Transferor on a Valuation Date, zero provided that upon the occurrence of an Initial S&P Rating Event or a Subsequent S&P Rating Event (as each are defined in the Schedule) which arises pursuant to an S&P rating, the Credit Support Amount shall mean such sum as may be agreed between Party A and S&P or, failing such agreement, an amount which shall be determined on a basis which is no more onerous than the S&P Criteria as amended from time to time, or any other applicable criteria which enable entities rated lower than a specified level to participate in structured finance transactions which, through collateralisation, are rated at a higher level. For the avoidance of doubt the Credit Support Amount shall not be required to exceed such amount as would be required (in accordance with the S&P Criteria) to maintain or restore the rating of the Notes by S&P at or to the level they would have been at immediately prior to the relevant Rating Downgrade. For the further avoidance of doubt the over-collateralisation shall be

determined as being VB x 0.1 x the average notional amount over the remaining life of swap, where the VB is determined with reference to the remaining life of the equivalent swap).

***Fitch Criteria:***

**"Credit Support Amount"** shall mean, with respect to a Transferor on a Valuation Date, the greater of zero and (1) an amount equal to the sum of (a) the product of A and the net mark-to-market value of the outstanding Transactions on such Valuation Date determined by Party A in good faith from time to time, and (b) the product of B and the sum of the Notional Amounts (as defined in the Confirmation for each relevant Transaction and as determined by the Calculation Agent with respect to such Valuation Date, taking into account the amortising nature (if relevant) of such Notional Amounts), minus (2) Party A's Threshold, where :

**"A"** means 100% and **"B"** means the **"Volatility Cushion"** (as determined by the Calculation Agent in accordance with the table set out in Appendix 2 to the article entitled "Counterparty Risk in Structured Finance Transactions: Swap Criteria" published by Fitch in September 2004 in the Fitch Criteria) calculated on the basis that the weighted average life of the outstanding Transactions is to be determined by reference to the time remaining (in years) from such Valuation Date until the Termination Date (as defined in the Confirmation relating to the relevant Transaction) of the relevant Transaction only.

(vii)     ***Additional Definitions***

"**Rating Agencies**" means S&P, Fitch and Moody's (each a "Rating Agency").

(viii) ***Demands and Notices***

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice:

(A)     shall be given to or made at the following addresses:

If to Party A:

Name:     Lehman Brothers Special Financing Inc.
          c/o Lehman Brothers Inc.
          Transaction Management
          745 Seventh Avenue, 28th Floor
          New York, New York 10019

Telephone:   +44 (0) 207 011 7376
Facsimile:   +44 (0) 207 260 1266

with a copy to:

Address:      Lehman Brothers Holdings Inc.
              399 Park Avenue
              11ᵗʰ Floor
              New York, New York 10022

Attention:    Corporate Counsel
Facsimile:    + 1 212 520 0176

with a copy to:

Address:      Lehman Brothers International (Europe)
              25 Bank Street
              London
              E14 5LE

Attention:    Legal/Transaction Management
Telephone:    +44 (0) 207 011 7376
Facsimile:    +44 (0) 207 260 1266

If to Party B:

Name:         Eurosail-UK 2007-1NC PLC
              c/o Capstone (Treasury)
              6 Broadgate
              London EC2M 2QS

Facsimile:    020 7920 1314
Attention:    Head of Finance

**LEHMAN BROTHERS SPECIAL**          **EUROSAIL-UK 2007-1NC PLC**
**FINANCING INC.**

..........................................          ........................................

LEHMAN BROTHERS SPECIAL
FINANCING INC.

*R. Sandilands.*

(Name of Party)

**Richard Sandilands**
By:    .....Authorised Signatory....

Name:
Title:
Date:

EUROSAIL-UK 2007-2NC PLC

...........................................

(Name of Party)

**Wilmington Trust SP Services (London) Limited**

By:    ...........................................

