Hearing date and time: December 6, 2011 at 10:00 a.m. (EST)
Response Deadline: November 10, 2011 at 4:00 p.m. (EST)

HARRIS BEACH PLLC
David M. Capriotti, Esq.
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202
Telephone: (315) 423-7100
Facsimile: (315) 422-9331

Attorneys for Claimants
F.F. Thompson Foundation Inc.,
Frederick Ferris Thompson Hospital and
F.F. Thompson Health System, Inc.



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
In re                                         :        Chapter 11 Case No.
                                              :        08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., et al.,        :
                                              :        (Jointly Administered)
                            Debtors.          :
--------------------------------------------------------------x

## RESPONSE TO DEBTORS' NOTICE OF PROPOSED ASSUMPTION OF EXECUTORY CONTRACTS WITH F.F. THOMPSON FOUNDATION INC. AND THE FREDERICK FERRIS THOMPSON HOSPITAL AND OBJECTION TO PLAN SUPPLEMENT

The F.F. Thompson Foundation Inc., the Frederick Ferris Thompson Hospital and

F.F. Thompson Health System, Inc. (collectively "Thompson") through their counsel,

Harris Beach PLLC, respectfully submit this Response to the Debtors' Notice of

Proposed Assumption of Executory Contract and object to the Debtors' Plan Supplement,

and represent to the Court as follows:

1.      On or about October 25, 2011 the Debtors filed a Plan Supplement (the

"Plan Supplement") in connection with the Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (the

5.    Commencing on September 15, 2008, and continuing for some time thereafter, Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated subsidiaries (the "Debtors") filed voluntary cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.    As a result of the bankruptcy filings, and consistent with the express terms of the Agreements, Thompson terminated the derivative transactions with the Debtors and designated October 31, 2008 as the Early Termination Date.

7.    On September 17, 2009, Thompson timely filed four proofs of claim in these cases for damages resulting from the early termination of the derivative contract, as follows:

(i)    F.F. Thompson Foundation Inc. Claim No. 14722; $508,639.58;

(ii)    F.F. Thompson Foundation Inc. Claim No. 14725; $508,639.58;

(iii)    Frederick Ferris Thompson Hospital Claim No. 14723; $508,639.58; and

(iv)    Frederick Ferris Thompson Hospital Claim No. 14724; $508,639.58; (collectively, the "Claims").

## B. THE ADR PROCEDURES

8.    After filing the Claims, Thompson became involved in the Tier 2 alternative dispute resolution procedures for derivative contracts pursuant to this Court's Order dated September 27, 2010 (the "ADR Procedures").

9.    In connection with the ADR Procedures, Thompson provided the Debtors with extensive information and verification of its calculations, and has wholly complied with the required ADR Procedures.  To date, the Debtors have not provided Thompson

with reliable information to contest the amount of the Claims. Instead, the Debtors made a settlement demand seeking $243,873.54 from Thompson in December 2010.

10.     While counsel for Thompson has attempted to proceed with the ADR process, those efforts have not been successful.

## C. THE CLAIMS OBJECTION

11.     On or about July 11, 2011, the Debtors filed a One Hundred Sixty-Third Omnibus Objection to Claims (the "Claims Objection"). Ostensibly, this was Debtor's second attempt at defeating Thompson's valid claim.

12.     In that Objection, the Debtors objected to the Claims, stating that they "have examined the proofs of claim" and "have identified the No Liability Derivatives Claims as claims that should be disallowed and expunged on the basis that they provide no basis of liability as to the Debtors." (See Claims Objection, at ¶¶ 2 and 11).

13.     The Debtors further stated that they "developed and utilized a thorough, multi-step process to review claims filed against the Debtors based on a Derivatives Contract" and have determined that they do not owe any of the Claimants money, including Thompson, and therefore requested that the Court disallow and expunge the Claims. (See Claims Objection, at ¶¶ 13 and 14.)

14.     Thompson filed an extensive Response to the Objection (the "Claims Objection Response"), attaching a copy of the relevant sections of ISDA Master Agreement (the "Derivative Contract") and the Guarantee that provide the underlying contractual basis for the Claims.

