**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Lehman Brothers Holdings Inc.** | **Case No. 08-13555-jmp** |
| **Debtor.** | |

-------------------------------------------------------x

| | |
|---|---|
| **The Carabetta Organization, Ltd.,** | |
| **Plaintiff,** | **Adversary Proceeding** |
| | **No. 11-** |
| **-against-** | |
| | **COMPLAINT** |
| **Lehman Brothers Holdings Inc., and** | |
| **LB Summit Ridge 300 Schraffts Road, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

-------------------------------------------------------x

The Carabetta Organization, Ltd., ("TCO", or the "Plaintiff"), by its attorneys, the Law Offices of David Carlebach, Esq., as and for its complaint against Lehman Brothers Holdings Inc. (the "Debtor") and LB Summit Ridge 300 Schraffts Road, LLC ("LB Summit") (collectively, the "Defendants"), alleges upon information and belief as follows:

**Parties**

1.  The Plaintiff is a Delaware state corporation with an office at 200 Pratt Street, Meriden, CT 06450.

2.  Upon information and belief, the Debtor is a Delaware state corporation with an office at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

3.      Upon information and belief, LB Summit is a Delaware state Limited Liability Company with an office at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

**Jurisdiction and Venue**

4.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 105(a) 1334. Consideration of this adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157. Venue is proper before this Court pursuant to 28 U.S.C. §1409(a). Plaintiff has standing to bring this proceeding as a party in interest under 11 U.S.C. § 1109(b).

**Nature of This Adversary Proceeding**

5.      As will be set forth in detail below, the Plaintiff requires the Court to grant it equitable and injunctive relief against LB Summit and the Debtor to avoid a loss to the Debtor's creditors by way of the flawed and fraudulent bidding procedure implemented by LB Summit and the Debtor in connection with the sale of the property known as Summit Ridge Apartments, 300 Schrafftes Drive, Waterbury, CT (the "Property").

6.      In particular, LB Summit is ready to sell the Property, which was put up for sale purportedly via a sealed bid process, to a lower bidder for the sole reason that the real estate broker involved is a friend of the lower bidder. The Debtor, who is in full control of the sale process, has approved the sale to go forward, despite having knowledge of the flawed and fraudulent bidding process, and that the sale to the lower bidder will yield less proceeds to the Debtor's creditors.

7. Thus, the Court should enjoin the Defendants from taking any further steps in connection with selling the Property to the lower bidder, and order the Defendants to accept the Plaintiff's higher and superior bid and sell the Property to the Plaintiff or the entity the Plaintiff will form for the purpose of purchasing the Property.

8. The Debtor's and LB Summit's malicious conduct, in which they are attempting to do an end-run around the fiduciary duties imposed by the Bankruptcy Code by way of this flawed and fraudulent sale procedures, warrants severe punitive damages in the amount of at least $100,000,000.00.

## STATEMENT OF FACTS

9. On September 15, 2008, the Debtor filed a voluntary Chapter 11 petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Manhattan Division).

10. LB Summit is the owner of the Property.

11. LB Summit is a subsidiary of the Debtor, and, as set forth herein, the Debtor controls LB Summit and the sale of the Property.

12. The Property is a 64- unit apartment community built on 5+ acres.

13. In or around October 2011, LB Summit put the Property up for sale. Grubb & Ellis Company ("G & E") was the exclusive real estate agent.

14. Although not being sold pursuant to a bankruptcy court order, the sale of the Property is related to the Debtor's Chapter 11 case, since the proceeds of the sale will be used for the benefit of the creditors. Indeed, the Debtor's Third Amended Plan of Reorganization (the "Plan")

contemplates the orderly liquidation of the Debtor's commercial real estate assets for the benefit of creditors.

15. The Property was put up for sale purportedly via a sealed bid auction process. However, as set forth below, the actual bidding process is not over, and immediate judicial intervention is necessary to avoid a loss to the creditors of the estate via the flawed and fraudulent sale procedure.

