EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS<br>HOLDINGS, INC., et al.,<br><br>             Debtors | Case No. 08-13555<br><br>Chapter 11<br><br>Jointly Administered |

## NOTICE OF PARTIAL TRANSFER OF
## CLAIM PURSUANT TO RULE 3001(e)

PLEASE TAKE NOTICE that $4,000,000.00 of or an undivided 32.971% ownership interest in the claim set forth below (the "Transferred Claim"), of Highland Credit Strategies Master Fund, L.P. ("Assignor") filed as an original or amended Proof of Claim against the Debtor(s):

| Proof of Claim<br>Amount | Proof of Claim<br>No. |
|---|---|
| 12,132,000 | 13206 |

has been transferred and assigned to Citigroup Financial Products Inc. ("Assignee"). The signature of Assignor on this document is evidence of the transfer of $4,000,000.00 of or an undivided 32.971% ownership interest in the claim and all rights thereto.

Assignor hereby waives any notice or hearing requirements imposed by Rule 3001 of the Bankruptcy Rules, and stipulates that an order may be entered recognizing this Assignment as an unconditional assignment and the Assignee herein as the valid owner of the Transferred Claim. You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect of the Transferred Claim to the Assignee.

| | | | | |
|---|---|---|---|---|
| ASSIGNEE: | Citigroup Financial Products Inc. | | ASSIGNOR: | Highland Credit Strategies<br>Master Fund, L.P. |
| Address: | Citigroup Financial Products Inc.<br>390 Greenwich Street, 4th Floor<br>New York, NY 10013<br>Attention: Mark Heimowitz | | Address: | Highland Credit Strategies<br>Master Fund, L.P.<br>c/o Highland Capital<br>Management, LP<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240 |

Signature: ~~_____~~
Name: ~~BRIAN BLESSING~~
Title: ~~AUTHORIZED SIGNATORY~~
Date: _____

Signature: _____
Name: _____ 11/2/11
Title: **CARTER CHISM**
Date: **AUTHORIZED SIGNATORY**

With a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn: Douglas R. Davis
Phone: 212-373-3000
Email: ddavis@paulweiss.com

-21-

## ASSIGNMENT AND TRANSFER OF CLAIM AGREEMENT

ASSIGNMENT AND TRANSFER OF CLAIM AGREEMENT ("Agreement") dated as of this 8th day of November 2011, by and between Highland Credit Strategies Master Fund, L.P. ("Seller") and Citigroup Financial Products Inc. ("Purchaser"; Seller and Purchaser are referred to herein collectively as the "Parties" and individually as a "Party").

## RECITALS

A.      Seller and Lehman Brothers Special Financing Inc. ("LBSFI") are party to that certain ISDA Master Agreement dated as of July 1, 2008 (the "ISDA Master Agreement").

B.      Lehman Brothers Holdings Inc. ("LBHI"; and, together with LBSFI, each a "Debtor" and collectively the "Debtors") is a Credit Support Provider under the ISDA Master Agreement and a Guarantor pursuant to a guaranty agreement.

C.      Pursuant to the ISDA Master Agreement, Seller and LBSFI entered into the transactions described in the LBSFI Proof of Claim (as such term is defined herein).

D.      On September 15, 2008, LBHI filed a voluntary petition under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), and is currently in proceedings for reorganization in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), administered under Chapter 11 Case No. 08-13555 (JMP) et seq. (the "Bankruptcy Proceedings").  On October 3, 2008, LBSFI filed a voluntary petition under chapter 11 of the Bankruptcy Code, and is currently in proceedings for reorganization in the Bankruptcy Court, and is administered under Chapter 11 Case No. 08-13888 (JMP) and is jointly administered with the Bankruptcy Proceedings.

E.      On or about September 22, 2008, by notice to LBSFI, Seller designated an Early Termination Date (as defined in the ISDA Master Agreement) in respect of all outstanding Transactions (as defined in the ISDA Master Agreement) and determined the amount payable in respect of the Early Termination Date (as defined in the ISDA Master Agreement).

F.      On December 16, 2008, the Bankruptcy Court entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption of Prepetition Derivatives Contracts [Dkt. No. 2257] (the "Settlement Order").

G.      Pursuant to the Settlement Order, on September 15, 2009, Seller, LBSFI, and LBHI entered into a Termination Agreement (the "Termination Agreement") to resolve certain claims arising under the ISDA Master Agreement.  Pursuant to the Termination Agreement, LBSFI and LBHI agreed to the allowance of (i) a general, unsecured claim in the amount of $12,132,000.00 against LBSFI, and (ii) a general, unsecured claim in the amount of $12,132,000.00 against LBHI, in settlement of the claims held by Seller arising under the ISDA Master Agreement (as more particularly described below as the LBSFI Proof of Claim and the LBHI Proof of Claim); provided, however, the aggregate recovery of Seller was not to exceed $12,132,000.00.

H.      Seller filed the LBSFI Proof of Claim (as such term is defined herein) on September 16, 2009.

I.      Seller filed the LBHI Proof of Claim (as such term is defined herein) on September 18, 2009.

J.      On September 24, 2010, the Debtors filed their Forty-Fifth Omnibus Objection to Claims

(Settled Derivative Claims) [Dkt. No. 11582] (the "Objection"). The LBSFI Proof of Claim and the LBHI Proof of Claim were among the objected claims in the Objection. The Objection sought an order providing (i) that the amount claimed in the LBSFI Proof of Claim was for an allowed unsecured claim in an amount equal to $12,132,000.00; and (ii) that the amount claimed in the LBHI Proof of Claim was for an allowed unsecured claim in an amount equal to $12,132,000.00. On November 10, 2010, the Order Granting Debtors' Forty-Fifth Omnibus Objection to Claims (Settled Derivative Claims) [Dkt. No. 12669] (the "Objection Order") was entered in the Bankruptcy Proceedings providing that (i) the LBSFI Proof of Claim (as hereinafter defined) was allowed as a general, unsecured claim in an amount not greater than $12,132,000.00 (the "LBSFI Claim Amount") and (ii) the LBHI Proof of Claim was allowed as a general, unsecured claim against LBHI in an amount not greater than $12,132,000.00 (the "LBHI Claim Amount").

K.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Transferred Rights (as such term is defined herein) on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.      Seller's Claims. Seller hereby represents and warrants to Purchaser and Purchaser's successors and assigns as of the Effective Date that:

(a)     a proof of claim, date-stamped September 16, 2009 and assigned claim number 13206 (the "LBSFI Proof of Claim", of which a true and complete copy is attached to this Agreement as Exhibit A-1) was duly and timely filed by Seller against LBSFI in the amount of $12,534,685.60 (such claim is hereinafter referred to as the "LBSFI Claim") on account of LBSFI's direct obligations to Seller under the ISDA Master Agreement and the Termination Agreement, which, except with respect to the resolution of the Objection by the Objection Order as described above, LBSFI Proof of Claim has not been revoked, withdrawn, amended or modified and no right thereunder has been waived, and all statements in the LBSFI Proof of Claim are true and correct as of the date hereof and no other proof of claim or other document has been submitted by Seller with respect to the LBSFI Claim;

(b)     a proof of claim, date-stamped September 18, 2009 and assigned claim number 16840 (the "LBHI Proof of Claim", of which a true and complete copy is attached to this Agreement as Exhibit B-1) was duly and timely filed by Seller against LBHI in the amount of $12,132,000.00 (such claim is hereinafter referred to as the "LBHI Claim") on account of LBHI's guaranty obligation to Seller under the ISDA Master Agreement and the Termination Agreement, which, except with respect to the resolution of the Objection by the Objection Order as described above, LBHI Proof of Claim has not been revoked, withdrawn, amended or modified and no right thereunder has been waived, and all statements in the LBHI Proof of Claim are true and correct as of the date hereof and no other proof of claim or other document has been submitted by Seller with respect to the LBHI Claim;

(c)     a Derivative Questionnaire (as such term is defined in the Bar Date Order[1]) was duly and timely filed electronically by Seller against LBSFI on October 12, 2009 (the "LBSFI Derivative Questionnaire") and, except with respect to the resolution of the Objection by the Objection Order as described above, has not been revoked, withdrawn, amended or modified and no right thereunder has been waived, and all statements in the LBSFI Derivative

---

[1]     The term "Bar Date Order" refers to that certain Order, entered on July 2, 2009, pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form [Dkt. No. 4271].

Questionnaire are true and correct as of the date hereof and a true and complete copy of the filing confirmation acknowledging completion of the LBSFI Derivative Questionnaire is attached to this Agreement as Exhibit A-2;

(d)     a Guarantee Questionnaire (as such term is defined in the Bar Date Order) was duly and timely filed electronically by Seller against LBHI on October 12, 2009 (the "LBHI Guarantee Questionnaire") and, except with respect to the resolution of the Objection by the Objection Order as described above, has not been revoked, withdrawn, amended or modified and no right thereunder has been waived, and all statements in the LBHI Guarantee Questionnaire are true and correct as of the date hereof and a true and complete copy of the filing confirmation acknowledging completion of the LBHI Guarantee Questionnaire is attached to this Agreement as Exhibit B-2;

(e)     pursuant to Section 1 of the Termination Agreement, the aggregate recovery of Seller with respect to its Claims (as defined herein) shall not exceed the settlement amount of $12,132,000.00; and

(f)     the Official Committee of Unsecured Creditors under the Bankruptcy Proceedings (the "Committee") has consented to such Settlement Amount against each of LBSFI and LBHI, as confirmed in an electronic message from counsel to the Committee (the "Committee Email"), a true and complete print-out of which is attached hereto as Exhibit D.

2.     Assignment and Transfer of Seller's Claims.

(a)     In consideration of the Purchase Price (as defined herein), the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

(i)     subject to the satisfaction or waiver of the conditions in Section 4(b), Seller irrevocably sells, transfers, assigns, grants and conveys the Transferred Rights (as hereinafter defined) to Purchaser with effect on and after the Effective Date; and

(ii)     subject to the satisfaction or waiver of the conditions in Section 4(a), Purchaser irrevocably acquires and assumes the Transferred Rights (as hereinafter defined) with effect on and after the Effective Date.

(b)     As used herein, the following terms shall have the meanings set forth below:

"Average LIBOR" means (i) the sum of all the individual LIBOR for each day in the applicable period, divided by (ii) the total number of days in such period.

"Claim" or "Claims" means the LBSFI Claim and the LBHI Claim individually or collectively.

"LIBOR" means, for any day, the one-month London Interbank Offered Rate for deposits in U.S. Dollars as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day. For any day that is not a business day, LIBOR shall be the rate published by the BBA on the immediately preceding business day.

"Transferred Rights" means, collectively, the Transferred LBSFI Rights and the Transferred LBHI Rights.

"Transferred LBHI Rights" means $4,000,000.00 of the LBHI Claim Amount or an undivided 32.971% ownership interest in Seller's right, title and interest in, to and under:

(i)     the LBHI Claim, including, without limitation, "claims" as defined in Section 101(5)

of the Bankruptcy Code, any and all right to receive principal, interest, fees, damages, penalties and other amounts in respect of the LBHI Claim (in each case whether accruing prior to, on or after the date of this Agreement), if any, and, to the extent relating to the LBHI Claim, accounts, accounts receivable and other rights and interest of Seller against LBHI, including, without limitation, all of Seller's right, title and interest in, to and under the LBHI Proof of Claim and LBHI Guarantee Questionnaire, if any;

(ii)     any actions, claims, rights, lawsuits and/or causes of action, whether against LBHI or any other party, and/or voting rights and other rights and benefits of any nature whatsoever arising out of or in connection with the LBHI Claim;

(iii)     all rights in, to and under any collateral or guarantees related to the LBHI Claim;

(iv)     all transfer agreements, if any, under which Seller or any prior seller acquired the rights underlying or constituting the LBHI Claim, but only to the extent related to the LBHI Claim;

(v)     all cash, securities, instruments and other property which may be paid or distributed by LBHI in satisfaction of LBHI Claim under or pursuant to any plan of reorganization or liquidation in the Bankruptcy Proceedings, any redemption, restructuring or other liquidation or otherwise;

(vi)     all proceeds of any kind of the foregoing, including, without limitation, all cash, securities or other property distributed or payable on account of, or exchanged in return for, any of the foregoing; and

(vii)     for the avoidance of any doubt, the Transferred LBHI Rights do not include any claims, or any proofs of claim filed by Seller against LBHI or any affiliate of LBHI, including any foreign affiliates such as, but not limited to, Lehman Brothers International (Europe) ("LBIE"), or any other rights against LBHI or obligations owed by LBHI, that Seller possesses against LBHI other than those arising from, contained in or related to the ISDA Master Agreement, the LBHI Proof of Claim, the LBHI Guarantee Questionnaire and the Termination Agreement.

"Transferred LBSFI Rights" means $4,000,000.00 of the LBSFI Claim Amount or an undivided 32.971% ownership interest in Seller's right, title and interest in, to and under:

(i)     the LBSFI Claim, including, without limitation, any and all right to receive principal, interest, fees, damages, penalties, dividends and other amounts in respect of the LBSFI Claim (in each case whether accruing prior to, on or after the date of this Agreement), if any, and, to the extent relating to the LBSFI Claim, accounts, accounts receivable and other rights and interest of Seller against LBSFI, including, without limitation, all of Seller's right, title and interest in, to and under the LBSFI Proof of Claim, if any;

(ii)     any actions, claims, rights, lawsuits and/or causes of action, whether against LBSFI or any other party, and/or voting rights and other rights and benefits of any nature whatsoever arising out of or in connection with the LBSFI Claim;

(iii)     all rights in, to and under any collateral or guarantees related to the LBSFI Claim;

(iv)     all transfer agreements, if any, under which Seller acquired the rights underlying or constituting the LBSFI Claim, but only to the extent related to the LBSFI Claim;

-4-

    (v)      all cash, securities, instruments and other property which may be paid or distributed by LBSFI in satisfaction of LBSFI Claim under or pursuant to any plan of reorganization or liquidation in the Bankruptcy Proceedings, any redemption, restructuring or other liquidation or otherwise;

    (vi)     all proceeds of any kind of the foregoing, including, without limitation, all cash, securities or other property distributed or payable on account of, or exchanged in return for, any of the foregoing; and

    (vii)    for the avoidance of any doubt, the Transferred LBSFI Rights do not include any claims, or any proofs of claim filed by Seller against LBSFI or any affiliate of LBSFI, including any foreign affiliates such as, but not limited to, LBIE, or any other rights against LBSFI or obligations owed by LBSFI, that Seller possesses against LBSFI other than those arising from, contained in or related to the ISDA Master Agreement, the LBSFI Proof of Claim, the LBSFI Derivative Questionnaire and the Termination Agreement.

(c)      For the avoidance of doubt, the sale and assignment of the Transferred Rights shall be deemed an absolute and unconditional assignment of the Transferred Rights.

(d)      From and after the date on which Purchaser is, or is deemed to be, substituted for Seller pursuant to Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Purchaser shall be deemed to be owner of the Transferred Rights, and shall be entitled to identify itself as the owner of the Transferred Rights on the records of each of the Debtors and their respective affiliates in the Proceedings, or the Bankruptcy Court. If for any reason Purchaser is not substituted or not deemed to be substituted for Seller, then the Parties intend that the contribution be a true participation of the Transferred Rights until such time when the Bankruptcy Court recognizes the transfer and substitution of Purchaser for Seller.

3.      Purchase Price. The consideration paid by Purchaser to Seller is the sum of (a) the product of the LBHI Purchase Rate (as specified in the purchase price terms contained in Schedule 1 hereto) and the LBHI Proof of Claim Amount (the "LBHI Purchase Price") and (b) the product of the LBSFI Purchase Rate (as specified in the purchase price terms contained in Schedule 1) and the LBSFI Claim Amount (the "LBSFI Purchase Price"; and the sum of the LBHI Purchase Price and the LBSFI Purchase Price being the "Purchase Price"). Upon the satisfaction of the conditions set forth in Section 4(a), Purchaser shall immediately and irrevocably pay to Seller the Purchase Price by wire transfer of immediately available funds in US dollars to Seller's account specified on Schedule 2. The date the Purchase Price is paid shall be hereinafter referred to as the "Effective Date".

4.      Conditions Precedent.

(a)      Purchaser's obligations to pay the Purchase Price to Seller and to acquire the Transferred Rights on the Effective Date shall be subject to the conditions that:

    (i)      Seller's representations and warranties in this Agreement shall be true and correct on the Effective Date;

    (ii)     Seller shall have complied in all material respects with all covenants required in this Agreement to be complied with by it on or before the Effective Date; and

    (iii)   Purchaser shall have received (A) this Agreement duly executed on behalf of Seller, (B) an Evidence of Transfer of Claim in the form attached hereto as Exhibit C, duly executed on behalf of Seller, to be filed by the Purchaser with the Bankruptcy Court together with a transfer notice evidencing the transfer of the Transferred LBHI Rights

to Purchaser under Bankruptcy Rule 3001(e) (the "<u>LBHI Notice of Transfer</u>"), and (C) an Evidence of Transfer of Claim in the form attached hereto as <u>Exhibit C</u>, duly executed on behalf of Seller, to be filed by the Purchaser with the Bankruptcy Court together with a transfer notice evidencing the transfer of the Transferred LBSFI Rights to Purchaser under Bankruptcy Rule 3001(e) (the "<u>LBSFI Notice of Transfer</u>") (the documents referenced in clauses (A) through (C), collectively, the "<u>Assignment Documents</u>"). The Assignment Documents shall be provided by the Purchaser and approved by Seller.

(b)    Seller's obligation to sell, transfer, assign, grant, and convey the Transferred Rights to Purchaser on the Effective Date shall be subject to the conditions that:

(i)    Purchaser's representations and warranties in this Agreement shall be true and correct on the Effective Date;

(ii)    Purchaser shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Effective Date; and

(iii)    Seller shall have received (A) this Agreement duly executed on behalf of Purchaser, and (B) payment of the Purchase Price from Purchaser.

5.    <u>Mutual Representations of Seller and Purchaser</u>. Each of Seller and Purchaser hereby represents and warrants to the other Party, and to the other Party's successors and assigns, as of the Effective Date that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction of organization, in good standing under such laws, and has full power and authority and has taken all action necessary to execute and deliver each Assignment Document and to perform its obligations under each Assignment Document and to consummate the transactions contemplated by each Assignment Document;

(b)    the execution, delivery and performance by it of each Assignment Document does not and will not violate any law or regulation of the jurisdiction under which it exists, any other law applicable to it or any other agreement to which it is a party or by which it is bound;

(c)    each Assignment Document has been duly and validly authorized, executed and delivered by it and is legal, valid, binding and enforceable against it in accordance with its terms except that the enforceability may be limited by bankruptcy, insolvency or laws governing creditors rights generally;

(d)    it acknowledges that (i) the other Party currently may have, and later may come into possession of, information relating to the Transferred Rights, Debtors, or Debtors' affiliates or the status of the Bankruptcy Proceedings that is not known to it and that may be material to a decision to transfer or acquire/assume the Transferred Rights and all related rights (as appropriate) (the "<u>Excluded Information</u>"), (ii) it has not requested the Excluded Information, and has agreed to proceed with the purchase or sale of the Transferred Rights and all related rights (as appropriate) hereunder without receiving the Excluded Information, and (iii) the other Party shall have no liability to it, and each Party waives and releases any claims that it might have against the other Party or the other Party's officers, directors, employees, agents and controlling persons and their respective successors and assigns whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information; provided, however, that each Party's Excluded Information shall not and does not affect the truth or accuracy of such Party's representations or warranties in this Agreement;

(e)    it is aware that the Purchase Price may differ both in kind and amount from any distributions

or dividends ultimately made pursuant to any plan of reorganization confirmed by the Bankruptcy Court in the Bankruptcy Proceedings and that Seller is not responsible for any difference in the distribution in the Bankruptcy Proceedings with respect to the Claims from the Purchase Price;

(f)     except for filings that are expressly contemplated in this Agreement, no notice to, consent of, registration with, or approval of, or any other action by, any relevant person or entity (including any state, federal or other regulatory agency or commission) is or will be required to execute, deliver and perform its obligations under this Agreement or for the assignment contemplated herein to become effective; and

(g)     (i) it has adequate information concerning the business and financial condition of the Debtors, the Transferred Rights and the status of the Proceedings in order to make an informed decision regarding the purchase and sale under this Agreement, (ii) it is able to bear the economic risk associated with the sale and purchase of the Transferred Rights; (iii) it has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement; and (iv) it has independently and without reliance on the other Party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied on the other Party's express representations, warranties, covenants, agreements and indemnities in this Agreement. Each party acknowledges that the other party has not given it any investment advice, credit information, or opinion on whether the purchase of the Transferred Rights is prudent.

