# EXHIBITS A-E

# EXHIBIT A

LBSF-CalWine.xls

**Currency Legend:**
DKK - Danish Krone
EUR - EURO
GBP - Pound Sterling
JPY - Japanesse YEN
KRW - Korean Won
NOK - Norwegian Krone
PLN - Polish Zlotych
RUB - Russian Rubles
SEK - Swedisk Krona
BRL - Brazilian Real

| Type | Port | Legal Entity | Bant Acct# | TRADE | SETTLE | SECURITY | Foreign Currency | CRSS RATE | USD Currency |
|------|------|--------------|-----------|-------|--------|----------|-----------------:|----------:|-------------:|
| Forward Sell | CWWPP | California Winery Workers Pension Plan | 610001348-06 | 8/26/2008 | 9/29/2008 | -BRL Cash | -2,863,450.76 | 1.6546 | 1,730,600.00 |
| Forward Buy | CWWPP | California Winery Workers Pension Plan | 610001348-06 | 9/16/2008 | 9/29/2008 | -BRL Cash | 2,863,450.76 | 1.8555 | -1,543,223 ⁰⁰ |

# EXHIBIT B

**◢FXall**®

900 Third Avenue          **T** +1 646 268 9900
3rd Floor                 **F** +1 646 268 9996
New York NY 10022         **www.fxall.com**

April 3, 2007

ING Investment Management, LLC
10 Statehouse Square
Hartford, CT 06103

Attn:    David L. Bercaw

Re:    FXall User Agreements

Welcome to FXall!

Enclosed for your records please find an original fully-executed FXall User Agreement. Please feel free to contact me at (646) 268-9900 with any questions you may have.

We look forward to working with you.

Best regards,

Stephanie Noel

Enclosure

MAY-18-2007  17:40      ING Investment Management                    P.002

08-13555-mg    Doc 22630-1    Filed 11/16/11    Entered 11/23/11 10:58:46    Exhibit A -
F    Pg 6 of 37
ING Investment AM 2007.03.15.07

# FXall Master User Agreement

The undersigned hereby agree to the terms of the FXall Master User Agreement (the "Agreement") in the form attached hereto, including the pricing and optional services elections made below by selecting the appropriate boxes below. Capitalized terms used herein shall have the same meanings ascribed thereto in the Agreement.

## Pricing Plan Options

Customer elects to subscribe for the Special Plan indicated below. If no indication is made below, Customer will be subject to the "Base Plan" fees set forth in the Agreement.

☐    "Ruby Plan"                            ☐    "Sapphire Plan"

☑    "Emerald Plan"                         ☐    "Diamond Plan"

## Optional Service Elections

Customer elects to subscribe for the Services indicated below :

☐    FXall QuickConnect™                    ☐    FXall TrAPI™

Customers subscribing for a QC Custom Implementation and/or FXall TrAPI™ shall be required to execute separate agreements in respect thereof.

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day written below (the "Effective Date").

FXall:                                       Customer:

**FX Alliance, LLC**, for itself and its affiliates, referred to as     I N G  I n v e s t m e n t  M a n a g e m e n t  L L C
"FXall," or in the first person (e.g., "we," "us" or "our")            for itself and as agent for its clients (as defined in the Agreement),
                                             referred to as "Customer," or in the second person (e.g., "you" or "your")

By: _Michael C Mendez_                       By: _D J L. Bercaw_
Name: _Michael C Mendez_                     Name: _DAVID L. BERCAW_
Title: _COO_                                 Title: _Senior Vice President_
                                             address:
                                             _10 State House Square_
900 Third Avenue                             _Hartford  CT   06103_
3rd Floor
New York, N.Y. 10022
phone: (646) 268-9900                        phone: _860 - 275 - 2225_
fax: (646) 268-9996                          fax: _860 - 275 - 2831_
e-mail: support@fxall.com                    e-mail: _DAVID. BERCAW ) INGINVESTMENT. COM_

Dated: _MARCH  29, 2007_          (the "Effective Date")

MAY-18-2007  17:40        ING Investment Management                                          P.003

08-13555-mg    Doc 22630-1    Filed 11/16/11    Entered 11/23/11 10:58:46    Exhibit A -
                                    ING Investment AM 2007.03.15.07
                                F    Pg 7 of 37

# FXall Master User Agreement

**1. General.** This Agreement (including the Annexes and Operational Procedures) governs your use of the System to access certain FXall Content, submit your Transaction Data and/or conduct those Transactions that are specified by us in Annex A. Capitalized terms are defined in Section 20. Your use of the System is conditioned on each person on whose behalf you conduct Transactions (a "client") having a Trading Relationship with each Provider with which you conduct Transactions through the System. You acknowledge and agree that (a) the System is solely a means to communicate FXall Content and Orders and to facilitate Transactions; (b) with respect to each Transaction, (i) we are not a party to, and will not have any liability, or maintain any trading accounts, with respect to such Transaction, (ii) you, acting as agent for your clients, and your clients, will each proceed only against the applicable Provider to enforce any of your clients' rights in connection with any such Transaction and (iii) subject to the terms of the applicable Trading Relationship, the relevant client account shall be liable for and neither you, acting as agent for such account, nor such client account may repudiate a Transaction upon receipt by the System of a Trade Offer from you; and (c) the opinions, research and recommendations of the Providers are not our opinions, research or recommendations, and we do not endorse them or any FXall Content provided by Providers. The relevant client account shall be responsible for the clearance, execution and settlement of each such Transaction, as established by the applicable Trading Relationship between the applicable client and the applicable Provider. In the event of a dispute between the parties to a Transaction, we will provide, upon request, such information pertaining to the Transaction as is available to us, subject to any obligation we have not to disclose such information and any legal privilege.

**2. License.** FXall hereby grants you a non-exclusive, non-sublicensable, non-transferable, non-assignable personal right and license, for the term of this Agreement, to use the System and Services in the Territory. If you request, we may make available, and provide you with specifications for, one or more FXall software products or services (including, but not limited to, FXall QuickConnect™ and/or FXall APIs) ("Additional Licensed Materials") to enhance your use of the System; our provision of any Additional Licensed Materials may be subject to the execution of an additional agreement and may be at an additional charge. All Additional Licensed Materials shall remain our property; are part of the System and you may use any such Additional Licensed Materials (and any interface created from them) only in accordance with this license and any additional document or agreement governing the use of such Additional Licensed Materials. We do not guarantee that your system will be able to interface with the System through any such Additional Licensed Materials and we shall have no responsibility with respect to adapting your system to interface with the System. You may not, without our prior written consent, make any change or interface to the System that is not specifically authorized by the Operational Procedures.

**3. Ownership of Intellectual Property.** Your Transaction Data and all IP Rights therein are your property; other than the license granted in Section 4, we obtain no rights therein. The System, all FXall Content and all IP Rights in them are our (or our suppliers' or licensors') property and, other than the license granted in Section 2, you obtain no rights in them. You agree that all Click-Stream Data and all Aggregated Transaction Data and all IP Rights in them are our property, notwithstanding that they may be derived in part from your Transaction Data or your use of the System. We shall have no obligation to provide you with any Click-Stream Data or Aggregated Transaction Data. We agree not to, without your prior written consent, sell, license or otherwise provide to any person other than you any Click-Stream Data that directly or indirectly identifies you. Each party shall promptly notify the other of any actual or threatened misappropriation of any IP Right of such other party of which such party becomes aware.

**4. Use of Your Transaction Data.** You hereby grant us (and our affiliates) a worldwide, royalty-free, irrevocable license during the term of this Agreement to transmit and distribute your Transaction Data on the System on a real-time basis only to and from Providers that you have designated and only in connection with the Services.

You also hereby grant to us (and our affiliates) a perpetual, worldwide, royalty-free, irrevocable license to aggregate, compile and analyze your Transaction Data with data of other Customers and/or Providers and create derivative works therefrom. We will not sell, license or provide to any person (other than you) any Aggregated Transaction Data that directly or indirectly identifies you without your prior written consent.

**5. Authorized Persons.** You shall designate one or more employees or other persons under your control as your administrator or administrators, who shall designate other such employees or persons as Authorized Persons, or APs, who will be able to access and use the System on your behalf. Each administrator will also be an AP. Each administrator will have the ability to distribute to each AP a unique user identification ("User ID") and a corresponding password or other access code to enable such AP to access and use the System. The acts of your APs shall be deemed to be your acts. You shall be liable to FXall for the conduct of your APs on the System; in particular, you acknowledge that a breach by any of your APs of any provision of this Agreement or any Trading Relationship constitutes a breach by you. Upon becoming aware of any improper access to or use of the System, you shall immediately notify us and immediately terminate such person's access to and use of the System. You acknowledge and agree that access to and use of the System is through the World Wide Web or other Internet services, which are not necessarily secure, and we do not warrant that such systems are secure. You shall be responsible for the security of your (and your APs') use of the System, and shall take and maintain appropriate steps to ensure the security of your (and their) use of the System.

**6. Your Use of the System.** You agree that you will access and use the System for your own internal use, and will not reproduce any portion of the System or the FXall Content, or alter, decompile or reverse engineer any component of the System (unless otherwise required by Applicable Law) or otherwise take any action likely to harm the System. Notwithstanding the foregoing, you may make and retain copies of reports and records produced by the System of your own Transactions, and you may print copies of any portion of FXall Content, *provided* that you retain and comply with all copyright and other proprietary notices and disclaimers. You agree that your access to and use of the System may be restricted by Applicable Law, and that you will abide by such restrictions. You agree that you will not use the System to (i) send messages that are fraudulent, harassing, libelous, slanderous, obscene, or a violation of any rights of publicity or privacy; (ii) facilitate criminal transactions; or (iii) contravene any Applicable Law. You agree you and the appropriate client account shall be bound by all communications, including Orders and Trade Offers, which are accompanied by a valid User ID (each, a "Customer Order"). We may rely on any such Customer Order and shall have no duty to verify it further. You shall be deemed to have given a Customer Order when we receive it through the System (whether or not you receive any acknowledgment). We may act on such Customer Orders, and any resulting Transactions and other related rights and obligations shall be binding on you, as agent for your clients, and the appropriate client account pursuant to the terms of the appropriate Trading Relationship. You shall be responsible for all administration of your use of the System, including input errors, all record keeping, data file backups and maintenance. At all times you shall use industry-standard anti-virus software and security measures to protect against any viruses operating on your system.

**7. Our Control of the System.** Your access to and use of the System may be subject to limitations we reasonably impose and disclose to you. In addition, we may, without notice, impose further restrictions due to market conditions, Applicable Law, the protection of the security and integrity of the System or other circumstances beyond the control of FXall, as we may determine; *provided* that, in each case, we will inform you as promptly as practicable. You agree that any such limitation or restriction is for the exclusive benefit of FXall; you may not rely on us to implement any limitation or restriction for your benefit. We have sole control over, and may make changes to, the configuration, appearance, content and functionality of the System; *provided* that we will give you advance written notice,

2

MAY-18-2007 17:41 ING Investment Management P.004

08-13555-mg Doc 22630-1 Filed 11/16/11 Entered 11/23/11 10:58:46 Exhibit A - ING Investment AM 2007.03.15.07
F Pg 8 of 37

as soon as reasonably practicable, of any change in the architecture of the System that would materially affect your ability to use the System. We do not guarantee the availability of, or your access to, any Provider on the System at any time. We may terminate your access to a Provider at any time, or may suspend or discontinue a Provider's participation on the System.

