Hearing Date and Time: November 30, 2011 at 10:00 a.m EST.
Response Deadline: November 11, 2011

MANATT, PHELPS & PHILLIPS, LLP
IVAN L. KALLICK (CA 097649) (pro hac vice application pending)
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone: (310) 312-4000
Facsimile: (310) 312-4242
Email: ikallick@manatt.com

*Counsel to Catholic Healthcare West*

THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

| | |
|---|---|
| In re | : Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No.08-13355 (JMP) |
| | : (Jointly Administered) |
| Debtors. | |

--------------------------------------------------------------- x

## RESPONSE OF CATHOLIC HEALTHCARE WEST TO DEBTORS' ONE HUNDRED EIGHTY-SECOND OMNIBUS OBJECTION TO CLAIMS

Catholic Healthcare West ("CHW"), by its undersigned counsel, hereby responds to the One Hundred and Eighty-Second Omnibus Objection to Claims (Valued Derivative Claims) (the "Objection") by Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, including but not limited to Lehman Brothers Special Financing Inc. ("LBSF"), debtors-in-possession in the above captioned, jointly administered cases, that seeks to reduce and allow CHW's proof of claim, claim number 67145 (the "CHW Claim") from $18,717,643.65 to $13,101,419.00.

1

## INTRODUCTION

1. The Objection seeks reduction of the CHW Claim on the alleged and unsubstantiated ground the amount sought is "greater than the fair, accurate, and reasonable value determined by the Debtors after a review of the claimant's supporting documentation and the Debtors' books and records". However, the Objection fails to provide the valuation methodology LBSF used to reduce the CHW Claim by more than $5.6 million dollars. Instead, the Objection merely refers to the 2009 Declaration of Gary H. Mandelblatt (the "Mandelblatt Declaration") "for more comprehensive discussion of the valuation process". (Objection at FN 2, p.6, *See also* Docket No. 4113, exhibit "C" and Objection at ¶2).

2. CHW, and its retained expert that prepared the financial analysis, financial model and the financial narrative attached to the CHW Claim, has reviewed the Mandelblatt Declaration and found that it only describes in general terms the valuation methodology LBSF proposed to use in 2009 to value a large number of creditor claims. The Mandelblatt Declaration is not CHW Claim-specific nor does it offer any details or calculations that would allow a reasonable person to understand why LBSF believes that the CHW Claim is overstated by approximately $5.6 million dollars.

3. Rather than providing a specific analysis of the CHW Claim, the Mandelblatt Declaration merely states that LBSF intends to "value the transactions on the same date as that particular counterparty's transactions were terminated and determine whether the Debtors' valuation matches the counterparty's valuation. The derivative contracts, including the ISDA Master Agreements and schedules, describe standard methodologies for valuation upon early termination of the transactions. Such valuation methods include obtaining "market quotations

2

or using a 'loss' calculation." (Mandelblatt Decl. at ¶30). Simply put, all the Mandelblatt Declaration does is describe in general terms alternate methodologies that might or could be employed to value claims and provides no definitive statement as to how the CHW Claim should be valued.

4. After describing the market quotations methodology the Mandelblatt Declaration goes on to conclude that "under the typical governing contract, if counterparties are unable to obtain the required number of market quotations, they must resort to the "loss" calculation method.[1] Loss calculation allows the counterparty to consider factors other than market quotations in valuing the Transaction under the Derivative Contract. It is <u>critical</u> that the Debtors receive the necessary information required to understand the counterparty's loss calculation to verify the reasonableness and validity of the calculation <u>because minor differences in loss methodology can lead to significant differences in valuations.</u>" (Mandelblatt Decl. at ¶33).

5. Indeed, the difference of over $5.6 million dollars is plainly significant and CHW has no idea which methodology LBSF used. However, if it was the "loss" calculation method then it is just as critical for CHW to "receive necessary information" as it is for LBSF. To date CHW has no information by which to verify what "necessary information" LBSF may have received and is relying on. The Objection offers no explanation other than "the valued derivative claims should be reduced and allowed" on "the basis that the amounts listed on the proofs of claim are greater than the fair, accurate, and reasonable values determined by the Debtors after a review of the claimant's supporting documentation and the Debtor's books and records". (Objection at ¶11).

---

[1] CHW used the loss calculation method.

