UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

### DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS PURSUANT TO SECTION 1129 OF THE BANKRUPTCY CODE

*Harvey R. Miller*
*Lori R. Fife*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated:  November 29, 2011
        New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

FACTS .................................................................................................................................... 3

ARGUMENT .......................................................................................................................... 12

I.     THE PLAN SATISFIES SECTION 1129(a)(1) OF THE BANKRUPTCY CODE ....... 13

     A.     The Classification of Claims and Interests Complies With Section 1122 of the Bankruptcy Code .............................................................................................. 13

     B.     The Plan Complies with Section 1123 of the Bankruptcy Code ........................ 23

II.     THE PLAN SATISFIES SECTION 1129(a)(2) OF THE BANKRUPTCY CODE ....... 25

     A.     The Debtors Have Complied With Section 1125 of the Bankruptcy Code ......... 25

     B.     The Requirements of Section 1126 of the Bankruptcy Code Have Been Satisfied .......................................................................................................... 26

III.     THE PLAN HAS BEEN PROPOSED IN GOOD FAITH IN COMPLIANCE WITH SECTION 1129(a)(3) OF THE BANKRUPTCY CODE ................................... 27

IV.     THE PLAN COMPLIES WITH SECTION 1129(a)(4) OF THE BANKRUPTCY CODE ..................................................................................................................... 29

V.     THE DEBTORS WILL COMPLY WITH SECTION 1129(a)(5) OF THE BANKRUPTCY CODE ........................................................................................... 30

VI.     THE PLAN DOES NOT CONTAIN ANY RATE CHANGES ..................................... 31

VII.     THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS OF, AND EQUITY INTEREST HOLDERS IN, EACH OF THE DEBTORS. .............................. 31

VIII.     THE PLAN HAS BEEN ACCEPTED BY OR IS DEEMED TO HAVE BEEN ACCEPTED BY ALL IMPAIRED CLASSES ENTITLED TO VOTE ON THE PLAN, AND AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED ............................................................................. 35

IX.     THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS ............................................................................................... 37

X.     THE PLAN SATISFIES SECTION 1129(a)(10) OF THE BANKRUPTCY CODE ..................................................................................................................... 38

XI.     THE PLAN IS FEASIBLE ....................................................................................... 38

XII.     THE PLAN COMPLIES WITH SECTION 1129(a)(12) ............................................ 40

XIII.     SECTION 1129(a)(13) IS INAPPLICABLE ............................................................. 40

i

08-13555-mg    Doc 22747    Filed 11/29/11    Entered 11/29/11 16:10:18    Main Document
Pg 3 of 57


# TABLE OF CONTENTS
## (continued)

**Page**

XIV. THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS UNDER
SECTION 1129(b) OF THE BANKRUPTCY CODE FOR NON-ACCEPTING
CLASSES ................................................................................................................ 42

    A.     The Plan Does Not Discriminate Unfairly ........................................................ 43

    B.     The Plan Is Fair and Equitable ......................................................................... 44

CONCLUSION ................................................................................................................ 46

EXHIBIT A: Glossary ........................................................................................... A-1

ii

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................32, 33, 34, 36

*Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d 942 (2d
    Cir. 1996) ...............................................................................................................18

*In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000)............................................32

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) ..........31

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd P'ship)*, 21 F.3d 477 (2d
    Cir. 1994) ...............................................................................................................18

*In re Buttonwood Partners, Ltd.*, 111 B.R 57 (Bankr. S.D.N.Y. 1990)........................................43

*In re Campbell*, 89 B.R. 187 (Bankr. N.D. Fla. 1988)..................................................................36

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010) ............................................34

*In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..........................................13, 27, 29

*In re Delphi Corp.*, Case No. 05-44481 (RDD), 2009 WL 637315 (Bankr. S.D.N.Y. Mar.
    10, 2009) ................................................................................................................41

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) ..................43

*In re Drexel Burnham Lambert Group. Inc.*, 138 B.R. 723
    (Bankr. S.D.N.Y. 1992) ...................................................................13, 22, 25, 32

*In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr.
    S.D.N.Y. July 15, 2004)........................................................................ 18, 20-22, 34

*In re Gen. Motors Corp.*, Case No. 09-50026 (REG), Tr. of Record (Bankr. S.D.N.Y.
    June 25, 2009)........................................................................................................41

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd.
    II)*, 994 F.2d 1160 (5th Cir. 1993) .........................................................................12

*Heins v. Ruti-Sweetwater Inc. (In re Ruti-Sweetwater Inc.)*, 836 F.2d 1263 (10th Cir.
    1988) ......................................................................................................................36

*In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987) .........................................................42

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986)..............................................43

*In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009)................................................39

*JPMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................13, 18, 19, 34

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988) .......................................................................................................13, 38, 42, 43

*In re Kent Terminal Corp.*, 166 B.R. 555 (Bankr. S.D.N.Y. 1994)..............................................13

*Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137 (2d Cir. 1984) ...................................................27

*In re Leslie Fay Cos., Inc.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .............................................29

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984)........................................................27

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374 (9th Cir. 1985) ......................................................................................................................................39

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000).............................................................25

*In re Quigley Co.*, 346 B.R. 647 (Bankr. S.D.N.Y. 2006).............................................................37

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990).......................................................30

*In re River Vill. Assocs.*, 161 B.R. 127 (Bankr. E.D. Pa. 1993) ...................................................30

*In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281 (Bankr. N.D. Ill. 2008) ........................................20

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y.)........................................................................30

*In re U.S. Truck Co.*, 47 B.R. 932 (E.D. Mich. 1985) .................................................................39

*In re United Marine Inc.*, 197 B.R. 942 (Bankr. S.D. Fla. 1996) .................................................42

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380 (5th Cir. 1986) ..............................................................................45

*United States v. Energy Res. Co.*, 495 U.S. 545 (1990)...............................................................38

*In re Uno Rest. Holdings Corp.*, Case No. 10-10209, 2010 Bankr. LEXIS 2931 (Bankr. S.D.N.Y. 2010) ....................................................................................................................33

*In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006).........................................21

*In re Worldcom Inc.*, Case No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...............................................................................................................................19, 43

*In re Young Broad. Inc.*, 430 B.R. 99 (Bankr. S.D.N.Y. 2010)....................................................13

# FEDERAL STATUTES

| | |
|---|---|
| 11 U.S.C. § 365 | 24 |
| 11 U.S.C. § 503(b) | 37 |
| 11 U.S.C. § 506 | 14, 16, 17 |
| 11 U.S.C. § 507 | 39 |
| 11 U.S.C. § 507(a) | passim |
| 11 U.S.C. § 507(a)(8) | 37 |
| 11 U.S.C. § 510(a) | 19, 43, 44 |
| 11 U.S.C. § 510(b) | passim |
| 11 U.S.C. § 1114 | 40 |
| 11 U.S.C. § 1122 | passim |
| 11 U.S.C. § 1122(a) | 13, 18, 20 |
| 11 U.S.C. § 1122(b) | 14, 19, 22 |
| 11 U.S.C. § 1123 | 13, 22, 24 |
| 11 U.S.C. § 1123(a) | 23 |
| 11 U.S.C. § 1123(a)(1) | 23 |
| 11 U.S.C. § 1123(a)(2) | 23 |
| 11 U.S.C. § 1123(a)(3) | 23 |
| 11 U.S.C. § 1123(a)(4) | 23 |
| 11 U.S.C. § 1123(a)(5) | 23 |
| 11 U.S.C. § 1123(a)(6) | 24 |
| 11 U.S.C. § 1123(a)(7) | 24 |
| 11 U.S.C. § 1123(a)(8) | 23 |
| 11 U.S.C. § 1123(b) | 24 |
| 11 U.S.C. § 1123(b)(1) | 24 |

11 U.S.C. § 1123(b)(2) ..................................................................................................24

11 U.S.C. § 1123(b)(3) ..................................................................................................24

11 U.S.C. § 1124........................................................................................................23

11 U.S.C. § 1125........................................................................................................25

11 U.S.C. § 1126....................................................................................................25, 26

11 U.S.C. § 1126(a)(6)..................................................................................................30

11 U.S.C. § 1126(c)......................................................................................................26

11 U.S.C. § 1126(g) ............................................................................................26, 36, 43

11 U.S.C. § 1129..............................................................................................1, 3, 12, 45

11 U.S.C. § 1129(a) ................................................................................................12, 24

11 U.S.C. § 1129(a)(1) ........................................................................................13, 25, 44

11 U.S.C. § 1129(a)(2) ............................................................................................25, 27

11 U.S.C. § 1129(a)(3) ............................................................................................27, 29

11 U.S.C. § 1129(a)(4) ............................................................................................29, 30

11 U.S.C. § 1129(a)(5) ..................................................................................................31

11 U.S.C. § 1129(a)(6) ..................................................................................................31

11 U.S.C. § 1129(a)(7) ......................................................................................31, 32, 35

11 U.S.C. § 1129(a)(8) ......................................................................................35, 36, 42

11 U.S.C. § 1129(a)(9) ............................................................................................37, 38

11 U.S.C. § 1129(a)(9)(A) ..............................................................................................36

11 U.S.C. § 1129(a)(9)(C) ..............................................................................................38

11 U.S.C. § 1129(a)(10) ................................................................................................38

11 U.S.C. § 1129(a)(11) ......................................................................................38, 39, 40

11 U.S.C. § 1129(a)(12)........................................................................................39, 40

11 U.S.C. § 1129(a)(13)........................................................................................39, 40

11 U.S.C. § 1129(b) ................................................................................................ passim

11 U.S.C. § 1129(b)(1) ........................................................................................... 43

11 U.S.C. § 1129(b)(2)(B) ...................................................................................... 45

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................. 44

11 U.S.C. § 1129(b)(2)(C)(ii) ................................................................................. 43

28 U.S.C.§ 1930 ...................................................................................................... 39

### FEDERAL RULES

Fed. R. Bank. P. 9019 ........................................................................................... 3, 23

### LEGISLATIVE HISTORY

H.R. Rep. No. 95-595 (1977) ............................................................................ 13, 24

S. Rep. No. 95-989 (1978) ...................................................................................... 13

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above captioned chapter 11 cases (together, the "Debtors"[1] and when referred to with their non-debtor affiliates, "Lehman"), submit this Memorandum of Law (the "Memorandum"), in support of confirmation of the Debtors' Third Amended Joint Chapter 11 Plan, dated August 31, 2011 (as the same has been or may be amended, modified, supplemented, or restated, the "Plan")[2] pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code").

