UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

## DEBTORS' MEMORANDUM OF LAW, PURSUANT TO SECTION 1123(b)(3)(A) OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN SUPPORT OF PLAN SETTLEMENTS

*Harvey R. Miller*
*Lori R. Fife*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: November 29, 2011
New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ............................................................ 1

FACTS ................................................................................................. 4

PLAN SETTLEMENTS ....................................................................... 8

I.      STANDARD FOR APPROVAL UNDER BANKRUPTCY RULE 9019 .................... 11

II.     THE GLOBAL SETTLEMENT SHOULD BE APPROVED ....................................... 13

     A.     Risk of Substantive Consolidation ....................................................... 13

           1.     Legal Standard for Substantive Consolidation ........................................ 14

           2.     The Result of Litigation Regarding Substantive Consolidation is Highly Uncertain .................................................................................. 18

                    a.     Entanglement ............................................................ 19

                         (i).     Nature of the Lehman Enterprise and Entanglement of its Affairs ................................................... 19

                         (ii).    Facts that may reduce the risk of substantive consolidation .............................................................. 22

                    b.     Creditor Reliance ...................................................... 24

                         (i).     Lack of Reliance on Separateness of Entities .................. 25

                        (ii).    Facts that might support denial of Substantive Consolidation based on reliance ..................................... 27

            3.     Enforcement of a Litigated Judgment May Be Difficult, But Not Insurmountable Through Potential Alternative Remedies ...................... 29

           4.     The Complexity, Duration, Expense, Inconvenience and Delay Associated with Litigation Should be Avoided ...................................... 35

           5.     An Overwhelming Majority of Creditors Affirmatively Support the Proposed Settlement ............................................................................ 37

           6.     Competent and Experienced Professionals Have Evaluated the Settlement ............................................................................................ 38

           7.     All Economic Stakeholders Benefit From the Global Settlement .......... 38

           8.     The Global Settlement is a Product of Robust Arm's Length Bargaining and Represents an Informed Judgment of the Debtors ......... 40

     B.     Recharacterization of Certain Claims of LBHI ................................................. 41

           1.     Legal Standard for Recharacterization .................................................... 43

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| | 2. | The Compromise of the Characterization of Certain Claims of LBHI Against Subsidiary Debtors Satisfies the Legal Standards Under Bankruptcy Rule 9019 | 45 |
| III. | | BILATERAL SETTLEMENTS WITH FOREIGN AFFILIATES AND CERTAIN OTHER CREDITORS | 47 |
| | A. | Overview of Claims And Settlements | 48 |
| | | 1. The Global Close and Non-Guarantee Affiliate Claims | 49 |
| | | 2. Guarantee Claims | 49 |
| | | 3. The Settlements | 51 |
| | B. | Settlement with the Lehman UK Entities | 52 |
| | | 1. Settlement with LBSF | 54 |
| | | 2. Settlement with LBHI | 59 |
| | |    a. Guarantees of Back-To-Back Transactions | 59 |
| | |    b. LB Lux | 60 |
| | |    c. Bankhaus Client Money Claim | 62 |
| | |    d. R3/JPM Claims | 63 |
| | |    e. Other Claims Against LBHI and Against Lehman UK Entities | 64 |
| | | 3. Settlements with LCPI, LOTC, LBCC, LBCS and Other Debtors | 65 |
| | | 4. The Farrallon Objection Should Be Overruled | 65 |
| | | 5. The UK Settlement Agreement Should Be Approved | 67 |
| | C. | Settlement With Bankhaus | 71 |
| | | 1. Settlement With LBHI Relating to SCA Claim | 72 |
| | | 2. Settlements With Other Debtors Relating To Swaps And Repos | 73 |
| | | 3. The Bankhaus Settlement Agreement Should Be Approved | 74 |
| | D. | Settlements With LBT and LBSN | 74 |
| | | 1. Asserted Claims and Defenses | 75 |
| | | 2. The LBT and LBSN Settlement Agreements Should be Approved | 77 |
| | E. | Settlement With The Lehman Hong Kong Entities | 79 |
| | | 1. Asserted Claims and Defenses | 80 |

# TABLE OF CONTENTS
## (continued)

**Page**

2. The Hong Kong Settlement Agreement Should be Approved ................ 82

F. Settlements With Other Foreign Affiliates ......................... 83

1. The Lehman Japan Entities ..................................... 83

2. The Lehman Luxembourg Settlement Agreements ................. 85

a. LB Lux .................................................. 85

b. LBEF ................................................... 85

3. The Lehman Singapore Entities ............................... 87

G. Settlement With Deutsche Bundesbank ("Bundesbank") ................... 87

H. Settlement With Bundesverband deutscher Banken e.V. ("BdB") ..................... 89

I. Settlement With Entschädigungseinrichtung deutscher Banken GmbH
("EdB") ........................................................... 91

J. Settlement of Dispute with Deutsche Bank Regarding Classification of
Claims ............................................................. 92

1. The Dispute Regarding Classification of the Bankhaus Claims ............. 93

2. Settlement of the Dispute with Deutsche Bank ..................... 95

K. The Debtors' Claims Schedule And Schedule of Claims by Debtor-
Controlled Entities ................................................. 97

IV. THE BILATERAL SETTLEMENTS ARE FAIR AND REASONABLE AND
SHOULD BE APPROVED ................................................. 98

A. The Results of Litigation Regarding Intercompany Claims And Other
Issues Are Highly Uncertain ......................................... 98

B. The Complexity, Duration, Expense, Inconvenience and Delay Associated
with Litigation Should be Avoided ................................... 98

C. An Overwhelming Majority of Creditors Affirmatively Support the
Bilateral Settlements ............................................... 100

D. Competent and Experienced Professionals Have Evaluated and Support
the Settlements ..................................................... 101

E. All Economic Stakeholders Benefit From the Bilateral Settlements ................. 101

F. The Bilateral Settlements are a Product of Robust Arm's Length
Bargaining and Represent an Informed Judgment of the Debtors .................... 102

CONCLUSION ............................................................ 103

EXHIBIT A: Glossary ..................................................... A-1

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*In re 599 Consumer Elecs., Inc.*, 195 B.R. 244 (S.D.N.Y. 1996)...................................................24

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365
   B.R. 24 (Bankr. S.D.N.Y. 2007)...................................................32, 43, 44

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere
   Clubs, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993)....................................................13

*In re Alico Mining, Inc.*, 278 B.R. 586 (Bankr. D. Fla. 2002) ......................................................30

*In re Amco Insur.*, 444 F.3d 690 (5th Cir. 2006) ...........................................................30

*In re Apex Oil Co.*, 118 B.R. 683 (Bankr. E.D. Mo. 1990) ...........................................................18

*In re Apex Oil Co.*, 111 B.R. 245 (Bankr. E.D. Mo. 1990) ...........................................................18

*In re Ashford Hotels, Ltd.*, 226 B.R. 797 (Bankr. S.D.N.Y. 1998)........................................................12

*In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001) ...........................................................44

*In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255 (6th Cir. 1997) ...........................................................31

*Barry v. Smith (In re N.Y., New Haven & Hartford R.R. Co.)*, 632 F.2d 955 (2d Cir. 1980)........39

*In re Best Products Co.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................11, 12

*In re Bonham*, 229 F.3d 750 (9th Cir. 2000) ...........................................................30

*Burden v. United States*, 917 F.2d 115 (3d Cir. 1990)...................................................33

*Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106 (1939)...................................................11

*In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (Peck, J.) ...............................68

*In re Cold Harbor Assocs. L.P.*, 204 B.R. 904 (Bankr. E.D.Va. 1997)........................................45

*In re Colin*, 44 B.R. 806 (Bankr. S.D.N.Y. 1984) ...........................................................34

*Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599 (2d Cir. 1983)................................11, 12

*In re Donut Queen, Ltd.*, 41 B.R. 706 (Bankr. E.D.N.Y. 1984) ....................................................14

*In re Dow Corning Corp.*, 192 B.R. 415 (Bankr. E.D. Mich. 1996) ....................................38, 101

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499 (Bankr. S.D.N.Y. 1991) .................................................................. passim

*In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............. passim

*In re DRW Prop. Co.* 54 B.R. 489 (Bankr. N.D. Tex. 1985) ......................................................31

*In re Enron Corp.*, Case No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ..........................................................................................................14, 18

*In re Envirodyne Indus., Inc.*, 79 F.3d 579 (7th Cir. 1996) ....................................................33, 34

*FDIC v. Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992) ........................................................14, 15

*In re Hibbard Brown & Co.*, 217 B.R. 41 (Bankr. S.D.N.Y. 1998) ...............................................11

*In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007) ..........................................................99

*James Talcott, Inc. v. Wharton (In re Cont'l Vending Mach. Corp.)*, 517 F.2d 997 (2d Cir. 1975) ..................................................................................................................14

*Jezarian v. Raichle (In re  Stirling Homex Corp.)*, 579 F.2d 206, 212 (2d Cir. 1978) ...........33, 34

*In re Lewellyn*, 26 B.R. 246 (S.D. Iowa 1982) .............................................................................31

*In re LLS America*, No. 09-06194-PCW11, Findings of Fact and Conclusions of Law (Bankr. C.D. Ca. Sept. 8, 2011) ...........................................................................30

*Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994) ..................................................................11, 13

*Off. Comm. of Unsec. Cred. v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009) .........................................................42, 43, 45

*Off. Comm. of Unsec. Cred. of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...............................................................30

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2007)....................................................................25

*In re Park South Sec., LLC*, Case No. 03-8024A (Bankr. S.D.N.Y. Sept. 10, 2003) ...................31

*Pepper v. Litton*, 308 U.S. 295 (1939) ................................................................................32, 34

*In re Pinetree Partners, Ltd.*, 87 B.R. 481 (Bankr. N.D. Ohio 1988) ...........................................44

*Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson ("TMT Trailer Ferry")*, 390 U.S. 414, 424 (1968)........................................................11, 12, 67, 98

*In re R2D2*, No. LA10-19924-BR, Trs. of Proceedings (Bankr. C.D. Ca., Sept. 7, 2011)...........30

*In re Resorts Int'l, Inc.,* 145 B.R. 412 (Bankr. D.N.J. 1990).........................................................18

*In re Richton Int'l Corp.*, 12 B.R. 555 (Bankr. S.D.N.Y. 1981)...................................................24

*Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941) ...............................................29

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, Case No. 08-1789A
    (Bankr. S.D.N.Y. June 9, 2009)...............................................................................................31

*Simon v. Brentwood Tavern (In re Brentwood Golf Club, LLC)*, 329 B.R. 802 (Bankr.
    E.D. Mich 2005) .......................................................................................................................30

*Soviero v. Franklin Nat'l Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964).............................29

*SPC Plastics Corp. v. Griffith (In re Structurelite Plastics Corp.)*, 224 B.R. 27 (B.A.P 6th
    Cir. 1998) ..................................................................................................................................34

*In re Spielfogel*, 211 B.R. 133 (Bankr. E.D.N.Y. 1997) ...............................................................11

*Stern v. Marshall*, 131 S.Ct. 2594 (2011) .....................................................................................37

*In re Stoecker,* 125 B.R. 767 (Bankr. N.D. Ill. 1991) ...................................................................18

*United States. v. Noland*, 517 U.S. 535 (1996)..............................................................................33

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d
    515 (2d Cir. 1988).............................................................................................................. passim

*In re Virtual Network Servs.*, 902 F.2d 1246 (7th Cir. 1990) ........................................................33

*In re Washington Mutual Inc.*, Case No. 08-12229, 2011 WL 4090757 (Bankr. D. Del.
    Sept. 13, 2011) ..........................................................................................................................32

*In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006) ..........................................18

*In re WorldCom, Inc.*, 347 B.R. 123 (Bankr. S.D.N.Y. 2006).......................................................99

*In re Worldcom, Inc.*, Case No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
    2003) .........................................................................................................................................14

## FEDERAL STATUTES

11 U.S.C. § 105(a) ..........................................................................................................................44

11 U.S.C. § 510(c) .....................................................................................................................33, 34

11 U.S.C. § 1123(b)(3)(A)................................................................................................................1

## FEDERAL RULES

Fed. R. Bankr. P. 9019 ........................................................................................................... passim

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above captioned chapter 11 cases (collectively, the "Debtors"[1] and when referred to with their non-debtor affiliates, "Lehman"), submit this Memorandum of Law (the "Memorandum"), pursuant to section 1123(b)(3)(A) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in support of confirmation of the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors, dated August 31, 2011 (as the same has been or may be amended, modified, supplemented, or restated, the "Plan") and, in particular, the settlements that are encompassed by the Plan and constitute the Plan foundation.[2]

## PRELIMINARY STATEMENT

The prompt, efficient conclusion of the Debtors' chapter 11 cases is premised on the comprehensive proposed resolution and settlement of the difficult, multi-faceted and diverse issues that have permeated these unprecedented and enormously complex proceedings, including, most significantly, the overarching issue of whether the equitable doctrine of substantive consolidation should be applied to all or some of the Debtors and their Affiliates.

---

[1] In addition to LBHI, the Debtors include Lehman Commercial Paper Inc. ("LCPI"); Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Brothers Special Financing Inc. ("LBSF"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers OTC Derivatives Inc. ("LOTC"); Lehman Brothers Financial Products Inc. ("LBFP"); Lehman Brothers Derivative Products Inc. ("LBDP"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI Statler Arms LLC.

[2] For ease of reference and readability, the Debtors have included as Exhibit A a glossary of defined terms (the "Glossary") used in this Memorandum. Capitalized terms used but not defined in this Memorandum shall have the meaning ascribed to them in the Plan. Certain defined terms included in the Glossary have been simplified from their definition in the Plan. To the extent there is any inconsistency between the definition of any term in the Glossary and the Plan, the Plan shall govern.

Since the commencement of these cases, the issue of substantive consolidation has materially divided creditors.  Indeed, the strong convictions of opposing creditors resulted in the filing of two creditor-sponsored alternative chapter 11 plans, in addition to the Debtors' Plan.  The alternative plans proposed polar opposite outcomes for the Debtors and their Affiliates and creditors.

At one extreme, an ad hoc group of senior bondholders of LBHI (the "Ad Hoc Group") proposed to substantively consolidate substantially all of the Debtors as well as certain of their foreign affiliates (the "Foreign Affiliates").  At the other extreme, various creditors (the "Non-Con Plan Proponents") asserting direct claims against subsidiary debtors and Lehman Brothers Treasury Co. B.V. ("LBT") and related Guarantee Claims against LBHI proposed a separate liquidation of each of the Debtors' estates based upon their conclusion that there is absolutely no risk that any of the Debtors or their Affiliates could be substantively consolidated.

In an effort to avoid what would likely be extraordinary costs and delays to the Debtors and their economic stakeholders associated with plan litigation (including discovery and protracted trial and appellate court litigation regarding the underlying disputes among the parties), the Debtors assumed an aggressive leadership role.  They organized a series of concentrated negotiation sessions in June 2011 with their major stakeholders, including the Ad Hoc Group, the Non-Con Plan Proponents, various noteholders of LBT asserting substantial Guarantee Claims against LBHI (the "LBT Noteholders") and some of the administrators of their major Foreign Affiliates, to pursue a rational economic resolution of all issues that would expedite the further administration of the chapter 11 cases and result in the confirmation of a chapter 11 plan for the Debtors.  As a result of the robust, good faith, arm's-length negotiations, the meetings were successful and yielded substantial consensus and creditor support for the

Debtors' Plan, as evidenced by the execution of plan support agreements (the "Plan Support Agreements") in June 2011 by 30 institutional creditors holding over $100 billion in creditor claims.

The Plan does not substantively consolidate any of the Debtors or their Affiliates. Rather, the Plan incorporates an integrated negotiated resolution (the "Global Settlement") that implements a series of linked concessions and compromises by all classes of creditors of the Debtors. The Global Settlement comprehensively resolves the myriad legal and economic issues that have permeated these chapter 11 cases (collectively, the "Plan Issues"), including, *inter alia*, substantive consolidation, the characterization of the intercompany balances owed to LBHI by Subsidiary Debtors, the allowed amounts of Affiliate Claims, the ownership and rights of various Debtors and Affiliates with respect to certain assets and the allocation of costs and expenses of administration among the Debtors. The Plan also incorporates nine (9) comprehensive settlements agreed to by the Debtors and the Foreign Administrators who together control eighty-seven (87) of the Debtors' Foreign Affiliates, and four (4) settlements with other creditors that are consistent with the underlying principles of and integral to the Plan and the Global Settlement (the "Bilateral Settlements").

The Plan, the Global Settlement, and the Bilateral Settlements are supported by the official committee of unsecured creditors (the "Creditors' Committee"); the Ad Hoc Group; virtually all of the Non-Con Plan Proponents; LBT Noteholders asserting billions of dollars in Guarantee Claims against LBHI; eighty-seven (87) of the Debtors' Foreign Affiliates; and various other creditors. In sum, to date, over 150 creditors who asserted more than approximately $450 billion in aggregate claims against the Debtors have executed and delivered Plan Support Agreements to the Debtors.

Most importantly, the Plan has been overwhelmingly accepted by <u>every</u> class of creditors of each Debtor that voted on the Plan.  *See* Voting Certification.  Not a single class voted to reject the Plan.

The Plan, the Global Settlement, and the Bilateral Settlements obviate extended and expensive litigation that inevitably would reduce and delay distributions to holders of allowed claims.  The Plan represents the best path for the Debtors to exit from chapter 11 and avoids economic prejudice to creditors.  The Plan, the Global Settlement, and the Bilateral Settlements will maximize and accelerate recoveries to all economic stakeholders, who will receive larger and earlier distributions because of the Global Settlement than they would otherwise if the litigation alternative is pursued.  The Global Settlement should be approved and the Plan confirmed.

## FACTS

Contemporaneously with this Memorandum, the Debtors filed a memorandum of law in support of confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code (the "<u>Section 1129 Memorandum</u>"), the Debtors' response to remaining objections to confirmation (the "<u>Response</u>") and the declarations of John K. Suckow, Daniel J. Ehrmann and Steven J. Cohn in support of confirmation of the Plan (collectively, the "<u>Declarations</u>").  The pertinent and salient facts are set forth in the Disclosure Statement, approved by order dated September 1, 2011, the Section 1129 Memorandum, the Response and the Declarations, and are incorporated herein as if fully and at length set forth.  Particularly relevant facts are hereinafter set forth and may be referred to as appropriate in connection with argument.

Since the commencement of these chapter 11 cases, an issue that has materially divided creditors is whether the Debtors and certain or all of their Affiliates should be substantively consolidated.  Many divergent views and strong convictions were presented to the

Debtors and the Creditors' Committee by parties in interest as to a global, fair and equitable resolution of the Debtors' chapter 11 cases and issues. In order to fully inform their judgment, over a period of more than two years, the Debtors and the Creditors' Committee independently pursued exhaustive reviews and investigations to determine whether substantive consolidation of all or a portion of Lehman was legally sustainable and a fair result in the context of the legal precedent and pertinent facts and circumstances.

In conducting their investigation and analysis, the Debtors and their professionals:

- reviewed and considered Lehman's prepetition businesses, operations, books and records, public filings, intercompany and third-party contracts and transactions, communications and other information;

- reviewed thousands of documents, including: corporate, tax and financial records; company presentations and reports; real estate documents; private equity documents; investor relations documents; SEC filings; derivatives transaction documents; and documents relating to guarantees;

- conducted extensive interviews of the Debtors' current and former employees;

- conducted interviews of some of the Debtors' major derivatives counterparties regarding (i) creditor perception of and reliance on the independent identity and legal integrity of the various Lehman Affiliates, including the extent to which LBHI guarantees affected extensions of credit and transactional business; (ii) creditor understandings of how the Lehman enterprise was administered and managed; and (iii) whether and how creditors assessed the creditworthiness of and risk limitations for Lehman Affiliates;

- met often with and considered the informed views of various groups and parties in interest, many of whom had conducted their own independent investigation and analyses of the pervasive issues, including the Creditors' Committee, the Ad Hoc Group, the Non-Con Plan Proponents, the LBT Noteholders and various Foreign Administrators;

- extensively researched and considered the relevant legal principles and the applicability of such principles to the circumstances of these cases; and

- considered legal and factual memoranda submitted by interested groups and parties, which often advocated diametrically opposing views regarding substantive consolidation and the other Plan Issues.

During the administration of the chapter 11 cases, the Debtors and the Creditors' Committee separately, and often in consultation with each other, undertook investigations regarding potential litigation to recharacterize LBHI's claims against the other Debtors. The evaluation of such claims presented significant issues for all creditors in light of their magnitude and the impact such claims could have on recoveries to creditors. The analysis of LBHI's claims against the other Debtors was a challenging task in light of the tens of thousands of intercompany transactions and bookkeeping entries daily involving billions of dollars. Accordingly, in evaluating potential claims to recharacterize LBHI's creditor claims to equity interests, the Debtors and the Creditors' Committee focused their analyses on a sampling of intercompany transactions and evaluated general patterns within Lehman's intercompany funding accounts and intercompany operations.

The Debtors also have spent considerable time and expense over the last two years, often in consultation with the Creditors' Committee, to review the very large claims filed against the Debtors by Foreign Affiliates and to evaluate the facts and legal enforceability of the Claims asserted, particularly Guarantee Claims against LBHI by Foreign Affiliates. The Debtors' evaluations included their strongly held positions as to the purposes of the underlying guarantees and the defenses to such Claims. Approximately $223 billion in Guarantee Claims were asserted against LBHI by the settling Foreign Affiliates. The Debtors have participated in multiple group and individual meetings among the Foreign Affiliates to reconcile the differences among the parties in the effort to achieve a reasonable and practical resolution of complicated legal and factual issues, in the best interests of worldwide creditors of Lehman.

Given the competing interests, the economic significance of the legal issues and the enormous body of facts and transactions involved, it was clear to the Debtors and the Creditors' Committee that, if left unresolved, potential litigation of the Plan Issues would be extremely costly and would materially delay distributions to creditors.  Based upon their exhaustive and separate investigations, the Debtors and the Creditors' Committee independently concluded that there were material risks to creditors of substantive consolidation and the prosecution of other Plan Issues.  Therefore, it was concluded that it was in the best interests of the Debtors and creditors not to litigate those disputes.  That informed conclusion forms the basis for the Global Settlement and Plan.

As a result of extensive negotiations that occurred in June 2011, and certain modifications to the Global Settlement, a significant number of creditors, including members of the Ad Hoc Group, the Non-Con Plan Proponents and LBT Noteholders, entered into Plan Support Agreements with the Debtors.  Substantially all of the proponents of the Ad Hoc Plan and the Non-Con Plan also agreed to suspend prosecution of their alternative plans, subject to confirmation of the Debtors' Plan.

Since July 1, 2011, the Debtors have continued to pursue their objective of a consensual confirmation.  In that regard, the Debtors have reached comprehensive settlements that are consistent with the underlying principles of the Plan and the Global Settlement with Foreign Administrators who together control eighty-seven (87) Foreign Affiliates, including the Lehman UK Entities (including Lehman Brothers International (Europe) ("LBIE")), LBT, Lehman Brothers Bankhaus AG ("Bankhaus"), the Lehman Hong Kong Entities, Lehman Brothers Securities N.V., the Lehman Japan Entities, the Lehman Singapore Entities, Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*) and Lehman Brothers (Luxembourg

S.A.) (in liquidation) (together, the "Lehman Luxembourg Entities"); certain German

governmental entities; and Deutsche Bank and certain holders of participations in Claim Nos.

59006 and 58233 (collectively, the "Bilateral Settlements").  Claims against the Debtors will be

reduced by more than approximately $295 billion from their asserted amounts as a result of the

Bilateral Settlements with the Foreign Affiliates and certain German governmental entities.

## PLAN SETTLEMENTS

The fundamental objective of the Plan is to resolve difficult issues consensually

and, thus, to obviate the potential for complex and extended litigation that would significantly

delay and possibly reduce the value of distributions to the Debtors' economic stakeholders.

Approval of the Global Settlement is a condition precedent to the confirmation of the Plan.  The

approval of the Global Settlement and confirmation of the Plan will maximize and expedite

recoveries to creditors and provide certainty and finality to the Debtors and all parties in interest.

The Plan and the Global Settlement are the result of very intense, good-faith, arm's-length

negotiations with parties in interest and economic stakeholders.  The Global Settlement is the

foundation of the Plan.  It is overwhelmingly supported by the Debtors' economic stakeholders

and should be approved and the Plan confirmed.

The Global Settlement implements the resolution of Plan Issues through the

following mechanisms:

- ▪ Plan Adjustment:  In order to resolve the risk of substantive consolidation to creditors, and in recognition of the potential harms and benefits to the various creditors of Lehman of substantive consolidation, a portion of distributions from certain unsecured creditors that would receive a lower distribution if the Debtors and their Affiliates were substantively consolidated (*i.e.*, all holders of allowed general unsecured claims against the Participating Subsidiary Debtors and allowed Guarantee Claims against LBHI) are reallocated to those unsecured creditors that would benefit from substantive consolidation of the Debtors (holders of allowed direct, non-guarantee, non-affiliated claims against LBHI).  The inter-creditor settlement and proposed reallocation is based upon the collective determination of the Debtors and the Creditors'

Committee that there is at least a 20% risk of substantive consolidation of the
Debtors and their Affiliates.

