**Hearing Date and Time: December 6, 2011 at 10:00 a.m. (Prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile: (212) 701-5800

Marshall S. Huebner

James H.R. Windels

Brian M. Resnick

Rajesh S. James

Darren S. Klein

LINKLATERS LLP

1345 Avenue of the Americas

New York, New York 10105

Telephone: (212) 903-9000

Facsimile: (212) 903-9100

Martin Flics

Paul S. Hessler

*Attorneys for the Joint Administrators of the UK Administration Companies and the Joint Liquidators of the UK Liquidation Companies*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In Re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
|  | (Jointly Administered) |
| Debtors. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STATEMENT OF THE UK ADMINISTRATION COMPANIES AND UK LIQUIDATION COMPANIES (I) IN SUPPORT OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND (II) IN RESPONSE TO THE FARALLON OBJECTION THERETO**

TO:    THE HONORABLE JAMES M. PECK
       UNITED STATES BANKRUPTCY JUDGE

The UK Administration Companies,[1] acting through their respective administrators

(collectively, the "**Joint Administrators**"[2]), and the UK Liquidation Companies,[3] acting through

their respective liquidators (collectively, the "**Joint Liquidators**"[4]), file this statement (i) in

support of the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors [Docket No. 19627] (as may be amended, modified or supplemented by the

Debtors from time to time, the "**Plan**") and (ii) in response to the objection (the "**Objection**") of

Farallon Capital Partners, L.P., Farallon Capital (AM) Investors L.P., Farallon Capital

Institutional Partners II, L.P., Farallon Capital Offshore Investors II, L.P. and Noonday Offshore,

Inc. (collectively, "**Farallon**") to the Plan [Docket No. 21643] and the settlement agreement,

dated October 24, 2011, among the Debtors, the UK Administration Companies, the UK

---

[1] As used herein, "**UK Administration Companies**" means Lehman Brothers International (Europe) ("**LBIE**"); Lehman Brothers Limited; Lehman Brothers Holdings PLC; LB UK Re Holdings Limited; Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited; LB UK Financing Ltd; LB SF No. 1; Cherry Tree Mortgages Limited; Lehman Brothers Lease & Finance No. 1 Limited; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; LB RE Financing No. 3 Limited; Lehman Brothers (PTG) Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration).

[2] The Joint Administrators of LBIE are Anthony Victor Lomas, Steven Anthony Pearson, Derek Anthony Howell, Paul David Copley and Russell Downs. The Joint Administrators of the UK Administration Companies other than LBIE are Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann, Michael John Andrew Jervis and Derek Anthony Howell.

[3] As used herein, "**UK Liquidation Companies**" means Eldon Street (Cube) Limited; Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Platform Home Mortgage Securities No. 4 Limited; Platform Commercial Mortgage Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; LBO Investments Limited; LBQ Funding (UK); and LB Lomond Investments (each in liquidation).

[4] The Joint Liquidators of the UK Liquidation Companies are Derek Anthony Howell and Ian Oakley-Smith.

Liquidation Companies and certain other UK affiliates[5] (collectively, the "**UK Affiliates**")
included in the plan supplement [Docket No. 21254] (the "**Settlement Agreement**" or the
"**Settlement**").

## BACKGROUND

Beginning on September 15, 2008, the Debtors commenced voluntary cases under
chapter 11 of the United States Code in the United States Bankruptcy Court for the Southern
District of New York.  On the same day, LBIE and certain of its affiliates entered UK
administration proceedings, and, since that date, certain other LBIE affiliates entered UK
administration or liquidation proceedings.

Forty-five UK Affiliates filed more than 100 proofs of claim against fourteen different
Debtors, totaling over $100 billion.  In these proofs of claim, the UK Affiliates asserted six
primary bases for their claims, which were, in turn, based on tens of thousands of underlying
transactions:

(i)    amounts owed from the Debtors to the UK Affiliates as a result of failed and pending
trades;

(ii)    amounts owed from the Debtors to the UK Affiliates as a result of financing trades,
including repos, reverse repos, buy/sell back transactions and "RASCALS"
transactions;

(iii)    amounts owed from the Debtors to the UK Affiliates as a result of a variety of
intercompany transactions, including intercompany derivatives transactions;

