**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

## DECLARATION OF JOHN K. SUCKOW IN SUPPORT OF
## CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN
## OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

John K. Suckow makes this declaration pursuant to 28 U.S.C. § 1746, and states:

1.      I am the President and Chief Operating Officer of Lehman Brothers

Holdings Inc. and a Managing Director with Alvarez & Marsal North America, LLC ("A&M"),

a restructuring advisory services firm with numerous offices throughout the world.

2.      A&M is a well-known global organization that provides restructuring

advisory services to numerous businesses and industries.  A&M restructuring professionals

specialize in interim management, crisis management, turnaround consulting, creditor advisory

and financial/operational restructuring.  A&M's debtor advisory services include a range of

activities to assist in the stabilization and improvement of a debtor's financial position and

operations, including the development and validation of forecasts and business plans, as well as

related assessments of a debtor's strategic options.  A&M's activities also include monitoring

and managing cash and cash flow, as well as managing relationships among a debtor and its

creditors.  A&M also engages in the assessment of strategies such as cost reductions and in the

design and negotiation of financial restructuring arrangements.

3.      A&M was engaged by the Debtors following the commencement of a

chapter 11 case by LBHI on September 15, 2008.  A&M formally commenced the engagement

during the week of September 15, 2008.  At that time, the Debtors were actively engaged in the

negotiation of the sale of the North American Capital Markets business to Barclays Capital Inc.

("BarCap").  That sale, approved by the Court on September 20, 2008, was consummated on

September 22, 2008.  As a result of that sale, essentially all of the approximately 10,000 persons

employed by the Debtors in the United States were transferred to BarCap.  Although BarCap, as

part of the sale arrangement, agreed to provide services to the Debtors pursuant to a transition

service agreement, the transfer of the employees and the information technology handicapped the

initial efforts to gain control of the Debtors' property and establish procedures for the

administration of the Debtors' cases.  To mitigate that handicap, A&M provided more than two

hundred A&M personnel to establish proper oversight and administration of the Debtors and

their property as efficiently as possible.  A&M professionals immediately began working closely

with the few Debtors' employees that remained after the BarCap sale and engaged with BarCap

to define the requirements of the transition services agreement.

4.    In connection with its engagement, A&M professionals performed

services that included: (a) reviewing and assessing the Debtors' financial information, including,

among other things, its short and long term projected cash flows, (b) assisting in asset

identification, analysis and sales, (c) formulation of a human resources plan, (d) development of

business and strategic plans to maximize the Debtors' asset values, (e) establishing

communications and relationships with the Debtors' creditors, and (f) performing all other

services as required to manage the estates, as reasonably requested and directed by the Board of

Directors of LBHI. As part of A&M's engagement, Bryan Marsal was initially appointed as the

Debtors' Chief Restructuring Officer.  I worked side-by-side with Mr. Marsal as part of the

A&M senior management team for the Debtors' cases.  Subsequently, as the chaos that erupted

2

after the commencement of the chapter 11 case of LBHI began to subside and the controls

directed by A&M had been implemented, Mr. Marsal was appointed as the Chief Executive

Officer of LBHI.  In April 2009, I was appointed as President and Chief Operating Officer of

LBHI.  A&M, as the senior management team, has been and continues to be deeply involved in

the affairs and administration of the Debtors' businesses and these cases.

5.      I submit this declaration in support of the confirmation of the Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors[1]

[ECF No. 19627].  Unless otherwise stated herein, the facts set forth in this declaration are based

upon my personal knowledge or the personal knowledge of employees of the Debtors or A&M

who report to me, reasonable inquiry, review by me or those who report to me of records

maintained by the Debtors and their subsidiaries, some of which are attached to this declaration,

or my opinion based upon my familiarity with the Debtors' business, operations and financial

condition.  If I were called upon to testify, I could and would testify competently as to the facts

set forth herein.

6.      After the commencement of the Debtors' chapter 11 cases, one of the

charges and responsibilities of the Debtors, under my guidance and that of other A&M

personnel, was to initiate an intensive fact investigation of the prepetition structure and

---

[1] The Debtors include Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc.
("LCPI"); Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Brothers Special Financing
Inc. ("LBSF"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers OTC Derivatives
Inc. ("LOTC"); Lehman Brothers Financial Products Inc. ("LBFP"); Lehman Brothers Derivative
Products Inc. ("LBDP"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES
Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC
Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua
Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI
Statler Arms LLC.

operations of the Lehman enterprise[2] in consultation with other professionals engaged by the

Debtors.  The investigation sought to ascertain the facts and circumstances that might be relevant

to the consideration of whether the equitable doctrine of substantive consolidation should be

applied to the Debtors and all or some of their Affiliates[3] so as to create a *de facto* merger of the

assets and liabilities of all or some of the Debtors and their Affiliates.

7.      During the course of the investigation, current and former employees of

the Lehman enterprise who had knowledge concerning the specific matters relevant to the issue

of substantive consolidation were interviewed by the Debtors' attorneys and related documents

were reviewed.  The Debtors' attorneys also interviewed other individuals employed by asserted

creditors of the Lehman enterprise concerning: (a) creditor perception of and reliance on the

independent identity and legal integrity of the various Lehman units; (b) creditors'

understandings of how the Lehman enterprise managed itself, including how assets flowed to

and/or from the various Lehman entities; and (c) how creditors assessed the creditworthiness of

the Lehman enterprise and determined credit limits for particular Lehman entities.

8.      The Debtors' attorneys reviewed all of the information collected

throughout the investigation and reported the results of the investigation to the Debtors and

A&M.  The data was assessed to consider which facts were likely to militate in favor of and

against substantive consolidation of the nominally separate Lehman entities.  The investigation

and evaluation of the facts ascertained led the Debtors to conclude that there are numerous facts

---

[2] "Lehman" or the "Lehman enterprise" shall mean collectively, LBHI, its affiliated Debtors in the above-captioned chapter 11 cases, its Affiliates that are the subject of various foreign insolvency proceedings, its non-Debtor Affiliates (domestic and foreign) and Lehman Brothers Inc. ("LBI").  The definition shall not include Neuberger Berman.

[3] Terms not otherwise defined herein shall have the meaning ascribed to them in the *Debtors' Memorandum of Law, Pursuant To Section 1123(b)(3)(A) of The Bankruptcy Code and Rule 9019 of The Federal Rules of Bankruptcy Procedure, In Support of Plan Settlements* (the "Memorandum").

and circumstances that weighed heavily in favor of substantive consolidation and numerous facts and circumstances that weighed heavily against substantive consolidation. I have identified many of those facts in the paragraphs that follow.

### Facts Weighing In Favor Of Substantive Consolidation

9.      There are numerous facts and circumstances demonstrating that: (i) there was substantial entanglement and interweaving of the affairs, transactions and operations of the Lehman enterprise that disregarded legal entities and corporate separateness; and (ii) creditors, generally, relied on the financial condition of the overall Lehman enterprise – and not specific legal entities – in doing business, extending credit and entering into transactions with Lehman.

### Entanglement of Affairs

*Operation of Business*

10.      Lehman held itself out as a group of business segments that sold various products under a single, publicly-recognized umbrella – "Lehman Brothers." Lehman was operated as one enterprise, organized into three business segments, without regard to legal niceties or specific corporate integrity, *i.e.*: (i) Capital Markets, (ii) Investment Banking and (iii) Investment Management. *See* **Exhibit 1** (Lehman Brothers Holdings Inc. Form 10-K) at pp. 3-9, 46-54; **Exhibit 2** (Consolidated Supervised Entity (CSE) Overview presentation) at pp. 9-13.

11.      Lehman's Capital Markets business had two main segments: Equities and Fixed Income. Lehman's Capital Markets business was a leading global market-maker in numerous equity and fixed income products, including U.S., European and Asian equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage- and asset-back securities, preferred stock, municipal

securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products.  *See* Ex.1 (LBHI 10-K) at p. 4.

