# EXHIBIT 3



**Confidential** *Presentation to:*

## Moody's Investor Services

# Corporate Governance

*June 22, 2006*

## LEHMAN BROTHERS

---

## Discussion Topics

I.  Board of Directors

II.  Executive Management
- Culture and Policies
- Internal Control Committees

III.  Independent Control Functions
- Finance
- Legal & Compliance
- Corporate Audit

IV.  Sarbanes Oxley

V.  Consolidated Supervised Entity

---

## Overview

- Corporate governance is critical to protecting the Franchise and is grounded in the realization that nothing is as valuable as a company's reputation.

- Our commitment to the highest standards of governance and ethical behavior is core to who we are and what we are as a Firm.

- These standards are expected from all employees from top to bottom. Each employee is responsible for risk management and for "doing the right thing".

- Our policy of compensating employees with a large portion of deferred stock has reinforced this philosophy. With the level of employee ownership at around 30%, employees think and act like owners.

- The Firm has committed many of its best people to its control infrastructure. We support and reward people in control positions, so we can continue to attract the highest qualified people to these roles.

- We have also invested significantly in technology to support our control infrastructure.

- Our corporate governance framework relies on a multi-layered control infrastructure with functions that operate in a coordinated manner. We are not covering risk or liquidity management, which have been dealt with separately.

- In this presentation, we will review each of the components of our governance organization, including the Board of Directors, Executive Management and Oversight and the Firm's independent control functions.

LEHMAN BROTHERS                2

# I. Board of Directors

LEHMAN BROTHERS

## Board of Directors – Overview

◆ A key to good corporate governance is an engaged Board of Directors with the independence and experience to oversee management effectively.

◆ The Board meets or exceeds all NYSE (and PCXE) and SEC independence requirements.

   – Only one member of management is on the Board.

   – Each of the other nine directors is independent.

◆ Overall director attendance at Board and committee meetings during fiscal 2005 averaged 98%.

   – The Firm also expects each director to attend the Annual Meeting of Stockholders, and each director attended the 2006 Annual Meeting.

◆ Seven of the Firm's outside directors are former CEOs of major companies.

◆ All members of the Board of Directors will be elected annually beginning in 2007 as the result of the approval at the 2006 Annual Meeting of Stockholders of a management proposal to de-stagger the Board.

LEHMAN BROTHERS      3

---

## Board of Directors – Members

◆ The Firm's CEO, Richard S. Fuld, Jr., is the only member of management on the Board and has been a director since 1990. The outside members of the Board, all of whom have been determined to be independent, are:

| | | |
|---|---|---|
| Michael L. Ainslie | Former CEO of Sotheby's | Director since 1996 |
| John F. Akers | Former CEO of IBM | Director since 1996 |
| Roger S. Berlind | Private investor and principal of Berlind Productions; former CEO of predecessors of our Firm | Director since 1985 |
| Thomas H. Cruikshank | Former CEO of Halliburton | Director since 1996 |
| Marsha Johnson Evans | Rear Admiral, U.S. Navy (Retired) | Director since 2004 |
| Sir Christopher Gent | Former CEO of Vodafone Group PLC; Non-Executive Chairman of GlaxoSmithKline plc | Director since 2003 |
| Roland A. Hernandez | Former CEO of Telemundo | Director since 2005 |
| Dr. Henry Kaufman | Economist and former Managing Director and member of the Executive Committee of Salomon Brothers | Director since 1995 |
| John D. Macomber | Former CEO of Celanese | Director since 1998 |

LEHMAN BROTHERS      4

## Board of Directors – Director Appointments

- ◆ Marsha Johnson Evans elected in 2004; Roland A. Hernandez elected in 2005; Dina Merrill retired in 2006.

- ◆ The Board has adopted Director criteria recommended by the Nominating and Corporate Governance Committee, which identify personal characteristics and core competencies that the Board seeks in director candidates.
  - – Independence and conflicts of interest are also considered, as is whether any candidate has special interests that would impair his or her ability to represent the interests of all stockholders.

- ◆ The Nominating and Corporate Governance Committee takes into account the candidates' current occupation and the number of other boards on which they serve in determining whether he/she has the ability to devote sufficient time to carry out their duties.
  - – Likewise, an existing director must notify the Board of any significant change in his/her primary job responsibilities in order that the Board may reassess that director's ability to serve on the Board.

- ◆ The Firm's Corporate Governance Guidelines also provide that a Director of the Firm should not be a director of more than four other public companies.

- ◆ The Nominating and Corporate Governance Committee will consider director nominees recommended by stockholders and has established procedures by which stockholders may submit their nominees to the Board.

- ◆ The Board does not believe that arbitrary term or age limits on directors' service are appropriate, since it values the insight and experience of directors who have served on the Board for an extended period of time. The Board believes that its self-evaluation process is an important determinant of Board tenure.

LEHMAN BROTHERS                                    5

---

## Board of Directors – Independence

- ◆ The Board reviews annually the relationships that each Director has with the Firm, including business, personal and charitable relationships. The Board has determined that each of the outside directors is independent under the standards of the NYSE (and the PCXE).
  - – Mr. Kaufman was found to be independent in May 2006, after sufficient time had elapsed since the expiration of a prior consulting agreement with the Firm.

- ◆ To assist it in its Director independence determinations, the Board has adopted a set of categorical standards for relationships that are deemed not to impair a Director's independence[1].

- ◆ The only relationships which exceed the categorical standards are Directors' prior investments in certain investment partnerships sponsored by the Firm, which were offered to such Directors on favorable employee terms. Directors have not been permitted to invest on preferred terms since August 2001.

- ◆ The Board has determined that these investments do not impair any Director's independence, because no Director has made any commitment to any of such investment partnerships since August 2001, and none of the rights of Directors as limited partners in these investment partnerships are contingent in any way on their continued service as Directors.

(1): Summarized on pages 26 – 28 of the Proxy Statement

LEHMAN BROTHERS                                    6

# Board of Directors – Director Compensation

- Each non-management director receives an annual cash retainer of $75,000.
  - The chairman of the Audit Committee receives an additional annual retainer of $25,000, and each non-management director who serves as a chairman of any other committee receives an additional annual retainer of $15,000. Each non-management director who serves as a committee member (including as a chairman) receives $2,500 per committee meeting and $1,500 per unanimous written consent.
- The annual equity retainer paid to non-management directors is, at the director's election, either 3,400 restricted stock units or an option to purchase 10,200 shares of common stock (figures are adjusted to reflect the Firm's 2-for-1 stock split on April 28, 2006).
  - The majority of Directors generally elect to receive RSUs, which do not convert into common stock until termination of service as a director.
- The Board believes that a meaningful portion of a director's compensation should be paid in the form of common stock of the Firm in order to more closely align the interests of directors and the Firm's stockholders.
- The Compensation and Benefits Committee periodically reviews director compensation (including additional compensation for committee members) in comparison to corporations that are similarly situated to ensure that such compensation is reasonable, competitive and customary.
  - In April 2006 (before the stock split), the annual equity retainer was reduced from 2,500 RSUs or 7,500 options to 1,700 RSUs or 5,100 options (all on a pre-split basis).

LEHMAN BROTHERS                    7

---

# Board of Directors – Director Share Ownership

- The Corporate Governance Guidelines require each non-management director to maintain ownership of at least 6,000 shares of the Firm's common stock and/or restricted stock units (on a post-split basis).
- Set forth below is the number of shares of common stock and restricted stock units (excluding shares underlying options) and the number of shares underlying options owned by each non-management director as of June 1, 2006:

| | Shares and RSUs | Stock Options |
|---|---|---|
| Michael L. Ainslie | 54,577 | 76,596 |
| John F. Akers | 27,213 | 95,920 |
| Roger S. Berlind | 597,216 | 76,596 |
| Thomas H. Cruikshank | 72,060 | - |
| Marsha Johnson Evans | 13,541 | - |
| Sir Christopher Gent | 19,681 | - |
| Roland A. Hernandez* | 4,406 | - |
| Dr. Henry Kaufman | 68,073 | 111,988 |
| John D. Macomber | 138,340 | 61,596 |

\* Roland Hernandez became a director effective September 13, 2005. New directors have three years to meet the stock ownership requirement.

LEHMAN BROTHERS                    8

## Board of Directors – Committees

- The Board has the following committees:
  - Audit Committee
  - Compensation and Benefits Committee
  - Executive Committee
  - Finance Committee
  - Nominating and Corporate Governance Committee
- Each of the Audit, Compensation and Benefits, and Nominating and Corporate Governance Committees consists solely of independent directors and operates under a written charter adopted by the Board.
- The Finance Committee also consists solely of independent directors.
- In addition, the Board has adopted and operates under written Corporate Governance Guidelines.
- The committee charters and Corporate Governance Guidelines are posted on the Firm's public web site *(www.lehman.com)*.
- Also posted on the Firm's public web site are means for:
  - Contacting the Audit Committee regarding accounting, internal accounting controls or auditing matters
  - Contacting the non-management directors

LEHMAN BROTHERS                9

## Board of Directors - Meetings

- During fiscal 2005, the Board held 8 meetings. The Audit Committee met 7 times, the Compensation and Benefits Committee met 7 times, the Nominating and Corporate Governance Committee met 6 times and the Finance Committee met 2 times.
- In addition, during fiscal 2005 the Compensation and Benefits Committee acted by unanimous written consent 2 times and the Executive Committee acted by unanimous written consent 13 times[1]. All such actions were reported to the full Board.
- Overall director attendance at Board and committee meetings during fiscal 2005 averaged 98%.
- The Board holds regularly scheduled executive sessions, where non-management directors meet independently of management. The presiding director of executive sessions is Mr. Macomber. The non-management directors held eight executive sessions during fiscal 2005.
- At each Board meeting, updates on financial and legal matters, as well as reports on any committee meetings since the last Board meeting, are presented to the Board.
  - The financial update is a detailed review of results of operations and financial condition, including the performance of the Firm by business unit and by region, as well as the Firm's liquidity, capital and balance sheet leverage. The legal update consists of an update on outstanding litigation and regulatory matters.
- In addition, the Board receives an annual presentation on the Firm's budget, as well as periodic updates on Risk.

