# EXHIBIT 23

DRAFT 7/28/06

**LEHMAN BROTHERS INC.**
**745 Seventh Avenue**
**New York, New York 10019**

**LEHMAN COMMERCIAL PAPER INC.**
**745 Seventh Avenue**
**New York, New York  10019**

_____ __, 200_

[Name of Borrower]
Senior [Secured] Credit Facilities
Commitment Letter

[Name]
[Address]

Attention:

Ladies and Gentlemen:

You have advised Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers Inc. ("LBI") that [Name of Borrower], a [        ] corporation (the "Borrower"), intends to [describe and define Acquisition/Refinancing/Restructuring/Recapitalization/other transaction].  In that connection, you have requested that LBI agree to structure, arrange and syndicate senior [secured] credit facilities in an aggregate amount of up to $[        ] (the "Credit Facilities"), and that LCPI commit to provide the entire principal amount of the Credit Facilities.

LBI is pleased to advise you that it is willing to act as sole advisor, sole lead arranger and sole bookrunner for the Credit Facilities.

Furthermore, LCPI is pleased to advise you of its commitment to provide the entire amount of the Credit Facilities upon the terms and subject to the conditions set forth or referred to in this commitment letter (the "Commitment Letter") and in the Summary of Terms and Conditions attached hereto as Exhibit A (the "Term Sheet").

It is agreed that LBI will act as the sole advisor, sole lead arranger and sole bookrunner for the Credit Facilities and that LBI will, in such capacity, perform the duties and exercise the authority customarily performed and exercised by it in such role.  You agree that, except as set forth in the Term Sheet and the Fee Letter referred to below, no other agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation will be paid in connection with the Credit Facilities unless you and we shall so agree.

We intend to syndicate the Credit Facilities to a group of lenders (together with LCPI, the "Lenders") identified by us in consultation with you.  LBI intends to commence syndication efforts promptly upon the execution of this Commitment Letter, and you agree actively to assist LBI in completing a syndication satisfactory to it.  Such assistance shall include (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit

materially from your existing lending relationships [and the existing lending relationships of the Target/Sponsor], (b) direct contact between senior management and advisors of the Borrower [and the Target/Sponsor] and the proposed Lenders, (c) assistance in the preparation of a Confidential Information Memorandum and other marketing materials to be used in connection with the syndication[, including using your best efforts to cause such Confidential Information Memorandum to conform to market standards as reasonably determined by LBI and LCPI]  and (d) the hosting, with LBI and senior management of the [Borrower/Target], of one or more meetings of prospective Lenders [, and, in connection with any such Lender meeting, your consultation with LBI and LCPI with respect to the presentations to be made at such meeting, and your making available appropriate officers and representatives to rehearse such presentations prior to such meetings, as reasonably requested by LBI and LCPI].  [At our request, you agree to assist in the preparation of a version of the Confidential Information Memorandum and lender presentation materials consisting exclusively of information and documentation that is either publicly available or not material with respect to [the Borrower/Target], their respective affiliates and any of their respective securities for purposes of United States federal and state securities laws.]  [You also agree that, at your expense, you will work with LBI and LCPI to procure a rating for the Credit Facilities prior to the closing by Moody's Investors Service, Inc. and Standard & Poor's Ratings Group.]

        LBI will manage all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Lenders and the amount and distribution of fees among the Lenders.  In its capacity as arranger, LBI will have no responsibility other than to arrange the syndication as set forth herein and in no event shall be subject to any fiduciary or other implied duties.  To assist LBI in its syndication efforts, you agree promptly to prepare and provide to LBI and LCPI all information with respect to the Borrower[, the Target], the [Acquisition/ Refinancing/Restructuring/Recapitalization/other transaction] and the other transactions contemplated hereby, including all financial information and projections (the "Projections"), as we may reasonably request in connection with the arrangement and syndication of the Credit Facilities.  You hereby represent and covenant that (a) all information other than the Projections (the "Information") that has been or will be made available to LBI or LCPI by you or any of your representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to LBI or LCPI by you or any of your representatives have been or will be prepared in good faith based upon reasonable assumptions.  You agree to supplement any Information or Projections from time to time during the syndication process to the extent necessary to cause the foregoing representation and warranty relating to the Information and Projections to continue to be true and correct.  You understand that in arranging and syndicating the Credit Facilities we may use and rely on the Information and Projections without independent verification thereof.

        As consideration for LCPI's commitment hereunder and LBI's agreement to perform the services described herein, you agree [,jointly and severally,] to pay [, or to cause the Borrower to pay,] to LCPI the nonrefundable fees set forth in Annex I to the Term Sheet and in

the Fee Letter dated the date hereof and delivered herewith (the "Fee Letter").

The commitments and agreements of LBI and LCPI described herein are subject to (a) there not occurring or becoming known to us any material adverse condition or material adverse change in or affecting the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries, taken as a whole, [or the Target and its subsidiaries, taken as a whole,] (b) our completion of and satisfaction in all respects with a due diligence investigation of the Borrower [and the Target], (c) our not becoming aware after the date hereof of any information or other matter (including any matter relating to financial models and underlying assumptions relating to the Projections) affecting the Borrower [, the Target] or the transactions contemplated hereby that in our judgment is inconsistent in a material and adverse manner with any such information or other matter disclosed to us prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in financial, banking or capital market conditions that, in our judgment, could materially impair the syndication of the Credit Facilities, (e) our satisfaction that prior to and during the syndication of the Credit Facilities there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Borrower [or the Target/Sponsor] or any affiliate thereof, (f) [insert any additional conditions appropriate to transaction], (g) the negotiation, execution and delivery on or before _____ __, 200_ of definitive documentation with respect to the Credit Facilities satisfactory to LCPI and its counsel, [(h) there being a period of at least __ days between the commencement of the syndication process and the occurrence of the Closing Date,] (i) your compliance with your covenants and agreements contained herein and the correctness of your representations and warranties contained herein, and (j) the other conditions set forth or referred to in the Term Sheet.  The terms and conditions of LCPI's commitment hereunder and of the Credit Facilities are not limited to those set forth herein and in the Term Sheet.  Those matters that are not covered by the provisions hereof and of the Term Sheet are subject to the approval and agreement of LCPI and the Borrower.

