# EXHIBIT 24

WGM 7/23/2007

**[FORM BRIDGE EQUITY TERM SHEET]**

**NON-BINDING TERM SHEET**

**[NAME OF PROPERTY/PORTFOLIO]**

*The following terms represent talking points and are intended for discussion purposes only. Any offer, commitment, obligation, or agreement of Lehman Brothers Holdings Inc. or [NAME OF SPONSOR] shall arise only upon the signing of formal documents by authorized signatories of Lehman Brothers Holdings Inc. and [NAME OF SPONSOR]. The information contained herein is strictly confidential and is intended for distribution to and review by the intended parties only.*

- Lehman Brothers Holdings Inc. or an affiliate or related entity ("Lehman") will form a joint venture (the "Joint Venture") with [**NAME OF SPONSOR**] or an affiliated or related entity ("Sponsor") that will acquire (the "Transaction") [**DESCRIBE PROPERTY/PORTFOLIO**] (the "Property"). Lehman's Equity Commitment is subject to the general provisions detailed herein and to the execution of a definitive joint venture agreement between Sponsor and Lehman (the "Joint Venture Agreement").

- Initial Joint Venture Capitalization: Total initial capitalization of the Joint Venture shall be approximately **$[_____]** based on a purchase price of **$[_____]** (exclusive of closing costs). Total initial equity contributions to the Joint Venture (the "Initial Joint Venture Equity") shall be approximately **$[_____]** based on **[__]%** leverage [**and subject to Lehman's option to provide the Junior Mezz Debt described below**]. Any increase or decrease in leverage from the percentage of leverage described above or any increase in total capitalization shall require Sponsor's and Lehman's approval.

- Initial Joint Venture Equity Commitment (as a percentage of Initial Joint Venture Equity):
    - Sponsor:        **[___]%**

    - Lehman:        Bridge Equity contribution of **[___]%[, subject to Lehman's option to provide the Junior Mezz Debt]**.

- Bridge Commitment Fee: [**Four percent (4%)**] of Lehman's Initial Joint Venture Equity Commitment, payable to Lehman at the closing of the Transaction (the "Closing"), subject to the limitations hereafter provided. The Bridge Commitment Fee shall be paid by the Joint Venture as part of the capitalized cost of the Transaction. If the Transaction is consummated but Lehman's Joint Venture Equity Commitment is not funded in whole or in part for any reason (including by reason of Sponsor funding more equity) [**Sponsor shall nevertheless cause the Joint Venture to pay Lehman the Bridge Commitment Fee**] or [**the Bridge Commitment Fee shall be four percent (4%) of any of Lehman's Initial Joint Venture Equity Commitment actually funded and [three percent (3%)] of the remainder of Lehman's Initial Joint Venture Equity Commitment**]. No Bridge Commitment Fee will be due if the Transaction is not consummated.

- Bridge Equity Return: In addition to the Bridge Commitment Fee, Lehman shall be entitled to a return of [**twelve percent (12%)**] per annum, compounded monthly, on its equity investment in the Joint Venture (the "Bridge Equity Return"). The Bridge Equity Return will be paid from pro rata cash flow distributions based on equity contributed by Lehman, with the balance, if any, to be realized by Lehman through the sale of its equity interest to Syndication Investors (as defined below). The Bridge Equity Return is in addition to any fees paid or payable to Lehman.

- Syndication of Bridge Equity: Lehman and Sponsor intend to jointly syndicate Lehman's equity in the Joint Venture (the "Syndication") within [**six (6)**] months after the Closing (the "Syndication

Period") to third-party equity investors ("Syndication Investors") with the Sponsor taking the primary lead in the Syndication at a price (the "Syndication Price") that provides Lehman with a return of its original capital *plus* the Bridge Equity Return accrued and unpaid through the date of such Syndication. Sponsor and Lehman agree to cooperate in the Syndication effort with the objective of completing the Syndication prior to the end of the Syndication Period. In no event shall Lehman be required to sell to any Syndication Investors who are not approved by both Sponsor and Lehman, nor shall Lehman be required to sell for a price that is more or less than the Syndication Price, except in its sole and absolute discretion. Lehman shall not be required to close the first sale until at least **[___]%** of Lehman's total equity is sold to Syndication Investors (the "Minimum Threshold"), except in its sole and absolute discretion. Neither Lehman nor Sponsor shall withhold its approval of any Syndication Investors proposed by the other, provided such Syndication Investor meets the definitional requirements of a Syndication Investor as provided for in the Joint Venture Agreement. The first closing shall be held promptly following the date such Minimum Threshold is achieved. In all events Lehman and Sponsor shall jointly determine all aspects of any sale of Bridge Equity prior to a Failed Syndication (including timing and purchasing parties other than as provided for above with respect to the purchasing parties and except that the price shall be equal to the Syndication Price). In no event shall Sponsor be entitled to receive any "markup" or other compensation in excess of the Syndication Price. Additionally, it is contemplated that sales to Syndication Investors will be accomplished through the redemption of Lehman's interest with the proceeds of the issuance of new equity to the Syndication Investors. Sponsor agrees not to unreasonably withhold its consent to any additional modifications to the Joint Venture Agreement requested by Lehman or potential Syndication Investors so long as same do not have a material adverse effect on Sponsor.

