# EXHIBIT 28

Committed Margin

2006 Version

### Cross Margining and Netting Agreement

Cross Margining and Netting Agreement ("CMN Agreement") dated as of February 2, 2007, by and among ███████████████████████████████████ of ████████████ a sub-fund of ████████████ an open-ended unit trust organized under the laws of Ireland ("Counterparty"), Lehman Brothers International (Europe) ("LBIE") Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Inc. ("LBI"). LBIE, LBSF and LBI are hereinafter referred to collectively as the "Lehman Brothers Entities" and each as a "Lehman Brothers Entity".

## WITNESSETH:

WHEREAS, the Lehman Brothers Entities have made, and may from time to time make, extensions of credit to Counterparty pursuant to Base Contracts that the Lehman Brothers Entities have entered into, or may from time to time enter into, with Counterparty;

WHEREAS, Counterparty has requested the Lehman Brothers Entities to enter into this CMN Agreement in order to reduce its operational expense in respect of the Base Contracts; and

WHEREAS, the Lehman Brothers Entities wish to reduce their collective risk in respect of Counterparty.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Definitions.

Capitalized terms used in this CMN Agreement and not otherwise defined herein shall have the meanings ascribed thereto in Exhibit I.

2.    Margin Requirements; Excesses and Deficits.

2.1. *Calculation of Margin Requirement.* By the Margin Notification Deadline on each Business Day, one or more Lehman Brothers Entities shall (i) determine the Basic Margin Requirement for each Base Contract, (ii) determine the Additional Margin Requirement for all of the Base Contracts, and (iii) determine the Margin Requirement for each Base Contract by allocating the Additional Margin Requirement between the Base Contracts as they shall determine in their sole discretion.

2.2. *Transfer of Margin Requirement.* Subject to Sections 2.3 and 2.4, (i) to the extent that the Margin Requirement determined in respect of any Base Contract pursuant to Section 2.1 is due to a Lehman Brothers Entity from Counterparty, Counterparty shall

Transfer Eligible Credit Support with a Value equal to that Margin Requirement to that Lehman Brothers Entity and (ii) to the extent that the Margin Requirement so determined in respect of any Base Contract is due to Counterparty from a Lehman Brothers Entity, that Lehman Brothers Entity shall Transfer Eligible Credit Support with a Value equal to that Margin Requirement to Counterparty.

2.3. *Application of Excesses to Deficits.*  If Eligible Credit Support is due from one or more Lehman Brothers Entities to Counterparty pursuant to Section 2.2 in respect of any Base Contract (that Base Contract being "in Excess") at the same time that Eligible Credit Support is due from Counterparty to one or more Lehman Brothers Entities in respect of any other Base Contract (that Base Contract being "in Deficit"), each Lehman Brothers Entity that is a party to a Base Contract that is in Excess (each such Lehman Brothers Entity, a "**Lehman Brothers Transferor**") shall, subject to Section 4.2, Transfer on behalf of Counterparty Eligible Credit Support otherwise due to Counterparty to one or more Lehman Brothers Entities party to a Base Contract in Deficit (each such Lehman Brothers Entity, a "**Lehman Brothers Transferee**") to reduce the amount such Base Contract is in Deficit, until such Base Contract in Excess is no longer in Excess or there are no more Base Contracts in Deficit; provided, however, that if the Lehman Brothers Transferor does not Transfer Eligible Credit Support pursuant to this Section 2.3, the Lehman Brothers Transferor shall not be in breach of this Section 2.3 or Section 2.2 but Counterparty shall be relieved of its obligations to Transfer Eligible Credit Support to the Lehman Brothers Transferees to the extent (but only to the extent) of the amount of such Eligible Credit Support not Transferred by the Lehman Brothers Transferor.  Eligible Credit Support to be Transferred by the Lehman Brothers Transferors shall be allocated among the Lehman Brothers Transferees as they agree.

2.4. *Transfer of Remaining Excesses.*  Subject to Section 5.8 hereof, to the extent that a Base Contract remains in Excess after the Transfers set forth in Section 2.3 (a "**Remaining Excess**"), upon receipt of a written request from Counterparty, the relevant Lehman Brothers Transferor shall Transfer to Counterparty Eligible Credit Support the Value of which does not exceed such Remaining Excess.

2.5. *Manner of Delivery and Holding Transferred Credit Support.*  Eligible Credit Support Transferred by a Lehman Brothers Entity to Counterparty or by Counterparty (or by a Lehman Brothers Entity on Counterparty's behalf) to a Lehman Brothers Entity pursuant to this Section 2 in respect of any Base Contract shall be delivered and held subject to the terms on which Eligible Credit Support is required to be Transferred and, if applicable, held under that Base Contract, whether such Eligible Credit Support is Transferred to fulfill a Basic Margin Requirement or the portion of the Additional Margin Requirement allocated to that Base Contract.

3.      Timing of Transfers.

3.1. *Transfers by the Lehman Brothers Entities.*  Any Transfer that is required to be made pursuant to Section 2.4 shall be made by the Transfer Deadline on the Business Day a written request is received by the relevant Lehman Brothers Entity unless such request is sent after the Margin Notification Deadline, in which case such Lehman

2

Brothers Entity shall make such Transfer by the Transfer Deadline on the following Business Day.

3.2. *Transfers by Counterparty.*  By the Margin Notification Deadline on each Business Day, a Lehman Brothers Entity shall, by a single notice, notify Counterparty of the aggregate amount of Eligible Credit Support required to be Transferred by Counterparty in respect of the Margin Requirements (after taking account of any Transfers that have been or will be made by the Lehman Brothers Entities on Counterparty's behalf as set forth in Section 2.3).  By the Transfer Deadline on each Business Day, Counterparty shall make all Transfers required to be made pursuant to such notice, unless such notice is sent after the Margin Notification Deadline, in which case Counterparty shall make all Transfers required to be made pursuant to such notice by the Transfer Deadline on the following Business Day.

4.    Allocation of Credit Support; Netting of Transfers; Cash Transfers; Regulatory Requirements; U.S. Dollar Equivalent.

4.1. *Allocation of Credit Support.*  To the extent that any Transfer from one Lehman Brothers Entity to another takes place or is deemed to take place pursuant to Section 2.3, this Section 4.1 or Section 4.2 on each Business Day, the Transfer shall be deemed to satisfy (in whole or, as the case may be, in part) the obligation pursuant to Section 2.2 of the Lehman Brothers Transferor to Transfer the relevant Eligible Credit Support to Counterparty and Counterparty's obligation to Transfer the relevant Eligible Credit Support to the Lehman Brothers Transferee.  Accordingly, any such Transfer or deemed Transfer on each Business Day shall be deemed to constitute the Transfer of Credit Support from the Lehman Brothers Transferor to Counterparty and the Transfer of Credit Support from Counterparty to the Lehman Brothers Transferee as a return of, or an addition to, Credit Support pursuant to the terms of a Base Contract, or as a repricing of a Base Contract, as determined by the Lehman Brothers Transferor or the Lehman Brothers Transferee, as applicable, in its sole discretion pursuant to the terms of the Base Contract in Excess or in Deficit, as applicable.  Without prejudice to Section 2.2, which Lehman Brothers Entity will act as Lehman Brothers Transferor or Lehman Brothers Transferee shall be determined by the Lehman Brothers Entities in their sole discretion, except that where a Transfer is necessary for any Regulatory Requirements to be satisfied, the Transfer shall first be effected in such a way as to satisfy those Regulatory Requirements.

4.2. *Optional Netting.*  If Counterparty and any Lehman Brothers Entity would otherwise be required pursuant to one or more Base Contracts to Transfer on the same day Credit Support, payments or deliveries to or among one another in the same currency or in the same type of non-cash asset, one or more Lehman Brothers Entities may, at their option, calculate the netting of any or all such Transfers so that fewer Transfers need be made. One or more Lehman Brothers Entities shall determine whether and the extent to which any such netting results in a deemed Transfer from a Lehman Brothers Entity to Counterparty and from Counterparty (acting through a Lehman Brothers Entity or Entities on its behalf) to a Lehman Brothers Entity, the nature of such Transfer, and the allocation of such Transfer to one or more Base Contracts pursuant to Section 4.1.

