# EXHIBIT 30

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO THE QUALIFICATIONS SET FORTH HEREIN IN ALL RESPECTS.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
                 Debtors.                 :        (Jointly Administered)
                                          :
----------------------------------------------------------------x
```

**DISCLOSURE STATEMENT FOR THE AMENDED
JOINT SUBSTANTIVELY CONSOLIDATING CHAPTER 11 PLAN FOR
LEHMAN BROTHERS HOLDINGS INC. AND CERTAIN OF ITS AFFILIATED
DEBTORS OTHER THAN MERIT, LLC, LB SOMERSET LLC AND LB
PREFERRED SOMERSET LLC, PROPOSED BY THE
<u>AD HOC GROUP OF LEHMAN BROTHERS CREDITORS</u>**

WHITE & CASE LLP
1155 Avenue of Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

Attorneys for the Ad Hoc Group of
Lehman Brothers Creditors

Dated:  New York, New York
           April 27, 2011

# TABLE OF CONTENTS

**Page**

I.   PREAMBLE ................................................................................................................1

II.  INTRODUCTION ......................................................................................................5

    A.   Summary of the Plan....................................................................................6

    B.   Basis For Substantive Consolidation ........................................................11

        1.   Overview........................................................................................11

        2.   Creditors Dealt With Lehman as a Single Economic Unit and Did Not Rely on the Separate Identity of LBHI's Affiliates When Extending Credit ...........................................................................14

        3.   Intercompany Entanglements.........................................................17

            a.   Integrated Business Operations.........................................17

            b.   Intercompany Claims ........................................................25

            c.   Intercompany Causes of Action........................................29

        4.   Conclusion .....................................................................................30

    C.   Purported Guarantee and Blanket Guarantee Claims ...............................31

    D.   Side Letter Claims.....................................................................................33

    E.   Inflated Derivative Claims.........................................................................34

    F.   The Debtors' Plan ......................................................................................36

III. OVERVIEW OF PLAN............................................................................................39

    A.   Classification of Claims and Equity Interests under the Plan...............................39

    B.   Holders of Claims Entitled to Vote...........................................................45

    C.   Voting Procedures......................................................................................46

    D.   Confirmation Hearing ...............................................................................47

IV.  GENERAL INFORMATION....................................................................................47

V.   SUMMARY OF THE CHAPTER 11 PLAN ...........................................................47

    A.   Classification and Treatment of Claims and Equity Interests...............................47

## TABLE OF CONTENTS
### (continued)

Page

1.    Treatment of Unclassified Claims ...............................................47

    a.    Administrative Expense Claims......................................47

    b.    Professional Compensation and Reimbursement Claims ..............48

    c.    Priority Tax Claims......................................................49

2.    Summary of Classes....................................................49

    a.    Treatment of Claims Against the Debtors and Equity Interests in LBHI............................................................50

B.    Acceptance or Rejection of the Plan....................................59

1.    Classes Entitled to Vote................................................59

2.    Class Acceptance Requirement.........................................59

3.    Separate Classification for Settlement Purposes.......................60

4.    Undivided Voting......................................................60

5.    Nonconsensual Confirmation..........................................60

C.    Means for Implementation of the Plan..................................61

1.    Substantive Consolidation of the Consolidated Debtors ..............61

2.    Substantive Consolidation of Certain Designated Non-Debtor Affiliates ................................................................61

3.    Substantive Consolidation of LBT and LBSN.........................63

4.    Plan Administrator.....................................................64

    a.    Authority of the Plan Administrator ...............................64

    b.    No Liability of Plan Administrator................................65

5.    Creation and Distribution of New Securities; Creation of Separately Managed Asset Vehicles....................................65

6.    Allowance of Non-Consolidated Intercompany Claims...............66

7.    Indenture Trustees, Creditors' Committee Members and the Plan Proponents............................................................66

## TABLE OF CONTENTS
### (continued)

Page

8.      Treatment of Disputed Claims ...................................................................66

9.      Redistribution of Subordinated Unsecured Claims Recoveries ................68

10.     Special Provisions Regarding LBT ...........................................................69

11.     Special Provisions Regarding LBSN .........................................................69

D.      Provisions Governing Distributions ......................................................................69

1.      Postpetition Interest ...................................................................................69

2.      Distributions of Plan Consideration ..........................................................69

3.      Minimum Distribution and Manner of Payment ........................................70

4.      Distributions Free and Clear ......................................................................70

5.      Delivery of Distributions and Undeliverable Distributions .......................70

6.      Withholding and Reporting Requirements .................................................70

7.      Time Bar to Cash Payment Rights .............................................................71

8.      Setoff and Recoupment ..............................................................................71

9.      Net Distributions to Foreign Affiliates ......................................................71

10.     Allocation of Distributions .........................................................................71

11.     Maximum Distribution ...............................................................................72

E.      Payment Notes .......................................................................................................72

1.      Issuance and Distribution ...........................................................................72

2.      Transferability of Payment Notes ..............................................................72

3.      Fractional Distributions ..............................................................................72

4.      Paying Agent ..............................................................................................72

5.      Exemption from Registration ......................................................................72

6.      Deemed Transfer To DTC ..........................................................................73

7.      Discretion of Plan Administrator ...............................................................73

## TABLE OF CONTENTS
### (continued)

Page

F.  Liquidating Trust ...........................................................73

    1.  Execution of Liquidating Trust Agreement ................73

    2.  Federal Income Tax Treatment ...............................74

    3.  Tax Reporting ...................................................75

    4.  Dissolution ......................................................76

G.  Treatment of Executory Contracts and Unexpired Leases ...................76

    1.  Rejected Contracts and Leases of the Debtors........................77

    2.  Assumed Contracts and Leases of the Debtors........................77

    3.  Insurance Policies ...............................................77

    4.  Cure of Defaults.................................................77

    5.  Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan...............78

H.  Conditions Precedent to Plan's Confirmation and Effective Date........78

    1.  Conditions to Confirmation of the Plan....................78

    2.  Conditions to Effective Date of the Plan ...................78

    3.  Waiver of Conditions.........................................79

I.  Effect of Confirmation of the Plan.........................................79

    1.  Vesting of Assets ...............................................79

    2.  Binding Effect ..................................................79

    3.  Release, Exculpation and Limitation of Liability .....................79

    4.  Injunction ......................................................80

    5.  Retention of Litigation Claims and Reservation of Rights.........81

    6.  Terms of Injunctions or Stays................................81

J.  Summary of Other Provisions of Plan .................................81

## TABLE OF CONTENTS
### (continued)

Page

1.  Management and Administration on a Consolidated Basis ...................82

2.  LAMCO .................................................................................................82

3.  Amendment or Modification of the Plan ...................................................82

4.  Allocation of Plan Distributions Between Principal and Interest .............82

5.  Revocation or Withdrawal of the Plan......................................................82

6.  Dissolution of the Creditors' Committee..................................................83

7.  Exemption from Transfer Taxes ...............................................................83

8.  Retention of Jurisdiction ..........................................................................83

9.  Plan Supplement ......................................................................................84

K.  Summary of Recovery Analysis Under the Plan .........................................85

VI.  CONFIRMATION AND CONSUMMATION OF THE PLAN......................................85

A.  Solicitation of Votes ......................................................................................85

B.  The Confirmation Hearing..............................................................................85

C.  Confirmation ..................................................................................................86

1.  Acceptance ...............................................................................................86

2.  Feasibility.................................................................................................86

3.  Best Interests Test ....................................................................................87

4.  Competing Plans ......................................................................................89

D.  Consummation ...............................................................................................90

VII.  CORPORATE GOVERNANCE AND MANAGEMENT OF THE DEBTORS ON THE
EFFECTIVE DATE.............................................................................................90

A.  Board of Directors and Management ..............................................................90

1.  Board of Directors....................................................................................90

2.  Holders of the Stock of Debtors On Effective Date ................................91

## TABLE OF CONTENTS
### (continued)

Page

3. Plan Administrator ................................................................................91

4. Corporate Existence ............................................................................91

5. Certificates of Incorporation and By-laws .........................................92

6. Wind-Down ..........................................................................................92

7. Transferability of Claims and Debt Securities and Post Effective Date Disclosure ....................................................................................92

8. Stock Trading Restrictions ..................................................................93

VIII. SECURITIES LAWS MATTERS .................................................................93

A. Existing Equity Interests ....................................................................93

B. Initial Distribution of New Securities ................................................93

C. Resales of New Securities/Rule 144 and Rule 144A .........................94

D. Payment Notes ....................................................................................96

1. Holders' Benefits .................................................................................96

2. Appointment of Paying Agent .............................................................96

3. Transferability of Payment Notes .......................................................96

4. DTC Eligibility and Delivery ..............................................................97

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ....................................99

A. Certain Bankruptcy Law Considerations ...........................................99

B. Conditions Precedent to Consummation of the Plan ..........................99

C. Asset Sales ........................................................................................100

D. Estimation of Allowed Claims ..........................................................100

E. Certain Tax Considerations ...............................................................100

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........100

A. Consequences to the Consolidated Debtors ......................................101

## TABLE OF CONTENTS
### (continued)

Page

| | 1. | Tax Filing Status; Tax Attributes | 101 |
|---|---|---|---|
| | 2. | General Discussion of Plan | 103 |
| | | a. Asset Dispositions and Transfers | 103 |
| | | b. Plan Distributions | 103 |
| | 3. | Tax Impact of the Plan on the Debtors | 103 |
| | | a. Cancellation of Debt | 103 |
| | | b. Limitation of NOL Carryforwards and other Tax Attributes | 104 |
| | | c. Non-U.S. Income Tax Matters | 106 |
| | 4. | Transfer of Liquidating Trust Assets to a Liquidating Trust | 106 |
| B. | | Consequences to Holders of Claims and LBHI Equity Interests | 106 |
| | 1. | Realization and Recognition of Gain or Loss, In General | 106 |
| | 2. | Holders of Allowed Claims in All Classes Except 5A, 5B, 5C, 19 and 20 | 107 |
| | 3. | Allocation of Consideration to Interest | 108 |
| | 4. | Receipt by Holders of Payment Notes | 108 |
| C. | | Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests | 108 |
| | 1. | Classification of the Liquidating Trust | 108 |
| | 2. | General Tax Reporting by the Liquidating Trust and Beneficiaries | 109 |
| | 3. | Tax Reporting for Assets Allocable to Disputed Claims | 111 |
| D. | | Withholding on Distributions, and Information Reporting | 111 |
| XI. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 112 |
| XII. | | VOTING PROCEDURES AND REQUIREMENTS | 112 |
| A. | | Ballots and Voting Deadline | 112 |
| B. | | Voting Procedures | 113 |

## TABLE OF CONTENTS
### (continued)

                                                 **Page**

C.    Special Note for Holders of Notes Issued Directly by LBHI ............................113

        1.    Beneficial Owners ....................................................................................113

        2.    Nominees ...................................................................................................114

                a.    Pre-Validated Ballots .................................................................114

                b.    Master Ballots .............................................................................114

        3.    Securities Clearing Agencies ....................................................................115

        4.    Miscellaneous .........................................................................................115

D.    Fiduciaries and other Representatives ................................................................115

E.    Parties Entitled to Vote ......................................................................................116

F.    Agreements Upon Furnishing Ballots.................................................................117

G.    Waivers of Defects, Irregularities, Etc...............................................................117

H.    Withdrawal of Ballots; Revocation.....................................................................117

I.    Further Information; Additional Copies ............................................................118

XIII.    CONCLUSION AND RECOMMENDATION...............................................................119

Schedule A - Definitions

**Exhibits**

Exhibit 1        Amended Joint Chapter 11 Plan of the Ad Hoc Group of Lehman Brothers
                    Creditors
Exhibit 2        Plan Proponents' Recovery Analysis for the Consolidated Debtors
Exhibit 3        Plan Proponents' Liquidation Analysis for the Consolidated Debtors
Exhibit 4        Sample Potential Disclosure Templates
Exhibit 5        Members of the Ad Hoc Group of Lehman Brothers Creditors

## I.    PREAMBLE

The members of the Ad Hoc Group of Lehman Brothers Creditors (the "Plan Proponents" or the "Group") submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against and Equity Interests in Lehman Brothers Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries, as debtors (each a "Debtor," and collectively, the "Debtors") for (i) the solicitation of acceptances of the Amended Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of its Affiliated Debtors Other than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by the Ad Hoc Group of Lehman Brothers Creditors, dated April 27, 2011, as the same may be amended or modified (the "Plan"), filed by the Plan Proponents with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan ("Confirmation Hearing") scheduled for [_____]. Except as otherwise indicated in the Plan, the Plan applies to each of the twenty Debtors for which "exclusivity" has expired, but does not apply to the Excluded Debtors. The Plan Proponents, however, reserve the right to (i) seek a termination of exclusivity with respect to the Excluded Debtors and (ii) make applicable this Plan or any other plan of reorganization to the Excluded Debtors in the future or otherwise to seek to substantively consolidate any or all of the Excluded Debtors with LBHI by a separate contested matter or adversary proceeding.

This Disclosure Statement reflects certain amendments and modifications that have been made to the original Disclosure Statement. In particular, the Disclosure Statement has been updated to reflect:

- Changes made by the Debtors to the Debtors' assumptions with respect to asset valuations and claims realization;

- Recent events in the Debtors' Chapter 11 Cases that affect the Plan and the general passage of time;

- Modification to Plan classification to account for the Debtors' changed view of rights arising under various contractual subordination agreements; and

- The certification of existing Claims through issuance of Payment Notes under the Plan.

Pursuant to the Plan, Payment Notes will be issued to certain holders of Allowed Claims in certain Classes primarily for the purpose of recording transfers of ownership of such Claims. The Plan Proponents believe that the issuance of Payment Notes as set forth in the Plan will greatly increase the market liquidity for Allowed Claims and represents a substantial enhancement over the prior Plan and a substantial benefit to holders of Allowed Claims as compared to the Debtors' Plan.

Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to such terms in the Plan or in Schedule A, attached hereto.

The key Exhibits attached to this Disclosure Statement include:

- The Plan (Exhibit 1);

- The Plan Proponents' Recovery Analysis for the Consolidated Debtors (Exhibit 2); and

- The Plan Proponents' Liquidation Analysis for the Consolidated Debtors (Exhibit 3).

In addition, attached to the Debtors' Disclosure Statement are the following key exhibits, which are incorporated for informational purposes herein by reference:

- The Debtors' published Balance Sheets of each Debtor (i) as of its applicable Commencement Date and (ii) as of June 30, 2010 (Debtors' Disclosure Statement Exhibits 2A and 2B);

- The Debtors' published Estimates of Claims and Claims Data (Debtors' Disclosure Statement Exhibit 6); and

- The Debtors' published Cash Flow Estimates Through 2014 (Debtors' Disclosure Statement Exhibit 7).

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that the Plan Proponents believe may be entitled to vote to accept or reject the Plan. As explained in greater detail herein, such ballot may permit certain holders to also vote to accept or reject the Debtors' Plan.

On [_____], 2011, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor in the relevant classes to make an informed judgment whether to accept or reject the Plan (the "Disclosure Statement Order"). APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating ballots. In addition, detailed voting instructions accompany each ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and how the votes will be tabulated. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

Concurrently with the solicitation of the Plan, the Debtors are soliciting the Debtors' Plan and certain self-styled "Non-Consolidation Plan Proponents" are soliciting a third plan of reorganization that rejects any and all attempts by the Plan Proponents and/or the Debtors to settle inter-estate issues (the "Non-Settlement Plan").  As explained below, the Plan Proponents contend that the Debtors' Plan and the Non-Settlement Plan are unconfirmable, provide inferior recoveries to the Plan and are subject to numerous legal and equitable defects. Notwithstanding that the Plan Proponents believe the Plan to be superior to the Debtors' Plan and the Non-Settlement Plan, if entitled to vote on the three plans, you may vote to accept or reject:  (i) the Plan; (ii) the Debtors' Plan; (iii) the Non-Settlement Plan; (iv) all three plans; or (v) none of the plans.  The Bankruptcy Court, however, may confirm only one plan for the Debtors (although it could conceivably confirm one plan as to certain of the Debtors and another plan as to certain or all of the other Debtors).  If more than one plan is confirmable, the Bankruptcy Court will have a certain degree of discretion in determining which plan of reorganization to confirm pursuant to section 1129(c) of the Bankruptcy Code, but shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND SUCH STATEMENTS RELY UPON THE INFORMATION PROVIDED IN THE DEBTORS' DISCLOSURE STATEMENT AND CERTAIN OTHER PUBLICLY AVAILABLE DOCUMENTS.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF REGARDLESS OF THE DATE OF ACTUAL DELIVERY OF THE DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE EXHIBITS, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS, THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS, THE PLAN PROPONENTS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS, THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS, THE PLAN PROPONENTS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX – "CERTAIN RISK FACTORS TO BE CONSIDERED" OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENTS.

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE ("IRC"); (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

CAUTIONARY STATEMENTS CONCERNING DEBTORS' PROJECTIONS, VALUATION OF ASSETS, ESTIMATION OF CLAIMS AND FINANCIAL STATEMENTS; FORWARD-LOOKING STATEMENTS:

CERTAIN INFORMATION CONTAINED HEREIN, INCLUDING THE DEBTORS' PROJECTIONS, VALUATION OF ASSETS, ESTIMATION OF CLAIMS AND FINANCIAL STATEMENTS WERE PROVIDED TO THE PLAN PROPONENTS BY THE DEBTORS,  PUBLICLY DISCLOSED BY THE DEBTORS IN THE DEBTORS' DISCLOSURE STATEMENT AND OTHER PUBLIC FILINGS OR WERE OBTAINED FROM PUBLICLY AVAILABLE SOURCES.  ALTHOUGH THE PLAN PROPONENTS AND THEIR FINANCIAL ADVISORS AND REPRESENTATIVES CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, ASSETS AND LIABILITIES THEY RELIED UPON THE ACCURACY AND COMPLETENESS OF ALL SUCH INFORMATION FURNISHED TO THEM OR OTHERWISE PUBLICLY FILED BY THE DEBTORS AND ASSUMED THAT SUCH INFORMATION WAS REASONABLY PREPARED IN GOOD FAITH AND ON A BASIS REFLECTING THE DEBTORS' MOST ACCURATE CURRENTLY AVAILABLE INFORMATION. THE PLAN PROPONENTS AND THEIR ADVISORS AND REPRESENTATIVES DID NOT INDEPENDENTLY VERIFY OR SEEK INDEPENDENT VALUATIONS OR APPRAISALS OF SUCH INFORMATION IN CONNECTION HEREWITH.

THE INCLUSION OF SUCH INFORMATION HEREIN SHOULD NOT BE REGARDED AS AN INDICATION THAT THE PLAN PROPONENTS OR ANY OF THEIR

ADVISORS OR REPRESENTATIVES CONSIDER SUCH INFORMATION TO BE AN ACCURATE PREDICTION OF FUTURE EVENTS OR A COMPLETE AND ACCURATE REFLECTION OF THE DEBTORS' CURRENT FINANCIAL CONDITION AND SUCH INFORMATION SHOULD NOT BE RELIED ON AS SUCH. NEITHER THE PLAN PROPONENTS NOR ANY OF THEIR ADVISORS OR REPRESENTATIVES ASSUMES ANY RESPONSIBILITY FOR THE REASONABLENESS, COMPLETENESS, ACCURACY OR RELIABILITY OF SUCH INFORMATION AND NONE OF THEM INTENDS TO UPDATE OR OTHERWISE REVISE SUCH INFORMATION TO REFLECT CIRCUMSTANCES EXISTING AFTER THE DATE WHEN MADE OR TO REFLECT THE OCCURRENCE OF FUTURE EVENTS EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS ARE SHOWN TO BE IN ERROR.

CERTAIN MATTERS DISCUSSED HEREIN (INCLUDING, BUT NOT LIMITED TO, THE PROJECTIONS) ARE FORWARD-LOOKING STATEMENTS THAT ARE SUBJECT TO CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THE STATEMENTS INCLUDED HEREIN (INCLUDING THE PROJECTIONS) AND SHOULD BE READ WITH CAUTION. THESE STATEMENTS INCLUDE, BUT ARE NOT LIMITED TO STATEMENTS AS TO: ESTIMATED PROCEEDS OF THE DEBTORS' PROPOSED ASSET SALES, THE DEBTORS' EXPECTED FUTURE FINANCIAL POSITION, LIQUIDITY, RESULTS OF OPERATIONS AND CASH FLOWS, ESTIMATES AS TO RISK THE DEBTORS ARE UNABLE TO COLLECT UPON THEIR OUTSTANDING RECEIVABLES/ASSETS, FUTURE POTENTIAL EFFECTS OF THE CHAPTER ELEVEN CASES, LIQUIDATION VALUATIONS OF ASSETS AND ESTIMATED LIQUIDATION CLAIMS. THESE STATEMENTS REFLECT CURRENT VIEWS AND ASSUMPTIONS THAT MAY BE AFFECTED BY VARIOUS FACTORS, INCLUDING THE PLAN PROPONENTS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN AND DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES, THE DEBTORS' ABILITY TO COMPLETE ASSET SALES AND REALIZE EXPECTED RECOVERIES, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT AND MANY OF WHICH ARE BEYOND THE CONTROL OF THE PLAN PROPONENTS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THESE STATEMENTS WILL PROVE ACCURATE, AND ACTUAL RESULTS MAY BE MATERIALLY DIFFERENT THAN THOSE CONTAINED HEREIN.

## II.    INTRODUCTION

The Plan Proponents are comprised of a broad range of stakeholders in these Chapter 11 Cases, including, pension funds, municipalities, institutional holders and secondary holders, holding, in the aggregate, over $19 billion of Claims across the Lehman Brothers capital structure, including approximately $16 billion of Senior Unsecured Claims against LBHI. See Exhibit 5 attached hereto for additional information relating to the Plan Proponents. In addition, by order dated April 18, 2011, the Bankruptcy Court determined that Rule 2019 applies to the Plan Proponents. On April 22, 2011, the Plan Proponents filed their Rule 2019 Statement providing detailed information regarding Claims held against the Debtors and certain affiliates.

On numerous past occasions, the Plan Proponents have been able to work cooperatively with the Debtors and the Creditors' Committee on significant issues affecting the Debtors' reorganization and have repeatedly expressed their desire to see these Chapter 11 Cases resolve themselves quickly with minimal administrative overhead.[1]  Nevertheless, on June 29, 2010, the Plan Proponents filed a preliminary objection to the Debtors' Plan on the basis that, among other things, such plan did not reflect a fair assessment of the risks and rewards attendant to an active litigation of inter-Debtor disputes (as described more fully herein) and, moreover, with respect to various foreign and domestic affiliates of LBHI, the Debtors' Plan did not reflect a realistic assessment of the risks of such litigation.  In response to the preliminary objection, the Debtors indicated to the Court and parties in interest a willingness to establish a process for transparency and creditor participation in plan negotiations.  Despite this promise, to date, the Plan Proponents believe that the Debtors have not yet translated their willingness into action. Instead, the Debtors chose to amend their plan and, while such amendments acknowledge certain of the inequities that were inherent in the Debtors' Plan,[2] the Plan Proponents believe that the Debtors' Plan remains unconfirmable, unfair as a matter of form and substance and inferior to the Plan.

As a consequence of these events, the Plan Proponents have independently made contact with holders of billions of dollars of other claims against Lehman Brothers who are supportive generally of the Plan and increased creditor involvement in the plan process – a process that the Plan Proponents believe has not advanced materially since the filing of the Debtors' First Plan over <u>one</u> <u>year</u> ago. Further, even if the Debtors' Plan is ultimately confirmed, the Debtors' Plan leaves unresolved certain asset ownership and other intercompany issues that would result in potentially years of continued litigation. While the Plan Proponents are committed to the time and expense of litigation, if necessary, that is not the path preferred by the Plan Proponents.  Rather, the Plan Proponents file this Plan as an alternative that seeks to, among other things, resolve the material issues left open under the Debtors' Plan.  Recently, on April 25, 2011, the Non-Consolidation Plan Proponents filed the Non-Settlement Plan.  The Non-Settlement Plan offers no settlement of the inter-estate issues and seeks to force judicial resolution that would therefore likely result in protracted litigation.   The Plan Proponents sincerely hope that other creditors will see the wisdom in resolving such issues and ending the overwhelming burdens of allowing the Debtors to remain in chapter 11.

## A.  Summary of the Plan

Unlike the Debtors' Plan and the Non-Settlement Plan, the Plan is premised on the judicially-ordered substantive consolidation, for voting and distribution purposes, of the Consolidated Debtors' estates and certain Designated Non-Debtor Affiliates and the potential settlement of all issues relating thereto.  On the Effective Date, except as otherwise provided in the Plan, for the purposes of making Distributions and post-Effective Date governance, all assets and liabilities of each Consolidated Debtor will be treated as though they are merged into and

---

[1] To date, administrative fees incurred by the Debtors in these Chapter 11 Cases have surpassed $1 billion.

[2] (<u>See</u> Debtors' Disclosure Statement at 87.)

with the assets of LBHI. In particular, under the Plan, (i) Intercompany Claims between and among the Consolidated Debtors will be deemed eliminated, (ii) Third-Party Guarantee Claims for which a Consolidated Debtor is the Primary Obligor on the corresponding Primary Claim will be deemed merged and eliminated, and (iii) all Claims against multiple Consolidated Debtors for the same debt or legal obligation (a "<u>Duplicate Claim</u>") will be deemed merged and eliminated, so that any claim against such Consolidated Debtor and any Guarantee Claim or Duplicate Claim will be deemed to be one obligation of the Consolidated Debtors with respect to their estates.

While the Plan Proponents acknowledge that relevant legal jurisprudence places an affirmative burden on parties advocating for substantive consolidation, the Plan Proponents submit that relying on such burden as a justification for a plan not premised on substantive consolidation is misplaced. The Plan Proponents submit that the Debtors and the Non-Consolidation Plan Proponents will face tremendous hurdles in attempting to prosecute a non-consolidated plan for an enterprise as complex as Lehman.

In fact, the Debtors' Plan is not a plan that provides for the true non-consolidation of the Debtors. Rather, it is a "books and records" plan, which begins with the Debtors' books and records and then makes adjustments off such books and records as may be convenient for the Debtors to achieve settlements. The Plan Proponents believe that any plan (the Debtors' or otherwise) that purports to accept Lehman's books and records presents significant legal and equitable problems. Specifically, in prosecuting the Debtors' Plan, unless the Debtors are able to obtain settlements from a multitude of parties with various interests across numerous jurisdictions, the Debtors will face the difficult and extremely time consuming task of obtaining a judicial determination as to the validity of the assets and liabilities as set forth in the Debtors' books and records.

Properly assessing the assets and liabilities as set forth in the Debtors' books and records would require, among other things, (i) unwinding a complex web of intercompany relationships set forth in questionable documentation and (ii) resolving Intercompany Claims and asset ownership disputes. The Debtors have admitted that various aspects of prosecuting a non-consolidated plan would involve an enormous amount of work and could take many years to resolve, further delaying Distributions to creditors and adding to the already unprecedented fees and expenses incurred by the Debtors in these Cases. For example, the Debtors have acknowledged as follows:

> To attempt to reconcile Intercompany Claims with the procedural and evidentiary rigors of court proceedings under a multiplicity of local insolvency laws and rules of evidence would be a protracted and expensive labor that could take many years to complete.

(Debtors' Amended Disclosure Statement at 59.) Moreover, according to the Debtors:

> The Allowance of Intercompany Claims or balances is a fact-intensive and costly analysis, especially in light of the hundreds of thousands of intercompany bookkeeping entries that occurred every month and the fact that Lehman's general ledger accounts

operated on a net basis making it very difficult to trace the cash
sweeps from Affiliate bank accounts to particular transactions.

(Debtors' Amended Disclosure Statement at 84.)   For these reasons and others, the Plan
Proponents believe that, while a proponent of substantive consolidation may bear a heavy burden
of proof, the Debtors, as proponents of Lehman's books and records, face an even heavier
burden—the almost impossible task of demonstrating that such books and records represent and
reflect prepetition reality.   Upon information and belief, neither the Debtors nor the Creditors'
Committee has engaged in a material validation of the Intercompany Claims because of the
enormity and the practical impossibility of the project.  In fact, the Plan Proponents submit that
the Debtors' enormously complex and intertwined Chapter 11 Cases are typical of estates for
which substantive consolidation is both warranted and necessary.   The "heavy burden" of
establishing substantive consolidation is met by the very nature of these cases and the practical
impossibility of sorting out the Debtors' assets and liabilities on a non-consolidated basis.

At bottom, substantive consolidation, as set forth in the Plan and as discussed in
greater detail below, would avoid the need to address many of these difficult intercompany
issues and would save the estates considerable time and massive litigation costs.
Notwithstanding that the Plan seeks to substantively consolidate the Debtors and certain
Affiliates thereof, the Plan also includes certain settlement features designed to avoid the cost
and delay associated with litigation over the appropriateness of substantive consolidation and
other related inter-Debtor issues.  A summary of the key settlements contained in the Plan are set
forth in the following chart:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

| CLAIMANT[3] | SUBSTANTIVE CONSOLIDATION TREATMENT UNDER THE PLAN | PROPOSED SETTLEMENT TREATMENT UNDER THE PLAN |
|---|---|---|
| Senior Unsecured Claims against LBHI | Pro rata share of Consolidated Debtors' assets[4] based upon 1.0 times Allowed Claim amount without dilution from proposed settlement treatments. | Pro rata share of Consolidated Debtors' assets based upon 1.0 times Allowed Claim amount, diluted by settlement treatments, plus pro rata share of Reallocated LBT Distributions, if any and Reallocated LBSN Distributions, if any. |
| Claims against a Subsidiary Debtor with a Guarantee from LBHI | No Distribution on account of Guarantee Claim and pro rata share of Consolidated Debtors' assets based upon 1.0 times Allowed Claim amount against Subsidiary Debtor. | Pro rata share of Consolidated Debtors' assets based upon 1.4 times Allowed Claim (divided between the Primary Claim, which shall receive 1.15 times Allowed Claim and the Guarantee Claim, which shall receive 0.25 times Allowed Claims.) |
| Claims against a Foreign Affiliate with a Guarantee from LBHI | If Primary Obligor is subject to substantive consolidation, unless Foreign Administrator makes assets available for Distribution under the Plan, no Distribution from Consolidated Debtors.<br><br>If Primary Obligor is not subject to substantive consolidation, deemed Disallowance of Claims until certain conditions are satisfied. | Pro rata share of Consolidated Debtors' assets based upon 0.7 times Allowed Claim not subject to further reduction with rights to receive distribution directly from Foreign Affiliate fully retained. |
| Claims of Foreign Affiliates other than LBT and LBSN | Either no Distribution from chapter 11 Debtors as a consequence of substantive consolidation or elimination or reduction of Allowed Claim through litigation. | Pro rata share of Consolidated Debtors' assets at an Allowed amount to be agreed upon. |
| LBT and LBSN Claims against LBHI | No Distribution from chapter 11 Debtors. | Pro rata share of Consolidated Debtors' assets based upon 1.0 times Allowed Claim amount, which shall be deemed Allowed in the amount of $33.17 billion with respect to LBT and $5.25 billion with respect to LBSN (each the balance as of Global Close). |
| Claims against LBT and LBSN with a Guarantee from LBHI | No Distribution on account of Guarantee Claim and pro rata share of Consolidated Debtors' assets from its estates based upon 1.0 times Allowed Claim amount against LBT or LBSN, as applicable. | Pro rata share of Consolidated Debtors' assets based upon 0.5 times Allowed Claim amount, not subject to further reduction and rights to receive distributions directly from LBT or LBSN, as applicable, fully retained. |

---

[3] Recoveries set forth in this chart do not reflect additional entitlements that may exist as a consequence of enforcement of contractual subordination rights.

