# EXHIBIT 32

(Multicurrency-Cross Border)



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of August 1, 2007

**LEHMAN BROTHERS**                    and
**DERIVATIVE PRODUCTS INC.**



have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.        **Interpretation**

(a)        *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)        *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)        *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.        **Obligations**

(a)        *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS
DERIVATIVE PRODUCTS INC.**
*(Name of Party)*

█████████████████████
*(Name of Party)*

By: _T. Craig Jenkins_____

Name: _T. Courtney Jenkins_

Title: _Authorized Signatory_

Date:

By: ████████████████_____

Name: ████████████████

Title: ████████████████

Date: ████████████████

(Multicurrency-Cross Border)

**SCHEDULE**
**to the**
**Master Agreement**
dated as of August 1, 2007
between
**LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. ("Party A"),**
a corporation organized under the laws of the State of Delaware
and

████████████████████████████ ("Party B"),
an insurance company organized under the laws of New York

## Part 1. Termination Provisions

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

        Section 5(a)(v),   Lehman Brothers Special Financing, Inc., Lehman Brothers Finance SA, Lehman Brothers Commercial Corporation, Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Commodity Services Inc.

        Section 5(a)(vi),   Not applicable.
        Section 5(a)(vii),   Not applicable.
        Section 5(b)(iv),   Not applicable.

        and in relation to Party B for the purpose of:-

        Section 5(a)(v),   Not applicable.
        Section 5(a)(vi),   Not applicable.
        Section 5(a)(vii),   Not applicable.
        Section 5(b)(iv),   Not applicable.

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

        The following provisions apply:-

        **"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

        **"Threshold Amount"** means, USD 20 million (or its equivalent in any other currency) in the case of Party A, and,-USD 100 million, in the case of Party B .

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B.

(e)     The **"Automatic Early Termination"** provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)     **"Termination Currency"** means United States Dollars ("USD").

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:-

    (i)    Trigger Events. The occurrence of a Trigger Event shall constitute an Additional Termination Event. Each of the following events shall constitute a Trigger Event. For each of the Termination Events in this Part 1(h)(i), Party A shall be the Affected Party :

        (1)    Downgrade. Party A ceases to maintain a Single A Quality financial program, counterparty or similar rating from both of the Relevant Rating Agencies;

        (2)    **Failure To Deliver Collateral.** The occurrence of an Event of Default under the ISDA Master Agreement dated July 16, 1998 between Party A and LBSF (the "Offsetting Transaction Master Agreement") as a result of LBSF's failure to deliver, or procure delivery of, collateral to Party A in the amounts and within the time required (subject to any applicable cure period) thereunder and under the terms of any applicable Credit Support Document, as such may be amended from time to time without the consent of, or notice to, Party B, provided such amendments are consistent with the requirements of Party A's financial program as represented to the Relevant Rating Agencies.

        (3)    **Bankruptcy.** Lehman Brothers Holdings Inc. ("Holdings"), or LBSF: (A) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (C) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (E) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) through (G) inclusive; or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; and

        (4)    **Capital Requirement.** Party A shall fail to maintain capital in the amount consistent with its financial program as represented to the Relevant Rating Agencies.

    (ii)    **Ratings Decline.** Party B (i) fails to maintain an Insurance Financial Strength rating (or any successor rating) of at least Baa1 (the "Moody's Rating") as determined by Moody's Investors Service, Inc. ("Moody's"); or (i i) fails to maintain a Financial Strength rating (or any successor rating) of at least BBB+ (the "S&P Rating") as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"); or (iii) ceases to be rated by either Moody's or S&P. For clarification, in the event either Moody's or S&P assigns a rating to Party B that is lower than the Moody's Rating or the S&P Rating, as the case may be, then such rating shall be determinative. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(i) **Event of Default or Other Termination Event After Trigger Event.** If a Trigger Event shall have occurred and an event or circumstance which would otherwise constitute or give rise to (1) an Event of Default with Party A as the Defaulting Party (other than an Event of Default pursuant to Sections 5(a)(vii) [or 5(a)(ix)]); (2) a Termination Event other than a Trigger Event shall occur, or (3) a Credit Assignment Event (as defined in part 5(a)(i) hereof), such Trigger Event will prevail and such other event or circumstance will not constitute an Event of Default, a Termination Event or a Credit Assignment Event, as the case may be.

