UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : |  |
----------------------------------------------------------------x

### DECLARATION OF DANIEL J. EHRMANN IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

Daniel J. Ehrmann makes this declaration pursuant to 28 U.S.C. § 1746, and states:

1.       I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm with offices throughout the world.  I am a member of the New York Bar and qualified to practice law in France, where I began my career as an attorney.  I joined A&M in 2000.  Since joining A&M I have specialized as a turnaround and restructuring professional.  The nature and scope of A&M's business is described in the *Declaration of John K. Suckow In Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors*, filed contemporaneously herewith.  I have performed services in connection with interim management and financial and operational advisory and restructuring engagements.

2.       This declaration is submitted in support of approval of the Global Settlement[1] and the Bilateral Settlements and the confirmation of the Debtors' Third Amended

---

[1] Terms not otherwise defined herein shall have the meaning ascribed to them in the *Debtors' Memorandum of Law, Pursuant To Section 1123(b)(3)(A) of The Bankruptcy Code and Rule 9019 of The Federal Rules of Bankruptcy Procedure, In Support of Plan Settlements* (the "Memorandum").

Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors,[2] ECF No.

19627 (the "Plan").  Unless otherwise stated herein, the facts set forth in this declaration are

based upon my personal knowledge or the personal knowledge of employees of the Debtors or

A&M who report to me, reasonable inquiry, review by me or those who report to me of records

maintained by the Debtors and their subsidiaries, some of which are attached to this declaration,

or my opinion based upon my familiarity with the Debtors' business, operations and financial

condition.  If I were called upon to testify, I could and would testify competently as to the facts

set forth herein.

**Familiarity with the Bilateral Settlements**

3.    One of my primary areas of responsibility since the commencement of the

Debtors' chapter 11 cases has been the management of all of the Debtors' international

operations, including the Debtors' relationships with the Foreign Affiliates and related parties.

Over a period of more than two years, on behalf of the Debtors, I led the negotiations with the

Debtors' Foreign Affiliates and other creditors that resulted in the Bilateral Settlements described

in the submissions in support of the Plan.  The Bilateral Settlements are fair, reasonable and in

the best interests of the Debtors and their economic stakeholders.  The Bilateral Settlements are

integral to the Global Settlement that is the linchpin of the Plan.  They should be approved.

---

[2] The Debtors include Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc.
("LCPI"); Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Brothers Special Financing
Inc. ("LBSF"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers OTC Derivatives
Inc. ("LOTC"); Lehman Brothers Financial Products Inc. ("LBFP"); Lehman Brothers Derivative
Products Inc. ("LBDP"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES
Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC
Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua
Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI
Statler Arms LLC.

<u>**The Bilateral Settlements**</u>

4.       The Foreign Affiliates were an integral part of the Lehman enterprise and

its firmwide financial reporting, cash management, custodial and trading systems.  The

interrelationships of the Debtors and the Foreign Affiliates consisted of a complex web of

intercompany funding balances and custodial and contractual relationships that were documented

and managed through Lehman's integrated financial and operating systems.  The commencement

of separate foreign insolvency proceedings for more than 100 Foreign Affiliates following

LBHI's chapter 11 case gave rise to a multiplicity of intercompany issues and challenges as to

the nature, validity and enforceability of Intercompany Claims and Guarantee Claims asserted by

Foreign Affiliates against LBHI.

**I.       OVERVIEW OF CLAIMS AND SETTLEMENTS**

5.       Given the enormity and complexity of the relationships among the

Affiliates, it was evident to me at the outset of these cases that a uniform method of dealing with

the claims from the Foreign Affiliates would maximize values for all estates.  On May 12, 2009,

the Debtors and their Foreign Affiliates in Hong Kong, Singapore, Australia, and Germany

executed the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies

(the "<u>Protocol</u>"),[3] which became the catalyst for the negotiations that have led to the Debtors'

Plan that has been overwhelmingly accepted by classes of impaired creditors.  *See* **Exhibit 1**

(Protocol).  The Debtors and their Foreign Affiliates held their first multilateral meeting in

London on July 16, 2009, and have held ten additional in-person multilateral meetings since their

initial meeting.  Substantially all signatories of the Protocol, as well as certain non-signatory

Foreign Affiliates, attended these meetings.  I attended all of these in-person multilateral

---

[3] LBI, and Foreign Affiliates in the Netherlands, Curacao, Switzerland, Luxembourg subsequently joined
as signatories to the Protocol.

meetings as well as engaged in many discussions and negotiations with Foreign Affiliates and

their professionals to set the foundation for bilateral settlement discussions and frame, discuss

and resolve the issues and controversies pertaining to matters such as information sharing, cross-

border cooperation, reconciliation of non-trading balances, and valuation of trading balances on a

mutually satisfactory basis.[4]

### A.    The Global Close and Non-Guarantee Affiliate Claims

6.    The Debtors and substantially all of their Foreign Affiliates agreed to

adopt the "Global Close" to establish a common set of accounting records for the entities as of

September 14, 2008, which would be based upon available and reconstructed records.  At my

direction and using the Global Close as a starting point, subject to inquiry into material

discrepancies, the Debtors' employees and A&M professionals have scrupulously reviewed the

intercompany balances between the Debtors and each of the Foreign Affiliates.  It was also

agreed that claim amounts based on trading balances (*e.g.*, intercompany derivatives

transactions) would be determined using mid-market levels as of the end of day on the applicable

termination date.

7.    In parallel with multilateral discussions among the Protocol signatories,

bilateral discussions were initiated between the Debtors and each of the Foreign Affiliates.

Applying the principles of the Global Close and the agreed mid-market values, under my

leadership, the Debtors engaged in a rigorous, comprehensive analysis of their respective

balances to determine the amount of net Intercompany Claims.  Based on extensive

reconciliation between each Foreign Affiliate's asserted Intercompany Claims and the Global

---

[4] The Debtors and the Foreign Affiliates have also devoted considerable time during these meetings to discussions and presentations concerning (i) the Plan and prior plans, (ii) the Ad Hoc Plan, and (iii) the Non-Con Plan.

Close, the Debtors and Foreign Affiliates have agreed to the net Intercompany Claim amounts set forth in the Bilateral Settlements.

### B.    Guarantee Claims

8.    Many of the Foreign Affiliates asserted substantial Guarantee Claims against LBHI based upon a variety of different asserted guarantees issued by LBHI, which can be grouped into three categories:  Transaction Guarantees, Entity-Specific Guarantees, or the Corporate Resolutions.  Under my direction the Guarantee Claims were extensively reviewed and the facts and circumstances relating to each were evaluated by the Debtors.  As part of this review, the legal risks and related issues were assessed.

9.    The Guarantee Claims were evaluated based upon the type of guarantee involved (*e.g.*, Transaction Guarantees, Entity-Specific Guarantees, or the Corporate Resolutions, *etc.*).  The applicable legal principles were provided by the professionals.  Based upon the assessments made, in most instances, the Debtors concluded that claims based on Entity-Specific Guarantees or the Corporate Resolutions could be highly susceptible to challenge and likely unenforceable by the Foreign Affiliates for lack of actual reliance in extending credit.  In addition, serious issues were raised as to whether the Corporate Resolutions represented enforceable contracts duly enacted by LBHI.

10.    The potential effect of substantive consolidation on each of the Guarantee Claims was also raised in opposition to the Guarantee Claims, as such claims would be eliminated if substantive consolidation were directed.  The Debtors' settlements with Foreign Affiliates take into account all of the litigation risks inherent in the prosecution of the claims and the defenses that would have to be decided.  As a result, the parties concluded that it would be in their mutual interest to avoid the time, costs and complications of such litigation by reaching fair and reasonable compromises of the issues that would be mutually beneficial to parties in interest

and provide for substantial reductions in asserted amounts of Foreign Affiliate Guarantee

Claims.

### C.    The Settlements

11.    I led the difficult and arduous negotiations over the past two years that

resulted in nine comprehensive settlements with Foreign Administrators who together control 87

of the Debtors' Foreign Affiliates.  I participated in scores of meetings in numerous countries

during this period with the Foreign Administrators, often accompanied by the Debtors' attorneys.

In addition to such meetings, employees and A&M professionals under my supervision have met

and spoken on an almost daily basis with employees and representatives of the various Foreign

Administrators, in a continuous and persistent effort to reconcile intercompany balances,

terminated derivatives and secured financing trades and failed trades, and uncover the facts and

legal risks pertinent to each Intercompany Claim and Guarantee Claim.

12.    The consequences of any potential litigation, including the risks and

potential for substantial expense and delay, and the vagaries of any litigation were considered in

consultation with the Debtors' professionals.  With that perspective, I believe that each of the

Bilateral Settlements falls well above the range of reasonableness and is in the best interests of

all parties in interest to achieve the expeditious conclusion of these chapter 11 cases.  With the

exception of one *ipse dixit* objection to the UK Settlement Agreement, there is not a single

objection to any of the Bilateral Settlements.

13.    In the aggregate, the Foreign Affiliates with Bilateral Settlements asserted

$327.8 billion in claims against the Debtors.  Pursuant to the Bilateral Settlements, the Foreign

Affiliates' claims against the Debtors will be allowed in an aggregate amount equal to $61.4

billion, representing a reduction of 81% in the aggregate asserted claims against the Debtors.  It

is necessary that these large claims – particularly the Foreign Affiliate Guarantee Claims – be

resolved in connection with the Global Settlement to enable expeditious distributions to

creditors.  Absent the Bilateral Settlements, such distributions would be indefinitely delayed

pending the outcome of the litigations that may involve conflicts of law and other major

challenging issues.

14.    While each Bilateral Settlement is unique, they contain certain common

elements:

- Each settlement fully reconciles all intercompany trading and non-trading balances among the Debtors and the Foreign Affiliates in accordance with the Global Close and allows the resulting net Intercompany Claims.

- Each settlement provides for an agreement by the Foreign Affiliates for substantial reductions to the allowed amounts of Guarantee Claims, depending on the particular facts and circumstances related to such claims.  In the aggregate, the Guarantee Claims asserted by the settling Foreign Affiliates have been reduced from $223 billion to $11.2 billion.

- Each settlement provides for mutual releases from and against claims disallowed pursuant to the settlements, and an agreement by each applicable Foreign Affiliate to vote for and support the Plan.

- Each settlement is subject to the confirmation of the Plan and, in some cases, approvals from the relevant courts, agencies, or supervisors in the applicable Foreign Affiliate's separate insolvency proceeding.  As to the latter condition, the Debtors have been informed by most of the Foreign Administrators that all necessary approvals have been obtained, or are likely to be obtained shortly.

## II.    SETTLEMENT WITH THE LEHMAN UK ENTITIES

15.    The Lehman UK Entities asserted among the most substantial and

complex claims against the Debtors.  The Debtors likewise asserted substantial claims against the

Lehman UK Entities.  In connection with these claims, a series of intercompany disputes and

issues arose almost immediately following the commencement of the LBHI chapter 11 case and

the onset of the administration proceedings in the UK.  I led the Debtors in comprehensive,

robust and, at times, contentious negotiations with the Lehman UK Entities' administrators and

their professionals and worked extensively with the Debtors' attorneys and the Creditors'

Committee in efforts to resolve the differences and issues with the Lehman UK Entities.  After

numerous meetings in London and New York which consumed countless hours of negotiations,

the Debtors and the administrators of the Lehman UK Entities ultimately reached an agreement

in principle on September 15th, 2011, and a settlement agreement (the "UK Settlement

Agreement"), dated October 24, 2011.

        16.     A summary of the most significant filed claims and allowed claims

pursuant to the UK Settlement Agreement is set forth below:

| Approximate Aggregate Claims Held by Lehman UK Entities Against the Debtors | | |
|---|---|---|
| **Debtor** | **Filed** | **Allowed (Net of Setoff)** |
| *Direct Claims of LBIE Against LBHI* | $11.8 billion | $0.0 |
| *Direct Claims of Other Lehman UK Entities against LBHI* | $4.5 billion | $4.5 billion |
| *Guarantee Claims of LBIE Against LBHI* | $101.1 billion | $1.008 billion |
| *Guarantee Claims of Other Lehman UK Entities Against LBHI* | $21.8 billion | $1.6 billion |
| *Direct Claims of LBIE Against LBSF* | $23.7 billion | $0.9 billion |
| *Direct Claims Against LCPI* | $0.3 billion | $0.3 billion |
| *Direct Claims Against LBCC* | $2.8 billion | $0.0 billion |
| *TOTAL* | **$166.0 billion** | **$8.4 billion** |
| Approximate Aggregate Claims Held by Debtors Against Lehman UK Entities | | |
| **Debtor** | **Filed** | **Allowed (Net of Setoff)** |
| *Claims Held By LBHI* | N/A[5] | $5.6 billion |
| *Claims Held By LBSF* | N/A | $0.6 billion |
| *Claims Held By LBCS* | N/A | $76. 2 million |
| *Claims Held By LCPI* | N/A | $32.3 million |
| *Claims Held By Other Debtors* | N/A | $441,462 |
| *TOTAL* | N/A | **$6.3 billion** |

## A.    Settlement with LBSF

17.    The claims asserted against LBSF by the Lehman UK Affiliates are principally derivatives-based, and for the most part, are based upon transactions that LBIE entered into with LBSF to mirror and offset LBIE's transactions with third parties.  The disputes

---

[5] The Debtors have not yet filed proofs of claim against the Lehman UK Entities.  The bar date for filing proofs of debt against LBIE is December 31, 2012; no bar date has been established for the filing of proofs of debt against the other Lehman UK Entities.

concerning LBSF's trades with LBIE have turned primarily upon the application and proper

interpretation of a letter agreement between LBSF and LBIE (the "<u>LBSF Side Letter</u>").  *See*

**Exhibit 2** (LBSF Side Letter).

18.    Prior to the Commencement Date, at LBSF's request, LBIE regularly

entered into derivatives transactions with clients ("<u>Client Transactions</u>") who either preferred or

required a regulated UK broker/dealer as their counterparty.  LBIE and LBSF

contemporaneously entered into identical "back-to-back" transactions that passed the economic

risk of LBIE's Client Transactions to LBSF (the "<u>LBSF Back-To-Back Transactions</u>").  Absent

the LBSF Side Letter, the Debtors would have been able to negotiate with LBIE and agree to

mutually acceptable determinations of damages arising from terminated LBSF Back-To-Back

Transactions.  However, it is my understanding that depending on its application, the LBSF Side

Letter altered the manner in which damages are calculated in significant ways, as more fully

explained in the Memorandum.  Generally, it is my understanding that if the LBSF Side Letter is

applied to the calculation of damages arising from terminated LBSF Back-To-Back Transactions,

then the claims arising against, or payables owing to LBSF, must mirror the claims against, or

payables received by LBIE, respectively, resulting from the corresponding terminated Client

Transactions.

19.    At my direction, the Debtors have conducted an extensive and rigorous

review of the facts and circumstances surrounding LBSF's entry into the LBSF Side Letter and

scrutinized LBSF's trading records with LBIE to determine how the LBSF Side Letter had been

implemented.  The facts and circumstances were reviewed by the Debtors' attorneys, who

considered the potentially applicable legal doctrines and general contract law, taking into

account both New York law and English law.  After in-depth discussions with the Creditors'

Committee and its professionals, the Debtors vigorously disputed LBIE's construction of the

LBSF Side Letter and its application on several grounds.  Specifically,

- The LBSF Side Letter was never intended to apply to a bankruptcy of LBSF or LBIE, as opposed to the bankruptcy or insolvency of a counterparty.

- To the extent the LBSF Side Letter had any application:

  o the LBSF Side Letter created an agency relationship between LBSF and LBIE, and therefore, LBIE had no discretion to unilaterally settle its Client Transactions without LBSF's participation as a party economically affected by such settlements.

  o the LBSF Side Letter did not apply to Client Transactions that had not been terminated prior to December 12, 2008 (the date on which LBSF terminated all LBSF Back-To-Back Transactions).

The Debtors have also asserted that LBIE's claims based on the LBSF Back-To-Back

Transactions should be discounted to reflect the risk of substantive consolidation.  LBIE has

strenuously rejected the Debtors' arguments, asserting various claims and defenses as stated in

the Memorandum.

20.    To the extent that the LBSF Side Letter may apply, its application raises

serious difficulties in respect of the Debtors' ability to quantify pertinent amounts and damages.

My team of professionals has expended extensive time and resources analyzing and negotiating

with LBIE the valuation of settled Client Transactions, as well as the potential valuation of

Client Transactions that LBIE has not yet settled.  However, these efforts have been difficult and

complex because a large number of the Client Transactions have not been fully settled, resulting

in uncertainty of the full scope of actual payments to be made to LBIE, or claims against LBIE.

21.    LBSF and LBIE also have disputed their respective rights and claims

relating to certain securities currently in LBIE's possession or in the possession of other

custodians such as LBI (the "<u>LBSF Assigned Assets</u>").  LBSF asserts ownership of these

securities and, to the extent that LBIE is unable to recover them from custodians, at a minimum, that it holds unsecured claims against LBIE for the value of the securities.  LBSF believes that these securities have value in excess of $1 billion.  LBIE has rejected LBSF's claims for the value of such securities.  LBIE has contended that it has no liability to LBSF for securities held by custodians, and has reserved its right to argue that LBIE itself had right, title, and/or interest to these securities.

22.      After extensive consideration, including frequent consultations with the Creditors' Committee, LBSF and LBIE agreed that the most effective way to resolve the difficult issues and disputes over the LBSF Back-to-Back Transactions and the claims relating to the LBSF Assigned Assets would be to allow LBIE to (i) keep the LBSF Assigned Assets and pursue them for its own benefit; and (ii) have an allowed claim in LBSF Class 5C in an amount of $900 million, representing a substantial reduction from the approximately $23.7 billion claim originally filed by LBIE.

23.      Additionally, certain other Lehman UK Entities other than LBIE will have aggregate allowed claims against LBSF in the amount of $34.5 million.  LBSF, in turn, will have allowed claims against certain Lehman UK Entities in the amount of $601.5 million.  The amounts allowed are consistent with the reconciled books and records of the respective entities and are a part of the claims reconciliation process inherent in the settlements that benefit the Debtors and end potential expensive litigation.

**B.      Settlement with LBHI**

**1.      Guarantees of Back-To-Back Transactions**

24.      Based on the Debtors' review of their records, it is my understanding that LBIE entered into similar letter agreements in July 2006 (together with the LBSF Side Letter, the "Side Letters") with several of its other affiliates as to transactions similar to the LBSF Back-To-

Back Transactions (together with the LBSF Back-To-Back Transactions, the "Back-To-Back Transactions").  LBIE has asserted Guarantee Claims against LBHI based on damages resulting from such Back-To-Back Transactions, in an aggregate amount of approximately $33.5 billion.  These filed claims are predicated upon Corporate Resolutions and Transactional Guarantees in respect of the obligations of LBSF and other Lehman Affiliates, including LBF, LBCC and LOTC to LBIE pursuant to the Back-To-Back Transactions.  Under my direction, the Debtors have reviewed these claims and, in consultation with the Debtors' attorneys, considered the litigation risks described above as to the LBSF Side Letter.  In consideration of such risks, and after applying a setoff of the full amount of LBHI's approximately $6.5 billion claim against LBIE, LBIE has agreed pursuant to the UK Settlement Agreement that it has no claim against LBHI on account of the Back-To-Back Transactions.  Thus, LBIE will have no net claims on account of the $33.5 billion of claims against LBHI.

## 2.    LB Lux

25.    LB Lux is a Lehman Affiliate incorporated in Luxembourg.  Based on the review of the Debtors' records, it is my understanding that LB Lux operated as an intermediary, mainly borrowing securities from third parties and LBI, and then lending them to LBIE under two different forms of agreements:[6] either (i) an Overseas Lending Agreement (the "OSLA") or (ii) a Global Master Repurchase Agreement (the "GMRA" and, together with the OSLA, the "GMRA/OSLA").  *See* **Exhibit 3** (OSLA); **Exhibit 4** (GMRA).  LBIE then used the borrowed securities to trade with third parties.

26.    I am informed that both LB Lux and LBIE had the right to terminate the GMRA/OSLA upon the occurrence of UK administration for LBIE.  However, neither party

---

[6] It is my understanding that LB Lux was subjected to liquidation on April 1, 2009 in Luxembourg.

exercised the right until LBIE terminated the GMRA/OSLA on March 31, 2009.  It is also my

understanding that if the GMRA/OSLA had terminated upon LBIE's being subjected to UK

administration, LBIE would have had an immaterial and possibly no claim at all against LB Lux.

However, it is claimed that due to movements in the prices of the relevant securities, the delay in

terminating the GMRA/OSLA resulted in LBIE filing a claim against LB Lux in the approximate

amount of $6 billion for amounts allegedly due under the GMRA/OSLA.  In addition, LBIE

asserted a related Guarantee Claim against LBHI in the same amount (the "<u>LBIE-Lux Guarantee</u>

<u>Claim</u>") based on (i) an Entity-Specific Guarantee of LB Lux's obligations dated August 24,

2000 (the "<u>LB Lux Guarantee</u>"), *see* **Exhibit 5** (LB Lux Guarantee) and (ii) the Corporate

Resolutions.

       27.     Based upon its own valuation of the securities traded between LBIE and

LB Lux, LBHI does not dispute LBIE's claim amount against LB Lux and the resulting

Guarantee Claim amount against LBHI, if March 31, 2009 termination date values were applied.

However, LBHI disputes the LBIE-Lux Guarantee Claim on several grounds:

- LBHI contends that the GMRA/OSLA automatically terminated by its terms upon LBIE's entry into UK administration proceedings. It is my understanding that, if LBHI were to prevail in this argument, LBIE might have no claim against LB Lux.  LBIE disputes this construction of the GMRA/OSLA, asserting that termination did not occur until LBIE gave notice of termination.

- Based on LBHI's review of the facts relating to the administration of LB Lux's proceedings, LBHI believes that LBIE may have had duties, contractual or otherwise, to assist LB Lux in connection with the GMRA/OSLA.  LBIE has vigorously disputed these contentions.

- LBHI has also asserted that the LBIE-Lux Guarantee Claim is susceptible to the same enforceability and substantive consolidation risks as other Guarantee Claims.  LBIE disputes this, contending that it can show both knowledge of and reliance on the LB Lux Guarantee and the Corporate Resolutions.

It is my understanding that LB Lux has also rejected LBIE's approximately $6 billion direct claim, the resolution of which is the subject of pending litigation in Luxembourg (the "LBIE-Lux Litigation").

28.     The Debtors have considered the relative costs and benefits of assisting LB Lux in its prosecution of the LBIE-Lux Litigation and simultaneously objecting to the LBIE-Lux Guarantee Claim, and the risks and benefits of prosecuting such litigation to a final judgment.  Based on these considerations, and given my understanding that LBHI and LBIE hold the vast majority of the claims that have been asserted against LB Lux, LBHI and LBIE have concluded that it is in the best interests of their respective parties in interest to reach a pragmatic, economic resolution and settlement of the issue.

29.     LBHI and LBIE have agreed to make reasonable efforts to seek a stay of the LBIE-Lux Litigation, and to resolve the LBIE-Lux Guarantee Claim.  LBIE and LBHI also have agreed to share distributions out of the LB Lux liquidation on the basis of 45% to LBHI and 55% to LBIE.  LBHI has therefore negotiated a favorable division of distributions – if instead, LBHI's $1 billion claim shared with LBIE's asserted $6 billion claim on a *pro rata* basis, LBHI would only be entitled to a 14% of LB Lux's distributions.

### 3.     Bankhaus Client Money Claim

30.     It is my understanding that on September 12, 2008, LBIE transferred certain client money in the aggregate amount of approximately $1.008 million to Bankhaus, with the alleged understanding that approximately $1.008 million was to be repaid, with interest, on September 15, 2008.  It is also my understanding that this client money was not repaid, and that on December 22, 2009, LBIE filed a petition with the Frankfurt am Main Regional Court in Germany (the "Frankfurt Court"), claiming a "right of separation" with respect to the $1 billion (the "Bankhaus Client Money Claim"), *i.e.*, that the $1 billion should be returned to LBIE in its

entirety, with interest, because the funds constitute client money. It is my understanding that on

October 7, 2010, the Frankfurt Court dismissed LBIE's petition, and LBIE subsequently

appealed. On appeal, the decision of the Frankfurt Court was reversed and remanded for

reconsideration by the Frankfurt Court.

31.    Bankhaus has objected to the LBIE petition, asserting that the $1 billion

claim should be treated as an intercompany loan that, under the German Insolvency Code, should

be automatically subordinated to all other creditor claims against Bankhaus.

32.    LBIE also has asserted a Guarantee Claim against LBHI on account of the

foregoing based upon (i) an Entity-Specific Guarantee of Bankhaus's obligations dated

November 21, 2002 (the "Bankhaus Guarantee") and (ii) the Corporate Resolutions (the

"LBIE/Bankhaus Guarantee Claim"). *See* **Exhibit 6** (Bankhaus Guarantee). LBIE has also

asserted that LBHI's approximately $6.5 billion Intercompany Claim cannot be set off against

the LBIE/Bankhaus Guarantee Claim. LBHI has challenged the LBIE assertions. LBHI has also

challenged the LBIE/Bankhaus Guarantee Claim as a result of the overall consideration of the

validity and enforceability of the Bankhaus Guarantee and the Corporate Resolutions.

33.    At my direction, extensive review with the Debtors' attorneys concerning

the potential outcome of LBIE's litigation with Bankhaus has occurred. The Debtors also have

considered the relative risks and benefits of litigation as to the enforceability of the Bankhaus

Guarantee, the Corporate Resolutions, and the possibility of substantive consolidation. In

consideration of the other significant benefits provided to LBHI by the Lehman UK Entities, it

was determined that the disputes concerning the LBIE/Bankhaus Guarantee Claim should be

settled by allowing LBIE a Guarantee Claim (Class 4B) against LBHI in the amount of $1.008

billion (the "Allowed LBIE Guarantee Claim"), but subject to the condition that LBHI will not

have to make any distributions to LBIE on account of any portion of the Allowed LBIE

Guarantee Claim that is allowed if LBIE gets paid in full from Bankhaus.  The net result is that

any exposure to LBHI based upon the Allowed LBHI Guarantee Claim has been greatly reduced

and may be minimal.

### 4.    R3/JPM Claims

34.    LBIE has agreed to treat certain claims held by LBHI against LBIE as

third-party claims, *i.e.*, not subject to offset.  Specifically, LBIE will grant third party treatment

to the following claims:

- ▪ all LBHI claims as to which LBHI is a subrogee of JPMorgan Chase
  Bank, N.A., or any of its affiliates (each, a "<u>JPM Entity</u>"), against LBIE,
  to the extent of the distributions by LBHI or applied from LBHI's property
  to such JPM Entity pursuant to that certain Collateral Disposition
  Agreement among JPMorgan Chase Bank, N.A. and the Debtors dated
  March 16, 2010 (the "<u>JPM Claim</u>"); and

- ▪ all claims assigned to LBHI pursuant to that certain Assignment of Claim
  entered into as of October 17, 2008, between R3 Capital Partners Master,
  L.P. ("<u>R3</u>") and LBHI, and for which, prior to the Execution Date, LBHI
  is subrogated to a claim of R3 against LBIE (the "<u>R3 Claim</u>" and together
  with the JPM Claim, the "<u>JPM/R3 Claims</u>").

LBIE and LBHI have agreed to an expedited period for LBIE to review the JPM/R3 Claims, with

the expectation that the parties will seek to reach a consensual resolution as to the allowed

amount of the JPM/R3 Claims.  LBIE's agreement to treat these claims as third-party claims

results in a potential substantial benefit to LBHI.

### 5.    Other Claims Against LBHI and Against Lehman UK Entities

35.    At my direction, an in depth review of the Intercompany Claims between

LBHI and the Lehman UK Entities (other than LBIE) was conducted by my team and a

reconciliation of intercompany balances was negotiated.  Based upon these efforts, the parties

have agreed to the allowance of Guarantee Claims against LBHI in an aggregate amount of

approximately $1.6 billion.  This is a reduction from the approximately $21.8 billion in

Guarantee Claims filed by the other Lehman UK Affiliates and results from not only the review

of the intercompany books and records between LBHI and the Lehman UK Entities, but also

after taking into account the enforceability of the Corporate Resolutions, substantive

consolidation, and other legal issues.

36.     LBHI and the Lehman UK Entities (other than LBIE), also, as part of the

settlement, have agreed on the allowed amounts of the direct claims of such Lehman UK Entities

against LBHI, and LBHI's direct claims against them.  Accordingly, pursuant to the UK

Settlement Agreement, (i) certain of the Lehman UK Entities (other than LBIE) shall have

allowed direct claims against LBHI in an aggregate amount of approximately $4.5 billion in

LBHI Class A, and (ii) LBHI shall have allowed, unsecured claims against certain of the Lehman

UK Entities (other than LBIE) in an aggregate amount equal to approximately $5.6 billion.  The

amounts allowed are consistent with the reconciled books and records of the respective entities

and are a part of the claims reconciliation process inherent in the settlements that benefit the

Debtors and end potential expensive litigation.

### C.     Settlements with LCPI, LOTC, LBCC, LBCS, and Other Debtors

37.     The parties have agreed to the unsecured Intercompany Claim amounts

between Debtors other than LBHI and LBSF and the Lehman UK Entities.  Certain Lehman UK

Entities (including LBIE) will have allowed claims against (i) LCPI, (ii) LOTC, (iii) LBCC, and

(iv) LBCS, and (v) certain other Debtors in aggregate respective amounts equal to approximately

(i) $303.6 million, (ii) $68.1 million, (iii) $139,764, (iv) $659,343 and (v) $2,310.  Each of these

amounts is consistent with the obligations owed to the particular Lehman UK Entities based

upon the review of the facts and legal principles.

38.     Pursuant to the UK Settlement Agreement, (i) LBCS, (ii) LCPI, and (iii) other Debtors will have allowed unsecured claims against certain of the Lehman UK Entities in aggregate respective amounts equal to approximately (i) $76.3 million, (ii) $32.3 million, and (iii) $441,462.  In my business judgment, these amounts fairly reflect the respective obligations of the settling entities.

**D.     The UK Settlement Agreement Should Be Approved**

39.     The UK Settlement Agreement is fair, reasonable and manifestly in the best interests of each of the Debtors and its economic stakeholders.  I have led the negotiations with the Lehman UK Entities as a fiduciary for each of the relevant Debtors.  The UK Settlement Agreement provides material and significant benefits for *each* of the Debtors.

40.     The UK Settlement Agreement

- achieves a full and final reconciliation of substantially all Intercompany Claims between the Debtors and the Lehman UK Entities;

- resolves billions of dollars of disputes concerning the allowable amounts of claims and the ownership rights of the Debtors and the Lehman UK Entities to certain assets; and

- results in a substantial reduction in the claims filed against the Debtors by the Lehman UK Entities that would otherwise delay distributions to holders of allowed claims.

41.     The UK Settlement Agreement clearly benefits LBHI by reducing $139.2 billion in claims filed against LBHI to an allowed claim in the amount of $7.1 billion, thus avoiding the uncertainty and delay of litigation over the numerous factual and legal issues relating to Guarantee Claims and substantive consolidation.  In addition to this substantial reduction in claims against LBHI, LBHI has obtained material benefits as a result of the UK Settlement Agreement:

■ LBHI believes that LB Lux's estate has substantial assets to distribute. By agreeing to share distributions 45%/55%, LBHI will substantially increase its recoveries from LB Lux;

■ Although LBHI will have no net claim against LBIE, LBHI expects to realize material recoveries from its $5.6 billion in claims against the other Lehman UK Entities, that would otherwise remain unresolved and subject to the uncertainties of litigation;

■ LBHI expects to realize value from the R3/JPM Claims as a result of LBIE's agreement to treat these claims as third-party claims that are not subject to setoff by LBIE's claims against LBHI.

42.     I have reviewed the Farallon Objection, which speculates, with no evidentiary support, that the UK Settlement Agreement *may* not be in the best interests of LBHI because "the proposed settlement *may* involve LBHI subsidizing a more favorable settlement for the benefit of other Debtors and creditors, in particular Lehman Brothers Special Financing Inc." (Farrallon Objection ¶¶ 15-16) (emphasis added). This speculation is absolutely false. LBHI is receiving substantial, material benefits from the UK Settlement Agreement, and the UK Settlement Agreement is absolutely in the best interests of LBHI and its economic stakeholders.

43.     LBSF has also undeniably received substantial benefits from the UK Settlement Agreement. LBIE has agreed to reduce its claim against LBSF in the amount of approximately $23.7 billion to $900 million plus the value of the LBSF Assigned Assets, in recognition of the litigation risks attendant to the LBSF Side Letter litigation. By crediting the value of the LBSF Assigned Assets to the reduction of LBIE's claim against LBSF, the parties have also resolved their dispute concerning the value and ownership of these assets. LBSF will realize a substantial benefit from these assets despite the fact that LBIE disputes LBSF's rights to these securities and notwithstanding LBIE's uncertain ability to recover these securities. Avoiding litigation – and its inherent risks and delay – over the novel issues implicated by the LBSF Back-To-Back Transactions and LBSF Side Letter greatly inures to LBSF's benefit. And

LBSF will realize value from having an aggregate $601.5 million in claims allowed against the

Lehman UK Entities without having to litigate the allowance of these claims.

44.    The Lehman UK Entities' claims against other Debtors have also been

substantially reduced – most notably, the claims against LBCC, which have been reduced from

approximately $2.8 billion to $139,764.  At the same time, the Debtors with net claims against

the Lehman UK Entities have been able to crystallize those claims, some of which are billions of

dollars and will be allowed claims in the UK proceedings, thus avoiding the need to subject these

claims to any adjudication by the UK court.  In each case, these claims allowed in favor of and

against the Debtors are consistent with the Debtors' reconciled books and records.

45.    The Debtors have considered all of the benefits above, and carefully

weighed them against the risks of expensive, protracted litigation that would consume the

Debtors for many years.  In light of these relative risks and benefits, I believe the UK Settlement

Agreement is fair and reasonable and in the best interests of each of the Debtors and its

stakeholders.

46.    The UK Settlement Agreement is integral to the Global Settlement, and

should be approved as part of the Debtors' Plan.  LBIE has an absolute and unconditional

termination right if the UK Settlement Agreement is not approved as part of the Plan.  If the UK

Settlement Agreement is terminated, the Debtors will lose the Plan support of the Lehman UK

Entities, and all the benefits of the UK Settlement Agreement will fall away.  From the Debtors'

perspective, the termination of the UK Settlement Agreement would result in a tremendous loss

of time, money, and value to the Debtors and their stakeholders.  Approval of the UK Settlement

Agreement is more than appropriate.

III.    SETTLEMENT WITH LBT

47.    LBT is a private limited liability company under Dutch law established for

the purpose of obtaining financing for general business operations of the Lehman enterprise

through the issuance of notes primarily in Europe and Asia (the "Programs").  *See* **Exhibit 7**

(Excerpts from Base Prospectus, Euro Medium Term Note Program, July 24, 2008) (the "2008

Base Prospectus") at p. 234; *see also* **Exhibit 8**, (Prospectus and Listing Particulars, Inflation

Linked Notes December 2005 – December 2017, filed November 30, 2005) at p.24 (the "2005

Prospectus and Particulars").  Under the Programs, LBT issued structured notes with a variety of

characteristics (the "Structured Notes") to individuals and financial institutions.  *See id.*

Pursuant to a loan agreement, dated May 26, 2000 (the "Loan Agreement"), the proceeds

generated from LBT's issuance of Structured Notes were upstreamed to LBHI and used by LBHI

to fund the operations of the Lehman enterprise in exchange for LBHI's obligation to repay such

amounts to LBT.  *See* **Exhibit 9** (Loan Agreement).  LBHI guaranteed LBT's obligations to the

LBT Noteholders under the Structured Notes.  *See*, *e.g.*, **Exhibit 10** (Guarantee Agreement with

respect to the Euro Medium-Term Note Program, dated August 22, 2001).  LBT Noteholders

have asserted billions of dollars in Guarantee Claims against LBHI.

48.    LBT also entered into derivatives transactions with other Lehman

Affiliates, including certain of the Debtors, to hedge the risk of the derivative element of the

Structured Notes and Warrants and Certificates, respectively.

A.    **Asserted Claims and Defenses**

49.    LBT asserted an approximately $34.8 billion claim against LBHI on

account of amounts due under the Loan Agreement (the "LBT Intercompany Claim").  LBT also

filed partially unliquidated claims against LBHI based upon Transactional Guarantees and the

Corporate Resolutions relating to damages arising from the termination of LBT's derivatives

trades with other Lehman Affiliates, including certain Debtors.

**B.     Risk of Substantive Consolidation with Respect to LBT**

50.     Considerable time and resources have been expended in reviewing the

facts and circumstances pertaining to LBT's operations and its relationship to LBHI.  Based on

the review of the facts, documents, and historical record, the risk that LBT could be substantively

consolidated is credible.  The following facts have been considered:

- LBT was established for tax and regulatory purposes to enable LBHI to issue debt in the European and Asian markets for the Lehman enterprise.  LBT's only activity was the issuance of notes and the direction of the note proceeds to LBHI.  *See* **Exhibit 7** (2008 Base Prospectus) at p. 234; **Exhibit 11** (Bankruptcy Report of Bankruptcy Trustees of Lehman Brothers Treasury Co. B.V., Nov. 3, 2009) at § 1.2.1.

- Substantially all of the funds obtained by LBT from third parties were upstreamed to LBHI, pooled within Lehman's centralized cash management system, and disbursed by LBHI in the exercise of its discretion for the benefit of the operations and maximization of the Lehman enterprise.

- LBT has no assets other than Intercompany Claims and has no ability to repay its obligations to third parties other than through its recoveries on such Intercompany Claims.  *See* **Exhibit 12** (Bankruptcy Report of Bankruptcy Trustees of Lehman Brothers Treasury Co. B.V., Dec. 22, 2008) at § 2.1 – 2.2

- All LBT notes issuances were guaranteed by LBHI as essential to the sale of such notes.

- LBT's debt documents allowed LBHI to assume LBT's liabilities at any time, without noteholder consent, and to thereby extinguish LBHI's guarantee.  *See*, *e.g.*, **Exhibit 7** (2008 Base Prospectus) at 116.

51.     Initially, it was determined that the LBT Intercompany Claim should be

reduced by 50% to account for the risk that substantive consolidation could be ordered with

respect to LBT.  However, LBT and the LBT Noteholders strenuously disputed the contention

that LBT could be substantively consolidated, arguing instead that LBT strictly adhered to many

corporate formalities and maintained a separate existence from LBHI.  The creditors also

contended, based upon the various offering documents for the Structured Notes, that they relied

on the separateness of LBT and the guarantees of LBT's obligations by LBHI, which were

clearly disclosed in the relevant offering documents.

> 52.    LBT Noteholders have asserted billons of dollars in Guarantee Claims

against LBHI.  They constitute one of LBHI's most significant creditor groups.  I along with

John Suckow led the A&M team negotiations of the Plan.  During these negotiations and

meetings with creditors concerning the Global Settlement and the Plan, it became clear to me

that unless the LBT Intercompany Claim was reconciled and allowed, LBT Noteholders would

not have supported the Global Settlement and the Plan Adjustment.  To achieve the benefits of

the Global Settlement in June 2011, and in exchange for the mutual concessions of the parties

that led to the Global Settlement, we determined that it was in the best interest of the Debtors and

their estates to provide in the Plan for the allowance of the LBT Intercompany Claim in the

amount of $34.548 billion in LBHI Class 4A (Senior Affiliate Claims).

## C.    The LBT Settlement Agreement

> 53.    On August 30, 2011, the Debtors entered into a settlement agreement with

LBT (the "<u>LBT Settlement Agreement</u>") to memorialize the allowance of the LBT Intercompany

Company in accordance with the Global Settlement and the Plan.  In addition, pursuant to the

LBT Settlement Agreement:

- LBSF will have an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBT in an amount equal to approximately $1.0 billion; and

- LBCS will have an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBT in an amount equal

to approximately $43.5 million. These amounts reflect a negotiated value of derivatives claims of LBSF and LBCS against LBT.

LBT has agreed to waive all other claims that it has asserted against LBHI.

54.     The Global Settlement embodied in the Plan could not have been achieved absent the Debtors' agreement to allow the LBT Intercompany Claim in the amount set forth in the LBT Settlement Agreement. The Global Settlement and the confirmation of the Debtors' Plan will yield benefits that far outweigh the concessions made in respect of LBT Intercompany Claims. As such, the LBT Settlement Agreement is in the best interests of the Debtors and their economic stakeholders and should be approved.

**IV.     SETTLEMENTS WITH BANKHAUS, LBSN, THE LEHMAN HONG KONG ENTITIES, THE LEHMAN LUXEMBOURG ENTITIES, THE LEHMAN JAPAN ENTITIES, THE LEHMAN SINGAPORE ENTITIES, BUNDESBANK, BDB, AND EDB**

55.     The Debtors have entered into settlement agreements with the other Foreign Affiliates and German governmental entities identified below. As stated, no objections have been filed to these settlements.

56.     Each of the Bilateral Settlements consist largely of (i) a full and final reconciliation of all non-trading intercompany balances in accordance with the Global Close, and agreement on the resulting net Intercompany Claims, (ii) a full reconciliation of trading (*e.g.*, derivatives) balances, and agreement on the resulting net Intercompany Claims, and (iii) a settlement and compromise on Guarantee Claims asserted against LBHI, taking into account the risks of substantive consolidation and the Debtors' other challenges to enforceability of such claims.

57.     The Debtors consulted extensively with their legal advisors in order to evaluate the litigation risks attendant to each Guarantee Claim in light of the facts and circumstances surrounding it and the purported guarantee document or documents to which it

refers.  Consequently, the Guarantee Claims allowed pursuant to the Bilateral Settlements have

been substantially reduced, and represent a fair settlement of any potential litigation in respect of

these claims.  In addition, each Intercompany Claim allowed pursuant to the Bilateral

Settlements has been the subject of scrupulous diligence under my supervision and represents a

thorough reconciliation of the parties' books and records, and valuation of terminated derivatives

trades and failed trades.

58.    The Debtors have devoted a substantial amount of time and resources to

fully resolve these claims, and have regularly consulted with the Creditors' Committee's

advisors in connection with the same.  Each of the Bilateral Settlements is fair and reasonable, in

the Debtors' best interests, and should be approved.

### A.    Settlement with LBSN

59.    LBSN filed an approximately $6.1 billion claim against LBHI based upon

LBSN's loan to LBHI of the proceeds generated from the issuance of Warrants and Certificates

(the "LBSN Intercompany Claim").  LBSN also filed claims in excess of $383.9 million against

LBHI based on, among other things, Transactional Guarantees and Corporate Resolutions

relating to LBSN's derivatives trades with other Lehman Affiliates.

60.    On October 19, 2011, the Debtors entered into a settlement agreement (the

"LBSN Settlement Agreement") with LBSN.  Pursuant to the LBSN Settlement Agreement,

LBSN will have an allowed, senior, non-priority, non-subordinated general unsecured claim

against LBHI in LBHI Class 4A in a net amount equal to approximately $5.2 billion.  In

addition, pursuant to the LBSN Settlement Agreement, LBSN will also have

▪    an allowed, non-priority, non-senior, non-subordinated general
unsecured claim against LBSF in LBSF Class 5C in a net amount
equal to approximately $74.8 million; and

- an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBCC in LBCC Class 5C in a net amount equal to approximately $1.3 million.

LBSN has agreed to waive all other claims that it has asserted against LBHI.

**B.      Settlement with Bankhaus**

61.      Bankhaus filed claims against the Debtors in an aggregate amount of $39.3 billion, including a $29.9 billion claim against LBHI in respect of the SCA; a $1.24 billion claim against LCPI arising from certain repurchase agreements, and a largely unliquidated claim against LBSF arising from certain swaps.  Pursuant to the Bankhaus Settlement Agreement, Bankhaus will have:

- an allowed, unsecured claim against LBHI on account of the SCA (exclusive of the claim previously allowed pursuant to the Initial Bankhaus Claims Settlement Agreement) in an aggregate amount equal to approximately $6.4 billion (the "Allowed SCA Claim");

- allowed claims against LCPI in an aggregate amount of approximately $1.3 billion, subject to certain reductions, as described in detail in the Bankhaus Settlement Agreement;[7] and

- allowed claims against LBSF in an amount equal to $1.2 billion, subject to certain reductions, as described in detail in the Bankhaus Settlement Agreement.

These net claim amounts have been set off against and reduced by the claims that LCPI and LBSF have against Bankhaus in the amount of approximately $320.9 million and $69.3 million, respectively.  In addition, LBCC and LBCS will have allowed, non-subordinated, non-priority unsecured net claims against Bankhaus in amounts equal to approximately $102 million and $149.7 million, respectively.

---

[7] This amount does not include the LCPI Claim which was previously allowed pursuant to the Initial Bankhaus Claims Settlement Agreement (each defined below).

C.    **Settlement with the Lehman Hong Kong Entities**

62.    The Lehman Hong Kong Entities filed numerous claims against the

Debtors arising, among other things, on account of (i) derivatives transactions; (ii) intercompany

funding balances; (iii) failed and/or pending trades; (iv) stock lending/borrowing transactions;

(v) repurchase and reverse repurchase transactions; (vi) money market placements; (vii)

subordinated loans; (viii) custody arrangements respecting securities, cash and other property;

and (ix) collateralized debt obligations.  Many of these claims were asserted in unliquidated

amounts.

63.    In addition, certain Lehman Hong Kong Entities filed Guarantee Claims

against LBHI in both liquidated and unliquidated amounts based upon both Transactional

Guarantees and the Corporate Resolutions.  The largest Guarantee Claims were filed by Lehman

Brothers Asia Holdings Ltd. ("LBAH") in an aggregate amount of approximately $4.8 billion

and by Lehman Brothers Commercial Corporation Asia Ltd. ("LBCCA" and, together with

LBAH, the "Relevant HK Entities"), in an aggregate amount of approximately $1.6 billion.  In

the aggregate, the liquidated claims filed by all of the Lehman Hong Kong Entities against the

Debtors total approximately $10.5 billion.

64.    LBHI in turn asserted claims against the Relevant HK Entities that, in the

aggregate, total $11 billion.  During the course of their negotiations, the Relevant HK Entities

expressed a concern that any reduction in their offsetting Guarantee Claims against LBHI would

substantially increase the amount of LBHI's net claims against them, at the expense of their

third-party creditors.  In order to facilitate a settlement that maximized recoveries to the Debtors

and their creditors, and given the relatively small amount of third-party claims filed against the

Relevant HK Entities, the Debtors proposed a trust mechanism that would allow the third-party

creditors of the Relevant HK Entities to be unaffected by the settlement, but also allowed the

Relevant HK Entities to agree to a reduction in their Guarantee Claims against LBHI.  Through

this trust mechanism, LBHI will reallocate a portion of its distributions from the Relevant HK

Entities to the third-party creditors of the Relevant HK Entities.  The reallocated amounts will be

calculated such that, through a combination of distributions from the Relevant HK Entities and

reallocated distributions from LBHI, the third-party creditors of the Relevant HK Entities receive

as much as they would have received absent a reduction of the Relevant HK Entities Guarantee

Claims against LBHI.  I believe that it is in LBHI's economic interest to pursue the trust

structure given its minimal costs and significant benefits.

65.    On July 31, 2011, the Debtors entered into a settlement agreement (the

"Hong Kong Settlement Agreement") with the Lehman Hong Kong Entities.  As a result of the

Hong Kong Settlement Agreement, LBHI will be entitled to an aggregate amount of

approximately $10.4 billion in allowed claims against the Relevant Hong Kong Entities.

**D.    Settlement with the Lehman Japan Entities**

66.    The Lehman Japan Entities filed claims primarily against LBHI,

consisting almost entirely of Guarantee Claims based upon the Corporate Resolutions and, in

limited instances, Transactional Guarantees.  In total, the Lehman Japan Entities asserted more

than $23.4 billion in Guarantee Claims against LBHI.  The Lehman Japan Entities have also

asserted approximately $384.2 million in claims against LBSF based on general intercompany

claims and derivatives contracts.

67.    LBHI has also asserted claims against LBJ, LBCM, and Sunrise

aggregating approximately $703.4 million.

68.    On October 24, 2011, the Debtors and the Lehman Japan Entities entered

into a settlement agreement dated (the "Japan Settlement Agreement").  The following claims

will be allowed pursuant to the Japan Settlement Agreement, in the classes indicated therein:

- the Lehman Japan Entities will have allowed, non-priority, non-subordinated general unsecured claims (i) against LBHI in an aggregate amount equal to $276,850,573, and (ii) against LBSF, in an aggregate amount equal to $236,341,918;

- LBHI will have allowed unsecured claims against the Lehman Japan Entities in an aggregate amount equal to $78,719,417; and

- LBCC will have allowed unsecured claims against the Lehman Japan Entities in an aggregate amount equal to $115,817,806.

E.     **The Lehman Luxembourg Settlement Agreements**

1.     **LB Lux**

69.     LBHI has asserted a claim against LB Lux in excess of $1.1 billion based on amounts advanced to LB Lux.  LB Lux has filed approximately $417.5 million in Guarantee Claims against LBHI based on the Corporate Resolutions and relating to claims that LB Lux has asserted against LBIE.

70.     On October 25, 2011, the Debtors entered into a settlement agreement with LB Lux (the "LB Lux Settlement Agreement").  Pursuant to the LB Lux Settlement Agreement, LBHI will have an allowed, non-subordinated, general unsecured claim against LB Lux in a net amount equal to approximately $1.0 billion, which reflects a minimal risk-adjusted Guarantee Claim.  The Guarantee Claims that LB Lux has filed against LBHI in the aggregate amount of $417.5 million will be disallowed.

2.     **LBEF**

71.     LBEF filed claims against LBHI in the aggregate amount of approximately $10.9 billion.  LBEF's largest claim against LBHI, in the amount of approximately $10.7 billion, consists of a direct claim that alleges that more than $10.0 billion of proceeds for Call Warrants sold by LBEF were collected either by LBHI, or by an Affiliate of

LBHI, and are owed to LBEF.  In addition, LBEF has asserted certain Intercompany Claims and other Guarantee Claims against LBHI.

72.    On October 25, 2011, the Debtors entered into a settlement agreement with LBEF (the "LBEF Settlement Agreement").  Pursuant to the LBEF Settlement Agreement, LBEF will have

- an allowed, non-priority, non-senior, non-subordinated general unsecured claim against LBHI in Class 8 in an amount equal to $700,837;

- an allowed, non-priority, senior, non-subordinated general unsecured claim against LBHI in Class 4B in an amount equal to $14,533,045, and

- an allowed, non-priority, senior, non-subordinated general unsecured claim against LBHI in Class 4A in an amount equal to $119,207,203.

Under the LBEF Settlement Agreement, that portion of the LBEF that relates to the Call Warrants (asserted in excess of $10.0 billion) has been disallowed in its entirety, and the remainder of the LBEF Guarantee Claim has been substantially reduced to account for the litigation risks attendant to such claim.

### F.    The Lehman Singapore Entities

73.    The Lehman Singapore Entities filed an aggregate $489.4 million in claims against the Debtors, consisting of a combination of intercompany funding claims, derivatives claims, and Guarantee Claims based on the Corporate Resolutions.  On August 24, 2011, the Debtors and certain Debtor-Controlled Entities entered into a settlement agreement (the "Singapore Settlement Agreement") with the Lehman Singapore Entities.  Pursuant to the Singapore Settlement Agreement:

- the Lehman Singapore Entities will have $142.4 million of allowed claims against the Debtors in the classes indicated therein, representing a substantial reduction from the total of $489.4 million in claims initially asserted against the Debtors; and

▪ LBHI will have an aggregate allowed claim against the Lehman Singapore Entities of $450,019,446.

**G.      Settlement with Deutsche Bundesbank ("Bundesbank")**

74.      Bundesbank filed an approximately $12.2 billion Guarantee Claim against LBHI based upon the Bankhaus Guarantee, and on account of collateralized loans that Bundesbank had made to Bankhaus.  The Debtors and Bundesbank entered into a settlement agreement dated October 11, 2011 pursuant to which Bundesbank will have an allowed, non-priority, senior unsecured claim against LBHI in Class 5 in an amount equal to $3.5 billion.

**H.      Settlement with BdB**

75.      BdB filed proofs of claim against LBHI totaling approximately $25.7 billion, based upon both the BdB Indemnity and the Bankhaus Guarantee (the "<u>BdB Guarantee Claims</u>").  The BdB Guarantee Claims assert that, as a result of Bankhaus's insolvency proceeding, BdB (i) paid compensation to creditors of Bankhaus, (ii) incurred refinancing, personnel, and organization costs to carry out the compensation payments, and (iii) incurred fees in connection with pursuing its claims.  The BdB Guarantee Claims also assert amounts due to BdB under the Bankhaus Guarantee and BdB Indemnity on account of certain contingent and unliquidated compensation claims that BdB expects it will pay in the future.

76.      The Debtors entered into a settlement agreement with BdB dated September 30, 2011 (the "<u>BdB Settlement Agreement</u>"), which substantially reduces the claims asserted by BdB against LBHI.  Pursuant to the BdB Settlement Agreement, BdB will have (i) an allowed, non-priority, unsecured third party guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of $1,288.42 and (ii) an allowed, non-priority unsecured third party guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of approximately $5.3 billion.

I.     **Settlement with EdB**

77.     EdB filed a proof of claim against LBHI in the amount of approximately

$3.0 million based upon the Bankhaus Guarantee, and as successor to the claims against

Bankhaus of Bankhaus's depositors.

78.     The Debtors entered into a settlement agreement with EdB, dated

September 30, 2011, pursuant to which EdB will have a non-priority unsecured third party

guarantee claim against LBHI, classified under the Plan in LBHI Class 9A, in the amount of

approximately $1.5 million.

V.     **SETTLEMENT OF DISPUTE WITH DEUTSCHE BANK REGARDING
CLASSIFICATION OF CLAIMS**

79.     A settlement agreement approved by this Court on January 14, 2010, ECF

No. 6665 (the "Initial Bankhaus Claims Settlement Agreement") resolved the allowance of

certain claims asserted by Bankhaus against LCPI and LBHI as guarantor of LCPI's obligations.

Specifically, the settlement provides that Bankhaus has an (i) "allowed and accepted non-priority

unsecured claim in the amount of $1,015,500,000 against LCPI" (the "LCPI Claim") and (ii)

"allowed and accepted non-priority unsecured claim as a creditor of LBHI…in the aggregate

amount equal to $1,380,900,000," subject to certain potential reductions (the "LBHI Claim," and

together with the LCPI Claim, the "Bankhaus Claims").  The Initial Bankhaus Claims Settlement

Agreement also provides that the Bankhaus Claims "shall be treated in a like manner to that of

other general unsecured claims against LBHI and LCPI and receive treatment and distribution on

account of such claims equal to that of other general unsecured claims against LBHI and LCPI."

80.     At the time the Initial Bankhaus Claims Settlement Agreement was

entered into, the Debtors had not yet proposed a chapter 11 plan.  On March 15, 2010, the

Debtors filed their initial chapter 11 plan with the Court.

81.      On June 24, 2010, the Debtors were informed that Bankhaus had sold the Bankhaus Claims to Deutsche Bank. Following its acquisition of the Bankhaus Claims, Deutsche Bank sold participations in such Claims to various third parties, including Centerbridge Credit Advisors LLC, Monarch Alternative Capital LP and Anchorage Capital Group, L.L.C.

1.      **The Dispute Regarding Classification of the Bankhaus Claims**

82.      In connection with the Plan, the Debtors indicated in the Disclosure Statement that the LCPI Claim is included in LCPI Class 5C (Affiliate Claims Other Than Those of Participating Debtors) and the LBHI Claim in LBHI Class 4B (Senior Affiliate Guarantee Claims). The Debtors believe that these classifications are consistent with the terms of the Initial Bankhaus Claims Settlement Agreement and are proper because these claims are based on claims filed by Bankhaus, an Affiliate of the Debtors, and the LBHI Claim is based on a guarantee.

83.      Deutsche Bank and the Participants have disputed the classification of the Bankhaus Claims. On, September 27, 2011, Deutsche Bank filed the *Motion of Deutsche Bank AG Pursuant to Section 105(a) and Rule 3013 to Enforce Settlement Approval Order and to Correct Misclassification of Claims*, ECF No. 20321 (the "DB Motion"), seeking to have the Bankhaus Claims classified in LCPI Class 4A (General Unsecured Claims Other Than Those of Designated Entities) and LBHI Class 7 (General Unsecured Claims), respectively. Various entities holding participations in the Bankhaus Claims filed joinders to the DB Motion. The Debtors objected to the DB Motion, and following a hearing held on October 19, 2011, the Court denied it without prejudice to Deutsche Bank's right to renew its request for relief in connection with confirmation of the Plan., ECF No. 21223.

84.      On October 28, 2011, Deutsche Bank filed the *Objection to Confirmation of Plan as to LBHI and LCPI to the Extent it Fails to Properly Classify and Treat Deutsche Bank AG Claims and Renewed Motion to Treat Such Claims Like and Equal to General Unsecured*

*Claims Against LBHI and LCPI as Required by Court Approved Settlement,* ECF No. 21416.  On

that same date, Deutsche Bank served the Debtors with discovery requests, including requests for

the production of documents, interrogatories and deposition notices.  Many of the documents

relevant to this dispute are within the sole purview of Bankhaus and would be cumbersome,

expensive and time-consuming to obtain.

85.    The Debtors initially proposed that Deutsche Bank's Objection be

deferred until after the Confirmation Hearing, but Deutsche Bank refused to do so.

**2.    Settlement of the Dispute with Deutsche Bank**

86.    To settle the dispute with Deutsche Bank regarding the classification of

the Bankhaus Claims, and avoid litigation of this issue at the Confirmation Hearing, LBHI,

LCPI, Deutsche Bank, Monarch Alternative Capital LP, Stone Lion Portfolio L.P., Permal Stone

Lion Fund Ltd. Centerbridge Credit Advisors LLC and Anchorage Capital Group, L.L.C. entered

into the Settlement Agreement, dated as of November 23, 2011 (the "DB Claims Settlement

Agreement").  The DB Claims Settlement Agreement provides that (i) the LCPI Claim will be

Allowed in LCPI Class 5C (Claims of an Affiliate Other Than Participating Debtors) in the

amount of $1,015,500,000 (the same amount as in the Initial Bankhaus Claims Settlement

Agreement) and (ii) notwithstanding anything in the Initial Bankhaus Claims Settlement

Agreement or order approving such agreement, the LBHI Claim shall be Allowed in LBHI Class

4B (Senior Affiliate Guarantee Claims) in the amount of $920,000,000 (the "Allowed LBHI

Claim").  The parties have agreed that the Allowed LBHI Claim will be deemed satisfied in full

and not entitled to any future Distribution if combined Distributions on the LCPI Claim and the

Allowed LBHI Claim equal $1,380,900,000.

87.    The Initial Bankhaus Claims Settlement Agreement provided that the

Allowed Amount of the LBHI Claim would be $1,380,900,000, less any Distributions received

on account of the LCPI Claim.  Based on the estimated Distributions set forth in the Disclosure

Statement, holders of Claims in LCPI Class 5C will receive a Distribution of 52.1% of their

Allowed Claim amount; thus, the Allowed amount of the LBHI Claim would be reduced by the

estimated Distribution of $528,060,000 on account of the LCPI Claim  -- to $852,840,000.

88.      The effect of the fixing of the LBHI Claim at $920 million in the DB

Claims Settlement Agreement is an increase of the LBHI Claim by approximately $67,160,000;

applying the 15.5% estimated rate of Distributions to holders of Claims in LBHI Class 4B set

forth in the Disclosure Statement, the DB Claims Settlement Agreement results in additional

Distributions of approximately $10 million.  This $10 million is substantially less than the $69

million increase in Distributions that the holders of the Bankhaus Claims would receive if

Deutsche Bank prevailed on its classification motion.  At the same time, the minimal increase in

the claim against LBHI that results from the DB Claims Settlement Agreement will affect LBHI

creditor recoveries by less than half a basis point.

89.      The DB Claims Settlement Agreement was based on extensive arms'-

length negotiations and resolves the long-standing disputes between the parties.  It provides that

Deutsche Bank will withdraw its objection to the confirmation of the Plan, cease any and all

discovery requests made in connection with the Bankhaus Claims and the Plan, and that all

participants will support the confirmation and consummation of the Plan.  The DB Claims

Settlement Agreement resolves the potential for extended, expensive litigation that could delay

the confirmation and consummation of the Plan.  The settlement of the dispute regarding the

classification of the Bankhaus Claims is fair and reasonable and in the best interests of LBHI,

LCPI and their creditors, and should be approved.

## VI.    THE DEBTORS' CLAIMS SCHEDULE AND SCHEDULE OF CLAIMS BY DEBTOR-CONTROLLED ENTITIES

90.    As stated in section X.B.2 of the Disclosure Statement, all Affiliate Claims between and among the Debtors and Debtor-Controlled Entities will be allowed in the amounts of recorded intercompany balances set forth on the Debtors' books and records, after reconciliation, as of the applicable Commencement Date.  Guarantee Claims against LBHI have been reduced to account for the litigation risks attendant to such claims relating to enforceability and substantive consolidation.  The allowed amounts of all Affiliate Claims between and among the Debtors and Debtor-Controlled Entities have been set forth on the Debtors' Claims Schedule, which is annexed to the Plan as Schedule 2, and on the Schedule of Claims by Debtor-Controlled Entities, which is incorporated into the Plan Supplement as Exhibit 9.  The Debtors' Claim Schedule and Schedule of Claims by Debtor-Controlled Entities are incorporated into the Plan and will become effective on the Effective Date.  I believe that all amounts in these schedules accurately reflect the reconciled books and records of the Debtors and fairly take into account the legal risks attendant to enforcement of these claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of November, 2011.

/s/ Daniel J. Ehrmann
Daniel J. Ehrmann

**<u>Exhibit 1</u>**

Protocol

# CROSS-BORDER INSOLVENCY PROTOCOL
# FOR THE LEHMAN BROTHERS GROUP OF COMPANIES

This cross-border insolvency protocol (the "Protocol") establishes a framework for the conduct of the Proceedings (as such term is defined herein) concerning Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors worldwide that are parties hereto (collectively, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman") and the management of the estates of the Debtors pursuant to those Proceedings.

## Background[1]

### A.    The Proceedings

Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Dates"), the Debtors commenced (or in some cases, had initiated against them) plenary insolvency, administration, liquidation, rehabilitation, receivership, or like proceedings ("Plenary Proceedings") in different jurisdictions (the "Plenary Fora") and before different courts and governmental, regulatory, or administrative bodies (the "Tribunals"), as well as proceedings that are secondary or ancillary to a Plenary Proceeding ("Limited Proceedings," and together with the Plenary Proceedings, the "Proceedings") in jurisdictions other than the Plenary Fora (together with the Plenary Fora, the "Fora" and each a "Forum").

In certain of these Proceedings, the Debtors remain authorized to operate their businesses and manage their properties as "Debtors in Possession," while in others, liquidators, administrators, trustees, custodians, supervisors or curators have been appointed to manage the Debtors' affairs and represent their insolvency estates (collectively, with Debtors in Possession, the "Official Representatives"). Furthermore, in certain of these Proceedings, one or more statutory committee of creditors or equity holders has or have been appointed (the "Committees").

### B.    Lehman's Global Business

Lehman was a truly global group of companies. Prior to the events leading up to these Proceedings, Lehman was the fourth largest investment bank in the United States, and one of the largest financial services firms in the world. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide. Its headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

To manage their businesses efficiently, Lehman utilized a centralized cash management system to collect and transfer the funds generated by its operations and disburse those funds to satisfy the obligations required to operate their businesses. The cash management

---

[1] Factual statements contained in this Background are for informational purposes only and shall not be deemed admissions by, or binding on, any party hereto.

system facilitated Lehman's cash monitoring, forecasting, and reporting, subject to the regulatory requirements of various jurisdictions.  Furthermore, prior to the commencement of the Proceedings, LBHI and its direct and indirect subsidiaries continuously worked together and shared information in unison.  This information was spread across 2,700 different software applications and dispersed throughout ledger accounts in its subsidiaries across the globe.

## C.   The Need for a Protocol

Given the integrated and global nature of Lehman's businesses, many of the Debtors' assets and activities are spread across different jurisdictions, and require administration in and are subject to the laws of more than one Forum.  The efficient administration of each of the Debtors' individual Proceedings would benefit from cooperation among the Official Representatives.  In addition, cooperation and communication among Tribunals, where possible, would enable effective case management and consistency of judgments.

Accordingly, this Protocol is designed to facilitate the coordination of the Proceedings, and to enable the Tribunals and Official Representatives to co-operate in the administration of their respective Debtors' estates in the interest of all of the Debtors' creditors.

## Terms

## 1.   Purpose and Aims

1.1.   The parties acknowledge that this Protocol represents a statement of intentions and guidelines designed to minimize the costs and maximize recoveries for all creditors of the Proceedings, by promoting the sharing of relevant information among the parties and the international coordination of related activities in the Proceedings, while respecting the separate interests of creditors and other interested parties to each Proceeding (which shall be subject at all times to the local laws of the jurisdiction applicable to each Official Representative), and the independence, sovereignty, and authority of each Tribunal.

1.2.   In recognition of the substantive differences among the Proceedings in each jurisdiction, this Protocol shall not be legally enforceable nor impose on Official Representatives any duties or obligations, including (but not limited to) any obligations (i) that may be inconsistent with or that may conflict with the duties or obligations to which the Official Representative is subject under applicable law, or (ii) that are not in the interests of the Debtor's estate represented by the Official Representative and/or its creditors.  Furthermore, nothing in this Protocol should be interpreted in any way so as to interfere with (i) the proper discharge of any duty, obligation or function of an Official Representative, or (ii) the exercise of statutory or other powers otherwise available to an Official Representative under applicable law.

1.3.   Official Representatives should coordinate with each other and cooperate in all aspects of the Proceedings, subject in appropriate cases to bilateral protocols and protocols for communication among Official Representatives, Tribunals and Committees, that may be executed in furtherance of this Protocol. In doing so, the Official Representatives acknowledge and agree that the parties shall deal in good faith with each other in the interests of maximizing recovery for all of the Debtors' creditors.

**1.4.** The aims of this Protocol are:

**1.4.1. Coordination** – To promote international cooperation and the coordination of activities in the Proceedings; and to provide for the orderly, effective, efficient, and timely administration of the various Proceedings in order to reduce their cost and maximize recovery for creditors.

**1.4.2. Communication** – To promote communication among Official Representatives and Committees; and to provide, wherever possible, for direct communication among Tribunals.

**1.4.3. Information and Data Sharing** – To provide for the sharing of relevant information and data among Official Representatives in order to promote effective, efficient, and fair administrations, and to avoid duplication of effort and activities by the parties.

**1.4.4. Asset Preservation** – To identify, preserve, and maximize the value of the Debtors' worldwide assets for the collective benefit of all creditors and other interested parties.

**1.4.5. Claims Reconciliation** – To coordinate an efficient and transparent claims process; and in particular, to provide for a consistent and measured approach to the calculation and adjudication of intercompany claims that avoids unnecessary intercompany litigation.

**1.4.6. Maximize Recoveries** – To cooperate in marshalling the assets of the Debtors in order to maximize recovery for all of the Debtors' creditors.

**1.4.7. Comity** – To maintain the independent jurisdiction, sovereignty, and authority of all Tribunals.

**1.5.** Notwithstanding the multilateral nature of this Protocol, nothing herein shall restrict Official Representatives from dealing with other Official Representatives on a bilateral basis on matters that concern only their respective Debtors, provided that Official Representatives should keep each other generally informed of any bilateral protocols with other parties hereto, to the extent that such bilateral protocols address similar aims as this Protocol.

## 2.  **Notice**

**2.1.** Official Representatives should provide adequate notice by email to the parties hereto, as well as to any Committees established in the Proceedings, of relevant matters in which those parties have an interest.

**2.2.** Where appropriate, each Official Representative should provide adequate notice by email as far in advance as possible of any matters in which other Official

Representatives have a material interest and that may require preparation and/or travel by such Official Representatives, such as any creditors' or shareholders' meetings, statutory deadlines, administrative deadlines, or hearings before a Tribunal.

## 3.    Rights of Official Representatives and Creditors to Appear

**3.1.**    Subject to the laws of each Forum, Official Representatives shall have the right to appear in all of the Proceedings, whether before a Tribunal or in statutory meetings convened pursuant to applicable law. If required and available in a particular Forum, an exequatur or similar proceeding may be utilized to implement recognition of the Official Representative.

**3.2.**    Official Representatives shall not, by virtue of their being a party to this Protocol, be deemed to have submitted to jurisdiction in any Forum, nor shall appearing in a Forum, whether in person or pursuant to Section 3.3, subject an Official Representative to jurisdiction for any purpose other than the matter with respect to which the appearance is made, except, (i) to the extent otherwise set forth herein to the contrary, and (ii) to the extent that an Official Representative otherwise submits to the jurisdiction of a Forum.

**3.3.**    To the extent that an Official Representative is entitled to appear in the Proceedings under applicable law but cannot be present before the Tribunal or Committee(s) (or similar body, as the case may be) either in person or through counsel, the parties hereto shall consent to the Official Representative's communication of any observations to such Tribunal or Committee(s) prior to any order (or similar action) being made, provided that such communication is made in writing and copies of such communication are non-confidential and delivered to all interested parties or filed on the Tribunal's public records.

## 4.    Communication and Access to Data and Information Among Official Representatives

**4.1.**    Official Representatives should keep each other generally informed when appropriate of any relevant information and material developments in matters involving the Debtors and their Proceedings, and should consent wherever possible to the sharing of information among Official Representatives, which consent should not be unreasonably withheld.

**4.2.**    Official Representatives should share information regarding the Debtors, and their assets and liabilities, which each may lawfully share with the other; provided, however, that with respect to work product or other privileged information, Official Representatives may, but are not obliged, to share such information with each other, subject to all privileges under the applicable rules of evidence or applicable law, and provided that sharing work product or privileged information shall not be deemed a waiver of any attorney-client privilege or work product protections under the applicable rules of evidence or applicable law.

**4.3.**    To facilitate access to information, Official Representatives should make available to each other, upon request, any information that is publicly available in their respective Fora; and may, where permitted under applicable laws, share non-public information

with other Official Representatives, subject to appropriate confidentiality arrangements and all privileges under the applicable rules of evidence.

4.4.    Official Representatives agree that each shall not (and shall direct their respective agents and representatives not to) provide any non-public information received from the other to any third party, unless such information is (i) agreed to by the other party, (ii) required by applicable law, or (iii) required by order of any Tribunal.

4.5.    The approval of this Protocol by a Tribunal (by entry of an order or otherwise) shall constitute the recognition by such Tribunal and the Official Representative in that Tribunal's Proceeding that communications among Official Representatives and their respective professionals, employees, agents, and representatives are subject to, and do not waive any attorney-client, work-product, legal, professional, or other privileges recognized under any applicable law; provided, however, that approval of this Protocol by a Tribunal shall not result in the parties hereto, other than the Official Representative in that Proceeding, becoming subject to the jurisdiction and laws of that Tribunal and Forum.

4.6.    Each Official Representative should cooperate in the gathering and sharing of certain data and share analysis of certain transactions by:

> 4.6.1.    sharing, via free, read-only access, all relevant information and data that it has the right to disclose and for which it is not required to make payment relating to (i) material interest holders of an asset, (ii) restitution of assets, and (iii) relevant information that assists such other Official Representative to fulfill its duties, except where (x) litigation has commenced (or is contemplated), or (y) statutory or regulatory requirements prohibit disclosure;

> 4.6.2.    if an Official Representative is in possession of the books, records, correspondence and other materials or documents that belong to another Debtor, providing the Official Representative of such other Debtor's estate such books, records, correspondence and other materials or documents;

> 4.6.3.    coordinating in good faith the investigations of pre-filing activities with any other Official Representative with an interest in such activities, so long as the interests of the Official Representatives coordinating such investigations do not diverge; and

> 4.6.4.    liaising with any other Official Representatives on matters (i) in which such other Official Representatives have a significant mutual interest, so long as their interests do not diverge and (ii) relating to a significant strategy to exit from a Proceeding in which such other Official Representatives have an interest.

4.7.    Any sharing of information and data shall not include or give an Official Representative a right of automatic access to (i) documents relating to a Debtor's post-filing

transactions, or (ii) working papers, summaries, or other work product drafted by an Official
Representative, and any professionals retained in the course of a Proceeding.

## 5.    Communication Among Tribunals

5.1.    The Guidelines Applicable to Court-to-Court Communication in Cross-
Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall, where applicable to the
relevant Proceeding and where recognized by the Tribunal of the relevant Proceeding, be
incorporated by reference and form part of this Protocol subject to formal adoption of the
Guidelines in whatever form by each Tribunal, in whole or in part and with or without
modifications (if any). Where there is any discrepancy between the Protocol and the Guidelines,
this Protocol shall prevail.

## 6.    Communication Among Committees

6.1.    To the extent permitted and approved by the respective Committee, non-
public information available to the Committee in any Forum may, if relevant to a matter in which
another Debtor has an interest, be shared with the Committees of such Debtor, subject to
appropriate confidentiality arrangements and all privileges under the applicable rules of evidence
or applicable law.

## 7.    Asset Preservation

7.1.    Each Tribunal should administer the assets subject to its jurisdiction.

7.2.    If, in the course of a Proceeding, an Official Representative learns or
believes that another Debtor could have a material interest in a particular asset whose value
and/or recovery is at risk, such Official Representative may notify the Official Representative of
the Debtor whose estate includes such asset and, where practicable and consistent with the duties
of such Official Representative under applicable laws, the Official Representative of the Debtor
whose estate includes such asset should consult with the Official Representative of the Debtor
that may have such material interest prior to: (i) the sale, abandonment, or any disposition of
such asset; (ii) the termination, suspension, or other transition of any employees managing such
asset; or (iii) the commencement of any judicial, or non-judicial, proceeding affecting such asset.

7.3.    In the event that (a) an Official Representative claims to have a legal or
beneficial interest in property which is transferred to, or received by another Debtor, or (b) an
Official Representative determines that the estate for which it is responsible has improperly
received or is improperly holding property transferred from or owned by another estate, such
Official Representatives should cooperate in:

7.3.1.    Assessing the ownership of such transferred property and provide
all relevant information, to the extent not otherwise restricted,
allowing each Official Representative to ascertain ownership of the
property; and

7.3.2.    Where ownership of the property has been established and subject
to applicable laws: (i) returning the property to the Official

Representative of the Debtor establishing its right to such property; and (ii) refraining (to the extent an Official Representative may do so and subject to applicable laws) from transferring or co-mingling property once another Official Representative establishes ownership of such transferred property.

**7.4.**    Official Representatives should, to the extent permitted under applicable law and where appropriate, cooperate to maximize the realizable value of assets for which multiple Debtors have an interest. Official Representatives also recognize that in certain cases such as where a Debtor (the "<u>Funding Estate</u>") has an existing interest in an asset which forms part of another Debtor's estate (the "<u>Funded Estate</u>"), the Official Representative of the Funding Estate may wish to provide funding towards the asset held by the Funded Estate in order to preserve and maximize its realizable value. In such event, the Official Representative of the Funded Estate may, subject to applicable laws, allow such funding to be provided on mutually acceptable bilateral terms

**7.5.**    Should the Funded Estate, after appropriate consultation with the Funding Estate and after obtaining any necessary approval in an applicable Proceeding, (i) dispose of the asset after receiving funds from the Funding Estate, and (ii) receive proceeds in respect of such disposition, then the Funding Estate shall receive a fair allocation of share of such proceeds.

**7.6.**    Where applicable, compliance with sections 7.2 through 7.6 by Official Representatives is subject to approval from their respective Tribunals or Committees, as the case may be under local law.

## 8.    <u>Claims</u>

**8.1.**    Where there are two or more Proceedings pending as to the same Debtor, those being one or more Plenary Proceeding and/or one or more Limited Proceedings, a claim should be filed only in the Proceeding(s) designated by the Official Representative of such Debtor (provided that certain Official Representatives may be required to make such designation in accordance with applicable law).

**8.2.**    Without prejudice to secured claims or rights *in rem*, and subject to applicable law, Official Representatives should adjust distributions so that a creditor who has received payment with respect to its claim in one Proceeding may not receive a payment for the same claim in any other Proceeding as to the same Debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received in respect of that claim.

**8.3.**    Consistent with section 8.2 above, if any claims against one or more Debtors (a "<u>Direct Claim</u>") is subject to a guarantee issued by another Debtor (a "<u>Guarantee</u>"), the Official Representatives shall seek to adjust distributions on the allowed Direct Claim and allowed Guarantee claim so that distributions on the Direct Claim and distributions on the Guarantee do not exceed in the aggregate the amount of the Direct Claim or the Guarantee, whichever is highest. Subject to the preceding sentence, distributions on a Direct Claim shall not

reduce the amount of any claim asserted under a corresponding Guarantee, and distributions under a Guarantee shall not reduce the amount of any corresponding Direct Claim.

      **8.4.**    Official Representatives should, where possible and subject to the applicable laws of the relevant forum, endeavor to coordinate notice procedures and establish the same deadlines for the filing of claims in their respective Proceedings, and in all other matters regarding the filing, reviewing and objecting to claims.

## 9.     Special Procedures for Intercompany Claims

      **9.1.**    The Official Representatives agree that in order to provide for the efficient and timely administration of these Proceedings, and to reduce their cost and maximize recovery for creditors, resources and time should not be spent reviewing historical intercompany accounting records to resolve claims asserted in their respective Proceedings by other Official Representatives on the basis of (i) the allocation of overhead or expense from one Debtor to another Debtor, (ii) the flow of funds from one Debtor to another Debtor, (iii) the incurrence of a liability by one Debtor on behalf of another Debtor, or (iv) a transaction between Debtors (collectively, "Intercompany Claims"); but that rather, it is in the best interests of the Debtors' creditors for Official Representatives to agree to a common set of financial accounting records that form the basis of Intercompany Claims, and that those financial records shall be *prima facie* valid unless there are elements of proof suggesting that a transaction was recorded in error, or that no such transaction ever occurred or is inconsistent with the inter-company accounting records of the relevant Debtor(s).

      **9.2.**    Subject to the other provisions of this section 9, the Official Representatives shall endeavor to negotiate in good faith to attempt to reach a consensual resolution of any differences in their accounting of Intercompany Claims. Only to the extent that Official Representatives certify that they are unable to consensually resolve in good faith any differences in their accounting of Intercompany Claims, the Official Representatives shall resort to adjudication by the Tribunal holding jurisdiction over such claims.

      **9.3.**    The Official Representatives shall establish a committee (the "Procedures Committee"), whose members shall be jointly appointed by the Official Representatives and, where required, the Committees, and confirmed by the Tribunals (where applicable) overseeing each Proceeding, to consensually resolve, in accordance with section 9.1 above and in good faith, any differences in the accounting of Intercompany Claims.

      **9.4.**    The Procedures Committee shall propose the (i) procedures, (ii) accounting methodologies, and (iii) elements of proof that it intends to use in its calculation and consensual resolution of Intercompany Claims (the "Accounting Procedures"). Furthermore, if two or more Debtors were counterparties to a derivative contract in which the contractual obligations are referenced to one or more underlying assets or indices of asset values and subject to movements in the financial markets (such as contracts for the purchase, sale, or loan of securities; forward contracts; repurchase agreements; or swap agreements; and in some cases, multiple such agreements governed by a master agreement) (the "Intercompany Derivative Contracts"), and if an Intercompany Derivative Contract has been rejected, terminated, liquidated, or accelerated by any of the Debtor counterparties thereto, any damages (the

"Intercompany Derivatives Claims") that arise shall be measured and fixed by the Procedures Committee, pursuant to a methodology to be agreed upon by the members of the Procedures Committee (the "Derivatives Methodology").

9.5.    As soon as is practicable after the Procedures Committee has agreed upon its Accounting Procedures and Derivatives Methodology, the Official Representatives shall, to the extent required under applicable law, seek approval from their respective Tribunals or Committees (where required) for the use of the Accounting Procedures and Derivatives Methodology in their respective Proceedings in the resolution of Intercompany Claims either as a general rule or on a case by case basis.

9.6.    The Official Representatives should cooperate to submit the findings of the Procedures Committee (the "Procedures Committee Findings"), in a form substantially similar to each other, for approval by their respective Tribunals or Committees to the extent required by applicable law.

9.7.    To the extent that creditors, Committees, or other interested parties object to (i) the application of the Accounting Methodology, or (ii) the application of the Derivatives Methodology, or (iii) any of the Procedures Committee Findings, all Official Representatives should coordinate a response to such objections.

## 10.    Submission of Winding-Up Plan, Plan of Reorganization or Liquidation, or Deed of Company Arrangement

10.1.    Where applicable and permitted under the law of the Forum in a Proceeding, Official Representatives should endeavor to submit a winding-up plan, plan of reorganization or liquidation, or deed of company arrangement (a "Plan") in their respective Proceedings, or to amend a Plan once submitted (to the extent permitted by applicable law) so that each Official Representative's Plan is consistent with Plans filed by other Official Representatives, provided that nothing herein shall require an Official Representative to agree (or shall be deemed to be an agreement), and shall not constitute a waiver of such Official Representative's right to object, to the Plan of another Official Representative.

10.2.    Official Representatives should endeavor to coordinate all procedures in connection with their Plans to the extent permitted by applicable law, including, without limitation, all solicitation proceedings relating to their plans.

10.3.    No provision of this Protocol contemplates that any Official Representative is required to delay filing, prosecuting or consummating a Plan with respect to the estate administered by such Official Representative.

## 11.    Comity

**11.1.**    The parties hereto agree that each Tribunal is an independent, sovereign Tribunal, entitled to preserve its independent jurisdiction and authority with respect to matters before it and the conduct of the Official Representatives.

**11.2.**    Each Tribunal shall have sole jurisdiction and power over the conduct of the Proceeding in that forum; the appointment of the Official Representatives and their professionals, their retention, tenure in office, and compensation; and the hearing and determination of matters arising in that forum.

**11.3.**    Nothing in this Protocol is intended to interfere with the exercise of jurisdiction by each of the Tribunals in the Proceedings, or to interfere with the natural rules or ethical principles by which an Official Representative is bound according to applicable national law and professional rules.

## 12.    Amendment

**12.1.**    This Protocol may not be waived, amended, or modified orally or in any other way or manner (including, without limitation, pursuant to a Plan) except by a writing signed by a party to be bound and, where applicable, approved by the Tribunal with jurisdiction over that party.  Notice of any proposed amendment to this Protocol shall be provided via email by the party or parties hereto proposing such to all Official Representatives, and their respective Committees.

**12.2.**    Additional parties may be added to this Protocol at any time after the effective date of this Protocol by means of an amendment pursuant to section 12.1.

## 13.    Adherence

**13.1.**    Notwithstanding the provisions of section 12, nothing in this Protocol shall preclude Official Representatives who are not parties hereto from adhering to the terms of this Protocol.

## 14.    Execution and Application

**14.1.**    This Protocol shall inure to the benefit of the parties hereto and their respective successors, assigns, representatives, heirs, executors, administrators, trustee, receivers, custodians, or curators, as the case may be, to the extent permitted under applicable law. Nothing herein shall create a right for any entity that is not a party to the Protocol, and a party hereto shall not be bound by this Protocol in its dealings with any entity that is not a party hereto.

**14.2.**    Any request for the entry of an order which is contrary to the provisions of this Protocol must be made on notice to all Official Representatives and their respective Committees by the proponent of the order.

**14.3.**    This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same

instrument, and may be signed by facsimile signature, which shall be deemed to constitute an original signature.

14.4.    A Tribunal having jurisdiction over an Official Representative shall retain jurisdiction over such Official Representative for the purpose of approving any amendments or modifications thereto in accordance with applicable laws; provided, however, in no event shall this or any other provision in this Protocol be deemed to create any liability on the part of an Official Representative for any reason.

14.5.    Each Official Representative shall exercise good faith efforts to take such actions and execute such documents as may be necessary and appropriate to implement and effectuate this Protocol.

14.6.    This Protocol shall be deemed effective with respect to each Official Representative and the estate administered thereby upon execution by all Official Representatives whose signature blocks appear below, and its approval by the Tribunal with jurisdiction over such estates or the relevant Committee (or similar body), where such approval is required under applicable law.

14.7.    This Protocol shall remain in effect with respect to any Official Representative who is a party hereto and the estate administered thereby until the earlier of (i) the conclusion of that Official Representative's Proceeding as respectively defined by applicable law; or (ii) where applicable, and after providing notice to the parties hereto, entry of an order (or similar action) terminating this Protocol by the Tribunal having jurisdiction over such Proceeding, or approval of such termination by the relevant Committee(s) (or similar body) where such approval is required under applicable law, upon a determination by such Tribunal or Committee(s) that the Protocol has achieved all of its objectives as to that Official Representative's Proceeding.

*[signature pages follow]*

EXECUTION COPY

**IN WITNESS WHEREOF**, the parties hereto have caused this Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

Dated:  As of May 12, 2009

**LEHMAN BROTHERS HOLDINGS INC.,**
**on its own behalf and on behalf of its affiliates that**
**are debtors in cases pending under chapter 11 of**
**Title 11 of the United States Code.**

By: _____
       Name:  Daniel Ehrmann
       Title:  Vice President

_____

Rutger Shimmelpenninck in his capacity as bankruptcy trustee ("curator") for **LEHMAN BROTHERS TREASURY CO. B.V.**

_____

Dr. Michael C. Frege in his capacity as insolvency administraton ("Insolvenzverwalter") of **LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

**IN WITNESS WHEREOF**, the parties hereto have caused this Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

Dated:  As of May 12, 2009

**LEHMAN BROTHERS HOLDINGS INC.,**
**on its own behalf and on behalf of its affiliates that**
**are debtors in cases pending under chapter 11 of**
**Title 11 of the United States Code.**

By:  _____

       Name:  Daniel Ehrmann
       Title:  Vice President

_____

Rutger Shimmelpenninck in his capacity as bankruptcy trustee ("curator") for **LEHMAN BROTHERS TREASURY CO. B.V.**

_____

Dr. Michael C. Frege in his capacity as insolvency administraton ("Insolvenzverwalter") of **LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of **LEHMAN
BROTHERS INVESTMENTS PTE. LTD. (IN CREDITORS'
VOLUNTARY LIQUIDATION)**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of **LEHMAN
BROTHERS FINANCE ASIA PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of **LEHMAN
BROTHERS COMMODITIES PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of **LEHMAN
BROTHERS PACIFIC HOLDINGS PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of **SAIL
INVESTOR PTE. LTD. (IN CREDITORS' VOLUNTARY
LIQUIDATION)**

**EXECUTION COPY**

_(signature)_

_____

Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS ASIA PACIFIC (SINGAPORE) PTE. LTD.
(IN CREDITORS' VOLUNTARY LIQUIDATION)

_____

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA GRANICA PTY LIMITED (Administrators
Appointed) by Neil Singleton, as one of the joint and
several administrators

_____

Executed for and on behalf of LEHMAN BROTHERS
REAL ESTATE AUSTRALIA COMMERCIAL PTY
LIMITED (Administrators Appointed) by Neil
Singleton, as joint and several administrators

_____

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA REAL ESTATE HOLDINGS PTY LIMITED
(Administrators Appointed) by Neil Singleton, as joint
and several administrators

Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS ASIA PACIFIC HOLDINGS PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA GRANICA PTY LIMITED (Administrators
Appointed) by Neil Singleton, as one of the joint and
several administrators

Executed for and on behalf of LEHMAN BROTHERS
REAL ESTATE AUSTRALIA COMMERCIAL PTY
LIMITED (Administrators Appointed) by Neil
Singleton, as joint and several administrators

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA REAL ESTATE HOLDINGS PTY LIMITED
(Administrators Appointed) by Neil Singleton, as joint
and several administrators

EXECUTION COPY

_____
**Executed** for and on behalf of **LEHMAN BROTHERS
AUSTRALIA FINANCE PTY LIMITED** (Administrators
Appointed) by **Neil Singleton,** as joint and several
administrators

_____
**Executed** for and on behalf of **LEHMAN BROTHERS
AUSTRALIA HOLDINGS PTY LIMITED** (Administrators
Appointed) by **Neil Singleton,** as one of the joint and
several administrators

_____
**Executed** for and on behalf of **LEHMAN BROTHERS
AUSTRALIA LIMITED** (Administrators Appointed) by
**Neil Singleton,** as one of the joint and several
administrators

_____
**Executed** for and on behalf of **LBHV 1 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton,** as one
of the joint and several administrators

EXECUTION COPY

_____

**Executed** for and on behalf of **HV 1 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____

**Executed** for and on behalf of **HV 2 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
HOLDINGS LIMITED (In Liquidation)**

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
LIMITED (In Liquidation)**

EXECUTION COPY

---

**Executed** for and on behalf of **HV 1 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

---

**Executed** for and on behalf of **HV 2 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

---

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
HOLDINGS LIMITED (In Liquidation)**

---

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
LIMITED (In Liquidation)**

EXECUTION COPY

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS FUTURES
ASIA LIMITED (In Liquidation)

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS SECURITIES
ASIA LIMITED (In Liquidation)

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LBQ HONG KONG FUNDING
LIMITED (In Liquidation)

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS NOMINEES
(H.K.) LIMITED (In Liquidation)

**EXECUTION COPY**

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS ASIA
CAPITAL COMPANY (In Liquidation)

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS
COMMERCIAL CORPORATION ASIA LIMITED (In
Liquidation)

## **Exhibit 2**

LBSF Side Letter

24th July 2006

Lehman Brothers International (Europe)
25 Bank Street
London
E14 5LB

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

Dear Sirs,

This letter will confirm the agreement between Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers Special Financing Inc. ("LBSF") concerning transactions between LBIE and LBSF ("Intercompany Transactions") for which LBIE has an offsetting transaction on identical terms with a client (the "Client Transaction"), leaving LBIE with no market position risk. In the event that a Client Transaction should terminate or be closed-out and a settlement amount be calculated in respect of that termination or close-out, LBIE and LBSF agree that the related, offsetting Intercompany Transaction will also terminate or be closed-out contemporaneously, and a settlement amount determined as payable by LBIE under the Client Transaction will become payable by LBSF to LBIE as a settlement amount under the Intercompany Transaction, and a settlement amount payable to LBIE under the Client Transaction will become payable by LBIE to LBSF as a settlement amount under the Intercompany Transaction, but only to the extent LBIE actually receives that settlement amount from its client under the Client Transaction, it being the intent of LBIE and LBSF that LBIE should not accept market risk or counterparty credit risk under any Client Transaction, and that all risks under Client Transactions should be passed to LBSF under the Intercompany Transactions.

Signed for and on behalf of:
**Lehman Brothers International (Europe)**

HUW MERRIMAN
AUTHORISED SIGNATORY

Agreed and acknowledged by:
**Lehman Brothers Special Financing Inc.**

By:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
25 BANK STREET LONDON E14 5LE TELEPHONE +44 (0)20 7102 1000
REGULATED BY THE FINANCIAL SERVICES AUTHORITY.
MEMBER OF THE LONDON STOCK EXCHANGE AND THE INTERNATIONAL SECURITIES MARKET ASSOCIATION.
REGISTERED IN ENGLAND NO. 2538254 AT THE ABOVE ADDRESS.

## **Exhibit 3**

OSLA

Version: DECEMBER 1995

DATED...... August 14, 2000 ...............

---

## OVERSEAS SECURITIES LENDER'S AGREEMENT

---

Clifford Chance,
200 Aldersgate Street
London, EC1A 4JJ

Ref: TJH

# CONTENTS

**Clause**  **Page**

1.  INTERPRETATION ........................................................................... 4

2.  LOANS OF SECURITIES ................................................................ 15

3.  DELIVERY OF SECURITIES ......................................................... 15

4.  RIGHTS AND TITLE ...................................................................... 15

5.  RATES ............................................................................................. 18

6.  COLLATERAL ................................................................................ 19

7.  REDELIVERY OF EQUIVALENT SECURITIES ......................... 22

8.  SET-OFF ETC. ................................................................................ 23

9.  TAXATION ..................................................................................... 25

10. LENDER'S WARRANTIES ............................................................. 25

11. BORROWER'S WARRANTIES ...................................................... 26

12. EVENTS OF DEFAULT .................................................................. 27

13. OUTSTANDING PAYMENTS ........................................................ 28

14. TRANSACTIONS ENTERED INTO AS AGENT ........................... 28

15. TERMINATION OF COURSE OF DEALINGS BY NOTICE ......... 29

16. GOVERNING PRACTICES ............................................................. 30

17. OBSERVANCE OF PROCEDURES ............................................... 30

18. SEVERANCE ................................................................................... 30

19. SPECIFIC PERFORMANCE .......................................................... 30

20. NOTICES ......................................................................................... 30

21. ASSIGNMENT ................................................................................ 30

22. NON-WAIVER ................................................................................ 30

23. ARBITRATION AND JURISDICTION .......................................... 31

24.   TIME ........................................................................................................ 31

25.   RECORDING ........................................................................................... 31

26.   GOVERNING LAW ................................................................................. 31

SCHEDULE ........................................................................................................ 33

**THIS AGREEMENT** is made the|6ᵗʰ day of  August , 1999 2000

**BETWEEN:-**

(1)   **LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

a company incorporated under the laws of England and Wales whose registered office
is at One Broadgate, London EC2M 7HA

and

(2)   LEHMAN BROTHERS (LUXEMBOURG) S.A.

a company incorporated under the laws of   Luxembourg       whose registered
office is at   3, Boulevard Du Prince Henri , L-1724 Luxembourg.

**WHEREAS:-**

1.   From time to time the Parties hereto may enter into transactions in which one Party
(the **"Lender"**) agrees to lend to the other (the **"Borrower"**) from time to time
Securities (as hereinafter defined) subject to any Inland Revenue provisions then in
force.

2.   All transactions carried out under this Agreement will be effected in accordance with
the Rules (as hereinafter defined) **TOGETHER WITH** current market practices,
customs and conventions.

**NOW THIS AGREEMENT WITNESSETH AND IT IS HEREBY AGREED AS
FOLLOWS:-**

1.   <u>INTERPRETATION</u>

(A)   In this Agreement:-

**"Act of Insolvency"**     means in relation to either Party

> (i)   its making a general assignment for the benefit
> of, or entering into a reorganisation,
> arrangement, or composition with creditors, or
>
> (ii)   its admitting in writing that it is unable to pay
> its debts as they become due, or
>
> (iii)   its seeking, consenting to or acquiescing in the
> appointment of any trustee, administrator,
> receiver or liquidator or analogous officer of it
> or any material part of its property, or;
>
> (iv)   the presentation or filing of a petition in respect
> of it (other than by the other Party to this

4

Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such Party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding in respect of which no such 30 day period shall apply) not having been stayed or dismissed within 30 days of its filing;

(v)    the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such Party over all or any material part of such Party's property; or

(vi)    the convening of any meeting of its creditors for the purpose of considering a voluntary arrangement as referred to in Section 3 of the Insolvency Act 1986 (or any analogous proceeding);

**"Agent"**    shall have the same meaning given in Clause 14;

**"Alternative Collateral"**    means Collateral of a Value equal to the Collateral delivered pursuant to Clause 6 and provided by way of substitution for Collateral originally delivered or previously substituted in accordance with the provisions of Clauses 6(F) or 6(G);

**"Appropriate Tax Vouchers"**       means:-

        (i)     either such tax vouchers and/or certificates as shall enable the recipient to claim and receive from any relevant tax authority, in respect of interest, dividends, distributions and/or other amounts (including for the avoidance of doubt any manufactured payment) relating to particular Securities, all and any repayment of tax or benefit of tax credit to which the Lender would have been entitled but for the loan of Securities in accordance with this Agreement and/or to which the Lender is entitled in respect of tax withheld and accounted for in respect of any manufactured payment; or such tax vouchers and/or certificates as are provided by the Borrower which evidence an amount of overseas tax deducted which shall enable the recipient to claim and receive from any relevant tax authority all and any repayment of tax from the UK Inland Revenue or benefits of tax credit in the jurisdiction of the recipient's residence; and

        (ii)    such vouchers and/or certificates in respect of interest, dividends, distributions and/or other amounts relating to particular Collateral;

**"Approved UK Collecting Agent"**       means a person who is approved as such for the purposes of the Rules of the UK Inland Revenue relating to stocklending and manufactured overseas dividends;

**"Approved Intermediary"**       means a person who is approved as such for the purposes of the Rules of the UK Inland Revenue relating to stocklending and manufactured overseas dividends;

**"Assured Payment"**       means a payment obligation of a Settlement Bank arising (under the Assured Payment Agreement) as a result of a transfer of stock or other securities to a CGO stock account of a member of the CGO for whom that Settlement Bank is acting;

**"Assured Payment Agreement"**       means an agreement dated 24 October 1986 between the Bank of England and all the other banks which are for the time being acting as Settlement Banks in relation to the CGO regulating the obligations of such banks to make payments in respect of transfers of securities

through the CGO as supplemented and amended from time to time;

**"Base Currency"**  has the meaning given in the Schedule hereto;

**"Bid Price"**  in relation to Equivalent Securities or Equivalent Collateral means the best available bid price thereof on the most appropriate market in a standard size;

**"Bid Value"**  Subject to Clause 8(E) means:-

(A)  in relation to Equivalent Collateral at a particular time:-

(i)  in relation to Collateral Types B(x) and C (more specifically referred to in the Schedule) the Value thereof as calculated in accordance with such Schedule;

(ii)  in relation to all other types of Collateral (more specifically referred to in the Schedule) the amount which would be received on a sale of such Collateral at the Bid Price thereof at such time less all costs, fees and expenses that would be incurred in connection with selling or otherwise realising such Equivalent Collateral, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out such sale or realisation and adding thereto the amount of any interest, dividends, distributions or other amounts paid to the Lender and in respect of which equivalent amounts have not been paid to the Borrower in accordance with Clause 6(G) prior to such time in respect of such Equivalent Collateral or the original Collateral held gross of all and any tax deducted or paid in respect thereof;

and

(B)  in relation to Equivalent Securities at a particular time the amount which would be received on a sale of such Equivalent Securities at the Bid Price thereof at such time less all

7

costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction;

**"Borrower"**

with respect to a particular loan of Securities means the Borrower as referred to in Recital 1 of this Agreement;

**"Borrowing Request"**

means a request made (by telephone or otherwise) by the Borrower to the Lender pursuant to Clause 2(A) specifying the description, title and amount of the Securities required by the Borrower, the proposed Settlement Date and duration of such loan and the date, time, mode and place of delivery which shall, where relevant, include the bank agent clearing or settlement system and account to which delivery of the Securities is to be made;

**"Business Day"**

means a day on which banks and securities markets are open for business generally in London and, in relation to the delivery or redelivery of any of the following in relation to any loan, in the place(s) where the relevant Securities, Equivalent Securities, Collateral (including Cash Collateral) or Equivalent Collateral are to be delivered;

**"Cash Collateral"**

means Collateral that takes the form of a deposit of currency;

**"Central Gilts Office" or "CGO"**

means the computer based system managed by the Bank of England to facilitate the book-entry transfer of gilt-edged securities;

**"CGO Collateral"**

shall have the meaning specified in paragraph A of the Schedule;

**"CGO Rules"**

means the requirements of the CGO for the time being in force as defined in the membership agreement regulating membership of the CGO;

**"Close of Business"**

means the time at which banks close in the business centre in which payment is to be made or Collateral is to be delivered;

**"Collateral"**

means such securities or financial instruments or deposits of currency as are referred to in the Schedule hereto or any combination thereof which are delivered by the Borrower to the Lender in accordance with this Agreement and shall include the certificates and other

8

documents of or evidencing title and transfer in respect of the foregoing (as appropriate), and shall include Alternative Collateral;

**"Defaulting Party"**      shall have the meaning given in Clause 12;

**"Equivalent Collateral" or**      in relation to any Collateral provided under this Agreement
**"Collateral equivalent to"**      means securities, cash or other property, as the case may be, of an identical type, nominal value, description and amount to particular Collateral so provided and shall include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate). If and to the extent that such Collateral consists of securities that are partly paid or have been converted, subdivided, consolidated, redeemed, made the subject of a takeover, capitalisation issue, rights issue or event similar to any of the foregoing, the expression shall have the following meaning:

(a)      in the case of conversion, subdivision or consolidation the securities into which the relevant Collateral has been converted, subdivided or consolidated **PROVIDED THAT**, if appropriate, notice has been given in accordance with Clause 4(B)(vii);

(b)      in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(c)      in the case of a takeover, a sum of money or securities, being the consideration or alternative consideration of which the Borrower has given notice to the Lender in accordance with Clause 4(B)(vii);

(d)      in the case of a call on partly paid securities, the paid-up securities **PROVIDED THAT** the Borrower shall have paid to the Lender an amount of money equal to the sum due in respect of the call;

(e)      in the case of a capitalisation issue, the relevant Collateral **TOGETHER WITH** the securities allotted by way of a bonus thereon;

(f)      in the case of a rights issue, the relevant Collateral **TOGETHER WITH** the securities allotted thereon, **PROVIDED THAT** the Borrower has given notice to the Lender in accordance with Clause 4(B)(vii), and has paid

9

to the Lender all and any sums due in respect thereof;

(g)    in the event that a payment or delivery of Income is made in respect of the relevant Collateral in the form of securities or a certificate which may at a future date be exchanged for securities or in the event of an option to take Income in the form of securities or a certificate which may at a future date be exchanged for securities, notice has been given to the Borrower in accordance with Clause 4(B)(vii) the relevant Collateral **TOGETHER WITH** securities or a certificate equivalent to those allotted;

(h)    in the case of any event similar to any of the foregoing, the relevant Collateral **TOGETHER WITH** or replaced by a sum of money or securities equivalent to that received in respect of such Collateral resulting from such event;

For the avoidance of doubt, in the case of Bankers' Acceptances (Collateral type B(v)), Equivalent Collateral must bear dates, acceptances and endorsements (if any) by the same entities as the bill to which it is intended to be equivalent and for the purposes of this definition, securities are equivalent to other securities where they are of an identical type, nominal value, description and amount and such term shall include the certificate and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate);

"Equivalent Securities"    means securities of an identical type, nominal value, description and amount to particular Securities borrowed and such term shall include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate). If and to the extent that such Securities are partly paid or have been converted, subdivided, consolidated, redeemed, made the subject of a takeover, capitalisation issue, rights issue or event similar to any of the foregoing, the expression shall have the following meaning:

(a)    in the case of conversion, subdivision or consolidation the securities into which the borrowed Securities have been converted, subdivided or consolidated **PROVIDED**

10

THAT if appropriate, notice has been given in accordance with Clause 4(B)(vii);

(b)    in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(c)    in the case of takeover, a sum of money or securities, being the consideration or alternative consideration of which the Lender has given notice to the Borrower in accordance with Clause 4(B)(vii);

(d)    in the case of a call on partly paid securities, the paid-up securities PROVIDED THAT the Lender shall have paid to the Borrower an amount of money equal to the sum due in respect of the call;

(e)    in the case of a capitalisation issue, the borrowed Securities TOGETHER WITH the securities allotted by way of a bonus thereon;

(f)    in the case of a rights issue, the borrowed Securities TOGETHER WITH the securities allotted thereon, PROVIDED THAT the Lender has given notice to the Borrower in accordance with Clause 4(B)(vii), and has paid to the Borrower all and any sums due in respect thereof;

(g)    in the event that a payment or delivery of Income is made in respect of the borrowed Securities in the form of securities or a certificate which may at a future date be exchanged for securities or in the event of an option to take Income in the form of securities or a certificate which may at a future date be exchanged for securities, notice has been given to the Borrower in accordance with Clause 4(B)(vii) the borrowed Securities TOGETHER WITH securities or a certificate equivalent to those allotted;

(h)    in the case of any event similar to any of the foregoing, the borrowed Securities TOGETHER WITH or replaced by a sum of money or securities equivalent to that received in respect of such borrowed Securities resulting from such event;

11

For the purposes of this definition, securities are equivalent to other securities where they are of an identical type, nominal value, description and amount and such term shall include the certificate and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate);

| | |
|---|---|
| **"Event of Default"** | has the meaning given in Clause 12; |
| **"Income"** | any interest, dividends or other distributions of any kind whatsoever with respect to any Securities or Collateral; |
| **"Income Payment Date",** | with respect to any Securities or Collateral means the date on which Income is paid in respect of such Securities or Collateral, or, in the case of registered Securities or Collateral, the date by reference to which particular registered holders are identified as being entitled to payment of Income; |
| **"Lender"** | with respect to a particular loan of Securities means the Lender as referred to in Recital 1 of this Agreement; |
| **"Manufactured Dividend"** | shall have the meaning given in Clause 4(B)(ii); |
| **"Margin"** | shall have the meaning specified in the Schedule hereto; |
| **"Nominee"** | means an agent or a nominee appointed by either Party and approved (if appropriate) as such by the Inland Revenue to accept delivery of, hold or deliver Securities, Equivalent Securities, Collateral and/or Equivalent Collateral on its behalf whose appointment has been notified to the other Party; |
| **"Non-Defaulting Party"** | shall have the meaning given in Clause 12; |
| **"Offer Price"** | in relation to Equivalent Securities or Equivalent Collateral means the best available offer price thereof on the most appropriate market in a standard size; |
| **"Offer Value"** | Subject to Clause 8(E) means:- |

(a) in relation to Collateral equivalent to Collateral types B (ix) and C (more specifically referred to in the Schedule hereto) the Value thereof as calculated in accordance with such Schedule; and

(b) in relation to Equivalent Securities or Collateral equivalent to all other types of Collateral (more specifically referred to in the

12

Schedule hereto) the amount it would cost to buy such Equivalent Securities or Equivalent Collateral at the Offer Price thereof at such time together with all costs, fees and expenses that would be incurred in connection therewith, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction;

**"Parties"**

means the Lender and the Borrower and "Party" shall be construed accordingly;

**"Performance Date"**

shall have the meaning given in Clause 8;

**"Principal"**

shall have the meaning given in Clause 14;

**"Reference Price"**

means:

(a)    in relation to the valuation of Securities, Equivalent Securities, Collateral and/or Collateral equivalent to types B (ii), (viii), (xi) and (xii) (more specifically referred to in the Schedule hereto) such price as is equal to the mid market quotation of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral as derived from a reputable pricing information service (such as the services provided by Reuters, Extel Statistical Services and Telerate) reasonably chosen in good faith by the Lender or if unavailable the market value thereof as derived from the prices or rates bid by a reputable dealer for the relevant instrument reasonably chosen in good faith by the Lender, in each case at Close of Business on the previous Business Day;

(b)    in relation to the valuation of Collateral and/or Collateral equivalent to Collateral types A and B(i) (more specifically referred to in the Schedule hereto), the CGO Reference Price of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral then current as determined in accordance with the CGO Rules from time to time in force.

(c)    in relation to the valuation of Collateral and/or Collateral equivalent to Collateral types B(iii), (iv), (v), (vi) (vii) and (ix), (more specifically referred to in the Schedule hereto), the market

13

value thereof as derived from the rates bid by Barclays Bank PLC for such instruments or, in the absence of such a bid, the average of the rates bid by two leading market makers for such instruments at Close of Business on the previous Business Day;

**"Relevant Payment Date"**  shall have the meaning given in Clause 4(B)(i);

**"Rules"**  means the rules for the time being of the Stock Exchange (where either Party is a member of the Stock Exchange) and/or any other regulatory authority whose rules and regulations shall from time to time affect the activities of the Parties pursuant to this Agreement including but not limited to the stocklending regulations and guidance notes relating to both stocklending and manufactured interest and dividends for the time being in force of the Commissioners of the Inland Revenue and any associated procedures required pursuant thereto **(PROVIDED THAT** in an Event of Default, where either Party is a member of the Stock Exchange, the Rules and Regulations of the Stock Exchange shall prevail);

**"Securities"**  means Overseas Securities as defined in paragraph 1(1) of Schedule 23A to the Income and Corporation Taxes Act 1988 which the Borrower is entitled to borrow from the Lender in accordance with the Rules and which are the subject of a loan pursuant to this Agreement and such term shall include the certificates and other documents of title in respect of the foregoing;

**"Settlement Bank"**  means a settlement member of the CHAPS and Town Clearing systems who has entered into contractual arrangements with the CGO to provide Assured Payment facilities for members of the CGO;

**"Settlement Date"**  means the date upon which Securities are or are to be transferred to the Borrower in accordance with this Agreement;

**"Stock Exchange"**  means the London Stock Exchange Limited;

**"Value"**  at any particular time means in respect of Securities and Equivalent Securities, the Reference Price thereof then current and in respect of Collateral and/or Equivalent Collateral such worth as determined in accordance with the Schedule hereto.

(B)   All headings appear for convenience only and shall not affect the interpretation hereof.

(C)     Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin", "redeliver" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to redeliver Equivalent Securities or Equivalent Collateral as the case may be.

(D)     For the purposes of Clauses 6(H)-6(K) and 8(C)-8(E) of this Agreement or otherwise where a conversion into the Base Currency is required, all prices, sums or values (including any Value, Offer Value and Bid Value) of Securities, Equivalent Securities, Collateral or Equivalent Collateral (including Cash Collateral) stated in currencies other than the Base Currency shall be converted into the Base Currency at the spot rate of exchange at the relevant time in the London interbank market for the purchase of the Base Currency with the currency concerned.

(E)     Where at any time there is in existence any other agreement between the Parties the terms of which make provision for the lending of Securities (as defined in this Agreement) as well as other securities the terms of this Agreement shall apply to the lending of such Securities to the exclusion of any other such agreement.

(F)     Any reference in this Agreement to an act, regulation or other legislation hereunder shall include a reference to any statutory modification or re-enactment thereof for the time being in force.

## 2.     LOANS OF SECURITIES

(A)     The Lender will lend Securities to the Borrower, and the Borrower will borrow Securities from the Lender in accordance with the terms and conditions of this Agreement and with the Rules **PROVIDED ALWAYS THAT** the Lender shall have received from the Borrower and accepted (by whatever means) a Borrowing Request.

(B)     The Borrower has the right to reduce the amount of Securities referred to in a Borrowing Request **PROVIDED THAT** the Borrower has notified the Lender of such reduction no later than midday London time on the day which is two Business Days prior to the Settlement Date unless otherwise agreed between the Parties and the Lender shall have accepted such reduction (by whatever means).

## 3.     DELIVERY OF SECURITIES

The Lender shall procure the delivery of Securities to the Borrower or deliver such Securities in accordance with the relevant Borrowing Request **TOGETHER WITH** appropriate instruments of transfer duly stamped where necessary and such other instruments as may be requisite to vest title thereto in the Borrower. Such Securities shall be deemed to have been delivered by the Lender to the Borrower on delivery to the Borrower or as it shall direct of the relevant instruments of transfer, or in the case of Securities held by an agent or a clearing or

settlement system on the effective instructions to such agent or the operator of such system to hold the Securities absolutely for the Borrower, or by such other means as may be agreed.

4.    RIGHTS AND TITLE

(A)    The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(i)    any Securities borrowed pursuant to Clause 2;

(ii)    any Equivalent Securities redelivered pursuant to Clause 7;

(iii)    any Collateral delivered pursuant to Clause 6;

(iv)    any Equivalent Collateral redelivered pursuant to Clauses 6 or 7;

shall pass from one Party to the other subject to the terms and conditions mentioned herein and in accordance with the Rules, on delivery or redelivery of the same in accordance with this Agreement, free from all liens, charges and encumbrances. In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a computer based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or redeliver any of the assets so acquired but, in so far as any Securities are borrowed or any Collateral is delivered to such Party, such Party shall be obliged, subject to the terms of this Agreement, to redeliver Equivalent Securities or Equivalent Collateral as appropriate.

(B)    (i)    Where Income is paid in relation to any Securities on or by reference to an Income Payment Date on which such Securities are the subject of a loan hereunder, the Borrower shall, on the date of the payment of such Income, or on such other date as the Parties may from time to time agree, (the "**Relevant Payment Date**") pay and deliver a sum of money or property equivalent to the same (with any such endorsements or assignments as shall be customary and appropriate to effect the delivery) to the Lender or its Nominee, irrespective of whether the Borrower received the same. The provisions of sub-paragraphs (ii) to (v) below shall apply in relation thereto.

(ii)    subject to sub-paragraph (iii) below, in the case of any Income comprising a payment, the amount (the "**Manufactured Dividend**") payable by the Borrower shall be equal to the amount of the relevant Income together with an amount equivalent to any deduction, withholding or payment for or on account of tax made by the relevant issuer (or on its behalf) in respect of such Income together with an amount equal to any other tax credit associated with such Income unless a lesser amount is agreed

16

between the Parties or an Appropriate Tax Voucher (together with any further amount which may be agreed between the Parties to be paid) is provided in lieu of such deduction, withholding tax credit or payment.

(iii)    Where either the Borrower, or any person to whom the Borrower has on-lent the Securities, is unable to make payment of the Manufactured Dividend to the Lender without accounting to the Inland Revenue for any amount of relevant tax (as required by Schedule 23A to the Income and Corporation Taxes Act 1988) the Borrower shall pay to the Lender or its Nominee, in cash, the Manufactured Dividend less amounts equal to such tax. The Borrower shall at the same time if requested supply Appropriate Tax Vouchers to the Lender.

(iv)    If at any time any Manufactured Dividend falls to be paid and neither of the Parties is an Approved UK Intermediary or an Approved UK Collecting Agent, the Borrower shall procure that the payment is paid through an Approved UK Intermediary or an Approved UK Collecting Agent agreed by the Parties for this purpose, unless the rate of relevant withholding tax in respect of any Income that would have been payable to the Lender but for the loan of the Securities would have been zero and no income tax liability under Chapter VIIA of Part IV of the Income and Corporation Taxes Act 1988 would have arisen in respect thereof.

(v)    In the event of the Borrower failing to remit either directly or by its Nominee any sum payable pursuant to this Clause, the Borrower hereby undertakes to pay a rate to the Lender (upon demand) on the amount due and outstanding at the rate provided for in Clause 13 hereof. Interest on such sum shall accrue daily commencing on and inclusive of the third Business Day after the Relevant Payment Date, unless otherwise agreed between the Parties.

(vi)    Each Party undertakes that where it holds securities of the same description as any securities borrowed by it or transferred to it by way of collateral at a time when a right to vote arises in respect of such securities, it will use its best endeavours to arrange for the voting rights attached to such securities to be exercised in accordance with the instructions of the Lender or Borrower (as the case may be) **PROVIDED ALWAYS THAT** each Party shall use its best endeavours to notify the other of its instructions in writing no later than seven Business Days prior to the date upon which such votes are exercisable or as otherwise agreed between the Parties and that the Party concerned shall not be obliged so to exercise the votes in respect of a number of Securities greater than the number so lent or transferred to it. For the avoidance of doubt the Parties agree that subject as hereinbefore provided any voting rights attaching to the relevant Securities, Equivalent Securities, Collateral and/or Equivalent Collateral shall be exercisable by the persons in whose name they are registered or in the case of Securities, Equivalent Securities, Collateral and/or Equivalent Collateral in bearer form, the persons by or on behalf of whom they are held, and not necessarily by the Borrower or the Lender (as the case may be).

(vii)     Where, in respect of any borrowed Securities or any Collateral, any rights relating to conversion, sub-division, consolidation, pre-emption, rights arising under a takeover offer or other rights, including those requiring election by the holder for the time being of such Securities or Collateral, become exercisable prior to the redelivery of Equivalent Securities or Equivalent Collateral, then the Lender or Borrower, as the case may be, may, within a reasonable time before the latest time for the exercise of the right or option give written notice to the other Party that on redelivery of Equivalent Securities or Equivalent Collateral, as the case may be, it wishes to receive Equivalent Securities or Equivalent Collateral in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice.

(viii)     Any payment to be made by the Borrower under this Clause shall be made in a manner to be agreed between the Parties.

## 5.   RATES

(A)     In respect of each loan of Securities, the Borrower shall pay to the Lender, in the manner prescribed in sub-Clause (C), sums calculated by applying such rate as shall be agreed between the Parties from time to time to the daily Value of the relevant Securities.

(B)     Where Cash Collateral is deposited with the Lender in respect of any loan of Securities in circumstances where:

(i)     interest is earned by the Lender in respect of such Cash Collateral and that interest is paid to the Lender without deduction of tax, the Lender shall pay to the Borrower, in the manner prescribed in sub-Clause (C), an amount equal to the gross amount of such interest earned. Any such payment due to the Borrower may be set-off against any payment due to the Lender pursuant to sub-Clause (A) hereof if either the Borrower has warranted to the Lender in this Agreement that it is subject to tax in the United Kingdom under Case I of Schedule D in respect of any income arising pursuant to or in connection with the borrowing of Securities hereunder or the Lender has notified the Borrower of the gross amount of such interest or income; and

(ii)     sub-Clause (B)(i) above does not apply, the Lender shall pay to the Borrower, in the manner presented in sub-Clause (C), sums calculated by applying such rates as shall be agreed between the Parties from time to time to the amount of such Cash Collateral. Any such payment due to the Borrower may be set-off against any payment due to the Lender pursuant to sub-Clause (A) hereof.

(C)     In respect of each loan of Securities, the payments referred to in sub-Clauses (A) and (B) of this Clause shall accrue daily in respect of the period commencing on and inclusive of the Settlement Day and terminating on and exclusive of the Business Day upon which Equivalent Securities are redelivered or Cash Collateral is repaid. Unless otherwise agreed, the sums so accruing in respect of each

calendar month shall be paid in arrears by the Borrower to the Lender or to the Borrower by the Lender (as the case may be) not later than the Business Day which is one week after the last Business Day of the calendar month to which such payments relate or such other date as the Parties shall from time to time agree. Any payment made pursuant to sub-Clauses (A) and (B) hereof shall be in such currency and shall be paid in such manner and at such place as shall be agreed between the Parties.

6.    COLLATERAL

(A)    (i)    Subject to sub-Clauses (B), (C) and (E) below the Borrower undertakes to deliver Collateral to the Lender (or in accordance with the Lender's instructions) **TOGETHER WITH** appropriate instruments of transfer duly stamped where necessary and such other instruments as may be requisite to vest title thereto in the Lender simultaneously with delivery of the borrowed Securities and in any event no later than Close of Business on the Settlement Date. Collateral may be provided in any of the forms specified in the Schedule hereto (as agreed between the Parties);

(ii)    where Collateral is delivered to the Lender's Nominee any obligation under this Agreement to redeliver or otherwise account for Equivalent Collateral shall be an obligation of the Lender notwithstanding that any such redelivery may be effected in any particular case by the Nominee.

(B)    Where CGO Collateral is provided to the Lender or its Nominee by member-to-member delivery or delivery-by-value in accordance with the provisions of the CGO Rules from time to time in force, the obligation of the Lender shall be to redeliver Equivalent Collateral through the CGO to the Borrower in accordance with this Agreement. Any references, (howsoever expressed) in this Agreement, the Rules, and/or any other agreement or communication between the Parties to an obligation to redeliver such Equivalent Collateral shall be construed accordingly. If the loan of Securities in respect of which such Collateral was provided has not been discharged when the Collateral is redelivered, the Assured Payment obligation generated on such redelivery shall be deemed to constitute a payment of money which shall be treated as Cash Collateral until the loan is discharged, or further Equivalent Collateral is provided later during that Business Day. This procedure shall continue daily where CGO Collateral is delivered-by-value for as long as the relevant loan remains outstanding.

(C)    Where CGO Collateral or other collateral is provided by delivery-by-value to a Lender or its Nominee the Borrower may consolidate such Collateral with other Collateral provided by the same delivery to a third party for whom the Lender or its Nominee is acting.

(D)    Where Collateral is provided by delivery-by-value through an alternative book entry transfer system, not being the CGO, the obligation of the Lender shall be to redeliver Equivalent Collateral through such book entry transfer system in accordance with this Agreement. If the loan of Securities in respect of which such Collateral was provided has not been discharged when the Collateral is redelivered, any payment obligation generated within the book entry transfer system on such redelivery shall be deemed to constitute a payment of money which shall be treated as Cash Collateral until the loan is discharged, or further Equivalent Collateral is provided later during that Business Day. This procedure shall continue when Collateral is delivered-by-value for as long as the relevant loan remains outstanding;

(E)    Where Cash Collateral is provided the sum of money so deposited may be adjusted in accordance with Clause 6(H). Subject to Clause 6(H)(ii), the Cash Collateral shall be repaid at the same time as Equivalent Securities in respect of the Securities borrowed are redelivered, and the Borrower shall not assign, charge, dispose of or otherwise deal with its rights in respect of the Cash Collateral. If the Borrower fails to comply with its obligations for such redelivery of Equivalent Securities the Lender shall have the right to apply the Cash Collateral by way of set-off in accordance with Clause 8.

(F)    The Borrower may from time to time call for the repayment of Cash Collateral or the redelivery of Collateral equivalent to any Collateral delivered to the Lender prior to the date on which the same would otherwise have been repayable or redeliverable **PROVIDED THAT** at the time of such repayment or redelivery the Borrower shall have delivered or delivers Alternative Collateral acceptable to the Lender.

(G)    (i)    Where Collateral (other than Cash Collateral) is delivered in respect of which any Income may become payable, the Borrower shall call for the redelivery of Collateral equivalent to such Collateral in good time to ensure that such Equivalent Collateral may be delivered prior to any such Income becoming payable to the Lender, unless in relation to such Collateral the Parties are satisfied before the relevant Collateral is transferred that no tax will be payable to the UK Inland Revenue under Schedule 23A of the Income and Corporation Taxes Act 1988. At the time of such redelivery the Borrower shall deliver Alternative Collateral acceptable to the Lender.

(ii)    Where the Lender receives any Income in circumstances where the Parties are satisfied as set out in Clause 6(G)(i) above, then the Lender shall on the date on which the Lender receives such Income or on such date as the Parties may from time to time agree, pay and deliver a sum of money or property equivalent to such Income (with any such endorsements or assignments as shall be customary and appropriate to effect the delivery) to the Borrower and shall supply Appropriate Tax Vouchers (if any) to the Borrower.

(H)    Unless the Schedule to this Agreement indicates that Clause 6(I) shall apply in lieu of this Clause 6(H), or unless otherwise agreed between the Parties, the Value of

20

the Collateral delivered to or deposited with the Lender or its nominated bank or depository (excluding any Collateral repaid or redelivered under sub-Clauses (H)(ii) or (I)(ii) below (as the case may be) ("**Posted Collateral**")) in respect of any loan of Securities shall bear from day to day and at any time the same proportion to the Value of the Securities borrowed under such loan as the Posted Collateral bore at the commencement of such loan. Accordingly:

    (i)    the Value of the Posted Collateral to be delivered or deposited while the loan of Securities continues shall be equal to the Value of the borrowed Securities and the Margin applicable thereto (the "**Required Collateral Value**");

    (ii)    if on any Business Day the Value of the Required Collateral Value in respect of any loan of Securities exceeds the Required Collateral Value in respect of such loan, the Lender shall (on demand) repay such Cash Collateral and/or redeliver to the Borrower such Equivalent Collateral as will eliminate the excess; and

    (iii)    if on any Business Day the Value of the Posted Collateral falls below the Required Collateral Value, the Borrower shall (on demand) provide such further Collateral to the Lender as will eliminate the deficiency.

(I)    Subject to Clause 6(J), unless the Schedule to this Agreement indicates that Clause 6(H) shall apply in lieu of this Clause 6(I), or unless otherwise agreed between the Parties:-

    (i)    the aggregate Value of the Posted Collateral in respect of all loans of Securities outstanding under this Agreement shall equal the aggregate of the Required Collateral Values in respect of such loans;

    (ii)    if at any time the aggregate Value of the Posted Collateral in respect of all loans of Securities outstanding under this Agreement exceeds the aggregate of the Required Collateral Values in respect of such loans, the Lender shall (on demand) repay such Cash Collateral and/or redeliver to the Borrower such Equivalent Collateral as will eliminate the excess;

    (iii)    if at any time the aggregate Value of the Posted Collateral in respect of all loans of Securities outstanding under this Agreement falls below the aggregate of Required Collateral Values in respect of all such loans, the Borrower shall (on demand) provide such further Collateral to the Lender as will eliminate the deficiency.

(J)    Where Clause 6(I) applies, unless the Schedule to this Agreement indicates that this Clause 6(J) does not apply, if a Party (the "**first Party**") would, but for this Clause 6(J), be required under Clause 6(I) to repay Cash Collateral, redeliver Equivalent Securities or provide further Collateral in circumstances where the other Party (the "**second Party**") would, but for this Clause 6(J), also be required to repay Cash Collateral or provide or redeliver Equivalent Collateral under Clause 6(I), then the Value of the Cash Collateral or Equivalent Collateral deliverable by the first Party ("**X**") shall be set-off against the Value of the Cash Collateral, or Equivalent Collateral or further Collateral deliverable by the second Party ("**Y**")

and the only obligation of the Parties under Clause 6(I) shall be, where X exceeds Y, an obligation of the first Party, or where Y exceeds X, an obligation of the second Party, to repay Cash Collateral, redeliver Equivalent Collateral or to deliver further Collateral having a Value equal to the difference between X and Y.

(K) Where Cash Collateral is repaid, Equivalent Collateral is redelivered or further Collateral is provided by a Party under Clause 6(H), the Parties shall agree to which loan or loans of Securities such repayment, redelivery or further provision is to be attributed and failing agreement it shall be attributed, as determined by the Party making such repayment, redelivery or further provision to the earliest outstanding loan and, in the case of a repayment or redelivery up to the point at which the Value of Collateral in respect of such loan is reduced to zero and, in the case of a further provision up to the point at which the Value of the Collateral in respect of such loan equals the Required Collateral Value in respect of such loan, and then to the next earliest outstanding loan up to the similar point and so on.

(L) Where any Cash Collateral falls to be repaid or Equivalent Collateral to be redelivered or further Collateral to be provided under this Clause 6, it shall be delivered within the minimum period after demand specified in the Schedule or if no appropriate period is there specified within the standard settlement time for delivery of the relevant type of Cash Collateral, Equivalent Collateral or Collateral, as the case may be.

7. REDELIVERY OF EQUIVALENT SECURITIES

(A) The Borrower undertakes to redeliver Equivalent Securities in accordance with this Agreement and the terms of the relevant Borrowing Request. For the avoidance of doubt any reference herein or in any other agreement or communication between the Parties (howsoever expressed) to an obligation to redeliver or account for or act in relation to borrowed Securities shall accordingly be construed as a reference to an obligation to redeliver or account for or act in relation to Equivalent Securities.

(B) Subject to Clause 8 hereof and the terms of the relevant Borrowing Request the Lender may call for the redelivery of all or any Equivalent Securities at any time by giving notice on any Business Day of not less than the standard settlement time for such Equivalent Securities on the exchange or in the clearing organisation through which the relevant borrowed Securities were originally delivered. The Borrower shall as hereinafter provided redeliver such Equivalent Securities not later than the expiry of such notice in accordance with the Lender's instructions. Simultaneously with the redelivery of the Equivalent Securities in accordance with such call, the Lender shall (subject to Clause 6(I), if applicable) repay any Cash Collateral and redeliver to the Borrower Collateral equivalent to the Collateral delivered pursuant to Clause 6 in respect of the borrowed Securities. For the avoidance of doubt any reference herein or in any other agreement or communication between the Parties (however expressed) to an obligation to redeliver or account for or act in relation to Collateral shall accordingly be construed as a reference to an obligation to redeliver or account for or act in relation to Equivalent Collateral.

(C) If the Borrower does not redeliver Equivalent Securities in accordance with such call, the Lender may elect to continue the loan of Securities **PROVIDED THAT** if the Lender does not elect to continue the loan the Lender may by written notice to

the Borrower elect to terminate the relevant loan. Upon the expiry of such notice the provisions of Clauses (8) (B) to (F) shall apply as if upon the expiry of such notice an Event of Default had occurred in relation to the Borrower (who shall thus be the Defaulting Party for the purposes of this Agreement) and as if the relevant loan were the only loan outstanding.

(D)     In the event that as a result of the failure of the Borrower to redeliver Equivalent Securities to the Lender in accordance with this Agreement a "buy-in" is exercised against the Lender then provided that reasonable notice has been given to the Borrower of the likelihood of such a "buy-in", the Borrower shall account to the Lender for the total costs and expenses reasonably incurred by the Lender as a result of such "buy-in".

(E)     Subject to the terms of the relevant Borrowing Request, the Borrower shall be entitled at any time to terminate a particular loan of Securities and to redeliver all and any Equivalent Securities due and outstanding to the Lender in accordance with the Lender's instructions. The Lender shall accept such redelivery and simultaneously therewith (subject to Clause 6(I) if applicable) shall repay to the Borrower any Cash Collateral or, as the case may be, redeliver Collateral equivalent to the Collateral provided by the Borrower pursuant to Clause 6 in respect thereof.

(F)     Where a TALISMAN short term certificate (as described in paragraph C of the Schedule) is provided by way of Collateral, the obligation to redeliver Equivalent Collateral is satisfied by the redelivery of the certificate to the Borrower or its expiry as provided for in the Rules applying to such certificate.

(G)     Where a Letter of Credit is provided by way of Collateral, the obligation to redeliver Equivalent Collateral is satisfied by the Lender redelivering for cancellation the Letter of Credit so provided, or where the Letter of Credit is provided in respect of more than one loan, by the Lender consenting to a reduction in the value of the Letter of Credit.

8.     SET-OFF ETC.

(A)     On the date and time (the **"Performance Date"**) that Equivalent Securities are required to be redelivered by the Borrower in accordance with the provisions of this Agreement the Lender shall simultaneously redeliver the Equivalent Collateral and repay any Cash Collateral held (in respect of the Equivalent Securities to be redelivered) to the Borrower. Neither Party shall be obliged to make delivery (or make a payment as the case may be) to the other unless it is satisfied that the other Party will make such delivery (or make an appropriate payment as the case may be) to it simultaneously. If it is not so satisfied (whether because an Event of Default has occurred in respect of the other Party or otherwise) it shall notify the other party and unless that other Party has made arrangements which are sufficient to assure full delivery (or the appropriate payment as the case may be) to the notifying Party, the notifying Party shall (provided it is itself in a position, and willing, to perform its own obligations) be entitled to withhold delivery (or payment, as the case may be) to the other Party.

23

(B)    If an Event of Default occurs in relation to either Party, the Parties' delivery and payment obligations (and any other obligations they have under this Agreement) shall be accelerated so as to require performance thereof at the time such Event of Default occurs (the date of which shall be the **"Performance Date"** for the purposes of this clause) and in such event:

    (i)    the Relevant Value of the Securities to be delivered (or payment to be made, as the case may be) by each Party shall be established in accordance with Clause 8(C); and

    (ii)    on the basis of the Relevant Values so established, an account shall be taken (as at the Performance Date) of what is due from each Party to the other and (on the basis that each Party's claim against the other in respect of delivery of Equivalent Securities or Equivalent Collateral or any cash payment equals the Relevant Value thereof) the sums due from one Party shall be set-off against the sums due from the other and only the balance of the account shall be payable (by the Party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be payable on the Performance Date.

(C)    For the purposes of Clause 8(B) the Relevant Value:-

    (i)    of any cash payment obligation shall equal its par value (disregarding any amount taken into account under (ii) or (iii) below);

    (ii)    of any securities to be delivered by the Defaulting Party shall, subject to Clause 8(E) below, equal the Offer Value thereof; and

    (iii)    of any securities to be delivered to the Defaulting Party shall, subject to Clause 8(E) below, equal the Bid Value thereof.

(D)    For the purposes of Clause 8(C), but subject to Clause 8(E) below, the Bid Value and Offer Value of any securities shall be calculated as at the Close of Business in the most appropriate market for securities of the relevant description (as determined by the Non-Defaulting Party) on the first Business Day following the Performance Date, or if the relevant Event of Default occurs outside the normal business hours of such market, on the second Business Day following the Performance Date (the **"Default Valuation Time"**);

(E)    (i)    Where the Non-Defaulting Party has following the occurrence of an Event of Default but prior to the Default Valuation Time purchased securities forming part of the same issue and being of an identical type and description to those to be delivered by the Defaulting Party and in substantially the same amount as those securities or sold securities forming part of the same issue and being of an identical type and description to those to be delivered by him to the Defaulting Party and in substantially the same amount as those securities, the cost of such purchase or the proceeds of such sale, as the case may be, (taking into account all reasonable costs, fees and expenses that would be incurred in connection therewith) shall be treated as the Offer Value or Bid Value, as

24

the case may be, of the relevant securities for the purposes of this Clause 8.

(ii)     Where the amount of any securities sold or purchased as mentioned in (E)(i) above is not in substantially the same amount as those securities to be valued for the purposes Clause 8(C) the Offer Value or the Bid Value (as the case may be) of those securities shall be ascertained by dividing the net proceeds of sale or cost of purchase by the amount of the securities sold or purchased so as to obtain a net unit price and multiplying that net unit price by the amount of the securities to be valued.

(F)     Any reference in this Clause 8 to securities shall include any asset other than cash provided by way of Collateral.

(G)     If the Borrower or the Lender for any reason fail to comply with their respective obligations under Clauses 6(F) or 6(G) in respect of redelivery of Equivalent Collateral or repayment of Cash Collateral such failure shall be an Event of Default for the purposes of this Clause 8, and the person failing to comply shall thus be the Defaulting Party.

(H)     Subject to and without prejudice to its rights under Clause 8(A) either Party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities, Collateral and cash transfers waive its right under this Agreement in respect of simultaneous delivery and/or payment **PROVIDED THAT** no such waiver in respect of one transaction shall bind it in respect of any other transaction.

## 9.     TAXATION

(A)     The Borrower hereby undertakes promptly to pay and account for any transfer or similar duties or taxes chargeable in connection with any transaction effected pursuant to or contemplated by this Agreement, and shall indemnify and keep indemnified the Lender against any liability arising in respect thereof as a result of the Borrower's failure to do so.

(B)     A Party undertakes to notify the other Party if it becomes or ceases to be an Approved UK Intermediary or an Approved UK Collecting Agent.

## 10.     LENDER'S WARRANTIES

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Lender:

(A)     it is duly authorised and empowered to perform its duties and obligations under this Agreement;

(B)     it is not restricted under the terms of its constitution or in any other manner from lending Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(C)    it is absolutely entitled to pass full legal and beneficial ownership of all Securities provided by it hereunder to the Borrower free from all liens, charges and encumbrances;

(D)    where the Schedule to this Agreement specifies that this Clause 10(D) applies, it is not resident in the United Kingdom for tax purposes and either is not carrying on a trade in the United Kingdom through a branch or agency or if it is carrying on such a trade the loan is not entered into in the course of the business of such branch or agency, and it has (i) delivered or caused to be delivered to the Borrower a duly completed and certified Certificate (MOD2) or a photocopy thereof bearing an Inland Revenue acknowledgement and unique number and such Certificate or photocopy remains valid or (ii) has taken all necessary steps to enable a specific authorisation to make gross payment of the Manufactured Dividend to be issued by the Inland Revenue;

## 11.    BORROWER'S WARRANTIES

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Borrower:

(A)    it has all necessary licenses and approvals, and is duly authorised and empowered, to perform its duties and obligations under this Agreement and will do nothing prejudicial to the continuation of such authorisation, licences or approvals;

(B)    it is not restricted under the terms of its constitution or in any other manner from borrowing Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(C)    it is absolutely entitled to pass full legal and beneficial ownership of all Collateral provided by it hereunder to the Lender free from all liens, charges and encumbrances;

(D)    it is acting as principal in respect of this Agreement;

(E)    where the Schedule to this Agreement specifies this Clause 11(E) applies, it is subject to tax in the United Kingdom under Case I of Schedule D in respect of any income arising pursuant to or in connection with the borrowing of Securities hereunder;

## 12.    EVENTS OF DEFAULT

Each of the following events occurring in relation to either Party (the **"Defaulting Party"**, the other Party being the **"Non-Defaulting Party"**) shall be an Event of Default for the purpose of Clause 8:-

(A)    the Borrower or Lender failing to pay or repay Cash Collateral or deliver or redeliver Collateral or Equivalent Collateral upon the due date, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(B)    the Lender or Borrower failing to comply with its obligations under Clause 6, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(C)    the Borrower failing to comply with Clause 4(B)(i), (ii) or (iii) hereof, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(D)    an Act of Insolvency occurring with respect to the Lender or the Borrower and (except in the case of an Act of Insolvency which is the presentation of a petition for winding up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party in which case no such notice shall be required) the Non-Defaulting Party serves written notice on the Defaulting Party;

(E)    any representations or warranties made by the Lender or the Borrower being incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(F)    the Lender or the Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations hereunder and/or in respect of any loan hereunder, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(G)    the Lender (if appropriate) or the Borrower being declared in default by the appropriate authority under the Rules or being suspended or expelled from membership of or participation in any securities exchange or association or other self-regulatory organisation, or suspended from dealing in securities by any government agency, and the Non-Defaulting Party serves written notice on the Defaulting Party;

(H)    any of the assets of the Lender or the Borrower or the assets of investors held by or to the order of the Lender or the Borrower being transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation and the Non-Defaulting Party serves written notice on the Defaulting Party, or

(I)    the Lender or the Borrower failing to perform any other of its obligations hereunder and not remedying such failure within 30 days after the Non-Defaulting Party serves written notice requiring it to remedy such failure, and the Non-Defaulting Party serves a further written notice on the Defaulting Party.

Each Party shall notify the other if an Event of Default occurs in relation to it.

13.    <u>OUTSTANDING PAYMENTS</u>

In the event of either Party failing to remit either directly or by its Nominee sums in accordance with this Agreement such Party hereby undertakes to pay a rate to the other Party upon demand on the net balance due and outstanding of 1% above the Barclays Bank PLC base rate from time to time in force.

14.    TRANSACTIONS ENTERED INTO AS AGENT

(A)    Subject to the following provisions of this Clause, the Lender may enter into loans as agent (in such capacity, the **"Agent"**) for a third person (a **"Principal"**), whether as custodian or investment manager or otherwise (a loan so entered into being referred to in this clause as an "Agency Transaction").

(B)    A Lender may enter into an Agency Transaction if, but only if:-

   (i)    if specifies that loan as an Agency Transaction at the time when it enters into it;

   (ii)    it enters into that loan on behalf of a single Principal whose identity is disclosed to the Borrower (whether by name or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) at the time when it enters into the loan; and

   (iii)    it has at the time when the loan is entered into actual authority to enter into the loan and to perform on behalf of that Principal all of that Principal's obligations under the agreement referred to in (D)(ii) below.

(C)    The Lender undertakes that, if it enters as agent into an Agency Transaction, forthwith upon becoming aware:-

   (i)    of any event which constitutes an Act of Insolvency with respect to the relevant Principal; or

   (ii)    of any breach of any of the warranties given in Clause 14(E) below or of any event or circumstance which has the result that any such warranty would be untrue if repeated by reference to the current facts;

   it will inform the Borrower of that fact and will, if so required by the Borrower, furnish it with such additional information as it may reasonably request.

(D)    (i)    Each Agency Transaction shall be a transaction between the relevant Principal and the Borrower and no person other than the relevant Principal and the Borrower shall be a party to or have any rights or obligations under an Agency Transaction. Without limiting the foregoing, the Lender shall not be liable as principal for the performance of an Agency Transaction or for breach of any warranty contained in Clause 10(D) or 11(E) of this Agreement, but this is without prejudice to any liability of the Lender under any other provision of this Clause.

   (ii)    All the provisions of the Agreement shall apply separately as between the Borrower and each Principal for whom the Agent has entered into an Agency transaction or Agency Transactions as if each such Principal were a party to a separate agreement with the Borrower in all respects identical with this Agreement other than this paragraph and as if the Principal were Lender in respect of that agreement.

28

**PROVIDED THAT**

if there occurs in relation to the Agent an Event of Default or an event which would constitute an Event of Default if the Borrower served written notice under any sub-Clause of Clause 12, the Borrower shall be entitled by giving written notice to the Principal (which notice shall be validly given if given to the Lender in accordance with Clause 20) to declare that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal. If the Borrower gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given; and

if the Principal is neither incorporated nor has established a place of business in Great Britain, the Principal shall for the purposes of the agreement referred to in (D)(ii) be deemed to have appointed as its agent to receive on its behalf service of process in the courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in the United Kingdom, the person appointed by the Agent for the purposes of this Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other party.

(iii)   The foregoing provisions of this Clause do not affect the operation of the Agreement as between the Borrower and the Lender in respect of any transactions into which the Lender may enter on its own account as principal.

(E)   The Lender warrants to the Borrower that it will, on every occasion on which it enters or purports to enter into a transaction as an Agency Transaction, have been duly authorised to enter into that loan and perform the obligations arising thereunder on behalf of the person whom it specifies as the Principal in respect of that transaction and to perform on behalf of that person all the obligations of that person under the agreement referred to in (D)(ii).

## 15.   TERMINATION OF COURSE OF DEALINGS BY NOTICE

Each Party shall have the right to bring the course of dealing contemplated under this Agreement to an end by giving not less than 15 Business Days' notice in writing to the other Party (which notice shall specify the date of termination) subject to an obligation to ensure that all loans which have been entered into but not discharged at the time such notice is given are duly discharged in accordance with this Agreement and with the Rules.

## 16.   GOVERNING PRACTICES

The Borrower shall use its best endeavours to notify the Lender (in writing) of any changes in legislation or practices governing or affecting the Lender's rights or obligations under this Agreement or the treatment of transactions effected pursuant to or contemplated by this Agreement.

17.    OBSERVANCE OF PROCEDURES

Each of the Parties hereto agrees that in taking any action that may be required in accordance with this Agreement it shall observe strictly the procedures and timetable applied by the Rules and, further, shall observe strictly any agreement (oral or otherwise) as to the time for delivery or redelivery of any money, Securities, Equivalent Securities, Collateral or Equivalent Collateral entered into pursuant to this Agreement.

18.    SEVERANCE

If any provision of this Agreement is declared by any judicial or other competent authority to be void or otherwise unenforceable, that provision shall be severed from the Agreement and the remaining provisions of this Agreement shall remain in full force and effect.    The Agreement shall, however, thereafter be amended by the Parties in such reasonable manner so as to achieve, without illegality, the intention of the Parties with respect to that severed provision.

19.    SPECIFIC PERFORMANCE

Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver or redeliver Securities, Equivalent Securities, Collateral or Equivalent Collateral but without prejudice to any other rights it may have.

20.    NOTICES

All notices issued under this Agreement shall be in writing (which shall include telex or facsimile messages) and shall be deemed validly delivered if sent by prepaid first class post to or left at the addresses or sent to the telex or facsimile number of the Parties respectively or such other addresses or telex or facsimile numbers as each Party may notify in writing to the other.

21.    ASSIGNMENT

Neither Party may charge assign or transfer all or any of its rights or obligations hereunder without the prior consent of the other Party.

22.    NON-WAIVER

No failure or delay by either Party to exercise any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege as herein provided.

23.    ARBITRATION AND JURISDICTION

(A)    All claims, disputes and matters of conflict between the Parties arising hereunder shall be referred to or submitted for arbitration in London in accordance with

30

English Law before a sole arbitrator to be agreed between the Parties or in default of agreement by an arbitrator to be nominated by the Chairman of The Stock Exchange on the application of either Party, and this Agreement shall be deemed for this purpose to be a submission to arbitration within the Arbitration Acts 1950 and 1979, or any statutory modification or re-enactment thereof for the time being in force.

(B)   This Clause shall take effect notwithstanding the frustration or other termination of this Agreement.

(C)   No action shall be brought upon any issue between the Parties under or in connection with this Agreement until the same has been submitted to arbitration pursuant hereto and an award made.

## 24.   TIME

Time shall be of the essence of the Agreement.

## 25.   RECORDING

The Parties agree that each may electronically record all telephonic conversations between them.

## 26.   GOVERNING LAW

This Agreement is governed by, and shall be construed in accordance with, English Law.

**IN WITNESS WHEREOF** this Agreement has been executed on behalf of the Parties hereto the day and year first before written.

SIGNED BY )                    R. STORY
)
)
ON BEHALF OF ) **LEHMAN BROTHERS INTERNATIONAL (EUROPE)**
)
)
IN THE PRESENCE OF: )        C. BENSON

SIGNED BY )
)                    P. GAMESTER            T. HARROLD
)
ON BEHALF OF )   LEHMAN BROTHERS (LUXEMBOURG) S.A.
)
)
IN THE PRESENCE OF: )        C. BENSON                    J. Dorman

31

## SCHEDULE

## COLLATERAL

### Types

Collateral acceptable under this Agreement may include the following or otherwise, as agreed between the Parties from time to time whether transferable by hand or within a depositary:-

A.       British Government Stock and other stock registered at the Bank of England which is transferable through the CGO to the Lender or its Nominee against an Assured Payment, hereinbefore referred to as CGO Collateral.

B.       (i)       British Government Stock and Sterling Issues by foreign governments (transferable through the CGO), in the form of an enfaced transfer deed or a long term collateral certificate or overnight collateral chit issued by the CGO accompanied (in each case) by an executed unenfaced transfer deed;

         (ii)      Corporation and Commonwealth Stock in the form of registered stock or allotment letters duly renounced;

         (iii)     UK Government Treasury Bills;

         (iv)      U.S. Government Treasury Bills;

         (v)       Bankers' Acceptances;

         (vi)      Sterling Certificates of Deposit;

         (vii)     Foreign Currency Certificates of Deposit;

         (viii)    Local Authority Bonds;

         (ix)      Local Authority Bills;

         (x)       Letters of Credit;

         (xi)      Bonds or Equities in registrable form or allotment letters duly renounced;

         (xii)     Bonds or Equities in bearer form.

C.       Unexpired TALISMAN short-term certificates issued by The Stock Exchange; and

D.       Cash Collateral.

32

## VALUATION OF COLLATERAL

Collateral provided in accordance with this Agreement shall be evaluated by reference to the following, or by such means as the Parties may from time to time agree:-

(A)    in respect of Collateral types A and B(i), the current CGO value calculated by reference to the middle market price of each stock as determined daily by the Bank of England, adjusted to include the accumulated interest thereon (the CGO Reference Price);

(B)    in respect of Collateral types B(ii) to (ix), (xi) and (xii) the Reference Price thereof;

(C)    in respect of Collateral types B(x) and C the value specified therein.

## MARGIN

The Value of the Collateral delivered pursuant to Clause 6 by the Borrower to the Lender under the terms and conditions of this Agreement shall on each Business Day represent not less than the Value of the borrowed Securities **TOGETHER WITH** the following additional percentages hereinbefore referred to as ("the Margin") unless otherwise agreed between the Parties:-

(i)    in the case of Collateral types A, B(i) to (x) and D: 0 %, (for Certificates of Deposit the Margin shall be the accumulated interest thereon); or

(ii)    in the case of Collateral types B(xi), (xii) and C: 0 %

If the Value of the borrowed Securities includes any margin over the mid market price of the borrowed Securities this shall be taken into account in determining the Margin applicable.

## BASIS OF MARGIN MAINTENANCE

Clause 6 (I) (global margining) shall apply.

Clause 6(J) (netting of margin where one party both a Borrower and Lender) shall apply.

Minimum period after demand for transferring Cash Collateral or Equivalent Collateral:

(a)    Cash Collateral: within one Business Day;
(b)    Equivalent Collateral: not less than the standard settlement time for such Collateral on the exchange or clearing organisation through which the relevant Collateral was originally delivered.

## BASE CURRENCY

The Base Currency applicable to this Agreement is ____EUROS____.

## LENDER'S WARRANTIES

Where the Lender is _LEHMAN BROTHERS (LUXEMBOURG) SA_ Clause 10(D) shall/shall not
apply.

Where the Lender is Lehman Brothers International (Europe) Clause 10(D) shall not apply.

## BORROWER'S WARRANTIES

Where the Borrower is _LEHMAN BROTHERS (LUXEMBURY) SA_ Clause 11(E) shall/shall not
apply.

Where the Borrower is Lehman Brothers International (Europe) Clause 11(E) shall apply.

## **Exhibit 4**

GMRA



**THE BOND MARKET ASSOCIATION**

The Bond Market Association
New York •Washington •London
www.bondmarkets.com

**ISMA**

International Securities Market Association
Rigistrasse 60, P.O. Box, CH-8033, Zürich
www.isma.org

**2000 VERSION**

### TBMA/ISMA

## GLOBAL MASTER REPURCHASE AGREEMENT

Dated as of _16th August, 2004_

**Between:**

**Lehman Brothers International (Europe)**          **("Party A")**

**and**

**Lehman Brothers (Luxembourg) SA**          **("Party B")**

1.   **Applicability**

(a)   From time to time the parties hereto may enter into transactions in which one party, acting through a Designated Office, ("Seller") agrees to sell to the other, acting through a Designated Office, ("Buyer") securities and financial instruments ("Securities") (subject to paragraph 1(c), other than equities and Net Paying Securities) against the payment of the purchase price by Buyer to Seller, with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain or on demand against the payment of the repurchase price by Seller to Buyer.

(b)   Each such transaction (which may be a repurchase transaction ("Repurchase Transaction") or a buy and sell back transaction ("Buy/Sell Back Transaction")) shall be referred to herein as a "Transaction" and shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto, unless otherwise agreed in writing.

October 2000





ISMA

(c)    If this Agreement may be applied to -

    (i)    Buy/Sell Back Transactions, this shall be specified in Annex I hereto, and the provisions of the Buy/Sell Back Annex shall apply to such Buy/Sell Back Transactions;

    (ii)    Net Paying Securities, this shall be specified in Annex I hereto and the provisions of Annex I, paragraph 1(b) shall apply to Transactions involving Net Paying Securities.

(d)    If Transactions are to be effected under this Agreement by either party as an agent, this shall be specified in Annex I hereto, and the provisions of the Agency Annex shall apply to such Agency Transactions.

2.    **Definitions**

(a)    "Act of Insolvency" shall occur with respect to any party hereto upon –

    (i)    its making a general assignment for the benefit of, entering into a reorganisation, arrangement, or composition with creditors; or

    (ii)    its admitting in writing that it is unable to pay its debts as they become due; or

    (iii)    its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

    (iv)    the presentation or filing of a petition in respect of it (other than by the counterparty to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding, in respect of which no such 30 day period shall apply) not having been stayed or dismissed within 30 days of its filing; or

    (v)    the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property; or

    (vi)    the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding);

(b)    "Agency Transaction", the meaning specified in paragraph 1 of the Agency Annex;

(c)    "Appropriate Market", the meaning specified in paragraph 10;





ISMA

(d)    "Base Currency", the currency indicated in Annex I hereto;

(e)    "Business Day" –

 (i)    in relation to the settlement of any Transaction which is to be settled through Clearstream or Euroclear, a day on which Clearstream or, as the case may be, Euroclear is open to settle business in the currency in which the Purchase Price and the Repurchase Price are denominated;

 (ii)    in relation to the settlement of any Transaction which is to be settled through a settlement system other than Clearstream or Euroclear, a day on which that settlement system is open to settle such Transaction;

 (iii)    in relation to any delivery of Securities not falling within (i) or (ii) above, a day on which banks are open for business in the place where delivery of the relevant Securities is to be effected; and

 (iv)    in relation to any obligation to make a payment not falling within (i) or (ii) above, a day other than a Saturday or a Sunday on which banks are open for business in the principal financial centre of the country of which the currency in which the payment is denominated is the official currency and, if different, in the place where any account designated by the parties for the making or receipt of the payment is situated (or, in the case of a payment in euro, a day on which TARGET operates);

(f)    "Cash Margin", a cash sum paid to Buyer or Seller in accordance with paragraph 4;

(g)    "Clearstream", Clearstream Banking, société anonyme, (previously Cedelbank) or any successor thereto;

(h)    "Confirmation", the meaning specified in paragraph 3(b);

(i)    "Contractual Currency", the meaning specified in paragraph 7(a);

(j)    "Defaulting Party", the meaning specified in paragraph 10;

(k)    "Default Market Value", the meaning specified in paragraph 10;

(l)    "Default Notice", a written notice served by the non-Defaulting Party on the Defaulting Party under paragraph 10 stating that an event shall be treated as an Event of Default for the purposes of this Agreement;

(m)    "Default Valuation Notice", the meaning specified in paragraph 10;

(n)    "Default Valuation Time", the meaning specified in paragraph 10;

(o)    "Deliverable Securities", the meaning specified in paragraph 10;

(p)    "Designated Office", with respect to a party, a branch or office of that party which is





ISMA

21.   **Third Party Rights**

No person shall have any right to enforce any provision of this Agreement under the Contracts (Rights of Third Parties) Act 1999.

Lehman Brothers International (Europe)

By_____

Title_____
      CONRAD SANTOS
      MANAGING DIRECTOR

Date_____

Lehman Brothers (Luxembourg) SA

By_____

Title_**A. Kamarowsky**_____    F. Cannizzaro
         **Director**                 Director

Date _29 July 2004_

October 2000                    - 28 -

## ANNEX 1

### Supplemental Terms or Conditions

Paragraph references are to paragraphs in the Agreement.

1.    **The following elections shall apply -**

(a)    paragraph 1(c)(i).  Buy/Sell Back Transactions may be effected under this Agreement, and accordingly the Buy/Sell Back Annex shall apply.

(b)    paragraph 1(c)(ii). Transactions in Net Paying Securities may be effected under this Agreement, and accordingly the provisions of sub-paragraphs (i) and (ii) below shall apply.

    (i)    The phrase "other than equities and Net Paying Securities" shall be replaced by the phrase "other than equities".

    (ii)    In the Buy/Sell Back Annex the following words shall be added to the end of the definition of the expression "IR": "and for the avoidance of doubt the reference to the amount of Income for these purposes shall be to an amount paid without withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such Income made in certain circumstances may be subject to such a withholding or deduction".

(c)    paragraph 1(d). Agency Transactions may be effected under this Agreement, and accordingly the Agency Annex shall apply.  The parties acknowledge and agree that, in relation to some Transactions relating to U.S. Securities, Party A may act as agent for Lehman Brothers Inc. as Principal.

In addition, the following Annexes shall also apply with respect to relevant Transactions:

Equities Annex
Italian Annex
Gilts Annex
Japanese Annex

(d)    paragraph 2(d).  The Base Currency shall be:

    (i)    for the purposes of paragraph 4, United States Dollars
    (ii)    for the purposes of paragraph 10, United States Dollars

(e)    paragraph 2(p). list Buyer's and Seller's Designated Offices

Party A: London and Frankfurt.

Party B: Luxembourg

(f)    paragraph 2(cc).  The pricing source for calculation of Market Value shall be: Market Value will be calculated in accordance with market practice prevailing in the principal market for the relevant securities as determined by Party A.

(g)    paragraph 2(rr). Spot rate to be: as specified in paragraph 2(rr).

(h)    paragraph 3(b). both Seller and Buyer to deliver Confirmation.

(i)    paragraph 4(f). Interest rate on Cash Margin to be Fed Funds Open for USD (available on Bloomberg page FEDL), EONIA for Euro (available on Bloomberg page EBF) and SONIA for GBP (available on Bloomberg page BBAM).

Interest to be payable upon redelivery of any Cash Margin.

(j)    paragraph 4(g). Delivery period for margin calls to be:

    (i)    For gilt edged Securities & U.S. Securities, if margin call is made by 7.00 a.m. EST / 12.00 p.m. GMT, delivery will be for same day settlement.

    (ii)    For all other Securities, if margin call is made by 7.00 a.m. EST / 12.00 p.m. GMT, delivery will be for next day settlement.

    (iii)    For Cash Margin, if margin call is made by 10.00 a.m. EST / 3.00 p.m. GMT, delivery will be made for same day settlement. If a second call for Cash Margin is made on a day when a previous call for Cash Margin has been made by 10.00 a.m. EST / 3.00 p.m. GMT delivery of the second Cash Margin will also be made for same day settlement.

(k)    paragraph 6(j). Paragraph 6(j) shall apply, and the events specified in paragraph10(a) identified for the purposes of paragraph 6(j) shall be those set out in sub paragraphs (i) through (x) of paragraph 10(a) of this Agreement.

(l)    paragraph 10(a)(ii). Paragraph 10(a)(ii) shall apply.

(m)    paragraph 14. For the purposes of paragraph 14 of this Agreement -

    (i) Address for notices and other communications for Party A –

    (a) Address: **Lehman Brothers International (Europe) – Head Office**
            25 Bank Street, London E14 5LE

    Attention:
        For trading issues: Trading Manager, Central Funding Desk
    Telephone: 44 (20) 7260 2333
    e-mail: cfueurope@exeulon.lehman.com

        For confirmation issues: Trade Support / Operations
    Telephone: 44 (20) 7260 2344/2971
    Facsimile: 44 (20) 7260 3022/2518
    e-mail: fidfinancing@exeulon.lehman.com

        For margin issues: Global Margin Europe
    Telephone: 44 (20) 7011 7290
    Facsimile: 44 (20) 7260 1324
    e-mail: repofutmargin@exeulon.lehman.com

        For documentation issues: Transaction Management (London)
    Telephone: 44 (20) 7102 1730
    Facsimile: 44 (20) 7102 2044

e-mail: emanckte@lehman.com

(b) Address: **Lehman Brothers International (Europe) – Frankfurt Branch**
Gruneburgweg 18, D-60322 Frankfurt am Main, Germany

Attention:
For <u>trading</u> issues: Trading Manager, Central Funding Desk
Telephone: 44 (20) 7260 2333
e-mail: cfueurope@exeulon.lehman.com

For <u>confirmation</u> issues: Trade Support / Operations
Telephone: 44 (20) 7260 2344/2971
Facsimile: 44 (20) 7260 3022/2518
e-mail: fidfinancing@exeulon.lehman.com

For <u>margin</u> issues: Global Margin Europe (London)
Telephone: 44 (20) 7011 7290
Facsimile: 44 (20) 7260 1324
e-mail: repofutmargin@exeulon.lehman.com

For <u>documentation</u> issues: Transaction Management (London)
Telephone: 44 (20) 7102 1730
Facsimile: 44 (20) 7102 2044
e-mail: emanckte@lehman.com

(ii) Address for notices and other communications for Party B -

Address:        7, Val Ste-Croix, L-1371 Luxembourg
Attention:      Alexis Kamarowsky, Managing Director
Telephone:    +352 22 11 90
Facsimile:     +352 22 11 92
E-mail:          alexis.kamarowsky@interconsult.lu

(n)    paragraph 17. For the purposes of paragraph 17 of this Agreement -

(i)  Party A is not required to appoint an agent for service of process.

(ii) Party B appoints as its agent for service of process:
Not applicable.

2.    **The following supplemental terms and conditions shall apply -**

Existing Transactions

(a)    All Repurchase Transactions and Buy/Sell Back Transactions entered into by
the parties prior to the date of this Agreement which are outstanding at the
date of the Agreement, shall be deemed to be entered into pursuant to this
Agreement and shall be governed by the terms of this Agreement.

Forward Transactions

(b)    The parties agree that Forward Transactions (as defined in sub-paragraph
(i)(A) below) may be effected under this Agreement, and accordingly the
provisions of sub-paragraphs (i) to (iv) below shall apply.

October 2000                    - 31 -

(i) The following definitions shall apply -

(A) "Forward Transaction", a Transaction in respect of which the Purchase Date is at least three Business Day after the date on which the Transaction was entered into and has not yet occurred;

(B) "Forward Repricing Date", with respect to any Forward Transaction, the date which is such number of Business Days before the Purchase Date as is equal to the minimum period for the delivery of margin applicable under paragraph 4(g).

(ii) The Confirmation relating to any Forward Transaction may describe the Purchased Securities by reference to a type or class of Securities, which, without limitation, may be identified by issuer or class of issuers and a maturity or range of maturities. Where this paragraph applies, the parties shall agree the actual Purchased Securities not less than two Business Days before the Purchase Date and Buyer or Seller (or both), as shall have been agreed, shall promptly deliver to the other party a Confirmation which shall describe such Purchased Securities.

(iii) At any time between the Forward Repricing Date and the Purchase Date for any Forward Transaction the parties may agree either -

(A) to adjust the Purchase Price under that Forward Transaction; or

(B) to adjust the number of Purchased Securities to be sold by Seller to Buyer under that Forward Transaction.

(iv) Where the parties agree to an adjustment under paragraph (iii) above, Buyer or Seller (or both), as shall have been agreed, shall promptly deliver to the other party a Confirmation of the Forward Transaction, as adjusted under paragraph (iii) above.

(c) With respect to any Forward Transaction, paragraphs 2 and 4 of the Agreement are amended as follows.

(i) Paragraph 2(ww) is deleted and replaced by the following -

"(ww) Transaction Exposure means -

(i) with respect to any Forward Transaction at any time between the Forward Repricing Date and the Purchase Date, the difference between (A) the Market Value of the Purchased Securities at the relevant time and (B) the Purchase Price;

(ii) with respect to any Transaction at any time during the period (if any) from the Purchase Date to the date on which the Purchased Securities are delivered to Buyer or, if earlier, the date on which the Transaction is terminated under paragraph 10(g), the difference between (A) the Market Value of the Purchased Securities at the relevant time and (B) the Repurchase Price at the relevant time;

(iii) with respect to any Transaction at any time during the period from the Purchase Date (or, if later, the date on which the Purchased Securities

are delivered to Buyer or the Transaction is terminated under paragraph 10(g)) to the Repurchase Date (or, if later, the date on which Equivalent Securities are delivered to Seller or the Transaction is terminated under paragraph 10(h)), the difference between (A) the Repurchase Price at the relevant time multiplied by the applicable Margin Ratio (or, where the Transaction relates to Securities of more than one description to which different Margin Ratios apply, the amount produced by multiplying the Repurchase Price attributable to Equivalent Securities of each such description by the applicable Margin Ratio and aggregating the resulting amounts, the Repurchase Price being for this purpose attributed to Equivalent Securities of each such description in the same proportions as those in which the Purchase Price was apportioned among the Purchased Securities) and (B) the Market Value of Equivalent Securities at the relevant time.

In each case, if (A) is greater than (B), Buyer has a Transaction Exposure for that Transaction equal to the excess, and if (B) is greater than (A), Seller has a Transaction Exposure to Buyer equal to the excess."

(ii)    In paragraph 4(c) -

(A)    the words "any amount payable to the first party under paragraph 5 but unpaid" are deleted and replaced by "any amount which will become payable to the first party under paragraph 5 during the period after the time at which the calculation is made which is equal to the minimum period for the delivery of margin applicable under paragraph 4(g) or which is payable to the first party under paragraph 5 but unpaid"; and

(B)    the words "any amount payable to the other party under paragraph 5 but unpaid" are deleted and replaced by "any amount which will become payable to the other party under paragraph 5 during the period after the time at which the calculation is made which is equal to the minimum period for the delivery of margin applicable under paragraph 4(g) or which is payable to the other party under paragraph 5 but unpaid".

(d)    With respect to Income Payments, the following is inserted after the phrase 'to such a withholding or deduction' at the end of paragraph 5 of the Agreement:

", subject to the Seller (for the purposes of paragraph 5(i)), or the first party (for the purposes of paragraph 5(ii)), validly completing and delivering to the Buyer or the second party, as the case may be, the appropriate W-8 or W-9 form (and such other documentation as may reasonably be requested). In the event that the Seller or the first party, as the case may be, does not provide such forms and other relevant documentation, the Buyer or second party, as the case may be, may deduct such amounts as may be required by applicable law and shall not be required to pay to or to indemnify the Seller or first party, as the case may be, in respect of such amounts deducted."

(e)    With respect to Payment and Transfer, the following is inserted at the end of paragraph 6(b) of the Agreement:

"Such money payable and additional amounts will only be payable where the receiving party has validly completed and delivered to the paying party

the appropriate W-8 or W-9 form (and such other documentation as may reasonably be requested) as the case may be. In the event that the receiving party does not deliver to the paying party such forms and other documentation, the paying party may deduct such amounts as may be required by applicable law and shall not be required to pay to or to indemnify the receiving party in respect of such amounts deducted."

(f)     **Emerging Market Securities.** These terms and conditions apply only to Transactions in "emerging market securities" (as defined in sub-clause (iii) below):

    (i)     If any Securities have been suspended from their principal trading market or the Buyer is unable to obtain a Market Value for such Securities from a generally recognised source:

        (A)     for the purpose of paragraph 4, the Securities' value shall be nil;

        (B)     the Buyer shall deliver the Securities to the Seller upon delivery to the Buyer of sufficient New Purchased Securities and, if necessary, Equivalent Margin Securities or Cash Margin to satisfy the conditions of paragraph 4;

        (C)     in addition, the Buyer may, by written notice to the Seller, accelerate the relevant Repurchase Date to any Business Day that is not earlier than one Business Day after the effective date of the notice.

    (ii)     If, during the course of any Transaction in emerging market securities:

        (A)     there is a material adverse change in, or event which could have a material adverse effect on, the business or financial position of either party (that party being the affected party) which, in the commercially reasonable judgement of the other party, could impair the affected party's ability to perform its obligations under this Agreement or any such Transaction; or

        (B)     in the country of incorporation of either party or the country of incorporation of the issuer of the Securities:

            (1)     there is a force majeure event or act of state, including but not limited to any of the following, and such event prevents either party from delivering or receiving the relevant Securities:

               (aa)     a declaration of national emergency; or

               (bb)     a disaster or civil unrest that would constitute a national emergency; or

               (cc)     the imposition of martial law; or

(dd)   a declaration of war by or against that country; or

(ee)   a declaration of a general banking moratorium.

(2)   it is unlawful or impossible for either party to so make or receive a payment or delivery in connection with such Securities, or

(3)   an event occurs which, if the date of the occurrence were the Valuation, Settlement or Payment Date for the Transaction, would prevent valuation, settlement or payment in accordance with this Agreement or make valuations, settlement or payment unlawful or impossible;

(the party with respect to which or in respect of whose country of organisation the event occurs being the affected party or if the event occurs in the jurisdiction of the issuer of the Securities (and neither party is incorporated in the issuer's country), both parties being affected parties); or

(C)   the value of the Securities falls more than 25% below the total of Purchase Price plus accrued Price Differential (the Seller being the affected party); or

(D)   either party's ultimate parent company fails to maintain a rating of Baa3 or higher from Moody's Investor Services, Inc. and BBB- or higher from Standard & Poor's Corporation on its long-term, senior unsecured debt (that party being the affected party),

then a party may, by written notice to the affected party (or to the other party if both parties are the affected parties), accelerate the Repurchase Date to any Business Day that is not earlier than one Business Day after the date of the notice.

(iii)   "emerging market securities" shall mean all Securities not issued in:

Australia, Austria, Belgium, Canada, Denmark, Finland, France, Germany, Ireland, Italy, Japan, Luxembourg, Netherlands, New Zealand, Norway, Spain, Sweden, Switzerland, United Kingdom, United States of America or as otherwise agreed between the parties.

(g)   Party A may, from time to time, act through the agency of Lehman Brothers Inc., Lehman Brothers Asia Capital Co. or any other affiliate of Party A in respect of any Transaction, in which event:

(i)   any such Transaction shall be governed by the terms of this Agreement;

(ii)    Party A shall be bound as principal by the terms of any such Transaction;

(iii)    Party B shall be entitled to rely on statements, agreements and confirmations whether oral or written, by Lehman Brothers Inc., Lehman Brothers Asia Capital Co. or other affiliate of Party A or their authorised officers, and purporting to bind Party A hereunder, as if such statements, agreements and confirmations had been made directly by party A.

(h)    Notwithstanding anything to the contrary in this Agreement or in any of the Annexes hereto, "Securities" for the purposes of this Agreement may include U.S. Treasury instruments and other securities that are cleared primarily through a clearance facility in the United States (such Treasury instruments and other securities, collectively, "U.S. Securities"), in respect of which the following provisions shall apply:

(i)    paragraph 6(a) is amended by the addition of the words "or a Federal Reserve Bank" after the words "or Clearstream" in sub-paragraph (ii) thereof,

(ii)    paragraph 17 is amended by the addition of the following after the word "England" in the first line thereof:

", except that all terms and phrases which are used in this Agreement and which expressly refer to statutory provisions of the United States of America or any State thereof shall be governed by and construed in accordance with the federal laws of the United States of America and the laws of the State of New York without giving effect to the conflict of law principles thereof."

(iii)    The following additional provisions will apply to this Agreement:

**"Intent**

(1) The parties recognise that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended.

(2) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder, or to exercise any other remedies pursuant to Paragraph 10 hereof, is a contractual right to liquidate such Securities as described in Sections 555 and 559 of Title 11 of the United States Code, as amended."

(i)    (i)    This paragraph applies where a party to the Agreement is incorporated in Germany or has a branch located in Germany.

(ii)    In this paragraph – **"Insolvenzordnung"** means the Insolvency Act, which came into force in Germany on 1 January 1999.

"**Insolvenzverfahren**" means insolvency proceedings instituted under that Act and "**Insolvenzverwalter**" means as *Insolvenzverwalter* appointed under that Act.

(iii)   Without limiting any other provision of Paragraph 2(a) or Paragraph 10 of the Agreement, in the case of a party incorporated in Germany or has a branch located in Germany:

(aa)   the reference to an analogous officer in Paragraph 2(a)(iii) and (v) shall include *Insolvenzverwalter;*

(bb)   the reference to any analogous proceeding in Paragraph 2(a)(iv) shall include an *Insolvenzverfahren*; and

(cc)   an Event of Default shall for the purposes of Paragraph 10 of the Agreement occur immediately, and without the need for the service of a Default Notice, if an application is made for the institution of an *Insolvenzverfahren* **or if measures are taken pursuant to §§ 46 or 46a para.1 of the German Banking Act (Kreditwesengesetz)**

(j)   Without prejudice to the provisions of Clause 2(a) of the Agreement, the definition of "Act of Insolvency" should include, in relation to any party established in Luxembourg, whether with its principal office or through a branch:

(i)   the filing of a petition for "*sursis de paiement et gestion contrôlée*" proceedings, as defined in Article 60 of the Law dated 5 April, 1993 on the financial sector;

(ii)   the opening of "*sursis de paiement et gestion contrôlée*" proceedings, as provided for in Article 77 of the Law dated 30 March, 1988 on UCIs and Articles 55ff. of the Law dated 21 June, 1999 on pensions funds; and

(iii)   the petitions for the opening of "*gestion contrôlée et sursis de paiement*" proceedings as defined in the Grand-Ducal Decree dated 24 May, 1935 on suspension of payments and controlled management.

(k)   All Transactions under this Agreement can be terminated by either party on the giving of 5 Business Days notice.

(l)   It is the intent of both parties to this Agreement that all Transactions under it, qualify as a "Transfer of Securities" pursuant to Section 1058 of the United States Internal Revenue Code.

**ANNEX II**
**Form of Confirmation**

To:

From:

Date:

Subject:      [Repurchase][Buy/Sell Back]* Transaction
              (Reference Number:          )

Dear Sirs,

The purpose of this [letter / facsimile / telex], a "Confirmation"" for the purposes of the
Agreement, is to set forth the terms and conditions of the above repurchase transaction
entered into between us on the Contract Date referred to below.

This Confirmation supplements and forms part of, and is subject to, the Global Master
Repurchase Agreement as entered into between us as of [          ] as the same may
be amended from time to time (the "Agreement"). All provisions contained in the
Agreement govern this Confirmation except as expressly modified below. Words and
phrases defined in the Agreement and used in this Confirmation shall have the same
meaning herein as in the Agreement.

1.    Contract Date:

2.    Purchased Securities [state type[s] and nominal value[s]]:

3.    CUSIP, ISIN or other identifying number[s]:

4.    Buyer:

5.    Seller:

6.    Purchase Date:

7.    Purchase Price:

8.    Contractual Currency:

9.    Repurchase Date]:*

10.   Terminable on demand]:*

11.   Pricing Rate:

[12. Sell Back Price:]*

13.   Buyers Bank Account[s] Details:

14.   Sellers Bank Account[s] Details:

[15.   The Transaction is an Agency Transaction. [Name of Agent] is acting as agent for

[name or identifier of Principal]]:*

[16.    Additional Terms]:*

Yours faithfully,

* Delete as appropriate

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**GILTS ANNEX**

**Supplemental terms and conditions where repurchase transactions are to effected in
UK gilt-edged securities**

## 1. Interpretation

1.1  In this Part of this Annex -

(a)    the *Agreement* means the Agreement dated 16ᵗʰ Aug, 2004 substantially in the form of the TBMA/ISMA Global Master Repurchase Agreement (2000 Version) of which this Annex forms part;

(b)    **CREST** means the computer-based system and associated clerical procedures established by CRESTCo Limited to facilitate the transfer of gilt-edged securities and other uncertificated securities;

(c)    *CHAPS system* means the same day payment system operated by the CHAPS Clearing Company Limited;

(d)    *gilt-edged securities* means securities which are gilt-edged securities for the purposes of section 50 (7) of the Income and Corporation Taxes Act 1988.

1.2  Terms to which a defined meaning is given in the Agreement have the same meanings in this Annex.

## 2. Scope

2.1  The parties have agreed that the Transactions to which the Agreement applies may include Transactions in respect of gilt-edged securities.

2.2  The terms and conditions set out in this Annex apply to Transactions in respect of gilt-edged securities and, to the extent and in the circumstances provided in paragraph 3.3(c) below, Transactions wholly or partly in respect of such other securities as are referred to in that paragraph.

## 3. CREST

3.1  CREST shall be an agreed securities clearance system for the purposes of paragraph 6(a)(iii) of the Agreement.

3.2  Where under the rules and procedures of the CREST the delivery of any Securities from a securities account in the name of one party or its nominee or agent *(the transferor)* to a securities account in the name of the other party or its nominee or agent *(the transferee)* gives rise to an assured payment obligation by which the settlement bank acting for the transferee is obliged to make a payment to the settlement bank acting for the transferor, the creation of that assured payment obligation shall for the purposes of the Agreement and any

Transaction be treated as a payment from the transferee to the transferor of an amount equal to the amount of the assured payment obligation.

3.3(a)  Subject to and in accordance with the following provisions of the sub-paragraph, the parties may agree to enter into an overnight sale and repurchase transaction (a **DBV Transaction**) to be effected under the "delivery-by-value" facility of CREST.

(b)  The Confirmation relating to a DBV Transaction -

      (i)     shall specify the Transaction as a DBV Transaction;

      (ii)    shall not describe the Purchased Securities;

      (iii)   shall specify as the Purchase Price the consideration to be input in respect of the delivery of the Purchased Securities through CREST;

      (iv)   shall specify the pricing rate for that DBV Transaction.

(c)  The Purchased Securities under a DBV Transaction shall be such Securities (which may include Securities which are not gilt-edged securities) as shall be selected and delivered by CREST on the apportionment of securities to the relevant delivery in accordance with the rules and procedures of CREST.

(d)  The amount by which the Repurchase Price under a DBV Transaction exceeds the Purchase Price shall be paid by Seller to Buyer on the Repurchase Date on or as soon as practicable after the delivery of Equivalent Securities through CREST from a securities account of Buyer to a securities account of Seller.  Such payment shall be made through CREST or outside CREST in same day funds.

(e)  If on the Repurchase Date of a DBV Transaction Equivalent Securities are not delivered to Seller by reason of the fact that either party's membership of CREST has been terminated or suspended then, unless before the latest time for delivery of such Equivalent Securities under the rules and procedures of CREST an Event of Default has occurred under paragraph 10 of the Agreement in respect of either party, such non-delivery shall be deemed to constitute -

      (i)     where Buyer's membership of CREST has been terminated or suspended, a failure by Buyer to deliver Equivalent Securities on  the Repurchase Date.

      (ii)    where Seller's membership of CREST has been terminated or suspended, a failure by Seller to pay the Repurchase Price on the Repurchase Date.

(f)  If on the Repurchase Date of a DBV Transaction Equivalent Securities are not delivered to Seller by reason of the fact that there are insufficient Securities of the relevant description standing to the credit of Buyer's account to enable delivery of the Equivalent Securities or there is insufficient cash standing to the credit of Seller's account to enable payment of the Repurchase Price then, unless before the latest time for delivery of such Equivalent Securities under the rules and procedures of CREST an Event of Default has

occurred under paragraph 10 of the Agreement in respect of either party, such non-delivery shall be deemed to constitute --

    (i)    where there are insufficient Securities of the relevant description standing to the credit of Buyer's account to enable delivery of the Equivalent Securities, a failure by Buyer to deliver Equivalent Securities on the Repurchase Date;

    (ii)    where there is insufficient cash standing to the credit of Seller's account to enable payment of the Repurchase Price, a failure by Seller to pay Repurchase Price on the Repurchase Date.

(g)  If after an Event of Default has occurred under paragraph 10 of the Agreement Equivalent Securities to the Purchased Securities are delivered to a securities account of Seller against the creation of an assured payment obligation in accordance with the rules and procedures of CREST notwithstanding the termination of the relevant DBV Transaction, such delivery shall give rise to the following obligations, each of which shall be conditional on the simultaneous performance of the other --

    (i)    an obligation on Seller to deliver to Buyer on demand securities equivalent to the securities so delivered; and

    (ii)    an obligation on Buyer to pay to Seller on demand a sum equal to the assured payment obligation so created.

3.4(a)  The parties may agree to enter into a series of DBV Transactions to be confirmed by a single Confirmation, each such DBV Transaction being for the same Purchase Price and each such DBV Transaction other than the first commencing on the Repurchase Date of the previous Transaction.  Such a series DBV Transactions is in the paragraph referred to as -

    (i)    an *Open DBV Repo* if the Repurchase Date of the last Transaction in the series is not specified in the Confirmation but it is instead provided that, if either party gives to the other notice of not less than a stated period, the DBV Transaction which will be due for Termination on the date specified in the notice will be the last Transaction in the series and the series will be limited accordingly;

    (ii)    a *Term DBV Repo* if the date on which the last Transaction in the series is due for Termination is specified in the Confirmation.

(b)  Subject to the following provisions of this sub-paragraph, paragraph 3.3 above shall apply in respect of each DBV Transaction forming part of an Open DBV Repo or a Term DBV Repo.

(c)  It shall not be necessary for any Transaction forming part of an Open DBV Repo or a Term DBV Repo to be evidenced by a separate Confirmation and, subject to sub-paragraph 3.4(d) below, each such Transaction shall be deemed to be entered into on the Repurchase Date of the preceding such Transaction.

(d)  Notwithstanding the preceding provisions of this sub-paragraph, a transaction which would otherwise be deemed to be entered into on any day and would form part of an Open

DBV Repo or a Term DBV Repo shall be deemed not to be entered into if before the parties have taken the steps necessary to effect delivery of the Purchased Securities under that Transaction on that day in accordance with the rules and procedures of the CREST –

    (i)    an Event of Default has occurred in relation to either party; or

    (ii)    an earlier Transaction forming part of that Open DBV Repo or Term DBV Repo has been terminated under paragraph 10(g) or 10(h) of the Agreement.

(e)  In any case where sub-paragraph 3.4(d) above applies, no further Transaction forming part of the relevant Open DBV Repo or Term DBV Repo shall arise.

(f)  Subject to sub-paragraph 3.4(h) below, and save in so far as the Confirmation relating to an Open DBV Repo or Term DBV Repo may otherwise provide, that part (if any) of the Repurchase Price in respect of each Transaction in the relevant series (other than the last such Transaction) which exceeds the Purchase Price shall not be payable on the Repurchase Date, but shall instead be deferred until, and shall be payable on, the Repurchase Date of the last Transaction in the series.  Such payments shall be made through CREST or outside CREST in same day funds.

(g)  Any amount payable in respect of a Transaction forming part of an Open DBV Repo or Term DBV Repo payment of which has been deferred under sub-paragraph 3.4(f) above shall, until it is paid or the relevant Transaction is terminated under any provision of paragraph 10 of the Agreement, be treated for the purposes of paragraph 4(c) of the Agreement as if it were an amount payable under paragraph 5 of the Agreement.

(h)  If any Transaction forming part of an Open DBV Repo or Term DBV Repo is terminated under any provision of paragraph 10 of the Agreement, any amounts payable in respect of any earlier Transactions forming part of that Open DBV Repo or Term DBV Repo payment of which has been deferred under sub-paragraph 3.4(f) above shall become due and payable immediately.

### 4. Transactions in partly-paid Securities

4.1  This paragraph applies where –

    (a)    the Purchased Securities under a Transaction are Securities on which a call or instalment remains to be paid; and

    (b)    the due date for the payment of any such call or instalment occurs before the Termination of the Transaction.

4.2  Seller shall pay to Buyer, for value on or before the due date of the call or instalment, an amount equal to the call or instalment payable on that date in respect of Securities equivalent to the Purchased Securities.

4.3  No adjustment to the Repurchase Price shall be made in consequence of the call or instalment or of the payment made by Seller under paragraph 4.2 above.

4.4  On and from the due date for the payment of the call or instalment the expression "Equivalent Securities" shall with respect to that Transaction be taken to mean Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities but after payment of the call or instalment in question.

## 5. Exercise of rights of conversion

5.1   This paragraph applies where the Purchased Securities under a Transaction are Securities in respect of which a right of conversion (whether arising under the terms of issue of the Securities or under a conversion offer made after such issue) becomes exercisable before the Termination of the Transaction.

5.2  Seller may, not later than a reasonable period before the latest time for the exercise of the right of conversion, give to Buyer written notice to the effect that, on Termination of the Transaction, it wishes to receive Securities in such form as will arise if the right of conversion is exercised or, in the case of a right of conversion which may be exercised in more than one manner, is exercised in such manner as is specified in the notice.

5.3  With effect from the latest time for the exercise of the right of conversion the expression "Equivalent Securities" shall be taken to mean -

> (a)   if a notice has been given under paragraph 5.2 above not later than the time specified in that sub-paragraph, such amount of such Securities of such description as fall to be held by a holder of Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities if he has exercised the right of conversion in the manner specified in the notice;

> (b)   in any other case, such amount of Securities of such description as fall to be held by a holder of Securities of the same issuer, forming part of the same issue and being of an identical type, nominal value, description and amount as the Purchased Securities if he has not exercised the right of conversion.

## 6. Termination of on demand Transactions

6.1  Paragraph 3(e) of the Agreement shall not apply, but shall be replaced by the following -

> "(e)  In the case of on demand Transactions, demand for Termination shall be made by Buyer or Seller, by telephone or otherwise, and shall provide for Termination to occur as soon as reasonably practicable after such demand or on such date (being at least one Business Day after that on which the demand is made) as may be specified in the demand: provided that, unless otherwise agreed between the parties, a demand which is made before 10 a.m. on a Business Day may provide for Termination to occur not later than the close of business on that day."

## 7. Dividend entitlements: effect on margin provisions

7.1  This paragraph applies where -

(a)   the ex-dividend date for the payment of any dividend on any Purchased Securities occurs before the Termination of the relevant Transaction; or

(b)   the ex-dividend date for the payment of any dividend on any gilt-edged securities which have been delivered to a party as Margin Securities occurs before Equivalent Margin Securities have been delivered to the other party.

7.2  For the purposes of paragraph 4 of the Agreement -

(a)   where paragraph 7.1(a) above applies, from the period from the ex-dividend date until the Termination of the Transaction, Buyer shall be deemed to have received a payment of Cash Margin equal to the amount of the dividend payable on the Purchased Securities by reference to that ex-dividend date;

(b)   where paragraph 7.1(b) above applies, the party which has received those Margin Securities shall, from the period from the ex-dividend date until Equivalent Margin Securities are delivered to the other party, be deemed to have received a payment of Cash Margin equal to the amount of the dividend payable on those Margin Securities by reference to that ex-dividend date.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**EQUITIES ANNEX**

**Supplemental terms and conditions for transactions in equities**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated 16 August 2001 between **Lehman Brothers International (Europe)** and **Lehman Brothers (Luxembourg) SA** (the "Agreement").

**1.    Scope**

(a)    The parties have agreed that -

    (i)    the Transactions to which this Agreement applies may include Transactions in respect of which the Purchased Securities consist of or include equities; and

    (ii)    a transfer of Margin Securities may consist of or include equities,

and the terms and conditions of this Annex shall apply to such Transactions and transfers of Margin Securities.

(b)    In relation to Transactions and transfers of Margin Securities to which this Annex applies, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 3 to 5 of this Annex.

**2.    Interpretation**

(a)    In this Annex -

    (i)    "equities" and "equity securities" include shares or stock in the share capital of a corporation, whether ordinary shares or preference shares or other kinds of shares or stock;

    (ii)    "Equivalent Margin Securities" and "Equivalent Securities" mean, in relation to Margin Securities and Purchased Securities which are equity securities and which are partly paid, or have been converted, sub-divided, consolidated, redeemed, made the subject of a takeover, capitalisation issue, rights issue or event similar to any of the foregoing –

        (A)    in the case of conversion, sub-division or consolidation, securities equivalent to the securities into which the relevant Securities have been converted, sub-divided or consolidated; provided that, if appropriate, notice has been given in accordance with paragraph 4 (a) of this Annex;

        (B)    in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

        (C)    in the case of takeover, a sum of money or securities equivalent to the consideration or alternative consideration of which notice has been

given in accordance with paragraph 4(a) of this Annex;

(D)   in the case of a call on partly paid securities, securities equivalent to the paid-up securities; provided that, in the case of Equivalent Securities, Seller or, in the case of Equivalent Margin Securities, the party which transferred the relevant Margin Securities shall have paid to the other party a sum of money equal to the sum due in respect of the call;

(E)   in the case of a capitalisation issue, securities equivalent to the relevant Securities together with the securities allotted by way of bonus thereon;

(F)   in the case of a rights issue, securities equivalent to the relevant Securities together with the securities allotted thereon; provided that notice has been given to the other party in accordance with paragraph 4(a) of this Annex;

(G)   in the event that income in the form of securities, or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities is distributed, securities equivalent to the relevant Securities together with securities or a certificate or an entitlement equivalent to those allotted; provided that notice has been given in accordance with paragraph 4(a) of this Annex;

(H)   in the case of any event similar to any of the foregoing, securities equivalent to the relevant Securities together with or replaced by a sum of money or securities or other property equivalent to that received in respect of such Securities resulting from such event.

(b)   In the event of any conflict between the terms of this Annex and the Agreement the terms of this Annex shall prevail.

**3.   Income Payments**

(a)   Subject as otherwise provided in this Annex or as otherwise agreed between the parties, where the Income paid or distributed by the issuer of Purchased Securities or Margin Securities is not in the form of money but is in the form of other property, the obligation of a party under paragraph 5 of the Agreement to pay to the other party an amount equal to the amount paid by the issuer shall be construed as an obligation to transfer property equivalent to that distributed by the issuer.

(b)   The existing paragraph 5 of the Agreement shall be replaced by the following -

**"5.   Income Payments**

(a)   Unless otherwise agreed -

(i)   where the Term of a particular Transaction extends over an Income Payment Date in respect of any Securities subject to that Transaction which are not equities, Buyer shall on the date such Income is paid by the issuer transfer to or credit to the account of Seller an amount

equal to (and in the same currency as) the amount paid by the issuer;

(ii)    where Margin Securities which are not equities are transferred from one party ("the first party") to the other party ("the second party") and an Income Payment Date in respect of such Securities occurs before Equivalent Margin Securities are transferred by the second party to the first party, the second party shall on the date such Income is paid by the issuer transfer to or credit to the account of the first party an amount equal to (and in the same currency as) the amount paid by the issuer,

and for the avoidance of doubt references in this sub-paragraph to the amount of Income paid by the issuer of any Securities shall be to an amount paid without any withholding or deduction for or on account of taxes or duties notwithstanding that a payment of such Income made in certain circumstances may be subject to a withholding or deduction.

(b)    (i)    Unless otherwise agreed, where the Purchased Securities the subject of a Transaction consist of or include equities in respect of which an Income Payment Date would, but for this provision, occur during the Term of such Transaction, Seller shall seek to effect a substitution of such equities in accordance with paragraph 8(a) before the Notice Date referred to in sub-paragraph (b)(iii), but if such a substitution has not been effected by that date then Termination of such Transaction shall, provided that Seller has notified Buyer of such Termination in accordance with sub-paragraph (b)(iii), occur on, and, accordingly, the Repurchase Date of such Transaction shall fall on, the Business Day immediately preceding such Income Payment Date.

(ii)    Unless otherwise agreed and except to the extent that Equivalent Margin Securities in respect of the relevant Margin Securities have already been transferred, where one party (the "transferor") has transferred Margin Securities which are equities to the other (the "transferee") then, on the Business Day preceding the next Income Payment Date in respect of such Margin Securities, the transferee shall transfer to the transferor Equivalent Margin Securities in respect of such Margin Securities in exchange for new Margin Securities as if such transfers were made pursuant to a request under paragraph 8(d) to which the transferee had agreed; provided that (aa) the transferor has given notice to the transferee in accordance with sub-paragraph (b)(iii) of the application of this sub-paragraph (b)(ii) and (bb) the transferor has provided reasonable details to the transferee of the Margin Securities in question, the relevant Income Payment Date and the new Margin Securities to be exchanged for such Equivalent Margin Securities and the transferee has indicated to the transferor that such new Margin Securities are acceptable to it.

(iii)    Any notice given pursuant to sub-paragraphs (b)(i) or (b)(ii) above shall not be valid unless given so as to be effective, at the latest, one hour before the close of business on the last Business Day (the "**Notice Date**") on which the recipient would customarily be required to

initiate settlement of the securities to be transferred by it pursuant to such notice in order for settlement to take place on the Business Day immediately preceding the relevant Income Payment Date.

(iv)   Nothing in this sub-paragraph (b) shall prejudice any entitlement of either party to terminate a Transaction in any other manner permitted by the Agreement.

(c)   Unless otherwise agreed between the parties, where (notwithstanding, and without prejudice to, sub-paragraph (b) above) Equivalent Securities in respect of Purchased Securities which are equities or, as the case may be, Equivalent Margin Securities in respect of Margin Securities which are equities have not been transferred by Buyer to Seller or the transferee to the transferor prior to an Income Payment Date in respect of such Securities, sub-paragraph (a) above shall not apply in respect of such Securities, but instead Buyer shall or, as the case may be, the transferee shall, on the date Income is paid by the issuer of those Securities, transfer to or credit to the account of Seller or, as the case may be, the transferor -

(i)   an amount equal to (and in the same currency as) so much of such Income attributable to such Securities as is (if it is the holder of such Securities on such Income Payment Date) or would have been (if it had been the holder of such Securities on such Income Payment Date) paid in cash by the issuer to the holder; and

(ii)   an amount equal to such amount, if any, in respect of tax or tax benefit as Buyer or the transferee is (if it is the holder of such Securities on such Income Payment Date) or would have been (if it had been the holder of such Securities on such Income Payment Date) entitled to claim or recover in cash from the issuer's jurisdiction in respect of such Income payment;

provided that, unless otherwise agreed between the parties, if Buyer or, as the case may be, the transferee has failed to make reasonable efforts to transfer the relevant Equivalent Securities or Equivalent Margin Securities prior to such Income Payment Date in circumstances where the proviso to sub-paragraph (b)(i) above or, as the case may be, sub-paragraph (b)(ii) has been satisfied, then, instead of transferring or crediting the amount referred to in sub-paragraphs (i) and (ii) of this sub-paragraph (c), Buyer or, as the case may be, the transferee shall indemnify Seller or, as the case may be, the transferor in respect of any cost, loss (including for the avoidance of doubt the amount of Income that would have been paid to Seller or, as the case may be, the transferor if it had been the holder of such Securities on such Income Payment Date) or damage (excluding, for the avoidance of doubt, any consequential loss or damage) suffered by such person which it would not have suffered had the relevant Equivalent Securities or Equivalent Margin Securities been transferred prior to such Income Payment Date.

(d)   Where Buyer or, as the case may be, the transferee is required by law to

make any transfer or credit pursuant to sub-paragraph (c)(i) or (ii)[1] above subject to withholding or deduction of taxes or duties, and as a result would, but for this sub-paragraph, be required to pay additional amounts under paragraph 6(b) of the Agreement, unless otherwise agreed between the parties, it shall only be obliged to pay such additional amounts to the extent that it could, in the relevant circumstances, have avoided, satisfied or off-set the relevant obligation to withhold or deduct (or to account for the tax withheld or deducted) by utilising any available tax credit in respect of the relevant Securities (or transactions relating to them).".

4.    **Corporate actions and voting**

(a)    In relation to Purchased Securities or Margin Securities which are equities (and in respect of which Equivalent Securities or, as the case may be, Equivalent Margin Securities have not been transferred) Buyer, in the case of Purchased Securities, or the transferee, in the case of Margin Securities, shall notify the other party within a reasonable time after the date on which a holder of such Securities would in the normal course have received such notice from the issuer of any notice issued by the issuer of such Securities to the holders of such Securities relating to any proposed conversion, sub-division, consolidation, takeover, pre-emption, option or other similar right or event affecting such Securities or of any Income payment declared in respect of such Securities. Whether or not such notice is received from the first party, the other party may -

    (i)    where the relevant Securities are Purchased Securities, cause the Transaction to be terminated in accordance with paragraphs 3(d), (e) and (f) of the Agreement as if the Transaction were an on demand Transaction or, where the relevant Securities are Margin Securities, request that Equivalent Margin Securities be transferred in respect of such Securities to paragraph 8(d) of the Agreement; and/or (as appropriate);

    (ii)    within a reasonable time before the latest time for the exercise of the right or option give written notice to the first party that on redelivery of Equivalent Securities or Equivalent Margin Securities, as the case may be, it wishes to receive Equivalent Securities or Equivalent Margin Securities in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice; provided that if any sum is required to be paid by a holder of the securities to the issuer or any other person in order to exercise such rights, the other party shall pay to the first party an amount equal to such sum.

(b)    Where any voting rights fall to be exercised in relation to any Purchased Securities or Margin Securities which are equities and in respect of which Equivalent Securities or, as the case may be, Equivalent Margin Securities have not been transferred, neither Buyer, in the case of Purchased Securities, nor the transferee, in the case of Margin Securities, shall have any obligation to arrange for voting rights of that kind to be

---

[1] Note: this is intended to make clear that the disapplication of the gross-up provision does not apply where the buyer/transferee has failed to co-operate with the seller/transferor – in these circumstances there is no transfer under (c)(i) or (ii) and the indemnity in (c) applies.

exercised in accordance with the instructions of the other party in relation to such Purchased Securities or Margin Securities, unless otherwise agreed between the parties.

## 5.     Transfer

(a)     Seller shall promptly pay and account for any transfer or similar duties or taxes chargeable in connection with the transfer of Purchased Securities which are equities and any Equivalent Securities in respect thereof and shall reimburse to Buyer the amount of any liability incurred by it as a result of Seller's failure to do so.

(b)     Where Margin Securities which are equities are transferred by one party to the other, the transferor (the first party) shall promptly pay and account for any transfer or similar duties or taxes chargeable in connection with such transfer as well as in connection with any subsequent transfer by the transferee (the second party) of Equivalent Margin Securities in respect thereof to the first party and shall reimburse to the second party the amount of any liability incurred by the second party as a result of the first party's failure to do so.

(c)     In relation to Transactions to which this Annex applies and unless otherwise agreed, where any Purchased Securities, Equivalent Securities, Margin Securities or Equivalent Margin Securities are transferred through a settlement system which automatically generates a mandatory payment or delivery, or a mandatory obligation to pay or deliver, against the transfer of such Securities, then -

(i)     such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the extent that it is applied to discharge an obligation of the transferee to effect a payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a Margin Transfer made by the transferee; and

(ii)     unless the parties shall have agreed otherwise, the party receiving such Margin Transfer shall cause to be made to the other party for value the same day either, where such Margin Transfer is a payment, an irrevocable payment in the amount of such Margin Transfer or, where such Margin Transfer is a delivery, an irrevocable delivery of Securities (or other property, as the case may be) equivalent thereto.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**BUY/SELL BACK ANNEX**

**Supplemental terms and conditions for Buy/Sell Back Transactions**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated 16 August, 2004 between **Lehman Brothers International (Europe)** and **Lehman Brothers (Luxembourg) SA** (the "Agreement").

**1.    Scope**

(a)    The parties have agreed that the Transactions to which this Agreement applies may include Buy/Sell Transactions.

(b)    In relation to Buy/Sell Back Transactions, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 3 to 5 of this Annex.

**2.    Interpretation**

(a)    In this Annex -

(i)    "Accrued Interest", with respect to any Purchased Securities subject to a Buy/Sell Back Transaction, unpaid Income that has accrued during the period from (and including) the issue date or the last Income Payment Date (whichever is the later) in respect of such Purchased Securities to (but excluding) the date of calculation. For these purposes unpaid Income shall be deemed to accrue on a daily basis from (and including) the issue date or the last Income Payment Date (as the case may be) to (but excluding) the next Income Payment Date or the maturity date (whichever is the earlier);

(ii)    "Sell Back Differential", with respect to any Buy/Sell Back Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Buy/Sell Back Transaction (on a 360 day basis or 365 day basis in accordance with the applicable ISMA convention, unless otherwise agreed between the parties for the Transaction) to the sum of (a) the Purchase Price and (b) Accrued Interest paid on the Purchase Date for such Transaction for the actual number of days during the period commencing on (and including) the Purchase Date for such Buy/Sell Back Transaction and ending on (but excluding) the date of calculation;

(iii)    "Sell Back Price", with respect to any Buy/Sell Back Transaction, means -

(x)    in relation to the date originally specified by the parties as the Repurchase Date pursuant to paragraph 3(b)(iii) of the Agreement, the price agreed by the Parties in relation to that Buy/Sell Back Transaction, and

(y)    in any other case (including for the purposes of the application of paragraph 4 (margin maintenance) o paragraph 10 (Events of Default) of the Agreement), the product of the formula (P + AI +D) - (IR + C), where -

P   =   the Purchase Price

AI   =   the amount, equal to Accrued Interest at the Purchase Date, paid under paragraph 3(f) of this Annex

D   =   the Sell Back Differential

IR   =   the amount of any income in respect of the Purchased Securities payable by the issuer on or, in the case of registered Securities, by reference to, any date falling between the Purchase Date and the Repurchase Date

C   =   the aggregate amount obtained by daily application of the Pricing Rate for such Buy/Sell Back Transaction to any such Income from (and including) the date of payment by the issuer to (but excluding) the date of calculation

(b)     References to "Repurchase Price" throughout the Agreement shall be construed as references to "Repurchase Price or the Sell Back Price, as the case may be".

(c)     In Paragraph 10(c)(i) of the Agreement (relating to Events of Default), the reference to the "Repurchase Prices" shall be construed as a reference to "Repurchase Prices and Sell Back Prices".

(d)     In the event of any conflict between the terms of this Annex III and any other term of the Agreement, the terms in this Annex shall prevail.

**3.**    **Initiation; Confirmation; Termination**

(a)     Each Transaction shall be identified at the time it is entered into and in the Confirmation relating to it as either a Repurchase Transaction or a Buy/Sell Back Transaction.

(b)     In the case of a Buy/Sell Back Transaction the Confirmation delivered in accordance with paragraph 3 of the Agreement may consist of a single document in respect of both of the transactions which together form the Buy/Sell Back Transaction or separate Confirmations may be delivered in respect of each such transaction. Such Confirmations may be in the form of Annex 11 to the Agreement except that, subject to sub-paragraph (c) below, such Confirmations shall not include the item specified in paragraph 10 of Annex 11.

(c)     When entering into a Buy/Sell Back Transaction the parties shall also agree the Sell Back Price and the Pricing Rate to apply in relation to that Transaction on the scheduled Repurchase Date. The parties shall record the Pricing Rate in at least one Confirmation applicable to that Buy/Sell Back Transaction.

(d)     Buy/Sell Back Transactions shall not be terminable on demand.

(e)     In the case of a Buy/Sell Back Transaction, the Purchase Price shall be quoted exclusive of Accrued Interest to the Purchase Date on the Purchased Securities and the Sell Back Price shall be quoted exclusive of Accrued Interest.

(f)     For the purposes of paragraph 3(c) of the Agreement, in the case of a Buy/Sell Back Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the payment of the Purchase Price plus an amount equal to Accrued Interest to the Purchase Price on such Purchased Securities.

(g)     In the case of a Buy/Sell Back Transaction, paragraph 3(f) of the Agreement shall not apply. Termination of such a Transaction will be effected on the Repurchase Date by transfer to Seller or its agent of Equivalent Securities against the payment by Seller of (i) in a case where the Repurchase Date is the date originally scheduled by the parties pursuant to paragraph 3(b)(iii) of the Agreement, the Sell Back Price referred to in paragraph 2(iii)(x) of this Annex plus an amount equal to Accrued Interest to the Repurchase Date; and (ii) in any other case, the Sell Back Price referred to in paragraph 2(iii)(y) of this Annex.

## 4.   Margin maintenance: "repricing"

If the parties agree that a Buy/Sell Back Transaction is to be repriced in accordance with paragraph 4(i) of the Agreement, they shall at the time of such repricing agree the Purchase Price, the Sell Back Price and the Pricing Rate applicable to the Repriced Transaction.

## 5.   Income Payments

Paragraph 5 of the Agreement (relating to Income payments) shall not apply to Buy/Sell Back Transactions.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**AGENCY ANNEX**

**Supplemental terms and conditions for Agency Transactions**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated 16ᵗʰ Aug, 2004 between **Lehman Brothers International (Europe)** and **Lehman Brothers (Luxembourg) SA** (the "Agreement")

**1.    Scope and Interpretation**

(a)    The parties have agreed that the Transactions to which this Agreement applies may include Agency Transactions.

(b)    Subject to the following provisions of this Annex, either party may enter into Transactions as agent for a third person (a "Principal"), whether as custodian or investment manager or otherwise (a Transaction so entered into being an "Agency Transaction"). In this Annex the party entering into an Agency Transaction as agent is referred to as the "Agent" and the other party is referred to as the "other party".

(c)    In relation to Agency Transactions, the Agreement shall be construed as if it had been amended and supplemented as set out in paragraphs 2 to 5 of this Annex.

**2.    Initiation; Confirmation**

(a)    A party may enter into an Agency Transaction if, but only if -

   (i)    it specifies that Transaction as an Agency Transaction at the time when it enters into it and in the Confirmation;

   (ii)    it enters into that Transaction on behalf of a single Principal whose identity is disclosed to the other party (whether by name or by reference to a code or identifier which the parties have agreed will be used to refer to a specified Principal) at the time when it enters into the Transaction; and

   (iii)    it has at the time when the Transaction is entered into actual authority to enter into the Transaction on behalf of that Principal and to perform on behalf of that Principal all of that Principal's obligations under the Agreement.

(b)    A transaction shall not be entered into under the Agreement and this Annex if both parties specify that they propose to enter into that transaction as an agent.

**3.    Notification**

Each party undertakes that, if it enters as agent into an Agency Transaction, forthwith upon becoming aware -

   (i)    of any event which constitutes an Event of Default with respect to the relevant Principal; or

(ii)    of any breach of any of the warranties given in paragraph 5(c) below or of any event
or circumstance which has the result that any such warranty would be untrue if
repeated by reference to the current facts;

it will inform the other party of that fact and will, if so required by the other party, furnish the
other party with such additional information as the other party may reasonably request.

## 4.    Separate agreement

(a)    Each Agency Transaction shall be a transaction between the relevant Principal and
the other party and no person other than the relevant Principal and the other party
shall be a party to or have any rights or obligations under an Agency Transaction.
Without limiting the foregoing, the Agent shall not be liable as principal for the
performance of an Agency Transaction, but this is without prejudice to any liability of
the Agent under any other provision of this Annex.

(b)    All the provisions of the Agreement shall apply separately as between the other party
and each Principal for whom the Agent has entered into an Agency Transaction or
Agency Transactions as if each such Principal were a party to a separate agreement
with the other party in all respects identical with the Agreement as supplemented by
the provisions of this Annex other than this paragraph, but with the following
additions and modifications –

(i)    if there occurs in relation to the Agent an Event of Default or an event which
would constitute an  Event of Default if the other party served a Default Notice
or other written notice under any sub-paragraph of paragraph 10 of the
Agreement, the other party shall be entitled by giving written notice to the
Principal (which notice shall be validly given if given to the Agent in
accordance with paragraph 14 of the Agreement) to declare that by reason of
that event an Event of Default is to be treated as occurring in relation to the
Principal. If the other party gives such a notice then an Event of Default shall
be treated as occurring in relation to the Principal at the time when the notice
is deemed to be given in accordance with paragraph 14 of the Agreement;

(ii)    if the Principal is neither incorporated nor has established a place of business
in Great Britain, the Principal shall for the purposes of paragraph 17 of the
Agreement as so applicable be deemed to have appointed as its agent to
receive on its behalf service of process in the Courts of England the Agent, or
if the Agent is neither incorporated nor has established a place of business in
the United Kingdom, the person appointed by the Agent under paragraph 17
of the Agreement, or such other person as the Principal may from time to time
specify in a written notice given to  the other party.

(c)    The Agent shall do all such things and provide the other party with all such
information as may be necessary to identify any Transaction Exposure which may
arise in respect of any Principal.

(d)    The foregoing provisions do not affect the operation of the Agreement as between
the other party and the Agent in respect of any Transactions into which the Agent
may enter on its own account as a principal.

**5.    Representations and warranties**

(a)    Paragraph 9(b) of the Agreement shall be deleted and replaced by the following:

> "(b)    it will engage in this Agreement and the Transactions contemplated hereunder as principal or, subject to and in accordance with the terms of the Agency Annex hereto, as agent and the conditions referred to in the Agency Annex hereto will be fulfilled in respect of each Transaction into which it enters as an agent;".

(b)    At the beginning of the last sentence of paragraph 9 of the Agreement there shall be added the words "Subject to the Agency Annex hereto,".

(c)    Each party warrants to the other that it will, on every occasion on which it enters or purports to enter into a transaction as an Agency Transaction, be duly authorised to enter into that transaction on behalf of the person whom it specifies as the Principal in respect of that transaction and to perform on behalf of that person all the obligations of that person under the Agreement.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**ITALIAN ANNEX**

**Supplemental terms and conditions for transactions in
Italian Domestic Purchased Securities or Italian Bonds**

**1.     Scope**

In the event of Repurchase Transactions or Buy/Sell Back Transactions in Domestic Purchased Securities (as defined below) or in Italian Bonds (as defined below) whether or not such Italian Bonds fall within the definition of Domestic Purchased Securities, the following provisions shall apply and, where in conflict with any other term of the Agreement or of the Buy/Sell Back Annex, they shall prevail.

**2.     Interpretation**

(a)     The following definition shall be added to paragraph 2 of the Agreement-

"Domestic Purchased Securities" means Purchased Securities which are issued in Italy whether or not the issuer thereof is incorporated in Italy or has a presence in Italy.

(b)     The following definitions shall replace the corresponding definitions contained in paragraph 2 of the Buy/Sell Back Annex-

(i)     "Accrued Interest", with respect to any Domestic Purchased Securities unpaid Income that has accrued during the period from (and excluding) the issue date or the last Income Payment Date (whichever is the later) in respect of such Domestic Purchased Securities to (and including) the date of calculation.  For these purposes unpaid Income shall be deemed to accrue on a daily basis from (and excluding) the issue date or the last Income Payment Date (as the case may be) to (and including) the next Income Payment Date or the maturity date (whichever is the earlier).

(ii)     "Sell Back Differential", with respect to any Transaction in Domestic Purchased Securities as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction (on a 360 day basis unless otherwise agreed between the parties for the Transaction) to the sum of (a) the Purchase Price and (b) Accrued Interest paid on the Purchase Date for such Transaction for the actual number of days during the period commencing on (and excluding) the Purchase Date for such Transaction and ending on (and including), the date of calculation.

(c)     References to "Repurchase Price" and to "Sell Back Price" throughout this Annex shall be construed as references to "Repurchase Price or the Sell Back Price, as the case may be".

3.    **Settlement method**

The settlement method in relation to Transactions in Domestic Purchased Securities shall be "in the counter" (giornaliera titoli) unless the parties in the relevant Confirmation agree that such settlement method shall be "over the counter" (Conto Accentrato Titoli (CAT) copertura giornaliera) (such terms having the meanings specified in the relevant regulations issued by the Bank of Italy).

4.    **Late delivery**

(a)    In connection with a Transaction in Domestic Purchased Securities, if seller fails to deliver Domestic Purchased Securities to Buyer on the Purchase Date or Buyer fails to deliver Securities equivalent to Domestic Purchased Securities on the Repurchase Date and Buyer or, as the case may be, Seller (the "affected party") elects to terminate the Transaction in accordance with paragraph 10(g)(iii) or, as the case may be paragraph 10(h)(iii) of the Agreement, the parties agree that for the purposes of paragraph 10(c) –

      (i)    If the affected party has at any time in the period beginning on the date on which the failure occurred and ending at the Default Valuation Time, purchased, whether by way of a repurchase transaction, buy and sell back transaction or otherwise, Securities forming part of the same issue and being of an identical type and description as those Purchased Securities or Equivalent Securities, the affected party shall, to the extent that it does not fall within paragraph 10(e), treat the cost of such purchase (including all Transaction Costs) as the Default Market Value of those Securities;

      (ii)    in calculating the Default Market Value, Transaction Costs incurred in connection with a purchase of Securities under paragraph 10(e)(i)(A)(aa) or (bb) shall include-

            (aa) any costs imposed by the Bank of Italy as a result of the failure; and

            (bb) an amount equal to interest on the amount of any deposit which the affected party is required to make with the Bank of Italy at the greater of the Pricing Rate for the relevant Transaction and EURIBOR (on a 360 day basis unless otherwise agreed by the parties to the Transaction) which shall be payable by the other party to the affected party.

(b)    If buyer fails to deliver Equivalent Securities to Seller on the applicable Repurchase Date, Seller may by written notice to the other party, elect to adjust the Transaction in accordance with sub-paragraph (c) below.

(c)    The adjustment of a Transaction (the "Original Transaction") under this subparagraph shall be effected as follows. The Original Transaction shall be terminated on the Repurchase Date for the Original Transaction and the parties shall be deemed to enter into a new Transaction (the "Replacement Transaction") in accordance with the following provisions-

(i)   the Purchase Date under the Replacement Transaction shall be the Repurchase Date under the Original Transaction;

(ii)   the Purchased Securities under the Replacement Transaction shall be Securities equivalent to the Purchased Securities under the Original Transaction;

(iii)   the Purchase Price under the Replacement Transaction shall, unless otherwise agreed, be the Market Value of the Purchased Securities for that Transaction on the Purchase Date for the Replacement Transaction as determined by Seller;

(iv)   the Pricing Rate under the Replacement Transaction shall, unless otherwise agreed, be minus five per cent;

(v)   the Repurchase Date under the Replacement Transaction shall be the Business Day following the Purchase Date under the Replacement Transaction;

(vi)   the Margin Ratio and, subject as aforesaid, the other terms of the Replacement Transaction shall, unless otherwise agreed, be identical to those of the Original Transaction; and

(vii)   the obligations of the parties with respect to the delivery of the Purchased Securities and the payment of the Purchase Price under the Replacement Transaction shall be set off against their obligations with respect to the delivery of Equivalent Securities and payment of the Repurchase Price under the Original Transaction and accordingly only a net cash sum be paid by one party to the other.  If such net sum is payable by Seller to Buyer, that sum shall be payable on the Repurchase Date under the Replacement Transaction.

(d)   If the Repurchase Date for any Transaction Buyer delivers to Seller part only of the Equivalent Securities which it should have delivered (the "Delivered Securities" and the part of the Equivalent Securities which Buyer has failed to deliver being the "Undelivered Securities") Seller shall not be obliged to accept delivery of the Delivered Securities but instead may elect to terminate that Transaction in accordance with paragraph 10(h)(iii) of the Agreement, in which case sub-paragraph (a) above shall apply.  If Seller elects to accept delivery of the Delivered Securities, the Transaction shall be terminated and Buyer and Seller shall be deemed to enter into a new Transaction in respect of the Undelivered Securities in accordance with the provisions of sub-paragraph (e) below.

(e)   Where this paragraph applies, the Transaction (the "Terminated Transaction") shall be terminated.  Upon such termination, Buyer shall transfer to Seller or its agent the Delivered Securities against payment by Seller of the proportion of the Repurchase Price which corresponds to the Delivered Securities and the parties shall be deemed to enter into a new Transaction on the following terms-

(i)   the Purchase Date under the new Transaction shall be the Repurchase Date under the Terminated Transaction;

(ii)    the Purchased Securities under the new Transaction shall be Securities equivalent to the Undelivered Securities;

(iii)    the Purchase Price under the new Transaction shall be the Market Value of the Undelivered Securities at the Purchase Date under the new Transaction as determined by Seller;

(iv)    the Repurchase Date under the new Transaction shall be the Business Day following the Purchase Date under the new Transaction;

(v)    the Pricing Rate under the new Transaction shall, unless otherwise agreed, be minus five per cent;

(vi)    the Margin Ratio and, subject as aforesaid, the other terms of the New Transaction shall, unless otherwise agreed, be identical to those of the Terminated Transaction; and

(vii)    the obligations of the parties with respect to the delivery of the Undelivered Securities and the payment of that part of the Repurchase Price which corresponds to the Undelivered Securities under the Terminated Transaction shall be set off against their obligations with respect to the delivery of the Purchased Securities and the payment of the Purchase Price under the new Transaction and accordingly only a net cash sum shall be paid by Seller to Buyer. If such net sum is payable by Seller to Buyer, that sum shall be payable on the Repurchase Date under the new Transaction.

## 5.    Withholding tax

(a)    Transactions in Domestic Purchased Securities between an Italian resident and a counterparty which is not resident in Italy for Italian tax purposes (but excluding the foreign branches of entities incorporated in Italy) where the non-Italian party is Buyer, are subject to the then applicable withholding tax in accordance with the following formula which provides the adjustment of the originally agreed Pricing Rate (such adjustment expressed as a percentage, the "Pricing Rate Adjustment") in such a manner which reduces the Pricing Rate by a percentage equal to the relevant applicable withholding tax rate on any capital gains realised on the relevant Domestic Purchased Securities unless otherwise provided in any applicable tax treaty.

Pricing Rate Adjustment = (Pssnt − Pssnp) x Awtr x (360/gg) x (100/Pssnp)

| | | |
|---|---|---|
| Pssnt = | Prezzo supersecco netto a termine | Sell Back Price net of accrued interest and matured original issue discount |
| Pssnp = | Prezzo supersecco netto a pronti | Purchase price net of accrued interest and matured original issue discount |

| Awtr = | Tasso della ritenuta d'imposta applicabile | Applicable withholding tax rate |
|---|---|---|
| gg = | giorni di durata della Transaction | number of days in the Transaction (excluding the Purchase Date and including the Repurchase Date). |

To the extent that the withholding tax referred to above is applicable to Buyer and Seller is required to pay the amount of such withholding tax to the Italian tax authorities, Seller shall be entitled to deduct the amount of such tax from the Repurchase Price as adjusted in accordance with the Pricing Rate Adjustment or, within ten days of the demand of Seller to make the relevant payment, Buyer shall reimburse Seller in respect of the amount required to be paid by it. Seller shall, upon demand by Buyer, provide Buyer with appropriate evidence of the amount of tax deducted and paid to the Italian tax authorities as Buyer may reasonably require to obtain any tax relief under any applicable tax treaty or to obtain any tax credit in respect of its income in the country in which it is resident or out of which it is acting.

(b)     Should Buyer be-

    (i)     resident in a country with which Italy has entered into a double tax treaty which recognises the Italian tax authorities' right to exchange information with the tax authorities of such country; or

    (ii)     a supranational entity

no withholding tax shall apply pursuant to Article 26bis of Presidential Decree no.600 of 29th September, 1973.

**6.     Construction of Buy/Sell Back Annex**

The provisions of the Buy/Sell Back Annex shall apply to Buy/Sell Back Transactions in Domestic Purchased Securities as if –

    (a)     references to Buy/Sell Back Transactions shall be construed as references to Buy/Sell Back Transactions in Domestic Purchased Securities; and

    (b)     references to Purchased Securities shall be construed as references to Domestic Purchased Securities.

**7.     Income**

(a)     Unless otherwise agreed –

    (i)     paragraph 5 of the Agreement shall apply without modification in respect of any payment of Income in respect of Italian Bonds which could be received without a withholding or deduction on account of Italian tax being made at

source by an owner of such Italian Bonds which is a body corporate resident in Italy or in one of the jurisdictions listed in Decree of the Minister of Finance of the Republic of Italy dated 4th September, 1996 issued pursuant to Legislative Decree no. 239 of 1st April, 1996 having an appropriate double tax treaty with Italy (whether or not either of the parties is such a body corporate);

(ii)    paragraph 5 of the Agreement shall be modified, in its application to any payment of Income in respect of Italian Bonds other than such a payment falling within sub-paragraph (i) above, by deducting from the amount required to be transferred or credited under that paragraph an amount equal to any amount which would, on the assumption that Buyer owned the Italian Bonds at the relevant Income Payment Date, be withheld or deducted at source on account of Italian tax;

(iii)    in relation to Buy/Sell Back Transactions in Italian Bonds, the amount "IR" in the formula for computing the Sell Back Price pursuant to paragraph 2(iii)(y) of the Buy/Sell Annex shall be calculated on the same basis as the amount required to be transferred or credited pursuant to paragraph 5 is calculated in accordance with sub-paragraphs (i) and (ii) above;

(iv)    without prejudice to the provisions set out in the final sentence of sub-paragraph 5(a) above, neither party shall be obliged to deliver or transfer to the other, or to account to the other for, any tax credits or refunds to which it may become entitled in respect of Income on Italian Bonds; and

(v)    paragraph 11 of the Agreement (Tax Event) shall not apply to any Transaction by virtue of any Italian Bonds ceasing to be Securities in respect of which a deduction or withholding on account of Italian tax is required to be made in respect of a payment of Income to such an owner as is referred to in sub-paragraph (i) above.

(b)    For the purposes of this paragraph "Italian Bonds" means any Securities which are issued by the Italian government or local authorities (or the Securities which for Italian tax purposes are treated likewise) or by other entities and to which the provisions of Legislative Decree no. 239 of 1st April, 1996, as amended, granting a special tax treatment will apply.

**TBMA/ISMA GLOBAL MASTER REPURCHASE AGREEMENT (2000 VERSION)**

**JAPANESE SECURITIES ANNEX**

**Supplemental terms and conditions for Transactions in Japanese Securities**

This Annex constitutes an Annex to the TBMA/ISMA Global Master Repurchase Agreement dated 16ᵗʰ August , 2004    between **Lehman Brothers International (Europe)** and **Lehman Brothers (Luxembourg) SA** (the "Agreement").

**1.      Scope**

Paragraphs 2 and 3 of this Annex apply to all Transactions involving Securities issued in Japan ("*Japanese Securities*"), but not to other Transactions in other Securities.  Paragraphs 2 and 4 of this Annex apply where (a) one of the parties is, and the other party is not, resident in Japan for tax purposes and (b) where the parties have agreed that the Purchased Securities for Transactions will comprise or include Exempt Securities.  For the purpose of this Annex "Exempt Securities" means Securities which are specified in the Tax Special Measurement Law (sozei tokubetsu sochi hou) and the Cabinet Order of the Tax Special Measurement Law for the purpose of the exemption from the withholding of the interests received from certain Japanese financial institutions as specified in the Tax Special Measurement Law, with respect to the transactions of sale and repurchase of, or those of the sale and purchase with buy/sell back conditions of, the certain securities; provided that such transactions meet the requirements as provided in the relevant laws and regulations.

**2.      Interpretation**

(a)      Paragraph references are to paragraphs in the Agreement unless otherwise set out herein.

(b)      In the event of any conflict in the terms and conditions of this Annex and any other term of the Agreement or any Annex to the Agreement, the terms in this Annex shall prevail.

**3.      Amendments to Agreement**

(a)      In respect of Japanese Securities, paragraph 2(t) is amended by deleting the word "and" after the phrase "(ii) part of the same issue;" in line 2 and inserting the following phrase immediately after the word "amount" in line 3:

"; and (iv) of the same treatment relating to the withholding or deduction of taxes or duties"

(b)      In respect of Japanese Securities, the following phrase is inserted at the end of paragraph 2(aa) after "such Margin Transfer" in line 2:

"but excluding Net Paying Securities issued in Japan".

(c)      For the avoidance of doubt, "Net Paying Securities" defined in paragraph 2(ff) includes Japanese Securities in respect of which a transferee would, on the Income Payment Date following a transfer to it, be subject to a withholding on account of income tax on all or part of the Income that has accrued during the calculation period ending on that

Income Payment Date due to any facts or circumstances existing prior to the transfer to the transferee.

(d)      Paragraph 6(a) is amended as follows:

Unless otherwise agreed, all money paid hereunder (i) shall be settled through the Bank of Japan Financial Network System ("BOJ Net"), or (ii) shall be immediately available, freely convertible funds of the relevant currency. All securities to be transferred hereunder (i) shall be transferred through the BOJ Net, or (ii) shall be in suitable form for transfer and shall be accompanied by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonably request, or (iii) shall be transferred through the book entry system of Euroclear or Clearstream, or (iv) shall be transferred through  any other agreed securities clearance system, or (v) shall be transferred by any other method mutually acceptable to Seller and Buyer.

(e)      Paragraph 6(h) shall not apply with respect to payments in connection with the transfer of Japanese Securities.

(f)      Paragraph 6(i) shall not apply with respect to the transfer of Japanese Securities.

## 4.    Act of Insolvency

(a)      Notwithstanding paragraph 2(a)(iv), an "Act of Insolvency" shall occur with respect to any party hereto immediately upon the filing of a petition in respect of it (including by the counterparty to the Agreement in respect of any obligation under the Agreement) with any court in Japan for the bankruptcy (*hasan*), corporate reorganisation (*kaisha kosei*) or civil rehabilitation (*minji saisei*) of such party, regardless of the "not having been stayed or dismissed within 30 days of its filing" provision.

(b)      Notwithstanding paragraph 10(a)(vi), the occurrence with respect to Seller or Buyer of an Act of Insolvency identified in the preceding paragraph 4(a) of this Annex shall constitute an Event of Default without the service of a Default Notice on the Defaulting Party; provided, however, that any party hereto who has become aware of such an Act of Insolvency shall immediately notify the other party of such occurrence.

Except as amended herein, the Agreement shall continue to have full force and effect in all respects.

## **Exhibit 5**

LB Lux Guarantee

28/03/'04 19:00 FAX 020 7102 4034    LEHMAN BROTHERS    ☒019/021

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    Lehman Brothers (Luxembourg) S.A.

We do hereby absolutely, irrevocably and unconditionally guarantee to pay on your behalf all obligations, whether as borrower or lender, under any stock lending or stock repurchase agreement (the "Obligations"). We guarantee the prompt payment of the Obligations by you, your successors, endorsees or assigns, now existing, or which hereafter may be contracted or existing, as the same shall respectively become due, together with accrued interest and charges, and we agree to reimburse each respective creditor of the Obligations, its successors, endorsees and assigns, for all expenses, including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment hereunder.

At your request, we will provide an original of this Guarantee to each creditor of your Obligations as requested of us by you in writing.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration. We shall have no right of subrogation with respect to any payments we make under this Guarantee until all Obligations are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and the beneficiaries of this Guarantee may exercise their rights hereunder without first having to take any action against you or any other guarantor. We agree that in the event the Obligations which are guaranteed hereunder are paid, our liability as guarantor shall continue and remain in full force and effect in the event that all or part of such payment is recovered from you as a preference or fraudulent transfer under the U. S. Federal Bankruptcy Code, or any similar applicable state or foreign law.

We hereby waive diligence, presentment, protest and demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

This Guarantee shall remain in full force and effect until the first to occur of (a) a notice by us to you that we are terminating this Guarantee or (b) the Obligations are no longer in existence. Termination of this Guarantee shall not affect our liability hereunder as to the Obligations incurred or arising out of transactions entered into prior to the termination hereof.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

**IN WITNESS WHEREOF,** I have set my hand and seal on August 24, 2000.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: O. Budor

Title: V.P.

SEAL

2.

## **Exhibit 6**

Bankhaus Guarantee

**Anlage 1**

29. SEP. 2008 23:00    LEHMAN BROTHERS +49 69 153076499    NR. 907    S. 7



E-2279-211102-LC

## GUARANTEE

THIS GUARANTEE is dated as of November 21, 2002 and is by Lehman Brothers Holdings Inc., a Delaware corporation (the "Guarantor") in favor of Lehman Brothers Bankhaus A.G., a company incorporated under the laws of the Federal Republic of Germany ("LBB" which expression shall include its successors and assigns) and any Counterparty (as defined below).

The Guarantor desires to unconditionally guarantee LBB's obligations to Counterparties (the "Obligations") as set forth in this Guarantee.

Accordingly, in consideration of the benefits accruing to the Guarantor from LBB's becoming obligated to Counterparties, the mutual promises contained in this Guarantee and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor and LBB hereby agree as follows:

1.  **Definitions.**

    The following terms shall have the following meanings:

    "Counterparty" means any Person that is entitled to payment by LBB.

    "Person" means any individual, partnership, limited liability company, corporation, trust, joint stock company, unincorporated organization, joint venture, association, company, business trust or other entity or any government or agency, instrumentality or political subdivision of a government.

2.  **Representation and Warranties.**

    The Guarantor represents and warrants that this Guarantee has been duly authorized, executed and delivered by the Guarantor and that this Guarantee constitutes a valid and legally binding obligation of the Guarantor enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights affecting the Guarantor and to general equity principles.

3.  **Payment Obligations.**

    If LBB fails to make any payment to a Counterparty, the Guarantor will following the request of the Counterparty promptly pay directly to the Counterparty the amount of funds that LBB was required to pay and did not pay the Counterparty under the Obligation. Any payment by the Guarantor to the Counterparty shall discharge and satisfy, by a like amount, any obligation of LBB to the Counterparty. Each of the Guarantor and LBB acknowledges and agrees that each Counterparty is an express third-party beneficiary of this Guarantee. No

Page 1 of 5

20 SEP. 2008 23:00    LEHMAN BROTHERS -49 69 153376499    NR. 907    S. 8

other persons or entities, other than the parties hereto and Counterparties, shall
have any rights, directly or indirectly, under or pursuant to this Guarantee.

4.    **Waiver of Subrogation.**

The Guarantor waives any and all rights that the Guarantee may have with respect
to LBB as a result of making any payment under this Guarantee, including,
without limitation, any right of subrogation, set off or counterclaim. The
Guarantor understands and agrees that LBB shall have no obligations to it as a
result of any payment made under this Guarantee.

5.    **Nature of Obligations, Non Performance; Waivers.**

The obligations of the Guarantor under Section 3 of this Guarantee are continuing
and irrevocable and the Guarantor waives all other defenses to payment
hereunder. Without limiting the foregoing, the failure by LBB to perform its
obligations under any agreement or instrument under which it is a party or by
which it is bound or the bankruptcy of LBB shall not affect the Guarantor's
obligations under this Guarantee. The Guarantor waives any failure or delay on
the part of the Counterparty in asserting or enforcing any of its rights or making
any claims or demands under this Guarantee. The Guarantor acknowledges and
agrees that this Guarantee is one of payment and not of collection.

6.    **Rank of Obligations.**

The Guarantor warrants and agrees that the payment obligations of the Guarantor
that may arise under Section 3 of this Guarantee constitute irrevocable,
unconditional, unsecured and unsubordinated obligations of the Guarantor and
rank pari passu with all other unsecured and unsubordinated obligations of the
Guarantor.

7.    **Reinstatement.**

If any payment by LBB that would be an Obligation of the Guarantor if not for
such payment by LBB is voided (an "Avoidance Event") under any bankruptcy or
other insolvency-related law of any jurisdiction to which LBB may be or become
subject, and, as a result of such Avoidance Event, the applicable Counterparty (or
any assignee(s) or successor(s) in interest thereof) is required to return such
voided payment, or any portion of such voided payment (an "Avoided Payment"),
the Guarantor will pay the amount of the Avoided Payment out of funds of the
Guarantor within three business days of receipt by the Guarantor of a certified
copy of a final non-appealable order of a court or other governmental body having
jurisdiction, or such other written evidence as shall be reasonably acceptable to
the Guarantor, with respect to such Avoided Payment (specifying the amount and
required manner of repayment thereof), either (i) directly to such court or other
governmental body having jurisdiction or (ii) upon presentation of evidence

reasonably satisfactory to the Guarantor that the applicable Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof) has repaid such amount in satisfaction of the legal requirements relating thereto, to such Counterparty (or, if applicable, any assignee(s) or successor(s) in interest thereof). This Guarantee, and the obligations of the Guarantor hereunder, shall be deemed reinstated if and to the extent required to give effect to the obligation of the Guarantor to pay any Avoided Payment in accordance with the preceding sentence.

8.    Termination; Amendment.

This Guarantee may be amended or terminated at any time by written amendment or agreement signed by all parties executing this Guarantee provided, however, that no such amendment may adversely affect the rights, whether absolute or contingent, of any Counterparty that shall have accrued or which may accrue under any agreement or instrument, other than any rights with respect to any Obligation agreed to after the date that Counterparty has received notice of such amendment; and provided further that no such termination shall be effective with respect to any agreement or instrument agreed to prior to Counterparty's receipt of notice of such termination until such time as all such Obligations theretofore agreed to or incurred by LBB shall either no longer be outstanding or be satisfied in full.

9.    Notices.

All notices or demands on the Guarantor shall be deemed effective when received, shall be in writing and shall be delivered by hand or by registered mail, or by facsimile transmission promptly confirmed by registered mail, addressed to the Guarantor at:

If to the Guarantor:    Lehman Brothers Holdings Inc.
                        745 Seventh Avenue
                        New York, NY 10019
                        Attention:    Corporate Counsel
                        Telephone:    (212) 526-0858
                        Facsimile:    (212) 520-0176

If to LBB:              Lehman Brothers Bankhaus A.G.
                        Rathenauplatz 1
                        D-60313, Frankfurt Am Main, Germany
                        Attention:    Legal Counsel
                        Telephone:    +49-69-15307-6401
                        Facsimile:    +49-69-15307-6499

Page 3 of 5

20. SEP. 2009 23:00    LEHMAN BROTHERS +49 69 153076499              NR. 987   S. 13

Any such notice or demand shall be deemed to have been received:

(a)   if sent by telefax, with a confirmed receipt of transmission from the receiving machine, on the day on which transmitted; and

(b)   in the case of a written notice given by hand or by courier, on the day of actual delivery.

10.   **Assignment; Successors.**

Neither this Guarantee nor any rights or obligations hereunder may be assigned, transferred or delegated to any other Person or entity, and any such assignment, transfer or delegation shall be null and void, provided however that any Counterparty may assign their rights and interest and obligations hereunder to an assignee or transferee to which they have transferred their interest and obligations under any agreement or instrument in which the Counterparty and Guarantor are parties pursuant to the provisions thereof. This Guarantee shall be binding upon the Guarantor and upon its successors.

11.   **Withholding Taxes.**

Any payments to a Counterparty under this Guarantee shall be free of all withholding, stamp and other taxes and other governmental charges of any nature whatsoever. If any withholding is required, the Guarantor will pay the same to the appropriate governmental body and pay such additional amount to the Counterparty which, after deduction of any withholding, stamp or other taxes or other governmental charge of any nature whatsoever imposed with respect to the payment of such additional amount, shall result in the Counterparty receiving an amount equal to the amount that otherwise would have been payable had there been no such withholding.

12.   **Governing Law.**

(a)   This Guarantee shall be governed and construed in accordance with the substantive law of the State of New York, without regard to conflicts of law principles.

(b)   The Guarantor irrevocably submits to the non-exclusive jurisdiction of the courts of New York City.

(c)   LBB irrevocably appoints LBHI in relation to proceedings in State of New York as its agent to receive service of any legal processes on its behalf in connection with this Guarantee without excluding any other means of service permitted by the law of the relevant jurisdiction.

20. SEP. 2008 23:00    LEHMAN BROT-ERS +49 69 (53076499    NR. 907    S. 11

IN WITNESS WHEREOF, this Guarantee has been duly executed as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:  Oliver Budde
Title:  Vice President

LEHMAN BROTHERS BANKHAUS A.G.

By: _____
Name:  Helmut Olivier                    Frank Oliver Zeitz
Title:  Member of the Managing Board     Prokurist

Page 5 of 5

# **Exhibit 7**

2008 Base Prospectus

BASE PROSPECTUS

# LEHMAN BROTHERS HOLDINGS INC.
(INCORPORATED IN THE STATE OF DELAWARE)

# LEHMAN BROTHERS TREASURY CO. B.V.
(INCORPORATED WITH LIMITED LIABILITY IN THE NETHERLANDS
AND HAVING ITS STATUTORY DOMICILE IN AMSTERDAM)

# LEHMAN BROTHERS BANKHAUS AG
(INCORPORATED IN THE FEDERAL REPUBLIC OF GERMANY)

## U.S.$100,000,000,000
# EURO MEDIUM-TERM NOTE PROGRAM
UNCONDITIONALLY AND IRREVOCABLY GUARANTEED
AS TO NOTES TO BE ISSUED BY EACH OF LEHMAN BROTHERS TREASURY CO. B.V.
AND LEHMAN BROTHERS BANKHAUS AG BY

# LEHMAN BROTHERS HOLDINGS INC.

---

Lehman Brothers Holdings Inc. (including when acting through its London Branch, "*LBHI*"), Lehman Brothers Treasury Co. B.V. ("*LBTCBV*") and Lehman Brothers Bankhaus AG (including when acting through its London Branch, "*LBB*") (each an "*Issuer*" and collectively, the "*Issuers*") have established a program (the "*Program*") under which they may from time to time issue medium-term notes (the "*Notes*") in series (each a "*Series*" or the "*Notes of a Series*") with each Series comprising one or more tranches (each a "*Tranche*") of Notes, outside the United States with maturities of one month or more from the date of issue and denominated in U.S. dollars or, subject to certain conditions and as provided in "*Form of the Notes*" and "*Terms and Conditions of the Notes*" herein, in other currencies or composite currencies. Each Note issued by LBTCBV or LBB will have the benefit of an unconditional and irrevocable guarantee (the "*Guarantees*") of LBHI, as guarantor thereunder (in such capacity, the "*Guarantor*"), as to all amounts of principal and premium and interest, if any, thereof and thereon due. The maximum principal amount of Notes outstanding under the Program may not at any time exceed U.S.$100,000,000,000, of which the maximum principal amount of Notes outstanding issued by LBB may not at any time exceed U.S.$2,000,000,000 (or, in each case, the equivalent in other currencies or composite currencies calculated as described herein); provided that the Issuers reserve the right to increase such amount from time to time.

The Notes, which may be issued at their principal amount or at a premium or discount to their principal amount, may bear interest on a fixed or floating rate basis or equity linked interest and/or interest linked to the performance of one or more reference entities or other basis or combination thereof or be issued on a fully discounted basis and not bear interest.

Notes of a Series may be issued on an unsubordinated basis or a subordinated basis in either bearer or registered form. Notes in bearer form will initially be represented by a temporary global Note. Each temporary global Note which is intended to be issued in new global note form (a "*New Global Note*" or "*NGN*") will be deposited on or around the issue date thereof with a common safekeeper for Euroclear Bank SA/NV ("*Euroclear*") and Clearstream Banking, société anonyme, Luxembourg ("*Clearstream, Luxembourg*"). Each temporary global Note which is not intended to be issued in new global note form (a "*Classic Global Note*" or "*CGN*") will be deposited on or about the issue date thereof with a common depositary for Euroclear and Clearstream, Luxembourg. Notes in bearer form will not be exchangeable for Notes in registered form. Notes in registered form may initially be issued in definitive or global form and, in the latter case, the global Note will be deposited on or about the issue date thereof with either a common depositary for Euroclear and Clearstream, Luxembourg or a custodian for The Depositary Trust Company ("*DTC*"). Notes, in registered form will not be exchangeable for Notes in bearer form. See "*Form of the Notes*" and "*Terms and Conditions of the Notes*" herein.

Application has been made to the Irish Financial Services Regulatory Authority (the "*IFSRA*"), which is the Irish competent authority for the purpose of Directive 2003/71/EC (the "*Prospectus Directive*") for approval of this Base Prospectus (the "*Base Prospectus*") as a base prospectus issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "*Prospectus Regulations*") for the purpose of giving information with regard to the issue of Notes under the Program during the period of twelve months after the date hereof. Application will be made for Notes issued under the Program to be admitted to the Official List of the Irish Stock Exchange and to trading on its regulated market and on the Alternative Securities Market of the Irish Stock Exchange. Such approval relates only to the Notes which are to be admitted to trading on the EU Regulated Market of the Irish Stock Exchange or other regulated markets for the purposes of Directive 2004/39/EC or which are to be offered to the public in any Member State of the European Economic Area. Application has also been made to the Singapore Exchange Securities Trading Limited (the "*Singapore Stock Exchange*") for approval in respect of the listing and quotation on the Official List of the Singapore Stock Exchange of any Notes issued under the Program which are agreed at the time of the issue to be so listed on the Singapore Stock Exchange during the period of 12 months after the date of this Base Prospectus. The Singapore Stock Exchange assumes no responsibility for the correctness of any statements made or opinions or reports contained in this Base Prospectus. Admission of the Notes to the Official List of the Singapore Stock Exchange and quotation of the Notes on the Singapore Stock Exchange is not to be taken as an indication of the merits of the Issuers or the Guarantor, or the Notes.

Notes to be issued pursuant to the Program will have the minimum denomination specified in the relevant Final Terms or Drawdown Prospectus (each term as defined below), subject to compliance with all applicable legal and/or regulatory and/or central bank requirements.

The Program provides that Notes may also be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or that they will be admitted to listing, trading and/or quotation by any other competent authority, stock exchange and/or quotation system as may be agreed between the relevant Issuer and the relevant Dealer(s). In particular, Notes denominated in Australian dollars and issued in the domestic Australian capital markets ("*Australian Domestic Notes*") by LBTCBV or LBHI may be listed on the Australian stock exchange operated by ASX Limited (the "*Australian Stock Exchange*").

Neither the Notes nor the Guarantees have been, or will be, registered under the United States Securities Act of 1933, as amended (the "*Securities Act*"), and may include Notes in bearer form that are subject to United States tax law requirements. Neither the Notes nor the Guarantees may be offered, sold or delivered within the United States or to U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. The Issuers may offer and sell certain Series of Notes within the United States to persons reasonably believed by such Issuers to be qualified institutional buyers (each, a "*QIB*") within the meaning of Rule 144A under the Securities Act ("*Rule 144A*") in reliance on the exemption provided by Rule 144A.

---

Arranger and Dealer

# LEHMAN BROTHERS

The date of this Base Prospectus is July 24, 2008.

This Base Prospectus replaces the Base Prospectus dated July 24, 2007.

**Risks relating to LBHI as Issuer and Guarantor**

*Market Risk*

As a global investment bank, risk is an inherent part of the Group's business. The Group's businesses are materially affected by conditions in the financial markets and economic conditions generally around the world. A favourable business environment is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. Slowing growth, contraction of credit, increasing energy prices, declines in business or investor confidence or risk tolerance, increases in inflation, higher unemployment, outbreaks of hostilities or other geopolitical instability, corporate, political or other scandals that reduce investor confidence in capital markets and natural disasters, among other things, can affect the global financial markets. In addition, economic or political pressures in a country or region may cause local market disruptions and currency devaluations, which may also affect markets generally. In the event of changes in market conditions, such as interest or foreign exchange rates, equity, fixed income, commodity or real estate valuations, liquidity, availability of credit or volatility, the Group's businesses could be adversely affected in many ways, including those described below.

*The Group's Client-Flow Revenues May Decline in Adverse Market Conditions.* Recently, the residential real estate market in the U.S. has experienced a significant downturn due to declining real estate values, substantially reducing mortgage loan originations and securitizations, and precipitating more generalized credit market dislocations and a significant contraction in available liquidity globally, which negatively impacted the Group's revenues. These factors have continued into the beginning of fiscal 2008 and, combined with rising oil prices, declining business and consumer confidence and increased unemployment, have precipitated an economic slowdown and fears of a possible recession. Further declines in real estate values in the U.S. or elsewhere and continuing credit and liquidity concerns could further reduce the Group's level of mortgage loan originations and securitisations and increase the Group's mortgage inventory while adversely affecting its value. In addition, continued or further credit market dislocations or sustained market downturns may reduce client flow revenues and adversely affect the value of the Group's inventory in other businesses.

Changes in interest rates, and in particular long-term rates, especially if such changes are rapid, may create a less favourable environment for certain of the Group's businesses. Rising interest rates may cause a decline in the Group's mortgage origination and securitization businesses in particular, as the volume of the Group's origination and securitization activity may decline.

The Group's Investment Banking revenues, in the form of financial advisory and debt and equity underwriting fees, are directly related to the number and size of the transactions in which the Group participates and therefore they were adversely affected in the latter half of 2007 by the mortgage and credit market dislocations, and may be further impacted by continued or further credit market dislocations or sustained market downturns.

Sustained market downturns or continued or further credit market dislocations and liquidity issues would also likely lead to a decline in the volume of capital market transactions that the Group executes for its clients and, therefore, to a decline in the revenues it receives from commissions and spreads earned from the trades it executes for its clients. In addition, because the fees that it charges for managing its clients' portfolios are in many cases based on the value of those portfolios, a market downturn that reduces the value of its clients' portfolios would reduce the revenues it receives from its asset management business. Heightened risk aversion among investors may cause them to shift their trading activity to higher quality and more liquid products, which are generally somewhat less profitable for the Group.

Even in the absence of a market downturn, below-market investment performance by the Group's fund and portfolio managers could reduce Investment Management revenues and assets under management and result in reputational damage that might make it more difficult to attract new investors.

experience and more established relationships with clients, regulators and industry participants in the relevant market, which could adversely affect its ability to expand.

**Risks relating to LBB**

The risk factors set out above are not considered to affect the ability of LBB to fulfil its obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

**Risks relating to LBTCVB**

The risk factors set out above are not considered to affect the ability of LBTCBV to fulfil its respective obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

(j)    *Written Resolutions*

A resolution in writing signed by or on behalf of all Holders of Notes of a Series who for the time being are entitled to receive notice of a meeting of Holders of Notes of that Series will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Holders of Notes of that Series.

**13.    Assumption of Obligations**

LBHI or any wholly-owned Subsidiary of LBHI may assume the obligations of LBTCBV or LBB (or any corporation which shall have previously assumed the obligations of LBTCBV or LBB (as applicable) as provided in this Condition 13 (Assumption of Obligations); LBTCBV or LBB (as applicable) or such corporation in each case being referred to herein as the "*prior Issuer*") for the due and punctual payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on and Additional Amounts, if any, in respect of the Notes issued by it and the performance of every covenant of the Fiscal Agency Agreement, the Notes and each Calculation Agency Agreement on the part of the prior Issuer to be performed or observed; provided that: (i) LBHI or such Subsidiary of LBHI, as the case may be, shall expressly assume such obligations by an amendment or supplement to the Fiscal Agency Agreement, executed by LBHI and such Subsidiary, if applicable, and delivered to the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) for the benefit of the Holders of the Notes, Coupons, Receipts and Talons; (ii) if such Subsidiary assumes such obligations, LBHI shall, by such amendment or supplement, confirm that its Guarantees shall apply to such Subsidiary's obligations under the Notes, Coupons, Receipts and Talons and the Fiscal Agency Agreement and each Calculation Agency Agreement, as modified by such amendment or supplement; provided, however, that this subsection (ii) shall not apply in the event of such an assumption by a Subsidiary of LBHI, not being incorporated in The Netherlands, the long-term debt securities of which, as of the effective date of such assumption and after giving effect thereto, have a rating from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. which is equal to or higher than those of LBHI; (iii) LBHI or such Subsidiary, as the case may be, shall confirm in such amendment or supplement that LBHI or such Subsidiary, as the case may be, will pay to the Holders such Additional Amounts as provided by, and subject to the limitations set forth in, Condition 9 (Payment of Additional Amounts; Tax Redemption) as may be necessary in order that every net payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on the Notes will not be less than the amount provided for in the Notes to be then due and payable; provided, that such obligation shall extend to any deduction or withholding for or on account of any present or future tax, assessment or governmental charge imposed upon such payment by any taxing authority of or in the country in which LBHI or any such Subsidiary is organized (it being understood that, except as aforesaid, neither LBHI nor such Subsidiary shall be obligated to make any indemnification or payments in respect of any tax consequences to any Holder of a Note or Couponholder, Receiptholder or Talonholder as a result of the assumption of rights and obligations described herein and which arise as a result of the domicile or residence of such Holder in, or connection of such Holder with, or subjection of such Holder to, any jurisdiction); and (iv) immediately after giving effect to such assumption, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing.

Upon any such assumption, LBHI or such Subsidiary, as the case may be, shall succeed to, and be substituted for, and may exercise every right and power of, the prior Issuer under the Fiscal Agency Agreement, the Notes issued by the prior Issuer and each Calculation Agency Agreement, with the same effect as if LBHI or such Subsidiary, as the case may be, had been named as the prior Issuer in the Fiscal Agency Agreement, and the prior Issuer shall be released from all liability under the Fiscal Agency Agreement, the Notes issued by it and each Calculation Agency Agreement.

For the avoidance of doubt, no consent of any Holder of Notes is required for the transactions contemplated by this Condition 13 (Assumption of Obligations).

116

## LEHMAN BROTHERS TREASURY CO. B.V

### General

LBTCBV was incorporated in The Netherlands on March 8, 1995 (under the Dutch Civil Code (*Burgerlijk Wetboek*)) with registration number 33267322 with the Chamber of Commerce and Industry of Amsterdam (Kamer van Koophandel en Fabrieken) as a private company with limited liability ("*besloten vennootschap met beperkte aansprakelijkheid*") for an unlimited duration. LBTCBV is a wholly-owned subsidiary of Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated under the laws of the State of Delaware, which is in turn wholly-owned by LBHI. The principal activity of LBTCBV is to act as a Netherlands finance company supporting the working capital needs of various, principally European, subsidiaries of LBHI. LBTCBV does not have any subsidiary undertakings. LBTCBV has no employees.

The registered office and principal place of business of LBTCBV is at Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands and the telephone number is +31 20 406 4444.

The objects for which LBTCBV was established (which can be found at article 2 of its articles of association) are to finance companies and other enterprises with which it forms a group, to borrow, to lend and to raise funds, to participate in all sorts of financial transactions including the issue of bonds, promissory notes or other securities or debt instruments, to invest in securities in the widest sense of the word, to grant guarantees, to assume liability and to grant security over its assets for the obligations of companies and other enterprises with which it forms a group and of third parties.

To the best of LBTCBV's knowledge, it is in material compliance with the applicable corporate governance regimes in The Netherlands.

### LBTCBV has share capital consisting of:

Ordinary shares, EUR 454 par value; 7,500 authorized; 4,406 allotted, called up and fully paid.

### Directors of LBTCBV

Set forth below are the names and the principal occupations of the current members of the Board of Management of LBTCBV:

| Name | Function of LBTCBV | Principal Outside Activities |
|---|---|---|
| Leonard M. Fuller | Director | None |
| Dave Rushton | Director | None |
| Christian Fischer | Director | None |
| Wolbert Kamphuijs | Director | Proxyholder of Equity Trust |
| Rumoldus de Schutter | Director | Director of Equity Trust NV Amsterdam |

The business address of Leonard Fuller is Talstrasse 82, 8021 Zurich, Switzerland. The business address of Dave Rushton is 25 Bank Street, London E14 5LE. The business address of Christian Fischer is Rathenauplatz 1, D-60313, Frankfurt am Main, Germany.

The business address of Wolbert Kamphuijs and Rumoldus de Schutter is Atrium Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands.

There are no known conflicts of interest between any duties of the members of the Board of Management to LBTCBV and their respective private interests or other duties.

234

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS TREASURY CO. B.V.

### Year-End Financial Information

The following tables set forth selected financial information of LBTCBV for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBTCBV for the year ended November 30, 2007.

### Profit and Loss Account Data

| | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|
| | US$ '000 | |
| Operating Income | 33,188 | 1,167 |
| Operating expense | (32,964) | (111) |
| **Net Operating Income and Expense** | 224 | 1,056 |
| Interest and similar income | 1,415,884 | 770,179 |
| Interest and similar expense | (1,384,562) | (748,632) |
| **Net financial income and expense** | 31,322 | 21,547 |
| **Result from ordinary operations before tax** | 31,546 | 22,603 |
| Tax on result from ordinary operations | (4,430) | (6,916) |
| **Result form ordinary operations after tax** | 27,116 | 15,687 |

### Balance Sheet Data

| | 2007 | 2006 |
|---|---|---|
| | US$ '000 | |
| **Assets** | | |
| **Financial Fixed Assets** | | |
| Due from group companies – amounts due more than one year | 23,014,032 | 19,080,440 |
| **Current Assets** | | |
| Due from group companies – amounts due within one year | 11,331,314 | 3,502,636 |
| Cash at bank | 24,623 | 91,035 |
| Taxation receivable | 147 | |
| Other assets | 68,034 | |
| | 11,424,118 | 3,593,671 |
| **Total Assets** | 34,438,150 | 22,674,111 |

### Shareholder's Equity and Liabilities

**Shareholder's Equity**

| | 2007 | 2006 |
|---|---|---|
| Common shares – EUR 454 par value; authorised – 7,500 shares; | | |
| Issued and fully paid – 4,406 shares (EUR 2,000,324) | 2,545 | 2,545 |
| Retained earnings | 77,412 | 50,296 |
| **Total Shareholder's Equity** | 79,957 | 52,841 |

**Long-Term Liabilities**

| | 2007 | 2006 |
|---|---|---|
| Guaranteed notes payable – amounts due after more than one year | 29,857,275 | 19,275,620 |

|  | 2007 | 2006 |
|---|---|---|
|  | US$ '000 | |
| **Current Liabilities** | | |
| Guaranteed notes payable – amounts due within one year | 4,271,283 | 3,106,544 |
| Bank overdrafts | 26,012 | 46,027 |
| Payable to group company | 3,962 | 4,566 |
| Accrued interest payable | 199,309 | 150,387 |
| Taxation payable | 0 | 2,350 |
| Other accrued liabilities | 352 | 35,776 |
| **Total Current Liabilities** | 4,500,918 | 3,345,650 |
| **Total Shareholder's Equity and Liabilities** | 34,438,150 | 22,674,111 |

|  | 2007 | 2006 |
|---|---|---|
|  | US$ '000 | |
| **Cash flow from operating activities** | | |
| Net profit for the year after taxation | 27,116 | 15,687 |
| Adjustments to Reconcile net income to net cash used in operating activities | | |
| (Gain)/Loss on early redemption of debt | (32,873) | 1,088 |
| Amortisation of Debt Discount | 40,040 | 16,227 |
| Amount due from group companies waived | 32,873 | |
| (Increase) in amounts due from group companies | (11,795,143) | (6,395,508) |
| Increase/(Decrease) in Creditors | 10,544 | 73,217 |
| (Increase)/Decrease in Debtors | (68,181) | 0 |
| **Net cash flow from operating activities** | (11,785,624) | (6,289,289) |
| **Cash flows from financing activities** | | |
| Net Increase in issued debt | 11,739,227 | 6,322,860 |
| Net Increase/(Decrease) in Bank overdraft | (20,015) | 46,026 |
| Net Increase in share capital | 0 | 1,457 |
| **Net cash flow from financing activities** | 11,719,212 | 6,370,343 |
| Net cash flow, movement in cash | (66,412) | 81,054 |
| Net Cash at beginning of year | 91,035 | 9,981 |
| Net Cash at end of year | 24,623 | 91,035 |

**<u>Exhibit 8</u>**

2005 Prospectus and Particulars

# LEHMAN BROTHERS

## LEHMAN BROTHERS TREASURY CO. B.V.

### ISSUER

## PROSPECTUS AND LISTING PARTICULARS

## INFLATION LINKED NOTES DECEMBER 2005 –DECEMBER 2017

The notes issued by Lehman Brothers Treasury Co. B.V. are unconditionally and irrevocably guaranteed by

## LEHMAN BROTHERS HOLDINGS INC.

**Lehman Brothers International (Europe), Milan**

**Arranger (*Responsabile del Collocamento*)**

The publication of this Prospectus does not entail any assessment by CONSOB as to the suitability of the proposed investment and on the merits of the data and information related hereto.

Listing particulars filed with CONSOB on 30 November 2005, after *nulla osta* issued with release no. 5077527 of 22 November 2005

*Lehman Brothers Treasury Co. B.V.*

*Registered office in Atrium, Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands - Share capital €771,800*

*Registered with the Chamber of Commerce and Industry of Amsterdam at number 267-322*

The consolidated stockholders' equity of Lehman Brothers as of 31 May 2005 was USD 15,878 million.

For a detailed analysis please see Section B, Chapter IV, Paragraph 4.4.2.4 (*Net financial indebtedness*), Paragraph 4.7.3 (*Variation of the net consolidated financial indebtedness as of 31 May 2005*) of the Information Document.

### Conflict of Interest

The Notes are issued by LB BV, a company incorporated in The Netherlands, which acts as a finance company supporting the funding needs of various, principally European, subsidiaries of LBHI. LB BV is a wholly-owned subsidiary of Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated under the laws of the State of Delaware, which is in turn wholly-owned by LBHI. Since its incorporation, LB BV has been indirectly controlled by LBHI, which irrevocably guarantees the payments of principal and interests of the Notes. LB BV, LBHI, and Lehman Brothers International (Europe) (acting as Calculation Agent of the Notes) and Lehman Brothers International (Europe), Milan (acting as Arranger) are companies of Lehman Brothers and LBHI is the holding company of LB BV, Lehman Brothers International (Europe) and other companies within the Lehman Brothers group. Therefore, it is possible that decisions affecting the rights of the Noteholders may be made when the interests of the above companies are in conflict. To ensure that each of those companies' course of action is properly determined, safeguards are in place (such as Chinese-walls) that seek to protect due process in the making of decisions and execution of orders.

### Law and jurisdiction

The laws that generally govern LB BV corporate powers and internal activities are the laws of The Netherlands and the courts with jurisdiction to hear any claim related to such corporate powers and internal activities are the courts of The Netherlands.

Corporate powers and internal activities of LBHI are governed by Delaware law, and any dispute arising in connection with such powers or activities will be settled in a Delaware court.

In case of controversies other than the above, the applicable law and jurisdiction will be determined according to the applicable private international law.

### Related parties transactions

Lehman Brothers has no material transactions with related parties, under the US GAAP, that require to be disclosed, except for certain transactions carried out with certain directors and officers of Lehman Brothers.

To the extent permitted by the Sarbanes-Oxley Act of 2002, Lehman Brothers directors and senior officers (executive officers) (please see Section B, Chapter II, paragraph 2.1.1 (*Board of Directors of LBHI*) and paragraph 2.2 (*Information on senior officers of Lehman Brothers*) of the Information Document) and their associates, including family members, from time to time may be or may have been indebted to the Company or its subsidiaries under lending arrangements offered by those companies to the public. Such indebtedness is in the ordinary course of business, is substantially on the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with unaffiliated third parties who are not employees of Lehman Brothers and does not involve a more than normal risk of collectibility or present other unfavorable features. In addition, officers in charge (executive officers), directors and affiliated persons may engage in transactions in the ordinary course of business involving other goods and services provided by Lehman Brothers, such as banking, brokerage, investment and financial advisory products and services (including investment funds), on terms similar to those extended to management directors of Lehman Brothers generally or, in the case of goods and services provided to non-management Directors, on the same terms as provided to unaffiliated third parties who are not employees of Lehman Brothers.

SEC and available at the Italian Stock Exchange's premises as well as at the Milan office of Lehman Brothers International (Europe). For further information see the following Section B, Chapter IV, Paragraph 4.7 (*Principal consolidated economic and financial items related to the semester ended on 31 May 2005*) of the Information Document.

Unless otherwise stated, all references to quarters are to Lehman Brothers' fiscal quarters and semesters, and all references to years are to Lehman Brothers' fiscal years ended 30 November of such years.

## SECTION A

## INFORMATION ON THE ISSUER OF THE NOTES

## CHAPTER I

## INFORMATION ON THE ACTIVITIES OF THE ISSUER

### 1.1 History and development

LB BV was incorporated in The Netherlands on 8 March 1995 (with registration number 267-322 with the Chamber of Commerce and Industry of Amsterdam (Kamer van Koophandel en Fabrieken)) as a private company with limited liability ("besloten vennootschap met beperkte aansprakelijkheid") for an unlimited duration. LB BV is a wholly-owned subsidiary of Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated under the laws of the State of Delaware, which is in turn wholly-owned by LBHI. The registered office and principal place of business of LB BV is at Atrium, Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands.

### 1.2 Description of the activities

The principal activity of LB BV is to act as a Netherlands finance company supporting the funding needs of various, principally European, subsidiaries of LBHI. LB BV does not have any subsidiary undertakings.

The principal activity of LB BV is substantially the issue of notes and debt securities denominated in different currencies and placed principally in the markets of EU Member States. The securities so issued by LB BV are guaranteed by the express guarantee of LBHI. The principal market for LB BV notes is the Euro market and the placing policies of the notes aim at providing investors with highly liquid securities with several maturity options. LB BV also issues securities denominated in other currencies in order to strengthen the diversification of the investor base and enter into different capital markets.

It must be noted that as of the present moment LB BV has no rating.

In order to review the main items of the Issuer's financial statements in the three fiscal years ended 30 November 2003, 2002 and 2001 please see the previous section "Selected financial data – Selected Financial data of the Issuer"

### 1.3 Other information

As of 30 November 2004 LB BV had no employees.

Furthermore, as of the same date LB BV had no real estate assets.

There are no pending civil or fiscal judicial or arbitration proceeding.

The Issuer did not hold any investments in properties or acquired interests in other companies in the three fiscal years ended 30 November 2004, 2003 and 2002, nor at the date of this document holds any such investment.

LB BV's activity does not depend to any material extent on policies of research and development.

LB BV does not have and did not have in the three fiscal years ended 30 November 2004, 2003 and 2002 any loss carried forward for fiscal purposes and does not have and did not have in such years any tax reduction or fiscal exemption.

None of LB BV's assets are "segregated" or "destined to any specific obligation" of LB BV within the meaning of articles 2447-ter, first paragraph, and 2447-novies, fourth paragraph, of the Italian civil code.

LB BV does not exercise any "direction and coordination activity" of other Lehman Brothers subsidiaries or other companies, generally, within the meaning of article 2497 of the Italian civil code.

LB BV is part of Lehman Brothers, one of the leading global banking groups, serving institutional, corporate, government and high-net-worth clients. LBHI is the holding company of the Lehman Brothers group of companies.

For a description of LBHI's activity and Lehman Brothers group, see Section B, Chapter I, paragraph 1.2 (*Description of LBHI's and Lehman Brothers' activity*) and 1.8.6 (*Information on the Lehman Brothers group*) of the Information Document.

Within Lehman Brothers, LB BV conducts treasury activities, under the coordination and indirect control of LBHI and pursuant to the guidelines and financial polices set by LBHI for Lehman Brothers (for a description of Lehman Brothers group see Section B, Chapter I, Paragraph 1.8.6 ("*Information on the Lehman Brothers group*") of the Information Document.

## CHAPTER II

### INFORMATION ON THE CORPORATE OFFICERS OF THE ISSUER

**The Management Board**

Set forth below are the names and the principal occupations of the current members of the Management Board of the Issuer

Leonard M. Fuller, born in Scotland, 8 August 1956;

Pascale B.F. Vidalie, born at Arras, Pas-de-Clais, France, 3 September 1964 (director appointed on 1st March 2004);

Frank O. Zeitz, born in Hamburg, Germany, 6 October 1961.

The business address of Leonard Fuller is Talstrasse 82, 8021 Zurich, Switzerland and the business address of Frank Zeitz and Pascale B.F. Vidalie is Rathenauplatz 1, 60313 Frankfurt, Germany.

Members of the Management Board are appointed by resolution of the sole shareholder without any limit of time, save the possibility to be removed by resolution of the sole shareholder at any time.

Members of the Management Board received no remuneration from the Issuer for their activities. At present, none of the members of the Management Board have any main occupation outside Lehman Brothers.

The laws of The Netherlands do not require the supervision and control of the management activities of the Issuer by external auditors or by any internal body of the Issuer in addition to the Management Board itself.

As the Issuer is incorporated in The Netherlands, the provisions set out by Book V, Title V, Chapter V, Section VI-*bis* of the Italian civil code (related to the management and control in public companies) are not applicable.

## CHAPTER III

## INFORMATION ON THE OWNERSHIP STRUCTURE

The Issuer is wholly-owned by Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated pursuant to the laws of the State of Delaware, with registered office in 2711 Centerville Road, Wilmington, Delaware, 19808 U.S.A., which is in turn wholly-owned by LBHI. Since its incorporation, LB BV has been indirectly controlled by LBHI (as regards the information on the ownership structure of LBHI, please see Section B, Chapter III (*Information on the ownership structure of LBHI*) of this Document).

At the date of the Information Document, no "relevant shareholders' agreement" governing, inter alia, shareholders' vote, exists for the purpose of Article 122 of Legislative Decree No 58, 24 February 1998.

**4.3 Scheme of the variation on the net assets value in the fiscal years ended on 30 November 2004, 2003 and 2002**

(EUR/000)

| Description | Shareholder's equity | Retained earnings (excluded net profit for the year) | Net profit for the year | Total |
|---|---|---|---|---|
| Beginning balance 2002 | 771 | 7,335 | - | 8,106 |
| End balance 30/11/2002 | 771 | 7,335 | 3,290 | 11,396 |
| Year 2003 | | | | |
| End balance 30/11/2003 | 771 | 10,625 | 3,630 | 15,026 |
| Year 2004 | | | | |
| End balance 30/11/2004 | 771 | 14,255 | 4,585 | 19,611 |

**4.4 Operating performance of the Issuer and its capital and financial condition**

As indicated above, the net profits of the Issuer from the end balance on 30 November 2002 to the end balance on 30 November 2004 have increased. The authorised share capital comprises 7,500 common shares of EUR 454 each, of which 1,700 common shares were issued on 8 March 1995 for cash, fully paid. There were no changes to the authorised or issued share capital during the three fiscal years ended on 30 November 2004, 2003 and 2002.

The net profit changes from a balance of EUR 3,630,000 at the fiscal year end of 2003 to a balance of EUR 4,585,000 at the fiscal year end of 2004. The total indebtedness of LB BV (which includes the guaranteed notes (short and long term) issued by LBBV as of 30 November 2004) increased from EUR 6,201,700,000 in 2003 to EUR 8,195,488,000 at the fiscal year end of 2004.

Considering the limited number and the nature of the activities of the Issuer, there is no further information on the operating performance and on the capital and financial position of the Issuer of such import that it should be disclosed in the Information Document. As a matter of fact, as indicated under Paragraph 1.2 above, the Issuer operates as financial entity for Lehman Brothers; the amount of the issues therefore depends annually on the needs of Lehman Brothers.

**4.5 Summary of significant accounting principles used in connection with the 2004, 2003 and 2002 financial statements**

The accounts of the Issuer have been prepared in accordance with the provisions of Title 9, Book 2 of the Dutch Civil Code. The accounts are prepared under the "historical cost convention", modified by the conversion of foreign currencies into Euros (see below the sub-paragraph *Currency conversion*). The auditors (Ernst & Young Accountants) have conducted their audit in accordance with auditing standards generally accepted in The Netherlands. No variation has occurred in the accounting principles adopted for the drafting of the balance-sheet: the Issuer is not obliged to adopt the IAS/IFRS under the Dutch law and it does not  plan to implement the same.

Below is a synthesis of the main accounting principles used in connection with the preparation of LB BV financial statements.

*Accounting convention*

The financial statements have been prepared pursuant to the "*historical cost convention*", amended to take into account the differences between the various currencies in which the items of the financial statements where originated.

*Record of financial results*

Financial results and expenses, calculated on the criteria indicated above, are directly recorded within the data of the period to which they refer.

Commissions, in the form of interest payable in connection with derivative agreements, due to the transfer of risk to other companies within Lehman Brothers, are recorded in the financial statement of LB BV either in consideration of the maturity of the underlying notes or, alternatively, in light of the duration of the transaction to which the derivative agreements refer.

*Currency conversion*

Transactions denominated in foreign currencies are accounted for in Euros at the rate of exchange prevailing at the end of the month in which the transaction accrued. Assets and liabilities denominated in foreign currencies are accounted for in Euros at the rates of exchange prevailing at the balance sheet date. Resulting exchange gains and losses are recognised in the profit and loss account on a net basis. Guaranteed notes payable, which are swapped into a currency other than the original currency of denomination, are accounted for in Euros at the rate prevailing at the balance sheet date. Adjustments for the effects of the related swap contracts are included in amounts due from group companies and other accrued liabilities. Such swap contracts generally mature in accordance with the terms of the related borrowings.

*Assets and liabilities*

Assets and liabilities, save as indicated otherwise, are recorded on the basis of their nominal value.

**4.6 Analysis of the main items included in the financial statements**

Financial fixed assets include intra-group credits, with a maturity of more than one year. The total amount of financial fixed assets as of 30 November 2004 was EUR 7,353,933,000, compared with EUR 5,598,113,000 as of 30 November 2003 and EUR 3,421,318,000 as of 30 November 2002. Such variation is related to the fact that, during fiscal years 2004 and 2003 there have been further credits, of an amount respectively of EUR 2,879,410,000 and EUR 3,041,453,000. From such amounts are deducted credits subject to early redemption (equal respectively to EUR 398,111,000 in 2004 and EUR 189,774,000 in 2003), the currency exchanges (equal respectively to EUR 389,007,000 in 2004 and EUR 402,937,000 in 2003) and transfers of certain credits to the item "current assets" (equal respectively to EUR 336,472 in 2004 and EUR 271,947,000 in 2003).

As far as current assets are concerned, cash at bank (equal to EUR 1,693,000 on 30 November 2004, EUR 3,314,000 on 30 November 2003 and EUR 225,000 on 30 November 2002) consists only of short term deposits.

For a detailed analysis of short and long term debts, see the following paragraph 4.7 (*Total amount of loans, debts and commitments of the Issuer*) of the Information Document.

**4.7 Total amount of loans, debts and commitments of the Issuer**

The major market for notes issued by LB BV is the Euro market and the placing policies of the notes aim at providing investors with highly liquid securities with several options of maturities. LB BV issues notes also named in currencies other than the Euro in order to strengthen the diversification of the investor base and enter different capital markets. For this purpose, on 31 March 1995, LB BV issued an offering memorandum together with Lehman Brothers Holdings PLC and LBHI relating to a programme for the issuance of debt instruments. The total amount of the Euro Medium Term Note Programme (EMTN Programme) may not exceed EUR 4,000,000,000. The instruments may be denominated in any currency. Further to several increases, the maximum issuance has been increased to EUR 25,000,000,000. Further to subsequent amendments to the EMTN Programme, Lehman Brothers Bankhaus AG (a German bank) replaced Lehman Brothers Holdings PLC as party to the Programme.

The total amount of notes, with a maturity of more than one year, issued by LB BV, including the notes issued under the EMTN Programme and outstanding on 30 November 2004 was Euro 7,678,168,000. Every note issued by LB BV is guaranteed by LBHI.

In particular, the following notes have been issued in the currency indicated:

- EUR (interest rate between 0.00% and 7.50%): 4,414,745,000;

- USD (interest rate between 0.00% and 7.90%): 2,288,296,000;

- Japanese Yen (JPY) (interest rate between 0.14% and 2.40%):469,528,000;

- Swedish Koron (SEK) (interest rate between 2.23% and 2.73%): 23,146,000;

- Hong Kong Dollar (HKD) (interest rate between 0.74% and 8.88%): 187,630,000;

- Swiss Franc (CHF) (interest rate between 0.74% and 0.86%):140,157,000;

- Danish Koron (DKK) (interest rate 2.20%): 12,519,000.

- Australian Dollars (AUD) (interest rate between 4.99% and 5.35%): 79,236,000;

- Sterling (GBP) (interest rate between 4.72% and 5.04%): 39,918,000; and

- Singapore Dollar (SGD) (interest rate 4,10%): 22,993,000.

As of 30 November 2004 LB BV also had notes with a maturity of less than one year outstanding for an aggregate amount of EUR 517,320,000. All of these notes are guaranteed  by LBHI.

The total amount of all other loan, debt and commitments of LB BV as of 30 November 2004 was EUR 67,052,000 (including intra-group indebtedness, debts for accrued interest, tax liabilities and other commitments).

## CHAPTER V

### INFORMATION ON RECENT TRENDS AND PROSPECTS OF THE ISSUER

LB BV continues to issue notes as part of its EMTN programme denominated, inter alia, in the main G7 currencies. As the underlying businesses grow the extent of note issuance grows. The activities of LB BV remain similar year on year.

The proceeds of the issues have been used for general funding purposes of Lehman Brothers, in particular those of European subsidiaries of Lehman Brothers.

No material changes to the techniques of fund raising have occurred. LB BV charges its affiliates, on an arm's length basis, for the administrative costs of issuing notes. Arm's length charges take into account many factors including the impact of external interest rates and commission levels.

LB BV believes that the results of the year 2005 will be found to be in line with the results of the previous years.

The current intention of LB BV is to continue conducting its business in the same manner as it currently does.

It must be noted that under Dutch law LB BV is not obliged to draft interim financial statements.

# CHAPTER VI

## GENERAL INFORMATION ON THE ISSUER AND ITS SHARE CAPITAL

### 6.1 Name and form

Lehman Brothers Treasury Co. B.V. is a private company with limited liability ("*besloten vennootschap met beperkte aansprakelijkheid*") incorporated pursuant to the Dutch Civil Code (*Burgerlijk Wetboek*) and to any other material law of The Netherlands.

### 6.2 Registered office

Atrium, Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherland.

### 6.3 Date of incorporation

LB BV was incorporated in The Netherlands on 8 March 1995.

### 6.4 Duration of the Issuer

Unlimited duration.

### 6.5 Legislation whereunder the Issuer operates and jurisdiction in case of disputes

The law that generally governs LB BV corporate powers and internal activities is the law of The Netherlands, with particular reference to the provisions set forth in the Dutch Civil Code (*Burgerlijk Wetboek*), the Netherlands Securities Market Supervision Act 1995 (*Wet toezicht effectenverkeer 1995*, the "**SMSA**") and the Exceptions to the SMSA (*Vrijstellingsregeling Wet toezicht effectenverkeer 1995*). The courts with jurisdiction to hear any claim related to such corporate powers and internal activities are the courts of The Netherlands.

The form and content of the Notes, as well as the rights and obligations under the Notes, even for the aspects not directly governed by the terms and conditions of the Notes (attached to the Supplement in the second part of the Information Document), are governed by Italian law and the Court of Milan has non exclusive jurisdiction.

The Trust Agreement, which govern the duties and powers of the Trustee is governed by the laws of New York, U.S.A, save for the provisions related to the rules for Noteholders meeting, which are governed by the Italian law. Non-exclusive competent courts for any dispute related to the Trust Agreement are set in Milan, Italy and in New York, U.S.A.

### 6.6 Registration number

LB BV is registered with the Chamber of Commerce and Industry of Amsterdam (*Kamer van Koophandel en Fabrieken*) with registration number 267322.

### 6.7 Corporate purpose of the Issuer

Pursuant to Article 2 of LB BV's Articles of Association, the objects for which the company was established are to finance companies and other enterprises with which it forms a group, to borrow, to lend and to raise funds, to participate in all sort of financial transactions, including the issue of notes, promissory notes or other securities or debt instruments, to invest in securities in the widest sense of the word, to grant guarantees, to assume liabilities and to grant security over its assets for the obligations of companies and other enterprises with which it forms a group and of third parties. The objects specified in the preceding paragraph are to be construed in the widest sense including any activity or purpose which is related, incidental, or conducive thereto including the granting of loans as referred to in paragraph 5, of Article 4 of the Articles of Association. In

pursuing its objects LB BV is also bound to take into account the interests of the group of companies and enterprises with which it is affiliated.

## 6.8 Shareholder's capital

The authorised share capital comprises 7,500 common shares of EUR 453.78 each (for a total amount of EUR 3,403,350), of which 1,700 common shares (for a total amount of EUR 771,426) were issued on 8 March 1995 for cash, fully paid.

The authorised share capital and the number of common shares issued has remained unchanged since 1995. Therefore, part of the authorised share capital (equal to a number of 5,800 common shares) has not been issued.

Each common share of LB BV (except for any common shares held by LB BV or by a subsidiary of LB BV) give the right to vote in the general meeting of the shareholders.

The sole shareholder, on the basis of proposal of the board of directors (or even in absence of such proposal), decides each year the portion of profits resulting from the profit and loss account to be set aside as reserves. The remaining profits may be distributed to the shareholder, pursuant to the terms decided by the same.

LB BV may distribute profits only if the net shareholder's equity exceeds the total share capital paid in (including any recalled capital) plus reserves required by the law or by LB BV Articles of Association.

If LB BV registers profits, provided the authorisation of the general meeting of the shareholders has been obtained, the board of directors may decide to pay sums on account of future dividends to the shareholder (provided that the abovementioned requirement for the net shareholder's equity and the fully paid stock capital is complied with).

Dividends are payable at LB BV's registered office from the date on which the earnings are declared, except in the case that the resolution of the shareholder in general meeting provides for a different place or date of payment. The rights to receive payments which have not been collected within 5 years from the due date are subject to prescription in favour of LB BV.

## 6.9 Rules on transfer of Issuer shares

Pursuant to the LB BV's By-Laws (Article 8) any transfer of LB BV's shares must take place by written agreement, in compliance with Article 2.196 of the Civil Code of The Netherlands.

Pursuant to Article 9 of the LB BV's By-Laws:

"1. Each and any transfer of shares will require the prior approval of the Management Board.

2. A request for approval will be made to LB BV by the transferor stating the number of shares involved, the price and other conditions of transfer, the name of the person to whom the transferor wishes to transfer those shares and whether or not the transferor agrees to a transfer of shares in the capital of LB BV.

3. A decision on any request must be taken within two months of receipt thereof. If no decision is announced to the transferor within this term, approval will be deemed to have been granted.

4. A rejection of any request will nevertheless be deemed to be an approval if the Management Board does not at the time of the communication of its rejection to the transferor give the transferor the names of one or more persons – whether existing shareholders, third parties or LB BV itself – who are prepared to purchase the shares to which the request relates for cash consideration (the "prospective purchaser").

## **Exhibit 9**

Loan Agreement

+31 20 7119999

# LEHMAN BROTHERS

To:              Lehman Brothers Holdings Inc. (the "Borrower")

Attention:       Paolo Tonucci
                 Director
                 Head of European Asset & Liability Management

26th May, 2000

Dear Sirs

Lehman Brothers Treasury Co. B.V. (the "Lender"), is pleased to confirm its agreement with the Borrower to make available to the Borrower a loan (the "Loan") on an uncommitted basis on the following terms and conditions:

1.      **Definitions and Interpretation**

"**Business Day**" means a day on which the relevant Amsterdam and London financial markets are open for the transaction of business contemplated hereby and, in relation to a day on which a payment is required hereunder, a day on which banks are open for business in the place of payment;

"**Facility Documents**" means this letter and any other deed, document or agreement from time to time entered into pursuant hereto or thereto;

"**Indebtedness**" shall be construed so as to include any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

"**Loan**" means the aggregate principal amount outstanding in respect of the Advances and otherwise hereunder; and

"**Maturity**" in relation to an Advance means the last day of the agreed term of such Advance.

Headings when used herein shall be ignored for the purposes of construction.

+31 20 7119999

2.    **The Loan**

(i)    This facility is intended for general corporate purposes for the trade of the Borrower (including the funding, whether directly or indirectly, of the businesses of the affiliates of the Borrower)

(ii)   The Loan may be drawn down in any number of advances (each an "Advance") in an agreed amount denominated in an agreed currency for an agreed term.

3    **Availability**

(i)    Not later than 10.00 a.m. (London time) on the day one Business Day before the proposed day of such borrowing a request may be made for an Advance by the Borrower in the form of the Request to Borrow (the "Request") attached hereto or an offer to make an Advance may be made by the Lender in the form of the Offer to Lend (the "Offer") attached hereto.

The Request or the Offer, whichever applicable, will state the proposed borrowing date (being a Business Day) and the proposed amount, currency, interest period, term and interest rate to apply to the proposed Advance The Lender may agree to the terms of the Request (or, as the case may be, the Borrower may agree to the terms of the Offer) by returning a signed copy of the relevant document indicating its agreement.

(ii)   Each Advance may be made on the agreed borrowing date referred to in the Request or the Offer if no event has occurred which is or may become an Event of Default (as referred to in Clause 11 below) and representations set out in Clause 9 are true on and as of the proposed date for the making of such Advance.

4.    **Interest**

(i)    Interest is payable on each Advance at the agreed intervals and at the agreed rate per annum for such Advance.

(ii)   If the Borrower fails to pay any amount payable hereunder on the due date therefor (whether at stated maturity, by acceleration or otherwise), the Borrower shall on demand from time to time pay interest on such overdue amount from the due date up to the date of actual payment (as well after as before judgment) at a rate determined by the Lender from time to time to be equal to the higher of 1 % per cent. above:

(a)    the interest rate for the Advance to which the failure to pay relates as provided in Clause 4(i); and

(b)    the cost to the Lender of funding such principal or other amount.

Such interest shall be compounded every three months.

(iii)  Interest shall be calculated on the basis of a 360 or 365 day year, as specified in the Request or Offer, whichever appropriate, and for the actual number of days elapsed in the period in question.

+31 20 7119999

**5. Repayment**

Each Advance shall be repaid in full on its maturity and in the currency in which it is denominated together with accrued interest.

**6    Payments**

(i)    All payments to be made hereunder shall be made to the Lender on the due date to the Lenders account as specified in the relevant Request or Offer without set-off or counter-claim.

(ii)    In the event that the Borrower makes any payment of the principal of an Advance other than on the due date therefor or fails to borrow in accordance with a Request given pursuant to Clause 3(i) above, the Borrower shall forthwith on demand from the Lender pay to the Lender such additional amounts as the Lender may certify, as necessary to compensate it for any loss or expense sustained or incurred as a result of such payment or such failure to borrow, as the case may be.

**7.    Taxes**

(i)    All payments to be made by the Borrower hereunder shall be made free and clear of and without deduction for or on account of tax unless the Borrower is required to make such a payment subject to the deduction or withholding of tax, in which case the sum payable by the Borrower in respect of which such deduction or withholding is required to be made shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Lender receives and retains (free from any liability in respect of any such deduction or withholding) a net sum equal to the sum which it would have received and so retained had no such deduction or withholding been made or required to be made.

(ii)    Without prejudice to the provisions of Clause 7(i), if the Lender is required to make any payment on account of tax or otherwise (not being tax imposed on its net income by the jurisdiction in which it is incorporated on or in relation to any sum received or receivable by the Lender hereunder (including, without limitation, any sum received or receivable under this sub-clause) or any liability in respect of any such payment is asserted, imposed, levied or assessed against the Lender, theBorrower will upon demand of the Lender promptly indemnify the Lender against such payment or liability, together with any interest, penalties and expenses payable or incurred in connection therewith.

**8.    Additional Costs**

If the result of any present or future law, regulation, treaty or official directive (whether or not having the force of law) or any change therein or in the interpretation or application thereof or compliance by the Lender with any request of any relevant authority is directly or indirectly to increase the cost to the Lender of the transactions contemplated hereby, or is to reduce any amount receivable by the Lender or the effective return to the Lender hereunder whether by way of change in the manner in which the Lender allocates capital to its obligations hereunder or otherwise, the Borrower will, forthwith on demand, pay to the Lender such amounts as it shall certify as necessary to compensate it for such additional cost or reduction.

+31 20 7119999

9    **Representations**

The Borrower represents that:

(i)    it has power to enter into the Facility Documents and to exercise its rights and perform its obligations thereunder and all action required to authorise its execution of the Facility Documents and its performance of its obligations thereunder has been duly taken;

(ii)    in any proceedings taken in England in relation to any of the Facility Documents, it will not be entitled to claim for itself or any of its assets immunity from suit, execution, attachment or other legal process;

(iii)    in any proceedings taken in relation to any of the Facility Documents, the choice of English law as the governing law of the Facility Documents and any judgment obtained in England will be recognised and enforced;

(iv)    all acts, conditions and things required to be done, fulfilled and performed in order (a) to enable the Borrower lawfully to enter into, exercise its rights under and perform and comply with the obligations expressed to be assumed by the Borrower in the Facility Documents (b) to ensure that the obligations expressed to be assumed by the Borrower in the Facility Documents are legal, valid and binding and (c) to make the Facility Documents admissible in evidence in England have been done, fulfilled and performed and the obligations referred to above are so legal, valid and binding; and

(v)    the execution of the Facility Documents and the exercise of the Borrower's rights and performance of its obligations thereunder do not and will not:

(a)    conflict with any agreement, mortgage, bond or other instrument or treaty to which the Borrower is a party or which is binding upon the Borrower or any of the Borrower's assets; or

(b)    conflict with any applicable law, regulation or official or judicial order.

10    **Covenants**

The Borrower shall:

(i)    obtain, comply with the terms of and do all that is necessary to maintain in full force and effect all authorisations, approvals, licences and consents required in or by the laws and regulations of England to enable the Borrower lawfully to enter into and perform its obligations under the Facility Documents or to ensure the legality, validity, enforceability or admissibility 'm evidence in the place of payment of the Facility Documents;

(ii)    after the delivery of the request for an Advance to be made hereunder and before the proposed making of the Advance, notify the Lender of the occurrence of any event which results in or may reasonably be expected to result in any of the representations contained in Clause 9 being untrue at or before the time of the proposed making of the Advance;

(iii)    promptly inform the Lender of the occurrence of any Event of Default or any event which might become an Event of Default and, upon receipt of a written request to that effect from the Lender, confirm to the Lender that, save as previously notified to the Lender or as notified in such confirmation, no such event has occurred;

+31 20 7119999

(iv)    ensure that at all times the Lender's claims against you under the Facility Documents rank at least pari passu with the claims of all its unsecured creditors; and

(v)    on request by the Lender, furnish the Lender with such information about itself as the Lender may reasonably require.

**Events of Default**

If:

(i)    the Borrower fails to pay any sum due from the Borrower under any of the Facility Documents at the time, in the currency and in the manner specified herein and such failure in respect of any amount other than the principal amount of one or more of the Advances is continued for a period of thirty days; or

(ii)    any representation or statement made by the Borrower in any of the Facility Documents or in any notice or other document, certificate or statement delivered by the Borrower pursuant thereto or in connection therewith is or proves to have been incorrect or misleading when made; or

(iii)    the Borrower fails duly to perform or comply with any of the obligations expressed to be assumed by it in any of the Facility Documents and such failure (other than a failure in respect of an obligation which is specifically dealt with elsewhere in this Clause 11) is continued for a period of ninety days after there has been given to the Borrower by the Lender a written notice specifying such failure and requiring it to be remedied and stating that such notice is a notice of default; or

(iv)    any of the Borrower's indebtedness is not paid when due, any of the Borrower's indebtedness is declared to be or otherwise becomes due and payable prior to its specified maturity or any of the Borrower's creditors become entitled to declare any of the Borrower's indebtedness due and payable prior to its specified maturity; or

(v)    the Borrower, voluntarily or otherwise, takes any corporate action or other steps are taken or legal proceedings are started for its winding-up, dissolution, administration or reorganisation or for the appointment of a receiver, administrator, administrative receiver, trustee or similar officer of the Borrower or of any or all of its assets; or

(vi)    at any time it is or becomes unlawful for the Borrower to perform or comply with any or all of its obligations under any of the Facility Documents or any of the Borrower's obligations thereunder are not or cease to be legal, valid and binding; or

(vii)    the Borrower is unable to pay any of its debts within the meaning of Section 123(1)(e) of the Insolvency Act 1986 or makes a general assignment for the benefit of its creditors,

then the Lender shall be under no obligation to advance monies pursuant to this letter and may by notice to the Borrower require repayment (forthwith or otherwise as the Lender may require) of the Loan with accrued interest thereon together with any other sums then owed by the Borrower under the Facility Documents.

The Borrower also undertakes to indemnify the Lender m demand against any loss or expense, including legal fees, sustained or incurred as a consequence of the occurrence of any Event of Default referred to above.

## 12.    Conditions Precedent

The Lender's agreement to make the Loan available is subject to its having received the following in form and substance satisfactory to it:

    (i)    a copy certified by a duly authorised officer of the Borrower of the constitutive documents of the Borrower;

    (ii)    a copy, certified by a duly authorised officer of the Borrower of a Board Resolution of the Borrower approving the execution, delivery and performance of each of the Facility Documents and the terms and conditions of this letter and authorising a -named person or persons to sign this letter and any documents to be delivered by the Borrower pursuant hereto;

    (iii)    a certificate of a duly authorised officer of the Borrower setting out the names and signatures of the persons authorised to sign on behalf of the Borrower, this letter and the other Facility Documents and any documents to be delivered hereto or thereto.

## 13.    Assignment

This letter shall bind and ensure to the benefit of both parties hereto and their respective successors and assigns Neither party shall be capable of assigning all or any of its rights or obligations under the Facility Documents without the prior written consent of the other party.

## 14    Miscellaneous

    (i)    The Borrower shall pay all costs and expenses (including all legal fees) incurred by the Lender in connection with the negotiation, preparation and execution of the Facility Documents, the enforcement of the Facility Documents and the preservation of the Lender's rights thereunder and will also pay or indemnify the Lender against all present and future stamp duties or other similar taxes payable (including any interest and penalties) in respect thereof.

    (ii)    No failure by the Lender in exercising any right, power or privilege under any of the Facility Documents shall operate as a waiver thereof or prejudice any other or further exercise by the Lender of any of our rights or remedies thereunder. The rights and remedies therein are cumulative and not

    (iii)    notice to either party may be given providing by law, ... receipt but, if not in writing then, without prejudice to such effectiveness, confirmed forthwith thereafter in writing) to it at its address first stated above, marked for the attention of the person first stated above, or to such other address as it may specify to the other

## 15    Governing Law

+31 20 7119999

This Letter shall be governed by and construed in accordance with the laws of England and the parties hereto submit to the jurisdiction of the English courts in respect of any dispute hereunder

Yours faithfully,

For and on behalf of
LEHMAN BROTHERS TREASURY CO. B.V.

We agree to the above

Dated ...... 26 ᵗʰ Ma.·    2000

For and on behalf of
LEHMAN BROTHERS HOLDINGS Inc.

+31 20 7119999

## Schedule 1

### Form of [Request to Borrow/Offer to Lend] ]

To:                    [Lehman Brothers Treasury Co. BN.]/Lehman Brothers Holdings Inc.

Pursuant to the terms of the Facility Letter made between us dated [                    ] Iwe hereby
deliver to you a [Request To Borrow/Offer To Lend] ] on the following terms:


Proposed borrowing date:

Amount:

Currency:

Term:

Interest rate:

Interest period:

Interest is to be calculated on the basis of a 36013651 day year and the actual number of days elapsed in the period in question.

Account Details of Borrower:

Account Details of Lender:

    e indicate your agreement to lend/borrowed on these terms by returning a signed copy of this letter within days of the date
hereof.

---

To:          Lehman Brothers Holdings Inc./[Lehman Brothers Treasury Co. B.V ]

We                                    agree to lend/borrowed on the terms set out in the Request To
Borrow/Offer To
Lend ] issued by [                    ] on [                    ], of which this is a copy.



]          Delete as appropriate.

## **Exhibit 10**

Guarantee Agreement – Euro Medium-Term Note Program

**C L I F F O R D**

**C H A N C E**

LIMITED LIABILITY PARTNERSHIP

EXECUTION COPY

LEHMAN BROTHERS HOLDINGS INC.
LEHMAN BROTHERS HOLDINGS PLC
LEHMAN BROTHERS TREASURY CO. B.V.

U.S.$15,000,000,000
EURO MEDIUM-TERM NOTE PROGRAM

*Unconditionally and irrevocably guaranteed, as to Notes to be issued by
Lehman Brothers Holdings Plc and Lehman Brothers Treasury Co. B.V., by*

LEHMAN BROTHERS HOLDINGS INC.

---

GUARANTEE AGREEMENT

---

22 August 2001

# CONTENTS

**Clause**                                                                                            **Page**

1.   Definitions .................................................................................................... 2

2.   Guarantee ..................................................................................................... 3

3.   Status ............................................................................................................ 4

4.   Continuing Guarantee .................................................................................. 5

5.   Reinstatement .............................................................................................. 5

6.   Immediate Recourse ..................................................................................... 5

7.   Covenants ...................................................................................................... 5

8.   Deposit Of Guarantee ................................................................................... 5

9.   Stamp Duties ................................................................................................. 5

10.  Partial Invalidity ........................................................................................... 6

11.  Notices ........................................................................................................... 6

12.  Governing Law .............................................................................................. 6

**THIS GUARANTEE AGREEMENT** is made as of 22 August 2001.

_____

**BY**

(1)    **LEHMAN BROTHERS HOLDINGS INC.** (the "**Guarantor**")

**IN FAVOUR OF**

(2)    **HOLDERS** (as defined below); and

(3)    **THE ACCOUNTHOLDERS** (as defined below);

**WHEREAS**

(A)    **LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS HOLDINGS PLC** and **LEHMAN BROTHERS TREASURY CO. B.V.** (each an "**Issuer**" and together the "**Issuers**") have established a Program (the "**Program**") for the issuance of euro medium-term notes (the "**Notes**"). In connection with the Program the Issuers have entered into an Amended and Restated Fiscal Agency Agreement dated 22 August 2001 (as supplemented and amended from time to time, the "**Fiscal Agency Agreement**") with Bank One, NA as Fiscal Agent and Registrar and the other parties referred to therein. Notes in bearer form may be represented initially by a permanent global Note (the "**Permanent Global Note**") or by a temporary global Note (the "**Temporary Global Note**") exchangeable in accordance with its terms for a Permanent Global Note or, as the case may be, definitive notes in bearer form ("**Definitive Notes**") and/or registered Notes ("**Registered Notes**") represented by definitive Notes in registered form ("**Definitive Registered Notes**") or global Notes in registered form ("**Global Registered Notes**"). Permanent Global Notes are, in accordance with their respective terms, exchangeable for Definitive Notes and/or Registered Notes represented by Definitive Registered Notes and/or Global Registered Notes. Registered Notes may be represented initially by Definitive Registered Notes and/or Global Registered Notes. Global Registered Notes, whether issued initially or in exchange for Bearer Notes, are themselves exchangeable, in accordance with their terms, for Definitive Registered Notes. References herein to "**Global Notes**" shall be to Permanent Global Notes, Temporary Global Notes and Global Registered Notes. A Global Note will be delivered to a depositary or a common depositary for any one or more of the Clearing Systems (as defined below) for credit to such securities clearing (or any other) account or accounts with any Clearing System as may be determined by the terms and conditions and operating procedures or management regulations of the relevant Clearing System with its respective participants and/or accountholders. Notes denominated in Australian dollars may be issued in the domestic Australian capital markets ("**Australian Domestic Notes**") by Lehman Brothers Treasury Co. B.V. ("**LBTCBV**") pursuant to a deed poll to be executed by LBTCBV (the "**Deed Poll**") and such Australian Domestic Notes will be issued in registered (or inscribed) form and take the form of entries on a register to be maintained by an Australian registrar to be appointed by LBTCBV.

(B)    The Guarantor has agreed to guarantee irrevocably the payment of principal and interest together with all other sums payable by the relevant Issuer under the Notes issued by

Lehman Brothers Holdings Plc and Lehman Brothers Treasury Co. B.V. (each a **"Guaranteed Issuer"** and together the **"Guaranteed Issuers"**) and to guarantee irrevocably the performance by each Guaranteed Issuer of its obligations under the Amended and Restated Deed of Covenant, dated 25 August 2000, by each of the Issuers in favour of the parties named herein (as supplemented and amended from time to time, the **"Deed of Covenant"**) and the performance by LBTCBV of its obligations under the Deed Poll.

**NOW THIS DEED WITNESSES** as follows:

1.     **DEFINITIONS**

1.1     In this Guarantee the following words and expressions shall have the following meanings:

**"Accountholder"** shall bear the meaning ascribed thereto in the Deed of Covenant in respect of Guaranteed Notes;

**"Clearing System"** means each of Euroclear, Clearstream, Luxembourg and any other clearing system specified in the relevant Pricing Supplement;

**"Conditions"** means the terms and conditions of the relevant Notes, as the same may be modified or supplemented in accordance with the terms thereof, and any reference to a numbered **"Condition"** is to the correspondingly numbered provision thereof;

**"Euroclear"** means Euroclear Bank S.A./N.V., as operator of the Euroclear System;

**"Guaranteed Note"** shall mean a Note issued by either of the Guaranteed Issuers (including an Australian Domestic Note issued by LBTCBV) and shall include any related Coupon, Talon or Receipt;

**"Holder"** shall bear the meaning ascribed thereto in the Conditions, in respect of any Guaranteed Note;

**"Relevant Date"** means either (i) the date on which payment of the relevant Note first becomes due or (ii) if the full amount of the moneys payable has not been received by the Fiscal Agent (or any other paying agent in respect of the relevant Note) on or prior to such due date, the date on which all moneys then due for payment shall have been so received and notice to that effect shall have been duly given to the Holders or Accountholders; and

**"this Guarantee"** shall mean this Guarantee Agreement as amended or supplemented from time to time.

1.2     Headings used in this Guarantee are for each of reference only and shall not affect its construction.

1.3     Unless otherwise defined herein, terms defined in the Conditions have the same respective meanings when used in this Guarantee.

2.    **GUARANTEE**

2.1    The Guarantor hereby irrevocably and unconditionally guarantees to the Holders and the Accountholders the performance by each Guaranteed Issuer of all its obligations pursuant to the Conditions of the Notes including without limitation:

(a)    the due and punctual payment of each amount payable in respect of any Guaranteed Note, the Deed of Covenant and the Deed Poll as and when the same become due and payable; and

(b)    any obligation to deliver or procure the delivery of any securities pursuant to such Conditions,

so that the Guarantor shall, if a Guaranteed Issuer shall fail punctually to perform any such obligation forthwith perform or procure the performance of the obligation in accordance with the applicable Conditions upon written demand by such Holder or Accountholder including (without limitation) the due and punctual payment of any such amount in the manner and currency prescribed by such Note which the relevant Guaranteed Issuer shall be liable to pay under and pursuant to such Guaranteed Note, the Deed of Covenant or the Deed Poll or the delivery of any securities pursuant to such Conditions and which such Guaranteed Issuer shall have failed to pay or deliver (as the case may be) at the time such demand is made.

2.2    This Guarantee is one of payment and not collection. The Guarantor acknowledges that its obligations hereunder are several and independent obligations of the Guaranteed Issuers and that the Guarantor shall be liable as sole principal debtor, with the consequence that such liability will not be discharged, impaired or otherwise affected by anything which would not so discharge, impair or otherwise affect its liability if it were a sole principal debtor, including without limitation:

(a)    any time, indulgence, waiver or consent at any time given to the relevant Guaranteed Issuer or any other person;

(b)    any amendment to the Conditions in respect of the Guaranteed Notes, the Deed of Covenant or the Deed Poll or to any security or other guarantee or indemnity;

(c)    the making or absence of any demand on the relevant Guaranteed Issuer or any other person;

(d)    the enforcement or absence of enforcement of any Guaranteed Notes, the Deed of Covenant or the Deed Poll or of any security or other guarantee or indemnity;

(e)    the release of any such security, guarantee or indemnity;

(f)    the dissolution, amalgamation, reconstruction or reorganisation of the relevant Guaranteed Issuer or any other person;

(g)    the winding up of the relevant Guaranteed Issuer or the bringing of any analogous proceeding in any jurisdiction or any change in its status, function, control or ownership; and

(h)    the illegality, invalidity, irregularity or unenforceability of, or any defect in, any provision of any Guaranteed Note, the Deed of Covenant or the Deed Poll or any of the relevant Guaranteed Issuer's obligations in respect thereof.

2.3    As a separate and alternative stipulation, the Guarantor irrevocably agrees that any sum expressed to be payable by a Guaranteed Issuer under any Guaranteed Note, the Deed of Covenant or the Deed Poll which is for any reason (including, without limitation, by reason of any provision of any Guaranteed Note, the Deed of Covenant or the Deed Poll being or becoming void, unenforceable or otherwise invalid under any applicable law) (whether or not now known or becoming known to the relevant Guaranteed Issuer, the Guarantor, the Holder(s), the Accountholder(s) or any other person) not recoverable from it on the basis of a guarantee will nevertheless be recoverable from it as if it were the sole principal debtor will be paid by it to the Holder(s) or the Accountholder(s) on written demand. This indemnity constitutes a separate and independent obligation from the other obligations in this Guarantee, gives rise to a separate and independent cause of action and will apply irrespective of any indulgence granted by the Holder(s), the Accountholder(s) or any other person.

3.    **STATUS**

3.1    The claims of the Holders and Accountholders against the Guarantor in respect of senior Guaranteed Notes will constitute direct, unconditional and (subject to the provisions of Condition 11 (Negative Pledge with respect to Senior Notes) and in the Fiscal Agency Agreement) unsecured obligations of the Guarantor and rank *pari passu* in right of payment among the Guarantee, prior to the equity securities of the Guarantor and equally with all other unsecured and unsubordinated obligations of the Guarantor (subject, in the event of insolvency, to laws affecting creditors' rights generally).

3.2    The claims of the Holders and the Accountholders against the Guarantor in respect of subordinated Guaranteed Notes constitute direct, unsecured and subordinated obligations of the Guarantor and rank *pari passu* among themselves and *pari passu* will all other present and future unsecured, unconditional and subordinated indebtedness of the Guarantor and will be subordinated, in the event of the winding-up of the Guarantor, to the claims of its Senior Creditors. Amounts payable under the Guarantee shall be due and payable by the Guarantor in such winding-up only if and to the extent that all claims against the Guarantor by its Senior Creditors have been paid in full.

3.3    Subject to applicable law, no Holder or Accountholder may be granted any security by the Guarantor or any third party or claim any right of set-off in respect of any amount owed to it by the Guarantor under this Guarantee in connection with subordinated Guaranteed Notes and each Holder or relevant Accountholder shall be deemed to have waived all such rights.

3.4    Subsequent agreements which limit the subordination effected pursuant to Clause 3.2 or which accelerate payments under this Guarantee in respect of subordinated Guaranteed Notes are not permitted by law. Should payments be effected in respect of subordinated Guaranteed Notes by the Guarantor before the maturity date without legal preconditions being fulfilled, the amount paid shall be refunded to the Guarantor notwithstanding any agreement to the contrary.

4.    **CONTINUING GUARANTEE**

This Guarantee is a continuing guarantee and shall extend to the ultimate balance of all the obligations of the Guaranteed Issuers under any Guaranteed Note notwithstanding any settlement of account or other matter or thing whatsoever. It shall remain in full force and effect until all such obligations have been irrevocably paid and satisfied in full. Furthermore, such obligations are additional to, and not in substitution for, any security or other guarantee or indemnity at any time existing in favour of any person.

5.    **REINSTATEMENT**

If any payment received by a Holder or Accountholder shall, on the subsequent bankruptcy, insolvency, corporate reorganisation or other similar event of the relevant Guaranteed Issuer, be avoided or set aside under any laws relating to such events, such payment shall not be considered as discharging or diminishing the liability of the Guarantor and this Guarantee shall continue to apply as if such payment had at all times remained owing by the relevant Guaranteed Issuer, provided that the obligations of the relevant Guaranteed Issuer and/or the Guarantor under this Clause 5 shall, as regards each payment made to the Holder or Accountholder which is avoided or set aside, be contingent upon such payment being reimbursed to the relevant Guaranteed Issuer or other persons entitled through the relevant Guaranteed Issuer.

6.    **IMMEDIATE RECOURSE**

The Guarantor waives any right it may have of first requiring a Holder or Accountholder to proceed against or enforce any other rights or security against the relevant Guaranteed Issuer or any other person before claiming from the Guarantor hereunder.

7.    **COVENANTS**

7.1    The Guarantor covenants in favour of the Holders and the Accountholders that it will duly perform and comply with the obligations expressed to be undertaken by it in the Conditions.

8.    **DEPOSIT OF GUARANTEE**

This Guarantee shall be deposited with and held by the Fiscal Agent until all obligations of the Guaranteed Issuers and/or in respect of the Guaranteed Notes have been discharged in full. The Guarantor hereby acknowledges the right of every Holder and Accountholder to the production of this Guarantee.

9.    **STAMP DUTIES**

The Guarantor shall pay all stamp, registration and other taxes and duties (including any interest and penalties thereon or in connection therewith) which may be payable upon or in connection with the execution and delivery of this Guarantee, and shall indemnify each Holder and Accountholder against any claim, demand, action, liability, damages, cost, loss or expense (including, without limitation, reasonably legal fees and any applicable value added tax) which it incurs as a result of or arising out of or in relation to any failure of the Guarantor to pay or delay in paying any of the same.

10.    **PARTIAL INVALIDITY**

If at any time any provisions hereof is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the laws of any other jurisdiction shall in any way be affected or impaired thereby.

11.    **NOTICES**

All notices, demands or other communications by any Holder or Accountholder upon the Guarantor shall be duly served upon the Guarantor if served on the Guarantor by letter at 3 World Financial Center, New York, New York 10285.

12.    **GOVERNING LAW**

This Guarantee shall be governed by, and construed in accordance with, the law of the State of New York.

**IN WITNESS** whereof the Guarantor has executed this Guarantee the day and year first above written.


**EXECUTED**                                      )
by **LEHMAN BROTHERS HOLDINGS**    )
**INC.** acting by                                )



Oliver Budde
Vice President

**<u>Exhibit 11</u>**

Bankruptcy Report of Bankruptcy Trustees
of Lehman Brothers Treasury Co. B.V., Nov. 3, 2009

H O U T H O F F   B U R U M A

# BANKRUPTCY REPORT

Bankruptcy report number **4** of the Bankruptcy Trustees of

**Lehman Brothers Treasury Co. B.V. ("LBT")**

**3 November 2009**

*The Bankruptcy Trustees communicate in two ways with holders of notes and certificates issued by LBT (jointly: "**Noteholders**"): (i) information the Bankruptcy Trustees are obliged to provide to Noteholders pursuant to the Dutch Bankruptcy Act, e.g. about the filing of claims, the date of the creditors' meeting and any distribution, is also provided in "Notices to Noteholders". The Bankruptcy Trustees will send these notices through the electronic communication channels of the clearing systems; (ii) information about the progress of the bankruptcy will be made public by the Bankruptcy Trustees by issuing quarterly public reports. Both the notices and the public reports are available on* **www.lehmanbrotherstreasury.com***.*

---

### Key items:

- The Bankruptcy Trustees do not intend to request the Amsterdam District Court to set dates for the filing of claims and for the claims admission meeting before the second half of 2010.

- The Bankruptcy Trustees are party to the *Cross-Border Insolvency Protocol* and have participated in meetings with official representatives that are also party to this Protocol on 23 and 24 September 2009 in New York and on 15 and 16 October 2009 in Amsterdam.

- The Bankruptcy Trustees have filed several proofs of claim in the Chapter 11 proceedings of Lehman Brothers Holdings Inc. ("**LBHI**") (see paragraph 3 for more details). The Bankruptcy Trustees explicitly refer Noteholders to the website of LBHI (www.lehman-docket.com) for detailed information regarding the Chapter 11 proceedings of LBHI.

- As to the valuation of Noteholders' claims, the Bankruptcy Trustees have formulated provisional valuation principles in paragraph 6 of this report.

- On 13 October 2009, Frédéric Verhoeven was appointed co-bankruptcy trustee by the Amsterdam District Court.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

| | | |
|---|---|---|
| Company details | : | **Lehman Brothers Treasury Co. B.V.** |
| Bankruptcy number | : | 08.0494-F |
| Date of decision | : | (Provisional suspension of payments: |
| | | 19 September 2008) |
| | : | Bankruptcy:  8 October 2008 |
| Bankruptcy trustees | : | Rutger J. Schimmelpenninck and Frédéric |
| | | Verhoeven |
| Supervisory judge | : | Ms W.A.H. Melissen |
| Company activities | : | The objective of LBT in accordance with its articles of association was - briefly summarised - the financing of companies of the Lehman Brothers Group, by borrowing, lending and raising monies and participating in all kinds of financial transactions, including the issuance of financial instruments. |
| Period under review | : | 1 July 2009 - 30 September 2009 |
| Hours spent in period under review: | | 1,879.7 |
| Hours spent - total | : | 8,545.3 |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A                                                          3/23

**0.      Preliminary comments**

0.1     This is the fourth report of the Bankruptcy Trustees. This report covers the period of 1 July 2009 through 30 September 2009. The Bankruptcy Trustees emphasise that the information in this report - in particular the financial data - is subject to further investigation. At a later stage it may turn out that a major part of this information must be adjusted. This report should be read in conjunction with the previous three reports. Definitions and abbreviations in this report are used in the same manner as in the previous reports, except with respect to paragraph 6 which contains a specific list of definitions related to that paragraph.

0.2     The Bankruptcy Trustees have previously informed Noteholders and (other) creditors by means of notices dated 23 September 2008, 8 October 2008, 22 December 2008 and 1 October 2009, respectively. These notices are available, with other important information, on the website www.lehmanbrotherstreasury.com.

0.3     The bankruptcy of LBT is complex and its cross-border financial and legal aspects are complicated. In this report the Bankruptcy Trustees present the current state of affairs in a simplified manner in accordance with the guidelines for bankruptcy reporting applicable in the Netherlands.

**1.      Statement of affairs**

1.1     <u>Management and organisation</u>
         LBT is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware) Inc, which company in turn is fully owned by LBHI, the holding company of the worldwide operating Lehman Brothers group (the "**Lehman Brothers Group**").

1.2     <u>Activities LBT</u>

1.2.1   *Introduction*
         LBT was incorporated for the financing of the business activities of the Lehman Brothers Group by issuing - through various intermediary parties - financial instruments, in particular "(**structured**) **Notes**" to institutional and private investors. The characteristics of these Notes vary from relatively simple to very complex. In most cases – if not in all – the principal of the loan as well as the amount of the return is linked to the movements of (embedded) derivative market elements such as equity prices, stock indices, commodities, etc. LBT on-lent the revenues of the Notes to LBHI.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

1.2.2.  LBT hedged the risks related to these derivative elements by entering into swaps under ISDA-agreements with other entities of the Lehman Brothers Group. In principle, these swaps were concluded by LBT for each individual series of Notes, as a result of which LBT in principle was not supposed to run risks on the movements of the underlying values related to the Notes it had issued. These other Lehman Brothers Group entities subsequently covered (part of) the risks that they had assumed from LBT by entering into hedging agreements with external parties. Documentation that was made available to the Bankruptcy Trustees shows that the derivative market elements in the Notes, contrary to what was intended and perhaps by mistake, were not always fully hedged. The Bankruptcy Trustees have requested Lehman Brothers (International) Europe ("**LBIE**") for further accounting information with respect to the hedges and expect that they will receive this information in the next reporting period. At a later stage the Bankruptcy Trustees will form their views on the hedging strategy applied by LBT.

1.3.    Financial information

1.3.1.  *Accounting*
As a result of the multitude and diversity of the financial instruments LBT issued, the bookkeeping of LBT is complicated and operationally interwoven with the accounting systems of the Lehman Brothers Group.

As set out in the previous reports, LBIE performed a number of important duties for LBT, including various administrative duties.

LBIE and Lehman Brothers Limited ("**LBL**") have their respective corporate seat in London and have been in administration (insolvency proceedings under English law) since 15 September 2008. Four partners of PricewaterhouseCoopers in England have been appointed as joint administrators for these entities, as well as a number of other U.K. based Lehman Brothers Group companies (the "**Joint Administrators**").

1.3.2.  *Available financial information / Global close*
The global close of the accounts of the Lehman Brothers Group as at 15 September 2008 (as described in more detail in § 1.3 of the first report) was finalised in January 2009. The Bankruptcy Trustees have not actively been involved in the global close process. As part of this process, which was initiated by (former employees of) LBHI and LBIE, a provisional balance sheet of LBT was drawn up (in accordance with US GAAP) as at Monday 15 September 2008 (start of business day), which more or less equals Friday 12 September 2008 (close of business).

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

For both LBHI and LBIE the respective balance sheet positions at 15 September 2008 are of importance since on that day both the administration of LBIE and the Chapter 11 proceedings in respect of LBHI were declared. For the determination of their respective financial positions within the context of these insolvency proceedings, both LBHI and LBIE will initially proceed on the basis of the figures produced within the scope of the global close.

The Joint Administrators have presented a procedure to various official representatives which aims at dealing - on a bilateral basis - with intercompany positions. To this end the Joint Administrators provided the official representatives with a "Memorandum of Understanding" outlining this procedure in more detail. In addition, the Joint Administrators organised a presentation in London on 15 July 2009 for the representatives of the entities that have an intercompany position with LBIE about the realisation of the global close and the resulting financial data.

The Bankruptcy Trustees have not formally responded to this "Memorandum of Understanding". At present the Bankruptcy Trustees prefer addressing the outcome of the global close and LBT's 15 September 2008 balance, in the meetings held between the official representatives that joined the *Cross-Border Insolvency Protocol* (the "**Protocol**") and the representatives of Lehman Brothers Japan, Lehman Brothers Equity Finance S.A. and Lehman Brothers Luxembourg S.A. (these entities have not (yet) officially signed the Protocol but endorse its principles) (jointly: the "**Protocol-parties**"). The Bankruptcy Trustees refer to § 1.4 of the third report for the background of the Protocol.

1.3.3.  *Meetings within the scope of the Protocol*
The Protocol-parties have had their first meeting in London on 16 and 17 July 2009 and in New York on 23 and 24 September 2009. At the meeting in London the joint objective was formulated to strive for a process in which intercompany positions can be established by the various official representatives in a coordinated, efficient and transparent manner. The first step in this process was making the financial information, which could be derived from the various IT-systems within the Lehman Brothers Group, available to the Protocol-parties. In addition, a *Procedures Committee* was established consisting of representatives of the various Protocol-parties. Twice a month the Procedures Committee holds conference calls to monitor the progress in the process and to address specific issues.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

In New York on 23 and 24 September 2009 LBHI organised a two-day (financial) 'mini-seminar' for the Procedures Committee explaining the internal procedures behind the global close. The attending parties were provided with financial information related to their respective entities and as well as specific insight in the IT-systems that generated the financial data. The purpose of the meetings in New York was also to establish - to the extent possible - the population of intercompany trades that exist between the entities.

In Amsterdam the Protocol-parties had the second Protocol-meeting on 15 and 16 October 2009 which followed up on the "mini-seminar". Principles relating to the valuation of the intercompany positions were also discussed. The next meeting of the Protocol-parties is scheduled for January 2010 and it is expected that this meeting will focus on the legal aspects related to the valuation of inter-company claims.

The position of the Joint Administrators with respect to the Protocol is still that participating in multilateral meetings would not be in the best interests of LBIE and its creditors. For this reason the Joint Administrators choose not to participate in the aforementioned meetings in New York and Amsterdam

1.3.4.  *Swaps*

As stated before, in principle LBT covered the risks related to the derivative elements embedded in the Notes by entering into swap agreements with other Lehman Brothers Group entities. Some of the ISDA-agreements, including the agreement with Lehman Brothers Finance S.A. ("**LBF**"), could have been automatically terminated upon the occurrence of certain events of default as defined in the respective ISDA-agreement while as regards to other ISDA-agreements the Bankruptcy Trustees have received termination notices. The Bankruptcy Trustees refer to the overview on page 7 of the third report for the (provisional) status of the ISDA-agreements LBT entered into and note that LBIE has sent a notice aimed to terminate its ISDA-agreement with LBT as of 30 June 2009.

The legal validity of the termination of the various ISDA-agreements is investigated in more detail. The Bankruptcy Trustees reserve all rights in respect thereof - and therefore also in respect of the valuation of the positions outstanding under the ISDA-agreements. It is noted that the Protocol meetings address the reconciliation of the trade information obtained from several accounting sources with respect to the swap positions. Given the large number of trades that the parties entered into and the complexity of the accounts, this reconciliation process might take some time. At a later stage, parties might

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver
of any rights, claims or defenses.

formulate a practical approach to come to a calculation of the outstanding positions under the various ISDA agreements.

1.4.   Cause of provisional moratorium and bankruptcy
       The Bankruptcy Trustees refer to the second report, § 1.9.

**2.     Assets**

2.1.   In the period under review the Bankruptcy Trustees received EUR 7,781,047 from the Tax Authorities (see the previous reports, § 2.1).

2.2.   The balance of LBT's estate accounts was EUR 9,394,999 on 30 September 2009. In addition LBT holds is a total amount of approximately EUR 94,740 in various bank accounts. These amounts will be transferred to the estate accounts in the coming period.

**3.     Debtors**

3.1.   As reported in the first report, the receivable of LBT due from LBHI is based on a loan agreement between of 26 May 2000 (annex III to the first report) and amounts to USD 34,782,418,198 according to the balance sheet as at 31 August 2008 and USD 32,604,207,177 according to the balance sheet as at 7 October 2008. This difference is the result of two factors. In the period between 31 August 2008 and 7 October 2008 repayments were made, also the USD denominated loan to LBHI consists of various currencies. In this period the USD increased in value in respect of other currencies.

3.2.   The Bankruptcy Trustees filed proofs of claim against LBHI and various other U.S. entities of the Lehman Brothers Group, including, but not limited to, proofs of claim with respect to the loan agreement mentioned above, the 'Independent Guarantee' of 16 September 1997 (annex IV to the first report) and proofs of claim in relation to positions under various ISDA-agreements. At this stage it is not required to substantiate each filed proof of claim with a specific amount,

In addition the Bankruptcy Trustees filed a proof of claim with LBHI in relation to the *Unanimous Written Consent of the Executive Committee of the* (LBHI's) *Board of Directors* of 9 June 2005 (the "**Board Resolution Guarantee**"). By filing this proof of claim the Bankruptcy Trustees have asserted claims LBT may have in relation to this Board Resolution Guarantee, including, but not limited to a claim of USD 38,413,246.93 for claims under various intercompany swap transactions.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

Below is an overview of the claims filed by LBT in the various U.S. proceedings: The Bankruptcy Trustees note that all claims filed may be amended at a later stage.

| Debtor | Claim Description | Amount (to the extent applicable) |
|---|---|---|
| Lehman Brothers Holdings Inc. | Intercompany Loan/Advances | USD 34,820,143,374.91 |
| Lehman Brothers Holdings Inc. | Independent Guarantee | USD 34,820,990,272.45 |
| Lehman Brothers Holdings Inc. | Board Resolution Guarantee | USD 38,413,246.93 |
| Lehman Brothers Holdings Inc. | Swap Guarantee | USD 37,566,349.39 |
| Lehman Brothers Special Financing Inc. | Intercompany Receivable | USD 445,419.11 |
| Lehman Brothers Commodity Services Inc. | Derivative | - |
| Lehman Brothers Commercial Corporation | Derivative | USD 37,349,197.95 |
| Lehman Brothers Holdings Inc. | Derivative | - |
| Lehman Brothers Special Financing Inc. | Derivative | - |
| East Dover Limited | Catchall | - |
| CES Aviation IX LLC | Catchall | - |
| CES Aviation V LLC | Catchall | - |
| CES Aviation LLC | Catchall | - |
| Lehman Scottish Finance L.P. | Catchall | - |
| Lehman Brothers Financial Products Inc. | Catchall | - |
| Lehman Brothers Commercial Corporation | Catchall | - |
| Lehman Commercial Paper Inc. | Catchall | - |
| Lehman Brothers Derivatives Products Inc. | Catchall | - |
| Lehman Brothers OTC Derivatives | Catchall | - |

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

H O U T H O F F   B U R U M A

| Debtor | Claim Description | Amount (to the extent applicable) |
|---|---|---|
| Lehman Brothers Special Financing Inc. | Catchall | - |
| Lehman Brothers Commodity Services Inc. | Catchall | - |
| PAMI Statler Arms LLC | Catchall | - |
| LB 745 LLC | Catchall | - |
| Lehman Brothers Holdings Inc. | Catchall | - |
| LB 2080 Kalakaua Owners LLC | Catchall | - |
| LB Rose Ranch LLC | Catchall | - |
| Structured Asset Securities Corporation | Catchall | - |
| BNC Mortgage LLC | Catchall | - |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | Catchall | - |

In principle, all the proofs of claim with their addenda submitted by the Bankruptcy Trustees will be available from LBHI's website (www.lehman-docket.com) in the coming weeks.[1]

## 4.    Bank / Security

4.1.    Claim from bank(s)
See previous report, § 4.1.

## 5.    Lawfulness

5.1.    Accounting obligation
The Bankruptcy Trustees will give their view on the accounts and the accounting obligation at a later stage.

5.2.    Filing of annual accounts
According to the Commercial Register the most recent annual accounts of LBT (for 2007) were timely filed on 30 May 2008.

---

[1] Click the link "*Filed claims and Schedules*" at the top of the page and enter the search term "*Lehman Brothers Treasury*" in the field "*name starts with*".

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**H O U T H O F F   B U R U M A**

5.3.    Auditor's report
The annual accounts of LBT for 2007 have been provided with an unqualified auditors' report.

5.4.    Management
At a later stage the Bankruptcy Trustees will further investigate the fulfilment of duties the Board of Directors (under the articles of association) or any de facto director.

5.5.    Fraudulent acts (*Paulianeus handelen*)
The Bankruptcy Trustees will further investigate this at a later stage.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

## 6.    Creditors: valuation principles

### 6.1.    Introduction

#### 6.1.1.    *Provisional valuation principles*

As the Bankruptcy Trustees announced in the previous report, provisional principles for the valuation of claims arising from Notes will be set forth in this report. Noteholders that wish to react to these principles are requested to do so before mid-December 2009.

The Notes that have been issued by LBT are complex, both from a legal and a financial perspective. Various legal must be resolved before a calculation of the value of the claims arising from Notes can be made. The principles and views expressed in this chapter may be subject to change and are therefore presented without prejudice.

The Bankruptcy Trustees intend to announce definitive valuation principles in their public report of January 2010. Subsequently, the necessary valuation of claims arising from Notes will be carried out. When such valuations have been completed, the Bankruptcy Trustees intend to request the Supervisory Judge to establish the dates for the filing of claims (the "**Claims Filing Date**") and the subsequent Claims Admission Meeting (in which claims will be admitted or disputed). Such a request to the Supervisory Judge will not be made before the second half of 2010.

In this report, the Bankruptcy Trustees address the valuation of claims under the Programs, and not the valuation of any claims under the guarantees granted by LBHI to Noteholders of LBT.

Capitalised terms used in this paragraph are defined in paragraph 6.7 (*Definitions*).

#### 6.1.2.    *Why is the valuation of the Notes important?*

Under the Dutch Bankruptcy Act, creditors must file their claims with the Bankruptcy Trustees in order to be entitled to a distribution out of the bankruptcy proceeds on the basis of the admitted claim. To determine the amount of the admissible claims, and as a consequence, of a distribution, the value of the claims must be assessed.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

6.2.    The Contractual Amount and the Admissible Amount

The starting point for the valuation of claims arising from Notes is the terms and conditions of the underlying contracts (*i.e.* the Conditions of the relevant Notes). These Conditions specify the amounts that are payable to Noteholders under such contracts (the **"Contractual Amount"**), and when such amounts are due and payable.

The Bankruptcy Trustees intend to adhere to the Conditions to the extent permitted by Dutch bankruptcy law.

Once the Contractual Amounts have been determined, Dutch bankruptcy law must be followed in order to calculate (based on the Contractual Amounts) the corresponding amount that can be admitted in the Dutch bankruptcy proceeding of LBT (the **"Admissible Amount"**).

The interpretation and application of the Dutch Bankruptcy Act ("**DBA**"; most of the relevant provisions date from its inception in 1896) in the context of the Conditions of the Notes gives rise to a number of questions. To the extent that case law does not provide answers, the Bankruptcy Trustees will adopt solutions that are equitable and pragmatic.

6.3.    When Notes are due and payable

In order to formulate valuation principles, an understanding of the point in time when Notes become due and payable is important. This paragraph describes when Notes become due and payable.

6.3.1.    *Notes do not automatically become due and payable as a result of LBT's bankruptcy*

According to the applicable Conditions of the Notes and the law that applies to such Conditions, as a general principle, Notes do <u>not</u> become automatically due and payable as a result of the Chapter 11 procedure of LBHI or LBT's bankruptcy or moratorium of payments.

There may be exceptions to this general principle and Noteholders should refer to the Conditions applicable to their Notes.

Furthermore, Dutch (bankruptcy) law does not contain any rule pursuant to which Notes (automatically) become due and payable as a result of the aforementioned events.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver

of any rights, claims or defenses.

H O U T H O F F   B U R U M A

6.3.2.  *In principle, Notes become due and payable at the end of their term*

According to the applicable Conditions, as a general principle, Notes become due and payable at the end of their term, being the Final Maturity Date. There are exceptions to this principle: that is, Notes become due and payable at the Mandatory Early Redemption Date (if applicable), or following the submission of an *acceleration notice* at the Early Redemption Date. These exceptions are described below.

6.3.3.  *Notes that become due and payable as a result of market fluctuations ("triggering events")*

A limited number of Notes becomes due and payable at the Mandatory Early Redemption Date when (at *Scheduled Observation Dates* (as defined in the relevant Final Terms)) the value of certain reference assets fluctuate above or below prescribed thresholds as a result of market fluctuations. These thresholds and the *Scheduled Observation Dates* are described in the Final Terms of the relevant Notes.

6.3.4.  *Acceleration of Notes renders Notes due and payable*

Upon the occurrence of certain *events of default* (as defined in the applicable Conditions, such as the moratorium with respect to LBT, its bankruptcy, or the Chapter 11 proceedings of LBHI), holders of a Series of Notes are entitled to *accelerate* the respective Series of Notes in accordance with the Conditions of the Notes.[2] In the event of a valid acceleration, Notes become due and payable at their Early Redemption Date. This right of acceleration is further described in paragraph 6.6 (*Acceleration*) below.

6.4.  <u>Valuation principles for different categories of Notes</u>

The Contractual Amount at the moment at which Notes become due and payable is in principle established at the Final Maturity Date, the Mandatory Early Redemption Date or the Early Redemption Date (whichever is applicable) in accordance with the requirements of the applicable Conditions or Final Terms.

For the purpose of formulating valuation principles, the Bankruptcy Trustees have distinguished the following four categories of Notes.

---

[2] Under the German Program only the Notes of the Noteholders that have validly accelerated their Notes become due and payable and not the entire Series of Notes.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

6.4.1.   ***Category I***: *Claims arising from Notes that became due and payable before the Bankruptcy Date*

In the case of Notes that were due and payable before the Bankruptcy Date, the Admissible Amount, is the Contractual Amount, increased by any interest that accrues to the benefit of the Noteholder in accordance with the Conditions. Such contractual interest will in principle accrue for the period that begins when the Notes became due and payable and ends at the Bankruptcy Date (Article 128 DBA)[3]. If no contractual interest applies, the Bankruptcy Trustees will assess whether a statutory default interest is applicable.

6.4.2.   ***Category II***: *Claims arising from Notes that became due and payable within one year after the Bankruptcy Date*

In principle, the Admissible Amount of claims arising from Notes that became due and payable within one year after the Bankruptcy Date is the Contractual Amount (Article 131, paragraph 2, first sentence DBA). Any component of the Contractual Amount that corresponds to interest due over the period from the Bankruptcy Date to the date that the Note became due and payable is not taken into account (Article 128 DBA).

As such, claims arising from Notes that became due and payable within one year after the Bankruptcy Date are admissible for the Final Redemption Amount, the Early Redemption Amount, or the Mandatory Early Redemption Amount, provided that these amounts will not include any interest accrued after the Bankruptcy Date.

6.4.3.   ***Category III***: *Claims arising from Notes that become due and payable later than one year after the Bankruptcy Date but before the Claims Filing Date*

The Admissible Amount is determined by calculating the present value of the aforementioned Contractual Amount at the date of the first anniversary of the bankruptcy (8 October 2009).

The discount rate that will be used in the present value calculation of the aforementioned Contractual Amounts will be a "*risk-free interest rate*". The Bankruptcy Trustees intend to increase this "*risk-free interest rate*" by a "*credit spread*" specific to the Lehman Brothers Group. In determining the present value of the claims falling into Category III, all future contractual payments will be taken into account and will be discounted to their present value at 8 October

---

[3] See paragraph 6.8 (*Relevant Articles of the Dutch Bankruptcy Act*) for a translation of the relevant Articles of the Dutch Bankruptcy Act.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

2009. As such, the contractually agreed upon effective interest rate will be reflected in the determination of the Admissible Amount (Article 131, paragraph 3 of the DBA).

A *risk-free interest rate* is the interest rate on government bonds issued in the currency of the relevant Note. The Bankruptcy Trustees will, for each currency, use *risk-free interest rates* on government bonds where the term to maturity corresponds with the period between the first anniversary of the bankruptcy (8 October 2009) and the date on which the Notes concerned become due and payable. A summary of the ranges of *risk-free interest rates* that will be applied is provided in paragraph 6.9 (*Overview of risk free rates*).

The *credit spread* for Lehman Brothers is an additional interest charge, over and above the *risk-free interest rate*, that investors in Lehman Brothers debt demanded. The magnitude of this spread depends on the terms of the debt instrument and therefore varies from one debt instrument to another. In the days preceding the Chapter 11 of LBHI, such spreads increased substantially. In light of these factors, the Bankruptcy Trustees intend to use an overall average *credit spread* in the range of 2.5% to 3.5% (based on relevant market information for the period one month preceding 15 September 2008).

6.4.4.   ***Category IV****: Claims arising from Notes that become due and payable after the Claims Filing Date*

a.   *Distinction between Notes with a determined and an undetermined amount*

It is expected that at the Claims Filing Date a number of Notes will still be outstanding because these Notes will not have reached their Final Maturity Date and will not have been accelerated at that date.

For this category of claims, the Dutch Bankruptcy Act makes a distinction between claims with a determined amount (*bepaalde waarde*) and claims with an undetermined amount (*onbepaalde waarde*). Whether a claim has an undetermined or a determined amount will be assessed on the Claims Filing Date.

When the Contractual Amounts of such a claim can be calculated in accordance with the applicable Conditions, the claim is or can be *determined* (and as such falling within the scope of Article 131, paragraph 2, second sentence DBA). When the Contractual Amount of such a claim cannot be established at the Claims Filing Date in accordance with the applicable Conditions, the claim is *undetermined* (Article 133 DBA). Whether claims qualify as determined or undetermined depends on the specific terms and conditions of each Note. For

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

example, if the Contractual Amount equals to a fixed amount, a claim from such Note would qualify as determined.

In principle, all claims arising from Notes that have matured or that have been (mandatorily) accelerated before the Claims Filing Date are considered <u>determined</u>.

b.   *Claims arising out of Notes that are due and payable after the Claims Filing Date and that have a determined amount*

Claims arising from Notes that are due and payable after the Claims Filing Date and that have a determined amount will be treated using the Category III valuation approach described above.

c.   *Claims arising from Notes that are due and payable after the Claims Filing Date and that have an undetermined amount*

To the extent that claims arising from Notes that become due and payable after the Claims Filing Date have an undetermined amount or component, their value must be estimated (*geschat*) at the Bankruptcy Date in accordance with Article 133 DBA. This estimate is referred to as the "Deemed Contractual Amount."

The Admissible Amount is then established by calculating the value of the Deemed Contractual Amount at the date of the first anniversary of the bankruptcy (8 October 2009) (Article 131, paragraph 2 DBA).

If a claim arising out of Notes has both determined and undetermined elements (for example '*Capital Protected Notes*' which are partially determined) only the undetermined element is estimated pursuant to Article 133 DBA as set out in this paragraph. The determined element will be valued in accordance with the rules provided for under Category III.

d.   *Calculation of the Deemed Contractual Amount*

As described above, the value of claims in Category IV that have an undetermined amount or component should be estimated at the Bankruptcy Date (the Deemed Contractual Amount).

The Bankruptcy Trustees' understanding of Article 133 DBA is that in order to estimate Deemed Contractual Amounts, all relevant circumstances should be taken into account. Consequently, the Bankruptcy Trustees have tentatively concluded that the appropriate date for the determination of Deemed Contractual Amounts is 15 September 2008 at the beginning of the business day (New York time/EST). This tentative conclusion is based on the following:

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

(i)   On 15 September 2008, LBHI was granted relief under Chapter 11. Consequently, the business operations of LBT ceased on 15 September 2008; no further Notes were issued or redeemed after that date and also the financial records of LBT were no longer kept up-to-date;

(ii)  As a result of LBHI's Chapter 11 procedure, the financial markets have - in the weeks following - exhibited volatile fluctuations. The market values of underlying assets directly preceding the granting of Chapter 11 to LBHI therefore provide a more appropriate starting point for the purpose of valuing claims;

(iii) The ISDA agreement between LBT and LBF, its counterparty with respect to equity swaps, may be terminated on 19 September 2009 when LBT was granted a moratorium of payments.

6.5.    Exchange rates

As all claims in the bankruptcy of LBT must be filed in euro, the claims arising from Notes issued in foreign currencies must be converted into euro. For each of the aforementioned categories of claims, Article 133 DBA requires that the euro exchange rate on the Bankruptcy Date must be applied.

6.6.    Acceleration

6.6.1.  *The right of acceleration*

Upon the occurrence of certain *events of default* (as defined in the applicable Conditions such as the provisional moratorium with respect to LBT, its bankruptcy, or the Chapter 11 proceedings of LBHI), holders of a Series of Notes are entitled to *accelerate* the relevant Series of Notes in accordance with the Conditions of the Notes.[4] The Programs stipulate that, as a result of a valid acceleration by the required percentage of Noteholders, the *entire* Series of Notes concerned becomes due and payable, except for the German Note Issuance Program that stipulates that *only* claims of specific holders of a Series of Notes that have exercised their right of acceleration become due and payable.

The conditions and requirements of the right of acceleration vary by Program and are included in the Conditions. The Bankruptcy Trustees have not been able to verify whether (Series of) Notes have been validly accelerated, among other things because not all acceleration notices evidence that the required proportion

---

[4] An exception to this is the Italian program where the trustee (JPMorgan Chase National Association) has the right to accelerate Notes. A notice of acceleration of the Italian Program was received on 7 October 2009.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

of Noteholders under a specific Series of Notes has been obtained. A list of ISIN codes in relation to which the Bankruptcy Trustees have received a notice seeking to accelerate the corresponding Notes will be placed on the website www.lehmanbrotherstreasury.com in November 2009.

For the sake of completeness, the Bankruptcy Trustees note that under some Programs valid accelerations can be revoked by a prescribed percentage of holders of a Series of Notes pursuant to the relevant Conditions. Until now, the Bankruptcy Trustees have not received communication aimed at revoking previously made acceleration.

6.6.2.  *Effect of acceleration on valuation*

For most Programs, as a result of acceleration, the Contractual Amount (the Early Redemption Amount) is calculated as of the date of acceleration in accordance with the applicable Conditions or Final Terms, whereby in principle the data elements used in the calculation are determined as of the date of acceleration.

As a result of acceleration the Notes will become determined as of the Early Redemption Date and the Early Redemption Amount (being the Contractual Amount) can be calculated based on relevant information at the Early Redemption Date. The Early Redemption Date dictates when a Note becomes due and payable, which in turn dictates into which of the above categories the relevant Note will fall.

6.6.3.  *No acceleration after a certain date*

The Bankruptcy Trustees are investigating the possibility of setting, with the approval of the court, a final date for the acceleration of all Notes. Claims under Notes that at such date have not been accelerated and have not matured will be established in accordance with Article 131 and 133 DBA.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

6.7.   <u>Definitions</u>

| | |
|---|---|
| **Admissible Amount** | the value for which the relevant Note can be admitted in the Dutch bankruptcy proceeding of LBT. The Admissible Amount is calculated based on the Contractual Amount or the Deemed Contractual Amount |
| **Bankruptcy Date** | 8 October 2008 |
| **Claims Admission Meeting** | the meeting, chaired by the Supervisory Judge, in which the claims of all creditors will either be admitted (*erkend*) or disputed (*betwist*) by the Bankruptcy Trustees |
| **Claims Filing Date** | the date for filing of claims in the bankruptcy of LBT as set by the Supervisory Judge in accordance with Article 108 of the Dutch Bankruptcy Act |
| **Conditions** | the terms and conditions of the Notes, which are contained in the respective prospectuses in relation to the Programs |
| **Contractual Amount** | the amount that would be payable to a Noteholder under the relevant Conditions of a Note, such as the Final Redemption Amount, the Early Redemption Amount or the Mandatory Early Redemption Amount |
| **DBA** | Dutch Bankruptcy Act (*Faillissementswet*) |
| **Deemed Contractual Amount** | With respect to undetermined claims arising from Notes, the estimated amount of the claim at the Bankruptcy Date |
| **Early Redemption Amount** | the amount payable to a Noteholder on the Early Redemption Date as specified in the relevant prospectus and/or the applicable Final Terms |
| **Early Redemption Date** | the date on which Notes become due and payable at their Early Redemption Amount as a result of an |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

HOUTHOFF BURUMA

| | acceleration |
|---|---|
| **Final Maturity Date** | the maturity date of the Notes on which the Notes will be redeemed at their Final Redemption Amount. In the Conditions and Final Terms, this date can also be defined as "Maturity Date" |
| **Final Redemption Amount** | the amount payable on the Final Maturity Date as specified in the relevant prospectus and/or the applicable Final Terms |
| **Final Terms** | a separate document in relation to each issue of a Series of Notes, amending and finalizing the Conditions |
| **Mandatory Early Redemption Amount** | the amount payable upon the occurrence of certain 'triggering events" (as further specified under 'mandatory early redemption events' in the relevant Final Terms) |
| **Mandatory Early Redemption Date** | the date on which certain Notes will be automatically redeemed at their Mandatory Early Redemption Amount |
| **Notes** | notes and certificates issued by LBT under the Programs |
| **Noteholders** | institutional and private investors that hold Notes |
| **Programs** | the USD 100,000,000,000 Euro Medium Term Note Program ("EMTN Program"), the USD 4,000,000,000 German Note Issuance Program, the (Swiss) Certificates Program and the (Italian) Inflation Linked Notes Program |
| **Series of Notes** | the entirety of Notes of a single issuance of Notes, which may comprise of one or more tranches issued on different issue dates. The Notes of each Series of Notes are subject to identical terms, except that the issue date, the issue price and the amount of the first payment of interest may be different in respect of different tranches |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

6.8.    <u>Relevant Articles of the Dutch Bankruptcy Act</u>

**Article 128** (to the extent relevant, informal translation):

*Interest accruing after the bankruptcy order may not be admitted unless secured by a pledge or mortgage. (...)*

**Article 131** (informal translation):

*1. A claim with an uncertain due date or which entitles the creditor to periodic payments shall be admitted for its value at the date of the bankruptcy order.*

*2. All claims which become payable within one year after the date of the commencement of the bankruptcy shall be considered exigible at that time. All claims which become payable one year thereafter shall be admitted for their value one year from the date of the commencement of the bankruptcy.*

*3. Only the time and method of installment payments, a profit opportunity, where applicable, and, if the claim bears interest, the agreed interest rate shall be taken into account for the calculation.*

**Article 133** (informal translation):

*Claims having an indeterminate or uncertain value or whose value is not expressed in Dutch currency or not expressed in money at all, shall be admitted for their estimated value in Dutch currency.*

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

6.9.    Overview of risk-free rates

**Term structures per country as of 12 September 2008 (in %)**

| Country | Currency | Maturity | | | | |
|---|---|---|---|---|---|---|
| | | 1Y | 5Y | 10Y | 15Y | 20Y |
| Germany | EUR | 4.281 | 3.967 | 4.226 | 4.618 | 4.708 |
| US | USD | 1.965 | 2.926 | 4.058 | 4.307 | 4.398 |
| UK | GBP | 4.625 | 4.536 | 4.669 | 4.768 | 4.733 |
| Japan | JPY | 0.592 | 1.130 | 1.555 | 1.883 | 2.188 |
| Switzerland | CHF | 2.197 | 2.567 | 2.839 | 3.176 | 3.267 |
| Australia | AUD | 5.885 | 5.617 | 5.676 | 5.696 | |
| Canada | CAD | 2.764 | 3.175 | 3.753 | 4.082 | 4.158 |
| Czech Republic | CZK | 3.447 | 3.893 | 4.373 | 4.652 | 4.677 |
| Denmark | DKK | 4.432 | 4.225 | 4.415 | 4.716 | 4.849 |
| Hong Kong | HKD | 1.593 | 2.530 | 2.785 | | |
| Hungary | HUF | 8.646 | 8.054 | 7.745 | 7.511 | |
| Israel | ILS | 2.080 | 3.210 | 4.230 | 4.580 | 4.640 |
| Mexico | MXN | 8.390 | 8.454 | 8.507 | 8.510 | 8.541 |
| New Zealand | NZD | 6.542 | 5.741 | 5.839 | | |
| Norway | NOK | 5.884 | 4.546 | 4.501 | 4.559 | |
| Poland | PLN | 6.270 | 5.925 | 5.886 | 5.807 | 5.589 |
| Russia | RUB | 6.983 | 7.652 | 7.802 | 8.287 | |
| Singapore | SGD | 1.391 | 2.413 | 3.068 | 3.430 | 3.467 |
| Slovakia | SKK | 4.667 | 4.616 | 4.824 | 4.991 | 4.800 |
| South Africa | ZAR | 10.079 | 9.249 | 9.054 | 8.943 | 8.689 |
| Sweden | SEK | 4.399 | 3.904 | 3.890 | 3.869 | |

Source: Bloomberg

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**7.      Miscellaneous**

7.1.    Timing

The winding-up of the bankruptcy of LBT largely depends on the completion of the Chapter 11 proceedings of LBHI.

7.2.    Provision of information

This public report as well as the previous and next reports are available on www.lehmanbrotherstreasury.com. The original version in Dutch is also available on this website.

In the event of any difference between the Dutch version and the English translation, the Dutch text prevails, with the exception of paragraph 6, of which the English text is decisive. The public reports are also available for inspection at the Amsterdam District Court.

Creditors who are holders of a Note issued by LBT, which has been provided with an ISIN code that is included on the list of ISIN codes (which list part of the balance sheet of LBT as of 31 August 2008, annex I to the first report), are requested to read the notice of 22 December 2008 and to wait for further information from the Bankruptcy Trustees about the filing of claims in the bankruptcy.

Other creditors than holders of Notes who believe that they have a claim against LBT are requested to submit those claims in writing, provided with underlying documents, to:

**Houthoff Buruma N.V.**
**Attn. Frédéric Verhoeven**
**PO Box 75505**
**NL-1070 AM Amsterdam, the Netherlands**

Amsterdam, 3 november 2009

Rutger J. Schimmelpenninck                               Frédéric Verhoeven
bankruptcy trustee                                       bankruptcy trustee

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

## Exhibit 12

Bankruptcy Report of Bankruptcy Trustees
of Lehman Brothers Treasury Co. B.V., Dec. 22, 2008

H O U T H O F F   B U R U M A

# BANKRUPTCY REPORT

Bankruptcy report number **1** of the bankruptcy trustee of

**Lehman Brothers Treasury Co. B.V.** ("**LBT**")

**22  December 2008**

*The bankruptcy trustee of LBT communicates with holders of* notes *issued by LBT* ("Noteholders") *in two ways: (i) information the bankruptcy trustee is obliged to provide to Noteholders pursuant to the [Dutch] Bankruptcy Act, e.g. about the filing of claims, the date of the creditors' meeting and any distribution, is provided in* "Notices to Noteholders". *The bankruptcy trustee will send these notices through the electronic information channels of the clearing systems; (ii) information about the progress of the bankruptcy will be made public by the Bankruptcy Trustee by publishing quarterly public reports. Both the notices and the public reports are available on* www.lehmanbrotherstreasury.com *and* www.houthoff.com.

| | | |
|---|---|---|
| Company Details | : | Lehman Brothers Treasury Co. B.V. |
| Moratorium number | : | 08.0036-S |
| Bankruptcy number | : | 08.0494-F |
| Date of decision | : | Moratorium:    19 September 2008 |
| | | Bankruptcy:    8 October 2008 |
| Administrator/bankruptcy trustee | : | R.J. Schimmelpenninck |
| Supervisory judge | : | W.A.H. Melissen |
| Company activities | : | The objective of LBT in accordance with its articles of association is - briefly summarized - the financing of companies that were members of the Lehman Brothers Group (as defined below), including by borrowing, lending and raising monies and participating in all kinds of financial transactions, including the issuance of debt notes. |
| Turnover data | : | Operating income according to the audited annual accounts 2007: US$ 33,188,000. |
| Period covered by this Report | : | Moratorium:    19 September - 7 October 2008 |
| | | Bankruptcy:    8 October - 30 November 2008 |

Hours spent by Houthoff Buruma

| in period under review | : Moratorium: | 595.90 |
|---|---|---|
| | Bankruptcy: | 1,191.70 |
| Hours spent - total | : 1,787.60 | |

---

## 0.    Preliminary comments

0.1    This is the first report of LBT's bankruptcy trustee (the "**Bankruptcy Trustee**"). The report covers the period of the (provisionally granted) moratorium (*surséance van betaling*) (19 September 2008 - 7 October 2008) and the first period of the bankruptcy (8 October 2008 – 30 November 2008). The Bankruptcy Trustee emphasises that the information in this report - in particular the financial data - is subject to further investigation. This information may have to be substantially revised following this investigation. The Bankruptcy Trustee informed Noteholders and creditors before by means of two notices to creditors of 23 September 2008 and 8 October 2008. These notices are available at www.houthoff.com and www.lehmanbrotherstreasury.com.

0.2    The bankruptcy of LBT is legally complex and has many cross-border aspects. In this report the Bankruptcy Trustee represents the present state of affairs in a simplified manner in accordance with the guidelines for bankruptcy reporting applicable in the Netherlands.

## 1.    Statement of affairs

1.1    <u>Management and organisation</u>
LBT was incorporated on 8 March 1995 and is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware) Inc, which company in turn is wholly-owned by Lehman Brothers Holdings Inc. ("**LBHI**"). LBHI is incorporated in Delaware in the United States and is the holding company of the worldwide operating Lehman Brothers group (the "**Lehman Brothers Group**").

LBT has its corporate seat at Strawinskylaan 3105 (Atrium), in (1077 ZX) Amsterdam. Mr Fuller (from 11 September 1996), Mr Fischer (from 26 November 2007), Mr Kamphuijs (from 30 December 2005) and Mr Van Burg (from 2 September 2008) (the "**Board of Directors**") are listed in the Commercial Register as the managing directors of LBT. Any two directors are authorised to represent and bind LBT.

1.2.    LBT's activities

LBT helped finance the business activities of the Lehman Brothers Group by issuing structured notes - through various parties acting as intermediaries - to both financial institutions and individuals. The characteristics of these notes are varied; from relatively simple to tailored to the wishes of specific and usually professional investors. Another important characteristic is that in many - if not most - cases the principal amount of the notes as well as the amount and payment of interest is linked to various derivative market elements such as the development of specific share prices or the prices of commodities such as gold and oil.

LBT hedged the risks related to these derivative market elements by entering into agreements ("*swaps*") - based on umbrella ISDA-agreements – with other members of the Lehman Brothers Group. These swaps were entered into by LBT for each individual series of notes, as a result of which in economic and accounting terms LBT did not run any market risk of value movements with respect to the notes it issued. According to the information obtained by the Bankruptcy Trustee, these other Lehman Brothers Group entities subsequently covered the risks that they had taken over in this manner from LBT, insofar as they deemed such necessary, by entering into *hedging*-agreements with external market players.

LBT lent the proceeds of the notes to LBHI.

1.3.    Financial information

As a result of the multitude of outstanding notes and the inherent complexity of the valuation of derivative elements, the accounting of LBT is very complicated and operationally interwoven with the accounting of the Lehman Brothers Group.

Lehman Brothers International (Europe) ("**LBIE**") and Lehman Brothers Limited ("**LBL**") both members of the Lehman Brothers Group, have their corporate seat in London and are under administration.  PwC has been appointed administrator for both companies. LBIE, along with LBL's assistance, acted as arranger, dealer and calculation agent with respect to an important part of the programs for the issuance of notes referred to in paragraph 7 below. In these capacities LBIE structured the issuances, took care of the underlying documentation and coordinated the sale and purchase of the notes.

LBIE also calculated the value of the notes. For the implementation of these activities, LBIE engaged employees of the Lehman Brothers Group from other cities (in particular New York and Tokyo). Many of these employees left the

Lehman Brothers Group, including by entry into the employ of Nomura or Barclays, which companies worldwide took over a large part of the activities of the Lehman Brothers Group. As a result the number of employees with operational and accounting knowledge about LBT was drastically reduced, which makes the production of up-to-date figures and valuations quite difficult.

The consequence of all this is that it is difficult in many cases to determine the values of the notes issued by LBT and of the corresponding financial positions under the *swaps*. Another aspect is that various clauses (*"events of default"*) in the note documentation and the hedging agreements have become effective as a result of LBHI's Chapter 11 filing, the moratorium and the bankruptcy of LBT, which is of major influence on the balance sheet position of LBT. Nevertheless, the currently available financial information is attached as annexes to this report. The Bankruptcy Trustee explicitly refers to the conditional character of these data. This applies in particular to the receivables from and debts to group companies; due to the high volatility of underlying values it may even turn out at any moment that receivables are debts and vice versa.

The Lehman Brothers Group drew up an internal balance sheet for LBT at the end of every month. The balance sheet of LBT was prepared according to both Dutch and American accounting standards (NL GAAP and US GAAP, respectively), although the NL GAAP balance sheet – as opposed to the US GAAP balance sheet – was not drawn up every month, but twice every (financial) year (upon the year-end close on 30 November and the half year-end close on 31 May).

The most recently published and audited annual accounts of LBT according to NL GAAP, for the financial year ending on 30 November 2007, are available on www.lehmanbrotherstreasury.com. The most recent unpublished and unaudited semi-annual accounts of LBT for the half year ending on 31 May 2008 (according to NL GAAP) dates from 13 August 2008 and is also available on this website.

The balance sheet most recently generated (internally) by Lehman Brothers Group - not audited or published - dates from 31 August 2008 (NL GAAP and US GAAP) and has been attached as **Annex I**. In the right-hand column of this balance sheet (on US GAAP or *mark to market* basis) the '*Intercompany Receivables*' and '*Intercompany Payables*' as at 31 August 2008 have been valued. The Bankruptcy Trustee is not able to validate these valuations. To the extent underlying indices have declined in value (and have caused the value of the notes to decline), the value of the corresponding swaps has similarly decreased. The market value of the notes on this balance sheet, moreover, has

been adjusted with a "credit spread adjustment" of US$ 3,024,721,623 in view of the relatively low creditworthiness of the Lehman Brothers Group on that date.

The Lehman Brothers Group is presently engaged in a "*global close*" of the books as at 12 September 2008, end of the trading day, being the last trading day before LBHI filed a Chapter 11 petition on 15 September 2008. The Bankruptcy Trustee will post the US GAAP balance sheet of LBT on the aforementioned website once it becomes available.

The assets and liabilities of LBT according to NL GAAP as at 7 October 2008, being the last trading day before the bankruptcy date, are shown by the provisional balance sheet attached to this report as **Annex II**. The Bankruptcy Trustee observes that this balance sheet originates from the records of the Lehman Brothers Group and that – unlike as regards the balance sheet as at 31 August 2008 referred to above – no audit procedures have taken place in respect of this balance sheet as was usually done at the end of every month. The intercompany positions (receivables/debts from/to group companies) included in this balance sheet have not been confirmed by the other parties concerned. The Bankruptcy Trustee will post a US GAAP balance sheet of LBT as at 7 October 2008 if and when it becomes available. Due to LBHI's Chapter 11 filing and the turmoil in the financial markets, market data for making internal valuations of the financial positions within the Lehman Brothers Group, have no longer been updated, or only partially, as from 15 September 2008.

1.4.    Profits and loss
According to the audited and approved annual accounts 2007 according to NL GAAP, the profits of LBT after taxation for 2007 were US$ 27,116,000.

1.5.    Balance sheet total
According to the audited and approved annual accounts for 2007 according to NL GAAP, the balance sheet total of LBT at 30 November 2007 was US$ 34,438,150,000.

1.6.    Pending proceedings
As far as the Bankruptcy Trustee is aware, LBT is not involved in any legal proceedings.

1.7.    Insurance
As far as we are aware there are no insurance policies in the name of LBT. The Bankruptcy Trustee is aware, however, of a "Directors' and Officers Liability Insurance", which has been taken out by LBHI and which also seems to cover the Directors & Officers of Lehman Brothers Group entities, extending perhaps

to the managing directors of LBT as well. The Bankruptcy Trustee will further examine this policy.

1.8.   <u>Rent</u>
As far as the Bankruptcy Trustee is aware, LBT is not a party to any lease agreement.

1.9.   <u>Cause of provisional moratorium and bankruptcy</u>
On 15 September 2008 LBHI filed its petition under Chapter 11 of the US Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. On 19 September 2008 LBT filed a petition with the Amsterdam District Court for the granting of a provisional moratorium. The District Court granted this petition on the same date and appointed Ms W.A.H. Melissen as supervisory judge (*rechter-commissaris*) and the Bankruptcy Trustee as administrator (*bewindvoerder*).

Immediately after his appointment the administrator consulted with the Board of Directors in order to investigate the (financial) position and the possibility that LBT would eventually be able pay its creditors in whole or in part. The administrator concluded, after consultations with the Board of Directors and representatives of LBIE and the administrators of LBIE in Amsterdam and London, and on the basis of administrative documents made available to him, that there was no real prospect of LBT being able to satisfy its creditors in the foreseeable future. An important factor for these findings was the lack of clarity about the major asset of the company (the receivable from LBHI) and the extent to which this asset - considering the Chapter 11 proceeding of LBHI - might be realised. In view of the provisions in article 242 paragraph 1 under 5° of the Dutch Bankruptcy Act, the administrator asked the Amsterdam District Court on 1 October 2008 to withdraw the provisionally granted moratorium and to simultaneously order the bankruptcy.

At the hearing the Board of Directors opposed this request for withdrawal. After granting an initial week's suspension in order for the administrator and the Board of Directors to provide some additional information, the Amsterdam District Court granted the request of the administrator to withdraw the moratorium while ordering the bankruptcy on 8 October 2008, declared LBT bankrupt, found that LBT's centre of main interests ('COMI') was in the Netherlands, and appointed Ms W.A.H. Melissen as supervisory judge and the administrator as Bankruptcy Trustee. In accordance with article 23 of the Dutch Bankruptcy Act the bankruptcy of LBT became effective with retroactive effect on 8 October 2008 at 0:00 hours.

## 2.    Assets

2.1.    Because LBT only functioned as a financing company (see in this respect also §
1.2) it has – relatively limited - liquid assets at its disposal. At the time of the
moratorium an amount of €38,657.97 was in the bank account(s) held in the
Netherlands. This amount was transferred to the bankruptcy account with Kas
Bank N.V. At the time of the moratorium LBT also held credit balances in various
currencies in bank accounts with JPMorgan Chase Bank N.A. On the
instructions of the Board of Directors and the administrator the total credit
balance in these accounts (€5,506,541.10) was transferred to an account with
ING Bank N.V. in the period of the moratorium. This account is currently at the
disposal of the estate.

2.2.    LBT's assets consist primarily of receivables due from Group companies,
including the receivable due from LBHI arising from the on-lending of income
from notes. In this respect the Bankruptcy Trustee refers to § 3.1.

## 3.    Accounts receivable

3.1.    Because both the debt to note holders and the (more or less) corresponding
intercompany derivative receivables/payables are based on valuations of so-
called underlying values, which may rise or fall on a daily basis, the receivables
and liabilities of LBT also change on a daily basis. There is also the effect,
moreover, of different currencies used upon the issuance of structured notes
and the corresponding swaps (hedges). Because the underlying values and
currencies have changed from day to day after 31 August 2008, at present
nothing can be said yet with certainty about the volume of receivables from
and/or debts to LBT. The receivable due from LBHI is based on a loan
agreement between LBT and LBHI dated 26 May 2000 (**Annex III**) and amounts
to US$ 34,782,418,198 according to the balance sheet per 31 August 2008 NL
GAAP and to US$ 32,604,207,177 according to the balance sheet as at 7
October 2008 NL GAAP. The differences are mainly caused by movements of
the underlying currencies.

According to article 3 of an "Independent Guarantee" dated 16 September 1997
(**Annex IV**), LBHI guaranteed its obligations under the aforementioned loan
agreement with LBT and also guaranteed that LBT will yearly earn at least a
margin of 0.125% (percent) of the amount of the notes. The Independent
Guarantee refers to a "tax ruling" dated 2 March 1995. This tax ruling as well as
some supporting correspondence has been attached to this report as **Annex V**.
The Bankruptcy Trustee will further investigate the legal aspects of this
Independent Guarantee.

As far as we are aware no further security or guarantees have been provided for the benefit of LBT for receivables due from third parties or from other companies belonging to the Lehman Brothers Group.

**4.    Bank / Security**

4.1.    <u>Claims from bank(s)</u>
It follows from the annual accounts 2007 of LBHI that LBT and Lehman Brothers Bankhaus AG ("**LB Bankhaus**") had entered into a "*multi-currency unsecured revolving credit facility*" with a syndicate of banks, which was valid until April 2010. According to the annual accounts 2007 of LBHI as at 30 November 2007 no credit was drawn under this facility by LBT. The facility is not stated in the annual accounts 2007 of LBT. The facility is US$ 2,500,000,000 and guaranteed by LBHI. It seems to follow from conversations that PwC had with some employees of the Lehman Brothers Group in London that on the bankruptcy date LBT had not drawn credit under this facility. The Bankruptcy Trustee will further investigate this matter in the next period under review.

**5.    Continuation**

5.1.    Considering the nature of the activities of LBT as well as the extent of dependence on the Lehman Brothers Group, a relaunch or, as the case may be, the continuation of LBT in moratorium or in bankruptcy was not an option.

**6.    Investigations**

6.1.    <u>Accounting obligation</u>
The books of the company were primarily kept in electronic form and are (still) available as such on the computer systems of the Lehman Brothers Group. The (hard copy) books and records at LBT's Amsterdam office mainly consisted of bank statements, tax records, correspondence, various agreements and documentation with respect to the diverse note programs and have since been moved to the office of the Bankruptcy Trustee.

6.2.    <u>Filing of annual accounts</u>
According to the Commercial Register the most recent annual accounts of LBT (2007) were filed on 30 May 2008 and therefore on time.

6.3.    <u>Auditor's unqualified audit report</u>
The annual accounts of LBT for 2007 have been provided with an unqualified auditors' report.

6.4.    Obligation of payment on shares
This will be subject of further investigation in the coming period under review.

6.5.    Improper management
At a later stage the Bankruptcy Trustee will further investigate the way in which the Board of Directors fulfilled its duties.

6.6.    Fraudulent acts in respect of creditors (*Paulianeus handelen*)
The Bankruptcy Trustee will further investigate this at a later stage.

**7.    Creditors**

7.1.    LBT issued notes under four programs: (i) the *US$ 100,000,000,000 Euro Medium Term Note Program* (the "**EMTN Program**"); (ii) the *US$ 4,000,000,000 German Note Program;* (iii) the Swiss C*ertificates Program* and (iv) the Italian *Inflation Linked Note Program*.

The majority of the outstanding notes (about US$ 30.8 billion) has been issued under the EMTN Program, varying from relatively simple notes to complex products. As observed in § 1.3, at this moment it is not possible to establish the outstanding debt as at 12 September 2008 or as at the date of bankruptcy according to US GAAP rules. In most cases the note documentation gives Noteholders the right to immediately claim (to "accelerate") receivables because specific *events of default* became operative, like the Chapter 11 petition of LBHI and the moratorium and the bankruptcy of LBT. At present the Bankruptcy Trustee does not take a position about the effects of invoked accelerations on the valuation of debts under the notes.

7.2.    To the Bankruptcy Trustee's knowledge, no security has been provided for any of LBT's notes or other obligations.

**8.    Miscellaneous**

8.1.    Term of winding-up bankruptcy
The winding-up of the bankruptcy of LBT largely depends on the winding-up of the insolvency proceedings of LBHI.

8.2.    Plan of action
In the first quarter of 2009 the Bankruptcy Trustee will attempt to finalise the analysis of the books and the note documentation. Because the majority of the agreements and the note documentation were not subject to Dutch law, the Bankruptcy Trustee will seek further advice from the English and American lawyers who were engaged in the past period under review. As soon as the

Bankruptcy Trustee can definitely adopt a position regarding the valuation of the claims, the Bankruptcy Trustee will start preparing the procedure for submission of the claims. To this end the Bankruptcy Trustee will continue the current consultations with the parties involved in the note issuances, including the various clearing institutions (including Clearstream Banking S.A. Luxembourg and Euroclear Banking Brussels S.A./N.V.). For these purposes the Bankruptcy Trustee will investigate what the possibilities are to coordinate the submission of claims with LBHI.

8.3.  <u>Provision of information</u>
This first public report (as well as every subsequent public report) will also be available on [www.lehmanbrotherstreasury.com](www.lehmanbrotherstreasury.com) and www.houthoff.com. In the event of any difference between the Dutch version and the English translation, the Dutch text prevails. The public reports are also available for inspection at the Amsterdam District Court. The District Court does not provide information for free.

8.4.  Creditors who are holders of a note issued by LBT, which has been provided with an ISIN code *and* is also on the list of ISIN-codes belonging to the balance sheet of LBT of 31 August 2008 (Annex I), are requested to read the 'Third notice to creditors' of the Bankruptcy Trustee (dated 22 December 2008) and to wait for further information from the Bankruptcy Trustee about the submission of claims in the bankruptcy. <u>A final date for the submission of claims has not been fixed yet</u>.

8.5.  Other creditors who believe that they have a claim against LBT are requested to submit those claims in writing, provided with underlying documents, to:

**Houthoff Buruma N.V.**

**To the attention of Mr. F. Verhoeven**

**PO Box 75505**

**NL-1070 AM Amsterdam**

Amsterdam, 22 December 2008

R.J. Schimmelpenninck, bankruptcy trustee

*****