WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                                          :   Chapter 11 Case No.
                                                               :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                   :   08-13555 (JMP)
                                                               :
                          Debtors.                             :   (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**DECLARATION OF STEVEN J. COHN IN SUPPORT OF**
**CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

    Steven J,. Cohn makes this declaration pursuant to 28 U.S.C. § 1746, and states:

    1.  I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M") and Senior Vice President and Co-Treasurer of Lehman Brothers Holdings Inc. ("LBHI," and together with its affiliated debtors, the "Debtors").[1]

---

[1] The Debtors include: Lehman Brothers Holdings Inc., LB 745 LLC, PAMI Statler Arms LLC, Lehman Brothers Commodity Services Inc., Lehman Brothers Special Financing Inc., Lehman Brothers OTC Derivatives Inc., Lehman Brothers Derivatives Products Inc., Lehman Commercial Paper Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Financial Products, Inc., Lehman Scottish Finance L.P., CES Aviation LLC, CES Aviation V LLC, CES Aviation IX LLC, East Dover Limited, Luxembourg Residential Properties Loan Finance S.a.r.l., BNC Mortgage LLC, Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC.

2. A&M is a well-known global organization that provides restructuring advisory services to numerous businesses and industries. A&M restructuring professionals specialize in interim management, crisis management, turnaround consulting, creditor advisory and financial/operational restructuring. A&M's debtor advisory services include a range of activities to assist in the stabilization and improvement of a debtor's financial position and operations, including the development and validation of forecasts and business plans, as well as related assessments of a debtor's strategic options. A&M's activities also include monitoring and managing cash and cash flow, as well as managing relationships among a debtor and its creditors. A&M also engages in the assessment of strategies such as cost reductions and in the design and negotiation of financial restructuring arrangements.

3. A&M was engaged by the Debtors following the commencement of a chapter 11 case by LBHI on September 15, 2008. A&M formally commenced the engagement during the week of September 15, 2008. At that time, the Debtors were actively engaged in the negotiation of the sale of the North American Capital Markets business to Barclays Capital Inc. ("BarCap"). That sale, approved by the Court on September 20, 2008, was consummated on September 22, 2008. As a result of that sale, essentially all of the approximately 10,000 persons employed by the Debtors in the United States were transferred to BarCap. Although BarCap, as part of the sale arrangement, agreed to provide services to the Debtors pursuant to a transition service agreement, the transfer of the employees and the information technology handicapped the initial efforts to gain control of the Debtors' property and establish procedures for the administration of the Debtors' cases. To mitigate that handicap, A&M provided more

than two hundred A&M personnel to establish a proper oversight and administration of the Debtors and their property as efficiently as possible.  A&M professionals immediately began working closely with the few Debtors' employees that remained after the BarCap sale and engaged with BarCap to define the requirements of the transition services agreement.

4. In connection with its engagement, A&M professionals performed services that included: (a) reviewing and assessing the Debtors' financial information, including, among other things, its short and long term projected cash flows, (b) assisting in asset identification, analysis and sales, (c) formulation of a human resources plan, (d) development of business and strategic plans to maximize the Debtors' asset values, (e) establishing communications and relationships with the Debtors' creditors, and (f) performing all other services as required to manage the estates, as reasonably requested and directed by the Board of Directors of LBHI.  As part of A&M's engagement, Bryan Marsal was initially appointed as the Debtors' Chief Restructuring Officer.  I worked side-by-side with Mr. Marsal as part of the A&M senior management team for the Debtors' cases.  Subsequently, as the chaos that erupted after the commencement of the chapter 11 case of LBHI began to subside and the controls directed by A&M had been implemented, Mr. Marsal was appointed as the Chief Executive Officer of LBHI.  A&M, as the senior management team, has been, and continues to be, deeply involved in the affairs and administration of the Debtors' businesses, and these cases.

5. I hold a Bachelor's degree in economics from Tufts University and a Master's degree in business administration, with a concentration in finance and accounting, from the University of Pennsylvania, Wharton School of Business.  I am a

Certified Public Accountant (CPA) in the State of New York. I have more than 15 years experience leading troubled companies through the turnaround and restructuring process, specializing in managing cash flow improvement, developing business plans, determining the appropriate financial structure for a company, and negotiating with the various constituencies of a company in distress. Since joining A&M in 1998, I have served as chief restructuring officer, chief financial officer and financial advisor in connection with numerous corporate turnarounds and restructurings.

6.   I submit this Declaration in support of confirmation of the *Third Amended Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Chapter 11 Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated August 31, 2011 (as modified by the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, filed on November 29, 2011, the "Plan").[2] Specifically, I submit this Declaration in support of the (a) Plan's satisfaction of section 1129(a)(7) of the Bankruptcy Code and (b) the compromise and settlement included in the Plan relating to the recharacterization of LBHI's claims against the Subsidiary Debtors.

