**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                             :
**In re:**                                    :        Chapter 11 Case No.
                                                             :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**    :        08-13555 (JMP)
                                                             :
                          **Debtors.**        :        (Jointly Administered)
                                                             :
------------------------------------------------------------ x

### STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS (I) IN SUPPORT OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND (II) IN RESPONSE TO OBJECTIONS TO SUCH PLAN

*Dennis F. Dunne*          MILBANK, TWEED, HADLEY & McCLOY LLP
*Evan R. Fleck*            1 Chase Manhattan Plaza
*Dennis C. O'Donnell*      New York, New York 10005
                          Telephone: (212) 530-5000

                          Counsel for Official Committee of Unsecured
                          Creditors of Lehman Brothers Holdings Inc., et al.

Dated: November 29, 2011
       New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT ...................................................................................................................... 1

A.  The Committee's Role in the Chapter 11 Cases and Plan Negotiations .................................. 2

B.  The Plan Satisfies the Standards of Section 1123 of the Bankruptcy Code and the Plan
    Settlements Satisfy the Standards of Bankruptcy Rule 9019 .................................................... 3

    i.    Applicable Settlement Approval Standards ................................................................. 4

    ii.   The Plan and the Plan Settlements Satisfy Applicable Standards ................................ 6

    iii.  LBIE Settlement is Fair and Equitable and in the Best Interests of the Estates ......... 11

C.  The Debtors Are Entitled To Discharge Under Section 1141(d)(3) of the Bankruptcy
    Code ....................................................................................................................................... 13

D.  Third-Party Releases and Exculpations Are Consistent With Established Precedent And
    Appropriate Under Unique Circumstances of These Cases .................................................... 16

    i.    Court Has Subject Matter Jurisdiction Over Plan Releases ........................................ 16

    ii.   Plan Releases Are Otherwise in Accord  With Applicable Second Circuit
          Standards ................................................................................................................... 19

          a.    Plan Releases Are Narrowly Tailored ............................................................... 20

          b.    Plan Releases Are Essential To The Plan ......................................................... 21

                (1)   Plan Fiduciary Exculpation ....................................................................... 22

                (2)   PSA Creditor Exculpation ......................................................................... 24

    iii.  Plan Releases Meet the Standard Articulated  By the Second Circuit in
          *Metromedia* ............................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

<u>Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)</u>,
412 B.R. 53 (S.D.N.Y. 2008) .................................................9

<u>Broussard v. First Am. Health Care of Ga., Inc. (In re First Am. Health Care of Ga., Inc.)</u>,
220 B.R. 720 (Bankr. S.D. Ga. 1998) ...................................................15

<u>Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)</u>,
428 B.R. 43 (S.D.N.Y. 2010) ...................................................18

<u>Cartalemi v. Karta Corp. (In re Karta Corp.)</u>, 342 B.R. 45 (S.D.N.Y. 2006) .........................21, 31

<u>Celotex Corp. v. Edwards</u>, 514 U.S. 300 (1995) ...........................................16

<u>Cosoff v. Rodman (In re W.T. Grant Co.)</u>, 699 F.2d 599 (2d Cir. 1983) .......................................5

<u>Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
Inc.)</u>, 416 F.3d 136 (2d Cir. 2005) .................................................. passim

<u>FDIC v. Colonial Realty Co.</u>, 966 F.2d 57 (2d Cir. 1992) ...........................................7

<u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................... passim

<u>In re Almatis B.V.</u>, No. 10-12308 (MG), 2010 Bankr. LEXIS 5875 (Bankr. S.D.N.Y.
Sept. 20, 2010) .................................................23

<u>In re Ashford Hotels Ltd.</u>, 226 B.R. 797 (Bankr. S.D.N.Y. 1998) ...................................5

<u>In re Calpine Corp.</u>, No. 05-60200 (BRL), 2007 Bankr. LEXIS 4390 (Bankr. S.D.N.Y.
Dec. 19, 2007) .................................................22

<u>In re Chateaugay Corp.</u>, 201 B.R. 48 (Bankr. S.D.N.Y.1996) ...............................18, 19

<u>In re Chemtura Corp.</u>, 439 B.R. 561 (Bankr. S.D.N.Y. 2010) .....................................23

<u>In re Crabtree & Evelyn, Ltd.</u>, No. 09-14267 (BRL), 2009 Bankr. LEXIS 4674
(Bankr. S.D.N.Y. Nov. 19, 2009) .........................................21

<u>In re Crabtree & Evelyn, Ltd.</u>, No. 09-14267 (BRL), 2010 Bankr. LEXIS 3199 (Bankr.
S.D.N.Y. Jan. 14, 2010) .................................................29, 31

<u>In re DBSD N. Am., Inc.</u>, 419 B.R. 179 (Bankr. S.D.N.Y. 2009), <u>rev'd in part on other
grounds</u>, 643 F.3d 79 (2d Cir. 2010).................................................23, 31

<u>In re Drexel Burnham Lambert Grp., Inc.</u>, 960 F.2d 285 (2d Cir. 1992) .........................21, 22, 29

In re Drexel Burnham Lambert Grp. Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ......................4, 7

In re Edge Petroleum Corp., Case No. 09-20644 (Bankr. S.D. Tex. Dec. 14, 2009) ...................15

In re Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) ................................................5

In re Enron Corp., No. 01-16034, 2004 Bankr. LEXIS 2549 (AJG),
    (Bankr. S.D.N.Y. July 15, 2004).....................................................................................14, 15

In re Extended Stay Inc., No. 09-13764 (JMP) 2010 Bankr. LEXIS 5411
    (Bankr. S.D.N.Y. July 20, 2010).............................................................................................23

In re Fairpoint Commc'ns, Inc., 452 B.R. 21 (Bankr. S.D.N.Y. 2011) ..................................17, 18

In re Finlay Enters., Inc., No. 09-14873 (JMP), 2010 Bankr. LEXIS 5584
    (Bankr. S.D.N.Y. June 29, 2010)............................................................................17, 23, 25, 26

In re Global Water Technologies, Inc., 311 B.R. 896 (Bankr. D. Colo. 2004) ...........................14

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007)........................................23, 24

In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007).......................................................9, 11

In re Mal Dunn Assocs., Inc., 406 B.R. 622 (Bankr. S.D.N.Y. 2009).....................................20, 21

In re Motors Liquidation Co., 447 B.R. 198 (Bankr. S.D.N.Y. 2011)..............................17, 21, 23

In re Neff Corp., No. 10-12610 (SCC), 2010 Bankr. LEXIS 6159
    (Bankr. S.D.N.Y. Sept. 21, 2010) ...........................................................................................23

In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) .............................................................20

In re Penton Bus. Media Holdings, Inc., No. 10-10689 (AJG), 2010 Bankr. LEXIS 2355
    (Bankr. S.D.N.Y. Mar. 5, 2010)................................................................................................4

In re Purofied Down Prods. Corp., 150 B.R. 519 (S.D.N.Y. 1993) ..............................................5

In re Refco Inc., No. 06-60006 (Bankr. S.D.N.Y. Dec. 15, 2006) .................................................5

In re River Capital Corp., 155 B.R. 382 (Bankr. E.D. Va. 1991).................................................15

In re Spiegel Inc., No. 03-11540 (BRL), 2006 WL 2577825
    (Bankr. S.D.N.Y. 2006) ..................................................................................................... passim

In re T-H New Orleans Ltd. P'ship (In re of T-H New Orleans), 188 B.R. 799 (E.D. La.
    1995), aff'd, 116 F.3d 790 (5th Cir. 1997) .............................................................................15

In re T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),
    116 F.3d 790 (5th Cir. 1997) ..................................................................................................13

In re WorldCom, Inc., No. 02-13533 (AJG), 2003 WL 23861928
    (Bankr. S.D.N.Y. Oct. 31, 2003) ...........................................................5

Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion
    Media Networks, Inc.), 419 B.R. 585 (Bankr. S.D.N.Y. 2009).........................................21, 31

Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),
    517 F.3d 52 (2d Cir. 2008), rev'd and remanded on other grounds sub nom., Travelers
    Indem. Co. v. Bailey, 557 U.S. 137 (2009), (2d Cir. 2010) ("Manville II") ....................17, 18

JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter
    Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009)...............................................4, 21, 29, 32

MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp., et al.),
    837 F.2d 89 (2d Cir. 1988)..........................................................................29

Nellis v. Shugrue, 165 B.R. 115 (S.D.N.Y. 1994).......................................................5

Pacor, Inc. v Higgins, 743 F.2d 984 (3d Cir. 1984)....................................................16

Publicker Indus., Inc. v. U.S., 980 F.2d 110 (2d Cir. 1992) ..........................................19

Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791
    (S.D.N.Y. 1995), aff'd, 68 F.3d 26 (2d Cir. 1995) .....................................................4

Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),
    330 B.R. 394 (Bankr. S.D.N.Y. 2005).....................................................22, 30, 32

Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),
    860 F.2d 515 (2d Cir. 1988) ("Augie/Restivo") ..........................................................7

Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497
    (S.D.N.Y. 2005) ................................................................................20

STATUTES

11 U.S.C. § 727...............................................................................13

11 U.S.C. § 105............................................................................17, 30

11 U.S.C. § 363...............................................................................30

11 U.S.C. § 727...............................................................................13

11 U.S.C. § 1123...........................................................................3, 4, 12

11 U.S.C. § 1125..............................................................................1, 2

11 U.S.C. § 1141.........................................................................13, 14, 15

11 U.S.C. § 1142.................................................................................................................30

28 U.S.C. § 1334.................................................................................................................17

**RULES**

Fed. R. Bankr. P. 9019.................................................................................................3, 4, 12

The Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc. and each of the debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby files this statement (the "Statement") (i) in support of the confirmation of the *Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (as amended from time to time, the "Plan") [Docket No. 19627][1] and (ii) in response to the objections (the "Objections")[2] interposed to the Plan by certain parties in interest (the "Objectors"), and respectfully states as follows:

**STATEMENT**

1.      The Plan represents the fruition of years of diligent work by the Debtors and the Committee that has culminated in a global settlement of the myriad complex legal issues that equitably apportions value among the various creditor groups in this, the largest chapter 11 case in history.  The Committee, as one of the two principal fiduciaries in the Chapter 11 Cases, was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements -- both those integrated into the Plan and those contained in the Plan Supplement (collectively, the "Plan Settlements") -- that the Plan garnered the support of most of the Debtors' creditors.  The Committee has also carefully reviewed and analyzed each of the

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan, the *Plan Supplement* [Docket No. 21254] or the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code* [Docket No. 19629] (the "Disclosure Statement"), as applicable.

[2]     The Statement addresses certain issues raised in the following Objections:  (i) *Objection of the United States of America* (the "Government") [Docket No. 21624]; (ii) *Objection of Tracy Hope Davis, the United States Trustee for Region 2* (the "United States Trustee") [Docket No. 21640]; (iii) *Objection of Farallon Capital Partners, L.P., Farallon Capital (AM) Investors L.P., Farallon Capital Institutional Partners II, L.P., Farallon Capital Offshore Investors II, L.P. and Noonday Offshore, Inc.* (collectively, the "Farallon Entities") [Docket No. 21643]; (iv) *Objection of the Texas Comptroller of Public Accounts* ("Texas Comptroller") [Docket No. 21573]; (v) *Objection of Mark Mazzatta and Michele McHugh-Mazzatta* (the "Mazzattas") [Docket No. 21581]; and (vi) *China Development Industrial Bank and Dotson Investments Ltd* (collectively, "CDIB") [Docket No. 21649]; *Objection of Andorra Banc Agricol REIG, S. A.* ("Andbanc") [Docket No. 21664].

Objections and believes that, notwithstanding the arguments propounded therein, the Plan

satisfies all applicable confirmation standards.  Accordingly, and as set forth more fully herein

and in the briefs and affidavits filed by the Debtors in support of the Plan confirmation

(collectively, the "Debtors' Briefs"), the Committee fully supports confirmation of the Plan and

respectfully submits that each Objection should be overruled.

> **A.**     **The Committee's Role in the Chapter 11
> Cases and Plan Negotiations**

> 2.      As explained more fully in the *Statement of the Official Committee of

*Unsecured Creditors in Support of the Disclosure Statement for the Second Amended Joint*

*Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to*

*Section 1125 of the Bankruptcy Code* [Docket No. 19459], since its formation on September 17,

2008, in furtherance of its fiduciary duties, the Committee has been involved in every aspect of

the Chapter 11 Cases.  The Committee, with the assistance of its advisors, has evaluated the

claims, factual contentions and legal theories of all key constituencies in the Chapter 11 Cases,

and has analyzed numerous recovery scenarios and conducted frequent meetings with individual

creditors and various *ad hoc* creditor groups to better understand their respective views.

> 3.      The Committee has also developed its own legal theories and strategies

regarding, among other matters, the appropriate allocation of value distributable under the Plan

to various classes of creditors.  In connection with the foregoing, the Committee has reviewed

and analyzed such issues as substantive consolidation, intercompany claims re-characterization,

and the enforceability of guarantees, all of which had the potential effect of reallocating value

from one group of creditors to another.  In so doing, the Committee brought to bear a

comprehensive knowledge of each Debtor's assets and claims pool, as well as a global

perspective on the key value drivers, each acquired as a result of the Committee's immersion in every aspect of the Chapter 11 Cases.

4.      The Committee's holistic perspective on the issues confronting, and the options available to, the Debtors allowed it to become, together with the Debtors, a principal architect of a plan construct that achieved the most fair and equitable result for creditors available under the circumstances.  From the very beginning, the centerpiece of such construct was a global settlement of the numerous critical issues, including the risk of substantive consolidation of the Debtors' estates and those of its affiliates, the potential re-characterization of intercompany balances between LBHI and certain other Debtors, the allowed amount of claims among the Debtors and their non-Debtor affiliates (the "Affiliates"), the proper allocation among the Debtors of the costs and expenses of administering the Chapter 11 Cases, and the Debtors' ownership rights to certain assets (collectively, the "Plan Issues"), through a reallocation of value among the various affected Debtors (the "Plan Adjustment").  This concept was included in all iterations of the chapter 11 plan for the Debtors on which the Committee and the Debtors collaborated, beginning with the Debtors' First Amended Chapter 11 Plan filed on January 25, 2011, and culminating with the Plan.  To preserve this critical concept -- that alone could assure an equitable resolution of the Chapter 11 Cases -- the Committee worked with the Debtors to forge the Plan Settlements.

**B.      The Plan Satisfies the Standards of Section 1123 of the Bankruptcy Code and the Plan Settlements Satisfy the Standards of Bankruptcy Rule 9019**

5.      Certain of the Objectors assert that the Plan Settlements generally, and the LBIE Settlement (as defined below) in particular, fail to satisfy the standards of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, particularly with respect to the

3

Plan Adjustment feature. (Mazatta Objection ¶¶ 9-10; Farallon Entities' Objection ¶¶ 12-14; CDIB Objection ¶¶ 6-10; Andbanc Objection ¶ 4.) As more fully set forth below, and in the Debtors' Briefs, the Plan Settlements, including the Plan Adjustment feature, are fair, equitable and in the best interests of each Debtor's unsecured creditors.

i. Applicable Settlement Approval Standards

6. Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may include a "settlement or adjustment of any claim." 11 U.S.C. § 1123(b)(3)(A). Settlements incorporated into a plan of reorganization pursuant to section 1123(b)(3) are held to the same approval standard as settlements presented on motion pursuant to Bankruptcy Rule 9019. See, e.g., Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 794 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), aff'd, 68 F.3d 26 (2d Cir. 1995); see also In re Penton Bus. Media Holdings, Inc., No. 10-10689 (AJG), 2010 Bankr. LEXIS 2355 (Bankr. S.D.N.Y. Mar. 5, 2010) (same); JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (same); In re Drexel Burnham Lambert Grp. Inc., 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992) (same). In either case, to be approved, the settlement must be fair and equitable and in the best interests of the estate. See Best Prods., 177 B.R. at 794; see also Drexel, 138 B.R. at 768-69 (approving plan settlements as "fair and equitable and in the best interest of the Debtors, their estates, Creditors, and Shareholders").

7. Plan settlements "are favored by the Courts, because they allow the estate to avoid the expenses and burdens associated with litigating contested claims." Drexel, 138 B.R. at 758 (internal citations omitted). Indeed, in many similarly large and complex chapter 11

cases, this Court has approved plans of reorganization embodying global settlements of disputes

regarding substantive consolidation, intercompany claims, third-party guarantee claims and

allocation of assets among debtors.[3]

      8.     The decision to approve a particular settlement lies within the sound

discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).

