Mrs. S.A.B. Van Rooy, DVM and LLM
Schoonouwenseweg 24
2821 NX STOLWIJK
THE NETHERLANDS
Telephone:    + 31 182 34 34 43
Facsimile:    + 31 182 34 34 43
Email:        sabvanrooy@hotmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

The Chambers of the Honorable James M. Peck
One Bowling Green
New York
New York 10004
Courtroom 601
UNITED STATES OF AMERICA



| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*) | ) | **Case No. 08 – 13555 (JMP)** |
| **Debtors.** | ) | **(Jointly Administered)** |

### RESPONSE OF MRS. S.A.B. VAN ROOY
### TO DEBTORS' TWO HUNDRED THIRTEENTH OMNIBUS OBJECTION
### TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM

Mrs. S.A.B. Van Rooy ("Van Rooy") hereby responds to the Two Hundred Thirteenth Omnibus Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 20102] (the "Objection") by Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), that seeks to disallow and expunge, or in the alternative, reclassify as equity interests, *inter alia*, Van Rooy's Claim No. 54549 (the "Claim"), and respectfully states as follows:

### EXTENSION OF TIME

1. Debtors' attorney, Mr. Ryan Martin, provided Van Rooy an extension of time to November 25, 2011 (or even longer if necessary) in order to respond to Debtors' Objection, that he confirmed in an email of November 7, 2011. *See* **EXHIBIT A**.

**BACKGROUND**

2. On September 15, 2008 (the "Petition Date") LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

3. Prior to the commencement of these chapter 11 cases, LBHI apparently concluded on January 3, 2007 a so called Limited Partnership Agreement ("Partnership Agreement") with two wholly-owned Subsidiaries of LBHI and one other party, establishing the limited partnership Lehman Brothers UK Capital Funding IV LP ("LB UK IV"). *See* Exhibit D. The conditions of existence of this limited partnership were set out in the Partnership Agreement, which was governing the relationship between parties and that was formed under the "Limited Partnerships Act 1907" in the United Kingdom and Wales. On January 3, 2007 the limited partnership LB UK IV was registered at the official Registrar of Companies of the United Kingdom, the so called Companies House (the "Registrar" or "Companies House").

4. Hereby Van Rooy notifies the fact that the Debtors did not attach the complete copies of the entire Partnership Agreement to the Objection. The major and crucial part of the Partnership Agreement is missing in Exhibit D of Debtors' Objection. Van Rooy will come back to this later.

5. Pursuant to the terms of the Partnership Agreement LBHI agreed to become and operate as a "Guarantor" for all obligations of LB UK IV to the holders of the Securities. *See* Exhibit D, cover page. Because of the fact that major and crucial part of this Partnership Agreement is missing, the precise definition and interpretation of the term "Guarantor" is still unknown as well as LBHI's obligations, commitments, liabilities, undertakings, role etc. as a party to this Partnership Agreement.

6. The General Partner of LB UK IV was "LB GP No. 1 Ltd", a wholly-owned Subsidiary of LBHI (incorporated with limited liability in England and Wales with registered number 5355491). According to information of the Registrar LB GP No. 1 Ltd was a Private Limited Company.

7. The Preferential Limited Partner of LB UK IV was "LB Investment Holdings Ltd", also a wholly-owned Subsidiary of LBHI (incorporated with limited liability in England and Wales with registered number 5355491). According to information of the Registrar LB Investment Holdings Ltd was also a Private Limited Company.

8. Another Limited Partner of LB UK IV was the Bank of New York Depository (Nominees) Limited, a Private Limited Company incorporated with limited liability in England and Wales with registered number 03227439. According to an extract obtained from the Companies House the ultimate parent company of the Bank of New York Depository (Nominees) Limited is The Bank of New York Mellon Company, a company incorporated in the United States of America.

9. Prior to the commencement of the chapter 11 cases, LB UK IV issued the Euro Fixed Enhanced Capital Advantaged Preferred Securities (Euro ECAPS) (the "Securities"). The Securities for LB UK IV were issued pursuant to a Base Prospectus dated January 4, 2007 (the "Base Prospectus"), which also included the so called Final Terms (the "Final Terms"). See Exhibit B. "Preferred Securities" is defined as "... Holders which are entitled to the benefits of this Subordinated Guarantee...". See Exhibit B, pp. 34-35.

10. LBHI guaranteed all obligations of LB UK IV or the Issuer (the "Issuer") to the holders of the Securities by a separate Subordinated Guarantee executed contemporaneously with the Base Prospectus (the "LBHI Guarantee" or the "Guarantee"). Under the Guarantee, LBHI irrevocably agreed to *"pay in full to the Holders the Guaranteed Payments [under the LB UK IV-issued securities], as and when due, to the extent that such payments shall not have been paid when due and payable by the Issuer [LB UK IV], regardless of any defence, right of set-off or counterclaim which the Issuer [LB UK IV] may have or assert. This Guarantee is continuing, irrevocable and absolute."* See Exhibit B, p. 35, §2.1.

11. The Guarantee was executed and delivered by LBHI *for the benefit of the holders. See* Exhibit B, p. 34, 38. Furthermore LBHI guaranteed: *"Subject to operation of law, all guarantees and agreements contained in this Guarantee shall bind the successors, assigns, receivers, trustees and representatives of LBHI and shall inure the benefit of the Holders."* See Exhibit B, p. 38, §5.1.

12. The Base Prospectus was constituted under the European Directive 2003/71/EC (the "Directive 2003/71/EC"). The Final Terms, having the benefit of a subordinated guarantee of LBHI as the "Guarantor", comprised the final terms required to list and had admitted to trading the issue by LB UK IV of the Preferred Securities described herein. Pursuant to the Final Terms, the Final Terms of the Preferred Securities must be read in conjunction with the Base Prospectus. Full information on the issuer and the offer of the Preferred Securities was only available on the basis of the combination of these Final Terms and the Base Prospectus.

3

Each of the LB GP No. 1 Ltd (the "General Partner"), acting on behalf of the Issuer, as well as the Guarantor accepted responsibility for the information contained in these Final Terms"[1]. The Final Terms were signed by LB GP No. 1 Ltd as General Partner, acting on behalf of the Issuer, and were also signed on behalf of the Guarantor LBHI.

13. On July 2, 2009, the Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271]. The Bar Date Order created a separate claims process for filing guarantee claims against LBHI for holders of certain "programs securities" issued by non-debtor affiliates of LBHI outside of the United States and establishing November 2, 2009 as the bar date for filing these claims (collectively, the "LPS Claims Process"). As part of the LPS Claims Process, on July 27, 2009, LBHI issued a Notice of Deadlines for Filing Proofs of Claim Based on Lehman Programs Securities (the "LPS Claims Notice").

14. The LPS Claims Notice directed creditors to LBHI's website, where a list of securities subject to the LPS Claims Process was posted. The Securities of Van Rooy were included on that list and, as of the date of this Response, remain on that list.

15. The LPS Claims Notice instructed that "You MUST file a Securities Programs Proof of Claim [the LPS Claims Process claims form] to share in LBHI's estate if you have a claim based on a Lehman Programs Security" (capitalization in original).

16. Van Rooy's bank, the Rabobank, held securities of behalf of Van Rooy[2] subject to the LPS Claims Process. The only way Van Rooy could pursue her guarantee claim against LBHI for the Securities was to file a claim through the LPS Claims Process.

---

[1] See Exhibit B, Final Terms, p. 4.

[2] Background of purchase of Securities

On March 26, 2007 Van Rooy's father, Mr. A.A.A. Van Rooy, purchased "LEHMAN BROTHERS UK 5.75% PERPETUAL" bonds with a nominal value of sixty thousand euro (€60,000), five point seven five percent interest (5.75%), with a life up to the twenty fifth of April two thousand and forty nine. On March 30, 2007 Mr. A.A.A. Van Rooy purchased "LEHMAN BROTHERS UK 5.75% PERPETUAL" bonds with a nominal value of fifteen thousand euro (€15,000), five point seven five percent interest (5.75%), with a life up to the twenty fifth of April two thousand and forty nine.

4

17. Van Rooy complied with the express requirements of the LPS Claims Notice. On October 28, 2009 Van Rooy timely filed a Proof of claim (Claim number 54549) with International Securities Identification Number XS0282978666, blocking number 9524857, in the amount of $ 106,132.50 (EUR 75,000 / seventy five thousand euro's), attached hereto as **EXHIBIT C**, against LBHI in accordance with the Code, the Federal Rules of Bankruptcy Procedure, the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of claim Form dated July 2, 2009 [Docket No. 4271] and

---

At the time Mr. A.A.A. Van Rooy purchased the earlier mentioned Lehman bonds, he was not informed by his bank, the Binck Bank nv in Amsterdam (the Netherlands), about the terms that belonged to these bonds and about the precise issuer of these bonds. The only information Mr. A.A.A. van Rooy obtained about these bonds was the fact that these bonds were "guaranteed by LBHI in de United States of America", which seemed a safe investment in order to help his daughter to finance the sale and mortgage costs of her first house. At the time Mr. A.A.A. van Rooy purchased these bonds, he was not informed by the Binck Bank about the fact that LB UK IV was the issuer of these bonds and that the so called Base Prospectus of January 4, 2007 and its terms belonged to these bonds. Because of the fact that Mr. A.A.A. van Rooy at the time he purchased these bonds was not aware of the existence of this Base Prospectus and its ambiguous, inconsistent, inaccurate and even misleading terms, he also did not agree with the terms of this Base Prospectus and the fact that a possible claim would be subordinated, disallowed and expunged. Mr. A.A.A. Van Rooy was also not aware of the fact that this Base Prospectus referred to a so called Partnership Agreement, with its own (mostly still unknown) terms. In case Mr. A.A.A. van Rooy would have known about the ambiguous, inconsistent, inaccurate and even misleading terms of this Base Prospectus and the Partnership Agreement as well if he had known that the supposed guarantee of LBHI would in fact not have any effect, he would never have bought these bonds.

By deed of April 4, 2007 Mr. A.A.A. Van Rooy and his wife Mrs. E.P. van Rooy-Ooms gifted the "LEHMAN BROTHERS UK 5.75% PERPETUAL" bonds with a nominal value of seventy five thousand euro (€75,000) to their daughter, Mrs. S.A.B. Van Rooy (Claimant in this case). The purpose of the gift of these bonds was to help their daughter (Van Rooy) with financing the sale and mortgage costs of her first house in the village of Stolwijk (the Netherlands). Because these bonds were deposited in account number 145866 in the givers' name at the Binck Bank, the bonds were transferred to Van Rooy's account at the ING Bank. On May 8, 2007 the bonds were transferred from Van Rooy's account at the ING Bank to a new account of Van Rooy at the Rabobank. From May 8, 2007 to present the Rabobank has Van Rooy's bonds under management. See **EXHIBIT B** (Testimony from Mr. S. Muller of the Rabobank, October 25, 2011).

On September 28, 2009 the Rabobank informed Van Rooy that she had to fill in a "Proof of claim-form", that the Rabobank would send on her behalf to the right Debtor(s).

