**U.S. Department of Labor**          Office of the Solicitor
Washington, D.C. 20210



November 29, 2011

**UPS OVERNIGHT DELIVERY**

Honorable James M. Peck
United States Bankruptcy Judge
United States Bankruptcy Court
One Bowling Green
New York, NY 10004



Re:   In re Lehman Brothers Holdings Inc. et al, 08-13555 (JPM)
      (Jointly Administered)

Dear Judge Peck:

We write to express the disagreement of the Secretary of the United States
Department of Labor to certain portions of the Debtors' proposal in their letter dated
November 23, 2011(the "Letter') in response to Your Honor's request at the November
16 hearing that "what amounts to a funded lawyer" be provided to the participants and
beneficiaries of the LBHI Plan (the "Participants"). Hearing Transcript at page 56, line 2.
A copy of the transcript is attached for the Court's convenience.

In satisfaction of Your Honor's request, the Debtors propose to (i) seek and pay
for the retention of special counsel to prepare an analysis as to which, if any, of the
retirees and long term disabled (collectively, the "Retirees") are vested (the "Vested
Rights Analysis"), and (ii) have LBHI provide the Retirees "with reports regarding the
status of their medical benefits" (the "LBHI Report Proposal"). Letter at 2. The Vested
Rights Analysis appears to be a viable approach.  The Secretary would like to see the
retention application and also be provided with a copy of the analysis. Also, as Your
Honor suggested at the hearing, the Secretary believes that the universe of the analysis
should be expanded to include active employees as some may have vested rights to
retiree medical benefits

The LBHI Report Proposal, however, appears to fall short of what the Court
requested. First, it appears that LBHI has been the primary provider of information to the

Retirees in the past. As the many responses to the Motion reflected considerable confusion as to the status and rights of the Retirees, the LBHI Report Proposal does not explain how it will address these past failures.

We understand that it may be too late in the case for the appointment of a retiree committee pursuant to section 1114, but respectfully suggest that a basic goal of section 1114 may be accomplished by the appointment of special counsels pursuant to Your Honor's powers under section 105(a) of the Bankruptcy Code. For example, section 105(a) has been used to extend the reach of section 362(a) to non-debtors, where appropriate, e.g., SMF Realty Co. v. Consolini, 903 F.Supp. 656, 662 (S.D.N.Y. 1995); to appoint a legal representative for future claimants in asbestos cases, e.g., In re Johns-Manville Corp., 36 B.R. 743, 757 (Bankr. S.D.N.Y. 1984); and to appoint special counsel to assist a patient care ombudsman. In re Synergy Hematology-Oncology Medical Associates, 433 B.R. 316, 319 (Bankr. C.D. Cal. 2010). By these means, "those separate classes [current employees, retirees and those on long term disability] can be advised in a thoughtful and understandable way as to what their rights are." Hearing Transcript at page 56, lines 4 – 6.

In the alternative, ERISA and the terms of the VEBA would allow the VEBA trustee herself at the cost of the Debtors to retain special counsels for this purpose. Because these special counsels may be representing different classes of participants and beneficiaries as opposed to the VEBA, it would be problematic for the VEBA to pay for their representation.

We will be available, if Your Honor has any questions on these matters for which we may be of assistance.

Respectfully submitted,

Leonard H. Gerson
Trial Attorney, SOL/PBSD
U.S. Department of Labor
Office of the Solicitor
Plan Benefits Security Division
Room N-4611
P.O. Box 1914
Washington, DC 20013
(202) 693-5615
gerson.leonard@dol.gov

cc:  Richard Krasnow, Esq.

Ms. Carol Rado, VEBA Trustee

3

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP)(Jointly Administered),

5                08-01420(JMP)(SIPA)

6    - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8    LEHMAN BROTHERS HOLDINGS, INC., et al.,

9                Debtors.

10    - - - - - - - - - - - - - - - - - - -x

11    In the Matter of:

12    LEHMAN BROTHERS INC.,

13                Debtor.

14    - - - - - - - - - - - - - - - - - - -x

15

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                November 16, 2011

21                10:09 AM

22

23    B E F O R E :

24    HON. JAMES M. PECK

25    U.S. BANKRUPTCY JUDGE

Page 2

1

2      HEARING re Motion of Colorado Plaintiffs Authorizing 2004

3      Examination of Debtors [ECF No. 15200]

4

5      HEARING re Motion of Colorado Plaintiffs for Relief from the

6      Automatic Stay  [ECF No. 15201]

7

8      HEARING re Debtors' Motion to Establish Procedures for the

9      Consensual Amendment and Assumption of Certain Non-Terminated

10     Prepetition Derivatives Contracts [ECF No. 21297]

11

12     HEARING re Debtors' Motion Pursuant to Section 105(a) of the

13     Bankruptcy Code and Bankruptcy Rule 9019 for Approval of a

14     Settlement and Compromise with Danske Bank A/S [ECF No. 21298]

15

16     HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

17     James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

18     to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

19     of the Federal Rules of Bankruptcy Procedure (i) for

20     Authorization and Approval of a Stock Purchase Agreement

21     Regarding the VEBA and (ii) for Authorization and Approval of a

22     Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

23     and Case No. 08-01420, ECF No. 4654]

24

25

Page 3

1

2    HEARING re The Providence Funds' Motion for an Order Settling

3    Hearing Date and Establishing Discovery and Briefing Schedule

4    or, in the Alternative, for a Status Conference [LBI ECF No.

5    4678]

6

7    HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

8    James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

9    to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

10   of the Federal Rules of Bankruptcy Procedure (i) for

11   Authorization and Approval of a Stock Purchase Agreement

12   Regarding the VEBA and (ii) for Authorization and Approval of a

13   Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

14   and Case No. 08-01420, ECF No. 4654]

15

16   HEARING re Uvino v. Lehman Brothers Holdings Inc. [Case No. 10-

17   05428]

18

19   Adjourned Matters:

20   Motion of Official Committee of Unsecured Creditors for

21   Reconsideration of Court's September 17, 2008 Interim Order (i)

22   Authorizing Debtor to Obtain Post-petition Financing Pursuant

23   to Sections 363 and 364 of Bankruptcy Code and (ii) Granting

24   Liens and Superpriority Claims to Postpetition Lenders Pursuant

25   to Section 364 of Bankruptcy Code [ECF No. 434]

Page 4

1

2    Motion of Fativa, Inc., et al. to Compel Immediate Payment of

3    Postpetition Administrative Expense Claims [ECF No. 7102]

4

5    Motion of Fidelity National Title Insurance Company to Compel

6    Compliance with Requirements of Title Insurance Policies [ECF

7    No. 11513]

8

9    Motion of Jason T. Taylor for Relief from the Automatic Stay

10   [ECF No. 14377]

11

12   Motion of Phillip Walsh for Relief from the Automatic Stay [ECF

13   No. 14571]

14

15   Motion of Giants Stadium LLC for Leave to Conduct Discovery of

16   the Debtors Pursuant to Federal Rule of Bankruptcy Procedure

17   2004 [ECF No. 16016]

18

19

20

21

22

23

24

25   Transcribed by:  Sharona Shapiro

Page 5

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:    JACQUELINE MARCUS, ESQ.

9           RICHARD KRASNOW, ESQ.

10          ERIKA DEL NIDO, ESQ.

11          LAWRENCE J. BAER, ESQ.

12

13

14   BROWN RUDNICK LLP

15          Attorneys for Providence Funds

16          Seven Times Square

17          New York, NY 10036

18

19   BY:    DAVID J. MOLTON, ESQ.

20          HOWARD STEEL, ESQ.

21

22

23

24

25

Page 7

```
 1    LEVIN LEE LLP

 2          Attorneys for SIPA Trustee

 3          570 Lexington Avenue, 16th Floor

 4          New York, NY 10022

 5

 6    BY:   KENNETH E. LEE, ESQ.

 7

 8

 9    LINKLATERS LLP

10          Attorneys for Lehman Brothers International (Europe)

11          1345 Avenue of the Americas

12          New York, NY 10105

13

14    BY:   JAMES R. WARNOT, JR., ESQ.

15

16

17    MILBANK, TWEED, HADLEY & MCCLOY LLP

18          Attorneys for Official Committee

19          One Chase Manhattan Plaza

20          New York, NY  10005

21

22    BY:   EVAN R. FLECK, ESQ.

23          GRACE M. GILLIGAN, ESQ.

24

25
```

Page 8

```
 1    STUTMAN TREISTER & GLATT

 2          Attorneys for Creditor, Elliot

 3          1901 Avenue of the Stars, 12th Floor

 4          Los Angeles, California 90067

 5

 6    BY:   MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

 7          JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

 8          MARINA FINEMAN, ESQ. (TELEPHONICALLY)

 9

10

11    U.S. DEPARTMENT OF LABOR

12          Office of the Solicitor

13          200 Constitution Avenue, NW

14          Room N 4611

15          Washington, DC 20210

16

17    BY:   LEONARD H. GERSON, ESQ.

18

19

20

21

22

23

24

25
```

Page 9

1    VENABLE LLP

2         Attorneys for the Deutsche Bank A/S London Branch

3         Rockefeller Center

4         1270 Avenue of the Americas

5         Twenty-Fifth Floor

6         New York, NY 10020

7

8    BY:   CAROLLYNN H.G. CALLARI, ESQ.

9

10

11   ALSO PRESENT TELEPHONICALLY:

12   ANATOLY BUSHLER, Farallon Capital Management

13   BARBARA ROTH, In Pro Per/Pro Se

14

15

16

17

18

19

20

21

22

23

24

25

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 10

1                    P R O C E E D I N G S

2          THE COURT:  Be seated.  Good morning.

3          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

4    Marcus of Weil Gotshal & Manges on behalf of Lehman Brothers

5    Holdings Inc. and its affiliated debtors.

6          Items number 1 and 2 on the agenda this morning are

7    related to each other.  They are the motions of the Colorado

8    plaintiffs for Rule 2004 examinations and for relief from the

9    automatic stay.  The debtors objected to both motions several

10   months ago and since then have been trying to reach a

11   consensual resolution.

12         The Colorado plaintiffs are involved in litigation in

13   state court in Colorado.  They allege that they have claims

14   relating to the design, construction or maintenance of a golf

15   course owned by debtor LB Rose Ranch LLC.

16         The debtors and the Colorado plaintiffs have entered

17   into a stipulation, subject to the approval of the Court, which

18   provides as follows -- I have a copy of it, Your Honor, if I

19   may approach.

20         THE COURT:  Please approach.  Thank you.

21         MS. MARCUS:  The automatic stay in the cases of LBHI

22   and Rose Ranch will be modified solely to permit the Colorado

23   plaintiffs to assert any and all claims relating to the design,

24   construction or maintenance of the golf course and prosecute

25   such claims against LBHI, Rose Ranch and/or their insurers in

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 11

1  order to recover damages from the insurance policies and

2  proceeds.

3      They will also be granted relief to settle the

4  Colorado litigation with the insurers for LBHI or Rose Ranch,

5  and to execute or collect upon any judgment rendered in their

6  favor in the Colorado litigation against the insurance policies

7  and proceeds without further court approval.

8      The automatic stay with respect to PAMI Statler

9  remains unmodified, and the Colorado plaintiffs have agreed not

10  to assert any claims against LBHI or recover any amounts in

11  excess of the insurance proceeds from LBHI.

12      There is, however, a reservation of rights pursuant

13  to which the Colorado plaintiffs reserve their right to seek to

14  assert claims in the Rose Ranch case, to the extent that their

15  claims are not satisfied from the insurance.  And Rose Ranch

16  reserves its right to object to any claim for any reason,

17  including the fact that the bar date has passed.

18      Counsel to the creditors' committee has been provided

19  with a copy of the stipulation prior to today's hearing.  The

20  debtors believe that the terms of the stipulation are

21  reasonable.  And if the Court has no questions we'd request

22  that the Court so order the stipulation.

23      THE COURT:  This has been pending for a long time and

24  has been adjourned on numerous occasions.  I have no interest

25  in upsetting a settlement.  One question, how does this impact

Page 12

1    the request for 2004 examinations?

2         MS. MARCUS:  My understanding is that that request

3    will be withdrawn, Your Honor.

4         THE COURT:  I'd like that confirmed on the record.

5         MS. MARCUS:  I'm not sure if counsel -- I don't think

6    they're here.  I don't know if they're on the phone but I

7    can -- how would you like me to handle that?

8         THE COURT:  I'm going to treat the fact that it's not

9    covered in the stipulation as an indication that the motion is

10   withdrawn without prejudice.

11        MS. MARCUS:  That's fine, Your Honor.

12        THE COURT:  All right.  The stipulation will be

13   approved.

14        MS. MARCUS:  Thank you, Your Honor.

15        The next item, Your Honor, is the debtors' motion to

16   establish procedures for the consensual amendment and

17   assumption of certain nonterminated pre-petition derivatives

18   contracts.  The debtors filed the declaration of Daniel Ehrmann

19   of Alvarez & Marsal in support of the motion.

20        Just a little bit of background, Your Honor.  In light

21   of the upcoming confirmation hearing, the debtors have been

22   engaged in a massive review of all of their executory

23   contracts, and in particular their huge portfolio of

24   derivatives contracts.  In making decisions regarding

25   assumption or rejection of such contracts the debtors realized

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 13

1    that there was a group of derivatives contracts as to which the

2    debtors might be able to pay a small sum in order to obtain

3    substitute performance by a third party and thereby obtain the

4    counter-parties' consent to assumption and assignment of in the

5    money contracts.

6         Specifically, the motion seeks authority for the

7    debtors to amend and assume any derivatives contract, determine

8    the applicable cure amount under such contract, and satisfy all

9    cure amounts and pay any fees associated with securing

10   substitute performance without further order of the Court but

11   subject to the approval of the creditors' committee and the

12   applicable counter-party.

13        We received two responses to this motion, although my

14   understanding is there's a third one that's not reflected on

15   the agenda.  The statement of Asbury Atlantic, Inc. and Asbury

16   Solomons, Inc. and the reservation of rights of Bank of

17   Montreal; I understand that U.S. Bank filed a similar

18   reservation of rights.  The responses are similar and can be

19   dealt with by the clarification on the record.

20        Asbury Atlantic and Asbury Solomons state that they

21   are filing their reservation in order to, quote, "make clear

22   that nothing in any order granting the motion shall be

23   construed as authority for the debtors to take any unilateral

24   action to amend the Asbury swaps", close quote.

25        Bank of Montreal, and I suppose U.S. Bank, state that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 14

1    they filed their reservation of rights to preserve their

2    position that the motion does not apply to their master

3    agreement which it contends has been terminated, and to

4    preserve its right to insist upon full compliance with the

5    terms of the Bankruptcy Code.

6         As I indicated, Your Honor, we think our motion was

7    very clear, but these are only consensual agreements and

8    therefore we don't view either reservation of rights as, in

9    effect, an objection to the motion.  I'm happy to make the

10   clarification again that we're only talking about consensual

11   resolutions here.

