BLANK ROME LLP
The Chrysler Building
405 Lexington Ave.
New York, NY  10174-0208
(212) 885-5000
Andrew B. Eckstein
Jeremy A. Rist

Attorneys for Jenner's Pond

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br><br>08-13555(JMP)<br><br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS SPECIAL FINANCING, INC., *et al.*<br><br>Debtors. | Chapter 11 Case No.<br><br>08-13888(JMP)<br><br>(Jointly Administered) |

**JENNER'S POND'S RESPONSE TO DEBTORS' TWO HUNDRED THIRTY-THIRD OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)**

Jenner's Pond ("Jenner's Pond") respectfully submits this Response to Debtors' Two Hundred Thirty-Third Omnibus Objection To Claims (No Liability Derivatives Claims), dated November 8, 2011 [Docket No. 21741] (the "Objection") as it relates to Jenner's Pond, and states as follows:

1. On November 8, 2011, Debtors filed the Objection, through which they objected to sixty claims filed in these jointly administered bankruptcy proceedings on the basis that all sixty claims "provide no basis of liability as to the Debtors." (Objection ¶ 2.)

2. As it pertains to Jenner's Pond, however, the Objection is untimely and deficient – untimely, because the parties are presently engaged in a mediation initiated by Debtors that may resolve the issues implicated by the Objection and by Jenner's Pond's claims against Debtors; and deficient, because Debtors provide no specific detail about why they consider Jenner's Pond's valid claims to have no value.

3. As a result, Jenner's Pond requests that further treatment of the Objection be postponed until the ADR process has run its course, and, at that time, should further consideration of the Objection be necessary, that the Court either deny the Objection, or order Debtors to provide further detail in support of the Objection and allow Jenner's Pond discovery into the basis thereof.

## FACTUAL BACKGROUND

4. Jenner's Pond is a Pennsylvania non-profit corporation that operates a continuing care retirement community in West Grove, Pennsylvania.

5. Jenner's Pond and Lehman Brothers Special Financing Inc. ("LBSF") are parties to an interest rate swap transaction pursuant to an ISDA Master Agreement ("Master Agreement") dated as of October 25, 2006, as supplemented by a Schedule and Credit Support Annex, each dated as of October 25, 2006, a Guarantee from Lehman Brothers Holding Inc. ("LBHI"), dated as of October 25, 2006, and 2 Confirmations with a trade date of October 25, 2006: Global Reference Number 2719503, an amortizing transaction in the amount of $40,210,000; and Global Reference Number 2719523, an amortizing transaction in the amount

of $31,675,000.  (All of the foregoing collectively referred to herein as the "Swap Agreement," with the swap transactions effectuated thereby referred to as the "Swap Transactions").[1]

6. An event of default occurred under, among other provisions, Section 5(a)(vii) of the Master Agreement as a result of the Chapter 11 bankruptcy filing by LBHI on September 15, 2008.  A separate event of default under the same Section occurred by reason of the subsequent Chapter 11 bankruptcy filing by LBSF on October 3, 2008.

7. The occurrence of the events of default triggered various rights, both under the Master Agreement and otherwise, including Jenner's Pond's right to withhold monthly payments otherwise payable under the Master Agreement, and the right to terminate the Swap Transactions under Sections 2(a)(iii), 5(a)(vii), and 6(a) of the Master Agreement.

8. Soon after the occurrence of the events of default, representatives of Jenner's Pond determined that Jenner's Pond likely would need to terminate the Swap Transactions with LBSF and replace them with another interest rate swap(s).

9. In April 2009, to attempt to find a replacement counterparty to fulfill the requirements of the Master Agreement concerning the calculation of a Settlement Amount[2] if the Swap Transactions were terminated, Jenner's Pond, through a financial advisor, Raymond James, solicited actionable Market Quotations from eight Reference Market-makers.

10. But this process was complicated by at least two reasons:  first, the markets in early 2009 were volatile, and potential Market-makers were more interested in closing out their

---

[1] In the interests of efficiency, and because Debtors are in possession of every specific document mentioned herein, Jenner's Pond is attaching no documents as exhibits to this Response, but all are available from Jenner's Pond upon request.

[2] All capitalized terms that are not defined herein take their meaning from the Swap Agreement.

own transactions with defaulting parties rather entering into new deals; and second, the terms of the Swap Transactions were particularly favorable to Jenner's Pond.

