HEARING DATE: December 14, 2011 at 10:00 a.m. EST

Lindsee P. Granfield
Lisa M. Schweitzer
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Capital Inc.
and Barclays Bank PLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | : | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

------------------------------------------------------------x

**OBJECTION OF BARCLAYS CAPITAL INC. AND BARCLAYS BANK PLC
TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR RECONSIDERATION OF COURT'S SEPTEMBER 17, 2008 INTERIM
ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTIONS 363 AND 364 OF BANKRUPTCY
CODE & (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-
PETITION LENDERS PURSUANT TO SECTION 364 OF BANKRUPTCY CODE**

Barclays Capital Inc. ("Barclays Capital") and Barclays Bank PLC (collectively with Barclays Capital, "Barclays"), by and through their undersigned counsel, hereby submit this objection (the "Objection") to the Motion Of Official Committee Of Unsecured Creditors (the "Committee") For Reconsideration Of Court's September 17, 2008 Interim Order (I) Authorizing Debtor To Obtain Postpetition Financing Pursuant To Sections 363 And 364 Of Bankruptcy Code And (II) Granting Liens And Superpriority Claims To Postpetition Lenders Pursuant To Section 364 Of Bankruptcy Code (the "DIP Order"), dated September 29, 2008 (D.I. 434, the "Motion"). In support of its Objection, Barclays respectfully states as follows:

**BASIS FOR OBJECTION**

1. The Committee's apparent attempt to renegotiate the terms of the DIP Facility – including the fees payable thereunder – is not only procedurally improper, but is impermissible under the Bankruptcy Code. As a primary matter, the Court's findings that Barclays acted as good faith lenders – which the Committee has not challenged – preclude the Court from now reversing or modifying the DIP Order, the terms of which Barclays relied upon in extending credit.[1] Moreover, the basis on which the Committee moves – an alleged "change in circumstances" – does not even satisfy the threshold for disturbing a financing order. In fact, the primary "change" that the Committee's Motion points to is the closing of the sale of assets to Barclays Capital, which was not only foreseeable but indeed expressly contemplated at the time the DIP Order was entered. Finally, the Committee's Motion is untimely to the extent it seeks reconsideration under Bankruptcy Rule 9023, and (as the Committee's own authorities recognize) simply does not represent the extraordinary circumstances necessary for relief from an order under Bankruptcy Rule 9024.[2]

**FACTS AND PROCEDURAL HISTORY**

2. On Monday, September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Periodically thereafter, certain of LBHI's affiliates commenced their own voluntary cases under Chapter 11 of the Bankruptcy Code. The cases of LBHI and its affiliated debtors (collectively, the "Debtors") are jointly administered.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the DIP Order.

[2] As set forth in footnote six below, there is a dispute between the Barclays and the Debtors as to the status of unpaid fees under the DIP Facility. However, the Motion is completely silent as to how the existence of any such dispute is at all relevant to the relief the Committee seeks. While the arguments set forth in this Objection compel denial of the Committee's Motion, Barclays reserves all of its rights under the DIP Facility and the DIP Order.

3. That same day, the United States Trustee noticed an organizational meeting for unsecured creditors in order to form the Committee. The organizational meeting was scheduled for Tuesday, September 16, 2008.[3] The United States Trustee noticed the appointment of the Committee on Wednesday, September 17, 2008.[4]

4. The Debtors then sought authority to obtain postpetition financing, on the terms set forth in the Postpetition Credit Agreement, dated as of September 17, 2008 (the "DIP Facility") that they had negotiated with Barclays.[5] This DIP Motion set forth the Debtors' efforts to obtain financing, and the basis for their business judgment in entering into the DIP Facility. DIP Motion ¶¶ 16-19. The DIP Motion explained that the Debtors "negotiated with the DIP Lenders at arms-length, in good faith" such that "the DIP Lenders and *all obligations incurred* under the DIP Facility should be afforded the benefits of Section 364(e) of the Bankruptcy Code." Id. at ¶ 19 (emphasis added).

