WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                    :

**In re**                              :       **Chapter 11 Case No.**
                                      :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :      **08-13555 (JMP)**
                                      :

                     **Debtors.**        :      **(Jointly Administered)**
                                      :

------------------------------------------------------------------x

**NOTICE OF AMENDMENT TO DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION**
**TO MONETIZE EQUITY INTERESTS IN NEUBERGER BERMAN GROUP LLC**

        **PLEASE TAKE NOTICE** that the above-captioned Debtors and Neuberger

Berman Group LLC have agreed to modify certain provisions of the Term Sheet attached as

Exhibit A to the pending Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy

Code to Monetize Equity Interests in Neuberger Berman Group LLC [Docket No. 21847] (the

"Motion"). A copy of a revised proposed order approving the Motion is attached hereto as

Exhibit 1. A blackline reflecting the changes to the proposed order and Term Sheet is attached

hereto as Exhibit 2.

The hearing to consider the relief requested in the Motion remains scheduled for December 14, 2011 at 10:00 a.m. before the Honorable James M. Peck, United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York,  New York, Room 601.


Dated:  December 9, 2011
      New York, New York

             /s/ Lori R. Fife_____
             Lori R. Fife

             WEIL, GOTSHAL & MANGES LLP
             767 Fifth Avenue
             New York, New York 10153
             Telephone: (212) 310-8000
             Facsimile: (212) 310-8007

