PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
John A. Morris, Esq.

UNITED STATES BANKRUPTCY COURT
SOTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

### RESPONSE OF JOINT VOLUNTARY LIQUIDATORS OF ICP STRATEGIC CREDIT INCOME MASTER FUND LTD. TO DEBTORS' ONE HUNDRED AND EIGHTY NINTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY REPO CLAIMS)

The Joint Voluntary Liquidators (the "Liquidators") of ICP Strategic Credit Income

Master Fund Ltd. ("ICP Master Fund") hereby responds (the "Response") to *Debtors' One*

*Hundred and Eighty Ninth Omnibus Objection to Claims (No Liability Repo Claims)* (the

"Objection").  In support of their Response, the Liquidators assert as follows:

### The Claim

1.      Lehman Commercial Paper, Inc. ("LCPI") is a debtor in the above-

referenced chapter 11 cases.

2.      Lehman Brothers Inc. ("LBI") is a debtor in a proceeding before this

Court pursuant to the Securities Investor Protection Act (the "SIPA Proceeding").

3.      On September 22, 2009, ICP Master Fund filed claim no. 32518 (the

"Claim") against LCPI.  As described in the Claim, ICP entered into a BMA Master Repurchase

Agreement (September 1996 Version), dated as of March 5, 2007 (the "MRA"), with Lehman

Brothers Inc. ("LBI") and (together with LBI, the "Lehman MRA Parties").  Under the MRA,

one party, as seller, may sell securities or other assets, in exchange for consideration, to the other party, as buyer, with a simultaneous agreement by the buyer to return the securities or assets initially sold, in exchange for consideration (the "Repurchase Price"), at a date certain or on demand (a "Repo Transaction").  A true and correct copy of the Claim is attached hereto as Exhibit 1 and a copy of the MRA is attached hereto as Exhibit A to the Claim.

4.    ICP Master Fund entered into a Repo Transaction with the Lehman MRA Parties pursuant to which ICP delivered certain PERI 2005-1A C bonds (the "Peritus Bonds") with a Repurchase Price of $1,965,713.00 (the "Peritus Repurchase Price") the ("Peritus Repo Transaction").  The aggregate face value of Peritus Bonds was $7,000,000.00.  Upon information and belief, as of the date hereof, the Peritus Repo Transaction remains open (i.e., the Peritus Bonds have not been returned to ICP nor has the Peritus Repurchase Price been paid).  A copy of an account statement (the "Account Statement") from LBI confirming possession of the Peritus Bonds is attached as Exhibit B to the Claim.

5.    As described in the Claim, ICP Master Fund asserted a Claim in the amount of not less than $7,833,471.56 on account of the Lehman MRA Parties' defaults under the MRA.  ICP Master Fund also reserved its rights to amend, modify and/or supplement its Claim.

### The Objection

6.    The Debtors' object to the Claim solely on the basis that the Claim should have been asserted against debtor LBI as the counterparty to the Peritus Repo Transaction and not against debtor LCPI.  The Debtors do not dispute any of the facts asserted in the Claim, including that LCPI was a party to the MRA or the amount of the Claim.

2

**Response**

7.      ICP Master Fund was known as *ICP Structured Credit Income Master Fund Ltd* ("ICP Structured") prior to a name change in 2008.  At all relevant times, ICP Master Fund had three shareholders (collectively, the "Shareholders"):  ICP Credit Partners LLC GP ("ICP GP"), ICP Strategic Credit Income Fund LP ("ICP Income"), and ICP Strategic Credit Income Fund Ltd ("ICP Credit").  Upon information and belief, Thomas C. Priore is a Director of each of the Shareholders and the ICP Master Fund.  As such, Mr. Priore was authorized to act on behalf of ICP Master Fund (and, previously, ICP Structured).  Mr. Priore signed the Claim on behalf of ICP Master Fund.  On or about August 10, 2010, the Grand Court of the Cayman Islands ordered that ICP Credit be wound up, and that Steven Akers and Hugh Dickson be appointed as Official Liquidators of ICP Credit.  On October 22, 2010, Mr. Priore executed two "Written Resolutions of the Shareholders of ICP Strategic Credit Income Master Fund Ltd," on behalf of two of the Shareholders, ICP GP and ICP Income (the "Priore Resolutions").

8.      On October 27, 2010, the Liquidators executed "Written Resolutions of the Shareholders of ICP Strategic Credit Income Master Fund Ltd" on behalf of the third Shareholder, ICP Credit (the "Liquidators' Resolution" and together with the Priore Resolutions, the "Resolutions").  Pursuant to the Resolutions, it was resolved that (a) ICP Master Fund be liquidated and wound up voluntarily and (b) Steven Akers and Hugh Dickson were appointed as joint voluntary liquidators of ICP Master Fund.

9.      On November 25, 2010, Mr. Dickson filed, on behalf of ICP Master Fund, a petition to continue ICP Master Fund's liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "CI Court"), Cause No. FSD: 269 of 2010 (AJJ).  On December 23, 2010, the CI Court signed and filed a "Supervision Order" that provided, among other things, that (a) the liquidation of ICP Master Fund "be continued under

the supervision of the [CI] Court;" and (b) the Liquidators "be appointed as official liquidators of" ICP Master Fund.  Pursuant to the Resolutions and Supervision Order, the Liquidators have the sole authority to act on behalf of ICP Master Fund.

10.    The Liquidators were appointed after Mr. Priore filed the Claim and after the claims' bar date in LBI's chapter 11 case.  The Liquidators have been charged with winding up the ICP Master Fund's business and were not aware that the Claim should have been asserted against LBI in addition to LCPI.

11.    Based on the exhibits to the Claim, the Liquidators believe that ICP Master Fund filed a claim in LBI's SIPA proceeding based on the same facts asserted in the Claim.  The Liquidators have been unable to confirm that such claim was filed in LBI's SIPA proceeding.  As such, contemporaneously herewith the Liquidators are filing the *Motion of Joint Voluntary Liquidators of ICP Strategic Credit Income Master Fund Ltd. to File Late Claim* (the "ICP Motion") in the LBI SIPA Proceeding.  Through the ICP Motion, the Liquidators seek entry of an order authorizing them to file a late claim agaisnt LBI to the extent such claim has not been filed.  The Liquidators respectfully request that the Court adjourn the hearing on the Debtors' Objection until such time as it considers the ICP Motion.

Dated:  New York, New York
         December 13, 2011

                          PACHULSKI STANG ZIEHL & JONES LLP


                          By: */s/ John A. Morris*
                                John A. Morris, Esq.
                                780 Third Avenue, 36th Floor
                                New York, New York 10017
                                Telephone: (212) 561-7000
                                Facsimile:  (212) 561-7777

**<u>Exhibit 1</u>**

<table>
<tr><td>
**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076
</td><td colspan="2">**PROOF OF CLAIM**</td></tr>
</table>

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) | Filed: USBC - Southern District of New York Lehman Brothers Holdings Inc., Et Al. 08-13555 (JMP)     0000032518 |
|---|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Commercial Paper Inc.** | Case No. of Debtor **08-13900** | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. This form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

ICP Structured Credit Income Master Fund Ltd
c/o Institutional Credit Partners LLC
360 Madison Avenue, 10th Floor
New York, New York 10017
Attn: Peter W. Gaudet, Chief Operating Officer

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on: _____

Telephone number: 212-821-1983     Email Address: pgaudet@icpcapital.com

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1.   **Amount of Claim as of Date Case Filed: $**  see attached
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2.   **Basis for Claim:** see attached
(See instruction #2 on reverse side.)

3.   **Last four digits of any number by which creditor identifies debtor:** _____
3a.   **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4.   **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
**Amount of Secured Claim: $**_____   **Amount Unsecured: $**_____

5.   **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

6.   **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**_____
(See instruction #6 on reverse side.)

7.   **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8.   **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
9-21-09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

THOMAS C. PRIORE, DIRECTOR   212-821-1924

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

## _____ DEFINITIONS _____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## _____ INFORMATION _____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re** | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.* | **08-13555 (JMP)** |
| **Debtor.** | |

## ATTACHMENT TO PROOF OF CLAIM OF ICP STRUCTURED CREDIT INCOME MASTER FUND LTD AGAINST LEHMAN COMMERCIAL PAPER INC.

The undersigned, having an office at 360 Madison Avenue, 10th Floor, New York, New York 10017-7128, is an authorized signatory of ICP Structured Credit Income Master Fund Ltd ("ICP")[1] and duly authorized to execute and file this claim on behalf of ICP (the "Claim"). In support of the Claim, ICP represents as follows:

### Background

### Master Repurchase Agreement and the Peritus Repo Transaction

1.      ICP entered into a BMA Master Repurchase Agreement (September 1996 Version), dated as of March 5, 2007 (the "MRA"), with Lehman Brothers Inc. ("LBI") and Lehman Commercial Paper Inc. ("LCPI", and together with LBI, the "Lehman MRA Parties"). Under the MRA, one party, as seller, may sell securities or other assets, in exchange for consideration, to the other party, as buyer, with a simultaneous agreement by the buyer to return the securities or assets initially sold, in exchange for consideration (the "Repurchase Price"), at a date certain or on demand (a "Repo Transaction"). A copy of the MRA is attached hereto as Exhibit A.

---

[1]      On August 14, 2008, "ICP Structured Credit Income Master Fund Ltd" was renamed "ICP Strategic Credit Income Master Fund Ltd."

v 4

2.      ICP entered into a Repo Transaction with the Lehman MRA Parties pursuant to which ICP delivered certain PERI 2005-1A C bonds (the "Peritus Bonds") with a Repurchase Price of $1,965,713.00 (the "Peritus Repurchase Price") (the "Peritus Repo Transaction"). The aggregate face value of Peritus Bonds was $7,000,000.00. As of the date hereof, the Peritus Repo Transaction remains open (i.e., the Peritus Bonds have not been returned to ICP nor has the Peritus Repurchase Price been paid). A copy of an account statement (the "Account Statement") from Lehman confirming possession of the Peritus Bonds is attached hereto as Exhibit B.

**Bankruptcy Cases (LCPI) and SIPA Proceeding (LBI)**

3.      On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings nc. ("LBHI"), LCPI's parent, filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). LCPI filed a petition for relief under chapter 11 of the Bankruptcy Code on October 5, 2008 and became a debtor in these jointly administered bankruptcy cases.

