## Exhibit A

### THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.

**If you are in any doubt as to the action you should take, you are recommended to seek advice immediately from your own professional adviser.**

**If you have sold or otherwise transferred all of your interests as an Eligible Offeree (as defined in the proposed Claim Resolution Agreement contained in Part III of this document (the "Agreement")), please forward this document as soon as possible to the purchaser or transferee, or to the stockbroker, bank or other agent through whom the sale or transfer was effected for onward transmission to the purchaser or transferee. However, this document should not be forwarded or transmitted in or into any jurisdiction outside the United Kingdom if to do so would constitute a violation of the relevant laws in such jurisdiction.**

**The information in this document does not constitute nor does it form part of any offer to sell or to purchase or to subscribe for, or the solicitation of an offer to sell or purchase or subscribe for, any securities in any jurisdiction or territory.**

**Certain of the securities which are the subject of the Agreement may have been issued by Affiliates of the Company (the "Affiliate Securities"). No offer or sale of Affiliate Securities may have been registered under the United States Securities Act of 1933, as amended (the "Securities Act"). Any Affiliate Securities that may be delivered under the Agreement may not be offered or sold to other investors except as part of a transaction that is registered under the Securities Act or that is exempt from registration.**

**This document should be read in conjunction with the accompanying Form of Acceptance which sets out the procedure for acceptance of the Offer. The information used by or relied upon by the Company for the purpose of determining the level of acceptances in relation to the Offer is not determinative of any rights or claims of any person and should not be used or relied upon for this or any other purpose. This information is not an indication of any allocation or distribution of assets or calculation of claims or liabilities that a person may receive or have under the Agreement. Please refer to the Agreement for further information regarding allocations and distributions of assets and calculations of claims and liabilities.**

**Further copies of this document may be downloaded from the PricewaterhouseCoopers website at _http://www.pwc.co.uk/eng/issues/lehman_updates.html._**

---

Circular in relation to a proposed

# CLAIM RESOLUTION AGREEMENT

between

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)

## (in administration)

and

# ELIGIBLE OFFEREES

---

Your attention is drawn to the Letter from the Administrators which is set out in Part I on pages I-1 to I-30 of this document and to the Important Notices set out on page 2 of this document.

The procedure for acceptance of the Offer is set out in Schedule 1 to the Agreement in Part III on pages III-159 to III-169 of this document and in the accompanying Form of Acceptance.

If you wish to accept the Offer to enter into the Agreement, you must complete, sign and submit your Form of Acceptance to the Company by sending a scanned copy by email to claimresolutionagreement@lbia-eu.com or by faxing a copy to +44 (0)20 7067 8542 as soon as possible and in any event so as to be received by the Company no later than **5.00 p.m. (London time) on Tuesday 29 December 2009**.

After you submit your Form of Acceptance by email or facsimile, you must send the original as soon as possible by pre-paid post or air mail to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, PO Box 62492, London E14 1JX, United Kingdom or by courier only to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, 25 Bank Street, Canary Wharf, London E14 5LE, United Kingdom (marked for the attention of E. Levy).

## Important Notices

This document has been prepared solely in connection with the Agreement.

The information contained in this document has been prepared by the Company and the Administrators based upon information available to them.

The statements contained in this document are made as at the date of this document, unless some other time is specified in relation to them, and delivery or service of this document shall not give rise to any implication that there has been no change in the facts set out in this document since such date or that the information in this document is correct as at any time subsequent to such date.

Nothing contained in this document shall constitute any admission of any fact or liability on the part of the Company or the Administrators with respect to any asset to which it, they or any person may be entitled or any claim against it, them or any person.

The summary of the principal provisions and effect of the Agreement set out in Part II of this document and the information and explanations set out in Part I of this document are qualified in their entirety by reference to the Agreement, the full text of which is set out at Part III of this document. In the event of any discrepancy or inconsistency between the provisions of the Agreement and any information or statement set out elsewhere in this document, the provisions of the Agreement shall prevail. Each recipient of this document is advised to read and consider carefully the text of the Agreement and to make its own independent decision in relation to the Agreement. Nothing in this document should be relied upon or treated as a recommendation or an inducement to enter into the Agreement.

This document has been prepared solely to assist Eligible Offerees in relation to the proposal of the Agreement. Nothing in this document should be relied upon for any purpose, including, without limitation, for the purchase or in connection with the purchase of any asset or liability of the Company.

No person has been authorised by the Company or any of the Administrators to make any representations or give any information other than the statements contained herein, and, if given or made, such representations or information must not be relied upon as having been authorised by the Company or any of the Administrators.

The Administrators are acting as agents for and on behalf of the Company and none of the Administrators, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken or assumed by the Company or in respect of any failure on the part of the Company in relation to the Agreement. The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any claims in tort as well as under the laws of contract. The Administrators, their firm, partners, employees, agents, advisers or representatives shall be entitled to rely on, enforce and enjoy the benefit of this paragraph as if they were a party to this document.

Recipients of this document should not construe the contents of this document as legal, tax or financial advice. Recipients of this document should consider consulting their own professional advisers as to legal, tax, financial or other relevant matters before taking any action in connection with the Agreement.

Capitalised terms used in this document have the meanings ascribed to them in the section in which they appear or in Part 18 of the Agreement which is set out at Part III of this document.

NEITHER THIS CIRCULAR NOR THE CLAIM RESOLUTION AGREEMENT NOR ANY OTHER DOCUMENT RELATING TO THE CLAIM RESOLUTION AGREEMENT HAS BEEN PREPARED FOR THE PURPOSES OF ANY SOLICITATION OR OFFER TO THE PUBLIC IN ANY JURISDICTION OR TERRITORY AND THIS CIRCULAR AND SUCH OTHER DOCUMENTS MAY NOT BE DISTRIBUTED OR MADE AVAILABLE FOR SUCH PURPOSE. NONE OF THIS CIRCULAR, THE CLAIM RESOLUTION AGREEMENT AND ANY OTHER DOCUMENT RELATING TO THE CLAIM RESOLUTION AGREEMENT HAS BEEN SUBMITTED FOR CLEARANCE TO ANY REGULATORY AUTHORITY.

IF YOU ARE IN ANY DOUBT ABOUT ANY OF THE CONTENTS OF THIS DOCUMENT, YOU SHOULD OBTAIN INDEPENDENT PROFESSIONAL ADVICE.

**Dated 24 November 2009**

**Administrators of the Company:**

Mr. Anthony Victor Lomas
PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT

Mr. Steven Anthony Pearson
PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT

Mr. Dan Yoram Schwarzmann
PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT

Mr. Michael John Andrew Jervis
PricewaterhouseCoopers LLP
Plumtree Court
London EC4A 4HT

**Legal Advisers to the Company and the Administrators:**

Linklaters LLP
One Silk Street
London EC2Y 8HQ

## IF YOU WISH TO ACCEPT THE OFFER

If you wish to accept the Offer to enter into the Agreement with the Company, you must complete and sign a Form of Acceptance and submit it to the Company:

- by sending a scanned copy by email to **claimresolutionagreement@lbia-eu.com**

or

- by faxing a copy to **+44 (0)20 7067 8542**

as soon as possible and so as to be received by the Company no later than

**5.00 p.m. (London time) on Tuesday 29 December 2009.**

After you submit your Form of Acceptance by email or facsimile, you must send the original to the Company as soon as possible:

**by pre-paid post or air mail to**:
Lehman Brothers International (Europe)
(in administration)
Trust Property 24th Floor, PO Box 62492
London E14 1JX
United Kingdom

**or by courier only to**:
Lehman Brothers International (Europe)
(in administration)
Trust Property 24th Floor, 25 Bank Street
London E14 5LE
United Kingdom
(marked for the attention of E. Levy)

Detailed instructions on how to complete the Form of Acceptance are set out in the notes on page 4 of the Form of Acceptance (also found on page III-173 of this document).

# TABLE OF CONTENTS

**Page**

**PART I LETTER FROM THE ADMINISTRATORS**............................................................................. **I-1**

SCHEDULE 1 BACKGROUND HISTORY ......................................................................... I-7

SCHEDULE 2 READER'S GUIDE TO THE CLAIM RESOLUTION AGREEMENT.......................... I-14

**PART II SUMMARY OF THE PRINCIPAL PROVISIONS AND EFFECT OF THE CLAIM**

   **RESOLUTION AGREEMENT**.................................................................................... **II-1**

**PART III CLAIM RESOLUTION AGREEMENT** .............................................................. **III-1**

SCHEDULE 1 TERMS AND CONDITIONS OF THE OFFER....................................................... III-159

SCHEDULE 2 FORM OF ACCEPTANCE .................................................................. III-170

SCHEDULE 3 FORM OF DISPUTE NOTICE.............................................................. III-174

SCHEDULE 4 WRITTEN RESOLUTIONS AND MEETINGS OF SIGNATORIES....................... III-175

[This page has been intentionally left blank.]

**PART I**
**LETTER FROM THE ADMINISTRATORS**

**Lehman Brothers International (Europe) (in administration)**

**Lehman Brothers
International (Europe) (in
administration)**
25 Bank Street
London
E14 5LE

**To:**      The Eligible Offerees

**Date:**    24 November 2009

Dear Sirs,

**The Claim Resolution Agreement (the "Agreement") and the return of Assets**

**1      Introduction**

The purpose of this letter is to introduce and provide a brief explanation of the Administrators' proposals contained within the Circular (of which this letter forms part) for the basis of returning segregated trust assets held by Lehman Brothers International (Europe) (in administration) (the "**Company**") to its clients.

The Company is making an offer, subject to certain terms and conditions, to certain persons (referred to in the Agreement as "**Eligible Offerees**") to enter into and be bound by the Agreement set out at Part III of the Circular (the "**Offer**"). The Agreement is proposed by the Company for the determination of ownership claims to certain assets and other non-proprietary claims against and liabilities to the Company, as applicable, in accordance with certain contractual mechanisms. These contractual mechanisms are set out in the Agreement at Part III of the Circular. You are advised to read the Agreement in full, including the terms and conditions of the Offer at Schedule 1 to the Agreement, as only those with full particulars of their position are likely to be able to assess the full impact of accepting the Offer.

Further background history on the effect of the Company's entry into administration on segregated trust assets held by the Company can be found at Schedule 1 to this letter. A brief "readers' guide" to the Offer and the Agreement is set out at Schedule 2 to this letter. Part II of the Circular contains a more detailed summary of the key terms of the Agreement.

Unless the context requires otherwise, capitalised terms used in this letter have the same meaning as given to them in the Agreement and any descriptions of such capitalised terms in this letter are merely summaries of these terms.

*In order to benefit from the terms of the Agreement it is essential that you submit a duly completed Form of Acceptance. Failure to submit a Form of Acceptance will mean you will not be treated in accordance with the terms of the Agreement.*

**2      Why is the Offer being made?**

On 15 September 2008 the Company was placed into administration and, according to its records, over US$35 billion of assets belonging to clients were held by the Company in various sub-custodians and depots. Since that date the Administrators have been seeking

to return property to clients, but have faced numerous challenges and issues. The proposed arrangements seek to address these challenges.

The process of returning assets has been slow and costly and is not attractive to clients, as it requires clients to provide indemnification and credit support to the Company in exchange for the return of assets. In many cases, it is not possible to return assets held on trust to clients for whom they are being held due to, amongst other things, uncertainty over competing claims or counterparties being unwilling or unable to comply with the indemnification requirements.

One of the primary objectives of the Administrators has been to develop a standard methodology to expedite the return of trust property held by the Company to its rightful owners. The Administrators initially proposed to launch a scheme of arrangement under Part 26 of the Companies Act 2006 to assist with this. However, the Court of Appeal ruled that the English courts do not have jurisdiction to sanction a scheme of arrangement which varies proprietary rights in the manner proposed by the Company.

The Administrators have worked with a sub-committee of the Creditors' Committee of the Company (referred to as the "**Claim Resolution Agreement Working Group**") to develop an approach, which incorporates a number of key provisions in order to return assets to clients. This approach is set out in the Agreement and, subject to certain acceptance thresholds, will bind those clients who pro-actively elect to sign up to its terms by accepting the Offer.

The Administrators believe that, for those clients who become party to the Agreement, the Agreement establishes the most efficient available method of determining the return of segregated client assets which the Company holds on trust.

3      **Are you eligible for the Offer?**

The Offer is being made to all Eligible Offerees. There are two categories of Eligible Offerees.

The first category (referred to in the Agreement as "**TA Offerees**") are clients of the Company who, as at the date of the Circular, have ownership claims to assets which were recorded in the books and records of the Company and the relevant sub-custodian or depot as being held in a segregated manner for clients, separately from the Company's own assets, as at the time the Company entered into administration.

The second category (referred to in the Agreement as "**NTA Offerees**") are clients of the Company who do not have ownership claims to segregated assets but who, at the date of the Circular, are party to Financial Contracts with the Company as at the time the Company entered into administration. The term "**Financial Contract**" encompasses any bilateral or multilateral contract entered into before 15 September 2008 (whether evidenced in writing or not) relating to one or more transactions or positions of a financial nature, including contracts for the delivery and/or custody of Assets, entered into with the Company. Contracts which are purely administrative or service contracts do not constitute Financial Contracts.

4      **What does the Agreement do?**

The objective of the Agreement is to establish standard methods for the termination and valuation of Financial Contracts and to expedite the process of asset distribution in order to bring finality to Signatories in respect of these positions.

### 4.1   Signatories

If it becomes effective, the Agreement will be made between the Company and Eligible Offerees who agree to be bound by it (referred to in the Agreement as "**Signatories**").

There are two types of Signatories, referred to in the Agreement as "**TA Signatories**" and "**NTA Signatories**". TA Signatories are those Signatories who assert, or who the Company believes have, an "**Asset Claim**" as at the time the Company entered into administration. In summary, an Asset Claim is an ownership claim to "**Trust Assets**", which include assets held in a segregated manner for clients separately from the Company's own securities and assets derived from them, such as dividends and coupons. TA Signatories may also have non-proprietary claims against the Company pursuant to Financial Contracts. NTA Signatories are those Signatories who do not have or assert Asset Claims but who are party to Financial Contracts with the Company as at the time the Company entered into administration. Due to the conditionality of the Offer, the Agreement is likely to become effective for NTA Signatories at a later date than for TA Signatories. You are referred to Schedule 1 to the Agreement for further details.

### 4.2   Asset Claims

The Agreement establishes methods to assist the Company in determining TA Signatories' Asset Claims. In particular, TA Signatories are requested to submit their Asset Claims by the "**Bar Date**", which is 26 February 2010 or such later date as the Company may notify to Signatories. If a Signatory fails to submit an Asset Claim before the Bar Date, the Company will determine that Signatory's entitlement to Trust Assets on the basis of the information available to the Company at the time it makes the determination.

Under the Agreement, each Signatory will be released by all other Signatories from all Asset Claims to Trust Assets distributed to it in accordance with the Agreement. This will lessen the risk of competing claims being brought against a Signatory who receives Trust Assets from the Company and means that TA Signatories will not be required to provide the form of indemnity currently required upon the distribution of Trust Assets.

The Agreement does not compromise Signatories' proprietary rights, if any, to Securities which the Company rehypothecated but which remain identifiable within the accounts of the Company that hold the Company's own Securities because the Company did not complete the transfer or other disposal of those Securities.

The Agreement sets out structured procedures for the return of Trust Assets. In some circumstances, these procedures may compromise certain contractual rights of Signatories; for example, rights to potential consequential losses (if any). It is not possible to predict how the application of these procedures may affect individual Signatories at this stage because of the highly fact-dependent nature of an individual's circumstances. It is within this context that the Administrators believe the Agreement is in the overall interests of creditors as a whole.

The Agreement cannot bind people who do not sign up to the Agreement (referred to in the Agreement as "**Non-Signatories**") and so, if the Agreement method of allocation or distribution of Trust Assets is subject to challenge by a Non-Signatory, court directions or other court determination may be necessary before distribution of those Trust Assets. The Agreement also cannot give TA Signatories protection from any ownership claims which Non-Signatories may seek to assert against Trust Assets in the hands of TA Signatories.

### 4.3 Other claims under Financial Contracts

The Agreement establishes a mechanism for the termination and close-out of all Financial Contracts between a Signatory and the Company. The claims or liabilities under each such contract are netted off under the Agreement to determine a single net claim against or liability to the Company. In the event that the net figure is a claim against the Company, this will be an ascertained unsecured claim against the Company for the purposes of any future distribution from the general estate of the Company.

In respect of TA Signatories, any such net liabilities due to the Company will be applied against a TA Signatory's entitlement to available Trust Assets, thereby establishing an amount of Trust Assets to be distributed to that TA Signatory after taking into account such TA Signatory's net liabilities to the Company.

TA Signatories may be able to reduce the amount of Trust Assets appropriated by the Company in satisfaction of their net liabilities by requesting that these liabilities are applied first against any shortfall claims they may have in respect of Trust Assets. The Agreement also contains a mechanism whereby Signatories are able to collateralise their net financial liabilities under the Agreement with their admitted claims to Pre-Administration Client Money, thereby enabling Signatories to gain the full value of their admitted claims to Pre-Administration Client Money at the earliest opportunity.

## 5 Advantages of accepting the Offer

The Administrators have worked closely with the Claim Resolution Agreement Working Group to develop the Agreement in a form that balances the requirement to return certain Assets held on trust by the Company to their rightful owners quickly and efficiently with the need to ensure that the unsecured estate is not disadvantaged. The Claim Resolution Agreement Working Group includes both unsecured creditors and clients of the Company who have Asset Claims to Trust Assets.

In the Administrators' view, the Agreement provides the most efficient solution for the return of Trust Assets, in terms of both time and cost to the Company and its clients. In particular, the Administrators are of the view that the Agreement will benefit Signatories and should be implemented on the basis that it is expected to:

(i)     expedite the return of Trust Assets to Signatories;

(ii)    provide finality and certainty regarding the financial position between Signatories and the Company;

(iii)   reduce costs and mitigate risks of competing claims to Trust Assets to which the Company and TA Signatories might otherwise be exposed; and

(iv)    expedite the release of Assets which are not held on trust and enable subsequent distributions to clients of the Company, on the basis that the Agreement will not only deal with claims to Trust Assets but also establish Signatories' unsecured claims, if any, against the Company.

In seeking to achieve an effective multilateral solution to the determination of Signatories' positions, the implementation of the Agreement will progress the Administration of the Company, enabling further advances to be made in the management of the unsecured estate. For this and other reasons outlined in this letter, the Administrators are also of the opinion that the Agreement is in the best interests of the creditors of the Company as a whole.

In particular, the Administrators also believe that the Agreement will benefit the unsecured clients of the Company since it is expected to:

(i)     speed up the agreement of unsecured claims because all unsecured claims of Signatories are determined by operation of the Agreement as described in (ii) above;

(ii)    expedite the distribution process for unsecured clients on the basis that the unsecured claims can be determined more quickly; and

(iii)   reduce the level of unsecured claims as certain claims of Signatories for consequential and indirect losses are compromised by the Agreement.

## 6       Position of Eligible Offerees who do not accept the Offer

Eligible Offerees who do not become party to the Agreement will be Non-Signatories and will not have the right to have their claims against the Company determined in accordance with the terms of the Agreement.

Non-Signatories' claims are likely to take longer to finalise outside the processes and mechanisms to be put in place by the Agreement. For Non-Signatories who have ownership claims to Trust Assets, this may delay the return of those Assets as no Trust Assets can be returned to a client before its net financial position has been calculated and an appropriate amount of Trust Assets have been retained to satisfy that client's liabilities to the Company.

The concessions and compromises contained in the Agreement which operate to the benefit of Signatories are unlikely to be available to clients of the Company who choose not to accept the Offer and who attempt to negotiate bilateral arrangements for the return of Assets held on trust by the Company.

Under the Agreement, each Signatory will release all other Signatories from all Asset Claims to Trust Assets distributed to those other Signatories in accordance with the Agreement. Non-Signatories will not benefit from such mutual releases and so they may face a greater risk of challenge by claimants with competing claims to any Assets returned to them by the Company.

In addition, Non-Signatories are likely to be subject to higher costs than Signatories in respect of the return of Trust Assets. The level of costs charged on the return of Trust Assets under the Agreement has been set on the basis that, in general, determining clients' claims to Trust Assets and distributing Trust Assets in accordance with the Agreement should be more efficient than doing so on a bilateral basis. The Administrators' experience to date has identified that significant time and effort is required to determine a Non-Signatory's claim to Trust Assets outside the framework of the Agreement and that the costs borne by a Non-Signatory for the return of Trust Assets are likely, therefore, to be higher.

## 7       Consequences of failure to fulfil the conditions to the Offer

The Agreement will only become effective if certain conditions to the Offer are met, including the condition that the Offer must be accepted by at least 90 per cent. of TA Offerees with ownership claims to Trust Assets within the control of the Company subject only to limited exceptions. If the conditions to the Offer are not met or waived and the Offer lapses, the Administrators will continue to distribute Trust Assets on a case-by-case basis in accordance with the prioritisation principles set out in the Trust Property Order. There

are certain disadvantages to this method of return compared to the distribution mechanisms under the Agreement:

(i)     the mutual releases of Asset Claims to Trust Assets contained in the Agreement will not come into effect and therefore clients may be more vulnerable to claims from other clients in respect of Trust Assets returned to them by the Company on a bilateral basis;

(ii)    In the immediate term, clients will be required to give indemnities, in most cases backed by third-party credit support, to protect the Company and clients who have received distributions of Trust Assets against the risk of later competing claims to the Trust Assets which were distributed to those clients. These indemnity and credit support requirements will be onerous;

(iii)   clients' net unsecured claims against or liabilities to the Company may not be determined at the time of return of the Trust Assets, leaving clients facing uncertainty as to the value of their unsecured claims, if any; and

(iv)    the Administrators expect that distributions of Trust Assets will be more complex, potentially requiring numerous court applications, and will therefore take much longer to complete on a bilateral basis than if the Agreement were effective to govern Asset Claims of Signatories.

## 8    Conclusion

The Administrators are of the opinion that the Agreement represents the most efficient method of returning Trust Assets to those clients with ownership claims to them for the reasons set out in this letter. The members of the Claim Resolution Agreement Working Group have also expressed their unanimous support for the Agreement.

You are strongly advised to review and consider carefully the Agreement and the Offer. You are reminded that failure to gain sufficient support for the Agreement before 5.00 p.m. (London time) on 29 December 2009 will result in the Offer lapsing and the bilateral return process will remain the primary mechanism for the return of Trust Assets to clients of the Company.

By supporting the Agreement and Offer you will help ensure that the threshold condition is met and maximise the prospect of recovering your Trust Assets held by the Company in the shortest timeframe. The Joint Administrators look forward to receiving your Form of Acceptance.

Yours faithfully,

SA Pearson

Joint Administrator
Lehman Brothers International (Europe) (in administration)
as agent and without personal liability

*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers International (Europe) on 15 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*
*Lehman Brothers International (Europe) registered in England and Wales with registered no. 02538254.*
*VAT registration no. 446 9315 28*

# SCHEDULE 1
# BACKGROUND HISTORY

## 1    Introduction

The Administrators were appointed on 15 September 2008 pursuant to an order of the Court dated 15 September 2008 made under Paragraph 12 of Schedule B1 of the Insolvency Act under which the Administrators were appointed joint administrators of the Company.

The Administration Order was made to achieve a better result for the Company's creditors as a whole than would be likely if the Company were wound up (without first being in administration).

This Schedule 1 contains background information on the Administration of the Company as it relates to the management of Trust Assets. Creditors of the Company can find further details of the Administration to date in the progress reports produced by the Administrators and sent to all known creditors and counterparties of the Company. The first progress report covers the period from 15 September 2008 to 14 March 2009 and the second progress report covers the period from 15 March 2009 to 14 September 2009.

## 2    Corporate history

### 2.1    Business activities

Investment banking was at the core of the business of the Lehman group. Until its collapse, the Lehman group was one of the four biggest investment banks in the United States. It provided financial services to corporations, governments and municipalities, institutional clients and high-net-worth individuals. The Company was the Lehman group's main European broker-dealer. It provided investment banking services to clients (including corporate clients, institutions, governments, hedge funds and private clients) on a global basis.

### 2.2    Prime services and custody

One of the Company's major business areas was prime services, which related to the Company acting as prime broker to institutional clients, mostly hedge funds. As prime broker, the Company provided a broad range of services, including execution of securities and derivatives trades, clearing and settlement of trades (whether executed by the Company or by other executing brokers), custody, financing, foreign exchange, stocklending, and valuation and reporting for the client's portfolio. The Company's clients would often actively trade in securities and derivatives on many markets globally, taking both long and short positions, and would also require stock borrowing, financing facilities and foreign exchange services.

Entering into a relationship with the Company as prime broker enabled a client to engage in active trading on markets worldwide, to take long and short positions for arbitrage or other purposes, and to trade on a leveraged basis (through financing provided by the Company and through derivatives transactions). It also enabled the client to operate its business without itself having membership of exchanges, clearing systems etc., and without having substantial back-office systems and personnel.

Other persons with interests in Trust Assets include clients who placed securities with the Company by way of safe custody, private individuals whose accounts were dealt with by

the Company's private investment management division, market counterparties who posted collateral with the Company pursuant to derivatives trades otherwise than on a total title transfer basis (such as other investment banks) and the Company's Affiliates within the Lehman group.

## 3 Effect of the Administration on Trust Assets

The control and management of Trust Assets has been a key focus for the Administrators since the Company entered administration. Some of the issues facing the Administrators in dealing with Trust Assets are described below.

### 3.1 Intermediaries and Sub-Intermediaries

The Company did not generally hold assets itself but did so through depositories, exchanges, clearing systems and sub-custodians (referred to in the Agreement as "**Intermediaries**", being the entities with whom the Company had a direct contractual or fiduciary relationship, and "**Sub-Intermediaries**", being such entities below that level). The method used depended on the types of assets being held, the jurisdictions and markets in which they were held, the systems through which they were traded, the currencies involved and applicable regulatory requirements. The Company operated 42 custodian relationships through 80 markets operating 738 real-world securities accounts.

Following their appointment, the Administrators identified and contacted the network of these Intermediaries and Sub-Intermediaries in order to bring Trust Assets under the direct and unfettered control of the Administrators. A summary of the status of Trust Assets is set out below (figures as at 30 September 2009):

| Status | US$ billion |
| --- | --- |
| **Trust Assets at 15 September 2008** | 35.0 |
| Trust Assets returned (value as at 15 September 2008) | 13.3 |
| Trust Assets excluding Derived Assets | 9.4 |
| Trust Assets yet to be in the control of the Administrators (including LBI, LBJ and closed depots) | 7.5 |
| Balance (including mark to market movement from 15 September 2008 to 30 September 2009 (gross of redemptions)) | 4.8 |
| **Total** | 35.0 |
| Derived Assets under the Administrators' control | 2.0 |

### 3.2 Affiliates as Intermediaries

In some jurisdictions, the Intermediaries holding Trust Assets on behalf of the Company are Affiliates. Some of these Affiliates are now in insolvency proceedings themselves and the Administrators are working with the insolvency office holders of those Affiliates to obtain control over Trust Assets held by those Affiliates. Where necessary, the Administrators have filed claims in the estates of these Affiliates for the return of Trust Assets.

### 3.3    Affiliate lien claims over Trust Assets

In many cases, the agreements under which Trust Assets are held by the Company for a client purport to create security interests, liens and/or set-off rights over those Trust Assets in respect of the liabilities owed by the client to the Company and any of its Affiliates. Potential claims by Affiliates pursuant to such security arrangements cannot be established from the Books and Records of the Company and the Company can only definitively establish these if and when Affiliates assert these claims. In the meantime, the Company cannot safely return Trust Assets to clients without incurring a liability where there is a possibility that an Affiliate may have a security interest or similar interest in those Trust Assets.

The Administrators have written to certain key Affiliates requesting details of any claims these Affiliates have against Trust Assets belonging to clients of the Company for indebtedness owed to them by the client of the Company and inviting them to participate in mutual arrangements for the confidential exchange of information in relation to such indebtedness and such Trust Assets. Not all Affiliates have responded to these letters. A lack of response from an Affiliate as at the date of the Circular does not mean that an Affiliate has relinquished any claim for indebtedness against a client of the Company. TA Signatories are required either to warrant that they do not have any indebtedness to any Affiliate or to disclose details of such indebtedness as part of the process prescribed by the Agreement for submitting claims.

### 3.4    Failed trades

Upon the appointment of the Administrators, the Company failed to settle trades with certain counterparties, clearing systems and exchanges. The Administrators have undertaken very considerable work to ascertain the population of failed trades across depots under the Administrators' control and to establish their impact, including in relation to Trust Assets. Under this workstream, the Administrators are reconciling the Company's Books and Records to revise book entries to reflect real-world settlements so far as they are able. However, a significant proportion of these failed trades impacted stock lines held in depots over which the Company currently does not have control, including stock lines held by the Company through LBI.

### 3.5    Stock Shortfalls

The Administrators have reconciled the Company's Books and Records against those depots under its control on a stock line-by-stock line basis. This reconciliation has identified a small amount of shortfalls (approximately US$300m). This reconciliation exercise has not been possible for Trust Assets held through Intermediaries in depots which are not under the Administrators' control, including stock lines held by the Company through LBI and certain other Affiliates, as the necessary information is still in the process of being provided to the Administrators.

### 4    Identifying claims to Trust Assets

The Administrators have written to account holders thought potentially to have claims against the Company for the return of, or in respect of, Trust Assets, in order to obtain from them full details of such claims, rights or other interests which the clients purport to have in relation to Trust Assets. The Administrators also issued a notice on the Website inviting those clients and counterparties to whom such letters were not sent, but who nonetheless believe that they might have such interests, to supply details of claims, rights or interests

which they believe they have in relation to Trust Assets. However, the Administrators have not received responses to these letters from all clients or counterparties.

**5      Difficulties in returning Trust Assets**

In many cases, it has not been possible to return Trust Assets as requested due to the complexities and difficulties in establishing a client's entitlement to Trust Assets and actual and potential competing client claims to such assets.

First, the Administrators have to try to establish, based on the information available to them, whether any other person could assert a claim to the same Trust Assets. The removal of such uncertainty depends upon the Administrators having the necessary degree of assurance that the Books and Records of the Company are complete and accurate. However, the Administrators cannot rely entirely on the accuracy of the Books and Records of the Company and they have not yet received all the information requested from Intermediaries and Sub-Intermediaries, in particular from Affiliates who are Intermediaries or Sub-Intermediaries. Also, as described in section 4 (*Identifying claims to Trust Assets*), the Administrators have not received responses from all clients to the enquiries they have made.

Secondly, there is a degree of uncertainty as to potential claims by Affiliates in respect of Trust Assets. Potential claims by Affiliates pursuant to security arrangements cannot be established from the Books and Records of the Company and the Company can only definitively establish these if and when Affiliates assert the claims, as described in section 3.3 (*Affiliate lien claims over Trust Assets*).

In addition, there are a number of client-specific issues that the Administrators have to determine on a case-by-case basis before returning Trust Assets to a client. An examination of the contractual documentation with that client needs to be performed to determine whether the client has a proprietary claim to the Trust Assets in question. The Administrators also have to address the termination of open contracts to crystallise a client's overall financial position with the Company, and agree valuations for derivatives and other financial transactions before determining, *inter alia*, how set-off is applied in any given case. Each client's liabilities (if any) to the Company must be calculated and it must be determined whether they should be deducted from the Trust Assets that the Company holds for that client. The Administrators must also confirm whether Trust Assets are available to them for distribution.

The Administrators recognised the difficulties faced by clients as a result of uncertainty regarding whether and when they would receive their property and a process for implementing the return of Trust Assets was established as described in section 6 (*Return of Trust Assets so far*).

**6      Return of Trust Assets so far**

Pursuant to an order of the Court dated 7 October 2008, the Administrators are authorised to implement and/or give effect to certain processes regarding the management of proprietary claims to Trust Assets. A list of the processes approved by this order can be viewed on the Website at:

*http://www.pwc.co.uk/eng/issues/lehman_client_money_assets_update_071008.html.*

Pursuant to the terms of the order, a Hardship and Prioritisation Committee was set up by the Administrators to consider the return of Trust Assets to clients who have made requests

for such returns and whose claims are suitable for prioritisation in accordance with the principles set out in the order.

In this manner, the Company has returned an estimated US$13.3 billion of Trust Assets to some 81 clients since the Administration Date. However, due to the complexities and difficulties in returning Trust Assets described in sections 3 (*Effect of the Administration on Trust Assets*) and 5 (*Difficulties in returning Trust Assets*), an asset can only be returned by the Administrators in limited circumstances and in many cases the conditions associated with returning Trust Assets, including requiring undertakings and indemnities from clients are unacceptably onerous for the vast majority of clients.

## 7    Development of the Agreement and the Offer

### 7.1    The "bar date" concept

Given the drawbacks of returning Trust Assets to clients as described in section 6 (*Return of Trust Assets so far*), the Administrators considered seeking to establish a final claims submission date, or "bar date", for claims to Trust Assets.

A bar date would serve to limit the information to which the Administrators would be required to have regard when determining claims to Trust Assets and would therefore assist the Company in making distributions of Trust Assets with protection from the risks of subsequent competing claims and without the need for continuing undertakings from clients who received distributions of Trust Assets.

The English administration procedure itself does not provide for the setting of a bar date for such claims. Therefore, the Administrators explored the possibilities of setting a bar date in respect of claims to Trust Assets either through a scheme of arrangement under Part 26 of the Companies Act or through an application to the Court to set a bar date through the Court's inherent jurisdiction to give directions in respect of the execution and administration of trusts.

### 7.2    Development of a proposed scheme of arrangement

The Administrators initially proposed to launch a scheme of arrangement under Part 26 of the Companies Act to assist with the distribution of Trust Assets and the determination of affected clients' financial positions in respect of the Company. However,  the Court of Appeal upheld the first instance ruling that the English courts do not have jurisdiction to sanction a scheme of arrangement which varies proprietary rights in the manner proposed by the Company.

### 7.3    Development of the Agreement

In order to avoid unnecessary delay to the return of Trust Assets to clients of the Company, the Administrators have developed the Agreement and the Offer in parallel with the appeal process regarding the scheme of arrangement described in section 7.2 (*Development of a proposed scheme of arrangement*).

Further detail on the terms of the Offer and the provisions of the Agreement can be found in the "readers' guide" at Schedule 2 to the Letter from the Administrators and at Part II of the Circular.

The Administrators have worked closely with the Claim Resolution Working Group to establish the terms of the Agreement and the members of the Claim Resolution Working Group have expressed their unanimous support for the Agreement. In addition,

representatives of the FSA have been invited to the various meetings and conference calls between the Administrators and the Claim Resolution Agreement Working Group in relation to the development of the Agreement. The FSA has been kept fully informed at each stage of the evolution of the Offer and has been provided with a copy of the Circular.

## 8    Lehman Brothers Holdings Inc. as guarantor of certain obligations of the Company

On 15 September 2008, Lehman Brothers Holdings Inc. ("**LBHI**") filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the United States Bankruptcy Code.

LBHI issued various forms of guarantees relating to, amongst others, contracts and financing transactions, derivative contracts and other performance guarantees entered into by various members of the Lehman group.

In particular, the executive committee of the board of directors of LBHI issued a unanimous written consent on 9 June 2005 in which the executive committee resolved that LBHI thereby fully guaranteed the payment of all liabilities, obligations and commitments of certain subsidiaries of LBHI, including those of the Company.

LBHI has its own procedure for filing proofs of claim against LBHI (including those claims based on guarantees and other promises made by LBHI), which included a bar date of 22 September 2009 for the filing of proofs of guarantee claims against LBHI and a deadline of 22 October 2009 for the provision of supporting evidence.

The Agreement does not purport to affect the effectiveness of any guarantee between LBHI and a Signatory.

No representations, whether express or implied, are made in the Circular as to the nature or effectiveness of any guarantee or other obligation of LBHI. Neither the Administrators nor the Company express any view as to whether any creditor of the Company does or may have a claim against LBHI on this basis and creditors should take their own legal advice on this matter.

## 9    CAPCO as insurer of certain obligations of the Company

CAPCO is an insurance company licensed by the state of Vermont. It was established by a number of securities investment firms, including the Company, who were seeking to provide net equity excess account protection over the protection limits currently provided by the Securities Investor Protection Corporation in the United States and the FSA in the United Kingdom.

The excess protection is provided to the securities affiliates of the participants in the form of bonding coverage. This protection is triggered only in the event of the financial failure and liquidation of a participating securities affiliate. The protection is intended only to cover lost assets and it will not meet any other types of claims, for example, claims for negligence.  The protection is also not triggered unless the client's account exceeds the limits of account protection provided by the FSA. Other restrictions apply as contained in the relevant bond.

No representations, whether express or implied, are made in the Circular as to the nature or effectiveness of any guarantee or other obligation of CAPCO. In particular, not every Signatory may be eligible for insurance protection by CAPCO and not every element of a

creditor's claim against the Company (including claims of Signatories within the Agreement) may be covered by the surety bond issued by CAPCO.

The Agreement does not purport to affect the effectiveness of any surety bond issued by CAPCO of which a Signatory has the benefit. The Agreement provides that the Company may disclose information regarding a Signatory to CAPCO to the extent that CAPCO requests or requires such information.

No representations, whether express or implied, are made in the Circular as to the nature or effectiveness of any surety bond issued by CAPCO in respect of the Company's liabilities. Neither the Administrators nor the Company express any view as to whether any creditor of the Company does or may have a claim against CAPCO on this basis and creditors should take their own legal advice on this matter.

## SCHEDULE 2
## READER'S GUIDE TO THE CLAIM RESOLUTION AGREEMENT

**1    Introduction**

This guide provides a "plain English" summary of the Claim Resolution Agreement (the "**Agreement**") provided to you by the Administrators of Lehman Brothers International (Europe) (in Administration) (the "**Company**").

The Agreement represents a proposed contractual arrangement between the Administrators and those parties that agree to be bound by it (referred to as "**Signatories**").

The purpose of the Agreement is to allow the Company and Signatories to compromise and agree on the treatment of all of the Signatories' claims relating to trust assets (i.e. securities) and financial contracts. While the principal focus of the Agreement is to facilitate the return of trust assets to those Signatories with ownership claims ("**TA Signatories**"), it also contains mechanisms to determine the claims of those Signatories with purely unsecured financial claims (for example, those with derivative positions or repurchase agreements) ("**NTA Signatories**"). Because of the complex issues that are being dealt with under the Agreement, it is, by necessity, a very complicated document.

The purpose of this guide is to provide you with an easier to read, easier to understand summary of the material provisions in the Agreement as well as some of the commercial rationale for those provisions. A more technical, detailed description of the Agreement can be found at Part II of the Circular and a copy of the Agreement itself is included at Part III of the Circular.

Before making your decision, you should review the actual Agreement and remaining parts of the Circular in consultation with your legal advisers. It is the Agreement and not this summary that will govern the disposition of your claims against the Company.

The Agreement includes a number of notices that are to be provided by the Company to the Signatory and by the Signatory to the Company. The Company has set up an internet portal to which all potential TA Signatories should now have access. TA Signatories will be able to receive and provide information in relation to their trust asset claims through the portal.

As the Administrators have discussed with trust creditors on numerous occasions, the issues relating to the assets that were held by the Company at Lehman Brothers Inc. ("**LBI**") are particularly complex. The return of assets held at LBI will work differently than the return of assets that are within the Company's control. Accordingly, this summary contains a separate section (see section 5 (*Lehman Brothers Inc.*)) that deals specifically with LBI and how the Agreement will affect trust creditors with securities that were held by the Company at LBI.

**2    Overview of the Agreement**

The Agreement has been structured to determine the following with respect to each Signatory:

**2.1    Trust Assets**

The Company will determine, based on its books and records and other relevant information it receives from each Signatory, the trust assets it holds (or are shown to be

held in the books and records) on behalf of that Signatory. Under the Agreement, trust assets also include assets subsequently derived from those segregated assets (e.g. dividends and coupons received post-administration) but rehypothecated securities and certain other assets have been excluded.

Signatories will also be requested to submit information related to their trust asset claims against the Company prior to a "bar date" which is expected to be 26 February 2010. If a Signatory does not submit a claim before the bar date, the Company will be free to distribute assets after that date based on the information available to it at that time of distribution which may result in the Signatory receiving fewer assets than would otherwise be the case.

The Company is, in general, going to be returning trust assets on a stock line by stock line basis. To the extent there is a shortfall in the amount of a particular stock line available to be returned to a Signatory, that Signatory would have an unsecured claim against the Company for the deficiency (referred to as an "**Asset Shortfall Claim**"). This Asset Shortfall Claim, if used to offset liabilities owed to the Company as described below, would be based on the value of that stock line at the time the assets then held by the Company are returned to clients (which would include assets derived from such stock line up to such time). If the Asset Shortfall Claim is to be used as part of the Signatory's general unsecured claim against the Company, it will be valued based on the value of the relevant stock line as of the last business day prior to the date of administration (i.e., 12 September 2008).

## 2.2    Unsecured Claims

The Company will determine the value of any unsecured claims each Signatory has against the Company (which claims will principally arise from: (i) the value of the Signatory's rehypothecated long positions; (ii) the Signatory's cash balances (for those clients that were not entitled to client money protection under FSA rules); and (iii) amounts owed to the Signatory under financial contracts, such as derivatives). The Agreement provides for rehypothecated long positions to be valued as of the last business day prior to the date of administration (i.e., 12 September 2008) (based on the rationale that the Company used the value of the rehypothecated long positions to obtain financing that was then provided to clients as margin debt). Financial contracts that have been closed out will be valued based on the close-out amounts determined in the manner set out in the contracts. Open financial contracts will be automatically closed out on the last business day of the month in which the Signatory enters into the Agreement. The Agreement sets out different methodologies to be used in determining the value of the close-out amounts under these financial contracts.

## 2.3    Liabilities

The Company will determine the amount of any liabilities that the Signatory owes to the Company (which liabilities will principally arise from: (i) the value of the Signatory's short positions; (ii) the Signatory's margin debt balances; and (iii) amounts owed by the Signatory to the Company under financial contracts). The Agreement provides for short positions to be valued as of the last business day prior to the date of administration (i.e., 12 September 2008). Financial contracts will be valued as described above.

### 2.4    Net Contractual Position

All unsecured claims and liabilities of each Signatory arising out of the close-out amounts of their financial contracts with the Company (which, for the avoidance of doubt, includes the rehypothecated longs, shorts and cash balances other than client money) will be netted against each other to determine that Signatory's net contractual position. If the Signatory has more claims than liabilities, it will have a net financial claim against the Company (that will ultimately entitle the Signatory to a portion of the dividend to be paid by the Company to its unsecured creditors). If the Signatory has more liabilities than claims, it will owe a net financial liability to the Company. The Company will only distribute trust assets to a Signatory once that Signatory has satisfied any net financial liability owed to the Company.

The Agreement describes the various methods a Signatory will have to satisfy its net financial liability, some of which are described below. In addition to making sure a Signatory's net financial liability has been satisfied, the Company also intends to appropriate assets that would otherwise be distributable to a Signatory if a third party (which, in most instances, will be an affiliate of the Company) has a lien interest in the assets of that Signatory (these were common for clients who had cross margin and netting agreements in place with various Lehman entities). All assets appropriated in this respect will be subsequently liquidated, though the relevant Signatory will first be given the option to purchase such assets. Any proceeds received by the Company for these appropriated assets which have not been used to settle the Signatory's indebtedness to the third party will be released to the Signatory once the lien has been released or the indebtedness to the third party has been satisfied.

### 2.5    Pre-Administration Client Money

The Company will determine the amount of any pre-administration client money (for those clients who were entitled to client money protection under FSA rules) owed to the Signatory. This amount is referred to as a Signatory's "**Pre-Administration Admitted Client Money Claim**". While distributions of pre-administration client money will not be made under the Agreement, to the extent there is a shortfall in the amount of money that is returned to the Signatory (which could occur, for example, in the event the Company does not receive back all or a portion of the cash that the Company had on deposit with Lehman Brothers Bankhaus AG), that Signatory would have an unsecured claim for the amount of the deficiency.

### 2.6    Collateralisation Elections

The timing of the resolution of outstanding legal issues surrounding pre-administration client money claims is uncertain but it appears unlikely they will be resolved until some time after the Company is ready to make a substantial distribution of trust assets. As discussed above in section 2.4 (*Net Contractual Position*), the Company will not be able to distribute trust assets to a Signatory without that Signatory satisfying its net financial liability to the Company. The Company understands, however, that Signatories will want to use claims against the Company as a set off for any liabilities owed and, depending on their particular circumstance, may want to determine which claims should be used for purposes of set off and which claims should be used for the basis of recovery against the Company (whether through the unsecured dividend or through a return of assets or pre-administration client money).

The Agreement includes a mechanism which the Company believes provides TA Signatories with the greatest amount of flexibility in terms of using their set off rights without delaying the return of trust assets. A TA Signatory may decide to make one or more

of the Collateralisation Elections available under the Agreement. By making such election(s), a TA Signatory will collateralise its net financial liability owed to the Company with: (i) its Pre-Administration Client Money; (ii) a cash amount (which the TA Signatory will need to provide itself) equivalent to the value of any of its trust assets that would otherwise have been appropriated by the Company in respect of such net financial liability; and/or (iii) its Affected Intermediary Admitted Claim Amount (as described in section 5.3 (*Collateralisation Election*)). To the extent that a net financial liability owed to the Company is collateralised, the TA Signatory will effectively be able to suspend the set-off between such amount of the net financial liability and any assets allocated to the TA Signatory. When the amount of: (x) any shortfall claim for a Pre-Administration Admitted Client Money Amount or (y) any Asset Shortfall Claim is ascertained, the shortfall will first be set-off against the then remaining net financial liability before the posted collateral is set-off against any remaining net financial liability.

As a result, in exchange of posting the relevant collateral, a TA Signatory will be able to:

(i)     obtain full value (by way of set-off) for any shortfall claim for pre-administration client money, any Asset Shortfall Claim and/or Affected Intermediary Admitted Claim Amount up to the amount of its net financial liability as opposed to having an unsecured claim against the Company for the same amount; and

(ii)    reduce the amount of assets appropriated by the Company.

An NTA Signatory may also decide to collateralise its net financial liability with its Pre-Administration Client Money Claim. If it does so, it will also be able to obtain full value (by way of set-off) for any shortfall claim for pre-administration client money up to the amount of its net financial liability, as opposed to having an unsecured claim against the Company for the same amount.

## 2.7    Position Statement

Concurrently with the distribution of the Circular (including the Agreement), the Company is providing potential TA Signatories with an updated position and balance statement through the internet portal. The statement is an update to the positions statement provided in early September 2009 and contains the following information regarding your account at the Company:

(i)     list of rehypothecated securities and their value as of the date prior to administration as determined by the Company;

(ii)    list of non-hypothecated long positions and their value as of 30 September 2009 (this is the date being used for purposes of determining whether the conditions under the Agreement have been satisfied);

(iii)   list of short positions and their value as of the date prior to administration as determined by the Company;

(iv)    summary of cash balances and margin debt;

(v)     close-out amounts with respect to financial contracts to the extent the financial contracts have been closed out and fair market value of open financial contracts as determined by the Company; and

(vi)    value of the positions held at LBI based on their value as of 19 September 2008.

The statement should provide an indication of what may be received under the Agreement and the amount of any residual unsecured claim against the Company but it is not final and

binding. TA Signatories are invited to submit any further information or proposed revisions to the Company through the portal in order to ultimately agree on the final position with the Company.

## 3      The Offer

### 3.1     How do you accept?

The offer is open for acceptance until **5.00 p.m. (London time) on 29 December 2009**.

If you wish to accept and become a Signatory, you should complete, sign and submit a Form of Acceptance by this date.

The Company may, but is not obliged to, extend the offer period beyond 29 December 2009 or keep the offer open for acceptance. If extended, anyone who submits a form during the extended period will be subject to higher costs.

Full details of the action required to accept the Offer are set out in Schedules 1 and 2 to the Agreement at Part III of the Circular.

### 3.2     Conditions of the Offer

The Agreement will only become effective once all the conditions have been satisfied or waived. These conditions are:

**3.2.1**   holders of at least 90 per cent. (by value) of trust assets now under the Company's control (i.e. excluding those assets held by LBI) signing up to the Agreement. In Schedule I to the Agreement, this is referred to as the "**Acceptance Condition**";

**3.2.2**   the Company obtaining an acceptable court order regarding the distribution of trust assets (see section 4.2 (*Part 2 – Asset Claims and Bar Date*) for further details); and

**3.2.3**   no regulator or court makes a ruling making the Agreement unenforceable, illegal or difficult to implement.

The Offer will lapse if:

(i)      the Acceptance Condition is not satisfied or waived by 29 December 2009 (unless the Company chooses to extend the initial offer period); or

(ii)     all the other conditions are not satisfied or waived by 30 June 2010.

For NTA Signatories, the Offer is also conditional on the Company not promoting, or there not being effective, a scheme of arrangement under the Companies Act or a company voluntary arrangement under the Insolvency Act for the purpose of dealing with the claims of general unsecured creditors.

### 3.3     Agreement becomes effective

Once effective, the Company will notify you by email and confirm whether or not you are a Signatory. The Company will then determine the date or dates on which distributions of trust assets will be made. A Signatory's aggregate distributions will be made in full and final settlement of that Signatory's claims to trust assets.

If the Company determines a Signatory has an unsecured claim against it, that claim will be an ascertained unsecured claim in the winding-up of the Company or in any other distribution of assets to unsecured clients.

### 3.4    Modifications

While the Company will have the ability to make minor or technical changes it thinks are not prejudicial to Signatories, material changes to the Agreement (including a change to or waiver of the Acceptance Condition) will require the approval of a substantial majority of Signatories.

## 4    Summary of Agreement

### 4.1    Part 1 – General Provisions

This part contains some of the general provisions relating to the Agreement. These provisions cover the following:

(i)    the Agreement will become effective once the conditions have been satisfied or waived (as outlined above);

(ii)    if a creditor is acting as an agent, custodian or trustee on behalf of its clients, this must be disclosed in the form of acceptance. These creditors will also need to enter into a bilateral arrangement to tailor the terms of the Agreement to their circumstances;

(iii)    the Company will have the unilateral right to exclude a party from the Agreement. As a practical matter, the Company only intends to use this right in very limited circumstances where permitting a party to sign the Agreement would, in the Company's view, be detrimental to the estate of the Company. If Signatories suffer a loss as a result of anyone being excluded, they will be compensated;

(iv)    the Company has entered a number of bilateral arrangements with certain trust creditors. Those trust creditors will still be given the opportunity to sign up to the Agreement. The Company may need to amend or vary the terms of the Agreement as it applies to such Signatories but will only do so to ensure consistency with those arrangements;

(v)    one of the main purposes of the Agreement from the Company's perspective is to obtain a release from the Signatories to claims they might otherwise have against the Company and the Administrators, including any claims for consequential damages. The Agreement includes this release, but also includes a release whereby each Signatory will release all other Signatories from any ownership claims to assets distributed under the Agreement. The Signatories will not, however, release any claims it may have against Lehman Brothers Holdings Inc. ("**LBHI**"), LBI or CAPCO in respect of any claims (including, but not limited to, guarantee or insurance claims). In exchange for the release being provided by the Signatories, the Signatories receive new claims against the Company;

(vi)    the Agreement also provides that the Company will, subject to certain exceptions, release claims it may have against Signatories under financial contracts. In exchange for the release provided by the Company, the Company receives the right to determine claims in accordance with the Agreement;

(vii)    in order to protect the Company's ability to return any cash received post-administration that is entitled to client money protection, the Agreement contemplates an assignment of those claims to an independent third party to be nominated by the Company for the purpose of holding client money claims so that such claims do not become a part of the Company's estate;

(viii)   the Agreement does not restrict any Signatory from transferring their entire position to another Signatory; the transferee will then be treated as a Signatory for the purposes of the transferred position. However, once a Signatory agrees to be bound by the Agreement, it will not be able to transfer its position to a non-Signatory unless the non-Signatory agrees to be bound by the Agreement. The Agreement does restrict the benefit of set off arising from pre-Agreement transfers; a Signatory cannot set off liabilities and assets transferred to it against its original position or liabilities and assets transferred to it by different people;

(ix)    the Agreement does not restrict the transfer of assets to the Company for value as agreed between the relevant Signatory and the Company;

(x)     the Agreement includes a general provision that provides that a Signatory can not recover more than once with respect to the same asset claims (other than recoveries made under a guarantee);

(xi)    a moratorium will be imposed on the ability of Signatories to bring claims against the Company, the creditors' committee and the Administrators unless in accordance with the Agreement; and

(xii)   the Agreement allows the Company to first deal with the claims and disputes of TA Signatories before dealing with the claims and disputes of NTA Signatories. While the Company will have discretion in terms of the order in which it returns assets to clients, its actions in this regard and with respect to all other actions under the Agreement must be taken in good faith.

## 4.2    Part 2 – Asset Claims and Bar Date

The Administrators intend to apply to the court for directions that a bar date be set for the submission of all claims to trust assets (whether by Signatories or others). This bar date is expected to be around 26 February 2010 and will be communicated to trust creditors. Trust creditors will be requested to submit information about their claims to the Company before the bar date.

The Company has set up a portal (as noted in section 1 (*Introduction*) above) that is available on the internet. TA Signatories will be able to submit their claims via this internet portal. As described in section 2.7 (*Position Statement*), concurrently with the distribution of the Agreement, the Company has distributed to you statements that show the information in the Company's books and records regarding your claims.

If you do not provide information by the bar date, the Company will be entitled to distribute assets using the information then available to it with respect to your claims.

## 4.3    Part 3 – Relevant Information

The Company is going to use all relevant information available to it in order to evaluate your claims.

The Company's books and records recorded some trades as having settled even though they did not actually settle. These are referred to as "**Failed Trade Entries**". The Company intends, in general, to reverse Failed Trade Entries and adjust its books and records to reflect known settlements. The Company will credit or debit each Signatory for an amount equal to the difference in value that would have resulted had the trades settled on the relevant settlement date.

The Company will keep information regarding each client's positions confidential and will not disclose this information unless it is required to do so by law or legal process. If the Company must disclose information regarding a client's positions, it will, subject to certain exceptions, do so without specifically identifying the relevant client by name.

To the extent a trust creditor has incomplete documentation regarding its relationship with the Company, the Company will do its best to take into account all relevant information available to it and, if insufficient information is available, it will apply the Company's standard terms of the applicable agreements.

### 4.4    Part 4 – Management of Assets Prior to Distribution

The Company's ability to process corporate actions was seriously impaired following the insolvency and the sale of LBI's operations to Barclays Capital Inc. However, the Administrators have now set up procedures for dealing with corporate actions with respect to securities it is holding on behalf of the trust creditors and, where possible, will generally try to accommodate the requests of the trust creditors with respect to corporate actions. The Company will charge a modest fee (US$3,000) to effect corporate actions, will require it is indemnified for any actions taken and will not take action with respect to de minimis corporate actions. The Company generally will not take any action if a payment is required. The Company will, however, act commercially and, if a corporate action that the Company is aware of is clearly in the interests of the Company or the trust creditor, the Company is likely to take it.

In this part, the Company reiterates that it will act in accordance with the standard of care imposed on a fiduciary in respect of the trust assets and the trust creditors. The Company also agrees not to appropriate any trust assets claimed by Signatories for the estate except as specifically set forth in the Agreement.

### 4.5    Part 5 – Asset Valuation Methodology

The Agreement includes a detailed process for valuing assets. Generally speaking, the Company will seek to use market prices to value assets. If market prices are not available, the Company will look to other observable prices in order to value the assets. To the extent pricing information is not available, the Company will take into account other relevant information in order to determine the value of the assets. The Company will also take into account the size of the assets being valued when determining their values. Values will be determined in US dollars.

### 4.6    Part 6 – Overview of Distribution

In order for the Company to make distributions to the trust creditors, it must first determine the following items with respect to each trust creditor:

(i)    Net Contractual Position – this is described above in section 2.4 (*Net Contractual Position*) and below in section 4.7 (*Part 7 – Net Contractual Position*) in more detail;

(ii)    Retention Amount – any amount that the Company must retain in order to reserve against claims that third parties may be able to assert with respect to a trust creditor's assets by virtue of a lien. The most common example of this would be claims that an affiliate of the Company might have to a trust creditor's assets because of a cross margin and netting agreement entered into by the trust creditor;

(iii)    Ascertained Non-Financial Contract Liabilities – these would be liabilities not related to financial contracts that a trust creditor might have to the Company. In general, these are liabilities that would arise outside of the ordinary course of business (primarily relating to actions taken in violation of UK insolvency laws) and are unlikely to be an issue for most trust creditors who had a typical prime brokerage relationship with LBIE; and

(iv)    Distributable Trust Assets and Asset Shortfalls – the Company will only be able to return to clients trust property that is within its control. Ultimately, the Company will need to determine how much of a shortfall exists with respect to the return of a specific asset (i.e., stock line) once it has identified all of the assets that are likely to be available within a specific stock line.

The Company will determine the above amounts on a trust creditor by trust creditor basis and, except with respect to assets held by LBI or any other intermediaries that return trust creditors' assets to the Company on a similar basis as LBI (which mechanisms are discussed below in section 5 (*Lehman Brothers Inc.*), assets will be returned on a stock line-by-stock line basis.

To the extent a trust creditor has a liability to the Company, it will have several options (described below) for satisfying those obligations.

## 4.7    Part 7 – Net Contractual Position

In general, a trust creditor's net contractual position will be determined by netting the unsecured claims that client has against the Company against the liabilities owed by that trust creditor to the Company arising out of the close-out amount of each of the financial contracts. In order to determine the net contractual position, the Company needs to be able to value each of the trust creditor's claims against and liabilities to the Company under its financial contracts with the Company.

Under the Agreement, all open financial contracts (for example, derivatives, repurchase agreements, etc.) will have to be terminated in order for the Company to determine that client's net contractual position. The Company will have the right to treat any seemingly defective termination notices with respect to open financial contracts as effective terminations of the financial contract. In addition, any remaining open financial contracts will be deemed terminated as of the last business day of the month in which the Signatory enters into the Agreement.

The close-out amounts under the terminated open financial contracts will be determined in accordance with the financial contract valuation methodology described in this part of the Agreement. The principal goal is to have the valuation methodology set forth in the financial contract determine the close-out amount subject to certain overriding valuation principles, including that the value of rehypothecated securities and short positions is to be valued as at the date prior to administration.

If the open contracts cannot be valued in accordance with the contract valuation methodology or the Company determines that it is not reasonably practicable to do so, the Agreement sets forth other mechanisms for valuing the open financial contracts. If the trust creditor is the party that is supposed to determine the close-out amount under the financial contract, then the trust creditor will be required to submit a valuation statement to the Company setting forth the close-out amount calculated by it under the financial contract.

Close-out amounts will all be converted to US dollars as at the date of administration.

In accordance with standard insolvency rules, trust creditors will not be entitled to any interest in respect of their claims against the Company, including with respect to close-out amounts under open financial contracts.

The Company will notify a Signatory of its net contractual position once all positions have been closed out. If the net amount is positive, the Signatory will have a net financial claim against the Company. If the net amount is negative, the Signatory will have a net financial liability to the Company.

Signatories will be responsible for paying interest to the Company from the date of administration at Libor + 100 basis points with respect to their net financial liability (i.e., the net amount after setting off all unsecured claims against the Company, including the value of rehypothecated longs, cash and close-out amounts against all liabilities owed to the Company, including debit balances, short positions and close-out amounts). Signatories will be able to reduce their net financial liabilities (and, accordingly, the accrual of this interest) by making Collateralisation Elections as described in section 4.11 (*Part 11 – Appropriation and Distribution*).

The amount of interest to be attributed to a net financial liability will be determined on each date that a Signatory's distributions and appropriations are valued, and is the amount of interest described above which has accrued over the period since the previous such date (or if none, since the date of administration). If the value of the net financial liability has changed, and not as a result of interest accrual since that time (for example, because the Company has admitted a greater liability for pre-administration client money that has been collateralised than previously), then a balancing adjustment shall be made to recognise that the previous reduction for an appropriation was made for a greater amount of interest than is now the case. To the extent this implies a negative interest value, the net financial liability shall be reduced accordingly. Interest on the net financial liability is calculated as a simple (not compounded) amount. When a Signatory chooses to collateralise, the interest bearing portion of the net financial liability shall first be attributed to the uncollateralised portion of the Signatory's net financial liability.

## 4.8    Part 8 – Retention Amount

Because many Signatories will also have relationships with affiliates of the Company who may be able to assert liens or other security interests over those Signatories' assets held at the Company, the Company will need to take these security interests into account before being able to distribute assets to any particular Signatory.

The Agreement includes various mechanisms for the Company to determine the amount that must be appropriated with respect to any Signatory for these security interests. In due course, the Company may establish a bar date for affiliates to claim a security interest in the assets held at the Company for the benefit of the Signatories.

Once sufficient assets have been appropriated by the Company to cover those claims (even if those claims have not been resolved), the Company will proceed to make distributions to the Signatory in accordance with the terms of the Agreement.

## 4.9    Part 9 – Non-Financial Contract Liabilities

The Company will have to determine whether a Signatory has any non-financial contract liabilities to the Company. These could include, for example, preference claims relating to actions that occurred in the period of time right before the administration. To the extent a Signatory has a non-financial contract liability, the liability must be satisfied by the

Signatory before the Company can make a distribution to them. As discussed above in section 4.6 (*Part 6 – Overview of Distribution*), this is unlikely to be an issue for most trust creditors who had a typical prime brokerage relationship with the Company.

### 4.10    Part 10 – Allocation of Assets and Asset Shortfall Claim

This part of the Agreement deals with how the Company will allocate trust assets that are under its control. At the date of this Circular, this principally relates to European and some Asian securities that are now held by a new custodian on behalf of the Company but excludes the US securities that were held at LBI as these have not been returned to the Company.

The Company will determine allocations of these trust assets on a stock line by stock line basis. What this means is that the Company will look at how much of a particular stock they are holding and compare that to the total amount of client claims with respect to that specific stock line and will make distributions pro rata on that basis. Determining how much each Signatory owns with respect to a specific stock line will be determined based on all of the relevant information available to the Company. If a Signatory alleges that they are entitled to a different amount of an asset compared to what is in the Company's records, no distribution of that asset will be made to that Signatory until the dispute is resolved.

If a Signatory receives a distribution of assets from another intermediary, the Signatory will be required to notify the Company of this distribution so that the Company can take that into account when making future distributions to that Signatory and others.

Once the Company has received all of the individual claims to a particular stock line (including those claims of non-Signatories) and compared it to the amount of that stock line that the Company controls, the Company will determine whether there is a shortfall in that particular stock line. The Company is entitled to disregard a claim made by non-Signatories: (i) if it determines the claim to be false; or (ii) to the extent it determines it is overstated.

If a stock line does not have a potential shortfall, Signatories who have a claim to that stock line will be allocated an amount equal to the agreed claim amount for that stock line.

If there is a shortfall with respect to a particular stock line, the Company will further divide the claims with respect to that stock line into four asset pools. The first two pools are for: (i) claims which constitute custody securities (meaning that these securities were credited to a specifically designated custody account according to the books and records of the Company); and (ii) claims which constitute non-custody securities (this will include most of the traditional prime broker clients). The remaining two pools are for claims over assets which constitute part of the affected asset pool (which essentially relates to a pool where an intermediary such as LBI will return assets on an aggregate rather than stock line by stock line basis); these assets will fall into either: (i) a group of single customer pools; or (ii) a multiple stock line pool. These pools are explained in section 5.2 (*Pooling*) below.

Under the Agreement, the Company will allocate assets in each pool independently from any allocation of assets in respect of another pool, even if the assets are from the same stock line.

Shortfalls will be applied pro rata among each separate asset pool based on the claim amount of the individual Signatory in the relevant asset pool compared to the total claim amounts of all Signatories in that respective asset pool. The Company will reserve an amount of assets from each asset pool to be used to satisfy the claims of parties that have not signed the Agreement.

Amounts of assets that are not set aside will be allocated to Signatories pro rata to their claims, but no amounts will be allocated to non-Signatories unless: (i) Signatories and non-Signatories agree how the shortfall should be allocated; or (ii) a court has approved or directed how the shortfall should be allocated.

The Company will only determine the Asset Shortfall Claims of Signatories once it has resolved all disputes with both Signatories and non-Signatories relating to their claim amounts. Signatories will be able to use Asset Shortfall Claims: (i) to offset other liabilities to the Company; or (ii) as the basis of an unsecured claim against the Company.

### 4.11    Part 11 – Appropriation and Distribution

When the Company is ready to make distributions of assets to the Signatories, it will be entitled to recover from those assets an amount sufficient to satisfy any liabilities the trust creditor owes to the Company.

At this point in time, there are several categories of potential distribution assets. These include:

(i)     the Signatory's allocation of long positions that are under the Company's control;

(ii)    any amounts previously retained by the Company in respect of the security claims of third parties (which, for the most part, would be lien claims of affiliates of the Company who had contractual relationships with the Signatory) but which have not been used to settle the relevant trust creditor's indebtedness to such third parties;

(iii)   amounts of collateral whether actually posted by the Signatory or deemed posted by the Signatory by virtue of: (a) the collateral assignment of pre-administration client money claims to the Company; (b) the making of what is referred to as an appropriation deferral election by depositing cash collateral with the Company in an amount equal to the lesser of (x) the value of trust assets proposed to be returned to that Signatory (that might otherwise be appropriated by the Company to satisfy liabilities owed to it by that Signatory) or (y) that Signatory's net financial liability; or (c) the collateral assignment of the Affected Intermediary Admitted Claim Amount (as described in section 5.3 (*Collateralisation Election*));

(iv)    any pre-administration client money shortfall claim that a Signatory may have;

(v)     any shortfall claim arising with respect to an Affected Intermediary Admitted Claim Amount (as described in section 5.3 (*Collateralisation Election*));

(vi)    the net financial claim of a Signatory that results after offsetting all of that Signatory's claims and liabilities; and

(vii)   any Asset Shortfall Claim that a Signatory may have.

There are also several categories of distribution liabilities. These include:

(i)     costs relating to the Agreement that are going to be charged to each Signatory;

(ii)    non-financial contract liabilities of a Signatory;

(iii)   any amounts that are required to be retained by the Company in respect of the security claims of third parties; and

(iv)    the net financial liability of a Signatory that results after offsetting all of that Signatory's close-out amounts of each of the financial contracts with the Company.

This liability will include both the collateralised and uncollateralised portion of the liability.

These liabilities will have to be satisfied before the Company can make a net distribution of assets to a Signatory. The costs to be assessed under the Agreement will be based on the value of trust assets returned and will be 75 basis points with respect to pure custody clients and 100 basis points with respect to other trust creditors. A higher cost amount will apply to trust creditors who enter into the Agreement after the end of the initial offer period. The Administrators' experience to date is that considerable time and effort is required to determine a non-Signatory's claims to assets under bilateral arrangements; costs borne by non-Signatories are therefore expected to be significantly higher.

A Signatory's liabilities to the Company can be settled in several ways, including:

(i)      the Company may use assets that would otherwise be distributed to the Signatory to reduce the liabilities;

(ii)     Signatories will be permitted to make payments to the Company to pay the amount of any liabilities (so that the Signatory can receive the assets back in full rather than have a portion kept by the Company);

(iii)    if an intermediary has retained assets belonging to a Signatory in respect of claims against that Signatory and subsequently transfers those assets to the Company; and

(iv)     the application towards satisfaction of its liabilities to the Company of any collateral amount posted by a Signatory with respect to: (a) their pre-administration client money claims; (b) an appropriation deferral election; or (c) their Affected Intermediary Admitted Claim Amount (as described in section 5.3 (*Collateralisation Election*)).

The Company will be able to make distributions and appropriations with respect to a Signatory once the following conditions have been satisfied:

(i)      the Signatory's net contractual position has been determined and all disputes relating to the net contractual position have been resolved;

(ii)     the Company is satisfied that it does not expect to identify any further security claims to that Signatory's trust assets or the relevant deadline has passed for third parties with security claims to assert claims over the assets that would otherwise be distributable to the Signatory; and

(iii)    any of the non-financial contract liabilities required to be ascertained before distribution and appropriation have been ascertained.

Once the above conditions have been satisfied, the Company will be in a position to make distributions to Signatories. The Company will make distributions on a stock line by stock line basis and will be able to determine in its sole discretion the order of distributions, though as with all other provisions in the Agreement, the Company has agreed to act in good faith.

Distributions and appropriations by the Company will be determined using the value of the relevant assets and liabilities as of a day falling on the twenty-fifth business day prior to the latest date on which the Company intends to give instructions for distribution of the relevant assets.

A Signatory's net financial liabilities to the Company will have to either be satisfied or collateralised (as described in more detail below) in order for the Company to distribute assets to that Signatory.

Under the Agreement, Signatories will be entitled to use the value of their pre-administration client money claims, any Asset Shortfall Claims and any Affected Intermediary Admitted Claim Amounts (described in section 5.3 (*Collateralisation Election*)) to offset any financial liabilities to the Company. However, the amount of these claims for a particular Signatory may not be determined until after the Company is otherwise ready to make a distribution of assets to that Signatory. Because the Company can only make distributions of assets once it has provided for any liabilities owed to it by the Signatory, a Signatory will be allowed to collateralise its net financial liability owed to the Company with: (i) its pre-administration client money claim; (ii) cash in an amount equal to the value of assets that would otherwise be appropriated by the Company (instead of being returned to the Signatory) by making an appropriation deferral election; and/or (iii) any Affected Intermediary Admitted Claim Amount (described in section 5.3 (*Collateralisation Election*)). Assuming these claims exceed the amount of the Signatory's net financial liability, the assets would be distributed to the Signatory by the Company in lieu of the Company appropriating those assets to satisfy the net financial liability to the Company. The remaining net financial liability will ultimately have to be satisfied, but the Signatory will be able to satisfy that net financial liability either by: (i) applying part of the collateral amount to the Company (or effectively making a payment to the Company); or (ii) using its pre-administration client money claim, Asset Shortfall Claim or Affected Intermediary Admitted Claim Amount once each are determined to offset the net financial liability. By collateralising the net financial liability, a Signatory will, in addition to receiving asset distributions earlier than would otherwise have been the case, reduce the accrual of interest payable to the Company with respect to those net financial liabilities.

The mechanisms described above are intended to give the Signatory flexibility in determining the order in which its assets (including its pre-administration client money claims and shortfall claims) are applied to reduce its liabilities to the Company and should allow the Signatory to do so in a way to maximise its recovery against the Company.

Asset Shortfall Claims will, to the extent they are used to reduce net financial liabilities, be valued as at the date of distribution of the other assets in that stock line. Once a Signatory has reduced its net financial liabilities to zero (whether by using Asset Shortfall Claims to reduce net financial liabilities or by using other claims against the Company to reduce net financial liabilities), the excess Asset Shortfall Claims will be valued as of the date before administration (or 12 September 2008).

### 4.12    Part 12 – Delivery of Distributions

This part covers the manner in which assets will be distributed to the Signatories. A Signatory who fails to claim a distribution within 12 months of being provided with notice of the distribution will waive its rights to that distribution. Any surplus assets relating to a particular stock line will belong to the estate of the Company (except where they relate to excess assets distributed for any Signatories by LBI).

### 4.13    Part 13 – Closing

Under this part the Company agrees to deliver closing statements to the Signatories; those with trust claims will receive this statement at the time of their final distribution and/or appropriation.

**4.14    Part 14 – Representations and Warranties, and certain Undertakings by a Signatory**

Signatories will be required to provide the Company with a standard set of representations and warranties and to agree to notify the Company when it receives any distribution from an intermediary.

**4.15    Part 15 – Tax**

This part provides the Company with the right to withhold any tax payable or required to be withheld in connection with a distribution to a Signatory and allows the Company to make any disclosures required by any tax authority.

**4.16    Part 16 – Dispute Resolution Mechanism**

The Agreement includes a dispute resolution mechanism to resolve disputes relating to:

(i)      the net contractual position;

(ii)     a claim amount;

(iii)    the value of an intermediary distribution; or

(iv)    distributions and appropriations by the Company.

If the issue cannot be resolved between the relevant Signatory and the Company, the Company will determine whether the issue should be referred to a valuation expert, adjudicator or the court. If the Signatory disagrees with the Company's decision, the issue will be referred to the court. The valuation expert or adjudicator will apportion the costs of resolving the dispute between the Company and the Signatory.

**4.17    Part 17 – Other Provisions**

This part includes other miscellaneous provisions.

In particular, this part sets out the powers of the Company to modify the Agreement. Substantive amendments will require the approval of a substantial majority of the Signatories.

This part also includes a provision that reiterates that all actions and determinations by the Company under the Agreement will be made in good faith.

**4.18    Part 18 – Definitions and Interpretations**

This part includes a listing of all of the capitalised terms used throughout the Agreement and the definitions for those terms.

**5    Lehman Brothers Inc.**

**5.1    SIPA**

LBI is the subject of a liquidation proceeding under the Securities Investor Protection Act of 1970 ("**SIPA**"). SIPA includes a specific set of rules governing the return of assets to customers. While these are US and not UK laws, the Company generally understands that under SIPA all securities held by customers are considered "customer property" and in the SIPA proceeding the trustee will seek to make a pro rata distribution to all customers based on total assets that are in an omnibus fund of customer property. This means that LBI is not required to return assets on a stock line by stock line basis and is not expected to do

so. Rather, there will be one pool of property which will be used to satisfy all customer claims (which will include the claims of the Company on behalf of its clients). Further, we understand that under SIPA the obligation is to return either the securities held by the customer at the time of the commencement of the SIPA proceeding or the net equity of the customer as of the date of the commencement of the SIPA proceeding (in our case, 19 September 2008). Therefore, to determine the value of allocation of assets held by LBI and the value of any shortfall claims, that date will be used. In addition, before returning customers' assets, the Company understands that LBI may first deduct liabilities of those customers to LBI. The value of the asset claims less these liabilities is referred to as a customer's net equity.

## 5.2   Pooling

Under the Agreement, if the Company has enough information to identify all the Signatories to which all the assets returned, or to be returned, by LBI relate, those assets will fall into a single pool for each such Signatory. The Company will then pass through distributions to each such Signatory (subject to making provision for any liabilities owed to the Company). If the Company does not have enough information, all of the assets returned, or to be returned, from LBI will fall into a multiple stock line pool to be liquidated for cash and shared between all affected Signatories according to their net equity claims against LBI.

## 5.3   Collateralisation Election

Signatories will be entitled, at their option, to collateralise their net financial liabilities with the value of the lesser of: (i) their aggregate claim against the Company for assets custodied at LBI (based on their value as of 19 September 2008); and (ii) the value of their net equity claim to "customer property" as described in section 5.1 (*SIPA*) above (again based on the value as of 19 September 2008). This amount is referred to as the "**Affected Intermediary Admitted Claim Amount**". If a Signatory elects to make this collateralisation election, that Signatory will have to give up its right to receive any of the derived assets received with respect to that Signatory's assets held by LBI for the period after 19 September 2008. As a Signatory would obtain a full set off by effectively using its assets to pay its liabilities as of 19 September 2008, the Company does not think it is appropriate for the Signatory to receive derived assets that relate to the period after 19 September 2008.

The collateralisation will operate under the Agreement in a similar way to the pre-administration client money election described in section 2.6 (*Collateralisation Elections*), except that when assets are delivered by LBI to the Company, the Company will appropriate them against collateralised net financial liabilities; under the pre-administration client money election, only surplus cash may be appropriated and/or distributed.

## 5.4   Shortfalls

In addition, the Company will agree to be responsible for any shortfalls in the return of assets by LBI to the Company in respect of customer claims, but deficiencies will only be considered "shortfalls" if they would be viewed as shortfalls under SIPA (because as a matter of fairness to the Company's unsecured creditors, the Company cannot agree to give Signatories claims against the Company's estate for matters where the Company does not have a corresponding claim against LBI).

If Signatories do not collateralise their net financial liability, they may therefore be entitled to a shortfall claim as well as to allocations of assets returned by LBI in accordance with the Agreement. This Asset Shortfall Claim would be an amount equal to the lesser of: (i)

the amount admitted by LBI as the shortfall between the Signatory's net equity "customer claim" and the amount actually delivered to the Signatory in respect of its LBI positions; and (ii) the amount by which the claim against the Company for the value of the Signatory's assets at LBI (valued as of 19 September 2008) exceeds the value of the assets returned by LBI (again valued as of 19 September 2008).

If a Signatory collateralises its net financial liability as described in section 5.3 (*Collateralisation Election*), once LBI has finally distributed all assets to customers, the Signatory will be entitled to an Asset Shortfall Claim (for set off purposes only) equal to the amount by which the value of the assets returned to that Signatory (valued as at each delivery and/or appropriation date) is less than the Affected Intermediary Admitted Claim Amount. This ensures a Signatory making the Collateralisation Election described in section 5.3 (*Collateralisation Election*) receives the full value for set off purposes of the Affected Intermediary Admitted Claim Amount. To the extent that this asset shortfall exceeds the net financial liability of the Signatory, the Signatory will be entitled to a residual asset shortfall claim equal to the amount (if any) by which the net financial liability set off against the asset shortfall claim following collateralisation is less than the asset shortfall claim that would have arisen if the Signatory had chosen to collateralise its Affected Intermediary Admitted Claim Amount.

[This page has been intentionally left blank.]

**PART II**
**SUMMARY OF THE PRINCIPAL PROVISIONS AND EFFECT OF THE CLAIM**
**RESOLUTION AGREEMENT**

**THE FULL TEXT OF THE CLAIM RESOLUTION AGREEMENT IS SET OUT IN PART III. A SUMMARY OF THE PRINCIPAL PROVISIONS OF THE AGREEMENT AND RELATED MATTERS IS SET OUT BELOW. THIS SUMMARY OF THE AGREEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE AGREEMENT. YOU ARE ADVISED TO READ AND CONSIDER CAREFULLY THE TEXT OF THE AGREEMENT ITSELF. UNLESS THE CONTEXT REQUIRES OTHERWISE, CAPITALISED TERMS USED IN THIS SUMMARY HAVE THE SAME MEANING AS GIVEN TO THEM IN THE AGREEMENT AND ANY DESCRIPTIONS OF SUCH CAPITALISED TERMS IN THIS SUMMARY ARE THEMSELVES MERELY SUMMARIES OF THESE TERMS.**

## 1    Purpose of the Agreement

The purpose of the Agreement is to allow the Company and Signatories to compromise and agree all claims of the Signatories relating to Trust Assets and Financial Contracts, other than certain specified Excluded Claims (the concept of Excluded Claims is described more fully in section 10.3 (*Excluded Claims*)), in exchange for mechanisms to:

(i)    determine Asset Claims and to effect Distributions and Appropriations of Distributable Trust Assets of TA Signatories. The concept of Asset Claims is described more fully in section 8 (*Asset Claims made under the Agreement*) and the concepts underlying the making of Distributions are described in section 26 (*Distributions and Appropriations under the Agreement*);

(ii)    allocate and make provision for the costs of managing Trust Assets and Allocating Distributable Trust Assets to TA Signatories;

(iii)    retain any Retention Amount of TA Signatories. This concept is described in section 26.13 (*Retention Claim and Retention Amount*);

(iv)    determine, quantify and crystallise the value of unsecured claims (including any Asset Shortfall Claim, Pre-Administration Client Money Shortfall Claim and Net Financial Claim) of all Signatories;

(v)    determine the Net Financial Liability and Net Financial Claim of all Signatories. This concept is described more fully in section 22 (*A Signatory's contractual position*); and

(vi)    determine certain other liabilities owed to the Company by the Signatories, including Ascertained Non-Financial Contract Liabilities.

## 2    TA Signatories and NTA Signatories

A "**TA Signatory**" is any person who enters into the Agreement and has an ownership claim to Segregated Assets as at the Time of Administration. TA Signatories may also have non-proprietary claims against the Company pursuant to Financial Contracts.

All other persons (other than the Company) who enter into the Agreement and who do not have or assert ownership claims to Segregated Assets but are parties to Financial Contracts with the Company as at the Time of Administration are "**NTA Signatories**".

TA Signatories will have different rights and obligations under the Agreement from NTA Signatories.

In addition, the Company may prioritise dealing with TA Signatories over dealing with the NTA Signatories under the Agreement.

A person may become, or cease to be, a party to the Agreement as a result of transfers of rights and liabilities being claimed. These are subject to restrictions - see section 3 (*Transfer of Position*) below.

## 3    Transfer of Position

A Signatory may transfer to any other Signatory its entire package of claims and liabilities with respect to the Company (referred to as its "**Entire Position**"). A Signatory may not transfer parts of its Entire Position, for example transactions under Financial Contacts that are master agreements (each such part referred to as a "**Position**"). It is also not permitted to transfer any Positions whatsoever to a Non-Signatory, unless that Non-Signatory becomes a Signatory (i.e., its Accession Date falls) before the transfer is effective. If that is the case, it must have transferred its Entire Position. Once a transfer is effective, a transferring Signatory will no longer be a party to the Agreement. Instead, the relevant transferee will step into its shoes. Both transferor and transferee must notify the Company of a transfer, giving sufficient details.

Where a Signatory has previously had some Positions transferred to it, those Positions will be grouped according to the person from whom they were transferred. With regard to each such group of Positions (and any original set of Positions that a Signatory may have had, which were not transferred to it), the Signatory shall be treated as if it were a separate party to the Agreement; its claims and liabilities, calculations and determinations will be made in respect of each group separately. It will not be allowed to aggregate rights or liabilities from different groups; nor will it be able to set off (by Appropriation or otherwise) assets and liabilities from different groups against each other; only when they derive from the same transferee group. This applies with regard to Financial Contracts (and associated Close-Out Amounts) as well as in relation to Assets. All Positions, regardless as to how they were acquired by a Signatory, may, however, be Appropriated in reduction of Costs Amount, Ascertained Non-Financial Contract Liabilities, Limited Ascertained Non-Financial Contract Liabilities, and Unfunded Retention Amounts.

## 4    Shortfalls in particular circumstances

If the Company determines that a Signatory (a "**Shortfall Signatory**") has a greater Asset Shortfall Claim than would otherwise have been the case owing to the Company:

(i)    having excluded a person from entering into the Agreement by exercising its right of exclusion under the terms of the Offer; or

(ii)    having entered into a bilateral agreement with a Non-Signatory,

then the Company will compensate the Shortfall Signatory by paying it a cash amount equal to the amount of Assets (represented by that portion of the difference in the two Asset Shortfall Claims) which would have been available for Appropriation against the Shortfall Signatory's liabilities had either (i) or (ii) above not occurred.

## 5    Trust Assets

## 5.1    Components of Trust Assets

The main subject matter of the Agreement relating to the return of assets is Trust Assets. These comprise Segregated Assets, Derived Assets and Recovered Assets but do not include anything which is Excluded Property.

"**Segregated Assets**" are any Securities which at the Time of Administration were held on a segregated basis. That means that they were recorded as being held separately from the Company's own Securities in both the Books and Records of the Company and also held separately from the Company's own Securities at the Company's custodian or depository (the "**Intermediary**"). If, in fact, the Intermediary only has a single unsegregated account for the Company, then Securities held with the Intermediary will still be treated as being Segregated Assets up to the maximum of the Asset Claims to such Securities. Securities will be Segregated Assets if they were the subject of a purchase with a trade date before the Time of Administration, even if that trade actually settled after that time, provided the Securities were in fact delivered into the relevant segregated account.

"**Derived Assets**" are securities or money received by the Company after the Time of Administration arising out of, or derived from, any Security which was itself a Trust Asset at or immediately before the time of receipt. They include Assets generated from Derived Assets. In some cases, where the previous Trust Assets have ceased to exist, they may entirely replace the previous Trust Assets (such Trust Assets which have ceased to exist, "**Converted Assets**").

"**Recovered Assets**" are Assets recovered from any Pre-Agreement Provisionally Returned Asset Recipients pursuant to the terms of their relevant bilateral agreements with the Company (see section 11 (*Pre-Agreement Asset Contracts*)).

## 5.2    Excluded Property and Non-Trust Assets

Excluded Property consists of Non-Trust Assets and Security Interests over Trust Assets.

Non-Trust Assets comprise anything held by the Company other than Segregated Assets, Derived Assets and Recovered Assets. They include securities that have been rehypothecated by the Company ("**Rehypothecated Securities**"), Converted Assets, Assets distributed under the Agreement (defined in the Agreement as "**Returned Assets**"), Pre-Agreement Provisionally Returned Assets that are not Recovered Assets (defined in the Agreement as "**Pre-Agreement Returned Assets**"), Assets appropriated by the Company under the Agreement (defined in the Agreement as "**Appropriated Assets**"), Pre-Administration Client Money and any Assets beneficially owned by the Company.

A Security Interest is any proprietary interest in a Trust Asset arising by way of lien or security.

## 6    Clients with terminated charge version International Prime Brokerage Agreements

The Company acted as prime broker to clients under the prime brokerage agreement in respect of acquisitions and disposals of securities for the clients, lending securities and advancing cash. Most prime brokerage agreements entered into by the Company provide for all securities to be held by the Company as custodian subject to a security interest or lien in favour of the Company and subject to the Company having a right to use the securities (the "**IPBA (Charge)**").

The Company's entry into Administration entitled a client to serve a default notice on the Company under the standard IPBA (Charge) and terminate the IPBA (Charge). Upon termination of the IPBA (Charge), all outstanding obligations of the Company and the client to deliver securities or pay cash under the IPBA (Charge) become due immediately, the market values of all such cash and securities are established and an account is taken of

what is due from each party to the other. The sums due from one party are set off against the sums due from the other and the balance of the account is payable by the party having the claims valued at the lower amount. The Administrators have been advised that an effect of these termination and close-out provisions of the IPBA (Charge) appears to be to convert the client's ownership rights to securities held by the Company into monetary obligations owed to the client by the Company. This effect is contested by the affected clients.

However, under the terms and conditions of the Agreement, a termination of an IPBA (Charge) following the Time of Administration will not in itself prevent a Signatory's claim to the relevant Securities held under the terminated IPBA (Charge) from being an Asset Claim under the Agreement.

The Administrators considered carefully the effect of including claims to securities held under the IPBA (Charge) of clients who terminated their IPBA (Charge) after the Time of Administration as Asset Claims in the Agreement. Any attempt to exclude these claims as Asset Claims could result in a legal challenge from such clients seeking to argue that termination of the IPBA (Charge) does not convert ownership rights into monetary sums. Based on analysis of the Books and Records of the Company, these clients would have potential ownership claims upon a large number of stock lines. The Company would lack the certainty in respect of competing claims necessary for the Company to distribute any of these stock lines to Signatories whilst any such challenge by these clients was continuing. In addition, the costs of defending such a challenge would have to be borne by the Company, at least initially. Even if the Court were to order ultimately that the clients bringing such a challenge should pay costs, it is unlikely that such an order would cover all of the Company's defence costs.

The Administrators analysed the number of clients with a terminated IPBA (Charge), the value of their existing claims which would be released under the Agreement and the value of the new claims which they would receive under the Agreement. Clients with IPBA (Charge) agreements terminated after the Time of Administration benefit from having their claims to the relevant Securities being treated as Asset Claims, rather than by merely having unsecured claims against the Company. In addition, it is likely to be more beneficial to the general unsecured estate to include the relevant claims to Securities of those clients with IPBA (Charge) agreements terminated after the Time of Administration as Asset Claims than for the entirety of their claims to rank with the remaining unsecured creditors for a Distribution out of the unsecured estate. In particular, this reflects all claims of these clients for consequential loss being compromised under the Agreement, whereas, if they were not Signatories (as they may be disincentivised to accept the Agreement if they were to lose their ownership rights to those Securities under the Agreement), any successful claims for consequential loss would dilute the return to the remaining unsecured creditors. The Administrators are of the view that it is in the best interests of the creditors as a whole to include Signatories' claims to Securities under a terminated IPBA (Charge) as Asset Claims in the Agreement.

## 7    Lien or other security over Trust Assets

In some cases, the Trust Assets held by the Company are subject to a lien or other security right in favour of a person other than the client who placed those Trust Assets with the Company. From the Company's Books and Records to date, the Administrators have identified a number of accounts that have Trust Assets pledged to Affiliates.  Although it is

not always clear from the Books and Records, the Administrators are aware of other security rights over a number of accounts.

In particular, certain documentation under which the Company holds Trust Assets on behalf of its clients creates a lien or other security right over these Trust Assets which secures the discharge of liabilities owed by the Company's clients to Affiliates of the Company.

These liens or other security rights are not compromised by the Agreement. However, if you are an Affiliate or other person and you believe that you have the benefit of such a lien or other security right, you should contact the Administrators as soon as practicable.

As described in paragraph 3.3 (*Affiliate lien claims over Trust Assets*) of Schedule 1 to Part I of the Circular, the Company has written to certain key Affiliates requesting details of any security or lien interests they believe they have over Trust Assets. As at the date of this document, Affiliates have not responded to these letters. However, a lack of response from an Affiliate as at the date of this document does not mean that an Affiliate has relinquished any claim for indebtedness against a TA Signatory. TA Signatories are required either to warrant that they do not have any indebtedness to any Affiliate of the Company or to disclose details of such indebtedness as part of the process for submitting claims under the Agreement.

Please refer to section 26.13 (*Retention Claim and Retention Amount*) for further details on how Trust Assets which are the subject of a lien or other security interests will be dealt with under the Agreement.

## 8    Asset Claims made under the Agreement

### 8.1    Asset Claims

All ownership claims of a TA Signatory against the Company for the return of Trust Assets will be dealt with under the Agreement. A TA Signatory's claims to Assets which are or should have been Trust Assets ("**Asset Claims**") form the basis of determination of its entitlement to participate in Distributions of Assets under the Agreement.

The agreed Asset Claims of the Pre-Agreement Provisionally Returned Asset Recipients under the relevant Pre-Agreement Contracts are also treated as Asset Claims under the Agreement for the purposes set out in section 11 (*Pre-Agreement Asset Contracts*).

### 8.2    Custody Asset Claims and Non-Custody Asset Claims

Asset Claims are divided into claims for Assets held on a custody basis (a "**Custody Asset Claim**") and claims for other types of Assets (a "**Non-Custody Asset Claim**").

It should be noted that Derived Assets include monies arising from or in respect of Segregated Assets and/or other Derived Assets that are Securities, so an Asset Claim will also include a claim for money received after the Time of Administration and which is a Derived Asset.

There are a number of points to note about Asset Claims:

8.2.1    the claim should be an ownership claim (other than a claim for a Derived Asset which is money);

8.2.2    the Assets must be Trust Assets; in particular, they cannot be Excluded Property;

**8.2.3**    the claim extends to property which the Company should have held even if in fact it did not. However, if the reason that the Company did not hold the Security was because it was a Rehypothecated Security or, if such Security is a Security Covered By Client Money (see section 9.5 (*Money segregated by the Company to cover depot breaks*) below), no Asset Claim can be made for it. The Signatory would instead have a Pre-Administration Client Money Claim in relation to the Securities Covered By Client Money, and it may have an unsecured claim in respect of the failure of the Company to redeliver equivalent securities in respect of any Rehypothecated Securities. However, if these are the only claims the Signatory has against the Company in respect of Assets, it will not have an Asset Claim under the Agreement at all and will be treated as an NTA Signatory;

**8.2.4**    unless otherwise required by law or regulation, the obligation of the Company in respect of the claim will not exceed its obligation under the terms of the agreement or arrangement that gives rise to such claim. The Company is not assuming any additional liability in respect of the claim under the Agreement; and

**8.2.5**    it is intended that an Asset Claim be made notwithstanding any provision of any contract which would or might result in a person not having that claim if: (i) that person had such a claim immediately prior to the Time of Administration; and (ii) that person would have had such a claim on the Effective Date but for the application of such provision. This is the mechanism described in the third paragraph of section 6 (*Clients with terminated charge version International Prime Brokerage Agreements*) above.

The concepts of Custody Security and Non-Custody Security are described more fully in the description of the various pools of Assets provided for under the Agreement in section 23 (*Allocations and shortfalls*). A diagram representing these concepts is set out at Appendix 3.

## 9    Money and the treatment of money under the Agreement

### 9.1    Pre-Administration Client Money

Pre-Administration Client Money is not dealt with under the Agreement, in the sense that Distributions of such money will not be made through the Agreement (except in the limited circumstances as described in section 26.8 (*Collateral Allocation*)) and any claims in respect of such money will not be released under the Agreement. Signatories will, however, be able to elect to have such claims taken into account as part of the calculation of their Distribution (see section 26.6 (*Client Money Collateralisation Election*) below). A Signatory who elects to take into account their Pre-Administration Client Money as part of the calculation of their Distribution may do so at any time.

A Signatory who does not elect to take into account their Pre-Administration Client Money Claim in a Client Money Collateralisation Election will have an unsecured claim admitted against the Company which is equal to any shortfall in the Pre-Administration Client Money Claim outstanding at that time.

### 9.2    Post-Administration Client Money which is a Derived Asset

The Agreement contains a provision pursuant to which each Signatory assigns to AssignCo its claim to, and its right in respect of, any Post-Administration Client Money received by or on behalf of the Company after the Time of Administration and which is a

Derived Asset. The Company will, however, account in full for this Post-Administration Client Money to the Signatories as part of their claim to the Securities from which the Post-Administration Client Money was derived. This is a liability to be met by the Company in priority to the Company's obligations to its general unsecured creditors because it will be treated by the Company as an expense of the Administration and will rank in priority to claims of unsecured creditors. If the Company receives any Derived Assets arising from a Corporate Action or a Corporate Event, such Derived Assets will be accounted for as part of the Trust Assets from which they are derived. The Company will identify Securities and/or their Derived Assets on a Stock Line-by-Stock Line basis into one of four kinds of Asset Pool. Any Derived Assets will be allocated into one of the four kinds of Asset Pool in accordance with the Securities from which such Derived Assets arise.

### 9.3    Post Administration Client Money which is not a Derived Asset

Only Post-Administration Client Money which is a Derived Asset is covered by this Agreement. Any Post-Administration Client Money that is not a Derived Asset will be dealt with outside of the Agreement.

### 9.4    Non-client and non-trust money

Money that does not fall within any of the above categories (whether arising prior to or after the Time of Administration) will form part of the Company's assets. Signatories may have claims against the Company in respect of such sums. To the extent that they do, these will be taken into account as part of the calculation of a Signatory's Net Contractual Position.

### 9.5    Money segregated by the Company to cover depot breaks

Before the Company entered into Administration, where the Company was aware that insufficient assets had been segregated for a client, it customarily segregated an amount of cash of the same value as the under-segregated assets as Client Money for such client until such under-segregation of assets has been rectified. Under the Agreement, such Client Money is treated equally with any other Pre-Administration Client Money. In order to avoid double counting under the Agreement, a Signatory will not have an Asset Claim in respect of those under-segregated assets for which the Company had segregated an equivalent amount of Client Money for such Signatory. Such assets are referred to in the Agreement as "**Securities Covered By Client Money**" and are excluded from Securities which can be the subject of an Asset Claim.

### 10    Modified Claims, Released Claims and New Claims

Under the Agreement, each Signatory's Asset Claims (save to the extent that they are Excluded Claims) in respect of Trust Assets will continue to exist, but will be modified (described as "**Modified Claims**"), so that upon:

(i)    Distribution, each Signatory shall receive full (to the extent the Company can give that), unencumbered title to the distributed Assets, and all other Signatories shall each waive and release all their ownership claims to those Assets against the Released Parties;

(ii)    Appropriation, the Company shall receive full (to the extent the Signatories can give that), unencumbered title to the appropriated Assets, and all other Signatories shall each waive and release all their ownership claims to those Assets against the Released Parties; and

(iii)    retention, transfer or disposition of Surplus Assets, the Company shall receive full
(to the extent the Signatories can give that), unencumbered title to the Surplus
Assets, and all other Signatories shall each waive and release all their ownership
claims to those Surplus Assets against the Released Parties.

In addition, they will waive and release their Claims (save to the extent that they are
Excluded Claims) against the Released Parties (referred to as "**Released Claims**") under
Financial Contracts (apart from claims modified as described above); in respect of payment
for or on account of any Asset; and for consequential or economic loss in respect of any
Asset. These are exchanged for new rights: to have their Net Contractual Position,
Allocations and Distributions determined on the basis set out in the Agreement; to claim as
a new obligation of the Company their Net Financial Claim; and to have an Ascertained
Claim (if any) for such amount as is determined under the Agreement - see section 10.1
(*Ascertained Claim*) below.

Signatories will not, however, release any Excluded Claims (see section 10.3 (*Excluded
Claims*) below); claims against people other than Released Parties; and, claims to Post-
Administration Client Money (which must be assigned to AssignCo, and as a result
continue to exist once assigned) - see section 9.2 (*Post-Administration Client Money which
is a Derived Asset*).

The "**Third Party Obligations**" provisions of Clause 4.6 of the Agreement provide that
certain rights will survive where guarantees, indemnities or other obligations given by third
parties in respect of that claim would otherwise be affected, but then only to the extent for
such third party rights to remain effective. However, for the purpose of determining a
Signatory's new rights under the Agreement, such surviving claims shall be treated as
released claims, and not surviving claims. There is no assurance that rights, which this
Agreement purports to preserve, will survive for the benefit of Signatories as against third
parties.

Further, Signatories will be subject to a moratorium under the Agreement. Please see
section 13 (*Stay of proceedings*) for more information.

No Signatory will be entitled to recover more than once in respect of the same Asset or
claim, whether under the Agreement or otherwise.

## 10.1    Ascertained Claim

An Ascertained Claim is an unsecured claim in the Company's winding-up or any other
Distribution of the Company's assets generally to its unsecured creditors for an amount
determined under the Agreement.

## 10.2    Released Parties

Released Parties are the Company, the Administrators, and their firms, members, agents,
partners or employees, and all Signatories. The Agreement does not release claims (if any)
which a Signatory may have against Lehman Brothers Holdings Inc. as guarantor of the
Company or LBI, or against CAPCO or Lehman Brothers Bankhaus AG.

## 10.3    Excluded Claims

Excluded Claims include: Retention Claims - see section 26.13 (*Retention Claim and
Retention Amount*); claims for Excluded Property (other than Appropriated Assets) - see
section 5.2 (*Excluded Property and Non-Trust Assets*) and any loss or damage consequent

on the Company not performing any of its obligations in relation to Excluded Property; claims against the Company for breach of the Agreement; and contractual claims, but not under a Financial Contract, which the Company determines it is not in the interests of the Company's unsecured creditors to resolve via the Agreement.

In particular, the Signatory does not compromise its ownership rights, if any, to Securities which are not Segregated Assets because the Company rehypothecated them, but which remain identifiable within the accounts of the Company that record or hold the Company's own Securities because the Company did not complete a transfer or other disposal of those Securities.

## 10.4    Further releases and waivers by Signatories

Under the Agreement, each Signatory also waives and releases (amongst other things):

**10.4.1**  all ownership claims it may have in respect of any Pre-Agreement Provisionally Returned Assets and Pre-Agreement Returned Assets, and all claims in respect of such Assets against any person to whom these have already been returned by the Company. The Company does, however, retain the right to request the return of Pre-Agreement Provisionally Returned Assets under the Pre-Agreement Contract, in which case they will become Recovered Assets. See section 11 (*Pre-Agreement Asset Contracts*);

**10.4.2**  the members of the Creditors' Committee Group from any liability to any Signatory or the Company arising in connection with the preparation, negotiation and operation of the Agreement; and

**10.4.3**  the Administrators, the Advisers and their firms, members, agents, partners and employees from any liability that they may have to any Signatory arising in connection with the preparation, negotiation and operation of the Agreement.

The "**Creditors' Committee Group**" comprises the members of the Creditors' Committee, including any sub-committees thereof, and their investment managers and investment managers' affiliates, and each of their respective advisers, firms, members, agents, partners, officers, directors and employees, but at all times only in their respective capacities described in this definition, which ultimately derive from the role of the Creditors' Committee and, where the context requires, means them individually or collectively.

## 10.5    Application of the Agreement to prior agreements

The Agreement does not affect the terms of any bilateral agreements made between the Company and any Signatory prior to the Signatory's Accession Date, save as otherwise agreed between the Company and that Signatory. The Company has the right to vary or amend the terms of the Agreement as they apply to any such Signatory prior to entering into the Agreement for the sole purpose of rendering the application of this Agreement to such Signatory consistent with such other agreements.

## 11    Pre-Agreement Asset Contracts

The Company has entered into bilateral agreements (each a "**Pre-Agreement Asset Contract**") with certain persons ("**Pre-Agreement Provisionally Returned Asset Recipients**") pursuant to which: (i) each such person's Asset Claim was agreed; and (ii) Assets ("**Pre-Agreement Provisionally Returned Assets**") have been delivered by the Company to such person towards the satisfaction of such agreed Asset Claim. Such

bilateral agreements contain an obligation for the Pre-Agreement Provisionally Returned Asset Recipient to redeliver Securities, or assets equivalent to such Securities, to the Company if it is determined that too great an amount of Pre-Agreement Provisionally Returned Assets was delivered to such person.

By treating: (i) the previously agreed Asset Claim of the Pre-Agreement Provisionally Returned Asset Recipient as an "Asset Claim" for the purposes of the Agreement, and (ii) the Pre-Agreement Provisionally Returned Assets as "Distributable Trust Assets", the Company will be able to determine, on the basis of the Allocation determined under the Agreement, whether any Pre-Agreement Provisionally Returned Assets ought to be returned to the Company as Recovered Assets and, where the relevant Pre-Agreement Provisionally Returned Asset Recipient is also a Signatory, whether any additional Distributable Trust Assets should be Allocated to such Pre-Agreement Provisionally Returned Asset Recipient in respect of its agreed Asset Claim.

## 12    Claims released by the Company

### 12.1    Released Claims

**12.1.1**    Under the Agreement, the Company will waive and release the Claims against the Signatories in respect of all rights under any Financial Contracts.

**12.1.2**    Such claims do not include:

(i)      any claim that the Company may have against any person, other than the Signatories, to do with any Trust Assets, any other Assets, or any other contract;

(ii)     claims against the Signatories for breach of the Agreement; and

(iii)    any Antecedent Transaction Liabilities.

### 12.2    New Claims

The Company will have such released claims exchanged for the following:

**12.2.1**    the right to determine the Net Contractual Position, Allocations, Appropriations and Distributions of each Signatory on the basis set out in the Agreement;

**12.2.2**    the right to claim as a new obligation of the Signatory the Distribution Liabilities, as calculated under the Agreement, from the Signatory; and

**12.2.3**    the right to Appropriate such part of the Distributable Trust Assets as are Allocated to a Signatory in or towards the discharge of that Signatory's Distribution Liabilities to the Company, as provided for in the Agreement.

## 13    Stay of proceedings

The Agreement prevents Signatories from taking any action against the Company for the purpose of obtaining payment of any claim. If, notwithstanding the prohibition, a Signatory obtains any judgment, decision or award and takes any enforcement step after the Effective Date in respect of a claim, the Signatory will be treated as having received on account of its claim an advance Distribution under the Agreement equal to the amount or gross value of any money, property or advantage obtained by it at the expense of the Company as a result of such action.

## 14    Bar Date and Asset Claim

### 14.1    The Bar Date under the Agreement

Under the Agreement, Signatories will agree to submit their Asset Claims against the Company by 26 February 2010 or such other date as the Company notifies to Signatories under the Agreement. This date is referred to in the Agreement as the "**Bar Date**". If a Signatory fails to submit an Asset Claim before the Bar Date, the Company will determine such Signatory's entitlements to Trust Assets on the basis of information available to the Company at the time of such determination.

The Bar Date does not apply to NTA Signatories, nor does it apply to the claims of TA Signatories which are not Asset Claims. Signatories' close-out amounts in respect of each Financial Contract should be determined in accordance with the procedures set out in Part 7 of the Agreement.

After the Bar Date, any information received from Non-Signatories concerning claims they may assert which possibly affect Distributions will not affect the Distribution of any Trust Assets for which the Company has already given associated instructions for settlement. If such claims are received before this date, any preparations for Distribution may be suspended whilst the matter is investigated.

Eligible Offerees should note that neither the Bar Date in the Agreement nor any bar date set by the Court (described in section 14.2) (*Court application for a bar date*) will prevent a Non-Signatory from taking action against a Signatory to recover Trust Assets distributed to that Signatory before the Company had become aware of the Non-Signatory's proprietary claims. However, it is expected that a Non-Signatory would face considerable practical difficulties in establishing such a claim to Trust Assets in the hands of a Signatory.

### 14.2    Court application for a bar date

The Administrators intend to apply to the Court for directions that a bar date be set for the submission of all claims to beneficial ownership of Trust Assets, whether by Signatories or others. If the Court application in respect of this bar date is successful, a client will not be entitled to take any action for breach of trust against the Company in respect of Trust Assets distributed to other clients of the Company after the bar date based on the knowledge of the Company on the day of giving the settlement instructions for the Distribution in question.

If the Court sets a bar date as described above, it is likely that the same date will be used as the Bar Date in the Agreement and notified to Signatories in accordance with the Agreement.

### 14.3    Procedures for TA Signatories to provide information in relation to Asset Claims

Each TA Signatory may submit any information in relation to its Asset Claims by amending or confirming such information via the Portal on or before 5.00 p.m. (London time) on the Bar Date in accordance with the terms of the Agreement and where necessary provide any supplementary information, in order for the Company to determine its Asset Claims. TA Signatories should have received a User ID and Password for the Portal from the Company. Any TA Signatory who has not received a User ID and Password for the Portal should contract the Company as soon as possible after its Accession Date in order to submit its Asset Claims.

**14.4 Failure to submit Asset Claims**

If a Signatory does not submit any information in relation to its Asset Claims to the Company by 5.00 p.m. (London time) on the Bar Date, the Company will determine such Signatory's entitlements under the Agreement at any time after the Bar Date using its Relevant Information that is available to the Company at the time of such determination. This puts Signatories who do not provide such information on a timely basis at risk that the Company may distribute Trust Assets without regard to such Signatories' full Asset Claims.

**14.5 Withdrawal of Asset Claims**

At any time, a TA Signatory may withdraw its Asset Claims and any related information by giving a Notice to the Company.

## 15    Relevant Information and Incompletely Documented Agreements

**15.1 Relevant Information**

The Company will only be required to have regard to Relevant Information in determining matters under the Agreement.

Relevant Information is, at the time of the determination in question:

15.1.1    information capable of being ascertained by the Company from its Books and Records;

15.1.2    information made available to the Company by a TA Signatory in relation to its Asset Claims validly submitted in accordance with the terms of the Agreement;

15.1.3    any information made available by a Signatory or Non-Signatory to the Company before or after the Bar Date;

15.1.4    information contained in Notices received by the Company under the Agreement;

15.1.5    information made available to the Company by Intermediaries, Sub-Intermediaries and by the Company's affiliates;

15.1.6    information made available to the Company by any relevant exchanges; and

15.1.7    information which may be taken into account when determining any Close-Out Amount of any Financial Contract and any value of any Relevant Asset in accordance with the methodologies provided in the Agreement.

The Company may take into account: (i) any information which is not Relevant Information for the purpose of making determinations; or (ii) any information which comes into its possession after making such determinations, in respect of a Signatory pursuant to the Agreement.

**15.2 Incompletely Documented Agreements**

If the relevant terms of a contract cannot be ascertained solely from the Company's Books and Records (an "**Incompletely Documented Agreement**"), then the Company will use its reasonable endeavours to ascertain the terms of such Incompletely Documented Agreement, and, if that Signatory provides Relevant Information, the Company and the Signatory will use their reasonable endeavours to agree the terms which apply to such Incompletely Documented Agreement.

### 15.3    Standard Terms

If no, or no further, information is available and provided by the relevant Signatory or if the Company and the relevant Signatory are unable to agree on the terms and conditions that apply to an Incompletely Documented Agreement, then the terms and conditions of such Incompletely Documented Agreement will be determined by the Company, based on any information it then has in its possession, as supplemented by those terms and conditions which customarily applied at the relevant time to substantially similar contracts which the Company entered into with other comparable counterparties.

### 15.4    Incomplete or missing information

Each Signatory shall be solely responsible for the cost of providing any information to the Company, including any information in relation to its Asset Claims, which shall be submitted at the Signatory's risk. The Company will have no obligation, responsibility or liability for incomplete or missing information or any errors in information, including information relating to any Asset Claims.

If any information provided by a Signatory is ambiguous, unclear or insufficient, the Company may request by Notice that the relevant Signatory provides supplementary information, at the cost of such Signatory. In the absence of a satisfactory response to such a request within 20 Business Days of the Notice, the Company may disregard such unclear or ambiguous information or may, acting in a commercially reasonable manner, attribute a clarificatory meaning. Where the information provided by the Signatory is insufficient, the Company may use its Relevant Information.

## 16    Disclosure and confidentiality

Signatories waive, to the maximum extent permitted by law, any breach of confidentiality arising from the operation of the Agreement and authorise the Company to disclose any information which the Company is required to disclose or which the Company considers to be necessary or desirable to enable the Agreement to be administered effectively or for the purposes of any disclosures required by law, any court or the rules of any regulatory body.

Where the Company discloses any Relevant Information to any other person, the Company shall have all references to the identity of a Signatory deleted unless the Company determines that references to the identify of a Signatory are necessary to assist the purpose of disclosure. The Company will be free to disclose information: (i) to CAPCO; or (ii) to a Signatory against whom proceedings in court have been brought in order to ascertain whether the person bringing such proceedings is also a Signatory.

## 17    Reversal of entries for Failed Trades

Transactions for the purchase, sale or delivery of Securities which have not in fact settled ("**Failed Trades**") may be represented in the Books and Records of the Company as having settled. To address this, any such incorrect entry will be reversed, unless it is related to a Connected Trade, in which case it will be replaced with a new entry in the Company's Books and Records to reflect the status of such Connected Trade without regard to the Failed Trade.

## 18    Representations, Warranties and Undertakings by the Signatories

The representations and/or warranties by a Signatory:

(i)     upon the relevant Accession Date;

(ii)    upon provision/submission of information (including by the Portal); and

(iii)   on each Delivery Instruction Date,

are set out in Part 14 (*Representations and Warranties, and certain Undertakings by a Signatory*) of the Agreement. Part 14 of the Agreement also sets out the Undertakings provided by each Signatory in relation to Intermediary Distributions, as well the claims by the Company in respect of any breach of Warranty or Undertaking by a Signatory.

## 19    Management of Assets prior to Distribution

### 19.1   Corporate Actions

The Company will deal with discretionary events occurring in relation to Securities which are Trust Assets (each, a "**Corporate Action**"). Corporate Actions include a subscription rights issue, a tender offer, a security split, a bonus issue, an exercise of voting rights, an exercise of conversion rights, a merger, an election in relation to dividends and any other analogous or similar action.

If a Corporate Action arises in respect of Trust Assets and the matter is either: (i) where no Instructions have been received and the relevant Corporate Action is (a) the grant of tradable subscription rights to holders of the Relevant Securities, then, if not otherwise automatically sold in the relevant market, such rights will be sold; or (b) the grant of bonus rights to holders of the Relevant Securities which require no payment to be made, then such rights will be taken up; or (ii) where a TA Signatory has notified the Company in writing of an instruction regarding a Corporate Action, then the Company will attempt to identify the relevant Security, the nature of the Corporate Action, the amounts of the relevant Security held, the identity of TA Signatories and TA Non-Signatories to which such holdings appear to be attributable and the amounts of the Relevant Security attributable thereto.

Where paragraph (ii) above is applicable, the Company will not take any action in relation to a Corporate Action unless:

**19.1.1**   the Company has received clear and unambiguous instructions from a TA Signatory in relation to such action ("**Instructions**");

**19.1.2**   the relevant TA Signatory has agreed to pay a fee (the "**Fee**") to the Company;

**19.1.3**   the Company considers that there are reasonable grounds to believe that such TA Signatory may be Allocated the relevant amount of the Securities (the "**Relevant Securities**"). Any view as to this matter is without prejudice to any final determination under the Agreement as to whether the Relevant Securities are ultimately Allocated to the relevant TA Signatory;

**19.1.4**   the Company has been indemnified to its satisfaction against any loss, cost, claim, action, demand or expense which may be incurred or made against it in connection with such action; and

**19.1.5**   the Company has determined that it is reasonably practicable for the Company to effect the Instructions in the time available.

The Fee referred to above will be US$3,000 (plus any applicable VAT). The Company reserves the right to increase the Fee if its costs relating to the Instructions will be materially higher than US$3,000.

The Company will not be required to take any action regarding Trust Assets in respect of Corporate Actions to the extent that it requires a payment to be made by the Company. The Company will be under no obligation to take any steps with regard to any Corporate Action save as provided in section 20 (*Undertakings by the Company with regard to Trust Assets*).

### 19.2    Indemnity given by Signatory

Under the Agreement, the relevant TA Signatory will be required to:

19.2.1    indemnify the Company and all of the Company Released Parties from and against any liabilities which it may incur as a result of attempting to effect the Instruction, and waive any right of action it may have against the Company Released Parties as a result of attempting to effect the Instruction;

19.2.2    acknowledge and agree, amongst other things, that the Company will be entitled to deal with any proceeds realised as a result of carrying out the Instructions (the "**Realisation**") as the Company sees fit, that by carrying out the Instructions the Company does not accept that the relevant TA Signatory has any entitlement to the Realisation or the Securities, that the Fee will be payable without set-off, deduction, counterclaim or the exercise of any liens and that the Company Released Parties will not be responsible for any failure on the part of any person to comply with any instruction the Company may give to it contemplated in the Instructions; and

19.2.3    if the Securities are held through a custodian or depository over which the Company has no or restricted access, it may not be possible to effect the Instruction or to ascertain if the Instruction has been effected.

### 19.3    Corporate Events, Derived Assets and Failed Trades

A Corporate Event includes a payment of a dividend, coupon, redemption amount, exchange or analogous event. If a Corporate Action or a Corporate Event occurs, then, to the extent that any Derived Assets are actually received by the Company as a result, such Derived Assets will (unless the Court otherwise orders) be accounted for as part of the Trust Assets from which they are derived.

If any Failed Trades are outstanding in relation to the relevant Trust Assets, no action will be taken in respect of any Corporate Action unless each party to such Failed Trade gives its written consent to the proposed Corporate Action and waives any right of action against the Company and the Company Released Parties arising out of, in connection with or as a result of the carrying out of the Instructions.

## 20    Undertakings by the Company with regard to Trust Assets

### 20.1    The Company will act as fiduciary in respect of Trust Assets and, consistent with that standard of care, will not:

20.1.1    take, or (to the extent that, in its capacity as fiduciary, it has power to control) permit another person to take, any action which would result in any Distributable Trust Assets ceasing to be Distributable Trust Assets; or

**20.1.2** omit to take, or (to the extent that, in its capacity as fiduciary, it has power to control) permit another person to omit to take, any action, the omission of which would result in Distributable Trust Assets ceasing to be Distributable Trust Assets.

**20.2** Save as otherwise provided under the Agreement, nothing under the Agreement will impose on the Company any more extensive obligations than its obligations prior to 15 September 2008 (the "**Administration Date**"). In any case, the Company will not be required to take any step that would result in expense or liability to the Company for which it considers it will not be indemnified.

**20.3** The Company, to the extent that it is able to do so in its capacity as trustee, will use all reasonable endeavours to gather in Trust Assets and to remove any impediment on Assets being Distributable Trust Assets. The Company will not be required to transfer any asset to which it is absolutely entitled nor to expend any amount on discharging any liability unless and to the extent that it will be indemnified for the expense of so doing or where the net value of its assets will not be decreased as a result.

**20.4** From the Effective Date, the Company will not Appropriate for itself any Trust Assets save in accordance with, and to the extent of, its rights to Appropriate Assets or as otherwise permitted by the Agreement.

## 21   Asset Valuation Methodology

**21.1** The value of any Security or the obligation to deliver Securities as at the relevant valuation date will be an amount in US dollars determined by the Company using a specified valuation methodology (the "**Asset Valuation Methodology**"). The value will be:

**21.1.1** if the Company has sold Securities of that type on that date, the proceeds of sale; or

**21.1.2** otherwise: (i) the mid-market price for that Asset that is reported by a recognised pricing source; (ii) failing which, the arithmetic mean of the bid and offer prices that are published on a recognised pricing source; (iii) failing which, the mid-point between firm bid and offer quotations; or (iv) failing which, the mid-point between indicative bid and offer quotations or, if one or more bid prices and offer prices are both provided, the arithmetic mean of the bid prices and the offer prices; or

**21.1.3** otherwise, the fair market value (which will be based on mid-market pricing and may be zero) for the Asset, as determined by the Company. The Company may take into account any Relevant Information, including, without limitation, one or more of the following types of information:

(i) any bid or offer prices, customary bid-offer spreads and any historical trading prices in respect of Assets which are comparable as published by any exchange or quotation system or other generally recognised price source;

(ii) market data in respect of the relevant market supplied by one or more third parties or derived from internal sources, including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads and correlations; and

> (iii)   the results of the operation of any models or other pricing methodologies, including manual or automated calculations performed by the Company or the proprietary pricing models of, or information supplied by, one or more third parties, selected by the Company,

provided that, in all cases:

(a)   the Company has no obligation to solicit or obtain a specific number of quotations, values or prices and may seek any number of quotations, values or prices that it considers appropriate;

(b)   the Company may discard quotations, values or prices that it has obtained where it determines this to be appropriate in the circumstances, in particular, where the Company believes that the discarded quotations, values or prices would have a distorting effect on any arithmetic mean;

(c)   the time as at which quotations are to be obtained will be selected by the Company;

(d)   if only bid quotations, values or prices or only offer quotations, values or prices are made available, then the Company may determine the Mid-Market Value by reference to the historical or customary bid-offer spreads for the Asset or comparable Assets; and

(e)   in any event, if the Company determines that the value that would otherwise have been determined (based on sale price or by reference to a reported price or mid-market prices based on quotes) does not represent the fair market value of the Asset, then the Company may determine the value based on paragraph 21.1.3 above.

**21.2**   The Company may adjust any quotation, value or price to reflect the fact that the amount of the Asset being valued is unusually large or small for such Asset in the relevant market or where different quotations have been received in smaller amounts to produce an aggregate equivalent to the amount of the Relevant Asset. The Company's determinations, valuations and calculations of value will be performed in a commercially reasonable manner.

## 22   A Signatory's contractual position

The Agreement compromises all claims relating to Financial Contracts between the Company and the Signatories. In order to do this, the Agreement provides a regime for ascertaining claims other than Asset Claims. The key concepts are Financial Contract, Open Contract, Close-Out Amount and Net Contractual Position. A series of diagrams representing these concepts is set out at Appendix 2.

### 22.1   Financial Contracts

A Financial Contract is a contract between the Company and a Signatory entered into before the Administration Date relating to transactions or positions of a financial nature (and which is not a purely administrative or non-financial services contract), including contracts for the delivery and/or custody of Assets. It includes Master Agreements.

### 22.2    Open Contracts and automatic termination

With respect to each Signatory, any Financial Contract which has not been terminated before its Accession Date will be automatically terminated on the last Business Day of the month in which the Accession Date in respect of such Signatory falls (the "**Open Contract Termination Date**"). Following an Accession Date, any voluntary early termination right will be ineffective. Automatic termination will not prejudice any pre-existing ownership rights or claims. A diagram representing this concept is set out at Appendix 1.

### 22.3    Close-Out Amount

The Close-Out Amount is the amount payable by either the Company or the relevant Signatory to the other as a result of termination of a Financial Contract. The Close-Out Amount will be expressed in US dollars. If the Financial Contract provides for some other currency, the amount will be converted to US dollars using the exchange rate as at the close of business on the Administration Date. Close-Out Amounts will be determined in accordance with the applicable Financial Contract Valuation Methodology, in each case incorporating certain Overriding Valuation Provisions.

### 22.4    Financial Contract Valuation Methodologies

The Financial Contract Valuation Methodology will be:

22.4.1    first, in accordance with the methodology for calculating termination payments provided for in the Financial Contract (the "**Contractual Valuation Methodology**");

22.4.2    secondly, in certain circumstances as agreed between the Company and the Signatory (the "**Agreed Valuation Methodology**"); and

22.4.3    thirdly, if neither the Contractual Valuation Methodology nor the Agreed Valuation Methodology is applicable, then a fallback methodology (the "**Fallback Valuation Methodology**").

### 22.5    Determining Party

The determination of the Close-Out Amount will be made by the person described under the Agreement as the Determining Party. In the case where the Contractual Valuation Methodology is used, the Determining Party will generally be the party entitled or required under the relevant provisions of the Financial Contract to determine the Close-Out Amount. In the case where the Agreed Valuation Methodology or the Fallback Valuation Methodology is used, the Company will be the Determining Party. A diagram representing the valuation methodologies and the rules for deciding who should act as the Determining Party is set out in Appendix 2.

### 22.6    Contractual Valuation Methodology

The Contractual Valuation Methodology follows the valuation provisions of the relevant Financial Contract as modified by the Overriding Valuation Provisions. Where the Determining Party is the Signatory, the determination of the Close-Out Amount must be evidenced by a statement (the "**Valuation Statement**") showing the calculation in reasonable detail.

**22.7  Agreed Valuation Methodology**

The Agreed Valuation Methodology applies where the Company is the Determining Party under the Contractual Valuation Provisions and it is not reasonably practicable to use the Contractual Valuation Provisions. In this case, a methodology will be agreed between the Company and the Signatory.

**22.8  Fallback Valuation Methodology**

22.8.1  The Fallback Valuation Methodology will apply if:

(i)     a Financial Contract does not contain any Contractual Valuation Provisions;

(ii)    the relevant terms of a Financial Contract cannot be ascertained;

(iii)   the relevant Contractual Valuation Provision is unclear or ambiguous or incapable of strict compliance due to a technicality, and the parties are unable to agree to the required modifications to such Contractual Valuation Provision; or

(iv)    the Agreed Valuation Methodology applies but the parties are unable to agree an Agreed Valuation Methodology.

22.8.2  The Fallback Valuation Methodology is based upon:

(i)     the Mid-Market Value; plus

(ii)    the Unpaid Amounts owing to the Signatory; less

(iii)   the Unpaid Amounts owing to the Company.

22.8.3  Mid-Market Value is the arithmetic mean of (which may be a zero value):

(i)     an amount, if any, that would be paid by or to the Company in consideration for the entry into of a transaction similar to the Financial Contract; and

(ii)    an amount, if any, that would be paid by or to the Signatory for the entry into such a similar transaction,

provided that, for the purpose of determining the Mid-Market Value, both the Company and the Signatory will be assumed to have a prime credit quality.

22.8.4  Unpaid Amounts owing to any party mean the aggregate of:

(i)     any amounts that became payable (or that would have become payable but for any Flawed Asset Provision) to such party under the terms of the Financial Contract and which remain unpaid; and

(ii)    for each obligation which was (or would have been but for any Flawed Asset Provision) required to be settled by delivery of assets (the "**Unpaid Amount Deliverables**") to such party and which has not been so settled, an amount equal to the value of such Unpaid Amount Deliverables.

**22.9  Overriding Valuation Provisions**

22.9.1  The Overriding Valuation Provisions are:

(i)     any Asset Claim which is the subject of a Financial Contract will be disregarded in the valuation of the Close-Out Amount. This is to avoid the same claim being counted twice;

(ii)     for any contract automatically terminated under the Agreement, the Close-Out Amount (except to the extent that it relates to Short Positions and Rehypothecated Securities) will be determined as at the Open Contract Termination Date. A Short Position is an obligation of the Signatory to deliver equivalent Securities (or pay an amount equal to their value) to the Company arising in connection with a Short Sale. A Short Sale is a transaction which involves a sale or other transfer for value of Securities by a Signatory where the Signatory is required to borrow such Securities from the Company at the time of sale or transfer, and in connection with which the Signatory assumes an obligation to deliver equivalent Securities (or to pay an amount equal to their value) to the Company at a future date;

(iii)     the value of:

(a)     any Security which is the subject of a Short Position; and

(b)     any Rehypothecated Security,

will generally be the market closing price on the last Business Day immediately before the Time of Administration. Any other obligation which arises after the Time of Administration will be disregarded from this calculation;

(iv)     any term of a Financial Contract which provides that an obligation of a party is subject to a condition precedent that an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event has not occurred and/or is not continuing with respect to the other party will be disregarded in the calculation of the Close-Out Amount;

(v)     any term of a Financial Contract which:

(a)     provides that an amount which, but for such term, would be payable by one party to the other party as a result of termination of such Financial Contract, would not be payable to such other party as a result of an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event having occurred with respect to such other party; or

(b)     provides that only the party which is not subject to an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event is entitled to receive a payment following the termination of such Financial Contract,

will be disregarded in the calculation of the Close-Out Amount;

(vi)     any Pre-Administration Client Money Claim will be disregarded in the valuation of any Close-Out Amount;

(vii)     no interest will accrue on any unpaid liability of the Company from the Administration Date, save to the extent that such interest would accrue under Rule 2.88 of the Insolvency Rules;

(viii)     no account will be taken of any obligations owing to or from third parties in the valuation of any Close-Out Amount; and

(ix)    no account will be taken of any amounts which might be, or in due course become, due from a Signatory to the Company under Sections 238 to 245 of the Insolvency Act (adjustment of prior transactions), Sections 423 to 425 of the Insolvency Act (provisions against debt avoidance) or Sections 213 to 215 of the Insolvency Act (fraudulent or wrongful trading), or as a result of any misfeasance, breach of duty or breach of contract owed by the Signatory to the Company ("**Antecedent Transaction Liabilities**").

The Company may disregard any of the Overriding Valuation Provisions in its absolute discretion provided that this does not prejudice a Signatory's Net Contractual Position.

## 22.10  Net Contractual Position

The Net Contractual Position is the sum of all the Close-Out Amounts as between the Company and a Signatory. This may be a net sum due from the Signatory to the Company (which amount shall bear interest as described in section 22.11 (*Interest*) below, together a "**Net Financial Liability**") or a net sum due from the Company to the Signatory (a "**Net Financial Claim**", on which amount interest is not payable).

The Net Contractual Position will be determined finally under the Agreement. A Signatory may challenge the determination under the dispute resolution mechanism (the "**Dispute Resolution Mechanism**") provided for under the Agreement and described more fully in section 31 (*Dispute Resolution Mechanism*).

The determination of the Net Contractual Position by the Company in respect of a Signatory will be evidenced by a statement (the "**Net Contractual Position Statement**") showing the calculation in reasonable detail.

## 22.11  Interest

Interest will accrue on the outstanding Gross Uncollateralised Liability on a daily basis at the Applicable Rate from the Administration Date. The "**Gross Uncollateralised Liability**" of a Signatory is the amount by which a Signatory's Net Financial Liability exceeds: (i) the value of any Deferral Cash Amounts (if it has made an Appropriation Deferral Election); (ii) the greatest value of a Signatory's shortfall on Pre-Administration Client Money that is admitted from time to time (if it has made a Client Money Collateralisation Election); and (iii) the value of any Affected Intermediary Admitted Claim Amount (if it has made an Affected Intermediary Collateralisation Election).

The Applicable Rate means a simple rate of interest equal to the lesser of: (i) USD-LIBOR plus 1 per cent.; and (ii) the highest rate of interest applicable to any sum due from that Signatory to the Company in any Financial Contract. No interest will accrue on any Net Financial Claim, save to the extent provided in Rule 2.88 of the Insolvency Rules.

The amount of interest to be attributed to a Net Financial Liability will be determined on a Distribution Value Date as the amount of interest specified above which has accrued over the period since the previous Distribution Value Date or, if the first Distribution Value Date, since the Administration Date. If the Gross Uncollateralised Liability has changed since that time, then a balancing adjustment shall be made to recognise that a reduction was made for a greater amount of interest than is now the case. To the extent this implies a negative interest value, the Net Financial Liability shall be reduced accordingly. Interest on the Net Financial Liability is calculated as a simple (not compounded) amount. When a Signatory

exercises its Collateralisation Election, the interest bearing portion of the Net Financial Liability shall first be attributed to the uncollateralised portion of the Net Financial Liability.

## 23   Allocations and shortfalls

**23.1**   Allocation is the process by which the Company identifies Distributable Trust Assets and records the entitlements of TA Signatories to those Assets in its Books and Records.

**23.2**   A series of diagrams representing the concepts described below is set out at Appendix 3.

### 23.3   Allocation on a Stock Line-by-Stock Line basis

The Company will determine the Allocation of Distributable Trust Assets following the Bar Date on a Stock Line-by-Stock Line basis. Stock Lines shall be chosen by the Company in its absolute discretion in such order as it sees fit.

### 23.4   Stock Lines

A "**Stock Line**" refers to a group of fungible Securities often identified by a unique ISIN or CUSIP number and it also includes all the Derived Assets of such fungible Securities. However, if a group of fungible Securities are held through more than one Intermediary and at least one of them is an Affected Intermediary (see section 23.5 (*Affected Intermediaries and Affected Stock Lines*)), the Securities that are held through each such Affected Intermediary shall form a separate Stock Line.

### 23.5   Affected Intermediaries and Affected Stock Lines

An "**Affected Intermediary**" is an Intermediary that returns Trust Assets of more than one Stock Line to the Company on the basis that any shortfall on each of those Stock Lines (an "**Affected Stock Line**") would be shared amongst every claimant to all of the Affected Stock Lines. If any shortfall is to be shared amongst the claimants in proportion to the aggregate of their respective Asset Claims to all of the Affected Stock Lines, such an Affected Intermediary is an "**Asset Claim Intermediary**". If any shortfall is to be shared amongst the claimants in proportion to any other of their Claims against the Affected Intermediary as determined by such Affected Intermediary, then such an Affected Intermediary is a "**Net Equity Intermediary**".

LBI is an Affected Intermediary. See section 24 (*Allocation of Assets held through LBI*) for further information.

### 23.6   Identification of Distributable Trust Assets

The Trust Assets which can be distributed under the Agreement ("**Distributable Trust Assets**") must be identifiable, within the control of the Company and not subject to any order or restriction affecting dealings in it. The quantity of Distributable Trust Assets may increase over the duration of the Agreement if further Trust Assets come under the Company's control during the term of the Agreement.

Pre-Agreement Provisionally Returned Assets which are subject to claw-back under the terms of the relevant bilateral agreements between the Company and the Pre-Agreement Provisionally Returned Asset Recipients are also treated as Distributable Trust Assets for the purposes set out in section 5.1 (*Components of Trust Assets*).

### 23.7    Individual Claim Amount

Except for Trust Assets held by a Net Equity Intermediary (see section 23.8 (*Net Equity Amount*)), a Signatory's entitlement to an Allocation and the amount of Distributable Trust Assets to be Allocated to it will be based on its Asset Claim. The amount of Assets in a Stock Line which are the subject of an Asset Claim of any person (whether such person is a Signatory or a Non-Signatory) is that person's "**Individual Claim Amount**". This will be determined by the Company based on the Relevant Information. The concept of Relevant Information is discussed more fully in section 15 (*Relevant Information and Incompletely Documented Agreements*).

### 23.8    Net Equity Amount

A Signatory's entitlement to an Allocation and the amount of Distributable Trust Assets to be Allocated to it with respect to Trust Assets held through a Net Equity Intermediary will be based on its Net Equity Amount. The "**Net Equity Amount**" is determined by the Company, using information received from the Net Equity Intermediary, as the amount of Claim which the Net Equity Intermediary recognises or acknowledges in quantifying the Asset Claim of each TA Claimant to the Trust Assets held by the Net Equity Intermediary. A "**TA Claimant**" is someone with a claim to Trust Assets, whether or not they are a Signatory.

The Company will use reasonable endeavours to pass onto a Signatory such information received from a Net Equity Intermediary which the Company uses in determining that Signatory's Net Equity Amount. If a Signatory wishes to challenge the Net Equity Intermediary on the accuracy of such information, the Company will, subject to certain requirements being met (including receiving a satisfactory indemnity from the Signatory on costs and other liabilities), use reasonable endeavours to help the Signatory engage the Net Equity Intermediary in order to resolve their differences directly.

### 23.9    TA Claimant Amount

The "**TA Claimant Amount**" of a TA Claimant means its Individual Claim Amount or (where a Net Equity Intermediary is involved) its Net Equity Amount. A Signatory may challenge the Company's determination of its TA Claimant Amount through the Dispute Resolution Mechanism provided that it submits to the Company the amount which it alleges to be the correct TA Claimant Amount (the "**Alleged TA Claimant Amount**").

### 23.10    Reallocation following the receipt of new Relevant Information

If the Company receives or otherwise becomes aware of any new Relevant Information on any day that relates to an Asset Claim in respect of a Stock Line or an Asset Pool (as applicable) after any determination in relation to Allocation has been made by the Company in respect of such Stock Line or Asset Pool and the Company believes that the new Relevant Information would have resulted in a different determination of Allocation had it been available at the time, then the Company will take into account such new Relevant Information and will re-determine the Allocation in respect of such Stock Line or Asset Pool again. However, when the Company re-determines the Allocation, it will not take into account as Distributable Trust Assets any Assets for which instructions for settlement in respect of their Appropriation or Distribution have already been given.

### 23.11    Identification of Stock Lines with potential shortfall

For each Stock Line other than an Affected Stock Line, the Company will commence the Allocation process by first determining whether there is a potential shortfall for such Stock

Line. This is determined by comparing the amount of all the Distributable Trust Assets that have been Identified by the Company for that Stock Line against the total Individual Claim Amounts of all persons with an Asset Claim to that Stock Line.

**23.12  Allocation for Stock Line without potential shortfall**

If the Company determines that a Stock Line (other than an Affected Stock Line) does not have a potential shortfall, each Signatory who has an Asset Claim to that Stock Line will be Allocated an amount of Distributable Trust Assets by the Company equal to its Individual Claim Amount for that Stock Line.

**23.13  Four types of Asset Pools**

A diagram representing the concepts described below is set out at Appendix 2.

If the Company determines that a Stock Line: (i) has a potential shortfall; or (ii) is an Affected Stock Line, the Company shall divide the Distributable Trust Assets in respect of that Stock Line into the relevant asset pool(s) and determine the TA Claimant Amounts in respect of each Asset Pool based on the Relevant Information.

**23.13.1**  Each Stock Line that is not held by an Affected Intermediary but has a potential shortfall, will be divided into one of two pools:

(i)  a "**Custody Securities Pool**" for Custody Securities and their Derived Assets; and

(ii)  a "**Non-Custody Securities Pool**" for Non-Custody Securities and their Derived Assets.

"**Custody Securities**" are those Securities which are Trust Assets credited to a custody account in the Books and Records of the Company and its Intermediary and which are capable of being the subject of a Custody Asset Claim. "**Non-Custody Securities**" are all other Securities which are Trust Assets. Securities credited to custody accounts generally relate to those Securities delivered to the Company by its clients under a specific custody arrangement.

**23.13.2**  All Affected Stock Lines held by the same Affected Intermediary will either fall into:

(i)  one of a group of Single Customer Pools; or

(ii)  a single Multiple Stock Line Pool,

each as further described in section 23.14 (*Single Customer Pool and Multiple Stock Line Pool*).

Under the Agreement, the Company will Allocate the Assets in each Asset Pool independently of any Allocation of Assets in respect of another Asset Pool, including where such Assets of such other Asset Pool are of the same Stock Line.

**23.14  Single Customer Pool and Multiple Stock Line Pool**

If the Company determines that an Affected Intermediary will identify to the Company all the TA Claimants who own all the Assets that it returns to the Company, then all Distributable Trust Assets of a specific TA Claimant (a "**Single Customer**") will fall into one pool (a "**Single Customer Pool**") for that Single Customer. Otherwise, all of the Distributable Trust Assets returned, or to be returned, from that Affected Intermediary shall

fall into a single pool (a "**Multiple Stock Line Pool**") for all of the TA Claimants with respect to that Affected Intermediary.

The Company will determine, before any Allocation is made in respect of any Distributable Trust Assets from an Affected Intermediary, whether all the Distributable Trust Assets from that Affected Intermediary will fall into: (i) a number of Single Customer Pools; or (ii) one Multiple Stock Line Pool.

### 23.15  Realisation of Assets

The Company will endeavour to liquidate all Distributable Trust Assets of a Multiple Stock Line Pool in a commercially reasonable manner within six months following the return of such Distributable Trust Assets.

### 23.16  Custody Securities Pool, Non-Custody Securities Pool and Multiple Stock Line Pool – Reservation of Assets for TA Non-Signatories

Before any Allocation is made in respect of: (i) a Custody Securities Pool or a Non-Custody Securities Pool where there is a potential shortfall; or (ii) a Multiple Stock Line Pool, the Company will first notionally set aside an amount of Distributable Trust Assets from the relevant Asset Pool, by designating them as "**Reserved Assets**", equal to the TA Claimant Amounts of all the TA Non-Signatories making Asset Claims in respect of the relevant Stock Line(s). Reserved Assets will not form part of the Distributable Trust Assets that can be Allocated under the Agreement.

Reserved Assets in respect of a TA Non-Signatory's Asset Claim will cease to be Reserved Assets if, and to the extent that, they are in excess of the amount of Distributable Trust Assets which would be required to satisfy such TA Non-Signatory's Asset Claim.

If a TA Non-Signatory enters into the Agreement after Reserved Assets have been designated in respect of an Asset Claim, then all of the Distributable Trust Assets which have been designated as Reserved Assets in respect of its Asset Claim will cease to be Reserved Assets.

### 23.17  Allocation in respect of Custody Securities Pool, Non-Custody Securities Pool or Multiple Stock Line Pool

Distributable Trust Assets that are not Reserved Assets are Allocated to each TA Signatory in proportion to its TA Claimant Amount in respect of the relevant Asset Pool. Accordingly, the amount of shortfall is also shared amongst the relevant TA Signatories in proportion to their relevant TA Claimant Amounts.

The Allocation provisions in the Agreement also provide for various adjustments to be made upon the occurrence of certain events, for example, upon:

(i)  the resolution of a dispute by a TA Signatory over its TA Claimant Amount;

(ii)  further Distributable Trust Assets being Identified by the Company;

(iii)  Distributable Trust Assets ceasing to be designated as Reserved Assets; and

(iv)  the Company becoming aware that a particular TA Signatory has received a direct Distribution of Trust Assets from an Intermediary or has obtained Distributable Trust Assets from the Company in breach of the moratorium under the Agreement (see section 23.19 (*Intermediary Distribution and Recoverable Delivery Value*) for further detail).

These adjustments allow Allocations to be made pending resolution of all disputes or further Identification of Distributable Trust Assets. They also seek to ensure that Distributable Trust Assets are Allocated to TA Signatories in proportion to their respective Asset Claim to the relevant Asset Pool that is known to the Company and remains outstanding at such time.

No Signatory can receive an Allocation of Assets in respect of an Asset Pool greater than its Asset Claim.

### 23.18   Allocation in respect of Single Customer Pool

The Company will Allocate all the Distributable Trust Assets in a Single Customer Pool to the Single Customer.

However, if the Company determines at any time that it can no longer Identify the Distributable Trust Assets that relate to a Single Customer, then all Allocations with respect to the related Affected Intermediary will cease, unless:

(i)      the Court so requires or permits (for a particular Allocation);

(ii)     the Company and all the Single Customers of that Affected Intermediary agree; or

(iii)    the Agreement is modified to provide for an alternative method of Allocation.

### 23.19   Intermediary Distribution and Recoverable Delivery Value

Where a Signatory receives any Assets or value in respect of an Asset Claim to Trust Assets in a Custody Securities Pool, a Non-Custody Securities Pool or a Multiple Stock Line Pool, not from the Company but directly from an Intermediary or its Sub-Intermediary (an "**Intermediary Distribution**"), then it will be required to notify the Company and the Company will take this into account for the purpose of reducing such Signatory's subsequent Allocation of the relevant Asset Pool, unless the relevant Intermediary is a Net Equity Intermediary and the relevant Intermediary Distribution has already been taken into account in the relevant Net Equity Amount. An Intermediary Distribution will be valued as at the date the benefit of it is received by the Signatory.

Where a Signatory has made a successful claim against the Distributable Trust Assets in a Custody Securities Pool, a Non-Custody Securities Pool or a Multiple Stock Line Pool in breach of the moratorium described in section 13 (*Stay of proceedings*), the Company will also take into account the value of any Distributable Trust Assets so delivered to such Signatory ("**Recoverable Delivery Value**") for the purpose of reducing such Signatory's subsequent Allocation of the relevant Asset Pool. The Distributable Trust Assets received by the Signatory in breach of the moratorium will be valued as at the date on which such Distributable Trust Assets are delivered by or on behalf of the Company.

The Intermediary Distribution Value (unless the relevant Intermediary is a Net Equity Intermediary and such Intermediary Distribution has already been taken into account in the relevant Net Equity Amount) and the Recoverable Delivery Value will also be deducted from the TA Signatory's Asset Shortfall Claims.

### 23.20   Shortfalls with respect to a Custody Securities Pool or a Non-Custody Securities Pool

If, at the time of the Last Allocation of a Custody Securities Pool or Non-Custody Securities Pool, the aggregate amount of the Allocations made to a Signatory is less than its

Individual Claim Amount to that Asset Pool, then that Signatory will have an Asset Shortfall Claim equal to the difference. The Asset Shortfall Claim is an unsecured claim against the Company.

The value of an Asset Shortfall Claim will be taken as at the date of the Last Allocation unless and to the extent that a Signatory's claim remains unsatisfied when all Distributions have been made to it, in which case it will be valued as at the close of business on the last Business Day before the Time of Administration. The Company's obligation in respect of Asset Shortfall Claims will, unless otherwise required by law or regulation, not exceed its obligations under the terms of the agreement or arrangement that gave rise to the relevant Asset Claim.

### 23.21  Shortfalls with respect to an Affected TA Signatory

An "**Affected TA Signatory**" is a TA Signatory who has an Asset Claim to Securities in an Affected Stock Line. Any Asset Shortfall Claim of an Affected TA Signatory will be determined with respect to all of its Asset Claims to Affected Stock Lines held through the same Affected Intermediary

The Asset Shortfall Claim of an Affected TA Signatory will be the lesser of:

(i)     the shortfall admitted by the Affected TA Signatory in respect of its liabilities owed to the Affected TA Signatory in connection with the TA's Signatory's Trust Assets that are held by it (after taking into account: (a) that the relevant Affected Intermediary may be permitted to discharge its liability to return Trust Assets by returning an amount of cash which is equal to the value of such Trust Assets as at a time later than the relevant Provisional Valuation Date; and/or (b) any rights of set-off available to such Affected Intermediary); and

(ii)    the shortfall as determined by the Company, being the value of the difference between the Affected TA Signatory's TA Claimant Amount and the value of the Allocations made to the Affected TA Signatory in respect of the related Asset Claims.

The Asset Shortfall Claim will be determined on the basis of the value of the relevant Securities as at the date on which the Affected Intermediary values the Assets in the Affected Stock Line in order to determine the proportional sharing of shortfall by all of the Affected TA Signatories.

### 24     Allocation of Assets held through LBI

A significant element of the Trust Assets was held through LBI. LBI itself is subject to insolvency proceedings under the US Securities Investor Protection Act ("**SIPA**"). Under SIPA, the Company understands that LBI will meet Customer Claims as defined in SIPA with Customer Property as defined in SIPA. If there is insufficient Customer Property to meet all Customer Claims, then LBI will apportion the available Customer Property pro rata to the Customer Claims. In effect, this means that all claims in respect of Trust Assets held by LBI will share equally in the total amount of Customer Property. Therefore, LBI is an Affected Intermediary and, more specifically, a Net Equity Intermediary.

If LBI provides the Company with sufficient information to enable the Company to Identify all the particular TA Claimants to which all Distributable Trust Assets should be returned, then all Assets held by LBI will fall into Single Customer Pools. Otherwise, all of the Assets held by LBI will fall into a Multiple Stock Line Pool.

The Company understands that LBI will value Customer Claims as at 19 September 2008 (the date that the proceeding under SIPA was commenced against LBI). Therefore, the value of any Asset Claim made in respect of any Affected Stock Line held by LBI for the purpose of determining the: (i) Allocation in respect of such Affected Stock Line; and (ii) the value of any Asset Shortfall Claim will be based on the value and quantities as at that date.

## 25    No Distribution of Distributable Trust Assets to TA Non-Signatories unless certain conditions are met

For Affected Stock Lines or other Stock Lines with a potential shortfall, the Company will not return any Distributable Trust Assets to a TA Non-Signatory unless:

**25.1.1**    the proposed application of Distributable Trust Assets has been agreed between the Company and all TA Claimants with respect to that Stock Line;

**25.1.2**    the Company is compelled by the Court to do so; or

**25.1.3**    the proposed application of Distributable Trust Assets is in accordance with the methodology prescribed in the Agreement (which is based on the concept that Allocation will be made to each TA Signatory and TA Non-Signatory pro rata to its TA Claimant Amounts in respect of the relevant Asset Pool) and such proposed application has been: (a) agreed between the Company and all TA Signatories having an Asset Claim to such Stock Line; or (b) permitted by the Court.

## 26    Distributions and Appropriations under the Agreement

This section focuses on the process of Distribution and Appropriation of Distributable Trust Assets of TA Signatories. This includes certain Collateralisation Elections which TA Signatories can make in order to potentially obtain full value for some or all the shortfall (if any) on their claims against the Company to redelivery of Trust Assets held by the Company or Affected Intermediaries and/or Pre-Administration Client Money. A series of diagrams representing the concepts outlined below is set out at Appendix 4.

NTA Signatories who owe a Net Financial Liability to the Company may also make a Collateralisation Election to potentially obtain full value for some of all the shortfall (if any) on their Pre-Administration Client Money. This is further set out in section 26.6 (*Client Money Collateralisation Election*).

### 26.1    Distribution process

Following an Allocation to a TA Signatory of Distributable Trust Assets and the determination of the Net Contractual Position of that TA Signatory, the process of determining a Distribution to that TA Signatory under the Agreement can begin, subject to the following conditions being satisfied:

**26.1.1**    the Company has ascertained if there is any Retention Claim in respect of that TA Signatory, such that the Company is required to account to a Retention Creditor in respect of liabilities secured on such Distributable Trust Assets. The process of dealing with Retention Claims is described more fully in section 26.13 (*Retention Claim and Retention Amount*);

**26.1.2**    that TA Signatory does not have certain unascertained or unquantified Non-Financial Contract Liabilities to the Company. Non-Financial Contract Liabilities are described more fully in section 26.12 (*Non-Financial Contract Liabilities*); and

**26.1.3**  the Allocation is not of a very small amount or value unless it is the final Allocation of a Stock Line.

Once these conditions are met, the Company shall in its absolute discretion choose to deliver Distributions on a Stock Line-by-Stock Line basis or on a TA Signatory-by-TA Signatory basis or on both bases in such order as the Company sees fit. This is to allow the Company to effect the Distributions in the most cost effective manner by combining the Distributions to TA Signatories and reducing any administrative costs.

## 26.2  Appropriation

The Company will be entitled to appropriate a TA Signatory's Distributable Trust Assets (as well as other amounts the Company owes that TA Signatory) to discharge any liabilities of that TA Signatory to the Company. This process is called Appropriation. Appropriation involves a full transfer of title of the relevant Securities to the Company or an absolute entitlement of the Company to retain money or any cash amounts. Any remaining Assets after the Appropriation process are then available for Distribution to that TA Signatory.

## 26.3  Distribution Assets and Distribution Liabilities

The assets available for Appropriation are called Distribution Assets, comprising the relevant Allocation together with a number of other assets or claims for which the Company may be accountable to the TA Signatory. The liabilities that can be reduced by Appropriation are called Distribution Liabilities, comprising that TA Signatory's Net Financial Liability (if any) together with any amount which the Company is required to withhold in respect of Retention Claims relating to such TA Signatory, such TA Signatory's liability for costs and any other Ascertained Non-Financial Contract Liabilities. The reduction of Distribution Liabilities has specific legal effects, namely that it discharges the obligation of the TA Signatory to pay or account to the Company for such amount of liability that has been reduced.

TA Signatories may also discharge their Distribution Liabilities by payment in cash to the Company at any time or by instructing the Company to apply its Collateral Amount in discharge of its Net Financial Liability (if it has made a Collateralisation Election). Distribution Liabilities may also be discharged by way of an Intermediary Retention.

## 26.4  Waterfall provisions

A TA Signatory may make certain elections, which could affect whether certain assets will be applied as Distribution Assets and whether certain liabilities will be applied as Distribution Liabilities in the waterfall provisions. These elections are described in section 26.5 (*Collateralisation Elections*). Appropriations and Distributions will be determined in accordance with the waterfall provision that applies to each of the following circumstances:

(i)      an Allocation to a TA Signatory with a Net Financial Claim;

(ii)     an interim Allocation to a TA Signatory with a Net Financial Liability;

(iii)    a Last Allocation of an Asset for a Stock Line to a TA Signatory with a Net Financial Liability;

(iv)    an Asset Allocation to a TA Signatory with a Net Financial Liability with a Collateralisation Election (other than an Affected Intermediary Collateralisation Election);

(v)      an Asset Allocation to an Affected TA Signatory with a Net Financial Liability with an Affected Intermediary Collateralisation Election;

(vi)     a Last Allocation of Pre-Administration Client Money to a TA Signatory with a Net Financial Liability (only if a Client Money Collateralisation Election is made);

(vii)    a final Distribution of Collateral Amount (only if a Client Money Collateralisation Election or an Appropriation Deferral Election is made); and

(viii)   an Appropriation of Shortfall For Appropriation (only if an Affected Intermediary Collateralisation Election is made).

Appendix 4 describes some of these waterfall provisions, including the applicable Distribution Assets to reduce or discharge applicable Distribution Liabilities, including the priority of application of Distribution Assets towards the reduction of Distribution Liabilities.

The Company will, as soon as reasonably practicable following the determination of a Distribution or Appropriation and in any case within five Business Days of the relevant Distribution Value Date, give a notice to the relevant TA Signatory (a "**Distribution and Appropriation Notice**"). A Distribution and Appropriation Notice will contain certain information, including a list of relevant Distribution Assets and Distribution Liabilities and their value as at the relevant Distribution Value Date, the amount and value of any Distribution Asset which the Company intends to Appropriate to reduce the Distribution Liabilities, the number or amount of any Distribution Asset which the Company intends to deliver as a Distribution to such TA Signatory (if any), whether any Collateralisation Election may be made (and the relevant Deferral Cash Amount and Deferral Cash Payment Date), the Deferral Election Deadline (if an Appropriation Deferral Election has not already been made) and the Delivery Instruction Date (if any Distribution falls due to be made to the TA Signatory).

**26.5**    **Collateralisation Elections**

There are three kinds of Collateralisation Election available to Signatories under the Agreement, depending on whether the Signatory is an NTA Signatory or a TA Signatory, and whether it has an Asset Claim to Stock Lines that are held by a Net Equity Intermediary, such as LBI.

By making such election(s), a Signatory will collateralise its Net Financial Liability owed to the Company with:

(i)       its claim to Pre-Administration Client Money (a "**Client Money Collateralisation Election**", see section 26.6 (*Client Money Collateralisation Election*);

(ii)      its Deferral Cash Amount (an "**Appropriation Deferral Election**", see section 26.7 (*Appropriation Deferral Election for a TA Signatory*)); and/or

(iii)     its Affected Intermediary Claim Amount (an "**Affected Intermediary Collateralisation Election**", see section 26.9 (*Affected Intermediary Collateralisation Election*)).

Any of the elections has the effect of collateralising an amount of the Net Financial Liability ("**Collateralised Net Financial Liability**") with the Signatory's Total Collateralisation Amount. The "**Total Collateralisation Amount**" comprises: (i) the Collateral Amount; (ii) the Collateral Claim Amount; and (iii) the Affected Intermediary Claim Amount of the Signatory.

The "**Collateral Amount**" is the total of all Distributions of Pre-Administration Client Money that have been made by the Company from time to time (but have been retained as collateral) as well as all Deferral Cash Amounts (applicable to TA Signatories only) paid to the Company. The "**Collateral Claim Amount**" is the amount of Pre-Administration Admitted Client Money Claim that remains unsatisfied from time to time. The "**Affected Intermediary Claim Amount**" is the amount admitted by the Company to be the value of the TA Signatory's claim against the relevant Net Equity Intermediary as reduced by the value of any Asset Allocation that has been Appropriated from time to time under the terms of the Affected Intermediary Collateralisation Election.

For the Client Money Collateralisation Election and the Appropriation Deferral Election, to the extent that an amount of Net Financial Liability owed to the Company is collateralised, the TA Signatory will effectively be able to suspend the set-off between such amount of the Net Financial Liability and any Assets Allocated to the TA Signatory (to the extent that those Assets do not relate to any Affected Intermediary Collateralisation Election). When the amount of: (a) any shortfall claim for a Pre-Administration Admitted Client Money Amount; or (b) any Asset Shortfall Claim is ascertained, such shortfall will first be set-off against the then remaining Net Financial Liability before the posted collateral is set-off against any remaining Net Financial Liability.

As a result, in exchange for posting the relevant collateral, a TA Signatory making the Client Money Collateralisation Election or the Appropriation Deferral Election will be able to:

(i)     obtain full value (by way of set-off) of any shortfall claim for its Pre-Administration Admitted Client Money Amount and/or its Asset Shortfall Claim to the extent that there is sufficient Net Financial Liability to set off against them as opposed to having an unsecured claim against the Company to the same amount; and

(ii)    reduce the amount of its Trust Assets appropriated by the Company.

The Affected Intermediary Collateralisation Election works differently to the other two kinds of Collateralisation Election and is described separately in section 26.9 (*Affected Intermediary Collateralisation Election*).

## 26.6    Client Money Collateralisation Election

A Signatory may elect to collateralise its Net Financial Liability with its Pre-Administration Client Money Claim that is admitted by the Company (a "**Pre-Administration Admitted Client Money Amount**"). The Pre-Administration Admitted Client Money Amount is subject to increase by an agreement between the Company and the Signatory or a judgment by a court of competent jurisdiction. When this election is made, Allocations of Assets cannot be Appropriated to reduce the Collateralised Net Financial Liability until such time as any shortfall claim for Pre-Administration Admitted Client Money Amount in respect of that TA Signatory is determined (Appropriations can still be made to discharge Uncollateralised Net Financial Liability). The Signatory will also not receive any Distributions of Pre-Administration Client Money in the interim, which collateralises part of the Net Financial Liability (but the Signatory may use this collateral to reduce its Net Financial Liability at any time and will receive any Collateral Allocations (see section 26.8)).

If no Client Money Collateralisation Election is made, any shortfall claim for a Pre-Administration Admitted Client Money Amount is dealt with outside the Agreement and

cannot be applied as a Distribution Asset in the Appropriation process; however, such shortfall claim will become an unsecured claim against the Company.

A Signatory making a Client Money Collateralisation Election is required to effect a transfer to AssignCo of all of its Pre-Administration Client Money Claims. The purpose of this is to enable the Company to realise the benefit of the Client Money Collateralisation Election in compliance with the FSA's client money rules.

### 26.7 Appropriation Deferral Election for a TA Signatory

A TA Signatory may elect to defer the Appropriation of Assets in respect of Allocations. This election gives the TA Signatory the benefit of receiving Distributions of Allocations without regard to its Net Financial Liability at that time (if and to the extent that such Allocations are not Appropriated to reduce the other Distribution Liabilities). This election can only be made on the first Allocation of a Stock Line. For the first Allocation and each subsequent Allocation of that Stock Line, the TA Signatory must deliver to the Company a cash amount ("**Deferral Cash Amount**") equal to the value of the Allocation (or, if less, its Net Financial Liabilities) which will increase the Collateral Amount. For further description on timing of an Appropriation Deferral Election, see Appendix 4.

### 26.8 Collateral Allocation

If the Total Collateralisation Amount exceeds the Net Financial Liability at any time, then an amount equal to the lesser of: (i) the surplus of Total Collateralisation Amount over the Net Financial Liability; and (ii) the Collateral Amount will be paid to the Signatory (a "**Collateral Allocation**"). The Collateral Amount and Total Collateralisation Amount will be correspondingly reduced. A Collateral Allocation is only applicable under a Client Money Collateralisation Election or an Appropriation Deferral Election.

### 26.9 Affected Intermediary Collateralisation Election

An Affected TA Signatory who has an Asset Claim to securities held by a Net Equity Intermediary, such as LBI, may elect to collateralise its Net Financial Liability initially with its Affected Intermediary Admitted Claim Amount before any Distribution or Appropriation has been made with respect to such Asset Claim; and subsequently with its Affected Intermediary Claim Amount. The "**Affected Intermediary Admitted Claim Amount**" is determined by the Company to be the lesser of: (i) the Affected TA Signatory's relevant Net Equity Amount; and (ii) its total Individual Claim Amounts in respect of the relevant Affected Stock Lines.

The Affected Intermediary Claim Amount will form part of the Total Collateralisation Amount. Any Asset Allocation which relates to the relevant Net Equity Intermediary will be Appropriated by the Company to Reduce the Collateralised Net Financial Liability (as well as other applicable Distribution Liabilities).

If the total value of all such Asset Allocation is less than the Affected Intermediary Admitted Claim Amount, then such deficit (the "**Shortfall For Appropriation**") will be Appropriated by the Company to reduce further any remaining Collateralised Net Financial Liability. Therefore, a TA Signatory will be able to obtain full value of such Shortfall For Appropriation to the extent that there is sufficient Collateralised Net Financial Liability to set off against it.

However, unlike an Asset Shortfall Claim, any remaining Shortfall For Appropriation after all the Collateralised Net Financial Liability has been Reduced will not become an Ascertained

Claim. Instead, a different amount determined by the Company (which may be zero) (the "**Ascertained Shortfall Amount**") will become as Ascertained Claim. The Ascertained Shortfall Amount is the amount of the TA Signatory's Asset Shortfall Claim in respect of the relevant Affected Stock Lines (see section 23.21 (*Shortfalls with respect to an Affected TA Signatory*)) over and above the amount of Collateralised Net Financial Liability which has been Reduced by the Shortfall For Appropriation. The effect of this is that the Company allows the TA Signatory, by setting off against Collateralised Net Financial Liability, to obtain full value of its recognised claim against an Affected Intermediary as at the value date for claims against the Net Equity Intermediary (19 September 2008 in the case of LBI) without having to wait to see what the value of any actual shortfall may be. However, for the purpose determining any residual shortfall that would become an unsecured claim against the Company, the Company will only take into account any lower amount of shortfall that is admitted by the relevant Net Equity Intermediary. This reflects the complexity and uncertainty around what amount a Net Equity Intermediary may ultimately acknowledge as a shortfall. The determination of Ascertained Shortfall Amount is further described in Appendix 4.

There are a few additional consequences in making an Affected Intermediary Collateralisation Election which an Affected TA Signatory should be aware of:

(i)     any Appropriation Deferral Election (whether made before or after the Affected Intermediary Collateralisation Election) will not apply to the Trust Assets of the relevant Affected Stock Lines;

(ii)    the TA Signatory will incur an additional liability (an "**Affected Intermediary Derived Asset Liability**") to the Company equal to an amount of Derived Assets relating to any Assets Allocated to such TA Signatory and such liability will be discharged by the Appropriation of the relevant Derived Assets (in effect, the TA Signatory will no longer receive the benefit of any Derived Assets from the relevant Affected Stock Lines); and

(iii)   as the Company has collateralised the Net Financial Liability equal to the TA Signatory's Claim in respect of the relevant Affected Stock Lines, the TA Signatory will be obliged to pay to the Company an amount equal to the value of any benefits which the TA Signatory received directly from the Net Equity Intermediary Claim in respect of the relevant Affected Stock Lines. Such payment will be applied by the Company to Reduce the applicable Distribution Liabilities as if it were an Asset Allocation.

### 26.10  Ascertained unsecured claims

Following all Appropriations and Distributions, to the extent that there is any excess Asset Shortfall Claim, Net Financial Claim or shortfall claim in Pre-Administration Client Money (whether or not a Client Money Collateralisation Election has been made) remaining or any Ascertained Shortfall Amounts, they will be Ascertained Claims, as described in section 10.1 (*Ascertained Claim*), of the relevant TA Signatory in the insolvency of the Company.

### 26.11  Set-off on winding-up or Distribution

In the winding-up or any Distribution in administration of the Company, which will take place outside the Agreement, the Company may, in accordance with applicable insolvency law, be entitled to set off against a Signatory's Ascertained Claims any amounts due from

that Signatory to the Company, thereby potentially reducing the value of that Signatory's Ascertained Claims.

## 26.12   Non-Financial Contract Liabilities

Non-Financial Contract Liabilities of a TA Signatory are all its outstanding Liabilities to the Company, whether arising under the Agreement or otherwise, but excluding its Net Financial Liability and its liability in respect of the Costs Amount and Unfunded Retention Amount. For the purposes of the Agreement, Non-Financial Contract Liabilities will be calculated in US dollars and, if they are not denominated in US dollars, the Company will convert such Non-Financial Contract Liabilities into US dollars using the rate of exchange on the Administration Date. This notional conversion will not prejudice the Company's rights to take any action outside of the Agreement in respect of any Non-Financial Contract Liabilities denominated in their original currency.

## 26.13   Retention Claim and Retention Amount

Where the Company is under a fiduciary obligation to account to a person (a "**Retention Creditor**") out of Trust Assets for the liabilities of a TA Signatory to that Retention Creditor and the Company is aware of such fact and of a claim (the "**Retention Claim**") of a Retention Creditor prior to making any Distribution, then the Company will be entitled to retain from that Distribution an amount (the "**Retention Amount**") in respect of that Retention Claim.

The Retention Amount will be the amount (if any) of the Retention Claim determined by a court ("**Judgment Amount**") and/or the amount (if any) agreed between the TA Signatory and the Retention Creditor ("**Agreed Amount**") and/or the amount (if any) alleged by the Retention Creditor to be the Retention Claim ("**Alleged Amount**").

The aggregate of the Retention Amounts will be a Distribution Liability. Whenever a Distribution is made, it will be applied in accordance with the applicable waterfall provisions towards discharging any Judgment Amounts or Agreed Amounts. Distribution Assets will be Appropriated to fund a Funded Retention Amount, which is a notional ledger. Amounts credited to the ledger will be available for discharging Judgment Amounts and Agreed Amounts provided that there is an adequate reserve for Alleged Amounts.

All Securities retained in respect of Retention Amounts will be liquidated. The relevant TA Signatory will be first given the option to purchase such Securities.

The Company will not be responsible to the TA Signatories for the application by the Retention Creditors of any payments made to them by the Company.

Whether or not any Retention Amount is retained, each TA Signatory will remain obliged to the Retention Creditors and will take any Distribution made by the Company to it subject to any equities which may exist in favour of the Retention Creditor or any other third party.

## 26.14   Delivery mechanics

The Agreement contains delivery mechanics to effect Distributions. If a TA Signatory fails to deliver appropriate notifications to enable delivery within 12 months of the proposed Distribution, then it will forfeit its rights to receive the Distribution.

If, after having made all Distributions in respect of any particular type of Asset which are required to be made under the Agreement, there remains Distributable Trust Assets of that

type which could still be available for delivery, then the Company will retain, transfer or dispose of such Assets.

### 26.15  No double counting

The Agreement does not compromise ownership claims to assets held by the Company which are not Trust Assets (other than Appropriated Assets). This includes assets wrongfully rehypothecated which are still held by the Company on an unsegregated basis. Non-Trust Assets will be disregarded in calculating Allocations, Asset Claims and Asset Shortfall Claims. However, the monetary value of a claim in respect of a Non-Trust Asset may be taken into account in calculating a Close-Out Amount under a Financial Contract. If this is the case and a Signatory has received a benefit in respect of the amount so claimed, then the Signatory must account to the Company for any recovery it makes in respect of such Non-Trust Asset, whether such recovery is by way of delivery of securities, payment of cash, set-off or otherwise.

### 27  Effect of winding-up (liquidation)

The Agreement is intended to continue if the Company goes into an insolvent liquidation. If the Company goes into an insolvent liquidation, the Agreement would not be binding on a liquidator of the Company. However, the English courts are unlikely to permit a liquidator of the Company to act in contravention of the terms of the Agreement.

### 28  Currency

The Agreement will operate in US dollars. All calculations and valuations between the Signatory and the Company under it will be made in US dollars. If any amount is determined in a currency other than US dollars, such amount will be converted to US dollars at the exchange rate on the date of valuation or when such amount falls to be determined. Where the Company has converted money into a currency different from that of receipt (the "**Initial Conversion**"), the Signatory's claim will be converted into that different currency at the actual rate of exchange used to effect such Initial Conversion.

### 29  Tax

The Company may withhold any Tax payable or required to be withheld or accounted for in relation to either any Appropriation, Distribution or any other payment which, as a result of the implementation and operation of the Agreement, the Company is treated as making for Tax purposes.

The Company may also make any disclosures or reports to any Tax Authorities in respect of any matters which are the subject of, or arise as a result of the implementation and operation of, the Agreement.

The Company is not obliged to provide any Tax certificates in respect of any dividends or other payments made or received in respect of Securities forming the basis of a Signatory's Asset Claim.

Any stamp duty, stamp duty reserve tax, transfer taxes, VAT or other Tax liabilities or costs arising out of the implementation and operation of the Agreement (including, but not limited to, any Tax costs arising from the making of the Distributions or Appropriations in cash or kind) will be borne by the Signatories.

A Signatory is required under the Agreement to deliver to the Company any form or document that may be required or reasonably requested in writing in order to allow the Company to make a payment in accordance with the Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, with any such form or document to be accurate and completed in a manner reasonably satisfactory to Company and to be executed and to be delivered with any reasonably required certification, as soon as reasonably practicable.

## 30    Costs

### 30.1    Costs Amount

The Company will withhold for its own benefit from Distributions an amount in respect of the costs associated with the conduct and operation of the Agreement (the "**Costs Amount**").

The Costs Amount is:

(i)    0.75 per cent. of the value of the Asset Claims of Signatories whose Asset Claims are for Custody Securities only and who do not have any outstanding claim or liability in respect of any Financing and Derivatives Contract; or

(ii)    1.00 per cent. of the value of the Asset Claims of any other Signatories,

in either case, the Costs Amount will not exceed US$2.5 million for any TA Signatory.

### 30.2    Costs Amount will increase for TA Signatories who accept the Agreement after the end of Initial Offer Period

If clients do not accept the Offer by the end of the Initial Offer Period, the costs for managing the trust property will double and there will be no maximum cap on such costs. The Costs Amount will be:

(i)    1.50 per cent. of the value of the Asset Claims of Signatories whose Asset Claims are for Custody Securities only and who do not have any outstanding claim or liability in respect of any Financing and Derivatives Contract; or

(ii)    2.00 per cent. of the value of the Asset Claims of any other Signatories.

The Company may in its absolute discretion waive the Costs Amount in part for such TA Signatory, subject to a minimum of the Costs Amount that would have applied had such TA Signatory accepted the Offer before the end of the Initial Offer Period.

### 30.3    Costs Rebate Amount

On the determination of the final Distribution and Appropriation with respect to a Signatory, the Company will pay to that Signatory, if relevant, the Costs Rebate Amount.

The Costs Rebate Amount is the excess (if any) of:

(i)    the Costs Amount; over

(ii)    the same percentage used by the Company in determining the Costs Amount of the relevant Signatory multiplied by the sum of:

(a)    the value of each Allocation to such Signatory; and

(b)      the value of any Intermediary Distribution or Intermediary Retention.

In each case, if the Costs Rebate Amount is less than a de minimis amount, it will be reduced to zero.

## 31      Dispute Resolution Mechanism

### 31.1      Subject matter of Dispute

The Dispute Resolution Mechanism exclusively governs the resolution of any and all disputes between the Company and Signatories relating to certain notices issued by the Company under the Agreement. These are:

(i)      a Net Contractual Position Statement;

(ii)      a Claim Amount Notice;

(iii)      a Distribution and Appropriation Notice; and

(iv)      an Intermediary Distribution Value Notice.

The Dispute Resolution Mechanism does not prevent the parties from entering into a compromise, arrangement or settlement.

### 31.2      Procedures applicable if a Signatory wishes to raise a Dispute

If a Signatory wishes to raise a Dispute, it must notify the Company in a specified form on or before 5.00 p.m. (London time) on: (i) the twenty-fifth Business Day after the date the Claim Amount Notice, an Intermediary Distribution Value Notice or Net Contractual Position Statement is given by the Company; or (ii) the tenth Business Day after the date the Distribution and Appropriation Notice is given by the Company (the "**Notice Dispute Deadline**"). The notice must include reasonable details of the nature and basis of the challenge. Where appropriate, details of an agent to accept service of process in England and Wales must be included. If a Signatory fails to serve such notice within the time period specified, then the Signatory will be deemed to have accepted as final and binding the relevant notice issued by the Company.

There will be a period of 20 Business Days during which the parties will endeavour to resolve the Dispute amicably.

If the issue cannot be resolved amicably, then the Company will determine in good faith but otherwise in their absolute discretion whether the issue should be referred for determination to the Valuation Expert, to the Adjudicator or to the Court.

If the Signatory disagrees with the Company's decision to have the Dispute resolved by the Valuation Expert, it may contest the decision, in which case the Company will, in good faith but otherwise in its absolute discretion, refer the issue to the Adjudicator, or to the Court.

If a Signatory disagrees with the Company's decision to have the issue resolved by the Adjudicator, the issue will be resolved by the Court.

No amount awarded may exceed the amount of a Signatory's claim under the Agreement.

### 31.3    The Valuation Expert and Adjudicator

Matters relating to any valuation where there are no related questions of law to be determined will generally be referred to the Valuation Expert. He acts as an expert and not as an arbitrator.

The Valuation Expert will be an individual who has at least five years' experience in dealing with financial products of the relevant type, be duly qualified to discharge his functions and powers under the Agreement, possess the appropriate expertise having regard to the nature of the matter and have no conflicts of interest.

The Adjudicator will be an individual who has been appointed a Queen's Counsel for at least five years, be duly qualified to discharge his functions and powers under the Agreement, possess the appropriate expertise having regard to the nature of the matter and have no conflicts of interest. He acts as an expert and not as an arbitrator.

The Company will provide the Signatory with the names of two candidates to act as Adjudicator or Valuation Expert, from which the Signatory will choose its preferred individual.

The Signatory will provide a deposit on account of fees of the lesser: of (i) US$50,000; and (ii) subject to a minimum of US$25,000, 10 per cent. of the value of the Signatory's Asset Claim.

In the case of the Valuation Expert, the parties will provide him with details of their respective valuations and assumptions behind those valuations, together with any additional documentation or information that they wish to be taken into account by the Valuation Expert in reaching his decision. The disputing parties may (but are not obliged to) submit written representations to the Valuation Expert.

In the case of the Adjudicator, the parties will present their cases in writing to him within a prescribed period.

The Valuation Expert or Adjudicator will (subject to certain limitations as to timing) decide the information he requires and the procedure and timetable he wishes to adopt. Where a Signatory fails to respond in a timely manner to requests for information, it will be deemed to have abandoned the Dispute. The Valuation Expert or Adjudicator may require the parties to appear before him.

The Valuation Expert or Adjudicator will, in his absolute discretion, consider such matters as he thinks fit in making his determination. He will be entitled to consult with such advisers, including legal advisers and experts, and to take into account such information or evidence obtained from these sources, as he may deem appropriate.

If the Valuation Expert considers that the issue gives rise to issues of law or other matters outside his area of expertise, he will notify the parties that he no longer considers himself capable of determining the matter and the Company will determine in good faith but otherwise in its absolute discretion whether the matter should be referred to the Adjudicator or to the Court.

Upon reaching a decision, the Valuation Expert or Adjudicator will inform the parties in writing of his decision. He will not be obliged to give reasons for his decision.

### 31.4    Costs, appeals, indemnities and insurance

The decision of the Valuation Expert or the Adjudicator will, insofar as the law allows, be final and binding.

The Valuation Expert or the Adjudicator will be remunerated at such reasonable rate as may be agreed by the Company, and will be reimbursed his reasonable costs and expenses.

Any remuneration, costs, charges and expenses incurred by the Valuation Expert or the Adjudicator or by the parties themselves will be apportioned between the parties in such proportions as the Valuation Expert or Adjudicator may determine. If a Signatory defaults in its liability, then that Signatory's share of the Valuation Expert's or Adjudicator's remuneration, costs, charges and expenses (plus any applicable VAT) will be deducted from the deposit paid by that Signatory and/or taken into account when calculating the Signatory's Distribution.

The Company will provide an indemnity to the Valuation Expert or the Adjudicator and may obtain insurance against the indemnity.

### 31.5    Disputes outside the Dispute Resolution Mechanism

Nothing under the Agreement will prevent the Court from having jurisdiction to hear applications from the Company, the Administrators or any Signatory with respect to the operation or implementation of the Agreement, to the extent that such matters fall outside the scope of the Dispute Resolution Mechanism. However, save for those disputes that are subject to the Dispute Resolution Mechanism, the Company reserves its right to rely on the statutory moratorium on legal proceedings.

A diagram representing the Dispute Resolution Mechanism is set out at Appendix 5.

### 31.6    Court procedure

Where the Court is required to determine a Dispute, proceedings must be commenced within a prescribed period of the Dispute arising. If the Signatory fails to do so, it will be deemed to have abandoned the Dispute.

### 32    Signatories to co-operate

The Signatories will co-operate with and render such assistance to the Company as it may reasonably require and will provide such assistance as the Company may reasonably require in connection with gathering in any Trust Assets, removing any impediments upon Assets being Distributable Trust Assets or enforcing obligations owed to the Company.

### 33    Modifications

Other than for minor or technical amendments or for those that the Company determines are not prejudicial to Signatories' interests, no amendment, modification or waiver in respect of the Agreement will be effective unless in writing and previously approved by: (i) the Company; and (ii) an Extraordinary Resolution.

The Company may certify that it has determined that any such amendment, modification or waiver will materially affect some (but not all) of the Signatories, or will materially affect different classes or groups of Signatories in different ways.

The Company is authorised under the Agreement to agree for and on behalf of the relevant Signatories, all amendments, modifications or waivers, if so directed by an Extraordinary Resolution of the relevant Signatories.

Schedule 4 to the Agreement sets out the regulations governing the meeting of Signatories and the passing of resolutions (including written resolutions) by Signatories.

The Company will not be responsible for having acted in good faith on a resolution purporting to have been passed by the Signatories even if it is later found that there was a defect in the constitution of the meeting or the passing of the resolution or that the resolution was not valid or binding on the Signatories.

## 34    Conflict

In the event of a conflict or inconsistency between the provisions of the Agreement, the Companies Act, the Insolvency Act, the Insolvency Rules and the FSA Rules, for the purposes of the Agreement, and to the extent such acts and/or rules permit, the terms of the Agreement will prevail.

If the Company is wound up (a "**Liquidation Event**"), the Agreement will not terminate and will continue in full force and effect. In the event of any inconsistency between the terms of the Agreement and the Insolvency Act or the Insolvency Rules as they apply to the Company following a Liquidation Event, for the purposes of the Agreement, the terms of the Agreement will prevail.

## 35    Act in good faith

All actions and determinations by the Company under the Agreement will be made in good faith. Subject to any applicable provision of the Insolvency Act, no Signatory will be entitled to challenge the validity of any act done or omitted to be done in good faith by the Company and it will not be liable for any loss whatsoever and howsoever arising unless such loss is attributable to wilful default, fraud, dishonesty or negligence.

## 36    Modification of foreign law contracts

Where the Agreement purports to modify any contract which is governed by a law other than English law, the modification will be effective to the maximum extent permitted under the proper law of the contract. Each Signatory undertakes to the Company under the Agreement to take all actions that the Company requests to perfect any modifications to such contracts in order to ensure that such modifications are effective to the fullest extent possible under such governing law.

## 37    Governing law and jurisdiction

The Agreement will be governed by, and construed in accordance with, English law and the parties will be subject to the exclusive jurisdiction of the courts of England in respect of the Agreement. The Company will retain the right to bring proceedings elsewhere, and may seek to have the Agreement recognised in other jurisdictions.

**Appendix 1**
**Termination of Financial Contracts**



(This diagram is produced for illustration purposes only, does not include all contemplated scenarios and does not represent the relevant provisions of the Agreement in full.)

**Appendix 2**

**1      Determination of Close-Out Amount and Valuation Methodologies**

There will be one Close-Out Amount for each Financial Contract.

The Close-Out Amount in respect of each Financial Contract will be determined by the relevant Determining Party in accordance with the applicable Financial Contract Valuation Methodology. There are three alternative Financial Contract Valuation Methodologies. The Overriding Valuation Provisions form part of each Financial Contract Valuation Methodology.



The Determining Party:

•      for the Contractual Valuation Methodology, will be the party as determined on page II-43; and

•      for the Agreed Valuation Methodology and the Fallback Valuation Methodology, will be the Company.

(This diagram is produced for illustration purposes only, does not include all contemplated scenarios and does not represent the relevant provisions of the Agreement in full.)

## 2A    Determining Party under Contractual Valuation Methodology



Does the Financial Contract specify who should be the party to determine the amount or amounts payable by one party to the other as a result of the termination of such Financial Contract (such party, the "**Contractual Determining Party**")?

No

Yes

Does the Financial Contract require an event of default, act of insolvency or other similar event to have occurred in respect of a party in order to ascertain the Contractual Determining Party?

Yes

No

The event of default, act of insolvency or other similar event will be deemed to have occurred in respect of the Company only.

General Rule:
The Contractual Determining Party will be the Determining Party, with two exceptions:

The Company will be the Determining Party.

Exception 1:
If the Contractual Determining Party is a person other than the Company, and that person has not delivered a Valuation Statement on or before the Valuation Submission Date

Exception 2:
If there is more than one Contractual Determining Party, each such party will be a Determining Party to the extent that it is entitled or required under the Financial Contract to contribute to the determination of the amount or amounts payable by one party to the other as a result of the termination of such Financial Contract.

(This diagram is produced for illustration purposes only, does not include all contemplated scenarios and does not represent the relevant provisions of the Agreement in full.)

## 2B Financial Contract Valuation Methodologies

Does the Financial Contract contain terms that are ascertainable (Contractual Valuation Provisions) for calculating the Close-Out Amount?

**No**

**Yes**

Do the terms conflict with the Overriding Valuation Provisions?

Is it reasonably practicable in the Company's opinion to amend the Contractual Valuation Provisions so that they do not conflict with the Overriding Valuation Provisions?

**Yes**

**No**

**Yes**

Contractual Valuation Provisions will be amended to be consistent with Overriding Valuation Provisions

**No**

Is it reasonably practicable in the Company's opinion for the Company to amend such Contractual Valuation Provisions so that the Close-Out Amount may be determined no later than 30 Business Days following the Open Contract Termination Date of such Signatory?

Do the Contractual Valuation Provisions require or permit the Close-Out Amount to be determined after 30 Business Days following the Open Contract Termination Date of the relevant Signatory?

**No**

**Yes**

**Yes**

**No**

Contractual Valuation Provisions will be amended so that the Close-Out Amount may be determined no later than 30 Business Days following the Open Contract Termination Date of such Signatory

The Determining Party (see previous page) shall calculate the Close-Out Amount in accordance with such Contractual Valuation Methodology. Is the Company the Determining Party?

**No**

**Yes**

Does the Company consider that the Determining Party has calculated the Close-Out Amount in accordance with the Contractual Valuation Methodology?

**No**

The Company shall determine the Close-Out Amount as if it were the Determining Party

Is it reasonably practicable in the Company's opinion for the Company to determine the Close-Out Amount in accordance with the Contractual Valuation Methodology?

**Yes**

**Yes**

**No**

The Signatory (or other such third party Determining Party) shall determine the Close-Out Amount in accordance with the Contractual Valuation Methodology

The Company shall determine the Close-Out Amount in accordance with the Contractual Valuation Methodology

Can the Company and the Signatory agree an alternative valuation methodology for determining the Close-Out Amount or agree the Close-Out Amount?

**No**

The Company shall determine the Close-Out Amount using the Agreed Valuation Methodology or use the agreed Close-Out Amount

The Company shall determine the Close-Out Amount in accordance with the Fallback Valuation Methodology

(This diagram is produced for illustration purposes only, does not include all contemplated scenarios and does not represent the relevant provisions of the Agreement in full.)

Notes: (1) If the Contractual Valuation Provisions differ depending upon the event of termination, then the Contractual Valuation Provisions relating to the election made by the Signatory will be followed, unless no such election is made, in which case the Contractual Valuation Provisions relating to an event of default which most closely corresponds to an act of insolvency of the Company will be followed. (2) If the Company has determined that the Contractual Valuation methodology is unclear or ambiguous or incapable of strict compliance due to technicality or (where the Determining Party is not the Company) is unable to determine whether the Determining Party has calculated the Close-Out Amount in accordance with the Contractual Valuation Methodology due to a technicality which makes the Contractual Valuation Methodology unclear, ambiguous or incapable of strict compliance, then the Company and the Signatory will agree modifications to the Contractual Valuation Methodology proposed by the Company to eliminate the technicality, failing which the Fallback Valuation Methodology will apply.

**Appendix 3**
**Allocation Overview**



(This diagram is produced for illustration purposes only, does not include all contemplated scenarios and does not represent the relevant provisions of the Agreement in full.)

## Appendix 4
## Distribution and Appropriation

**1**    **Distribution Assets and Distribution Liabilities**

The Company will Appropriate Distribution Assets available to a Signatory to reduce the Distribution Liabilities applicable to such Signatory, subject to the general rules set out below and the specific circumstance (each specific circumstance is illustrated by a waterfall in paragraph 3 below).

Certain Distribution Assets cannot be used to reduce certain Distribution Liabilities. Whether a certain Distribution Asset can be used to reduce a certain Distribution Liability will depend on the specific circumstance, including whether certain elections are made by the Signatory.

| Distribution Assets | | Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Allocations of Assets ("**Asset Allocation**")[1]<br>• Collateral Allocations*<br>• Collateral Amount*<br>• Net Financial Claim | • Asset Shortfall Claim<br>• Any shortfall claim for Pre-Administration Client Money ("**Pre-Administration Client Money Shortfall Claim**")*<br>• Shortfall For Appropriation* | • Costs Amount<br>• Ascertained Non-Financial Contract Liabilities<br>• Limited Ascertained Non-Financial Contract Liabilities<br>• Unfunded Retention Amount<br>• Affected Intermediary Derived Asset Liability* | • Uncollateralised Net Financial Liability<br>• Collateralised Net Financial Liability* |

[1]  *Note that this may also apply to a Retention Allocation*

*\* denotes items that only become a Distribution Asset or Distribution Liability if certain elections are made. See paragraph 2 below.*

### General Rules

(i)    For a TA Signatory, Type A Distribution Assets (other than Net Financial Claim) may be used to reduce Type A or Type B Distribution Liabilities.

(ii)    For a TA Signatory, Asset Shortfall Claim, Pre-Administration Client Money Shortfall Claim and Shortfall For Appropriation can only be applied to reduce Net Financial Liability and not any of the other Distribution Liabilities. For an NTA Signatory, Pre-Administration Client Money Shortfall Claim can only be applied to reduce Net Financial Liability.

(iii)    For a TA Signatory, Net Financial Claim can only be used to reduce Limited Ascertained Non-Financial Contract Liabilities.

(iv)    For all Signatories, Distribution Assets and Distribution Liabilities are valued on the Distribution Value Date for the purpose of Appropriation and Distribution.

(v)    Any remaining Type A Distribution Assets after Appropriation (other than Net Financial Claim) will be distributed to the relevant TA Signatory.

(vi)    For a TA Signatory, any remaining Type B Distribution Assets (other than any Shortfall For Appropriation) and Net Financial Claim after Appropriation will become Ascertained Claims against the Company. An Ascertained Claim (other than an Ascertained Shortfall Amount) in respect of an Asset Shortfall Claim will be valued as at the Date Before Administration. For an NTA Signatory, any remaining Pre-Administration Client Money Shortfall Claim will become Ascertained Claim against the Company.

(vii)    For all Signatories, any Distribution Liabilities not reduced after Appropriation will remain unsatisfied.

The Distribution Value Date is the date that falls 25 business days prior to the latest date on which the Company intends to give instructions for settlement of such Distribution Assets.

## 2    Collaterialisation Election

### 2.1    Total Collateralisation Amount and Net Financial Liability

When a Collateralisation Election is made, a notional ledger will be established to record the Total Collateralisation Amount, comprising the Collateral Claim Amount. The Collateral Amount is the total of all interim Distributions of Pre-Administration Client Money and all Deferral Cash Amounts paid to the Company from time to time. The Collateral Claim Amount is essentially the shortfall on the claim on Pre-Administration Client Money. Over time, any interim Distributions of Pre-Administration Client Money will increase the Collateral Amount and correspondingly reduce the Collateral Claim Amount. Any payment of Deferral Cash Amounts will also increase the Collateral Amount (for TA Signatories only), which in turn increases the Total Collateralisation Amount. Any Asset Allocation Appropriated under the Affected Intermediary Collateralisation Election will reduce the Affected Intermediary Admitted Claim Amount, which in turn decreases the Total Collateralisation Amount. The concept of the Total Collateralisation Amount collateralising part of Net Financial Liability is represented in diagram 1 below.

**Diagram 1 – Total Collateralisation Amount**



### 2.2    Collateral Allocation

There is one exceptional circumstance when a Signatory may receive its interim Distribution of Pre-Administration Client Money. If, at any time, the Total Collateralisation Amount exceeds the Net Financial Liability (an "**NFL**"), then an amount equal to the lesser of: (i) the surplus of Total Collateralisation Amount over the NFL; and (ii) the Collateral Amount will be an Asset Allocation (each, a "**Collateral Allocation**") to such Signatory and the Collateral Amount shall be correspondingly reduced. A Collateral Allocation will be an interim Asset Allocation and may be Appropriated to reduce the Signatory's Distribution Liabilities under Waterfall 3d in paragraph 3 below. The concept of a Collateral Allocation is illustrated in diagram 2 below.

**Diagram 2 – Collateral Allocation**



**2.3    Timing for Appropriation Deferral Election**

A TA Signatory may only make an Appropriation Deferral Election at the time when the Company notifies the TA Signatory of its first interim Asset Allocation in respect of that Asset Allocation.

The timing for making an Appropriation Deferral Election and paying the Deferral Cash Amount is illustrated in diagram 3 below.

**Diagram 3 – Timing for Appropriation Deferral Election**





The main benefit of Collateralisation Election in respect of a Pre-Administration Client Money Claim is that when the Pre-Administration Client Money Shortfall Claim (i.e. the shortfall claim in the Distribution of Pre-Administration Admitted Client Money Amount for which the Company is liable) is determined, the Collateral Claim Amount will be equal to such Pre-Administration Client Money Shortfall Claim and then applied as a Distribution Asset to first reduce the NFL of the Signatory before any other Distribution Asset is applied to reduce the NFL (see Waterfall 3c in paragraph 3 below).

**3    Distribution and Appropriation Waterfalls**

*The diagrams below are only included for the purpose of illustrating how the waterfalls would operate given a certain set of facts and they do not cover every case that may apply to or result from such waterfall. Whether all Distribution Assets will be Appropriated and whether any Distribution will fall due to be made to a Signatory depends on the facts of each case, which is specific to each Signatory. All Distribution Assets and Distribution Liabilities are valued as at the Distribution Value Date.*

**3.1    TA Signatory with a Net Financial Claim**

**Waterfall 1a – Asset Allocation to a TA Signatory with a Net Financial Claim**

**Facts**

In this first waterfall, the TA Signatory has a Net Financial Claim against the Company (so the TA Signatory does not have an NFL). The TA Signatory has not made any Collateralisation Election. The Company determines an Asset Allocation to such TA Signatory.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| ● Asset Allocation<br>● Net Financial Claim | ● Asset Shortfall Claim | ● Costs Amount<br>● Ascertained NFCL<br>● Unfunded Retention Amount | |

**Analysis and Examples**

Asset Allocations will be Appropriated to reduce, first, Costs Amount, secondly, Ascertained Non-Financial Contract Liabilities and, thirdly, Unfunded Retention Amount in that order.

If Asset Allocation is greater than Distribution Liabilities, then any remaining Asset Allocation will be a Distribution to the TA Signatory. All Distribution Liabilities will be discharged and reduced to zero. See diagram 4.1 below which illustrates an example.

**Diagram 4.1 – Allocation to TA Signatory with a Net Financial Claim (Case 1)**



If Asset Allocation is smaller than Distribution Liabilities, then no Distribution will be made to the TA Signatory. Each Distribution Liability that is not reduced by the Asset Allocation will remain unsatisfied. See diagram 4.2 below which illustrates an example. In that example, Costs Amount, Ascertained Non-Financial Contract Liabilities ("**Ascertained NFCL**") and part of the Unfunded Retention Amount are discharged in full. The remaining portion of the Unfunded Retention Amount remains unsatisfied.

**Diagram 4.2 – Allocation to TA Signatory with a Net Financial Claim (Case 2)**



**Waterfall 1b – Net Financial Claim against Ascertained NFCL**

**Facts**

The TA Signatory has a Net Financial Claim against the Company and the Company has some remaining Limited Ascertained NFCL against the TA Signatory.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| ● Net Financial Claim | | ● Limited Ascertained NFCL (if any) | |

**Analysis and Examples**

Net Financial Claim will be Appropriated to reduce any remaining Limited Ascertained NFCL (if any). If the Net Financial Claim exceeds the Limited Ascertained NFCL, then the Limited Ascertained NFCL will be reduced in full and any remaining amount of Net Financial Claim after Appropriation will become an Ascertained Claim. If the Net Financial Claim is less than the Limited Ascertained NFCL, then the Net Financial Claim will be Appropriated in full and any remaining Limited Ascertained NFCL that are not reduced will remain outstanding.

In addition, the TA Signatory will have an Ascertained Claim for an amount equal to its Asset Shortfall Claim (if any).

**3.2     TA Signatory with an NFL**

**Waterfall 2 – Asset Allocation to a TA Signatory with a NFL**

**Facts**

A TA Signatory has an NFL to the Company. The Company determines an Asset Allocation to such TA Signatory. The TA Signatory has not made any Collateralisation Election, so all of its NFL is Uncollateralised NFL. As the TA Signatory has not made an Appropriation Deferral Election, an Asset Allocation can be Appropriated to reduce its Uncollateralised NFL (as shown by Uncollateralised NFL being an applicable Distribution Liability in this

circumstance). As the Company is not expecting to make any further Asset Allocations in respect of a Stock Line and assuming that there is a shortfall in Assets for such Stock Line, the Company has determined an Asset Shortfall Claim in respect of such Stock Line. Such Asset Shortfall Claim can only be Appropriated to reduce Uncollateralised NFL and not any other Distribution Liability.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Asset Allocation | • Asset Shortfall Claim | • Costs Amount<br>• Ascertained NFCL<br>• Unfunded Retention Amount | • Uncollateralised NFL |

### Analysis and Examples

**Asset Shortfall Claim**

Asset Shortfall Claim will be Appropriated to reduce Uncollateralised NFL. If Asset Shortfall Claim is greater than Uncollateralised NFL, then any remaining Asset Shortfall Claim (Valued as at the close of business on the last Business Day before the Time of Administration) will be an Ascertained Claim of the TA Signatory. If Asset Shortfall Claim is less than Uncollateralised NFL, then the Asset Shortfall Claim will be Appropriated in full.

**Asset Allocation**

Asset Allocation will then be Appropriated to reduce, first, Costs Amount, secondly, Uncollateralised NFL (any left after being reduced by Asset Shortfall Claim), thirdly, Ascertained NFCL, and, fourthly, Unfunded Retention Amount in that order. If Asset Allocation is greater than Distribution Liabilities, then any remaining Asset Allocation will be a Distribution to the TA Signatory. Distribution Liabilities are reduced to zero. If Asset Allocation is less than Distribution Liabilities, then no Distribution will be made to the TA Signatory. Each Distribution Liability that is not reduced by the Asset Allocation will remain unsatisfied.

Diagram 5 below illustrates an example. In that example, the Asset Shortfall Claim with a Value of 70 discharged a portion of the Uncollateralised NFL equal to 70. The portion of the Uncollateralised NFL equal to 30 is then discharged in full by Appropriation of the Asset Allocation. The Asset Allocation also discharges in full the Costs Amount, the Ascertained NFCL and part of the Unfunded Retention Amount, leaving the other part Unfunded Retention Amount as an unsatisfied Distribution Liability.

**Analysis and Examples**

**Diagram 5 – Last Asset Allocation to TA Signatory with an NFL**



3.3    **Client Money Collateralisation Election and Appropriation Deferral Election**

**Waterfall 3a – Interim Asset Allocation to TA Signatory with a NFL and a Client Money Collateralisation Election and/or Appropriation Deferral Election**

**Facts**

A TA Signatory has an NFL to the Company. The Company determines an interim Asset Allocation to such TA Signatory. The TA Signatory has made a Client Money Collateralisation Election and an Appropriation Deferral Election (but not an Affected Intermediary Collateralisation Election), so its NFL comprises a Collateralised NFL and an Uncollateralised NFL.

Since the TA Signatory has made an Appropriation Deferral Election for this Asset Allocation, an interim Asset Allocation cannot be Appropriated to reduce its Uncollateralised NFL. This is evident from Uncollateralised NFL not being an applicable Distribution Liability in this circumstance. The effect is that the Uncollateralised NFL of the TA Signatory is disregarded for the purpose of determining a Distribution of such interim Asset Allocation (resulting in the applicable Distribution Liabilities being broadly the same as if the TA Signatory does not have any NFL to the Company: see Waterfall 1a). If the TA Signatory has not made an Appropriation Deferral Election, the Uncollateralised NFL will form a Distribution Liability.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Asset Allocation | | • Costs Amount<br>• Ascertained NFCL<br>• Unfunded Retention Amount | |

**Analysis and Examples**

Asset Allocation will be used to reduce, first, Costs Amount, secondly, Ascertained NFCL and, thirdly, Unfunded Retention Amount in that order.

If the Asset Allocation is greater than Distribution Liabilities, then Distribution Liabilities will be discharged in full. Any remaining Asset Allocation will be a Distribution to the TA Signatory (see diagram 4.1 under Waterfall 1a).

If the Asset Allocation is less than Distribution Liabilities, then the Asset Allocation will be Appropriated in full. Each Distribution Liability that is not reduced by the Asset Allocation will remain unsatisfied (see diagram 4.2 under Waterfall 1a).

**Waterfall 3b – Last Asset Allocation to TA Signatory with a NFL and a Client Money Collateralisation Election and/or Appropriation Deferral Election**

**Facts**

A TA Signatory has an NFL to the Company. The Company determines a last Asset Allocation in respect of an Asset Pool to this TA Signatory. The TA Signatory has made a Client Money Collateralisation Election and an Appropriation Deferral Election (but not an Affected Intermediary Collateralisation Election), so the NFL comprises a Collateralised NFL and an Uncollateralised NFL.

Upon the last Asset Allocation of that Asset Pool and upon determination of an Asset Shortfall Claim, the Asset Shortfall Claim can be Appropriated to reduce, first, the Uncollateralised NFL and, secondly, the Collateralised NFL. The Asset Shortfall Claim can only be Appropriated to reduce the NFL and not any other Distribution Liabilities.

The last Asset Allocation can be Appropriated to reduce the Uncollateralised NFL, which is shown by the Uncollateralised NFL being an applicable Distribution Liability in this circumstance but the Collateralised NFL will not be an applicable Distribution Liability by virtue of the Collateralisation Election in respect of the Pre-Administration Client Money (the Collateralised NFL is only an applicable Distribution Liability upon the last Distribution of Pre-Administration Client Money: see Waterfall 3c).

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Asset Allocation | • Asset Shortfall Claim | • Costs Amount<br>• Ascertained NFCL<br>• Unfunded Retention Amount | • Uncollateralised NFL<br>• Collateralised NFL |

**Analysis and Examples**

Asset Shortfall Claim will be Appropriated to reduce NFL. If Asset Shortfall Claim is greater than NFL, then NFL will be discharged in full and any remaining Asset Shortfall Claim (Valued as at the close of business on the last Business Day before the Time of Administration) will be an Ascertained Claim of the TA Signatory. If Asset Shortfall Claim is less than NFL, then the Asset Shortfall Claim will be Appropriated in full.

Then the Asset Allocation will be Appropriated to reduce, first, Costs Amount, secondly, Uncollateralised NFL (to the extent there is any after being first reduced by Asset Shortfall Claim), thirdly, Ascertained NFCL and, fourthly, Unfunded Retention Amount in that order.

If Asset Allocation is greater than Distribution Liabilities, then all Distribution Liabilities will be discharged. Any remaining Asset Allocation will be a Distribution to the TA Signatory and will be delivered to the TA Signatory.

If Asset Allocation is less than Distribution Liabilities, then no Distribution will be made to the TA Signatory. Each Distribution Liability that is not reduced by the Asset Allocation will remain unsatisfied.

In the example illustrated by diagram 6.1 below, the Asset Shortfall Claim fully discharges the NFL and any remaining Asset Shortfall Claim is an Ascertained Claim to the TA Signatory. Asset Allocation is then Appropriated to reduce the remaining Distribution Liabilities, including the Costs Amount, Ascertained NFCL and Unfunded Retention Amount. Any remaining Asset Allocation will be a Distribution to the TA Signatory.

**Diagram 6.1 – Last Allocation to TA Signatory with NFL (Case 1)**



In the example illustrated by diagram 6.2 below, the Asset Shortfall Claim is Appropriated in full but is only sufficient to discharge a portion of the Uncollateralised NFL equal to 60. Uncollateralised NFL of 40 remains outstanding. The Asset Allocation is then applied as the next Distribution Asset and Appropriated to discharge Distribution Liabilities, including the Uncollateralised NFL of 40 in full. A portion of the remaining Asset Allocation is a Distribution to the TA Signatory.

**Diagram 6.2 – Last Allocation to TA Signatory with Appropriation Deferral Election (Case 2)**



**Waterfall 3c – Last Distribution of Pre-Administration Client Money to a TA Signatory with an NFL and Client Money Collateralisation Election**

**Facts**

A TA Signatory has an NFL to the Company. The TA Signatory has made a Client Money Collateralisation Election . The Company determines the Pre-Administration Client Money Shortfall Claim of that TA Signatory.

This Waterfall 3c applies in a very limited circumstance, i.e. when the Company determines the Pre-Administration Client Money Shortfall Claim of a TA Signatory who has made the Client Money Collateralisation Election. This determination can happen at any time, whether before or after the last Asset Allocation of a particular Asset Pool. This waterfall deals solely with such Pre-Administration Client Money Shortfall Claim and is not affected by any Asset Allocation for any particular Asset Pool.

As mentioned above, Pre-Administration Client Money Shortfall Claim can only be Appropriated to reduce NFL and not any other Distribution Liabilities.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| | • Pre-Administration Client Money Shortfall Claim | | • Uncollateralised NFL<br>• Collateralised NFL |

**Analysis and Examples**

Pre-Administration Client Money Shortfall Claim will be Appropriated to reduce the Collateralised NFL and Uncollateralised NFL.

If Pre-Administration Client Money Shortfall Claim is greater than the NFL, then all NFL will be discharged in full. Any remaining Pre-Administration Client Money Shortfall Claim will be

an Ascertained Claim to the TA Signatory. If Pre-Administration Client Money Shortfall Claim is less than the NFL, then the Pre-Administration Client Money Shortfall Claim will be Appropriated in full. NFL that is not reduced by the Pre-Administration Client Money Shortfall Claim will remain unsatisfied.

In the example illustrated by diagram 7.1 below, the Pre-Administration Client Money Shortfall Claim is Appropriated in full to discharge the Collateralised NFL.

**Diagram 7.1 – Last Distribution of Pre-Administration Client Money to TA Signatory with NFL Client Money Collateralisation Election (Case 1)**



In the example illustrated by diagram 7.2 below, the Pre-Administration Client Money Shortfall Claim fully discharges the Collateralised NFL. The remaining Pre-Administration Client Money Shortfall Claim is an Ascertained Claim to the TA Signatory.

**Diagram 7.2 – Last Distribution of Pre-Administration Client Money to TA Signatory with NFL (Client Money Collateralisation Election) (Case 2)**



**Waterfall 3d – Final Distribution of Collateral Amount following determination of Pre-Administration Client Money Shortfall Claim and Last Asset Allocation**

The interim Distributions of Pre-Administration Client Money and payment of Deferral Cash Amounts will increase the Collateral Amount. The Collateral Amount will be Appropriated to reduce, first, Costs Amount, secondly, Uncollateralised NFL (to the extent there is any after being reduced by Asset Shortfall Claim and Pre-Administration Client Money Shortfall Claim), thirdly, Collateralised NFL (to the extent there is any after being reduced by Asset Shortfall Claim and Pre-Administration Client Money Shortfall Claim), fourthly, Ascertained NFCL and, fifthly, Unfunded Retention Amount in that order.

If the Collateral Amount is greater than Distribution Liabilities, then the Distribution Liabilities will be discharged in full. Any remaining Collateral Amount will be paid back to the TA Signatory.

If the Collateral Amount is less than Distribution Liabilities, then the Collateral Amount will be Appropriated in full. Each Distribution Liability that is not reduced by the Collateral Amount will remain unsatisfied.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Collateral Amount | | • Costs Amount <br> • Ascertained NFCL <br> • Unfunded Retention Amount | • Uncollateralised NFL <br> • Collateralised NFL |

In the example illustrated by diagram 8.1 below, the Collateral Amount is applied as a Distribution Asset and discharges in full Costs Amount, NFL, Ascertained NFCL and the Unfunded Retention Amount. The remaining portion of the Collateral Amount is a Distribution to the TA Signatory.

**Diagram 8.1 – Collateral Amount (Case 1)**



In the example illustrated by diagram 8.2 below, the Collateral Amount is applied as a Distribution Asset to reduce the applicable Distribution Liabilities. The Collateral Amount is

Appropriated in full and is only sufficient to discharge the Costs Amount, NFL, the Ascertained NFCL and a portion of the Unfunded Retention Amount. The remaining portion of the Unfunded Retention Amount remains an outstanding Distribution Liability.

**Diagram 8.2 – Collateral Amount (Case 2)**



### 3.4    Affected Intermediary Collateralisation Election

**Waterfall 4a – Asset Allocation following an Affected Intermediary Collateralisation Election**

**Facts**

A TA Signatory has an NFL to the Company. The TA Signatory has made an Affected Intermediary Collateralisation Election in respect of a Net Equity Intermediary so its NFL comprises a collateralised portion and an uncollateralised portion. The Company determines an interim Asset Allocation to such TA Signatory in respect of the Affected Stock Lines of such Net Equity Intermediary.

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| • Asset Allocation | | • Costs Amount | • Collateralised NFL |
| | | • Ascertained NFCL | |
| | | • Unfunded Retention Amount | |
| | | • Affected Intermediary Derived Asset | |

| Applicable Distribution Asset | | Applicable Distribution Liabilities | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| | | Liability | |

**Analysis and Examples**

Since the Asset Allocation relates to the Stock Lines of the relevant Net Equity Intermediary, the Asset Allocation would not follow any of the waterfalls set out above. Instead, such Asset Allocation will be Appropriated by the Company to reduce first, any Affected Intermediary Derived Asset Liability relating to that Asset Allocation, secondly, Costs Amount, thirdly, Collateralised NFL, fourthly Ascertained NFCL and fifthly, Unfunded Retention Amount in that order.

If the Asset Allocation is greater than Distribution Liabilities, then all Distribution Liabilities will be discharged. Any remaining Asset Allocation will be a Distribution to the TA Signatory and will be delivered to the TA Signatory. See diagram 9.1 below. This may only happen where, following an Affected Intermediary Collateralisation Election, the Total Collateralisation Amount exceeds all Distribution Liabilities.

**Diagram 9.1 – Asset Allocation following an Affected Intermediary Collateralisation Election**



If the Asset Allocation is less than Distribution Liabilities, then no Distribution will be made to the TA Signatory. Each Distribution Liability that is not reduced by the Asset Allocation will remain unsatisfied. See diagram 9.2 below.

**Diagram 9.2 – Asset Allocation following an Affected Intermediary Collateralisation Election**



**Waterfall 4b – Last Allocation of Assets from the Affected Intermediary under an Affected Intermediary Collateralisation Election**

**Facts**

After the Company has determined that it does not expect to make any further Asset Allocation in relation to Distributable Trust Assets received from the relevant Net Equity Intermediary to the TA Signatory, the Company determines the Shortfall For Appropriation of the TA Signatory.

| Applicable Distribution Asset | | Applicable Distribution Liability | |
|---|---|---|---|
| **Type A** | **Type B** | **Type A** | **Type B** |
| | • Shortfall For Appropriation | | • Collateralised NFL |

**Analysis and Examples**

The Shortfall For Appropriation will be Appropriated to reduce Collateralised NFL.

If the Shortfall For Appropriation is less than the Collateralised NFL, then the Shortfall For Appropriation will be Appropriated in full. Collateralised NFL that is not reduced by the Shortfall For Appropriation will remain unsatisfied.

If Shortfall For Appropriation is greater than the Collateralised NFL, then all NFL will be discharged in full. Any remaining Pre-Administration Client Money Shortfall Claim will not become an Ascertained Claim, but instead, the TA Signatory will have an Ascertained Claim in an amount equal to the Ascertained Shortfall Amount (which may be zero) as determined by the Company. See diagram 10 below.

**Diagram 10 – Shortfall For Appropriation**



4    **Affected Intermediary Collateralisation Election**

This section explains how the Ascertained Shortfall Amount is determined with the different amounts of NFL.

**Facts**

A TA Signatory has an Asset Claim against securities held by LBI. The TA Signatory has not made any other Collateralisation Elections and there are no Derived Assets in respect of such securities. The TA Signatory has an NFL owed to the Company. LBI Distributes an aggregate value of Asset Allocations worth 70 to the Company (assuming that the value of Assets have not changed from the 19 September 2008 to the relevant Distribution Value Date). There are no other Distribution Liabilities (other than the NFL). The amount of the Affected Intermediary Admitted Claim Amount is 100.

**Analysis and Examples**

The NFL will be collateralised by the Affected Intermediary Admitted Claim Amount (100). The Asset Allocations (70) will be used to Reduce the NFL first. The Shortfall For Appropriation, which is the difference between the Affected Intermediary Admitted Claim Amount (100) and the aggregate value of Asset Allocations (70) is 30. The Asset Shortfall Claim (10) is the difference between the lower of LBI acknowledged liability or the Company liability (80) and the LBI Assets returned by LBI (70).

(a)    If the TA Signatory has an NFL of 120, then there is a full Appropriation of Asset Allocation (70) and the Shortfall For Appropriation (30). Since the Shortfall For Appropriation has been Appropriated in full, there will be no Ascertained Claim against the unsecured estate.

(b)    If the TA Signatory has an NFL of 90, then there is a full Appropriation of Asset Allocations (70) but only part of the Shortfall For Appropriation (20) is Appropriated. As the Shortfall For Appropriation has not been Appropriated in full, there is a potential admitted claim equal to the Ascertained Shortfall Amount. The Ascertained Shortfall Amount is the Asset Shortfall Claim (10) less Collateralised NFL Reduced to zero by Appropriation against the related Shortfall For Appropriation (20), subject to a minimum of zero. Since the Ascertained Shortfall

Amount is zero (minus 10 rounded up to zero), there will be no Ascertained Claim against the unsecured estate.

(c)     If the TA Signatory has an NFL of 75, then there is full Appropriation of Asset Allocations (70) but only part of the Shortfall For Appropriation (5) is Appropriated. As the Shortfall For Appropriation has not been Appropriated in full, there is a potential admitted claim equal to the Ascertained Shortfall Amount. The Ascertained Shortfall Amount is the Asset Shortfall Claim (10) less the amount of Collateralised NFL that is Reduced to zero by Appropriation against the related Shortfall For Appropriation (5), subject to a minimum of zero. Since the Ascertained Shortfall Amount is 5, the Ascertained Claim against the unsecured estate is 5.

Diagram 11 below illustrates the interaction between Affected Intermediary Collateralisation Election with different amounts of NFL.

### Diagram 11 – Ascertained Shortfall Amount



(The diagrams in this Appendix are produced for illustration purposes only, do not include all contemplated scenarios and do not represent the relevant provisions of the Agreement in full.)

**Appendix 5**
**Dispute Resolution**

The Dispute Resolution Mechanism provides a procedure for resolving Disputes between the Company and a Signatory arising out of any Determination Notice issued by the Company to a Signatory (a Dispute).

Each of the following is a Determination Notice:

- a Net Contractual Position Statement;

- a Claim Amount Notice;

- an Intermediary Distribution Value Notice; and

- a Distribution and Appropriation Notice.

The Dispute Resolution Mechanism does not prevent the Company from entering into a compromise, arrangement or settlement with a Signatory in relation to a Dispute.

The following procedure applies for resolving a Dispute:





**VALUATION EXPERT**
(5 years' experience)

5 Business Days

Signatory objects to having the Dispute determined by a
Valuation Expert (by means of a
Valuation Expert Contest Notice)

within 25 Business Days
of sending Forum Notice

Company notifies Signatory of two potential Valuation
Experts

10 days

Signatory notifies Company of choice of Valuation
Expert

as soon as reasonably
practicable

Valuation Expert confirms appointment

10 Business Days

Signatory provides to the Valuation Expert a copy of the
Determination Notice, Dispute Notice and deposit on
account of fees

20 Business Days

Parties provide the Valuation Expert with valuations,
assumptions and any additional information

At any time, the Valuation Expert concludes that he is
not competent to determine the Dispute (and issues a
Cessation of Appointment Notice)

as soon as reasonably
practicable/20 Business Days

The Valuation Expert sends notice to the parties of the
procedure to be followed and whether any additional
information is required

Further steps as provided for in the
above notice

as soon as reasonably
practicable

The Valuation Expert issues final and binding decision

**ADJUDICATOR**
(QC of 5 years/individual of comparable status for a
Dispute regarding a different jurisdiction)

5 Business Days

Signatory objects to having the Dispute determined by the
Adjudicator (by means of an Adjudicator Contest Notice)

within 15 Business Days
of sending Forum Notice

Company notifies Signatory of two potential Adjudicators

10 days

Signatory notifies Company of choice of Scheme
Adjudicator

as soon as reasonably
practicable

Adjudicator confirms appointment

10 Business Days

Signatory provides to the Adjudicator a copy of the
Determination Notice, Dispute Notice and a deposit on
account of fees

20 Business Days

Signatory produces a Statement of Case along with other
documentation on which it wishes to rely

20 Business Days

The Company produces a Statement of Case along with
other documentation on which it wishes to rely

as soon as reasonably
practicable/20 Business Days

Adjudicator sends notice to the parties of the procedure to
be followed and whether any additional information is
required

Further steps as provided for in the
above notice

Adjudicator considers such matters and consults such
advisers as he deems necessary, including the Valuation
Expert in reaching his determination

as soon as reasonably
practicable

(This diagram is produced for illustration purposes only, does not
include all contemplated scenarios and does not represent the
relevant provisions of the Agreement in full.)

**PART III**
**CLAIM RESOLUTION AGREEMENT**

[This page has been intentionally left blank.]

Dated the Effective Date

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)
# (IN ADMINISTRATION)

and

# THE SIGNATORIES
## (as defined in this Agreement)

# CLAIM RESOLUTION AGREEMENT

Linklaters

One Silk Street
London EC2Y 8HQ

Telephone (+44) 20 7456 2000
Facsimile (+44) 20 7456 2222

Ref  M Voisin/C Hallsworth/H Dhillon/
     M Au Yeung/S Ahmed

[This page has been intentionally left blank.]

**Table of Contents**

| Contents | Page |
|---|---|

**PART 1: GENERAL PROVISIONS** ............................................................................................ III-10

1  **Effective Date** ........................................................................................................... III-10

2  **Eligibility of Signatories** ......................................................................................... III-10

3  **Effect of other agreements on this Agreement** ............................................. III-11

4  **Effect of this Agreement on Signatories' Claims** ........................................ III-11

5  **Effect of this Agreement on the Company's Claims** ................................... III-15

6  **Transfer of Positions** ........................................................................................ III-16

7  **No double counting** .......................................................................................... III-17

8  **Moratorium** ......................................................................................................... III-18

9  **Release of Liability** ........................................................................................... III-19

10  **Priorities of the Company under this Agreement** ......................................... III-19

**PART 2: ASSET CLAIMS AND BAR DATE** ........................................................................ III-20

11  **Asset Claims and Bar Date** ............................................................................. III-20

**PART 3: RELEVANT INFORMATION** .................................................................................. III-22

12  **Information** .......................................................................................................... III-22

13  **Confidentiality** ................................................................................................... III-23

14  **Incompletely Documented Agreement** ........................................................... III-24

**PART 4: MANAGEMENT OF ASSETS PRIOR TO DISTRIBUTION** ................................ III-25

15  **Corporate Events, Corporate Actions and Derived Assets** ....................... III-25

16  **Undertakings by the Company in respect of the Trust Assets** ................... III-28

**PART 5: ASSET VALUATION METHODOLOGY** ............................................................... III-30

17  **Asset Valuation Methodology** ......................................................................... III-30

**PART 6: OVERVIEW OF DISTRIBUTION** .......................................................................... III-33

18  **Overview of Distribution mechanism** ............................................................. III-33

**PART 7: NET CONTRACTUAL POSITION** ......................................................................... III-36

19  **Termination of Financial Contracts** ................................................................ III-36

20  **Close-Out Amount** ............................................................................................. III-36

21      Contractual Valuation Methodology..............................................................III-39

22      Agreed Valuation Methodology ....................................................................III-44

23      Fallback Valuation Methodology ..................................................................III-45

24      Net Contractual Position ..............................................................................III-47

25      Determination of Net Financial Claim and Net Financial Liability...............III-48

PART 8: RETENTION AMOUNTS...............................................................................III-51

26      Retention Claims and Retention Creditors...................................................III-51

27      Identification of Trust Assets subject to Retention Claim ...........................III-51

28      Determination of Retention Amount ............................................................III-51

29      Unfunded Retention Amount and Funded Retention Amount......................III-52

30      Payment to Retention Creditor ....................................................................III-54

31      Appropriation for Reduction of Unfunded Retention Amount .....................III-55

32      Parallel Debt.................................................................................................III-55

PART 9: NON-FINANCIAL CONTRACT LIABILITIES ................................................III-57

33      Non-Financial Contract Liabilities................................................................III-57

PART 10: ALLOCATION OF ASSETS AND ASSET SHORTFALL CLAIM ...............III-59

34      General principles........................................................................................III-59

35      Identification of Distributable Trust Assets for each Stock Line..................III-60

36      Individual Claim Amount, Net Equity Amount and TA Claimant Amount.....III-60

37      Determination of Intermediary Distribution Value .......................................III-62

38      Dispute between a TA Signatory and a Net Equity Intermediary ................III-63

39      Dispute over the TA Claimant Amount or the Intermediary Distribution Value ........III-63

40      Identification of Stock Lines with potential shortfall....................................III-64

41      Allocation for Stock Line with no potential shortfall....................................III-64

42      Allocation for Stock Line with potential shortfall .........................................III-64

43      Identification of Distributable Trust Assets into Asset Pools.......................III-64

44      Reservation of Assets from a Custody Securities Pool, a Non-Custody Securities Pool
        or a Multiple Stock Line Pool for TA Non-Signatories................................III-66

45    Allocation of Assets in respect of a Custody Securities Pool, a Non-Custody
      Securities Pool or a Multiple Stock Line Pool ............................................... III-67

46    Asset Shortfall Claim with respect to a Custody Securities Pool or a Non-Custody
      Securities Pool .............................................................................................. III-71

47    Allocation in respect of a Single Customer Pool ........................................... III-71

48    Asset Shortfall Claim with respect to an Affected TA Signatory ................... III-72

49    Shortfall Signatory ........................................................................................ III-73

50    Reallocation following the Company becoming aware of a new TA Claimant Amount
      or Alleged TA Claimant Amount ..................................................................... III-74

51    Application of Distributable Trust Assets towards satisfaction of Asset Claims of TA
      Non-Signatories ............................................................................................. III-74

PART 11: APPROPRIATION AND DISTRIBUTION ..................................................... III-76

52    Introduction ................................................................................................... III-76

53    No set-off ....................................................................................................... III-76

54    Distribution Assets ........................................................................................ III-77

55    Distribution Liabilities ................................................................................... III-78

56    Conditions to Distributions and Appropriations ........................................... III-81

57    Distribution Value Date .................................................................................. III-83

58    Distribution and Appropriation Notice ........................................................... III-83

59    Collateralisation Election .............................................................................. III-85

60    Appropriation of Distribution Assets to Reduce Distribution Liabilities.................... III-90

61    Distributions relating to Pre-Agreement Asset Contracts ........................... III-98

62    Ascertained Claims ....................................................................................... III-98

PART 12: DELIVERY OF DISTRIBUTIONS ................................................................ III-100

63    Delivery of Distributions................................................................................ III-100

PART 13: CLOSING ................................................................................................... III-104

64    Closing Statement ........................................................................................ III-104

PART 14: REPRESENTATIONS AND WARRANTIES, AND CERTAIN UNDERTAKINGS BY A
SIGNATORY ............................................................................................................... III-105

65    Provision of Representations and Warranties, and certain Undertakings.............. III-105

**PART 15: TAX** .................................................................................................. III-108

**66**    **Tax** ............................................................................................................. III-108

**PART 16: DISPUTE RESOLUTION MECHANISM** ................................................ III-109

**67**    **Disputes, Disputing Parties and Determination Notices** ......................... III-109

**68**    **Dispute Notice** ......................................................................................... III-109

**69**    **Valuation Expert** ...................................................................................... III-111

**70**    **Adjudicator** .............................................................................................. III-113

**71**    **The Court** ................................................................................................. III-116

**72**    **Appeals, costs, indemnities and insurance** ........................................... III-116

**73**    **Indemnity insurance** ................................................................................ III-117

**74**    **Miscellaneous** .......................................................................................... III-117

**PART 17: OTHER PROVISIONS** ......................................................................... III-119

**75**    **No personal liability on the Administrators** ............................................ III-119

**76**    **Non-reliance on Circular by Signatory** .................................................... III-119

**77**    **Authority** .................................................................................................. III-119

**78**    **Delegation by the Company of its functions** ........................................... III-119

**79**    **Signatories to co-operate** ........................................................................ III-120

**80**    **Modifications** ........................................................................................... III-120

**81**    **Conflict** .................................................................................................... III-121

**82**    **Liquidation Event** ..................................................................................... III-121

**83**    **Act in good faith** ...................................................................................... III-121

**84**    **No challenge to the validity of acts of the Company or its Delegates** .................... III-121

**85**    **Payment** ................................................................................................... III-122

**86**    **Entire Agreement** ..................................................................................... III-122

**87**    **Partial invalidity** ...................................................................................... III-122

**88**    **Modification of foreign law contracts** ...................................................... III-122

**89**    **Notices** ..................................................................................................... III-122

**90**    **Authority to sign Notices and documents** ............................................... III-124

**91**    **General notifications and advertisements** ............................................... III-124

**92**    **Extension and calculation of deadlines** ................................................................... **III-125**

**93**    **Treatment of International Prime Brokerage Agreements terminated at or after the
Time of Administration** .................................................................................................... **III-125**

**94**    **Third Party rights** ............................................................................................................ **III-126**

**95**    **Governing law and jurisdiction** .................................................................................... **III-126**

**PART 18: DEFINITIONS AND INTERPRETATION** ................................................................. **III-127**

**96**    **Definitions** ....................................................................................................................... **III-127**

**97**    **Interpretation** .................................................................................................................. **III-157**

**SCHEDULE 1 TERMS AND CONDITIONS OF THE OFFER** ................................................. **III-159**

**SCHEDULE 2 FORM OF ACCEPTANCE** .............................................................................. **III-170**

**SCHEDULE 3 FORM OF DISPUTE NOTICE** ......................................................................... **III-174**

**SCHEDULE 4 WRITTEN RESOLUTIONS AND MEETINGS OF SIGNATORIES** ................... **III-175**

[This page has been intentionally left blank.]

**This Claim Resolution Agreement** (this "**Agreement**") is made on the Effective Date between:

(1)    **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**, a company incorporated in England and Wales with registered number 2538254 whose registered address is 25 Bank Street, London E14 5LE, acting by its administrators, Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT; and

(2)    each person who has:

(i)

(a)    validly accepted the Offer by the Company to enter into this Agreement in accordance with the terms of such Offer; and

(b)    been given an Accession Notice by the Company on or after the Effective Date; or

(ii)

(a)    otherwise become a Signatory to this Agreement by operation of this Agreement; and

(b)    been given a confirmation to such effect by the Company,

(each, a "**Signatory**" and, together, the "**Signatories**").

**Background:**

(A)    The Administrators were appointed to act as joint administrators of the Company on the Administration Date by an order of the High Court of Justice, Chancery Division.

(B)    The Company and Signatories have entered into this Agreement to release, modify and agree all Claims of the Signatories relating to the Trust Assets and Financial Contracts (other than certain specified Excluded Claims) in exchange for mechanisms to:

(i)    determine the Asset Claims to Trust Assets and to effect Distributions and Appropriations of Distributable Trust Assets of TA Signatories;

(ii)    allocate and make provision for the costs of managing Trust Assets and Allocating Distributable Trust Assets to TA Signatories;

(iii)    retain any Retention Amount of TA Signatories;

(iv)    determine, quantify and crystallise the value of unsecured claims (including any Asset Shortfall Claim, Pre-Administration Client Money Shortfall Claim and Net Financial Claim) of TA Signatories;

(v)    determine the Net Financial Liability, Pre-Administration Client Money Shortfall Claim and Net Financial Claim of all Signatories; and

(vi)    determine certain other Liabilities owed to the Company by Signatories, including Ascertained Non-Financial Contract Liabilities,

(together, the "**purposes**").

**It is agreed** as follows:

## PART 1: GENERAL PROVISIONS

**1    Effective Date**

**1.1    Effectiveness of this Agreement**

This Agreement shall be effective on and from the Effective Date.

**1.2    Terms and Conditions of the Offer**

The terms and conditions set out in Schedule 1 apply to the Offer (and to any Further Offer, as may be applicable) to enter into this Agreement and, once this Agreement is effective, form part of this Agreement unless otherwise stated in this Agreement.

**1.3    Notification of the Effective Date**

The Company shall, on or as soon as practicable following the Effective Date, Notify each Signatory of the Effective Date of this Agreement.

**2    Eligibility of Signatories**

**2.1    Persons acting as Representative Signatory**

The Company shall have the power to amend the terms of this Agreement to enable potential Representative Signatories to enter into this Agreement. The amendments to be made by the Company in accordance with this Clause 2.1 shall be made on a bilateral basis between the Company and each such Representative Signatory, respectively, but the effect of such bilateral arrangements is that the Representative Signatories shall be Signatories to this Agreement as amended or varied by the terms of such bilateral arrangements. The bilateral arrangements may vary in detail from one Representative Signatory to another provided that the terms of such bilateral arrangements shall, for the sole purpose of ensuring that all the provisions of this Agreement described in Clause 18, apply separately to the Net Contractual Position and Ownership Claims of each Beneficiary represented by each such Representative Signatory and shall permit all Distributions (after any applicable Appropriations) to be made to the Representative Signatory on behalf of the Beneficiary, and the Company may require specific representations, warranties and undertakings from and tailored to such Representative Signatory. The Company has the right to request any further information from potential Representative Signatories for the purposes of entering into such bilateral arrangements, including information on: (i) the identities of the Beneficiaries; and (ii) any Liabilities of the Beneficiaries to the Company or any Retention Creditors.

**2.2    Effect of Further Offer**

If the Company makes a Further Offer to Eligible Offerees (pursuant to paragraph 7.10 of Schedule 1), each of the Signatories agrees that if an Eligible Offeree validly accepts such Further Offer by the Company in accordance with the terms of such Further Offer, such Eligible Offeree shall become a Party to this Agreement and have all the rights, benefits and obligations under this Agreement as if it were an original Signatory to this Agreement.

**2.3    Consequence of excluding Excluded Parties**

If the Company determines that a person who has submitted a Form of Acceptance to the Company will be excluded from being a Signatory to this Agreement (pursuant to paragraph

13.5 of Schedule 1, an "**Excluded Party**"), then Clause 49 of this Agreement shall apply to any Signatory who suffers any direct losses as a result of this Clause 2.3.

**2.4    Determination of TA Signatory and NTA Signatory**

The Company shall, as soon as reasonably practicable, determine whether a Signatory is a TA Signatory or an NTA Signatory. The Company shall make such determination initially and, notwithstanding that, the Company may change such determination from time to time thereafter so that a TA Signatory may become, and be treated as, an NTA Signatory for the purposes of this Agreement, and vice versa.

**3    Effect of other agreements on this Agreement**

**3.1    Effect of other agreements**

This Agreement shall not affect the terms of any Pre-Agreement Contract made with any Signatory prior to its Accession Date, save as otherwise agreed between the Company and that Signatory. The Company shall have the right to vary or amend the terms of this Agreement as they apply to any Signatory that has entered into such Pre-Agreement Contract for the sole purpose of rendering the application of this Agreement to such Signatory consistent with such Pre-Agreement Contract.

**3.2    Pre-Agreement Asset Contracts**

Each Pre-Agreement Provisionally Returned Asset Recipient shall:

**3.2.1**    for the purposes of Part 10, be treated as if:

(i)    it had not received any Pre-Agreement Provisionally Returned Assets, so that Distributable Trust Assets shall include all Pre-Agreement Provisionally Returned Assets;

(ii)    it is a Signatory whether or not it is, in fact, a Non-Signatory; and

(iii)    the amount or value of any Claim finally agreed in the associated Pre-Agreement Asset Contract (if applicable) shall have been determined in accordance with this Agreement; and

**3.2.2**    for the purposes of Part 7, have a Close-Out Amount and Net Contractual Position for any Financial Contract(s), which is/are the subject of a Pre-Agreement Asset Contract, equal to any value(s) so agreed.

The provisions of this Clause 3.2 are solely for the purpose of determining whether any Pre-Agreement Provisionally Returned Assets under any Pre-Agreement Asset Contract should become Recovered Assets, and the notional Allocations under this Agreement. Any actual Distribution or Appropriation under this Agreement to a Signatory that is a Pre-Agreement Provisionally Returned Asset Recipient shall be determined in accordance with Clause 61.

**4    Effect of this Agreement on Signatories' Claims**

**4.1    Claims modified by Signatories**

With effect from its Accession Date, each Signatory's Asset Claims to Trust Assets against the Released Parties shall (to the extent that they are not Excluded Claims, and subject to Clause 4.3) be modified and amended (together, the "**Modified Claims**") so they constitute the New Claims described in Clause 4.4.

**4.2    Claims released by Signatories**

With effect from its Accession Date, each Signatory shall waive and release the following Claims against the Released Parties (to the extent that they are not Excluded Claims, and subject to Clause 4.3):

4.2.1    all Claims for or in respect of any payment for or on account of any Asset which is or was at any time the subject of an Asset Claim;

4.2.2    all Claims for consequential or economic loss (including Claims for loss of bargain, loss of value or other losses computed by reference to the value which may have been available to a Signatory had any obligation of the Company to the Signatory been duly performed in a timely manner in accordance with its terms) in respect of any Asset which is or was at any time the subject of an Asset Claim; and

4.2.3    all Claims (apart from, for the avoidance of doubt, Modified Claims) in respect of any Financial Contract,

(together, the "**Released Claims**").

**4.3    Qualifications to modification and release**

The Modified Claims and the Released Claims shall not include:

4.3.1    any Post-Administration Client Money Claim (pursuant to Clause 4.8);

4.3.2    Excluded Claims (although Signatories shall be required to account to the Company for the benefit of any such Ownership Claims to Non-Trust Assets in accordance with Clause 7.3);

4.3.3    Claims against the Company for breach of any of the terms of this Agreement or for any failure on the part of the Company to discharge its obligations under this Agreement; and

4.3.4    any counter-claims against the Company for or in respect of any Ascertained Non-Financial Contract Liabilities that the Company may assert against any Signatory.

**4.4    New Claims of Signatories**

**4.4.1    Modified Claims**

The Modified Claims of each Signatory shall remain unaffected, save that:

(i)    upon any Distribution pursuant to this Agreement:

(a)    the Signatory shall receive full title (to the extent that the Company and/or the other Signatories are able to convey such title) to those Assets delivered to the Signatory as the Distribution, free and clear of any liens, charges, Claims or encumbrances to which the Company or any other Signatory would otherwise be entitled to benefit, and which (in conjunction with Clause 4.4.1(ii) and Clause 4.4.1(iii)) shall be in full and final satisfaction of the Signatory's Modified Claims; and

(b)    each other Signatory shall waive and release all their Ownership Claims against the Released Parties, to those Assets delivered to the Signatory as the Distribution; and

(ii)    upon any Appropriation pursuant to this Agreement:

(a) the Company shall receive full title (to the extent that the Signatories are able to convey such title) to those Assets so Appropriated by the Company, free and clear of any liens, charges, Claims or encumbrances to which any Signatory would otherwise be entitled to benefit; and

(b) each Signatory shall waive and release all their Ownership Claims against the Released Parties, to those Assets of the Signatory so Appropriated; and

(iii) upon any retention, transfer or disposition of Surplus Assets pursuant to this Agreement:

(a) the Company shall receive full title (to the extent that the Signatories are able to convey such title) to those Surplus Assets, free and clear of any liens, charges, Claims or encumbrances to which any Signatory would otherwise be entitled to benefit; and

(b) each Signatory shall waive and release all their Ownership Claims against the Released Parties, to those Surplus Assets so retained, transferred or disposed.

### 4.4.2 Released Claims

All Signatories shall have their Released Claims exchanged for the following, as appropriate:

(i) the right to have their Net Contractual Position, Allocations, Distributions and Appropriations determined on the basis set out in this Agreement;

(ii) the right to claim as a new obligation of the Company their Net Financial Claim (if any); and

(iii) an Ascertained Claim (if any) for such amount as is determined under this Agreement,

(together with the Modified Claims as modified by Clause 4.4.1, the "**New Claims**").

## 4.5 Conveyance

For the purpose of any Distribution, Appropriation, retention, transfer or disposition of any Assets contemplated by Clause 4.4.1 (or otherwise by this Agreement) in relation to a Signatory, such Signatory hereby transfers and assigns those Assets, and all its right, title and interest in those Assets, to the recipient specified in this Agreement; and agrees, so far as permitted by applicable law, to sign and execute all such documents and do all such further acts and things as may be necessary, in the opinion of the Company, to give effect to each such transfer and assignment.

## 4.6 Third Party Obligations

### 4.6.1 Surviving Claims

If the release of a Claim against the Company by a Signatory pursuant to Clause 4.2 would affect a guarantee, indemnity or other obligation given by a Third Party in respect of that Claim (a "**Third Party Obligation**"), such that the Third Party Obligation would be extinguished by such release, then, notwithstanding Clause 4.2, that Released Claim (a "**Surviving Claim**") shall not be released by the Signatory but shall

continue to exist to the extent necessary for the Third Party Obligation to remain effective despite the acquisition of a corresponding New Claim.

**4.6.2    No entitlement to enforce Surviving Claims**

Notwithstanding Clause 4.6.1, no Signatory or any person who may derive a Claim in respect of a Surviving Claim, whether by reason of subrogation or otherwise, shall be entitled to make, enforce or prove any Claim against the Company in respect of such Surviving Claim, whether in any legal proceedings, by way of proof in any insolvency proceedings affecting the Company or by way of set-off, netting, counterclaim or attachment.

**4.6.3    Signatories' rights in respect of Surviving Claims**

Surviving Claims shall be taken into account by the Company for the purposes of calculating the New Claims of the relevant Signatory against the Company in accordance with this Agreement as though they were Released Claims that are not Surviving Claims.

**4.6.4    Discharge of Surviving Claims**

Satisfaction by the Company of a New Claim in respect of a Surviving Claim of the Signatory shall constitute a valid discharge pro tanto of the Surviving Claim against the Company.

**4.7    Waiver of Claims relating to Intermediary and Sub-Intermediary**

Each Signatory irrevocably waives any Claims it may have against:

**4.7.1**    any Intermediary or Sub-Intermediary for or in respect of Assets held by that Intermediary or Sub-Intermediary at the Time of Administration that have been Appropriated by the Company to Reduce such Signatory's Distribution Liabilities pursuant to Clause 60; and

**4.7.2**    any Intermediary, Sub-Intermediary or the Company for or in respect of any Intermediary Retention.

**4.8    Post-Administration Client Money comprising Derived Assets**

**4.8.1**    Each Signatory hereby irrevocably:

(i)    effects an absolute assignment to AssignCo of all and any Post-Administration Client Money Claims which comprise Derived Assets ("**Assignable Post-Administration Client Money Claims**") and all of its rights with respect thereto. The Company, acting as authorised agent of AssignCo, hereby accepts such assignment;

(ii)    directs the Company to pay any Post-Administration Client Money relating to, or proceeds of, an Assignable Post-Administration Client Money Claim ("**Assignable Post-Administration Client Money**") that would, but for Clause 4.8.1(i), have been made to the Signatory to a bank account opened in the name of AssignCo (such account, the "**Post-Administration Client Money Collection Account**") and the Signatory agrees that AssignCo shall be entitled to retain such amount absolutely for its own account without any obligation to account for it to the Signatory; and

(iii)    agrees that each payment by the Company in accordance with Clause 4.8.1(ii) in respect of Assignable Post-Administration Client Money held on the Statutory Trust shall constitute a valid discharge pro tanto of the Statutory Trust upon which the Company held the relevant amount of Assignable Post-Administration Client Money for the Signatory and the Company's obligations with respect to the distribution of Derived Assets comprised of such amount of Assignable Post-Administration Client Money.

**4.8.2**    The modification, waiver and release pursuant to Clause 4.1 and Clause 4.2 shall not affect a Signatory's Assignable Post-Administration Client Money Claims (if any) and, to the extent (if any) necessary to preserve such Assignable Post-Administration Client Money Claims, shall also not affect the obligations giving rise to such Assignable Post-Administration Client Money Claims.

**4.8.3**    Each Signatory:

(i)    undertakes that if, notwithstanding the assignment in Clause 4.8.1, it receives any amount or benefit in relation to an Assignable Post-Administration Client Money Claim, it shall promptly upon receipt and without need for any demand pay such amount or, as the case may be, the fair value of such benefit to the Post-Administration Client Money Collection Account for AssignCo's account, except to the extent such amounts form part of any Pre-Agreement Returned Asset;

(ii)    irrevocably authorises the Company, AssignCo and the Administrators to take all such action as they may reasonably consider appropriate in the name of, and on behalf of, the Signatory to establish, pursue or enforce any Assignable Post-Administration Client Money Claims;

(iii)    agrees to promptly render such assistance and take such action as the Company, AssignCo or the Administrators may reasonably request in relation to any Assignable Post-Administration Client Money Claims including, without limitation, action to enforce any of the Assignable Post-Administration Client Money Claims to the extent that the assignment in Clause 4.8.1 is, for any reason, ineffective; and

(iv)    agrees not to take any action in relation to any Assignable Post-Administration Client Money Claim (save as provided in this Agreement) or to waive, compromise, dispose of, charge, encumber or otherwise deal with the same except as so requested.

## 5    Effect of this Agreement on the Company's Claims

### 5.1    Claims released by the Company

**5.1.1**    With effect from the Accession Date of each Signatory, the Company shall, subject to Clause 5.1.2, release the Claims against the relevant Signatory for, or in respect of, all rights in respect of any Financial Contracts (together, the "**Company Released Claims**").

**5.1.2**    The Company Released Claims shall not include:

(i)    any Claim (including, but not limited to, Claims in respect of, or under, any guarantee) that the Company may have against any person other than the

Signatories, whether arising in respect of any Trust Assets, any other Asset or any other contract;

(ii) Claims against the Signatories for breach of any of the terms of this Agreement or for any failure on the part of the Signatories to discharge their obligations under this Agreement; and

(iii) any Antecedent Transaction Liabilities.

**5.2     New Claims**

The Company shall have its Company Released Claims exchanged for the following:

**5.2.1** the right to determine the Net Contractual Position, Allocations, Appropriations, Distributions and Ascertained Claims of each Signatory on the basis set out in this Agreement;

**5.2.2** the right to Claim as a new obligation of the Signatory the Distribution Liabilities, as calculated under this Agreement, from the Signatory; and

**5.2.3** the right to Appropriate such part of the Distributable Trust Assets as is Allocated to a Signatory in or towards the discharge of that Signatory's Distribution Liabilities to the Company, as provided for under this Agreement.

**6     Transfer of Positions**

**6.1     Transfer of Entire Position to a Signatory**

Nothing in this Agreement shall prevent a Signatory from Transferring its Entire Position to any other Signatory after the Time of Administration. Such Transferee shall be treated as a Signatory in respect of the Entire Position Transferred to it by the Transferor. The Transferor shall cease to be a Signatory.

**6.2     Transfer of Entire Position to a Non-Signatory after the Accession Date**

A Signatory shall not Transfer all or any part of its Entire Position to a Non-Signatory after its Accession Date, unless such Non-Signatory becomes a Signatory at or before the time such Transfer is effective, in which case Clause 6.1 shall apply.

**6.3     Transferred Position**

**6.3.1** A Signatory who is a Transferee in respect of one or more Transferred Positions shall be treated as a separate Signatory in respect of: (i) its Original Position; and (ii) each such Transferred Position, for the purposes of calculating its rights and Liabilities under the Agreement, such that its Claims against the Company and Liabilities owed to the Company pursuant to each such Transferred Position shall not be aggregated with its Claims against the Company, and Liabilities owed to the Company, comprising its Original Position, or any Claims against the Company, and Liabilities owed to the Company, arising under other Transferred Positions.

**6.3.2** The Distribution Assets and the Distribution Liabilities under the Original Position and each Transferred Position may be applied towards the Reduction or Appropriation of, or collateralised against, each other in the same way and to the same extent as the Transferor would have been entitled to had it been a Signatory, but, for the avoidance of doubt, such Distribution Assets and such Distribution Liabilities shall not be applied

under this Agreement towards the Reduction or Appropriation of, or collateralised against:

(i)     any Distribution Liabilities or any Distribution Assets (as applicable) of the Transferee in respect of the Transferee's Original Position; or

(ii)    any Distribution Liabilities or any Distribution Assets (as applicable) of the Transferee in respect of any other Transferred Position.

## 6.4    Transfers of Trust Assets to the Company

Nothing in this Agreement shall restrict any Signatory or Non-Signatory from Transferring any Trust Asset (or interest in a Trust Asset) to the Company for such consideration as may be agreed between the Company and such Signatory or Non-Signatory, including the Reduction of any Liability of such Signatory or Non-Signatory to the Company, whether or not under this Agreement.

## 6.5    Notice of Transfer

Each Signatory who is a Transferor, or who is a Transferee, undertakes to Notify the Company of the relevant Transfer, including sufficient detail for the Company to determine what Positions have been so Transferred by, or to, it respectively.

## 7    No double counting

## 7.1    Intermediary Distribution

If a Signatory receives or has received an Intermediary Distribution, whether before or after its Accession Date, any subsequent Allocation Amount(s) which would have been Allocated to such Signatory up to the Excess Value shall be Allocated to other Signatories in respect of the same Asset Pool in accordance with Clause 45.3.7.

## 7.2    Intermediary Retention

If the Company receives or has received an Intermediary Retention in respect of a Signatory whether before or after its Accession Date, the relevant Intermediary Retention shall Reduce pro tanto the Distribution Liabilities of that Signatory in accordance with Clause 55.4.3.

## 7.3    Breach of moratorium in relation to Non-Trust Assets

If a Signatory successfully asserts a Claim, whether in breach of Clause 8.1 or otherwise, against Non-Trust Assets in respect of a Liability owed to it by the Company which has been taken into account in the determination of that Signatory's Net Contractual Position, Asset Shortfall Claim or Ascertained Claim, then the value (as determined by the Company) of any benefits which have been received by or on behalf of that Signatory from the Company by way of delivery of Securities, payment of cash, set-off or otherwise, as a result of the successful assertion of such Claim, as at the date upon which the Company makes such delivery or payment or applies such set-off, shall be applied in or towards discharge or reduction of any Net Financial Claim, Asset Shortfall Claim or Ascertained Claim which that Signatory has against the Company. If the value of such benefits exceeds such relevant Net Financial Claim, Asset Shortfall Claim or Ascertained Claim, then such excess shall be a Non-Financial Contract Liability, except to the extent of that Signatory's receipts under any Third Party Obligation.

**7.4     Breach of moratorium in relation to a Released Claim or a Modified Claim**

If a Signatory obtains against the Company in relation to a Released Claim or a Modified Claim, an order, judgment, decision or award of a court or tribunal, whether in contravention of Clause 8.1 or otherwise, and the Company is required by such court or tribunal to deliver, or otherwise pay the realisation proceeds of, any Distributable Trust Assets of an Asset Pool in or towards the satisfaction of such order, judgment, decision or award, the Value of such Distributable Trust Assets so delivered or realised, as at the date of delivery or realisation, shall be a "**Recoverable Delivery Value**" and any subsequent Allocation Amount(s) which would have been Allocated to such Signatory up to the Excess Value shall be Allocated to another Signatory in respect of the same Asset Pool in accordance with Clause 45.3.7. To the extent that the sum of: (i) the Recoverable Delivery Value; and (ii) the aggregate Value, as at the Provisional Valuation Date, of all the Assets which have been Allocated to that Signatory in respect of the relevant Asset Pool exceeds the sum of the Value as at the Provisional Valuation Date and of each Asset that is included in its TA Claimant Amount in respect of that Asset Pool, such excess shall be a Non-Financial Contract Liability.

**7.5     No double counting in respect of same Asset or Claim**

To the extent not already provided for in Clause 7.1 to Clause 7.4, no Signatory will be entitled to recover more than once in respect of the same Asset or Claim, except in the case of recoveries pursuant to any Third Party Obligation (provided that the full amount recovered shall not exceed the original Claim).

**8     Moratorium**

**8.1     No Proceedings against the Company or Creditors' Committee Group**

Upon and with effect from the Effective Date, absent any fraud, no Signatory shall be entitled to take, commence or continue any Proceedings against the Company, the Creditors' Committee Group, the Administrators, the Advisers, or their firms, members, agents, partners or employees in any jurisdiction whatsoever in relation to any Released Claim or any Modified Claim except as expressly agreed by the Company or, in the case of any Proceedings against the Creditors' Committee Group, as expressly agreed by the Creditors' Committee.

**8.2     No Asset Claim and no double counting**

If and to the extent that a Signatory obtains against the Company in relation to a Released Claim or a Modified Claim, an order, judgment, decision or award of a court or tribunal in contravention of Clause 8.1, such order, judgment, decision or award shall not give rise to an Asset Claim and shall, subject to Clause 7.3, be disregarded when determining the Liability of the Company under this Agreement.

**8.3     Enforcement of Agreement by Signatory**

Nothing in this Clause 8 shall prejudice the enforcement by a Signatory of its rights under this Agreement or preclude a Signatory or the Company from applying to the Court to determine any matter arising under it or in relation to this Agreement (save to the extent that the Dispute Resolution Mechanism provides otherwise).

**8.4     Enforcement of Agreement by Company**

Nothing in this Agreement shall preclude the Company from taking, commencing or continuing any Proceedings against a Signatory to the extent that they do not comply with their

obligations under this Agreement, or in respect of any dispute regarding New Claims or Excluded Claims.

## 9    Release of Liability

### 9.1    Release and waiver by Signatories

Each Signatory hereby waives and releases fully and absolutely:

9.1.1    each and every Ownership Claim it may have in respect of any Pre-Agreement Provisionally Returned Assets and Pre-Agreement Returned Assets and each and every Claim in respect of such Assets that it may have against any person to whom the Company shall have returned such Assets other than in its capacity as the Pre-Agreement Provisionally Returned Asset Recipient;

9.1.2    the members of the Creditors' Committee Group in their capacity as such from any Liability (whether present, future, actual, prospective or contingent) that they may have to any Signatory or the Company arising in connection with the preparation and negotiation of this Agreement and in connection with their acts, omissions or defaults under this Agreement as members of the Creditors' Committee Group;

9.1.3    each and every Claim the Company and each of the Signatories may have in connection with the negotiation and preparation of this Agreement against the members of the Creditors' Committee Group;

9.1.4    the Administrators, the Advisers and their firms, members, agents, partners and employees from any Liability (whether present, future, actual, prospective or contingent) that they may have to any Signatory arising in connection with the preparation and negotiation of this Agreement and in connection with their acts, omissions or defaults under or in connection with this Agreement; and

9.1.5    each and every Claim each of the Signatories may have in connection with the negotiation and preparation of this Agreement against the Administrators, the Advisers and their firms, members, agents, partners and employees.

### 9.2    Creditors' Committee Group indemnity

The Company shall indemnify the members of the Creditors' Committee Group against all costs, charges, expenses and Liabilities suffered or properly incurred by each of them, in such capacity, as a result of a breach by any Signatory of its obligations under Clause 8.1.

## 10    Priorities of the Company under this Agreement

The Company may, in its absolute discretion:

(i)    determine the Asset Claims, Net Contractual Positions, Allocations, Retention Claims, Distributions, Appropriations and deliveries in respect of TA Signatories first, prior to determining the Net Contractual Positions of the NTA Signatories;

(ii)    deal with the Disputes from TA Signatories first, prior to those of NTA Signatories; and

(iii)    deal with any Signatory, or any group of them, within each group of TA Signatories, or NTA Signatories, in such order as the Company sees fit,

provided that this does not conflict with the terms of this Agreement.

# PART 2: ASSET CLAIMS AND BAR DATE

## 11    Asset Claims and Bar Date

### 11.1    Notification of Bar Date

The Company shall, as soon as practicable following the Effective Date, Notify each TA Signatory in accordance with Clause 89 and place an advertisement in accordance with Clause 91 to inform the TA Signatories of the Bar Date of this Agreement.

### 11.2    Procedures for TA Signatories to provide information in relation to Asset Claims

**11.2.1**    Each TA Signatory may submit any information in relation to its Asset Claims by amending or confirming the information that is available on the Portal in accordance with Clause 89.1.1 and, where necessary, provide any supplementary information in order for the Company to determine its Asset Claims. To the extent not so confirmed or amended by such TA Signatory, the Company shall treat such information as true and accurate.

**11.2.2**    A TA Signatory may submit any information in relation to its Asset Claim other than in accordance with Clause 89.1.1, subject to the consent of the Company (such consent not to be unreasonably withheld or delayed), provided that, for the purposes of this Clause 11.2.2, it shall not be unreasonable for the Company to withhold its consent where submission of such information by a TA Signatory other than in accordance with Clause 89.1.1 would require the Company to expend disproportionate costs, time or effort in dealing with such information.

**11.2.3**    Any TA Signatory who has not received a User ID and Password for the Portal from the Company shall contact the Company in accordance with Clause 89.3 as soon as practicable after its relevant Accession Date to obtain a User ID and Password for the Portal.

### 11.3    Failure to submit Asset Claims

**11.3.1**    Subject to Clause 12, to the extent that a TA Signatory does not submit any information in relation to its Asset Claims in accordance with Clause 11.2.1 and Clause 11.2.2 to the Company by 5.00 p.m. (London time) on the Bar Date, the Company shall determine such Signatory's entitlements under this Agreement at any time after the Bar Date using Relevant Information relating to such Signatory that is available to the Company at the time of such determination.

**11.3.2**    The Company shall, subject to Clause 12.3 and Clause 50, still take into account any Relevant Information relating to a Stock Line or Asset Pool submitted by a TA Signatory on any day after the Bar Date, for the purpose of Allocation for that Stock Line or Asset Pool, but any Assets for which instructions for settlement in respect of their Distribution or Appropriation have already been given will not be taken into account as Distributable Trust Assets of that Stock Line or Asset Pool.

### 11.4    Superseding

If a TA Signatory has previously submitted any information in respect of its Asset Claims, such TA Signatory may only submit new or further information in respect of its Asset Claims that was previously submitted by such TA Signatory by amending such information via the Portal (or otherwise as the Company directs).

**11.5** **Withdrawal of Asset Claims**

A TA Signatory may withdraw its Asset Claims and any related information at any time by giving a Notice to the Company by electronic mail.

# PART 3: RELEVANT INFORMATION

## 12    Information

### 12.1    Relevant Information

For the purposes of making a determination in respect of a Signatory pursuant to this Agreement, the Company shall have regard to the following information to the extent available to it at the time of such determination:

**12.1.1**    information that is capable of being ascertained by the Company from its Books and Records;

**12.1.2**    information made available to the Company by a TA Signatory in relation to its Asset Claims in accordance with Clause 11.2, including any information that has been uploaded by the Company on the Portal in relation to a TA Signatory;

**12.1.3**    any information made available by a Signatory or Non-Signatory to the Company before or after the Bar Date;

**12.1.4**    information contained in Notices received by the Company pursuant to this Agreement;

**12.1.5**    information made available to the Company by Intermediaries, Sub-Intermediaries and Affiliates;

**12.1.6**    information made available to the Company by any relevant exchanges; and

**12.1.7**    information which may be taken into account when determining any Close-Out Amount of any Financial Contract and any Value of any Relevant Asset in accordance with this Agreement, whether provided by a Signatory or a Third Party or otherwise available to the Company, which shall include, for the avoidance of doubt, any information provided by a Signatory pursuant to Clause 14,

(together, the "**Relevant Information**").

### 12.2    Discretion to use any information

The Company may, in its absolute discretion, take into account any information which is not Relevant Information for the purposes of making determinations in respect of a Signatory pursuant to this Agreement, and may, in its absolute discretion, take into account any information which comes into its possession after making such determinations, whether in response to a request for supplementary information or otherwise.

### 12.3    Disregarding information due to costs, time or effort

Notwithstanding Clause 12.2 and Clause 14, the Company shall be entitled to disregard information received after the Bar Date, from a Signatory or any other person, where it would not be reasonably practicable for the Company to take such information into account because of the disproportionate costs, time or effort required to interpret such information.

### 12.4    Incomplete or missing information in Asset Claims

**12.4.1**    Each Signatory shall be solely responsible for the cost of providing any information to the Company, including any information in relation to its Asset Claims, which shall be submitted at the Signatory's risk. The Company shall have no obligation, responsibility or Liability for incomplete or missing information or any errors in information, including information relating to its Asset Claims.

**12.4.2**   If any information provided by a Signatory is ambiguous, unclear or insufficient, the Company may request by Notice that the relevant Signatory provides supplementary information, at the cost of such Signatory. In the absence of a satisfactory response to such a request within 20 Business Days of the Notice, the Company may disregard such unclear or ambiguous information or may, acting in a commercially reasonable manner, attribute a clarificatory meaning. Where the information provided by the Signatory is insufficient, the Company may use its Relevant Information.

## 12.5   Reversal of Failed Trade Entry

Any Failed Trade Entry shall be reversed, unless such Failed Trade Entry recorded a Connected Trade (or Connected Trades) as well as a Failed Trade, in which case, such Failed Trade Entry shall be replaced with a new entry in the Books and Records of the Company to reflect the status of such Connected Trade (or Connected Trades) without regard to the Failed Trade.

## 13   Confidentiality

### 13.1   Waiver of confidentiality by Signatories

All Signatories hereby waive, to the maximum extent permitted by law, any breach of confidentiality arising from the operation of this Agreement and authorise the Company to disclose to any other person any information which the Company is required to disclose or considers to be necessary or desirable to disclose to enable this Agreement to be administered effectively and/or for the purposes of disclosure as set out in Clauses 13.2, 13.3 and 13.4.

### 13.2   Deletion of identity of Signatories

Where the Company discloses any Relevant Information to any other person in accordance with this Clause 13.1, the Company shall have all references to the identity of a Signatory deleted unless the Company determines that references to the identity of a Signatory are necessary to assist the purpose of disclosure.

### 13.3   Disclosure of information to authorities and CAPCO

Clause 13.2 shall not restrict or prevent:

**13.3.1**   any disclosure required by law or by any court of competent jurisdiction, the rules and regulations of any regulatory body or stock exchange or any enquiry or investigation by any governmental, official or regulatory body which is lawfully entitled to require such disclosure; or

**13.3.2**   any disclosure by the Company to CAPCO of any information received or generated by the Company pursuant to this Agreement to the extent that such information is requested or required by CAPCO.

### 13.4   Disclosure of identity of Signatories bringing Claims in breach of this Agreement

Clause 13.2 shall not restrict or prevent any disclosure by the Company to a Signatory against whom Proceedings in any court of competent jurisdiction have been brought, of whether the person bringing such Proceedings is a Signatory.

## 14      Incompletely Documented Agreement

### 14.1    Incompletely Documented Agreement

If, in respect of any contract, agreement or arrangement between the Company and a Signatory, it is not possible to ascertain solely from the Books and Records of the Company the terms applicable to that contract, agreement or arrangement (an "**Incompletely Documented Agreement**"), then the Company shall have regard to all Relevant Information and shall use its reasonable endeavours to make enquiry of the Signatory to determine if any, or any further, information is available to ascertain the terms of such Incompletely Documented Agreement. If any such information is available and the Signatory provides such information so that it is received by the Company within 10 Business Days of the Company's enquiry, the Company and the Signatory shall then use their reasonable endeavours to agree the terms and conditions which apply to such Incompletely Documented Agreement.

### 14.2    Standard Terms

If no further information is available and provided within 10 Business Days of the Company's enquiry by the relevant Signatory or if the Company and the relevant Signatory are unable to agree on the terms and conditions that apply to an Incompletely Documented Agreement, then the terms and conditions of such Incompletely Documented Agreement shall be determined by the Company, based on any information it then has in its possession, as supplemented by those terms and conditions which customarily applied at the relevant time to any contract, agreement or arrangement of a substantially similar type which the Company had entered into with other comparable counterparties (the "**Standard Terms**").

## PART 4: MANAGEMENT OF ASSETS PRIOR TO DISTRIBUTION

**15      Corporate Events, Corporate Actions and Derived Assets**

**15.1    Corporate Actions**

The Company shall deal with Corporate Actions occurring in relation to Relevant Securities which are Trust Assets subject to the conditions set out in this Clause 15.

**15.2    Information relating to Corporate Actions**

If a Corporate Action arises in respect of Relevant Securities which are Trust Assets and either:

(i)      it is of the type described in Clause 15.7; or

(ii)     a TA Signatory has Notified the Company in writing of an instruction regarding such Corporate Action,

then the Company will use reasonable endeavours to identify the following information:

**15.2.1**   the identity of the Relevant Securities;

**15.2.2**   the nature of the Corporate Action, including its commercial terms;

**15.2.3**   the amounts of the Relevant Securities held in different Intermediaries or Sub-Intermediaries and the nature of such accounts;

**15.2.4**   the identity of TA Signatories and TA Non-Signatories to which such holdings appear to be attributable and the amounts of the Relevant Securities attributable thereto; and

**15.2.5**   whether any Failed Trades are outstanding in relation to the Relevant Securities.

**15.3    No obligation on the Company**

The Company shall be under no obligation to take any steps with regard to any Corporate Action save as provided in this Clause 15.

**15.4    Conditions for Corporate Actions**

In the case of a Corporate Action which falls within Clause 15.2(ii), the Company will not take any action in relation to such Corporate Action unless:

**15.4.1**   the Company has received clear and unambiguous instructions from a TA Signatory in relation to such action ("**Instructions**");

**15.4.2**   the relevant TA Signatory has agreed to pay a fee (the "**Corporate Action Fee**") to the Company in consideration of the Company agreeing to use reasonable endeavours to follow the Instructions;

**15.4.3**   the Company, acting in a commercially reasonable manner, considers that there are reasonable grounds to believe that such TA Signatory may be Allocated the Securities which are the subject of the Instructions (the "**Relevant Securities**"). Any view taken by the Company is without prejudice to any final determination under this Agreement as to whether the Relevant Securities are ultimately Allocated to the relevant TA Signatory;

**15.4.4**   the Company has been indemnified to its satisfaction against any loss, Liability, cost, Claim, action, demand or expense which may be incurred or made against it in

connection with such action. The Company shall exercise its discretion in respect of these matters as it sees fit having regard to the interests of the creditors of the Company as a whole; and

**15.4.5**  the Company has determined that it is reasonably practicable for the Company to effect the Instructions in the time available.

## 15.5  Corporate Action Fee

The Corporate Action Fee referred to in Clause 15.4.2 will be US$3,000 (plus any applicable VAT) and is payment in or towards reimbursement of the costs incurred by the Company in dealing with the Instructions. The Company reserves the right to increase the Corporate Action Fee if the Company, acting in a commercially reasonable manner, concludes that the costs relating to the Instructions will be materially higher than US$3,000.

## 15.6  Procedure for carrying out Instructions

Unless modified by bilateral agreement between the Company and the TA Signatory, any TA Signatory that provides the Company with Instructions in relation to a Corporate Action shall also be deemed to have acknowledged and confirmed to the Company that, by providing such Instructions, it thereby:

**15.6.1**  indemnifies all of the Company Released Parties from and against any Claims and losses, Liabilities, costs (including, without limitation, legal costs and experts' and consultants' fees), charges, expenses, actions, proceedings, Claims and demands arising out of or in connection with the carrying out of the Instructions; and

**15.6.2**  acknowledges and agrees that:

(i)  it waives any right of action it may have against the Company Released Parties arising out of, in connection with, or as a result of the carrying out of the Instructions;

(ii)  the Company shall be entitled to deal with any proceeds realised as a result of carrying out the Instructions (the "**Realisation**") as the Company sees fit (in its absolute discretion) until such time as the Company has ascertained to its satisfaction the extent of the relevant TA Signatory's entitlement (if any) to the Realisation;

(iii)  by carrying out the Instructions, the Company does not:

(a)  make any admission that the Company is or was obliged to carry out the Instructions;

(b)  agree that the Company will carry out any other instructions received from the relevant TA Signatory;

(c)  accept that the relevant TA Signatory has any entitlement to the Realisation of the Relevant Securities; or

(d)  make any admissions that any part or whole of the Realisation constitutes Trust Assets;

(iv)  in carrying out the Instructions, the Company reserves all rights in relation to the foregoing and that, in particular, the Company's carrying out of the Instructions and all steps relating thereto are without prejudice to this

Agreement or any other agreements between the relevant TA Signatory and the Company;

(v)    the Corporate Action Fee shall be payable within three Business Days of the date upon which the relevant TA Signatory agrees to pay it and, if not so paid, shall, at the election of the Company, be deductible from any combination of: (a) any Realisation; (b) any amount that the Company determines to be payable by it to the relevant TA Signatory; or (c) the proceeds of sale of such relevant Trust Assets as may be required, and, for these purposes, the Company may make any necessary currency conversion. The Corporate Action Fee shall be payable without set-off, deduction, counterclaim or the exercise of any liens, any right to which is waived by the relevant TA Signatory;

(vi)    the Administrators act as agents for and on behalf of the Company, and in doing so they and their firms, members, agents, partners, employees and their representatives shall not incur any personal liability whatsoever in relation to steps taken by the Company in connection with the Instructions. This acknowledgement of the exclusion of liability shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any Claims in tort as well as under the laws of contract and each of the Administrators, their firms, members, agents, partners and employees shall be entitled to rely on, enforce and enjoy the benefit of this acknowledgement;

(vii)    the Company Released Parties shall not be responsible for any failure on the part of any person to comply with any instruction the Company may give to them or carry out or make any transaction or payment contemplated in the Instructions; and

(viii)    if the Relevant Securities are held through an Intermediary or Sub-Intermediary over which the Company has no or restricted access, it may not be possible to effect the Instructions or to ascertain if the Instructions have been effected.

## 15.7   Corporate Action without Instructions

If no Instructions have been received and the relevant Corporate Action is:

**15.7.1**    subject to Clause 15.7.2, the grant of tradable subscription rights to holders of the relevant Securities, then, if not otherwise automatically sold in the relevant market, such rights shall be sold by the Company at a price and time determined by it in its absolute discretion; or

**15.7.2**    the grant of bonus rights to holders of the Relevant Securities which require no payment to be made, then such rights shall be taken up.

## 15.8   No action to be taken if payment is required

The Company shall not be required to take any action regarding Trust Assets in respect of Corporate Actions to the extent that it requires a payment to be made by the Company. The Company may take such action in any event if the Company considers that to do so will ultimately be more beneficial to the creditors of the Company as a whole.

**15.9    No Corporate Action if below de minimis level**

The Company shall not be required to take any action regarding Trust Assets in respect of Corporate Actions to the extent that the Company determines, acting in a commercially reasonable manner, that the value (as determined by the Company) of such Corporate Action is below a de minimis level determined by the Company from time to time.

**15.10    Failed Trades**

If, in relation to a Corporate Action, any Failed Trades are outstanding in respect of Trust Assets and the relevant TA Signatory would, were it not for such failure to settle, have sold or transferred the Relevant Securities to one or more Third Parties, no action will be taken in respect of that Corporate Action unless each such Third Party gives, in a form satisfactory to the Company, its written consent to the proposed Corporate Action and waives any right of action against the Company Released Parties arising out of, in connection with, or as a result of, the carrying out of the Instructions.

**15.11    Corporate Event**

Each of the following shall be a Corporate Event:

**15.11.1**  payment of a dividend;

**15.11.2**  payment of a coupon;

**15.11.3**  payment of a redemption amount;

**15.11.4**  an exchange of a security for a security, of a security for cash, of a security for any other securities or assets, or of a security for any combination of these; and

**15.11.5**  any other analogous or similar event,

in each case, where the relevant event would not qualify as a Corporate Action.

**15.12    Derived Assets form part of Trust Assets**

To the extent that any Derived Assets are actually received by the Company (or otherwise constitute Distributable Trust Assets) as a result of the occurrence of a Corporate Action or a Corporate Event, such Derived Assets will be accounted for as part of the Trust Assets from which they are derived.

**16    Undertakings by the Company in respect of the Trust Assets**

**16.1    Standard of care of the Company**

The Company shall act in accordance with the standard of care imposed on a fiduciary in respect of the Trust Assets to the TA Signatories. Consistent with that standard of care, the Company shall not, save as provided in this Agreement:

**16.1.1**  take, or (to the extent that, in its capacity as fiduciary, it has the power to control) permit another person to take, any action which would result in any Distributable Trust Assets ceasing to be Distributable Trust Assets; or

**16.1.2**  omit to take, or (to the extent that, in its capacity as fiduciary, it has the power to control) permit another person to omit to take, any action the omission of which would result in Distributable Trust Assets ceasing to be Distributable Trust Assets.

**16.2    Exceptions to the standard of care**

However, notwithstanding Clause 16.1:

16.2.1    nothing in this Agreement shall impose on the Company more extensive obligations than its obligations prior to Administration; and

16.2.2    the Company shall not be obliged to take any action, or omit to take any action, or procure the same in respect of any other person (to the extent it has power in its capacity as fiduciary to do so), unless the Company has been indemnified to its satisfaction against any loss, Liability, cost, Claim, action, demand or expense which may be incurred or made against it in connection with such action or omission.

**16.3    The Company acting as trustee of the Trust Assets**

The Company shall, to the extent that it is able to do so in its capacity as trustee, use all reasonable endeavours to gather in Trust Assets and to remove any impediment on Assets being Distributable Trust Assets, provided that the Company shall not be required to transfer any asset to which the Company is absolutely entitled nor to expend any amount on discharging any Liability unless and to the extent that the Company will be indemnified for, and on behalf of, the Signatories for the expense of so doing or where the net value of the Assets of the Company will not be decreased as a result.

**16.4    Appropriation Rights of the Company**

From the Effective Date, the Company shall not Appropriate for itself any Trust Assets save in accordance with, and to the extent of, its Appropriation Rights or as otherwise permitted by this Agreement.

## PART 5: ASSET VALUATION METHODOLOGY

## 17    Asset Valuation Methodology

### 17.1    Asset Valuation Methodology

The Value of: (i) any Unpaid Amount Deliverable; and (ii) any other Security (each such Security being Valued, a "**Relevant Asset**") as at the relevant Asset Valuation Date shall be an amount in US dollars determined by the Company in accordance with the following provisions (the "**Asset Valuation Methodology**"):

**17.1.1**    **Proceeds of sale**: if the Company sells or has sold on that date a Security that is fungible with, or otherwise substantially economically equivalent to, the Relevant Asset, the proceeds of sale; or

**17.1.2**    **Reported price**: if Clause 17.1.1 does not apply, subject to Clause 17.1.6(i) to Clause 17.1.6(v):

   (i)    **Reported mid-market price**: if a single price (not being a bid price or an offer price) for the Relevant Asset is quoted on a generally recognised exchange or quotation system or published by a generally recognised price source for the Relevant Asset and the quotation or publication of such price is not suspended on the relevant Asset Valuation Date, the single price for the Relevant Asset so quoted or published at 5.00 p.m. in the relevant market on the relevant Asset Valuation Date; or

   (ii)    **Arithmetic mean of reported bid price and offer price**: if a bid price and an offer price for the Relevant Asset are both quoted on a generally recognised exchange or quotation system or published by a generally recognised price source for the Relevant Asset and the quotation or publication of such bid price and offer price is not suspended on the relevant Asset Valuation Date, the arithmetic mean of the bid price and the offer price so quoted or published at 5.00 p.m. in the relevant market on the relevant Asset Valuation Date; or

**17.1.3**    **Mid-market value using firm quotations**: if Clause 17.1.1 and Clause 17.1.2 do not apply, subject to Clause 17.1.6(i) to Clause 17.1.6(v), if the Company has obtained one or more firm bid quotations and one or more firm offer quotations in respect of the Relevant Asset from market makers or regular dealers in an appropriate market for such Asset on the Asset Valuation Date, then the mid-point between: (i) such bid quotation (or, if there are two or more such bid quotations, the arithmetic mean of such bid quotations); and (ii) such offer quotation (or, if there are two or more such offer quotations, the arithmetic mean of such offer quotations); or

**17.1.4**    **Mid-market value using indicative quotations**: if Clauses 17.1.1 to 17.1.3 do not apply, subject to Clause 17.1.6(i) to Clause 17.1.6(v), if the Company has obtained one or more indicative bid quotations and one or more indicative offer quotations in respect of the Relevant Asset from market makers or regular dealers in an appropriate market for such Asset on the Asset Valuation Date, then the mid-point between: (i) such bid quotation (or, if there are two or more such bid quotations, the arithmetic mean of such bid quotations); and (ii) such offer quotation (or, if there are two or more such offer quotations, the arithmetic mean of such offer quotations); or

**17.1.5**    **Fallback valuation**: if Clauses 17.1.1 to 17.1.4 do not apply, subject to Clause 17.1.6(i) to Clause 17.1.6(v), the fair market value (which shall be based on mid-

market pricing and may be zero) for the Relevant Asset on the relevant Asset Valuation Date, as determined by the Company, for which purpose the Company may take into account any Relevant Information, including, without limitation, one or more of the following types of information:

(i)     any bid or offer prices on or about the relevant Asset Valuation Date in respect of the Relevant Asset or Assets which are comparable to the Relevant Asset, customary bid-offer spreads for the Relevant Asset or Assets which are comparable to the Relevant Asset and any historical trading prices in respect of the Relevant Asset or Assets which are comparable to the Relevant Asset, as published by any exchange or quotation system or other generally recognised price source;

(ii)    market data in respect of the relevant market supplied by one or more third parties or derived from internal sources, including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads and correlations; and

(iii)   the results of the operation of any models or other pricing methodologies, including manual or automated calculations performed by the Company's personnel using existing or reinstated systems of the Company (including the use of statistical inference techniques) or the proprietary pricing models of, or information supplied by, one or more third parties selected by the Company.

**17.1.6**  **Provisos to Asset Valuation Methodology**: Clauses 17.1.2 to 17.1.5 are subject to the following:

(i)     the Company has no obligation to solicit or obtain a specific number of quotations, values or prices and may seek any number of quotations, values or prices that it considers appropriate;

(ii)    the Company may discard quotations, values or prices that it has obtained where it determines this to be appropriate in the circumstances, in particular where the Company believes that the discarded quotations, values or prices would have a distorting effect on any arithmetic mean;

(iii)   the time as at which quotations are to be obtained will be selected by the Company;

(iv)    if only bid quotations, values or prices or only offer quotations, values or prices are made available to the Company, then the Company may determine the mid-market value for the Relevant Asset by reference to the historical bid-offer spreads for the Relevant Asset or customary bid-offer spreads for Assets comparable to the Relevant Asset, as determined by the Company; and

(v)     notwithstanding Clause 17.1.6(i) to Clause 17.1.6(iv) above, if the Company determines that: (a) it would not be commercially reasonable to determine the Value in accordance with Clause 17.1.2, Clause 17.1.3 or Clause 17.1.4; or (b) the Value that would otherwise have been determined under Clause 17.1.2, Clause 17.1.3 or Clause 17.1.4 does not represent the fair market value of the Relevant Asset, then the Company may determine the Value of the Relevant Asset in accordance with Clause 17.1.5.

**17.2 Valuations as at the Date before Administration**

For the avoidance of doubt, valuations required to be made as at the Date Before Administration shall disregard all subsequent Corporate Actions and Corporate Events and all Derived Assets.

**17.3 Adjustment for size**

For the avoidance of doubt, the Company may adjust any quotation, value or price obtained or determined in accordance with Clauses 17.1.1 to 17.1.5 to reflect the fact that the amount of the Relevant Asset being Valued in accordance with Clause 17.1 is unusually large or unusually small for such Asset in the relevant market, or where different quotations have been received in smaller amounts to produce an aggregate equivalent to the amount of the Relevant Asset.

**17.4 Determinations by the Company**

All determinations, valuations and calculations of the Company for the purpose of this Clause 17 shall be performed in a commercially reasonable manner.

**17.5 Conversion to US dollars**

For the purpose of this Clause 17, amounts denominated in a currency other than US dollars shall be converted into US dollars using the Spot Rate at the Relevant FX Conversion Time.

## PART 6: OVERVIEW OF DISTRIBUTION

## 18    Overview of Distribution mechanism

### 18.1    Distribution mechanism

Parts 7 to 12 of this Agreement set out the mechanism for determining: (i) in respect of each Signatory, the Net Contractual Position; and (ii) in respect of each TA Signatory:

**18.1.1**    any Retention Amount;

**18.1.2**    its Ascertained Non-Financial Contract Liabilities (including its Limited Ascertained Non-Financial Contract Liabilities);

**18.1.3**    its TA Claimant Amount to each Asset Pool;

**18.1.4**    the Identification of Assets that constitute Distributable Trust Assets for each Asset Pool;

**18.1.5**    Allocations of Distributable Trust Assets;

**18.1.6**    Distributions and Appropriations of Distribution Assets;

**18.1.7**    any Asset Shortfall Claim in respect of an Asset Pool; and

**18.1.8**    the delivery and payment of Distributions.

### 18.2    Determination procedure

**18.2.1**    In respect of each TA Signatory, the Net Contractual Position, any Retention Amount, Ascertained Non-Financial Contract Liabilities (including its Limited Ascertained Non-Financial Contract Liabilities) and any Allocation may be determined independently of each other prior to Distribution and Appropriation of Distribution Assets to such TA Signatory.

**18.2.2**    In respect of each TA Signatory, any Net Contractual Position, Retention Amount and Ascertained Non-Financial Contract Liabilities (including its Limited Ascertained Non-Financial Contract Liabilities) will be determined on a per TA Signatory basis. Allocations of Distributable Trust Assets to TA Signatories will be determined on a per Stock Line basis (other than for Affected Intermediaries). Allocations of Distributable Trust Assets of a Stock Line are dependent upon: (i) the Identification of Trust Assets of that Stock Line that constitute Distributable Trust Assets for that Stock Line; and (ii) determination of the TA Claimant Amount of all TA Signatories and Non-Signatories to that Stock Line. Interim Allocations for a Stock Line may be determined pending the resolution of any Dispute over the Company's determination of a TA Claimant Amount. Allocations of Distributable Trust Assets from Affected Intermediaries to TA Signatories shall be done on a per Affected Intermediary basis.

**18.2.3**    Distributions and Appropriations will only be determined in respect of a TA Signatory and an Asset Pool, when the following have been ascertained: (i) that TA Signatory's Net Contractual Position; (ii) whether that TA Signatory has a Retention Amount and, if so, its amount; (iii) that the Allocation of Assets of the same Asset Pool is not a De Minimis Allocation; and (iv) whether any Non-Financial Contract Liabilities as described in Clause 33.1 and Clause 33.4 have become Ascertained Non-Financial Contract Liabilities and which of those are Limited Ascertained Non-Financial Contract Liabilities. Any Asset Shortfall Claim will only be determined in respect of a TA

Signatory and an Asset Pool, when all Assets of that Asset Pool have been Allocated pursuant to a Last Allocation.

**18.2.4**   The Net Contractual Position will be determined in respect of each NTA Signatory.

### 18.3   Determination of Net Contractual Position

**18.3.1**   Each Open Contract between the Company and a Signatory shall be terminated in accordance with Clause 19.

**18.3.2**   A Close-Out Amount in respect of each Financial Contract between the Company and a Signatory shall be determined in accordance with Part 7.

**18.3.3**   A Net Contractual Position in respect of all Financial Contracts between the Company and a Signatory shall be determined in accordance with Clause 24 and Clause 25.

### 18.4   Determination of Retention Amounts

**18.4.1**   The Company shall determine the Retention Amount in respect of each TA Signatory, from time to time, in accordance with Clause 28.

**18.4.2**   The handling of Retention Amounts and payments of Retention Amounts to Retention Creditors will be dealt with in accordance with Part 8.

### 18.5   Determination of Ascertained Non-Financial Contract Liabilities

The Company shall determine from time to time any Ascertained Non-Financial Contract Liabilities in respect of each TA Signatory in accordance with Part 9.

### 18.6   Determination of Allocation and Asset Shortfall Claim

**18.6.1**   The Company shall, from time to time, Identify Assets that constitute Distributable Trust Assets for each Asset Pool in accordance with Clause 43.

**18.6.2**   The Company shall, from time to time, Allocate an amount of Assets which are Distributable Trust Assets to each TA Signatory with a relevant Asset Claim in accordance with Clause 41, Clause 45 or Clause 47, as the case may be.

**18.6.3**   The Company shall determine the Asset Shortfall Claim of a TA Signatory in accordance with Clause 46 or Clause 48, as the case may be.

### 18.7   Determination of Appropriations and Distributions

**18.7.1**   A TA Signatory may elect to discharge its Net Financial Liability and its other Distribution Liabilities in full or in part by Payment to the Company in accordance with Clause 55.4.2.

**18.7.2**   A TA Signatory may elect to reduce its outstanding Net Financial Liability by the amount of any Collateral Amount that it may have against the Company in accordance with Clause 55.4.4.

**18.7.3**   A Signatory may elect to make a Collateralisation Election under Clause 59.

**18.7.4**   After determining the Net Contractual Position of a TA Signatory and one or more Allocations to that TA Signatory in respect of an Asset Pool, the Company will determine Appropriations and Distributions to such TA Signatory in respect of its Allocations in accordance with Part 11.

**18.7.5**  Appropriations of Distribution Assets of a TA Signatory to Reduce a Signatory's Distribution Liabilities will be effected in accordance with Clause 60.

（i）  Distributions and Appropriations in relation to a TA Signatory with a Net Financial Claim against the Company will be determined in accordance with Clause 60.1.

（ii）  Distributions and Appropriations in relation to a Signatory with a Net Financial Liability to the Company will be determined in accordance with Clauses 60.2 to 60.8.

（iii）  Distributions and Appropriations in relation to Affected Stock Lines that are the subject of an Affected Intermediary Collateralisation Election shall be determined in accordance with Clause 60.3 and Clause 60.6.

（iv）  Distributions and Appropriations in relation to a Signatory who has made a Client Money Collateralisation Election shall be determined in accordance with Clause 60.4, Clause 60.7 and Clause 60.8.

**18.7.6**  Deliveries and payments of Distributions to Signatories will be made in accordance with Clause 63.

## PART 7: NET CONTRACTUAL POSITION

**19    Termination of Financial Contracts**

**19.1    Effect of this Agreement on Open Contracts**

All Open Contracts between the Company and a Signatory shall be terminated in accordance with this Clause 19.

**19.2    Defective Notice of Termination**

The Company shall have the right to deem any Defective Notice of Termination as having validly terminated the relevant Financial Contract between the Company and the Signatory on the date specified in that Defective Notice of Termination or otherwise in accordance with the terms of the relevant Financial Contract, despite any defect in or uncertainty about the effect of such notice.

**19.3    Termination of Open Contracts**

Each Open Contract not terminated pursuant to Clause 19.2 shall be deemed to be terminated as between the Company and the relevant Signatory on the relevant Open Contract Termination Date without any action being required to be taken by the Company, notwithstanding any action by or on behalf of the Signatory before the Open Contract Termination Date purporting to terminate such Open Contract.

**19.4    General provisions in relation to termination**

19.4.1    Any termination of an Open Contract otherwise than pursuant to this Clause 19 shall be void.

19.4.2    The termination of any Open Contract under this Clause 19 shall not prejudice any Ownership Claims of the Signatory which may have existed prior to such termination, which shall survive to the extent that any Ownership Claims survive (subject to any modification) under this Agreement, including those rights that survive pursuant to Clause 93, subject always to any Appropriation Rights.

19.4.3    Subject to Clause 93, no termination of any Open Contract under this Clause 19 shall modify any contract or rights between a Signatory and any Third Party.

**20    Close-Out Amount**

**20.1    Determination of the Close-Out Amount**

The Close-Out Amount in respect of each Financial Contract shall be determined by the relevant Determining Party in accordance with the applicable Financial Contract Valuation Methodology. For the avoidance of doubt, the Overriding Valuation Provisions form part of each Financial Contract Valuation Methodology.

**20.2    Financial Contract Valuation Methodologies**

Without prejudice and subject to the other provisions set out in this Part 7, the Close-Out Amount in respect of a Financial Contract shall be determined:

20.2.1    first, in accordance with the Contractual Valuation Methodology, insofar as it is possible to do so under Clause 21;

20.2.2   secondly, in the circumstances as further set out in Clause 22, in accordance with the Agreed Valuation Methodology; and

20.2.3   thirdly, if neither the Contractual Valuation Methodology nor the Agreed Valuation Methodology is applicable as further described in Clause 23, in accordance with the Fallback Valuation Methodology,

(each of the Contractual Valuation Methodology, the Agreed Valuation Methodology and the Fallback Valuation Methodology, a "**Financial Contract Valuation Methodology**").

### 20.3   Positive Close-Out Amounts and negative Close-Out Amounts

A Close-Out Amount (or a Close-Out Component) representing an amount payable by the Signatory to the Company shall be expressed as a negative number. A Close-Out Amount (or a Close-Out Component) representing an amount payable by the Company to the Signatory shall be expressed as a positive number.

### 20.4   Overriding Valuation Provisions

Each of the following shall be an "**Overriding Valuation Provision**":

20.4.1   **Exclusion of Asset Claim**: any Asset Claim which is the subject of a Financial Contract shall be disregarded in the Valuation of the Close-Out Amount;

20.4.2   **Open Contracts**: the Close-Out Amount, in respect of each Open Contract, except to the extent that it relates to Short Positions and Rehypothecated Securities, shall be determined as at the Open Contract Termination Date;

20.4.3   **Short Positions and Rehypothecated Securities**: for the purpose of determining the Close-Out Amount of a Financial Contract:

(i)   the Value of:

(a)   any Security which is the subject of a Short Position; and

(b)   any Rehypothecated Security,

shall be the market closing price as quoted on a generally recognised price source for such Security as at the relevant Asset Valuation Date, provided that, if it is impossible or otherwise not reasonably practicable for the Company to obtain such market closing price, the Value of such Security shall be determined in accordance with the Asset Valuation Methodology in Clause 17; and

(ii)   any other payment or delivery obligation arising under the Financial Contract in relation to Clause 20.4.3(i)(a) or Clause 20.4.3(i)(b) (including, for example, the payment obligation of manufactured dividends in respect of Clause 20.4.3(i)(a) or Clause 20.4.3(i)(b)) which become payable or deliverable on or after the Administration Date shall not be taken into account in the determination of the relevant Close-Out Amount;

20.4.4   **Flawed Asset Provisions**: any term of a Financial Contract which provides that an obligation of a party is subject to a condition precedent that an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event has not occurred and/or is not continuing with respect to the other party (any such term, a "**Flawed Asset Provision**") shall be disregarded in the calculation of the Close-Out Amount;

20.4.5 **Walk away provisions**: any term of a Financial Contract which:

(i)     provides that an amount which, but for such term, would be payable by one party to the other party as a result of termination of such Financial Contract would not be payable to such other party as a result of an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event having occurred with respect to such other party; or

(ii)    provides that only the party which is not subject to an event of default, failure to pay or deliver, act of insolvency, breach of contract or other similar event is entitled to receive a payment following the termination of such Financial Contract,

shall be disregarded by the Determining Party in the calculation of the Close-Out Amount;

20.4.6 **Exclusion of Pre-Administration Client Money Claim**: any Pre-Administration Client Money Claim shall be disregarded in the Valuation of any Close-Out Amount but without prejudice to the calculation in Clause 59;

20.4.7 **Accrual of interest**: in determining the Close-Out Amount in respect of a Financial Contract, no interest shall accrue on any unpaid Liability of the Company from the Administration Date save to the extent that such interest would accrue under Rule 2.88 of the Insolvency Rules;

20.4.8 **Third Party Liabilities**: in determining the Close-Out Amount in respect of each Financial Contract, no account will be taken of any Liabilities which are asserted to be due from that Signatory to persons other than the Company or due to that Signatory from persons other than the Company; and

20.4.9 **Antecedent transactions**: in determining the Close-Out Amount in respect of a Financial Contract, no account will be taken of any amounts which might be, or in due course become, Antecedent Transaction Liabilities.

## 20.5   Disapplication of Overriding Valuation Provisions

The Company may in its absolute discretion disapply any of the Overriding Valuation Provisions if it deems that it is not reasonably practicable to apply such Overriding Valuation Provision, provided that this shall result in a greater Net Contractual Position in respect of a Financial Contract than would otherwise have been the case, and shall not affect any Signatory's Asset Claim.

## 20.6   The Determining Party

20.6.1 The party determining the calculation of the Close-Out Amount in respect of a Financial Contract in accordance with this Part 7 shall be referred to as the "**Determining Party**".

20.6.2 If the Contractual Valuation Methodology applies, the Determining Party shall be determined in accordance with Clause 21.7. Where the Determining Party in respect of a Financial Contract is:

(i)     a Signatory, such Signatory shall submit a Valuation Statement to the Company; and

(ii)    a Third Party, the relevant Signatory shall request the Third Party to submit a Valuation Statement to the Company,

in each case, in accordance with Clause 21.

**20.6.3**  If the Agreed Valuation Methodology applies, the Determining Party shall be the Company, in accordance with Clause 22.

**20.6.4**  If the Fallback Valuation Methodology applies, the Determining Party shall be the Company, in accordance with Clause 23.

**20.6.5**  Where the Determining Party is the Company, the Company may deal with any Signatory or group of them in such order as the Company sees fit, provided that this does not prejudice or unduly delay meeting the objectives and purposes of this Agreement.

## 21    Contractual Valuation Methodology

### 21.1    Contractual Valuation Provisions

In respect of each Financial Contract, "**Contractual Valuation Provisions**" shall be any terms in such Financial Contract which provide for the calculation of an amount or amounts payable by one party to the other as a result of the termination of such Financial Contract.

### 21.2    Application of the Contractual Valuation Provisions and the Overriding Valuation Provisions

**21.2.1**  Subject to the other provisions of this Clause 21, in respect of each Financial Contract, the Close-Out Amount shall be determined in accordance with the relevant Contractual Valuation Provisions, as modified and supplemented by the Overriding Valuation Provisions.

**21.2.2**  If there is any conflict between any Contractual Valuation Provision and the Overriding Valuation Provisions, Clause 21.6 shall apply.

**21.2.3**  The Contractual Valuation Provisions in respect of a Financial Contract, as modified and supplemented by the Overriding Valuation Provisions, shall be the "**Contractual Valuation Methodology**" in respect of such Financial Contract.

### 21.3    Close-Out Amount

**21.3.1**  Where the Contractual Valuation Methodology contains provisions for calculating a single amount payable by one party to the other as a result of the termination of a Financial Contract, such amount shall be the Close-Out Amount in respect of such Financial Contract.

**21.3.2**  Where the Contractual Valuation Methodology contains provisions for calculating more than one amount payable by one party to the other as a result of the termination of a Financial Contract (each such amount, a "**Close-Out Component**"), the aggregate of each Close-Out Component, as determined by the Company, shall be the Close-Out Amount in respect of such Financial Contract.

### 21.4    Election of the relevant Contractual Valuation Provisions within a Financial Contract

Where the Contractual Valuation Provisions of a Financial Contract differ depending upon the reason for the termination of such Financial Contract:

**21.4.1**  if a valid election between such differing provisions has been made by the Signatory in accordance with the relevant Financial Contract (including as a result of any defect in

the election having been waived by the Company), then the Contractual Valuation Provisions shall apply on the basis of that election; or

**21.4.2**  if no such valid election has been made, then the Contractual Valuation Provisions that, in the opinion of the Company, are applicable following an event that most closely corresponds to an act of insolvency with respect to the Company shall apply to such Financial Contract.

## 21.5    Valuation postponement provisions

**21.5.1**  Subject to Clause 21.5.2, if any Contractual Valuation Provisions in respect of a Signatory would require or permit the Close-Out Amount to be determined 30 Business Days after the relevant Open Contract Termination Date of that Signatory, they shall be amended such that the Close-Out Amount may be determined no later than the 30 Business Days after the relevant Open Contract Termination Date of such Signatory. The Company shall determine the nature and extent of the amendments necessary to achieve this and Notify the Signatory of such amendments.

**21.5.2**  If the Company determines that it is not reasonably practicable to effect such amendments, the Close-Out Amount in respect of such Financial Contract shall be determined in accordance with the Fallback Valuation Methodology in Clause 23, unless:

(i)      the Close-Out Amount in respect of such Financial Contract is the aggregate of the Close-Out Components; and

(ii)     the Contractual Valuation Provisions enable some of the Close-Out Components to be determined on or before the Valuation Submission Date (the "**Unaffected Close-Out Components**"),

then such Financial Contract shall be treated as two separate Financial Contracts, comprising:

(a)      one Financial Contract in respect of the transactions to which the Unaffected Close-Out Components relate, the Close-Out Amount of which shall be determined in accordance with the Contractual Valuation Methodology; and

(b)      one Financial Contract in respect of all other transactions, the Close-Out Amount of which shall be determined in accordance with the Fallback Valuation Methodology in Clause 23.

The Company shall Notify the Signatory of its determination to treat a Financial Contract as two separate Financial Contracts in accordance with this Clause 21.5.2.

## 21.6    Conflict between Contractual Valuation Provisions and the Overriding Valuation Provisions

**21.6.1**  Subject to Clause 21.6.2, if a Contractual Valuation Provision conflicts with any of the Overriding Valuation Provisions such that a determination of the Close-Out Amount in accordance with such Contractual Valuation Provision would result in a non-compliance with any Overriding Valuation Provisions, the latter shall prevail and such Contractual Valuation Provision shall be amended only to the extent necessary to enable the Close-Out Amount to be determined without such conflict. The Company shall determine the nature and extent of the amendments necessary to achieve this and Notify the Signatory of such amendments.

21.6.2   If the Company determines that it is not reasonably practicable to effect such amendments, the Close-Out Amount in respect of such Financial Contract shall be determined in accordance with the Fallback Valuation Methodology in Clause 23.

## 21.7   The Determining Party under the Contractual Valuation Methodology

### 21.7.1   The Contractual Determining Party

The party which is entitled or required under the Contractual Valuation Provisions of a Financial Contract to determine the amount or amounts payable by one party to the other as a result of the termination of such Financial Contract shall be the "**Contractual Determining Party**" in respect of such Financial Contract.

### 21.7.2   The Contractual Determining Party conditional upon occurrence of event of default

Where the Contractual Valuation Provisions of an Open Contract which is terminated in accordance with Clause 19.3 require an event of default, act of insolvency, failure to pay or deliver, breach of contract or other similar event to have occurred in respect of one party in order to ascertain the Contractual Determining Party, then such an event of default, act of insolvency, breach of contract or other similar event shall be deemed to have occurred in respect of the Company for this purpose only.

### 21.7.3   General rule

The Contractual Determining Party in respect of a Financial Contract shall be the Determining Party in respect of such Financial Contract, provided that:

(i)   if the Contractual Determining Party is a person other than the Company and that person fails to deliver a Valuation Statement on or before the Valuation Submission Date, the Company shall be the Determining Party;

(ii)   if there is more than one Contractual Determining Party, each such party shall be a Determining Party to the extent that, pursuant to the Contractual Valuation Provisions, it is entitled or required to contribute to the determination of the amount or amounts payable by one party to the other as a result of the termination of such Financial Contract (such extent, the "**Contribution to Determination**") subject to Clause 21.7.4; and

(iii)   if the Contractual Valuation Provisions do not specify any Contractual Determining Party, the Company shall be the Determining Party.

### 21.7.4   Multiple Contractual Determining Parties

Where there is more than one Contractual Determining Party, this Clause 21.7.4 shall apply to each such Contractual Determining Party with respect to its relevant Contribution to Determination as if: (i) it were the sole Contractual Determining Party in respect of such Financial Contract; and (ii) its Contribution to Determination represented the entire right or obligation under the Contractual Valuation Provisions of a Financial Contract to determine the amount or amounts payable by one party to the other as a result of the termination of such Financial Contract.

### 21.8    Valuation Statements

#### 21.8.1    Signatory to submit Valuation Statement

If the Signatory is the Determining Party in respect of a Financial Contract, then, to the extent not already required by the Contractual Valuation Provisions, the Signatory shall submit a Valuation Statement for such Financial Contract to the Company on or before the Valuation Submission Date.

#### 21.8.2    Third Party to submit Valuation Statement

If a Third Party is the Determining Party in respect of a Financial Contract, then, to the extent not already required by the Contractual Valuation Provisions, the Signatory shall request the Third Party to provide a Valuation Statement for such Financial Contract to the Company on or before the Valuation Submission Date.

#### 21.8.3    Company may consider Valuation Statement not in compliance with the Overriding Valuation Provisions

Where the calculation of a Close-Out Amount contained in a Valuation Statement is not in compliance with any of the Overriding Valuation Provisions, the Company may give consideration to such calculation, notwithstanding such non-compliance, after making such adjustments to the calculation to the extent it considers necessary in order to rectify such non-compliance, provided that if additional information not already contained in such Valuation Statement is required to be taken into account in order to make such adjustments, the Company may request the relevant Signatory or Third Party to provide supplementary information in accordance with Clause 21.8.5.

#### 21.8.4    New Valuation Statement or amendment to previously submitted Valuation Statement

If a Signatory or Third Party has previously submitted a Valuation Statement in respect of a Financial Contract, such Signatory or Third Party may only submit a new Valuation Statement superseding such previously submitted Valuation Statement, or an amendment to such previously submitted Valuation Statement:

(i)      if such new Valuation Statement or amendment is submitted prior to the Valuation Submission Date; and

(ii)
    (a)      if the previously submitted Valuation Statement was submitted prior to the Effective Date and the new Valuation Statement or amendment is being submitted to ensure compliance of the Close-Out Amount with the provisions of this Agreement; or

    (b)      with the consent of the Company.

#### 21.8.5    Company may request supplementary information

Notwithstanding Clause 21.8.4 where, in the opinion of the Company, the information on a Valuation Statement is ambiguous, unclear or insufficient (including for the purpose of making any adjustments in accordance with Clause 21.8.3), the Company may request the relevant Signatory or Third Party to provide supplementary information and, in the absence of a satisfactory response to such a request on or before the twentieth Business Day after the request has been made, the Company may disregard such unclear or ambiguous information or treat such Valuation

Statement as invalid to the extent of the insufficiency of the information, or may attribute a clarificatory meaning which shall be binding on such Signatory.

### 21.9    Failure to apply the Contractual Valuation Methodology

If the Determining Party is the Signatory or a Third Party and it fails to determine the Close-Out Amount or a Contribution to Determination in accordance with the Contractual Valuation Methodology, the Company shall, subject to Clause 22.1, determine the Close-Out Amount or the Contribution to Determination in respect of such Financial Contract in accordance with the Contractual Valuation Methodology as if it were the Determining Party. In such circumstances, the Company's determination shall prevail over any determination that the Signatory or a Third Party has made, even if it purports to be in compliance with the Contractual Valuation Methodology. For the avoidance of doubt, the Contractual Valuation Methodology shall be applied by the Company as if the Contractual Determining Party were still the Signatory or a Third Party.

### 21.10    Unclear or ambiguous Contractual Valuation Provision

#### 21.10.1    The Company as Determining Party

Where the Determining Party is the Company and the Company determines that the Contractual Valuation Provision in respect of a Financial Contract is unclear, ambiguous or incapable of strict compliance due to a technicality, the Company shall: (i) determine the modifications to the Contractual Valuation Provision to the extent (and only to the extent) as are necessary or desirable to eliminate such uncertainty, ambiguity or incapacity; and (ii) Notify the relevant Signatory of such modifications (which may be in the Net Contractual Position Statement). If the Company has not received a Notice from the Signatory that it objects to such modifications by 5.00 p.m. in London on the tenth Business Day following the day on which the Company Notifies such Signatory of such modifications, the Signatory shall be deemed to have accepted such modifications to the Contractual Valuation Provision. If the Company receives a Notice from the Signatory that it objects to such modifications before 5.00 p.m. in London on the tenth Business Day following the day on which the Company Notifies such Signatory of such modifications, subject to Clause 21.10.3, the Company and the Signatory may agree such modifications to the Contractual Valuation Provision as are necessary or desirable to eliminate such uncertainty, ambiguity or incapacity, provided that such modification is not, in the opinion of the Company, materially prejudicial to the interests of other Signatories as a whole or the unsecured creditors of the Company as a whole.

#### 21.10.2    Signatory or Third Party as Determining Party

Subject to Clause 21.10.3, where the Company determines that the Contractual Valuation Provision in respect of a Financial Contract is unclear or ambiguous or incapable of strict compliance due to a technicality, such that the Company is unable to determine whether the Signatory or a Third Party has determined the Close-Out Amount or a Contribution to Determination in accordance with such Contractual Valuation Methodology, the Company and the Signatory or that Third Party may agree such modifications to the Contractual Valuation Provision as are necessary or desirable to eliminate such uncertainty, ambiguity or incapacity, provided that such modification is not, in the opinion of the Company, materially prejudicial to the interests of other Signatories as a whole or the unsecured creditors of the Company as a whole.

### 21.10.3   Inability to agree modifications

If the Company determines that it cannot agree with the Signatory or a Third Party to such modifications to the Contractual Valuation Provision, the Company shall be deemed to be the Determining Party and shall determine the Close-Out Amount in respect of that Financial Contract in accordance with the Fallback Valuation Methodology. In such circumstances, the Company's determination shall prevail over any determination made by the Signatory or a Third Party, whether or not it complies with the Contractual Valuation Methodology.

## 22   Agreed Valuation Methodology

### 22.1   Circumstances where Agreed Valuation Methodology may be applicable

**22.1.1**   Where the Company is the Determining Party in respect of a Financial Contract (including, for the avoidance of doubt, where the Company is deemed to be the Determining Party pursuant to Clause 21.9) and the Contractual Valuation Methodology would otherwise apply but the Company determines that it is not reasonably practicable for it to calculate such Close-Out Amount in accordance with the Contractual Valuation Methodology, the Company shall Notify the Signatory of this determination.

**22.1.2**   If the Company has not received a Notice from the Signatory that it objects to the determination under Clause 22.1.1 by 5.00 p.m. in London on the tenth Business Day following the day on which the Company Notifies the Signatory of such determination (the "**Fallback Notification Date**"), the Signatory shall be deemed to have accepted such determination and the Company shall determine the Close-Out Amount in respect of the relevant Financial Contract in accordance with the Fallback Valuation Methodology.

**22.1.3**   If the Company receives a Notice from the Signatory that it objects to the determination under Clause 22.1.1 before 5.00 p.m. in London on the tenth Business Day following the day on which the Company Notifies the Signatory of such determination, the Company and the Signatory may:

(i)   agree an alternative valuation methodology for determining the Close-Out Amount in respect of that Financial Contract; or

(ii)   agree a Close-Out Amount for that Financial Contract,

provided that such alternative valuation methodology or agreed Close-Out Amount (each an "**Agreed Valuation Methodology**") complies with the Overriding Valuation Provisions and such Agreed Valuation Methodology is not materially prejudicial to the interests of other Signatories as a whole or the unsecured creditors of the Company as a whole.

### 22.2   Determination of the Agreed Valuation Methodology

If the Company agrees with the Signatory on the Agreed Valuation Methodology, the Company shall determine the Close-Out Amount in respect of the relevant Financial Contract in accordance with the Agreed Valuation Methodology.

**22.3    Failure to reach an Agreed Valuation Methodology**

If the Company determines that it cannot agree with the Signatory on an Agreed Valuation Methodology, the Company shall: (i) Notify the Signatory of this determination; and (ii) determine the Close-Out Amount in respect of the relevant Financial Contract in accordance with the Fallback Valuation Methodology.

**23    Fallback Valuation Methodology**

**23.1    Applicability of the Fallback Valuation Methodology**

Where:

**23.1.1**    a Financial Contract does not contain any Contractual Valuation Provisions;

**23.1.2**    the terms of a Financial Contract (or the terms of any Contractual Valuation Provisions that it may contain) cannot be ascertained; or

**23.1.3**    the Company determines that it is not reasonably practicable to apply the Contractual Valuation Methodology (including where the Signatory or a Third Party, having initially been the Determining Party, has failed to determine a Close-Out Amount in accordance with the Contractual Valuation Methodology and the Company is deemed to be the Determining Party pursuant to Clause 21.9) and (i) if the Signatory does not Notify the Company before 5.00 p.m. in London on the Fallback Notification Date that it objects to the determination under Clause 22.1.1; or (ii) the Company and the relevant Signatory cannot agree to an Agreed Valuation Methodology in accordance with Clause 22, then the Company shall determine the Close-Out Amount of that Financial Contract in accordance with the Fallback Valuation Methodology.

**23.2    Lack of Contractual Valuation Provisions or governing terms of Financial Contract**

For the avoidance of doubt, for the purpose of determining whether a Financial Contract contains any Contractual Valuation Provisions or whether the terms of a Financial Contract (or the terms of any Contractual Valuation Provisions that it may contain) can be ascertained, the provisions of Clause 14 shall apply.

**23.3    The Fallback Valuation Methodology**

**23.3.1**    The "**Fallback Valuation Methodology**" refers to the calculation of a Close-Out Amount in accordance with the Overriding Valuation Provisions, being an amount equal to:

(i)    the Mid-Market Value; plus

(ii)    the Unpaid Amounts owing to the Signatory; less

(iii)    the Unpaid Amounts owing to the Company.

**23.3.2**    All determinations, valuations and calculations of the Company for the purpose of this Clause 23 shall be performed in a commercially reasonable manner.

**23.4    Determination of the Mid-Market Value**

**23.4.1**    "**Mid-Market Value**" means, with respect to one or more Positions under a Financial Contract, a value (which may be zero) equal to the arithmetic mean of:

(i)    one or more amounts, if any, that would be paid to the Company (expressed as a negative number) or by the Company (expressed as a positive number) in

consideration for entering into a transaction between the Company and a Hypothetical Counterparty in respect of such Position or group of Positions under the Financial Contract on terms which are the same, in all material respects, as those of the Financial Contract on the Fallback Valuation Date, other than any terms that require a payment to be made or assets to be delivered on or prior to the Fallback Valuation Date (or would have done so but for any Flawed Asset Provision); and

(ii)    one or more amounts, if any, that would be paid to the Signatory (expressed as a positive number) or by the Signatory (expressed as a negative number) in consideration for entering into a transaction between the Signatory and a Hypothetical Counterparty in respect of such Position or group of Positions under the Financial Contract on terms which are the same, in all material respects, as those of the Financial Contract on the Fallback Valuation Date, other than any terms that require a payment to be made or assets to be delivered on or prior to the Fallback Valuation Date (or would have done so but for any Flawed Asset Provision),

provided that, for the purpose of determining the Mid-Market Value, both the Company and the Signatory shall be assumed to have a creditworthiness of prime quality.

### 23.4.2    Relevant Information for determining the Mid-Market Value

In determining the Mid-Market Value, the Company may consider any Relevant Information, including, without limitation, one or more of the following types of information:

(i)    quotations (either firm or indicative) for replacement transactions supplied by one or more third parties;

(ii)    market data in respect of the relevant market supplied by one or more third parties or derived from internal sources, including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads and correlations; and

(iii)    the results of the operation of any models or other pricing methodologies, including manual or automated calculations performed by the Company's personnel using existing or reinstated systems of the Company (including the use of statistical inference techniques) or the proprietary pricing models of, or information supplied by, one or more third parties selected by the Company.

### 23.4.3    Discretions in determining the Mid-Market Value

In determining the Mid-Market Value:

(i)    subject to the Overriding Valuation Provisions, the date and time as of which the quotations are to be obtained will be selected by the Company;

(ii)    the Company may discard values or prices where it determines appropriate in the circumstances, in particular where the Company reasonably believes that the discarded values or prices would have a distorting effect on any arithmetic mean; and

(iii)    the Company shall not be required to: (a) enter, or seek to enter, into any replacement contract(s) or transaction(s); or (b) transfer, or seek to transfer, any contract(s) or transaction(s).

**23.5    Determination of Unpaid Amounts**

"**Unpaid Amounts**" owing to any party means, with respect to a Financial Contract, the aggregate of:

**23.5.1**    any amounts that became payable (or that would have become payable but for any Flawed Asset Provision) to such party under the terms of such Financial Contract on or prior to the Fallback Valuation Date and which remain unpaid on such Fallback Valuation Date; and

**23.5.2**    for each obligation which was (or would have been but for any Flawed Asset Provision) required to be settled by delivery of assets (the "**Unpaid Amount Deliverables**") to such party on or prior to such Fallback Valuation Date and which has not been so settled on the Fallback Valuation Date, an amount equal to the Value of such Unpaid Amount Deliverables as at the relevant Asset Valuation Date.

**23.6**    The Company shall not take any action against a Signatory to recover any outstanding Collateralised Net Financial Liability at any time.

**24    Net Contractual Position**

**24.1    Conversion of Close-Out Amounts into US dollars**

All Close-Out Amounts shall be denominated in US dollars. To the extent that a Close-Out Amount is denominated in a currency other than US dollars, the Company shall convert such Close-Out Amount into US dollars using the Spot Rate as of the Relevant FX Conversion Time.

**24.2    Determining the Net Contractual Positions**

**24.2.1**    If there is only one Financial Contract between the Company and a Signatory, the Close-Out Amount in respect of that Financial Contract shall be the Net Contractual Position in respect of that Signatory.

**24.2.2**    Subject to Clause 24.2.3, if there is more than one Financial Contract between the Company and a Signatory, the Company shall aggregate the Close-Out Amounts in respect of those Financial Contracts. The aggregate of such Close-Out Amounts shall be the Net Contractual Position in respect of that Signatory.

**24.2.3**    The Company shall not aggregate the Close-Out Amounts in respect of the Post-Administration Financial Contracts of a Signatory with Close-Out Amounts in respect of Pre-Administration Financial Contracts of that Signatory. A Signatory that has had a Post-Administration Financial Contract Transferred to it from a Transferor after the Time of Administration shall aggregate the Close-Out Amounts in respect of those Post-Administration Financial Contracts that have been Transferred to it after the Time of Administration from the same Transferor. The operation of this Clause 24.2.3 may result in a Signatory having more than one Net Contractual Position.

**24.3    Netting agreements disregarded**

Any term in any contract between the Company and the Signatory which purports to, or which would, but for this Clause 24.3, have the effect of aggregating or setting off two or more Close-Out Amounts in a way that is inconsistent with the determination of the Net Contractual Position under this Clause 24 shall be disregarded.

**24.4    Net Contractual Position Statement**

The Company shall, as soon as reasonably practicable following the determination of the Net Contractual Position in respect of a Signatory, provide a statement ("**Net Contractual Position Statement**") to such Signatory showing the Net Contractual Position and the Close-Out Amount for each Financial Contract in respect of such Signatory.

**25    Determination of Net Financial Claim and Net Financial Liability**

**25.1    Net Financial Claim**

A Net Contractual Position in respect of a Signatory expressed as a positive number will represent an amount due and owing by the Company to that Signatory, which shall constitute an ascertained unsecured claim of that Signatory in the winding-up of the Company or any distribution of the Company's assets to its unsecured creditors (such Claim, a "**Net Financial Claim**"). For the avoidance of doubt, no interest shall accrue on any Net Financial Claim, save to the extent provided in Rule 2.88 of the Insolvency Rules.

**25.2    Net Financial Liability**

A Net Contractual Position in respect of a Signatory expressed as a negative number will represent an amount due and owing by that Signatory to the Company. Interest shall accrue daily in respect of such amount from the Administration Date on any Gross Uncollateralised Liability and be calculated as the Net Financial Interest Amount from time to time determined in accordance with Clause 25.3. The aggregate of such amounts due and owing by the Signatory to the Company and the Net Financial Interest Amount from time to time shall constitute a debt due and payable from that Signatory to the Company (such debt, a "**Net Financial Liability**"); provided that, if the Net Financial Interest Amount would, but for the operation of this Clause 25.2, otherwise be a value expressed as a negative number, then the Net Financial Liability shall be Reduced by the absolute value of that Net Financial Interest Amount.

**25.3    Net Financial Interest Amount**

**25.3.1**    The "**Net Financial Interest Amount**", in respect of any date for which it is required to be determined (the "**Current Date**"), is an amount determined by the Company that is equal to:

(i)    the amount of Gross Uncollateralised Liability Interest due and payable on the Current Date in respect of the period from (and including) the immediately preceding Distribution Value Date (or if none, the Administration Date; in each case, the "**Prior Date**") to (but excluding) the Current Date; less

(ii)

(a)    unless the Prior Date is the Administration Date, the absolute value equal to the difference between:

(x)    the amount of Gross Uncollateralised Liability Interest that would have been due and payable on the Prior Date in respect of the period from (and including) the Administration Date to (but excluding) the Prior Date (such period, the "**Previous Period**"), determined using the Greatest Pre-Administration Admitted Client Money Amount relevant to the Prior Date; and

(y)     the amount of Gross Uncollateralised Liability Interest that would have been due and payable on the Prior Date in respect of the Previous Period, determined using the Greatest Pre-Administration Admitted Client Money Amount relevant to the Current Date; or

(b)     if the Prior Date is the Administration Date, zero.

**25.3.2**     To determine the Net Financial Interest Amount, and in respect of each Signatory:

(i)     the "**Gross Uncollateralised Liability Interest**" shall be an amount of interest on the Gross Uncollateralised Liability calculated on a daily basis at the then prevailing Applicable Rate, from the Administration Date until the date on which such Gross Uncollateralised Liability is reduced to zero (the "**Relevant Period**") in accordance with Part 11;

(ii)     the "**Gross Uncollateralised Liability**" on each day is an amount (subject to a minimum of zero) equal to: (a) its outstanding Net Financial Liability (excluding any Net Financial Interest Amount) on such day; less (b) the greatest amount of all its Pre-Administration Admitted Client Money Amounts (the "**Greatest Pre-Administration Admitted Client Money Amount**") that is admitted or determined in accordance with Clause 59.2.3 during the Relevant Period; less (c): (x) for the period from the Administration Date to the date on which an Affected Intermediary Admitted Claim Amount is admitted or determined in accordance with Clause 59.4.3, such Affected Intermediary Admitted Claim Amount; and (y) thereafter, the Affected Intermediary Claim Amount from time to time during the Relevant Period; less (d) in respect of any day, the amount by which the Total Collateralisation Amount as at that day exceeds the sum of: (x) the Greatest Pre-Administration Admitted Client Money Amount (if any); and (y) the amount determined in accordance with the preceding sub-paragraph (c) (if any); and

(iii)     the "**Applicable Rate**" means a simple rate of interest equal to the lesser of (a) USD-LIBOR plus 1 per cent.; and (b) the highest rate of interest applicable to any sum due from that Signatory to the Company, where the Signatory is not the defaulting party, as specified in any Financial Contract between that Signatory and the Company.

For the avoidance of doubt, interest shall accrue daily, payable in arrear, from the Administration Date on any Gross Uncollateralised Liability notwithstanding that the relevant Greatest Pre-Administration Admitted Client Money Amount or Affected Intermediary Admitted Claim Amount is established after the Administration Date.

## 25.4    Reduction of Net Financial Liability

Any Reduction of Net Financial Liability shall first be deemed to Reduce the portion comprising any Net Financial Interest Amount until that has been Reduced in full, and then the portion not comprising any Net Financial Interest Amount.

## 25.5    Collateralised Net Financial Liability

In respect of a Signatory who has made a Collateralisation Election, the element of the Net Financial Liability comprising the Net Financial Interest Amount shall be deemed attributed to the Uncollateralised Net Financial Liability, unless the Net Financial Interest Amount exceeds the Uncollateralised Net Financial Liability, in which case such excess portion of the Net

Financial Interest Amount shall be deemed attributed to the Collateralised Net Financial Liability.

## PART 8: RETENTION AMOUNTS

**26**     **Retention Claims and Retention Creditors**

**26.1**   **Retention Claims**

A "**Retention Claim**" in respect of a Signatory is a Claim of a person:

**26.1.1**   who is a Security Interest Claimant in respect of a Security Interest over Assets in respect of which the Signatory is the Pledgor; and

**26.1.2**   to whom the Company is under a fiduciary obligation to account for the Liabilities of such Signatory due and owing to that person out of the Trust Assets by reason of such Security Interest.

**26.2**   **Retention Creditors**

A person who has a Retention Claim is a "**Retention Creditor**".

**27**     **Identification of Trust Assets subject to Retention Claim**

The Company shall use its reasonable endeavours to identify, in respect of each Signatory, any Retention Claim according to the Relevant Information and any other information provided to the Company from time to time (including, for the avoidance of doubt, information provided to the Company by a Signatory, a Retention Creditor or a competent court) until such time (the "**Retention Claim Identification Cut-Off Time**") as: (i) the Company in its absolute discretion determines that it does not expect to identify any (or any further) Retention Claims in respect of such Signatory; or (ii) a Court confirms that the Company is at liberty to make Distributions and Appropriations of Distributable Trust Assets to the Signatory without regard to Retention Claims that have not yet been identified or resolved. The Company may postpone a Retention Claim Identification Cut-Off Time determined under limb (i) above if that test ceases to be correct.

**28**     **Determination of Retention Amount**

**28.1**   **Retention Amount**

The "**Retention Amount**", in respect of a Signatory, from time to time, is equal to the aggregate of one or more of the following:

**28.1.1**   all amounts determined by a competent court, whose rulings are binding upon the Company and which are not then subject to appeal, as being Liabilities of the Signatory due and owing to a Retention Creditor which are secured by Trust Assets (the "**Judgment Amounts**");

**28.1.2**   if not represented by a Judgment Amount, all amounts agreed between the relevant Signatory and a Retention Creditor as being Liabilities of the Signatory due and owing to such Retention Creditor which are secured by Trust Assets (the "**Agreed Amounts**"); and

**28.1.3**   all amounts as alleged by a Retention Creditor to be the total Liabilities of the Signatory due and owing to such Retention Creditor which are secured by Trust Assets which, at such time, have not been (i) agreed with the relevant Signatory; or (ii) determined by a competent court whose rulings are binding upon the Company and which are not then subject to appeal (the "**Alleged Amounts**"),

(any Judgment Amount, Agreed Amount or Alleged Amount, a "**Retention Claim Amount**"). Solely for the purpose of calculating the Retention Amount, a Retention Claim Amount denominated in a currency other than US dollars shall be converted into US dollars using the Spot Rate as of the Relevant FX Conversion Time.

### 28.2    Timing of determination

The Company shall determine the Retention Amount of each Signatory:

28.2.1    as soon as reasonably practicable following the Retention Claim Identification Cut-Off Time in respect of such Signatory;

28.2.2    in relation to a Signatory falling within Clause 28.2.1, as soon as reasonably practicable following:

(i)    the Company being notified of any additional Retention Claim not previously identified in respect of such Signatory; and

(ii)    the Company being notified that an Alleged Amount has become a Judgment Amount or an Agreed Amount; and

28.2.3    on each Distribution Value Date with respect to such Signatory.

## 29    Unfunded Retention Amount and Funded Retention Amount

### 29.1    Unfunded Retention Amount

In respect of each Signatory, the amount of Retention Amount determined by the Company as soon as reasonably practicable following the Retention Claim Identification Cut-Off Time shall notionally be designated as the "**Unfunded Retention Amount**". Once established, an Unfunded Retention Amount shall only be: (i) decreased following a Reduction of the Unfunded Retention Amount in accordance with Clause 55.4 together with a corresponding increase of the Funded Retention Amount in accordance with Clause 29.2; or (ii) increased or decreased following a change in the Retention Amount in accordance with Clause 29.3, Clause 29.4 or Clause 29.5.

### 29.2    Conversion of Unfunded Retention Amount to Funded Retention Amount

29.2.1    On each occasion on which the Unfunded Retention Amount is Reduced in accordance with Clause 55.4, the Funded Retention Amount in respect of each currency in which any Retention Claim Amount is denominated shall be increased by an amount equal to a portion of such Reduction (where the Unfunded Retention Amount is Reduced by an Appropriation of Securities, after deducting any costs and expenses relating to the realisation of such Securities), converted into such currency using the Spot Rate as of the Relevant FX Conversion Time, pro rata to the Unfunded Retention Amount Component in respect of such currency relative to the Unfunded Retention Amount (immediately before such Reduction).

29.2.2    Once established, a Funded Retention Amount shall only be: (i) increased together with a corresponding Reduction of the Unfunded Retention Amount in accordance with this Clause 29.2; or (ii) increased or decreased in accordance with Clause 29.5 and Clause 30.

**29.3    Changes in Retention Amount due to exchange rate fluctuation**

At any time when, and to the extent that, there is an increase or decrease in the Retention Amount as determined by the Company which is due to the fluctuation of the exchange rate of the currency in which a Retention Claim Amount is denominated, the Unfunded Retention Amount shall correspondingly be increased or decreased by an amount equal to a portion of such increase or decrease (as applicable) pro rata to the Unfunded Retention Amount relative to the Retention Amount (immediately before such increase or decrease).

**29.4    Increase in Retention Amount otherwise than due to exchange rate fluctuation**

At any time when, and to the extent that, there is an increase in the Retention Amount as determined by the Company which is not due to the fluctuation of the exchange rate of the currency in which a Retention Claim Amount is denominated, the Unfunded Retention Amount shall be increased by the same amount.

**29.5    Decrease in Retention Amount otherwise than due to exchange rate fluctuation**

At any time when, and to the extent that, there is a decrease in the Retention Amount as determined by the Company (the amount of such decrease, denominated in US dollars, the "**Retention Decrease Amount**") which is due to a decrease of the aggregate Retention Claim Amount denominated in a currency (the "**Relevant Currency**") for reasons other than: (i) the fluctuation of the exchange rate of the Relevant Currency against the US dollar; or (ii) payment to a Retention Creditor:

29.5.1    the Unfunded Retention Amount Component in respect of the Relevant Currency shall be decreased by an amount equal to the lesser of (a) the Retention Decrease Amount and (b) such Unfunded Retention Amount Component; and

29.5.2    if there is any surplus of the Retention Decrease Amount over the Unfunded Retention Amount Component in respect of the Relevant Currency (immediately prior to the most recent determination of the Retention Amount), the Funded Retention Amount in respect of the Relevant Currency shall be decreased by an amount equal to such surplus, and:

(i)    in the case where the surplus is less than the remaining Unfunded Retention Amount (immediately after the decrease in accordance with Clause 29.5.1):

(a)    the Unfunded Retention Amount Component in respect of each currency other than the Relevant Currency shall be decreased in an amount equal to a portion of such surplus pro rata to the Unfunded Retention Amount Component in respect of such currency relative to the remaining Unfunded Retention Amount; and

(b)    the Funded Retention Amount in respect of each currency other than the Relevant Currency shall be increased by an amount equal to the reduction of the Unfunded Retention Amount Component in respect of such currency converted into such currency using the Spot Rate as of the Relevant FX Conversion Time; or

(ii)    in the case where the surplus is equal to or greater than the remaining Unfunded Retention Amount (immediately after the decrease in accordance with Clause 29.5.1):

(iii)    the Unfunded Retention Amount shall be decreased to zero;

    (a)    the Funded Retention Amount in respect of each currency other than the Relevant Currency shall be increased to the aggregate Retention Claim Amount denominated in such currency; and

    (b)    such excess surplus (if any) shall be deemed to form part of the Distributable Trust Assets to be Allocated to such Signatory on its next Allocation Date (such Allocation, a "**Retention Allocation**").

## 29.6   No interest on Funded Retention Amount

The Company shall have no obligation to account to any Retention Creditor or any Signatory for any interest accruing from time to time on the Funded Retention Amount, which may be retained by the Company absolutely for its own account.

## 30    Payment to Retention Creditor

## 30.1   Decrease in Funded Retention Amount

A Funded Retention Amount shall only be decreased: (i) in accordance with Clause 29; or (ii) by a payment to a Retention Creditor in accordance with this Clause 30. The Company shall have no responsibility to ensure that any Retention Creditor applies any amount so received for any particular purpose.

## 30.2   In respect of a Funded Retention Amount

### 30.2.1   One Retention Claim in respect of a Funded Retention Amount

If the Company is only aware of one Retention Claim in respect of a Funded Retention Amount which has not been discharged in full, the Company may only make a payment (denominated in the Relevant Currency) up to an amount equal to the relevant Funded Retention Amount to the relevant Retention Creditor to discharge the Retention Claim in full or in part, provided that the Retention Claim is not in respect of an Alleged Amount.

### 30.2.2   Multiple Retention Claims in respect of a Funded Retention Amount

If the Company is aware of more than one Retention Claim in respect of a Funded Retention Amount which has not been discharged in full:

(i)    if none of the Retention Claims is in respect of an Alleged Amount, the Company may make a payment (denominated in each Relevant Currency, respectively) to discharge each such Retention Claim (a) in full, if such Funded Retention Amount is greater than or equal to the aggregate Retention Amounts denominated in the Relevant Currency (converted into the Relevant Currency using the Spot Rate as of the Relevant FX Conversion Time) or (b) in part, pro rata to their respective Agreed Amounts or Judgment Amounts, as applicable, if such Funded Retention Amount is less than the aggregate Retention Amounts denominated in the Relevant Currency (converted into the Relevant Currency using the Spot Rate as of the Relevant FX Conversion Time); and

(ii)    if at least one of the Retention Claims is in respect of an Alleged Amount, the Company may only make a payment (denominated in each Relevant Currency, respectively) from any excess of the Funded Retention Amount above the aggregate amount of all such Alleged Amounts denominated in the Relevant

Currency, to discharge each such Retention Claim which is not in respect of an Alleged Amount: (a) in full, if the amount of such excess is greater than or equal to the aggregate of the Judgment Amounts and/or Agreed Amounts denominated in the Relevant Currency; or (b) in part, pro rata to their respective Judgment Amounts or Agreed Amounts, as applicable, if the amount of such excess is less than the aggregate of the Judgment Amounts and/or Agreed Amounts denominated in the Relevant Currency.

### 30.3   An order of a Court of competent jurisdiction

After making such adjustments to the Unfunded Retention Amount and Funded Retention Amount in accordance with Clause 29.5, the Company may make a payment (denominated in each Relevant Currency, respectively) to discharge each Retention Claim in respect of each Funded Retention Amount of which the Company is aware: (i) in full, if the relevant Funded Retention Amount is greater than or equal to the aggregate of the Judgment Amounts and/or Agreed Amounts denominated in the Relevant Currency; or (ii) otherwise, in part, pro rata to their respective Agreed Amounts or Judgment Amounts, as applicable (unless there is a legally binding order of priorities in relation to such Retention Claims that is different, in which case such legally binding order of priorities shall apply).

### 30.4   No payments in discharge of Alleged Amounts

The Company shall not make a payment at any time to discharge a Retention Claim in respect of an Alleged Amount.

## 31   Appropriation for Reduction of Unfunded Retention Amount

### 31.1   Realisation of Securities

Any Assets that are Appropriated to Reduce any Unfunded Retention Amount under Clause 60 shall be realised for cash (if not already in cash) by the Company as soon as reasonably practicable following such Appropriation, provided that the Signatory shall be first given the option to purchase such Securities for a purchase price equal to the Value of such Securities as at the relevant Distribution Value Date. For the purpose of this Clause 31.1, the Company shall not take into account the proceeds of sale of such Security to such Signatory in applying Clause 17.1.1 of the Asset Valuation Methodology.

### 31.2   Conversion into the currency denomination of the Funded Retention Amount

If: (i) the realisation proceeds of the Appropriated Securities; or (ii) any Appropriated Assets which comprise cash, are not denominated in the currency of the relevant Funded Retention Amount which shall be increased in accordance with Clause 29.2, then the Company shall convert such proceeds or Assets (as applicable) into such currency at the actual rate of exchange available to the Company at the time of receipt of such proceeds or Assets (as applicable).

## 32   Parallel Debt

### 32.1   Payment of debt by Signatory

Each Signatory hereby irrevocably and unconditionally undertakes to pay to the Company amounts equal to any Retention Claim Amount.

**32.2   Corresponding Debt and Parallel Debt**

Each Signatory and the Company acknowledge that the obligations of each Signatory under this Clause 32 are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of that Signatory to any Retention Creditor in respect of any Retention Claim (its "**Corresponding Debt**") nor shall the amounts for which each Signatory is liable under this Clause 32 (its "**Parallel Debt**") be limited or affected in any way by its Corresponding Debt provided that:

**32.2.1**   the Parallel Debt of each Signatory shall be decreased to the extent that its Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

**32.2.2**   the amount of the Parallel Debt of a Signatory shall at all times be equal to the amount of its Corresponding Debt.

**32.3   Company not a trustee**

For the purpose of this Clause 32, the Company acts in its own name and not as a trustee, and its Claims in respect of the Parallel Debt shall not be held on trust.

## PART 9: NON-FINANCIAL CONTRACT LIABILITIES

**33    Non-Financial Contract Liabilities**

**33.1    Meaning of Non-Financial Contract Liabilities**

The Non-Financial Contract Liabilities of a Signatory are all its outstanding Liabilities to the Company, whether arising under this Agreement or otherwise, but excluding:

**33.1.1**    Net Financial Liability;

**33.1.2**    Costs Amount; and

**33.1.3**    Unfunded Retention Amount.

**33.2    Ascertained Non-Financial Contract Liabilities**

The Company shall: (i) determine from time to time whether there are any Non-Financial Contract Liabilities in respect of each Signatory; and (ii) as soon as reasonably practicable thereafter, determine or otherwise ascertain whether such Non-Financial Contract Liabilities comprise an obligation to pay an ascertained amount of money that is due and payable. Non-Financial Contract Liabilities that have been so determined or ascertained shall be the "**Ascertained Non-Financial Contract Liabilities**" in respect of the relevant Signatory.

**33.3    Conversion of Ascertained Non-Financial Contract Liabilities into US dollars**

For the purpose of Part 11, Ascertained Non-Financial Contract Liabilities shall be denominated in US dollars. To the extent that any Ascertained Non-Financial Contract Liabilities are denominated in a currency other than US dollars, the Company shall convert such Ascertained Non-Financial Contract Liabilities into US dollars using the Spot Rate as of the Relevant FX Conversion Time. For the avoidance of doubt, the conversion of such Ascertained Non-Financial Contract Liabilities into US dollars for the purpose of Part 11 shall not prejudice any of the Company's rights to take any action against the Signatory outside this Agreement in respect of any Non-Financial Contract Liabilities denominated in their Original Currency.

**33.4    Certain Non-Financial Contract Liabilities**

Non-Financial Contract Liabilities shall include, without limitation, any of the following:

**33.4.1**    any amounts payable from a Signatory to the Company arising from a Claim for damages made by the Company against the Signatory for breach of any Representation and Warranty or failure to comply with any Undertaking;

**33.4.2**    any Antecedent Transaction Liabilities;

**33.4.3**    the value of the relevant benefits which have been received by or on behalf of that Signatory in excess of its Net Financial Claim, Asset Shortfall Claim or Ascertained Claim as set out in Clause 7.3, except to the extent of that Signatory's receipts under any Third Party Obligation;

**33.4.4**    the excess described in Clause 7.4, without prejudice to Clause 63.7; and

**33.4.5**    any costs and expenses incurred by the Company as a result of a Signatory's failure to make a Payment as set out in Clause 55.4.2.

**33.5    Limited Ascertained Non-Financial Contract Liabilities**

Where a TA Signatory's Ascertained Non-Financial Contract Liabilities include any amount arising from the Antecedent Transaction Liabilities, the Company shall exclude such Antecedent Transaction Liabilities from the Ascertained Non-Financial Contract Liabilities (the Ascertained Non-Financial Contract Liabilities following such exclusion, the "**Limited Ascertained Non-Financial Contract Liabilities**") for the purpose of Appropriation of such TA Signatory's Net Financial Claim to reduce any Ascertained Non-Financial Contract Liabilities under Clause 60.1.

# PART 10: ALLOCATION OF ASSETS AND ASSET SHORTFALL CLAIM

## 34    General principles

### 34.1    Allocation of Distributable Trust Assets

The Company shall allocate Distributable Trust Assets by identifying them in the Books and Records of the Company as belonging to a particular Stock Line and, where applicable, a particular Asset Pool, and being available in due course for Appropriation or Distribution in relation to the Asset Claim of a particular Signatory, in accordance with this Part 10 for the purpose of determining: (i) the Appropriation and/or Distribution of such Distributable Trust Assets to the Company or, as the case may be, such Signatory under Part 11; and (ii) the Asset Shortfall Claim of such Signatory in relation to such Distributable Trust Assets (such an allocation for this purpose, an "**Allocation**" and "**Allocate**", "**Allocated**", "**Unallocated**" and "**Allocating**" shall be construed accordingly).

### 34.2    Stock Lines

**34.2.1**    Subject to Clause 34.2.2, a "**Stock Line**" means a group of fungible Securities, often identified by a unique ISIN or CUSIP number and, in relation to the Asset of an Asset Pool, includes all Derived Assets of such a group of fungible Securities.

**34.2.2**    Where a group of fungible Securities is held through more than one Intermediary and one or more of those Intermediaries is an Affected Intermediary, the portion of fungible Securities that is held through each Affected Intermediary shall be deemed to form a separate Stock Line.

**34.2.3**    Where a group of fungible Securities is deemed to form more than one Stock Line in accordance with Clause 34.2.2 and the Relevant Information available to the Company at such time is not sufficiently adequate or reliable for the Company to Identify the Stock Line(s) in respect of an amount of Asset that is subject to a particular Asset Claim, then the Assets that are subject to such Asset Claim shall be apportioned between each of such Stock Lines pro rata to the amount of Distributable Trust Assets that have been Identified by the Company in respect of such Stock Lines at such time.

### 34.3    Allocation on a Stock Line-by-Stock Line basis

The Company shall determine the Allocation of Distributable Trust Assets following the Bar Date on a Stock Line-by-Stock Line basis. Stock Lines shall be chosen by the Company in its absolute discretion in such order as it sees fit.

### 34.4    Reallocation following the receipt of new Relevant Information

If the Company receives or otherwise becomes aware of any new Relevant Information that relates to an Asset Claim in respect of a Stock Line or an Asset Pool (as applicable) after any determination in relation to Allocation has been made by the Company in respect of such Stock Line or Asset Pool, the Company shall redetermine the Allocation in respect of such Stock Line or Asset Pool in accordance with Clause 50.

### 34.5    Affected Intermediary and Affected Stock Lines

An Intermediary is an "**Affected Intermediary**" if it is required or permitted by any applicable law to return Trust Assets comprising more than one Stock Line (each, an "**Affected Stock Line**") to the Company, or to the Company on behalf of other people, on the basis that the aggregate of any shortfall in respect of each Affected Stock Line shall be borne by all people

having an Asset Claim to any of the Affected Stock Lines (each, an "**Affected Claimant**") pro rata to: (i) their Asset Claims to all Affected Stock Lines held through that Affected Intermediary (an "**Asset Claim Intermediary**"); or (ii) any other Claims of (or derived from) such Affected Claimants against the Affected Intermediary, as determined by, or on behalf of, such Affected Intermediary (a "**Net Equity Intermediary**").

**34.6    Affected Stock Line**

Clause 40, Clause 41 and Clause 42 shall not apply in respect of an Affected Stock Line.

**34.7    Maximum Allocation**

The aggregate Allocation of Assets in respect of an Asset Pool to any Asset Pool Signatory under this Part 10 shall not be greater than the maximum of its TA Claimant Amount, without prejudice to Clause 63.7.

**35      Identification of Distributable Trust Assets for each Stock Line**

In respect of each Stock Line, the Company shall determine:

(i)      whether an Asset comprises Trust Assets;

(ii)     whether any Trust Assets comprise Distributable Trust Assets by reference to the definition of "Trust Assets" and "Distributable Trust Assets", including whether such Assets have been located or identified; and

(iii)    the Asset Pool or Asset Pools into which each Stock Line falls.

The process of any such determination in relation to a Stock Line is referred to as the "**Identification**" of the Distributable Trust Assets relating to that Stock Line, and "**Identified**" and "**Identify**" shall be construed accordingly.

**36      Individual Claim Amount, Net Equity Amount and TA Claimant Amount**

**36.1    Individual Claim Amount**

The Company shall determine the amount (i.e. number) of Assets in a Stock Line which are the subject of an Asset Claim based on the Relevant Information available to the Company at the time of such determination (in respect of each person having an Asset Claim and in respect of each Stock Line, its "**Individual Claim Amount**").

**36.2    Net Equity Amount**

The Company shall determine the Net Equity Amount of each Affected Claimant in respect of a Net Equity Intermediary once it has received sufficient information from the relevant Net Equity Intermediary in order to do so. The "**Net Equity Amount**" for each such Affected Claimant is the amount of the Claims of (or derived from) the Affected Claimant against the Net Equity Intermediary that the Net Equity Intermediary recognises or acknowledges for the purpose of quantifying that Affected Claimant's Asset Claim in respect of Trust Assets held by such Net Equity Intermediary. If the Company determines that it cannot determine the Net Equity Amount for all Affected Claimants in respect of a Net Equity Intermediary, then no further Allocation shall be made in respect of any Distributable Trust Assets returned to the Company from such Net Equity Intermediary unless:

36.2.1    the Company is subject to an order made by a court of competent jurisdiction, which:

(i)    requires the Company to make an Allocation in respect of such Distributable Trust Assets;

(ii)    determines the entitlements of TA Claimants to the relevant Distributable Trust Assets; or

(iii)    permits the Company to make an Allocation, Distribution or Appropriation in respect of such Distributable Trust Assets without incurring a liability to the TA Claimants in doing so,

provided that either:

(a)    the order is not capable of being appealed; or

(b)    the relevant time period for lodging an appeal (or seeking permission to appeal) has passed and no such appeal has been lodged (or permission sought);

36.2.2    the proposed Allocation has been agreed between: (i) the Company; and (ii) each Affected Claimant in relation to such Net Equity Intermediary; or

36.2.3    this Agreement has been modified in accordance with Clause 80 to provide for an alternative method of Allocation which takes into account such insufficiency of information.

## 36.3    TA Claimant Amount

"**TA Claimant Amount**" means:

36.3.1    in relation to: (i) a Stock Line which is not an Affected Stock Line; or (ii) an Affected Stock Line in respect of an Asset Claim Intermediary, an Individual Claim Amount; and

36.3.2    in relation to a Net Equity Intermediary, a Net Equity Amount.

## 36.4    Asset Claims of Non-Signatories

Where a Non-Signatory asserts an Asset Claim on a Stock Line, the Company may, in its absolute discretion based on its own Books and Records, disregard such Asset Claim in whole or part if the Company determines that such Non-Signatory has no Asset Claim to such Stock Line or if the Company considers that an Asset Claim to such Stock Line has been overstated.

## 36.5    Claim Amount Notice

As soon as reasonably practicable after determining: (i) all the Individual Claim Amounts in respect of a Stock Line; or (ii) all the Net Equity Amounts in respect of a Net Equity Intermediary, the Company shall send a Notice (a "**Claim Amount Notice**") to:

36.5.1    each person whom the Company determines as having an Asset Claim to such Stock Line or Asset Pool, specifying its TA Claimant Amount; and

36.5.2    each person who alleges to the Company (in its information provided via the Portal, or through other means of communication) that it has an Asset Claim with respect to the relevant Stock Line but for whom the Company determines that it does not have an Asset Claim with respect to such Stock Line, specifying a TA Claimant Amount of zero.

The Company may provide a TA Signatory's TA Claimant Amount by uploading such information onto the Portal of such Signatory and such provision of information via the Portal shall be deemed to be a Claim Amount Notice to such TA Signatory.

## 37    Determination of Intermediary Distribution Value

### 37.1    Intermediary Distribution Notice

As soon as reasonably practicable and in no event later than 20 Business Days after receiving an Intermediary Distribution (where a Signatory receives an Intermediary Distribution after its Accession Date), or within twenty Business Days of its Accession Date (where a Signatory has received an Intermediary Distribution prior to its Accession Date), the relevant Asset Pool Signatory shall send a Notice (an "**Intermediary Distribution Notice**") to the Company specifying:

**37.1.1**    the date on which it has received the Intermediary Distribution;

**37.1.2**    the Asset Claim to which such Intermediary Distribution relates; and

**37.1.3**    information on the composition of the Intermediary Distribution in reasonable detail, including:

(i)    the identity and number of Securities (where such Intermediary Distribution comprises delivery of Securities);

(ii)    the amount of money (where such Intermediary Distribution comprises payment of money); and/or

(iii)    the amount of Liability owed by such Signatory to the relevant Intermediary that has been set off (where such Intermediary Distribution comprises a set-off of Liabilities between such Signatory and the relevant Intermediary).

### 37.2    Company may request further information

Where the information in an Intermediary Distribution Notice of an Asset Pool Signatory is ambiguous, unclear or insufficient, the Company may request in writing that the relevant Signatory provides supplementary information and, in the absence of a satisfactory response to such request within 10 Business Days of its receipt, the Company may disregard such unclear or ambiguous information or may, in a commercially reasonable manner, attribute a clarificatory meaning which shall be binding on all Signatories.

### 37.3    Intermediary Distribution Value

As soon as reasonably practicable after the Company receives an Intermediary Distribution Notice from an Asset Pool Signatory, the Company shall: (i) determine the Value of each Intermediary Distribution as at the date on which such Intermediary Distribution was received by the Signatory (the "**Intermediary Distribution Value**"); and (ii) send a Notice (the "**Intermediary Distribution Value Notice**") to such Asset Pool Signatory Notifying it of the Intermediary Distribution Value as determined by the Company.

**38      Dispute between a TA Signatory and a Net Equity Intermediary**

**38.1     Information about Net Equity Amount**

The Company shall use reasonable endeavours to provide a TA Signatory with the relevant information received from the Net Equity Intermediary which the Company takes into account in determining the Net Equity Amount.

**38.2     Challenge by TA Signatory of Intermediary determination**

If a TA Signatory Notifies the Company that it wishes to challenge: (i) the accuracy of any information provided to it in accordance with Clause 38.1; or (ii) any other determination by the Net Equity Intermediary in connection with its Asset Claim, and it requests the Company's assistance in connection with such challenge, the Company shall, subject to Clause 38.3, use reasonable endeavours to assist such TA Signatory in making such challenge, including towards establishing a direct line of communication between the TA Signatory and the Net Equity Intermediary in order to enable the difference to be resolved directly.

**38.3     Conditions to assistance from Company**

The Company shall not take any action to assist a TA Signatory under Clause 38.2 unless:

**38.3.1**   the Company has received a clear and unambiguous request from a TA Signatory in relation to such action;

**38.3.2**   the Company has been indemnified to its satisfaction against any loss, Liability, cost, Claim, action, demand or expense which may be incurred or made against it in connection with such action. The Company shall exercise its discretion in respect of these matters as it sees fit having regard to the interests of the creditors of the Company as a whole; and

**38.3.3**   the Company has determined that it is reasonably practicable for the Company to take such action.

**38.4     Limit to Company's duties**

The Company shall not be required to take any other action in relation to a challenge by a TA Signatory of the determination of a Net Equity Amount by a Net Equity Intermediary.

**39      Dispute over the TA Claimant Amount or the Intermediary Distribution Value**

**39.1     Alleged TA Claimant Amount**

Notwithstanding any provisions to the contrary in Part 16, the Dispute Notice from a TA Signatory disputing a Claim Amount Notice must specify the relevant Alleged TA Claimant Amount.

**39.2     Suspension of Allocation**

No Distributable Trust Assets of a Stock Line or an Asset Pool (as applicable) will be Allocated to a Signatory until any Dispute over its Individual Claim Amount or Intermediary Distribution Value in respect of that Stock Line or, in the case of a Multiple Stock Line Pool, all Disputes over all of its TA Claimant Amounts or Intermediary Distribution Values in respect of that Multiple Stock Line Pool, is or are resolved.

**39.3    TA Claimant Amount or Intermediary Distribution Value following the resolution of a Dispute**

Following the final resolution of a Dispute between the Company and a Signatory relating to a TA Claimant Amount or an Intermediary Distribution Value, the amount so settled as a result of the resolution of the Dispute shall become the TA Claimant Amount or the Intermediary Distribution Value (as applicable).

**40    Identification of Stock Lines with potential shortfall**

As soon as reasonably practicable after: (i) all of the Individual Claim Amounts or Alleged Individual Claim Amounts to a Stock Line that is not an Affected Stock Line have been determined; and (ii) such time when the Company determines that it does not expect to Identify any further Distributable Trust Assets in respect of such Stock Line, the Company shall compare:

(a)    the amount of Distributable Trust Assets Identified in respect of such Stock Line; and

(b)    the sum of each Individual Claim Amount or, if applicable, Alleged Individual Claim Amount in respect of that Stock Line (such sum, the "**Total Claim Amount**").

**41    Allocation for Stock Line with no potential shortfall**

For each Stock Line that is not an Affected Stock Line in respect of which the amount of Distributable Trust Assets Identified is greater than or equal to the Total Claim Amount:

(i)    subject to Clause 39.2, the Company shall Allocate to each Signatory with an Asset Claim to such Stock Line an amount of Distributable Trust Assets (each, an "**Allocation Amount**") equal to its Individual Claim Amount, less the sum of: (a) any Intermediary Distribution Value; and (b) any Recoverable Delivery Value, in each case converted into an amount of Securities of the relevant Stock Line based on the Value of such Securities as at the Date Before Administration; and

(ii)    the remainder of this Part 10 shall not apply in respect of that Stock Line, other than Clause 50, which shall apply.

**42    Allocation for Stock Line with potential shortfall**

For each Stock Line in respect of which the amount of Distributable Trust Assets Identified is less than the Total Claim Amount of such Stock Line and that is not an Affected Stock Line, the Company shall proceed to determine the Asset Pool in which the Distributable Trust Assets belong, and the remainder of this Part 10 shall apply.

**43    Identification of Distributable Trust Assets into Asset Pools**

**43.1    Asset Pools**

43.1.1    The Company shall Identify the Distributable Trust Assets that comprise the Assets in each Asset Pool for each Stock Line falling within Clause 42. All Distributable Trust Assets of each such Stock Line shall be divided into one of two pools:

(i)    Distributable Trust Assets which comprise Custody Securities and/or Derived Assets arising from such Custody Securities (in respect of each Stock Line, a "**Custody Securities Pool**"); and

(ii)  Distributable Trust Assets which comprise Non-Custody Securities and/or Derived Assets arising from such Non-Custody Securities (in respect of each Stock Line, a "**Non-Custody Securities Pool**").

43.1.2  The Company shall Identify the Distributable Trust Assets that comprise the Assets in each Asset Pool for each Affected Stock Line. All Distributable Trust Assets in respect of each Affected Stock Line for an Affected Intermediary shall either fall into:

(i)  one of a group of Single Customer Pools; or

(ii)  the same Multiple Stock Line Pool,

as determined by the Company in accordance with Clause 43.2.

## 43.2  Determining the relevant Asset Pool for an Affected Stock Line

43.2.1  If the Company determines that it has received, or it is likely that it will receive, sufficient information from such an Affected Intermediary to enable the Company to Identify all the particular TA Claimants to which all Distributable Trust Assets returned, or proposed to be returned, from such Affected Intermediary relate (each such TA Claimant, a "**Single Customer**"), all such Distributable Trust Assets that relate to a specific Single Customer shall fall into a separate pool (each a "**Single Customer Pool**") in respect of each such Single Customer.

43.2.2  If the Company cannot determine that all such Distributable Trust Assets fall within one or more Single Customer Pools, then the Distributable Trust Assets in all of the Affected Stock Lines that are held by that Affected Intermediary shall fall into a single pool (such Asset Pool, a "**Multiple Stock Line Pool**").

43.2.3  For the avoidance of doubt, after any Allocation has been made with respect to any Distributable Trust Assets that have been returned from an Affected Intermediary, the determination by the Company in accordance with Clause 43.2.1 or Clause 43.2.2 shall be irrevocable.

## 43.3  Each Asset Pool to be Allocated independently

43.3.1  The Company shall Allocate the Assets in each Asset Pool independently of any Allocation of Assets in respect of another Asset Pool, including, for the avoidance of doubt, where such Assets of such other Asset Pool are of the same Stock Line.

43.3.2  To the extent that any Assets remain Unallocated in an Asset Pool following the Last Allocation of such Asset Pool, such excess Assets shall be Surplus Assets for the purpose of Clause 63.7 and shall not form part of any other Asset Pool.

## 43.4  Determination of the Asset Claim relating to each Asset Pool

The Company shall determine the Asset Pool which is the subject of the Individual Claim Amount of each TA Signatory before making any Allocation of Assets in respect of that Asset Pool. Where an Individual Claim Amount of a TA Signatory in respect of a single Stock Line may be in respect of a Custody Securities Pool and/or a Non-Custody Securities Pool, the Company shall apportion the Asset Claim between Individual Claim Amounts in accordance with the Relevant Information. If the Relevant Information is not sufficiently adequate or reliable to do this, the Company shall apportion the entire Asset Claim to the relevant Non-Custody Securities Pool.

## 44 Reservation of Assets from a Custody Securities Pool, a Non-Custody Securities Pool or a Multiple Stock Line Pool for TA Non-Signatories

This Clause 44 does not apply to any Single Customer Pool and any reference to an "**Asset Pool**" in this Clause 44 shall not be construed as a reference to any Single Customer Pool.

### 44.1 TA Non-Signatory

Any Non-Signatory that: (i) the Company determines has an Asset Claim to a Stock Line; or (ii) alleges to the Company that it has an Asset Claim with respect to a Stock Line, is a "**TA Non-Signatory**" in respect of that Stock Line.

### 44.2 Reserved Asset from an Asset Pool

The Company shall designate as "**Reserved Assets**" an amount of Distributable Trust Assets in each Asset Pool for which there is at least one TA Non-Signatory in respect of a Stock Line to which such Asset Pool relates. Such designation shall be made before any Allocation is determined in respect of such Asset Pool in an amount equal to the lesser of:

44.2.1   the sum of each TA Non-Signatory's TA Claimant Amount or, if applicable, Alleged TA Claimant Amount in respect of that Asset Pool; and

44.2.2   from time to time, the total amount of Distributable Trust Assets in such Asset Pool (as applicable).

### 44.3 Distributable Trust Assets ceasing to be designated as Reserved Assets

44.3.1   The Company shall cease to designate an amount of Distributable Trust Assets as Reserved Assets in respect of a TA Claimant Amount or Alleged TA Claimant Amount (as the case may be) of a TA Non-Signatory in accordance with this Clause 44.3.

44.3.2   If the Company:

(i)   has agreed with a TA Non-Signatory the amount of Distributable Trust Assets of a Stock Line which would be required to satisfy such TA Non-Signatory's Asset Claim; or

(ii)   determines the maximum amount (which may be zero) of Distributable Trust Assets of a Stock Line that would be required to enable such TA Non-Signatory's Asset Claims to be satisfied,

and such amount is less than the amount of the Reserved Assets, the excess of any Distributable Trust Assets which has been designated as Reserved Assets in respect of such TA Non-Signatory's Asset Claim over such amount in Clause 44.3.2(i) or Clause 44.3.2(ii), as the case may be, shall cease to be designated as Reserved Assets.

44.3.3   If the Accession Date of a TA Non-Signatory that becomes a Signatory falls on a date after Reserved Assets have been designated in respect of its Asset Claim, all of the Distributable Trust Assets which have been designated as Reserved Assets in respect of that TA Non-Signatory's Asset Claim shall cease to be designated as Reserved Assets.

## 45 Allocation of Assets in respect of a Custody Securities Pool, a Non-Custody Securities Pool or a Multiple Stock Line Pool

This Clause 45 does not apply to any Single Customer Pool and any reference to an "**Asset Pool**" in this Clause 45 shall not be construed as a reference to any Single Customer Pool.

### 45.1 Determination of Provisional Allocation Percentage

The "**Provisional Allocation Percentage**" of each Asset Pool Signatory at any time shall be determined by the Company in accordance with the following formula:

$$\text{Provisional Allocation Percentage} = 100\% \text{ x } \frac{\text{Individual Claim Value}}{\text{Total Claim Value}}$$

Where:

"**Individual Claim Value**" means, in respect of each Asset Pool Signatory at any time, an amount equal to: (i) the sum of the Value, as at the Provisional Valuation Date, of each Asset that is included in its Individual Claim Amount; or (as the case may be) (ii) its Net Equity Amount in respect of the relevant Asset Pool, except that the Individual Claim Value which is the subject of any underlying Dispute over a related TA Claimant Amount by each Asset Pool Signatory at such time shall be calculated by reference to its Alleged TA Claimant Amount in respect of the relevant Asset Pool; and

"**Total Claim Value**" at any time shall be determined by the Company as the sum of the Individual Claim Values of each of the Asset Pool Signatories at such time as determined by the Company.

### 45.2 Timing of determination

The Company shall determine the Provisional Allocation Percentage of each Asset Pool Signatory as soon as reasonably practicable following the Dispute Notice Deadline in respect of all the Claim Amount Notices in respect of the relevant Asset Pool, and thereafter:

45.2.1 as soon as reasonably practicable following any resolution of a (or, in the case of a Multiple Stock Line Pool, all) Dispute(s) between an Asset Pool Signatory and the Company over the TA Claimant Amount (or, in the case of a Multiple Stock Line Pool, all TA Claimant Amounts) relating to that Asset Pool;

45.2.2 as soon as reasonably practicable following the Accession Date of a TA Claimant after the Effective Date in respect of the relevant Asset Pool to this Agreement; and

45.2.3 as soon as reasonably practicable after the Company receives or otherwise becomes aware of new Relevant Information that relates to an Asset Claim in respect of a Stock Line or an Asset Pool (as applicable) in accordance with Clause 50.

### 45.3 Determination of Allocation Amount

#### 45.3.1 Allocation Amount

The Company shall Allocate an amount of Distributable Trust Assets not comprising Reserved Assets (each, an "**Allocation Amount**") to each Asset Pool Signatory in respect of: (i) a Custody Securities Pool or a Non-Custody Securities Pool of a Stock Line to which Clause 42 applies; or (ii) a Multiple Stock Line Pool in accordance with this Clause 45.3.

### 45.3.2    Allocation Amount following the Identification of Distributable Trust Assets

Subject to Clause 39.2 and Clause 45.3.5, as soon as reasonably practicable following: (i) the first Allocation Date of an Asset Pool; and (ii) only in relation to a Multiple Stock Line Pool, on any subsequent Allocation Date on which additional Distributable Trust Assets have been Identified, the Company shall Allocate an Allocation Amount to each Asset Pool Signatory equal to its most recently determined Provisional Allocation Percentage multiplied by the amount of any Distributable Trust Assets which have been Identified by the Company in respect of that Allocation Date and which are not Reserved Assets.

### 45.3.3    Allocation Amount following the satisfaction of an Asset Claim of a TA Non-Signatory

Subject to Clause 39.2 and Clause 45.3.5, as soon as reasonably practicable following any subsequent Allocation Date on which additional Distributable Trust Assets cease to be designated as Reserved Assets in accordance with Clause 44.3.2, the Company shall Allocate an Allocation Amount to each Asset Pool Signatory of the relevant Asset Pool equal to its most recently determined Provisional Allocation Percentage multiplied by the amount of Distributable Trust Assets ceasing to be designated as Reserved Assets in respect of that Allocation Date.

### 45.3.4    Allocation Amount following the acceptance of a TA Non-Signatory

Subject to Clause 39.2 and Clause 45.3.5, as soon as reasonably practicable following any subsequent Allocation Date on which a TA Non-Signatory enters into this Agreement after the Effective Date:

(i)    the TA Non-Signatory that has entered into this Agreement shall be Allocated an Allocation Amount from the Distributable Trust Assets, which have ceased to be designated as Reserved Assets as a result of its entering into this Agreement in accordance with Clause 44.3.3, equal to the sum of each Allocation Amount (if any) which the Company would have Allocated to such TA Non-Signatory on each previous Allocation Date (if any) if such TA Non-Signatory had been a Signatory to this Agreement since the Effective Date; and

(ii)    to the extent that any Distributable Trust Assets, which have ceased to be designated as Reserved Assets as a result of its entering into this Agreement in accordance with Clause 44.3.3, exceeds the Allocation Amount of that TA Non-Signatory determined in accordance with Clause 45.3.4(i), each Asset Pool Signatory (including the TA Non-Signatory that has entered into this Agreement) that has an Asset Claim or Net Equity Amount with respect to the Distributable Trust Assets ceasing to be designated as Reserved Assets shall be Allocated an Allocation Amount equal to a portion of such excess pro rata to each Asset Pool Signatory's most recently determined Provisional Allocation Percentage.

### 45.3.5    Suspension of Allocation for any Signatory Disputing its TA Claimant Amount

The aggregate of any Allocation Amount which would have been Allocated to an Asset Pool Signatory in accordance with Clause 45.3.2, Clause 45.3.3 and Clause 45.3.4 if such Allocation had not been suspended by Clause 39.2 shall be the "**Suspended Allocation Amount**" in respect of that Asset Pool Signatory.

**45.3.6    Allocation Amount following the resolution of a Dispute over a TA Claimant Amount**

Subject to Clause 45.3.5, as soon as reasonably practicable following an Allocation Date on which a Dispute over the TA Claimant Amount of an Asset Pool Signatory has been resolved:

(i)     if the TA Claimant Amount so settled as a result of the resolution of the Dispute is equal to the Alleged TA Claimant Amount, the Company shall Allocate an Allocation Amount to such Asset Pool Signatory equal to the Suspended Allocation Amount; and

(ii)    if the TA Claimant Amount so settled as a result of the resolution of the Dispute is less than the Alleged TA Claimant Amount:

(a)    the Company shall Allocate an Allocation Amount to such Asset Pool Signatory equal to the sum of each Allocation Amount (if any) which the Company would have Allocated to such Asset Pool Signatory on each previous Allocation Date (if any) if: (x) such Asset Pool Signatory were not Disputing its TA Claimant Amount; and (y) its Provisional Allocation Percentage were calculated by reference to its TA Claimant Amount so settled as a result of the resolution of the Dispute; and

(b)    the Company shall, subject to Clause 39.2, Allocate an Allocation Amount to each Asset Pool Signatory (including the Asset Pool Signatory which has just resolved its Dispute over the TA Claimant Amount) equal to such portion of: (x) the Suspended Allocation Amount of the Asset Pool Signatory for which the Dispute over its TA Claimant Amount is resolved; less (y) the Allocation Amount determined in accordance with Clause 45.3.6(ii)(a), pro rata to each Asset Pool Signatory's most recently determined Provisional Allocation Percentage.

**45.3.7    Effect of Intermediary Distribution Value and Recoverable Delivery Value on Allocation Amount**

(i)     **General rule**

Subject to Clause 45.3.8 and Clause 45.3.7(iv), if the Company becomes aware that an Asset Pool Signatory has received: (a) an Intermediary Distribution; and/or (b) any Distributable Trust Assets (or the realisation proceeds of any Distributable Trust Assets), in each case in contravention of Clause 8.1 (such an Asset Pool Signatory, an "**Over-Allocated Signatory**"), then the immediately following Allocation Amount(s) which would have been Allocated to it under Clause 45.3.2, 45.3.3, 45.3.4, 45.3.6 or 45.3.7(iii), with a Value as at the Provisional Valuation Date up to an amount equal to the Excess Value (such Allocation Amount(s), the "**Reallocation Amount**"), shall instead be Allocated to the other Asset Pool Signatories in accordance with Clause 45.3.7(iii).

(ii)    **Excess Value**

The "**Excess Value**" shall be an amount determined by the Company equal to the product of: (a) 100 per cent. less the most recently determined Provisional Allocation Percentage of such Over-Allocated Signatory; and (b) the relevant

Intermediary Distribution Value and/or Recoverable Delivery Value (as applicable).

(iii)  **Allocation of the Reallocation Amount**

The Company shall Allocate to each Asset Pool Signatory other than the Over-Allocated Signatory such portion of the Reallocation Amount pro rata to the most recently determined Provisional Allocation Percentage of each such other Asset Pool Signatory, provided that:

(a)  to the extent that a Reallocation Amount comprises Distributable Trust Assets which would have been Allocated to that Over-Allocated Signatory as a result of an Allocation of a Reallocation Amount from another Over-Allocated Signatory, such other Over-Allocated Signatory shall not be included in the Allocation under this Clause 45.3.7;

(b)  if each Asset Pool Signatory other than the Over-Allocated Signatory is excluded under Clause 45.3.7(iii)(a), then the Company shall Allocate the Reallocation Amount to such Over-Allocated Signatory notwithstanding Clause 45.3.7(i).

(iv)  **Suspension of Allocation pending determination of or resolution of Dispute over an Intermediary Distribution Value**

If the Company becomes aware that an Asset Pool Signatory has received an Intermediary Distribution, but the Intermediary Distribution Value: (a) has not been determined by the Company; or (b) is the subject of a Dispute by the relevant Asset Pool Signatory, the immediately following Allocation Amount(s) which would have been Allocated to it under Clause 45.3.2, 45.3.3, 45.3.4, 45.3.6 or 45.3.7(iii) shall not be Allocated until: (x) the Intermediary Distribution Value has been determined; or (y) the Dispute over the Intermediary Distribution Value is resolved (as applicable).

45.3.8  **No double counting of Intermediary Distribution with respect to a Net Equity Amount**

If the Company determines that the Net Equity Amount of any TA Signatory has already taken into account an amount of Intermediary Distribution received by such Asset Pool Signatory (including, for the avoidance of doubt, the reduction of Liabilities of such TA Signatory to the relevant Affected Intermediary by way of set-off), then Clause 45.3.7 shall not apply with respect to such amount of Intermediary Distribution.

## 45.4    Realisation of Assets

The Company shall, acting in a commercially reasonable manner, use reasonable endeavours to sell all the Distributable Trust Assets of a Multiple Stock Line Pool within six months following the return of such Distributable Trust Assets by the Affected Intermediary to the Company.

## 45.5    The Company may determine an Allocation in respect of the Multiple Stock Line Pool before all Distributable Trust Assets have been Identified

The Company may, from time to time, make an Allocation of Distributable Trust Assets which have been Identified in respect of a Multiple Stock Line Pool to an Asset Pool Signatory in accordance with this Part 10, whether or not the Company expects additional Assets may subsequently be Identified.

## 46    Asset Shortfall Claim with respect to a Custody Securities Pool or a Non-Custody Securities Pool

### 46.1    Asset Shortfall Claim to be determined after Last Allocation

The Company shall determine the Asset Shortfall Claim for each Asset Pool Signatory as soon as reasonably practicable after making the Last Allocation from a Custody Securities Pool or a Non-Custody Securities Pool.

### 46.2    Amount of Asset Shortfall Claim

The "**Asset Shortfall Claim**" for each Asset Pool Signatory of a Custody Securities Pool or a Non-Custody Securities Pool means an amount (or several amounts where the Asset Pool includes Derived Assets) determined by the Company as:

**46.2.1**    its Individual Claim Amount; less

**46.2.2**    the aggregate of all its Allocation Amounts with respect to that Asset Pool,

provided that the Value of an Asset Shortfall Claim: (i) being applied as a Distribution Asset (Valued as at the relevant Distribution Value Date) in the priority of application under Clause 60.5; or (ii) becoming an Ascertained Claim (Valued as at the Date Before Administration) under Clause 62.1; shall not include the aggregate of the Intermediary Distribution Value and Recoverable Delivery Value received by such Asset Pool Signatory in respect of the relevant Asset Pool.

## 47    Allocation in respect of a Single Customer Pool

### 47.1    Allocation Amount

The Company shall Allocate to each Signatory with an Asset Claim to a Single Customer Pool an "**Allocation Amount**" equal to such amount of Distributable Trust Assets that have been returned from such Affected Intermediary from time to time and which have been Identified by the Company as relating to such Signatory.

### 47.2    Suspension of Allocation

If, at any time after an Allocation has been made in accordance with Clause 47.1, the Company determines that, notwithstanding its determination under Clause 43.2.1, the information received from the relevant Affected Intermediary is insufficient to enable the Company to continue to Identify the Distributable Trust Assets returned from such Affected Intermediary that relate to a Single Customer, then no further Allocation shall be made in respect of any Distributable Trust Assets returned to the Company from such Affected Intermediary unless:

(i)    the Company is subject to an order made by a court of competent jurisdiction, which:

    (a)    requires the Company to make an Allocation in respect of such Distributable Trust Assets;

    (b)    determines the entitlements of Trust Asset Claimants to the relevant Distributable Trust Assets; or

    (c)    permits the Company to make an Allocation, Distribution or Appropriation in respect of such Distributable Trust Assets without incurring a liability to the TA Claimants in doing so,

provided that either:

(x)     the order is not capable of being appealed; or

(y)     the relevant time period for lodging an appeal (or seeking permission to appeal) has passed and no such appeal has been lodged (or permission sought);

(ii)    the proposed Allocation has been agreed between: (a) the Company; and (b) each Single Customer in relation to such Affected Intermediary; or

(iii)   this Agreement has been modified in accordance with Clause 80 to provide for an alternative method of Allocation which takes into account such insufficiency of information.

## 48    Asset Shortfall Claim with respect to an Affected TA Signatory

### 48.1    Affected TA Signatory

Each TA Signatory who has an Asset Claim to Securities in respect of an Affected Stock Line is an "**Affected TA Signatory**" with respect to the relevant Affected Intermediary. Any Asset Shortfall Claims of an Affected TA Signatory shall be determined with respect to all of its Asset Claims against the same Affected Intermediary in accordance with this Clause 48.

### 48.2    Timing of determination of Asset Shortfall Claim

The Company shall determine the Asset Shortfall Claim for each Affected TA Signatory as soon as reasonably practicable after:

48.2.1    the Company has made the Last Allocation: (i) in respect of such Affected TA Signatory's Asset Claim to Securities held by the relevant Affected Intermediary (where the Affected TA Signatory is a Single Customer); or (ii) otherwise, in respect of the relevant Multiple Stock Line Pool; and

48.2.2    the Company determines that it has received sufficient information from the relevant Affected Intermediary to determine the Asset Shortfall Claim in accordance with Clause 48.3.

### 48.3    Amount of Asset Shortfall Claim

The Asset Shortfall Claim for each Affected TA Signatory in respect of an Affected Intermediary means a cash value determined by the Company as the lesser of:

48.3.1    (i) the Value of such amount of Assets as of the Provisional Valuation Date; or (ii) otherwise, a cash value, in each case (i) and (ii), admitted by the relevant Affected Intermediary to be the shortfall between: (a) the amount of Distributable Trust Assets that have been returned by the Affected Intermediary to the Company in respect of such TA Signatory; and (b) the amount of Assets which should have been returned to the Company by the Affected Intermediary in order to fully discharge the liability of such Affected Intermediary in respect of such TA Signatory, in each case (a) and (b), in respect of the Trust Assets that were held by such Affected Intermediary (after taking into account: (x) the ability of the relevant Affected Intermediary to discharge the liability to return Trust Assets by returning an amount of cash to the Company equal to the value of such Trust Assets as at a time later than the relevant Provisional Valuation Date; and/or (y) the exercise of any rights to set-off available to such Affected

Intermediary, in each case (x) and (y), as permitted or required under the relevant governing laws and regulations applicable to such Affected Intermediary); and

**48.3.2** the Value of its Individual Claim Amount as of the Provisional Valuation Date to each of the Affected Stock Lines in respect of such Affected Intermediary; less the aggregate of the Value as of the Provisional Valuation Date of all of its Allocations in respect of its Asset Claims to Securities held by the relevant Affected Intermediary,

provided that the Asset Shortfall Claim: (i) being applied as a Distribution Asset in the priority of application under Clause 60.5; (ii) becoming an Ascertained Claim under Clause 62.1; or (iii) used to determine the amount of Ascertained Shortfall Amount under Clause 62.2.2 shall not include the aggregate of the Intermediary Distribution Value (only to the extent that such Intermediary Distribution Value applies to Clause 45.3.7 in accordance with Clause 45.3.8) and Recoverable Delivery Value received by such Asset Affected TA Signatory in respect of the relevant Asset Claim.

## 49    Shortfall Signatory

### 49.1    Shortfall Signatory

A "**Shortfall Signatory**" is:

**49.1.1** an Affected TA Signatory who has made an Affected Intermediary Collateralisation Election, and whose Ascertained Shortfall Amount is greater than it would have been as a consequence of either condition in Clause 49.2;

**49.1.2** otherwise, a TA Signatory whose: (i) TA Claimant Amount in respect of an Asset Pool cannot be satisfied to the same extent that it would have been as a consequence of either condition in Clause 49.2; and (ii) Asset Shortfall Claim, following Appropriation in accordance with Clause 61, exceeds its Net Financial Liability.

### 49.2    Shortfall Signatory Conditions

In relation to an Asset Pool, the conditions to a TA Signatory being a Shortfall Signatory are:

**49.2.1** A TA Claimant to that Asset Pool is a Non-Signatory as a result of being an Excluded Party pursuant to Clause 2.3; and

**49.2.2** The Company has entered into a bilateral arrangement with a TA Non-Signatory that affects Asset Claims to that Asset Pool.

### 49.3    Payment to Shortfall Signatory

**49.3.1** The Company shall pay to a Shortfall Signatory falling within Clause 49.1.1 a cash value equal to the Value of its Ascertained Shortfall Amount less the Value that would have been determined as the Shortfall Signatory's Ascertained Shortfall Amount had such Excluded Party been a Signatory, or the Company not entered into such bilateral arrangement, as the case may be; provided that the Shortfall Signatory's Ascertained Shortfall Amount shall thereafter be deemed to be the lesser of such amounts described in Clause 49.1.1.

**49.3.2** The Company shall pay to a Shortfall Signatory falling within Clause 49.1.2 a cash value equal to the lesser of: (i) the Value by which the Shortfall Signatory's Asset Shortfall Claim exceeds its Net Financial Liability; and (ii) the Value of the Shortfall Signatory's Asset Shortfall Claim less the Value that would have been determined as

its Asset Shortfall Claim had such Excluded Party been a Signatory, or the Company not entered into such bilateral arrangement, as the case may be.

## 50    Reallocation following the Company becoming aware of a new TA Claimant Amount or Alleged TA Claimant Amount

On any day when the Company receives or otherwise becomes aware of any new Relevant Information that relates to an Asset Claim in respect of a Stock Line or an Asset Pool (as applicable) after any determination of an Allocation Amount has been made by the Company in respect of such Stock Line or Asset Pool in circumstances where the Company believes that such new Relevant Information would have resulted in the determination of different Allocation Amounts had it been available at the time, the Company shall disregard all previous determinations of the Allocation for such Stock Line or Asset Pool, and shall proceed to re-determine the Allocation Amounts taking into account such new Relevant Information and in accordance with this Part 10, provided that:

(i)    any Assets for which instructions for settlement in respect of their Distribution or Appropriation have already been given will not be taken into account as Distributable Trust Assets of the relevant Stock Line or Asset Pool;

(ii)    the Asset Claim of any TA Claimant in respect of which instructions for settlement for a Distribution or Appropriation have already been given (each such TA Claimant, a "**Satisfied Claimant**") shall be reduced by the amount of their Asset Claim which has been satisfied by such Distribution or Appropriation that has been made and/or which will be satisfied by such Distribution or Appropriation as set out in such Distribution and Appropriation Notice;

(iii)    the Asset Claim of a Satisfied Claimant (as reduced in accordance with Clause 50(ii)) shall not be taken into account in the determination of Allocation Amounts until all other Signatories with an Asset Claim to the relevant Stock Line or Asset Pool have been Allocated an Allocation Amount to the same pro rata extent as the Asset Claim of such Satisfied Claimant has been satisfied by such Distribution or Appropriation and/or will be satisfied by such Distribution or Appropriation as set out in the Distribution and Appropriation Notice; and

(iv)    the Company shall not deliver a new Claim Amount Notice to any person if the information in its Claim Amount Notice remains the same.

## 51    Application of Distributable Trust Assets towards satisfaction of Asset Claims of TA Non-Signatories

### 51.1    Restriction on satisfying Asset Claims of TA Non-Signatories

The Company shall not apply any Distributable Trust Assets (whether or not such Distributable Trust Assets are designated as Reserved Assets in accordance with Clause 44) towards the satisfaction of Asset Claims of a TA Non-Signatory in respect of a Stock Line unless:

51.1.1    the proposed application of Distributable Trust Assets has been agreed between: (i) the Company; (ii) such TA Non-Signatory; (iii) each person who the Company determines as having an Asset Claim to such Stock Line; and (iv) any other person who has alleged to the Company that it has an Asset Claim to such Stock Line but with whom the Company has not reached an agreement in respect of its alleged Asset Claim;

**51.1.2**  the Company is subject to an order made by a court of competent jurisdiction, which requires the Company to make such application of Distributable Trust Assets or which determines the entitlements of Trust Asset Claimants to the relevant Stock Line, provided that either: (i) the order is not capable of being appealed; or (ii) the relevant time period for lodging an appeal (or seeking permission to appeal) has passed and no such appeal has been lodged (or permission sought);

**51.1.3**  the proposed application of Distributable Trust Assets is in accordance with Clause 51.2 and the Company has obtained an order from a court of competent jurisdiction, the effect of which is to afford the Company protection from liability in its capacity as trustee in respect of the relevant Trust Assets in carrying out such proposed application of Distributable Trust Assets, provided that either: (i) the order is not capable of being appealed; or (ii) the relevant time period for lodging an appeal (or seeking permission to appeal) has passed and no such appeal has been lodged (or permission sought); or

**51.1.4**  the proposed application of Distributable Trust Assets is in accordance with Clause 51.2 and has been agreed between the Company and all TA Signatories having an Asset Claim to such Stock Line.

**51.2**  **Requirements for satisfaction of Asset Claims of TA Non-Signatories**

A proposed application of Distributable Trust Assets shall satisfy the requirement of Clause 51.1.3 or Clause 51.1.4, as the case may be, if:

**51.2.1**  it is carried out in respect of a Stock Line other than an Affected Stock Line on the same or substantially similar basis as an Allocation in accordance with this Part 10 as if all TA Non-Signatories to such Stock Line have entered into this Agreement; and

**51.2.2**  it is carried out in respect of an Affected Stock Line on the same or substantially similar basis as an Allocation in accordance with this Part 10 as if all TA Non-Signatories with an Asset Claim to such Affected Stock Line and each other Affected Stock Line with respect to the same Affected Intermediary have entered into this Agreement.

# PART 11: APPROPRIATION AND DISTRIBUTION

## 52    Introduction

### 52.1    Appropriation and Distribution

The Company will determine Distributions of Distribution Assets to a Signatory, subject to any rights of the Company to Appropriate any Distribution Assets to Reduce such Signatory's Distribution Liabilities to the Company in full or in part.

### 52.2    Definitions

"**Distribution**" means any distribution of a Distribution Asset to a Signatory determined in accordance with this Part 11.

"**Appropriation**" means any application or appropriation by the Company of any Distribution Asset to Reduce Distribution Liabilities in accordance with Clause 54.3, and "**Appropriate**", "**Appropriated**" and "**Appropriating**" shall be construed accordingly.

"**Reduction**" means any reduction or discharge of Distribution Liabilities in accordance with Clause 55.3, and "**Reduce**", "**Reduced**" and "**Reducing**" shall be construed accordingly.

### 52.3    Costs Amount

The Company shall determine the Costs Amount applicable to each TA Signatory from time to time. The Company shall have a discretion to waive the Costs Amount, in part, in respect of a TA Signatory whose Acceptance Date falls after the end of the Initial Offer Period subject to a minimum of the Costs Amount that would have applied had such Acceptance Date fallen before the end of the Initial Offer Period.

## 53    No set-off

### 53.1    No set-off for Assets and Liabilities Transferred post Administration

**53.1.1**    Only those Assets and Liabilities comprising, respectively, Distribution Assets and Distribution Liabilities of a Signatory that have been held or owed by that Signatory at the Time of Administration can be applied towards each other for Reduction or set-off in accordance with this Part 11.

**53.1.2**    Subject to Clause 6.3, no Liabilities comprising Distribution Liabilities that have been Transferred to a Signatory after the Time of Administration may be applied against the Appropriation of Assets comprising any Distribution Assets: (i) held by that Signatory before the Time of Administration; or (ii) that have been Transferred to such Signatory. Distribution Liabilities that have been Transferred to a Signatory after the Time of Administration may be applied against the Appropriation of any Distribution Assets that have been Transferred by the same Transferor to that Signatory after the Time of Administration.

**53.1.3**    Subject to Clause 6.3, no Distribution Assets that have been Transferred to a Signatory after the Time of Administration may be applied towards the Reduction of any Distribution Liabilities: (i) owed by the Signatory since the Time of Administration; or (ii) that have been Transferred to such Signatory. Distribution Assets that have been Transferred to a Signatory after the Time of Administration may be applied towards the Reduction of any Distribution Liabilities that have been Transferred by the same Transferor to that Signatory after the Time of Administration.

**53.1.4**   Notwithstanding Clauses 53.1.1 to 53.1.3, all Assets comprising Distribution Assets of a Signatory, whether such Assets have been held or owed by that Signatory before or after the Time of Administration, and all Distribution Assets whether such Distribution Assets have been Transferred to such Signatory before or after the Time of Administration, can be Appropriated to Reduce each of the Distribution Liabilities in the following order of priority: (i) the Costs Amount, (ii) Ascertained Non-Financial Contract Liabilities or Limited Ascertained Non-Financial Contract Liabilities (as applicable) and (iii) Unfunded Retention Amounts.

## 54    Distribution Assets

### 54.1    Distribution Assets

"**Distribution Assets**" are Assets and/or Claims for which the Company is accountable to, or for the benefit of, a Signatory under this Agreement and which comprise:

**54.1.1**   any Asset Allocation to the TA Signatory determined in accordance with Part 10;

**54.1.2**   any Retention Allocation to the TA Signatory determined in accordance with Part 8;

**54.1.3**   if a Collateralisation Election has been made, any Collateral Allocation to the TA Signatory determined in accordance with Clause 59.10, the Collateral Amount of the Signatory and any Pre-Administration Client Money Shortfall Claim of the Signatory;

**54.1.4**   if an Affected Intermediary Collateralisation Election has been made, any Shortfall For Appropriation determined in accordance with Clause 60.6.2;

**54.1.5**   the Net Financial Claim of the TA Signatory determined in accordance with Part 7; and

**54.1.6**   any Asset Shortfall Claim of the TA Signatory for each Asset Pool.

### 54.2    Applicability of Distribution Assets

**54.2.1**   An Asset Allocation shall be applied as a Distribution Asset in the priorities of application under Clauses 60.1, 60.2, 60.3, and 60.5.

**54.2.2**   A Retention Allocation shall be applied as a Distribution Asset in the priority of application under Clause 60.2.

**54.2.3**   A Collateral Allocation shall be applied as a Distribution Asset in the priority of application under Clause 60.4.

**54.2.4**   Any Asset Shortfall Claim shall be applied as a Distribution Asset in the priority of application under Clause 60.5.

**54.2.5**   Any Shortfall For Appropriation shall be applied as a Distribution Asset in the priority of application under Clause 60.6.

**54.2.6**   Any Pre-Administration Client Money Shortfall Claim shall be applied as a Distribution Asset in the priority of application under Clause 60.7.

**54.2.7**   Any Collateral Amount shall be applied as a Distribution Asset in the priority of application under Clause 60.8.

**54.2.8**   Any Net Financial Claim shall be applied as a Distribution Asset in the priority of application under Clause 60.1.

**54.2.9**   Any Asset Shortfall Claim and any Pre-Administration Client Money Shortfall Claim shall only be Appropriated to Reduce Net Financial Liability and shall not be

Appropriated to Reduce any other Distribution Liabilities. Any Net Financial Claim shall only be Appropriated to Reduce the Limited Ascertained Non-Financial Contract Liabilities and shall not be Appropriated to Reduce any other Distribution Liabilities.

**54.2.10**  Subject to Clause 6 and Clause 53, each of the Distribution Assets may be determined and Appropriated by the Company at different times to Reduce different Distribution Liabilities. In determining any Distribution and Appropriation, the Company will only take into account Distribution Assets that are available and applicable for Appropriation at that time. The Company has no obligation to determine all Distribution Assets of a Signatory prior to determining a Distribution or an Appropriation.

## 54.3  Effect of Appropriation of Distribution Assets

The effect of Appropriation of Distribution Assets differs depending on the type of Distribution Asset. The effect of Appropriation for each type of Distribution Asset shall be:

**54.3.1**  for Securities comprising an Allocation, to Appropriate and convey or otherwise transfer to the Company full and absolute title (to the extent that the Signatory is able to convey such title) in such Securities upon such time of Appropriation, free and clear of any encumbrances, restrictions, limitations and any equitable interest or Equity of Redemption of the relevant TA Signatory in such Securities, and any of which that may exist shall be extinguished;

**54.3.2**  for any money comprising an Allocation, Collateral Amount, Retention Allocation or Collateral Allocation, to entitle the Company to retain such amount absolutely for its own account without any obligation to account for it to the Signatory;

**54.3.3**  for any Asset Shortfall Claim, to reduce the Ascertained Claim of the relevant TA Signatory by such amount as is equal to the Appropriated amount of the Asset Shortfall Claim;

**54.3.4**  for any Shortfall For Appropriation, to reduce the Shortfall For Appropriation of the relevant TA Signatory by such amount as is equal to the Appropriated amount of the Shortfall For Appropriation;

**54.3.5**  for any Pre-Administration Client Money Shortfall Claim, to reduce the Ascertained Claim of the relevant Signatory by an amount equal to the Appropriated amount of the Pre-Administration Client Money Shortfall Claim; and

**54.3.6**  for any Net Financial Claim, to reduce the Net Financial Claim of the relevant TA Signatory by such amount as is equal to the Appropriated amount of the Net Financial Claim.

## 55  Distribution Liabilities

## 55.1  Distribution Liabilities

"**Distribution Liabilities**" are Liabilities due and owing by the Signatory to the Company which may be Reduced by Appropriation of Distribution Assets (or as otherwise provided under Clause 55.4) under this Agreement and which comprise:

**55.1.1**  the Costs Amount applicable to that TA Signatory;

**55.1.2**  any Ascertained Non-Financial Contract Liabilities of that TA Signatory;

**55.1.3**  any Limited Ascertained Non-Financial Contract Liabilities of that TA Signatory;

55.1.4   any Unfunded Retention Amount relating to that TA Signatory;

55.1.5   the Net Financial Liability (if any) of that Signatory, which may comprise Uncollateralised Net Financial Liability and Collateralised Net Financial Liability if a Collateralisation Election has been made; and

55.1.6   if an Affected Intermediary Collateralisation Election has been made, the Affected Intermediary Derived Asset Liability of that TA Signatory.

## 55.2   Applicability of Distribution Liabilities

55.2.1   The Costs Amount shall be applied as a Distribution Liability in the priorities of application under Clauses 60.1 to 60.5 and Clause 60.8.

55.2.2   Any Ascertained Non-Financial Contract Liabilities shall be applied as a Distribution Liability in the priorities of application under Clauses 60.1 to 60.5 and Clause 60.8.

55.2.3   Any Limited Ascertained Non-Financial Contract Liabilities shall be applied as a Distribution Liability in the priority of application under Clause 60.1.

55.2.4   Any Unfunded Retention Amount shall be applied as a Distribution Liability in the priorities of application under Clauses 60.1 to 60.5 and Clause 60.8.

55.2.5   The Net Financial Liability shall be applied as a Distribution Liability in the priorities of application under Clause 60.2 and Clause 60.5, if no Collateralisation Election has been made.

55.2.6   The Uncollateralised Net Financial Liability shall be applied as a Distribution Liability in the priorities of application under Clauses 60.2 (unless an Appropriation Deferral Election has been made) 60.5, 60.7 and 60.8, if a Collateralisation Election has been made.

55.2.7   The Collateralised Net Financial Liability shall be applied as a Distribution Liability in the priorities of application under Clauses 60.3, 60.6, 60.7 and 60.8, if a Collateralisation Election has been made.

55.2.8   The Affected Intermediary Derived Asset Liability shall be applied as a Distribution Liability in the priority of application under 60.3, if an Affected Intermediary Collateralisation Election has been made.

55.2.9   Subject to Clause 6 and Clause 53, each of the Distribution Liabilities may be Reduced at different times and in different ways, including by Appropriation of different Distribution Assets. In determining any Distribution or Appropriation, the Company will only take into account Distribution Liabilities that exist at that time. Any subsequent increase in Distribution Liabilities, such as Ascertained Non-Financial Contract Liabilities, Limited Ascertained Non-Financial Contract Liabilities, Affected Intermediary Derived Asset Liability or Unfunded Retention Amount, shall not invalidate any prior Distribution or Appropriation.

## 55.3   Effect of Reduction of Distribution Liabilities

The effect of Reduction of Distribution Liabilities differs depending on the type of Distribution Liability. The effect of Reduction for each type of Distribution Liability shall be:

55.3.1   for a Costs Amount, to discharge the obligation of the TA Signatory to pay or account to the Company for such amount of the Costs Amount as is Reduced;

55.3.2   for Ascertained Non-Financial Contract Liabilities or Limited Ascertained Non-Financial Contract Liabilities, to discharge the obligation of the TA Signatory to pay or account to the Company for such amount of the Ascertained Non-Financial Contract Liabilities or Limited Ascertained Non-Financial Contract Liabilities as is Reduced;

55.3.3   for an Unfunded Retention Amount, to decrease the Unfunded Retention Amount by such Reduced amount and increase the Funded Retention Amount by such Reduced amount correspondingly in accordance with Clause 29.2;

55.3.4   for a Net Financial Liability, to discharge the obligation of the Signatory to pay or account to the Company for such amount of Net Financial Liability as is Reduced; and

55.3.5   for an Affected Intermediary Derived Asset Liability, to discharge the obligation of the Affected TA Signatory to pay or account to the Company for such amount of Affected Intermediary Derived Asset Liability.

## 55.4   Reduction of Distribution Liabilities

Distribution Liabilities may be Reduced in full or in part from time to time in any one way or a combination of ways as set out in Clauses 55.4.1 to 55.4.4.

### 55.4.1   Appropriation

Subject to Clause 55.5, Distribution Liabilities shall be Reduced by Appropriation by the Company of Distribution Assets in accordance with the priorities of application in Clause 60.

### 55.4.2   Payment

Distribution Liabilities may be Reduced by Payment by the Signatory to the Company on any Business Day upon giving not less than five Business Days' Notice to the Company. Such Notice shall show the amount and proposed payment date of such Payment and give details of the relevant account from which any amount for such Payment will be paid. If the Company incurs any costs and expenses as a result of the Signatory's failure to make such Payment in accordance with such Notice, such costs and expenses shall be a Non-Financial Contract Liability in respect of such Signatory.

A Signatory shall specify in such Notice which of the Distribution Liabilities and the amount of each such Distribution Liability it is intending to Reduce by way of such Payment, failing which the Company shall decide in its absolute discretion.

### 55.4.3   Intermediary Retention

Subject to Clause 55.5, Distribution Liabilities shall be Reduced upon the receipt by the Company of any Intermediary Retention on any Business Day.

The Company shall, as soon as reasonably practicable following the receipt of such Intermediary Retention:

(i)     determine the Value of such Intermediary Retention, as at the Business Day on which such Intermediary Retention is received by the Company;

(ii)    determine which of the Distribution Liabilities and the amount of each such Distribution Liability that is Reduced by the Value of such Intermediary Retention according to the purpose of such Intermediary Retention, if and to the extent that such purpose is either: (a) notified to the Company by the relevant Intermediary or Sub-Intermediary, as the case may be; or (b) reasonably apparent to the Company. Failing Clause 55.4.3(ii)(a) and Clause

55.4.3(ii)(b) above, the Company shall determine a Reduction of Distribution Liabilities in its absolute discretion; and

(iii)     as soon as reasonably practicable following the determination of Clause 55.4.3(ii)(a) and Clause 55.4.3(ii)(b), Notify the TA Signatory of such determinations.

### 55.4.4    Election to apply Collateral Amount

A Signatory may give an irrevocable instruction to the Company to Appropriate its Collateral Amount in full or in part to Reduce its Collateralised Net Financial Liability on any Business Day upon giving not less than fifteen Business Days' Notice to the Company.

The Signatory shall specify in such Notice the amount of such Collateral Amount that the Company shall Appropriate, failing which the Company shall decide, in its absolute discretion, the amount of Collateral Amount that it may Appropriate to Reduce such Signatory's Collateralised Net Financial Liability in its absolute discretion. The Collateral Amount shall be Reduced accordingly.

## 55.5    Limitation on Reduction of Non-Financial Contract Liabilities

Any Non-Financial Contract Liabilities shall not be Reduced by Appropriation of Distribution Assets under Clause 55.4.1 or receipt of Intermediary Retention under Clause 55.4.3 if (and then only to the extent that) such Reduction would:

### 55.5.1    be prohibited by any applicable law or regulation; or

### 55.5.2    have the effect of Reducing such Non-Financial Contract Liabilities to an extent greater or more extensive than is permitted under Rule 2.85 or Rule 4.90 of the Insolvency Rules or, if greater, any contract between such Signatory and the Company.

## 55.6    Outstanding amount of Distribution Liability

### 55.6.1    Any reference to a Distribution Liability shall, at any time, be a reference to the outstanding amount of such Distribution Liability following any Reduction effected prior to such time.

### 55.6.2    Any Costs Amount, Net Financial Liability or Affected Intermediary Derived Asset Liability that has been Reduced in full shall, from such time, cease to be a Distribution Liability.

### 55.6.3    Any Unfunded Retention Amount, Ascertained Non-Financial Contract Liability or Limited Ascertained Non-Financial Contract Liability that has been Reduced in full shall, from such time, cease to be a Distribution Liability provided that it may be subsequently increased (if determined appropriate) to become a Distribution Liability again.

# 56    Conditions to Distributions and Appropriations

## 56.1    Conditions

The Company may determine Distributions and Appropriations with respect to a Signatory at any time when each of the conditions set out in Clauses 56.1.1 to 56.1.4 is satisfied, except that once the condition in Clause 56.1.1 in respect of an NTA Signatory is satisfied, the

Company may determine the Distributions and Appropriations with respect to such NTA Signatory.

### 56.1.1   Net Contractual Position

The Net Contractual Position of such Signatory has been determined in accordance with Part 7 or, where that Signatory disputes its Net Contractual Position in accordance with Clause 68, such Dispute has been resolved.

### 56.1.2   Retention Claim

The Retention Claim Identification Cut-Off Time relating to such TA Signatory has occurred and has not been postponed to a later date in accordance with Clause 27.

### 56.1.3   Allocation and no suspension by reason of De Minimis Allocation

An Allocation to such TA Signatory has been determined and the determination of a Distribution or Appropriation is not suspended by reason of such Allocation not being a De Minimis Allocation as described in Clause 56.3.

### 56.1.4   Non-Financial Contract Liabilities have been ascertained

If the Company determines at any time that a TA Signatory has any of the Non-Financial Contract Liabilities as described in Clause 33.1 and Clause 33.4 and such Non-Financial Contract Liabilities have not yet become Ascertained Non-Financial Contract Liabilities or Limited Ascertained Non-Financial Contract Liabilities (as the case may be), then no Distribution or Appropriation shall be determined until such time as the Non-Financial Contract Liabilities have become Ascertained Non-Financial Contract Liabilities.

## 56.2   Valid determination

### 56.2.1
Once the condition in Clause 56.1.1 has been satisfied, it will remain satisfied for the duration of this Agreement. The conditions in Clause 56.1.2, Clause 56.1.3 and Clause 56.1.4 may be satisfied at any one point in time and subsequently cease to be satisfied.

### 56.2.2
Provided that the Company has determined a Distribution or Appropriation at a time when the conditions in Clauses 56.1.1 to 56.1.4 are satisfied with respect to a TA Signatory, then any such Distribution or Appropriation shall not be invalidated if at any subsequent time any one of the conditions in Clause 55.1.2, Clause 56.1.3 or Clause 56.1.2 ceases to be satisfied.

### 56.2.3
Once the conditions in Clauses 56.1.1 to 56.1.4 have been satisfied, the Company shall, in its absolute discretion, choose to deliver Distributions of Distributable Trust Assets:

(i)      on a Stock Line-by-Stock Line basis;

(ii)     on a Signatory-by-Signatory basis; and/or

(iii)    in a combination of both Clause 56.2.3(i) and Clause 56.2.3(ii),

in such order as the Company sees fit, provided that this does not prejudice or unduly delay meeting the objectives and purposes, or otherwise conflict with the terms, of this Agreement.

### 56.3    De Minimis Allocation

If the Company determines, in its absolute discretion, that Assets of a particular Asset Pool which have been Allocated to a TA Signatory are of such minimal quantity that it would not be reasonably practicable for a Distribution or Appropriation to be determined with respect to such Allocation (a "**De Minimis Allocation**"), then no Distribution or Appropriation for such De Minimis Allocation shall be determined until the earlier of:

**56.3.1**    any additional Allocation of Assets of the same Asset Pool to such TA Signatory, which, when aggregated with such De Minimis Allocation, is of such quantity that the Company determines in its absolute discretion that it would be reasonably practicable for a Distribution or Appropriation to be determined; and

**56.3.2**    the final Allocation of Assets of that Asset Pool.

### 56.4    Distributable Trust Assets subject to encumbrances

If the Company determines that any Distributable Trust Asset that would otherwise be eligible for Distribution or Appropriation is subject to any Security Interest or other encumbrance that would prevent or restrict the Distribution or Appropriation of that Distributable Trust Asset in accordance with this Agreement, the Company may postpone the Distribution or Appropriation of that Distributable Trust Asset until such Security Interest or other encumbrance is removed, discharged or otherwise dealt with to the Company's satisfaction.

## 57    Distribution Value Date

The Company shall determine Distributions and Appropriations using the Value of the relevant Distribution Assets and Distribution Liabilities as of a date (such date, a "**Distribution Value Date**") falling on the twenty-fifth Business Day prior to the latest date on which the Company intends to give instructions for settlement of such Distribution Assets, regardless of whether any such Distribution Assets would actually fall due for delivery to a Signatory or be Appropriated in full by the Company.

## 58    Distribution and Appropriation Notice

### 58.1    Distribution and Appropriation Notice

The Company shall, as soon as reasonably practicable following the determination of any Distribution or Appropriation and in any case within five Business Days of the relevant Distribution Value Date, give a Notice to the relevant Signatory (such Notice, a "**Distribution and Appropriation Notice**"). If a TA Signatory receives a Distribution and Appropriation Notice from the Company and the Company becomes aware of new Relevant Information prior to the instructions for settlement having been given in respect of the relevant Distribution or Appropriation, which affects the calculation or determination of the information in respect of the Allocation of one or more Stock Lines provided in the Distribution and Appropriation Notice, then the original Distribution and Appropriation Notice to the extent of that Stock Line or those Stock Lines shall cease to be final and binding between the Parties. If an Appropriation Deferral Election is made by a TA Signatory relating to the Asset Allocation of that Stock Line and a Deferral Cash Amount is Paid to the Company once instructions for settlement in respect of the relevant Distribution or Appropriation have been given, then the Company shall, as soon as practicable, return the Deferral Cash Amount to such TA Signatory. The Company shall send a new Distribution and Appropriation Notice amending or superseding the original Distribution and Appropriation Notice, or if the Company decides that no Assets would be delivered to such TA Signatory, then the Company shall send a Notice to this effect.

## 58.2    Multiple Distributions and Appropriations

A single Distribution and Appropriation Notice may be given in respect of the Distribution or Appropriation of more than one Distribution Asset, provided that it shall specify all Relevant Information set out in Clause 58.3 in respect of each such Distribution Asset.

## 58.3    Content of Distribution and Appropriation Notice

A Distribution and Appropriation Notice shall contain the following information:

58.3.1    a list of each Distribution Asset relating to such Distribution or Appropriation, including the identification details of any Securities, number of any Securities and amount of any cash;

58.3.2    the Value of each relevant Distribution Asset as at the Distribution Value Date;

58.3.3    a list of each Distribution Liability of the Signatory as at the Distribution Value Date, subject to Clause 58.4;

58.3.4    the Value of each such Distribution Liability as at the Distribution Value Date, subject to Clause 58.4;

58.3.5    the number or amount and the Value of any Distribution Asset which the Company intends to Appropriate to Reduce such Signatory's Distribution Liabilities;

58.3.6    the number or amount of any Distribution Asset which the Company intends to deliver as a Distribution to such Signatory, if any;

58.3.7    whether a Collateralisation Election may be made by the Signatory and, if so, the Collateral Amount, Collateral Claim Amount and Affected Intermediary Claim Amount as at the relevant Distribution Value Date, and if an Appropriation Deferral Election has not already been made with respect to that Asset Allocation, then the Deferral Election Deadline, the Deferral Cash Amount and the Deferral Cash Payment Date relating to such Asset Allocation;

58.3.8    if a Collateralisation Election has already been made by the Signatory, the Collateral Amount, Collateral Claim Amount and the Affected Intermediary Claim Amount as at the relevant Distribution Value Date and, if an Appropriation Deferral Election has already been made with respect to an Asset Allocation, the Deferral Cash Amount and the Deferral Cash Payment Date relating to such Asset Allocation;

58.3.9    the Distribution Value Date; and

58.3.10    the Delivery Instruction Date, if any Distribution shall fall due for delivery by the Company.

## 58.4    Statement of Distribution Liabilities

58.4.1    Any information relating to Distribution Liabilities in any Distribution and Appropriation Notice may not reflect any Reduction of such Distribution Liabilities which have been effected by Payment by the Signatory or receipt of Intermediary Retention by the Company within the period of five Business Days preceding the relevant Distribution Value Date.

58.4.2    This Clause 58.4 shall not affect the effectiveness of the Reduction of such Distribution Liabilities. The Company shall take into account any such Reduction as soon as reasonably practicable following such Distribution Value Date and reflect such Reduction in the next Distribution and Appropriation Notice to such Signatory.

## 59    Collateralisation Election

### 59.1    Collateralisation Election

Subject to this Clause 59, a Signatory may elect to collateralise its Net Financial Liability with one or more of the following amounts or liabilities (each of the below, a "**Collateralisation Election**"):

**59.1.1**    its Pre-Administration Admitted Client Money Amount (a "**Client Money Collateralisation Election**");

**59.1.2**    its Deferral Cash Amount (for a TA Signatory only); and/or

**59.1.3**    its Affected Intermediary Admitted Claim Amount (for an Affected TA Signatory in respect of the Affected Stock Lines of a Net Equity Intermediary only) (an "**Affected Intermediary Collateralisation Election**").

### 59.2    Pre-Administration Admitted Client Money Amount

**59.2.1**    A Signatory's Net Financial Liability may only be collateralised by its Pre-Administration Admitted Client Money Amount if all or part of its Pre-Administration Client Money Claim has been admitted or determined as a Pre-Administration Admitted Client Money Amount in accordance with this Clause 59.2.

**59.2.2**    A Signatory may elect to collateralise its Net Financial Liability with its Pre-Administration Client Money Claim on any Business Day by giving not less than fifteen Business Days' Notice to the Company.

**59.2.3**    The "**Pre-Administration Admitted Client Money Amount**" in respect of a Signatory, from time to time, is equal to the aggregate of:

(i)    any amount admitted from time to time by the Company as the Liability of the Company to that Signatory in respect of its Pre-Administration Client Money Claim; and

(ii)    any amount (other than an amount in Clause 59.2.3(i)) determined from time to time by a court of competent jurisdiction, whose ruling is binding upon the Company and the Signatory and which is not then subject to appeal, as the Liability of the Company to that Signatory in respect of its Pre-Administration Client Money Claim,

in each case, provided that such Liabilities remain unsatisfied at the time when: (a) the Collateralisation Election is made; or (b) an Ascertained Claim is determined or admitted by the Company pursuant to Clause 62.3.2.

### 59.3    Deferral Cash Amount

**59.3.1**    A TA Signatory may elect to defer the exercise of the Company's rights to Appropriate an Asset Allocation of a particular Asset Pool to Reduce its Net Financial Liability until its Asset Shortfall Claim for that Asset Pool has been determined (such election, an "**Appropriation Deferral Election**"). A TA Signatory may only make such election upon the first Asset Allocation of a Stock Line in respect of an Asset Pool by giving Notice to the Company on or prior to the fifteenth Business Day following the relevant Distribution Value Date of such Asset Allocation (the "**Deferral Election Deadline**").

**59.3.2**    If an Appropriation Deferral Election is made, the TA Signatory shall, on or prior to each day falling on the fifth Business Day following any Distribution Value Date relating

to an Asset Allocation of that Asset Pool (each, a "**Deferral Cash Payment Date**"), Pay to the Company a cash amount (each such amount, a "**Deferral Cash Amount**") equal to the lesser of:

(i)     the Value of that Asset Allocation as at such Distribution Value Date; and

(ii)    the Net Financial Liability of the TA Signatory as at such Distribution Value Date.

**59.3.3**    If the TA Signatory fails to pay any Deferral Cash Amount on or prior to the relevant Deferral Cash Payment Date, then the Company may without prior notice exercise its rights to Appropriate any Asset Allocation to such TA Signatory to Reduce its Net Financial Liability.

**59.3.4**    The aggregate amount of all Deferral Cash Amounts in respect of an Asset Pool Paid by the TA Signatory to the Company shall increase the Collateral Amount which shall be applied as a Distribution Asset in the priority of payment under Clause 60.8.

## 59.4    Affected Intermediary Admitted Claim Amount

**59.4.1**    An Affected TA Signatory may collateralise its Net Financial Liability by its Affected Intermediary Admitted Claim Amount in respect of a Net Equity Intermediary on any Business Day before the Company gives a Distribution and Appropriation Notice to such Affected TA Signatory in relation to any Asset Allocation in respect of Distributable Trust Assets received from such Net Equity Intermediary, by giving not less than fifteen Business Days' Notice to the Company.

**59.4.2**    Such Affected TA Signatory's Net Financial Liability may only be collateralised after the Affected Intermediary Admitted Claim Amount has been admitted or determined by the Company in accordance with Clause 59.4.3.

**59.4.3**    The "**Affected Intermediary Admitted Claim Amount**" of an Affected TA Signatory in respect of a Net Equity Intermediary is an amount admitted by the Company equal to the lesser of: (i) the aggregate Value, as at the Provisional Valuation Date, of its Individual Claim Amounts (excluding all Derived Assets included in such Individual Claim Amounts) in respect of the relevant Affected Stock Lines; and (ii) its Net Equity Amount in respect of such Net Equity Intermediary.

## 59.5    Consequence of Affected Intermediary Collateralisation Election

### 59.5.1    Overrides any Appropriation Deferral Election

If an Affected TA Signatory makes an Affected Intermediary Collateralisation Election, any Appropriation Deferral Election (for the avoidance of doubt, including an Appropriation Deferral Election which such Affected TA Signatory makes after making an Affected Intermediary Collateralisation Election) shall not apply with respect to any Asset Allocation in relation to any Affected Stock Line which is the subject of such Affected Intermediary Collateralisation Election.

### 59.5.2    Undertaking to pay Intermediary Distribution Value to the Company

Each Signatory undertakes that, if it elects to make an Affected Intermediary Collateralisation Election, it shall pay the Company an amount of cash equal to:

(i)     any Intermediary Distribution Value received from the relevant Net Equity Intermediary unless the Company determines that such Intermediary Distribution Value has been taken into account in the relevant Net Equity

Amount of the Affected TA Signatory (including for the avoidance of doubt, the reduction of Liabilities of such TA Signatory to the relevant Affected Intermediary by way of set-off); or

(ii)     the value of any asset received by a Signatory on or after the Administration Date from the relevant Net Equity Intermediary that, had it been received by the Company, would have been a Derived Asset.

Such amount of cash is payable promptly and in no event later than 20 Business Days after the later of: (a) the day on which the Affected TA Signatory makes an Affected Intermediary Collateralisation Election; or (b) the day on which the amount of such Intermediary Distribution Value has been determined (in relation to (i) above) or such asset has been received by the Affected TA Signatory (in relation to (ii) above).

Such amount of cash received by the Company shall be deemed to become an Asset Allocation in relation to any Affected Stock Line which is the subject of such Affected Intermediary Collateralisation Election, and shall be subject to Appropriation and/or Distribution in respect of such Signatory in accordance with this Part 11.

### 59.5.3    Covenant to pay Derived Assets

If an Affected TA Signatory makes an Affected Intermediary Collateralisation Election, such Affected TA Signatory covenants to transfer to the Company all Derived Assets forming part of any Asset Allocation in respect of that Affected TA Signatory and Affected Intermediary (the liability of such Affected TA Signatory in respect of such Derived Assets being "**Affected Intermediary Derived Asset Liability**").

## 59.6    Consequence of Client Money Collateralisation Election

This Clause shall immediately apply upon a valid Client Money Collateralisation Election by a Signatory.

### 59.6.1    Each Signatory hereby irrevocably:

(i)     effects an absolute assignment to AssignCo of all and any Pre-Administration Client Money Claims and all of its rights with respect thereto. The Company, acting as the authorised agent of AssignCo, hereby accepts such assignment;

(ii)     directs the Company (or, as the case may be, the relevant compensation scheme, insurer or other person) to pay any Pre-Administration Client Money or proceeds of a Pre-Administration Client Money Claim that would, but for Clause 59.6.1, have been made to the Signatory to a bank account opened in the name of AssignCo (such account, the "**Pre-Administration Client Money Collection Account**") and the Signatory agrees that AssignCo shall be entitled to retain such amount absolutely for its own account without any obligation to account for it to the Signatory; and

(iii)     agrees that each payment by the Company in accordance with Clause 59.6.1(i) in respect of Pre-Administration Client Money held on Statutory Trust shall constitute a valid discharge pro tanto of the Statutory Trust upon which the Company held the relevant amount of Pre-Administration Client Money for the Signatory and the Company's obligations with respect to the distribution of such amount of Pre-Administration Client Money.

59.6.2   The Signatory:

(i)     undertakes that if, notwithstanding the assignment in Clause 59.6.1(i), it receives any amount or benefit in relation to a Pre-Administration Client Money Claim, it shall promptly upon receipt and without need for any demand pay such amount or, as the case may be, the fair value of such benefit to the Pre-Administration Client Money Collection Account for AssignCo's account;

(ii)    irrevocably authorises the Company, AssignCo and the Administrators to take all such action as they may reasonably consider appropriate in the name of, and on behalf of, the Signatory to establish, pursue or enforce any Pre-Administration Client Money Claims;

(iii)   agrees to promptly render such assistance and take such action as the Company, AssignCo or the Administrators may reasonably request in relation to such Client Money Claims including, without limitation, action to enforce any of the Pre-Administration Client Money Claims to the extent that the assignment in Clause 59.6.1(i) is, for any reason, ineffective; and

(iv)    agrees not to take any action in relation to such Client Money Claim or to waive, compromise, dispose of, charge, encumber or otherwise deal with the same except as so requested.

## 59.7   Total Collateralisation Amount

59.7.1   At any time, the aggregate of the Collateral Claim Amount, the Collateral Amount and the Affected Intermediary Claim Amount of a Signatory shall be the "**Total Collateralisation Amount**".

59.7.2   The "**Collateral Claim Amount**" shall be the Signatory's Pre-Administration Admitted Client Money Amount as admitted or determined from time to time in accordance with Clause 59.2 that remains unsatisfied from time to time.

59.7.3   The "**Collateral Amount**" shall be the aggregate amount of: (i) all Pre-Administration Client Money distributions paid into the Pre-Administration Client Money Collection Account from time to time in accordance with Clause 59.6.1(i) in respect of the Signatory; and (ii) all Deferral Cash Amounts paid to the Company in accordance with Clause 59.3 less any decrease in accordance with Clause 59.9.

59.7.4   The "**Affected Intermediary Claim Amount**" shall be the Affected Intermediary Admitted Claim Amount as reduced by the Value of any Asset Allocation as at the Distribution Value Date that has been Appropriated in accordance with Clause 60.3.

59.7.5   Upon a valid Collateralisation Election by a Signatory, the Company shall establish a notional ledger to record:

(i)     the Collateral Claim Amount in respect of any Client Money Collateralisation Election;

(ii)    the Collateral Amount in respect of any Client Money Collateralisation Election and/or Appropriation Deferral Election; and

(iii)   the Affected Intermediary Claim Amount in respect of an Affected Intermediary Collateralisation Election,

in each case of such Signatory from time to time.

**59.7.6**   No interest shall accrue on the Collateral Amount, the Collateral Claim Amount or Affected Intermediary Admitted Claim Amount.

## 59.8   Collateralised Net Financial Liability and Uncollateralised Net Financial Liability

At any time, the portion of such Signatory's Net Financial Liability equal to the lesser of: (i) the Total Collateralisation Amount at that time; and (ii) its Net Financial Liability at that time, shall be the collateralised portion of its Net Financial Liability (such portion, the "**Collateralised Net Financial Liability**").

At any time, such Signatory's Net Financial Liability less the Collateralised Net Financial Liability at that time shall be the uncollateralised portion of its Net Financial Liability (such portion, the "**Uncollateralised Net Financial Liability**").

## 59.9   Increase or decrease of Collateral Claim Amount and Collateral Amount

**59.9.1**   On each occasion that the Company pays a distribution of Pre-Administration Client Money to the Pre-Administration Client Money Collection Account in accordance with Clause 59.6.1(i) in respect of a Signatory, the Signatory's Collateral Claim Amount shall be reduced by an amount equal to such payment and the Signatory's Collateral Amount shall be increased by an amount equal to such payment.

**59.9.2**   The Signatory's Collateral Amount shall only be increased either: (i) together with a corresponding reduction of the Signatory's Collateral Claim Amount in accordance with Clause 59.9.1; or (ii) in respect of a TA Signatory, whenever a TA Signatory pays a Deferral Cash Amount to the Company in accordance with Clause 59.3, and shall be decreased in accordance with Clause 55.4.4, Clause 59.10 or Clause 60.8.

**59.9.3**   The Signatory's Collateral Claim Amount shall only be decreased: (i) together with a corresponding increase of the Collateral Amount in accordance with Clause 59.9.1; or (ii) in accordance with Clause 59.10, and shall only be increased to the extent of any increase, from time to time, of the Signatory's Pre-Administration Admitted Client Money Amount.

## 59.10   Collateral Allocation attributable to surplus Collateral Amount

**59.10.1**   If at any time the Total Collateralisation Amount exceeds the Net Financial Liability of a Signatory that has made a Collateralisation Election, then an amount equal to the lesser of: (i) the surplus of the Total Collateralisation Amount over such Net Financial Liability; and (ii) the Collateral Amount, shall be deemed to be an Allocation to such Signatory (such deemed Allocation, a "**Collateral Allocation**").

**59.10.2**   A Collateral Allocation shall be applied as a Distribution Asset in the priority of payment under Clause 60.4 and there shall be a corresponding Reduction in the Collateral Amount.

## 59.11   Application of Pre-Administration Client Money Shortfall Claim as Distribution Asset

**59.11.1**   In respect of a Signatory who has made a Collateralisation Election in respect of a Pre-Administration Client Money Claim, as soon as reasonably practicable following such time when the Company, in its absolute discretion, determines that: (i) it does not expect to make any further distribution of Pre-Administration Client Money in satisfaction of any Signatory's Pre-Administration Client Money Claim; and (ii) it does not expect any further increase to that Signatory's Pre-Administration Admitted Client

Money Amount, the Company shall determine the "**Pre-Administration Client Money Shortfall Claim**" of such Signatory as an amount equal to the Signatory's Collateral Claim Amount at such time.

**59.11.2** Upon the determination of a Signatory's Pre-Administration Client Money Shortfall Claim, the Signatory's Collateral Claim Amount shall be reduced to zero and the Pre-Administration Client Money Shortfall Claim shall be applied as a Distribution Asset in accordance with Clause 60.7.

## 60 Appropriation of Distribution Assets to Reduce Distribution Liabilities

### 60.1 Allocation to TA Signatory with a Net Financial Claim

**60.1.1 Applicable Distribution Assets and Distribution Liabilities**

For a TA Signatory with a Net Financial Claim, where an Asset Allocation is determined in respect of any Stock Line at any time:

(i)     the applicable Distribution Asset shall be such Asset Allocation and Net Financial Claim; and

(ii)    the applicable Distribution Liability shall be the Costs Amount, Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount.

**60.1.2 First priority of application**

The Company shall Appropriate the Asset Allocation towards the Reduction of the applicable Distribution Liabilities, based on the Value of such Asset Allocation and the amount of such Distribution Liabilities as at the relevant Distribution Value Date, in the following order of priority:

(i)     first, Costs Amount;

(ii)    secondly, Ascertained Non-Financial Contract Liabilities; and

(iii)   thirdly, Unfunded Retention Amount.

**60.1.3 Excess Distribution Asset or outstanding Distribution Liabilities**

If the Value of such Asset Allocation exceeds the aggregate amount of the applicable Distribution Liabilities, then all such Distribution Liabilities will be Reduced in full by Appropriation in accordance with Clause 60.1.2 and any remaining Value of the Asset Allocation after Appropriation in accordance with Clause 60.1.2 shall be a Distribution to the TA Signatory.

If the Value of the Asset Allocation is less than the aggregate amount of the applicable Distribution Liabilities, then the Asset Allocation will be Appropriated in full and any applicable Distribution Liability that is not Reduced in full in accordance with Clause 60.1.2 shall remain outstanding.

**60.1.4 Second priority of application**

The Company shall Appropriate the Net Financial Claim towards the Reduction of the amount of the Limited Ascertained Non-Financial Contract Liabilities at the relevant Distribution Value Date.

**60.1.5    Excess Distribution Asset or outstanding Distribution Liabilities**

If the Net Financial Claim exceeds the Limited Ascertained Non-Financial Contract Liabilities, then the Limited Ascertained Non-Financial Contract Liabilities will be Reduced in full in accordance with Clause 60.1.4 and any remaining amount of Net Financial Claim after Appropriation in accordance with Clause 60.1.4 shall become an Ascertained Claim.

If the Net Financial Claim is less than the Limited Ascertained Non-Financial Contract Liabilities, then the Net Financial Claim will be Appropriated in full and any remaining Limited Ascertained Non-Financial Contract Liabilities that are not Reduced in accordance with Clause 60.1.4 shall remain outstanding as a Liability of the TA Signatory to the Company.

## 60.2    Interim Asset Allocation or Retention Allocation to a TA Signatory with a Net Financial Liability

**60.2.1    Applicability**

This Clause 60.2 applies to: (i) an Asset Allocation in respect of any Stock Line, other than any Affected Stock Lines that are the subject of an Affected Intermediary Collateralisation Election; and (ii) a Retention Allocation.

**60.2.2    Applicable Distribution Assets and Distribution Liabilities**

For a TA Signatory with a Net Financial Liability, where an Asset Allocation is determined at any time prior to the determination of an Asset Shortfall Claim for that Asset Pool or where a Retention Allocation is determined:

(i)     the applicable Distribution Asset shall be such Asset Allocation or Retention Allocation, as the case may be; and

(ii)    the applicable Distribution Liabilities shall be the Costs Amount, Net Financial Liability (subject to whether a Collateralisation Election has been made), Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount.

**60.2.3    Priority of application**

The Company shall Appropriate the Asset Allocation or the Retention Allocation, as the case may be, towards the Reduction of the applicable Distribution Liabilities, based on the Value of such Asset Allocation or Retention Allocation, as the case may be, and the amount of such Distribution Liabilities as at the relevant Distribution Value Date, in the following order of priority:

(i)     first, Costs Amount;

(ii)    secondly, if no Collateralisation Election has been made, Net Financial Liability; or, if a Collateralisation Election has been made, the Uncollateralised Net Financial Liability (unless an Appropriation Deferral Election has been made in respect of that Asset Allocation, in which case the Uncollateralised Net Financial Liability shall not be an applicable Distribution Liability);

(iii)   thirdly, Ascertained Non-Financial Contract Liabilities; and

(iv)    fourthly, Unfunded Retention Amount.

**60.2.4   Excess Distribution Asset or outstanding Distribution Liabilities**

If the Value of the Asset Allocation or the Retention Allocation exceeds the aggregate amount of the Distribution Liabilities, then all applicable Distribution Liabilities will be Reduced in full in accordance with Clause 60.2.3 and any remaining Value of the Asset Allocation after Appropriation in accordance with Clause 60.2.3 shall be a Distribution to the TA Signatory or any remaining value of the Retention Allocation after Appropriation in accordance with Clause 60.2.3 shall be paid to the TA Signatory.

If the Value of the Asset Allocation or the Retention Allocation is less than the aggregate amount of the applicable Distribution Liabilities, then such Asset Allocation or such Retention Allocation, as the case may be, will be Appropriated in full and any applicable Distribution Liability that is not Reduced in full in accordance with Clause 60.2.3 shall remain outstanding.

## 60.3   Asset Allocation following an Affected Intermediary Collateralisation Election

**60.3.1   Applicability**

This Clause 60.3 applies to an Asset Allocation in respect of an Affected Stock Line that is the subject of an Affected Intermediary Collateralisation Election.

**60.3.2   Applicable Distribution Assets and Distribution Liabilities**

For a TA Signatory with a Net Financial Liability who has made an Affected Intermediary Collateralisation Election, where an Asset Allocation is determined in respect of the Net Equity Intermediary the subject of the Affected Intermediary Collateralisation Election :

(i)      the applicable Distribution Asset shall be such Asset Allocation; and

(ii)     the applicable Distribution Liabilities shall be the Affected Intermediary Derived Asset Liability relating to that Asset Allocation, Costs Amount, Collateralised Net Financial Liability, Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount.

**60.3.3   First priority of application**

The Company shall Appropriate any part of the Asset Allocation that comprises Derived Assets towards the Reduction of the Affected Intermediary Derived Asset Liability relating to that Asset Allocation, based on the Value of the component of such Asset Allocation that comprises Derived Assets and the amount of the Affected Intermediary Derived Asset Liability as at the relevant Distribution Value Date.

**60.3.4   Excess Distribution Asset or outstanding Distribution Liability**

It is intended that the Value of the component of such Asset Allocation that comprises Derived Assets will equal the amount of the Affected Intermediary Derived Asset Liability such that all such Affected Intermediary Derived Asset Liability will be Reduced in full by Appropriation and the component of such Asset Allocation will be Appropriated in full, in each case in accordance with Clause 60.3.3.

**60.3.5   Second priority of application**

The Company shall Appropriate the balance of the Asset Allocation that does not comprise Derived Assets towards the Reduction of the applicable Distribution Liabilities, based on the Value of the balance of such Asset Allocation and the amount

of such Distribution Liabilities as at the relevant Distribution Value Date, in the following order of priority:

(i)     first, Costs Amount;

(ii)    secondly, Collateralised Net Financial Liability;

(iii)   thirdly, Ascertained Non-Financial Contract Liabilities; and

(iv)    fourthly, Unfunded Retention Amount.

**60.3.6    Excess Distribution Asset or outstanding Distribution Liabilities**

If the Value of the Asset Allocation exceeds the aggregate amount of the applicable Distribution Liabilities, then all applicable Distribution Liabilities will be Reduced in full in accordance with Clause 60.3.5 and any remaining Value of the Asset Allocation after Appropriation in accordance with Clause 60.3.5 shall be a Distribution to the TA Signatory.

If the Value of the Asset Allocation is less than the amount of the aggregate amount of the applicable Distribution Liabilities, then such Asset Allocation will be Appropriated in full and any applicable Distribution Liability that is not Reduced in full in accordance with Clause 60.3.5 shall remain outstanding.

**60.4    Interim Collateral Allocation to a Signatory with a Net Financial Liability**

**60.4.1    Applicable Distribution Assets and Distribution Liabilities**

For a TA Signatory with a Net Financial Liability who has made a Collateralisation Election, where a Collateral Allocation is determined in accordance with Clause 59.10 at any time prior to the determination of its Pre-Administration Client Money Shortfall Claim and the Last Allocation:

(i)     the applicable Distribution Asset shall be such Collateral Allocation; and

(ii)    the applicable Distribution Liabilities shall be the Costs Amount, Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount.

**60.4.2    Priority of application**

The Company shall Appropriate the Collateral Allocation towards the Reduction of the applicable Distribution Liabilities, based on the amount of such Collateral Allocation and such applicable Distribution Liabilities as at the relevant Distribution Value Date, in the following order of priority:

(i)     first, Costs Amount;

(ii)    secondly, Ascertained Non-Financial Contract Liabilities; and

(iii)   thirdly, Unfunded Retention Amount.

**60.4.3    Excess Distribution Asset or outstanding Distribution Liabilities**

If the amount of Collateral Allocation exceeds the aggregate amount of the applicable Distribution Liabilities, then all applicable Distribution Liabilities will be Reduced in full in accordance with Clause 60.4.2 and an amount equal to such remaining amount of the Collateral Allocation after Appropriation in accordance with Clause 60.4.2 shall be paid to the TA Signatory.

If the amount of Collateral Allocation is less than the aggregate amount of the applicable Distribution Liabilities, then the Collateral Allocation will be Appropriated in full and any applicable Distribution Liability that is not Reduced in full in accordance with Clause 60.4.2 shall remain outstanding.

### 60.4.4    Interim Collateral Allocation to an NTA Signatory

For an NTA Signatory with a Net Financial Liability that has made a Collateralisation Election, where a Collateral Allocation is determined in accordance with Clause 59.10 at any time prior to the determination of its Pre-Administration Client Money Shortfall Claim, an amount equal to such Collateral Allocation shall be paid to the NTA Signatory.

## 60.5    Last Asset Allocation to a TA Signatory with a Net Financial Liability

### 60.5.1    Applicability

This Clause 60.5 applies to any Asset Allocation and/or Asset Shortfall Claim in respect of any Stock Line other than any Affected Stock Lines that are the subject of an Affected Intermediary Collateralisation Election.

### 60.5.2    Applicable Distribution Assets and Distribution Liabilities

For a TA Signatory with a Net Financial Liability, upon the determination of an Asset Shortfall Claim of an Asset Pool:

(i)     the applicable Distribution Assets shall be such Asset Shortfall Claim and any Asset Allocation; and

(ii)    the applicable Distribution Liabilities shall be the Net Financial Liability (subject to whether a Collateralisation Election has been made), Costs Amount, Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount.

### 60.5.3    First priority of application

The Company shall first Appropriate such Asset Shortfall Claim towards the Reduction of Net Financial Liability or, if a Collateralisation Election has been made, first, the Uncollateralised Net Financial Liability and, secondly, the Collateralised Net Financial Liability in that order, in each case, based on the Value of the Asset Shortfall Claim and the amount of such Net Financial Liability or the Uncollateralised Net Financial Liability and the Collateralised Net Financial Liability, as the case may be, as at the relevant Distribution Value Date.

### 60.5.4    Excess Asset Shortfall Claim and outstanding Net Financial Liability after first priority of application

If the Asset Shortfall Claim exceeds the Net Financial Liability, then the Net Financial Liability will be Reduced in full in accordance with Clause 60.5.3 and any remaining amount of Asset Shortfall Claim after Appropriation in accordance with Clause 60.5.3 shall be Valued as at the Date Before Administration and become an Ascertained Claim.

If the Asset Shortfall Claim is less than the Net Financial Liability, then the Asset Shortfall Claim will be Appropriated in full and any remaining Net Financial Liability or the Uncollateralised Net Financial Liability and the Collateralised Net Financial

Liability, as the case may be, that is not Reduced in accordance with Clause 60.5.3 shall remain outstanding for application as a Distribution Liability under Clause 60.5.5.

**60.5.5    Second priority of application**

The Company shall then Appropriate the Asset Allocation towards the Reduction of the applicable Distribution Liabilities in the order of priority set out in this Clause 60.5.5, based on the Value of such Asset Allocation and the amount of such Distribution Liabilities as at the relevant Distribution Value Date following any Reduction effected in accordance with Clause 60.5.3. The applicable Distribution Liabilities shall be Reduced in the following order of priority:

(i)        first, Costs Amount;

(ii)       secondly:

(a)    if a Collateralisation Election has been made, the Uncollateralised Net Financial Liability; or

(b)    if no Collateralisation Election has been made, the Net Financial Liability;

(iii)      thirdly, Ascertained Non-Financial Contract Liabilities; and

(iv)      fourthly, Unfunded Retention Amount.

**60.5.6    Excess Distribution Assets or outstanding Distribution Liabilities after second priority of application**

If the Value of the Asset Allocation exceeds the aggregate amount of the Distribution Liabilities in Clause 60.5.5, then all such applicable Distribution Liabilities will be Reduced in full in accordance with Clause 60.5.5. Any remaining Value of such Asset Allocation after Appropriation in accordance with Clause 60.5.5 shall be a Distribution to the TA Signatory.

If the aggregate Value of the Asset Allocation is less than the aggregate amount of the applicable Distribution Liabilities in Clause 60.5.5, then the Asset Allocation will be Appropriated in full and any applicable Distribution Liability in Clause 60.5.5 that is not Reduced in full in accordance with Clause 60.5.5 shall remain outstanding.

**60.6    Last Asset Allocation of Assets from the Affected Intermediary under an Affected Intermediary Collateralisation Election**

**60.6.1    Applicability**

This Clause 60.6 applies in respect of the Affected Stock Lines that are the subject of an Affected Intermediary Collateralisation Election upon the Company having determined that it does not expect to make any further Asset Allocation in relation to Distributable Trust Assets received from such Net Equity Intermediary to an Affected TA Signatory.

**60.6.2    Shortfall For Appropriation**

As soon as reasonably practicable after making the determination in Clause 60.6.1, the Company shall determine the "**Shortfall For Appropriation**" of such Affected TA Signatory in respect of such Net Equity Intermediary in an amount equal to any excess of: (i) the relevant Affected Intermediary Admitted Claim Amount; over (ii) the aggregate Value of each such Asset Allocation (other than the Derived Asset

components subject to the first priority of application in Clause 60.3.3) as at the relevant Distribution Value Date.

### 60.6.3  Applicable Distribution Assets and Distribution Liabilities

Upon the determination of a Shortfall For Appropriation in respect of a TA Signatory and a Net Equity Intermediary, the subject of such Affected Intermediary Collateralisation Election:

(i)  the applicable Distribution Asset shall be any Shortfall For Appropriation; and

(ii)  the applicable Distribution Liability shall be the Collateralised Net Financial Liability.

### 60.6.4  Priority of application

The Company shall Appropriate any Shortfall For Appropriation towards the Reduction of the Collateralised Net Financial Liability based on the Value of such Collateralised Net Financial Liability at the relevant Distribution Value Date.

### 60.6.5  Excess Shortfall For Appropriation and outstanding Net Financial Liability after priority of application

If the Shortfall For Appropriation is less than the Collateralised Net Financial Liability, then the Shortfall For Appropriation will be Appropriated in full and any remaining Collateralised Net Financial Liability that is not Reduced in accordance with Clause 60.6.4 shall remain outstanding for application as a Distribution Liability.

If the Shortfall For Appropriation exceeds the Collateralised Net Financial Liability, then the Net Financial Liability will be Reduced in full and the Affected TA Signatory shall have an Ascertained Claim in an amount equal to the Ascertained Shortfall Amount (which may be zero) determined by the Company in accordance with Clause 62.2.

## 60.7  Last distribution of Pre-Administration Client Money to Signatory

### 60.7.1  Applicable Distribution Assets and Distribution Liabilities

For a Signatory with a Net Financial Liability who has made a Collateralisation Election in respect of Pre-Administration Client Money, upon the determination of its Pre-Administration Client Money Shortfall Claim:

(i)  the applicable Distribution Asset shall be any Pre-Administration Client Money Shortfall Claim; and

(ii)  the applicable Distribution Liabilities shall be the Collateralised Net Financial Liability and the Uncollateralised Net Financial Liability.

### 60.7.2  Priority of application

The Company shall Appropriate any Pre-Administration Client Money Shortfall Claim towards the Reduction of the Uncollateralised Net Financial Liability and the Collateralised Net Financial Liability based on the amount of such Pre-Administration Client Money Shortfall Claim and Net Financial Liability as at the relevant Distribution Value Date.

### 60.7.3 Excess Pre-Administration Client Money Shortfall Claim and outstanding Net Financial Liability after first priority of application

If the amount of the Pre-Administration Client Money Shortfall Claim exceeds the aggregate amount of the Uncollateralised Net Financial Liability and the Collateralised Net Financial Liability, then the Net Financial Liability will be Reduced in full in accordance with Clause 60.7.2 and any remaining amount of Pre-Administration Client Money Shortfall Claim after Appropriation in accordance with Clause 60.7.2 shall become an Ascertained Claim of such Signatory.

If the amount of the Pre-Administration Client Money Shortfall Claim is less than the aggregate amount of the Uncollateralised Net Financial Liability and the Collateralised Net Financial Liability, then the Pre-Administration Client Money Shortfall Claim will be Appropriated in full and any remaining Uncollateralised Net Financial Liability and/or the Collateralised Net Financial Liability that is not Reduced in accordance with Clause 60.7.2 shall remain outstanding for application as a Distribution Liability under Clause 60.8.

## 60.8 Final Distribution of Collateral Amount following determination of Pre-Administration Client Money Shortfall Claim and final Asset Allocation

### 60.8.1 Applicable Distribution Assets and Distribution Liabilities

For a Signatory with a Net Financial Liability who has made a Collateralisation Election where: (a) the Collateralisation Election is in respect of Pre-Administration Client Money and the Company has determined such Signatory's Pre-Administration Client Money Shortfall Claim; (b) (for a TA Signatory) the Collateralisation Election is an Appropriation Deferral Election and there is no further Asset Allocation in respect of such TA Signatory; or (c) (for a TA Signatory) the Collateralisation Election falls within both (a) and (b) and the criteria in both (a) and (b) are satisfied, then:

(i)     the applicable Distribution Asset shall be the Collateral Amount; and

(ii)    the applicable Distribution Liabilities for a TA Signatory shall be the Net Financial Liability, Costs Amount, Ascertained Non-Financial Contract Liabilities and Unfunded Retention Amount and for an NTA Signatory shall be the Net Financial Liability.

### 60.8.2 Priority of application

For a TA Signatory, the Company shall Appropriate the Collateral Amount towards the Reduction of the applicable Distribution Liabilities, based on the amount of such Collateral Amount and such applicable Distribution Liabilities as at the relevant Distribution Value Date following any Reduction effected in accordance with Clause 60.7.2, in the following order of priority:

(i)     first, Costs Amount;

(ii)    secondly, the Net Financial Liability;

(iii)   thirdly, Ascertained Non-Financial Contract Liabilities; and

(iv)    fourthly, Unfunded Retention Amount.

For an NTA Signatory, the Company shall Appropriate the Collateral Amount towards the Reduction of the Net Financial Liability, based on the amount of such Collateral

Amount and such Net Financial Liability as at the relevant Distribution Value Date following any Reduction effected in accordance with Clause 60.7.2.

### 60.8.3 Excess Distribution Asset or outstanding Distribution Liabilities after second priority of application

If the Collateral Amount exceeds the aggregate amount of the applicable Distribution Liabilities, or in the case of an NTA Signatory, the Net Financial Liability, in this Clause 60.8.2, then all such applicable Distribution Liabilities, or Net Financial Liability (as applicable), will be Reduced in full in accordance with this Clause 60.8.2. An amount equal to any remaining Collateral Amount after Appropriation in accordance with this Clause 60.8.2 shall be paid to the Signatory.

If the Collateral Amount is less than the aggregate amount of the applicable Distribution Liabilities, or the Net Financial Liability (as applicable), in this Clause 60.8.2, then the Collateral Amount will be Appropriated in full and any applicable Distribution Liability in this Clause 60.8.2 that is not Reduced in full in accordance with this Clause 60.8.2 shall remain outstanding.

## 61 Distributions relating to Pre-Agreement Asset Contracts

If a TA Signatory who is a Pre-Agreement Provisionally Returned Asset Recipient would, but for the operation of this Clause 61, otherwise be due a Distribution pursuant to Clause 60, then if the amount of such Distribution in the Company's absolute discretion (after the Company has made an appropriate adjustment to reflect timing differences relating to value and the accrual of Derived Assets between the date of return of the Pre-Agreement Provisionally Returned Assets and the proposed value date of the Distribution and Appropriation Notice for such Distribution) is:

(i)    equal to or greater than the amount of the Signatory's Pre-Agreement Provisionally Returned Assets:

    (a)    the Pre-Agreement Provisionally Returned Assets shall be its Pre-Agreement Returned Assets; and

    (b)    the Distribution (otherwise determined in accordance with Part 11) less its Pre-Agreement Returned Assets (after adjustment as provided above) shall be the Distribution to such Signatory for the purpose of this Agreement; or

(ii)    less than an amount of the Signatory's Pre-Agreement Provisionally Returned Assets:

    (a)    the Distribution (otherwise determined in accordance with Part 11) shall be its Pre-Agreement Returned Assets;

    (b)    there shall be no further Distribution to such Signatory for the purpose of this Agreement; and

    (c)    nothing in this Agreement shall be construed to prevent the Company from pursuing, or be a waiver of any right of the Company to pursue, the Signatory for such excess amounts of Pre-Agreement Provisionally Returned Assets in accordance with any such terms of the relevant Pre-Agreement Asset Contract.

## 62 Ascertained Claims

The Company shall determine the following Ascertained Claims (if any) of a Signatory.

**62.1    Asset Shortfall Claim**

For a Signatory with a Net Financial Liability, subject to Clause 46.2 or Clause 48.3 (as applicable), the aggregate of all excess Asset Shortfall Claims after Appropriation in accordance with Clause 60.5.4 shall be Valued as at the Date Before Administration and become an Ascertained Claim.

For a Signatory with a Net Financial Claim, subject to Clause 46.2 or Clause 48.3 (as applicable), the aggregate of all Asset Shortfall Claims shall be Valued as at the Date Before Administration and become an Ascertained Claim.

**62.2    Ascertained Shortfall Amount**

62.2.1    For an Affected TA Signatory who has made an Affected Intermediary Collateralisation Election and has an amount of Shortfall For Appropriation remaining after all Collateralised Net Financial Liability has been Reduced in accordance with Clause 60.6.5, the Ascertained Shortfall Amount shall become an Ascertained Claim.

62.2.2    An "**Ascertained Shortfall Amount**" for an Affected TA Signatory in respect of the relevant Net Equity Intermediary is an amount, subject to a minimum of zero and subject to Clause 48.3, equal to the Asset Shortfall Claim of such TA Signatory in respect of such Net Equity Intermediary (determined in accordance with Clause 48.3) less the amount of the Collateralised Net Financial Liability Reduced to zero by Appropriation against the related Shortfall For Appropriation in accordance with Clause 60.6.4.

**62.3    Pre-Administration Client Money Shortfall Claim**

62.3.1    For a Signatory who has made a Collateralisation Election, the amount of its Pre-Administration Client Money Shortfall Claim remaining after Appropriation in accordance with Clause 60.7.3 shall become an Ascertained Claim.

62.3.2    In respect of a Signatory who has not made a Collateralisation Election in respect of a Pre-Administration Client Money Claim, as soon as reasonably practicable following such time when the Company, in its absolute discretion, determines that it does not expect to make any further distribution of Pre-Administration Client Money in satisfaction of any Signatory's Pre-Administration Client Money Claim, the Company shall determine and admit as an Ascertained Claim an amount equal to the Signatory's Pre-Administration Admitted Client Money Claim that remains unsatisfied at that time.

**62.4    Net Financial Claim**

A TA Signatory with a Net Financial Claim, after Appropriation in accordance with Clause 60.1.4, shall have an Ascertained Claim for an amount equal to such Net Financial Claim remaining after Appropriation.

An NTA Signatory with a Net Financial Claim shall have an Ascertained Claim for an amount equal to such Net Financial Claim.

# PART 12: DELIVERY OF DISTRIBUTIONS

## 63    Delivery of Distributions

### 63.1    Delivery of Distributions to Signatories

**63.1.1**    The Company shall deliver to each Signatory its Distribution in accordance with this Clause 63.

**63.1.2**    Each Signatory's Distribution may be delivered to it by a number of different deliveries. The Company shall, acting in a commercially reasonable manner, determine the Delivery Instruction Date in respect of each delivery.

**63.1.3**    Unless otherwise specified under this Agreement, a Signatory shall not be entitled to any payment or other assets, whether of interest or otherwise, if the delivery of the Distribution falls after the Delivery Date or if the Delivery Instruction Date or the Delivery Date is postponed (or both of them are) by reason of this Clause 63.

**63.1.4**    Any Securities to be delivered by the Company under this Part 12 shall be rounded down to the nearest: (i) whole number of Securities; or (ii) integral multiple of the minimum transfer value of such Security, and delivered to the relevant Signatory in accordance with Clause 63.2. The Company shall, provided that it is reasonably and economically practicable to do so, realise the number of the Securities which have been subject to the rounding down (if any) in aggregate and shall pay the realisation proceeds of the fractional entitlement of such Securities, to the Signatory in accordance with Clause 63.5.

### 63.2    Method of delivery of Securities

**63.2.1**    In order for the instruction for settlement to be given in respect of any Securities to which it is entitled out of a Distribution on a Delivery Instruction Date, a Signatory must send a Notice (an "**Asset Delivery Notice**") to the Company no later than 5.00 p.m. (London time) on the day which is five Business Days before the Delivery Instruction Date in relation to such Securities (the "**Notice Cut-off Date**"). An Asset Delivery Notice may be provided to the Company by a Signatory in respect of Securities of a single Stock Line or in respect of one or more classes or categories of Securities.

**63.2.2**    If a Signatory has delivered a valid Asset Delivery Notice in respect of Securities of one Stock Line or in respect of one or more classes or categories of Securities, the Company shall treat that Asset Delivery Notice as valid for all subsequent Distributions of Securities of the same Stock Line, class or category, unless and until the Signatory delivers a replacement Asset Delivery Notice to the Company in accordance with Clause 63.2.1.

**63.2.3**    An Asset Delivery Notice shall:

(i)    specify the Securities (whether by Stock Line, class or category) to which it applies;

(ii)    contain full details of the person and/or account to which the Securities are to be delivered, together with the method by which delivery is to be effected and any other information that may be required for delivery of the Securities;

(iii)    specify an account to which any cash amounts are to be paid; and

(iv) authorise the production of such Notice in any applicable administrative or legal proceedings.

The Company may treat any Asset Delivery Notice which, in the opinion of the Company, is not compliant with this Clause 63.2.3, as null and void.

**63.2.4** Notwithstanding Clause 63.2.3, where, in the opinion of the Company, the information in an Asset Delivery Notice is ambiguous, unclear or insufficient, the Company may reject such Asset Delivery Notice as invalid and request the relevant Signatory to provide a revised Asset Delivery Notice curing the ambiguity, lack of clarity or insufficiency.

**63.2.5** Notwithstanding Clause 63.2.3, where, in the opinion of the Company, the instructions for and method of delivery of Securities as set out in the Asset Delivery Notice, or such instructions or method of delivery would involve disproportionate costs, the Company may in its absolute discretion:

(i) reject such Asset Delivery Notice as invalid and request the relevant Signatory to provide a revised Asset Delivery Notice with alternative instructions for and method of delivery of such Securities, which shall also be subject to this Clause 63.2.5; or

(ii) require the Signatory to pay to the Company such sum of money as the Company determines necessary to meet the additional costs incurred in delivering such Securities and the Company need not effect such delivery until these extra costs have been paid to it by the Signatory.

**63.2.6** If a Signatory delivers an Asset Delivery Notice to the Company after 5.00 p.m. (London time) on the Notice Cut-off Date in relation to any Securities, then the Delivery Instruction Date for those Securities may, at the discretion of the Company, be postponed to the day that falls up to five clear Business Days after the day on which such Asset Delivery Notice is given or, if the Company considers that that date is not reasonably practicable, such later date as the Company may decide.

**63.2.7** Provided that the Signatory has delivered a valid Asset Delivery Notice in accordance with Clause 63.2.1, Clause 63.2.2 and Clause 63.2.3, and subject to the Delivery Disruption Event provisions set out in Clause 63.4, the Company shall give, or procure the giving of, the instruction for settlement of each delivery on the Delivery Instruction Date to the person and/or account specified in the Asset Delivery Notice in such commercially reasonable manner as the Company shall determine to be appropriate for such delivery at the risk of the relevant Signatory.

**63.2.8** If the Signatory fails to deliver an Asset Delivery Notice to the Company in respect of a Distribution (or any delivery in respect of that Distribution) by 5.00 p.m. (London time) on the day falling 12 months after the Notice Cut-off Date, the Signatory shall forfeit its right to receive delivery of the relevant Distribution (or part of it) and such Distribution (or part of it) shall be deemed to be an Unclaimed Distribution and applied in the manner set out in Clause 63.6.

## 63.3    Delivery Date

**63.3.1** The "**Delivery Date**" in respect of any Securities comprising a Distribution shall be such date that the Company determines, acting in a commercially reasonable manner, would be the date on which those Securities would be delivered to the Signatory if the

Company instructed their delivery in accordance with the relevant Asset Delivery Notice on the respective Delivery Instruction Date.

### 63.4 Delivery Disruption Event

63.4.1 If the Company determines that delivery of a Distribution (or part of it) is not practicable on a Delivery Date by reason of a Delivery Disruption Event relating to those Securities, then that Delivery Date shall be postponed to the first following Business Day in respect of which there is no such Delivery Disruption Event; provided that, subject as provided below, in no event shall delivery be made later than such date as the Company and the Signatory may mutually agree (the "**Physical Delivery Deadline**").

63.4.2 The Company and the Signatory shall make reasonable endeavours to agree to such other alternative method of delivery which is not subject to a Delivery Disruption Event on or before the Physical Delivery Deadline.

63.4.3 If the delivery of the Distribution (or part of it) is not practicable by reason of a Delivery Disruption Event having occurred and continuing on the Physical Delivery Deadline, then, in lieu of delivery of the Distribution (or part of it), the Company shall discharge its obligations to deliver the Distribution to the Signatory by: (i) using reasonable endeavours to sell the relevant Distribution; and (ii) to the extent that the Company is able to sell the relevant Distribution, paying the Signatory the proceeds of such sale in accordance with Clause 63.5.

### 63.5 Method of delivery of money

63.5.1 Any Distribution of money shall be delivered by payment of cash by telegraphic transfer or other electronic means in immediately available funds to such bank account as the Signatory shall Notify to the Company in writing on the relevant Delivery Date at the risk of such Signatory.

63.5.2 A Distribution of money to Signatories shall be deemed to have been delivered on the day that the wire transfer instruction is given by or on behalf of the Company to the relevant bank.

63.5.3 Receipt of the amount of any such telegraphic transfer or an amount received by other electronic means into such bank account shall be good discharge and satisfaction of the money in respect of which it was paid.

63.5.4 If the Company has made a payment of money by telegraphic transfer or other electronic means using details provided by the Signatory, and such payment fails to be credited to that account and remains in the bank account of the Company, then the Company shall Notify the Signatory and request details of an alternative bank account from that Signatory. Signatories will have a period of 12 months to provide such instructions and the Company shall send a second request for instructions six months after the first request, and a third request three months after the second request. If the Signatory fails to provide details of an alternative bank account to the Company within 12 months of the date of the failed transfer of the cash, such failure to provide instructions to the Company shall be deemed a discharge of the Company's obligations to that Signatory in respect of that payment and the Signatory shall forfeit its Claim to that Distribution and such Distribution shall be considered to be an Unclaimed Distribution and applied in the manner set out in Clause 63.6.

**63.6**     **Unclaimed Distributions**

At the expiration of 12 months from a Delivery Instruction Date, a Signatory who fails to Claim a Distribution pursuant to Clause 63.2.8 or Clause 63.5.4 (an "**Unclaimed Distribution**") shall be deemed to have waived its rights to that Distribution pursuant to this Agreement and the Company shall retain, transfer or dispose of such Unclaimed Distribution.

**63.7**     **Surplus Assets**

If, after having made all Distributions in respect of any particular type of Asset which are required to be made under this Agreement, there remains Distributable Trust Assets of that type which could still be available for delivery (the "**Surplus Assets**"), the Company shall retain, transfer or dispose of such Surplus Assets, except to the extent any such Assets relate to excess assets distributed for the benefit of any Signatory by LBI.

# PART 13: CLOSING

## 64    Closing Statement

### 64.1    Closing Time

Upon the determination of the final Distribution and Appropriation to a TA Signatory and an NTA Signatory that has made a Collateralisation Election (such time, the "**Closing Time**"), the Company shall give a Closing Statement to such Signatory.

### 64.2    Closing Statement

**64.2.1**    The "**Closing Statement**" for a TA Signatory shall specify the following information:

(i)    any outstanding Net Financial Liability and Non-Financial Contract Liabilities of such TA Signatory, as at such date;

(ii)    all Allocations to such TA Signatory under this Agreement;

(iii)    all Distributions to such TA Signatory under this Agreement;

(iv)    any Asset Shortfall Claim and any other Ascertained Claim of such TA Signatory;

(v)    if a Collateralisation Election has been made, the Pre-Administration Client Money Claim or Pre-Administration Client Money Shortfall Claim (if any) of such TA Signatory;

(vi)    all payments that have been made to such TA Signatory's Retention Creditors;

(vii)    any Intermediary Distribution and Intermediary Retention in respect of such TA Signatory; and

(viii)    the Costs Amount and, if applicable, any Costs Rebate Amount to be repaid to such TA Signatory.

**64.2.2**    The "**Closing Statement**" for an NTA Signatory shall specify the following information:

(i)    any outstanding Net Financial Liability of such NTA Signatory as at such date;

(ii)    all Distributions to such NTA Signatory under this Agreement;

(iii)    any Ascertained Claim of such NTA Signatory; and

(iv)    if a Client Money Collateralisation Election has been made, the Pre-Administration Client Money Claim or Pre-Administration Client Money Shortfall Claim (if any) of such NTA Signatory.

**64.2.3**    The Closing Statement shall also state that the Company has discharged all of its obligations in respect of that Signatory pursuant to this Agreement.

### 64.3    Payment of Costs Rebate Amount

At the Closing Time for a TA Signatory, if the Company determines that there is a Costs Rebate Amount for such TA Signatory, it shall pay such Costs Rebate Amount to such bank account as the TA Signatory has Notified to the Company in writing in accordance with Clause 63.5.

# PART 14: REPRESENTATIONS AND WARRANTIES, AND CERTAIN UNDERTAKINGS BY A SIGNATORY

**65      Provision of Representations and Warranties, and certain Undertakings**

**65.1    Provision of Initial Representations and Warranties upon signing this Agreement**

Each Signatory represents and warrants to the Company that as at its Accession Date:

65.1.1    it is duly organised and validly existing under the laws of its jurisdiction of incorporation, or (if not applicable) under the laws of which it is established, and, if relevant under such laws, in good standing and has full power and authority to conduct its business activities;

65.1.2    it has (or, in respect of completed actions, at the relevant time had) the power to execute this Agreement and any documentation relating to this Agreement to which it is a party, to deliver this Agreement and any documentation relating to this Agreement that it is required to deliver and to perform its obligations under this Agreement and any documentation relating to this Agreement to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

65.1.3    such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any term or provision of any agreement or instrument binding on or affecting it or any of its assets, and will not result in a breach of, or constitute a default or termination event under, any such agreement or instrument;

65.1.4    all actions or things required to be taken, fulfilled or done (including, without limitation, the obtaining of any consent or licence or the making of any filing or registration) by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

65.1.5    its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in proceedings in equity or at law)); and

65.1.6    there is not pending or, to its knowledge, threatened against it any action, suit or proceedings at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement,

(each, an "**Initial Representation and Warranty**", and together, the "**Initial Representations and Warranties**").

**65.2    Provision of Information Representations and Warranties upon submission of information**

By submitting information in respect of its Asset Claims (via the Portal or otherwise), each TA Signatory represents and warrants to the Company, as at: (i) the date of submission of such information; and (ii) with respect to Clause 65.2.5 and Clause 65.2.8, each time upon

providing the Company with any information in accordance with this Agreement (whether in response to requests for information from the Company, Adjudicator, the Valuation Expert or otherwise), that:

**65.2.1** the TA Signatory has a right, free from encumbrances, to make an Asset Claim in respect of an Asset or has fully disclosed to the Company all encumbrances in respect of that Signatory's right to make an Asset Claim in respect of that Asset;

**65.2.2** save as specifically disclosed (via the Portal or otherwise), or permitted by Clause 6, the TA Signatory is not asserting any Asset Claims, Pre-Administration Client Money Claims or any other Claims or Liabilities against the Company that have been Transferred to such TA Signatory after the Time of Administration;

**65.2.3** the Signatory is not asserting an Asset Claim in respect of any Asset previously received from another person, including, for the avoidance of doubt, any other Signatories;

**65.2.4** the Signatory has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, all documents and obligations pursuant to this Agreement, including, for the avoidance of doubt, the power and authority to provide Relevant Information to the Company;

**65.2.5** the Signatory believes, after making due and careful enquiries, that the information in respect of its Asset Claims submitted (via the Portal or otherwise), any Intermediary Distribution Notice, the Valuation Statements, the Asset Delivery Notice and any further information provided to the Company in accordance with this Agreement, whether in response to requests for information from the Company, Adjudicator or the Valuation Expert, or otherwise, is true, complete, accurate and not misleading;

**65.2.6** save as previously disclosed in writing, the Signatory is not aware, having made due and careful enquiries, of any further Liabilities in respect of the Asset which may give rise to an entitlement on the part of the Company to withhold a Retention Amount in accordance with Part 8 and any previously disclosed Liabilities in respect of the Asset have been fully and accurately disclosed;

**65.2.7** the Signatory has the ability, and is permitted pursuant to the applicable laws of the jurisdiction in which that Signatory is located, to lawfully accept the delivery of any Distribution made by the Company in accordance with this Agreement and to give full discharge to the Company Released Parties for the Assets which have been delivered to such Signatory as a Distribution;

**65.2.8** the Signatory is not prohibited by:

(i)       any law or regulation applicable to such Signatory;

(ii)      any constitutional documents of such Signatory; or

(iii)     any agreement or instrument binding on such Signatory,

from disclosing the information relating to its Asset Claims (via the Portal or otherwise) or receiving any Distributions pursuant to this Agreement,

(each, an "**Information Representation and Warranty**", and together, the "**Information Representations and Warranties**").

### 65.3    Repetition of Information Representations and Warranties

Each TA Signatory shall be deemed to repeat in full the Information Representations and Warranties on each Delivery Instruction Date that the relevant TA Signatory is due to be delivered a Distribution.

### 65.4    Disclosure against Information Representations and Warranties

The Information Representations and Warranties shall be subject to any specific matters which are fully and fairly disclosed by each Signatory to the Company in the information submitted via the Portal by such Signatory, or otherwise disclosed by Notice to the Company from the Signatory by 5.00 p.m. on the Business Day before the relevant Delivery Instruction Date, provided that:

65.4.1    Signatories shall not be entitled to disclose information against the Information Representations and Warranties set out in Clause 65.2.4 and Clause 65.2.7 and, for the avoidance of doubt, the Initial Representations and Warranties; and

65.4.2    in respect of Information Representations and Warranties against which Signatories are entitled to make disclosures, matters are disclosed in sufficient detail to enable the Company to assess their impact on the relevant Asset Claims and/or the relevant Distribution.

### 65.5    Undertaking to Notify incorrect or misleading Representations and Warranties

Each of the Signatories undertakes that, if it becomes aware that any Representation and Warranty given by it under this Clause 65 was incorrect or misleading in any material respect when made or repeated, or would be so if then repeated, it shall Notify the Company of this as soon as reasonably practicable.

### 65.6    Undertakings in relation to Intermediary Distribution

Each TA Signatory undertakes to the Company, as at its Accession Date, that the Signatory shall: (i) where it has received an Intermediary Distribution on or prior to the Accession Date, promptly after its relevant Accession Date; or (ii) where it receives an Intermediary Distribution after the Accession Date, promptly following the receipt of such Intermediary Distribution, provide an Intermediary Distribution Notice to the Company in accordance with Clause 37.1.

### 65.7    Claim for breach of Representation and Warranty

The Company may make a Claim for damages against any Signatory for breach of any of the Representations and Warranties or failure to comply with any Undertakings set out in this Clause 65, whether or not the relevant facts, matters or circumstances giving rise to the breach of any Representations and Warranties were known to the Company, or could have been discovered (whether by any investigation made by or on behalf of the Company or otherwise), provided that such breach of Representations and Warranties or failure to comply with Undertakings had not previously been disclosed to the Company, where, and in a manner by which, such disclosure is permitted or required pursuant to this Agreement. The Company shall be entitled to take any such Claim for damages arising from such breach of any Representations and Warranties or failure to comply with any Undertakings into account when calculating the Non-Financial Contract Liabilities of such Signatory.

# PART 15: TAX

**66    Tax**

**66.1    Power to withhold Tax**

The Company may, in its absolute discretion, withhold any Tax payable or, in the reasonable opinion of the Company, required to be withheld or accounted for in relation to any Appropriation, any Distribution or any payment which, as a result of the implementation and operation of this Agreement, the Company is treated as making for Tax purposes (including, but not limited to, circumstances where a payment is made, or treated as being made, because a Claim against the Company is set off against a Liability which is owed to the Company).

**66.2    Disclosure to Tax Authorities**

The Company may also make any disclosures or reports to any Tax Authorities in respect of any matters which are the subject of, or arise as a result of, the implementation and operation of this Agreement.

**66.3    Tax certificates**

The Company is not obliged to provide any Tax certificates in respect of any dividends or other payments made or received in respect of any Securities forming the basis of a Signatory's Asset Claim to Signatories.

**66.4    Tax liabilities**

Any stamp duty, stamp duty reserve tax, transfer taxes, VAT or other Tax liabilities or costs, including any penalties or interest, arising out of the implementation and operation of this Agreement (including, but not limited to, any Tax costs arising from the making of Distributions or Appropriations in cash or kind) shall be borne by the Signatories whether chargeable directly or primarily against, or attributable directly or primarily to, the Signatories or any other person.

**66.5    Tax obligations**

A Signatory will deliver to the Company any form or document that may be required or reasonably requested in writing in order to allow the Company to make a payment in accordance with this Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to Company and to be executed and to be delivered with any reasonably required certification, as soon as reasonably practicable.

## PART 16: DISPUTE RESOLUTION MECHANISM

**67    Disputes, Disputing Parties and Determination Notices**

**67.1    Disputing Parties**

This Dispute Resolution Mechanism shall govern the resolution of any and all disputes between the Company on the one hand and a Signatory on the other hand (together the "**Disputing Parties**") arising out of or relating to any of the following Notices issued by the Company pursuant to this Agreement:

**67.1.1**    a Net Contractual Position Statement;

**67.1.2**    a Claim Amount Notice;

**67.1.3**    an Intermediary Distribution Value Notice; or

**67.1.4**    a Distribution and Appropriation Notice,

each, a "**Determination Notice**" and, each such dispute, a "**Dispute**".

**67.2    Settlement of Dispute**

For the avoidance of doubt, nothing in this Clause 67 or in any of Clauses 68 to 74 precludes the Disputing Parties from entering into a compromise, arrangement or settlement of a Dispute at any stage, whether by mediation or otherwise, nor precludes the Company from entering into a compromise, arrangement or settlement with a Signatory or person who claims to be a Signatory.

**68    Dispute Notice**

**68.1    Dispute Notice**

If a Signatory wishes to raise a Dispute with respect to a Determination Notice relating to its Claim, it must Notify the Company by way of a written Notice, to be received by the Company on or before 5.00 p.m. (London time) on the Dispute Notice Deadline, that it wishes to raise a Dispute. This Notice (the "**Dispute Notice**") must be in writing in the form set out in Schedule 3. It must specify which aspect(s) of the Determination Notice the Signatory wishes to challenge and must include reasonable details of the nature and basis of the challenge. If the Signatory is neither resident, nor has its principal place of business, in England and Wales, the Dispute Notice must also provide details of, and appoint, an agent to accept service of process in England and Wales in respect of any legal action or proceedings arising out of or in connection with the Dispute. If the Signatory fails to serve a Dispute Notice within the time period specified within this Agreement, the Signatory shall be deemed to have accepted the Determination Notice and to have given up any rights of objection in relation to the same, whether under this Agreement or otherwise. The Determination Notice is then final and binding and no subsequent Dispute may be raised by the Signatory in respect of that Determination Notice.

**68.2    Amicable resolution**

Upon receipt by the Company of a Dispute Notice, the Disputing Parties shall first, and for a period of 20 Business Days, seek to resolve the Dispute amicably.

### 68.3    Determination of Dispute by Company

Where the parties are unable to resolve the Dispute amicably within the time period referred to in Clause 68.2, the Company shall determine in good faith but otherwise in its absolute discretion, and notwithstanding anything to the contrary in any contract to which the Dispute relates, whether the Dispute should be referred for determination to the Valuation Expert pursuant to Clause 69, to the Adjudicator pursuant to Clause 70 or to the Court pursuant to Clause 71. The Company shall Notify the Signatory of its decision in writing (a "**Forum Notice**") within 10 Business Days of the expiry of the time period referred to in Clause 68.2.

### 68.4    Dispute forum

Subject to Clause 68.5, Clause 68.7 and Clause 69.11.5, the Company's decision as regards the forum for resolving the Dispute pursuant to Clause 68.3 shall be final and binding.

### 68.5    Valuation Expert Contest Notice

If the Signatory disagrees with the Company's decision to have a Dispute resolved by the Valuation Expert, the Signatory may, within five Business Days of receipt of a Forum Notice sent in accordance with Clause 68.3, Notify the Company in writing (a "**Valuation Expert Contest Notice**") that it requires it to reconsider its decision and refer the Dispute either to the Adjudicator or to the Court.

### 68.6    Revised Forum Notice

Upon receipt of a Valuation Expert Contest Notice, the Company shall determine in good faith but otherwise in its absolute discretion, and notwithstanding anything to the contrary in any contract to which the Dispute relates, whether the Dispute should be referred for determination to the Adjudicator pursuant to Clause 70, or to the Court pursuant to Clause 71. The Company shall Notify the Signatories of its revised determination in writing (a "**Revised Forum Notice**") within five Business Days of receipt of a Valuation Expert Contest Notice. The Company's revised determination as regards the forum for resolving the Dispute shall, subject to Clause 68.7, be final and binding.

### 68.7    Adjudicator Contest Notice

If the Signatory disagrees with the Company's decision to have a Dispute resolved by the Adjudicator, the Signatory may, within five Business Days of receipt of a Forum Notice sent in accordance with Clause 68.3 or a Revised Forum Notice sent in accordance with Clause 68.6, Notify the Company in writing (an "**Adjudicator Contest Notice**") that it requires the Dispute to be resolved by the Court pursuant to Clause 71.1.

### 68.8    Early determination

Notwithstanding the foregoing, if the Disputing Parties agree that it would be beneficial to obtain a determination of an issue before the issuance of a Determination Notice, the Disputing Parties may make a joint referral for early determination to the Court, to the Valuation Expert or the Adjudicator. The Disputing Parties shall agree which forum is most appropriate for resolving the issue and shall also agree the procedure for obtaining an early determination.

### 68.9    Award of Alleged TA Claimant Amount

In determining a Dispute, the maximum amount that may be awarded to a Signatory in respect of its TA Claimant Amount shall be no more than the Alleged TA Claimant Amount Claimed by

the Signatory in the relevant Dispute Notice. The Signatories irrevocably waive any rights they may have to, and undertake not to bring a Claim for, an Asset Claim in excess of the relevant Alleged TA Claimant Amount.

## 69    Valuation Expert

### 69.1    Exclusive jurisdiction of Valuation Expert

Where the Company determines pursuant to Clause 68.3 that the Valuation Expert should determine a Dispute, the Valuation Expert shall, subject to Clause 68.5, have exclusive jurisdiction to settle that Dispute.

### 69.2    Settlement of Dispute by Valuation Expert

If the Company determines, pursuant to Clause 68.3, that the Valuation Expert shall settle the Dispute, then, provided no Valuation Expert Contest Notice has been served by a Signatory, the Company shall, within 25 Business Days of sending a Forum Notice, provide in writing to the Signatory the names of two candidates willing to act as an independent valuation expert (the "**Valuation Expert**"), together with contact details for those candidates.

### 69.3    Attributes of Valuation Expert

The Valuation Expert shall:

**69.3.1**    be an individual who has at least five years' experience in dealing with financial products of the type that are the subject matter of the Dispute Notice;

**69.3.2**    in the reasonable opinion of the Company, be duly qualified to discharge the functions and powers of the Valuation Expert, as applicable, under this Agreement, with the appropriate expertise having regard to the nature of the Dispute; and

**69.3.3**    in the reasonable opinion of the Valuation Expert, have no conflict of interest in accepting the appointment, provided that having previously acted as a Valuation Expert in relation to a Dispute shall not be considered a conflict of interest.

### 69.4    Election of Valuation Expert

Within 10 Business Days of receipt of the names of the two candidates in accordance with Clause 69.2 or Clause 69.8, the Signatory shall Notify the Company which of the candidates it elects to act as Valuation Expert, following which the Company shall take steps to confirm his appointment and to agree the terms of such appointment.

### 69.5    Powers of Valuation Expert

The Valuation Expert shall have the powers, rights and duties conferred upon him by this Agreement. The Valuation Expert shall act as an expert and not as an arbitrator.

### 69.6    Terms of appointment of Valuation Expert

The Valuation Expert shall be retained on such reasonable terms as may be agreed by the Company.

### 69.7    Acceptance of appointment by Valuation Expert

As soon as reasonably practicable, the Valuation Expert shall notify the Disputing Parties in writing that he has accepted the appointment.

**69.8    Failed appointment of Valuation Expert**

If the Valuation Expert chosen by the Signatory is unable or unwilling to accept the appointment, or is unable to agree the terms of his appointment to the satisfaction of the Company, the Company shall, as soon as reasonably practicable, provide in writing to the Signatory the names and contact details of two alternative candidates (one of whom may be a candidate previously not selected by the Signatory). The provisions of Clause 69.4 shall then apply.

**69.9    Provision of deposit to Valuation Expert**

Within 10 Business Days of the receipt of confirmation given by the Valuation Expert pursuant to Clause 69.7, the Signatory shall provide to the Valuation Expert (copied simultaneously to the Company) a copy of the relevant Determination Notice and Dispute Notice, together with a deposit of the lesser of: (i) US$50,000; and (ii) subject to a minimum of US$25,000, 10 per cent. of the Value of the Signatory's Asset Claim, on account of the Valuation Expert's fees. No referral to the Valuation Expert may proceed without payment of the deposit and the deposit shall be payable in respect of each Determination Notice that is the subject of the Dispute.

**69.10    Provision of information to Valuation Expert**

The Disputing Parties shall, within 20 Business Days of the receipt by the Valuation Expert of the Determination Notice, the Dispute Notice and the deposit to the Valuation Expert in accordance with Clause 69.9, provide the Valuation Expert with details of their respective valuations and assumptions behind those valuations, together with any additional documentation or information that they wish to be taken into account by the Valuation Expert in reaching his decision. The Disputing Parties may (but are not obliged to) submit written representations to the Valuation Expert within the same period of 20 Business Days.

**69.11    Determination of Dispute by Valuation Expert**

The Valuation Expert shall be entitled to rely exclusively upon the documents supplied to him pursuant to Clause 69.9 and Clause 69.10 when determining the Dispute.

**69.11.1**    Following the receipt of the documents supplied pursuant to Clause 69.9 and Clause 69.10, the Valuation Expert shall, as soon as reasonably practicable and in any event within 20 Business Days:

(i)    notify the Disputing Parties in writing of whether he requires additional evidence or representations to be provided to him; and

(ii)    provide details of the procedure and timetable he wishes to adopt for resolving the Dispute.

**69.11.2**    The Valuation Expert shall, in his absolute discretion, consider such matters as he thinks fit in making his determination. The Valuation Expert shall be entitled to consult with such advisers, including legal advisers and experts, and to take into account such information or evidence obtained from these sources, as he may deem appropriate. Subject to Clause 69.11.5, the Valuation Expert shall be entitled (but is not obliged) to substitute his own valuation for those provided by the Disputing Parties.

**69.11.3**    Each Disputing Party shall respond promptly (and, subject to Clause 72.4, at its own expense) to all reasonable requests for information and other assistance that the Valuation Expert requests in connection with making his determination. If the Signatory fails to provide any documentation or information within the timeframe provided in this Agreement (or such other time period as the Valuation Expert directs), it shall be

deemed to have abandoned the Dispute and to have accepted the relevant Determination Notice. The Determination Notice is then final and binding and no subsequent Dispute may be raised by the Signatory in respect of that Determination Notice.

**69.11.4** The Valuation Expert may, but is not obliged to, require the Disputing Parties to appear before him and address him on any matters, in which case the Disputing Parties shall appear on such date and at such place as the Valuation Expert shall reasonably prescribe. If the Valuation Expert requires the parties to appear before him, the Valuation Expert shall be entitled to prescribe and lay down such reasonable procedures or provisions as he, in his absolute discretion, deems appropriate for the purposes of assisting him in reaching his determination.

**69.11.5** If, in the course of considering the Dispute, the Valuation Expert considers that the Dispute gives rise to issues of law (including, without limitation, issues as to the interpretation of the terms of the Agreement) or other matters outside his area of expertise, he shall Notify the Disputing Parties that he no longer considers himself capable of determining the Dispute. Upon receiving notice from the Valuation Expert (a "**Cessation of Appointment Notice**"), the Company shall determine in good faith but otherwise in its absolute discretion, and notwithstanding anything to the contrary in any contract to which the Dispute relates, whether the Dispute should be referred for determination to the Adjudicator pursuant to Clause 70, or to the Court pursuant to Clause 71. The Company shall Notify the Signatory of its decision in writing within five Business Days of receipt of a Cessation of Appointment Notice, by means of a Revised Forum Notice. The Company's revised determination of forum shall, subject to Clause 68.7, be final and binding.

**69.11.6** Upon the conclusion of the procedure adopted pursuant to this Clause 69, the Valuation Expert shall, as soon as reasonably practicable, inform the Disputing Parties in writing of his decision. The Valuation Expert shall not be obliged to give reasons for his decision.

## 70    Adjudicator

### 70.1    Exclusive jurisdiction of Adjudicator

Where the Company determines pursuant to Clause 68.3, Clause 68.6 or Clause 69.11.5 that the Adjudicator should determine a Dispute, the Adjudicator shall, subject to Clause 68.7, have exclusive jurisdiction to settle that Dispute.

### 70.2    Settlement of Dispute by Adjudicator

If the Company determines, pursuant to Clause 68.3, Clause 68.6 or Clause 69.11.5, that the Adjudicator shall settle the Dispute, then, provided no Adjudicator Contest Notice has been served by the Signatory, the Company shall, within fifteen Business Days of sending a Forum Notice or Revised Forum Notice, provide in writing to the Signatory the name of two candidates willing to act as an independent adjudicator (the "**Adjudicator**"), together with contact details for those candidates.

**70.3    Attributes of Adjudicator**

The Adjudicator shall:

**70.3.1**    be an individual who has been appointed Queen's Counsel and has held this position for at least five years or an individual of comparable status in whose jurisdiction the laws are applicable to the Dispute;

**70.3.2**    in the reasonable opinion of the Company, be duly qualified to discharge the functions and powers of the Adjudicator, as applicable, under this Agreement, with the appropriate expertise having regard to the nature of the Dispute; and

**70.3.3**    in the reasonable opinion of the Adjudicator, have no conflict of interest in accepting the appointment, provided that having previously acted as Adjudicator in relation to a Dispute shall not be regarded as being a conflict of interest.

**70.4    Election of Adjudicator**

Within 10 Business Days of receipt of the names of the two candidates in accordance with Clause 70.2 or Clause 70.8, the Signatory shall Notify the Company of which of the candidates it elects to act as Adjudicator, following which the Company shall take steps to confirm his appointment and to agree the terms of such appointment.

**70.5    Powers of Adjudicator**

The Adjudicator shall have the powers, rights and duties conferred upon him by this Agreement. The Adjudicator shall act as an expert and not as an arbitrator.

**70.6    Terms of appointment of Adjudicator**

The Adjudicator shall be retained on such reasonable terms as may be agreed by the Company, which may include the imposition of an obligation for the payment of fees and disbursements, by the Disputing Parties, on an ongoing basis.

**70.7    Acceptance of appointment by Adjudicator**

As soon as reasonably practicable, the Adjudicator shall notify the Disputing Parties that he has accepted the appointment.

**70.8    Failed appointment of Adjudicator**

If the Adjudicator chosen by the Signatory is unable or unwilling to accept the appointments, or is unable to agree the terms of his appointment to the satisfaction of the Company, the Company shall, as soon as reasonably practicable, provide in writing to the Signatory the names and contact details of two alternative candidates (one of whom may be a candidate previously not selected by the Signatory). The provisions of Clause 70.4 shall then apply.

**70.9    Provision of deposit to Adjudicator**

Within 10 Business Days of receipt of confirmation given by the Adjudicator pursuant to Clause 70.7, the Signatory shall provide to the Adjudicator (copied simultaneously to the Company) a copy of the relevant Determination Notice and Dispute Notice, together with a deposit of the lesser of: (i) US$50,000; and (ii) subject to a minimum of US$25,000, 10 per cent. of the Value of the Signatory's Asset Claim, on account of the Adjudicator's fees. No referral to the Adjudicator may proceed without payment of the deposit and the deposit shall be payable in respect of each Determination Notice that is the subject of the Dispute.

**70.10  Provision of information to Adjudicator**

Within 20 Business Days of receipt by the Adjudicator of the Determination Notice, the Dispute Notice and the deposit in accordance with Clause 70.9, the Signatory shall provide to the Adjudicator and simultaneously to the Company a written statement of its position (a "**Statement of Case**"), together with any documentation and other evidence upon which it wishes to rely.

Within 20 Business Days of receipt by the Company of the Signatory's Statement of Case, the Company shall provide to the Adjudicator and simultaneously to the Signatory its Statement of Case, together with any documentation and other evidence upon which it wishes to rely.

**70.11  Determination of Dispute by Adjudicator**

The Adjudicator shall be entitled to rely exclusively upon the documents supplied to him pursuant to Clause 70.9 and Clause 70.10 when determining the Dispute.

70.11.1  Following the receipt of the Disputing Parties' Statements of Case, the Adjudicator shall, as soon as reasonably practicable and in any event within 20 Business Days:

(i)  notify the Disputing Parties in writing of whether he requires additional evidence or representations to be provided to him; and

(ii)  provide details of the procedure and timetable he wishes to adopt for resolving the Dispute.

70.11.2  The Adjudicator shall, in his absolute discretion, consider such matters as he thinks fit (including the Statements of Case and evidence provided in accordance with Clause 70.9 and Clause 70.10, and any additional evidence he deems necessary or desirable, including evidence obtained as a result of his own investigations or research) in making his determination. The Adjudicator shall be entitled to consult with such advisers, including legal advisers and experts (including persons who have previously acted as a Valuation Expert), and to take into account information or evidence obtained from these sources, as he may deem appropriate.

70.11.3  Each Disputing Party shall respond promptly (and, subject to Clause 72.4, at its own expense) to all reasonable requests for information and other assistance that the Adjudicator requests in connection with making his determination. If the Signatory fails to provide any documentation or information within the timeframe provided in this Agreement (or such other time period as the Adjudicator directs), it shall be deemed to have abandoned the Dispute and to have accepted the relevant Determination Notice. The Determination Notice is then final and binding and no subsequent Dispute may be raised by the Signatory in respect of that Determination Notice.

70.11.4  The Adjudicator may, but is not obliged to, require the Disputing Parties to appear before him and address him on any matters, in which case the Disputing Parties shall appear on such date and at such place as the Adjudicator shall reasonably prescribe. If the Adjudicator requires the parties to appear before him, the Adjudicator shall be entitled to prescribe and lay down such reasonable procedures or provisions as he in his absolute discretion deems appropriate for the purposes of assisting him in reaching his determination.

70.11.5  Upon the conclusion of the procedure adopted pursuant to this Clause 70, the Adjudicator shall, as soon as reasonably practicable, inform the Disputing Parties in writing of his decision. The Adjudicator shall not be obliged give reasons for his decision.

## 71    The Court

### 71.1    Exclusive jurisdiction of the Court

Where the Company determines pursuant to Clause 68.3, Clause 68.6 or Clause 69.11.5, or a Signatory requires pursuant to Clause 68.7, that the Court should determine a Dispute, the Court shall have exclusive jurisdiction to settle that Dispute.

### 71.2    Failure to issue Proceedings

If the Signatory fails to issue Proceedings in the Court and to serve the claim form within the timeframe provided in Clause 70, it shall be deemed to have abandoned the Dispute and to have accepted the relevant Determination Notice. The Determination Notice is then final and binding and no subsequent Dispute may be raised by the Signatory in respect of that Determination Notice.

## 72    Appeals, costs, indemnities and insurance

### 72.1    Right of appeal

The decision of the Valuation Expert or the Adjudicator on any Dispute referred to them in accordance with this Agreement shall, insofar as the law allows, be final and binding. There shall be no right of appeal therefrom, nor shall there be any right to make any claim against the Valuation Expert or the Adjudicator in respect thereof, save in the case of any loss arising from the Valuation Expert's or Adjudicator's fraud, wilful default, dishonesty or negligence.

### 72.2    Rate of remuneration

The Valuation Expert and the Adjudicator shall be entitled to be remunerated at such reasonable rate as may be agreed by the Company and to be reimbursed their reasonable costs and expenses in carrying out their duties under this Agreement.

### 72.3    Apportionment of remuneration of Valuation Expert or Adjudicator

Any remuneration, costs, charges and expenses incurred by the Valuation Expert or the Adjudicator in respect of a Dispute shall be apportioned between the Disputing Parties in such proportions as the Valuation Expert or Adjudicator may determine in their absolute discretion, and shall be paid in accordance with Clause 72.5, Clause 72.6 and Clause 72.7.

### 72.4    Apportionment of costs of Disputing Parties

Any remuneration, costs, charges and expenses incurred by the Disputing Parties in respect of a Dispute determined by the Valuation Expert or the Adjudicator shall be apportioned between the Disputing Parties in such proportions as the Valuation Expert or Adjudicator may determine in their absolute discretion, and shall be paid in accordance with Clause 72.5, Clause 72.6 and Clause 72.7.

### 72.5    Costs borne by a Signatory

Any costs, charges and expenses (together with any applicable VAT) directed by the Valuation Expert or the Adjudicator to be borne by a Signatory in respect of a Dispute shall be borne in full by that Signatory. The deposit paid pursuant to Clause 69.9 and Clause 70.9 shall be applied against this amount and then, if there is a shortfall, the Signatory shall be liable to the Company to discharge such shortfall in full without set-off, deduction, defence to payment or counterclaim. The Company may deduct such shortfall in accordance with Clause 72.7.

**72.6    Costs borne by the Company and/or the Administrators**

Any costs, charges and expenses directed by the Valuation Expert or the Adjudicator to be borne by the Company and/or the Administrators shall be borne in full by the Company and shall be paid as an expense of the Administration.

**72.7    Default of Signatory**

If a Signatory defaults in its Liability under Clause 72.5, then that Signatory's share of the Valuation Expert's or Adjudicator's remuneration, costs, charges and expenses shall be deducted from the deposit paid by that Signatory and/or taken into account when calculating the Signatory's Distribution.

**72.8    General indemnification of the Valuation Expert and the Adjudicator**

The Company shall indemnify the Valuation Expert and the Adjudicator against:

**72.8.1**    all actions, Claims, proceedings and demands brought or made against him in respect of any act done or omitted to be done by him in good faith, without wilful default, fraud, dishonesty or negligence in the course of performing his duties and functions under this Agreement; and

**72.8.2**    all costs, charges, expenses and Liabilities properly incurred by the Valuation Expert and the Adjudicator in the course of performing their duties and functions under this Agreement.

**72.9    Specific indemnification of the Valuation Expert and the Adjudicator**

Without prejudice to the generality of Clause 72.8, the Company shall indemnify the Valuation Expert and the Adjudicator:

**72.9.1**    against any costs, charges, expenses and Liabilities properly incurred by them in defending any proceedings, whether civil or criminal, in respect of any wilful default, fraud, dishonesty or negligence in relation to the performance of their duties and functions under this Agreement, in which judgment is given in their favour or in which they are acquitted; or

**72.9.2**    in connection with any application in any such proceedings in which relief is granted to them by a court from liability for wilful default, fraud, dishonesty or negligence in relation to the operation of this Agreement.

**73    Indemnity insurance**

The Company may purchase and maintain at the Company's cost for the Valuation Expert and the Adjudicator insurance against any Liability in respect of which the Company would be obliged to indemnify that person in accordance with Clause 72.8 and Clause 72.9.

**74    Miscellaneous**

**74.1    Exclusivity of Dispute Resolution Mechanism**

The Dispute Resolution Mechanism shall be the exclusive method for determining any Dispute and Signatories shall be barred from bringing any other proceedings in any jurisdiction in respect of a Dispute.

**74.2    Jurisdiction of the Court**

Notwithstanding the foregoing, nothing in this Agreement shall (save to the extent that such matters are Disputes and therefore subject to the Dispute Resolution Mechanism) prevent the Court from having jurisdiction to hear applications from the Company, the Administrators or any Signatory with respect to the operation or implementation of this Agreement, or from hearing applications for directions brought by the Administrators in the Administration.

**74.3    Extension of time limits of Dispute Resolution Mechanism**

Save in respect of Clause 68.1 (the time limit for which may not be extended), any of the time limits in this Dispute Resolution Mechanism may be extended by prior written agreement between the Disputing Parties or by the Adjudicator or Valuation Expert, as appropriate.

# PART 17: OTHER PROVISIONS

**75    No personal liability on the Administrators**

The Administrators have entered into this Agreement as agents for and on behalf of the Company and none of the Administrators, their firm, partners, employees, agents, advisers or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken or assumed by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Agreement. The exclusion of liability set out in this Clause 75 shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any Claims in tort as well as under the laws of contract. Each of the Administrators, their firm, partners, employees, agents, advisers and representatives shall be able to rely on this Clause 75 as if they were a party to this Agreement.

**76    Non-reliance on Circular by Signatory**

So far as permitted by law and except in the case of fraud, the Company shall not be liable in respect of anything done or suffered by a Signatory in reliance on the Circular (save for this Agreement contained within the Circular). The Signatory has made its own independent decision to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment and upon advice from its own advisers as it has deemed necessary. The Signatory is not relying on any communication (written or oral) of or from the Company, including the Circular (save for this Agreement contained within the Circular), as a recommendation or an inducement to enter into this Agreement, it being understood that information and explanations related to this Agreement in the Circular (save for this Agreement contained within the Circular) will not be relied upon or treated as a recommendation or an inducement to enter into this Agreement. Nothing in this Agreement will exclude any liability the Company may have under the regulatory system (as defined in the FSA Rules) which may not be excluded or restricted thereunder.

**77    Authority**

Each Signatory hereby irrevocably authorises the Company to make such Claims of, give such release or discharge to, sign or execute any agreement or instrument with, and/or take all such action (as the Company may reasonably consider appropriate) in relation to, any Intermediary, in the name of, and on behalf of, the Signatory for the purpose of establishing, pursuing, or enforcing any distribution of, or any Claim for the distribution of, Assets from an Intermediary to the Company. The authority conferred by this Clause 77 shall not apply to any determination or notice from an Affected Intermediary in respect of which a TA Signatory has Notified the Company that it wishes to make a challenge under Clause 38.

**78    Delegation by the Company of its functions**

**78.1    Power of the Company to delegate**

In carrying out its functions under this Agreement, the Company shall (without prejudice to the full terms of this Agreement) be empowered, to the extent that such powers are necessary for or reasonably incidental to the implementation of this Agreement, to:

78.1.1  employ and remunerate accountants, actuaries, lawyers and other professional advisers or agents in connection with this Agreement; and

78.1.2  delegate in writing to any person all or any of the functions, rights, authorities, powers and discretions conferred upon the Company under this Agreement, and from time to time to revoke any such delegation, provided that the Company shall be responsible for any act or omission of any such Delegate to the same extent as if the Company had itself exercised the relevant functions, rights, authorities, powers and discretions.

## 79    Signatories to co-operate

### 79.1    Signatories to co-operate

The Signatories shall:

79.1.1  co-operate with and render such assistance to the Company as it may reasonably require, including, but not limited to, the provision of information and documents in connection with their Asset Claims, the calculation of their Net Contractual Position and the operation of this Agreement;

79.1.2  provide such assistance as the Company may reasonably require in connection with gathering in any Trust Assets, removing any impediments upon Assets being Distributable Trust Assets or enforcing obligations owed to the Company; and

79.1.3  use best endeavours to ensure that maximum effect is given to this Agreement.

## 80    Modifications

### 80.1    Modification of Agreement

Subject to each of Clause 3.1 and Clause 80.3, no amendment, modification or waiver in respect of this Agreement (or any agreement supplemental to it) shall be effective unless in writing and previously approved by (i) the Company; and (ii) Extraordinary Resolution.

### 80.2    Powers of modification of the Company

In furtherance of Clause 80.1:

80.2.1  the Company may certify that it has determined, as it may do in its absolute discretion, that any such amendment, modification or waiver will materially affect some (but not all) of the Signatories, or will materially affect different classes or groups of Signatories in different ways;

80.2.2  the Company is hereby authorised to agree for and on behalf of the relevant Signatories, all amendments, modifications or waivers, if so directed by an Extraordinary Resolution Direction; and

80.2.3  the Company shall not be responsible for having acted in good faith on a resolution purporting to have been passed by the Signatories (either in writing or, if at a meeting, in respect of which minutes of such meeting have been made and signed) even if it is later found that there was a defect in the constitution of the meeting or the passing of the resolution or that the resolution was not valid or binding on the Signatories.

**80.3   Minor, technical or not materially prejudicial amendments**

The Company may, without the consent of the Signatories, amend, modify or waive any term or condition of this Agreement (or any agreement supplemental to it), which is, in its opinion:

**80.3.1**   of a formal, minor or technical nature, or to correct a manifest error; or

**80.3.2**   not materially prejudicial to the interests of the Signatories (or some of them).

**80.4   Notice of outcome**

The Company shall inform the relevant Signatories, by written Notice in accordance with Clause 89, of any modification of this Agreement made in accordance with this Clause 80.

**81   Conflict**

In the event of a conflict or inconsistency between the provisions of this Agreement, the Companies Act, the Insolvency Act, the Insolvency Rules or the FSA Rules, for the purposes of this Agreement, and to the extent such acts and/or rules permit, the provisions of this Agreement shall prevail.

**82   Liquidation Event**

**82.1   Survival of Agreement upon a Liquidation Event**

**82.1.1**   If the Company shall become subject to a Liquidation Event, this Agreement shall not terminate and shall continue in full force and effect.

**82.1.2**   In the event of any inconsistency between the provisions of this Agreement and the Insolvency Act or the Insolvency Rules as they apply to the Company following a Liquidation Event in accordance with this Clause 82.1, for the purposes of this Agreement the provisions of this Agreement shall prevail to the extent that the law allows.

**83   Act in good faith**

All actions and determinations by the Company under this Agreement shall be made in good faith.

**84   No challenge to the validity of acts of the Company or its Delegates**

Subject to any applicable provision of the Insolvency Act, no Signatory shall be entitled to challenge the validity of any act done or omitted to be done in good faith by the Company, or any Delegate, in pursuance of its functions or duties under this Agreement, or the exercise or non-exercise by the Company or any Delegate, in good faith, of any power or discretion conferred upon it for the purposes of this Agreement, and neither the Company nor any Delegate shall be liable for any loss whatsoever and howsoever arising out of any such act or omission, exercise or non-exercise of any power or discretion, unless such loss is attributable to the wilful default, fraud or dishonesty of the Company or to the wilful default, fraud or dishonesty of any Delegate.

## 85    Payment

Any Payment to the Company under this Agreement shall be made in immediately available funds in US dollars to a bank account as Notified in advance by the Company to the relevant payor.

## 86    Entire Agreement

This Agreement contains the whole agreement between the Company and each Signatory relating to the subject matter of this Agreement at the date of the relevant Signatory's Accession Date to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement (save as provided in Clause 3) between the Company and each Signatory in relation to the matters dealt with in this Agreement.

## 87    Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Agreement under the law of that jurisdiction shall in any way be affected or impaired thereby.

## 88    Modification of foreign law contracts

Where this Agreement purports to modify any contract which is governed by a law other than English law, the modification will be effective to the maximum extent permitted under the proper law of the contract. Each Signatory undertakes to the Company to take all actions that the Company requests (including executing such instruments or entering into such agreements, in each case governed by the relevant proper law) to perfect any modifications to such contracts in order to ensure that such modifications are effective to the fullest extent possible under such governing law.

## 89    Notices

### 89.1    General provisions

**89.1.1**    Any Notice or other communication to be given, or document to be sent to the Company, pursuant to this Agreement, except where this Agreement otherwise provides, shall be in writing in English and shall be delivered:

(i)    by NTA Signatories by electronic mail; or

(ii)    by TA Signatories by using the Portal or electronic mail,

in accordance with this Clause 89.

**89.1.2**    The accidental omission by the Company to send any Notice, communication or document in accordance with this Clause 89, or the non-receipt of any such Notice, communication or document by any Signatory, shall not affect the provisions of this Agreement.

**89.1.3**    A Signatory may submit any information or give Notices or other communication or send documents to the Company by registered post or by courier using an internationally recognised courier company other than in accordance with Clause

89.1.1, subject to the consent of the Company (such consent not to be unreasonably withheld or delayed) (so far as permitted by applicable law or regulation). For the purposes of this Clause 89.1.3 it shall not be unreasonable for the Company to withhold its consent where submission of such information or giving of Notices or communication or sending documents by registered post or courier would require the Company to expend disproportionate costs, time or effort in dealing with such information, Notices, communication or documents.

## 89.2    The Portal

89.2.1    The Portal will only be available to TA Signatories. TA Signatories will be able to access the Portal if they have obtained a unique login (a "**User ID**") and password (a "**Password**") from the Company.

89.2.2    The Company may give any Notice or other communication or send any document to TA Signatories that have been given access to the Portal by uploading the same to the Portal. TA Signatories will be sent an electronic mail notification to inform them that such Notice, communication or document has been uploaded. Any such Notice, communication or document shall be deemed to have been received when it was first uploaded or, if later, when the recipient received (or is deemed to have received) notice of the fact that it was available on the Portal.

## 89.3    Addresses

89.3.1    Any Notice or communication shall be given or any document shall be sent to the Company:

(i)    by electronic mail to claimresolutionagreement@lbia-eu.com by any Signatory;

(ii)    by using the Portal to send an electronic mail to the address above by any TA Signatory; or

(iii)    by pre-paid post or air mail to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, PO Box 62492, London E14 1JX, United Kingdom, or by courier, using an internationally recognised courier company (if Clause 89.1.3 applies), only to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, 25 Bank Street, Canary Wharf, London E14 5LE, United Kingdom.

89.3.2    Any Notice or communication shall be given or any document shall be sent by the Company:

(i)    to an NTA Signatory by electronic mail to the address specified by the recipient;

(ii)    to a TA Signatory by using the Portal by uploading the Notice or communication to that part of the Portal that is allocated to the User ID of that TA Signatory within the Portal or by electronic mail to the address specified by the TA Signatory; or

(iii)    to a Signatory by registered post or by courier to the address specified by the recipient from time to time,

where "**address**" includes, without limitation, any electronic mail address or postal address used for the purposes of such communications.

89.3.3   The Signatories shall provide details of an electronic mail address in their Forms of Acceptance and upon request by the Company and maintain such electronic mail account at their own risk and shall be responsible for informing the Company of any changes to the electronic mail address and/or providing an alternative electronic mail address (as appropriate).

## 89.4   Notices by electronic mail

89.4.1   Any Notice or communication given or document sent by electronic mail shall be sufficiently served by sending the same by electronic mail to the address specified in Clause 89.3.

89.4.2   Any Notice or communication given or document sent by electronic mail shall be deemed to have been received:

(i)      if sent in accordance with Clause 89.3.1, at the time recorded on the response email that will be automatically generated by the Company's electronic mail system; or

(ii)     otherwise, at the time recorded on the computer of the person to whom the electronic mail is addressed,

provided that, if such receipt occurs on a day which is not a Business Day in London or after 5.00 p.m. on any Business Day in London, such Notice, communication or document shall be deemed to have been received at 9.30 a.m. on the next Business Day in London.

## 89.5   Notices by registered post or courier

89.5.1   Any Notice or communication given or document sent by registered post or courier by the Company shall be sufficiently served by sending the same to the address specified by the recipient from time to time in accordance with Clause 89.3.2.

89.5.2   Any Notice or communication given or document sent by registered post or courier by the Signatory shall be effective upon receipt by the Company and shall be deemed to have been received at the time of delivery in accordance with Clause 89.3.1.

## 90   Authority to sign Notices and documents

In the case of a Notice, communication or document, including, for the avoidance of doubt, this Agreement, which is signed on behalf of a Signatory, the Company shall not be required to make enquiry as to the authority of the signatory of that Notice, communication or document to sign such Notice, communication or document on behalf of such Signatory.

## 91   General notifications and advertisements

The Company may also, in its absolute discretion, publish any information in respect of this Agreement (including information in respect of Bar Date, other relevant dates pursuant to this Agreement and communications from the Company), and any other Notice, communication or document required to be or capable of being given or sent under this Agreement, on the Website.

## 91.1   Notices

Any Notice, communication or document which is published on the Website shall be deemed to have been received when the material was first made available on that Website or, if later,

when the recipient received (or is deemed to have received) notice of the fact that the material was available on the Website.

## 91.2    Advertisements

Any advertisements by the Company in respect of this Agreement shall be placed in at least the following website and newspapers:

**91.2.1**    the Website;

**91.2.2**    the *Financial Times* (United Kingdom and international editions); and

**91.2.3**    *The Wall Street Journal* (European, US and Asian editions).

## 91.3    Accidental failure to send communication by the Company

Accidental failure by the Company to send any communication to any Signatory shall not be considered a breach of its obligations pursuant to this Agreement and shall not prejudice the operation of this Agreement as regards that Signatory or at all. The Company shall not be liable to any Signatory for such failure but it may, in its absolute discretion, extend the deadline laid down in this Agreement for any Signatory affected by such failure in accordance with Clause 92.

## 92    Extension and calculation of deadlines

All or any of the deadlines laid down by this Agreement for the taking of any step by the Company or by any Signatory, save in respect of the Dispute Resolution Mechanism, may be postponed or extended for such period or periods as may be determined by the Company in its absolute discretion, whether in relation to one or more Asset Claims only or in relation to all Asset Claims, or to matters relevant to the determination of Net Contractual Positions.

## 93    Treatment of International Prime Brokerage Agreements terminated at or after the Time of Administration

## 93.1    Custody Security, Non-Custody Security and/or Trust Assets

Any Security which would otherwise be a Custody Security, a Non-Custody Security and/or Trust Assets shall not fail to be a Custody Security, a Non-Custody Security and/or Trust Assets, as the case may be, by reason of the application at or after the Time of Administration of any provision of any contract waiving, releasing or otherwise negating the existence of a trust over such Asset, and "**Custody Asset Claim**", "**Non-Custody Asset Claim**", "**Signatory**", "**Converted Asset**", "**Non-Trust Assets**", "**Net Contractual Position**", "**Close-Out Amount**", "**Trust Assets**", "**TA Signatory**" and "**Distributable Trust Assets**" shall be construed accordingly.

## 93.2    Custody Asset Claim, Non-Custody Asset Claim

Any Claim that would otherwise be a Custody Asset Claim or a Non-Custody Asset Claim, as appropriate, shall not fail to be treated as such by reason only of the application at or after the Time of Administration of any provision of any contract waiving, releasing or otherwise negating the existence of a trust over the relevant Securities that would prevent the delivery of such Securities to satisfy such Claim, and "**Custody Asset Claim**", "**Non-Custody Asset Claim**", "**Signatory**", "**Converted Asset**", "**Non-Trust Assets**", "**Net Contractual Position**", "**Close-Out Amount**", "**Trust Assets**", "**TA Signatory**" and "**Distributable Trust Assets**" shall be construed accordingly.

**94**     **Third Party rights**

Except as provided for in Clauses 4.7, 5, 9, 75, and this Clause 94, nothing in this Agreement or the Circular is intended to, nor should it be construed as purporting to, confer any rights on, or to be enforceable by, any Third Party. Any term of this Agreement apart from those provisions of the specified Clauses that confer rights on Third Parties may be amended or waived in accordance with Clause 80 without the consent any person named or described in this Clause 94 or in Clauses 4.7, 5, 9, or 75.

**95**     **Governing law and jurisdiction**

**95.1**     **Exclusive jurisdiction**

This Agreement shall be governed by, and construed in accordance with, English law and the Signatories hereby agree that the courts of England shall (save as otherwise provided in the Dispute Resolution Mechanism and save as provided in Clause 95.2) have exclusive jurisdiction to hear and determine any dispute or Proceedings arising out of or in connection with the Circular or this Agreement, or the operation of this Agreement, and the Signatories hereby submit to the exclusive jurisdiction of the courts of England for such purposes. The Signatories also waive any objections to Proceedings in the courts of England that may arise that are based on the grounds of the venue or that the Proceedings have been brought in an inconvenient forum.

**95.2**     **Proceedings in other jurisdictions**

Notwithstanding the provisions of Clause 95.1, the Company retains the right to bring Proceedings in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

## PART 18: DEFINITIONS AND INTERPRETATION

**96      Definitions**

In this Agreement, unless inconsistent with the subject or context, the following expressions bear the following meanings:

| | |
|---|---|
| "**Acceptance Condition**" | has the meaning set out in paragraph 4.1 of Schedule 1 |
| "**Acceptance Date**" | has the meaning set out in paragraph 8.7 of Schedule 1 |
| "**Acceptance Threshold Claims**" | has the meaning set out in paragraph 4.2 of Schedule 1 |
| "**Acceptance Threshold Offerees**" | has the meaning set out in paragraph 4.2 of Schedule 1 |
| "**Acceptance Value**" | has the meaning set out in paragraph 4.2 of Schedule 1 |
| "**Accession Date**" | in respect of a Signatory, the date on which the Company Notifies such Signatory that its Form of Acceptance has been validly submitted and that such Signatory is a Party to this Agreement |
| "**Accession Notice**" | a Notice given by the Company to a Signatory on or after the Effective Date confirming that its Form of Acceptance has been validly submitted and that such Signatory is a Party to this Agreement |
| "**Adjudicator**" | such person as may be appointed as Adjudicator in accordance with the provisions of Clause 70.2 |
| "**Adjudicator Contest Notice**" | has the meaning set out in Clause 68.7 |
| "**Administration**" | the administration of the Company under the Administration Order |
| "**Administration Date**" | 15 September 2008 |
| "**Administration Order**" | the order of the Court dated 15 September 2008 made under paragraph 12 of Schedule B1 of the Insolvency Act under which the Administrators were appointed joint administrators of the Company |
| "**Administrators**" | the persons from time to time serving as joint administrators in the Administration who, as at the date of this Agreement, are Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, United Kingdom |
| "**Advisers**" | (i)      Linklaters LLP; and<br>(ii)     any other professional advisers to the Administrators |
| "**Affected Claimant**" | has the meaning set out in Clause 34.5 |
| "**Affected Intermediary**" | has the meaning set out in Clause 34.5 |
| "**Affected Intermediary Admitted Claim Amount**" | has the meaning set out in Clause 59.4.3 |

| | |
|---|---|
| "**Affected Intermediary Claim Amount**" | has the meaning set out in Clause 59.7.4 |
| "**Affected Intermediary Collateralisation Election**" | has the meaning set out in Clause 59.1.3 |
| "**Affected Intermediary Derived Asset Liability**" | has the meaning set out in Clause 59.5.3 |
| "**Affected Stock Line**" | has the meaning set out in Clause 34.5 |
| "**Affected TA Signatory**" | has the meaning set out in Clause 48.1 |
| "**Affiliate**" | in relation to the Company, any Subsidiary, a Holding Company or any other Subsidiary of that Holding Company |
| "**Agreed Amounts**" | has the meaning set out in Clause 28.1.2 |
| "**Agreed Valuation Methodology**" | has the meaning set out in Clause 22.1.3 |
| "**Alleged Amounts**" | has the meaning set out in Clause 28.1.3 |
| "**Alleged Individual Claim Amount**" | means, with respect to a Stock Line, the amount of Assets which a person alleges to be the subject of its Asset Claim to that relevant Stock Line |
| "**Alleged Net Equity Amount**" | means, with respect to each Affected Claimant, the amount of Claims of (or derived from) the Affected Claimant against the Net Equity Intermediary, as alleged by such Affected Claimant, that the Net Equity Intermediary should recognise or acknowledge for the purpose of quantifying that Affected Claimant's Asset Claim in respect of Trust Assets held by such Net Equity Intermediary |

"**Alleged TA Claimant Amount**"  means:

(i)   in relation to (a) a Stock Line which is not an Affected Stock Line or (b) an Affected Stock Line in respect of an Asset Claim Intermediary, an Alleged Individual Claim Amount; and

(ii)  in relation to a Net Equity Intermediary, an Alleged Net Equity Amount

| | |
|---|---|
| "**Allocate**", "**Allocated**", "**Allocating**", and "**Allocation**" | each has the meaning set out in Clause 34.1 |
| "**Allocation Amount**" | has the meaning set out in Clause 41(i), Clause 45.3 and Clause 47.1 |

"**Allocation Date**"   in relation to an Asset Pool:

(i)   the first date on which both:

(a)   (x) in the case of a Custody Securities Pool and a Non-Custody Securities Pool, the Company has determined that it does not expect to Identify any further Distributable Trust Assets for that Asset Pool or (y) in the case of a Multiple Stock Line Pool, Distributable Trust Assets have been Identified for that Asset Pool; and

|  | (b) | the first Provisional Allocation Percentage has been determined for an Asset Pool Signatory of that Asset Pool; and |
| (ii) |  | each subsequent date on which: |
|  | (a) | (in respect of a Multiple Stock Line Pool) additional Distributable Trust Assets have been Identified for an Asset Pool; |
|  | (b) | a Dispute over a TA Claimant Amount of any Asset Pool Signatory of that Asset Pool has been resolved; or |
|  | (c) | Distributable Trust Assets of that Asset Pool cease to be Reserved Assets in accordance with Clause 44.3 |

| "**Antecedent Transaction Liabilities**" | amounts due and payable from a Signatory to the Company under Sections 238 to 245 of the Insolvency Act (adjustment of prior transactions), Sections 423 to 425 of the Insolvency Act (provisions against debt avoidance) or Sections 213 to 215 of the Insolvency Act (fraudulent or wrongful trading) or as a result of any misfeasance, breach of duty or breach of contract owed by the Signatory to the Company |
| "**Applicable Rate**" | has the meaning set out in Clause 25.3.2(iii) |
| "**Appropriate**" | has the meaning set out in Clause 52.2 |
| "**Appropriated Asset**" | at any time, any Asset which has been Appropriated by the Company prior to such time pursuant to Part 11 |
| "**Appropriation**" | has the meaning set out in Clause 52.2 |
| "**Appropriation Deferral Election**" | has the meaning set out in Clause 59.3.1 |
| "**Appropriation Rights**" | the rights of the Company to Appropriate any Distribution Asset pursuant to Clause 60 |
| "**Ascertained Claim**" | an ascertained, unsecured claim in the winding-up of the Company or any distribution of the Company's assets generally to its unsecured creditors |
| "**Ascertained Non-Financial Contract Liabilities**" | has the meaning set out in Clause 33.2 |
| "**Ascertained Shortfall Amount**" | has the meaning set out in Clause 62.2.2 |
| "**Asset**" | any Security or Post-Administration Client Money |
| "**Asset Allocation**" | any Allocation of Distributable Trust Assets |
| "**Asset Claim**" | a Custody Asset Claim and/or a Non-Custody Asset Claim, as appropriate |
| "**Asset Claim Intermediary**" | has the meaning set out in Clause 34.5 |
| "**Asset Delivery Notice**" | has the meaning set out in Clause 63.2.1 |
| "**Asset Pool**" | a Custody Securities Pool, a Non-Custody Securities Pool, a Multiple Stock Line Pool or a Single Customer Pool |

| | |
|---|---|
| "**Asset Pool Signatory**" | with respect to each Asset Pool, a Signatory that has an Asset Claim with respect to any Assets in such Asset Pool and references to an Asset Pool Signatory are to that Signatory in that capacity only and not generally in its capacity as a Signatory |
| "**Asset Shortfall Claim**" | has the meaning set out in Clause 46.2 or Clause 48.3 |

"**Asset Valuation Date**"

(i)     in respect of any Rehypothecated Security and for the purpose of calculating its Value in accordance with Clause 20.4.3, the Date Before Administration;

(ii)     in respect of any Security which is the subject of Short Positions Security and for the purpose of calculating its Value in accordance with Clause 20.4.3, the Date Before Administration;

(iii)     in respect of any Unpaid Amount Deliverable in accordance with Clause 23.5.2 other than any Rehypothecated Security and Securities which are the subject of Short Positions, the date on which such Unpaid Amount Deliverable was (or would have been but for any Flawed Asset Provision) required to be settled;

(iv)     in respect of any Individual Claim Value, the Provisional Valuation Date;

(v)     in respect of any Security that is the subject of an Allocation and for the purpose of calculating its Value in Clause 60, the relevant Distribution Value Date;

(vi)     in respect of any Security forming part of an Asset Shortfall Claim and for the purpose of calculating its Value in accordance with Clause 60.5.3, the relevant Distribution Value Date;

(vii)     in respect of any Security forming part of any excess Asset Shortfall Claim for the purpose of Clause 60.5.4 or any aggregate Asset Shortfall Claim for the purpose of Clause 62.1, the Date Before Administration;

(viii)     in respect of any Ownership Claim asserted against Non-Trust Assets and for the purpose of Clause 7.3, the date on which such Signatory successfully asserts such Claim; and

(ix)     in respect of any other Relevant Asset, any date which the Company determines appropriate for calculating the Value of such Relevant Asset

| | |
|---|---|
| "**Asset Valuation Methodology**" | has the meaning set out in Clause 17.1 |
| "**Assignable Post-Administration Client Money Claims**" | has the meaning set out in Clause 4.8.1(i) |
| "**Assignable Post-Administration Client Money**" | has the meaning set out in Clause 4.8.1(ii) |

"**AssignCo**"

means such company (or other person) as the Company shall determine, and for whose name and details this Agreement will be updated on or prior to the Effective Date

"**Bar Date**"

26 February 2010 or such later date as the Company may Notify the Signatories in its sole discretion

"**Beneficiary**"

each person for whom a Representative Signatory holds Trust Assets and is a Beneficiary by virtue of the bilateral agreement between the Company and that Representative Signatory by which that Representative Signatory becomes a party to this Agreement

"**Books and Records**"

books, records or other information in any form including paper, electronically stored data, magnetic media, film and microfilm. For the avoidance of doubt, Books and Records in respect of the Company shall include information received by the Company from the Signatory through the Portal, but shall not include books, records or other information: (i) owned by persons other than the Company but to which the Company has access (whether full or partial); or (ii) which the Company cannot locate or access

"**Business Day**"

(i)   a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York;

(ii)  in the case of an obligation to be performed in a country other than the United Kingdom or the United States of America, a day on which banks are open for general business in such country;

(iii) in the case of the determination of an event or circumstance required to be calculated by reference to a day in any country other than the United Kingdom or the United States of America, a day on which banks are open for general business in such country; or

(iv)  in the case of any country, a day on which banks are open for general business in such country

"**CAPCO**"

Customer Asset Protection Company, an insurance company licensed by the state of Vermont, United States of America

"**CASS Rules**"

the rules set out in Chapters 7 and 7A of the FSA's Client Assets Sourcebook (as amended)

"**Cessation of Appointment Notice**"

has the meaning set out in Clause 69.11.5

"**Charge Long Positions**"

in respect of an Acceptance Threshold Offeree, the "Charge Long Positions" referred to at line item reference 2.2.1 of that Acceptance Threshold Offeree's Updated Position and Balance Statement

"**Circular**"

the circular dated 24 November 2009 issued by the Company in connection with this Agreement (including the appendices

thereto)

| | |
|---|---|
| "**Claim**" | a claim in law or in equity of whatsoever nature: |

(i)  including for (but not limited to) breach of contract, tort, restitutionary claims and breach of trust;

(ii)  whether arising by, amongst other things, reason of insolvency or the termination, whether voluntary or for cause, of any contractual obligation or for any failure of a person to perform any contractual, legal or regulatory obligation or otherwise; and

(iii)  for, amongst other things, the enforcement of any right to, or any liability in respect of a right to:

    (a)  seek or enforce judgment;

    (b)  exercise any remedy (for damages or otherwise), indemnity and contribution, whether for losses (including consequential loss, economic loss, loss of bargain, loss of value, or other losses computed by reference to value which may have been available had an obligation been duly performed in a timely manner, or otherwise), costs, and expenses of any nature; or

    (c)  apply any set-off, netting, withholding, combination of accounts or retention or similar rights in respect of any claim or liability whatsoever,

and "**Claimant**", "**to Claim**" and "**Claiming**" shall be construed accordingly

| | |
|---|---|
| "**Claim Amount Notice**" | has the meaning set out in Clause 36.5 |
| "**Client Money**" | money which is client money pursuant to and as defined in the FSA Rules |
| "**Client Money Collateralisation Election**" | has the meaning set out in Clause 59.1.1 |
| "**Closed Contract**" | any Financial Contract that is not an Open Contract |
| "**Close-Out Amount**" | in respect of a Financial Contract and each Signatory that is a party to it: (i) a single amount payable by either one of the Company or the relevant Signatory to the other as a result of termination of such Financial Contract as determined in accordance with Clause 20; or (ii) the aggregate of each Close-Out Component in accordance with Clause 21.3 |
| "**Close-Out Component**" | has the meaning set out in Clause 21.3 |
| "**Closing Date**" | has the meaning set out in paragraph 2.2 of Schedule 1 |
| "**Closing Statement**" | has the meaning set out in Clause 64 |
| "**Closing Time**" | has the meaning set out in Clause 64.1 |
| "**Collateral Allocation**" | has the meaning set out in Clause 59.10 |

| | |
|---|---|
| "**Collateral Amount**" | has the meaning set out in Clause 59.7.3 |
| "**Collateral Claim Amount**" | has the meaning set out in Clause 59.7.2 |
| "**Collateralisation Election**" | has the meaning set out in Clause 59.1 |
| "**Collateralised Net Financial Liability**" | has the meaning set out in Clause 59.8 |
| "**Companies Act**" | the Companies Act 2006 |
| "**Company**" | Lehman Brothers International (Europe) (in administration), incorporated in England and Wales with registered number 2538254 |
| "**Company Released Claims**" | has the meaning set out in Clause 5.1.1 |
| "**Company Released Parties**" | the Company, the Administrators and their firms, members, agents, partners or employees |
| "**Conditions**" | the conditions to the Offer set out in paragraph 4 of Schedule 1 |
| "**Connected Trade**" | (i) any transaction between the Company and a Signatory relating to a Financial Contract that was entered into contemporaneously with, and/or is directly or indirectly linked to, a Failed Trade, which was scheduled to settle on or before the Administration Date and has actually settled; or |
| | (ii) any transaction between the Company and a Signatory relating to a Financial Contract that was entered into contemporaneously with, and/or is directly or indirectly linked to, a Failed Trade, which was scheduled to settle after the Administration Date |
| | provided, however, that in no event shall a transaction between the Company and a Third Party be a Connected Trade |
| "**Contractual Determining Party**" | has the meaning set out in Clause 21.7.1 |
| "**Contractual Valuation Methodology**" | has the meaning set out in Clause 21.2.3 |
| "**Contractual Valuation Provisions**" | has the meaning set out in Clause 21.1 |
| "**Contribution to Determination**" | has the meaning set out in Clause 21.7.3(ii) |
| "**Converted Asset**" | any Asset which has, after the Time of Administration, been exchanged or replaced (including, without limitation, as a result of any Corporate Action or Corporate Event in respect of such Asset), realised, disposed of or appropriated or which has matured |
| "**Corporate Action**" | a subscription rights issue, a tender offer (such as a takeover offer, exchange offer or other similar offer or proposal) which may be of a security for a security, cash, any other securities or assets, or any combination of these, a scheme of arrangement pursuant to Part 26 of the Companies Act, a security subdivision/security split, a reverse security split, a |

bonus issue or a bonus rights issue, an exercise of voting rights, an exercise of conversion rights in relation to convertible bonds/warrants, a capital reorganisation, a merger, an election in relation to dividends (whether for cash or securities), and any other analogous or similar action

"**Corporate Action Fee**"   has the meaning set out in Clause 15.4.2

"**Corporate Event**"   has the meaning set out in Clause 15.11

"**Costs Amount**"   an amount determined by the Company on each Distribution Value Date equal to the relevant Costs Amount Percentage multiplied by the aggregate amount of the Value as at the Bar Date of all Asset Claims (including any new or additional Asset Claims submitted by that TA Signatory up to the relevant Distribution Value Date that have previously not been added to such amount (whether or not the Asset Claim is subsequently reduced or withdrawn)), as supplemented by further information or as attributed a clarificatory meaning in accordance with Clause 12.4.2 provided that, where the Acceptance Date for a TA Signatory falls on a date on or prior to the end of the Initial Offer Period, such amount shall not exceed US$2.5 million for any TA Signatory

"**Costs Amount Percentage**"   (i)   where the Acceptance Date for a TA Signatory falls on a date on or prior to the end of the Initial Offer Period:

(a)   in respect of a TA Signatory that is a Pure Custody Signatory, 0.75 per cent.; and

(b)   in respect of a TA Signatory that is not a Pure Custody Signatory, 1.00 per cent.

(ii)   where the Acceptance Date for a TA Signatory falls on a date after the end of the Initial Offer Period:

(a)   in respect of a TA Signatory that is a Pure Custody Signatory, 1.50 per cent.; and

(b)   in respect of a TA Signatory that is not a Pure Custody Signatory, 2.00 per cent.

"**Costs Rebate Amount**"   (i)   in respect of each TA Signatory, the difference as determined by the Company between:

(a)   the Costs Amount determined as at the last Distribution Value Date; less

(b)   the relevant Costs Amount Percentage of the sum of:

(I)   the Value as at the Bar Date of all Asset Allocations to such TA Signatory;

(II)   the Value of each Intermediary Distribution as at the date on which such Intermediary Distribution was received by the Signatory; and

(III)   the Value of each Intermediary Retention as at the date on which such Intermediary

|  | Retention was received by the Company from the relevant Intermediary; and |
|---|---|
|  | (ii) in all cases provided that, if the difference between (a) and (b) above is less than US$1,000, the Costs Rebate Amount shall be deemed to be zero |
| "**Court**" | the High Court of Justice in England and Wales |
| "**Creditors' Committee**" | the committee of creditors of the Company constituted under paragraph 57 of Schedule B1 to the Insolvency Act |
| "**Creditors' Committee Group**" | the members of the Creditors' Committee, including any sub-committees thereof, and their investment managers and investment managers' affiliates, and each of their respective advisers, firms, members, agents, partners, officers, directors and employees, at all times only in their respective capacities described in this definition, which ultimately derive from the role of the Creditors' Committee and, where the context requires, means them individually or collectively |
| "**Current Date**" | has the meaning set out in Clause 25.3 |
| "**CUSIP number**" | the number assigned to a Security by the Company on Uniform Security Identification Procedures |
| "**Custody Agreement**" | any agreement, whether written, oral or otherwise, between the Company and any person for the provision of custodial services in respect of cash, Securities or other assets by the Company to such person, including, for the avoidance of doubt, custody arrangements evidenced by the maintenance of a custody account for a person on the Company's Books and Records within a range of account codes typically used by the Company for custody services |
| "**Custody Asset Claim**" | (i) an Ownership Claim against the Company for or in respect of: (a) any Securities (excluding any Rehypothecated Securities and Securities Covered By Client Money) which were recorded in the Books and Records of the Company at the Time of Administration as Securities which, pursuant to an obligation giving rise to an Ownership Claim against the Company in respect of such Securities, the Company held or should have held as Custody Securities; and (b) Derived Assets relating to such Securities other than money; and |
|  | (ii) a Claim against the Company in respect of any Derived Asset relating to (a) or (b) above that is money. |
|  | For the avoidance of doubt, unless otherwise required by law or regulation, the obligation of the Company in respect of a Custody Asset Claim shall not exceed the obligation of the Company under the terms of the agreement or arrangement that gives rise to such Custody Asset Claim |
| "**Custody Long Positions**" | in respect of an Acceptance Threshold Offeree, the "Custody |

|  | Long Positions" referred to at line item reference 2.1.1 of that Acceptance Threshold Offeree's Updated Position and Balance Statement |
|---|---|
| "**Custody Securities Pool**" | has the meaning set out in Clause 43.1 |
| "**Custody Security**" | a Security which is a Trust Asset credited to a custody account of a TA Claimant with the Company and, where held by an Intermediary and designated as being held for the Company's customers, is expressed to be so held for the benefit of the Company's custody customers |
| "**CVA**" | a company voluntary arrangement proposed or to be proposed by the Administrators under Part I of the Insolvency Act for the purpose of dealing with the claims of general unsecured creditors of the Company |
| "**Date Before Administration**" | the last business day before the Administration Date. For the purpose of this definition only, "**business day**" shall mean a business day in the city or principal market which is most closely connected to or for the trading in respect of the relevant Security that is being Valued |
| "**De Minimis Allocation**" | has the meaning set out in Clause 56.3 |
| "**Defective Notice of Termination**" | in respect of any Financial Contract, a notice which a Signatory served on the Company on or before the Accession Date of that Signatory which would have validly terminated such Financial Contract in accordance with its terms but for a failure by that Signatory to comply with the terms of the relevant Financial Contract with regard to the delivery of notices in general or the requirements for Notices of Termination in particular |
| "**Deferral Cash Amount**" | has the meaning set out in Clause 59.3.2 |
| "**Deferral Cash Payment Date**" | has the meaning set out in Clause 59.3.2 |
| "**Deferral Election Deadline**" | has the meaning set out in Clause 59.3.1 |
| "**Delegate**" | any person appointed as a delegate pursuant to Clause 78.1.2 |
| "**deliver**" | when used in relation to the delivery or payment of any Securities or money forming part of a Distribution, "**deliver**" means delivery in accordance with Clause 63 and "**delivery**" and "**delivered**" shall be construed accordingly |
| "**Delivery Date**" | has the meaning set out in Clause 63.3.1 |
| "**Delivery Disruption Event**" | an event beyond the control of the Company as a result of which the Company cannot deliver the Distribution in accordance with the instructions of the Signatory specified in the Asset Delivery Notice, or an event in which the delivery of the Distribution is rendered illegal under any applicable law or regulation |
| "**Delivery Instruction Date**" | in relation to any Distribution that the Company is due to make to a Signatory by delivery in accordance with Clause 63, the |

|  | latest day on which the Company must give instructions for settlement of such Distribution |
|---|---|

"**Derived Asset**"     any Asset received by the Company after the Time of Administration arising out of or derived from any Security (but also including interest on Post-Administration Client Money that was originally derived from a Security) which was itself a Trust Asset at or immediately before the time that that other Asset was received, including:

(i)     any Security or Post-Administration Client Money which an Intermediary delivers to the Company in lieu of a Segregated Asset held by such Intermediary, as required by, or otherwise permitted under, the applicable law of that Intermediary;

(ii)     any sale proceeds of any Security comprising paragraph (i) above realised by the Company in accordance with Clause 45.4; and

(iii)     any proceeds or consideration received in exchange, replacement, realisation, disposal, appropriation or maturity of any Converted Asset,

and, when used in relation to a particular Security, any Asset that is so derived from that Security

| "**Determination Notice**" | has the meaning set out in Clause 67.1 |
|---|---|
| "**Determining Party**" | has the meaning set out in Clause 20.6.1 |
| "**Dispute**" | has the meaning set out in Clause 67 |
| "**Dispute Notice**" | has the meaning set out in Clause 68.1 |

"**Dispute Notice Deadline**"     the twenty-fifth Business Day after the date the Claim Amount Notice, an Intermediary Distribution Value Notice or Net Contractual Position Statement is given by the Company or the tenth Business Day after the date a Distribution and Appropriation Notice is given by the Company

"**Dispute Resolution Mechanism**"     the procedures for resolving Disputes as described in Clauses 67 to 74

"**Disputing Parties**"     has the meaning set out in Clause 67

"**Distributable Trust Assets**"     at any time, any Trust Assets which fulfil each of the following criteria at such time:

(i)     they have been sufficiently identified and located by the Company to enable the Company to Identify them in accordance with Clause 35;

(ii)     they are within the direct custody or control of the Company or any Intermediary through which the Company has indirect custody or control of the Assets and which is willing and able to act in accordance with a direction from the Company in respect of such Trust Assets; and

(iii)     they are not subject to any order or restriction of any

competent court or authority which would prevent or interfere with the operation of this Agreement in respect of such Trust Assets,

provided that:

(a)  Trust Assets which do not fulfil each of the criteria above at any time may subsequently become Distributable Trust Assets at such time as they fulfil each of the criteria above and for as long as they continue to fulfil each of the criteria above; and

(b)  conversely, Trust Assets which have at any time fulfilled each of the criteria above may cease to be Distributable Trust Assets at any time that they cease to fulfil each of the criteria above

| | |
|---|---|
| "**Distribution**" | has the meaning set out in Clause 52.2 |
| "**Distribution and Appropriation Notice**" | has the meaning set out in Clause 58.1 |
| "**Distribution Assets**" | has the meaning set out in Clause 54.1 |
| "**Distribution Liabilities**" | has the meaning set out in Clause 55.1 |
| "**Distribution Value Date**" | has the meaning set out in Clause 57 |
| "**Effective Date**" | the date on which this Agreement became effective as declared by the Company in accordance with paragraph 12 of Schedule 1 |
| "**Eligible Offeree**" | has the meaning set out in paragraph 3.2 of Schedule 1 |
| "**Entire Position**" | in respect of a Signatory, its Asset Claims, Pre-Administration Client Money Claims, Asset Shortfall Claims, Ascertained Claims, Distribution Liabilities, Financial Contracts (including all transactions under them) and any other Claims or Liabilities under this Agreement that together comprise all of the Claims against the Company of, and Liabilities owed to the Company by, that Signatory |
| "**Equity of Redemption**" | has the meaning given to it under English law and, in relation to security given under a legal system other than English law, any proprietary interest in an Asset that confers rights that are equivalent to an equity of redemption under English law |
| "**Excess Value**" | has the meaning set out in Clause 45.3.7(ii) |
| "**Excluded Claims**" | from time to time, any Claim: |

(i)  for or in respect of Excluded Property other than Appropriated Assets;

(ii)  for loss or damage relating to the failure of the Company to perform any of its obligations with regard to Excluded Property;

(iii)  that is a Retention Claim;

(iv)  against the Company for breach of any of the terms of

this Agreement or for any failure on the part of the Company to discharge their obligations under this Agreement; or

(v) against the Company under a contract: (a) which is not a Financial Contract; and (b) where the Company, in its absolute discretion, determines it is not in the interests of the unsecured creditors of the Company as a whole to have the obligations under that contract resolved through this Agreement,

provided that no Claim in respect of, or connected or related to, a Financial Contract shall be an Excluded Claim

| | |
|---|---|
| "**Excluded Party**" | has the meaning set out in Clause 2.3 |
| "**Excluded Property**" | at any time:<br>(i)    Non-Trust Assets; and<br>(ii)    any Security Interest over Assets |
| "**Extended Offer Period**" | has the meaning set out in paragraph 7.8 of Schedule 1 |
| "**Extraordinary Resolution**" | has the meaning given to it in Schedule 4 |
| "**Extraordinary Resolution Direction**" | means a direction by an Extraordinary Resolution of relevant Signatories |
| "**Failed Trade**" | any transaction for the purchase, sale or delivery of any Security which has actually failed to settle |
| "**Failed Trade Entry**" | an entry in the Books and Records of the Company recording a Failed Trade as having settled |
| "**Fallback Notification Date**" | has the meaning set out in Clause 22.1.2 |
| "**Fallback Valuation Date**" | in respect of an Open Contract, the Open Contract Termination Date or as soon as reasonably practicable thereafter and, in respect of a Closed Contract, the date on which such Closed Contract was terminated or as soon as reasonably practicable thereafter |
| "**Fallback Valuation Methodology**" | has the meaning set out in Clause 23.3.1 |
| "**Financial Contract**" | any bilateral or multilateral contract entered into before the Administration Date (whether evidenced in writing or not) relating to one or more transactions or positions of a financial nature (and which is not a purely administrative or services contract), including contracts for the delivery and/or custody of Assets, entered into between a Signatory and the Company. For the avoidance of doubt, Master Agreements are Financial Contracts and each Master Agreement, together with the transactions entered into under it, shall be treated as a single Financial Contract |
| "**Financial Contract Valuation Methodology**" | has the meaning set out in Clause 20.2 |

| | |
|---|---|
| "**Financial Instrument**" | any financial instrument, including, without limitation, any share, instrument creating or acknowledging indebtedness, instrument creating or acknowledging entitlements to investments, warrant or unit in a collective investment scheme, that is capable of being credited to an account of the Company with an Intermediary, excluding money |
| "**Financing and Derivatives Contract**" | a Financial Contract which is capable of giving rise to a Liability of the Signatory to the Company in the form of indebtedness or such other arrangement with an economic effect similar to an indebtedness, including a Financial Contract which provides for: |

(i) an obligation of the Signatory to pay money or deliver Securities to the Company in respect of (a) a loan of cash and/or Securities or (b) a Security repurchase (or reverse-repurchase) arrangement; or

(ii) an obligation of the Signatory to pay or deliver Securities to the Company in accordance with the terms of a derivative transaction, contract for differences transaction or a transaction for the sale and purchase of any futures or options contract.

For the avoidance of doubt, (x) any standard terms of business, (y) a Custody Agreement or (z) a Prime Brokerage Agreement under or in connection with which a Signatory does not have any Liability as described above, as determined by the Company as at the Bar Date, is not a Financing and Derivatives Contract with respect to such Signatory

| | |
|---|---|
| "**Flawed Asset Provision**" | has the meaning set out in Clause 20.4.4 |
| "**Form of Acceptance**" | has the meaning set out in paragraph 1.2 of Schedule 1 |
| "**Forum Notice**" | has the meaning set out in Clause 68.3 |
| "**FSA**" | the Financial Services Authority of the United Kingdom |
| "**FSA Handbook**" | the handbook containing rules, principles and guidance made by the FSA under powers given to it by the FSMA as modified, amended or revised from time to time |
| "**FSA Rules**" | the FSMA and the FSA Handbook |
| "**FSMA**" | Financial Services and Markets Act 2000 |
| "**Funded Retention Amount**" | an amount in a notional ledger established and designated as such by the Company in respect of each currency in which any Retention Claim Amount in respect of a Signatory is denominated |
| "**Further Offer**" | has the meaning set out in paragraph 7.10 of Schedule 1 |
| "**Greatest Pre-Administration Admitted Client Money Amount**" | has the meaning set out in Clause 25.3.2(ii) |
| "**Gross Uncollateralised Liability**" | has the meaning set out in Clause 25.3.2(ii) |

| | |
|---|---|
| "**Gross Uncollateralised Liability Interest**" | has the meaning set out in Clause 25.3.2(i) |
| "**Holding Company**" | in relation to the Company, any other company, corporation or legal entity in respect of which it is a Subsidiary |
| "**Hypothetical Counterparty**" | a hypothetical market counterparty with a creditworthiness of prime quality |
| "**Identification**" | has the meaning set out in Clause 35 |
| "**Incompletely Documented Agreement**" | has the meaning set out in Clause 14.1 |
| "**Individual Claim Amount**" | has the meaning set out in Clause 36.1 |
| "**Individual Claim Value**" | has the meaning set out in Clause 45.1 |
| "**Information Representation and Warranty**" | has the meaning set out in Clause 65.2 |
| "**Initial Offer Period**" | has the meaning set out in paragraph 2.2 of Schedule 1 |
| "**Initial Representation and Warranty**" | has the meaning set out in Clause 65.1 |
| "**Insolvency Act**" | the Insolvency Act 1986 |
| "**Insolvency Rules**" | the Insolvency Rules 1986 |
| "**Instructions**" | has the meaning set out in Clause 15.4.1 |
| "**Intermediary**" | a custodian, clearing system, depository, nominee or other person who holds assets (including, for the avoidance of doubt, rights in respect of Assets) on behalf of or to the order of the Company, and which has a direct contractual or fiduciary relationship with the Company in relation to those assets |
| "**Intermediary Distribution**" | (i) any asset or benefit received by a Signatory on or after the Administration Date from an Intermediary or its Sub-Intermediary (other than from the Company), by way of delivery of Security, payment of cash, set-off or otherwise equivalent to Appropriation or Distribution under this Agreement, in or towards satisfaction of an Asset Claim of that Signatory, as determined by the Company; and |
| | (ii) for the purpose of Clause 48.3 only, also includes any asset received by a Signatory on or after the Administration Date from an Intermediary or its Sub-Intermediary (other than from the Company) that, had it been received by the Company, would have been a Derived Asset. |
| | For the avoidance of doubt, Intermediary Distribution includes any such assets or benefits received by a Signatory between the Administration Date and its Accession Date |
| "**Intermediary Distribution Notice**" | has the meaning set out in Clause 37.1 |

| | |
|---|---|
| "**Intermediary Distribution Value**" | has the meaning set out in Clause 37.3 |
| "**Intermediary Distribution Value Notice**" | has the meaning set out in Clause 37.3 |
| "**Intermediary Retention**" | any asset or benefit which an Intermediary or its Sub-Intermediary has: (i) withheld from an Intermediary Distribution to a Signatory; and (ii) transferred to the Company by way of delivery of Security, payment of cash, set-off or otherwise equivalent to Appropriation or Distribution under this Agreement, in or towards the satisfaction of that Signatory's Distribution Liabilities |
| "**International Prime Brokerage Agreement (Charge Version)**" | means the international prime brokerage agreement entered into between a Signatory and the Company pursuant to which the assets of the Signatory were held for the Signatory by the Company as trustee for itself and/or others subject to a security interest, including with a right of use of such assets by the Company |
| "**ISIN**" | International Securities Identification Number |
| "**Judgment Amounts**" | has the meaning set out in Clause 28.1.1 |

"**Last Allocation**"

(i)   in respect of a Custody Securities Pool or a Non-Custody Securities Pool, the Allocation to the relevant Asset Pool Signatory(ies) of an Asset in the relevant Asset Pool where:

    (a)   there are no Disputes or all Disputes arising have been resolved over the TA Claimant Amount and/or Intermediary Distribution Value by the relevant Asset Pool Signatories; and

    (b)   no Distributable Trust Assets in respect of the relevant Asset Pool are designated as Reserved Assets in respect of its TA Claimant Amount or Alleged TA Claimant Amount of a TA Non-Signatory (as the case may be)

(ii)   in respect of a Multiple Stock Line Pool, the Allocation to the relevant Asset Pool Signatory(ies) of an Asset in the relevant Asset Pool:

    (a)   after the Company has determined in its absolute discretion that it does not expect to Identify any further Assets in respect of that Asset Pool;

    (b)   where there are no Disputes or all Disputes arising have been resolved over the TA Claimant Amount and/or Intermediary Distribution Value by the relevant Asset Pool Signatories; and

    (c)   where no Distributable Trust Assets in respect of the relevant Asset Pool are designated as Reserved Assets in respect of its TA Claimant Amount or Alleged TA Claimant Amount of a TA Non-Signatory (as the case may be); and

| | (iii) | in respect of a Single Customer Pool and in respect of the relevant Single Customer, the Allocation where the Company has determined in its absolute discretion that it does not expect to Identify any further Assets to be returned from such Affected Intermediary that relate to the Asset Claim of such Single Customer |

"**LBI**"  Lehman Brothers Inc.

"**Liabilities**"  all liabilities, duties and obligations of every description, whether deriving from contract, common law, case law, legal provisions, statute or otherwise, whether present or future, actual or contingent, ascertained or unascertained or disputed and whether owed or incurred severally or jointly or as principal or surety, and "**Liability**" means any one of them

"**Limited Ascertained Non-Financial Contract Liabilities**"  has the meaning set out in Clause 33.5

"**Liquidation Event**"  either an order by the Court to compulsorily wind up the Company or the commencement of a creditors' voluntary winding-up in respect of the Company (both pursuant to the Insolvency Act and the Insolvency Rules)

"**Master Agreement**"  an agreement which provides a set of common terms and conditions for one or more transactions entered into under it, which together form a single agreement

"**Mid-Market Value**"  has the meaning set out in Clause 23.4.1

"**Modified Claims**"  has the meaning set out in Clause 4.1

"**Multiple Stock Line Pool**"  has the meaning set out in Clause 43.2.2

"**Net Contractual Position**"  the amount determined in accordance with Clause 24.2

"**Net Contractual Position Statement**"  has the meaning set out in Clause 24.4

"**Net Equity Amount**"  has the meaning set out in Clause 36.2

"**Net Equity Intermediary**"  has the meaning set out in Clause 34.5

"**Net Financial Claim**"  has the meaning set out in Clause 25.1

"**Net Financial Interest Amount**"  has the meaning set out in Clause 25.3.1

"**Net Financial Liability**"  has the meaning set out in Clause 25.2

"**New Claims**"  has the meaning set out in Clause 4.4

"**Non-Custody Asset Claim**"  (i)  an Ownership Claim against the Company for or in respect of: (a) any Securities (excluding any Rehypothecated Securities and Securities Covered By Client Money) which were recorded in the Books and Records of the Company as at the Time of Administration as Securities which, pursuant to an obligation giving rise to an Ownership Claim against the Company in respect of such Securities, the

|  | Company held or should have held as Non-Custody Securities; and (b) Derived Assets relating to such Securities other than money; and |
| --- | --- |
| (ii) | a Claim against the Company in respect of any Derived Assets relating to (a) or (b) above that is money. |
| (iii) | For the avoidance of doubt, unless otherwise required by law or regulation, the obligation of the Company in respect of a Non-Custody Asset Claim shall not exceed the obligation of the Company under the terms of the agreement or arrangement that gives rise to such Non-Custody Asset Claim |

| | |
| --- | --- |
| "**Non-Custody Securities Pool**" | has the meaning set out in Clause 43.1 |
| "**Non-Custody Security**" | any Security which is a Trust Asset, but not a Custody Security |
| "**Non-Financial Contract Liabilities**" | has the meaning given to it in Clause 33.1 and "**Non-Financial Contract Liability**" means any one of such Non-Financial Contract Liabilities |
| "**Non-Signatory**" | any person who is not a Signatory to this Agreement |
| "**Non-Trust Assets**" | any Assets held or controlled by the Company, other than Segregated Assets, Derived Assets and Recovered Assets, including, without limitation: (i) a Rehypothecated Security; (ii) a Converted Asset; (iii) a Returned Asset; (iv) a Pre-Agreement Returned Asset; (v) from the time of Appropriation, an Appropriated Asset; (vi) any Pre-Administration Client Money; and (vii) any Assets beneficially owned by the Company, including any Surplus Assets |
| "**Notice**" | any notice given in accordance with Clause 89, and "**Notify**", "**Notifying**" and "**Notified**" shall be construed accordingly |
| "**Notice Cut-off Date**" | has the meaning set out in Clause 63.2.1 |
| "**Notice of Termination**" | with respect to a Financial Contract, any notice from one party to another which purports to terminate such Financial Contract, regardless of whether such notice effectively terminates such Financial Contract in accordance with its terms |
| "**NTA Condition**" | has the meaning set out in paragraph 9.1 of Schedule 1 |
| "**NTA Offerees**" | has the meaning set out in paragraph 3.1 of Schedule 1 |
| "**NTA Signatory**" | any Signatory that is not a TA Signatory |
| "**Offer**" | has the meaning set out in paragraph 1.1 of Schedule 1 |
| "**Open Contract**" | with respect to each Signatory, any Financial Contract that has not been terminated on or before the Accession Date of that Signatory |
| "**Open Contract Termination Date**" | in respect of each Signatory, the last Business Day of the month in which its relevant Accession Date falls |
| "**Original Position**" | the Entire Position of a Signatory as at the Time of Administration |

| | |
|---|---|
| "**Over-Allocated Signatory**" | has the meaning set out in Clause 45.3.7 |
| "**Overriding Valuation Provision**" | has the meaning set out in Clause 20.4 |
| "**Ownership Claim**" | with respect to an Asset in the possession or custody of a person (the "**holder**"), a Claim by another (the "**ownership claimant**") that: |

     (i)    the ownership claimant is the legal or beneficial owner of that Asset (whether or not it is subject to any prior ranking Security Claim of any person); and

     (ii)    for the delivery or transfer of the Asset to (or to the order of) the ownership claimant by the holder in order to convey all right, title and interest in the Asset, subject to any right of the holder to withhold such delivery or transfer until the satisfaction of some condition precedent by the ownership claimant, including satisfaction of any Security Claim,

but shall exclude any Claim in contract for the delivery or transfer of the Asset by the holder to the ownership claimant, unless such a Claim is capable of remedy by an order for specific performance (or equivalent under a legal system outside England)

| | |
|---|---|
| "**Parallel Debt**" | has the meaning set out in Clause 32.2 |
| "**Party**" | means the Company or any Signatory |
| "**Password**" | has the meaning set out in Clause 89.2.1 |
| "**Payment**" | in respect of any payment to the Company, a payment in accordance with Clause 85 and "**Pay**" and "**Paid**" shall be construed accordingly |
| "**Physical Delivery Deadline**" | has the meaning set out in Clause 63.4.1 |
| "**Pledge Positions**" | in respect of an Acceptance Threshold Offeree, the "Pledge Positions" referred to at line item reference 2.3.1 of that Acceptance Threshold Offeree's Updated Position and Balance Statement |
| "**Pledgor**" | in relation to any Security Interest, the party over whose assets the Security Interest has been created |
| "**Portal**" | a secure online facility made available by the Company through which certain Signatories (expected, initially, to be limited to TA Signatories) may access information about their Positions with the Company using their unique User ID and Password |
| "**Position**" | any asset (including an Asset) or Liability comprising a part of a Signatory's Entire Position, including an individual transaction under a Financial Contract |
| "**Post-Administration Client Money**" | any Client Money which is received by the Company after the Time of Administration and for which the Company remains accountable, but, for the avoidance of doubt, shall not include |

|  | Pre-Administration Client Money or Pre-Administration Client Money Claims |
|---|---|
| "**Post-Administration Client Money Claim**" | any Claim by the Signatory in relation to Post-Administration Client Money including: |

(i)    any Claim by the Signatory, whether against the Company or any other person, for or in respect of Post-Administration Client Money held on the Statutory Trust (or for or in respect of the proceeds of, or any substitute for, such money or any assets over which a trust, charge or other proprietary right exists in respect of such money);

(ii)    any Claim against the Company for or in respect of a shortfall in the Signatory's recovery of the Post-Administration Client Money whether on the basis that such money is owed as a debt, or that the Company is responsible for the loss of any Post-Administration Client Money or on any other basis whatsoever;

(iii)    any Claim or entitlement (including any discretionary entitlement) of the Signatory against any compensation scheme, insurer or other person in respect of Claims to or loss of Post-Administration Client Money;

(iv)    any debt, contractual right or other Claim which has given rise to a Post-Administration Client Money Claim; and

(v)    any right to waive, compromise, dispose of or otherwise deal with any of the foregoing,

provided that this definition does not apply to (a) Client Money unrelated to the Company or (b) Claims by the Signatory under insurance or other arrangements entered into with a person unconnected with the Company by the Signatory for its own benefit

| "**Post-Administration Client Money Collection Account**" | has the meaning set out in Clause 4.8.1(i) |
|---|---|
| "**Post-Administration Financial Contract**" | in relation to a Signatory, any Financial Contract (or any Positions under it) to which the Signatory became a party after the Time of Administration by reason of a Transfer from a Transferor |
| "**Pre-Administration Admitted Client Money Amount**" | has the meaning as set out in Clause 59.2.3 |
| "**Pre-Administration Client Money**" | any Client Money which was received or held by the Company prior to the Time of Administration and for which the Company remained accountable at the Time of Administration and any money earned or arising at any time in respect thereof, whether before or after the Time of Administration |

| | |
|---|---|
| "**Pre-Administration Client Money Claim**" | any Claim by the Signatory in relation to Pre-Administration Client Money including: |

    (i)    any Claim by the Signatory, whether against the Company or any other person, for or in respect of money held on the Statutory Trust (or for or in respect of the proceeds of, or any substitute for, such money or any assets over which a trust, charge or other proprietary right exists in respect of such money) or including, without limitation:

        (a)    any entitlement against the Company to a distribution from the Pre-Administration Client Money Pool;

        (b)    any Claim to Pre-Administration Client Money held at the Time of Administration outside of the Pre-Administration Client Money Pool; and

        (c)    any Pre-Administration Client Money received after the Time of Administration;

    (ii)    any Claim against the Company for or in respect of a shortfall in the Signatory's recovery from the Pre-Administration Client Money Pool whether on the basis that such money is owed as a debt, or that the Company is responsible for the loss of any Pre-Administration Client Money or on any other basis whatsoever;

    (iii)    any Claim or entitlement (including any discretionary entitlement) of the Signatory against any compensation scheme, insurer or other person in respect of Claims to or loss of Pre-Administration Client Money;

    (iv)    any debt, contractual right or other Claim which has given rise to a Pre-Administration Client Money Claim; and

    (v)    any right to waive, compromise, dispose of or otherwise deal with any of the foregoing,

provided that this definition does not apply to: (a) Client Money unrelated to the Company; or (b) Claims by the Signatory under insurance or other arrangements entered into with a person unconnected with the Company by the Signatory for its own benefit

| | |
|---|---|
| "**Pre-Administration Client Money Collection Account**" | has the meaning set out in Clause 59.6.2 |
| "**Pre-Administration Client Money Pool**" | the pool created pursuant to CASS Rule 7.9.6R (as in force at the Time of Administration) |
| "**Pre-Administration Client Money Shortfall Claim**" | has the meaning set out in Clause 59.11.1 |
| "**Pre-Administration Financial** | at any time in relation to a person, any Financial Contract (or |

| | |
|---|---|
| Contract" | any Positions under it) to which that person was a party at the Time of Administration and, at the relevant time, continues to be a party |
| "**Pre-Agreement Asset Contract**" | a Pre-Agreement Contract pursuant to which: |
| | (i)    Pre-Agreement Provisionally Returned Assets were distributed, transferred or delivered; and |
| | (ii)    such Assets or other assets may be required to be redelivered, delivered or paid to the Company, |
| | provided that the amount or value of any Claim for the purposes of this Agreement shall be the amount or value finally agreed for such Claim(s) in the Pre-Agreement Contract |
| "**Pre-Agreement Contract**" | any agreement entered into by the Company with a person after the Time of Administration, and where such person is a Signatory before their Accession Date |
| "**Pre-Agreement Provisionally Returned Asset**" | any Security which has been distributed, transferred or delivered by the Company to a person after the Time of Administration but prior to the Effective Date, in respect of which such person has an obligation to redeliver to the Company such Security or assets equivalent to such Security and proceeds of any conversion and/or derived assets of such Security or assets equivalent to such Security, whether in full or in part, which obligation includes an indemnity to the Company that compensates the Company, in whole or in part, for the consequences of any failure to make such a redelivery |
| "**Pre-Agreement Provisionally Returned Asset Recipient**" | a person who has undertaken pursuant to a Pre-Agreement Asset Contract to redeliver to the Company, in certain circumstances, any Pre-Agreement Provisionally Returned Asset |
| "**Pre-Agreement Returned Asset**" | any Pre-Agreement Provisionally Returned Asset that, in retrospect (and after the adjustment referred to in parentheses in the first paragraph of Clause 61), has been properly distributed, transferred or delivered by the Company to the relevant Pre-Agreement Provisionally Returned Asset Recipient as determined by the Company in accordance with Clause 61 |
| "**Previous Acceptors**" | has the meaning set out in paragraph 11.3 of Schedule 1 |
| "**Previous Period**" | has the meaning set out in Clause 25.3 |
| "**Prime Brokerage Agreement**" | any agreement, whether written, oral or otherwise, between the Company and any person for the provision of prime brokerage services or margin lending services by the Company to such person including, for the avoidance of doubt, cash margin trading arrangements evidenced by the maintenance of a margin account for a person on the Company's Books and Records within a range of account codes typically used by the Company for such services |

| | |
|---|---|
| "**Prior Date**" | has the meaning set out in Clause 25.3 |
| "**Proceedings**" | any process, action, legal or other proceeding, including, without limitation, any administrative, judicial or quasi-judicial proceeding, any regulatory process, arbitration, alternative dispute resolution, mediation, judicial review, adjudication, forfeiture, re-entry, seizure, distraint, execution, enforcement of judgment or any other step taken for the purpose of creating or enforcing a lien |
| "**Provisional Allocation Percentage**" | has the meaning set out in Clause 45.1 |
| "**Provisional Valuation Date**" | the Date Before Administration, unless the Provisional Allocation Percentage relates to an Asset Claim to an Affected Stock Line, in which case, the date as determined by the Company as the date on which the relevant Intermediary valued, or was required to value, the Assets of such Affected Stock Line for the purpose of determining the pro rata shortfall to be borne by the relevant Affected Claimants |
| "**Pure Custody Signatory**" | a Signatory which: |

(i)     does not have any outstanding Claim or Liability in respect of any Financing and Derivatives Contract (whether terminated or not terminated) with the Company; and

(ii)    does not have a Non-Custody Asset Claim against the Company,

as determined by the Company as at the Bar Date for the sole purpose of determining the Costs Amount that is applicable to such Signatory. For the avoidance of doubt, the determination by the Company on whether a Signatory is a Pure Custody Signatory is made without prejudice to the right of the Company under this Agreement to determine (i) and (ii) above again for all other purposes in this Agreement

| | |
|---|---|
| "**purposes**" | has the meaning given to it on page III-9 of this Agreement |
| "**Realisation**" | has the meaning set out in Clause 15.6.2(ii) |
| "**Reallocation Amount**" | has the meaning set out in Clause 45.3.7 |
| "**Recoverable Delivery Value**" | has the meaning set out in Clause 7.4 |
| "**Recovered Asset**" | any Asset received by the Company at any time from a Pre-Agreement Provisionally Returned Asset Recipient to satisfy its redelivery obligation to the Company in respect of any Pre-Agreement Provisionally Returned Asset |
| "**Reduction**" | has the meaning set out in Clause 52.2 |
| "**rehypothecate**" | to appropriate an asset (including money) that is subject to a Security Interest pursuant to which the Pledgor of that asset has an Equity of Redemption in respect of that asset, in such a manner as to eliminate that Equity of Redemption and replace it with a contractual obligation to redeliver equivalent assets or |

|  | pay an amount of equivalent value, and "**rehypothecation**" and "**rehypothecated**" shall be construed accordingly |
|---|---|
| "**Rehypothecated Security**" | as at the Time of Administration, any Security which was rehypothecated by the Company, including any Security which was appropriated by the Company so as to cease being a Segregated Asset, whether or not the Company was entitled to do so |
| "**Released Claims**" | has the meaning set out in Clause 4.2 |
| "**Released Parties**" | in respect of a Signatory, the Company Released Parties together with all other Signatories. |

For the avoidance of doubt:

(i)    Lehman Brothers Holding Inc., Lehman Brothers Inc. and CAPCO; and

(ii)   Lehman Brothers Bankhaus AG,

shall not be Released Parties

| "**Relevant Asset**" | has the meaning set out in Clause 17.1 |
|---|---|
| "**Relevant Currency**" | has the meaning set out in Clause 29.5 |
| "**Relevant FX Conversion Time**" | |

(i)    for the purpose of Clause 17.5, the close of business in London on: (a) if the Asset being valued comprises Trust Assets, the relevant Asset Valuation Date; and (b) otherwise, the Administration Date;

(ii)   for the purpose of Clause 24.1, the close of business in London on the Administration Date;

(iii)  for the purpose of Clause 28, the close of business in London on the day on which the Retention Amount is determined;

(iv)   for the purpose of the definition of Unfunded Retention Amount Component, the close of business in London on the day on which the Unfunded Retention Amount Component is determined;

(v)    for the purpose of Clause 29.2, the close of business in London on the day on which the Unfunded Retention Amount is Reduced;

(vi)   for the purpose of Clause 29.5.2, the close of business in London on the day on which the Funded Retention Amount in respect of each currency other than the Relevant Currency is increased;

(vii)  for the purpose of Clause 30.2.2, the close of business in London on the day on which the Funded Retention Amount is determined; and

(viii) for the purpose of Clause 33.3, the close of business in London on the Administration Date,

provided that, if the Company determines that it is not reasonably practicable for it to determine the foreign currency exchange rate as at the close of business in London, then

|  | such other time as the Company determines in its absolute discretion |
|---|---|
| "**Relevant Information**" | has the meaning set out in Clause 12.1 |
| "**Relevant Period**" | has the meaning set out in Clause 25.3.2(i) |
| "**Relevant Securities**" | has the meaning set out in Clause 15.4.3 |
| "**Representation and Warranty**" | any Initial Representation and Warranty or Information Representation and Warranty, and "**Representations and Warranties**" shall be construed accordingly |
| "**Representative Offeree**" | any Eligible Offeree who is acting as an agent, trustee, custodian or other similar representative on behalf of its clients or other third parties (excluding any Eligible Offeree who is acting as an authorised signatory on behalf of and with the power to bind its principal to enter into this Agreement) |
| "**Representative Signatory**" | a Representative Offeree who becomes a Signatory to this Agreement |
| "**Reserved Assets**" | at any time, means such amount of Distributable Trust Assets designated as such in accordance with Clause 44.2 and which has not ceased to be so designated in accordance with Clause 44.3 |
| "**Reset Date**" | the last Business Day in London of every month following the Effective Date |
| "**Retention Allocation**" | has the meaning set out in Clause 29.5.2(ii) |
| "**Retention Amount**" | an amount determined in accordance with Clause 28 |
| "**Retention Claim**" | has the meaning set out in Clause 26.1 |
| "**Retention Claim Amount**" | has the meaning set out in Clause 28 |
| "**Retention Claim Identification Cut-Off Time**" | has the meaning set out in Clause 27 |
| "**Retention Creditor**" | on any date, any person which has notified the Company of a Retention Claim in accordance with Clause 28 or is otherwise determined by the Company based on Relevant Information to have a Retention Claim as at such date |
| "**Retention Decrease Amount**" | has the meaning set out in Clause 29.5 |
| "**Returned Asset**" | at any time, any Asset comprising a Distribution that has been delivered to a Signatory by the Company prior to such time pursuant to Clause 60 |
| "**Revised Forum Notice**" | has the meaning set out in Clause 68.6 |
| "**Revised Offer**" | has the meaning set out in paragraph 7.7 of Schedule 1 |
| "**Satisfied Claimant**" | has the meaning set out in Clause 50(ii) |
| "**Scheme**" | a scheme of arrangement proposed or to be proposed by the Company under Part 26 of the Companies Act for the purpose |

|  | of dealing with the claims of general unsecured creditors of the Company |
|---|---|
| "**Securities Covered By Client Money**" | in respect of a Signatory, any Securities: |

(i)     which were recorded in the Books and Records of the Company at the Time of Administration as Securities which, pursuant to a legal or equitable obligation of the Company, should have been held by the Company as Custody Securities or Non-Custody Securities (as applicable) for that Signatory but which were not so held; and

(ii)    in respect of which the Company, prior to and at the Time of Administration, held as Client Money in a client bank account (as defined under the CASS Rules) an amount of money determined by the Company from time to time as equivalent to the value of such Securities, to which Client Money the Signatory is entitled under the CASS Rules

| "**Security**" or "**Securities**" | any Financial Instrument or any right in respect of any Financial Instrument against a custodian, clearing system, depositary, nominee or other person who holds assets (including, for the avoidance of doubt, rights in respect of assets) on behalf of or to the order of a person who holds such Financial Instrument |
|---|---|
| "**Security Claim**" | any Claim asserted by a Security Interest Claimant that it has a Security Interest |
| "**Security Interest**" | any legal, equitable or possessory interest (or equivalent under a legal system outside England) of a person (a "**Security Interest Claimant**") in an identified or identifiable asset that is in the nature of a lien, pledge or security that encumbers the entitlement of the Pledgor to that asset until one or more obligations of the Pledgor to the Security Interest Claimant are discharged in full |
| "**Security Interest Claimant**" | has the meaning set out in the definition of "Security Interest" |
| "**Segregated Asset**" | any Security which was recorded in the Books and Records of the Company as at the Time of Administration as being held in a segregated manner for customers of the Company separately from other Securities held by the Company which are available to the unsecured creditors of the Company and which was: |

(i)     held in physical form by the Company and segregated from other Securities held in physical form by the Company which are not credited to an account of a customer of the Company;

(ii)    held in physical form by an Intermediary for the Company's customers and segregated from other Securities held in physical form by such Intermediary which are not credited to an account of a customer of

such Intermediary; or

(iii)   if not held in physical form by an Intermediary,

    (a)   credited to an account designated in the Books and Records of the Intermediary as an account in the name of the Company, but being held by the Company for the benefit of its customers; or

    (b)   where the Intermediary does not designate any account recorded in its Books and Records as being for the Company's customers, credited to an account in the name of the Company

| | |
|---|---|
| **"Short Position"** | an obligation of the Signatory to deliver equivalent Securities (or pay an amount equal to their value) to the Company arising in connection with a Short Sale |
| **"Short Sale"** | a transaction which involves a sale or other transfer for value of Securities by a Signatory or by the Company for the account of the Signatory where the Signatory is required to borrow such Securities from the Company at the time of sale or transfer, and in connection with which the Signatory assumes an obligation to deliver equivalent Securities (or to pay an amount equal to their value) to the Company at a future date |
| **"Shortfall For Appropriation"** | has the meaning set out in Clause 60.6.2 |
| **"Shortfall Signatory"** | has the meaning set out in Clause 49 |
| **"Signatory"** | has the meaning given to it on page III-9 of this Agreement |
| **"Single Customer"** | has the meaning set out in Clause 43.2.1 |
| **"Single Customer Pool"** | has the meaning set out in Clause 43.2.1 |
| **"Spot Rate"** | in respect of a conversion of a currency (the "**Original Currency**") into another currency (the "**Target Currency**"), the rate at which the Target Currency may be purchased in the London spot market using the Original Currency at the Relevant FX Conversion Time, as determined by the Company in its absolute discretion |
| **"Standard Terms"** | has the meaning set out in Clause 14.2 |
| **"Statement of Case"** | has the meaning set out in Clause 70.10 |
| **"Statutory Trust"** | the statutory trust created by the CASS Rules |
| **"Stock Line"** | has the meaning set out in Clause 34.2 |
| **"Sub-Intermediary"** | in respect of each Intermediary, a custodian, clearing system, depository, nominee or other person which holds assets (including rights in respect of assets) on behalf of or to the order of such Intermediary, and which has a direct or (through one or more Sub-Intermediaries) indirect contractual or fiduciary relationship with the Intermediary in relation to those assets |
| **"Subsidiary"** | in relation to the Company or its Holding Company, any |

company, corporation or other legal entity:

(i) which is controlled, directly or indirectly, by the Company or its Holding Company;

(ii) more than half the issued share capital of which is beneficially owned, directly or indirectly, by the Company or its Holding Company; or

(iii) which is a subsidiary of another Subsidiary of the Company or its Holding Company,

and, for this purpose, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of the majority of its board of directors or equivalent body

| | |
|---|---|
| "**Surplus Assets**" | has the meaning set out in Clause 63.7 |
| "**Surviving Claim**" | has the meaning set out in Clause 4.6.1 |
| "**Suspended Allocation Amount**" | has the meaning set out in Clause 45.3.5 |
| "**TA Claimant**" | any TA Signatory or TA Non-Signatory |
| "**TA Claimant Amount**" | has the meaning set out in Clause 36.3 |
| "**TA Non-Signatory**" | has the meaning set out in Clause 44.1 |
| "**TA Offerees**" | has the meaning set out in paragraph 3.1 of Schedule 1 |
| "**TA Signatory**" | any Signatory that asserts, or any Signatory that the Company believes has, an Asset Claim |
| "**Tax**" | all forms of taxation, whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or otherwise and shall further include payments in respect of or on account of such forms of taxation, in each case whether of the United Kingdom or elsewhere in the world whenever imposed and whether chargeable directly or primarily against or attributable directly or primarily to the Company, a Signatory or any other person |
| "**Tax Authority**" | any taxing or other authority competent to impose any liability in respect of Tax, or responsible for the administration and/or collection of Tax or enforcement of any law in relation to Tax |
| "**terminated**" | in respect of a Financial Contract, that the relevant contract has matured or expired or, as the context requires, been terminated, accelerated, closed out, or the payment or delivery rights and obligations arising under it have fallen due or been crystallised, or other similar event has occurred, either: |

(i) by operation of the contract (including, for the avoidance of doubt, where such event takes effect automatically, by effluxion of time or where the Signatory has effectively served a Notice of Termination in respect of such Financial Contract to the Company which terminates such Financial Contract in accordance with its terms); or

|  | (ii)    by operation of Clause 19, |
|  | and "**terminate**" and "**termination**" shall be construed accordingly |
| "**Third Party**" | means in relation to any contract, a person who is not a party to that contract |
| "**Third Party Obligation**" | has the meaning set out in Clause 4.6.1 |
| "**Time of Administration**" | 7.56 a.m. (London time) on the Administration Date |
| "**Total Claim Amount**" | has the meaning set out in Clause 40 |
| "**Total Claim Value**" | has the meaning set out in Clause 45.1 |
| "**Total Collateralisation Amount**" | has the meaning set out in Clause 59.7.1 |
| "**Transfer**" | in relation to any asset or liability, the assignment, novation, sale or any other form of transfer (including any succession in title arising by operation of insolvency or any other law), which is effective to transfer the title to, rights of and obligations under such asset or liability, as the case may be, from one person to another and "**Transferred**" shall be construed accordingly |
| "**Transferee**" | means any Signatory to whom one or more Positions or Entire Positions have been Transferred |
| "**Transferor**" | means any person who makes a Transfer of one or more Positions or an Entire Position to a Signatory |
| "**Transferred Position**" | any Position that has been Transferred |
| "**Trust Assets**" | at any time, any Assets which fulfil the following criteria at such time: |
|  | (i)    they are a Segregated Asset, a Derived Asset or a Recovered Asset; and |
|  | (ii)    they are not Excluded Property |
| "**Unaffected Close-Out Components**" | has the meaning set out in Clause 21.5.2(ii) |
| "**Unallocated**" | has the meaning set out in Clause 34.1 |
| "**Unclaimed Distribution**" | has the meaning set out in Clause 63.6 |
| "**Uncollateralised Net Financial Liability**" | has the meaning set out in Clause 59.8 |
| "**Undertaking**" | any of the undertakings given by the Signatory under Clauses 4.8.3, 6.5, 32.1, 59.6.2, 65.5, 65.6, 68.9 and 88, and "**Undertakings**" shall be construed accordingly |
| "**Unfunded Retention Amount**" | has the meaning set out in Clause 29.1 |
| "**Unfunded Retention Amount Component**" | in respect of each currency, that portion of the Unfunded Retention Amount that comprises the aggregate Retention Claim Amounts denominated in such currency converted into US dollars using the Spot Rate as of the Relevant FX Conversion Time |

| | |
|---|---|
| "**Unpaid Amounts**" | has the meaning set out in Clause 23.5 |
| "**Unpaid Amount Deliverables**" | has the meaning set out in Clause 23.5.2 |
| "**unsecured creditors**" | those persons who have unsecured claims against the Company |
| "**Updated Position and Balance Statement**" | the updated position and balance statement provided to each TA Offeree by the Company through the Portal on or around the date of this Agreement |
| "**US dollars**" or "**US$**" | the lawful currency of the United States of America |
| "**USD-LIBOR**" | on any Reset Date, the London Inter-Bank Offered Rate for deposits in US dollars for a designated maturity of one month which appears on the Telerate Page 3750 as of 11.00 a.m. (London time) on the day which is two London Business Days prior to such Reset Date and, if such rate does not appear on the Telerate Page 3750, then the rate for such Reset Date will be determined on the basis of the arithmetic mean of the rates at which deposits in US dollars are offered by at least three major banks in the London interbank market to prime banks in the London interbank market for a designated maturity of one month commencing on that Reset Date and in a representative amount of a reasonable size, as determined by the Company |
| "**User ID**" | has the meaning set out in Clause 89.2.1 |
| "**Valuation Expert**" | an independent valuation expert appointed pursuant to Clause 69.2 |
| "**Valuation Expert Contest Notice**" | has the meaning set out in Clause 68.5 |
| "**Valuation Statement**" | in respect of each Financial Contract, one or more statements that, when taken together, show in reasonable detail the calculation of the relevant Close-Out Amount or Close-Out Components for such Financial Contract. Such statement(s) may be contained within any other Notice or document which the Signatory may send to the Company in accordance with this Agreement, including, for the avoidance of doubt, any supplementary information provided by the Signatory in accordance with Clause 21.8.5 |
| "**Valuation Submission Date**" | in respect of each Signatory, 30 Business Days after its relevant Open Contract Termination Date, unless the Company has: |
| | (i)   amended the Contractual Valuation Provisions of a Financial Contract in accordance with Clause 21.5.1 or 21.6.1; or |
| | (ii)  determined to treat a Financial Contract as two separate Financial Contracts in accordance with Clause 21.5.2, |
| | in which case the Valuation Submission Date in relation to such Financial Contract shall be the day falling 20 Business |

|  | Days after the Company has Notified the relevant Signatory of the relevant amendments. For the avoidance of doubt, the Valuation Submission Date in respect of Clause 21.7.3 and Clause 21.8.1 shall be 30 Business Days after the relevant Open Contract Termination Date of a Signatory in respect of its Closed Contracts |

"**Value**"  unless otherwise specifically provided in this Agreement:

(i)   in respect of any Financial Contract, the Close-Out Amount of such Financial Contract as determined in accordance with the applicable Financial Contract Valuation Methodology set out in Clauses 19 to 24;

(ii)  in respect of any Relevant Asset, the Value of such Relevant Asset as determined in accordance with the Asset Valuation Methodology set out in Clause 17.1;

(iii) in respect of a monetary amount of a given currency, the value in that currency of that monetary amount; and

(iv)  in respect of a variable that is itself a composite of other variables, its Value shall be determined with regard to the Value of each of its composite elements,

and "**Valuation**" and "**Valued**" shall be construed accordingly

"**VAT**"  within the European Union, such tax as may be levied in accordance with (but subject to derogations from) the Directive 2006/112/EC and outside the European Union any tax levied by reference to added value or sales

"**Website**"  the Company's site on the website of PricewaterhouseCoopers LLP at *http://www.pwc.co.uk/eng/issues/lehman_updates.html*

## 97    Interpretation

97.1    In this Agreement, unless the context otherwise requires or unless otherwise expressly provided:

97.1.1   references to any specified provision of this Agreement shall be construed as references to that provision subject to any modification, addition or condition approved or imposed pursuant to Clause 80;

97.1.2   references to a "**person**" include any company, unincorporated association or partnership, whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

97.1.3   references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

97.1.4   words importing the plural shall include the singular and vice versa and words importing one gender shall include all genders;

97.1.5   headings are for ease of reference only and shall not affect the interpretation of this Agreement;

97.1.6   references to Clauses, Parts and Schedules are to Clauses and Parts of and Schedules to this Agreement, and references to time are to London time;

97.1.7   if there is any ambiguity, inconsistency, discrepancy or conflict between this Agreement and any other part of the Circular, this Agreement shall prevail;

97.1.8   the language which governs the interpretation of this Agreement is the English language. All notices to be given by any Party and all other communications and documentation which are in any way relevant to this Agreement or the performance or termination of this Agreement shall be in the English language;

97.1.9   the words "**include**" and "**including**" are to be construed without limitation;

97.1.10  a reference to "**indebtedness**" includes any obligation (whether incurred as principal or surety or otherwise) for the payment or repayment of money, whether present or future, actual or contingent;

97.1.11  a reference to a "**judgment**" includes any order, injunction, determination, award or other judicial or arbitral measure in any jurisdiction; and

97.1.12  a reference to a "**law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatever (and "**lawful**" and "**unlawful**" shall be construed accordingly).

97.2     In determining whether any action is "**reasonably practicable**" for the Company for the purposes of this Agreement, regard shall be had to:

97.2.1   the fact that the Company is in administration;

97.2.2   the fact that the Company is not operating as an investment bank whose business includes prime brokerage services;

97.2.3   the actual limitations on access to Books and Records of the Company and other resources;

97.2.4   the materiality of the likely impact of such action on the Company's aim to control costs and to deal with matters arising under this Agreement expeditiously; and

97.2.5   any other matters of order or more general application.

# SCHEDULE 1
# TERMS AND CONDITIONS OF THE OFFER

## 1      The Offer

1.1      The Company hereby makes an offer (the "**Offer**"), on the terms and subject to the conditions set out in this Schedule 1 and the Form of Acceptance, to Eligible Offerees (as defined in paragraph 3 below) to enter into and be bound by all of the provisions of the Claim Resolution Agreement (the "**Agreement**") as if they had signed the Agreement itself.

1.2      Eligible Offerees may accept the Offer by completing and submitting, in accordance with paragraph 8 below, a form of acceptance to the Company in the form set out in Schedule 2 to the Agreement (the "**Form of Acceptance**"), subject to the provisions set out in this Schedule 1.

## 2      General

2.1      The terms and conditions set out in this Schedule 1 apply to the Offer and, once the Agreement is effective, are incorporated in and form part of the Agreement. Unless the context requires otherwise, capitalised terms used in this Schedule 1 have the same meaning as ascribed to them in the Agreement and any reference to "**Signatory**" in the definition of such capitalised term in the Agreement shall be construed as a reference to "**Eligible Offeree**" in this Schedule 1.

2.2      Except where the context otherwise requires, in this Schedule 1 and in the Form of Acceptance:

2.2.1      "**Closing Date**" means 5.00 p.m. (London time) on Tuesday 29 December 2009 (or such later time and/or date as may apply under paragraph 7.7 below or as the Company may decide in accordance with paragraph 7.3 below);

2.2.2      "**Initial Offer Period**" means the period from the date of the Circular until the Closing Date;

2.2.3      any reference to the "**Offer**", "**Closing Date**" or the "**Initial Offer Period**" includes any revision or variation to or extension of it in accordance with this Schedule 1; and

2.2.4      any reference to a person having an "**Ownership Claim**" or being party to a "**Financial Contract**" as at the Time of Administration includes a person to whom such claim or contract has been Transferred, subject to paragraph 8.8.1 below.

## 3      Eligible Offerees

3.1      The Offer is open for acceptance, subject to paragraph 9.1 and paragraph 13.5 below, by those persons who, at the date of the Circular:

3.1.1      have Ownership Claims to Segregated Assets as at the Time of Administration (the "**TA Offerees**"); and

3.1.2      are not TA Offerees but who are party to Financial Contracts with the Company as at the Time of Administration (the "**NTA Offerees**").

3.2      Each TA Offeree or, as the case may be, NTA Offeree is referred to in this Schedule 1 as an "**Eligible Offeree**" and together, the "**Eligible Offerees**".

**3.3**     The Company reserves the right to determine whether a person is eligible to accept the Offer pursuant to paragraph 3.1 above.

**3.4**     The following criteria shall not of themselves disqualify a person from being a TA Offeree:

**3.4.1**     the fact that the Company or any other person may have Claims of any nature whatsoever against that person whether or not those Claims are ascertained, capable of being reduced by any set-off, netting, withholding, combination of accounts, retention and/or any other similar operation and irrespective of the amount of such Claims;

**3.4.2**     any defect in the title which the Company itself or any Intermediary may have to the Trust Assets which are the subject of the relevant Ownership Claim provided that such defect in title did not have the effect that none of the relevant Assets were held as Segregated Assets;

**3.4.3**     the fact that any other person also has an Ownership Claim to the same Segregated Assets; and

**3.4.4**     the fact that such person's Ownership Claim is disputed, uncertain, conditional, unascertained, future or contingent and regardless of whichever system of law may govern the Ownership Claim provided such claim is of a type the courts of England would be prepared to recognise and enforce.

**3.5**     In determining whether a person is a TA Offeree, no regard shall be had to the application upon or after the Time of Administration of any provision of any Financial Contract which would or might result in a person not having an Ownership Claim to Segregated Assets if: (i) that person had an Ownership Claim to Segregated Assets immediately prior to the Time of Administration; and (ii) that person would have an Ownership Claim to Segregated Assets at the time of the Offer but for the application of such provision.

**4     Conditions to the Offer**

**4.1**     The Offer is subject to the following conditions (the "**Conditions**"):

**4.1.1**     valid Forms of Acceptance being received, in accordance with paragraph 8.4 below, by the Company by the Closing Date from Acceptance Threshold Offerees who represent not less than 90 per cent. of the Acceptance Value of the Acceptance Threshold Claims in aggregate.

This Condition 4.1.1 is referred to in this Schedule 1 as the "**Acceptance Condition**";

**4.1.2**     the Company having obtained from the Court, following its application for leave to distribute assets after a bar date, an order in terms acceptable to the Company as regards liberty to distribute assets; and

**4.1.3**     prior to the time at which the Offer would otherwise become or be declared unconditional in all respects, no government or governmental, quasi-governmental, regulatory or investigative body, court, authority, or any other similar body or person in any jurisdiction having given notice of a decision to take, institute or threaten any action or suit, or having required any action to be taken, or otherwise having done anything, which, in the absolute opinion of the Company, would:

(i)     make the Agreement or its implementation void, unenforceable or illegal (in whole or in part); or

(ii)     restrict or delay to a material extent or otherwise materially interfere with the implementation or require material amendment of the Agreement.

**4.2**   For the purposes of the Acceptance Condition:

**4.2.1**   "**Acceptance Threshold Claims**" means Ownership Claims to Distributable Trust Assets of each Acceptance Threshold Offeree that appear in the Books and Records of the Company as at the statement date of such Acceptance Threshold Offeree's Updated Position and Balance Statement as determined by the Company.

**4.2.2**   "**Acceptance Threshold Offerees**" means the TA Offerees with Acceptance Threshold Claims excluding those TA Offerees who are:

(i)     Representative Offerees; and

(ii)     such other TA Offerees as the Company may decide, in its absolute discretion, to exclude as Acceptance Threshold Offerees.

**4.2.3**   "**Acceptance Value**" means, in respect of each Acceptance Threshold Offeree, the aggregate of the values of such Acceptance Threshold Offeree's Custody Long Positions, Charge Long Positions and Pledge Positions as determined by the Company and provided to each Acceptance Threshold Offeree on its Updated Position and Balance Statement.

**4.3**   The Acceptance Values will be used by the Company solely for the purpose of determining the level of acceptances in relation to the Offer. They are not determinative of any rights or claims of any person and are not an indication of any allocation or distribution of assets or calculations of claims or liabilities that a person may receive or have under the Agreement.

**4.4**   The Company reserves the right to withdraw the Offer at any time before the Effective Date if any of the Conditions set out in paragraph 4.1 above in the absolute opinion of the Company is not satisfied or is not capable of being satisfied. In such circumstances, the Company will notify Eligible Offerees of its withdrawal in accordance with the provisions of paragraph 14 below.

**4.5**   The Company will not invoke any of the Conditions set out in paragraph 4.1 above so as to cause the Offer not to proceed, to lapse or to be withdrawn unless the circumstances which give rise to the right to invoke the relevant Condition are, in the absolute opinion of the Company, of material significance in the context of the Offer.

**5**     **Waiver of Acceptance Condition**

**5.1**   The Company may waive the Acceptance Condition with the consent of Acceptance Threshold Offerees who represent not less than 90 per cent. of the Acceptance Value of the Acceptance Threshold Claims (in aggregate) of those Acceptance Threshold Offerees who have submitted a Form of Acceptance to the Company (as at the date of notification by the Company of the proposed waiver or such other date as the Company may decide).

**5.2**   As soon as practicable after it decides that it wishes to waive the Acceptance Condition, the Company shall notify (in accordance with the provisions of paragraph 14 below) each Acceptance Threshold Offeree who has submitted a Form of Acceptance to the Company and request consent from each such Acceptance Threshold Offeree to the waiver of the Acceptance Condition by such date as the Company may decide.

**5.3**   If the requisite majority set out in paragraph 5.1 above consent to the waiver of the Acceptance Condition, each Eligible Offeree who has submitted a Form of Acceptance to the

Company (whether before or after the waiver of the Acceptance Condition) shall be bound by such waiver and shall not have a right to withdraw its Form of Acceptance on the basis of or by reason of such waiver.

5.4     As soon as practicable after the waiver of the Acceptance Condition in accordance with the provisions of this paragraph 5, the Company shall notify the Eligible Offerees (in accordance with the provisions of paragraph 14 below) of such waiver.

5.5     The waiver of the Acceptance Condition shall take effect on such date as the Company may determine, provided that consent to the waiver is obtained from Acceptance Threshold Offerees in accordance with paragraph 5.1 above.

## 6       Waiver of other Conditions

6.1     The Company reserves the right to waive, in whole or in part, at any time before the Effective Date, all or any of the Conditions set out in paragraph 4.1 above except for the Acceptance Condition which shall be subject to the provisions of paragraph 5 above.

6.2     As soon as practicable after it decides to waive any of the Conditions set out in paragraph 4.1 above other than the Acceptance Condition, the Company shall notify the Eligible Offerees (in accordance with the provisions of paragraph 14 below) of such waiver which shall take effect on such date as the Company may determine.

## 7       Acceptance period

7.1     The Offer will be open for acceptance by Eligible Offerees at any time during the Initial Offer Period.

7.2     If the Acceptance Condition is satisfied on or before the Closing Date, the Company will notify the Eligible Offerees (in accordance with the provisions of paragraph 14 below) that the Offer has become unconditional as to acceptances (but is subject to any other conditions that remain unsatisfied in the absolute opinion of the Company).

7.3     If, at any time prior to the Closing Date, the Acceptance Condition has not been satisfied or waived in the absolute opinion of the Company, or for any other reason in its sole discretion, the Company:

    7.3.1    may extend the Closing Date to such later time and/or date as the Company may determine, subject to paragraph 7.4 below; and

    7.3.2    will notify Eligible Offerees of the new Closing Date in accordance with the provisions of paragraph 14 below.

7.4     The Company may extend the Closing Date from 5.00 p.m. (London time) on Tuesday 29 December 2009 to a time and date that is no later than 5.00 p.m. (London time) on Friday 26 February 2010. Any further extension by the Company of the Closing Date beyond such time and date shall be subject to the approval of the Creditors' Committee.

7.5     The Offer will lapse:

    7.5.1    in the case of TA Offerees:

        (i)     if the Acceptance Condition has not been satisfied or waived by the Closing Date, provided that the Company has decided not to extend the Closing Date pursuant to paragraph 7.3 above; or

      (ii)    if all of the Conditions set out in paragraph 4.1 above (other than the Acceptance Condition) have not been satisfied or waived by 5.00 p.m. (London time) on Wednesday 30 June 2010.

**7.5.2** in the case of NTA Offerees:

      (i)    if the Acceptance Condition has not been satisfied or waived by the Closing Date, provided that the Company has decided not to extend the Closing Date pursuant to paragraph 7.3 above;

      (ii)    if all of the Conditions set out in paragraph 4.1 above (other than the Acceptance Condition) have not been satisfied or waived by 5.00 p.m. (London time) on Wednesday 30 June 2010; or

      (iii)    if the NTA Condition (as defined in paragraph 9 below) is not satisfied or waived by 5.00 p.m. (London time) on Wednesday 30 June 2010 or such later time and/or date as the Company may decide.

**7.5.3** If the Offer lapses in relation to TA Offerees pursuant to paragraph 7.5.1 above, the Company will notify the TA Offerees in accordance with the provisions of paragraph 14 below.

**7.5.4** If the Offer lapses in relation to NTA Offerees pursuant to paragraph 7.5.2 above, the Company will notify the NTA Offerees in accordance with the provisions of paragraph 14 below.

**7.6** If the Offer lapses pursuant to paragraph 7.5.1 or 7.5.2 above, it will cease to be capable of further acceptance and the Company and any TA Offeree or, as the case may be, NTA Offeree who has submitted a Form of Acceptance at or prior to the time when the Offer so lapses will cease to be bound by such Form of Acceptance.

**7.7** If any term of the Offer is revised by the Company in accordance with the provisions of paragraph 11 below (the "**Revised Offer**"), the Revised Offer will remain open for acceptance until, whichever is later:

**7.7.1** the Closing Date; or

**7.7.2** the day which is 14 days from the date on which written notification of the revision is provided by the Company to Eligible Offerees, in which case the Closing Date shall be deemed to be extended to such date.

**7.8** Notwithstanding that the Offer may have become unconditional as to acceptances or that the Effective Date of the Agreement may have been declared in accordance with paragraph 12 below, the Company reserves the right to keep the Offer open for acceptance by Eligible Offerees to such later time and/or date after the end of the Initial Offer Period as it may determine or for an indefinite period after the end of the Initial Offer Period (the "**Extended Offer Period**").

**7.9** In the event that the Company decides to have an Extended Offer Period by keeping the Offer open after the end of the Initial Offer Period, the Company will notify Eligible Offerees in accordance with the provisions of paragraph 14 below.

**7.10** After the end of the Initial Offer Period or, as the case may be, the end of the Extended Offer Period, the Company reserves the right to make further offers to Eligible Offerees, including a restricted number or category of Eligible Offerees that may comprise only one person, to enter into the Agreement (each a "**Further Offer**").

7.11    Each Further Offer shall be subject to such terms and conditions (if any) as the Company may determine, provided that any such terms and/or conditions shall not be more favourable, in the absolute opinion of the Company, to the Eligible Offerees to whom any such Further Offer is made than the terms and conditions of the Offer set out in this Schedule 1.

7.12    Those Eligible Offerees whose Forms of Acceptance are received by the Company after the end of the Initial Offer Period will be subject to higher Costs Amounts than those whose Forms of Acceptance are received by the Company before the end of the Initial Offer Period (subject to and in accordance with the provisions of the Agreement).

## 8    Form of Acceptance

8.1    Each Eligible Offeree who wishes to accept the Offer must complete, execute and submit (or authorise the completion, execution and submission of) a Form of Acceptance to the Company, subject to paragraph 10 below.

8.2    Each Form of Acceptance submitted by or on behalf of an Eligible Offeree must include an electronic mail address to which notices and communications may be sent by the Company in accordance with the provisions of paragraph 14 below.

8.3    Each Form of Acceptance submitted by or on behalf of an Eligible Offeree must also include a disclosure of whether that person is:

8.3.1    acting as principal on its own behalf or as an authorised signatory executing the Form of Acceptance on behalf of and with authority to bind its principal to the Agreement; or

8.3.2    acting as a Representative Offeree (in which case the provisions of paragraph 10 below shall apply).

8.4    A completed and signed Form of Acceptance must be submitted to the Company by emailing a scanned copy to claimresolutionagreement@lbia-eu.com or by faxing a copy to +44 (0)20 7067 8542. As soon as possible after the Form of Acceptance has been so submitted by electronic mail or facsimile, the original must be sent to the Company by pre-paid post or air mail to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, PO Box 62492, London E14 1JX, United Kingdom or by courier only to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, 25 Bank Street, Canary Wharf, London E14 5LE, United Kingdom (marked for the attention of E. Levy).

8.5    Forms of Acceptance must be submitted to the Company as soon as possible and in any event so as to be received by the Company by electronic mail or facsimile no later than the Closing Date (subject to paragraphs 7.8 and 7.10 above).

8.6    Without prejudice to any other provision in this Schedule 1, the Company reserves the right to treat a Form of Acceptance as being validly submitted to the Company even if the Form of Acceptance is not entirely in order or complete or is not received in the manner stated in this Schedule 1.

8.7    As soon as practicable after it receives a Form of Acceptance from an Eligible Offeree by electronic mail or facsimile, the Company will send an electronic mail to such Eligible Offeree confirming receipt of its Form of Acceptance. The date of receipt by the Company of a duly completed and signed Form of Acceptance submitted by an Eligible Offeree by electronic mail or facsimile is referred to as the "**Acceptance Date**" of such Eligible Offeree.

8.8    Each Eligible Offeree by whom or on whose behalf a Form of Acceptance is executed (save for a Representative Offeree in which case paragraph 10 below shall apply) irrevocably

undertakes, represents, warrants and agrees to and with the Company as at its Acceptance Date (so as to bind such person and its personal representatives, heirs, successors and assignees) to the following effect that:

8.8.1    the execution of a Form of Acceptance constitutes, on and subject to the terms and conditions set out in this Schedule 1:

(i)      an irrevocable acceptance of the Offer (subject to the right of withdrawal in the circumstances described in paragraph 11.3 below and the right of exclusion of the Company in paragraph 13.5 below);

(ii)     an undertaking to execute any further documents and give any further assurances as may be reasonably requested by the Company in order to implement the Agreement;

(iii)    a representation and warranty that such person has not Transferred its Entire Position prior to its Acceptance Date; and

(iv)    an undertaking that, except in accordance with the Agreement, such person shall not Transfer any of its Positions after its Acceptance Date;

8.8.2    it is duly organised and validly existing under the laws of its jurisdiction of incorporation, or (if not applicable) under the laws under which it is established, and, if relevant under such laws, in good standing and has full power and authority to conduct its business activities;

8.8.3    it has (or, in respect of completed actions, at the relevant time had) the power to execute the Form of Acceptance, the Agreement and any documentation relating to the Agreement to which it is a party, to deliver the Form of Acceptance, the Agreement and any documentation relating to the Agreement that it is required to deliver, and to perform its obligations under the Form of Acceptance and the Agreement and any documentation relating to the Agreement to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

8.8.4    such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any term of provision of any agreement or instrument binding on or affecting it or any of its assets, and will not result in a breach of, or constitute a default or termination event under, any such agreement or instrument;

8.8.5    all actions or things required to be taken, fulfilled or done (including, without limitation, the obtaining of any consent or licence or the making of any filing or registration) by it with respect to the Form of Acceptance and the Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

8.8.6    its obligations under the Form of Acceptance and the Agreement constitute, or (upon the Accession Date of such Eligible Offeree) will constitute, its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in proceedings in equity or at law)); and

8.8.7    there is not pending or, to its knowledge, threatened against it any action, suit or proceedings at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of the Form of Acceptance and the Agreement or its ability to perform its obligations under the Form of Acceptance and the Agreement.

8.9    The Company reserves the right to require evidence of power and authority or any supporting documentation or supplementary information from any person who executes or submits a Form of Acceptance to the Company.

## 9    Acceptances by NTA Offerees

9.1    A Form of Acceptance submitted by an NTA Offeree to the Company shall be subject to the following condition (the "**NTA Condition**"):

9.1.1    by no later than 5.00 p.m. (London time) on Wednesday 30 June 2010 or such later time and/or date as the Company may decide, one of the following events having occurred:

     (i)    the Court declining on an application by the Administrators or the Company to permit meetings of the Company's creditors to be convened for the purposes of voting in relation to the Scheme;

     (ii)    a failure to obtain approval of the Scheme or the CVA from the requisite majority of creditors or classes of creditors at the relevant Scheme or CVA meeting(s);

     (iii)    the Court declining to sanction the Scheme;

     (iv)    the Court revoking a decision approving the CVA on the grounds of unfairness or material irregularity; or

     (v)    the Company notifying NTA Offerees that it has decided not to promulgate or propose the Scheme or the CVA.

9.2    Any Form of Acceptance submitted by an NTA Offeree shall not be valid and effective unless and until the NTA Condition is satisfied in the absolute opinion of the Company.

9.3    If the Scheme or, as the case may be, the CVA becomes effective (provided that, in the case of the CVA, it is not challengeable under section 6 of the Insolvency Act, the Offer in relation to NTA Offerees will be treated as having automatically lapsed as from the effective date of the Scheme or, as the case may be, the CVA (subject to the provisions of paragraphs 7.5.2 and 7.5.4 above). The Offer will thereafter cease to be capable of acceptance by any NTA Offeree and the Company and any NTA Offeree who has submitted a Form of Acceptance at or prior to the time when the Offer so lapses will cease to be bound by such Form of Acceptance.

9.4    The Company reserves the right to waive the NTA Condition, in whole or in part, at any time before the applicable Effective Date in relation to NTA Offerees. As soon as practicable after it decides to waive the NTA Condition, the Company shall notify the NTA Offerees (in accordance with the provisions of paragraph 14 below) of such waiver which shall take effect on such date as the Company may determine.

**10      Representative Offerees**

10.1    If an Eligible Offeree is acting as a Representative Offeree, the mere execution of the Form of Acceptance will not constitute a valid acceptance or bind the Representative Offeree to the Agreement since such person is acting in a representative capacity.

10.2    Such Representative Offeree must submit its Form of Acceptance and also provide all necessary information to the Company as reasonably requested by the Company in order for the Company and such person to enter into the Agreement on a bilateral basis with such amendments as may be agreed in accordance with the provisions of Clause 2.1 of the Agreement.

**11      Revised Offer and withdrawal**

11.1    Once submitted to the Company, a Form of Acceptance shall be irrevocable, except in the circumstances specified in this paragraph 11.

11.2    Although no revision is envisaged, the Company reserves the right to revise the terms of the Offer set out in this Schedule 1 at any time before the Effective Date.

11.3    If any term of the Offer set out in this Schedule 1 is revised by the Company and such revision, in the absolute opinion of the Company, represents a material change or amendment of the Offer, the Company will notify Eligible Offerees in accordance with the provisions of paragraph 14 below. Those Eligible Offerees who have previously submitted a Form of Acceptance to the Company (the "**Previous Acceptors**") will be informed that they may withdraw such Form of Acceptance within 14 days of written notification by the Company of such revision.

11.4    If the Company does not receive written notification of withdrawal of a Form of Acceptance from a Previous Acceptor within 14 days following written notification of revision of the terms of the Offer, the Form of Acceptance previously submitted by or on behalf of such Previous Acceptor shall be deemed to be, and will be treated as, valid in respect of the Offer as so revised.

11.5    This paragraph 11 shall not apply to waiver of any of the Conditions set out in paragraph 4.1 above, which shall be subject to the provisions of paragraphs 5 and 6 above, nor to waiver of the NTA Condition which shall be subject to the provisions of paragraph 9.4 above.

**12      Declaration of Effective Date**

12.1    The Company shall declare the Effective Date of the Agreement in relation to the TA Offerees as soon as practicable after all of the Conditions set out in paragraph 4.1 above have, in the absolute opinion of the Company, been satisfied or waived by the Company in accordance with paragraphs 5 and 6 above.

12.2    The Company shall declare the Effective Date of the Agreement in relation to the NTA Offerees as soon as practicable after all of the Conditions set out in paragraph 4.1 above and the NTA Condition have, in the absolute opinion of the Company, been satisfied or waived by the Company in accordance with paragraph 9.4 above.

12.3    The Company shall, as applicable, confirm to the TA Offerees or, as the case may be, the NTA Offerees that the Offer has become unconditional in all respects and notify them of their applicable Effective Date in accordance with the provisions of paragraph 14 below.

## 13      Notification of Accession Date

**13.1**   The Company shall confirm (in accordance with the provisions of paragraph 14 below) to each person who has submitted a Form of Acceptance whether such Form of Acceptance has been validly submitted and whether such person is or is not a Signatory to the Agreement.

**13.2**   The Company reserves the right, in its absolute discretion, to consider and deal with Forms of Acceptance which are received by the Company from TA Offerees as a priority ahead of those Forms of Acceptance which are received by the Company from NTA Offerees.

**13.3**   In the case of a TA Offeree, the confirmation pursuant to paragraph 13.1 above shall be provided by the Company no later than:

**13.3.1**   the Effective Date; or

**13.3.2**   if later, 25 days after the TA Offeree's Acceptance Date.

**13.4**   In the case of an NTA Offeree, the confirmation pursuant to paragraph 13.1 above shall be provided by the Company no later than:

**13.4.1**   60 days after the satisfaction of the NTA Condition in accordance with paragraph 9.1 above, as determined by the Company; or

**13.4.2**   if later, 60 days after the NTA Offeree's Acceptance Date.

**13.5**   The Company reserves the right in its absolute discretion to exclude any person from being a party to the Agreement. No person shall be, or be treated as, a Signatory to the Agreement unless and until the Company has sent a notification in accordance with this paragraph 13 to such person confirming that that person is a Signatory to the Agreement.

## 14      Notices and announcements

**14.1**   Any notice or communication to be given or document to be sent by or on behalf of the Company pursuant to this Schedule 1 shall be in writing in English and may be delivered as the Company considers appropriate:

**14.1.1**   by electronic mail to the address specified by the recipient on its Form of Acceptance or provided otherwise to the Company;

**14.1.2**   where applicable, via the Portal to TA Offerees;

**14.1.3**   by an announcement or update published on the Website; or

**14.1.4**   by post or air mail to the address specified by the recipient or the last known address of such person.

**14.2**   Any notice or communication given or document sent by or on behalf of the Company pursuant to this Schedule 1 shall be deemed to be received by the recipient at the time stated in Clause 89 or Clause 91 of the Agreement as applicable.

**14.3**   Save as otherwise specified in this Schedule 1, any notice or communication to be given or document to be sent to the Company pursuant to this Schedule 1 shall be in writing in English and may be delivered to the Company:

**14.3.1**   by electronic mail to claimresolutionagreement@lbia-eu.com; or

**14.3.2**   by facsimile to +44 (0)20 7067 8542.

## 15  Governing law and jurisdiction

15.1  All matters and disputes arising out of or in connection with the Offer or the Form of Acceptance shall be governed by, and construed in accordance with, English law.

15.2  The execution of a Form of Acceptance by or on behalf of an Eligible Offeree constitutes such Eligible Offeree's:

15.2.1  submission to the exclusive jurisdiction of the courts of England in relation to all matters and disputes arising out of or in connection with the Offer or the Form of Acceptance; and

15.2.2  agreement that nothing shall limit the right of the Company to bring any Proceedings arising out of or in connection with the Offer or the Form of Acceptance in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

## SCHEDULE 2
## FORM OF ACCEPTANCE

### THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.

**If you are in any doubt about the action you should take, you are recommended to seek advice immediately from your own professional adviser.** If you have sold or otherwise transferred all of your interests as an Eligible Offeree (as defined in the Claim Resolution Agreement contained in Part III of the accompanying Circular (the "**Agreement**")), please forward this document together with the accompanying documentation as soon as possible to the purchaser or transferee, or to the stockbroker, bank or other agent through whom the sale or transfer was effected for onward transmission to the purchaser or transferee. However, such documents should not be forwarded or transmitted in or into any jurisdiction outside the United Kingdom if to do so would constitute a violation of the relevant laws in such jurisdiction.

This Form of Acceptance should be read in conjunction with the accompanying Circular and the Agreement contained therein. Unless the context otherwise requires, capitalised terms used in this Form of Acceptance have the meanings ascribed to them in the Agreement.

This document does not constitute nor does it form part of any offer to sell or to purchase or to subscribe for, or the solicitation of an offer to sell or purchase or subscribe for, any securities in any jurisdiction or territory. Certain of the securities which are the subject of the Agreement may have been issued by Affiliates of the Company (the "**Affiliate Securities**"). No offer or sale of Affiliate Securities may have been registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"). Any Affiliate Securities that may be delivered under the Agreement may not be offered or sold to other investors except as part of a transaction that is registered under the Securities Act or that is exempt from registration.

The information used by or relied upon by the Company for the purpose of determining the level of acceptances in relation to the Offer is not determinative of any rights or claims of any person and should not be used or relied upon for this or any other purpose. This information is not an indication of any allocation or distribution of assets or calculation of claims or liabilities that a person may receive or have under the Agreement. Please refer to the  Agreement for further information regarding allocations and distributions of assets and calculations of claims and liabilities.

Further copies of this document may be downloaded from the PricewaterhouseCoopers website at *http://www.pwc.co.uk/eng/issues/lehman_updates.html.*

## FORM OF ACCEPTANCE
of the Offer

in relation to a proposed

### CLAIM RESOLUTION AGREEMENT
between

### LEHMAN BROTHERS INTERNATIONAL (EUROPE)
### (in administration)
and

### ELIGIBLE OFFEREES

**You must submit your Form of Acceptance so as to be received by the Company no later than 5.00 p.m. (London time) on Tuesday 29 December 2009.**

#### ACTION TO BE TAKEN

- Your attention is drawn to the notes set out on page 4 of this Form of Acceptance and to Schedule 1 to the Agreement, the terms of which are incorporated in and form part of this Form of Acceptance. Your acceptance of the Offer is on the terms and subject to the conditions set out in Schedule 1 to the Agreement.

- If you wish to accept the Offer to enter into the Agreement, you must complete Section A of this Form of Acceptance. If you are an NTA Offeree (as defined in the Agreement), you must complete both Section A (except Box 1) and Section B of this Form of Acceptance.

- Please submit your completed and signed Form of Acceptance as soon as possible and in any event so as to be received by the Company no later than **5.00 p.m. (London time) on Tuesday 29 December 2009**. Completed and signed Forms of Acceptances may be submitted by email to claimresolutionagreement@lbia-eu.com or by facsimile to +44 (0)20 7067 8542. After you submit your Form of Acceptance by email or facsimile, you must send the original to the Company by pre-paid post or air mail to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, PO Box 62492, London E14 1JX, United Kingdom or by courier only to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, 25 Bank Street, Canary Wharf, London E14 5LE, United Kingdom (marked for the attention of E. Levy).

1

**The provisions of Schedule 1 to the Agreement are incorporated in and form part of this Form of Acceptance. Please carefully read the notes on page 4 of this Form of Acceptance before completing this Form of Acceptance.**

## SECTION A

| **1** | **TA OFFEREE'S DETAILS** <br><br> This Box 1 only applies to TA Offerees. If you are an NTA Offeree, you must provide your details in Section B of this Form of Acceptance in addition to completing Boxes 2 to 5 of this Section A. | Name:<br><br><br>GAC Code: <sup>(See Note 3)</sup> |

Name:

GAC Code: (See Note 3)

| **2** | **ACCEPT THE OFFER** <br><br> Please put a tick or an X in the box to the right. | | I wish to accept the offer to enter into the Agreement on the terms and conditions set out in Schedule 1 to the Agreement and hereby agree to be bound by all of the provisions of the Agreement contained in Part III of the Circular (subject to Note 5 below in the case of Representative Offerees). |

| **3** | **CAPACITY** <sup>(See Notes 4 and 5)</sup> <br><br> Please put a tick or an X in the appropriate box to the right to confirm the capacity in which you are executing this Form of Acceptance. | | (i) | acting as principal on my own behalf or as an authorised signatory executing this Form of Acceptance on behalf of and with authority to bind my principal to the Agreement. |

I represent that I am:

**OR**

(ii) a Representative Offeree (that is, I am acting as an agent, custodian or trustee on behalf of clients or other third parties).

| **4** | **SIGNATURE** <sup>(See Notes 6 and 7)</sup> |

Signed by or on behalf of the TA Offeree named in Box 1 above or, as the case may be, the NTA Offeree named in Box 6 overleaf.

| Signature | Name of signatory |
| Date | Title of signatory |

| **5** | **EMAIL ADDRESS** <sup>(See Note 8)</sup> <br><br> You must provide in the box to the right an email address to receive notifications from the Company in relation to the Agreement. | |

2

## SECTION B <sup>(See Note 2)</sup>

**Please complete this Section B only if you are an NTA Offeree.**

| **6** | **NTA OFFEREE'S DETAILS** | Name:<br><br><br>Client Account/ID Number: |

| **7** | **ADDRESS**<br><br>Please provide the mailing address of the NTA Offeree in the box to the right. | |

| **8** | **TELEPHONE NUMBER**<br><br>Please provide the telephone number (including the international dialling code) of the NTA Offeree in the box to the right. | |

| **9** | **FAX NUMBER**<br><br>Please provide the fax number of the NTA Offeree in the box to the right. | |

3

## Notes for Completion of the Form of Acceptance

1.  This Form of Acceptance must be completed and signed by you or on your behalf if you are an Eligible Offeree (as defined in the Agreement) and wish to accept the Offer to enter into the Agreement with the Company. Once you have completed and signed this Form of Acceptance in accordance with the instructions set out herein, this will constitute your acceptance of the Offer (subject to the terms and conditions in Schedule 1 to the Agreement) and your agreement to be bound by all of the provisions of the Agreement as if you had signed the Agreement itself (save in the circumstances set out in Note 5 below).

2.  If you are an NTA Offeree, you must complete both Section A (except Box 1) and Section B of this Form of Acceptance. A TA Offeree should complete only Section A of this Form of Acceptance. As a general guideline, you are likely to be a TA Offeree based on the Company's Books and Records if you have received, on or around the date of the Circular, a personal letter from the Company by email containing access links to the Circular and a Form of Acceptance. If you have not received such a letter from the Company and you are an Eligible Offeree, you are likely to be an NTA Offeree.

3.  Your GAC Code is your unique client reference number provided by the Company. Box 1 in Section A applies to TA Offerees only. If you are an NTA Offeree, you must provide your details (including your Client Account or ID Number) by completing all of the boxes in Section B.

4.  This Form of Acceptance must include a disclosure of whether you: (i) are acting as principal on your own behalf or as an authorised signatory executing this Form of Acceptance on behalf of and with power to bind your principal; or (ii) are a Representative Offeree (that is, you are an agent, custodian or trustee acting on behalf of clients or other third parties).

5.  If you are a Representative Offeree, the mere execution of this Form of Acceptance will not constitute a valid acceptance or bind you to the Agreement since you are acting in a representative capacity. You will need to submit your Form of Acceptance and provide all necessary information to the Company as reasonably requested by the Company in order for you and the Company to enter into the Agreement on a bilateral basis with such amendments as may be agreed in accordance with Clause 2.1 of the Agreement.

6.  Unless you are a Representative Offeree (in which case see Note 5 above), on execution of this Form of Acceptance you are deemed to give the undertakings, representations and warranties to the Company that are set out in paragraph 8.8 of Schedule 1 to the Agreement.

7.  If you are signing this Form of Acceptance as authorised signatory on behalf of the Eligible Offeree, please state your title and the capacity in which you are signing this Form of Acceptance. The Company may require you to provide evidence of power and authority or any other supporting documentation in connection with the execution and submission of this Form of Acceptance.

8.  You must provide a valid email address to which notices and communications may be sent by the Company to you in connection with the Agreement.

9.  Once this Form of Acceptance is completed and signed, you should submit this Form of Acceptance to the Company as soon as possible and in any event so as to be received by the Company by email or facsimile no later than **5.00 p.m. (London time) on Tuesday 29 December 2009**.

10. You may submit your completed and signed Form of Acceptance by emailing a scanned copy to the Company at claimresolutionagreement@lbia-eu.com or by sending a copy by facsimile to +44 (0)20 7067 8542. After submitting your Form of Acceptance by email or facsimile, you must send the original by pre-paid post or air mail to the following address: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, PO Box 62492, London E14 1JX, United Kingdom or by courier only to: Lehman Brothers International (Europe) (in administration), Trust Property 24th Floor, 25 Bank Street, Canary Wharf, London E14 5LE, United Kingdom (marked for the attention of E. Levy).

11. As soon as practicable after it receives your Form of Acceptance by email or facsimile, the Company will send an email to you to confirm receipt of your Form of Acceptance.

4

## SCHEDULE 3
## FORM OF DISPUTE NOTICE

**IMPORTANT: This Notice must be completed in full in order for it to be operative.**

| | | |
|---|---|---|
| 1 | Name of Signatory | |
| 2 | Registered address and contact details (including postal address) for Signatory | |
| 3 | Is the Signatory resident in, or does it have its principal place of business in, England or Wales? | |
| 4 | If the answer to 3 is 'NO', please complete the attached form for the appointment of an agent to accept service of process in England and Wales | |
| 5 | Please provide details of the Determination Notice that the Signatory is challenging (e.g. date and type of notice) | |
| 6 | Please specify the aspects of the Determination Notice that the Signatory is challenging | |
| 7 | Please explain the reasons why the Signatory is challenging those aspects of the Determination Notice, including the Signatory's view of the correct position/approach | |
| 8 | Please provide details (including underlying workings, where relevant) of the Signatory's calculation of any figures that it is disputing | |
| 9 | Please provide copies of any past correspondence relating to the subject matter of the dispute | |

If further space is needed to respond, additional sheets should be attached to and submitted with this form.

# SCHEDULE 4
# WRITTEN RESOLUTIONS AND MEETINGS OF SIGNATORIES

## PART I
## GENERAL

### Interpretation

**1**    In this Schedule 4:

**1.1**    references to a meeting are to a meeting of Signatories (or some of them) and include, unless the context otherwise requires, any adjournment;

**1.2**    references to "Signatories" are only to those Signatories who have rights in respect of which (i) a written resolution has been (or is to be) proposed, or (ii) a meeting has been (or is to be) called, as determined in the absolute discretion of the Company; provided that such determination shall accord with any certification made by the Company pursuant to Clause 80.2.1 of this Agreement;

**1.3**    "**agent**" means a holder of a voting certificate or a proxy for a Signatory;

**1.4**    "**Extraordinary Resolution**" means a resolution passed at a meeting duly convened and held in accordance with this Agreement, by a majority of at least 75 per cent. of the votes cast;

**1.5**    "**voting ratio**" means, in respect of a Signatory, that proportion of the aggregate applicable voting value of Signatories which is represented by the voting value attributable to the relevant Signatory; and

**1.6**    "**voting value**" means, for a Signatory, the Value (in US dollars), which the Company determines for the date of the proposed meeting or resolution, of the Signatory's Distribution Assets less its Distribution Liabilities, subject to a minimum of US$1.00; provided that those Values that have not then been finalised or agreed shall be such Values as the Company then attributes to them from its Books and Records pending their finalisation or agreement, as the case may be.

### Powers

**2**    Subject to the terms and conditions of this Agreement and without prejudice to any powers conferred on other persons by this Agreement, the Signatories (or, if applicable, a meeting of them) shall have power by Extraordinary Resolution:

**2.1**    to sanction any proposal for any amendment, modification, variation, compromise, abrogation or waiver of, or arrangement in respect of, the rights of the Company against the Signatories or the Signatories against the Company, whether or not those rights arise under this Agreement;

**2.2**    to assent to any modification of this Agreement (or any agreement supplemental to it) proposed;

**2.3**    to authorise anyone to concur in and do anything necessary to carry out and give effect to an Extraordinary Resolution;

**2.4**    to give any authority, direction or sanction required to be given by Extraordinary Resolution;

2.5    to appoint any persons (whether Signatories or not) as a committee or committees to represent the Signatories' interests and to confer on them any powers or discretions which the Signatories could themselves exercise by Extraordinary Resolution; and

2.6    to discharge or exonerate the Company from any Liability in respect of any act or omission for which it may become responsible under this Agreement (or any agreement supplemental to it).

3    Any notice or communication to be given, or document to be sent, pursuant to this Schedule (including the submission of a written resolution) shall be provided, except where this Agreement otherwise provides or the Company otherwise specifies at such time, in accordance with Clause 89, Clause 90 and Clause 91. In relation to the submission of any written resolution by, or on behalf of, a Signatory, a copy of the original shall follow by post or courier to the address specified by the Company at such time.

## PART II
## WRITTEN RESOLUTIONS

### Written resolutions

4    A written resolution signed by Signatories with 75 per cent. of the aggregate applicable voting value shall take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Signatories.

5    At least five days' notice (exclusive of the day on which the notice is given and of the day appointed for the passing of such written resolution) shall be given by the Company to the Signatories. The notice shall: (i) specify the day appointed for the passing of the written resolution, the nature of the resolution proposed, and the relevant Signatory's voting value for such purpose; and (ii) shall explain: (a) how Signatories may submit completed written resolutions; and (b) the details of the time limits applicable.

## PART III
## MEETINGS

### Convening a meeting

6    The Company may at any time convene a meeting. Every meeting shall be held at a time and place approved by the Company.

7    At least 21 days' notice (exclusive of the day on which the notice is given and of the day of the meeting) shall be given by the Company to the Signatories. The notice shall: (i) specify the day, time and place of meeting, the nature of the resolutions to be proposed, and the relevant Signatory's voting value and voting ratio; and (ii) shall explain: (a) how Signatories may appoint proxies and vote; and (b) the details of the time limits applicable and procedures concerning such matters as appointment of a chairman, who may attend and vote at the meeting, and adjournment of the meeting.

### Chairman

8    The chairman of a meeting shall be such person as the Company appoints. The chairman need not be a Signatory or agent. The chairman of an adjourned meeting need not be the same person as the chairman of the original meeting.

### Quorum and adjournment

**9** No business (except choosing a chairman, if applicable) shall be transacted at a meeting unless a quorum is present at the commencement of business. If a quorum is not present within 15 minutes from the time initially fixed for the meeting, it shall, if convened on the requisition of Signatories or if the Company agrees, be dissolved. In any other case, it shall be adjourned (in accordance with the procedures specified for the meeting). If a quorum is not present within 15 minutes from the time fixed for a meeting so adjourned, the meeting shall be dissolved.

**10** Two or more Signatories or agents present in person shall be a quorum only if they represent:

**10.1** in the case of any meeting (except where such meeting was previously adjourned through want of quorum), 25 per cent. of the proportion of the total number of persons who are entitled to attend and vote at the meeting which they represent; and

**10.2** in the case of a meeting that was previously adjourned through want of quorum, whatever the proportion of the total number of persons who are entitled to attend and vote at the meeting which they represent.

**11** The chairman may, with the consent of (and shall if directed by) a meeting, adjourn the meeting from time to time and from place to place. Only business which could have been transacted at the original meeting may be transacted at a meeting adjourned in accordance with this paragraph 11 or paragraph 10.

**12** At least 10 days' notice of a meeting adjourned through want of a quorum shall be given in the same manner as for an original meeting and that notice shall state the quorum required at the adjourned meeting. No notice need, however, otherwise be given of an adjourned meeting.

### Voting

**13** Each question submitted to a meeting shall be decided by a poll, and shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.

**14** Every person who is present in person and is eligible to vote (in accordance with the procedures of such meeting) has one vote in respect of their voting ratio.

**15** In case of equality of votes, the chairman shall have a casting vote in addition to any other votes which he may have.

### Effect and publication of an Extraordinary Resolution

**16** An Extraordinary Resolution shall be binding on all the Signatories (if passed at a meeting, whether or not all Signatories were present at the meeting) and they shall be bound to give effect to it accordingly. The passing of such a resolution shall be conclusive evidence that the circumstances justify its being passed. The Company shall give notice of the passing of an Extraordinary Resolution to Signatories within fourteen days but failure to do so shall not invalidate the resolution.

**Minutes**

17    Minutes shall be made of all resolutions and proceedings at every meeting (if any) and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting, shall be conclusive evidence of the matters in them. Until the contrary is proved, every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

**Company's power to prescribe regulations**

18    Subject to all other provisions in this Agreement the Company may, without the consent of the Signatories, prescribe such further regulations regarding the holding of meetings and attendance and voting at them as it, in its sole discretion, determines including (without limitation) such requirements as the Company thinks reasonable to satisfy itself that the persons who purport to make any requisition in accordance with this Agreement (or any agreement supplemental to it) are entitled to do so and so as to satisfy itself that persons who purport to execute written resolutions, or attend or vote at a meeting, are entitled to do so.

Linklaters LLP
One Silk Street
London EC2Y 8HQ