**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------- x
                                          :
In re:                                    :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
               Debtors.                   :        (Jointly Administered)
                                          :
--------------------------------------------------------- x
```

### NINTH APPLICATION OF MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP, COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM JUNE 1, 2011 THROUGH AND INCLUDING SEPTEMBER 30, 2011

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |
| Period for which compensation and reimbursement is sought: | June 1, 2011 – September 30, 2011 |

Amount of Compensation
requested:                                      $12,334,262.25

Amount of Expense
Reimbursement requested:               $493,651.21

This is an: __X__ interim _____ final application.

This is the ninth interim fee application filed by Milbank, Tweed, Hadley & M^cCloy LLP in these
cases.

NINTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>c</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2011 – SEPTEMBER 30, 2011)

| Name | Position; Experience | Hourly Rate | Total Hours | Total Compensation |
|---|---|---|---|---|
| Paul Aronzon | Financial Restructuring Partner for 21 years; admitted in 1979. | $1,095 | 21.90 | $23,980.50 |
| Dennis Dunne | Financial Restructuring Partner for 13 years; admitted in 1991. | $1,095 | 247.50 | $271,012.50 |
| Trayton Davis | Alternative Investments Partner for 22 years, admitted in 1981. | $1,075 | 10.40 | $11,180.00 |
| Jay Grushkin | Alternative Investments Partner for 22 years, admitted in 1982. | $1,075 | 9.40 | $10,105.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 14 years; admitted in 1996. | $1,025 | 29.20 | $29,930.00 |
| Peter Benudiz | Global Corporate Partner for 18 years; admitted in 1987. | $1,025 | 23.50 | $24,087.50 |
| David Cohen | Litigation Partner for 9 years; admitted in 1994. | $1,025<br>$512.5* | 524.60<br>33.40 | $537,715.00<br>$17,117.50 |
| Wilbur Foster Jr | Financial Restructuring Partner for 20 years; admitted in 1982. | $995 | 485.70 | $483,271.50 |
| Thomas C. Janson | Global Corporate Partner for 18 years; admitted in 1985. | $995 | 3.50 | $3,482.50 |
| Dale Ponikvar | Tax Partner for 21 years; admitted in 1981. | $995<br>$497.5* | 335.20<br>4.10 | $333,524.00<br>$2,039.75 |
| Paul Wessel | Tax Partner for 15 years; admitted in 1988. | $995 | 14.50 | $14,427.50 |
| Nicholas James Angel | Financial Restructuring Partner for 3 years; admitted in 1986. | $975 | 7.10 | $6,922.50 |
| David Lamb | Global Corporate Partner for 21 years; admitted in 1992. | $975 | 95.20 | $92,820.00 |
| Catherine Marsh | Global Project Finance Partner for 7 years; admitted in 1995. | $975 | 8.60 | $8,385.00 |
| Eric Moser | Global Finance Partner for 12 years; admitted in 1991. | $975 | 35.00 | $34,125.00 |
| Winthrop Brown | Global Finance Partner for 28 years; admitted in 1975. | $950 | 6.90 | $6,555.00 |
| Stacey J. Rappaport | Litigation Partner for 7 years; admitted in 1997. | $925 | 124.50 | $115,162.50 |
| James Warbey | Global Finance Partner for 6 years; admitted in 1996. | $925 | 255.60 | $236,430.00 |
| Russell Kestenbaum | Tax Partner for 4 years; admitted in 1999. | $900 | 32.90 | $29,610.00 |

| Risa Rosenberg | Financial Restructuring Of Counsel for 9 years; admitted in 1984. | $900 | 36.30 | $32,670.00 |
|---|---|---|---|---|
| Paul Denaro | Global Securities Partner for 3 years; admitted in 2000. | $875 | 76.30 | $66,762.50 |
| Evan R. Fleck | Financial Restructuring Partner for 1 year; admitted in 2002. | $850 | 791.00 | $672,350.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 4 years; admitted in 1992. | $860 $430* | 1019.50 13.00 | $876,770.00 $5,590.00 |
| Kevin Ashby | Litigation Associate for 8 years; admitted in 2004. | $715 | 7.20 | $5,148.00 |
| Adrian Azer | Litigation Associate for 8 years; admitted in 2003. | $715 $357.5* | 611.30 38.70 | $437,079.50 $13,835.25 |
| Edward G. Baldwin | Litigation Associate for 8 years; admitted in 2003. | $715 | 19.00 | $13,585.00 |
| Drew Batkin | Tax Associate for 9 years; admitted in 2003. | $715 $357.5* | 230.70 1.50 | $164,950.50 536.25 |
| Lisa Brabant | Real Estate Associate for 13 years; admitted in 1999. | $715 | 29.20 | $20,878.00 |
| Aaron Renenger | Litigation Associate for 9 years; admitted in 2002. | $715 | 343.30 | $245,459.50 |
| Brian Stern | Global Corporate Associate for 8 years; admitted in 2003. | $715 | 10.70 | $7,650.50 |
| Steven Szanzer | Financial Restructuring Associate for 11 years; admitted in 2001. | $715 | 266.10 | $190,261.50 |
| Stephen Tudway | Litigation Associate for 13 years; admitted in 1998. | $715 | 67.80 | $48,477.00 |
| Lena Mandel | Senior Attorney for 9 years; admitted in 1991. | $705 | 247.00 | $174,135.00 |
| Grace Gilligan | Litigation Associate for 7 years; admitted in 2005. | $695 | 436.20 1.60 | $303,159.00 556.00 |
| Justin McClelland | Litigation Associate for 19 years; admitted in 1993. | $695 | 49.20 | $34,194.00 |
| Peter Newman | Financial Restructuring Associate for 7 years; admitted in 2005. | $695 | 44.20 | $30,719.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 7 years; admitted in 2005. | $695 | 19.30 | $13,413.50 |
| Melanie Westover | Litigation Associate for 7 years; admitted in 2005 | $695 | 8.10 | $5,629.50 |
| Michael L. Fleischer | Global Corporate Associate for 6 years; admitted in 2006. | $675 | 26.20 | $17,685.00 |

| Karen Gartenberg | Financial Restructuring Associate for 6 years; admitted in 2006. | $675 | 5.70 | $3,847.50 |
|---|---|---|---|---|
| Sarah A. Sulkowski | Litigation Associate for 6 years; admitted in 2006. | $675 | 36.10 | $24,367.50 |
| John K. White Jr. | Litigation Associate for 6 years; admitted in 2006. | $675 | 226.60 | $152,955.00 |
| Nicholas Bassett | Litigation Associate for 5 years; admitted in 2007. | $650<br>$325* | 417.80<br>6.50 | $271,570.00<br>$2,112.50 |
| Melissa Ann Clark | Global Corporate Associate for 5 years; admitted in 2006. | $650 | 3.60 | $2,340.00 |
| James C. Harris | Financial Restructuring Associate for 5 years; admitted in 2008. | $650 | 140.50 | $91,325.00 |
| Aluyah Imoisili | Litigation Associate for 5 years; admitted in 2006. | $650<br>$325* | 167.90<br>27.70 | $109,135.00<br>$9,002.50 |
| Stephanie Sklar | Real Estate Associate for 5 years; admitted in 2007. | $650 | 40.20 | $26,130.00 |
| Jeremy Sussman | Financial Restructuring Associate for 5 years; admitted in 2007. | $650 | 352.00 | $228,800.00 |
| Constance Beverley | Litigation Associate for 5 years; admitted in 2008. | $625<br>$312.5* | 44.60 | $27,875.00 |
| Nicole Leyton Rosser | Tax Associate for 4 years; admitted in 2008. | $625 | 8.30 | $5,187.50 |
| Melanie Ann McLaughlin | Financial Restructuring Associate for 4 years; admitted in 2008. | $625 | 11.60 | $7,250.00 |
| Gregory Papeika | Financial Restructuring Associate for 4 years; admitted in 2008. | $625 | 148.40 | $92,750.00 |
| Sangyoon Nathan Park | Litigation Associate for 4 years; admitted in 2008. | $625 | 364.40 | $227,750.00 |
| Harsha Rao | Alternative Investments for 4 years; admitted in 2008. | $625 | 24.90 | $15,562.50 |
| Charles Rubio | Financial Restructuring Associate for 4 years; admitted in 2008. | $625 | 128.30 | $80,187.50 |
| Mikhel Schecter | Alternative Investments Associate for 4 years; admitted in 2008. | $625 | 22.00 | $13,750.00 |
| Andrew Sullivan | Global Securities Associate for 4 years; admitted in 2008. | $625 | 19.60 | $12,250.00 |
| Jennie Woltz | Litigation Associate for 4 years; admitted in 2008. | $625 | 92.80 | $58,000.00 |

| | | | | |
|---|---|---|---|---|
| Andrew Young | Financial Restructuring Associate for 4 years; admitted in 2006. | $625 | 156.90 | $98,062.50 |
| La Tonya D. Brooks | Litigation Associate for 3 years; admitted in 2009. | $600 | 47.10 | $28,260.00 |
| Gabriel Carnwath | Global Corporate Associate for 3 years; admitted in 2009. | $600 | 105.60 | $63,360.00 |
| Ateesh Chanda | Litigation Associate for 3 years; admitted in 2009. | $600 | 38.40 | $23,040.00 |
| Michael Clarke | Global Finance Associate for 3 years; admitted in 2009. | $600 | 26.40 | $15,840.00 |
| Julie Constantinides | Global Corporate Associate for 3 years; admitted in 2009. | $600 | 6.50 | $3,900.00 |
| Erin Culbertson | Litigation Associate for 3 years; admitted in 2009. | $600 | 93.80 | $56,280.00 |
| Melissa A. Galicia | Global Transportation and Space Finance Associate for 3 years; admitted in 2009. | $600 | 2.30 | $1,380.00 |
| Joanna L. Grossman | Tax Associate for 3 years; admitted in 2009. | $600 | 201.00 | $120,600.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 3 years; admitted in 2009. | $600 | 523.10 | $313,860.00 |
| Roger Lee | Financial Restructuring Associate for 3 years; admitted in 2009. | $600 | 41.70 | $25,020.00 |
| Andrea McNamara | Financial Restructuring Associate for Associate for 3 years; admitted in 2009. | $600 $300* | 776.90 17.00 | $466,140.00 $5,100.00 |
| Rachel Pojunas | Litigation Associate for 3 years; admitted in 2009. | $600 | 151.80 | $91,080.00 |
| Jeremy Steckel | Global Securities Associate for 3 years; admitted in 2009. | $600 | 44.90 | $26,940.00 |
| Diane R. Young | Financial Restructuring Associate for 3 years; admitted in 2009. | $600 | 27.90 | $16,740.00 |
| Armando Acosta III | Litigation Associate for 2 years months; admitted in 2010. | $550 | 200.30 | $110,165.00 |
| Brittany Akins | Litigation Associate for 2 years; admitted in 2010. | $550 | 134.20 | $73,810.00 |
| John Babtie | Global corporate Associate for 2 years; admitted in 2010. | $550 | 7.30 | $4,015.00 |
| John Calabrese | Litigation Associate for 2 years; admitted in 2010. | $550 | 84.20 | $46,310.00 |
| Randy Clark | Tax Associate for 2 years; admitted in 2010. | $550 | 121.40 | $66,770.00 |

| | | | | |
|---|---|---|---|---|
| Bradley Friedman | Financial Restructuring Associate for 2 years; admitted in 2010. | $550 | 633.20 | $348,260.00 |
| Shemetreal J. Harris | Alternative Investments Associate for 2 years; admitted in 2010. | $550 | 12.40 | $6,820.00 |
| Jacob Jou | Litigation Associate for 2 years; admitted in 2010. | $550 | 211.00 | $116,050.00 |
| Matthew Kanter | Financial Restructuring Associate for 2 years; admitted in 2010. | $550 | 449.80 | $247,390.00 |
| Denise Linton | Litigation Associate for 2 years; admitted in 2010. | $550 | 536.30 | $294,965.00 |
| Tiara Lipps | Real Estate Associate for 2 years; admitted in 2010. | $550 | 19.30 | $10,615.00 |
| Sara Mischner | Alternative Investments Associate for 2 years; admitted in 2010. | $550 | 8.60 | $4,730.00 |
| Andrew Morton | Financial Restructuring Associate for 2 years; admitted in 2010. | $550 | 9.90 | $5,445.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 2 years; admitted n 2010. | $550 | 34.10 | $18,755.00 |
| Neema Saran | Litigation Associate for 2 years; admitted in 2010. | $550 | 17.00 | $9,350.00 |
| Megha Shah | Global Securities Associate for 2 years; admitted in 2010. | $550 | 21.30 | $11,715.00 |
| Brian Sturm | Financial Restructuring Associate for 2 years; admitted in 2010. | $550 | 54.10 | $29,755.00 |
| Jeremy Wells | Global Securities Associate for 2 years; admitted in 2010. | $550 | 382.50 | $210,375.00 |
| Brian Youn | Alternative Investments Associate for 2 years; admitted in 2010. | $550 | 5.20 | $2,860.00 |
| Ranee Adipat | Global Securities Associate for 1 year; admitted in 2011. | $460 | 26.90 | $12,374.00 |
| Eluard Alegre | Financial Restructuring Associate for 1 year; admitted in 2011. | $460 | 116.40 | $53,544.00 |
| Alicia Bove | Litigation Associate for 1 year; admitted in 2011. | $460 | 527.90 | $242,834.00 |
| Matthew Brod | Financial Restructuring Associate for 1 year; admitted in 2011. | $460 | 622.30 | $286,258.00 |

| Hugh Carlson | Litigation Associate for 1 year; admitted in 2011. | $460 | 6.00 | $2,760.00 |
|---|---|---|---|---|
| Brenton T. Culpepper | Litigation Associate for 1 year; admitted in 2011. | $460 | 310.70 | $142,922.00 |
