WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York  10110
(212) 382-3300
William A. Maher
Paul R. DeFilippo

Attorneys for Plaintiffs

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| ARCHSTONE LB SYNDICATION PARTNER LLC, LEHMAN BROTHERS HOLDINGS, INC., REPE ARCHSTONE GP HOLDINGS, LLC, LUXEMBOURG TRADING FINANCE S.a.r.l., LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE S.a.r.l., LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE  2 S.a.r.l., and LEHMAN COMMERCIAL PAPER, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BANC OF AMERICA STRATEGIC VENTURES, INC., BANK OF AMERICA, N.A., BIH ASN LLC, BARCLAYS CAPITAL REAL ESTATE INC., and ARCHSTONE EQUITY HOLDINGS INC.,<br><br>Defendants. | Adversary Proceeding No. 11-_____  (JMP)<br><br>**COMPLAINT** |

Plaintiffs ARCHSTONE LB SYNDICATION PARTNER LLC ("Lehman Archstone"), LEHMAN BROTHERS HOLDINGS, INC. ("Lehman Brothers"), REPE ARCHSTONE GP HOLDINGS, LLC ("Lehman REPE"), LUXEMBOURG TRADING FINANCE S.a.r.l. ("Lehman Luxembourg"), LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE S.a.r.l. ("Lehman Luxembourg 1"), LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE 2 S.a.r.l. ("Lehman Luxembourg 2"), and LEHMAN COMMERCIAL PAPER, INC. ("Lehman Commercial Paper") (collectively "Plaintiffs" and collectively with their debtor and non-debtor affiliates "Lehman"), for their complaint against defendants BANC OF AMERICA STRATEGIC VENTURES, INC. ("BofA Strategic"), BANK OF AMERICA, N.A. ("BANA" and together with BofA Strategic, "Bank of America"); BIH ASN LLC ("Barclays BIH"), BARCLAYS CAPITAL REAL ESTATE INC. ("Barclays Capital"), and ARCHSTONE EQUITY HOLDINGS INC. ("Barclays Equity"; and together with Barclays BIH and Barclays Capital, "Barclays") (collectively, "Defendants") allege, upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      Plaintiffs and Defendants are the holders of virtually all of the equity interest in the group of companies that operate as "Archstone" (the "Archstone Entities"). Defendants have proposed to sell one-half of their interests in the Archstone Entities (the "Transfer") to ERP Operating Limited Partnership, an affiliate of Equity Residential, a Maryland real estate investment trust ("Equity Residential") – the largest competitor with Archstone in the apartment business.  Defendants also have granted Equity Residential an option to buy the

balance of their interests in Archstone in the event Plaintiffs exercise their "Right of First Offer"

with respect to Defendants' proposed Transfer of their Archstone interests (the "Option").

2.    On December 14, 2011, Plaintiffs delivered to Defendants their Notices of

Intent to exercise their "Right of First Offer" (or "ROFO Right") with regard to the above-

referenced transaction.  Under the relevant agreements between the parties, Plaintiffs have until

as soon as January 21, 2012 (extended to January 23) within which to obtain Court approval,

deliver a binding notice of election to purchase and pay a $66 million deposit and then to close

the transaction (if Court approval is obtained) and pay the balance of the $1,325,000,000

purchase price within two business days thereafter.  In this adversary proceeding, Plaintiffs seek,

among other things, (i) an order clarifying the terms by which Plaintiffs have the right to

purchase, pursuant to the exercise of their ROFO Right, the interests that Defendants have

proposed to sell in their respective Notices of Intent to Sell Interests ("Notices"); (ii) an order

that Defendants specifically perform their obligations under the relevant agreements (the

"Archstone Agreements") to include in their Notices all material terms of the proposed

Transfers, including the rights under the Option that Defendants granted to Equity Residential;

(iii) an injunction against Defendants consummating any Transfer to Equity Residential,

including any proposed Transfer pursuant to the Option; (iv) an order divesting Defendants of

their voting and governance rights in the Archstone Entities; and (v) damages and attorneys'

fees.

3.    Pending entry of an order clarifying the scope of the ROFO Right

available to Plaintiffs, Plaintiffs also request as immediate relief an order staying (i) Plaintiffs'

time to deliver a binding "Election Notice" with respect to their ROFO Right, (ii) Plaintiffs' time

to make a "ROFO Deposit" of approximately $66 million and (iii) the two business day period

after making a binding Election within which Plaintiffs must close the purchase.  Plaintiffs also

seek an order enjoining any Transfer by Defendants of their interests in the Archstone Entities

pending such determination (including a Transfer by the Option) pending determination of the

relief sought above and expedited discovery in advance of an evidentiary hearing.

          4.     Archstone holds one of  the largest residential real estate portfolios in the

nation.  Plaintiffs, Defendants and certain other parties acquired Archstone in 2007 for a

purchase price of approximately $22.2 billion.  Since the acquisition, the parties' interests in

Archstone have been restructured on several occasions, including, most recently, pursuant to a

motion approved by this Court by Order dated November 18, 2010 [Docket No. 12894].  Since

the summer of 2011, Defendants have been attempting to sell their interests in Archstone, and in

the process have committed numerous material breaches of the Archstone Agreements.

          5.     In violation of several significant contractual provisions, Defendants have

conspired to sell their combined approximately 53% interests in Archstone to Archstone's largest

competitor – Equity Residential.  Defendants have been in negotiations concerning their sale

with Equity Residential, and others, for months.  Any such sale, however, is contingent upon

Plaintiffs' Right of First Offer under the parties' governing agreements.

          6.     During the course of Defendants' negotiations to sell their interests in

Archstone, Defendants failed to perform their duties under the Archstone Agreements relating to

the sale of their interests (i) to provide information about the sale process to Plaintiffs on a

regular basis and in a commercially reasonable manner, and (ii) to refrain from acting in concert

to deprive Plaintiffs of their rights under the Archstone Agreements.

          7.     After Plaintiffs notified Defendants of their material breaches of the

Archstone Agreements as set forth above, Defendants purported to deliver the Notices late in the

4

evening on Friday, December 2, 2011, offering Plaintiffs the opportunity to purchase one-half of

Defendants' interests in Archstone.  Defendants' Notices purported to provide Plaintiffs ten

calendar days following receipt to decide whether (i) to purchase Defendants' interests on the

terms offered to Equity Residential, (ii) to sell Plaintiffs' proportional interests to Equity

Residential, or (iii) to do nothing and allow the admission of Equity Residential as an Archstone

partner.  Defendants subsequently agreed, due to the deficiencies in the Notices, that the ten days

for Plaintiffs to act would not begin to run until December 6, 2011.  Plaintiffs sent their Notices

of Intent to exercise their ROFO Right on December 14, 2011.

        8.     Prior to completing the exercise of the ROFO Right within a 50 day

period, however, Plaintiffs require the assistance of the Court.  Most significantly, the Notices

themselves are incomplete and breach the Archstone Agreements because they fail to include a

"material term" of the proposed Transfer which is required to be included in the Notices pursuant

to the Archstone Agreements – the rights under the Option Defendants granted to Equity

Residential to purchase the remaining 50% of Defendants' Archstone interests if Plaintiffs

exercise their ROFO Right.  That Option is contained in the "Other Interest Agreement," which

was delivered to Plaintiffs under separate cover from, and was not made part of, the Notices.

The intentional exclusion of the Option from the interests available for purchase pursuant to the

Notices is the result of collusion among the Defendants and Equity Residential to deprive

Plaintiffs of their rights under the Archstone Agreements.  The Option, however, must be made

part of the Transfer subject to Plaintiffs' ROFO Right because the Archstone Agreements require

that a Notice shall include all material terms, including the relevant economic terms, of a

proposed transfer, and the Option itself states that it is part of the consideration to the buyer for

entering into the Interest Purchase Agreement (defined below).  The Archstone Agreements

contemplate that Plaintiffs would have the first opportunity to acquire Defendants' Interests which Defendants are prepared to sell, and including the rights under the Option in the Notices available for Purchase by Plaintiffs, and allowing Plaintiffs to exercise their option rights before any other Person, is consistent with those agreements.

