Robert N. Michaelson                                 Hearing Date: December 21, 2011
The Michaelson Law Firm                              Hearing Time: 10:00 a.m.
11 Broadway, Suite 615
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

*Attorneys for Brian W. Monahan*


**UNITED STATES BANKRUPTCY COURT**
**SOUNTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

In re                                                Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,             Case No. 08-13555 (JMP)

                                     Debtors.                 (Jointly Administered)

-----------------------------------------------------------------X


**AMENDED RESPONSE OF BRIAN W. MONAHAN TO DEBTOR'S ONE HUNDRED**
**AND EIGHTEENTH AND ONE HUNDRED EIGHTY FIFTH OMNIBUS**
**OBJECTIONS TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS (EQUITY**
**INTERESTS) RE: CLAIMS 20774 AND 20775**


**TO THE HONORABLE JAMES M. PECK,**
**UNITED STATES BANKRUPTCY JUDGE:**

       Brian W. Monahan ("Claimant") by his undersigned counsel, hereby submits this amended

response to Debtors' 185th Omnibus Objection to Claims (To Reclassify Claims as Equity Interests)

(the "Objection").[1] In support thereof, Claimant respectfully states as follows:

**Preliminary Statement**

      1.     Lehman Brothers Holdings Inc. ("LBHI") and its affiliates object to Claim No.

20774 and 20775 (collectively "Claims") of Claimant on the grounds that the Claims are based on

either restricted stock units, contingent stock awards, stock options, or other equity related

compensation, both distributed and not distributed, and vested and unvested, the ownership of

---

[1] Claimant previously submitted *pro se* responses that were not filed in accordance with the court's ECF system.

{00002492v1 }

which constitutes equity interests in a debtor but does not constitute a claim against a debtor's

estate. LBHI bases its objections on an overly broad interpretation of Section 510(b) of the United

States Bankruptcy Code that does not apply in this case.

2.       LBHI further seeks to disallow and expunge the portions of the Claimant's claim

based on No Liability Non-Debtor Employee Claims. LBHI asserts that its records indicate that the

claimant was employee of Lehman Brothers Inc. ("LBI") and, therefore, LBHI has no liability for

the compensation –related obligations of LBI.

3.       Claimant is a former employee of LBHI where he was employed as a commissioned

broker from 1986 to 2009.  Throughout 26 years of Claimant's employment at Lehman Brothers the

management never made a distinction between being employed by LBHI or by LBI. Moreover,

Claimant received LBHI's RSUs as part of his compensation not LBI's.  (*See* Exhibit A – Lehman

Brothers Holding Inc. Stock Incentive Plan).

4.       LBHI also seeks reclassification of RSUs as equity securities because "agreements

governing certain Equity Awards allegedly provide that, in the event of a bankruptcy of LBHI, all

claims arising from, in connection with, or in any way relating to, any failure of LBHI to deliver

shares of common stock shall have the same priority as, and no greater priority than, common stock

interests in LBHI". (LBHI is citing 2003 and 2004 Equity Award Program Agreement, ¶ 10).

5.       The later versions of Equity Award Program, the 2005 Lehman Brothers Holding

Inc. Stock Incentive Plan as amended in 2007, do not contain any language that references

bankruptcy consequences. Therefore this clause is obsolete and void.

6.       As part of its standard practice, LBHI paid commission based sales people in private

equity, asset management and hedge fund departments for particularly large deals in installments

over 5 to 6 years on anniversary dates. Thus, all but $169,591.32 of the amount of 20774 claim

($1,479,381.69) is represents sales commissions earned by Claimant but unpaid by LBHI in 3rd and

4th quarters of 2008 and the years of 2009 through 2011.

7.       LBHI forced commission based employees to receive wages partially in LBHI

Restricted Stock Units ("RSU") (the "RSU Plan",) which had a five year cliff vesting period.  Over

the years the percentage of earnings that employees had to contribute to the RSU Plan was increased

unilaterally to approximately 42% (*See* Exhibit A at p.3, Q3 and A3).

8.       The RSU Plan forced employees, against their will, to receive deferred non-taxable

income.  Employees did not have any the rights in RSUs that typically run "with a purchase of

stock" because LBHI did not have to issue any stock until the end of the five year cliff vesting

period. Thus, an employee only received rights to a future distribution of stock in lieu of already

earned commissions. Making matters even worse, employees had no choice but to accept this

arrangement if they wanted to remain employed. Employees who chose to leave forfeited the entire

unvested portion of RSUs allocated to them. (*See* Exhibit A at p.15, "Voluntary Termination").