Name:
Title:
Date:

# APPENDIX A

## Moody's Eligible Credit Support

| INSTRUMENT | FIRST TRIGGER<br><br>Posting Daily | SECOND TRIGGER<br><br>Posting Daily |
|---|---|---|
| Sterling Cash | 100% | 100% |
| EURO Cash | 99% | 97% |
| U.S. Dollar Cash | 98% | 95% |
| Fixed-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department with Remaining Maturity | | |
| < 1 Year | 98% | 95% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 92% |
| 5 to 7 years | 98% | 91% |
| 7 to 10 years | 98% | 89% |
| 10 to 20 years | 98% | 86% |
| > 20 years | 98% | 84% |
| Floating-Rate Negotiable Treasury Debt Issued by the U.S. Treasury Department | | |
| All Maturities | 98% | 94% |
| Fixed-Rate U.S. Agency Debentures with Remaining Maturity | | |
| < 1 Year | 98% | 94% |
| 1 to 2 years | 98% | 94% |
| 2 to 3 years | 98% | 93% |
| 3 to 5 years | 98% | 91% |
| 5 to 7 years | 98% | 90% |
| 7 to 10 years | 98% | 88% |
| 10 to 20 years | 98% | 85% |
| > 20 years | 98% | 83% |
| Floating-Rate U.S. Agency Debentures | | |
| All Maturities | 98% | 93% |

| Fixed-Rate Euro-Zone Government Bonds Rated **Aa3** or Above with Remaining Maturity | | |
|---|---|---|
| < 1 Year | 99% | 97% |
| 1 to 2 years | 99% | 96% |
| 2 to 3 years | 99% | 95% |
| 3 to 5 years | 99% | 93% |
| 5 to 7 years | 99% | 92% |
| 7 to 10 years | 99% | 91% |
| 10 to 20 years | 99% | 86% |
| > 20 years | 99% | 84% |
| Floating-Rate Euro-Zone Government Bonds Rated **Aa3** or Above | | |
| All Maturities | 99% | 96% |
| Fixed-Rate United Kingdom Gilts with Remaining Maturity | | |
| < 1 Year | 100% | 99% |
| 1 to 2 years | 100% | 98% |
| 2 to 3 years | 100% | 97% |
| 3 to 5 years | 100% | 96% |
| 5 to 7 years | 100% | 95% |
| 7 to 10 years | 100% | 94% |
| 10 to 20 years | 100% | 90% |
| > 20 years | 100% | 88% |
| Floating-Rate United Kingdom Gilts | | |
| All Maturities | 100% | 99% |
| All other instruments | 0% or such higher percentage in respect of which Moody's has provided a written ratings affirmation | 0% or such higher percentage in respect of which Moody's has provided a written ratings affirmation |

For the purpose of the above table, (I) the column headed "First Trigger" shall apply for as long as (1) the Second Rating Trigger Requirements do not apply; or (2) less than 30 Local Business Days have elapsed since the last time the Second Trigger Required Ratings did not apply and (II) the column headed "Second Trigger" shall apply for as long as the Second Rating Trigger Requirements do apply and 30 or more Local Business Days have elapsed since the Second Trigger Required Ratings did not apply.