15.     The Claims Objection Response also attached the four proofs of claim timely filed by Thompson, along with the documentation attached in support of the

Claims, including a Detailed Statement of Calculation that clearly identified how the amount of the Claims were determined. A copy of the Statement of Calculation is attached hereto as Exhibit "A". In addition, Thompson submitted an Affidavit of Christopher J. Everett, an investment banker and capital advisor, to further describe the process that was used to calculate the amount of the Claims. To date, Debtors have not produced even a scintilla of evidence to refute the evidence submitted in support of the Claims.

16.     In its Claims Objection Response, Thompson argued that, if the Debtors had properly raised a dispute regarding the liability or amount of the Claims, those issues can be resolved by this Court after expert testimony and an evidentiary hearing. However, since the Debtors had not even met their evidentiary burden to rebut the validity of the Claims, Thompson requested that the Claims Objection be overruled and denied in its entirety.

17.     Instead of moving forward toward a resolution of the Claims Objection that remains pending before the Court, the Debtors have unilaterally and repeatedly adjourned the hearings. The next hearing date is November 30, 2011.

## II. ARGUMENT

### A. THE ASSUMPTION NOTICE AND PROPOSED CURE AMOUNT

18.     Having failed at two attempts to get rid of Thompson's Claims and apparently wanting to avoid bringing those pending contested matters to a conclusion, the Debtors have now decided they will take a third "bite at the apple" to seek to have Thompson's Claims eliminated through the Contract Assumption process.

19.    Without any justification for the $0 Proposed Cure Amount, the Debtors have elected to move forward (in a back door attempt) to have the Claims reduced to zero ($0), with the hope that Thompson does not object.  The approval of the Proposed Cure Amount would, in essence, eliminate the Proofs of Claim and prevent Thompson from seeking to recover its damages.

20.    Moreover, that Assumption would presumably allow the Debtors to continue in their attempt to recover of $243,873.54 from Thompson.

21.    The Assumption Notice itself is less than clear about exactly what the Debtors are trying to accomplish.  The Notice provides that the contract will be assumed to "the extent not already rejected by Court order or expired by its own terms."

22.    Upon information and belief, the Debtors have never taken the position that the Contract was not properly terminated under its terms – in fact – the Debtors have acknowledged that they received the Early Termination Notice on November 3, 2008 and have taken the position that Thompson owes the Debtors over $200,000 as a result of the Early Termination.   At no point have the Debtors stated the Agreements were not properly terminated.

## B.  THE AGREEMENTS WERE PROPERLY TERMINATED

23.    It is well-established that section 560 of the Bankruptcy Code permits a counter-party to a derivatives contract, such as the Agreements here, to terminate the contract post-petition, based, *inter alia*, on the *ipso facto* provision contained in the contract notwithstanding the existence of the automatic stay.  See 11 U.S.C. §560; In re Enron Corp., 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) (stating that the right to

terminate a swap agreement arises "only from defaults first triggered because of one of the otherwise proscribed ipso facto provisions").

24.     Specifically, section 560 of the Bankruptcy Code provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, <u>termination,</u> or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. §560 (emphasis added).

25.     Thompson's basis for termination was consistent with the requirements of section 560, in that the reason for termination was the fact that the Debtors had filed the bankruptcy cases. A copy of the Termination Notice is attached hereto as Exhibit "B".

26.     Given that the Debtors have had ample opportunity to challenge Thompson's termination of the Agreements, but have not done so, they are estopped from challenging the termination at this point, notwithstanding the exhaustive reservations that are contained throughout the Debtors' pleadings.

## C.  <u>THE AGREEMENTS ARE NOT EXECUTORY AND THEREFORE ARE NOT ASSUMABLE</u>

27.     Because the Agreements are terminated, they are not executory and therefore are not subject to assumption and cure.

28.     There is no question that the Second Circuit characterizes executory contracts as those "on which performance remains due to some extent on both sides." <u>Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services Limited (In re Lehman Bros. Holdings Inc.)</u>, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010) (citations omitted).

29.    Similarly, pursuant to section 365 of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a) (emphasis added).

30.    Case law holds, where the Agreements are terminated, there is no obligation on either party to the Agreements to perform so that the Agreements are not executory, and therefore, are not subject to assumption pursuant to section 365(a).