16. On or around October 6, 2011, TCO offered a bid on the Property to Patrick Bisceglia of G & E for the amount of $2,715,760.00.

17. Shortly thereafter, on October 12, 2011, TCO inspected the Property.

18. At that time, TCO discussed with Mr. Bisceglia the bid amount which would ensure that TCO would be the successful bidder.

19. Mr. Bisceglia responded that a bid of $3 million would ensure TCO as the successful bidder.

20. On the spot, TCO bid $3 million. Mr. Bisceglia acknowledged and accepted the bid at that time. In addition, at that time, TCO told Mr. Bisceglia and another man that was accompanying him that TCO would match any other bid, and that TCO will give LB Summit the highest and best bid. TCO further said that Joe Carabetta, the founder of TCO, is "Mr. Connecticut", that he is capable of closing this deal, and that he need not look any further for a buyer.

21. TCO also e-mailed the bid in writing to Mr. Bisceglia on that date.

22. Thereafter, TCO was in contact with Mr. Bisceglia concerning finalizing the deal.

23. On November 1, 2011, Mr. Bisceglia advised TCO that he had received a "better offer" from another bidder, and that they had already sent a contract out to this lower bidder.

24. Mr. Bisceglia advised TCO that this "better offer" was actually a bid in the amount of $3,050,000.

25. TCO responded with a bid of $3.2 million.

26. However, Mr. Bisceglia advised TCO that, although this "better offer" was actually an amount less than TCO's bid, LB Summit would accept the lower bid anyway.

27. On the phone, Mr. Bisceglia told TCO that the lower bidder was a friend of his and that this lower bidder assured him that he will beg borrow and steal to make the deal happen. It was clear that, at this time, it was questionable whether this lower bidder even had the financial capability to close.

28. TCO responded to Mr. Bisceglia by reminding him that TCO would have no problem closing on its higher bid of $3.2 million, and that it made no sense to entertain his friend's bid for two simple reason. First, because it was a lower bid, and, second, it was questionable whether his friend was even capable of closing.

29. Mr. Bisceglia responded that the lower bidder was his friend, and that he would have LB Summit accept this lower bid, and that he (Mr. Bisceglia) would do everything he could to ensure that his friend gets the Property for his lower bid.

30. In e-mail correspondence with Mr. Bisceglia, Mr. Bisceglia acknowledged TCO's previous bid of $3.2 million, but was only using it as a backstop if the sale to the lower bidder did not work out.

31. Notably, as evidenced by Mr. Bisceglia's actions, the bidding process never closed, and it is not over until there is a signed contract.

32. Shortly thereafter, TCO's counsel contacted Debtor's counsel explaining the above flawed and fraudulent bidding process. TCO's counsel made Debtor's counsel aware that the Property was not being sold to the highest bidder, to the detriment of the Debtor's estate and creditors.

33. On November 9, 2011, TCO's counsel followed up these communications with an e-mail to Mr. Bisceglia, which was cc'd to Debtor's counsel, once again reiterating the fraudulent bidding process, and putting the Debtor on notice that TCO would seek injunctive relief from the Court to prevent the fraud.

34. On November 10, 2011, the Debtor's counsel responded to this e-mail and advised TCO's counsel that it would allow LB Summit to proceed with the sale of the Property to the lower bidder. This e-mail was nothing more that a rubber stamp on the fraud being perpetrated by the Debtor, G & E and LB Summit.

35. TCO's counsel responded by once again reiterating the clear fraud being perpetrated on the Court, the estate, and its creditors, and putting them on notice of the instant application.

36. The communications with Debtor's counsel evidences that the Debtor, in reality is in control of the sale of the Property, and that the Property is, defacto, property of the estate. Furthermore, the proceeds of the eventual sale of the Property - which will be controlled by the Debtor and used for the benefit of creditors - will be property of the estate as well.

37. G & E has advised TCO that they have delivered a proposed contract to the lower bidder, but, upon information and belief, the contract has not yet been executed, nor is it yet binding.