(h)     Assignee is, and should in all respects hereof be deemed to be, a "purchaser" and not an "assignee" with respect to the Transferred Rights, as such terms are discussed and contrasted in *In re Enron Corp. v. Springfield Associates L.L.C.*, 379 B.R. 425 (S.D.N.Y. 2007).

6.     <u>Additional Representations and Warranties of Seller</u>. Seller hereby represents and warrants to Purchaser and to Purchaser's successors and assigns as of the Effective Date that:

(a)     except as described in Recital J, it has not received notice of any objection, expunction, defense or counterclaim relating specifically to the LBSFI Claim, the LBHI Claim or the other Transferred Rights by or on behalf of any Debtor or any other party to reduce the amount of the Transferred Rights or to reduce the value of or impair the Claims;

(b)     as provided in the Objection Order, the LBSFI Claim has been allowed in an amount not greater than $12,132,000.00, and no payment or other distribution has been received by or on behalf of Seller in full or partial satisfaction of the Transferred LBSFI Rights;

(c)     as provided in the Objection Order, the LBHI Claim has been allowed in an amount not greater than $12,132,000.00, and no payment or other distribution has been received by or on behalf of Seller in full or partial satisfaction of the Transferred LBHI Rights;

(d)     Seller is the sole legal and beneficial owner of and has good and marketable title to the Transferred Rights, free and clear of any and all liens, claims, rights of setoff, security interests, participations, or encumbrances of any kind or nature whatsoever existing as of the Effective Date and will transfer to Purchaser such good and marketable title to the Transferred Rights, free and clear of any and all liens, claims, rights of setoff, security interests, participations, or encumbrances of any kind or nature whatsoever existing as of the Effective Date;

(e)     Seller (i) has not previously sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part, to any person (or agreed to do any of the foregoing) and (ii) is the original creditor of the Debtors and original holder of

the Transferred Rights;

(f) Seller has not engaged and will not engage in any acts, conduct or omission and Seller has not had any relationship with any Debtor or its affiliates, that will result in Purchaser receiving in respect of the Transferred Rights proportionately less payments or distributions or less favorable treatment (including timing of payments and distributions) than other unsecured creditors of such Debtor;

(g) Seller does not, and did not on the date of the commencement of the Bankruptcy Proceedings against any Debtor, hold any funds or property of such Debtor of any affiliate of such Debtor;

(h) the designation of the Early Termination Date under and as defined in the ISDA Master Agreement, giving rise to the Claims, was effected by Seller in accordance with the terms of the ISDA Master Agreement and not in violation of any law to which Seller or the Proceedings are subject, and is reflected in the LBHI Proof of Claim and the LBSFI Proof of Claim;

(i) to the best of Seller's knowledge, the amount payable by the Debtors in respect of the Early Termination Date has been calculated (including but not limited to the conversion of currencies) by Seller in accordance with the terms of the ISDA Master Agreement;

(j) the Seller, LBSFI, and LBHI agreed to settle the Claims pursuant to the procedures set forth in the Settlement Order, resulting in the Sellers, LBSFI, and LBHI entering into and executing the Termination Agreement;

(k) to the best of Seller's knowledge, Seller did not breach any terms or provisions of the ISDA Master Agreement or the related guaranty;

(l) to the best of Seller's knowledge, Seller did not breach any terms or provisions of the Termination Agreement;

(m) Seller has no obligation or liability to the Debtors related to or in connection with the Claims, except as set out in the LBSFI Proof of Claim and the LBHI Proof of Claim;

(n) Seller (i) is not an "affiliate" or "insider" within the meaning of 11 U.S.C. §§101(2) and 101(31), respectively, and is not, and has not been, a member of any official or unofficial creditors' committee appointed in the Bankruptcy Proceedings; and (ii) is not, and shall not be or become, an "underwriter" in respect of all or any part of the Transferred Rights within the meaning of Section 1145 of the Bankruptcy Code;

(o) Seller has provided to Purchaser (i) complete and accurate copies of all each of the documents related to the Claims or any transfer thereof and all notices, documents and agreements relating thereto, each as amended through the date hereof, which copies are true and complete as of the date hereof and have not been withdrawn, amended or modified and (ii) a complete and accurate summary of all non-written material related to the Claims or the Transferred Rights, if any;

(p) either (i) no interest in the Transferred Rights is being sold by or on behalf of one or more Benefit Plans (as defined below) or (ii) the transaction exemption set forth in one or more Prohibited Transaction Exemptions ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions

-8-

determined by in-house asset managers) is applicable with respect to the sale of the Transferred Rights. As used herein, "Benefit Plan" means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it ("ERISA"), a "plan" as defined in Section 4975 of the Code or any entity whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan";

(q)     as provided for in the Termination Agreement, LBSFI and LBHI have agreed to the allowance of the Claims as general, unsecured claims in an amount not greater than $12,132,200.00; and

(r)     to the best of Seller's knowledge, there currently are no preference actions against Seller arising out of the Claims.

7.     <u>Additional Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to Seller and to Seller's successors and assigns as of the Effective Date that:

(a)     Purchaser is entitled to receive any payments and distributions to be made to it hereunder without the withholding of any tax; and will furnish to Seller such forms, certifications, statements and other documents as Seller may request from time to time to evidence Purchaser's exemption from the withholding of any tax imposed by any jurisdiction or to enable Seller to comply with any applicable laws or regulations relating thereto;

(b)     [reserved]

(c)     either (i) no interest in the Transferred Rights is being acquired by or on behalf of an entity that is, or at any time while the Transferred Rights are held thereby will be, one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Purchaser's rights thereunder;

(d)     without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Purchaser is not purchasing the Transferred Rights with a view towards the sale or distribution thereof in violation of the U.S. Securities Act of 1933, as amended; provided, however, that Purchaser may resell the Transferred Rights; and

(e)     Purchaser understands that the Claims are based upon, and controlled by, the Termination Agreement. Purchaser is not obtaining any additional "claims" as defined in Section 101(5) of the Bankruptcy Code that the Seller possesses against LBSFI or LBHI (or any other third party) that is not provided for in the Termination Agreement.

8.     <u>Acknowledgments.</u>

(a)     Purchaser acknowledges that (i) Seller makes only the representations and warranties set forth above, (ii) the transfer of the Transferred Rights by Seller to Purchaser is irrevocable and is without representation or warranty, whether express or implied, of any kind or character by Seller except as expressly provided in this Agreement, (iii) Seller makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made by any person other than Seller in or in connection with the LBSFI Proof

D1995045

of Claim or the LBHI Proof of Claim or the execution, legality, validity, or enforceability (with respect to any person other than Seller) of the LBSFI Proof of Claim or LBHI Proof of Claim; (iv) Seller makes no representation or warranty and assumes no responsibility with respect to the financial condition, creditworthiness, properties, affairs, status or nature of the Debtors or the performance or observance by the Debtors of any of their respective obligations under the LBSFI Proof of Claim or LBHI Proof of Claim or any other instrument or document; and (v) Purchaser shall have no recourse to Seller, except for (x) Seller's breaches of its representations, warranties, or covenants expressly stated in this Agreement and (y) Seller's indemnities, in each case as expressly stated in this Agreement; and (vi) while Seller has not previously sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Transferred Rights, in whole or in part, to any party (or agreed to do any of the foregoing), Seller may have already, or may in the future, take such actions with respect to portions of the LBHI Claim Amount and the LBSFI Claim Amount that are not included in the Transferred Rights.

(b)     Seller acknowledges that (i) its sale of the Transferred Rights to Purchaser is irrevocable and (ii) Seller shall have no recourse to Purchaser, except for (x) Purchaser's breaches of its representations, warranties, or covenants and (y) Purchaser's indemnities, in each case as expressly stated in this Agreement.

9.     <u>Indemnification</u>.

Seller agrees to indemnify, defend and hold Purchaser and Purchaser's respective officers, directors, employees, agents and controlling persons and their respective successors and assigns (collectively, the "<u>Purchaser Indemnitees</u>") harmless from and against any and all expenses, losses, claims, damages, suits, proceedings, objections and liabilities which are actually incurred by the Purchaser Indemnitees or any of them, including, but not limited to, attorneys' fees and expenses, caused by, or in any way resulting from or relating to (i) the breach of any of Seller's representations, warranties, agreements or covenants expressly stated in this Agreement or (ii) any obligation to disgorge to or reimburse or pay any person for any payments, property or collateral actually received or applied by Seller under or in connection with the Transferred Rights.

10.     <u>Attorney-In-Fact; Settlement of Seller's Claim; Further Actions</u>.

(a)     Seller hereby irrevocably appoints Purchaser as its true and lawful attorney-in-fact solely with respect to the Transferred Rights, and authorizes Purchaser to act in Seller's name, place and stead, to demand, sue for, compromise and recover all such amounts which are, or may hereafter become, due and payable for or on account of the Transferred Rights herein assigned. Seller hereby grants unto Purchaser full authority to do all things necessary to enforce the Transferred Rights and Seller's rights thereunder. Seller agrees that the powers granted in this paragraph are discretionary in nature and exercisable at the sole option of Purchaser. Purchaser shall have no obligation to prove, defend, or take any affirmative action with respect to proving the validity or amount of the Transferred Rights.  In the event the Purchaser does take any affirmative actions in connection with the Transferred Rights, including any affirmative actions to prove, defend, or with respect to proving the validity or amount of the Transferred Rights, then the Purchaser solely, and without any recourse against Seller, shall be responsible for any fees, costs, or other expenses taken in connection therewith.

(b)     Seller shall not compromise or settle the Transferred Rights or change the LBSFI Proof of Claim or the LBHI Proof of Claim without the prior written consent of Purchaser. In performing any of its obligation under this Section 10 and in otherwise complying with its obligations under this Agreement, Seller hereby covenants and agrees to act reasonably at all times.

-10-

(c)     Seller further agrees that if Seller receives any distributions on account of the Transferred Rights, whether in the form of cash, securities, instruments or any other property, the aforementioned shall constitute property of the Purchaser to which the Purchaser has an absolute  right. Seller shall hold such property in trust and will at its own expense, deliver to Purchaser any such property in the same form received, together with any endorsements or documents necessary to transfer such property to Purchaser within two business days of receipt in the case of cash and five business days in the case of securities. Should all or any portion of the distributions on account of the Transferred Rights not be assignable by Seller to Purchaser, then Seller grants to Purchaser a participation interest in the Transferred Rights or such distributions, in accordance with applicable law.

11.     <u>Miscellaneous</u>.

(a)     <u>Further Assurances</u>.

(i) Each of the Parties hereto agrees to execute and/or deliver, or cause to be executed and/or delivered, all such instruments and documents (including, without limitation, any supporting documents evidencing the Transferred Rights), and to take all such action as the other Party may reasonable request, promptly upon the request of such other Party and at each Party's own expense, in order to effectuate the intent and purpose of, and to carry out the terms of, this Agreement and to cause Purchaser to become the legal and beneficial owner and holder of the Transferred Rights.

(ii) Seller agrees to deal with Purchaser or any of Purchaser's direct or indirect assignees, if applicable, in respect of all matters described in this Clause 11(a) and, if dealing directly with any of Purchaser's direct or indirect assignees in accordance with Purchaser's instructions, shall be deemed to have discharged its obligations under this Clause 11(a) relating to Purchaser.

(b)     <u>Further Transfers</u>. Seller hereby acknowledges that Purchaser may at any time reassign any or all of the Transferred Rights, together with all right, title and interest of Purchaser in to, and under this Agreement without the prior consent of or notice to the Seller.

(c)     <u>Survival</u>. All representations, warranties, covenants and agreements contained herein shall survive the Effective Date and the execution, delivery and performance of this Agreement and any sale, assignment, participation or transfer by Purchaser of any or all of the Transferred Rights, and shall inure to the benefit of Seller, Purchaser and their respective successors and assigns; provided, however, that the obligations of Seller and Purchaser contained herein shall continue and remain in full force and effect until fully paid, performed and satisfied.

(d)     <u>Interest</u>.  If either Party fails to make a payment or distribution to the other Party within the time period specified in this Agreement, the Party failing to make full payment of any amount when due shall, upon five days written demand by the other Party, pay such amount due together with interest on it for each day from (and including) the date when due to (but excluding) the date when actually paid, at a rate per annum equal to Average LIBOR.

(e)     <u>No Set-Off</u>. Each payment to be made by either Party hereunder shall be made without set-off, counterclaim or deduction of any kind.

(f)     <u>Governing Law; Jurisdiction; Service of Process</u>. The laws of the State of New York shall govern this Agreement, without regard to any conflict of laws provisions thereof. Each Party submits to the jurisdiction of the federal or state courts located in the County of New York, State of New York and agrees that any litigation relating to this Agreement shall be brought only in such courts. Each Party consents to service of process by certified mail at its address

-11-

listed in <u>Schedule 2</u> hereto.

(g)    <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which, together constitute one and the same instrument. Transmission by facsimile or electronic mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

(h)    <u>WAIVER OF JURY TRIAL</u>. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(i)    <u>3001(e) Transfer</u>. Seller hereby acknowledges and consents to all terms set forth in this Agreement and, upon timely payment of the Purchase Price as provided above, waives its right to raise any objection thereto and its right to receive notice pursuant to Bankruptcy Rule 3001(e), and consents to the substitution of Seller by Purchaser for all purposes in the Bankruptcy Proceedings, including, without limitation, for voting and distribution purposes with respect to the Transferred Rights. Purchaser agrees to file the LBSFI Notice of Transfer and LBHI Notice of Transfer with the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 3001(e).

(j)    <u>Tax Forms</u>. Purchaser hereby agrees to provide to Seller such forms, certifications, statements and other documents as Seller may request from time to time to evidence Purchaser's exemption from the withholding of any tax imposed by any jurisdiction or to enable Seller to comply with any applicable laws or regulations relating thereto.

(k)    <u>Notices; Payments by Wire Transfer</u>. All demands, notices, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given when hand-delivered or duly deposited in the mails, by certified or registered mail, postage prepaid-return-receipt requested, to the addresses set forth on <u>Schedule 2</u> hereto, or such other address as may be furnished hereafter by notice in writing. All payments by Seller to Purchaser and Purchaser to Seller under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller and Purchaser, as applicable, in accordance with the wire instructions specified in <u>Schedule 1</u>.

(l)    <u>Integration</u>. This Agreement, together with any schedules and exhibits hereto, constitutes the entire agreement and understanding between the Parties with respect to the Claims and supersedes all prior agreements, understandings or representations pertaining to the Claims, whether oral or written. There are no warranties, representations or other agreements between the Parties in connection with the Claims except as specifically and expressly set forth herein.

(m)    <u>Captions and Headings</u>. The captions and headings in this Agreement are for convenience only and are not intended to be full or accurate descriptions of the contents thereof. Such captions and headings shall not be deemed to be part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

D1995045

(n)     <u>Severability</u>. If any provision of this Agreement or any other agreement or document delivered in connection with this Agreement, if any, is partially or completely invalid or unenforceable in any jurisdiction, then that provision shall be ineffective in that jurisdiction to the extent of its invalidity or unenforceability, but the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement, all of which shall be construed and enforced as if that invalid or unenforceable provision were omitted, nor shall the invalidity or unenforceability of that provision in one jurisdiction affect its validity or enforceability in any other jurisdiction as long as this Agreement, so modified, continues to express, without material change, the original intent of the parties as to the subject matter of this Agreement and such modification will not substantially impair the parties' respective benefits and expectations hereunder.

(o)     <u>Confidentiality</u>. Each Party agrees that except (i) as may be compelled by legal process, by an order, judgment or decree of a court of other governmental authority of competent jurisdiction, or (ii) disclosures to its own employees, professional advisors or representatives, (iii) as required to implement or enforce the terms of this Agreement, or (iv) disclosures to any governmental entity or authority or regulatory or self-regulatory entity having or asserting jurisdiction over it, it shall not disclose to any person the existence of, or terms and conditions of, this Agreement or any document executed or delivered in connection herewith, except that Purchaser may disclose this Agreement (but not the Purchase Price) to any prospective purchaser or transferee of all or any portion of the Transferred Rights, provided that such prospective purchaser or transferee shall be advised of and agree to be bound by either the provisions of this Section 11(o) or other provisions at least as restrictive as this Section 11(o).

(p)     <u>Amendments; Waivers</u>.

    (i)     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

    (ii)     No failure on the part of either Party to exercise, and no delay in exercising, any right hereunder or under any related document shall operate as a waiver thereof by such Party, nor shall any single or partial exercise of any right hereunder or under any other related document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of each Party provided herein and in other related documents (A) are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law and (B) are not conditional or contingent on any attempt by such Party to exercise any of its rights under any other related documents against the other Party or any other entity.

(q)     <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

*[Remainder of page intentionally left blank; signatures follow on next page]*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Assignment and Transfer of Claim Agreement as of the date first stated above.

HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.
By: Highland General Partner, L.P., its general partner
By: Highland GP Holdings, LLC, its general partner
By: Highland Capital Management, L.P., its sole member
By: Strand Advisors, Inc., its general partner

By: _____

Name: **CARTER CHISM**
Title: **AUTHORIZED SIGNATORY**

CITIGROUP FINANCIAL PRODUCTS INC.
By: _____
Name:
BRIAN BLESSING
Title: AUTHORIZED SIGNATORY

-14-

**EXHIBIT A-1**

[LBSFI PROOF OF CLAIM]

D1995045

*Original*

| United States Bankruptcy Court/Southern District of New York | **PROOF OF CLAIM** |
|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Special Financing, Inc | Case No. of Debtor 08-13888 |

**UNIQUE IDENTIFICATION NUMBER: 200**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000013206

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (see definition on reverse side.)

THIS

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Highland Credit Strategies Master Fund, L.P.
c/o Highland Capital Management, LP
13455 Noel Road, Suite 800
Dallas, TX 75240
(972) 628-4100

Scott Everett
Haynes and Boone, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219
(214) 651-5000
scott.everett@haynesboone.com

☑ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number: 3134
(If known)

Filed on: 03/02/09

Telephone number:        Email Address:

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:        Email Address:

**1. Amount of Claim as of Date Case Filed:** $ 12,534,685.60

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9), complete Item 6.

☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attached Addendum
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____
**3a.** Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☑ Other

Describe: See attached Addendum

Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

**FOR COURT USE ONLY**

**FILED / RECEIVED**

SEP 16 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/11/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Patrick Boyce
CFO

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

In re                                             :
                                                  :
                                                  :
LEHMAN BROTHERS SPECIAL                           :
FINANCING INC.                                    :          Case No.  08-13888 (JMP)
                                                  :
                                                  :
                            Debtor.               :
-------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

1.       On September 15, 2008, Lehman Brothers Holdings, Inc. ("LBHI") filed its voluntary petition for bankruptcy protection under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Southern District of New York (the "Court").  On October 3, 2008 (the "Petition Date"), LBHI subsidiary, Lehman Brothers Special Financing Inc. ("LBSF"), filed its voluntary petition for protection under chapter 11 of the Bankruptcy Code in this Court.

2.       Prior to the Petition Date, LBSF and Highland Credit Strategies Master Fund, L.P. ("Highland Credit Strategies") entered into that certain ISDA Master Agreement (1992 Form) dated as of July 1, 2008, the Credit Support Annex and Schedule to Master Agreement related thereto and all Confirmations and Transactions thereunder, in each case, as such documents were amended and supplemented from time to time (collectively, the "Agreement") with LBSF.[1]  A copy of the Agreement is attached hereto as *Exhibit A.*

---

[1] Capitalized terms not otherwise defined shall have the meanings given in the Agreement.