**8. Investment Authority.** You represent that you conduct Transactions exclusively on behalf of clients, and that you have due authorization from each such client to transact on the System and to act as such client's agent in conducting Transactions in foreign exchange, Money Market Instruments and other instruments and products. You represent, warrant and agree that such Transactions create legal, valid, binding and enforceable obligations of the relevant client accounts enforceable by you and the applicable Provider in accordance with their terms. You shall be solely responsible for all aspects of your relationship with your clients and for compliance with Applicable Law in connection therewith, and we shall not be liable with respect thereto. Without limiting the generality of the foregoing, you shall (i) retain full responsibility for performing any required assessment of the suitability of each Order submitted by you on behalf of a client; (ii) provide client support, including addressing all inquiries from your clients regarding Transactions; and (iii) provide your clients with all required disclosures in connection with any Transaction.

**9. Fees.** You shall pay us the fees specified in Annex B. In addition, you shall pay any and all taxes and other charges imposed by any government or taxing authority in connection with this Agreement or relating to the Services (other than income tax on our income). You shall also pay any line, communication or other charges arising from your use of the System. Amounts not paid to us when due and payable shall bear interest at the HSBC prime bank rate plus one percent (1%) per annum from the date such amounts are due.

**10. Term and Termination.** This Agreement shall be effective on the Effective Date for a period of one year, and shall automatically be extended by successive one year periods at the end of each term *unless* either party terminates this Agreement as provided herein. This Agreement may be terminated (a) by either party (i) upon written notice immediately on any breach by the other party of Section 2, 3 or 18 of this Agreement, (ii) upon the failure of the other party to cure its breach of any other provision of this Agreement within thirty (30) days of its receipt of written notice of such breach from the first party or (iii) at any time, upon thirty (30) days prior written notice to the other party, (b) by you upon written notice within thirty (30) days of any notice of increase in any fee for Services you currently receive, or (c) by us in the event that the System has been compromised. Immediately upon termination of this Agreement, the license granted in Section 2 shall terminate, you shall cease all use of, and shall not access the System, and you shall promptly return to us or destroy, at your expense, all documents and other materials (and all copies thereof) that contain, refer to, or relate to the System, Services or FXall Content except for necessary archival copies, *provided*, that your confidentiality obligations hereunder with respect to the retained archival copies shall survive the termination of this Agreement and shall continue for so long as you retain such archival copies. You agree to certify to us in writing (upon our request for any such certification) that all such materials have been returned or destroyed. You agree that we may inform any Provider with which you have a relationship that this Agreement has been terminated. Termination of this Agreement shall not affect a party's obligations with respect to any liability or matter arising prior to such termination, including any Transactions executed or fees due or accrued prior to such termination. The provisions of Sections 3, 4, 10, 16, 17, 18, 19 and the indemnification obligations of Sections 11 and 12 shall survive any termination of this Agreement.

**11. Your Additional Representations and Warranties.** At all times during the term of this Agreement, you represent, warrant and covenant to FXall that (i) this Agreement is duly authorized and executed, and creates your legal, valid and binding obligation enforceable by us in accordance with its terms; (ii) the execution, delivery and performance of this Agreement does not violate any

Applicable Law, or any agreement which binds you or affects any of your material assets; (iii) you, acting as agent for the appropriate client, assume full responsibility for the applicable client account's performance of each Transaction; (iv) either (A) any client account on behalf of which you access or use the System is not, a Benefit Plan Client, or (B) your access to or use of the System will not result in any nonexempt prohibited transaction under ERISA or the Code (or any similar law); (v) each individual you appoint as an AP participates in the conduct of any aspect of your foreign exchange execution activities; (vi) you and each of your APs who use the System have all necessary licenses and authorizations (including in connection with the conduct of Transactions); (vii) you are located, qualified and registered (if required) as a corporate or institutional professional investor in one of the jurisdictions listed in Part I of Annex D, or you are located in a jurisdiction listed in Part II of Annex D and meet the requirements applicable to such jurisdiction as set forth therein (either such jurisdiction being referred to as "your jurisdiction"); (viii) no AP shall access or use the System unless such AP is a resident of and is physically located in your jurisdiction; and (ix) any access to and use of the System by you is only by APs. You expressly acknowledge and agree that any access to or use of the System by any AP who is physically located outside of your jurisdiction is strictly prohibited. You agree to indemnify, protect and hold harmless FXall, our Affiliated Parties and our and their Representatives (collectively, the "FXall Parties") from and against any Losses relating to or arising out of your (or any of your AP's) use of or access to the System, the conduct of Transactions through the System on behalf of a client of yours, or your breach of any of your representations, warranties or covenants herein, other than Losses that are covered by our indemnification obligations under Section 12, and except to the extent such Losses result from our fraud, gross negligence, willful misconduct, knowing breach of confidentiality or material breach of any of our representations, warranties or covenants herein.

**12. Our Representations and Warranties.** At all times during the term of this Agreement, we represent and warrant to you that we have all rights, authority, actions and licenses necessary to provide you with rights to access and use the System granted herein, and we shall indemnify, protect and hold you and your Representatives harmless from and against any Losses resulting from or arising out of any Proceedings, to the extent that they are based upon a claim of breach of the foregoing representation and warranty, *except* to the extent such Losses result from (i) your fraud, gross negligence, willful misconduct or knowing breach of confidentiality or (ii) your use of the System in any manner not permitted hereunder; *provided* that, and without limiting the foregoing indemnification obligation of FXall and the disclaimers set forth in Section 16, if any third party asserts a claim that the System infringes or violates such third party's IP Rights or that we do not have all rights, authority, actions and licenses to provide you with the right to access and use the System granted herein, we may, at our election, either (A) defend against such claim, (B) modify or redesign the System to avoid such infringement claim, (C) obtain a license from such third party to permit you to continue to use the System, or (D) terminate this Agreement. The provisions of this Section 12 state the sole and exclusive liability of FXall, and your exclusive remedy, with respect to any such third party claim. **Notwithstanding the foregoing, you acknowledge and agree that we may not be licensed, authorized, registered or otherwise permissioned in any jurisdiction other than the Territory described in Annex D hereto, as amended from time to time by us by notice to you; and you further acknowledge and agree that you will be responsible for ensuring that any activity that you undertake in any jurisdiction, whether as principal or agent on behalf of any clients, is in compliance with Applicable Law.**

**13. Personal Information.** We collect the following personal information about each AP: name, company name and address, company e-mail address and phone number, and an additional entry to be used as verification of an AP's identity in telephone calls with the Client Interaction Center, such as the name of a city easily remembered by the AP but not easily ascertained or guessed by a third party. We may use an AP's personal information (i) to identify the AP as a representative of the Customer, (ii) to monitor use of the FXall website, and for internal administration and

analysis; and (iii) to send each AP information about our products and services. An AP may opt out of the opportunity to receive such information at any time by notifying us. **By disclosing an AP's personal information to us, you and each AP consent to the disclosure of such AP's personal information to FXall for use as described above.** Prior to initial access to the System, each AP shall electronically execute an acknowledgement appearing on the System to the effect that such AP consents to the disclosure, collection, storage and processing of the personal information described above. We may send an AP's personal information internationally so long as the purpose of such transmission is within the permitted use as described above.

    **14. Cookies.** We may set cookies on an AP's computer as identification to permit access to areas of the FXall website in place of login and password and to record use of the FXall website; no such cookies shall be accessible by domains outside of FXall.

    **15. Third Parties.** Certain parts of the System are provided by or in conjunction with third parties. We are not responsible for the use of personal information that an AP gives directly to such third parties, or which such third parties may collect about an AP while such AP visits pages hosted by them. APs should refer to the respective privacy policies of such third parties for information about their use of personal information.

    **16. Disclaimers. Except as set forth in Section 12, the FXall Parties make no representation or warranty to you as to the System or Customer Transaction Data, express or implied, including any implied warranty of merchantability or fitness for a particular purpose, any warranty of non-infringement, or any warranty regarding the ability or inability to use, or, as applicable, the result of, the System or Customer Transaction Data, with respect to their accuracy, reliability, performance, completeness, timeliness, continued availability or otherwise, or any warranty that the System or Customer Transaction Data will conform to any description thereof provided by us, be free of errors or perform any desired operations or functions. You acknowledge and agree that the System is provided on an "as is" basis at your sole risk. No FXall Party will have any responsibility to maintain the System or to supply any corrections, updates or releases in connection therewith. No FXall Party shall be deemed to be an advisor or fiduciary to you or your client accounts; neither access to nor use of the System shall constitute any investment advice or advertisement, any offer, or solicitation of an offer, by any FXall Party for the purchase or sale of any investment, securities or other property or a representation that any investment, security or other property is suitable for you or your clients.**

    In accessing or using the System, you may be linked to websites or otherwise presented with material provided or prepared by third parties. We shall not be liable for the content, views, opinions, products or services offered on such websites. You acknowledge and agree that certain of our Providers and/or their customers may be active principals in the markets for the instruments available for trading on the System (or similar or related instruments) and may engage in transactions in such instruments before, after or simultaneously with your entry of an Order or at different prices from those provided through the System and may have material non-public information with respect thereto. Certain Providers and Customers also may be affiliated with, or own interests in, FXall.

    Neither party hereto shall be liable for any delay or failure in the performance of its obligations hereunder if and only to the extent such delay or failure is attributable to any cause beyond such party's reasonable control.

    **17. Limitation of Liabilities. Except for the indemnification in Section 12 and any Losses that you incur arising from our fraud, gross negligence, willful misconduct or knowing breach of confidentiality, none of the FXall Parties shall have any liability, direct or indirect, contingent or otherwise, to you or to third parties, for the accuracy, reliability, performance, completeness, timeliness, continued availability or otherwise, of** the System, or for delays or omissions therein or interruptions on the delivery thereof. In no event shall any FXall Party be liable for any special, indirect, exemplary, incidental, punitive or consequential damages, whether foreseeable or not, relating to your use of, or inability to use, the System, even if we have been advised of the possibility of such damages. No FXall Party shall have any duty to verify, correct, complete or update the System (or any information thereon).