3

6. LBSF claims that "the debtors have developed and currently utilize a thorough, multi-step process to review claims filed against the debtors and based on a derivative contract ("Derivative Claims") in order to determine the fair, accurate, and reasonable value of such claims for purposes of settlement". In order to determine the Proposed Settlement Amount the Debtors "(i) collect and review documents related to the relevant Derivative Claim including, but not limited to the relevant Derivative Questionnaire and/or Guarantee Questionnaire, the termination notice, and the valuation statement; (ii) reconcile posted collateral and any cash payments already received, made, or missed; and (iii) review the valuation methodology used by the claimant to determine the value of the claim, including verifying the legitimacy of quotes provided by the claimant in connection with their valuation statement, reviewing claimant's 'loss' calculation, and evaluating any set-off claims." (Objection at ¶14). But, once again, LBSF offers no explanation of the valuation methodology it relies on to justify the reduction of the CHW Claim, does not reference the Reserve Fund Agreements ("RFA") between LBSF and CHW (copies of which are annexed as Exhibits 1-5 of the CHW Claim) that governs the relationship between the parties and does not provide any calculations or the date of the calculations. CHW, on the other hand, employs a broadly accepted market methodology to value its claim in accordance with rules LBSF and CHW stipulated in the RFA's. CHW's financial analysis, financial model and the financial narrative are attached to the CHW Claim as Exhibit 6 to the CHW Claim.

## CHW'S VALUATION METHODOLOGY

7. Under the terms of the RFA, the Burdened Party, CHW, has the right to calculate a Termination Amount "as reasonably determined in good faith by the Burdened

Party, to be the Burdened Party's total losses and costs, or gains, in connection with a termination, including any loss of bargain, cost of funding, or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position ..."

8. In 2004, under the terms of the RFA, CHW delivered to LBSF an amount equal to the "Scheduled Reserve Amount" as set forth in the chart below in exchange for Eligible Securities to deposit with the trustee to satisfy the liquidity reserve account requirement of its bonds. When these securities matured, CHW would again deliver the "Scheduled Reserve Amount" to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF provided CHW with a guaranteed rate of return on the "Scheduled Reserve Amount." The RFA's had a scheduled termination date as set forth in the chart below when the final scheduled Bond Payments were due (*See* Exhibit A to RFA's). LBSF provided CHW with a guaranteed rate of return as set forth in the chart below.

| Bond Series | Scheduled Reserve Amount | Guaranteed Rate | Scheduled Termination |
|---|---|---|---|
| California Series G | $2,910,000 | 4.912% | July 1, 2023 |
| California Series H & I | $10,000,000 | 4.975% | July 1, 2026 |
| Maricopa Series A | $8,557,000 | 4.963% | July 1, 2026 |
| Maricopa Series B | $17,500,000 | 5.012% | July 1, 2029 |
| Nevada Series A | $4,163,000 | 4.942% | July 1, 2024 |

9. LBHI, the credit support provider for LBSF, filed for bankruptcy on September 15, 2008 and LBSF ceased to perform under terms of the RFA's. LBSF filed for bankruptcy on October 3, 2008.

10. Without the RFA's, when the securities in the RFA's matured, CHW was able to reinvest the proceeds only in the open market at significantly lower yields than the guaranteed rate of return originally offered by LBSF.

5

11. For the purpose of the Calculation of Loss, CHW's expert has looked at a valuation on September 27, 2010, the date that LBSF rejected the RFA.

12. In order to calculate CHW's Loss, CHW's expert sought to calculate the market value (the "Termination Value") using the quotation method as detailed in the RFA's. CHW's expert solicited eleven firms to provide quotations (JPMorgan Chase Bank, PNC Bank, Sumitomo Mitsui Banking Corp., Goldman Sachs, Deutsche Bank, Bank of America Merrill Lynch, Royal Bank of Canada, Barclays Bank, Wells Fargo Bank, Citigroup, and Morgan Stanley). A summary of the responses received on October 21, 2010 is shown in the table below. Only two firms, Citigroup and Morgan Stanley, were willing to provide quotations. The other firms cited various reasons for not participating, most notably concerns about potential legal risk stemming from becoming involved in a dispute to which they are not a party. The quotations shown in the table below reflect the dollar amount that each dealer would need to receive from CHW in order to take on LBSF's position under the Agreements, as of the close of business on September 27, 2010. With only two firms providing quotations, the RFA's require the Termination Value to be determined through a calculation of CHW's total losses and costs.