## PRELIMINARY STATEMENT

On September 15, 2008, as a result of a financial tsunami that swept through the global financial markets, LBHI was compelled to commence an ill-prepared chapter 11 case. Included in the maelstrom of financial destruction that resulted was the race to the courthouse that engulfed the Debtors' foreign affiliates (the "Foreign Affiliates") that became subject to voluntary and involuntary insolvency proceedings in approximately sixteen (16) jurisdictions around the world. Overnight, Lehman had transformed from an integrated global enterprise to adverse factions of Affiliates and third-parties competing with each other over the billions of dollars of assets at stake. The chaos that ensued was mammoth and presented the potential for years of extended, complex, and expensive litigation among competing interests and entities.

---

[1] In addition to LBHI, the Debtors include Lehman Commercial Paper Inc. ("LCPI"); Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Brothers Special Financing Inc. ("LBSF"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers OTC Derivatives Inc. ("LOTC"); Lehman Brothers Financial Products Inc. ("LBFP"); Lehman Brothers Derivative Products Inc. ("LBDP"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l.; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI Statler Arms LLC.

[2] For ease of reference and readability, the Debtors have included as Exhibit A a glossary of defined terms (the "Glossary") used in this Memorandum. Capitalized terms used but not defined in this Memorandum shall have the meaning ascribed to them in the Plan. Certain defined terms included in the Glossary have been simplified from their definition in the Plan. To the extent there is any inconsistency between the definition of any term in the Glossary and the Plan, the Plan shall govern.

Accordingly, a fundamental objective of the Debtors has been to alleviate that potentiality of litigation in the context of economic and practical realities; an objective that would enable the maximization of recoveries to holders of allowed claims undiminished by potentially excessive costs and time integral to massive litigation. The Plan represents the culmination of the earnest efforts of the Debtors to achieve a consensual resolution of the chapter 11 cases. As the Court stated at the Disclosure Statement hearing on August 30, 2011: "to have marshaled the resources that were marshaled for this process and to have achieved substantial consensus leading to the agreement of proponents of competing plans to support this debtors' plan borders on the miraculous." *See* Hr. Tr. Aug. 30, 2011 at 53:18-22.

The Plan is supported by the official committee of unsecured creditors (the "Creditors' Committee"); members of the ad hoc group of senior bond holders (the "Ad Hoc Group"); virtually all of the proponents of a non-consolidation chapter 11 plan (the "Non-Con Plan Proponents"); numerous holders of notes issued by Lehman Brothers Treasury Co. B.V. ("LBT") asserting substantial Guarantee Claims against LBHI (the "LBT Noteholders"); Foreign Administrators who together control 87 of the Debtors' Foreign Affiliates; and various other significant creditors. Importantly, more than 150 creditors who asserted more than approximately $450 billion in aggregate claims against the Debtors have executed and delivered Plan support agreements (the "Plan Support Agreements") to the Debtors. The Debtors have also been advised by Epiq Bankruptcy Solutions, LLC ("Epiq"), the Debtors' claims and balloting agent, that the Plan has been overwhelmingly accepted by every class of impaired creditors that voted on the Plan. *See* Voting Certification. Not a single class voted to reject the Plan.

Pg 11 of 57

In addition to this Memorandum, in further support of confirmation of the

Debtors' Plan, the following have been filed contemporaneously:

- Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011;

- Debtors' Memorandum of Law, Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, in Support of Plan Settlements (the "Global Settlement Memorandum");

- Debtors' Response to Objections to Confirmation (the "Response"); and

- Declarations of (i) John K. Suckow, the President and Chief Operating Officer of LBHI and a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), (ii) Daniel J. Ehrmann, a Senior Vice-President of LBHI and a Managing Director with A&M; and (iii) Steven J. Cohn, a Senior Vice-President and Co-Treasurer of LBHI and a Managing Director with A&M, in support of confirmation of the Plan (collectively, the "Declarations").

The Plan satisfies all of the confirmation standards of section 1129 of the

Bankruptcy Code and achieves the objectives of chapter 11. The Debtors' Plan should be

approved.

## FACTS

The pertinent and salient facts are set forth in the Disclosure Statement, the

Global Settlement Memorandum, the Response and the Declarations and are incorporated herein

as if fully and at length set forth. Particularly relevant facts are set forth below and will be

referenced as appropriate in connection with the argument portion of this Memorandum.

1.     Commencing on September 15, 2008 (the "Commencement Date"), and

periodically thereafter, LBHI and certain of its subsidiaries commenced voluntary cases (the

"Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. Prior to September 15, 2008,

Lehman was an integrated financial enterprise constituting the fourth largest investment bank in

the United States. Lehman conducted a worldwide business and operations that employed over

25,000 employees.  Lehman's business was operated and managed as an integrated web that

reported for management purposes by product lines, and not on a legal entity basis.  As of May

31, 2008, Lehman's consolidated assets totaled approximately $639 billion, and its consolidated

liabilities totaled approximately $613 billion.

2.      Virtually all of Lehman's business segments were operated or were

managed out of the "world headquarters" at 745 Seventh Avenue in New York, New York.

LBHI, the ultimate parent of all Lehman legal entities, functioned as the central nerve center and

decision maker.  Through the LBHI Board of Directors, executive committee and various firm-

wide standing committees,[3] LBHI had responsibility and control over firm-wide issues,

including, decisions concerning strategy, risk, liquidity, funding, operations and new products.

In many instances, there were overlapping directors, officers and committees between LBHI and

its Affiliates.  Generally, LBHI directed all operations for the enterprise.

3.      LBHI served as the central banker and as the primary conduit for raising

the majority of the external financing for operations.  In order to collect, transfer, and distribute

funds efficiently, Lehman utilized a centralized cash management system to ensure that all of the

units had sufficient funding to operate their respective businesses.  The cash management system

facilitated Lehman's cash monitoring, forecasting and reporting, while ensuring compliance with

various regulatory requirements.  The capital of each Lehman entity was sourced from a single

pool of money that would be swept from many unregulated Affiliates and regulated Affiliates (to

the extent permitted) on a daily basis and used the next day to fund operations on an as needed

basis without regard to source or legal entity.  The cash management system resulted in tens of

---

[3] The firm-wide standing committee consisted of the Executive Committee, the Management Committee,
the Conflicts Task Force, the Finance Committee, the Operating Exposure Committee and the Risk
Committee.

thousands of intercompany transfers occurring on a daily basis.

4.       Generally, the intercompany balances between LBHI and its Affiliates were running totals that fluctuated daily.  Intercompany balances were not "zeroed out"; rather, they were carried over from day to day, month to month and year to year.  In addition, many Lehman Affiliates did not have their own bank accounts.  Their obligations and receivables were often settled by another Lehman Affiliate, typically Lehman Brothers Inc. ("<u>LBI</u>"), Lehman Brothers International (Europe) ("<u>LBIE</u>") or Lehman Brothers Japan Inc. ("<u>LBJ</u>"), and an intercompany balance was reflected on books and records of the relevant entities.  The movement of cash between, as well as the payment of expenses on account of the various legal entities, was accounted for through intercompany accounting.

5.       In the ordinary course, generally all financial reporting for Lehman was done on a consolidated basis at the LBHI level and was broken out by business segments and by geographic region, not by legal entity.  Due to the consolidated reporting, material intercompany accounts and transactions were not reported.  With few exceptions, most Lehman Affiliates did not publish, disseminate or make available individual financial statements.

6.       Each day, the Lehman global enterprise initiated, participated, and consummated tens of thousands of transactions involving billions of dollars at a velocity that, in retrospect, is almost incomprehensible.  Although many of the Lehman Affiliates facially appeared to maintain significant operations, transacted with third parties and had their own assets, it is evident that Lehman operated as a single unified business.  It is not surprising, therefore, that the failure of LBHI resulted in the catastrophic downfall of the entire Lehman enterprise and the domino effect causing the Chapter 11 Cases and foreign insolvency proceedings that ensued.  Following the commencement of LBHI's chapter 11 case, over eighty

(80) insolvency proceedings involving Lehman Foreign Affiliates were initiated in approximately sixteen (16) jurisdictions.  These included LBIE – the primary operating unit of the Lehman enterprise in Europe, whose size and complexity alone exceeded many domestic investment banks.  The prospect of intense adverse proceedings and conflicts loomed over the Chapter 11 Cases.

7.    Consequently, the days following September 15, 2008 bristled with fear and the onset of panic in the financial markets.  On September 19, 2008, LBHI's operating U.S. broker/dealer, LBI, which employed the bulk of the Debtors' employees (approximately 10,000 individuals), was subjected to liquidation proceedings under the Securities Investor Protection Act of 1970, as amended.  In order to preserve the jobs of thousands of employees and provide for the orderly transfer of customer accounts, the Debtors orchestrated a going concern sale of their North American capital markets business to Barclays Capital Inc. ("BarCap"), which also prevented a disastrous meltdown of the global financial markets.

8.    As a priority, the immediate focus of the Chapter 11 Cases was to achieve control of assets and all data, records and other information relating to the Lehman business. The abrupt failure of LBHI initiated a breakdown in Lehman's global financial accounting system.  The consequent disruption impaired the ability to locate, control and administer the Lehman business.  The problem was accentuated by the need to realize value from assets potentially subject to severe and imminent erosion, such as the North American capital markets business and the Neuberger Berman and associated investment management business.  The sale of the North American capital markets business, that encompassed the assets and business of LBI, within five (5) days of the Commencement Date resulted in the satisfaction of thousands of customer accounts.  The sale of a substantial portion of the investment management business was

approved by the Court within ninety-eight (98) days of the Commencement Date, which preserved the investment management business and inured to the ultimate benefit of LBHI that retained a significant equity interest.

9.      Unfortunately, the BarCap transaction essentially stripped the Debtors of employees and aggravated the initial phase of gaining control of the case administration. However, under the supervision and administration of the Debtors' financial advisors, A&M and the personnel and experience infused by it, over the course of the first year of administration, the Debtors (i) established control over their assets; (ii) achieved stability of administration of workstreams to maximize values; (iii) established relationships with foreign administrators and fiduciaries facilitated by the international protocol and completion of the "Global Close" to enable the Debtors to deal with claims asserted by the Foreign Affiliates; (iv) developed procedures to unravel and secure the value of the Debtors' massive derivatives portfolio of more than 10,000 contracts and approximately 1.7 million transactions; and (v) developed the foundation for formulating a proposal for a chapter 11 plan that would avoid the incurrence of extended, expensive, prolix and difficult litigation.