- Recharacterization:  To compromise and settle the disputes and potential
  litigation regarding the characterization of LBHI's intercompany claims
  against all of the Subsidiary Debtors, LBHI will only receive distributions on,
  and be entitled to setoff, 80% of the amount of its claims against a Subsidiary
  Debtor that relate to the funding of operations of such Subsidiary Debtor.
  LBHI's claims that relate to specific transactions with a Subsidiary Debtor,
  such as a derivatives contract or repurchase agreement, are not reduced as
  such claims do not have a material risk of recharacterization.  LBHI's claims
  against the Participating Subsidiary Debtors are not subject to the Plan
  Adjustment.

- LBHI Claims against LCPI and LBSF.  The first $100 million of Distributions
  that LBHI receives from (i) LCPI on account of its Affiliate Claim against
  LCPI will automatically be distributed to holders of Allowed General
  Unsecured Claims against LCPI in LCPI Class 4A, and (ii) from LBSF on
  account of its Affiliate Claim against LBSF will automatically be distributed
  to holders of Allowed General Unsecured Claims against LBSF in LBSF
  Class 4A.

- LBSF Additional Settlement Amount.  The first $70 million that is recovered
  by LBSF on its assets in excess of $14.156 billion will be distributed only to
  holders of Allowed General Unsecured Claims in LBSF Class 4A and
  Affiliate Claims of entities other than LBHI and the Participating Subsidiary
  Debtors included in LBSF Class 5C.  LBHI and the other Participating
  Subsidiary Debtors will waive the right to receive such distribution.

- LBT Senior Affiliate Claim.  LBT will have an Allowed Senior Affiliate
  Claim in LBHI Class 4A in the amount of $34.548 billion.

- Allocation of Costs and Expenses.  LBSF will have an Allowed
  Administrative Expense Claim against LBHI in the amount of $300 million on
  account of the reallocation of administrative costs incurred in connection with
  the review, reconciliation and resolution of derivatives claims filed against
  LBSF and corresponding Guarantee Claims against LBHI.

- Designated Entities.  The Racers 2007-A Trust will have (i) an Allowed Claim
  against LBSF in the amount of $1,947,735,000, (ii) an Allowed Claim against
  LCPI in the amount of $5 billion and (iii) an Allowed Guarantee Claim
  against LBHI in the amount of $1,947,735,000.  All other Claims of the
  Racers Trusts will be disallowed.  The unsecured claims asserted by LBHI
  against LCPI based on the Fenway transactions will be allowed in the amount
  of $230 million.  The Allowed Claims of the Designated Entities are subject to
  the Plan Adjustment.

- ▪ <u>Structured Securities Valuation Methodologies</u>.  Pursuant to certain Plan Support Agreements, the Debtors agreed to apply the Structured Securities Valuation Methodologies to the structured securities claims of plan support creditors.  In furtherance of that commitment, on August 10, 2011, the Debtors obtained the Bankruptcy Court's approval of procedures for the calculation and allowance of all claims based on structured securities in accordance with such methodologies.

The Global Settlement and the described mechanisms were painstakingly negotiated among the Debtors, the Creditors' Committee and major stakeholders.  Each aspect of the Global Settlement is interdependent and relied upon by creditors who made material concessions as to their respective positions to enable the expeditious confirmation of the Plan.  A modification to any aspect of the Global Settlement or the failure to approve the Global Settlement *in toto* undoubtedly may result in events of termination under the Plan Support Agreements; and such an occurrence would set back the administration of the chapter 11 cases for an extended period as the Debtors and their adversaries get bogged down in the maze of uncontrolled litigation and prosecution of competing proposed plans.

The Plan also incorporates comprehensive Bilateral Settlements among the Debtors and certain of their Foreign Affiliates as well as certain third party creditors that asserted substantial complex claims against the Debtors.  The Bilateral Settlements resolve various particular disputes, including issues as to the allowable amounts of claims asserted by the creditors.  Such settlements take into account the legal and factual risks to the allowance of the claims, including the potential effects of substantive consolidation and the Debtors' challenges to the enforceability of Guarantee Claims asserted by Affiliate claimants.  As result of the Bilateral Settlements, the allowed claims of the Foreign Affiliates and the German governmental entities will result in a reduction of over $295 billion in the aggregate from the amounts asserted against the Debtors.  All of the Bilateral Settlements are consistent with the principles of the Global

Settlement and should be approved.  They resolve many of the largest claims asserted against the

Debtors and eliminate potential difficult, time consuming litigation that would otherwise occur.

Approval of the Bilateral Settlements also eliminates potential significant impediments to

making meaningful speedy distributions to creditors.

## I.      STANDARD FOR APPROVAL UNDER BANKRUPTCY RULE 9019

Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice

and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).

This rule empowers bankruptcy courts "to approve settlements if they are in the best interests of

the estate."  *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert

Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  The settlement need not result in the

best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of

reasonableness."  *Id.*; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d

Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

"Compromises are a normal part of the process of reorganization."  *Prot. Comm.

for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson* ("*TMT Trailer Ferry*"), 390 U.S.

414, 424 (1968) (*quoting Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

Compromises may be effected separately during the reorganization proceedings or in the body of

the plan itself.  *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 758 (Bankr.

S.D.N.Y. 1992).  The decision to approve a particular compromise lies within the sound

discretion of the bankruptcy court.  *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).

The court's discretion must be exercised "in light of the general public policy favoring

settlements."  *In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  A proposed

compromise and settlement implicates the issue of whether it is "fair and equitable, and … in the

best interest of the [debtor's] estate."  *In re Best Products Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y.

1994) (internal citations omitted).  The court must apprise itself "of all [relevant] facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer Ferry,* 390 U.S. at 424.

The following factors are generally considered in determining whether a proposed settlement should be approved:

> (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law;
>
> (ii) the difficulties of collecting any litigated judgment;
>
> (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;
>
> (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;
>
> (v) the competence and experience of attorneys and other professionals who support the settlement;
>
> (vi) the relative benefits to be received by affected parties;
>
> (vii) the extent to which the settlement is the product of arm's-length bargaining and not the product of fraud or collusion; and
>
> (viii) the debtor's informed judgment that the settlement is fair and reasonable.

*See TMT Trailer Ferry,* 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

While a court must evaluate "all … factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry,* 390 U.S. at 424, there is no requirement for the conduct of a "mini-trial" of the claims being settled or a full independent investigation.  *See In re W.T. Grant Co.*, 699 F.2d at 608; *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505.  "The bankruptcy judge does not have to decide the numerous questions of law and fact. . . The court need only canvass the settlement to determine whether it is within the

acceptable range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

Lastly, in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993) (emphasis added), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

## II.    THE GLOBAL SETTLEMENT SHOULD BE APPROVED

In reaching the Global Settlement, the Debtors and the Creditors' Committee considered the nature of the claims and issues, the costs, and time delay that will necessarily occur as part of the prosecution of the multiple Plan Issues that would be pursued by the competing parties. The Global Settlement is unquestionably—and by far—the better alternative.

### A.    RISK OF SUBSTANTIVE CONSOLIDATION

The most highly controverted issue in the Debtors' chapter 11 cases is the applicability of the equitable doctrine of substantive consolidation to the Debtors and certain or all of their Affiliates, with the result being a *de facto* single merged entity of pooled assets and liabilities. The Debtors and the Creditors' Committee have been keenly aware of the issue and its possible ramifications from the outset of these cases. They each pursued their own exhaustive reviews to investigate, evaluate and consider whether substantive consolidation of all or a portion of the Lehman enterprise is appropriate and a fair and reasonable means of dealing with the Debtors and their financial stakeholders, taking into account the governing legal principles and pertinent facts and circumstances. In that context, the Global Settlement fairly and reasonably evaluates facts and legal principles and the unique circumstances of the Lehman enterprise. The Global Settlement reflects a reasonable resolution over the conflicting arguments as to the risks of substantive consolidation.

1.      **Legal Standard for Substantive Consolidation**

"The equitable doctrine of substantive consolidation permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 764. "In the course of satisfying the liabilities of the consolidated debtors from the common pool of assets, intercompany claims are eliminated and guaranties from co-debtors are disregarded." *In re Worldcom, Inc.*, Case No. 02-13533, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003); *see also In re Enron Corp.*, Case No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, at *203-04 (Bankr. S.D.N.Y. July 15, 2004).

"The *sole purpose* of substantive consolidation is to ensure the equitable treatment of all creditors." *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988) (emphasis added). Courts have cautioned that substantive consolidation is to "be 'used sparingly' because of the possibility of unfair treatment of creditors who have dealt solely with the corporation having a surplus as opposed to those who have dealt with the related entities with deficiencies." *James Talcott, Inc. v. Wharton (In re Cont'l Vending Mach. Corp.)*, 517 F.2d 997, 1001 (2d Cir. 1975). A request for substantive consolidation "must be evaluated within the larger context of balancing the prejudice resulting from the proposed consolidation against the effect of preserving separate debtor entities." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 764-65 (*citing In re Donut Queen, Ltd.*, 41 B.R. 706, 709-10 (Bankr. E.D.N.Y. 1984)). "When deciding whether to order substantive consolidation, the courts in this circuit also use a balancing test to determine whether the relief achieves the best results for all creditors." *In re Worldcom Inc.*, Case No. 02-13533, 2003 WL 23861928, at *36 (*citing FDIC v. Colonial Realty Co.*, 966 F.2d 57, 60 (2d Cir. 1992)). Further,

to ensure fair treatment of all creditors, "a searching review of the record, on a case-by-case basis" must be conducted. *Colonial Realty Co.*, 966 F.2d at 61.

The Second Circuit's decision in *In re Augie/Restivo Baking Co.*, considered two potential circumstances in which the imposition of substantive consolidation might be appropriate: (i) whether the affairs of the debtors are so hopelessly entangled that consolidation will benefit all creditors or (ii) "whether creditors dealt with the [particular] entities as a single economic unit and did not rely on their separate identity in extending credit," such that consolidation is within creditor expectations, but taking into account any potential prejudice to particular creditors that may result from the consolidation. *In re Augie/Restivo Baking Co.*, 860 F.2d at 518. The establishment of either determinative test may be sufficient to require substantive consolidation.

The chapter 11 cases of *In re Drexel Burnham Lambert Grp. Inc.*, involving an investment banking business, a broker-dealer, trading companies and other financial markets related businesses, are most germane to the Debtors. In *Drexel*, the court substantively consolidated groups of affiliated debtors, including registered and regulated broker dealer operations. 138 B.R. at 730, 773. The *Drexel* court created a matrix of seventeen determinative factors to decide whether the interrelationship among the debtors warranted substantive consolidation. *Id.* at 764. The *Drexel* court concluded that substantive consolidation was appropriate based upon a variety of facts and circumstances—and the facts of the Lehman enterprise are remarkably similar to *Drexel*.

| **Drexel** | **Lehman** |
|---|---|
| • "Drexel operated as a single enterprise, for the benefit of the entire Drexel Burnham Lambert firm. … Drexel was managed with an eye to profit maximization for the entire enterprise rather than its various subsidiary components." *Id.* at 741. | • Lehman was operated and managed as a single enterprise operating along business segments without regard to legal entity integrity and with an eye towards maximizing the value of the enterprise as a whole. |
| • Drexel had interlocking directors and one or more of three named individuals served as directors and, in most cases, officers of each of the Drexel debtors. *Id.* | • Overlapping directors, officers and committees were prevalent throughout the Lehman enterprise. Very few Lehman Affiliates had independent directors unless required to do so for regulatory reasons, and, in such cases, the selection of directors was centrally controlled. |
| • Except for one entity, all of Drexel was headquartered and controlled from two of its offices in New York City. "All the space was leased in the name of DBL Group and paid for by DBL Inc. Through various intercompany accounts, rent was charged back to DBL Group and reallocated to the various Debtors." *Id.* | • The Lehman enterprise operated out of shared office space organized by business line, with the center of gravity for the management, governance and control of the Lehman enterprise being in New York. Real property and leases, generally, were in the name of LBHI, Lehman Brothers Inc. ("LBI") or Neuberger Berman and, rent and related expenses were all paid by LBI generally with funds originated from the common enterprise pool. |
| • "All support functions, including finance, legal, administrative, operations, clearing systems, communications, mailroom, internal audit, and, external audit were provided by DBL Inc." *Id.* | • The Lehman enterprise had a firm-wide corporate department that provided services to all of its business segments, including processing of securities transactions, compliance with applicable regulatory and legal requirements, technology infrastructure, information security, treasury operations, financial reporting and business unit financial support, tax planning and compliance, internal audit, expense management, legal support, human resources and other support functions. Through intercompany transfers and adjustments, the costs of these services were allocated to various business units. |
| • "Throughout Drexel, most employees received checks and W-2 statements from DBL Inc., although their salary expense, once charged to DBL Group, was then expensed by DBL Group to the various Drexel components." *Id.* | • Most U.S. employees received W-2 statements from and were compensated by LBI generally with funds originated from the common enterprise pool, without regard to function or place of employment. Lehman Brothers Limited ("LBL") served the same functions for Lehman's European businesses. LBI or LBL would, however, charge back the various business |

- There was an intricate network of intercompany accounts, including "equity accounts, tax accounts, operating accounts, and, in some instances, loan balances . . . . Some of the account balances represented years of transactions." *Id.*

- "With respect to the Drexel Operating Companies, other than DBL Inc., it was customary for their customers, creditors, and counterparties to seek guarantees from DBL Group." *Id.*

- Most of "the Drexel Operating Companies [were] subject to extensive regulation, directly and indirectly," by various government regulators. *Id.* "Although these reporting requirements . . . caused Drexel to segregate and identify on its books, the assets and liabilities of DBL Inc., DBL GSI and DBL Trading, it also caused an asset transfer and investment holding structure that was designed and motivated, in large part, to hold certain illiquid assets and investment transactions in DBL Group or the Drexel Investment Companies outside the regulatory environment governing the Drexel Operating Companies." *Id.* at 741-42.

- "[T]he enterprise and the preeminence of the firm, as a whole, was dominant." *Id.* at 742. For instance, "Drexel embarked upon a course of action which essentially 'lent' the assets of DBL Group to support the underwriting and other operations of the Drexel Operating Companies, particularly DBL Inc." *Id.* "DBL Group suffered tremendous losses on these support activities, became increasingly illiquid and. . .lost access to the commercial paper market, was unable to meet its obligations, and commenced these Chapter 11 cases." *Id.*

- "When any Drexel Investment Company required cash … DBL Group funded the cash requirements through moving cash from DBL Inc. through DBL Group to the Drexel Investment Company, as needed." *Id.* at 742-43. "Similarly, when a Drexel Investment Company realized cash, the cash was usually moved to

segments for which an employee provided services.

- Lehman's intercompany balances represent a web of complex financial transactions, some dating back decades. All forms of intercompany transactions were generally recorded on the records of the particular entities.

- LBHI guaranteed the obligations of virtually all Lehman Affiliates in multiple forms. Guarantees did not need to be requested or negotiated and were typically provided in the ordinary course.

- Certain Lehman Affiliates were separately regulated and were incorporated for specific purposes. Unregulated Lehman Affiliates were largely used as "booking sites" for trades and were managed on a group wide enterprise basis, with little ability to finance themselves or conduct business independently. Most transactions booked in unregulated Affiliates were typically booked based on the type of transaction involved.

- The success of the Lehman enterprise as a whole dominated its operations. The LBHI board of directors and various standing firm-wide committees had responsibility over enterprise wide issues, including strategy, risk, liquidity, funding, operations, and new products. Loans, cash and other assets were typically moved from entity to entity to support the operations of and benefit the enterprise.

- LBHI was the ultimate source of funds for all Lehman Affiliates, funding the needs of its Affiliates through intercompany cash infusions and advances. Lehman pooled capital of all Affiliates for the benefit of the enterprise at LBHI. The capital requirements of each Lehman Affiliate was in turn sourced generally

DBL Group to support its obligations. The movement was recorded as part of the intercompany accounts." *Id.* at 743.

from that single pool of cash. The movement of cash between legal entities was recorded.

In short, the facts regarding Lehman closely track those of *Drexel*, and the plain implication is that the doctrine of substantive consolidation is potentially applicable to the Debtors and their Affiliates. In that context, the advisability of a settlement to obviate the risks and costs of litigation of such complex issues is reasonable and appropriate. "It is well established that debtors may properly reach a settlement regarding whether the estates should be substantively consolidated." *In re Enron Corp.*, 2004 Bankr. LEXIS 2549, at *195. *See also In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006) (approving plan settlement of substantive consolidation); *In re Resorts Int'l, Inc.,* 145 B.R. 412, 418, 459 (Bankr. D.N.J. 1990) (finding a global settlement contained in plan settling all potential litigation, including substantive consolidation, as fair and equitable); *In re Stoecker,* 125 B.R. 767, 774 (Bankr. N.D. Ill. 1991) (referring to settlement of substantive consolidation motion); *In re Apex Oil Co.,* 118 B.R. 683, 688 and 111 B.R. 245 (Bankr. E.D. Mo. 1990) (referring to court's previous approval of settlement of several significant claims, including substantive consolidation).

### 2.    The Result of Litigation Regarding Substantive Consolidation is Highly Uncertain

Based upon their own diligence and assessments, both the Debtors and the Creditors' Committee independently concluded that (i) there are relevant facts and law weighing heavily for and against substantive consolidation and, further, that (ii) the Global Settlement offers a fair resolution in light of the legal and economic risks to parties in interest. The actions of the Ad Hoc Group and Non-Con Plan Proponents and the respective chapter 11 plans proposed by them illuminate the polar extremes and the intense conflicts that exist. Absent settlement, the outcome of litigation over substantive consolidation may not be easily predicted.

Such litigation would be extremely fact specific, involving extensive discovery and a potentially lengthy trial and probable appeals to the District Court and the Second Circuit from any decision.

### a.    Entanglement

In investigating the extent of entanglement as to Lehman, the Debtors focused on three aspects of Lehman's prepetition operations:  (i) the organization and operation of the enterprise, including the extent to which Lehman was run as a single business, and not as separate legal entities; (ii) the nature of and difficulty in verifying intercompany transactions; and (iii) the degree of maintenance of separate books, records and bank accounts.

(i)  *Nature of the Lehman Enterprise and Entanglement of its Affairs*

The following facts illustrate the risk that substantive consolidation of the Debtors and their Affiliates may be ordered:

- *Lehman operated as one company*.  Lehman was operated and managed as a single enterprise operating according to business segments, without regard or observation of legal entity integrity.  The LBHI board of directors, its executive committee and various standing firm-wide committees had responsibility over enterprise wide issues, including strategy, risk, liquidity, funding, operations, and new products.  Strategic decisions were made by the firm-wide executive committee and then rubber stamped as needed by boards of directors of the various subsidiaries as directed by the executive committee.  The center of gravity for the management, governance and control of the Lehman enterprise was in New York.  For example:

  ° Cash was managed across the organization as a whole;

  ° Risk was managed on a firm-wide level, and assigned by enterprise risk managers by business segments and regions and without regard to legal entities;

  ° LBHI was the primary conduit for raising the majority of the external financing for operations of the Lehman enterprise.  Decisions to raise financing were made by the Lehman Finance Committee;

  ° A single investment committee existed for the entire Lehman enterprise;

  ° The global tax group handled all tax matters for the entire enterprise and

transactions were structured to use legal entities in a tax-efficient manner;

° Litigation against any Lehman Affiliate was governed and overseen
centrally;

° Compliance functions for all Lehman Affiliates were governed and
overseen centrally;

° Overlapping directors, officers and committees were prevalent throughout
the Lehman enterprise; and

° Only a small number of Lehman Affiliates had any independent directors
unless required to do so for regulatory reasons, and, in such event, the
selection of such directors was centrally controlled. The subsidiary boards
rarely, if ever, met in person and most subsidiary actions were taken by
unanimous written consent emailed to directors.

▪ *LBHI acted as the "central bank" for all Lehman Affiliates.* LBHI was the
ultimate source of funds for all Lehman Affiliates, funding the needs of its
U.S. subsidiaries through intercompany cash advances. To the extent other
Lehman Affiliates raised funds, their ability to do so was based on a guarantee
by LBHI. LBHI funded its activities through a combination of master notes,
commercial paper, bank credit facilities, and other money market related
instruments raised either directly or through finance subsidiaries. LBHI, as a
holding company, was dependent on its subsidiaries for funds. In Europe, the
U.K. branch of LBHI and LBIE (under the oversight of LBHI) served the
same function for European opeations as LBHI in the United States.

▪ *Lehman pooled cash of the enterprise and cash moved seamlessly.* Lehman
pooled capital of most Affiliates for the benefit of the enterprise and the capital
of each Lehman Affiliate was in turn sourced from a single pool of the
enterprise's capital. On a daily basis, the treasury department swept cash from
Lehman Affiliates (other than certain regulated entities) into an LBHI
account. This pool of capital was used to maximize overnight investment and
to finance the Lehman enterprise – including regulated entities such as LBI,
LBIE, Lehman Brothers Japan Inc. ("LBJ") and Bankhaus – throughout the
day as needed.

▪ *Globally Consolidated Cash Management.* Transactions by all of the Lehman
Affiliates worldwide were systematically consolidated onto a single general
ledger either directly or indirectly. As a result of the unitary cash
management system, there were tens of thousands of intercompany
transactions daily involving billions of dollars. Lehman's Global Cash
Collateral Management (GCCM) and Treasury Workstation systems managed
movement of cash in and out of the firm and allowed all cash flows to be
centrally monitored. These systems were used to effect intercompany

transfers at day's end to fund the entities with bank accounts exhibiting a deficit.

- *Intercompany balances were eliminated for consolidated balance sheets.* The intercompany balance between LBHI and each Affiliate was a running total that fluctuated daily. While certain intercompany transactions that involved a regulated entity were settled regularly, generally, intercompany balances were not "zeroed out"; rather, they were carried over from day to day, month to month and year to year. Some of the intercompany balances date back years and would be extremely difficult, if not impossible, to validate (other than the fact that they were purportedly recorded on the enterprise books and records). Intercompany balances were simply disregarded when consolidated balance sheets were issued in accordance with accounting principles.

- *LBI/LBIE settled payments for many Lehman Affiliates.* Many Lehman Affiliates did not have their own bank accounts. If an entity did not have its own bank account, its obligations and receivables would be processed by another Lehman Affiliate, typically LBI or LBIE, and an intercompany balance would be recorded on the books and records. For example, for foreign exchange transactions, LBI would execute wire transfers on behalf of LBCC. LBI would receive the money and record a payable to LBCC and LBCC would record a receivable from LBI.

- *Securities Transaction Settlements.* LBI, LBIE and LBJ, as regulated broker dealer entities, settled securities transactions on behalf of other Lehman Affiliates. In addition, collateral posted by third parties for the benefit of unregulated Lehman Affiliates was typically held by LBI or LBIE.

- *Unregulated Affiliates were largely "booking sites."* Unregulated Lehman Affiliates were largely used as "booking sites" for trades. These unregulated entities were managed on a group wide enterprise system and had little ability to finance themselves or conduct business independently. Many unregulated Lehman Affiliates were thinly capitalized and did not have their own bank accounts. Most transactions booked in unregulated entities across Lehman Affiliates based on the type of trade involved.

- *Intercompany Repos and Securitization Vehicles.* Assets were freely moved from entity to entity in order to position them for repurchase transactions with counterparties for the benefit of Lehman as a whole. This was accomplished generally through intercompany transfers supported by participation and repurchase agreements. For example, some loans originated by LBHI and certain of its Affiliates were used to enter into repurchase transactions with LCPI in which LCPI was the buyer and employed the assets subject to the repurchase agreement to enter into further transactions with third parties or to obtain secured financing. Lehman's standing committees regularly directed

the movement of loans into securitization vehicles to provide additional financing capacity for the entire enterprise.

(ii) *Facts that may reduce the risk of substantive consolidation*

- *Reconstruction of Books and Records.* Following the sale of the North American capital markets business to Barclays Capital Inc., the Debtors, with great efforts, were able to reconstruct, electronically, Lehman's records so that intercompany transactions and balances could be reviewed and the Global Close accomplished – paving the way for the implementation of the Protocol. Lehman did maintain separate financial records for each active legal entity. There is no evidence that Lehman's recordkeeping was materially deficient or unreliable.

- *Generally, electronic recordkeeping was maintained for all active Affiliates and regularly reconciled.* A staff of almost 300 legal entity controllers regularly reviewed the books and records of the legal entities, investigated irregularities, reviewed substantiation for some of the accounting entries and was responsible for reconciling intercompany accounts and transfers on a regular basis. For example, at the end of each month, an intercompany "break" report was generated. This report listed intercompany balances that did not have a match on the general ledger. The legal entity controllers would work with each other to reconcile the "breaks." The legal entity controllers prepared financial statements and were responsible for reviewing the financial statements for legal entities and ensuring that they were appropriately supported when required for specific purposes, and prepared such financial statements.