---

[5] Certain other UK affiliates that are neither UK Administration Companies nor UK Liquidation
Companies are parties to the Settlement Agreement.  These other UK affiliates are Acenden Limited (f/k/a Capstone
Mortgage Services Limited); Blue I Real Estate Limited; Eldon Street (Birchin) Limited; Eldon Street (Colbert
Orco) Limited; Eldon Street (Fidenza) Limited; Eldon Street (Harley) Limited; Eldon Street (Jefferson) Limited;
Harley Property Ventures Limited; LB Holdings Intermediate 1 Limited; LB SF Warehouse Limited; LB Yellow
(No. 1) Limited; MBAM Investor Limited; Myra Sarl; Parkmetro Limited; Preferred Group Limited; Preferred
Holdings Limited; Preferred Mortgages Limited; Resetfan Limited; SM Funding No. 1 Limited; Southern Pacific
Funding 3 Ltd.; Southern Pacific Mortgage Ltd.; Southern Pacific Personal Loans Limited; Southern Pacific
Residuals 4 Limited; Stepstone Mortgage Funding Limited; Thayer Group Limited (in liquidation) (acting by its
joint liquidators, Nick Vermeulen and Mark James); Thayer Properties (Jersey) Limited (in liquidation) (acting by
its joint liquidators, Nick Vermeulen and Mark James); and Yellow Real Estate Limited.

(iv)    amounts owed from the Debtors to the UK Affiliates in connection with setoff rights under other transactions;

(v)    amounts owed from the Debtors to the UK Affiliates from pre-petition receipts and payments as a result of a cash management system in which LBHI functioned as banker and paymaster to the UK Affiliates; and

(vi)    amounts owed from the Debtors to the UK Affiliates on account of guarantees of the transactions described above or of transactions with other Lehman entities.

Beginning in the earliest days of these chapter 11 cases and continuing through October 2011, the UK Affiliates and the Debtors have engaged in an extensive claims reconciliation and settlement negotiation process. After convening scores of in-person and telephonic meetings among their principals and advisors, and spending literally tens of thousands of hours reconciling and negotiating the almost unthinkably complex relationships between them, the UK Affiliates and the Debtors announced that they had agreed upon a settlement in principle of their claims on September 15, 2011. After yet further intense and extensive negotiation, the Settlement Agreement was finalized and included as part of the plan supplement filed by the Debtors on October 25, 2011, exactly as (i) presaged to this Court at the Disclosure Statement hearing and (ii) provided for in the Disclosure Statement approved by this Court's September 1, 2011 Order [Docket No. 19631].

The Settlement Agreement has the full support of the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "**Committee**"). Indeed, representatives of the Committee participated in multiple discussions with the parties over the course of several months, and the Committee's senior investment banker attended the final, multi-day negotiations in London that culminated in the agreement in principle. Shortly thereafter, the Committee expressed its support for the settlement, subject to reviewing the definitive documentation, which

4

the Debtors provided to the Committee's professionals as drafts were exchanged between the Debtors and the UK Affiliates.

Given the magnitude, variety and complexity of the claims of the Debtors and the UK Affiliates, the Settlement Agreement is the product of unusually long and exceedingly hard-fought efforts by all parties to reach a consensual resolution of claims arising from tens of thousands of discrete transactions. It avoids extended and costly litigation on a mind-boggling multitude of issues, including the value, size and classification of all parties' claims, and substantive consolidation issues with respect to both US and foreign Debtors. It should be approved.

Finally, the Settlement Agreement provides that, subject to certain terms and conditions, LBIE shall file a statement in support of approval and confirmation of the Plan. Pursuant to and subject to the terms and conditions of the Settlement Agreement, LBIE, which timely submitted ballots voting to accept the Plan, hereby confirms its support of confirmation of the Plan.[6]

## ARGUMENT

With no evidentiary support of any kind, Farallon objects to the Settlement Agreement on three grounds. Specifically, it argues that (1) the Debtors have not shown that the Settlement Agreement is fair and equitable and in the best interest of the Debtors; (2) the Settlement Agreement "*may* not be in the best interest of the LBHI estate" because "the proposed settlement *may* involve LBHI subsidizing a more favorable settlement for the benefit of other Debtors and creditors, in particular Lehman Brothers Special Financing Inc." ("**LBSF**"); and (3) application

---

[6] LBIE, of course, reserves all rights and remedies under the Settlement Agreement and applicable law, including its express right under the Settlement Agreement to terminate the Settlement Agreement in the event that it is not approved by the Court as part of the Debtors' Plan.

for approval of the Settlement Agreement should be heard post-confirmation.  (Objection ¶¶ 15–

16, 27 (emphasis added).)  As discussed below, none of these arguments has merit.