12.     The Lehman enterprise maintained a firm-wide Corporate Division that provided services to all of its business units (and to all legal entities), including processing of securities transactions, safeguarding of customers' securities, risk management, compliance with applicable regulatory and legal requirements, technology infrastructure, information security, treasury operations, financial reporting and business unit financial support, tax planning and compliance, internal audit, expense management, legal support, human resources and other support functions.  *See* Ex. 1 (LBHI 10-K) at p. 10; Ex. 2 (CSE Overview) at pp. 14-17; **Exhibit 3** (Corporate Governance Presentation to Moody's Investor Services) at pp. 47-72; **Exhibit 4** (Office of the Chief Financial Officer Organization Chart); **Exhibit 5** (Office of the Chief Financial Officer Treasury Organization Chart); **Exhibit 6** (Global Tax Organization Chart).

13.     The Lehman enterprise operated out of shared office space organized by business line (without regard to specific legal entities), with a significant portion of its employees operating out of the world headquarters at 745 Seventh Avenue in New York City. *See* Ex.1 (LBHI 10-K) at p. 22.  Domestic real property and leases, generally, were in the name of LBHI, LBI and Neuberger Berman.  LBI served as the enterprise's paymaster in the U.S. and paid the lease rentals and other charges generally with funds originated from the common enterprise pool.  *See* **Exhibit 7** (Schedule of leases).

14.     Litigation against any Lehman entity was managed globally in New York by the Lehman Litigation Department.  Compliance functions for all Lehman entities were performed by central, firm-wide compliance teams.  *See* Ex. 2 (CSE Overview) at pp. 51-70; Ex.

3 (Corporate Governance Presentation) at pp. 53-57; **Exhibit 8** (Legal and Regulatory Matters and Client Complaints policy).

15.    Tax planning was the responsibility of the Lehman Global Tax Group. The Global Tax Group reviewed tax disclosures in prospectuses, assisted in structuring transactions firm-wide in a tax-efficient manner and provided foreign tax advice.  *See* Ex. 6 (Global Tax Organization Chart).

16.    The costs of these corporate services were allocated to individual business units for business performance management purposes without regard to specific legal entities. *See* **Exhibit 9** (Allocation Summit Overview Presentation).

17.    Employees were given and used business cards that read simply "Lehman Brothers," and employees had email addresses "@lehman.com."  Domestic employment offers identified "Lehman Brothers" as the employer.   Employee benefits and personnel policies were the responsibility of the Lehman global human resources group.  *See* **Exhibit 10** (Employment offer templates).

18.    U.S. employees were generally paid by LBI, which, as stated, acted as the paymaster for the Lehman enterprise in the United States, regardless of the business line or legal entity for which the employee may have performed services, generally with funds originated from the common enterprise pool.

*Direction and Supervision Was Done at a Firm-wide Level*

19.     The LBHI Board of Directors, its Executive Committee and various standing LBHI Board committees had broad responsibility over firm-wide issues, including global strategy, risk, liquidity, funding, operations, and new products.   *See* Ex. 2 (CSE Overview) at pp. 14-17, 26-31; Ex. 3 (Corporate Governance Presentation) at pp. 28-38.

20.     Standing Lehman firm-wide committees included the Executive
Committee, the Management Committee, the Conflicts Task Force, the Finance Committee, the
Investment Committee, the Operating Exposures Committee, the Risk Committee and the
Strategic Acquisitions Committee.  *See* **Exhibit 11** (Committees Homepage from Lehman Live);
Ex. 2 (CSE Overview) at pp. 34-42.  These committees made strategic decisions, which were
generally ratified as needed by the appointed boards of directors of various subsidiaries; such
ratification was usually accomplished by execution of a written resolution without a formal
meeting of the particular board.  *See* Ex. 3 (Corporate Governance Presentation) at pp. 28-38;
**Exhibit 12** (Sample LBSF Electronic Consents).

21.     All material transactions had to be approved by the appropriate firm-wide
transaction approval committee, which included:  Bridge Loan Committee, Commitment
Committee, Complex Structured Finance Transactions Committee, Investment Committee,
Strategic Acquisitions Review Committee.  These transaction approval committees were
delegated their authorities by the firm's Executive Committee.  Legal entities did not have their
own investment committees.  *See* Ex. 11 (Committees Homepage from Lehman Live); Ex. 2
(CSE Overview) at pp. 34, 42; Ex. 3 (Corporate Governance Presentation) at pp. 39-46.

22.     LBHI and the Lehman enterprise were subject to group-wide supervision
and examination by the SEC as a Consolidated Supervised Entity ("CSE").  As one of only five
CSEs, the SEC required Lehman to comply with minimum capital standards on a consolidated
basis.  *See* Ex. 1 (LBHI 10-K) at pp. 10, 135; Ex. 2 (CSE Overview) at p. 79; Ex. 3 (Corporate
Governance Presentation) at pp. 78-80.

23.     Risk was managed on a firm-wide level, through comprehensive, group-
wide risk management procedures.  Risk Management was a global, integrated function under

the leadership of the Global Head of Risk Management appointed by LBHI.  A single Lehman

Risk Committee, which included the firm's Executive Committee, the Global Head of Risk

Management and certain other members of senior management, regularly reviewed risk

exposures and position concentrations, allocated usage of capital to each business line, and

established trading and credit limits for counterparties.  *See* Ex. 1 (LBHI 10-K) at pp. 13, 69-71;

Ex. 2 (CSE Overview) at pp. 39, 113-139; Ex. 3 (Corporate Governance Presentation) at p. 35.

24.     Risk appetite (the amount Lehman was "prepared to lose" in a year from

market and counterparty credit risk, as well as from stress events) was approved by the firm's

Risk Committee on an annual basis and reviewed quarterly for requisite changes.  This total

firm-wide risk appetite was allocated to business segments, business lines and regions and

finally, to individual desks based upon business lines and without regard to legal entities.  Risk

appetite usage was calculated daily both on a global, consolidated basis, and at regional, segment

and line-of-business levels, and it was monitored on a daily basis against the established limits.

*See* Ex. 2 (CSE Overview) at pp. 122-127; **Exhibit 13** (Sample Firm-wide Risk Report).

25.     Lehman maintained a firm-wide Credit Risk Management group that

established a credit limit for each counterparty across all Lehman entities.  This limit was then

allocated down to the business lines on an as-needed basis.  Limits were reviewed annually or

biannually, while usage against the limits was monitored daily by Credit Risk Management.  *See*

Ex. 2 (CSE Overview) at pp. 129-130, 138.

*Financing and Cash Management Were Done at a Firm-wide Level*

26.     LBHI was primarily a holding company and its cash flow and consequent

ability to pay dividends and satisfy its obligations under securities it issued was dependent upon

the earnings of its subsidiaries and the distribution of those earnings as dividends or loans or

9

other payments by those subsidiaries to LBHI.  In Europe, the U.K. branch of LBHI and LBIE
(under the oversight of LBHI), served some of the same functions for European operations as
LBHI performed in the United States.  *See* Ex. 1 (LBHI 10-K) at p. 17.

27.    LBHI, as the enterprise's "bank," was the primary conduit for raising the
majority of the external financing for operations of the Lehman enterprise and the ultimate
source of funds for all Lehman entities, funding the needs of its U.S. and foreign subsidiaries
through intercompany advances.  To the extent other Lehman entities raised funds, their ability
to do so, clearly, was based on a guarantee by LBHI.  Decisions to raise financing were made by
the Lehman Finance Committee, and the Lehman enterprise funded its activities through a
combination of master notes, commercial paper, bank credit facilities, bonds, lines-of-credit,
foreign denominated debt and other money market related instruments.  *See* Ex. 1 (LBHI 10-K)
at pp. 57-61.

28.    LBHI pooled the capital of Lehman entities for the benefit of the entire
Lehman enterprise and the capital of each Lehman entity was in turn sourced from that single
pool of the enterprise's capital.  At the end of each business day, any excess cash held by many
of LBHI's Affiliates would be transferred by the Treasury Department into an LBHI account,
where the cash was collected into a single pool of funds for the Lehman enterprise.  This pool of
funds was used to maximize overnight investment and to finance the Lehman enterprise –
including regulated entities such as LBI, LBIE and Bankhaus – throughout the next day as
needed.  *See* Ex. 2 (CSE Overview) at pp. 108-111; **Exhibit 14** (Global Close Seminar –
Financial Close Process and Financial Close) at pp. 9-15; **Exhibit 15** (Global Close Seminar –
Intercompany Accounts) at pp. 5-10; **Exhibit 16** (Finance Systems Overview).