*(1): See page 14 for details of resolutions.*

LEHMAN BROTHERS                10

## Board of Directors – Meetings (Cont'd)

◆ The Board regularly receives presentations from senior management on different aspects of the Firm. Set forth below are the topics of the presentations made during 2004, 2005 and 2006 (to date):

- – Risk, Liquidity, Capital and Balance Sheet
- – Strategic Opportunities
- – Global Capital Markets - Fixed Income Division
- – Overview of Competitive Landscape
- – Lehman Brothers Europe

- – Recruiting
- – Corporate Communications, Investor Relations and Creditor Relations
- – Compliance
- – Investment Banking
- – Technology
- – Diversity

◆ The Overview of Competitive Landscape presentation took place over the course of three successive Board meetings in late 2005 and provided a detailed competitive analysis of the Firm's investment banking, fixed income, equities and investment management businesses and a review of the strategic plans for each business.

◆ The Lehman Brothers Europe presentation took place at the May 2006 Board meeting which was held at the Firm's European headquarters. It consisted of presentations regarding the Firm's German and Italian franchises, its European mortgage franchise and its European investment management division, as well as an overview of the European Franchise.

LEHMAN BROTHERS                    11

## Board of Directors – Meetings (Cont'd)

◆ In accordance with the Corporate Governance Guidelines, the Firm has established an orientation program designed to familiarize new directors with, among other things, the Firm's operations, strategic plans, Code of Ethics, executive officers and outside auditors.

◆ In accordance with the Corporate Governance Guidelines, the Board annually evaluates the effectiveness of the Board and its committees. The purpose of this evaluation is to increase the effectiveness of the Board as a whole, and specifically to review areas in which the Board and/or management believes that the Board could make a better contribution.

◆ In accordance with their respective charters, each of the Audit, Compensation and Benefits, and Nominating and Corporate Governance Committees annually reviews the Committee's compliance with its charter and the adequacy of its charter.

- – The charters of these Committees, as well as the Firm's Corporate Governance Guidelines, have been amended since their adoption in order to address evolving corporate governance rules and practices.

LEHMAN BROTHERS                    12

## Finance Committee

◆ Finance Committee
  – The Finance Committee is comprised of the following five independent directors: Dr. Henry Kaufman (Chairman), John Akers, Roger Berlind, Marsha Johnson Evans and Roland Hernandez.
  – The Finance Committee reviews and advises the Board of Directors on the financial policies and practices of the Firm, including liquidity, capital and risk management, and periodically reviews, among other things, major capital expenditure programs and significant capital transactions.
  – The Finance Committee reviews the Firm's budget at its January meeting. The Finance Committee's responsibilities also include annually recommending to the Board of Directors: (1) the Firm's dividend policy and (2) the Firm's share repurchase plan.

## Executive Committee

◆ The Executive Committee consists of Mr. Fuld, who chairs the Executive Committee, and Mr. Macomber.

◆ The Executive Committee has the authority, in the intervals between meetings of the Board of Directors, to exercise the authority of the Board of Directors, except with respect to those matters that the Delaware General Corporation Law or the Restated Certificate of Incorporation reserve to the full Board of Directors.

◆ The Executive Committee acted by unanimous consent 13 times during fiscal 2005.
  – Of these consents, 4 related to securities offerings, 4 to officers or authorized signatories, 3 to guarantees of subsidiary obligations, 1 to an investment and 1 to a human resources matter.
  – All such actions were reported to the full Board.

## Code of Authorities

◆ The Executive Committee of the Board of Directors has adopted a Code of Authorities setting forth the levels of management approval or Board approval required for transactions entered into by the Firm outside of the ordinary course of business.

◆ Actions requiring Board approval include:

– Repurchases of equity of Lehman Brothers Holdings Inc.;

– Public offering or private placement of common equity of the Firm or any of its subsidiaries and public offering of preferred stock or debt securities (excluding commercial paper);

– Granting a full guarantee of all obligations of a Firm subsidiary;

– Acquisition or disposition of part or all of a business over a specified dollar threshold; and

– Any other transaction not otherwise covered in the Code of Authorities over $100 million.

## Audit Committee

◆ The Audit Committee is comprised of the following four independent directors: Thomas Cruikshank (Chairman), Michael Ainslie, Roger Berlind and Christopher Gent

– As required by the Audit Committee charter, each member of the committee has a working familiarity with basic finance and accounting terminology and practices.

– The Board of Directors has determined that Mr. Cruikshank is an "audit committee financial expert" as defined under SEC rules.

◆ The Audit Committee's responsibilities include:

– Review of quarterly and annual financial statements;

– Oversight of the independent auditors, Ernst & Young, with sole responsibility to hire and fire;

– Pre-approval of all audit and non-audit services performed by Ernst & Young;

– Oversight of Internal Audit;

– Oversight of Compliance.

◆ As part of its oversight responsibilities, the Audit Committee regularly receives reports from Internal Audit and Compliance. They are kept informed of the activities, findings and follow up on internal control reviews and regulatory initiatives.

◆ In carrying out its duties, the Audit Committee has the authority to retain outside legal, accounting or other advisors, including the authority to approve the fees and expenses of such advisors.

◆ In accordance with its charter, the Audit Committee conducts a self-evaluation at least annually.

## Auditor Independence

- ◆ The Firm's independent auditors are Ernst & Young LLP.
- ◆ Ernst & Young and Corporate Audit attend Audit Committee meetings and participate in separate private sessions with the Audit Committee.
- ◆ Approximately 86% of the fees paid to Ernst & Young in fiscal 2005 were for audit or audit-related services, and a similar percentage is expected in fiscal 2006.
- ◆ No services can be performed by the Firm's independent auditors unless the Audit Committee has granted pre-approval pursuant to detailed procedures adopted by the Audit Committee.
- ◆ The Audit Committee will not grant approval for any services:
  - – That are prohibited by applicable law or by any rule or regulation of the SEC or other regulatory body; or
  - – That would constitute strategic consulting services of the type typically provided by management consulting firms.

## Ernst & Young Fees

- ◆ Ernst & Young fees for fiscal 2005:

|  |  |
|---|---|
| Audit Fees | $16,175,000 |
| Audit-Related Fees | 5,578,000 |
| Total Audit and Audit-Related Fees | 21,753,000 |
| Tax Fees | 3,141,000 |
| All Other Fees | 430,000 |
| Total | $25,324,000 |

- ◆ The audit-related services provided by Ernst & Young include: audits of employee benefit plans and of certain consolidated subsidiaries; agreed-upon procedures letters issued to rating agencies for the Firm's triple-A rated derivatives subsidiaries; securitization verification procedures and due diligence services; accounting consultations regarding the application of generally accepted accounting principles related to proposed or actual transactions impacting the Firm's financial statements; financial and accounting due diligence related to acquisitions; SAS 70 internal control reporting; and regulatory capital consultations.
- ◆ Tax services provided by Ernst & Young include tax return consultations, preparation and review.
- ◆ Other services provided by Ernst & Young include accounting and tax consultations related to investment banking and capital markets transactions for the Firm's clients.

## Compensation and Benefits Committee

- ◆ The Compensation and Benefits Committee is comprised of the following three independent directors: John Akers (Chairman), Christopher Gent and John Macomber.
- ◆ The responsibilities of the Compensation and Benefits Committee include:
  - – The Firm's overall compensation philosophy;
  - – Approval of corporate goals for the CEO and other executive officers;
  - – Evaluation of the CEO and executive officers;
  - – Approval of compensation of the CEO and executive officers.
- ◆ In carrying out its duties, the Compensation and Benefits Committee has the authority to retain outside legal or other advisors, including the authority to approve the fees and expenses of such advisors.
  - – The Compensation and Benefits Committee has engaged an external compensation consulting firm specializing in the financial services industry to assist it with benchmarking and compensation analysis and to provide on-going consulting on executive compensation practices.
- ◆ In accordance with its charter, the Compensation and Benefits Committee conducts a self-evaluation at least annually.