You agree[, jointly and severally,] (a) to indemnify and hold harmless LBI, LCPI, their respective affiliates and their respective officers, directors, employees, advisors, and agents (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Credit Facilities, the use of the proceeds thereof, the [Acquisition/Refinancing/ Restructuring/Recapitalization/other transaction] or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they [are found by a final, non-appealable judgment of a court to] arise from the willful misconduct or gross negligence of such indemnified person, and (b) to reimburse LBI and LCPI and their affiliates on demand for all out-of-pocket expenses (including due diligence expenses, syndication expenses (including the charges of Intralinks), [consultant's fees and expenses,] travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the Credit Facilities and any related documentation (including this Commitment Letter, the Term Sheet, the Fee Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof.  No indemnified person shall

be liable for any damages arising from the use by unauthorized persons of Information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Credit Facilities.

You acknowledge that LBI and its affiliates (the term "LBI" being understood hereinafter in this paragraph to include such affiliates, including LCPI) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. LBI will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by LBI of services for other companies, and LBI will not furnish any such information to other companies. You also acknowledge that LBI has no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies. You further acknowledge that LBI is a full service securities firm and LBI may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of the Borrower and its affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. LBI may employ the services of its affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits afforded LBI hereunder.

This Commitment Letter shall not be assignable by you without the prior written consent of LBI and LCPI (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and LBI and LCPI. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter [, the work letter dated [       ], between you and LCPI] and the Fee Letter are the only agreements that have been entered into among us with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York.

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter, the Term Sheet or the Fee Letter nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person (including, without limitation, other potential providers or arrangers of financing) except (a) to your officers, agents and advisors [and, on a confidential basis, those of the Seller] who are directly involved in the consideration of this matter [(except that the Fee Letter may not be disclosed to the Seller)] or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which

case you agree to inform us promptly thereof)[, provided, that the foregoing restrictions shall cease to apply (except in respect of the Fee Letter and its terms and substance) after this Commitment Letter has been accepted by you].

The [compensation,] reimbursement, indemnification and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or LCPI's commitment hereunder[; provided, that your obligations under this Commitment Letter, other than those arising under the fourth [co-agents], fifth [syndication help], sixth [information and projections] and twelfth [confidentiality] paragraphs hereof, shall automatically terminate and be superseded by the provisions of the definitive documentation relating to the Credit Facilities upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.]

LBI also will provide financial advisory services to the Borrower with respect to the transaction to which this Commitment Letter relates.  The Borrower agrees that LBI has the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Borrower, provided that LBI will submit a copy of any such advertisements to the Borrower for its approval, which approval shall not be unreasonably withheld. [Furthermore, the Borrower agrees to include a reference to LBI's role as financial advisor in any press release announcing the transaction.]

LCPI is committed to complying with U.S. statutory and regulatory requirements designed to assist the federal government in combating money laundering and any activity, which facilitates the funding of terrorist or criminal activities.  The USA PATRIOT Act enhances the money laundering prevention requirements imposed on securities firms and other financial institutions.  As part of our customer identification and verification procedures, LCPI may ask the Borrower to provide additional information as necessary to verify its identity and comply with these procedures.  Until such additional information or documentation is provided, LCPI may not be able to effect any transactions for the Borrower.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Term Sheet and the Fee Letter by returning to LCPI executed counterparts hereof and of the Fee Letter  [, together with the amounts agreed upon pursuant to the Fee Letter to be payable upon the acceptance hereof,] not later than 5:00 p.m., New York City time, on _____ __, 200__.  The commitments and agreements of LBI and LCPI herein will expire at such time in the event LCPI has not received such executed counterparts [and such amounts] in accordance with the immediately preceding sentence.

LBI and LCPI are pleased to have been given the opportunity to assist you in connection with this financing, and we look forward to working with you.

Very truly yours,

LEHMAN COMMERCIAL PAPER INC.

By: _____
     Name:
     Title:  Authorized Signatory

LEHMAN BROTHERS INC.

By: _____
     Name:
     Title:

Accepted and agreed to
as of the date first
written above by:

[Name of Borrower]

By: _____
     Title:

[Signature Page of Commitment Letter]

<u>EXHIBIT A</u>

<u>[NAME OF BORROWER]</u>

$_____ CREDIT FACILITIES

Summary of Terms and Conditions

_____, 200__

  [Describe Acquisition/Refinancing/Restructuring/Recapitalization or other transaction (the "<u>Transaction</u>"), defining any necessary terms to be used elsewhere in the Term Sheet]

I.  <u>Parties</u>

Borrower:  _____ (the "<u>Borrower</u>").