- **[Lehman Retention of Permanent Equity. Notwithstanding anything to the contrary contained herein, Lehman, in its sole and absolute discretion, will have the right to retain (or have an affiliate retain) up to $[_____] of Lehman's equity in the Joint Venture as permanent equity (the "Retained Equity") on the following terms:**

    **(i) no promote would be payable with respect to the Retained Equity;**

    **(ii) no administration fee would be payable with respect to the Retained Equity; and**

    **(iii) Lehman would be entitled, prior to a Failed Syndication, to all rights granted to any Syndication Investor with capital contributed in the Transaction less than or equal to the Retained Equity (i.e., a most favored nations clause).]**

- Syndication Indemnification: All offering materials required for the Syndication shall be prepared by Sponsor, subject to the right of Lehman to approve all such offering materials. Lehman and Sponsor shall comply in all respects with all applicable securities and other laws in connection with the Syndication. Each of Lehman and Sponsor shall have the right to approve the marketing plan and all material actions taken in connection with the Syndication. Sponsor and creditworthy affiliates of Sponsor acceptable to Lehman (collectively, the "Sponsor Indemnitor") shall indemnify Lehman and its affiliates from any securities or other liability (other than any liability described in the next sentence) whether arising from the actions of Sponsor or from any misstatement or omission contained in any marketing or offering materials (except to the extent provided in the sentence below) or otherwise. Lehman shall indemnify Sponsor and its affiliates from any securities or other liability arising from the actions of Lehman in violation of the securities laws or from any of the following:

2

       (i)    any information about Lehman or its affiliates provided by Lehman or its affiliates for use in the offering materials;

       (ii)    any provision contained in the offering materials that (A) was proposed by Lehman, and (B) Sponsor specifically objected to in writing and as to which Sponsor advised Lehman that Sponsor would only include in the offering materials if Lehman agreed to be solely responsible for any loss, claim, damage or liability, joint or several, or any action arising from such provision; and

       (iii)    the affirmative acts of Lehman in marketing Lehman's equity interest or otherwise in connection with the Syndication (but which shall not include any claims based on the offering materials, except as provided in this sentence).

- Transfer of Sponsor Equity: Sponsor may not directly or indirectly transfer any of its equity in the Joint Venture at any time.

- Promote:  All distributions by the Joint Venture to its partners will be made *pro rata* based on contributed capital, except that after the Initial Syndication Date (and subject to the Failed Syndication provisions below), Sponsor will be entitled to a **[___]** percent (**[___]%**) promote after the Syndication Investors receive a **[___]** percent (**[___]%**) IRR; *provided, however*, that there will be no promote of Lehman's capital in the Joint Venture so long as Lehman continues to own any equity interest in the Joint Venture.  **[Notwithstanding anything to the contrary contained herein, (i) in the event that a sale of the Property or any portion thereof or any direct or indirect interest therein occurs prior to the completion of the Syndication, then all distributions resulting from such sale will be made *pro rata* to the partners based on contributed capital, and (ii) in the event Sponsor or its affiliates acquire Lehman's remaining equity interest in the Joint Venture prior to sale to Syndication Investors and subsequently sells or otherwise disposes of (or enters into an agreement to sell or otherwise dispose of) the Property or any portion thereof or the direct or indirect ownership interests in the Joint Venture or the Property prior to the date that is [one (1)] year after the Closing, Lehman shall be entitled to receive any profit received by Sponsor or its affiliates in connection with such sale or disposition attributable to the portion of Lehman's remaining equity interest so acquired by Sponsor or its affiliates (based on distributions being made pro rata without a promote).**]

- Sponsor Fees:  Sponsor shall not receive any administration fees or promote distributions prior to the date on which the first Syndication Investor is admitted to the Joint Venture (the "Initial Syndication Date").  From and after the Initial Syndication Date, Sponsor will receive (i) promote distributions as described above and (ii) an annual administration fee (payable monthly) equal to the product obtained by multiplying (A) **[___]%** by (B) the aggregate equity interests in the Joint Venture that have been acquired by Syndication Investors.  No administration fee shall be payable on Lehman's equity at any time.  To the extent cash flow from the Property after payment of all other expenses is insufficient to pay the administration fee due in any month, the unpaid portion of such administration fee shall accrue without interest and be payable when cash flow is sufficient to pay such deferred amount.