3

4.3. *Reallocation of Credit Support and Collateral.*   One or more Lehman Brothers Entities may for any purpose and at any time, including to satisfy or secure one or more Obligations of any Lehman Brothers Affiliate to Counterparty or Counterparty to any Lehman Brothers Affiliate, or to reallocate any Credit Support from a Base Contract with one Lehman Brothers Entity to another Base Contract with another Lehman Brothers Entity, elect to Transfer, cause to be Transferred, or allocate Credit Support, Collateral or payments to one or more Lehman Brothers Affiliates or to itself (the "Transferee"). Any such Transfer shall be deemed to constitute (a) the Transfer to Counterparty of Credit Support from the Lehman Brothers Entity to which such Credit Support had been allocated and (b) the Transfer of Credit Support from Counterparty to the Transferee pursuant to the terms of any Base Contract or other arrangement between Counterparty and the Transferee and (where applicable) this Agreement. Any Transfer by a Lehman Brothers Affiliate of a payment otherwise due from a Lehman Brothers Entity to Counterparty to a Lehman Brothers Entity shall be considered to be a collection by such other Lehman Brothers Entity on Receivables Collateral.

4.4. *Cash Transfers.*  Notwithstanding anything to the contrary in any Base Contract, if a Lehman Brothers Entity has been Transferred non-cash Credit Support under a Base Contract and such Lehman Brothers Entity is required pursuant to Section 2 to Transfer Eligible Credit Support in respect of such Base Contract to Counterparty, such Lehman Brothers Entity may satisfy such Obligation by Transferring cash, even if such Base Contract does not provide for repricing. In such a case, such Lehman Brothers Entity shall be deemed to have Transferred such cash as Eligible Credit Support to Counterparty under such Base Contract and to have retained the non-cash Eligible Credit Support as Eligible Credit Support under such Base Contract.

4.5. *Regulatory Requirements.*  Notwithstanding anything to the contrary herein, all actions of each party hereto, and all calculations hereunder, are subject to all Regulatory Requirements. Without limiting the foregoing, no Transfer of Credit Support or payment (including by means of netting) shall be made or required if such Transfer would violate any Regulatory Requirement, and any Lehman Brothers Entity shall have the right to require any Transfer of Credit Support from Counterparty at any time in order to satisfy any Regulatory Requirement. Notwithstanding anything to the contrary herein, no Lehman Brothers Entity shall be required under any provision of this Agreement to take any action to satisfy a Regulatory Requirement applicable to Counterparty if, after taking such action, any Regulatory Requirement applicable to any Lehman Brothers Entity would fail to be satisfied.

4.6 *U.S. Dollar Equivalents.*  All Basic Margin Requirements and Additional Margin Requirements in currencies other than U.S. Dollars shall be converted into and expressed in their U.S. Dollar Equivalents, unless otherwise determined by one or more Lehman Brothers Entities in their sole discretion.

4.7 *Interest.*  (a) In the event there is no other agreement that provides for interest to be paid upon cash Credit Support Transferred by a Lehman Brothers Entity to Counterparty in respect of a Base Contract, Counterparty shall pay interest upon any cash Credit Support Transferred by a Lehman Brothers Entity in respect of such Base Contract

4

at the Applicable Rate from (and including) the date such cash Credit Support is Transferred to (but excluding) the date on which such cash Credit Support is returned.

(b) In the event there is no other agreement that provides for interest to be paid upon cash Credit Support Transferred by Counterparty to a Lehman Brothers Entity in respect of a Base Contract, Lehman shall pay interest upon any cash Credit Support Transferred by Counterparty in respect of such Base Contract at the customary rate for such market.

5.    Remedies upon Close-out Event.

**5.1. _Close-out._** Upon the occurrence of any Close-out Event, each Lehman Brothers Entity shall be entitled at any time and from time to time, without notice, to cause the Close-out of any or all Base Contracts, determine related Settlement Amounts, and take such other actions as may be permitted or provided for under any of the Base Contracts (but without regard to any cure periods, notice requirements, dispute resolution provisions or other timing requirements specified in any such Base Contract) or Applicable Law. Subject to Section 5.2, upon Close-out of any Base Contract, the Settlement Amount for such Base Contract shall be due.

**5.2. _Other Remedies upon Close-out Event._** Upon the occurrence of any Close-out Event, each Lehman Brothers Entity shall have the right to net the U.S. Dollar Equivalents of the Settlement Amounts due from it to Counterparty and from Counterparty to such Lehman Brothers Entity under all Base Contracts between Counterparty and such Lehman Brothers Entity, so that a single settlement payment (the "Net Settlement Payment") shall be payable by or to Counterparty and such Lehman Brothers Entity, which Net Settlement Payment shall be immediately due and payable (subject to the other provisions hereof, to the provisions of any Base Contract, except as modified hereby, or Applicable Law granting a Lehman Brothers Entity rights relating to collateral, setoff, netting and recoupment). Each Lehman Brothers Entity shall also be entitled to:

(a) exercise all rights and remedies of a secured party under the UCC in respect of the Collateral;

(b) retain, liquidate, apply, collect on and set off any or all Collateral delivered under any Contract against any Net Settlement Payment or other Obligation owed to it or any other Lehman Brothers Entity under any Contract;

(c) set off and net any Net Settlement Payment or other Obligation owed by it or any other Lehman Brothers Entity under any Contract against (i) any Credit Support pledged to Counterparty by any Lehman Brothers Entity under any Contract and (ii) any Net Settlement Payment or other Obligation owed by Counterparty to it or any other Lehman Brothers Entity; and

(d) exercise any other remedies provided under this CMN Agreement or Applicable Law.

5

It is the intention of the parties that this Clause 5.2 contains legally enforceable close-out netting provisions to provide for a single net sum owing to and from the Counterparty to the Lehman Brothers Entities or from the Lehman Brothers Entities to the Counterparty with respect to the this CMN Agreement.

5.3. *Interest.* Interest shall be payable on each Net Settlement Payment (or any other amount) owed to a Lehman Brothers Entity by Counterparty, after taking into account the provisions herein in relation to collateral, setoff, netting and recoupment, at the Applicable Default Rate, as determined by the Lehman Brothers Entity to which such Net Settlement Payment is owed, from (and including) the date such Net Settlement Payment (or any other amount) is due to (but excluding) the date that such Net Settlement Payment (or any other amount) is paid or otherwise satisfied.

5.4. *Priorities.* Unless otherwise agreed by the relevant Lehman Brothers Entities, the exercise of remedies under this Section 5 shall be subject in all events to the priority of security interests as set forth in Section 6 hereof, the relative rights of a First Priority Lehman Brothers Entity and of the Second Priority Lehman Brothers Entities, and the setoff, recoupment and other rights of a Lehman Brothers Entity party to a Base Contract that is Receivables Collateral being prior to the security interest of the Lehman Brothers Entities in such Receivables Collateral.

5.5. *Collection and Similar Rights.* In the event any Obligation of Counterparty to a Lehman Brothers Affiliate is satisfied by application of Credit Support or Collateral held by or transferred to another Lehman Brothers Affiliate or by any offset or netting of an Obligation to Counterparty from another Lehman Brothers Affiliate, such other Lehman Brothers Affiliate shall immediately Transfer to such Lehman Brothers Affiliate the amount so applied or netted. If a Lehman Brothers Entity exercises its rights against Receivables Collateral by collecting on such Receivables Collateral from another Lehman Brothers Entity that is the account debtor thereon, such other Lehman Brothers Entity shall immediately Transfer to such Lehman Brothers Entity the amount to be collected thereunder.