[4] The Consolidated Debtors' assets shall include the assets of the Designated Non-Debtor Affiliates (which are subject to substantive consolidation under the Plan) solely to the extent such Designated Non-Debtor Affiliate makes its assets available for Distribution under the Plan. In absence of so doing, the Plan provides for other equitable relief with respect to such other Designated Non-Debtor Affiliates.

As addressed in the above table, with respect to certain Classes that could, in theory, receive greater distributions under a non-substantively consolidating plan, the Plan offers certain enhanced treatments as consideration for accepting the Plan.  Under the Plan, holders of Claims against the Consolidated Debtors (other than LBHI) and holders of Third-Party Guarantee Claims for which a Consolidated Debtor is the Primary Obligor on the corresponding Primary Claim are entitled to receive Distributions over those amounts such creditors would receive in a purely substantively consolidating plan, provided that such holders hold Claims in a Class that votes to accept the Plan.  In the event that the requisite Classes vote to accept the Plan and the Plan is confirmed, the relevant Debtors' estates will be deemed substantively consolidated as part of a plan settlement pursuant to sections 1123(a)(5) and (b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure.  In the event that one or more requisite Classes fail to accept the Plan, the Plan Proponents intend to seek a determination from the Bankruptcy Court that the substantive consolidation of one or more of the Debtors' estates is appropriate as a matter of law and fact.  Under either scenario, holders of Claims in any Class that fails to accept the Plan shall not be entitled to receive enhanced Distributions.

Although the Plan Proponents believe that substantive consolidation of the assets and liabilities of all of the Lehman Non-Debtor Affiliates, including the Foreign Affiliates, with those of the Debtors is warranted, to avoid potential delay caused by, among other things, jurisdictional considerations, as well as in consideration of judicial economy, the Plan seeks to substantively consolidate only certain of the Non-Debtor Affiliates.  The Plan Proponents anticipate engaging in negotiations regarding the terms of the Plan with representatives of the Foreign Affiliates and key stakeholders thereof who may be asserting, among other things, Guarantee Claims and Intercompany Claims against the Debtors.  In the event such negotiations are unsuccessful, the Plan provides for the substantive consolidation of certain Designated Non-Debtor Affiliates, as well as the imposition of other legal and equitable relief from the Bankruptcy Court relating to most or all Foreign Affiliates.

The Plan Proponents believe that the Plan represents a fair economic resolution for all of the Debtors' claimants that will expedite the administration of the Debtors' Chapter 11 Cases, accelerate recoveries to creditors of all estates and enhance judicial efficiencies by avoiding protracted litigation over inter-Debtor disputes and other issues which would otherwise exist outside of a substantive consolidation, including disputes related to Intercompany Claims and asset ownership.  The Plan thus enables the Debtors' estates to avoid incurring costs and extended delay that would otherwise result from litigation of the multifaceted and complex issues raised by the Debtors' Plan, as well as issues which the Debtors' Plan does not purport to resolve, including inter-Debtor allocations of assets and liabilities and any of the myriad of asset ownership disputes.  Finally, the proposed settlement with and offer of enhanced treatment to LBT and holders of related Guarantee Claims are the product of extensive but yet incomplete discussions with certain holders of material Claims against LBT, including related Guarantee Claims against LBHI.  Such discussions remain ongoing.

### B. Basis For Substantive Consolidation

#### 1. Overview

Substantive consolidation is an equitable remedy designed to carry out the chief purpose of the Bankruptcy Code – the equitable treatment of all creditors.  Under controlling authority, substantive consolidation is appropriate where one of the following two factors exists: (1) creditors transacted with affiliated entities as a single economic unit and did not rely on their separate identity in extending credit or (2) the affairs of affiliated entities are so entangled that consolidation will benefit all creditors of those entities.  See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988).  The facts and circumstances of Lehman Brothers' business operations and insolvency proceedings satisfy both alternative factors of this test.  Substantive consolidation of the assets and liabilities of LBHI and its direct and indirect subsidiaries and affiliates is therefore appropriate and necessary to ensure the equitable treatment of all Lehman Brothers' creditors.  Indeed, in the only comparable liquidation of an investment bank – that of Drexel Burnham Lambert Group, Inc. – the Bankruptcy Court for the Southern District of New York substantively consolidated not only the domestic trading subsidiaries, but also former broker-dealer and foreign trading operations.  See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992).

In Drexel, the court found that there were adequate grounds to approve the substantive consolidation provided for in the debtors' plan of reorganization.  In reaching this conclusion, the court provided a list of factors that should be considered when ascertaining whether the interrelationship between the entities warrants substantive consolidation:

- the existence of guarantees of affiliates' liabilities;

- the assumption by the parent company of contractual obligations of its subsidiaries;

- the failure to distinguish between the property of each entity;

- the degree of difficulty in segregating and ascertaining individual assets and liabilities of each entity;

- the shifting of funds from one company to another without observing corporate formalities;

- the subsidiary having grossly inadequate capital;

- the sharing of overhead, management, accounting, and other related expenses among the different corporate entities;

- the parent paying the salaries of its subsidiaries' employees;

- the parent owning all or a majority of the capital stock of its subsidiaries;

- the parent and its affiliates having common directors and officers;

- the parent shifting individuals on and off the subsidiaries' board of directors;

- the parent or other affiliates financing subsidiaries;

- the parent referring to the subsidiary as a department or a division;

- the directors of the subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent;

- the parent, its affiliates, and the subsidiary acting from the same business location; and

- the subsidiary having substantially no business except that with the parent or its affiliates or no assets except those conveyed to it by the parent of an affiliate.

Id. at 764. The Plan Proponents believe that many, if not all, of these factors exist here, as well as certain other facts not present in Drexel that further support substantive consolidation.

The court in Drexel also noted that it must be considered whether there are benefits that could accrue to creditors from substantive consolidation such as (i) "potential savings in costs and time by eliminating the need to disentangle the records and accounts of the debtors"; (ii) "elimination of duplicate claims and the need to adjudicate which debtor is liable"; (iii) "financial benefit from consolidating the operations of the debtors"; and (iv) "whether consolidation would enhance debtor rehabilitation and thereby produce a reorganized enterprise with greater profit potential." Id. at 765. In the instant case, the Plan Proponents believe that substantive consolidation would enable the avoidance of the costs and extended time that would otherwise be incurred in connection with litigation of the multifaceted and complex issues among and between each of the Debtors and their Foreign Affiliates.

The Debtors themselves acknowledge that substantive consolidation is a legitimate and possible outcome for these Chapter 11 Cases, concluding that "entity-specific facts weigh both in favor and against substantive consolidation." (Debtors' Disclosure Statement at 81.) Indeed, the Debtors list twelve factors that would support the substantive consolidation of the Debtors, including that "(i) Lehman operated as if it were one company that was organized by business division, not necessarily by legal entity; (ii) LBHI's board of directors and executive committee had responsibility for Lehman's firm-wide strategy, risk, funding, liquidity, operations and products; (iii) Foreign Debtors and non-Debtor Affiliates were utilized to raise capital in foreign currencies to enable Lehman to manage the risk in movements in foreign currencies exchange rates; (iv) one investment committee existed for all Lehman's transactions; (v) the Debtors shared administrative and back-office functions; (vi) certain Debtors had certain overlapping directors and officers; (vii) certain subsidiaries had no employees or physical premises, (viii) Lehman's cash-management systems were centralized and managed on a firm-wide basis through LBHI; (ix) tax returns were filed with the IRS on a consolidated basis; (x) creditors generally transacted with Lehman as one economic enterprise and did not rely on the separate identity or credit of any single Affiliate; (xi) creditors did not have access to financial statements of most of the Affiliates; and (xii) LBHI purportedly guaranteed all obligations of certain of its subsidiaries." (Id. at 82.) By contrast, the Debtors list only five factors that, if established, might weigh against substantive consolidation of the Debtors. (Id.)

The Debtors' Chief Executive Officer has expressed views as to the merits of substantively consolidating the Lehman Entities. Specifically, at the September 22, 2010 hearing before the Bankruptcy Court, Mr. Bryan Marsal explained that "[t]he company, on the substantive consolidation side, was operated as one company . . . it really was not managed on a legal-entity basis." (Hr'g Tr. 45:1-45:3, Sep. 22, 2010.) Mr. Marsal continued, "[t]here was a centralized cash management system and really, reliance - - there's no apparent - - as far as we can see, there's no good argument made for separate credit analysis. There was one entity that we saw from a financial credit analysis standpoint that people were looking to." (Id. at 45:13-17.)[5] Also supportive of this viewpoint is Justice Briggs, who oversees certain aspects of LBIE's insolvency proceedings and who has found that "[t]he [Lehman Brothers] Group sought to present itself to the world, and to organize itself internally, as a single integrated business enterprise, rather than a collection of separate legal entities . . . . " In the Matter of Lehman Brothers International (Europe) (In Administration), [2010] EWHC 2914 (Ch) [49] (the "RASCALS Opinion"). The Debtors have expressly reserved the right to withdraw the Debtors' Plan and propose an alternative plan, which the Debtors have indicated may "contemplate global consolidation of the Debtors." (Debtors' Disclosure Statement at 131.)

Even the Examiner, while not tasked to investigate the appropriateness of substantive consolidation of the Debtors, has laid out certain facts that strongly favor substantively consolidating the Debtors' estates. For instance, with respect to the manner in which the Lehman enterprise conducted its business prepetition, the Examiner found:

> Lehman functioned as an integrated company, and in general structured and managed its businesses along different product lines within the three divisions. Lehman and its subsidiaries typically presented themselves to the public as "Lehman" or "Lehman Brothers." Customers typically had a relationship with LBI, but Lehman employees would book certain trades to the legal entity within Lehman that corresponded to the product being traded, or that satisfied tax, financing or regulatory considerations. Multiple Lehman entities often were used to structure particular types of transactions. As a result, customers whose relationships were with LBI would, in fact, often have their business transacted through other Lehman entities. Those customers generally did not rely on the [separate] credit rating of those Lehman entities; indeed, those customers sometimes were not even aware that Lehman entities other than LBI were involved in their transactions.

(Examiner's Report vol. 5 [Docket No. 8307] at 1967-68 (footnotes omitted)). Moreover, the Examiner states that "Lehman personnel asserted that customers did not rely on the credit ratings of [LBHI affiliate operating companies that regularly traded], with the exception of LBDP and LBFP [the separately rated entities]." (Id. at 1970 (footnotes omitted).)

---

[5] Debtors' counsel clarified at the hearing that these statements were not intended to constitute admissions and were being made for informational purposes only. (Hr'g Tr. 46:7-46:11, Sep. 22, 2010.) The statements are included herein for informational purposes, as well.

Based on the foregoing, and as discussed in more detail herein, numerous facts militate in favor of the substantive consolidation of all Lehman Entities. In proposing this Disclosure Statement, the Plan Proponents have relied on a variety of primary and secondary sources to prepare the ensuing disclosures, including the Examiner's Report (including the voluminous exhibits made available in connection therewith), pleadings and exhibits filed with the Court, discussions with the Debtors, market participants and counterparties to the Lehman enterprise as well as prepetition securities filings of the Debtors. Certain other materials have been made available from third-party proceedings, including adversary proceedings in these cases and legal proceedings involving Foreign Affiliates. All factual disclosures made herein are based on materials currently available and reflect, as of the date hereof, the Plan Proponents' best information and belief as to the Debtors' operations. Because the Debtors are believed to be in possession of a substantial volume of materials directly relevant to the following disclosures, the Plan Proponents reserve the right to amend and supplement this Disclosure Statement to reflect additional and/or modified disclosures once production of such materials is made.

    **2.**    **Creditors Dealt With Lehman as a Single Economic Unit and Did Not Rely on the Separate Identity of LBHI's Affiliates When Extending Credit**

In connection with any substantive consolidation litigation, the Plan Proponents intend to demonstrate that counterparties did not rely on the separate creditworthiness of the Lehman Entities, and in particular, the derivative subsidiaries, for a variety of reasons. First, counterparties apparently traded with Lehman Brothers with the expectation that all trades would be honored. From the perspective of trading parties, commercial transactions such as the trading of equities, loans and bonds with an unregulated trading affiliate were not contemplated to be an extension of credit (other than to the Lehman Group as a whole) or require a credit analysis. Accordingly, a credit risk analysis in respect to any particular Lehman subsidiary was unnecessary, particularly as substantially all of these obligations were purportedly guaranteed by LBHI. Investment banks active in the business of trading, such as Lehman Brothers, guaranteed the obligations of their respective trading subsidiaries as a matter of course. Parent guarantees became customary as they helped promote a secure and efficient trading environment. Like other big investment banks, LBHI guaranteed its subsidiaries' obligations in almost every trade to assure the counterparty that its trades would execute and settle as contemplated by the governing ISDAs. To that end, credit mitigation covenants with respect to LBHI, such as ratings triggers, were almost always included in the ISDAs. As derivative trades were safeguarded by daily mark-to-market accounting and guarantees from investment-grade banking institutions, counterparties engaging in trading activities were indifferent to the credit risk of any particular Lehman Entity. Accordingly, most counterparties to Lehman ISDAs likely did not conduct any due diligence relating to the credit risk of individual Lehman subsidiaries engaged in trading activities.

Also, because the majority of Lehman Entities that were used for booking trades were unregulated subsidiaries, they did not engage in formal financial reporting. The market recognized that these entities were simply booking entities used by Lehman Brothers for legal, tax and regulatory reasons. Consequently, even if counterparties wanted to conduct due diligence on the separate credit risk of such unregulated entities, up-to-date financial reports were generally unavailable. Moreover, even if separate financial statements were available,

because they were unaudited, not subject to regulatory oversight and distorted by extensive intercompany activities, counterparties could not reasonably rely on such statements to assess the creditworthiness of unregulated subsidiaries.  A credit analysis of LBHI, on the other hand, was more reliable because, among other things (i) LBHI's public company filings and audited financial statements were readily available, making LBHI's financial state significantly more transparent; (ii) LBHI had ratings from various rating agencies, which ratings were obtained on the basis of the Lehman Group's consolidated balance sheet; and (iii) LBHI was financially viable and had access to the capital markets.

With respect to trading between Lehman Brothers and broker-dealer counterparties, broker-dealers generally were not aware of whether they were trading with Lehman Brothers or any other broker-dealer because in the inter-dealer market, third-party brokers match broker-dealers to maintain their anonymity.  Notably, when a broker-dealer trades with another broker-dealer, the trade is executed by an inter-dealer broker and confirmed with what is colloquially called "the Street."  Thus, broker-dealers cannot plausibly argue that they relied on the creditworthiness of a Lehman counterparty as the trade would have been brokered by a third party.

As trading activities with Lehman unregulated subsidiaries were completed pursuant to parent company guarantees, unregulated entities were viewed by trading counterparties simply as an extension of the Lehman Group.  With respect to trading activities with other broker-dealers, Lehman Brothers notified other broker dealer counterparties of the Lehman Entity in which their transactions would be recorded only after the trade was booked and frequently had more than one ISDA negotiated with each counterparty to facilitate this structure.  Based on the product selected by the counterparty, Lehman Brothers would record the transaction in the Lehman Entity in which such products were recorded.  Moreover, pursuant to the Transfer Provisions (as defined below), Lehman Brothers had the right to assign the transactions covered by the ISDA to certain other Affiliates at any time based on its sole discretion.  Given Lehman Brothers' approach to ISDAs and the Transfer Provisions, the credit risk of any particular Lehman derivative subsidiary had little meaning.  Accordingly, counterparties focused their due diligence on the creditworthiness of LBHI and relied on the credit mitigants negotiated in the ISDAs in the event LBHI's long-term credit rating was downgraded.  Counterparties entered into ISDAs with Lehman Brothers as long as they were comfortable with the creditworthiness of LBHI and the Lehman Entities as a consolidated business enterprise.

Counterparties also could not rely on the separate creditworthiness of Lehman trading subsidiaries as it was generally recognized that these entities were not independently viable operative companies.  Any attempted credit analysis of Lehman Brothers' unregulated subsidiaries would have been futile given that such entities had no access to liquidity or capital, other than that provided by their affiliates.  These entities typically had extensive intercompany dealings, many of which were apparently not conducted on an arms' length basis.  Moreover, as described in more detail below, all cash on the books of Lehman trading subsidiaries (such as LBSF) were swept daily, leaving such entities with only unsecured intercompany claims at the close of each day.  Once the daily sweep occurred, such entities no longer had control or possession over their purported assets.  In addition, collateral was typically held by broker-dealer affiliates such as LBI and LBIE upon settlement and was made available to them for use in the

normal course of their clearance and settlement activities. As a result, unregulated Lehman Entities had little, if any, control over the possession of their securities and were seldom provided with protections typically afforded to third-party customers for the safekeeping of their securities. Counterparties thus could not (and did not) rely on the subsidiary's books to assess its credit exposure. Indeed, at the end of the third quarter, prior to LBSF's bankruptcy filing, internal financial statements indicate that LBSF had an estimated leverage ratio of 200 to 1 (assets of $106 billion to equity of $468 million as of August 31, 2008), (see Barclays Litigation Exhibits, BCI EX 00115133); notwithstanding this massive leverage ratio (which did not even include substantial off-balance sheet leverage), however, counterparties and other third parties continued to conduct business with LBSF on an unsecured basis.

Counterparties' treatment of the Lehman Entities as a single enterprise is also readily evident in the lack of capital protections and other related negative covenants in the swap agreements governing each trade. The swap agreements did not impose any requirements such as (i) audited financial statements; (ii) collateralization of intercompany receivables; (iii) a credit rating; (iv) triggers in the ISDA that references the derivative subsidiary; (v) restrictions on cash flow; and/or (vi) other capital requirements. In addition, if a particular counterparty to a swap agreement was actually focused on the creditworthiness of the derivative subsidiary alone, LBHI had two rated derivatives subsidiaries – LBFP and LBDP – with which the counterparty could request to transact. To the extent counterparties entered into swap transactions with LBSF or other unregulated derivative subsidiaries, the counterparties were exclusively relying on the guarantee of LBHI, and not on the separate creditworthiness of that derivative subsidiary.

Moreover, many Lehman ISDAs contained a provision permitting the Lehman Entity party thereto to transfer freely its rights and obligations to any other Lehman Entity (the "Transfer Provision"). For administrative ease, Lehman Brothers requested the Transfer Provision to allow it to quickly and seamlessly transfer third-party OTC derivative contracts between subsidiaries to achieve the most favorable economic advantage for the Lehman Group as a whole. Given that domestic and foreign regulations governing derivative subsidiaries were constantly evolving, the Transfer Provisions gave Lehman Brothers the flexibility to shift books of derivative contracts from one Lehman Entity to another based on which entity was subject to jurisdiction with the most favorable legal, tax or regulatory requirements. For example, a book of products would be moved from a regulated broker-dealer entity such as LBIE to an unregulated derivative subsidiary such as LBSF if capital charges for that particular product were determined by LBHI, in its sole discretion, to be non-economical based upon its assessment of the underlying risk. Simply put, the Transfer Provisions allowed Lehman Brothers to move derivative positions from entity to entity without going through the cumbersome exercise of obtaining counterparty consent each time. ISDA counterparties typically agreed to such Transfer Provisions because their transactions were guaranteed by LBHI under the ISDA and they were indifferent as to which Lehman Entity was deemed to be the trading counterparty. Lehman Brothers negotiated for and received these Transfer Provisions because it was widely understood that the unregulated subsidiaries were merely booking sites and counterparties were generally unconcerned by such transfers, which could occur at any time without providing prior notice to the applicable counterparty or obtaining such counterparty's consent.

The Transfer Provisions, which appear both in inter-Lehman agreements as well as in agreements with third parties, were found in ISDAs attached to proofs of claim filed against

the Debtors. For example, Part 5(c) of the Schedule to Master ISDA Agreement dated April 23, 2004, by and between LOTC and LBI provides:

> Transfer. Notwithstanding anything to the contrary . . . in this Agreement, [LBI] may assign its rights and obligations under this Agreement . . . to any Affiliate of [LBHI] effective upon delivery to [LOTC] of the guarantee by [LBHI], in favor of [LOTC], of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

Such Transfer Provisions were typically included in ISDAs involving an unregulated derivative subsidiary where LBHI agreed to guarantee that Lehman counterparty's obligations thereunder. See, e.g., Schedule to Master ISDA Agreement dated April 23, 2004, by and between LOTC and LBI, part 5(c) [Proof of Claim No. 64122]; Schedule to the Master ISDA Agreement dated November 3, 1997, by and between LBIE and LBI, part 5(d) [Proof of Claim No. 64122]; Master ISDA Agreement dated July 23, 1986, by and among Shearson LBSF, Shearson LBHI, and Shearson LBI, ¶ 9 [Proof of Claim No. 67147]; Schedule to Master ISDA Agreement dated October 31, 2007, by and between LBSF and The Hospitals of Ontario Pension Plan Trust Fund, part 5(k) [Proof of Claim No. 16235]; Schedule to Master ISDA Agreement dated September 12, 2008, by and between LBSF and Credit Suisse International, part 5(j) [Proof of Claim No. 22813]; Schedule to the Master ISDA Agreement dated April 5, 2007, by and between LBIE and Genfina SA., part 5(c) [Proof of Claim No. 3584].

## 3. Intercompany Entanglements

### a. Integrated Business Operations

The Plan Proponents also intend to demonstrate in connection with any substantive consolidation litigation that Lehman Brothers operated as one integrated business in the global financial markets. Lehman utilized three business segments – Capital Markets, Investment Banking and Investment Management – to offer a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. A multitude of entities, ranging from regulated broker-dealer entities, such as LBIE and LBI, to unregulated derivative and loan trading subsidiaries, such as LBSF and LCPI, were formed and organized along these three business segments.

Because Lehman Brothers operated as one integrated business entity, its operational strategies were driven by economic considerations of the Lehman Group as a whole, and not by economic considerations as they related to individual Lehman Entities on a standalone basis. As such, corporate formalities and the legal separateness of each Lehman Entity were disregarded as a means to achieve greater efficiencies for Lehman Brothers as a whole. Consequently, Lehman Brothers freely transferred assets such as cash, securities holdings and other collateral from one Lehman Entity to another, as discussed below. Lehman Brothers also engaged in hedging activities to control market and credit risk of the Lehman Group as a whole, and without regard to the market and credit risk profile of any specific Lehman Entity. Such activities were achieved through a labyrinth of multi-billion dollar intercompany transactions that resulted in intercompany balances that in many cases bear no

relation to the economic realities of the intercompany transactions that actually took place or the underlying third-party transaction.

      To further achieve net efficiencies across the Lehman Group, Lehman Brothers' operational infrastructure was highly integrated and centralized, and characterized by, among other things:  (i) a centralized cash management system designed to collect and transfer funds generated by its global operations and disburse those funds to satisfy the obligations required to operate its global businesses; (ii) centralized securities and clearing operations, which were all integrated and localized in LBI or a local broker-dealer affiliate within a foreign jurisdiction; (iii) a centralized paymaster that funded all operating costs and expenses on behalf of the applicable Lehman Entities, including costs and expenses relating to overhead, personnel, legal, accounting, financial and other professional services, intellectual and information technology resources, and local and federal taxes; (iv) a single employer – LBI or local entity within a foreign jurisdiction – that employed all employees within that area; (v) integrated IT and accounting systems; (vi) centralized structure for management of LBHI's subsidiaries; (vii) consolidated financial statements; and (viii) shared bank and depository accounts where assets of various Lehman Entities were comingled.

      By way of example, Lehman Brothers' trading activities prominently demonstrate the nature and extent of the interdependencies and entanglement among Lehman Entities. Evidence will show that LBHI and its direct and indirect subsidiaries and affiliates (other than special purpose vehicles) operated as a single, integrated entity to facilitate and implement trading activities in global equity, debt and commodity markets.  Specifically, Lehman Brothers' 4,000 subsidiary entities collectively shared information across 2,700 software applications and global ledgers to produce, clear, and settle hundreds of thousands of trading transactions each day.

      In connection with that activity, Lehman Brothers' unregulated affiliates were largely used as "booking sites" for trades and did not have any independent capability to execute and settle trades.  Standing alone, these unregulated entities had no real economic substance and no ability to finance themselves or conduct business independently.  They had few, if any, employees, and were managed under a group-wide management system.  Substantially all transactions booked in unregulated affiliates were conducted by employees of Lehman Brothers' broker-dealer entities – such as LBI or LBIE – and by the traders employed by such broker-dealer entities.  For example, substantially all U.S. Lehman Brothers employees were employed by LBI.  Further, LBI salesmen and traders dealt with customers and counterparties as an integrated business and had the ability to book transactions across all Lehman Entities.  Based on the nature of the trade and its underlying instrument, LBI traders booked trades in the Lehman Entity predesignated by Lehman Brothers' central management to carry such trades for legal, tax or regulatory reasons.  One trade could spawn multiple downstream intercompany transactions among multiple legal entities as Lehman aimed to balance the overall net trading position. Depending on whether the trade rendered Lehman Brothers long or short in its net position, a series of responsive intercompany transactions would be implemented to balance Lehman Brothers' overall trade position.

      In such a case, which is not only indicative of Lehman's operational strategy but also indicative of what are believed to be hundreds of thousands of transactions between Lehman

Entities, any attempt to view each Lehman Entity involved on a standalone basis would materially distort the economic reality of the transaction.

To further complicate matters, Lehman Brothers' unregulated subsidiaries neither had possession nor control over their assets.  The unregulated entities were subject to daily cash sweeps, daily movement of securities and collateral and a variety of intercompany charges connected to services provided or procured by LBI.  Corporate formalities were ignored as Lehman Brothers' management exercised unfettered discretion to transfer cash, collateral and securities holdings from one subsidiary to another or transfer market risks from one entity to another through the use of intercompany derivative transactions or parent blanket guarantees and side letters to maximize economic advantage to the Lehman Group.  In addition, assets of subsidiaries were not safeguarded through customer agreements or safekeeping arrangements and were generally comingled with those of other subsidiaries to allow Lehman's broker-dealer affiliates, including LBI and LBIE, maximum ability to utilize these assets in clearing and settling customer and proprietary activities of Lehman Brothers.

With respect to these intercompany arrangements, Justice Briggs noted that, with respect to LBIE, "[n]one of these agreements were negotiated at arm's length between their various parties, all of which were wholly owned subsidiaries of sub-subsidiaries of LBHI." (RASCALS Opinion ¶ 106.)  Moreover, "[f]ar from being the product of any bargaining process, they appear to have been put in place mainly . . . for purposes of having more to do with being able to demonstrate fact-patterns about inter-company dealings relevant to regulators, auditors and fiscal authorities, rather than to serve as binding and rigidly enforceable contracts between the entities concerned." Id.

As a consequence, Lehman's unregulated subsidiaries' books are believed to consist almost entirely of facially inscrutable intercompany balances generated by a complicated web of intercompany transactions that in some cases reflect years of intercompany transactions. Further, if marketable securities were included on the balance sheet of an unregulated subsidiary, such securities were not in its possession and control and were likely not safeguarded, rendering any separate credit analysis even more unreliable.

### (i)  Intercompany Financings and Securities Settlements

As noted, as part of its integrated operations, Lehman Brothers engaged in a complicated web of intercompany financings to conduct day-to-day business.  There were three key players in intercompany financings – LBHI, LBI and LBIE.  LBHI played the role of the equity and debt capital provider, and provided unsecured intercompany financing to its subsidiaries and affiliates.  LBI and LBIE, as regulated broker-dealer entities in the United States and Europe, respectively, settled securities transactions on behalf of other Lehman Entities, such as LBSF, and also provided the vast majority of secured financing to the Lehman Entities.  Only LBI, LBIE and other broker-dealer affiliates had the ability to settle securities transactions. Other Lehman Entities, such as LBSF, were merely booking locations and lacked the necessary licenses, accounts and staff to participate directly in securities transactions in the market. Accordingly, LBI, LBIE or another broker-dealer affiliate (depending on the jurisdiction in which the trade was booked) had to effectuate securities transactions on behalf of "booking-only" Lehman Entities.  To implement such securities transactions, intercompany settlement

processes were set up to generate trade tickets and accounting entries which had the effect of daily repurchase transactions (also referred to as a "repo") or stock loans between LBIE or LBI and the booking-only Lehman Entity. These intercompany settlement processes were designed to settle securities transactions efficiently from the standpoint of Lehman Brothers as a whole, and to provide a pool of collateral to the broker-dealer entities for use in financing and settling customer and proprietary transactions.

Lehman Entities generally financed their long securities positions and arranged for the settlement of their short positions through a complex and opaque series of intercompany secured borrowing and lending transactions. An unregulated Lehman subsidiary acquiring securities typically received financing from a broker-dealer affiliate settling the trade through the use of intercompany repo agreements. In these transactions, the unregulated Lehman subsidiary surrendered its security as collateral to obtain the financing. In other words, LBI or LBIE would borrow money from a repo counterparty to settle its affiliates' purchase, and book an intercompany journal entry to record the internal repo financing of this purchase. Because Lehman Entities (other than LBI, LBIE and, in certain jurisdictions, other broker-dealer affiliates) lacked the capability of settling transactions, they generally did not enter into repo agreements directly with other market participants. If secured financing was not available, LBHI would directly finance the Lehman Entity with unsecured intercompany loans.

As liquidity tightened in 2007, and especially after the Federal Reserve Bank opened up the discount window in March 2008, Lehman Brothers engaged in a frantic rush to finance its risky illiquid assets. This led to many complex intercompany transactions involving the pledge or sale of securities, loans or other financial instruments among the Lehman Entities and the establishment of large intercompany balances. On information and belief, these intercompany transactions were not conducted at arms-length and may not be adequately reflected in the intercompany balances. These intercompany transactions had little economic substance and, in many cases, were potentially designed to achieve a desired reporting result.

Billions of dollars of these intercompany transactions related to the ultimate pledging of collateral to JPMorgan in late 2008. On March 24, 2010, the Court approved a Collateral Disposition Agreement between the Debtors and JPMorgan, pursuant to which many of those pledged assets were returned to the Debtors' estates. The Collateral Disposition Agreement, however, does not alleviate concerns with unraveling the underlying intercompany transactions that resulted in those assets being pledged because underlying questions relating to ownership of those assets persist among the estates of the Debtors and their Affiliates.

These intercompany transactions had the following consequences, among others: (1) the sheer complexity of the transactions created uncertainty in determining the legal relationship among the parties to a particular transaction, and (2) because it would be difficult, if not impossible, in many circumstances to peel away layers of complexity, no definitive conclusions regarding asset ownership could be forthcoming even upon extensive investigation.

One example of intercompany settlement processes used by the Lehman Entities is a process referred to as the Regulation and Administration of Safe Custody and Local Settlement ("RASCALS"). The Lehman Entities applied the RASCALS process to large classes of securities acquired by LBIE, which acted as a hub for the account of Affiliates, including

LBF, LBSF, LBCCA and LBAH.  In the typical case, the Affiliate purported to confer upon LBIE its proprietary interest in the underlying security, leaving the Affiliate with a contractual right against LBIE to recover its proprietary interest in equivalent securities at a future date.  The intended effect of the processes (whether or not successful) was to replace an unsecured obligation by the Affiliate to refund LBIE the purchase price for the acquisition of the security from the street with a secured obligation of the Affiliate to pay for its re-acquisition from LBIE of an equivalent security under the RASCALS processes, whereby paying the repurchase price under the off-leg of a repo or paying back the collateral pledged during the pendency of a stock loan (repos and stock loans being the two types of transaction used by RASCALS).  It was not Lehman's intention that the purchases and re-purchases under the RASCALS process be cash settled. Rather, payment and repayment was intended to be achieved, in form by what might "loosely [be] call[ed] book entries," but in substance by a series of successive offsets. (RASCALS Opinion ¶ 16.)