(j) **Effect of Trigger Event.** Notwithstanding anything to the contrary contained in this Agreement, if a Trigger Event occurs the following provisions shall apply:

    (1) **Notice.** Party A shall, within one Business Day of becoming aware of such occurrence, notify Party B by facsimile transmission or electronic messaging system (the date such notice is transmitted, the "**Notice Date**"), specifying the nature of the Trigger Event and designating the Early Termination Date in respect of all Transactions. The Early Termination Date so designated shall be no later than the fifth Universal Business Day following such Notice Date. The Early Termination Date so designated shall be subject to change as specified in paragraph (j)(4)(a) below and, in the case of affected Transactions only, as specified in paragraph (j)(4)(b) below.

    (2) **Market Quotation.** For the purposes of determining the Settlement Amount pursuant to Section 6(e)(ii)(3), the "Market Quotation" of a Terminated Transaction (which may be positive or negative) shall be the amount reasonably determined by Party A, using Market Rates and Volatilities and by polling the Dealer Group as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date. Party A shall perform such determinations in good faith in accordance with its usual operating procedures and pursuant to industry standards. For purposes of this definition, if the Market Quotation of a Terminated Transaction represents an amount payable to Party A, it shall be expressed as a negative number, and if the Market Quotation represents an amount payable to Party B, it shall be expressed as a positive number. For purposes of determining the Settlement Amount, Unpaid Amounts (which shall be determined by Party A) in respect of the Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after the Early Termination Date is to be included. Party A shall notify Party B of the Market Quotation of each Terminated Transaction, the Settlement Amount and the Termination Currency Equivalent of any Unpaid Amounts within two Business Days following the Early Termination Date.

    (3) **Payment Date.** The amount calculated as being due as a result of a Termination Event that arises as a result of a Trigger Event pursuant to Section 6(e)(ii)(3) will be payable, in the case of an amount due and owing to Party A, within five Universal Business Days following the Early Termination Date, and in the case of an amount due and owing to Party B, within ten Universal Business Days following the Early Termination Date. Party A and Party B agree that the party that is required to pay such amount shall be required to pay interest on such amount for the period from (and including) the Early Termination Date to (but excluding) the date payment is required to be made, at the Agreed Interest Rate. If either party fails to pay such amount on the due date, such failure shall constitute a breach of this Agreement, but shall not constitute an Event of Default (including an Event of Default pursuant to Section 5(a)(i) or 5(a)(ii)) for purposes of this Agreement. In the event of any such failure by either party, such party shall be required to pay interest on such overdue amount for the period from (and including) such due date to (but excluding) the date of actual payment, at the default rate, which is the Agreed Interest Rate plus 3% per annum. Interest payable under this paragraph will be calculated on the basis of daily compounding and the actual number of days elapsed divided by 360.

    (4) **Effect of Market Disruption Event.** (a) In the event that a Market Disruption Event exists on any Early Termination Date, such date shall not be an Early Termination Date for any outstanding Transaction. In such event Party A shall notify Party B and the earlier to occur of (i) the next succeeding Universal Business Day on which a Market Disruption Event does not exist and (ii) the eighth Universal Business Day following the day on which

notice of the occurrence of a Trigger Event was given shall be considered the Early Termination Date for all outstanding Transactions and a Settlement Amount shall be obtained for that Early Termination Date in accordance with the terms set forth in this paragraph (j). As used herein, "Market Disruption Event" means any of the following events, the existence of which shall be reasonably determined by Party A: (i) any suspension or material limitation of trading (excluding daily settlement limits in the normal course of trading) on the New York Stock Exchange, London Stock Exchange or other recognized stock exchange the effect of which on financial markets makes it impracticable or inadvisable, in the reasonable view of Party A, to proceed with the determination of the Settlement Amount, (ii) the declaration of a banking moratorium by the Bank of England, United States federal authorities, New York State or other recognized international, national or regional banking authority whatever to the effect of which on financial markets makes it impracticable or inadvisable, in the reasonable view of Party A, to proceed with the determination of the Settlement Amount, (iii) the occurrence of any outbreak or escalation of hostilities or a declaration by the United States of a national emergency or war the effect of which on financial markets makes it impracticable or inadvisable, in the reasonable view of Party A, to proceed with the determination of the Settlement Amount, or (iv) the occurrence of any other calamity or crisis or any other event the effect of which, in the reasonable view of Party A and a majority of eleven randomly selected unaffiliated Qualified Counterparties of Party A (who are not Affiliates of Party A) whose Settlement Amounts otherwise would have been determined on such Early Termination Date, makes it impracticable or inadvisable to proceed with the determination of such Settlement Amounts on such Early Termination Date.