7.   I am familiar with the terms and provisions of the Plan, the disclosure statement relating thereto (the "Disclosure Statement"), and the documents comprising the Plan Supplement. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, or the personal knowledge of employees of the Debtors or A&M who report to me, reasonable inquiry, review by me

---

[2]   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement.

or those who report to me of relevant documents, or my opinion based upon my familiarity with the Debtors' business, operations and financial condition. If called upon to testify, I can and will testify competently as to the facts and opinions set forth herein.

### The Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code

8.  I have directly supervised the preparation of the analysis of the estimated recoveries that holders of Claims and Equity Interests in each of the Debtors would receive if each Debtor were liquidated under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). The analysis was performed by professionals at A&M, in consultation with the employees and management of the Debtors and the assistance of Lazard Freres & Co. LLC. The liquidation analysis is attached to the Disclosure Statement as Exhibit 5 (as modified by the Plan Supplement, the "Liquidation Analysis").

9.  The Liquidation Analysis examines the effects that a conversion of the Debtors' chapter 11 cases to cases under chapter 7 would have on the proceeds available for distribution to holders of Claims and Equity Interests in each of the Debtors. The Liquidation Analysis is based upon various assumptions regarding the costs and timing of: (1) recoveries the Debtors would receive from the accelerated liquidation of their assets, and (2) the reconciliation of all Claims asserted against each of the Debtors. The Debtors have spent a substantial amount of time and effort reviewing the filed Claims and estimating the amount of Claims that will ultimately be allowed against each Debtor. The estimated amount of Allowed prepetition Claims included in the Liquidation Analysis is, with one exception, identical to the estimated Allowed Claims in the recovery analysis which sets forth estimated Distributions to Creditors under the Plan

(attached to the Disclosure Statement as Exhibit 4) (as amended in the Plan Supplement filed on October 25, 2011, the "Recovery Analysis").

10. The only difference in the estimates of Allowed Claims used in the Liquidation Analysis and the Recovery Analysis, is the inclusion in the Liquidation Analysis of a $1 billion administrative expense Claim against LBHI relating to LBHI's obligations under the Court-approved capital maintenance agreement for Aurora Bank, FSB ("Aurora Bank"). If LBHI's chapter 11 case is converted to a chapter 7 case, the FDIC may assume control of Aurora Bank and sell or liquidate the bank. An accelerated sale or liquidation of Aurora Bank may result in an estimated $1 billion administrative expense claim against LBHI based upon LBHI's obligations under the capital maintenance agreement.

11. The Liquidation Analysis is based on various assumptions regarding the estimated proceeds expected to be received from the liquidation of the Debtors' assets over a 12 to 18 month period and the costs and expenses of the liquidation of the assets. Given the complexity of the Chapter 11 Cases and the Debtors' assets, and the number of Claims asserted against the Debtors, if the Debtors' cases were converted to chapter 7, it is reasonable to estimate that it would take a chapter 7 trustee(s) approximately three to six months to familiarize himself with the Debtors' estates before beginning the process to sell any assets, resolve significant numbers of Claims or commence any litigation. Many of the Debtors' assets are complex financial instruments, the valuation of which requires significant time and analysis. The Debtors hold vast portfolios of commercial loans, real estate loans, REO assets and private equity investments that would take a substantial amount of time to review and value.

12. The Liquidation Analysis assumes that it would likely take a chapter 7 trustee significant additional time beyond the period for the liquidation of the Debtors' assets to investigate, reconcile, negotiate and/or begin to litigate the approximately 37,000 Claims remaining on the claims register. As set forth in Exhibit 6 to the Disclosure Statement, there are complex issues that need to be resolved relating to many of the Claims, including, without limitation, disputes regarding the validity of prime brokerage claims, the validity and enforceability of guarantee claims, and the valuation of claims based on derivatives contracts.

13. As a result of the necessary start-up period and time for a chapter 7 trustee to liquidate the Debtors' large portfolios and reconcile the Claims, the Liquidation Analysis assumes that a chapter 7 trustee would not make any distributions until 2013 at the earliest. Such delay in distributions in a chapter 7 liquidation would increase the overall costs and expenses incurred by the Debtors, including fees payable to the chapter 7 trustee and its new professional advisors. While these new parties familiarize themselves with the background and status of the cases, there would be an inevitable delay in the unwind process.