Courts in the Second Circuit will approve a settlement so long as it does not "fall[ ] below the

lowest point in the range of reasonableness."  Cosoff v. Rodman (In re W.T. Grant Co.), 699

F.2d 599, 608 (2d Cir. 1983).  When considering a proposed settlement, the bankruptcy court

"does not have to decide the numerous questions of law and fact . . . .  The court need only

canvass the settlement to determine whether it is within the acceptable range of reasonableness."

Nellis, 165 B.R. at 123 (internal quotation and citation omitted).  Further, a court may give

weight to the informed judgment of the debtor that a settlement is fair and equitable.  In re

Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels

Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate

that [court] substitute [its] judgment for the Trustee's, but only that [it] test his choice for

reasonableness. . . If the Trustee chooses one of two reasonable choices, [the court] must approve

that choice, even if, all things being equal, I would have selected the other.").

---

[3]    See, e.g., In re WorldCom, Inc., No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) (confirming plan that incorporated settlements of issues regarding substantive consolidation and enforceability and priority of intercompany claims); In re Adelphia Commc'ns Corp., 368 B.R. 140 (Bankr. S.D.N.Y. 2007) (confirming plan that incorporated global settlement of disputes regarding substantive consolidation, validity, amount and priority of intercompany claims, and allocation of proceeds from sale of debtors' assets); In re Refco Inc., No. 06-60006 (Bankr. S.D.N.Y. Dec. 15, 2006), *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries* [Docket No. 3971] (confirming plan premised on settlements of debtor-creditor, inter-debtor and inter-creditor disputes, and settlement of substantive consolidation issue through a "consensual pooling" of assets and liabilities of certain debtors); In re Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004), *Order Confirming Supplemental Modified Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code and Related Relief* [Docket No. 19759] (confirming plan that incorporated global settlement of intercompany claims and substantive consolidation issues).

ii.    The Plan and the Plan Settlements Satisfy Applicable Standards

9.    The Plan Settlements are the most critical component of the Plan, as they represent a negotiated resolution of the Plan Issues that has garnered the support of creditors asserting over $450 billion in claims, including fiduciaries appointed in the foreign insolvency proceedings of eighty-seven Affiliates.  Such resolution benefits all of the Debtors' creditors by avoiding the prolonged and costly litigation of some or all of the Plan Issues.

10.    The most vigorously contested of the Plan Issues in the Chapter 11 Cases has been the appropriateness of substantive consolidation of all or various groups of the Debtors and their affiliated entities.  The complexity of the controversy surrounding this issue is evidenced by the competing plans of reorganization filed in the Chapter 11 Cases (the "Competing Plans").[4]  With each of the Competing Plans based on a diametrically opposed view as to the appropriateness of substantive consolidation of all or some of the Debtors and their affiliates, they demonstrated that colorable arguments existed on both sides of this dispute.  As explained in the Disclosure Statement, litigating substantive consolidation (as well as the other Plan Issues) would have been extraordinarily time consuming, uncertain and expensive, not the least because of the fact that the worldwide scope of Lehman's insolvency raises novel and untried jurisdictional issues regarding the propriety of cross-border substantive consolidation and -- no matter the outcome -- any decision on the issue would likely be subject to multiple levels of appellate review and face unprecedented enforcement challenges around the world.

---

[4]    *Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and its Affiliated Debtors Other than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents*, dated April 25, 2011 [Docket No. 16229]; and *Amended Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC, Proposed by the Ad Hoc Group of Lehman Brothers Creditors*, dated April 27, 2011 [Docket No. 16315].

11.     Even putting aside the jurisdictional dimension, substantive consolidation is an equitable remedy that requires a court to engage in a fact-intensive inquiry regarding the minutiae of the interrelationships among debtors.  Up to seventeen factors may be considered in the substantive consolidation inquiry, with the results being further balanced against any prejudice resulting from the proposed consolidation.  See In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992).  Given that, in this case, the requisite inquiry had to be conducted with respect to twenty-three Debtors and Affiliates in sixteen separate jurisdictions, the substantive consolidation analysis proved to be a daunting task even when, for investigative purposes, the seventeen factors were distilled to two paramount ones, of which the rest could be viewed as "merely variants."  Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988) ("Augie/Restivo").[5]

12.     Nevertheless, at the outset of the Chapter 11 Cases, the Committee directed its advisors to determine whether substantive consolidation of all or some of the Debtors, or substantive consolidation of the Debtors with some or all of the Affiliates was indicated and, if so, whether it would be an appropriate result for the Debtors' unsecured creditors.  In undertaking this analysis, the Committee's advisors investigated all aspects of the Debtors' prepetition businesses relevant to the substantive consolidation inquiry, including information developed by the Committee's financial advisors, document discovery received from various sources, public information available prior to the commencement of the Chapter 11 Cases, interviews with creditors, and information received from the Debtors and from the Examiner.  In addition, the Committee and its advisors engaged in extensive discussions and

---

[5]    These two factors are: (i) whether creditors dealt with the debtors as a single economic unit, and did not rely on their separate identities in extending credit (i.e., creditor reliance); or (ii) whether the affairs of the debtors are so entangled that substantive consolidation will benefit all creditors (i.e., hopeless entanglement).  Id.; see also FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992) (noting that substantive consolidation turns on these two critical factors).

information gathering from various creditors and creditor groups regarding the appropriateness of substantive consolidation.

13.      Applying the first <u>Augie/Restivo</u> factor (i.e., hopeless entanglement) to the data established by this investigation, the Committee concluded that facts existed that weighed both in favor (such as the existence of a consolidated cash management system and consolidated accounting and tax reporting systems) and against (such as separate books and records, accounting systems that could be reconstructed without unwarranted delay or expense and the regulatory environment that necessitated separate recordkeeping) substantive consolidation.

14.      Furthermore, the Committee also concluded that persuasive evidence existed on both sides of the argument with respect to the second <u>Augie/Restivo</u> factor, creditor reliance.  For example, on the one hand, creditors could have perceived "Lehman" as a single entity as a result of, among other things, (i) common officers and directors, (ii) common headquarters and office space, (iii) shared staff and payroll, (iv) prevalence of intercompany guarantees and other intercompany credit support, and (v) inadequate capitalization of certain subsidiaries.  On the other hand, creditors could contend that they relied on the Debtors' corporate separateness because, among other reasons, (i) the Debtors' public filings disclosed such separateness, and (ii) such creditors evaluated independent creditworthiness of Lehman subsidiaries and undertook to obtain intercompany guarantees.

15.      Moreover, the Committee recognized that (i) the cost, in both time and resources, of litigation to resolve the substantive consolidation question would be substantial; (ii) such litigation would not provide any assurance of the outcome deemed most favorable by the Committee; and (iii) the resolution of such litigation might require several levels of appellate review, thereby postponing indefinitely any prospect of distribution to the Debtors' creditors.

Thus, the Committee concluded that an economic settlement that bridged the gap between substantive consolidation and deconsolidation would be in the best interest of the Debtors' creditors.  Accordingly, the Committee championed the compromise reflected in the Plan Adjustment that allocates the risks and potential costs according to the relevant circumstances of each Debtor.

16.     The Second Circuit has summarized the factors for determining whether a settlement is fair and equitable as follows: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (iii) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to, or affirmatively support, the proposed settlement; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's length bargaining.  Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (internal citations and quotations marks omitted); see also Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 60 (S.D.N.Y. 2008) (applying same to find whether settlement was fair and equitable).

17.     Applying the Iridium factors demonstrates that the Plan Settlements are fair and equitable and should be approved by this Court.  First, through the settlement of the Plan Issues, particularly, of the substantive consolidation issue, the Debtors have avoided years of

complex, expensive and uncertain litigation with the potential to delay the conclusion of the

Chapter 11 Cases and distributions to creditors.  It is beyond doubt that litigating each of the

issues resolved by the Plan Settlements would have been both protracted and prohibitively

expensive.  By way of illustration, under the *Order Establishing Schedule and Procedures in*

*Connection with Discovery Related to Plan Confirmation and Other Issues* [Docket No. 16003],

in the weeks prior to agreement on the Plan Settlements the Debtors received more than 875

document requests with respect to the Plan.  Thus, even under the streamlined discovery protocol

approved by the Court, it would have taken many months to resolve these discovery requests.