When Van Rooy received the Debtors' Objection and recently contacted Debtors' attorney (telephone number was mentioned on the Objection), Van Rooy finally found out that her Lehman bonds were issued by LB UK IV and that the terms of these bonds were described in the Base Prospectus of January 4, 2007.

As such Van Rooy is the holder of these bonds/securities as she owned an interest in LB UK IV, that was defined as Preferred Securities and benefited by LBHI's Guarantee.

5

the "LPS Claims Notice"). The Claim was filed against LBHI on account of LBHI's Guarantee of the Euro

Fixed Rate Enhanced Capital Advantaged Preferred Securities, issued by LB UK IV.

18. Per the Debtors' assertion in the Objection, LB UK IV was allegedly dissolved on June 22, 2010. In

support of this assertion the Debtors attached 'Exhibit E' to the Objection, what appears to be certificates of

the Companies House purporting to dissolve the General Partner and Preferential Limited Partner of LB UK

IV.

19. On September 1, 2011, the Debtors filed their *Third Amended Joint Chapter 11 Plan of Lehman Brothers*

*Holdings Inc. and its Affiliated Debtors* dated August 31, 2011 (the "Plan") [Docket No. 19627]. The Plan is

currently pending before this Court.

20. On September 16, 2011, the Debtors filed the Objection seeking to disallow and expunge the Proof of

Claim.

## RESPONSE

### *I. The Claim should not be disallowed and expunged*

**Main objective of Directive 2003/71/EC (the European legal base for the Base Prospectus): ensuring the
protection of investors**

21. The Base Prospectus dated January 4, 2007 has to comply with the requirements of Directive 2003/71/EC

and its implementing measures (of the European Parliament and of the Council of 4 November 2003 on the

prospectus to be published when securities are offered to the public or admitted to trading and amending). *See*

**EXHIBIT D**. Therefore the terms of the Base Prospectus and its Guarantee should be interpreted by the main

objective of Directive 2003/71/EC: ensuring the protection of investors.

22. Pursuant to preamble (10) of Directive 2003/71/EC the aim of this Directive and its implementing

measures is to ensure investor protection and market efficiency, in accordance with high regulatory standards

adopted in the relevant international fora. (...)

23. Pursuant to preamble (16) of Directive 2003/71/EC one of the objectives of this Directive is to protect

investors. It is therefore appropriate to take account of the different requirements for protection of the various

categories of investors and their level of expertise. Disclosure provided by the prospectus is not required for

offers limited to qualified investors. In contrast, any resale to the public or public trading through admission to trading on a regulated market requires the publication of a prospectus. (...)

24. Pursuant to preamble (18) of Directive 2003/71/EC the provision of full information concerning securities and issuers of those securities promotes, together with rules on the conduct of business, the <u>protection of investors</u>. Moreover, such information provides an effective means of increasing confidence in securities and thus of contributing to the proper functioning and development of securities markets. The appropriate way to make this information available is to publish a prospectus. (...)

25. Pursuant to preamble (20) of Directive 2003/71/EC such information, which needs to be <u>sufficient</u> and as <u>objective</u> as possible as regards the financial circumstances of the issuer and the rights attaching to the securities, should be provided in an <u>easily analysable and comprehensible form</u>. Harmonisation of the information contained in the prospectus should provide equivalent investor protection at Community level.

26. Pursuant to preamble (21) of Directive 2003/71/EC <u>information is a key factor in investor protection;</u> a summary conveying the essential characteristics of, and risks associated with, the issuer, any guarantor and the securities should be included in the prospectus. To ensure easy access to this information, the summary should be written in <u>non-technical language</u> and normally should not exceed 2 500 words in the language in which the prospectus was originally drawn up.

27. Pursuant to preamble (27) of Directive 2003/71/EC <u>investors should be protected by ensuring publication of reliable information</u>. The issuers whose securities are admitted to trading on a regulated market are subject to an ongoing disclosure obligation but are not required to publish updated information regularly. Further to this obligation, issuers should, at least annually, list all relevant information published or made available to the public over the preceding 12 months, including information provided to the various reporting requirements laid down in other Community legislation. This should make it possible to ensure the publication of consistent and easily understandable information on a regular basis.

28. Pursuant to preamble (36) of Directive 2003/71/EC the competent authority of the host Member State should be entitled to receive a certificate from the competent authority of the home Member State which states that the prospectus has been drawn up in accordance with this Directive. In order to ensure that the purposes

of this Directive will be fully achieved, <u>it is also necessary to include within its scope securities issued by issuers governed by the laws of third countries</u>.

29. Pursuant Article 5 (1) of Directive 2003/71/EC the Base Prospectus must contain all information which, according to the particular nature of the Issuer and of the securities offered to the public or admitted to trading on a regulated market, is necessary <u>to enable investors to make an informed assessment of the assets and liabilities, financial position, profit and losses, and prospects of the Issuer and of the Guarantor, and of the rights attaching to such securities</u>. This information must be presented in an <u>easily analysable and comprehensible form</u>. Pursuant Article 2 (2)(d) of Directive 2003/71/EC, the definition 'offer of securities to the public' means a communication to persons in any form and by any means, presenting <u>sufficient information on the terms of the offer and the securities to be offered</u>, so as to enable an investor <u>to decide to purchase or subscribe to these securities</u>. This definition shall also be applicable to the placing of securities through financial intermediaries.

30. Pursuant to Article 5 (2) of the Directive 2003/71/EC[3] a Base Prospectus must contain information concerning the Issuer and the securities to be offered to the public or to be admitted to trading on a regulated market. It must also include a summary. The summary must, in a brief manner and in nontechnical language, convey the essential characteristics and risks associated with the Issuer, the Guarantor and the securities, in the language in which the Base Prospectus was originally drawn up. The summary must also contain a warning that <u>civil liability</u> attaches to those persons who have tabled the summary including any translation thereof, and applied for its notification, <u>if the summary is misleading, inaccurate or inconsistent when read together with the other parts of the Base Prospectus</u>.

---

[3]**Article 5 (2) of Directive 2003/71/EC:**
**The prospectus**
(...) 2. The prospectus shall contain information concerning the issuer and the securities to be offered to the public or to be admitted to trading on a regulated market. It shall also include a summary. The summary shall, in a brief manner and in nontechnical language, convey the essential characteristics and risks associated with the issuer, any guarantor and the securities, in the language in which the prospectus was originally drawn up. The summary shall also contain a warning that:
(a) it should be read as an introduction to the prospectus;
(b) any decision to invest in the securities should be based on consideration of the prospectus as a whole by the investor;
(...)
(d) civil liability attaches to those persons who have tabled the summary including any translation thereof, and applied for its notification, but only if the summary is misleading, inaccurate or inconsistent when read together with the other parts of the prospectus.

31. Pursuant to Article 6 (1) of the Directive 2003/71/EC <u>responsibility for the information given in a prospectus</u> attaches at least to the issuer or its administrative, management or supervisory bodies, the offeror, the person asking for the admission to trading on a regulated market or <u>the guarantor</u>, as the case may be. The persons responsible must be clearly identified in the prospectus by their names and functions or, in the case of legal persons, their names and registered offices, as well as declarations by them that, to the best of their knowledge, the information contained in the prospectus is in accordance with the facts and that the prospectus makes no omission likely to affect its import. <u>Civil liability will apply to those persons responsible for the information given in a prospectus if the summary is misleading, inaccurate or inconsistent when read together with the other parts of the prospectus.</u> *See* Article 6 (2) of Directive 2003/71/EC.

32. Pursuant to Article 10 (1) of the Directive 2003/71/EC issuers whose securities are admitted to trading on a regulated market shall at least <u>annually</u> provide a document that contains or refers to all information that they have published or made available to the public over the preceding 12 months in one or more Member States and in third countries in compliance with their obligations under Community and national laws and rules dealing with the regulation of securities, issuers of securities and securities markets. Issuers shall refer at least to the information required pursuant to company law directives, Directive 2001/34/EC and Regulation (EC) No 1606/ 2002 of the European Parliament and of the Council of 19 July 2002 on the application of international accounting standards. Pursuant to Article 10 (2) the document shall be filed with the competent authority of the home Member State after the publication of the financial statement. Where the document refers to information, it shall be stated where the information can be obtained.

33. For the foregoing reasons, the terms of the Base Prospectus (including the LBHI Guarantee) dated January 4, 2007 should be interpreted according the main objective of Directive 2001/34/EC regarding a prospectus, that has to be published when securities are offered to the public or are admitted to trading: <u>ensuring the protection of investors</u>.


**The major and crucial part of the Partnership Agreement is missing in Exhibit D of Debtors' Objection and the Debtors refuse to date to convey the complete copies of the entire document**

34. Debtors' Objection is based on arguments that refer to the Partnership Agreement of January 3, 2007 (*See* Exhibit D).

35. The terms of the Base Prospectus refer many times to the terms of the Limited Partnership Agreement, e.g.[4] "The Preferred Securities are limited partnership interests in the Issuer. The following description should be read in conjunction with, and, is subject to the terms of the Limited Partnership Agreement..." (*see* Exhibit B, p. 20); "As used in this Subordinated Guarantee, capitalized terms not defined herein shall have the meanings ascribed to them in the Limited Partnership Agreement ..." (*see* Exhibit B, p. 34); "The General Partner, the Preferential Limited partner and BNYD have, inter alios, entered into a limited partnership agreement on 3 January 2007 (Limited Partnership Agreement) for the purpose of establishing the Issuer." (*see* Exhibit B, p. 41); "The duties to and functions of the General Partner are contained in the Limited Partnership Agreement." (*see* Exhibit B, p. 41); "The business of the Issuer is generally to raise finance for the Group and is more particularly described in the Limited Partnership Agreement." (*see* Exhibit B, p. 42); "The Limited Partnership Agreement to establish the Issuer was duly authorised by a resolution of the board of directors of the General Partner passed on 20 December 2006. The entering into of the Limited Partnership Agreement, the Agency Agreement, the Administration Agreement, the Subscription Agreement and the Subordinated Guarantee by LBHI will be authorised by the Chief Financial Officer of LBHI on the date specified in the Final Terms pursuant to the authority delegated to him by the Guarantor. All consents, approvals, authorisations or other orders of all regulatory authorities required by the Issuer under the laws of England and Wales and LBHI under the laws of the State of Delaware and the United States of America have been, or will prior to the Closing Date be, given for the issue of the Preferred Securities and for the Issuer, the General Partner and LBHI, as the case may be, to undertake and perform their respective obligations as appropriate under the Limited Partnership Agreement, the Subscription Agreement, the Agency Agreement, the Preferred Securities and the Subordinated Guarantee" (*see* Exhibit B, p. 59); "In addition, the following documents are available for inspection at the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:... (c) the Limited Partnership Agreement" ." (*see* Exhibit B, p. 60).

36. Pursuant to the Contents of the Partnership Agreement (Exhibit D, page 1) this document has at least 38 pages or more. The documentation that the Debtors attached to their Objection contains only page 1

---

[4]Base Prospectus, e.g. p. 5, p. 20, p. 21, p. 34, p. 41, p. 42, p. 59, p. 60.