12        THE COURT:  That's how I read the motion.

13        MS. MARCUS:  Thank you, Your Honor.

14        I would like to note that the motion does indicate

15   that the debtors reserve all their rights should it become

16   necessary at some point down the road to assume these contracts

17   over the opposition of counter-parties, but that's not the

18   subject of this motion at all.  And with that, Your Honor, we'd

19   request that the Court approve the motion.

20        THE COURT:  I'm prepared to do that but I'm going to

21   ask whether or not any of the parties that filed reservation of

22   rights wish to be heard.

23        MR. PRICE:  Good morning, Your Honor.  Craig Price

24   from Chapman and Cutler.  I'm here on behalf of both the Bank

25   of Montreal and U.S. Bank.  We filed reservation of rights and

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 15

1    we're fine with the clarification that this only applies to

2    nonterminated agreements.

3            THE COURT:  Okay.  No one else seems to want to say

4    anything.  It's approved.

5            MS. MARCUS:  Thank you, Your Honor.

6            Item 4 on the agenda is the debtors' motion pursuant

7    to sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

8    for approval of a settlement and compromise with Danske Bank.

9    The debtors have filed a declaration of Daniel Ehrmann in

10   support of this motion as well.

11           The settlement resolves claims filed against LBHI and

12   LCPI by Danske relating to a 1996 master repurchase agreement.

13   Danske filed claims against LBHI and LCPI in the amount of not

14   less than approximately 699 million which the motion defines as

15   the deficiency claims.  In addition, Danske filed additional

16   claims against LBHI and LCPI in the amount of 40 million

17   dollars.

18           The settlement provides that Danske will have a

19   nonpriority general unsecured claim against each of LCPI and

20   LBHI in the amount of 580 million dollars.  Danske will also

21   waive and release the additional claims with prejudice.  Danske

22   will also cause its wholly owned subsidiary to assign a loan

23   that we've called the Playa Pelicano loan in the original

24   amount of 33 million dollars to LCPI.  And LBSF shall waive any

25   claims it may have against Danske under certain documents.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 16

1   There are certain Danske excluded claims which are not being

2   released under the terms of the settlement agreement.  And LBHI

3   and LCPI on the one hand and Danske on the other hand, release

4   each other from all claims under the master repurchase

5   agreement, the deficiency claims, the guarantees and related

6   documents.

7           Contemporaneously with entering into the settlement

8   agreement, Danske entered into a plan support agreement.  As

9   indicated on the agenda, no objections to the Danske settlement

10  have been filed with the Court.  For the reasons set forth in

11  the motion and the Ehrmann declaration, the debtors believe

12  that the Danske settlement is fair and equitable and in the

13  best interests of the debtors' estate, and we request that the

14  Court approve it.

15          THE COURT:  I'm prepared to do that.  It's

16  uncontested.  I would be comforted to hear that the creditors'

17  committee has reviewed this and has no issue.

18          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

19  Tweed, Hadley & McCloy on behalf of the official committee of

20  unsecured creditors.

21          Yes, Your Honor, the committee has, as was the case

22  with the Lehman Re, the State Street, the Swedbank settlements,

23  which were very similar and all part of the whole, you know,

24  repo to the street program that Lehman had engaged in for a

25  period of time.  We have reviewed the amount of the deficiency

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 17

1   claim, in particular.  Our real estate financial advisors have

2   independently looked at the competing expert reports that went

3   into the mediation here and have compared the values ultimately

4   agreed to to their own underwriting of these properties, and

5   believe that in light of the litigation risks involved in going

6   further with a litigation on these fronts that the numbers that

7   we came out with here, 580 million, with all the other issues

8   thrown in are a fair settlement for the debtors.

9          THE COURT:  Fine.  The settlement is approved.

10         MS. MARCUS:  Thank you, Your Honor.

11         My partner Richard Krasnow will handle item number 5

12  on the agenda.

13         May I be excused, Your Honor?

14         THE COURT:  Okay.

15         MS. MARCUS:  Thanks.

16         MR. KRASNOW:  Will Your Honor bear with me for one

17  minute?  We may have resolved one of the objections.  I just

18  need to, if I may, consult?

19         THE COURT:  You may consult.

20     (Pause)

21         MR. KRASNOW:  Your Honor, Richard Krasnow, Weil

22  Gotshal & Manges on behalf of the Chapter 11 debtors.

23         I appreciate the Court's indulgence.  It will be

24  rewarded, Your Honor; we have resolved one of the objections.

25         Your Honor, the next matter on the calendar in the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 18

1   Chapter 11 cases is the joint motion of LBHI and the SIPA

2   trustee seeking approval or authority to consummate a stock

3   purchase agreement relating to shares of Aceso, a wholly owned

4   subsidiary of LBI, and for authority for the SIPA trustee and

5   LBHI to compromise and settle disputes that they have or may

6   have with respect to Aceso and a VEBA that is controlled by

7   Aceso.

8          Your Honor, the item is item number 5 on the LBHI or

9   the debtors' agenda and item number -- I'm sorry, Your Honor --

10  number 6 on the SIPA agenda.  I assume Your Honor will consider

11  that together.

12         THE COURT:  It's item 7 on the SIPA agenda.

13         MR. KRASNOW:  I misspoke, Your Honor.

14         Your Honor, pursuant to this motion we are seeking

15  very limited relief, which is to say, Your Honor, that if the

16  Court were to be inclined to grant the relief sought in the

17  motion then that relief would be limited to a transaction

18  pursuant to which the SIPA trustee will sell and LBHI will buy

19  the shares of Aceso which are owned by the trustee for a very

20  limited purchase price of 1,885 dollars.  And LBHI would agree

21  to reduce a claim that it has asserted against LBI relating to

22  funding that had been provided by LBHI to LBI on September 12,

23  2008 of 125 million dollars of which 90 million dollars was

24  used by LBI to fund a VEBA which is controlled by Aceso.

25         Additionally, LBHI and the SIPA trustee on behalf of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 19

1    LBI, pursuant to that agreement, would be exchanging neutral

2    releases relating to claims which are property of their

3    respective estates, no more but no less, but only claims that

4    are property of their respective estates that pertain to the

5    VEBA.  That is the only relief that we and the SIPA trustee are

6    seeking today.

7         Your Honor, there were three groups of objections that

8    were filed to the motion, one of which was filed by the

9    Department of Labor, which was the objection as to which I

10   requested the Court's indulgence to engage in a discussion with

11   the representative with the Department of Labor.  We believe we

12   have resolved that objection.

13        We have done it and will do it in two ways, the first

14   of which we've already done.  That first step was to revise the

15   order, and the blackline copy of the revised order was attached

16   to our response to the objections so that the order is even

17   clearer that the only relief that the Court would be granting

18   to us and the only approval that the Court would be granting to

19   us, if the Court is inclined to grant the motion, would be to

20   approve the sale, the transfer of the shares which I've

21   described, and the compromising settlement which is part and

22   embedded in the releases.

23        What the Department of Labor has asked that we do is

24   to revise the order further to make it clearer, although we

25   think it's clear anyway, but to make it clearer that the only

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 20

1    claims that are being released here are claims which are

2    property of the respective estates, that is to say, LBHI and

3    LBI.  Now while it's our view that we can only release claims

4    that are property of our estate, in light of the fact that if

5    we amend the order as I've so described, that apparently will

6    satisfy the Department of Labor so we do not need to consider

7    any further the objection it filed.  We're prepared to do that

8    and we believe that the SIPA trustee is similarly prepared to

9    amend the order in that regard.

10         In light of -- well, Your Honor, perhaps the

11   Department of Labor may want to speak so we can see if I am

12   accurate in that regard, and then we can deal with the other

13   objections that have been filed, if that's acceptable to the

14   Court.

15         THE COURT:  That is acceptable.  I'd first like to

16   confirm that the SIPA trustee agrees with what you have just

17   said so at least the parties to the transaction are on the same

18   page.

19         MR. KRASNOW:  Yes, Your Honor.

20         MR. LEE:  Good morning, Your Honor.  Kenneth Lee from

21   Levine Lee representing the SIPA trustee, James Giddens.

22         I would like to echo Mr. Krasnow's remarks.  The SIPA

23   trustee is in agreement with the proposed revisions to the

24   order to further clarify it that have been requested by the

25   Department of Labor, and we are in favor of granting the relief

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 21

1    sought.

2              THE COURT:  Okay.

3              MR. LEE:  Thank you, Your Honor.

4              THE COURT:  I'll hear now from counsel for the

5    Department of Labor.

6              MR. GERSON:  Good morning, Your Honor.  Leonard Gerson

7    for the U.S. Department of Labor.

8              We are in agreement with the proposed revisions that

9    Mr. Krasnow described to the Court.  We appreciate the effort

10   that's been made to clarify the order.

11             THE COURT:  If you could just explain to me what your

12   concern was and how that concern has been resolved by virtue of

13   the language change.

14             MR. GERSON:  Under ERISA, unlike bankruptcy, there's

15   this concept of two hats.  You wear a hat with respect to

16   whatever allocations you have to your employer, the

17   corporation.  You also have separate obligations to an ERISA

18   plan if you're a fiduciary to an ERISA plan.  Part of those

19   obligations can be bringing an action if there is a violation

20   of ERISA.  That action would not be property of the estate

21   because it wouldn't be for the benefit of the estate,

22   nevertheless you have an obligation to bring that action.  So

23   we wanted it to be clear that what was not being released was

24   any obligation that LBHI or LBHI employees or officers had to

25   bring an ERISA action if there was a violation --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 22

1        THE COURT:  Understood.

2        MR. GERSON:  -- with respect to the plans.

3        THE COURT:  Thank you for the clarification.

4        MR. GERSON:  You're welcome.

5        THE COURT:  And I take it you're satisfied that the

6   language being added to the order --

7        MR. GERSON:  Right.

8        THE COURT:  -- will resolve this to at least the

9   Department's satisfaction.

10       MR. GERSON:  That's correct, Your Honor.  Of course it

11  wasn't just this language that was added this morning, it was

12  the earlier language that the debtors and the SIPA trustee

13  added to make it clear that all the Court was approving was the

14  transfer of the stock and the limited release in the stock

15  purchase agreement rather than any future actions that will be

16  taken by the debtors once they own the stock, and furthermore,

17  their statement in their papers that any further actions they

18  take will be in compliance with ERISA.

19       THE COURT:  All right.

20       MR. GERSON:  Thank you, Your Honor.

21       MR. KRASNOW:  Your Honor, now just to turn to the two

22  categories with remaining objections before I get into some of

23  the details of the motion which, if you will, deal with some of

24  the issues raised in the objection.

25       In addition to the formal objection that was filed by

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 23

1   the Department of Labor which has been just been resolved,

2   there was something which I will style as a formal objection

3   filed by a Ms. Wendy Uvino.  As reflected in that document, Ms.

4   Uvino has no economic stake whatsoever with respect to this

5   motion.

6            THE COURT:  But she was, at least at one time

7   according to the objection, trustee of the VEBA.

8            MR. KRASNOW:  She was at one time, but currently --

9            THE COURT:  That's what I said.

10           MR. KRASNOW:  -- and currently is not a trustee of the

11   VEBA.  She also was, as the Court may be aware in light of the

12   pending litigation with Ms. Uvino, an officer of LBHI involved

13   with HR.  And indeed she, in that capacity, assisted the

14   debtors and their professionals in the due diligence and

15   analysis of the group benefit plan, particularly with respect

16   to retirees in connection with the ultimate termination of the

17   plan as it relates to the retirees that occurred over two years

18   ago.

19           THE COURT:  If I could just interject, and I don't

20   want to in any way deflect you from your chosen rounds of going

21   through the various objections, but I have reviewed each of the

22   objections, including the objections that were not formally

23   docketed, submitted in written form by a member of former

24   Lehman employees, some of whom are, by their own description,

25   elderly and infirm, who have expressed deep-seated concerns

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 24

1    about this motion, whether or not there has been sufficient

2    time to respond to the motion and the potential impact that the

3    motion may have upon ongoing health care and retiree benefits

4    to which these individuals may be entitled.

5        If I understand correctly what you have represented at

6    the outset as to the limited nature of the relief being sought,

7    and if I understand what the Department of Labor's counsel has

8    said in reference to the limited nature of the releases being

9    exchanged, at least in respect of possible claims arising under

10   ERISA, is there anything for the Court to deal with in

11   reference to the pending objections?  Because it's my strong

12   sense, but I want to discuss it with you, that the relief being

13   sought is so limited that read literally it does not have any

14   direct or indirect impact upon the rights of any individual

15   beneficiary of the VEBA, although it is conceivable that if

16   future acts as suggested in the motion take place, there could

17   be an adverse impact.  But I'm not approving that now.  Do I

18   understand that all correctly?

19       MR. KRASNOW:  Your Honor took my presentation out of

20   my mind and into your own statements.  Absolutely.  That was

21   precisely the point that we attempted to make in our response

22   and I intended to address here today.

23       The concerns that have been expressed by the retirees,

24   concerns that we're very sympathetic about, one could say that

25   it's one thing for a creditor in a commercial transaction to

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 25

1    lose money as a consequence of a bankruptcy, but that's not the

2    same as retirees, as a consequence of the failure of a business

3    losing or potentially losing medical benefits.  So we're very

4    sympathetic to that.  And there is nothing that the Court would

5    be doing today that directly affects that.

6            In the motion, out of a desire to be as transparent as

7    possible, not only from the perspective of advising the Court

8    and the creditors, but more importantly the retirees, we felt

9    that the right thing to do is to advise the retirees as to the

10   source of payments to them with respect to medical benefits

11   which are not now covered by a debtors' sponsored group plan,

12   and what action we may or may not be taking in the future, in

13   part based upon what the Department of Labor may or may not do

14   with respect to an application that we have not yet filed with

15   respect to the use of certain of the VEBA funds, which funds

16   will only be used consistent with the terms of the VEBA, and

17   whatever exemption we may get from the VEBA to reimburse the

18   estate for certain monies that they expended with respect to

19   benefits.  But as far as the relief that we are seeking today

20   from the Court, were the Court to grant it, it doesn't deal at

21   all with respect to potential future events.

22           THE COURT:  Let me just ask this question because I

23   don't want to predict what may be in the minds of the

24   individual objectors who are concerned about the consequences

25   of future acts.  But how will these individuals ever know

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 26

1   what's going on with respect to the VEBA and will they have an

2   opportunity to be heard, to the extent that they have an

3   objection?

4           MR. KRASNOW: Well, Your Honor, I'll try to answer

5   that as best I can because I'm not sure what the future events

6   will be.  To be clear, Your Honor, the VEBA was formed prior to

7   the commencement of the case, prior to any knowledge that there

8   would be a case, but with full knowledge that things were

9   somewhat in distress at Lehman.  There was a concern --

10          THE COURT: So this was a lifeboat created for -- this

11  was a lifeboat --

12          MR. KRASNOW: Absolutely.

13          THE COURT:  -- created for the benefit of certain

14  present and former employees to protect employee benefits at a

15  time of financial uncertainty?