11. These terms included the facts that: (i) Jenner's Pond was not required to post any security interest in its own assets or revenues, and was required to post no collateral; (ii) LBSF was required to post collateral; (iii) there was a distant maturity date on the second transaction, with no optional termination rights, put, or market tear-ups by LBSF; and (iv) a cross-default threshold of $10,000,000 was set at a very high percentage of Jenner's Pond's assets.

12. Jenner's Pond's credit profile, its section 501(c)(3) not-for-profit status, and its lack of a public credit rating also complicated efforts to obtain actionable Market Quotations and identify a potential replacement counterparty.

13. Eventually, Jenner's Pond received only one actionable Market Quotation. That quotation replicated certain of the key and material terms outlined above, but not completely. The proposed Replacement Swap ("Actionable Replacement Swap") with Morgan Stanley Capital Services would have required Jenner's Pond to purchase a swaption that provided a cap on the maximum negative mark-to-market, the cross-default threshold would have been lowered to $2,000,000, and Jenner's Pond would have been required to enter into a bilateral Credit Support Annex. As a result, the fixed rate under the Actionable Replacement Swap would have been higher than under the Swap Transactions because it would have incorporated the cost of purchasing the required swaption and the expenses payable to Jenner's Pond's financial advisor.

14. Jenner's Pond did not execute this Actionable Replacement Swap because of these higher costs.

15. However, on April 23, 2009, Jenner's Pond entered into two different swap transactions with Morgan Stanley Capital Services (the "Replacement Swaps"). These transactions, however, were on substantially different material terms and conditions than the Swap Transactions with LBSF.

16. Also on April 23, 2009, upon securing the Replacement Swaps, pursuant to Section 6(a) of the Master Agreement Jenner's Pond designated in writing an Early Termination Date of April 23, 2009, with respect to the Swap Transactions, and accordingly terminated the Swap Transactions.

17. Subsequently, on May 5, 2009, Jenner's Pond provided to LBSF its calculation of the Settlement Amount as provided for in Sections 6(d) and 6(e)(i) of the Master Agreement.

18. In determining the Settlement Amount, Jenner's Pond relied on personnel associated with Raymond James, which had significant experience in interest rate swaps and calculations of this type.

19. Because no Reference Market-marker provided a Market Quotation on the same key and material terms and conditions as the Swap Transactions, Jenner's Pond relied on the Loss methodology under part (b) of the definition of "Settlement Amount" in the Master Agreement.

20. The definition of "Loss" in the Master Agreement is broad. It means any amount a party: "reasonably determines in good faith to be its total losses and costs . . . in connection with [a terminated transaction], including any loss of bargain, cost of funding, or at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position[.] A party may (but

need not) determine its Loss by reference to quotations or relevant rates or prices from one or more leading dealers in the relevant markets."

21.     Under that standard, Jenner's Pond determined that it incurred a substantial loss resulting from the early termination of the Swap Transactions. Jenner's Pond was unable to locate a replacement swap counterparty that was willing to agree on the key terms and conditions consistent with the Swap Agreement with LBSF. The Actionable Replacement Swap most closely mirrored what the market was willing to offer in approximation of the Swap Transactions, although it contained certain terms more burdensome to Jenner's Pond than the original Swap Agreement. The valuation of those burdens to Jenner's Pond reflected Jenner's Pond loss of bargain and cost of funding in connection with the termination of the Swap Transactions.

22.     Taking into account these differences and certain other expenses associated with the termination of the Swap Transactions, Jenner's Pond determined in a commercially reasonable manner that its Loss on the terminated Swap Transactions was $1,219,923, together with an estimated $75,000 in reasonable out-of-pocket expenses, including legal fees, associated with Jenner's Pond's enforcement and protection of its rights under the Swap Agreement as provided for by Section 9 of the Master Agreement.

23.     Jenner's Pond offset the total amount owed to it by LBSF by $476,513 in unpaid amounts reflecting net settlement payments owed by Jenner's Pond on various dates between December 1, 2008, and April 1, 2009. Pursuant to Jenner's Pond's calculations, the net amount owed by LBSF to Jenner's Pond was $826,841.

24.     The net amount owed by LBSF to Jenner's Pond – $826,841 – served as the basis of the Proof of Claim Jenner's Pond filed on September 17, 2009, in case number 08-13888

(JMP) (Bankr. S.D.N.Y.) (Unique Identification No. 88803570), subject to amendment.  Also on that same date, Jenner's Pond filed a Proof of Claim in case number 08-13555 (JMP) (Bankr. S.D.N.Y.) (Unique Identification No. 1000097107), asserting a claim against LBHI as Credit Support Provider/guarantor under the Swap Agreement for $826,841, subject to amendment. (Collectively, the Proofs of Claim are referred to herein as the "Jenner's Pond Claims.")