5. At a September 17, 2008 hearing on the DIP Motion, counsel for the Debtors noted their urgent need for financing under the DIP Order, representing that "[w]ithout approval of the immediate ability to utilize the 200 million dollars under the proposed DIP credit agreement, Lehman's operations may cease as early as tonight" and "without this DIP financing, the debtor's employees and the business is at real peril." Hr'g Tr. 82:10–82:12, 87:24–87:25 (Sept. 17, 2008) (D.I. 352). The Debtors' counsel also noted that absent approval of the DIP Facility, the Debtors "likely would not be able to realize on substantial other sales that perhaps will occur in the future." Id. at 82:15-17.

---

[3] See Notice of Organizational Meeting to be Held on Tuesday, September 16, 2008 to Form an Official Committee of Unsecured Creditors (D.I. 17).

[4] See Appointment of Committee of Unsecured Creditors (D.I. 62).

[5] See Debtor's Motion for Order: (i) Authorizing Debtor to Obtain Postpetition Financing Pursuant to Sections 363 and 364 of Bankruptcy Code, (ii) Granting Liens and Superpriority Claims to Postpetition Lenders Pursuant to Section 364 of Bankruptcy Code, and (iii) Scheduling Final Hearing (D.I. 59) (the "DIP Motion").

6. When asked by the Court whether there was "an intention on the part of the lender to encourage refinancing or repayment within" the first sixty days, counsel for the Debtors confirmed their "belief that the DIP financing will not be outstanding for more than two months." Hr'g Tr. 84:4–9 (Sept. 17, 2008). Indeed, the Debtors' counsel even characterized the DIP Facility as akin to "a bridge to a sale" – namely, the pending asset sale to Barclays Capital Inc. Id. at 84:10-12.

7. At this hearing on the DIP Motion, counsel for the Committee specifically raised the fees that would be payable under the DIP Facility, including a pre-payment fee, suggesting that those terms were allegedly above market rates. Hr'g Tr. 93:6-94:7, 95:11-96:2 (Sept. 17, 2008). The Court rejected these arguments, noting that it "d[id] not consider a pre-payment to be at all off-market", but instead a protection for "the pre-payment risk that [the Court] consider[ed] reasonable for a lender to guard against and to provide for in fees." Id. at 94:23-95:7. When further pressed by the Committee to consider the fees in relation to the size of the DIP Facility, the Court noted that even if it agreed with the Committee's arguments, the consequence would be to "not approve the interim facility and . . . set a match to this asset because it won't be financed." Id. at 96:6-8. The Court thus held that:

> THE COURT: …to not approve this [DIP F]acility doesn't just mean that the hypothetical Friday payroll for the big Chapter 11 debtor is not paid; it means that market participants everywhere, globally, are materially adversely affected. I consider that to be an exceptional circumstance and one in which it may not be good practice to be worrying too much about whether the facility itself is richly priced. It is the only facility. And I am not going to convert this hearing into a public renegotiation of the fee letter.
>
> MR. DESPINS: Okay. Got it. You've heard me. That's all I can say.
>
> THE COURT: And you've heard me.
>
> MR. DESPINS: Thank you.

4

MS. FIFE: With that, Your Honor, I'd ask you to approve the interim financing.
Id. at 97:3-17.

8. Immediately following this hearing, the Court entered the DIP Order on September 17, 2008. That order approved the DIP Facility, and authorized the Debtors to borrow funds up to $200 million in accordance with its terms. In particular, the DIP Order provided that "[a]ny and all fees paid or required to be paid in connection with the [DIP Facility] are hereby authorized and shall be paid in accordance with the terms and provisions of the [DIP Facility]." DIP Order, ¶ 8. The Court directed that the DIP Order "shall become effective immediately upon its entry and shall be valid and binding on all parties in interest." Id., ¶ 1.

9. The DIP Order further provided that, based on the record presented to the Court, the DIP Facility was negotiated at arms' length and in good faith. DIP Order, ¶ G. The Court thus provided that Barclays was entitled to the full protections of Section 364(e) "in the event that this Interim Order or any provision herein is vacated, reversed, or modified, on appeal *or otherwise*." Id. (emphasis added). The DIP Order is thus express that even "in the event that any or all of the provisions of this Interim Order . . . are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any Lien or claim authorized or created hereby or thereby or any Postpetition Obligations incurred hereunder or thereunder." DIP Order ¶ 26.