             Attorneys for Debtors
             and Debtors in Possession

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
```
In re                                                    :    **Chapter 11 Case No.**
                                                         :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                         :
                               **Debtors.**    :    **(Jointly Administered)**
```
-------------------------------------------------------------------x
```

**ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE**
**BANKRUPTCY CODE AUTHORIZING THE MONETIZATION**
**OF EQUITY INTERESTS IN NEUBERGER BERMAN GROUP LLC**

Upon the motion, dated November 9, 2011,[1] of Lehman Brothers Holdings Inc. and

its affiliated debtors in the above referenced chapter 11 cases, as debtors and debtors in possession

(collectively, the "Debtors"), pursuant to sections 105 and 363 of the Bankruptcy Code and

Bankruptcy Rule 6004, for authorization to monetize the equity interests in Neuberger Berman

Group LLC, as more fully described in the motion, and as amended by the revised proposed order

and Term Sheet filed by the Debtors on December 9, 2011 (collectively, the "Motion"); and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance with

28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the

Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the second amended order entered June 17, 2010

governing case management and administrative procedures (ECF No. 9635); and a reasonable

opportunity to object or be heard regarding the Motion having been afforded to all such parties; and

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the
Motion.

it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors are authorized to take all actions contemplated by the Term Sheet attached hereto as Exhibit A; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the Debtors' right, title, and interest in any Equity Interests sold in accordance with the Term Sheet shall be sold free and clear of any and all liens, claims, and encumbrances; and it is further

ORDERED that NBG will be a good faith purchaser and is granted the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code and consummation of the redemptions or sales of the Equity Interests shall not be affected by reversal or modification on any appeal of this Order; and it is further

ORDERED that the Debtors are authorized to, and authorized to cause their non-Debtor affiliates to, (i) provide any consents in respect of, perform all obligations and enter into any agreements contemplated by the Term Sheet, and (ii) execute such other documents and take such other actions as may be necessary or appropriate to effectuate the Term Sheet and the transactions contemplated thereunder or the provisions of this Order; and it is further

ORDERED that the Term Sheet and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; *provided further* that Court approval shall be required for any such modification, amendment or supplement that does have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any stay imposed by Bankruptcy Rule 6004(h) is hereby waived and this Order shall be immediately effective and enforceable; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: _____ __, 2011
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

3

# EXHIBIT A

**Summary of Transaction Terms: Neuberger Berman Refinancing**

1. **Second Amended and Restated Limited Liability Company Agreement of Neuberger Berman Group LLC, as amended**

    (a) NBSH Acquisitions, LLC ("NBSH"), Lehman Brothers Holdings Inc. ("LBHI") and certain subsidiaries of LBHI (together with LBHI, the "LBHI Parties" and collectively with NBSH and LBHI, the "LLC Parties") are party to that certain Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") of Neuberger Berman Group LLC (the "Company") dated as of May 4, 2009, as amended as of May 1, 2010 and on May 18, 2011. The LLC Agreement and the amending documents are attached as Exhibit A.

    (b) The LLC Parties desire to undertake the transactions described below and to amend and restate the LLC Agreement and any related agreements (including entry into new agreements) to reflect the terms set forth below.

2. **Initial Transactions – New Debt, Redemption of Preferred Units and Purchase of Class A Units**

    (a) As a condition precedent to the transactions contemplated by this Summary of Transaction Terms, the Company will raise debt in the form of bank and/or bond securities (the "New Debt") in an amount[1] which, along with existing cash on the balance sheet of the Company, will be sufficient to redeem all of the LBHI Parties' preferred units in the Company and all of NBSH's vested preferred units in the Company and will be used for such redemption. The preferred units will be redeemed at par plus accrued preferred return. In addition, at or before Closing, the Company shall pay to the holders of the preferred units an additional return in the amount of 2.5% of the par value outstanding as of December 1, 2011 (the "Additional Return"). Accordingly, the LBHI Parties shall receive as Additional Return $20,343,750.00 on or before Closing of the redemption of the preferred units. The LLC Parties currently anticipate that the principal amount of the New Debt will be at least $720 million and that approximately $125 million of existing cash on the balance sheet will be used for these purposes; however the actual amounts of New Debt and cash on the balance sheet required for these purposes may change prior to the Closing. The principal amount of the New Debt will not exceed the amount that will be sufficient to (i) redeem all of the LBHI Parties' preferred units in the Company, together with accrued preferred return, (ii) pay the Additional Return, (iii) redeem all of NBSH's vested preferred units in the Company, together with accrued preferred return, (iv) purchase 50% of the LBHI Parties' Class A units permitted to be repurchased pursuant to Section 2(c) (and less $125 million of existing cash on the balance sheet) and (v) pay the Company's transaction expenses.

    (b) The Company will redeem unvested preferred units held by NBSH in exchange for an interest-bearing note at LIBOR + 300 basis points. The terms of the note will include a payment schedule that mirrors the vesting schedule of the preferred units that are held by the employees of the Company.

---

[1] Subject to Sections 2(a) and 11(b), amount of New Debt and mix of bank and bond securities to be determined at NB's Board discretion in order to optimize execution.

(c) In connection with the closing of the redemption all of the LBHI Parties' preferred units in the Company and all of NBSH's vested preferred units in the Company  (the "Closing"), the Company will have the option to purchase Class A units in the Company from the LBHI Parties at the Agreed Valuation (as defined below) as of December 31, 2011 (the "Initial Valuation"); provided, however, that the number of Class A units purchased in connection with the Closing shall not exceed 10% of the aggregate common units of the Company (i.e., Class A units, Class B units and Profits Interest units) outstanding immediately prior to Closing (the "Closing Cap").  If the Company intends to purchase Class A units in connection with the Closing, the Company will provide a written notice to the LBHI Parties within 30 days following the Closing which indicates the number of Class A units to be purchased in connection with the Closing based upon the Initial Valuation.  See Section 5 for the process for the determination of the Agreed Valuation and Section 7 for the timetable for the purchases of Class A units made in connection with the Closing based upon the Initial Valuation.

3. **Purchase of Class A Units After the Closing using Excess Cash Flow**

(a) The Company is obligated to redeem Class A units held by the LBHI Parties using its excess cash flow ("ECF"), as of December 31 of the preceding year, as follows; provided that the Company may not purchase more than 26% of the Class A units held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) in any calendar year after the Closing (i.e., beginning with the December 31, 2012 valuation) (the "Post-Closing Annual Cap"); and provided, further, that in the event that the number of such Class A units purchased by the Company in 2013 is less than the Post-Closing Annual Cap ("Shortfall Percentage"), the Company may purchase additional Class A units up to the Shortfall Percentage in excess of the Post-Closing Annual Cap in 2014 and 2015, but in no event may the Company purchase in the aggregate more than 28.5% of the Class A units held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) in each of 2014 and 2015:

| Senior Secured Term Loan Leverage Level | % ECF Sweep to Redeem LBHI Equity |
| --- | --- |
| ≥1.5x | 25 |
| <1.5x – ≥1.0x | 75 |
| <1.0x | 100 |

Leverage levels and excess cash flow sweep ratios and percentages are subject to further negotiation with the lenders (but ECF sweep ratios and percentages to redeem equity owned by the LBHI Parties will not increase).

(b) ECF will be calculated net of (i) payments to terminated and retired employees  (provided that in no event will such payments to terminated and retired employees for a calendar year exceed the aggregate amount paid to the LBHI Parties for Class A units in the applicable year (whether using ECF or otherwise)), (ii) tax distributions and (iii) mandatory debt amortization payments, and otherwise to be on market terms and duplicative of the excess cash flow definition applied to the bank debt (if any).  If there is no ECF definition in the New Debt documentation, the definition will be agreed to by the Company and the LBHI Parties.

2

(c) On March 31 of each year, the Company must (subject to the Post-Closing Annual Cap) apply the applicable percentage of ECF to repurchase Class A units held by the LBHI Parties at the Agreed Valuation (as defined below). The Company must purchase the applicable number of Class A units from the LBHI Parties and the LBHI Parties must sell the applicable number of Class A units to the Company, in each case at the Agreed Valuation determined as of December 31 of the preceding year.

**4.    Additional Optional Purchase of Class A Units After the Closing**

(a) The Company has the option to purchase Class A units from the LBHI Parties at the Agreed Valuation after the Closing (in addition to those purchased using ECF pursuant to Section 3) subject to the Post-Closing Annual Cap. The timetable for the purchases is set forth in Section 7.

(b) The purchase price for any Class A units purchased by the Company as contemplated in Section 2(c) and this Section 4 may be financed through proceeds raised from new equity issued to NBSH. In such event, the Company will use cash from, or cash that would otherwise be paid (currently or in the future) to, employees who commit to purchase or receive, as the case may be, equity (in the amount of the commitment that was made) (such commitments, the "Employee Commitments").

**5.    Purchase Price and Valuation for Class A Units**

The "Agreed Valuation," is an amount equal to the greater of (i) the Valuation Agent Value (as defined below) and (ii) the Employee Repurchase Value (as defined below).

(a) "Valuation Agent Value" means the average valuation/price provided by two valuation agents engaged by the Company, each providing an independent valuation as of December 31 of the year preceding the purchase.

(b) One valuation agent shall be selected by NBG and one valuation agent shall be selected by the LBHI Parties. Each of NBG and the LBHI Parties shall have the right to replace the valuation agent it selected if such valuation agent is (A) no longer competent or able to value an asset management business or (B) develops a material conflict of interest which cannot be addressed through the implementation of appropriate procedures (such as screening measures or other ethical barriers), in each case, subject to the consent of the other party as to the newly selected valuation agent solely as it relates to the competency of such agent in valuing an asset management business and/or material conflicts of interest raised by the potential engagement of such agent to provide such services, and in any event which consent may not be unreasonably withheld.

(c) Each of the valuation agents will be instructed to (A) structure the valuation to ensure that value is properly allocated between units that have different rights and entitlement to the Company's profits and distributions, including without limitation differences between common units and profits interest units and any distribution thresholds applicable to any such units, (B) value material acquisitions and joint ventures in accordance with the terms outlined in Appendix 1 to the extent applicable, (C) apply only a single, 17.5% percentage discount for any minority, liquidity or non-control considerations to the estimated equity value of the Company except as otherwise provided in this Summary of Transaction Terms (including pursuant to Section 9 and Sections 1(e), 1(f) and 1(g) of

3

Appendix 1) (the "Specified Discount"), (D) deliver the valuation report for December 31 of any year no later than March 31 of the following year (the "Valuation Delivery Date") and (E) disregard any tax-related reserves that are established in connection with or as a result of the transactions contemplated by this Summary of Transaction Terms.

(d)    The Company shall deliver requested documentation in a timely manner to the valuation agents to enable delivery of a valuation by the Valuation Delivery Date.  The budget used for the valuation must be approved by the board of directors of the Company (the "Board"), including by the majority vote of the independent members of the Board.  In the event that any independent Board member is replaced, the appointment of any Board member to replace such independent Board member shall require the consent of the majority of the remaining independent members.  The Company shall deliver an annual budget to the Board for their approval by December 31 of each year.

(e)    The Company will pay the fees of both valuation agents, subject to a cap of $125,000 per year on the cost of each of the valuation agents.

## 6.    Employee Repurchases

(a)    For purposes of this Summary of Transaction Terms, "Employee Repurchase Value" means the price paid to retiring or terminated employees for their Class B units in the applicable year based on the valuation process set forth in the LLC Agreement for the purchase of employee equity or as otherwise instructed by the Board.

(b)    In no event shall the aggregate amount paid to the LBHI Parties for Class A units (whether for purchases using the ECF sweep or other optional purchases or redemptions of common equity by the Company) in any calendar year be less than the aggregate payments to terminated and retired employees for their equity (other than preferred units) in the applicable year, subject to the Post-Closing Annual Cap (unless the Post-Closing Annual Cap is waived in the sole discretion of the LBHI Parties).

## 7.    Timeline for Payments and Purchases of Equity

(a)    All purchases and redemptions of equity from the LBHI Parties by the Company contemplated by this Summary of Transaction Terms (including purchases and commitments for purchases of Class A units made in connection with the Closing based upon the Initial Valuation) will be expressly permitted under the documentation for the New Debt (including, for example, any incurrence of debt by the Company to fund).  All purchases and redemptions of equity by the Company shall be effected in accordance with the following timeline in any applicable year:

### *Required purchase of equity using ECF*

(i)    March 31: The Company shall use ECF calculated as of December 31 of the preceding year (as set forth in Section 3) to purchase Class A units from the LBHI Parties at the Agreed Valuation, subject to the Post-Closing Annual Cap (for the avoidance of doubt, the Post-Closing Annual Cap does not apply to purchases based upon the Initial Valuation, which are subject to the Closing Cap).

4

*Optional purchase of equity*

(ii) All purchases and commitments for purchases of Class A units from the LBHI Parties made by the Company in connection with the Closing based upon the Initial Valuation are subject to the following terms and timeline:

    A.    Later of (x) Closing date + 1 Month and (y) Valuation Delivery Date + 1 Month (such date, the "Closing Commitment Date"): A commitment notice from the Company to purchase Class A units from the LBHI Parties is due. Payment for all purchases based on such commitments shall be delivered on the Closing Commitment Date, provided that, at the election of the Company, all (or any portion of) the payments for purchases based on Employee Commitments may be delivered on a quarterly basis as set forth in Section 7(a)(ii)(B) below.

    B.    If the Closing Commitment Date is in 2012, payments for purchases based on Employee Commitments which the Company elects to pay quarterly as permitted in Section 7(a)(ii)(A) above will be delivered on the following dates: (i) Closing Commitment Date, and (ii) the last day of each calendar quarter of the year in which the Closing Commitment Date occurs. If the Closing Commitment Date is in 2013, the entire amount of the foregoing payments will be delivered on the Closing Commitment Date.

    C.    All purchases based on Employee Commitments are to be paid with an interest rate of LIBOR + 350 basis points applied from January 1, 2012.

(iii) All purchases and commitments for purchases of Class A units from the LBHI Parties made by the Company (other than in connection with the Closing based upon the Initial Valuation or the required purchase of Class A units using ECF a set forth in Section 7(a)(i) above) are subject to the following terms and timeline of any applicable year:

    A.    Valuation Delivery Date + 1 Month: A commitment notice from the Company with respect to commitments to purchase Class A units from the LBHI Parties is due. Payment for all purchases based on such commitments shall then be delivered on the Valuation Delivery Date + 1 Month, provided that at the election of the Company, all (or any portion of) the payments for purchases based on Employee Commitments may be delivered on a quarterly basis as set forth in Section 7(a)(iii)(B) below.

    B.    Payments for purchases based on Employee Commitments which the Company elects to pay quarterly as permitted in Section 7(a)(iii)(A) to be delivered on the following dates: (i) Valuation Delivery Date + 1 Month; and (ii) June 30th, September 30th, and December 31st.

    C.    All purchases based on Employee Commitments to be paid with an interest rate of LIBOR + 350 basis points applied from January 1 of the applicable year.

(iv) Any purchases of additional Class A units in excess of the annual Post-Closing Annual Cap may be made on such terms and at such times as may be agreed between the LBHI Parties and NBSH.

8. **Special Allocation of Income**

(a) The LBHI Parties will receive a special allocation of net income in the Company equal to the dollar amount of the total proceeds received in the applicable calendar year from all purchases and redemptions of Class A units held by the LBHI Parties (which allocation will be appropriately adjusted downward to take into account the LBHI Parties' capital accounts in the Company for the preceding calendar year), other than those purchases and redemptions pursuant to the initial transactions as set forth in Section 2[2]; provided that (i) (A) the Company has received on the Closing date a "should" level opinion issued by the Company's outside tax counsel and addressed to the Company regarding this special allocation of income methodology, in a form reviewed in advance by the LBHI Parties and reasonably acceptable to the Company and (B) an updated "should" level opinion shall be prepared and delivered to the Company each year and made available for review by the LBHI Parties, and such updated opinion shall address changes, if any, in the Internal Revenue Code or its interpretation by applicable governmental authorities (such updated opinion to be prepared by the same outside tax counsel or another reputable, nationally recognized, tax counsel) and (ii) the Company has provided confirmation each year that its tax preparer will sign the Company's tax returns that include the special allocation of income methodology.

(b) The Company will reimburse the LBHI Parties for any increase in state and local tax liability (including interest and penalties) (i) "directly" associated with the specially allocated income and (ii) incurred as a result of the special allocation that is caused "indirectly" as a result of other assets/investments held by LBHI and its subsidiaries in the applicable jurisdiction subject to an aggregate cap, in the case of this clause (ii), of $35 million.

(c) The Company will prepare K-1's and file tax returns and related information returns in accordance with the tax opinion and any updates thereto delivered pursuant to Section 8(a).

(d) Tax related payments shall be made to the LBHI Parties and NBSH if the special allocation methodology is overturned or reversed, in an amount sufficient to indemnify each of the LBHI Parties and NBSH for any additional taxes (including interest and penalties) such party must pay as a result of the overturning or reversal of the special allocation methodology (where the reallocation of income arising from the overturning or reversing of the special allocation shall take into account the ownership split in the tax year being modified, e.g., reversal of 2012 special allocation in 2014 will presumably result in reallocations of income based on 2012 ownership).

(e) Each of the LBHI Parties and NBSH must provide the Company and each other appropriate tax records and other supporting documents to substantiate any indemnification or other tax payments (e.g., substantiation of increased state and local tax liability or increased U.S. federal tax liability (including interest and penalties)).

---

[2] Application to pre-emptive right purchases in Section 11 to be discussed between the parties.

### 9.   Future Exit

(a)   The Company shall use reasonable commercial efforts to be rated, and to continue to be rated, by S&P and Moody's (together, the "Agencies").

(b)   If, at any time after December 31, 2015, (i) the Company carries investment grade ratings from the Agencies, or an investment grade rating from one Agency if only one of the Agencies provides a rating to the Company at such time or (ii) the Company has incurred Debt (as defined in Appendix 1) other than Permitted Debt (as defined below) and has a ratio of original Debt (i.e., the New Debt issued at Closing) to EBITDA in the last 12 months of less than 2.5 (such ratio, the "Triggering Debt Ratio Test"), then, in either case, the Company will be required to repurchase the LBHI Parties' remaining equity within 15 months, but in no case later than April 30, 2017 (the earlier date, the "Payment Date") at the most recent Agreed Valuation as of the repurchase date; provided, however, that the Specified Discount shall be 0%.

  (i)   If full payment is not made by the Payment Date, the LBHI Parties will have right to exercise demand registration rights to cause the Company to monetize the remaining interest of the LBHI Parties in the Company via a public offering within six months from such notice.

  (ii)   If the Payment Date is on or prior to 6 months after the previous Valuation Delivery Date, the purchase price for the LBHI Parties' equity shall accrue interest at LIBOR + 350 basis points from January 1 to the Payment Date.

(iii)   If the Payment Date is more than 6 months after the previous Valuation Delivery Date, the purchase price for the LBHI Parties' equity shall accrue interest at the following rates: (i) LIBOR + 350 basis points from January 1 to the date that is 6 months after the Valuation Delivery Date; (ii) LIBOR + 450 for the 7th month after the Valuation Delivery date, with monthly increases of 25 basis points thereafter.

(iv)   For the avoidance of doubt, if at any point after December 31, 2015 the Company is or becomes investment grade or satisfies the Triggering Debt Ratio Test, the Company may still make its annual purchases based on the December 31, 2015 valuation with the Specified Discount of 17.5% up to the Post-Closing Annual Cap.  All equity purchases thereafter will be at a Specified Discount of 0%.

(c)   In the event the LBHI Parties own any equity in the Company on December 31, 2016, then the Company will be required to repurchase the LBHI Parties' remaining equity by April 30, 2017 at the Agreed Valuation as of December 31, 2016.  For purchases made between January 1, 2017 and April 30, 2017, if the Specified Discount has not been reduced to 0% pursuant to Section 9(b), the Specified Discount will be 17.5%.  All purchases made during this time frame must be closed, and all proceeds from such purchases must be in cash, and must be received by the LBHI Parties by April 30, 2017. If full payment is not made by such date, the LBHI Parties shall have demand registration rights to cause the Company to monetize the LBHI Parties' remaining stake via a public offering within six months from such notice.

(d)   "Permitted Debt" means (i) Debt to refinance the then-existing principal amount of New Debt issued at Closing, (ii) Debt to finance the purchase of 100% of the remaining Class A units (it being understood that this provision is subject to the Post-Closing Annual Cap

and thus would only be applicable when 25% or less of the equity held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) remains outstanding, or in the case where the Specified Discount is 0% after December 31, 2015), which proceeds of such Debt must be immediately remitted to purchase the LBHI Parties' equity, (iii) Debt existing on the Closing date (including any draw-downs over the life of the revolving credit facility), (iv) Debt incurred with the approval of the LBHI Parties, (v) for the avoidance of doubt, any interest accruing on additional purchases of equity from the LBHI Parties to be made by December 30, 2016 as provided in Section 9(c), (vi) Debt up to an aggregate of $40 million for the specific purpose of undertaking improvements to the Company's real estate facilities, and (vii) other Debt not covered by the foregoing clauses (i) through (vi) up to an aggregate of $15 million (provided that, if greater than $15 million, Debt incurred pursuant to this clause (vii) shall not be treated as Permitted Debt for purposes of clause (ii) of Section 9(b)).

**10. Exit for Preemptive Rights Purchases**

(a)   Notwithstanding Section 9, the following shall apply to equity in the Company purchased by the LBHI  Parties pursuant to the exercise of pre-emptive rights as contemplated by Appendix 1 (such purchases, the "Preemptive Rights Issuances"):

(i)   The Company shall use its commercially reasonable efforts to purchase Preemptive Rights Issuances occurring within three years from Closing in equal annual amounts, in addition to the other annual purchases.

(ii)   The Company shall use its commercially reasonable efforts to purchase Preemptive Rights Issuances occurring after the third anniversary of the Closing by no later than the earlier of (i) one year from the date that the LBHI Parties no longer own any equity in the Company other than the Preemptive Rights Issuances, and (ii) April 30, 2017 (the earlier date, the "End Date").  Such purchases shall be made in equal annual amounts from the issuance date through the date by which the purchases must be made in accordance with the immediately preceding sentence.

(iii)   Any Preemptive Rights Issuances will be purchased by the Company at the then-applicable Agreed Valuation with the then-applicable Specified Discount (as specified above under "Future Exit").

(iv)   Any failure by the Company to purchase any Preemptive Rights Issuances (whether or not included as part of the annual purchases) shall not give rise to any registration obligation on the part of the Company or trigger any of the registration rights provisions under "Future Exit" (for the avoidance of doubt, the LBHI Parties may pursue legal remedies to enforce payment by the deadline specified above, but only if the Company has not used its commercially reasonable efforts to purchase any Preemptive Rights Issuances).

(v)   For purposes of this Section 10 only, "Commercially Reasonable Efforts" is to be defined to include use of commercially reasonable efforts by the Company to execute draw downs of available capacity under lending facilities, issuances of debt and equity securities; provided that if Preemptive Rights Issuances remain outstanding after the End Date, notwithstanding such commercially reasonable efforts, the LBHI Parties shall have the option of converting remaining equity in the Company into a

8

subordinated note (without any contractual transfer restrictions such that it is freely assignable to a third party buyer) to pay interest at the then highest interest paying tranche of the Company's funded indebtedness + 200 basis points, to increase by an additional 200 basis points annually until fully paid off, with interest accruing from the End Date and payable quarterly in cash.

## 11. Governance / Other

(a) LBHI Parties' governance rights will be revised with the decrease in equity ownership by the LBHI Parties (see Appendix 1 for detail).

(b) The terms of the New Debt shall not conflict with, and shall be consistent with, (i) the terms of this Summary of Transaction Terms or their operation and (ii) the Ancillary Term Sheet agreed between LBHI and the Company on or about November 8, 2011, in each case, unless otherwise mutually agreed to by the LBHI Parties and the Company.

(c) The LBHI Parties will have the registration rights as set forth in Sections 9 and 10 above, including a covenant by the Company to be fully prepared to facilitate an initial public offering ("IPO") in accordance with the registration rights.

(d) The Board will determine the appropriate entity to become the public registrant to issue equity in an IPO process.  Currently the Company may use NBSH to issue equity in an IPO process but for tax, accounting or other reasons may later choose to create an alternative structure and create a new holding company between NBSH and the Company or another structure as part of the IPO process.  NBSH has audited financials since May, 2009 and will be the default entity to issue equity, unless the Board determines another structure would more appropriate.  All of the LBHI Parties' registration rights will apply to the public registrant which is selected for an IPO.  Any IPO must result in the public registrant paying cash and/or the common equity issued by the IPO vehicle in exchange for all of the LBHI Parties' equity at the Company and any lock-ups relating to any registration statement will not exceed 180 days.  Unless permitted under accounting rules, the LBHI Parties may not swap common units in the Company for new equity in NBSH or another entity which is the public registrant prior to the IPO process.

(e) In the event that the Company sells any common units or any other equity linked instrument of the Company to one or more third parties at an implied common equity valuation higher than the common equity valuation used to pay the LBHI Parties for its Class A units in the 12-month period preceding such third party sale, then the Company shall pay to the LBHI Parties an amount equal to (i) 100% of the difference  between the price per unit the LBHI Parties would have received at such higher implied common equity valuation *minus* the price per unit the LBHI Parties received for the Class A units sold in such 12-month period *multiplied* by (ii) the lesser of (x) the number of Class A units sold by the LBHI Parties in the 12-month period and (y) the number of Class A units that could have been purchased at such implied common equity valuation with the aggregate consideration that the third party in the third-party transaction provided for the purchased common units or other equity linked instrument, as the case may be.  For the avoidance of doubt, for the purposes of this Section 11(e), the commitment date (i.e. either the Closing Commitment Date pursuant to Section (7)(a)(ii)(A) or Valuation Delivery Date + 1 Month pursuant to Section 7(a)(iii)(A)) shall be considered the sale date for Employee Commitment purchases of Class A units.

9

(f) The LBHI Parties shall have customary information rights, including rights to receive annual consolidated NBSH audited financials, quarterly unaudited financials, budgets, tax information and any information or other reporting provided to lenders.

(g) LBHI will be permitted to publicly disclose in its periodic reporting summary level information regarding the Company's aggregate assets under management, total revenues, aggregate mutual fund net flows, and total headcount.

(h) The LBHI Parties shall have the right to transfer Class A units provided that transferees agree to be bound by the transfer rights under the existing LLC Agreement.

(i) If the Company issues or otherwise sells units or any other equity linked instrument to a third party, LBHI Parties will have pro-rata tag along rights to participate in such transaction at the same implied common equity valuation and transfer their units to the third-party buyer at what would be the price per Class A Unit based on such implied common equity valuation. Alternatively, in lieu of the pro-rata tag along rights described above, the Company, at its option, shall offer to redeem from the LBHI Parties up to that number of Class A Units that could be purchased at the same implied common equity valuation using a percentage of the net proceeds received from the sale to such third party equal to the LBHI Parties pro rata ownership interest in the Company.

## 12. Deal Consummation

(a) The transactions contemplated by this Summary of Transaction Terms are subject to approval of this Summary of Transaction Terms by the Bankruptcy Court and approval of definitive documents by the respective boards of directors of the Company and LBHI (which approval will be given on a basis consistent with Section 12(d) below).

(b) The Closing must occur no later than December 31, 2012, or as may be extended by mutual agreement of the Company and the LBHI Parties; provided, that if the Closing occurs on or after July 1, 2012, interest will accrue at LIBOR + 350 basis points on the purchase price for any common units (which are not already subject to interest under this Summary of Transaction Terms) sold in connection with the initial transactions at Closing from July 1, 2012 through the date such units are paid for.

(c) The Company shall use commercially reasonable efforts to pursue financing in respect of New Debt, provided that the transactions contemplated by this Summary of Transaction Terms are subject to (i) the Company obtaining financing in respect of New Debt on terms and conditions satisfactory to the Board (in its sole discretion) and a majority-in-interest of the members of NBSH, and (ii) the Board determining that it is prudent for the Company to incur New Debt. For the avoidance of doubt, if the Company in its good faith judgment does not believe that the financing market conditions or the business results of the Company are favorable to the incurrence of a financing on acceptable terms, then the Company may suspend its efforts to pursue such financing.

(d) The Company and the LBHI Parties shall promptly proceed in good faith to negotiate and execute definitive documents to reflect the terms of this Summary of Transaction Terms and shall not propose to include in the definitive documents new or changed economic or other material terms from the terms of this Summary of Transaction Terms.

# APPENDIX 1

## LBHI GOVERNANCE RIGHTS WITH DECREASING EQUITY OWNERSHIP

Set forth below are (1) modifications, if any, of the LBHI Parties' governance and certain other related rights under the LLC Agreement upon the Closing and after the Closing as the LBHI Parties' percentage ownership of the outstanding common units in the Company continue to decrease pursuant to the transactions contemplated in this Summary of Transaction Terms and (2) the level of the LBHI Parties' percentage ownership of the outstanding common units of the Company upon which such rights would be eliminated or modified.

1. **The LBHI Parties have the following rights prior to the Closing, but such rights will be eliminated upon the Closing (subject to the limitations set forth herein):**

   (a) Size of the Board: consent right over any increase or decrease in the authorized size of the Board will be eliminated (provided that independent directors shall maintain at all times at least a 2/7 representation ratio). In the event that any independent Board member is replaced, the appointment of any Board member to replace such independent Board member shall require the consent of the majority of the remaining independent members.

   (b) Equity Issuances: consent right over (i) all third-party equity issuances and (ii) employee equity issuances up to the Annual Approved Basket (as defined below) and at a value no less than the Minimum Employee Issuance Value (as defined below) will be eliminated.

   (c) Debt Incurrence: upon the Closing, the LBHI Parties will not have a consent right for any indebtedness for borrowed money, guarantees thereof and liens related thereto (collectively, "Debt") except when the covenants or other requirements of such other Debt would restrict the Company from making any required ECF purchase of Class A units from the LBHI Parties or would modify the ECF calculation methodology with respect to mandatory repurchases under the transaction financing documents in a manner that is adverse to the LBHI Parties, in each case as described in this Summary of Transaction Terms. The Board must approve all Debt.

   (d) Material Acquisitions:

      (i) Consent right over dispositions, leases and capital expenditures will be eliminated. The consent right over acquisitions will be eliminated to the extent that the purchase price or prices for acquisitions and joint ventures for any calendar year equal in the aggregate to 10% or less of the NB Enterprise Value (defined as the Standard Valuation (as defined below) (without applying the Specified Discount) for the purposes of this Section 1(d) and Section 1(e)). The consent right over any acquisition or joint venture for any calendar year which is not permitted by the preceding sentence will also be eliminated if (x) for the next subsequent valuation following the transaction closing, the Valuation Agents automatically value the transactions/assets purchased at the higher of (A) the purchase price plus transaction costs, subject to downward adjustment for market deterioration (based on an agreed index) from the closing date to the valuation date (the "Transaction Valuation") or (B) the value resulting from using the valuation methodologies set forth in this Summary of Transaction Terms (the "Standard Valuation"), and (y) for the second such subsequent valuation following the transaction closing, the LBHI Parties are given the opportunity to elect within 10 business days after receiving notice of the signing of the transaction, to have the Valuation Agents value the transactions/assets purchased at the Transaction Valuation. If the LBHI Parties do not make the election set forth in the preceding clause (y), then the Valuation Agents will value the transactions/assets purchased using the Standard Valuation.

(ii)    Any material acquisitions, as well as material dispositions, leases, and capital expenditures, must be approved by Board and must be at arms length with an unrelated third party.  Leases and capital expenditures may be approved via Board approval of the budget.

(iii)    Acquisitions entered into with the consent of the LBHI Parties shall not count towards the 10% basket described in Section 1(d)(i) and shall not be subject to the restrictions described in Section 1(d)(i).

(e)    Joint Ventures.

(i)    Consent right over the establishment, investment or participation in or loan of money or equipment to, any partnership or joint venture will be eliminated to the extent that joint ventures, together with acquisitions, for any calendar year equal in the aggregate to 10% or less of the NB Enterprise Value (defined as the Standard Valuation (without applying the Specified Discount) for the purposes of Section 1(d) and this Section 1(e)).  The consent right over joint ventures for any calendar year which is not permitted by the preceding sentence will be eliminated if (x) after giving effect to pro forma cash flow requirements after such transactions, the Company's projected ECF amount available for the next purchase of the LBHI Parties' Class A units pursuant to Section 6(d) of this Summary of Transaction Terms will not be lower than it would have been if the transaction had not occurred, or (y) in the case where the condition in the foregoing clause (x) is not met, the LBHI Parties are given the opportunity to elect within 10 business days after receiving notice of the signing of the transaction, to have the Valuation Agents value the transactions/assets purchased at the purchase price plus transaction costs for the two years following the consummation of the transaction.  If the LBHI Parties do not make such election, then the Valuation Agents will value the transactions/assets purchased using the valuation methodologies set forth in this Summary of Transaction Terms.

(ii)    Any joint ventures must be approved by Board and must be at arms length with an unrelated third party.

(iii)    Joint ventures entered into with the consent of the LBHI Parties shall not count towards the 10% basket described in Section 1(e)(i) and shall not be subject to the restrictions described in Section 1(e)(i).

(f)    Sale, Merger or Reorganization: consent right over any reorganization, consolidation, merger, sale of all or substantially all the assets, or other change of control transaction of the Company or any of its subsidiaries with another entity, will be eliminated provided that:

(i)    any such transaction occurring within two years from Closing will result in (A) NBSH having drag-along rights at the (1) transaction price, or (2) at the election of the LBHI Parties to be made within 10 business days after the LBHI Parties receive notice of the signing of the transaction, the Agreed Valuation assuming a Specified Discount of 0% as of the last day of the quarter preceding the signing of the transaction, and (B) the LBHI Parties having tag-along rights at the transaction price;

(ii)    any such transaction occurring between the second and fourth years after Closing will result in (A) NBSH having drag-along rights at the (1) transaction price, or (2) at the election of the LBHI Parties to be made within 10 business days after the LBHI Parties receive notice of the signing of the transaction, the Agreed Valuation as of the last day of the quarter preceding the signing of the transaction (assuming the Specified Discount as of the signing of the transaction) and (B) the LBHI Parties having tag-along rights at the transaction price; and

2

(iii)  any such transaction occurring more than four years after the Closing (or occurring at any time after the closing with the consent of the LBHI Parties) will result in (A) NBSH having drag-along rights at the transaction price, and (B) the LBHI Parties having tag-along rights at the transaction price.

**2.  The LBHI Parties have the following rights prior to the Closing but such rights will be modified upon the LBHI Parties owning less than 25.0% of all outstanding common units in the Company at the time:**

(a)  <u>Appointment of CEO</u>: consent right over the appointment of a new CEO will be eliminated.

**3.  The LBHI Parties have the following rights prior to the Closing but such rights will be modified upon the LBHI Parties owning less than 15.0% and then less than 5.0% of all outstanding common units in the Company at the time:**

(a)  <u>Board seats</u>: prior to the Closing, the LBHI Parties are entitled to appoint two members to the Board and are entitled to have one of its directors appointed to all major committees.  Upon the LBHI Parties owning less than 15.0% of all outstanding common units of the Company, the LBHI Parties will only be entitled to appoint one member to the Board and the director may only be appointed to the Audit Committee.  Upon the LBHI Parties owning less than 5.0% of all outstanding common units of the Company, the LBHI Parties will only be entitled to appoint one member to the Board.

**4.  The LBHI Parties have the following rights prior to the Closing but such rights will be eliminated upon the LBHI Parties owning less than 7.5% of all outstanding common units in the Company at the time:**

(a)  <u>Adverse tax actions</u>: consent right over the undertaking of any tax action which would reasonably be expected to have an adverse effect on a Class A member of the Company will be eliminated.

**5.  The LBHI Parties have the following rights prior to the Closing and such rights will not be eliminated until the LBHI Parties no longer hold any common units in the Company:**

(a)  <u>Transfers by NBSH</u>: Equity holders of NBSH are prohibited from transferring their equity in NBSH (other than pursuant to a permitted change of control transaction), <u>provided</u>, that, in addition to any existing permitted transfer rights, NBSH equity holders will be permitted to transfer equity to (i)  any family member for tax/estate planning purposes or (ii) to other NBSH equity holders.

(b)  <u>Dividends/Distributions</u>: consent right over the declaration and/or payment of any dividends or any distributions will not be eliminated upon Closing, but the LBHI Parties will not have consent rights  in relation to (i) tax distributions, (ii) distributions to consummate permitted repurchases of former employee or LBHI Parties' Class A units, or (iii) pro rata distributions from ECF in any annual period where the maximum amount (i.e., up to the Post-Closing Annual Cap) of Class A units have been purchased from the LBHI Parties at the Agreed Valuation.

(c)  <u>Liquidation, dissolution or winding up</u>[1]: consent right over the liquidation, dissolution or winding up of the Company.-

(d)  <u>Information necessary for the LBHI Parties to prepare its tax returns</u>: The Board must cause the Company to deliver to the LBHI Parties within 90 days of the end of a fiscal year information with

---

[1] Appropriate protection of the LBHI Parties' economic interests in the case of sales of Company assets out of the ordinary course to be provided in definitive documentation.

respect to the Company as may be necessary for the LBHI Parties to prepare their federal, state, and local tax returns (which information may include quarterly estimates in lieu of finalized amounts), with the delivery of final versions of such information as soon as reasonably practicable thereafter but in any event no later than September 10 of the applicable fiscal year for Federal K-1s (or acceptable substitute) and September 30 of the applicable fiscal year for state and local information.

(e)  <u>"Most Favored Nation" protection</u>: In the event that any of the LBHI Parties' governance rights (other than with respect to Board seats) in existence immediately after the Closing are provided to any other investor in the Company with an ownership level at or below 50% of the LBHI Parties' then-applicable ownership level, the LBHI Parties shall also be given such rights regardless of the LBHI Parties' ownership level at that time.

(f)  <u>Certain Transactions</u>: any (i) material affiliate transactions between the Company and NBSH (unless contemplated by the LLC Agreement) or (ii) engagement of advisors or other material expenditures by the Company for the benefit of NBSH will, in each case, be submitted to the Board for approval or approved via Board approval of the budget.

(g)  <u>Pre-emptive Rights</u>:  The LBHI Parties have pre-emptive rights on all of the Company's equity issuances to third parties subject to the exit provisions specified in this Summary of Transaction Terms.

(h)  <u>Employee Equity Issuances</u>.

   (i)  Consent right will be eliminated with respect to equity issuances to employees (whether directly or indirectly through back to back issuances for monetary consideration or as compensation, unless such equity issuances are (1) in excess of the Annual Approved Basket (as defined below) or (2) at a value less than the Standard Valuation  including an aggregate discount of 30% ("Minimum Employee Issuance Value").  The LBHI Parties and the Company will agree on acceptable forms of equity issuance prior to Closing.  For the avoidance of doubt, current forms of equity issuances (i.e., common units, phantom equity and profits interests units) are acceptable subject to confirmatory diligence by the LBHI Parties on all terms and conditions of current forms of equity issuances.  Issuances which are not compliant with the foregoing agreed forms of equity will require the LBHI Parties' consent.

   (ii)  "Annual Approved Basket" shall be the greater of (a) the amount it would cost for the Company to make the maximum purchase of the LBHI Parties' equity allowed under Closing Cap or the Post-Closing Annual Cap in each year, as the case may be, and, if applicable, 100% of the remaining LBHI Parties' equity required to be purchased under Section 9 (Future Exit) of this Summary of Transaction Terms, <u>less</u> the ECF used to purchase the LBHI Parties' equity in that year and (b) 4% of the Company's revenue for the applicable valuation year (e.g., revenue for 2011 applicable to purchases to be made at the December 31, 2011 valuation) as determined based on actual monthly revenue for January to October of such applicable year and good faith estimate by the Company for November to December of such applicable year.  For the avoidance of doubt, if the Company issues any equity over the Post-Closing Annual Cap in order to make required purchases under Section 9 (Future Exit) of this Summary of Transaction Terms, then such equity must be issued in an amount sufficient to redeem 100% of the remaining Class A units held by the LBHI Parties (with a Specified Discount of 0%) and proceeds from its issuance must be used to repurchase all of the LBHI Parties' equity.  The Annual Approved Basket shall be calculated annually after receipt of the Agreed Valuation and determination of that year's ECF equity repurchase amounts in accordance with the terms set forth in this Summary of Transaction Terms.

4

(iii) "Standard Valuation" shall mean the valuation delivered in accordance with the LLC Agreement by the valuation agent selected by the Company.

(iv) All equity issuances must be approved by the Board.

(v) There will not be any preemptive rights or consent right on permitted reissuances of securities previously issued to retiring or terminated employees under the LLC Agreement, provided, that (A) in the case of profits interest units with a distribution threshold under the LLC Agreement, the distribution threshold is not less than the Standard Valuation and (B) in the case of common units, the units are issued at or above the Minimum Employee Issuance Value.

(i) Compensation Approval: The Board will approve, in advance, a specified range of aggregate annual cash and other compensation (including base pay, bonuses, and equity grants). The Compensation Committee will approve, in advance, the annual cash and other compensation (including base pay, bonuses and equity grants) of the Chief Executive Officer and his direct reports. At such time as the LBHI Parties are no longer entitled to appoint a director to the Compensation Committee, the Compensation Committee and the independent director(s) of the Compensation Committee must approve the Chief Executive Officer's compensation and the Chief Executive Officer and the independent director(s) of the Compensation Committee must approve the compensation of the Chief Executive Officer's direct reports.

(j) Tag-Along Rights. As described above under "Merger or Reorganization".

(k) Information Rights. As described in Section 10(e) of this Summary of Transaction Terms.

**6. Process for exercising consent rights:**

(a) The LBHI Parties shall notify the Company on or prior to the 15th business day after the day that the LBHI Parties receive notice from the Company of the triggering events set forth in this Appendix 1 as to whether the LBHI Parties intend to provide consent to the taking of any of the following actions (where applicable given the LBHI Parties' percentage ownership in the Company at the time of the notice and the limitations set forth herein):

(i) incurring Debt (as described in Section 1(c));

(ii) entering into material acquisitions (as described in Section 1(d));

(iii) entering into joint ventures (as described in Section 1(e));

(iv) entering into a sale, merger or reorganization (as described in Section 1(f));

(v) undertaking adverse tax actions (as described in Section 4(a));

(vi) declaring or paying dividends/distributions (as described in Section 5(b)); and

(vii) approving the liquidation, dissolution or winding up of the Company (as described in Section 5(c)).

(b) If the LBHI Parties do not timely notify the Company of its intent with respect to an action, then the LBHI Parties will be deemed to have approved such action.

**EXHIBIT 2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                   :        **Chapter 11 Case No.**
                                      :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :        **08-13555 (JMP)**
                                      :
                    **Debtors.**     :    **(Jointly Administered)**
-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE MONETIZATION OF EQUITY INTERESTS IN NEUBERGER BERMAN GROUP LLC

Upon the motion, dated November 9, ~~2011 (the "Motion"),[1]~~ 2011,[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the above referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for authorization to monetize the equity interests in Neuberger Berman Group LLC, as more fully described in the ~~Motion~~ motion, and as amended by the revised proposed order and Term Sheet filed by the Debtors on December 9, 2011 (collectively, the "Motion"); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the second amended order entered June 17, 2010 governing case management and administrative procedures (ECF No. 9635); and a reasonable opportunity to object or be heard regarding the Motion having been afforded to all such

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

parties; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors are authorized to take all actions contemplated by the Term Sheet attached hereto as Exhibit A; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the Debtors' right, title, and interest in any Equity Interests sold in accordance with the Term Sheet shall be sold free and clear of any and all liens, claims, and encumbrances; and it is further

ORDERED that NBG will be a good faith purchaser and is granted the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code and consummation of the redemptions or sales of the Equity Interests shall not be affected by reversal or modification on any appeal of this Order; and it is further

ORDERED that the Debtors are authorized to, and authorized to cause their non-Debtor affiliates to, (i) provide any consents in respect of, perform all obligations and enter into any agreements contemplated by the Term Sheet, and (ii) execute such other documents and take such other actions as may be necessary or appropriate to effectuate the Term Sheet and the transactions contemplated thereunder or the provisions of this Order; and it is further

ORDERED that the Term Sheet and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; *provided further* that Court approval shall be required for any such modification, amendment or supplement that does have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any stay imposed by Bankruptcy Rule 6004(h) is hereby waived and this Order shall be immediately effective and enforceable; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: _____ __, 2011
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**Summary of Transaction Terms: Neuberger Berman Refinancing**

1.  **Second Amended and Restated Limited Liability Company Agreement of Neuberger Berman Group LLC, as amended**

    (a)  NBSH Acquisitions, LLC ("NBSH"), Lehman Brothers Holdings Inc. ("LBHI") and certain subsidiaries of LBHI (together with LBHI, the "LBHI Parties" and collectively with NBSH and LBHI, the "LLC Parties") are party to that certain Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") of Neuberger Berman Group LLC (the "Company") dated as of May 4, 2009, as amended as of May 1, 2010 and on May 18, 2011.  The LLC Agreement and the amending documents are attached as Exhibit A.

    (b)  The LLC Parties desire to undertake the transactions described below and to amend and restate the LLC Agreement and any related agreements (including entry into new agreements) to reflect the terms set forth below.

2.  **Initial Transactions – New Debt, Redemption of Preferred Units and Purchase of Class A Units**

    (a)  As a condition precedent to the transactions contemplated by this Summary of Transaction Terms, the Company will raise debt in the form of bank and/or bond securities (the "New Debt") in an amount [1] which, along with existing cash on the balance sheet of the Company, will be sufficient to redeem all of the LBHI Parties' preferred units in the Company and all of NBSH's vested preferred units in the Company and will be used for such redemption.  The preferred units will be redeemed at par plus accrued preferred return.  In addition, at or before Closing, the Company shall pay to the holders of the preferred units an additional return in the amount of 2.5% of the par value outstanding as of December 1, 2011 (the "Additional Return").  Accordingly, the LBHI Parties shall receive as Additional Return $20,343,750.00 on or before Closing of the redemption of the preferred units.  The LLC Parties currently anticipate that the principal amount of the New Debt will be ~~approximately~~at least $720 million and that approximately $125 million of existing cash on the balance sheet will be used for these purposes; however the actual amounts of New Debt and cash on the balance sheet required for these purposes may change prior to the Closing.  The principal amount of the New Debt will not exceed the amount that will be sufficient to (i) redeem all of the LBHI Parties' preferred units in the Company, together with accrued preferred return, (ii) pay the Additional Return, (iii) redeem all of NBSH's vested preferred units in the Company, together with accrued preferred return, (iv) purchase 50% of the LBHI Parties' Class A units permitted to be repurchased pursuant to Section 2(c) (and less $125 million of existing cash on the balance sheet) and (v) pay the Company's transaction expenses.

    (b)  The Company will redeem unvested preferred units held by NBSH in exchange for an interest-bearing note at LIBOR + 300 basis points.  The terms of the note will include a payment schedule that mirrors the vesting schedule of the preferred units that are held by the employees of the Company.

---

[1] Subject to ~~Section 12~~Sections 2(a) and 11(b), amount of New Debt and mix of bank and bond securities to be determined at NB's Board discretion in order to optimize execution.

(c)  In connection with the closing of the redemption all of the LBHI Parties' preferred units in the Company and all of NBSH's vested preferred units in the Company  (the "Closing"), the Company will have the option to purchase Class A units in the Company from the LBHI Parties at the Agreed Valuation (as defined below) as of December 31, 2011 (the "Initial Valuation"); provided, however, that the number of Class A units purchased in connection with the Closing shall not exceed 2010% of the aggregate common units of the Company (i.e., Class A units, Class B units and Profits Interest units) outstanding immediately prior to Closing (the "Closing Cap").  If the Company intends to purchase Class A units in connection with the Closing, the Company will provide a written notice to the LBHI Parties within 30 days following the Closing which indicates the number of Class A units to be purchased in connection with the Closing based upon the Initial Valuation.  See Section 65 for the process for the determination of the Agreed Valuation and Section 87 for the timetable for the purchases of  Class A units made in connection with the Closing based upon the Initial Valuation.

3.  ~~Reset of Annual Rate of Return on Preferred Units~~

(a)  ~~Concurrent with the Closing, the annual rate of return on the preferred units in the Company (including preferred units held by NBSH) shall be reset as of January 1, 2011 (the "Reset Date") to the implied effective weighted average cost of the New Debt.  Any preferred return paid by the Company prior to the Closing that exceeds the new rate of return and which relates to the period after the Reset Date shall be returned to the Company.~~

(b)  ~~If the Closing does not occur prior to or on February 29, 2012, the retroactive adjustment to the annual rate of return will only apply for the calendar year of 2011.~~

**3.**  4.  **Purchase of Class A Units After the Closing using Excess Cash Flow**

(a)  The Company is obligated to redeem Class A units held by the LBHI Parties using its excess cash flow ("ECF"), as of December 31 of the preceding year, as follows; provided that the Company may not purchase more than 2526% of the Class A units held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) in any calendar year after the Closing (i.e., beginning with the December 31, 2012 valuation) (the "Post-Closing Annual Cap"); and provided, further, that in the event that the number of such Class A units purchased by the Company in 2013 is less than the Post-Closing Annual Cap ("Shortfall Percentage"), the Company may purchase additional Class A units up to the Shortfall Percentage in excess of the Post-Closing Annual Cap in 2014 and 2015, but in no event may the Company purchase in the aggregate more than 28.5% of the Class A units held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) in each of 2014 and 2015:

| Senior Secured Term Loan Leverage Level | % ECF Sweep to Redeem LBHI Equity |
|---|---|
| ≥1.5x | 25 |
| <1.5x – ≥1.0x | 75 |
| <1.0x | 100 |

Leverage levels and excess cash flow sweep ratios and percentages are subject to further negotiation with the lenders (but ECF sweep ratios and percentages to redeem equity owned by the LBHI Parties will not increase).

(b) ECF will be calculated net of (i) payments to terminated and retired employees  (provided that in no event will such payments to terminated and retired employees for a calendar year exceed the aggregate amount paid to the LBHI Parties for Class A units in the applicable year (whether using ECF or otherwise)), (ii) tax distributions and (iii) mandatory debt amortization payments, and otherwise to be on market terms and duplicative of the excess cash flow definition applied to the bank debt (if any).  If there is no ECF definition in the New Debt documentation, the definition will be agreed to by the Company and the LBHI Parties.

(c) On March 31 of each year, the Company must (subject to the Post-Closing Annual Cap) apply the applicable percentage of ECF to repurchase Class A units held by the LBHI Parties at the Agreed Valuation (as defined below).  The Company must purchase the applicable number of Class A units from the LBHI Parties and the LBHI Parties must sell the applicable number of Class A units to the Company, in each case at the Agreed Valuation  determined as of December 31 of the preceding year.

**4. 5. Additional Optional Purchase of Class A Units After the Closing**

(a) The Company has the option to purchase Class A units from the LBHI Parties at the Agreed Valuation after the Closing (in addition to those purchased using ECF pursuant to Section 43) subject to the Post-Closing Annual Cap.  The timetable for the purchases is set forth in Section 8.7.

(b) The purchase price for any Class A units purchased by the Company as contemplated in Section 2(c) and this Section 54 may be financed through proceeds raised from new equity issued to NBSH.  In such event, the Company will use cash from, or cash that would otherwise be paid (currently or in the future) to, employees who commit to purchase or receive, as the case may be, equity (in the amount of the commitment that was made) (such commitments, the "Employee Commitments").

**5. 6. Purchase Price and Valuation for Class A Units**

The "Agreed Valuation," is an amount equal to the greater of (i) the Valuation Agent Value (as defined below) and (ii) the Employee Repurchase Value (as defined below).

(a) "Valuation Agent Value" means the average valuation/price provided by two valuation agents engaged by the Company, each providing an independent valuation as of December 31 of the year preceding the purchase.

(b) One valuation agent shall be selected by NBG and one valuation agent shall be selected by the LBHI Parties.  Each of NBG and the LBHI Parties shall have the right to replace the valuation agent it selected if such valuation agent is (A) no longer competent or able to value an asset management business or (B) develops a material conflict of interest which cannot be addressed through the implementation of appropriate procedures (such as screening measures or other ethical barriers), in each case, subject to the consent of the other party as to the newly selected valuation agent solely as it relates to the competency of such agent in valuing an asset management business and/or material conflicts of

3

interest raised by the potential engagement of such agent to provide such services, and in any event which consent may not be unreasonably withheld.

(c) Each of the valuation agents will be instructed to (A) structure the valuation to ensure that value is properly allocated between units that have different rights and entitlement to the Company's profits and distributions, including without limitation differences between common units and profits interest units and any distribution thresholds applicable to any such units, (B) value material acquisitions and joint ventures in accordance with the terms outlined in Appendix 1 to the extent applicable, (C) apply only a single, ~~20~~17.5% percentage discount for any minority, liquidity or non-control considerations to the estimated equity value of the Company except as otherwise provided in this Summary of Transaction Terms (including pursuant to Section ~~10~~9 and Sections 1(e), 1(f) and 1(g) of Appendix 1) (the "Specified Discount"), (D) deliver the valuation report for December 31 of any year no later than March 31 of the following year (the "Valuation Delivery Date") and (E) disregard any tax-related reserves that are established in connection with or as a result of the transactions contemplated by this Summary of Transaction Terms.

(d) The Company shall deliver requested documentation in a timely manner to the valuation agents to enable delivery of a valuation by the Valuation Delivery Date. The budget used for the valuation must be approved by the board of directors of the Company (the "Board"), including by the majority vote of the independent members of the Board. In the event that any independent Board member is replaced, the appointment of any Board member to replace such independent Board member shall require the consent of the majority of the remaining independent members. The Company shall deliver an annual budget to the Board for their approval by December 31 of each year.

(e) The Company will pay the fees of both valuation agents, subject to a cap of $125,000 per year on the cost of each of the valuation ~~agent selected by the LBHI Parties~~agents.

## 6. ~~7.~~ Employee Repurchases

(a) For purposes of this Summary of Transaction Terms, "Employee Repurchase Value" means the price paid to retiring or terminated employees for their Class B units in the applicable year based on the valuation process set forth in the LLC Agreement for the purchase of employee equity or as otherwise instructed by the Board.

(b) In no event shall the aggregate amount paid to the LBHI Parties for Class A units (whether for purchases using the ECF sweep or other optional purchases or redemptions of common equity by the Company) in any calendar year be less than the aggregate payments to terminated and retired employees for their equity (other than preferred units) in the applicable year, subject to the Post-Closing Annual Cap (unless the Post-Closing Annual Cap is waived in the sole discretion of the LBHI Parties).

## 7. ~~8.~~ Timeline for Payments and Purchases of Equity

(a) All purchases and redemptions of equity from the LBHI Parties by the Company contemplated by this Summary of Transaction Terms (including purchases and commitments for purchases of Class A units made in connection with the Closing based upon the Initial Valuation) will be expressly permitted under the documentation for the New Debt (including, for example, any incurrence of debt by the Company to fund). All

purchases and redemptions of equity by the Company shall be effected in accordance with the following timeline in any applicable year:

### Required purchase of equity using ECF

(i)    March 31: The Company shall use ECF calculated as of December 31 of the preceding year (as set forth in Section 43) to purchase Class A units from the LBHI Parties at the Agreed Valuation, subject to the Post-Closing Annual Cap (for the avoidance of doubt, the Post-Closing Annual Cap does not apply to purchases based upon the Initial Valuation, which are subject to the Closing Cap).

### Optional purchase of equity

(ii)   All purchases and commitments for purchases of Class A units from the LBHI Parties made by the Company in connection with the Closing based upon the Initial Valuation are subject to the following terms and timeline:

   A.    Later of (x) Closing date + 1 Month and (y) Valuation Delivery Date + 1 Month (such date, the "Closing Commitment Date"): A commitment notice from the Company to purchase Class A units from the LBHI Parties is due.  Payment for all purchases based on such commitments shall be delivered on the Closing Commitment Date, provided that, at the election of the Company, all (or any portion of) the payments for purchases based on Employee Commitments may be delivered on a quarterly basis as set forth in Section 87(a)(ii)(B) below.

   B.    Payments If the Closing Commitment Date is in 2012, payments for purchases based on Employee Commitments which the Company elects to pay quarterly as permitted in Section 87(a)(ii)(A) above to will be delivered on the following dates: (i) Closing Commitment Date, and  (ii) the last day of each calendar quarter of the year in which the Closing Commitment Date occurs.  If the Closing Commitment Date is in 2013, the entire amount of the foregoing payments will be delivered on the Closing Commitment Date.

   C.    All purchases based on Employee Commitments are to be paid with an interest rate of LIBOR + 350 basis points applied from January 1 of the year in which the Closing occurs 1, 2012.

(iii)  All purchases and commitments for purchases of Class A units from the LBHI Parties made by the Company (other than in connection with the Closing based upon the Initial Valuation or the required purchase of Class A units using ECF a set forth in Section 87(a)(i) above) are subject to the following terms and timeline of any applicable year:

   A.    Valuation Delivery Date + 1 Month: A commitment notice from the Company with respect to commitments to purchase Class A units from  the LBHI Parties is due.  Payment for all purchases based on such commitments shall then be delivered on the Valuation Delivery Date + 1 Month, provided that at the election of the Company, all (or any portion of) the payments for purchases based on Employee Commitments may be delivered on a quarterly basis as set forth in Section 87(a)(iii)(B) below.

   B.    Payments for purchases based on Employee Commitments which the Company elects to pay quarterly as permitted in Section 87(a)(iii)(A) to be delivered on the

following dates: (i) Valuation Delivery Date + 1 Month; and (ii) June 30th, September 30th, and December 31st.

  C.  All purchases based on Employee Commitments to be paid with an interest rate of LIBOR + 350 basis points applied from January 1 of the applicable year.

(iv) Any purchases of additional Class A units in excess of the annual Post-Closing Annual Cap may be made on such terms and at such times as may be agreed between the LBHI Parties and NBSH.

**8.** ~~9.~~ **Special Allocation of Income**

(a) The LBHI Parties will receive a special allocation of net income in the Company equal to the dollar amount of the total proceeds received in the applicable calendar year from all purchases and redemptions of Class A units held by the LBHI Parties (which allocation will be appropriately adjusted downward to take into account the LBHI Parties' capital accounts in the Company for the preceding calendar year), other than those purchases and redemptions pursuant to the initial transactions as set forth in Section 2[2]; provided that (i) (A) the Company has received on the Closing date a "should" level opinion issued by the Company's outside tax counsel and addressed to the Company regarding this special allocation of income methodology, in a form reviewed in advance by the LBHI Parties and reasonably acceptable to the Company and (B) an updated "should" level opinion shall be prepared and delivered to the Company each year and made available for review by the LBHI Parties, and such updated opinion shall address changes, if any, in the Internal Revenue Code or its interpretation by applicable governmental authorities (such updated opinion to be prepared by the same outside tax counsel or another reputable, nationally recognized, tax counsel) and (ii) the Company has provided confirmation each year that its tax preparer will sign the Company's tax returns that include the special allocation of income methodology.

(b) The Company will reimburse the LBHI Parties for any increase in state and local tax liability (including interest and penalties) (i) "directly" associated with the specially allocated income and (ii) incurred as a result of the special allocation that is caused "indirectly" as a result of other assets/investments held by LBHI and its subsidiaries in the applicable jurisdiction subject to an aggregate cap, in the case of this clause (ii), of $35 million.

(c) The Company will prepare K-1's and file tax returns and related information returns in accordance with the tax opinion and any updates thereto delivered pursuant to Section ~~9~~8(a).

(d) Tax related payments shall be made to the LBHI Parties and NBSH if the special allocation methodology is overturned or reversed, in an amount sufficient to indemnify each of the LBHI Parties and NBSH for any additional taxes (including interest and penalties) such party must pay as a result of the overturning or reversal of the special allocation methodology (where the reallocation of income arising from the overturning or reversing of the special allocation shall take into account the ownership split in the tax year being modified, e.g., reversal of 2012 special allocation in 2014 will presumably result in reallocations of income based on 2012 ownership).

---

[2] Application to pre-emptive right purchases in Section 11 to be discussed between the parties.

(e)  Each of the LBHI Parties and NBSH must provide the Company and each other appropriate tax records and other supporting documents to substantiate any indemnification or other tax payments (e.g., substantiation of increased state and local tax liability or increased U.S. federal tax liability (including interest and penalties)).

## 9.  ~~10.~~ Future Exit

(a)  The Company shall use reasonable commercial efforts to be rated, and to continue to be rated, by S&P and Moody's (together, the "Agencies").

(b)  If, at any time after December 31, 2015, (i) the Company carries investment grade ratings from the Agencies, or an investment grade rating from one Agency if only one of the Agencies provides a rating to the Company at such time or (ii) the Company has incurred Debt (as defined in Appendix 1) other than Permitted Debt (as defined below) and has a ratio of original Debt (i.e., the New Debt issued at Closing) to EBITDA in the last 12 months of less than 2.5 (such ratio, the "Triggering Debt Ratio Test"), then, in either case, the Company will be required to repurchase the LBHI Parties' remaining equity within 15 months, but in no case later than April ~~1, 2018~~30, 2017 (the earlier date, the "Payment Date") at the most recent Agreed Valuation as of the repurchase date; provided, however, that the Specified Discount shall be 0%.

(i)  If full payment is not made by the Payment Date, the LBHI Parties will have right to exercise demand registration rights to cause the Company to monetize the remaining interest of the LBHI Parties in the Company via a public offering within six months from such notice.

(ii)  If the Payment Date is on or prior to 6 months after the previous Valuation Delivery Date, the purchase price for the LBHI Parties' equity shall accrue interest at LIBOR + 350 basis points from January 1 to the Payment Date.

(iii)  If the Payment Date is more than 6 months after the previous Valuation Delivery Date, the purchase price for the LBHI Parties' equity shall accrue interest at the following rates: (i) LIBOR + 350 basis points from January 1 to the date that is 6 months after the Valuation Delivery Date; (ii) LIBOR + 450 for the 7th month after the Valuation Delivery date, with monthly increases of 25 basis points thereafter.

(iv)  For the avoidance of doubt, if at any point after December 31, 2015 the Company is or becomes investment grade or satisfies the Triggering Debt Ratio Test, the Company may still make its annual purchases based on the December 31, 2015 valuation with Specified Discount of ~~20~~17.5% up to the Post-Closing Annual Cap. All equity purchases thereafter will be at a Specified Discount of 0%.

(c)  ~~If by September 30, 2017 the Company has not become investment grade or satisfied the Triggering Debt Ratio Test and the Company (i) has not exhausted the Post-Closing Annual Cap for annual purchases made during 2017, it may make an additional one-time commitment on that date to make additional purchases by December 29, 2017 at the Agreed Valuation as of December 31, 2016 (with interest accruing at LIBOR + 350 basis points from January 1, 2017) with the Specified Discount being 20% for purchases up to the Post-Closing Annual Cap and 0% for purchases above the Post-Closing Annual Cap, or (ii) has exhausted the Post-Closing Annual Cap for annual purchases made during~~

2017, it may make an additional one-time commitment on that date to make additional purchases by December 29, 2017 at the Agreed Valuation as of December 31, 2016 (with interest accruing at LIBOR + 350 basis points from January 1, 2017 on amounts being purchased) with the Specified Discount being 0%.

(c) (d) In the event the LBHI Parties own any equity in the Company on December 31, 2017, 2016, then the Company will be required to repurchase the LBHI Parties' remaining equity by April 1, 2018 by April 30, 2017 at the Agreed Valuation as of December 31, 2017 with the Specified Discount being 0% (which valuation reports are to be delivered by March 31, 2018).2016.  For purchases made between January 1, 2017 and April 30, 2017, if the Specified Discount has not been reduced to 0% pursuant to Section 9(b), the Specified Discount will be 17.5%.  All purchases made during this time frame must be closed, and all proceeds from such purchases must be in cash, and must be received by the LBHI Parties by April 30, 2017.  If full payment is not made by such date, the LBHI Parties shall have demand registration rights to cause the Company to monetize the LBHI Parties' remaining stake via a public offering within six months from such notice.

(d) (e) "Permitted Debt" means (i) Debt to refinance the then-existing principal amount of New Debt issued at Closing, (ii) Debt to finance the purchase of 100% of the remaining Class A units (it being understood that this provision is subject to the Post-Closing Annual Cap and thus would only be applicable when 25% or less of the equity held by the LBHI Parties immediately after the Closing (taking into account any purchases and commitments of Class A units made in connection with the Closing based upon the Initial Valuation) remains outstanding, or in the case where the Specified Discount is 0% after December 31, 2015), which proceeds of such Debt must be immediately remitted to purchase the LBHI Parties' equity, (iii) Debt existing on the Closing date (including any draw-downs over the life of the revolving credit facility), (iv) Debt incurred with the approval of the LBHI Parties, (v) for the avoidance of doubt, any interest accruing on additional purchases of equity from the LBHI Parties to be made by December 29, 2017 30, 2016 as provided in Section 10 9(d c), (vi) Debt up to an aggregate of $40 million for the specific purpose of undertaking improvements to the Company's real estate facilities, and (vii) other Debt not covered by the foregoing clauses (i) through (vi) up to an aggregate of $15 million (provided that, if greater than $15 million, Debt incurred pursuant to this clause (vii) shall not be treated as Permitted Debt for purposes of clause (ii) of Section 10 9(b)).

**10. 11. Exit for Preemptive Rights Purchases**

(a) Notwithstanding Section 10, 9, the following shall apply to equity in the Company purchased by the LBHI  Parties pursuant to the exercise of pre-emptive rights as contemplated by Appendix 1 (such purchases, the "Preemptive Rights Issuances"):

(i) The Company shall use its commercially reasonable efforts to purchase Preemptive Rights Issuances occurring within three years from Closing in equal annual amounts, in addition to the other annual purchases.

(ii) The Company shall use its commercially reasonable efforts to purchase Preemptive Rights Issuances occurring after the third anniversary of the Closing by no later than the earlier of (i) one year from the date that the LBHI Parties no longer own any equity in the Company other than the Preemptive Rights Issuances, and (ii) April 1, 2018 30, 2017 (the earlier date, the "End Date").  Such purchases shall be made in equal annual

amounts from the issuance date through the date by which the purchases must be made in accordance with the immediately preceding sentence.

(iii)   Any Preemptive Rights Issuances will be purchased by the Company at the then-applicable Agreed Valuation with the then-applicable Specified Discount (as specified above under "Future Exit").

(iv)   Any failure by the Company to purchase any Preemptive Rights Issuances (whether or not included as part of the annual purchases) shall not give rise to any registration obligation on the part of the Company or trigger any of the registration rights provisions under "Future Exit" (for the avoidance of doubt, the LBHI Parties may pursue legal remedies to enforce payment by the deadline specified above, but only if the Company has not used its commercially reasonable efforts to purchase any Preemptive Rights Issuances).

(v)   For purposes of this Section ~~11~~10 only, "Commercially Reasonable Efforts" is to be defined to include use of commercially reasonable efforts by the Company to execute draw downs of available capacity under lending facilities, issuances of debt and equity securities; provided that if Preemptive Rights Issuances remain outstanding after the End Date, notwithstanding such commercially reasonable efforts, the LBHI Parties shall have the option of converting remaining equity in the Company into a subordinated note (without any contractual transfer restrictions such that it is freely assignable to a third party buyer) to pay interest at the then highest interest paying tranche of the Company's funded indebtedness + 200 basis points, to increase by an additional 200 basis points annually until fully paid off, with interest accruing from the End Date and payable quarterly in cash.

## 11. ~~12.~~ Governance / Other

(a)   LBHI Parties' governance rights will be revised with the decrease in equity ownership by the LBHI Parties (see Appendix 1 for detail).

(b)   The terms of the New Debt shall not conflict with, and shall be consistent with, (i) the terms of this Summary of Transaction Terms or their operation and (ii) the Ancillary Term Sheet agreed between LBHI and the Company on or about November ~~[8]~~8, 2011, in each case, unless otherwise mutually agreed to by the LBHI Parties and the Company.

(c)   The LBHI Parties will have the registration rights as set forth in Sections ~~10~~9 and ~~11~~10 above, including a covenant by the Company to be fully prepared to facilitate an initial public offering ("IPO") in accordance with the registration rights.

(d)   The Board will determine the appropriate entity to become the public registrant to issue equity in an IPO process.  Currently the Company may use NBSH to issue equity in an IPO process but for tax, accounting or other reasons may later choose to create an alternative structure and create a new holding company between NBSH and the Company or another structure as part of the IPO process.  NBSH has audited financials since May, 2009 and will be the default entity to issue equity, unless the Board determines another structure would more appropriate.  All of the LBHI Parties' registration rights will apply to the public registrant which is selected for an IPO.  Any IPO must result in the public registrant paying cash and/or the common equity issued by the IPO vehicle in exchange for all of the LBHI Parties' equity at the Company and any lock-ups relating to any

9

registration statement will not exceed 180 days. Unless permitted under accounting rules, the LBHI Parties may not swap common units in the Company for new equity in NBSH or another entity which is the public registrant prior to the IPO process.

(e)  In the event that the Company sells any common units or any other equity linked instrument of the Company to one or more third parties at an implied common equity valuation higher than the common equity valuation used to pay the LBHI Parties for its Class A units in the 12-month period preceding such third party sale, then the Company shall pay to the LBHI Parties an amount equal to (i) 100% of the difference between the price per unit the LBHI Parties would have received at such higher implied common equity valuation *minus* the price per unit the LBHI Parties received for the Class A units sold in such 12-month period *multiplied* by (ii) the lesser of (x) the number of Class A units sold by the LBHI Parties in the 12-month period and (y) the number of Class A units that could have been purchased at such implied common equity valuation with the aggregate consideration that the third party in the third-party transaction provided for the purchased common units or other equity linked instrument, as the case may be. For the avoidance of doubt, for the purposes of this Section 11(e), the commitment date (i.e. either the Closing Commitment Date pursuant to Section (7)(a)(ii)(A) or Valuation Delivery Date + 1 Month pursuant to Section 7(a)(iii)(A)) shall be considered the sale date for Employee Commitment purchases of Class A units.

(f)  ~~(e)~~ The LBHI Parties shall have customary information rights, including rights to receive annual consolidated NBSH audited financials, quarterly unaudited financials, budgets, tax information and any information or other reporting provided to lenders.

(g)  LBHI will be permitted to publicly disclose in its periodic reporting summary level information regarding the Company's aggregate assets under management, total revenues, aggregate mutual fund net flows, and total headcount.

(h)  ~~(f)~~ The LBHI Parties shall have the right to transfer Class A units provided that transferees agree to be bound by the transfer rights under the existing LLC Agreement.

(i)  If the Company issues or otherwise sells units or any other equity linked instrument to a third party, LBHI Parties will have pro-rata tag along rights to participate in such transaction at the same implied common equity valuation and transfer their units to the third-party buyer at what would be the price per Class A Unit based on such implied common equity valuation. Alternatively, in lieu of the pro-rata tag along rights described above, the Company, at its option, shall offer to redeem from the LBHI Parties up to that number of Class A Units that could be purchased at the same implied common equity valuation using a percentage of the net proceeds received from the sale to such third party equal to the LBHI Parties pro rata ownership interest in the Company.

**12.** ~~13.~~ **Deal Consummation**

(a)  The transactions contemplated by this Summary of Transaction Terms are subject to~~, among other conditions,~~ approval of this Summary of Transaction Terms by the Bankruptcy Court and approval of definitive documents by the respective boards of directors of the Company and LBHI (which approval will be given on a basis consistent with Section 12(d) below).

(b)  The Closing must occur no later than ~~June 30,~~ December 31, 2012, or as may be extended ~~at the sole discretion of the LBHI Parties~~ by mutual agreement of the Company and the LBHI Parties; provided, that if the Closing occurs on or after July 1, 2012, interest will accrue at LIBOR + 350 basis points on the purchase price for any common units (which are not already subject to interest under this Summary of Transaction Terms) sold in connection with the initial transactions at Closing from July 1, 2012 through the date such units are paid for.

(c)  ~~This~~ The Company shall use commercially reasonable efforts to pursue financing in respect of New Debt, provided that the transactions contemplated by this Summary of Transaction Terms ~~does not create any binding obligations whatsoever on the Company, NBSH, or the LBHI Parties, and no party should act in reliance upon its terms.~~ are subject to (i) the Company obtaining financing in respect of New Debt on terms and conditions satisfactory to the Board (in its sole discretion) and a majority-in-interest of the members of NBSH, and (ii) the Board determining that it is prudent for the Company to incur New Debt. For the avoidance of doubt, if the Company in its good faith judgment does not believe that the financing market conditions or the business results of the Company are favorable to the incurrence of a financing on acceptable terms, then the Company may suspend its efforts to pursue such financing.

(d)  The Company and the LBHI Parties shall promptly proceed in good faith to negotiate and execute definitive documents to reflect the terms of this Summary of Transaction Terms and shall not propose to include in the definitive documents new or changed economic or other material terms from the terms of this Summary of Transaction Terms.

11

## APPENDIX 1

### LBHI GOVERNANCE RIGHTS WITH DECREASING EQUITY OWNERSHIP

Set forth below are (1) modifications, if any, of the LBHI Parties' governance and certain other related rights under the LLC Agreement upon the Closing and after the Closing as the LBHI Parties' percentage ownership of the outstanding common units in the Company continue to decrease pursuant to the transactions contemplated in this Summary of Transaction Terms and (2) the level of the LBHI Parties' percentage ownership of the outstanding common units of the Company upon which such rights would be eliminated or modified.

1.  **The LBHI Parties have the following rights prior to the Closing, but such rights will be eliminated upon the Closing (subject to the limitations set forth herein):**

    (a) Appointment of CEO: consent right over the appointment of a new CEO will be eliminated.

    (a) (b) Size of the Board: consent right over any increase or decrease in the authorized size of the Board will be eliminated (provided that independent directors shall maintain at all times at least a 2/7 representation ratio). In the event that any independent Board member is replaced, the appointment of any Board member to replace such independent Board member shall require the consent of the majority of the remaining independent members.

    (b) (c) Equity Issuances: consent right over (i) all third-party equity issuances and (ii) employee equity issuances up to the Annual Approved Basket (as defined below) and at a value no less than the Minimum Employee Issuance Value (as defined below) will be eliminated.

    (c) (d) Debt Incurrence: upon the Closing, the LBHI Parties will not have a consent right for any indebtedness for borrowed money, guarantees thereof and liens related thereto (collectively, "Debt") except when the covenants or other requirements of such other Debt would restrict the Company from making any required ECF purchase of Class A units from the LBHI Parties or would modify the ECF calculation methodology with respect to mandatory repurchases under the transaction financing documents in a manner that is adverse to the LBHI Parties, in each case as described in this Summary of Transaction Terms. The Board must approve all Debt.

    (d) (e) Material Acquisitions:

    (i)  Consent right over dispositions, leases and capital expenditures will be eliminated. The consent right over acquisitions will be eliminated to the extent that the purchase price or prices for acquisitions and joint ventures for any calendar year equal in the aggregate to 10% or less of the NB Enterprise Value (defined as the Standard Valuation (as defined below) (without applying the Specified Discount) for the purposes of this Section 1(ed) and Section 1(fe)). The consent right over any acquisition or joint venture for any calendar year which is not permitted by the preceding sentence will also be eliminated if (x) after giving effect to pro forma cash flow requirements after such transactions, the Company's projected ECF amount available for the next purchase of the LBHI Parties' Class A units pursuant to Section 7(d) offor the next subsequent valuation following the transaction closing, the Valuation Agents automatically value the transactions/assets purchased at the higher of (A) the purchase price plus transaction costs, subject to downward adjustment for market deterioration (based on an agreed index) from the closing date to the valuation date (the "Transaction Valuation") or (B) the value resulting from using the valuation methodologies set forth in this Summary of Transaction Terms will not be lower than it would have been if the transaction had not occurred, or (y) in the case where the condition in the foregoing clause (x) is not met(the "Standard Valuation"), and (y) for the second such

subsequent valuation following the transaction closing, the LBHI Parties are given the opportunity to elect within 10 business days after receiving notice of the signing of the transaction, to have the Valuation Agents value the transactions/assets purchased at the ~~purchase price plus transaction costs for the two years following the consummation of the transaction~~Transaction Valuation.  If the LBHI Parties do not make ~~such~~the election set forth in the preceding clause (y), then the Valuation Agents will value the transactions/assets purchased using the ~~valuation methodologies set forth in this Summary of Transaction Terms.~~Standard Valuation.

(ii)    Any material acquisitions, as well as material dispositions, leases, and capital expenditures, must be approved by Board and must be at arms length with an unrelated third party.  Leases and capital expenditures may be approved via Board approval of the budget.

(iii)    Acquisitions entered into with the consent of the LBHI Parties shall not count towards the 10% basket described in Section 1(~~e~~d)(i) and shall not be subject to the restrictions described in Section 1(~~e~~d)(i).

(e)    ~~(f)~~Joint Ventures.

(i)    Consent right over the establishment, investment or participation in or loan of money or equipment to, any partnership or joint venture will be eliminated to the extent that joint ventures, together with acquisitions, for any calendar year equal in the aggregate to 10% or less of the NB Enterprise Value (defined as the Standard Valuation (without applying the Specified Discount) for the purposes of Section 1(~~e~~d) and this Section 1(~~f~~e)).  The consent right over joint ventures for any calendar year which is not permitted by the preceding sentence will be eliminated if (x) after giving effect to pro forma cash flow requirements after such transactions, the Company's projected ECF amount available for the next purchase of the LBHI Parties' Class A units pursuant to Section ~~7~~6(d) of this Summary of Transaction Terms will not be lower than it would have been if the transaction had not occurred, or (y) in the case where the condition in the foregoing clause (x) is not met, the LBHI Parties are given the opportunity to elect within 10 business days after receiving notice of the signing of the transaction, to have the Valuation Agents value the transactions/assets purchased at the purchase price plus transaction costs for the two years following the consummation of the transaction.  If the LBHI Parties do not make such election, then the Valuation Agents will value the transactions/assets purchased using the valuation methodologies set forth in this Summary of Transaction Terms.

(ii)    Any joint ventures must be approved by Board and must be at arms length with an unrelated third party.

(iii)    Joint ventures entered into with the consent of the LBHI Parties shall not count towards the 10% basket described in Section 1(~~f~~e)(i) and shall not be subject to the restrictions described in Section 1(~~f~~e)(i).

(f)    ~~(g)~~Sale, Merger or Reorganization: consent right over any reorganization, consolidation, merger, sale of all or substantially all the assets, or other change of control transaction of the Company or any of its subsidiaries with another entity, will be eliminated provided that:

(i)    any such transaction occurring within two years from Closing will result in (A) NBSH having drag-along rights at the (1) transaction price, or (2) at the election of the LBHI Parties to be made within 10 business days after the LBHI Parties receive notice of the signing of the transaction, the Agreed Valuation assuming a Specified Discount of 0% as of the last day of the quarter preceding the signing of the transaction, and (B) the LBHI Parties having tag-along rights at the transaction price;

2

(ii) any such transaction occurring between the second and fourth years after Closing will result in (A) NBSH having drag-along rights at the (1) transaction price, or (2) at the election of the LBHI Parties to be made within 10 business days after the LBHI Parties receive notice of the signing of the transaction, the Agreed Valuation as of the last day of the quarter preceding the signing of the transaction (assuming the Specified Discount as of the signing of the transaction) and (B) the LBHI Parties having tag-along rights at the transaction price; and

(iii) any such transaction occurring more than four years after the Closing (or occurring at any time after the closing with the consent of the LBHI Parties) will result in (A) NBSH having drag-along rights at the transaction price, and (B) the LBHI Parties having tag-along rights at the transaction price.

**2. The LBHI Parties have the following rights prior to the Closing but such rights will be modified upon the LBHI Parties owning less than 25.0% of all outstanding common units in the Company at the time:**

(a) Appointment of CEO: consent right over the appointment of a new CEO will be eliminated.

**3. 2. The LBHI Parties have the following rights prior to the Closing but such rights will be modified upon the LBHI Parties owning less than 15.0% and then less than 5.0% of all outstanding common units in the Company at the time:**

(a) Board seats: prior to the Closing, the LBHI Parties are entitled to appoint two members to the Board and are entitled to have one of its directors appointed to all major committees. Upon the LBHI Parties owning less than 15.0% of all outstanding common units of the Company, the LBHI Parties will only be entitled to appoint one member to the Board and the director may only be appointed to the Audit Committee. Upon the LBHI Parties owning less than 5.0% of all outstanding common units of the Company, the LBHI Parties will only be entitled to appoint one member to the Board.

**4. 3. The LBHI Parties have the following rights prior to the Closing but such rights will be eliminated upon the LBHI Parties owning less than 7.5% of all outstanding common units in the Company at the time:**

(a) Adverse tax actions: consent right over the undertaking of any tax action which would reasonably be expected to have an adverse effect on a Class A member of the Company will be eliminated.

**5. 4. The LBHI Parties have the following rights prior to the Closing and such rights will not be eliminated until the LBHI Parties no longer hold any common units in the Company:**

(a) Transfers by NBSH: Equity holders of NBSH are prohibited from transferring their equity in NBSH (other than pursuant to a permitted change of control transaction), provided, that, in addition to any existing permitted transfer rights, NBSH equity holders will be permitted to transfer equity to (i) any family member for tax/estate planning purposes or (ii) to other NBSH equity holders.

(b) Dividends/Distributions: consent right over the declaration and/or payment of any dividends or any distributions will not be eliminated upon Closing, but the LBHI Parties will not have consent rights in relation to (i) tax distributions, (ii) distributions to consummate permitted repurchases of former employee or LBHI Parties' Class A units, or (iii) pro rata distributions from ECF in any annual period where the maximum amount (i.e., up to the Post-Closing Annual Cap) of Class A units have been purchased from the LBHI Parties at the Agreed Valuation.

3

(c) <u>Liquidation, dissolution or winding up</u>[1]: consent right over the liquidation, dissolution or winding up of the Company.-

(d) <u>Information necessary for the LBHI Parties to prepare its tax returns</u>: The Board must cause the Company to deliver to the LBHI Parties within 90 days of the end of a fiscal year information with respect to the Company as may be necessary for the LBHI Parties to prepare their federal, state, and local tax returns (which information may include quarterly estimates in lieu of finalized amounts), with the delivery of final versions of such information as soon as reasonably practicable thereafter but in any event no later than September 10 of the applicable fiscal year for Federal K-1s (or acceptable substitute) and September 30 of the applicable fiscal year for state and local information.

(e) <u>"Most Favored Nation" protection</u>: In the event that any of the LBHI Parties' governance rights (other than with respect to Board seats) in existence immediately after the Closing are provided to any other investor in the Company with an ownership level at or below 50% of the LBHI Parties' then-applicable ownership level, the LBHI Parties shall also be given such rights regardless of the LBHI Parties' ownership level at that time.

(f) <u>Certain Transactions</u>: any (i) material affiliate transactions between the Company and NBSH (unless contemplated by the LLC Agreement) or (ii) engagement of advisors or other material expenditures by the Company for the benefit of NBSH will, in each case, be submitted to the Board for approval or approved via Board approval of the budget.

(g) <u>Pre-emptive Rights</u>:  The LBHI Parties have pre-emptive rights on all of the Company's equity issuances to third parties subject to the exit provisions specified in this Summary of Transaction Terms.

(h) <u>Employee Equity Issuances</u>.

  (i) Consent right will be eliminated with respect to equity issuances to employees (whether directly or indirectly through back to back issuances for monetary consideration or as compensation, unless such equity issuances are (1) in excess of the Annual Approved Basket (as defined below) or (2) at a value less than the Standard Valuation  including an aggregate discount of 30% ("Minimum Employee Issuance Value").  The LBHI Parties and the Company will agree on acceptable forms of equity issuance prior to Closing.  For the avoidance of doubt, current forms of equity issuances (i.e., common units, phantom equity and profits interests units) are acceptable subject to confirmatory diligence by the LBHI Parties on all terms and conditions of current forms of equity issuances.  Issuances which are not compliant with the foregoing agreed forms of equity will require the LBHI Parties' consent.

  (ii) "Annual Approved Basket" shall be the greater of (a) the amount it would cost for the Company to make the maximum purchase of the LBHI Parties' equity allowed under Closing Cap or the Post-Closing Annual Cap in each year, as the case may be, and, if applicable, 100% of the remaining LBHI Parties' equity required to be purchased under Section ~~10~~9 (Future Exit) of this Summary of Transaction Terms, <u>less</u> the ECF used to purchase the LBHI Parties' equity in that year and (b) 4% of the Company's revenue for the applicable valuation year (e.g., revenue for 2011 applicable to purchases to be made at the December 31, 2011 valuation) as determined based on actual monthly revenue for January to October of such applicable year and good faith estimate by the Company for November to December of such applicable year.  For the avoidance of doubt, if the Company issues

---

[1] Appropriate protection of the LBHI Parties' economic interests in the case of sales of Company assets out of the ordinary course to be provided in definitive documentation.

any equity over the Post-Closing Annual Cap in order to make required purchases under Section ~~10~~9 (Future Exit) of this Summary of Transaction Terms, then such equity must be issued in an amount sufficient to redeem 100% of the remaining Class A units held by the LBHI Parties (with a Specified Discount of 0%) and proceeds from its issuance must be used to repurchase all of the LBHI Parties' equity. The Annual Approved Basket shall be calculated annually after receipt of the Agreed Valuation and determination of that year's ECF equity repurchase amounts in accordance with the terms set forth in this Summary of Transaction Terms.

(iii)    "Standard Valuation" shall mean the valuation delivered in accordance with the LLC Agreement by the valuation agent selected by the Company.

(iv)    All equity issuances must be approved by the Board.

(v)    There will not be any preemptive rights or consent right on permitted reissuances of securities previously issued to retiring or terminated employees under the LLC Agreement, <u>provided</u>, that (A) in the case of profits interest units with a distribution threshold under the LLC Agreement, the distribution threshold is not less than the Standard Valuation and (B) in the case of common units, the units are issued at or above the Minimum Employee Issuance Value.

(i)    <u>Compensation Approval</u>: The Board will approve, in advance, a specified range of aggregate annual cash and other compensation (including base pay, bonuses, and equity grants). The Compensation Committee will approve, in advance, the annual cash and other compensation (including base pay, bonuses and equity grants) of the Chief Executive Officer and his direct reports. At such time as the LBHI Parties are no longer entitled to appoint a director to the Compensation Committee, the Compensation Committee and the independent director(s) of the Compensation Committee must approve the Chief Executive Officer's compensation and the Chief Executive Officer and the independent director(s) of the Compensation Committee must approve the compensation of the Chief Executive Officer's direct reports.

(j)    <u>Tag-Along Rights</u>. As described above under "Merger or Reorganization".

(k)    <u>Information Rights</u>. As described in Section ~~11~~10(e) of this Summary of Transaction Terms.

**<u>6.</u>    ~~5.~~ Process for exercising consent rights:**

(a)    The LBHI Parties shall notify the Company on or prior to the 15th business day after the day that the LBHI Parties receive notice from the Company of the triggering events set forth in this Appendix 1 as to whether the LBHI Parties intend to provide consent to the taking of any of the following actions (where applicable given the LBHI Parties' percentage ownership in the Company at the time of the notice and the limitations set forth herein):

(i)    incurring Debt (as described in Section 1(~~d~~c));

(ii)    entering into material acquisitions (as described in Section 1(~~e~~d));

(iii)    entering into joint ventures (as described in Section 1(~~f~~e));

(iv)    entering into a sale, merger or reorganization (as described in Section 1(~~g~~f));

(v)    undertaking adverse tax actions (as described in Section ~~3~~4(a));

(vi)    declaring or paying dividends/distributions (as described in Section ~~4~~5(b)); and

5

(vii)   approving the liquidation, dissolution or winding up of the Company (as described in Section 45(c)).

(b)   If the LBHI Parties do not timely notify the Company of its intent with respect to an action, then the LBHI Parties will be deemed to have approved such action.