4.      On July 2, 2009, the Bankruptcy Court entered an order (the "Chapter 11 Bar Date Order"), setting September 22, 2009 at 5:00 p.m. (prevailing Eastern Time) (the "Chapter 11 Bar Date") as the last date and time for filing proofs of claim in the bankruptcy cases of LBHI, LCPI and other affiliate debtors (collectively, and together with the bankruptcy cases of all affiliate debtors, the "Bankruptcy Cases"). ICP asserts this Claim pursuant to the Chapter 11 Bar Date Order.

5.      On September 19, 2008 (the "SIPA Filing Date"), the Securities Investor Protection Corporation ("SIPC") filed an application (the "SIPA Application") against LBI in the

2

United States District Court for the Southern District of New York (the "District Court") for a

protective decree under the provisions of the Securities Investor Protection Act of 1970, as

amended ("SIPA") and for the appointment of a trustee for the liquidation of LBI. The SIPC

Application was granted by the District Court on September 19, 2008 resulting in the entry of a

protective decree (the "SIPA Order") adjudicating that the customers of LBI were in need of the

protection afforded by SIPA and appointing a trustee for the liquidation of the business of LBI.

The District Court also referred the proceeding to Bankruptcy Court, where it is currently

pending (the "SIPA Proceeding").

6.    The Bankruptcy Court entered an order on November 7, 2008 setting (i)

January 30, 2009 as the deadline to file customer "net equity" claims against LBI, and (ii) June 1,

2009 as the deadline to file all other claims against LBI.

7.    On or around January 27, 2009, ICP filed a customer claim (the "SIPA

Customer Claim") against LBI in the SIPA Proceedings in which ICP sought recovery of certain

amounts to the extent not recovered from the customer property held by LBI. A copy of the

SIPA Customer Claim is attached hereto as Exhibit C.

8.    On or around May 29, 2009, ICP filed a claim against LBI in the SIPA

Proceedings (the "SIPA Claim") in which ICP asserted that an Event of Default (as defined in

the MRA) under the MRA had occurred and claimed, among other things, the return of the

Peritus Bonds (or, in the alternative, payment of their face value of $7,000,000), plus any and all

Income (as defined in the MRA) paid or distributed thereon[2] and certain other amounts. The

SIPA Claim also asserted, among other things, a claim under the CMNA for damages in

_____

[2]    Calculated to be $652,161.02 as of the date of the SIPA Claim, which figure has further accrued, and
continues to accrue, since such date, as set forth below.

3

connection with LBI's refusal to honor its obligations thereunder. A copy of the SIPA Claim, without exhibits,[3] is attached hereto as <u>Exhibit D</u>.

   9.  This Claim is being asserted in these Bankruptcy Cases against LCPI on an analogous basis as the SIPA Claim filed against LBI in the SIPA Proceeding.

<div align="center"><b><u>Basis of Claim</u></b></div>

<b><u>Defaults under the MRA</u></b>

   10.  Paragraph 11 of the MRA defines an Event of Default, in part, as an Act of Insolvency (as defined in the MRA) occurring with respect to Seller or Buyer. MRA, ¶ 11. Paragraph 2(a) of the MRA defines "Act of Insolvency" with respect to any party as, among other things, "the commencement of [a bankruptcy or insolvency] case or proceeding against such party, or another seeking [the appointment of a trustee], or the filing against a party of an application for a protective decree under the provisions of [SIPA], which…results in the entry of an order for…[the appointment of a trustee], the issuance of a protective decree or the entry of an order having a similar effect…" MRA, ¶ 2(a)(i)-(ii).

   11.  Pursuant to paragraph 2(a)(ii) of the MRA, an Act of Insolvency with respect to LBI occurred on the SIPA Filing Date upon the filing of the SIPC Application which resulted in entry of the SIPA Order. An Event of Default under the MRA thus occurred on the SIPA Filing Date. Pursuant to paragraph 11(a) of the MRA, written notice from the non-defaulting party is not required with respect to an Event of Default based upon an Act of Insolvency.

   12.  Paragraph 10(b) of the MRA provides, in pertinent part, that upon the occurrence of an Event of Default, the non-defaulting party may, at its option (which option is

---

[3]  Copies of exhibits to the SIPA Claim are appended as exhibits to this Claim and, as such, have not been reproduced with the SIPA Claim. Copies of the exhibits as appended to the SIPA Claim may be requested from the

<div align="center">4</div>

deemed to have been exercised immediately upon the occurrence of an Act of Insolvency),

declare an Event of Default, upon which, the Repurchase Date (as defined in the MRA) for each

Transaction is deemed immediately to occur.

   13. ICP asserts the following:

     (a) <u>Claim for Return of the Peritus Bonds, or, in the alternative the</u>

<u>face value thereof</u>. As stated above, the Peritus Bonds have not been

returned to ICP nor has the Peritus Repurchase Price been paid. ICP

hereby asserts a Claim for return of the Peritus Bonds pursuant to the

MRA, or, in the alternative, payment of the face value of the Peritus Bonds

in the amount of not less than $7,000,000.00.

     (b) <u>Claim for Income</u>. The MRA provides that "[ICP] shall be

entitled to receive an amount equal to all Income paid or distributed on or

in respect of the [Peritus Bonds] that is not otherwise received by [ICP], to

the full extent it would be so entitled if the [Peritus Bonds] had not been

sold to [the Lehman MRA Parties]."  MRA, ¶ 5.  The MRA defines

"Income," with respect to a security like the Peritus Bonds, as "any

principal thereof and all interest, dividends or other distributions thereon."

<u>Id.</u>, § 2(f).  To date, the Lehman MRA Parties owe ICP $833,471.56[4] for

Income paid or distributed to the Lehman MRA Parties on the Peritus

Bonds.  ICP accordingly asserts a Claim of not less than $833,471.56 for

such Income, plus an unliqudiated claim for any Income that may in the

---

contact person listed below.

[4] Calculated as the amount claimed in the SIPA Claim (<u>i.e.</u>, $652,161.02), plus an additional $181,310.54
accrued since that date.

future be paid or distributed and become payable to ICP pursuant to the
MRA.

(c)    Claim for Replacement Security Losses.    Given the Lehman
MRA Parties' default under the MRA on account of the commencement of
the SIPA Proceedings, the MRA permits ICP to purchase replacement
securities of the same class and amount as the Peritus Bonds
("Replacement Securities") or, in its sole discretion, to be deemed to have
purchased Replacement Securities. MRA, ¶ 11(d)(ii).  If ICP purchases
(or is deemed to purchase) Replacement Securities, LCPI is liable to ICP
for any excess of the price paid (or deemed paid) by ICP for the
Replacement Securities over the Repurchase Price for the Peritus Bonds
replaced thereby (the "Replacement Damages").  Id., ¶ 11(e).  ICP has not
purchased Replacement Securities to date.  ICP nevertheless asserts a
contingent, unliquidated claim against LCPI for any Replacement
Damages should ICP purchase (or be deemed to purchase) Replacement
Securities in the future.

(d)    Claim for Legal Fees and Other Expenses.    Given the Lehman
MRA Parties' default under the MRA on account of the commencement of
the SIPA Proceedings, LCPI is liable to ICP under the MRA for (i) the
amount of all reasonable legal or other expenses incurred by ICP in
connection with or as a result of the event of default, (ii) damages in an
amount equal to the cost (including all fees, expenses and commissions) of
entering into replacement transactions and entering into or terminating

6

hedge transactions in connection with or as a result of the Lehman MRA

Parties' default, and (iii) any other loss, damage, cost or expense directly

arising or resulting from the Lehman MRA Parties' default in connection

with the Peritus Repo Transaction.  MRA, ¶ 11(g).  To date, ICP has

incurred approximately $10,000 in legal fees and expenses (the "Legal

Expenses") to date in connection with the defaults under the MRA and

preparation of this Claim.  ICP accordingly asserts a claim of not less than

$10,000 on account of Legal Expenses and an unliquidated claim against

LCPI for any related costs (including, without limitation, any as yet

unliquidated legal fees and expenses incurred by ICP in excess of the

Legal Expenses).  A schedule detailing these Legal Expenses is set forth in

Exhibit E hereto.

(e)      Claim Under Cross Margin and Netting Agreement.      ICP,

the Lehman MRA Parties and Lehman Brothers Special Financing Inc. (an

affiliate debtor in these Bankruptcy Cases) entered into a Cross Margining

and Netting Agreement, dated as of March 18, 2008 (the "CMNA"), in

connection with the MRA and a certain ISDA agreement with LBSF (the

"ISDA Agreement").[5]  A copy of the CMNA is attached as Exhibit F.  To

date, the Lehman MRA Parties have refused to honor their obligations to

ICP under the CMNA.  ICP accordingly asserts a contingent, unliquidated

---

[5]      Concurrently with this Claim, ICP is also asserting a claim in these Bankruptcy Cases against LBSF based upon early termination of the ISDA Agreement, which claim is the subject of a separate proof of claim (the "LBSF Claim").  ICP is also asserting claims in these Bankruptcy Cases against LBHI, which claims are analogous to the LBSF Claim and this Claim, based on certain guarantees of LBSF and LBI's obligations under the ISDA Agreement and MRA, respectively, which claims are the subject of a single, separate proof of claim (the "LBHI Guarantee Claim").

claim against LCPI for all damages in connection with the Lehman MRA

Parties' refusal to honor its obligations under the CMNA.

14.      As of the date of the filing of this Claim, ICP has not received the Peritus

Bonds nor any payment on account of any portion of the Claim (including, without limitation,

the face value of the Peritus Bonds), from either of the Lehman MRA Parties nor has ICP

received any amounts or property claimed in the SIPA Claim and SIPA Customer Claim

(including, without limitation, the Peritus Bonds).

**Reservation of Right to Amend this Claim; Contingent Right of Set Off**

15.      ICP reserves the right to amend, modify and/or supplement this Claim,

pending resolution of certain other related claims asserted by ICP against LBI, LCPI, LBHI or

LBSF (collectively, the "Lehman Entities"), including, without limitation, the SIPA Claim, the

SIPA Customer Claim, LBSF Claim and LBHI Claim (collectively with this Claim, the "ICP

Lehman Claims").

16.      In addition, under the CMNA, the Lehman MRA Parties may have a right,

which ICP neither concedes nor denies here, to set off or net certain amounts owed to/from

LBSF or the Lehman MRA Parties (e.g., the Peritus Repurchase Price), against amounts or

property owed from/to ICP (e.g., the Peritus Bonds or any amount claimed in the ICP Lehman

Claims).  ICP hereby asserts that the ability of any of the Lehman Entities to exercise any such

right is contingent upon the outcome of the ICP Lehman Claims.  For instance, to the extent that

any of the Lehman Entites (or any trustee or administrator acting on its behalf) seeks to set off or

net the amount of the Peritus Repurchase Price against any of the ICP Lehman Claims, ICP

hereby objects to such set off or netting without a corollary return of the Peritus Bonds (or, in the

alternative, their aggregate face value), plus other related amounts (as set forth in greater detail

8

above).  To the extent that any such set off or netting right is properly and equitably exercised,

ICP reserves the right to amend this Claim to reflect any amounts so set off or netted.