| Eric S. Gold | Alternative Investments Associate for 1 year; admitted in 2011. | $460 | 38.10 | $17,526.00 |
| Regina Gromen | Alternative Investments Associate for 1 year; admitted in 2011. | $460 | 35.80 | $16,468.00 |
| Katie J. Hamilton | Litigation Associate for 1 year; admitted in 2011. | $460 | 11.90 | $5,474.00 |
| Nicole J. Lee | Financial Restructuring Associate for 1 year; admitted in 2011. | $460 | 355.20 | $163,392.00 |
| Mark McCrone | Litigation Associate for 1 year; admitted in 2011. | $460 | 594.90 | $273,654.00 |
| Michael Price | Financial Restructuring Associate for 1 year; admitted in 2011. | $460 | 25.50 | $11,730.00 |
| Christina Totino | Litigation Associate for 1 year; admitted in 2011. | $460 | 277.80 | $127,788.00 |
| Jonathan Keen | Financial Restructuring Associate for 1 year; admitted in 2011. | $295 | 10.70 | $3,156.50 |
| Monica Alston | Case Manager | $255 | 435.80 | $111,129.00 |
| Abayomi A. Ayandipo | Case Manager | $255 | 164.90 | $42,049.50 |
| Oscar Castrillon | Case Manager | $255 | 51.60 | $13,158.00 |
| Angel R. Anderson | Case Manager | $255 | 8.00 | $2,040.00 |
| Rena Ceron | Case Manager | $225 | 12.50 | $2,812.50 |
| Jennifer L. Russo | Case Manager | $255 | 5.00 | $1,275.00 |
| Richard Cosentino | Legal Assistant | $280 | 426.70 | $119,476.00 |
| Randy Hooks | Legal Assistant | $280 | 319.90 | $89,572.00 |
| Kim Strosser | Legal Assistant | $280 | 69.70 | $19,516.00 |
| Charles J. Sheehan | Legal Assistant | $280 | 159.00 | $44,520.00 |
| Tobias Brinkmann | Legal Assistant | $245 | 4.80 | $1,176.00 |
| Dakota Blake | Legal Assistant | $225 | 4.30 | $967.50 |
| Paul Butters | Legal Assistant | $225 | 76.10 | $17,122.50 |
| Mary A. Hood | Legal Assistant | $225 | 28.40 | $6,390.00 |
| Peter Delfausse | Legal Assistant | $195 | 17.90 | $3,490.50 |
| Charmaine Thomas | Legal Assistant | $195 | 227.00 | $44,265.00 |
| Kyle Martin | Legal Assistant | $185 | 568.40 | $105,154.00 |
| Jason Hsu | Legal Assistant | $175 | 99.10 | $17,342.50 |
| Liga R Michailovs | Legal Assistant | $175 | 8.30 | $1,452.50 |
| Wendy Sobel Barr | Legal Assistant | $165 | 105.50 | $17,407.50 |
| Jacqueline Brewster | Managing Attorney Clerk | $185 | 86.90 | $16,076.50 |

| | | | | |
|---|---|---|---|---|
| Matthew Ottenstein | Librarian | $215 | 2.70 | $580.50 |
| Robin Traylor | Librarian | $215 | 24.50 | $5,267.50 |
| Janelle Blanchard | Litigation Support Specialist | $290 | 28.40 | $8,236.00 |
| Theartis Everett | Litigation Support Specialist | $290 | 167.40 | $48,546.00 |
| James McGuire | Litigation Support Specialist | $290 | 22.20 | $6,438.00 |
| Alexander Sacklowski | Litigation Support Specialist | $290 | 3.70 | $1,073.00 |
| Juliana Valles | Litigation Support Specialist | $290 | 11.70 | $3,393.00 |
| Rhodely Vallon | Litigation Support Specialist | $290 | 366.40 | $106,256.00 |
| Juan Rojas | Litigation Support Specialist | $250 | 10.30 | $2,575.00 |
| Sarah E. Kagen | Litigation Support Specialist | $220 | 4.70 | $1,034.00 |
| Paul Greengross | Litigation Support Specialist | $200 | 2.60 | $520.00 |
| Maria Smilen | File Clerk | $125 | 38.30 | $4,787.50 |
| **Total** | | **$595.35 (blended rate)[1]** | **20,717.80 Hours** | **$12,334,262.25** |

---

[1]        The blended rate excluding paraprofessionals is $668.54 per hour.

**NINTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2011 – SEPTEMBER 30, 2011)**

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 125.40 | 94,535.00 |
| General Case Strategy Meetings | 6.70 | 6,273.50 |
| Project Monitoring/Court Calendar & Docket Maintenance | 380.40 | 133,281.00 |
| Hearings and Court Communications | 347.70 | 226,351.50 |
| Non-Working Travel | 216.90 | 113,933.25 |
| Interested Party Communications/Website/Lehman Team Hotline | 290.60 | 141,284.00 |
| Communications with Debtors | 3.60 | 2,785.00 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 702.00 | 512,053.00 |
| Secured Creditors Issues/Meetings/Communications | .70 | 693.00 |
| LBI/SIPC Coordination and Issues | 544.60 | 353,079.50 |
| Insurance Issues | 28.00 | 24,957.00 |
| Employee/ERISA/Benefits/Pension Issues | 57.10 | 49,315.00 |
| Tax Issues | 1,007.20 | 763,067.50 |
| Corporate Governance | 3.50 | 3,482.50 |
| Other General Business Operation Issues | 2.60 | 1,833.00 |
| Intercompany Issues | 203.90 | 117,909.00 |
| Real Estate Matters | 844.50 | 598,506.50 |
| Private Equity | 7.90 | 6,223.50 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 5,028.20 | 3,111,139.00 |
| Loans/Investments | 276.50 | 179,466.50 |
| Domestic Bank and Related Regulatory Issues | 22.50 | 18,624.50 |
| International Insolvency Issues | 611.70 | 444,051.50 |
| Schedules/Statement of Financial | .60 | 360.00 |

| | | |
|---|---|---|
| Non-Derivative Automatic Stay/Safe Harbor Issues | 146.60 | 85,117.00 |
| Miscellaneous Asset Sales/363 Issues | 6.60 | 4,535.00 |
| Non-Derivative Executory Contracts/365 Issues | 6.00 | 4,025.00 |
| DIP Financing | 9.90 | 4,504.00 |
| Exit Financing | 1.20 | 1,314.00 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 1,941.10 | 1,267,654.50 |
| Disclosure Statement/Solicitation/Voting | 479.40 | 276,121.50 |
| Non-Derivative Claims | 1,577.20 | 946,428.50 |
| Other Bankruptcy Motions and Matters | 210.60 | 131,198.00 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 2,598.10 | 1,384,938.50 |
| 2004 Issues | 11.90 | 6,545.00 |
| Appeals | 1.00 | 850.00 |
| Firm's Own Billing/Fee Applications | 1,298.00 | 453,976.50 |
| Firm's Own Retention Issues | 109.20 | 62,811.00 |
| Third Party Retention/Fee Application/Other Issues | 331.50 | 182,710.50 |
| Stock Loan Litigation | 1,276.70 | 618,329.00 |
| **Total** | **20,717.80** | **$12,334,262.25** |

NINTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(JUNE 1, 2011 – SEPTEMBER 30, 2011)

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 2,649.53 |
| Cab Fares/Local Travel | 31,314.53 |
| Computer Database Research | 300,074.92 |
| Fees | 7,917.42 |
| Mail | 23.75 |
| Meals | 19,266.65 |
| Messenger | 2,793.04 |
| Misc | 93.73 |
| Outside Reproduction | 441.52 |
| Photocopies | 58,122.10 |
| Telephone | 24,516.28 |
| Travel | 46,437.74 |
| **TOTAL DISBURSEMENTS** | **$493,651.21** |

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

----------------------------------------------------------- x

**NINTH APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**JUNE 1, 2011 THROUGH AND INCLUDING SEPTEMBER 30, 2011**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & MᶜCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc.

("LCPI") and their affiliated debtors in possession in the above-captioned cases (collectively, the

"Debtors" and, together with their non-Debtor affiliates, "Lehman"), hereby submits its

application (the "Application"), pursuant to sections 330 and 331 of chapter 11 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rule 2016

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Guidelines for Fees

and Disbursements for Professionals in Southern District of New York Bankruptcy Cases

adopted by the Court on June 24, 1991, and amended on April 21, 1995, and November 25, 2009

(collectively, the "Local Guidelines"), the United States Trustee Guidelines for Reviewing

Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330,

effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Fourth Amended Order Pursuant

to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing

Procedures for Interim Monthly Compensation and Reimbursement of Expenses of

Professionals, dated April 14, 2011 (the "Interim Compensation Order") [Docket No. 15997],

and the guidelines contained in the Fee Committee's Confidential Letter Report on the Sixth

Interim Application of Milbank, dated April 12, 2011 (the "Fee Committee Guidelines"), for the

allowance of interim compensation for professional services rendered from June 1, 2011 through

and including September 30, 2011 (the "Ninth Interim Compensation Period"), and for

reimbursement of expenses incurred in connection with such services.  In support thereof,

Milbank respectfully represents as follows:

## **INTRODUCTION**

### A.    **Background**

1.    Bankruptcy Filing.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' Chapter 11 Cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

2.      Creditors' Committee.  On September 17, 2008, the Office of the United

States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the

Committee in the Chapter 11 Cases.

3.      SIPA Trustee.  On September 19, 2008, a proceeding (the "SIPA

Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA")

with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a

registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"SIPA Trustee") administering LBI's estate.

4.      Examiner.  The United States Bankruptcy Court for the Southern District

of New York (the "Court") approved the appointment of Anton R. Valukas as examiner (the

"Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner,

dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report (the

"Examiner's Report") on February 8, 2010 under seal, which was subsequently unsealed on

March 11, 2010.

5.      Fee Committee.  On May 26, 2009, the Court appointed a fee committee

(the "Fee Committee") and approved a fee protocol (the "Fee Protocol") in the Chapter 11 Cases.

On January 24, 2011, the Court approved the Fee Committee's recommendation to appoint

Richard A. Gitlin as the successor Independent Member on the Fee Committee.  By motion dated

March 11, 2011, the Fee Committee sought authorization to amend the Fee Protocol, which the

Court granted on April 14, 2011 (the "Amended Fee Protocol") [Docket No. 15998].

6.      Debtors' Plan and Disclosure Statement.  On March 15, 2010, the Debtors

filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

[Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 8332], along with their revised

Chapter 11 Plan [Docket No. 8330].

7.      Debtors' First Amended Plan and Disclosure Statement.  On January 25,

2011, the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors (the "Debtors' First Amended Plan") [Docket No. 14150] and the

Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code  (the

"Debtors' First Amended Disclosure Statement") [Docket No. 14151].

8.      Debtors' Second Amended Plan and Disclosure Statement.  Following the

filing of competing plans of reorganization by the Ad Hoc Group of Lehman Brothers Creditors

(the "Ad Hoc Group Plan") and the Non-Consolidation Plan Proponents (the "Non-Con Plan"),

the Debtors filed their Second Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors (the "Second Amended Plan") [Docket No. 18204] and the Disclosure

Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 18205] on

June 30, 2011.

9.      Debtors' Third Amended Plan and Disclosure Statement.  After numerous

and lengthy negotiations among the Debtors, the Committee and multiple creditor groups,

including Lehman's affiliates in countries outside of the U.S. (the "Foreign Affiliates"), on

September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors (as amended, modified and supplemented, the

"Plan") [Docket No. 19627] and the Debtors' Disclosure Statement for the Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section

1125 of the Bankruptcy Code (the "Disclosure Statement") [Docket No. 19629].  Also on

September 1, 2011, the Court entered an amended order approving the Disclosure Statement,

establishing solicitation and voting procedures in connection with the Plan, scheduling a

confirmation hearing for December 6, 2011, and establishing notice and objection procedures for

the confirmation hearing [Docket No. 19631].  On September 15, 2011, the Court entered an

order approving a modification to the Disclosure Statement [Docket No. 20016].  On December

6, 2011, the Court entered an order confirming the Plan [Docket No. 23023].

> 10.    Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines

is attached hereto as Exhibit "A."