9.      Moreover, the terms of the proposed Transfer to Equity Residential violate the Archstone Agreements.  For example, the Interest Purchase Agreement attached to the Notices shows that Defendants entered into a "voting trust or agreement" with Equity Residential that effectively requires Defendants not to vote on certain significant matters requiring unanimous consent (including retention of Archstone executives and a budget) without Equity Residential's approval.  Defendants effectively have given Archstone's largest competitor a veto right over Archstone's budget and retention of management.  The plain terms of the Archstone Agreements, as well as the implied duty of good faith and fair dealing, specifically prohibit such "voting agreement" and collusion.

10.      As a result, Defendants have breached the Archstone Agreements and the covenant of good faith and fair dealing implied therein, and Defendants should not be allowed to benefit from the terms of those agreements.  Defendants deprived Plaintiffs of their contractual right to information required to make an informed choice concerning Lehman's largest real-estate investment.  Defendants issued plainly incomplete Notices which did not comply with the Archstone Agreements, intended to or with the effect of depriving Plaintiffs of their rights under the Bridge Equity Providers Agreement.  Accordingly, Defendants must be directed to specifically perform their obligation to include the rights under the Option in the Notices identifying the Transfer Securities available for purchase by Plaintiffs, and they must be enjoined from consummating any Transfer to Equity Residential, including any proposed Transfer

pursuant to the Option.  In addition, the terms subject to the ROFO Right must be clarified,
Defendants should be divested of their voting and governance rights in Archstone, and
Defendants must pay damages for the foregoing as well as Plaintiffs' attorneys' fees.

## **PARTIES**

11.    Plaintiff ARCHSTONE LB SYNDICATION PARTNER LLC is a
Delaware limited liability company with its principal place of business in New York, New York.

12.    Plaintiff LEHMAN BROTHERS HOLDINGS, INC. is a Delaware
corporation with its principal place of business in New York, New York.

13.    Plaintiff REPE ARCHSTONE GP HOLDINGS, LLC is a Delaware
limited liability company with its principal place of business in New York, New York.

14.    Plaintiff LUXEMBOURG TRADING FINANCE S.a.r.l. is a Luxembourg
société à responsabilité limitée with its principal place of business in Luxembourg.

15.    Plaintiff LUXEMBOURG RESIDENTIAL PROPERTIES LOAN
FINANCE S.a.r.l. is a Luxembourg société à responsabilité limitée with its principal place of
business in Luxembourg.

16.    Plaintiff LUXEMBOURG RESIDENTIAL PROPERTIES LOAN
FINANCE 2 S.a.r.l. is a Luxembourg société à responsabilité limitée with its principal place of
business in Luxembourg.

17.    Plaintiff LEHMAN COMMERCIAL PAPER, INC. is a New York
corporation with its principal place of business in New York, New York.

18.    Defendant BANC OF AMERICA STRATEGIC VENTURES, INC. is a
Delaware corporation with its principal place of business in New York, New York.

19.    Defendant BANK OF AMERICA, N.A. is a bank national association with its principal place of business in Charlotte, North Carolina.

20.    Defendant BIH ASN LLC is a Delaware limited liability company with its principal place of business in New York, New York.

21.    Defendant BARCLAYS CAPITAL REAL ESTATE INC. is a Delaware corporation.

22.    Defendant ARCHSTONE EQUITY HOLDINGS INC. is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 157(c) because this adversary proceeding and the claims asserted by Plaintiffs arise under, arise in and/or relate to the Chapter 11 proceedings of the above-captioned Debtors Lehman Brothers Holdings, Inc. *et* al. This Court entered an Order [Docket No. 9229], on May 25, 2010, granting the Debtors' Motion for Authorization to Restructure Certain Terms of the Archstone Credit Facilities (the "Authorization Order"), and an Order [Docket No. 12894] on November 18, 2010, granting the Debtors' Motion for Authorization to Modify Certain Terms of the Restructuring of the Archstone Credit Facilities (the "Modification Order"), as being "in the best interests of the Debtors, their respective estates and creditors, and all parties in interest," and retaining jurisdiction "with respect to all matters arising from or related to the implementation of [those] Order[s]." The Archstone Agreements were amended pursuant to the Authorization Order and the Modification Order, and this action arises from or relates to the amendments to those agreements effectuated pursuant to the Court's Orders. Pursuant to the standing order of reference of the United States District Court for the Southern District of New York, dated July

8

10, 1984, all proceedings arising in, arising under and/or related to cases under Title 11 of the

United States Code (as amended, the "Bankruptcy Code") are referred to this Court for

adjudication.

24.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a)(2)

because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

this judicial district and pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding and

the claims asserted by Plaintiffs arise in and/or relate to the Chapter 11 proceedings of Debtors

Lehman Brothers Holdings, Inc. *et al.*, Chapter 11 Case No. 08-13555 (JMP).  In addition, the

parties have agreed that venue of any matter concerning the enforcement of the parties' contracts

should lie exclusively in the courts of New York.

## RELEVANT FACTS

### A.    Acquisition of Archstone

25.    For most of 2007, Archstone was the second largest publicly-traded

residential real estate investment trust in the United States.  Archstone owns more than 400

apartment communities that contain more than 70,000 residential units, including units under

construction.  In October 2007, a joint venture led by a Lehman affiliate and Tishman Speyer

Real Estate Venture VII, L.P. took Archstone private through a leveraged buyout in which other

Lehman affiliates and affiliates of Bank of America and Barclays provided secured financing and

made bridge-equity investments that they intended to syndicate to other investors.

26.    In total, the acquisition of Archstone was financed by more than $16

billion in secured financing either assumed or provided by Lehman, Bank of America, and

Barclays (collectively, the "Lenders"), and certain third party lenders.  Such secured financing

included a combination of mortgage loans, mezzanine loans, term loans, and revolving loans.

27.    The Lenders provided about $6.4 billion of such financing to Archstone

according to the following proportions:  Lehman contributed approximately 47%; Bank of

America contributed approximately 28%; and Barclays contributed approximately 25%.

Lehman's roughly 47% stake in the various secured loans to Archstone amounted to more than

$3 billion.  In addition, certain non-Debtor affiliates of Lehman invested approximately $2.39

billion in equity or bridge equity of Archstone.

28.     Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries filed with this

Court voluntary petitions under Chapter 11 of the Bankruptcy Code.  Certain other Lehman

affiliates commenced their voluntary cases under Chapter 11 of the Bankruptcy Code on October

5, 2008, and January 7, 2009, respectively.  The Debtors' Chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors

are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

29.     On September 17, 2008, the United States Trustee for the Southern

District of New York ("U.S. Trustee") appointed the statutory committee of unsecured creditors

pursuant to section 1102 of the Bankruptcy Code ("Creditors' Committee").

30.     On December 6, 2011, the Bankruptcy Court signed an Order Confirming

the Modified Third Amended Joint Chapter 11 Plan of Lehman.

**B.      Archstone's Restructuring**

31.     The Lenders originally contemplated that Archstone would generate

sufficient funds to repay the financing through property sales and operations.  Due to challenging

conditions in the capital markets and property sales markets, it proved difficult for Archstone to

generate the funds necessary to meet its liabilities, resulting in Archstone's need for additional

liquidity.

32.    In order to preserve the value of their debt and equity investments, commencing in January 2009, the Lenders modified the terms of the financing pursuant to this Court's order dated January 28, 2009 [Docket No. 2677].  As part of the modification of the financing, the Lenders committed an additional $485 million, plus available letters of credit, as new priority financing to provide necessary operating liquidity.  Among other things, the modification was intended by the Lenders to provide Archstone with additional time to generate proceeds through asset sales, and to preserve the Lenders' sizeable investment in Archstone.