Thus, employees who received RSUs instead of cash compensation were restricted by "golden

handcuffs". In addition, LBHI kept changing the RSU Plan rules as time went on. At one point

LBHI announced that it would buy the RSUs back but it never kept its promise.

9.       Following the commencement of the LBHI Chapter 11 proceeding, Claimant

filed the Claims which total $3,302,594.70 consisting of (i) unpaid compensation related to

unvested RSUs in the amount of $1,653,621 (claim 20775) and $137,057.46 of claim 20774; (ii)

unpaid compensation of $9,605.46 earned in 2008 and withheld in July of 2008 for RSU

investment by LBHI but never actually invested; (iii) $22,928.39 related to a refund due to

Claimant in cash for withholding more than the maximum amount required by the RSU plan;

and (iv) $1,479,382.39 related to earned but unpaid commissions.

## Claimant's Claims

10.      As noted, the Claim consists of four parts. The first part is based on the withheld

compensation actually contributed to the RSU plan but which falls outside the scope and intent

of the Section 510 (b) restrictions. The second part consists of unpaid compensation and,

therefore, is simply a claim for unpaid wages that does not require any interpretation or

application of Section 510(b). The third part is the amount by which LBHI exceeded the maximum

withholdings from Claimant's wages required by the RSU plan and consequently is a claim for a cash

refund. The fourth part is the amount of commissions earned by Claimant that LBHI never paid,

and therefore is another claim for unpaid wages. For the reasons stated below, each portion of

these distinct claims should be allowed in their entirety as general unsecured claims.

A. **RSU Plan Contributions**

11.    LBHI withheld a total of $1,653,621(claim 20775) and $137,057.46 (claim 20774)

from Claimant in lieu of cash compensation and contributed it to the RSU Plan. However,

LBHI never delivered any shares to Claimant.

12.    Section 101(15) of the Bankruptcy Code defines "equity security" either as:

(A) share in a corporation, whether or not transferable or denominated "stock", or
similar security (This definition clearly does not apply since no shares were issued or
transferred.) or

(B) interest of a limited partner in a limited partnership; or

(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a
share, security, or interest of kind specified in subparagraph (A) or (B) of this
paragraph."

13.    The unissued non vested RSUs do not fall within a definition of a security in

Section 101(15) because Claimant did not have any rights to purchase or sell or subscribe to

LBHI stock. He had no rights that typically run with the ownership of an equity security.

14.    Relying on a broad interpretation of Section 510(b) and *In re Enron Corp.,* 341

B.R.141, 62 (Bankr. S.D.N.Y. 2006) (Objection at ¶30), the Debtors assume that the unissued

and non-vested RSUs constitute equity interests. In *Enron,* however, the Court expressly noted

that its ruling was limited to the facts of that case. *Enron,* 341 B.R. at 144 En.3 ("The Court

notes that its conclusions apply only to stock options similar to those presented here. The Court issues no opinion as to whether stock options might be designed in such fashion that would result in different treatment under section 510(b).").  Unlike this case, *Enron* involved stock options which Enron employees were free to, but chose not to, exercise before filing of the petition. *Enron,* 341 B.R. at 151-52.

15.     RSUs are substantially different from stock options in that prior to vesting the employee owns nothing and has no right to exercise anything. "Unless otherwise determined by the Committee or as otherwise set forth in any Award Agreement, an Award shall not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of by the Participant otherwise than by will or by the laws of descent and distribution".  (*See* Exhibit A, Lehman Brothers Holding Inc. 2005 Stock Incentive Plan, paragraph 12.)

16.     On the grant date, the employee only receives a mere promise of the value of RSUs as of that date in exchange for the already performed responsibilities. That promise is contingent upon the employee staying with the employer until the vesting point. Thus, Claimant could only become equity holder if, and only if, RSUs vested and, therefore, no "purchase" occurred.

17.     LBHI essentially held RSUs in escrow until the vesting point, at which time the LBHI transferred the shares to a different account controlled by the employees. Therefore, Claimant was not an equity holder and his claims should not be subordinated because he had no control over the RSUs prior to the vesting point. *See, In re Motels of America., Inc.,*146 B.R. 542, 544 (Bankr. D. Del. 1992).

18.     LBHI's reliance on the "phantom stock" portion of the Enron decision is also unavailing. In *Enron* the deferred stock was vested before the filing of the bankruptcy petition and the purchasers had a right to physical possession of the shares. *Enron*, 341 B.R. at 162-63.