## Fitch Eligible Credit Support

|  | Eligible Credit Support | Fitch | Valuation Percentage by rating of the Notes assuming no Ratings Downgrade has occurred | | | |
|---|---|---|---|---|---|---|
|  |  |  | AAA/ Aaa | AA/ Aa2 | A/A2 | BBB/ Baa2 |
| (A) | cash in the Eligible Currency | | 100% | 100% | 100% | 100% |
| (B) | Negotiable Debt Obligations (as defined below) issued by the Government of the United Kingdom having a remaining time to maturity of not more than one year; | | 98.00% | 99.00% | 99.00% | 99.00% |
| (C) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to maturity of more than one year but not more than 3 years; | | 96.00% | 97.30% | 97.50% | 97.70% |
| (D) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to maturity of more than 3 years but not more than 5 years; | | 94.50% | 96.00% | 96.90% | 97.10% |
| (E) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to maturity of more than 5 years but not more than 7 years; | | 93.00% | 95.00% | 96.20% | 96.40% |
| (F) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to maturity of more than 7 years but not more than 10 years; | | 92.00% | 94.00% | 95.00% | 96.00% |
| (G) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to maturity of more than 10 but not more than 15 years; | | 89.00% | 93.00% | 94.00% | 95.00% |
| (H) | Negotiable Debt Obligations issued by the Government of the United Kingdom having a remaining time to | | | | | |

| Eligible Credit Support | Fitch | Valuation Percentage by rating of the Notes assuming no Ratings Downgrade has occurred | | | |
|---|---|---|---|---|---|
| | | AAA/ Aaa | AA/ Aa2 | A/A2 | BBB/ Baa2 |
| maturity of more than 15 years; | | | | | |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| (I) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of not more than one year; | | 98.50% | 99.00% | 99.00% | 99.00% |
| (J) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than one but not more than 3 years; | | 96.50% | 97.30% | 97.60% | 97.70% |
| (K) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than 3 but not more than 5 years; | | 94.50% | 96.00% | 96.90% | 97.10% |
| (L) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than 5 but not more than 7 years; | | 93.00% | 95.00% | 96.00% | 96.40% |
| (M) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than 7 but not more than 10 years; | | 92.00% | 94.00% | 95.00% | 96.00% |
| (N) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than 10 but not more than 15 years; | | 90.00% | 93.00% | 94.00% | 95.00% |
| (O) | Negotiable Debt Obligations issued by the Government of the United States of America having a maturity at issuance of more than 15 years; | | | | | |
| (P) | Such other credit support as agreed between Party A and the Rating | Such Valuation Percentage as agreed between Party A and the Rating Agency from time to time in respect of such | | | | |

| | | Valuation Percentage by rating of the Notes assuming no Ratings Downgrade has occurred | | | |
|---|---|---|---|---|---|
| **Eligible Credit Support** | **Fitch** | **AAA/ Aaa** | **AA/ Aa2** | **A/A2** | **BBB/ Baa2** |
| Agencies from time to time. | | Eligible Credit Support. | | | |

For the purposes of this Annex, "Negotiable Debt Obligation" shall mean a debt obligation in a stated principal amount with a non-variable fixed maturity, which cannot be redeemed by its issuer before its maturity nor put to the issuer for redemption before its maturity. It must bear interest on its stated principal amount at a non-variable fixed rated until maturity (or, in the case of an obligation with an original maturity of less than one year, bear no interest at all).

**Standard & Poor's Eligible Credit Support**

With respect to the calculation of the Credit Support Amount in accordance with the S&P Criteria set out below, the Valuation Percentages in respect of Eligible Credit Support shall be as agreed between Party A , Party B and S&P from time to time (other than in respect of Eligible Credit Support in the form of Cash, for which the Valuation Percentage shall be 100%).

**EXHIBIT D**

# LEHMAN BROTHERS

**Eurosail-UK 2007-2NP PLC**

29  March 2007

### BBR Swap Confirmation

Our reference:

The purpose of this communication (the "**Confirmation**") is to confirm the terms and conditions of the transaction entered into between Lehman Brothers Special Financing Inc. ("**LBSF**" or "**Party A**") and Eurosail-UK 2007-2NP PLC (the "**Counterparty**" or "**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a binding agreement between us as to the terms of the Transaction.   This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below.

This Confirmation supplements, forms a part of and is subject to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) dated as of 29 March 2007 (the "**Agreement**") between Party A and Party B.  All provisions contained in or incorporated by reference into the Agreement upon its execution shall govern this Confirmation except as expressly modified below.