31.    It has been held that "[i]t is axiomatic that before 11 U.S.C. §365 can apply a contract must exist. If a contract has expired by its own terms then there is nothing left to assume or reject." Texscan Corp. v. Commercial Union Ins. Cos. (In re Texscan Corp.), 107 B.R. 227, 230 (B.A.P. 9th Cir. 1989).

32.    Similarly, where a contract or lease is terminated, it is no longer executory and cannot be assumed. See Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir.); cert. denied, 469 U.S. 982 (1984); Georgia Heritage Associates, LP v. Westfields Apartments, LLC (In re Westfields Apartments, LLC), 2010 WL 2179622, at * 4 (Bankr. S.D. Ga. 2010).

33.    Thus, it is clear that there is no executory contract for the Debtors to assume so that the Plan Supplement must be modified to remove Thompson, and the proposed assumption of Thompson's Agreements must be denied.

### D.    ASSUMING ASSUMPTION IS POSSIBLE – THE CURE AMOUNT EXCEEDS $500,000

34.    Assuming, *arguendo*, that it is still possible to assume the Derivative Contract with Thompson, the Debtors must cure the outstanding amounts prior to the contract being assumed. 11 U.S.C. § 365(b)(1)(A). The Debtors have provided absolutely no evidence that the Proposed Cure Amount is $0, whereas Thompson has

filed its Claims with supporting documentation evidencing the existing damages of $508,639.58.

35.     However, even if the Debtors were to pay the $508,639.58 to make Thompson "whole" under the Termination, upon information and belief, the Debtors have ceased its participation in this type of activity, therefore, they would not be able to perform under Derivative Contract or honor their obligations as required.

36.     Moreover, the Assumption Notice curiously provides that the proposed Assumption is: "without prejudice to the Debtor's rights to claim that the Contract expired by its own terms or was terminated prior to the effective date of the assumption", which is exactly what occurred here. Assumption Notice, p. 2, fn 2.   It appears that the primary purpose of the Assumption Notice and Plan Supplement is to attempt to somehow avoid Thompson's Claims that resulted from the termination, but to also preserve the Debtors' alleged claims that purportedly arise from the same termination. Clearly such a result is not equitable and should not be allowed in this case.

37.     Thompson has invested significant resources in participating in the ADR procedures, responding to the Claims Objection, and now responding to the Assumption Notice. The Debtors have made three (3) different attempts to expunge the Claims without making any efforts to reach the substance of the dispute.

38.     Thompson remains ready and willing to engage in further discussions with the Debtors regarding the allowance of these Claims.   In the alternative, Thompson respectfully requests that this Court conduct an evidentiary hearing to have the Court determine that the Agreements cannot be assumed, or in the alternative, to establish the amount of the Claims and/or "Cure Amount."

## III. CONCLUSION

39.     As mentioned above, Debtors have attempted to avoid the adjudication of Thompson's claims and are now trying to have those Claims established at $0 through the Proposed Cure Amount contained in the Assumption Notice.  The Debtors have wholly failed to provide any basis in support of the position that the terminated Agreements are assumable or to support their disagreement with the computation of the Proposed Cure Amount.  The Debtors have simply not sustained their burden of proof, and their request for relief should be denied in its entirety.

40.     Nothing contained herein shall be deemed to be a waiver by Thompson of any rights it may have under applicable law and Thompson reserves its right to amend and supplement this Response, and to object or otherwise respond to additional pleadings on any grounds outlined herein and any other grounds available.

41.     Thompson further reserves its rights with respect to the treatment of the Agreements under any plan of reorganization or plan of liquidation proposed in connection with these cases, including but not limited to, the right to further dispute the treatment of the Agreement as an executory contract.

WHEREFORE, Claimants respectfully request that the Court issue an Order denying the Debtors' request to approve the assumption of the Agreements and the Proposed Cure Amount as set forth herein, and granting such other and further relief as to the Court may seem just and proper.