38. TCO has demonstrated that enjoining LB Summit and/or the Debtor from selling the Property to the lower bidder is necessary to avoid and vitiate the fraud and egregious breach of fiduciary duty being perpetrated against the estate and its creditors. The Court must stop the flawed and fraudulent bidding process for the Property - which the Debtor controls - to avoid the loss to the estate and its creditors. As set forth extensively herein, TCO requires the injunctive relief requested, as the Debtor is attempting to do an end-run around its obligations under the provisions of the Bankruptcy Code to maximize the estate for the creditors, by having LB Summit implement and carry out bidding procedures for the Property which are clearly improper. The Court must stop the sale of the Property to the lower bidder, and ultimately order that the Property be sold to TCO to implement the purpose of the Bankruptcy Code.

39. Moreover, and more significantly, based on public information, the Debtor has in excess of $15 billion of commercial real estate that it seeks to liquidate pursuant to the Plan for the benefit of creditors. The liquidation of a significant portion of that real estate will be done in similar fashion to the Property, without the safeguards inherent in the sale procedures of Section 363 of the Bankruptcy Code. In light of the flagrant cronyism and disregard of its fiduciary obligations displayed here by the Debtor one can only surmise that similar abuses may occur if the Court does not intervene. Needless to say, there is a manifest public interest in ensuring the integrity of the liquidation of this estate.

**FIRST CLAIM FOR RELIEF**

40. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 39 of the complaint, as if fully set forth herein.

41. LB Summit seeks to sell the Property to a lower bidder. Enjoining LB Summit from taking any further steps to sell the Property to this lower bidder is necessary to avoid and vitiate the fraud being perpetrated against the estate and its creditors.

42. Furthermore, because real estate is unique, the opportunity to purchase certain real property is unique as well. Should LB Summit sell the Property to the lower bidder, TCO will have lost this unique business opportunity, and this would render any subsequent rulings in favor of TCO in this proceeding moot.

43. Accordingly, selling the Property to the lower bidder would irreparably harm the Plaintiff.

44. Plaintiff does not have an adequate remedy at law.

45. Based on the foregoing, the Court should enter a judgment in Plaintiff's favor and enter an order enjoining LB Summit from taking any further steps to sell the Property to the lower bidder.

## SECOND CLAIM FOR RELIEF

46. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 of the complaint, as if fully set forth herein.

47. LB Summit is a subsidiary of the Debtor and the Debtor controls LB Summit and the sale of the Property.

48. The Debtor seeks to sell the Property to a lower bidder. Enjoining the Debtor from taking any further steps to sell the Property to this lower bidder is necessary to avoid and vitiate the fraud being perpetrated against the estate and its creditors.

49. Furthermore, because real estate is unique, the opportunity to purchase certain real property is unique as well. Should the Debtor sell the Property to the lower bidder, TCO will have lost this unique business opportunity, and this would render any subsequent rulings in favor of TCO in this proceeding moot.

50. Selling the property to the lower bidder would irreparably harm the Plaintiff.

51. Plaintiff does not have an adequate remedy at law.

52. Based on the foregoing, the Court should enter judgment in Plaintiff's favor and enter an order enjoining the Debtor from taking any further steps to sell the Property to the lower bidder.

### THIRD CLAIM FOR RELIEF

53. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 52 of the complaint, as if fully set forth herein.

54. As previously mentioned, an opportunity to purchase certain real property is a unique endeavor. Should the Debtor sell the Property to the lower bidder, TCO will have lost this unique business opportunity.

55. LB Summit, under the control of the Debtor, has implemented a flawed and inherently unfair bidding process for the Property clearly designed to favor certain potential purchasers, but not designed to generate the most proceeds. Such a sale would irreparably harm TCO.

9

56. Plaintiff does not have an adequate remedy at law.

57. Based on the foregoing, the Court should enter a judgment in Plaintiff's favor and enter an order compelling LB Summit to sell the property to the Plaintiff or the entity the Plaintiff will form for the purpose of purchasing the Property.