D_Lehman - Highland Credit Strategies POC(1699213_1) (2).DOC

3.    On September 22, 2008, Highland Credit Strategies sent the Notice of Default and Early Termination to LBSF whereby Highland Credit Strategies declared an Event of Default under Section 5(a)(vii) of the Agreement.  A copy of the Notice of Default is attached hereto as **Exhibit B.**  Through the Notice of Default, Highland Credit Strategies designated September 22, 2008 as the Early Termination Date for all Transactions under the Agreement.

4.    On October 10, 2008, Highland Credit Strategies provided to LBSF its Calculation Statement Following Early Termination of ISDA Agreement (the "Calculation Statement") pursuant to Section 6(d)(i) of the Agreement as a result of the designation of the Early Termination Date of all Transactions pursuant to the Notice of Termination.  A copy of the Calculation Statement is attached hereto as **Exhibit C.**

5.    Pursuant to Section 6(d)(ii) of the Agreement, the amount of $12,534,685.60 is due and payable from LBSF pursuant to the Calculation Statement.

6.    Notwithstanding the inclusion of the amounts representing Posted Collateral in this proof of claim, Highland Credit Strategies additionally demands the immediate return of the Posted Collateral pursuant to Section 8(b)(iii) of the Credit Support Annex.

7.    Highland Credit Strategies is filing this proof of claim with full reservation of rights, including the right to further amend or supplement the proof of claim at a later date or to request additional relief to obtain the return of the Posted Collateral.

8.    Nothing provided for herein shall limit Highland Credit Strategies' rights under the Agreement.

# EXHIBIT "A"

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 1, 2008

**LEHMAN BROTHERS SPECIAL**        and        **HIGHLAND CREDIT**
**FINANCING INC.**                                **STRATEGIES MASTER FUND,**
                                                        **L.P.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

<div align="center">2</div>

(ii)   *Liability.* If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

(i)   *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

<div align="center">4</div>

<div align="right">ISDA® 1992</div>

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) ***Illegality***. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) ***Tax Event***. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) ***Tax Event Upon Merger***. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) ***Credit Event Upon Merger***. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) ***Additional Termination Event***. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) ***Event of Default and Illegality***. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**ISDA® 1992**

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

<div align="center">10</div>

**7.      Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)    if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

<div align="center">15</div>

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)  the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)  such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                                          **ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17                                                                                                    ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*(Name of Party A)*

By: _____

Name:

Title:

Date:

Locke R. McMurray
Managing Director

**HIGHLAND CREDIT STRATEGIES MASTR FUND, L.P.**

*(Name of Party B)*

By: Highland General Partner, L.P., its general partner

By: Highland GP Holdings, LLC, its general partner

By: Highland Capital Management, L.P. Its sole member

By: Strand Advisors, Inc., its general partner

By: _____

Name:

Title:       Patrick Boyce
             Chief Administrative Officer

Date:

(Multicurrency–Cross Border)

<div align="center">

**SCHEDULE**
to the
**Master Agreement**
dated as of July 1, 2008
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of the State of Delaware
and
**HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.** ("Party B")
an exempted limited partnership organized under the laws of
Bermuda

</div>

**Part 1: Termination Provisions**

In this Agreement:

(a)     **"Specified Entity"** means:

    in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers OTC Derivatives Inc. |
| | Lehman Brothers Commercial Corporation |
| | Lehman Brothers Finance S.A. |
| | Lehman Brothers Commodity Services Inc. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

    and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B; provided, however, that the phrase ", or becoming capable at such time of being declared," is hereby deleted.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) three percent (3%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 20 million and (ii) three percent (3%) of the aggregate Net Asset Value of Party B in the case of Party B (or its equivalent in any other currency).

For the purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Lehman Brothers Holdings Inc., as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Services, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services ("S&P").

(e)     The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Market Quotation and Second Method will apply unless otherwise provided in a Confirmation; provided, however, that Loss will apply to a Credit Derivative Transaction comprised of a portfolio of Reference Entities (a "Portfolio Transaction") except for a Portfolio Transaction in which the portfolio of Reference Entities is comprised of the CDX and iTraxx indexes.

(g)     "Termination Currency" means United States Dollars ("USD").

(h)     Additional Termination Events will apply. Each of the following shall constitute an Additional Termination Event:-

(i)     Material Amendment. Any Operative Document (as hereinafter defined) or constitutional document (including, without limitation, investment policies or guidelines) of Party B is amended or modified in a manner which, in the reasonable judgment of Party A, has a materially adverse effect on Party A or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)    Change in Management or Control. (A) The Investment Manager or the General Partner merges or consolidates with (unless the General Partner Investment Manager is the surviving entity), or sells or otherwise transfers its advisory business or all or a material portion of its assets to, any individual or entity (other than an affiliate of Investment Manager or General Partner Manager which is acceptable to Party A in its reasonable judgment and where any affiliate controlled by either or both of James Dondero and Mark Okada shall be deemed acceptable; (B) an event listed in Section 5(a)(vii) occurs with respect to the Investment Manager or the General Partner; or (C) the Investment Manager or the General Partner has any of its registrations, authorizations, licenses or memberships with any federal or state governmental or regulatory authority revoked, suspended, terminated, limited or qualified, and such revocation, suspension, termination, limitation or qualification has a material adverse effect on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii)   Change of Investment Manager. Investment Manager or an affiliate, acceptable to Party A in its reasonable judgment where any affiliate controlled by either or both of James Dondero and Mark Okada shall be deemed acceptable, ceases to be the Investment Manager to Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv)    Decline in Net Asset Value. On any day during the term hereof, Party B (A) fails to maintain a Net Asset Value in an amount equal to fifty (50) percent of Party B's highest historical year-end Net Asset Value as reflected in Party B's audited financial statements during any immediately preceding eighteen (18) month period after the execution date of this Agreement, or (B) has experienced a decline in its Net Asset Value as measured from the last day of the immediately preceding calendar month end of twenty (20) percent or more, or (C) has experienced a decline in its Net Asset Value during any twelve month period as measured from the last day of the immediately preceding twelfth calendar month, of forty (40) percent or more. For the avoidance of doubt, Party A may use the NAV Statement or any other financial performance or Net Asset Value information provided by Party B pursuant to Part 3(b) or Part 5(d)(iii) and hereof in making a determination hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v)    **Failure to Deliver Financial Statements.** Party B fails to deliver or provide, after the elapse of two (2) business days following notice from Party A of any such failure, its audited annual financial statements, its NAV Statement within the timeframe specified in Part 3(b) hereof, or its verbal estimate of its Net Asset Value and performance pursuant to Part 5(d)(iii) hereof. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vi)    **Key-person.** One or more of the following occurs with respect to both Key Persons (as defined in Part 5 hereof): (A) an Incompetency Event; (B) death or incarceration; or (C) both such Key Persons cease to exercise, either directly or indirectly, a significant influence over the management of Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vii)    **Plan Assets.** At any time during the term of this Agreement, the assets of Party B are subject to Title I of ERISA or Section 4975 of the Code as "Plan Assets" as defined therein, or if any investor in Party B is a governmental plan, Party B is subject to any law, regulation, policy or procedure which is similar to Section 406 of ERISA or Section 4975 of the Code and that is applicable to Party B by reason of such governmental plan's investment in Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a)    **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is an exempted limited partnership duly organized and validly existing under the laws of Bermuda.

(c)    **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

21

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of the Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | An incumbency certificate with respect to the signatories of this Agreement and the Credit Support Documents (if any). | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the resolutions or other actions of (i) in the case of Party A, the board of directors of Party A, and (ii) in the case of Party B, its General Partner, certified by a an authorized person of the relevant entity, pursuant to which such party is authorized to enter into this Agreement, the relevant Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Within 150 days after fiscal year-end. | Yes, but solely with respect to audited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of the Schedule. | Upon execution of this Agreement. | No |
| Party B | Monthly statement which includes the Net Asset Value of Party B and the performance of Party B for the preceding month ("NAV Statement"). | Within 20 Local Business Days after each month-end. | Yes |
| Party B | Operative Documents specified in Part 5(n) hereof. | Upon execution of this Agreement. | Yes |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An Investment Manager letter, reasonably acceptable to Party A (the "Side Letter"). | Upon execution of this Agreement. | Yes |

**Part 4: Miscellaneous**

(a)  **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to Party A:

| | |
|---|---|
| Address: | c/o Lehman Brothers Inc.<br>Legal Compliance and Audit Group<br>Capital Markets Contracts - Legal<br>1271 Avenue of the Americas, 43rd Floor<br>New York, NY 10020 |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

For all purposes.

Address for notices or communications to Party B:

| | |
|---|---|
| Address: | Highland Credit Strategies Master Fund, L.P.<br>c/o Highland Capital Management, L.P.<br>13455 Noel Road<br>Two Galleria Tower, Suite 1300<br>Dallas, TX 75240 |
| Attention: | Britt Brown |
| Telephone No.: | (972) 628-4100 |
| Facsimile No.: | (972) 628-4172 |

For all purposes.

(b)  **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:    Not applicable.

Party B appoints as its Process Agent:    Highland Capital Management, L.P.
245 Park Avenue, 24th Floor
New York, NY 10167

(c)  **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)  **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)  **Calculation Agent.** The Calculation Agent is Party A, unless (a) the Calculation Agent is otherwise specified in a Confirmation in relation to the relevant Transaction, or (b) an Event of Default with respect

23

to Party A has occurred and is continuing, in which case the parties will mutually appoint a financial institution which would qualify as a Reference Market-maker to act as Calculation Agent until the earlier of (i) a designation under Section 6(c)(ii), or (ii) the discontinuance of such Event of Default with respect to Party A.

(f)    **Credit Support Document.**

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule, and the Credit Support Annex which supplements, forms part of, and is subject to this Agreement.

In the case of Party B, the Credit Support Annex which supplements, forms part of, and is subject to this Agreement.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    Not applicable.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will <u>not</u> apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement; provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)    **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

(a)    **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

   (g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (i)    *Status of Parties.* The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction.

24

(j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)    **Additional Representations of Party B.** Party B represents to Party A in accordance with <u>Section 3</u> of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

(i)    **Reliance on the Investment Manager.** Pursuant to the Trading Authorization, Party B has granted the Investment Manager full discretionary power and authority to make investment decisions for, in the name of, and on behalf of, Party B, including without limitation the power and authority to enter into Transactions as the agent for Party B and to advise and direct Party B to enter into this Agreement and Transactions and to execute and deliver Confirmations in connection therewith. In connection with Party B's entering into this Agreement and any Transactions hereunder, Party A will be entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document which Party A reasonably believes to be genuine furnished to Party A by an employee or agent of the Investment Manager in connection with this Agreement and the Transactions as though such request, instruction, certificate, opinion, or other document were given directly by Party B, until such time that Party B affirmatively, and upon written notice to Party A, revokes, terminates, or modifies the Trading Authorization.

(ii)    **No Plan Assets.** The assets of Party B do not and will not constitute "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

(c)    **Additional Obligations of Party B.** Party B agrees with Party A (so long as Party A and Party B has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party) that:

(i)    **Obligations Relating to Representations.** It will not take any action during the term of this Agreement that may render any of the representations and warranties in this Agreement (including this Schedule) untrue, incorrect or incomplete, and, if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B will immediately give written notice thereof to Party A.

(ii)    **Notice of Certain Events.** It will provide Party A, promptly upon becoming aware of the same, with written notice of: (A) any proposed action, change, or modification to any Operative Document or any other action to be voted on in respect of Party B, in each case that may cause a Termination Event or Event of Default; (B) any pending or threatened litigation, action, claim, or proceeding that may materially adversely affect the ability of Party B to perform its obligations under this Agreement or any Transaction; or (C) the Investment Manager's impending resignation or termination as investment adviser to Party B, or any other facts or developments that may adversely affect the status of Party B to this Agreement.

(iii)    **Net Asset Value.** It will provide Party A, promptly upon request (and in no event more than two local Business Days after such request), with a verbal estimate of its Net Asset Value and performance.

(d)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)    *Set-off.*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger or an Additional Termination Event and the designation of an Early Termination Date pursuant to <u>Section 6</u> of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any

25

Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)     For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)     This provision shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(e)     **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor; provided that, any assignment hereunder shall not be permitted if, as a result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax which would not have arisen had such assignment not been effected.

(f)     **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(g)     **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(h)     **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(i)     **No Violation or Conflict.** Section 3(a)(iii) is hereby amended by inserting the words "or investment policies, or guidelines, procedures, or restrictions" immediately following the words "documents".

(j)     **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "second".

(k)     **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not

26

released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(l)     **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(m)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(n)    **Additional Definitions.** Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Code**" means Internal Revenue Code of 1986, as amended, or any successor statute.

"**ERISA**" means Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

"**General Partner**" means Highland General Partner LP, a Delaware limited partnership, the sole general partner of Party B.

"**Incompetency Event**" means the declaration by a court of competent jurisdiction that a Key Person is incompetent due to a physical, mental or emotional condition resulting from injury, sickness, disease or other cause.

"**Investment Manager**" means Highland Capital Management, L.P., a Delaware limited partnership.

"**Key Persons**" mean both James Dondero and Mark Okada.

"**Net Asset Value**" of Party B shall be equal to the gross assets of Party B less the aggregate amount of all liabilities of Party B (including all absolute and contingent liabilities of any kind) and shall be determined in accordance with generally accepted accounting principles in the country in which Party B is organized or the United States and on a basis consistent with prior periods, subject, at any time, to any change thereon consistent with customary standards in effect at such time per the Financial Accounting Standards Board ("FASB").

"**Operative Documents**" means (i) the Amended and Restated Limited Partnership Agreement of Party B dated as of August 24, 2005, as amended from time to time; (ii) the Confidential Private Offering Memorandum for Limited Partnership Interests in Highland Credit Strategies Fund, L.P. dated as of November 11, 2005, (iii) the Confidential Private Offering Memorandum for Highland Credit Strategies Fund, Ltd. dated as of November 11, 2005 ; and (iv) the Trading Authorization and other constitutional documents, investment policies, procedures, restrictions, or guidelines and the then-current disclosure document of Party B and the Investment Manager (if different from Trading Authorization).

"**Trading Authorization**" means the applicable then in effect Investment Management Agreement dated as of August 18, 2005, between Party B and Investment Manager, authorizing the Investment Manager to act on behalf of Party B.

(o)    **Misrepresentation.** Section 5(a)(iv) of the Agreement is hereby amended by inserting the words (i) ", the Investment Manager" after the word "party" in the second line; (ii) ", Side Letter" after the word "Agreement" in the third line.

(p)  Amend and Restate Prior Agreement.  This Agreement shall replace and supersede the ISDA Master Agreement dated as of January 5, 2006, between Party A and Party B.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)  **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)  <u>Incorporation of 1998 FX and Currency Option Definitions</u>.  The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)  <u>Amendment of 1998 FX and Currency Option Definitions</u>.  The following amendments are made to the 1998 Definitions:

        Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

        **Currency Obligation.**  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)  **Confirmations.**  Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)  **Netting and Related Provisions.**  Section 2(c) shall not apply to FX Transactions or Currency Option Transactions.  In lieu thereof, the following shall apply:

    (i)  <u>Netting, Discharge and Termination of FX Transactions</u>.  The following provisions shall apply to FX Transactions:

        Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

    (ii)  <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>.  The following provisions shall apply to Currency Option Transactions:

        Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option

28

Transaction under this Agreement.

(d)    **Inconsistencies.** In the event of any conflict between:

   (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

   (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

   (iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| LEHMAN BROTHERS SPECIAL FINANCING INC. | HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P. |
|---|---|
| *Party A* | *Party B* |

By: Highland General Partner, L.P., its general partner

By: _____

By: Highland GP Holdings, LLC., its general partner

By: Highland Capital Management, L.P. Its sole member

By: Strand Advisors, Inc., its general partner

By: _____

| | |
|---|---|
| Name: Locke R. McMurray | Name: Patrick Boyce |
| Title: Managing Director | Title: Chief Administrative Officer |
| Date: | Date: |

29

# LEHMAN BROTHERS

### EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P. ("Party B") have entered into a Master Agreement dated as of July 1, 2008, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, either of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)    Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

1

# LEHMAN BROTHERS

(h)    Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

i.    Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

ii.    Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

iii.    no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

iv.    this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

v.    the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)    Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)    No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)    If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

2

# LEHMAN BROTHERS

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

3



*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

to the Schedule to the

Master Agreement

dated as of July 1, 2008

between

| **LEHMAN BROTHERS SPECIAL FINANCING INC.**<br>*Party A* | **HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.**<br>*Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)    *Definitions and Inconsistency*.  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor*.  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3.  Credit Support Obligations**

(a)    *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

> (i) the Credit Support Amount
>
> exceeds
>
> (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

> (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party
>
> exceeds
>
> (ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4.  Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

> (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and
>
> (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

<div align="center">2</div>

<div align="right">ISDA®1994</div>

**(d)**   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6.  Holding and Using Posted Collateral**

(a)     *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

<div align="center">4</div>

<div align="right">ISDA®1994</div>

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a). in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b) *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c) *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d) *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)  *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)  *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)  *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)  *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)  *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)  *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)  *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)  *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)  *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA®1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA®1994

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

9                                                    ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
> > (A) Cash, the amount thereof; and
> >
> > (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**ISDA®1994**

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of July 1, 2008
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(hereinafter referred to as "Party A")
and
**HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.**
(hereinafter referred to as "Party B")

**Paragraph 13.  Elections and Variables**

(a)  **Security Interest for "Obligations".**  The term **"Obligations"** as used in this Annex includes the following additional obligations: None.

(b)  **Credit Support Obligations.**

    (i)  **Delivery Amount, Return Amount and Credit Support Amount**

        (1)  **"Delivery Amount"** has the meaning specified in Paragraph 3(a).

        (2)  **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (3)  **"Credit Support Amount"** has the meaning specified in Paragraph 3.

    (ii)  **Eligible Collateral.**  The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (1) Cash, in the form of U.S. Dollars. | [X] | [X] | 100% |
| (2) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of not more than one year. | [X] | [X] | 99% |
| (3) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than one year but not more than ten years. | [X] | [X] | 98% |
| (4) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than ten years. | [X] | [X] | 97% |
| (5) Such other Eligible Collateral as may be agreed between the parties. | [X] | [X] | As agreed between the parties. |

    (iii)  **Other Eligible Support.**  The following items will qualify as **"Other Eligible Support"** for the party specified:  Not applicable.

    (iv)  **Thresholds.**

        (1)  **"Independent Amount"** shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

        (2)  **"Threshold"** means, with respect to Party A and Party B, zero.

        (3)  **"Minimum Transfer Amount"** means, with respect to a party, USD 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer

Amount shall not apply to the Independent Amount, and _provided further_ that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or Affected Party shall be zero.

(4)    **Rounding.** The Delivery Amount and the Return Amount shall be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

(i)    **"Valuation Agent"** means Party A unless an Event of Default with respect to Party A has occurred and is continuing, in which case the parties will mutually appoint a financial institution which would qualify as a Reference Market-maker to act as Valuation Agent until the earlier of (i) a designation under Section 6(c)(ii), or (ii) the discontinuance of such Event of Default with respect to Party A.

(ii)    **"Valuation Date"** means any Local Business Day.

(iii)    **"Valuation Time"** means the close of business in New York on a Local Business Day provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    **"Notification Time"** means 3:00 p.m., New York time, on a Local Business Day.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** For purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event. For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party A | Party B |
|---|---|---|
| Illegality |  |  |
| Tax Event |  |  |
| Tax Event Upon Merger |  |  |
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule (if any). | [X] | [X] |

(e)    **Substitution.**

(i)    **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii).

(ii)    **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    **Dispute Resolution**

(i)    **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii)    **Value.** For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations

(except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

(iii) **Alternative.** Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral.**

(i) **Eligibility to Hold Posted Collateral; Custodians.**

(1) Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(A) Party A is not a Defaulting Party.

(B) The Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party A is: Not applicable.

(2) Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(A) Party B is not a Defaulting Party.

(B) The Custodian, if any, is a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party B is: As notified by Party B to Party A.

(ii) **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h) **Distributions and Interest Amount.**

(i) **Interest Rate.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii) **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month. A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred.