    **18. Confidential Information.** Each party acknowledges that it or its Representatives may be exposed to or acquire information which is proprietary or confidential to the other party, its affiliated companies or third parties (including any Customer or client account). Any and all information obtained by such party (or its Representatives) including the Services, any trade secrets, processes, proprietary data, and information or documentation related thereto shall be deemed to be confidential and proprietary information ("Confidential Information"), but shall not include information which is or becomes part of the public domain, or information which is known or developed by a party outside of this Agreement, or obtained from a third party not bound by any confidentiality obligation. Confidential Information of FXall includes any FXall API, FXall Additional Licensed Materials and any related documentation, the terms of this Agreement and any other information designated orally or in writing as confidential. Each party agrees (i) to hold Confidential Information of the other in strict confidence; (ii) not to disclose such Confidential Information to third parties or to use such Confidential Information for any purpose other than as contemplated and authorized by this Agreement; and (iii) to advise each of its Representatives who may be exposed to such Information to keep such Confidential Information confidential; *provided, however*, that we may disclose the terms of this Agreement (and Annex E hereto) to any Provider to whom you expect to submit Orders, with whom you expect to conduct Transactions or whose Provider Content you expect to access through the System. A party may disclose Confidential Information of the other party if such information is required to be disclosed by Applicable Law or pursuant to a subpoena or order of, or in connection with any report, audit, inquiry or other request for information from, a court or a regulatory, self-regulatory, legislative or other governmental body of competent jurisdiction to which such disclosing party or any of its Representatives is subject; *provided, however*, that prior notice of such disclosure shall be provided to the non-disclosing party as soon as practicable so that the non-disclosing party may seek an appropriate protective order or take such action as the non-disclosing party deems appropriate to prevent or limit the release or disclosure of such information.

    **19. Additional Terms. (a)** This Agreement is deemed entered into in the City of New York, and shall be governed by the laws of the State of New York. The parties hereby consent to the personal jurisdiction of, and venue in, the state and federal courts in New York County, New York. **(b)** Neither party may assign or transfer this Agreement without the other party's prior written consent; *provided*, that we may assign or transfer this Agreement to any affiliate or legal successor of ours without your consent. **(c)** Notices hereunder may be transmitted by hand copy, facsimile, in electronic form on the Internet, by electronic mail or through any other electronic or digital communications system not prohibited by Applicable Law. **(d)** Each party agrees that it will not, without the prior written consent of the other party, use the other party's name (including any trademarks or proprietary identifiers) or represent that any product or service has been endorsed by the other party. **(e)** Except with respect to changes to the Operational Procedures, the Services, the Territory and with respect to changes in fees charged for access to the System, which may be amended by us on notice to you, this Agreement may not be amended or modified unless expressly agreed to in writing by both parties. **(f)** If any provision or term hereof is illegal, invalid or unenforceable, the legality, validity and enforceability of the remainder of this Agreement shall not be affected. **(g)** This Agreement contains the entire agreement of the parties, and supersedes all other agreements between them, with respect to its subject matter.

    **20. Definitions.** As used herein, the following terms shall have the following definitions.

4

MAY-18-2007  17:43          ING Investment Management                                    P.006

08-13555-mg     Doc 22630-1    Filed 11/16/11    Entered 11/23/11 10:58:46    Exhibit A-
ING Investment AM 2007.03.15.07
F    Pg 10 of 37

Additional Licensed Materials shall mean FXall software products or services (including, but not limited to, FXall QuickConnect™ and/or FXall APIs) designed to enhance the Customer's use of the System.

Affiliated Party shall mean any Provider, or any affiliate, equity owner, third-party vendor, contractor or technology supplier of FXall or of a Provider.

Aggregated Transaction Data shall mean Customer Transaction Data that is aggregated, compiled and analyzed together with transaction-related data of others.

Agreement shall mean this agreement between FXall and Customer, including all Annexes hereto.

AP shall mean an Authorized Person.

API shall mean an application programming interface of the System, which will enable a customer computer system to interface with the System.

Applicable Law shall mean any foreign, federal, state or other law, rule, regulation, interpretation or action of relevant regulatory organizations or self-regulatory organizations applicable to access to and use of the System, including the conduct of Transactions.

Authorized Person shall mean an employee or other person under your control designated by you or one of your administrators to be able to access and use the System, Services and FXall Content on your behalf.

Benefit Plan Client shall mean any one of the following: (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA), whether or not subject to the fiduciary responsibility provisions of ERISA, including any U.S. or foreign governmental or private pension plan, (b) a "plan" described in Section 4975(e)(1) of the Code or (c) any person or entity that is, or would be deemed to be using, for purposes of the fiduciary responsibility provisions of ERISA or Section 4975 of the Code, an asset of any of (a) or (b) above.

Click-Stream Data shall mean click-stream and similar data that tracks the use of the System by any person.

Customer shall mean the customer whose name appears on the first page of this Agreement as "Customer."

Code shall mean the U.S. Internal Revenue Code of 1986, as amended.

ERISA shall mean the Employee Retirement Income Security Act of 1974, as amended.

FXall Content shall mean all content, data and other information appearing on the System, including Provider Content, but excluding Customer Transaction Data.

FXall Party shall mean FXall, our Affiliated Parties and our and their Representatives.

IP Rights shall mean all intellectual property and proprietary rights in any jurisdiction, including such rights in copyrights, trademarks, service marks, patents and trade secrets.

Losses shall mean liabilities, judgments, settlements, damages and costs, including reasonable attorneys' fees and disbursements.

Money Market Instrument shall mean a short-term deposit or loan with a banking institution appropriately regulated in the relevant jurisdiction where the deposit is taken or the loan made, as applicable.

Operational Procedures shall mean the FXall Customer Administration User Guide, the FXall Trader User Guide, the FXall Operations Center User Guide, the FXall Settlement Center User Guide, the FXall QuickConnect™ User Guide, the FXall Money Market User Guide and other similar user guides, as such may be amended from time to time by us after notice to you.

Orders shall mean the instructions, requests for quotes, bids, offers, orders and other Transaction-related communications appearing on the System.

Proceedings shall mean third-party suits, actions, claims, demands or similar proceedings.

Provider shall mean a dealer or other provider of foreign exchange or other products participating in the System.

Provider Content shall mean articles, research, forecasts, reports, advice, lectures, speeches, on-line chats, data, information and other content relating to foreign exchange markets and other markets, transactions and related products supplied by Providers to FXall.

Representative of a party shall mean each of such party's directors, officers, employees, agents, secondees, representatives and APs.

SC Event shall mean an event connected with the Customer's use the System's Settlement Center functionality. The following events are SC Events:

(a) *Matching.* Each match for an allocation shall be an SC Event. A single Transaction may give rise to multiple allocations and, consequently, multiple SC Events. Each allocation shall be a separate SC Event. A Swap Transaction will give rise to a minimum of two SC Events.

(b) *Netting.* In the event the Customer agrees with a Provider on a reduced number of currency payments in respect of multiple Transactions between the Customer and such Provider, each such netted payment will be treated as a separate SC Event (in addition to the SC Events in respect of each allocation for each Transaction included in the netted payment).

(c) *Messaging.* Each message sent on behalf of the Customer over the SWIFT network (other than the first MT300 sent to the Customer's counterparty in connection with the original match) shall be a separate SC Event. Each message sent notifying a third party of a Transaction, a modification to a Transaction, or a change in settlement instructions shall be a separate SC Event. Neither transmission of a give-up message by Customer to its prime broker through the System nor receipt by Customer of an acknowledgement from its prime broker shall be deemed to be an SC Event for the Customer.

Services shall mean the services provided through the System to customers, as described in Annex A, as amended from time to time by FXall in its discretion.

System shall mean the Internet-based, interactive electronic trading interface and information distribution platform operated by or on behalf of FXall, including (a) the FXall Content, (b) the Services, (c) any FXall API and/or Additional Licensed Materials and (d) the FXall websites, on and through which customer may (i) obtain access to FXall Content, (ii) submit Customer Transaction Data to one or more Providers and (iii) initiate and conduct Transactions.

Territory shall mean those jurisdictions listed in Annex D, as amended from time to time by FXall in its reasonable discretion.

Trade Offer shall mean any message from the Customer requesting to trade on specified terms after receipt by the Customer of a quote from a Provider.

Trading Relationship shall mean the trading relationship between a Customer and a Provider, which relationship will govern the rights and obligations between the Customer and the Provider in connection with a Transaction.

Transaction shall mean any transaction in respect of currency (including Money Market Instruments) or foreign exchange or other transactions including those described in Annex A, as amended from time to time by FXall in its discretion.

Transaction Data shall mean requests for quotes, offers, bids, pricing, matching, netting settlement and similar transaction-related information submitted to one or more Providers, and messages sent in respect thereof; Transaction Data includes information in respect of Transactions conducted through the System through the use of the System's trading functionality, as well as information a Customer may upload to the System in respect of Transactions conducted otherwise than through the use of the System's trading functionality.

Viruses shall mean any computer viruses, worms, Trojan horses or other harmful codes.

**Annex A – List of Transactions and Services**

## TRANSACTIONS

The System permits the Customer to execute the following foreign exchange Transactions through the System's Trading functionality:

- Spots
- Swaps
- Forwards

in each case for various currencies.

The System also permits the Customer to execute Transactions in Money Market Instruments through the System's Trading functionality.

The System will also permit the Customer to request the applicable Provider to agree to amend a Transaction after it has been executed. Amendments may take the following form:

- Post Trade Allocations
- Value Date To Follow
- Cancel and Rebook
- Rebook at Average Rate
- Historical Rate Rollovers

## SERVICES

**Information.** FXall will provide basic research supplied by Providers, to the extent the Providers choose to make such research available through the System without charge.

**Reporting.** The FXall Basic Reporting Service allows Customer to access and run detailed analysis and reports of Customer's trading activity, FXall's Relationship Manager Adviser (RMA) report, and FXall Official Hourly Rates and benchmark rates. In addition, the Customer may obtain downloadable benchmark rates, among other information, through FXall Market Insight, available through FXall QuickConnect™. The information contained in the FXall Basic Reporting Service and FXall Market Insight is Confidential Information, subject to the provisions of the User Agreement, including such information as FXall averages, benchmark rates and other statistical information relating to the FXall System, all of which is confidential and proprietary to FXall.

**Settlement.** FXall Settlement Center facilitates the processes of confirmation matching, settlement netting, settlement instruction enrichment and third party notification in respect of foreign exchange and Money Market Instrument Transactions.

**Accessing FXall Functionality.** Customer may access FXall functions through the FXall Graphical User Interface (GUI), through a variety of upload/download and other interfaces to integrate FXall with Customer's internal systems (which shall constitute Additional Licensed Materials), and through third-party systems provided by approved FXall vendors.

### QuickConnect™

FXall QuickConnect™ is an FXall application that runs at the Customer's site and allows the Customer to upload Transaction information from a Customer system in the Customer's format to the FXall System and download Transaction information from the FXall System in the Customer's format to a Customer system. Customer may itself implement QuickConnect to integrate a Customer system to the FXall trading application ("FXall Trading Center"), the FXall Settlement Center or FXall Market Insight (each of FXall Trading Center, Settlement Center and Market Insight being referred to as a "QC Available Function"), using FXall's standard XML messaging formats identified in the QuickConnect™ User Guide by means of the QC Integration Toolkit. Customer may implement QuickConnect to integrate a Customer system to one or more QC Available Functions using messaging formats other than the FXall standard XML formats identified in the QuickConnect™ User Guide via the QC Standard Integration Service; or Customer may request a custom integration requiring an extraordinary amount of effort and/or labor, as determined by FXall in its discretion (a "QC Custom Integration").