| Bond Series | Citigroup | Morgan Stanley |
|---|---|---|
| California Series G | $866,000 | $763,000 |
| California Series H & I | $3,324,000 | $2,920,000 |
| Maricopa Series A | $2,831,000 | $2,486,000 |
| Maricopa Series B | $6,430,000 | $5,607,000 |
| Nevada Series A | $1,291,000 | $1,135,000 |
| TOTAL | $14,742,000 | $12,911,000 |

13. While only two quotations were received, CHW's expert determined they provide usable information for calculating CHW's loss. CHW believes both firms have recognized expertise in agreements of this nature and satisfy the RFA's definition of a "leading dealer in the relevant markets." The trading personnel at both firms have had extensive historical experience in comparable agreements.

14. Not having the benefit of the third quotation, CHW's expert chose to determine its loss amount as equal to the higher quotation (i.e., Citigroup's quotation) of $14,742,000. To determine CHW's total losses and costs, this amount was adjusted for termination-related costs, unpaid amounts and interest, since these amounts were not included in the dealer quotations. Unpaid amounts consist of semiannual payments CHW should have received from the time LBSF ceased making payments under the Agreements (January 1, 2009) up to the termination date (September 27, 2010), calculated at the Guaranteed Rates. Costs, in accordance with the RFA's definition of Termination Amount, include "incidental costs and expenses incurred by [CHW] in connection with such termination and enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees)."

15.    Below is a table summarizing the calculation of CHW's Loss.

| | |
|---|---:|
| Loss Amount (Quotation) | $14,742,000.00 |
| Plus Unpaid Amounts payable to CHW | $3,735,061.29 |
| Plus Interest Owed on Unpaid Amounts* | $40,582.36 |
| Plus Legal Fees associated with Termination | $50,000 |
| Plus Advisory Fees associated with Termination | $150,000.00 |
| Total amount payable to CHW: | $18,717,643.65 |

*Calculated at CHW's cost of funds.

## RESERVATION OF RIGHTS

16.    To the extent this Court finds that CHW has not met its burden of proof regarding the LBSF Claim and does not overrule the Objection, CHW reserves the right to: (i) seek discovery from the Debtors regarding the Debtors' valuation of the Claims; (ii) supplement or amend the Response; and (iii) request a full evidentiary hearing pursuant to Bankruptcy Rule 9014(e) and Rule 9014-2 of the Local Rules of Bankruptcy Procedure to determine the proper amount of the Claims.

**WHEREFORE**, CHW requests that the Court (i) deny the Objection, with prejudice; (ii) allow the CHW Claim in its full amount and (iii) provide such other relief as is just.

Dated:      Los Angeles, California
November 10, 2011

Respectfully submitted,

/s/ Ivan L. Kallick
Ivan L. Kallick (*pro hac vice* applcation pending)
Manatt, Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone: 310-312-4000
Telecopy: 310-312-4224
Email: ikallick@manatt.com

*Attorneys for Catholic Healthcare West*

## CERTIFICATE OF SERVICE

Anthony J. Staltari, hereby certifies pursuant to 28 U.S.C. § 1746 that:

1. I am a member in good standing of the Bar of this Court and am an attorney employed by the law firm of Manatt, Phelps & Phillips, LLP, attorneys for Catholic Healthcare West in this matter.

2. On this date, true and correct copies of the annexed **RESPONSE OF CATHOLIC HEALTHCARE WEST TO DEBTORS' ONE HUNDRED EIGHTY-SECOND OMNIBUS OBJECTION TO CLAIMS** were served upon the following:

### SERVICE LIST

Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
(Attn: Robert Lemons, Esq., Penny Reid, Esq. and Ralph Miller, Esq.)

Office of the United States Trustee for the Southern District of New York
33 Whitehall Street
21st Floor
New York, New York 10004
(Attn: Elisabeth Gasparini, Esq. and Andrea Schwartz, Esq.)

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
(Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.)

via Federal Express, overnight delivery.

I hereby certify under the penalty of perjury that the forgoing statements are true and correct. Executed in New York, New York on this 10th Day of November 2011.

Anthony J. Staltari