10.     After developing and stabilizing their infrastructure, the Debtors turned their attention to the maximization of value and recovery of their assets.  Generally, the Debtors' assets can be divided into five asset classes: derivatives contracts, real estate assets, commercial loans, private equity/principal investments and bank platforms.  Given the enormous number of the assets that needed to be administered, sold or otherwise resolved, the Debtors established various procedures and protocols that balanced the need for the Debtors to move quickly to secure the value of their assets with appropriate creditor oversight.  In that regard, the Debtors established procedures for resolution of derivatives contracts that were "in the money" to the

Debtors, as well as alternative dispute resolution procedures for the Debtors' affirmative claims based on derivatives contracts.  As a result of the alternative dispute resolution procedures, the Debtors have recovered approximately $1 billion.  In total, from the Commencement Date through October 31, 2011, the Debtors have recovered more than $13.8 billion from their derivatives assets.

11.    The Debtors have also established protocols to manage and sell such assets in an efficient manner to enable them to maximize the value of their real estate assets. Since the Commencement Date, the Debtors and their non-Debtor controlled Affiliates have collected in excess of $3.9 billion in gross recoveries from their real estate assets through June 30, 2011.  In addition to its prominent role in derivatives and the real estate markets, Lehman was a significant participant in the commercial lending industry prior to the Commencement Date and held a significant amount of commercial and residential loans.  The primary focus on the Debtors' loan strategy has been the consensual termination and limitation of damages for unfunded loan commitments of the Debtors and the maximizing of recoveries on issued Loans. As of June 30, 2011, the Debtors have terminated unfunded commitments on loans in the aggregate amount of $26.2 billion.

12.    September 22, 2009 was established as the deadline for parties to file proofs of prepetition claims against the Debtors.  Over 67,000 proofs of claim asserting liquidated amounts in excess of approximately $1.2 trillion were filed against the Debtors.  To date, the Debtors have filed two hundred thirty-two (232) omnibus objections to claims.  These objections, taken together with all settlements entered into by the Debtors, have resulted in the voluntary withdrawal, reduction, reclassification, disallowance or expungement of approximately 32,000 claims in the amount of approximately $455 billion.

13.    A fundamental objective of the Debtors since the commencement of these cases has been an expeditious exit from chapter 11 that maximizes recoveries to creditors.  In order to achieve that goal, the Debtors have recognized the overarching issue in these chapter 11 cases was whether the equitable doctrine of substantive consolidation is applicable to the Debtors and their Affiliates.  In the exercise and fulfillment of their fiduciary duties, during a period of over two years, the Debtors conducted an in-depth and exhaustive investigation, review and analysis of the facts and circumstances relating to the Debtors in the context of the applicable legal principles.  At the same time, the Creditors' Committee conducted its own investigation. The Debtors also regularly met with and considered the views of their interested creditors. Based upon their analyses, the Debtors and Creditors' Committee each, independently, concluded that litigation over substantive consolidation and other major issues should be avoided.  The complex facts and issues involved rendered the outcome of litigation highly uncertain.  It was also concluded that the prosecution of the litigation would be an expensive and extended exercise and strenuously contested.

14.    Accordingly, on January 25, 2011, when the Debtors filed their first amended chapter 11 plan, they proposed to compromise the myriad of legal and economic issues presented by the Debtors' chapter 11 cases (collectively, the "Plan Issues").  The Plan Issues include whether the equitable doctrine of substantive consolidation may be applied to the Debtors and their Affiliates, the characterization of the intercompany balances owed to LBHI by Subsidiary Debtors, the allowed amounts of Affiliate Claims, the ownership and rights of various Debtors and their Affiliates with respect to certain assets, and the allocation of costs and expenses of administration among the Debtors.  In response, two alternative chapter 11 plans and related disclosure statements were filed by the Ad Hoc Group and the Non-Con Plan Proponents,

respectively.  The alternative plans are polar opposites.  At one extreme, the Ad Hoc Group

proposed to substantively consolidate essentially all of the Debtors as well as certain of their

Foreign Affiliates.  At the opposite extreme, the Non-Con Plan Proponents proposed a separate

liquidation of each of the Debtor's cases based upon their conclusion that there is <u>absolutely</u> no

risk of substantive consolidation.

15.     To avoid the costs, delays and utter confusion that would result from the

prosecution of three competing chapter 11 plans, the Debtors took the initiative and began

intense negotiations in June 2011 with their major stakeholders, including members of the Ad

Hoc Group, members of the Non-Con Plan Proponents, many LBT Noteholders and various

Foreign Administrators, to achieve a consensus to resolve the manifold conflicts and issues that

separated the parties.  These negotiations were successful and additional compromises were

incorporated into the Debtors' Plan in exchange for Plan Support Agreements that were executed

by the Debtors' major stakeholders.  The Ad Hoc Group and the Non-Con Plan Proponents also

agreed to suspend consideration of their alternative plans pending the prosecution of the Debtors'

Plan.  Pursuant to the Global Settlement, the Plan does not substantively consolidate any of the

Debtors or their Affiliates, but incorporates a series of interconnected concessions by parties in

interest to expedite the administration of these cases to resolve the Plan Issues finally and fully.

A more detailed description of the Global Settlement is set forth in the Global Settlement

Memorandum.

16.     During the course of plan negotiations in June 2011, the Debtors and eight

(8) of their thirteen (13) largest derivatives counterparties also entered into settlement

agreements for the allowance of their respective derivatives claims and the payment of amounts

due by such counterparties to the Debtors, in accordance with a settlement framework that

applied standardized, uniform and transparent principles and methodologies to calculate such

amounts.  The application of uniform principles and methodologies and the voluntary settlements

entered into by the relevant parties eliminated potential time-consuming and expensive litigation

regarding the valuations of thousands of derivatives transactions.  The settlements also

eliminated certain impediments to making meaningful distributions to creditors.  Since June

2011, the Debtors have settled with two (2) additional derivatives counterparties from the group

of thirteen (13).  Pursuant to such settlement agreements, the primary derivatives claims of the

settled counterparties have been allowed in the aggregate amount of approximately $7.8 billion

and corresponding guarantee claims in approximately the same amount against LBHI, which

represents a reduction of $7.3 billion from the $15.1 billion in primary claims originally asserted

by such parties in the aggregate.

        17.     Since June 2011, the Debtors have pursued their objective to achieve a

consensual confirmation.  In furtherance of that objective, the Debtors reached comprehensive

settlements that are consistent with the underlying principles of the Plan and the Global

Settlement with eight (8) administrators and certain third-party creditors.  The Bilateral

Settlements have been incorporated into the Debtors' Third Amended Plan filed on September 1,

2011, including the additional settlements that were contained in the Plan Supplement filed on

October 25, 2011.  Assuming the approval of the Bilateral Settlements, the claims of such parties

against the Debtors will be reduced by an aggregate amount of $267 billion.  Each of the

settlements is described in the Global Settlement Memorandum.

        18.     In total, as a result of the additional settlements that the Debtors have

achieved in furtherance of the Plan, more than 150 creditors who asserted claims in excess of

approximately $450 billion in aggregate claims against the Debtors have executed Plan Support

Agreements.

19.     On September 1, 2011, the Court approved the Disclosure Statement for

the Plan as containing adequate information to enable a hypothetical reasonable investor to make

an informed vote on the Plan.  The Court also established procedures for the solicitation of votes

to accept or reject the Plan (the "<u>Disclosure Statement Order</u>").  The Debtors have complied with

the Disclosure Statement Order and have completed the solicitation of votes to accept or reject

the Plan.

20.     In the aggregate, 75,322 creditors asserting a total amount of over $405

billion in claims against the Debtors voted on the Plan.  The Plan has been accepted by 71,553

creditors asserting claims in the aggregate amount of approximately $400 billion against the

Debtors (which represents 95% in number and 98.68% in amount of voting creditors).  As set

forth in the Voting Certification, <u>every</u> class of creditors that voted on the Plan overwhelmingly

accepted the Plan, including at least two Classes at each of the 23 Debtors.  Of the 134 classes

entitled to vote on the Plan, ninety-three (93) classes accepted the Plan.  No votes were submitted

in the remaining forty-one (41) classes (the "<u>Non-Voting Classes</u>"), which should be deemed to

have accepted the Plan.  Significantly, no class voted to reject the Plan.

## ARGUMENT

To achieve confirmation of the Plan, each of the Debtors must demonstrate that

the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.

As the United States Court of Appeals for the Fifth Circuit stated in  *Heartland Federal. & Loan*

*Association v. Briscoe Enterprises., Ltd. II (In re Briscoe Enterprises., Ltd. II)*:  "The

combination of legislative silence, Supreme Court holdings, and the structure of the

[Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the

debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."  994 F.2d

1160, 1165 (5th Cir. 1993); *see also In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y.

2010) (citations omitted); *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010)

(citations omitted); *JPMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC (In re

Charter Commc'ns)*, 419 B.R. 221,224 (Bankr. S.D.N.Y. 2009), *appeal dismissed*, 449 B.R. 14

(S.D.N.Y. 2011); *In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) (holding

that "the final burden of proof at . . . confirmation hearings remains a preponderance of the

evidence").  The Debtors will demonstrate, by a preponderance of the evidence, that all of the

subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

I.    **THE PLAN SATISFIES SECTION 1129(a)(1) OF THE BANKRUPTCY CODE.**

Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the

applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(l).  The legislative history of

section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122

and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan,

respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see

also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir.

1988); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

The Plan fully complies with the requirements of the Bankruptcy Code.

A.    **The Classification of Claims and Interests Complies With Section 1122 of the
Bankruptcy Code.**

Section 1122 of the Bankruptcy Code provides as follows:

> (a) Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests of such
> class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122(a).  The Plan provides for the separate classification of Claims against and Equity Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Equity Interests.  In total, there are one-hundred sixty-one (161) Classes of Claims against and Equity Interests in the Debtors.