- *Transfers were recorded.* The movement of cash between legal entities for cash management purposes was done using the GCCM, TWS and other specific cash management systems. Cash activity generated within these systems was tracked and recorded in the respective cash management system with an automatic data feed to the general ledger. The general ledger system tracked, in the aggregate, such activity with internal coding which made it possible to sort transactions by legal entity and each entry in the general ledger could be traceable to a particular legal entity. Each Lehman employee was assigned a management code that would capture all direct costs (compensation, occupancy, etc.) associated with such employee.

- *A borrowing entity was charged for any advances made on its behalf by a lending entity.* Although certain Affiliates would regularly advance funds on behalf of other Affiliates, such as LBI or LBIE, an intercompany payable was electronically recorded on the borrowing entity's books and a receivable was recorded on the lending entity's books. For example, LBI would pay the salaries and benefits of virtually all U.S.-based Lehman employees, but would then charge back certain Lehman Affiliates for which an employee

provided services. This type of intercompany transaction was sometimes settled with a cash payment, but generally transactions for borrowed money and trading activities remained in the intercompany balance and would be adjusted over time (except for regulated broker-dealers, which settled their intercompany balances daily).

▪ *Some intercompany loans were formally documented and were more typical of a third-party transaction.* Occasionally, some cash transfers were formally documented as intercompany loans, subordinated loans or cash infusions. In such instances, there were terms for the loan, including maturity date and interest rates, though interest was generally accrued as part of the intercompany balance rather than paid in cash. Intercompany loans, including subordinated loans, to regulated entities were made as necessary to comply with regulatory capital requirements.

▪ *Regulatory Oversight of Individual Entities.* Certain Lehman Affiliates were separately regulated and incorporated for specific purposes.

▪ *Independent balance sheets and tax forms.* Each US entity had separate pro forma IRS 1120 forms prepared, and a separate hard copy file of supporting documentation. Foreign subsidiaries filed IRS 5471 forms (informational returns that indicate that foreign entities were taxpayers in appropriate jurisdictions). Certain legal entities were required in particular states to file separate state tax returns. Tax audits were sometimes conducted of a particular legal entity and both formal and informal tax sharing agreements were in place that allocated tax liabilities and benefits among Lehman Affiliates.

Accordingly, there exists a basis to conclude that the Lehman enterprise, generally, kept books and records and intended to record the enterprises' transactions. Such books and records are not so hopelessly scrambled that it would be impossible to ascertain the flow of transactions among the units of the enterprise and with third parties. As such, facts in connection with entanglement may militate against directing substantive consolidation. Nonetheless, in light of the integrated nature of the Lehman enterprise's prepetition business, the technical recordkeeping may not be adequate to accurately reconcile and unwind the tens of thousands of intercompany transactions daily involving billions of dollars to determine the "true" assets and liabilities of the various units of the enterprise. The volumes of intercompany

transactions recorded on the books and records over time are huge and extremely difficult and time consuming to unravel to fully understand and analyze.

### b.    Creditor Reliance

The alternative test of *Augie/Restivo* concerns the perception of creditors of the Lehman enterprise when they engaged in business transactions with it.  The inquiry is "whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit.'"  *Augie/Restivo*, 860 F.2d at 518 (citations omitted); *In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996).  Whether the "creditor reliance" test may be satisfied in these cases is fact specific and would entail extensive discovery, evidence at trial, and fact-finding after trial.  It is (and would continue to be) a subject of conflicting arguments.  Multiple facts, at this stage, may be cited for and against the establishment of creditor reliance.

The most controversial and significant fact in connection with creditor reliance is the existence and almost universal requirement of LBHI guarantees to support certain businesses of the Lehman enterprise.  The existence of parent guarantees has been a relevant and persistent factor noted by courts in favor of directing substantive consolidation.  *See, e.g., In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. at 766 (directing substantive consolidation based on establishment of facts that included the existence of required and well-known intercompany guarantees running from DBL Group to the subsidiaries); *see generally In re Richton Int'l Corp.*, 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981) (directing substantive consolidation where the established facts demonstrated the existence of "extensive cross corporate guarantees of both bank and trade obligations.").  However, the existence of outstanding guarantees may not be conclusive in particular fact patterns.  *See, e.g., Augie/Restivo*, 860 F.2d 515 (holding that

substantive consolidation was inappropriate where the particular lender advanced funds prior to any merger of the entities involved and assumed that it was dealing with separate entities, and, accordingly, bargained for a guarantee as a credit enhancement from a recognized separate entity); *In re Owens Corning*, 419 F.3d 195, 212-14 (3d Cir. 2007) (reversing approval of substantive consolidation where banks established that they had bargained for credit enhancements in making a new loan in a distressed situation and required as a condition of the loan that guarantees be provided so they might access the assets of the guarantors in the event of default).

The significance of LBHI guarantees as to whether creditors relied on the separateness and independent existence of the various Lehman entities does not present a bright-line conclusion. Lehman creditors, generally, and in particular in respect of derivatives transactions, have contended that the fact that they entered into transactions with the Lehman enterprise based on standardized contractual agreements (*e.g.*, ISDA forms) that automatically required an LBHI guarantee supports their alleged reliance on the separateness of the Lehman Affiliates. However, other facts militate against that conclusion. It was standard practice for LBHI to issue guarantees without any negotiations. Arguably, the credit of the Lehman Affiliate was irrelevant as the counterparty relied on the guarantee of LBHI and the Lehman enterprise. Contractual provisions and circumstances described below tend to support the argument that counterparties were not relying on the separate corporate existence of the Lehman Affiliate.

(i) *Lack of Reliance on Separateness of Entities*

- *Creditors generally did not have access to financial statements of unregulated Affiliates.* All of Lehman's external public financial reporting, other than for specific regulated Affiliates, was done on a consolidated basis at the LBHI level and was separated out by business segments and geographic region, not by legal entity. Generally, unregulated Affiliates did not have audited financial statements that were publicly available. With certain limited

exceptions, such as in the case of LBFP and LBDP (entities created for a specific purpose and type of transactions that required AAA credit ratings), creditors could not have relied on the financial statements for unregulated Affiliates because no such financial statements existed.

- *Generally, derivatives counterparties were not given a choice of contracting Lehman Affiliate as long as the LBHI guarantee was granted.*  Lehman booked derivatives transactions to an entity based on the type of transaction and LBHI guaranteed the obligations of its Affiliates under such derivatives contracts.  LBHI's guarantee was given as a matter of course in virtually every derivatives transaction and did not need to be requested or negotiated.

- *Provisions found in most Lehman derivatives contracts reflect reliance on Lehman as a whole.*  Provisions found in most Lehman derivatives contracts (other than LBDP and LBFP contracts) support the argument that counterparties were not relying on the identity of the particular Lehman Affiliate, but rather on the creditworthiness of LBHI and the Lehman enterprise.  Such provisions include those that:

  ° permitted the Lehman Affiliate to assign all of its rights and obligations under the agreement to any other Affiliate without the consent of the counterparty, so long as the obligations of the Lehman Affiliate continued to be guaranteed by LBHI;

  ° made the amount of collateral that had to be posted by the Lehman Affiliate dependent on the credit rating of LBHI (rather than that of the subsidiary);

  ° made the applicability of the debt non-payment cross-default provision dependent on LBHI's stockholder equity (rather than that of the subsidiary); and

  ° required financial information only from LBHI (and not from the subsidiary).

- *No ratings of most unregulated Affiliates.*  Generally, unregulated Affiliates did not have independent credit ratings apart from LBHI.  Presentations to the rating agencies generally discussed the Lehman enterprise on a firm-wide basis across business lines and regions, not the financial condition or credit rating of any particular legal entity.  Credit rating agencies generally adopted a similar approach in their reports.

- *Real estate transactions reflect reliance on the Lehman enterprise as a whole.*  Generally, as to real estate transactions, form term sheets were used as a starting point, the vast majority of which defined LBHI "or any of its affiliates, successors and/or assigns" as the Lehman Affiliate.  The ultimate

Lehman Affiliate that would be the party to the transaction was not a point of negotiation and essentially irrelevant, as long as LBHI guaranteed or assumed liability for the transaction.  The Lehman Affiliate was decided based on the type of transaction involved.  For example, LCPI was used for corporate and term loans, LBHI or Bankhaus was used for mortgage and mezzanine loans, Property Asset Management Inc. or "PAMI" (in the form of a single asset special purpose entity created as a wholly owned subsidiary) was used for equity and bridge equity transactions, and Lehman ALI was used for California mortgages.  Most standard forms of debt agreements and equity investment agreements contain a provision permitting Lehman to transfer the loan or equity freely among its affiliates without the consent of the counterparty.

By comparison, the facts and circumstances of LBDP and LBFP – the "AAA"-rated subsidiaries – stand in sharp contrast to those of the other Lehman Affiliates.  The particular facts as to those entities more clearly establish that their creditors were relying on the separate identity and financial condition of LBDP and LBFP in their business transactions.  For example, LBDP and LBFP had separate credit ratings that were not tied to that of LBHI.  LBHI did not guarantee the derivatives obligations of LBDP and LBFP.  LBDP and LBFP contracts were not freely assignable to other Lehman Affiliates without the express consent of counterparties.

(ii)  *Facts that might support denial of Substantive Consolidation based on reliance*

- *Creditors have alleged that they relied on separateness.*  Creditors of particular Subsidiary Debtors and Foreign Affiliates (*e.g.*, LBT), such as the Non-Con Plan Proponents, have alleged that they relied on corporate separateness of LBHI and its Affiliates in order to obtain "structural seniority" by obtaining a separate contract from the relevant Affiliate and a guarante from LBHI and would attempt to establish their allegations.

- *Numerous public filings indicated the corporate separateness of LBHI from its Affiliates.*  As noted in the disclosure statement to the Non-Con Plan filed by the Non-Con Plan Proponents, LBHI specifically disclosed to its creditors that it existed separate and apart from its operating subsidiaries and that such subsidiaries would not be liable for the publicly traded LBHI debt.  SEC filings included the following statements:

  ° We are a holding company and you can only depend on our earnings and assets, and not those of our subsidiaries, for payment of principal and

interest on the notes;

° The notes will be solely our obligations, and no other entity will have any obligation, contingent or otherwise, to make any payments in respect of the notes;

° Our subsidiaries will have no obligation to pay any amount in respect of the notes or to make any funds available therefor;

° Due to the covenants contained in certain of our debt agreements and regulations relating to capital requirements affecting certain of our more significant subsidiaries, the ability of certain subsidiaries to pay dividends and other distributions and make loans to us is restricted;

° As an equity holder, our ability to participate in any distributions of assets of any subsidiary is subordinate to the claims of creditors of the subsidiary.

*See* Non-Con Disclosure Statement, at 10.

The Global Settlement gives due consideration to the strengths and weaknesses of issues presented by substantive consolidation and its implications to creditors. The distributions under the Plan to any particular creditor take into account the issues and, in the spirit of resolution and compromise, are not greater than the distributions that would be made under the best possible judicial determination in favor of such creditor and are no less than the distributions that would be made under the worst possible outcome for such creditor, if the issues were resolved by judicial determination. The Global Settlement realistically assesses the relative risks associated with the prosecution of a motion to substantively consolidate the Debtors and their Affiliates. It assumes at least a 20% risk that such motion would be granted and allocates that risk by limited contributions among creditors. Yet the Plan does not materially prejudice any creditor's recovery and effectively accelerates distributions. The relevant facts establish beyond peradventure that there exists a real risk that substantive consolidation may be granted. Evaluating that risk at 20% is conservative. In this circumstance, the Global Settlement

unequivocally falls within the range of reasonableness.  The Global Settlement as to the

substantive consolidation issues, *inter alia*, should be approved.

### 3.    Enforcement of a Litigated Judgment May Be Difficult, But Not Insurmountable Through Potential Alternative Remedies

In addition to uncertainty of the facts and law surrounding a litigated outcome of

substantive consolidation, to the extent that substantive consolidation is ordered, practical

difficulties may arise associated with enforcement of a litigated judgment to the extent an

Affiliate, such as LBI or a Foreign Affiliate subject to a foreign proceeding, does not or is unable

voluntarily to submit its assets to the control of this Court to become part of the common pool of

assets.  Many of the Debtors' Affiliates who were units of the integrated operations of the

Lehman enterprise are currently subject to foreign insolvency proceedings, or, in the case of LBI,

a proceeding under the Securities Investor Protection Act of 1970, as amended.

While there may be complications associated with enforcing an order of

substantive consolidation, depending upon the particular circumstances, as an initial matter,

substantive consolidation of a foreign, regulated, or non-debtor entity is not *per se*

impermissible.  The determination of whether substantive consolidation should be directed is

subject to the same fact specific and legal analyses discussed.  The substantive consolidation of

non-debtor and debtor entities is well recognized.  In 1941, the United States Supreme Court

implicitly approved the substantive consolidation of a debtor and a non-debtor where the debtor

in that case had abused corporate formalities and fraudulently conveyed the debtor's assets to the

non-debtor to prevent the debtor's creditors from reaching the transferred assets.  *See Sampsell v.

Imperial Paper & Color Corp.*, 313 U.S. 215 (1941).  In 1964, the Second Circuit also

recognized a bankruptcy court's power to substantively consolidate a debtor with a non-debtor in

order to ensure the equitable treatment of creditors.  *Soviero v. Franklin Nat'l Bank of Long*

*Island*, 328 F.2d 446 (2d Cir. 1964) (upholding lower court's consolidation of debtor and

fourteen non-debtor corporations where there was commingling of assets and functions, as well

as a disregard for corporate form).  This Court has recognized the permissibility of such a result.

*See Off. Comm. of Unsec. Cred. of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343

B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (denying substantive consolidation where the legal

standard was not satisfied, but noting that there are cases that have substantively consolidated

debtors with non-debtor affiliates and that in an appropriate case, a bankruptcy court may

substantively consolidate debtor and non-debtor entities).

Other courts have also ordered the substantive consolidation of debtors and non-

debtors.  *See In re Bonham*, 229 F.3d 750 (9th Cir. 2000) (ordering substantive consolidation of

the debtor with two non-debtor companies owned and operated by the debtor); *In re LLS*

*America*, No. 09-06194-PCW11, Findings of Fact and Conclusions of Law (Bankr. C.D. Ca.

Sept. 8, 2011) [ECF No. 771] (ordering substantive consolidation of debtor and non-debtor

affiliates); *see also In re Alico Mining, Inc.*, 278 B.R. 586, 588 (Bankr. D. Fla. 2002) (noting that

there is substantial authority to support its power to substantively consolidate debtors and non-

debtors); *Simon v. Brentwood Tavern* (*In re Brentwood Golf Club, LLC*), 329 B.R. 802 (Bankr.

E.D. Mich 2005) (substantively consolidating debtor golf club with non-debtor tavern operated at

golf club where corporate formalities were disregarded and other substantive consolidation

factors were satisfied).[3]

---

[3] Although many courts that have considered the issue have concluded that it is within a
bankruptcy court's equitable powers to substantively consolidate debtor and non-debtor entities,
some courts have voiced concern with the conclusion.  *See e.g., In re Amco Ins.*, 444 F.3d 690,
696 n.3 (5th Cir. 2006) (noting that when implicating non-debtors, "[s]ubstantive consolidation
should be ordered with more caution than normal, and jurisdictional concerns may also be at
issue"); *see also In re R2D2*, No. LA10-19924-BR, Trs. of Proceedings (Bankr. C.D. Ca., Sept.
7, 2011) [ECF No. 759] (denying substantive consolidation of debtors and non-debtors where

Similarly, a regulated entity, such as LBI or LBIE, is not immune to the risks of substantive consolidation. In *Drexel Burnham*, the Court confirmed a chapter 11 plan that provided for the substantive consolidation of two sets of debtor entities that included both regulated and non-regulated companies. *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. at 741-44. Specifically, "DBL Inc.," Drexel's registered broker-dealer, and "DBL GSI," Drexel's registered U.S. Government securities dealer, were each substantively consolidated with non-regulated entities. *See id.* at 729, 741-44. Notably, DBL Inc. was substantively consolidated with three debtor entities that were established to meet foreign and domestic regulatory requirements so that the operations of DBL Inc. could be extended to Japan, the Caribbean and the United Kingdom. *Id.* at 744.

The equitable doctrine of substantive consolidation has also been applied *by this Court* to merge the assets and liabilities of stockbrokers in liquidation under SIPA with another bankruptcy estate not in liquidation or subject to SIPA. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, Case No. 08-1789A (BRL) (Bankr. S.D.N.Y. June 9, 2009) [ECF No. 252] (Consent Order Substantively Consolidating Estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Investment Securities LLC); *In re Park South Sec., LLC*, Case No. 03-8024A (RDD) (Bankr. S.D.N.Y. Sept. 10, 2003) [ECF. No. 27] (Order Substantively Consolidating the Assets and Liabilities of Eberhard Investment Associates, Inc. with Estate of Park South Securities, LLC, in Liquidation); *see also In re Lewellyn*, 26 B.R. 246 (S.D. Iowa 1982); *In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255 (6th Cir. 1997) (affirming the application of stockbroker liquidation provisions under subchapter III of chapter 7 of the

---

neither *Augie/Restivo* factor was present); *In re DRW Prop. Co.* 54 B.R. 489 (Bankr. N.D. Tex. 1985) (denying substantive consolidation of debtors with non-debtors and stating that it was unaware of any authority to substantively consolidate debtor and non-debtor partnerships).

Bankruptcy Code to substantively consolidated estates of a broker-dealer that defrauded creditors and an individual debtor).

Notwithstanding the foregoing, the Debtors recognize that many of their Affiliates are subject to foreign proceedings, and that difficulties may arise as to enforcement of an order directing substantive consolidation. Such potential complications do not, however, require the absolute conclusion that there is no risk of substantive consolidation as to such foreign entities.

If a Foreign Affiliate does not or is unable to cooperate voluntarily with an order directing substantive consolidation of a particular foreign entity, there are other equitable means available to the Court to implement a finding that substantive consolidation is warranted. The Court may equitably disallow the claims filed by the foreign representative that does not or is unable to comply with an order. *See Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 71-73 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss because equitable disallowance of claims by bankruptcy court remains viable cause of action, separate from equitable subordination), *aff'd in relevant part*, 390 B.R. 64, 74-75 (S.D.N.Y. 2008) (concluding that the United States Supreme Court's decision in *Pepper v. Litton*, 308 U.S. 295 (1939) "fairly read, certainly endorses the practice (in appropriate circumstances) of the equitable disallowance of claims, not on the basis of any statutory language, but as within the equitable powers of a bankruptcy court"); *In re Washington Mutual Inc.*, Case No. 08-12229, 2011 WL 4090757, at *112-13 (Bankr. D. Del. Sept. 13, 2011) (concluding that court has "authority to disallow a claim on equitable grounds 'in those extreme instances – perhaps very rare – where it is necessary as a remedy.'"). The proposed remedy would reflect the fact that substantive consolidation eliminates intercompany claims. Alternatively, the Court may equitably disallow Guarantee Claims for which the Affiliate is the

primary obligor and thereby effectuate the elimination of such claims based upon substantive

consolidation of the entities.

In addition, equitable subordination of the Foreign Affiliates' claims and

Guarantee Claims may effectuate the objective of substantive consolidation in the event of non-

compliance with the order directing substantive consolidation.  While courts generally require a

showing of inequitable or wrongful conduct to order equitable subordination of creditors' claims,

a "number of courts have provided for equitable subordinate without making creditor misconduct

a necessary prerequisite for its application."  *See In the Matter of Virtual Network Servs. Corp.*,

902 F.2d 1246, 1250 (7th Cir. 1990) (affirming district court's equitable subordination of claim

and its reasoning that, *inter alia*, "the goal of equitable subordination focuses not on the conduct

of the creditor but on fairness to creditors in a particular case" and concluding that section

510(c)(1) of the Bankruptcy Code "authorizes courts to equitably subordinate claims to other

claims on a case-by-case basis without requiring in every instance inequitable conduct"); *see

also United States v. Noland*, 517 U.S. 535, 543 (1996) (deferring and not deciding the issue of

"whether a bankruptcy court must always find creditor misconduct before a claim may be

equitably subordinated"); *In re Envirodyne Indus., Inc.*, 79 F.3d 579, 582 (7th Cir. 1996)

(affirming lower courts' equitable subordination of claims without showing of inequitable or

wrongful conduct and adopting "flexible approach of *Virtual Network* in which a court must look

to the origin and nature of the unsecured claim and decide whether equity requires that it be

subordinated to claims of other general unsecured creditors"); *Burden v. United States*, 917 F.2d

115, 120 (3d Cir. 1990) (adopting reasoning of *Virtual Network* and concluding, based on an

"overwhelming consistency in judgments rendered by the federal courts," that "creditor

misconduct is not a prerequisite for equitable subordination"); *Jezarian v. Raichle (In the Matter*

*of Stirling Homex Corp.*), 579 F.2d 206, 212 (2d Cir. 1978) (affirming district court's equitable subordination of claims without showing of inequitable conduct and quoting *Pepper*, 308 U.S. at 307-08, for the proposition that "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate"); *SPC Plastics Corp. v. Griffith (In re Structurelite Plastics Corp.)*, 224 B.R. 27, 35 (B.A.P 6th Cir. 1998) (affirming bankruptcy court's equitable subordination of claims without showing of inequitable conduct and stating that "[a] number of courts … have recognized 'no fault subordination' that looks to the nature and origin of the claim" (citing, *inter alia, Envirodyne*)); *In re Colin*, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984) (equitably subordinating a claim without showing of inequitable conduct and rejecting argument that "inequitable conduct represents the exclusive basis for equitable subordination under § 510(c)").  Under such authority, in the extreme and unusual circumstances present here, if the Court were to conclude that substantive consolidation of a Foreign Affiliate is appropriate, it may exercise its discretion to equitably subordinate the claims of Affiliates that do not or are unable to comply with the Court's ruling in fairness to all creditors.

        Weighing all of the countervailing facts and disputed legal issues, including the difficulties that may be associated with—and alternatives to—enforcing a judgment of substantive consolidation, the Debtors and Creditors' Committee concluded that a resolution based upon an assumed 20% risk of substantive consolidation is a reasonable exercise of judgment that produced a fair result for all economic stakeholders.  The Debtors and the Creditors' Committee have concluded that a settlement of substantive consolidation is in the best interests of all of the Debtors and affected creditors.  As stated, the Global Settlement in all respects falls within the range of reasonableness required for approval by the Court.  In addition,

the overwhelming acceptance of the Plan by impaired classes of creditors confirms and supports the conclusions of the Debtors and the Creditors' Committee.

### 4.   The Complexity, Duration, Expense, Inconvenience and Delay Associated with Litigation Should be Avoided

The Global Settlement resolves the most significant inter-case disputes and issues. Absent the Global Settlement, full prosecution of extraordinarily complex, difficult litigation of substantive consolidation and related issues would ensue. The litigation (including discovery, trial, and appeals) would be extremely fact-intensive, consume a substantial amount of money, significantly delay distributions to creditors and prolong the costs of administering the chapter 11 cases while eroding the Debtors' assets. The Debtors project it may take years to litigate the issues presented in this Court, and substantial additional time if pertinent appeals are filed. The Debtors' creditors would be forced to await reduced distributions. In contrast, the Global Settlement provides economic stakeholders with both a fair and reasonable alternative to the woes of litigation and the certainty of immediate distributions. The Debtors and the Creditors' Committee and all accepting creditors clearly have expressed their judgment that the Global Settlement balances the risks and provides a practical solution that is fair, reasonable, and an efficient means to end these chapter 11 cases. It avoids the costly and vexatious, multifaceted and protracted litigation and delay that would unavoidably otherwise occur.

The settlement of the issues relating to substantive consolidation will permit the Debtors and their economic stakeholders to avoid:

- the extensive diligence and discovery regarding a whole host of underlying facts associated with litigation over substantive consolidation, including review and potential untangling of the millions of intercompany transactions among the Debtors and their Affiliates;

  ° As an example of the magnitude of discovery that can be expected with respect to litigation over substantive consolidation, pursuant to the discovery protocol and procedures order entered by the Court on April 14,

2011, over 875 document requests and more than 200 proposed search terms were served on the Debtors seeking information dating back to 2005 and beyond (as many requests were unlimited as to time) to which millions of documents could potentially be responsive. For each one of these requests, the Debtors would be required to dedicate substantial resources to review all potentially responsive documents. Discovery, including hundreds of document requests and proposed search terms, was also served on over 70 participants in the discovery protocol.