## I.    THE SETTLEMENT IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES

"Irrespective of whether a claim is settled as part of a plan pursuant to section

1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule

9019, the standards applied by the Bankruptcy Court for approval are the same."  *In re Best*

*Prods. Co.*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995).  In either case, "[t]he settlement must be fair

and equitable and in the best interests of the estate."  *Id.*; *accord In re Chemtura Corp.*, 439 B.R.

561, 593 (Bankr. S.D.N.Y. 2010).  *See generally Protective Comm. for Indep. Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).

In assessing whether a settlement is "fair and equitable" and "in the best interest of the

estate," the Bankruptcy Court's role is not to substitute its business judgment for that of the

debtor-in-possession.  *See Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y.

1987) (stating that courts should respect the business judgment of the trustee), *aff'd*, 863 F.2d 45

(2d Cir. 1988).  Instead, the Court should accord deference to the debtors' business judgment,

*JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter*

*Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (Peck, J.), and approve a settlement

unless it "'fall[s] below the lowest point in the range of reasonableness,'" *Cosoff v. Rodman (In*

*re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689,

693 (2d Cir. 1972)) (alteration in original); *see also In re Adelphia Commc'ns Group.*, 368 B.R.

140, 225 (Bankr. S.D.N.Y. 2007).  The range of reasonableness is broad.  As Farallon itself

freely admits, "[t]he settlement need not be the best that the debtor could have obtained," and the

breadth of the range recognizes the "uncertainties of law and fact in any particular case and the

concomitant risks and costs necessarily inherent in taking any litigation to completion."

(Objection ¶ 10 (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979), and

*Charter Communc'ns*, 419 B.R. at 252)); *accord Newman*, 464 F.2d at 693.

    Here, the Settlement Agreement unquestionably satisfies these standards.  Based on the

framework announced by the U.S. Supreme Court in *TMT Trailer Ferry*, the Second Circuit has

identified seven factors that bankruptcy courts should consider when assessing whether a

settlement is "fair and equitable" and "in the best interest of the estate."  *Motorola, Inc. v.*

*Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462

(2d Cir. 2007); *Charter Communc'ns*, 419 B.R. at 252–53 & n.19 (evaluating settlement under

the *Iridium* factors); (Objection ¶ 11 (acknowledging that the Settlement should be assessed

under the *Iridium* factors)).  Here, each of these factors supports the conclusion that the

Settlement Agreement is fair and equitable and in the best interests of the Debtors' estates.

### A.  The Settlement is Fair, Given the Substantial Benefits that the Settlement Provides the Estates

    The Settlement protects the Debtors' estates from the very substantial claims filed by the

UK Affiliates.  *See Iridium*, 478 F.3d at 462 (citing "the balance between the litigation's

possibility of success and the settlement's future benefits" as a critical factor).  As discussed

above, the UK Affiliates filed proofs of claim totaling over $100 billion, based on tens of

thousands of intercompany, derivatives and other financing transactions and the guarantees

thereof.  Many of these claims are based on transactions or express guarantees of transactions

with respect to which the UK Affiliates (in their view) have a high probability of success.

The magnitude of the UK Affiliates' potential recovery on these claims is demonstrated by the more than $26 billion that the Debtors agreed to reserve with respect to such claims—a figure arrived at after years of reconciliation work undertaken by the parties.[7] These reserve amounts represent the parties' agreement, subject to additional reconciliation, on the *net* inbound claims of the UK Affiliates against the Debtors, prior to the application of any legal risk-weighting discounts on the claims in either direction.  While the Debtors have raised certain defenses against a portion of those claims, the UK Affiliates have strong arguments supporting their claims.  In addition, LBHI's claims against the UK Affiliates, including the $6.5 billion claim against LBIE mentioned in the Objection, are not free from legal risk, including the argument that these claims should be recharacterized as equity in the applicable UK Affiliate and cannot be used to setoff such UK Affiliate's claims against LBHI.