29.     The LBHI cash management system functioned on a global basis. Transactions by all of the Lehman entities worldwide were systematically consolidated onto a single general ledger either directly or indirectly.  Lehman's Global Cash and Collateral Management system (GCCM) and Treasury Workstation (TWS) managed movement of cash in and out of the enterprise and enabled all cash flows to be monitored centrally, *i.e.*, from Lehman headquarters in New York and Jersey City.  These cash transfer systems controlled the bank accounts of the various Lehman units around the world and implemented intercompany transfers at day's end to fund the entities with bank accounts exhibiting a deficit.  *See* Ex. 2 (CSE Overview) at pp. 108-111; Ex. 14 (Global Close Seminar – Financial Close Process and Financial Close) at pp. 9-15; Ex. 15 (Global Close Seminar – Intercompany Accounts) at pp. 5-10; Ex. 16 (Finance Systems Overview).

30.     Absent regulatory requirements, LBHI the following morning would not refund the same amount swept the previous night to Affiliate bank accounts, but would instead transfer only sufficient funds to cover the forecasted needs of the particular entity for that day. As a result of the consolidated cash management system, there were thousands of intercompany transactions each day.  *See* Ex. 15 (Global Close Seminar – Intercompany Accounts); Ex. 16 (Finance Systems Overview).

31.     Not every Lehman entity had its own bank account.  If a Lehman entity did not have its own bank account (or if it settled its transactions through a regulated broker dealer), its obligations and receivables would have been handled by another legal entity, typically LBHI, LBI or LBIE, and an intercompany balance was recorded.  For example, for foreign exchange transactions, LBI would execute wire transfers on behalf of LBCC.  LBI would

receive the money and record a payable to LBCC, and LBCC would record a receivable from LBI.

32.     LBI, LBIE and LBJ, as regulated broker/dealer entities, settled securities transactions on behalf of other Lehman units.  Securities collateral posted by third parties for the benefit of non-regulated Lehman units was typically held by LBI or LBIE.  *See* **Exhibit 17** (LBI Client Statement Showing Third-Party Collateral Posted for the Benefit of LBSF).

33.     Loans and other assets were freely moved between Lehman units as needed to position them for repurchase transactions with third parties for the benefit of the Lehman enterprise as a whole.  This was accomplished through intercompany transfers supported by participation and repurchase agreements.  For example, some loans originated by LBHI and certain of its subsidiaries were used to enter into repurchase transactions with LCPI in which LCPI was the buyer and employed the assets subject to the repurchase agreement to enter into further transactions with third parties or to obtain secured financing.  *See* **Exhibit 18** (Sample Repo Confirmations Between LBHI and LCPI).  Similarly, Lehman regularly moved its loans into securitization vehicles to provide additional financing capability for the firm.

*Financial Reporting and Regulatory Supervision Was Done on a Consolidated Basis*

34.     Lehman reported its earnings on a consolidated basis by filing consolidated financial statements for LBHI, its subsidiaries and all other entities in which it had a controlling financial interest or was considered to be the primary beneficiary.  All material inter-company accounts and transactions were eliminated in connection with such consolidation as required by applicable accounting rules and standards.  *See* Ex. 1 (LBHI 10-K) at p. 94.

35.     External (public) financial reporting was done at an LBHI, consolidated, entity-wide level.  Unregulated Lehman Affiliates, generally, did not publish, disseminate or

make available audited financial statements (other than to satisfy certain statutory or regulatory requirements in various foreign jurisdictions).  *See* Ex. 1 (LBHI 10-K) at pp. 11-12.

36.     The intercompany balances between LBHI and each Affiliate were maintained as a running total that fluctuated daily.  Certain intercompany transactions that involved a regulated entity or monthly operating expenses were settled regularly.  For the most part, however, intercompany balances – including those involving financing or trading transactions – were not "zeroed out"; rather, they were carried over from day to day, month to month and year to year.  Some of the intercompany balances date back years and would be extremely difficult, if not impossible, to validate independently.  *See* Ex. 15 (Global Close Seminar – Intercompany Accounts).

37.     Non-regulated Lehman trading entities were largely used as "booking sites" for trades.  These non-regulated entities were managed on a group wide basis and had little ability to finance themselves or conduct business independently.  Non-regulated entities were, for the most part, minimally or thinly capitalized.  Generally, transactions booked in unregulated entities were booked based upon the type of trade involved.

*Corporate Structure and Formalities*

38.     Only a small portion of Lehman Affiliates had independent directors unless required to do so for regulatory reasons, and, in such cases, the selection of directors was centrally controlled.  The appointed boards of directors of such entities, rarely, if ever, met in person.  Most subsidiary entity actions were taken by unanimous written consent of directors via email.  *See* Ex. 12 (Sample LBSF Electronic Consents).

39.     Most corporate formalities and niceties for most active Affiliates were handled centrally by the firm-wide office of the Corporate Counsel section of the Law Department.  *See* Ex. 2 (CSE Overview) at p. 54.

40.     Most Lehman Affiliates had a common slate of administrative officers who handled the standard corporate secretarial and certain other functions.  *See* **Exhibit 19** (SOFA schedules showing common slate of administrative officers).

**Creditor Reliance on the Lehman Enterprise**

41.     There are numerous facts and circumstances demonstrating that creditors did not rely on the separate creditworthiness of the various Lehman Affiliates.  For the most part, creditors did not have access to the financial statements for the various subsidiaries.  All of Lehman's external financial reporting was done on a consolidated basis at the LBHI level and was broken out by business segments and by geographic region, not by legal entity.  *See* Ex. 1 (LBHI 10-K) at pp. 47-57.  The financial affairs of most Affiliates were not audited, except for certain Foreign Affiliates in order to comply with statutory or regulatory requirements. Consequently, with certain limited exceptions, such as in the case of LBFP and LBDP, creditors had no access to (and could not have relied upon) audited financial statements for individual legal entities because these statements were not provided to creditors.

42.     If investors or counterparties asked about individual Lehman entities other than LBHI, they were generally provided with a Lehman Company Overview created by the Treasury Department, which explained the Lehman corporate structure, how guarantees worked and described the principal subsidiaries.  *See* **Exhibit 20** (Company Overview document).

43.     Moreover, counterparties entering into derivatives contracts with Lehman (other than with LBDP or LBFP) generally did not have a choice of which Lehman entity would

be the "primary" party to the contract. Rather, Lehman managed its derivatives transactions

centrally on a firm-wide basis, choosing which entity any given transaction was booked to based

on the type of transaction. The LBHI guarantee of the transactions was the essential *quid pro*

*quo* of the transaction, without which the counterparty would not have extended credit.

Transactions were booked to the following entities depending upon the nature of the transaction:

- LBSF: Fixed income derivatives

- LBF: Equity derivatives

- LBCC: Foreign exchange related transactions

- LBCS: Commodities transactions

- LOTC: OTC equity derivatives

- LBDP/LBFP: fixed income derivative transactions with certain
  counterparties who needed to face a AAA-rated entity

*See* Ex. 2 (CSE Overview) at pp. 71-77, 98-101; Ex. 20 (Company Overview).

44.     It is my understanding that creditors generally did not express any concern

about which legal entity they were transacting with because LBHI guaranteed virtually every

derivatives transaction as a matter of the counterparty's requirement or documentation. An

LBHI guarantee was part of the Lehman form International Swaps and Derivatives Association

("ISDA") agreement and did not need to be requested or negotiated, but was clearly the

obligation relied upon by the counterparty in extending credit. *See* **Exhibit 21** (Sample ISDA

Master Agreement with a form LBHI guarantee attached to the Schedule).