LEHMAN BROTHERS                    19

---

## Executive Compensation – General

- ◆ The Compensation and Benefits Committee evaluates the performance of the CEO and other executive officers of the Firm, and, based on such evaluation, reviews and approves the annual salary, bonus, share and option awards, other long-term incentives, perquisites and other benefits to be paid to them.
- ◆ In making its decisions with respect to the compensation of executive officers, the Compensation and Benefits Committee has adopted the following philosophical positions and policies:
  - – Tie compensation for executive officers to both annual and long-term Firm, business unit and individual performance goals that are structured to align the financial interests of executive officers with those of stockholders.
  - – Deliver a significant portion of total compensation in equity-based awards, thereby further aligning the financial interests of executive officers with those of the Firm's stockholders and encouraging prudent long-term strategic decisions.
  - – Ensure that compensation opportunities are compatible with those at major competitors, so that the Firm can attract, retain and motivate talented executive officers who are key to the Firm's long-term success.

LEHMAN BROTHERS                    20

## Executive Compensation – CEO Compensation

◆ Set forth below is the annual compensation of our Chairman and CEO for the last three fiscal years:

| | Annual Compensation | | Other Annual Compensation (a) | Long-Term Compensation Awards | | All Other Compensation (c) |
|---|---|---|---|---|---|---|
| Fiscal Year | Salary | Bonus | | Restricted Stock Unit Awards (b) | Securities Underlying Options | |
| 2005 | $750,000 | $13,750,000 | — | $14,942,021 | 450,000 | $17,791 |
| 2004 | 750,000 | 10,250,000 | — | 10,357,143 | 450,000 | 16,028 |
| 2003 | 750,000 | 6,650,000 | — | 8,000,000 | 400,000 | 14,439 |

(a)   In each of the three years, the aggregate incremental cost to the Firm of perquisites received by Mr. Fuld (after reimbursements by Mr. Fuld) did not exceed the $50,000 disclosure threshold under SEC rules.

(b)   The values indicated are calculated by multiplying the closing market price of the Common Stock on the respective dates the awards were granted by the number of shares awarded. RSUs are subject to significant vesting and forfeiture restrictions and pursuant to the terms of the awards cannot be sold or transferred until they convert to Common Stock. Dividends are payable by the Company on all such holdings from their respective dates of award and are reinvested in additional RSUs. The total number of RSUs granted for Fiscal 2005 that underlies the value shown for Mr. Fuld was 117,054.61. In addition, Mr. Fuld received 91,000 RSUs in fiscal 2004 and 60,000 RSUs in fiscal 2003 in accordance with the Firm's 2000 Performance Stock Unit Program.

(c)   Consists of the dollar value of above-market earnings on deferred compensation.

## Nominating & Corporate Governance Committee

◆ The Nominating and Corporate Governance Committee is comprised of the following three independent directors: Marsha Johnson Evans (Chairman), Thomas Cruikshank and John Macomber.

◆ The responsibilities of the Nominating and Corporate Governance Committee include overseeing corporate governance and making recommendations to the Board on:

–   Board Composition;

–   Board Committee Composition;

–   Corporate Governance Guidelines.

◆ In carrying out its duties, the Nominating and Corporate Governance Committee has the authority to retain outside legal or other advisors, including the authority to approve the fees and expenses of such advisors.

◆ In accordance with its charter, the Nominating and Corporate Governance Committee conducts a self-evaluation at least annually.

## Whistleblower Procedures

◆ The Board of Directors has adopted procedures for the anonymous submission of communications directed to non-management directors, as well as complaints about accounting, internal accounting controls or auditing matters.

◆ The mail and email address and the toll-free telephone number are monitored by the Office of the General Counsel.

◆ Communications directed to the non-management directors are communicated to the non-management directors no later than the time of the next regularly scheduled executive session of the Board of Directors.

◆ Complaints about accounting, internal accounting controls or auditing matters are promptly communicated to the Chairman of the Audit Committee.

◆ The status of accounting complaints is reported on a quarterly basis to the Audit Committee and, if it so directs, to the full Board of Directors.

◆ In addition, the Firm has a dedicated telephone line operated by an external provider that enables employees to anonymously report concerns about fraud and other corporate misconduct to senior management of the Firm.

LEHMAN BROTHERS                    23

## Defensive Profile

◆ The Firm has not adopted a shareholder rights plan.

◆ As a result of the approval at the 2006 Annual Meeting of Stockholders of a management proposal to declassify the Board, the Firm no longer has a classified Board and all directors will be elected annually beginning in 2007.

◆ The Firm believes the existence of statutory anti-takeover provisions provide the Firm with sufficient leverage in responding to takeover bids or otherwise negotiating significant corporate transactions.

LEHMAN BROTHERS                    24

## Supplemental Materials

◆ The following additional materials are being provided in connection with this presentation:

   – Corporate Governance Guidelines

   – Audit Committee Charter

   – Compensation and Benefits Committee Charter

   – Nominating and Corporate Governance Committee Charter

   – Code of Ethics

   – 2005 Annual Report

   – 2006 Proxy Statement

LEHMAN BROTHERS                                25

---

# II. Executive Management

LEHMAN BROTHERS

## Executive Management – Overview

◆ Strong executive management and oversight is another critical component of the Firm's corporate governance framework.

◆ Along with the Board, our executive management establishes mechanisms to achieve the Firm's goals and reinforces them day-to-day.

◆ The CEO and senior management have set the tone of a strong culture where integrity and risk management guide decision making.

◆ Key mechanisms for the Firm's executive management include:

– Firm and divisional mission statements

– Policies, procedures and other operating guidelines

– Organizational/management structures and committees for decision making

LEHMAN BROTHERS                                    26

**Culture and Policies**

LEHMAN BROTHERS

## Culture and Policies

- Behavioral policies such as a code of ethics and code of conduct help establish and reinforce our culture. They stress the Firm's values it holds and looks for in others along with values around conducting business.

- The Firm has adopted a Code of Ethics which provides guidance to help recognize and deal with ethical issues, provides a mechanism for the reporting of unethical or unlawful conduct, and helps maintain a culture of honesty and accountability.

- The Code of Ethics satisfies both the provisions of Sarbanes-Oxley and the NYSE and PCXE corporate governance rules and is posted on the Firm's public web site.

- Topics addressed by the Code of Ethics include procedures for reporting violations, conflicts of interest, safeguarding Firm and client property, compliance with applicable laws, fair dealing, and accurate accounting and documentation.

- The Code of Ethics must be read in conjunction with the Firm's long-standing internal Code of Conduct and applies to all employees and directors.

- The Firm also maintains detailed policies covering a variety of other subjects, including insider trading, political contributions, privacy protection and money laundering prevention.

LEHMAN BROTHERS                          27

**Internal Control Committees
Oversight and Governance**

LEHMAN BROTHERS

## Committee Oversight & Governance

- ◆ The same principles of corporate governance apply to the internal control committees of the Firm:
  - – As discussed, strong executive management and oversight is a critical component of the Firm's corporate governance framework;
  - – The Firm has established mechanisms to achieve the company's goals and to ensure that the appropriate checks and balances are reinforced on a daily basis.

- ◆ Four important components of the Firm's governance framework include:
  - – Involvement of the Board of Directors;
  - – Internal Control Committees that are managed by individuals not involved in running the business day-to-day;
  - – Direct management of business areas;
  - – Independent control functions (risk management, compliance, audit, etc.).

- ◆ Corporate Governance is critical to strong risk management and to the internal control infrastructure of the Firm
  - – Part of protecting the Firm's reputation and the franchise;
  - – Employees at all levels are responsible for "doing the right thing";
  - – The Firm continually invests in the best people and in technology within the control infrastructure groups.

- ◆ Corporate Governance and the control infrastructure are based upon a multi-layered, coordinated framework.

---

## Committee Oversight & Governance

- ◆ This multi-layered framework includes a committee structure that facilitates and ensures the appropriate level of risk review, monitoring and mitigation across the Firm.

- ◆ The committee structure is comprised of a variety of Firm, divisional and business level committees which together ensure that transactions/proposals are reviewed appropriately.

- ◆ Regional committees serve to further supplement and support the committee structure, where appropriate:
  - – Operating Exposures Committee;
    - • Operating Control Committee-Europe.

- ◆ Embedded within the committee structure is the Firm's culture of always operating in a team oriented environment, as well as managing our risk and preserving our financial strength and reputation.

- ◆ The Firm's overall committee structure and the internal control committees are predicated upon active representation and participation by the internal control infrastructure groups.

- ◆ Transactions are typically evaluated at the business unit and division level. Once approved there, they may also be subject to a rigorous approval process at a Firm level committee.

## Committee Oversight & Governance

- ◆ The Firm has also established an independent internal control committee oversight group known as, Internal Control Committee Oversight & Governance (ICCOG).

- ◆ The group has commenced a general review of the Firm's Committee structure and is in the process of establishing and implementing a set of standards (Policies & Procedures) for the Firm's internal control committees.

- ◆ ICCOG is responsible for reviewing the Firm's committee structure to ensure:
  - – Appropriate set of committees has been established to review risks;
  - – Transactions/proposals are first evaluated at the business unit and divisional level;
  - – Once reviewed and approved at that level, transactions/proposals are then subject to review by the Firm level committees, as and when appropriate;
  - – All risks are reviewed at the appropriate levels of Senior Management;
  - – All proper infrastructure control groups are represented across the various internal control committees.