Guarantors:  [Holdings] [The holding company parent of the Borrower ("<u>Holdings</u>")] and each of [its] [the Borrower's] direct and indirect, existing and future, subsidiaries (excluding foreign subsidiaries to the extent a guarantee thereby could reasonably be expected to result in adverse tax consequences) (the "<u>Guarantors</u>"; the Borrower and the Guarantors, collectively, the "<u>Credit Parties</u>").

Sole Advisor, Sole
Arranger and Sole
Bookrunner:  Lehman Brothers Inc. (in such capacity, the "<u>Arranger</u>").

Syndication Agent:  Lehman Commercial Paper Inc. (in such capacity, the "<u>Syndication Agent</u>").

Administrative Agent:  Lehman Commercial Paper Inc. (in such capacity, the "<u>Administrative Agent</u>").

Lenders:  A syndicate of banks, financial institutions and other entities arranged by the Arranger (collectively, the "<u>Lenders</u>").

II.  <u>Types and Amounts of Credit Facilities</u>

1. <u>Term Loan Facilities</u>

Types and Amounts of
Facilities:  Term Loan Facilities (the "<u>Term Loan Facilities</u>") in an aggregate amount of $_____ (the loans thereunder, the "<u>Term Loans</u>") as follows:

Tranche A Term Loan Facility:  A [six] year term loan facility (the "Tranche A Term Loan Facility") in an aggregate principal amount equal to $_____ (the loans thereunder, the "Tranche A Term Loans").  The Tranche A Term Loans shall be repayable in quarterly installments [in amounts to be agreed upon until the date that is [six] years after the Closing Date (as defined below).] [in an aggregate principal amount for each year following the Closing Date (as defined below) equal to the amount set forth opposite such year below (with the installments in each such year being equal in amount):]

| Period | Principal Amount |
|---|---|
| | $ |

Tranche B Term Loan Facility:  A [seven] year term loan facility (the "Tranche B Term Loan Facility") in an aggregate principal amount equal to $_____ (the loans thereunder, the "Tranche B Term Loans").  The Tranche B Term Loans shall be repayable [in nominal quarterly installments in amounts to be agreed upon for the first [six] years and thereafter in substantial quarterly installments in amounts to be agreed upon until the date that is [seven] years after the Closing Date]. [in quarterly installments [in an aggregate principal amount for each year following the Closing Date equal to the amount set forth opposite such year below [(with the installments in each such year being equal in amount)]:]

| Period | Principal Amount |
|---|---|
| | $ |

Tranche C Term Loan Facility:  An [eight] year term loan facility (the "Tranche C Term Loan Facility") in an aggregate principal amount equal to $_____ (the loans thereunder, the "Tranche C Term Loans").  The Tranche C Term Loans shall be repayable [in nominal quarterly installments in amounts to be agreed upon for the first [seven] years and thereafter in substantial quarterly installments in amounts to be agreed upon until the date that is eight years after the Closing Date.] [in quarterly installments [in an aggregate principal amount for each year following the Closing Date equal to the amount set forth opposite such year below [(with the installments in each such year being equal in amount)]:]

| Period | Principal Amount |
|---|---|

$

[On the basis of market reception during the syndication process, the Arranger may determine, [with the consent of the Borrower (which consent shall not be unreasonably withheld)][in consultation with the Borrower], to increase or decrease the amount of the Tranche B Term Loan Facility, and to correspondingly decrease or increase the amount of the Tranche C Term Loan Facility, provided that the aggregate amount of the Term Loan Facilities will equal $_____.]

[Types and Amount of Facilities:

_____-year term loan facility (the "Term Loan Facility") in the amount of $_____ (the loans thereunder, the "Term Loans").  [The Arranger, in its sole discretion (after consultation with the Borrower), may determine that the Term Loans shall comprise two separate tranches (the Term Loans comprising one tranche with a final maturity on the _____ anniversary of the Closing Date (as defined below), the "Tranche A Term Loans" and the Term Loans comprising the other tranche with a final maturity on the _____ anniversary of the Closing Date, the "Tranche B Term Loans").  The aggregate amount of Term Loans constituting Tranche A Term Loans and the Tranche B Term Loans, respectively, shall be determined by the Arranger in its sole discretion after consultation with the Borrower.]

Availability:

The Term Loans shall be made [in a single drawing on the Closing Date (as defined below)][in up to _____ drawings, in minimum amounts to be determined, during the period commencing on the Closing Date (as defined below) and ending on _____].

Purpose:

The proceeds of the Term Loans shall be used to [finance the Transaction and to pay related fees and expenses].

2.  Revolving Credit Facility

Type and Amount of Facility:

_____-year revolving credit facility (the "Revolving Credit Facility"; together with the Term Loan Facility, the "Credit Facilities") in the amount of $_____ (the loans thereunder, [together with (unless the context otherwise requires) the Swing Line Loans described below], the "Revolving Credit Loans"; and, together with the Term Loans, the "Loans").

Availability:

The Revolving Credit Facility shall [, subject to the then-current Borrowing Base,] be available on a revolving basis during the

period commencing on the Closing Date and ending on [_____ __, 200_] [the _____ anniversary thereof] (the "<u>Revolving Credit Termination Date</u>").

[Letters of Credit

A portion of the Revolving Credit Facility not in excess of $_____ shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by a Lender to be selected in the syndication process (in such capacity, the "<u>Issuing Lender</u>"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) five business days prior to the Revolving Credit Termination Date, <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Credit Loans) on the same business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Revolving Credit Facility shall be irrevocably and unconditionally obligated to reimburse the Issuing Lender on a <u>pro rata</u> basis.]