- Property Management and Leasing Fees:  Sponsor shall serve as property manager and owner's leasing agent with respect to the Property, and shall be compensated at market rates which will be specified in the definitive documents.  The parties shall agree on a form of property management and leasing agreement which will be executed at Closing.  The property management and leasing agreements will be terminable by Lehman (so long as Lehman continues to hold any equity interest

3

in the Joint Venture) or a majority in interest of Syndication Investors if Sponsor is removed as general partner as described herein and will also be terminable upon the occurrence of certain events to be specified in the definitive documents.

- Control:  Sponsor shall direct and control the day-to-day operations of the Joint Venture and Lehman (so long as Lehman continues to hold any equity interest in the Joint Venture) shall have the right to advance and approve all "major decisions" which will be specified in the Joint Venture Agreement.  Additionally, a majority in interest of the Syndication Investors shall have the right to approve certain "major decisions" which will be specified in the definitive documents.

- Failed Syndication:  If the Syndication of all of Lehman's equity interest in the Joint Venture has not been completed by the expiration of the Syndication Period, such Syndication shall be deemed a "Failed Syndication" and (A) Lehman shall be entitled to assume sole control over the Syndication of its remaining equity interest and shall be permitted to sell its remaining equity interest to any investor that is an "accredited investor" under the securities laws, in Lehman's sole discretion, and (B) Lehman will have the sole authority to reduce or eliminate the promote and administration fee as well as the right to grant to one or more of the Syndication Investors the same approval rights that Lehman has, as described above under "Control." Additionally, after a Failed Syndication:

    (i)    Lehman will be free to sell its remaining equity interest in the Joint Venture free of any promote or administration fee;

    (ii)   If Lehman does not elect to eliminate all promote and administration fees as described above, from and after such Failed Syndication, Lehman will be entitled to receive a portion of the promote and administration fees to be allocated among Sponsor and Lehman in proportion to their respective interests in the Joint Venture as of the date the Syndication is deemed to have failed and after giving effect to any prior transfers of interests to Syndication Investors;

    (iii)  Lehman will be entitled, at any time on or after the **[__]** year anniversary of the Closing to require the sale of the Property at a price designated by Lehman, subject to Sponsor's right to purchase Lehman's Interest in the Joint Venture based on the amount Lehman would receive if the Property were sold at Lehman's specified price. Additionally, at any time on or after the **[__]** year anniversary of the Closing, Lehman may trigger a buy/sell;

    **[(iv)   The Bridge Equity Return will be [twelve percent (12%)] from the Closing until the date which is [six (6)] months from the Closing, (2) [eighteen percent (18%)] from the date that is [six (6)] months from the Closing until the date which is [nine (9)] months from the Closing and (3) [twenty percent (20%)] from the date that is [nine (9)] months from the Closing and thereafter; and**

    **[(v)   After the [__] year anniversary of the Closing, all distributions by the Joint Venture shall be made pari passu to all partners based on contributed capital and the distributions to Lehman and Sponsor shall then be reallocated and distributed as follows: First, to Lehman until Lehman shall have received a return of all of its capital contributions together with Bridge Equity Return above; second, to Sponsor until Sponsor shall have received a return of all of its capital contributions; and third, to Lehman and Sponsor pro rata based on their respective capital contributions.]**

4

- Debt Financing:  Lehman has the exclusive right to provide financing with respect to the Transaction at a net profit margin of [**one percent (1%)**] of the amount of the financing provided. Any financing will be on terms agreed upon by Lehman and Sponsor and set forth in a separate term sheet between Lehman and Sponsor.

- Employees: Unless approved by Lehman, neither the Joint Venture nor any of its subsidiaries shall have employees, and any employees related to the Property will be employees of Sponsor or its affiliates or third party property managers.

- Future Financings:  At all times (regardless of whether Lehman retains any equity at such time), Lehman or its affiliates will have the exclusive right to provide any future financing to the Joint Venture or its affiliates or subsidiaries or otherwise related to the Property at a net profit margin of [**one percent (1%)**] of the amount of the financing provided and otherwise on terms to be agreed upon by Lehman and Sponsor.

- Capital Services:  At all times (regardless of whether Lehman retains any equity at such time), Lehman would have the exclusive right to provide all future investment banking, financial advisory or similar services on behalf of the Joint Venture or any of its subsidiaries.