5.6. *No Discharge.* Counterparty's Obligations to the Lehman Brothers Entities shall not be discharged by the exercise of any remedy set forth in any Contract or otherwise except to the extent the exercise of such remedies is final and complete and has not been objected to by any person or entity prior to the expiration of all applicable statutes of limitations.

5.7. *Stays.* If the exercise of any right pursuant to this Section 5 shall be avoided or set aside by a court or shall be restrained, stayed or enjoined under Applicable Law, then the Obligations in respect thereof shall be reinstated, or in the event of restraint, stay or injunction, preserved in the amounts (including any interest thereon) as of the date of restraint, stay or injunction between the applicable Lehman Brothers Entities, on the one hand, and Counterparty, on the other, until such time as such restraint or injunction shall no longer prohibit exercise of such right.

5.8. *No Transfers.* No Lehman Brothers Entity shall be required to Transfer any Credit Support or any other amounts hereunder to Counterparty (including for Transfer

6

by Counterparty to any Lehman Brothers Entity) if a Close-out Event, or an event that with the passage of time or the giving of notice, or both, would become a Close-out Event, has occurred with respect to Counterparty, or if such Transfer would cause a Base Contract to be in Deficit.

     *5.9. Order of Remedies.* Subject to Section 6.2, in exercising any remedies under any Contract or otherwise, each Lehman Brothers Entity shall be entitled to exercise such remedies, with respect to such of the Obligations, and in such order, as it determines in its sole discretion.

**6.**    **Collateral.**

     *6.1. Grant of Security Interest.* Without prejudice to any prior security interest granted in favor of any Lehman Brothers Entity, Counterparty hereby grants to each Lehman Brothers Entity a security interest in and assigns by way of security, all Collateral, to secure all of Counterparty's Obligations to such Lehman Brothers Entity.

     *6.2. Priority; Waiver*

     6.2.1. All Securities and Cash Collateral pledged by Counterparty in connection with a particular Base Contract shall secure first Counterparty's Obligations under that Base Contract and second, Counterparty's Obligations under all other Base Contracts and this CMN Agreement. Each Lehman Brothers Entity that does not have a first lien on any Securities and Cash Collateral (with respect to such Securities and Cash Collateral, a **"Second Priority Lehman Brothers Entity"**) shall take no action in respect of such Securities and Cash Collateral without the consent of the Lehman Brothers Entity having a first lien on such Securities and Cash Collateral (with respect to such Securities and Cash Collateral, the **"First Priority Lehman Brothers Entity"**), and the First Priority Lehman Brothers Entity shall be entitled to exercise all remedies in respect thereof (without being required to consult with any Second Priority Lehman Brothers Entity except to the extent required by Applicable Law, and each Second Priority Lehman Brothers Entity hereby waives any right to be so consulted to the extent permitted by Applicable Law). Each Second Priority Lehman Brothers Entity agrees that its security interest is subject and subordinate to any interest in such Securities and Cash Collateral in favor of any derivatives clearing organization, contract market or futures commission merchant in respect of any futures or commodity option position of Counterparty that is subject to regulation under the Commodity Exchange Act, and in no event will such Second Priority Lehman Brothers Entity have any right to exercise any remedies in respect of such Securities and Cash Collateral until such time as all Obligations with respect to the First Priority Lehman Brothers Entity and any related obligations to any such derivatives clearing organization, contract market or futures commission merchant have been satisfied in full. Each Second Priority Lehman Brothers Entity acknowledges that Counterparty's rights in such Securities and Cash Collateral, and such Lehman Brothers Entity's lien thereon, are subject to the

7

insolvency of the First Priority Lehman Brothers Entity, including the customer property allocation rules under the applicable securities and commodities laws.

6.2.2.    All Receivables Collateral (and all Securities and Cash Collateral delivered but not yet allocated to a particular Base Contract) shall secure all Obligations under all Base Contracts without preference or priority, and all Lehman Brothers Entities shall be entitled to take such actions as they determine in their sole discretion in respect of any foreclosure or other application of, or collection on, any such Securities and Cash Collateral and Receivables Collateral, including, without limitation, the priority of each Lehman Brothers Entity's rights in the proceeds of any such foreclosure, application or collection. Any conflicting claims to Securities and Cash Collateral and Receivables Collateral between the Lehman Brothers Entities shall be resolved as the Lehman Brothers Entities shall agree. The setoff, recoupment and other rights of each Lehman Brothers Entity with respect to a Base Contract to which such Lehman Brothers Entity is a party are prior to any other rights in respect of that Base Contract that constitute Receivables Collateral.

6.2.3.    Counterparty waives any right it may have of first requiring any Lehman Brothers Entity to proceed against or claim payment from any other person or enforce any guarantee or security before enforcing its rights against the Collateral.

6.3. *Control; Notification of Security Interest; Further Assurances.*

6.3.1.    Counterparty and each Lehman Brothers Entity acknowledge and agree that any Securities and Cash Collateral held by a Lehman Brothers Entity shall be held by such Lehman Brothers Entity for itself as secured party and also as agent, representative and bailee for each other Lehman Brothers Entity and, as such, each Lehman Brothers Entity shall, subject to Section 6.2, comply with any entitlement orders or other instructions or directions originated by such other Lehman Brothers Entity with respect to the Securities and Cash Collateral without any further consent of Counterparty. Each Lehman Brothers Entity and Counterparty further agree that, subject to Section 6.2.1., with respect to any commodity contracts carried in an account maintained on the books of any Lehman Brothers Entity, each such Lehman Brothers Entity shall apply any value distributed on account of any commodity contract carried in any such account as directed by any other Lehman Brothers Entity without further consent by Counterparty. Each Lehman Brothers Entity and Counterparty agree that all Securities and Cash Collateral credited to any securities account maintained on the books of any Lehman Brothers Entity shall be treated as a financial asset for purposes of the UCC. For purposes of Articles 8 and 9 of the UCC, to the extent that Counterparty has any control with respect to any Collateral, upon the occurrence of a Close-out Event, Counterparty shall no longer have any control over such Collateral. For purposes of Articles 8 and 9 of the UCC, to the extent that Counterparty has any right to originate entitlement orders or other instructions or directions with respect to any Securities and Cash Collateral or any

8

commodity contracts, Counterparty shall no longer have any such right upon the occurrence of a Close-out Event.

6.3.2.    Each Lehman Brothers Entity hereby notifies each other Lehman Brothers Entity of its security interest and assignment by way of security under Section 6.1, each Lehman Brothers Entity acknowledges such notice from each other Lehman Brothers Entity and each Lehman Brothers Entity consents to the security interest and assignment by way of security.  Counterparty and each Lehman Brothers Entity agree that Counterparty's grant of the security interest and assignment by way of security under Section 6.1 shall not be a breach of any restriction on assignment in this CMN Agreement or any Base Contract or otherwise.

6.3.3.    Counterparty agrees that at any time and from time to time, at the expense of Counterparty, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that any Lehman Brothers Entity may request, in order to perfect and protect each grant of a security interest and assignment by way of security under Section 6.1 or to enable any Lehman Brothers Entity to exercise or enforce its rights and remedies hereunder with respect to the Collateral or any part thereof (including, without limitation, the filing of any UCC financing statements, whether initial filings, amendments or continuations deemed necessary or appropriate by any Lehman Brothers Entity).

6.3.4.    Counterparty hereby irrevocably grants each Lehman Brothers Entity a power of attorney, with full authority to act in the place and stead of Counterparty, under a power coupled with an interest, and in the name of Counterparty or otherwise, from time to time in such Lehman Brothers Entity's discretion to take any action and to execute any instrument which such Lehman Brothers Entity may deem necessary or advisable to accomplish the purposes of this CMN Agreement or to effectuate each grant of a security interest and assignment by way of security under Section 6.1.  Each Lehman Brothers Entity is authorized, without limitation, to prepare and file UCC financing statements, whether initial filings, amendments or continuations, with respect to the Collateral, at Counterparty's expense.

6.3.5.    Without at least 90 days' prior written notice to each Lehman Brothers Entity, Counterparty shall not change its jurisdiction of organization (or the organizational identification number, if any, issued by such jurisdiction to Counterparty), and without at least 30 days' prior written notice to each Lehman Brothers Entity, Counterparty shall not change its name, type of organization, its place of business, or if it has more than one place of business, its chief place of business and chief executive office, each as set forth in Schedule III hereto, or otherwise change its form.

6.4.  *Characterization.*    It is the parties' intention that Title Transfer Credit Support characterized as such under the terms of a Base Contract shall continue to be characterized as such.

9

7.   **Non-Exclusive.**

Each Lehman Brothers Entity's rights under this CMN Agreement (including in respect of the Basic and Additional Margin Requirements and remedies upon a Close-out Event) are in addition to, and not in limitation or exclusive of, any other rights which it may have (whether under the Base Contracts, any other agreement, by operation of law or otherwise), and nothing herein shall prevent any Lehman Brothers Entity from exercising any right such party may have under any Base Contract, Applicable Law or otherwise to cause the termination, liquidation or acceleration of any Base Contract or exercising any right under any security or credit support arrangement relating to any Base Contract, any right to net or set off payments which may arise under any Base Contract, under Applicable Law or otherwise, or any other right or remedy of such party. The provisions of this CMN Agreement shall supersede any provisions contained in any of the Base Contracts that would otherwise limit the rights and remedies given to the Lehman Brothers Entities herein, including without limitation any provisions relating to the valuation of Credit Support, the delivery of Credit Support, the amount and nature of Credit Support required to be Transferred, the delivery of notices, the timing of notices, Credit Support deliveries or Close-out and dispute resolution procedures relating to Credit Support or Close-out. All determinations and calculations by a Lehman Brothers Entity of any amounts hereunder or under any Base Contract, including the Basic Margin Requirement for each Base Contract and the Additional Margin Requirement, shall be conclusive absent manifest error. Each Base Contract is hereby incorporated into this CMN Agreement, and this CMN Agreement is hereby incorporated into each Base Contract; and any transfer (including any pledge) hereunder or under any Base Contract shall be a transfer "under" and "in connection with" each Base Contract.

8.   **Representations and Warranties.**

8.1. *Representations and Warranties of each Party.* Each party hereto represents and warrants, and shall be deemed to represent and warrant as of the date hereof and as of the time it enters into any Base Contract, to each of the other parties hereto as follows:

(a)   it has full power and authority to execute and deliver this CMN Agreement, to enter into such Base Contract and to perform its obligations hereunder and thereunder and has taken all necessary action to authorize such execution, delivery and performance;

(b)   it has entered into or, as the case may be, will enter into the Contracts as principal;

(c)   the person signing this CMN Agreement on its behalf is, and any person representing it in entering into a Base Contract is, duly authorized to do so on its behalf;

(d)   it has obtained all authorizations of any governmental or regulatory body required in connection with the Contracts and such authorizations are in full force and effect;

[New York #931306 v34]

(e)    the execution, delivery and performance of this CMN Agreement, and any Base Contract either have been or will be, prior to entering into each Base Contract, duly authorized by all necessary corporate action and do not and will not violate any law, ordinance, charter, by-law, or rule applicable to it or any transactional restriction or agreement binding on or affecting such party or any of its assets; and

(f)    this CMN Agreement has been, and any Base Contract has been or will be at the time it is entered into, duly and properly executed and delivered by such party and constitutes and will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as the enforcement of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.2. *Additional Counterparty Representations.*    Counterparty represents and warrants, and shall be deemed to represent and warrant as of the date hereof, as of the time it enters into any Base Contract and as of the time it pledges any Collateral or transfers any Credit Support thereunder or hereunder, to each of the Lehman Brothers Entities as follows:

(a)    the Lehman Brothers Entities have a valid, enforceable and, upon appropriate filings by the Lehman Brothers Entity, a perfectible security interest in, all Collateral that is, or that is expressed to be, pledged by Counterparty to a Lehman Brothers Entity;

(b)    it is the sole owner of or otherwise has the right to Transfer any Credit Support it transfers to a Lehman Brothers Entity under the relevant Base Contract free and clear of any security interest, lien, encumbrance or other restriction (other than a lien routinely imposed on all securities in a relevant clearance system);

(c)    each transfer made or obligation incurred pursuant to each Base Contract (i) is being made without intent to hinder, delay, or defraud any entity to which it is or will become, on or after the date that such transfer is made or such obligation is incurred, indebted, (ii) is being made in exchange for reasonably equivalent value and (iii) will not cause it to become insolvent;

(d)    it is not engaged in business or a transaction, or is about to engage in business or a transaction, for which its remaining property is an unreasonably small capital;

(e)    it is not insolvent or unable to pay its debts within the meaning of Applicable Law and is not unable to pay its debts as they mature and it is paying and it anticipates for the foreseeable future that it will continue to pay, its debts as they mature;

(f)    except for security interests or other encumbrances created by the Base Contracts or hereunder in favor of the Lehman Brothers Entities, no person has or will have any right, title, claim or interest (by way of lien, mortgage, pledge, charge,

11

security interest or other encumbrance, or otherwise) in, against, or to the Collateral or Credit Support;

(g)     no pledge of Collateral or delivery of Credit Support violates any agreement by which it is bound;

(h)     it has and will materially benefit from executing and delivering this CMN Agreement and from entering into the Base Contracts;

(i)     it has entered into, is entering into and will enter into the Contracts in good faith and for the purpose of carrying on its business and there are reasonable grounds for believing that entering into the Contracts will benefit it;

(j)     Counterparty's exact legal name, type of organization and jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Counterparty), its place of business, or if it has more than one place of business, its chief place of business and chief executive office, at the date of this Agreement and for the four months immediately preceding the date of this Agreement are as set forth in Schedule III; and

(k)     Counterparty is a "financial institution" as defined in and pursuant to FDICIA.

(l)     This CMN Agreement, each Base Contract and each Transaction entered into thereunder will be entered into by the Counterparty in compliance with the terms of the any rules, guidance, directions and requirements made by the Irish Financial Services Regulatory Authority ("Regulations").

*8.3     Acknowledgements.*

8.3.1   Counterparty recognizes that the Lehman Brothers Entities, in allocating Credit Support, in exercising remedies upon a Close-out Event, or in taking any other action contemplated hereby, will be under no obligation to Counterparty, to minimize the Lehman Brothers Entities' economic risks in connection with the Base Contracts and otherwise and the impact to the Lehman Brothers Entities of any insolvency or bankruptcy of Counterparty (including, without limitation, application of any safe harbor provisions for financial contracts under the Bankruptcy Code).

8.3.2   Each party recognizes that there are no third-party beneficiaries of this CMN Agreement other than the Lehman Brothers Affiliates.  Counterparty hereby acknowledges that Lehman Brothers Affiliates are intended to be third party beneficiaries of this CMN Agreement.

8.3.3   Each Party intends that (i) each transfer of Collateral and Credit Support and each payment to be made under any Contract is a "margin payment", "settlement payment", and "transfer" within the meaning of Sections 362, 546 and 548 of Title 11 of the Bankruptcy Code; (ii) each obligation under any Contract is

12

an obligation to make a "margin payment", "settlement payment" and "payment" within the meaning of Sections 362 and 560 of the Bankruptcy Code; (iii) this CMN Agreement constitutes a "netting contract" within the meaning of and as defined in FDICIA; (iv) each payment entitlement and payment obligation hereunder constitutes a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in FDICIA; (v) this CMN Agreement is a "master netting agreement" and the parties are "master netting agreement participants" within the meaning of and as such terms are used in any law, rule, regulation, statute, or order applicable to the parties' rights herein, whether now or hereafter enacted or made applicable, including Sections 362, 546, 561 and 562 of the Bankruptcy Code; (vi) each Base Contract is a "swap agreement," "forward contract," "securities contract", "repurchase agreement" or "commodity contract" within the meaning of the Bankruptcy Code; (vii) all pledges of Collateral under the Base Contracts and hereunder are transfers under and in connection with "swap agreements", or "margin payments" or "settlement payments" within the meaning of the Bankruptcy Code; (viii) all Collateral and Credit Support is held or has been transferred to margin, guarantee, secure and settle "swap agreements", "forward contracts", "securities contracts", "repurchase agreements" and "commodities contracts" as part of a single integrated business relationship and arrangement; and (ix) the exercise of remedies under Section 6 are protected by FDICIA and Sections 362, 555, 556, 559, 560 and 561 of the Bankruptcy Code.

8.3.4    COUNTERPARTY ACKNOWLEDGES THAT ALLOCATIONS OF CREDIT SUPPORT PURSUANT TO SECTION 4.1 TO A LEHMAN BROTHERS ENTITY OTHER THAN LBI AND TRANSFERS OF CREDIT SUPPORT FROM LBI PURSUANT TO SECTION 2 OR 5 MAY RESULT IN THE LOSS BY COUNTERPARTY OF RIGHTS AND PROTECTIONS AFFORDED BY RULES 15C3-3, 8C-1 AND 15C2-1 UNDER THE SECURITIES EXCHANGE ACT OF 1934, THE SECURITIES INVESTOR PROTECTION ACT OF 1970 AND ANY "EXCESS" SIPC COVERAGE LBI MAY MAINTAIN.

8.3.5    In connection with the negotiation of and the entering into this CMN Agreement and each Base Contract, Counterparty acknowledges and agrees that: (i) each Lehman Brothers Entity is acting for its own account and is not acting as a fiduciary for, or a financial or investment advisor to Counterparty (or in any similar capacity); (ii) Counterparty is not relying upon any communications (whether written or oral) from any Lehman Brothers Entity as investment advice or as a recommendation to enter into this CMN Agreement or any Base Contract, it being understood that information and explanations related to the terms and conditions of this CMN Agreement or any Base Contract shall not be considered investment advice or a recommendation to enter into this CMN Agreement or any Base Contract; (iii) Counterparty has not received from any Lehman Brothers Entity any assurance or guarantee as to the expected results of this CMN Agreement or any Base Contract; and (iv) Counterparty has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting

13

advisors to the extent it has deemed necessary, and it has made its own independent investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by any Lehman Brothers Entity.

9.    Miscellaneous.

9.1  *Entire Agreement.*  This CMN Agreement shall constitute the entire and exclusive understanding and agreement by the parties with respect to the matters addressed herein.

9.2  *Single Relationship.*  Each party acknowledges and agrees that (a) each Contract has been entered into in consideration of and in reliance upon the fact that all Contracts constitute a single business relationship and have been made in consideration of each other, and (b) the performance by Counterparty of each and every Obligation under any Contract is a condition precedent to the performance by each Lehman Brothers Entity of any Obligation to Counterparty, whether or not arising under such Contract or any other Contract.

9.3  *Assignment.*  Each Lehman Brothers Entity shall have the right to assign its rights and delegate its obligations in respect of any Base Contract or any transaction under any Base Contract to another Lehman Brothers Entity, and, upon such delegation, the assignee Lehman Brothers Entity may release the assignor Lehman Brothers Entity from its obligations to Counterparty in respect of such Base Contract or transaction without further consent of Counterparty.  Counterparty may not assign its rights or delegate its obligations under any Contract without the prior written consent of each Lehman Brothers Entity, and any purported assignment or delegation absent such consent is null and void. To the extent the prior sentence is unenforceable under Applicable Law, and consistent with Section 9.2, Counterparty may not assign its rights or delegate its obligations under any Contract without the prior written consent of each Lehman Brothers Entity unless it assigns its rights and delegates its obligations under all Contracts, and any purported assignment or delegation absent such consent is null and void. Subject to the foregoing, all Contracts shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

9.4.  *Termination.*  Any Lehman Brothers Entity may terminate this CMN Agreement on ninety (90) days' prior written notice to Counterparty and the other Lehman Brothers Entities, or immediately with contemporaneous written notice if required by any Regulatory Requirement (in each case, the date such termination becomes effective, the "CMN Agreement Termination Date"), but no such termination shall affect any Base Contract, the security interest of any Lehman Brothers Entity in any Collateral, or the ownership, setoff, netting and recoupment rights of any Lehman Brothers Entity in any Title Transfer Credit Support. Notwithstanding the provisions of any Base Contract, on or prior to the CMN Agreement Termination Date, each Lehman Brothers Entity party to a Base Contract shall in its sole discretion determine and notify Counterparty of the margin requirements under such Base Contract necessary to comply with any applicable Regulatory Requirements and to protect itself from any potential credit exposure to Counterparty in respect of such Base Contract. Such margin

14

requirements shall be effective as of the CMN Agreement Termination Date and Counterparty's obligations in respect of such margin requirements shall survive the termination of this CMN Agreement.

9.5 *Adjustment Relating to Interest.* The obligations of the Lehman Brothers Entities in respect of interest provided in Section 5.3 shall be reduced to the same extent that interest provided therein may not lawfully be included in calculating the obligations of Counterparty in respect of any Settlement Amount or Net Settlement Payment.

9.6 *Notices.* Unless otherwise specified, all notices and other communications to be given to a party hereunder orally or in writing and shall be given to the address, telex (if confirmed by the appropriate answerback), fax (confirmed if requested) or telephone number and to the individual or department specified with respect to such party on Schedule II or such other address, telex, telecopy or telephone number as such party may hereafter specify for the purpose of notice given in accordance with this paragraph. Unless otherwise specified, any notice, instruction or other communication, shall be effective upon receipt if given in accordance with this paragraph. Without limiting the provisions of Section 7, the notice provisions of this CMN Agreement supersede the notice provisions of any Base Contract in respect of determinations of margin requirements, transfers of Credit Support, the occurrence of a Close-out Event and the Close-out of such Base Contract.

9.7 *Interpretation; Headings and Subheadings.* References in this CMN Agreement to "pledge" or "pledgor" include a grant of a security interest in Collateral and to the party granting such security interest and references to a Base Contract Collateral or Credit Support "held by" or "transferred to" a party include Base Contract Collateral or Credit Support held directly or indirectly by such party or over which such party has direct or indirect control, or with respect to which such party has perfected a security interest by filing or registration. The headings and subheadings of this CMN Agreement are for convenience of reference only and shall not affect the meaning or construction of any provision hereof.

9.8 *Governing Law; Severability.* THIS AGREEMENT AND EACH BASE CONTRACT THAT IS NOT EXPRESSED TO HAVE A GOVERNING LAW PROVISION AND ALL MATTERS ARISING FROM OR RELATING TO THIS AGREEMENT AND EACH SUCH BASE CONTRACT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CONFLICTS OF LAW DOCTRINE. Wherever possible, each provision of this CMN Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this CMN Agreement shall be prohibited by or invalid or unenforceable under such laws, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability without otherwise affecting the validity or enforceability of such provision or the remaining provisions of this CMN Agreement.

9.9 *Jurisdiction; Process.*

[New York #93 1305 v34]

9.9.1.    With respect to any suit, action, claim, or proceedings relating to this CMN Agreement (collectively, "Proceedings"), each party irrevocably and unconditionally:

(i)  submits to the jurisdiction of the courts of the State of New York and United States federal courts located in New York, New York;

(ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum, and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party.

(iii) WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY PROCEEDINGS.

9.9.2.    Counterparty hereby appoints the Process Agent specified in Schedule IV hereto to receive, for it and on its behalf, service of process in any suit, action or proceedings relating to this CMN Agreement and any Base Contract.   If for any reason the Process Agent is unable to act as such, Counterparty will promptly notify the Lehman Brothers Entities and within thirty (30) days appoint a substitute process agent acceptable to the Lehman Brothers Entities.  Counterparty irrevocably consents to service of process given in the manner provided for written notices in Section 9.6 hereof.  Nothing in this CMN Agreement will affect the right of any party to serve process in any other manner permitted by law.

9.10 *Costs of Enforcement.*  Counterparty shall be liable for and shall, on demand, indemnify and hold harmless each Lehman Brothers Entity for and against all reasonable out-of-pocket expenses, including, without limitation, legal fees and any stamp, registration, documentation or similar taxes or costs of collection, incurred by such Lehman Brothers Entity by reason of the enforcement or protection of its rights under any Contract.

9.11 *Counterparts.*  This CMN Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

9.12 *Amendments; Waivers.*  Except as expressly provided elsewhere in this CMN Agreement, no amendment, modification, supplement or waiver in respect of this CMN Agreement shall be effective unless in writing and signed by all of the parties hereto.  No failure or delay by any party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

16

IN WITNESS WHEREOF, the parties have signed this CMN Agreement as of the date stated above.



By: _____
Name: _____
Title: _____

LEHMAN BROTHERS
INTERNATIONAL (EUROPE)

By: _____
Name: _____
Title: _____ Alison McComble-Lawrence
Director &
Authorised Signatory

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By: _____
Name: _____
Title: _____ Robert E. Guglielmo
Senior Vice President

LEHMAN BROTHERS INC.

By: _____
Name: _____
Title: Scott Willoughby
Senior Vice President

17

Schedule I

## SCHEDULE OF BASE CONTRACTS

Each of following agreements shall be a Base Contract:

Margin Lending Agreement between Lehman Brothers International (Europe) as arranged by Lehman Brothers Inc. and ███████████████████ted December 20, 2006(as amended) (the "MLA")

Global Master Securities Lending Agreement between ████████████████and Lehman Brothers International (Europe), dated December 20, 2006 (as amended)

Customer Account Agreement - Prime Brokerage between Lehman Brothers Inc. and ████████████ █████████dated December 20, 2006 (as amended) (the "Equity PB")

ISDA Master Agreement between Lehman Brothers Special Financing Inc. and ████████████ ████████dated January 23, 2007 (as amended) (the "LBSF ISDA")

I-1

Schedule II

ADDRESSES FOR NOTICES

Counterparty: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Address:

Phone:
Fax:
Attention of:

**Lehman Brothers Entities:**

**Lehman Brothers International (Europe)**

Address:    25 Bank Street
            London E14 5LE
            England

Legal:
        Attention of: Alison McCombie-Lawrence
        Phone: +44 20 710 21126
        E-mail: amccombi@lehman.com

Margin:
        Attention of: Cross Margin (Kristin DeSario/Umar Palik)
        Phone: +44-20-710-21325
        E-mail: crossmargin@lehman.com

**Lehman Brothers Inc. Special Financing Inc.**

Address:    745 7th Avenue
            New York, NY 10019

I-2

USA

Legal:
    Attention of: Scott Kimmel
    Phone: +1 212 526 2439
    E-mail: sckimmel@lehman.com

Margin:
    Attention of: Cross Margin (Kristin DeSario/Kayvan Parvin)
    Phone: +1 212-526-1210
    E-mail: crossmargin@lehman.com

## Schedule III

Counterparty's exact legal name, type of organization, jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Counterparty), place of business, or if it has more than one place of business, its chief place of business and chief executive office, are as of the date of this CMN Agreement and for the four preceding months:



umbrella unit trust organized pursuant to the laws of Ireland

Registered Office

I-4

Schedule IV

I-5

Schedule V
[Intentionally omitted.]

EXHIBIT I

DEFINITIONS

"**Act of Insolvency**" means that Counterparty, or any guarantor of, or similar or other credit support provider of or with respect to, Counterparty: (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the foregoing events; or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"**Additional Margin Requirement**" means the sum of (i) the Committed Additional Margin Requirement, (ii) the Uncommitted Additional Margin Requirement, (iii) such additional amount, if any, as one or more Lehman Brothers Entities determine is necessary to assure that all Lehman Brothers Entities and Counterparty satisfy all Regulatory Requirements, and (iv) such additional amounts as may be determined by one or more Lehman Brothers Entities in their sole discretion to protect one or more Lehman Brothers Entities from potential credit exposure to Counterparty.

"**Applicable Default Rate**" means, with respect to interest to be paid by Counterparty to a Lehman Brothers Entity under Section 5.3 in respect of a Net Settlement Payment after such payment is due, the Applicable Rate plus three hundred basis points.

"**Applicable Law**" means all applicable laws, rules, regulations, policy and interpretive statements of any governmental or quasi-governmental authorities and securities, commodities and options exchanges and self-regulatory organizations, including but not limited to all initial and maintenance margin requirements.

"**Applicable Rate**" means, with respect to interest to be paid by Counterparty to a Lehman Brothers Entity under Section 4.7 in respect of Credit Support Transferred by a Lehman Brothers Entity, a rate of interest per annum (computed on the basis of daily compounding and the actual number of days elapsed over a year of such number of days as is customary for transactions involving the relevant currency in the London interbank market) equal to the average of the rates at which overnight deposits in the relevant currency are offered by two major banks (selected by the relevant Lehman Brothers Entity) in the London interbank market at or

about 11:00 a.m. (London time) on each day of such period, or, if no such rates are available, a rate of interest as the relevant Lehman Brothers Entity may reasonably select.

"**Bankruptcy Code**" means the United States Bankruptcy Code, as the same may be amended from time to time.

"**Base Contract**" means any agreement or transaction between Counterparty and a Lehman Brothers Entity and identified in Schedule I, as the same may be supplemented or amended from time to time (and, in the case of any master agreements or umbrella agreements, including any prime brokerage agreements, identified in Schedule I, each transaction thereunder or covered thereby), and any related security agreements (other than this CMN Agreement), and any terms or conditions incorporated by reference into any of the foregoing.

"**Basic Margin Requirement**" means, with respect to any Base Contract at any time, the amount determined by any of the Lehman Brothers Entities to be the exposure at that time of the relevant Lehman Brothers Entity to Counterparty (or vice versa) in respect of that Base Contract, determined by the Lehman Brothers Entities in accordance with any mark-to-market or other margin calculation provisions of that Base Contract (but without applying any thresholds, minimum transfer amounts, independent amounts, or haircuts or discounts on the value of Credit Support associated with that Base Contract and without regard to any notice or dispute resolution procedures provided for by such Base Contract) or, if there are no such provisions, by the Lehman Brothers Entities in a reasonable manner. If a Lehman Brothers Entity has such an exposure to Counterparty in respect of a Base Contract, the Basic Margin Requirement is an amount due to such Lehman Brothers Entity pursuant to such Base Contract; if Counterparty has such an exposure to a Lehman Brothers Entity in respect of a Base Contract, the Basic Margin Requirement is an amount due to Counterparty pursuant to such Base Contract.

"**Business Day**" means each day on which commercial banks and foreign exchange markets are generally open to settle payments in New York City.

"**Cessation Event**" means the occurrence of one or more of the following circumstances or events (and without regard to whether any such circumstances or events is continuing):

(a) If Lehman Brothers Holdings Inc. (i) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A3 (the "Moody's Rating") as determined by Moody's Investors Service, Inc. ("Moody's"); or (ii) fails to maintain a long-term senior unsecured debt rating (or any successor rating) of at least A- (the "S&P Rating") as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"); or (iii) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Lehman Brothers Holdings Inc. that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such lower rating shall be determinative; or

(b) If the 5 year credit spread of Lehman Brothers Credit Default Swap increases by more than 100 basis points over a six (6) month period; or

I-8

(c) If Lehman Brothers Holdings Inc. (i) fails to maintain a short-term rating (or any successor rating) of at least P-1 (the "Moody's Short-Term Rating") as determined by Moody's; or (ii) fails to maintain a short-term issue credit rating (or any successor rating) of at least A-1 (the "S&P Short-Term Rating") as determined by S&P; or (iii) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Lehman Brothers Holdings Inc. that is lower than the Moody's Short-Term Rating or the S&P Short Term Rating, as the case may be, then such lower rating shall be determinative.

(d) If the Prospectus of ███████████ dated as of ███████████, Trust Deed dated as of January 22, 2007, the Trading Authorization and other constitutional documents, investment policies, procedures, restrictions, or guidelines and the then-current disclosure document of the Counterparty and the Investment Manager (if different from Trading Authorization) or constitutional document (including, without limitation, investment policies or guidelines) of the Counterparty is amended or modified in a manner which, in the commercially reasonable discretion of any Lehman Brother Entity, is reasonably likely to have a materially adverse effect on any Lehman Brother Entity under this CMN Agreement or on the ability or authority of the Counterparty to perform its obligations under this CMN Agreement.

(e) ███████████████████ merges or consolidates with, or sells or otherwise transfers its advisory business or all or a material portion of its assets to, any individual or entity; (B) bankruptcy occurs with respect to the Investment Manager; or (C) the Investment Manager has any of its registrations, authorizations, licenses or memberships with any federal or state governmental or regulatory authority revoked, suspended, terminated, limited or qualified.

(f)     Investment Manager ceases to be the investment manager to the Counterparty.

(g) On any day during the term hereof, any Lehman Brother Entity determines that the Counterparty (A) has failed to maintain a Net Asset Value in an amount equal to the greater of (x) an amount equal to 50% of Party B's NAV as of Party B's first day of business, and (y) 50 percent of the Counterparty's highest historical year-end Net Asset Value as reflected in the Counterparty's audited financial statements, or (B) has experienced a decline in its Net Asset Value during any one-month period preceding such date, of 10 percent or more (excluding redemptions) or 20 percent of more (including redemptions), or (C) has experienced a decline in its Net Asset Value during any three-month period preceding such date, of 15 percent or more (excluding redemptions) or 30% or more (including redemptions), or (D) has experienced a decline in its Net Asset Value during any twelve-month period preceding such date, of 20 percent or more (excluding redemptions) or 40% or more (including redemptions).

(h) The Counterparty fails to deliver or provide its latest available audited annual financial statements or its NAV Statement within two (2) Local Business Days of any Lehman Brother Entity's request.

(i)  One or more of the following occurs with respect to both of ███████ and ███████ ("Key Person") (A) an incompetency event; (B) death or incarceration; or (C) the Key Person ceases to exercise, or a person who is not a Key Person exercises, either directly or indirectly, a significant influence over the management of the Counterparty.

(j)  At any time during the term of this CMN Agreement, "benefit plan investors" (within the meaning of U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101 (the "Plan Asset Regulation")) hold twenty-five percent (25%) or more of the value of any class equity interest in the Counterparty as determined in accordance with the Plan Asset Regulation.

"Close-out" means termination, cancellation, liquidation, acceleration, designation of an early termination date, acceleration of a repurchase date, other similar action or any other remedial action, as determined by the relevant Lehman Brothers Entity.

"Close-out Event" means (i) the occurrence or existence of (A) any breach, misrepresentation, default, event of default, event that, with the giving of notice or the lapse of time or both, would constitute an event of default or other similar condition or event (however described) in respect of Counterparty, or any guarantor of, or similar or other credit support provider of or with respect to, Counterparty under this CMN Agreement, any Base Contract or any other agreement between Counterparty and any Lehman Brothers Affiliate, (B) any condition which would allow a Lehman Brothers Entity to Close-out any Contract or (C) an Act of Insolvency, or (ii) Counterparty disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, any Contract or any other agreement between Counterparty and any Lehman Brothers Affiliate.

"CMN Agreement Termination Date" has the meaning set forth in Section 9.4 of this CMN Agreement.

"Collateral" means (a) all property pledged by or on behalf of Counterparty to a Lehman Brothers Entity, whether or not there are any outstanding Obligations, and all other securities, money and other property delivered by or on behalf of Counterparty to any Lehman Brothers Entity, held or carried by any Lehman Brothers Entity for the account of Counterparty, or due from any Lehman Brothers Entity to Counterparty (other than Title Transfer Credit Support) ("Securities and Cash Collateral"), and (b) all of Counterparty's right, title and interest in and to any Base Contract, subject to the setoff, netting, recoupment and other rights of the Lehman Brothers Entity party to such Base Contract ("Receivables Collateral"), and in each case all rights relating thereto and all cash and non-cash proceeds thereof; provided, however, that "Collateral", "Securities and Cash Collateral" and "Receivables Collateral" shall not include for purposes of this CMN Agreement any Margin Stock or rights to Margin Stock.

"Commitment Period" means the period of time, which may be adjusted by Lehman Brothers Entity with 90 days' notice, commencing on the date of execution of this CMN Agreement and terminating on the earlier of (i) the close of business 90 calendar days after the date on which a Lehman Brothers Entity gives Counterparty notice of termination of the Committed Margin Terms, provided that if such 90th day is not a Business Day, then the

Commitment Period will terminate on the next Business Day or (ii) a Close-out Event. or (iii) following a Cessation Event on the date specified to Counterparty in writing by a Lehman Brothers Entity. All transactions entered into upon or after the provision of such notice will not be governed by the Committed Margin Terms and will be entered into upon the terms of the MLA (in the case of transactions entered into pursuant to the MLA) or the terms of the ISDA Master (in the case of transactions entered into pursuant to the ISDA Master).

"**Committed Additional Margin Requirement**" means, with respect to the Committed Margin Portfolio the total calculation of margin in accordance with the Committed Margin Terms.

"**Committed Margin Portfolio**" means the transactions specified in Schedule V that one or more Lehman Brothers Entities determine in their sole discretion are eligible for the Committed Margin Terms.

"**Committed Margin Terms**" means the margin terms and method of calculation outlined in Part III of Schedule V of this CMN Agreement which the Lehman Brothers Entities shall apply to the Committed Margin Portfolio during the Commitment Period. The Lehman Brothers Entities may amend the Committed Margin Terms upon 90 calendar days' notice to Counterparty and amend or terminate at any time following a Close-out Event and/or Cessation Event.

"**Commodity Exchange Act**" means the United States Commodity Exchange Act, as the same may be amended from time to time.

"**Contract**" means each Base Contract and this CMN Agreement.

"**Credit Support**" means (a) all property pledged by or on behalf of Counterparty to a Lehman Brothers Entity, or by a Lehman Brothers Entity to Counterparty to secure a Base Contract (including any cash Transferred, or deemed Transferred, under Section 4.4), whether or not there are any outstanding Obligations, and (b) all property transferred by or on behalf of Counterparty or a Lehman Brothers Entity to provide setoff, netting or recoupment rights under or in connection with a Base Contract, whether or not there are any outstanding Obligations under such Base Contract ("Title Transfer Credit Support"), and in each case all rights relating thereto and all cash and non-cash proceeds thereof; provided, however, that "Credit Support" shall not include for purposes of this CMN Agreement any Margin Stock or rights to Margin Stock.

"**Deficit**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Eligible Credit Support**" means, subject to Section 4.4 of this CMN Agreement, in the case of Credit Support to be Transferred in respect of any Base Contract that is a reverse repurchase transaction, the "Purchased Securities" thereunder, U.S. Dollars, U.S. Treasury Securities or such other Credit Support as is agreed by the parties, and, in the case of Credit Support to be Transferred in respect of any other Base Contract, cash in U.S. Dollars or other property determined by a Lehman Brothers Entity in its sole discretion. Notwithstanding the foregoing, a Lehman Brothers Transferor shall be entitled, if it is required to transfer Eligible Credit support otherwise due to Counterparty in respect of a reverse repurchase transaction to a

Lehman Brothers Transferee to satisfy the obligation of Counterparty to such Lehman Brothers Transferee, to transfer any Credit Support such Lehman Brothers Transferor may hold under such reverse repurchase transaction.

"**Excess**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**FDICIA**" means the netting provisions of the Federal Deposit Insurance Corporation Improvement Act of 1991, and Regulation EE issued by the Board of Governors of the Federal Reserve System.

"**First Priority Lehman Brothers Entity**" has the meaning set forth in Section 6.2 of this CMN Agreement.

"**G-10 Country**" has the meaning set forth in Schedule V of this CMN Agreement.

"**G-10 Country Currency**" has the meaning set forth in Schedule V of this CMN Agreement.

"**Lehman Brothers Affiliate**" means (i) each Lehman Brothers Entity, (ii) any entity, whether now or hereafter existing, controlled, directly or indirectly, by any Lehman Brothers Entity, (iii) any entity, whether now or hereafter existing, that controls, directly or indirectly, any Lehman Brothers Entity or (iv) any entity, whether now or hereafter existing, directly or indirectly under common control with any Lehman Brothers Entity. For this purpose, "control" of any entity or any Lehman Brothers Entity means ownership of a majority of the voting power of the entity or any Lehman Brothers Entity.

"**Lehman Brothers Transferee**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Lehman Brothers Transferor**" has the meaning set forth in Section 2.3 of this CMN Agreement.

"**Margin Notification Deadline**" means 12:00 p.m., New York City time.

"**Margin Requirement**" means, with respect to any Base Contract at any time, if the amount equal to (i) the Basic Margin Requirement with respect to such Base Contract that is an exposure of the relevant Lehman Brothers Entity to Counterparty, if any, plus (ii) any portion of the Additional Margin Requirement allocated to such Base Contract by one or more Lehman Brothers Entities in accordance with Section 2.1 minus (iii) the Basic Margin Requirement with respect to such Base Contract that is an exposure of Counterparty to the relevant Lehman Brothers Entity, if any, is a positive number, such amount and the Margin Requirement shall be due from Counterparty to such Lehman Brothers Entity. If such amount is a negative number, the Margin Requirement shall be the absolute value of such amount and the Margin Requirement shall be due from such Lehman Brothers Entity to Counterparty.

"**Margin Stock**" means all securities defined to be margin stock under Section 221.2 of Regulation U issued by the Board of Governors of the Federal Reserve System

and all interpretations thereof by the Board of Governors of the Federal Reserve System or staff thereof.

"Net Asset Value" or "NAV" means as of any date the Counterparty's total assets minus its total liabilities, in each case as of such date calculated in accordance with the Counterparty's Articles of Association and the most recent prospectus of Counterparty.

"Net Settlement Payment" has the meaning set forth in Section 5.2 of this CMN Agreement.

"Obligations" means, as the context requires, each and every obligation of Counterparty under, pursuant to or in connection with the Contracts to all Lehman Brothers Affiliates and all Lehman Brothers Affiliates to Counterparty under, pursuant to or in connection with the Contracts, including, without limitation, payment and delivery obligations (including in respect of any and all property pledged by or on behalf of any Lehman Brothers Entity to secure a Base Contract and Credit Support transferred to Counterparty) and any payment or delivery obligations in respect of any previously terminated transaction, in each case whether arising heretofore or hereafter, and whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, financial, physical, secured, or unsecured and howsoever arising.

"Other Transactions" means any transaction under a Base Contract which is not a Committed Margin Portfolio transaction.

"Proceedings" has the meaning given to it in Section 9.9.1.

"Receivables Collateral" has the meaning set forth in the definition of Collateral.

"Regulatory Requirement" means (a) with respect to any Lehman Brothers Entity or Counterparty, all requirements under Applicable Law, including without limitation all requirements as to the manner of a Lehman Brothers Entity's holding Credit Support, the manner of transfer to a Lehman Brothers Entity of Credit Support, and the amount of Credit Support transferred to a Lehman Brothers Entity in respect of any Base Contract; and (b) with respect to any Lehman Brothers Entity, (i) all requirements to hold or to have been transferred Collateral or Credit Support in respect of any Base Contract in order for such Lehman Brothers Entity to avoid any capital charges or other adverse capital consequences, intercompany collateral requirements or limitations on the volume of intercompany transactions, or any adverse tax consequences and (ii) all margin requirements imposed by any Lehman Brothers Entity as a result of Applicable Law.

"Remaining Excess" has the meaning set forth in Section 2.4 of this CMN Agreement.

"Second Priority Lehman Brothers Entity" has the meaning set forth in Section 6.2 of this CMN Agreement.

"Securities and Cash Collateral" has the meaning set forth in the definition of Collateral.

I-13

"**Securities Intermediary**" shall have the meaning set forth in Article 8 of the UCC.

"**Settlement Amount**" means with respect to each Base Contract, (a) the amount calculated as payable by one party to the other upon Close-out of such Base Contract, and (but without duplication) any accrued but unpaid amounts payable by one party to the other prior to such Close-out, determined in accordance with the provisions of such Base Contract, or (b) if the relevant Lehman Brothers Entity determines in its sole discretion that the determination of such amounts under the provisions of such Base Contract is impractical at the time of Close-out or if no method of determination is specified in such Base Contract, such amount as is determined by the relevant Lehman Brothers Entity in a reasonable manner as being payable upon Close-out of such Base Contract and any accrued but unpaid amounts, including, without limitation, any loss of bargain or cost of funding incurred by such Lehman Brothers Entity and, without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position that is required to put such Lehman Brothers Entity in the same economic position as it would have been but for the occurrence of the Close-out Event from which such Close-out arose. If the Obligations with respect to one or more Base Contracts have not matured, terminated, liquidated or been accelerated, then the Lehman Brothers Entities shall in good faith estimate the Settlement Amount with respect to such Base Contracts as of the date of determination in respect of such Base Contracts.

"**SIPC**" means the Securities Investor Protection Corporation.

"**Title Transfer Credit Support**" has the meaning set forth in the definition of Credit Support.

"**Transfer**" or "**Transferred**" means:

(a)     in the case of cash:  payment or delivery by wire transfer into one or more bank accounts of the transferee;

(b)     in the case of certificated securities that cannot, or which the parties have agreed will not, be paid or delivered by book-entry: payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a valid and legally effective transfer to the transferee;

(c)     in the case of securities that must, or which the parties have agreed will, be paid or delivered by book-entry:  the crediting by a Securities Intermediary of such securities to the transferee's "securities account" (within the meaning of the UCC) maintained with such Securities Intermediary; and

(d)     in the case of other forms of property:  as agreed between the parties.

In the case of a Transfer by any Lehman Brothers Entity of an Excess to satisfy a Deficit, "Transfer" means such action, if any, as determined by the relevant Lehman Brothers Entity.

I-14

**"Transfer Deadline"** means 5:00 p.m., New York City time.

**"Transferee"** has the meaning set forth in Section 4.3 of this CMN Agreement.

**"UCC"** means the New York Uniform Commercial Code, as in effect from time to time.

**"Uncommitted Additional Margin Requirement"** means such additional margin amounts for Other Transactions as may be determined by one or more Lehman Brothers Entities in their sole discretion based on the margin terms agreed for such Other Transactions between one or more Lehman Brothers Entities and the Counterparty.

**"U.S. Dollar Equivalent"** of an amount as of any date means (i) in respect of an amount denominated in U.S. Dollars, such amount and (ii) in respect of any amount dominated in a currency other than U.S. Dollars ("Other Currency"), the amount expressed in U.S. Dollars, as determined by one or more Lehman Brothers Entities, that would be required to purchase or sell, as appropriate, such amount of such Other Currency as of such date with or for U.S. Dollars at the rate equal to the spot exchange rate of a foreign exchange agent (selected in good faith by such Lehman Brothers Entity or Lehman Brothers Entities, as applicable) (in the city in which such foreign exchange agent is located) at such time as the Lehman Brothers Entities in their sole and absolute discretion shall determine).

**"Value"** means, with respect to an item of Credit Support allocated to a Base Contract under Section 4.1, as determined in a reasonable manner by one or more Lehman Brothers Entity or Entities, the U.S. Dollar Equivalent of the market value of such item of Credit Support as adjusted by any haircut or discount applicable to such item of Credit Support under the terms of such Base Contract, except that the Value of any item of Credit Support that is not Eligible Credit Support shall be zero.

I-15