Due to the intricacies of the above-described intercompany financings and the failure by the Lehman Entities to treat such financings as arms' length transactions and safeguard each Lehman Entity's assets from comingling, a dispute arose among various Lehman Entities with regard to the ownership of the securities held by LBIE and subjected to the RASCALS process.  Recently, on November 19, 2010, Justice Briggs held that LBIE held a proprietary interest in the underlying securities subjected to RASCALS and remained a secured creditor of Affiliates because of the effect of the underlying repo transactions among the various Affiliates even though no cash moved.  The Court noted, however, that even assuming LBIE has an interest in those securities, the ownership of these assets remains unclear because of ongoing uncertainty about liens that would extend over those assets under affiliate custodian agreements. (RASCALS Opinion ¶ 216 ("They are subject to various other competing claims, and to the resolution of issues such as lien and the consequences of shortfall which are not for determination on this application.").)  LBIE, in fact, recently indicated that the resolution of the extended liens issue is critical and material to the winding down of LBIE.  (Joint Administrators' Progress Report for the Period 15 September 2010 to 14 March 2011 at 5, 20.)

Similar intercompany repo arrangements exist by and among various other Lehman Entities.  For example, LBHI entered into transactions with LCPI characterized as intercompany repos of approximately $5.5 billion[6] whereby LCPI breached the repo by failing to repurchase the securities subject to the repo, similar to the circumstances analyzed by Justice Briggs.  (See LCPI Schedules filed June 14, 2009, Rider B16; Examiner's Report vol. 5 [Docket No. 8307] at Appendix 22 ¶ 15 ("Technically, these transactions were recorded in MTS as repos and reverse repos.").)  Whether LBHI is a secured creditor of LCPI with respect to this collateral and entitled to billions of dollars of deficiency claims for any related mark-to-market shortfall because of LCPI's failure to repurchase the securities is just one of the many issues plaguing any attempt to determine with any rigor the intercompany ownership of assets.

Additionally, certain Lehman Entities existed principally for the purpose of raising capital.  For instance, LBT was incorporated to finance the business activities of the

---

[6] In the original Schedules filed by LCPI, the intercompany repo balance was approximately $13 billion, which decreased to $5.5 billion in the Schedules filed only three months later.  (See LCPI Schedules filed March 11, 2009, Rider B16.)

Lehman Group by issuing financial instruments – in particular structured notes – to institutional and private (including retail) investors. Upon issuing these notes, LBT would transfer the proceeds to LBHI through intercompany loans. Accordingly, LBT's only substantial asset is its Intercompany Claims against LBHI and its only substantial liabilities are the amounts it owes to its noteholders. LBSN served a similar purpose. Creditors recognized that such entities had little or no economic substance and instead looked, if at all, only to LBHI's creditworthiness.

By using these entities to raise capital and by issuing guarantees thereof, LBHI effectively obligated itself twice for the same debt. The Plan Proponents submit that to allow one creditor to assert two dollars in claims for every one dollar of loss from the same debtor violates principles of ratable distribution and offends notions of uniform treatment for creditors. The Plan Proponents therefore believe that, even absent substantive consolidation, Guarantee Claims based on notes issued by these entities should be disallowed in their entirety.

### (ii)    Pooling of Material Assets

As a consequence of certain of the foregoing "financing" transactions, substantial doubt remains over the legal title to many material assets within the Lehman Brothers enterprise. Indeed, the Debtors have filed a myriad of motions purporting to seek relief advancing the collective good of all Debtor estates "without prejudice" to key issues regarding any individual estate's rights against other estates. These "without prejudice" motions and inter-Debtor reservations of rights have been necessitated by, among other things, the manner in which Lehman operated its enterprise and the difficulties inherent in unpacking sophisticated financing structures and transactions such that they can be viewed on an estate-by-estate basis. Particularly in connection with the frantic desire to finance increasingly illiquid assets throughout 2007 and 2008 (as more fully described in the Examiner's Report and below), the movement of assets and liabilities between individual Debtors was both so complicated and convoluted that, in the absence of substantive consolidation, significant and time-consuming judicial intervention will be needed to determine definitively which Debtor estate owns or has an interest in what assets and where material third-party and intercompany liabilities properly reside.

For example, in Lehman Brothers Holdings Inc.'s and Lehman Commercial Paper Inc.'s Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Transfer Funds to Rosslyn LB Syndication Partner LLC, dated May 25, 2010 (the "Rosslyn Motion") [Docket No. 9238], the Debtors state that "LCPI may have, at some point, formally owned Rosslyn LB, but has since purportedly sold a 100% participation interest in it (or in Rosslyn LB's 78.5% interest to Rosslyn JV) to RACERS, and, as a result, Rosslyn LB's 78.5% limited partnership interest in Rosslyn JV may be legally or beneficially under the purported indirect control of RACERS." (Rosslyn Motion ¶ 15 (emphasis added).) In the Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement Between Lehman Brothers Holdings Inc., Lehman Commercial Paper Inc., Silver Lake Credit Fund, L.P. and Silver Lake Financial Associates, L.P., dated June 23, 2010 (the "Silver Lake Motion") [Docket No. 9808], the Debtors state:

> In the ordinary course of its business during the prepetition period, LBHI entered into various repurchase transactions with, among others, LCPI in an effort to obtain financing using its assets as

> collateral. The SLCF Interest may have been pledged by LBHI as
> collateral to LCPI in connection with such a prepetition
> transaction.

(Silver Lake Motion ¶ 8 (emphasis added).)   In LBHI's Motion Pursuant to Sections 105(a),
363(b)(1) and 363(f) of the Bankruptcy Code and Rule 6004(h) of the Bankruptcy Rules for
Authorization to Transfer Certain Mortgage Servicing Rights to Aurora Bank FSB, dated June
23, 2010 (the "Aurora Motion") [Docket No. 9809], the Debtors state:

> In the ordinary course of its business during the prepetition period,
> LBHI entered into various repurchase transactions with, amongst
> others, [LCPI], . . . in an effort to obtain financing using LBHI's
> assets as collateral.  It may be the case that LBHI's MSRs,
> including the Designated Fannie Mae MSRs to be transferred to
> the Bank pursuant to this Motion, were pledged as collateral to
> LCPI in connection with such a prepetition transaction.

(Aurora Motion ¶ 24 (emphasis added.)    And, in LBHI's and LCPI's Motion Pursuant to
Bankruptcy Rule 9019 to Enter into the Release and Termination of Loan Agreement and Other
Documents with TS Boston Core Holdings, L.P.; 125 High Junior Mezz, L.P.; One Federal
Intermediate Mezz, L.P.; One Federal Junior Mezz, L.P.; and Other Borrower Affiliates, dated
July 27, 2010 (the "One Federal Plaza Motion") [Docket No. 10462], the Debtors state that
"Lehman's records are unclear as to the exact interests purportedly participated to RACERS . . ."
(One Federal Plaza Motion ¶ 25 n.3.)

            Similar ownership and entanglement issues have arisen in connection with (i) the
Motion of Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code for
Authority to Consent to Its Non-Debtor Affiliate Lehman ALI Inc. (I) Entering Into Commitment
Letter with Innkeepers USA Trust; (II) Supporting the Chapter 11 Plan of Certain Affiliates of
Innkeepers USA Trust; and (III) Participating in the Auction for Certain of the Assets or Equity
of Innkeepers USA Trust, dated March 22, 2011 [Docket No. 15259]; (ii) the Motion Pursuant to
Sections 105 and 363 of the Bankruptcy Code for Approval of the Purchase of Notes Issued by
Pine CCS, Ltd. from Barclays Bank PLC and the Termination of the Pine Securitization, dated
March 23, 2011 [Docket No. 15283]; (iii) the Motion of Lehman Brothers Holdings Inc.
Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to
Make Additional Investments with Respect to 25 and 45 Broad Street, dated March 22, 2011
[Docket No. 15257]; (iv) Motion of LBHI Pursuant to Sections 105 and 363 of the Bankruptcy
Code for Approval of Two Note Purchase Agreements with the Insolvency Administrator of
Lehman Brothers Bankhaus AG (in Insolvenz) [Docket No. 14743]; (v) the Debtors' Motion
Pursuant to Section 363 of the Bankruptcy Code for an Order (I) Allowing LCPI to Acquire
Certain Loans Through a Joint Venture and (II) Authorizing LCPI and LBHI to Provide Gap
Funding Through a Term Loan, Revolver, and Preferred Equity Investment [Docket No. 10647];
(vi) State Street Bank and Trust Company v. Lehman Commercial Paper Inc. [Adv. P. No. 08-
01743]; (vii) the Motion of Lehman Brothers Holdings Inc. Pursuant to Section 363 of the
Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure for Authority
to Amend Participation Agreements and to Purchase Additional Participation Interests Related to
Heritage Fields Property [Docket No. 10523]; (viii) LCPI's Motion Pursuant to Section 363 of

the Bankruptcy Code for Authority to (I) Consent to Its Non-Debtor Affiliate Lehman ALI Inc. (A) Entry Into Plan Support Agreement Related to the Restructuring of Innkeepers USA Trust; and (B) Consummation of the Transactions Set Forth in the Plan Term Sheet; and (II) Provide Funds to Solar Finance Inc., a Non-Debtor Affiliate, to Provide Debtor-In-Possession Financing, dated July 27, 2010 [Docket No. 10465]; and (ix) the Debtors' Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Authorizing Lehman Commercial Paper Inc. to Settle Dispute with the Metropolitan Life Insurance Company, dated March 2, 2009 [Docket No. 2978].

### (iii)    Enterprise-Focused Hedging Activities

As noted above, Lehman Brothers' hedging activities were designed to control market and credit risks of the enterprise on a global basis. Accordingly, Lehman focused on hedging risk along business groups and product lines, not risk as it pertained to a specific Lehman Entity. Such hedging activities often resulted in a cascading series of intercompany entries in an attempt to balance the respective risk positions of Lehman Entities. In essence, LBHI and other operating subsidiaries committed their assets to support the underwriting of other entities' increasingly risky assets or positions. This was done apparently without regard to the business prospects or financial soundness of any one particular entity, and any attempt to view such transactions on an estate-by-estate basis would lead to economic irrationalities and abnormalities.

### (iv)    Certain Cash Management and Centralized Operational Activities

Lehman Brothers utilized centralized cash management systems to collect and transfer the funds generated by their operations and disburse such money to fund the consolidated business. More specifically:

- LBHI acted as the central banker for the Lehman Entities, aggregating excess cash for investment and advancing money to certain subsidiaries to cover shortfalls, primarily through its main operating account at Citibank (the "Main Operating Account"). (Cash Management Motion ¶ 10.)

- In the United States, LBHI generally collected cash through (i) daily upstream of excess cash generated by its unregulated subsidiaries, (ii) occasional cash paydown of intercompany debt by its regulated subsidiaries, (iii) interest income on investments and principal payments from maturity on investments, (iv) debt issuances, and (v) asset sale proceeds. This cash was collected into the Main Operating Account. In Europe, the UK "branch" of LBHI served the same function as LBHI in the United States. (Cash Management Motion ¶¶ 12, 14.)

  - If an unregulated subsidiary had a positive cash position at the end of the business day, LBHI swept all excess cash into the Main Operating Account. If an unregulated subsidiary had a negative cash position at the end of the business day, LBHI funded the shortfall. (Cash Management Motion ¶ 16.)

o  Regulated subsidiaries on occasion upstreamed cash to LBHI to pay down intercompany debts or received cash from LBHI to fund any shortfalls. (Cash Management Motion ¶ 17.)

o  Cash and securities activities of unregulated subsidiaries generally cleared through LBI, which acted as the clearing and settlement agent for group activities.

• Generally, unregulated domestic subsidiaries did not maintain their own collection or disbursement bank accounts. Instead, their collections or disbursements were implemented through the accounts owned by the other domestic subsidiaries. LBSF and LBIE settled certain transactions, including derivatives, futures, and foreign exchange transactions into LBI's bank accounts. (Cash Management Motion ¶¶ 13, 15.)

• European subsidiaries also did not maintain separate bank accounts. Rather, they utilized LBI, LBIE and LBHI to settle securities transactions, receive and make cash payments, and secure financing for their operations. For instance, "LBF had no bank account of its own and was therefore unable directly to settle unsecured inter-company balances with LBIE by cash payment." (RASCALS Opinion ¶ 184.) "At the end of each month, temporary journal entries were made reflecting a netting, as between LBIE and LBF, of all unsecured inter-company balances, and the novation of the resulting net balance to LBHI. . . . LBHI was interposed between LBF and LBIE, so that any net debt on the unsecured inter-company account owed by LBF to LBIE was replaced by a debt from LBF to LBHI, and a debt from LBHI to LBIE. If the net balance was owed the other way, LBIE would owe LBHI, and LBHI would owe LBF. Similar arrangements existed as between LBIE and certain other affiliates, including LBSF, LBCCA and LBAH, but not LBI." (RASCALS Opinion ¶ 184.)

As a result of the foregoing, few, if any, of the Lehman Entities could – or did – operate on a standalone basis. These entities lacked access to, among other things, cash or other current assets, employees or staff, information systems, intellectual property or physical space in which to operate. Any attempt to treat each Lehman Entity as a distinct corporate entity would require a host of assumptions and estimations with respect to cash and operations that are inconsistent with each Lehman Entity's balance sheet. These countless centralized operational activities further highlight the need for substantive consolidation to provide an equitable distribution scheme.

### b.  Intercompany Claims

The financial schedules filed in these Chapter 11 Cases reflect that there are billions of dollars of unsecured Intercompany Claims among the various Lehman Entities. Not surprisingly, many of these Intercompany Claims constitute a large portion of the assets held by each Lehman Entity's bankruptcy estate. For example, LBHI has listed approximately $210 billion in assets, of which an estimated $147 billion is net intercompany receivables. (See Debtors' Disclosure Statement Exhibit 2A at 279.)

These Intercompany Claims are derived from a complex web of intercompany transactions that were entered in connection with, among others, resale and repurchase agreements, securities borrowed and lending transactions, borrow/pledge transactions, client margin loans and derivative transactions, with many starting with a third-party transaction, but

most reflecting intercompany financing activity. Accurate reconciliation of such intercompany claims has yet to occur (although substantial time has passed since the commencement of the Debtors' Chapter 11 Cases) because such intercompany claims often involved multiple Lehman Entities (many of which are currently involved in foreign insolvency proceedings) and their values are keyed to one or more underlying assets or indices of asset values and therefore, are subject to movements in the market. In other words, one market transaction executed by a Lehman Entity could spawn multiple downstream intercompany transactions necessary to settle the trade, hedge the risk and move collateral between affiliates in order to obtain financing. Because intercompany balances were routinely netted, any legal recognition of such balances would require an evaluation of tens if not hundreds of thousands of transactions, as well as the processes for their recordation. Even if one were to accept as valid all routine intercompany book entries such as cash receipts and disbursements, payroll and service allocations, and securities settlements, the general ledger of each Lehman Entity is expected to contain thousands of non-ordinary course transactions that form the basis of the net balances presented. All such non-ordinary course transactions are subject to evaluation and potential disallowance or recharacterization in the absence of substantive consolidation.

The pervasive use of "Repo 105" adds to the complexity and difficulty of arriving at a legitimate reflection of intercompany obligations. Repo 105 transactions served no legitimate business purpose and instead were used by Lehman to temporarily remove securities inventory from its balance sheet and to allegedly materially mislead the public as to the true financial condition of the consolidated enterprise in late 2007 and 2008. Lehman engaged in tens of billions of dollars of Repo 105 transactions at quarter-end in late 2007 and early 2008. By first quarter 2008, Lehman had temporarily removed $49 billion of assets from its balance sheet at quarter end through Repo transactions.

The Repo 105 transactions involved the transfer of investment grade securities by Lehman to banks in the United Kingdom in return for short term loans for cash, which was used to pay down liabilities. Lehman recorded such a transaction as a "sale" although the transfer was made with the binding understanding that Lehman would repurchase the same securities from the bank within a short time in return for improved balance sheet "metrics."

Because Lehman could not obtain a true sale opinion under U.S. law, Lehman was forced to run the Repo 105 transactions through LBIE, which could engage in transactions that could be categorized as "sales." Accordingly, to effectuate Repo 105, Lehman would transfer tens of billions of dollars of securities from across the enterprise through intercompany transactions. As a consequence, the books and records may be infected with tens of billions of dollars of non arm's length and potentially fraudulent transactions.

Adding another layer to the complexity and uncertainty, the accuracy of intercompany balances reflected on each of the Lehman Entity's books is subject to inherent flaws in Lehman Brothers' accounting systems. On information and belief, Lehman Entities' books were maintained by accounting softwares that produced results depending on the "coding" of each of the tens of thousands of accounts. Put another way, the balances of such accounts would only be accurate in the unlikely event that the tens of thousands of accounts were each correctly coded by Lehman Brothers' employees. If an account was incorrectly coded, the resulting balance would also be incorrect, and such inaccuracy would go uncorrected until the

mistake was identified through a complex reconciliation process of intercompany transactions and balances.  These various coding errors and mistakes were apparent in the LBI SIPA allocation motion where more than $500 million of intercompany coding transactions were sought to be recharacterized from non-customer to customer accounts.  (See SIPA Allocation Motion at ¶¶ 93, 94.)  The extent of these coding errors makes clear that mistakes were made and that the intercompany balances reflected on each Lehman Entity's books contain inaccuracies that, absent substantive consolidation, would need to be analyzed – at great time and expense – to determine their true nature, if one were to pursue a "books and records" case.

These intercompany relationships are often largely circular and of potential questionable substance.  These "Lehman Group Loops" exist on a large scale among, for instance, LBHI, LBIE, LBSN, LBF, and LBAH.  The circular nature of these relationships can be depicted as follows:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

# Lehman Group Loops
$ in millions



---

1.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 8, Annex 8-3.
2.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 6, Annex B-2.
3.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 8, Annex 8-3.
4.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 6, Annex B-2.
5.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 8, Annex 8-3.
6.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 8, Annex 8-3.
7.   Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan Exhibit 6, Annex B-2; Exhibit 8, Annex 8-3.
8.   Claim No. 63847, Attachment A.
9.   LBIE (In Administration) v. Lehman Brothers Finance & ors [2010] EWHC 2914 (Ch), ¶ 147.
10.   LBIE (In Administration) v. Lehman Brothers Finance & ors [2010] EWHC 2914 (Ch), ¶ 147.
11.   Claim Nos. 58151 and 58163.
12.   Claim No. 58654.
13.   Claim No. 58145.
14.   *See generally*, LBIE (In Administration) v. Lehman Brothers Finance & ors [2010] EWHC 2914 (Ch).
15.   Claim No. 63847, Attachment A.
16.   Claim No. 58655.

For this and other reasons, the Plan Proponents have designated LBIE, LBF, and LBAH, as well as LB RE 1 and LB RE 2 as Designated Non-Debtor Affiliates subject to substantive consolidation.   Additionally, the Plan Proponents reserve the right to designate additional Affiliates or other entities as Designated Non-Debtor Affiliates upon taking formal discovery.   In the absence of substantive consolidation, the unwinding of these Lehman Group Loops and others could take years.   In the Debtors' Motion for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlements with Bamburgh Investments (UK) Ltd and Corfe Investments (UK) Ltd, dated December 11, 2009, the Debtors already essentially collapsed a complicated Lehman Group Loop among various Lehman Entities, thereby eliminating an aggregate amount of intercompany claims totaling in excess of €9 billion.   Notwithstanding the substantive consolidation of any Foreign Affiliate, the Plan provides for the continued recognition of the priority rights of trust claimants and customers to the extent provided for under the laws of the applicable local jurisdictions.

The Plan Proponents anticipate that certain parties in interest will assert (even in the absence of the filing of the Plan) that certain Intercompany Claims asserted by one Lehman Entity against another Lehman Entity are subject to recharacterization as Equity Interests.   In other chapter 11 cases, courts have looked to a variety of factors to determine whether an investment that purports to be debt should be recharacterized as equity, including: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

On a theoretical deconsolidated basis, certain Intercompany Claims represent a substantial asset of certain estates and a material liability of others.   The Plan Proponents do not believe, however, that any party seeking such recharacterization can successfully recharacterize and pursue a deconsolidated plan of reorganization.   As an initial matter, a number of the factors listed above, if proven, would only serve to demonstrate that Lehman Entities neither conducted intercompany business on an arms-length basis nor kept accurate books and records, each of which would support by inference the assertion that the Affiliate at issue should be substantively consolidated with LBHI.   Additionally, if Intercompany Claims were recharacterized as Equity Interests, one Lehman Entity's insolvency (which would be worsened by the recharacterization itself) would lead to fraudulent transfer claims against its Affiliates for the recharacterized capital contributions, thereby offsetting the effects of recharacterization.

### c.   Intercompany Causes of Action

Given the significant volume and magnitude of transactions by and between Lehman Entities in the years prior to the commencement of the Debtors' Chapter 11 Cases, a substantial number of transactions are subject to bona fide disputes with respect to, not only their economic substance, but also the equitable and legal effects on the various Lehman Entities involved in such transactions.   To the extent that the Lehman Entities are not substantively

consolidated, and, even under the Plan in the absence of a settlement with certain of the Foreign Affiliates, many of these transactions may be subject to avoidance actions brought under chapter 5 of the Bankruptcy Code or recharacterization under general equitable principles. Such litigation is expected to be both expensive and time-consuming, and may result in material reductions or increases in intercompany balances and the net claims of the Lehman Entities. For example, LBHI made over $1.5 billion in capital contributions to LCPI between March and August 2008 (with $900 million capital contributions in August 2008), which, in absence of substantive consolidation, will be subject to avoidance and could potentially result in significant intercompany claims being asserted. (See Examiner's Report vol. 5 [Docket No. 8307] at 1607.) In addition, claims may exist under various prepetition inter-Debtor contracts that will not be reflected in the existing intercompany balances. Such claims could include general breaches of prepetition asset management and cost allocation agreements, as well as breaches of specific transaction-based agreements such as derivative instruments, credit and collateral support agreements, and credit and participation and syndication agreements. To date, the Plan Proponents are unaware of any analysis undertaken by the Debtors to review systematically the various Lehman Entities' potential inter-Debtor causes of action, all of which would need to be evaluated, on a Debtor-by-Debtor basis, with the same rigor applied to third-party transactions in the absence of substantive consolidation of the Debtors. While such review – and any ensuing litigation – is proceeding, in accordance with section 502(d) of the Bankruptcy Code it is likely that no distribution in respect of Intercompany Claims would be made, thereby diminishing available distributions on the Effective Date of any Plan that did not seek substantive consolidation. In particular, in light of the prepetition insolvency of LBHI, each Affiliate Guarantee Claim would need to be scrutinized to determine which debts thereunder were incurred after the first date of insolvency, as under existing precedent such claims would be subject to avoidance on fraudulent conveyance grounds.

### 4. Conclusion

The facts of Drexel have in many ways foreshadowed the current situation of Lehman Brothers. In Drexel, the United States Bankruptcy Court for the Southern District of New York approved substantive consolidation based on facts substantially similar to the facts and circumstances of Lehman Brothers' bankruptcy proceedings. See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y 1992). Similarly to Lehman Brothers, Drexel involved multiple debtors, including broker-dealer entities and unregulated subsidiaries, collectively engaged in the business of providing investment banking, securities brokerage, trading, merchant banking and other financial services. Notably, however, Lehman Brothers' pre and postpetition business operations involve a substantially greater level of entanglement than in Drexel due to Lehman Brothers' integrated operations and the massive volume of intercompany transactions implemented among hundreds of Lehman subsidiaries and affiliates.

The facts detailed above clearly support the substantive consolidation of the various entities that comprise Lehman Brothers. The benefits to be gained by substantive consolidation as provided for under the Plan outweigh any attendant risks or expenses as substantive consolidation would provide for the efficient administration and reorganization of Lehman Brothers' bankruptcy proceedings for the benefit of all creditors involved.

### C. Purported Guarantee and Blanket Guarantee Claims

The Plan also proposes an economic solution with respect to Allowed Claims against LBHI based on its purported guarantee of the liabilities of certain of its Affiliates. As documented above, LBHI frequently guaranteed the obligations of certain of its Affiliates in connection with derivative transactions, the issuances of securities and other commitments pursuant to guarantees executed for the benefit of a particular counterparty or in respect of a particular obligation (each a "Transaction Guarantee"). In addition, LBHI purportedly entered into various guarantees or other support agreements (collectively, the "Blanket Guarantees"), including:

- on various dates, LBHI enacted various unanimous written consents of the Board of Directors of Lehman Brothers Holdings Inc. (the "Guarantee Resolutions"), which suggest that LBHI could fully guarantee all liabilities, obligations and commitments of over 20 specified subsidiaries of LBHI, including LBIE, LBSF, LBAH, LBB, Lehman Brothers Commercial Bank, LBCC, Lehman Brothers Commercial Corporation Asia Limited, Lehman Brothers, Equity Finance (Cayman) Limited, LBF, Lehman Brothers Holdings Plc, Lehman Brothers Japan Inc., Lehman Brothers (Luxembourg) Equity Finance S.A., Lehman Brothers (Luxembourg) S.A., LOTC, Lehman Brothers Securities Asia Limited, LBSN, LBT, Lehman Re Limited, LBCS, Lehman Brothers Bank, FSB, Lehman Brothers Finance Asia Pte. Ltd., and Lehman Brothers PTE Ltd. (collectively, the "Guaranteed Subsidiaries"), (see Examiner's Report vol. 5 1774);

- on January 4, 2008, LBHI purportedly issued a Blanket Guarantee to Standard & Poor's Rating Services on behalf of any counterparty of LBIE (the "S&P Guarantee");

- on November 21, 2002 and July 19, 2006, LBHI purportedly issued Blanket Guarantees to LBB on behalf of any counterparty of LBB (the "Bankhaus Guarantees");

- on August 15, 2002, LBHI purportedly entered into that certain Security & Collateral Agreement with LBB (the "SCA"), pursuant to which LBHI purportedly agreed to post cash collateral to LBB in respect of any losses suffered by LBB if either an asset decreases in value below a certain level, or a borrower fails to make a payment when due and payable; and

On information and belief, the Blanket Guarantees were issued to achieve favorable regulatory outcomes associated with intercompany dealings or to establish bases for separate credit ratings; the Blanket Guarantees were not issued in connection with any specific transactions. Also on information and belief, the Blanket Guarantees were maintained internally and their existence was rarely disclosed to third-party trading counterparties.

Based on the most recent estimates provided by the Debtors, an outstanding aggregate amount of $104.1 billion of Guarantee Claims have been asserted against LBHI. Of this amount, $91.7 billion has been asserted by third parties while $12.2 billion has been asserted by LBHI's own Affiliates. Undoubtedly, a substantial portion of these claims (both by third parties and Affiliates) have been asserted based solely on the Blanket Guarantees.

The Plan Proponents intend to challenge the validity of various Guarantee Claims and the enforceability of the underlying Transaction Guarantee and Blanket Guarantees. A determination regarding the enforceability of the Blanket Guarantees and the validity of a Claim asserted by a third-party creditor necessitates engaging in extensive factual and legal analysis. Litigation with respect to the enforceability of Guarantees will require the Court to determine, among other matters: (i) whether the Blanket Guarantees constitute valid agreements between LBHI and the Guaranteed Subsidiaries and/or a third-party creditor, (ii) whether a third-party creditor was an intended third-party beneficiary of such contract, (iii) whether a third-party creditor had actual knowledge of the Blanket Guarantees and relied upon them at the point in time that such creditor transacted business with a Guaranteed Subsidiary, (iv) whether the Blanket Guarantees were intended to protect other Affiliates of LBHI and (v) whether the Blanket Guarantees or obligations allegedly incurred thereunder are avoidable under chapter 5 of the Bankruptcy Code. Each of these matters present underlying issues that would be a precondition to allowance of, and distribution of recoveries in respect of, such claims.

Based upon their initial review of the Blanket Guarantees, the Plan Proponents have concluded that substantial questions exist with respect to the enforceability of the Blanket Guarantees. First, certain of the Blanket Guarantees fail to evidence the clear and explicit intent required by law to create a guarantee as such Blanket Guarantees contemplate the issuance of further documentation to evidence the guarantees. Rather, such Blanket Guarantees are merely in the nature of an agreement to agree which is unenforceable as a matter of law. Second, even if the Guarantee Resolutions constitute enforceable guarantees, the facts and circumstances associated with the creation of the Guarantee Resolutions make clear that the parties did not intend the Guarantee Resolutions to benefit Affiliates on account of intercompany transactions and therefore, the Affiliate Guarantee Claims based on Guarantee Resolutions should be disallowed. Third, based on the small percentage of Claims filed by third parties on account of the Guarantee Resolutions, it is unlikely that any third parties actually relied on such Guarantee Resolutions when extending credit to a Lehman Entity. Finally, certain Blanket Guarantee Claims at LBHI are likely avoidable under sections 544, 547 or 548 of the Bankruptcy Code as preferential and/or fraudulent transfers. It appears that LBHI did not receive reasonably equivalent value in exchange for incurring any of the purported guarantee obligations, LBHI was insolvent when certain of the purported obligations were incurred, and certain of the underlying transfers which purportedly triggered guarantee obligations occurred within the preference period.

With respect to Transaction Guarantees, the Court would be required to review each Transaction Guarantee and the circumstances surrounding the entry into the underlying contract or obligation and determine (i) whether the guarantees are valid and enforceable contracts, (ii) whether the guarantees were properly executed, (iii) whether the counterparty actually relied upon the Transaction Guarantee at the time that it transacted business, (iv) when the underlying debt arose in relation to the solvency of LBHI, and (v) whether the Guarantee or any obligation allegedly incurred thereunder is avoidable under chapter 5 of the Bankruptcy Code. The Plan Proponents' rights to challenge the enforceability of Guarantee Claims are reserved in all respects, including the right to seek to avoid any of the Transaction Guarantees on the basis that it is avoidable under either of section 544, 547 or 548 of the Bankruptcy Code as fraudulent transfers. Indeed, under existing Second Circuit precedent, any guarantee claim at LBHI would be subject to avoidance if the underlying debt was incurred after the insolvency of

LBHI and the primary obligor.  See Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 990 (2d Cir. 1981); see also Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant Inc.), 337 B.R. 495, 502 n.3 (Bankr. S.D.N.Y. 2006).  For example, in that the Debtors have admitted the insolvency of LBHI and LBSF as of June 2008, each debt incurred by LBSF after that date would not be supported by a valid Transaction Guarantee claim at LBHI, and any filed claim in respect thereof would be subject to disallowance.

In the absence of substantive consolidation, the Plan Proponents intend to seek a determination that (i) Guarantee Claims must be reduced, for voting and distribution purposes, by the amount of actual distributions received or anticipated to be received on account of the corresponding Primary Claim and (ii) such claims must be reduced to reflect the economic effect of having each intercompany account offset by an amount equal to actual distributions made by LBHI to holders of Guarantee Claims in respect of the guaranteed Lehman Entity.  If a Class of Third-Party Guarantee Claims votes to accept the Plan, however, the holders of Allowed Claims in such Class shall receive the treatment set forth in the Plan without reduction based upon distributions received or anticipated to be received on account of the corresponding Primary Claim, up to a full single satisfaction.

### D.  Side Letter Claims

The existence of "back-to-back" transactions between Affiliates and third parties and certain single paragraph side-letter arrangements ("Side-Letter Arrangements"), coupled with the assertion of Guarantee Claims under the Guarantee Resolutions and Transaction Guarantees, further highlights the need for substantive consolidation or, in the absence thereof, to eliminate or substantially reduce such Claims on other equitable or legal grounds.

One example of many of such arrangements is evidenced by that certain side letter between LBSF and LBIE, dated July 24, 2006, which purports to pass the risk of certain derivative transactions between LBIE and a third party to LBSF – i.e., LBIE purports to act as a mere pass-through entity.  As stated by LBIE, "[t]he Side Letter provided for LBSF and LBIE to adopt close-out mechanics as set forth therein with the intent that all client counterparty risk incurred by LBIE would be passed through to LBSF."  (Proof of Claim No. 21530 (emphasis added).)  The effect of this arrangement was to, in form, create two transactions where, in substance, it was intended that there only be one.  LBIE has asserted a $23 billion claim against LBSF in connection with this side letter.

Permitting Distributions to be made on account of Transaction Guarantees, Blanket Guarantees, Side-Letter Arrangements, and the related Primary Claim will allow third-party creditors to receive, in essence, four distributions on account of a single injury – one against the Primary Obligor on account of the Primary Claim, a second against LBHI on account of the Transaction Guarantee, a third against LBHI indirectly through the Primary Obligor on account of the Guarantee Resolution and a fourth against LBHI indirectly through the Primary Obligor on account of the Side-Letter Arrangement.  If permitted to occur, this would be grossly inequitable.



   In the absence of substantive consolidation, a determination regarding the enforceability of each Side-Letter Arrangement will be required.  The Court will need to determine, among other matters, (i) whether the Side-Letter Arrangements are valid and enforceable contracts, (ii) whether the Side-Letter Arrangements were properly executed, (iii) whether the Side-Letter Arrangements were intended to protect other Affiliates of LBHI against a bankruptcy of LBHI or its Affiliates, and (iv) whether the Side-Letter Arrangements are avoidable under chapter 5 of the Bankruptcy Code.

   In addition to the above-referenced Guarantee Claims and back-to-back transactions, there are a multitude of other intercompany arrangements that are susceptible to fraudulent conveyance actions thus underscoring the need for substantive consolidation.

### E.  Inflated Derivative Claims

   A number of parties have filed significant Claims against the Debtors based on Derivative Contracts, including Claims against LBHI based on Guarantees thereof, which are supported by purported market values around the time of Lehman's bankruptcy filing. In light of the recent Third Circuit decision in In re American Home Mortgage Holdings, Inc., No. 09-4295, 2011 WL 522945 (3d Cir. Feb. 16, 2011), the Plan Proponents believe that such claims may be grossly overstated and subject to significant reduction or disallowance.

American Home discusses the application of section 562(b) of the Bankruptcy Code to the allowance of claims arising under a terminated repurchase agreement. Sections 562(a) and (b) provide:

> (a) If the trustee rejects a swap agreement, securities contract (as defined in section 741), forward contract, commodity contract (as defined in section 761), repurchase agreement, or master netting agreement pursuant to section 365(a), or if a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of--
>
> > (1) the date of such rejection; or
> >
> > (2) the date or dates of such liquidation, termination, or acceleration.
>
> (b) If there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value.

11 U.S.C. § 562(a), (b) (emphasis added).

In American Home, market value as a measure of damages at the time of termination was not available as a "commercially reasonable determinant of value," because the market was "dysfunctional" as of the date of such termination. Id. at *10. Ultimately, the court in American Home determined that a discounted cash flow analysis provided an appropriate measure of damages. Using a discounted cash flow analysis, the court determined that the repo lender, which had asserted a deficiency claim of approximately $478 million relating to an original repurchase price of approximately $1.2 billion, was not entitled to any allowed claim. Although American Home addressed specifically a deficiency claim arising under a repo contract, section 562(b) is not so limiting and applies to all safe-harbor type contracts.

Applying American Home, it is clear that section 562(b) of the Bankruptcy Code prohibits parties from utilizing market determinants when asserting claims arising under all safe-harbor type contracts while the applicable market is not functioning properly.

It is beyond reasonable dispute that the financial markets generally were not functioning properly at the time of Lehman's collapse. As such, claims under derivative contracts and repurchase agreements based on purported market values at that time are improperly valued and likely overstated. More information, however, is required to determine the magnitude of the potential overstatement of claims. Nevertheless, the facts of American Home and the elimination of a $475 million claim provides an example of the potential impact that proper application of section 562(b) may have on claims allowance.

### F.  The Debtors' Plan

As the Debtors have acknowledged, the outcome of the Chapter 11 Cases invariably depends on the resolution of a myriad of inter-Debtor, inter-creditor and Debtor-creditor issues, including, but not limited to (i) the potential substantive consolidation of the Debtors and certain of their Affiliates, (ii) the validity and enforceability of Guarantee Claims, (iii) the Allowed amount of Intercompany Claims, including as between the Debtors themselves, (iv) the characterization of certain intercompany balances owed to LBHI by certain Subsidiary Debtors, (v) the potential equitable, contractual or statutory subordination of certain Claims, and (vi) the ownership and rights of various Debtors and their Affiliates with respect to certain assets. Notwithstanding this, the Debtors have made little progress fostering meaningful discussions and negotiations between the Debtor estates' respective creditor constituencies.  (See Debtors' Disclosure Statement at 2.)

The Debtors' First Plan purported to effect a settlement of certain issues, including substantive consolidation by allowing Affiliate Guarantee Claims in the aggregate amount of approximately $21 billion and capping Third-Party Guarantee Claims in the aggregate amount of approximately $94 billion.  As evidenced by the Debtors' most recent Claims estimates, which estimate the Allowed amount of Affiliate Guarantee Claims to be approximately $12 billion and the Allowed amount of Third-Party Guarantee Claims to be approximately $92 billion, the Debtors' First Plan, if confirmed and consummated, would have effected no economic settlement of key issues referenced above, including substantive consolidation.

Accordingly, on June 29, 2010, the Plan Proponents filed a preliminary objection to the Debtors' First Plan on the basis that, among other things, such plan did not reflect a fair assessment of the risks and rewards attendant to an active litigation of inter-Debtor disputes and, moreover, with respect to various foreign and domestic affiliates of LBHI, the Debtors' First Plan did not reflect a realistic assessment of the risks and rewards of such litigation.

Following the filing of the Group's preliminary objection and filing of the Group's First Plan, the Debtors amended the Debtors' First Plan.  Such amendments acknowledge the inequities that were inherent in the Debtors' First Plan, but the Plan Proponents believe that the Debtors' Plan remains both unconfirmable and unfair.

The Debtors' Plan reflects a series of purported "settlements" proposed by the Debtors in an attempt to reconcile two potential opposing structures for allocating estate value:  a plan premised on global or partial substantive consolidation of the Debtors' estates and a series of individual Debtor plans that purport to recognize strictly the corporate identity of each Debtor and the allowance of all Intercompany Claims and Guarantee Claims of affiliated Debtors and their respective creditors as recorded in the Debtors' books and records.  In pertinent part, substantive consolidation would eliminate intercompany claims, guarantee claims against any consolidated entity that guaranteed the obligations of another consolidated entity, and any disputes concerning the ownership of assets among the consolidated entities.  A strict entity-by-entity approach, on the other hand, will require examination of tens, if not hundreds, of thousands of intercompany transactions giving rise to claims or causes of action.  In the Debtors' Disclosure Statement, the Debtors readily acknowledge that substantive consolidation is a

possible approach to the treatment of creditors and claims across the various Debtor estates and a potentially legitimate outcome for these Chapter 11 Cases. (Debtors' Disclosure Statement at 81-83.) The Debtors further disclose that there are a number of facts that would support the substantive consolidation of the Debtors. (Debtors' Disclosure Statement at 82.)

Despite recognition that the inter-Debtor issues are the subject of legitimate debate, the Debtors seek to justify their decision to propose settlements of all inter-Debtor issues, ostensibly on the basis that litigation could take years to resolve. The Debtors' Disclosure Statement, however, provides only generically described analyses that the Debtors claim to have performed and fails to provide any detailed analysis or explanation for how the avoidance of such litigation justified the proposed settlements. For example, the Debtors state:

> The percentage of Distributions from holders of Claims against Participating Subsidiary Debtors that will be reallocated for each Class is calculated by using a weighted average of two scenarios: (1) a compromise of various issues that does not provide for the substantive consolidation of the Debtors and (2) a compromise of various issues, including substantive consolidation of LBHI and the Participating Subsidiary Debtors. The calculations of the recovery amounts in scenario 1 are weighed at 80% and in scenario 2 are weighed at 20%.

(Debtors' Disclosure Statement at 87.) Nowhere, however, do the Debtors describe with any detail why an 80/20 split is appropriate and why, for instance, a 50/50 split is not.

Based upon their stated perception of cost and delay, the Debtors assert that the Debtors' Plan will resolve all claims and expedite the administration of the Debtors' Chapter 11 Cases by accelerating recoveries to creditors and avoiding the potential costs and extended time that would purportedly be incurred in connection with litigation of multifaceted and complex issues associated with the Chapter 11 Cases, including the inter-Debtor issues.

The Plan Proponents strongly dispute the Debtors' conclusions and believe that the Debtors' Plan is fundamentally flawed. First, the Debtors' proposed allocation of value within the individual Debtor estates, particularly with respect to its proposed treatment of inter-estate conflicts, is virtually impossible to evaluate given the unresolved ownership and entanglement issues explained above. Neither creditors nor the Debtors can assess the fairness of the inter-Debtor and inter-Affiliate settlements proposed by the Debtors' Plan without first understanding the value of such settlements, which necessarily requires a far more nuanced and informed determination of asset ownership and third-party and intercompany liabilities of each Debtor. Given the difficulties inherent in untangling sophisticated intercompany financing structures and transactions and the attendant movement of assets and liabilities between individual Debtors, however, an informed evaluation of such inter-Debtor issues cannot be achieved without incurring exorbitant costs and other resources over a course of many years, if at all. (The Debtors have so far not done this.) Put simply, the Debtors' Plan requires either foregoing a fairness evaluation and accepting ad hoc allocations of value to each of the Debtors or incurring all of the costs and extended time the Debtors' Plan purports to avoid.

In addition, the Plan Proponents do not believe that the Debtors' Plan, even as amended, reflects a fair assessment of the risks and rewards attendant to an active litigation of inter-Debtor issues.  The Group believes that, under the Debtors' Plan, Debtors and other affiliates of LBHI will be permitted to participate to a disproportionately large extent in distributions from both their primary obligor, and against LBHI, their purported guarantor.  As explained above, substantial grounds may exist that would permit the Bankruptcy Court to substantively consolidate the Debtors and their Foreign Affiliates if the issue is litigated.  If the Debtors were substantively consolidated, such creditors would be left with a single claim against the Consolidated Debtors and, on account thereof, a single vote on any proposed plan of reorganization.  The Group believes that this risk is not adequately reflected.

Further, the Debtors' Plan contemplates the implementation of a "Debtor Allocation Agreement" which purports to resolve (i) "the costs and benefits of Jointly Owned Litigation Claims," (ii) "commonly held tax benefits and obligations," (iii) expenses of administration of the Chapter 11 Cases, and (vi) "certain other [unspecified] inter-Debtor related issues."  (See Debtors' Plan §§ 1.33, 6.3.)  However, because of significant overlap among the Debtors' key decision makers and because no single management group or independent legal counsel is acting solely in the interest of any particular Debtor in connection with inter-Debtor issues or the Debtors' Plan, it remains unclear how the Debtors intend to implement the Debtor Allocation Agreement or what economics that agreement would embody.  The Non-Consolidation Plan Proponents seek the appointment of a "Domestic Operating Company Representative" to act as a fiduciary of the "Domestic Operating Companies" as a means of resolving the "inherent conflict of interest."  (Non-Settlement Disclosure Statement at 7.)  Given that such representative is appointed only upon substantial consummation of the Non-Settlement Plan, it is unclear how such plan can be confirmed while the inter-estate issues remain outstanding.

As well, there is an open question as to how the Debtors (and their counsel) can actually prosecute the Debtors' Plan.  The Group submits that in its current form, the Debtors will not be able to prosecute their plan in absence of acceptance by holders of Senior Claims, General Unsecured Claims and Derivative Claims against LBHI (each as defined in the Debtors' Plan and collectively, the "Pure LBHI Claims").  For instance, to coerce the holders of Pure LBHI Claims to accept the Debtors' Plan, the Debtors' Plan contains an illegal "death trap" that is nothing more than a penalty to be imposed upon the holders of Pure LBHI Claims for failing to accept the plan.  If not accepted by holders of Pure LBHI Claims, the Debtors, to confirm their plan, must cram down the holders of Pure LBHI Claims, which will require LBHI, as one of the plan proponents, to (i) argue that assets of subsidiary Debtors should not be made available to satisfy the claims of its creditors, (ii) advocate for the allowance of certain disputed claims against it in the largest amounts and for the allowance of its disputed claims against other Debtors in reduced amounts, and (iii) support plans at subsidiary Debtors that fail the best interests test with respect to its claims, all of which constitutes a clear breach of fiduciary duties.

Finally, the Debtors state that "[i]f an Affiliate does not enter into a settlement agreement with the applicable Debtor prior to the Voting Deadline as to the Allowed Amount of its Senior Intercompany Claim, Senior Affiliate Guarantee Claim, Intercompany Claim or Affiliate Guarantee Claim, then the Plan and Disclosure Statement shall constitute a motion to estimate such Claim(s) at one dollar" and, moreover, "[t]he estimated Claim shall constitute the

Allowed amount of such Claim for all purposes under the Plan, including, without limitation, voting and Distributions, and no reserves shall be maintained for such Claims." (Debtors' Disclosure Statement at 88-89.) The Plan Proponents support any and all efforts by the Debtors to mitigate Claims.   While the Plan Proponents hope to engage in productive settlement discussions with the Foreign Affiliates regarding the terms of this Plan, the Plan Proponents are prepared to challenge without constraint the Claims of the Foreign Affiliates in the event consensual resolutions cannot be achieved and/or it is determined that the Debtors are constrained in their abilities to challenge the Claims of their Foreign Affiliates.

## III.    OVERVIEW OF PLAN

### A.  Classification of Claims and Equity Interests under the Plan

The Claims asserted against the Consolidated Debtors and certain Non-Debtor Affiliates, as well as Equity Interests in LBHI, are separated into Classes.   Generally, the classification structure of the Plan includes Classes for senior and subordinated unsecured debt, guarantee claims filed by third parties and non-Debtor intercompany claims.

The following table briefly summarizes the classification and treatment of all Claims against the Debtors and the Equity Interests in LBHI under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as Exhibit A.  Furthermore, the Estimated Recoveries included in the below table are based solely upon the financial information publicly disclosed by the Debtors in the Debtors' Disclosure Statement, monthly operating reports, Securities and Exchange Commission filings as well as other publicly available sources.   The Plan Proponents do not warrant the accuracy of such information.   Actual recoveries may be higher or lower than the amounts indicated based upon the actual realization from the liquidation of assets and reconciliation of claims and liabilities.  In addition, for a more detailed description of the terms and provisions of the Plan, see section V – "Summary of the Chapter 11 Plan" of this Disclosure Statement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Payment in Cash by the Consolidated Debtors in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date such holder's Claim becomes an Allowed Claim. | 100%. | Unimpaired, Not Entitled to Vote (Deemed to Accept) |
| 2 | Secured Claims | At the option of the Plan Administrator: (i) payment in Cash by the Consolidated Debtors in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date such Claim becomes an Claim; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Secured Claim is entitled.  In the event an Allowed Claim is treated under clause (i) or (ii) above, the Liens securing such Claim will be deemed released and extinguished without further order of the Bankruptcy Court. | 100%. | Unimpaired, Not Entitled to Vote (Deemed to Accept) |
| 3 | Senior Unsecured Claims | Pro Rata Share of (i) Plan Consideration, (ii) Subordinated Class 5A Distribution, (iii) Subordinated Class 5B Distribution, (iv) Subordinated Class 5C Distribution, Reallocated LBSN Distribution, if any, and (v) Reallocated LBT Distribution, if any. | If all Classes accept, 25.4%. If all Classes reject, 24.4%.[7] | Impaired, Entitled to Vote |
| 4 | General Unsecured Claims | Pro Rata Share of (i) Plan Consideration, (ii) Reallocated LBSN Distribution, if any, and (iii) Reallocated LBT Distribution, if any. | If all Classes accept, 22.6%. If all Classes reject, 21.7%.[7] | Impaired, Entitled to Vote |
| 5A | Subordinated Class 5A Claims | Shall not receive any Distributions on account of such Allowed Claims and instead such Distributions shall be allocated to the holders of Allowed Claims in Class 3 and Class 10 in accordance with Section 9.2 of the Plan until all holders of Allowed Claims in such Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Subordinated Class 5A Claim shall receive its Pro Rata Share of (i) Plan Consideration and (ii) Subordinated Class 5C Distribution. | 0%. | Impaired, Not Entitled to Vote (Deemed to Reject) |
| 5B | Subordinated Class 5B Claims | Shall not receive any Distributions on account of such Allowed Claims and instead such Distributions shall be allocated to the holders of Allowed Claims in Class 3, Class 10, Class 12, and any Class in Classes 8A through 8n that votes to reject the Plan, in accordance with Section 9.2 of the Plan until all holders of Allowed Claims in such | 0%. | Impaired, Not Entitled to Vote (Deemed to Reject) |

[7] The Plan contemplates the waiver of certain litigation rights in the event certain Classes of Claims vote to accept the Plan.  In the event that such Classes vote to reject the Plan, the Plan Proponents believe that recoveries for Class 3 and Class 4 would be higher than as indicated herein as a consequence of the enforcement of such litigation rights. For the purposes of preparing their recovery analysis, the Plan Proponents have not included the benefits that may be derived from the enforcement of litigation rights.  For illustrative purposes only, however, if the Claims in Class 8, Class 9, Class 10 and Class 11 were reduced by 30% as a consequence of litigation, the recoveries for Class 3 and Class 4 would increase to 26.5% and 23.2%, respectively.

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| | | Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Subordinated Class 5B Claim shall receive its Pro Rata Share of (i) Plan Consideration and (ii) Subordinated Class 5C Distribution. | | |
| 5C | Subordinated Class 5C Claims | Shall not receive any Distributions on account of such Allowed Claims and instead such Distributions shall be allocated to the holders of Allowed Claims in Class 3, Class 5A, Class 5B, Class 10, Class 12, and any Class in Classes 8A through 8n that votes to reject the Plan, in accordance with Section 9.2 of the Plan until all holders of Allowed Claims in such Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Subordinated Class 5C Claim shall receive its Pro Rata Share of Plan Consideration | 0%. | Impaired, Not Entitled to Vote (Deemed to Reject) |
| 6A-6n | Subsidiary Unsecured Claims,  as separately designated on a Subsidiary-Debtor-by-Subsidiary-Debtor basis | Pro Rata Share of Plan Consideration; *provided*, *however*, that if a Class in Classes 6A through 6n votes to accept the Plan, the Pro Rata Share for each holder of an Allowed Claim in such accepting Class will be determined using an amount equal to 115% of such Allowed Claim as consideration for the settlement of issues relating to substantive consolidation and similar intercompany disputes provided under the Plan. | If all Classes accept, 22.4%. If all Classes reject, 21.7%. | Impaired, Entitled to Vote |
| 7A-7n | Consolidated Third-Party Guarantee Claims, as separately designated on a Primary-Obligor-by-Primary-Obligor basis | Not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if a Class in Classes 7A through 7n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class will be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share will be determined using an amount equal to 25% of such Allowed Claim, which amount will not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 7A through 7n which accept the Plan on any grounds other than substantive consolidation are fully reserved. | If all Classes accept, 4.9%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 6.2 of the Plan |
| 8A-8n | Senior Non-Consolidated Third-Party Guarantee Claims, as separately designated on a Primary-Obligor-by-Primary-Obligor basis | Pro Rata Share of (i) Plan Consideration, (ii) Subordinated Class 5B Distribution and (iii) Subordinated Class 5C Distribution; *provided*, *however*, that all Claims in Classes 8A through 8n will be deemed Disputed Claims and not entitled to Distributions under the Plan unless and until (a) each Debtor and Debtor-Controlled Entity with a Claim against the applicable Primary Obligor has received all distributions on account of such Claim to the extent enforceable as determined by the Bankruptcy Court without subordination, reduction or offset of any kind unless otherwise agreed to by the Plan Proponents or the Plan Administrator, as applicable, and (b) such holder establishes that it has received all distributions it is entitled to receive on account of its Primary Claim and such Primary Claim has not otherwise received payment | If all Classes accept, 13.6%. If all Classes reject, unknown. | Impaired, Entitled to Vote |

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| | | in full. | | |
| | | If the conditions set forth in subclauses (a) and (b) are not properly satisfied as determined by the Bankruptcy Court before the 3rd anniversary following the Effective Date, such Claim will be deemed a Disallowed Claim and expunged from the claims register; *provided, however,* that if a Class in Classes 8A through 8n votes to accept the Plan, all Claims in such Class will not be deemed Disputed Claims and each holder of an Allowed Claim in such Class will be entitled to receive at the time such Claim becomes an Allowed Claim its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share will be determined using an amount equal to 70% of the holder's Allowed Claim without regard to whether the conditions set forth in subclauses (a) and (b) above have been satisfied and will not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim; *provided further, however,* that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 8A through 8n which accept the Plan on any grounds other than the failure of the conditions set forth in (a) and (b) to be satisfied are fully reserved. | | |
| 9A-9n | General Non-Consolidated Third-Party Guarantee Claims, as separately designated on a Primary-Obligor-by-Primary-Obligor basis | Pro Rata Share of Plan Consideration; *provided, however,* that all Claims in Classes 9A through 9n shall be deemed Disputed Claims and not entitled to Distributions under the Plan unless and until (a) each Debtor and Debtor-Controlled Entity with a Claim against the applicable Primary Obligor has received all distributions on account of such Claim to the extent enforceable as determined by the Bankruptcy Court without subordination, reduction or offset of any kind unless otherwise agreed to by the Plan Proponents or the Plan Administrator, as applicable, and (b) such holder establishes that it has received all distributions it is entitled to receive on account of its Primary Claim and such Primary Claim has not otherwise received payment in full.<br><br>If the conditions set forth in subclauses (a) and (b) are not properly satisfied as determined by the Bankruptcy Court before the 3rd anniversary following the Effective Date, such Claim shall be deemed a Disallowed Claim and expunged from the claims register; *provided, however,* that if a Class in Classes 9A through 9n votes to accept the Plan, all Claims in such Class shall not be deemed Disputed Claims and each holder of an Allowed Claim in such Class shall be entitled to receive at the time such Claim becomes an Allowed Claim its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall be determined using an amount equal to 70% of the holder's Allowed Claim without regard to whether the conditions set forth in subclauses (a) and (b) above have been satisfied and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim; *provided further, however,* that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 9A through 9n which accept the Plan on | If all Classes accept, 13.6%.<br><br>If all Classes reject, unknown. | Impaired, Entitled to Vote |

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| | | any grounds other than the failure of the conditions set forth in subclauses (a) and (b) to be satisfied are fully reserved. | | |
| 10 | Senior Non-Consolidated Intercompany Claims | Subject to Section 9.6 of the Plan, its Pro Rata Share of (i) Plan Consideration, (ii) Subordinated Class 5A Distribution, (iii) Subordinated Class 5B Distribution, (iv) Subordinated Class 5C Distribution. | If all Classes accept, 22.2%. If all Classes reject, unknown. | Impaired, Entitled to Vote |
| 11 | General Non-Consolidated Intercompany Claims | Subject to Section 9.6 of the Plan, its Pro Rata Share of Plan Consideration. | If all Classes accept, 19.4%. If all Classes reject, unknown. | Impaired, Entitled to Vote |
| 12 | Senior Non-Consolidated Affiliate Guarantee Claims | Subject to Section 9.6 of the Plan, its Pro Rata Share of (i) Plan Consideration, (ii) Subordinated Class 5B Distribution and (iii) Subordinated Class 5C Distribution. | If all Classes accept, 22.2%. If all Classes reject, unknown. | Impaired, Entitled to Vote |
| 13 | General Non-Consolidated Affiliate Guarantee Claims | Subject to Section 9.6 of the Plan, its Pro Rata Share of Plan Consideration. | If all Classes accept, 19.4%. If all Classes reject, unknown. | Impaired, Entitled to Vote |
| 14A | LBT Intercompany Claims | Not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14A and Class 15A vote to accept the Plan, the Claims will be Allowed in an aggregate amount equal to $33,170,000,000 and the holder of the Allowed Claim in Class 14A shall be entitled to receive its Pro Rata Share of Plan Consideration. | If all Classes accept, 19.4%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 8.2 of the Plan |
| 14B | LBSN Intercompany Claims | Not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14B and Class 15B vote to accept the Plan, the LBSN Intercompany Claims will be Allowed in an aggregate amount equal to $5,250,000,000 and the holder of the Allowed Claim in Class 14B shall be entitled to receive its Pro Rata Share of Plan Consideration. | If all Classes accept, 19.4%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 8.2 of the Plan |
| 15A | LBT Third-Party Guarantee Claims | Not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14A and Class 15A vote to accept the Plan, each holder of an Allowed Claim in Class 15A shall receive 50% of its Pro Rata Share of Plan Consideration and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim with the remaining 50% of such Pro Rata Share of Plan Consideration made available for Distributions to holders of Allowed Claims in Class 3 and Class 4 as described further in Section 9.3 of the Plan. | If all Classes accept, 9.7%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 8.2 of the Plan |
| 15B | LBSN Third-Party Guarantee Claims | Not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14B and Class 15B vote to accept the Plan, each holder of an Allowed Claim in Class 15B shall receive | If all Classes accept, 9.7%. If all Classes | Impaired, Entitled to Vote Solely for the Purposes of Effecting a |

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| | | 50% of its Pro Rata Share of Plan Consideration and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim with the remaining 50% of such Pro Rata Share of Plan Consideration made available for Distributions to holders of Allowed Claims in Class 3 and Class 4 as described further in Section 9.4 of the Plan. | reject, 0.0%. | Proposed Settlement as set forth in Section 8.2 of the Plan |
| 16A-16n | Designated Non-Debtor Affiliate Intercompany Claims, as separately classified on a Designated-Non-Debtor-Affiliate-by-Designated-Non-Debtor-Affiliate basis | Not entitled to a Distribution as a consequence of substantive consolidation; *provided, however,* that if a Class in Classes 16A through 16n and the corresponding Classes in each of Classes 17A through 17n and Classes 18A through 18n vote to accept the Plan, the Claims in such Class and the Debtor Consolidated Claims against such holder shall be Allowed in an aggregate amount as agreed by the Plan Proponents and the holder of the Allowed Claim in such Class, and such holder shall be entitled to receive its Pro Rata Share of Plan Consideration but solely to the extent the Consolidated Debtors receive distributions from the Designated Non-Debtor Affiliates on account of the Debtor Consolidated Claims without subordination, reduction or offset of any kind unless agreed to by the Plan Proponents or Plan Administrator, as applicable. | If all Classes accept, 19.4%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 7.2 of the Plan |
| 17A-17n | Senior Designated Non-Debtor Affiliate Third-Party Guarantee Claims, as separately designated on a Primary-Obligor-by-Primary-Obligor basis | Not entitled to a Distribution as a consequence of substantive consolidation; *provided, however,* that if a Class in Classes 17A through 17n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class shall be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall be determined using an amount equal to 70% of such Allowed Claim, which amount shall not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII, and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further, however,* that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 17A through 17n which accept the Plan on any grounds other than substantive consolidation are fully reserved. | If all Classes accept, 13.6%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 7.2 of the Plan |
| 18A-18n | General Designated Non-Debtor Affiliate Third-Party Guarantee Claims, as separately designated on a Primary-Obligor-by-Primary-Obligor basis | Not entitled to a Distribution as a consequence of substantive consolidation; *provided, however,* that if a Class in Classes 18A through 18n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class shall be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall be determined using an amount equal to 70% of such Allowed Claim, which amount shall not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII, and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further, however,* that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 18A through 18n which accept the Plan on any grounds other than substantive | If all Classes accept, 13.6%. If all Classes reject, 0.0%. | Impaired, Entitled to Vote Solely for the Purposes of Effecting a Proposed Settlement as set forth in Section 7.2 of the Plan |

| Class | Type of Claim or Equity Interest | Treatment of Allowed Claims Under the Plan | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|---|
| | | consolidation are fully reserved. | | |
| 19 | Section 510(b) Claims asserted against any of the Consolidated Debtors | Shall not receive any Distributions on account of such Allowed Claim unless and until all holders of Allowed Claims other than Allowed Claims in Class 19 are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Claim in Class 19 will receive its Pro Rata Section 510(b) Claim Share of remaining Plan Consideration. | 0% | Impaired, Not Entitled to Vote (Deemed to Reject) |
| 20 | Equity Interests in LBHI | Each holder of an Equity Interest in LBHI will neither receive nor retain any property or interest in property on account of such Equity Interests; *provided, however*, that in the event that all Allowed Claims in Classes 1 through 19 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its Pro Rata Equity Share of any remaining assets of the Debtors consistent with such holder's rights of priority of payment existing immediately prior to the Commencement Date. | 0%. | Impaired, Not Entitled to Vote (Deemed to Reject) |

## B.  Holders of Claims Entitled to Vote

Pursuant to the Bankruptcy Code, only holders of allowed Claims or Equity Interests in classes of Claims or Equity Interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject a proposed plan.  Classes of Claims or Equity Interests in which the holders of Claims or Equity Interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan.  Classes of Claims or Equity Interests that will not receive or retain property on account of Claims or Equity Interests are deemed to have rejected the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see section V.A – "Classification and Treatment of Claims and Equity Interests" of this Disclosure Statement.

Claims in Classes 1 and 2 are unimpaired, and to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions in the Allowed amount of their respective Claims under the Plan.  Claims in all other Classes under the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims (other than Claims in Classes 5A, 5B, 5C, 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n, 18A-18n, 19 and 20 subject to certain exceptions) will receive Distributions under the Plan.  Holders of Claims in Classes 3, 4, 6A-6n, 8A-8n, 9A-9n, 10, 11, 12 and 13 are entitled to vote to accept or reject the Plan.  Holders of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n, 18A-18n are entitled to vote to accept or reject the Plan solely for the purposes of effecting proposed settlements.  Holders of Claims in Classes 5A, 5B, 5C, 19 and holders of Equity Interests in LBHI in Class 20 are impaired and are conclusively deemed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than

one-half in number of the Claims that cast ballots for acceptance of the plan. For a more detailed description of the requirements for confirmation of the Plan, see section VI – "Confirmation and Consummation of the Plan" of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Plan Proponents reserve the right to amend the Plan in accordance with Section 19.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Plan Proponents shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code enables the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of Claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.

**THE PLAN PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS IN ALL CLASSES ENTITLED TO VOTE ACCEPT THE PLAN.**

### C. Voting Procedures

The voting deadline is 4:00 p.m. prevailing Eastern Time, [_____], 2011 (the "Voting Deadline").

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive ballots enabling you to vote each separate Class of Claims. Instructions for returning ballots are included with each form of ballot.

If the return envelope provided with your ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline.

Do not return any other documents with your ballot.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** BY NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON _____ __, 2011**. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____ __, 2011 as the record date for holders of Claims and Equity Interests entitled to vote on the Plan (the "Voting Record Date"). Accordingly, only holders of record as of the Voting Record Date that otherwise are entitled to vote under the Plan will receive a ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot or if you have any questions concerning

the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Epiq Bankruptcy Solutions, LLC at (646) 282-1800.

### D. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on __, 2011 at __:__ __.m. (prevailing Eastern Time) before the Honorable James M. Peck in Room 601, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are actually filed and received on or before _____ __, 2011 at __:__ __.m. (prevailing Eastern Time) in the manner described below in section VI.B – "The Confirmation Hearing" of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## IV.    GENERAL INFORMATION

For an overview of the chapter 11 process and a description and history of the business of Lehman, events leading up to chapter 11, the Chapter 11 Cases, the claims reconciliation process and bar date, and the Debtors' relationship with Lehman Brothers, Inc. and LAMCO, please refer to the Debtors' Disclosure Statement, dated January 25, 2011 [Docket No. 14151]. For a discussion of Intercompany Claims, see section II.B – "Basis for Substantive Consolidation" of this Disclosure Statement.

## V.    SUMMARY OF THE CHAPTER 11 PLAN

### A. Classification and Treatment of Claims and Equity Interests

The following summarizes the classification and treatment of Claims and Equity Interests under the Plan.

#### 1. Treatment of Unclassified Claims

##### a. Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration of any of the Consolidated Debtors' Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estates of the Consolidated Debtors, any actual and necessary expenses of operating the businesses of the Consolidated Debtors, any indebtedness or obligations incurred or assumed by the Consolidated Debtors in connection with the conduct of their business from and after the Commencement Date, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees and charges assessed against the estates of the Consolidated Debtors under section 1930 of chapter 123 of title 28 of the United States Code. Certain creditors may have super-priority claims against the Consolidated Debtors which are Administrative Expense Claims with priority over other Administrative Expense Claims.

Except as provided in the next sentence with respect to ordinary course obligations and in section V.A.1.b – "Professional Compensation and Reimbursement Claims" of this Disclosure Statement with respect to professional compensation and reimbursement Claims, and to the extent a holder agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive Cash from the Consolidated Debtors in an amount equal to the Allowed amount of such Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable. Allowed Administrative Expense Claims representing liabilities or other obligations incurred in the ordinary course of business by a Debtor incurred by such Debtor, however, will be paid in full and performed by the Consolidated Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

The Consolidated Debtors estimate that Allowed Administrative Expense Claims payable on the Effective Date, including compensation and reimbursement of expenses payable to professionals retained in the Chapter 11 Cases, will be approximately $7.5 billion. The Consolidated Debtors may pay amounts in respect of reconciled cure payments under executory contracts and unexpired leases assumed pursuant to the Plan. The estimated amount of Allowed Administrative Expense Claims does not include amounts subject to asserted rights of setoff held by the Consolidated Debtors. In the event such asserted setoff rights are not valid, the aggregate amount of Allowed Administrative Expense Claims may increase.

### b. Professional Compensation and Reimbursement Claims

Compensation and Reimbursement Claims are Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 363(b) 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code (the "Compensation and Reimbursement Claims"). All payments to professionals for Compensation and Reimbursement Claims will be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. All applications for compensation for services rendered and reimbursement of expenses are subject to approval of the Bankruptcy Court after review by the Fee Committee appointed in the Chapter 11 Cases.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case and to attorneys for, and other professional advisors to, such entities. The amounts, if any, which may be sought by entities for such compensation, are not known at this time. Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and object to the allowance of any Claims for compensation and reimbursement of expenses.

Pursuant to the Plan, each holder of a Compensation and Reimbursement Claim will (a) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is 120 days after the Effective Date or such other date as may be fixed by

the Bankruptcy Court, and (b) be paid by or on behalf of the Consolidated Debtors in full and in Cash in the amounts Allowed upon (i) the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (ii) such other terms as may be mutually agreed upon by the claimant and the Plan Administrator.  The Consolidated Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred after the Effective Date in the ordinary course and without Bankruptcy Court approval.

Upon information and belief, it was standard policy of Lehman Brothers to obtain discounted fee arrangements from major providers of professional services prior to the Commencement Date.  The Plan Proponents anticipate that the Plan Administrator will institute similar policies requiring fee accommodations.

### c.  Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by or on behalf of a Consolidated Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim against a Consolidated Debtor will receive Cash from the Consolidated Debtors in an amount equal to the Allowed amount of such Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.

As of December 31, 2010, the relevant bar dates for all taxing authorities have expired.  According to the Debtors, LBHI has made significant progress in resolving and narrowing numerous open federal, state and local tax issues, and various dispute resolution processes are ongoing with relevant taxing authorities.  The Debtors currently expect an aggregate amount of Allowed Priority Tax Claims by all federal, state and local taxing authorities of approximately $2 billion.

### 2.  Summary of Classes

The Plan is premised on the substantive consolidation of (a) the Debtors, (b) if either Class 14A or Class 15A reject the Plan, LBT, (c) if either Class 14B or Class 15B reject the Plan, LBSN, and (d) if a Class in Classes 16A through 16n or a corresponding Class in Classes 17A through 17n or Classes 18A through 18n rejects the Plan, the corresponding Designated Non-Debtor Affiliate, for the purposes of voting to accept or reject the Plan, confirmation of the Plan and Distributions under the Plan.  The Plan places all Claims against the Consolidated Debtors, other than Administrative Expense Claims and Priority Tax Claims, and Equity Interests in Classes listed below for all purposes, including voting and Distribution pursuant to the Plan (except as otherwise specified in the Plan, including with respect to substantive consolidation as described in Article VI, Article VII, and Article VIII of the Plan).

The Class 6, Class 7, Class 8, Class 9, Class 16, Class 17 and Class 18 Class designations below provide for multiple separate classes per category, which are described together for convenience only.  Each Class designated in each of the Class 6, Class 7, Class 8, Class 9, Class 16, Class 17 and Class 18 categories of classification will constitute a separate Class for all purposes under the Plan.  For example, all Classes in the Class 6 category are designated on a Subsidiary-Debtor-by-Subsidiary-Debtor basis.  As a consequence, all Class 6

Subsidiary Unsecured Claims asserted against LBSF are classified in their own Class separately from all other Class 6 Subsidiary Unsecured Claims asserted against each other Subsidiary Debtor.

Unless otherwise specified below, including with respect to substantive consolidation, holders of Allowed Claims in each Class will receive a Pro Rata Share of Plan Consideration from the Consolidated Debtors.

### a.   Treatment of Claims Against the Debtors and Equity Interests in LBHI

### (i)   Class 1 – Priority Non-Tax Claims

Class 1 will consist of all Priority Non-Tax Claims, which include  (a) any Claim, other than an Administrative Expense Claim or Priority Tax Claim, against a Consolidated Debtor entitled to priority in payment under section 507(a) of the Bankruptcy Code, (b) if LBT is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBT in its Foreign Proceeding subject to the provisions of Section 8.1 of Plan, (c) if LBSN is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBSN in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, and (d) if a Designated Non-Debtor Affiliate is substantively consolidated pursuant to Article VII of the Plan, Claims equivalent thereto asserted against such Designated Non-Debtor Affiliate in its Foreign Proceeding subject to the provisions of Section 7.1 of the Plan.

Each holder of an Allowed Claim in Class 1 will be paid in Cash by the Consolidated Debtors in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date such holder's Claim becomes an Allowed Claim.

### (ii) Class 2 – Secured Claims

Class 2 will consist of all Secured Claims which include (a) any Claim against a Consolidated Debtor (i) to the extent reflected in the Schedules or upon a proof of claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of such setoff, (b) if LBT is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBT in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, (c) if LBSN is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBSN in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, and (d) if a Designated Non-Debtor Affiliate is substantively consolidated pursuant to Article VII of the Plan, Claims equivalent thereto asserted against such Designated Non-Debtor Affiliate in its Foreign Proceeding subject to the provisions of Section 7.1 of the Plan.

At the option of the Plan Administrator, each holder of an Allowed Claim in Class 2 will be satisfied by: (i) payment in Cash by the Consolidated Debtors in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim; (ii) the sale or disposition proceeds of the Collateral securing such

Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim will be deemed released and extinguished without further order of the Bankruptcy Court.

### (iii) Class 3 – Senior Unsecured Claims

Class 3 will consist of all Senior Unsecured Claims asserted against LBHI.  Each holder of an Allowed Claim in Class 3 shall receive its Pro Rata Share of (i) Plan Consideration, (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5A Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, (iii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5B Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, (iv) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, (v) if both Class 14B and Class 15B vote to accept the Plan, 50% of each Aggregate LBSN Guarantee Claims Distribution pursuant to Section 9.4 of the Plan, and (vi) if both Class 14A and Class 15A vote to accept the Plan, 50% of each Aggregate LBT Guarantee Claims Distribution pursuant to Section 9.3 of the Plan.

The underlying agreements for each Subordinated Note provide that upon the bankruptcy of LBHI, no payments will be made to holders of Subordinated Unsecured Claims in respect of the Subordinated Notes until all senior obligations of LBHI have been satisfied in full.  To give effect to these provisions included in the documents underlying the Subordinated Notes, all Distributions under the Plan made by LBHI will be calculated as if each holder of an Allowed Subordinated Unsecured Claim based on a Subordinated Note were to receive its Pro Rata Share of a Distribution from LBHI; *provided*, *however*, that amounts that would have been distributed to holders of Allowed Subordinated Unsecured Claims will be automatically distributed to holders of Allowed Senior Unsecured Claims.  The Plan does not propose to include holders of Third-Party Guarantee Claims or Intercompany Claims against LBHI as entitled to share in the redistribution described above.

### (iv) Class 4 – General Unsecured Claims

Class 4 will consist of all General Unsecured Claims, which include (a) any Claim against LBHI, other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, an Intercompany Claim, a Guarantee Claim or a Section 510(b) Claim, (b) if LBT is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBT in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, (c) if LBSN is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBSN in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, and (d) if a Designated Non-Debtor Affiliate is substantively consolidated pursuant to Article VII of the Plan, Claims equivalent thereto asserted against such Designated Non-Debtor Affiliate in its Foreign Proceeding subject to the provisions of Section 7.1 of the Plan.

Each holder of an Allowed Claim in Class 4 shall receive its Pro Rata Share of (i) Plan Consideration, (ii) if both Class 14B and Class 15B vote to accept the Plan, 50% of each Aggregate LBSN Guarantee Claims Distribution pursuant to Section 9.4 of the Plan, and (iii) if both Class 14A and Class 15A vote to accept the Plan, 50% of each Aggregate LBT Guarantee Claims Distribution pursuant to Section 9.3 of the Plan.

### (v)  Class 5A – Subordinated Class 5A Claims

Class 5A will consist of all Subordinated Class 5A Claims, which include any Claim asserted against LBHI arising under the Class 5A Subordinated Notes.  Holders of Claims in Class 5A will not receive any Distributions on account of such Claims and instead such Distributions will be allocated to the holders of Allowed Claims in Class 3 and Class 10 accordance with Section 9.2 of the Plan until all holders of Allowed Claims in such Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Claim in Class 5A will receive its Pro Rata Share of (i) Plan Consideration and (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan.

### (vi)  Class 5B – Subordinated Class 5B Claims

Class 5B will consist of all Subordinated Class 5B Claims, which include any Claim asserted against LBHI arising under the Class 5B Subordinated Notes.  Holders of Allowed Claims in Class 5B will not receive any Distributions on account of such Claims and instead such Distributions will be allocated to the holders of Allowed Claims in Class 3, Class 10, Class 12 and any Class in Classes 8A through 8n that votes to reject the Plan, in accordance with Section 9.2 of the Plan until all holders of Allowed Claims in such Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Claim in Class 5B will receive its Pro Rata Share of (i) Plan Consideration and (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan.

### (vii)  Class 5C – Subordinated Class 5C Claims

Class 5C will consist of all Subordinated Class 5C Claims, which include any Claim asserted against LBHI arising under the Class 5C Subordinated Notes.  Holders of Allowed Claims in Class 5C will not receive any Distributions on account of such Claims and instead such Distributions will be allocated to the holders of Allowed Claims in Class 3, Class 5A, Class 5B, Class 10, Class 12 and any Class in Classes 8A through 8n that votes to reject the Plan, in accordance with Section 9.2 of the Plan, until all holders of Allowed Claims in such Classes are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Claim in Class 5C will receive its Pro Rata Share of  Plan Consideration.

### (viii)  Classes 6A-6n – Subsidiary Unsecured Claims

Class 6A through 6n will consist of all Subsidiary Unsecured Claims, which include any Claim asserted against a Consolidated Debtor other than LBHI, other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, an Intercompany Claim, a Guarantee Claim or a Section

510(b) Claim.  Classes 6A through 6n will be separately designated on a Subsidiary-Debtor-by-Subsidiary-Debtor basis.

Each holder of an Allowed Claim in each of Classes 6A through 6n will receive its Pro Rata Share of Plan Consideration; *provided*, *however*, that if a Class in Classes 6A through 6n votes to accept the Plan, the Pro Rata Share for each holder of an Allowed Claim in such accepting Class will be determined using an amount equal to 115% of such Allowed Claim as consideration for the settlement of issues relating to substantive consolidation and similar intercompany disputes provided under the Plan.

### (ix)  Classes 7A-7n – Consolidated Third-Party Guarantee Claims

Classes 7A through 7n will consist of Consolidated Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which a Consolidated Debtor is the Primary Obligor on the corresponding Primary Claim and will be separately designated on a Primary-Obligor-by-Primary-Obligor basis.

Each holder of a Claim in Classes 7A through 7n is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if a Class in Classes 7A through 7n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class will be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share will be determined using an amount equal to 25% of such Allowed Claim, which amount will not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 7A through 7n which accept the Plan on any grounds other than substantive consolidation are fully reserved.

### (x)  Classes 8A-8n – Senior Non-Consolidated Third-Party Guarantee Claims

Classes 8A through 8n will consist of Senior Non-Consolidated Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which a Non-Consolidated Affiliate is the Primary Obligor that is entitled to a contractual right of priority in payment to Subordinated Class 5B Claims and Subordinated Class 5C Claims, but not Subordinated Class 5A Claims (excluding an "Other Financial Obligation" as defined in the Class 5B Subordinated Notes or Class 5C Subordinated Notes) and will be separately designated on a Primary-Obligor-by-Primary-Obligor basis.

Each holder of an Allowed Claim in Classes 8A through 8n will receive its Pro Rata Share of (i) Plan Consideration, (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5B Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, and (iii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan; *provided*, *however*, that all Claims in Classes 8A through 8n

will be deemed Disputed Claims and not entitled to Distributions under the Plan unless and until (a) each Debtor and Debtor-Controlled Entity with a Claim against the applicable Primary Obligor has received all distributions on account of such Claim to the extent enforceable as determined by the Bankruptcy Court without subordination, reduction or offset of any kind unless otherwise agreed to by the Plan Proponents or the Plan Administrator, as applicable, and (b) such holder establishes that it has received all distributions it is entitled to receive on account of its Primary Claim and such Primary Claim has not otherwise received payment in full. If the conditions set forth in subclauses (a) and (b) are not properly satisfied as determined by the Bankruptcy Court before the 3rd anniversary following the Effective Date, such Senior Non-Consolidated Third-Party Guarantee Claim will be deemed a Disallowed Claim and expunged from the claims register; *provided*, *however*, that if a Class in Classes 8A through 8n votes to accept the Plan, all Claims in such Class will not be deemed Disputed Claims and each holder of an Allowed Claim in such Class will be entitled to receive at the time such Claim becomes an Allowed Claim its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share will be determined using an amount equal to 70% of the holder's Allowed Claim without regard to whether the conditions set forth in subclauses (a) and (b) above have been satisfied and will not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 8A through 8n which accept the Plan on any grounds other than the failure of the conditions set forth in (a) and (b) to be satisfied are fully reserved.

### (xi)  Classes 9A-9n – General Non-Consolidated Third-Party Guarantee Claims

Classes 9A through 9n will consist of General Non-Consolidated Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which a Non-Consolidated Affiliate is the Primary Obligor, other than a Senior Non-Consolidated Third-Party Guarantee Claim and will be separately designated on a Primary-Obligor-by-Primary-Obligor basis.

Each holder of an Allowed Claim in Classes 9A through 9n shall receive its Pro Rata Share of Plan Consideration; *provided*, *however*, that all Claims in Classes 9A through 9n shall be deemed Disputed Claims and not entitled to Distributions under the Plan unless and until (a) each Debtor and Debtor-Controlled Entity with a Claim against the applicable Primary Obligor has received all distributions on account of such Claim to the extent enforceable as determined by the Bankruptcy Court without subordination, reduction or offset of any kind unless otherwise agreed to by the Plan Proponents or the Plan Administrator, as applicable, and (b) such holder establishes that it has received all distributions it is entitled to receive on account of its Primary Claim and such Primary Claim has not otherwise received payment in full. If the conditions set forth in subclauses (a) and (b) are not properly satisfied as determined by the Bankruptcy Court before the 3rd anniversary following the Effective Date, such General Non-Consolidated Third-Party Guarantee Claim shall be deemed a Disallowed Claim and expunged from the claims register; *provided*, *however*, that if a Class in Classes 9A through 9n votes to accept the Plan, all Claims in such Class shall not be deemed Disputed Claims and each holder of an Allowed Claim in such Class shall be entitled to receive at the time such Claim becomes an Allowed Claim its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall

be determined using an amount equal to 70% of the holder's Allowed Claim without regard to whether the conditions set forth in subclauses (a) and (b) above have been satisfied and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 9A through 9n which accept the Plan on any grounds other than the failure of the conditions set forth in subclauses (a) and (b) to be satisfied are fully reserved.

### (xii) Class 10 – Senior Non-Consolidated Intercompany Claims

Class 10 will consist of Senior Non-Consolidated Intercompany Claims which include any Intercompany Claim against LBHI asserted by a Non-Consolidated Affiliate that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 5B Subordinated Notes or Class 5C Subordinated Notes), other than any Senior Non-Consolidated Affiliate Guarantee Claim or General Non-Consolidated Affiliate Guarantee Claim.

Each holder of an Allowed Claim in Class 10 will receive, subject to Section 9.6 of the Plan, its Pro Rata Share of (i) Plan Consideration, (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5A Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, (iii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5B Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, and (iv) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan.

### (xiii) Class 11 – General Non-Consolidated Intercompany Claims

Class 11 will consist of General Non-Consolidated Intercompany Claims, which include (a) any Intercompany Claim asserted by a Non-Consolidated Affiliate, other than a Senior Non-Consolidated Intercompany Claim, Senior Non-Consolidated Affiliate Guarantee Claim or General Non-Consolidated Affiliate Guarantee Claim, (b) if LBT is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBT in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, (c) if LBSN is substantively consolidated pursuant to Article VIII of the Plan, Claims equivalent thereto asserted against LBSN in its Foreign Proceeding subject to the provisions of Section 8.1 of the Plan, and (d) if a Designated Non-Debtor Affiliate is substantively consolidated pursuant to Article VII of the Plan, Claims equivalent thereto asserted against such Designated Non-Debtor Affiliate in its Foreign Proceeding subject to the provisions of Section 7.1 of the Plan.

Each holder of an Allowed Claim in Class 11 will receive, subject to Section 9.6 of the Plan, its Pro Rata Share of Plan Consideration.

### (xiv) Class 12 – Senior Non-Consolidated Affiliate Guarantee Claims

Class 12 will consist of Senior Non-Consolidated Affiliate Guarantee Claims, which include any Third-Party Guarantee Claim for which a Non-Consolidated Affiliate is the Primary Obligor that is entitled to a contractual right of priority in payment to Subordinated Class 5B Claims and Subordinated Class 5C Claims, but not Subordinated Class 5A Claims (excluding an "Other Financial Obligation" as defined in the Class 5B Subordinated Notes or Class 5C Subordinated Notes).

Each holder of an Allowed Claim in Class 12 will receive, subject to Section 9.6 of the Plan, its Pro Rata Share of (i) Plan Consideration, (ii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5B Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan, and (iii) the total Distribution that would have been made to holders of Allowed Subordinated Class 5C Claims but for the reallocation of such Distribution pursuant to Section 9.2 of the Plan.

### (xv) Class 13 – General Non-Consolidated Affiliate Guarantee Claims

Class 13 will consist of General Non-Consolidated Affiliate Guarantee Claims, which include any Guarantee Claim asserted by a Non-Consolidated Affiliate, other than a Senior Non-Consolidated Affiliate Guarantee Claim. Each holder of an Allowed Claim in Class 13 will receive, subject to Section 9.6 of the Plan, its Pro Rata Share of Plan Consideration.

### (xvi) Class 14A – LBT Intercompany Claims

Class 14A will consist of LBT Intercompany Claims, which include any Intercompany Claim asserted against any of the Consolidated Debtors by LBT. Each holder of a Claim in Class 14A is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14A and Class 15A vote to accept the Plan, the LBT Intercompany Claims will be Allowed in an aggregate amount equal to $33,170,000,000 and the holder of the Allowed Claim in Class 14A shall be entitled to receive its Pro Rata Share of Plan Consideration.

### (xvii) Class 14B – LBSN Intercompany Claims

Class 14B will consist of LBSN Intercompany Claims, which include any Intercompany Claim asserted against any of the Consolidated Debtors by LBSN. Each holder of a Claim in Class 14B is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14B and Class 15B vote to accept the Plan, the LBSN Intercompany Claims will be Allowed in an aggregate amount equal to $5,250,000,000 and the holder of the Allowed Claim in Class 14B shall be entitled to receive its Pro Rata Share of Plan Consideration.

### (xviii)  Class 15A – LBT Third-Party Guarantee Claims

Class 15A will consist of LBT Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which LBT is the Primary Obligor.  Each holder of a Claim in Class 15A is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14A and Class 15A vote to accept the Plan, each holder of an Allowed Claim in Class 15A shall receive 50% of its Pro Rata Share of Plan Consideration and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim with the remaining 50% of such Pro Rata Share of Plan Consideration made available for Distributions to holders of Allowed Claims in Class 3 and Class 4 as described further in Section 9.3 of the Plan.

### (xix)  Class 15B – LBSN Third-Party Guarantee Claims

Class 15B will consist of LBSN Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which LBSN is the Primary Obligor.  Each holder of a Claim in Class 15B is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if both Class 14B and Class 15B vote to accept the Plan, each holder of an Allowed Claim in Class 15B shall receive 50% of its Pro Rata Share of Plan Consideration and shall not be subject to reduction as a consequence of Distributions received on account of the corresponding Primary Claim with the remaining 50% of such Pro Rata Share of Plan Consideration made available for Distributions to holders of Allowed Claims in Class 3 and Class 4 as described further in Section 9.4 of the Plan.

### (xx)  Classes 16A-16n – Designated Non-Debtor Affiliate Intercompany Claims

Classes 16A through 16n will consist of Designated Non-Debtor Affiliate Intercompany Claims, which include any Intercompany Claim asserted by a Designated Non-Debtor Affiliate and will be classified separately classified on a Designated-Non-Debtor-Affiliate-by-Designated-Non-Debtor-Affiliate basis.  Each holder of a Claim in Classes 16A through 16n is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if a Class in Classes 16A through 16n and the corresponding Classes in each of Classes 17A through 17n and Classes 18A through 18n vote to accept the Plan, the Claims in such Class and the Debtor Consolidated Claims against such holder shall be Allowed in an aggregate amount as agreed to by the Plan Proponents and the holder of the Allowed Claim in such Class, and such holder shall be entitled to receive its Pro Rata Share of Plan Consideration but solely to the extent the Consolidated Debtors receive distributions from the Designated Non-Debtor Affiliates on account of the Debtor Consolidated Claims without subordination, reduction or offset of any kind unless agreed to by the Plan Proponents or Plan Administrator, as applicable.

### (xxi)  Classes 17A-17n – Senior Designated Non-Debtor Affiliate Third-Party Guarantee Claims

Classes 17A through 17n will consist of Senior Designated Non-Debtor Affiliate Third-Party Guarantee Claims, which include any Guarantee Claim against LBHI asserted by a

Non-Consolidated Affiliate that is entitled to a contractual right of priority in payment to Subordinated Class 5B Claims and Subordinated Class 5C Claims, but not Subordinated Class 5A Claims (excluding an "Other Financial Obligation" as defined in the Class 5B Subordinated Notes or Class 5C Subordinated Notes) and will be separately designated on a Primary-Obligor-by-Primary-Obligor basis.

Each holder of a Claim in Classes 17A through 17n is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if a Class in Classes 17A through 17n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class shall be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall be determined using an amount equal to 70% of such Allowed Claim, which amount shall not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII, and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 17A through 17n which accept the Plan on any grounds other than substantive consolidation are fully reserved.

### (xxii) Classes 18A-18n – General Designated Non-Debtor Affiliate Third-Party Guarantee Claims

Classes 18A through 18n will consist of General Designated Non-Debtor Affiliate Third-Party Guarantee Claims, which include any Third-Party Guarantee Claim for which a Designated Non-Debtor Affiliate is the Primary Obligor, other than any Senior Designated Non-Debtor Affiliate Third-Party Guarantee Claim and will be separately designated on a Primary-Obligor-by-Primary-Obligor basis.

Each holder of a Claim in Classes 18A through 18n is not entitled to a Distribution as a consequence of substantive consolidation; *provided*, *however*, that if a Class in Classes 18A through 18n votes to accept the Plan, each holder of an Allowed Claim in such accepting Class shall be entitled to receive its Pro Rata Share of Plan Consideration, provided that such Pro Rata Share shall be determined using an amount equal to 70% of such Allowed Claim, which amount shall not be subject to further reduction as a consequence of substantive consolidation in accordance with Article VI, Article VII, and Article VIII of the Plan or Distributions received on account of the corresponding Primary Claim; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Claim in any of Classes 18A through 18n which accept the Plan on any grounds other than substantive consolidation are fully reserved.

### (xxiii)  Class 19 – Section 510(b) Claims

Class 19 will consist of Section 510(b) Claims, which include any Claim against the Consolidated Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

Each holder of an Allowed Claim in Class 19 will not receive any Distributions on account of such Allowed Claim unless and until all holders of Allowed Claims other than Allowed Claims in Class 19 are fully satisfied in the Allowed amount of such Claims, in which case each holder of an Allowed Claim in Class 19 will receive its Pro Rata Section 510(b) Claim Share of remaining Plan Consideration.

### (xxiv)  Class 20 – Equity Interests

Class 20 will consist of all Equity Interests, which include shares of common stock, preferred stock, other forms of ownership interest, or an interest or right to convert into such an equity or ownership interest or to acquire any equity or ownership interest or any interest or right for which the amount owing is determined by reference to an equity or ownership interest, including, without limitation, vested  and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, the LBHI 2005 stock incentive plan or the LBHI employee incentive plan, in LBHI that was in existence immediately prior to the Commencement Date for LBHI.

On the Effective Date, all Equity Interests in LBHI will be cancelled and one new share of LBHI's common stock shall be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements; *provided*, *however*, that the Plan Administrator may not exercise any voting rights appurtenant thereto in conflict with Article X of the Plan.  Each holder of an Equity Interest in LBHI will neither receive nor retain any property or interest in property on account of such Equity Interests; *provided*, *however*, that in the event that all Allowed Claims in Classes 1 through 19 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its Pro Rata Equity Share of any remaining assets of the Debtors consistent with such holder's rights of priority of payment existing immediately prior to the Commencement Date.  The rights of the holders of former Equity Interests in LBHI shall be nontransferable.  Unless otherwise determined by the Plan Administrator, on the date that LBHI's Chapter 11 Case is closed, all such former Equity Interests in LBHI shall be deemed cancelled and of no force and effect provided that such cancellation does not adversely impact the Debtors' estates.

### B.  Acceptance or Rejection of the Plan

#### 1.  Classes Entitled to Vote

Except for Classes 1, 2, 5A, 5B, 5C, 19 and 20, all Classes of Claims are entitled to vote on the Plan, *provided*, *however*, that Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n are entitled to vote on the Plan solely for the purposes of effecting the proposed settlements in the Plan.

#### 2.  Class Acceptance Requirement

A Class of Claims will have accepted the Plan for all purposes herein if at least two-thirds in amount and one-half in number of the Allowed Claims of such Class held by

creditors, other than any entity designated pursuant to section 1126(e) of the Bankruptcy Code, have voted to accept the Plan.

### 3.  Separate Classification for Settlement Purposes

Notwithstanding the substantive consolidation of the Consolidated Debtors, the Plan provides that holders of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n will be entitled to vote on the Plan solely for the purposes of effecting proposed settlements.  To the extent that a Class of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n (and, in some instances, the corresponding Class of Claims) accepts the Plan, the Plan and the settlements embodied in the Plan will become binding on the holders of Claims in such Class and the holders of Allowed Claims in such accepting Class will be entitled to receive the Distributions set forth in Sections 4.9, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, and 4.22 of the Plan, respectively.  Notwithstanding the designation of the Claims in Classes 7A through 7n as a Class separate from the corresponding Primary Claims, to the extent that a Class in Classes 7A through 7n rejects the Plan, each Claim in such Class will be merged with its corresponding Primary Claim as a consequence of substantive consolidation and such rejecting Class 7A through 7n, if any, will be deemed extinguished from the Plan.  If a Class in Classes 16A through 16n or the corresponding Class in Classes 17A through 17n or Classes 18A through 18n votes to reject the Plan, each Claim in the such rejecting Class or Classes shall be deemed eliminated as a consequence of substantive consolidation and such rejecting Class or Classes shall be deemed extinguished from the Plan.  If a Class in Classes 17A though 17n or Classes 18A through 18n votes to accept the Plan but the corresponding Class in Classes 16A through 16n votes to reject the Plan, holders of Claims in such accepting Class shall be entitled to receive the Distributions set forth in Section 4.21 or Section 4.22 of the Plan, as applicable, as a settlement notwithstanding substantive consolidation.  If either Class 14A or Class 15A rejects the Plan, each Claim in both Class 14A and Class 15A shall be deemed eliminated as a consequence of substantive consolidation and both Class 14A and Class 15A shall be deemed extinguished from the Plan.  If either Class 14B or Class 15B rejects the Plan, each Claim in both Class 14B and Class 15B shall be deemed eliminated as a consequence of substantive consolidation and both Class 14B and Class 15B shall be deemed extinguished from the Plan.

### 4.  Undivided Voting

To the extent an Allowed Primary Claim asserted against a Debtor and a corresponding Allowed Third-Party Guarantee Claim are controlled by the same Person as of record on the Voting Record Date, such Person will be required to vote both Claims in a like manner.  In the event that such Person does not vote both Claims in a like manner, then such Person will be deemed to have voted both Claims to accept the Plan.

### 5.  Nonconsensual Confirmation

If any impaired Class of Claims entitled to vote on the Plan rejects the Plan, the Plan Proponents reserve the right to amend the Plan in accordance with Section 19.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired Classes of Claims or Equity Interests that

are deemed to reject the Plan, the Plan Proponents will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## C.  Means for Implementation of the Plan

### 1.  Substantive Consolidation of the Consolidated Debtors

The Plan and Disclosure Statement shall constitute a motion to substantively consolidate each Subsidiary Debtor with LBHI.  Accordingly, on the Effective Date, except as otherwise provided in the Plan, (a) for the purposes of making Distributions pursuant to the Plan and post-Effective Date governance, subject to Section 11.7 of the Plan, all assets and liabilities of each Consolidated Debtor will be treated as though they are merged into and with the assets and liabilities of LBHI, (b) no Distributions will be made under the Plan on account of Consolidated Debtor Intercompany Claims, and (c) except to the extent set forth in Section 4.9 of the Plan, Third-Party Guarantee Claims for which a Consolidated Debtor is the Primary Obligor on the corresponding Primary Claim will be deemed merged and eliminated, so that any claim against such Consolidated Debtor and any Guarantee thereof will be deemed to be one obligation of the Consolidated Debtors with respect to their consolidated estate.

Notwithstanding that the Plan seeks to substantively consolidate the Subsidiary Debtors, the Plan provides that holders of Claims in Classes 7A through 7n will be entitled to vote on the Plan solely for the purposes of effecting a proposed settlement.  If a Class in Classes 7A through 7n accepts the Plan, the Plan and the settlements embodied in the Plan will become binding on the holders of Claims in such Class and the holders of Allowed Claims in such accepting Class will be entitled to receive the Distributions set forth in Section 4.9 of the Plan. Notwithstanding the designation of the Claims in Classes 7A through 7n as a Class separate from the corresponding Primary Claims, if a Class in Classes 7A through 7n rejects the Plan, each Claim in such Class will be merged with its corresponding Primary Claim as a consequence of substantive consolidation and such rejecting Class 7A through 7n, if any, will be deemed extinguished from the Plan.

### 2.  Substantive Consolidation of Certain Designated Non-Debtor Affiliates

The Plan and this Disclosure Statement shall constitute a motion to substantively consolidate certain Designated Non-Debtor Affiliates with the Consolidated Debtors.  On the Effective Date, (a) except to the extent set forth in Section 4.20 of the Plan, no Distributions will be made under the Plan on account of Designated Non-Debtor Affiliate Intercompany Claims, and (b) except to the extent set forth in Section 4.21 and Section 4.22 of the Plan, Third-Party Guarantee Claims for which a Designated Non-Debtor Affiliate is the Primary Obligor on the corresponding Primary Claim will be deemed merged and eliminated, so that any claim against such Designated Non-Debtor Affiliate and any Guarantee thereof will be deemed to be one obligation of the Consolidated Debtors with respect to their estates.  For the purposes of making Distributions and post-Effective Date governance, including as in Article X of Plan, if a Designated Non-Debtor Affiliate makes its assets available fully to the Plan Administrator for Distribution and management under the Plan, (x) subject to Section 11.7 of the Plan, all assets and liabilities of the Designated Non-Debtor Affiliate will be treated as though they are merged into and with the assets and liabilities of the Consolidated Debtors, and (y) holders of Allowed

Claims against such Designated Non-Debtor Affiliate will be entitled to a single distribution and the treatment set forth in Class 1, Class 2, Class 3, Class 11 or Class 19, as applicable. If the Designated Non-Debtor Affiliate refuses or is otherwise unable to make its assets available fully to the Plan Administrator for Distribution and management under the Plan, no holder of a Claim against the Designated Non-Debtor Affiliate (including any Third-Party Guarantee Claim except to the extent otherwise set forth in Section 7.2 of the Plan) will be entitled to a Distribution under the Plan on account of such Claim and the Confirmation Order will provide for such other relief necessary to give effect to the substantive consolidation, including the economic equivalent thereof, of such Designated Non-Debtor Affiliate. Notwithstanding Section 11.7 of the Plan, all rights of trust claimants or the statutory rights of customers pursuant to laws of the local jurisdiction will be preserved.

Notwithstanding that the Plan seeks to substantively consolidate the Designated Non-Debtor Affiliates, the Plan provides that holders of Claims in Classes 16A through 16n, 17A through 17n and Classes 18A through 18n shall be entitled to vote on the Plan for the purposes of effecting a proposed settlement. If a Class in Classes 16A through 16n and the corresponding Classes in Classes 17A through 17n and Classes 18A through 18n accept the Plan (the "Accepting Designated Non-Debtor Affiliate Classes"), (a) such Designated Non-Debtor Affiliate shall not be substantively consolidated with the Consolidated Debtors, (b) the Plan and the settlements embodied herein shall become binding on the holders of Claims in the Accepting Designated Non-Debtor Affiliate Classes, (c) the holders of Allowed Claims in the Accepting Designated Non-Debtor Affiliate Classes shall be entitled to receive the Distributions set forth in Section 4.20, Section 4.21 and Section 4.22 of the Plan, respectively, and (d) holders of Claims against such Designated Non-Debtor Affiliate shall not be entitled to any Distributions under the Plan but shall instead retain their rights to receive distributions directly from such Designated Non-Debtor Affiliate. If a Class in Classes 16A through 16n or the corresponding Class in Classes 17A through 17n or Classes 18A through 18n votes to reject the Plan (the "Rejecting Designated Non-Debtor Affiliate Classes"), each Claim in the Rejecting Designated Non-Debtor Affiliate Classes shall be deemed eliminated as a consequence of substantive consolidation and the Rejecting Designated Non-Debtor Affiliate Classes shall be deemed extinguished from the Plan. If a Class in Classes 17A through 17n or Classes 18A through 18n votes to accept the Plan but the corresponding Class in Classes 16A through 16n votes to reject the Plan, holders of Claims in such accepting Class shall be entitled to receive the Distributions set forth in Section 4.21 or Section 4.22 of the Plan, as applicable, as a settlement notwithstanding substantive consolidation.

At any time prior to the entry of the Confirmation Order or such other time as may be ordered by the Bankruptcy Court, the Plan Proponents, in their sole discretion, may identify any Affiliate to be a Designated Non-Debtor Affiliate or declassify any previously identified Designated Non-Debtor Affiliate. To the extent the Plan Proponents declassify any Affiliate previously identified as a Designated Non-Debtor Affiliate, the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Intercompany Claim of such Affiliate shall be fully preserved. In the event the Bankruptcy Court determines not to substantively consolidate a Designated Non-Debtor Affiliate, the corresponding Claims in the applicable Class in Classes 16A through 16n shall automatically be deemed to be Claims classified in Class 11 and Claims in Classes 17A through 17n and Classes 18A through 18n shall automatically be deemed to be Claims classified in Class 8 or Class 9, respectively.

### 3.  Substantive Consolidation of LBT and LBSN

The Plan and this Disclosure Statement shall constitute a motion to substantively consolidate each of LBT and LBSN with LBHI.  On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (a) for the purposes of making Distributions and post-Effective Date governance, including as in Article X of the Plan, all assets and liabilities of each of LBT and LBSN will be treated as though they are merged into and with the assets and liabilities of LBHI, subject to Section 11.7 of the Plan, (b) except to the extent set forth in Section 4.16 and Section 4.17 of the Plan, no Distributions will be made under the Plan on account of each of LBT Intercompany Claims and LBSN Intercompany Claims, (c) except to the extent set forth in Section 4.18 and Section 4.19 of the Plan, Third-Party Guarantee Claims for which either LBT or LBSN is the Primary Obligor on the corresponding Primary Claim will be deemed merged and eliminated, so that any claim against either LBT or LBSN and any Guarantee thereof will be deemed to be one obligation of the Consolidated Debtors with respect to their estates and (d) holders of Allowed Claims against LBT and LBSN shall be entitled to a single distribution and the treatment set forth in Class 1, Class 2, Class 4, Class 11, Class 13 or Class 19, as applicable.

Notwithstanding that the Plan seeks to substantively consolidate each of LBT and LBSN, the Plan provides that holders of Claims in Class 14A, Class 14B, Class 15A and Class 15B shall be entitled to vote on the Plan for the purpose of effecting a proposed settlement.  If both Class 14A and Class 15A accept the Plan, (a) LBT shall not be substantively consolidated with LBHI, (b) the Plan and the settlements embodied herein shall become binding on the holders of Claims in Class 14A and Class 15A, (c) the holders of Allowed Claims in Class 14A and Class 15A shall be entitled to receive the Distributions set forth in Section 4.16 and Section 4.18 of the Plan, respectively, and (d) holders of Claims against LBT shall not be entitled to any Distributions under the Plan but shall instead retain their rights to receive distributions directly from LBT.  Similarly, if both Class 14B and Class 15B accept the Plan, (a) LBSN shall not be substantively consolidated with LBHI, (b) the Plan and the settlements embodied herein shall become binding on the holders of Claims in Class 14B and Class 15B, (c) the holders of Allowed Claims in Class 14B and Class 15B shall be entitled to receive the Distributions set forth in Section 4.17 and Section 4.19 of the Plan, respectively, and (d) holders of Claims against LBSN shall not be entitled to any Distributions under the Plan but shall instead retain their rights to receive distributions directly from LBSN.  If either Class 14A or Class 15A rejects the Plan, each Claim in both Class 14A and Class 15A shall be deemed eliminated as a consequence of substantive consolidation and both Class 14A and Class 15A shall be deemed extinguished from the Plan.  If either Class 14B or Class 15B rejects the Plan, each Claim in both Class 14B and Class 15B shall be deemed eliminated as a consequence of substantive consolidation and both Class 14B and Class 15B shall be deemed extinguished from the Plan.

If both Class 14A and Class 15A vote to accept the Plan, with respect to the proceeds of Distributions under the Plan, LBT shall make any and all distributions in its Foreign Proceeding on account of Primary Claims against LBT directly from an account (or accounts) located in the State of New York.  If both Class 14B and Class 15B vote to accept the Plan, with respect to the proceeds of Distributions under the Plan, LBSN shall make any and all distributions in its Foreign Proceeding on account of Primary Claims against LBSN directly from an account (or accounts) located in the State of New York.  The Confirmation Order shall

provide the Consolidated Debtors with a prejudgment attachment lien against any and all distributions to be made to any Non-Consolidated Affiliate or Designated Non-Debtor Affiliate in respect of any amounts owing by such Non-Consolidated Affiliate or Designated Non-Debtor Affiliate to a Consolidated Debtor or Debtor Controlled Entity.

### 4.  Plan Administrator

### a.  Authority of the Plan Administrator

Pursuant to the Plan, the Plan Administrator will be designated by the Board of Directors as of the Effective Date, with approval by the Bankruptcy Court.  The Plan Administrator shall report to the Board of Directors as reconstituted on the Effective Date and thereafter may be replaced by the Board of Directors in the Board of Directors' sole discretion. If the Plan Administrator resigns or is terminated, the Board of Directors shall select a new Plan Administrator.

The Plan Administrator will have the authority and right on behalf of the Consolidated Debtors, subject to the oversight of the Board of Directors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(ii)     make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)     exercise its reasonable business judgment to direct and control the wind down, liquidation and/or abandoning of the assets of the Consolidated Debtors and assets of LBT, LBSN and the Designated Non-Debtor Affiliates made available as set forth in Section 7.1 of the Plan or Section 8.1 of the Plan, as the case may be;

(iv)     prosecute all Litigation Claims, including Avoidance Actions, on behalf of the Consolidated Debtors, and to elect not to pursue any Litigation Claims and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Litigation Claims, as the Plan Administrator may determine is in the best interests of the Consolidated Debtors;

(v)     make payments to existing professionals who will continue to perform in their current capacities;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     hire and terminate employees;

(viii)     maintain the books and records and accounts of the Consolidated Debtors;

(ix)    invest Cash of the Consolidated Debtors, including any Cash proceeds realized from the liquidation of any assets of the Consolidated Debtors, including any Litigation Claims, and any income earned thereon;

(x)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(xi)    administer each Debtor's tax obligations, including (i) filing and paying tax returns, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required by any Governmental Unit or applicable law; and

(xiii)    determine whether to create a Liquidating Trust pursuant to Section 14.1 and which assets to transfer to such Liquidating trust or to issue New Securities in accordance with Section 9.6 of the Plan.

### b.  No Liability of Plan Administrator

The Plan Administrator shall have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors, the Designated Non-Debtor Affiliates, LBT, LBSN or holders of Claims against or Equity Interests in the Debtors, the Designated Non-Debtor Affiliates, LBSN or LBT other than for gross negligence or willful misconduct of the Plan Administrator.  The Consolidated Debtors will indemnify and hold harmless the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence or willful misconduct.

### 5.  Creation and Distribution of New Securities; Creation of Separately Managed Asset Vehicles

In the discretion of the Plan Administrator, the Consolidated Debtors may form new (or utilize existing) entities that shall principally hold certain existing assets of the Consolidated Debtors and, in connection therewith, create New Securities for Distribution under the Plan, which may include one or more separately managed REIT-Cos. to hold certain real estate assets of the Consolidated Debtors and a separate entity to manage the remaining assets of the Consolidated Debtors.  In the event that the Plan Administrator determines to make multiple types of New Securities available to holders of Allowed Claims and Equity Interests, each such holder shall receive of each type of New Security its Pro Rata Share.

**6.  Allowance of Non-Consolidated Intercompany Claims**

Each holder of a Non-Consolidated Intercompany Claim shall have an Allowed Non-Consolidated Intercompany Claim against a Consolidated Debtor only if such holder (a) recognizes and honors each of the Consolidated Debtors' and Consolidated-Debtor-Controlled Entities' Claims, if any, against such holder as determined by the Bankruptcy Court without giving effect to subordination, recharacterization or offset and (b) agrees not to set off such Allowed Non-Consolidated Intercompany Claim against any Claim of a Consolidated Debtor or Consolidated-Debtor-Controlled Entity against such holder

**7.  Indenture Trustees, Creditors' Committee Members and the Plan Proponents**

Subject to the occurrence of the Effective Date, the reasonable fees and expenses (including attorneys' fees) of (i) the indenture trustees with respect to the Senior Notes (but solely to the extent such fees were incurred in connection with advancing the interests of the Senior Notes); (ii) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustees or members of the Creditors' Committee; and (iii) the Plan Proponents, respectively, will be Allowed as Administrative Expense Claims and will be paid by the Consolidated Debtors.

**8.  Treatment of Disputed Claims**

As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator. Objections to and requests for estimation of Claims will be filed with the Court and served on the claimant on or before the later of (a) the date that is 2 years after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

As of the Effective Date and notwithstanding any prior determination by the Bankruptcy Court, each Third-Party Guarantee Claim in Classes 8A through 8n and Classes 9A through 9n will be deemed Disputed unless and until (a) (i) each  Debtor with Claims against the applicable Primary Obligor has received all distributions on account of such Claims to the extent enforceable as determined by the Bankruptcy Court without being subordinated (statutorily or otherwise), recharacterized, set off or not honored in any other way and (ii) the applicable holder of such Third-Party Guarantee Claim has demonstrated that it (or the holder of the Primary Claim) has received all distributions it is or will ultimately be entitled to receive on account of its Claims against the Primary Obligor, or (b) the Class containing such Third-Party Guarantee Claim has voted to accept the Plan; *provided further*, *however*, that the rights of the Plan Proponents and the Plan Administrator to object to the Allowance of any Third-Party Guarantee Claim in any of Classes 8A through 8n and Classes 9A through 9n which accept the Plan on any grounds other than the satisfaction of the conditions set forth in subclauses (a)(i) and (ii) are fully reserved.

If any portion of a Claim is a Disputed Claim, no Distribution will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

An Estimation Order may be used to calculate and to establish the amount of the Disputed Claims Estimated Amount.  The Plan Administrator, or the Plan Proponents, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim regardless of whether the Plan Administrator or Plan Proponents have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated; *provided*, *however*, that if the estimate constitutes the maximum limitation on a Claim, or on more than one such Claim within a Class of Claims, as applicable, the Plan Administrator or the Plan Proponents, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

On and after the Effective Date, the Plan Administrator will have the authority to settle or otherwise resolve or withdraw any objections to Claims and to compromise, settle or otherwise resolve any Disputed Claims.  Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Administrator will have the authority to settle or compromise all Claims and Disputed Claims without further review or approval of the Bankruptcy Court, other than the settlement or compromise of a Claim or Disputed Claim where the proposed Allowed amount of such Claim is greater than or equal to $10,000,000.

On the date of the first Distribution that is at least sixty (60) days after the date a Disputed Claim becomes an Allowed Claim, the Plan Administrator will remit, solely from the Disputed Claims Reserve to the holder of such Allowed Claim, Cash equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date.  Upon the occurrence of each Distribution Date after the first Distribution Date, each holder of a Claim that becomes an Allowed Claim subsequent to the immediately preceding Distribution Date will have recourse solely to the Plan Consideration reserved in the Disputed Claims Reserve to recover Distributions that such holder would have been entitled to receive through the prior Distribution Date.  To the extent that a Disputed Claim against a Consolidated Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the Cash held in the Disputed Claims Reserve on account of such Claim but not distributed to the holder of such Claim in accordance with Section 12.5 of the Plan will be released from the Disputed Claims Reserve and become Plan Consideration.  Notwithstanding anything provided in the Plan to the contrary, the ADR Procedures shall remain in effect unless and until the Plan Administrator determines otherwise.

Holders of Disputed Claims will not be entitled to interest if such Disputed Claim becomes an Allowed Claim unless the holder of such Allowed Claim is entitled to postpetition interest on such Claim under the Bankruptcy Code and the Plan.

On the Effective Date, the Plan Administrator will establish a Disputed Claims Reserve and fund such Disputed Claims Reserve with Cash in the amount of the Disputed Claim Estimated Amount.  Such reserved Cash will be transferred to the Plan Administrator to be held for holders of Disputed Claims.  If the Plan Administrator determines in its sole discretion that the value of the Consolidated Debtors' assets other than Cash exceeds the amount of Cash reserved in the Disputed Claims Reserve, the Plan Administrator may in its discretion release such Cash for Distribution to holders of Allowed Claims and fund the Disputed Claims Reserve with Plan Consideration when realized from the future disposition of assets or other available sources.

## 9.  Redistribution of Subordinated Unsecured Claims Recoveries

To give effect to agreements of holders of Subordinated Claims, all Distributions under the Plan made by the Consolidated Debtors shall be calculated as if each holder of an Allowed Claim in Class 5A, Class 5B and Class 5C were to receive its Pro Rata Share of Plan Consideration from the Consolidated Debtors, and, in the case of each holder of an Allowed Claim in Class 5A and Class 5B, its Pro Rata Share of Subordinated Class 5C Distribution; *provided, however*, that:

(a)    the Subordinated Class 5A Distribution shall be automatically distributed to holders of Allowed Claims in Class 3 and Class 10 pursuant to Section 4.3 and Section 4.12 of the Plan, respectively, until all such Claims are satisfied in full;

(b)    the Subordinated Class 5B Distribution shall be automatically distributed to holders of Allowed Claims in Class 3, Class 10, Class 12 and any Class of Classes 8A through 8n that votes to reject the Plan, pursuant to Section 4.3, Section 4.12, Section 4.14 and Section 4.10 of the Plan, respectively, until all such Claims are satisfied in full; and

(c)    the Subordinated Class 5C Distribution shall be automatically distributed to holders of Allowed Claims in Class 3, Class 5A, Class 5B, Class 10, Class 12 and any Class of Classes 8A through 8n that votes to reject the Plan, pursuant to Section 4.3, Section 4.5, Section 4.6, Section 4.12, Section 4.14 and Section 4.10 of the Plan, respectively, until all such Claims are satisfied in full; *provided, however*, that any portion of the Subordinated Class 5C Distribution payable to holders of Allowed Claims in Class 5A shall be automatically redistributed to holders of Allowed Claims in Class 3 and Class 10 pursuant to Section 9.2(a) of the Plan until all such Claims are satisfied in full; *provided, further*, that any portion of the Subordinated Class 5C Distribution payable to holders of Allowed Claims in Class 5B shall be automatically distributed to holders of Allowed Claims in Class 3, Class 10, Class 12 and any Class of Classes 8A through 8n that votes to reject the Plan, pursuant to Section 9.2(b) of the Plan until all such Claims are satisfied in full.

### 10. Special Provisions Regarding LBT

For the purpose of settling LBT Intercompany Claims and Third-Party Guarantee Claims for which LBT is the Primary Obligor on the corresponding Primary Claims, if both Class 14A and Class 15A accept the Plan, all Distributions under the Plan shall be calculated as if each holder of an Allowed LBT Third-Party Guarantee Claim in Class 15A were to receive its Pro Rata Share of a Distribution of Plan Consideration; *provided*, *however*, that 50% of the Aggregate LBT Guarantee Claims Distribution shall automatically be distributed to holders of Allowed Claims in Class 3 and Class 4 in accordance with Section 4.18 of the Plan.

### 11. Special Provisions Regarding LBSN

For the purpose of settling LBSN Intercompany Claims and Third-Party Guarantee Claims for which LBSN is the Primary Obligor on the corresponding Primary Claims, if both Class 14B and Class 15B accept the Plan, all Distributions under the Plan shall be calculated as if each holder of an Allowed LBSN Third-Party Guarantee Claim in Class 15B were to receive its Pro Rata Share of a Distribution of Plan Consideration; *provided*, *however*, that 50% of the Aggregate LBSN Guarantee Claims Distribution shall automatically be distributed to holders of Allowed Claims in Class 3 and Class 4 in accordance with Section 4.19 of the Plan.

### D. Provisions Governing Distributions

### 1. Postpetition Interest

In accordance with section 502(b)(2) of the Bankruptcy Code (except as otherwise provided by sections 562 and 502(g)(2) of the Bankruptcy Code), the amount of all Unsecured Claims against the Debtors will be calculated as of the Commencement Date. Except as otherwise explicitly provided in the Plan, no holder of a Claim will be entitled to or will receive Postpetition Interest on their Claim.

### 2. Distributions of Plan Consideration

On the Effective Date, or as soon thereafter as practicable, after the reservation of funds for or satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Consolidated Debtors determine to pay such Allowed Secured Claim in Cash) against a Debtor, the Consolidated Debtors will make a Distribution of Plan Consideration in accordance with the provisions of the Plan to holders of Allowed Claims. After the initial Distribution, the Plan Administrator on behalf of the Consolidated Debtors will make Distributions of Plan Consideration in accordance with the Plan to holders of Allowed Claims not less frequently than semi-annually on March 30 and September 30 of each year, provided that each such Distribution in the aggregate is not less than $10,000,000. Notwithstanding the foregoing, the Plan Administrator may determine, in its sole discretion, (a) to make a Distribution that is less than $10,000,000 in the aggregate, or (b) not to make a Distribution to the holder of an Allowed Claim on the basis that it has not yet determined whether to object to such Claim and such Claim will be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator determines not to object to such Claim (or the time to object to Claims expires),

agrees with the holder of such Claim to allow such Claim in an agreed upon amount or objects to such Claim and such Claim is Allowed by a Final Order.

### 3.   Minimum Distribution and Manner of Payment

No payment of Cash of less than $100 will be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Plan Administrator.  Unless the Person receiving a Distribution under the Plan agrees otherwise, any Distribution under the Plan will be made in United States Dollars and, at the election of the Plan Administrator, by check on a domestic bank or by wire transfer from a domestic bank.  Distributions to foreign creditors may also be made, at the option of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 4.   Distributions Free and Clear

Except as otherwise provided in the Plan, any Distributions under the Plan will be free and clear of any Liens, Claims and encumbrances, and no other entity, including the Debtors or the Plan Administrator will have any interest, legal, beneficial or otherwise, in assets transferred pursuant to the Plan.

### 5.   Delivery of Distributions and Undeliverable Distributions

Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proof of claim filed by the holder of such Allowed Claim or on the Schedules filed with the Bankruptcy Court, unless the address on such Schedules is superseded by a new address as set forth (a) on a proof of claim filed by a holder of an Allowed Claim or (b) in another writing notifying the Plan Administrator (at the addresses set forth in Section 19.8 of the Plan) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder will be made unless and until the Plan Administrator is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder at its then-current address, without interest.  All demands for undeliverable Distributions will be made on or before six (6) months after the date such undeliverable Distribution was initially made.  Thereafter, the amount represented by such undeliverable Distribution will irrevocably revert to the Consolidated Debtors and any Claim in respect of such undeliverable Distribution will be discharged and forever barred from assertion against any Debtor or its respective property.

### 6.   Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Plan Administrator has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory

to such issuing or disbursing party for payment of any such tax obligations.   The Plan Administrator may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9 as applicable, to each such holder.  If the Plan Administrator makes such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution will irrevocably revert to the Consolidated Debtors and any Claim in respect of such Distribution will be discharged and forever barred from assertion against such Debtor or its respective property.

### 7.   Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims will be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any check will be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided check will be made on or before 90 days after the expiration of the 90-day period following the date of issuance of such check. Thereafter, the amount represented by such voided check will irrevocably revert to the Consolidated Debtor and any Claim in respect of such voided check will be discharged and forever barred from assertion against any Debtor and its property.

### 8.   Setoff and Recoupment

The Consolidated Debtors may set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that any Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Consolidated Debtors of any such Claim any Debtors may have against such claimant. Furthermore, the substantive consolidation of any Debtor with any other Debtor or other Affiliate pursuant to the Plan shall not create mutuality for purposes of determining setoff rights of any holder of any Claim or provide or expand any rights of subordination (whether arising under statute, contractually or otherwise).

### 9.   Net Distributions to Foreign Affiliates

In the event a Distribution to a Foreign Affiliate (the "Receiving Affiliate") would affect the amount of Distributions the Consolidated Debtors receive from another Foreign Affiliate (the "Paying Foreign Affiliate") as a consequence of such Paying Foreign Affiliate being a creditor of the Receiving Affiliate, the Consolidated Debtors may, but are not required to, reduce or net any Distribution to a Receiving Affiliate by the anticipated distribution the Paying Foreign Affiliate is due to receive from the Receiving Affiliate.

### 10.  Allocation of Distributions

Distributions to any holder of an Allowed Claim will be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### 11. Maximum Distribution

In no event will any holder of any Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim, including after taking into account amounts received from sources other than the Debtors on account of such Allowed Claim.

## E.  Payment Notes

### 1.  Issuance and Distribution

Subject to Section 13.7 of the Plan, on or after the Effective Date, the Consolidated Debtors shall issue Payment Notes for distribution by the Plan Administrator for the benefit of holders of Allowed Claims in all Classes other than Class 1, Class 2, Class 5A, Class 5B, Class 5C, Class 19 and Class 20.

### 2.  Transferability of Payment Notes

Payment Notes shall be freely transferable to the fullest extent permitted under law.  From and after the Effective Date, Payment Notes shall evidence Allowed Claims and the transfer of a Payment Note shall transfer the corresponding Allowed Claim evidenced thereby.  Holders of Payment Notes shall be the only Persons entitled to Distributions under the Plan on account of corresponding Allowed Claims.

### 3.  Fractional Distributions

Payment Notes shall be denominated in whole dollar amounts and no fractional Payment Notes shall be issued.  Allowed Claims shall be rounded down to the nearest dollar for the purpose of determining the amount of Payment Notes to be distributed to any holder of an Allowed Claim.

### 4.  Paying Agent

The Plan Administrator shall appoint a Paying Agent which shall be charged with making Distributions to holders of Payment Notes under the Plan, maintaining a register for the Payment Notes and performing such other duties in respect of the Payment Notes as may be required by law.

### 5.  Exemption from Registration

The issuance and distribution of the Payment Notes shall not be registered under section 5 of the Securities Act or any state or local law on the basis that the issuance and distribution of the Payment Notes does not involve an "offer" or "sale" of securities with the meaning of section 5 of the Securities Act, including rule 145 promulgated thereunder, or any state or local law.  The Payment Notes issued and distributed on such basis shall not be "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act.  To the extent that the Bankruptcy Court determines that the issuance and distribution of the Payment Notes involves an "offer" or "sale," the issuance and distribution of Payment Notes shall be exempt from registration under section 5 of the Securities Act and any state or local law

requiring registration pursuant to section 1145 of the Bankruptcy Code.  To the extent that the Bankruptcy Court determines that Payment Notes cannot be distributed pursuant to section 1145 of the Bankruptcy Code, the Payment Notes shall be issued and distributed to Accredited Investors only pursuant to the exemption from registration under section 5 of the Securities Act provided by section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.

## 6.  Deemed Transfer To DTC

Subject to satisfying DTC's issue eligibility requirements, the Consolidated Debtors will deposit the Payment Notes with DTC (except such deposit is not practical or advisable with respect to any particular Payment Notes).  The ownership of Allowed Claims will be deemed transferred to DTC with respect to those Payment Notes registered in the name DTC or its nominee; provided that the rights of holders of Payment Notes shall be reflected through beneficial ownership of Payment Notes in accordance with the DTC's rules and practices.  Such transfer shall be deemed to be in compliance with Federal Rule of Bankruptcy Procedure 3001(e).

## 7.  Discretion of Plan Administrator

Payment Notes shall be issued and distributed pursuant to Article XIII of the Plan unless the Plan Administrator determines in its sole discretion that such issuance and distribution would be inadvisable or impractical.  In the event the Plan Administrator makes such determination, the provisions of Article XIII of the Plan shall have no force or effect.

## F.  Liquidating Trust

## 1.  Execution of Liquidating Trust Agreement

After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Consolidated Debtors and holders of Allowed Claims against and Equity Interests in such Consolidated Debtors, the Plan Administrator and a Liquidating Trustee shall execute a Liquidating Trust Agreement, and shall take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which shall be for the benefit of Liquidating Trust Beneficiaries.  In the event of any conflict between the terms of Section 14.1 of the Plan and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of Section 14.1 of the Plan shall govern.  A Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of a Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

Each Liquidating Trust shall be established for the sole purpose of liquidating and distributing the assets of the Consolidated Debtor that contributed to such Liquidating Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

Each Liquidating Trust shall consist of Liquidating Trust Assets. After the creation of a Liquidating Trust pursuant to Section 14.1 of the Plan, the Plan Administrator shall transfer all of the Liquidating Trust Assets to a Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code.

Each Liquidating Trust shall be administered by a Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

A Liquidating Trustee shall have the same authority in respect of all taxes of the Consolidated Debtors, and to the same extent, as if the Liquidating Trustee were the Consolidated Debtor.

A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all Available Cash (including any Cash received from the Consolidated Debtors and treating any permissible investment as Cash for purposes of Section 14.7 of the Plan), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Consolidated Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), or (c) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; provided, however, that such Liquidating Trustee shall not be required to make a Distribution pursuant to Section 14.7 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impractical.

## 2. Federal Income Tax Treatment

For all United States federal income tax purposes, all parties (including, without limitation, the Consolidated Debtors, a Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests. Accordingly, Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating

Trust Assets as are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

## 3. Tax Reporting

A Liquidating Trustee shall file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 14.9(a) of the Plan. A Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for the purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets. Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if such Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), such Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including such Liquidating Trustee, the Debtors and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

A Liquidating Trustee shall be responsible for payment, out of Liquidating Trust Assets, of any taxes imposed on a Liquidating Trust or its assets.

A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Consolidated Debtor as to whom the Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Consolidated Debtor for all taxable periods through the dissolution of such Liquidating Trust

### 4.  Dissolution

A Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; provided, however, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to Section 14.1 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If at any time a Liquidating Trustee determines, in reliance upon such professionals as a Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve such Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, such Liquidating Trust, and any insider of such Liquidating Trustee, and (iii) dissolve such Liquidating Trust.

### G.  Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the counterparty to such contract or lease agreement may file a Claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code.

## 1.  Rejected Contracts and Leases of the Debtors

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed pursuant to an Order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (iii) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Consolidated Debtors.

Notwithstanding subsection (iii), the Plan Proponents reserve the right, on or prior to the Confirmation Date, to amend the Plan Supplement to remove any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, rejected or assumed.  The Plan Proponents will provide notice of any amendments to the Plan Supplement to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document in the Plan Supplement shall not constitute an admission by the Plan Proponents that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

## 2.  Assumed Contracts and Leases of the Debtors

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.  To the extent any provision of an executory contract or unexpired lease to be assumed by the Consolidated Debtors under the Plan limits such Debtors' ability to assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

## 3.  Insurance Policies

Pursuant to the Plan, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts and will be deemed assumed under the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Litigation Claims that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

## 4.  Cure of Defaults

Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Consolidated Debtors will cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Consolidated Debtors pursuant to the Plan in accordance with section 365(b) of the Bankruptcy Code.  All disputed defaults that are

required to be cured will be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Consolidated Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties.

### 5. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Consolidated Debtors no later than forty-five (45) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to the Plan Supplement relating to such executory contract or unexpired lease. **Except as set forth in the preceding sentence, all such Claims must otherwise comply with the provisions of the Bar Date Order, including, without limitation, the Derivatives Questionnaire and the Guarantee Questionnaire. All such Claims not filed in accordance with the foregoing and within such time will be forever barred from assertion against the Consolidated Debtors and their estates.** Any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan will be classified pursuant to Article III of the Plan.

### H. Conditions Precedent to Plan's Confirmation and Effective Date

### 1. Conditions to Confirmation of the Plan

A condition precedent to the confirmation of the Plan is that the Bankruptcy Court shall have entered a Confirmation Order with respect to such Plan in form and substance satisfactory to the Plan Proponents.

### 2. Conditions to Effective Date of the Plan

The Plan will not become effective unless and until the following conditions will have been satisfied pursuant to the Plan:

(a)     the Confirmation Order, in form and substance acceptable to the Plan Proponents, shall have been entered;

(b)     all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been effected or executed and delivered, as applicable, in form and substance satisfactory to the Plan Proponents;

(c)     all authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(d)     the certificates of incorporation, by-laws and other organic documents of the Debtors shall have been amended to the extent necessary to effectuate the Plan.

### 3.  Waiver of Conditions

Notwithstanding the foregoing, the Plan Proponents reserve the right to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 16.2 of the Plan other than Section 16.2(a) of the Plan.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Plan Proponents decide that one of the conditions precedent to the Effective Date of the Plan cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Plan Proponents shall file a notice of the inability to satisfy such condition precedent with the Bankruptcy Court.

## I.  Effect of Confirmation of the Plan

### 1.  Vesting of Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of (a) the Consolidated Debtors' estates and (b) LBT, LBSN and the Designated Non-Debtor Affiliates, to the extent substantively consolidated pursuant to the Plan, will vest in the Consolidated Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Consolidated Debtors may take any action, including, without limitation, the operation of their businesses, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided in the Plan.

### 2.  Binding Effect

On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 3.  Release, Exculpation and Limitation of Liability

**On and after the Effective Date, the Debtors and all entities who have held, hold or may hold Claims against or Equity Interests in (a) any or all of the Consolidated Debtors and (b) LBT, LBSN and the Designated Non-Debtor Affiliates, to the extent substantively consolidated pursuant to the Plan (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, shall be deemed to have released the Released Parties from, and none of the Released Parties shall have or incur any liability for, any**

**Claim, Cause of Action or other assertion of liability for any act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto;** *provided*, *however*, **that (i) in no event shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any Released Party for any act taken or omitted to be taken prior to the Commencement Date be released by the Plan and (ii) nothing provided in the Plan shall affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence;** *provided*, *further*, **that nothing in the Plan shall limit the liability of the professionals of the Debtors or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Model Code of Professional Responsibility.**

### 4.   Injunction

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, who served in any such capacity, whether arising under the Debtors' constituent documents, contract, law or equity, shall be assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date.  The prosecution of any so-indemnified Cause of Action shall, upon the occurrence of the Effective Date, be enjoined and prohibited.

### 5.   Retention of Litigation Claims and Reservation of Rights

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Litigation Claims that the Consolidated Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against any Debtor, its officers, directors, or representatives, (ii) any and all Claims or rights arising under any tax sharing agreement among the Debtors and their Affiliates (including the tax sharing agreement among the Debtors and LBI based on their regular and consistent course of conduct over many years), (iii) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of an Affiliate's assets, and (iv) any and all Avoidance Actions.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff, or other legal or equitable defense which a Debtor had immediately prior to the Commencement Date, against or with respect to any Claim.  The Consolidated Debtors shall have, retain, reserve, and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced; *provided*, *however*, that the foregoing shall not restrict the Consolidated Debtors' ability to retain, prosecute or settle any Avoidance Actions.

Except as expressly provided in the Plan, the Plan Administrator shall, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.  The Plan Administrator shall prosecute all such retained Litigation Claims.

### 6.   Terms of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

### J.   Summary of Other Provisions of Plan

The following subsections summarize certain other significant provisions of the Plan.  The Plan should be referred to for the complete text of these and other provisions of the Plan.

### 1.  Management and Administration on a Consolidated Basis

The Consolidated Debtors will be managed and administered on a consolidated basis.  Any fiduciary duties that the directors and officers of the Consolidated Debtors may owe to creditors or shareholders, as the case may be, will be owed on a consolidated basis.

### 2.  LAMCO

Subject to the discretion and direction of the Plan Administrator, LAMCO may serve as asset manager for certain assets of the Consolidated Debtors under the Plan.  Title and ownership of the assets of the Debtors will not be transferred to LAMCO.  Ownership and ultimate decision-making authority with respect to each asset after the Effective Date will be vested in the Consolidated Debtors.

### 3.  Amendment or Modification of the Plan

The Plan Proponents reserve the right to propose alterations, amendments, or modifications of or to the Plan in writing at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, modified or amended, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

### 4.  Allocation of Plan Distributions Between Principal and Interest

Pursuant to the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 5.  Revocation or Withdrawal of the Plan

The Plan Proponents reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date.  If the Plan Proponents revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such

Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person, including the Plan Proponents, in any other further proceedings involving such Debtor.

In the event that the Plan Proponents choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Plan Proponents reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Plan Proponents reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan under chapter 11 of the Bankruptcy Code at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### 6. Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents will terminate.

### 7. Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in connection with any disposition of assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 8. Retention of Jurisdiction

Following the Confirmation Date, the Bankruptcy Court will retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     to hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(b)     to determine any and all pending adversary proceedings, applications and contested matters relating to the Chapter 11 Cases;

(c)     to hear and determine any objection to Claims;

(d)      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)      to issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(f)      to consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)      to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, including any agreements or documents contemplated by the Plan;

(i)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)      to hear and determine any actions brought against the Plan Administrator in connection with the Plan;

(k)      to hear and determine any actions brought to recover all assets of the Debtors and property of the estates, wherever located;

(l)      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Commencement Date;

(m)      to hear all matters relating to Article XVII of the Plan, including, without limitation, all matters relating to the releases, exculpation, and injunction granted thereunder;

(n)      to hear any other matter consistent with the provisions of the Bankruptcy Code; and

(o)      to enter a final decree closing the Chapter 11 Cases.

### 9.  Plan Supplement

The amended certificates of incorporations and by-laws of the Debtors (if any) and a list of any contracts or leases to be assumed or assumed and assigned by the Debtors in accordance with Section 14.1 of the Plan will be contained in the Plan Supplement that is filed

with the Clerk of the Bankruptcy Court at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.

### K.  Summary of Recovery Analysis Under the Plan

The Recovery Analysis setting forth the estimated Claim and estimated recoveries for each Class as well as assumptions related thereto is annexed hereto as Exhibit 2.

## VI.    CONFIRMATION AND CONSUMMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.  Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 3 through 20 of the Plan are impaired, and the holders of Allowed Claims in each of these Classes other than Classes 5A, 5B, 5C, 19 and 20 are entitled to vote to accept or reject the Plan; provided however, that the holders of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n, 18A-18n are entitled to vote on the Plan solely for purposes of effecting the proposed settlements contained in the Plan.  The holders of Claims in Classes 5A, 5B, 5C and 19 will not receive any distributions under the Plan and are conclusively presumed to have rejected the Plan.  The holders of Equity Interests in LBHI in Class 20 are impaired and are conclusively presumed to have rejected the Plan.

As to the classes of Claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that class that have timely voted to accept or reject a plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor in an impaired Class (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of claim on or before the Bar Date or Securities Programs Bar Date, as applicable, or any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is entitled to vote on the Plan.

### B.  The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for [_____], commencing at [_:___ __.m] Eastern Time, before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States District Court for the Southern District of New York, Room 601, Alexander Hamilton Customs House, One Bowling

Green, New York, New York 10004.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or amount and description of the Equity Interest held by the objector.  Any such objection must be filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order and the amended Case Management Order, dated [_____], on or before [_____] at [_:___ __.m], Eastern Time. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### C.  Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of Claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the plan.

### 1.  Acceptance

The Claims in Classes 3 through 20 of the Plan are impaired under the Plan and, the holders of Allowed Claims in such impaired Classes, other than Claims in Classes 5A, 5B, 5C, 19 and 20, are entitled to vote to accept or reject the Plan; provided however, that the holders of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n are entitled to vote on the Plan solely for purposes of effecting the proposed settlements contained in the Plan.  Claims in Classes 5A, 5B, 5C and 19 and Equity Interests in LBHI in Class 20 are receiving no Distributions under the Plan and, therefore, are conclusively presumed to have voted to reject the Plan.

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Plan Proponents reserve the right to amend the Plan in accordance with Section 19.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Plan Proponents shall request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

### 2.  Feasibility

The Bankruptcy Code permits a plan to be confirmed only if it is not likely to be followed by liquidation or the need for further financial reorganization.

Since the Plan contemplates a liquidation, for purposes of determining whether the Plan meets this requirement, the Plan Proponents have analyzed the Consolidated Debtors' ability to meet their obligations under the Plan over the expected period of liquidation.  As part of this analysis, the Plan Proponents have relied on cash flow estimates for the Consolidated Debtors for the five-year period ending December 31, 2014 (the "Projection Period") and have

prepared a liquidation analyses for the Consolidated Debtors. These cash flow estimates, and the assumptions on which the Debtors state they are based are included in Exhibit 7 annexed to the Debtors' Disclosure Statement.  Based upon such estimates, the Plan Proponents believe that the Consolidated Debtors will be able to make all payments required pursuant to the Plan and, therefore, after confirmation of the Plan they will be able to liquidate their assets and make Distributions as contemplated.   The Plan Proponents expect that the liquidation of the Consolidated Debtors' assets and Claims reconciliation will take longer than the Projection Period.

The Debtors have stated that they have prepared their cash flow estimates based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions that the Debtors considered to be significant are described in the cash flow estimates, which are annexed to the Debtors' Disclosure Statement as Exhibit 7.  The cash flow estimates have not been examined or compiled by independent accountants.   The Plan Proponents make no representation as to the accuracy of the cash flow estimates or the Debtors' ability to achieve the results.  Many of the assumptions on which the cash flow estimates are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the Projection Period may vary from the estimated results and the variations may be material.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Debtors have based the cash flow estimates in connection with their own independent evaluation of the Plan.

### 3.  Best Interests Test

The Bankruptcy Code requires that the Bankruptcy Court, as a condition to confirming the Plan, find that the Plan is in the best interests of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find that the Plan will provide a holder of an Impaired claim who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Equity Interests if the Consolidated Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Consolidated Debtors' assets if their Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from liquidating the Consolidated Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to creditors would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases.  Costs of a liquidation of the Consolidated Debtors under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Consolidated Debtors in the Chapter 11 Cases (such as

compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs and Claims arising from the operations of the Consolidated Debtors during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests. The liquidation under chapter 7 would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of Unsecured Claims.

The Debtors have stated that, as of January 1, 2011, they have postpetition employment agreements with approximately 413 employees, who spent a significant amount of time analyzing and reviewing the Debtors' assets and have built infrastructures to manage such assets. A chapter 7 trustee would have the option of either retaining current employees of the Debtors or rejecting the contracts of some or all of the Debtors' employees. If the chapter 7 trustee decides that only a fraction of such employees are required to liquidate the Consolidated Debtors' assets, and therefore rejects such employment contracts, the Consolidated Debtors would incur additional administrative expenses from the rejection of postpetition contracts which would be paid prior to Classes of Claims. Furthermore, due to the complexity and size of the Consolidated Debtors' assets it would take the chapter 7 trustee months to analyze and review the assets, incurring additional expenses on the estate.

In addition, the recoveries that the Consolidated Debtors would receive from the expeditious liquidation of their assets is likely to be substantially less than the recoveries if the Consolidated Debtors hold such assets and dispose of them over a longer period of time. While the financial markets have improved since the period immediately following the Commencement Date, in the Plan Proponents' business judgment, the liquidation of the assets under the current market conditions would result in the Consolidated Debtors taking a substantial discount on the value of their assets.

In a chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Equity Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior class were paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Consolidated Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in

bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Plan Proponents have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is greater than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.

The Liquidation Analysis prepared by the Plan Proponents is annexed hereto as Exhibit 3. The information set forth in Exhibit 3 provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Consolidated Debtors' estates. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of both the Debtors and the Plan Proponents. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Consolidated Debtors were, in fact, to undergo such a liquidation.

## 4. Competing Plans

The Plan Proponents anticipate that, at the same time the Plan Proponents seek to have the Bankruptcy Court confirm the Plan, the Debtors will seek to have the Debtors' Plan confirmed and the Non-Consolidation Plan Proponents will seek to have the Non-Settlement Plan confirmed. As noted above, the Plan Proponents contend that the Debtors' Plan and the Non-Settlement Plan are unconfirmable. Assuming, however, that the Plan, the Debtors' Plan and the Non-Settlement Plan are all confirmable, the Bankruptcy Court may confirm only one plan. Pursuant to section 1129(c) of the Bankruptcy Code, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." However, the Bankruptcy Court is only obligated to consider the preferences of creditors and equity security holders, not simply obey them.[8]

In deciding which competing plan of reorganization to confirm, the Bankruptcy Court will apply a four-factor analysis, considering (i) the type of plan; (ii) the treatment of creditors and equity security holders; (iii) the feasibility of the plan; and (iv) the preferences of creditors and equity security holders.[9]  Under the "type of plan" analysis, a reorganization plan is usually preferable to a liquidation plan.[10]  Given that the Plan, the Debtors' Plan and the Non-

---

[8] In re River Village Assoc., 181 B.R. 795, 807 (E.D. Pa. 1995).

[9] See, e.g., In re ASARCO LLC, 420 B.R. 314, 327 (S.D. Tex. 2009); In re River Valley Fitness One Ltd. Partnership, No. 01-12829-JMD, 2003 WL 22298573 at *9 (Bankr. D. N.H. Sept. 19, 2003); In re Internet Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003); In re Holley Garden Apartments, Ltd., 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999).

[10] In re Holley Garden, 238 B.R. at 495.

Settlement Plan are liquidation plans, the first factor is not dispositive here.  Under the second factor, the Bankruptcy Court should confirm the plan that provides better treatment for the creditors and equity security holders.[11]  The feasibility factor dictates the Bankruptcy Court to give preference to the plan that is more feasible than the other proposed plans.[12]  The last factor is statutory, and requires the Bankruptcy Court to "consider the preferences of creditors and equity security holders in determining which plan to confirm."  11 U.S.C. § 1129(c).

### D.  Consummation

The Plan will be consummated on the Effective Date.  The Effective Date of the Plan will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in Section 16.2 of the Plan, have been satisfied or waived by the Debtors pursuant to Section 16.3 of the Plan.  For a more detailed discussion of the conditions precedent to the Plan and the consequences of the failure to meet such conditions, see section V.H – "Conditions Precedent to Plan's Confirmation and Effective Date" of this Disclosure Statement.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## VII.  CORPORATE GOVERNANCE AND MANAGEMENT OF THE DEBTORS ON THE EFFECTIVE DATE

Pursuant to the Plan, on the Effective Date, the Consolidated Debtors will be managed and administered on a consolidated basis as a consequence of substantive consolidation.  Any fiduciary duties that the directors and officers for the Consolidated Debtors may owe to creditors or shareholders, as the case may be, will be owed on a consolidated basis.

### A.  Board of Directors and Management

#### 1.  Board of Directors

As of the Effective Date, the existing Board of Directors shall be terminated and a new Board of Directors shall be selected consisting of seven (7) members.  The Debtors and the Creditors' Committee shall appoint one (1) director each.  The remaining five (5) members of the Board of Directors shall be selected from a panel of nominees by a majority vote determined by the amount of Allowed Claims voting in favor of the Plan.  The Debtors and the Creditors' Committee may each nominate three (3) individuals to the panel.  Any holder or group of holders holding in the aggregate not less than $2.5 billion of Claims Allowed as of the Voting Record Date may nominate one (1) individual to the panel; *provided, however*, that such holder or group of holders may also nominate one (1) additional individual to the panel for each additional $5 billion of Claims held by such holder or group of holders and Allowed as of the Voting Record Date.  Vacancies on the Board of Directors following the Effective Date shall be filled by vote of the remaining members of the Board of Directors.

---

[11] Id.

[12] Id. at 496.

The new Board of Directors shall have full discretion with respect to the continued retention or termination of any existing managers or advisors to the Consolidated Debtors.

## 2.  Holders of the Stock of Debtors On Effective Date

On the Effective Date, all Equity Interests in LBHI shall be cancelled and one new share of LBHI's common stock will be issued to the Plan Administrator and the Plan Administrator will hold such common stock in furtherance of its performance of its obligations in connection with its winding up of the businesses, assets, properties and affairs of the Debtors. Such shares of common stock of LBHI will be held in trust by the Plan Administrator for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements; provided that the Plan Administrator may not exercise any voting rights appurtenant thereto in conflict with Article X of the Plan.

## 3.  Plan Administrator

The Plan Administrator will have the rights and powers of a debtor-in-possession under section 1107 of the Bankruptcy Code, and such other rights, powers and duties incident to causing the performance of the Debtors' obligations under the Plan, including, without limitation, the duty to assess the merits of Claims and object to those Claims that the Plan Administrator determines to be, in whole or in part, without merit, to prosecute such objections and defend Claims and counterclaims asserted in connection therewith, to prosecute such causes of action, to liquidate assets of the Consolidated Debtors' estates, to wind up the businesses, assets, properties and affairs of the Debtors, to make distributions under the Plan and such other duties as are necessary to effectuate the terms and provisions of the Plan.    The Plan Administrator will continue to exist until entry of a Final Order by the Bankruptcy Court closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

## 4.  Corporate Existence

After the Effective Date, the Plan Administrator may (a) decide to (i) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (ii) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor or merge such Debtor with another Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust), or (iii) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law; *provided, however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor-Controlled Entity, and (b) resolve Debtor Intercompany Claims in its sole discretion.

### 5.  Certificates of Incorporation and By-laws

The certificate of incorporation and by-laws of each Debtor will be amended as of the Effective Date to the extent necessary to carry out the provisions of the Plan.  The amended certificate of incorporation and by-laws of such Debtor (if any) will be included in the Plan Supplement.

### 6.  Wind-Down

The wind-down and liquidation of each of the Consolidated Debtors' assets (as determined for federal income tax purposes) shall occur over a period of 3 years after the Effective Date, subject to receiving a private letter or other equivalent guidance from the IRS permitting a longer period of time without adversely impacting the status of the Plan for federal income tax purposes (it being understood that such liquidation may include the transfer of all or part of the assets of the Debtors to one or more Liquidating Trust within the meaning of Treas. Reg. § 301.7701-4).

### 7.  Transferability of Claims and Debt Securities and Post Effective Date Disclosure

The Plan does not impose any restrictions on the ability to transfer Claims against the Consolidated Debtors, including debt securities issued by LBHI, and, in fact, enhances liquidity through the issuance of Payment Notes.  See section V.E. – "Payment Notes" of this Disclosure Statement.  In the Plan Proponents' view, this represents a critical competitive advantage of this Plan. Further, under this Plan, in the discretion of the Plan Administrator, the Consolidated Debtors may create new entities that shall principally hold existing assets of the Consolidated Debtors that the Plan Proponents determine would be more valuable if spun off into separate entities and, in connection therewith, create New Securities for Distribution to holders of Allowed Claims and Equity Interests in a manner consistent with the provisions of the Plan.

The Plan Proponents anticipate that the Consolidated Debtors will as soon as is reasonably practicable after the Effective Date attempt to satisfy applicable reporting requirements, including reporting requirements under the Securities and Exchange Act of 1934. In addition to such reporting requirements imposed by law, the Plan Proponents anticipate that the Consolidated Debtors will disclose such additional information as may be reasonable to assist stakeholders in evaluating the progress of the Consolidated Debtors' efforts to liquidate each asset class, consistent with the types of disclosures that the Plan Proponents have previously requested that the Debtors make during the pendency of the Chapter 11 Cases.  Examples of public disclosures that may be provided by the Consolidated Debtors are annexed hereto as Exhibits 4A through 4M.  The disclosures the Plan Proponents expect to be provided will be on a consolidated basis giving effect to the substantive consolidation provided pursuant to the Plan. The Plan Proponents believe that substantive consolidation will permit more meaningful disclosure to creditors because the Debtors' disclosures currently remain subject to further adjustments, which may be material, pending review of ongoing intercompany financial transactions.

### 8. Stock Trading Restrictions

Under the Plan, the restrictions imposed by the Stock Trading Restrictions Order shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

## VIII.  SECURITIES LAWS MATTERS

### A.  Existing Equity Interests

On the Effective Date all existing Equity Interests in LBHI will be cancelled and one new share of LBHI's common stock shall be issued to the Plan Administrator which will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements.  On the Effective Date all existing Equity Interests in each of the Debtors other than LBHI will be retained by such holder and only cancelled if and when such Debtor is dissolved in accordance with the Plan.  In the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Plan, each holder of an Equity Interest in such Debtor may receive its Pro Rata Equity Share of any remaining assets of such Debtor.

### B.  Initial Distribution of New Securities

The Plan Proponents intend that any New Securities issued pursuant to the Plan representing an interest in any entity formed by the Consolidated Debtors pursuant to the provisions of Section 9.5 of the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code.

Section 1145(a)(1) exempts such offers and sales if three principal requirements are satisfied:

- the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

- the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and

- the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claims or interests and partly for cash or property.

The Plan Proponents believe that the offer and sale of the New Securities satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code insofar as the entities issuing the New Securities are successors to the Debtors within the meaning of section 1145(a)(1).

To the extent it is determined that the exemption provided by section 1145 is not available, the Debtors would be required to register the New Securities under the Securities Act,

or qualify for an alternative exemption from the registration requirements of the Securities Act, before issuance.

### C.  Resales of New Securities/Rule 144 and Rule 144A

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering.  Therefore, if issued pursuant to the section 1145 exemption, New Securities may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.  In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions:

- purchases a claim with a view to distribution of any security to be received in exchange for such claim;

- offers to sell securities offered or sold under the plan for the holders of such securities;

- offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan; or

- is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor or its successor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive New Securities under the Plan pursuant to the exemption from registration set forth in section 1145 of the Bankruptcy Code, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such securities may, however, be able, under certain conditions described below, to sell such securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

To the extent that persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "<u>Restricted Holders</u>"), resales of such securities by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell New Securities without registration if they are able to comply with the applicable provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities (other than a holder of restricted securities) is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

To the extent it is determined that the exemption provided by Section 1145 is not available and the Debtors register the New Securities under the Securities Act before issuance, any person who received a distribution of such securities who is not an "affiliate" of the issuer would be permitted to transfer such securities freely under the Securities Act. Pursuant to Rule 144 of the Securities Act, any "affiliate" of an issuer who resells restricted securities will not be deemed to be an underwriter if certain conditions are met. These conditions include the requirement that the person holds the securities for a six-month period (with respect to a reporting issuer), current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE DEBTORS WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE PLAN PROPONENTS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN NEW SECURITIES. ACCORDINGLY, IT IS RECOMMENDED THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

### D.  Payment Notes

On or after the Effective Date of the Plan, the Plan Administrator designated by the Board of Directors and approved by the Bankruptcy Court shall distribute Payment Notes to all holders of Allowed Claims unless the Plan Administrator determines that such distribution is inadvisable or impractical.  Payment Notes are instruments evidencing ownership of the various types of Allowed Claims as set forth in Article IV of the Plan and the obligation of the Consolidated Debtors to make any corresponding Distributions under the Plan.  The transfer of a Payment Note will constitute a transfer of the corresponding Allowed Claim evidenced thereby.  Holders of Payment Notes will be entitled to Distributions under the Plan on account of corresponding Allowed Claims.

#### 1.  Holders' Benefits

The Payment Notes are intended to provide holders of Allowed Claims with liquidity through the deposit of the related Payment Notes with DTC.  As discussed in subparagraph 4 below in more detail, this would result from the ability of the holders to settle transfers of Payment Notes electronically without the need to deliver paper certificates or register such transfers with the Consolidated Debtors.  The liquidity of any market for the Payment Notes will depend upon many factors, including: (i) the determination of DTC regarding DTC eligibility of the Payment Notes, (ii) the number of holders, (iii) the aggregate market value of the Payment Notes, and (iv) the interest of securities dealers in making a market.  No one intends to apply for listing of the Payment Notes on any national securities exchange, but, it is possible that the Payment Notes would trade on the over-the-counter market and that price quotations might be reported.

To maximize the potential liquidity benefits of the Payment Notes, holders will need to have a securities account with a direct or indirect DTC participant as explained below.  Only holders with such accounts will be eligible to receive Payment Notes through DTC's DWAC service.

#### 2.  Appointment of Paying Agent

In connection with the issuance of the Payment Notes, the Plan Administrator shall appoint a Paying Agent charged with (i) making distributions, including any payments or transfers made to a person other than a Debtor under the Plan, to holders of Payment Notes under the Plan, (ii) maintaining a register for the Payment Notes and (iii) performing such other duties in respect of the Payment Notes as may be required by law.

#### 3.  Transferability of Payment Notes

The issuance and distribution of the Payment Notes shall not be registered under section 5 of the Securities Act or any state or local law on the basis that the issuance and distribution of the Payment Notes does not involve an "offer" or "sale" of securities within the meaning of section 5 of the Securities Act, including rule 145 promulgated thereunder, or any state or local law.  It is also intended that Payment Notes shall not be "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act.  Assuming that is the case, any

person who received a distribution of Payment Notes who is not an "affiliate" of the issuer of the Payment Notes, will be permitted to transfer such securities freely under the Securities Act. Transfers may be conducted through DTC if the Payment Notes are deemed DTC-eligible. Pursuant to Rule 144 of the Securities Act, any holder deemed an "affiliate" of the issuer of the Payment Notes will be permitted to transfer such Payment Notes only if certain conditions are met.  These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, and that notice of the resale be filed with the SEC.

To the extent that the Bankruptcy Court determines that the issuance and distribution of the Payment Notes involves an "offer" or "sale," such issuance and distribution shall be exempt from registration under section 5 of the Securities Act and any state or local law requiring registration pursuant to section 1145 of the Bankruptcy Code.  If issued under section 1145, the Payment Notes would be subject to the resale restrictions described above under section VIII.C – "Resales of New Securities/Rule 144 and Rule 144A" for securities issued pursuant to the exemption under section 1145 of the Bankruptcy Code.

However, should the Bankruptcy Court determine that the Payment Notes are not eligible for exemption from the registration requirements of the Securities Act under section 1145 of the Bankruptcy Code and determine that the issuance and distribution of the Payment Notes involves an "offer" or "sale," only Allowed Claims holders who are Accredited Investors within the meaning of Rule 501 of Regulation D promulgated under the Securities Act will be issued and receive Payment Notes pursuant to the exemption from registration provided by section 4(2) of the Securities Act.  Section 4(2) provides an exemption for "private placements," or transactions by an issuer not involving any public offering.  In this case, persons who are not Accredited Investors but hold Allowed Claims will not be issued and will not receive Payment Notes.  The claims of such persons will continue to exist in their current form. Allowed Claims that continue to exist in their current form will be freely transferable.

## 4.  DTC Eligibility and Delivery

The Payment Notes will be issued only in registered book entry form. Subject to satisfying DTC's issue eligibility requirements, the Consolidated Debtors will deposit the Payment Notes with DTC (except to the extent that such deposit is not practical or advisable with respect to any particular Payment Notes).  To the extent that the Payment Notes are DTC-eligible, the Payment Notes will be represented by one or more global Payment Notes, for which the Paying Agent will serve as custodian.  DTC-eligible Payment Notes will be registered in the name of DTC or its nominee, which will be the registered holder of such Payment Notes. Ownership of beneficial interests in the Payment Notes deposited with DTC will only be shown on, and the transfer of that ownership will only be effected through, records maintained by DTC or its nominee (with respect to interests of DTC participants) and the records of DTC participants or other securities intermediaries, as applicable (with respect to interests of persons other than DTC participants).  As a result, only holders of Allowed Claims who maintain securities accounts with direct or indirect DTC participants will be eligible to receive Payment Notes through DTC.

It is intended that Payment Notes will be distributed to holders of Allowed Claims through DTC's DWAC services. Any holders of Allowed Claims who wish to receive their Payment Notes through the DWAC system shall be required to provide necessary information, including a DTC participant number and account number, to the Paying Agent. It shall be the sole responsibility of such holder or their DTC participant to initiate the DWAC deposit into their accounts upon receipt of notice that the Payment Notes have been released.

The holders of Payment Notes that are not deposited with DTC due to lack of eligibility or otherwise shall have their interests recorded in their name on the books and records of the Paying Agent.  Any trades of the securities evidenced by the Payment Notes recorded in that manner that are settled through the Paying Agent shall require such documentation as the Paying Agent may reasonably request.

In the event that the Bankruptcy Court determines that the Payment Notes are restricted securities, the Payment Notes will be delivered through DWAC only to QIBs that duly complete and return questionnaires certifying their status as a "qualified institutional buyer" under Rule 144A of the Securities Act. Such QIB Payment Notes shall bear customary legends for DTC-eligible Rule 144A securities, providing that such securities may not be offered, sold or otherwise transferred unless the sale is registered under the Securities Act or subject to an exemption from the registration requirements of the Securities Act.  Any transfers of securities evidenced by such Payment Notes shall be effected only through records maintained by DTC and its direct and indirect participants.  Payment Notes of non-QIB holders of Allowed Claims will not be deposited with DTC.

DTC has advised as follows:  DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the Uniform Commercial Code and a "Clearing Agency" registered pursuant to the provisions of Section 17A of the Exchange Act.  DTC was created to hold securities for DTC participants and to facilitate the clearance and settlement of securities transactions between DTC participants through electronic book entry changes in accounts of DTC participants, thereby eliminating the need for physical movement of certificates.  DTC participants include security brokers and dealers, banks, trust companies and clearing corporations and may include certain other organizations.  Indirect access to the DTC system is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly (indirect participants).

Although DTC is expected to follow the foregoing procedures in order to facilitate transfers of interests in a global security among its participants, it is under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.  Neither the Plan Administrator nor the Paying Agent will have any responsibility for the performance of DTC or its participants, indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations.

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

NO REPRESENTATIONS CONCERNING OR RELATED TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

### A.  Certain Bankruptcy Law Considerations

It is not possible to predict with certainty the length of the Chapter 11 Cases or to assure that the Plan will be confirmed.  Even if all voting Classes vote in favor of the Plan and the requirements for "cramdown" are met with respect to any Class deemed to have rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  As discussed in section VI – "Confirmation and Consummation of the Plan" of this Disclosure Statement, section 1129 of the Bankruptcy Code requires, among other things, a showing that the value of distributions to dissenting holders of Claims and Equity Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Plan Proponents believe that the Plan will meet such test with respect to all Classes for the Consolidated Debtors, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Even if the Plan is confirmed, the continued prolongation of the Chapter 11 Cases may have an adverse effect on the Debtors' businesses and ultimate recovery on the Debtors' assets.  Prolonged Chapter 11 Cases will result in the Debtors' incurrence of substantial additional Administrative Expense Claims and Professional Fee Claims and will require the Debtors' management to continue to devote substantial time and energy which would otherwise be directed at efficiently operating the Debtors' distribution process and marketing the Debtors' assets to augment the value of the Debtors' estates.

### B.  Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that

any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court, and if the Plan is confirmed, there can be no assurance that the Plan will be consummated and the restructuring completed.

### C.  Asset Sales

Under the Plan, distributions to holders of Allowed Claims will be funded substantially by the liquidation of the Debtors' assets.  Although the Debtors will seek to maximize the price they receive for their assets, it is impossible to predict with certainty the value that the Debtors will receive and the resulting distributions.

### D.  Estimation of Allowed Claims

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from estimates.  Because the estimated amounts are based solely upon (i) the Debtors' review of the their books and records, (ii) the Debtors' review of the Claims, (iii) the Debtors' estimates as to additional Claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the cases from chapter 11 to chapter 7 and (iv) the Debtors' estimates of Claims that will be Allowed following the objections to Claims by the Debtors, such estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated therein.

### E.  Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Holders of Eligible Claims (as defined below) and other interested parties should read carefully the discussion set forth in section X – "Certain U.S. Federal Income Tax Consequences of the Plan" of this Disclosure Statement for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## X.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN[13]

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims.  This summary does not address the federal income tax consequences to holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, or holders whose Claims are entitled to payment in full in Cash.

This summary is based on the IRC, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect

---

[13] This section is solely based on the information provided in the Debtors' Disclosure Statement.

on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties at this time. The Plan Proponents have not requested an opinion of counsel with respect to any of the tax aspects of the Plan. While the Plan Proponents might seek a ruling from the IRS concerning certain, but not all, of the federal income tax consequences of the Plan, there is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling. This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker/dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, tax-exempt organizations, or any other Debtor entity as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investments, traders in securities that elect to use a mark-to-market method of accounting for their security holding, certain expatriates, or former long-term residents of the United States, persons who received common stock of LBHI as compensation, or pass-through entities or investors in pass-through entities).

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all distributions to holders of Claims will be taxed accordingly.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

*__IRS Circular 230 Notice__: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Equity Interests for the purpose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

### A. Consequences to the Consolidated Debtors

#### 1. Tax Filing Status; Tax Attributes

LBHI, on behalf of itself and the other members of the LBHI Group, including the domestic Subsidiary Debtors and other LBHI directly and indirectly owned corporations, including LBI, file a federal income tax return on a consolidated basis (the "__LBHI Group__"). For

the tax year ended December 31, 2008, for federal income tax purposes, the LBHI Group reported a consolidated NOL of approximately $48 billion.  For tax year ended December 31, 2009, the Debtors' federal consolidated income tax return reflected an additional NOL of approximately $5 billion.  Under recent legislation, LBHI elected to carry back its 2008 NOL for five tax years.  The loss carried back to 2003, the fifth previous tax year, is limited to 50% of the taxable income reported for that year.  For the tax year that ended December 31, 2010, the Debtors state that the LBHI Group will also report an additional NOL.  Based on a historic stock ownership analysis for purposes of the NOL change-in-ownership rules under section 382 of the IRC, as well as a Court order imposing certain restrictions on the trading of LBHI's equity, the Debtors have stated that they believe that no limitation under section 382 currently applies to the consolidated NOL carryforwards of the LBHI Group.  Though there is generally a limitation on the amount of NOLs that can offset income for AMT purposes, pursuant to an IRS Notice, taxpayers availing themselves of the five-year NOL carryback described above are not subject to this limitation with respect to such qualifying NOL, regardless of whether the NOL is carried back or carried forward.  However, the amount and use of any NOLs, as well as the application of any limitations, remain subject to review and adjustment by the IRS (including the carry back of a portion of such NOLs to help reduce any prior year tax adjustments).  See section XI.C.1.c.(i) – "Priority Tax Claims" of the Debtors' Disclosure Statement (describing the current status of federal income tax audits).  The tax impact of the Plan on the NOLs and other tax attributes of the LBHI Group are discussed in section X.A.3 of this Disclosure Statement.

Prior to April 1, 2010, LBHI and LBI owned a significant number of noneconomic residual REMIC (real estate mortgage investment conduit) interests.  These REMIC interests produced net excess inclusion income, which represents phantom taxable income to its holders and cannot be offset by other deductions, including an NOL.  During 2010, ownership of the REMIC interests was transferred to a third party.

LBI, currently a member of the LBHI Group, and certain other significant foreign subsidiaries that were owned by LBHI prior to bankruptcy and continue to be owned by LBHI now, are in separate bankruptcy administrations or liquidation proceedings that are not under the Debtors' control.  The proceedings in those various administrations might result in the LBHI Group having to recognize taxable income or having to relinquish foreign tax credits (including previously utilized foreign tax credits), among other things.  Given the Debtors' lack of visibility and control into these various administrations, the Debtors do not have the ability to manage the tax consequences to them associated with these various administrations.  The impact of these and other tax events could be material to the Debtors.

The substantive consolidation of LBHI and the Subsidiary Debtors for bankruptcy purposes does not result in a similar consolidation of those entities for U.S. federal income tax purposes.  Consequently, the liquidation of the LBHI Group may result in deemed distributions by the Subsidiary Debtors to their parent companies for U.S. federal income tax purposes.

Under the Code, the distribution of all of the assets of a Subsidiary Debtor that is a member of the LBHI Group and that is insolvent at the time of such transfer may result in the deemed transfer of all of the stock of such Subsidiary Debtor, resulting in (i) the extinguishment of all of the tax attributes of such Subsidiary Debtor (including its NOLs), (ii) the recognition of COD income and (iii) a worthless stock deduction for the parent of such Subsidiary Debtor.  The

recognition of COD income by such Subsidiary Debtor could result in a loss or reduction in certain tax attributes, including NOLs, of such Subsidiary Debtor and of other members of the LBHI Group. There can be no assurance that the character or amount of the worthless stock deduction will result in such deductions mitigating the loss of the tax attributes, including NOLs, of the Subsidiary Debtor and other members of the LBHI Group. To the extent the loss of such tax attributes occurs prior to the realization by the LBHI Group of taxable gain from the disposition of any of the LBHI Group's assets, there is a risk that the LBHI Group will incur federal income tax liability that may otherwise have been offset by such tax attributes. However, the Plan Administrator will have discretion to regulate the timing of the distributions of the LBHI Group's assets and the recognition of income from the sale of such assets in order to mitigate such potential income tax liability.

## 2.  General Discussion of Plan

The Plan sets forth a plan for resolution of the outstanding Claims against and Equity Interests in the Debtors. The Plan is premised on substantive consolidation and Allowed Claims against the Consolidated Debtors will be satisfied from the assets of the Consolidated Debtors.

### a.  Asset Dispositions and Transfers

The Plan does not specify the manner in which assets will be disposed of in order to satisfy Claims. However, that notwithstanding, certain assets may be disposed of over time during the pendency of the Plan that may produce taxable income. LBHI's NOL carryforward should generally be available to offset any tax gains or operating income that might be realized over time as LAMCO manages the Debtors' business operations and disposes of a certain Debtor's assets, subject to the potential application of section 382 of the IRC, as discussed below. The transfer of assets by members of the LBHI Group to other members of such Group, including transfers to newly formed entities in order to create New Securities may also result in the recognition of income as a result of such transfers, for example, when such transferred assets or entities holding such assets are distributed or otherwise transferred outside the LBHI Group. LBHI's NOL carryforward should also generally be available to offset any such income, again subject to the potential application of section 382 of the IRC as discussed below. See section X.A.3.b.ii – "IRC Section 382 Limitations – Possible Application to the LBHI Group" of this Disclosure Statement.

### b.  Plan Distributions

The Plan provides for Distributions to holders of Allowed Claims and Equity Interests as more fully described in section V – "Summary of the Chapter 11 Plan."

## 3.  Tax Impact of the Plan on the Debtors

### a.  Cancellation of Debt

The IRC provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred that arises by

reason of the discharge of the debtor's indebtedness. Under applicable Treasury Regulations, the reduction in certain tax attributes (such as NOL carryforwards) occurs under consolidated return principles, as in the case of the Debtors who are members of the LBHI Group. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). Settlement of a guarantee claim should not give rise to COD. Any reduction in tax attributes under the COD rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs.

Consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Plan Proponents do not believe that any material amount of COD should be incurred by the Consolidated Debtors as a result of the implementation of the Plan prior to the disposition of all or substantially all of their assets (other than to the extent any Allowed Claim's distribution is subject to a maximum amount, or has been or is separately settled for less than its carrying value), subject to the discussion above under section X.A.1 - "Tax Filing Status; Tax Attributes." Accordingly, the Plan Proponents do not believe that the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs), should have a material impact on the Consolidated Debtors. Nevertheless, there can be no assurance that all or a substantial amount of the COD could be incurred earlier due to, among other things, a lack of direct authoritative guidance as to when COD occurs in the context of a liquidating chapter 11 plan.

### b.  Limitation of NOL Carryforwards and other Tax Attributes

### (i)  IRC Section 382 Limitations – General

Under section 382 of the IRC, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation.

In general, the amount of this annual limitation is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (for example, 4.55% for ownership changes occurring in April 2011). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change by taking into account the surrender or cancellation of creditors' claims, also with certain adjustments. The annual limitation can potentially be increased by the amount of certain recognized built-in gains, as discussed below. Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue

its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains).

As indicated above, section 382 of the IRC also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Due to the Debtors' utilization of the mark-to-market method of accounting, the Plan Proponents do not expect that the majority of the assets will have either built-in-gains or built-in-losses.

### (ii)    IRC Section 382 Limitations – Possible Application to the LBHI Group

In light of the foregoing, the LBHI Group's ability to utilize certain NOLs (and carryforwards thereof) and certain other tax attributes would be potentially subject to limitation if LBHI were to undergo an "ownership change" within the meaning of section 382 of the IRC by reason of the implementation of the Plan or otherwise. As indicated above, based on a historic section 382 analysis of the changes in LBHI's stock ownership performed by the Debtors and discussed in the Debtors' Disclosure Statement, as well as the order entered by the Bankruptcy Court effective November 5, 2008 imposing certain restrictions on the trading of LBHI's equity, the Plan Proponents believe that no ownership change under section 382 has occurred to date, nor will occur prior to the Effective Date, that would limit the availability of the tax attributes of the LBHI Group to offset such taxable income. Moreover, pursuant to the Plan, the holders of Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable. Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Plan Proponents do not believe that the Plan should result in an ownership change of LBHI. Nevertheless, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, there is no assurance that the IRS would not take a contrary position (including with respect to the treatment for federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of LBHI throughout the liquidation process). If, notwithstanding the Plan Proponents' position, an ownership change were considered to occur, the Debtors could incur a material amount of federal income tax in connection with the liquidation of the Debtors' assets, unless (1) the

Debtors' assets are distributed pursuant to the Plan on or before the date of such ownership change or (2) the amount of the annual limitation (taking into account the increase therein for certain recognized built-in gains) is large enough to permit the LBHI Group to utilize an amount of NOL carryforwards and other attributes sufficient to offset such income tax.

### c.  Non-U.S. Income Tax Matters

Historically, LBHI and its Affiliates conducted their business activities on a global basis, with offices located throughout the world, through both non-U.S. entities and non-U.S. branch operations of domestic entities.  At present, the LBHI Group continues to maintain material debt and equity positions in many of these non-U.S. entities, notwithstanding the fact that most of such Affiliates are currently under separate legal administration or receivership and uncertain collectability.  Importantly, however, given the current U.S. tax profile of the LBHI Group, any future remittance received from any such separate administration or receivership in satisfaction of historic debt and/or equity positions may be subject to host country, non-U.S. withholding taxes, thereby reducing the amounts available for distribution to creditors by the Consolidated Debtors' estate.

### 4.  Transfer of Liquidating Trust Assets to a Liquidating Trust

As indicated above, any time after the Effective Date and throughout the period permitted for the liquidation of the Debtors under Article XIV of the Plan, the Plan Administrator may, if it determines that a Liquidating Trust is in the best interests of the Consolidated Debtors and holders of Allowed Claims against, and Equity Interests in, such Debtor, transfer some or all of the Consolidated Debtors' assets to a Liquidating Trust on behalf of all or a portion of respective claimants and/or holders of Equity Interests of such Consolidated Debtors.  The transfer of assets by the Plan Administrator to a Liquidating Trust may result in the recognition of gain or loss by the Consolidated Debtors, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtors' tax basis in such assets.  Due to the Debtors' utilization of the mark-to-market method of accounting, the majority of assets are not expected to have either built-in-gains or built-in-losses.

### B.  Consequences to Holders of Claims and LBHI Equity Interests

### 1.  Realization and Recognition of Gain or Loss, In General

The federal income tax consequences of the implementation of the Plan to a holder of a Claim or LBHI Equity Interest will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim or Equity Interest, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.  A holder of an LBHI Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust

Interests), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder, including, as discussed below, any beneficial interests in a Liquidating Trust (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).   With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see section X.B.3 – "Allocation of Consideration to Interest" of this Disclosure Statement.

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the holder and has been held for more than one year.  Each holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

As discussed below (see section X.C.1 – "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests–Classification of the Liquidating Trust"), each holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust (if and when established) will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Claims and Equity Interests receiving the Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation amount holders of Allowed Claims of undeliverable Plan distributions) should not be included, for federal income tax purposes, in the holder's amount realized of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interests in the underlying assets of the Liquidating Trust.  See section X.C. – "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests" of this Disclosure Statement.

A holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of a Liquidating Trust.

## 2.  Holders of Allowed Claims in All Classes Except 5A, 5B, 5C, 19 and 20

Except for Classes 5A, 5B, 5C, 19 and 20, the Plan provides, in certain circumstances, for a distribution of Cash or a Pro Rata Share of Plan Consideration, as distributed from time to time (but in no instance to exceed the amount of the Allowed Claim) to each Allowed Claim against the Consolidated Debtors and certain Non-Debtor Affiliates.  The holder of an Allowed Claim in the foregoing Classes generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value

of any other property received in the exchange (other than amounts allocable to accrued but unpaid interest) and (b) the holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under such holder's method of tax accounting.

### 3.  Allocation of Consideration to Interest

Pursuant to Section 11.9 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4.  Receipt by Holders of Payment Notes

The receipt of Payment Notes by certain holders of Allowed Claims in certain Classes as described in Article XIII of the Plan, should not result in a taxable event for such holders.

## C.  Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests

### 1.  Classification of the Liquidating Trust

A Liquidating Trust, if created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Any such Liquidating Trust will be structured to comply with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of

which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that any such Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

### 2.  General Tax Reporting by the Liquidating Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Consolidated Debtors, the Liquidating Trustee, holders of Allowed Claims and Equity Interests and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than assets allocable to Disputed Claims) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims or Equity Interests receiving Liquidating Trust Interests (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the

Consolidated Debtors, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by a Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Except as discussed below with respect to any reserve for Disputed Claims, the Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

### 3.    Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (a) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made, any amounts allocable to, or retained on account of, Disputed Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in such reserves, and all distributions from such assets (which distributions will be net of the expenses relating to the retention of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors.  All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

### D.    Withholding on Distributions, and Information Reporting

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  These categories are very broad; however, there are numerous exceptions.  Holders of Allowed Claims are urged to consult their tax advisors regarding the Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Regulations and whether the transactions contemplated by the Plan would be subject to these Regulations and require disclosure on the holders' tax returns.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of Allowed Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If, however, the requisite acceptances are not received, or the requisite acceptances are received but the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) the Debtors' Plan, (ii) the Non-Settlement Plan, (iii) the formulation of an alternative plan or plans of reorganization or (iv) liquidation of all of the Debtors under chapter 7 of the Bankruptcy Code.

## XII.    VOTING PROCEDURES AND REQUIREMENTS

### A.  Ballots and Voting Deadline

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that the Plan Proponents believe may be entitled to vote to accept or reject the Plan.  BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE VOTING INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate ballots, which must be used for each separate Class of Claims.  Ballots and Master Ballots should be returned to:

| If by overnight mail or hand delivery, to: | If by first-class mail, to: |
|---|---|
| Epiq Bankruptcy Solutions, LLC | Lehman Ballot Processing Center |
| Attn:  Lehman Ballot Processing Center | c/o Epiq Bankruptcy Solutions, LLC |
| 757 Third Avenue, 3rd Floor | FDR Station, P.O. Box 5014 |
| New York, New York 10017 | New York, New York 10150-5014 |

If the return envelope provided with your ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE **RECEIVED** BY NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON _____ ___, 2011.**  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____ ___, 2011 as the record date for holders of Claims and Equity Interests entitled to vote on the Plan (the "Voting Record Date").  Accordingly, only holders of record as of the Voting Record Date that otherwise are entitled to vote under the Plan will receive a ballot and may vote on the Plan.

YOU WILL NOTE THAT YOUR BALLOT SETS FORTH A CLAIM AMOUNT THAT IS BASED EITHER ON YOUR PROOF OF CLAIM OR DEBTORS'

SCHEDULES OF LIABILITIES.  BY INCLUDING SUCH CLAIM AMOUNT, THE PLAN PROPONENTS ARE NOT ADMITTING THAT YOU HAVE A CLAIM IN THE STATED AMOUNT AND IS NOT WAIVING ANY RIGHTS THEY MAY HAVE TO OBJECT TO YOUR VOTING OF THE CLAIM IN SUCH AMOUNT OR YOUR RECOVERY UNDER THE PLAN BASED ON SUCH AMOUNT.

### B.  Voting Procedures

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Impaired Claims who actually vote will be counted. The failure of a holder to deliver a duly executed ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

The Plan Proponents are providing the solicitation materials to holders of Claims and Equity Interests that are entitled to vote ("Eligible Claims") whose names (or the names of whose Nominees) appear as of the Voting Record Date in the records maintained by the Debtors, the security holders list maintained by the indenture trustee and the list of participants provided by the Depository Trust Company, Euroclear Bank, Clearstream Bank, or other applicable depository.  Nominees should provide copies of the solicitation materials to the beneficial owners of the Eligible Claims.  Any beneficial owner of Eligible Claims who has not received a ballot should contact his/her or its Nominee or the Solicitation Agent.

Holders of Eligible Claims should provide all of the information requested by the ballots they receive.  Holders of Eligible Claims should complete and return all ballots that they receive in the return envelope provided with each such ballot.

### C.  Special Note for Holders of Notes Issued Directly by LBHI

For purposes of the notes issued directly by LBHI (the "LBHI Issued Notes"), only holders of the LBHI Issued Notes as of the Voting Record Date are entitled to vote on the Plan.  The indenture trustee will not vote on behalf of the holders of such notes.  Holders must submit their own ballots.

### 1.  Beneficial Owners

A beneficial owner holding LBHI Issued Notes as record holder in its own name should vote on the Plan by completing and signing the enclosed ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

Any beneficial owner holding LBHI Issued Notes in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such beneficial owner's Nominee).

• Complete and sign the enclosed beneficial owner ballot.  Return the ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process the ballot and return it to the Solicitation Agent by the Voting Deadline.  If no self-

addressed, postage-paid envelope was enclosed for this purpose, contact the Solicitation Agent for instructions.

- Complete and sign the pre-validated ballot (as described below) provided to you by your Nominee. Return the pre-validated ballot to the Solicitation Agent by the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

Any ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Solicitation Agent that ballot or a Master Ballot that reflects the vote of such beneficial owner. **The Plan Proponents are not responsible for a Nominee's failure to timely and accurately transmit to the Solicitation Agent a beneficial holder's ballot or Master Ballot.**

### 2. Nominees

A Nominee that is the registered holder of LBHI Issued Notes for a beneficial owner on the Voting Record Date should obtain the votes of the beneficial owners of such LBHI Issued Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

#### a. Pre-Validated Ballots

A Nominee may pre-validate a ballot by: (i) signing the ballot; (ii) indicating on the ballot the name of the registered holder and the amount of LBHI Issued Notes held by the Nominee; and (iii) forwarding such ballot together with the solicitation materials and other materials requested to be forwarded, to the beneficial owner for voting. The beneficial owner must then complete the information requested in the ballot, review the certifications contained in the ballot, and return the ballot directly to the Solicitation Agent in the pre-addressed, postage-paid envelope so that it is received by the Solicitation Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" ballots were delivered should be maintained by the Nominee for inspection for at least one year from the Voting Deadline.

#### b. Master Ballots

A Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate his/her or its vote on the ballot, complete the information requested in the ballot, review the certifications contained in the ballot, execute the ballot, and return the ballot to the Nominee. After collecting the ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the ballot, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is received by the Solicitation Agent before the Voting Deadline. All ballots returned by beneficial owners should either be forwarded to the Solicitation Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline.

**EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS RECEIVED BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE.**

### 3.  Securities Clearing Agencies

The Plan Proponents expect that The Depository Trust Company, Euroclear Bank, Clearstream Bank, and each other applicable depository, as a Nominee holder of securities issued or guaranteed by the Debtors, will arrange for its participants to vote by providing a record date listing of participants entitled to vote.  Such participants will be authorized to vote their Voting Record Date positions held in the name of such securities clearing agencies.

### 4.  Miscellaneous

For purposes of voting to accept or reject the Plan, the beneficial owners of LBHI Issued Notes will be deemed to be the "holders" of the Claims represented by such LBHI Issued Notes.  Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Plan Proponents, in their sole discretion, may request that the Solicitation Agent attempt to contact such voters to cure any such defects in the ballots.

Except as provided below, unless the ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such ballot, the Plan Proponents may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking Confirmation of the Plan.

In the event of a dispute with respect to any LBHI Issued Note Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

### D.  Fiduciaries and other Representatives

If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Plan Proponents, must submit proper evidence satisfactory to the Plan Proponents of authority to so act.  Authorized signatories should submit the separate ballot of each beneficial owner for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT THE PLAN PROPONENTS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT BE COUNTED.

IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR THE SOLICITATION AGENT.

### E.  Parties Entitled to Vote

Generally, any holder of an Allowed Claim against or Equity Interest in any of the Debtors at the date on which the order approving this Disclosure Statement is entered by the clerk of the Bankruptcy Court whose Claim or Equity Interest has not previously been disallowed by the Bankruptcy Court is entitled to vote to accept or reject the Plan if such Claim or Equity Interest is Impaired under the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Equity Interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Equity Interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Equity Interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Equity Interest as it existed before the default.

A holder of a Claim or Equity Interest may vote to accept or reject a plan if the Claim or Equity Interest is "allowed," which means generally that no party-in-interest has objected to such Claim or Equity Interest, and the Claim or Equity Interest is Impaired by the plan.  If, however, the holder of an Impaired Claim or Equity Interest will not receive or retain any property under the plan on account of such Claim or Equity Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such Claims and Equity Interests do not actually vote on the plan.  If a Claim or Equity Interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such Claim or Equity Interest to have accepted the plan and, accordingly, holders of such Claims and Equity Interests are not entitled to vote on the plan.

Holders of Claims in Classes 5A, 5B, 5C and 19 are Impaired but will not receive or retain any property under the Plan on account of their Claims.  All Holders of Equity Interests in LBHI are Impaired but will not receive or retain any property under the Plan on account of their Equity Interests.  Accordingly, under section 1126(g) of the Bankruptcy Code, Classes 5A, 5B, 5C and 19 and Equity Interests in LBHI are not entitled to vote to accept or reject the Plan and are conclusively deemed to have rejected the Plan.

Holders of Claims in Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n are Impaired but are not entitled to Distributions as a consequence of substantive consolidation.  Nonetheless, Classes 7A-7n, 14A, 14B, 15A, 15B, 16A-16n, 17A-17n and 18A-18n are entitled to vote on the Plan solely for the purposes of effecting the proposed settlements provided under the Plan and determining such Classes' eligibility to receive enhanced treatment provided under the Plan in the event any such Class votes to accept the Plan.

Holders of Claims in Classes 1 and 2 are not Impaired and will receive Distributions for the full Allowed amount of their Allowed Claims.  Accordingly, under section 1126(f) of the Bankruptcy Code, Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Therefore, in accordance with sections 1126 and 1129 of the Bankruptcy Code, the Plan Proponents are only soliciting acceptances from holders of Claims in Classes 3, 4, 6A-6n, 7A-7n, 8A-8n, 9A-9n, 10, 11, 12, 13, 14A, 14B, 15A, 15B, 16A-16n, 17A-17 and 18A-18n.

Any Claim or Equity Interest as to which an objection has been filed is not entitled to vote, unless the Bankruptcy Court, upon application of the holder to whose Claim or Equity Interest an objection has been made temporarily allows such Claim or Equity Interest to the extent that it deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### F. Agreements Upon Furnishing Ballots

The delivery of an accepting ballot to the Solicitation Agent by a holder of Eligible Claims pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to the Solicitation and (ii) the terms of the Plan; *provided*, *however*, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### G. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Solicitation Agent and the Plan Proponents in their sole discretion, which determination will be final and binding. As indicated in this section XII – "Voting Procedures and Requirements," effective withdrawals of ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Plan Proponents reserve the absolute right to contest the validity of any such withdrawal. The Plan Proponents also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Plan Proponents or their counsel, be unlawful. The Plan Proponents further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Plan Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Plan Proponents (or the Bankruptcy Court) determine. Neither the Plan Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### H. Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to

the Solicitation Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Solicitation Agent in a timely manner at the address set forth in section XII – "Voting Procedures and Requirements" of this Disclosure Statement.   Prior to the filing of the Plan, the Plan Proponents intend to consult with the Solicitation Agent to determine whether any withdrawals of ballots were received and whether the Requisite Amount of acceptances of the Plan have been received.  As stated above, the Plan Proponents expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan.  In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received.

## I.  Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the solicitation materials, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rules of Bankruptcy Procedure 3017(d)), please contact the Solicitation Agent:

**Epiq Bankruptcy Solutions, LLC**
**Attn:  Lehman Ballot Processing Center**
**757 Third Avenue, 3rd Floor**
**New York, New York 10017**
**(646) 282-1800**

## XIII.  CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Plan Proponents urge holders of Impaired Claims entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than [_:__ __].m., Eastern Time, on [_____, ___].

Dated:    New York, New York
          April 27, 2011

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JCS – 6031)

By:  /s/  Gerard Uzzi_____
     Gerard Uzzi

Attorneys for the Ad Hoc Group of
Lehman Brothers Creditors

## Schedule A

## Definitions

1.    <u>Accepting Designated Non-Debtor Affiliate Classes</u> means any Classes in Classes 12A through 12n and the corresponding Class in Classes 13A through 13n that accept the Plan.

2.    <u>Affiliate Guarantee Claim</u> means any Claim against LBHI asserted by an Affiliate of the Debtors on the basis of a Guarantee.

3.    <u>ALI</u> means Lehman ALI Inc.

4.    <u>AMT</u> means any alternative minimum tax.

5.    <u>Barclays</u> means Barclays Capital, Inc. or Barclays Bank PLC.

6.    <u>Bar Date</u> means September 22, 2009, the deadline for filing proofs of Claim against any of the Debtors in the Chapter 11 Cases.

7.    <u>Board of Directors</u> means the board of directors of the Consolidated Debtors.

8.    <u>Case Management Order</u> means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures approved and entered by the Bankruptcy Court on September 22, 2008 [Docket No. 285], as amended on February 13, 2009 [Docket No. 2837], and as further amended on June 17, 2010 [Docket No. 9635].

9.    <u>Cash Management Motion</u> means the Debtors Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) for Authorization to (i) Continue Using Existing Centralized Cash Management System, as Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (iii) Maintain Existing Bank Accounts and Business Forms; (B) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code: and (C) to Schedule a Final Hearing [Docket No. 669].

10.    <u>COD</u> means cancellation of debt.

11.    <u>Compensation and Reimbursement Claims</u> means those Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 363(b), 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.

12.    <u>Debtor Allocation Agreement</u> means that allocation agreement, the implementation of which is contemplated by the Debtors' Plan, which purports to resolve, among other things, inter-Debtor related issues.

13.    <u>Debtors' Disclosure Statement</u> means the disclosure statement for the Debtors' Plan.

14.    Debtors' First Plan means the Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors.

15.    Debtors' Liquidation Analysis means the liquidation analysis prepared by the Debtors' management which is annexed to the Debtors' Disclosure Statement as Exhibit 5.

16.    Debtors' Plan means the First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors.

17.    Debtors' Recovery Analysis means that certain analysis prepared by the Debtors setting forth the estimated Claims and estimated recoveries for each Class as well as assumptions related thereto which is annexed to the Debtors' Disclosure Statement as Exhibit 4.

18.    DWAC means DTC's Deposit and Withdrawal At Custodian.

19.    EII means excess inclusion income.

20.    Eligible Claim means any Claim for which the Holder of such Claim is entitled to vote.

21.    Examiner means Anton R. Valukas, appointed as examiner on January 19, 2009.

22.    Examiner's Report means the report issued by the Examiner on March 11, 2010.

23.    Foreign Administrator means each of the Persons that is managing the affairs and representing the insolvency estate of an Affiliate of the Debtors subject to a Foreign Proceeding.

24.    Guarantee Claims means any Claim arising under or in connection with a Guarantee.

25.    Guarantee Resolution Claim means any claim arising under or in connection with the Guarantee Resolution.

26.    Global Close means the full accounting close conducted for Lehman as of September 14, 2008 by a limited number of legal entity controllers, product controllers and operational personnel who were at Lehman's offices in New York, London, and in Asia, and who had left Lehman but were still available through transition services agreements at Barclays and Nomura.

27.    Group's First Plan means the Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by the Ad Hoc Group of Lehman Brothers Creditors.

28.    Impaired means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

29.    IRC means the Internal Revenue Code.

30.    ISDA means an agreement under the 1992 or 2002 International Swap Dealers Association form.

31.    JPMorgan means JPMorgan Chase Bank, N.A.

32.    LAMCO means the asset management company that may manage certain assets of the Debtors.

33.    LBCCA means Lehman Brothers Commercial Corporation Asia Limited (in Liquidation).

34.    LBHI Group means LBHI and the Subsidiary Debtors with which it files a consolidated U.S. federal income tax return.

35.    LBHI Issued Notes means those notes issued directly by LBHI.

36.    Lehman Program Securities means certain notes (i) issued by LBHI and its Affiliates to retail investors located outside of the United States and (ii) included on a list published on www.lehman-docket.com on July 17, 2009.

37.    Liquidation Analysis means the liquidation analysis prepared by the Plan Proponents which is annexed to the Disclosure Statement as Exhibit 3.

38.    Main Operating Account means that main operating account at Citibank through which LBHI acted as the central banker for the Lehman Entities.

39.    Master Ballots means the ballots upon which the Nominees of beneficial holders shall indicate acceptances and rejections of the Plan in accordance with the voting procedures described herein.

40.    NOL means any net operating loss.

41.    Non-Settlement Disclosure Statement means the disclosure statement for the Non-Settlement Plan.

42.    Non-Settlement Plan means the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by the Non-Consolidation Plan Proponents.

43.    Nominee means an institutional holder of record that may hold notes in "street name" on behalf of beneficial owners or otherwise represent such beneficial owners.

44.    Nomura means Nomura International PLC.

45.    OTC means over-the-counter.

46.    Professional Fee Claim means any Claim of a professional for compensation or reimbursement of costs and expenses relating to services incurred during the period from the Petition Date to the Effective Date.

47. <u>Projection Period</u> means the five-year period ending December 31, 2014 for which the Debtors relied on cash flow estimates for the Consolidated Debtors to prepare a liquidation analysis for the Consolidated Debtors.

48. <u>QIB</u> means a "qualified institutional buyer" under Rule 114A of the Securities Act.

49. <u>RACERS</u> means restructured asset certificates with enhanced returns.

50. <u>Recovery Analysis</u> means that certain analysis prepared by the Plan Proponents setting forth the estimated Claims and estimated recoveries for each Class as well as assumptions related thereto which is annexed to the Disclosure Statement as Exhibit 2.

51. <u>Rejecting Designated Non-Debtor Affiliate Classes</u> means any Classes in Classes 12A through 12n and the corresponding Class in Classes 13A through 13n that reject the Plan.

52. <u>REMIC</u> means a real estate mortgage investment conduit.

53. <u>Securities Programs Bar Date</u> means November 2, 2009, the deadline for filing proofs of Claim against any of the Debtors in the Chapter 11 Cases based on the Lehman Program Securities.

54. <u>SIPA</u> means the Securities Investor Protection Act of 1970.

55. <u>Solicitation Agent</u> means the Person selected to act as the Debtors' agent in soliciting the Plan and tabulating votes in connection with the Plan.

56. <u>Transaction Guarantee</u> means each guarantee LBHI executed guaranteeing the obligations of certain of its Affiliates in connection with derivative transactions, the issuance of securities and other commitments.

57. <u>Transfer Provision</u> means the provision in many of the Lehman ISDAs permitting the Lehman Entity party thereto to transfer freely its rights and obligations to any other Lehman Entity.

58. <u>Treasury Regulations</u> means the regulations promulgated under title 26 of the United States Code.

59. <u>Voluntary Petition</u> means a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

60. <u>Voting Deadline</u> means 4:00 p.m. on _____ ___, 2011, which is the time and date by which ballots must be completed and received by Epiq Bankruptcy Solutions, LLC.