(b)     If on an Early Termination Date as to which there is no Market Disruption Event, there are conditions in a local market that, in the reasonable judgment of Party A, materially would impede its ability to determine the Market Quotation for certain Transactions in that market (a "Local Market Disruption Event"), Party A shall notify Party B of those conditions no later than one hour prior to the scheduled time for determining the Market Quotation for such affected Transactions on that date. Upon receipt of such notice, Party B shall have the right to delay the Early Termination Date for the affected Transactions (without affecting the Early Termination Date for any other Transactions under this Agreement) by notifying Party A in writing within one hour of its election to exercise that right. In such event, the Early Termination Date for each such affected Transaction shall be the next day on which Party A and Party B agree that the Local Market Disruption Event ceases to exist, but in any case not later than the due date for Settlement Amount payments owed to Party A with respect to unaffected Transactions as provided in paragraph (j)(3). Market Quotations so obtained for any affected Transaction shall be included in the calculation of the Settlement Amount to be paid as provided in paragraph (j)(3). No delay in the Early Termination Date for any affected Transaction as provided above shall affect the days on which payments would otherwise be required to be made pursuant to paragraph (j)(3) had no such delay occurred, it being understood, however, that interest shall begin to accrue pursuant to such paragraph with respect to any such affected Transaction only from (and including) the delayed Early Termination Date.

(5)     **Payments on Early Termination.** This Agreement shall be amended by adding the following new subsection (3) to Section 6(e)(ii):

"(3)     **Trigger Event.** If an Early Termination Date results from a Trigger Event, Party A shall determine the Settlement Amount of all Terminated Transactions on such date, and the amount payable will be equal to (A) the Settlement Amount in respect of the Terminated Transactions plus (B) the Termination Currency Equivalent of Unpaid Amounts owing to Party B minus (C) the Termination Currency Equivalent of Unpaid Amounts owing to Party A. If that amount is a positive number, Party A will pay it to Party B; if it is a negative number, Party B will pay the absolute value of that amount to Party A. [For purposes of

determining the Settlement Amount under this subsection, clause (b) of the definition of Settlement Amount shall not apply.]"

(k)    **Additional Definitions.**

As used in this Schedule, the following terms shall have the following meanings:

**"Agreed Interest Rate"** for any day means the overnight ask rate in effect for such day, as set forth opposite the caption "ON" under the heading "Euro-Dollar" on Telerate Page 4756 (or any successor page thereto), as of 11:00 a.m., New York time, on such day.

**"Business Day"** means any day other than a Saturday or Sunday on which banks in New York are not required or authorized by law to be closed.

**"Dealer Group"** means the following entities and such other entities as may be selected by Party A from time to time: JPMorgan Chase Bank, Citibank, N.A., Barclays Bank PLC, Merrill Lynch Capital Services, Inc., Deutsche Bank AG, The Royal Bank of Scotland plc, HSBC Bank USA, Sumitomo Mitsui Banking Corporation, Bank of Tokyo-Mitsubishi Limited, Westpac Bank Corp., Goldman Sachs & Co. and BNP Paribas.

Notwithstanding the definition of Dealer Group, (i) for U.S. dollar and Canadian dollar information, the dealers that may be polled shall be JPMorgan Chase Bank, Citibank, N.A., Deutsche Bank AG, Merrill Lynch Capital Services, Inc., and Goldman Sachs & Co.; and (ii) for European currency information, the dealers that may be polled shall be those listed in clause (i) of this paragraph and, in addition, Barclays Bank PLC, Deutsche Bank AG, The Royal Bank of Scotland plc and BNP Paribas.

**"LBSF"** means Lehman Brothers Special Financing Inc.

**"Market Rates and Volatilities"** means, in the case of interest rates and volatilities, the interest rates and volatilities obtained from the Telerate and Reuters screens where practicable and from polling the Dealer Group and, in the case of foreign exchange rates and volatilities and other pricing parameters, the foreign exchange rates and volatilities or pricing parameters obtained from polling the Dealer Group. In each case, for all rates, volatilities or other parameters obtained, at least five members of the Dealer Group shall be polled, the highest and lowest of such returns (including, in the case of interest rates and volatilities, the rates and volatilities obtained from the Telerate and Reuters screens, if any) shall be discarded and the simple mathematical average of the remaining values shall be used to perform the applicable determination.

**"Moody's"** means Moody's Investors Service, Inc.

**"Person"** means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

**"Relevant Rating Agencies"** means, S&P and Moody's, or such of them as then assigns a financial program, counterparty or similar rating to Party A at Party A's request, or any other nationally recognized rating agency then rating Party A at Party A's request (each, individually, a Relevant Rating Agency).

**"S&P"** means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

**"Single A Quality"** means, in the case of S&P, A, in the case of Moody's, A2, in the case of Fitch IBCA, Inc., A, and, in the case of any other Relevant Rating Agency, a designation of similar quality.

**"Universal Business Day"** means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Frankfurt, London, New York, Tokyo and the city in which Party B's head or home office is located.

**Part 2.  Tax Representations.**

(a)     **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) and 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     **Payee Representations.**

(i)    For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of the State of New York.

(ii)   For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation shall be deemed to be specified in Part 2(b) and shall be made and repeated at the times specified in Section 3 of this Agreement.

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)     Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |
| Party B | Accurate, complete, and duly executed copies of U.S. Internal Revenue Service Form(s) W-9.- | (i) As of the date of this Agreement (the "Relevant Date") and thereafter prior to each successive anniversary of the Relevant Date, (ii) promptly upon reasonable demand by Party A, and (iii) promptly upon learning that any such form(s) previously provided by Party B has become obsolete or incorrect.] |

(b)     Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of | Upon substitution of LBSF | No |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | Exhibit A to this Schedule | for Party A pursuant to Part 5(a) of this Schedule. | |
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party B | A copy of the resolutions (the "Authorizing Resolution") of the board of directors of Party B, certified by the secretary (or equivalent officer) of Party B, pursuant to which Party B is authorized to enter into this Agreement, any Credit Support Document to be executed by it and each Transaction entered into under this Agreement. | Upon execution of this Agreement. | Yes |
| Party A and B | A copy of the annual report of the party (and any Credit Support Provider of such Party) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |

**Part 4. Miscellaneous.**

(a)    **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to **Party A**:

| | |
|---|---|
| Address: | Lehman Brothers Derivative Products Inc.<br>c/o Lehman Brothers Inc.<br>Transaction Management Group<br>Corporate Advisory Division<br>745 Seventh Avenue<br>New York, NY 10019 |
| Attention:<br>Telephone No.:<br>Facsimile No.: | Documentation Manager<br>(212) 526-7187<br>(212) 526-7672 |
| | For all purposes. |

Address for notices or communications to **Party B**:

Address:



Attention:
Telephone No.:
Facsimile No.:

(b) **Process Agent.** For the purpose of <u>Section 13(c)</u>:-
Party A appoints as its Process Agent:  Not applicable.

Party B appoints as its Process Agent:  Not applicable.

(c) **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d) **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e) **Calculation Agent.** The Calculation Agent is Party A unless (a) the Calculation Agent is otherwise specified in a Confirmation in relation to the relevant Transaction, or (b) an Event of Default with respect to Party A has occurred and is continuing, in which case the parties will mutually appoint a financial institution which would qualify as a Reference Market-maker to act as Calculation Agent until the earlier of (i) a designation under Section 6(c)(ii), or (ii) the discontinuance of such Event of Default with respect to Party A.

(f) **Credit Support Document.**

In the case of Party A: Not applicable, provided that, from and after the substitution of LBSF for Party A hereunder pursuant to Part 5(a) of this Schedule, the Credit Support Document applicable in the case of Party A shall be Guarantee of Holdings in the form of Exhibit B to this Schedule.}

In the case of Party B:-Not applicable.

(g) Credit Support Provider.

In relation to Party A: Not applicable[, provided that from and after the substitution of LBSF for Party A hereunder pursuant to Part 5(a) of this Schedule, the Credit Support Provider in relation to Party A shall be Holdings.}

In relation to Party B: Not applicable.

(h) Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i) Jurisdiction. Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j) Netting of Payments. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any of the Transactions (in each case starting from the date of this Agreement).

(k)     "Affiliate" will have the meaning specified in Section 14 of this Agreement.

(l)     Change of Account.  The following sentence shall be added to the end of Section 2(b) of the Agreement: "If such new account shall not be in the same tax jurisdiction as the original account the prior written consent of the other party is required for such change."

(m)    Litigation.  Section 3(c) is hereby amended by deleting the words "or any of its affiliates" therefrom.

**Part 5. Other Provisions.**

(a)     **Credit Assignment Event.**

(i)     A "Credit Assignment Event" shall occur if at any time during the term of this Agreement, Party B ceases to maintain the Minimum Rating Requirement (as defined below) from both Moody's and S&P. Following the occurrence of a Credit Assignment Event, the rights and obligations of Party A under this Agreement and all Transactions hereunder shall automatically, and without any further action by any party, be deemed to have been assigned and delegated to LBSF, effective on the third Business Day following notification by Party A to Party B of such assignment and Party B expressly and irrevocably consents to such assignment and assumption, except that no such assignment and assumption shall occur at any time after the occurrence of any event of default under any master agreement between Party A and LBSF. As of and from the effective date of such assignment, LBSF shall succeed to all rights and obligations of Party A under this Agreement and all Transactions hereunder. Notwithstanding the above, if at the time of such assignment LBSF and Party B are parties to a master agreement that sets forth general terms and conditions applicable to swap and related transactions between LBSF and Party B, the Transactions hereunder transferred to LBSF pursuant to the above provision will be governed by such master agreement.

"**Minimum Rating Requirement**" means (A) with respect to Moody's, a long-term senior unsecured debt rating, counterparty rating, or long-term deposit-paying rating of at least Aa3 or a financial strength rating of at least Aa2 (or, in the event that Moody's does not provide the long-term or other types of ratings referred to above with respect to Party B, a commercial paper or short-term rating of at least P-1); and (B) with respect to S&P, a long-term senior unsecured debt rating, counterparty rating, financial program rating or certificate of deposit rating of at least AA- or a financial strength rating of at least AA (or, in the event that S&P does not provide the long-term or other types of ratings referred to above with respect to Party B or Party B's Credit Support Provider, a commercial paper rating or short-term rating of A-1).

(ii)    Party A represents that it has provided separate consideration to LBSF for the right to assign this Agreement and the Transactions hereunder to LBSF pursuant to clause (i), and Party B shall not owe Party A any termination or other payment upon any such assignment.

(iii)   Notwithstanding clause (i) above, no assignment of any Transaction to LBSF shall occur if, prior to the effective date of the assignment described in such clause (i), Party B notifies Party A that Party B agrees to (A) terminate all Transactions as if a Termination Event has occurred with Party B as the Affected Party or (B) assign all Transactions to a third party on terms acceptable to Party A and Party B.

(iv)    Notwithstanding clauses (i) through (iii) above, no transfer or assignment payment shall be due to or owing from either Party A or Party B other than its obligations under the Transactions.

(v)     Notwithstanding the foregoing, the assignment provisions of this paragraph shall not take effect if, at the time such assignment would be required, Party B shall have satisfied in full all of its payment obligations under Section 2(a) of this Agreement and shall at such time have no future payment obligations, whether absolute or contingent, under such Section.

(vi)    Upon an assignment pursuant to this Part 5(a)(i), (A) a Trigger Event shall cease to constitute an Additional Termination Event and (B) it shall be an Additional Termination Event with LBSF as the Affected Party if Lehman Brothers Holdings Inc. ("Holdings"), as Credit Support Provider for LBSF, ceases to maintain the following rating requirements:  (A) with respect to Moody's, a long term senior unsecured debt rating, counterparty rating, or long term deposit paying rating of at least Baa3, or a claims paying ability or financial strength rating of at least Baa2 (or, in the event that Moody's does not provide the long term or other types of ratings referred to above with respect to Holdings, a commercial paper or short term rating of at least P3); and (B) with respect to S&P, a long term senior unsecured debt rating, counterparty rating, financial program rating or certificate of deposit rating of at least BBB- or a financial strength rating of at least BBB- (or, in the event that S&P does not provide the long  term or other types of ratings referred to above with respect to Holdings, a commercial paper rating or short term rating of A2).

**Miscellaneous**:

(a)    **Commencement of Voluntary Bankruptcy.** So long as Party A is solvent, Party A shall not (i) admit in writing its inability generally to pay its debts as they become due; (ii) make a general assignment, arrangement or composition with or for the benefit of its creditors; (iii) institute a proceeding seeking a judgment of insolvency or bankruptcy or any other relief in respect of Party A under any bankruptcy or insolvency law or other similar law affecting creditors' rights; (iv) pass a resolution for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); or (v) seek the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets.

(b)    **No Capital Contribution to Party A.** Party A, Holdings and LBSF have each acknowledged to and agreed with each other, and Party B hereby acknowledges, that neither Holdings nor LBSF nor any Affiliate of Party A is under any obligation whatsoever (whether express or implied) to contribute capital to Party A. Party B represents and warrants to Party A that in executing and delivering this Agreement, and performing its obligations hereunder, Party B is relying on the credit of Party A alone, and not on the credit of any other entity that may be affiliated with Party A.

(c)    **Intention to Enter into a "Swap Agreement".** Each of Party A and Party B hereby acknowledges and agrees that this Agreement and all Additional Direct Agreements and each Transaction hereunder or thereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(d)    **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(e)    **Transfer.** Section 7 of the Agreement is hereby modified by inserting the following after the word "party" but before the comma in the third line thereof:

", provided, however, that such consent shall not be unreasonably withheld"

(f)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(g)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(h)    **Definitions.** This Agreement, each Confirmation, and each Transaction are subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. as amended, supplemented, updated, restated, and superseded from time to time (collectively the "Definitions"), and will be governed in all respects by the Definitions. The Definitions, as so modified are incorporated by reference in, and made part of, this Agreement and each Confirmation as if set forth in full in this Agreement and such Confirmations. Subject to Section 1(b), in the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. Also, subject to Section 1(b), in the event of any inconsistency between the provisions of any Confirmation and this Agreement, or the Definitions, such Confirmation will prevail for the purpose of the relevant Transaction.

(i)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(j)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(k)    **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

    (1)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

    (2)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

    (3)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

    (4)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

    (5)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(l)    **Setoff.** Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments and deliveries under this Agreement shall be made without setoff or counterclaim and will not be subject to any conditions except as provided in Section 2(c) of this Agreement, provided however, that:

Following the occurrence of a Termination Event or Event of Default, each party will have the right to set off, counterclaim or withhold payment or delivery in respect of any payment due by the other party under this Agreement or any other transaction between the parties to this Agreement (including any guarantee issued by one party to the other party), whether matured or unmatured, regardless in each case of the office or branch through which a party is acting, and the relevant party's obligations hereunder shall be deemed to be satisfied and discharged to the extent of such setoff, counterclaim or withholding.

Upon the exercise by one party of any such right of setoff, counterclaim or withholding of payment or delivery, notice of such exercise shall be provided promptly to the other party (and in any event, not later than one Local Business Day prior to the date such payment is due).

(m)    **No Setoff to Party A Affiliates.** Except as provided in paragraph 5(m) above, Party B agrees that all payments required to be made by it under this Agreement shall be made without setoff or counterclaim for, and that it shall not withhold payment or delivery under this Agreement in respect of, any default by any Affiliate of Party A under any Other Agreement or any amount relating to any Other Agreement between Party B and such Affiliate of Party A or between an Affiliate of Party B and such Affiliate of Party A. As used herein, "Other Agreement" means any agreement, including, but not limited to, (i) any transaction (including

an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (ii) any liability, claim or obligation (whether present or future, contingent or otherwise), or (iii) any combination of one or more of the transactions described above. This paragraph (n) shall supersede any setoff right contained in any Other Agreement or any agreement relating to any Other Agreement between Party B and any such Affiliate of Party A or between an Affiliate of Party B and such Affiliate of Party A.

(n)    **Pledge of Swap Payment Rights and Other Property by Party A.** Party A has pledged its rights to receive payments under this Agreement and under certain other swap agreements entered into or to be entered into by Party A ("Other Swap Agreements"), and has pledged or will pledge certain other property for the benefit of Party B and the counterparties under such Other Swap Agreements, ratably to secure Party A's obligations to make certain payments to Party B and such counterparties under this Agreement and the Other Swap Agreements. To the extent of any payments made by the provider(s) of any Qualified Credit Enhancement (as defined in Party A's Operating Guidelines) for the benefit of Party B, such provider(s) will be subrogated to the rights of Party B under this Agreement; provided that such provider(s) shall not be entitled to enforce such subrogation hereunder until all obligations of Party A to Party B under this Agreement shall have been paid in full.

(o)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(p)    **Tape Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(q)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS**
**DERIVATIVE PRODUCTS INC.**
*Party A*

*Party B*

By: _T. Cury Jn____

Name: _T- Courtney (Benton)_

Title: _Authorized Signatory_

Date:

By: _____

Name: _____

Title: _____

Date:

# LEHMAN BROTHERS

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and ████████████ ("Party B") have entered into a Master Agreement dated as of August 1, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

1

# LEHMAN BROTHERS

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:

Date:

2