14. In addition to the delay in making initial distributions and increased expenses of a chapter 7 liquidation, a fire-sale of the Debtors' assets by a chapter 7 trustee over the next 12 to 18 months would result in lower recoveries than if the assets were sold in an orderly fashion following the confirmation of the Plan. This projection is based, in part, on the expected loss of a number of the Debtors' employees that have an intimate understanding of the Debtors' assets and on certain other reasonable assumptions underlying the reduced estimated recoveries, including:

a. <u>Derivatives Contracts</u>: Certain key employees will leave for other employment opportunities, resulting in the loss of legacy knowledge relating to the derivatives portfolio, and disrupting ongoing settlement discussions with counterparties.

b. <u>Real Estate Assets</u>: A forced liquidation of the large portfolio of Real Estate Assets over a 12 month-period would require significant discounts to the current valuations due to (i) lack of liquidity in the markets, (ii) insufficient demand for the Debtors' large portfolio of Real Estate Assets, (iii) bulk sales, (iv) the inability of the liquidating trustee to offer representations and warranties in connection with sales, (v) unique characteristics or size of certain commercial real estate assets, and (vi) the fees of bankers or brokers utilized to market and sell Real Estate Assets.

c. <u>Private Equity/Principal Investments</u>: The private equity investments are primarily bespoke instruments that include certain contractual and structural impediments that could reduce recoveries, including tag-along rights, regulatory restrictions or co-investment or partnership structures. Certain investments have required future capital calls and the failure to meet these comes with a substantial financial penalty. In addition, potential purchasers would be aware that the Debtors are liquidating their assets over a shortened period of time. Accelerated sales of these complex investments would increase the costs of financial and legal advisors as compared to an orderly liquidation.

d. <u>Loans</u>: The Debtors would take significant discounts based on the following: (i) the market's knowledge that the Debtors are liquidating their portfolio of Loans over a shortened period of time, (ii) the large size of certain of the Debtors' positions, (iii) Loans to special purpose vehicles are illiquid and are not traded in any commercial market, (iv) the existence of future funding commitments for several Loans, and (v) Loans participated to collateralized loan obligation structures are generally illiquid.

15. Based upon the assumptions set forth in the Liquidation Analysis, the Debtors estimate that each of the Debtors will distribute less to their creditors if the cases were converted to chapter 7 than if each of the Debtors was liquidated pursuant to the Plan. The Liquidation Analysis sets forth the estimated net distributable assets for each Debtor included in both the Debtors' Recovery Analysis and the Liquidation Analysis.

16. The Liquidation Analysis assumes that a chapter 7 trustee would consummate the same settlements and compromises on the same terms and conditions included in the Plan. The settlements and compromises were the result of extensive

arms' length negotiations with various creditors, or groups of creditors, including several affiliates of the Debtors that are currently in liquidation or insolvency proceedings in foreign jurisdictions.  In each case, the settling parties were represented by experienced financial advisors and attorneys.   The compromises and settlements in the Plan resolve highly contentious disputes among the Debtors' creditors on various issues.  The litigation of these issues would be time consuming and expensive.  A chapter 7 trustee would have to spend time analyzing each of the plan issues resolved by the compromises and settlements included in the Plan.  I believe a chapter 7 trustee would determine that the compromises and settlements included in the Plan are the most reasonable means to avoid protracted litigation of the various issues resolved by the Plan.

17. Each of the assumptions underlying the Liquidation Analysis and set forth in Exhibit 5 to the Disclosure Statement (and modified by the Plan Supplement) is reasonable under the circumstances.  Section 1129(a)(7) is satisfied as the Liquidation Analysis demonstrates that holders of Claims in each Class or Equity Interests in each of the Debtors will receive at least as much, if not more, value under the Plan than they would receive in a hypothetical chapter 7 liquidation.

18. Accordingly, I submit that the Plan is in the best interests of all holders of Claims and Equity Interests in all Classes of the Plans of each of the Debtors.

**The Compromise and Settlement included in the Plan
<u>Regarding the Treatment of Certain Intercompany Claims is Reasonable</u>**

19. I have also been directly involved in the review and analysis of the intercompany Claims among the Debtors and their controlled Affiliates.  The Debtors' books and records indicate that prior to the Commencement Date, tens of thousands of

intercompany transactions were entered into each day involving billions of dollars. Such transactions have been entered into for a variety of reasons, including the management of risk on a firm-wide basis, the funding of the operations of its Affiliates, the lending of funds on a secured and unsecured basis, the entry into trading transactions, or the general processing of cash receipts and disbursements. As of the Commencement Date, there were approximately $700 billion in gross outstanding intercompany payables and receivables among the Debtors and the non-Debtor Affiliates.

20. I have been informed that the determination of whether a intercompany balance should be recharacterized as an equity contribution, rather than indebtedness, is a fact-intensive analysis based on a consideration of many factors, including, but not limited to: (i) the names given to the instruments, if any, evidencing indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of an interest rate and interest payments; (iv) the source of repayments; (v) the identity of interest between the borrower and the lender; (vi) the adequacy of the capitalization of the borrower; (vii) the security, if any, for the advances; (viii) the ability of the borrower to obtain financing from outside lending arrangements; (ix) the extent to which the advances were contractually subordinated to the claims of outside creditors; (x) the extent to which advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide for repayment.

21. Under my supervision, A&M personnel and employees of the Debtors have analyzed a sampling of intercompany transactions to determine whether the intercompany balances resulting therefrom should be allowed as Claims or

recharacterized as Equity Interests. Due to the number of intercompany transactions on the Debtors' books and records, it was impractical for A&M and the Debtors to analyze each intercompany balance, or even a statistically significant sample of transactions, to determine the appropriate treatment. Such an analysis would have taken years to complete, and in any event, transactions were often recorded on a net basis on Lehman's general ledger, which make it almost impossible to match each cash transfer to a particular transaction.

22.     Recognizing these limitations, the focus of the analysis undertaken was on general patterns within Lehman's general intercompany funding account. We were able to determine that a majority of the intercompany transactions between LBHI and its Affiliates consisted of funding receipts/payments for general business purposes. The intercompany funding accounts generally operated like lines of credit. Affiliates could "draw" funds from LBHI as necessary to satisfy their cash needs. These "draw" transactions created a payable to LBHI. At the end of each business day, any excess cash held by many of LBHI's Affiliates would be transferred back to LBHI, thus reducing the payable by such Affiliate to LBHI. The transfer of cash by Affiliates back to LBHI indicates that at least a portion of the amounts due to LBHI was repaid in satisfaction of indebtedness.

23.     Intercompany transactions, other than those affecting Intercompany Funding Balances (as defined below), were typically documented, provided for fixed terms and maturity of payments, and, in some cases, provided collateral or other security interests to LBHI to secure repayment. With limited exceptions, there were no agreements by the parties that LBHI's claims would be

contractually subordinated to the claims of outside creditors.  Intercompany balances that relate to the funding of specific intercompany transactions (e.g., derivative contracts or repurchase agreements) and recorded in separate accounts are the least susceptible to being subordinated or recharacterized as equity contributions as it is more difficult to argue that specific transactions were equity contributions as opposed to debt obligations.

24. As to intercompany balances that relate to the funding of operations of a Subsidiary Debtor but does not relate to specific transactions, such as derivative contracts or repurchase agreements ("Intercompany Funding Balances"), there is a material risk that certain loans or advances were provided in a manner that, in litigation, could have characteristics of equity contributions.  For example, while interest was charged on such advances and added to the intercompany balances in the books and records, there were no fixed terms or agreements governing repayment, and intercompany balances would typically be carried for extended periods of time.  Other than regulated Affiliates, most of LBHI's Affiliates were thinly capitalized and did not have an ability to obtain financing from outside lending institutions.

25. The Creditors' Committee and their advisors also conducted their own analysis of the same sample of intercompany transactions.  Based on their analysis, the Creditors' Committee determined there is a 20% probability that, if the matter were litigated, a court would recharacterize intercompany balances relating to LBHI's funding of the operations of its Affiliates as equity contributions.  The Debtors conferred with the Creditors' Committee and their advisors and determined that the conclusions about the risk that Intercompany Funding Balances were subject to recharacterization were reasonable.

26. To account for the risk that certain intercompany claims of LBHI against its Affiliates could be recharacterized as equity contributions, as well as the fact that these intercompany balances would be disregarded if the Debtors were substantively consolidated, the Plan includes as a compromise and settlement, that LBHI shall only receive a distribution on, and be entitled to setoff against, 80% of that portion of LBHI's Allowed Claim against a Subsidiary Debtor that relates to an Intercompany Funding Balance. The amount of LBHI's Allowed Claims against the Subsidiary Debtors and the portion of LBHI's Allowed Claims that relates to Intercompany Funding Balances and is subject to the provisions of the settlement and compromise included in the Plan are set forth on Exhibit 2 to the Plan.

27. In my business judgment, this proposed compromise and settlement between LBHI and each of the Subsidiary Debtors gives due consideration to the strengths and weaknesses of the merits of any litigation of these issues. Litigation over the recharacterization of all of the Debtors' intercompany balances would necessarily entail vast amounts of discovery regarding the millions of intercompany transactions which would be extraordinarily expensive and time consuming. No creditor objected to this aspect of the Plan in any respect.

The settlement and compromise included in the Plan is a fair and reasonable compromise for LBHI and each of the Subsidiary Debtors and is in the best interests of the estates and creditors of all of the Debtors.

I declare under penalty of perjury under the laws of the Unites States that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of November 2011.

/s/ Steven J. Cohn
Steven J. Cohn