And these requests represented only a fraction of discovery that a full litigation of the Plan Issues

would have necessitated.

18.    Second, the support of the Committee, which has extensively and

independently evaluated the economic benefits of each Plan Settlement, as well as that of

creditors asserting over $450 billion in claims that have executed plan support agreements, and

the fact that only six of the tens of thousands of the Debtors' creditors are still pursuing

unresolved objections to any aspect of the Plan Settlements, demonstrates the overwhelming

degree to which creditors believe that the Plan Settlements serve their paramount interests.

19.    Third, among the parties in interest supporting the Plan are the insolvency

administrators of foreign Affiliates with fiduciary duties to their own creditor base, who have

sought and received affirmative approval of the relevant Plan Settlements from such Affiliates'

creditors and/or applicable foreign courts.

20.    Finally, the Plan Settlements are the result of over a year of arms-length

negotiations among parties represented by competent and sophisticated counsel.  Indeed, counsel

to the Debtors and the Committee have served in the same roles in many cases, among which is

the second largest bankruptcy case in history – In re Enron Corp., et al..

21.     In light of all of the foregoing, the Plan Settlements satisfy each of the

Iridium factors, and should be deemed fair and equitable by this Court.

   iii. LBIE Settlement is Fair and Equitable
     and in the Best Interests of the Estates

22.     One of the Objections targets exclusively the settlement (the "LBIE

Settlement") among the Debtors and certain of their U.K. Affiliates, including, among others,

Lehman Brothers International (Europe) ("LBIE," and together with the other U.K. Affiliates,

the "U.K. Affiliates").  (Farallon Entities' Objection ¶¶ 12-29.)  The Farallon Entities contend

that the Debtors have failed to carry their burden of demonstrating that the LBIE Settlement is

fair and equitable because the Debtors have failed to disclose critical information regarding the

LBIE Settlement, making it impossible for this Court or parties in interest to determine whether

it falls within the range of reasonableness.  (Farallon Entities' Objection ¶ 12.)  Further, based on

the information that is provided in the Disclosure Statement and Plan Supplement, the Farallon

Entities contend that the LBIE Settlement is not in the best interests of the LBHI estate due to a

perceived disparity in the treatment afforded to creditors of LBHI and that afforded to the

creditors of other Affiliates.  (Id. at ¶¶ 15-16.)

23.     The Farallon Entities contend that they lack adequate information to assess

the LBIE Settlement.  However, in addition to including in the Plan Supplement the actual

documentation memorializing the LBIE Settlement, the Debtors' and the Committee's advisors

have endeavoured to provide the Farallon Entities with additional information, on a public basis,

regarding this settlement, including additional detail regarding the claims LBIE asserted against

the Debtors. Despite such efforts, the Farallon Entities continue to maintain that they do not have the information they need to evaluate the LBIE Settlement.

24.     As the settlement documentation and the Debtors' Briefs make clear, the LBIE Settlement addresses the mutual claims of LBIE, the largest of the U.K. Affiliates, and the Debtors. Such claims include, without limitation, a multibillion dollar guarantee claim against LBHI, based on, among others, claims arising from LBIE's prepetition deposits at Lehman Brothers Bankhaus, AG ("Bankhaus"), a $4.588 billion claim asserted against LBSF under a "side letter" related to certain derivatives transactions, as well as claims related to the "extended lien" that LBIE allegedly holds for the benefit of all Affiliates.

25.     The Committee's advisors conducted their own factual investigation and analyzed the legal issues associated with the claims asserted by all parties, including the cross-border aspects, the enforceability of the agreements pursuant to which "extended liens" were asserted, the various guarantees pursuant to which LBIE asserted claims against LBHI, and the side letter pursuant to which LBIE asserted claims against LBSF. Furthermore, the Committee's advisors actively participated in the discussions that resulted in the LBIE Settlement. As the result of this process, the Committee has concluded that the LBIE Settlement is fair and equitable and in the best interests of the Debtors' estates and creditors.

26.     Based on all of the foregoing, as well as the arguments articulated in the Debtors' Briefs, the Committee urges the Court to approve all Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as fair and equitable and in the best interests of each Debtor's estate and creditors.

C.    **The Debtors Are Entitled To Discharge Under Section 1141(d)(3) of the Bankruptcy Code**

27.    Certain of the Objectors argue that the Plan is a liquidating plan that impermissibly purports to grant discharge to the Debtors in violation of section 1141(d)(3) of the Bankruptcy Code. (LibertyView Objection ¶ 20; United States Trustee Objection at Section D; CACIB Objection ¶ 14; Texas Comptroller ¶ 3.)   They are incorrect.

28.    It is true that section 1141(d)(3) of the Bankruptcy Code provides that: "the confirmation of a plan does not discharge a debtor if (i) the plan provides for the liquidation of all or substantially all of the property of the estate; (ii) the debtor does not engage in business after consummation of the plan; and (iii) the debtor would be denied a discharge under section 727(a)." 11 U.S.C. § 1141(d)(3).  All three of these requirements must be met in order to deny a discharge to a debtor under section 1141(d)(3).   See, e.g., Fin. Sec. Assur. v. In re T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 803 (5th Cir. 1997).

29.    Because the Debtors clearly would be denied a discharge under section 727(a) of the Bankruptcy Code,[6] it is the other two requirements of section 1141(d)(3) that should determine whether the Plan's discharge of the Debtors is proper.  As stated above, under section 1141(d)(3)(A), if a corporate debtor's plan provides for the "liquidation of all or substantially all of the property of the estate," such debtor is not eligible for a discharge.  Courts, however, have distinguished between plans that provide for "a wholesale liquidation" of the estate's assets upon plan confirmation and those that provide for "a supervised divestiture

---

[6]    Section 727(a)(1) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor is not an individual." 11 U.S.C. § 727(a)(1).  Thus, because the Debtors are not individuals, they would be denied a discharge under section 727(a).

process." In re Enron Corp., No. 01-16034, 2004 Bankr. LEXIS 2549 (AJG), at *215 (Bankr.

S.D.N.Y. July 15, 2004).

30.    The Enron plan provided that the reorganized debtors would transfer

certain assets to various trusts, while retaining the rest of their assets, and that the plan

administrator would continue to manage and operate the retained assets "until a favorable sale or

resolution of each of the Remaining Assets [was] finalized." Id. at *216.  Indeed, the Enron

court recognized that "[t]he wind down of the Debtors' estates remains a complicated process as

there are a significant number of individual assets that need to be collected or sold, or otherwise

handled." Id.  Under such circumstances, the Enron court granted a discharge to the Enron

debtors. Id. at 215.

31.    As in Enron, the Plan provides for an extended and complex liquidation

process managed by the Plan Administrator.  In fact, the Plan provides that the Plan

Administrator will wind down the assets of the estates over a period of three years or more.  As

have the Debtors throughout these cases, the Plan Administrator will manage these assets post-

Effective Date to maximize value until their eventual sale.

32.    Section 1141(d)(3)(B) of the Bankruptcy Code provides that no discharge

is appropriate where a debtor does not engage in business after the plan's consummation.  In

applying section 1141(d)(3)(B), courts have generally found that a debtor continues to "engage

in business" even where the business has been reduced or altered.  For instance, in In re Global

Water Technologies, Inc., 311 B.R. 896, 900 (Bankr. D. Colo. 2004), the court found that while

certain aspects of the debtor's business would no longer exist, the fact that core personnel and

established business relationships would continue to exist was sufficient for the court to hold that

the debtor would engage in business after the consummation of the plan and was thus entitled to a discharge.

33.     Moreover, the Enron court concluded that "where a debtor's post-confirmation business consists of managing assets pending their sale to third parties, such debtor is entitled to a discharge." Id. at *215; see also Fin. Sec. Assur. v. In re T-H New Orleans Ltd. P'ship (In re of T-H New Orleans), 188 B.R. 799, 804 (E.D. La. 1995), aff'd, 116 F.3d 790, 803-04 (5th Cir. 1997) (holding that conducting business for two years after confirmation while simultaneously marketing the debtor's main asset and seeking refinancing constitutes engaging in business); In re Edge Petroleum Corp., Case No. 09-20644 (Bankr. S.D. Tex. Dec. 14, 2009) (allowing discharge where plan called for the liquidation of some of the debtors' assets and permitted certain subsidiaries to continue to operate their businesses); In re River Capital Corp., 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (holding that section 1141(d)(3)(B) does not apply where plan provided for the retention of 40 percent of residual value for new stockholders and current management indicated an intention to continue to engage in business after consummation of the plan); Broussard v. First Am. Health Care of Ga., Inc. (In re First Am. Health Care of Ga., Inc.), 220 B.R. 720, 726 (Bankr. S.D. Ga. 1998) (plan provided an option to liquidate assets after confirmation, but did not mandate that result).

34.     Finally, the Plan presents an even more compelling case for a discharge than the Enron plan did: while the plan administrator under the Enron plan was authorized solely to "hold and liquidate" the retained assets, the Plan permits the Plan Administrator to take any necessary actions, including, without limitation, to operate the Debtors' businesses, to use, acquire, sell, lease and otherwise dispose of property, to enter into transactions, agreements, understandings or arrangements, whether or not in the ordinary course of business, and execute,

15

deliver, implement, and perform any and all obligations, instruments, documents and papers.

(Plan § 13.1.)  As such, the Debtors will continue to operate some of their businesses for several

years while they manage certain assets and liquidate others.  Thus, all Objections to the Debtors'

discharge under the Plan should be overruled.

>   **D.   Third-Party Releases and Exculpations Are Consistent
>         With Established Precedent And Appropriate Under
>         Unique Circumstances of These Cases**

35.    Certain of the Objectors argue that the Plan cannot be confirmed because

(i) the Court does not have jurisdiction to grant releases to third parties, and (ii) the third-party

releases and exculpations contained in the Plan are impermissibly broad.  (United States Trustee

at 15-19; Government ¶¶ 12-25.)  Contrary to these assertions, the third-party releases and

exculpations granted under the Plan to (i) fiduciaries of the Debtors and their professionals (the

"Plan Fiduciary Exculpation") and (ii) the PSA Creditors and related parties (the "PSA Creditor

Exculpation," and together with the Plan Fiduciary Exculpation, the "Plan Releases") are proper

and should not prevent the confirmation of the Plan.

>   i.    Court Has Subject Matter Jurisdiction
>         Over Plan Releases

36.    The Objectors' assertions to the contrary notwithstanding, this Court has

subject matter jurisdiction to grant the Plan Releases because such releases directly relate to acts

or omissions arising out of the Chapter 11 Cases.  "Congress intended to grant comprehensive

jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all

matters connected with the bankruptcy estate." Celotex Corp. v. Edwards, 514 U.S. 300, 308

(1995) (citing Pacor, Inc. v Higgins, 743 F.2d 984, 994 (3d Cir. 1984)) (holding that bankruptcy

court had jurisdiction under section 105 of Bankruptcy Code to enjoin claims against third party who was not involved in bankruptcy proceeding).[7]

37.     The Second Circuit has recognized that bankruptcy courts have subject matter jurisdiction over claims that directly affect the *res* of the estate.  See, e.g., Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52, 66 (2d Cir. 2008) ("Manville I"), rev'd and remanded on other grounds sub nom., Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009), aff'g in part and rev'g in part, 600 F.3d 135 (2d Cir. 2010) ("Manville II") (court found it had jurisdiction under 28 U.S.C. §§ 1334(a) and (b) to approve third-party injunctions, releases and exculpations);[8] In re Finlay Enters., Inc., No. 09-14873 (JMP), 2010 Bankr. LEXIS 5584, at *24 (Bankr. S.D.N.Y. June 29, 2010) (section 105(a) of Bankruptcy Code permits issuance of injunction and approval of third party releases and exculpations); In re Fairpoint Commc'ns, Inc., 452 B.R. 21, 29-30 (Bankr. S.D.N.Y. 2011) (bankruptcy court had subject matter jurisdiction over non-derivative claims against third party because claims created contingent indemnification obligation that directly affected the *res* of bankruptcy estate); In re Spiegel Inc., No. 03-11540 (BRL), 2006 WL 2577825, at *14 (Bankr. S.D.N.Y. Aug. 16, 2006) (court has power to enjoin suits against third parties if actions against such parties would have ***at least a conceivable effect*** upon debtors) (emphasis added).

38.     The Government and the United States Trustee assert that the Plan Releases exceed the Court's jurisdiction because they purport to release "direct" claims against third-party non-debtors that are unrelated to the Debtors' estates.  (Government ¶ 24; United

---

[7]     See generally In re Motors Liquidation Co., 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) (finding that third-party releases are not inconsistent with the Bankruptcy Code).

[8]     Section 1334(b) states, in relevant part, that "notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

States Trustee at 18.)  Such assertions, however, are incorrect as they are based on an overly

broad interpretation of the Second Circuit's holdings in Manville I & II.  Id. (citing Manville II,

600 F.3d at 153) (clarifying on remand that bankruptcy court does not have jurisdiction to enjoin

non-derivative claims against debtor's insurers ).  Manville I & II, however, are distinguishable

from the facts presented here and therefore do not limit this Court's jurisdiction to grant the Plan

Releases.

       39.     In Manville I & II, the bankruptcy court approved a settlement between

the debtor and its insurer with respect to claims against the debtor's asbestos policies, which

settlement barred all non-derivative third-party claims against the insurer and channelled them to

a trust.  Manville I, 517 F.3d at 68.  Another insurer brought contribution and indemnification

claims against the settling insurer based on the settling insurer's independent wrongdoing.

Manville II, 600 F.3d at 152-53.  The Second Circuit's holding declining to enjoin these claims

turned on the fact that such claims were predicated on an independent duty owed by the settling

insurer and did not implicate any claim against the estate.  Manville I, 517 F.3d at 65; see In re

FairPoint Commc'ns, Inc., 452 B.R. 21, 28 (S.D.N.Y. 2011) (recognizing the holding as specific

to the circumstances of Manville); Campbell v. Motors Liquidation Co. (In re Motors

Liquidation Co.), 428 B.R. 43, 57 n.18 (S.D.N.Y. 2010) (same).

       40.     By contrast, the Plan Releases are expressly limited to "act[s] taken or

omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the negotiation,

formulation, dissemination or consummation or administration of the Plan and related

documents." (Plan § 13.3.)  The test for determining whether a claim is "related to" a debtor is

"whether the outcome of a proceeding 'might have any "conceivable effect" on the bankrupt

estate' or if the proceeding has 'any significant connection' with the bankrupt estate."  In re

Chateaugay Corp., 201 B.R. 48, 63 (Bankr. S.D.N.Y.1996) (quoting Publicker Indus., Inc. v. United States, 980 F.2d 110, 114 (2d Cir. 1992)).  The Chateaugay court went on to "interpret[ ] the conceivable effect test to be 'extremely broad' so as to 'find related to jurisdiction in a wide variety of circumstances,'" including when the claims enjoined "implicate[d] the interpretation or enforcement of this Court's orders."  In re Spiegel Inc., 2006 WL 2577825 at *8 (quoting Chateaugay, 201 B.R. at 63 (citations omitted)).  Accordingly, the approval of the Plan Releases, which are intended to enjoin any claim with a conceivable effect on the Debtors' estates, are within this Court's broad jurisdiction.

ii.    Plan Releases Are Otherwise in Accord
With Applicable Second Circuit Standards

41.    The Government and United States Trustee further argue that the Plan Releases do not meet the standard articulated in Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005). (Government ¶¶ 12-22; United States Trustee at 15-19.)  The Government and the United States Trustee, however, fail to account for the unusually broad scope of the releases in Metromedia that provoked the Second Circuit to apply a heightened standard to such releases, which is inapplicable here.  In Metromedia, the plan included non-debtor releases that covered "any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with *any matter related to [Metromedia] or one or more subsidiaries* . . . whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise."  Metromedia, 416 F.3d at 141-42 (emphasis added).  Such releases not only covered an atypically wide scope of conduct well beyond activities in connection with the administration of a chapter 11 case, but also failed to exclude claims based on culpable conduct.  In this context, the Second Circuit found it

19

necessary to articulate a stringent standard targeted at improper and overbroad third-party releases.

42.        In counseling against excessively broad releases of this type that "lend themselves to abuse," however, the Second Circuit also recognized that a third-party release is justified if it "plays an important part in the debtor's reorganization plan." Metromedia, 416 F.3d at 141-42.  Here, the Plan Releases are appropriately limited and are an essential part of the Plan.  Therefore, they should be approved.

        a.      Plan Releases Are Narrowly Tailored

43.        In accordance with Second Circuit standards, the Plan Releases are narrowly tailored.  First, the Plan Releases are limited to actions or omissions arising solely out of or in connection with the Chapter 11 Cases and do not apply to any prepetition claims.  (Plan §§ 13.3 and 13.5.)  "Plainly there is less potential for abuse if only post-petition events are covered."  In re Adelphia Communc'ns Corp., 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007). Courts have previously found comparable limitations on the breadth of third-party releases to be sufficient.  See, e.g., In re Oneida Ltd., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (third-party releases were sufficiently narrow as they only covered conduct taken in connection with the chapter 11 cases); Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 504 (S.D.N.Y. 2005) (finding that the exculpation provision was sufficiently limited to only conduct occurring after the filing of the debtors' bankruptcy petitions).

44.        Furthermore, the Plan Releases do not cover acts constituting willful misconduct or gross negligence, (Plan §§ 13.3 and 13.5.), a limitation which courts have also found sufficient to overcome similar overbreadth challenges.  See, e.g., In re Oneida, 351 B.R. at 94 n.22 (noting that the plan release provisions were sufficiently narrow because they did not provide releases for gross negligence, willful misconduct, fraud or criminal conduct); In re Mal

Dunn Assocs., Inc., 406 B.R. 622, 626 (Bankr. S.D.N.Y. 2009) (third-party releases were

approved where they did not release liability for acts of gross negligence and willful misconduct

and, thus, not did provide blanket immunity); In re Motors Liquidation Co., 447 B.R. 198, 220

(Bankr. S.D.N.Y. 2011) (noting that the exculpation was carefully drafted to carve out matters

unworthy of protection, such as intentional misconduct or gross negligence).

45.    Finally, the Plan Releases do not limit the liability of professionals under

the New York Rules of Professional Conduct.  (Plan § 13.3.)  Accordingly, the Plan Releases are

appropriately narrow and are in accordance with numerous third-party release provisions

approved by courts in the Southern District of New York.

b.    Plan Releases Are Essential To The Plan

46.    The Second Circuit has approved third-party releases, exculpations and

injunctions that are essential to a debtor's plan of reorganization.  See In re Drexel Burnham

Lambert Grp., Inc., 960 F.2d 285, 293 (2d Cir. 1992) (injunction limiting lawsuits against

debtor's former officers and directors was key component of settlement agreement that was

"unquestionably an essential element of [the debtor's] ultimate reorganization"); see also

Metromedia, 416 F.3d at 142 (acknowledging that third-party releases are proper when such

releases are important to the debtor's plan).[9]  In keeping with the standard articulated by the

---

[9]    Indeed, many district and bankruptcy courts have reached similar conclusions.  See, e.g., Cartalemi v. Karta
Corp. (In re Karta Corp.), 342 B.R. 45, 54 (S.D.N.Y. 2006) (in absence of third-party releases, released parties
would not contribute to plan which would make it unconfirmable); Ion Media Networks, Inc. v. Cyrus Select
Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009)
(without third-party releases of board of directors and certain lenders, critical aspects of plan would not have
been achieved); In re Charter Commc'ns, 419 B.R. at 259 (third party releases were essential component of
plan); In re Crabtree & Evelyn, Ltd., No. 09-14267 (BRL), 2009 Bankr. LEXIS 4674, at *150 (Bankr. S.D.N.Y.
Nov. 19, 2009) ("absent the third-party releases it is unlikely that the Debtor would be able to confirm a Plan, as
the [lenders'] willingness to fund the Plan and provide for a Distribution to Unsecured Creditors is contingent
upon the granting of such releases."); In re Mal Dunn Assocs., Inc., 406 B.R. 622, 626 (Bankr. S.D.N.Y. 2009)
(upholding third-party releases in global settlement agreement and asset purchase agreement that served as
"backbone" of debtor's plan); In re Spiegel Inc.,No. 03-11540 (BRL), 2006 WL 2577825, at *8 (Bankr.
S.D.N.Y. Aug. 16, 2006) (plan release and injunction were critical components of settlement that played vital
part in plan and were necessary to successful reorganization); In re Calpine Corp., No. 05-60200 (BRL), 2007

Second Circuit in <u>Drexel</u>, the Plan Settlements are "an essential element" of the Debtors'

reorganization; and the Plan Releases are "key components" of those settlements.  Indeed, the

Plan Releases were a key demand of the PSA Parties.  Thus, the Plan Releases are essential to

the Debtors' reorganization.  See <u>Drexel</u>, 960 F.2d at 293.

(1)    <u>Plan Fiduciary Exculpation</u>

47.    The Government takes issue with the Plan Releases on a number of

grounds, both with respect to the Plan Fiduciary Exculpation and the PSA Creditor Exculpation.

It contends, for example, that the Plan Fiduciary Exculpation is inappropriate as to the Debtors'

management, or to the Debtors' and Committee's professionals, each of which undertook to

accomplish no more than their positions required and have otherwise been compensated for the

work they performed.  (Government Objection ¶¶ 15, 17.)

48.    The Government's argument, however fails to take into account the

unique nature of the Chapter 11 Cases, which required the active management of the Debtors'

assets by the management and professionals throughout these cases.  This involved, among other

things, the acquiring or restructuring of assets to maximize the value of the Debtors' portfolios.

This also, at times, necessitated the Debtors' professionals, with the active assistance of the

Committee's professionals, to assume management of at-risk assets on a day-to-day basis

without the comfort of a court order authorizing any specific intervention.  Such high-risk

efforts, which have arguably yielded billions of dollars in incremental value for the Debtors'

estates, involve incremental exposure to liability for the management and the estate

professionals, thereby necessitating that the Plan Releases inure to their benefit.

---

Bankr. LEXIS 4390, at *27 (Bankr. S.D.N.Y. Dec. 19, 2007) (third-party release, indemnification and exculpation provisions were "an essential means of implementing the Plan . . . an integral element of the transactions incorporated into the Plan . . . [and] important to the overall objectives of the Plan"); <u>Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)</u>, 330 B.R. 394, 437-38 (Bankr. S.D.N.Y. 2005) (no other plausible way to proceed with plan given investors' insistence on non-debtor releases and injunctions).

49.    Indeed, the reason that exculpation provisions are included "so frequently" in chapter 11 plans is because "stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." In re Motors Liquidation Co., 447 B.R. at 220; In re Chemtura Corp., 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (same); In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), rev'd in part on other grounds, 643 F.3d 79 (2d Cir. 2010) (same); In re Adelphia Commc'ns Corp., 368 B.R. 140, 269 (Bankr. S.D.N.Y. 2007) (same).[10]  Courts in the Second Circuit have consistently found that "[s]trong arguments can be made that the bankruptcy system would be strengthened if plan fiduciaries were more broadly protected from claims by disgruntled or harassing stakeholders." In re Motors Liquidation Co., 447 B.R. at 220; see also In re Chemtura Corp., 439 B.R. at 610 (recognizing legitimate need for third-party releases to protect released parties from frivolous claims of other stakeholders); In re Granite Broad. Corp., 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving a provision "follow[ing] the text that has become standard in this district," which exculpated the debtors and their pre- and postpetition lender "and their respective representatives for actions in connection, related to, or arising out of the Reorganization Cases").

50.    In the final analysis, the approach advocated by the Government is inconsistent with the policy of inducing active good faith participation by parties in interest in the chapter 11 process without the danger of exposure to potentially expensive and vexatious litigation.  Cf. Granite, 369 B.R. at 139 (finding that exculpation provision applying only to acts or omissions in  connection with the plan and the bankruptcy cases required, "in effect, that any

---

[10]    Releases and exculpation clauses are commonplace in large chapter 11 cases.  See, e.g., In re Neff Corp., No. 10-12610 (SCC), 2010 Bankr. LEXIS 6159 (Bankr. S.D.N.Y. Sept. 21, 2010); In re Almatis B.V., No. 10-12308 (MG), 2010 Bankr. LEXIS 5875 (Bankr. S.D.N.Y. Sept. 20, 2010); In re Extended Stay Inc., No. 09-13764 (JMP) 2010 Bankr. LEXIS 5411 (Bankr. S.D.N.Y. July 20, 2010); In re Finlay Enters., Inc., No. 09-14873 (JMP), 2010 Bankr. LEXIS 5584 (Bankr. S.D.N.Y. June 29, 2010).

claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation"). The Plan Fiduciary Exculpation is appropriately limited in scope to protect all potential interests while not discouraging active, good faith participation in the chapter 11 process. It conforms to the form of release that "has become standard in this district" and continues to be accepted by the courts. Id. Accordingly, the Plan Fiduciary Exculpation should be approved.

(2)    PSA Creditor Exculpation

51.    As to the PSA Creditors that are beneficiaries of the PSA Creditor Exculpation, the primary justification for this benefit is the role that such parties have played in the plan process. The efforts of the PSA Creditors in this regard date back more than two years. The PSA Creditors participated in numerous in-person and telephonic meetings with the Debtors and the Committee throughout 2010 and 2011, with these discussions coming to a head during the month of June 2011, when the final terms of the Plan were negotiated and the Plan Support Agreements were executed by each of the PSA Creditors. Without these efforts, and the largely consensual and constructive input of the PSA Creditors, the Plan Settlements could never have been reached so expeditiously, and months, perhaps years, of litigation and plan negotiations might still lie ahead of the Debtors.

52.    Pursuant to the Plan Support Agreements, the PSA Creditors agreed to not prosecute the Competing Plans and to support and, when properly solicited, to vote to accept the Plan. Another component of the agreement was the assurance that the Plan, as prosecuted, would include the PSA Creditor Exculpation. Without the inclusion of such protections, this widely-supported Plan might well not have been possible. Thus, the Plan Releases should be approved as they are essential to the Plan.

24

iii.    Plan Releases Meet the Standard Articulated
By the Second Circuit in *Metromedia*

53.    Even were this Court to find that the Metromedia standards are applicable

to the Plan Releases, the Debtors have demonstrated that such standards have been met.  Under

Metromedia, third-party releases are appropriate in "rare cases" that render the releases

"important to the debtor's plan."  Metromedia, 416 F.3d at 141.  While the Metromedia court

acknowledged that there is no established test to determine when a third-party release is

"important" to a debtor's plan, it noted that courts have approved non-debtor releases when

(i) the estate received substantial consideration in return for the releases; (ii) the enjoined claims

would indirectly impact the debtor's reorganization by way of indemnification or contribution

rights; and/or (iii) the affected parties have consented.  Id. at 142.  As more fully set forth below,

the circumstances of the Chapter 11 Cases are rare and meet the applicable standard.

a.    Released Parties Have Made Substantial
Contributions To Debtors' Reorganization

54.    Courts have approved third-party release, exculpation and injunction

provisions where "[e]ach of the Released Parties made a material contribution to the chapter 11

cases by foregoing certain rights, or by negotiating, implementing, and in some cases funding,

the Debtors' Plan."  Finlay Enters., 2010 Bankr. LEXIS 5584 at *25.  In Finlay Enterprises, this

Court approved releases of (i) the debtor's management and employees for their active

participation in the marketing and sale of the debtor's assets, which maximized value for the

estates, while managing and winding down the debtor's businesses; (ii) the unsecured creditors'

committee for its active participation in the cases and in negotiating settlements that led to the

plan; (iii) a secured creditor that contributed a portion of its distribution to unsecured creditors;

(iv) certain senior lenders and indenture trustees that participated actively in the cases and in the

plan process; and (v) each of the representatives and professionals of the foregoing.  Id. at *26-

25

*28.  In so doing, this Court found that such contributions "confer[red] substantial benefits on the Debtors' estates and creditors by avoiding the cost, expense, and uncertainty of litigation over various claims asserted by parties in interest and by providing for a settlement of claims that result[ed] in a cash distribution to unsecured creditors that would not otherwise be available in the absence of a global settlement and release."  Id. at *25.  Noting these benefits, the overwhelming support for the plan, and the fact that such support had resulted in increased value for creditors, this Court found that the releases clearly satisfied the Metromedia standard.  Id. at *30.

55.    Like the released parties in Finlay Enterprises, each of the Released Parties have materially contributed to the Chapter 11 Cases by participating actively in various aspects of the Chapter 11 Cases, foregoing certain rights, and/or by participating in the formulation of the Plan.

56.    Each member of the Committee and its professional advisors, for example, have substantially contributed to the Debtors' reorganization through active participation in every aspect of the administration of the Chapter 11 Cases, including asset stabilization, liquidation, litigation and claims reconciliation.  In addition to numerous informal and special meetings, the Committee met twice each week to discuss and make decisions regarding all aspects of the Debtors' cases (one of which meetings, held every week for over a year and a half, was devoted entirely to plan matters).  Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established, at the outset of the Chapter 11 Cases, six subcommittees to review and evaluate issues and transactions with respect to various asset/claim categories – Derivatives, Real Estate, Private Equity/Principle Investments, Loan Book, Domestic Banks, and Tax.  Thereafter, the Committee also established a Litigation

Subcommittee.  Each of these subcommittees also met regularly, thus further increasing the

substantial time commitment required by the Committee members who served on these

subcommittees.

57.     Likewise, the Committee's professionals have made contributions to these

cases beyond those expected or required of Committee professionals in a traditional chapter 11

case.  Unlike in other large chapter 11 cases – where operational restructurings are being

contemplated and most of the debtor's pre-petition personnel continues to run the debtor's

businesses during the restructuring – the Debtors have been in a liquidation mode from day one.

Within a week of LBHI's filing, all but a small minority of its employees had been terminated or

moved to Barclays Capital Inc. as part of the sale of the broker/dealer business (although some of

the derivatives professionals were re-hired by the Debtors to continue the administration of those

assets).  The task of running the remaining businesses, pending their ultimate liquidation, was

left largely, by force of circumstance, to the Debtors' and the Committee's professionals.

Further, the Committee's professionals not only played an active role in the negotiation of many

of the Plan Settlements, but also, as described above, developed the concept that provided the

basis of the Plan Adjustment.  See supra ¶ [3].

58.     Similarly, the Debtors' directors, officers, employees, agents and

professionals have expended more time and effort than is the norm in a typical chapter 11 case.

In addition to administering a $66.3 billion portfolio of assets, comprised of $24.0 billion in

derivatives contracts, $19.9 billion in real estate assets with highly volatile values, $10.4 billion

in highly illiquid private equity assets, some of which required active management, and $12.0

billion in corporate debt, the Debtors' professionals reconciled over 66,000 proofs of claim,

negotiated settlements of multi-billion dollar claims with Affiliates and proposed the Plan, to which only 20 objections were interposed.

59.    With respect to the PSA Creditors, as described in detail in the Disclosure Statement, they have each made a material contribution to the Chapter 11 Cases by agreeing to restructure their claims in such a way that additional value became available to other general unsecured creditors.  (Disclosure Statement, § II(A).)  Without such reallocation of value to which the PSA Creditors voluntarily agreed, the plan process would likely have become mired in a protracted and costly litigation.  In addition, the PSA Creditors and their respective officers, directors, employers, agents and professionals have contributed significantly to the reorganization through active participation and negotiation of the Plan with other claimants, and by agreeing to stay the prosecution of the Competing Plans, which would inevitably have involved litigating substantive consolidation, among other Plan Issues.  Not only did the efforts of the PSA Creditors and their agents avoid costly and protracted litigation, thereby allowing for the expeditious distribution of value to creditors, they served to resolve various other matters, including disputed ownership and valuations of certain claims, and allocation of expenses.

60.    The Government contends that, because negotiations occur in all bankruptcy cases, with give and take on both sides, the PSA Creditor Exculpation should not be approved because there is nothing "unique" about the plan process in these cases.  However, in the context of the Chapter 11 Cases, the PSA Creditor Exculpation cannot be viewed as simply a standard provision readily conceded in the course of a routine negotiation process; it was, instead, a necessary, bargained-for element of that process.  Absent the Debtors' agreement to provide the PSA Creditor Exculpation, the PSA Creditors would have been less likely to have engaged in the plan process to the extent they did (on account of their own claims and to marshal

additional support for the Plan within the broader community of creditors), including their entry

into Plan Support Agreements and consummation of settlements with respect to their **more than

$450 billion** in claims against the Debtors.

61.    Thus, the active participation of the PSA Creditors in the plan process and

the necessity of inclusion of the PSA Creditor Exculpation in the Plan make this release a "key

component" of the Plan Settlements.  Drexel Burnham, 960 F.2d at 293.  The Plan Settlements

are, in turn, the "cornerstone" of the Plan.  See MacArthur Co. v. Johns-Manville Corp. (In re

Johns-Manville Corp., et al.), 837 F.2d 89, 90 (2d Cir. 1988).  As such, the PSA Creditor

Exculpation can hardly be characterized as a routine, potentially abusive plan provision.  The

facts  demonstrate the PSA Creditor Exculpation was bargained for, beneficial and justified.

62.    Finally, **no** economic stakeholder or fiduciary has objected to the PSA

Creditor Exculpation.  The objections of parties with no economic interest in the Debtors' estates

should not trump the interests of the economic stakeholders who benefited from the concessions

made by the PSA Creditors in connection with the Plan Settlements.  Therefore, the PSA

Creditors should be afforded the benefit of their bargain and receive the protection of the PSA

Creditor Exculpation.

    b.    Certain of the Released Claims Would
        Impact Reorganization

63.    Courts in the Second Circuit have approved third-party releases when

there has been an "identity of interest" between the non-debtor and the debtor such that the estate

would be impacted by claims against the non-debtor because of its indemnification or

contribution rights.[11]  Certain of the Debtors' directors, officers, employees, agents and

---

[11]    See Metromedia, 416 F.3d at 142; In re Crabtree & Evelyn, Ltd., No. 09-14267 (BRL), 2010 Bankr. LEXIS
3199 (Bankr. S.D.N.Y. Jan. 14, 2010) (approved third-party releases because, among other things, certain
releasees shared identity of interest with debtor); In re Charter Commc'ns, 419 B.R. 221, 259 (Bankr. S.D.N.Y.

professionals are parties to indemnification and/or contribution agreements with the Debtors by

virtue of the Debtors' certificates of incorporation and bylaws and the terms of Alvarez and

Marsal's engagement.  Section 11.6 of the Plan provides for the survival of these indemnification

and contribution claims.  In addition, the proposed Director Selection Committee Order provides

for a broad indemnity to several of the leading PSA Creditors, as well as the Debtors' and

Committee's representatives serving on the Director Selection Committee.  See *Debtors' Motion*

*for Order, Pursuant to Sections 105(a), 363(b), and 1142(b) of the Bankruptcy Code, Appointing*

*the Director Selection Committee, Approving Retention of Korn/Ferry International by LBHI as*

*Such Committees Executive Search Advisors, and Granting Certain Related Relief*  [Docket No.

21082].

      64.    Any claims made against the foregoing third parties, if ultimately

successful, would essentially become claims against the Debtors' estates and deplete estate

resources.  See, e.g., In re XO Commc'ns, 330 B.R. at 441 ("There is an identity of interest

between the debtor and the third party, usually an indemnity relationship, such that a suit against

the nondebtor is, in essence, a suit against the debtor or will deplete assets of the estate.").  For

this additional reason, the Plan Releases should be granted as to any third parties  to whom the

Debtors have indemnification obligations.

---

2009) (third-party releases approved where debtors' indemnification obligations to their directors, officers,
agents and professionals created identity of interest); In re Adelphia Commc'ns Corp., 368 B.R. 140, 268
(Bankr. S.D.N.Y. 2007) ("to the extent that third party releases are congruent with indemnification obligations,
and the Debtors would be liable for any liability imposed on such persons, third party release are acceptable.");
In re Spiegel Inc., No. 03-11540 (BRL), 2006 WL 2577825, at *8 (Bankr. S.D.N.Y. Aug. 16, 2006) (debtor's
estate and the allocation of debtors' property among its creditors are impacted by contribution and indemnity
claims); In re XO Commc'ns, 330 B.R. at 440 ("identity of interest present as a result of
indemnification/contribution exposure of the Debtor" justified nondebtor releases).

    c.        The Majority of Affected Creditors
                Have Consented to Plan Releases

65.      Courts in the Second Circuit generally approve third-party releases,

exculpations and injunctions when affected parties consent to these provisions.[12]  Consent may

take the form of an affirmative vote for the plan, as was the case in In re Adelphia

Communications Corp., where the court held releases and exculpation to be enforceable against

any party that voted in favor of the plan.  368 B.R. at 268.  The overwhelming majority of

creditors voted to accept the Plan, due, in large measure, to the efforts of the Debtors to

consensually resolve the vast majority of the issues affecting the Plan, as well as the fact that

only twenty objections to the Plan were filed, all but six of which appear to have been resolved

by the Debtors prior to the date hereof.  Such overwhelming support is indicative of the affected

creditors' consent to the Plan, including the Plan Releases.

    d.        The Chapter 11 Cases are Sufficiently
                Unique to Warrant the Plan Releases

66.      Even the Metromedia court acknowledged that, if the circumstances of a

particular case and the plan formulation process are truly "rare," third party release may well be

warranted.  Metromedia, 416 F. 3d at 141.  See also Cartalemi v. Karta Corp. (In re Karta Corp.),

342 B.R. 45, 54 (S.D.N.Y. 2005) (noting the uniqueness of the debtor's businesses and

substantial contribution of the releasees to the reorganization of the debtor, the court upheld the

third-party releases, reasoning that otherwise the released parties would not contribute to the

plan, which would make it ultimately unconfirmable).

---

[12]    Metromedia, 416 F.3d at 142;  In re Crabtree & Evelyn, Ltd., 2010 Bankr. LEXIS 3199 (non-debtor releases
were binding upon creditors that accepted the plan); In re Ion Media Networks, 419 B.R. at 602 ("Non-Debtor
Releases have been consented to by a vast majority of the affected creditors"); In re DBSD N. Am., Inc., 419
B.R. 179 (Bankr. S.D.N.Y. 2009) (parties bound to exculpation provisions when they had consented to them, or
were deemed to have done so).

67.     In In re Charter Communications, this Court upheld third-party releases required by a settlement agreement integral to the debtor's plan.  In so doing, this Court noted the unique circumstances attendant to the plan: it was "especially remarkable having been negotiated at the height of the so-called Great Recession," and the debtor's "structure [was] complex, its debt load [was] enormous, and its bankruptcy [was] one of the largest prearranged cases ever filed."  419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009).[13]  See also In re XO Commc'ns., at 438 (noting the exceptional circumstances that allowed the debtor to achieve a superior recovery under a proposed plan of reorganization in a rapidly declining market).

68.     Measured against the foregoing standard, the circumstances of the Chapter 11 Cases are unquestionably unique.  Not only are the Chapter 11 Cases the largest and most complex bankruptcy cases in history, but also the Plan was negotiated and the Plan Settlements were reached against the backdrop of unstable and deteriorating financial markets.  Further, the ability to reach consensus for the Plan, given a claims base of over 66,000 creditors and the highly divergent interests held by such creditors, further illustrates the truly unique and rare circumstances surrounding the formulation of the Plan.

69.     For this reason, as well as all the other reasons stated herein and in the Debtors' Briefs, the Plan Releases are clearly appropriate and should be approved by the Court.

---

[13]    The Government contends that the "unique circumstances" presented in Charter Communications that justified the third-party releases were the "uniquely personal structuring benefits [where] no other party could stand in their shoes and achieve the same result." Government ¶ 16 (quoting In re Charter Commc'ns, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009).  This, however, mischaracterizes the Court's holding.  The Court made this observation in its discussion of whether the estates will be receiving substantial consideration in exchange for the releases.  See Id. at 258-59.

**WHEREFORE**, the Committee respectfully requests that the Court:  (i) overrule

each Objection, (ii) confirm the Plan, and (iii) grant such other relief as is just.

Dated:  New York, New York
         November 29, 2011

                                          **MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY** LLP

                                       By:  /s/ Dennis F. Dunne
                                          Dennis F. Dunne
                                          Evan R. Fleck
                                          Dennis C. O'Donnell
                                          1 Chase Manhattan Plaza
                                          New York, New York 10005
                                          Telephone: (212) 530-5000

                                       Counsel for Official Committee of Unsecured
                                       Creditors of Lehman Brothers Holdings Inc., et al.