(Contents), page 2, page 6 and page 26 of the Partnership Agreement. The Debtors have thus <u>selected</u> just 4 pages from at least 38 pages, which <u>they</u> considered as "relevant" to their Objection, but the Debtors have failed (so far it seems to be on purpose) to attach the other 34 pages (or more) of this Partnership Agreement to the Objection.

37. The major and crucial part of the Partnership Agreement is missing in Exhibit D of Debtors' Objection, like most definitions & interpretations and clauses about the Formation of the Issuer, Management of the Issuer, Commitments of all parties, Capital Contributions of all parties, Preferred Securities, Preferential Securities, Preferential Limited partner, Registration of Partnerships Interests, Certificates of Preferred Securities, Transfer of interests in the Issuer, Capital Accounts, Allocation of Income and Distributions, Books, Records and accounts, Withdrawal/Replacement of the General Partner, Partnership Finances, Dissolution of Partnership, Partnerships Meetings, Undertakings of LBHI, General information, Part I and Part II Form of Global Certificate for Preferred Securities.

38. Pursuant Article 8 of the Directive 2003/71/EC[5] the omission from the Base Prospectus of the complete copies of the entire Partnership Agreement is not allowed, because this omission would be likely to mislead the public with regard to facts and circumstances essential for an informed assessment of the Issuer LB UK IV or the Guarantor LBHI and of the rights attached to the securities to which the Base Prospectus relates. In addition the complete copies of the entire Partnership Agreement are not of minor importance because it influences the assessment of the financial position and prospects of the Issuer LB UK IV or the Guarantor.

---

[5]Article 8 of the Directive 2003/71/EC:

**Omission of information**
(...)
2. The competent authority of the home Member State may authorise the omission from the prospectus of certain information provided for in this Directive or in the implementing measures referred to in Article 7(1), if it considers that: (...)

(b) disclosure of such information would be seriously detrimental to the issuer, provided that the omission would not be likely to mislead the public with regard to facts and circumstances essential for an informed assessment of the issuer, offeror or guarantor, if any, and of the rights attached to the securities to which the prospectus relates; or
(c) such information is of minor importance only for a specific offer or admission to trading on a regulated market and is not such as will influence the assessment of the financial position and prospects of the issuer, offeror or guarantor, if any.

39. Because the major and crucial part of the Partnership Agreement is missing, Van Rooy has no way of taking notice of the complete copies of the entire document and has no way of determining whether definitions, terms, clauses, conditions, purposes, etc. of the missing copies are relevant or not in this case.

40. This selective documentation prevents also the Court from studying, assessing and evaluating the complete copies of the entire Partnership Agreement and its definitions, terms, conditions, purposes, clauses etc. in relation to Debtors' Objection and in relation to Van Rooy's Claim.

41. For example the major part of Clause 16.4 is missing in Exhibit D, which clause is very relevant to this case. Clause 16.4 refers to other clauses/conditions of the Partnerships Agreement concerning the obligations and liabilities of parties upon dissolution of the Issuer and upon the contribution to the Issuer's capital in case of an Issuer's deficit of capital in relation to payment of any creditors.

42. Furthermore is in the Partnership Agreement for example mentioned (page 2) that LBHI is a party to this Partnership Agreement solely for the purposes of acknowledging its terms, agreeing to any actions to be performed by LBHI in the Conditions and clause 18. Because Exhibit D does not show the entire agreement, it's unclear for which purposes LBHI is a party to this Partnership Agreement. It's also unclear which actions should be performed by LBHI as a "Guarantor" and which liabilities, obligations and commitments LBHI had to perform (and/or did not perform) pursuant to the terms and clauses of this Partnership Agreement.

43. On November 2, 2011 Van Rooy requested Debtors' attorney, Mr. Ryan Martin from Weil, Gotshal & Manges LLP, by phone to mail her the complete copies of the entire Partnership Agreement establishing LB UK IV. Mr. Martin answered that he did not want to mail the complete copies of the entire Partnership Agreement, because according to him the major part of the Partnership Agreement was "confidential" and "not open to the public."

44. After this phone call on November 2, 2011, Van Rooy requested Mr. Martin again by email of November 2, 2011, by two emails of November 4, 2011 and by two emails of November 7, 2011 to mail the complete copies of the entire Partnership Agreement. Mr. Martin answered on November 7, 2011 that *"he was afraid that there is not much more he could convey."* See **EXHIBIT A** (copy of earlier mentioned emails).

45. Van Rooy has the right to take notice of the complete copies of the entire Partnership Agreement and to determine herself which parts from the Partnership Agreement are relevant or not in order to refute Debtors'

Objection properly. Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms stipulates the right to a fair trial, which includes in this case also the claimant's right to get notice of the complete copies of the entire Partnership Agreement on which base the Debtors expunged and disallowed the Claim.

46. Because of the incomplete documentation of the Partnership Agreement, Van Rooy is unable to oppose Debtors' Objection in a proper and lawful way. Without this information, Van Rooy cannot fully respond to the Two Hundred Thirteenth Objection. This is a infringement of Van Rooy's rights and is contrary to (international) law. Without such disclosure, the Court is also insufficiently able to take into account, to assess and to evaluate all definitions, terms, conditions, purposes, clauses etc. of this Partnership Agreement and consequently to give a lawful ruling whether Van Rooy's Claim should be disallowed and expunged or not.

**On the Petition Date and at the time Van Rooy filed the Claim, Van Rooy held a valid and enforceable claim against LBHI**

47. The Objection does not dispute that LBHI assumed its obligations to Van Rooy through the LBHI Guarantee. Rather, the Objection argues that the Claim is unenforceable under Section 502(b)(1) of the Bankruptcy Code on the basis that LBHI's Subordinated Guarantee, and thus "[a]ny obligation LBHI may have had to guarantee the obligations of LB UK IV," terminated with the alleged dissolution of LB UK IV on June 22, 2010, nearly two years **after** the Petition Date of September 15, 2008. Objection, ¶ 10

48. Under Bankruptcy Rule 3001(f), "[a] proof of claim executed and filed in accordance with [the Bankruptcy] rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also *In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr. S.D.N.Y. 2009).

49. Under Rule 3001(f), the allegations of a proof of claim are taken as true and the claim enjoys *prima facie* validity. *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991); *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 818 F.2d 1135, 1143 (5th Cir. 1987). *See also Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 551-52 (5th Cir. 1985) ("a proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes *prima facie* evidence of the validity and the amount of the claim") (citing to FED. R. BANKR. P. 3001(f)); *Glinka v. Dartmouth Banking Co. (In re Kelton Motors, Inc.)*, 121 B.R. 166, 190

(Bankr. D. Vt. 1990) ("there is a presumption of the validity of the proof of claim" under Rule 3001(f)); *In re Windsor Commc'ns Group, Inc.*, 45 B.R. 770, 773 (Bankr. E.D. Pa. 1985) (holding that filing a proof of claim in accordance with the Bankruptcy Code and the Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim). "The interposition of an objection does not deprive the presumptive validity unless the objection is supported by substantial evidence." *In re Hemingway Transport Inc.*, 993 F.2d 915, 925 (1st Cir. 1993).

50. Once a creditor files a *prima facie* valid proof of claim, the burden of proof shifts to the debtor/objector "to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992) (citing In re Holm*, 931 F.2d at 623). [T]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." In re Spiegel, Inc., No. 03-11540 (BRL), 2007 WL 2456626, at *15 n.6 (Bankr. S.D.N.Y. 2007) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)). Specifically, the objecting party must come forward with substantial facts to overcome the proof of claim's *prima facie* validity. *Webster v. Barbara (In re Otis & Edwards, P.C.)*, 115 B.R. 900, 914 (Bankr. E.D. Mich. 1990).

51. The Bankruptcy Code is explicit, and it is well established, that upon an objection to a claim, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*, and shall allow such claim in such amount." 11 U.S.C. § 502(b) (emphasis added).

52. Thus, the Bankruptcy Code section 502(b) by its terms requires that claims be determined as of LBHI's Petition Date of September 15, 2008. Numerous courts are in accord. *See, e.g., In re Oakwood Homes Corp.*, 449 F.3d 588, 595 (3D Cir. 2006) ("11 U.S.C. § 502 (b) speaks in terms of determining the 'amount' of a claim 'as of' the petition date"); *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 527 (5th Cir. 2004) ("Under § 502(b), the rights of holders of claims and interests are fixed as of the Petition Date"); *In re Arcade Pub., Inc.*, 455 B.R. 373, 378 (Bankr. S.D.N.Y. 2011) ("Under section 502, if an objection is made, the court shall determine the amount of such claim '*as of the filing date*'"); *In re South Side House, LLC*, 451 B.R. 248, 260 (Bankr. E.D.N.Y. 2011) ("[I]f a claim arises from a prepetition right to payment under applicable nonbankruptcy law, then there is a presumption that the claim will be allowed, subject to an express provision of the Bankruptcy Code disallowing it."); *In re Solutia Inc.*, 379 B.R. 473, 482-483 (Bankr. S.D.N.Y. 2007) ("Code § 502(b)

14

requires that a claim be determined _as of the filing date_... Allowance of claims is not a forward-looking

process") (emphasis in original); _LTV Steel Co. v. Aetna Cas. And Surety Co._ (_In re Chateaugay Corp._), No.

94-cv-1257, 1996 WL 346010, at *2 (S.D.N.Y. June 24, 1996) (the "underlying purpose of 11 U.S.C. §

502(b)" is to "treat... all claimants equally by fixing the amount of their claims _as of the filing date_".); In _re_

_Parker_, 308 B.R. 129, 132 (Bankr. D. Conn. 2004) ("Section 502(b)(1) is generally understood to refer to

claims which were unenforceable _at the time the bankruptcy case was commenced_ . . . .") (emphasis in

original).6

53. The Objection does not provide evidence that refutes the prima facie validity of the Claim. The Debtors do

not contest that Van Rooy's Proof of Claim was filed in accordance with Rule 3001. Nor do the Debtors

significantly challenge that Van Rooy's Claim arising from the Lehman Securities Programs is fair, accurate

and reasonable. The Debtors have done nothing to overcome the proof of the Claim's prima facie validity.

Accordingly, Van Rooy's Claim should continue to be treated as valid prima facie.

54. At the time of the filing of the Claim, LB UK IV was in existence and had not yet been allegedly

dissolved. In fact, it was not until nearly two years after the Petition Date of September 15, 2008 that LB UK

IV was allegedly dissolved. Therefore, on the Petition Date and at the time Van Rooy filed the Claim, Van

Rooy held a valid and enforceable claim against LBHI. The fact that LB UK IV was allegedly dissolved after

the Petition Date and after the deadline set forth in the Bar Date Order for the LPS Claims Process does not

absolve LBHI of timely claims filed against it in respect of the LBHI Guarantee. Pursuant to Section 502(b) of

the Bankruptcy Code, Van Rooy's guarantee Claim against LBHI are determined as of September 15, 2008

and not determined as of the subsequent dissolutions of LB UK IV, which dissolution, upon Van Rooy's

obtained factual information and belief, the Debtors caused. Pursuant to Section 502(b) of the Bankruptcy

Code such claim remains valid notwithstanding the fact that at least one General Partner and at least one

---

6 This Court has recognized that a claim may be rendered unenforceable by a change in applicable nonbankruptcy law
occurring after the petition date. See In re Ernst, 368 B.R. 296, 305 (Bankr. S.D.N.Y. 2007) ("_[A]pplicable law, as that
term is used in § 502(b)(1), by its very nature is not a static concept, and so it is understandable that there is no language
within this subsection that . . . limits the determination of applicable law to such law that was subsisting and in effect as
of the petition date._"). By contrast, the dissolution of LB UK IV nearly two years after the Petition Date was a factual
occurrence that in no way altered any law upon which the Claim was based.

Limited Partner of LB UK IV may have allegedly dissolved postpetition. Van Rooy's Claim against LBHI is therefore enforceable and should be allowed.

**LBHI conceded liability by including the Securities in the LPS Claims Process**

55. The Objection to the Claim should be overruled on the basis that LBHI is liable as a guarantor, and concedes as much in the list of securities subject to the LPS Claims Process, attached hereto as "Exhibit A".

56. The Debtors assert that they have no liability for the Securities. *See* Objection ¶10. This is in direct contravention of the LBHI Guarantee of the UK Capital Funding Entities and the Securities. The Debtors' Objection fails as it provides insufficient evidentiary support for LBHI's assertion that it has no liability for the Securities; indeed the Debtors conceded LBHI's liability for the Claim by including the Securities in the LPS Claims Process.

57. The LPS Claims Notice required that Van Rooy filed the Claim against LBHI for the Securities in the LPS Claims Process. In reliance on that requirement and the list on which the Debtors included the Securities (the Program Securities List), Van Rooy filed the Claim. The Securities have not been, as of the date hereof, removed by LBHI from the list of securities subject to the LPS Claims Process maintained on the Debtors' website. This is presumably no accident, as amending the schedule would be easy enough to do. If the Debtors had wanted to reclassify claims in connection with the Preferred Securities as equity claims, then the Debtors should not have included these Preferred Securities on that list.

**LBHI is obligated under the LBHI Guarantee to pay the Liquidation Distribution to Van Rooy**

58. Upon the dissolution of the Issuer, holders of Preferred Securities, such as Van Rooy, became entitled to a Liquidation Distribution (Exhibit B, § 3.1 p. 26 and Summary, p. 9) consisting of US$1,000 per preferred security (Id. at p. 21). LBHI became obligated under the Guarantee for certain Guaranteed Payments owed to Van Rooy including the Optional Redemption Price (Exhibit B, p. 34). The Optional Redemption Price is defined as including the Liquidation Preference which is defined as including the Liquidation Distribution (Exhibit B, § 3.1 pp. 21, 34). Accordingly, LBHI is obligated under the Guarantee to pay the Liquidation Distribution to Van Rooy.

**The Termination Clause is not controlling**

59. The Debtors claim that the Guarantee provides it "*shall terminate and be of no further force and effect upon the earliest of ...dissolution of the issuer...*" (the "Termination Clause"). *See* Objection, ¶10; *see also* Exhibit B, §4 pp. 37-38. Accordingly, LBHI alleges that it has no liability to the holders of the Preferred Securities Claims and seeks to disallow and expunge those claims. *See* Objection, ¶10.

60. LBHI cannot rely on the Termination Clause because it is directly contradicted by a more specific provision of the Guarantee, which states that "[t]he obligations, covenants, agreements and duties of LBHI under this Subordinated Guarantee shall *in no way be affected or impaired* by reason of the happening from time to time of any of the following: ... the voluntary or involuntary winding up, dissolution of, or other similar proceedings affecting, the Issuer or any of the assets of the Issuer" (the "Survival Clause"). *See* Exhibit B, §2.4(d) pp. 35-36 (emphasis added).

61. The Termination Clause and the Survival Clause cannot be reconciled and thus only one can be effective. *See, e.g., In re Lehman Brothers Holdings Inc.*, 445 B.R. 143, 202 (Bankr. S.D.N.Y. 2011) ("Because these two contemporaneous documents are in conflict with one another as to the same subject matter, one of them must control the outcome.").

62. When two conflicting contractual provisions are irreconcilable, the Court must determine which provision will stand. *See Israel v. Chabra*, 601 F.3d 57 (2d Cir. 2010) (finding that when two clauses in guaranty agreement were mutually exclusive, court had to "choose which must stand and which must fall"). The Survival Clause should be given effect because it is more specific than the general terms of the Termination Clause. Under New York law[7], "courts construing contracts must give 'specific terms and exact terms ... greater weight than general language.'" *County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (citation omitted). Here, the central issue is whether LBHI has an obligation to holders of the Preferred Securities Claims after dissolution of the Issuer. The Survival Clause specifically states that "[t]he obligations, covenants, agreements and duties of LBHI" under the Guarantee are *not* affected by the dissolution of the Issuer. *See* Exhibit B, § 2.4 pp. 35-36.

---

[7] The Guarantee is governed and interpreted in accordance with the laws of the State of New York. Exhibit B, p. 39.

63. Therefore, the dissolution of LB UK IV did not relieve LBHI of its obligations under the Guarantee and, thus, is not grounds for LBHI to disallow its obligation under the Guarantee and disallow and expunge the Claim. *See Guedj v. Dana*, 302 A.D.2d 268 (N.Y. App. Div. 1st Dept. 2003) (holding that dissolution of corporate primary obligor did not terminate guarantor's obligations where necessity of continued existence of the corporate primary obligor was ambiguous under the governing agreement).

64. Relatedly, the Debtors have provided no detail whatsoever regarding the circumstances surrounding the alleged dissolution of the General Partner and the Preferential Limited Partner of the limited partnership under the name of LB UK IV UK, which led to the dissolution of LB UK IV. Without such disclosure, it's almost impossible determining precisely whether LBHI took, or caused to be taken, any action to bring about the dissolution of the UK Capital Funding Entities in order to try to terminate the LBHI Guarantee and have the Claim disallowed and expunged.

65. Further, even if there were no Survival Clause, the Termination Clause provides for a reinstatement of the Guarantee as follows:

> this Subordinated Guarantee will continue to be effective or will be reinstated, as the case may be, if at any time payment of any sums paid in respect of the Preferred Securities or under this Subordinated Guarantee must be restored to a Holder for any reason whatsoever. (Exhibit B, §4 p. 38).

66. Here, the reinstatement provision is applicable as Van Rooy's $ 106,132.50 paid to purchase the Preferred Securities must be restored to her as a result of the dissolution of the Issuer.

67. Even without the reinstatement provision, the conflict between the Termination Clause and the Survival Clause should be resolved in favor of Van Rooy. Full information on the Issuer LB UK IV and the offer of the Preferred Securities was only available on the basis of the combination of the Final Terms and the Base Prospectus. *See* Exhibit B, p. 1 of Final Terms. The Final Terms of the Preferred Securities must be read in conjunction with the Base Prospectus. The Final Terms, having the benefit of a subordinated guarantee of LBHI as the "Guarantor", comprised the final terms required to list and had admitted to trading the issue by LB UK IV of the Preferred Securities described herein. Each of the LB GP No. 1 Ltd (the "General Partner"), acting on behalf of the Issuer, as well as the <u>Guarantor LBHI accepted responsibility for the information contained in these Final Terms</u>". *See* Exhibit B, p. 4 of Final Terms. The Final Terms were signed by LB GP

No. 1 Ltd as General Partner, acting on behalf of the Issuer, and were also <u>signed on behalf of the Guarantor</u> <u>LBHI</u>.

68. In addition pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at <u>all times</u> be either **LBHI itself** or a <u>directly or indirectly wholly-owned Subsidiary of</u> <u>LBHI</u>". *See* Exhibit B, p. 41. Pursuant to § 3.3(b) of the LBHI Guarantee (Exhibit B, p. 37) "the General Partner will at all times be a directly or indirectly wholly-owned Subsidiary of LBHI". LB UK IV was a wholly controlled subsidiary undertaking of the General Partner.

69. <u>Upon this information, the Guarantee was drafted by LBHI</u>, and under New York law, courts "generally interpret contractual ambiguities against the drafter." *Photopaint Techs, v. Smartlens Corp.*, 335 F.3d 152 (2d Cir. 2003). Accordingly, the Termination Clause should not be given effect and the Survival Clause should control the outcome.

70. Besides, pursuant to Article 6 (1) of Directive 2003/71/EC (**EXHIBIT D**)[8] <u>responsibility for the</u> <u>information given in the Base Prospectus</u> attaches at least to the Issuer or its administrative, management or supervisory bodies, the offeror, the person asking for the admission to trading on a regulated market or <u>the</u> <u>Guarantor</u> (i.e. LBHI). When the Summary of the Base Prospectus (*see* Exhibit B, p. 5-12) is read together with the other parts of the Base Prospectus, the conclusion is that the Summary is inconsistent, inaccurate and even misleading. Pursuant to Article 6 (2) of Directive 2003/71/EC civil liability has to attach the persons who were responsible for the information given in the Base Prospectus (i.e. LBHI), because this Summary, when read together with the other parts of the Base Prospectus, is inconsistent, inaccurate and even misleading. Therefore the inconsistent, inaccurate and even misleading Base Prospectus should be interpreted against the

---

[8]**Article 6 of Directive 2003/71/EC:**
**Responsibility attaching to the prospectus**
1. Member States shall ensure that responsibility for the information given in a prospectus attaches at least to the issuer or its administrative, management or supervisory bodies, the offeror, the person asking for the admission to trading on a regulated market or the guarantor, as the case may be. The persons responsible shall be clearly identified in the prospectus by their names and functions or, in the case of legal persons, their names and registered offices, as well as declarations by them that, to the best of their knowledge, the information contained in the prospectus is in accordance with the facts and that the prospectus makes no omission likely to affect its import.
2. Member States shall ensure that their laws, regulation and administrative provisions on civil liability apply to those persons responsible for the information given in a prospectus. However, Member States shall ensure that no civil liability shall attach to any person solely on the basis of the summary, including any translation thereof, unless it is misleading, inaccurate or inconsistent when read together with the other parts of the prospectus.

drafter, which was LBHI. In addition the Summary incorporated information by reference (it refers to the

Partnership Agreement, without disclosing this documentation), which is in breach with Article 11 (1) of

Directive 2003/71/EC[9].

71. Further, the Survival Clause is more germane to the investors' agreement than the Termination Clause, and

thus the Survival Clause should stand. When resolving irreconcilable differences between contract clauses, the

Second Circuit has "enforce[d] the clause relatively more important or principal to the contract." *Israel v.*

*Chabra*, 601 F.3d at 63. In this matter, the Guarantee was executed by LBHI for the benefit of holders of

preferred securities to induce the holders to provide necessary funds. *See* Exhibit B, p. 34. Holders of the

Preferred Securities Claims depended on the Survival Clause and LBHI's declaration that the Guarantee is

"continuing, irrevocable and absolute" (Exhibit B, § 2.1 p. 35), that holders "may enforce this Subordinated

Guarantee directly against LBHI" (Exhibit B, § 2.6 p. 36), and that "LBHI acknowledges that its obligations

hereunder are several and independent of the obligations of the Issuer with respect to the Preferred Securities

and that LBHI shall be liable as principal and sole obligor hereunder..." (Exhibit B, § 2.8 p. 36). Accordingly,

the Survival Clause is of more importance to the contract and more clearly resonates with the overall

confidence that the Guarantee sought to build in the holders of the Preferred Securities Claims.

72. In addition the Survival Clause should stand , because the Court should take the main purpose of Directive

2003/71/EC and its implementing measures into account: to ensure the protection of investors. As mentioned

before, the Directive 2003/71/EC and its implementing measures are the European legal base for the

constitution of the Base Prospectus (including its Guarantee):. Therefore the inconsistent, ambiguous,

inaccurate and even misleading terms of the Base Prospectus should be interpreted against the drafter LBHI

and in favor of the Holders (investors) of the Preferred Securities.

---

[9]**Article 11 of Directive 2003/71/EC:**
**Incorporation by reference**
1. Member States shall allow information to be incorporated in the prospectus by reference to one or more previously or simultaneously published documents that have been approved by the competent authority of the home Member State or filed with it in accordance with this Directive, in particular pursuant to Article 10, or with Titles IV and V of Directive 2001/34/EC. This information shall be the latest available to the issuer. The summary shall not incorporate information by reference.(...)

73. The conclusion is that the Debtors improperly rely on a Termination Clause to contend that the Debtors have no liability to Van Rooy. The Termination Clause is not controlling here as it contains a reinstatement provision which is applicable to Van Rooy and is also directly contradicted by a Survival Clause. Under New York law, when two contractual provisions are irreconcilable, courts will uphold the provision that is more specific or more principal to the contract. Here, the Survival Clause is not only more specific than the Termination Clause, it also is more central to the overall purpose of the agreement.

74. Further, when ambiguities exist in contracts, courts generally interpret the ambiguities against the drafter, which, upon earlier mentioned information , was LBHI. The inconsistent, ambiguous, inaccurate and even misleading terms of the Base Prospectus should be interpreted against the drafter LBHI and in favor of the Holders of the Preferred Securities. Accordingly, the Termination Clause is not controlling, which means that LBHI is liable to Van Rooy and Van Rooy's Proof of claim should not be disallowed and expunged.


**LBHI is not now "being wound up" within the meaning of the LBHI Guarantee and thus LBHI was not allowed to dissolve LB UK IV**

75. Pursuant to the Summary of the Base Prospectus (Exhibit B, p. 9-10) and pursuant to § 3.3 of the Guarantee (Exhibit B, p. 37) LBHI covenanted to the holders of the Securities that:

*"(a) unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and*

*(b) the General Partner will at all times be a directly or indirectly wholly-owned Subsidiary of LBHI unless (i) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (ii) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred. "*

76. While the Plan currently pending before this Court contemplates the creation of liquidating trusts to assist the reorganized Debtors in disposing of some of their businesses and assets following the effective date of the Plan (Plan, Art. X): (i) the Plan has not yet been approved by this Court; (ii) even if the Plan is approved by

this Court, LBHI will pass through the effective date of the Plan as a reorganized entity; and (iii) the Plan is a reorganization plan under chapter 11 of the Bankruptcy Code, not a liquidating plan.

77. The Plan bears many more indicia of being a reorganization plan and not one of liquidation, particularly as it relates to LBHI. Articles VI and VII of the Plan create an elaborate governance structure of LBHI and certain of the other Debtors that will pass through the Plan effective date as reorganized entities. LBHI, as the Plan Administrator (as such term is defined in the Plan), is a reorganized entity under the Plan, not an entity that commences liquidation on the Plan's effective date. Furthermore, as set forth in Article 15.2 of the Plan, LBHI and the other reorganized Debtors may issue new securities or create entities to issue such securities (not an activity normally associated with an entity in liquidation).

78. Therefore, LBHI is not now "being wound up" within the meaning of the LBHI Guarantee. Moreover, LBHI was not "being wound-up" at the time LB UK IV was allegedly dissolved and will not "be wound up" for a minimum of multiple years, if ever, should this Court approve the Plan. Even if the dissolution of LB UK IV could serve as the basis for the termination of the LBHI Guarantee, such dissolution generally required that LBHI be "wound up" itself and this event never occurred.

79. Accordingly, any action taken, or caused to be taken, by LBHI to bring about the dissolution of the General Partner and the Preferential Limited Partner of LB UK IV, as the case may be, or LB UK IV itself (as noted above, the facts surrounding this issue are not clear and have not been fully disclosed by LBHI) would be in direct violation of the express terms of § 3.3 of the Guarantee.

80. Therefore, to the extent LBHI was so involved, it cannot benefit from the resulting termination of the LBHI Guarantee and the disallowance of the Claim. *See Gilpin v. Oswego Builders, Inc.* 930 N.Y.S.2d 120, 124 (N.Y. App. Div. 4th Dept., 2011).

81. LBHI should not be allowed to hide behind the Termination Clause while it waited for the Guarantee to terminate pursuant to the LBHI Guarantee's own terms (or while LBHI took, or caused to be taken, actions that would bring about the termination of the LBHI Guarantee).

82. It is well settled that the doctrine of unclean hands requires that a party seeking equity must come into court with clean hands. See Gilpin, 930 N.Y.S.2d at 124 (citing *Pecorella v. Greater Buffalo Press*, 107 A.D.2d 1064, 1065 (N.Y. App. Div. 4th Dept. 1985). Such doctrine may bar recovery where a party seeking

such recovery " 'is guilty of immoral, unconscionable conduct.' " *Id.* (quoting *National Distillers & Chem. Corp. v. Seyopp Corp.,* 17 N.Y.2d 12, 16 (N.Y. 1966)).

**According to information obtained from the Companies House the status of the limited partnership LB UK IV is to date still "active"**

83. Per the Debtors' assertion in the Objection, LB UK IV was allegedly dissolved on June 22, 2010 (Objection ¶ 10). In support of this assertion the Debtors attached 'Exhibit E' to the Objection, what appears to be the certificate of the Companies House in the United Kingdom purporting to dissolve the General Partner and Preferential Limited Partner of LB UK IV. The Debtors provided however in the Objection a wrong website address of the Companies House, which is the official Registrar of Companies of the United Kingdom and Wales. The right website address of the Companies House is: www. companieshouse.gov.uk

84. Pursuant to the terms of the Base Prospectus IV (Exhibit B; p. 11 and p. 32, § 14.1) the Limited Partnership Agreement establishing the Issuer / LB UK IV and the Preferred Securities were governed by, and construed in accordance with, English law.  Pursuant to the terms of the Partnership Agreement (Exhibit D, p. 2 and p. 41) the limited partnership LB UK IV was formed and registered under the "Limited Partnerships Act 1907" of the UK and Wales. Pursuant to Section 5 of the Limited Partnerships Act 1907 LB UK IV had be registered as such in accordance with the provisions of this Act[10]. The Debtors failed however to mention the number of registration of LB UK IV in the Objection.

85. According information of the Companies House the registration number of LB UK IV is "LP011818". The website of the Companies House provides by means of the so called "WebCHeck" information about limited partnerships and companies. Some of the information is free, other information can be ordered and paid for.

---

[10]http://www.legislation.gov.uk

**Limited Partnerships Act 1907**

**REGISTRATION OF LIMITED PARTNERSHIP REQUIRED**

**5.** Every limited partnership must be registered as such in accordance with the provisions of this Act, or in default thereof it shall be deemed to be a general partnership, and every limited partner shall be deemed to be a general partner.

86. Van Rooy obtained from the Companies House all information that was available about LB UK IV.

Although the Debtors state that the limited partnership LB UK IV was "automatically dissolved" pursuant to

the terms of the Partnership Agreement (Objection ¶ 10), the Debtors failed to provide any proof of the

"automatic dissolution" of LB UK IV itself.

87. In the event of a dissolution of a limited partnership, Section 6(3) of the Limited Partnerships Act 1907

stipulates that the general partners must wind up its affairs unless the court orders otherwise. [11]

88. However based on the "Company Details" of the Companies House of November 4, 2011 the status of the

limited partnership under de name of LB UK IV is to date still "active". See **EXHIBIT E** (extract obtained

from website of the Companies House). Van Rooy refers also to other company details of LB UK IV, which

was the only available information about LB UK IV that the Registrar could provide.  See **EXHIBIT F,** fax of

November 8, 2011 from the Companies House.

89. Section 9(1) of the Limited Partnerships Act 1907[12] stipulates that "if during the continuance of a limited

partnership any change is made or occurs in ... (b) the general nature of the business, (d) the partners or the

---

[11] http://www.legislation.gov.uk/

**Limited Partnerships Act 1907**

**MODIFICATIONS OF GENERAL LAW IN CASE OF LIMITED PARTNERSHIPS**

**6**. (1) A limited partner shall not take part in the management of the partnership business, and shall not have power to bind the firm:
Provided that a limited partner may by himself or his agent at any time inspect the books of the firm and examine into the state and prospects of the partnership business, and may advise with the partner thereon.
If a limited partner takes part in the management of the partnership business he shall be liable for all debts and obligations of the firm incurred while he so takes part in the management as though he were a general partner.
(2) A limited partnership shall not be dissolved by the death or bankruptcy of a limited partner, and the lunacy of a limited partner shall not be a ground for dissolution of the partnership by the court unless the lunatic's share cannot be otherwise ascertained and realised.
(3) In the event of the dissolution of a limited partnership its affairs shall be wound up by the general partners unless the court otherwise orders.
(4) Repealed.
(5) Subject to any agreement expressed or implied between the partners
(a) Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the general partners
(b) A limited partner may, with the consent of the general partners, assign his share in the partnership, and upon such an assignment the assignee shall become a limited partner with all the rights of the assignor
(c) The other partners shall not be entitled to dissolve the partnership by reason of any limited partner suffering his share to be charged for his separate debt
(d) A person be may introduced as a partner without the consent of the existing limited partners
(e) A limited partner shall not be entitled to dissolve the partnership by notice.

[12] http://www.legislation.gov.uk

name of any partner, (e) the term or character of the partnership", the firm is obliged to send a statement (specifying the nature of the change) to the Registrar. Furthermore article 9(2) stipulates that if default is made in compliance with the requirements of this section each of the general partners shall on conviction under the Magistrates Courts Acts 1980 be liable to a fine not exceeding one pound for each day during which the default continues.

90. Debtors' statement that LB UK IV was "automatically dissolved" (Objection ¶ 10) seems to be incorrect under English law; the registration of a dissolution of a limited partnership is mandatory. Even if Debtors' statement that LB UK IV was dissolved would be correct, the General Partner LB GP No. 1 Ltd and, in its absence LBHI, is on conviction under the Magistrates Courts Acts 1980 and is liable to a fine not exceeding one pound for each day during which the default continues. The General Partner LB GP No. 1 Ltd and LBHI apparently failed to date to notify the Companies House about the dissolution of the limited partnership LB UK IV.

91. The Debtors do have liability to the holders of Subordinated Guarantee Claims and to Van Rooy in particular, because the issuer LB UK IV is not "automatically dissolved" and thus the Guarantee is <u>not</u> terminated.

---

**Limited Partnerships Act 1907**

**REGISTRATION OF CHANGES IN PARTNERSHIPS**

**9.** (1) If during the continuance of a limited partnership any change is made or occurs in

(a) the firm name
(b) the general nature of the business
(c) the principal place of business
(d) the partners or the name of any partner
(e) the term or character of the partnership
(f) the sum contributed by any limited partner
(g) the liability of any partner by reason of his becoming a limited instead of a general partner or a general instead of a limited partner

a statement, signed by the firm, specifying the nature of the change shall within seven days be sent by post or delivered to the Registrar at the registry office in that part of the United Kingdom in which the partnership is registered.

(2) If default is made in compliance with the requirements of this section each of the general partners shall on conviction under the Magistrates Courts Acts 1980 be liable to a fine not exceeding one pound for each day during which the default continues.

**Details regarding the circumstances surrounding the alleged dissolution of the General Partner and the Preferential Limited Partner, that caused the alleged dissolution of LB UK IV. The General Partner was struck off the register and dissolved due to its failure to file the Group of companies' accounts (including LB UK IV) in compliance with (amongst others) the requirements of the Companies Act 2006. LB Investment Holdings Ltd also failed to file its accounts in compliance with (amongst others) the requirements of the Companies Act 2006 and applied for a voluntary striking off, while it failed to comply to perform its duty to inform its creditors (i.e. Van Rooy) about the application.**

92. Facts show that LBHI took, or caused to be taken, actions to bring about the dissolution of LB UK IV in order to try to terminate the LBHI Guarantee and have the Claim disallowed and expunged.

93. Pursuant Section 386(1) of the Companies Act 2006[13] every company, whether or not they are trading, must keep adequate accounting records. All private limited companies must file every year their accounts at the Registrar. The failure to file accounts is under the Companies Act 2006 a criminal offence.

94. According to information Van Rooy obtained from several employees of the Registrar and based on the Company Details (*see* **EXHIBIT G**) & the Filing History of the General Partner LB GP No. 1 Ltd (*see* **EXHIBIT H**) from the Registrar, the General Partner failed to file the Group of companies' accounts

---

[13]http://www.legislation.gov.uk

**Section 386 of the Companies Act 2006: Duty to keep accounting records**
(1) Every company must keep adequate accounting records.
(2) Adequate accounting records means records that are sufficient—
(a) to show and explain the company's transactions,
(b) to disclose with reasonable accuracy, at any time, the financial position of the company at that time, and
(c) to enable the directors to ensure that any accounts required to be prepared comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

(3) Accounting records must, in particular, contain—
(a) entries from day to day of all sums of money received and expended by the company and the matters in respect of which the receipt and expenditure takes place, and
(b) a record of the assets and liabilities of the company.

(4) If the company's business involves dealing in goods, the accounting records must contain—
(a) statements of stock held by the company at the end of each financial year of the company,
(b) all statements of stocktakings from which any statement of stock as is mentioned in paragraph (a) has been or is to be prepared, and
(c) except in the case of goods sold by way of ordinary retail trade, statements of all goods sold and purchased, showing the goods and the buyers and sellers in sufficient detail to enable all these to be identified.

(5) A parent company that has a subsidiary undertaking in relation to which the above requirements do not apply must take reasonable steps to secure that the undertaking keeps such accounting records as to enable the directors of the parent company to ensure that any accounts required to be prepared under this Part comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

(including LB UK IV) in compliance with (amongst others) the requirements of the Companies Act 2006. This documentation demonstrates that the General Partner filed on July 25, 2009 its last Group of companies' accounts of November 30, 2006. As mentioned before, pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at <u>all times</u> be either **LBHI itself** or a <u>directly or indirectly wholly-owned Subsidiary of LBHI</u>". *See* Exhibit B, p. 41.

95. Due to the General Partner's failure to file the Group of companies' accounts, the Registrar took pursuant to the terms of Section 1000 of the Companies Act 2006[14] several steps to strike the General Partner off the register. The Registrar has sent to LB GP No. 1 Ltd several letters inquiring whether the company is carrying on business or in operation. On March 9, 2010 the Registrar published pursuant Section 1000 of the Companies Act 2006 a (first) notice in the Gazette that at the expiration of three months from the date of the notice LB GP No. 1 Ltd would, unless cause to the contrary is shown, be struck off the registrar and would be dissolved. Pursuant to Section 1000(4) the Registrar may not strike a company off under this section until after the expiration of three months from the publication of this notice in the Gazette, unless cause to the

---

[14] http://www.legislation.gov.uk

**PART 31 of the Companies Act 2006:**
DISSOLUTION AND RESTORATION TO THE REGISTER

CHAPTER 1 STRIKING OFF
*Registrar's power to strike off defunct company*

**Section 1000: Power to strike off company not carrying on business or in operation**
(1) If the registrar has reasonable cause to believe that a company is not carrying on business or in operation, the registrar may send to the company by post a letter inquiring whether the company is carrying on business or in operation.
(2) If the registrar does not within one month of sending the letter receive any answer to it, the registrar must within 14 days after the expiration of that month send to the company by post a registered letter referring to the first letter, and stating—
(a) that no answer to it has been received, and
(b) that if an answer is not received to the second letter within one month from its date, a notice will be published in the Gazette with a view to striking the company's name off the register.
(3) If the registrar—
(a) receives an answer to the effect that the company is not carrying on business or in operation, or
(b) does not within one month after sending the second letter receive any answer, the registrar may publish in the Gazette, and send to the company by post, a notice that at the expiration of three months from the date of the notice the name of the company mentioned in it will, unless cause is shown to the contrary, be struck off the register and the company will be dissolved.
(4) At the expiration of the time mentioned in the notice the registrar may, unless cause to the contrary is previously shown by the company, strike its name off the register.
(5) The registrar must publish notice in the Gazette of the company's name having been struck off the register.
(6) On the publication of the notice in the Gazette the company is dissolved.
(7) However—
(a) the liability (if any) of every director, managing officer and member of the company continues and may be enforced as if the company had not been dissolved, and
(b) nothing in this section affects the power of the court to wind up a company the name of which has been struck off the register.

contrary is shown by the company. *See* **EXHIBIT I**. This file copy shows the Registrar's first notice pursuant

Section 1000 about LB GP No. 1 Ltd in the Gazette of March 3, 2010.

96. When the time expired as mentioned in the notice and no person (including LBHI!) showed cause that the

striking off of and dissolution of LB GP No. 1 Ltd should not be done, the Registrar published on June 22,

2010 a second notice in the Gazette that the name of LB GP No. 1 Ltd has been struck off the register. On the

publication of the notice in this final Gazette, LB GP No. 1 Ltd was dissolved.

97. However pursuant to the terms of Section 1000(7) of the Companies Act 2006 —

> (a) the liability (if any) of every director, managing officer and member of the company continues and
> may be enforced as if the company had not been dissolved, and
> (b) nothing in this section affects the power of the court to wind up a company the name of which has
> been struck off the register.

98. Furthermore, the Company Details (**EXHIBIT J**, obtained from the Registrar) & Filing History of the

Preferential Limited Partner LB Investment Holdings Ltd (**EXHIBIT K**, obtained from the Registrar)

demonstrate that LB Investment Holdings Ltd filed on July 27, 2008 its last accounts of November 30, 2006.

LB Investment Holdings Ltd thus also failed to file its accounts on time.

99. On January 19, 2011 LB Investment Holdings Ltd applied to the Registrar to be struck off the register and

to dissolve. *See* **EXHIBIT L** (application of LB Investment Holdings Ltd, that Van Rooy obtained from the

Registrar). This is called a "voluntary striking off" pursuant Section 1003 of the Companies Act 2006[15].

---

[15]http://www.legislation.gov.uk

*Voluntary striking off*
**Section 1003 of the Companies Act 2006:Striking off on application by company**
(1) On application by a company, the registrar of companies may strike the
company's name off the register.
(2) The application—
(a) must be made on the company's behalf by its directors or by a majority of them, and
(b) must contain the prescribed information.
(3) The registrar may not strike a company off under this section until after the expiration of three months from the
publication by the registrar in the Gazette of a notice—
(a) stating that the registrar may exercise the power under this section in relation to the company, and
(b) inviting any person to show cause why that should not be done.
(4) The registrar must publish notice in the Gazette of the company's name having been struck off.
(5) On the publication of the notice in the Gazette the company is dissolved.
(6) However—
(a) the liability (if any) of every director, managing officer and member of the company continues and may be enforced as
if the company had not been dissolved, and
(b) nothing in this section affects the power of the court to wind up a company the name of which has been struck off the
register.

100. However, LB Investment Holdings Ltd failed to perform the duty imposed by Section 1006(1)(c)[16] to inform its creditors (as Van Rooy) about the application. A person who fails to perform the duty imposed on him by this section commits an offence pursuant Section 1006(4) of the Companies Act 2006. If he does so with the intention of concealing the making of the application from the person concerned, he commits an aggravated offence pursuant Section 1006(7).

101. On February 1, 2011 the Registrar published in the Gazette the first notice about the voluntary striking off of LB Investment Holdings Ltd. Pursuant to Section 1003(3) the Registrar may not strike a company off under this section until after the expiration of three months from the publication by the Registrar in the Gazette of a notice (a) stating that the Registrar may exercise the power under this section in relation to the company, and (b) inviting any person to show cause why that should not be done.

102. When the time expired as mentioned in the notice and no person (including LBHI!) showed cause that the striking off of and dissolution of LB Investment Holdings Ltd should not be done, the Registrar published on June 22, 2010 a second notice in the Gazette that the name of LB GP No. 1 Ltd had been struck off the register. On May 17, 2011 the Registrar published in the Gazette the final notice that LB Investment Holdings

---

[16]http://www.legislation.gov.uk

**Section 1006 of the Companies Act 2006: Copy of application to be given to members, employees, etc**
(1) A person who makes an application under section 1003 (application for voluntary striking off) on behalf of a company must secure that, within seven days from the day on which the application is made, a copy of it is given to every person who at any time on that day is—
(a) a member of the company,
(b) an employee of the company,
(c) a creditor of the company,
(d) a director of the company,
(e) a manager or trustee of any pension fund established for the benefit of employees of the company, or
(f) a person of a description specified for the purposes of this paragraph by regulations made by the Secretary of State. Regulations under paragraph (f) are subject to negative resolution procedure.
(2) Subsection (1) does not require a copy of the application to be given to a director who is a party to the application.
(3) The duty imposed by this section ceases to apply if the application is withdrawn before the end of the period for giving the copy application.
(4) A person who fails to perform the duty imposed on him by this section commits an offence.
If he does so with the intention of concealing the making of the application from the person concerned, he commits an aggravated offence.
(5) In proceedings for an offence under this section it is a defence for the accused to prove that he took all reasonable steps to perform the duty.
(6) A person guilty of an offence under this section (other than an aggravated offence) is liable—
(a) on conviction on indictment, to a fine;
(b) on summary conviction, to a fine not exceeding the statutory maximum.
(7) A person guilty of an aggravated offence under this section is liable—
(a) on conviction on indictment, to imprisonment for a term not exceeding seven years or a fine (or both);
(b) on summary conviction—
(i) in England and Wales, to imprisonment for a term not exceeding twelve months or to a fine not exceeding the statutory maximum (or both);
(ii) in Scotland or Northern Ireland, to imprisonment for a term not exceeding six months, or to a fine not exceeding the statutory maximum (or both).

Ltd had been dissolved via a voluntary strike off. On the publication of the notice in this final Gazette, LB Investment Holdings Ltd was dissolved. *See* **EXHIBIT K**, copy of Filing History of LB Investment Holdings Ltd (obtained from website of Companies House).

103. Section 386(5) of the Companies Act 2006 stipulates that a <u>parent company</u> that has a subsidiary undertaking in relation to which the requirements regarding accounting records do not apply <u>must take reasonable steps to secure that the undertaking keeps such accounting records</u> as to enable the directors of the parent company to ensure that any accounts required to be prepared under this Part comply with the requirements of this Act (and, where applicable, of Article 4 of the IAS Regulation).

104. Pursuant to the terms of Section 386(5) of the Companies Act 2006 LBHI had as the ultimate parent company the duty to ensure that its subsidiary undertakings LB GP No. 1 Ltd and LB Investment Holding Ltd were keeping and filing adequate accounting records that complied with the requirements of (amongst others) the Companies Act.

105. If a company fails to comply with any provision of Section 386 (duty to keep accounting records), an criminal offence is committed by every officer of the company who is in default (pursuant Section 387 of the Companies Act 2006).[17] All the directors of the company risk prosecution. On conviction, a director could end up with a criminal record and a fine of up to £5,000 for each offence. In addition, the law imposes a civil penalty for late filing of accounts on the company. The amount of the penalty depends on how late the accounts arrive and whether the company is private or public at the date of the balance sheet.

---

[17] http://www.legislation.gov.uk

**Section 387 of the Companies Act 2006: Duty to keep accounting records: offence**
A person guilty of an offence under this Section is liable—
(a) on conviction on indictment, to imprisonment for a term not exceeding two years or a fine (or both);
(b) on summary conviction—
(i) in England and Wales, to imprisonment for a term not exceeding twelve months or to a fine not exceeding the statutory maximum (or both);
(ii) in Scotland or Northern Ireland, to imprisonment for a term not exceeding six months, or to a fine not exceeding the statutory maximum (or both).

08-13555-mg    Doc 22959    Filed 11/28/11    Entered 12/05/11 16:11:38    Main Document
Pg 31 of 40

106. Facts show that the General Partner LB GP No. 1 Ltd and the Limited Partner LB Investment Holdings Ltd failed to comply with the requirements of the Companies Act 2006 and that criminal offences were committed by every officer of these companies who were in default.

107. The failure of LB GP No. 1 Ltd to deliver the Group of companies' accounts (including LB UK IV) on time caused its strike off by the Registrar and caused its dissolution on June 22, 2010.

108. The failure of LB Investment Holdings Ltd to deliver timely accounting records also led to several warning letters from the Registrar. Finally LB Investment Holdings Ltd applied for a voluntary strike off, that caused its dissolution on May 17, 2011. LB Investment Holdings Ltd failed to perform its duty of Section 1006(1)(c) and did not inform its creditors about the application for a voluntary striking off. However the liability of every director, managing officer and member of both companies continues and may be enforced as if the companies had not been dissolved (*See* Section 1000(7) and Section 1003(6) of the Companies Act 2006).

109. The ultimate parent company of LB GP No. 1 Ltd and LB Investment Holdings Ltd, LBHI, did apparently not take any reasonable steps to secure that its subsidiary undertakings were keeping accounting records that complied with the requirements of (among others) the Companies Act 2006 and that would prevent the Registrar to strike off and to dissolve the companies.

110. When the Registrar published on March 9, 2010 the first notice of LB GP No. 1 Ltd's striking off and dissolution, LBHI apparently did not take any action to show cause that the striking off of and dissolution of LB GP No. 1 Ltd should not be done (pursuant Section 1000(3)(b)). By not taking any action, LBHI caused the dissolution of the General Partner, and with it, LB UK IV's dissolution.

111. When the Registrar published on February 1, 2011 the first notice of LB Investment Holdings Ltd's voluntary striking off, LBHI apparently also did not take any action to show cause why the voluntary striking off and dissolution of LB Investment Holdings Ltd should not be done (pursuant Section 1003(3)(b)). By not taking any action, LBHI caused the dissolution of the Preferential Limited Partner, and with it, LB UK IV's dissolution.

112. In addition LBHI violated the terms of the Base Prospectus (Exhibit B, p. 41 and p. 60), because it guaranteed to the Holders of the Securities that it would prepare audited annual financial statements of LB UK

31

IV: "No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30 November 2007. Thereafter, it is intended that the Issuer will prepare audited annual financial statements."

113. Moreover, although the Partnership Agreement provided clauses to withdraw/replace and substitute the General Partner and Limited Partner of LB UK IV, LBHI did not take any action to replace and/or to substitute these partners. *See* further below.

114. Accordingly LBHI violated the express terms of § 3.3 of the Guarantee (Exhibit B, p. 37), because LBHI brought about the dissolution of the General Partner, brought about the dissolution of the Preferential Limited Partner, and with this, the dissolution of LB UK IV itself. Therefore, to the extent LBHI was so involved, it cannot benefit from the resulting termination of the Guarantee and the disallowance of the Claim. LBHI should not be allowed to hide behind the Termination Clause while it failed to take any actions that would have prevented the termination of the LBHI Guarantee to terminate pursuant to the Guarantee's own terms.

115. The doctrine of unclean hands requires that a party seeking equity must come into court with clean hands. Such doctrine may bar recovery where a party seeking such recovery 'is guilty of immoral, unconscionable conduct.'

**Although the Partnership Agreement provided clauses for the replacement and substitution of the General Partner and of the Limited Partner, it must be assumed that LBHI was <u>not</u> willing to replace and/or to substitute the General Partner and the Limited Partner**

116. The Debtors state that "LB UK IV, the Issuer of the securities, was automatically dissolved pursuant to the terms of the Partnership Agreements establishing LB UK IV, which provide for the dissolution of the issuer when the partnership no longer has at least one general partner <u>or</u> at least one limited partner." (Objection ¶ 10). However Clause 2.3 of the Partnership Agreement stipulates <u>differently</u> and provides <u>cumulative</u> (four times "and" instead of once "or") conditions:

    (1) The Issuer LB UK IV shall not be terminable by the General partner (whether on notice or otherwise) <u>**and**</u> (cumulative)

    (2) The Issuer LB UK IV shall continue until the earlier of the date on which the Issuer is dissolved or terminated in accordance with the provisions of this Agreement, <u>**and**</u> (cumulative)

(3) The Issuer LB UK IV shall continue until the first date on which there is not at least one general partner
**and** (cumulative)

(4) The Issuer LB UK IV shall continue until at least one limited partner for the purposes of the Act.

117. The Partnership Agreement stipulates that the Issuer LB UK IV shall <u>not</u> be terminable by the General Partner whether on notice or otherwise. Pursuant to the terms of the Base Prospectus regarding LB UK IV, "LHBI will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at <u>all times</u> be either <u>LBHI itself</u> or a <u>directly or indirectly wholly-owned Subsidiary of LBHI</u>". *See* Exhibit B, p. 41. Pursuant to § 3.3(b) of the LBHI Guarantee (Exhibit B, p. 37) "the General Partner will at all times be a directly or indirectly wholly-owned Subsidiary of LBHI". LB UK IV was a wholly controlled subsidiary undertaking of the General Partner. The duties to and functions of the General Partner are contained in the Limited Partnership Agreement (*see* Exhibit B, p. 41), that Debtors failed to attach completely.

118. According the Contents of the Partnership Agreement (Exhibit B, page 2), the Partnership Agreement provides a clause (Clause 14 on page 24) for the <u>Withdrawal</u> / <u>Replacement</u> of the General Partner.

119. In addition Clause 16.3 of the Partnership Agreement regarding the "Continuation of partnership"[18] shows that the Partnership Agreement also provides clauses for "<u>a new or substituted General Partner or Limited Partner</u>". Pursuant to the Base Prospectus IV (Exhibit B, p. 5 and p. 22), the definition of "Preferential Limited Partner" is: "LB Investment Holdings Ltd (…), a wholly-owned Subsidiary of LBHI **or** any other Subsidiary of LBHI." With other words: The Preferential Limited Partner will be at all times a wholly-owned Subsidiary of LBHI. The Debtors failed however (on purpose?) to attach the complete copies of the entire Partnership Agreement to the Objection, including earlier mentioned clauses about replacement and substitution of the General Partner and (Preferential) Limited Partner.

---

[18] Clause 16.3 of the Partnership Agreement concerning the "Continuation of partnership" stipulates:

> *"The Issuer shall not be dissolved or terminated by the Incapacity of any Limited Partner, the assignment of transfer by any Limited partner of its Preferred Securities, of the admission of <u>a new or substituted General Partner or Limited partner</u>."*

120. The facts surrounding this issue are not clear and have not been fully disclosed by LBHI. As long as the contrary is not proven by Debtors, it must be assumed that the General Partner LB GP No. 1 Ltd and the Limited Partner LB Investment Holdings Ltd were not willing to take any timely action to replace and/or to substitute themselves.

121. As long as the contrary is not proven by Debtors, it must also be assumed that LBHI was not willing to take any action to replace and/or to substitute the General Partner LB GP No. 1 Ltd for another General Partner of "LBHI itself" (*See* Exhibit B, p. 41) or a "directly or indirectly wholly-owned Subsidiary of LBHI". In addition it must also be assumed that LBHI was not willing to take any action to replace and/or to substitute the Limited Partner LB Investment Holdings Ltd, that was also a wholly-owned Subsidiary of LBHI.

122. Although the terms of the Partnership Agreements establishing LB UK IV provided for the replacement and/or substitution of the General Partner and the Limited Partner and stipulated that LB UK IV should not be terminable by the General Partner, LBHI apparently took not any actions to replace and/or to substitute the General Partner and the Limited Partner that caused the dissolution of LB UK IV.

123. Accordingly LBHI violated the express terms of § 3.3 of the LBHI Guarantee (Exhibit B, § 3.3 p. 37). LBHI caused the dissolution of the General Partner, caused the dissolution of the Limited Partner and with this, also the dissolution of LB UK IV itself. Therefore, to the extent LBHI was so involved, it cannot benefit from the resulting termination of the Guarantee and the disallowance of the Claim. LBHI should not be allowed to hide behind the Termination Clause while it failed to take any actions that would have prevented the termination of the Guarantee to terminate pursuant to the Guarantee's own terms. Again, it is well settled that the doctrine of unclean hands requires that a party seeking equity must come into court with clean hands. Such doctrine may bar recovery where a party seeking such recovery 'is guilty of immoral, unconscionable conduct.'

124. It is noted that The Bank of New York Depository (Nominees) Limited ("BNY") became a limited partner in the Partnership under the name of LB UK IV on the Closing Date of the Partnership Agreement. According to the information obtained from the Registrar BNY is a dormant Private Limited Company, which status is still "active". See **EXHIBIT M**. At the time of dissolution of the General Partner, two other limited

partners (LB Investment Holdings Ltd & BNY) still existed. At the time of dissolution of the Limited Partner
LB Investment Holdings Ltd, at least one (other) limited partner (i.e. BNY) still existed.

## II. The Claim should not be reclassified as equity

125. In the alternative, the Debtors allege that the Preferred Securities Claims should be reclassified as equity
interests. *See* Objection ¶11.

126. In support of their claim, the Debtors cite to § 2.9 of the Guarantee (Exhibit B, p. 36) which states:
"*Subject to applicable law, LBHI agrees that its obligations hereunder constitute unsecured obligations of
LBHI subordinated in right of payment to Senior Creditors and will at all times rank: (a) junior to all
subordinated liabilities of LBHI ... (b) pari passu with Parity Securities, ... and (c) senior to the Junior Share
Capital of LBHI*" (the "Subordination Clause").

### Reclassification of the Claim requires filing an adversary proceeding

127. By seeking to reclassify the Claim as an equity interest, LBHI is seeking to subordinate the Claim. Rule
7001 of the Federal Rules of Bankruptcy Procedures requires that a proceeding to subordinate any allowed
claim or interest must be brought by way of an adversary proceeding. Fed. R. Bankr. P. 7001(8). Accordingly,
the Objection should be dismissed as having been brought in a procedurally improper way.

128. Even if LBHI can seek to reclassify the Claim as equity without filing an adversary proceeding, such
attempt should be denied because the Debtors included the Preferred Securities on the Lehman Program
Securities List. If the Debtors had wanted to reclassify claims in connection with the Preferred Securities as
equity claims, then the Debtors should not have included these Preferred Securities on that list. Accordingly,
LBHI should be stopped from doing so.

129. To the extent the Bankruptcy Court does not overrule the Objection, Van Rooy reserves the right to seek
discovery and to request a full evidentiary hearing pursuant to Bankruptcy Rule 9014(e) and Rule 9014-2 of
the Local Rules of Bankruptcy Procedure to determine the proper amount of Van Rooy's Claim, and the
reasons why the Debtors initially characterized the Preferred Securities as securities giving rise to cognizable
claims.

**The Subordination Clause is ambiguous**

130. The Preferred Securities Claims should not be reclassified as equity interests because the Subordination Clause is ambiguous and contradictory.

Specifically, the Subordination Clause purports to rank any claims arising from any failure of LBHI to pay under the Guarantee "pari passu with Parity Securities..."

131. The definition of Parity Securities, however, is far from clear and unambiguous as it specifically excludes the Preferred Securities and then apparently seeks to include securities issued by the Issuer which would include the Preferred Securities. *See* Exhibit B, p. 34.[19]

132. The Debtors seem to acknowledge the ambiguity by quoting only a small portion of the definition. See Objection footnote 4 pp. 5-6. Parsing through the language, Parity Securities is either any security issued by LBHI that ranks pari passu with LBHI's obligations under the Guarantee or any security "issued by the Issuer ... and entitled to the benefit of the Subordinated Guarantee." See Exhibit B, p. 34. Thus, the interpretation is that the Guarantee ranks pari passu with any security that ranks pari passu with it or with the Preferred Securities. Such a circular definition does not meet the unambiguous standard that the Debtors concede must be present.

133. Indeed, the Debtors do not argue that any class of preferred stock of LBHI was issued on a pari passu basis with the Preferred Securities as the definition requires. And of course, the Debtors cannot argue that the Preferred Securities were issued on a pari passu basis with itself.

134. Accordingly, the ambiguity of the definition of Parity Securities precludes the Debtors from enforcing the alleged subordination of the Preferred Securities Claims. Thus Van Rooy's Claim should not be reclassified as an equity interest because the Debtors cannot demonstrate an unambiguous subordination right inasmuch as it uses terms that are ambiguous and contradictory.

---

[19]"Parity Securities" is defined as: "...any non-cumulative preferred stock, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by LBHI and ranking *pari passu* with LBHI's obligations under this Subordinated Guarantee or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from LBHI ranking *pari passu* with this Subordinated Guarantee." *See* Exhibit B, p. 34.

135. Further, the Subordination Clause merely states that "LBHI agrees" that their own obligations to holders of Preferred Securities Claims will be reduced. There is no indication from the language of the Subordination Clause that holders of the Preferred Securities Claims, such as Van Rooy, ever agreed to subordinate their claims.

136. However, to the extent the Claim is reclassified by the Court as an equity interest in LBHI, such equity interest must maintain its relative priority *vis-à-vis* LBHI's other equity interests (whether existing on the Petition Date or created as the result of other claims against LBHI being reclassified as equity). This is critical to ensure that, among other things, any Plan Trust Stock (as such term is defined in the Plan) or other securities to be issued under the Plan for the benefit of Van Rooy and all other holders of claims based on the LBHI Guarantee whose claims were reclassified as equity, will have the same relative priority that such claims had in respect of the equity interests of LBHI (whether existing on the Petition Date or created as the result of other claims against LBHI being reclassified as equity) prior to such reclassification.

## RESERVATION OF RIGHTS AND JOINDER

137. Van Rooy reserves any and all applicable rights at law and/or equity, all claims, and all defenses, including without limitation the right to discovery in connection with Debtors' Objection and the right to amend or supplement this Response and to join in the response of any other party to the Objection. Without limiting the foregoing, Van Rooy reserves the right to amend or supplement this Response after she has received the complete copies of the Partnership Agreement establishing LB UK IV.

138. Van Rooy hereby incorporates by reference and joins in the arguments raised in the responses to claim objections filed by similarly situated creditors in connection with the Two Hundred Thirteenth Omnibus Objection and similar objections filed by LBHI in connection with claims similar to the Claim, including without limitation the responses filed by *e.g.*

(I)     Response(s) of Dotson Investments Limited to Debtors' Two Hundred Thirteenth Omnibus Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 22023];

(II)    Response of Banque Populaire Côte d'Azur to Debtors' Two Hundred Thirteenth Omnibus
Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 22304] (collectively,
the "Responses to the Two Hundred Thirteenth Omnibus Objection");

(III)    Responses to the Two Hundred Fourteenth Omnibus Objection;

(IV)    Response of Banco Itau Europa Luxembourg S.A. to Debtors Two Hundred Fifteenth Omnibus
Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 21998];

(V)    Response(s) of Lloyds TSB Bank PLC (Geneva Branch) to Debtors' Two Hundred Fifteenth
Omnibus Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket Nos. 22008,
22011, 22012, 22013, & 22014];

(VI)    Response of Lamita Jabbour to Debtors' Two Hundred Fifteenth Omnibus Objection to Disallow
and Expunge Certain Filed Proofs of Claim [Docket No. 22020] (collectively, the "Responses to the
Two Hundred Fifteenth Omnibus Objection");

(VII)    Response of Bank Privée Edmond de Rothschild S.A. to Debtors' Two Hundred Sixteenth Omnibus
Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 22334];

(VIII)    Response of Bank Safdie to Debtors' Two Hundred Sixteenth Omnibus Objection to Disallow and
Expunge Certain Filed Proofs of Claim [Docket No. 22348];

(IX)    Response(s) of Lloyds TSB Bank PLC (Geneva Branch) to Debtors' Two Hundred Sixteenth
Omnibus Objection to Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 22015]
(collectively, the "Responses to the Two Hundred Sixteenth Omnibus Objection");

(X)    Response of Clariden Leu Limited to Debtors' Two Hundred Seventeenth Omnibus Objection to
Disallow and Expunge Certain Filed Proofs of Claim [Docket No. 22017] (collectively, the
"Responses to the Two Hundred Seventeenth Omnibus Objection").


### CONCLUSION

139. For the foregoing reasons, Van Rooy respectfully requests that the Court enter a order (i) denying the

Debtors' request for an order disallowing and/or reclassifying the Claim overruling the Objection and (ii)

allowing the Claim as a general unsecured claim in an amount no less than $ 106,132.50 together with interest

and (iii) granting Van Rooy such other and further relief as this Court deems just and proper under the circumstances.

140. Van Rooy requests the Debtors to return any reply to this Response to Van Rooy's address (*see* below). Any reply in order to reconcile, settle, or otherwise resolve the Claim should also be conducted to the claimant herself, Mrs. S.A.B. Van Rooy.

Dated: November 22, 2011

Stolwijk, The Netherlands

Respectfully submitted

by Mrs. S.A.B. van Rooy, DVM and LLM

Schoonouwenseweg 24,

2821 NX Stolwijk,

THE NETHERLANDS

Telephone:     + 31 182 34 34 43
Facsimile:     + 31 182 34 34 43
Email:         sabvanrooy@hotmail.com

**_Exhibits attached to Van Rooy's Response (Claim Number 54549):_**

A.   An email of November 7, 2011 from Debtors' attorney, Mr. Ryan Martin, about an extension of time and about Van Rooy's several requests to mail the complete copies of the entire Partnership Agreement of January 3, 2007.

B.   Letter of October 25, 2011 of Mr. S. Muller of the Rabobank.

C.   Van Rooy's Proof of claim ( Claim number 54549).

D.   Directive 2003/71/EC, the European legal base for the Base Prospectus (including the LBHI Guarantee) dated January 4, 2007.

E.   Company Details of Lehman Brothers UK Capital Funding IV LP, extract obtained from the website of the Companies House on November 4, 2011.

F.   Other Company Details of Lehman Brothers UK Capital Funding IV LP, extracts obtained by fax of November 8, 2011 from the Companies House.

G.   Company Details of the General Partner LB GP No. 1 Ltd (extract obtained from the website of the Registrar), that demonstrate that the General Partner filed on July 25, 2009 its last Group of companies' accounts (i.e. LB UK IV) of November 30, 2006.

H.   Company Details & Filing History of the General Partner LB GP No. 1 Ltd, obtained from the website of the Registrar.

I.   File copy obtained from the Registrar, first notice in the Gazette of March 3, 2010 about the striking off and dissolution of LB GP No. 1 Ltd pursuant to Section 1000 of the Companies Act 2006.

J.   Company Details of the Preferential Limited Partner LB Investment Holdings Ltd from the Registrar; it demonstrates that LB Investment Holdings Ltd filed on July 27, 2008 its last accounts of November 30, 2006.

K.   Copy of Filing History of LB Investment Holdings Ltd (obtained from website of Companies House), that demonstrates its voluntary striking off and dissolution pursuant to Section 1003 of the Companies Act 2006.

L.   Application from LB Investment Holdings Ltd for a voluntary striking off and dissolution pursuant Section 1003 of the Companies Act 2006.

M.   Copy of Filing History of The Bank of New York Depository (Nominees) Limited (obtained from website of Companies House), that demonstrates its status is still "active" and it's a dormant Private Limited Company.