16          MR. KRASNOW: If I can -- the answer to that is yes,

17  but if I can rephrase that slightly because it becomes --

18          THE COURT: You don't like the term lifeboat?

19          MR. KRASNOW: Lifeboat I will accept because that's

20  accurate.  It was to try to ensure that those who were then

21  covered by the LBHI group benefit plan were assured that no

22  matter what happened there would be sufficient monies available

23  to cover what was then estimated to be six months worth of

24  medical benefits.  And those individuals who were covered by

25  that plan, generally speaking -- the plan itself, the terms of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 27

1   the plan govern so in case I misstate I'm not intending to

2   expand the universe or decrease it -- were active employees of

3   U.S. Lehman equities, some of which, but relatively few of

4   which were employed by LBHI, most were employed by LBI and

5   maybe subsidiaries -- then subsidiaries of LBI, employees who

6   were on long-term disability and retirees.

7        At that time all medical expenses were self insured by

8   Lehman. There was no insurance plan per se. So in furtherance

9   of that, as I noted earlier, LBHI advanced, provided funding to

10  LBI of 125 million, of which 90 million went into this health

11  benefit trust which is the VEBA we've referred to.

12       We all know what events occurred on September 15th and

13  September 19th of 2008 with respect to LBHI and LBI and

14  thereafter for other Lehman entities. Notwithstanding those

15  filings, health benefits were covered and were paid by the

16  VEBA. No monies were expended by LBHI for anybody in that

17  regard because the VEBA, consistent with its terms, covered

18  those expenses. Asiko (sic) or Aceso -- I constantly

19  mispronounce that -- Aceso was under the control --

20       THE COURT: Does that term have any meaning,

21  incidentally?

22       MR. KRASNOW: If it does, Your Honor --

23       THE COURT: You don't know it.

24       MR. KRASNOW: -- I am completely unaware of what it

25  is.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 28

1        THE COURT:  All right.  So it's just a made-up word?

2        MR. KRASNOW:  Maybe.  I don't know whether it was

3   intended to stand for something.

4        But that was a wholly owned and continues today to be

5   a wholly owned subsidiary of LBI, and therefore under the

6   control of the SIPA trustee.

7        Between September and March the payments were made

8   from the VEBA as was contemplated and provided for under VEBA,

9   but in March of '09 the SIPA trustee caused the VEBA to suspend

10  all payments.  As a consequence, LBHI had to immediately step

11  in and start covering, if you will, medical expenses for its

12  active employees, and since the group benefit plan covered as

13  well retirees, the retirees as well.

14       However, given the nature of the Lehman case, we are

15  disposing of assets.  It was clear to the debtors that at least

16  as to retirees they could not, consistent with their fiduciary

17  duties to their stakeholders, continue to make those payments

18  ad infinitum.  And so in or about June or thereabouts, after

19  some thinking and analysis it was concluded that as it relates

20  to the retirees LBHI would have to take appropriate steps to

21  terminate those health benefits.

22       The question was what steps were to be taken, the

23  timing of the implementation, and what, if anything, could be

24  afforded to the retirees to cushion what could be a devastating

25  blow.  This was not going to be an action similar to that which

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 29

1    LTV in its first Chapter 11 did, which was to just terminate

2    the medical benefits and to see the kind of stories that

3    appeared when that happened some decades ago, in terms of the

4    impact on employees.

5         And so we dual tracked.  The first was, while it had

6    no obligation to do so, to explore whether or not we could

7    provide to these retirees, at their own expense, some

8    alternative.  So when we announced to them we intended to

9    terminate, we could similarly announce to them something that

10   would be available to them for medical benefits, to pay medical

11   benefits that would be a cheaper alternative than either having

12   to look to themselves or to have to themselves purchase medical

13   insurance.

14        At the same time, an analysis was undertaken, in light

15   of the provisions of the group benefit plan, that allowed for,

16   by their terms, a termination of all or any portion of the plan

17   to any of the beneficiaries, as to whether or not there were

18   any parties who had vested benefits, because it was our view,

19   based on the case law in this district, that in light of the

20   terms of those benefit plans we could terminate them without

21   having to go through the 1114 process, as to those individuals

22   who did not have vested benefits.  If somebody had vested

23   benefits we could not terminate those benefits outside of 1114.

24   And so while we were looking for alternatives, we undertook as

25   extensive a due diligence process as we thought we could, which

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 30

1   was overseen by Ms. Uvino.  And at the conclusion of that due

2   diligence process, we determined that it did not appear that

3   there were any documents that afforded to anybody any vested

4   rights for medical benefits.

5        Concurrently with that, based on discussions that we

6   had with Aetna, we were able to afford to employee -- retirees

7   a non-LBHI-sponsored plan -- a plan which, at least

8   colloquially speaking, was an Aetna plan -- which employee --

9   the retirees could avail themselves of, cheaper premiums than

10  they would otherwise have and some sort of bridge, if you will.

11       We determined that this was not something which we

12  would give thirty days' notice to or sixty days' notice to

13  employees -- or retirees.  And so, in October, we sent notices

14  out advising these retirees that we would be terminating the

15  plan as to them, effective December 31, and gave them notice of

16  this Aetna plan, if you will.

17       Notices were given to approximately 1,100 retirees.

18  There were numerous inquiries, as one would expect, in response

19  to that.  I can't characterize all of them, but my

20  understanding is many of them had indicated an expectation that

21  it was going to happen, in light of where Lehman was, and an

22  appreciation for the fact that we actually expended time and

23  effort to see whether we could at least facilitate offering to

24  them this Aetna plan.  In none of the communications that we

25  received from these parties at that time did anyone indicate

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 31

1   that they had any vested benefits.  The group benefit plan was

2   terminated as of December 31.

3          As I previously indicated, Your Honor, the group

4   benefit plan -- or the VEBA, rather, by its terms, was to be

5   used for the benefit of beneficiaries of the plan.  Therefore,

6   effective December 31 -- or January 1, I may be off by a day --

7   that VEBA could not, by its terms, be used for anyone other

8   than active employees and those with long-term disabilities who

9   were going to be going on to a COBRA because they, too, got

10  notices, but they had COBRA available to them -- couldn't be

11  used for them either, excuse me.  I don't think it could be

12  used for COBRA.

13         In January of 2010, the SIPA trustee decided to cause

14  the VEBA to be amended so that it would include the retirees.

15  And he had the ability to cause that to happen because Aceso

16  was under his jurisdiction.

17         I should note, Your Honor, that, as reflected in the

18  motion, we have made a commitment to the trustee because he

19  made it a condition of this deal that the VEBA would continue

20  to be used for those purposes -- that is, to cover the

21  retirees -- so long as there are funds there.  We have

22  indicated that we will not only do that, but continue to use

23  the VEBA for the remaining purposes for which it exists, which

24  is to cover active employees.  And we would cover COBRA

25  payments with respect to those with long-term disabilities.  It

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 32

1    is our intention to use the VEBA for those purposes, as we set

2    forth in the motion.

3              There is something else we are going to try to do, and

4    we made it clear in the motion papers.  As a result of the

5    trustee's suspension of the VEBA in March of 2009, as I

6    indicated, we had to take on all of those expenses.  And while

7    the VEBA was amended in January 2010 to cover the retirees as

8    well as others, the SIPA trustee only allowed the VEBA funds to

9    be used for the retirees.  He did not allow it to be used to

10   cover the LBHI active employees, even though they were clearly

11   within the then group benefit plan and today's group benefit

12   plan.

13             LBHI was required, therefore, to expend monies that

14   should have been covered by the VEBA and would have been

15   covered by the VEBA, but for the actions taken by the SIPA

16   trustee.  We believe it is appropriate to seek reimbursement --

17   not a reversion, but reimbursement -- of that which LBHI

18   expended and that should have been covered by the VEBA.

19             While I understand there may be a debate as to whether

20   or not we need an exemption from the Department of Labor in

21   order to be able to do that, we are -- it is our intention to

22   seek such an exemption.  That's not something before the Court.

23   If we obtain that exemption, then there will be the

24   reimbursement of approximately twenty-five million dollars.  If

25   the exemption is not obtained, then we will not have the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 33

1   reimbursement and we will have to evaluate what the then uses

2   of those monies will be, consistent with the terms of the VEBA

3   and applicable law, including ERISA.

4        Now, all of that ultimately has an effect on the

5   retirees, but lest we forget, this is a limited fund in any set

6   of circumstances.  It will end.  When it will end, vis-a-vis

7   the retirees, I cannot stand here and tell you.  We believe

8   that no matter what happens, it will continue at least through

9   2012.  Whether it continues much beyond that I can't really

10  say.  But while we understand why the retirees would prefer

11  that the VEBA be used only for their benefit, the fact of the

12  matter is that the VEBA was created for the benefit of others

13  as well.  And we intend to, as we should, use it for those

14  purposes as well.

15       THE COURT:  Well, my understanding, which has been

16  clarified now on multiple occasions during this morning's

17  hearing, is that today's motion does not directly or even

18  indirectly implicate what happens in the future with respect to

19  the reimbursement claim.

20       MR. KRASNOW:  Correct, Your Honor.

21       THE COURT:  And so there's nothing in today's motion

22  that directly or indirectly impacts the rights of those who

23  have objected in their capacity of beneficiaries of the VEBA.

24       However, by virtue of the fact that the motion

25  provides reasonable transparency into the debtors' thought

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 34

1    process with respect to a claimed entitlement to reimbursement

2    of up to twenty-five million dollars and inasmuch as effecting

3    such reimbursement reduces the funds within the VEBA available

4    to pay ongoing benefits to retirees and others, I understand

5    the reason that so many parties have chosen to be heard by

6    submitting letters to me and filing those letters on the

7    docket.

8         Which brings me back to the question I asked you about

9    fifteen minutes ago --

10        MR. KRASNOW:  Sorry, Your Honor.

11        THE COURT:  I appreciate the long explanation; it's

12   very helpful.  But the question is in what manner, if at all,

13   will these individuals and others similarly situated know about

14   what's going on with respect to the VEBA?

15        MR. KRASNOW:  We will have to -- I can't speak to what

16   is required under ERISA, but if we determine that, within a

17   reasonable period of time, the VEBA funds will not be available

18   because they will have been depleted, we will give notice to

19   the retirees because, presumably, the Aetna plan will still be

20   there.  And in order for them to avail themselves of that, they

21   will have to start making the premium payments.

22        It would not seem, to me, appropriate to give someone

23   notice of that of thirty days.  So we will give them reasonable

24   notice based upon whatever the circumstances may be at the

25   time, including an analysis of where we -- are we on the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 35

1    twenty-five million and what we envision the future uses will

2    be.  I cannot speak, Your Honor, to what rights, if any, the

3    retirees will have, once we give them the notice, under

4    applicable law.  But whatever rights they may have, whatever

5    notices LBHI is required to give, it will give.

6            As I noted earlier, Your Honor, it's not clear we had

7    to give ninety days' notice when we decided to terminate the

8    plan as it related to them, but we thought it was the right

9    thing to do.  I would like to think, Your Honor, that that

10   approach will continue even after our emergence from Chapter

11   11.

12           I hope I've been responsive to Your Honor.

13           THE COURT:  You have been responsive, although I

14   suspect anybody who's listening to this won't really understand

15   what, if any, notice they're going to be able to get.  And I

16   think that's probably because you don't know.

17           MR. KRASNOW:  You're absolutely right, Your Honor.

18           THE COURT:  Okay.

19           MR. KRASNOW:  I've tried to explain it as best I can.

20           THE COURT:  Now, I do have a fundamental question that

21   I just don't know the answer to on the basis of looking at the

22   papers, which is whether or not the change in equity control of

23   Aceso, A-C-E-S-O, will lead to any change in ongoing management

24   of the VEBA in terms of the identity of the trustee, the

25   decision process with respect to the VEBA and the management of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 36

1      its assets.

2              MR. KRASNOW:  I think the answer is we don't believe

3      there will be any.  In fact, I don't want to speak for the SIPA

4      trustee, but I think one of the motivations that the SIPA

5      trustee had in agreeing to this transaction was that we were in

6      a better position to manage the VEBA than, frankly, the SIPA

7      trustee is.  They have a different focus than we have had.

8              I don't believe that today there is a view that there

9      will be a change in who is the trustee --

10             THE COURT:  Who is the trustee now?

11             MR. KRASNOW:  Carol Rado, I think is the trustee, who

12     is an employee of either LBHI or LAMCO.

13             UNIDENTIFIED SPEAKER:  LBHI.

14             MR. KRASNOW:  Of LBHI, Your Honor.

15             So there has been an LBHI employee who has been a

16     trustee of the VEBA since the commencement of the Chapter 11

17     case.  So that's -- there -- to that extent, LBHI, if you will,

18     has been involved -- certainly has been aware.  So we do not

19     envision, as of today, any change.

20             THE COURT:  Okay.  Is there anything more you wish to

21     add at this point?

22             MR. KRASNOW:  Your Honor, for the reasons set forth in

23     the motion and on the record, and I also would refer to the

24     declaration of Mr. Hershan, which was filed with the motion, we

25     believe that the proposed transaction is in the best interest

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 37

1    of LBHI, its creditors, and should be approved.

2         THE COURT:  Before asking if any of the objectors who

3    are on the phone or present in court wish to be heard, I'm

4    going to ask counsel for the SIPA trustee to explain, from his

5    perspective, why this transaction makes sense.

6         MR. LEE:  Your Honor, Ken Lee, for the SIPA trustee.

7         The transaction makes sense from the perspective of

8    the SIPA trustee, Your Honor, because it was our conclusion,

9    after doing extensive fact investigation as to the purposes

10   behind the creation of the VEBA and the purposes for which it

11   was intended that the funds had a very limited purpose and

12   could not be really directed to the benefit for any claimants

13   in the SIPA proceeding -- any customer claims or other non-

14   customer claims -- and that, in addition to that, it was

15   requiring the trustee to expend some amount of time and

16   attention on managing an entity over which it didn't actually

17   have full control since the -- as explained, the VEBA has its

18   own trustee.  And LBHI is involved with respect to various

19   benefit plans and administering benefits to current and former

20   employees.

21         In addition to that, there were a number of disputes

22   between LBI and LBHI concerning the funding of the VEBA and as

23   to whether there were claims going in both directions for those

24   sums of money.  And this proposed transaction resolves all of

25   those claims and, therefore, settles a significant matter that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 38

1    is open between LBI and LBHI.

2          So for those reasons, we believe that it is in the

3    best interest of the LBI estate as well.

4          THE COURT:  Okay.

5          MR. LEE:  Thank you, Your Honor.

6          THE COURT:  You wish to be heard on behalf of the

7    committee?

8          MR. O'DONNELL:  Dennis O'Donnell, Milbank, Tweed,

9    Hadley & McCloy, on behalf of the official committee.

10         Just to note that we have had extensive discussions

11   with the debtors about this motion as well and believe that in

12   its narrow form, the form presented to the Court today, in

13   terms of the two components, it should be granted.  Obviously,

14   based on Mr. Krasnow's presentation, there are lots of issues

15   that will need to be dealt with after this transaction is

16   consummated.  And we're simply reserving our rights with

17   respect to how all those should turn out.

18         THE COURT:  All right.  I'll now hear from anybody who

19   is in court, either as an individual or through counsel or by

20   telephone, who have lodged objections to the requested relief.

21   You can come forward if you wish.

22         Please identify yourself for the record.

23         MR. DELANEY:  Yes, sir.  Judge, first of all, thank

24   you very much for letting me come here.  My name is Steve

25   Delaney.  I am a retiree from Lehman Brothers.  I worked there

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 39

1    for about twenty-four years and retired in 2006.

2         I raise this just because I heard about standing.  I

3    thought it'd be good if I could just explain what the program

4    was that I was involved with.  I don't know anything about the

5    disabled programs, the COBRA programs or what have you.  But

6    when I went to work at Lehman Brothers, part of the procedure

7    and part of the policy indicated that if you stayed at Lehman

8    Brothers -- and this is back in 1983 -- and retired from Lehman

9    Brothers at fifty-five, you would have lifetime retiree health

10   benefits.

11        You had to do some things.  First of all, you had to

12   be an employee, I think, before 1990.  So the universe is

13   fairly small with regard to that.  Second thing is you had to

14   retire at age fifty-five, so you had to have longevity.  And

15   the accumulation of your age and time in service had to be

16   seventy-five pts.  In --

17        THE COURT:  Can I ask you, was fifty-five viewed as

18   regular retirement or early retirement?

19        MR. DELANEY:  I don't know the answer to that, Judge.

20   I know at fifty-five, you qualify for all the retirement

21   benefits.  There was no mandatory retirement --

22        THE COURT:  This is what bankrupted Greece, you know.

23        MR. DELANEY:  It probably may have bankrupted -- I

24   don't think this bankrupted Lehman Brothers.  I'm pretty sure

25   of that.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 40

1          THE COURT:  All right.

2          MR. DELANEY:  So as far as standing, that's where I

3     am.  I am a retiree.  I've been receiving the benefits.

4          I heard today from counsel that this program was

5     terminated at one point in time, somewhere in 2009.  It may

6     have been terminated in the back rooms with other people

7     discussing, but the reality of it is, for the retirees, when

8     they would notify of a termination of this program, what do

9     they all do?  They all call human resources.  I called human

10    resources.  This is important benefit, what is going on?  The

11    response was not that you're not going to have health coverage.

12    The response is very simply do not worry, it's going to be

13    taken care of, you're going to continue to have your health

14    coverage and it's still going to be the same program,

15    administered by Aetna, and you'll still pay the same

16    coverage -- I have the same -- paying the same premium.

17         THE COURT:  Who made the --

18         MR. DELANEY:  So the reality of it was --

19         THE COURT:  Excuse me, just -- who made these

20    representations to you?

21         MR. DELANEY:  Human resources at Lehman Brothers HI.

22    And it wasn't so much the representations.  It was because

23    after they announced to us that we were going to get this

24    coverage and it was going to be through LBHI, we proceeded to

25    get our quarterly bill from Aetna which was the same insurance

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 41

1    coverage for the exact same amount and we had the same

2    coverage.

3            And I've been having that coverage for the last two-

4    and-a-half years.  And I think it's absolutely great.  I get a

5    bill every quarter from Aetna under the term Lehman Brothers

6    Holdings, Inc.  Special program -- special statement for my

7    health insurance.

8            So as far as what I knew and what other retirees -- I

9    can't speak for them -- knew, there was no termination.  We

10   continue to have the same coverage for the same amount for the

11   period of time that we're into bankruptcy.

12           Now, I really didn't understand -- I hate to

13   apologize -- the machinations that went on before in terms of

14   what was really being asked for.  When I read the document, I

15   literally viewed this as two things: one, the holding company

16   wants to end retiree health benefits and, two, they got a pot

17   of gold of thirty-seven million dollars and they want to take

18   twenty-five million and turn that over to LBHI to pay for the

19   employee health benefits while they continue to work at Lehman

20   Brothers after the bankruptcy.

21

22   Now I can understand looking at this that the money was put

23   aside for the benefit of retirees and other people.  At some

24   point in time, there becomes an important decision as who are

25   we working for.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 42

1          In my letter, I indicated that as of the filing of

2    bankruptcy, the Lehman creditors, really, were the only party

3    in interest as far as what was left of the estate.  If Lehman

4    Brothers at that point in time had been dissolved or liquidated

5    within six months, the creditors would have gotten X cents on

6    the dollar.  I think at the CDS auction -- I don't know -- who

7    knows -- the price was somewhere around eight and a half, nine

8    cents on the dollar.  A decision was made at the holding

9    company to keep this in operation.  Why?  For the benefit of

10   the creditors.  And it was a very good benefit, because if we

11   look at the benefits to the creditors, the value of their bonds

12   which were in CDS at eight or nine cents on the dollar, are now

13   trading -- at least on the bid side, at twenty-four, which

14   means they're probably worth a lot more.

15          So by keeping this entity alive for two and a half

16   years, what I understand from press releases, there's 160 of

17   billion of debt out there, at 18 points, keeping Lehman alive

18   has resulted in a benefit to the creditors of about 22 billion

19   dollars.  Having received that benefit, which can be totally

20   liquidated right now in the market, but I think they'll all

21   hang on for the recovery, now we have LBHI coming back to a pot

22   and saying we want twenty-five million out of that to pay for

23   the health benefits for individuals who were employed to

24   increase the value of the holdings of the creditors.  Which

25   they did.  And it's great.  And I don't begrudge, you know, the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 43

1    creditors getting their piece of the action out of this.  But

2    we have a trust that may have come to an end in terms of health

3    benefits for LBHI in seven months; they're now trying to milk

4    this for another two and a half years while they reap the

5    benefit of this.

6            As I look through the Bankruptcy Rule -- because I've

7    got to admit I only used Google for this, so probably not the

8    most extensive coverage, there are two things that I saw about

9    benefits; one, has anyone been appointed to represent us?  I

10   don't know.  The only thing I got was that notice in the mail

11   to which I filed an objection.  It talks in terms of what's

12   fair and equitable for all parties; the debtor, the creditor,

13   retirees, whatever they may be.  The -- I understand that what

14   you did today certainly didn't impact us directly.  But I

15   think --

16           THE COURT:  I haven't done anything yet.

17           MR. DELANEY:  oh, I'm sorry, Judge.  But --

18           THE COURT:  I'm just --

19           MR. DELANEY:  -- it sounded like --

20           THE COURT:  I'm just listening.

21           MR. DELANEY:  Okay.  But it seems to me, looking at

22   what has gone on over this period of time -- it's been three

23   and a half years.  I honestly do not know what benefits I have

24   under any statute, bankruptcy or risk or anything like that.

25   We've got a million lawyers here and not one of them can tell

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 44

1    me just what my benefits are?

2            I don't want to rabble rouse, but I'd like to know

3    where we stand and I'd like to know why can't we have someone

4    appointed to represent us?  We're spending a lot of money in

5    this case for lawyers sitting around and doing things that may

6    be beneficial or not beneficial.  We have a statute that seems

7    to convey some sort of interest to the retirees in this case,

8    and if it's recognized, why can't we have someone speak on our

9    behalf who is knowledgeable?  I certainly am not knowledgeable

10   in this area.

11           And the other things -- I'm requesting is one, I'd

12   like to have someone appointed to make sure that we are fully

13   versed in what our rights are.  Second of all, I think the

14   twenty-five million payments which may not be on the floor

15   today but was certainly raised by those -- the motion should be

16   denied.  I don't know whether I'm going to around to get

17   notice.  As time goes on, the universe of these retirees gets

18   smaller and smaller.  As I say, you had to be you had to be

19   retired at fifty-five and be employed at Lehman before 1990.

20   So it's a smaller and smaller group and they're not around --

21   it would seem to that to protect these people to the extent

22   they are entitled to protection under the statute, that someone

23   should be appointed to oversee what's going on.  And I

24   definitely think it's not fair in assessing the value to all

25   parties that LBHI reap the gain of another twenty-five million

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 45

1    while the retirees are losing health benefits.

2            THE COURT:  Okay --

3            MR. DELANEY:  Okay?

4            THE COURT:  Thanks for your --

5            MR. DELANEY:  Thank you very much.

6            THE COURT:  -- presentation, Mr. Delaney.

7        Is there anyone else who wishes to be heard?

8        You may come forward.

9            MS. RASMUSSEN:  Thank you, Your Honor.  My name is

10   Marianne Rasmussen.  I'm a beneficiary of the trust but also I

11   had been chief human resources officer at Lehman from 1994 to

12   2001 and I had twenty-nine years of experience with the firm

13   and then prior to that, Shearson Lehman and American Express,

14   so it was all bridged.

15       A few things that were said today -- just doing math,

16   when we talk about if the VEBA comes down to only twelve

17   million, my calculation is that that would probably be only,

18   like, maximum five months left.  The reason I say that is

19   because if we do the math, we've gone through almost fifty

20   million dollars of the fund so far.  So if we take away that --

21   I'm sorry; maybe it's -- 150 -- but the 12 million dollars left

22   would probably be substantially taken by year end because many,

23   many people hold all their bills and they send them and submit

24   them all at once.  So that's one part of it, so it's usually a

25   significant portion that eats up all that money at that point.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 46

1    And even if we have twelve million, it's probably four to five

2    months left.

3         Also, there are a couple of things that were raised in

4    counsels' response that I'd like to address.  They talked

5    about -- only about a dozen people responding.  I talked to a

6    number of people that I know.  Three of the six people said

7    they didn't even receive that one letter and the other three

8    people that I spoke to -- well, I submitted an objection letter

9    and so did Antoinette LaBelle.  Other people just feel like

10   they don't have the expertise and the ability to do it, so we

11   do it as laypeople.  But, also, Wendy Uvino's letter that was

12   sent to the Court, even though it said an objection letter, I

13   think it was more like an amicus friend of the Court letter

14   that she was trying to do because she certainly had lots of

15   experience.  Some of the things that counsel said that she had

16   to do -- well, she was employed by the firm so of course she

17   had to go through this extensive research.

18        They also said there was only some response to the

19   October 16th, 2009 letter that was Exhibit B.  I happen to know

20   that I personally tried to call and I was asked to call back

21   several times because they had so many phone calls about that.

22        Then, it was also said that people didn't really call

23   too much after -- between that two-year period of time.  Well,

24   I guess the question is why would they if they received a

25   January 11th, 2010 letter which said, in bold, "No increase in

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 47

1   your cost, new plan design applies, assuming arrangements for

2   the health care trust to pay premiums are finalized.  Your plan

3   costs for 2010 will not increase over 2009 cost and therefore

4   you will not be responsible for the full cost of coverage."  So

5   it's literally telling us it's going back to the way it was

6   three months prior to when we received that October 2009

7   letter.

8         So people -- of course they didn't respond because

9   they thought everything had been taken care of.  Again, most of

10  the people that we're talking about are not sophisticated

11  people.  Forgetting about the percentage of people that are

12  investment bankers and the traders.  Seventy percent of the

13  people were paid an average amount for their job.  They were

14  operations people, they were technology people, they were

15  secretaries, et cetera.  So when they receive a letter like

16  this, they are confused and they probably don't know what to

17  do.

18        Many of the trust beneficiaries are the old Shearson

19  people.  When I say old, I mean they're equivalent to almost

20  our parents' age.  I believe that many of them did have defined

21  vested rights because many of them had the old Shearson wording

22  and they have nothing else.  And those did not -- those summary

23  plan descriptions did not say anything about the company had

24  the right to mend (sic), change or terminate.  That was prior

25  to 1994, prior to the IPO and many of these people have been

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 48

1  retired for many, many years.  These -- some of these people

2  that are being affected are eighty-five, ninety year old

3  people.  And, as I said before, these people also -- not only

4  are they aged people, but they also probably also lack the

5  resources -- both the ability and the finance to really address

6  some of these issues.

7       And with that, I thank the Court very much for your

8  time.

9       THE COURT:  Thank you, Ms. Rasmussen.

10      Is there anyone else in court who wishes to be heard

11  on this issue?

12      Mr. Gerson?

13      MR. GERSON:  Yes.  I -- the statements of the retirees

14  just reinforces our view in our papers that Section 1114

15  doesn't apply and even in the Delphi case, where Judge Drain

16  decided it wasn't applicable where there was an absolutely

17  right to modify, he still appointed a committee to represent

18  the interests of the retirees with respect to the open issues.

19  I think that leave exists in this case.

20      THE COURT:  Well, I hear what you said and before

21  commenting further, I'd like to ask if there are any other

22  affected retirees or objectors who wish to be heard who may be

23  on the telephone, rather than present in court?

24      MR. GERSON:  Of course, Your Honor.  Thank you.

25      THE COURT:  Okay.  I hear --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 49

1          MS. ROTH:  If it please Your Honor --

2          THE COURT:  Please identify yourself.

3          MS. ROTH:  Yes, good morning, Your Honor.  My name is

4  Barbara Roth (ph.), I.D. 45606260 --

5          THE COURT:  You're going to have to speak up because

6  you're coming through in a somewhat soft way.

7          MS. ROTH:  I'm sorry, Your Honor.  Good morning, Your

8  Honor, Judge James Peck.  My name is Barbara Roth, ID number

9  4600260.  I'm calling from Clearwater, Florida and wanted to

10 thank you for the opportunity to present my case to you today

11 regarding the notice of motion and settlement agreement

12 regarding Lehman health care trust.

13          I submitted (sic) documentation from you with regard

14 to the motion which was received via mail on October 25th at 6

15 p.m. in route to the emergency room and I was admitted to the

16 hospital from 10/25 and released this past weekend which did

17 not give me the opportunity to present myself in New York.  I

18 believe that this motion was not given enough allocation (sic)

19 for me get a legal representation.  While I was in the hospital

20 I had the benefit of contacting your office, Mary Lopez, the

21 case administrator, and Epiq and also the debitors (sic) for

22 Lehman Brothers Holding, Inc. with regard to how I need to file

23 the motion.

24          According to Ms. Lopez, the lawyers filed -- excuse

25 me, Your Honor, Weil, Gotshal & Manges, a former firm that I

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 50

1  worked with, with Lehman, left out documentation with regard to

2  how to file, where to file and the case number was missing

3  because there were sub cases with each motion.  Furthermore,

4  per this letter, I contacted Lehman's hotline and left a voice

5  mail message to find out how I can utilize forwarding this

6  motion to you and I did not receive a response that was

7  favorable until I was specifically told we are -- represent

8  you, we're not at liberty to disseminate any information.  And

9  I explained to her my scenario of being in the hospital was --

10 that I told to you --

11        THE COURT:  Excuse me for breaking in.  But I wonder

12 if you could, rather than going through the background, tell me

13 what your objection is.  Just tell me what it is in plain

14 language.

15        MS. ROTH:  Well, my objection to you is I did not

16 leave the do -- receive the documation (sic) in time to hire a

17 lawyer.  I also thought that I was best in the company.  I

18 worked with Lehman Brothers from 1993 to 1995.  I'm on

19 disability and I've never seen any information with regard to

20 the plan being terminated.  I had various conversations with

21 Carol Rayo (ph.) when they notified me that it was going to be

22 seized and then I received a phone call which I had on tape

23 stating that there's no need to worry, everything will be

24 reinstated, there'll be no charges for insurance and you'll be

25 covered.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 51

1          THE COURT:  Okay.

2          MS. ROTH:  And so there was a lot of confusion and --

3          THE COURT:  I think I understand what you're saying as

4    follows.

5          MS. ROTH:  I have been with the company --

6          THE COURT:  If I could just -- if I could just break

7    in for a moment because --

8          MS. ROTH:  Yes, sir.

9          THE COURT:  -- I'm sympathetic to your situation but I

10   have a docket that I need to move through.  I need to find out

11   if there are other objectors and we need to move forward with

12   this morning's calendar.

13         It seems to me from what I've heard that you complain

14   that you did not have adequate notice of today's hearing, that

15   you want an opportunity to be able to express your opposition

16   to the relief being requested in a more formal way in which you

17   believe that it is unfair for you to be deprived of ongoing

18   benefits under the plan that is before the Court.

19         Did I fully summarize your position?

20         MS. ROTH:  Yes, you did.

21         THE COURT:  Okay.

22         MS. ROTH:  And I was under the assumption since I

23   started at the very beginning with Lehman Brothers -- Inc. and

24   went through every merger and acquisition, that I still have

25   documents here saying I'm covered until I'm sixty --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 52

1      THE COURT:  I think I understand the nature of your

2   concern and I'm going to ask if there's anyone else who's on

3   the phone who wishes to be heard, to express something

4   different.

5      MS. ROTH:  Thank you, Your Honor.

6      THE COURT:  Thank you.

7      Is there anyone else who wishes to be heard on this

8   point?

9      MS. ROTH:  If I may add just one other issue?  I think

10  it would be fair and justice (sic) to have some type of Lehman

11  representative set up to answer questions and I guess further

12  explain the process and policies because there's so much

13  documentation that's conflicting.  And whomever I have called

14  has -- have no assistance whatsoever.

15     THE COURT:  Okay.  I understand -- I understand the

16  nature of your complaint.  Thank you very much.

17     I'm going to give the debtor through counsel an

18  opportunity to comment with reference to the individual

19  objections that have been lodged, but only if counsel feels

20  there's a need to comment.

21     MR. KRASNOW:  No, Your Honor.  We can't help but feel

22  sympathetic for some of the concerns that have been expressed,

23  but unfortunately, Lehman is where it is and we are not seeking

24  relief today that really goes to the issues that these people

25  have addressed and raised.  but to make one thing clear in

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 53

1    terms of one comment that was made, Your Honor, the -- there's

2    nothing that we are doing nor that we currently contemplate

3    doing -- we -- and it's not our plan, but that we contemplate

4    doing with respect to the Aetna plan which is really the basis

5    for which or through which these medical payments are being

6    satisfied.

7              That's it, Your Honor.  We rest on our papers.

8              THE COURT:  Okay.

9              Counsel for the Department of Labor made a comment

10   that no one has responded to yet that perhaps this is a

11   situation in which a committee should be formed to represent

12   the interests of beneficiaries of the group benefit plan.  At

13   this juncture in this extraordinarily protracted and complex

14   bankruptcy case which is heading next month toward a

15   confirmation hearing, it is too late -- especially by oral

16   request to be forming any kind of formal committee.  But, I am

17   concerned, particularly in reference to the written statements

18   that have been filed with the Court and the statements that

19   have been made by Mr. Delaney and Mr. -- Ms. Rasmussen in open

20   court today, that this is a confusing situation for the

21   individuals who are affected.  Health care in the United States

22   is a subject that the Supreme Court will be addressing next

23   year.  Courts of appeals throughout the United States have been

24   addressing the Health care law; it's a very controversial

25   subject and a subject that's politically grounded.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 54

1          Here, we are talking about the private rights of

2    individuals who don't fully understand, even the sophisticated

3    ones, precisely what their rights are.  Notwithstanding the

4    fact that it has been represented forcefully and credibly in

5    court that appropriate correspondence went out to notify

6    parties who are beneficiaries of the VEBA as to the termination

7    of benefits and the continuation of coverage that was

8    substantially similar under what has been described as the

9    Aetna plan.

10         As I said at the outset and as Mr. Krasnow confirmed,

11   the relief that is being sought today is fairly surgical and

12   benign in relative terms.  All that is happening, as I

13   understand it, is that from a structural perspective, control

14   of the entity that in turns controls the VEBA is being

15   transferred from the trustee of LBI to LBHI and certain limited

16   releases -- limited in a manner acceptable to the Department of

17   Labor, are being exchanged.  nothing in today's motion directly

18   or indirectly affects the rights of any beneficiaries of the

19   VEBA, however, it is clear from a fair reading of the motion

20   and from the statements made by debtors' counsel that at some

21   point in the future, it is foreseeable that LBHI will be taking

22   steps, if permitted, under applicable law -- which is not

23   bankruptcy law, to reimburse itself up to twenty-five million

24   dollars from funds that are currently held by the VEBA in

25   respect of certain health care payments made directly by LBHI

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 55

1   to cover individuals who are otherwise subject to the

2   protection of the group benefit plan.

3        It is really that twenty-five million dollar

4   reimbursement that has been proposed but that is not part of

5   the motion itself that I believe has generated most of the

6   objections that we have heard today.  Additionally, I believe

7   that the objections are motivated by a profound sense of fear

8   and insecurity as to what will happen to particularly

9   vulnerable individuals who are dependent upon the health care

10  benefits that are funded by the VEBA.

11       I am extremely sympathetic to the objections that have

12  been raised and I recognize that counsel for the debtor has

13  also expressed sympathy.  In effect, however, those are hollow

14  words because expressing sympathy does not provide any

15  significant relief nor does it provide the information that the

16  individuals appear to require.

17       I will grant the relief requested but I'm going to

18  condition that relief upon something that may or may not be

19  within my powers.  I do not know whether or not I have any

20  ability to direct that the trustee of the VEBA or those working

21  at LBHI who are in control of the VEBA through Aceso, but I

22  would like the individuals who are in a position to make a

23  difference, to provide meaningful information to all of the

24  beneficiaries, both current employees, retirees and those on

25  disability, as to precisely what is going on, when action is

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 56

1  going to be taken, it may affect their rights, and provide them

2  with what amounts to a funded lawyer; a lawyer that can

3  represent the interests of the classes of affected

4  beneficiaries so that those separate classes can be advised in

5  a thoughtful and understandable way as to what their rights

6  are. And it seems to me -- and I may not have every class

7  clearly in mind, but the three classes that may need separate

8  representation; by (sic) those who are current employees, those

9  who are retirees and those who are on disability. It may be

10  that those who are on disability and those who are retirees

11  fall into the same category. But I am not satisfied simply at

12  proving what amounts to a benign transaction in a setting that

13  includes so much obvious pain and concern on the part of those

14  who are looking to the VEBA as a source of Health care

15  coverage.

16         Now, having said what I've said, I do not mean to

17  overstep my prerogatives and jurisdiction. For that reason,

18  I'm conditioning this on not an order from the Court, but a

19  strong suggestion with a request for voluntary compliance. I

20  won't enter the order unless and until I hear a report as to

21  whether or not what I have suggested can be arranged. If it

22  can't be, for good reason, I'll reconsider the conditions I've

23  imposed.

24         If there's anyone who wishes to say anything in

25  response to what I've said, this is the time to do it.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 57

1    Otherwise, we're going to move on to the next agenda item.

2           MR. KRASNOW:  Thank you, Your Honor.  Your Honor, I

3    believe the -- we've concluded the Chapter 11 debtors' portion

4    of the agenda, so I will turn it over to the representatives

5    for the SIPA trustee.

6           MR. SALZMAN:  Good morning, Your Honor.  My name is

7    Michael Salzman.  I'm from Hughes, Hubbard & Reed and I am here

8    for the SIPA trustee.  And my part of the activity today

9    concerns the motion that the Providence funds made for a

10   schedule to proceed with litigation and I believe, therefore,

11   that Mr. Molton, on behalf of Providence, would be the

12   proponent of the motion and, therefore, it occurs to me that

13   Mr. Molton would be next up.

14          THE COURT:  He is, in fact, on his way.

15          MR. MOLTON:  Thank you, Mr. Salzman.  Good morning,

16   Your Honor.  David Molton of Brown Rudnick here with Howard

17   Steel for the four Providence funds which I'll call the funds.

18   Your Honor, I'm going to be brief.  I think our papers

19   adequately set forth our situation.  I'm going to -- I know, as

20   Your Honor knows, since the commencement of this case three

21   years ago, the funds have been persistent in asking for prompt

22   progress and determination of their disputed customer status.

23          We're not being told, reading my friend Mr. Salzman's

24   papers, that we have to, according to them, wait until sometime

25   in 2013 before our issue is even teed up, until there's a

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 58

1    determination of a disputed house claim by LBIE which may

2    implicate, arguably, some of our securities and then, possibly

3    thereafter, later in 2013, second quarter, where the omnibus

4    claim, to the extent it does not get resolved, is teed up.  I

5    think, Your Honor -- and I'll get to it in a minute -- our

6    situation is wholly independent of those issues.

7         But in any event, Your Honor, that's too long and

8    those proceedings, as I'm going to contend and submit, are

9    irrelevant.  We're asking, Judge, that this argu -- that our

10   motion or our dispute as to customer status be teed up

11   relatively quickly.  I know certain people objected to our

12   proposal for an early 2012 tee up. Needless to say, we're

13   willing to work with our friends on the other side in terms of

14   a schedule but it would be a prompt schedule.

15        I'm not going to get into the merits of the argument,

16   Your Honor.  They've got their position, we've got ours.  Your

17   Honor's seen it, Your Honor has seen it last year, Your Honor

18   saw it a couple of years ago when I stood up here.  Suffice it

19   to say there's a dispute.  That dispute is one that we believe

20   can be -- is mostly a legal dispute and one that can be

21   resolved relatively quickly on an accelerated hearing schedule.

22        We don't have any other remedy, Judge, but to come

23   here three years now.  And I know Your Honor has seen me

24   intermittently in that time asking, on occasion, for the same

25   thing.  But we have no other remedy other than to come here and

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 59

1    ask for Your Honor's intervention in this in order to compel

2    the trustee to tee up this motion concerning folks who has a

3    contractual relationship with them and argument is we're

4    customers of LBI.

5              THE COURT:  Mr. Molton, let me just break in --

6              MR. MOLTON:  Yes.

7              THE COURT:  -- and ask you a fundamental question.

8    This is really a request to jump ahead of some other matters

9    that are on the LBI docket in a manner that, at least the

10   trustee argues, in fundamentally inefficient because many of

11   the  same issues that you're concerned with are tied up in the

12   LBI house claim.  And my question to you is why is it efficient

13   to do what you're proposing?  I understand your clients are

14   impatient and you have a job to do.  Why does that mean that I

15   should do anything special for you?

16             MR. MOLTON:  Well, first of all, Judge, we're not

17   asking -- we don't think it's special for us.  We think that,

18   pursuant to the way Your Honor's case managed this case, an

19   omnibus hearing can be teed up that would affect all alleged

20   300s similarly situated, folks who are like us.  Indeed, a year

21   and a half ago, we submitted, on their request, a stipu -- a

22   proposed stipulation of uncontested facts that would guide that

23   hearing to resolve these legal situations.

24             But let me get to the crux and the gist of your

25   matter, Judge.  We don't believe that these issues are tied up

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 60

1   in the other claims.  We believe SIPA, first of all, requires

2   them to timely adjudicate our customer status.  The

3   finalization of that status, Your Honor is -- affects issues

4   that are wholly independent from the adjudication of the house

5   claim or the omnibus claim.  First of all, it will affect our

6   right to get advances from SIPA which may be one of the reasons

7   why they want to deny us customer status.  Because if they just

8   hold LBIE to be the customer and not these 300 other folks who

9   we argue also enjoy customer status --

10          THE COURT:  You said you weren't getting to the

11   merits, Mr. Molton.

12          MR. MOLTON:  Okay.  Put it aside.  I'll get it aside.

13   But it affects our distribution right.  To the extent there are

14   interim debtors, which we hope there are, it would affect our

15   clients right to those interim distributions to have

16   finalization as to the adjudication of our status.  It affects

17   how we deal, Your Honor, with the ongoing LBIE proceedings and

18   the allegations or the position that were found in that matter.

19   To have finalization and adjudication of our customer status

20   will allow our clients to finally understand their rights in

21   this proceeding and make decisions as to how they will go

22   forward to resolve situations globally across the board.

23          We think we're entitled to it under the statute, Your

24   Honor.  We don't believe, as our friends from the committee put

25   in their paper, that there's any connection between the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 61

1   resolution of the LBIE claims, whether it be the house claim or

2   the omnibus claim, in connection with the resolution of what we

3   believe, again, Your Honor, will be a very legally oriented

4   decision by this Court on pretty well undisputed facts.  We're

5   not asking for preferential treatment, we're not asking to be

6   put ahead of anyone, Your Honor.  We're asking that our claim

7   be adjudicated.  We're asking Your Honor to include all of

8   those similarly situated.

9          First of all -- and in light of what I said, Your

10  Honor, for the trustee who has fiduciary duties to timely and

11  promptly pursue and adjudicate and resolve customer claim

12  status -- customer claims -- disputed customer claims, to say

13  the resolution of our claim would be meaningless, is just, from

14  our perspective, a frivolous argument.  And we're very

15  concerned, Judge, that we're being strung along, that to some

16  extent we find ourselves between a rock and a hard place, that

17  we're being a pinball between the various self-motivated claims

18  of these two brokers, one in the United States and one in

19  England, who are using us and delaying the adjudication of our

20  claim to our detriment for whatever their negotiating, as

21  they've been negotiating for now over three years to resolve

22  claims between them.

23         Again, I think that's it, Judge, unless Your Honor has

24  any further questions, I'll rely on our papers and really ask

25  that we have our day in court.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 62

1        THE COURT:  Okay.

2        MR. MOLTON:  Thank you.

3        THE COURT:  Thank you.

4        MR. SALZMAN:  Michael Salzman again.  The fundamental

5   premise that Mr. Molton puts forth, that his claim is wholly

6   independent of the LBIE omnibus claim is false on its face.

7   It's the same exact property.  The omnibus claim was made by

8   LBIE precisely on behalf of Mr. Molton's clients and 299 other

9   funds.  And we've spent the last three years with LBIE

10  reconciling positions to come to where we are.  It's not the end

11  of the road and we're very sorry that it's not the end of the

12  road and we recognize the responsibility to move to the end of

13  the road.

14        But we've gotten to the place we are by dint of

15  comparing the LBIE books and records with the LBI books and

16  records.  There were almost 200,000 different claims that had

17  to be dealt with in Lehman week.  We've dealt with them.  We're

18  now in the process of taking, really, I would say, two

19  important steps that are going on simultaneously.  One is to

20  litigate the remaining legal issues with LBIE if they cannot be

21  agreed upon and, at the same time, as our papers indicate, we

22  have started, I want to say, trial logs, three way discussions

23  with people such as Mr. Molton's clients, other of those funds

24  that are direct claimants into LBIE and on behalf of whom LBIE

25  has made the omnibus claim to us, to give those people an

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 63

1   understanding of what's involved and to make sure that they are

2   satisfied, to the extent they can be, with -- that the books

3   and records accurately show what occurred and if they have any

4   differences to let us know and work that out.

5          But it is fundamentally wrong to say that this case

6   can progress in any meaningful way by separately working in

7   this court and having discovery and litigation with these 300

8   different claimants.  And it would -- as LBIE agrees with us on

9   this point, if you saw their paper filed yesterday.  The issues

10  are -- they say intertwined; I would say they're largely the

11  same, not just intertwined, as to was particular security here

12  or there?  And I submit, Your Honor, that it would be a

13  profound mistake to get us off track now with these 300 other

14  people.

15         THE COURT:  Well, okay, let me just break in and ask

16  you a question that's relatively straightforward.  It's simply

17  about timing.  I view the motion being pressed by Mr. Molton as

18  primarily growing out of a strong sense of frustration that

19  this process has been dragging on for too long and that unless

20  he, for the benefit of his clients and others who may be

21  similarly situated, jumps in and says to me please do something

22  about this, this is going to go on indefinitely and he has no

23  control over his fate, his client's fate.  What do you say to

24  that?  And a subpart; why can't this be carved out of the LBIE

25  claim?  Why can't there be some separate determination that all

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 64

1    of these 300 or so hedge funds that have the same kind of

2    contractual relationship, both with LBIE and LBI, can have at

3    least their customer status issues resolved?  What's wrong with

4    that?

5             MR. SALZMAN:  The omnibus claim -- the allowance of

6    the omnibus claim gives these people what they're entitled to

7    insofar as they could have customer status.  We think it's

8    clear by definition, according to the books and records,

9    they're 056 accounts.  That means they were customers of LBIE,

10   not of LBI.

11            THE COURT:  Is that really determinative?  I mean, I

12   know I saw that in your papers and I know that, from an

13   internal perspective, that kind of coding may be significant

14   but does it really determine that ultimate legal question?

15            MR. SALZMAN:  I think it's not, by itself -- it's not

16   a hundred percent but it's close to a hundred percent.  And

17   beyond that, where we've been going these last three years in

18   working with LBIE to reconcile the positions would be a

19   futility, frankly, if these people were now going to start over

20   and press direct claims.  We think that the way -- the fastest

21   way home, frankly, is to resolve the LBIE, LBI issue.  At that

22   point, the 8.3 billion dollars that's up on the table will be

23   allocable.  If it's more or less, based on whatever Your Honor

24   decides, so be it.

25            And at that point, we believe -- and we believe that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 65

1   almost all of the other 300 people -- and I think it's notable

2   that, to this point at least, only Providence is on this motion

3   today -- that these other people recognize that if we work with

4   them, LBIE takes up the cudgels for them, to the extent there's

5   a disagreement, that that will get us home and that the 300

6   other people who have all -- most of whom have made direct

7   claims in this court, did so largely for protective reasons; we

8   won't have to litigate any of those things.  And we're

9   anticipating, as Mr. Kobak put in the interim report recently,

10  that instead of having these 300 people in court here

11  litigating, that once the omnibus claim in done, that we're

12  done.

13          THE COURT:  Okay.  Well, you've just said something

14  that makes it sound pretty simple.  Once it's done, we're done.

15  Well, what's the process for getting that done?  That's an

16  enormously protracted, fact-specific process that, I think,

17  runs out over something like eighteen months.

18          MR. SALZMAN:  But the reality, Your Honor, is that

19  getting a short answer test question answer to the question do

20  the --

21          THE COURT:  Does this mean that this group has to wait

22  eighteen months before they can do anything?  Because if that's

23  what you're saying, I suspect they're going to be saying in

24  response that's awfully long to have to wait, isn't it?

25          MR. SALZMAN:  It's --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 66

1      THE COURT:  And we have issues that we assert are

2  separate and apart from this distracting other issue.  We just

3  want to know whether we're customers and why can't we do that

4  now?  What's the answer to that?

5      MR. SALZMAN:  Well, the most direct answer, without

6  being flip in any way and being respectful, is that --

7      THE COURT:  Respectful of whom?

8      MR. SALZMAN:  Of both Your Honor and of these people

9  and their interests.  Is that knowing the answer to that

10  question does not advance the ball.  The omnibus claim --

11      THE COURT:  But it may advance the ball for them.  I

12  think what they're saying is we understand that the trustee is

13  focused on the LBIE claim, big numbers there, and believes that

14  if they can resolve that, since we're included in that

15  universe, that this will all go away more neatly.  I think they

16  understand the argument you've made but they're saying

17  something else.  They're saying we're customers and have rights

18  in the LBI case.  And we want to have those rights determined

19  and vindicated and we don't want to wait for what we say is a

20  collateral issue.  I think that's their argument.  Don't you

21  think that's their argument?

22      MR. SALZMAN:  I do think that's their argument.

23      THE COURT:  So why -- what's wrong with that argument?

24      MR. SALZMAN:  What's wrong is that it does not advance

25  the ball in terms of their getting anything.  We still have to

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 67

1    determine the omnibus claim.  It's the same exact CUSIPs, it's

2    the same exact positions, it's the same exact cash and it's

3    illogical to do anything with them and give them anything,

4    promise them anything, represent anything to them until that

5    issue is resolved.

6           When Mr. Molton refers to -- criticizes us for saying

7    it would be meaningless, I think what we're trying to convey is

8    that there is a process, it is systematic, it's going to -- it

9    deals with their property and we're going to get it to them.

10   But having separate discovery as to -- their contention, for

11   example -- and Province is one of some people but not a

12   majority of people who are saying well, we really did business

13   in New York.  We don't recognize the fact that we -- this other

14   contract with LBIE has anything to do with it.

15          To get a trial on that subject is collateral.  To have

16   discovery about that is collateral.  It's not something that

17   can be addresses in a paper without discovery.  They themselves

18   acknowledge that they're asking for discovery and so on.

19          THE COURT:  I think they say limited discovery.

20          MR. SALZMAN:  Yes.  But the books and rec -- I mean,

21   where we are right now is the books and records say 056,

22   London, they got account statements from London and trying the

23   issue of to what extent beyond the, let's say, ninety-nine

24   percent that the books and records and those account statements

25   are determinative, just takes us spinning way out from the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 68

1    process that'll actually get us to getting them their property.

2          THE COURT:  I understand that to be your position.  I

3    want to hear from Mr. Molton on something.

4          MR. SALZMAN:  Thank you.

5          MR. MOLTON:  Your Honor.

6          THE COURT:  Having heard what I just heard --

7          MR. MOLTON:  Yes.

8          THE COURT:  -- how are you and your clients benefitted

9    in a meaningful way by having a separate litigation over your

10   customer status as to LBI when the very same CUSIPs, as I

11   understand it, are tied up in another proceeding altogether

12   which has a long timeline to resolve?

13         MR. MOLTON:  I'll answer that, Your Honor.  And I'm

14   going to answer it by referring to the fact that one thing my

15   friend Mr. Salzman didn't say is at the end of this long

16   process, we'll treat you as customers in this proceeding.  He

17   doesn't say that for a reason.  Because it's not their intent

18   to ever try and concede that issue.  What they intend to do --

19   and if you listen to it carefully, it's not the vindication of

20   our rights in this proceeding or it's not even a timely

21   adjudication of our status in this proceeding but it's

22   adjudicating what the LBIE omnibus claim is and go over there.

23   That's where you belong.  Not that we have rights in this

24   proceeding.

25         And what he doesn't say is it's not apples and apples.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 69

1    I'm not an English lawyer but I understand that in the LBIE

2    proceeding, because LBIE hypothecated immediately before the

3    insolvency and their filing, a good deal of all of these

4    securities, whether or not there were margin balances or not,

5    we would be treated over there as general unsecured creditors

6    which is something that I think LBIE would like.

7         Here, we have preferred customer status, if Your Honor

8    decides we're a customer.  And our whole point the last three

9    years has been to say we believe the statute contemplates this

10   too.  There could be two customers regarding the same disputed

11   property.  Indeed, Section 78fff-3(a)(5), as Your Honor

12   knows -- and I think Judge Lifland commented about that statute

13   recently regarding the feeder funds in the Madoff proceeding

14   which he said because they weren't broker-dealers or bankers,

15   that doesn't apply.  But we're accorded customer status in this

16   proceeding under that provision, entitled to advances from

17   SIPA, notwithstanding that we may have been also a customer at

18   LBIE.

19        So it's significant to me, when you actually peel back

20   the layers of what they're saying, to look at what they're not

21   saying.  They're never going to concede -- they don't say hey,

22   at the end of their dance with LBIE, you know, we're going to

23   give you customer status but everything's going to be resolved.

24   They don't say that.  Because that's not what their position is

25   going to be.  We want -- we're entitled per the statute to

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 70

1    have, as Your Honor said, our rights vindicated here.  We're

2    asking for a determination of status.  I think that that's a

3    separate, distinct issue, recognized by the statute -- and

4    indeed, if Your Honor -- I don't want to get into merits but I

5    think the Second Circuit's decision in Madoff and what it

6    defines as customer, touches a number of undisputed facts here

7    that pulls us into that status.  But I'm not going to go there;

8    just responding to my friend's point.

9          But that's the reason why, Judge.  What they're doing

10   vis-a-vis LBIE and its claims and the house claim concerns

11   arguably their property and also the house claims to the extent

12   the house claim includes hypothecated securities that are ours

13   and the trustee wins on the denial of that claim in this

14   proceeding?  Which means that they're regulated to general

15   unsecured creditors vis-a-vis that claim in this proceeding.

16   They're probably going to get no distribution.  We don't have a

17   remedy.  If that's where our property is.  And we don't know

18   that.  We say well, they speculate that it is, they speculate

19   that it isn't, nobody's told us yes or no.

20          And I just want to put up the fact that every time I

21   appear here -- well, we're talking to people.  We're talking to

22   people like you.  Yes.  Sometimes they call us.  You know, Mr.

23   Warnot, who I know, has had my papers for a number of weeks.

24   I've seen him on other matters.  I got his paper yesterday

25   where he says I'd be glad to call Mr. Molton and talk to him.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 71

1    The bottom line, Judge, is we're entitled to have, as Your

2    Honor said, our rights vindicated in this proceeding.  We don't

3    believe it's going to be -- in the scheme of the resources that

4    have been allocated to attorneys in this case, it's de minimis.

5    And I think Your Honor can get on with it, can make that

6    determination and I think that the determination of those 300

7    customers who have this situation, which can be done on an

8    omnibus fashion, will facilitate these guys talking to each

9    other and coming to some resolutions.

10          In any event, that's all I have to say unless Your

11   Honor has any other questions.

12          THE COURT:  Okay.  Is there more from anybody?

13          MR. WARNOT:  Your Honor, may I be heard?  I'm from

14   LBIE.

15          THE COURT:  Of course.

16          MR. WARNOT:  James Warnot from Linklaters for LBIE.  I

17   do agree with one thing that Mr. Molton said, that this is

18   taking way too long.  But most of the other things he said I

19   disagree with.  In fact, the funds are LBIE customers.  They've

20   put claims into the LBIE proceeding, they've entered into a

21   claims resolution agreement which is a very, very complicated

22   document as to how their claims will be dealt with, including

23   the impact of any recovery in this proceeding, we have asserted

24   claims on their behalf in the omnibus proceeding and so, in

25   fact, we think that's where the merits would ultimately come

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 71

1   The bottom line, Judge, is we're entitled to have, as Your

2   Honor said, our rights vindicated in this proceeding.  We don't

3   believe it's going to be -- in the scheme of the resources that

4   have been allocated to attorneys in this case, it's de minimis.

5   And I think Your Honor can get on with it, can make that

6   determination and I think that the determination of those 300

7   customers who have this situation, which can be done on an

8   omnibus fashion, will facilitate these guys talking to each

9   other and coming to some resolutions.

10          In any event, that's all I have to say unless Your

11  Honor has any other questions.

12          THE COURT:  Okay.  Is there more from anybody?

13          MR. WARNOT:  Your Honor, may I be heard?  I'm from

14  LBIE.

15          THE COURT:  Of course.

16          MR. WARNOT:  James Warnot from Linklaters for LBIE.  I

17  do agree with one thing that Mr. Molton said, that this is

18  taking way too long.  But most of the other things he said I

19  disagree with.  In fact, the funds are LBIE customers.  They've

20  put claims into the LBIE proceeding, they've entered into a

21  claims resolution agreement which is a very, very complicated

22  document as to how their claims will be dealt with, including

23  the impact of any recovery in this proceeding, we have asserted

24  claims on their behalf in the omnibus proceeding and so, in

25  fact, we think that's where the merits would ultimately come

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 72

1    out.

2          To respond to one of the questions that you posed

3    earlier, I don't think it's quite as simple or that all 300 are

4    similarly situated, such that a preliminary determination could

5    be made of their customer status, whether they're LBI

6    customers.  Frankly, if they're LBI customers and they want to

7    drop their claim against us, then maybe that's okay.  But

8    you've got to look at the suite of contracts which are not the

9    same for all 300.  In fact, even the versions changed over

10   time.  You've got to look at some of these internal procedures

11   that Mr. Salzman alluded to, how the accounts are designated,

12   where the account statements go and you've got a whole course

13   of dealing as to how these clients dealt with Lehman over the

14   years.  And we think it's clear that that points to LBIE

15   customers for the very vast, vast majority of them.

16          So you can't say that our omnibus claim, which is

17   asserted solely on behalf of these 300 or so hedge funds and as

18   to which the recoveries will go to those customers, are not

19   related with the claims that these 300 are trying to assert.

20   And we just don't see how you can litigate those two things at

21   the same time.  We are pushing for as fast a schedule as is

22   possible with LBI.  We filed our objection on the 31st of

23   October.  We're negotiating a litigation schedule now.

24          But with re -- one thing that could advance the ball

25   with respect to many of these individual customers, including

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 73

1   Mr. Molton's customers, are to talk about it.  To understand

2   precisely what their claim is into LBIE, what their claim is

3   into LBI, what they owe LBIE under the margin lending agreement

4   that will cover many of the issues that Mr. Molton is referring

5   to and what is in the omni claim on their behalf.  So for all

6   those reasons, we believe that the relief requested by Mr.

7   Molton doesn't simplify things but, in fact, overly complicates

8   them.

9          THE COURT:  Okay.  Does the committee have anything to

10  say on this?

11         MR. O'DONNELL:  Of course, Your Honor.  Your Honor,

12  Dennis O'Donnell, Milbank Tweed Hadley & McCloy.  We did file a

13  statement in support of Mr. Molton's motion.  We did so because

14  I think approximately three years ago, on October 13th of '08,

15  we filed a pleading in opposition to the first motion that was

16  made for discovery here.  I felt strongly at the time that all

17  of things that have been said by the LBI trustee and by the

18  LBIE trustee here made sense; that there was a process that

19  should unfold here.

20         But it is three years later and I think what Your

21  Honor has said as well, we agree with entirely which is that

22  there are separate issues here.  I've heard it said several

23  different ways here but I -- from a very basic -- you know,

24  without -- with limited visibility and to all the facts and

25  circumstances here, but from a very basic perspective here.  It

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 74

1    would appear that there are, in fact, two sets of contractual

2    relationships here.  They can be dealt with separately.  They

3    should be evaluated separately.

4          The LBI trustee has issues letters of determination

5    with respect to all of the LBI claims and there are -- there's

6    a process for objecting to that -- whatever the

7    determination -- and having it decided by that court.  And I

8    think what Mr. Molton is saying is that that process, which

9    affects only this Court, should be allowed to play out in this

10   Court.

11         THE COURT:  Mr. O'Donnell, let's me just ask you

12   something very basic.  This would appear to be a matter as to

13   which the committee does not have a dog in the fight.  Why are

14   you here?

15         MR. O'DONNELL:  Your Honor, we're here as we have been

16   before on other LBI related matter because, as I think Your

17   Honor said very early in the case, that there is a semi-

18   permeable membrane between the LBIE case and the LBI --

19         THE COURT:  But how is the committee affected by this

20   question of how to deal with --

21         MR. O'DONNELL:  The committee --

22         THE COURT:  -- the interests of these hedge funds.

23         MR. O'DONNELL:  The committee is affected by who winds

24   up being a customer and not a customer in the LBI case and we

25   had, for the most part, ninety-nine percent of the time, been

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 75

1    on the same page as the LBI trustee as to how to handle the

2    treatment of customer claims.  We, a few weeks ago, filed a

3    statement in support of their approach to the TBD claims -- TBA

4    claims, rather, and have worked with -- you know, worked

5    constructively with the LBI trustee.  Because we view the LBHI

6    estate as a beneficiary of -- a residual beneficiary of that

7    estate which would benefit our creditors.  So I think we do

8    have -- we have had all along that interest is how things

9    develop at LBH -- at LBI and view this as a situation where we

10   just disagree as to how the treatment should be -- how these

11   claims should be treated.

12            THE COURT:  Okay.  Thank you.  Is there more?

13            The fallback relief requested in the Providence motion

14   is that we conduct a status conference under Section 105(d).

15   And I'm prepared to do that sometime after the confirmation

16   process has run its course in the LBHI case.  I don't know what

17   the right date is for scheduling that status conference but for

18   discussion purposes only, let's say that next omnibus hearing

19   after whenever a confirmation order is entered, assuming one is

20   entered.

21            If a confirmation order is not entered, we'll have it,

22   say, in February of 2012 with the understanding that between

23   now and then -- and the holidays are upon us; that probably

24   means in January -- the parties will endeavor, through good

25   faith meet and confer sessions, to achieve something

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 76

1    approaching light if not heat, with respect to the possible

2    acceleration of the determination of customer status, in a

3    manner that will not complicate or delay resolution of the

4    omnibus claim but by LBIE.

5           I have heard all of these arguments. I've reviewed

6    the papers that have been filed. There is a level of

7    complexity to this that I'm not sufficiently fluent at this

8    point to address with the kind of thoughtfulness that it

9    deserves. It troubles me that there's an even split here with

10   two respected lawyers saying we can do this and two respected

11   lawyers saying we can't do this. Or at least we can't do it

12   efficiently. I don't have a sufficient clarity of vision at

13   this point as to who's right.

14          And so I would like the parties to try to see if they

15   can persuade the other side, perhaps, either that there is

16   merit to waiting to merit to bifurcating. And you can provide

17   me with a status report and I can provide you with some

18   comments when next we're together on this subject. It seems to

19   me that it would be useful, to me, if the parties could submit

20   position papers, with respect to the matters that have been

21   discussed, that can be in the form of simple correspondence

22   that is docketed, sometime prior to the status conference. I'm

23   not setting a date. A day or two before. Thereby giving me

24   some advanced notice as to what the issues have turned out to

25   be.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 77

1          Mr. Krasnow, you've returned to the room. Does that

2     signify anything?

3          MR. KRASNOW: Your Honor, it simply signifies, I

4     think, that we may be at the conclusion of this morning's

5     agenda.

6          THE COURT: That's a good thing. We're adjourned

7     until 2 o'clock.

8          (Recess from 12:07 p.m. until 2:06 p.m.)

9          THE COURT: Be seated, please. Good afternoon.

10         MR. ROSEN: Thank you, Your Honor.

11         THE COURT: I think the only matter on this afternoon

12    is the motion to dismiss in Uvino v. Lehman, so let's proceed

13    with that.

14         MR. BAER: Good afternoon, Your Honor, Lawrence Baer,

15    Weil, Gotshal & Manges, on behalf of Lehman Brothers. Your

16    Honor, I will assume familiarity with background facts in this

17    case based upon the prior motion practice and the Court's May

18    decision. Just like to add a couple of highlights of our --

19    the arguments set forth in our papers.

20         The quantum meruit argument that plaintiff makes in

21    this case is, essentially, unchanged from the quantum meruit

22    argument that was made in the original complaint. In fact,

23    it's striking from a comparison of the blackline that I ran

24    between the original complaint and the amended complaint there

25    were no changed allegations with respect to quantum meruit. On

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 78

1    its face, the quantum meruit allegations apply to the

2    commitment letter.  That is a claim that this Court has

3    previously dismissed; that is a -- the work of plaintiff,

4    covered by the original commitment letter, which expired on

5    December 31, 2009.

6         Plaintiff, in response to our motion to dismiss, said,

7    well, you know, we'll stipulate that the -- this new quantum

8    meruit claim set forth in the amended complaint applies only to

9    that period covered by the renewal commitment letter, that

10   being January 1st, 2010 to June 2010.  The fact of the matter

11   is the complaint says what the complaint says, and it is

12   improper to amend one's pleadings through a brief.

13        THE COURT:  I saw that.  But it's apparent to me that,

14   perhaps, through inartful pleading, perhaps, through lack of

15   diligence, perhaps, through error, there was a failure to do

16   that which the previous decision and order required.  But

17   you're not prejudiced.  And I'm not going to make that the

18   reason for dismissal, so you --

19        MR. BAER:  Well --

20        THE COURT:  -- shouldn't spend a lot of time there.

21   I'm going to deem the complaint amended so that it complies

22   totally with the Court's earlier decision.  It can't be

23   otherwise.

24        MR. BAER:  As the Court is aware, the simple -- the

25   procedural argument is not our only argument with respect to

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 79

1    the quantum meruit count set forth in the amended complaint.

2    What is clear based upon the established case law in New York

3    and as construed by the federal courts is that in order to

4    succeed on a claim for quantum meruit, the plaintiff must have

5    a reasonable expectation of increased compensation:  not merely

6    an expectation, a hope, a subjective belief that is

7    unreasonable, but a reasonable expectation of increased

8    compensation.  Here it's undisputed, as pled in the amended

9    complaint, that, certainly, as of December 3rd at the latest,

10   2009, when Lehman Brothers presented to Ms. Uvino the proposed

11   amended -- or excuse me, the proposed renewal commitment

12   letter, that the terms of her compensation were set going

13   forward.

14         The plaintiff attempts to argue in its opposition

15   papers based upon lots of back and forth that took place in

16   2009 preceding the presentation of the renewal commitment

17   letter, the handwritten comment on the original commitment

18   letter about the review and a potential for bonus potential.

19   But all that's irrelevant because as of December 3rd, 2009 when

20   Ms. Uvino received the renewal commitment letter, there was no

21   doubt whatsoever based upon the pleadings that there was no

22   reasonable expectation of increased compensation.  And indeed,

23   she said, well, if that's the case, I'm going to leave; I'm

24   going to get another job.  So for the reasons set forth in our

25   brief and as I've just highlighted, that essential element of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 80

1    the quantum meruit is lacking --

2         THE COURT:  Let me ask you --

3         MR. BAER:  -- in the amended complaint.

4         THE COURT:  Let me ask you a question as to how as a

5    purely intellectual matter one gets to the conclusion that that

6    element is lacking on a motion to dismiss as opposed to

7    following a period of discovery, which includes the testimony

8    of the people who were involved in the actual negotiation and

9    drafting of the commitment letter; as well as the state of mind

10   testimony of the plaintiff herself.  If you're talking about

11   reasonable expectation, it's not clear to me how that is

12   inferred in the absence of any record.

13        MR. BAER:  Your Honor, first of all, the negotiation

14   with respect to the original commitment letter, I would submit,

15   respectfully, is irrelevant.  What we're talk -- that -- the

16   Court has already dismissed that claim.  What we're talking

17   about is the period subsequent to the expiration of the

18   original commitment letter, which is January 2010 to --

19        THE COURT:  Forget the period of time for a moment

20   because what we're talking about is an element of the cause of

21   action of quantum meruit.  And you said in your papers and

22   you're saying now that, in effect, there is no plausible cause

23   of action that can be asserted for quantum meruit because under

24   no set of facts could this plaintiff have a reasonable

25   expectation of additional compensation, correct?

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 81

1          MR. BAER:  Yes, Your Honor.

2          THE COURT:  That's my question to you purely as a

3  intellectual proposition.  Forget the case law; forget the

4  timeline.

5          MR. BAER:  Okay.

6          THE COURT:  We're talking now about the element of a

7  cause of action.  How is it possible to conclude on a motion to

8  dismiss where I must accept as true everything that has been

9  pleaded in the complaint that this plaintiff had no reasonable

10  expectation?  How do I do that as a matter of law?

11          MR. BAER:  Your Honor, you may rely on the plaintiff's

12  own words.  In the amended complaint at paragraph 50, she says

13  that on or about November 30th, 2009 she reviewed -- I'm

14  extrapolating because it's not the actual words -- Hershan also

15  reviewed -- Mr. Hershan was her boss -- also reviewed with

16  plaintiff the renewal terms of a second commitment period

17  beyond December 31, 2009.  On or about December 3rd, 2009,

18  Hershan hand delivered to plaintiff a renewal commitment

19  letter, a copy of which is annexed to the complaint, which sets

20  forth the terms of compensation going forward.

21          Plaintiff did not sign the commitment letter because

22  she continued to disagree with the compensation.  Now, she also

23  states in her papers that she said, well, if you're not going

24  to increase my compensation, I'm going to leave.  She knew as

25  of December 31 that it was a done deal.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 82

1      The -- she had pled her case throughout 2009 as set

2  forth in the pleadings.  I'm not asking Your Honor to guess

3  what was going on here.  There is -- can be no other reasonable

4  interpretation of the facts as pled by this plaintiff.

5      She went back and forth with her boss.  She pled with

6  him that she was underpaid, that the terms of the job had

7  changed, whatever her reasons were for trying to get additional

8  compensation.  Her boss ultimately sat down with her, gave her

9  her review, said, "That's all very well and good, but I'm not

10  going to give you more money.  Here are the terms going

11  forward."

12      She continued to work under those terms.  I mean

13  quantum meruit is not a doctrine where every employee who

14  believes he or she should be paid more gets to, you know, after

15  termination try to rejigger the numbers or renegotiate the

16  deal; otherwise, every employee at will would be doing that.

17  It's only where the plaintiff for this -- and in particular for

18  this period of time had any sort of reasonable belief, was lead

19  to believe, that she would get more.  She had pled her case.

20  She was told no more.  She was not only told no more, she was

21  given a piece of paper that said no more, these are the terms.

22      THE COURT:  But she didn't sign the continuation

23  commitment letter.

24      MR. BAER:  She didn't sign.  That's correct.  If --

25      THE COURT:  So couldn't she have -- and this is really

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 83

1    the proposition that I'm discussing with you now.

2          MR. BAER:  Yes, Your Honor.

3          THE COURT:  Couldn't she have the reason of:  "Well, I

4    didn't sign this.  I'm doing work that's well beyond what was

5    originally contemplated.  This group I'm now working for has

6    grown in size because of the needs of the reorganization."

7          "My responsibilities are significantly greater than

8    they used to be.  I'm not signing this.  I'm going to look for

9    another job, and I'm going to pursue claims for quantum

10   meruit."  Couldn't she have that subjective intent?

11         MR. BAER:  Her subjective intent is only a relevant

12   consideration for the Court to the extent it was a reasonable

13   subjective intent.

14         THE COURT:  Well, how do I -- that's really what I'm

15   dealing with here.

16         MR. BAER:  Yes.

17         THE COURT:  My question to you is the same question.

18   It's a motion to dismiss.

19         MR. BAER:  Yes.

20         THE COURT:  There's no discovery.  You don't have

21   anything that you're relying on to say, see, this is what she

22   said in her deposition.  You're looking at her complaint,

23   something that presumably Mr. Rosen prepared.  It's not as if

24   this is a state court pleading; this is a federal pleading.

25         MR. BAER:  I understand, Your Honor.  We --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 84

1    THE COURT: So, just as a purely theoretical

2    proposition, how do I get to where you want me to be by

3    determining under no set of reasonable circumstances could she

4    have believed that she had the possibility of getting

5    additional compensation for her work?

6    MR. BAER: Your Honor, not just relying on the

7    complaint, but the documents attached to the complaint.

8    All right. The renewal commitment letter, which is

9    admitted --

10    THE COURT: But she didn't sign it.

11    MR. BAER: She didn't sign it, correct. From that

12    point forward, she continued to show up to work. She -- if she

13    wanted to, and this is what quantum meruit was all -- is all

14    about, she could quit, say: "You know what, I've been asking

15    for more money all year long."

16    "I didn't get it. You now are trying to re-up me for

17    a renewal period. I've asked for more money for the renewal

18    period. I'm leaving."

19    And in fact, that's what she did do. She began a job

20    search at least as alleged. And if she began a job search,

21    that itself is evidence that she had no expectation.

22    THE COURT: No, it's not. It's evidence that she

23    wanted to get out; it's not evidence that she had no

24    expectation that while she was there she might earn more money.

25    MR. BAER: The fact of the matter is, Your Honor, as

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 85

1   pled -- I'll come back to that.  I just want to address one

2   other point that was addressed -- or that was made or implied

3   in the Court's question about the larger job.  There's no

4   allegation in the complaint that the job changed between the

5   end of December 2009 and January to June 2010.

6        The argument about the increased responsibilities, and

7   it was more than she bargained for; and it was going to be a --

8   you know, a none event liquidating a debtor with, you know, for

9   a short period of time, no employees, no HR functions, all of

10  that occurred in the period before December 31st, 2009.  That

11  was covered by the commitment letter not the renewal commitment

12  letter.  So her job didn't really change at all from December

13  31st to January 1st.

14       So her -- the expectation that she would get -- be

15  paid more based upon increased responsibilities under the

16  renewal commitment letter is also unreasonable because the job

17  responsibilities under the renewal -- under the commitment

18  letter, which -- with which she was clearly not satisfied,

19  didn't change in the renewal period.  There were the same

20  larger jobs -- larger responsibilities, more than she had

21  bargained for, I mean, assuming all of the facts as pled are

22  true.

23       THE COURT:  Okay.  Let's just assume all the facts

24  pled are true --

25       MR. BAER:  Yes.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 86

1    THE COURT:  -- and we run through the timeline that

2    you've just given me.

3        MR. BAER:  Yes.

4        THE COURT:  She has greater responsibilities than she

5    had bargained for.  She had a signed commitment letter.  The

6    commitment letter expires.

7        She is asked to sign a renewal.  She doesn't sign the

8    renewal.  She doesn't sign the renewal because she believes the

9    terms of employment set forth in the document do not fairly

10   reflect the compensation and remuneration that someone doing

11   her job should get in the market.  "I'm not signing that," she

12   says to herself and to others.

13       MR. BAER:  Right.

14       THE COURT:  But she proceeds to continue as a good

15   professional to do her job because Lehman's reorganization, in

16   part, depends on that.  She does her job, but she feels she's

17   being unfairly treated.  She may believe because she's doing a

18   good job and had good performance reviews that she has a

19   reasonable basis, not having signed the document, not that

20   she's a lawyer, but she's been dealing with employment-related

21   issues for most of her career, to at least put in a claim "for

22   what I think I'm worth."  How do I know based upon the

23   complaint that that's not one reasonable way to read the

24   complaint?

25       We're back at the same point.  You're arguing

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 87

1   emphatically that I must find based upon this record, and there

2   is no record except for the complaint and some documents

3   attached to it, that she had no reasonable expectation.  I have

4   rather easily, I think, demonstrated that it's possible that

5   she had such an expectation.  You're still free to argue it's

6   not reasonable.

7          MR. BAER:  And indeed, Your Honor, that is the essence

8   of my argument.  I have no reason to doubt that Ms. Uvino had a

9   hope, believed that she should have been paid more.  I mean

10  that's demonstrated by the record in this case.  She, you know,

11  way back when is --

12         THE COURT:  So how do I determine reasonableness with

13  respect to a cause of action for quantum meruit in a setting

14  where there is no discovery?  There are no smoking guns yet.

15  There are no admissions against interest yet.

16         There's nothing that you can point to or that I can

17  point to.  Why should I grant this motion to dismiss as to this

18  aspect of the complaint?

19         MR. BAER:  Well, the --

20         THE COURT:  I don't see it yet.

21         MR. BAER:  The cases that I cite to Your Honor in

22  connection with this matter relied on various factors to

23  determine reasonableness.  In one case, somebody was one of --

24  the plaintiff was told, "I'm paying you too much.  I'm not

25  going to pay you X amount going forward."

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 88

1    The appellate division of the state of New York found

2    in that case -- I don't recall the plaintiff's name, but Liza

3    Minnelli was the defendant in that case -- that once told,

4    "Listen, you are not -- I can't afford to pay you the amount,

5    and I'm cutting your salary in half," there's no reasonable

6    expectation going forward that you would be paid any more than

7    half the amount.  Here the objective facts, I mean, Wendy

8    Uvino, I -- you know, I hate to be folksy, but my mother used

9    to say, you know, it's like banging your head against the wall

10   sometimes when she was -- talked to me as a child, all right.

11       Wendy Uvino could ask multiple times of Rob Hershan,

12   you know, "I'd like more money.  I'd like more money.  I'd like

13   more money. I'd like more money," put it in writing, "Here's

14   some metrics for other professionals in the field.  Look this

15   shows I'm entitled to more money," and I believe as Ms. Uvino

16   says in her amended complaint, Mr. Hershan ignored those

17   metrics and told her she wouldn't be paid any additional money.

18   At what point does it become unreasonable?  It seems to me

19   we're -- this isn't even -- isn't close.

20       And I understand, Your Honor, that you are -- you've

21   characterized my argument as emphatic because I truly believe

22   that there is no interpretation other than Ms. Uvino was being

23   unreasonable if she actually believed -- and I doubt she did,

24   quite frankly, as of December 2009, if she believed that she

25   was going to get more money after that.  She'd been asking for

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 89

1    over a year.  She provides data that says, "See, I'm entitled

2    to more."  They say --

3          THE COURT:  You've just proven to me the opposite of

4    the point you're trying to prove because you've demonstrated

5    that one way to read the complaint is that the plaintiff

6    believed that she was entitled to more compensation.  And it

7    wasn't simply a belief based upon a fanciful notion; it was

8    based upon metrics.  She had actually gone out and found

9    comparables as to what this position should be worth on the

10   market.

11         One could conclude, not necessarily conclusively

12   conclude, that it would not be unreasonable for a human

13   resources professional who has not signed a contract to believe

14   that she might enjoy a claim under quantum meruit for what

15   people who did this work in comparable settings might be paid

16   greater than the amount offered.  Now, that's not to say that

17   she would win.  That's not to say that following discovery this

18   isn't a case acceptable to motion for summary judgment based

19   upon established facts, but everything that you're presenting

20   in this argument is hypothesis.

21         MR. BAER:  Your Honor, what is not a hypothesis is

22   that when she presented the metrics, they were rejected.

23         THE COURT:  So what?  Nothing was signed.  We have an

24   unreasonable employer and a reasonable employee.  That's one

25   possibility:  an employer who was trying to save as much as

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 90

1   possible on cost to the administration.  That's a perfectly

2   honorable goal for a reorganization such as this or any other

3   reorganization.  If you can get somebody to work for less that

4   might be entitled to more, you've saved money.

5          MR. BAER:  Your Honor --

6          THE COURT:  But if that person leaves, well, I guess

7   you have to replace that person or do without the spot.

8          MR. BAER:  Right.  Your Honor, respectfully, this

9   motion, and I recognize that this is a motion to dismiss, is

10  not about whether Ms. Uvino, whether there's an argument that

11  could be made she's entitled to more money based upon the

12  metrics and the value to the estate.  I'm not attempting to go

13  there.  What --

14         THE COURT:  This is about whether she has a reasonable

15  basis to believe that she can get more money.  I don't know

16  how, which is my opening proposition, that can be conclusively

17  determined on a motion to dismiss.

18         MR. BAER:  Your Honor, when your -- when you

19  repeatedly ask your boss, "I want more money," and your boss

20  tells you, "I understand that.  I'm not going to give you more

21  money," to say that, notwithstanding, my boss' unequivocal

22  remarks and unequivocal conclusion, and --

23         THE COURT:  Tell me --

24         MR. BAER:  -- a writing --

25         THE COURT:  Tell me where in the record with respect

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 91

1   to the unsigned commitment letter everything that you have just

2   said was said can be found.

3        MR. BAER:  Yes, Your Honor, it's all in the amended

4   complaint.  All right.  As I said, in the allegations

5   supporting the quantum meruit claim, Ms. Uvino, and it does

6   begin around paragraph 14 of the amended complaint and run

7   through paragraph 57, she details a course of history both

8   under the renewal -- under the original commitment letter and

9   the time leading up to the renewal commitment letter a desire

10  to have increased compensation.

11       Indeed, she writes an e-mail that is attached to the

12  amended complaint in March to Mr. Hershan setting forth all the

13  reasons that she thinks she's entitled to more money, and what

14  she gets back is -- what she -- what happens next is she has a

15  meeting with Mr. Hershan in November.  They go over the review.

16  He --

17       THE COURT:  That's in the complaint?

18       MR. BAER:  Yes, at paragraph 50.

19       THE COURT:  What does it say?

20       MR. BAER:  On November 30th, Hershan also reviewed

21  with plaintiff the renewal terms of a second commitment period

22  beyond December 31, 2009.  So that clearly sets forth, Your

23  Honor, that on November 30th plaintiff and Mr. Hershan

24  discussed the terms of employment covering the January 1st

25  period and prospectively after January 1st, so the time that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 92

1   would have been covered by the renewal commitment letter.  As a

2   follow on to that November 30th meeting, three days later on

3   December 3rd Mr. Hershan hand delivers to plaintiff the renewal

4   commitment letter, a copy of which is attached to the

5   complaint, which sets forth the terms of employment going

6   forward from January 1st prospectively.

7          There's no doubt what those terms are.  They were

8   discussed with her on November 30th.  They were presented to

9   her in writing on December 3rd.

10          THE COURT:  We don't know what was discussed on

11   November 30th.  We only have a bald allegation of the most

12   general nature.  We don't know what she said to him or what he

13   said to her.

14          MR. BAER:  On -- I can only take the complaint as it

15   comes, Your Honor.  The allegations on their face say that they

16   discussed the terms, the renewal terms, of a second commitment

17   period.  The very next sentence, "On December 30th, Hershan

18   hand delivered to plaintiff a renewal commitment letter, a copy

19   of which is attached as Exhibit G.  The plaintiff did not sign

20   the renewal commitment letter because she continued to disagree

21   with the terms of the compensation."  All right.

22          THE COURT:  How does this lead to dismissal?

23          MR. BAER:  Because --

24          THE COURT:  I think there's a limit to how much time

25   we should spend on this point.  I have -- what I think you have

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 93

1  already concluded is a fundamental disagreement with the

2  conclusions that can be reasonably reached from the complaint

3  on this critical element of quantum meruit.  I don't think it's

4  there on the motion to dismiss; I think as an intellectual

5  matter it can't be done absent something more.

6         MR. BAER:  Your Honor, I know it's improper for me to

7  pose this question to the Court and I won't.  But as a -- as

8  you've put it, as a purely intellectual matter, at one -- at

9  what point does it become unreasonable in the face of continued

10  refusals both orally and in writing to give her any more money?

11  At what point does it become unreasonable for Ms. Uvino to

12  believe that she would get more money?

13         It just -- it seems to me --

14         THE COURT:  After you take --

15         MR. BAER:  -- we're well beyond that point.

16         THE COURT:  After you take a bunch of depositions in

17  this case, maybe you'll be able to prove that point.  You can't

18  prove it on a motion to dismiss to my satisfaction.

19         MR. BAER:  Very good, Your Honor.  I'd like to address

20  the second point if I may.

21         THE COURT:  Sure.

22         MR. BAER:  Second point is for a breach of contract

23  based upon the terms of the original commitment letter, and in

24  particular the handwritten entry on the commitment letter

25  during -- which sets forth in sum and substance that a review

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 94

1    will be held by June 30th, and at that time the possibility of

2    consideration of a potential increase in bonus potential --

3    very conditional statement -- would be considered.  As Your

4    Honor pointed out in your decision in May, that statement does

5    not include an enforceable promise to increase anyone's

6    compensation; it merely sets forth a time by which a review

7    would be conducted and a subject matter would be considered.

8    It is black letter law that in order to have a claim for breach

9    of contract, one must have damages and the damages must be

10   beyond merely speculative.

11           Here in response to our arguments and a case that's

12   really on all fours where a plaintiff -- the Hudson case, where

13   a plaintiff said, "Well, I didn't get my review after 90 days,

14   and therefore I'm entitled to a breach of contract claim and

15   I'm damaged thereby," the Court said, "Well, no, all you had

16   was a definite promise for a review.  You didn't have a

17   definite promise for an increase in compensation.  It's

18   entirely too speculative to go there.  No one can really tell

19   whether or not you would get the increase, so I'm going to

20   dismiss the cause of action as a matter of law."

21           Here, first of all, the Hudson case is unaddressed and

22   for that reason alone as a matter of law the claims should be

23   dismissed.  But secondly, the reasoning offered by plaintiff's

24   counsel or plaintiff is that she has damages because she would

25   have been looking for a job earlier, and she -- you know, but

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 95

1    let's assume she would have gone out and searched for a job.

2    We don't know what the timing of that would have been.  We

3    certainly don't know what -- when she would have received an

4    offer.  We certainly don't know what the terms of compensation

5    would have been had she gone out and gotten another job.  And

6    indeed, she might be making more, in which case there would be

7    no damage as a result.

8         So I mean we're really beyond the realm of speculation

9    here, Your Honor, when it comes to this issue of whether or not

10   Ms. Uvino would have had increased compensation as a result of

11   a review being conducted on or about June 30th, 2009, and

12   therefore I would ask that the Court dismiss that claim.

13        THE COURT:  Okay.  Mr. Rosen, let me hear from you.

14        MR. ROSEN:  Thank you, Your Honor.  Your Honor, first,

15   by brief defense of myself on the first cause of action, I read

16   your decision to say that I was only to amend the last cause of

17   action, and that's the instruction I gave to my associate.  So

18   when they raised it -- because I deemed it the first cause of

19   action amended by your decision, which is my -- because you

20   hadn't allowed us to re-plea it -- that, we would not ever

21   filed an amended pleading.  It would have just been deemed

22   amended by your decision.  That was my read on it.  If it

23   caused confusion, that's why I immediately offered, stipulated

24   to do it.

25        On the second issue, Your Honor, I'm not going to go

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 96

1    there because you've gotten -- you've said everything that I

2    was going to say in terms of the issue.  The only other thing I

3    would point out on that, that cause of action to dismiss the

4    quantum meruit claim is the exact cause of action that you

5    already ruled on and that motion should not even have been made

6    again.  They never appealed it: they never saw -- came back to

7    you in any way; they just remade the exact same motion in front

8    of you.

9              Going to the contract cause of action, and Your Honor,

10   one of the things that counsel has done as a good lawyer,

11   opposing counsel, is he's parsed things that shouldn't

12   necessarily be parsed out.  When that meeting took place and on

13   the breach of contract when that meeting -- when the meeting

14   took place, and they've acknowledged that the meeting did not

15   take place until November 30th and the performance review was

16   not given until December 2nd, my client was still under the --

17   as she is today, under the position that under the contract

18   that already passed that she had damages because they had

19   breached their agreement and that she certainly wasn't going to

20   sign a new contract that was going to let them off the hook on

21   that.

22             And to reinforce that, the Court has to remember

23   something very important:  by not signing the renewal contract,

24   she lost, and it's part of our damages which is where they're

25   also wrong on the breach -- she lost $50,000 dollars worth of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 97

1    her bonus because there was a holdback on the bonus of 20%,

2    which would be $50,000 in this case, if you didn't sign the

3    renewal contract.  So she clearly had an expectation that she

4    was entitled to more because, otherwise, if she thought she

5    wasn't, she would have just signed it and then gotten another

6    job.  So, she had -- she most certainly had a higher

7    expectation of that, and she wasn't going to waive any of her

8    damages.

9            Let me address the Hudson case head on, all right,

10   because, first of all, it's not a mandatory authority to you.

11   Secondly, it's about a one or two line scribbled on this, and

12   it contains additional elements that are not present here.  It

13   was an oral promise to give an increase and it was an oral

14   promise to give a performance review, which never took place.

15           Here we have a written a contract with a written

16   promise to conduct a performance review by a finite period of

17   time which they clearly breached -- there is no -- there's no

18   dispute over that -- by five months -- no, six months.  I'm

19   sorry, by six months.  They breached that agreement, and it

20   said that that review was specifically to consider an enhanced

21   bonus.

22           And then what happens, that performance review

23   actually takes place.  Out of a scale of one to five, my client

24   gets a one with a one being the highest for a review, and she

25   gets no enhanced bonus whatsoever.  She gets the same 10% that