25. Additionally, on October 22, 2009, Jenner's Pond filed Supplemental Questionnaires related to the Jenner's Pond Claims (the Guarantee Questionnaire and the Derivative Questionnaire).

26. On November 8, 2011, the Debtors filed the Objection.

**I.  The Objection To The Jenner's Pond Claims Should Be Deferred Because Of The Pending Mediation Between Debtors And Jenner's Pond.**

27. First, proceedings on the Objection should be deferred until the conclusion of the alternative dispute resolution process LBSF initiated related to the parties' obligations under the Swap Agreement and the termination of the Swap Transactions.

28. On August 18, 2011, pursuant to the ADR procedures the Court established in its order of September 17, 2009, LBSF served on Jenner's Pond Derivatives ADR Notice 187, which launched a mediation process between the parties related to the Swap Agreement and the Swap Transactions.

29. The subject of the mediation is Jenner's Pond's putative obligations to LBSF related to the termination of the Swap Transaction, and LBSF's obligations to Jenner's Pond for the same.  In other words, the very subject of the Jenner's Pond Claims may be resolved through the mediation.[3]

---

[3] In the interest of the confidentiality of the mediation process, exactly what is at issue in the mediation and Debtors' positions in connection therewith are not provided here.  The Mediation

7

30. A mediation between the parties is presently scheduled for January 31, 2012.

31. Concerns of economy and judicial efficiency suggest that it would be improper to consider Debtors' Objection prior to the conclusion of the ADR process, as any issues between the parties related to the Swap Agreement, Swap Transactions, and the Jenner's Pond Claims may be resolved thereby.

32. Accordingly, Jenner's Pond respectfully suggests that further consideration of, discovery into, and briefing concerning Debtors' Objection should be deferred until such time as the ADR process in which the parties are presently engaged may have unsuccessfully concluded. In the event the mediation process serves its intended function, consideration of the Objection may be unnecessary.

**II. The Objection Is Inadequate To Carry Debtors' Burden And Should Be Denied, Or Debtors Should Be Required To Provide Further Detail Concerning Their Evaluation Of The Jenner's Pond Claims And Discovery From Debtors Should Be Ordered.**

33. Even if the Court were to presently consider Debtors' Objection, however, it is insufficient to overcome the *prima facie* value of the Jenner's Pond Claims.

34. The Objection states no facts whatsoever concerning the Jenner's Pond Claims, save for the relevant Debtor against which the claims were filed, the relevant case number, the date the claims were filed, the claim numbers, the amount of each claim, and, for each, the "Reason for Proposed Disallowance" simply being "No Liability Claim." (*See* Objection, Ex. A, at line items 27 and 28.)

---

Agreement between the parties and the Court's Order dated September 17, 2009 (incorporated into the Mediation Agreement) may prevent Debtors' positions, statements, and arguments made in connection with the alternative dispute resolution process from being repeated in this filing.

35. The Objection only describes the general terms and procedures under which Debtors reviewed the sixty claims at issue in the Objection – indeed, the terms and procedures under which Debtors reviewed many other claims in connection with other omnibus objections as well. It provides only that "[a]fter a review of the claimants' supporting documentation and the Debtors' books and records, the Debtors have determined that, based on the fair, accurate, and reasonable values of the subject Derivatives Contracts [] and the netting provisions thereunder, the Debtors do not owe any amounts to the claimants but rather, in most cases, the respective claimants actually owe money to the Debtors[.] . . . Therefore, the No Liability Derivatives Claims do not constitute valid *prima facie* claims[.]" (Objection ¶ 2; *see also* Objection ¶ 11.)

36. The Objection then proceeds to state only a general method by which the claims at issue in this Objection were evaluated – again, a method that appears to be the method by which Debtors handled many hundreds of the other claims filed against them – and incorporates by reference the Declaration of Gary H. Mandelblatt, filed over two years ago, for a "more comprehensive discussion of the valuation process." (Objection ¶ 13.)

37. The Objection then summarily concludes only that "[t]he Debtors have undertaken this lengthy process with respect to each of the No Liability Derivatives Claims and concluded that a fair, accurate and reasonable valuation of the No Liability Derivatives Claims demonstrates that the Debtors do not owe any of the claimants money and that either no amounts are owed to either party or the claimant in fact owes the Debtors money." (Objection ¶ 14.)

38. Significantly, the Objection lacks any allegation concerning, or information describing, exactly how Debtors evaluated the Jenner's Pond Claims, the information or other materials reviewed, the calculations made in determining how the Jenner's Pond Claims

9

constitute No Liability Derivative Claims, and the Debtors' own determination concerning the value of the Jenner's Pond Claims, or Jenner's Pond's liability to Debtors for the same.

39.     The Objection accordingly fails to set forth sufficient evidence to trump the *prima facie* validity of the Jenner's Pond Claims, and should be denied on that basis.  *See* Fed. R. Bankr. P. 3001(f); *In re Rock & Republic Enters.*, 2011 Bankr. LEXIS 2401, at *27 (Bankr. S.D.N.Y. June 20, 2011) (party objecting to a claim has the burden of advancing "evidence equal in force to the prima facie case"); *In re Feinberg*, 442 B.R. 215, 220 (Bankr. S.D.N.Y. 2010) (objecting party has the burden of producing "evidence sufficient to negate [the] prima facie validity" of the claim).

40.     The Jenner's Pond Claims should instead be allowed.  Section 502(a) of the Bankruptcy Code states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Rule 3001(f) of the Bankruptcy Rules also provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

41.     An objection to a proof of claim does not strip the claim of this presumptive validity, *unless* "sufficient evidence to negate one or more of the sworn facts in the proof of claim." *In re Martinez*, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009).  The objecting party is required to "introduce evidence as to the invalidity of the claim or the excessiveness of its amount." *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).  There must be "substantial" evidence in opposition to a claim for the objector to prevail.  *See, e.g., In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr. S.D.N.Y. 2009); *In re Radnor Holdings*, 353 B.R. 820, 845-46 (Bankr. D. Del. 2006).

42.     The objecting party "may not rebut the *prima facie* case merely by stating that the amount [of the claim] is not correct; [it] must produce some evidence to support that statement[.]" *In re Forte*, 234 B.R. 607, 618 (Bankr. E.D.N.Y. 1999). Only then would Jenner's Pond have the burden of producing further evidence in support of its claim. *See DJK Residential*, 416 B.R. at 104 ("objector bears the initial burden of persuasion"); *In re Greene*, 71 B.R. 104, 106 (Bankr. S.D.N.Y. 1987).

43.     Here, Jenner's Pond has provided ample detail (both legal and factual) concerning how the value of the Jenner's Pond Claims was derived. Jenner's Pond relied on the broad valuation process contemplated by the Master Agreement to which Debtors and Jenner's Pond were parties, and calculated its essential loss of bargain as a result of the occurrences of the events of default and the necessary termination of the Swap Transactions. The relevant information previously was provided to Debtors both through the procedures spelled out in the Swap Agreement, as well as through the proof of claim procedures established for these bankruptcy proceedings. Jenner's Pond has met its burden of proof. Debtors, by contrast, have done nothing but describe a general process they may have used to determine their understanding of the value of the claims, without providing any specific detail about that process, what information was considered, and the Debtors' specific calculations, and further fail to refute any specific part of Jenner's Pond's own calculations.

44.     In the alternative, should the Court not deny the Objection, Jenner's Pond requests that the Court order Debtors to provide further detail as to Debtors' objection to the Jenner's

Pond Claims *specifically*, as well as discovery into the bases for the Objection and the Debtors' contentions.[4]

45.     Jenner's Pond expressly reserves the right after discovery to provide further amended or supplemental briefing on the applicable factual and legal issues, and to present evidence if necessary in defense against the Objection, including documents and live testimony at a full evidentiary hearing pursuant to Bankruptcy Rule 9014 and Rule 9014-2 of the Local Rules of Bankruptcy Procedure.

Dated:  December 8, 2011
        New York, New York

                                            /s/ Andrew B. Eckstein
                                            Andrew B. Eckstein

                                            BLANK ROME LLP
                                            The Chrysler Building
                                            405 Lexington Ave.
                                            New York, NY  10174-0208
                                            Tel: (212) 885-5000
                                            Fax: (212) 885-5001

                                            Jeremy A. Rist
                                            One Logan Square
                                            Philadelphia, PA  19103
                                            Tel:  (215) 569-5500
                                            Fax:  (215) 832-5500

                                            Attorneys for Jenner's Pond

---

[4] It should be noted that Debtors have had the benefit of Jenner's Pond's response to a Subpoena for Rule 2004 Examination dated July 6, 2010, by which Jenner's Pond produced thousands of pages of documents to Debtors.