10. In accordance with the terms of the DIP Facility, the Debtors delivered a Funding Notice, requesting that Barclays deliver $200,000,000 in Base Rate Loans on September 17, 2008. In reliance on the DIP Order, Barclays funded that amount by wire on September 18, 2008. On October 2, 2008, the Debtors repaid $813,000; on October 3, 2008, the Debtors repaid

5

an additional $200,123,178.51, but left unpaid certain termination fees due and owing under the DIP Facility.[6]

11.    The period within which parties could timely notice an appeal from, or move for reconsideration of, the DIP Order expired on September 27, 2008. No party timely appealed or filed any motion under Bankruptcy Rule 9023 concerning the DIP Order. See generally Docket in Case No. 08-13555. Nonetheless, the Committee's Motion – filed on September 29, 2008 – purports to seek relief from the DIP Order under both Bankruptcy Rules 9023 and 9024.[7]

## ARGUMENT

**A.    The Policies Underlying Section 364(e) Do Not Allow Modification of the DIP Order**

12.    Courts have repeatedly recognized that in order to overcome lenders' reluctance to lend to a bankrupt entity, they must ensure that post-petition lenders who have acted in good faith can continue to rely on the financing orders under which they extended credit. See A&K Endowment Inc. v. General Growth Properties, Inc. (In re General Growth Properties, Inc.), 423 B.R. 716, 721 (S.D.N.Y. 2010) (dismissing appeal of DIP Order, where Section 364(e) aims to assure good faith lenders who relied on the DIP order that "they need not worry about

---

[6]    There has been an exchange of correspondence, whereby the Debtors and Barclays have set forth their respective positions as to whether or not such fees are currently due and payable. However, neither this Objection – nor the Committee's Motion – seeks to resolve the merits of such dispute at this time. Indeed, pursuant to this Court's order, the Debtors have established a segregated account, into which $10.5 million was deposited, over which Barclays has a first priority lien to the same extent as granted under the DIP Order. Unless and until the Barclays' outstanding claims under the DIP Facility are resolved, all parties' rights and defenses on the merits of any unpaid Postpetition Obligations (as defined in the DIP Order) are reserved. See Order Pursuant to Sections 105 and 364 of the Bankruptcy Code Authorizing the Debtors to Grant First Priority Liens in Cash Collateral Posted in Connection with the Hedging Transactions the Debtors Enter into Through Certain Futures and Prime Brokerage Accounts, dated March 11, 2009 (D.I. 3047).

[7]    By agreement of the Committee and Barclays, the Committee's Motion was initially adjourned from time to time in order to both allow discussions between the parties and to permit litigation of the motions that culminated in the Court's decision on the various motions under Rule 60(b) of the Federal Rules of Civil Procedure concerning the orders approving the sale of certain of the Debtors' assets to Barclays Capital. See generally In re Lehman Brothers Holdings Inc., 445 B.R. 143 (Bankr. S.D.N.Y. 2011). Thereafter, the Committee unilaterally adjourned its Motion.

their priority merely because some creditor is objecting to the transaction"); White Rose Food Corp. v. Gen. Trading Co. Inc. (In re Clinton St. Food Corp.), 170 B.R. 216, 220 (S.D.N.Y. 1994) (same); see also Boullioun Aircraft Holding Co. v. Smith Mgmt. (In re W. Pac. Airlines, Inc.), 181 F.3d 1191, 1195 (10th Cir. 1999) (clarifying that the purpose of Section 364(e) is "to encourage lenders to advance funds to a bankrupt company in reliance on the unstayed order of bankruptcy court"); In re EDC Holding Co., 676 F.2d 945, 947 (7th Cir. 1982) (explaining that Section 364(e) "seek[s] to overcome people's natural reluctance to deal with a bankrupt firm . . . by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry").  Congress codified this principle in Section 364(e), which provides that obligations incurred under a properly authorized loan shall not be affected by a subsequent reversal or modification of the financing order on appeal, so long as the lender acted in good faith and the aggrieved creditor failed to obtain a stay.  11 U.S.C. § 364(e).  Courts in this circuit have held that Section 364(e)'s protections apply not only to the debt itself, but to any agreements or conditions that were necessary to obtain credit.  See Clinton St. Food, 170 B.R. at 220 (holding that Section 364(e) protects all of a lender's bargained for consideration, as a narrower "crabbed interpretation" would frustrate Congressional intent); In re Texaco, Inc., 92 B.R. 38, 52 (S.D.N.Y. 1988) (suggesting that change-in-control provisions which formed part of financing agreement approved by the bankruptcy court were similarly protected by 364(e)).[8]

---

[8] See also Keltic Fin. Partners LP v. Foreside Mgmt Co. LLC (In re Foreside Mgmt Co. LLC), 402 B.R. 446, 452 n. 4 (1st Cir. B.AP. 2009) (collecting cases applying Section 364(e) "not just to the validity of financing itself, but also to the terms of collateralization") (citations omitted); In re Cooper Commons, LLC, 430 F.3d 1215, 1219 (9th Cir. 2005) (holding that 364(e) protected not only the debt itself, but also "the validity of any clause of the debt agreement that might have motivated the creditor to extend the credit"); Boullioun Aircraft, 181 F.3d at 1195 ("[Section] 364(e) prohibits not only outright invalidation of a lien or priority where the challenging party has failed to seek a stay, but also modification of the terms of a post-petition lender's bargained-for collateral"); In re Ellingsen MacLean Oil Co., Inc., 834 F.2d 599, 600 (6th Cir. 1987) (where bank extended post-petition financing in return for the waiver of any right to challenge its pre-petition liens, the protection of § 364(e) applied to both the post-petition debt and the waiver).  While a single circuit court has suggested a contrary approach, it has done so only in the context of cross-collateralization clauses, which it concluded were never authorized by Section 364 in the first place.

13. While 364(e)'s literal terms apply only to appeals, in light of its underlying policy of promoting finality in financing orders, courts have extended its protections to foreclose subsequent modifications by the bankruptcy court itself under Rule 9024 or otherwise. The district court's decision in In re Pan Am Corp., 162 B.R. 667, 672 (S.D.N.Y. 1993) is instructive. The Pan Am bankruptcy court modified its own DIP order to effectively provide that the borrowings would not be repaid until resolution of a pending adversary proceeding. Id. at 670. On appeal, the district court determined that although the bankruptcy court did not state the basis for its decision, it could only have modified its financing order under Rule 60(b). Id. at 671-72. On the merits, the district court reversed and remanded, holding that while Section 364(e) does not facially apply to subsequent bankruptcy court orders, "to allow the DIP orders, non-modifiable on their face, to be modified . . . subsequent to their issuance is inconsistent with the protection given to [the lender] as a DIP lender under Section 364(e)." Id. at 672.

14. The Seventh Circuit has similarly applied Section 364(e) to preclude a bankruptcy court from backtracking on its own financing order. See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351 (7th Cir. 1990). In Kham, after the bankruptcy court entered a financing order that granted the DIP lenders priority administrative claims against the estate, the court confirmed a plan of reorganization that equitably subordinated the lenders' claims. The Seventh Circuit reversed, explaining that "[a]lthough § 364(e) speaks only of modification on appeal, it instantiates the principle that bankruptcy judges may make *binding* commitments to give priority to new credit. If creditors fear that the rug will be pulled out from under them, they will hesitate to lend. So § 364(e) . . . disable[s] courts from backtracking on

---

See In re Saybrook Mfg. Co., 963 F.2d 1490 (11th Cir. 1992). However, the Committee does not argue that the Court lacked authority to approve the DIP Facility under Section 364 – only that circumstances have now changed. As such, Section 364(e) remains applicable here even under the Saybrook approach.

promises in the absence of bad faith, which is a very narrow exception." Id. at 1355 (emphasis in original). Kham thus clarified that "a lender that extends credit in reliance on a financing order is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous." Id.

15. Indeed, other bankruptcy courts have rejected the very arguments on which the Committee's Motion is based. In re Fleetwood Enterprises, Inc., 427 B.R. 852, 863-64 (Bankr. C.D. Cal. 2010) is directly on point. The Fleetwood court rejected an effort by the creditors' committee to seek reconsideration of the court's approval of a commitment fee that was approved as part of an interim financing order. The court held that Section 364(e) protected the lender – which had extended credit in reliance on the court's approval of the fee – such that "it would be inappropriate to allow modification of the interim [DIP] order when [the lender's] rights have vested in reliance on the order." Id. at 863; see also In re W. Pac. Airlines, Inc., 224 B.R. 799, 803 (D. Colo. 1998) (agreeing with the analysis in Kham, and reaffirming that "[t]he DIP Lenders are entitled as a matter of law to rely on the terms of the bankruptcy court's financing orders unless they are shown to have acted in bad faith."); In re Lockwood Corp., No. BK93-80133, 1998 Bankr. LEXIS 2019 (Bankr. D. Neb. Jan. 29, 1998) (extending the rationale of Section 364(e) to protect against subsequent decisions by the bankruptcy court itself where "[a]mending or altering the Financing Order . . . would be completely inequitable and unjust" as "[i]n reliance upon the Financing Order", the DIP lender had "loaned [the debtor] in excess of five million dollars."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 281 (Bankr. D. Mass. 1993) (holding that "under the reasoning of Kham & Nate's Shoes, the [bankruptcy court's prior financing orders] cannot and should not be modified"); In re Am. Res. Mgmt. Corp., 51 B.R. 713, 722 (Bankr. D. Utah 1985) ("The bank advanced funds to the

trustee in reliance upon those [post-petition financing] orders. The Chapter 11 process would be undermined if this Court were to, in effect, undo those orders").

16. These authorities and the terms of the DIP Order itself clearly bar the relief the Committee's Motion seeks. The Court has already entered detailed findings of fact concerning Barclays' status as a good faith lender. See, e.g., DIP Order, ¶ G. Nothing in the Committee's Motion calls those findings into question. Barclays agreed to enter into the DIP Facility, which provided for payment of certain fees to Barclays in connection with the extension of credit. The DIP Facility – and any fees due and payable thereunder – were thereafter approved by the Court in the DIP Order. DIP Order ¶ 8. Indeed, that DIP Order provides that in accordance with Section 364(e), the claims and obligations incurred in connection with the DIP Facility remain valid notwithstanding any "modification, amendment or vacation" of the DIP Order "by a subsequent order of this or any other Court." DIP Order ¶¶ G, 26.

17. Barclays ultimately extended credit in reliance on the DIP Order, advancing the Debtors more than $200 million, providing the Debtors with adequate funds to maintain their operations pending the closing of the Barclays Sale. The Committee's attempt to now rewrite or otherwise undermine the DIP Order – using its Motion as an avenue for renegotiation of the fees payable under the DIP Facility – would effectively operate to "pull the rug out from under" Barclays, in direct contravention of the principles underlying Section 364(e). The Bankruptcy Code protects Barclays against such modifications to the DIP Order and the terms of the DIP Facility that it approved and authorized. This alone compels denial of the Committee's Motion as a matter of law.

**B.  In Any Event, There Are No Extraordinary Circumstances Justifying Relief from the DIP Order Under Rule 9024**

18. Even if the principles of Section 364(e) did not foreclose the Committee's belated challenge to the DIP Order (which they do), the Committee has failed to set forth any grounds that would meet the threshold for relief under the Bankruptcy Rules.

19. Initially, while the Committee's Motion purports to seek relief under both Bankruptcy Rules 9023 and 9024[9], the governing version of Rule 9023 (which governs motions to amend judgments) clearly requires that a motion thereunder "must be filed no later than 10 days after entry of the judgment." See Fed. R. Bankr. P. 9023(e).[10] The DIP Order was entered on September 17, 2008, while the Committee's Motion was not filed until September 29, 2008 – twelve days after entry. Rule 9023 is thus unavailable to the Committee.[11]

20. Nor do the allegations in the Committee's Motion even begin to satisfy the standards for relief under Bankruptcy Rule 9024 (which incorporates most provisions of Federal Rule of Civil Procedure 60(b)). Even assuming arguendo that the protections of Section 364(e) were not preclusive (which they are), the Committee could obtain relief from the DIP Order under Rule 9024 "only upon a showing of exceptional circumstances." See In re Lehman

---

[9] The ECF docket entry associated with the Committee's Motion also makes reference to Bankruptcy Rule 3008. However, Rule 3008 is used appropriately only to seek reconsideration of an order allowing or disallowing a claim against the estate under Section 502 of the Bankruptcy Code. See In re Best Payphones, Inc., No 01-15472 (SMB), 2008 WL 2705472, at *2 (Bankr. S.D.N.Y. July 3, 2008). As Rule 3008 appears nowhere in the text of the Committee's Motion, Barclays believes this docket entry was made in error, and will not further address Rule 3008.

[10] The Committee's Motion and the DIP Order were docketed more than a year before the December 1, 2009 amendments that extended the time period for relief under Bankruptcy Rule 9023 from ten days to fourteen days. Accordingly, the ten day period provided by the prior iteration of Rule 9023 governs. See, e.g., In re Taub, 421 B.R. 37, 43 (Bankr. E.D.N.Y. 2009) (holding that reconsideration motion docketed in August 2009 was untimely, where it was docketed thirteen days after the order, as the "[December 2009] amendments to these rules do not expand the ten day filing period [that is] applicable to the Motion to Reconsider.").

[11] See Ass'n for Retarded Citizens of Conn. v. Thorne, 68 F.3d 547, 553 (2d Cir. 1995) (considering under Rule 60(b) a motion for reconsideration that would be untimely under Rule 59, as "[m]otions [for modification of a final order] served within 10 days of judgment ordinarily will fall under Rule 59(e), while motions served later fall under Rule 60(b).")

11

Brothers Holdings Inc., 445 B.R. 143, 168 (Bankr. S.D.N.Y. 2011).[12] In particular, the Court has noted that where a purchaser of a debtor's assets has been found to act in good faith, and accorded the protections of Section 363(m), providing assurance of finality is of particular concern, such that Rule 60(b) relief is available only upon presentation of new evidence that would change the outcome of the proceeding. Id. at 182. This same standard applies by analogy to the Committee's Motion, as Barclays was found to act in good faith (a finding the Committee's Motion does not challenge) and accorded the parallel protections of 364(e).[13]

21.     The Committee's Motion sets forth no such exceptional circumstances. Instead, the Committee's Motion relies on what it characterizes as "changed circumstances" – namely, the closing of the Barclays sale, which decreased the Debtors' post-petition financial obligations and provided it with access to cash proceeds. See Motion at 2, 3-4. Initially, these alleged "changed circumstances" transpired only after the DIP Facility had been approved, and after the Debtors had already drawn $200 million in proceeds. See Fleetwood Enters., 427 B.R. at 863 (denying Rule 60 motion as to interim financing order, as "though hindsight revealed that the interim financing may have been unnecessary to preservation of debtors' estate, this was not the fault of [the DIP lender], which maintained all of its obligations throughout the interim period."). In any event, it was specifically contemplated at the time of the hearing on the DIP

---

[12]    The Motion fails to specify precisely which subsection of Rule 9024(b) the Committee relies upon in seeking to modify the DIP Order. However, because Bankruptcy Rules 9024(b)(1) through (5) are facially inapplicable to the Committee's claim of "changed circumstances", the Committee must be seeking to rely on the catch-all provisions of Bankruptcy Rule 9024(b)(6).

[13]    See Kham, 908 F.2d at 1655 (Section "364(e) and companion provisions, e.g. 11 U.S.C. § 363(m), former Bankruptcy R. 8-703(a)(6), disable courts from backtracking on promises in the absence of bad faith, which is a very narrow exception."); Matter of Ellingsen MacLean Oil Co., Inc., 65 B.R. 358, 361 (W.D. Mich. 1986) ("The Court observes that the legislative history of section 364(e) indicates that it is the analog to section 363(m)"); see also H.Rep. No. 595, 95th Cong., 1st Sess. 346-347; S.Rep. No. 989, 95th Cong., 2d Sess. 57-58 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5843-5844, 6302-6303; S.Rep. No. 989, 95th Cong., 2d Sess. 57-58 (1978). ("Subsection (e) provides the same protection for credit extenders pending an appeal of an authorization to incur debt as is provided under section 363(1) for purchasers: the credit is not affected on appeal by reversal of the authorization . . .The protection runs to a good faith lender, whether or not he knew of the pendency of the appeal.").

Motion that the Debtors would sell their assets to Barclays, and leave the DIP Facility outstanding for no more than two months. See Hr'g Tr. 84:4–84:12 (Sept. 17, 2008).[14] The mere fact that the Debtor has now repaid the DIP as contemplated given its access to alternative funds hardly qualifies as an extraordinary, or even as an unforeseen "change" in circumstances. See, e.g., In re AMC Realty Corp., 270 B.R. 132, 146 (Bankr. S.D.N.Y. 2001) (refusing to alter so-ordered stipulation pursuant to Rule 60(b) where the claimed basis for relief was contemplated by the stipulation itself). This is particularly the case where objections to the amount of fees due under the DIP Facility were already raised by the Committee at the September 17, 2008 hearing and rejected by the Court. See Hr'g Tr. 97:3-17 (Sept. 17, 2008).

22. While the Motion makes additional reference to the Bankruptcy Court's general equitable powers to modify its own orders, the Second Circuit has clarified that "the amenability of a final order to modification by the bankruptcy court itself . . . is governed by Bankruptcy Rule 9[0]24, which incorporates Fed. R. Civ. P. 60." In re Emergency Beacon Corp., 666 F.2d 754, 758 (2d Cir. 1981). The Committee thus cannot avoid the standard of Bankruptcy Rule 9024 by resort to the Court's grant of authority under Section 105(a).

23. Ultimately, the Committee's own authorities demonstrate the impropriety of granting relief under Rule 9024, as Barclays relied on the DIP Order in extending credit. While the Committee cites to In re Mettlen, 174 B.R. 822, 826 (D. Kan. 1994), the Mettlen court in fact reversed the bankruptcy court's attempt to rescind a stipulation of settlement in the absence of fraud or bad faith, as the parties had "materially changed position" in reliance on the stipulation. The Committee's remaining authorities either involve actual misconduct, or

---

[14] In addition, the Debtors themselves negotiated for terms in the DIP Facility providing that repayment would not be immediately due and owing upon closing or termination of the Barclays sale. See DIP Facility at § 1.1 (definition of Maturity Date); Hr'g Tr. at 83:19-83:22 (Sept. 17, 2008) (explaining that "The maturity date of the loan is the earlier of six months after the closing date, the termination of the asset purchase agreement and the consummation of the sale of Neuberger Berman.")

13

recognized that relief could be granted only because no parties had acted in reliance on the order being reconsidered.  See Maxwell Newspapers Inc. v. Travelers Indem. Co. (In re Maxwell Newspapers Inc.), 170 B.R. 549, 550 (S.D.N.Y. 1994) (affirming bankruptcy court's vacatur of stipulation which contained material omissions that amounted to fraud under Bankruptcy Rule 9024(b)(3)); In re Babco, 133 B.R. 286, 289 (Bankr. D. Conn. 1991) (setting aside stipulated order where "there [were] no intervening interests at stake . . . and [the party] ha[d] not alleged any reliance upon the stipulation"); In re Lenox, 902 F.2d 737, 740 (9th Cir. 1990) (noting the bankruptcy court's power to reconsider or modify its orders exists only "so long as no intervening rights have become vested in reliance on the orders.").  These authorities themselves demonstrate that where Barclays – which this Court has already found acted in good faith – extended credit in reliance on the terms that the DIP Order approved (including the fees that were specifically authorized and directed to be paid), that order cannot now simply be rewritten or set aside.

## REQUEST FOR RELIEF

WHEREFORE, for the reasons set forth herein, Barclays respectfully requests that this Court: (a) deny the Committee's Motion in its entirety; and (b) grant such other and further relief as this Court may deem just or proper.

Dated: New York, New York
       December 8, 2011

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   /s/ Lindsee P. Granfield

Lindsee P. Granfield
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Capital Inc. and Barclays Bank PLC*