**Miscellaneous**

17.    The Claim is evidenced by various documents and instruments, including

the MRA, the Account Statement, the SIPA Customer Claim, the SIPA Claim, the CMNA, and

any and all other information and documents as may be submitted by ICP in respect of this

Claim.  ICP reserves the right to attach, produce, and/or rely upon additional documents

supporting its Claim or additional documents that may become available after further

investigation or discovery or upon request.

18.    No judgment has been rendered on account of the Claim.

19.    The amounts of any payment on the Claim has been credited and deducted

for the purpose of making this Claim.

20.    The Claim is filed as an unsecured claim.

21.    All notices and distributions in respect of the Claim should be forwarded

to:

> ICP Structured Credit Income Master Fund Ltd
> c/o Institutional Credit Partners LLC
> 360 Madison Avenue, 10th Floor
> New York, New York 10017
>
> Attn:  Peter W. Gaudet, Chief Operating Officer

22.    This proof of claim is filed to protect ICP from forfeiture of its claims by

reason of the Chapter 11 Bar Date.  The filing of this proof of claim is not and should not be

construed to be:  (a) a waiver or release of the rights of ICP against any other entity or person

liable for all or part of any claim described herein; (b) a waiver of the right to seek to have the

reference withdrawn or contest the Court's jurisdiction with respect to the subject matter of these

claims, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in this case against or otherwise involving ICP; (c) a waiver of any right to the subordination, in favor of ICP, of indebtedness or liens held by creditors of LCPI, LBI, LBSF, LBHI, or any affiliated debtor; or (d) an election of choice of law or remedy that waives or otherwise affects any other remedy of ICP.

23.     ICP reserves the right, in accordance with Court orders and procedures to amend, modify and/or supplement this Claim, and/or file additional claims from time to time as may be necessary or appropriate.

24.     The filing of this Claim shall not constitute a concession or admission by ICP of any liability or the existence or veracity of any facts with respect to any claim that has been or may be asserted against ICP by third parties.

25.     Nothing contained herein shall limit the rights of ICP from commencing any proceeding or taking any action concerning its claims or any lien or security interest to the extent permitted by the Bankruptcy Code or applicable non-bankruptcy law.

Dated: New York, NY
       September 21, 2009

ICP STRUCTURED CREDIT INCOME
MASTER FUND LTD

By: THOMAS C. PRIORE
Title: DIRECTOR

10

**Exhibit A to Attachment to Proof of Claim**

**BMA Master Repurchase Agreement dated as of March 5, 2007**



# Master Repurchase Agreement

September 1996 Version

| | |
|---|---|
| Dated as of | March 5, 2007 |
| Between: | Lehman Brothers Inc.<br>Lehman Commercial Paper Inc. |
| and | ICP Structured Credit Income Master Fund Ltd. |

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
\*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

    (i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

    (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g)  The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h)  To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i)  The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

| | |
|---|---|
| **Lehman Brothers Inc.**<br>**Lehman Commercial Paper Inc.** | **ICP Structured Credit Income Master Fund Ltd.** |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: Robert E. Guglielmo<br>Senior Vice President | Title: _____ |
| Date: 3/6/2008 | Date: _____ |

**ANNEX I**
**Supplemental Terms and Conditions**

This Annex forms a part of the Master Repurchase Agreement dated as of  March 5, 2007
(the "Agreement") between **Lehman Brothers Inc., Lehman Commercial Paper Inc.,** and

**ICP Structured Credit Income Master Fund Ltd.**

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.  In addition to this Annex I and Annex II the following Annexes (and any schedules or exhibits attached thereto) shall be deemed executed by the parties hereto and shall also form a part of the Agreement:

    X[None]
    --Annex IV Party as Agent
    --Annex VI Buy/Sell Back Transactions
    --Annex VII Transactions Involving Registered Investment Companies
    --Annex VIII Transactions in Equity Securities
    --Annex IX Transactions Involving Certain Japanese Financial Institutions

2.  With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) that executed the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.

3.  Definitions.  For purposes of the Agreement, the following terms shall have the following meanings:

    (a) "Margin Notice Deadline", 10:00 am New York City time.

    (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction.  In no event shall a Saturday or Sunday be considered a business day.

4.  Purchase Price Maintenance.

    (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

    (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5.  Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial.

    (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

(b)  To the extent that either party has or hereafter may acquire any immunity (sovereign or
otherwise), such party irrevocably waives such immunity, with respect to itself and its revenues
and assets, from (i) any legal action, suit or proceeding (ii) jurisdiction of any court, (iii) arbitration,
(iv) relief by way of arbitration award, injunction, order for specific performance or recovery of
property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or
enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent
permitted by applicable law, that it will not raise, claim or cause to be pleaded any such immunity
at or in respect of any such action or proceeding brought to enforce its obligations under the
Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

(c)  Insofar as permitted by law, each party hereto hereby irrevocably waives any right that it may
have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this
Agreement or the Transactions contemplated hereby.

**Annex II**
**Names and Addresses for Communications Between Parties**

LEHMAN BROTHERS
745 Seventh Avenue, 19th Floor
New York, New York  10019

Attn.:  Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

**Legal/Documentation Information:**

| | |
|---|---|
| Name of Firm: | ICP Structured Credit Income Master Fund Ltd. |
| Address: | c/o Institutional Credit Partners |
| | 445 Park Avenue, 12th Floor |
| | New York, New York  10022 |
| Attn: | Genevieve Carpente |
| Tel #: | (212) 821-1982 |
| Fax #: | (212) 821-1959 |

**Business/Trading Information:**

| | |
|---|---|
| Name of Firm: | Institutional Credit Partners |
| Address: | 445 Park Avenue |
| | 12th floor |
| | New York, New York  10022 |
| Attn: | Genevieve Carpente |
| Tel #: | (212) 821-1982 |
| Fax #: | (212) 821-1959 |

ver_3-03

Annex II-1

**Exhibit B to Attachment to Proof of Claim**

**<u>Account Statement</u>**

# LEHMAN BROTHERS | Fixed Income Financing MTM Statement

| TO: | ICP SCIF |
|---|---|
| A/C #: | 1851860 |
| | ICP CAPITAL |
| C/P NAME: | ICP STRUCTURED CREDIT INCOME MASTER FUND LTD |
| PHONE: | 212-821-1982 |
| FAX: | |
| EMAIL: | lstaudin@lehman.com;carmine.aliberti@ophedge.com;gcarpente@icpcapita |

| FROM: | LEHMAN BROTHERS INC. |
|---|---|
| | DALA VONGSA |
| PHONE: | 212-526-1210 |
| FAX: | 212-520-0146 |
| EMAIL: | dvongsa@lehman.com |

| DATE: | 12-Sep-2008 |
|---|---|
| COB VALUATION DATE: | 11-Sep-2008 |
| REPORTING CCY: | USD |

*POSITIVE NUMBERS = LEHMAN RECEIVABLE*
*NEGATIVE NUMBERS = LEHMAN PAYABLE*

| Summary | |
|---|---|
| Economic Exposure | (2,224,333) |
| Margin/Haircut Amount | 1,965,713 |
| Margin Exposure | (258,620) |
| Cash Free Collateral | 0 |
| Security Free Collateral | 0 |
| Portfolio Margin Requirement | 0 |

**Detail**

**Deal Type RR**

| ISIN/CUSIP Deal ID | Mkt Date Account | Coupon Description | Original Face | Factor | Mkt Price | On Date/ Off Date | Fin Rate | Fin Interest | Coupon Interest | Loan | Market Value | Mrgn / Hrct | Mrgn/Hrct Amt | Margin Exposure USD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71400GAA9 481M510 | 5/24/15 1651560 | 9.00 PERI 2005-1A C | 2,666,769 | 0.878100 | 66.0000 | 4/8/08 | 3.662 | 12,428 | (63,224) | 748,872.00 | (1,545,473) | 200.000 | 748,872 | (98,526) |
| 71400GAA9 481M540 | 5/24/15 1651560 | 9.00 PERI 2005-1A C | 4,333,231 | 0.878100 | 66.0000 | 4/8/08 | 3.662 | 20,195 | (102,732) | 1,216,841.00 | (2,511,238) | 200.000 | 1,216,841 | (160,094) |
| RR Total | | | 7,000,000 | | | | | 32,623 | (165,956) | 1,965,713.00 | (4,056,711) | | 1,965,713 | (258,620.00) |
| Grand Total | | | 7,000,000 | | | | | 32,623 | (165,956) | 1,965,713.00 | (4,056,711) | | 1,965,713 | (258,620.00) |

"F" Denotes Free Collateral Fail

## Disclaimer

The above estimated value[s] are as of the date indicated and do not represent actual bids or offers by Lehman Brothers. There can be no assurance that actual trades could be completed at such value[s]. Unless otherwise specified, the above valuations represent mid-market valuations. Mid-market values attempt to approximate the current economic value of a given position using prices and rates at the average of the bid and offer for the respective underlying asset(s) or reference rate(s). The bid-side is the estimated amount a party would pay to purchase the asset.

Discussions of the trade values in general, and indicative or firm price quotations and actual trade prices in particular, may vary significantly from these written estimated values as a result of various factors, which may include (but are not limited to) prevailing credit spreads, market liquidity, position size, transaction and financing costs, hedging costs and risks and use of capital and profit. These estimates may not be representative of any theoretical or actual internal valuations employed by us for our own purposes, may vary during the course of any particular day and may vary significantly from the estimates or quotations that would be given by another dealer. You should consult with your own accounting or other advisors as to the adequacy of this information for your purposes.

As a condition for providing these estimates, you agree that Lehman Brothers makes no representation and shall have no liability in any way arising therefrom to you or any other entity for any loss or damage, direct or indirect, arising from the use of this information.

**Exhibit C to Attachment to Proof of Claim**

**<u>SIPA Customer Claim</u>**



**CUSTOMER CLAIM FORM**
**LEHMAN BROTHERS INC.**

Account Name: _ICP STRUCTURED CREDIT INCOME MASTER FUND LTD_
_ICP ASSET MANAGEMENT LLC_    Daytime Phone: _212-821-1983_

Account Number: _0710007INS 5_    Email: _PGAUDET@ICPCAPITAL.COM_

Address: _360 MADISON AVE, 10TH FLOOR_
_NEW YORK, NY 10017_    Taxpayer I.D. Number _ICP STRUCTURED CREDIT INCOME MASTER FUND LTD_

Contact Person: _PETER W. GAUDET_    (Social Security No.): _98-0473434_
_ICP ASSET MANAGEMENT LLC_
_13-4307944_

## PLEASE NOTE

- A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT.

- TO BE ELIGIBLE FOR THE MAXIMUM PROTECTION AFFORDED UNDER THE SECURITIES INVESTOR PROTECTION ACT ("SIPA"), ALL CUSTOMER CLAIMS SHOULD BE RECEIVED BY THE TRUSTEE ON OR BEFORE JANUARY 30, 2009; THE TRUSTEE WILL DETERMINE WHETHER CLAIMS MEET THE STATUTORY REQUIREMENTS FOR "CUSTOMER" CLAIMS UNDER SIPA; INCLUSION OF A CLAIM OR CLAIM TYPE ON THIS CLAIM FORM IS NOT DETERMINATIVE OF CUSTOMER STATUS UNDER SIPA.

- THE DEADLINE FOR FILING ALL CLAIMS IS JUNE 1, 2009. NO CLAIM WILL BE ALLOWED IF IT IS RECEIVED AFTER THAT DATE.

- ALL CLAIMS ARE DATED AS OF THE DATE RECEIVED BY THE TRUSTEE.

- YOU MAY FILE YOUR CLAIM ELECTRONICALLY ONLINE AT WWW.LEHMANTRUSTEE.COM OR SEND YOUR COMPLETED AND SIGNED CLAIM FORM TO THE TRUSTEE VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED.

- IF YOUR ACCOUNT HAS BEEN TRANSFERRED TO ANOTHER BROKERAGE FIRM, BUT YOU BELIEVE YOU HAVE A CLAIM FOR PROPERTY OWED TO YOU BY LEHMAN BROTHERS INC., YOU MUST FILE A CLAIM TO PROTECT YOUR RIGHTS.

- LEHMAN BROTHERS INC. IS THE ONLY LEHMAN ENTITY THAT IS A DEBTOR IN THIS SIPA LIQUIDATION PROCEEDING. THIS CUSTOMER CLAIM FORM APPLIES ONLY TO LEHMAN BROTHERS INC. AND DOES NOT APPLY TO ANY OTHER LEHMAN ENTITY, INCLUDING ANY ENTITY IN A PROCEEDING UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.

This claim form must be completed electronically online at www.lehmantrustee.com or mailed promptly, together with supporting documentation, to the following:

| If by first class mail: | If by overnight mail: |
|---|---|
| Lehman Brothers Inc. Claims Processing | Lehman Brothers Inc. Claims Processing |
| c/o Epiq Bankruptcy Solutions, LLC | c/o Epiq Bankruptcy Solutions, LLC |
| P.O. Box 6389 | 10300 SW Allen Blvd |
| Portland, OR 97228-6389 | Beaverton, OR 97005 |

*ALL FROM TERMINATED CDS POSITIONS (SEE SUPPORT)*

1. **CLAIM FOR MONEY BALANCES OR CASH AS OF SEPTEMBER 19, 2008:**

   a.  LBI owes me a credit or cash in the amount of:        $ *2,477,033.46*

   b.  I owe LBI a debit or cash in the amount of:           $ _____

   c.  If you wish to repay the debit balance listed in point b. above please
       insert the amount you wish to repay and attach a check payable to
       "James W. Giddens, Trustee for the SIPA Liquidation of Lehman
       Brothers Inc." If you wish to make a payment, **it must be enclosed**
       with this claim form.

                                                            $ _____

2. **CLAIM FOR SECURITIES AS OF SEPTEMBER 19, 2008:**

   <u>Please Do Not Claim Any Securities You Have In Your Possession</u>

                                              YES        NO
                                         (Circle Y or N)

   a.  LBI owes me securities:              Y         (N)

   b.  I owe LBI securities:                Y         (N)

   c.  If yes to either, please list below (or in
       additional pages as necessary):

| Trade Date of Transaction (mm/dd/yyyy) | Name of Security | CUSIP | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|---|
| | | | LBI Owes Me (Long) | I Owe LBI (Short) |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

If additional space is needed, attach additional pages providing the information in the exact
format above.

*✳ CDS ALREADY TERMINATED THEREFORE CASH OWED*

### 3. COMMODITY FUTURES CLAIMS

| | YES | NO |
|---|---|---|
| | | (Circle Y or N) |
| Do you have a claim based on a commodity futures account? | Y | (N) |

If the answer to the above question is "yes," please state the amount, and explain the basis for your claim below, attaching additional pages and supporting documents as necessary:

Amount of Claim: _____

Basis for Claim: _____

_____

_____

_____

_____

### WHEN COMPLETING SECTIONS 1 THROUGH 3 PLEASE KEEP IN MIND:

- If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate that your claim is an estimated claim.
- Proper documentation can speed the review, allowance, and satisfaction of your claim.
- Please enclose: copies of your last LBI account statement; purchase or sale confirmation slips; copies of checks that relate to the securities or cash you claim; and any other documentation or correspondence you believe will be of assistance in processing your claim.
- Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement.
- If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

### PLEASE CIRCLE THE APPROPRIATE ANSWER FOR ITEMS 4 THROUGH 11.

**NOTE:** IF "Y" IS CIRCLED FOR ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

| | | YES | NO |
|---|---|---|---|
| | | | (Circle Y or N) |
| 4. | Does your claim in any way relate to an entity other than Lehman Brothers Inc. (for example, Lehman Brothers Holdings Inc., or another Lehman subsidiary)? | (Y) *SEE SUPPORT* | N |
| 5. | Has there been any change in your account since September 19, 2008? | Y | (N) |

3

*ONLY DIFFERENCE IS THAT NOTICE OF EARLY TERMINATION WAS GIVEN*

6.  Are you or were you a party to a repurchase or reverse repurchase agreement, director, officer, partner, shareholder, lender to, or capital contributor of LBI?   *See Support*   (Y)   N

7.  Are you related to, or do you have any business venture with, any of the persons specified in "6" above, or any employee or other person associated in any way with LBI? If so, give name(s).   Y   (N)

8.  Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of LBI?   Y   (N)

9.  Is this claim being filed on behalf of a customer of a broker or dealer or bank? If so, provide documentation with respect to each customer on whose behalf you are claiming.   Y   (N)

10. Have you ever given any discretionary authority to any person to execute securities transactions with or through LBI on your behalf? Give names, addresses and phone numbers.   Y   (N)   *Account is A0 LTD (See Support)*

11. Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? If so, give name of that broker.   Y   (N)

Please list the full name, address, phone number, and email address of anyone assisting you in the preparation of this claim form:

Full name: _____
Address: _____
_____
Phone number: _____
Email address: _____

If more than one person is assisting you, attach additional pages providing the information in the exact format above.   *PLEASE READ ALL SUPPORT AS IT CLARIFIES DETAILS*

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF UP TO $50,000 OR IMPRISONMENT OF UP TO FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date *January 27, 2009* _____   Signature _____
Date _____   Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

4

# SUPPORT FOR QUESTION 1. a.

*11-16-2005  Valuation Summary (Support Units)*

| | RMS ID | Ticker | Notional ($mm) | Strike | Trade Date | Maturity | CP B/S | Spread Mid | Mid MTM |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 25033856 | DENK | $25,000,000 | 0.1925 | 3/14/08 | 3/20/16 | B | 0.195 | ... |
| 2 | 20352972 | FNL | $25,000,000 | 0.1925 | 3/14/08 | 3/20/16 | B | 0.185 | ... |
| 3 | 25033654 | RAGB (AUSTRIA) | $25,000,000 | 0.1925 | 3/14/08 | 3/20/16 | B | 0.190 | ... |
| 4 | 20330528 | VIETNM | $20,000,000 | 2.830 | 8/13/08 | 9/20/18 | B | 3.300 | $509,751.49 |
| 5 | 20348133 | CHINA | $10,000,000 | 0.760 | 9/4/08 | 9/20/18 | B | 1.050 | $199,023.80 |
| 6 | 20348134 | HUWHY | $20,000,000 | 1.430 | 9/4/08 | 9/20/13 | B | 1.720 | $242,735.10 |
| 7 | 20143866 | CRH | $2,000,000 | 1.420 | 2/26/08 | 3/20/13 | B | 2.000 | $38,706.06 |
| 8 | 20120464 | CRH | $10,000,000 | 0.975 | 2/4/08 | 3/20/13 | B | 2.000 | $379,877.87 |
| 9 | 20121036 | CRH | $15,000,000 | 1.000 | 2/5/08 | 3/20/13 | B | 2.000 | $554,079.16 |
| 10 | 20124001 | CRH | $10,000,000 | 1.050 | 2/7/08 | 3/20/13 | B | 2.000 | $348,498.07 |
| 11 | 20154726 | CRH | $5,000,000 | 1.650 | 3/5/08 | 3/20/13 | B | 2.000 | $48,578.80 |
| 12 | 20066169 | FFHCN | $10,000,000 | 2.600 | 1/10/08 | 3/20/13 | B | 4.500 | $620,084.76 |
| 13 | 20111459 | FFHCN | $5,000,000 | 2.450 | 2/1/08 | 3/20/13 | B | 4.500 | $338,914.20 |
| 14 | 20286988 | BRK | ... | 0.880 | 6/27/08 | 9/20/13 | S | 1.350 | ... |
| 15 | USD | VARIABLE MARGIN WITHELD BY ICP | | | | | | | |

Total $2,477,003.46

CALCULATION NOTIFICATON LETTER TO LBI

AND

VALUATION SUPPORT

 **ICP**

ICP Structured Credit Income Master Fund Ltd
c/o ICP Asset Management LLC
360 Madison Avenue, 10th floor
New York, NY 10017

September 19, 2008

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention: Documentation Manager

### CALCULATION NOTICE

Re: ISDA Master Agreement (Multicurrency--Cross Border) between Lehman Brothers Special Financing Inc. ("you") and ICP Structured Credit Income Master Fund Ltd. ("we") dated July 20, 2007 (including the Schedule and Credit Support Annex thereto, and as may be amended, supplemented or modified from time to time, the "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

In connection with our notice of default and early termination previously delivered to you, we hereby notify you that we performed the calculations contemplated by Section 6(e) of the Agreement and have determined that you owe us U.S. $2,967,033.46. Details of our calculation of such amount are attached as Exhibit A. Such amount is immediately due and payable by you and should be wired to our account at:

        Citibank
        ABA routing #: 021000089
        Account #: 9937723794
        Reference: ICP Structured Credit Income Master Fund Ltd

Payment after today should be made together with interest as required under Section 6(d)(ii) of the Agreement. In addition, we shall be entitled to any other costs, expenses and damages as provided under the Agreement or at law.

We reserve all rights under law and under the Agreement, including, without limitation, to declare you to be in default in respect of any other default that may occur under the terms of the Agreement, and all rights we may have with respect to other transactions and other agreements with you or your affiliates.

This letter serves as our notice of calculations and statement of payments on early termination pursuant to Section 6(d)(i) of the Agreement.

Sincerely,

ICP Structured Credit Income Master Fund Ltd.

By: ICP Asset Management LLC
solely as investment manager and
not in its individual capacity

By: _____
Name: Thomas C. Priore
Title:    Director

**ICP Structured Credit Income Master Fund Ltd**

360 MADISON AVENUE, 10th FLOOR NEW YORK, NY 10017 (212) 821-1900



**EXHIBIT A**

**DETAILS OF CALCULATION**

See attached list of CDS Assets and Support as evidence of calculations made pursuant to this notice.

The following Bloomberg screenshots indicate the value of each swap agreement based on spread information received from third party brokers on Wednesday, September 17, 2008 which is the date that notice of early termination was sent from ICP Structured Credit Income Master Fund Ltd to Lehman Brothers Special Financing Inc.

| RMS ID | Ticker | Notional ($mm) | Strike | Trade Date | Maturity | ICP B/S | 9/15/08 Mid | Mid MTM |
|---|---|---|---|---|---|---|---|---|
| 1 | 25033656 | DENK | $25,000,000 | 0.1925 | 3/14/08 | 3/20/18 | B | 0.195 | ($6,912.93) |
| 3 | 25033654 | RAGB (AUSTRIA) | $25,000,000 | 0.1925 | 3/14/08 | 3/20/18 | B | 0.190 | ($16,877.63) |
| 5 | 20348133 | CHINA | $10,000,000 | 0.790 | 9/4/08 | 9/20/18 | B | 1.050 | $199,023.80 |
| 7 | 20143886 | ORH | $2,000,000 | 1.420 | 2/26/08 | 3/2013 | B | 2.000 | $38,706.06 |
| 9 | 20121036 | ORH | $15,000,000 | 1.000 | 2/5/08 | 3/2013 | B | 2.000 | $554,079.16 |
| 11 | 20154726 | ORH | $5,000,000 | 1.650 | 3/5/08 | 3/2013 | B | 2.000 | $48,578.80 |
| 13 | 20111459 | FFHCN | $5,000,000 | 2.450 | 2/1/08 | 3/2013 | B | 4.500 | $338,914.20 |

Total: $2,967,033.46

Customer Claim reflects 490,000 margin
call claimed by ICP

```
 2,967,033.46
   490,000.00
--------------
 3,477,033.46   revised claim
```

```
<HELP> for explanation.                                    Curncy CDSW
1<GO> to save Deal, 2<GO> to save curve source
                    CREDIT DEFAULT SWAP                     CPU:121
```

## Deal Information   RED Pair: KPBDCXAA5        Spreads         Date

| | |
|---|---|
| 7)Reference: ████████ | Curve Date: ██████ |
| Counterparty: LEH         Deal#: | Benchmark: S ██ ██Mid |
| Ticker: /██████ Series: ████ Privilege: █ User | US BGN Swap Curve |
| Business Days: ███ ██ Settlement Code: USD | |
| Business Day Adj: █ Following   Currency: USD | |
| █ BUY  Notional: ████ ██ ██ Amortizing: █ | Sprds:█ User      █Ask |
| Effective Date: ███████ Knock Out: N Month End: N | 180966 USD Senior   IMM |
| Maturity Date. ███████ Day Count:███/███ | Par Cds Spreads  Default |
| Payment Freq:  █ Quarterly  First Cpn:██████ | Flat:█   (bps)  Prob |
| Pay Accrued:   █ True  Next to Last Cpn:██████ | 3/20/09   11.500  █.████ |
| Curve Recovery: █ True  Date Gen Method:█ IMM | 9/21/09   19.500  █.████ |
| Recovery Rate:  0.25   Debt Type:█ Senior | 9/20/10   19.500  █.████ |
| Deal Spread: ████████bps 9)Upfront Fee: ████ | 9/20/11   19.500  █.████ |

## Calculator    Mode: █ Calc Price

| | | | 9/20/12   19.500  █.████ |
|---|---|---|---|
| Valuation Date: ██████ Model: █ ████████ | 9/20/13   19.500  █.████ |
| Cash Settled On: 9/19/08 | 9/21/15   19.500  █.████ |
| Price:      99.98006142 Repl Sprd:  19.500 bps | 9/20/18   19.500  █.████ |
| Principal:   4,984.64 Sprd DV01:  19,922.27 | Frequency. █ Quarterly |
| Accrued:   -11,897.57 Days: 89  32) Sprd KRR | Day Count: ███/███ |
| Market Val:  -6,912.93 IR DV01.    -2.25 | Recovery Rate: ██ ██ |

```
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                        H218-597-3 16-Sep-2008 16:29:09
```

```
<HELP> for explanation.                                    Corp  CDSW
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
             CREDIT  DEFAULT  SWAP                           CPU:299
```

**Deal Information** RED Pair:348FFAAA7    | **Spreads**    ▓Date

| Deal Information | Spreads |
|---|---|
| 7)Reference:Republic of Finland | Curve Date: 9/16/08 |
| Counterparty: LFH          Deal#: | Benchmark: S ▓ ▓Mid |
| Ticker /F▓ML2   Series: ▓    Privilege: ▓ User | US BGN Swap Curve |
| Business Days: ▓▓ ▓ ▓    Settlement Code: USD | |
| Business Day Adj. ▓ Following    Currency: ▓▓ | |
| ▓ BUY  Notional: ▓▓▓ ▓▓    Amortizing: N | Sprds:▓ User          ▓Ask |
| Effective Date: 9/19/08  Knock Out: ▓ Month End: N | 180967 USD Senior     IMMI |
| Maturity Date: 9/20/18    Day Count:ACT/360 | Par Cds Spreads  Default |
| Payment Freq: ▓ Quarterly    First Cpn: 9/20/08 | Flat:▓   (bps)   Prob |
| Pay Accrued: ▓ True  Next to Last Cpn:12/20/17 | 3/20/09    19.500  0.0013 |
| Curve Recovery ▓ True  Date Gen Method:▓ IMM | 9/21/09    19.500  0.0027 |
| Recovery Rate. 0.25    Debt Type:▓ Senior | 9/20/10    19.500  0.0053 |
| Deal Spread: 19.250bps 9)Upfront Fee: 0.00% | 9/20/11    19.500  0.0079 |
| **Calculator**    Mode: ▓ Calc Price | 9/20/12    19.500  0.0106 |
| Valuation Date: 9/17/08    Model: ▓ Bloomberg | 9/20/13    19.500  0.013▓ |
| Cash Settled On: 9/19/08 | 9/21/15    19.500  0.0182 |
| Price:      99.98005619 Repl Sprd:  19.500 bps | 9/20/18    19.500  0.0253 |
| Principal:    4,985.95 Sprd DV01:  19,923.94 | Frequency ▓ Quarterly |
| Accrued.   -11,897.57 Days. 89  32) Sprd KRR | Day Count: ACT/360 |
| Market Val·    -6,911.62 IR DV01    -2.25 | Recovery Rate: 0.25 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2008 Bloomberg Finance L.P.
                                                                        N218-597-3 16-Sep-2008 16:32:54

```
<HELP> for explanation.                                    Corp  CDSW
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
                CREDIT DEFAULT SWAP                        CPU:299
```

## Deal Information   RED Pair:0F77EAAB3

| | |
|---|---|
| 7)Reference: Republic of Austria | |
| Counterparty: LEH | Deal#: |
| Ticker: /USI   Series: | Privilege: User |
| Business Days: USD | Settlement Code: USD |
| Business Day Adj  Following | Currency: USD |
| BUY  Notional: 25.00 MM | Amortizing: N |
| Effective Date: | Knock Out: Month End: N |
| Maturity Date: 3/20/12 | Day Count: ACT/360 |
| Payment Freq: Quarterly | First Cpn: |
| Pay Accrued: True  Next to Last Cpn: | |
| Curve Recovery: True  Date Gen Method: IMM | |
| Recovery Rate:  0.25 | Debt Type: Senior |
| Deal Spread: 19.250 bps 9)Upfront Fee:  0.0% | |

## Spreads   Date

| | |
|---|---|
| Curve Date: | |
| Benchmark: S  Mid | |
| US BGN Swap Curve | |

Sprds: User   Ask
191051 USD Senior   IMMI
Par Cds Spreads  Default

| Flat: | (bps) | Prob |
|---|---|---|
| 3/20/09 | 19.000 | 0.0013 |
| 9/21/09 | 19.000 | 0.0026 |
| 9/20/10 | 19.000 | 0.0051 |
| 9/20/11 | 19.000 | 0.0077 |
| 9/20/12 | 19.000 | 0.0103 |
| 9/20/13 | 19.000 | 0.0127 |
| 9/21/15 | 19.000 | 0.0178 |
| 9/20/18 | 19.000 | 0.0253 |

Frequency: Quarterly
Day Count: ACT/360
Recovery Rate:

## Calculator

Mode: Calc Price

| | |
|---|---|
| Valuation Date: 9/17/08 | Model: |
| Cash Settled On: 9/19/08 | |
| Price. | 100.01992023 Repl Sprd   19.000 bps |
| Principal | -4,980.06 Sprd DV01:  19,912.22 |
| Accrued: | -11,897.57 Days: 89   32) Sprd KRR |
| Market Val: | -16,877.63 IR DV01:   2.24 |

```
Australia 61 2 9777 8600  Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                            H218-597-3 16-Sep-2008 16:26:08
```

<HELP> for explanation.                                        Corp **CDSW**
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
**CREDIT DEFAULT SWAP**                                        CPU:299

**Deal Information** RED Pair:9B8D7LAB3 | **Spreads** Date

| Deal Information | Spreads |
|---|---|
| 7)Reference: Socialist Republic of Vietnam | Curve Date: 9/16/08 |
| Counterparty. LEH              Deal#: | Benchmark: S 23 Mid |
| Ticker: /VIET1   Series:      Privilege: User | US BGN Swap Curve |
| Business Days: USD             Settlement Code: USD | |
| Business Day Adj: Following      Currency: USD | |
| BUY  Notional:      20.00 MM        Amortizing: N | Sprds: User              Ask |
| Effective Date: 9/17/08  Knock Out: Y Month End: N | 307678 USD Senior      IMMI |
| Maturity Date: 9/20/13        Day Count: ACT/360 | Far Cds Spreads   Default |
| Payment Freq:  S Semi-Annual   First Cpn: 9/22/08 | Flat: (bps)   Prob |
| Pay Accrued:  T True   Next to Last Cpn: 3/20/13 | 3/20/09   330.000  0.0221 |
| Curve Recovery: T True  Date Gen Method: I IMM | 9/21/09   330.000  0.0438 |
| Recovery Rate:    0.25    Debt Type: I Senior | 9/20/10   330.000  0.0651 |
| Deal Spread:     263.000 bps 9)Upfront Fee:   0.00% | 9/20/11   330.000  0.1240 |
| **Calculator**          Mode: Calc Price | 9/20/12   330.000  0.1025 |
| Valuation Date: 9/17/08        Model: | 9/20/13   330.000  0.1087 |
| Cash Settled On: 9/19/08 | 9/21/15   330.000  0.2064 |
| Price          97.20285363 Repl Sprd:  329.768 bps | 9/20/18   330.000  0.3573 |
| Principal·     559,429.27 Sprd DV01:  8,173.15 | Frequency: S Semi-Annual |
| Accrued·       -49,677.78 Days. 34  32) Sprd KRR | Day Count: ACT/360 |
| Market Val·    509,751.49 IR DV01:   -141.79 | Recovery Rate:    0.25 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                            M218-597-3 16-Sep-2008 16:35:44

\<HELP\> for explanation.
2\<GO\> to save curve source

Corp  **CDSW**

**CREDIT DEFAULT SWAP**                                      CPU:299

| **Deal Information** RED Pair:7I343AAC1 | **Spreads** |
| --- | --- |

**Deal Information** RED Pair:7I343AAC1

Reference:  CHINA (PEOPLE'S)
Counterparty: Lehman Brothers          Deal#: ▮▮▮▮▮
Ticker: /TZERO   Series NMSW   Privilege. F Firm
Business Days: USD              Settlement Code: USD
Business Day Adj. 1 Following          Currency: USD
B BUY  Notional: ▮▮▮▮10.00▮▮▮          Amortizing: N
Effective Date:  9/ 5/08   Knock Out: N Month End: N
Maturity Date:   9/20/18       Day Count:ACT/360
Payment Freq:   Q Quarterly     First Cpn:12/20/08
Pay Accrued:    T True    Next to Last Cpn. 6/20/18
Curve Recovery. T True    Date Gen Method.1 IMM
Recovery Rate:    0.40         Debt Type.1 Senior
Deal Spread:    79.000bps 9;Upfront Fee.   0.00%

**Calculator**                Mode: ▮ Calc Price
Valuation Date: ▮9/ 7/08▮   Model: ▮ ▮▮▮▮▮▮▮▮
Cash Settled On: 9/19/08
Price:          97.98342872 Repl Sprd:  105.000 bps
Principal:      201,657.13 Sprd DV01:  7,596.70
Accrued:        -2,633.33 Days. 12   32) Sprd KRR
Market Val:     199,023.80 IR DV01:    -92.47

**Spreads**                                     ▮Date
Curve Date: ▮9/16/08
Benchmark: S▮▮ ▮Mid
US BGN Swap Curve

Sprds:▮ User                    ▮Ask
191008 USD Senior              IMMI
Par Cds  Spreads  Default
Flat ▮   (bps)   Prob
3/20/09  105.000  ▮.0089
9/21/09  105.000  ▮.01▮▮
9/20/10  105.000  ▮.0040
9/20/11  105.000  ▮.05▮▮
9/20/12  105.000  ▮.0▮▮4
9/20/13  105.000  ▮.0▮47
9/21/15  105.000  ▮.11▮5
9/20/18  105.000  ▮.1▮▮0
Frequency: ▮ Quarterly
Day Count: ▮CT/▮▮▮
Recovery Rate:   ▮.40

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900   Singapore 65 6212 1000   U.S. 1 212 318 2000   Copyright 2008 Bloomberg Finance L.P.
H218-597-3 16-Sep-2008 16:36:41

&lt;HELP&gt; for explanation.                                    Corp **CDSW**
2&lt;GO&gt; to save curve source

## CREDIT DEFAULT SWAP                                    CPU:299

| **Deal Information** RED Pair:48CC56AB7 | **Spreads** ▓Date |
|---|---|
| Reference:  HUTCH WHAM INTL | Curve Date: ▓▓▓▓▓ |
| Counterparty: Lehman Brothers        Deal#: ▓▓▓▓▓ | Benchmark: **S** ▓▓ ▓Mid |
| Ticker· /TZERO    Series: NM$/    Privilege: F Firm | US BGN Swap Curve |
| Business Days: USD              Settlement Code: USD | |
| Business Day Adj. 1 Following            Currency: USD | |
| B BUY  Notional:▓▓▓▓▓▓▓▓         Amortizing· N | Sprds:▓ User         ▓Ask |
| Effective Date:  9/ 5/08  Knock Out: N Month End: N | 115800 USD Senior     IMMI |
| Maturity Date·    9/20/13    Day Count:ACT/360 | Par Cds Spreads   Default |
| Payment Freq:   Q Quarterly    First Cpn.12/20/08 | Flat:▓  (bps)  Prob |
| Pay Accrued:    T True    Next to Last Cpn· 6/20/13 | 3/20/09 ▓172.000▓ ▓0.014▓ |
| Curve Recovery  T True   Date Gen Method.I IMM | 9/21/09  172.000 ▓0.0▓▓ |
| Recovery Rate:    0.40         Debt Type:1 Senior | 9/20/10  172.000 ▓0.0▓▓ |
| Deal Spread:   143.000bps 9)Upfront Fee.  0.00% | 9/20/11  172.000 ▓0.▓▓▓ |
| **Calculator**              Mode:▓ Calc Price | 9/20/12  172.000 ▓0.1▓▓ |
| Valuation Date:▓9/17/08▓       Model·▓ ▓▓▓▓▓▓▓ | 9/20/13  172.000 ▓0.135▓ |
| Cash Settled On: 9/19/08 | 9/21/15  172.000 ▓0.1▓▓ |
| Price.           98.73865786 Repl Sprd:  172.000 bps | 9/20/18  172.000 ▓0.251▓ |
| Principal:        252,268.43 Sprd DV01:  8,592.46 | Frequency: ▓ Quarterly |
| Accrued·          -9,533.33 Days: 12   32) Sprd KRR | Day Count:▓▓▓/▓▓▓ |
| Market Val:      242,735.10 IR DV01:    -61.66 | Recovery Rate. ▓▓▓▓ |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
H219-597-3 16-Sep-2008 16:32:42

&lt;HELP&gt; for explanation.

1&lt;GO&gt; to save, 10&lt;GO&gt; to copy, 66&lt;GO&gt; to send, 99&lt;GO&gt; to delete

Corp **CDSW**

**CREDIT DEFAULT SWAP**

CPU:299

**Deal Information** RED Pair:6DD73YAA7

7)Reference: Quality Re-Holdings Corp
Counterparty: LEH                    Deal#:
Ticker: /CDS01    Series:         Privilege: U User
Business Days: USD              Settlement Code: USD
Business Day Adj: Following       Currency: USD
BUY Notional:          2.00 MM      Amortizing: N
Effective Date: 3/20/08    Knock Out: N Month End: N
Maturity Date: 3/20/13         Day Count: ACT/360
Payment Freq: Quarterly     First Cpn: 6/20/08
Pay Accrued: True    Next to Last Cpn: 12/20/12
Curve Recovery: True     Date Gen Method: IMM
Recovery Rate:     0.40         Debt Type: Senior
Deal Spread:      142.00 bps 9)Upfront Fee:    0.0 %

**Spreads**                          Date
Curve Date:
Benchmark: S 23 Mid
US BGN Swap Curve

Sprds: U User                        Ask
1748678 USD Senior            IMM
Par Cds Spreads  Default
Flat:    (bps)    Prob
3/20/09    200.000
9/21/09    200.000
9/20/10    200.000
9/20/11    200.000
9/20/12    200.000
9/20/13    200.000
9/21/15    200.000
9/20/18    200.000
Frequency: Quarterly
Day Count: ACT/360
Recovery Rate:    0.40

**Calculator**        Mode: Calc Price
Valuation Date: 9/17/08    Model: JPMorgan
Cash Settled On: 9/19/08
Price.           97.71364166 Repl Sprd:  199.994 bps
Principal:       45,727.17 Sprd DV01:   771.66
Accrued:         -7,021.11 Days: 89   32) Sprd KRR
Market Val:      38,706.06 IR DV01:     -10.18

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
H216-597-3 16-Sep-2008 17:10:12

```
<HELP> for explanation.                                    Corp  CDSW
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
              CREDIT  DEFAULT  SWAP                              CPU:299
```

| Deal Information   RED Pair:6DD73YAA7 | Spreads                        Date |
|---|---|
| 7)Reference: Odyssey Re Holdings Corp | Curve Date: |
| Counterparty: FF          Deal#: | Benchmark: S   Mid |
| Ticker: /DF 02   Series:      Privilege  U User | US BGN Swap Curve |
| Business Days: USD          Settlement Code: USD | |
| Business Day Adj.  Following        Currency: USD | |
| BUY  Notional:   10.00 MM        Amortizing: N | Sprds: U User          Ask |
| Effective Date:  4/5/08   Knock Out:  Month End: N | 1748678 USD Senior  IMMI |
| Maturity Date:  3/20/13        Day Count: ACT/360 | Par Cds Spreads  Default |
| Payment Freq:  Quarterly    First Cpn: 3/20/08 | Flat: Y  (bps)  Prob |
| Pay Accrued:  True   Next to Last Cpn: 12/20/12 | 3/20/09  200.000  0.0168 |
| Curve Recovery:  True   Date Gen Method:  IMM | 9/21/09  200.000  0.0335 |
| Recovery Rate:   0.40        Debt Type:  Senior | 9/20/10  200.000  0.0494 |
| Deal Spread:  97.500 bps 9)Upfront Fee:  0.00 % | 9/20/11  200.000  0.0663 |
| **Calculator**            Mode:  Calc Price | 9/20/12  200.000  0.0813 |
| Valuation Date: 9/17/08   Model: | 9/20/13  200.000  0.1552 |
| Cash Settled On: 9/19/08 | 9/21/15  200.000  0.2101 |
| Price:        95.96017965 Repl Sprd:   199.994 bps | 9/20/18  200.000  0.3059 |
| Principal:      403,982.04 Sprd DV01:   3,794.55 | Frequency.  Quarterly |
| Accrued:       -24,104.17 Days: 89  32) Sprd KRR | Day Count: ACT/360 |
| Market Val:     379,877.87 IR DV01:    -89.94 | Recovery Rate:   0.40 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2008 Bloomberg Finance L.P.
                                                                      H219-597-3 16-Sep-2008 17:11:29

```
<HELP> for explanation.
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete          Corp  CDSW
                       CREDIT DEFAULT SWAP                                    CPU:299

Deal Information RED Pair:6DD73YAA7        Spreads              Date
7)Reference:                              Curve Date: 9/16/08
Counterparty: LEH         Deal#:          Benchmark: S    Mid
Ticker: /      Series:       Privilege: User US BGN Swap Curve
Business Days: USD       Settlement Code: USD
Business Day Adj:  Following   Currency: USD
 BUY  Notional:       15.00       Amortizing: N    Sprds: User        Ask
Effective Date:            Knock Out:  Month End: N  1748678 USD Senior  IMMI
Maturity Date:            Day Count: ACT/       Par Cds Spreads Default
Payment Freq:  Quarterly    First Cpn:         Flat:   (bps)  Prob
Pay Accrued:  True    Next to Last Cpn:        3/20/09  200.000  0.0168
Curve Recovery.  True    Date Gen Method:  IMM  9/21/09  200.000  0.0335
Recovery Rate:   0.40      Debt Type:  Senior  9/20/10  200.000  0.0654
Deal Spread:       160.000 bps 9)Upfront Fee:    0.00%  9/20/11  200.000  0.0863
Calculator          Mode:  Calc Price          9/20/12  200.000  0.1203
Valuation Date: 9/17/08    Model:                9/20/13  200.000  0.1556
Cash Settled On: 9/19/08                         9/21/15  200.000  0.2101
Price.            96.05891677 Repl Sprd:  199.994 bps 9/20/18 200.000 0.2859
Principal:        591,162.49 Sprd DV01:  5,696.85  Frequency:  Quarterly
Accrued           -37,083.33 Days: 89   32) Sprd KRR Day Count: ACT/360
Market Val:       554,079.16 IR DV01:   -131.60   Recovery Rate:   0.40
```

Australia 61 2 9777 8600  Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000    U.S. 1 212 318 2000   Copyright 2008 Bloomberg Finance L.P.
                                                                          N218-597-3 16-Sep-2008 17:12:12

<HELP> for explanation.
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete

Corp **CDSW**

## CREDIT DEFAULT SWAP

CPU:299

### Deal Information  RED Pair:6DD73YAA7

| | |
|---|---|
| 7)Reference: Odyssey Re Holdings Corp | |
| Counterparty: LEH | Deal#: |
| Ticker: /OHRE   Series: | Privilege: User |
| Business Days: USA | Settlement Code: USD |
| Business Day Adj: Following | Currency: USD |
| BUY Notional: 10.00 MM | Amortizing: N |
| Effective Date: 9/19/08  Knock Out: Month End: N | |
| Maturity Date: 3/20/13 | Day Count: ACT/360 |
| Payment Freq: Quarterly | First Cpn: 3/20/08 |
| Pay Accrued: True   Next to Last Cpn: 12/20/12 | |
| Curve Recovery: True  Date Gen Method: IMM | |
| Recovery Rate: 0.40 | Debt Type: Senior |
| Deal Spread: .05.000 bps 9)Upfront Fee: 0.00% | |

### Calculator  Mode: Calc Price

Valuation Date: 9/17/08  Model: J P Morgan
Cash Settled On: 9/19/08

| | | |
|---|---|---|
| Price: | 96.25553595 | Repl Sprd: 199.994 bps |
| Principal: | 374,446.40 | Sprd DV01: 3,805.42 |
| Accrued: | -25,958.33 | Days: 89   32) Sprd KRR |
| Market Val: | 348,488.07 | IR DV01: -83.36 |

### Spreads  Date

Curve Date: 9/17/08
Benchmark: S    Mid
US BGN Swap Curve

| Sprds: User | | Ask |
|---|---|---|
| 1748678 USD Senior | | IMM |
| Par Cds  Spreads | | Default |
| Flat: (bps) | | Prob |
| 3/20/09 | 200.000 | 0.0168 |
| 9/21/09 | 200.000 | 0.0335 |
| 9/20/10 | 200.000 | 0.0654 |
| 9/20/12 | 200.000 | 0.0962 |
| 9/20/13 | 200.000 | 0.1263 |
| 9/20/13 | 200.000 | 0.1554 |
| 9/21/15 | 200.000 | 0.2101 |
| 9/20/18 | 200.000 | 0.3059 |

Frequency: Quarterly
Day Count: ACT/360
Recovery Rate: 0.40

Australia 61 2 9777 8600  Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
N218-597-3 16-Sep-2008 17:13:20

<HELP> for explanation.                                    Corp **CDSW**
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
## CREDIT DEFAULT SWAP                              CPU:299

### Deal Information   RED Pair:6DD73YAA7 | ### Spreads            Date

7)Reference: Odyssey Re Holdings Corp
Counterparty: LEH              Deal#:
Ticker /ORH09   Series:       Privilege: User
Business Days: USD            Settlement Code: USD
Business Day Adj: 1 Following           Currency: USD
B BUY  Notional:      5.00 MM       Amortizing: N
Effective Date: 9/19/08   Knock Out: N Month End: N
Maturity Date: 3/20/13         Day Count: ACT/360
Payment Freq:  Quarterly     First Cpn: 9/20/08
Pay Accrued: T True    Next to Last Cpn:12/20/12
Curve Recovery: T True   Date Gen Method: IMM
Recovery Rate    0.40            Debt Type: Senior
Deal Spread:       165.000 bps 9)Upfront Fee:   0.00%

### Calculator              Mode: 1 Calc Price
Valuation Date: 9/17/08      Model
Cash Settled On: 9/19/08
Price:           98.62050749 Repl Sprd: 199.994 bps
Principal:       68,974.63 Sprd DV01: 1,945.17
Accrued:        -20,395.83 Days. 89  32) Sprd KRR
Market Val:      48,578.80 IR DV01:   -15.36

Spreads side:
Curve Date: 9/16/08
Benchmark: S 23 Mid
US BGN Swap Curve

Sprds: U User            Ask
1748678 USD Senior   IMM1
Par Cds Spreads  Default
Flat:  (bps)   Prob
3/20/09  200.000  0.0162
9/21/09  200.000  0.0335
9/20/10  200.000  0.0654
9/20/11  200.000  0.0962
9/20/12  200.000  0.1263
9/20/13  200.000  0.1553
9/21/15  200.000  0.2101
9/20/18  200.000  0.2659
Frequency:  Quarterly
Day Count: ACT/360
Recovery Rate:    0.40

```
<HELP> for explanation.                                    Corp CDSW
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
              CREDIT DEFAULT SWAP                              CPU:299
```

| Deal Information RED Pair:333C91AC4 | Spreads                Date |
|---|---|
| 7)Reference: Fairfax Financial Holdings Ltd | Curve Date: 9/16/08 |
| Counterparty: LEH          Deal#: | Benchmark: S   Mid |
| Ticker: /FFH01   Series:      Privilege: U User | US BGN Swap Curve |
| Business Days: USD | |
| Business Day Adj: 1 Following   Settlement Code: USD | |
| B BUY  Notional   10.00 MM   Currency: USD | |
| Effective Date: 1/11/08   Amortizing: N | Sprds: U User            Ask |
| Maturity Date: 3/20/13   Knock Out: N Month End: N | 109149 USD Senior    IMMI |
| Payment Freq.  Q Quarterly   Day Count: ACT/360 | Par Cds Spreads   Default |
| Pay Accrued: T True   First Cpn: 3/30/08 | Flat: Y  (bps)    Prob |
| Curve Recovery: T True   Next to Last Cpn: 12/20/12 | 3/20/09  450.000  0.0375 |
| Recovery Rate:  0.40   Date Gen Method: I IMM | 9/21/09  450.000  0.0757 |
| Deal Spread:  950.000 bps 9)Upfront Fee   0.00% | 9/20/10  450.000  0.1111 |
|  | Debt Type: I Senior |

```
<HELP> for explanation.                                    Corp CDSW
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete
              CREDIT DEFAULT SWAP                              CPU:299
```

**Deal Information** RED Pair:333C91AC4

7)Reference: Fairfax Financial Holdings Ltd
Counterparty: LEH          Deal#:
Ticker: /FFH01   Series:      Privilege: U User
Business Days: USD
Business Day Adj: 1 Following
B BUY  Notional   10.00 MM
Effective Date: 1/11/08   Knock Out: N Month End: N
Maturity Date: 3/20/13
Payment Freq.  Q Quarterly   First Cpn: 3/30/08
Pay Accrued: T True   Next to Last Cpn: 12/20/12
Curve Recovery: T True   Date Gen Method: I IMM
Recovery Rate:  0.40   Debt Type: I Senior
Deal Spread:  950.000 bps 9)Upfront Fee   0.00%

Settlement Code: USD
Currency: USD
Amortizing: N
Day Count: ACT/360

**Calculator**   Mode: I Calc Price

Valuation Date: 9/17/08   Model: J
Cash Settled On: 9/19/08
Price            93.15637457 Repl Sprd:  449.986 bps
Principal        684,362.54 Sprd DV01:  3,362.77
Accrued:         -64,277.78 Days: 89  32) Sprd KRR
Market Val       620,084.76 IR DV01:   -146.70

**Spreads**                Date

Curve Date: 9/16/08
Benchmark: S   Mid
US BGN Swap Curve

Sprds: U User            Ask
109149 USD Senior    IMMI
Par Cds Spreads   Default
Flat: Y  (bps)    Prob
3/20/09  450.000  0.0375
9/21/09  450.000  0.0757
9/20/10  450.000  0.1111
9/20/11  450.000  0.2037
9/20/12  450.000  0.2412
9/20/13  450.000  0.3157
9/21/15  450.000  0.4118
9/20/18  450.000  0.5512
Frequency  Q Quarterly
Day Count: ACT/360
Recovery Rate:  0.40

```
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2008 Bloomberg Finance L.P.
                                                                          R218-597-3 16-Sep-2008 16:39:04
```



<HELP> for explanation.
1<GO> to save, 10<GO> to copy, 66<GO> to send, 99<GO> to delete

Corp  **CDSW**

# CREDIT DEFAULT SWAP

CPU:299

## Deal Information   RED Pair:333C91AC4

7)Reference: Fairfa. Financial Holdings Ltd
Counterparty: LEH                    Deal#:
Ticker: /FFH02   Series:        Privilege: User
Business Days: USD          Settlement Code: USD
Business Day Adj. Following        Currency: USD
BUY Notional:          5.00 MM      Amortizing: N
Effective Date:              Knock Out. Month End: N
Maturity Date: 3/20/12           Day Count: ACT/360
Payment Freq:   Quarterly      First Cpn: 3/20/08
Pay Accrued:    True    Next to Last Cpn: 12/20/11
Curve Recovery: True   Date Gen Method: IMM
Recovery Rate:   0.40           Debt Type: Senior
Deal Spread:        445.000 bps 9)Upfront Fee:   0.00%

## Calculator           Mode: Calc Price

Valuation Date: 9/17/09       Model:
Cash Settled On: 9/19/08
Price                92.61602164 Repl Sprd:    449.986 bps
Principal.          369,198.92 Sprd DV01:   1,672.01
Accrued:            -30,284.72 Days: 89   32) Sprd KRR
Market Val:         338,914.20 IR DV01:      -79.18

## Spreads                      Date

Curve Date:
Benchmark: S   Mid
US BGN Swap Curve

Sprds: User                    Ask
109149 USD Senior       IMM1
Par Cds Spreads  Default
Flat:    (bps)    Prob
3/20/09    450.000   0.0275
9/21/10    450.000
9/20/10    450.000
9/20/11    450.000
9/20/12    450.000
9/20/13    450.000
9/21/15    450.000
9/20/18    450.000
Frequency   Quarterly
Day Count   ACT/360
Recovery Rate:         0.40

COPY OF LAST LBI ACCOUNT STATEMENT

## Default Swaps

| GID | RMS ID | Product Type | Ticker | Trade Date | Maturity Date | Buy / Sell | CCY | Notional Amount CCY | Dirty Price | Indicative Spread | MTM (USD) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 20086169 | 20086169 | DEFAULTS | FFHCN | 10-Jan-2008 | 20-Mar-2013 | S | USD | 10,000,000 | | 0.0424 | (553,140) |
| 20111459 | 20111459 | DEFAULTS | FFHCN | 01-Feb-2008 | 20-Mar-2013 | S | USD | 5,000,000 | | 0.0424 | (306,416) |
| 20120464 | 20120464 | DEFAULTS | ORH | 04-Feb-2008 | 20-Mar-2013 | S | USD | 10,000,000 | | 0.0109 | (24,337) |
| 20121036 | 20121036 | DEFAULTS | ORH | 05-Feb-2008 | 20-Mar-2013 | S | USD | 15,000,000 | | 0.0109 | (20,352) |
| 20124001 | 20124001 | DEFAULTS | ORH | 07-Feb-2008 | 20-Mar-2013 | S | USD | 10,000,000 | | 0.0109 | 7,970 |
| 20143886 | 20143886 | DEFAULTS | ORH | 26-Feb-2008 | 20-Mar-2013 | S | USD | 2,000,000 | | 0.0109 | 33,470 |
| 20154726 | 20154726 | DEFAULTS | ORH | 05-Mar-2008 | 20-Mar-2013 | S | USD | 5,000,000 | | 0.0109 | 133,213 |
| 20286888 | 20286888 | DEFAULTS | BRK | 27-Jun-2008 | 20-Sep-2013 | B | USD | 20,000,000 | | 0.0112 | 83,888 |
| 20315194 | 20315194 | DEFAULTS | CDX_EM9 | 28-Jul-2008 | 11-Sep-2008 | S | USD | . | | | (13,900) |
| 20330528 | 20330528 | DEFAULTS | VIETNM | 13-Aug-2008 | 20-Sep-2013 | S | USD | 20,000,000 | | 0.0280 | (104,611) |
| 20348133 | 20348133 | DEFAULTS | CHINA | 04-Sep-2008 | 20-Sep-2018 | S | USD | 10,000,000 | | 0.0073 | 49,335 |
| 20348134 | 20348134 | DEFAULTS | HUWHY | 04-Sep-2008 | 20-Sep-2013 | S | USD | 20,000,000 | | 0.0135 | 76,821 |
| 20352972 | 20352972 | DEFAULTS | CDX_EM9 | 10-Sep-2008 | 15-Sep-2008 | B | USD | . | | | (13,900) |
| 25033653 | 25033653 | DEFAULTS | FINL | 14-Mar-2008 | 20-Mar-2018 | S | USD | 25,000,000 | | 0.0016 | 85,883 |
| 25033654 | 25033654 | DEFAULTS | RAGB | 14-Mar-2008 | 20-Mar-2018 | S | USD | 25,000,000 | | 0.0017 | 53,427 |
| 25033656 | 25033656 | DEFAULTS | DENK | 14-Mar-2008 | 20-Mar-2018 | S | USD | 25,000,000 | | 0.0017 | 55,898 |
| 25083708 | 25083708 | DEFAULTS | BGARIA | 09-Sep-2008 | 12-Sep-2008 | B | USD | . | | | (230,528) |

**DEFAULT SWAPS TOTAL:** (687,302)

## Collateral Data

| Deal ID | Coll Type | Security ID | Security Description | Maturity Date | CCY | Dirty Price | Quantity | Market Value (USD) |
|---|---|---|---|---|---|---|---|---|
| | VAR | USD | UNITED STATES DOLLARS | | USD | 0.00 | (490,000) | (490,000) |

**COLLATERAL DATA TOTAL:** (490,000)

OTHER DOCUMENTAION:


NOTICE OF EARLY TERMINATION TO LEHMAN
BROTHERS SPECIAL FINANCING INC.

AND

EMAIL CORRESPONDENCE T LEHMAN LEGAL
DEPARTMENT



ICP Structured Credit Income Master Fund Ltd
ICP Asset Management LLC
360 Madison Avenue, 10ᵗʰ floor
New York, New York  10017

September 16, 2008

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention: Documentation Manager

## NOTICE OF EARLY TERMINATION

Re: ISDA Master Agreement between Lehman Brothers Special Financing Inc. ("Lehman") and ICP Structured Credit Income Master Fund Ltd ("Fund") dated July 20, 2007, (the "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

This letter serves as notice of the designation of an Early Termination Date effective as of  September 16, 2008, pursuant to Section 5(a)(vii) and 6(a) of the Agreement.   Fund, on or as soon as reasonably practicable following the Early Termination Date, will notify Lehman of the amount due under the Agreement.

ICP Structured Credit Income Master Fund Ltd,

By:

By: _Thomas C. Priore_
Name:  Thomas C. Priore
Title:    Director

**ICP Structured Credit Income Master Fund Ltd**

**360 MADISON AVENUE, 10ᵗʰ FLOOR  NEW YORK, NY 10017 (212) 821-1900**

## Peter Gaudet

| | |
|---|---|
| **From:** | Peter Gaudet |
| **Sent:** | Monday, September 22, 2008 1:33 PM |
| **To:** | Kathryn Purvis (kpurvis@lehman.com) |
| **Subject:** | IMPORTANT - IMMEDIATE ATTENTION REQUIRED |
| **Attachments:** | signed Calculation Notice.pdf |

Kathryn,

This email acts as notification of ICP Asset Management LLC's (acting on behalf of the ICP Structured Credit Income Master Fund Ltd, collectively, "ICP") contention that Lehman Brothers refuses to honor the Cross Margin and Setting Agreement ("CMN Agreement") dated March 18, 2008, between ICP Structured Credit Income Master Fund Ltd and Lehman Brothers Inc, Lehman Brothers Special Financing and Lehman Commercial Paper, (collectively, "Lehman Brothers Entities")

In an attempt to resolve this situation, employees of ICP have contacted several people in your organization including Emacha Storch, Zachary Mazucci, Mithra Hariharan, and David Picotte. Additionally, as you are the Lehman employee who provided us this document, Ms Storch contacted you directly regarding this issue on Monday, September 16th. A representative of ICP also left you a voicemail on Monday the 16th and Tuesday the 17th. As of Friday, September 19th, there has been no response from you or any member of the Lehman Brothers legal department.

Please also note that ICP Asset Management LLC sent, via messenger and Fedex, a Notice of Early Termination on Tuesday, September 16, 2008 and a Calculation Notice on Friday, September 19, 2008 to Lehman Brothers Special Financing Inc c/o Lehman Brothers Inc

It is our most sincere desire that the parties involved exercise the CMN Agreement referenced above, and come to a commercial resolution in this matter. In that vein, I ask that you please contact us immediately

Following please find a full reconciliation of the outstanding securities with supporting documents in the file attached to this email which contains the Calculation Notice

I look forward to hearing from you as soon as possible.

Please see below

Best regards,
Peter

Peter W. Gaudet
Chief Operating Officer
Senior Managing Director
Institutional Credit Partners LLC
361 Madison Avenue, 10th Floor
New York, New York 10017
212-821-3704
917-837-4561 mobile
pgaudet@icpcapital.com

## Reconciliation of Payments Due

financed with ICP Structured Credit Income Master Fund Ltd from Lehman Brothers special finance in the amount of $3.5b

Documentation with Evaluation Notice and Support for CP's positions, based on a Termination Date of September 15, 2008.

financed with respect to another Peritus related position under a contracted Repo agreement with ICP Structured Credit Income Master Fund Ltd, separate from the Lehman repo position   *(Note: This is estimated as at this time; the financing financed with respect to the Peritus Bond that currently on repo with Lehman.   (GC+C )

NET PAYMENT due from Lehman Brothers Entities to ICP Structured Credit Income Master Fund Ltd
$2,967,033.46 - $1,965,712.65 = financing expenses = **$1,001,320.81 less financing expense due Lehman for the Peritus repo'ed position.**

**Exhibit D to Attachment to Proof of Claim**

**<u>SIPA Claim (without exhibits)</u>**[1]

---

[1] As stated in the Claim, copies of exhibits to the SIPA Claim are appended as exhibits to the Claim and, as such, have not been reproduced with the SIPA Claim here. Copies of exhibits as appended to the SIPA Claim may be requested from the contact person listed in the Claim.