**B.    Retention of Milbank and Billing History**

> 11.    Authorization for Milbank's Retention.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing

The Retention And Employment Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, As Counsel For

The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the

"Retention Order"), the Court authorized Milbank's retention as counsel for the Committee in

these Chapter 11 Cases.  The Retention Order, which became a final order on November 21,

2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the

Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and

the local rules and orders of this Court. Among other things, the Retention Order provides that Milbank's hourly rates are subject to periodic firm-wide adjustments in the ordinary course of Milbank's business.

12.    First Interim Fee Application. On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From September 17, 2008 Through And Including January 31, 2009 (the "First Interim Fee Application"). In the First Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from September 17, 2008 through and including January 31, 2009 (the "First Interim Compensation Period") in the total amount of $12,123,376.00,[1] and (ii) reimbursement of its actual and necessary expenses incurred during the First Interim Compensation Period in the amount of $668,388.72. Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim Compensation Period. On August 5, 2009, the Court approved the First Interim Fee Application, subject to a ten percent holdback pursuant to the recommendation of the Fee Committee. On September 10, 2009, the Court approved the release of the remaining holdback, subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

13.    Second Interim Fee Application. On August 14, 2009, Milbank filed its Second Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee

---

[1]    Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period by $129,111.00. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[2]    Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through

And Including May 31, 2009 (the "Second Interim Fee Application").  In the Second Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from February 1, 2009 through and including May 31, 2009 (the "Second

Interim Compensation Period") in the total amount of $16,829,521.00,[3] and (ii) reimbursement

of its actual and necessary expenses incurred during the Second Interim Compensation Period in

the amount of $1,019,754.61.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $14,582,737.21 during the Second Interim Compensation Period.  On

September 25, 2009, the Court approved the Second Interim Fee Application, subject to a ten

percent holdback pursuant to the recommendation of the Fee Committee.  On December 23,

2009, the Court released the ten percent holdback, subject to a $311,734.82 deduction, at the

recommendation of the Fee Committee.[4]

       14.    Third Interim Fee Application.  On December 14, 2009, Milbank filed its

Third Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through And

Including September 30, 2009 (the "Third Interim Fee Application").  In the Third Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2009 through and including September 30, 2009 (the "Third

---

[3]      Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[4]      Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

Interim Compensation Period") in the total amount of $10,881,540.00,[5] and (ii) reimbursement

of its actual and necessary expenses incurred during the Third Interim Compensation Period in

the amount of $583,803.10.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $7,480,652.96 during the Third Interim Compensation Period.  On

April 9, 2010, the Court approved the Third Interim Fee Application, subject to a $292,555.40

deduction, at the recommendation of the Fee Committee.[6]

15.    Fourth Interim Fee Application.  On April 16, 2010, Milbank filed its

Fourth Application Of Milbank, Tweed, Hadley & M[c]Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through

And Including January 31, 2010 (the "Fourth Interim Fee Application").  In the Fourth Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2009 through and including January 31, 2010 (the

"Fourth Interim Compensation Period") in the total amount of $13,595,778.50,[7] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fourth Interim

Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

---

[5]    Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period
by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

[6]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a
portion of such fees.

[7]    Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period
by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

Application, subject to a holdback of $733,570.87, relating to certain unresolved objections asserted by the Fee Committee.[8]

16.    <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its Fifth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through And Including May 31, 2010 (the "<u>Fifth Interim Fee Application</u>").  In the Fifth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from February 1, 2010 through and including May 31, 2010 (the "<u>Fifth Interim Compensation Period</u>") in the total amount of $19,450,342.75,[9] and (ii) reimbursement of its actual and necessary expenses incurred during the Fifth Interim Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim Compensation Period.[10]  On May 12, 2011, the Court approved the Fifth Interim Fee Application, subject to a holdback of $413,818.13, relating to certain unresolved objections asserted by the Fee Committee.[11]

17.    <u>Sixth Interim Fee Application</u>.  On December 14, 2010, Milbank filed its Sixth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

---

[8]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[9]    Milbank voluntarily reduced the fees it sought to have allowed for the Fifth Interim Compensation Period by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[10]    Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

[11]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Rendered And For Reimbursement Of Expenses During Period From June 1, 2010 Through And

Including September 30, 2010 (the "Sixth Interim Fee Application").  In the Sixth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services rendered

during the period from June 1, 2010 through and including September 30, 2010 (the "Sixth

Interim Compensation Period") in the total amount of $18,359,367.75,[12] and (ii) reimbursement

of its actual and necessary expenses incurred during the Sixth Interim Compensation Period in

the amount of $792,924.64.  Pursuant to the Interim Compensation Order, Milbank received

payment in the amount of $15,491,759.01 during the Sixth Interim Compensation Period.  On

October 25, 2011, the Court approved the Sixth Interim Fee Application, subject to a

$173,410.66 deduction, at the recommendation of the Fee Committee.[13]

        18.     Seventh Interim Fee Application.  On June 2, 2011, Milbank filed its

Seventh Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From October 1, 2010 Through

And Including January 31, 2011 (the "Seventh Interim Fee Application").  In the Seventh Interim

Fee Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from October 1, 2010 through and including January 31, 2011 (the

"Seventh Interim Compensation Period") in the total amount of $14,180,784.75,[14] and (ii)

---

[12]    Milbank voluntarily reduced the fees it sought to have allowed for the Sixth Interim Compensation Period by $229,420.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[13]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a portion of such fees.

[14]    Milbank voluntarily reduced the fees it sought to have allowed for the Seventh Interim Compensation Period by $133,519.75, on account of, among other things, certain matters identified by the Fee Committee.

reimbursement of its actual and necessary expenses incurred during the Seventh Interim

Compensation Period in the amount of $633,261.80.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $11,995,760.01 during the Seventh Interim

Compensation Period.  No hearing date has yet been scheduled with respect to the Seventh

Interim Fee Application.

19.    Eighth Interim Fee Application.  On August 15, 2011, Milbank filed its

Eighth Application Of Milbank, Tweed, Hadley & M$^c$Cloy LLP, Counsel to Official Committee

of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2011 Through

and Including May 31, 2011 (the "Eighth Interim Fee Application") in the total amount of

$14,678,049.25,[15] and (ii) reimbursement of its actual and necessary expenses incurred during

the Seventh Interim Compensation Period in the amount of $794,661.63.  Pursuant to the Interim

Compensation Order, Milbank received payment in the amount of $11,742,439.40 during the

Eighth Interim Compensation Period.  No hearing date has yet been scheduled with respect to the

Eighth Interim Fee Application.

20.    Application.  Milbank makes this ninth interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331

of the Bankruptcy Code.

21.    In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors seeking interim compensation and reimbursement of

---

However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

[15]    Milbank voluntarily reduced the fees it sought to have allowed for the Eighth Interim Compensation Period
by $191,269.75, on account of, among other things, certain matters identified by the Fee Committee.
However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of
such fees at a later date.

expenses.  During the Ninth Interim Compensation Period, Milbank submitted the following fee

statements:

    a.    On September 23, 2011 , pursuant to the Interim Compensation Order, Milbank served its thirty-third fee statement for the period from June 1, 2011 through and including June 30, 2011 (the "Thirty-Third Fee Statement").  The Thirty-Third Fee Statement sought (i) an allowance of $3,500,918.00 as compensation for services rendered and (ii) the reimbursement of $146,967.54 in expenses.  As of the date hereof, Milbank has received a total of $2,947,701.94, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Third Fee Statement.

    b.    On October 17, 2011, pursuant to the Interim Compensation Order, Milbank served its thirty-fourth fee statement for the period from July 1, 2011 through and including July 31, 2011 (the "Thirty-Fourth Fee Statement").  The Thirty-Fourth Fee Statement sought (i) an allowance of $2,587,891.25 as compensation for services rendered and (y) the reimbursement of $123,100.35 in expenses.  As of the date hereof, Milbank has received a total of $2,193,413.35, which represents payment for (i) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Fourth Fee Statement.

    c.    On November 18, 2011, pursuant to the Interim Compensation Order, Milbank filed and served its thirty-fifth fee statement for the period from August 1, 2011 through and including August 31, 2011 (the "Thirty-Fifth Fee Statement").  The Thirty-Fifth Fee Statement sought (i) an allowance of $3,179,437.50 as compensation for services rendered and (ii) the reimbursement of $114,943.68 in expenses.  As of the date hereof, Milbank has received a total of $2,658,493.68, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Fifth Fee Statement.

    d.    On December 5, 2011, pursuant to the Interim Compensation Order, Milbank filed and served its thirty-sixth fee statement for the period from September 1, 2011 through and including September 30, 2011 (the "Thirty-Sixth Fee Statement") and, together with the Thirty-Third Fee Statement, Thirty-Fourth Fee Statement and Thirty-Fifth Fee Statement, the "Fee Statements").  The Thirty-Sixth Fee Statement sought (i) an allowance of $3,066,015.50 as compensation for services rendered and (ii) the reimbursement of $108,704.64 in expenses.  As of the date hereof, Milbank has received a total of $2,561,517.04, which represents payment for (y) 80% of Milbank's fees and (z) 100% of the expenses incurred pursuant to the Thirty-Sixth Fee Statement.

    22.    Milbank has not entered into any agreement, express or implied, with any

other party for the purpose of fixing or sharing fees or other compensation to be paid for

professional services rendered in these cases.  No promises have been received by Milbank or

any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

23.    By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Ninth Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Ninth Interim Compensation Period.

24.    In this Application, Milbank seeks approval of $12,334,262.25[16] for legal services rendered on behalf of the Committee during the Ninth Interim Compensation Period and $493,651.21[17] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $12,827,913.46.

25.    Pursuant to the Interim Compensation Order, Milbank has already received payment of $10,361,126.01 during the Ninth Interim Compensation Period.  Milbank will seek a total payment of $2,466,787.45 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the Ninth Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[18]

---

[16]    The compensation sought by this Application reflects a voluntary reduction of approximately $164,335.25 including, but not limited to, certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[17]    This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines, including overtime meal expenses for which Milbank seeks reimbursement of no more than $20 per meal.  Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

[18]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Ninth Interim Compensation Period is $711.52 less

26. The fees sought by this Application reflect an aggregate of 20,217 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Ninth Interim Compensation Period, at a blended average hourly rate of $595.35 for both professionals and paraprofessionals. The blended hourly rate for professionals only is $668.54.

27. Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

28. Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee. These records are maintained in the ordinary course of Milbank's practice. For the convenience of the Court and parties in interest, a billing summary for the Ninth Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested. In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration. The compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

than the sum of fees and expenses set forth in the Fee Statements. Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

29.     Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[19]

30.     Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

31.     To provide an orderly summary of the services rendered on behalf of the Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |

---

[19]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

| | |
|---|---|
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/Swap Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |
| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |
| 04900 | Tax Litigation |

32.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that

Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee. The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complicated issues and problems that are presented by these extraordinary and complex cases.

A.      **General Case Administration**

33.      During the Ninth Interim Compensation Period, Milbank continued to maintain and undertake action in accordance with an elaborate protocol developed earlier in these Chapter 11 Cases for the organization and delegation of the substantial number of tasks engendered by Lehman's chapter 11 process. The protocol is designed to ensure that the Committee is kept apprised of all aspects of the Chapter 11 Cases. The protocol also guarantees that all matters are addressed, without duplication of effort. Due to the highly complex nature of the Debtors' cases, these tasks require knowledge, expertise, and input from a range of Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately familiar with the issues and the parties in the Chapter 11 Cases.

34.      Additionally, Milbank has established a system whereby all substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each material pleading filed in the Chapter 11 Cases. Milbank's efforts in setting up efficient methods of administering the Committee's needs ensure that the Committee has the information necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

17

**B.**    **Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

35.    During the Ninth Interim Compensation Period, the Committee held
weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings
with the Debtors.  In addition, the Committee convened special telephonic and in-person
meetings dedicated to discussing particular issues of import, most notably the Plan..  Prior to
each Committee meeting, Milbank prepared and distributed memoranda, presentations, and other
materials for the Committee members' review and consideration.  During the Committee
meetings, Milbank discussed with Committee members and their counsel all significant matters
arising during the Ninth Interim Compensation Period, in particular, the Plan and post-Effective
Date asset management options, and assisted the Committee in formulating positions with
respect to such issues.

36.    Through Committee meetings, conference calls and numerous other
communications with members of the Committee, Milbank has assisted the Committee in
(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and (ii) making
informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.
Indeed, without such meetings and the advice furnished to it by attorneys with expertise in a
variety of different practice areas, the Committee could neither function as a committee nor
make the many decisions that its statutory role and fiduciary duties require it to make in
connection with these cases.

**C.**    **Project Monitoring/Court Calendar & Docket Maintenance**

37.    During the Ninth Interim Compensation Period, Milbank continued to
maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to organize
and track (i) pleadings filed in the Chapter 11 Cases, the SIPA Proceeding, and related adversary

proceedings; (ii) ongoing projects; and (iii) upcoming deadlines. On a real-time basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access. Milbank also monitored the dockets and summarized and circulated substantive pleadings to the Milbank team. These summaries enabled Milbank to stay abreast of ongoing developments in these cases, facilitated the assignment of projects and helped ensure that deadlines were not missed.

38.    Additionally, Milbank maintained a comprehensive calendar of active matters in these cases. This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved beneficial in responding to inquiries and discussing these matters with the Committee and other parties in interest. Milbank also maintained, and circulated to the Committee on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines in the Chapter 11 Cases.

**D.    Hearings and Court Communications**

39.    During the Ninth Interim Compensation Period, Milbank prepared for and appeared at each of the hearings conducted before this Court, including, among others, (i) numerous regularly scheduled omnibus hearings; (ii) hearings on claims-related matters; (iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; (v) hearings in a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the SIPA Proceeding; and (vi) hearings in related cases and litigations, including the chapter 11 cases of the SunCal Debtors (as defined below) and a number of matters before the High Court of Justice for England and Wales (the "UK High Court").

40.    In advance of each hearing, Milbank conferred internally to address the issues presented by each motion or other substantive pleading and coordinate a response thereto. To that end, among other things, Milbank reviewed and analyzed documents, including

19

correspondence and pleadings, conducted factual and legal research, and met with numerous

parties to work toward the consensual resolution of any objections raised by the Committee or

other parties in interest.  Following each hearing, Milbank promptly advised the Committee of

pertinent Court rulings and developments.

E.      **Interested Party Communications/Website/Lehman Team Hotline**

41.     In accordance with the Stipulation and Agreed Order Between the Debtors

and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information

Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Court

approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the

Committee, continued to populate and maintain a public website (the "Committee Website").

The Committee Website contains a significant amount of content produced by Milbank, which is

updated frequently and designed to provide information to creditors worldwide, including,

among other things, (i) general information concerning the Chapter 11 Cases, including

adversary proceedings and the SIPA Proceeding; (ii) highlights of significant events; (iii) a

database of the Court's memorandum decisions and opinions issued in the Chapter 11 Cases,

adversary proceedings and the SIPA Proceeding; (iv) a listing of the orders granting the Debtors'

omnibus objections to claims, detailing the affected claims by claim number; (v) a case calendar;

(vi) a catalogue of materials and important dates and deadlines related to the Disclosure

Statement and the Plan; and (vii) answers to frequently asked questions, which are available in

several languages.

42.     The Committee Website also acts as a critical pathway for the

dissemination of information between Milbank and the Debtors' creditors.  For example, the

Committee Website permits creditors to register to receive monthly reports and to submit

inquiries directly to Milbank, as to which Milbank works in collaboration with the Debtors'

counsel (as required by the Creditor Information Protocol) to provide responses.

43.    During the Ninth Interim Compensation Period, Milbank continued to

expend substantial time maintaining and improving the Committee Website. In addition,

hundreds of creditors contacted Milbank via the Committee Website and telephonically with

questions concerning the Chapter 11 Cases and, more specifically, inquiries concerning the

proposed treatment of certain claims under the Debtors' Second Amended Plan, the Plan and the

Debtors' omnibus claim objection process. In accordance with the Creditor Information

Protocol, Milbank reviewed and responded to all such creditor inquiries.

44.    Milbank also spent considerable time working with each of the *ad hoc*

groups that formed during the Chapter 11 Cases, as well as with numerous individual creditors,

to advance the objectives of various creditor constituencies, assist such creditors' understanding

of critical issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues. At the

Court's direction, Milbank also frequently acted as an information "liaison" between the

Debtors, these *ad hoc* groups and other creditors.

**F.    Communications with Debtors**

45.    During the Ninth Interim Compensation Period, Milbank continued its

frequent communication and exchange of correspondence with the Debtors' counsel regarding,

among numerous other issues, case administration, responses to pleadings, issues related to the

Debtors' Second Amended Plan and the Plan, negotiations with the administrators and trustees

(the "Foreign Administrators") managing the affairs of the numerous proceedings (the "Foreign

Proceedings") initiated by or against the Foreign Affiliates, substantive consolidation, claims

based LBHI's purported guarantee of its affiliates' obligations, intercompany claims and

21

negotiations with the aforementioned *ad hoc* groups. Furthermore, Milbank prepared for and attended in-person meetings with the Committee members, the Debtors, and their respective professionals to, among other things, discuss the ongoing administration of the Chapter 11 Cases, the Debtors' emergence from chapter 11 and, specifically, the Plan and asset management options.

### G.    LBI/SIPC Coordination and Issues

46.    During the Ninth Interim Compensation Period, Milbank devoted significant time to analyzing various aspects of LBI's claims reconciliation process including, in pertinent part, (i) monitoring and, where contested, analyzing, the SIPA Trustee's objections to claims; (ii) reviewing and making recommendations to the Committee with respect to stipulations to close out prepetition transactions between LBI and various counterparties; and (iii) evaluating and making recommendations to the Committee regarding various motions and applications filed in the SIPA Proceeding. In addition, Milbank regularly participated in Court hearings related to the administration of the LBI estate on behalf of the Committee.

47.    Specifically, much of Milbank's time analyzing LBI's claim reconciliation process was dedicated to a review of the SIPA Trustee's efforts to resolve certain outstanding claims not yet categorized by the SIPA Trustee (the "TBA Claims"). This review involved research and analysis of the legal issues implicated by the expunging of such claims. After analyzing the TBA Claims, Milbank prepared and filed, on behalf of the Committee, a statement with respect the SIPA Trustee's proposed resolution of the issue [Adv. Proc. No. 08-01420; Docket No. 4670].

48.    Additionally, Milbank cooperated with the Debtors to address numerous inter-estate issues between the Debtors and LBI. Milbank and the Debtors' counsel worked

closely to prepare for meetings with the SIPA Trustee and representatives of the LBI estate to

discuss various issues related to administration of LBI and to reconcile the claims filed between

the parties.  To that end, Milbank analyzed preliminary proposals submitted by the Debtors and

the SIPA Trustee to reconcile such claims, which included researching the various legal issues

related to the treatment of claims under SIPA, the standards for determining the status of claims

filed against a broker-dealer, and the contractual rights underlying certain of the claims at issue.

**H.    Employee/ERISA/Benefits/Pension Issues**

49.    During the Ninth Interim Compensation Period, Milbank devoted

substantial time to researching, analyzing and communicating with the Debtors' counsel with

respect to certain administrative and judicial proceedings (the "UK Pension Proceedings") in the

United Kingdom ("UK") related to the Debtors' obligations to fund the Lehman Brothers

Pension Scheme (the "Pension Scheme"), sponsored by Lehman Brothers Limited ("LBL").  The

UK Pensions Regulator commenced the UK Pension Proceedings against LBHI and certain of its

non-Debtor affiliates based on a purported funding shortfall in the Pension Scheme and,

ultimately, issued a "financial support directive" imposing liability on LBHI, among others, with

respect to this shortfall.  The Debtors subsequently (i) appealed the administrative ruling to issue

the financial support directive against LBHI and its non-Debtor affiliate Lehman Brothers Asset

Management, LLC in respect of the Pension Scheme (the "Upper Tribunal Proceeding"), and

(ii) joined the UK Pensions Regulator as a respondent in a separate case involving the treatment

of pension-related liabilities under UK insolvency laws (the "Insolvency Proceeding").  The

Debtors obtained a stay in the Upper Tribunal Proceeding pending resolution in the Insolvency

Proceeding.  The UK High Court decided, consistent with the Debtors' position, that pension-

related liabilities should be treated as an expense of the administration (i.e., entitled to "super-

priority" status).  The Foreign Affiliates in administration in the UK appealed the UK High

Court's decision to which the Debtors and the UK Pensions Regulator have submitted responses.

The Court of Appeal upheld the UK High Court's decision on October 14, 2011.  Shortly

thereafter, the Foreign Affiliates appealed the Court of Appeal's decision and the UK Supreme

Court has agreed to hear the case, which will likely be heard in early 2013.  In connection

therewith, during the Ninth Interim Compensation Period, Milbank reviewed the relevant

documentation, researched applicable laws, and regularly discussed and analyzed the

proceedings with Debtors.  Milbank attended the Court of Appeal hearing and regularly updated

the Committee as to the status of the UK Pension Proceedings.

    50. In addition, Milbank researched critical legal issues, reviewed documents

and advised the Committee with respect to the proposed purchase by LBHI of LBI's 100%

ownership interest in Aceso Holdings Inc. ("Aceso"), the entity that owns the Lehman health

care trust set up as a voluntary employees' beneficiary association (the "VEBA"), and the

proposed settlement between LBHI and LBI related to the VEBA.  Prior to the Petition Date,

LBHI was the sponsor of a group health plan for all U.S. Lehman employees (the "Group

Plan").  Currently, there is approximately $37 million in the VEBA trusts.  Pursuant to the

proposed settlement between LBHI and LBI, LBHI will purchase LBI's shares of Aceso for

$1,885.00, and LBHI and LBI will release all claims against each other related to the VEBA.

LBHI intends to seek reimbursement from the VEBA for the $25 million paid by it in respect of

retiree, long term disability and current employee health benefits since March 2009, and use the

remaining VEBA funds to pay current employees' claims and fund retiree premiums until the

VEBA funds have been exhausted.

## I.    Tax Issues

51.    During the Ninth Interim Compensation Period, Milbank analyzed and evaluated federal, state, local, and international tax issues relating to the Debtors' estates.  A subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to (i) inform the Committee of significant tax matters (e.g., the structure of the Plan, the status and substance of the Debtors' planned private letter ruling request from the Internal Revenue Service ("IRS") and related filings); (ii) obtain Committee input as to certain tax matters; and (iii) ascertain information that may be relevant to the tax analysis.

52.    Milbank participated in weekly conferences with the Debtors' in-house tax department and the Debtors' counsel to discuss (i) the Debtors' ongoing business activities; (ii) the Debtors' tax compliance activities and preparedness; (iii) the progress of negotiations with the IRS, the Department of Justice, and state and local taxing authorities concerning tax audits by, and settlement discussions with, those authorities; (iv) certain tax issues with LBI's counsel; and (v) strategies for obtaining a ruling from the IRS regarding the tax consequences of the Plan.

53.    Milbank also reviewed and analyzed (i) tax issues related to the disposition of certain of the Debtors' assets; (ii) the Debtors' federal, state, local, and international tax exposures and potential refund claims; (iii) tax allocation issues among the Debtors, non-Debtor affiliates, and LBI; (iv) structural issues related to the Plan; and (v) the Debtors' request for a ruling from the IRS regarding the tax consequences of the Plan.

54. Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the federal income tax treatment of breakage costs on terminated derivatives; (ii) potential withholding obligations on dividend equivalent payments; (iii) the characterization and treatment of distributions made to LBI pursuant to the Plan; (iv) applicability of deemed exchange rules to Debtors' ruling request analysis; (v) trigger events for cancellation of indebtedness income; (vi) the application of Singapore withholding tax to distributions; and (vii) the potential application of section 505 of the Bankruptcy Code to a determination as to the potential applicability of withholding on distributions made pursuant to the Plan.

55. **Tax Litigation**. Milbank, on behalf of the Committee, continued to participate as intervenor in the Debtors' action against the United States (the "Government") for a tax refund relating to the "stock loan" transactions (the "Tax Litigation"), and undertook activities associated with representing the Committee's interests in that litigation. In particular, Milbank participated in the discovery process and analyzed various legal issues in connection with discovery in the United States and the UK.

56. Milbank reviewed the Government's document productions and privilege logs and assisted Debtors' counsel in drafting objections to certain privilege claims asserted by the Government. Milbank also participated in negotiations with Debtors' counsel and the Government to attempt to resolve disagreements over such privilege claims. Milbank performed research and prepared memoranda regarding the Debtors' and the Committee's legal positions on several contested discovery issues. Debtors' counsel also consulted with Milbank regarding the drafting of Debtors' interrogatories and Debtors' responses to the Government's

interrogatories. Finally, Milbank reviewed third-party document productions made in response to the Government's subpoenas.

## J.     Intercompany Issues

57.     Lehman Brothers Bankhaus AG ("Bankhaus") is a wholly-owned subsidiary of LBHI that was placed into an insolvency proceeding by the Frankfurt Local Court (*Amtsgericht*) on November 13, 2008. During the Ninth Interim Compensation Period, Milbank expended considerable time researching and analyzing the classification under the Plan of certain claims that Bankhaus held against LBHI and LCPI, but later transferred to a third-party creditor. In connection therewith, Milbank advised the Committee as to the risk that certain claimants would prevail in having Bankhaus claims reclassified.

58.     Milbank also continued to investigate certain intercompany issues raised by the Plan. Specifically, Milbank continued to examine the Debtors' treatment of claims arising in connection with the Debtors' intercompany repurchase agreements and the considerations affecting such treatment. In connection therewith, Milbank continued to assess the potential recharacterization of such claims as equity, as well as defenses that could be asserted against such recharacterization. Milbank also evaluated issues with respect to valuation and alternatives to the Debtors' proposed treatment of intercompany claims.

59.     Furthermore, Milbank researched and analyzed the preclusive effect of a potential confirmation order on the characterization of certain distributions provided for under the Plan to Lehman Brothers Treasury Co. B.V. ("LBT").

## K.     Real Estate Matters

60.     As reflected in the First Interim Fee Application, due to the size, complexity and potential for exposure, the Committee established a subcommittee (the "Real

Estate Subcommittee") to evaluate issues relating to the Debtors' extensive real estate portfolio.

During the Ninth Interim Compensation Period, the Real Estate Subcommittee held regular

telephonic meetings to address and make recommendations to the full Committee with respect to

issues related to the Debtors' real estate holdings in discrete assets (e.g., Archstone, Canary

Wharf, Excalibur, Hamilton Praedium, Hyatt Cincinatti, Innkeepers, LCOR, Moonlight Basin,

Ritz Carlton Kapalua, Rosslyn, Starman Étoile, SunCal, TPG Austin, 200 Fifth Avenue, 237

Park, 695 East Main Street and 1107 Broadway) and work with the Debtors under previously

approved protocols to maximize the value of the Debtors' real estate assets.

61.    The Debtors' real estate portfolio includes commercial, residential and

corporate interests in which the Debtors hold both debt and equity positions, often in the form of

joint ventures to develop large commercial projects.  During the Ninth Interim Compensation

Period, Milbank continued to work closely with the Committee's financial advisors to assess

whether the Debtors should continue to meet various real estate-related funding obligations and

whether to invest additional funds in certain assets to increase the potential sale value.  In

addition, Milbank evaluated the terms of the Debtors' proposed restructuring of certain debt

facilities (e.g., the Calvino/Zwinger facility).  In connection therewith, Milbank reviewed the

Debtors' rights, obligations and exposures relative to joint venture partners, borrowers, senior

secured lenders, unsecured creditors and other third parties, to further analyze the potential

consequences of the proposed restructurings or failures to fund capital calls on the Debtors'

creditors.  Milbank also participated in the consensual resolution of several outstanding real

estate-related motions.

62.    During the Ninth Interim Compensation Period, Milbank and the Debtors

negotiated revised procedures for the Debtors to (i) restructure, (ii) make new or additional debt

and/or equity investments in, and/or (iii) enter into settlements and compromises in connection

with existing real estate investments (the "Real Estate Protocol"). These negotiations culminated

in a motion by the Debtors to implement a revised Real Estate Protocol, which the Committee

supported [Docket No. 17615] and this Court ultimately approved. In addition, Milbank

researched and drafted memoranda in connection with certain real estate matters, prepared and

filed several pleadings in connection with real estate transactions requiring Court approval and

monitored legal proceedings related to the Debtors' real estate assets. Milbank also met

regularly with the Debtors and the Debtors' advisors regarding how the Debtors should use their

real estate assets to generate maximum value for the Debtors' creditors.

63.    **Archstone**. In 2007, certain of the Debtors and their non-Debtor affiliates

made equity investments and loans in connection with the leveraged buyout (the "LBO") of

Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Through

their non-debtor affiliates, the Debtors currently hold approximately 47% of the controlling

common equity interests in Archstone. In addition, Barclays Capital Inc. ("Barclays") and Bank

of America, N.A. ("Bank of America,") collectively hold approximately 53% of such interests.

In connection with the LBO, the co-sponsors provided secured financing to Archstone that

consisted of various loans, including, certain term loans, revolving loans, mezzanine loans, and a

development loan.

64.    As a result of the declining real estate market, Archstone was unable to

generate revenues or property sales sufficient to meet its various liabilities, including the

servicing of its secured debt, which resulted in the need for additional liquidity and several

restructurings. Accordingly, during the Ninth Interim Compensation Period, Milbank and the

Committee's financial advisors reviewed, researched and analyzed potential options for

unwinding the Debtors' investment in Archstone. Specifically, Milbank analyzed whether to pursue a private sale or take the company public through an initial public offering ("IPO"). Milbank engaged in numerous discussions with the Debtors over the proposed strategy regarding Archstone and contemporaneously provided updates to the Committee regarding the status of sale negotiations, IPO discussions and the "dual-track" approach (i.e., preparing for an IPO and approaching potential buyers about a sale).

65.    **Innkeepers**. Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers") owned 71 hotel properties throughout the U.S. Prior to the Petition Date, Lehman ALI, Inc. ("Lehman ALI") originated a $367,658,725 financing with Innkeepers that was bifurcated into a $250,000,000 floating rate first mortgage loan (the "ALI Mortgage Loan") and a $117,658,725 floating rate mezzanine loan (the "Mezzanine Loan"). The ALI Mortgage Loan was secured by 19 of Innkeepers' hotel properties and the Mezzanine Loan was secured by pledges of the equity of the entities holding those same 19 properties. Facing significant financial difficulties, Innkeepers filed for chapter 11 bankruptcy protection in July 2010 (the "Innkeepers Chapter 11 Cases"). During the Eighth Interim Compensation Period, an auction was held for 64 of Innkeepers' hotels in Innkeepers Chapter 11 Cases, which Cerberus Series Four Holdings LLC ("Cerberus") and Chatham Lodging Trust ("Chatham" and, together with Cerberus, the "Cerberus/Chatham Group") won, with a bid of approximately 1.119 billion.

66.    During the Ninth Interim Compensation Period, however, the Cerberus/Chatham Group failed to consummate the transaction, invoking the "material adverse effect" clause in the sale agreement. Innkeepers then filed a complaint against the Cerberus/Chatham Group seeking damages from the Cerberus/Chatham Group arising from the failure to close the transaction. Milbank reviewed the complaint filed by Innkeepers, attended a

30

status conference in the Innkeepers Chapter 11 Cases, researched legal issues in connection with the material adverse effect clause, the complaint, and the effect of the Innkeepers proceedings on recoveries to the Debtors and the Debtors' creditors, and apprised the Real Estate Subcommittee and the full Committee of relevant developments regarding the sale of Innkeepers' assets. Eventually, Innkeepers and the Cerberus/Chatham Group agreed on revised terms for the sale of the 64 hotels, which still provided a substantial payout to the Debtors' creditors. Milbank analyzed the revised transaction terms for the sale of the Innkeepers hotels, determined that it was still above the threshold for providing a substantial benefit to the estate, and recommended that the Committee approve the new deal on its terms, which the Committee did.

67.    **SunCal**.  SunCal is a collection of large-scale residential and commercial real estate projects in California.  Prior to the Petition Date, Lehman ALI, LCPI and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion.  As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors in the SunCal Cases.

68.    During the Ninth Interim Compensation Period, the long-pending appeal of the SunCal Debtors regarding SunCal's ability to pursue equitable subordination claims against LCPI without violating the automatic stay in LCPI's chapter 11 case was argued before the Ninth Circuit Court of Appeals (the "Ninth Circuit").  Milbank monitored the proceedings, attended oral arguments, explained the Ninth Circuit's decision to the Committee and answered Committee members' questions regarding the implications of the decision on the Debtors' estates and creditors.

69.    In addition, during the Ninth Interim Compensation Period, Milbank reviewed the Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Authority to (i) Enter into the Second Amended Joint Chapter 11 Plan Proposed by the Lehman Creditors and the SunCal Trustee on Behalf of the SunCal Involuntary Debtors in Eight of the SunCal Involuntary Debtors' Cases; (ii) Enter into the Second Amended Joint Chapter 11 Plan Proposed by the Lehman Lenders in Eleven of the SunCal Voluntary Debtors' Cases; and (iii) Participate in any Auction of the SunCal Debtors' Assets (the "SunCal Plan Motion") [Docket No. 18122].  Milbank analyzed the SunCal plans of reorganization and prepared and filed, on behalf of the Committee, a statement in support of the SunCal Plan Motion [Docket No. 18573].  Milbank also participated (telephonically) in the disclosure statement hearing in the SunCal Cases and discussed significant issues arising therefrom with the Committee.

## L.    Private Equity

70.    As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "Private Equity Subcommittee") to monitor and analyze developments with respect to the Debtors' private equity assets.  During the Ninth Interim Compensation Period, the Private Equity Subcommittee continued to review specific issues surrounding the Debtors' private equity portfolio with a view toward helping the Debtors maximize the value of such portfolio for the benefit of all creditors.  Specifically, Milbank worked closely with the Debtors, the Debtors' professionals and the Committee's financial advisors regarding these assets.

71.    Most significantly, Milbank and the Committee's financial advisors reviewed a restructuring transaction whereby LCPI took control of DHS Drilling from Delta

32

Petroleum and Chesapeake Energy (collectively, the "Sponsors").  Milbank and Houlihan performed diligence on the proposed transaction, and provided background and an overview of the investment to the Committee.  Based on such diligence, the advisors notified the Committee that the proposed restructuring maximized value of the Debtors' estates.  Accordingly, the Committee resolved to approve the Debtors' entry into the restructuring transaction based on the Sponsors' proposal.

**M.      Derivatives Issues**

72.      As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop value-maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the Ninth Interim Compensation Period, Milbank continued to conduct regular meetings with the Derivatives Subcommittee to address and, where appropriate, make recommendations to the Committee with respect to specific issues concerning the Debtors' portfolio of derivatives positions.

73.      **Derivatives ADR**.  On September 17, 2009, this Court entered an order approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order") [Docket No. 5207], pursuant to which the Committee, the Debtors and derivatives counterparties mediate disputes arising from the closing out of the Debtors' "in-the-money" derivatives portfolio.  During the Ninth Interim Compensation Period, Milbank continued to work closely with the Debtors to review and respond to counterparty notices filed under the Derivatives ADR Order, and to evaluate settlement proposals arising under the alternative dispute resolution

33

process.  In addition, Milbank participated in mediations on behalf of the Committee.  In

preparation for each such mediation, Milbank conducted extensive legal and factual research on

the issues in dispute and drafted numerous memoranda, including memoranda to the Derivatives

Subcommittee, describing such issues and seeking approval of minimum settlement amounts.

Such efforts have been instrumental in helping the Debtors achieve settlements in a total of 152

matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of over

$924 million into the Debtors' estates.

74.    **Derivatives Litigation**.  Milbank also continued to address issues related

to, and provided recommendations regarding, the highly complex derivatives-related adversary

proceedings commenced by and against the Debtors.  To that end, Milbank devoted substantial

resources to analyzing derivative contracts and other related transaction documents, monitoring

and participating actively in the derivatives-related adversary proceedings, communicating with

the Debtors' counsel and the Committee's financial advisors, and developing and evaluating

strategies to monetize complicated derivative transactions for the benefit of unsecured creditors

of each of the Debtors' estates.  In particular, Milbank researched and analyzed the issues

presented in, and advised the Committee with respect to, certain contested matters and adversary

proceedings including, among others, (i) *Michigan State Housing Development Authority v.*

*Lehman Brothers Derivative Products Inc. and Lehman Brothers Holdings Inc.*, Bankr. Ct. Adv.

Proc. No. 09-01728; (ii) *Lehman Brothers Holdings Inc. and Lehman Brothers Special*

*Financing, Inc. v. Nomura International PLC and Nomura Securities Co., Ltd.*, Bankr. Ct. Adv.

Proc. Nos. 10-03228 & 10-03229; and (iii) UK proceedings involving Belmont Park Investments

Pty Limited.  Additionally, Milbank analyzed the potential impact on outstanding matters of the

U.S. Supreme Court's decision in *Stern v. Marshall*.

34

75.     Prior to representing the Committee in the derivatives-related adversary proceedings, Milbank researched, among other things, complex legal issues related to the treatment of derivative contracts in bankruptcy.  Such research and analysis played an essential role in the development of strategies to recover amounts due to the Debtors in disputed derivatives transactions.

76.     **Derivatives Settlements**.  On December 16, 2008, this Court entered an order to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts (the "December Order") [Docket No. 2257], pursuant to which the Committee, the Debtors and derivatives counterparties negotiate outstanding derivative and guarantee claims of the counterparties or amounts due to the Debtors as they may arise from the closing out of the Debtors' derivatives portfolio.  On March 11, 2009 and April 22, 2010, respectively, this Court entered further orders authorizing the Debtors to grant first priority liens in cash collateral posted in connection with the hedging transactions entered into through certain futures and prime brokerage accounts (the "Hedge Order") [Docket No. 3047], and to purchase and sell notes issued by certain special purpose vehicles that are party to transactions with certain Debtors (the "SPV Notes Purchase Order") [Docket No. 8596].

77.     Pursuant to the December Order, the Hedge Order, and the SPV Notes Purchase Order, during the Ninth Interim Compensation Period, Milbank continued to work closely with the Debtors to review claims or receivables, hedge proposals, and proposed note purchases, and to arrive at negotiated settlements or transactions with respect thereto.  To that end, Milbank devoted substantial resources to analyzing derivative contracts and other related transaction documents, communicating with the Debtors' counsel and the Committee's financial advisors, and developing and evaluating strategies to monetize complicated derivatives

35

transactions for the benefit of unsecured creditors of each of the affected Debtors' estates.
Milbank also expended considerable time describing such analyses and recommendations in
numerous presentations and memoranda to the Committee.

78.     Furthermore, as described in the Disclosure Statement the Debtors
engaged in negotiations with a number of their largest derivatives counterparties regarding a
common approach for settlement of their derivatives claims pursuant to uniform and transparent
methodologies (the "Derivatives Framework").  Milbank reviewed and advised the Committee
with respect to the Derivatives Framework and multiple attendant negotiations, as well as
accompanying settlement agreements that, as of August 31, 2011, had resolved approximately
$9.6 billion of asserted derivatives claims and $6.2 billion of asserted derivatives guarantee
claims.

**N.      Loans/Investments**

79.     As reflected in the First Interim Fee Application, the Committee
established a subcommittee (the "Loan Book Subcommittee") to review and analyze issues
related to the Debtors' portfolio of commercial loans.  During the Ninth Interim Compensation
Period, the Loan Book Subcommittee reviewed and considered the proposed settlement of a
credit agreement entered into with Latshaw Drilling Company, LLC and Latshaw Drilling and
Exploration Company, Inc.  Specifically, Milbank analyzed the Motion of Lehman Commercial
Paper Inc. Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for
Approval of Settlement and Compromise with Latshaw Drilling Company, LLC and Latshaw
Drilling and Exploration Company, Inc. (the "Latshaw Motion") [Docket No. 16806].  On
behalf of the Committee, Milbank drafted a statement in support of the Latshaw Motion
[Docket No. 17593] indicating that the Committee did not object to the terms of the settlement

agreement because, in addition to the reasons set forth in the Latshaw Motion, the settlement

agreement imposed a minimal cost on LCPI's estate in exchange for obviating the need to

litigate issues relating to such matters as solvency in a "foreign" court.  The Court ultimately

approved the relief requested in the Latshaw Motion [Docket No. 17761].

        80.     In addition, Milbank, together with Houlihan, continued to evaluate

various options proposed by the Debtors to facilitate the management and monetization of the

Debtors' loan book portfolio.  Milbank continued to review, among other things, (i) the

circumstances under which an asset transfer transaction would be anticipated to give rise to a

true sale of loan interests; (ii) the likelihood that a final court order approving the Debtors'

proposed transfer could be modified or reversed upon reconsideration or appeal; and (iii) other

issues related to the potential management of the Debtors' loan portfolio.  Milbank provided the

Committee with its analyses of the Debtors' proposed transfer and the potential implications

such transfer would have on the Debtors' estates.

        81.     In connection therewith, Milbank analyzed the Debtors' Motion Pursuant

to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure

6004 for Authorization to (i) Enter into an Asset Management Agreement for the Management

of the Debtors' Commercial Loan Portfolio and (ii) Sell Commercial Loans to Special Purpose

Entities in Connection with the Issuance of Collateralized Loan Obligations (the "CLO

Motion") [Docket No. 18810].  Pursuant to the CLO Motion, the Debtors sought approval of an

asset management agreement, which provided for (i) the Debtors to hire Fraser Sullivan

Investment Management ("Fraser Sullivan") to manage certain commercial loans (the

"Commercial Loan Portfolio"), and (ii) the Debtors to sell commercial loans to issuers of

collateralized loan obligations ("CLOs"), as and when the Debtors and Fraser Sullivan

determined it was appropriate, and to take all other actions necessary, and pay all other fees and

expenses necessary to structure, create and market the CLOs.  On behalf of the Committee,

Milbank drafted a statement in support of the CLO Motion [Docket No. 19221] indicating that

the Committee supported the relief requested in the CLO Motion and agreed with the Debtors

that the engagement of Fraser Sullivan to administer the Commercial Loan Portfolio was in the

best interests of the Debtors' estates and their creditors.  The Court ultimately approved the

relief requested in the CLO Motion [Docket No. 19324].

82.     Finally, Milbank continued to work with the Committee's financial

advisors to present the legal and financial implications of the Debtors' loan book transactions to

the Loan Book Subcommittee in order to facilitate its recommendations and responsive courses

of action to the full Committee.  To that end, the Loan Book Subcommittee convened meetings

to discuss and formulate recommendations regarding all outstanding loan book matters.

## O.     Domestic Bank and Related Regulatory Issues

83.     Milbank continued to expend time in connection with analyzing issues

related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and,

together with Woodlands, the "Banks"), which are overseen by the Office of Thrift Supervision

(the "OTS") and the Federal Deposit Insurance Company (the "FDIC" and, together with the

OTS, the "Regulators").  Throughout the Chapter 11 Cases, the Debtors and the Committee's

professionals have sought to improve the capital levels at each of the Banks to satisfy regulatory

requirements, avoid potential seizures and liquidations by the Regulators, and facilitate the

resumption of depository functions at the Banks to preserve and maximize value.  Accordingly,

Milbank worked closely with the Debtors and their advisors to finalize the terms of settlements

among the Debtors and the Banks to achieve the Regulators' approval to resume normal profit-generating banking and lending operations.

84.     During the Ninth Interim Compensation Period, Milbank continued to work with the Debtors and their bankruptcy and regulatory counsel concerning implementation of the settlements, including, without limitation, through the sale processes for Aurora and its subsidiaries and the wind-down of Woodlands.  In addition, Milbank reviewed and analyzed issues in connection with litigation and investigations pending against Aurora, including an action brought by q*ui tam* plaintiff.

**P.     International Insolvency Matters**

85.     During the Ninth Interim Compensation Period, Milbank continued to monitor and analyze issues regarding the Foreign Proceedings.  Specifically, Milbank attorneys and paraprofessionals across various jurisdictions continued to collaborate with each other, the Debtors' counsel and the Foreign Administrators regarding the status of major issues among the Debtors and certain of the Foreign Affiliates and potential settlements thereof.  Milbank also reviewed and analyzed status reports published by the Foreign Administrators – including reports published by the administrators of LBT, Lehman Brothers Finance AG ("LBF") and Lehman Brothers Australia – and other publicly available information to keep the Committee informed with respect to, among other things, asset recoveries and claims reconciliation.  Based on such analyses, Milbank provided regular updates to the Committee regarding the status of the Foreign Proceedings, and their impact on the Debtors and the overall recoveries of the Debtors' creditors.

86.     Furthermore, Milbank worked with the Debtors' bankruptcy counsel concerning the implementation of numerous settlement agreements with the Foreign Affiliates

located in the UK, Hong Kong, Singapore, Japan, the Netherlands, and Luxembourg.  In

connection therewith, Milbank reviewed and commented on drafts of the settlement agreements,

researched relevant legal issues implicated by such review, communicated regularly with the

Debtors' counsel, and presented the legal issues to the Committee.  In each such instance, based

on the foregoing analyses, the Committee concluded that the settlement was in the best interests

of the Debtors and approved the Debtors' entry thereto.

        87.     Milbank also continued to monitor developments regarding that certain

Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the

"Protocol"), approved by the Court on June 17, 2009 [Docket No. 4020].  In connection

therewith, Milbank reported to the Committee on meetings of the Protocol signatories, in which

Milbank actively participated, held in London on June 1, 2011 and in New York on July 27,

2011.  At the Protocol Meetings, Milbank engaged with certain Foreign Administrators to,

among other things, (i) discuss issues regarding the Plan, and (ii) facilitate consensual

resolutions of contested issues among the Debtors and the Foreign Administrators.

        88.     **UK Issues**.  During the Ninth Interim Compensation Period, Milbank

monitored and discussed the implications with the Committee of the following ongoing

litigation proceedings in the UK:  (i) the appeal of the UK High Court's decision holding that

LBIE, and not any of the affiliates involved in the Regulation and Administration of Safe

Custody and Global Settlements ("RASCALS"), was the legal owner of not less than £700

million in securities subject to the RASCALS process; (ii) the appeal of the UK High Court's

decision holding that Financial Support Directions should be treated as an "expense" of a

company in administration and consequently rank in priority to the claims of all other unsecured

creditors; (iii) the appeal of the UK High Court's decision concerning "flip clauses" designed to

reorder payment priorities in bankruptcies; and (iv) LBIE's application to the UK High Court

for directions on a dispute between LBIE and LBF concerning the applicability of a side letter

associated with back-to-back transactions to LBIE's intercompany derivatives portfolio.

89.    The Debtors had also disclosed that assets held by LBIE for Lehman

affiliates as clients were potentially subject to liens (the "Extended Liens") in favor of other

Lehman affiliates.  Milbank continued to review agreements purporting to create Extended

Liens in order to advise the Committee of the potential impact that Extended Liens could have

on cross-border insolvency issues between the Debtors and their Foreign Affiliates and,

ultimately, creditor recoveries.  In that connection, Milbank produced a comprehensive

memorandum for the Committee examining the Extended Liens and evaluating different

outcomes for the proposed treatment of the Extended Liens by the UK High Court.  In

connection therewith, Milbank analyzed arguments likely to be raised by LBIE, its clients, or

other Lehman affiliates that may benefit from enforcement of Extended Liens, as well as how

the Debtors could benefit from or be harmed by the Extended Liens.  Milbank also monitored

the application submitted by the Joint Administrators of LBIE to the UK High Court for

directions and orders regarding the Extended Lien issue, and reviewed their position paper

regarding the enforceability of Extended Liens.

## Q.    Non-Derivative Automatic Stay/Safe Harbor Issues

90.    During the Ninth Interim Compensation Period, Milbank reviewed

numerous motions filed by parties in interest seeking to lift the automatic stay in order to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates.

91.    Specifically, Milbank analyzed lift-stay motions filed by

(i) Turnberry/Centra Sub, LLC, Turnberry/Centra Office Sub, LLC, Turnberry Retail Holding,

L.P., Jacquelyn Soffer, and Jeffrey Soffer; (ii) the Estate of Fannie Marie Gaines; and (iii) Michael A. Couch and Melissa A. Couch. In each case, Milbank reviewed the motion, researched relevant legal issues, drafted a memorandum to the Committee analyzing the merits of the motion and provided a recommended course of action to the Committee.

92.    Milbank also analyzed the Motion of Merrill Lynch Portfolio Management, Inc. ("MLPM") and Merrill Lynch Capital Services, Inc. ("MLCS") for Entry of an Order Compelling Specific Performance of Subordination Agreement Terms (the "Merrill Motion") [Docket No. 18033]. Pursuant to the Merrill Motion, MLPM and MLCS sought an order directing LBHI, as the successor in interest to LBI, and LBSF to release their respective mortgages on a multifamily housing project located in Broward County, Florida (the "Brampton Project"). On behalf of the Committee, Milbank drafted a statement in support of the Debtors' objection to the Merrill Motion [Docket No. 18570] indicating the Committee's agreement with the Debtors that the relief requested therein was procedurally improper, not supported by the terms of the subordination agreement, and not conducive to a global settlement of the parties' respective interests in the Brampton Project and certain other projects. The Court ultimately agreed with the Debtors and the Committee and denied the relief requested in the Merrill Motion [Docket No. 18806].

93.    **Motion to Enforce the Automatic Stay**. Milbank also analyzed the Motion of the Debtors Pursuant to Section 362(a) of the Bankruptcy Code for Enforcement of the Automatic Stay (the "Stay Enforcement Motion") [Docket No. 17061]. Pursuant to the Stay Enforcement Motion, the Debtors sought to enforce the automatic stay with respect to two motions filed in SunCal Chapter 11 Cases. Milbank drafted a statement in support of the Stay Enforcement Motion [Docket No. 17607] indicating the Committee's agreement with the

Debtors that the automatic stay extant in LCPI's chapter 11 case bars the SunCal Debtors from

joining requests for affirmative relief to their objections to the merits of LCPI's claims.  The

Debtors ultimately withdrew the Stay Enforcement Motion [Docket No. 18525].

R.    **Plan of Reorganization/Plan Confirmation/Plan Implementation**

94.    The Committee, as one of the two principal fiduciaries in the Chapter 11

Cases, was instrumental in developing, together with the Debtors, a chapter 11 plan construct

that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring,

through the numerous settlements integrated into the Plan, that the Plan garnered the support of

most of the Debtors' creditors.  Over the course of the past three years, the Committee, with the

assistance of its advisors, has evaluated the claims, factual contentions and legal theories of all

key constituencies in the Chapter 11 Cases, and has analyzed numerous recovery scenarios and

conducted frequent meetings with individual creditors and various *ad hoc* creditor groups to

better understand their respective views.  In addition, the Committee developed its own legal

theories and strategies regarding, among other matters, the appropriate allocation of value

distributable under the Plan to various classes of creditors.  In that connection, the Committee

reviewed and analyzed such issues as substantive consolidation, intercompany claims re-

characterization, and the enforceability of guarantees, all of which had the potential effect of

reallocating value from one group of creditors to another.  In so doing, the Committee brought

to bear a comprehensive knowledge of each Debtor's assets and claims pool, as well as a global

perspective on the key value drivers, each acquired as a result of the Committee's immersion in

every aspect of the Chapter 11 Cases.

95.    The Committee's perspective on the issues confronting, and the options

available to, the Debtors allowed it to become, together with the Debtors, a principal architect of

a plan construct that achieved the most fair and equitable result for creditors available under the circumstances. The centerpiece of such construct was a global settlement of the numerous critical issues, including the risk of substantive consolidation of the Debtors' estates and those of its affiliates, the potential re-characterization of intercompany balances between LBHI and certain other Debtors, the allowed amount of claims among the Debtors and the Foreign Affiliates, the proper allocation among the Debtors of the costs and expenses of administering the Chapter 11 Cases, and the Debtors' ownership rights to certain assets, through a reallocation of value among the various affected Debtors. This concept was included in all iterations of the chapter 11 plan for the Debtors on which the Committee and the Debtors collaborated, beginning with the Debtors' First Amended Plan filed on January 25, 2011, and culminating with the Plan. To preserve this critical concept, during the Ninth Interim Compensation Period, the Committee worked with the Debtors to forge the various settlements embodied in the Plan.

96. **The Debtors' Second Amended Plan**. During the Ninth Interim Compensation Period, Milbank and the Committee's financial advisors continued to worked closely with the Debtors to reach consensus with various of the domestic and foreign creditor groups. Milbank and the Committee's financial advisors met with various creditor groups to discuss each group's position on the Debtors' First Amended Plan, and alternative proposals to settle certain issues that arose in connection with plan negotiations, including substantive consolidation, the reconciliation of intercompany claims and guarantee claims, and the treatment of claims arising from the structured notes issued by LBHI, LBT and LBSNV. Milbank also reviewed and analyzed the Ad Hoc Group Plan and the Non-Con Plan, and regularly spoke with the Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group") and the proponents of the Non-Con Plan, among other creditor groups, to discuss the terms of their plans.

97.     These efforts culminated in a series of meeting that took place in June, 2011, among the Debtors, the Committee's advisors many of the proponents of the Ad Hoc Plan and the Non-Con Plan and certain other interested parties to negotiate and ultimately reach consensus on a consensual plan of reorganization.  In addition to taking part in each of these meetings, Milbank also participated in numerous meetings and teleconferences with the individual participants, working to find common ground among the often divergent interests of these creditors.  Throughout this process, Milbank ensured that the Committee was kept abreast of all of the developments regarding these negotiations and that the interests of all unsecured creditors were fully protected under the terms of the resultant plan of reorganization.  Such efforts ultimately led to the formulation of the Debtors' Second Amended Plan, filed on June 30, 2011.

98.     Upon the filing of the Debtors' Second Amended Plan, the proponents of the Ad Hoc Plan and the Non-Con Plan agreed to stay prosecution of their competing plans. Prior to such agreement, Milbank continued to perform the Committee's responsibilities as facilitator and intermediary for Discovery Requests, as outlined in comprehensive protocol by which creditors could take discovery on plan-related matters (the "Plan Discovery Protocol"), which the Court approved on April 14, 2011 [Docket No. 16003].  Milbank reviewed and compiled discovery requests, numbering close to 900, to be served on the Debtors on behalf of numerous creditors and creditor groups.  Working as an intermediary, Milbank convened a meet and confer to discuss such requests and coordinate a streamlined process for the Debtors' response thereto.  Such work continued until the time that this Court entered the Order Granting Debtors Motion for (i) Approval of Stipulation and Order Regarding Chapter 11 Plans and (ii) Stay of Related Discovery [Docket No. 18686].

45

99.     With the prosecution of the competing plans stayed, during the Ninth

Interim Compensation Period, Milbank continued to work with the Debtors and other parties in

interest to achieve further consensus on and support for the Debtors' Second Amended Plan.  In

that connection, Milbank met with various creditors and parties in interest to discuss the terms

and economics of the plan.  Milbank also reviewed and analyzed the various settlement

agreements into which the Debtors entered with their Foreign Affiliates and presented such

analyses to the Committee to aid in the Committee's determination as to whether to support and

ultimately approve the Debtors' entry into such agreements.

100.    In addition, Milbank began work on the implementation of the corporate

governance provisions of the Debtors' Second Amended Plan, which provided for, among other

things, the formation of a committee (the "Director Selection Committee") to select the post-

Effective Date board of directors of LBHI.  In that connection, Milbank convened various

meetings relating to the formation and mandate of the Director Selection Committee and aided

its members in the execution of their duties under the terms of the Debtors' Second Amended

Plan.

101.    **Structured Securities Valuation Motion**.  During the Ninth Interim

Compensation Period, Milbank also reviewed and analyzed the Debtors' proposed methodology

for the valuation of claims arising from certain structured securities issued or guaranteed by

LBHI (the "Structured Securities").  Pursuant to the Amended Motion Pursuant to Sections

105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of

Procedures for Determining the Allowed Amount of Claims Filed Based on Structured Securities

Issued or Guaranteed by Lehman Brothers Holdings Inc. [Docket No. 18127] (the "Structured

Securities Motion"), the Debtors sought approval of a methodology to value the Structured

46

Securities claims.  At the direction of the Committee, Milbank, together with FTI, conducted an

independent analysis of this methodology and any alternatives thereto.  As a result of this

diligence, the Committee filed a statement [Docket No. 19042] in response to the Structured

Securities Motion to, among other things, provide relevant information regarding the Debtors'

valuation methodologies so that each holder of the Structured Securities could make an informed

decision whether to accept the values of the Structured Securities to be provided by the Debtors.

With additional input from the Committee, the Debtors' amended the methodology, which this

Court approved on August 10, 2011.  The Committee continues to work with the Debtors to

resolve outstanding issues regarding the valuation of the Structured Securities claims.

**S.      Disclosure Statement/Solicitation/Voting**

               102.    During the Ninth Interim Compensation Period, Milbank reviewed the

Debtors' Disclosure Statement as well as the Debtors' Amended Motion (i) for Approval of the

Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing,

(ii) Establishing Solicitation and Voting Procedures, (iii) Scheduling a Confirmation Hearing,

and (iv) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint

Chapter 11 Plan (the "Disclosure Statement Approval Motion") [Docket No. 18126].  Milbank

researched and analyzed numerous legal issues related to (i) the Disclosure Statement Approval

Motion, (ii) the Debtors' proposed solicitation and voting procedures, and (iii) potential

deficiencies in the Debtors' Disclosure Statement in light of the disclosures required under

section 1125 of the Bankruptcy Code.

               103.    Milbank expended considerable time and effort working with the Debtors

to analyze and respond to objections that were filed in opposition to approval of the Disclosure

Statement.  In connection with these efforts, Milbank prepared and filed the Statement of the

Official Committee of Unsecured Creditors in Support of the Disclosure Statement for the

Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Statement in Support") [Docket

No. 19459]. The Statement in Support noted, among other things, that the Committee concluded

that the Disclosure Statement, as amended in response to the objections filed by various

objecting parties in interest and updated to reflect certain developments, provided adequate

information to allow any creditor to make an informed decision with respect to the Plan.

Milbank, on behalf of the Committee, also participated in the hearing before this Court to

consider the adequacy of the Disclosure Statement and voting procedures. These efforts proved

ultimately successful when this Court approved the Disclosure Statement on September 1, 2011.

      104.    Thereafter, on September 9, 2011, the Debtors filed a motion for approval

of a modification to the Debtors' Disclosure Statement [Docket No. 19813], which sought to

amend the Disclosure Statement to modify the description of the types of claims included in

LBHI Class 5. Milbank researched the legal and factual issues raised by such motion and

ultimately filed the Statement of Official Committee of Unsecured Creditors in Connection with

Debtors' Motion for Approval of a Modification to the Debtors' Disclosure Statement (the

"Statement in Connection") [Docket No. 19929]. The Statement in Connection noted, among

other things, that while the potential reclassification impacted the recoveries of the applicable

claimants, the Committee's financial advisors had confirmed that the overall impact of such

potential reclassification was *de minimis*.

      105.    Furthermore, on September 13, 2011, Milbank, on behalf of the

Committee, prepared a letter to the Debtors' unsecured creditors in connection with the

solicitation of their votes on the Plan. The letter stated that the Committee supported the Plan

and recommended that all holders of unsecured claims vote to accept the Plan in accordance with the instructions set forth on the ballots.

**T.**    **Claims Analysis**

106.    **Claims Database**.  Milbank continued, during the Ninth Interim Compensation Period, to refine the database of the Debtors' and certain of the Foreign Affiliates' debt offering documents (the "Database") that was created during the First Interim Compensation Period.  Milbank continued to use the Database to develop and present summary forensic capital structure information to the Committee and its advisors, as well as to answer individual queries from the Committee and the public about specific Lehman debt instruments. The Database is used by Milbank and the Committee's financial advisors on a regular basis to understand the Debtors' and certain Foreign Affiliates' capital structures, review proofs of claim, establish a basis upon which to determine and validate claim amounts, and analyze substantive consolidation, intercompany, preference, seniority and other potential issues. Access to the Database has proven invaluable to the Committee and its advisors, particularly with respect to the matters related to the claims reconciliation process and the Plan.

107.    **Capital Structure Analysis and Classification**.  Milbank expended considerable time analyzing numerous proofs of claim filed against the Debtors, valuations of such claims, and proposed settlements thereof.  Milbank reviewed and analyzed claims based on guarantees, make-whole arrangements, warrants, certificates, notes, derivatives, repurchase agreements, security collateral agreements, master custody agreements, structured securities, and residential mortgage backed securities, and intercompany claims, among others, to analyze the proposed classification of claims set forth in the Debtors' Second Amended Plan.  Milbank also reviewed and analyzed issues affecting the valuation and settlement of such claims, including

alternative dispute resolution procedures, exchange rate analysis, derivative valuation, and the rights of subrogation, setoff, indemnification and restitution.

108.    **Omnibus Claims Objections**.  During the Ninth Interim Compensation Period, Milbank reviewed and analyzed the Debtors' omnibus objections to claims, and spoke regularly with the Debtors and their counsel regarding such objections.  In that connection, Milbank researched and analyzed legal issues and responded to various creditor inquiries regarding objections to such creditors' claims.  Specifically, Milbank analyzed various discrete issues that arose in connection with the Debtors' omnibus objections, including the classification of claims arising from Lehman's issuance of "restricted stock units" to its employees, the validity of the omnibus proofs of claim filed by the indenture trustees to certain residential mortgage-backed securities transactions, the enforceability of guarantee claims, and the proper treatment of claims arising from intercompany repurchase agreements.

## U.    Other Bankruptcy Motions and Matters

109.    After the deadline for bringing avoidance actions passed on September 15, 2010 and tolling agreements were executed with various counterparties, Milbank continued to work with the Debtors, the Debtors' counsel and advisors, the Committee's financial advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's advisors to, among other things, to (i) identify and analyze categories of pre- and post-petition transfers potentially subject to avoidance and recovery; (ii) analyze the prepetition financial condition of the Debtors to determine whether the Debtors were insolvent and/or undercapitalized during any period for purposes of pursuing preference and constructive fraudulent transfer claims; (iii) investigate and analyze particular transfers identified as potential avoidance targets; (iv) analyze potential legal issues and defenses that might arise in connection with the pursuit of any avoidance actions; and

(v) develop potential litigation strategies.

110.    During the Ninth Interim Compensation Period, Milbank researched and prepared memoranda regarding the claims and issues raised by a wide range of pending and potential lawsuits and settlements impacting the Debtors' estates.  Milbank also held teleconferences and meetings, both internally and with the Debtors, and provided regular updates to the Committee regarding numerous adversary proceedings related to the Chapter 11 Cases.

111.    More specifically, Milbank worked with the Debtors' counsel to assess the likelihood of success in recovering potentially avoidable transfers granted to two insiders of the Debtors, in the form of general compensation and severance pay.  Milbank, in conjunction with its financial advisors, reviewed financial statements to trace the payments to the originating entity.  Milbank also extensively researched case law and prepared presentations to the Committee analyzing the claims.

112.    Additionally, Milbank assisted the Debtors' counsel in identifying certain loan elevations – which were granted by LCPI to certain defendants prior to LCPI's petition date – as avoidable preferential transfers.  Milbank has worked with the Debtors' counsel to recover the loan elevations by, among other things, analyzing and valuing potential causes of action and helping the Debtors' counsel frame the issues for the avoidance action proceedings against the defendants.  Milbank researched case law and statutes, reached out to financial experts and has prepared memoranda for the Committee analyzing the preferential transfers and post-petition transfers claims and defenses.

113.    On August 31, 2011, Milbank prepared and filed a motion with the Court seeking authority to prosecute and, if appropriate, settle causes of action on behalf of LCPI [Docket No. 19622] (the "STN Motion").  Through the STN Motion, the Committee sought

authorization to prosecute the loan elevation avoidance action proceedings on behalf of LCPI.

This Court granted the STN Motion on September 14, 2011.  Since taking over these

proceedings, Milbank has reviewed and begun to evaluate the transactional documents relating to

the loan elevations, and has corresponded with the defendants regarding litigation and/or

settlement intentions.

## V.  Non-Derivative Adversary Proceedings Preparation and Litigation

114.    During the Ninth Interim Compensation Period, Milbank researched and

prepared memoranda regarding the claims and issues raised by a wide range of pending and

potential lawsuits and settlements impacting the Debtors' estates.  Milbank also held

teleconferences and meetings, both internally and with the Debtors, and provided regular

updates to the Committee regarding numerous adversary proceedings related to the Chapter 11

Cases.

115.    Excluding cases in which the Committee's interests are represented by

conflicts counsel, Milbank monitored developments in and provided updates in the form of

reports and presentations to the Committee with respect to (i) all pending and potential

adversary proceedings commenced, or to be commenced, in this Court; (ii) pre-petition lawsuits

commenced against the Debtors and pre- and post-petition lawsuits against non-Debtor

affiliates, officers, directors, and related parties; (iii) litigation issues similar to those raised, or

to be raised, in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11 Cases

(collectively, the "Monitored Matters").  When appropriate and directed by the Committee,

Milbank intervened in the Monitored Matters, prepared pleadings and participated in oral

arguments and other proceedings with respect to the Monitored Matters on the Committee's

behalf.

52

116.    In connection with the Monitored Matters, Milbank reviewed and

analyzed proposed settlement agreements and advised the Committee regarding the same.

Milbank also participated in numerous settlement negotiations, conferences and mediations with

respect to the Monitored Matters on behalf of the Committee.  Specifically, Milbank

investigated various prepetition issues regarding certain transactions involving the Debtors and

reviewed the viability of potential causes of action.  Milbank also analyzed the implications of

recent court opinions on potential claims involving the Debtors and certain third parties.

Milbank continues to review legal theories and engage in discussions with the Debtors

regarding such potential claims.

**W.    Rule 2004 Issues**

117.    Giants Stadium LLC ("Giants Stadium") filed a motion for leave to

conduct discovery of the Debtors' pursuant to Federal Rule of Bankruptcy Procedure 2004 (the

"2004 Motion") [Docket No. 16016] during the Eighth Interim Compensation Period.  During

the Ninth Interim Compensation Period, the Debtors filed a motion to compel Giants Stadium to

produce documents improperly withheld as privileged, and Giants Stadium filed a motion to

attend and participate in the deposition of Robert Taylor.  Milbank reviewed these motions,

summarized them for the Committee and monitored the dispute between Giants Stadium and the

Debtors, which remains ongoing.

**X.    Firm's Own Billing/Fee Applications**

118.    During the Ninth Interim Compensation Period, Milbank reviewed the Fee

Statements for, among other purposes, compliance with the Interim Compensation Order, the

Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its Fee

Statements on all parties, as required by the Interim Compensation Order.

119.    In connection with the appointment of the Independent Member of the Fee

Committee, Milbank reviewed and analyzed matters related to the Amended Fee Protocol, and

corresponded regularly with the members of the Fee Committee and the other professionals

retained in the Chapter 11 Cases regarding such matters.  Additionally, Milbank continued to

work cooperatively with the Fee Committee to settle certain outstanding issues identified in the

Fee Committee reports pertaining to the retained professionals' Interim Fee Applications.

## Y.    **Third Party Retention/Fee Application/Other Issues**

120.    During the Ninth Interim Compensation Period, Milbank reviewed the

retention applications of Jones Day, Moulton Bellingham PC, CB Richard Ellis, Inc., Dechert

LLP and others, as certain of these professionals originally retained as ordinary course

professionals pursuant to the Court's Order Pursuant to Sections 105(a), 327, 328 and 330 of the

Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary

Course of Business, dated November 5, 2008 (the "OCP Order") [Docket No. 1394], exceeded

the $1 million cap on fees during the pendency of the Chapter 11 Cases established in the OCP

Order.

121.    Milbank also reviewed the monthly fee statements received from other

professionals pursuant to the Interim Compensation Order.  Finally, Milbank assisted in the

filing and service of the Eighth interim fee applications of other Committee professionals.

## IV.

## **ALLOWANCE OF COMPENSATION**

122.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  The services rendered to the

Committee were performed efficiently, effectively and economically, and the results obtained to

date have benefited not only the members of the Committee, but also the unsecured creditors of

each of the Debtors' estates.

123.     The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

124.     With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)     the time spent on such services;
>
> (B)     the rates charged for such services;
>
> (C)     whether the services were necessary to the administration of, or
> beneficial at the time which the service was rendered toward the
> completion of, a case under this title;
>
> (D)     whether the services were performed within a reasonable amount
> of time commensurate with the complexity, importance, and nature
> of the problem, issue, or task addressed;
>
> (E)     with respect to a professional person, whether the person is board
> certified or otherwise has demonstrated skill and expertise in the
> bankruptcy field; and

55

    (F)      whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

125.    The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

126.    In assessing the "reasonableness" of the fees requested, courts have looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by most courts.[20] See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds., 15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be considered in determining a reasonable allowance of compensation"). Milbank respectfully

---

[20]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code. Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997). A majority of the First Colonial factors are now codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

submits that the consideration of these so-called <u>Johnson</u> factors should result in this Court's

allowance of the full compensation requested.

 (A) <u>The Time and Labor Required</u>.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

 (B) <u>The Novelty and Difficulty of Questions</u>.  Novel and complex issues have arisen in the course of these Chapter 11 Cases, and it is anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

 (C) <u>The Skill Requisite to Perform the Legal Services Properly</u>.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

 (D) <u>The Preclusion of Other Employment by Applicant Due to Acceptance of the Case</u>.  Due to the size of Milbank's financial restructuring department and the firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients.  However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

 (E) <u>The Customary Fee</u>.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

 (F) <u>Whether the Fee is Fixed or Contingent</u>.  Milbank charges customary hourly rates, adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)    <u>Time Limitations Imposed by Client or Other Circumstances</u>.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)    <u>The Amount Involved and Results Obtained</u>.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars in what has been widely described as the largest chapter 11 case ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)    <u>The Experience, Reputation and Ability of the Attorneys</u>.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    <u>The "Undesirability" of the Case</u>.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    <u>Nature and Length of Professional Relationship</u>.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained <u>nunc pro tunc</u> to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

127.    The total time spent by Milbank attorneys and paraprofessionals during

the Ninth Interim Compensation Period was 20,717 hours and has a fair market value of

$12,334,262.25.  As shown by this Application and supporting exhibits, Milbank's services were

rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

128.    Milbank has incurred a total of $493,651.21 in expenses in connection with representing the Committee during the Ninth Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

129.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

130.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying and printing; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents

($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were generally accrued in connection with (i) conference calls in which the Committee, the Debtors and/or other parties in interest participated; and (ii) mobile phone charges for selected attorneys who were required to participate in Committee conference call while traveling on Committee business.

131.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[21]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

132.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

133.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates. However, in light of discussions with Fee Committee, no reimbursement for the charges incurred in connection with such services is requested in the Application.

134.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel or train fare expenses in excess of coach fares.[22]  Further, all overtime transportation costs were incurred after 8:00 p.m. for transporting timekeepers to their respective homes.  Moreover,

---

[21]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

[22]    Except in the instance of Amtrak's Acela Express train, where the lowest class is "business class."

although overtime meal expenses are listed in their actual amounts, per the Fee Committee

guidelines, Milbank does not seek reimbursement for overtime meal expenses beyond the $20.00

maximum per meal.  Throughout the Ninth Interim Compensation Period, Milbank has been

keenly aware of cost considerations and has tried to minimize the expenses charged to the

Debtors' estates.

## VI.

## NOTICE

135.    Notice of this Application has been given to (a) the Debtors, (b) counsel

for the Debtors, (c) the United States Trustee, and (d) the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order

conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D"

(i) allowing Milbank (a) interim compensation for professional services rendered as counsel for

the Committee during the Ninth Interim Compensation Period in the amount of $12,334,262.25

and (b) reimbursement of expenses incurred in connection with rendering such services in the

aggregate amount of $493,651.21 for a total award of $12,827,913.46; (ii) authorizing and

directing the Debtors to pay to Milbank $2,466,787.45 which is an amount equal to the

difference between (a) this $12,827,913.46 award and (b) $10,361,126.01, the total of all

amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation

Order for services rendered and expenses incurred during the Ninth Interim Compensation

Period; and (iii) granting such further relief as is just.

Dated: New York, New York
December 14, 2011

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By:  /s/ Dennis F. Dunne

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                            :

In re:                                :          Chapter 11 Case No.
                                            :

LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,  :          08-13555 (JMP)
                                            :

                          Debtors.           :          (Jointly Administered)
                                            :
-------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF NINTH APPLICATION OF MILBANK,
TWEED, HADLEY & MᶜCLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>JUNE 1, 2011 THROUGH AND INCLUDING SEPTEMBER 30, 2011</u>**

                Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991, and

amended on April 21, 1995 and November 25, 2009 (collectively, the "<u>Local Guidelines</u>"), the

United States Trustee Guidelines for Reviewing Applications for Compensation and

Reimbursement of Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the "<u>U.S.

Trustee Guidelines</u>"), and the guidelines contained in the Fee Committee's Confidential Letter

Report on the Sixth Interim Application of Milbank, Tweed, Hadley & MᶜCloy LLP, dated April

12, 2011 (the "<u>Fee Committee Guidelines</u>" and, together with the Local Guidelines and the U.S.

Trustee Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm Milbank, Tweed,

Hadley & MᶜCloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of Unsecured Creditors of

Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Commercial

Paper Inc. and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby certifies with respect to Milbank's ninth application for
allowance of compensation for services rendered and for reimbursement of expenses, dated
December 14, 2011 (the "Application"), for the period of June 1, 2011 through and including
September 30, 2011 (the "Ninth Interim Compensation Period") as follows:

     1.   I am the professional designated by Milbank in respect of compliance with
the Guidelines.

     2.   I make this certification in support of the Application, for interim
compensation and reimbursement of expenses for the Ninth Interim Compensation Period, in
accordance with the Local Guidelines.

     3.   In respect of section A.1 of the Local Guidelines, I certify that:

          a.   I have read the Application.

          b.   To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought fall within
the Guidelines.

          c.   Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

          d.   In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

     4.   In respect of section A.2 of the Local Guidelines, I certify that Milbank has
provided statements of Milbank's fees and disbursements previously accrued, by filing and
serving monthly statements in accordance with the Interim Compensation Order (as defined in
the Application), except that completing reasonable and necessary internal accounting and

---

[1]   The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

    5. In respect of section A.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the Fee Committee.

    6. I certify that the Application for interim compensation and reimbursement of

expenses for the Ninth Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines.

    7. Pursuant to the Fee Committee Guidelines, I certify that all transportation

charges fall within the reimbursement rule for transportation expenses.

Dated:   New York, New York
      December 14, 2011


          By:  /s/ Dennis F. Dunne
            Dennis F. Dunne

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the Fee Committee.

# **EXHIBIT C**

**Expenses**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| **FOURTH INTERIM FEE PERIOD** <br> **OCTOBER 1, 2009 – JANUARY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10 <br> Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| **FIFTH INTERIM FEE PERIOD** <br> **FEBRUARY 1, 2010 – MAY 31, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10 <br> Docket No. 10804 | $19,450,342.75 | $19,041,118.43 | $1,945,034.28 | $11,674,570.75 | $851,804.27 | $847,210.46 |

| **SIXTH INTERIM FEE PERIOD** <br> **JUNE 1, 2010 – SEPTEMBER 30, 2010** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/10 <br> Docket No. 13493 | $18,359,367.75 | $18,191,238.85 | $1,835,936.78 | $3,681,873.55 | $792,924.64 | $787,642.86 |

**FEE SCHEDULE A(1)**

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 6/2/11 Docket No. 17343 | $14,180,784.75 | [ ] | $2,818,286.54 | $[ ] | $633,261.80 | [ ] |

| EIGHTH INTERIM FEE PERIOD FEBRUARY 1, 2011 – MAY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/15/11 Docket No. 19273 | 14,678,049.25 | [ ] | $2,935,609.85 | [ ] | $794,661.63 | [ ] |

| NINTH INTERIM FEE PERIOD JUNE 1, 2011 – SEPTEMBER 30, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/11 Docket No. [   ] | 12,334,262.25[1] | [ ] | $2,466,787.45 | [ ] | $493,651.21 | [ ] |

---

[1] The amount requested on account of fees and expenses incurred by Milbank during the Ninth Interim Compensation Period was $711.52 less than the sum of fees and expenses set forth in the Fee Statements served during the Ninth Interim Compensation Period.

**FEE SCHEDULE A(1)**