33.    Subsequently, in light of difficult economic conditions, and the state of the real estate market, the Lenders effectuated a more comprehensive restructuring of the financing to improve Archstone's cash flow and liquidity on a long term basis by converting approximately $5.2 billion of debt, plus accrued interest, into new equity interests entitled to a preferred return, converting the priority financing into a new revolving facility, and extending the maturity dates of certain financing.  That comprehensive restructuring was authorized by this Court in Orders dated May 25, 2010 [Docket No. 9229] and November 18, 2010 [Docket No. 12894], and was completed in December 2010.

### C.    Current Archstone Structure

34.    The current structure of the Archstone Entities is complicated.  The discussion below describes only those aspects of Archstone's structure that are relevant to this action.

35.    Two of the primary entities relevant to this action are Archstone Multifamily JV LP (the "Fund") and Archstone Multifamily (Governance) LLC ("Fund Governance").

36.    The Fund is the principal vehicle for the bridge equity investments by

11

Lehman, Bank of America and Barclays.  The limited partners of the Fund include Plaintiff

Lehman Archstone and Defendants BofA Strategic and Barclays BIH.

      37.     Fund Governance, as its name suggests, controls the governance of the

Fund.  The members of Fund Governance include Plaintiff Lehman REPE and Defendants

BANA and Barclays BIH.

    **D.**     **The Archstone Agreements**

      38.     The following Archstone Agreements, among others, govern the

relationship among the parties with respect to Archstone:

      (i)     The Second Amended and Restated Bridge Equity Providers

Agreement, dated as of December 1, 2010 (the "Bridge Equity Providers

Agreement");

      (ii)     The Amended and Restated Syndication and Modification

Agreement, as amended as of December 2, 2010 (the "Syndication Agreement");

      (iii)     The Limited Liability Company Agreement of Archstone

Multifamily (Governance) LLC, as amended as of December 2, 2010 (the "Fund

Governance LLC Agreement");

      (iv)     The Voting Agreement, as amended as of December 2, 2010 (the

"Voting Agreement");

      (v)     The Limited Partnership Agreement of Archstone Multifamily JV

LP as amended (the "Fund LP Agreement"); and

      (vi)     The Archstone Enterprise LP First Amended and Restated Limited

Partnership Agreement.

      39.     Each of the above-referenced agreements has its own purpose, but they

collectively reflect a single, comprehensive agreement of the parties, as reflected, for example, in

Section 6.08 of the Bridge Equity Providers Agreement, titled "Entire Agreement," which states

that the Archstone Agreements identified in that section collectively "constitute the final

agreement between the parties . . . and are the complete and exclusive expression of agreement

of the parties . . . with respect to the subject matter hereof."

1.    **General Provisions**

40.    The Archstone Agreements and the parties' rights thereunder are all

governed by and interpreted, construed and enforced in accordance with the internal laws of the

State of Delaware, without giving effect to the conflicts of laws provisions thereof.

41.    All disputes among the parties relating to the Archstone Agreements are

subject to the exclusive jurisdiction of the state and federal courts of New York.

42.    Further, the parties to the Archstone Agreements are "entitled to an

injunction or injunctions to prevent breaches [of the Archstone Agreements] by the other parties

and to specifically enforce the terms and provisions of [the Archstone Agreements] against such

other parties."  Bridge Equity Providers Agreement § 6.07.

2.    **Management Provisions**

43.    The business and affairs of the Fund (and thus the business and affairs of

Archstone) are conducted and managed solely by the Fund's indirect general partner, Fund

Governance.  The business and affairs of Fund Governance (and thus the business and affairs of

the Fund and Archstone) were managed by the Managing Member, Plaintiff Lehman REPE, until

Defendants removed it as Managing Member on May 5, 2011.

44.    The Managing Member may "be removed as Managing Member (but shall

continue to be a Member), upon the written request of Barclays and [Bank of America] at any

time."  Fund Governance Agreement § 9(b)(ii).  In such event, Fund Governance becomes

"member managed" and the actions of Fund Governance (and thus the Fund and Archstone) require a majority vote of its Members. This is how Archstone has been managed since Defendants removed Lehman REPE as Managing Member of Fund Governance.

45.    Pursuant to the Voting Agreement, the parties are allocated the following voting percentages:

| | |
|---|---|
| Plaintiff Lehman REPE: | 47.29565% |
| Defendant Bank of America: | 27.70435% |
| Defendant Barclays: | 25% |

46.    Notwithstanding the Managing Member's authority or whether the Managing Member has been removed, certain specified actions require either a majority vote as well as the vote of two of the three Members (a "Major Matter") or a super-majority vote of 76% of the voting interests as well as the votes of all three Members (a "Special Major Matter"). Due to the various parties' respective interests in Archstone, the 76% voting interest requirement effectively requires a unanimous vote of Plaintiff Lehman REPE, Bank of America and Barclays for a Special Major Matter to be approved.

47.    Special Major Matters that are effectively required to be approved unanimously include, for example, approving "the merger, equity recapitalization (other than pursuant to the Syndication), reorganization, [or] public or private offering" of any Archstone-related entities, and the termination or determination of "the terms of employment" of "the CEO, COO or CFO of Archstone," and approval of the Archstone Budget, defined in the Voting Agreement as the annual business plan and operating capital expenditure budget for Archstone. Voting Agreement, Schedule D.

3.    **Transfer Restrictions**

48.    The Archstone Agreements prohibit Transfers of interests in Archstone that are not in compliance with those agreements.  The term "Transfer" is expansively defined as follows:  Any "Partnership Interest [or] portion of any Partnership Interest (or the proceeds thereof) . . . directly or indirectly, sold, transferred, assigned, distributed, contributed, pledged, hypothecated or otherwise disposed of, whether by way of transfer of contract or by exit from the Partnership of a transferring Partner and entry by a new Partner to the Partnership *or by means of any swap, derivative or similar transaction . . . .*"  Fund LP Agreement § 9.01 (emphasis added).

49.    The parties' right to Transfer their interests is governed and restricted by the terms of the Bridge Equity Providers Agreement, which "supersede" any "conflicting or inconsistent terms" in any of the other Archstone Agreements.  For example, any Transfer of a party's interest in one portion of Archstone (such as a party's equity interest in a specific Archstone-related entity or its voting interests relating to Archstone's governance) must be linked to a Transfer of the same proportion of that party's interest in all of its other Archstone-related equity interests.  In addition, Section 4.05 and 4.06 of the Bridge Equity Providers Agreement prohibit Transfers in breach or default of any of the other Archstone Agreements.

50.    Further, before a party to the Bridge Equity Providers Agreement can Transfer its interests, it must give the other parties an opportunity to exercise either their  "Right of First Offer" or their "Tag-Along Right."

51.    Specifically, if a party wishes to Transfer its Archstone-related interests, it must "provide not less than ten (10) Business Days' (the 'ROFO Notice Period') prior written notice (the 'ROFO Notice')" to the other parties.  A ROFO Notice "**shall set forth all of the material terms of the proposed Transfer**" including the price payable in cash and "**any other**

15

**economic terms relevant to the proposed Transfer**."  Upon receipt of a ROFO Notice, each non-transferring party "**will have the right to purchase" the transferring party's interest "on the terms set forth in the ROFO Notice** (the 'ROFO Right'), which right may only be exercised with respect to all of the [interests] being offered pursuant to the ROFO Notice." Bridge Equity Providers Agreement § 4.02(a) (emphasis added).

52.    The transferring party also is required to provide to the other parties, not less than ten business days prior to a proposed transfer, a "Tag-Along Notice."  A Tag-Along Notice also must include all economic terms relevant to such proposed Transfer.  Upon receipt of a Tag-Along Notice, each non-transferring party has "the right (but not the obligation) to participate in such Transfer . . . , pro-rata and pari passu."  Bridge Equity Providers Agreement § 4.02(b).

53.    Once a party receives a ROFO Notice or Tag-Along Notice, it must elect its rights promptly.  In Plaintiffs' case, they must

> (x) (1) **deliver[] a non-binding written preliminary indication** of such Non-Transferring Bridge Equity Provider's interest in exercising its ROFO Right (a 'Notice of Intent to Purchase') **within ten (10) calendar days after receipt of the applicable ROFO Notice** or (2) . . . deliver[] a non-binding written preliminary indication of its interest to exercise a potential Tag-Along Right in a transaction consistent with the terms of the ROFO Notice (a 'Notice of Intent to Sell'),

> (y) . . . , mak[e] a **filing with the bankruptcy court in the Lehman Bankruptcy Case, within ten (10) calendar days of its delivery of a Notice of Intent to Purchase** or Notice of Intent to Sell with respect to the applicable ROFO Notice, requesting that approval be granted to the debtor entities of Lehman, as applicable, to exercise its ROFO Right and/or Tag-Along Right (a 'Bankruptcy Court Approval Request'), and

> (z) **deliver[] a binding Election Notice within fifty (50) calendar days after receipt of the applicable ROFO Notice**, together with 5% of the purchase price as a deposit and **close on the purchase within two business days thereof.**

16

Bridge Equity Providers Agreement § 4.02(a) (emphasis added). The subject agreement

contemplates that as a debtor-in-possession Lehman would need Court approval before

committing to spend the substantial sums necessary to exercise its ROFO Right or to sell

an asset pursuant to a Tag-Along exercise.

**E.    Defendants' Material Breaches of the Archstone Agreements**

54.    Defendants' conduct following the December 2010 restructuring

demonstrates their disregard of the Archstone Agreements and their material breaches of those

agreements. As discussed more fully below, Defendants have breached several provisions of the

Archstone Agreements by, among other things, failing to include all material terms of their

proposed Transfer to Equity Residential in the Notices, entering into a voting agreement with

respect to "Special Major Matters" of Archstone not contemplated by the Archstone Agreements,

colluding to deny Plaintiffs their rights under the Archstone Agreements and failing to uphold

the covenant of good faith and fair dealing contained in the Archstone Agreements. Defendants'

prior material breaches prevent them from enforcing the terms of, and benefiting from, the

Archstone Agreements. Further, the Notices that Defendants ultimately sent to Plaintiffs require

clarification and confirmation of the terms included therein so that Plaintiffs may exercise their

rights in respect of all the material terms of the proposed Transfer, including the right under the

Option.

55.    In the late spring of 2011, the markets presented a potential opportunity

for the parties to exit their investment in Archstone, while maximizing the value of their

investment. Plaintiffs and the Defendants together initially considered both an initial public

offering ("IPO") and a private sale of Archstone or their Archstone interests.

56.    After continuing down the parallel paths of exploring both an IPO and a

private sale for some time, however, the Defendants informed Plaintiffs in August 2011 that they would refuse to even consider the IPO option, they were only interested in a private sale of their interests in Archstone, and they intended to proceed to effectuate such a private sale.  In or about late August, Plaintiffs and the Defendants received three proposals for the sale of Archstone. Plaintiffs declined to proceed with the sale of Archstone because the value of the proposals received did not reflect the value of Archstone, the offers received had execution risk, and the composition of the consideration offered was unsatisfactory.  The Defendants thereafter determined to proceed to sell their interests in Archstone without Plaintiffs.

57.    Once they began focusing exclusively on a private sale of their interests, the Banks failed to comply with the terms of the Archstone Agreements.  For example, despite Plaintiffs' repeated requests, Defendants failed to provide Plaintiffs with information pertaining to Defendants' efforts to market their interests, which they are obligated to provide to Plaintiffs under the Bridge Equity Providers Agreement.

58.    Moreover, Bank of America and Barclays' conduct related to their marketing efforts has put the value of Archstone itself in peril.  Notwithstanding their execution of a letter to management, dated June 29, 2011, agreeing to work diligently to complete retention agreements, the Banks have refused to conclude those retention agreements with key management personnel of Archstone.  Plaintiffs have the highest regard for the Archstone infrastructure, including the quality of its management team, which provides significant value to Archstone and which is essential to preserve.  As of the end of July 2011, nearly complete drafts of the retention agreements were prepared, but since then Defendants have failed to address these agreements or to complete them.  Indeed, Defendants on December 13, 2011 rejected Plaintiffs' proposal to proceed with approval of the retention agreements.  Inaction with respect to the

18

management retention agreements is not a viable alternative, however, since it not only risks the

loss of Archstone's key personnel, it also threatens to violate covenants contained in one or more

of Archstone's material loan agreements.

### 1. Defendants Have Continually Failed To Provide Plaintiffs With Required Information

59.    As discussed above, the Bridge Equity Providers Agreement requires

Plaintiffs to make a final, binding decision within fifty days of receipt of a ROFO Notice as to

whether they will purchase the transferring parties' interest (*i.e.*, exercise its ROFO Right), "Tag-

Along" with the transfer, or do nothing and retain their interest, and then be fully prepared to

close the appropriate transaction within two business days if it makes the final binding election

to purchase.  To meet this deadline, the Bridge Equity Providers Agreement requires that during

the marketing period the parties to keep each other informed.  This transparency requirement was

one of the benefits the parties agreed to in exchange for agreeing to the timetable in that

agreement.

60.    Section 3.01(g) of the Bridge Equity Providers Agreement provides, in

relevant part, as follows:

> With respect to any Transfers or potential Transfers by a Bridge
> Equity Provider of its Syndication Equity[1] in accordance with the
> provisions of Article 4, such Bridge Equity Provider shall, on a
> weekly basis or such other period as may be agreed to by all of the
> Bridge Equity Providers, report to each of the other Bridge Equity
> Providers in a commercially reasonable manner with respect to
> material matters and activities directly related to the marketing of
> the Syndication Equity of such Bridge Equity Provider, including
> the identity of any potential Syndication Investors, amounts of
> potential syndication investments, report as to the status of
> negotiations, and such other information as shall be reasonably
> requested by the Bridge Equity Providers.

---

[1] Syndication Equity is defined as "the Partnership Interests (with respect to each Partnership) held by the Bridge
Equity Providers, but excluding any Retained Equity held by any Bridge Equity Provider."

61.    Defendants had been marketing potential Transfers of their Syndication Equity for several months prior to their delivery of the Notices. Defendants, however, never supplied Plaintiffs with the reports and information required by the above quoted provision concerning their individual and concerted efforts to market their Syndication Equity that are within their individual or collective control.

62.    In this instance, these reporting and cooperation requirements were intended to avoid an impairment of Plaintiffs' rights and to ensure that Plaintiffs have sufficient information to be in a position to promptly and meaningfully exercise their rights in response to potential Transfers within the short time frames set forth in the Archstone Agreements. Defendants' failure to provide the required periodic marketing reports is one example of a pattern by the Defendants to deprive Plaintiffs of information to which they are entitled in connection with a proposed Transfer.

63.    On November 19, 2011, Plaintiffs notified Defendants of their non-compliance with the Archstone Agreements' requirements to provide information concerning their marketing efforts and demanded that BANA and Barclays immediately provide the following:

- a summary of all discussions held by Barclays and BANA with potential purchasers of Syndication Equity, including the identity of such potential purchasers and the status of such discussions;

- the amount of Transfer Securities[2] of each class to be purchased by any such purchaser and the proposed purchase price (including the breakdown between cash and non-cash consideration, if any), the timing of any proposed sale (including the timing for the entry into definitive agreements, receipt of any required consents or approvals and anticipated closing date) and all other material economic terms relating to such proposed sale; and

---

[2] Transfer Securities are defined as any "Syndication Equity, together with JMB Partnership Interests, Retained Equity, Fund Governance Voting Interests, Lakes Voting Membership Interests and Voting Percentage proposed to be transferred by any Bridge Equity Provider."

- copies of any term sheets and other documentation prepared in connection with any such sale, or the most current draft documentation to the extent definitive documents are not available.

64.    In the November 19 letter, Plaintiffs also informed Defendants that they would regard any ROFO Notice delivered by Defendants as improperly delivered prior to (i) full compliance by Defendants with their obligations under the Archstone Agreements, and (ii) a reasonable time for Plaintiffs to adequately review the material provided under such provisions. Since the Archstone Agreements do not allow for the cure of defaults once they are declared, Plaintiffs decided to allow Defendants an opportunity to conform with the agreements and expressly declined to declare Defendants in default in the November 19 letter.

65.    After three days passed without any response – much less disclosure of the required information – from Defendants, Plaintiffs reiterated their demand for information on November 22, 2011, and notified Defendants that they were in material breach of several provisions of the Archstone Agreements, including the provisions identified in this Complaint.

66.    On November 23, 2011, Defendants supplied a sparse three-line summary and one-page PowerPoint described as "relevant information with respect to the current status of the syndication process."

67.    On November 25, 2011, Plaintiffs informed Defendants that the information they provided was woefully inadequate and did not come close to approaching the scope of the information that Plaintiffs "reasonably requested," and to which they were entitled, pursuant to Section 3.01(g) of the Bridge Equity Providers Agreement, in their November 19, 2011 and November 22, 2011 notices.  Plaintiffs further demanded that Defendants, at the very least, provide Plaintiffs with the current draft of the purchase and sale agreement with the potential purchaser.

21

68.     Defendants again did not comply with Plaintiffs' requests for information, as required by the Archstone Agreements.  Instead, Defendants sent the Notices by email to Plaintiffs' representatives at 10:52 p.m. Eastern Time on Friday night, December 2, 2011.  The Notices also attached an "Execution Version" of an eighty-four page "Interest Purchase Agreement" among Defendants and Equity Residential, providing for the sale of one-half of Bank of America's and Barclays' Archstone interests for aggregate consideration of $1,325,000,000.  This Interest Purchase Agreement obviously had been negotiated for some time.

69.     On December 2, 2011, Defendants also transmitted a separate letter attaching the "Other Interest Agreement" (the Option, as defined above) which grants Equity Residential an option to acquire the balance of Bank of America's and Barclays' Archstone interests that are not covered by the Interest Purchase Agreement, for a price not less than $1,325,000,000 if Plaintiffs exercise their ROFO Right.

70.     The Notices as sent were incomplete, as Defendants later acknowledged. Continuing their practice of being less than forthcoming with relevant information, the Defendants did not supply the Disclosure Schedules to the Interest Purchase Agreement (even though those schedules are necessary in order to fully understand that agreement), nor did they supply the other information identified by Plaintiffs' November 19 and 22, 2011 Notices.

71.     Accordingly, on December 4, 2011, Plaintiffs notified Defendants of their failure to provide these Disclosure Schedules and other previously demanded information. Plaintiffs also stated that because of these failures, among others, Plaintiffs considered the Notices not validly delivered, and demanded that the missing information be provided by 5:00 p.m. Eastern Time on December 5, 2011.

22

72.    On December 5, 2011, at approximately 7:00 p.m., Bank of America and Barclays responded by providing the 300 page Disclosure Schedules to the Interest Purchase Agreement, undertaking to provide additional information by separate cover, and stating that they will not deem the 10-day period to respond to the Notices to begin running until December 6, 2011.  Defendants also began providing additional information concerning their efforts to market their Archstone interests "under separate cover" on December 6, although it is unclear whether they have completed that process.  One of the items requested by Plaintiffs in their December 4 letter was any side agreements between Defendants or their affiliates and Equity Residential.  Defendants claim that other then the Option, there are no side agreements.  On information and belief, despite the Banks' denials, such side deals must exist, since shortly after the Notices were delivered, Plaintiffs learned of the Defendants' prominent participation in a $1 billion Equity Residential bond issuance.

73.    On December 14, 2011, Plaintiffs delivered their Notices of Intent to Purchase in accordance with Section 4.02(a) of the Bridge Equity Providers Agreement.  According to that same agreement, Defendants may argue that Plaintiffs only have until as early as January 23, 2012 to issue their binding Election Notice, make the ROFO Deposit, and complete the transaction within two business days thereafter.  Before Plaintiffs should be required to issue its binding Election Notice, they seek a determination by the Court as to the terms to which their binding Election Notice will relate, and pending that determination ask the Court to order that the 50-day period for delivering that Election Notice, together with all related time periods be tolled and stayed from expiring.

74.    Having now had the opportunity to review the Disclosure Schedules, in addition to the Notices, the Interest Purchase Agreement and the Option, Plaintiffs have been

able to confirm numerous material breaches of the Archstone Agreements, which are described below.

### 2.    Breach of the Bridge Equity Providers Agreement by Failing to Include the Option in the Notices

75.    A fundamental requirement of a ROFO Notice under the Bridge Equity Providers Agreement is that it "shall set forth all of the material terms of the proposed Transfer . . . [including] . . . any other economic terms relevant to such proposed Transfer." Bridge Equity Providers Agreement § 4.02(a). Prior drafts of the Interest Purchase Agreement belatedly provided by Defendants contained a break-up fee to the buyer which was eliminated in favor of the Option. The Option states in the second "Whereas" of that document that it is given in consideration of Equity Residential's foregoing a break up fee under the Interest Purchase Agreement: "in lieu of paying a break up fee to Equity in the event such ROFO Right is exercised with respect to the Purchased Interests and the Purchased Interests are sold . . . [to Lehman] . . . [the Defendants] . . . have agreed to provide to Equity, and Equity is willing to accept, the option to purchase . . . [the balance of Barclays and Bank of America's interests in Archstone]." Accordingly, the Option is part of the consideration to the buyer under the Interest Purchase Agreement, it is a material term as well as a relevant economic term of the proposed Transfer and the rights under the Option should be part of the consideration to Lehman in the event Plaintiffs become the buyers.

76.    However, the Notices do not make reference to and apparently do not include the material term of the Option. The failure to include the Option in the Notices should be remedied by an Order requiring specific performance of Defendants' obligations under the Bridge Equity Providers Agreement to include all material terms of the Transfer in a ROFO Notice, including the Option, before Plaintiffs are required to issue their binding Election Notice

in response to the Notices in accordance with Section 4.02(a) of the Bridge Equity Providers Agreement.

77.     The parties to the Bridge Equity Providers Agreement have consented to the specific performance of that agreement in Section 6.07 thereof, and Plaintiffs request as part of the relief in this action that the Court specifically enforce the agreement and compel Defendants to provide Plaintiffs with complete ROFO Notices that include the rights under the Option as a material term of the Transfer available for exercise by Plaintiffs.  At the same time, the Court should enjoin the exercise of an option by any Person other than Plaintiffs until the expiration of the Option held by Plaintiffs.  This result comports with the Archstone Agreements which contemplate that Plaintiffs would have the first opportunity to acquire the Defendants' Archstone Interests which the banks are prepared to sell.

### 3.    Breach of the Bridge Equity Providers Agreement By Entering Into A Prohibited Agreement

78.     Section 5.01 (c) of the Bridge Equity Providers Agreement contains three interrelated limitations on activities of the parties to that agreement:

> **Each Bridge Equity Provider represents and agrees that it shall not**
>
> (i) grant any proxy or **enter into** or agree to be bound by **any voting trust or agreement** with respect to any of its Syndication Equity . . .  except as expressly contemplated by this Agreement. . .
>
> (ii) **enter into any agreement or arrangement of any kind with any Person** with respect to its Syndication Equity [or] Fund Governance Voting Interests. . . , **inconsistent with the provisions of this Agreement or for the purpose or with the effect of denying or reducing the rights of any other Bridge Equity Provider under this Agreement**. . . or
>
> (iii) **act**, for any reason, **as a member** of a group or **in concert with any other** Person in connection with the Transfer or voting of its Syndication Equity . . . **in any manner that is inconsistent with this Agreement**. (emphasis added)

79.    As set forth below, the Interest Purchase Agreement contains a provision at odds with the prohibitions in Section 5.01(c) of the Bridge Equity Providers Agreement by restricting Defendants' voting on all Special Major Matters that have not been pre-approved which effect a material change in the asset composition or capital structure of Archstone.  The list of Special Major Matters in Schedule C to the Voting Agreement is extensive and virtually all could have effects that materially impact the asset composition or capital structure of Archstone, such as purchases or sales of assets over $100 million, modifications to organizational documents, and entry into contracts in excess of $50 million.  At least two Special Major Matters are of particular relevance at this time – Archstone's annual business plan and annual operating and capital expenditure budget (the "Budget") and the management retention agreements,  which, under the Voting Agreement, require unanimous approval by the Members before implementation.  Neither the Budget nor the management retention agreements are identified as pre-approved Special Major Matters on the Disclosure Schedules to the Interest Purchase Agreement.  Accordingly, Defendants effectively have given Archstone's largest competitor a veto right over Archstone's Budget, retention of its management and possibly compliance with certain of its loan documents.

80.    Section 8.4 of the Interest Purchase Agreement provides that except for matters to which Equity Residential has failed to object or which are set forth on the Disclosure Schedules to the Interest Purchase Agreement, Equity Residential's obligation to close is conditioned on compliance with the covenant that "**[n]o Archstone Entity shall have taken action that constitutes a Special Major Matter under the Voting Agreement**," which "in the reasonable judgment of [Equity Residential]" would result in "a material change in the asset composition or capital structure . . . of the Archstone Entities."  (emphasis added)  Moreover,

26

Defendants have agreed in Section 11.1 of the Interest Purchase Agreement to use "Commercially Reasonable Efforts to take . . . all actions" to cause the sale to Equity Residential to occur.

81.    In addition, Section 13.3 of the Interest Purchase Agreement provides a material financial incentive to Defendants to cause the conditions in Section 8.4 to be satisfied. Section 13.3 requires Defendants to pay Equity Residential 3.5% of the price received by Defendants for their Archstone interests (or approximately $45 million) if Equity Residential terminates that agreement for the failure of the conditions in Section 8.4 to be satisfied and Defendants sell an equal or greater amount of their Archstone interests within six months of the date of termination.  Since Defendants have agreed to use their Commercially Reasonable Efforts to close, and must satisfy Section 8.4 as a condition to closing under the Intent Purchase Agreement, Defendants have in substance agreed not to approve any Special Major Matters except in accordance with the Interest Purchase Agreement.  This provision violates Section 5.01(c)(i) of the Bridge Equity Providers Agreement as a voting agreement with respect to their Archstone interests which is not expressly contemplated by the Bridge Equity Providers Agreement.

82.    Moreover, since early 2010, the parties have been working on development and subsequent documentation of a management incentive plan for the retention of Archstone management (the "Retention Agreements"), the approval of which would also constitute a Special Major Matter by virtue of (i) Section (xiv) of Schedule C to the Voting Agreement (relating to the terms of employment of executive employees of Archstone), and (ii) section (v) of Schedule C (due to the nature of the consideration to be granted to management in accordance with these agreements).

83.    As discussed above, Plaintiffs have been requesting that Defendants take action to complete the Retention Agreements for some time without success.  Counsel for Archstone reminded the parties of the deadline under the Archstone loan documents for acting on the Retention Agreements in two emails dated November 22 and December 7, 2011.  By agreeing not to approve the Retention Agreements without the Buyer's consent, Defendants have in essence handed Equity Residential a veto right over Archstone's ability to retain its valuable management personnel, and possibly even to comply with certain of its loan agreements.  The likelihood that Equity Residential will approve Retention Agreements in not high, since Equity Residential has made known that it does not place significant value in Archstone's infrastructure. Equity Residential's chairman, Sam Zell, was recently quoted in the Wall Street Journal on December 5, 2011, as follows:  "Lehman believes that their quote-unquote platform is very valuable, Mr. Zell said as the deal was being finalized.  'It may in fact be very valuable to them, but it ain't so valuable to us, because it's a redundancy.'"  *Zell's Archstone Deal Upsets Lehman Plan, Equity Residential Wants All of Firm; Lehman Prefers an IPO*, Wall St. Journal, (Dec. 5, 2011).  Absent approval by Equity Residential, Defendants' agreement to implement the Retention Agreements would breach the condition to closing in Section 8.4 of the Interest Purchase Agreement.

84.    To that end, on December 7, 2011, Lehman delivered to Defendants a Notice pursuant to Section 2.01(c) of the Voting Agreement calling for a vote of the Special Major Matter of approving the Retention Agreements.  On December 13, 2011, Defendants declined to approve the Retention Agreements.

4.      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

85.      Making approval of certain Special Major Matters contingent on the Buyer's approval also constitutes a breach of the covenant of good faith and fair dealing. That covenant is reaffirmed in Section 12(a) of the Fund Governance LLC Agreement. The Fund Governance LLC Agreement also incorporates the Voting Agreement, by reference, in Section 10.

86.      By agreeing to Section 8.4 of the Interest Purchase Agreement, Defendants have effectively put their desire to sell a portion of their Archstone interests to Equity Residential in direct conflict with the interests of Archstone in remaining a viable going concern, including maintaining its current management team intact, in performing a covenant in certain of its loan agreements respecting a material amount of its project debt and in being able to operate pursuant to an approved Budget, which is in the best interests of Archstone and not Equity Residential. The uncertainties generated by the sale process, including the contract buyer's public suggestion that management is redundant, exacerbates the risk that without Retention Agreements members of management may leave Archstone, which threatens Archstone's viability as a going concern.

87.      Defendants' conduct deprives Plaintiffs of their bargained-for rights under the Voting Agreement by restricting approval of Special Major Matters in a manner not contemplated by the Voting Agreement and by vesting approval over those actions in a competitor. In order for Defendants to perform their covenant to satisfy the conditions to closing under the Interest Purchase Agreement, they are requiring Archstone to bear the risk that Equity Residential will not consent to important matters, including to the execution of the Retention Agreements that are required to retain critical senior management as well as comply with certain

Archstone loan documents and to the adoption of a Budget.  In order to protect their own

interests as sellers, Defendants have effectively given Archstone's largest competitor control

over Archstone's future while they are still co-venturers with Plaintiffs in that company.

88.    This action by Defendants is arbitrary and unreasonable, and deprives

Plaintiffs from receiving the benefits of their bargain contained in the Fund Governance LLC

Agreement, where the covenant of good faith and fair dealing resides, and in which the Voting

Agreement is incorporated by reference.  The parties to the Voting Agreement did not agree to

any restriction on approval of certain Special Major Matters, but the Interest Purchase

Agreement restricts Defendants' ability to approve certain Special Major Matters at risk of

violating their covenant to cause conditions to the sale to Equity Residential to occur and

potentially exposing themselves to "Buyer Liquidated Damages" under Section 13.3 of that

agreement.

89.    Sections 4.05 and 4.06 of the Bridge Equity Providers Agreement prohibit

Transfers in violation of, among other things, the Voting Agreement and the Fund Governance

LLC Agreement, and permit Plaintiffs to refuse to accept Transfers in violation of such

agreements.  Section 2.02 of the Voting Agreement provides that the "Members shall be entitled

to approve or not approve of any proposed Budget submitted to them, in their sole discretion."

Two of the Members have placed their right to approval of the Budget in a Person not a Member,

violating the Voting Agreement.  Accordingly, Plaintiffs request an injunction against the

proposed Transfer to Equity Residential, including the transfer of the Option, as being a breach

of the implied covenant of good faith and fair dealing in the Fund Governance LLC Agreement

and the Voting Agreement, a declaratory judgment that Plaintiffs are not required to accept such

Transfers, and an order divesting Defendants of their voting rights with respect to their

Archstone interests.

### 5.     Breach By Collusive Activities

90.     The Banks jointly marketed their interests without complying with the

reporting requirement of the Bridge Equity Providers Agreement, negotiated and entered into the

same Interest Purchase Agreement and Other Interest Purchase Agreement, sent virtually

identical but incomplete ROFO Notices at the same time, both of which omitted the material

term of the Option and failed to include the Schedules to the Interest Purchase Agreement, in

violation of Section 4.02(a) of the Bridge Equity Providers Agreement.  This coordinated and

collusive activity breaches both section 5.01(c)(ii) and (iii) of the Bridge Equity Providers

Agreement, which prohibit any party from (a) entering into "**any agreement or arrangement of**

**any kind with any Person**" with respect to its Archstone interests which is **inconsistent with**

the Bridge Equity Providers Agreement, **or for the purpose or with the effect of denying or**

**reducing the rights of any other Bridge Equity Provider**, or (b) acting "**in concert** with any

other Person in connection with the transfer" of its Archstone interests **in a manner inconsistent**

with the Bridge Equity Providers Agreement.  (emphasis added)

91.     Defendants (a) have engaged in collusive action in connection with the

Transfers in a manner inconsistent with the Bridge Equity Providers Agreement by providing

incomplete and misleading Notices lacking, <u>e.g.</u>, the Option (in violation of Section 5.01(c)(iii))

and (b) by their course of conduct over several months have manifested that they are parties to an

agreement or arrangement with each other (and possibly Equity Residential) inconsistent with or

for the purpose or with the effect of denying or reducing Plaintiffs' rights under the Bridge

Equity Providers Agreement to receive information reports and a complete ROFO Notice (in

violation of Section 5.01(c)(ii)).  Pursuant to Section 6.07 of the Bridge Equity Providers

Agreement, Plaintiffs are entitled to specific performance by Defendants requiring them to

include the rights under the Option as part of the Notices.  In order that Plaintiffs may have the

ability to exercise their rights under the Option free of interference by Equity Residential, the

Court should also enter an order allowing Plaintiffs to exercise their option rights before the

exercise of the Option by Equity Residential.

### 6.    Need For Declaratory Relief
### With Respect to Terms of Notices

92.    Plaintiffs seek a declaratory judgment determining

(a)    that the ROFO Notices must include the rights under the Option;

(b)    that if they exercise their ROFO Right by issuance of a binding Election Notice, that binding Election Notice will be deemed an agreement to purchase the Archstone interests which are the subject of the Interest Purchase Agreement on substantially similar terms as the Interest Purchase Agreement, with appropriate modifications to such terms that are specific to Equity Residential, such as sections 6.1, 6.6, 7.1, 7.3 and excluding section 12.3.5 (which purports to limit sellers' liability for breach of the Bridge Equity Providers Agreement in a action brought by Lehman for breach of such agreement);

(c)    that the jurisdiction and venue provisions and the closing schedule in respect of Plaintiffs' purchase should be governed by the Bridge Equity Providers Agreement rather than Sections 14.5 and 2.3 of the Interest Purchase Agreement, respectively;

(d)    the applicability of several sections of the Interest Purchase Agreement, such as Defendants' agreements to extend their loans to Archstone in Section 11.7, Defendants' obligation to use "Commercially Reasonable Efforts" to have buyer's designees appointed to various boards of directors and managers of the Archstone entities in Section 11.8, and the obligations of Defendants to indemnify the buyer from various claims in Section 12.2.2, all have material value to any buyer and which should redound to Plaintiffs' benefit if they are the buyer;

(e)    that representations being made by Equity Residential under section 6.8 of the Interest Purchase Agreement that Equity Residential is solvent and the contemplated transactions are not fraudulent conveyances are either satisfied (as a result of confirmation of Lehman's plan of reorganization) or redundant if the Court approves the exercise by Lehman of its ROFO Rights as contemplated by the Bridge Equity Providers Agreement; and

(f)     the meaning and intent of section 11.10 of the Interest Purchase Agreement, which says that "each [Defendant] shall bear a portion equal to *two times its Proportionate Share* of (i) all fees and expenses" incurred by Defendants, the Archstone Entities and others, and "(ii) all Transfer Taxes," and the basis for the Archstone Entities payment of these amounts on behalf of Defendants.

93.     Finally, the material breaches of Bank of America and Barclays described above, including of the covenant of good faith and fair dealing, should not only prevent them from exercising their right to Transfer their interests to Equity Residential (including the rights under the Option), but also should be held to divest them of any management, governance or voting rights pursuant to the Archstone Agreements.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract – Injunction)

94.     Plaintiffs repeat and reallege each of the allegations contained in the previous paragraphs above as though fully set forth herein.

95.     Plaintiffs and Defendants entered into the Archstone Agreements.

96.     The Archstone Agreements constitute a valid and binding contract.

97.     Plaintiffs have performed their obligations under the Archstone Agreements.

98.     Defendants have materially breached the Archstone Agreements as alleged herein.

99.     Defendants have materially breached the implied duty of good faith and fair dealing.

100.    Section 6.07 of the Bridge Equity Providers Agreement provides, in relevant part, as follows:

> Each party hereto acknowledges and agrees that irreparable damage would occur to the other parties hereto and that the other

parties hereto will not have an adequate remedy at law in the event that any of the provisions of this Agreement to be performed by such party were not performed in accordance with their specific terms or were otherwise breached. Therefore, each party hereto is entitled to an injunction or injunctions to prevent breaches of this Agreement by the other parties and to specifically enforce the terms and provisions of this Agreement against such other parties hereto in any court of competent jurisdiction, without bond or other security being required, and appropriate injunctive relief may be applied for by such parties and granted in connection therewith.

101.    As a result of Defendants' breaches, Plaintiffs' have suffered and will suffer irreparable harm.

102.    Plaintiffs have no adequate remedy at law.

103.    Plaintiffs seek an injunction or injunctions against Defendants to prevent breaches of the Archstone Agreements, including an injunction staying the following: (i) Plaintiffs' time to deliver a binding "Election Notice" with respect to their ROFO Right; (ii) Plaintiffs' time to make a "ROFO Deposit" of approximately $66 million; and (iii) the two-business-day period after making a binding Election Notice within which Plaintiffs must close the purchase.

104.    Plaintiffs seek an injunction against Defendants consummating any "Transfer" (as defined in the Archstone Agreements) to Equity Residential, including any proposed Transfer pursuant to the Option.

105.    In addition, due to Defendants' material breaches of contract and breaches of the covenant of good faith and fair dealing, Plaintiffs are entitled to an injunction which bars Defendants from voting their interests in Archstone, and for such other and further relief as the Court deems just.

## COUNT II
### (Breach of Contract – Specific Performance)

106.   Plaintiffs repeat and reallege each of the allegations contained in the previous paragraphs above as though fully set forth herein.

107.   Plaintiffs and Defendants entered into the Archstone Agreements.

108.   The Archstone Agreements constitute a valid and binding contract.

109.   Plaintiffs have performed their obligations under the Archstone Agreements.

110.   Defendants have materially breached the Archstone Agreements as alleged herein.

111.   Defendants have materially breached the implied duty of good faith and fair dealing.

112.   Section 6.07 of the Bridge Equity Providers Agreement provides, in relevant part, as follows:

> Each party hereto acknowledges and agrees that irreparable damage would occur to the other parties hereto and that the other parties hereto will not have an adequate remedy at law in the event that any of the provisions of this Agreement to be performed by such party were not performed in accordance with their specific terms or were otherwise breached.  Therefore, each party hereto is entitled to an injunction or injunctions to prevent breaches of this Agreement by the other parties and to specifically enforce the terms and provisions of this Agreement against such other parties hereto in any court of competent jurisdiction, without bond or other security being required, and appropriate injunctive relief may be applied for by such parties and granted in connection therewith.

113.   As a result of Defendants' breaches, Plaintiffs have suffered and will suffer irreparable harm.

114.   Plaintiffs have no adequate remedy at law.

115.    Plaintiffs seek an order that Defendants specifically perform their obligations under the Archstone Agreements, including an order (i) that Defendants specifically perform their obligations under the Archstone Agreements to include all material terms of the proposed Transfer in their Notices, including the rights under the Option that Defendants granted to Equity Residential, (ii) compelling Defendants to observe and perform their obligations under the covenant of good faith and fair dealing in the Fund Governance Agreement by approving the Retention Agreements on a timely basis, and (iii) for such other and further relief as the Court deems just.

## COUNT III
### (Breach of Contract – Declaratory Judgment)

116.    Plaintiffs repeat and reallege each of the allegations contained in the previous paragraphs above as though fully set forth herein.

117.    Plaintiffs and Defendants entered into the Archstone Agreements.

118.    The Archstone Agreements constitute a valid and binding contract.

119.    Plaintiffs have performed their obligations under the Archstone Agreements.

120.    Defendants have materially breached the Archstone Agreements as alleged herein.

121.    Defendants have materially breached the implied duty of good faith and fair dealing.

122.    As a result of Defendants' prior material breaches, they are in no equitable position to invoke or enforce the terms of the Archstone Agreements.

123.    Plaintiffs are entitled to a judgment:

36

a.       Declaring that Defendants have committed prior material breaches of the Archstone Agreements;

b.       Declaring that Defendants are not entitled to enforce or invoke the provisions of the Archstone Agreements;

c.       Declaring that the Notices should include the Option as a material term;

d.       Declaring that until Plaintiffs determine whether to exercise the Option, Equity Residential may not exercise the Option and Defendants may not grant an option to any other Person;

e.       Declaring that the Option is part of the Transfer proposed by and subject to the Notices;

f.       Declaring that Plaintiffs are entitled to all of the rights of Equity Residential under the Interest Purchase Agreement and the Option, except such rights or duties that are inapplicable to Plaintiffs;

g.       Declaring Plaintiffs' rights and duties, and the status of the parties under the Notices;

h.       If the ROFO Right does not include all of the rights of Equity Residential under the Option, declaring the value of the Option and the purchase price payable by Plaintiffs if they exercise their rights under the Notices;

i.       Declaring that Defendants have ceased to hold any management, governance or voting rights under the Archstone Agreements and are remitted to holding merely the economic interest of an assignee of a members' or partners' interest in the Archstone-related entities; and

j.      For such other and further relief as the Court deems just.

## COUNT IV
### (Breach of Contract – Damages)

124.    Plaintiffs repeat and reallege each of the allegations contained in the previous paragraphs above as though fully set forth herein.

125.    Plaintiffs and Defendants entered into the Archstone Agreements.

126.    The Archstone Agreements constitute a valid and binding contract.

127.    Plaintiffs have performed their obligations under the Archstone Agreements.

128.    Defendants have materially breached the Archstone Agreements as alleged herein.

129.    Defendants have materially breached the implied duty of good faith and fair dealing.

130.    In addition to suffering irreparable harm, Plaintiffs have suffered and/or will, in the future, suffer damages as a result of Defendants' breaches.

131.    Plaintiffs are entitled to damages in an amount to be proven at trial as a result of Defendants' breaches.

## COUNT V
### (Attorneys' Fees)

132.    Plaintiffs repeat and reallege each of the allegations contained in the previous paragraphs above as though fully set forth herein.

133.    Section 6.05 of the Bridge Equity Providers Agreement incorporates Section 4.16 of the Syndication Agreement "as if set out" in the Bridge Equity Providers Agreement.

38

134.    Section 4.16 of the Syndication Agreement provides, in relevant part, as

follows:

> In the event of any litigation . . . , between or among the parties to
> enforce or interpret any provision or right hereunder, the
> unsuccessful party to such litigation covenants and agrees to pay
> the successful party all costs and expenses reasonably incurred,
> including, without limitation, reasonable attorneys' fees and
> disbursements, it being understood and agreed that the
> determination of the "successful party" shall be included in the
> matters which are the subject of such litigation.

135.    As a result of Defendants' breaches of contract, Plaintiffs were required to

initiate this proceeding to enforce their rights under the Bridge Equity Providers Agreement.

136.    Accordingly, Plaintiffs are entitled to an award of costs, expenses and

attorneys' fees incurred in connection with this proceeding.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    On Count I, a preliminary and final injunction against Defendants to

prevent their breaches of the Archstone Agreements, including an injunction staying the

following:  (i) Plaintiffs' time to deliver a binding "Election Notice" with respect to their ROFO

Right; (ii) Plaintiffs' time to make a "ROFO Deposit" of approximately $66 million; and (iii) the

two-business-day period after making a binding Election Notice within which Plaintiffs must

close the purchase; and an injunction against Defendants consummating any "Transfer" (as

defined in the Archstone Agreements) to Equity Residential, including any proposed Transfer

pursuant to the Option;

B.    On Count II, an order that Defendants specifically perform their

obligations under the Archstone Agreements, including an order (i) that Defendants specifically

perform their obligations under the Archstone Agreements to include all material terms of the

proposed Transfer in their Notices, including the rights under the Option that Defendants granted

39

to Equity Residential; and (ii) compelling Defendants to observe and perform their obligations under the covenant of good faith and fair dealing in the Fund Governance Agreement by approving the Retention Agreements on a timely basis;

      C.      On Count III, a judgment (i) declaring Defendants have committed prior material breaches of the Archstone Agreements; (ii) declaring that Defendants are not entitled to enforce or invoke the provisions of the Archstone Agreements; (iii) declaring that the Notices should include the Option as a material term; (iv) declaring that until Plaintiffs determine whether to exercise the Option, Equity Residential may not exercise the Option and Defendants may not grant an option to any other Person; (v) declaring that the Option is part of the Transfer proposed by and subject to the Notices; (vi) declaring that Plaintiffs are entitled to all of the rights of Equity Residential under the Interest Purchase Agreement and the Option, except such rights or duties that are inapplicable to Plaintiffs; (vii) declaring Plaintiffs' rights, duties and the status of the parties under the Notices; (viii) if the ROFO Right does not include all of the rights of Equity Residential under the Option, declaring the value of the Option and the purchase price payable by Plaintiffs if they exercise their rights under the Notices; and (ix) declaring that Defendants have ceased to hold any management, governance or voting rights under the Archstone Agreements and are remitted to holding merely the economic interest of an assignee of a members' or partners' interest in the Archstone-related entities;

      D.      On Count IV, damages in an amount to be proven at trial;

      E.      On Count V, and award of costs, expenses and attorneys' fees incurred in connection with this proceeding; and

        F.      On all Counts, such other and further relief that the Court deems just and

proper.

Dated:   New York, New York,
           December 15, 2011

                          Respectfully submitted,

                          WOLLMUTH MAHER & DEUTSCH LLP

                          By: _____ /s/ Paul R. DeFilippo _____
                                    Paul R. DeFilippo
                                    (pdefilippo@wmd-law.com)
                                    William A. Maher
                                    (wmaher@wmd-law.com)
                                    William F. Dahill
                                    (wdahill@wmd-law.com)
                                    Michael P. Burke
                                    (mburke@wmd-law.com)

                          500 Fifth Avenue
                          New York, New York 10110
                          (212) 382-3300

                          *Attorneys for Plaintiffs*