19.     By contrast, Claimant was not able to exercise any rights with respect to the RSUs prior to Debtors' bankruptcy filing. Therefore, this case presents a fundamentally different set of facts. Thus, Claimant, as a former employee, must be regarded as "creditor," rather than "investor", and, therefore, his claim is not subject to subordination as it would be if it were for damages arising from the purchase of stock. The LBHI Prospectus (the "Prospectus") (copy of which is annexed hereto as Exhibit B) states: "The plan is intended to constitute an "unfunded" plan for long - term incentive compensation. With respect to any payments not yet made to a participant, including any Participant - Optionee, by the company, nothing here in contained shall give any Participant any rights that are greater than those of a general creditor of the Company." "No Participant shall have any of the rights of a shareholder of the Company with respect to shares of Common Stock subject to an Award until the delivery of such shares of Common Stock". (Prospectus at p.11).

20.     The plain language of the Prospectus contradicts the rational for LBHI's objection. The clause "nothing here in contained shall give any Participant any rights that are greater than those of a general creditor" implies that the drafter's intent was to restrict the rights of a Participant to rights that do not exceed the rights of a general creditor. However, at the same time it does not subordinate the status of a Participant to a general creditor. Rather, it clearly allows a Participant to have rights at least equal to those of a general unsecured creditor. The clause "No Participant shall have any of the rights of a shareholder until the delivery of such shares of Common Stock" clearly indicates that LBHI did not perceive RSU plan participants as equity holders until LBHI actually delivered stock.

21.     Accordingly, the Claim is not an equity claim and Claimant is in form and substance a creditor. Subordinating this claim as "arising from the purchase or sale" of stock would not serve the underlying purposes of subordination under Section 510(b). The

Claimant's compensation was not dependent on LBHI's share price at the time of earnings, because he had already earned a set amount of dollars but received RSUs of uncertain future value instead. The past service gave rise to a matured right to payment with a payment simply deferred to later date. Claimant did not pursue greater profits as a shareholder nor did he ever become a shareholder according to the Prospectus.

22.      Finally, the unilateral terms of the agreement between LBHI and its employees to participate in the stock plan were unconscionable. The Prospectus states that: "The Committee shall have the full and exclusive power and authority to make, and establish the terms and conditions of, any Award to any person eligible to be a Participant, or waive any such terms and conditions at any time. [T]he Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award agreements, and to enter into non-uniform and selective Award agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's employment has been terminated for purposes of the Plan and (iv) any adjustments made to Awards." (Prospectus at p.8). This clause clearly illustrates that no participant had any control over anything that related to issuance or control of stock. Moreover, the entire Award agreement and particularly the bankruptcy clause in the original Equity Award Program make up a classic case of a contract of adhesion. LBHI imposed this scheme upon employees against their will. The employees had no power to decide how to spend their own paycheck.

### B. Claim for Unpaid Wages

23.      Claimant's wages, earned and allocated to the RSU plan in 2008, would normally enter the RSU Plan on December 1, 2008 as deferred compensation.  However, in 2008 the $9,605.46 of compensation attributable to Claimant that was supposed to be contributed to the RSU plan simply "disappeared" and is unaccounted for. Accordingly, this portion of the Claim is plainly outside the

scope of Section 510(b) and must be treated as a general unsecured claim.

### C. Claim for Unpaid Cash Refund

24.     In 2008 LBHI exceeded the maximum amount of withholdings from Claimant's earnings required by the RSU plan as evidenced by Claimant's compensation statement. (*See* Exhibit C). Accordingly, this portion of the Claim represents the remainder of cash refund in the amount of $22,928.39 that LBHI owed to Claimant. This cash refund is clearly outside the scope of Section 510(b) and must be treated as a general unsecured claim.

### D. Claim for Earned Unpaid Cash Commissions

25.     As part of a standard practice, LBHI paid commissions on particularly large deals to commission based sales people in private equity, asset management and hedge fund departments over 5 to 6 years on anniversary dates. $1,479,381.69 is the amount of commissions that LBHI owes claimant for completing such deals. Accordingly, this portion of the Claim is plainly outside the scope of Section 510(b) as it is a claim for unpaid wages and must be treated as a general unsecured claim.

**WHEREFORE**, Claimant respectfully requests the entry of order (i) dismissing the Objection with prejudice; (ii) and allowing the Claim, in its entirety "as general unsecured claim; and (iii) providing for such other relief as this Court deems just.

Dated: New York, New York
        December 15, 2011

                                    The Michaelson Law Firm
                                    11 Broadway, Suite 615
                                    New York, New York 10004
                                    Tel: 212.604.0685
                                    Fax: 800.364.1291


                                    By: */s/ Robert N. Michaelson*
                                            Robert N. Michaelson

                                    *Attorneys for Brian W. Monahan*