Lehman Brothers Europe Limited ("**LBEL**") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

The definitions and provisions contained in the 2000 ISDA Definitions, incorporating the June 2000 Version of the Annex, as amended and supplemented as at the date of this Confirmation (as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**")) (the "**Definitions**") are incorporated into this Confirmation.  In the event of any inconsistency between the Definitions and the provisions of this Confirmation, this Confirmation will govern.  References herein to a "**Transaction**" shall be deemed references to a "**Swap Transaction**" for the purposes of the Definitions.   Capitalised terms and expressions used in this Confirmation shall have the meanings ascribed to them herein (or by reference hereto) including in the paragraph headed "**Additional Definitions**" below or where not so defined shall have the meanings ascribed to them in the Agreement.

Each party hereto represents and warrants to the other party hereto that, in connection with the Transaction (i) it is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of that Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction, (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction, it is also capable of assuming, and assumes, the risks of that Transaction, and (iii) the other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General terms applicable to Party A and Party B:**

| | |
|---|---|
| Trade Date: | 29 March 2007 |
| Effective Date: | 29 March 2007 |
| Termination Date: | The earlier of 13 March 2045 and the Period End Date upon which the Principal Amount Outstanding of the Class E1c Notes is reduced to zero, subject to adjustment in accordance with the Following Business Day Convention. |
| Notional Amount: | BBR Linked Performing Balance. |
| Period End Dates: | The 13 day of March, June, September and December in each year, commencing with and including 13 June 2007, adjusted. |
| Business Days: | Any day (other than a Saturday or a Sunday) on which banks are generally open for business in New York and London and on which the Trans-European Automated Real-time Gross settlement Express Transfer System ("**TARGET**") (or any successor thereto) is open. |
| Calculation Agent: | Lehman Brothers Special Financing Inc. |

**Floating Amounts I (applicable to Party A only)**

| | |
|---|---|
| Floating Rate I Payer: | Party A |
| Floating Rate I Payer Payment Dates: | The 13 day of March, June, September and December in each year, commencing with and including 13 June 2007 subject, in each case, to |

|  | adjustment in accordance with the Following Business Day Convention. |
|---|---|
| Floating Rate I: | Three-month GBP LIBOR |
| Designated Maturity: | 3 months, except for the initial Calculation Period which shall be the Linear Interpolation of 3 months and 4 months. |
| Reset Date: | First Business Day of each Calculation Period. |
| Floating Rate I Day Count Fraction: | Actual/365 (fixed). |

## Floating Amounts II (applicable to Party B only)

| Floating Rate II Payer: | Party B |
|---|---|
| Floating Rate II Payer Payment Dates: | The 13 day of March, June, September and December in each year, commencing with and including 13 June 2007 subject, in each case, to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate II: | Weighted Average BBR Rate + 0.185% |
| Floating Rate II Day Count Fraction: | Actual/365 (fixed). |

## Account Details

| Payments to Party A in GBP should be made to: | Correspondent Bank, Citibank, London |
|---|---|
| Sort Code: | 18-50-08 |
| BIC Code: | CITIGB2L |
| Account of: | Lehman Brothers Holdings Inc., (SLHIUS3X) |
| Account No: | GB56CITI18500800066427 |
| Fav: | Lehman Brothers Special Financing Inc. (SLHIUS3S) |
| Payments to Party B in GBP should be made to: | Danske Bank A/S, London Branch |
| Account: | Eurosail-UK 2007-2NP plc |

| | |
|---|---|
| Account Number: | 22002651 |
| Sort Code: | 30-12-81 |

**Offices**

Party A                    Address for Notices:

c/o 25 Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE.

Party B                    Address for Notices:

Eurosail-UK 2007-2NP PLC
c/o Capstone (Treasury)
6 Broadgate
London  EC2M 2QS

Attention:    Head of Finance
Telephone:  020 7920 1314
Fax:             020 7920 1314

**Other Provisions**

Payments on Early Termination

For the purpose of Section 6(e), notwithstanding anything to the contrary in the Agreement, Loss will apply.

Notification Requirements

No later than 4 Business Days prior to each the end of each Period End Date, Party B will procure the Cash/Bond Administrator, as defined in the Prospectus, to notify the Calculation Agent of the BBR Linked Performing Balance of the BBR Linked Loans and the Average BBR Rate. The Calculation Agent shall then use this BBR Linked Performance Balance of the BBR Linked Loans to calculate the BBR Notional Amount for that Calculation Period.   If such notification is not received by that time, the Calculation Agent shall use the BBR Linked Performing Balance of the BBR Linked Loans and the Average BBR Rate received for the previous Calculation Period.

**Additional Definitions**

**"Average BBR Rate"**          As per the Prospectus.

| | |
|---|---|
| **"Class [E1c] Notes"** | As per the Prospectus. |
| **"BBR Linked Performing Balance"** | As per the Prospectus. |
| **"Prospectus"** | means the prospectus of Party B as the Issuer dated on or around 28 March 2007 issued and published in connection with the issue of the Notes. |
| **"Notes"** | As per the Prospectus. |
| **"Three-month GBP LIBOR"** | the Rate of Interest (as defined in Condition 4(c) of the Prospectus) for Sterling Notes (as defined in the Prospectus). |

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.

.................................................
duly authorised
for and on behalf of **Lehman Brothers Special Financing Inc.**

.................................................
duly authorised
for and on behalf of
**Eurosail-UK 2007- 2NP PLC**

| | |
|---|---|
| **"Notes"** | As per the Prospectus. |
| **"Three-month GBP LIBOR"** | the Rate of Interest (as defined in Condition 4(c) of the Prospectus) for Sterling Notes (as defined in the Prospectus). |

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.

*R. Sandilands*

**Robin Baker**
**Director**

duly authorised
for and on behalf of **Lehman Brothers Special Financing Inc.**

duly authorised
for and on behalf of
**Eurosail-UK 2007- 2NP PLC**

5

# LEHMAN BROTHERS

**Eurosail-UK 2007-2NP PLC**

29 March 2007

**Interest Rate Swap Confirmation**

Our reference:

The purpose of this communication (the "**Confirmation**") is to confirm the terms and conditions of the transaction entered into between Lehman Brothers Special Financing Inc. ("**LBSF**" or "**Party A**") and Eurosail-UK 2007-2NP PLC (the "**Counterparty**" or "**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below.

This Confirmation supplements, forms a part of and is subject to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) dated as of 29 March 2007 (the "**Agreement**") between Party A and Party B. All provisions contained in or incorporated by reference into the Agreement upon its execution shall govern this Confirmation except as expressly modified below.

Lehman Brothers Europe Limited ("**LBEL**") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

The definitions and provisions contained in the 2000 ISDA Definitions, incorporating the June 2000 Version of the Annex, as amended and supplemented as at the date of this Confirmation (as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**")) (the "**Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the provisions of this Confirmation, this Confirmation will govern. References herein to a "**Transaction**" shall be deemed references to a "**Swap Transaction**" for the purposes of the Definitions. Capitalised terms and expressions used in this Confirmation shall have the meanings ascribed to them herein (or by reference hereto) including in the paragraph headed "**Additional Definitions**" below or where not so defined shall have the meanings ascribed to them in the Agreement.

Each party hereto represents and warrants to the other party hereto that, in connection with the Transaction (i) it is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party

as investment advice or as recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of that Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction, (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction, it is also capable of assuming, and assumes, the risks of that Transaction, and (iii) the other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General terms applicable to Party A and Party B:**

| | |
|---|---|
| Trade Date: | 29 March 2007 |
| Effective Date: | 13 June 2007 |
| Termination Date: | The earlier of 13 June 2011 and the Period End Date upon which the Principal Amount Outstanding of the Class E1c Notes is reduced to zero, subject to adjustment in accordance with the Following Business Day Convention. |
| Notional Amount: | Performing Balance of Fixed Rate Loans. |
| Period End Dates: | The 13 day of March, June, September and December in each year, commencing with and including 13 September 2007, adjusted. |
| Business Days: | Any day (other than a Saturday or a Sunday) on which banks are generally open for business in New York and London and on which the Trans-European Automated Real-time Gross settlement Express Transfer System ("**TARGET**") (or any successor thereto) is open. |
| Calculation Agent: | Lehman Brothers Special Financing Inc. |

**Floating Amounts (applicable to Party A only)**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | The 13th day of March, June, September and December in each year, commencing with and including 13 September 2007 subject, in each case, to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | Three-month GBP LIBOR plus the applicable Asset Yield. |

| | |
|---|---|
| Reset Date: | First Business Day of each Calculation Period. |
| Floating Rate Day Count Fraction: | Actual/365 (fixed). |

## Fixed Amounts (applicable to Party B only)

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | The 13th day of March, June, September and December in each year, commencing with and including 13 September 2007 subject, in each case, to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate | Weighted Average Fixed Rate. |
| Fixed Rate Day Count Fraction: | Actual/365 (fixed). |

## Account Details

| | |
|---|---|
| Payments to Party A in GBP should be made to: | Correspondent Bank, Citibank, London |
| Sort Code: | 18-50-08 |
| BIC Code: | CITIGB2L |
| Account of: | Lehman Brothers Holdings Inc., (SLHIUS3X) |
| Account No: | GB56CITI18500800066427 |
| Fav: | Lehman Brothers Special Financing Inc. (SLHIUS3S) |
| Payments to Party B in GBP should be made to: | Danske Bank A/S, London Branch |
| Account: | Eurosail-UK 2007-2NP plc |
| Account Number: | 22002651 |
| Sort Code: | 30-12-81 |

## Offices

| | |
|---|---|
| Party A | Address for Notices: |

996587                                                 3

c/o 25 Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE.

Party B                                Address for Notices:

                                       Eurosail-UK 2007-2NP PLC
                                       c/o Capstone (Treasury)
                                       6 Broadgate
                                       London  EC2M 2QS

                                       Attention:    Head of Finance

                                       Telephone:  020 7920 1314

                                       Fax:         020 7920 1314

## Other Provisions

Payments on Early Termination          For the purpose of Section 6(e), notwithstanding anything to the contrary in the Agreement, Loss will apply.

Notification Requirements:             No later than 4 Business Days prior to the end of each Period End Date, Party B will procure the Cash/Bond Administrator, as defined in the Prospectus, to notify the Calculation Agent of the Performing Balance and the Weighted Average Fixed Rate. The Calculation Agent shall then use the Performing Balance to calculate the Notional Amount for that Calculation Period.  If such notification is not received by that time, the Calculation Agent shall use the Performing Balance and/or (as necessary) the Weighted Average Fixed Rate received for the previous Calculation Period.

## Additional Definitions

**"Asset Yield"**                      As per the Prospectus.

**"Class E1c Notes"**                  As per the Prospectus.

**"Performing Balance"**               As per the Prospectus.

**"Prospectus"**                       means the prospectus of Party B as the Issuer dated on or around 29 March 2007 issued and

|  | published in connection with the issue of the Notes. |
|---|---|
| **"Notes"** | As per the Prospectus. |
| **"Three-month GBP LIBOR"** | the Rate of Interest (as defined in Condition 4(c) of the Prospectus) for Sterling Notes (as defined in the Prospectus). |
| **"Weighted Average Fixed Rate"** | As per the Prospectus. |

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.


......................................................

duly authorised
for and on behalf of **Lehman Brothers
Special Financing Inc.**


......................................................

duly authorised
for and on behalf of
**Eurosail-UK 2007-2NP PLC**

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.

R. Sandilands

duly authorised
for and on behalf of **Lehman Brothers Special Financing Inc.**

duly authorised Wilmington Trust SP Services (London) Limited
for and on behalf of
**Eurosail-UK 2007-2NP PLC**

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 30 April, 2007 |
| To: | Eurosail-UK 2007-2NP PLC |
| | Attention:     Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Europe Limited |
| | Confirmations Group |
| | Facsimile:     (+1) 646-885-9564 (United States of America) |
| | Phone:          (+44) 207-102-7661 (United Kingdom) |
| | E-Mail:          IncomingStructured@lehman.com |

| | |
|---|---|
| Effort Id: | L1332798 |
| Global Id: | 2967560 |

Dear Sir or Madam:

The purpose of this communication (the "**Confirmation**") is to confirm the terms and conditions of the transaction entered into between Lehman Brothers Special Financing Inc. ("**LBSF**" or "**Party A**") and Eurosail-UK 2007-2NP PLC (the "**Counterparty**" or "**Party B**") on the Trade Date specified below (the "**Transaction**"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "**Confirmation**" as referred to in the ISDA Master Agreement specified below.

This Confirmation supplements, forms a part of and is subject to the 1992 ISDA Master Agreement (Multicurrency-Cross Border) dated as of 29 March 2007 (the "**Agreement**") between Party A and Party B. All provisions contained in or incorporated by reference into the Agreement upon its execution shall govern this Confirmation except as expressly modified below.

Lehman Brothers Europe Limited ("**LBEL**") is acting as agent on behalf of Party A for this Transaction. LBEL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. LBEL is regulated by the Financial Services Authority.

The definitions and provisions contained in the 2000 ISDA Definitions, incorporating the June 2000 Version of the Annex, as amended and supplemented as at the date of this Confirmation (as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**")) (the "**Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the provisions of this Confirmation, this Confirmation will govern. References herein to a "**Transaction**" shall be deemed references to a "**Swap Transaction**" for the purposes of the Definitions. Capitalised terms and expressions used in this Confirmation shall have the meanings ascribed to them herein (or by reference hereto) including in the paragraph headed "**Additional Definitions**" below or where not so defined shall have the meanings ascribed to them in the Agreement.

Each party hereto represents and warrants to the other party hereto that, in connection with the Transaction (i) it is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as recommendation to enter

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

into the Transaction, it being understood that information and explanations related to the terms and conditions of that Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction, (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction, it is also capable of assuming, and assumes, the risks of that Transaction, and (iii) the other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General terms applicable to Party A and Party B:**

| | |
|---|---|
| Trade Date: | 29 March 2007 |
| Effective Date: | 13 June 2007 |
| Termination Date: | The earlier of 13 June 2011 and the Period End Date upon which the Principal Amount Outstanding of the Class B1c Notes is reduced to zero, subject to adjustment in accordance with the Following Business Day Convention. |
| Notional Amount: | Performing Balance of Fixed Rate Loans. |
| Period End Dates: | The 13 day of March, June, September and December in each year, commencing with and including 13 September 2007, adjusted. |
| Business Days: | Any day (other than a Saturday or a Sunday) on which banks are generally open for business in New York and London and on which the Trans-European Automated Real-time Gross settlement Express Transfer System ("TARGET") (or any successor thereto) is open. |
| Calculation Agent: | Lehman Brothers Special Financing Inc. |

**Floating Amounts (applicable to Party A only)**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | The 13th day of March, June, September and December in each year, commencing with and including 13 September 2007 subject, in each case, to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate: | Three-month GBP LIBOR plus the applicable Asset Yield. |
| Reset Date: | First Business Day of each Calculation Period. |
| Floating Rate Day Count Fraction: | Actual/365 (fixed). |

Risk ID: 635060L / Effort ID: 1332798 / Global Deal ID: 2967560

**Fixed Amounts (applicable to Party B only)**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | The 13th day of March, June, September and December in each year, commencing with and including 13 September 2007 subject, in each case, to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate | Weighted Average Fixed Rate. |
| Fixed Rate Day Count Fraction: | Actual/365 (fixed). |

**Account Details**

Payments to Party A in GBP should be made to:

| | |
|---|---|
| | Correspondent Bank, Citibank, London |
| Sort Code: | 18-50-08 |
| BIC Code: | CITIGB2L |
| Account of: | Lehman Brothers Holdings Inc., (SLHIUS3X) |
| Account No: | GB56CITI18500800066427 |
| Fav: | Lehman Brothers Special Financing Inc. (SLHIUS3S) |

Payments to Party B in GBP should be made to:

| | |
|---|---|
| | Danske Bank A/S, London Branch |
| Account: | Eurosail-UK 2007-2NP plc |
| Account Number: | 22002651 |
| Sort Code: | 30-12-81 |

**Offices**

| | |
|---|---|
| Party A | Address for Notices: c/o 25 Lehman Brothers International (Europe), 25 Bank Street, London E14 5LE. |
| Party B | Address for Notices: |

Eurosail-UK 2007-2NP PLC
c/o Capstone (Treasury)
6 Broadgate
London EC2M 2QS
Attention:    Head of Finance
Telephone:  020 7920 1314
Fax:            020 7920 1314

**Other Provisions**

| | |
|---|---|
| Payments on Early Termination | For the purpose of Section 6(e), notwithstanding anything to the contrary in the Agreement, Loss will apply. |
| Notification Requirements: | No later than 4 Business Days prior to the end of each Period End Date, Party B will procure the Cash/Bond Administrator, as defined in the Prospectus, to notify the |

Risk ID: 635060L / Effort ID: 1332798 / Global Deal ID: 2967560

Page 3 of 5

Calculation Agent of the Performing Balance and the Weighted Average Fixed Rate. The Calculation Agent shall then use the Performing Balance to calculate the Notional Amount for that Calculation Period. If such notification is not received by that time, the Calculation Agent shall use the Performing Balance and/or (as necessary) the Weighted Average Fixed Rate received for the previous Calculation Period.

| | |
|---|---|
| Additional Payment: | Party B shall pay Party A the sum of GBP 3,748,000.00 on 02 April, 2007 subject to adjustment in accordance with the Following Business Day Convention. |

**Additional Definitions**

| | |
|---|---|
| "Asset Yield" | As per the Prospectus. |
| "Class E1c Notes" | As per the Prospectus. |
| "Performing Balance" | As per the Prospectus. |
| "Prospectus" | means the prospectus of Party B as the Issuer dated on or around 28 March 2007 issued and published in connection with the issue of the Notes. |
| "Notes" | As per the Prospectus. |
| "Three-month GBP LIBOR" | the Rate of Interest (as defined in Condition 4(c) of the Prospectus) for Sterling Notes (as defined in the Prospectus). |
| "Weighted Average Fixed Rate" | As per the Prospectus. |

Risk ID: 635060L / Effort ID: 1332798 / Global Deal ID: 2967560

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.

Yours sincerely,                           Accepted and agreed to:

Lehman Brothers Special Financing Inc.     Eurosail-UK 2007-2NP PLC

R. Sandilands.

                                           By:    _____
                                           Name:
                                           Title:

Please confirm that the foregoing correctly sets forth all of the terms and conditions of our agreement with respect to the Transaction by responding within three Business Days by signing in the space provided below and returning a copy to us.

Yours sincerely,

Lehman Brothers Special Financing Inc.

Accepted and agreed to:

Eurosail-UK 2007-2NP PLC

By: _____
Name: MICHAEL BEAVER
Title: FINANCIAL CONTROLLER

Risk ID: 635060L / Effort ID: 1332798 / Global Deal ID: 2967560