Dated: November 9, 2011
      Syracuse, New York

David M. Capriotti, Esq.
Lee E. Woodard, Esq.
HARRIS BEACH PLLC
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202
Telephone: (315) 423-7100
Facsimile: (315) 422-9331

Attorneys for Claimants
F.F. Thompson Foundation Inc.,
Frederick Ferris Thompson Hospital and
F.F. Thompson Health System, Inc.

060108 1689189v2

# EXHIBIT "A"

## ANNEX D

## STATEMENT OF CALCULATION

1) On or about, September 14, 2008, Holdings filed a voluntary petition for Chapter 11 reorganization with the U.S. Bankruptcy Court for the Southern District of New York. As a result of an Event of Default with respect to Party A resulting from the above mentioned filings by Holdings, all derivatives transactions entered into by Party B with Party A were terminated as prescribed by the Agreement. Party B designated October 31, 2008, as the Early Termination Date.

2) Party B retained Cain Brothers to schedule a competitive bid process for a new interest rate swap to replace the Terminated Transaction with Party A.

3) The method of calculating damages under the Agreement is Second Method, Market Quotation. Thus, the amount payable with respect to the Early Termination Date is equal to the absolute value of (a) the sum of the Settlement Amount and the Unpaid Amounts owing to Party B less (b) the Unpaid Amounts owing to Party A.

4) To comply with the requirements of the Agreement, Party B sent bid requests, including the related Confirmation and ISDA documents, along with credit material to the following dealers, each of whom qualified under the definition of "Reference Market-maker" in Section 12 of the Agreement and the terms of Part 1(h) of the Schedule to the Agreement: Bank of America, Citigroup, Deutsche Bank, JPMorgan, Key Bank, Morgan Stanley, and Wells Fargo.

5) Seven bids were solicited and two bids were received. On October 31, 2008, Party B received actionable bids from Deutsche Bank and Morgan Stanley for the replacement of the Terminated Transaction. However, Morgan Stanley's bid was disregarded as a quotation as it removed the $1,000,000 cap on Party B's Credit Support Amount and therefore did not preserve the economics of the Terminated Transaction.

6) Because Party B did not receive three qualifying actionable bids for the replacement swap, a Market Quotation could not be determined. Therefore, under Section 12 of the Agreement, the Settlement Amount for the transaction is Party B's Loss, that is, the amount Party B determines in good faith to be its total losses and costs in connection with the termination, including the cost of reestablishing any hedge. Party B may determine its Loss by reference to quotations from one or more dealers.

7) Please see below for a summary of the one qualifying actionable quotation Party B received along with the accrued interest through October 31, 2008, the Early Termination Date.

| | |
|---|---|
| Deutsche Bank Bid (Payable to Party B) | $(103,000.00) |
| Plus: Accrued Interest: | (11,433.80) |
| Total: | $(114,433.80) |

8) Party B declares the amount of the Deutsche Bank response to be a fair reflection of market value on the Early Termination Date. Accordingly, in accordance with the terms of the Agreement, Party B has calculated the Loss (without reference to Unpaid Amounts) to be $(114,433.80).

9) Pursuant to Section 2(a)(iii) of the Agreement, Party B withheld its October 3, 2008 payment amount of $18,880.07. This amount equals an Unpaid Amount to Party A.

10)    The Payment on Early Termination payable by Party B to Party A is $133,313.87 calculated as:

| | |
|---|---|
| Loss Amount | $(114,433.80) |
| Plus:  Unpaid Amount owing to Party B | 0.00 |
| Less:  Unpaid Amount owing to Party A | 18,880.07 |
| Payment on Early Termination | $(133,313.87) |

11)    Pursuant to Sections 6(e) and 9 of the Agreement, Party B estimates that its legal fees incurred by reason of the Event of Default and termination of the Transaction ("Reimbursable Expenses) will be $5,000.00. The Net Amount Payable is therefore $128,313.87, calculated as:

| | |
|---|---|
| Payment on Early Termination | $133,313.87 |
| Less: Reimbursable Expenses | 5,000.00 |
| Net Amount Payable: | $128,313.87 |

12)    Pursuant to Section 6(d)(ii) the Net Amount Payable, together with interest thereon from (and including) the Early Termination Date to (but excluding) the date such amount is paid, is due on the effective date of this notice. Such interest amount is calculated at the Default Rate, which is defined as USD LIBOR-BBA (with a Designated Maturity of one month) plus 1.00%. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. In accordance with these provisions, and based on a payment date of November 7, 2008, Party B has calculated the total Balance Owing payable by Party B to Party A, including interest, as $128,394.53.

| Date | Beginning Balance | Default Rate | Ending Balance |
|---|---|---|---|
| 10/31/2008 | $128,313.87 | 3.58125% | $128,326.43 |
| 11/1/2008 | $128,326.43 | 3.58125% | $128,338.98 |
| 11/2/2008 | $128,338.98 | 3.58125% | $128,351.54 |
| 11/3/2008 | $128,351.54 | 3.35750% | $128,363.31 |
| 11/4/2008 | $128,363.31 | 3.17750% | $128,374.46 |
| 11/5/2008 | $128,374.46 | 2.95625% | $128,384.83 |
| 11/6/2008 | $128,384.83 | 2.76750% | $128,394.53 |

13)    As of the date of this notice, Party A had failed to transfer the following Posted Collateral and Interest Amount to Party B as prescribed under Paragraph 8(b)(iii) of the Agreement (the "Collateral"):

| CUSIP | Description | Coupon | Maturity Date | Quantity | Principal Value | Accrued Interest | Cash Equivalent Value |
|---|---|---|---|---|---|---|---|
| 912810DX3 | US Treasury | 7.500% | 11/15/2016 | 50,000 | $60,720.42 | $1,752.72 | $62,473.14 |
| 9128276J6 | US Treasury | 5.750% | 8/15/2010 | 50,000 | 53,867.33 | 625.00 | 54,492.33 |
| 9128276T4 | US Treasury | 5.000% | 2/15/2011 | 50,000 | 54,078.21 | 543.48 | 54,621.69 |
| 9128277L0 | US Treasury | 4.875% | 2/15/2012 | 20,000 | 21,915.72 | 211.96 | 22,127.68 |
| 912828BH2 | US Treasury | 4.250% | 8/15/2013 | 35,000 | 37,510.18 | 323.37 | 37,833.55 |
| 9128275G3 | US Treasury | 5.500% | 5/15/2009 | 130,000 | 132,965.34 | 3,341.85 | 136,307.19 |
| | US Dollars | | | 268,782 | 268,782.00 | 396.53 | 269,178.53 |
| **Total** | | | | | $629,839.20 | $7,194.91 | $637,034.11 |

14)   Pursuant to Paragraph 8(b)(iv)(A) of Exhibit G of the Schedule of the Agreement, Party B hereby elects to set-off the Balance Owing against the Collateral resulting in a Net Balance Owing of $0.00 and a remaining Collateral amount of $508,649.28 (the "Remaining Collateral"), calculated as:

|                            |              |
|----------------------------|-------------:|
| Collateral                 | $637,034.11  |
| Less: Balance Owing to Party A | 128,394.53 |
| Remaining Collateral:      | $508,639.58  |

15)   The Remaining Collateral is hereby identified as follows:

| CUSIP | Description | Coupon | Maturity Date | Quantity | Principal Value | Accrued Interest | Cash Equivalent Value |
|-------|-------------|--------|---------------|----------|-----------------|------------------|-----------------------|
| 912810DX3 | US Treasury | 7.500% | 11/15/2016 | 50,000 | $60,720.42 | $1,752.72 | $62,473.14 |
| 9128276J6 | US Treasury | 5.750% | 8/15/2010 | 50,000 | 53,867.33 | 625.00 | 54,492.33 |
| 9128276T4 | US Treasury | 5.000% | 2/15/2011 | 50,000 | 54,078.21 | 543.48 | 54,621.69 |
| 9128277L0 | US Treasury | 4.875% | 2/15/2012 | 20,000 | 21,915.72 | 211.96 | 22,127.68 |
| 912828BH2 | US Treasury | 4.250% | 8/15/2013 | 35,000 | 37,510.18 | 323.37 | 37,833.55 |
| 9128275G3 | US Treasury | 5.500% | 5/15/2009 | 130,000 | 132,965.34 | 3,341.85 | 136,307.19 |
|  | US Dollars |  |  | 140,784 | 140,784.00 | 0.00 | 140,784.00 |
| **Total** |  |  |  |  | $501,841.20 | $6,798.38 | $508,639.58 |

# EXHIBIT "B"

# **Thompson**health

350 Parrish Street
Canandaigua, New York 14424
585-396-6000
Fax: 585-396-6534
www.thompsonhealth.com

## System Executive Office

Date:     October 31, 2008

To:       Lehman Brothers Special Financing Inc.
          745 Seventh Avenue, 5th Floor, New York, NY 10019
          Attention: Municipal Financial Products – Middle Office

          Allyson Carine – Senior Vice President
          Capital Markets Contracts – Legal
          Lehman Brothers
          1271 Avenue of the Americas, 43rd Floor
          New York, NY 10020

From:     The Frederick Ferris Thompson Hospital
          350 Parrish Street, Canandaigua, NY 14424
          Chief Financial Officer

### Termination Notice

Dear Sir or Madam:

Reference is made to that certain ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("Party A") and FF Thompson ("Party B") dated as of August 14, 2003 (together with the Schedule thereto, all annexes thereto and the Confirmation of the Transaction outstanding thereunder, the "Agreement"). Capitalized terms used and not defined below have the meanings given in the Agreement.

Following (i) the Event of Default Notice dated as of October 14, 2008 (the "Default Notice") attached hereto as Annex A and (ii) the Consent to Reference Market-maker Notice dated as of October 27, 2008 (the "Reference Market-maker Notice") attached hereto as Annex B, with respect to the bankruptcy of Party A and the bankruptcy of Party A's Credit Support Provider, Lehman Brothers Holdings Inc., which each constituted and continue to constitute an Event of Default under Section 5(a)(vii) of the Agreement with Party A as the Defaulting Party, Party B hereby notifies you of the following:

1) Pursuant to Section 6(a) of the Agreement, Party B hereby designates October 31, 2008 as the Early Termination Date in respect of the Transaction.

2) The Settlement Amount payable in connection with the designation of the Early Termination Date will be determined by Party B, as the Non-Defaulting Party, in

FF Thompson Hospital, Inc.  •  M M Ewing Continuing Care Center  •  F.F. Thompson Foundation, Inc.  •  FF Thompson Incorporated
and subsidiary Community Care Network, Inc.  •  Ontario County Advanced Life Support, Inc.  •  FFT Senior Communities, Inc.

accordance with the terms of the Agreement, including the terms outlined in Section 6(e)(i)(3) of the Agreement and in Part 1(h) of the Schedule to the Agreement.

3) Party B, as the Non-defaulting Party, has identified the following dealers as "Reference Market-makers", each of which qualifies under the definition of "Reference Market-makers" in Section 12 of the Agreement:

    a. Bank of America
    b. Citigroup
    c. Deutsche Bank
    d. JP Morgan
    e. Key Bank
    f. Morgan Stanley
    g. Wells Fargo

4) Party B will solicit quotations for the Transaction from the Reference Market-makers on or as soon as reasonably practicable after the Early Termination Date, in accordance with the Market Quotation payment measure set forth in the Agreement.

5) Party B will determine the Settlement Amount in accordance with Section 6(e)(i)(3) of the Agreement and will provide Party A with a statement of any amount payable by Party A or Party B, as the case may be. The payment date for the Settlement Amount will be two Local Business Days after the Early Termination Date.

6) Please note that pursuant to Section 9 of the Agreement, Party B will, in due course, be claiming an indemnity (whether by set-off or otherwise) for its reasonable out-of-pocket expenses, including without limitation, legal fees, incurred by reason of the enforcement and protection of Party B's rights under the Agreement and/or by reason of the early termination of the Transaction.

We thank you for your cooperation and we look forward to working with you on completing the above process in a timely manner. Nothing contained herein or related hereto shall be deemed to waive, limit or alter any of our rights, claims or causes of action under applicable law, the Agreement, any related documents or any matter related thereto. All such rights, claims and causes of action are hereby reserved.

Sincerely,

Deborah K. Weymouth, FACHE
Executive VP/CFO, Thompson Health
COO, F.F. Thompson Hospital