## FOURTH CLAIM FOR RELIEF

58. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57 of the complaint, as if fully set forth herein.

59. LB Summit is a subsidiary of the Debtor and the Debtor controls LB Summit and the sale of the Property

60. LB Summit, under the control of the Debtor, has implemented a flawed and inherently unfair bidding process for the Property clearly designed to favor certain potential purchasers, but not designed to generate the most proceeds. Such a sale would irreparably harm TCO.

61. Plaintiff does not have an adequate remedy at law.

62. The Court should enter a judgment in Plaintiff's favor and enter an order compelling the Debtor to sell, and/or cause LB Summit to sell, the Property to the Plaintiff or the entity the Plaintiff will form for the purpose of purchasing the Property.

## FIFTH CLAIM FOR RELIEF

63. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62 of the complaint, as if fully set forth herein

64. As set forth above, the sale of the Property is controlled by the Debtor and the proceeds of the sale will go to the benefit of the estate and its creditors. Thus, the Property is, defacto, property of the estate.

65. Based on the foregoing, the sale of the Property should be subject to approval by the Bankruptcy Court, pursuant to 11 U.S.C. § 105(a), even though the Property is being sold outside of a bankruptcy plan.

66. As also set forth above, the sale of the Property through the flawed and fraudulent bidding process, to the lower bidder, would cause a substantial loss to the estate and its creditors.

67. Plaintiff does not have an adequate remedy at law.

68. Accordingly, the Court should enter a judgment vitiating any and all steps taken by the Debtor and/or LB Summit to sell the Property to the lower bidder, including cancelling the sale in the event that the Debtor and/or LB Summit have already closed on the sale of the Property.

## SIXTH CLAIM FOR RELIEF

69. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 of the complaint, as if fully set forth herein.

70. The Debtor seeks to liquidate certain commercial real estate, including the Property, without the safeguards inherent in the sale procedures of Section 363 of the Bankruptcy Code. In

11

light of the flagrant cronyism and disregard of its fiduciary obligations displayed here by the Debtor, one can only surmise that similar abuses may occur if the Court does not intervene.

71. Such misconduct - which is a severe breach of the Debtor's fiduciary duty being perpetrated by way of LB Summit - merits severe punitive damages in the amount of at least $100,000,000.00.

**WHEREFORE,** this Court should grant judgment in favor of the Plaintiff as follows:

a. For the First Claim for Relief, a preliminary injunction, enjoining LB Summit from taking any further steps to sell the Property to the lower bidder;

b. For the Second Claim for Relief, a preliminary injunction, enjoining the Debtor from taking any further steps to sell the Property to the lower bidder;

c. For the Third Claim for Relief, enter an order compelling LB Summit to sell the Property to the Plaintiff or the entity the Plaintiff will form for the purpose of purchasing the Property;

d. For the Fourth Claim for Relief, enter an order compelling the Debtor to sell, and/or cause LB Summit to sell, the Property to the Plaintiff or the entity the Plaintiff will form for the purpose of purchasing the Property;

e. For the Fifth Claim for Relief, to enter a judgment vitiating any and all steps taken by the Debtor and/or LB Summit to sell the Property to the lower bidder, including cancelling the sale in the event that the Debtor and/or LB Summit have already closed on the sale of the Property.

    f.      For the Sixth Claim for Relief, punitive damages against Defendants in the amount of at least $100,000,000.00; and

    g.      Granting such other, further and different relief as may be just and proper under the circumstances.

Dated: New York, New York
November 22, 2011

**THE LAW OFFICES OF DAVID CARLEBACH, ESQ.**
Attorneys for Plaintiff The Carabetta Organization, Ltd.

By:    <u>s/David Carlebach, Esq. (DC-7350)</u>
David Carlebach, Esq. (DC-7350)
40 Exchange Place
New York, New York 10005
Tel. No.: (212) 785-3041