(iii) **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i) **Additional Representation(s).** Not applicable.

(j) **"Other Eligible Support and Other Posted Support."**

(i) **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k) **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l) **Addresses for Transfers.** As agreed between the parties from time to time.

(m) **Other Provisions.**

(i) **Local Business Day.** For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party

obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

(ii)  **Events of Default.** Paragraph 7(i) is hereby amended by deleting the word "two" and inserting in lieu thereof the word "one".

(iii)  **No offset.** The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

(c)  *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
*Party A*

By: _____

Name:

Title:

Date:

Locke R. McMurray
Managing Director

**HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.**
*Party B*

By: Highland General Partner, L.P., its general partner

By: Highland GP Holdings, LLC, its general partner

By: Highland Capital Management, L.P. Its sole memb

By: Strand Advisors, Inc., its general partner

By: _____

Name:

Title:      Patrick Boyce

Date:      Chief Administrative Officer

14

# EXHIBIT "B"



HIGHLAND CAPITAL
Management, L.P.

Highland Credit Strategies Master Fund, L.P.
c/o Highland Capital Management, L.P.
13455 Noel Road, Suite 800
Dallas, TX 75240

September 22, 2008

VIA COURIER AND FACSIMILE

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

Attention: Documentation Manager
Facsimile: (212) 526-7672

### NOTICE OF DEFAULT AND EARLY TERMINATION

Re:  ISDA Master Agreement (Multicurrency--Cross Border) between Lehman Brothers Special
Financing Inc. ("you") and Highland Credit Strategies Master Fund, L.P. ("we") dated January 5, 2006
(including the Schedule and Credit Support Annex thereto, and as may be amended, supplemented or
modified from time to time, the "Agreement").  Capitalized terms used herein and not otherwise defined
herein shall have the meanings ascribed to them in the Agreement.

This letter serves as a notice of the occurrence of an Event of Default with respect to you under Section
5(a)(vii) of the Agreement.  Accordingly, we hereby designate September 22, 2008 as the Early
Termination Date for all Transactions under the Agreement.  We will notify you, on or as soon as
reasonably practicable following the Early Termination Date, of the amount due under the Agreement.

We reserve all rights under law and under the Agreement, including, without limitation, to declare you to
be in default in respect of any other default that may occur under the terms of the Agreement, and all
rights we may have with respect to other transactions and other agreements with you or your affiliates.

Sincerely,

HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

By:      Highland General Partner, L.P., its general partner

By:      Highland GP Holdings, LLC, its general partner

By:      Highland Capital Management, L.P., its managing member

By:      Strand Advisors, Inc., its general partner

By:      [signature]
Name:  Mark Okada
Title:   Executive Vice President

# EXHIBIT "C"

## CALCULATION STATEMENT FOLLOWING EARLY TERMINATION OF
## ISDA AGREEMENT

| | |
|---|---|
| To: | Lehman Brothers Special Financing Inc. (**"Party A"**) c/o Lehman Brothers Inc. |
| Address: | Transaction Management Group |
| | Corporate Advisory Division |
| | 745 Seventh Avenue |
| | New York, NY 10019 |
| Attention: | Documentation Manager |
| Facsimile: | (212) 526-7672 |
| | |
| From: | Highland Credit Strategies Master Fund, L.P. (**"Party B"**) c/o Highland Capital |
| | Management, L.P. |
| | 13455 Noel Road, Suite 800 |
| | Dallas, TX 75240 |
| Phone: | (972) 628-4100 |
| Facsimile: | (972) 628-4147 |
| | |
| Date: | October 10, 2008 |
| | |
| Re: | ISDA Master Agreement (1992 Form) dated as of January 5, 2006 between Party A and Party B, the Credit Support Annex and Schedule to Master Agreement related thereto and all Confirmations and Transactions thereunder, in each case, as such documents are amended and supplemented from time to time (collectively, the "Agreement") |

---

Pursuant to Section 6(d)(i) of the Agreement, Party B hereby provides to Party A this calculation statement setting out amounts now due and payable as a result of the designation of the Early Termination Date of all Transactions pursuant to the Notice of Termination provided by Party B to Party A on September 22, 2008 in respect of the Agreement.

Party B hereby demands payment from Party A in the amount of $12,534,685.60 as calculated pursuant to Annex A hereto (the "Payment Amount"). The Payment Amount is due and payable immediately upon receipt of this calculation statement pursuant to Section 6(d)(ii) of the Agreement, and shall be paid by Party A in immediately available funds to the following account:

LAS99 1700628-1.079765.0011

Payment to:
Highland Credit Strategies Master Fund, L.P.
The Bank of New York
ABA #: 021 000 018
For credit to GLA: 211551
FFC Account#: 466107
Attention: Marisela Rodriguez, 713-483-6604
Reference: (Borrower Name, Type of Payment/description)
Email: mariselarodriguez@bankofny.com

Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in the Agreement.

HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

By: Highland General Partner, L.P., its general partner

By: Highland GP Holdings, LLC, its general partner

By: Highland Capital Management, L.P., its managing member

By: Strand Advisors, Inc., its general partner

By: _____

Name: Patrick Boyce

Title: Treasurer

LAS99 1700528-1.079765.0011

**Annex A to Calculation Statement**

**Settlement Amount**

       Market Quotations

       $19,828,813.38   Payable in respect of each Terminated Transaction for which
                                 Market Quotation was determined

       Loss

       $-7,639,606.77   Payable in respect of Party B's Loss for each Terminated
                                   Transaction for which Market Quotation cannot be determined
                                   or would not (in Party B's reasonable belief) produce a
                                   commercially reasonable result

**Unpaid Amounts (owing to Party A)**

       $4,738,318.06

**Unpaid Amounts (owing to Party B)**

       $1,312,261.25

**Posted Collateral**

       Initial Margin posted by Party B: $7,571,273.00
       Variation Margin posted by Party A: $-3,823,255.00
       Total Collateral:  $3,748,018.00
       September Collateral Interest: $3,152.34

**Expenses**

       $5,095.25      Amounts incurred by Party B and payable by Party A pursuant
                          to Section 11 of the Agreement.

**Set-off**

       $0              Any other obligation of Party B to Party A

**Total Net Amount Now Due to Party B**    **$12,519,415.39**

LAS99 1700628-1.079765.0011

Interest

| | |
|---|---|
| $15,270.21 | Interest payable by Party A pursuant to Section 6(d)(ii) of the Agreement |

**Total Net Amount Now Due to Party B including interest    $12,534,685.60**
Subject to accrual interest at Default Rate from date due to date paid in full

*Calculations details are attached hereto on the following pages.*

LAS99 1700628-1.079765.0011

**Highland Credit Strategies Master Fund, LP.**

| | | | |
|---|---|---|---|
| Settlement Amount | | | |
| | Market Quotation | $ | 19,828,813.38 |
| | Loss | | (7,639,606.77) |
| | | | |
| Unpaid Amounts (owed to Highland) | | | |
| | Unsettled Trades | | - |
| | 9/22 Premium payment | | 1,312,261.25 |
| | | | |
| Unpaid Amounts (owed to Lehman) | | | |
| | 9/22 Premium payment | | 4,738,318.06 |
| | | | |
| Posted Collateral | | | |
| | Initial Margin posted by Highland | | 7,571,273.00 |
| | Variation Margin posted by Lehman | | (3,823,255.00) |
| | Total Collateral | | 3,748,018.00 |
| | Sept Collateral Interest | | 3,152.34 |
| | | | |
| Highland Legal Expenses | | | |
| | Brian Albert Legal Expense | | 875.00 |
| | SRZ Legal Expense | | 4,220.25 |
| | Total Legal Expenses | | 5,095.25 |
| | | | |
| Set Off | | | - |
| | | | |
| Total Net Amount Due | | | 12,519,415.39 |
| | | | |
| Interest Payable | | | 15,270.21 |
| | | | |
| Total Net Amount Due plus interest | | | 12,534,685.60 |

| Portfolio | Asset | Bond | Record | Maturity | Initial Amount | Commitment Period | Trade Date | Effective Date | Cord Price | Bid | Ask | Time | Bid | Ask | Time |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Highland Credit Strategies Fund - CDS Lehman | Fortune Brands Inc. | CDS - 1.10% - 06/2013 - 14993341J - 03.27.28 | 0.515 | 6/20/2013 | 1,250,000.00 | 13,000,000.00 | 1/27/2008 | 3/20/2008 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | Duke Capital Corp. | CDS - 1.34% - 12/2008 - 256694A3 | 0.0 | 12/20/2008 | | 22,000,000.00 | 11/6/2007 | 12/20/2007 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | HCA Energy, Inc. | CDS - 1.25% - 0M/2D0A4 | 0.0345 | 6/20/2014 | 300,000.00 | 10,000,000.00 | 11/26/2007 | 12/20/2007 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | Semionic-Off Corp. | CDS - 4.315% 80D97A3 - 06.13.37 | 0.0915 | 6/20/2014 | 750,000.00 | 8,000,000.00 | 4/2/2007 | 4/3/2007 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 1.50% - 06/2013 | 0.05 | 6/20/2013 | | 13,000,000.00 | 4/2/2008 | 4/2/2008 | $3.13 | 33 | 37 | 65 | 91.875 | 151 | 8H4.14J|
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 1.50% - 06/2013 - 06.30.08 | 0.05 | 6/20/2013 | | 33,000,000.00 | 7/4/2008 | 7/4/2008 | $4.20 | | | | 91.875 | 16 | 15J4 |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 1.50% - 06/2013 07.10.08 | 0.05 | 6/20/2013 | | 34,000,000.00 | 7/11/2008 | 7/10/2008 | $4.20 | | | | 91.875 | 16 | 15J4 |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 1.50% - 06/2013 07.11.08 | 0.05 | 6/20/2013 | | 77,000,000.00 | 7/11/2008 | 7/11/2008 | $3.20 | | | | 91.875 | 16 | 15J4 |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 5.00% - 06/2013 - 07.31.08 | 0.05 | 6/20/2013 | | 77,000,000.00 | 7/31/2008 | 7/31/2008 | $4.20 | | | | 91.875 | 16 | 15J4 |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 5.00% - 06/2013 - 07.21.08 | 0.05 | 6/20/2013 | | (100,000,000.00) | 7/7/2008 | 7/7/2008 | $3.20 | | | | 91.875 | 16 | 15J4 |
| Highland Credit Strategies Fund - CDS Lehman | Tyson Foods, Inc. | CDS - 5.00% - 09/2013 - RDOFMA47 - 06.19.08 | 0.0513 | 6/20/2013 | | (5,000,000.00) | 4/24/2008 | 4/30/2008 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | McClatchy Company (AMI Rames) | CDS - 1.20% - 05/2011 - H80063A04 - 1.25.08 | 0.0 | 5/20/2011 | | (5,000,000.00) | 2/24/2008 | 3/20/2008 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | McClatchy Company (AMI Rames) | CDS - 1.20% - 05/2011 - H80063A04 - 1.24.08 | 0.0 | 5/20/2011 | | (7,000,000.00) | 2/24/2008 | 3/20/2008 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | CDX.NA.XT.10 | CDS - 1.50% - 06/2013 | 0.013 | 6/20/2013 | | (34,000,000.00) | 4/24/2008 | 4/24/2008 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | Arciner Financial Group, Inc. | CDS - 1.31% - 06/2013 - CD1156A4 | 0.0709 | 12/20/2013 | 350,000.00 | 4,500,000.00 | 12/21/2007 | 12/24/2007 | | | | | | | |
| Highland Credit Strategies Fund - CDS Lehman | Arciner Financial Group, Inc. | CDS - 1.31% - 12/2013 - CD1156A4 | 0.05 | 12/20/2013 | 300,000.00 | 2,000,000.00 | 12/14/2007 | 12/17/2007 | | 27 | 41 | 65 | | | |
| Highland Credit Strategies Fund - CDS Lehman | Arciner Financial Group, Inc. | CDS - 5.00% - CD1156A4 - 11.28 | 0.05 | 12/20/2013 | 200,000.00 | 1,200,000.00 | 11/7/2007 | 11/7/2008 | 100.48 | 27 | 41 | 65 | 15J0 | | |
| Highland Credit Strategies Fund - CDS Lehman | Arciner Financial Group, Inc. | CDS - 1.30% - CD1156A4 | 0.05 | 12/20/2013 | 200,000.00 | 3,200,000.00 | 11/7/2007 | 11/7/2008 | | 27 | 41 | 65 | 15J0 | | |
| Highland Credit Strategies Fund - CDS Lehman | Arciner Financial Group, Inc. | CDS - 4.80% - CD1156A4 | 0.8346 | 7/20/2013 | 280,000.00 | 1,000,000.00 | 1/4/2008 | 1/6/2008 | | 37 | 34 | 65 | 15J0 | 35 | 6:45:10 |
| Highland Credit Strategies Fund - CDS Lehman | ABLZ7.20.A | 0.0676 - 12/2009 | 0.05 | 12/20/2013 | 290,000.00 | 3,750,000.00 | 1/4/2008 | 1/6/2008 | | 37 | 34 | 65 | 15J0 | 35 | 6:45:10 |
| Highland Credit Strategies Fund - CDS Lehman | Interest Rate Swap | 3.74% Fixed Rate - 06/2020 | 0.04 | 6/30/2020 | | 22,000,000.00 | 1/4/2009 | 12/31/2009 | | 37 | 34 | 65 | 13J0 | 35 | 6:45:10 |
| Highland Credit Strategies Fund - CDS Lehman | Interest Rate Swap | Floating - 06/19/2013 | 0.0724 | 6/30/2020 | | 3,750,000.00 | 7/4/2007 | 7/6/2007 | | 37 | 34 | 65 | 3.10 | 35 | 6:45:10 |
| | | | 0.475 | | | 28,541,137.70 | 7/09/2007 | | | | | | | | |
| | | | | | 506,773.00 | 28,541,137.70 | | | | | | | | | |

| Security Name | Issuer | Asset | Spread | Maturity | Commitment Traded | Trade Date | Effective Date | REF | Accrued Interest | Initial Margin |
|---|---|---|---|---|---|---|---|---|---|---|
| Highland Credit Strategies Fund - CDS Lehman | Charter Communications Holdings, LLC | CDS 5.00% - 16117PAK6 | 0.05 | 9/20/2008 | 10,000,000.00 | 12/4/2007 | 12/5/2007 | | $ (129,166.67) | $ 1,200,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Charter Communications, Inc. | CDS 3.75% - 16117PAK6 | 0.0375 | 9/20/2008 | 1,000,000.00 | 7/31/2007 | 8/1/2007 | | (9,687.50) | 50,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Charter Communications, Inc. | CDS 4.250% - 09/2008 - 16117PAK6 | 0.0425 | 9/20/2008 | 2,000,000.00 | 8/15/2007 | 8/16/2007 | | (21,958.33) | 100,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Dole Food Company, Inc. | CDS 3.400% - 09/2008 - 256605AA5 | 0.014 | 9/20/2008 | 2,500,000.00 | 8/1/2007 | 8/2/2007 | | (11,556.33) | 125,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Freescale Semiconductor, Inc. | CDS 3.250% - 09/2008 - 35687MAA7 | 0.0335 | 9/20/2008 | 2,500,000.00 | 8/1/2007 | 8/2/2007 | | (10,893.75) | 125,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Goodyear Tire & Rubber Company, The | CDS 3.45 - 41362TAU4 | 0.015 | 9/20/2008 | 6,250,000.00 | 8/2/2007 | 9/2/2007 | | (24,218.75) | 187,500.00 |
| Highland Credit Strategies Fund - CDS Lehman | Harrah's Operating Company, Inc. | CDS 3.800% - 09/2008 - 413627AU4 | 0.0345 | 9/20/2008 | 2,000,000.00 | 8/7/2007 | 9/2/2007 | | (17,825.00) | 100,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Harrah's Operating Company, Inc. | CDS 3.800% - 09/2008 - 413627AU4 | 0.038 | 9/20/2008 | 2,000,000.00 | 8/7/2007 | 9/2/2007 | | (14,354.17) | 112,500.00 |
| Highland Credit Strategies Fund - CDS Lehman | Massey Energy Co. | CDS 3.00 - 576433AH6 | 0.03 | 9/20/2008 | 2,000,000.00 | 8/2/2007 | 8/3/2007 | | (13,500.00) | 80,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | NRG Energy, Inc. | CDS 1.500% - 09/2008 - 629377AT9 | 0.015 | 9/20/2008 | 1,250,000.00 | 8/2/2007 | 9/2/2007 | | (4,843.75) | 37,500.00 |
| Highland Credit Strategies Fund - CDS Lehman | NRG Energy, Inc. | CDS 1.500% - 09/2008 - 629377AT9 - 08.02.07 | 0.015 | 9/20/2008 | 3,500,000.00 | 8/2/2007 | 9/2/2007 | | (13,562.50) | 105,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | NRG Energy, Inc. | CDS 1.325 - 629377AT9 | 0.01325 | 9/20/2008 | 4,000,000.00 | 7/31/2007 | 9/2/2007 | | (15,758.33) | 120,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Reliant Energy, Inc. | CDS 1.500% - 09/2008 - 75953BAA7 | 0.015 | 9/20/2008 | 1,250,000.00 | 8/1/2007 | 8/2/2007 | | (4,843.75) | 37,500.00 |
| Highland Credit Strategies Fund - CDS Lehman | Reliant Energy, Inc. | CDS 1.500% - 09/2008 - 75953BAA7 - 08.02.07 | 0.015 | 9/20/2008 | 5,000,000.00 | 8/2/2007 | 9/2/2007 | | (19,375.00) | 150,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Reliant Energy, Inc. | CDS 1.525 - 75953BAA7 | 0.01525 | 9/20/2008 | 4,000,000.00 | 7/31/2007 | 8/1/2007 | | (15,738.33) | 120,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Tenet Healthcare Corporation | CDS 4.30% - 09/2008 - 88033GAY6 - 08.15.07 | 0.043 | 9/20/2008 | 2,000,000.00 | 8/15/2007 | 8/16/2007 | | (22,216.67) | 100,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Tenet Healthcare Corporation | CDS 5.850% - 09/2008 - 88033GAY6 | 0.05 | 9/20/2008 | 2,000,000.00 | 8/24/2007 | 8/25/2007 | | (25,833.33) | 130,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Tenet Healthcare Corporation | CDS 5.850% - 09/2008 - 88033GAY6 | 0.0585 | 9/20/2008 | 2,000,000.00 | 9/10/2007 | 9/11/2007 | | (30,225.00) | 160,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Univision Communications Inc. | CDS 3.45 - 91450GAB8 | 0.0345 | 9/20/2008 | 4,000,000.00 | 7/31/2007 | 8/1/2007 | | (35,600.00) | 200,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Univision Communications Inc. | CDS 3.55 - 91450GAB8 | 0.035 | 9/20/2008 | 6,000,000.00 | 8/16/2007 | 8/17/2007 | | (54,250.00) | 125,000.00 |
| Highland Credit Strategies Fund - CDS Lehman | Univision Communications Inc. | CDS 4.000% - 09/2008 - 91450GAB8 | 0.04 | 9/20/2008 | 2,500,000.00 | 8/1/2007 | 9/2/2007 | | (25,833.33) | 300,000.00 |
| | | | | | | | | | $ (590,898.32) | $ 3,865,000.00 |

**Jason Post**

| | |
|---|---|
| **From:** | Amol Shah |
| **Sent:** | Wednesday, October 01, 2008 1:36 PM |
| **To:** | Jason Post |
| **Subject:** | FW: Markit Valuations 22-Sep-2008 |
| **Attachments:** | RESULTS_HighCap_CDS&CDX&ABX_22Sep08.xls |

Regards,

**Amol Shah**
Highland Capital Management, L.P.
13455 Noel Rd, Suite 800
Dallas, TX 75240
972-419-6240

**From:** Fabio Pizzuto [mailto:fabio.pizzuto@markit.com]
**Sent:** Monday, September 22, 2008 3:42 PM
**To:** Amol Shah; Scott Crowell; Matt Killebrew; Joe Emmanuel; Bradley Mack
**Cc:** Frank Waterhouse; Val_NY
**Subject:** Markit Valuations 22-Sep-2008

Please find valuation results attached.

Best wishes,
Fabio Pizzuto
Markit

620 8th Avenue, 35th Floor
NY, NY 10018
Office: +1-212-205-1735
Email: fabio.pizzuto@markit.com

The content of this e-mail is confidential and may be privileged. It may be read, copied and used only by the
intended recipient and may not be disclosed, copied or distributed. If you received this email in error, please
contact the sender immediately by return e-mail or by telephoning +44 20 7260 2000, delete it and do not
disclose its contents to any person. You should take full responsibility for checking this email for viruses.
Markit reserves the right to monitor all e-mail communications through its networks.
Markit and its affiliated companies make no warranty as to the accuracy or completeness of any information
contained in this message and hereby exclude any liability of any kind for the information contained herein.
Any opinions expressed in this message are those of the author and do not necessarily reflect the opinions of
Markit.
For full details about Markit, its offerings and legal terms and conditions, please see Markit's website at
http://www.markit.com .

1

## Dan Drabinski

| | |
|---|---|
| From: | Dan Drabinski |
| Sent: | Monday, September 22, 2008 5:00 PM |
| Cc: | Jason Post; Britt Brown |
| Subject: | CDS Pricing Request: |
| Attachments: | CDS positions for trading desk final 9_22_08.xls |

Please price the attached list of CDS contracts as of 9/22/08. All prices should include both bid and ask. Please let me know if you have any questions.

---

Daniel J. Drabinski, Trader
Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Rd., Suite 800
Dallas, TX 75240
P: (972) 628-4100
F: (972) 628-4147
ddrabinski@hcmlp.com

1

## Jason Post

| | |
|---|---|
| **From:** | Dan Drabinski |
| **Sent:** | Tuesday, September 30, 2008 10:44 AM |
| **To:** | Jason Post |
| **Subject:** | FW: CDS Pricing Request: |
| **Attachments:** | CDS positions for trading desk final 9_22_08.xls |

'jim.joyce@gs.com'; 'mike.hommeyer@ms.com'; 'drew_berkery@ml.com';
'ROBERT.DEVRIES@CITIGROUP.COM', Justin.Adams@bofasecurities.com

**From:** Dan Drabinski
**Sent:** Monday, September 22, 2008 5:00 PM
**Cc:** Jason Post; Britt Brown
**Subject:** CDS Pricing Request:

Please price the attached list of CDS contracts as of 9/22/08. All prices should include both bid and ask. Please let me know if you have any questions.

Daniel J. Drabinski, Trader
Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Rd., Suite 800
Dallas, TX 75240
P: (972) 628-4100
F: (972) 628-4147
ddrabinski@hcmlp.com

1

| Portfolio | Issuer | Asset | Interest | Maturity | Commitment Traded | Trade Date | Effective Date | Bid (Ask) |
|---|---|---|---|---|---|---|---|---|
| Crusader - CDS Lehman | ABX.07.01 A | 0.640% - 12/2099 | 0.0064 | 12/1/2099 | 9,250,000.00 | 12/12/2007 | 12/17/2007 | |
| Highland Credit Strategies Fund - CDS Lehman | Interest Rate Swap | 7.240% Fixed Rate - 05/2023 | 0.0774 | 6/19/2023 | (28,561,137.70) | 7/10/2007 | 7/10/2007 | |
| Highland Credit Strategies Fund - CDS Lehman | Interest Rate Swap | Floating - 06/19/2023 | 0.035 | 6/19/2023 | 28,561,137.70 | 7/10/2007 | 7/10/2007 | |
| Highland Credit Strategies Fund - CDS Lehman | ABX.07.01 A | 0.640% - 12/2099 | 0.0064 | 12/6/2099 | 5,750,000.00 | 12/12/2007 | 12/17/2007 | |

<HELP> for explanation.                                          Equity**CDSW**
1<GO> to save Deal, 2<GO> to save curve source
### CREDIT  DEFAULT  SWAP                        CPU:300

| Deal | Send to VCON | Curves | View | Ref. Obligation | Bond Hedge | Forward CDS Matrix | Accessories |

## Deal  Information  RED Pair:37DF94AB3 | Spreads          Date

7)Reference: Fortune Brands Inc          | Curve Date: 07/22/08
Counterparty:                    Deal:      | Benchmark: S 23 M Mid
Ticker: /          Series:        Privilege: U User | US BGN Swap Curve
Business Days: USD              Settlement Code: USD
Business Day Adj: 1 Following          Currency: USD
B BUY  Notional:       5.00  MM      Amortizing: N | Sprds:U User          A Ask
Effective Date: 3/28/08   Knock Out: N Month End: N | 100057 USD Senior      IMMI
Maturity Date: 6/20/15          Day Count: ACT/360 | Par Cds Spreads  Default
Payment Freq: Q Quarterly     First Cpn: 6/20/08 | Flat:Y   (bps)   Prob
Pay Accrued: T True   Next to Last Cpn: 3/20/15 | 6/22/09  137.000  0.0170
Curve Recovery: T True   Date Gen Method:I IMM | 12/21/09  137.000  0.0283
Recovery Rate:   0.40    Debt Type: 1 Senior | 12/20/10  137.000  0.0503
Deal Spread:      210.000 bps 9)Upfront Fee: 0.00% | 12/20/11  137.000  0.0720
## Calculator          Mode: 1 Calc Price | 12/20/12  137.000  0.0931
Valuation Date: 07/22/08   Model: 9  JPMorgan | 12/20/13  137.000  0.1138
Cash Settled On: 9/24/08          | 12/21/15  137.000  0.1537
Price:      103.04309739 Repl Sprd:  136.909 bps | 12/20/18  137.000  0.2161
Principal:    -91,292.92 Sprd DV01:  1,282.22 | Frequency: Q Quarterly
Accrued:         0.00 Days: 0   32) Sprd KRR | Day Count: ACT/360
Market Val:   -91,292.92 IR DV01:    21.28 | Recovery Rate:    0.40

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
02-Oct-2008 16:46:19

Equity**MSG**

10
1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 11:46:34     Forwarded - Originally from: JASON BRAUTH (GOLDMAN, SACHS & CO.)

From: ◉ JIM JOYCE (GOLDMAN, SACHS & CO.)
     No Attachments

HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP
RECIPIENT TIME: 9/29 23:49:26



RETAILER/GROCER/CONSUMER CDS #18
SLE 53-58 -5|SMY 58-63 -3 |TGT 70-75 -8 |RSH 167-177 -
CVS 47-52 -5|KR  52-57 -4 |AZO 92-97 -7 |SRAC 465-480 -10
CAG 47-52 -5|DEL 80-87 -3 |JWN 123-133 -7 |NMG 445-465 -10
GIS 36-41 -4|ABS 127-137 -3 |SPLS 143-153 -4 |ODP 475-495 -10
CPB 24-29 -3|SVU 225-235 -3 |GPS 93-100 -4 |CCL 117-127 -13
MCD 28-33 -3|              |HD  148-158 -7 |RCL 425-440 -5
NWL 95-100-3|BDK 120-130 -10|KSS 118-128 -7 |EXPE 278-293 -12
KFT 81-86 -6|RYD 148-158 -12|JCP 195-205 -17|MAR 238-248 -12
WMT 40-45 -1|▨ 127-137 -13|FD  223-233 -10|HOT 268-278 -12
LOW 69-74 -6|DRI 203-213 -12|LTD 297-307 -8 |TSG 19-20½ -½
VFC 67-72 -5|TSN 303-313 -10|JNY 302-312 -18|HET 42¾ -44¾ -1
YUM 113-123-9|WEN 295-310 -10|LIZ 380-395 -5 |HLT 19-20½ -1½

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; price/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY! YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING (FULL TERMS) www.gs.com/disclaimer/pricinginfo). For UK, issued/app.
by GS Int'l. auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                           29-Sep-2008 16:49:30

15                                                    Corp **MAIL**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
    9/22 10:04:33    Edit & fwd - Originally from: KELLY MAIER (GOLDMAN, SACHS & CO.)
  From: o JIM JOYCE (GOLDMAN, SACHS & CO.)
        No Attachments
HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP
                                            RECIPIENT TIME: 9/24 23:07:01




HY TMT INDEX CDS    #4

| | | | | | | |
|---|---|---|---|---|---|---|
| AMD | 29/32 | | IKN | 100/120 | WIN 280/300 | -5 |
| AMKR | 565/595 | -10 | INTEL | 745/775 | +5 | |
| AT | 950/115 | -7 | LLL | 135/155 | -5 | |
| CLS | 405/435 | -10 | LU | 645/685 | +10 | |
| CVC HOLD | 465/495 | | LVLT | 20/23 | -20 | |
| CZN | 325/345 | | MCCC | 715/755 | -5 | |
| DISH | 350/380 | | NT | 17/20 | +20 | |
| DTV | 345/375 | -5 | QUS CAP | 560/590 | | |
| FLEX | 305/325 | | SANM SB | 585/615 | +10 | |
| FDC | 695/725 | | SDS SR | 530/570 | -10 | |
| FSL | 890/930 | -10 | UIS | 715/755 | -10 | |

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. Info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; price/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY; YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING (FULL TERMS: www.gs.com/disclaimer/pricinginfo). For UK, issued/app.
by GS Int'l, auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7300 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900   Singapore 65 6212 1000   U.S. 1 212 318 2600   Copyright 2008 Bloomberg Finance L.P.
                                            0401-637-1 24-Sep-2008 16:07:40

13                                                    Corp **MAIL**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
  9/22 6:41:25
  From: o JUSTIN ADAMS (BANC OF AMERICA SECU)                1-646-855-6030
        No Attachments                                         NEW YORK
justin.adams@boasecurities.com                 w: 646.855.6030 c:602.316.4616
                                               RECIPIENT TIME: 9/24 17:09:31

          BAS HY CDS:    EMS
          9/20/13
          CLS      440/460
          FLEX     315/325
     SAHN     580/600

This communication is confidential, may be legally privileged, and is for the sole use of the intended recipient. It is
not a solicitation, commitment or offer. It is NOT a research report under U.S. law, NOT a research department product
and is intended only for sophisticated investors/clients. It has been prepared by, and is a product of, a desk that
supports underwriting, sales, trading or investment banking activities, and we do not hold it out as impartial in
relation to such activities. See http://www.bankofamerica.com/emaildisclaimer for other information including
confidentiality provisions, electronic communication risks, transaction/pricing policies and certain other matters.
Australia 61 2 9777 8600 Brazil 5311 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                              C401-637-1 24-Sep-2008 16:09:33

Corp **MSG**

3
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 15:14:34
From: ⊙ JUSTIN ADAMS (BANC OF AMERICA SECU)                    1-646-855-6030
No Attachments                                                 NEW YORK
justin.adams@boasecurities.com                       w: 646.855.6030 c:602.316.4616
RECIPIENT TIME: 9/24 17:17:40

 HY10 91$\frac{11}{16}$-91$\frac{7}{8}$    HY9 89$\frac{1}{4}$-89$\frac{1}{2}$    HY8 89$\frac{5}{8}$-89$\frac{7}{8}$



This communication is confidential, may be legally privileged, and is for the sole use of the intended recipient. It is
not a solicitation, commitment or offer. It is NOT a research report under U.S. law, NOT a research department product
and is intended only for sophisticated investors/clients. It has been prepared by, and is a product of, a desk that
supports underwriting, sales, trading or investment banking activities, and we do not hold it out as impartial in
relation to such activities. See http://www.bankofamerica.com/emaildisclaimer for other information including
confidentiality provisions, electronic communication risks, transaction/pricing policies and certain other matters.
Australia 61 2 9777 8600 Brazil 3311 3048 4300 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
6401-637-1 24-Sep-2008 16:17:42

Corp **MSG**

12
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 13:33:36      Forwarded - Originally from: ANDREW GOLDMAN (MORGAN STANLEY)
From: ●ANDREW GOLDMAN (MORGAN STANLEY)
       No Attachments
a front row seat to history                              212 761 1751    973 809 6146
                                          RECIPIENT TIME: 9/24 17:20:37

 ig10 w/ 146¾ /148¼ -2¼  hy10 91⅞ /92⅜ - ⅜



         cdx

This is not research report and is not from MS Research but  it may refer to a research analyst/research report.Please
contact me for MS Research reports(plus important  disclosures)or review the latest reports at https://secure.
ms.com.Unless otherwise indicated,the views expressed are  the author's and may differ from those of MS Research or
others with-in Morgan Stanley.This material will not be  updated,and we do not represent that it is accurate or
complete.This is not an offer to buy or sell,or solicitation  of an offer to buy or sell,the securities mentioned.MS
may  invest in or act as market maker for securities mentioned or  may advise the issuers.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900        Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                    G401-637-1 24-Sep-2008 16:21:00

Backpage                                                Corp **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
    9/22 14:27:35    Forwarded - Originally from: SIDDHARTH PRABHU (GOLDMAN, SACHS & CO.)
    From: ⊙JIM JOYCE (GOLDMAN, SACHS & CO.)
        No Attachments
HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP
                                              RECIPIENT TIME: 9/24 23:18:59

 

HY10 5Y: 91$\frac{13}{16}$/92  -$\frac{13}{16}$Pt (Spread 746.9/740.8, +25.6)

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; price/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY, YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING (FULL TERMS: www.gs.com/disclaimer/pricinginfo). For UK, issued/app.
by GS Int'l, auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                        G401-637-1 24-Sep-2008 16:19:01

14                                                              Equity**MSG**
1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22  8:35:39

| From: ☺ ROMAN SHUKHMAN (JPMORGAN SECURITIES) | 1-212-834-7329 |
|---|---|
| No Attachments | NEW YORK |

CDS Trading                              w(212) 834-7329   c(917) 523-4323
                                         RECIPIENT TIME: 9/29 17:35:03

   hycdx10 92⅜ /93   141½ /143½   pick your poison

This communication is for information purposes only. It is not intended as an offer for the purchase or sale of any
financial instrument, a solicitation to participate in any trading strategy, or an official confirmation of any
transaction. The information is believed to be reliable, but we do not warrant its completeness or accuracy. Prices are
indicative only, and are subject to change without notice. See www.jpmorgan.com/usage for important usage terms. We may
hold a position or act as a market maker in any financial instrument discussed herein. Clients should consult their own
advisors regarding any tax, accounting or legal aspects of this information. Copyright 2007 JPMORGAN CHASE & CO.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                              29-Sep-2008 16:35:10

10                                                        Corp **MSG**

1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 14:51:40
From: ☺MARK HASSELL (UBS SECURITIES LLC)                    1-203-719-1300
        No Attachments                                        STAMFORD
Index Trading - HY/LCDX/Fear/Greed/Panic  mobile 203 554 8991  desk 203 719 1300
                                            RECIPIENT TIME: 9/24 17:18:15

HY10 91⅛ -¾     LCDX10 95.10-.30

Refer to the attached web link for important legal and regulatory
information: http://www.ubs.com/ussalestradingdisclaimer

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                    0401-637-1 24-Sep-2008 16:18:17

15                                              Corp **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 16:16:45
 From: ⊙ANDY HUBBARD (CREDIT SUISSE SECURI)            1-212-538-7007
        No Attachments                                        NEW YORK
HY Credit Derivatives      646 207 6145        andy.hubbard@credit-suisse.com
                                               RECIPIENT TIME: 9/24 17:16:27

 CDX HY10 100s Close:  91 5/8 - 91 7/8     Update: 5:16 PM

|        | Cpn | Bid    | Offer  | Chng   | Spread    | DV01 |
|--------|-----|--------|--------|--------|-----------|------|
| 100s   | 500 | 91 5/8 | 91 7/8 | - 7/8  | 742/735   | 3.21 |
| BBs    | 400 | 98 9/16| 99 9/16| -11/16 | 439/412   | 3.70 |
| Bs     | 500 | 90 3/8 | 91 3/8 | - 7/8  | 793/760   | 2.99 |
| HB     | 500 | 68 3/4 | 70 1/4 | -1 1/8 | 1820/1720 | 1.50 |
| 9/10 Roll | 2 5/16 | 2 9/16 | - 3/16 | (HY10 higher) |  |  |

(roll vs HY9 99s)

Maturity: 20-Jun-13
Unfunded CDX Index CDX10 Series 10

This message is sent by Credit Suisse or an affiliate ('CS') for information only.  Any price or yield information is
indicative and may be changed without notice.  The information contained herein is not an offer or solicitation to buy
or sell any security.  While this information has been obtained from sources believed to be reliable, its accuracy is
not guaranteed.  CS may hold positions in or buy and sell securities referred to herein, or perform/solicit investment
banking mandates or other services for any company named in this message.  Any reference to the terms of executed
transactions should be treated as preliminary only and subject to our formal written confirmation.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                              G401-637-1 24-Sep-2008 16:16:35

<HELP> for explanation.                                        Equity**CDSW**
1<GO> to save Deal, 2<GO> to save curve source
### CREDIT DEFAULT SWAP                                        CPU:299

## Deal Information  RED Pair:9J26DDAE2 | ## Spreads                  Date

| Deal Information | Spreads |
|---|---|
| 7)Reference: Tyson Foods Inc | Curve Date: 9/22/08 |
| Counterparty: ▓▓▓        Deal#: ▓▓ | Benchmark: S▓▓ ▓Mid |
| Ticker: /▓▓▓   Series:   Privilege: ▓ User | US BGN Swap Curve |
| Business Days: ▓▓ ▓▓ ▓▓ | |
| Business Day Adj: ▓ Following   Currency: ▓▓▓ | |
| ▓ BUY  Notional: ▓▓▓▓▓ ▓▓ | Amortizing: N |

| Sprds: ▓ User                    ▓Ask |
|---|
| 101779 USD Senior        IMMI |
| Par Cds Spreads   Default |
| Flat: ▓   (bps)    Prob |

| | Par Cds Spreads (bps) | Default Prob |
|---|---|---|
| Effective Date: 6/15/08   Knock Out: N Month End: N | 6/22/09 | ▓▓▓▓▓ ▓▓▓▓▓ |
| Maturity Date: 9/20/13      Day Count: ACT/360 | 12/21/09 | 311.500 ▓▓▓▓▓ |
| Payment Freq: ▓ Quarterly   First Cpn: 9/22/08 | 12/20/10 | 311.500 ▓▓▓▓▓ |
| Pay Accrued: ▓ True   Next to Last Cpn: 6/20/13 | 12/20/11 | 311.500 ▓▓▓▓▓ |
| Curve Recovery: ▓ True   Date Gen Method: ▓ IMM | 12/20/12 | 311.500 ▓▓▓▓▓ |
| Recovery Rate: 0.40   Debt Type: ▓ Senior | 12/20/13 | 311.500 ▓▓▓▓▓ |
| Deal Spread: ▓235.000▓ bps 9)Upfront Fee: ▓0.00% | 12/21/15 | 311.500 ▓▓▓▓▓ |

## Calculator      Mode: ▓ Calc Price     | 12/20/18 | 311.500 ▓▓▓▓▓ |

| Calculator | |
|---|---|
| Valuation Date: 9/22/08   Model: ▓ JPMorgan | |
| Cash Settled On: 9/24/08 | |
| Price:        96.90123245 Repl Sprd: 311.288 bps | Frequency: ▓ Quarterly |
| Principal:    154,938.38 Sprd DV01: 1,968.66 | Day Count: ACT/360 |
| Accrued:       0.00 Days: 0   32) Sprd KRR | Recovery Rate: ▓▓▓▓ |
| Market Val:   154,938.38 IR DV01: -36.91 | |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000        Copyright 2008 Bloomberg Finance L.P.
                                                                                H445-602-2 26-Sep-2008 17:55:32

11                                                        Corp  **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 12:54:01
   From: o JUSTIN ADAMS (BANC OF AMERICA SECU)                    1-646-855-6030
        No Attachments                                                NEW YORK
justin.adams@boasecurities.com                        w: 646.855.6030 c:602.316.4616
                                                   RECIPIENT TIME: 9/24 17:37:41

       ----- BAS XO/HY TRADE    : ⬛ #9   CDS    ---------------

       Lifted on balance of Tyson 5yr...

            ⬛___MR 12/20/2013 300 310 Market (3)

This communication is confidential, may be legally privileged, and is for the sole use of the intended recipient. It is
not a solicitation, commitment or offer. It is NOT a research report under U.S. law, NOT a research department product
and is intended only for sophisticated investors/clients. It has been prepared by, and is a product of, a desk that
supports underwriting, sales, trading or investment banking activities, and we do not hold it out as impartial in
relation to such activities. See http://www.bankofamerica.com/emaildisclaimer for other information including
confidentiality provisions, electronic communication risks, transaction/pricing policies and certain other matters.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                        6401-637-1 24-Sep-2008 16:37:43

Corp **MSG**

19
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 6:52:36    Edit & fwd - Originally from: JOSHUA FREELAND (MORGAN STANLEY)
From: ● JOSHUA FREELAND (MORGAN STANLEY)                    1-212-761-2771
No Attachments                                              NEW YORK
Credit Trading                                          mob:646-469-4771
RECIPIENT TIME: 9/24 17:39:20



[MS] - 5yr Food & Beverage

| ADM | 85/95 | -- | KFT | 81/86 | -- |
|-----|-------|----|-----|-------|----|
| BUD | 100/110 | -- | PBG | 56/63 | -- |
| CAG | 50/55 | -- | PEP | 45/52 | -- |
| CCE | 47/54 | -- | SLE | 55/60 | -- |
| CPB | 24/26● | -- | TAP | 67/77 | -- |
| GIS | 38/43 | -- | LSN | 300/310 | -- |
| HNZ | 51/56 | -- | CARGIL | ●92/102 | -- |
| HSY | 60/67 | -- | | | |
| K | 47/54 | -- | -much slower start to the | | |
| KO | 38/43● | -- | week so far | | |

This is not research report and is not from MS Research but  it may refer to a research analyst/research report.Please
contact ●● for MS Research reports(plus important disclosures)or review the latest reports at https://secure.
ms.com.Unless otherwise indicated,the views expressed are 'the author's and may differ from those of MS Research or
others with-in Morgan Stanley.This material will not be updated,and we do not represent that it is accurate or
complete.This is not an offer to buy or sell,or solicitation  of an offer to buy or sell,the securities mentioned.MS
may  invest in or act as market maker for securities mentioned or  may advise the issuers.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 63 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                        G401-637-1 24-Sep-2008 16:39:40

**Equity MSG**

1

1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS

9/22 14:54:18    Edit & fwd - Originally from: JASON BRAUTH (GOLDMAN, SACHS & CO.)

From: o JIM JOYCE (GOLDMAN, SACHS & CO.)

No Attachments

HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP

RECIPIENT TIME: 9/29 23:59:40



RETAILER/GROCER/CONSUMER CDS #22

| | | | | | | |
|---|---|---|---|---|---|---|
| SLE | 53-58 -5 | SWY | 58-63 -3 | TGT | 71-76 -7 | RSH | 170-180 +3 |
| CVS | 48-53 -5 | KR | 52-57 -4 | AZO | 93-98 -6 | SRAC | 470-485 -5 |
| CAG | 48-53 -4 | DEL | 80-87 -3 | JWN | 127-137 -3 | NWG | 450-470 -5 |
| GIS | 35-40 -5 | ABS | 127-137 -3 | SPLS | 145-155 -2 | ODP | 480-500 -5 |
| CPB | 23-28 -4 | SVU | 225-235 -3 | GPS | 93-100 -4 | CCL | 120-130 -10 |
| MCD | 27-32 -4 | | | HD | 153-163 -2 | RCL | 437-452 +7 |
| NWL | 96-101-2 | BDK | 122-132 -8 | KSS | 123-133 -4 | EXPE | 282-297 -8 |
| KFT | 81-86 -6 | RYD | 150-160 -10 | JCP | 202-212 -10 | MAR | 240-250 -10 |
| WMT | 40-45 -1 | FD | 130-140 -10 | FD | 230-240 -7 | HOT | 270-280 -10 |
| LOW | 71-76 -3 | DRI | 207-217 -8 | LTD | 300-310 -5 | TSG | 19½ -21 - |
| VFC | 70-75 -2 | BSX | 307-317 -5 | JNY | 310-320 -10 | HET | 43½ -45 - |
| YUM | 115-125-7 | WEN | 297-312 -8 | LIZ | 382-397 -3 | HLT | 19½ -21 -1 |

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen. avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns indicated. Assumption changes may materially impact returns; price/avail. may change w/o notice; past perf. not indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY; YOU AGREE NOT TO DISCLOSE & WE RELY ON THAT AGNT WHEN FURNISHING (FULL TERMS: www.gs.com/disclaimer/pricinginfo). For UK, issued/app. by GS Int'l, auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 9900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
29-Sep-2008 16:59:43



` Corp **MSG**

**11**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
    9/22 8:56:41     Forwarded - Originally from: SCOTT GOODWIN (CITIGROUP GLOBAL MAR)
    From: ⊕ PATRICK KRIS (CITIGROUP GLOBAL MAR)                           1-212-723-6065
          No Attachments                                                      NEW YORK
DISTRESSED DEBT     PATRICK.F.KRIS@CITI.COM   DESK 212-723-6065   CELL 703-855-9145
                                                 RECIPIENT TIME: 9/24 17:40:59



HIGH YIELD MEDIA/TELECOM CDS  HY10+

|          |           |   |       |          |     |   |     |
|----------|-----------|---|-------|----------|-----|---|-----|
| BCE INC  | 385 - 405 |   | IAR   | 47       | -   | 49 |    |
| BCE ACQ  | 720 - 750 |   | INTEL | LTD740   | -   | 770 |   |
| CCU      | 32 - 33   |   | INTEL | BMD685   | -   | 715 |   |
| CSCH     | 480 - 500 |   | MNI   | 33       | -   | 34 |    |
| CVCC     | 590 - 620 |   | RHD   | 38       | -   | 40 |    |
| DISH     | 360 - 380 |   | FON   | 330      | -   | 340 |   |
| DTV      | 355 - 375 |   | UVN   | 30       | -   | 32 |    |

For information purposes only. This is not a confirmation. Trade details are subject to terms and conditions contained
in our official confirmation. We may make markets, buy/sell as principal or have a position in financial products
herein. An employee may be a director of, and we may perform or solicit investment banking or other services from any
company herein. We do not guarantee that this information is accurate, complete or that any returns indicated will be
achieved. Price/availability is subject to change. This is not an offer to sell or a solicitation of any offer to buy
any financial product. Changes to assumptions may have material impact on returns. For info, please contact your rep.
Australia 61 2 9777 8600 Brazil 5311 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                              6401-637-1 24-Sep-2008 16:41:01

Equity**MSG**

4
1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
  9/22 9:01:32       Forwarded - Originally from: TOM SKOVE (GOLDMAN, SACHS & CO.)

| From: ⊙ JIM JOYCE (GOLDMAN, SACHS & CO.) |
| No Attachments |

HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP
                                        RECIPIENT TIME: 9/29 23:57:36

  5yr 32½ -34½

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; price/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY; YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING <FULL TERMS> www.gs.com/disclaimer/pricinginfo>. For UK, issued/app.
by GS Int'l. auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000        Copyright 2008 Bloomberg Finance L.P.
                                                                                 29-Sep-2008 16:57:37

1                                                    Corp **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 7:53:43      Edit & fwd - Originally from: DIXIE KLAIBERT (MERRILL LYNCH/NY,WFC)
From: ◇DIXIE KLAIBERT (MERRILL LYNCH/NY,WFC)                    1-212-449-4694
       No Attachments                                                NEW YORK
                                                              m:347 782 2046
                                            RECIPIENT TIME: 9/24 17:41:54
        ∗ML TMT∗ CABLE/MEDIA/TECH UPDATE:        w/ change from open
        BLC       395/405  -20 LIBERT  460/470  -7 TWC    145/155  -
        CA        170/180  -5  MNI     32/35    -  TWX    120/130 -10
        CBS       170/180  -9  MOT     245/255 -10 VIA    155/165  -5
        CMCSAcabl 40/50    -5  NWS     55/60    -
        CMCSAcorp 115/125 -15  NYT     330/340 -10
        COX       60/70    -5  OMC     55/60    -2
        CSC       57/62    -3  PBI     55/60    -2
        DIS       40/45    -   RCICN   155/165  -
        GCI       330/340  -5  RRD     150/160 -10
        IILG      475/485 -10  SJRCN   210/220  -5
        IPG       455/475  -5  TRICN   140/150  -
                               TWE     145/155  -

The information herein has been obtained from various sources. We do not guarantee its accuracy. Neither the
information, recommendations or opinions expressed herein constitutes an offer to buy or sell any securities,
futures, options, or investment products. Foreign currency denominated investments are subject to fluctuation in
exchange rates that could have a positive or adverse effect on the investor's return.

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                G401-637-1 24-Sep-2008 16:41:55

8                                                              Corp **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
    9/22 14:42:52
    From: o JUSTIN ADAMS (BANC OF AMERICA SECU)                  1-646-855-6030
          No Attachments                                            NEW YORK
    justin.adams@boasecurities.com                        W: 646.855.6030 c:602.316.4616
                                                    RECIPIENT TIME: 9/24 17:29:52
            BAS INDEX UPDATE: 1610  149½ /151  +0





This communication is confidential, may be legally privileged, and is for the sole use of the intended recipient. It is
not a solicitation, commitment or offer. It is NOT a research report under U.S. law, NOT a research department product
and is intended only for sophisticated investors/clients. It has been prepared by, and is a product of, a desk that
supports underwriting, sales, trading or investment banking activities, and we do not hold it out as impartial in
relation to such activities. See http://www.bankofamerica.com/emaildisclaimer for other information including
confidentiality provisions, electronic communication risks, transaction/pricing policies and certain other matters.
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2577 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                      6401-637-1 24-Sep-2008 16:29:53

16                                                        Corp **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
    9/22 15:12:51      Forwarded - Originally from: JOHN D MANN (GOLDMAN, SACHS & CO.)
  From: ○ JIM JOYCE (GOLDMAN, SACHS & CO.)
        No Attachments
HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP
                                                RECIPIENT TIME: 9/24 23:26:10
 HVOL10 390/400 +15.00 CDX10 150½ /152 +1.50 W/W-out  ¾ /1¾

hv10 hg10

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; prior/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY; YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING (FULL TERMS: www.gs.com/disclaimer/pricinginfo>. For UK, issued/app.
by GS Int'l. auth. and reg. by FSA, but not made avail. to retail client
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                              6401-637-1 24-Sep-2008 16:26:11

20                                                              Corp  **MSG**
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
  9/22 15:05:29
    From: ○ BRIAN WALTER (UBS SECURITIES LLC)                1-203-719-1300
              No Attachments                                      STAMFORD
"Insurance trading"                                           (c)516-313-3501
                                       RECIPIENT TIME:  9/24 17:25:33

  lg10   150½ -152



Refer to the attached web link for important legal and regulatory
information: http://www.ubs.com/ussalestradingdisclaimer

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                               G401-637-1 24-Sep-2008 16:25:34

```
                                                           Corp  MAIL
   10
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 15:50:52                                              Page 1 / 2
     From: ☻ROB DEVRIES (CITIGROUP GLOBAL MAR)              1-212-723-6001
   Subject:  MONOLINE & MORTGAGE INSURER CDS
         97) Bloomberg Function (RUNS)
ROBERT.DEVRIES@CITIGROUP.COM  (W) 212-723-6001     MOBILE 617-259-8130
MONOLINE & MORTGAGE INSURER CDS
```

| REFERENCE ENTITY | 5yr-CDS | RECOVERY | REFERENCE ENTITY | 5yr-CDS | RECOVERY |
|---|---|---|---|---|---|
| ABK AA (HOLD CO) | 37 - 40 | 20/27 | XLCA | 35 -39 | 27/34 |
| ABK AAA (OP CO) | 27½ - 30½ | 23/30 | | | |
| AA/AAA switch | 8 - 11 | | FGIC OPCO | 62 -66 | 21/28 |
| | | | FGIC CORP | 72 -82 | 5/15 |
| MBI AA (HOLD CO) | 27 - 30 | 20/27 | | | |
| MBI AAA (OP CO) | 37 - 40 | 23/30 | MTG | 12 -15 | 27/34 |
| AA/AAA switch | -10½ - -7½ | | PMI | 17 -20 | 26/33 |
| | | | RDN | 33½ -36½ | 25/32 |
| FSA | 765 -815 | 27/34 | | | |
| AGO | 17½ - 20½ | 27/34 | | | |

{RMGR <GO>}

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                      G401-637-1 24-Sep-2008 16:11:33

1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 6:44:36    Forwarded- Originally from: STEVE LIU (BANC OF AMERICA SECU)
From: JACK HOBSON (BANC OF AMERICA SECU)                    1-646-855-8326
No Attachments                                                NEW YORK
646 : 855-8326 (H) (517) 550-6410 (H) : JACK.R.HOBSON@BANKOFAMERICA.COM.
                                            RECIPIENT TIME: 9/29 17:29:10
          ******** BOFA MONOLINE CDS UPDATE     09/22/2008 ********

          Pls see our note earlier on differences between ABK and MBI cash
USER      needs in event of downgrades; suffice to say, holdcos will come
PROFILE   under more pressure as they are entities which gtee inv mtg biz-

          ABK AAA    26.5-28.5          ABK AA/AAA  +9.00/11.00
          ABK AA    +36.0-38.0          MBI AA/AAA  -8.00/-5.00
          MBI AAA    34.0-36.0
          MBI AA     27.5-29.5
          FSA AAA    740-780
          FGIC       63.0-67.0
          XLCA       34.0-37.0
          AGO AAA    19.0-21.0

[illegible disclaimer text]

1079   9/29 16:28 JIM JOYCE/Citizens and Windstream
1078   9/29 16:28 JIM JOYCE/qus corp
1077   9/29 16:26 JIM JOYCE/nortel
1076   9/29 16:25 JIM JOYCE/GS-NY- Felcor Lodging (FCH) Cash and CDS

       NEWS ON SHORT SELLING BAN: STNI SHORTRULE GO

Corp **MAIL**

2
1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
9/22 9:37:02     Forwarded - Originally from: CHRIS MCCARTHY (MORGAN STANLEY)
From: ● CHRIS MCCARTHY (MORGAN STANLEY)
No Attachments
AUTOS/BANKS/BROKERS/FIN/MONOLINES CDS          w212-761-1254     c201-248-8012
RECIPIENT TIME: 9/24 17:13:59

USER PROFILE

| === MS Banks/Brokers/Finance/Agency/Monolines CDS 12/13 # 4 |
|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BSC | 110/130 | -30 | ILFC | 580/620 | -90 | MBIA AAA | 36/39 | +2 |
| LEH | -/- | - | COFf | 320/350 | -20 | MBIA AA | 28/32 | +2 |
| MER | 245/275 | -85 | COFb | 260/290 | -20 | ABK AAA | 27/30 | +4 |
| GS | 265/295 | -70 | HSBCf | 220/250 | -10 | ABK AA | 36/40 | +2 |
| JPM | 115/130 | -25 | GECC | 300/330 | -20 | FSA AAA | 710/750 | +20 |
| CITI | 155/180 | -30 | CIT | 14½ /17½ | | FGIC AAA | *61/ | +1 |
| BAC | 120/135 | -25 | MTG | 9/12 | | XLCA | 32/36 | |
| WB | 380/430 | -60 | PMI | 17/20 | | HRB | 115/135 | |
| WFC | 115/130 | -25 | AIG | 14/17 | | SFI | 31/35 | -1 |
| CSFB | 70/100 | | AXP | 230/250 | -15 | | | |
| WM | 30/33 | | SLM | 820/860 | -60 | | | |
| CFC | 235/265 | -30 | RDN | 32/35 | -3 | | | |

This is not research report and is not from MS Research but  it may refer to a research analyst/research report.Please
contact me for MS Research reports(plus important  disclosures)or review the latest reports at https://secure.
ms.com.Unless otherwise indicated,the views expressed are  the author's and may differ from those of MS Research or
others with-in Morgan Stanley.This material will not be  updated,and we do not represent that it is accurate or
complete.This is not an offer to buy or sell,or solicitation  of an offer to buy or sell,the securities mentioned.MS
may  invest in or act as market maker for securities mentioned or  may advise the issuers.
Australia 61 2 9777 8500 Brazil 5511 3048 4500 Europe 44 20 7390 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000          Copyright 2008 Bloomberg Finance L.P.
E401-637-1 24-Sep-2008 16:14:01

Corp **MAIL**

1

1<GO>PURGE 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS

   9/22 8:04:08     Forwarded - Originally from: PAUL J MUCHRO (GOLDMAN, SACHS & CO.)

  From: ☉ JIM JOYCE (GOLDMAN, SACHS & CO.)

     No Attachments

HY 902-3830 (W) (646) 331-3517 (C) JIM.JOYCE@GS.COM "S" YOUSEFZADEH BACK-UP

                                RECIPIENT TIME: 9/24 23:15:09



FOLKS, MONOLINE OPEN

|      |     |           | POINTS |
|------|-----|-----------|--------|
| ABK  | AAA | 26.0/28.5 | 0      |
|      | AA  | 36.0/38.5 | 0      |
| MBIA | AAA | 34.0/36.0 | 0      |
|      | AA  | 27.0/29.5 | 0      |
| FSA  | AAA | 730/770   | 0      |
| XL   | AAA | 33.0/36.0 | 0      |

Not an offer, recommendation, gen. solicitation or off. confirm of terms. Prepared by Research/Sales/Trading from gen.
avail. info believed reliable. No representation of accuracy/completeness is made or that you will achieve returns
indicated. Assumption changes may materially impact returns; prior/avail. may change w/o notice; past perf. not
indicative of future results. GS may have a position in any subject investment. GS PRICING IS PROPRIETARY; YOU AGREE NOT
TO DISCLOSE & WE RELY ON THAT AGMT WHEN FURNISHING (FULL TERMS; www.gs.com/disclaimer/pricinginfo). For UK, issued/app.
by GS Int'l. auth. and reg. by FSA, but not made avail. to retail client.
Australia 61 2 9777 9600 Brazil 5511 3048 4500 Europe 44 20 7390 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 319 2000     Copyright 2008 Bloomberg Finance L.P.
                                                     6401-637-1 24-Sep-2008 16:15:12

EquityMSG

You are not allowed to copy this screen.

9/22 10:02:28

From: ERIC PITT (JPMORGAN CHASE BANK)                              1-212-834-4040
      No Attachments                                                      NEW YORK
DISTRESSED FIVE                        612 834 4040 0917 406 2402 SENDER(S)
                                       RECIPIENT TIME: 9/29 17:26:17

USER          JPM XO --- MONOLINES ---  FINDING A LEVEL ---
PHONE
              ABK HLD    37½ /39½
      [IB]    ABK OP     27½ /29½
              AGO        19½ /21½
              FGIC OP     62/66
              FSA OP     750/780
              MBIA HLD    27/29
              MBIA OP    35/37
              XL CAP     285/315
              XLCA       33½ /36½

This communication is for information purposes only. It is not intended as an offer or the purchase or sale of any
financial instrument, a solicitation to participate in any trading strategy, or an official confirmation of any
transaction. The information is believed to be reliable, but we do not warrant its completeness or accuracy. Prices
indicative only and are subject to change without notice. JPM von Jpmorgan conclusions for important. Does forms
hold a position or act as a market maker. Where financial instrument discussed herein. Clients show acknowledge that
advisors regarding any tax accounting or legal aspects of this information. Copyright 2007 JPMORGAN CHASE & CO.

1077  9/29 16:26 JIM JOYCE/nortel
1076  9/29 16:25 JIM JOYCE/CS HY- Felcor Lodging (FCH) Cash and CDS
1075  9/29 16:24 JIM JOYCE/mccc insight and sorch
1074  9/29 16:23 JIM JOYCE/intelsat

1                                                                    Equity**MSG**
1<GO>DEL 2<GO>REPLY 3<GO>FWD 11<GO>NEXT 12<GO>PREV 99<GO>OPTIONS
   9/22 15:59:53

| From: ⊕MICHAEL CANNON (UBS SECURITIES LLC) | 1-203-719-7844 |
|---|---|
| No Attachments | STAMFORD |

UBS Distressed   Some men just want to watch the world burn.

RECIPIENT TIME:  9/29 17:25:25

--UBS-- bond insurer/mtg insurer cds    -CLOSE-

| | | 09/19 | 12:00 | 13:00 | 14:00 | 15:00 | CLOSE |
|---|---|---|---|---|---|---|---|
| MBIA | op co | 33-35 | 37-39 | 37-39 | 37-39 | 38-40 | 37-38 |
| MBIA | h co | 26-28 | 27-29 | 27-29 | 27-29 | 28-30 | 28-30 |
| | op co | 25-27 | 29-31 | 29-31 | 28-30 | 30-32 | 29-31 |
| | h co | 34-36 | 38½-40½ | 38½-40½ | 37½-39½ | 39½-41½ | 39½-1½ |
| FSA | op co | 750-800 | 770-800 | 770-800 | 760-790 | 770-800 | 770-800 |
| XL | op co | 35-37 | 36½-38½ | 37-39 | 36-38 | 37-39 | 37-39 |
| FGIC | op co | 60-65 | 63-68 | 63-68 | 62-67 | 63-68 | 63-68 |
| AGO Corp | | 18-20 | 19-21 | 19-21 | 19-21 | 19½-21½ | 19½-1½ |
| PMI | | 17-19 | 16½-18½ | 17-19 | 17-19 | 17½-19½ | 17½-9½ |
| MTG | | 11-13 | 10½-12½ | 12-14 | 12-14 | 12½-14½ | 12½-4½ |
| RDN | | 34-36 | 33-35 | 33½-35½ | 33½-35½ | 34-36 | 34-36 |

Refer to the attached web link for important legal and regulatory
information: http://www.ubs.com/ussalestradingdisclaimer

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                                    29-Sep-2008 16:25:41

**Interest Claim**

| Date | Amount | Base Rate | Add on for Base Rate | Total Rate | Daily Accrual |
|------|--------|-----------|----------------------|------------|---------------|
| 9/22/2008 | 12,500,294.95 | 2.75% | 1.00% | 3.75% | $ 1,302.11 |
| 9/23/2008 | 12,500,294.95 | 2.75% | 1.00% | 3.75% | 1,302.11 |
| 9/24/2008 | 12,500,294.95 | 2.50% | 1.00% | 3.50% | 1,215.31 |
| 9/25/2008 | 12,500,294.95 | 2.50% | 1.00% | 3.50% | 1,215.31 |
| 9/26/2008 | 12,500,294.95 | 2.25% | 1.00% | 3.25% | 1,128.50 |
| 9/27/2008 | 12,500,294.95 | 2.25% | 1.00% | 3.25% | 1,128.50 |
| 9/28/2008 | 12,500,294.95 | 2.25% | 1.00% | 3.25% | 1,128.50 |
| 9/29/2008 | 12,500,294.95 | 3.25% | 1.00% | 4.25% | 1,475.73 |
| 9/30/2008 | 12,500,294.95 | 7.50% | 1.00% | 8.50% | 2,951.46 |
| | | | | Total | $ 12,847.53 |

<HELP> for explanation, <MENU> for similar functions.          Index **HP**

## CLOSE/MID/YIELD

FEDSOPEN  Garban Fed Funds  Open

Range ░░░░░░ to ░9/20/08░    Period █ Daily

Page  1 / 6
7.0000  M-Mkt Yield
HI 7.0000     ON  9/30/08
AVE 3.0841
LOW 1.7500    ON  9/26/08

| DATE | | YIELD | | DATE | YIELD | | DATE | YIELD |
|---|---|---|---|---|---|---|---|---|
| F | | | F | 9/12 | 2.1250 | F | 8/22 | 2.0625 |
| T | | | T | 9/11 | 2.0625 | T | 8/21 | 2.0000 |
| W | | | W | 9/10 | 2.0625 | W | 8/20 | 2.0000 |
| T | 9/30 H | 7.0000 | T | 9/ 9 | 2.0625 | T | 8/19 | 2.0625 |
| M | 9/29 | 2.7500 | M | 9/ 8 | 2.0625 | M | 8/18 | 2.1250 |
| | | | | | | | | |
| F | 9/26 L | 1.7500 | F | 9/ 5 | 2.0625 | F | 8/15 | 2.1875 |
| T | 9/25 | 2.0000 | T | 9/ 4 | 2.0625 | T | 8/14 | 2.0625 |
| W | 9/24 | 2.0000 | W | 9/ 3 | 2.0625 | W | 8/13 | 2.0625 |
| T | 9/23 | 2.2500 | T | 9/ 2 | 2.1250 | T | 8/12 | 2.0625 |
| M | 9/22 | 2.2500 | M | 9/ 1 | | M | 8/11 | 2.0625 |
| | | | | | | | | |
| F | 9/19 | 2.2500 | F | 8/29 | 2.1250 | F | 8/ 8 | 2.0625 |
| T | 9/18 | 2.5000 | T | 8/28 | 2.0625 | T | 8/ 7 | 2.0625 |
| W | 9/17 | 3.0000 | W | 8/27 | 2.0625 | W | 8/ 6 | 2.0625 |
| T | 9/16 | 3.7500 | T | 8/26 | 2.0625 | T | 8/ 5 | 2.1250 |
| M | 9/15 | 3.5000 | M | 8/25 | 2.0625 | M | 8/ 4 | 2.1250 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
H146-639-1 30-Sep-2008 13:55:09

**Jason Post**

| | |
|---|---|
| **From:** | Brian Albert [brian.albert@gmail.com] |
| **Sent:** | Monday, September 29, 2008 4:03 PM |
| **To:** | Jason Post |
| **Subject:** | Re: |

Apologies for the delay. I would put in $3500.

Brian

On Mon, Sep 29, 2008 at 1:42 PM, Jason Post <JPost@hcmlp.com> wrote:

Can you please send me the invoice amount related to work done in Lehman ISDA's as discussed?  Thanks

---

Highland Capital Management is growing. Check out Careers at www.hcmlp.com.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

--
Brian G. Albert, Esq.
Phone: 323-384-3631
brian.albert@gmail.com

Invoice No. UG 1090460

Invoice Date: 09/30/2008
Client Number : 041579
Matter Number: 0024

Michael Colvin, Esq.
Galleria Tower II
Highland Capital Management, L.P.
12455 Noel Road - Suite 800
Dallas, TX 75240

Employer Identification
Number 13-2633996

## Schulte Roth & Zabel LLP
919 Third Avenue, New York, NY 10022

Re: ISDA

FOR PROFESSIONAL SERVICES RENDERED through September 30, 2008,
in connection with Lehman ISDA as more fully described on the attached detailed billing report:

| | |
|---|---|
| Total Fees | $16,881.00 |
| TOTAL AMOUNT OF THIS INVOICE | $16,881.00 |

SRZ-10760979.2

041579-    Highland Capital Management L.P.                    Invoice No. UG 1090460
0024       ISDA                                               Page 2
09/30/2008

| Date | Timekeeper | | Hours |
|------|-----------|---|-------|
| 08/10/08 | M.A. Aluko | Attention to Lehman ISDAs for ISDA Terms Chart where each Lehman term was outlined and a chart was made. | 3.2 |
| 08/11/08 | M.A. Aluko | Attention to Lehman ISDAs; update terms to ISDA Chart | 4.2 |
| 08/11/08 | W. Teigman | Attention to ISDA terms chart and related communications | 2.2 |
| 08/14/08 | C. Ruiz | Finished revising Chart; Sent email to attorneys with revised Chart to review, confirm &/or comment on corrected input in Chart; Received/reviewed some attorney's Charts with comments/revisions and some with Repo information; then added them to Chart. | 1.3 |
| 08/22/08 | C. Ruiz | Finished adding grace periods chart to ISDA and other definitions; Added all attorney's revised & additional comments. Conference call to discuss chart with client; Made revisions to Chart; Sent email to Attorneys to complete chart for other funds; Telephone call from Highland (Jason) re other FTP file of documents. | 1.0 |
| 09/14/08 | K. Boggiano | Described the ISDA process- made outline/ researched issues related to the same/ outlined issues related to Lehman default and outlined ISDA documents / researched process. | 4.0 |
| 09/14/08 | U. Grofman | Call and prepare for call re LEH | 0.3 |
| 09/15/08 | C. Ruiz | Discussion with Highland (Jason) re termination letters & calculation info. | 1.5 |
| 09/16/08 | C. Ruiz | Printed Lehman ISDAs & gave to Kristin for review; Sent revised chart with only Lehman info. Continued updating chart. | 2.5 |
| 09/16/08 | D. Aron | Read emails from KB and AD re settling CDS - and related to Lehman ISDA documentation. | 0.4 |
| 09/16/08 | K. Boggiano | Discussions related to ISDA termination and ISDA unwinds and calculations related to the same/ research related to the same / review of agreements and internal discussions related to the same. | 5.0 |
| 09/17/08 | K. Boggiano | Multiple discussions related to default notices / review of provisions related to timing of defaults | 3.0 |
| 09/19/08 | K. Boggiano | Multiple discussions about the mechanics of unwind of isda. | 2.0 |

SRZ-10760979.2

041579   Highland Capital Management L.P.                    Invoice No. UG 1090460
0024     ISDA                                                                Page 3
09/30/2008

| Date | Timekeeper | | Hours |
|------|-----------|---|-------|
| 09/22/08 | K. Boggiano | Internal discussions related to ISDA unwinds; review of agreement for expenses / treatment; additional review of default provisions of agreement | 1.7 |

TOTAL HOURS   32.3

TIMEKEEPER TIME SUMMARY:

| Timekeeper | Hours | | Rate | | Value |
|-----------|-------|---|------|---|-------|
| U. Grofman | 0.3 | at | 695.00 | = | 208.50 |
| K. Boggiano | 15.7 | at | 625.00 | = | 9,812.50 |
| D. Aron | 0.4 | at | 595.00 | = | 238.00 |
| M.A. Aluko | 7.4 | at | 510.00 | = | 3,774.00 |
| W. Teigman | 2.2 | at | 550.00 | = | 1,210.00 |
| C. Ruiz | 6.3 | at | 260.00 | = | 1,638.00 |
| Totals | 32.3 | at | | = | 16,881.00 |

CURRENT FEES                                        $16,881.00

TOTAL AMOUNT OF THIS INVOICE                        $16,881.00

SRZ-10760979.2

Page 1 of 5

# LEHMAN BROTHERS    ‖ DERIVATIVES - MTM STATEMENT

**TO:** HIGHLAND CREDIT STRATEGIES MASTER FUND LP

**A/C #:** (2208H06)

**PHONE:** JENNIFER JUBRIUS

**FAX:**

**EMAIL:** jjurrius@hcmlp.com, highland.otc.collateral@hedgefundservices.com; hfmargin@hcmlp.com,opogorecon@hedgefundservices.com;

**FROM:** LEHMAN BROTHERS SPECIAL FINANCING INC

**CON:** ROGER BENSON

**PHONE:** 212-526-2025

**FAX:** 917-522-2025

**EMAIL:** rbce@lehman.com

**DATE:** 12-Sep-2008

**COB VALUATION DATE:** 11-Sep-2008

**REPORTING CCY:** USD

*POSITIVE NUMBERS = DUE TO LEHMAN/COLLATERAL HELD BY YOU*
*NEGATIVE NUMBERS = DUE TO YOU/COLLATERAL HELD BY YOU*

The below estimated value(s) are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value(s). Unless otherwise specified, the below valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). Discussions of trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit.

These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes. As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising there from to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information.

| MTM Summary | | Collateral Summary | Net Settlement Summary |
|---|---|---|---|
| Default Swaps Total: | (6,883,276) | Portfolio Independent Recollment: | |
| FID Swaps Total: | 22,090,926 | Debt Specific Independent Recollment: | 2,521,273 |
| **TOTAL:** | (4,796,350) | **TOTAL:** | 7,571,273 |

| GID | Ref GID | Product Type / Electronic Trade ID | Trade Date | Maturity Date | B/S | CCY | Notional Amount | Fixed Rate | Termination Amount (USD) |
|---|---|---|---|---|---|---|---|---|---|
| 20282682 | 20282682 | DEFAULTS CDX_HY_100_510_0 | 08-Jul-2008 | 20-Jun-2013 | S | USD | 50,000,000 | 0.0685 | (2,609,957) |
| 2995576 | 2995576 | DEFAULTS SANN | 02-Jun-2008 | 20-Jun-2012 | B | USD | 6,500,000 | 0.0537 | 98,005 |
| 3241598 | 3241598 | DEFAULTS RRI | 31-Jul-2007 | 20-Sep-2008 | B | USD | 4,000,000 | 0.0164 | (14,109) |
| 3241601 | 3241601 | DEFAULTS NRG | 31-Jul-2007 | 20-Sep-2008 | B | USD | 4,000,000 | 0.0120 | (14,553) |
| 3241643 | 3241643 | DEFAULTS UVN | 31-Jul-2007 | 20-Sep-2008 | B | USD | 4,000,000 | 0.1236 | (23,268) |
| 3242283 | 3242283 | DEFAULTS CHTR | 31-Jul-2007 | 20-Sep-2008 | B | USD | 1,000,000 | 0.2379 | (3,753) |
| 3246418 | 3246418 | DEFAULTS GT | 01-Aug-2007 | 20-Sep-2008 | B | USD | 6,250,000 | 0.0085 | (22,880) |
| 3246437 | 3246437 | DEFAULTS FSL | 01-Aug-2007 | 20-Sep-2008 | B | USD | 2,500,000 | 0.0394 | (16,580) |
| 3246470 | 3246470 | DEFAULTS UVN | 01-Aug-2007 | 20-Sep-2008 | B | USD | 2,500,000 | 0.1236 | (18,091) |
| 3246483 | 3246483 | DEFAULTS RRI | 01-Aug-2007 | 20-Sep-2008 | B | USD | 1,250,000 | 0.0164 | (4,326) |
| 3246513 | 3246513 | DEFAULTS NRG | 01-Aug-2007 | 20-Sep-2008 | B | USD | 1,250,000 | 0.0120 | (4,467) |
| 3246527 | 3246527 | DEFAULTS DOLEFC | 01-Aug-2007 | 20-Sep-2008 | B | USD | 2,500,000 | 0.0571 | (18,317) |
| 3246565 | 3246565 | DEFAULTS HET | 02-Aug-2007 | 20-Sep-2008 | B | USD | 6,250,000 | 0.1051 | (44,921) |
| 3250816 | 3250816 | DEFAULTS MEE | 02-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.0034 | (14,320) |
| 3250942 | 3250942 | DEFAULTS NRG | 02-Aug-2007 | 20-Sep-2008 | B | USD | 3,500,000 | 0.0120 | (12,508) |
| 3250857 | 3250857 | DEFAULTS RRI | 02-Aug-2007 | 20-Sep-2008 | B | USD | 5,000,000 | 0.0164 | (17,313) |
| 3250956 | 3250956 | DEFAULTS HET | 02-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.1051 | (12,568) |
| 3284446 | 3284446 | DEFAULTS THC | 15-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.0189 | (21,268) |
| 3285519 | 3285519 | DEFAULTS CHTR | 15-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.2379 | (10,066) |
| 3288928 | 3288928 | DEFAULTS UVN | 16-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.1236 | (35,676) |
| 3319271 | 3319271 | DEFAULTS THC | 28-Aug-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.0189 | (24,870) |
| 3341951 | 3341951 | DEFAULTS THC | 10-Sep-2007 | 20-Sep-2008 | B | USD | 2,000,000 | 0.0189 | (29,258) |
| 3476181 | 3476181 | DEFAULTS DOLEFC | 09-Nov-2007 | 20-Dec-2008 | B | USD | 25,000,000 | 0.0573 | (115,376) |
| 3494059 | 3494059 | DEFAULTS NRG | 04-Dec-2007 | 20-Dec-2008 | B | USD | 10,000,000 | 0.0120 | (61,040) |
| 3515721 | 3515721 | DEFAULTS CHTR | 04-Dec-2007 | 20-Sep-2008 | B | USD | 2,750,000 | 0.2379 | (38,681) |
| 3531909 | 3531909 | DEFAULTS ABX_HE_A071 | 12-Dec-2007 | 25-Aug-2037 | S | USD | | 0.0100 | 5,403,537 |
| 3534352 | 3534352 | DEFAULTS ABX | 13-Dec-2007 | 20-Dec-2011 | S | USD | 2,000,000 | 0.1465 | 376,641 |
| 3557472 | 3557472 | DEFAULTS ABX | 04-Jan-2008 | 20-Mar-2013 | B | USD | 2,000,000 | 0.1444 | 376,717 |
| 3561692 | 3561692 | DEFAULTS ABX | 16-Jan-2008 | 20-Mar-2013 | B | USD | 2,000,000 | 0.1444 | 464,905 |
| 3580999 | 3580999 | DEFAULTS ABX | 31-Jan-2008 | 20-Mar-2013 | B | USD | 2,000,000 | 0.1444 | 464,905 |
| 3622384 | 3622384 | DEFAULTS MNI | 13-Feb-2008 | 20-Mar-2015 | S | USD | 7,500,000 | 0.1513 | (1,466,555) |
| 3647399 | 3647399 | DEFAULTS MNI | 13-Feb-2008 | 20-Mar-2015 | S | USD | 4,000,000 | 0.1513 | (782,323) |
| 3648778 | 3648778 | DEFAULTS MNI | 14-Feb-2008 | 20-Mar-2015 | S | USD | 3,500,000 | 0.1513 | (684,535) |
| 3650125 | 3650125 | DEFAULTS MNI | 14-Feb-2008 | 20-Mar-2015 | S | USD | 3,500,000 | 0.1513 | (684,535) |

| | | Product Type | Trade Date | Effective Date | Maturity Date | B/S | CCY | Notional Amount | | Additional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 3740630 | 3740630 | DEFAULTS FO | | 27-Mar-2008 | 20-Jun-2013 | S | USD | 3,000,000 | 0.0158 | 80,598 |
| 3744876 | 3744876 | DEFAULTS CDX_IG_0613 | | 31-Mar-2008 | 20-Jun-2013 | S | USD | 240,000,000 | 0.0146 | (2,234,301) |
| 3749892 | 3749892 | DEFAULTS CDX_NY_S10_0 | 01-Apr-2008 | | 20-Jun-2013 | S | USD | 13,000,000 | 0.0685 | (675,589) |
| 3864176 | 3864176 | DEFAULTS TSN | | 18-Jun-2008 | 20-Sep-2013 | S | USD | 15,000,000 | 0.0320 | (146,010) |
| 3915088 | 3915088 | DEFAULTS CDX_HY_100_S10_0 | 30-Jun-2008 | | 20-Jun-2013 | S | USD | 35,000,000 | 0.0685 | (1,625,970) |
| 3924614 | 3924614 | DEFAULTS CDX_HY_100_S10_0 | 07-Jul-2008 | | 20-Jun-2013 | S | USD | 50,000,000 | 0.0685 | (2,609,957) |
| 3524646 | 3524646 | DEFAULTS CDX_HY_100_S10_0 | 07-Jul-2008 | | 20-Jun-2013 | S | USD | 50,000,000 | 0.0685 | (2,609,957) |
| 3963160 | 3963160 | DEFAULTS CDX_HY_100_S10_0 | 11-Jul-2008 | | 20-Jun-2013 | S | USD | 245,000,000 | 0.0685 | (13,043,979) |
| 3974042 | 3974042 | DEFAULTS CDX_HY_100_S10_0 | 21-Jul-2008 | | 20-Jun-2013 | S | USD | 12,000,000 | 0.0685 | (628,380) |

DEFAULTS SWAPS TOTAL

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3209457 | 1588889L | SWAP | 20-Jul-2007 | 23-Jul-2007 | 19-Jun-2023 | | USD | 29,561,128 | 2,086,926 | |

FIO SWAPS TOTAL

Detail Specific Breakdown (Schedule)

| Ref 1 | Ref 2 | Effective Date | Final Date | Maturity Date | Currency | Nominal (USD) | Percent | Interest (USD) |
|---|---|---|---|---|---|---|---|---|
| 3205457 | 1598886L | 20-Jul-2007 | 23-Jul-2007 | 19-Jun-2023 | USD | 30,627,342 | 1.00 | 306,273 |
| 2986576 | 2986576 | 12-Apr-2007 | 13-Apr-2007 | 20-Jun-2012 | USD | 16,500,000 | 6.00 | 990,000 |
| 3241601 | 3241601 | 31-Jul-2007 | 01-Aug-2007 | 20-Sep-2008 | USD | 4,000,000 | 3.00 | 120,000 |
| 3242283 | 3242283 | 31-Jul-2007 | 01-Aug-2007 | 20-Sep-2008 | USD | 1,050,000 | 5.00 | 50,000 |
| 3246437 | 3246437 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 2,500,000 | 5.00 | 125,000 |
| 3246483 | 3246483 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 2,500,000 | 1.50 | 37,500 |
| 3246527 | 3246527 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 2,500,000 | 5.00 | 125,000 |
| 3250816 | 3250816 | 02-Aug-2007 | 03-Aug-2007 | 20-Sep-2008 | USD | 2,000,000 | 4.00 | 80,000 |
| 3250857 | 3250857 | 02-Aug-2007 | 03-Aug-2007 | 20-Sep-2008 | USD | 5,000,000 | 3.00 | 150,000 |
| 3515721 | 3515721 | 04-Dec-2007 | 05-Dec-2007 | 20-Dec-2008 | USD | 10,000,000 | 12.00 | 1,200,000 |
| 3494069 | 3494069 | 20-Nov-2007 | 21-Nov-2007 | 20-Dec-2008 | USD | 10,000,000 | 3.00 | 300,000 |
| 3476161 | 3476161 | 06-Nov-2007 | 10-Nov-2007 | 20-Sep-2008 | USD | 25,000,000 | 5.00 | 300,000 |
| 3241951 | 3241951 | 10-Sep-2007 | 11-Sep-2007 | 20-Sep-2008 | USD | 2,000,000 | 8.00 | 160,000 |
| 3319271 | 3319271 | 28-Aug-2007 | 17-Aug-2007 | 20-Sep-2008 | USD | 2,000,000 | 6.50 | 130,000 |
| 3288928 | 3288928 | 16-Aug-2007 | 16-Aug-2007 | 20-Sep-2008 | USD | 6,000,000 | 5.00 | 300,000 |
| 3285519 | 3285519 | 15-Aug-2007 | 16-Aug-2007 | 20-Sep-2008 | USD | 2,000,000 | 5.00 | 100,000 |
| 3264446 | 3264446 | 02-Aug-2007 | 03-Aug-2007 | 20-Sep-2008 | USD | 2,000,000 | 5.00 | 100,000 |
| 3250956 | 3250956 | 02-Aug-2007 | 03-Aug-2007 | 20-Sep-2008 | USD | 2,000,000 | 5.00 | 100,000 |
| 3622384 | 3622384 | 31-Jan-2008 | 01-Feb-2008 | 20-Apr-2013 | USD | 2,000,000 | 14.00 | 280,000 |
| 3556099 | 3556099 | 15-Jan-2008 | 16-Jan-2008 | 20-Mar-2013 | USD | 2,000,000 | 14.00 | 280,000 |
| 3561692 | 3561692 | 04-Jan-2008 | 05-Jan-2008 | 20-Mar-2013 | USD | 2,000,000 | 10.00 | 200,000 |
| 3557472 | 3557472 | 03-Jan-2008 | 04-Jan-2008 | 20-Mar-2013 | USD | 2,000,000 | 10.00 | 200,000 |
| 3534352 | 3534352 | 13-Dec-2007 | 14-Dec-2007 | 20-Dec-2012 | USD | 4,000,000 | 8.00 | 320,000 |
| 3531809 | 3531809 | 12-Dec-2007 | 12-Dec-2007 | 25-Aug-2037 | USD | 5,750,000 | 4.00 | 230,000 |
| 3250842 | 3250842 | 02-Aug-2007 | 03-Aug-2007 | 20-Sep-2008 | USD | 3,500,000 | 3.00 | 105,000 |
| 3246565 | 3246565 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 3,500,000 | 3.00 | 105,000 |
| 3246513 | 3246513 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 2,500,000 | 5.00 | 125,000 |
| 3246470 | 3246470 | 01-Aug-2007 | 02-Aug-2007 | 20-Sep-2008 | USD | 2,500,000 | 5.00 | 125,000 |
| 3246416 | 3246416 | 31-Jul-2007 | 01-Aug-2007 | 20-Sep-2008 | USD | 6,250,000 | 3.00 | 187,500 |
| 3241643 | 3241643 | 31-Jul-2007 | 01-Aug-2007 | 20-Sep-2008 | USD | 4,000,000 | 5.00 | 200,000 |
| 3241598 | 3241598 | 31-Jul-2007 | 01-Aug-2007 | 20-Sep-2008 | USD | 4,000,000 | 3.00 | 120,000 |

DEAL SPECIFIC BREAKDOWN TOTAL

████████████████████████████

**Collateral Interest**

| Date | Amount | Total Rate | Daily Accrual |
|---|---|---|---|
| 9/1/2008 | 860,018.52 | 1.94000% | $ 46.35 |
| 9/2/2008 | 860,018.52 | 1.96000% | 46.82 |
| 9/3/2008 | 860,018.52 | 2.01000% | 48.02 |
| 9/4/2008 | 860,018.52 | 1.99000% | 47.54 |
| 9/5/2008 | 860,018.52 | 1.97000% | 47.06 |
| 9/6/2008 | 860,018.52 | 1.97000% | 47.06 |
| 9/7/2008 | 860,018.52 | 1.97000% | 47.06 |
| 9/8/2008 | 860,018.52 | 1.92000% | 45.87 |
| 9/9/2008 | 1,375,018.52 | 1.96000% | 74.86 |
| 9/10/2008 | 3,748,018.52 | 2.12000% | 220.72 |
| 9/11/2008 | 3,748,018.52 | 2.00000% | 208.22 |
| 9/12/2008 | 3,748,018.52 | 2.10000% | 218.63 |
| 9/13/2008 | 3,748,018.52 | 2.10000% | 218.63 |
| 9/14/2008 | 3,748,018.52 | 2.10000% | 218.63 |
| 9/15/2008 | 3,748,018.52 | 2.64000% | 274.85 |
| 9/16/2008 | 3,748,018.52 | 1.98000% | 206.14 |
| 9/17/2008 | 3,748,018.52 | 2.80000% | 291.51 |
| 9/18/2008 | 3,748,018.52 | 2.16000% | 224.88 |
| 9/19/2008 | 3,748,018.52 | 1.48000% | 154.09 |
| 9/20/2008 | 3,748,018.52 | 1.48000% | 154.09 |
| 9/21/2008 | 3,748,018.52 | 1.48000% | 154.09 |
| 9/22/2008 | 3,748,018.52 | 1.51000% | 157.21 |

Total    $    3,152.34

# CLOSE/MID/YIELD

FED101 Fed Fund Effect Rate

for explanation.

Page 1 / 3    Index HP

Range: ____ to 9/26/08    Period Daily

HI 2.30   ON 9/17/08
AVE 2.03
LOW 1.08   ON 9/26/08

| DATE | YIELD | DATE | YIELD | DATE | YIELD |
|------|-------|------|-------|------|-------|
| 9/29 | 1.56 | 9/12 | 2.10 | 8/22 | 2.02 |
| 9/26 L | 1.08 | 9/11 | 2.00 | 8/21 | 2.01 |
| 9/25 | 1.23 | 9/10 | 2.12 | 8/20 | 1.98 |
| 9/24 | 1.09 | 9/9 | 1.96 | 8/19 | 1.94 |
| 9/23 | 1.16 | 9/8 | 1.92 | 8/18 | 1.91 |
| 9/22 | 1.51 | 9/5 | 1.97 | 8/15 | 2.08 |
| 9/19 | 1.48 | 9/4 | 1.98 | 8/14 | 2.09 |
| 9/18 | 2.16 | 9/3 | 2.01 | 8/13 | 1.98 |
| 9/17 H | 2.30 | 9/2 | 1.96 | 8/12 | 1.95 |
| 9/16 | 1.98 | 9/1 | | 8/11 | 1.99 |
| 9/15 | 2.64 | | | 8/8 | 2.01 |
| | | | | 8/7 | 1.96 |
| | | | | 8/6 | 2.01 |
| | | | | 8/5 | 1.97 |
| | | | | 8/4 | 1.97 |

## JPMorgan Schedule of Interest
### HCSMF-HC - Highland Credit Strategies Master Fund LP

Period Start Date 09/01/2008 00:00:00
Period End Date 09/30/2008 23:59:59
Knowledge Date 09/30/2008 17:09:41
Accounting Calendar HCSF-M
Inventory Store Alliance And Popular
Custodian Account Included LEBSHCSMF
US Dollar

Report Type Swap

| Date | HCSMF-HC | LEBSHCSMF | FEDFUND Ntrrest | PAY$ Balance | SIMPLE Balance | Rate + b.p. Spread 860,018.52 | Ntrrest |
|------|----------|-----------|-----------------|--------------|----------------|-------------------------------|---------|
| * Opening Balance * | | | | | | | |
| 09/01/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.99 | 47.54 |
| 09/02/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.94 | 46.33 |
| 09/03/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.96 | 46.82 |
| 09/04/2008 | | | 0 | 860,018.52 | 860,018.52 | 2.01 | 47.54 |
| 09/05/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.99 | 47.54 |
| 09/06/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.99 | 47.54 |
| 09/07/2008 | | | 0 | 860,018.52 | 860,018.52 | 1.97 | 47.06 |
| 09/08/2008 | | | 511,000.00 | 860,018.52 | 175,018.52 | 1.93 | 73.22 |
| 09/09/2008 | | | 2,571,000.00 | 3,748,018.52 | 3,748,018.52 | 1.95 | 204.96 |
| 09/10/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.12 | 204.70 |
| 09/11/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.00 | 208.70 |
| 09/12/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.00 | 208.22 |
| 09/13/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.00 | 208.22 |
| 09/14/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.20 | 208.22 |
| 09/15/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.10 | 218.63 |
| 09/16/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.10 | 218.63 |
| 09/17/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.99 | 206.14 |
| 09/18/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 3.80 | 391.51 |
| 09/19/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.16 | 224.88 |
| 09/20/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 2.16 | 224.88 |
| 09/21/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.48 | 154.69 |
| 09/22/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.51 | 157.21 |
| 09/23/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.46 | 123.00 |
| 09/24/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.19 | 123.93 |
| 09/25/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.23 | 123.66 |
| 09/26/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.23 | 123.96 |
| 09/27/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.23 | 123.44 |
| 09/28/2008 | | | 0 | 3,748,018.52 | 3,748,018.52 | 1.28 | 112.44 |

200809301709419193014623965-20187-A.1.0



**JPMorgan Schedule of Interest**
**HCSMF-HC - Highland Credit Strategies Master Fund LP**
Period Start Date       09/01/2008 00:00:00
Period End Date         09/30/2008 23:59:59
Knowledge Date          09/30/2008 17:59:41
Accounting Calendar     HCSF-H
Inventory Date          HldLastLehPyehka
Custodian/Account Included   LEHBHCMF
US Dollar

Report Type: Swap

| Date | Movement | Report Type: Swap | Balance | Rate x B.P. Spread | Movement |
|------|----------|-------------------|---------|--------------------|----------|

2

200809301709419898148629652088576.1.0

&lt;HELP&gt; for explanation, &lt;MENU&gt; for similar functions.      Index **HP**

**CLOSE/MID/YIELD**                                    Page 1 / 6
FEDSOPEN  Garban Fed Funds  Open                 7.0000  M-Mkt Yield
                                                 HI 7.0000    ON 9/30/08
Range ░░░░░░ to ░░░░░░   Period ▓ Daily          AVE 3.0841
                                                 LOW 1.7500    ON 9/26/08

| | DATE | YIELD | | DATE | YIELD | | DATE | YIELD |
|---|---|---|---|---|---|---|---|---|
| F | | | F | 9/12 | 2.1250 | F | 8/22 | 2.0625 |
| T | | | T | 9/11 | 2.0625 | T | 8/21 | 2.0000 |
| W | | | W | 9/10 | 2.0625 | W | 8/20 | 2.0000 |
| T | 9/30 H | 7.0000 | T | 9/ 9 | 2.0625 | T | 8/19 | 2.0625 |
| M | 9/29 | 2.7500 | M | 9/ 8 | 2.0625 | M | 8/18 | 2.1250 |
| | | | | | | | | |
| F | 9/26 L | 1.7500 | F | 9/ 5 | 2.0625 | F | 8/15 | 2.1875 |
| T | 9/25 | 2.0000 | T | 9/ 4 | 2.0625 | T | 8/14 | 2.0625 |
| W | 9/24 | 2.0000 | W | 9/ 3 | 2.0625 | W | 8/13 | 2.0625 |
| T | 9/23 | 2.2500 | T | 9/ 2 | 2.1250 | T | 8/12 | 2.0625 |
| M | 9/22 | 2.2500 | M | 9/ 1 | | M | 8/11 | 2.0625 |
| | | | | | | | | |
| F | 9/19 | 2.2500 | F | 8/29 | 2.1250 | F | 8/ 8 | 2.0625 |
| T | 9/18 | 2.5000 | T | 8/28 | 2.0625 | T | 8/ 7 | 2.0625 |
| W | 9/17 | 3.0000 | W | 8/27 | 2.0625 | W | 8/ 6 | 2.0625 |
| T | 9/16 | 3.7500 | T | 8/26 | 2.0625 | T | 8/ 5 | 2.1250 |
| M | 9/15 | 3.5000 | M | 8/25 | 2.0625 | M | 8/ 4 | 2.1250 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                              H146-639-1 30-Sep-2008 13:35:09

**Interest Claim**

| Date | Amount | Base Rate | Add on for Base Rate | Total Rate | Daily Accrual |
|---|---|---|---|---|---|
| 9/22/2008 | 12,519,415.39 | 1.51% | 1.00% | 2.51% | $ 872.88 |
| 9/23/2008 | 12,519,415.39 | 1.46% | 1.00% | 2.46% | 855.49 |
| 9/24/2008 | 12,519,415.39 | 1.19% | 1.00% | 2.19% | 761.60 |
| 9/25/2008 | 12,519,415.39 | 1.23% | 1.00% | 2.23% | 775.51 |
| 9/26/2008 | 12,519,415.39 | 1.08% | 1.00% | 2.08% | 723.34 |
| 9/27/2008 | 12,519,415.39 | 1.08% | 1.00% | 2.08% | 723.34 |
| 9/28/2008 | 12,519,415.39 | 1.08% | 1.00% | 2.08% | 723.34 |
| 9/29/2008 | 12,519,415.39 | 1.56% | 1.00% | 2.56% | 890.27 |
| 9/30/2008 | 12,519,415.39 | 2.03% | 1.00% | 3.03% | 1,053.72 |
| 10/1/2008 | 12,519,415.39 | 1.15% | 1.00% | 2.15% | 747.69 |
| 10/2/2008 | 12,519,415.39 | 0.67% | 1.00% | 1.67% | 580.76 |
| 10/3/2008 | 12,519,415.39 | 1.10% | 1.00% | 2.10% | 730.30 |
| 10/4/2008 | 12,519,415.39 | 1.10% | 1.00% | 2.10% | 730.30 |
| 10/5/2008 | 12,519,415.39 | 1.10% | 1.00% | 2.10% | 730.30 |
| 10/6/2008 | 12,519,415.39 | 1.96% | 1.00% | 2.96% | 1,029.37 |
| 10/7/2008 | 12,519,415.39 | 2.97% | 1.00% | 3.97% | 1,380.61 |
| 10/8/2008 | 12,519,415.39 | 2.24% | 1.00% | 3.24% | 1,126.75 |
| 10/9/2008 | 12,519,415.39 | 1.40% | 1.00% | 2.40% | 834.63 |

Total    $ 15,270.21

GRAB

Index **HP**

Page 1 / 3

## CLOSE/MID/YIELD

FED 01   Fed Fund Effect Rate

Range [10/2/08] to [10/7/08]   Period [Daily]

HI 2.97
AVE 1.99
LOW .67

ON 10/ 7/08
ON 10/ 2/08

1.40

| DATE | YIELD | DATE | YIELD | DATE | YIELD | DATE | YIELD |
|------|-------|------|-------|------|-------|------|-------|
| 10/7 |       | 9/19 |       | 8/29 | 1.48 | 8/29 | 1.94 |
| 10/6 | 1.40 | 9/18 |       | 8/28 | 2.16 | 8/28 | 1.99 |
| 10/3 | 2.24 | 9/17 |       | 8/27 | 2.80 | 8/27 | 1.98 |
| 10/2 | 2.97 | 9/16 |       | 8/26 | 1.98 | 8/26 | 1.88 |
| 10/1 | 1.96 | 9/15 |       | 8/25 | 2.64 | 8/25 | 2.01 |
| 10/1 |       |      |       |      |      |      |      |
| 10/2 | 1.10 | 9/12 |       | 8/22 | 2.10 | 8/22 | 2.02 |
| 10/2 | .67 | 9/11 |       | 8/21 | 2.00 | 8/21 | 2.01 |
| 10/2 | 1.15 | 9/10 |       | 8/20 | 2.12 | 8/20 | 1.98 |
| 9/30 | 2.03 | 9/9 |       | 8/19 | 1.96 | 8/19 | 1.94 |
| 9/29 | 1.50 | 9/8 |       | 8/18 | 1.92 | 8/18 | 1.91 |
| 9/25 | 1.08 | 9/5 |       | 8/15 | 1.97 | 8/15 | 2.08 |
| 9/25 | 1.23 | 9/4 |       | 8/14 | 1.99 | 8/14 | 2.09 |
| 9/24 | 1.19 | 9/3 |       | 8/13 | 2.01 | 8/13 | 1.98 |
| 9/23 | 1.46 | 9/2 |       | 8/12 | 1.96 | 8/12 | 1.95 |
| 9/22 | 1.51 | 9/1 |       | 8/11 |      | 8/11 | 1.99 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2008 Bloomberg Finance L.P.
H142-738-0 10-Oct-08 7:15:08

From:   Origin ID: RBDA   (214)651-5000
Dian Gwinnup
Haynes and Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 752197673



Ship Date: 15SEP09
ActWgt: 2 LB
CAD: 9778083/WBUS0200
Account#: S *********

Delivery Address Bar Code

SHIP TO: (646)282-2500          BILL SENDER

**Epiq Bankruptcy Solutions, LLC**
**Attn: Lehman Brothers Claims**
**757 Third Avenue, Third Floor**
**New York, NY 10017**

Ref #     0034882.06191200 84
Invoice #
PO #
Dept #

RECEIVED

SEP 1 6 2009



TRK#
0201      7915 0630 9788

WED - 16SEP          A1
**PRIORITY OVERNIGHT**

**05 OGSA**

10017
NY-US

EWR



- - - - - - - - - - - **FOLD on this line and place in shipping pouch with bar code and delivery address visible**

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

**EXHIBIT A-2**

[LBSFI DERIVATIVE QUESTIONNAIRE]

elmorem | signout

NEW CLAIM / CLAIM TRACKING / CREDITOR INFO / CONTACT

## DERIVATIVE CLAIM SUMMARY

HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.
HAYNES AND BOONE, LLP
2323 VICTORY AVENUE, SUITE 700
Attn: Scott Everett
DALLAS, TX 75219

Name of Debtor | Lehman Brothers Special Financing Inc. (08-13888)

Please identify the counterparties, guarantor and/or credit support provider to the derivative contract. | Lehman Brothers Special Financing Inc. is the counterparty to the contract, and Lehman Brothers Holdings Inc. is the credit support provider/guarantor.

Have you entered into a termination agreement with the Debtors establishing the agreed upon amounts due in respect of derivative contracts? | Selected: Yes

Enter the amount of the derivative claim | $12,132,000.00

Please attach Termination Agreement

| File Name |
| --- |
| Highland Credit Strategies Master Fund LP Termination Letter 9-15-09.pdf |

©Epiq Systems, Inc.