### FXall TrAPI™

TrAPI™ is an application program interface that automates request-for-quote and dealing functions between Customer's treasury and/or order management system and FXall. TrAPI™ is available in both Java and COM formats, and is subject to a separate, additional license agreement. A subscription to the TrAPI™ includes the FXall Indicative Quotes application program interface.

FXall may make new or additional services available from time to time; to the extent that there are any additional charges associated with such new or additional services, the Customer may decline to subscribe for such services.

FXall may amend the provisions of this Annex A from time to time in its discretion, upon prior written notice to you.

## Annex B – Pricing Annex

### Customer Price Schedule

Services preceded by an asterisk (*) are for optional services; a Customer may subscribe for one or more of such optional services by electing to do so by checking the appropriate box under the heading "Optional Service Elections" on the first page hereof. A Customer may elect one of the Special Pricing Plans described below by checking the appropriate box under the heading "Pricing Plan Options" on the first page hereof. All Special Pricing Plan elections shall be effective for a period on one year from the time the election is made.

If the Customer elects one of the special pricing plans on the first page hereof (the "Ruby Plan," the "Emerald Plan," the "Sapphire Plan" and the "Diamond Plan," each, a "Special Plan"), Customer will be subject to a Special Plan Fee set forth below under the description of the Special Pricing Plan selected by the Customer. The Special Plan Fee charges will be assessed on a monthly basis in arrears. Customers who do not elect a Special Plan will be subject to the "Base Plan" fees set forth below; any such Customer may change its election to any one of the "Ruby Plan," the "Emerald Plan," the "Sapphire Plan" or the "Diamond Plan" at any time.

We may make changes to any fee on no less than thirty (30) days prior notice to you. If we make new or additional services available we may charge for them. A charge imposed for a new or additional service shall not be deemed to be a change to a fee set forth below. You, of course, may decline to subscribe for such service and avoid such charge.

### FXall "Base Plan"

#### User/Transaction Support Fees

*Basic Services.* Customer's access to the System shall be via Authorized Persons appointed by the Customer, at least one of which shall be Customer's administrator ("Entitlements Manager"). Customer shall be subject to monthly **User/Transaction Support Fees** at the rate of $300 per user per month for each such AP enabled to access the System with respect any functionality *other than the Money Market Instrument Transactions functionality*.

*Money Market User/Transaction Support Fees and Money Market Supplemental Fees.* Customer shall be subject to monthly **User/Transaction Support Fees** at the rate of $300 per user per month for each AP enabled to access the System with respect to Money Market Instrument Transactions functionality only (such Money Markets only AP shall not have access to any other functionality available through the System) ("Money Market User/Transaction Support Fees"). In addition to the monthly **User/Transaction Support Fees** set forth under *Basic Services* above, Customer shall be subject to monthly **Money Market Supplemental Fees** at the rate of $150 per user per month for each AP enabled to access the System with respect to both Money Market Instrument Transactions functionality and any other functionality available through the System; provided that if the Customer has any AP enabled to access the System with respect to Money Market Instrument Transactions functionality then Customer shall be subject to a minimum monthly charge of $300 per month for all Money Market User/Transaction Support Fees and Money Market Supplemental Fees.

No User/Transaction Support fee shall be payable in respect of one Entitlements Manager user if Customer is paying User/Transaction Support Fees in respect of at least one non-Entitlements Manager User. User/Transaction Support Fees (including Money Market User/Transaction Support Fees and Money Market Supplemental Fees) will be assessed on a monthly basis in arrears (a portion of the Customer's first payment to FXall in each year, in the amount of $100, shall be a site license fee).

#### Settlement Center

Settlement Center services are made available to the Customer for a fee in respect of each SC Event ("SC Event Fees") as follows:

| | |
|---|---|
| First 200 SC Events in a calendar month | $3.00 per SC Event |
| Next 200 SC Events in such calendar month | $2.00 per SC Event |
| Additional SC Events thereafter in such calendar month | $1.00 per SC Event |

These charges will be assessed on a monthly basis in arrears.

#### *QuickConnect™

Customer may elect to implement QuickConnect™ to integrate one or more Customer systems in one or more locations to the FXall System by making the election noted on the first page hereof. A Customer electing implement QuickConnect™ to integrate one or more Customer systems at one or more locations shall be subject to a **QC Integration Fee** in respect of each Customer system integrated at each location through a QuickConnect™ implementation to each QC Available Function and a **QC Maintenance Fee** in respect of each Customer system at each location integrated through a QuickConnect™ implementation to one or more QC Available Functions. The QC Integration Fee in respect of each Customer system at each location will be assessed in advance of the integration of such system at such location; the QC Maintenance Fee in respect of each Customer system integrated at each location will be assessed on a monthly basis in arrears. The fees for each Customer system integrated at each location shall be as follows:

- (a) the QC Integration Fee shall be $10,000 for each system at each location and each QC Available Function integrated via the QC Integration Toolkit and the QC Maintenance Fee shall be $250 per month for each Customer system at each location integrated via the QC Integration Toolkit;
- (b) the QC Integration Fee shall be $15,000 for each system at each location and each QC Available Function integrated via the QC Standard Integration Service, and the QC Maintenance Fee shall be $500 per month for each system at each location integrated via the QC Standard Integration Service; and
- (c) for a QC Custom Implementation, the QC Integration Fee and the QC Maintenance Fee shall be mutually agreed by FXall and the Customer.

For the avoidance of doubt, a Customer integrating a single Customer system at a single location via the QC Integration Toolkit to both the FXall Trading Center and the FXall Settlement Center shall be subject to an aggregate QC Integration Fee of $20,000 (*i.e.*, $10,000 per QC Available Function integrated to each Customer system at such location, in this case two QC Available Functions and one Customer system at a single location) and an aggregate QC Maintenance Fee of $250 per month (*i.e.*, $250 per Customer system integrated per location, in this case one system and one location).

### *FXall TrAPI™

Customer may elect to license the FXall TrAPI™ by making the election noted on the first page hereof, and executing a separate FXall TrAPI™ License Agreement. A Customer licensing TrAPI™ shall be subject to a **TrAPI™ Set-Up Fee** and a monthly **TrAPI™ Maintenance Fee**. The TrAPI™ Set-Up Fee will be assessed in advance; the TrAPI™ Maintenance Fee will be assessed on a monthly basis in arrears. The TrAPI™ Set-Up Fee shall be $10,000 and the TrAPI™ Maintenance Fee shall be $10,000 per month.

**Services preceded by an asterisk (*) are for optional services; a Customer may subscribe for one or more of such optional services by electing to do so by checking the appropriate box under the heading "Optional Service Elections" on the first page hereof. A Customer may elect one of the Special Pricing Plans described below by checking the appropriate box under the heading "Pricing Plan Options" on the first page hereof. All Special Pricing Plan elections shall be effective for a period on one year from the time the election is made. Customers who do not elect a Special Plan will be subject to the "Base Plan" fees set forth above; any such Customer may change its election to any one of the "Ruby Plan," the "Emerald Plan," the "Sapphire Plan" or the "Diamond Plan" at any time.**

### FXall "Base Plan" Trial Offer Period

**FXall shall waive any User/Transaction Support Fees, Money Market Supplemental Fees, Settlement Center Subscription Fees and SC Event Fees for the period (the "Trial Period") beginning on the Effective Date and ending on the earlier to occur of (a) that date that is one month after Customer's first Transaction through the System, (b) that date that is one month after Customer's first SC Event, or (c) that date that is three months after the Effective Date.**

## FXall Special Pricing Plans

### FXall "Ruby Plan"

#### FXall "Ruby Plan" Special Plan Fee

The FXall "Ruby Plan" requires Customer to pay a monthly **Special Plan Fee** of $995, and provides Customer the following changes from the FXall "Base Plan."

#### User/Transaction Support Fees

Customer shall be entitled to appoint five (5) Authorized Persons (including at least one Customer administrator) at no additional charge to the Customer (**"Base Users"**). If the Customer wishes to designate APs in addition to the Base Users, the Customer shall be subject to monthly User/Transaction Support Fees of $250 per user in excess of the Base Users.

#### Money Market Fees

The Customer shall be subject to a monthly Money Market Fee of $500 if it wishes to enable any of its APs to access the System with respect to Money Market Instrument Transactions.

#### Settlement Center Fees

The SC Event Fees shall be the same as under the "Base Plan."

#### *QuickConnect™

The *FXall QuickConnect™ fees shall be the same as under the "Base Plan."

#### FXall TrAPI™

The **TrAPI™ Set-Up Fee** and **TrAPI™ Maintenance Fees** shall be the same as under the "Base Plan."

#### FXall "Ruby Plan" Trial Offer Period

**For Customers electing the "Ruby Plan," FXall shall waive any Special Plan Fee, User/Transaction Support Fees, Money Market Fees and SC Event Fees for the period (the "Trial Period") beginning on the Effective Date and ending on the earlier to occur of (a) that date that is one month after Customer's first Transaction through the System, (b) that**

date that is one month after Customer's first SC Event, or (c) that date that is three months after the Effective Date. In the event Customer wishes to commence a QuickConnect™ implementation during the Trial Period, Customer shall pay FXall a QC Integration Fee of $10,000 in respect thereof. Customer may terminate this Agreement at no additional time during the Trial Period by giving notice to FXall; any amounts paid to FXall during the Trial Period (e.g., a QC Integration Fee) shall be non-refundable.

### FXall "Emerald Plan"

#### FXall "Emerald Plan" Special Plan Fee

The FXall "Emerald Plan" requires Customer to pay a monthly **Special Plan Fee** of $1,895, and provides Customer the following changes from the FXall "Base Plan."

#### User/Transaction Support Fees

Customer shall be entitled to appoint ten (10) Authorized Persons (including at least one Customer administrator) at no additional charge to the Customer (**"Base Users"**). If the Customer wishes to designate APs in addition to the Base Users, the Customer shall be subject to monthly User/Transaction Support Fees of $200 per user in excess of the Base Users.

#### Money Market Fees

The Customer shall be subject to a monthly Money Market Fee of $500 if it wishes to enable any of its APs to access the System with respect to Money Market Instrument Transactions.

#### Settlement Center Fees

The SC Event Fees shall be $0 for first 200 SC Events in a calendar month and $1.00 per SC Event in excess of 200 in such calendar month; *provided that* the initial matching of any Money Market Instrument Transaction conducted on the FXall System shall not be subject to SC Event Fees.

#### *QuickConnect™

The *FXall QuickConnect™ fees shall be the same as under the "Base Plan," *provided* that for Customer's first implementation the QC Integration Fee and the QC Maintenance Fees shall each be $0 if such implementation is via the QC Integration Toolkit.

#### FXall TrAPI™

The TrAPI™ Set-Up Fee and TrAPI™ Maintenance Fees shall be the same as under the "Base Plan."

#### FXall "Emerald Plan" Trial Offer Period

For Customers electing the "Emerald Plan," FXall shall waive any Special Plan Fee, User/Transaction Support Fees, Money Market Fees and SC Event Fees for the period (the "Trial Period") beginning on the Effective Date and ending on the earlier to occur of (a) that date that is one month after Customer's first Transaction through the System, (b) that date that is one month after Customer's first SC Event, or (c) that date that is three months after the Effective Date. In the event Customer wishes to commence a QuickConnect™ implementation during the Trial Period, Customer shall pay FXall a QC Integration Fee of $10,000 in respect thereof. Customer may terminate this Agreement at any time during the Trial Period by giving notice to FXall; any amounts paid to FXall during the Trial Period (e.g., a QC Integration Fee) shall be non-refundable. In the event that Customer does not exercise its option to terminate this Agreement during the Trial Period, any QC Integration Fee paid during the Trial Period shall be credited against the QC Integration Fee payable, if the implementation was via the QC Standard Integration Service, or against future amounts payable to FXall, if the implementation was via the QC Integration Toolkit.

### FXall "Sapphire Plan"

#### FXall "Sapphire Plan" Special Plan Fee

The FXall "Sapphire Plan" requires Customer to pay a monthly Special Plan Fee of $2,995, and provides Customer the following changes from the FXall "Base Plan."

#### User/Transaction Support Fees

Customer shall be entitled to appoint fifteen (15) Authorized Persons (including at least one Customer administrator) at no additional charge to the Customer ("Base Users"). If the Customer wishes to designate APs in addition to the Base Users, the Customer shall be subject to monthly User/Transaction Support Fees of $150 per user in excess of the Base Users.

#### Money Market Fees

The Customer shall be subject to a monthly Money Market Fee of $500 if it wishes to enable any of its APs to access the System with respect to Money Market Instrument Transactions.

#### Settlement Center Fees

The SC Event Fees shall be $0 for first 1,000 SC Events in a calendar month and $1.00 per SC Event in excess of 1,000 in such calendar month; *provided that* the initial matching of any Money Market Instrument Transaction conducted on the FXall System shall not be subject to SC Event Fees.

#### *QuickConnect™

The *FXall QuickConnect™ fees shall be the same as under the "Base Plan," *provided* that for Customer's first implementation the QC Integration Fee and the QC Maintenance Fees shall each be $0 if such implementation is via either the QC Integration Toolkit or the QC Standard Integration Service.

#### FXall TrAPI™

The TrAPI™ Set-Up Fee and TrAPI™ Maintenance Fees shall be the same as under the "Base Plan."

#### FXall "Sapphire Plan" Trial Offer Period

For Customers electing the "Sapphire Plan," FXall shall waive any Special Plan Fee, User/Transaction Support Fees, Money Market Fees and SC Event Fees for the period (the "Trial Period") beginning on the Effective Date and ending on the earlier to occur of (a) that date that is one month after Customer's first Transaction through the System, (b) that date that is one month after Customer's first SC Event, or (c) that date that is three months after the Effective Date. In the event Customer wishes to commence a QuickConnect™ implementation during the Trial Period, Customer shall pay FXall a QC Integration Fee of $10,000 in respect thereof. Customer may terminate this Agreement at any time during the Trial Period by giving notice to FXall; any amounts paid to FXall during the Trial Period (e.g., a QC Integration Fee) shall be non-refundable. In the event that Customer does not exercise its option to terminate this Agreement during the Trial Period, any QC Integration Fee paid during the Trial Period shall be credited future amounts payable to FXall.

### FXall "Diamond Plan"

#### FXall "Diamond Plan" Special Plan Fee

The FXall "Diamond Plan" requires Customer to pay a monthly Special Plan Fee of $11,900, and provides Customer the following changes from the FXall "Base Plan."

#### User/Transaction Support Fees

Customer shall be entitled to appoint thirty (30) Authorized Persons (including at least one Customer administrator) at no additional charge to the Customer ("Base Users"). If the Customer wishes to designate APs in addition to the Base Users, the Customer shall be subject to monthly User/Transaction Support Fees of $100 per user in excess of the Base Users.

#### Money Market Fees

The Customer shall be subject to a monthly Money Market Fee of $500 if it wishes to enable any of its APs to access the System with respect to Money Market Instrument Transactions.

#### Settlement Center Fees

The SC Event Fees shall be $0 for first 5,000 SC Events in a calendar month and $1.00 per SC Event in excess of 5,000 in such calendar month; *provided that* the initial matching of any Money Market Instrument Transaction conducted on the FXall System shall not be subject to SC Event Fees.

#### *QuickConnect™

The *FXall QuickConnect™ fees shall be the same as under the "Base Plan," *provided* that for Customer's first implementation the QC Integration Fee and the QC Maintenance Fees shall each be $0 if such implementation is via either the QC Integration Toolkit or the QC Standard Integration Service. In either case, an integration of a single Customer system at a single location to both the FXall Trading Center and Settlement Center shall give rise to only one QC Integration Fee.

#### FXall TrAPI™

The TrAPI™ Set-Up Fee and TrAPI™ Maintenance Fees shall be $0.

#### FXall "Diamond Plan" Trial Offer Period

For Customers electing the "Diamond Plan," FXall shall waive any Special Plan Fee, User/Transaction Support Fees, Money Market Fees and SC Event Fees for the period (the "Trial Period") beginning on the Effective Date and ending on the earlier to occur of (a) that date that is one month after Customer's first Transaction through the System, (b) that date that is one month after Customer's first SC Event, or (c) that date that is three months after the Effective Date. In the event Customer wishes to commence an implementation of QuickConnect™ or TrAPI™ during the Trial Period, Customer shall pay FXall a "Provisional Implementation Fee" of $10,000 in respect thereof. Customer may terminate this Agreement at any time during the Trial Period by giving notice to FXall; any amounts paid to FXall during the Trial Period (e.g., a Provisional Implementation Fee) shall be non-refundable. In the event that Customer does not exercise its option to terminate this Agreement during the Trial Period, any Provisional Implementation Fee paid during the Trial Period shall be credited future amounts payable to FXall.

All Special Pricing Plan elections shall be effective for a period of one year from the time the election is made (the "Pricing Plan Initial Term"), and shall automatically be extended by successive one year periods (a "Pricing Plan Renewal Term" and, together with the Pricing Plan Initial Term, the "Pricing Plan Terms") at the end of each Pricing Plan Term unless either party terminates this Agreement as provided herein; provided, however, that any Customer electing to terminate the Agreement pursuant to the terms of Section 10(a)(iii) hereof at any time other that during the Trial Period shall be obligated to pay all fees accrued or which would accrue under the Agreement through the end of the then current Pricing Plan Term.  Any Customer electing the "Ruby Plan" may change its election to any one of the "Emerald Plan," the "Sapphire Plan" or the "Diamond Plan" at any time; any Customer electing the "Emerald Plan" may change its election to any one of the "Sapphire Plan" or the "Diamond Plan" at any time; and any Customer electing the "Sapphire Plan" may change its election to the "Diamond Plan" at any time.  Any such change of plan election shall be effective on the first day of the calendar month immediately following FXall's receipt of such Customer's written notice thereof; a change of pricing plan shall not give rise to a new "Trial Offer Period" under the new pricing plan.

We may make changes to any fee on no less than thirty (30) days prior written notice to you. If we make new or additional services available we may charge for them. A charge imposed for a new or additional service shall not be deemed to be a change to a fee set forth above. You, of course, may decline to subscribe for such service and avoid such charge.

ING Investment AM 2007.03.15.07 B

**Annex C – Service Levels Annex**

The terms of this Annex C are available to each Customer in respect of the services Customer has elected to receive hereunder.

**1. General.** The System (including Additional Licensed Materials) and any other materials or services that may be provided by FXall are provided "as is," with all faults. Without limiting the foregoing, Customer is solely responsible for its use of the System (including any Additional Licensed Materials). We will use commercially reasonable efforts to make the System available during regular business hours in major trading centers (including London, New York, Tokyo and Hong Kong). We will use commercially reasonable efforts to correct any problem with the System that you are aware of and that you bring to our attention within a reasonable period of time. We shall use industry-standard anti-virus software and security measures to protect against Viruses operating on the System.

**2. Additional Licensed Materials.** FXall will provide to Customer one copy of each of FXall QuickConnect™, any FXall API and any other Additional Licensed Materials which the Customer has elected to license under the Agreement promptly after receipt by FXall of any fee associated with such Additional Licensed Materials that are required to be paid in advance (e.g., the QC Integration Fee or the TrAPI™ Set-Up Fee). If Customer Additional Licensed Materials do not function in accordance with their specifications, Customer may invoke this procedure for Development Support set forth in this Section 2 with respect to such asserted problem (*"Development Support Issue"*).

(a) Customer will be entitled to designate up to two developers employed by Customer (*"Designated Developers"*) as authorized to call FXall for Development Support with respect to Development Support Issues. Customer will register the name of each such developer and a unique personal identifier for each such developer by calling the FXall integration specialist (*"Integration Specialist"*) assigned to Customer at such Integration Specialist's office. FXall will use commercially reasonable efforts to provide Development Support to Designated Developers for Development Support Issues reported to the Integration Specialist between the hours of 9:00 A.M. and 5:00 P.M. local time, Monday through Friday, at such Integration Specialist's office (i.e., one of New York, London, Tokyo, or Singapore) with the exception of local bank or stock exchange holidays (*"Development Support Hours"*).

(b) In the event Customer requires Development Support for a Development Support Issue, one of the two Designated Developers may call the Integration Specialist during Integration Support Hours. Once the identity of the Developer is confirmed, the Developer will describe in commercially reasonable detail the Development Support Issue. FXall will then use commercially reasonable efforts to have FXall tech support call the Developer to discuss the Development Support Issue within two hours (excluding any period outside Support Hours) thereafter. If the Development Support Issue cannot be resolved during the call, FXall tech support will address the issue off-line and report back to the Developer within 24 hours. If FXall tech support is unable to resolve the issue within 24 hours, FXall will use commercially reasonable efforts to work with Customer to try to replicate the problem at FXall's site. If the Development Support Issue cannot be resolved within three business days, the issue will be escalated to FXall engineering for further investigation. FXall development management will also be notified of the problem at this point. If, after five business days the problem is unresolved, at Customer development management's request FXall development management will confer with Customer to develop a problem resolution plan. If, after ten business days, the problem is unresolved, at Customer's request the FXall CTO will confer with Customer to develop a problem resolution plan. Thereafter FXall shall make such further changes, if any, as FXall determines to be feasible and practicable. Designated Developers may also submit Development Support Issues by e-mail to techsupport@fxall.com. Such e-mails will be responded to within 24 hours (exclusive of periods outside Development Support Hours).

(c) After Customer has completed its development and final system testing, it will commence validation testing with FXall. The purpose of this testing is to give FXall an opportunity to determine whether Customer is using the Additional Licensed Materials in a manner consistent with FXall specifications and other FXall requirements.

(d) Customer will call the Integration Specialist during Development Support Hours two weeks before Customer wishes to begin validation testing to schedule a test preparation meeting with tech support and to schedule the test itself. At the test preparation meeting, FXall tech support will review the test procedure with Customer's developers and provide the standard test suite. If validation testing is passed successfully and FXall otherwise determines that the Customer implementation as tested meets FXall's requirements, Customer will be authorized to proceed with the implementation. If the testing fails, Customer will correct all errors and reschedule the validation test. Validation testing will be repeated as necessary.

(e) If, during the initial validation testing, Customer experiences significant or sustained failures caused by nonconformity of the Additional Licensed Materials with the applicable specifications, and not caused by the Customer implementation or by Customer error, then Customer may pursue the Development Support procedure set forth herein. If, after 30 days, the failures are unresolved, Customer shall have the right to terminate its subscription to the relevant Additional Licensed Materials.

**3. Use of the FXall Trading System.** Appropriately licensed Customer users may use the FXall graphical user interface to trade over the FXall platform pursuant to an FXall User Agreement; if the Customer is implementing Additional Licensed Materials, appropriately licensed Customer users may use the Additional Licensed Materials once the Customer implementation has passed the validation test. A user experiencing a problem using the System (a *"User Support Issue"*) may call the FXall CIC between the hours of 6:00 p.m. New York City time Sunday and 5:00 p.m. New York City time Friday (except for the period from 2:00 a.m. through 5:00 p.m. New York time on December 25th and the period from 6:00 p.m. New York time on December 31st through 5:00 p.m. New York time on January 1st) (*"User Support Hours"*) for User Support with respect to such User Support Issue. Customer will inform the CIC of the user's name, a personal identifier, and a call back number. Once the identity of the user is confirmed by the CIC (via FXall's authentication process), Customer will report the nature of the problem and describe in commercially reasonable detail the User Support Issue. FXall will classify the User Support Issue as:

(1) level 1 – user is uncertain whether a trade has been properly executed,

(2) level 2 – user is unable to request a quote or trade, or

(3) level 3 – any other User Support Issues.

For duly reported User Support Issues, FXall will use its commercially reasonable efforts to provide User Support as follows:

(a) level 1 – work directly with user to resolve;

(b) level 2 – respond to Customer within 30 minutes (exclusive of periods outside User Support Hours) with an estimated time to resolve;

(c) level 3 – respond to Customer within four hours (exclusive of periods outside User Support Hours) with an estimated time to resolve.

**4. System Unavailability.** If all, or substantially all, of the trading functionality of the System is generally inaccessible or unusable for any reason outside of Customer's control (other than for maintenance scheduled by FXall) for a cumulative period of four (4) or more hours during the period between 9:00 a.m. and 5:00 p.m. New York City time

on any business day (such day, a *"System Failure Day"*), any monthly fees payable with respect to the month in which such System Failure Day occurs shall be pro-rated on a daily basis to deduct amounts otherwise payable for each such System Failure Day that occurred during such month. For the avoidance of doubt, Customer's inability to access or use the System for reasons attributable to (i) Customer's own systems, (ii) any of Customer's application service providers, (iii)

Customer's connectivity service provider or (iv) Customer's own inability to access the internet shall not be deemed to be for reasons outside of Customer's control. In the event ten (10) or more System Failure Days occur within any month, then Customer may terminate the Agreement, notwithstanding any other terms of the Agreement, and receive a refund of any prepaid unapplied fees for the relevant failure period.

**Annex D – The Territory**

**List of Jurisdictions and Restrictions**

## Part I – Jurisdictions without Restrictions[1]

| | | | |
|---|---|---|---|
| [†]Australia[2] | Fiji | Jordan | Qatar |
| Bahamas | [†]Finland[3] | Kuwait | Singapore[2] |
| Bahrain | Germany | Lebanon | Spain[3] |
| Belgium[3] | [†]Hong Kong | Luxembourg | Sweden[3] |
| Bolivia | [†]Hungary | Mexico | Switzerland |
| British Virgin Islands | Iceland | Norway | Taiwan |
| Cayman Islands | Indonesia | [†]Panama | Turkey |
| Chile | [†]Israel | Peru | United Arab Emirates |
| Denmark[3] | Japan | Philippines | Venezuela |
| Egypt | Jersey | Portugal[3] | |

## Part II – Jurisdictions with Restrictions[1]

**Austria[3]**     The Customer is a corporation (*AG, GmbH, GmbH&Co KG*) registered and domiciled in Austria.

**Bermuda** The Customer represents and warrants that it carries on business from Bermuda or is based, incorporated or registered in Bermuda and, as any one of the foregoing, is:

(A) a body corporate that has total assets of not less than US$5,000,000 whether such assets are held solely by the corporate body or held partly by the corporate body and partly by any other corporate body of which it is a subsidiary company or a holding company; or

(B) an unincorporated association or a trust that has total assets of not less than US$5,000,000; or

(C) a collective investment scheme approved by the Bermuda Monetary Authority; or

(D) a body corporate in which all of the shareholders are "sophisticated investors", "high net worth private investors" or "high income private investors" as those terms are defined in the Investment Business Act 1998.

**[†]Canada**     The Customer is in Canada and

(A) in the case of a Customer located in the province of Alberta, such Customer is acting as principal and is a "Qualified Party" as such term is defined in Blanket Order 91-502(AB).

(B) in the case of a Customer located in the province of British Colombia, such Customer is acting as principal and is a "Qualified Party" as such term is defined in Blanket Order 91-501(BC).

(C) in the case of a Customer located in any province or territory other than Alberta and British Colombia, such Customer is an equivalent to a "Qualified Party" as defined in Blanket Order 91-502(AB) or Blanket Order 91(501)(BC) above.

(D) in the case of a Customer located in the province of Québec, the Customer acknowledges and agrees that it has expressly requested that all documents be drawn up in the English language only. **Le Customer consent à ce que tous les documents soient rédigés en anglais seulement.**

(E) the parties hereto declare that they have required that this Agreement and all documents and notices relating thereto be drawn up in the English language only.

**Les parties au présentes déclarent qu'elles on exigé que cette entente et tous les documents et avis y afférents soient rédigés en langue anglaise seulement.**

The Customer further represents that all Money Market Transactions entered into shall be consistent with the requirements of the Bank Act, if applicable.

**Cyprus**     The Customer is not an individual, but is a professional or institutional investor within the meaning of Annex ONE of the Code of Business Conduct of Investment Firms Directive 1/2003, is located and registered in Cyprus, and holds all the required licenses and authorizations to access and trade on the System.

**France[3]**     The Customer is not an individual but is a corporate or institutional professional investor.

**[†]Greece[3]**     The Customer is an institution resident in Greece and is a non-credit institution.

**[†]Guernsey**     The Customer is resident within the Bailiwick of Guernsey and is licensed either under The Protection of Investors (Bailiwick of Guernsey) Laws, 1987 to 1998 or under The Banking Supervision (Bailiwick of Guernsey) Law, 1994.

**[†]India**     The Customer is located and registered in India and is not in any manner disqualified under the provisions of the Foreign Exchange Management Act, 1999 from accessing and using the FXall System and transacting in the manner that it proposes to; and any Transaction so contemplated by the Customer is a genuine transaction and is not intended to, and does not involve, and is not designed for the purpose of, any contravention or evasion of the Foreign Exchange Management Act, 1999 or any rule, regulation, notification, direction or any order made thereunder.

**Ireland[3]**     The Customer is operating in Ireland for purposes of this Agreement and

(A) is within the category of investors who by virtue of the Investment Intermediaries Acts, 1995 to 2000, the Code of Conduct and the Handbook for Investment and Stockbroking Firms issued thereunder may be regarded as professionals in all investment services and instruments described in the Annex of the EU Investment Services Directive, including

(1) Credit institutions;

(2) Investment firms;

(3) Other authorised or regulated financial institutions;

(4) Insurance companies;

(5) Collective investment schemes and management companies of such schemes;

(6) Pension funds and management companies of such funds; and

(7) National governments, Central Banks, international and supranational institutions; and

does not ask for any higher level of protection than is extended to professional clients; or

(B) is one of the following institutions within the category of large and institutional investors who by virtue of the Investment Intermediaries Acts, 1995 to 2000, the Code of Conduct and

the Handbook for Investment and Stockbroking Firms issued thereunder may elect to be treated as a professional client:

(1) a financial institution not included in (A) above;

(2) a large company or partnership meeting two of the following three requirements:

(a) balance sheet total of €12,500,000 or greater

(b) Net turnover of €25,000,000 or greater

(c) Average number of employees during the financial year of 250 or greater;

(3) an institutional investor not included in (A) whose corporate purpose is to invest in financial instruments;

(4) a commodity dealer;

(5) a public sector body;

(6) an issuer of listed financial instruments (*i.e.*, entities whose securities are traded on a regulated market;

and hereby elects to be treated as a professional client and confirms that it has been informed of and is aware of the consequences of electing to be treated as a professional client rather than a private client.

**Consequences of electing to be treated as a professional rather than a private client:** Under the Code of Conduct for Investment and Stockbroking Firms (the "Code") issued by the Central Bank of Ireland pursuant to the Investment Intermediaries Acts, 1995 to 2000, private clients of investment business firms are accorded a higher level of protection than are professional clients. Those protections that the professional client loses by electing to be treated as a professional client are:

(1) That the terms of business prepared by FXall and provided to the Customer need not contain an outline of the Customer's investment objectives;

(2) That FXall will be entitled to recommend and/or undertake margined transactions and/or any other transactions of a variety stipulated by the Central Bank of Ireland from time to time without first having provided a risk disclosure statement to the Customer and without the Customer having signed a statement acknowledging that he/she/it is aware of the associated risks;

(3) That FXall may enter a relationship with the Customer without having taken all reasonable steps to obtain from the Customer details of the Customer's investment objectives, investment experience and any other facts about the Customer's financial position which FXall reasonably believes it needs to know, and ought reasonably be expected to attempt to find out (which requirements apply in the case of certain private clients only);

(4) That FXall need not take all reasonable steps to ensure that any advice which it gives or transactions which it effects for the Customer are suitable for the Customer (which requirements apply in the case of certain private clients only); and

(5) That FXall is not restricted from making unsolicited calls to the Customer.

**[†]Italy[3]** The Customer qualifies as a professional investor, which includes the following categories under Italian regulations:

(A) authorized intermediaries, as defined in Article 25 of CONSOB Regulation No. 11522 of July 1, 1998;

(B) management companies (società di gestione del risparmio);

(C) Undertakings for Collective Investment in Transferable Securities ("UCITS");

(D) pension funds;

(E) insurance companies;

(F) foreign legal entities which carry out, under mutual recognition, the activities mentioned under (A) to (E) above;

(G) issuers of securities traded in regulated markets;

(H) companies registered in the register of financial intermediaries provided for in Articles 106, 107 and 113 of Decree No. 385 of September 1, 1993;

(I) individuals who satisfy the "good standing requirements" for the management and internal auditing of società d'intermediazione mobiliare (*i.e.*, Italian investment service firms);

(J) fondazioni bancarie ("banking trusts");

(K) legal entities which have a sound experience in financial transactions as certified by its legal representative.

**Namibia** The Customer is not an individual, but is a professional or institutional investor located in Namibia and is licensed by the Bank of Namibia as an "authorized dealer" to conduct foreign exchange transactions.

**Netherlands[3]** Customer is in the Netherlands and

(A) is one of the following:

(1) a securities intermediary;

(2) a credit institution as defined in Article 1, first indent, of the Directive 77/780EEC of December 12, 1977 (L322/30);

(3) a financial institution as defined in Article 1 (6) of Directive 89/646/EEC of December 15, 1989 (L386/1);

(4) an insurance company having funds invested of at least €25 million or the equivalent thereof in foreign currency;

(5) an investment institution as referred to in the Act on the Supervision of Investment Institutions (Wet toezicht beleggingsinstellingen);

(6) a pension fund having funds invested of at least €25 million or the equivalent thereof in foreign currency;

(7) a central government;

(8) an international and supranational organization governed by public law; or

(9) a legal person having consolidated total assets of at least €500 million or having funds invested of at least €25 million or the equivalent thereof in foreign currency; and

(B) prior to the conduct of any such Transaction, the Customer will have delivered to FXall

(1) a copy of the official extract of the Customer's Dutch registration with the Trade Register of the Chamber of Commerce in the Netherlands or

(2) a certificate to the effect that the Customer is a bank, securities intermediary, insurance company or investment institution in the Netherlands which is registered or has a license under, respectively, the Act on the Supervision of Credit Institutions 1992, the Act on the Supervision of Securities Trade 1995, the Act on the Supervision of Insurance Business 1993 or the Act on the Supervision of Investment Institutions; and

(C) the person or persons executing the User Agreement on behalf of the Customer and any Authorized Person conducting Transactions within or from the Netherlands on behalf of the Customer shall be registered with the Trade Register as having authority to represent the Customer or be identified through a deed drawn up before a notary, a copy of which shall have been provided to FXall.

In addition, Customer represents that is organized under the laws of the Netherlands or is resident in the Netherlands and further represents, which representation will be deemed repeated upon entering into each Money Market Transaction (i.e., each bank loan or bank deposit transaction), that is falls into one of the following categories of "qualified investors" under applicable Dutch laws and regulations:

(I) banks, insurance companies, securities firms, collective investment institutions or pension funds that are supervised or licensed under Dutch law, including their Netherlands subsidiaries provided such subsidiaries are also subject to prudential supervision (either directly or indirectly through consolidated supervision at the level of their parent company);

(II) banks or securities firms licensed or supervised in a European Economic Area member state (other than The Netherlands) and registered with the Dutch Central Bank (*De Nederlandsche Bank N.V.*; "DNB") or the Netherlands Authority for the Financial Markets (*Stichting Autoriteit Financiële Markten*; "AFM") acting through a branch office in The Netherlands;

(III) Netherlands collective investment institutions which offer their shares or participations exclusively to professional investors or are otherwise exempt under the Exemption Regulation pursuant to the Investment Institutions Supervision Act;

(IV) the Dutch government (*de Staat der Nederlanden*), DNB, Dutch regional, local or other decentralised governmental institutions, or any international treaty organisations and supranational organisations located in The Netherlands;

(V) Netherlands enterprises or entities with total assets of at least €500,000,000 (or the equivalent thereof in another currency) according to their balance sheet at the end of the financial year preceding the date they acquire the Notes or any interest therein;

(VI) Netherlands enterprises, entities or individuals with a net equity (*eigen vermogen*) of at least €10,000,000 (or the equivalent thereof in another currency) according to their balance sheet at the end of the financial year preceding the date they acquire the Notes or any interest therein and who or which have been active in the financial markets on average twice a month over a period of at least two consecutive years preceding such date;

(VIII) any Netherlands person or Netherlands entity who or which is subject to supervision by a regulatory authority in any country in order to lawfully operate in the financial markets (which includes: authorised credit institutions, investment firms, other authorised or regulated financial institutions, insurance companies, collective investment schemes and their management companies, pension funds and their management companies, and commodity dealers);

(IX) any Netherlands person or Netherlands entity who or which engages in a regulated activity on the financial markets but who or which is not subject to supervision by a regulatory authority (which includes without limitation: exempt credit institutions, investment firms, financial institutions, insurance companies, collective investment schemes and their management companies, pension funds and their management companies, commodity dealers and special purpose vehicles);

(X) any Netherlands entity whose corporate purpose is solely to invest in securities (which includes, without limitation, hedge funds);

(XI) any Netherlands companies or Netherlands legal entities which meet at least two of the following three criteria according to their most recent consolidated or nonconsolidated annual accounts: (i) an average number of employees during the financial year of at least 250; (ii) total assets of at least €43,000,000; or (iii) an annual net turnover of at least €50,000,000; or

(XII) companies having their registered office in The Netherlands which do not meet at least two of the three criteria mentioned in (XI) above and which have (a) expressly requested the AFM to be considered as qualified investors (within the meaning of Directive 2003/71/EC) and (b) been entered on the register of qualified investors maintained by the AFM.

**New Zealand**  The Customer represents that

(A) its principal business is the investment of money; or

(B) in the course of and for the purposes of its business, it habitually invests money.

Customer agrees that Customer understands that FXall is not a registered or authorized exchange and does not operate a securities market regulated under New Zealand law.

**Oman**  The Customer is located and registered in the Sultanate of Oman as a professional or institutional investor and is:

(A) licensed to conduct banking business by the Central Bank of Oman; and/or

(B) licensed to conduct foreign exchange transactions by the Central Bank of Oman; and/or

(C) licensed as a broker or intermediary by the Capital Market Authority.

**Poland**  The Customer represents that the Customer's accessing the System, using FXall Content and executing Transactions through the System remains in full compliance with the Customer's pertinent national regulations regarding foreign exchange and, in particular, does not invoke the necessity to obtain any foreign exchange permits under such regulations.

**Russia**  The Customer is located and registered in the Russian Federation as a legal entity and holds all required licenses, permits and authorizations to access and execute Transactions on the System.

**South Africa**  The Customer is in South Africa and

(A) is one of the following:

(1) a registered company;

(2) a registered broker;

(3) a registered asset manager;

(4) a registered long and/or short-term insurer;

(5) a registered bank or branch of a foreign bank;

(6) a registered pension fund;

(7) a registered unit trust management company;

(8) a parastatal institution such as Eskom or Felkom; and

(B)

(1) has complied, and will continue to comply, with all of the provisions of the Exchange Control Regulations, 1961 issued pursuant to the Currency and Exchanges Act, 1933 (the "Exchange Control Regulations") applicable to the Customer for purposes of concluding, and performing its obligations, under this agreement, and for purposes of accessing and using the trading platform; and

(2) has obtained all of the exchange control approvals required to be obtained by the Customer, in terms of the Exchange Control Regulations, for purposes of concluding, and performing its obligations under, this agreement, and for purposes of accessing and using the trading platform.

**Thailand**  The Customer is registered with the relevant authority in Thailand as a financial institution licensed to engage in foreign exchange transactions including:

(A) a commercial bank (including Bangkok International Banking Facilities);

(B) a finance company; and

(C) any other similar juristic person so registered and licensed.

**United Kingdom**  Customer confirms that it:

(A) is an authorized or exempt person under the Financial Services and Markets Act 2000;

(B) would be classified as an "overseas financial institution" within the meaning of the UK Financial Services Authority Handbook of Rules and Guidance for Regulated Firms;

(C) is a body corporate (including a limited liability partnership) which has (or any of whose holding companies or subsidiaries has) called up share capital of at least £10 million (or its equivalent in any other currency);

(D) is a body corporate that meets (or any of whose holding companies or subsidiaries meet) two of the following tests:

    (i) a balance sheet total of €12.5 million;

    (ii) a net turnover of €25 million;

    (iii) 250 employees;

(E) is a local authority or public authority;

(F) is a partnership or unincorporated association which has net assets of at least £10 million (and calculated, in the case of a limited partnership, without deducting loans owing to any of the partners); or

(G) is a trustee of a trust (other than an occupational pension scheme, SSAS or stakeholder pension scheme) with assets of at least £10 million, calculated by aggregating the value of the cash and designated investments forming part of the trust's assets, but before deducting its liabilities.

Further, you agree:

(A) that this Agreement constitutes our written notice to you that you are being classified by us as a "market counterparty" in accordance with our regulatory obligations under the Financial Services and Markets Act 2000,

(B) that you may lose protections under the regulatory system that may otherwise be available were you not to be so classified, including, without limitation, all protections applicable to customers afforded by the rules in COB (other than those in COB 9 (Client assets)) and Principle 6 (Customer's interests), Principle 8 (Conflicts of interest) and Principle 9 (Customers: relationships of trust) and most of Principle 7 (Communications with clients) of the FSA Handbook, and, in respect of inter-professional business conducted between market counterparties, MAR 3 (Inter-professional conduct) of the FSA Handbook will now apply,

(C) that the person or persons signing this Agreement on your behalf have authority to do so,

(D) that you do not object to being classified as market counterparty, and

(E) that your ordinary activities involve you in carrying on Transactions for the purpose of your business.

**United States of America**   The Customer qualifies as an "eligible contract participant" as defined in the Commodity Exchange Act.

---

[1] Unless otherwise noted, this Agreement shall be deemed entered into between the Customer and FX Alliance, LLC, a Delaware (USA) limited liability company.

[2] In these jurisdictions, this Agreement shall be deemed entered into between the Customer and FX Alliance International, LLC (ARBN 097 253 640) (a Delaware (USA) company, members' liability limited).

[3] In these jurisdictions, this Agreement shall be deemed entered into between the Customer and FX Alliance Limited (regulated by the Financial Services Authority) and Customer agrees that it meets the conditions and makes the representations set out under "United Kingdom" above in this Annex D.

[†] Transactions in Money Market Instruments *is not* permitted in these jurisdictions.

**Annex E – Supplemental Electronic Trading Agreement**

In order to qualify to use the FXall System to effect Transactions with Providers, you agree that, to the extent these matters are not covered by your Trading Relationship with an applicable Provider, your account with such Provider shall be subject to the following terms and conditions (capitalized terms having the meanings assigned in the Agreement):

1. Your execution of the Agreement, or any other agreement with FXall, shall not supersede or replace the terms of any Trading Relationship, or any existing agreements or understandings, written or oral, that you have with such Provider; any Transaction on the System covered by such existing agreements or understandings with such Provider shall be subject to the terms and conditions thereof.

2. The representations, warranties, covenants, acknowledgements and agreements made by you in favor of FXall in Sections 1, 5, 6, 8, 11 and 19(d) of the FXall User Agreement in the form attached hereto are made herein for the benefit of such Provider, standing in the place of FXall; and all disclaimers and limitations of liabilities made by FXall in Sections 16 and 17 of such FXall User Agreement are made herein by such Provider. You acknowledge and agree that such Provider is a third party beneficiary of these provisions of the Agreement in the form attached hereto and shall have the ability to enforce its rights thereunder as if it were a party thereto in place of FXall, including Sections 11, 16 and 17 of the Agreement, which shall survive any termination of the Agreement.

3. You acknowledge and agree that access to and use of the System are through the World Wide Web or other Internet services which are not necessarily secure, and such Provider does not warrant that such systems are secure. You shall maintain and take appropriate steps to ensure the security of your (and each of your Representatives') access to and use of the System.

4. Such Provider shall maintain accounts for you in which such Provider shall effect and settle any Transactions entered into between you and such Provider, subject to any Applicable Laws, and subject to any agreements or understandings between you and such Provider.

5. You hereby consent to conduct Transactions and transmit Orders via electronic means and the Internet with such Provider.

# EXHIBIT C

# UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

**NOW THEREFORE BE IT,**

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 9, 2005

_____
Richard S. Fuld, Jr.

_____
John D. Macomber

2

## Schedule A
## to LBHI Unanimous Written Consent
## dated June 9 , 2005

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

# EXHIBIT D

Lehman Brothers Special Financing Inc.

Case No. 08-13888 (JMP)

Sch G
Executory Contracts and Unexpired Leases
G: Derivative Contracts

| Contract Counterparty | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Contract Description |
|---|---|---|---|---|---|---|---|---|
| CALIFORNIA COUNTY TOBACCO SECURITIZATION AGENCY - PLACER COUNTY | State Street Bank and Trust | CDO Services Group, Mail Code: EUC108 | 200 Clarendon Street | Boston | MA | 2116 | United States | Derivative Master Account Number 030106THEC |
| California Endowment | PIMCO | 840 Newport Center Drive | Suite 100 | Newport Beach | CA | 92660 | UNITED STATES | Derivative Master Account Number 0109010235 |
| CALIFORNIA FIELD IRONWORKERS P ENSION PLAN | Western Asset Management Co. | 385 East Colorado Blvd | | Pasadena | CA | 91101 | UNITED STATES | Derivative Master Account Number 0914051309 |
| California Housing Finance Agency | 1121 L Street, 7th Floor | | | Sacramento | CA | 95814 | UNITED STATES | Derivative Master Account Number 072303AIGF |
| California Lutheran University | 60 West Olsen Road | | | Thousand Oaks | CA | 91360 | UNITED STATES | Derivative Master Account Number 111204CLU |
| CALIFORNIA PUBLIC EMPLOYEES RETIREMENT SYSTEM (CALPERS) | c/o Calpiers-Investment Office | 400 Q Street, Suite E4800 | | Sacramento | CA | 95814 | UNITED STATES | Derivative Master Account Number 071503NAPA |
| CALIFORNIA PUBLIC EMPLOYEES RETIREMENT SYSTEM (CALPERS) | Calpers - Investment Office | 400 Q Street, Suite E4800 | Lincoln Plaza East | Sacramento | CA | 95821-9001 | UNITED STATES | Derivative Master Account Number 021904CPER |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | Western Asset Management Co. | 385 East Colorado Blvd | | Pasadena | CA | 91101 | UNITED STATES | Derivative Master Account Number 120106WEST |
| California Wellness Foundation | Western Asset Management Co. | 385 East Colorado Blvd | | Pasadena | CA | 91101 | UNITED STATES | Derivative Master Account Number 072202WAMC |
| CALIFORNIA WINERY WORKERS PENSION PLAN TRUST | 5780 Powers Ferry Road, N.W., Suite 300 | | | Atlanta | GA | 303274390 | United States | Derivative Master Account Number 050508INGI |
| CALYON | Foreign Exchange Dept | 1301 Avenue of Americas | | New York | NY | 10019 | UNITED STATES | Derivative Master Account Number 68103BQNY |
| Calyon | 1301 Avenue of the Americas | | | New York | NY | 10020 | UNITED STATES | Derivative Master Account Number 39692BQSZ |
| CALYON | 17-00 6 Raffles Quay | | | Singapore | | | Singapore | Derivative Master Account Number 051796BISI |
| Camden County Municipal Utilities | 1645 FERRY AVE | | | Camben | NJ | 8104 | United States | Derivative Master Account Number 030195CCMU |
| Camden-Clarke Memorial Hospital | 800 Garfield Avenue | PO Box 718 | | Parkersburg | WV | 26101 | UNITED STATES | Derivative Master Account Number 072004HOSP |

# EXHIBIT E

**ING** 🐾

**INVESTMENT MANAGEMENT**

Acknowledgement of Receipt

: _Kirsy Acosta_
Signature

: _10/2/08_
Date

Title:
Admin Asst
for Allyson
Carine

October 2, 2008

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
1271 Avenue of the Americas, 43rd Floor,
Attn: Documentation Manager
New York, NY 10020

With a copy to:

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc., 745 7th Avenue
Attn: Martin Amann
New York, NY 10019

**BY COURIER**

Dear Ladies and Gentlemen:

RE:    Foreign exchange transactions on behalf of any and all entities for which we act as agent
between Lehman Brothers Special Financing Inc. ("LBSF" or "you") and the following
entities:

ING Investment Management Co., as Agent for ING Investments, LLC, as Agent
on behalf of the entities listed on Appendix A with respect to their ISDA Master
Agreements.

ING Investment Management Co., as Agent on behalf of the entities listed on
Appendix B with respect to their ISDA Master Agreements.

ING Investment Trust Co., as Trustee on behalf of the entities listed on Appendix
C with respect to their ISDA Master Agreements.

ING Investment Management Co., as Agent for ING Life Insurance and Annuity
Company, as Agent on behalf of the entities listed on Appendix D with respect to
their ISDA Master Agreement.

(all of the above entities to be referred to as the "ING Counterparties" or "us" or "we"
and
all such foreign exchange transactions to be referred to as the "Transactions").

230 Park Avenue, 14th Floor
New York, NY 10169 USA

Telephone:  212-309-1777

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
October 2, 2008
Page 2


We note the following:

- On September 15, 2008 Lehman Brothers Holdings Inc. filed a petition under Chapter 11 of the U.S. Bankruptcy Code with the United State Bankruptcy Court for the Southern District of New York.

- LBSF is no longer transacting and, to the best of our knowledge, since September 15, 2008 has not been transacting foreign exchange business and will not close out existing Transactions in accordance with customary commercial expectations.

- LBSF has failed to settle certain Transactions with us in accordance with their terms. We consider such failures to be a breach of contract and repudiation of those Transactions and a repudiation of all other transactions.

After multiple efforts we have not been able to obtain assurances that LBSF will perform any transactions. Indeed, LBSF sales coverage has confirmed with us that it will not settle any Transactions with ING Counterparties.

Therefore, we accept the repudiation by LBSF and notify you that we designate September 15, 2008 as the date of termination of all transactions.

We are taking this action pursuant to customary terms that apply to foreign exchange transactions governed by ISDA Master Agreements or other terms implied by the terms of the Transaction confirmations and as permitted by the law in order to mitigate possible eventual loss to our clients should LBSF be unable or unwilling to perform its obligations. In order to mitigate our damages we have entered into replacement transactions.

We will provide you with a statement specifying the payments due in relation to the early termination date.

We reserve without limitation all rights and remedies provided in the agreements or otherwise.


Yours faithfully,

.......................................          .......................................

Executed for and on behalf of ING Investment Management Co., as Agent for ING Investments, LLC, ING Investment Management Co., ING Investment Trust Co., and ING Investment Management Co., as Agent for ING Life Insurance and Annuity Company as attorney in fact.

# APPENDIX B

California Winery Workers' Pension Plan Trust


**ING**

**INVESTMENT MANAGEMENT**

Acknowledgement of Receipt

Name: _____

Date: RECEIVED DEC 1 7 2008

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
Attention: Documentation Manager

BY COURIER

December 17, 2008

Dear Sirs,

We refer to the foreign exchange transactions on behalf of any and all entities for which we act as agent between Lehman Brothers Special Financing Inc. ("LBSF" or "you") and the following entities:

ING Investment Management Co., as Agent for ING Investments, LLC, as Agent on behalf of the entities listed on Appendix A.

ING Investment Management Co., as Agent on behalf of the entities listed on Appendix B.

ING Investment Trust Co., as Trustee on behalf of the entities listed on Appendix C.

ING Investment Management Co., as Agent for ING Life Insurance and Annuity Company, as Agent on behalf of the entities listed on Appendix D.

(all of the above entities to be referred to as "us" or "we" and all such foreign exchange transactions as listed in the attached Appendix F to be referred to as the "Transactions").

By a notice dated October 2, 2008, we designated September 15, 2008 as the early termination date in respect of all outstanding Transactions.

We have enclosed a summary of our calculation of the value of the Transactions and the net amount payable by LBSF to us or payable by us to you, as applicable.

This amount is due from the date of this letter together with interest thereon in U.S. Dollars from and including the early termination date at a rate of .97 per cent, per annum. The amount of interest accrued at such rate from and including the early termination date up to but excluding today's date calculated on the basis of daily compounding and the actual number of days elapsed is specified herein. In accordance with customary terms interest will continue to accrue on the amount due to the date of payment on the basis of daily compounding and the actual number of days elapsed.

The rate reflects our cost of funding from time to time, and accordingly may change. We will inform you of any changes to the rate which occurs after the date of this letter and prior to the date on which you make payment in full of the amounts due by you under the Agreement. With respect to any amounts owed by us to you as we have not received information from you as to the relevant account to which payment of the amounts should be made we will not pay interest accrued after the date of this letter.

The relevant account to which payment of the above number should be made is listed on Appendix E.

230 Park Avenue, 14th Floor                    Telephone: 212-309-1777
New York, NY 10169 USA



**ING**

**INVESTMENT MANAGEMENT**

Yours faithfully,

By: _Gerald T. Lins_

Name:   Gerald Lins
Title:    General Counsel

Executed for and on behalf of ING Investment Management Co., as Agent for ING Investments, LLC,
ING Investment Management Co., ING Investment Trust Co., and ING Investment Management Co., as
Agent for ING Life Insurance and Annuity Company as attorney in fact.

**APPENDIX B**

| Account Name | Amount Owed Us | Interest | Total Amount Owed Us |
|---|---|---|---|
| California Winery Workers' Pension Plan Trust | $187.376.74 | $461.84 | $187,838.58 |
| ███████████████████ | | ████████ | ████████ |

## APPENDIX E

| Account Name | Bank Name | Bank Routing Number | Account No. |
|---|---|---|---|
| ████████████ | Bank of New York | ██████ | ████ |
| California Winery Workers' Pension Plan Trust | Union Bank of California | 12-20004-96 | 61-000134807 |
| ████████████ | Northern Trust | | |
| ████████████ | Northern Trust | ███ | ██ |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | ███ | ██ |
| ████████████ | Bank of New York | ███ | ██ |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | ███ | ███ |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | ███ | ███ |
| ████████████ | Bank of New York | | |
| ████████████ | Bank of New York | | |

| Forward Sell | CWWPP | California Winery Worker's Pension Plan | 610001348-06 | 8/26/2008 | 9/29/2008 | -BRL Cash | -2,863,450.76 | 1.5548 | 1,730,600.00 | LEHM | 187,376.74 | | |
| Forward Buy | CWWPP | California Winery Worker's Pension Plan | 610001348-06 | 9/16/2008 | 9/29/2008 | -BRL Cash | 2,863,450.76 | 1.8665 | -1,543,223.26 | LEH-11 | | | |
| | | | | | | | | | | Receivable | Payable | NET | |
| | | CWWPP Fund Total | | | | | 0.00 | | | 187,376.74 | | 187,376.74 | CWWPP |