<u>LBHI</u>.  The Plan separately classifies Claims against or Equity Interests in LBHI into seventeen (17) Classes as follows:

- <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code or, to the extent applicable, 12 U.S.C. § 4617(b)(15), other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- <u>Class 3</u> provides for the separate classification of Senior Unsecured Claims, which generally are Claims based upon bonds issued by LBHI that are contractually entitled to a priority in right to payment over all subordinated debt Claims against LBHI.

- <u>Class 4A</u> provides for the separate classification of Senior Affiliate Claims, which are Claims asserted by Affiliates against LBHI that are contractually entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 4B</u> provides for the separate classification of Senior Affiliate Guarantee Claims, which are Guarantee Claims asserted by Affiliates that are contractually entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 5</u> provides for the separate classification of Senior Third-Party Guarantee Claims, which are Guarantee Claims asserted by a party that is not an Affiliate and that are contractually entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 6A</u> provides for the separate classification of Convenience Claims, which are Senior Unsecured Claims or General Unsecured Claims in an amount of $50,000 or less.

- <u>Class 6B</u> provides for the separate classification of Convenience Guarantee Claims, which are Senior Third-Party Guarantee Claims or Third-Party Guarantee Claims in an amount of $50,000 or less.

- <u>Class 7</u> provides for the separate classification of General Unsecured Claims against LBHI, which generally include trade vendor, rejection damages and litigation Claims (other than Claims subject to section 510(b) of the Bankruptcy Code), that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 8</u> provides for the separate classification of Affiliate Claims against LBHI, which are all Claims against LBHI asserted by an Affiliate that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 9A</u> provides for the separate classification of Third Party Guarantee Claims, which are Guarantee Claims asserted by a party that is not an Affiliate or a Designated Entity and that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 9B</u> provides for the separate classification of the Guarantee Claim of the Racers Trusts, which is allowed pursuant to the Global Settlement in the amount of $1.947 billion.

- <u>Classes 10A, 10B and 10C</u> provides for the separate classification Claims against LBHI that are contractually subordinated to certain other Claims against LBHI.

- <u>Class 11</u> provides for the separate classification of Claims against LBHI that are subordinated to other Claims against LBHI pursuant to section 510(b) of the Bankruptcy Code.

- <u>Class 12</u> provides for the separate classification of LBHI Equity Interests.

<u>LCPI and LBSF</u>.  With respect to each of LCPI and LBSF, the Plan separately

classifies Claims against or Equity Interests in LCPI or LBSF, as applicable, into nine (9)

Classes as follows:

- <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- ▪ <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- ▪ <u>Class 3</u> provides for the separate classification of Convenience Claims, which are General Unsecured Claims in an amount of $50,000 or less.

- ▪ <u>Class 4A</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors or Designated Entities.

- ▪ <u>Class 4B</u> provides for the separate classification of the Claims of the Designated Entities, which are allowed in fixed amounts in accordance with the Global Settlement.

- ▪ <u>Class 5A</u> provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against LCPI or LBSF.

- ▪ <u>Class 5B</u> provides for the separate classification of Affiliate Claims of the Participating Subsidiary Debtors,[4] which are all Claims of a Participating Subsidiary Debtor against LCPI or LBSF.

- ▪ <u>Class 5C</u> provides for the separate classification of Affiliate Claims other than the Participating Debtors,[5] which are all Claims of Affiliates against LCPI or LBSF other than Claims of LBHI and the other Participating Subsidiary Debtors.

- ▪ <u>Class 6</u> provides for the separate classification of Equity Interests in LCPI or LBSF.

<u>LBCS, LOTC and LBCC</u>.  With respect to each of LBCS, LOTC and LBCC, the

Plan separately classifies Claims against or Equity Interests in LBCS, LOTC or LBCC, as

applicable, into eight (8) Classes as follows:

- ▪ <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- ▪ <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

---

[4] "<u>Participating Subsidiary Debtors</u>" means LCPI, LBSF, LOTC, LBCC or LBCS.

[5] "<u>Participating Debtors</u>" means the Participating Subsidiary Debtors and LBHI.

- <u>Class 3</u> provides for the separate classification of Convenience Claims, which are General Unsecured Claims in an amount of $50,000 or less.

- <u>Class 4</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors.

- <u>Class 5A</u> provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against LBCS, LOTC or LBCC.

- <u>Class 5B</u> provides for the separate classification of Affiliate Claims of the Participating Subsidiary Debtors, which are all Claims of a Participating Subsidiary Debtor against LBCS, LOTC or LBCC.

- <u>Class 5C</u> provides for the separate classification of Affiliate Claims other than the Participating Debtors, which are all Claims of Affiliates against LBCS, LOTC or LBCC other than Claims of LBHI and the other Participating Subsidiary Debtors.

- <u>Class 6</u> provides for the separate classification of Equity Interests in LBCS, LOTC or LBCC.

<u>All Other Subsidiary Debtors</u>.  With respect to each of the remaining Subsidiary Debtors (*i.e.,* those that are not Participating Subsidiary Debtors), the Plan separately classifies Claims against or Equity Interests in such a Debtor, as applicable, into six (6) Classes as follows:

- <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- <u>Class 3</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors.

- <u>Class 4A</u> provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against the applicable Subsidiary Debtor.

- <u>Class 4B</u> provides for the separate classification of Affiliate Claims of Affiliates other than LBHI, which are all Claims of all Affiliates other than LBHI against the applicable Subsidiary Debtor.

- ▪ <u>Class 5</u> provides for the separate classification of Equity Interests in the applicable Subsidiary Debtor.

Courts interpreting section 1122(a) of the Bankruptcy Code generally uphold separate classification of unsecured claims if a reasonable basis exists for the classification and all claims within a particular class are substantially similar. *See Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").  Section 1122 of the Bankruptcy Code "only prohibits the identical classification of dissimilar claims and does *not* require the same classification for claims sharing some attributes."  *In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, at *203 (Bankr. S.D.N.Y. July 15, 2004) (emphasis added) (citations omitted).

Additionally, "[a] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) provided that there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."  *In re Enron Corp.*, 2004 Bankr. LEXIS, at *202; *see also In re Charter Commc'ns*, 419 B.R. at 264 n.35 (explaining that debtors "enjoy considerable discretion when classifying similar claims in different classes") (citations omitted).  The plan proponent's discretion is not, however, unlimited, and similar claims may not be classified "solely to engineer an assenting impaired class." *Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd P'ship)*, 21 F.3d 477, 482 (2d Cir. 1994).

The Plan's classification scheme complies with section 1122 of the Bankruptcy Code.  Generally, the Plan incorporates a "waterfall" classification and distribution scheme as to each of the Debtors that strictly follows the statutory priorities prescribed by the Bankruptcy Code.  As to each Debtor, the Plan separately classifies priority non-tax claims, secured claims,

unsecured claims and equity interests.  In addition, as permitted by section 1122(b) of the

Bankruptcy Code, the Plan provides for administrative convenience classes against LBHI and the

Participating Subsidiary Debtors.  After satisfying or reserving in full for allowed secured,

administrative and priority claims and payment of convenience claims in accordance with the

Plan, each Debtor will distribute its Available Cash to holders of allowed unsecured claims

(other than Section 510(b) Claims against LBHI) on a *pro rata* basis, which will be reallocated in

some cases as described below in accordance with the Global Settlement.

        Separate classes of unsecured claims against the Debtors in the Plan are based

upon whether the Claim is asserted by an Affiliate of the Debtors or a non-affiliated entity (*i.e.*

third parties).  Further, with respect to LBHI, unsecured claims are also separately classified

based upon the nature of the Claim.  Guarantee Claims are separately classified from direct

claims and senior and subordinated claims are separately classified in order to strictly comply

with sections 510(a) and (b) of the Bankruptcy Code.  This Plan classification of general

unsecured claims against the Debtors is valid and justified, as Guarantee Claims and Affiliate

Claims would be eliminated if the Court were to order substantive consolidation of the Debtors

and their Affiliates.  *See In re Worldcom Inc.*, Case No. 02-13533, 2003 WL 23861928, at *35

(Bankr. S.D.N.Y. Oct. 31, 2003) ("In the course of satisfying the liabilities of the consolidated

debtors from the common pool of assets, intercompany claims are eliminated and guaranties

from co-debtors are disregarded.") (citations omitted); *see also Charter Commc'ns*, 419 B.R. at

264 (finding separate classification justified because of the members' "disparate legal rights[.]").

Thus, there are legitimate bases to classify these claims separately from other general unsecured

claims against the Debtors.

The Plan classification scheme also is necessary to implement the Global

Settlement.  The primary settlement mechanism in the Plan is the Plan Adjustment provision.

Pursuant to the Plan Adjustment, in order to resolve the risk of litigation relating to substantive

consolidation, and in recognition of the potential harms and benefits that might result if

substantive consolidation is directed, a portion of the distributions to certain unsecured creditors

who would otherwise receive lesser distributions because of substantive consolidation are

reallocated to other creditors who would otherwise benefit from substantive consolidation.  The

Plan provides:

- Guarantee Claims asserted by third-parties are separately classified and
  reallocate 20% of their recoveries pursuant to the Plan Adjustment to settle the
  risk that such claims would be eliminated in the event of a substantive
  consolidation.

- Affiliate Claims have been separately classified against LBHI to resolve the
  risks to such claims of substantive consolidation as well as the other
  challenges to their Guarantee Claims against LBHI.  The settlements with
  Foreign Affiliates include substantial reductions to the allowed amount of
  Guarantee Claims against LBHI to account for such risks.  Similar reductions
  have been applied to the Affiliate Claims of the Subsidiary Debtors and
  Debtor-Controlled Entities against LBHI.[6]  Affiliate Claims (other than
  LBHI's Claims) against the Participating Subsidiary Debtors are subject to the
  Plan Adjustment.

- Direct Claims of third parties against LBHI (Senior and General Unsecured
  Claims) have been separately classified because such Claims would benefit
  from substantive consolidation.  The dilution to their recoveries caused by the
  sizable Guarantee Claims and Affiliate Claims against LBHI would be
  eliminated and such Claims would be able to share in the assets of the
  substantively consolidated Subsidiary Debtors and Affiliates.  Hence, Senior
  Unsecured Claims and General Unsecured Claims against LBHI *receive* Plan
  Adjustment.

---

[6] While Affiliate Claims and Guarantee Claims against LBHI share similar risks of some of the Plan
Issues, there is no requirement that Affiliate Claims and Guarantee Claims be classified together and
treated alike.  *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *92-98 (plan incorporated global
settlement of substantive consolidation and separately classified and treated intercompany and guarantee
claims); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 298 (Bankr. N.D. Ill. 2008) (noting that
section 1122(a) does not require "absolute homogeneity" of all claims or interests) (citations omitted).

A very similar classification structure was approved *In re Enron Corp.*, where the *Enron* debtors likewise proposed a plan that incorporated a global settlement to resolve potential litigation over issues such as substantive consolidation. *See In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at \*81-84 (discussed *infra*); *see also generally In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006) (approving separate classification of general unsecured claims in order to implement settlement of substantive consolidation). The *Enron* plan incorporated a comprehensive settlement of the global issues, including the risks of substantive consolidation. 2004 Bankr. LEXIS 2549, at \*91-92. Because intercompany and guarantee claims would be eliminated in a substantive consolidation, the *Enron* plan separately classified and treated such claims in order to implement the plan settlement. *Id.*, at \*82, 93. Similar to the classification schemes that were approved in *Enron* and *Winn-Dixie*, the Plan's classification scheme is necessary and appropriate to implement the Global Settlement and to resolve the Plan Issues, including substantive consolidation, and to achieve the objectives of chapter 11 to maximize the recoveries to allowed claim holders in an expeditious fashion.

In approving the classification scheme in *Enron*, the Court overruled objections to the separate classification and treatment of guarantee claims. *Id.* at \*203, 261-62. The Court held that "the treatment of Guaranty Claims … is appropriate in light of the global compromise embodied in the Plan and such classification and treatment is in accordance therewith." *Id.*, at \*261. "[G]iven the risk that a Guaranty Claim would not exist if there were substantive consolidation, it is appropriate to separately classify those claims and adjust the recovery on the Guaranty Claims to reflect this risk." *Id.*, at \*262. Specifically, the Court stated:

> "If total substantive consolidation were ordered, any claim against
> multiple debtor entities for the same liability, whether joint, primary or
> secondary (including guaranty claims), typically would be deemed to

constitute one claim to be satisfied … .  As a result, the multitude of Guarantee Claims would be extinguished in their entirety.  Although substantive consolidation often results in all guaranty claims being eliminated, it is appropriate for a settlement of substantive consolidation to recognize a portion of guarantee claims."

*Id.*, at *203-04 (*citing*, *inter alia*, *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 748

(approving settlement and substantive consolidation contained in plan under which only a

portion of guarantee claims were recognized)).

§ 1122(b).  Section 1122(b) of the Bankruptcy Code provides:  "A plan may

designate a separate class of claims consisting only of every unsecured claim that is less than or

reduced to an amount that the court approves as reasonable and necessary for administrative

convenience."  11 U.S.C. § 1122(b).  Consistent with 1122(b), for administrative convenience,

unsecured claims against LBHI (LBHI Classes 6A and 6B) and the Participating Subsidiary

Debtors (Class 3) of less than or reduced to $50,000 (other than those asserted by Affiliates) are

separately classified.  The inclusion of convenience Classes in the Plans of LBHI, LBCS, LBCC,

LBSF, LCPI and LOTC will permit those Debtors to make a single Distribution on account of

Convenience Claims and Convenience Guarantee Claims against such Debtors and avoid the

administrative burden of tracking the transfers of these Claims, repeating the calculations of the

distributions to holders of such claims, providing notices to holders of such Claims and preparing

and mailing or wiring Distributions to holders of such Claims on each Distribution Date.  The

definitions of Convenience Claims and Convenience Guarantee Claims, including the exclusions

of Claims based on public debt securities issued or guaranteed by LBHI or a Claim filed by a

nominee on behalf of one or more beneficial holders of Claims, is reasonable and necessary for

the administrative convenience.

Certain Creditors have objected to the classification scheme included in the Plan. The Debtors' responses to such objections are included in the Response. The classification scheme of the Plan is rational and was not proposed to create a consenting impaired Class or manipulate voting. All Claims and Equity Interests within a Class have the same or substantially similar rights as the other Claims and Equity Interests in that Class and will receive the same treatment under the Plan as the Claims and Equity Interests in the same Class. *A fortiori*, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code and should be approved.

**B.      The Plan Complies with Section 1123 of the Bankruptcy Code.**

Section 1123(a) of the Bankruptcy Code sets forth seven requirements which the proponent of a chapter 11 plan must satisfy.[7] *See* 11 U.S.C. § 1123(a). The Plan fully complies with each such requirement:

- ■ The Plan designates Classes of Claims and Classes of Equity Interests as required by section 1123(a)(1). *See* Plan, Art. III.

- ■ The Plan specifies whether each Class of Claims and Equity Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. *See* Plan, Arts. III, IV and V.

- ■ Except as otherwise agreed to by a holder of a particular Claim or Equity Interest, the treatment of each Claim or Equity Interest in each particular Class is the same as the treatment of each other Claim or Equity Interest in such Class, as required by section 1123(a)(4). *See* Plan, Art. IV and V.

- ■ The Plan provides adequate means for implementation of the Plan as required by section 1123(a)(5) through, among other things: (i) the appointment of a Plan Administrator with the duties and responsibilities set forth in Section 6.1(b) of the Plan to administer and maximize the value of the Debtors' estates; (ii) the Global Settlement and Bilateral Settlements incorporated into the Plan, *see* Plan § 6.5; (iii) the provisions governing Distributions under the

---

[7] An eighth requirement, set forth in 11 U.S.C. § 1123(a)(8), only applies in a case in which the debtor is an individual.

Plan, *see* Plan, Art. VIII; (iv) the procedures governing the allowance of Claims under the Plan; *see* Plan, Art. IX; (v) the dissolution or wind down of a Debtor or Debtor-Controlled Entity in accordance with applicable law and consistent with the implementation of the Plan, *see* Plan, § 7.6; and (vi) the liquidating trust vehicles that may be created under the Plan, *see* Plan, Art. X.

- The certificate of incorporation, articles of incorporation, limited liability company agreement or similar governing document, as applicable, of each Debtor has been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities, in accordance with section 1123(a)(6) of the Bankruptcy Code. *See* Plan Supplement, Exhibit 1.

- Sections 7.2, 7.3 and 7.4 of the Plan provide the manner in which the board of directors of each of the Debtors will be selected. The Plan provisions governing the manner of selection of any officer, director or trustee under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code. The Debtors will file with the Court a notice identifying the directors selected to serve on the board of directors of LBHI following the Effective Date. *See* Plan, Art. VII, Plan Supplement.

Section 1123(b) of the Bankruptcy Code also sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b):

- As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, all classes of Claims and Equity Interests treated under the Plan are impaired and subject to appropriate treatment. *See* Plan, Arts. III, IV and V.

- The Plan provides for the assumption or rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code, as contemplated by section 1123(b)(2) of the Bankruptcy Code. *See* Plan, Art. XI.

- Pursuant to section 1123(b)(3) of the Bankruptcy Code, as described in the Global Settlement Memorandum, the Plan is premised on the Global Settlement and Bilateral Settlements among the Debtors and certain of their Foreign Affiliates and creditors. *See* Plan § 6.5. As discussed in the Global Settlement Memorandum, the Plan settlements satisfy the standard for approval under Bankruptcy Rule 9019.

Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus

satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code as intended to accomplish the objectives of chapter 11 and the Bankruptcy Code.

## II.    THE PLAN SATISFIES SECTION 1129(a)(2) OF THE BANKRUPTCY CODE.

Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 759 (citations omitted).

### A.    The Debtors Have Complied With Section 1125 of the Bankruptcy Code.

The Debtors have complied with the applicable provisions of section 1125 of the Bankruptcy Code governing disclosure and plan solicitation.  On September 1, 2011, the Court approved the Disclosure Statement and entered the Disclosure Statement Order.  As set forth in the Affidavit of James Daloia, sworn to on October 14, 2011 [ECF No. 20882], each holder of a Claim or an Equity Interest was sent and should have received the solicitation materials in accordance with the Disclosure Statement Order, including, for holders of Claims entitled to vote, the Disclosure Statement (which includes as an exhibit a copy of the Plan), and a ballot. The Debtors solicited acceptances of the Plan in good faith and did not solicit acceptances of the Plan from any holder of a Claim or Equity Interest holder prior to the transmission of the Disclosure Statement.  No Creditors have filed objections to the Plan asserting that the Debtors did not comply with section 1125 of the Bankruptcy Code.

B.    **The Requirements of Section 1126 of the Bankruptcy Code Have Been Satisfied.**

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Plan.  Under section 1126, only holders of Allowed Claims in impaired Classes of Claims that will receive or retain property under the Plan on account of such Claims may vote to accept or reject the Plan.  In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from the holders of all Allowed Claims in each Class of impaired Claims that are entitled to vote to accept or to reject the Plan.  All Classes of Claims under the Plan are impaired, and the holders of Allowed Claims in each of these Classes (other than LBHI Classes 10A, 10B, 10C and 11) are entitled to vote to accept or reject the Plan.

As to impaired classes entitled to vote to accept or reject a plan, sections 1126(c) specifies the requirements for acceptance of a plan by classes of claims.  Specifically, "a class of claims has accepted a plan if such plan has been accepted by creditors … that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors … that have accepted or rejected such plan."  11 U.S.C. § 1126(c).  As to each of the Debtors, other than the Non-Voting Classes, which should be deemed to accept the Plan for the reasons discussed in Section VIII of this Memorandum, the Plan has been accepted by the requisite majorities proscribed by section 1126(c) of the Bankruptcy Code in every class of Claims entitled to vote in accordance with the Disclosure Statement Order.  In total, 95.00% in number and approximately 98.68% in dollar amount of all creditors and Claims that voted on the Plan voted to accept the Plan.

The holders of Claims in LBHI Classes 10A, 10B, 10C and 11 and Equity Interests in each of the Debtors are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, the Debtors did not solicit acceptances

from the holders of Equity Interests in each of the Debtors or holders of Claims in LBHI Classes 10A, 10B, 10C and 11.  The Debtors elect pursuant to section 1129(b) of the Bankruptcy Code to request confirmation of the Plan over the deemed rejections of such Classes.  The Plan does not discriminate unfairly and is fair and equitable with respect to each such Class.  Certain creditors in accepting Classes have asserted that the Plan, and the Global Settlement, discriminate unfairly against their Claims.  The Debtors' response to such assertions is set forth in the Response.

The requirements of section 1129(a)(2) have been satisfied.

## III.    THE PLAN HAS BEEN PROPOSED IN GOOD FAITH IN COMPLIANCE WITH SECTION 1129(a)(3) OF THE BANKRUPTCY CODE.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (citations omitted).  "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Chemtura Corp.*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).  "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan."  *Id.* (internal quotations and citations omitted).

In satisfaction of their fiduciary duties, the Debtors and the Creditors' Committee each separately conducted exhaustive reviews and analyses of the Plan Issues and Global Settlement.  In that regard, the Debtors repeatedly met with interested creditors, including

27

members of the Ad Hoc Group, the Non-Con Plan Proponents and the LBT Noteholders, in order

to consider their views concerning the Plan and the Global Settlement.  As evidenced by the

alternative chapter 11 plans filed by the Ad Hoc Group and the Non-Con Plan Proponents, these

parties were well informed of the issues.  On the basis of their investigations and diligence, the

Debtors and the Creditors' Committee each separately determined that it was in the interests of

all creditors to avoid litigation over the Plan Issues, and to pursue a rational non-litigation

alternative in order to maximize recoveries to creditors and avoid delay.

        While discussions and negotiations regarding the Plan Issues were extensive and

occurred over a long period of time among the Debtors, the Creditors' Committee and creditors,

the Plan and the Global Settlement were ultimately finalized in June 2011 following a series of

very extended robust good faith negotiations that resulted in mutual accommodations among the

Debtors, the Creditors' Committee, and the principal stakeholders and creditor constituencies,

including members of the Ad Hoc Group, certain of the Non-Con Plan Proponents and various

LBT Noteholders.  The number of Plan Support Agreements executed by parties asserting

approximately $450 billion in aggregate claims against the Debtors, as well as the overwhelming

acceptance of the Plan by impaired classes of creditors, reflects its inherent fairness, including

that of the Global Settlement, and the good faith efforts of the parties to achieve the objectives of

chapter 11.  Manifestly, the Debtors and Creditors' Committee have acted with the best

intentions for creditors in proposing the Plan.

        The Bilateral Settlement agreements among the Debtors and their Foreign

Affiliates and certain third party creditors likewise are indicative of the good faith efforts of the

parties to reach consensual resolutions to enable the attainment of the objectives of chapter 11.

The Bilateral Settlements have been achieved after extensive negotiations among the Debtors

and the various Foreign Administrators.  Each of the Bilateral Settlement agreements is unique

and has been carefully considered and negotiated to achieve a fair result for creditors of each

Lehman entity involved in order to avoid massive litigation that was almost a certainty at one

point in these cases.  The Foreign Administrators that have settled with the Debtors have

concluded, in recognition of their fiduciary duties to their respective creditors, that the Global

Settlement and the Plan is a fair and reasonable resolution of the issues presented by the Debtors'

chapter 11 cases and their insolvency proceedings.

Patently, the Plan resonates with fundamental fairness and reasonableness.  *See In

re Chemtura Corp.*, 439 B.R. at 608-09 (finding good faith requirement met because, among

other things, the debtor negotiated and reached agreements with several parties in interest to put

forward a chapter 11 plan which "in the aggregate demonstrate a good faith effort on the part of

the debtor to consider the needs and concerns of all major constituencies in this case"); *see also

In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is

proposed by the committee as well as the debtors is strong evidence that the plan is proposed in

good faith.").  While the Plan is proposed by the Debtors, the Creditors' Committee participated

in the negotiation of the terms of the Plan and supports the confirmation of the Plan.

The Plan has been proposed in good faith and complies with section 1129(a)(3).

There is no objection to the Plan on the basis that it was not proposed in good faith.

## IV.    THE PLAN COMPLIES WITH SECTION 1129(a)(4) OF THE BANKRUPTCY CODE.

Section 1129(a)(4) requires that "any payment made or to be made by the

proponent … for services or for costs and expenses in or in connection with the case, or in

connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been

construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re River Vill. Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84 B.R. 893, 907-08 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).

All payments for services provided to the Debtors during the Chapter 11 Cases have either been previously authorized by the Court or must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.2 of the Plan provides that all professional fees (other than ordinary course professionals) must be approved by the Court as reasonable pursuant to final fee applications.  In addition, Section 6.7 of the Plan provides for the payments of the reasonable fees and expenses of certain indenture trustees and the individual members of the Creditors' Committee.  The provisions of the Plan have been modified to respond to the objection of the United States Trustee for Region 2 to provide that the indenture trustees and individual members of the Creditors' Committee shall be required to file applications with the Court for the approval of the payment of claimed fees and expenses after notice and a hearing.

Therefore, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

## V.    THE DEBTORS WILL COMPLY WITH SECTION 1129(a)(5) OF THE BANKRUPTCY CODE.

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent there

are any insiders that will be retained or employed by the reorganized debtors, that there be disclosure of the identity and compensation of any such insiders. *See* 11 U.S.C. § 1129(a)(5).

The Plan complies with section 1129(a)(5) of the Bankruptcy Code. Sections 7.2, 7.3 and 7.4 of the Plan describe the manner in which the post-Effective Date board and management of each of the Debtors will be selected. The appointment and continuance of such officers and directors will be governed by the Amended By-Laws and the Plan Trust Agreement contained in the Plan Supplement. Prior to the Confirmation Hearing, the Debtors will disclose any identified directors and the compensation arrangements applicable to the directors.

The Plan clearly complies with section 1129(a)(5) of the Bankruptcy Code. There are no objections to the Plan challenging the manner in which officers and directors of the Debtors are selected or as to the Plan's compliance with section 1129(a)(5).

## VI.    THE PLAN DOES NOT CONTAIN ANY RATE CHANGES.

Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) is inapplicable.

## VII.   THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS OF, AND EQUITY INTEREST HOLDERS IN, EACH OF THE DEBTORS.

Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and stockholders in each Debtor. The best interests test focuses on potential individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 N.13 (1999). It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property

having a present value, as of the effective date of the plan, not less than the amount such holder

would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Under the best interests test, "the court must measure what is to be received by

rejecting creditors in the impaired classes under the plan against what would be received by them

in the event of liquidation under chapter 7.  In doing so, the court must take into consideration

the applicable rules of distribution of the estate under chapter 7, as well as the probable costs

incident to such liquidation."  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr.

S.D.N.Y. 2007).  The Court must evaluate the liquidation analysis cognizant of the fact that

"[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that

will not occur unless the case is actually converted to chapter 7."  *In re Affiliated Foods, Inc.*,

249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (citations omitted).  As section 1129(a)(7) makes

clear, the liquidation analysis applies only to nonaccepting holders of impaired claims or equity

interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 ("[T]he liquidation

analysis applies only to non-accepting impaired claims or interests.").

As set forth in the Liquidation Analysis and described in the Cohn Declaration,

the best interests test is satisfied as to <u>every single holder</u> of an Allowed Claim against and

Equity Interest in each Debtor.  Specifically, the Liquidation Analysis demonstrates that all

classes of Allowed Claims entitled to receive distributions under the Plan will recover value

equal to or in excess of what such Claims would receive in a hypothetical chapter 7 liquidation.

The Debtors' Liquidation Analysis is sound and reasonable and incorporates

justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the

additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7

trustee's fees and retention of new professionals; (ii) the delay and erosion of value that would be

caused to the Debtors' assets due to the need of the newly appointed chapter 7 trustee and its

professionals to familiarize themselves with the assets and liabilities of the Debtors; (iii) the

reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the

trustee; (iv) the reduced recoveries from the Debtors' derivatives, real estate and other primary

assets due to loss of many of the Debtors' employees who have an intimate understanding of

assets of and liabilities against the Debtors and developed counterparty relationships; (v)

projected market impediments, including lack of liquidity, supply and demand imbalances, and

reduced recoveries from bulk sales; and (vi) the inability of the chapter 7 trustee to provide seller

representations and warranties.  *See* Liquidation Analysis, at 5-1 – 5-10.

The assumptions and estimates in the Liquidation Analysis are sound and

reasonable in the context of these Chapter 11 Cases.  Similar assumptions are typically taken into

account in hypothetical liquidation analyses and have been approved by this Court.  *See e.g., In

re Adelphia Commc'ns Corp.*, 368 B.R. at 251-59 (considering, among other things, additional

administrative costs of appointing one or more chapter 7 trustees, loss of value associated with

loss of expertise of debtors' employees and professionals, increased claims against the debtors

and resulting delays in distributions); *see also In re Uno Rest. Holdings Corp.*, Case No. 10-

10209, 2010 Bankr. LEXIS 2931, at 227 (Bankr. S.D.N.Y. May 11, 2010) (liquidation analysis

considered increased costs and expenses of chapter 7 liquidation arising from fee payable to

chapter 7 trustee and its advisors, erosion of asset value in the context of expeditious liquidation

and "forced sale" atmosphere and substantial increases in claims) (*Order Confirming Second

Amended Joint Consolidation Plan of Reorganization*, filed July 6, 2010, ECF. No. 559).

The estimates regarding the Debtors' assets and liabilities that are incorporated

into the Liquidation Analysis are also based upon the knowledge and familiarity of the Debtors'

financial and other advisors that have been developed since the commencement of the Chapter 11 Cases and their relevant experience in chapter 11 proceedings. The Debtors' Liquidation Analysis should be given deference. *See In re Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize.").

   The Liquidation Analysis properly assumes that the compromises incorporated into the Plan would also be adopted and consummated in a hypothetical chapter 7 liquidation. As courts in this and other districts have consistently held, for purposes of evaluating a chapter 11 plan, the disclosed liquidation analysis should be prepared using the same or substantially similar assumptions as used in the proposed plan to enable creditors to compare the potential results under the Plan and alternatively, under chapter 7 of the Bankruptcy Code. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252-55 ("Comparing the estimated recovery for each impaired creditor under the Plan with its estimated recovery in a hypothetical chapter 7 case requires examining … the Settlement embodied in the Plan," because "it is reasonable to assume that a chapter 7 trustee would adopt settlements similar to the Settlement … embodied within the Plan in order to avoid the risks, length, cost and uncertainties of litigation."); *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *118 (holding that the debtors' liquidation analysis appropriately assumed "that the many issues resolved by the [chapter 11 plan's] global compromise would remain and require resolution in a conversion to chapter 7, [and] that practically it is more useful for [c]reditors to compare estimated recoveries using the same assumptions regarding these issues."); *see also In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010)

(holding that the settlement embodied in the plan would also be applied in the chapter 7 context because "if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7)").

The Plan satisfies the requirements of section 1129(a)(7).

## VIII.   THE PLAN HAS BEEN ACCEPTED BY OR IS DEEMED TO HAVE BEEN ACCEPTED BY ALL IMPAIRED CLASSES ENTITLED TO VOTE ON THE PLAN, AND AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED.

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan, as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).  As reflected in the Voting Certification, other than the Non-Voting Classes, the Plan has been overwhelmingly accepted by creditors holding well in excess of two-thirds in amount and one-half in number in each of the ninety three (93) impaired Classes of Creditors entitled to vote:

- 100% of the voting creditors in seventy-three (73) Classes voted to accept the Plan; and

- Over 90% of voting creditors (in number and amount) in seventeen (17) Classes voted to accept the Plan.

- For LBHI Class 7 (General Unsecured Claims), approximately 89% in number and 94% in amount of voting creditors accepted the Plan; For BNC Class 3 (General Unsecured Claims), approximately 71% in number and 99% in amount of voting creditors accepted the Plan; For LBCS Class 3 (Convenience Claims), approximately, 83% in number and 77% in amount of voting creditors accepted the Plan.

At least two impaired Classes of Claims voted to accept the Plan at each of the Debtors.  Thus, as to such impaired and accepting Classes, the requirements of section 1129(a)(8) have been satisfied.

Of the forty-one (41) Non-Voting Classes, fourteen (14) Classes did not have any eligible holders of allowed claims.  Twenty-four (24) other Non-Voting Classes are comprised of either Priority Non-Tax Claims or Secured Claims against the applicable Debtor, all of which are projected to be fully satisfied under the Plan in accordance with the absolute priority rule, subject to the Debtors' defenses to such claims.  In the remaining three (3) Non-Voting Classes, only five (5) creditors asserting claims in an aggregate amount of approximately $150,000 were eligible to vote.

Under these circumstances and in light of the overwhelming support for the Plan, the Non-Voting Classes should be deemed to have accepted the Plan.  In similar circumstances, it has been determined that non-voting, non-objecting classes should be deemed to have accepted the chapter 11 plan.  *See In re Adelphia Comm'cns Corp.*, 368 B.R. at 260-63 (holding that classes in which no creditor voted on the plan were deemed to accept the plan, where the proposed plan had overwhelming support from other classes, and the non-voting classes constituted a small percentage of all creditors, even though the plan provided that if no creditor voted in a class, such class shall be deemed to accept) (*citing Heins v. Ruti-Sweetwater Inc.* (*In re Ruti-Sweetwater Inc.*), 836 F.2d 1263, 1266 (10th Cir. 1988) ("a non-voting, non-objecting creditor . . . is deemed to have accepted the Plan")); *see also In re Campbell*, 89 B.R. 187, 188 (Bankr. N.D. Fla. 1988) ("those impaired classes which failed to vote and did not object to confirmation of the plan are deemed to have accepted the plan").

LBHI Classes 10A, 10B, 10C and 11 and Classes of Equity Interests in each

Debtor are not entitled to receive or retain any property under the Plan and, therefore, are

deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  *See In re*

*Quigley Co.,* 346 B.R. 647, 653 n.14 (Bankr. S.D.N.Y. 2006) ("If a class receives nothing, it is

deemed to reject the plan.").  As to these Classes, the Plan may be confirmed over their dissent

under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed

*infra*.

## IX.     THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS.

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed

claims entitled to priority under section 507(a) receive specified cash payments under the plan.

Unless the holder of a particular claim agrees to a different treatment with respect to such claim,

section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide. 11

U.S.C. § 1129(a)(9).

The Plan complies with section 1129(a)(9) of the Bankruptcy Code.  The Plan

provides that holders of allowed Administrative Expense Claims under section 503(b) of the

Bankruptcy Code and allowed priority claims under section 507(a) of the Bankruptcy Code

(excluding Priority Tax Claims under section 507(a)(8), as described below) will be paid in full

on the later of the Effective Date and the date such Claim becomes Allowed, unless such holder

agrees to less favorable treatment.  *See* Plan, § 2.1, Arts. IV and V.  The Plan, therefore, satisfies

the requirements of section 1129(a)(9)(A) and (B).

The Plan also satisfies the requirements of section 1129(a)(9)(C) of the

Bankruptcy Code in respect of the treatment of Priority Tax Claims under section 507(a)(8).

Pursuant to Section 2.3 of the Plan, except as otherwise may be agreed, holders of Allowed

Priority Tax Claims will be paid in full, in Cash, on the Effective Date, or in equal semi-annual

installments with interest at a fixed annual rate determined under applicable non-bankruptcy law

over a period of five years as permitted by section 1129(a)(9)(C) of the Bankruptcy Code.  There

are no objections to the Plan on the basis that the Plan does not provide for the payment of all

Claims entitled to priority under section 507(a).

The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## X.      THE PLAN SATISFIES SECTION 1129(a)(10) OF THE BANKRUPTCY CODE.

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance

of the Plan by at least one class of impaired claims, "determined without including any

acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth in the Voting

Certification, even after excluding Classes of Affiliate Claims, at least one class of impaired

Claims against each Debtor has accepted the Plan.  No creditor has asserted that section

1129(a)(10) has not been satisfied.  The Plan satisfies section 1129(a)(10) of the Bankruptcy

Code.

## XI.      THE PLAN IS FEASIBLE.

Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine

that the Plan is feasible as a condition precedent to confirmation.  Specifically, it requires that

confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is

proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section

1129(a)(11) requires the Court to determine whether the Plan may be implemented and has a

reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549

(1990); *Kane v. Johns-Manville Corp.*, 843 F.2d at 649.

The Plan is feasible within the meaning of this provision.  The key element of

feasibility is whether there is a reasonable probability that the provisions of the plan can be

performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.

As noted by the United States Court of Appeals for the Ninth Circuit:  "The purpose of section

1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity

security holders more under a proposed plan than the debtor can possibly attain after

confirmation."  *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374,

1382 (9th Cir. 1985) (citations omitted).  Clearly, the Plan does not contain any visionary scheme

but is a rational plan for the continued administration of the Debtors' assets that includes

operating businesses that are and will be closely supervised.  The mere prospect of financial

uncertainty cannot defeat confirmation on feasibility grounds.  *See In re U.S. Truck Co.*, 47 B.R.

932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).  There is no prospect of

financial uncertainty post confirmation asserted by any party in interest.

> In the context of the subject cases, the applicable feasibility test is to determine

whether a Debtor will be able to make the payments required under the Plan.  *See, e.g., In re

Journal Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (explaining that the feasibility

test is "whether the things which are to be done after confirmation can be done as a practical

matter under the facts") (internal quotation and citations omitted), *appeal dismissed sub nom.

Freeman v. Journal Register Co.*, 452 B.R. 367 (S.D.N.Y. 2010).  Manifestly, the things to be

done under the Plan can and will be done as a practical matter.

> The Plan contemplates a controlled and supervised divestiture of the Debtors'

assets to maximize recoveries and to provide periodic distributions to creditors.  The Debtors

have analyzed their ability to fulfill their obligations under the Plan and taken into consideration

their estimated costs of administration.[8]  The Debtors' post-Effective Date business is not

expected to change materially from the ongoing business operations conducted during the

Chapter 11 Cases.  Based upon the Debtors' estimates and prior course of conduct, the Debtors

will be able to continue to administer their assets as required by the Plan and make all payments

and distributions as contemplated by the Plan.

Consequently, the Plan satisfies the feasibility standard of section 1129(a)(11) of

the Bankruptcy Code.  There are no objections to the Plan based upon a failure to satisfy section

1129(a)(11).  The Plan, clearly, is feasible.

## XII.  THE PLAN COMPLIES WITH SECTION 1129(a)(12).

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section

1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"  11

U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges

assessed against the estate under [section 1930] of title 28" are afforded priority as administrative

expenses.  *Id*. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy

Code, Section 15.7 of the Plan provides that on the Effective Date and thereafter, the Plan

Administrator and any Liquidating Trustee thereafter appointed, shall pay all such fees.  There

are no objections to the Plan asserting the Plan does not provide for the payment of all fees

payable under section 1930 of title 28.

## XIII.  SECTION 1129(a)(13) IS INAPPLICABLE.

Section 1129(a)(13) requires that:

> The plan provides for continuation after the effective date of payment
> of all retiree benefits … at the level established pursuant to section

---

[8] Specifically, the Debtors prepared cash flow estimates for each of the Debtors for the four year period
ending December 31, 2014 and liquidation analyses for each Debtor.  These cash flow estimates, and the
assumptions on which they are based are included in Exhibit 7 to the Disclosure Statement.

> (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

Section 1129(a)(13) is inapplicable to the Debtors. The law in this District is clear that section 1114 of the Bankruptcy Code does not apply to retiree health plans that may be modified at will by a debtor. *See In re Delphi Corp.*, Case No. 05-44481 (RDD), 2009 WL 637315, at *1 (Bankr. S.D.N.Y. Mar. 10, 2009) ("section 1114's regime does not apply … because the various welfare plans are, under the terms of the plan documents themselves, modifiable at will"); *In re Gen. Motors Corp.*, Case No. 09-50026 (REG), Tr. of Record at 109:25-110:2 (Bankr. S.D.N.Y. June 25, 2009) ("section 1114 does not trump any agreement between a company and its employees that gives the company the right to amend or terminate a welfare plan"). As described more fully in the *Joint Motion of LBHI and LBI (I) For Authorization and Approval of a Stock Purchase Agreement Regarding the VEBA and (II) For Authorization and Approval of a Settlement Regarding the Same* [ECF No. 21109] and the *Debtors' Reply to Objections and in Further Support of the Joint Motion* [ECF No. 22180], based on the foregoing precedent and the terms of the various LBHI health care plans, all retiree health benefits were terminated effective December 31, 2009.

## XIV.   THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE FOR NON-ACCEPTING CLASSES.

Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors that rejects a plan.  *See* 11 U.S.C. § 1129(b) ("the court … shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan.") (emphasis added).  Accordingly, a dissenting creditor in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.  *See Kane v. Johns-Manville Corp.*, 843 F.2d at 650 (refusing to consider objection of dissenting creditor in accepting class because 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (overruling cramdown objection because objecting party was a member of an accepting class and therefore 1129(b)(1) afforded no protection to such party); *In re United Marine Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) (overruling absolute priority objection of a dissenting creditor in an accepting class because "the absolute priority rule only applies in the context of cramdown of an impaired *rejecting* class") (emphasis in original).  As each Class in which creditors were entitled to vote accepted the Plan by overwhelming majorities, cramdown is only relevant to those Classes of Claims and Equity Interests that are deemed to have rejected the

Plan.

LBHI Classes 10A, 10B, 10C and 11 and Classes of Equity Interests in each of

the Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy

Code.  The Plan may be confirmed as to each of these Classes pursuant to the "cram down"

provisions of section 1129(b) of the Bankruptcy Code.  There are no objections to the Plan on the

basis that the "cram down" provisions of section 1129(b) are not satisfied.

A.      **The Plan Does Not Discriminate Unfairly**

Section 1129(b)(1) does not prohibit discrimination between classes.  Rather, it

prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan

unfairly discriminates where similarly situated classes are treated differently without a

reasonable basis for the disparate treatment.  *See WorldCom Inc.*, 2003 WL 23861928, at *59

(citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990); *In re Johns-*

*Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other*

*grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom, Kane v. Johns-Manville Corp.*, 843 F.2d

636 (2d Cir. 1988)).  As between two classes of claims or two classes of equity interests, there is

no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.,*

*In re Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular facts and

circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., In re*

*Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate

classification and treatment was rational where members of each class "possess[ed] different

legal rights").

In the perspective of the foregoing standards, the Plan does not "discriminate

unfairly" with respect to any Class.  The Plan treatment of holders of Allowed Claims in LBHI

Classes 10A, 10B, 10C and LBHI Class 11 is based upon the statutory mandates of sections

510(a) and (b) of the Bankruptcy Code and, in the case of LBHI Classes 10A, 10B and 10C, their contractual subordination agreements.  Indeed, in order to comply with section 1129(a)(1) of the Bankruptcy Code, which requires that the plan comply with applicable provisions of the Bankruptcy Code, section 510 must be enforced.  Thus, LBHI Classes 10A, 10B, 10C and LBHI Class 11 are not similarly situated to any other class against LBHI and the disparate treatment of such Classes in comparison to other Classes of Claims that are not subordinated is not unfair.

The Plan also does not "discriminate unfairly" with respect to each Class of Equity Interests because, with respect to each Debtor, all Equity Interests in such Debtor are classified together and afforded the same treatment under the Plan.  As such, there is no discrimination, let alone unfair discrimination, among holders of Equity Interests.  Certain creditors in accepting Classes have asserted in objections to the Plan that the Plan "discriminates unfairly" as to their Claims.  These creditors lack standing to assert such objections.  The Debtors have responded to such assertions in the Response.

The Plan does not "discriminate unfairly" with respect to any impaired Classes of Claims or Equity Interests.

### B.    The Plan Is Fair and Equitable

Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

Distributions under the Plan are made in the order of priority proscribed by the Bankruptcy Code and in accordance with the rule of absolute priority.  Pursuant to the Plan, holders of Allowed Claims in a given class must be paid in full before a distribution is made to a more junior class.  The absolute priority rule is not violated as to the holders of Allowed Claims

in LBHI Class 10A, 10B, 10C and LBHI Class 11 because no distribution will be made on

account of Equity Interests in LBHI until such Claims are satisfied in full.  These claim holders

will not realize a recovery under the Plan as a result of the enforcement of sections 510(a) and

(b) of the Bankruptcy Code, not because consideration is being provided to junior classes.

   As to each Debtor, holders of Equity Interests are not entitled to receive or retain

any property of the Debtors on account of such Equity Interests unless and until all holders of

claims in senior classes are satisfied in full, including the payment of interest.  LBHI Stock has

no economic value and will be cancelled pursuant to the Plan in exchange for a single share to be

issued to the Plan Trust under the Plan and held for the benefit of holders of former LBHI Stock

as described in the Plan consistent with relative priority and economic entitlements of such

holders.  *See* Plan § 4.17(a).  Providing holders of Equity Interests in LBHI with a contingent

right to residual recovery of full satisfaction of allowed Claims against LBHI is consistent with

section 1129(b)(2)(B) of the Bankruptcy Code and not in violation of the fair and equitable rule.

No consideration will be provided to holders of Equity Interests in LBHI under the Plan unless

all holders of unsecured claims have been satisfied in full in accordance with such rule.

   In determining whether a plan is "fair and equitable," courts consider additional

factors to those set forth in section 1129(b).  For example, courts look to whether the holders of

claims that are senior to the claims of a dissenting class are receiving more than 100% of their

claims.  *See, e.g., United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of

Inwood Forest Assocs.)*, 793 F.2d 1380, 1410 (5th Cir. 1986), *aff'd en banc*, 808 F.2d 363 (5th

Cir. 1987), *aff'd*, 484 U.S. 365 (1988).  Under the Plan, no holder of an Allowed Claim will

receive consideration in excess of its entitlements under the Bankruptcy Code.

The Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

## **CONCLUSION**

The Plan complies with all of the requirements of section 1129 of the Bankruptcy Code and should be confirmed.

Dated: New York, New York
      November 29, 2011

                    /s/ Lori R. Fife
                    Harvey R. Miller
                    Lori R. Fife

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

# **EXHIBIT A**

# GLOSSARY

"<u>Ad Hoc Group</u>" means the group of senior bond holders with claims primarily against LBHI who filed the Joint Substantively Consolidating Chapter 11 Plan for LBHI and Certain of its Affiliated Debtors on December 15, 2010, as amended.

"<u>Bilateral Settlements</u>" means each of the settlement agreements incorporated in the Plan that has been entered into among one or more of the Debtors and Lehman Brothers Bankhaus AG, Lehman Brothers Treasury Co. B.V., Lehman Brothers Securities N.V., Lehman Brothers International (Europe) and the Lehman UK Entities, Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*), Lehman Brothers (Luxembourg) Equity Finance S.A. (in liquidation), the Hong Kong Lehman Entities In Liquidation, the Lehman Singapore Entities, the Lehman Japan Entities, Deutsche Bundesbank, Bundesverband Deutscher Banken E.V., Entschadigungseinrichtung Deutscher Banken Gmbh, or Deutsche Bank and certain holders of participations in Claim Nos. 59006 and 58233.

"<u>Declarations</u>" means the fact declarations filed by the Debtors in support of confirmation of the Plan.

"<u>Designated Entity</u>" means each of the Restructured Assets with Enhanced Returns 2007-7-MM Trust, the Restructured Assets with Enhanced Returns Series 2007-A Trust and the holder of the Fenway Claims.

"<u>Disclosure Statement Order</u>" means the amended order approving the Disclosure Statement and voting procedures with respect to the Plan, entered by the Court on September 1, 2011.

"<u>Foreign Affiliates</u>" means an Affiliate of the Debtors that is organized in a jurisdiction outside of the United States, is not under the corporate control of the Debtors and may be subject to an insolvency proceeding in a foreign jurisdiction.

"<u>Global Settlement</u>" means the integrated and comprehensive settlement that resolves the various Plan Issues through (i) the Plan Adjustment, (ii) Distributions to LBHI on only 80% of the portion of its claims against the Subsidiary Debtors relating to intercompany funding, (iii) the reallocation of the first $100 million distributed to LBHI on account of its Claims against LBSF and LCPI to holders of General Unsecured Claims in LBSF Class 4A and LCPI Class 4A, (iv) the Distribution to holders of General Unsecured Claims in LBSF Class 4A and Affiliate Claims in LBSF Class 5C of the first $70 million recovered by LBSF on account of its assets in excess of $14.156 billion, (v) the Allowed amount of Claims asserted by Designated Entities, (vi) the allowance of LBT's intercompany Claim against LBHI in the amount of $34.548 billion, (vii) the allocation of costs and expenses incurred in the administration of the estates pursuant to the Debtor Allocation Agreement, (viii) the principles included in the Structured Securities Valuation Methodologies; and (ix) the post-Effective Date governance provisions set forth in the Plan.

"<u>Global Settlement Memorandum</u>" means the Memorandum of Law filed contemporaneously herewith by the Debtors in support the Global Settlement and Bilateral Settlements that form the premise of the Plan.

"<u>Liquidation Analysis</u>" means the liquidation analysis attached as Exhibit 5 to the Disclosure Statement, as amended in the Plan Supplement that estimates the distributions to creditors in a hypothetical chapter 7 liquidation.

<u>Non-Voting Class</u> means Classes of Claims in which no votes to accept or reject the Plan were submitted by holders of Claims entitled to vote.

"<u>Non-Con Plan Proponents</u>" means those entities that filed the non-consolidation chapter 11 plan for LBHI and Certain of its Affiliated Debtors on April 25, 2011.

"<u>Participating Debtors</u>" means LBHI and each of the Participating Subsidiary Debtors.

"<u>Participating Subsidiary Debtor</u>" means LCPI, LBSF, LOTC, LBCC or LBCS.

"<u>Plan Adjustment</u>" is the primary mechanism in the Plan that implements the settlement of substantive consolidation through the redistribution of a certain percentage of recoveries from creditors who would receive lesser distributions if substantive consolidation is ordered (generally, holders of Guarantee Claims against LBHI and creditors (other than LBHI) of the Participating Subsidiary Debtors) to creditors would benefit from substantive consolidation (holders of Senior Unsecured Claims and General Unsecured Claims against LBHI).

"<u>Plan Issues</u>" means the issues and disputes among the Debtors and their creditors that are resolved by  the Global Settlement and the Bilateral Settlements included in the Plan, including, whether the equitable doctrine of substantive consolidation may be applied to the Debtors and their Affiliates, the characterization of the intercompany balances owed to LBHI by Subsidiary Debtors, the allowed amounts of Affiliate Claims, the ownership and rights of various Debtors and their Affiliates with respect to certain assets, and the allocation of costs and expenses of administration among the Debtors.

"<u>Plan Support Agreement</u>" means an agreement among the Debtors and a creditor pursuant to which, among other things, the creditor has agreed to vote in favor of the Plan (when properly solicited).

"<u>Response</u>" means the Debtors' Response to Objections to Confirmation, filed contemporaneously herewith.

"<u>Voting Certification</u>" means the affidavit filed by Epiq Bankruptcy Solutions LLC certifying the results of the votes to accept or reject the Plan.