- the extensive evidentiary hearings and complex litigation over substantive consolidation, whether through contested proceedings to consider confirmation of the Ad Hoc Plan and the Non-Con Plan (and any other alternative plans that may be filed) or otherwise, including:

  ° the disputed factual issues regarding whether the prepetition operations and relationships of the Debtors and their Affiliates, including Foreign Affiliates, satisfy the legal standard for substantive consolidation;

  ° the legal issue of whether the assets and liabilities of a Debtor and a regulated entity, a Foreign Affiliate in administration, a non-Debtor entity or LBI can be substantively consolidated;

  ° to the extent the Court orders substantive consolidation of the Debtors and one or more Foreign Affiliates or LBI, contested proceedings associated with the enforceability of such an order in foreign jurisdictions; and

  ° complications associated with reconciling the various insolvency laws of multiple foreign jurisdictions or SIPA to the extent substantive consolidation of a Foreign Affiliate or LBI is ordered;

  ° related disputes among the Debtors and their Affiliates regarding the ownership of assets and the extent, propriety and validity of claims among the Debtors and their Affiliates;

- the costs and professional fees associated with litigation of all of the foregoing; and

- the delay, uncertainty and creditors' lost time-value of money resulting from later distributions as a result of litigation of the foregoing issues.

An example of the potential time that would be consumed by litigation is the

pending litigation initiated by the Debtors against JP Morgan Chase. The adversary proceeding

was commenced on May 26, 2010. As of this date, discovery has not been completed and the

trial is not scheduled to commence until September 24, 2012.  The trial is likely to be further

deferred as discovery has been extended into 2012 and the litigation is subject to a pending

motion to withdraw the reference to the District Court, based upon *Stern v. Marshall*, 131 S.Ct.

2594 (2011).  That motion has not yet been scheduled for oral argument by the District Court.  In

addition, the Debtors' litigation against Barclays Capital Inc. for reconsideration of the order

approving the sale of Lehman's North American capital markets business extended over two (2)

years and cost the Debtors many millions of dollars.

Manifestly, the Global Settlement is in the best interest of the Debtors and their

economic stakeholders and should be approved.

### 5.    An Overwhelming Majority of Creditors Affirmatively Support the Proposed Settlement.

As noted above, the Global Settlement is supported by over 150 creditors who

asserted more than approximately $450 billion in aggregate claims against the Debtors.  Within

this group of supporting creditors are members of the Ad Hoc Group, members of the Non-Con

Plan Proponents, various LBT Noteholders and certain of the Debtors major Foreign Affiliates,

including, LBIE, LBT, Bankhaus, the Lehman Hong Kong Entities In Liquidation, LBSN,

Lehman Japan, LB Lux and Lehman Singapore.  The Plan has been accepted by over 71,000

creditors asserting claims in the aggregate amount of approximately $400 billion against the

Debtors (which represents 95% of the number of creditors who voted and 98.68% of the amount

of claims voted on the Plan).

The acceptance of the Plan and its integrated Global Settlement represents the

judgment of extremely sophisticated parties and their respective professionals, thoroughly

familiar with the facts and circumstances of the Lehman enterprise.  The alternative plans

proposed and now suspended by the Ad Hoc Group and Non-Con Plan Proponents represent the

significant time and resources invested by those groups to investigate the facts independently and test the legal viability of substantive consolidation, and the ability to challenge effectively the different legal positions.  The alternative plans starkly set the parameters of the potential litigation.  However, these groups and others, such as many LBT Noteholders, each with radically different economic interests and legal positions over the billions of dollars at stake in the Debtors' chapter 11 cases, have recognized the essential and inherent advantages and disadvantages to full scale warfare and the wisdom of the Debtors' Plan.  As a result, they have actively supported the Plan and its Global Settlement.

The acknowledged support of these economic stakeholders demonstrates the benefits and fairness of the Global Settlement and the Plan, and that the Global Settlement is in their best interests.

### 6.      Competent and Experienced Professionals Have Evaluated the Settlement.

As stated, the Global Settlement is supported overwhelmingly by creditors voting to accept the Plan.  The Debtors, the Creditors' Committee and the various Plan support parties are all highly sophisticated and are represented by experienced and knowledgeable attorneys and other professionals.  *See In re Dow Corning Corp.*, 192 B.R. 415, 424 (Bankr. E.D. Mich. 1996) (noting counsel's prominence in the field of law as weighing heavily in favor of settlements). The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise."  *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. at 505 (internal citations omitted).

### 7.      All Economic Stakeholders Benefit From the Global Settlement.

In assessing whether the distribution of a debtor's assets under a compromise is

fair and equitable, the Court must examine what creditors "could receive if the issues not

contested as a result of the compromise become the subject of a full-blown litigation." *Barry v.

Smith (In re N.Y., New Haven & Hartford R.R. Co.)*, 632 F.2d 955, 961 (2d Cir. 1980). "If a

reasonable outcome of litigation would result in the [creditors] receiving less than that afforded

them by the Compromise Plan, then the plan should be sustained." *Id.*

   Rather than subject creditors to the uncertainty and costs of litigating substantive

consolidation, the Plan proposes the resolution of such potential litigation and offers all holders

of allowed claims a recovery within the range of possible litigated outcomes.  All stakeholders

are recovering more than they would in a worst case outcome of litigation and less than they

would in a best case outcome of litigation over substantive consolidation.  For example, if

substantive consolidation is ordered, recoveries to holders of allowed Senior Unsecured Claims

and General Unsecured Claims against LBHI would be greater than a strict non-substantive

consolidation scenario.  But, such creditors would recover less than they are receiving under the

Plan if the Debtors and their Affiliates were not consolidated.

   Similarly, all creditors that reallocate a portion of their recoveries pursuant to the

Plan Adjustment fare better under the Plan than if the Court were to order substantive

consolidation.  In that scenario, creditors that are subject to the Plan Adjustment

would realize reduced recoveries on their primary claims because the substantial claims against

their Affiliates would be consolidated and the assets of the consolidated entities would be pooled

for distribution to all of their creditors.  In addition, Guarantee Claims and Affiliate Claims

would be eliminated entirely in a substantive consolidation.  In contrast, all creditors holding

such claims will receive a recovery under the Plan that is greater than what they would receive if

substantive consolidation were ordered because they are settling at a percentage of their risked

recovery.  Therefore, the Global Settlement represents a resolution that is in the best interests of all creditors.

### 8.    The Global Settlement is a Product of Robust Arm's-Length Bargaining and Represents an Informed Judgment of the Debtors.

The Debtors and the Creditors' Committee undertook independent reviews and diligence processes extending over a period of two years to determine the prospects of substantive consolidation of all or a portion of the Lehman enterprise.  In the course of that analysis and in formulating a fair proposal for creditors, in addition to their consultation with the Creditors' Committee, the Debtors met and considered the views of numerous parties in interest, including members of the Ad Hoc Group, the Non-Con Plan Proponents, LBT Noteholders, various Foreign Affiliates and other creditors, and their professionals.  The negotiations were difficult and rigorously pursued.  Those negotiations occurred over an extended period and culminated in the "all hands" meetings in June of 2011.  All of these negotiations were robust and conducted at arm's length and parties were represented by experienced professionals.

The participating creditors were all well-informed of the legal and factual issues presented by these chapter 11 cases.  The Creditors' Committee, as noted, undertook its own substantive consolidation analysis and played a meaningful role in the negotiations and discussions, representing the interests of all general unsecured creditors.  Each of the Ad Hoc Group, Non-Con Plan Proponents and LBT Noteholders that participated in the negotiations also conducted an extensive, penetrating analysis of the facts and issues.  The Foreign Administrators likewise conducted their own investigations.  Initially the parties were far apart.  However, as the difficulties of each position surfaced and the economic realities realigned, the need for compromise took hold and the Global Settlement resulted.  The judgment of all of these parties is reflective of the fairness and reasonableness of the Global Settlement and the need to approve it.

### B.    RECHARACTERIZATION OF CERTAIN CLAIMS OF LBHI.

Prior to its downfall, Lehman conducted its worldwide business pursuant to a centralized cash management system.  LBHI either directly or indirectly acted as the central bank for the Lehman enterprise worldwide.  Transactions by all Lehman Affiliates were systematically consolidated into a single general ledger.  Substantially all excess cash in bank accounts of most Affiliates (other than that required for regulatory purposes) was swept to LBHI at the close of business each day.  The cash was held as a single pool of funds for the benefit of the Lehman enterprise.  Cash, thereafter, would be funded to business lines by LBHI on an as needed basis.

In addition to the intercompany funding of operations, LBHI also engaged in direct intercompany transactions with many of its Affiliates that resulted in booked balances owed to and from the various Affiliates.  Such transactions were entered into in the ordinary course of business for a variety of reasons, including the management of risk on a firm-wide basis, funding subsidiaries' operations or lending funds to Affiliates (both on an unsecured and secured repo basis).  The balances of such intercompany payables and receivables fluctuated with a high degree of volatility as amounts were borrowed, repaid, reborrowed and repaid yet again to LBHI.  Generally, no documentation was executed in connection with these funding advance transactions and no conditions were set as to maturities, interest, etc.  The Debtors' records reflect that very substantial intercompany payables and receivables existed between and among the Debtors and their non-Debtor Affiliates.  As of September 14, 2008, there were approximately $700 billion in gross outstanding intercompany payables and receivables among the Debtors and certain non-Debtor Affiliates.[4]

The Debtors and the Creditors' Committee have expended considerable time and

---

[4] Such significant intercompany balances are included in Exhibit 8A to the Disclosure Statement.

resources to investigate and analyze the billions of dollars of intercompany balances among

LBHI and the Subsidiary Debtors.   The analysis of LBHI's Claims against the Subsidiary

Debtors is a fact-intensive and costly exercise, and a transaction specific consideration of the

relevant principles is particularly daunting in light of the tens of thousands of intercompany

recordkeeping entries that appear to have occurred daily.   The analysis is further complicated by

the fact that Lehman's general ledger accounts operated on a net basis making it virtually

impossible to trace cash transfers from Subsidiary Debtor bank accounts to identified

transactions.   Throughout the course of a business day, a Subsidiary Debtor may have conducted

literally thousands of transactions with third parties or Affiliates, which were administered

through subsystems within Lehman's IT infrastructure, causing LBHI to fund a Subsidiary

Debtor or vice versa.   The system did not directly link any particular advance from LBHI to a

particular payment from a Subsidiary Debtor.   In many cases, LBHI advanced funds directly to

Subsidiary Debtors that were not its direct subsidiaries, such as LBSF, LCPI, LBDP and LBFP,

which were subsidiaries of LBI prior to the Commencement Date.

Given the mode of operations and the sizeable asserted claims of LBHI against its

Subsidiary Debtors, it was apparent that the characterization of LBHI's claims against the

Subsidiary Debtors required evaluation in order to determine whether such claims were properly

characterized as debt (and entitled to share *pari passu* with other creditors) or equity infusions or

contributions.   The Debtors and Creditors' Committee recognized that an analysis of and

potential litigation regarding each and every transaction would take a virtual eternity to

complete, and at extraordinary expense to the Debtors' estates.   Accordingly, the Debtors

undertook an analysis of a sampling of intercompany transactions to determine whether the

intercompany balances resulting therefrom should be allowed as Claims or recharacterized as

Equity Interests.

The Plan embodies a compromise and settlement of issues relating to the characterization of LBHI's intercompany claims against all of its Subsidiary Debtors.  LBHI will receive distributions on, and be entitled to setoff against claims of the particular Subsidiary Debtor against it, 80% of the portion of its claims that relate to the funding of operations of such Subsidiary Debtor.  The resolution of the potential recharacterization issues forms a critical part of the integrated compromise captured by the Global Settlement.

### 1.    Legal Standard for Recharacterization

"Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*."  *Off. Comm. of Unsec. Cred. v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (*citing In re Autostyle Plastics, Inc.,* 269 F.3d 726, 747-48 (6th Cir. 2001), aff'd, 09-CIV. 10605, 2011 WL 3896249 (S.D.N.Y. Sept. 6, 2011).  Recharacterization turns on whether a debt actually exists.   *See In re BH S&B Holdings LLC*, 420 B.R. at 157; *see also Adelphia Commc'ns. Corp. v. Bank of Am., N.A.*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (noting that "recharacterization analyses focus on the substance of the transaction").  "The 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'"  *In re BH S&B Holdings LLC*, 420 B.R. at 157 (*citing Adelphia Commc'ns Corp.*, 365 B.R. at 74).

While there is some disagreement as to whether bankruptcy courts have the power

to recharacterize debt as equity,[5] the majority of courts, including this Court, hold that a

bankruptcy court has the power to recharacterize "ostensible debt as equity" under section 105(a)

of the Bankruptcy Code.  *See Adelphia Commc'ns Corp.*, 365 B.R. at 74 & n.209 (rejecting "the

contention … that bankruptcy courts lack the authority to recharacterize debt as equity."); *see

also In re Autostyle Plastics, Inc.*, 269 F.3d at 749 ("a bankruptcy court has the power to

recharacterize a claim from debt to equity").

      Courts generally consider the following factors identified by the Sixth Circuit in

*Autostyle* in determining whether an investment that purports to be a debt should be

recharacterized as equity:

    (1)  the names given to the instruments, if any, evidencing the indebtedness;

    (2)  the presence or absence of a fixed maturity date and schedule of payments;

    (3)  the presence or absence of a fixed rate of interest and interest payments;

    (4)  the source of repayments;

    (5)  the adequacy or inadequacy of capitalization;

    (6)  the identity of interest between the creditor and the stockholder;

    (7)  the security, if any, for the advances;

    (8)  the corporation's ability to obtain financing from outside lending institutions;

    (9)  the extent to which the advances were contractually subordinated to the claims of outside creditors;

    (10) the extent to which the advances were used to acquire capital assets; and

    (11) the presence or absence of a sinking fund to provide repayments.

---

[5] Because there is no provision in the Bankruptcy Code specifically allowing a court to recharacterize debt to equity, some courts have held that recharacterization of debt to equity is not allowed under the Bankruptcy Code.  *See, e.g., Pinetree Partners Ltd. v. OTR (In re Pinetree Partners, Ltd.),* 87 B.R. 481, 491 (Bankr. N.D. Ohio 1988) (indicating that there is no basis in bankruptcy law for the recharacterization of debt to equity).

269 F.3d at 749-50; *see also In re BH S&B Holdings LLC*, 420 B.R. at 157; *Adelphia Commc'ns Corp.*, 365 B.R. at 74. No one factor is controlling or decisive and a court must consider the circumstances of each case. *See In re BH S&B Holdings LLC*, 420 B.R. at 157; *see also In re Cold Harbor Assocs. L.P.*, 204 B.R. 904, 915 (Bankr. E.D.Va. 1997) ("The list of factors is not exclusive, and no one factor is predominant, nor are the factors to be given rigidly equal weight.").

> ### 2. The Compromise of the Characterization of Certain Claims of LBHI Against Subsidiary Debtors Satisfies the Legal Standards Under Bankruptcy Rule 9019

The compromise of the potential recharacterization issues as to certain Claims of LBHI against Subsidiary Debtors satisfies the legal standards under Bankruptcy Rule 9019. The proposed compromise gives due consideration to the risks that such Claims would be recharacterized if the issue was prosecuted to judgment, as well as the risk that such Claims would be eliminated in a substantive consolidation scenario. The Debtors and the Creditors' Committee have expended considerable time and resources to investigate and analyze the billions of dollars of intercompany balances among LBHI and the Subsidiary Debtors. It has been a fact-intensive and costly exercise already and would be even more so if pursued in actual litigation.

In applying the pertinent factors listed above to a sampling of intercompany transactions, the Debtors and the Creditors' Committee focused their analysis on general patterns within Lehman's general intercompany funding accounts, where most of the daily intercompany activity occurred including general operating expenses, loan and investment related cash disbursements, as well as certain less frequent transactions, such as the payment of dividends to LBHI, and transfers from LBHI to Affiliates. Different source systems in Lehman's cash management system would typically be associated with different types of intercompany funding,

so that the Debtors were able to observe what percentage of intercompany activity consisted of funding for operations as opposed to other purposes.  Interest on intercompany account balances in certain source systems was calculated on a nightly basis through an automated system, while interest on other account balances was calculated manually on a monthly basis.

Based on the source systems that fed into the sampling of intercompany balances, the Debtors were able to determine that a majority of the intercompany transactions between LBHI and the Subsidiary Debtors consisted of funding for general business purposes.  These accounts effectively operated like a line of credit:  Subsidiary Debtors could "draw" funds from LBHI as necessary to satisfy their cash needs, creating a payable to LBHI.  When there was excess cash in a Subsidiary Debtor's account at the close of business, it would generally be transferred to an LBHI consolidation account reducing the payable to LBHI or creating a receivable from LBHI.  While interest was charged on such advances and recorded, there were no fixed terms or agreements governing repayment, and intercompany balances would typically be carried for extended periods of time.  Other than regulated Affiliates, many of the Subsidiary Debtors were thinly capitalized and did not have an ability to obtain financing from third-party lending institutions.  Accordingly, based upon the above factors, the Debtors and the Creditors' Committee determined – a view that has not been challenged by a single creditor – that there existed some risk of recharacterization of LBHI's intercompany claims against the Subsidiary Debtors to equity based upon the intercompany balances accumulated as a result of LBHI's funding of operations of such Subsidiary Debtors.

Although the above-described risk exists, the Debtors and the Creditors' Committee determined that the overwhelming majority of intercompany transactions recorded for funding of operations should be treated as debt obligations to LBHI.  These intercompany

transactions, when documented, provided for fixed terms and maturity of payments, were extended to enable Subsidiary Debtors to enter into general business transactions, and, in some cases, provided collateral or other security to LBHI to secure repayment to LBHI.  With limited exceptions, no agreement was made that LBHI's claims would be contractually subordinated to the claims of third-party creditors.  Intercompany balances that related to the funding of specific intercompany transactions (*e.g.*, derivatives contracts or repurchase agreements) and recorded in separate accounts were determined to be the least susceptible to being recharacterized as equity contributions, and therefore, are not reduced to compromise a risk of recharacterization.

No party in interest has objected to the settlement of the issues relating to recharacterization of LBHI's claims against the Subsidiary Debtors pursuant to the Global Settlement.  The settlement of these issues should be approved for all of the reasons that the settlement of substantive consolidation should be approved.  It avoids the expense, uncertainty and delay associated with the prosecution of extremely complicated and legal factual issues.  The compromise falls well within the range of reasonableness and should be approved.  Full litigation of the large claims that LBHI asserts against the Subsidiary Debtors would be incredibly fact-intensive, would take years to finally resolve with no certainty of a result that would provide a better or fairer result than that under the Global Settlement, and severely complicate the administration of the chapter 11 cases without any apparent benefits to economic stakeholders.

No opposition has been interposed to this aspect of the Global Settlement.  It is a fair and reasonable resolution of very complex issues and should be approved.

## III.   BILATERAL SETTLEMENTS WITH FOREIGN AFFILIATES AND CERTAIN OTHER CREDITORS

The Foreign Affiliates that are now subject to pending insolvency proceedings were, prior to the Commencement Date, an integral part of the Lehman enterprise, including its

worldwide financial reporting, cash management, custodial and trading systems.  Over many years–in some cases, decades–the relationships among the Debtors and their Foreign Affiliates developed into a complex web of intercompany funding balances and custodial and contractual relationships that were documented and managed through Lehman's integrated financial and operating systems to allow Lehman to operate effectively its global enterprise in a seamless, expedient, and efficient manner.  Given the integrated and global nature of Lehman's business, the commencement of separate insolvency proceedings for more than one-hundred (100) Foreign Affiliates gave rise to a multiplicity of potentially daunting intercompany challenges, in particular as to the nature and validity of intercompany claims, and the enforceability of asserted Guarantee Claims by Affiliates against LBHI.

A.    OVERVIEW OF CLAIMS AND SETTLEMENTS

In October 2008, the Debtors and their Foreign Affiliates recognized that the novelty and complexity of the issues among them necessitated that they initiate comprehensive settlement discussions.  To facilitate these discussions, on May 12, 2009, the Debtors and their Foreign Affiliates in Hong Kong, Singapore, Australia, and Germany executed the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol").  Periodically, after its initial execution, other Foreign Affiliates and LBI joined as signatories to the Protocol.  The Debtors and their Foreign Affiliates held their first multilateral meeting in London on July 16, 2009, and have held ten additional in-person multilateral meetings since their initial meeting.  The Protocol, although precatory, generally provides for the sharing of information among signatories, asset preservation, and procedures for the consensual resolution of intercompany claims.

### 1.    The Global Close and Non-Guarantee Affiliate Claims

In accordance with the Protocol, the Debtors and substantially all of their significant Foreign Affiliates have agreed to adopt the "Global Close" to establish a common set of accounting records for the entities as of September 14, 2008, which would be based upon available or reconstructed records.  Using the Global Close as a starting point, the Debtors and their Foreign Affiliates analyzed the net claims based upon the balances and obligations recorded as a result of all transactions during the operation of the Lehman enterprise (the "Intercompany Claims").  Subject to inquiry into material discrepancies, the Debtors and the Foreign Affiliates reconciled their intercompany balances using the Global Close.  Although the Lehman UK Entities (including LBIE) elected not to participate in these multilateral meetings, at approximately the same time that the Debtors began multilateral meetings with the Protocol signatories, the Debtors and the Lehman UK Entities began to engage in good faith, arm's-length discussions along the same lines, endeavoring to agree to a common set of financial records and a consistent approach towards consensually reconciling claims.  Ultimately, most Foreign Affiliates and the Debtors agreed to settle (i) Intercompany Claims arising from derivatives transactions using mid-market, termination date values, and (ii) Intercompany Claims relating to non-trading balances using the Global Close.

Over time, coinciding with multilateral discussions among the Protocol signatories, bilateral discussions were initiated between the Debtors and each of the Foreign Affiliates.  Applying the principles of the Global Close, the Debtors engaged in a rigorous, comprehensive analysis of their respective balances to arrive at net Intercompany Claims.

### 2.    Guarantee Claims

Many of the Foreign Affiliates asserted very large Guarantee Claims against LBHI based upon a variety of different purported guarantees issued by LBHI, such as:

- transaction specific guarantees in connection with, among other things, derivatives transactions among Affiliates ("Transaction Guarantees");

- guarantees that are not related to a specified transaction, but are purported assurances of payment of all or a set of identified obligations of a particular Affiliate, such as guarantees of all obligations of an Affiliate that were issued under a guarantee agreement between LBHI and the Affiliate ("Entity-Specific Guarantees"); or

- pursuant to board resolutions adopted by the Executive Committee of LBHI's Board of Directors (the "Corporate Resolutions").

The Debtors, in consultation with the Creditors' Committee, have extensively reviewed and analyzed the Guarantee Claims asserted by the Foreign Affiliates and assessed the legal and factual defenses that may be asserted to their allowance. The Debtors generally have evaluated the asserted defenses to such Guarantee Claims based upon the type of guarantee involved, *e.g.*, Transaction Guarantees, Entity-Specific Guarantees, or Corporate Resolution. In most instances, the Debtors consider claims based on Entity-Specific Guarantees or the Corporate Resolutions to be highly susceptible to challenge because the applicable law generally requires a purported beneficiary of such a guarantee to demonstrate both knowledge of and reliance upon the guarantee. It is unlikely that the Foreign Affiliates actually relied (and could prove such reliance) upon these guarantees in extending credit. The Debtors also have serious concerns as to whether the Corporate Resolutions are enforceable contracts. As to each of the Guarantee Claims, the Debtors considered the effect that substantive consolidation would have on these claims, *i.e.*, that they would be eliminated. The Debtors' settlements with Foreign Affiliates take into account these and other litigation risks and provide for substantial reductions to the asserted amounts of such claims in order to settle the disputes, and resolve the Foreign Affiliate claims.

### 3.    The Settlements

As a result of more than two years of extremely difficult, arduous and intensive negotiations, and in close consultation with the Creditors' Committee, the Debtors have reached nine (9) comprehensive settlements with Foreign Administrators who together control eighty-seven (87) of the Debtors' Foreign Affiliates.  Each of these settlements is incorporated in the Plan or Plan Supplement.  In the aggregate, these Foreign Affiliates have asserted $327.8 billion in claims against the Debtors.  Pursuant to the settlement agreements that are summarized below, the Foreign Affiliates' Claims against the Debtors will be allowed in an aggregate amount equal to $61.4 billion, representing an 81% reduction in the aggregate claims asserted against the Debtors.  Importantly, other than one objection to the UK Settlement Agreement that should be overruled, there are no objections to any of the Bilateral Settlements.

While each settlement is unique, the Bilateral Settlements contain certain common elements.  First, each settlement fully reconciles all intercompany balances among the Debtors and the Foreign Affiliates in accordance with the Global Close and allows the resulting net Intercompany Claims.  Second, in order to take into account the Debtors' challenges to the Guarantee Claims asserted against LBHI, each settlement provides for an agreement by the Foreign Affiliates for substantial reductions to the allowed amounts of Guarantee Claims, depending on the particular facts and circumstances.  In the aggregate, the Guarantee Claims asserted by the settling Foreign Affiliates have been reduced from $223 billion to $11.2 billion.  Each of the settlements also provides for mutual releases from and against claims disallowed pursuant to the settlements, and an agreement by each Foreign Affiliate to vote for and support the Plan.

All of the Bilateral Settlements are subject to confirmation of the Plan and, in some cases, approvals from the relevant courts, agencies, or supervisors in each Foreign

Affiliate's separate insolvency proceeding.  With respect to the latter condition, the Debtors have

been informed by most of the Foreign Administrators that all such necessary approvals have

been obtained, or are likely to be obtained shortly.  Set forth below are brief descriptions of the

Debtors' Bilateral Settlements with the Lehman UK Entities, Bankhaus, LBT and LBSN, the

Lehman Hong Kong Entities, the Lehman Luxembourg Entities, the Lehman Japan Entities, and

the Lehman Singapore Entities.  In addition, a summary of three (3) settlements with three (3)

German governmental agencies whose claims are closely related to the Bankhaus insolvency

proceeding and the Debtors' settlement with Deutsche Bank are set forth below.[6]

### B.    SETTLEMENT WITH THE LEHMAN UK ENTITIES

Among all the prepetition intercompany relationships between the Debtors and

their Foreign Affiliates, the most complex were the Debtors' relationships with the Lehman UK

Entities, and in particular with LBIE, the regulated broker/dealer in Europe for the Lehman

enterprise.  LBIE's operations spanned a wide array of financial services, including custodial

services, securities trading and brokerage services, and the arrangement and sale of equity, fixed

income and derivatives instruments.  The Lehman UK Entities held a central role in the global

business of the Lehman enterprise.  Many of the Lehman UK Entities, including LBIE, were

subjected to administration or liquidation proceedings pursuant to the English insolvency law

immediately following the commencement of the LBHI chapter 11 case on September 15, 2008.

The Lehman UK Entities asserted numerous substantial claims against the

Debtors, which are discussed in more detail below.  The Debtors also have asserted claims

---

[6] These summaries (the "Summaries") are qualified in their entirety by the provisions of each
Bilateral Settlement.  The Summaries are intended to be used for information purposes only and
shall not, in any way, affect the meaning or interpretation of the Bilateral Settlements.  To the
extent of any conflict between these Summaries and the Bilateral Settlements, the Bilateral
Settlements shall govern.

against the Lehman UK Entities, including a $6.5 billion Intercompany Claim asserted by LBHI against LBIE.  In connection with these claims, and as a result of the Lehman UK Entities' complex relationships with the Debtors, a series of intercompany disputes and issues arose almost immediately following the commencement of the LBHI chapter 11 case and the onset of the administration and liquidation proceedings in the UK.  After more than two years (2) of robust, arm's-length, good faith negotiations between the Debtors (in close consultation with the Creditors' Committee) and the Lehman UK Affiliates, the Debtors and the Lehman UK Entities entered into a settlement agreement (the "UK Settlement Agreement"), dated October 24, 2011.

A summary of the most significant filed claims and allowed claims pursuant to the UK Settlement Agreement is set forth below.

| Approximate Aggregate Claims Held By Lehman UK Entities Against The Debtors | | |
|---|---|---|
| **Debtor** | **Filed** | **Allowed (Net of Setoff)** |
| *Direct Claims of LBIE Against LBHI* | $11.8 billion | $0.0 billion |
| *Direct Claims of Other Lehman UK Entities Against LBHI* | $4.5 billion | $4.5 billion |
| *Guarantee Claims of LBIE Against LBHI* | $101.1 billion | $1.008 billion |
| *Guarantee Claims of Other Lehman UK Entities Against LBHI* | $21.8 billion | $1.6 billion |
| *Direct Claims of LBIE Against LBSF* | $23.7 billion | $0.9 billion |
| *Direct Claims Against LCPI* | $0.3 billion | $0.3 billion |
| *Direct Claims Against LBCC* | $2.8 billion | $0.0 billion |
| *TOTAL* | **$166.0 billion** | **$8.4 billion** |
| **Approximate Aggregate Claims Held By Debtors Against Lehman UK Entities** | | |
| **Debtor** | **Filed** | **Allowed (Net of Setoff)** |
| *Claims Held By LBHI* | N/A[7] | $5.6 billion |
| *Claims Held By LBSF* | N/A | $0.6 billion |
| *Claims Held By LBCS* | N/A | $76. 2 million |
| *Claims Held By LCPI* | N/A | $32.3 million |
| *Claims Held By Other Debtors* | N/A | $441,462 |
| *TOTAL* | N/A | **$6.3 billion** |

### 1.      Settlement with LBSF

The claims asserted against LBSF by the Lehman UK Affiliates are principally

derivatives-based, and for the most part are based upon transactions that LBIE entered into with

---

[7] The Debtors have not yet filed proofs of claim against the Lehman UK Entities.  The bar date for filing proofs of debt against LBIE is December 31, 2012; no bar date has been established for the filing of proofs of debt against the other Lehman UK Entities.

LBSF to mirror and offset LBIE's transactions with third parties.  The disputes concerning

LBSF's trades with LBIE have turned primarily upon the application and proper interpretation of

a letter agreement between LBSF and LBIE (the "LBSF Side Letter") that, depending on its

application, would significantly change the calculation of damages arising from LBIE's

transactions with LBSF.

Prior to the Commencement Date, at LBSF's request, LBIE regularly entered into

derivatives transactions with clients ("Client Transactions") who either preferred or required a

regulated UK broker/dealer as their counterparty.  LBIE and LBSF contemporaneously entered

into identical "back-to-back" transactions that passed the economic risk of LBIE's Client

Transactions to LBSF (the "LBSF Back-To-Back Transactions").

On July 24, 2006, LBSF and LBIE entered into the LBSF Side Letter.  Pursuant to

the LBSF Side Letter, LBSF and LBIE agreed that if a Client Transaction terminated or closed-

out a derivatives transaction, then the related, offsetting LBSF Back-To-Back Transaction would

contemporaneously terminate or close-out, and (i) a settlement amount payable by LBIE under

the Client Transaction would become a payable by LBSF to LBIE under the LBSF Back-To-

Back Transaction or (ii) a settlement amount actually paid to LBIE under the Client Transaction

would become a payable by LBIE to LBSF under the LBSF Back-To-Back Transaction.

Absent the LBSF Side Letter, damages arising from the LBSF Back-To-Back

Transactions would be calculated by valuing the LBSF Back-To-Back Transactions themselves

using the standard terms of the ISDA master agreement to which LBSF and LBIE were parties.

The LBSF Side Letter, as of 2006, changed the manner in which damages are calculated in

significant ways.  First, under transactions that result in a payable from LBIE to LBSF, LBSF

bears the risk that LBIE may be unable to collect a settlement payment from its client.  Second,

the LBSF Side Letter exposes LBSF to the risk that LBIE might unilaterally settle Client

Transactions in amounts that are higher (in the case of LBIE payables) or lower (in the case of

LBIE receivables) than what LBSF would have agreed to.  Third, LBIE's counterparties may, in

many cases, as a non-defaulting counterparty under ISDA, (i) assert more favorable termination

rights than would otherwise have been available to LBIE in its transactions with LBSF, and (ii)

attempt to control the calculation of damages under their Client Transactions.  Fourth, in

circumstances where LBIE negotiated a global settlement with a counterparty (and in some

cases, one of its affiliates) of a mix of Client Transactions and other relationships, LBIE's

allocation of claim amounts to the Client Transactions might be disputed by LBSF.

        The Debtors vigorously dispute the application of the LBSF Side Letter on several

grounds.  First, the Debtors believe that the LBSF Side Letter is too ambiguous to be properly

interpreted absent parole evidence.  The LBSF Side Letter is only one (1) page in length, and its

only operative language consists of one (1) paragraph that states, in pertinent part:

> In the event that a Client Transaction should terminate or be
> closed-out and a settlement amount be calculated in respect of that
> termination or close-out, LBIE and LBSF agree that the related,
> offsetting Intercompany Transaction will also terminate or be
> closed out contemporaneously, and a settlement amount
> determined as payable by LBIE under the Client Transaction will
> become payable by LBSF to LBIE as a settlement amount under
> the Intercompany Transaction, and a settlement amount payable to
> LBIE under the Client Transaction will become payable by LBIE
> to LBSF as a settlement amount under the Intercompany
> Transaction, but only to the extent LBIE actually receives that
> settlement amount from its client under the Client Transaction…

Although the LBSF Side Letter appears to suggest that LBIE and LBSF intended that LBSF be

the party bearing all risk for Client Transactions where LBSF Back-To-Back Transactions were

executed, the plain language of the LBSF Side Letter does not address whether certain

transactions are intended to be LBSF Back-To-Back Transactions.  Notably, LBSF terminated its

derivatives transactions with LBIE on December 12, 2008.  The Debtors assert that to the extent

the LBSF Side Letter applies at all, it does not apply to Client Transactions that had not been

terminated prior to December 12, 2008.  The plain language of the LBSF Side Letter does not

address this issue.

To the extent that parole evidence is admissible, the Debtors contend that the

validity and enforceability of the LBSF Side Letter may be challenged.  The LBSF Side Letter

was never intended to apply in the circumstances of LBIE and LBSF being subject to insolvency

or bankruptcy administration, as opposed to when a counterparty is subject to bankruptcy or

insolvency.  To the extent the LBSF Side Letter has any effect, the Debtors assert that it creates

an agency relationship between LBSF and LBIE, and that as such, LBIE should have no

discretion in settling its Client Transactions, given that LBSF is economically affected by such

settlements.

LBIE has rejected the Debtors' arguments, asserting, *inter alia*, that they lack

merit because they depend on parole evidence and, as a preliminary matter, the language of the

LBSF Side Letter is clear and unambiguous.  Moreover, LBIE has argued that the terms of the

LBSF Side Letter are enforceable against the Debtors as to all LBSF Back-To-Back

Transactions, irrespective of whether or not LBSF has terminated the LBSF Back-To-Back

Transactions before or after Client Transactions have been terminated because (i) the language of

the LBSF Side Letter does not contain any such temporal limitation and (ii) imposing that

limitation would render meaningless the protections provided to LBIE by the letter.

In addition to questions regarding the application of the LBSF Side Letter, its

impact, to the extent that it applies, has also been difficult for the Debtors to quantify.  The

Debtors have spent extensive time and resources analyzing and discussing with LBIE the

valuation of Client Transactions that LBIE has already settled, as well as the potential valuation of Client Transactions that LBIE has not yet settled.  These efforts are complicated by the fact that many Client Transactions have not been fully settled, with resultant uncertainty of the full scope of actual settlement proceeds payable to LBIE, or claims against LBIE.

Finally, the Debtors also believe that LBIE's claims under the LBSF Back-To-Back Transactions should be discounted to reflect the substantive consolidation risk that LBIE faces.  LBIE has vigorously disputed that it has any risk of substantive consolidation with other Lehman Affiliates, *inter alia*, because it is subject to a foreign insolvency proceeding, was established as a separate entity for regulatory purposes, and was supervised by the Financial Services Authority.  The Debtors, however, have argued that arrangements such as the LBSF Side Letter only strengthen their argument that, particularly as to creditor reliance, there is a risk of substantive consolidation with respect to LBIE.

LBSF and LBIE also have disputed their respective rights and claims arising from certain securities that LBSF contends were delivered to LBIE to hold as LBSF's custodian pursuant to custody agreements between LBSF and LBIE (the "LBSF Assigned Assets").  The majority of these securities are currently in the possession of other custodians such as LBI, and LBIE's ability to recover them is uncertain.  LBSF asserts ownership of these securities and, to the extent that LBIE is unable to recover them from other custodians, at a minimum, unsecured claims against LBIE for the value of the securities.  LBSF believes that these securities have a value in excess of $1 billion.  LBIE has rejected LBSF's claims against LBIE for the value of such securities.  It has contended that it has no liability to LBSF for such securities under both applicable law and applicable agreements, and LBIE has reserved its right to argue that LBIE itself had right, title and/or interests to these assets.

After extensive analysis and debate, including frequent consultation with the Creditors' Committee and its advisors, LBSF and LBIE agreed that the most effective way to resolve the various disputes over LBSF Back-to-Back Transactions and claims arising from the LBSF Assigned Assets would be (i) to assign LBSF's interest in the LBSF Assigned Assets to LBIE and (ii) provide LBIE an allowed claim in LBSF Class 5C in an amount of $900 million – a substantial reduction from the approximately $23.7 billion originally asserted.  The other Lehman UK Entities other than LBIE will have aggregate allowed claims against LBSF in the amount of $34.5 million.  LBSF, in turn, will have allowed claims against the Lehman UK Entities the amount of $601.5 million, which amounts are consistent with the reconciled books and records of the respective entities.

### 2.      Settlement with LBHI

#### a.      Guarantees of Back-To-Back Transactions

LBIE entered into similar letter agreements in July 2006 (together with the LBSF Side Letter, the "Side Letters") with several of its other affiliates as to transactions similar to the LBSF Back-To-Back Transactions (together with the LBSF Back-To-Back Transactions, the "Back-To-Back Transactions").  LBIE has asserted approximately $33.5 billion in Guarantee Claims against LBHI billion based upon Corporate Resolutions and Transactional Guarantees of the obligations of LBSF and other Lehman Affiliates, including LBF, LBCC and LOTC, to LBIE under the Back-To-Back Transactions.  As a result of the various arrangements and negotiations between LBIE and LBHI, and after (i) consideration of the same litigation risks described above as to the LBSF Side Letter, and (ii) applying a setoff against the full amount of LBHI's approximately $6.5 billion claim against LBIE, LBIE has agreed pursuant to the UK Settlement Agreement to waive its claim against LBHI on account of the Back-To-Back Transactions.

Notably, LBIE has argued that LBHI's approximately $6.5 billion claim is subject to certain adverse litigation risks, including the risk that the claim could be recharacterized as a capital contribution. Therefore, LBIE's agreement to setoff its claims against LBHI by the full amount of LBHI's claim against LBIE represents a significant concession by LBIE.

### b.    LB Lux

LB Lux, a Lehman Affiliate incorporated in Luxembourg, as an intermediary, mainly borrowed securities from third parties, and then lent them to LBIE under two different forms of agreements.[8] The lending arrangements were executed under either (i) an Overseas Lending Agreement (the "OSLA") or (ii) a Global Master Repurchase Agreement (the "GMRA" and, together with the OSLA, the "GMRA/OSLA"). LBIE then used the borrowed securities to trade with third parties.

Although both LB Lux and LBIE had the right to terminate the GMRA/OSLA upon LBIE's entry into UK administration, neither exercised the right until LBIE terminated the GMRA/OSLA on March 31, 2009. If the GMRA/OSLA had terminated upon LBIE's entry into UK administration, LBIE would not have any claim against LB Lux. But due to movements in the prices of the relevant securities, the delay in terminating the GMRA/OSLA resulted in LBIE filing a claim against LB Lux in the approximate amount of $6 billion for amounts allegedly due under the GMRA/OSLA. In addition, LBIE asserted a corresponding Guarantee Claim against LBHI in the same amount (the "LBIE-Lux Guarantee Claim") based on (i) an Entity-Specific Guarantee of LB Lux's obligations dated August 24, 2000 (the "LB Lux Guarantee") and (ii) the Corporate Resolutions.

---

[8] LB Lux was subjected to liquidation on April 1, 2009 in Luxembourg.

Based upon its own valuation of the securities traded between LBIE and LB Lux, LBHI does not dispute that LBIE would hold an approximately $6 billion claim if March 31, 2009 termination date values were applied.  However, LBHI believes that there are credible defenses to the LBIE-Lux Guarantee Claim on several legal and equitable grounds:

- LBHI contends that the GMRA/OSLA automatically terminated by its terms upon LBIE's entry into UK administration proceedings. If LBHI were to prevail in this argument, LBIE might have no claim against LB Lux.  LBIE disputes this construction of the GMRA/OSLA, asserting that termination did not occur until LBIE gave notice of termination.

- Based on LBHI's review of the facts relating to the administration of LB Lux's proceedings, LBHI believes that LBIE may have had duties, contractual or otherwise, to assist LB Lux in connection with the GMRA/OSLA.  LBIE has vigorously disputed these contentions.

- LBHI has also asserted that the LBIE-Lux Guarantee Claim is susceptible to the same enforceability and substantive consolidation risks as other Guarantee Claims.  LBIE disputes this, contending that it can show both knowledge of and reliance on the LB Lux Guarantee and the Corporate Resolution.

Based on some of the same theories, LB Lux has also rejected LBIE's approximately $6 billion direct claim, the resolution of which is the subject of pending litigation in Luxembourg (the "LBIE-Lux Litigation").

Notwithstanding these pending disputes, LBIE and LBHI have acknowledged that the litigation of those novel and fact-intensive issues would potentially delay distributions to holders of allowed claims.  Because LBHI believes that LBHI and LBIE have the vast majority of the claims that have been asserted against LB Lux (LBHI has claims against LB Lux in the amount of approximately $1 billion), LBHI and LBIE have determined that it is in the best interests of their respective estates to reach a pragmatic, economic resolution to their dispute. Accordingly, LBIE and LBHI have agreed to make reasonable efforts to seek a stay of the LBIE-Lux Litigation, and to resolve the LBIE-Lux Guarantee Claim.  LBIE and LBHI also have

agreed to cooperate in an effort to maximize their respective recoveries, expedite distributions from the LB Lux liquidation and share such distributions 45% to LBHI and 55% to LBIE.  LBHI believes this resolution provides it with material value because (i) it will enable an expeditious distribution of LB Lux's substantial and valuable assets and (ii) it provides LBHI with a favorable share of such LB Lux distributions, *i.e.*, 45% in comparison to 14%, which would be its *pro rata* distribution based upon the relative size of LBIE's asserted and LBHI's allowed claims against LB Lux (*i.e.*, $1 billion compared to $6 billion).

### c.    Bankhaus Client Money Claim

On September 12, 2008, LBIE transferred certain clients' money in the aggregate amount of approximately $1.008 million to Bankhaus, with the alleged understanding that approximately $1.008 million was to be repaid, with interest, on September 15, 2008.  It was not repaid.  Accordingly, on December 22, 2009, LBIE filed a petition with the Frankfurt am Main Regional Court in Germany (the "Frankfurt Court"), claiming a "right of separation" with respect to approximately $1.008 million (the "Bankhaus Client Money Claim") – *i.e.*, that approximately $1.008 million should be returned to LBIE in its entirety, with interest – because the funds were client money.  Bankhaus has objected to the LBIE petition and asserted that the $1.008 million claim should be treated as an intercompany loan that, under the German Insolvency Code, could be automatically subordinated to all other creditor claims against Bankhaus.  On October 7, 2010, the Frankfurt Court dismissed LBIE's petition.  LBIE subsequently appealed.  On appeal, the decision of the Frankfurt Court was reversed and remanded for reconsideration by the Frankfurt Court.

LBIE has asserted a Guarantee Claim against LBHI on account of the client money that it deposited with Bankhaus based upon (i) an Entity-Specific Guarantee of

Bankhaus's obligations dated November 21, 2002 (the "Bankhaus Guarantee") and (ii) the

Corporate Resolutions (the "LBIE/Bankhaus Guarantee Claim").  LBIE also asserted that

because the Bankhaus Client Money Claim was made on behalf of its clients, the corresponding

LBIE/Bankhaus Guarantee Claim against LBHI lacks mutuality with LBHI's approximately $6.5

billion Intercompany Claim and therefore, cannot be set off.  LBHI has disputed this alleged lack

of mutuality.  LBIE also has disputed the enforceability of the LBIE/Bankhaus Guarantee Claim,

and in addition, has asserted that the claim is subject to the risk of substantive consolidation.

After consideration of the risks involved in LBIE's litigation with Bankhaus, the

strengths and weaknesses of the arguments concerning the Bankhaus Guarantee, the Corporate

Resolutions, and the possibility of substantive consolidation, and in consideration of other very

substantial benefits provided to LBHI by the Lehman UK Entities as part of an integrated

settlement, LBHI and LBIE have agreed to resolve their disputes concerning the LBIE/Bankhaus

Guarantee Claim by allowing LBIE a Guarantee Claim (Class 4B) against LBHI in the amount

of $1.008 million (the "Allowed LBIE Guarantee Claim"), but subject to the condition that LBHI

will not have to pay distributions to LBIE on account of any portion of the Allowed LBIE

Guarantee Claim that is paid in full from Bankhaus.

### d.    R3/JPM Claims

As part of the overall review of the parties' respective claims, LBIE has agreed to

treat certain claims now held by LBHI against LBIE as third-party claims, *i.e.*, not subject to

offset.  Specifically, LBIE will grant third party treatment to the following claims:

- all LBHI claims as to which LBHI is a subrogee of JPMorgan Chase Bank, N.A., or any of its affiliates (each, a "JPM Entity"), against LBIE, to the extent of the distributions by LBHI or applied from LBHI's property to such JPM Entity pursuant to that certain Collateral Disposition Agreement among JPMorgan Chase Bank, N.A. and the Debtors dated March 16, 2010 (the "JPM Claim"); and

- all claims assigned to LBHI pursuant to that certain Assignment of Claim entered into as of October 17, 2008, between R3 Capital Partners Master, L.P. ("R3") and LBHI, and for which, prior to the Execution Date, LBHI is subrogated to a claim of R3 against LBIE (the "R3 Claim" and together with the JPM Claim, the "JPM/R3 Claims")

LBIE and LBHI have agreed to an expedited timeframe for LBIE to review the JPM/R3 Claims, with the expectation that the parties will seek to reach a consensual resolution with respect to the allowed amount of the JPM/R3 Claims.

### e.    Other Claims Against LBHI and Against Lehman UK Entities

After extensive negotiations concerning the amount, validity, and enforceability of claims based on the Corporate Resolutions and Entity-Specific Guarantees, LBHI and the Lehman UK Entities (other than LBIE) have agreed to Guarantee Claims against LBHI in an aggregate amount of approximately $1.6 billion. This reduction from the approximately $21.8 billion in Guarantee Claims asserted by the other Lehman UK Entities takes into account a reconciliation between LBHI and the Lehman UK Entities of their books and records, a review of the facts relating to each Lehman UK Entity and its claims, and the risks of enforceability of the Corporate Resolutions, substantive consolidation, and other issues relating to Guarantee Claims generally described above.

LBHI and the Lehman UK Entities (other than LBIE), also, as part of the settlement, have agreed on the allowed amounts for the direct claims of such Lehman UK Entities against LBHI, and LBHI's direct claims against them. Accordingly, pursuant to the UK Settlement Agreement, (i) the Lehman UK Entities (other than LBIE) shall have allowed direct claims against LBHI in an aggregate amount of approximately $4.5 billion in LBHI Class 4A and (ii) LBHI shall have allowed, unsecured claims against certain of the Lehman UK Entities

(other than LBIE) in an aggregate amount equal to approximately $5.6 billion.  LBHI believes

that these amounts are consistent with the reconciled books and records of the respective entities.

### 3.    Settlements with LCPI, LOTC, LBCC, LBCS and Other Debtors

As a result of the extensive reviewing and reconciling of intercompany balances,

the parties have agreed to unsecured Intercompany Claim amounts against Debtors other than

LBHI and LBSF.  Certain Lehman UK Entities (including LBIE) will have allowed claims

against (i) LCPI, (ii) LOTC, (iii) LBCC, (iv) LBCS, and (v) certain other Debtors in aggregate

respective amounts equal to approximately (i) $303.6 million, (ii) $68.1 million, (iii) $139,764,

(iv) $659,343 and (v) $2,310.  Each of these amounts fairly reflects what the Debtors believe are

the obligations owed to the particular Lehman UK Entities.  As part of the process, the Lehman

UK Entities' claims against LBCC have been substantially reduced (along with any

corresponding Guarantee Claims against LBHI) from the originally asserted aggregate amount of

approximately $2.8 billion to $139,764.

Pursuant to the UK Settlement Agreement, (i) LBCS, (ii) LCPI, and (iii) other

Debtors will have allowed unsecured claims against the Lehman UK Entities in aggregate

respective amounts equal to approximately (i) $76.3 million, (ii) $32.3 million, and (iii)

$441,462.  These amounts fairly reflect the parties' obligations.

### 4.    The Farrallon Objection Should Be Overruled

Only one objection has been interposed to the UK Settlement Agreement (the

"Farrallon Objection"), by Farallon Capital Partners, L.P., Farallon Capital (AM) Investors L.P.,

Farallon Capital Institutional Partners II, L.P., Farallon Capital Offshore Investors II, L.P. and

Noonday Offshore, Inc. (collectively, "Farallon") [ECF No. 21643].  Farrallon does not assert

that the UK Settlement Agreement fails to meet the standard for approval of a settlement under

Bankruptcy Rule 9019.  Rather, the Farrallon Objection merely states that, as of the date of such

objection, the Debtors have not shown that the UK Settlement Agreement meets the requisite standard.  The Debtors submit that in this Memorandum they have demonstrated that the UK Settlement Agreement is manifestly fair and reasonable and in their best interests, and falls well above the lowest range of reasonableness.  Thus, the Farrallon objection should be overruled.

The Farrallon Objection also speculates, with no evidentiary support, that the UK Settlement Agreement *may* not be in the best interests of LBHI because "the proposed settlement *may* involve LBHI subsidizing a more favorable settlement for the benefit of other Debtors and creditors, in particular Lehman Brothers Special Financing Inc."  (Farrallon Objection ¶¶ 15-16) (emphasis added).  This is patently wrong.  Although the UK Settlement Agreement is a highly integrated settlement, as demonstrated herein, LBHI received substantial material benefits from the UK Settlement Agreement.

Finally, the Farrallon Objection argues that consideration of the UK Settlement Agreement should be conducted separately from the confirmation of the Plan because the current timetable does not provide the Court and parties in interest "sufficient time to canvass the issues and probe the settlement."  (Objection ¶ 27.).  This argument is procedurally barred by this Court's September 1, 2011 order approving the very timetables to which Farrallon objects.  Farrallon's opportunity to object to this timetable has passed.  More importantly, LBIE has an absolute and unconditional termination right if the UK Settlement Agreement is not approved as part of the Plan.  If the UK Settlement Agreement is terminated, and the Debtors lose the support of the Lehman UK Entities, the Debtors' confirmation hearing is likely to be delayed and become fiercely contested.  Furthermore, all the benefits of the UK Settlement Agreement would fall away, resulting in a tremendous loss of time, money, and value to the Debtors and their

stakeholders.  For the foregoing reasons, the Debtors submit that Farrallon has failed to establish

any basis for its objection and it should be overruled.

### 5.    The UK Settlement Agreement Should Be Approved

The UK Settlement Agreement satisfies every relevant factor identified by the

Supreme Court in *TMT Trailer Ferry* that courts consider when determining whether a

settlement is "fair and reasonable" and "in the best interests of the estate."  Specifically:

- **Probability of Success in Litigation.**  The UK Settlement Agreement resolves a multiplicity of novel, complex, fact-intensive, and in some cases, unprecedented issues.  The outcome of any litigation concerning these issues is highly uncertain.

- **Complexity and Likely Duration of Litigation.**

   - Pursuant to the UK Settlement Agreement, the Debtors and their UK Affiliates have been able to resolve, fully and finally, a myriad of intercompany claims and complex, difficult and sometimes, novel legal issues between their respective estates that, absent a settlement, and with fact specific, extensive discovery, would take years to adjudicate at great expense and delay.

   - To the extent that the disputes were prosecuted to a final judgment, there is a realistic possibility of inconsistent rulings in the US and the UK that would frustrate the enforceability of such final judgments, further delaying final resolutions between the Debtors and the Lehman UK Entities.  The Lehman UK Entities have already made applications to the UK High Court for directions relating to the Side Letters and other issues that impact the Debtors' estates.  Absent the settlement, the Debtors would need to expend substantial resources to commence actions in this Court as to the issues and disputes discussed, in order to preserve rights and maximize recoveries for their economic stakeholders.  If the foregoing issues were prosecuted to a final judgment in two separate, sovereign jurisdictions, a deadlock might ensue to the major prejudice of expeditious resolution.

   - The Lehman UK Entities have also agreed, as part of the settlement, to support the Plan.  Their support will prevent extended litigation with respect to confirmation of the Plan.

- **Proportion of creditors who do not object to/affirmatively support the settlement.**  Only one (1) creditor has objected to the UK Settlement

Agreement – and that creditor has not alleged that the UK Settlement Agreement falls below the lowest point in the range of reasonableness. All classes of creditors eligible to vote on the Debtors' Plan (including, of course, the class of which the lone objecting creditor is a member) have represented their support for the UK Settlement Agreement by voting overwhelmingly in support of the Plan. The Creditors' Committee was deeply involved in the negotiation of the UK Settlement Agreement and supports the settlement. The end result of the process is the settlement that has the support of the Creditors' Committee and an overwhelming majority of each Debtor's creditors.

- **Competence and Experience of Attorneys and Other Professionals Who Support the Settlement.** The Debtors, the Creditors' Committee and the Lehman UK Entities are all highly sophisticated and are represented by experienced and knowledgeable attorneys and other professionals.

- **Extent to Which the Settlement Is the Product of Arm's-length Bargaining.** The UK Settlement Agreement is "the product of a spirited negotiation in which sophisticated adversaries and their expert advisors bargained with each other aggressively and in good faith" for more than two (2) years in the effort to reach a consensual resolution of these issues. "The give and take of that process helps to validate the fairness of the result." *In re Charter Commc'ns*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009).

Above all, the benefits to be received by the Debtors because of the UK Settlement Agreement are valuable and manifestly in their best interests. Subject to certain limited excluded items, the UK Settlement Agreement achieves a full and final reconciliation of substantially all Intercompany Claims between the Debtors and the Lehman UK Entities. It resolves billions of dollars of disputes concerning the allowable amounts of claims and the ownership rights to certain assets. The UK Settlement Agreement results in a substantial reduction in some of the largest contested claims that have been filed against the Debtors. Resolution of these claims obviates the need for substantial reserves. Significantly, and most importantly, the UK Settlement Agreement eliminates the need for expensive, protracted litigation over novel, complex, fact-intensive issues that would consume the Debtors' estates for

many years and potentially result in much greater claims allowed against the Debtors' estates to the detriment of their other creditors.

The UK Settlement Agreement is unquestionably beneficial for LBHI. Having initially asserted more than $122.8 billion in Guarantee Claims against LBHI, the Lehman UK Entities have agreed to Guarantee Claims against LBHI in an aggregate amount equal to approximately $2.6 billion. Of this aggregate amount, LBIE will have only a single Guarantee Claim against LBHI in the amount of $1.008 billion based upon the Bankhaus Guarantee and relating to LBIE's client money claim against Bankhaus. If LBIE's claim against Bankhaus is ultimately granted a full right of separation, and paid in full by Bankhaus, LBIE will have no claims against LBHI. When compared with the approximately $101.1 billion claim that LBIE initially asserted against LBHI, this end result reflects not only a recognition of the legal and factual issues relevant to the LBIE claims, but also a full recognition of, and waiver of any defenses against, LBHI's approximately $6.5 billion dollar claim against LBIE.

In addition to this substantial reduction in claims against LBHI, LBHI has obtained material benefits as a result of the UK Settlement Agreement:

- LBHI has negotiated a favorable division of distributions from the LB Lux insolvency proceeding so that LBHI will receive 45% of distributions – more than that to which it would have been entitled if it shared with LBIE's asserted $6 billion claim on a *pro rata* basis (*i.e.*, 14%). LBHI believes that LB Lux's estate has substantial assets to distribute. By agreeing to share distributions 45%/55%, LBHI will substantially increase its recoveries from LB Lux.

- Although LBHI will have no net claim against LBIE, LBHI expects to realize material recoveries from its $5.6 billion in claims against the other Lehman UK Entities. Absent a settlement, these recoveries would have been delayed and fraught with uncertainty. LBHI would need to prove its Intercompany Claims against each Lehman UK Entity, submitting thousands of line-items from Lehman's idiosyncratic financial reporting systems to the rigors of relevant evidentiary requirements in the UK, and the scrutiny of the UK courts. LBHI would also need to object to the

Lehman UK Entities' Guarantee Claims against LBHI and seek to expunge or reduce them before it could assert its full net claims against the Lehman UK Entities. Adjudication of the Lehman UK Entities' Guarantee Claims against LBHI would require fact-intensive litigation, involving enormous amounts of discovery, documentary evidence, and witness testimony to prove the requisite knowledge and reliance upon the relevant Corporate Resolutions and Entity-Specific Guarantees. The resultant complication and delay would quickly erode the value of any distributions that LBHI would otherwise have realized from the Lehman UK Entities.

- ▪ LBHI expects to realize value from the R3/JPM Claims as a result of LBIE's agreement to treat these claims as third-party claims that are not subject to setoff by LBIE's claims against LBHI.

LBSF has also received undeniably substantial benefits from the UK Settlement Agreement. LBIE has agreed to reduce its claim against LBSF in the amount of approximately $23.7 billion to $900 million in recognition of the litigation risks attendant to the LBSF Side Letter, and in consideration for the value of the LBSF Assigned Assets. By crediting the value of the LBSF Assigned Assets to the reduction of LBIE's claim against LBSF, the parties have also resolved their dispute concerning the value and ownership of these assets. LBSF will therefore realize substantial value from these assets, despite the fact that LBIE disputes LBSF's rights to these securities, and notwithstanding LBIE's uncertain ability to recover these securities. Any litigation over the LBSF Side Letter is also avoided to LBSF's benefit. In light of the novel and complicated issues involved, any litigation over the LBSF Side Letter would be extremely uncertain, difficult, and fact-intensive. Distributions by LBSF might be substantially delayed on account of such litigation and, potentially, materially reduced. Absent the UK Settlement Agreement, parties would be mired in extensive discovery and valuation disputes regarding thousands of derivatives trades potentially covered by the LBSF Side Letter.

The Lehman UK Entities' claims against other Debtors have also been substantially reduced – most notably, the claims against LBCC, which have been reduced from

approximately $2.8 billion to $139,764. At the same time, the Debtors with net claims against

the Lehman UK Entities have been able to crystallize those claims, some of which are billions of

dollars and will be allowed claims in the UK proceedings, thus avoiding the need to subject these

claims to any adjudication by the UK courts.

For all the foregoing reasons, it is abundantly clear that the UK Settlement

Agreement is in each Debtor's best interests and falls well above the lowest range of

reasonableness, and should be approved.

### C.    SETTLEMENT WITH BANKHAUS

Bankhaus, a German bank and Lehman Affiliate established to conduct certain

banking activities, is regulated by Germany's Federal Supervisory Authority, *Bundesanstalt für

Finanzdienstleistungsaufsicht* ("BaFin") and the German Federal Reserve Bank (*Deutsche

Bundesbank*). Insolvency proceedings were opened in respect of Bankhaus by the Frankfurt

Court on November 13, 2008. On April 29, 2009, Bankhaus filed a chapter 15 petition for

recognition in this Court, and on May 22, 2009, this Court entered an order which, among other

things, recognized Bankhaus's insolvency proceeding as a foreign main proceeding pursuant to

section 1517 of the Bankruptcy Code.

Bankhaus filed claims against the Debtors in an aggregate amount of $39.3

billion. During the course of two years, the Debtors and Bankhaus engaged in extensive arm's-

length negotiations concerning these claims. A portion of Bankhaus's claim against LBHI was

previously allowed pursuant to a settlement agreement approved by this Court on January 14,

2010, ECF No. 6665 (the "Initial Bankhaus Claims Settlement Agreement"). On March 1, 2011,

the Debtors and certain Debtor-Controlled Entities entered into a second settlement agreement

with Bankhaus (the "Bankhaus Settlement Agreement").

1.        **Settlement With LBHI Relating to SCA Claim**

Bankhaus's asserted claims against LBHI are primarily based on the Security &

Collateral Agreement between LBHI and Bankhaus, dated August 15, 2002 (the "SCA").

Pursuant to the SCA, for regulatory reasons under German banking law, LBHI agreed to post

cash collateral to Bankhaus in respect of any losses suffered by Bankhaus if either an asset

decreases in value below a certain level, or a borrower fails to make a payment when due and

payable.  Based on alleged shortfalls in Bankhaus's assets, Bankhaus filed a partially

unliquidated claim against LBHI (the "SCA Claim"), and asserted that the SCA Claim could be

as high as $29.9 billion.

LBHI disputed the magnitude of this claim, and asserted that Bankhaus had

undervalued its assets.  For approximately two years, LBHI held discussions with Bankhaus

concerning the value of Bankhaus's assets, and the proper calculation of any shortfalls that

would give rise to a claim against LBHI under the SCA.  Because the majority of Bankhaus's

assets consist of real estate and commercial loans, LBHI's real estate and corporate loans teams

conducted extensive and detailed diligence concerning the value of these assets.  These teams

also consulted extensively with the Creditors' Committee and their advisors in arriving at their

valuations.  As a result of these negotiations, LBHI and Bankhaus have agreed that Bankhaus

will have an allowed, general unsecured claim against LBHI on account of the SCA (exclusive of

the claim previously allowed pursuant to the Initial Bankhaus Claims Settlement Agreement) in

an aggregate amount equal to approximately $6.4 billion (the "Allowed SCA Claim").[9]  The

---

[9] On March 23, 2011, this Court approved two note purchase agreements (the "NPAs") [ECF No.
15287], pursuant to which LBHI agreed to purchase Bankhaus's interest in certain notes with an
aggregate outstanding principal amount of approximately $1,543 million, for an aggregate
purchase price of $957 million.  One of the NPAs provides that if a chapter 11 plan incorporating
the terms of the Bankhaus Settlement Agreement is not confirmed on or before December 31,

Allowed SCA Claim substantially reduces the amounts initially asserted by Bankhaus against LBHI. The Allowed SCA Claim reflects the parties' agreement concerning the value of Bankhaus's assets and certain discounts on account of the enforceability of the SCA, and the substantive consolidation risks attendant to Bankhaus.

### 2. Settlements With Other Debtors Relating To Swaps And Repos

Bankhaus also filed a $1.24 billion claim against LCPI arising from certain repurchase agreements, and a largely unliquidated claim against LBSF arising from certain swap agreements. For the past two years, LCPI, LBSF and Bankhaus have worked diligently to reconcile all the relevant trades and determine the net claims arising therefrom. As a result of these extensive, rigorous, arm's-length negotiations, certain net claims will be allowed against LCPI and LBSF pursuant to the Bankhaus Settlement Agreement. Specifically, pursuant to the Bankhaus Settlement Agreement:

- Bankhaus will have allowed claims against LCPI in an aggregate amount of approximately $1.3 billion,[10] subject to certain reductions, as described in detail in the Bankhaus Settlement Agreement.

- Bankhaus will have an allowed claim against LBSF in an amount equal to $1.2 billion, subject to certain reductions, as described in detail in the Bankhaus Settlement Agreement.

These net claim amounts have been set off against the claims that LCPI and LBSF have against Bankhaus, which have been allowed pursuant to the Bankhaus Settlement Agreement, in the amount of approximately $320.9 million and $69.3 million, respectively. In addition, LBCC and

---

2012, LBHI is obligated to pay an additional $100 million to Bankhaus as further consideration for certain of the notes.

[10] This amount does not include the LCPI Claim (defined below) which was previously allowed pursuant to the Initial Bankhaus Claims Settlement Agreement.

LBCS will have allowed, non-subordinated, non-priority unsecured net claims against Bankhaus in amounts equal to approximately $102 million and $149.7 million, respectively.

### 3.    The Bankhaus Settlement Agreement Should Be Approved

The Bankhaus Settlement Agreement is the product of two years of arm's-length, good faith negotiations between the Debtors and Bankhaus.  As a result of extensive due diligence conducted by the LBHI (in consultation with the Creditors' Committee and its advisors) with respect to the value of Bankhaus's assets, the amount of the SCA Claim against LBHI has been substantially reduced.  The Allowed SCA Claim adequately reflects the value of Bankhaus's assets and the litigation risks attendant to the SCA on account of, among other things, substantive consolidation.  With respect to the other Debtors, the Bankhaus Settlement Agreement represents the intensive and comprehensive efforts to fully reconcile Bankhaus's intercompany trading relationships with the LBSF and LCPI, and liquidate any claims arising from such trades.

There are no objections to the Bankhaus Settlement Agreement.  Bankhaus has informed the Debtors that the Bankhaus Creditors' Committee (*Gläubigerausschuss*) approved the Bankhaus Claims Settlement Agreement on or about March 17, 2011, and the Bankhaus Creditors' Assembly (*Gläubigerversammlung*) approved the settlement on or about April 14, 2011.  For all the foregoing reasons, the Debtors submit that the Bankhaus Settlement Agreement is in the best interests of the Debtors and their respective estates and creditors, falls well above the lowest point in the range of reasonableness, and should be approved.

### D.    SETTLEMENTS WITH LBT AND LBSN

LBT is a private limited liability company under Dutch law established for the purpose of obtaining financing for general business operations of the Lehman enterprise through the issuance of notes primarily in Europe and Asia (the "Programs").  Under the Programs, LBT

issued structured notes with a variety of characteristics (the "Structured Notes") to individuals

and financial institutions.  Pursuant to a loan agreement, dated May 26, 2000 (the "Loan

Agreement"), the proceeds generated from LBT's issuance of Structured Notes were upstreamed

to LBHI and used by LBHI to fund the operations of the Lehman enterprise in exchange for

LBHI's obligation to repay such amounts to LBT.  LBHI guaranteed LBT's obligations to the

LBT Noteholders under the Structured Notes.  The LBT Noteholders have asserted billions of

dollars in Guarantee Claims against LBHI.

Similar to LBT, Lehman Brothers Securities N.V. ("LBSN") was established as a

limited liability company incorporated in Curaçao for the purpose of raising general corporate

financing for LBHI through the issuance of warrants and certificates (the "Warrants and

Certificates") to institutional and private investors (the "W&C Holders") under various Warrant

and Certificate Programs (the "W&C Programs").  Like the Structured Notes, the proceeds of the

Warrants and Certificates were loaned to LBHI in exchange for LBHI's obligation to repay the

loans.  LBHI also guaranteed LBSN's obligations under the W&C Programs.

Periodically, LBT and LBSN also entered into derivatives transactions with other

Lehman Affiliates, including certain of the Debtors, to hedge the risk of the derivatives element

of the Structured Notes and Warrants and Certificates, respectively.

### 1.    Asserted Claims and Defenses

LBT asserted an approximately $34.8 billion claim against LBHI on account of

amounts due under the Loan Agreement (the "LBT Intercompany Claim").[11]  LBT also filed

partially unliquidated claims against LBHI based upon Transactional Guarantees and the

---

[11] LBT also filed a $34 billion Guarantee Claim (the "LBT Loan Guarantee Claim"), based on a
purported guarantee by LBHI of the Loan Agreement.  LBT has acknowledged that the LBT
Loan Guarantee Claim is duplicative of the LBT Intercompany Claim, and has agreed that it
should be disallowed pursuant to the settlement agreement described below.

Corporate Resolutions, relating to damages arising from the termination of LBT's derivatives trades with other Lehman Affiliates, including certain Debtors. LBSN filed an approximately $6.1 billion claim against LBHI based upon LBSN's loan to LBHI of the proceeds generated from the issuance of Warrants and Certificates (the "LBSN Intercompany Claim"). LBSN also filed claims in excess of $383.9 million against LBHI based on among other things, Transactional Guarantees and Corporate Resolutions relating to LBSN's derivatives trades with other Lehman Affiliates.

The books and records of LBHI and LBT reflect, consistent with the Global Close, that approximately $34 billion of Structured Note proceeds had been lent to LBHI as of the Commencement Date. While the amount of the LBSN Intercompany Claim has been partially disputed by LBHI, generally, as with the LBT Intercompany Claim, LBHI has not disputed that at least $5 billion of Warrant and Certificate proceeds had been lent to LBHI as of the Commencement Date. Moreover, the LBT Intercompany Claim and the LBSN Intercompany Claim are based upon executed loan agreements – a fact that distinguishes these intercompany claims from most others that were undocumented, and are evidenced only by electronic entries in Lehman's intercompany accounting systems.

LBHI initially disputed the LBT Intercompany Claim and LBSN Intercompany Claim, asserting that such claims should be reduced by as much as 50%, in light of the particularly unique and high degree of risk that LBT and LBSN could be substantively consolidated. As entities whose sole activity was the sale of securities to raise general corporate financing for the Lehman enterprise through upstreaming proceeds to LBHI, the Debtors and the Creditors' Committee questioned whether LBT and LBSN had an independent existence and whether creditors could have reasonably relied on the independent credit of LBT and LBSN in

extending credit to those entities.  From the perspective of direct LBHI bondholders that have

only one claim against LBHI, the allowance of the LBT Intercompany Claim and LBSN

Intercompany Claim in full is highly inequitable as it results in LBT Noteholders and W&C

Holders receiving multiple recoveries merely because their securities were issued through a

conduit financing entity that lacked any separate corporate purpose rather than issued directly by

LBHI.

  The LBT Trustees and certain a number of major LBT Noteholders strenuously

disputed the contention that LBT could be substantively consolidated.  These creditors noted, for

example, that LBT and LBSN strictly adhered to many corporate formalities, had home offices in

the Netherlands and Curacao, maintained separate books and records, and – unlike many

Affiliates – had bank accounts held in their own names.  Such creditors also argued, based upon

the various offering documents for the Structured Notes, that they relied on the separateness of

LBT and LBSN and the guarantees of their obligations by LBHI as clearly identified and

advertised.

  In light of the magnitude of the LBT Intercompany Claim and the number and

amount of Guarantee Claims asserted by LBT Noteholders against LBHI, it was evident to the

Debtors, the Creditors' Committee, and other major stakeholders that a resolution of the highly

controverted issues would be beneficial.  Unless the LBT Intercompany Claim was allowed in its

reconciled net amount and without discount, LBT Noteholders would not have accepted the

settlement of substantive consolidation that is incorporated into the Global Settlement through

the Plan Adjustment.  In order to achieve the Global Settlement and obtain the consent and

support of the LBT Noteholders for the Plan, in particular the treatment of Guarantee Claims

under the Plan, the settlements provide that the LBT Intercompany Claim will be treated in a manner consistent with the Debtors' treatment of, and settlements with, other Foreign Affiliates.

### 2. The LBT and LBSN Settlement Agreements Should be Approved

After careful deliberation, and as a result of intensive, arm's-length negotiations with LBT and the LBT Noteholders, LBHI determined that it was appropriate to treat the LBT Intercompany Claim in a similar manner as non-guarantee claims of other Affiliates. In order to achieve the Global Settlement in June 2011, in exchange for the mutual concessions of the parties that led to the Global Settlement, the second amended Plan filed on July 1, 2011 provided for the allowance of the LBT Intercompany Claim in the amount of $34.548 billion. In accepting the Global Settlement and executing their Plan Support Agreements, all Plan support parties and the Creditors' Committee have agreed to the allowed LBT Intercompany Claim.

On August 30, 2011, the Debtors entered into a settlement agreement with LBT (the "LBT Settlement Agreement"), a copy of which is annexed to the Plan as Schedule 6, to memorialize the allowance of the LBT Intercompany Company in accordance with the Global Settlement. In addition, pursuant to the LBT Settlement agreement, (i) LBSF will have an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBT in an amount equal to approximately $1.0 billion; and (ii) LBCS will have an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBT in an amount equal to approximately $43.5 million.

Similarly, on October 19, 2011, the Debtors entered into a settlement agreement (the "LBSN Settlement Agreement")) with LBSN, a copy of which is incorporated into the Plan Supplement as Exhibit 5. Pursuant to the LBSN Settlement Agreement, LBSN will have an allowed, senior, non-priority, non-subordinated general unsecured claim against LBHI in LBHI Class 4A in a net amount equal to approximately $5.2 billion. Pursuant to the LBSN Settlement

Agreement, LBSN will also have (i) an allowed, non-priority, non-senior, non-subordinated

general unsecured claim against LBSF in LBSF Class 5C in a net amount equal to approximately

$74.8 million; and (ii) an allowed, non-priority, non-senior, non-subordinated general unsecured

claim against LBCC in LBCC Class 5C in a net amount equal to approximately $1.3 million.

Each of LBT and LBSN has agreed to waive all other claims that they have asserted against

LBHI based upon Transactional Guarantees and the Corporate Resolutions, and related to

derivatives transactions with other Lehman Affiliates.

There are no objections to the LBT Settlement Agreement or the LBSN

Settlement Agreement.  The Debtors have been informed that the supervisory judges overseeing

the bankruptcy proceedings of LBT and LBSN have both approved their respective settlement

agreements.

The Global Settlement embodied in the Plan could not have been achieved unless

the Debtors agreed to allow the LBT Intercompany Claim and the LBSN Intercompany Claim in

the amounts set forth in the LBT Settlement Agreement and LBSN Settlement Agreement,

respectively.  In the Debtors' judgment, the Global Settlement and the confirmation of the

Debtors' Plan are benefits that far outweigh any concessions made in respect of these

Intercompany Claims.  For all the foregoing reasons, the Debtors submit that the LBT Settlement

Agreement and LBSN Settlement Agreements are fair and reasonable and in the best interests of

the Debtors and their estates, and should be approved.

### E.     SETTLEMENT WITH THE LEHMAN HONG KONG ENTITIES

Lehman's businesses in Asia were expansive and complex, and conducted

through various entities based throughout the region.  On September 16, 2008, the Securities and

Futures Commission in Hong Kong restricted the trading activities of four regulated Lehman

Hong Kong Entities.  Subsequently, on September 17 and dates thereafter, the High Court of the

Hong Kong Administrative Region (the "Hong Kong Court") placed the Lehman Hong Kong Entities into provisional liquidation; on November 19 and dates thereafter, these entities were placed into liquidation.

### 1. Asserted Claims and Defenses

The Lehman Hong Kong Entities filed numerous claims against the Debtors on account of, among other things, (i) derivatives transactions; (ii) intercompany funding balances; (iii) failed and/or pending trades; (iv) stock lending/borrowing transactions; (v) repurchase and reverse repurchase transactions; (vi) money market placements; (vii) subordinated loans; (viii) custody arrangements respecting securities, cash and other property; (ix) collateralized debt obligations. Many of these claims were asserted in unliquidated amounts. These claims are extremely complex, involve difficult issues of law and are fact intensive.

In addition, certain Lehman Hong Kong Entities filed Guarantee Claims against LBHI in both liquidated and unliquidated amounts based upon both Transactional Guarantees and Corporate Resolutions. The largest Guarantee Claims were filed by Lehman Brothers Asia Holdings Ltd. ("LBAH") in an aggregate amount of approximately $4.8 billion and by Lehman Brothers Commercial Corporation Asia Ltd. ("LBCCA" and, together with LBAH, the "Relevant HK Entities"), in an aggregate amount equal to approximately $1.6 billion. In total, the liquidated amounts filed against the Debtors by all of the Lehman Hong Kong Entities summed approximately $10.5 billion.

In contrast, LBHI asserted claims against the Relevant HK Entities that, in the aggregate, total approximately $11 billion. As a result, LBHI is a net creditor of the Relevant HK Entities, and is in fact the largest creditor of LBAH. The Debtors estimate that the Relevant HK Entities will make significant distributions to holders of allowed claims.

The Debtors raised numerous challenges to the Guarantee Claims asserted by the Relevant HK Entities against LBHI, principally on the basis that the Lehman Hong Kong Entities lacked any knowledge or reliance on the Corporate Resolutions. The Lehman Hong Kong Entities had vigorously disputed the Debtors' assertions and asserted that based on extensive interviews and records, sufficient evidence could be produced to prove the requisite degree of knowledge and reliance. In addition, the Lehman Hong Kong Entities took the position that their estates could not be substantively consolidated because they were regulated entities and were subject to foreign administration. The potential for extended and expensive litigation loomed.

In addition to disputing the Guarantee Claims asserted by the Lehman Hong Kong Entities, the parties challenged the asserted amounts of claims arising from intercompany derivatives transactions. The complex intercompany transactions among the Debtors and Lehman Hong Kong Entities raise many uncertainties. In light of the substantial amounts at stake and in order to avoid the cost, delay, expense and uncertainty associated with litigation, some of which would have to occur in Hong Kong, the Debtors engaged in earnest and comprehensive efforts with the Lehman Hong Kong Entities to reconcile their differences in accordance with the principles of the Protocol and to achieve a rational economic outcome. During the course of their negotiations, the Relevant HK Entities expressed a concern that any reduction in their offsetting Guarantee Claims against LBHI would substantially increase the amount of LBHI's net claims against them, at the expense of their third-party creditors.

In order to facilitate a settlement that maximized recoveries to the Debtors and their creditors, and given the relatively small amount of third-party claims filed against the Relevant HK Entities, the Debtors proposed a trust mechanism that would allow the third-party

creditors of the Relevant HK Entities to be unaffected by the settlement, but also allowed the

Relevant HK Entities to agree to a reduction in their Guarantee Claims against LBHI.  Through

this trust mechanism, LBHI will reallocate a portion of its distributions from the Relevant HK

Entities to the third-party creditors of the Relevant HK Entities.  The reallocated amounts will be

calculated such that, through a combination of distributions from the Relevant HK Entities and

reallocated distributions from LBHI, the third-party creditors of the Relevant HK Entities receive

as much as they would have received absent a reduction of the Relevant HK Entities Guarantee

Claims against LBHI.  LBHI has concluded that it is in its economic interest to pursue the trust

structure given its minimal costs and significant benefits.

Accordingly, on July 31, 2011, the Debtors entered into a settlement agreement

(the "Hong Kong Settlement Agreement") with the Lehman Hong Kong Entities.  The Hong

Kong Settlement Agreement results from more than two years of arm's-length negotiations

between the Debtors and the Lehman Hong Kong Entities concerning the reconciliation of the

parties' books and records, the valuation of derivatives-related intercompany claims and the

appropriate risk-adjusted reductions to be applied to Guarantee Claims against LBHI to account

for the risks attendant to these claims.

## 2.    The Hong Kong Settlement Agreement Should be Approved

As a result of the Hong Kong Settlement Agreement, LBHI will be entitled to an

approximate aggregate of $10.4 billion in allowed claims against the Relevant HK Entities, and

will avoid the costs of expensive, fact-intensive litigation that would be incurred if these claims

were litigated in the Hong Kong courts.  As was the case with all of the Bilateral Settlements, the

Creditors' Committee and its advisors were regularly consulted regarding the Hong Kong

Settlement regarding the legal and factual issues and disputes.  No party has objected to the

approval of the Hong Kong Settlement Agreement.  On October 28, 2011, the Hong Kong

Entities in Liquidation informed the Debtors that Justice Barma of the Hong Kong High Court

approved the Hong Kong Settlement Agreement.  For all the foregoing reasons, the Debtors

believe that the Hong Kong Settlement Agreement and the trust mechanism contemplated

thereby is in their best interests and falls well above the lowest point in the range of

reasonableness, and should be approved.

### F.    SETTLEMENTS WITH OTHER FOREIGN AFFILIATES

In addition to the foregoing settlements, the Debtors have entered into various

settlement agreements with other Foreign Affiliates consisting largely of (i) a full and final

reconciliation of all intercompany funding claims consistent with the Global Close, (ii) a full

reconciliation and liquidation of derivatives claims, and (iii) a settlement and compromise on

Guarantee Claims asserted against LBHI, taking into account the risks of substantive

consolidation and the Debtors' other challenges to enforceability of such claims, including the

lack of knowledge and reliance by the Foreign Affiliates on such purported guarantees,

particularly the Corporate Resolutions.

Each of the settlements reflects substantial reductions to the asserted Guarantee

Claims of the settling Foreign Affiliates and also reflects a thorough reconciliation and resolution

of other claims among the parties.  The Debtors have devoted a substantial amount of time and

resources to fully resolve the Claims and regularly consulted with the Creditors' Committee's

advisors in connection with the same.  The settlements should be approved.

### 1.    The Lehman Japan Entities

On September 19, 2008 and dates thereafter, the Tokyo District Court

commenced civil rehabilitation proceedings under Japan's Civil Rehabilitation Act for four

Lehman Japan Entities:  Lehman Brothers Japan Inc. ("LBJ"), Lehman Brothers Holdings Japan

Inc. ("LBHJ"), Lehman Brothers Commercial Mortgage K.K. ("LBCM"), and Sunrise Finance

Co. Ltd. ("Sunrise").  LBHJ served primarily as a holding company for Lehman's Japanese

companies, while LBJ was Lehman's regulated broker/dealer in Japan.  LBCM and Sunrise

primarily invested in real estate assets.

The Lehman Japan Entities filed claims primarily against LBHI, consisting almost

entirely of Guarantee Claims based upon the Corporate Resolutions and, in limited instances, on

Transactional Guarantees.  In total, the Lehman Japan Entities asserted more than $23.4 billion

in aggregate Guarantee Claims against LBHI.  LBHI has disputed the Guarantee Claims

asserting that these claims should be reduced to account for the risks of substantive consolidation

and other the legal challenges to enforceability.  The Lehman Japan Entities argued that

substantive consolidation of foreign entities subject to civil rehabilitation proceedings in Japan is

not possible.  The Lehman Japan Entities have also asserted approximately $384.2 million in

claims against LBSF based on general intercompany and derivatives contracts.  LBSF has

worked with the Lehman Japan Entities to review these claims and reconcile them with the

Global Close resolving numerous disputes and issues concerning these claims.  As part of the

settlement considerations and discussions, the parties also reviewed LBHI's asserted claims

against LBJ, LBCM, and Sunrise aggregating a total of approximately $703.4 million.

On October 24, 2011, the Debtors and the Lehman Japan Entities entered into a

settlement agreement dated (the "Japan Settlement Agreement").  The following claims will be

allowed pursuant to the Japan Settlement Agreement, in the classes indicated therein:

- the Lehman Japan Entities will have allowed, non-priority, non-subordinated
general unsecured claims (i) against LBHI in an aggregate amount equal to
$276,850,573, and (ii) against LBSF, in an aggregate amount equal to
$236,341,918;

- LBHI will have allowed unsecured claims against the Lehman Japan Entities
in an aggregate amount equal to $78,719,417; and

▪ LBCC will have allowed unsecured claims against the Lehman Japan Entities in an aggregate amount equal to $115,817,806.

The Guarantee Claims allowed against the LBHI pursuant to the Japan Settlement Agreement represent a substantial reduction compared with the more than $23 billion in claims that the Lehman Japan Entities filed against the Debtors, and in LBHI's judgment, adequately reflect the litigation risks attendant to such claims. In addition, the Intercompany Claims that will be allowed against LBSF, and the claims that LBHI and LBCC will have against the Lehman Japan Entities, fairly reflect the parties' reconciled books and records. There are no objections to the Japan Settlement Agreement. The Japan Settlement Agreement is in the best interests of the Debtors and falls well above the lowest point in the range of reasonableness, and should be approved.

### 2. The Lehman Luxembourg Settlement Agreements

#### a. LB Lux

As stated above, LB Lux is a Lehman Affiliate incorporated in Luxembourg that, among other things, borrowed stock from third parties, and then lent the stock to LBIE. LBHI has asserted a claim against LB Lux in excess of $1.1 billion based on amounts advanced to LB Lux. LB Lux has filed Guarantee Claims in the approximate amount of $417.5 million against LBHI based on the Corporate Resolutions, and relating to claims that LB Lux has asserted against LBIE.

On October 25, 2011, the Debtors entered into a settlement agreement with LB Lux (the "LB Lux Settlement Agreement"). Pursuant to the LB Lux Settlement Agreement, LBHI will have an allowed, non-subordinated, general unsecured claim against LB Lux in a net amount equal to approximately $1.0 billion, which has been reduced by a minimal risk-adjusted

Guarantee Claim that was recognized by LBHI. The Guarantee Claims that LB Lux has filed against LBHI in the aggregate amount of $417.5 million will be disallowed.

### b.    LBEF

Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*) ("LBEF") is another Lehman Affiliate incorporated in Luxembourg that, among other things, issued call warrants (the "Call Warrants") to investors on the Luxembourg Stock Exchange. LBEF was declared bankrupt by the Court of Commerce of Luxembourg (the "Lux Court") on February 6, 2009.

LBEF filed claims against LBHI in the aggregate amount of approximately $10.9 billion. LBEF's largest claim against LBHI, in the amount of approximately $10.7 billion, consists of a direct claim that alleges that more than $10.0 billion of proceeds for the Call Warrants sold by LBEF were collected either by LBHI, or by an Affiliate of LBHI, and are owed to LBEF. LBHI has vigorously disputed this claim and asserted that there is no factual basis in Lehman's books and records for this claim. In addition, LBEF has asserted certain Intercompany Claims and other Guarantee Claims against LBHI.

On October 25, 2011, the Debtors entered into a settlement agreement with LBEF (the "LBEF Settlement Agreement"), a copy of which is incorporated into the Plan Supplement as Exhibit 5. Pursuant to the LBEF Settlement Agreement, LBEF will have

- an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBHI in Class 8 in an amount equal to $700,837;

- an allowed, non-priority, senior, non-subordinated general unsecured claim against LBHI in Class 4B in an amount equal to $14,533,045, and

- an allowed, non-priority, senior, non-subordinated general unsecured claim against LBHI in Class 4A in an amount equal to $119,207,203.

Under the LBEF Settlement Agreement, that portion of the LBEF claim that relates to the Call Warrants (asserted in excess of $10.0 billion) has been disallowed in its entirety, and the remainder of the LBEF Guarantee Claim has been substantially reduced to account for the litigation risks attendant to such claim.

There are no objections to the LBEF Settlement Agreement or the LB Lux Settlement Agreement. The LBEF Settlement Agreement and the LB Lux Settlement Agreement are in the best interests of the Debtors, are fair and reasonable, and should be approved.

### 3.    The Lehman Singapore Entities

Following the Commencement Date, six of Lehman's Affiliates in Singapore became subject to creditors' voluntary liquidation proceedings. These entities control assets and other Lehman Affiliates in nine different jurisdictions including Singapore, Malaysia, Thailand, India, China, Korea, Taiwan, Japan and Australia.

The Lehman Singapore Entities filed an aggregate $489.4 million in claims against the Debtors, consisting of a combination of intercompany funding, derivatives, and Guarantee Claims based on the Corporate Resolutions. On August 24, 2011, the Debtors and certain Debtor-Controlled Entities entered into a settlement agreement (the "Singapore Settlement Agreement") with the Lehman Singapore Entities, a copy of which is annexed to the Plan as Schedule 7. Pursuant to the Singapore Settlement Agreement:

- the Lehman Singapore Entities will have an aggregate $142.4 million of allowed claims against the Debtors in the classes indicated therein, representing a substantial reduction from the aggregate total of $489.4 million in claims initially asserted against the Debtors; and

- LBHI will have an aggregate allowed claim against the Lehman Singapore Entities of $450,019,446.

There are no objections to the Singapore Settlement Agreement. The Singapore Settlement Agreement fairly reflects the parties' reconciled books and records, and adequately accounts for

the litigation risks attendant to Guarantee Claims against LBHI.  For these reasons, the Singapore

Settlement Agreement is in the best interests of the Debtors, and should be approved.

### G.    SETTLEMENT WITH DEUTSCHE BUNDESBANK ("BUNDESBANK")

Bundesbank is the national central bank of Germany and is a member of the

European System of Central Banks (the "ESCB"), consisting of the national central banks of the

member states of the European Union and the European Central Bank (the "ECB").  To further

the objectives of the ESCB, members of the ECB, including Bundesbank, grant collateralized

loans to provide liquidity to financial institutions.

Bundesbank granted loans to Bankhaus and Bankhaus pledged certain assets to

Bundesbank as collateral for these loans.  Following the commencement of Bankhaus's

insolvency proceeding, Bundesbank asserted claims against Bankhaus on account of certain

collateralized loans that Bankhaus has not repaid.  Bundesbank continues to hold collateral

pledged by Bankhaus to secure these loans (the "Collateral") and has not yet exercised its right

as a secured creditor to liquidate the Collateral.

In connection with its direct claims against Bankhaus, Bundesbank also filed an

approximately $12.2 billion Guarantee Claim against LBHI (the "Bundesbank Guarantee

Claim") based upon the Bankhaus Guarantee.

LBHI disputed the Bundesbank Guarantee Claim on several grounds.  First, the

parties disputed whether Bundesbank benefits from a guarantee of payment or collection.

Because Bundesbank had not yet liquidated all of the Collateral, its direct claim against

Bankhaus, and the Bankhaus Guarantee Claim, did not account for the value of the Collateral.

LBHI disputed Bundesbank's position that it did not need to take into account the value of the

Collateral, and the parties disputed the valuation of the Collateral if the Bundesbank Guarantee

Claim were to be reduced by the amount thereof.  Second, LBHI argued that the Bundesbank

Guarantee Claim should be further discounted to account for the risks of substantive

consolidation and the challenges that LBHI could assert to the enforceability of the Bankhaus

Guarantee.  Bundesbank refuted each of these positions.  In particular, there was significant

disagreement among the parties regarding the reasonable and appropriate time to liquidate the

Collateral, and the allowability of any deficiency claim that would result from any liquidation.

LBHI also challenged the enforceability of the Bankhaus Guarantee by BdB.

After intense, arm's-length negotiations with Bundesbank concerning the value of

the Collateral, the enforceability of the Bankhaus Guarantee, and substantive consolidation risks

noted above, the Debtors and Bundesbank entered into a settlement agreement dated October 11,

2011 (the "Bundesbank Settlement Agreement"), pursuant to which Bundesbank will have an

allowed, non-priority, senior unsecured claim against LBHI in Class 5 in an amount equal to $3.5

billion (the "Allowed Bundesbank Claim").

Compared with the approximately $12.2 billion Bundesbank Guarantee Claim

that Bundesbank filed against LBHI, the Allowed Bundesbank Claim of approximately $3.5

billion represents a significant reduction in Bundesbank's claim against LBHI.  No party has

objected to the Bundesbank Settlement Agreement.  LBHI believes that the Allowed

Bundesbank Claim fairly reflects the value of the Collateral held by Bundesbank, as well as the

enforceability of the Bankhaus Guarantee and substantive consolidation risks attendant to the

Bundesbank Guarantee Claim.  Accordingly, the Debtors believe that the Bundesbank Settlement

Agreement is fair and reasonable, in their best interests, and should be approved.

### H.    SETTLEMENT WITH BUNDESVERBAND DEUTSCHER BANKEN E.V. ("BdB")

BdB is the association of private sector banks in Germany.  German private sector

banks maintain a voluntary depositor compensation scheme through BdB, which encompasses

the German Deposit Protection Fund ("GDPF"), a special fund within BdB.  The GDPF provides assistance to depositors, including compensation of depositors for certain deposits up to a maximum amount in the event of financial difficulties of member banks.

To offer the protection of the GDPF to its depositors, Bankhaus was required to meet certain conditions of participation in the GDPF, including the provision of an indemnity in favor of BdB against all losses incurred as a result of measures taken by BdB to protect Bankhaus's depositors.  On October 26, 1993, LBHI executed such an indemnity in favor of BdB (the "BdB Indemnity").

BdB filed proofs of claim against LBHI totaling approximately $25.7 billion, based upon both the BdB Indemnity and the Bankhaus Guarantee (the "BdB Guarantee Claims"). The BdB Guarantee Claims assert that, as a result of Bankhaus's insolvency proceeding, BdB (i) paid compensation to creditors of Bankhaus, (ii) incurred refinancing, personnel, and organization costs to carry out the compensation payments, and (iii) incurred fees in connection with pursuing its claims.  The BdB Guarantee Claims also assert amounts due to BdB under the Bankhaus Guarantee and BdB Indemnity on account of certain contingent and unliquidated compensation claims that BdB expects it will need to pay in the future.

LBHI disputed the BdB Guarantee Claims on several grounds, including BdB's estimation of the future compensation claims and its inclusion of incurred costs and expenses.  In addition, LBHI argued that the BdB Guarantee Claims should be discounted to account for the risks of substantive consolidation and the challenges that LBHI could assert to the enforceability of the Bankhaus Guarantee and the BdB Indemnity.  BdB refuted each of these positions.

After extensive, arm's-length negotiations with BdB concerning the above issues, the Debtors entered into a settlement agreement with BdB, dated September 30, 2011 (the "BdB

Settlement Agreement"), which substantially reduces the claims asserted by BdB against LBHI. Pursuant to the BdB Settlement Agreement, BdB will have (i) an allowed, non-priority, unsecured third party guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of $1,288.42 and (ii) an allowed, non-priority unsecured third party guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of approximately $5.3 billion (together, the "Allowed BdB Claims").

No party has objected to the BdB Settlement Agreement.  LBHI believes that the Allowed BdB Claims fairly reflect the compensation claims that BdB has paid and is expected to pay, as well as the enforceability and litigation risks attendant to the BdB Guarantee Claim. Accordingly, the Debtors believe that the BdB Settlement Agreement is fair and reasonable, in their best interests, and should be approved.

## I.    SETTLEMENT WITH ENTSCHÄDIGUNGSEINRICHTUNG DEUTSCHER BANKEN GMBH ("EDB")

EdB administers a mandatory compensation scheme for the benefit of depositors in defaulting financial institutions, pursuant to the German Deposit Guarantee and Investor Compensation Act.  The deposits protected by EdB are separate from those that have the benefit of the protection offered by the GDPF on behalf of BdB.

Following the commencement of Bankhaus's insolvency proceeding, certain compensation payments were made for the benefit of Bankhaus's depositors, and EdB became the successor to the depositors' claims against Bankhaus.  On account of these claims, and based upon the Bankhaus Guarantee, EdB filed a proof of claim against LBHI in the amount of approximately $3 million (the "EdB Guarantee Claim").

LBHI argued, as with the BdB Guarantee Claim, that the EdB Guarantee Claim should be discounted to account for the risks of substantive consolidation and the challenges that

LBHI could assert to the enforceability of the Bankhaus Guarantee.  EdB asserted that Bankhaus was not at risk of substantive consolidation.

After extensive, arm's-length negotiations with respect to these issues, LBHI and EdB entered into a settlement agreement dated September 30, 2011 (the "EdB Settlement Agreement"), pursuant to which EdB will have a non-priority unsecured third party guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of approximately $1.5 million (the "Allowed EdB Claim").  EdB will also timely to vote to accept the Plan and support the confirmation and consummation thereof.

No party has objected to the EdB Settlement Agreement.  The Allowed EdB Claim represents a substantial reduction in the claim asserted by EdB against LBHI, and in LBHI's judgment, fairly reflects both Bankhaus's current and potential future liability to its depositors and a discount for the enforceability and substantive consolidation risks attendant to the BdB Guarantee Claim.  The EdB Settlement Agreement should be approved.

**J.    SETTLEMENT OF DISPUTE WITH
DEUTSCHE BANK REGARDING CLASSIFICATION OF CLAIMS**

As discussed above, certain claims asserted by Bankhaus against LCPI under the SCA (as previously defined) and LBHI as guarantor of LCPI's obligations thereunder were resolved pursuant to the Initial Bankhaus Claims Settlement Agreement.  Specifically, the settlement provides that Bankhaus has an (i) "allowed and accepted non-priority unsecured claim in the amount of $1,015,500,000 against LCPI" (the "LCPI Claim") and (ii) "allowed and accepted non-priority unsecured claim as a creditor of LBHI…in the aggregate amount equal to $1,380,900,000," subject to certain potential reductions (the "LBHI Claim," and together with the LCPI Claim, the "Bankhaus Claims").  The Initial Bankhaus Claims Settlement Agreement also provides that the Bankhaus Claims "shall be treated in a like manner to that of other general

unsecured claims against LBHI and LCPI and receive treatment and distribution on account of

such claims equal to that of other general unsecured claims against LBHI and LCPI."

At the time the Initial Bankhaus Claims Settlement Agreement was entered into,

the Debtors had not yet proposed a chapter 11 plan. On March 15, 2010, the Debtors filed their

initial chapter 11 plan with the Court.

On June 24, 2010, the Debtors were informed that Bankhaus had sold the

Bankhaus Claims to Deutsche Bank. Following its acquisition of the Bankhaus Claims,

Deutsche Bank sold participations in such Claims to various third parties, including,

Centerbridge Credit Advisors LLC, Monarch Alternative Capital LP and Anchorage Capital

Group, L.L.C.

### 1.    The Dispute Regarding Classification of the Bankhaus Claims

In connection with the Plan, the Debtors indicated in the Disclosure Statement

that the LCPI Claim is included in LCPI Class 5C (Affiliate Claims Other Than Those of

Participating Debtors) and the LBHI Claim in LBHI Class 4B (Senior Affiliate Guarantee

Claims). Deutsche Bank and the Participants have disputed the classification of the Bankhaus

Claims in classes with other Claims filed by Affiliates, and have asserted that such Claims

should be included in LCPI Class 4A (General Unsecured Claims Other Than Those of

Designated Entities) and LBHI Class 7 (General Unsecured Claims).

The Debtors believe that the Bankhaus Claims were properly classified in LCPI

Class 5C and LBHI Class 4B, respectively, because the Bankhaus Claims are based on claims

filed by Bankhaus, an Affiliate of the Debtors, and the LBHI Claim is based on a guarantee. The

Initial Bankhaus Claims Settlement Agreement does not restrict the Debtors' ability to propose a

plan with multiple classes of general unsecured claims and classify the Bankhaus Claims with

other claims with similar legal rights and characteristics. As a result, the Bankhaus Claims were

classified by the Debtors with other general unsecured claims asserted by Affiliates.  The

Debtors believe that this classification is consistent with the terms of the Initial Bankhaus Claims

Settlement Agreement.

On, September 27, 2011, Deutsche Bank filed the *Motion of Deutsche Bank AG*

*Pursuant to Section 105(a) and Rule 3013 to Enforce Settlement Approval Order and to Correct*

*Misclassification of Claims* [ECF No. 20321] (the "DB Motion"), seeking to have the Court

determine that the Bankhaus Claims be classified in LCPI Class 4A and LBHI Class 7,

respectively.  Deutsche Bank asserted that, by stating that the Bankhaus Claims would be treated

as "general unsecured claims," the Initial Bankhaus Claims Settlement Agreement was clear that

the Bankhaus Claims should be in the classes in the Debtors Plan entitled General Unsecured

Claims: LBHI Class 7 and LCPI Class 4A.  Deutsche Bank argued that the Initial Bankhaus

Claims Settlement Agreement did not provide that the Bankhaus Claims would be treated like, or

classified with, other Affiliate Claims or Guarantee Claims.  Finally, Deutsche Bank argued that

to give effect to clause 12(k) of the Initial Bankhaus Claims Settlement Agreement, the

Bankhaus Claims must be included in the class of General Unsecured Claims and cannot be

included in any class of claims that is subject to a reduced recovery in settlement of any litigation

risk.  Various entities holding participations in the Bankhaus Claims filed joinders to the DB

Motion.

The Debtors objected to the DB Motion.  Following a hearing on the DB Motion

held on October 19, 2011, the Court entered an order denying the DB Motion without prejudice

to Deutsche Bank's right to renew its request for relief and challenge the classification of the

Bankhaus Claims in connection with confirmation of the Plan. [ECF No. 21223].

On October 28, 2011, Deutsche Bank filed the Objection to Confirmation of Plan as to LBHI and LCPI to the Extent it Fails to Properly Classify and Treat Deutsche Bank AG Claims and Renewed Motion to Treat Such Claims Like and Equal to General Unsecured Claims Against LBHI and LCPI as Required by Court Approved Settlement [ECF No. 21416].  Since that time, the parties have engaged in discovery in connection with the objection.

### 2.    Settlement of the Dispute with Deutsche Bank

To settle the dispute with Deutsche Bank regarding the classification of the Bankhaus Claims, and avoid litigation of this issue at the Confirmation Hearing, LBHI, LCPI, Deutsche Bank, Monarch Alternative Capital LP, Stone Lion Portfolio L.P., Permal Stone Lion Fund Ltd. Centerbridge Credit Advisors LLC and Anchorage Capital Group, L.L.C. entered into the Settlement Agreement, dated as of November 23, 2011 (the "DB Claims Settlement Agreement").  The DB Claims Settlement Agreement provides that (i) the LCPI Claim will be an Allowed in LCPI Class 5C (Claims of an Affiliate Other Than Participating Debtors) in the amount of $1.015 million (the same amount as in the Initial Bankhaus Claims Settlement Agreement) and (ii) notwithstanding anything in the Initial Bankhaus Claims Settlement Agreement or order approving such agreement, the LBHI Claim shall be Allowed in LBHI Class 4B (Senior Affiliate Guarantee Claims) in the amount of $920 million (the "Allowed LBHI Claim").  In accordance with section 8.13 and 8.14 of the Plan, the Allowed LBHI Claim will be deemed satisfied in full and not entitled to any future distribution if combined distributions on the LCPI Claim and the Allowed LBHI Claim equal $1.380 million.

The Initial Bankhaus Claims Settlement Agreement provided that the Allowed Amount of the LBHI Claim would be $1.380 million, less any distributions received on account of the LCPI Claim.  Based on the estimated distributions set forth in the Disclosure Statement, it is estimated that holders of claims in LCPI Class 5C will receive a distribution of 52.1% of their

Allowed Claim amount.  Based on such estimate, the holders of the LCPI Claim would receive a distribution of $528 million on account of the LCPI Claim, which would reduce the Allowed amount of the LBHI Claim to $852 million.  Based on the estimated distributions set forth in the Disclosure Statement, the effect of the fixing of the LBHI Claim at $920 million in the DB Claims Settlement Agreement is an increase of the LBHI Claim by $67 million.  The increased amount of the LBHI Claim will vary depending upon LCPI's ultimate distribution rate.

If Deutsche Bank were to prevail in its objection to the Plan and the Court ordered the LCPI Claim and LBHI Claim classified in LCPI Class 4A and LBHI Class 7, it is estimated that distributions on the Bankhaus Claims would increase by approximately $69 million as compared to the estimated distributions if the Debtors' were to prevail.  Based on the 15.5% estimated rate of distributions to holders of Claims in LBHI Class 4B set forth in the Disclosure Statement, the DB Claims Settlement Agreement results in additional distributions of approximately $10 million as compared to estimated distributions if LBHI were to prevail.

The DB Claims Settlement Agreement provides that Deutsche Bank will withdraw its objection to the confirmation of the Plan, cease any and all discovery in connection with the Bankhaus Claims and the Plan, and support the confirmation and consummation of the Plan.  In addition, each participant will support the confirmation and consummation of the Plan and, to the extent it has not already voted its claims, vote its claims to accept the Plan.  The Debtors have extended the objection deadline for the participants in the Bankhaus Claims while the DB Claims Settlement Agreement was negotiated.  The DB Claims Settlement Agreement resolves the long-standing disputes among Deutsche Bank, the participants and the Debtors and the potential for extended, expensive litigation.

The settlement with Deutsche Bank and the participants was agreed to based on extensive, good faith, arm's-length negotiations following the denial of DB Motion without prejudice and with the right to renew as aforesaid.  The agreement provides for a recovery on the Bankhaus Claims that is substantially less than that amounts the holders of such Claims would receive had Deutsche Bank prevailed it its objection to the Plan and the Court ordered that the Bankhaus Claims be classified in Classes requested by Deutsche Bank.  The minimal increase in the claim against LBHI that results from the DB Claims Settlement Agreement will effect LBHI creditor recoveries by less than half a basis point.  At the same time, the Debtors will avoid engaging in protracted, expensive, fact-intensive litigation involving considerable amounts of discovery.  Based upon the litigation risk attendant to the classification of these claims, LBHI and LCPI believe that the settlement of the dispute regarding the classification of the Bankhaus Claims is fair and reasonable and in the best interests of LBHI, LCPI and their creditors, and should be approved under Bankruptcy Rule 9019.

### K.    THE DEBTORS' CLAIMS SCHEDULE AND SCHEDULE OF CLAIMS BY DEBTOR-CONTROLLED ENTITIES

As stated in section X.B.2 of the Disclosure Statement, all Affiliate claims between and among the Debtors and claims of Debtor-Controlled Entities against the Debtors will be allowed in the amounts of recorded intercompany balances set forth on the Debtors' books and records, after reconciliation, as of the applicable Commencement Date.  Guarantee Claims against LBHI have been reduced to account for the litigation risks attendant to such claims relating to enforceability and substantive consolidation.  The allowed amounts of all Affiliate Claims between and among the Debtors and claims of Debtor-Controlled Entities against the Debtors have been set forth on the Debtors' Claims Schedule, which is annexed to the Plan as Schedule 2, and on the Schedule of Claims by Debtor-Controlled Entities, which is

incorporated into the Plan Supplement as Exhibit 9.  The Debtors' Claim Schedule and Schedule

of Claims by Debtor-Controlled Entities are incorporated into the Plan and will become effective

on the Effective Date.

## IV.    THE BILATERAL SETTLEMENTS ARE FAIR AND REASONABLE AND SHOULD BE APPROVED

The Bilateral Settlements satisfy the standards required under Bankruptcy Rule

9019 and should be approved.  Every relevant factor identified by the Supreme Court in *TMT*

*Trailer Ferry* that is considered in determining whether a settlement should be approved weighs

heavily in favor of the conclusion that the settlements are fair and reasonable.

### A.    THE RESULTS OF LITIGATION REGARDING INTERCOMPANY CLAIMS AND OTHER ISSUES ARE HIGHLY UNCERTAIN.

The Intercompany Claims arise from tens of thousands of intercompany

transactions that occurred daily involving billions of dollars among the Lehman enterprise and

Lehman's Affiliates.  The complexities of Lehman's various intertwined business lines and

custodial relationships, and idiosyncrasies of its highly sophisticated intercompany trading,

financial reporting and information systems, make the outcome of any litigation concerning

Intercompany Claims and related disputes highly uncertain.  This uncertainty would be

compounded by the fact that litigation of the Debtors' claims against all of the Foreign Affiliates

may need to take place in each of the Foreign Affiliates' respective insolvency proceedings in

multiple jurisdictions.  Even if the Debtors ultimately litigated all of their Intercompany Claims

against the Foreign Affiliates and prevailed, this global litigation, together with discovery, trials,

and appeals, would be extremely fact-intensive and costly, materially reducing recoveries to

creditors.  *See In re Iridium Operating LLC*, 478 F.3d 452, 465 (2d Cir. 2007) (settlement

avoided the pursuit of "an expensive and complex lawsuit which, even if ultimately successful,

offered little reward").  The Bilateral Settlements achieve a final resolution of all of these claims.

Absent the Bilateral Settlements, the outcome of such litigation may not be easily predicted.

**B.    THE COMPLEXITY, DURATION, EXPENSE, INCONVENIENCE AND DELAY ASSOCIATED WITH LITIGATION SHOULD BE AVOIDED**

Approval of the Bilateral Settlements is appropriate given the substantial "'likelihood [that] complex and protracted litigation, 'with its attendant expense, inconvenience, and delay'" would otherwise result with respect to the Debtors' Plan. *In re Iridium Operating LLC*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)). Absent the Bilateral Settlements, the Debtors would lack support of the Plan from the holders of some of the largest asserted claims against their estates. Moreover, many of the Foreign Affiliates would have objected vigorously to confirmation of the Plan, and plunged these cases headfirst into years of prolonged litigation concerning substantive consolidation and the confirmation of the Plan, significantly delaying distributions to creditors and prolonging the costs of administering the chapter 11 cases while eroding the Debtors' assets. The Debtors' creditors would be forced to await reduced distributions.

Absent the Bilateral Settlements, the Debtors would also be mired in extraordinarily complex, expensive and protracted litigation concerning the validity and amounts of Intercompany Claims. Litigation over the validity and amounts of Intercompany Claims, the validity and enforceability of Guarantee Claims, and the valuation of intercompany derivatives transactions would be extremely fact specific, involving extensive discovery, potentially lengthy trials, and probable appeals to appellate courts in every relevant jurisdiction. Each of the Debtors would need to fully substantiate hundreds of thousands of intercompany line items, as recorded in Lehman's highly complex electronic financial reporting systems. The sheer amount of evidence that would need to be produced, translated, and interpreted to each and every court would be unprecedented and would cause significant delays in the administration of the Debtors'

estates.  The resolution of many Intercompany Claims would also necessitate the interpretation

of the impact of foreign laws and regulations, and extensive diligence with respect to the value of

certain Debtors' assets.

Litigation of contested Guarantee Claims would be extremely fact-intensive, and

would require extensive discovery and deposition testimony with respect to each transaction at

issue.  Given the magnitude of the Guarantee Claims filed against LBHI, this category of

litigation alone would extend over a period of many years and cost many tens of millions of

dollars of administrative expenses.

Pending a final determination of the enormous Guarantee Claims filed by the

Foreign Affiliates, the Debtors would be required to maintain hundreds of billions of dollars of

reserves for the asserted claims of each Foreign Affiliate while the Intercompany Claims are

litigated.

### C. AN OVERWHELMING MAJORITY OF CREDITORS AFFIRMATIVELY SUPPORT THE BILATERAL SETTLEMENTS

No objections have been filed against any of the Bilateral Settlements other than

one objection that has been filed in respect of the UK Settlement Agreement.  Even this

objection only suggests that the settlement *may* not be in the best interests of the LBHI estate.

As amply demonstrated above, this suggestion is manifestly wrong – the UK Settlement

Agreement is unquestionably in the best interests of LBHI and the other Debtors.

In every other respect, the Bilateral Settlements are not only uncontested – they

enjoy the overwhelming support of all of the Debtors' creditors.  Every class of creditors in these

chapter 11 cases has represented its support of the Debtors' settlements by their *nearly*

*unanimous* votes to accept the Plan.  Many of these creditors and their respective professionals

are extremely sophisticated parties who have conducted their own independent analysis of the

Bilateral Settlements.  The acknowledged support of these economic stakeholders demonstrates the benefits and fairness of the Bilateral Settlements and the Plan, and that the Bilateral Settlements are in their best interests.  Each of the Bilateral Settlements has been approved and endorsed, either formally or informally, by the foreign courts overseeing the Foreign Affiliates' separate insolvency proceedings, or official creditor bodies that are appointed to oversee the performance of the Foreign Administrators.  The creditors of the Foreign Affiliates, who also have Guarantee Claims against LBHI and are therefore particularly affected by the Debtors' settlements with the Foreign Affiliates, have expressed their support of these settlements and the overall Global Settlement by voting overwhelmingly to accept the Plan.  Each of the Bilateral Settlements has been carefully reviewed, scrutinized, and is supported by the Creditors' Committee.

### D.    COMPETENT AND EXPERIENCED PROFESSIONALS HAVE EVALUATED AND SUPPORT THE SETTLEMENTS

As stated, the Bilateral Settlements are supported overwhelmingly by creditors voting to accept the Plan.  The Debtors, the Creditors' Committee and many of the Debtors' creditors are all highly sophisticated and are represented by experienced and knowledgeable attorneys and other professionals.  *See In re Dow Corning Corp.*, 192 B.R. 415, 424 (Bankr. E.D. Mich. 1996) (noting counsel's prominence in field of law as weighing heavily in favor of settlements).  The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise."  *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. at 505 (internal citations omitted).

E.    **ALL ECONOMIC STAKEHOLDERS BENEFIT FROM THE BILATERAL SETTLEMENTS**

As a result of the Bilateral Settlements, aggregate claims against the Debtors will be reduced by approximately $295 billion. As a result of the Bilateral Settlements, multiplicity of intercompany claims and disputes will be fully and finally resolved. Some of these claims constitute are the largest and most complex claims that have been asserted against the Debtors. Their resolution will dramatically expedite the Debtors' ability to exit these chapter 11 cases and commence to make distributions to holders of allowed claims.

F.    **THE BILATERAL SETTLEMENTS ARE A PRODUCT OF ROBUST ARM'S LENGTH BARGAINING AND REPRESENT AN INFORMED JUDGMENT OF THE DEBTORS**

The terms of the Bilateral Settlements are the result of extremely difficult and contentious negotiations, and an extensive review and diligence of asset values, derivatives transactions, and intercompany balances by the Debtors, the Creditors' Committee, the court appointed fiduciaries for the Foreign Affiliates, and all of their respective professionals. These negotiations were conducted over a period of more than two years, at arms'-length and in good faith.

The Bilateral Settlements are consistent with the principles of the Global Settlement and critical to the success of the Plan. In light of magnitude, number, and complexity of the claims that have been resolved, the novelty and fact-intensive nature of the potential litigation that will be eliminated, and the substantial reductions in claims that the Debtors' have negotiated pursuant to the Bilateral Settlements, it is beyond peradventure of a doubt that the Bilateral Settlements are fair and reasonable, and in the best interests of the Debtors and their economic stakeholders. For all the foregoing reasons, in the Debtors' business judgment, the terms of the settlements described above manifestly satisfy the standards applicable under

Bankruptcy Rule 9019.  The Bilateral Settlements fall well above the lowest point in the range of

reasonableness, and should be approved.

## **CONCLUSION**

The Global Settlement and the Bilateral Settlements are fair and reasonable, and

in the best interests of the Debtors and all interests in the Debtors' cases.  They should be

approved, and the Plan should be confirmed.

Dated:  New York, New York
        November 29, 2011

                    /s/ Lori R. Fife
                    Harvey R. Miller
                    Lori R. Fife

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

## EXHIBIT A

## GLOSSARY

"Ad Hoc Group" means the group of senior bond holders with claims primarily against LBHI who filed the Joint Substantively Consolidating Chapter 11 Plan for LBHI and Certain of its Affiliated Debtors on December 15, 2010, as amended.

"Bankhaus" Lehman Brothers Bankhaus AG (*in Insolvenz*).

"Bankhaus Guarantee" means LBHI's purported Entity-Specific Guarantee of Bankhaus's obligations dated November 21, 2002.

"Bankhaus Settlement Agreement" means the settlement agreement among the Debtors, certain Debtor-Controlled Entities, and Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) of Lehman Brothers Bankhaus AG (*in Insolvenz*), dated March 1, 2011.

"BdB" means Bundesverband deutscher Banken e.V.

"BdB Indemnity" means the indemnity LBHI executed in favor of BdB on October 26, 1993.

"Bilateral Settlements" means each of the settlement agreements incorporated in the Plan that has been entered into among one or more of the Debtors and Lehman Brothers Bankhaus AG, Lehman Brothers Treasury Co. B.V., Lehman Brothers Securities N.V., Lehman Brothers International (Europe) and the Lehman UK Entities, Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*), Lehman Brothers (Luxembourg) Equity Finance S.A. (in liquidation), the Hong Kong Lehman Entities In Liquidation, the Lehman Singapore Entities, the Lehman Japan Entities, Deutsche Bundesbank, Bundesverband Deutscher Banken E.V., Entschadigungseinrichtung Deutscher Banken Gmbh, or Deutsche Bank and certain holders of participations in Claim Nos. 59006 and 58233.

"Bundesbank" means Deutsche Bundesbank.

"Corporate Resolutions" means the purported guarantee issued by LBHI pursuant to board resolutions adopted by the Executive Committee of LBHI's Board of Directors.

"Declarations" means the fact declarations filed by the Debtors in support of confirmation of the Plan.

"Designated Entity" means each of the Restructured Assets with Enhanced Returns 2007-7-MM Trust, the Restructured Assets with Enhanced Returns Series 2007-A Trust and the holder of the Fenway Claims.

"Disclosure Statement Order" means the amended order approving the Disclosure Statement and voting procedures with respect to the Plan, entered by the Court on September 1, 2011.

"EdB" means Entschädigungseinrichtung deutscher Banken GmbH.

"Entity-Specific Guarantees" means purported guarantees that are not related to a specified transaction, but are purported assurances of payment of all or a set of identified obligations of a particular Affiliate, such as guarantees of all obligations of an Affiliate that were issued under a guarantee agreement between LBHI and the Affiliate.

"Farallon" means Farallon Capital Partners, L.P., Farallon Capital (AM) Investors L.P., Farallon Capital Institutional Partners II, L.P., Farallon Capital Offshore Investors II, L.P. and Noonday Offshore, Inc.

"Foreign Administrator" means each of the persons or entities that is managing the affairs and representing the insolvency estate of a Foreign Affiliate that is subject to a Foreign Proceeding.

"Foreign Affiliates" means an Affiliate of the Debtors that is organized in a jurisdiction outside of the United States, is not under the corporate control of the Debtors and may be subject to an insolvency proceeding in a foreign jurisdiction.

"Global Settlement" means the integrated and comprehensive settlement that resolves the various Plan Issues through (i) the Plan Adjustment, (ii) Distributions to LBHI on only 80% of the portion of its claims against the Subsidiary Debtors relating to intercompany funding, (iii) the reallocation of the first $100 million distributed to LBHI on account of its Claims against LBSF and LCPI to holders of General Unsecured Claims in LBSF Class 4A and LCPI Class 4A, (iv) the Distribution to holders of General Unsecured Claims in LBSF Class 4A and Affiliate Claims in LBSF Class 5C of the first $70 million recovered by LBSF on account of its assets in excess of $14.156 billion, (v) the Allowed amount of Claims asserted by Designated Entities, (vi) the allowance of LBT's intercompany Claim against LBHI in the amount of $34.548 billion, (vii) the allocation of costs and expenses incurred in the administration of the estates pursuant to the Debtor Allocation Agreement, (viii) the principles included in the Structured Securities Valuation Methodologies; and (ix) the post-Effective Date governance provisions set forth in the Plan.

"Initial Bankhaus Claims Settlement Agreement" means the settlement agreement among Bankhaus and LBHI, LCPI and Lehman ALI, Inc., which among other things resolved the allowance of certain claims asserted by Bankhaus against LCPI under the SCA and LBHI as guarantor of LCPI's obligations thereunder, dated January 14, 2010.

"LBAH" means Lehman Brothers Asia Holdings Limited (in liquidation).

"LBCCA" means Lehman Brothers Commercial Corporation Asia Limited (in liquidation).

"LBEF" means Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*)

"LBF" means Lehman Brothers Finance AG, in Liquidation, also known as Lehman Brothers Finance SA, in Liquidation.

"LB Lux" means Lehman Brothers (Luxembourg S.A.) (in liquidation).

"LBSN" means Lehman Brothers Securities N.V.

"<u>LBT</u>" means Lehman Brothers Treasury Co. B.V.

"<u>LBT Noteholders</u>" means the various noteholders of LBT asserting substantial Guarantee Claims against LBHI.

"<u>Lehman Hong Kong Entities</u>" means LBAH; Lehman Brothers Asia Limited (in liquidation); Lehman Brothers Futures Asia Limited (in liquidation); Lehman Brothers Securities Asia Limited (in liquidation); LBQ Hong Kong Funding Limited (in liquidation); Lehman Brothers Nominees (H.K.) Limited (in liquidation); Lehman Brothers Asia Capital Company (in liquidation); LBCCA; and Lehman Brothers Equity Finance (Cayman) Limiated (in official liquidation).

"<u>Lehman Japan Entities</u>" means Lehman Brothers Commercial Mortgage K.K.; Lehman Brothers Japan Inc.; Lehman Brothers Holdings Japan Inc.; Sunrise Finance Co. Ltd.; Hercules K.K.; Lehman Brothers Finance (Japan) Inc.; and Lehman Brothers Real Estate Limited.

"<u>Lehman Luxembourg Entities</u>" means LB Lux and LBEF.

"<u>Lehman Singapore Entities</u>" means Lehman Brothers Asia Pacific (Singapore) Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Pacific Holdings Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Investments Pte Ltd (In Creditors' Voluntary Liquidation); Lehman Brothers Commodities Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Finance Asia Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Pte Ltd; Lehman Brothers Securities Taiwan Limited; Lehman Brothers Singapore Pte. Ltd.; and Lehman Brothers Bangkok Riverside Development Pte. Ltd.

"<u>Lehman UK Entities</u>" means Lehman Brothers International (Europe); Lehman Brothers Limited; Lehman Brothers Holdings PLC; LB UK Re Holdings Limited; Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited; LB UK Financing Ltd; LB SF No. 1; Cherry Tree Mortgages Limited; Lehman Brothers Lease & Finance No. 1 Limited; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; LB RE Financing No. 3 Limited; Lehman Brothers (PTG) Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration and acting by their joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell); Eldon Street (Cube) Limited; Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Platform Home Mortgage Securities No. 4 Limited; Platform Commercial Mortgage Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; LBO Investments Limited; LBQ Funding (UK); and LB Lomond Investments (each in liquidation acting by their joint liquidators Derek Anthony Howell and Ian Oakley-Smith); and Acenden Limited (f/k/a Capstone Mortgage Services Limited); Blue I Real Estate Limited; Eldon Street (Birchin) Limited; Eldon Street (Colbert Orco) Limited; Eldon Street (Fidenza) Limited; Eldon Street (Harley) Limited; Eldon Street (Jefferson) Limited; Harley Property Ventures Limited; LB Holdings Intermediate 1 Limited; LB SF Warehouse Limited; LB Yellow (No. 1) Limited; MBAM Investor Limited; Myra Sarl; Parkmetro Limited; Preferred Group Limited; Preferred Holdings Limited; Preferred Mortgages Limited; Resetfan Limited; SM Funding No. 1 Limited; Southern Pacific Funding 3

Ltd.; Southern Pacific Mortgage Ltd.; Southern Pacific Personal Loans Limited; Southern Pacific Residuals 4 Limited; Stepstone Mortgage Funding Limited; Thayer Group Limited (in liquidation); Thayer Properties (Jersey) Limited (in liquidation); and Yellow Real Estate Limited.

"Non-Con Plan Proponents" means those entities that filed the non-consolidation chapter 11 plan for LBHI and Certain of its Affiliated Debtors on April 25, 2011.

"Participating Subsidiary Debtor" means LCPI, LBSF, LOTC, LBCC or LBCS.

"Plan Adjustment" is the primary mechanism in the Plan that implements the settlement of substantive consolidation through the redistribution of a certain percentage of recoveries from creditors who would receive lesser distributions if substantive consolidation is ordered (generally, holders of Guarantee Claims against LBHI and creditors (other than LBHI) of the Participating Subsidiary Debtors) to creditors would benefit from substantive consolidation (holders of Senior Unsecured Claims and General Unsecured Claims against LBHI).

"Plan Issues" means the issues and disputes among the Debtors and their creditors that are resolved by the Global Settlement and the Bilateral Settlements included in the Plan, including, whether the equitable doctrine of substantive consolidation may be applied to the Debtors and their Affiliates, the characterization of the intercompany balances owed to LBHI by Subsidiary Debtors, the allowed amounts of Affiliate Claims, the ownership and rights of various Debtors and their Affiliates with respect to certain assets, and the allocation of costs and expenses of administration among the Debtors.

"Protocol" means that certain Cross-Border Insolvency Protocol for The Lehman Brothers Group of Companies, dated May 12, 2009.

"Relevant HK Entities" means LBAH and LBCCA.

"SCA" means the Security & Collateral Agreement between LBHI and Bankhaus, dated August 15, 2002.

"Transaction Guarantees" means transaction specific guarantees in connection with, among other things, derivatives transactions among Affiliates.

"Voting Certification" means the affidavit filed by Epiq Bankruptcy Solutions LLC certifying the results of the votes to accept or reject the Plan.