As to LBIE and LBHI, the only part of the settlement to which Farallon has objected, LBHI agreed to reserve distributions on account of $7,098,042,008 in net claims asserted by LBIE.  This amount was calculated *after* deducting in full the more than $6.5 billion in claims that LBHI asserted against LBIE.  Had LBIE litigated and prevailed in toto against LBHI, its claim would have exceeded $13.5 billion.  Under the Settlement Agreement, LBIE's allowed unsecured claim against LBHI cannot exceed $1.008 billion, and could even be zero.  Moreover, under the Settlement Agreement, the distributions on this allowed claim are being held by LBHI pending the outcome of LBIE's litigation in Germany seeking trust status of LBIE's corresponding $1.008 billion claim against Lehman Brothers Bankhaus A.G. (*In Insolvenz*)

---

[7] At the same time as entering into the Settlement Agreement, the Debtors and certain UK Affiliates entered into a claim reserve agreement (the "**Reserve Agreement**"), which is attached as Exhibit A to the Settlement Agreement.

("**Bankhaus**").  Should LBIE ultimately prevail and recover 100 cents on the dollar from

Bankhaus, LBIE will not be entitled to one penny of those distributions from LBHI.  Thus, out of

not less than  $13.5 billion in total claims against LBHI, LBIE has agreed to accept between zero

and $1.008 billion.  In these circumstances, "the numbers themselves are undeniably powerful"

evidence supporting approval of the Settlement.  *Charter Communc'ns*, 419 B.R. at 241.[8]

B.    **The Settlement Avoids Complex and Protracted Litigation, with Its
Attendant Expense, Inconvenience and Delay**

Approval of the Settlement Agreement is also appropriate, given the substantial

"likelihood [that] complex and protracted litigation, 'with its attendant expense, inconvenience,

and delay'" would otherwise result.  *Iridium*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347

B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  As Farallon acknowledges (and is common

knowledge), the Debtors and the UK Affiliates "had a very complicated and multifaceted

relationship."  (Objection ¶ 23.)  The claims filed by the UK Affiliates and asserted by the

Debtors are based on literally tens of thousands of underlying transactions.  Moreover, the law

underlying the now-settled disputes between the parties is complex and in some cases rather

esoteric.  Substantive consolidation, recharacterization, guaranty and suretyship, implied

indemnity, subrogation, unilateral contract, comity, choice of law—these are but a few of the

many doctrines whose depths would have had to have been plumbed absent agreement.

---

[8] An additional benefit to LBHI is that the Settlement also protects LBHI's estate from the risk of
substantially lower recoveries with respect to LBHI's claims against Lehman Brothers (Luxembourg) S.A. ("**LB
Lux**").  Pursuant to the Settlement Agreement, LBHI and LBIE agreed to share any distributions either receives
from the LB Lux Estate, with LBHI entitled to 45% of such distributions and LBIE entitled to 55%.  LBHI's claims
against LB Lux are resolved pursuant to a separate settlement agreement to be approved under the Plan in the
amount of approximately $1 billion; LBIE's claims against LB Lux exceed $5.9 billion and are currently the subject
of protracted litigation in Luxembourg.  If LBHI and LBIE were each to receive pro rata recoveries from LB Lux
based on the claims that they filed (and stand prepared to prove and defend), LBHI only would be entitled to about
15% of the distributions received by LBHI and LBIE.  Instead, it is getting *three times* that amount.

Moreover, were the Debtors and the UK Affiliates required to litigate each of the many tens of billions of dollars in claims among them, the resulting litigation would have taken many years and cost many tens of millions of dollars of administrative expenses, all while the Debtors withheld distributions with respect to more than $26 billion in UK Affiliate claims.

C.    **The Settlement Enjoys the Support of Creditors, and Other Relevant Factors Support Approval of the Settlement**

The broad support that the Settlement enjoys among creditors further confirms that it is fair and equitable.  *See Iridium*, 478 F.3d at 462 (in assessing whether a settlement is fair and equitable, the court should consider "'the degree to which creditors either do not object to or affirmatively support the proposed settlement'" (quoting *WorldCom*, 347 B.R. at 137)).  The Committee, the statutory fiduciary for all of the Debtors' unsecured creditors, supports the Settlement and was involved in its negotiation over a period of many months.  *See, e.g.*, *Six W. Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.*, 286 B.R. 239, 248 (S.D.N.Y. 2002) (citing "the Creditors' Committee's decision to support" a settlement as "'further evidence of its fairness'" (quoting *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 45 (Bankr. S.D.N.Y. 1998))); *In re Ambac Fin. Group*, No. 10-15973, 2011 Bankr. LEXIS 4257, at *19 (Bankr. S.D.N.Y. Sept. 23, 2011) ("In considering the third *Iridium* factor—the paramount interests of creditors— the Court concludes that the support of the Creditors' Committee here weighs heavily in favor of approval of the proposed settlement.").  The Debtors briefed other creditor groups, including the Ad Hoc Group of Lehman Creditors, on the Settlement, and none has objected.  Indeed, out of the thousands of creditors in these cases (whose claims total more than $300 billion), the only party that has objected is Farallon, which accounts for a minuscule portion of the overall claims against the Debtors' estates (and whose "objection" all but admits that it is an unsubstantiated

shot in the dark).  As this Court has previously recognized in these cases, the idiosyncratic views

of a tiny minority should not be allowed to override a settlement reached, following extensive

analysis, by the Debtors in the exercise of their reasonable business judgment and supported by

the Committee in the exercise of its fiduciary duties.[9]

The other factors identified by the Second Circuit all support approval of the Settlement.

Farallon has not questioned the "competency and experience of counsel" supporting the

settlement.  *Iridium*, 478 F.3d at 462.  Nor has it questioned the propriety of the (entirely typical)

releases contained in the Settlement.  *Id.*  Finally, the Settlement is without any possible question

"the product of arm's length bargaining."  *Id.*  As noted above, the Settlement represents the

culmination of tens of thousands of hours of claims reconciliation, and intense, protracted and

arm's-length settlement negotiations that began in the earliest days of these chapter 11 cases and

continued through October 2011.

## II.    FARALLON SUPPLIES NO REASONED BASIS ON WHICH
## TO CONCLUDE THAT THE SETTLEMENT MISALLOCATES
## RESOURCES FROM THE LBHI TO THE LBSF ESTATE

The Objection wrongly suggests—without a scintilla of evidence (or even logic)—that

the Settlement Agreement "*may* not be in the best interest of the LBHI estate" because "the

proposed settlement *may* involve LBHI subsidizing a more favorable settlement for the benefit of

other Debtors and creditors, in particular Lehman Brothers Special Financing Inc."  (Objection

¶ 16 (emphasis added).)  It is with very good reason that two fiduciaries (the Debtors and the

---

[9] June 15, 2011 Omnibus Hearing Tr. at 77–78 (remarks of the Court) ("And I fully appreciate the fact that third-parties who are not directly involved in the negotiations could come to the conclusion that a better alternative to peace is war. . . .  The debtors and the creditors committee obviously disagree and think that the transaction that's before the Court is a rational one that makes sense under the present circumstances . . . . And having invested the time and the effort to get us to this point, they urge that I endorse their business judgment and I do.").

Committee) and tens of thousands of LBHI creditors, including many who have been extremely active throughout the proceedings, support or have no objection to it.

Farallon's all-but-explicit accusation—that both the Debtors and the Committee have breached their fiduciary duties to LBHI creditors and "taken a dive" qua LBHI to secure a better deal for LBSF—is both unsupported and unsupportable.  It is only through misleading sleight of hand that Farallon can even assert that "[u]nder the proposed [UK Affiliates] Settlement, a $6.5 billion receivable owed by LBIE to LBHI has turned into a $1 billion claim by LBIE against LBHI, a swing of negative $7.5 billion for LBHI."  (Objection ¶ 21.)  Farallon's argument fails utterly to account for *any* of the massive claims that LBIE has against LBHI.  As noted above, the Debtors have agreed to reserve more than $7 billion with respect to such claims, and this reserve was calculated *after* offsetting the full amount of LBHI's asserted $6.5 billion funding claim.  As a result, the Settlement Agreement effectively transforms LBHI's potential *net* exposure—of at least $7.0–$13.5 billion—to a claim of $1.008 billion that may never receive a penny of distributions from LBHI.[10]  To use Farallon's words with the actual numbers, the Settlement in fact effects a potential "swing of positive $6.0–$13.5 billion for LBHI."

III.    **FARALLON'S OBJECTION SUPPLIES NO REASONABLE
        BASIS FOR SEVERING THE SETTLEMENT AGREEMENT
        FROM THE REMAINDER OF THE PLAN**

Farallon also argues that the Settlement Agreement should be severed from the remainder of the Plan and its approval postponed until after the Plan has been confirmed, in order to permit

---

[10] As noted above, LBHI may never need to make *any* distributions to LBIE on account of its $1.008 billion unsecured claim.  The Settlement Agreement provides that LBHI will retain distributions on account of this claim pending the outcome of LBIE's litigation in Germany seeking trust status of its $1.008 billion claim against Bankhaus.  Should LBIE prevail and recover 100 cents on the dollar for these trust claims, LBIE will not be entitled to any distributions on this allowed claim against LBHI.

12

the Court and parties in interest "sufficient time to canvass the issues and probe the settlement." (Objection ¶ 27.)  This argument is procedurally barred and rests on assumptions that are both factually and legally deficient.  Moreover, Farallon has failed to mention that LBIE has an absolute and unconditional termination right if the Settlement is not approved as part of the Plan. Unsurprisingly, resolving the UK Affiliates' plan objections and securing their votes in favor of the Plan were central elements of the Settlement.  Thus, granting Farallon the relief it requests risks the massive benefits the Settlement provides to these estates.

As an initial matter, Farallon's argument is procedurally barred.  The timetable that Farallon now deems insufficient was approved by the Court in its September 1, 2011 order approving the Disclosure Statement, scheduling a confirmation hearing, and establishing notice and objection procedures for confirmation of the Plan.[11]  This is both appropriate and necessary because, as the Plan provides:  "any settlement agreement entered into among any of the Debtors and any Non-Controlled Affiliate that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms."  (Plan § 6.5(b)(vii).)  The Plan and approved Disclosure Statement each provide that the Plan Supplement shall be "filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Voting Deadline." (*id.* § 15.5; Discl. Stmt. § X.J.11 at 121.)  And the Court's September 1, 2011 order approved the Disclosure Statement, established a voting and objection deadline of November 4, 2011 (yielding an October 25, 2011 Plan Supplement filing deadline), and scheduled a confirmation hearing beginning December 6, 2011.

---

[11] Amended Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan, Docket No. 19631, Sept. 1, 2011.

13

If Farallon had any legitimate objection to this schedule, its deadline for voicing it passed on August 30, 2011, when the Debtors' motion to approve the Disclosure Statement, schedule the confirmation hearing, and establish notice and objection procedures for Plan confirmation was heard. Indeed, the likelihood—and the aspiration—that a settlement between the Debtors and the UK Affiliates would be filed on October 25 as part of the Plan Supplement and incorporated into the Plan—*exactly as subsequently happened*—was expressly discussed by counsel to the Debtors and the UK Affiliates at the August 30, 2011 hearing on the Disclosure Statement.[12] No party objected, and the order was entered.

Even had Farallon's argument been timely made, there is no factual or legal basis to sever the Settlement Agreement from the remainder of the Plan. Farallon's argument wrongly assumes that (1) parties in interest had no opportunity "to canvass the issues and probe the settlement," and that (2) severing the Settlement from the remainder of the Plan is necessary to afford the Court and parties in interests "sufficient time" to undertake these tasks. (Objection ¶ 27.) Both of these assumptions are incorrect.

The first assumption is wrong as a factual matter because the Committee, the fiduciary to the estates' unsecured creditors, *has* extensively canvassed the issues and probed the Settlement. The Committee closely monitored the negotiation of the Settlement, fully canvassed the issues, and probed the settlement to ensure that it falls well within the range of the reasonableness. The Committee's advisors attended the summit between representatives of the Debtors and the UK

---

[12] The Debtors repeatedly emphasized that they intended to enter into settlements with additional, non-controlled affiliates and such settlements would be included in the Plan Supplement, and counsel for the UK Administration Companies and UK Liquidation Companies confirmed that the Debtors and the UK Affiliates had a "serious in-person senior clients summit planned in London for mid-September, which we very much hope will add us [to] the long list of supporters of the plan." Aug. 30 Hr'g Tr. at 49; *see also id.* at 55.

Affiliates that led to the Settlement and were apprised of subsequent negotiations of the Settlement's documentation.

The second assumption is wrong as a matter of law because none of the Bankruptcy Code, the Bankruptcy Rules nor due process contemplates or requires the months-long settlement-approval process that Farallon envisions. Quite the contrary. Federal courts have recognized that approval of a settlement in bankruptcy should *not* involve an extensive evidentiary hearing. "As the Second Circuit has noted, a bankruptcy court need not have knowledge of all of the facts relevant to a suit's resolution, as '[t]he Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one.'" *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 948 (Bankr. S.D.N.Y. 1994) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982)) (alteration in original); *see also In re Town, LLC*, No. 09-11827, 2009 Bankr. LEXIS 2037, at *8 (Bankr. S.D.N.Y. July 27, 2009) ("A court is not required to conduct a mini-trial of the issues, but rather, to canvass them." (citing *In re W.T. Grant Co.*, 699 F.2d at 608)); *In re Adelphia Communc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005); *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 493, 496–97 (Bankr. S.D.N.Y. 1991).[13]

Indeed, the extended process contemplated by Farallon would defeat one of the principal rationales for settlement. Parties settle to *avoid* costly and time-consuming litigation. *See Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*,

---

[13] *Accord Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) (a bankruptcy court need not hold a full evidentiary hearing or even a "mini-trial" before a compromise can be approved); *Port O'Call Inv. Co. v. Blair (In re Blair)*, 538 F.2d 849 (9th Cir. 1976); *In re Capmark Fin. Group Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("Under Bankruptcy Rule 9019(a), the Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise.").

15

134 B.R. 499, 501 (Bankr. S.D.N.Y. 1991). The expedited procedure by which bankruptcy courts approve settlements reflects "the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522–23 (S.D.N.Y. 1993); *see also Resolution Trust Corporation v. The Official Committee of Unsecured Creditors of Frost Bros., Inc. (In re Frost Bros., Inc.)*, No. 91 Civ. 5244, 1992 U.S. Dist. LEXIS 18301, at *18 (S.D.N.Y. Nov. 30, 1992) ("If bankruptcy courts were required to approve settlements only after an exhaustive determination of the claims, then little would be saved by the settlement process."); 10 Collier on Bankruptcy ¶ 9019.02 (observing that, if a full evidentiary hearing or "mini-trial" were required, "there would be no point in compromising; the parties might as well go ahead and try the case.").

Consistent with these objectives, the Bankruptcy Rules do not require an extended judicial process and proceedings before a settlement is approved. Had the Debtors moved the Court for approval of the Settlement Agreement under Bankruptcy Rule 9019, they would have had to provide only twenty-one days' notice prior to hearing, well below the forty-two days' notice actually provided.[14] Moreover, the UK Affiliates understand that the Debtors and the Committee reached out to Farallon weeks before the scheduled confirmation hearing to provide Farallon with additional information and answer any questions about the Settlement.

---

[14] Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement," and further provides that such notice shall be given in accordance with Bankruptcy Rule 2002. Under Bankruptcy Rule 2002(a)(3), unless certain exceptions apply, parties in interest shall be given "21 days' notice by mail of . . . the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to [Bankruptcy] Rule 4001(d), unless the court for cause shown directs that notice not be sent."

16

In addition to being enshrined in this Court's order, the schedule and procedures approved by the Court in this case fully satisfy the requirements of due process.  While Farallon cites the complexity of the relationships among the Debtors and the UK Affiliates as a justification for a lengthier review of the settlement than would otherwise be required, courts have recognized, to the contrary, that "the more a controversy in litigation by a bankruptcy estate involves complex facts and novel theories of law, the *less* thoroughgoing a factual record is required before a Bankruptcy Court may approve a stipulation which appears on its face to substantially benefit the estate."  *Iannacone v. Berisford Capital Corp. (In re Hancock-Nelson Mercantile Co.)*, 95 B.R. 982, 993 (Bankr. D. Minn. 1989) (emphasis added).

Consistent with this precept, the Second Circuit has affirmed approval of complex settlements on timetables that provide materially less than the ample notice supplied in this case. In *In re Drexel Burnham Lambert Group*, 995 F.2d 1138 (2d Cir. 1993), for example, the Second Circuit rejected the objectors' argument that a complex settlement had been approved "without proper notice or a hearing" in a case where a schedule afforded parties in interest radically less notice than here.  *Id.* at 1141.  The settlement in question was a $1.3 billion multilateral resolution of 850 claims brought by 7,700 claimants against the debtors and approximately 600 other defendants.  *Id.* at 1141.  On February 14, 1992, the debtors moved under Bankruptcy Rule 9019 for approval of their participation in the settlement.  Unlike the Debtors, who filed the actual, executed Settlement Agreement with the plan supplement in the instant matter, the moving parties in *Drexel Burnham* simply sent claimants a three-page notice incorporating "a brief outline of the proposed principal terms of the Global Settlement" and informing them that a hearing on the motion would be held on March 6, 1992.  *Id.* at 1143.  The notice could not

17

provide claimants the details of the settlement, as those details were negotiated only *two days* before the hearing was ultimately held on March 9, 1992. [15]   After listening to various claimants' oral objections at the hearing, the district court approved the Bankruptcy Rule 9019 motion at oral argument.   *Id.*

The Second Circuit, after considering both the timing of the notice and its substance, held that the notice provided to claimants satisfied due process.   The court began by stating that "[n]o rigid constitutionally mandated standard governs the contents of notice in a case like the one before us.   Rather, the Due Process Clause requires the best notice practical under the circumstances . . . ."   *Id.* at 1144 (citations omitted).   Although the notice's description of the settlement was spare, the Second Circuit held that the notice was adequate because it was "reasonably calculated to apprise the parties of the terms of a proposed settlement and the options available in connection with the judicial proceeding."   *Id.*   The court viewed the complexity of the settlement and the intensity of negotiations surrounding its completion as leading to less, not more, specificity in the settlement description provided to claimants:   "precise specificity apparently was impossible given that negotiations with respect to details of the settlement agreement were ongoing and not concluded until the proverbial eleventh hour."   *Id.* at 1145.   Finally, when the objecting parties argued that the hearing itself was inadequate, casting the district court's immediate approval of the Bankruptcy Rule 9019 motion as evidence that oral arguments had been permitted only as a formality, the Second Circuit noted that "[a]ll interested parties were provided with an opportunity to make written and oral objections to the proposed settlement agreement," that the "trial court read all of the papers filed in objection to the joint

---

[15] The district court initially scheduled the hearing twenty-one days after notice was given, but postponed the hearing for three days to facilitate last-minute negotiations between parties to the settlement, as discussed below.

18

motion," that it "made clear . . . that everyone had the opportunity to ask all the questions necessary to satisfy themselves," and that it "considered all the objections raised, though it justifiably refused to allow minor quibbles to derail this expensive and intricate Global Settlement." *Id.*

Unlike their counterparts in the *Drexel Burnham* case, Farallon received the detailed Settlement Agreement forty-two—as opposed to two—days before the hearing.  Moreover, well before the hearing, the Debtors satisfied their burden of showing that the Settlement is fair and equitable and in the best interests of creditors.  Thus, the procedures here more than comport with the requirements of the Bankruptcy Code, the Bankruptcy Rules and due process, as construed by the Second Circuit.

Finally, prompt approval of the Settlement will benefit all creditors of the Debtors' estates by resolving tens of billions of dollars of claims against the estates, by avoiding extensive litigation and distraction, and by permitting the Debtors to pay out immediately billions of dollars that they would otherwise need to hold in reserve.  Farallon has neglected to let the Court know that there is no "free option" for the Debtors here:  LBIE retains the unqualified right to walk away from the Settlement Agreement if it is not approved as part of the Debtors' Plan. Unsurprisingly, being done and not having to address confirmation objections and a "no vote" by the UK Affiliates were an important part of the deal for the signatories.  Should LBIE exercise its termination right, the Debtors' estates could face tens of billions of additional claims and tens of millions of dollars of expenses that they will not face if the Settlement Agreement is approved on the very schedule ordered by this Court.

## **CONCLUSION**

For the foregoing reasons, the Plan should be confirmed, the Settlement Agreement

approved and Farallon's Objection overruled.

Dated:   New York, New York
         November 29, 2011

                         DAVIS POLK & WARDWELL LLP


                         By:   /s/ Marshall S. Huebner
                               Marshall S. Huebner
                               James H.R. Windels
                               Brian M. Resnick
                               Rajesh S. James
                               Darren S. Klein

                         450 Lexington Avenue
                         New York, New York 10017
                         Telephone: (212) 450-4000
                         Facsimile: (212) 701-5800


                         LINKLATERS LLP
                         1345 Avenue of the Americas
                         New York, New York 10105
                         Telephone: (212) 903-9000
                         Facsimile: (212) 903-9100
                         Martin Flics
                         Paul S. Hessler

                         *Attorneys for the Joint Administrators of
                         the UK Administration Companies and the
                         Joint Liquidators of the UK Liquidation
                         Companies*

20