45.     Most of Lehman's derivatives contracts contained various provisions

tending to show that counterparties did not rely on the creditworthiness of the particular Lehman

entity entering into the contact, but rather on LBHI and the entire Lehman enterprise. These

provisions: (a) permitted the Lehman subsidiary to assign all of its rights and obligations under

the agreement to any other affiliate without the consent of the counterparty, so long as the

obligations continued to be guaranteed by LBHI; (b) made the amount of collateral that had to be

posted by the Lehman subsidiary party dependent on the credit rating of LBHI (rather than that

of the subsidiary); (c) made the applicability of the debt non-payment cross-default provision

dependent on LBHI's stockholder equity (rather than that of the subsidiary); and (d) required

financial information only from LBHI (and not from the subsidiary).  *See* Ex. 21 (Sample ISDA

Master Agreement).

      46.    Further, most Lehman Affiliates did not have independent credit ratings

apart from LBHI.  As a result, creditors and counterparties had no basis to make judgments as to

the credit-worthiness of the subsidiary.

      47.    Presentations to the rating agencies generally discussed Lehman as a

single enterprise operating across business segments and geographic regions, not the financial

condition or credit rating of any particular legal entity.  *See* **Exhibit 22** (Selections from ratings

agency presentation).  Credit rating agencies generally adopted a similar approach in their

reports, providing financial information about Lehman as a single integrated enterprise.

      48.    Creditors entering into real estate transactions with the Lehman enterprise

also relied on Lehman as a whole.  For most real estate transactions, form term sheets were used

as a starting point, the vast majority of which defined LBHI "or any affiliate or related entity" as

the Lehman party.  The particular Lehman entity that would ultimately be the contracting party

to the transaction was not a subject of negotiation.  The designation of which Lehman entity

would be the contracting party was made by Lehman without consultation with the counterparty

and was usually based on the nature of transaction involved.  For example, LCPI was involved in

corporate and term loans, LBHI or Bankhaus participated in mortgage and mezzanine loans,

Property Asset Management Inc. or "PAMI" (in the form of a single-asset special purpose entity

created as a wholly-owned subsidiary) was involved in equity and bridge equity transactions, and

Lehman ALI was involved in California mortgages.  *See* **Exhibit 23** (Lehman Form Credit

Facilities), **Exhibit 24** (Lehman Form Bridge Equity Term Sheet), **Exhibit 25** (Lehman

Indicative Terms and Conditions Template).

**Facts Weighing Against Substantive Consolidation**

49.     There also are facts and circumstances demonstrating that the Lehman

enterprise record-keeping and affairs were not hopelessly entangled and were, in fact, similar to

what would be expected of a comparable enterprise and that, accordingly, Lehman's creditors

may have relied on the separate identities and financial condition of various Lehman entities in

extending credit.

**Entity Books and Records Can Be Disentangled**

50.     For the most part, Lehman Affiliates observed corporate formalities such

as appointments of officers and directors.  *See* Ex.12 (Sample LBSF Electronic Consents).

51.     Lehman maintained separate financial books and records for each active

legal entity; there is no evidence to suggest that bookkeeping was materially deficient or

unreliable.  A staff of almost 300 legal entity controllers in the Finance Division generally

reviewed the electronically maintained books and records regularly, investigated irregularities,

reviewed substantiation for some of the accounting entries and reconciled intercompany accounts

and transfers.  For example, at the end of each month, an intercompany "break" report was

generated.  This report listed intercompany balances that did not have a match on the general

ledger.  The legal entity controllers would work with each other to reconcile the "breaks."  The

legal entity controllers also ensured that the financial statements for each individual Lehman

17

legal entity were appropriately supported and prepared separate company financial statements when necessary. *See* Ex. 2 (CSE Overview) at pp. 92-94; Ex. 14 (Global Close Seminar – Financial Close Process and Financial Close) at pp. 16-20; Ex. 15 (Global Close Seminar – Intercompany Accounts) at pp. 9-11; **Exhibit 26** (Global Close Seminar – Systems Control Environment) at pp. 2-21.

52.     However, the legal entity controllers had no responsibility for the daily operations of the legal entity or its business lines. Rather, different professionals within the Finance Division were responsible for the accounting and financial control of the business lines and the daily net revenue reports, which was a separate process to provide a "check" of the numbers. *See* Ex. 3 (Corporate Governance Presentation) at p. 50.

53.     Certain Lehman Affiliates were required to make regular presentations to SEC regulators on a confidential basis, and separate income statements were part of these presentations. These presentations were not publicly accessible.

54.     Each U.S. Lehman legal entity also maintained balance sheets for specific purposes and in connection with completion of required tax forms. Separate pro forma IRS 1120 forms were prepared for each legal entity for internal purposes, with a separate hard copy file of supporting documentation. The file for each entity was in case of any inquiries, but was not made public. Foreign subsidiaries also filed IRS 5471 forms (informational returns that indicate that foreign entities were paying taxes in another jurisdiction). In addition, various Lehman legal entities were required to file separate state tax returns in some states, and tax audits were sometimes conducted as to a particular legal entity. Some Lehman entities entered into both formal and informal tax sharing agreements that allocated tax liabilities and benefits among the signing Lehman entities. *See* **Exhibit 27** (LBCC Form 1120).

55.     All transactions posted to the Lehman General Ledger had transaction codes. For each transaction, the internal code included information about the legal entity, the entry type, summary and detailed account information (*i.e.*, petty cash-Europe), the management code (the P&L or department code), the source code and the type of currency. This made it possible to sort transactions by legal entity and trace each entry in the general ledger to a particular legal entity. Each Lehman employee was assigned a management code that would capture all direct costs (compensation, occupancy, etc); therefore, the expenses associated with the employee would be recorded in the legal entity to which the employee was assigned and also mapped to the proper business and region. *See* Ex. 26 (Global Close Seminar – Systems Control Environment) at pp. 10, 15-21; Ex. 16 (Finance Systems Overview).

56.     All transactions among Lehman entities were tracked and recorded in the general ledger system with internal coding, including the movement of cash between the Lehman entities for cash management purposes. *See* Ex. 15 (Global Close Seminar – Intercompany Accounts) at p. 7.

57.     Borrowing Lehman entities were also charged for any advances made by the Lehman lending entity. Certain entities regularly advanced funds on behalf of others, such as LBI or LBIE, and an intercompany payable was recorded on the paying entity's books and a receivable was recorded for the lending entity. For example, while LBI paid the salaries and benefits of virtually all U.S.-based Lehman Brothers employees, LBI then charged back certain Lehman entities for which an employee provided services. This type of intercompany transaction was often settled with a cash payment, but transactions for borrowed money and trading activities remained in the intercompany balance over time (except for regulated broker-

dealers, which settled their intercompany balances daily). *See* Ex. 15 (Global Close Seminar – Intercompany Accounts) at pp. 2-8.

58.     Occasionally, some cash transfers were formally documented as intercompany loans, subordinated loans or equity infusions.  In such cases, there were terms for the loan, including maturity dates and interest rates, though interest was generally accrued as part of the intercompany balance rather than paid in cash.  Intercompany loans to regulated entities were somewhat common as it was necessary to ensure that they always met regulatory capital requirements.  *See* Ex. 15 (Global Close Seminar – Intercompany Accounts) at pp. 2-8.

59.     Certain Lehman entities were separately regulated and were incorporated for specific purposes.  For example, LOTC was registered with the SEC as an OTC equity derivatives dealer.  *See* Ex. 1 (LBHI 10-K) at p. 10.  LBCS was authorized by the Federal Energy Regulatory Commission to sell wholesale physical power at market-based rates and was subject to regulation under the Federal Power Act and certain other regulations.  *See* Ex. 1 (LBHI 10-K) at p. 11.

60.     Various Foreign Affiliates were also regulated.  For example, LBIE was an authorized investment firm in the United Kingdom and was subject to, among others, regulations promulgated and administered by the U.K.'s Financial Services Authority.  *See* Ex. 1 (LBHI 10-K) at p. 11.

61.     Certain Lehman entities, including LBI, LOTC, LBIE, LBJ and Bankhaus, were subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operated.  *See* Ex. 1 (LBHI 10-K) at p. 13.

62.     Certain Lehman entities did have separate credit ratings.  LBFP and LBDP were rated AAA and complied with certain capital and operating restrictions reviewed by various rating agencies.  *See* Ex. 1 (LBHI 10-K) at p. 135.

**Creditor Reliance on the Lehman Entities' Separate Identities**

63.     There are extant facts and circumstances indicating that some creditors may have relied on the separate identities of the Lehman legal entities in extending credit.

64.     Each counterparty had an ISDA Master Agreement with each Lehman legal entity with which it transacted.  Counterparties confirmed transactions executed under ISDA Master Agreements in the names of particular legal entities, as well as made payments to and received payments from accounts in the names of these legal entities.  *See* Ex. 21 (Sample ISDA Agreement).

65.     With certain exceptions – *i.e.*, prime brokerage accounts – counterparties could not cross net their position against various Lehman entities.  *See* **Exhibit 28** (Sample Cross-Margin and Netting Agreement).

66.     Certain asserted creditors of Lehman Affiliates have alleged that they relied on the structure of corporate identities and separateness of Lehman entities in order to obtain "structural seniority" by obtaining a separate contract from the Lehman contracting legal entity and LBHI in the form of a guarantee.  *See* **Exhibit 29** (Disclosure Statement for the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents) pp. 10-13.

67.     LBDP and LBFP, which were created for the specific purpose of transactions that required AAA credit-rated entities, had separate financial statements and

separate credit ratings that were not tied to that of LBHI, and LBHI did not guarantee their

obligations in connection with derivatives transactions.  These contracts also were not freely

assignable to other Lehman Brothers subsidiaries.  *See* **Exhibit 31** (LBFP Financial Statements);

**Exhibit 32** (LBDP ISDA Agreement).

> 68.    Finally, LBHI specifically and publicly disclosed to Lehman creditors

LBHI's separateness from its operating subsidiaries in numerous public SEC filings delivered to

purchasers of publicly traded LBHI debt, including the following statements:

- We are a holding company and you can only depend on our earnings and assets, and not those of our subsidiaries, for payment of principal and interest on the notes;

- The notes will be solely our obligations, and no other entity will have any obligation, contingent or otherwise, to make any payments in respect of the notes;

- Our subsidiaries will have no obligation to pay any amount in respect of the notes or to make any funds available therefor;

- Due to the covenants contained in certain of our debt agreements and regulations relating to capital requirements affecting certain of our more significant subsidiaries, the ability of certain subsidiaries to pay dividends and other distributions and make loans to us is restricted; and

- As an equity holder, our ability to participate in any distributions of assets of any subsidiary is subordinate to the claims of creditors of the subsidiary.

*See*  Ex. 1 (Lehman 10-K) at p. 17.

## The Plan Adjustment

69.     There are significant facts as to the pre-petition operations of Lehman that would support the substantive consolidation of various entities.  The Ad Hoc Group filed its alternative plan based upon its investigation and conclusion that the facts warranted substantive consolidation.  *See* **Exhibit 30** (Disclosure Statement for the Amended Joint Substantively Consolidating Chapter 11 Plan for Lehman Brotheres holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC, Proposed by the Ad Hoc Group of Lehman Brothers Creditors).

70.     There are also significant facts in connection with the pre-petition operations of Lehman that conflict with a substantive consolidation of the Lehman Affiliates. The Non-Consolidation Plan Proponents filed an alternative plan that is diametrically opposite from the Ad Hoc Plan, that is, based on the conclusion of those creditors that there is absolutely no chance of substantive consolidation of the Lehman Affiliates.  *See* Ex. 29 (Disclosure Statement for the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents).

71.     There is no bright line conclusion on the issue of substantive consolidation.  However, in the absence of the Plan Settlement, the only certainty concerning substantive consolidation is that it would be extremely expensive and time-consuming to fully prosecute the issue, eroding the resources of the Debtors and, most importantly, delaying distributions to entitled creditors.

72.     In the interests of benefiting all economic stakeholders and expediting the administration of the chapter 11 cases to achieve the objectives of chapter 11, the Debtors' Plan

proposes the settlement of the issue of substantive consolidation through the Plan Adjustment

that reallocates a portion of distributions from certain unsecured creditors that would otherwise

receive a lesser distribution if the Debtors and their Affiliates were substantively consolidated

(*i.e.*, all holders of allowed general unsecured claims against the Participating Subsidiary Debtors

and allowed guarantee claims against LBHI) to those unsecured creditors that would benefit

from substantive consolidation of the Debtors (*i.e.*, holders of allowed direct, non-guarantee,

non-affiliated claims against LBHI).  The inter-creditor settlement and proposed reallocation is

based upon the determination that there is at least a 20% risk of substantive consolidation of the

Debtors and their Affiliates.  The Plan, simply, recognizes that there is a risk that substantive

consolidation may be ordered after extensive litigation and because of that risk, all parties would

benefit from a rational, reasonable settlement that recognizes and accommodates that risk.  This

proposed settlement gives due consideration to the strengths and weaknesses of potential

arguments and presentations that may be made for and against substantive consolidation as

described above.  A compromise would prevent the erosion of the Debtors' resources that would

be used to prosecute the issues, and, thus, protect the quantum of the distributions proposed to be

made to the Debtors' creditors under the Plan.  In light of the facts stated, it is unreasonable to

conclude that there is absolutely no risk of substantive consolidation of the Lehman entities – a

consolidation that would recognize how LBHI operated its business and the potential conclusion

that creditors perceived the Lehman business in that perspective – so there is a rational need to

take account of the risks in a fair and reasonable manner.  The Debtors' Plan does that.  The

overwhelming acceptance of the Debtors' Plan demonstrates that the economic stakeholders

agree with the Debtors.

73.     The foregoing compromises, among others, embodied in the Plan would not have been possible without the material positive contributions made by the PSA Creditors. The PSA Creditors' active and intensive participation in the Plan process, including the agreement by the Ad Hoc Group and the Non-Consolidation Plan Proponents to suspend consideration of their respective competing plans, will result in the Debtors and their economic stakeholders saving substantial time and expense.  In order to induce these creditors to participate in the Plan process, including suspension of consideration of competing plans, the Debtors agreed to include in the Plan a specifically tailored and limited exculpation for creditors' good faith participation in the process of Plan proposal and prosecution.

74.     In anticipation of their being exculpated for conduct in connection with the Plan process, the PSA Creditors extended themselves in good faith to actively and intensively participate in the Plan process.  Inclusion of an exculpation for the PSA Creditors in the Plan was a condition of the material concessions made by all the PSA Creditors during the arms'-length negotiations that occurred that have resulted in real economic benefits for the Debtors' economic stakeholders.

75.     A consensual resolution of the Plan Issues could not have been achieved through economic concessions alone.  The Debtors' post-Effective Date corporate governance remained the final obstacle standing between a highly-consensual confirmation of the Debtors' plan and a highly-contested confirmation process involving at least three competing plans.  The inclusion in the Plan of the concept of a Director Selection Committee, and the diverse, representative composition thereof, and the inclusion of the Plan Trust and composition of the Plan Trustees were the necessary and critical last steps to obtaining plan support agreements from creditors.

76.    As a result of the negotiations of PSA Creditors, the Debtors' economic

stakeholders will play a fundamental role in the post-Effective Date corporate governance under

the Plan.  Inclusion in the Plan Trust Agreement of the indemnification and releases was

important to the PSA Creditors and their appointees to the Director Selection Committee that

would serve as Plan Trustees pursuant to the Plan.

## THE PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE

77.    I have reviewed and am generally familiar with the terms and provisions

of the Plan and the requirements for confirmation of the Plan under section 1129 of the

Bankruptcy Code.

### Section 1129(a)(1)

78.    The Plan provides for the separate classification of Claims and Equity

Interests based upon the differences in legal nature and/or priority of such claims and equity

interests in each Debtor:

LBHI.  The Plan separately classifies Claims against or Equity Interests in LBHI

into seventeen (17) Classes as follows:

- Class 1 includes Claims entitled to priority under section 507(a) of the
  Bankruptcy Code or, to the extent applicable, 12 U.S.C. § 4617(b)(15), other
  than Priority Tax Claims, which are not classified and are separately treated
  under section 2.3 of the Plan.

- Class 2 includes all Secured Claims that are secured by a lien or collateral or
  that are subject to a valid right of setoff in accordance with Section 506 of the
  Bankruptcy Code.

- Class 3 provides for the separate classification of Senior Unsecured Claims,
  which generally are Claims based upon bonds issued by LBHI that are
  contractually entitled to a priority in right to payment over all subordinated
  debt Claims against LBHI.

- Class 4A provides for the separate classification of Senior Affiliate Claims,
  which are Claims asserted by Affiliates against LBHI that are contractually

entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 4B</u> provides for the separate classification of Senior Affiliate Guarantee Claims, which are Guarantee Claims asserted by Affiliates that are contractually entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 5</u> provides for the separate classification of Senior Third-Party Guarantee Claims, which are Guarantee Claims asserted by a party that is not an Affiliate and that are contractually entitled to a priority in right to payment over certain subordinated debt Claims against LBHI.

- <u>Class 6A</u> provides for the separate classification of Convenience Claims, which are Senior Unsecured Claims or General Unsecured Claims in an amount of $50,000 or less.

- <u>Class 6B</u> provides for the separate classification of Convenience Guarantee Claims, which are Senior Third-Party Guarantee Claims or Third-Party Guarantee Claims in an amount of $50,000 or less.

- <u>Class 7</u> provides for the separate classification of General Unsecured Claims against LBHI, which generally include trade vendor, rejection damages and litigation Claims (other than Claims subject to section 510(b) of the Bankruptcy Code), that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 8</u> provides for the separate classification of Affiliate Claims against LBHI, which are all Claims against LBHI asserted by an Affiliate that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 9A</u> provides for the separate classification of Third Party Guarantee Claims, which are Guarantee Claims asserted by a party that is not an Affiliate or a Designated Entity and that are not entitled to a priority in right to payment over subordinated debt Claims against LBHI.

- <u>Class 9B</u> provides for the separate classification of the Guarantee Claim of the Racers Trusts, which is allowed pursuant to the Global Settlement in the amount of $1.947 billion.

- <u>Classes 10A, 10B and 10C</u> provides for the separate classification Claims against LBHI that are contractually subordinated to certain other Claims against LBHI.

- <u>Class 11</u> provides for the separate classification of Claims against LBHI that are subordinated to other Claims against LBHI pursuant to section 510(b) of the Bankruptcy Code.

- ▪ <u>Class 12</u> provides for the separate classification of LBHI Equity Interests.

<u>LCPI and LBSF</u>.  With respect to each of LCPI and LBSF, the Plan separately classifies Claims against or Equity Interests in LCPI or LBSF, as applicable, into nine (9) Classes as follows:

- ▪ <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- ▪ <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- ▪ <u>Class 3</u> provides for the separate classification of Convenience Claims, which are General Unsecured Claims in an amount of $50,000 or less.

- ▪ <u>Class 4A</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors or Designated Entities.

- ▪ <u>Class 4B</u> provides for the separate classification of the Claims of the Designated Entities, which are allowed in fixed amounts in accordance with the Global Settlement.

- ▪ <u>Class 5A</u> provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against LCPI or LBSF.

- ▪ <u>Class 5B</u> provides for the separate classification of Affiliate Claims of the Participating Subsidiary Debtors, which are all Claims of a Participating Subsidiary Debtor against LCPI or LBSF.

- ▪ <u>Class 5C</u> provides for the separate classification of Affiliate Claims other than the Participating Debtors, which are all Claims of Affiliates against LCPI or LBSF other than Claims of LBHI and the other Participating Subsidiary Debtors.

- ▪ <u>Class 6</u> provides for the separate classification of Equity Interests in LCPI or LBSF.

<u>LBCS, LOTC and LBCC</u>.  With respect to each of LBCS, LOTC and LBCC, the Plan separately classifies Claims against or Equity Interests in LBCS, LOTC or LBCC, as applicable, into eight (8) Classes as follows:

- <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- <u>Class 3</u> provides for the separate classification of Convenience Claims, which are General Unsecured Claims in an amount of $50,000 or less.

- <u>Class 4</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors.

- <u>Class 5A</u> provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against LBCS, LOTC or LBCC.

- <u>Class 5B</u> provides for the separate classification of Affiliate Claims of the Participating Subsidiary Debtors, which are all Claims of a Participating Subsidiary Debtor against LBCS, LOTC or LBCC.

- <u>Class 5C</u> provides for the separate classification of Affiliate Claims other than the Participating Debtors, which are all Claims of Affiliates against LBCS, LOTC or LBCC other than Claims of LBHI and the other Participating Subsidiary Debtors.

- <u>Class 6</u> provides for the separate classification of Equity Interests in LBCS, LOTC or LBCC.

<u>All Other Subsidiary Debtors</u>.  With respect to each of the remaining Subsidiary Debtors (*i.e.,* those that are not Participating Subsidiary Debtors), the Plan separately classifies Claims against or Equity Interests in such a Debtor, as applicable, into six (6) Classes as follows:

- <u>Class 1</u> includes Claims entitled to priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, which are not classified and are separately treated under section 2.3 of the Plan.

- <u>Class 2</u> includes all Secured Claims that are secured by a lien or collateral or that are subject to a valid right of setoff in accordance with Section 506 of the Bankruptcy Code.

- <u>Class 3</u> provides for the separate classification of General Unsecured Claims, which are all non-priority, unsecured Claims that are asserted by entities that are not Affiliates of the Debtors.

- **Class 4A** provides for the separate classification of Affiliate Claims of LBHI, which are all Claims of LBHI against the applicable Subsidiary Debtor.

- **Class 4B** provides for the separate classification of Affiliate Claims of Affiliates other than LBHI, which are all Claims of all Affiliates other than LBHI against the applicable Subsidiary Debtor.

- **Class 5** provides for the separate classification of Equity Interests in the applicable Subsidiary Debtor.

79.     The classification scheme was not proposed to create a consenting impaired Class or to manipulate voting.  All Claims and Equity Interests within a Class have the same or substantially similar rights as the other Claims and Equity Interests in that Class and will receive the same treatment under the Plan for their respective Claims and Equity Interests in the same Class.

80.     Generally, the Plan incorporates a "waterfall" classification and distribution scheme as to each of the Debtors.  As to each Debtor, the Plan separately classifies priority non-tax claims, secured claims, unsecured claims and equity interests.  In addition, the Plan incorporates administrative convenience classes against LBHI and the Participating Subsidiary Debtors.  After satisfying or reserving in full for allowed secured, administrative and priority claims and payment of convenience claims in accordance with the Plan, each Debtor will distribute its Available Cash to holders of allowed unsecured claims (other than Section 510(b) Claims against LBHI) on a *pro rata* basis, which will then be reallocated in some cases in accordance with the Global Settlement.

81.     The Plan provides for separate classes of general unsecured claims against the Debtors based upon whether the Claim is asserted by an Affiliate of the Debtors or a non-affiliated entity, and, additionally with respect to LBHI, based upon the nature of the Claim. Guarantee Claims are separately classified and senior and subordinated claims are separately classified in order to comply strictly with sections 510(a) and (b) of the Bankruptcy Code.  I

believe that this separate classification of unsecured claims against the Debtors is valid and

justified because, among other things, it is my understanding based upon discussions with the

Debtors' legal advisors that Guarantee Claims and Affiliate Claims would be eliminated if the

Court were to order substantive consolidation of the Debtors and their Affiliates.

       82.     The Plan classification scheme also is necessary to implement the Global

Settlement.  The primary settlement mechanism in the Plan is the Plan Adjustment provision.

Pursuant to the Plan Adjustment, in order to resolve the risk to creditors of litigation relating to

substantive consolidation, and in recognition of the potential harms and benefits that might result

if substantive consolidation is directed, a portion of the distributions to certain unsecured

creditors who would otherwise receive lesser distributions because of substantive consolidation

are reallocated to other creditors who would otherwise benefit from substantive consolidation.

       83.     For administrative convenience, the Plan provides for separate

classification of Convenience Claims which are Senior Unsecured Claims, Senior Third-Party

Guarantee Claims, General Unsecured Claims and Third-Party Guarantee Claims against LBHI

and General Unsecured Claims against the Participating Subsidiary Debtors asserted in amounts

equal to or less than $50,000 (and any Claims asserted in excess of $50,000, the holders of which

have elected to reduce the asserted amount of their Claims to $50,000).  I believe that the

inclusion of convenience Classes in the Plans of LBHI, LBCS, LBCC, LBSF, LCPI and LOTC

will permit those Debtors to make a single Distribution on account of Convenience Claims and

Convenience Guarantee Claims against such Debtors and avoid the administrative burden of

tracking the transfers of these Claims, relating to the calculations of the distributions to holders

of such claims, providing notices to holders of such Claims and preparing and mailing or wiring

Distributions to holders of such Claims on each Distribution Date.  The definitions of

Convenience Claims and Convenience Guarantee Claims, including the exclusions of Claims

based on public debt securities issued or guaranteed by LBHI or a Claim filed by a nominee on

behalf of one or more beneficial holders of Claims, is reasonable and necessary for the

administrative convenience.

84.    The Plan designates Classes of Claims and Classes of Equity Interests as

required by section 1123(a)(1).  *See* Plan, Art. III.  The Plan specifies whether each Class of

Claims and Equity Interests is impaired or unimpaired under the Plan and the treatment of each

such impaired Class.  *See* Plan, Arts. III, IV and V.  Except as otherwise agreed to by a holder of

a particular Claim or Equity Interest, the treatment of each Claim or Equity Interest in each

particular Class is the same as the treatment of each other Claim or Equity Interest in such Class.

*See* Plan, Art. IV and V.  The Plan provides adequate means for implementation of the Plan

through, among other things: (i) the appointment of a Plan Administrator with the duties and

responsibilities set forth in Section 6.1(b) of the Plan to administer and maximize the value of the

Debtors' estates; (ii) the Global Settlement and Bilateral Settlements incorporated into the Plan,

*see* Plan § 6.5; (iii) the provisions governing Distributions under the Plan, *see* Plan, Art. VIII;

(iv) the procedures governing the allowance of Claims under the Plan; *see* Plan, Art. IX; (v) the

dissolution or wind down of a Debtor or Debtor-Controlled Entity in accordance with applicable

law and consistent with the implementation of the Plan, *see* Plan, § 7.6; and (vi) the liquidating

trust vehicles that may be created under the Plan, *see* Plan, Art. X.  The certificate of

incorporation, articles of incorporation, limited liability company agreement or similar governing

document, as applicable, of each Debtor has been or will be amended on or prior to the Effective

Date to prohibit the issuance of non-voting equity securities.  *See* Plan Supplement, Exhibit 1.

The Plan provisions governing the manner of selection of any officer, director or trustee under

the Plan are consistent with the interests of creditors and equity security holders and with public

policy.  *See* Plan, Art. VII, Plan Supplement.

85.    All classes of Claims and Equity Interests treated under the Plan are

impaired and subject to appropriate treatment.  *See* Plan, Arts. III, IV and V.  The Plan provides

for the assumption or rejection of executory contracts and unexpired leases that have not been

previously assumed or rejected under section 365 of the Bankruptcy Code.  *See* Plan, Art. XI.

86.    As described above and in the Global Settlement Memorandum, the Plan

is premised on the Global Settlement and Bilateral Settlements among the Debtors and certain of

their Foreign Affiliates and third-party creditors.  *See* Plan § 6.5.

**Section 1129(a)(2)**

87.    On September 1, 2011, the Court approved the Debtors' Disclosure

Statement and entered the Disclosure Statement Order.  As set forth in the Affidavit of James

Daloia, sworn to on October 14, 2011 [ECF No. 20882], each holder of a Claim or an Equity

Interest was sent and should have received the solicitation materials in accordance with the

Disclosure Statement Order, including, for holders of Claims entitled to vote, the Disclosure

Statement (which includes as an exhibit a copy of the Plan), and a ballot.  The Debtors solicited

acceptances of the Plan in good faith and did not solicit acceptances of the Plan from any holder

of a Claim or Equity Interest prior to the transmission of the Disclosure Statement.

88.    I have been advised by Epiq that it has complied with the Disclosure

Statement Order in soliciting acceptances of the Plan from the holders of all outstanding Claims

in each class of impaired Claims that are entitled to vote to accept or to reject the Plan.

89.    Based on the Voting Certification, other than with respect to the Non-

Voting Classes, it is my understanding that the Plan has been accepted by the requisite majorities

proscribed by section 1126(c) of the Bankruptcy Code in every class of Claims entitled to vote in accordance with the Disclosure Statement Order. I have been advised by Epiq that in total, approximately 95% in number and approximately 98% in dollar amount of all Creditors and Claims that voted on the Plan voted to accept the Plan.

90.    The Debtors did not solicit acceptances from the holders of classes of Equity Interests in each of the Debtors or holders of Claims in LBHI Classes 10A, 10B, 10C and 11 because it is my understanding, based on discussions with the Debtors' legal advisors, that such Classes are conclusively presumed to have rejected the Plan. The Debtors elect to request confirmation of the Plan over the deemed rejections of such Classes. I believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class.

## Section 1129(a)(3)

91.    The Debtors have proposed the Plan in good faith. The Plan and the Global Settlement are the result of extensive and robust negotiations and accommodations among the Debtors, the Creditors' Committee, and principal stakeholders and creditor constituencies, including the Ad Hoc Group and the Non-Con Plan Proponents. Indeed, I believe that the overwhelming acceptance of the Plan by impaired classes of creditors reflects its inherent fairness, including that of the Global Settlement and the good faith efforts of the parties to achieve the objectives of chapter 11.

92.    The Bilateral Settlements among the Debtors and their Foreign Affiliates and certain third-party creditors likewise are indicative of the genuine good-faith efforts of the parties to reach consensual resolutions to enable the attainment of the objectives of chapter 11. The Foreign Administrators that have settled with the Debtors have concluded, in recognition of their fiduciary duties to their respective creditors, that the Global Settlement and the Plan is a fair

34

and reasonable resolution of the issues presented by the Debtors' chapter 11 cases and the

insolvency proceedings of their Foreign Affiliates.

**Section 1129(a)(4)**

93.    All payments for services provided to the Debtors during the Chapter 11

Cases have either been previously authorized by the Court or, under the Plan, must be approved

by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.

Specifically, section 2.2 of the Plan provides that all professional fees (other than ordinary course

professionals) must be approved by the Court as reasonable pursuant to final fee applications.  In

addition, section 6.7 of the Plan provides for the payments of the reasonable fees and expenses of

certain indenture trustees and the individual members of the Creditors' Committee.  This section

has been modified to provide that the indenture trustees and individual members of the Creditors'

Committee shall file applications with the Court for the approval of such fees.

**Section 1129(a)(5)**

94.    Sections 7.2, 7.3 and 7.4 of the Plan describe the manner in which the

post-Effective Date board and management of each of the Debtors will be selected.  The

appointment and continuance of such officers and directors will be governed by the Amended

By-Laws and Plan Trust Agreement contained in the Plan Supplement.  The Debtors will

disclose any identified directors at or before the Confirmation Hearing.

**Section 1129(a)(6)**

95.    The Plan does not provide for any rate changes by the Debtors.

**Section 1129(a)(8)**

96.    I have been advised that:

- As reflected in the Voting Certification, other than the Non-Voting Classes,
  the Plan has been overwhelmingly accepted by creditors holding well in

35

excess of two-thirds in amount and one-half in number in every impaired Class of Claims entitled to vote.

▪ Of the forty-one (41) Non-Voting Classes, fourteen (14) Classes did not have any eligible holders of allowed claims. Twenty-four (24) other Non-Voting Classes are comprised of either Priority Non-Tax Claims or Secured Claims against the applicable Debtor, all of which are projected to be fully satisfied under the Plan in accordance with the absolute priority rule, subject to the Debtors' defenses to such claims. In the remaining three (3) Non-Voting Classes, only five (5) creditors asserting claims in an aggregate amount of approximately $150,000 were eligible to vote.

▪ LBHI Classes 10A, 10B, 10C and 11 and Classes of Equity Interests in each Debtor are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As to such Classes, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below.

## Section 1129(a)(9)

97. The Plan provides that holders of allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code and allowed priority claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described below) will be paid in full on the later of the Effective Date and the date such Claim becomes Allowed, unless such holder agrees to less favorable treatment. *See* Plan, § 2.1, Arts. IV and V.

98. Pursuant to Section 2.3 of the Plan, except as otherwise may be agreed, holders of Allowed Priority Tax Claims will be paid in full, in Cash, on the Effective Date, or in equal semi-annual installments with interest at a fixed annual rate determined under applicable non-bankruptcy law over a period of five years.

## Section 1129(a)(10)

99. I have been advised that even after excluding Classes of Affiliate Claims, at least one class of impaired Claims against each Debtor has accepted the Plan.

**Section 1129(a)(11)**

       100.    It is my understanding, based on my discussions with the Debtors'

advisors, that the applicable feasibility test for the Chapter 11 Cases is to determine whether a

Debtor will be able to make the payments required under the Plan.

       101.    The Plan contemplates a controlled and supervised divestiture of estate

assets to maximize recoveries and make periodic distributions to creditors. The Debtors have

analyzed their ability to fulfill their obligations under the Plan and taken into consideration their

estimated costs of administration.[4] The Debtors post-Effective Date business is not expected to

change materially from the ongoing business conducted during the Chapter 11 Cases. Based

upon the Debtors' estimates and prior course of conduct, I believe that the Debtors will be able to

continue to administer their assets as required by the Plan and make all payments and

distributions as contemplated by the Plan. I believe, therefore, that the Plan is feasible. There

are no objections to the feasibility of the Plan.

**Section 1129(a)(12)**

       102.    The Debtors have paid all chapter 11 statutory and operating fees required

to be paid during these Chapter 11 Cases and filed all fee statements required to be filed.

Pursuant to Section 15.7 of the Plan, all fees payable pursuant to section 1930 of title 28 of the

United States Code shall be paid on the Effective Date by the Plan Administrator and any

Liquidating Trustee that may be appointed.

---

[4] Specifically, the Debtors prepared cash flow estimates for each of the Debtors for the four year period ending December 31, 2014 and liquidation analyses for each Debtor. These cash flow estimates, and the assumptions on which they are based, are included in Exhibit 7 to the Disclosure Statement.

**Section 1129(a)(13)**

103.    I have been advised that section 1129(a)(13) of the Bankruptcy Code is not applicable.

**Section 1129(b)**

104.    Based on discussions with the Debtors' legal advisors, LBHI Classes 10A, 10B, 10C and 11 and Classes of Equity Interests in each of the Debtors are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  It is my understanding that a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or equity interests so long as the plan is "fair and equitable" and it does not unfairly discriminate.  For the reasons described below, the Plan does not "unfairly discriminate" and the "fair and equitable" requirement is satisfied as to LBHI Classes 10A, 10B, 10C and 11 and Classes of Equity Interests in each of the Debtors, the only rejecting Classes under the Plan.

105.    The Plan treatment of holders of Allowed Claims in LBHI Classes 10A, 10B, 10C and LBHI Class 11 is based upon the statutory mandates of sections 510(a) and (b) of the Bankruptcy Code and, in the case of LBHI Classes 10A, 10B and 10C, their contractual subordination agreements.  Because LBHI Classes 10A, 10B, 10C and LBHI Class 11 are not similarly situated to any other class against LBHI, the disparate treatment of such classes in comparison to other classes of Claims that are not subordinated is not unfair.  All Equity Interests in each Debtor are classified together and afforded the same treatment under the Plan.  As such, there is no discrimination among holders of Equity Interests.  Based on the foregoing, I do not believe that the Plan "discriminates unfairly" with respect to any impaired Classes of Claims or Equity Interests.

106.    It is my understanding that the Distributions under the Plan are made in the order of priority proscribed by the Bankruptcy Code and in accordance with the rule of

38

absolute priority.  Pursuant to the Plan, holders of Allowed Claims in a given class must be paid

in full before a distribution is made to a more junior class.  It is also my understanding that the

absolute priority rule is not violated as to the holders of Allowed Claims in LBHI Class 10A,

10B, 10C and LBHI Class 11 because no distribution will be made on account of Equity Interests

in LBHI until such Claims are satisfied in full.  These claim holders will not realize a recovery

under the Plan as a result of the enforcement of sections 510(a) and (b) of the Bankruptcy Code,

not because consideration is being provided to junior classes.

       107.    As to each Debtor, holders of Equity Interests are not entitled to receive or

retain any property of the Debtors on account of such Equity Interests unless and until all holders

of claims in senior classes are satisfied in full, including the payment of interest.  It is my

understanding that LBHI Stock has no economic value and will be cancelled pursuant to the Plan

in exchange for a single share to be issued to the Plan Trust under the Plan and held for the

benefit of holders of former LBHI Stock as described in the Plan consistent with relative priority

and economic entitlements of such holders.  *See* Plan § 4.17(a).  No consideration will be

provided to holders of Equity Interests in LBHI under the Plan unless all holders of unsecured

claims have been satisfied in full in accordance with such rule.

108.    In light of all of the forgoing, confirmation of the Plan is appropriate, is in the best interests of all parties in interest, and should, therefore, be granted and the Global Settlement should be approved.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated:  November 29, 2011
        New York, New York

 /s/ John K. Suckow
John K. Suckow

## List of Exhibits

1.  Lehman Brothers Holdings Inc. Form 10-K for the fiscal year ended November 30, 2007

2.  Consolidated Supervised Entity (CSE) Overview dated May 5, 2005

3.  Corporate Governance Presentation to Moody's Investor Services dated June 22, 2006

4.  Office of the Chief Financial Officer Organization Chart dated June 18, 2008

5.  Office of the Chief Financial Officer Treasury Organization Chart

6.  Global Tax Organization Chart

7.  Schedule of leases

8.  Legal and Regulatory Matters and Client Complaints policy dated July 1, 2008

9.  Allocation Summit Overview Presentation dated March 26, 2007

10. Employment offer templates

11. Committees Homepage from Lehman Live

12. Sample LBSF Electronic Consents

13. Sample Firm-wide Risk Report for May 19, 2008

14. Global Close Seminar – Financial Close Process and Financial Control dated September 23-24, 2009

15. Global Close Seminar – Intercompany Accounts dated September 23-24, 2009

16. Finance Systems Overview

17. LBI Client Statement Showing Third-Party Collateral Posted for the Benefit of LBSF

18. Sample Repo Confirmations Between LBHI and LCPI

19. SOFA schedules showing common slate of administrative officers

20. Company Overview document (Second Quarter 2008)

21. Sample ISDA Master Agreement with a form LBHI guarantee

22. Selections from ratings agency presentation (May 2007 Fitch Annual Update)

23. Lehman Form Credit Facilities

24. Lehman Form Bridge Equity Term Sheet

25. Lehman Indicative Terms and Conditions Template

26. Global Close Seminar – Systems Control Environment dated September 23-24, 2009

27. LBCC Form 1120 for 2007

28. Sample Cross-Margining and Netting Agreement (2006 Version)

29. Disclosure Statement for the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents dated April 25, 2011

30. Disclosure Statement for the Amended Joint Substantively Consolidating Chapter 11 Plan for Lehman Brotheres holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC, Proposed by the Ad Hoc Group of Lehman Brothers Creditors dated April 27, 2011

31. LBFP Financial Statements

32. LBDP ISDA Agreement