- ◆ ICCOG has also established a Firm wide definition of "risk" committee
  - – A committee established to monitor and provide oversight on the Firm's risk taking activities;
  - – A committee established to review and approve (reject) proposals covering market and credit risk, financial risk, technology risk, regulatory risk, legal and compliance risk, operational risk and reputational risk;
  - – Such risk taking activities may encompass new products, transactions, investments, business areas, practices and reputational issues.

LEHMAN BROTHERS                    30

---

## Committee Oversight & Governance

- ◆ In addition to the functional designations as either Oversight or Transaction Approval, each committee has been designated with a risk monitoring role based upon the committee's purview and the established definition of "risk committee."

- ◆ The Firm has established a set of standards that govern the formation, authorities, operations and monitoring of its internal control committees.

- ◆ Standards are set based upon the risk monitoring role of the committee.

- ◆ Primary (key risk) committees are held to a higher level of standards than secondary committees
  - – For example, all Primary (key risk) & Secondary committees must establish and maintain committee charters;
  - – ICCOG working together with each one of the committees is in the process of establishing and implementing charters for all primary and secondary committees.

- ◆ The group has also designed and is in the process of implementing a consistent and integrated web-based platform for the committee framework. This platform will allow for standardization and centralization of:
  - – Charters;
  - – Agendas, presentations and minutes;
  - – Tracking of contingencies.

LEHMAN BROTHERS                    31

# Committee Oversight & Governance

| Management Oversight Committees | Type Of Committee |
|---|---|
| 1 Executive Committee ** | N/A |
| 2 Management Committee ** | N/A |
| 3 Risk Committee | Key Risk Committee |
| 4 Capital Markets Committee | Key Risk Committee |
| 5 Operating Exposures Committee (OEC) | Key Risk Committee |
| 6 Finance Committee | Key Risk Committee |
| 7 Conflicts Task Force (CTF) | Key Risk Committee |

| Transaction Approval Committees | Type Of Committee |
|---|---|
| 8 Commitment Committee | Key Risk Committee |
| 9 Bridge Loan Committee | Key Risk Committee |
| 10 Investment Committee | Key Risk Committee |
| 11 Fairness Opinion Committee (FOC) | Key Risk Committee |
| 12 IMD Product Review Committee (PRC) | Key Risk Committee |
| 13 New Products Committee (NPC) | Key Risk Committee |
| 14 Complex Structured Finance Transactions Committee (CSFTC) | Key Risk Committee |
| 15 Strategic Acquisition Review Committee (SARC) | Key Risk Committee |

** The Executive Committee & Management Committee are not deemed to be risk committees but rather have delegated authorities to various Management Oversight & Transaction Approval Committees

# Committee Oversight & Governance

| Regional/Divisional & Business Level Committees | Type Of Committee |
|---|---|
| 16 High Grade Commitment Committee | Screening Committee |
| 17 High Yield Commitment Committee | Screening Committee |
| 18 High Yield New Business Committee | Screening Committee |
| 19 Loan Participation Committee | Screening Committee |
| 20 Structured Finance Committee | Screening Committee |
| 21 Equity Commitment Committee | Screening Committee |
| 22 Model Control Committees | Key Risk Committee |
| 23 Valuation Committee | Other Committee |
| 24 MCD New Products Committee | Key Risk Committee |
| 25 Executive Oversight Committee | Key Risk Committee |
| 26 Complex Derivatives Transaction Review Committee | Screening Committee |
| 27 Operating Control Committee Europe (OCC-E) | Key Risk Committee |
| 28 Disclosures Committee | Key Risk Committee |

### Internal Control Committees
### Key Risk Committees

LEHMAN BROTHERS

---

## Management Oversight Committees

**Executive Committee**

◆ The Firm's **Executive Committee** is comprised of the most senior members of the Firm and is ultimately responsible for the leadership and strategic direction of the Firm. The Committee meets at least twice weekly, and more frequently as necessary. All major decisions impacting the Firm are reviewed and approved by the Executive Committee.

**Management Committee**

◆ The Firm's **Management Committee** includes all the major business unit operating heads and is responsible for the operations of and coordination among the global business units, including establishing near-term strategic initiatives. The Management Committee provides leverage for the Executive Committee.

**Capital Markets Committee**

◆ Overall risk management policy is established by the **Capital Markets Committee** which consists of the Chief Executive Officer, other members of the Firm's Executive Committee, the Chief Risk Officer, the Chief Economist and Strategist as well as various other business heads. The Capital Markets Committee serves to frame the Firm's risk opinion in the context of the global market environment.

## Management Oversight Committees

**Risk Committee**

◆ The Firm's **Risk Committee** meets at least weekly to review material risk exposures and any risk-taking activities deemed significant by the Chief Risk Officer. The Committee includes members of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer. Overall risk management policy is established by the Executive Committee.

◆ The Risk Committee reviews all risks on a very granular basis including, Risk Appetite usage versus limits; VaR; counterparty credit exposures by region, product, sector and ratings, top investment grade and non-investment grade names; large exposures: investment grade; non investment grade; principal transactions; workout; equities; pipeline (mandated, contingent, conditional); Firm relationship loans that are new or significant Firm relationship loans coming up for renewal; and other topics of interest as identified by the Chief Risk Officer.

◆ The Firm's Global Risk Management Division is completely independent of the trading areas, reporting directly to the Chief Administrative Officer of the Firm. The group combines the credit, market and operational risk functions to best facilitate the overall analysis of risk exposures.  Staff are located in each of the regional trading centers globally to better maintain daily contact with the trading areas.

LEHMAN BROTHERS                    35

---

## Management Oversight Committees

**Operating Exposures Committee (OEC)**

◆ The **Operating Exposures Committee's** mission statement is to:
  – Protect the franchise and make sure the Firm has the right set of controls and to address key risk and exposure areas impacting the Firm;
  – Examine activities where the Firm has the following potential risks: market, credit, operational, technology, legal, regulatory, documentation, tax, financial, capital and reputational;
  – Identify and act proactively to get ahead of the curve in addressing those areas and issues that leave the Firm most vulnerable and to sponsor appropriate measures to deal with them.

◆ The OEC plays two fundamental coordinating roles:
  – Proactive: The OEC seeks to identify and address vulnerabilities in internal controls by integrating the various risk management areas in order to mitigate risks across the Firm;
  – Reactive: The OEC provides a forum for addressing issues in a systematic and integrated fashion before potential problems arise.

◆ The OEC has delegated authority from the Executive Committee of the Firm and is also comprised of members of the Executive Committee.

LEHMAN BROTHERS                    36

## Management Oversight Committees

### Finance Committee

◆ The Firm's **Finance Committee** is responsible for developing, implementing and enforcing the Firm's liquidity, funding and capital position policies.

◆ The Committee approves / disapproves changes to the capital plan or updates to funding policies as required. Examples of decisions include: balance sheet target increases and debt issuance.

◆ Finance Committee policies include recommendations for capital and balance sheet size as well as the allocation of capital and balance sheet to the business units. Additionally, through the establishment and enforcement of capital and funding limits, the Finance Committee oversees compliance with policies and limits with the goal of ensuring the Firm is not exposed to undue funding or liquidity risk.

◆ The Finance Committee reports to the CAO and CFO. All committee members are direct reports of the CFO.

## Management Oversight Committees

### Conflicts Task Force

◆ The **Conflicts Task Force** (CTF) established in late 2003, identifies and reviews conflicts of interest and potential conflicts of interest across the Firm's multiple business units. The committee is responsible for assessing the adequacy of existing procedures and controls to mitigate conflicts, and makes recommendations and/or to the relevant business and/or to senior management regarding steps to improve conflict management.

◆ An important aspect of the CTF mission is to ferret out and understand the incentives which give rise to potential conflicts so that proper steps can be taken to disclose, minimize or eliminate such conflicts.

◆ The Firm defines a "conflict of interest" as any business practice or situation that, if not appropriately managed, has the potential to place the interests of:
  – One set of customers above another; or
  – The Firm or its employees ahead of the Firm's customers.

◆ CTF reviews conflicts relating to specific products and business areas, as well as business practices, and recommends the appropriate controls necessary to manage such conflicts.

## Transaction Approval Committees

### Commitment Committee

◆ The Firm's **Commitment Committee** reviews and approves all proposed offerings of securities and instruments to investing clients to determine whether Lehman Brothers Holdings Inc. (or any of its subsidiaries or affiliates) may act as lead or co-managing underwriter or placement agent or otherwise participate in any significant capacity in the offering.

◆ The Commitment Committee evaluates the due diligence investigation conducted for such transaction and passes on the structure of transactions and the creditworthiness of the issuer of securities or instruments, as well as the overall acceptability of the proposed transaction.

◆ While the Commitment Committee must approve all such transactions, significant transactions may also be subject to review by the Executive Committee upon the recommendation of a member of the Commitment Committee.

◆ The Commitment Committee is delegated its authorities by the Executive Committee of the Firm.

LEHMAN BROTHERS                    39

## Transaction Approval Committees

### Bridge Loan Committee

◆ The **Bridge Loan Committee** determines whether Lehman Brothers Holdings Inc. (or any of its subsidiaries or affiliates) will enter into transactions involving the commitment of any bridge/interim financing by the Firm.

◆ An interim loan generally includes any unsecured loan or financing (including any guarantee of unsecured third party debt or any similar capital commitments) or any commitment relating thereto that is expected to be refinanced through permanent loan facilities, the offering of debt or equity securities or asset sales. All reviews and determinations of interim loans will include any ancillary arrangements (e.g., guarantees, letters of credit, indemnification) relating thereto.

◆ The Bridge Loan Committee is delegated its authorities by the Executive Committee of the Firm.

LEHMAN BROTHERS                    40

## Transaction Approval Committees

**New Products Committee (NPC)**

◆ The Firm's <u>**New Products Committee**</u> serves as the forum for business units to present new products or businesses to relevant areas of the Firm in order to:

– Assess the potential risks of the new products or businesses to the Firm (including market, credit, operational, technology, legal, regulatory, documentation, tax, financial, capital and reputational risks);

– Ensure that appropriate infrastructure, including internal controls, is in place for the new products or businesses;

– Approve/disapprove and/or recommend enhancements related to managing the risks of such new products or businesses.

◆ The New Product Committee's scope of purview includes:

– Products or businesses that have not been offered or conducted by the Firm previously (or for a period of at least two years) that have a significant and materially different risk profile from that of existing products or businesses; or

– Offering products in a substantially different manner, which results in a significant and materially different risk profile; or

– Marketing an existing product into a new country which presents significant jurisdictional issues.

◆ The New Products Committee is delegated its authorities by the Executive Committee of the Firm.

LEHMAN BROTHERS                    41

---

## Transaction Approval Committees

**Complex Structured Finance Transaction Committee (CSFTC)**

◆ The <u>**Complex Structured Finance Transactions Committee**</u> reviews complex structured finance transactions, structured products, or other transactions that present significant reputational, legal or other extraordinary risks to the Firm which are not otherwise reviewed within existing Firm committees.

◆ CSFTC will supplement, and not replace existing approval processes at the Firm. Transaction Approval Committees (TACs) have been established in Fixed Income and Equities and are responsible for reviewing all CSFTs in these businesses to include non-standard, one-off trades, (whether primary or secondary) and other capital market transactions that come within the definition of CSFT but are not otherwise subject to review by the Commitment Committee or New Products Committee.

LEHMAN BROTHERS                    42

# Transaction Approval Committees

### Investment Committee

◆ The Firm's **Investment Committee**
  – Determines whether Lehman Brothers Holdings Inc. or any subsidiary, division or other entity controlled thereby will make or divest an Investment for the Firm's account, and
  – Reviews and approves the Firm's merchant banking activities.

◆ An "Investment" generally has as its primary purpose capital appreciation and includes:
  – Any capital commitment or investment (whether in the form of cash or securities) that at the time of commitment or investment is expected to be outstanding for a period of more than one year;
  – Any purchase of capital stock, partnership or membership interests, trust certificates or other equity securities on which are imposed significant restrictions on transferability, regardless of the expected holding period;
  – Any purchase of an equity interest in real estate (excluding ordinary course mortgage business);
  – Any transaction referred to the Committee for any reason by the CEO.

◆ The Investment Committee is delegated its authorities by the Executive Committee of the Firm.

LEHMAN BROTHERS                    43

---

# Transaction Approval Committees

### Investment Management Division (IMD) Product Review Committee

◆ The purpose of the **IMD Product Review Committee (PRC)** is to evaluate the potential impact to the Firm and the Investment Management Division arising from the introduction of new product and service offerings created or distributed anywhere within the IMD.

◆ The PRC combines and replaces both the PIM Risk Committee and the IMD New Business Initiatives Committee, which had previously been responsible for separate parts of the review process.

◆ PRC review will evaluate all aspects of the offering, including:
  – Financial, operational, technology, compliance and management infrastructure necessary to initiate and maintain the product offering;
  – Budgetary review and determination of economic viability of the product or service offering considering resource needs and opportunity costs;
  – Potential financial and legal liabilities;
  – Potential impact to reputation or franchise;
  – Considerations related to branding and marketing;
  – Potential conflicts of interest;
  – Regulatory considerations.

LEHMAN BROTHERS                    44

## Transaction Approval Committees

**Fairness Opinion Committee (FOC)**

◆ The **Fairness Opinion Committee** reviews any fairness opinion that the Firm is asked to deliver in an acquisition, sale, divestiture or other corporate transaction. The FOC also reviews any valuation or business purpose letter or opinion the Firm is requested to deliver.

◆ A fairness opinion, which is issued by a financial advisor in an acquisition, sale or divestiture, addresses the fairness of consideration to be offered or received from a financial point of view. The overwhelming majority of public transactions and most private transactions require fairness opinions to be delivered to the Company and part of the Board's evaluation of a transaction.

◆ The Fairness Opinion Committee is delegated its authorities by the Executive Committee of the Firm.

## Transaction Approval Committees

**Strategic Acquisition Review Committee**

◆ The **Strategic Acquisition Review Committee** was established in May 2006.

◆ The committee will cover strategic acquisitions, investments and joint ventures by the Firm.

◆ Its mandate is not to approve the strategic motivation for the transaction, but rather to review:
  – The risks the transaction raises for the Firm (legal, regulatory, reputational, counterparty and operational);
  – The due diligence completed by the deal team and their advisors;
  – The specific terms of the deal.

# III. Independent Control Functions

LEHMAN BROTHERS

---

# Internal Control Environment - Introduction

◆ In addition to executive oversight and internal control committees, the Firm relies on a global system of numerous multidisciplinary, interconnected and reinforcing controls.

◆ Various Support and Control groups serve as independent functions that are responsible to help protect the Firm and manage risks including: **financial, liquidity, market, credit, operational, technology, legal, regulatory and reputational.**

◆ Support and Control functions include:

| Finance | Risk Management | Corporate Advisory |
|---|---|---|
| – Financial Control | – Credit / Market Risk | – Audit |
| – Product Control | – Operational Risk | – Compliance |
| – Treasury | – Quantitative Risk | – Legal |
| **Operations** | **Technology** | **Other** |
| – Clearance and Settlement | – Development | – Human Resources |
| – Middle Office | – Data Center & Telecom | – Security |
| – Margin | – Business Continuity | – Corporate Communications |

◆ This section will describe Finance and Corporate Advisory activities that focus on helping the firm manage financial risk, legal risk, regulatory risk, reputational risk and overall internal control risk.

LEHMAN BROTHERS



**Financial Control**

LEHMAN BROTHERS

---

## Financial Control - Overview

- ◆ The Firm has a robust process to ensure the integrity of its financial statement and disclosure information which includes:

  - – Daily P&L and position review process;

  - – Monthly financial closings, including reconciliations to daily processes;

  - – Rigorous mark-to-market inventory valuation and independent mark verification process;

  - – Formal process to collect and process quarterly disclosure information;

  - – Internal due diligence meetings over SEC 10K/10Q reports, including review with Audit Committee;

  - – Model validation and control policies and procedures;

  - – Globally centralized balance sheet control and validation function;

  - – Specialized regulatory reporting functions in each region.

LEHMAN BROTHERS                    48

## Financial Control – Overview – (continued)

◆ A strong control mindset is fundamental to the organization and is continually reinforced.

◆ Finance is completely independent, organizationally as well as for compensation purposes, from the business units.

◆ The CFO, Controllers and most senior members of the Finance organization are CPA's with extensive Big 4 public accounting and industry experience.

◆ The Controller's function, which is responsible for external and internal MIS accounting and reporting and regulatory reporting, is broadly split into two major functions – Financial Control and Product Control. Inherent in this structure are numerous checks and balances to ensure the accuracy and reliability of publicly disclosed information.

◆ <u>Financial Control</u>:
   – Includes legal entity controllers (globally), financial reporting, regulatory reporting and accounting policy;
   – Key responsibilities include: legal entity financial statement preparation, global consolidation of all legal entities, validation and support for all account balances, analysis of all expenses and expense accruals, preparation of all required financial and regulatory capital filings, and evaluation of appropriate accounting for transactions.

## Financial Control – Overview – (continued)

◆ <u>Product Control</u>:
   – Product Controllers are the independent professionals within the Finance Division who are responsible for the accounting and financial control of each of our businesses. Product Controllers have developed product expertise in their respective areas and are tasked with thoroughly understanding the financial results of each business, including conducting detailed P&L reviews on a daily basis (each and every day) and monthly pricing verification procedures. They work closely with their partners in the Middle Office and the Risk Management Division. There are approximately 300 Product Controllers globally in the Firm.
   – Split by major business unit (FID, Equities, Investment Banking, IMD and Private Equity).

◆ <u>Monthly Closing Process</u>
   – The monthly financial closing process includes a reconciliation between our daily P&L and position review processes versus the independent month-end legal entity closing. The daily and month-end processes are separate, thus providing an independent "check" of numbers.
   – In addition to the above, our monthly closing includes the verification and validation of G/L balances as follows:
      • Review of judgmental reserves (legal, valuation);
      • All balance sheet accounts have designated "owners" to ensure amounts are reconciled to supporting records.

## Inventory Valuation – Control Environment (I)

◆ The Firm has a rigorous independent internal control framework which ensures the reliability of the mark-to-market process.

◆ This multi-tier framework includes:
  – Capital Markets Senior Management – Review of P&L and key risk positions on a daily basis;
  – Middle Office Operations Function – Calculation of daily P&L on a position by position level basis;
  – Risk Management Group – Calculation of Value at Risk ("VaR") on a daily basis, and analytical review of VaR versus actual daily P&L;
  – Finance via Product Controllers – Analysis of daily P&L and positions, month-end pricing verification, and review of new transactions;
    • Product Controllers review pricing on a daily basis, as an extension of the detailed P&L review process they perform daily. They also perform a more formal monthly price verification for their respective businesses.

◆ Product control is also the point of contact within Finance for all new transactions, ensuring that they have been appropriately reviewed and approved (Accounting Policy, Compliance, Regulatory, CSFTC, TAC, New Product Committee, etc).

LEHMAN BROTHERS                                    51

---

## Inventory Valuation – Control Environment (II)

◆ The monthly pricing verification process includes:
  – Where external prices are available, these are compared to actual prices recorded in the ledgers (e.g., Bloomberg, Reuters, IDSI, Telerate or independent broker quotes);
  – For positions priced using models, the model inputs are verified against external sources and against approved models;
  – Other analytical tools are utilized for certain types of positions, or to provide further support (e.g., comparison to similar securities of the issuer or a competitor, spread analysis vs. original issuance, etc.);
  – Prices of securities are compared to subsequent trade prices as further evidence of appropriate valuation.

◆ Positions included in the price verification process are reconciled to final balance sheet amounts to ensure the verification process is complete.

◆ When pricing models are utilized, the Firm has the following controls in place to ensure that only approved models are being utilized in the daily pricing as well as month-end validation process:
  – Product Control and Risk Management review and approve all models;
  – No changes can be made to these models without prior approval of Product Control and Risk Management.

LEHMAN BROTHERS                                    52



**Legal & Compliance**

LEHMAN BROTHERS

---

## Corporate Advisory Division

◆ The Corporate Advisory Division ("CAD") primarily consists of Audit, Compliance and Legal functions.

◆ CAD's primary mission is to identify, analyze, evaluate and manage risk relating to the way in which the Firm operates. This includes:
  – Reducing the potential for revenue losses, legal and regulatory liabilities and reputation damage.
  – Playing a leading role in the identification and mitigation of risk associated with:
    • New transactions, businesses and markets.
    • Expansion or variation of existing products.
  – Supporting overall growth of the Firm globally.

◆ Members of CAD work closely with all business and support divisions to ensure a strong risk control infrastructure globally.

LEHMAN BROTHERS                53

# Legal

◆ The Legal function consists of a number of groups that provide direction and advice across the Firm to ensure that laws are strictly followed.

◆ These groups include:
   – **Corporate Law and Corporate Secretary Office** – responsible for:
      • Reporting obligations and corporate governance of LBHI as a public company.
      • Financing of the Firm's operations.
      • Corporate acquisitions and divestitures.

   – **Business Advisory Legal groups** - responsible for:
      • Identifying and resolving legal matters arising out of businesses activities.
      • Mitigating legal risks associated with new transactions, products, businesses and jurisdictions.
      • All business areas including Equities, Fixed Income, Investment Banking, Investment Management and Mortgage Capital.

   – **Litigation –** responsible for:
      • Managing the Firm's claims or exposures in all court or arbitration proceedings globally.
      • Providing advice and consultation to the businesses pre-litigation;
         o structuring documents or proposals to avoid litigation;
         o negotiating settlements of disputes prior to the filing of proceedings.

# Legal

◆ Legal groups continued:
   – **Transaction Management** – responsible for:
      • Managing and mitigating transaction and counterparty-specific legal and documentation risk through the use of industry-standard master agreements and transaction-level documentation governing applicable over-the-counter transactions.
      • Drafting and negotiating the Firm's OTC derivatives and funding documentation.

   – **Other legal groups** include:
      • Government Affairs
      • Employment Law
      • Intellectual Property
      • Insurance
      • Contracts Law (technology and real estate)

## Compliance and Regulatory Law

◆ **Compliance**
- The Compliance Department provides advice to the Firm's businesses to ensure that they adhere to Firm policies as well as securities rules and regulations to which they are subject.
- Compliance teams are dedicated to Equities, Fixed Income, Investment Banking, Equity Research, Investment Management, Mortgage Capital and Operations.
- The Central Compliance group provides advice and coverage to all of the Firm's businesses in the areas of Continuing Education, Communications (including marketing materials), Registration, Examinations, Surveillance and Money Laundering Prevention.
- The Compliance Firm-wide Coordinating Office (also known as the Control Room)
  • Oversees the Watch and Restricted Lists (including maintaining the lists, surveillance of proprietary trading in Watch and Restricted List securities and reviewing research for companies on the Watch Lists).
  • Monitors employee outside business affiliations, employee political contributions, and employee trading.
  • Chaperones communications between Equity Research and Investment Banking.

## Compliance and Regulatory Law

◆ **Compliance (Cont.)**
- The Financial Crimes Prevention and Intelligence Unit ("FCPI") is responsible for due diligence inquiries and is comprised of two groups.
  • Money Laundering Prevention Group ("MLPG") oversees the Firm's Money Laundering Prevention Program and assists the Firm in detecting and reporting suspicious activity related to financial crimes.
  • The Due Diligence Review Group ("DDRG") performs enhanced due diligence reviews on customers for the Firm. The DDRG also performs due diligence for the Firm in support of various business transactions or functions.

◆ **Regulatory Law**
- The Regulatory Law group represents the Firm and its employees in all inquiries, regulatory requests, investigations, and proceedings initiated by U.S. and State government departments and agencies as well as the self-regulatory organizations, such as the New York Stock Exchange (NYSE) and the National Association of Securities Dealers (NASD).

- The group is involved in internal investigations and provides support for regulatory issues such as those that arise during the course of inspections.

**Corporate Audit**

# Mission

◆ The mission of the Corporate Audit Department is to independently confirm and help ensure a strong internal control environment:
  – That is commensurate with industry best practices;
  – That is supportive of the evolving regulatory framework;
  – By identifying control improvements and efficiency opportunities;
  – By working with management to mitigate risk and effect change.

◆ The Firm's General Auditor and Corporate Audit Department have an independent reporting line to the Audit Committee of the Board of Directors and internally to the Head of the Corporate Advisory Division and Chief Legal Officer.

◆ Corporate Audit is responsible for providing the Audit Committee and senior management of the Firm with an independent assessment of Lehman Brothers' internal control environment. This is accomplished by performing risk driven and mandated audit reviews and through involvement in Firm initiatives.

◆ The functions and activities of the department are determined strictly by the General Auditor and the Corporate Audit executive committee and are reviewed by the Audit Committee periodically. Senior management of the Firm provides views of business risk and planned changes.

◆ Coverage includes all global businesses, products and operations.

## Goals (I)

◆ **Conduct comprehensive assessment and audit reviews across the Firm on a risk and cycle basis**
  – Perform a formal and detailed risk assessment of all areas of the Firm as part of the annual planning and ongoing review process.
  – Develop and execute a risk based annual plan and related audit reviews.
  – Continuously adjust audit activities for changing market, business, risk and regulatory conditions.
  – Provide frequent reporting and active follow up on open audit findings.

◆ **Provide complete audit coverage of areas mandated by regulation**
  – Continue to conduct annual mandatory reviews required by global regulators.
  – Conduct audits to address significant increase in new regulatory mandates.
  – Maintain understanding of regulator initiatives and follow up on key inspection findings.
  – Meet with regulators to provide an understanding of Corporate Audit activities for them to leverage.

◆ **Participate in the evaluation and implementation of the Firm's key new initiatives**
  – Continue to actively participate in early phases of new business and infrastructure initiatives to influence the design and implementation of adequate control environments.
  – Confirm that the Firm's new business and structured product review committees and governance processes are operating effectively.

LEHMAN BROTHERS                    59

## Goals (II)

◆ **Maintain visibility and credibility with business managers throughout the Firm**
  – Meet with senior business and control group managers to maintain understanding of changing business risks and initiatives.
  – Provide regular reporting and updates on audit findings and status of open issues.

◆ **Drive global consistency in audit approach and standards**
  – Conduct common risk assessment, planning and audit reviews across divisions, functions and regions where appropriate.
  – Ensure ongoing communication and discuss findings between regional audit groups.
  – Continue to evolve technology supporting audit planning, review and reporting activities.

◆ **Staff and develop global department to be commensurate with the mission**
  – Ensure appropriate staffing level and experience to achieve goals and approved audit plan.
  – Provide technical and professional training for core disciplines along with management feedback.
  – Establish mechanism for staff to provide input and involvement in organizational improvement.

LEHMAN BROTHERS                    60

## Staffing Summary

◆ The Global Corporate Audit Department is currently staffed with a team of 119 professionals, an increase of 27% versus a year ago, and up 180% since 2002.

◆ Resources are located in each of the Firm's major regions with 70% in U.S., 20% in Europe, 8% in Asia, and 2% in India.

◆ The department's growth has been generally across all levels and disciplines to support the Firm's business initiatives and increased regulatory requirements.

◆ The organization is weighted with experience in both audit and financial services
  – Management Team – Over 15 years audit and industry experience on average;
  – Almost half of the group is at the manager level or above;
  – The vast majority of staff are hired with at least 2 years of experience and have on average 5 years of experience.

◆ Significant amount of staff have graduate degrees or advanced certifications including CPAs or Chartered Accountants, Series 7 registration and CISA certification.

LEHMAN BROTHERS                    61

---

## Staffing Focus

◆ Senior management of the department continues to focus on growing, upgrading and developing the organization as needed.
◆ In growing the department, management considers:
  – Building leadership and structure to leverage experience
  – Quality not quantity. Establish and maintain consistent standards by promoting:
    • Strong commitment and values;
    • Confidence in professional judgment;
    • Creative and broad thinking;
    • Interpersonal, communication and team oriented skills;
    • Project and change management involvement.
  – Balancing the group with business knowledge/functional expertise;
  – Recognizing individual and group accomplishments;
  – Empowering the organization to continuously drive improvement;
  – Providing training and development.
◆ The Audit Committee and management of the Firm continue to be supportive of the department's staffing needs.
◆ The General Auditor engages co-sourced resources on a limited basis ( 2 – 5 auditors per year) to augment staffing levels where permanent hires have not yet been completed.

LEHMAN BROTHERS                    62

## Approach Overview (I)

◆ The Corporate Audit approach is consistent with professional standards and guidelines and is designed with a set of principles, guidelines and tools that are complemented by professional judgment.

◆ In planning and performing audits of the internal control environment, the following five factors are considered to provide an opinion on the effectiveness of internal controls:
  – The environment – the overall business, market and regulatory environment;
  – Risk assessment – an evaluation of product complexity, operating and processing risk;
  – Control activities – the nature and clarity of current control processes;
  – Information and communication – the extent of automation and technology controls;
  – Monitoring – continuous assessment, reporting and follow up on review findings.

◆ This approach adheres to guidelines established for the industry by the ASB, the Treadway Commission (COSO), AICPA, etc. and addresses internal control mechanisms across all units and functions within the Firm with respect to:
  – The effectiveness and efficiency of operations;
  – The reliability of financial reporting;
  – Compliance with laws and regulations;
  – Governance and risk management oversight.

## Approach Overview (II)

◆ The Corporate Audit Department annual audit plan is developed based on an internally developed risk assessment model and then considers other factors including concerns of the regulators, discussions with business unit management and external audit.

◆ The plan reflects a cycle of coverage based on the risk assessment and mandatory requirements.

◆ The plan is continuously evaluated throughout the year
  – Developed in December;
  – Audit Committee approval in January (adjustments are made, if required);
  – Refined as business mix changes or as warranted by market events;
  – Audit Committee updates provided semi-annually.

◆ In general, audits of individual areas are governed by the following approach
  – Planning (includes risk based scoping);
  – Control Evaluation;
  – Testing;
  – Reporting;
  – Review and follow-up.

## Approach – Risk Assessment

◆ **Risk Assessment Model**
  – Annual risk assessment of all auditable universe areas
  – Assign risk ratings of high, medium or low
  – Document risk assessments
  – Risk assessments are captured and analyzed systemically
  – Risk assessments are evaluated throughout the course of the audit cycle

◆ **Identify and define risk categories:**
  – Market risk
  – Credit risk
  – Financial reporting risk
  – Technology risk
  – Operational risk
  – Legal/Regulatory risk
  – Reputation risk

◆ **For each product or process in the audit universe:**
  – Assess inherent risk
  – Assess internal control environment
  – Determine residual risk

LEHMAN BROTHERS                    65

---

## Approach – Planning and Control Evaluation

◆ **Planning and Scheduling**
  – Preliminary Scheduling includes reaffirming the need for audit review and timing; establishing resource and skill set needs; and initial coordination with E&Y and other key control groups.
  – Project Planning includes determining overall objectives and scope; beginning research of area, reviewing audit history and obtaining documentation and other sources of information; analyzing key risk factors; and informing clients/issuing announcement memo.

◆ **Control Evaluation and Testing**
  – Process walkthroughs and reviews include initial meetings to identify management concerns; interviews of appropriate personnel to review process flows, policies, procedures, MIS and key data; and to finalize audit testing approach, plan and scope;
  – Audit Documentation includes narratives that describe significant process flows and flow chart mappings of data/systems flows;
  – Control Templates include control models which define control objectives to meet accepted best practices, describe the Firm's controls that achieve control objectives, and evaluate if described controls are sufficient to achieve objectives;
  – Testing includes design of tests and development of testing matrices; conduct testing, evaluation and document testing results; review and validate testing results with appropriate managers; and conduct additional tests if necessary.

LEHMAN BROTHERS                    66

## Audit Approach – Reporting and Follow up

◆ **Audit Reporting includes:**
- Issuing reports based on findings discovered during audit reviews;
  - Categorize findings based on their level of priority;
  - Work with businesses to draft action plans that address findings;
  - Action plans require specific deliverables and dates;
- Important findings are reported to the Audit Committee.

◆ **Audit findings follow-up includes:**
- Active communication with businesses to monitor progress on action plans;
- Track findings and action plans throughout audit process;
- Provide management reporting of open action plans;
- Regular meetings with senior business managers to review status of action plans.

## Strategic Control Activities & Projects

◆ Corporate Audit participates in Firm and business specific new initiatives at all levels in order to influence the control environment during planning and implementation stages. These control activities and projects include, but are not limited to:
- Engage in the establishment of new locations or businesses;
- Understand and influence controls designed in new technology developments;
- Support the coordination of Lehman's client SAS70 development;
- Participate in potential new acquisition due diligence and integration activities.

◆ In addition, the group looks for opportunities and is asked to participate in efforts to influence the control environment across the Firm
- Project management or coordination activities for Firm-wide control initiatives;
- Define and/or enhance policies and standards across similar products and processes;
- Provide support for productivity and re-engineering activities;
- Provide support for regulatory activities;
- Special investigations as required.

## Audit Committee Reporting (I)

◆ The Audit Committee Charter details specific responsibilities including:
  – Oversight of internal audit function;
  – Management of external audit function;
  – Specific financial reporting and review responsibilities.

◆ The Committee formally meets generally 7 times annually and additionally meets to review the Firm's press releases prior to earnings announcements.

◆ The Committee's oversight of Corporate Audit includes both formal and informal interaction
  – Corporate Audit presents formally to the committee on various topics including:
    • Annual Audit Plan for approval – presented in January;
    • Annual report on Sarbanes Oxley 404(a) activities and findings – presented in February;
    • Semi-Annual updates on Audit activities and findings – Presented in May for Nov 1st – Apr 30th activities and in November for May 1st – Oct 31st activities.
  – General Auditor attends all Audit Committee meetings and meets with Committee individually in regular private sessions;
  – Committee Chairman and General Auditor interact on an ad-hoc basis.

LEHMAN BROTHERS                    69

## Audit Committee Reporting (II)

◆ Semi-annual updates to the Audit Committee include:
  – Overall Summary Conclusion
  – Global staffing update
    • Overall staffing levels by region and group
    • Significant changes, hires and departures
    • Key areas of recruiting focus
    • New hire profiles in appendix
  – Global staffing utilization and resource distribution
    • Across type of risk covered by review activity
    • Across business units and support groups
  – Strategic control and project activities
  – Audit Reviews
    • Reviews completed
    • Findings highlights/Control Concerns
  – Management Action Plan Tracking

LEHMAN BROTHERS                    70

## Interaction with External Auditors

◆ Active and ongoing coordination and interaction at all levels
  – Mutual Planning Cycles – Extensive communication on plan coverage and testing;
  – Interpretation of new industry developments and guidance.

◆ Cross reliance is optimized to the extent allowable
  – Internal Audit – key focus on adequate internal controls in support of operational and financial processes;
  – External Audit – key focus on financial statement and accounting accuracy;
  – Sarbanes-Oxley 404 (a)
    • Focus overlap on controls over financial reporting, leverage Corporate Audit wherever possible;
    • External auditor performs SAS65 review of Corporate Audit results wherever principal evidence is not required for external auditor opinion;
    • Shared findings and work papers.

◆ Joint participation in Senior Management and Audit Committee meetings to discuss findings, status and certify financial reporting (10-Q's and 10-K's).

LEHMAN BROTHERS                    71

## Closing Remarks

◆ The Global Corporate Audit group continues to expand in scope, involvement and resources to be commensurate with the diversification and growth of the Firm along with increasing internal and external requirements;

◆ The group is involved in the Firm's significant initiatives and is relied upon by external constituents.

◆ Department management continuously focuses on enhancing:
  – Hiring requirements;
  – Involvement and relevance;
  – Quality and depth of reviews;
  – Consistency;
  – Audit methodology and tools.

◆ Challenges for the department going forward include:
  – Continuing to balance conducting risk based audit reviews, addressing mandates and participating in new initiatives;
  – Keeping audit properly staffed in an overheated market.

LEHMAN BROTHERS                    72

# IV. Sarbanes Oxley

## Sarbanes-Oxley Compliance – Public Disclosures

◆ The Firm has a long-standing commitment to a robust control infrastructure and its multi-tier review process to ensure the accuracy of its financial statements and other publicly disclosed information.

◆ Pursuant to the Sarbanes-Oxley Act, the Firm's CEO and CFO certify the accuracy of the Firm's financial statements and the effectiveness of the Firm's internal controls and disclosure controls and procedures.

◆ As part of management's control and oversight, a formal due diligence process is conducted for reviewing annual and quarterly financial statements, as well as the Firm's internal controls, before the reports are filed with the SEC. This process consists of three elements:

– A meeting to review the financial statements, and to review the Firm's internal controls and disclosure controls and procedures.

• Led by the CEO and is attended by senior management of the Firm, Ernst & Young and the Firm's outside counsel.

• Involves presentations by the departments involved in the preparation of the SEC report and the Firm's internal controls, including Finance, Legal, Corporate Audit and Executive Compensation.

• A presentation is also made by Ernst & Young. Participants are asked to discuss any questions regarding the accuracy or completeness of the filings.

– Supporting certifications from senior business leaders and participants in the preparation of the financial statements.

– The Audit Committee reviews the financial statements and management's due diligence process.

## Sarbanes-Oxley Section 404(a) – Overview

◆ Lehman Brothers management is responsible for establishing and maintaining adequate internal controls over financial reporting.

◆ The Firm's internal control system is designed to provide assurance to management and the Board of Directors that the published financial statements are prepared and presented in a fair manner.

◆ Lehman Brothers management has conducted a thorough assessment during 2003 ("dress rehearsal"), 2004 and 2005, of the Firm's internal controls over financial reporting.

◆ The approach and process followed in conducting the assessment is consistent with industry standards.

◆ As a result of this process, management has concluded that the Firm's internal controls over financial reporting are effective.

◆ The required certification, representing the Sarbanes Oxley 404(a) attestation from management and Ernst and Young's opinion thereon, is included in the Firm's annual report.

◆ Management of the Firm continues to focus and dedicate appropriate resources to ensure compliance with attestation requirements.

◆ Corporate Audit is responsible for controls testing and works closely with senior management from Finance, Technology, Operations, Corporate Advisory Division, and the business units to refine the approach, drive the attestation process, and ensure focus on sustaining the requirements.

LEHMAN BROTHERS                                74

## Sarbanes 404(a) – Approach (I)

◆ The Firm's approach is designed to comply with the SEC's Sarbanes-Oxley 404(a) rule, considers guidance from the PCAOB and is coordinated closely with Ernst & Young.

◆ The process is globally consistent and includes a broad scope of controls across all areas of the Firm.

◆ The approach described below has been developed and followed to complete the 2003 "dress rehearsal", 2004 and 2005 attestations:

– **Define the Universe**

• The business/product and infrastructure groups of the Firm across all region are divided into "universe areas" that include financial reporting controls.

• These areas are evaluated versus materiality criteria developed as a guideline to evaluate the level of significance of an area to the Firm's financial statements and therefore were reviewed under the Sarbanes 404(a) rule.

– **Develop Best Practice Control Objectives**

• A control model was developed for each universe area and consists of a set of best practice control objectives that describe the control goals for the area.

• Control objectives reflect best practices of a controlled operating environment

• Control objectives represent the specific requirements to ensure that the financial statements meet the assertions of: existence or occurrence, completeness, valuation or measurement, rights and obligations, presentation and disclosure.

LEHMAN BROTHERS                                75

## Sarbanes 404(a) – Approach (II)

- ◆ **Sarbanes Oxley 404(a) approach continued**
  - – **Describe the Firm's Controls that Achieve Objectives**
    - • Control templates for each universe area are completed that describe the broad set of high level operating controls that accomplish the stated objectives.
    - • Control templates identify financial reporting controls and capture testing status and results.
    - • Management owns and approves the control templates.

  - – **Document Controls**
    - • The template describes high level controls and may be sufficient documentation.
    - • Additional documentation of policies and procedures that describe why and how a control is performed may be obtained to supplement the template.

  - – **Test Controls**
    - • Controls deemed to be relevant to financial reporting are tested and the results are documented and discussed with management.
    - • The amount of financial reporting controls that are tested is extensive and testing guidelines consider the frequency and type of control
    - • Testing is conducted in accordance with the Corporate Audit and standards.

LEHMAN BROTHERS                    76

## Sarbanes 404(a) – Approach (III)

- ◆ **Sarbanes Oxley 404(a) approach continued**
  - – **Management Review and Signoff**
    - • During the year, management at various levels reviews the documentation, testing results and status of progress towards meeting the certification requirements.
    - • Formal meetings are held with senior management to discuss the results of the testing and status of action plans.
    - • A sub-certification is completed by line and senior management, who certify that controls under their responsibility are designed and operating effectively to provide reasonable assurance regarding the reliability of financial reporting.
    - • Management's Attestation is included in the Firm's Annual Report

  - – **Audit Committee Reporting**
    - • The Audit Committee is apprised of the status of the 404(a) review throughout the year.
    - • Detailed updates are provided in November and January meetings.
    - • A final and formal report of the approach and findings is presented to the Committee by Corporate Audit in February in conjunction with the financial statement review.
    - • In addition, the external auditor's opinion on management's compliance process and the results of their independent testing is presented to the Committee.

  - – **Audit Follow Up** on findings is conducted as part of Corporate Audit's standard process.

LEHMAN BROTHERS                    77

# V. Consolidated Supervised Entity (CSE)

---

## Consolidated Supervised Entity (I)

### Overview

- The Firm was approved by the SEC as a Consolidated Supervised Entity (CSE) in early November of last year and began actively operating as a CSE effective December 1, 2005.
  - Thus, the SEC now has consolidated supervisory authority over <u>all</u> Lehman legal entities and across all Lehman businesses, even those previously deemed "unregulated."
- The CSE Rule requires comprehensive and stringent processes around various internal controls and reporting obligations, including:
  - Risk Management
    - Backtesting and stress testing
  - Internal Controls & Reporting Infrastructures
    - Population completeness & reconciliations
  - Corporate & Committee Governance
- The CSE examination and approval process included extensive reviews of numerous business areas/product lines (particularly those in previously unregulated entities) as well as internal control areas and functions.
- As part of the ongoing CSE review process the SEC also engages in periodic reviews of additional business areas and/or special topics.
- Since the examination, Risk Management & Finance have continued to meet with the SEC - Division of Market Regulation on a monthly basis, a practice that actually commenced in 2001.
- In addition, Corporate Audit and Treasury have also begun quarterly meetings with the Division of Market Regulation and the Firm has commenced quarterly reviews with the SEC-Office of Compliance Inspections & Examinations (OCIE) to review Legal, Compliance and Governance topics.

## Consolidated Supervised Entity (II)

### CSE Rule Requirements

◆ Lehman has been easily maintaining its various CSE regulatory capital requirements:
  – Holding Company Level
    • Maintain risk based capital ratio of 10% (total risk based capital /risk weighted assets);
    • Maintain $10 billion disclosable liquidity threshold.
  – Broker Dealer Level
    • Maintain tentative net capital threshold of $5 billion.
◆ The Firm is submitting monthly CSE risk based capital computations for both the holding company (LBHI) and the broker dealer (LBI) on a timely basis.
◆ Consolidating financial statements (for major subsidiaries) and intra-month VaR by business line are also provided on a monthly basis.

### Risk Management

◆ Implemented risk based capital computations for LBHI and LBI based upon inclusion of:
  – Market Risk (VaR);
  – Credit Risk Allowance;
    • MPE @ LBI and EPE @ LBHI;
  – Specific-Risk Add-ons;
  – Scenario Analysis;
  – Operational Risk Allowance (LBHI).
◆ Approval of ability to use models is predicated upon the fact that Risk models are robust, subject to rigorous validation and capture specific risk.
◆ Backtesting and stress testing results are provided to the SEC on a monthly basis.

LEHMAN BROTHERS                    79

---

## Consolidated Supervised Entity (III)

### Corporate Audit

◆ The five CSE firms worked together to develop a testing framework that meets the SEC's expectations.
◆ This work culminated with an "Agreed Upon Procedures" (AUP) program that has been developed and accepted amongst the CSE firms.
◆ The AUP, which is still being finalized will:
  – Place reliance upon work of Corporate Audit;
  – Replace the need for a formal, external auditor AUP.
◆ In addition, Corporate Audit has commenced quarterly meetings with the SEC to review all of its activities as well as selected reviews and findings.
◆ Corporate Audit has begun a formal review of the Firm's compliance with CSE Rule requirements. Testing plans have been developed for internal controls over market, credit, liquidity, funding, legal (including committee governance) and operational risks.

LEHMAN BROTHERS                    80

## Summary and Conclusion

◆ Lehman has long recognized the need for a rigorous and comprehensive control infrastructure and has invested, from the time of the spin-off, to build out and maintain a "Best in Class" control environment.

◆ Our Board has always been highly independent, diligent, motivated, focused and thoroughly engaged in their vital oversight role, and protecting our shareholders.
  – The Board is cohesive, stable and very engaged in how the Firm is run.

◆ Our multi layered control infrastructure is comprehensive, rigorous and deep.
  – Management all have very long tenure at Lehman and work well together.
  – Our transaction approval process is very thorough and disciplined.

◆ Our internal control environment is very well resourced, and supported throughout the Firm.

◆ In combination this great control framework has served the Firm well, supporting our strong, low volatility earnings, and maintaining our reputation for high integrity.

LEHMAN BROTHERS                    81