[Swing Line Loans:

A portion of the Revolving Credit Facility not in excess of $_____ shall be available for swing line loans (the "<u>Swing Line Loans</u>") from a Lender to be selected in the syndication process (in such capacity, the "<u>Swing Line Lender</u>") on same-day notice. Any Swing Line Loans will reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis. Each Lender under the Revolving Credit Facility shall acquire, under certain circumstances, an irrevocable and unconditional <u>pro rata</u> participation in each Swing Line Loan.]

Maturity:

The Revolving Credit Termination Date.

Purpose:

The proceeds of the Revolving Credit Loans shall be used [to finance the working capital needs] [for general corporate purposes] of the Borrower and its subsidiaries in the ordinary course of business.

[Borrowing Base:

The amount from time to time available under the Revolving Credit Facility shall not exceed percentages to be determined by the [Administrative Agent] of the eligible accounts receivable and eligible inventory (each of which terms shall be defined in the Credit Documentation (as defined below) in accordance with customary practices for transactions of this nature) of the Borrower and its domestic subsidiaries. The Borrowing Base will

be computed at least [monthly] [weekly] by the Borrower and a Borrowing Base certificate presenting the Borrower's computation will be delivered to the Administrative Agent promptly, but in no event later than the [15th day] [second business day] of the following [month] [week].]

[Clean-up [down]]:    The outstanding principal amount of all Revolving Credit Loans may not exceed [zero] [$_____] for at least _____ consecutive days during [the calendar month[s] of _____ and _____ in] each calendar year.]

III.    Certain Payment Provisions

Fees and Interest Rates:    As set forth on Annex I.

Optional Prepayments and Commitment Reductions:    Loans may be prepaid and commitments may be reduced by the Borrower in minimum amounts to be agreed upon.  Optional prepayments of the Term Loans shall be applied to [the Tranche A Term Loans, the Tranche B Term Loans and the Tranche C Term Loans ratably and to] the installments thereof [ratably in accordance with the then outstanding amounts thereof] [in inverse order of maturity] [in an order to be determined] and may not be reborrowed.  [Notwithstanding the foregoing, so long as any Tranche A Term Loans are outstanding, each holder of Tranche B Term Loans or Tranche C Term Loans shall have the right to refuse [all or any portion][up to 50%] of such prepayment allocable to its Tranche B Term Loans or Tranche C Term Loans, as the case may be, and [the amount so refused will be applied to prepay the Tranche A Term Loans] [50% of the amount refused will be applied to prepay the Tranche A Term Loans, with the remainder being retained by the Borrower.]

Mandatory Prepayments [and Commitment Reductions]:    The following amounts shall be applied to prepay the Term Loans [and reduce commitments under the Revolving Credit Facility]:

(a)    100% of the net proceeds of any sale or issuance of equity [or incurrence of certain indebtedness] after the Closing Date by [Holdings or by] the Borrower or any of its subsidiaries;

(b)    100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation and including any purchase price refund in respect of any acquisition) by [Holdings or by] the Borrower or any of its

subsidiaries of any assets, except for the sale of inventory in the ordinary course of business and subject to certain other customary exceptions [(including capacity for reinvestment)] to be agreed on; and

(c)     [___]% of excess cash flow (to be defined in a mutually satisfactory manner) for each fiscal year of the Borrower (commencing with the fiscal year [following the fiscal year] in which the Closing Date occurs).

All such amounts shall be applied, <u>first</u>, to the prepayment of the Term Loans and, <u>second</u>, to the permanent reduction of the Revolving Credit Facility. Each such prepayment of the Term Loans shall be applied [to the Tranche A Term Loans, the Tranche B Term Loans and the Tranche C Term Loans ratably and] to the installments thereof [ratably in accordance with the then outstanding amounts thereof] [in inverse order of maturity] [in an order to be determined] and may not be reborrowed. [Notwithstanding the foregoing, so long as any Tranche A Term Loans are outstanding, each holder of Tranche B Term Loans or Tranche C Term Loans shall have the right to refuse [all or any portion][up to 50%] of such prepayment allocable to its Tranche B Term Loans or Tranche C Term Loans, as the case may be, and [the amount so refused will be applied to prepay the Tranche A Term Loans] [50% of the amount refused will be applied to prepay the Tranche A Term Loans, with the remainder being retained by the Borrower.]  The Revolving Credit Loans shall be prepaid [and the Letters of Credit shall be cash collateralized or replaced] to the extent such extensions of credit exceed [(i)] the amount of the Revolving Credit Facility [or (ii) the then-current Borrowing Base].

[Prepayment Fee:            All optional and mandatory prepayments of principal in respect of the Tranche C Term Loans shall be accompanied by a prepayment fee equal to (a) if such prepayment is made on or  prior to the first anniversary of the Closing Date, 3% of the amount of the principal prepaid, (b) if such prepayment is made after the first anniversary of the Closing Date and on or prior to the second anniversary of the Closing Date, 2% if the amount of the principal prepaid and (c) if such prepayment is made after the second anniversary of the Closing Date and on or prior to the third anniversary of the Closing Date, 1% of the amount of the principal prepaid.]

IV.  <u>Collateral</u>

The obligations of each Credit Party in respect of the Credit Facilities and any swap agreements [and cash management arrangements] provided by any Lender (or any affiliate of a Lender) shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (including, without limitation, intellectual property, real property and all of the capital stock of [the Borrower and] each of its direct and indirect subsidiaries, <u>provided</u>, that only 65% of the voting stock of any foreign subsidiary that has not elected to be treated as a branch for U.S. income tax purposed shall be required to be pledged)[, except for those assets as to which the Administrative Agent shall determine in its sole discretion that the costs of obtaining such a security interest are excessive in relation to the value of the security to be afforded thereby].

V.  <u>Certain Conditions</u>

Initial Conditions:

The availability of the Credit Facilities shall be conditioned upon satisfaction of, among other things, the following conditions precedent (the date upon which all such conditions precedent shall be satisfied, the "<u>Closing Date</u>") on or before _____ __, 200_ [(with references to the Borrower and its subsidiaries in this paragraph being deemed to refer to and include the Existing Company and its subsidiaries after giving effect to the Transaction)]:

(a)  Each Credit Party shall have executed and delivered satisfactory definitive financing documentation with respect to the Credit Facilities (the "<u>Credit Documentation</u>").

(b)  [Holdings shall have received at least $_____ in cash from the issuance of its [common][preferred] stock and at least $_____ from the issuance of its [describe subordinated debt], each on satisfactory terms and conditions, and the Borrower shall have received at least $_____ from the issuance of its common stock to Holdings.  The capital structure of each Credit Party after the Transaction shall be satisfactory in all respects.]

(c)  The Transaction shall have been consummated [for an aggregate purchase price not exceeding $_____] pursuant to satisfactory documentation, and no provision thereof shall have been waived, amended, supplemented or otherwise modified.

(d)     The Lenders, the Administrative Agent and the Arranger shall have received all fees required to be paid on or before the Closing Date, and the Administrative Agent shall have received reimbursement of all out-of-pocket expenses of the Arranger and the Administrative Agent payable by the Borrower in connection with the Credit Facilities.

(e)     All governmental and third party approvals [(including landlords' and other consents)] necessary or, in the discretion of the Administrative Agent, advisable in connection with the Transaction, the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the Transaction or the financing thereof.

(f)     The Lenders shall have received (i) satisfactory audited consolidated financial statements of the Borrower for the two most recent fiscal years ended prior to the Closing Date as to which such financial statements are available [and audited consolidated financial statements of the Borrower for the portion of the current fiscal year preceding the Closing Date] and (ii) satisfactory unaudited interim consolidated financial statements of the Borrower for each [fiscal month and] quarterly period ended subsequent to the date of the latest financial statements delivered pursuant to clause (i) of this paragraph as to which such financial statements are available.

(g)     The Lenders shall have received a satisfactory pro forma consolidated balance sheet of the Borrower as at the date of the most recent consolidated balance sheet delivered pursuant to paragraph (f) above, adjusted to give effect to the consummation of the Transaction and the financings contemplated hereby as if such transactions had occurred on such date.

(h)     The Lenders shall have received a satisfactory business plan for fiscal years [   ] and a satisfactory written analysis of the business and prospects of the Borrower and its subsidiaries for the period from the Closing Date through the final maturity of the Term Loans.

(i)     [EBITDA (defined in a manner satisfactory to the Administrative Agent and the Arranger) of the [Borrower] [Target] for the latest twelve-month period ended on the date of the most recent quarterly financial statements delivered pursuant to clause (f) above shall equal at least $_____ from planned continuing operations, and the Borrower shall provide support for such calculation of a nature that is satisfactory to the Administrative Agent and the Arranger.]

(j)     [The pro forma total debt of [the Borrower] [Holdings] and its consolidated subsidiaries on the Closing Date shall not exceed _____ times pro forma EBITDA (defined in a manner satisfactory to the Administrative Agent and the Arranger) of [the Borrower] [Holdings] for the twelve-month period ending on the date of the most recent balance sheet delivered pursuant to paragraph (g) above), and the Borrower shall provide support for such calculation of a nature that is satisfactory to the Administrative Agent and the Arranger.]

(k)     The Lenders shall have received the results of a recent lien search in each relevant jurisdiction with respect to the Borrower and its subsidiaries, and such search shall reveal no liens on any of the assets of the Borrower or its subsidiaries except for liens permitted by the Credit Documentation or liens to be discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.  All documents and instruments required to perfect the Administrative Agent's first priority security interest in the Collateral (including delivery of stock certificates, together with undated stock powers executed in blank[, and control agreements in respect of all [material] deposit accounts and securities accounts of the Borrower and its subsidiaries]) shall have been executed and be in proper form for filing, and, in connection with the real estate collateral, the Administrative Agent shall have received satisfactory title insurance policies, surveys and other customary documentation to the extent reasonably requested by it.

(l)     [The fees and expenses to be incurred in connection with the Transaction and the financing thereof shall not exceed $_____ in the aggregate.]

(m)     [The Lenders shall have received a satisfactory independent audit prepared by a firm satisfactory to the Administrative Agent with respect to the accounts receivable and inventory of the Borrower and its subsidiaries.]

(n)     [The Lenders shall have received a satisfactory appraisal [valuation] of [certain assets to be specified by the Administrative Agent] by appraisers satisfactory to the Administrative Agent.]

(o)     [The Lenders shall have received a satisfactory solvency [opinion from an independent valuation firm satisfactory to the Administrative Agent] [certificate and analysis of the chief financial officer of the Borrower] which shall document the solvency of the Borrower and its subsidiaries after giving effect to the Transaction and the other transactions contemplated hereby.]

(p)     [The Lenders [shall have received a satisfactory environmental audit with respect to the real property owned or leased by the Borrower and its subsidiaries from a firm satisfactory to the Administrative Agent] [be satisfied with the environmental affairs of the Borrower and its subsidiaries.]

(q)     [The Lenders shall be satisfied that senior managers acceptable to them shall be available to manage the Borrower and its subsidiaries, and the Borrower shall have obtained key man life insurance on certain officers of the Borrower designated by the Administrative Agent in satisfactory amounts and on satisfactory terms.]

(r)     [The Lenders shall be satisfied with the sufficiency of amounts available under the Revolving Credit Facility to meet the ongoing working capital needs of the Borrower and its subsidiaries following the Transaction and the consummation of the other transactions contemplated hereby.]

(s)     [The Lenders have received a UCC Insurance Policy satisfactory in coverage and amount.][1]

---

[1]    To be included if the only collateral is equity.

(t)     [The Credit Facilities shall have received a rating of at least [___] from Moody's Investors Service, Inc. and [___] from Standard & Poor's Ratings Group, in each case with stable or better outlook.]

(u)     Receipt by the Lenders sufficiently in advance of closing of all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(v)     The Lenders shall have received such legal opinions (including opinions (i) from counsel to the Borrower and its subsidiaries, (ii) delivered to the Borrower by counsel to the Existing Company, accompanied by reliance letters in favor of the Lenders and (iii) from such special and local counsel as may be required by the Administrative Agent), documents and other instruments as are customary for transactions of this type or as they may reasonably request.

On-Going Conditions:    The making of each extension of credit shall be conditioned upon (a) the accuracy of all representations and warranties in the Credit Documentation (including, without limitation, the material adverse change and litigation representations) and (b) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit.  As used herein and in the Credit Documentation a "material adverse change" shall mean any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on (a) the Transaction, (b) the business, assets, property, condition (financial or otherwise) or prospects of the Borrower and its subsidiaries taken as a whole, or (c) the validity or enforceability of any of the Credit Documentation or the rights and remedies of the Administrative Agent and the Lenders thereunder.

VI.    Certain
       Documentation Matters    The Credit Documentation shall contain representations, warranties, covenants and events of default customary for financings of this type (in each case applicable to each of the Credit Parties, as appropriate) and other terms deemed appropriate by the Lenders, including, without limitation:

Representations and
Warranties:    Financial statements (including pro forma financial statements);

absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; [labor matters;] accuracy of disclosure; and creation and perfection of security interests.

| | |
|---|---|
| Affirmative Covenants: | Delivery of financial statements, reports, accountants' letters, projections, [borrowing base certificates,] officers' certificates and other information requested by the Lenders; payment of other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; further assurances (including, without limitation, with respect to security interests in after-acquired property); and agreement to obtain within ___ days after the Closing Date interest rate protection for at least \$_____ of the Credit Facilities on terms and conditions satisfactory to the Administrative Agent. |
| [Financial Covenants: | Financial covenants (including, without limitation, [minimum interest and fixed charge coverage, current ratio and tangible net worth and maximum leverage]).] |
| [Financial Covenants: | Financial covenants, (including, without limitation, the following): |

(i)    Minimum Consolidated EBITDA/Consolidated Debt Service:

Period                                                          Ratio

(ii)    Minimum Consolidated EBITDA/Consolidated Fixed Charges:

Period                                                          Ratio

(iii)    Maximum Consolidated Total Debt/Consolidated EBITDA:

Period                                                          Ratio

(iv)   Maximum Consolidated Senior Debt/Consolidated EBITDA:

<u>Period</u>                                                <u>Ratio</u>

(v)   Minimum Net Worth of _____ <u>plus</u> [50%] of (A) cumulative positive consolidated net income and (B) net proceeds from equity offerings.

**Negative Covenants:**   Limitations on: indebtedness [(including preferred stock of subsidiaries)]; liens; guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets; leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and modifications of subordinated and other debt instruments; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledge clauses; hedge agreements; changes in lines of business; [and changes in passive holding company status of Holdings].

**Events of Default:**   Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of representations and warranties; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee or security document[, subordination provisions] or security interest; and a change of control (the definition of which is to be agreed).

**Voting:**   Amendments and waivers with respect to the Credit Documentation shall require the approval of Lenders holding not less than a majority of the aggregate amount of the outstanding Loans and unused commitments under the Credit Facilities, except that (a) the consent of each Lender [directly] affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of [amortization or] [final] maturity of any Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof, (iii) increases in the amount or extensions of the expiry date of any Lender's commitment, (iv) imposition of any additional restrictions on assignments and participations and [(v) modifications to the pro rata provisions of the Credit Documentation] and (b) the consent of 100% of the Lenders shall be required with respect to (i) modifications to any of the voting percentages and (ii) releases of [significant] [all or substantially all of the] Guarantors or all or

[any substantial part] [substantially all] of the collateral.  [In addition, the consent of Lenders holding [a majority] [a percentage to be determined] of the aggregate amount of the Tranche A Term Loans,  the Tranche B Term Loans or the Tranche C Term Loans, as the case may be, shall be required with respect to certain modifications affecting the Term Loan Facility.]

Assignments and Participations:

The Lenders shall be permitted to assign and sell participations in their Loans and commitments, subject, in the case of assignments, to the consent of the Administrative Agent and the Borrower [and, in the case of any assignment of commitments under the Revolving Credit Facility, [the Issuing Lender] and[, the Swing Line Lender] (which consent in each case shall not be unreasonably withheld); provided, that no consent of the Borrower shall be required for assignments (i) by the Administrative Agent, (ii) to another Lender or to an affiliate of a Lender or an approved fund, (iii) of funded Term Loans or (iv) at a time when an event of default is outstanding.  [Non-pro rata assignments shall be permitted.]  [In the case of partial assignments (other than to another Lender or to an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 (in the case of assignments in respect of the Term Loan Facility) or $1,000,000 (in the case of assignments in respect of the Revolving Credit Facility)[, and, after giving effect thereto, the assigning Lender (if it shall retain any commitments or Loans) shall have commitments and Loans aggregating at least $1,000,000 (in the case of assignments in respect of the Term Loan Facility) or $1,000,000 (in the case of assignments in respect of the Revolving Credit Facility), in each case] unless otherwise agreed by the Borrower and the Administrative Agent.]  Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions.  Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of the Lender from which it purchased its participation would be required as described under "Voting" above.  Pledges of Loans in accordance with applicable law shall be permitted without restriction.  Promissory notes shall be issued under the Credit Facilities only upon request.

Yield Protection:

The Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a

day other than the last day of an interest period with respect thereto.

Expenses and
Indemnification:

The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Administrative Agent and the Arranger associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel and the charges of Intralinks) and (b) all out-of-pocket expenses of the Administrative Agent [and the Lenders] (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Credit Documentation.

The Administrative Agent, the Arranger and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).

Governing Law and Forum:    State of New York.

Counsel to the
Administrative Agent and
the Arranger:                Cadwalader, Wickersham & Taft LLP.

Annex I

Interest and Certain Fees

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to:<br><br>(i)     the Base Rate <u>plus</u> the Applicable Margin; or<br><br>(ii)    the Eurodollar Rate <u>plus</u> the Applicable Margin.<br><br>[<u>provided,</u> that all Swing Line Loans shall bear interest based upon the Base Rate.]<br><br>As used herein:<br><br>"<u>Base Rate</u>" means the higher of (i) the prime lending rate as set forth on the British Banking Association Telerate page 5 (or such other comparable page as may, in the opinion of the Administrative Agent, replace such page for the purpose of displaying such rate), as in effect from time to time (the "<u>Prime Rate</u>") and (ii) the federal funds effective rate from time to time <u>plus</u> 0.5%.<br><br>"<u>Applicable Margin</u>" means [(a) __%, in the case of Base Rate Loans (as defined below) and (b) __%, in the case of Eurodollar Loans (as defined below)] [a percentage determined in accordance with the pricing grid attached hereto as Annex I-A].<br><br>"<u>Eurodollar Rate</u>" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) at which eurodollar deposits for one, two, three or six months (as selected by the Borrower) are offered in the interbank eurodollar market. |
| Interest Payment Dates: | In the case of Loans bearing interest based upon the Base Rate ("<u>Base Rate Loans</u>"), quarterly in arrears.<br><br>In the case of Loans bearing interest based upon the Eurodollar Rate ("<u>Eurodollar Loans</u>"), on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| Commitment Fees: | The Borrower shall pay a commitment fee calculated at the rate of [½] of 1% per annum on the average daily unused portion of the Revolving Credit Facility, payable quarterly in arrears.  [Swing |

Line Loans shall, for purposes of the commitment fee calculations only, not be deemed to be a utilization of the Revolving Credit Facility].

[Letter of Credit Fees:    The Borrower shall pay a commission on all outstanding Letters of Credit at a per annum rate equal to [_____%] [the Applicable Margin then in effect with respect to Revolving Credit Loans that are Eurodollar Loans] on the face amount of each such Letter of Credit.  Such commission shall be shared ratably among the Lenders participating in the Revolving Credit Facility and shall be payable quarterly in arrears.

In addition to letter of credit commission, a fronting fee calculated at a rate per annum to be agreed upon by the Borrower and the Issuing Bank on the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account.  In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.]

Default Rate:    At any time when the Borrower is in default in the payment of any amount of principal [or Letter of Credit reimbursement obligations] due under the Credit Facilities, the entire principal amount of all Loans [and reimbursement obligations] shall bear interest at 2% above the rate otherwise applicable thereto.  Overdue interest, fees and other amounts shall bear interest at 2% above the rate applicable to Base Rate Loans.

Rate and Fee Basis:    All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of Base Rate Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.

Pricing Grid

| Ratio of Total Debt to EBITDA | Applicable Margin - Eurodollar Loans[†] | Commitment Fee[*] | Applicable Margin - Base Rate Loans[*] |
|---|---|---|---|
| ≥___ | ___% | ___% | ___% |
| ≥___ | ___% | ___% | ___% |
| ≥___ | ___% | ___% | ___% |
| ≥___ | ___% | ___% | ___% |
| <___ | ___% | ___% | ___% |

---

†   Notwithstanding the foregoing grid, until the delivery to the Lenders of the Borrower's financial statements for the first two full fiscal quarters following the Closing Date, the Applicable Margins and Commitment Fee rate will be those set forth above opposite a Leverage Ratio of ≥     .

**LEHMAN BROTHERS INC.**
**745 Seventh Avenue**
**New York, New York  10019**

**LEHMAN COMMERCIAL PAPER INC.**
**745 Seventh Avenue**
**New York, New York  10019**

_____, 200_

[Name of Borrower]
Senior [Secured] Credit Facilities
Fee Letter

[Name]
[Address]

Attention:

Ladies and Gentlemen:

Reference is made to the Commitment Letter dated the date hereof (including the attached Term Sheet, the "Commitment Letter") between us and you.  Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter.  This letter agreement is the Fee Letter referred to in the Commitment Letter.

As consideration for LBI's agreement to arrange the Credit Facilities and LCPI's commitment under the Commitment Letter, you agree to pay [, or cause the Borrower to pay,] the following fees:

[(i)    to LCPI, an underwriting fee (the "Underwriting Fee") in an amount equal to the greater of $_____ and ___% of the aggregate commitments under the Credit Facilities, [___% of which fee will be payable upon the acceptance by you of the Commitment Letter, with the remainder being] payable on the Closing Date.  It is understood that a portion of the Underwriting Fee shall be shared with the Lenders in the form of upfront fees [and that no other upfront fees shall be payable by you or the Borrower in connection with the syndication of the Credit Facilities]; and

[(ii)]    to the Administrative Agent, an annual administration fee in an amount equal to [(x) in the case of the first year, $_____ and (y) in the case of each subsequent year,] $_____ per year, which fee will be payable on the Closing Date and annually in advance on each anniversary thereof prior to the maturity or early termination of the Credit Facilities and the payment in full of all amounts owing thereunder.

In addition, LCPI and the other Lenders shall be paid the other fees specified in the Commitment Letter.

You also agree to pay to LCPI a commitment fee for the period from the date of

the acceptance by you of the Commitment Letter to the earlier of the Closing Date and the date of the termination of the Commitment Letter, calculated at the rate of [0.50]% per annum on the total amount of LCPI's commitment under the Commitment Letter, payable on the earlier of the Closing Date and the date of the termination of the Commitment Letter.

[You also agree to pay to LCPI a break-up fee in an amount equal to [25]% of any break-up, topping or similar fee received by the Borrower or any of its affiliates under any agreement relating to the Transaction.]

[In the event that [during the _____ month period commencing on the date hereof] you or the Borrower or any of your affiliates consummate the [Refinancing] [Acquisition] or any similar transaction [which has the effect of refinancing substantially all of the obligations contemplated to be refinanced in connection with the Refinancing] [which results in the acquisition of all or substantially all of the stock or assets of _____], in each case without causing the Closing Date to occur and making payment of the [Underwriting Fee] payable on the Closing Date, you also agree to pay to LCPI an amount equal to [$_____] [the [Underwriting] Fee] at the time of the consummation of such other transaction.]

You agree that, once paid, the fees or any part thereof payable hereunder and under the Commitment Letter shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated by the Commitment Letter are consummated. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds and shall be in addition to reimbursement of the out-of-pocket expenses of LBI and LCPI. You agree that LCPI may, in its sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of the other Lenders.

[In addition, the Borrower shall issue to LCPI (or to Lenders designated by LCPI) warrants to purchase __% of the common stock of the Borrower on a fully-diluted basis for an exercise price of $.01 per share (the "Warrants"). The Warrants shall be exercisable from the Closing Date until the _____ anniversary of the Closing Date. The Warrants will be issued pursuant to a Warrant Agreement and other documentation satisfactory to LCPI and the Borrower, which will include anti-dilution provisions, registration rights and other customary provisions.]

[You agree that during the next ___ months LBI or its affiliates will be offered the opportunity (which they may accept or decline in their sole discretion):

(i)      to act as [sole placement agent] [book-running lead placement agent] for, or [sole underwriter or sole initial purchaser] [book-running lead underwriter or book-running lead initial purchaser] of, or sole lead arranger and sole bookrunner for, any debt financing or any equity financing to be obtained, or any debt or equity securities to be issued, by or on behalf of the Borrower or any of its Subsidiaries;

(ii)     to act as sole advisor to the Borrower and its Subsidiaries with respect to any divestitures, acquisitions or similar transactions; and

(iii)    to advise the Borrower and its Subsidiaries with respect to the availability

and advisability of, and to provide, any interest rate, currency exchange or other hedging arrangements.]

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing; such an obligation will arise only to the extent provided in the Commitment Letter [(with respect to the Credit Facilities) or in other definitive documentation (with respect to the other financing and services described in the immediately preceding paragraph) in each case,] if accepted in accordance with its terms.  [In the event that LBI or its affiliate agrees to act as underwriter or placement agent for any financing described above, LBI or such affiliate shall be paid (i) in the case of any offering of high yield debt securities, a fee equal to 3% of the principal amount thereof and (ii) in the case of any other such transaction, fees to be mutually agreed upon based on LBI's or such affiliate's customary fees for the services rendered.]

LBI and LCPI shall be entitled, after consultation with you, to change the pricing, terms and structure of the Credit Facilities if LBI and LCPI determine that such changes are advisable to insure a successful syndication of the Credit Facilities.  The provisions of this paragraph shall survive the closing of the Credit Facilities until the completion of syndication of the Credit Facilities, and the Borrower shall enter into such amendments to the final documentation as may be reasonably requested by LCPI to document any changes to the Credit Facilities made pursuant to this paragraph. LCPI's commitment under the Commitment Letter is conditioned upon the provisions of this paragraph.

This Fee Letter may not be amended or waived except by an instrument in writing signed by LBI, LCPI and you.  This Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Fee Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

Please confirm that the foregoing is our mutual understanding by signing and returning to LCPI an executed counterpart of this Fee Letter [, together with the portion of the Underwriting Fee payable upon your acceptance of the Commitment Letter].

Very truly yours,

LEHMAN COMMERCIAL PAPER INC.


By:  _____
     Name:
     Title:  Authorized Signatory

LEHMAN BROTHERS INC.


By:  _____
     Name:
     Title:

Accepted and agreed to as of
the date first above written:

[Name of Borrower]


By:  _____
     Name:
     Title:

[Signature Page to Fee Letter]