- [**Convertible Junior Mezz:  Lehman may at its option provide a portion of its Bridge Equity contributions as junior mezzanine debt (the "Junior Mezz Debt"), instead of as Bridge Equity, which Junior Mezz Debt shall be convertible into equity of the Joint Venture at any time.  If so converted, the converted equity will be deemed a part of the Bridge Equity effective retroactively to the Closing. The Junior Mezz Debt will be syndicated as equity interests in the Joint Venture [(or retained as Retained Equity)] on the same terms and conditions (including those which apply after a Failed Syndication) as the remainder of the Bridge Equity.  The Junior Mezz Debt shall be provided for a [four percent (4%)] profit margin and Lehman shall be entitled to a return of [twelve percent (12%)] per annum, compounded monthly.**]

- Expenses:  All of Sponsor's and Lehman's third-party expenses with respect to the Joint Venture, including attorneys' fees, shall be paid by the Joint Venture as part of the capitalized cost of the Transaction.  Each of Sponsor and Lehman shall pay their own internal salary and overhead costs. In the event that Sponsor and Lehman do not enter into the Joint Venture and close the Transaction, Sponsor shall reimburse Lehman for all third party expenses incurred by Lehman in connection with the Transaction or the Joint Venture.

- Transfer Tax Liability:  Transfer or similar taxes or fees arising from the Transaction or the Syndication shall be paid jointly and severally by Sponsor and Sponsor Indemnitor, and the Sponsor and Sponsor Indemnitor shall jointly and severally indemnify the Joint Venture, Lehman and the Syndication Investors from any liability with respect thereto.

- Deal Structure:  The Transaction will be structured in a manner so as to minimize any tax issues in acquiring the Property and any transfer or similar taxes resulting from the Syndication **[[FOR NY TRANSACTIONS] (i.e., a nominee structure will be utilized**)], subject to the reasonable approval of such structure by Sponsor and Lehman.  Additionally, the ownership structure will be designed to maximize the potential for Syndication to both U.S. and non U.S. investors and will require the utilization of a REIT.

- Sunset:  The Joint Venture would be required to liquidate after **[___]** years.

5

- Liquidation:  The Joint Venture shall be subject to liquidation at any time after the **[___]** anniversary of the closing of the Syndication at the option of Sponsor or otherwise if approved by Syndication Investors holding at least 66 2/3% of the total ownership interest in the Joint Venture held by the Syndication Investors.

- Advisory Board:  After Syndication if there are multiple Syndication Investors, the Joint Venture will have an advisory board of Syndication Investors and Sponsor would convene meetings of such Advisory Board to discuss and approve issues involving conflicts of interest not expressly approved in the Joint Venture Agreement and other matters set forth in the definitive documents.  The definitive documents will also specify certain limited matters which must be approved by the Syndication Investors.

- Removal of General Partner:  A majority in interest of the Syndication Investors (or Lehman so long as Lehman continues to hold any equity interest in the Joint Venture) would have the right to remove the General Partner of the Joint Venture as well as any affiliated property manager and/or leasing agent under any property management and/or leasing agreement for acts of fraud, gross negligence, criminal conduct, willful misconduct or material breach of the Joint Venture Agreement or property management and/or leasing agreement, as specified in the definitive documents.  Upon any such removal the removed party would also lose its promote and administration fee.

- Title Insurance:  Lehman shall have the right to place all title insurance in connection with the Transaction in proportion to its Initial Joint Venture Equity in the Transaction.

- Confidentiality:  Lehman and Sponsor shall keep the terms and existence of this term sheet confidential, except as required by law, court order or stock exchange regulations.  Notwithstanding anything herein to the contrary, the confidentiality obligations under this letter shall not apply to disclosures in accordance with, or required by, the disclosure requirements applicable to Lehman, Sponsor or their respective affiliates due to their status as a publicly held company listed on the New York Stock Exchange or any other securities exchange (an "<u>Exchange</u>") (including, but not limited to, disclosure in accordance with, or required by, the rules of, or any listing agreement with, an Exchange).

- Non-binding:  Except for the confidentiality provisions set forth herein and except for the obligations contained in the sections entitled "Bridge Commitment Fee" and "Expenses," this term sheet is not binding and will not give rise to any right or obligation based on any legal or equitable theory (including any right to continue negotiations), it being intended that only a formal written agreement, if executed and delivered by Sponsor and Lehman, will bind the parties as to any matter which is the subject of this term sheet.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

AGREED AND ACCEPTED THIS ___ DAY OF [_____], 2007:

**LEHMAN BROTHERS HOLDINGS INC.**

_____

Name:

Title:

**[NAME OF SPONSOR]**

_____

Name:

Title: