**HEARING DATE AND TIME: December 21, 2011 at 10:00 AM (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :    08-13555 (JMP)
                                         :
                        Debtors.         :    (Jointly Administered)
------------------------------------------------------------------x
```

**OMNIBUS REPLY TO RESPONSES TO DEBTORS'**
**ONE HUNDRED EIGHTEENTH, ONE HUNDRED THIRTIETH, ONE**
**HUNDRED THIRTY-FIRST, ONE HUNDRED THIRTY-THIRD, ONE**
**HUNDRED THIRTY-FOURTH, ONE HUNDRED THIRTY-FIFTH,**
**ONE HUNDRED SEVENTY-SIXTH, AND TWO HUNDRED AND**
**SEVENTH OMNIBUS OBJECTIONS TO CLAIMS (TO RECLASSIFY**
**PROOFS OF CLAIM AS EQUITY INTERESTS)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, in the above-

referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"),

file this reply (the "Reply") to responses filed to certain omnibus claim objections, and

respectfully represent:

## Preliminary Statement

1.      Prior to the Commencement Date,[1] a portion of compensation to Lehman employees was paid in the form of restricted stock units and contingent stock awards, all of which provided the holders with a right to acquire common stock in LBHI.  The restricted stock units and contingent stock awards bear the hallmarks of equity interests: the employees enjoyed the benefits as shareholders in the increase in the value of LBHI, but also bore the risks that LBHI's stock would decline in value.  These awards were provided to enhance the attractiveness of employment as well as to increase the employees' personal stake in the welfare of the company.  The employees willingly engaged in the exchange of their labor for these awards and, as such, bargained for positions as shareholders of LBHI.  The responses to the Objections (as defined herein) contain no fact or law to support respondents' position that they are legally entitled to be treated as anything other than holders of Equity Interests in LBHI.

## Background

2.      Beginning on April 6, 2011, the Debtors filed eight omnibus objections to claims (collectively, the "Objections")[2] seeking to reclassify as equity interests claims based on restricted stock units and/or contingent stock awards issued between 2003 and 2008 (together,

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22973] (as supplemented, amended or modified, including by the Plan Supplement, the "Plan").

[2]  The Objections are the:  One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; and Two Hundred and Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012].

the "Equity Awards").[3]  Collectively, the Objections sought to reclassify as equity interests 2,796

proofs of claim (collectively, the "RSU Claims") filed by current and/or former employees of the

Debtors and/or their affiliates on this basis.  In a series of orders (collectively, the "Orders"),[4]

entered between June 3, 2011 and October 27, 2011, the Court granted the requested relief, and

reclassified as equity, RSU Claims asserting approximately $1.8 billion in aggregate claims,

ordering that such claims have the same priority as, and no greater priority than, common stock

interests in LBHI.  The hearing on the Objections has been serially adjourned with respect to any

RSU Claims for which a response was filed.  This Reply addresses certain responses

(collectively, the "Responses") to the Objections interposed by the holders (collectively, the

"Respondents") of the remaining RSU Claims (each, an "Outstanding Claim" and, collectively,

the "Outstanding Claims").  As set forth below, the Responses contain no fact or law sufficient to

compel this Court to overrule the Objections.  Accordingly, the Objections should be granted, the

Outstanding Claims should be reclassified as equity interests, and the holders of such equity

interests should be included in LBHI Class 12 of the Plan.

---

[3]  Attached hereto as Exhibit B are the program documents available to the Debtors in connection with the Equity Awards.

[4]  The Orders are the:  Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17349]; Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19527]; Second Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 21346]; Order Granting Debtors' One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17369]; Order Granting Debtors' One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17353]; Order Granting Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18177]; Order Granting Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18187]; Order Granting Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18178]; and Order Granting Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20610].

**A.**      **Respondents Have the Burden of Proof with Respect to the Outstanding Claims**

3.      A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) ("The burden . . . shifts to the claimant if the objector produces 'evidence equal in force to the prima facie case … which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'") (citation omitted); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007) ("If the objecting party rebuts the claimant's *prima facie* case, 'it is for the claimant to prove his claim, not for the objector to disprove it.'") (citation omitted); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim.").

4.      The Debtors have met their burden of persuasion to overcome the *prima facie* validity of the Outstanding Claims.  *See In re Oneida Ltd.*, 400 B.R. at 389.  As set forth in more detail in the Objections:  (i) the Equity Awards fall within the definition of "equity securities" under section 101(16) of the Bankruptcy Code (*see* Objections ¶¶ 12-14); (ii) contractual provisions enforceable pursuant to section 510(a) of the Bankruptcy Code subordinate certain Outstanding Claims to the same priority as common equity of LBHI (*see id.* ¶¶ 15-17); and (iii) section 510(b) of the Bankruptcy Code mandates that the Outstanding Claims have the same priority as common equity of LBHI (*see id.* ¶¶ 18-22).[5]

---

[5]  Notwithstanding certain Respondents' assertions to the contrary, the Debtors do not need to commence an adversary proceeding to seek to subordinate the Outstanding Claims pursuant to Bankruptcy Code section 510(b).

5.      As a result of the Objections, the burden has shifted to the Respondents to prove by a preponderance of the evidence that under applicable law the Outstanding Claims should be allowed.  *See In re Oneida*, 400 B.R. at 389 ("When the burden is shifted back to the claimant, it must then prove by a preponderance of the evidence that under applicable law the claim should be allowed.") (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) and *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)); *Rockefeller Ctr.*, 272 B.R. at 539).  None of the Responses contains facts or law sufficient to prove by a preponderance of the evidence that the Outstanding Claims should be allowed.

**B.      Assertions and Arguments in the Responses**
**Do Not Affect the Contractual and Statutory Priority of the RSU Claims**

The Responses assert some or all of the following arguments:  (i) the Equity Awards do not constitute equity in LBHI and, therefore, should not be classified as Equity Interests; (ii) the Equity Awards were compensation for services provided to the Debtors that would otherwise have been payable in cash; (iii) the Outstanding Claims are not based on damages that arise from the purchase or sale of a security and, therefore, section 510(b) of the Bankruptcy Code is inapplicable; and (iv) the Outstanding Claims are not Equity Interests because common stock was not actually delivered or because the Equity Awards did not vest as of the Commencement Date.  The Debtors' replies to these arguments are set forth below.  The chart attached hereto as Exhibit A addresses additional assertions made by Respondents and the Debtors' responses thereto.

---

*See* Fed. R. Bankr. P 7001(8); *see also In re Lernout & Hauspie Speech Prods., N.V.*, 264 B.R. 336, 339 (Bankr. D. Del. 2001) ("Because Rule 7001(8) appears to limit subordination complaints to allowed claims" and because "the consideration of whether a particular claim must be subordinated under § 510(b) for distribution purposes may proceed even where the claim has not yet been allowed," "the appropriate procedural vehicle for resolution" is a contested matter under Fed. R. Bankr. P. 9014.").

I.     Respondents' Assertion:  the Equity Awards do not constitute equity in LBHI and, therefore, should not be classified as Equity Interests.

6.     Debtors' Reply:  The Equity Awards, which provided grantees with a right to acquire common stock in LBHI at a specified future time upon the satisfaction of certain conditions, fall within the definition of "equity securities" under section 101(16) of the Bankruptcy Code.  Courts have interpreted the definition of equity security to include a range of stock-based transactions.  *See, e.g., In the Matter of Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D.N.Y. 1985) (holding that claims to exercise the stock option portion of a stock option plan are properly classified as equity security interests); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 520 (5th Cir. 2004) (holding that claimant's right to redeem stock was an equity security); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506 (Bankr. D. Ariz. 2000) (holding that a nontransferable, non-assignable put right "falls squarely within the contours of section 101(16)" because such put right does not include a "right to payment" in cash).  Certain Respondents assert that the language in section 101(16) of the Bankruptcy Code of "warrant or right, other than a right to convert" serves to exclude the Equity Awards from the definition. Contrary to such arguments, this language was intended to exclude bonds or similar debt instruments that contain a right to convert to equity from the definition of equity security.  *See In the Matter of Standard Oil & Exploration of Delaware, Inc.*, 136 B.R. 141, 150 (Bankr. W.D. Mich. 1992) (explaining that even though a note, which is a security, "may be later converted to stock, such right to convert itself does not transform the note into an 'equity security'"); *see also Carrieri*, 393 F.3d at 519 ("The phrase 'other than a right to convert' restricts only the word 'right' and not the rest of the section.").  This language, therefore, does not operate to exclude the Equity Awards from the definition of equity security under section 101(16).

7.     Any rights that Respondents may have under the Equity Awards do not

give rise to a "claim" within the meaning of section 101(5) of the Bankruptcy Code because

Respondents are not entitled to a "right to payment" in cash on behalf of the Equity Awards.

Agreements covering certain of the Equity Awards (the "Agreements") explicitly provided that:

> [LBHI]' and any Subsidiary's obligation with respect to the
> [Restricted Stock Units] granted hereunder is limited solely to the
> delivery to you or shares of Common Stock on the date when such
> shares are due to be delivered hereunder, and in no way shall
> [LBHI] or any subsidiary become obligated to pay in cash in
> respect of such obligation.

*See* 2003, 2004, 2005, 2006, and 2007 Equity Award Program Agreement, ¶ 6.[6]  For this reason,

Respondents' reliance on *In re Motels of America*, 146 B.R. 542 (Bankr. D. Del. 1992) is

misplaced.  In *In re Motels*, the claimant entered into an agreement whereby he was permitted to

sell up to 10% of his shares to the debtor on an annual basis at a fixed price.  *Id.* at 543.  Thus,

the claimant bargained for, and the debtor obliged itself to pay, a steady income stream rather

than relying only on a potential increase in the value of the debtor's shares.  In essence, the

agreement "provided [claimant] with an income stream in exchange for giving up the rights and

risks associated with an equity security holder." *Id.* at 544.

8.     The agreement in *In re Motels*, therefore, is distinguishable from the

Agreements governing the Equity Awards.  At no point did Respondents bargain for the right to

receive, and under no circumstances did LBHI have an obligation to deliver, cash in lieu of or in

exchange for the Equity Awards.  By contrast, Respondents bargained for rights to become

equity security holders, with all the attendant benefits and risks, as the value of the Equity

Awards varied with the value of LBHI's common stock.  Thus, such Equity Awards resemble an

---

[6]  The 2003, 2004, 2005, 2006, and 2007 Equity Award Program Agreements were attached as Exhibits B, C, D, E, and F, respectively, to the Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295] and are attached as Exhibit B hereto.

equity interest to which subordination under section 510(b) is applicable. *See Aristeia Capital v. Calpine Corp. (In re Calpine Corp.)*, Ch. 11 Case No. 05-60200 (BRL), 2007 U.S. Dist. LEXIS 86514, at *38 (S.D.N.Y. Nov. 21, 2007) ("The value of the conversion rights vary with the value of the common stock of [the debtor], and therefore resemble an equity interest to which Section 510(b) is applicable.").

II.     Respondents' Assertion:  the Equity Awards were compensation for services provided to the Debtors that would otherwise have been payable in cash.

9.      Debtors' Reply:  Respondents' argument that they received the Equity Awards as part of their overall compensation is irrelevant to the treatment and classification of the Outstanding Claims as equity interests, and does not impact the applicability of sections 510(a) and 510(b) of the Bankruptcy Code to claims based on the Equity Awards.

10.     There is a clear basis for subordination of many of the Outstanding Claims under section 510(a) of the Bankruptcy Code.  The Agreements provide that, in the event of a bankruptcy of LBHI, all claims arising from, in connection with, or in any way relating to, any failure of LBHI to deliver shares of common stock shall have the same priority as, and no greater priority than, common stock interests in LBHI.  These Agreements advised grantees that:

> All of [their] claims arising from, in connection with, or in any way relating to, any failure of [LBHI] to deliver to [them], or to a subsidiary for delivery by such subsidiary to [them], shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of [LBHI], to be claims for damages arising from the purchase or sale of Common Stock of [LBHI], within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in [LBHI].

*See*, *e.g.*, 2003 and 2004 Equity Award Program Agreements, ¶ 10.[7]  The mere fact that a claim

relates to compensation does not mean that the claim is not subject to section 510(a) of the

Bankruptcy Code.  *See In re Alta+Cast, LLC*, 301 B.R. 150 (Bankr. D. Del. 2003) (the Court

subordinated the claim of a former contractor of a debtor based on the terms of the contract,

which provided that the debtor would repurchase his membership interest upon termination

pursuant to language in the contractor's employment agreement but that the promissory note

used to repurchase such interest would be subordinated to any debt owed by the debtor to any

banks or trade creditors).

        11.     In addition, courts have held that equity interests distributed to employees

as part of their compensation are subject to subordination pursuant to section 510(b) of the

Bankruptcy Code.  The Court in *Enron* held that claims for damages that arise from the

ownership of employee stock options should be subordinated pursuant to section 510(b) of the

Bankruptcy Code.  *See In re Enron Corp.*, 341 B.R. 141, 144 (Bankr. S.D.N.Y. 2006).  The

Court concluded, among other things, that the exchange of an employee's labor for stock options

falls under a broad reading of the term "purchase" in section 510(b) of the Bankruptcy Code.  *Id.*

at 149-51.  Other courts have reached similar conclusions.  *See*, *e.g.*, *Frankum v. Int'l Wireless

Commc'ns Holdings, Inc. (In re Int'l Wireless Commc'ns Holdings, Inc.),* 279 B.R. 463, 467 (D.

Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003) ("That Appellants received the Debtors'

stock as part of a compensation package does not preclude the transfer from being characterized

as a purchase/sale of the Debtors' stock."); *In re U.S. Wireless Corp., Inc.*, 384 B.R. 713, 718

(Bankr. D. Del. 2008) (while "the grant of stock or stock options as a form of compensation for

---

[7]  The 2003 and 2004 Equity Award Program Agreements were attached as Exhibits B and C, respectively, to the Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295] and are attached as <u>Exhibit B</u> hereto.

employment is not technically the same as the purchase of a security in the open market," courts

"have read the term 'purchase' broadly and have included within its scope grants of stock and

stock options as compensation"); *In re Touch America Holdings, Inc.*, 381 B.R. 95, 104 (Bankr.

D. Del. 2008) (adopting the broad reading of the term "purchase" and noting that "stock given to

an employee as compensation nonetheless involves a 'bargain and exchange of value'").

12.    Like the Respondents, the employees in *Enron* argued that they did not

"purchase" the stock options, "but rather received them as part of an employee compensation

package." 341 B.R. at 150. The Court in Enron observed that while this would most likely be

described as a "grant" in common parlance, such "linguistic inconsistency" was not legally

relevant for the purposes of applying section 510(b). *Id.* Similarly, the employees in *Enron*, like

Respondents, maintained that they "never elected to receive stock options, but rather were

required to take a minimum percentage of their annual bonus in stock option form." *Id.* at 151.

The employees claimed that they did not "purchase" the stock options because there was no

voluntary exchange of goods, services or currency. *Id.* The Court dismissed this argument as

flawed, reasoning that,

> [a]lthough implicit, there is nonetheless a bargain and exchange of
> value. Here, the exchange is made not at the time of payment but
> prior to employment. If these Claimants were required to receive a
> portion of their compensation as options, *that was a condition of
> employment the Claimants willingly accepted in return for their
> labor.* These Claimants, thus, "purchased" the stock options with
> their labor.

*Id.* (emphasis added).

13.    Some of the Respondents attempt to avoid the holding in *Enron*, citing a

footnote where the Court noted that its conclusions apply only to stock options similar to those

presented and had no opinion as to whether stock options "might be designed in such a fashion

that would result in different treatment under section 510(b)." *Id.* at 144 n.3.  What Respondents

fail to do, however, is acknowledge the last sentence of the footnote, which clarifies:  "[T]o the

extent that stock options necessarily implicate the purchase or sale of a security, *it is doubtful*

*that any stock options could be so designed.*" *Id.* (emphasis added).  As discussed *infra*, the

Outstanding Claims are damage claims arising from the purchase or sale of a security, and thus,

require the same treatment – mandatory subordination under section 510(b) – as ordered by the

Court in *Enron*.

14.    In willingly engaging in the exchange of labor for Equity Awards, the

Respondents bargained not for cash, but to become shareholders of LBHI common stock.  In

doing so, they took on the risk and return expectations of shareholders.  Accordingly, all damage

claims arising from the purchase of such Equity Awards should be subordinated because the

Respondents contracted to bear those risks.  *See In re Int'l Wireless Commc'ns Holdings, Inc.*, 68

Fed App. at 278 (noting that by agreeing to receive shares as consideration, claimants agreed to

bear shareholder risk); *In re Worldwide Direct, Inc.*, 268 B.R. 69, 73 (Bankr. D. Del 2001)

(stating that by agreeing to accept stock in lieu of a cash payment under a severance agreement,

the claimant "bargained for the status as a shareholder, rather than a creditor.")

III.    Respondents' Assertion:  the Outstanding Claims are not based on damages that arise
from the purchase or sale of a security and, therefore, section 510(b) is inapplicable.

15.    Debtors' Reply:  While the Outstanding Claims assert a variety of

arguments and theories of liability, a common thread that runs through each Response is that the

Outstanding Claims arise from losses or damages (i.e., diminution in value of the Equity

Awards) resulting from the acquisition of the Equity Awards.  Precedent in this jurisdiction

dictates that section 510(b) of the Bankruptcy Code, as a remedial statute, should be interpreted

broadly to effectuate the intent of Congress:  namely, section 510(b) was enacted "to prevent

disappointed shareholders from recovering their investment loss by using fraud and other

securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy

proceeding." *In re Enron Corp.*, 341 B.R. at 158 (citing *Baroda Hill Invs., Ltd. v. Telegroup,*

*Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2002)).

16.    The Outstanding Claims, while veiled in fraud and/or breach of contract

causes of action, are at their core claims to recover damages arising from the purchase of the

Equity Awards.  Courts have interpreted a wide variety of claims to be for damages that arise

from the purchase of a security.  *See, e.g., In re Seaquest Diving LP*, 579 F.3d 411, 421 (5th Cir.

2009) (noting that the Second Circuit has adopted a broad reading of the damages category and

citing *Rombro v. Dufrayne (In re Med Diversified, Inc.*), 461 F.3d 251 (2d Cir. 2006)); *Queen v.*

*Official Comm. of Unsecured Creditors (In re Response U.S.A., Inc.*), 288 B.R. 88, 94 (D.N.J.

2003) (affirming the bankruptcy court's holding that claims seeking cash compensation under the

terms of a stock purchase agreement for the decline in value of stock were damage claims which

fit within the scope of section 510(b) rather than claims for a contractual right to payment); *In re*

*PT-1 Commc'ns, Inc.*, 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004) ("the claim need not flow

directly from the securities transaction, but can be viewed as 'arising from' the transaction if the

transaction is part of the casual link leading to the injury").

17.    Because there is a nexus or causal relationship between the bases for the

Outstanding Claims and the purchase of the Equity Awards, such claims "arise from" the

purchase of a security and are subject to subordination under section 510(b) of the Bankruptcy

Code.  Like the claimants in *Enron*, Respondents assert claims against the Debtors for fraudulent

inducement, fraudulent retention, and breach of contract related to the Equity Awards.  For

instance, Respondents argue that the Debtors fraudulently induced them to accept the Equity

Awards as part of their compensation packages.  The Court in *Enron* held that a fraudulent inducement claim of this sort is a "claim for damages directly related to a securities transaction" and "is a clear example of a typical claim by the defrauded purchaser of a security to which section 510(b) unambiguously applies."  341 B.R. at 150; *see also Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 215 (2d Cir. 1978), *cert. denied*, 439 U.S. 1074 (1979) (concluding that claims filed by persons who were allegedly induced by fraud to purchase the debtor's stock should be subordinated).  Respondents also assert, like the claimants in *Enron*, that the Debtors' allegedly fraudulent information and misleading financial reporting induced them to hold on to their vested Equity Awards.  Analyzing fraudulent retention claims, the court in *Enron* held that "claims alleging fraudulent retention of a stock option 'arise from' the purchase of that security and should be subordinated pursuant to section 510(b)."  341 B.R. at 159.

18.    Indeed, whether the damages to Respondents were caused by alleged fraud in the inducement, fraudulent retention, breach of contract, misappropriation, or other malfeasance does not matter, as such damages arose from and are based upon Respondents' purchase of the Equity Awards and, as such, are squarely within the scope of section 510(b).  *See In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b) . . . .").  Even if Respondents held cognizable claims under any of these legal theories, which the Debtors in no way concede, any claims arising therefrom would be subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

IV.    Respondents' Assertion:  the Outstanding Claims are not Equity Interests because common stock was not actually delivered or because the Equity Awards did not vest as of the Commencement Date.

19.    Debtors' Reply:  The Respondents do not provide any support for the assertion that the vesting of Equity Awards, or actual delivery of stock, is necessary for the subordination of the Outstanding Claims.  In fact, precedent supports the Debtors' position.  The Court in *Enron* rejected the argument that the purported claims are not equity because stock was not actually delivered.  The Court held that "physical possession of the security is not required for a claim based upon that security to be subordinated."  341 B.R. at 163 (citing *American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 830 (9th Cir. 2001)) (observing that "even if an investor never receives her promised shares, she . . . expects to participate in firm profits").  Likewise, in *In re Med Diversified, Inc.*, the Second Circuit affirmed the lower court's holding that section 510(b) mandates subordination of a former employee's claim based on the debtor's alleged failure to issue shares, despite the fact that the employee never actually received such shares.  461 F.3d at 258.  The policy rationale for mandatory subordination "applies 'even if there is no "actual" sale or purchase.'"  *Id.* (citing *Betacom*, 240 F.3d at 830-31); *see also In re U.S. Wireless Corp., Inc.*, 384 B.R. at 720 n.46 (noting that the fact that claimant never received certain portions of the equity package due to the various vesting dates was not a bar to the subordination of his entire claim under section 510(b) of the Bankruptcy Code).

20.    Similarly, the analysis under section 510(b) here does not depend on whether Respondents were actual shareholders, but rather on the nature of their underlying claim.  *See In re Touch America Holdings, Inc.*, 381 B.R. at 104 ("[T]he § 510(b) analysis does not hinge on whether the Plaintiffs label themselves as Plan participants or shareholders, but

requires consideration of the underlying nature of their claims."); *In re Walnut Equip. Leasing Co.,* Ch. 11 Case No. 97-19700 (DWS), 1999 Bankr. LEXIS 1626, at *20 (Bankr. E.D. Pa. Dec. 28, 1999) ("[T]he language of § 510(b) does not limit its application to any particular type of claimant . . . but, rather, focuses on the type of claim possessed."); *In re PT-1 Commc'ns, Inc.,* 304 B.R. at 609 (same). As discussed above, the Respondents' rights are limited solely to their holdings of Equity Awards, which only entitle the Respondents to the rights of a common stockholder and nothing more.

21.     Certain Respondents that earned commissions throughout the year assert that portions of their monthly paychecks for the year 2008 were deducted and because LBHI typically issued Equity Awards in November or December, such Respondents never received Equity Awards on account of such deductions. Some of such Respondents also assert that LBHI escrowed cash for their benefit on account of such amounts. Based on the Debtors' review of their books and records, no amounts were held in escrow, constructive trust, or otherwise for the benefit of Respondents in connection with the Equity Awards. Respondents assertions to the contrary are not supported by any evidence and are merely asserted in unsworn statements in certain of the Responses. Moreover, none of the foregoing changes the simple fact that these Respondents were only entitled to receive Equity Awards and LBHI was never obligated to pay such Respondents cash in connection therewith. The fact that the Equity Awards were not issued prior to the Commencement Date is irrelevant.

**Conclusion**

22.     As a result of the foregoing as well as the arguments set forth in the

Objections, the Outstanding Claims should be reclassified as equity because (i) the Equity

Awards fall within the Bankruptcy Code definition of "equity securities," (ii) the subordination

provisions of the agreements governing the Equity Awards are enforceable pursuant to

Bankruptcy Code section 510(a), and (iii) Bankruptcy Code section 510(b) mandates that the

Outstanding Claims have the same priority as common equity of LBHI.   Nothing in the law or

the Responses permits an alternative result.

Dated:  December 15, 2011
        New York, New York

/s/ *Robert J. Lemons*
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT A**

| | Respondents' Argument | Debtors' Response |
|---|---|---|
| 1. | A "Bankruptcy Distribution Event," as defined in the relevant Equity Awards agreements, which under certain of the Equity Award agreements was one of the "conditions to exercise" the equity options, was not triggered because LBHI has not proposed a chapter 11 plan, and thus any claims arising under those Agreements may not be subordinated. | The occurrence of a "Bankruptcy Distribution Event" is irrelevant because the provisions of the relevant Equity Awards agreements dictate subordination of the Outstanding Claims pursuant to section 510(a) of the Bankruptcy Code.  In any event, contrary to certain Respondents' assertions, the Plan was confirmed by an Order of this Court dated December 6, 2011 [ECF No. 23023].  Moreover, the Respondents' rights are limited solely to their holdings of Equity Awards, which only entitle the Respondents to the rights of a common stockholder of LBHI and nothing more.  Nothing in the Agreements provides Respondents with anything greater than a right to an Equity Interest. |
| 2. | The Debtors have not yet objected to other proofs of claims that were filed based on Equity Awards. | The Debtors intend to continue their review and analysis of each of the more than 67,000 proofs of claims filed in these chapter 11 cases and object thereto, as appropriate.  The fact that the Debtors have not yet objected to every proof of claim filed based on Equity Awards is not a basis to deny the current Objections with respect to the Outstanding Claims. |
| 3. | The holding in *Guiry v. Goldman, Sachs & Co.*, 2006 N.Y. App. Div. Lexis 6630 (1st Dept. May 18, 2006) dictates that the Equity Awards were compensation because the court in that case refers to unvested contingent rights to restricted stock as "incentive compensation." | Respondents' reliance on the use of the term "incentive compensation" in *Guiry v. Goldman, Sachs & Co.* is misplaced.  The *Guiry* Court, used the term "incentive compensation" for the purpose of distinguishing equity award type instruments from "wages" under the New York Labor Law.  "[W]e hold that deferred equity based compensation of this kind constitutes, as a matter of law, 'incentive compensation' . . . not included in the definition of 'wages' under Labor Law § 190(1).'" *Guiry v. Goldman, Sachs & Co.*, 2006 N.Y. App. Div. Lexis 6630 (1st Dept. May 18, 2006). The Debtors do not dispute that the Equity Awards were compensation but that does not change the analysis under section 510 of the Bankruptcy Code.  *See* Reply, ¶¶ 1, 9-14. |
| 4. | Amounts were deducted from the Respondents' payrolls and held in either an escrow account or in constructive trust for their benefit until such time as the funds would be used to purchase Equity Awards. | The Agreements expressly provided that the Respondents were never entitled to any cash payments.  *See* Reply, ¶ 7.  Moreover, Respondents' assertions that cash was deducted from their paychecks and escrowed for their benefit are not supported by any evidence and are merely asserted in unsworn statements in certain of the Responses. Based on the Debtors' review of their books and records, no amounts were held in escrow, constructive trust, or otherwise for the benefit of Respondents in connection with the Equity Awards. |

| | Respondents' Argument | Debtors' Response |
|---|---|---|
| 5. | Under Delaware state law, deferred share-based compensation is not a damage claim, but rather constitutes an unpaid debt under the Wage Act. Delaware code Annotated at Title 19, Part I, Chapter 11, Section 1101 to 1115. *See SCOA Indus. Inc. v. Bracken*, 374 A.2d 263 (Del. 1977); *Sietz v. Siegfried Group*, 2001 WL 1198941 (Del. Super. 2001); *Dept. of Labor Commons v. Green Giant*, 394 A.2d 753 (Del. Super. 1978). | The Wage Act cases cited by the Respondents are inapplicable here because "the purpose of the Delaware Wage Payment and Collection act is to provide a remedy for employees to recover regular direct recurrent wages unreasonably withheld by the employer." *Gallagher v. E.I. DuPont De Nemours & Co.*, CIV. A. 06C-12-188 WC, 2010 WL 1854131 (Del. Super. Apr. 30, 2010). Additionally, the definition of damages under section 510(b) of the Bankruptcy Code has been broadly interpreted by courts. *See* Reply, ¶¶ 15-16. |
| 6. | Because "this situation involv[es] thousands of former employees for their unpaid wages, [it] is a situation that extends the reach of § 510(b) beyond its legislative history and purpose." | This argument is legally unsupported. As the Court notes in *In re Worldcom, Inc.*, 329 B.R. 10, 13 (Bankr. S.D.N.Y. 2005), section 510(b) of the Bankruptcy Code does not discriminate between "great frauds" "which caused major damages to large and sophisticated investors" and "petty swindles involving little companies which cause small investors to lose small amounts." "The statute applies evenhandedly to swindles both great and small leading to claims for rescission or damages by investors both great and small." *Id.* |
| 7. | The United States Government assisted employees of all financial institutions except for the Debtors, and thus, former employees of the Debtors deserve similar treatment. | This argument is irrelevant to the application of section 510 of the Bankruptcy Code. |
| 8. | Reclassification of Equity Awards is unconscionable in light of the professional fees in the Debtors' cases. | This argument is irrelevant to the application of section 510 of the Bankruptcy Code. |
| 9. | There is a longstanding public policy tradition against forfeiture of earned compensation as evidenced by decisions under New York state law. *See Mirchel v. RMJ Securities Corp.*, 205 A.D.2d 388, 389 (1st Dept. 1994); *Weiner v. Diebold Group*, 173 A.D.2d 166, 167 (1st Dept. 1991); *Markby v. PaineWebber, Inc.*, 169 Misc.2d 173, 179 (Sup. Ct. N.Y. Co. 1996). | This argument is irrelevant to the application of section 510 of the Bankruptcy Code. Respondents' rights are not being forfeited but, instead, are being properly reclassified in the Debtors' capital structure. |

| | Respondents' Argument | Debtors' Response |
|---|---|---|
| 10. | Because Respondents conferred a benefit upon the Debtors by providing labor and the Debtors now seek to benefit from such labor without fully and adequately compensating the Respondents, the Debtors are the beneficiaries of unjust enrichment. | The principle of unjust enrichment is inapplicable to the court's analysis of subordination under section 510 of the Bankruptcy Code.  Respondents bargained for and willingly accepted the compensation packages – which included the risks and benefits attendant to the Equity Awards – in exchange for their labor.  *See* Reply, ¶¶ 11-12, 14. |
| 11. | The terms of the Equity Awards programs were unconscionable. | Respondents' assertions that the Equity Awards programs were unconscionable are not supported by any evidence and are merely asserted in unsworn statements in certain of the Responses.  Moreover, this argument is irrelevant to the application of section 510 of the Bankruptcy Code. |
| 12. | Compensation received in the form of Equity Awards is analogous to a margin account and the Debtors were required to compensate Respondents for the diminution in value. | Any claims for diminution of value of stock are damages claims arising from the purchase or sale of a security that are subject to mandatory subordination under section 510(b) of the Bankruptcy Code.  Nothing in the Equity Award agreements provides Respondents with anything greater than a right to an Equity Interest.  *See* Reply, ¶¶ 6-7, 10.  It is inherent in the nature of common stock that the value may increase or decline over time. |
| 13. | Classifying the claims as "Equity Interests" is incorrect based on IRS Code Section 409 which states that in order to allow the tax deferral, the plan must remain unfunded and unsecured and that the assets must remain the assets of the employer. | This argument is irrelevant to the application of section 510 of the Bankruptcy Code. |
| 14. | The holding in *FleetBoston Financial Corp. v. Alt*, 668 F. Supp.2d 277 (D. Mass., 2009) supports the assertion that because Respondents were holders of restricted stock units that never vested, they are not stockholders. | In *FleetBoston*, the court barred unvested restricted stock unit holders from bringing a breach of fiduciary duty action against a majority shareholder. *FleetBoston Financial Corp. v. Alt*, 668 F. Supp.2d 277, 279-280 (D. Mass., 2009).  The lack of standing for holders of unvested rights to purchase stock to bring suit for breach of fiduciary duty is irrelevant to the application of section 510 of the Bankruptcy Code.  Additionally, physical ownership of a security is not a prerequisite for subordination pursuant to section 510(b) of the Bankruptcy Code.  *See* Reply, ¶¶ 19-20. |
| 15. | Respondents thought they would receive cash because they received statements that attributed a value to their Equity Awards | The Equity Awards agreements did not provide for the payment of cash to holders.  In fact, the Agreements expressly provided that the Respondents were never entitled to any cash payments.  *See* Reply, ¶¶ 6-8. |

**EXHIBIT B**

# 2001 Lehman Brothers Managing Director Stock Option Award

## *Agreement Evidencing A Grant of A Nonqualified Stock Option*

**LEHMAN BROTHERS**

**1.    Grant of Option.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of September 20, 2001 and December 3, 2001 (the "Dates of Grant"), a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $46.64 per Share and $63.40 per Share, respectively, as specified in the Award Statement (the "Option Exercise Prices").

**2.    Additional Documents; Definitions.** Enclosed you will find a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3.    Exercisability.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)**    No part of this option may be exercised after November 29, 2011 (the "Final Expiration Date").

**(b)**    Beginning as of November 30, 2004, you may exercise this option as to no more than one-half of the Principal Option Shares (thirty-five percent of Shares subject to option pursuant to this Agreement); and

**(c)**    As of November 30, 2006, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4.    Conditions to Exercise.** This option may not be exercised unless all of the following conditions are met:

**(a)**    Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)**    You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the

option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)**    You must, unless otherwise provided below, at all times during the period beginning with January 31, 2002 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

**(i)**    **Termination before January 31, 2002.** In the event of your Termination for any reason before January 31, 2002, this option shall be forfeited and canceled.

**(ii)**    **Voluntary Termination With Competitive Activity.** In the event of your voluntary Termination with Competitive Activity on or after January 31, 2002, this option shall be forfeited and canceled.

**(iii)**    **Voluntary Termination Without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 31, 2002, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date (defined below), provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2011, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date. "Termination Expiration Date" means the later to occur of (i) November 30, 2006 or (ii) six months following your Termination, but in no event after November 29, 2011.

**(iv)**    **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

**(v)**    **Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 31, 2002, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares

2

until November 29, 2011, provided you do not engage in Detrimental Activity through that date.

(vi) **Retirement.** In the event of your Retirement on or after January 31, 2002, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2011, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

(vii) **Occurrence of a Bankruptcy Distribution Event, Death or Disability.** In the event of the occurrence on or after January 31, 2002 of (i) a Bankruptcy Distribution Event or (ii) your death or Disability, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2011, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option which is not exercisable pursuant to the provisions of this subparagraph 4(c) shall be canceled by Holdings.

5. **Non-Assignment.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

6. **Equitable Adjustment.** In the event of a Change in Capitalization occurring after the dates of grant of these options and prior to the exercise of the options in full, the number and kind of shares of Common Stock for which these options may then be exercised and the option prices shall be adjusted so as to reflect such change.

7. **Change in Control.** Upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee; provided however, that if the Change in Control occurs with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2011, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable

by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

8. **Amendment.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

9. **Binding Actions.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

10. **No Right to Continued Employment.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

11. **No Rights of a Stockholder.** Neither you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

12. **Applicable Law.** The validity, construction, interpretation, administration and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

13. **Withholding.** Holdings shall have the right to deduct from all amounts payable to you, any taxes required by law to be withheld therefrom. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other

3

person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

## Annex A: Definitions

**"Appropriate Officer"** means the Chief Executive Officer or Chief Administrative Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of your duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential, (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing, or (iii) any activity deemed to be detrimental to Holdings or any of its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 30% discount upon issuance of the award.

**"Friendly Change in Control"** means any Change in Control made with the prior approval of a majority of the independent members of the Incumbent Board.

**"Full Career Termination"** means a termination of employment with Holdings or any subsidiary when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** means the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (70% of the total number of Shares subject to option hereunder).

**"Retirement"** means a termination of employment with Holdings or any subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan and the agreement by a person not to engage in Competitive Activity or Detrimental Activity.

**"Termination"** means the actual date your employment with Holdings or any subsidiary is terminated.

# 2001 Lehman Brothers Senior Vice President Stock Option Award

## *Agreement Evidencing A Grant of A Nonqualified Stock Option*

**LEHMAN BROTHERS**

**1.    Grant of Option.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 3, 2001, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $63.40 per Share as specified in the Award Statement (the "Option Exercise Price").

**2.    Additional Documents; Definitions.** Enclosed you will find a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3.    Exercisability.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)**   No part of this option may be exercised after November 29, 2011 (the "Final Expiration Date").

**(b)**   Beginning as of November 30, 2003, you may exercise this option as to all of the Principal Option Shares (seventy-five percent of Shares subject to option pursuant to this Agreement); and

**(c)**   As of November 30, 2006, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4.    Conditions to Exercise.** This option may not be exercised unless all of the following conditions are met:

**(a)**   Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)**   You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such

sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)**   You must, unless otherwise provided below, at all times during the period beginning with January 31, 2002 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

**(i)**   **Termination before January 31, 2002.** In the event of your Termination for any reason before January 31, 2002, this option shall be forfeited and canceled.

**(ii)**   **Voluntary Termination With Competitive Activity.** In the event of your voluntary Termination with Competitive Activity on or after January 31, 2002, this option shall be forfeited and canceled.

**(iii)**   **Voluntary Termination Without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 31, 2002, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date (defined below), provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2011, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date. "Termination Expiration Date" means the later to occur of (i) November 30, 2006 or (ii) six months following your Termination, but in no event after November 29, 2011.

**(iv)**   **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

**(v)**   **Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 31, 2002, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2011, provided you do not engage in Detrimental Activity through that date.

**(vi)** **Retirement.** In the event of your Retirement on or after January 31, 2002, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2011, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

**(vii)** **Occurrence of a Bankruptcy Distribution Event, Death or Disability.** In the event of the occurrence on or after January 31, 2002 of (i) a Bankruptcy Distribution Event or (ii) your death or Disability, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2011, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option which is not exercisable pursuant to the provisions of this subparagraph 4(c) shall be canceled by Holdings.

**5.** **Non-Assignment.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6.** **Equitable Adjustment.** In the event of a Change in Capitalization occurring after the date of grant of these options and prior to the exercise of the options in full, the number and kind of shares of Common Stock for which these options may then be exercised and the option prices shall be adjusted so as to reflect such change.

**7.** **Change in Control.** Upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee; provided however, that if the Change in Control occurs with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2011, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in

Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8.** **Amendment.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9.** **Binding Actions.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10.** **No Right to Continued Employment.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

**11.** **No Rights of a Stockholder.** Neither you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12.** **Applicable Law.** The validity, construction, interpretation, administration and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13.** **Withholding.** Holdings shall have the right to deduct from all amounts payable to you, any taxes required by law to be withheld therefrom. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option

3

by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

---

### Annex A: Definitions

**"Appropriate Officer"** means the Chief Executive Officer or Chief Administrative Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor) habitual or gross negligence in the performance of your duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential, (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing, or (iii) any activity deemed to be detrimental to Holdings or any of its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 25% discount upon issuance of the award.

**"Friendly Change in Control"** means any Change in Control made with the prior approval of a majority of the independent members of the Incumbent Board.

**"Full Career Termination"** means a termination of employment with Holdings or any subsidiary when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** means the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (75% of the total number of Shares subject to option hereunder).

**"Retirement"** means a termination of employment with Holdings or any subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan and the agreement by a person not to engage in Competitive Activity or Detrimental Activity.

**"Termination"** means the actual date your employment with Holdings or any subsidiary is terminated.

## 2002 STOCK OPTION AWARD

# AGREEMENT EVIDENCING A GRANT OF A NONQUALIFIED STOCK OPTION



# LEHMAN BROTHERS

**1. GRANT OF OPTION.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 11, 2002, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $54.42 per Share as specified in the Award Statement (the "Option Exercise Price").

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. EXERCISABILITY.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)** No part of this option may be exercised after November 29, 2012 (the "Final Expiration Date").

**(b)** Beginning as of November 30, 2004, you may exercise this option as to all of the Principal Option Shares (seventy-five percent of Shares subject to option pursuant to this Agreement); and

**(c)** As of November 30, 2007, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4. CONDITIONS TO EXERCISE.** This option may not be exercised unless all of the following conditions are met:

**(a)** Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)** You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)** You must, unless otherwise provided below, at all times during the period beginning with January 30, 2003 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

(i) *Termination before January 30, 2003.* In the event of your Termination for any reason before January 30, 2003, this option shall be forfeited and canceled.

(ii) *Voluntary Termination with Competitive Activity.* In the event of your voluntary Termination with Competitive Activity on or after January 30, 2003, this option shall be forfeited and canceled.

(iii) *Voluntary Termination without Competitive Activity.* In the event of your voluntary Termination without Competitive Activity on or after January 30, 2003, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date (defined below), provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2012, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date. "Termination Expiration Date" means the later to occur of (i) November 30, 2007 or (ii) six months following your Termination, but in no event after November 29, 2012.

(iv) *Involuntary Termination with Cause.* In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

(v) *Involuntary Termination without Cause.* In the event of your involuntary Termination without Cause on or after January 30, 2003, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2012, provided you do not engage in Detrimental Activity through that date.

(vi) *Retirement.* In the event of your Retirement on or after January 30, 2003, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2012, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

(vii) *Occurrence of a Bankruptcy Distribution Event, Death, or Disability.* In the event of the occurrence on or after January 30, 2003 of (i) a Bankruptcy Distribution Event or (ii) your death or Disability, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2012, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option, which is not exercisable pursuant to the provisions of this subparagraph 4(c), shall be canceled by Holdings.

2

**5. NON-ASSIGNMENT.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the date of grant of this option and prior to the exercise of the option in full, the number and kind of shares of Common Stock for which this option may then be exercised and the option price shall be adjusted so as to reflect such change.

**7. CHANGE IN CONTROL.** Upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee; provided however, that if the Change in Control occurs with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2012, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9. BINDING ACTIONS.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

**11. NO RIGHTS OF A STOCKHOLDER.** Neither you (nor, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13. WITHHOLDING.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of your duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 25% discount upon issuance of the award.

**"Friendly Change in Control"** means any Change in Control made with the prior approval of a majority of the independent members of the Incumbent Board.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** means the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (75% of the total number of Shares subject to option hereunder).

**"Retirement"** means a Termination of employment with Holdings or any subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Termination"** means the end of employment with Holdings or any subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

©2003 Lehman Brothers.  All Rights Reserved.  LB8841

## 2003 STOCK OPTION AWARD

# AGREEMENT EVIDENCING A GRANT OF A NONQUALIFIED STOCK OPTION

*Managing Directors*



# LEHMAN BROTHERS

**1. GRANT OF OPTION.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $71.39 per Share as specified in the Award Statement (the "Option Exercise Price").

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. EXERCISABILITY.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)** No part of this option may be exercised after November 29, 2013 (the "Final Expiration Date").

**(b)** Beginning as of November 30, 2006, you may exercise this option as to no more than one-half of the Principal Option Shares (thirty-five percent of Shares subject to option pursuant to this Agreement); and

**(c)** As of November 30, 2008, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4. CONDITIONS TO EXERCISE.** This option may not be exercised unless all of the following conditions are met:

**(a)** Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)** You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)** You must, unless otherwise provided below, at all times during the period beginning with January 30, 2004 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

**(i)** *Termination before January 30, 2004.* In the event of your Termination for any reason before January 30, 2004, this option shall be forfeited and canceled.

**(ii)** *Voluntary Termination with Competitive Activity.* In the event of your voluntary Termination with Competitive Activity on or after January 30, 2004, this option shall be forfeited and canceled.

**(iii)** *Voluntary Termination without Competitive Activity.* In the event of your voluntary Termination without Competitive Activity on or after January 30, 2004, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date (defined below), provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2013, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date. "Termination Expiration Date" means the later to occur of (i) November 30, 2008 or (ii) six months following your Termination, but in no event after November 29, 2013.

**(iv)** *Involuntary Termination with Cause.* In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

**(v)** *Involuntary Termination without Cause.* In the event of your involuntary Termination without Cause on or after January 30, 2004, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2013, provided you do not engage in Detrimental Activity through that date.

**(vi)** *Retirement.* In the event of your Retirement on or after January 30, 2004, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2013, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

**(vii)** *Occurrence of a Bankruptcy Distribution Event, Death, or Disability.* In the event of the occurrence on or after January 30, 2004 of (i) a Bankruptcy Distribution Event or (ii) your death or Disability, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2013, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option, which is not exercisable pursuant to the provisions of this subparagraph 4(c), shall be canceled by Holdings.

**5. NON-ASSIGNMENT.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the date of grant of this option and prior to the exercise of the option in full, the number and kind of shares of Common Stock for which this option may then be exercised and the option price shall be adjusted so as to reflect such change.

**7. CHANGE IN CONTROL.** Upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee; provided however, that if the Change in Control occurs with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2013, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9. BINDING ACTIONS.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

**11. NO RIGHTS OF A STOCKHOLDER.** Neither you (nor, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13. WITHHOLDING.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of your duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 30% discount upon issuance of the award.

**"Friendly Change in Control"** means any Change in Control made with the prior approval of a majority of the independent members of the Incumbent Board.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** means the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (70% of the total number of Shares subject to option hereunder).

**"Retirement"** means a Termination of employment with Holdings or any subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Termination"** means the end of employment with Holdings or any subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

**4**

©2004 Lehman Brothers.  All Rights Reserved.  LB10484_C1_US_OP_Agmt/Option_Agreement_MD

## 2003 **STOCK OPTION** AWARD

# AGREEMENT EVIDENCING A GRANT OF A NONQUALIFIED STOCK OPTION

*Senior Vice Presidents*



# LEHMAN BROTHERS

**1.  GRANT OF OPTION.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $71.39 per Share as specified in the Award Statement (the "Option Exercise Price").

**2.  ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3.  EXERCISABILITY.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)** No part of this option may be exercised after November 29, 2013 (the "Final Expiration Date").

**(b)** Beginning as of November 30, 2005, you may exercise this option as to all of the Principal Option Shares (seventy-five percent of Shares subject to option pursuant to this Agreement); and

**(c)** As of November 30, 2008, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4.  CONDITIONS TO EXERCISE.** This option may not be exercised unless all of the following conditions are met:

**(a)** Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)** You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)** You must, unless otherwise provided below, at all times during the period beginning with January 30, 2004 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

(i) **Termination before January 30, 2004.** In the event of your Termination for any reason before January 30, 2004, this option shall be forfeited and canceled.

(ii) **Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity on or after January 30, 2004, this option shall be forfeited and canceled.

(iii) **Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 30, 2004, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date (defined below), provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2013, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date. "Termination Expiration Date" means the later to occur of (i) November 30, 2008 or (ii) six months following your Termination, but in no event after November 29, 2013.

(iv) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

(v) **Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 30, 2004, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2013, provided you do not engage in Detrimental Activity through that date.

(vi) **Retirement.** In the event of your Retirement on or after January 30, 2004, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2013, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

(vii) **Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** In the event of the occurrence on or after January 30, 2004 of (i) a Bankruptcy Distribution Event or (ii) your death or Disability, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2013, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option, which is not exercisable pursuant to the provisions of this subparagraph 4(c), shall be canceled by Holdings.

**5. NON-ASSIGNMENT.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the date of grant of this option and prior to the exercise of the option in full, the number and kind of shares of Common Stock for which this option may then be exercised and the option price shall be adjusted so as to reflect such change.

**7. CHANGE IN CONTROL.** Upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee; provided however, that if the Change in Control occurs with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2013, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9. BINDING ACTIONS.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

**11. NO RIGHTS OF A STOCKHOLDER.** Neither you (nor, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13. WITHHOLDING.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of your duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**3**

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 25% discount upon issuance of the award.

**"Friendly Change in Control"** means any Change in Control made with the prior approval of a majority of the independent members of the Incumbent Board.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** means the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (75% of the total number of Shares subject to option hereunder).

**"Retirement"** means a Termination of employment with Holdings or any subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Termination"** means the end of employment with Holdings or any subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

4



**2003**

# EQUITY AWARD PROGRAM

*Senior Vice President*

# LEHMAN BROTHERS

# 2003 EQUITY AWARD PROGRAM



*Senior Vice President*

## Contents

2003 Equity Award Program at a Glance . . . . . . . .1

How the Equity Award Program Works . . . . . . . . .2

Components of the 2003 Equity Award . . . . . . . .3

Equity Award Vesting
   When will my RSUs vest? . . . . . . . . . . . . . . . .3
   When will my stock options
   become exercisable? . . . . . . . . . . . . . . . . . . . . .3

Salaried Members of the Firm:
   2003 Equity Award Schedule . . . . . . . . . . . . . .4
   Award Calculation Example . . . . . . . . . . . . . . . .4

Investment Representatives (IRs):
   2003 Equity Award Schedule . . . . . . . . . . . . . .5
   Calculating Your 2003 Monthly Accrual . . . . . . .6
   Award Calculation Example . . . . . . . . . . . . . . . .7

Termination Provisions for RSUs
and Stock Options . . . . . . . . . . . . . . . . . . . . . . . .8

Tax Considerations . . . . . . . . . . . . . . . . . . . . . . . .11

Change in Control ("CIC") Provisions . . . . . . . . .12
   Payment of RSUs Upon a Friendly CIC . . . . . . .12

Dividend Equivalents . . . . . . . . . . . . . . . . . . . . . .13

Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Other Information . . . . . . . . . . . . . . . . . . . . . . . .13

This brochure describes significant features of the Lehman Brothers Equity Award Program for 2003. It is not intended to replace the award agreement or other official plan documents. This brochure should be read in conjunction with the other award documents.

## 2003 EQUITY AWARD PROGRAM AT A GLANCE

- All eligible Senior Vice Presidents (SVPs) receive a portion of their total compensation in conditional equity awards. The amount of compensation payable in equity increases as the amount of your compensation rises.

- The equity component of total compensation is in a combination of restricted stock units (RSUs) and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

- Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment with the Firm. On November 30, 2008, the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold at that time. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, traded, pledged, or assigned before conversion.

- Your 2003 RSUs were calculated based on the price of $53.54 per RSU (reflecting a December 10, 2003 market price of $71.39, less a 25 percent discount).

- Your 2003 stock options have an exercise price of $71.39 and will expire on November 29, 2013. The number of options you received was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option, less a 25 percent discount ($20.84).

**1**

*Senior Vice President*

*Your Award Summary details your 2003 award.*



# HOW THE EQUITY AWARD PROGRAM WORKS

The Equity Award Program for Senior Vice Presidents (SVPs) was developed to recognize the important role you, as an SVP, play in the success of the Firm. Together with your colleagues, you drive revenue generation, provide quality service and technical expertise to our clients and customers, manage expenses, and provide the infrastructure support to ensure efficient and effective processes. Given the key role you play in Lehman Brothers' success, it is important for you to have a significant stake in the Firm. With this in mind, the Equity Award Program for SVPs was designed to deliver a significant portion of your compensation in conditional equity awards (restricted stock units (RSUs) and stock options), which you acquire at a substantial discount. The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time.

Your 2003 equity award was awarded to you as a portion of your 2003 compensation. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2008. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time provided you meet certain terms and conditions. The RSUs cannot be sold, traded, pledged, or assigned for that five-year period.

The stock options awarded to you in 2003 will expire on November 29, 2013. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

## The Size of Your Award

The Award Summary shows your 2003 equity award. The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation. Under this schedule, the amount of compensation in the form of conditional equity awards (RSUs and stock options) increases as total compensation rises.

**Salaried Members of the Firm:** Your award was based on your 2003 total compensation, which includes salary earned in fiscal year 2003 plus any additional compensation with respect to the fiscal year in 2003, even if some of these payments are deferred or paid in 2004. Such compensation includes 2003 bonus, commissions, and other compensation.

**Investment Representatives (IRs):** Similar to salaried employees, you received a year-end conditional equity award as a portion of your 2003 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2002 through October 2003 (paid from January through November 2003) after all adjustments. For 2003, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2003 Equity Award Schedule appears on page 5.) The 2003 payout may have included regular grid production payout, certain special payments, and other production payout. During any period an IR is paid a draw, equity (in the form of RSUs and/or stock options) is awarded with respect to the amount of the draw. If the draw ends and the IR has earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued).

*Note that for purposes of this brochure, all references to payout or compensation assume compensation payments that are equity eligible only.*

## The Firm-Provided Discount

The number of RSUs you received for 2003 was based on the closing price of Lehman Brothers common stock ($71.39 per share), less a 25 percent discount. With a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value. A 25 percent discount really means that the Firm "grosses up" your contribution 33 percent at the outset.

The number of options you received for 2003 was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option on December 10, 2003, less a 25 percent discount ($20.84). These options have an exercise price of $71.39. Your 2003 options will expire approximately 10 years after the grant date, on November 29, 2013.



*The amount of compensation paid in equity increases as the amount of total compensation rises.*

# COMPONENTS OF 2003 EQUITY AWARD

## Equity Award in RSUs and Stock Options

All SVPs receive a portion of their total compensation in the form of conditional equity awards. The equity component of total compensation is in a combination of both RSUs and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

| Description | RSUs | Stock Options |
|---|---|---|
| Grant Date: | December 10, 2003 | December 10, 2003 |
| Market Price: | $71.39 | N/A |
| Exercise Price: | N/A | $71.39 |
| Black-Scholes Value: | N/A | $27.79 |
| Discount: | 25% | 25% |
| Cost to SVP: | $53.54 | $20.84 |
| Restriction Period: | 5 years, until 11/30/08 | N/A |
| Option Period: | N/A | 10 years, until 11/29/13 |



3

*Senior Vice President*

# EQUITY AWARD VESTING

## When will my RSUs vest?

The vesting provisions of your 2003 RSUs are consistent with last year's SVP RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2003 compensation before the discount (75 percent of the award). The discount portion represents 25 percent of your RSU award.

Your RSUs will vest in two stages:
2 Years (November 30, 2005):   Principal portion

5 Years (November 30, 2008):   Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2008, all of your RSUs will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

## When will my stock options become exercisable?

Your stock options will become exercisable consistent with the vesting schedule of your 2003 RSUs. Your stock options will become exercisable in two stages:
2 Years (November 30, 2005):     Principal portion

5 Years (November 30, 2008):     Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2013, all of your stock options will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions for RSUs and Stock Options* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.



# SALARIED MEMBERS OF THE FIRM

**EQUITY AWARD PROGRAM**

**4**

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation. An example of the calculations follows.

| Total Compensation Range | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $30,000 plus 16.25% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $62,500 plus 20% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $112,500 plus 35% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $200,000 plus 35% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $375,000 plus 45% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $600,000 plus 55% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 35% of 2003 total compensation |

## Award Calculation Example

Using the equity award schedule above, your 2003 equity award was determined at year-end based on your 2003 total compensation.

EXAMPLE: As an example, we'll go through the calculation for an SVP whose 2003 total compensation was $400,000.

| | |
|---|---|
| 2003 Total Compensation: | $400,000.00 |
| Equity Award Based on 2003 Grid: | $46,250.00 |
| RSU Component: | $34,687.50  (75% of Total Equity) |
| Stock Option Component: | $11,562.50  (25% of Total Equity) |

Based on a stock price of $71.39 and a Black-Scholes option value of $27.79, the components of the 2003 equity award are as follows:

| RSU Component | | Market Price | Discount Price | Number of Shares |
|---|---|---|---|---|
| RSU Award (75%): | $34,687.50 | $71.39 | $53.54 | 648 |
| **Option Component** | | | | |
| Option Award (25%): | $11,562.50 | $27.79 (a) | $20.84 | 555 |
| Total 2003 Equity Award: | $46,250.00 | | | |

(a) Black-Scholes value

**Note to Investment Representatives (IRs):** Your 2003 equity award was accrued as a portion of your monthly payout. Please refer to the section *IRs: Calculating Your 2003 Monthly Accrual* on page 6 for an illustration of how your monthly equity award accrual was determined.



# NVESTMENT REPRESENTATIVES (IRs)

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation.[*] An example of the calculations follows.

## 2003 Equity Award Schedule

| Total Compensation Range[*] | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2.50% of 2003 total compensation |
| $100,000 - $199,999 | $2,500 plus 7.50% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $10,000 plus 12.50% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $37,500 plus 20.31% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $78,125 plus 25.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $140,625 plus 43.75% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $250,000 plus 43.75% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $468,750 plus 56.25% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $750,000 plus 68.75% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 43.75% of 2003 total compensation |

[*]For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).



## Calculating Your 2003 Monthly Accrual

As an example, we'll go through the monthly calculation for an SVP IR whose 2003 total compensation earned from December 2002 through October 2003 (paid from January through November 2003) was $360,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Take YTD Total Payout for first month and annualize (multiply by 12 and divide by production month number). | $30,000 x 12 ÷ 1 | $360,000 |
| **Step 2** | Calculate equity accrual from 2003 award schedule on page 5. | $360,000 | $49,686 |
| **Step 3** | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($49,686 x 8.33%) - $0 | $4,141 |
| **Step 4** | Take YTD Total Payout for second month and annualize (multiply by 12 and divide by production month number). | $65,000 x 12 ÷ 2 | $390,000 |
| **Step 5** | Calculate equity accrual from 2003 award schedule on page 5. | $390,000 | $55,779 |
| **Step 6** | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($55,779 x 16.67%) - $4,141 | $5,156 |
| **Step 7** | Repeat for next month. | | |

### Example

| # | Pay Month | Monthly Total Payout($) | YTD Total Payout ($) | Annualized Total Payout ($) | Annualized Equity Award ($) | Allocation % | YTD Equity Accrual ($) | Monthly Equity Accrual ($) |
|---|-----------|------------------------|---------------------|----------------------------|----------------------------|--------------|------------------------|----------------------------|
| 1 | January | 30,000 | 30,000 | 360,000 | 49,686 | 8.33% | 4,141 | 4,141 |
| 2 | February | 35,000 | 65,000 | 390,000 | 55,779 | 16.67% | 9,297 | 5,156 |
| 3 | March | 40,000 | 105,000 | 420,000 | 61,872 | 25.00% | 15,468 | 6,171 |
| 4 | April | 25,000 | 130,000 | 390,000 | 55,779 | 33.33% | 18,593 | 3,125 |
| 5 | May | 28,000 | 158,000 | 379,200 | 53,586 | 41.67% | 22,327 | 3,734 |
| 6 | June | 32,000 | 190,000 | 380,000 | 53,748 | 50.00% | 26,874 | 4,547 |
| 7 | July | 38,000 | 228,000 | 390,857 | 55,953 | 58.33% | 32,639 | 5,765 |
| 8 | August | 40,000 | 268,000 | 402,000 | 58,216 | 66.67% | 38,811 | 6,172 |
| 9 | September | 32,000 | 300,000 | 400,000 | 57,810 | 75.00% | 43,358 | 4,547 |
| 10 | October | 27,000 | 327,000 | 392,400 | 56,266 | 83.33% | 46,889 | 3,531 |
| 11 | November | 33,000 | 360,000 | 392,727 | 56,333 | 91.67% | 51,639 | 4,750 |
| 12 | December [1] | — | 360,000 | 360,000 | 49,686 | 100.00% | 49,686 | (1,953) |
| **Total** | | | | | | | | **49,686** |

[1] Note that for purposes of calculating your 2003 equity award, your December payout was assumed to be zero.



## Award Calculation Example

As an example, we'll go through the calculation for an SVP IR with payout of $360,000 for 2003. For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|--------------------|---------------|
| **Step 1** | Your 2003 award was determined at year-end based on your total compensation from January through November. | Not applicable | $360,000 |
| **Step 2** | According to the schedule on page 5, the SVP in our example, with 2003 total compensation between $300,000 and $500,000 received $37,500 plus 20.31 percent of his 2003 total compensation over $300,000 in RSUs and stock options. | $37,500 + (20.31% x $60,000) | $49,686 |
| **Step 3** | The next step is to figure out how many options were awarded in 2003. The 2003 equity award was based on total payout, after all adjustments, for production months December 2002 through October 2003 (paid from January through November 2003) and the 2003 IR Equity Award Schedule on page 5. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, multiplied by 25 percent, gives us the stock option award. | [$37,500 + (20.31% x $60,000)] x 25% | $12,421.50 |
| **Step 4** | To calculate the number of options received, divide the value from step 3 by $20.84 (which represents the $27.79 Black-Scholes value of a 10-year Lehman Brothers option, less the Firm-provided 25 percent discount). | $12,421.50 ÷ $20.84 | 596 options |
| **Step 5** | The next step is to figure out how many RSUs were awarded in 2003. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, less the result in step 3 (which represents the value of the 2003 stock options), gives us the 2003 RSU award. | [($37,500 + (20.31% x $60,000)) - ($12,421.50)] | $37,264.50 |
| **Step 6** | To calculate the number of RSUs received, divided the value in step 5 by $53.54 (which represents the $71.39 price of Lehman Brothers stock on December 10, 2003, less the Firm-provided 25 percent discount). | $37,264.50 ÷ $53.54 | 696 RSUs |

7

*Senior Vice President*





EQUITY AWARD PROGRAM

**8**

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS

| Reason | RSUs | Stock Options |
|---|---|---|
| **General Rules** | | |
| **Salaried Members of the Firm** | ■ If termination occurs prior to January 30, 2004, all RSUs will be forfeited.<br><br>■ If termination occurs after January 30, 2004, the disposition of the RSUs will be subject to the provisions outlined below. | ■ If termination occurs prior to January 30, 2004, all options will be forfeited.<br><br>■ If termination occurs after January 30, 2004, the disposition of the options will be subject to the provisions outlined below. |
| **Investment Representatives** | ■ If termination occurs prior to November 30, 2003, the 2003 RSUs will be based on the amount of production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 75 percent. The disposition of the RSUs will be subject to the provisions outlined below. | ■ If termination occurs prior to November 30, 2003, options will be based on the amount of your production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 25 percent. The disposition of the options will be subject to the provisions outlined below. |
| **Voluntary Not to a Competitor** | ■ Entitled to the entire principal portion provided no Competitive Activity or Detrimental Activity through the Share Payment Date as defined below.<br><br>■ Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Competitive Activity or Detrimental Activity through the Share Payment Date.<br><br>■ If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Competitive Activity or Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>■ Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following the termination date. | ■ Entitled to the entire principal portion and discount portion of the option award.<br><br>■ Options become exercisable six months after termination (or on the scheduled date if sooner than six months), provided no Competitive Activity or Detrimental Activity.<br><br>■ Options remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after the termination date.<br><br>■ If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date), provided you do not engage in Competitive Activity or Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>■ In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |



# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Voluntary to a Competitor** | ■ Forfeit entire principal portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>■ Entitled to the entire principal portion if termination occurs after November 30, 2005 (two years after the award date) provided no Detrimental Activity.<br><br>■ Forfeit entire discount portion.<br><br>■ Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | ■ Forfeit entire principal portion and discount portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>■ Forfeit options that are not exercised prior to termination date if termination occurs after November 30, 2005 (two years after the award date). |
| **Involuntary with Cause** | ■ Entire principal and discount portion will be forfeited immediately upon termination. | ■ Entire principal and discount portion will be forfeited immediately upon termination. |
| **Involuntary without Cause** | ■ Entitled to the entire principal portion provided no Detrimental Activity through the Share Payment Date.<br><br>■ Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Detrimental Activity through the Share Payment Date.<br><br>■ If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>■ Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | ■ Entitled to the entire principal portion and discount portion of the option award.<br><br>■ Options become immediately exercisable and remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after termination date, provided no Detrimental Activity.<br><br>■ If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date) provided you do not engage in Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>■ In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |

**9**

*Senior Vice President*



# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Death, Disability, Retirement** | ■ Entire principal portion and discount portion will vest immediately.<br><br>■ Shares of Lehman Brothers common stock will be issued immediately.<br><br>■ Retirement means a termination of employment which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. | ■ Entire principal portion and discount portion will immediately become exercisable and remain exercisable until the expiration date (November 29, 2013).<br><br>■ Retirement means a termination of employment, which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. |

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2003 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

### COMPETITIVE ACTIVITY

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, all of the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### DETRIMENTAL ACTIVITY

Detrimental Activity means at any time (i) using information received during a person's employment with Lehman Brothers Holdings Inc. or any subsidiary, their affiliates or clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with Holdings or any subsidiary or to breach any of the terms of his or her employment with Holdings or any subsidiary; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).





# TAX CONSIDERATIONS

## Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period.

You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding.

Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

### RSUs

- No taxation on the award date.

- Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply upon conversion to common stock.

- If you retain your shares after RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date.

### Options

- No taxation on the award date.

- When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale prices (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply when options are exercised.

- If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise.

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.



EQUITY AWARD PROGRAM

**12**

# CHANGE IN CONTROL ("CIC") PROVISIONS

| Reason | RSUs | Stock Options |
|--------|------|---------------|
| **Hostile** | ■ All RSUs vest immediately.<br><br>■ Shares of Lehman Brothers common stock will be issued immediately. | ■ All options become immediately exercisable. |
| **Friendly** | ■ Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity.<br><br>■ The additional value of the RSUs in excess of the undiscounted RSU award price will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2008 (five years after the award date).<br><br>■ The RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | ■ Half of the non-exercisable options will become immediately exercisable.<br><br>■ The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates (75 percent on November 30, 2005 and 25 percent on November 30, 2008). |

## Payment of RSUs Upon a Friendly CIC

EXAMPLE: Let's use as an example an SVP whose 2003 compensation was $400,000. The amount of compensation paid in RSUs was $34,688 (for 648 RSUs at a market value of $46,261). Assume there is a Change in Control and the market price for Lehman Brothers stock at that time is $100 per share.

### UNDISCOUNTED PURCHASE PRICE:

■ Upon a Friendly Change in Control, this SVP receives a payment of shares (or cash) equivalent in value to the original award, $46,261. Assuming a market price of $100, this SVP would receive 463 shares.

### PREMIUM OVER UNDISCOUNTED PRICE:

■ The additional value of the RSUs, in excess of the original award value, $18,539 ((648 RSUs x $100) - $46,261), will be held on the SVP's behalf in either cash or equity of the successor entity.

■ The payment (in either cash or equity of the successor entity) will be subject to the same vesting and issuance restrictions as the RSU award.

■ Assume the SVP leaves within two years of the Change in Control:

– The SVP will be entitled to 75 percent of the additional value of the RSUs, in excess of the original award value ($18,539 x 75% = $13,904), provided no Competitive Activity or Detrimental Activity for a period of one year after termination date (or the second anniversary of the Change in Control, if sooner).

– The SVP will also be entitled to a pro-rata portion of the remaining 25 percent of the additional value of the RSUs (in excess of the original award value) based on the number of full years completed after the RSU award date (e.g., if termination occurs during 2006 (but before November 30, 2006), 2/5th of the remaining amount or $1,854).

– In total, the SVP will receive $15,758 ($1,854 plus $13,904) or 158 shares. In this example, the SVP receives 85 percent of the additional value of the RSUs in excess of the original award value.

■ Please note that this value may be converted to shares of the successor entity. In this instance, the above percentages will be applied to the converted shares.





# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs. Dividends will not be paid on stock option awards.

# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit award agreement, the Stock Option award agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award statement or your award agreement, call the Compensation Department at 212-526-8346 (5-8346), or for IRs, your PCS Human Resources contact at 212-526-2921 (5-2921).

**13**

*Senior Vice President*



## 2004 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 9, 2004 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

- The Principal Units (75% of the total award) shall become vested on November 30, 2006.

- The Discount Units (25% of the total award) shall become vested on November 30, 2009.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2009 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of your death or Disability, all outstanding Units held by you shall become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2005, all Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2006, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2006, you shall be entitled to receive freely transferable shares of Common Stock for the Principal Units.

**(ii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a Subsidiary after

November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(iv) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

**(v) Retirement.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i), (ii), (iii) and (iv), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units as soon as practicable following your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(d)(i) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d)(i). If you engage in Detrimental Activity prior to the Share Payment Date, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(vi) Occurrence of Death or Disability following Termination.** Notwithstanding the foregoing provisions of Paragraph 4(d)(i), (ii), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(d)(ii) or (iv) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of Paragraph 4(d) shall be canceled by Holdings.

**(e) Affidavit.** In the event of your Termination on or after January 31, 2005, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time.

**5. DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 31, 2005, you shall be paid cash and / or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

**7. NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

**8. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Share Payment Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

**9. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

**10. TREATMENT IN BANKRUPTCY.** (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a Subsidiary, Holdings agrees to deliver to (or at the direction of) such Subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a Subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with,

or in any way relating to, any failure of Holdings to deliver to you, or to a Subsidiary for delivery by such Subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

**11. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**12. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**13. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**14. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**15. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and / or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**16. SECTION 409(A)(1) TAX TREATMENT.** Notwithstanding any other provisions of this Agreement, if any payment otherwise due hereunder would have the effect of subjecting you to tax under the provisions of Code Section 409A(a)(1), such payment shall be postponed until the earliest date upon which the payment could be made without subjecting you to tax under the provisions of Code Section 409A(a)(1).

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

**"Retirement"** means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Share Payment Date"** means as soon as practicable after the earlier of (a) the Maturity Date or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

**"Termination"** means the end of employment with Holdings or a Subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

©2004 Lehman Brothers. All Rights Reserved.

4

# LEHMAN BROTHERS

## 2004 EQUITY AWARD PROGRAM

### SUMMARY OF SELECT MATERIAL TERMS

| | Employees up to and including Vice Presidents | Senior Vice Presidents | Managing Directors |
|---|---|---|---|
| **Eligibility[1]** | Active employees (both bonus-eligible and production-based) hired on or before November 30, 2004, including employees on an approved leave of absence, are eligible to receive an equity award for 2004. Any bonus-eligible employee whose employment terminates (or who gives notice or is notified of termination) prior to the time when bonuses are delivered in January 2005 will not be entitled to a 2004 equity award. In case of termination of employment, equity awards to production-based employees will be treated in accordance with the relevant plan provisions. | | |
| **Maximum Portion of Total Compensation in Equity** | 30% (see attached Schedule) | 35% (see attached Schedule) | 40% (see attached Schedule) |
| **Equity Award Mix** | 100% of the equity award will be in CSAs | **Election:**<br>• Choice of 25% options / 75% CSAs or 100% CSAs.<br>• If no election was made, 100% of the equity award will be in CSAs. | **Election:**<br>• Choice of 25% options / 75% CSAs or 100% CSAs.<br>• If no election was made, 100% of the equity award will be in CSAs. |
| **Principal & Discount** | Principal Portion: 75%<br>Discount Portion: 25% | Principal Portion: 75%<br>Discount Portion: 25% | Principal Portion: 70%<br>Discount Portion: 30% |
| **CSA Conditions/Option Exercise Schedule** | | | |
| **CSAs** | • 75% subject to Full Conditions for 2 years and Limited Conditions for an additional 3 years<br>• 25% subject to Full Conditions for 5 years | • 75% subject to Full Conditions for 2 years and Limited Conditions for an additional 3 years<br>• 25% subject to Full Conditions for 5 years | • 35% subject to Full Conditions for 3 years and Limited Conditions for an additional 2 years<br>• 65% subject to Full Conditions for 5 years |
| **Stock Options** | N/A | • 75% becomes exercisable 2 years after grant<br>• 25% becomes exercisable 5 years after grant | • 35% becomes exercisable 3 years after grant<br>• 65% becomes exercisable 5 years after grant |

---

[1] In addition, the following categories of employees are not eligible to participate: employees in the Firm's formal Analyst programs (excluding promoted analysts), employees on long-term disability, part-time hourly employees, and with exceptions as determined by the Firm, employees of Aurora Loan Services (except corporate officers), BNC Mortgage (except corporate officers), Burford Limited, ELQ Hypotheken, Executive Monetary Management, Finance America (except corporate officers), Liberty View, Lincoln Capital Management, Palarp Asset Management, Preferred Mortgages Limited, Southern Pacific Mortgage Limited, and certain other subsidiaries.

12/13/04 Non-US

# LEHMAN BROTHERS

## 2004 EQUITY AWARD PROGRAM
## SUMMARY OF SELECT MATERIAL TERMS

## TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination to Non-Competitor** | **CSAs:** Participants remain entitled to the principal portion of their CSA award plus a pro-rata portion of their discount (for each full year of employment after November 30, 2004). Shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Competitive Activity or Detrimental Activity.<br><br>**Stock Options:** Stock options become exercisable six months after termination and remain exercisable until the later of 5 years from grant, or 6 months after termination, provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| **Involuntary Termination** | **CSAs:** Participants remain entitled to the principal portion of their CSA award plus a pro-rata portion of the discount (for each full year of employment after November 30, 2004). Shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Detrimental Activity during this one-year period.<br><br>**Stock Options:** Stock options become exercisable immediately upon termination and remain exercisable until the later of 5 years from grant, or 6 months after termination, provided the participant does not engage in Detrimental Activity.<br><br>However, in the event of an involuntary termination for Cause, both the principal and discount portions of both CSAs and stock options will be forfeited. |
| **Voluntary Termination to Competitor** | **CSAs:** Participants forfeit all CSAs subject to Full Conditions. Any remaining shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Detrimental Activity during this one-year period.<br><br>**Stock Options:** Any stock options that have not been exercised prior to termination will be forfeited. |
| **Full Career Termination** | **CSAs:** Participants who voluntarily leave the Firm or are involuntarily terminated without Cause will receive 100% of the CSA discount (in addition to the principal portion) at the end of the fiscal quarter one year after termination, subject to applicable Competitive Activity and/or Detrimental Activity provisions during this one-year period. A termination is "Full Career" if:<br>• The participant has at least 20 years of service, <u>OR</u><br>• The participant has at least 10 years of service, is at least 45 years old and the sum of the participant's age plus service is 65 or more<br><br>**Stock Options:** All stock options will remain exercisable for a period of ten years after grant (subject to applicable Competitive Activity and/or Detrimental Activity provisions). |

*NOTE: All terms and conditions of the 2004 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Contingent Stock Award Letter, the Stock Option Award Agreement, the Stock Award Agreement for UK Approved Options, the Employee Incentive Plan, the 2001 Employee Incentive Plan Sub-Plan for UK Employees, and the Employee Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

12/13/04 Non-US

# LEHMAN BROTHERS

## 2004 EQUITY AWARD PROGRAM

**2004 EQUITY AWARD SCHEDULE**

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1% of 2004 TC | 2% of 2004 TC | 2% of 2004 TC |
| $75,000 - $99,999 | 2% of 2004 TC | 2% of 2004 TC | 2% of 2004 TC |
| $100,000 - $199,999 | $2,000 plus 6% of 2004 TC over $100,000 | $2,000 plus 6% of 2004 TC over $100,000 | $2,000 plus 6% of 2004 TC over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2004 TC over $200,000 | $8,000 plus 10% of 2004 TC over $200,000 | $8,000 plus 10% of 2004 TC over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15% of 2004 TC over $300,000 | $30,000 plus 16.25% of 2004 TC over $300,000 | $30,000 plus 16.25% of 2004 TC over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20% of 2004 TC over $500,000 | $62,500 plus 20% of 2004 TC over $500,000 | $62,500 plus 20% of 2004 TC over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25% of 2004 TC over $750,000 | $112,500 plus 35% of 2004 TC over $750,000 | $112,500 plus 35% of 2004 TC over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30% of 2004 TC over $1.0 million | $200,000 plus 35% of 2004 TC over $1.0 million | $200,000 plus 44% of 2004 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $310,500 plus 35% of 2004 TC over $1.5 million | $375,000 plus 45% of 2004 TC over $1.5 million | $420,000 plus 56% of 2004 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $485,500 plus 40% of 2004 TC over $2.0 million | $600,000 plus 55% of 2004 TC over $2.0 million | $700,000 plus 60% of 2004 TC over $2.0 million |
| $2,500,000 and up | $685,500 plus 45% of 2004 TC over $2.5 million up to a max of 30% of 2004 TC | 35% of 2004 TC | 40% of 2004 TC |

3

# LEHMAN BROTHERS

## GLOSSARY OF SELECTED TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract with any one or more of the Group Companies, failure by a person to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, wilful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offence being or equivalent to a felony or a misdemeanour constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanour), habitual or gross negligence in the performance of the person's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant, or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of a person's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Contingent Stock Awards (CSAs)"** A CSA represents the right to receive one share of Lehman Brothers common stock five years after the grant date. You can consider the CSAs as shares of Lehman Brothers common stock that the Firm holds on your behalf. Generally, CSAs cannot be sold, traded, pledged or transferred for that five-year period.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their Affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his or her employment with any of those corporations or entities or to breach any of the terms of his or her employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Exercise Price",** also known as the strike price, is the dollar amount that must be paid to the Firm to acquire the stock. The strike price of the stock options under the program is set at the closing price of the Common Stock on the New York Stock Exchange on the date the award is made.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years service with Holdings or any subsidiary.

CSAs which are subject to **"Full Conditions"** are forfeited if the award recipient engages in Competitive Activity or Detrimental Activity.

CSAs which are subject to **"Limited Conditions"** are forfeited if the award recipient engages in Detrimental Activity.

**"Stock Options"** offer recipients the right to buy a given amount of shares of company stock at a stated price (the "strike price" or "exercise price") within a specified period of time. The options have a ten-year term and are subject to vesting restrictions before they become exercisable.

12/13/04 Non-US

## 2005 **MANAGING DIRECTOR** EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of November 30, 2005 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

- Half of the Principal Units (35% of the total award) shall become vested on November 30, 2008.
- The remaining half of the Principal Units and all of the Discount Units (65% of the total award) shall become vested on November 30, 2010.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2010 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date, but no later than December 31, 2010.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of your death or Disability, on or after January 31, 2006, all outstanding Units held by you shall become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2006, all Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2008, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2008, you shall be entitled to receive freely transferable shares of Common Stock for half of the Principal Units (35% of the total award).

**(ii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a Subsidiary after November 30,

2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(iv) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

**(v) Retirement.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i), (ii), and (iv), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units on the 30th day following your Retirement. In the event of a voluntary Termination, if you engage in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply as of the date of your Retirement, and you shall forfeit Units in accordance with such provision or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d)(i). In any case, if you engage in Detrimental Activity prior to the Share Payment Date, you shall forfeit all Units held by you or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(vi) Occurrence of Death or Disability following Termination.** Notwithstanding the foregoing provisions of Paragraph 4(d)(i), (ii), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(d)(ii) or (iv) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of Paragraph 4(d) shall be canceled by Holdings.

**(e) Affidavit.** In the event of your Termination on or after January 31, 2006, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time or, in the event of Retirement, to repay to Holdings the full gross amounts or shares you received under this Agreement.

**5. DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 31, 2006, you shall be credited with a number of additional Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares with respect to Units are to be issued or delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**7. NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

**8. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the Units, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

**9. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

**10. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**15. CODE SECTION 409A.** It is intended that none of the Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

**ANNEX A: DEFINITIONS**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment

3

contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 30% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (70% of the total number of units awarded).

**"Retirement"** means a Termination when the person's age plus years of service with Holdings or any Subsidiary equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service.

**"Share Payment Date"** means the earlier of (a) the Maturity Date or (b) the 30th day after the completion of the fiscal quarter following the one-year anniversary of termination of employment.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

4

©2005 Lehman Brothers. All Rights Reserved.

# LEHMAN BROTHERS

## 2005 EQUITY AWARD PROGRAM

### SUMMARY OF SELECT MATERIAL TERMS

| | Employees up to and including Vice Presidents | Senior Vice Presidents | Managing Directors |
|---|---|---|---|
| **Eligibility[1]** | Active employees (both bonus-eligible and production-based) hired on or before November 30, 2005, including employees on an approved leave of absence, are eligible to receive an equity award for 2005. <br><br> Any bonus-eligible employee whose employment terminates (or who gives notice or is notified of termination) prior to the time when bonuses are delivered in January 2006 will not be entitled to a 2005 equity award.  In case of termination of employment, equity awards to production-based employees will be treated in accordance with the relevant plan provisions. | | |
| **Maximum Portion of Total Compensation in Equity** | 30% (see attached Schedule) | 35% (see attached Schedule) | 40% (see attached Schedule) |
| **Equity Award Mix** | 100% of the equity award will be in CSAs | **Election:** <br> • Choice of 25% options / 75% CSAs or 100% CSAs. <br> • If no election was made, 100% of the equity award will be in CSAs. | **Election:** <br> • Choice of 25% options / 75% CSAs or 100% CSAs. <br> • If no election was made, 100% of the equity award will be in CSAs. |
| **Principal & Discount** | Principal Portion:  75% <br> Discount Portion:  25% | Principal Portion:  75% <br> Discount Portion:  25% | Principal Portion:  70% <br> Discount Portion:  30% |
| **CSA Conditions/Option Exercise Schedule** | | | |
| **CSAs** | • 75% subject to Full Conditions for 2 years and Limited Conditions for an additional 3 years <br> • 25% subject to Full Conditions for 5 years | • 75% subject to Full Conditions for 2 years and Limited Conditions for an additional 3 years <br> • 25% subject to Full Conditions for 5 years | • 35% subject to Full Conditions for 3 years and Limited Conditions for an additional 2 years <br> • 65% subject to Full Conditions for 5 years |
| **Stock Options** | N/A | • 75% becomes exercisable 2 years after grant <br> • 25% becomes exercisable 5 years after grant | • 35% becomes exercisable 3 years after grant <br> • 65% becomes exercisable 5 years after grant |

---

[1] In addition, the following categories of employees are not eligible to participate:  employees on long-term disability or notified of their pending termination, part-time hourly employees, employees hired into the Firm's formal Analyst programs, and individuals employed by the following subsidiaries:  Aurora Loan Services (except corporate officers), BNC Mortgage (except corporate officers), Burford Limited, Capstone Mortgage Services Limited, ELQ Hypotheken, Executive Monetary Management, Finance America (except corporate officers), Lehman Brothers Private Services India Ltd. (except corporate officers), Palarp Asset Management, Preferred Mortgages Limited, and Southern Pacific Mortgage Limited.

12//05 Non-US

# Lehman Brothers

## 2005 EQUITY AWARD PROGRAM
## SUMMARY OF SELECT MATERIAL TERMS

### TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination to Non-Competitor** | **CSAs:**  Participants remain entitled to the principal portion of their CSA award plus a pro-rata portion of their discount (for each full year of employment after November 30, 2005).  Shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Competitive Activity or Detrimental Activity.<br><br>**Stock Options:**  Stock options become exercisable six months after termination and remain exercisable until the later of 5 years from grant, or 6 months after termination, provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| **Involuntary Termination** | **CSAs:**  Participants remain entitled to the principal portion of their CSA award plus a pro-rata portion of the discount (for each full year of employment after November 30, 2005).  Shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Detrimental Activity during this one-year period.<br><br>**Stock Options:**  Stock options become exercisable immediately upon termination and remain exercisable until the later of 5 years from grant, or 6 months after termination, provided the participant does not engage in Detrimental Activity.<br><br>However, in the event of an involuntary termination for Cause, both the principal and discount portions of both CSAs and stock options will be forfeited. |
| **Voluntary Termination to Competitor** | **CSAs:**  Participants forfeit all CSAs subject to Full Conditions.  Any remaining shares will be issued at the end of the fiscal quarter one year after termination, provided the participant does not engage in Detrimental Activity during this one-year period.<br><br>**Stock Options:**  Any stock options that have not been exercised prior to termination will be forfeited. |
| **Full Career Termination** | **CSAs:**  Participants who voluntarily leave the Firm or are involuntarily terminated without Cause will receive 100% of the CSA discount (in addition to the principal portion) at the end of the fiscal quarter one year after termination, subject to applicable Competitive Activity and/or Detrimental Activity provisions during this one-year period.  A termination is "Full Career" if:<br>• The participant has at least 20 years of service, <u>OR</u><br>• The participant has at least 10 years of service, is at least 45 years old and the sum of the participant's age plus service is 65 or more<br><br>**Stock Options:**  All stock options will remain exercisable for a period of ten years after grant (subject to applicable Competitive Activity and/or Detrimental Activity provisions). |

*NOTE:  All terms and conditions of the 2005 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Contingent Stock Award Letter, the Stock Option Award Agreement, the Stock Award Agreement for UK Approved Options, the Employee Incentive Plan, the 2001 Employee Incentive Plan Sub-Plan for UK Employees, and the Employee Incentive Plan Prospectus.  In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

12//05 Non-US

# LEHMAN BROTHERS

## 2005 EQUITY AWARD PROGRAM

### 2005 EQUITY AWARD SCHEDULE

| | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| **Total Compensation Range** | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $75,000 - $99,999 | 2% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $100,000 - $199,999 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30% of 2005 TC over $1.0 million | $200,000 plus 35% of 2005 TC over $1.0 million | $200,000 plus 44% of 2005 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $310,500 plus 35% of 2005 TC over $1.5 million | $375,000 plus 45% of 2005 TC over $1.5 million | $420,000 plus 56% of 2005 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $485,500 plus 40% of 2005 TC over $2.0 million | $600,000 plus 55% of 2005 TC over $2.0 million | $700,000 plus 60% of 2005 TC over $2.0 million |
| $2,500,000 and up | $685,500 plus 45% of 2005 TC over $2.5 million up to a max of 30% of 2005 TC | 35% of 2005 TC | 40% of 2005 TC |

12//05 Non-US

# LEHMAN BROTHERS

## GLOSSARY OF SELECTED TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract with any one or more of the Group Companies, failure by a person to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, wilful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offence being or equivalent to a felony or a misdemeanour constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanour), habitual or gross negligence in the performance of the person's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant, or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of a person's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Contingent Stock Awards (CSAs)"** A CSA represents the right to receive one share of Lehman Brothers common stock five years after the grant date. You can consider the CSAs as shares of Lehman Brothers common stock that the Firm holds on your behalf. Generally, CSAs cannot be sold, traded, pledged or transferred for that five-year period.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any Group Company relating to the business affairs of Holdings or any Group Company or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any Group Company to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Exercise Price"**, also known as the strike price, is the dollar amount that must be paid to the Firm to acquire the stock. The strike price of the stock options under the program is set at the closing price of the Common Stock on the New York Stock Exchange on the date the award is made.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years service with Holdings or any subsidiary.

CSAs which are subject to **"Full Conditions"** are forfeited if the award recipient engages in Competitive Activity or Detrimental Activity.

CSAs which are subject to **"Limited Conditions"** are forfeited if the award recipient engages in Detrimental Activity.

**"Stock Options"** offer recipients the right to buy a given amount of shares of company stock at a stated price (the "strike price" or "exercise price") within a specified period of time. The options have a ten-year term and are subject to vesting restrictions before they become exercisable.

2008 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

1. **GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 8, 2006 (the "Date of Grant"), the number of Restricted Stock Units ("2006 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2006 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2006 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2006 fiscal year ended November 30, 2006 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2006, the number of 2006 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2006 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

2. **ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. **VESTING.** Subject to Paragraph 4, 2006 Units awarded to you hereunder shall become vested in accordance with the vesting schedule applicable to you as described under the term "Vesting Schedule" in the glossary attached hereto.

4. **ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2006 Unit that has become vested which you hold on November 30, 2011 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(b) **Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2006 Units is called for hereunder, all 2006 Units held by you, whether or not vested, shall be terminated, forfeited, cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(c) **Occurrence of Death, Disability While You Are Employed**
Without limiting Paragraphs 4(b), 4(d)(ii), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate shares of Common Stock underlying all of your then outstanding 2006 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production-Based

Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

(d) **Effect of Termination.** Except if you are a Production-Based Employee, and subject to Paragraph 9 hereof, in the event of your Termination for any reason or notification of Termination prior to January 31, 2007, all 2006 Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence (including, without limitation, if you are a Production-Based Employee), the following rules shall apply:

(i) **Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2006 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2006 Units not so terminated.

(ii) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2006 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iii) **Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) 4(d)(v), and 9, and subject to Paragraphs 4(b), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2006 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2011, provided however, that your entitlement to receive freely transferable shares of Common Stock with respect to such unvested outstanding 2006 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect, but all then outstanding unvested 2006 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iv) **Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2006 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011. An express condition of your 2006 Units becoming vested and shares of Common Stock underlying such 2006 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii),

2

4(d)(v), 7, 9, 14 and 15,  in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2006 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(c), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2006 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production Based Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v)) shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2006 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2006 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2006 Units, with respect to each then outstanding 2006 Unit you then hold, you shall be credited with a number of additional 2006 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2006 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2006 Units to which they correspond; provided however, in the event you are not classified as a Production Based Employee, no such additional 2006 Units shall be granted to you in respect of any such dividend or distribution paid or made on Common Stock to holders of record on any date prior to January 31, 2007.

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the 2006 Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2006 Units are to be delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to 2006 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** 2006 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2006 Units, the number and kind of shares of Common Stock which may be delivered with respect to 2006 Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your 2006 Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be delivered. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the "undiscounted market value" (at the time of grant) of the shares of Common Stock underlying your outstanding 2006 Units (i.e., the fair market value of your 2006 Units determined on the date of grant) or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such "undiscounted market value" shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your 2006 Units shall remain otherwise subject to all delivery restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any 2006 Units, in which case you would only be delivered shares of Common Stock or receive the "undiscounted market value" in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such 2006 Units upon successful completion of a Change in Control.

10. **AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as

amended from time to time, (whether or not your rights are adversely affected).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of 2006 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the delivery of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**15. CODE SECTION 409A.** It is intended that none of the 2006 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the

Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

**ANNEX A: DEFINITIONS**

"**Appropriate Officer**" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"**Cause**" means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

"**Change in Capitalization**" means the occurrence of a circumstance described in Section 14 of the Plan.

"**Committee**" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any

4

activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of 2006 Units (and any dividend equivalents related thereto that are not Principal Units.  If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, thirty percent (30%) of your 2006 Units as of the date of grant will be Discount Units.  If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, twenty-five percent (25%) of your 2006 Units as of the date of grant will be Discount Units.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service,  (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) a person meets all of the following criteria:  (a) the person is at least 50 years old, and (b) the person has at least 5 years of service.

**"Principal Units"** shall mean the number of 2006 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award.  If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy percent (70%) of your 2006 Units as of the date of grant will be Principal Units.  If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy-five percent (75%) of your 2006 Units as of the date of grant will be Principal Units.

**"Share Payment Date"** means November 30, 2011.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Vesting Schedule"**  means the schedule below that is applicable to you, pursuant to which your 2006 Units are scheduled to vest subject to the terms and conditions of Paragraph 3 and the other terms and conditions of the Agreement:

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 50% on November 30, 2009;<br>50% on November 30, 2011 |
| Discount Units: | 100% on November 30, 2011. |

(b)  If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 100% on November 30, 2008 |
| Discount Units: | 100% on November 30, 2011. |

©2006 Lehman Brothers. All Rights Reserved.



# 2007 EQUITY AWARD PROGRAM

LIFE @ LEHMAN

YOUR BENEFITS AND LIFE BALANCE

For Bonus-Eligible Employees and
Production-Based Employees

## LEHMAN BROTHERS

# Eligibility

Active employees of the Firm (both bonus-eligible and production-based) hired on or before November 30, 2007, including employees on an approved leave of absence, are eligible to receive an equity award for 2007.

If a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level.   The disposition of the equity award is subject to the termination provisions on page 8.

Note that eligibility to receive an equity award is subject to a 5-share minimum.

# How the Equity Award Program Works

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm over time.  In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time.  Your 2007 equity award is awarded to you as a portion of your 2007 compensation.

Employees receive a portion of their total compensation (combined base salary, bonus, production payout, and other applicable forms of compensation) in the form of conditional equity awards.  For 2007, the equity award is in the form of contingent stock awards ("CSAs") for all employees and will be granted on December 7, 2007.  Each CSA represents the conditional right to receive one share of Lehman Brothers Holdings Inc. common stock five years after the grant date, on or about November 30, 2012. You can consider the CSAs as shares of Lehman Brothers common stock which you will be entitled to receive at that time, provided you meet certain terms and conditions.  The 2007 CSAs cannot be sold, traded, or pledged for that five-year period.

## The Size of Your Award

The details of your 2007 equity award are shown on your year-end compensation worksheet and will also be available on the Personal Award Summary section of the Equity Award Program site on LehmanLive, keyword EquityAward, before the end of the first quarter of 2008.  The amount of each employee's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title.  Under this schedule, the amount of compensation awarded in the form of conditional equity awards (CSAs) increases as total compensation rises.

**Bonus-Eligible Employees:**  Your 2007 award will be based on your 2007 total compensation, which includes salary earned in fiscal year 2007 plus any additional compensation with respect to fiscal year 2007, even if some of these payments are deferred or paid in 2008.  Such compensation includes 2007 bonus, commissions, and other compensation.

**Production-Based Employees:**  Similar to bonus-eligible employees, you received a year-end 2007 conditional equity award as a portion of your 2007 total compensation.  Your 2007 equity award accrues on a monthly basis, as a portion of your total payout on gross production during December 2006 through November 2007 (paid from January through December 2007) after all adjustments.  For 2007, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of the 2007 Equity Award Schedule appears on page 5.)  The 2007 payout may have included regular production payout, certain special payments, and other production payout.  During any period you are paid a draw, equity (in the form of CSAs) may be awarded with respect to the amount of the draw.  If the draw ends and you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which

overage is accrued).  Note that for purposes of this communication, all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of CSAs you receive for the Firm's 2007 fiscal year will be based on the closing price of Lehman Brothers Holdings Inc. common stock on December 7, 2007, less a discount:  30 % for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of CSAs awarded results in a total CSA award of $143; for other employees, with a 25 percent discount, every $100 of CSAs awarded results in a total CSA award of $133.  The discount really means that the Firm "grosses up" your non-discounted portion at the outset.

## How Will the Grant Price for My 2007 CSAs be Determined?

The grant price will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on December 7, 2007.  The grant price, along with the number of CSAs granted to you, will be communicated as part of the employee year-end compensation discussion with your manager.  For Production-based employees, please refer to the "Compensation Statement" within the Sales Compensation System or contact the Compensation Department in New York at (212) 526-8346.

## Conditions and Stock Entitlement

Your 2007 CSAs are subject to certain contingencies or conditions.  The conditions determine the terms of your ownership interest in the CSAs, as well as your entitlement to receive shares.

**Full Conditions**—Initially, your CSAs are subject to "full conditions," which must be satisfied in order for you to retain your interest in the CSAs and, ultimately, to receive Lehman Brothers stock.  While your CSAs are subject to full conditions, they could be forfeited if your employment with the Firm terminates or if you engage in any activity that is detrimental to the Firm.

**Limited Conditions**—Over time, some of the conditions will be satisfied if you remain employed with the Firm through the dates outlined below.  When these conditions are satisfied, your CSAs become subject to "limited conditions," and your eligibility to receive shares increases.  While your CSAs are subject to limited conditions, they will be forfeited if you engage in activity that is detrimental to the Firm or if your employment is terminated with Cause.

**Unconditional CSAs**—Provided you comply with the conditions of your award, the 2007 CSAs will become unconditional on November 30, 2012.  Once your CSAs become unconditional, they cannot be forfeited for any reason.

You should consider your 2007 CSA award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of CSAs awarded as part of your 2007 total compensation before the discount. The discount portion represents the balance of your CSA award, provided by the Firm. The conditions of your 2007 CSAs will apply as follows:

|  | **Period Subject to Full Conditions** | **Portion of Award** |
|---|---|---|
| **MDs** | through November 30, 2010<br>through November 30, 2012 | 35% (half of principal portion)<br>65% (half of principal portion plus the discount portion) |
| **Up to and including SVPs** | through November 30, 2009<br>through November 30, 2012 | 75% (the principal portion)<br>25% (the discount portion) |

Notwithstanding the above, if your employment is terminated by the Firm with Cause, or if you engage in Detrimental Activity, prior to November 30, 2012, all of your outstanding CSAs will be forfeited. Please refer to page 9 for the definition of Detrimental Activity.

## When Will I Receive Shares of Stock?

In general, your 2007 CSAs which become unconditional will convert to shares of Lehman Brothers Holdings Inc. common stock and will be delivered to you on November 30, 2012, subject to the terms and conditions of the Program. See the sections entitled *Termination Provisions* and *Change In Control ("CIC") Provisions* for further information on share delivery.

2007 CSA

# 2007 Equity Award Schedule

The participation schedule for 2007 is shown below. This schedule reflects the percentage of 2007 total compensation ("TC") that represents the principal portion of your 2007 CSAs. For production-based employees, the participation schedule for 2007 below is the same as the one previously communicated in 2006. An example of the calculations follows.

**2007 EQUITY AWARD SCHEDULE**

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

# Award Calculation Example

Using the Equity Award Schedule above, your 2007 equity award will be determined at year end based on your 2007 total compensation.  Sample illustrations are shown below.

|  | Employees thru VP Level | SVPs | MDs |
|---|---|---|---|
| 2007 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| *Amount of Compensation in CSAs:* | *$2,300* | *$71,875* | *$240,000* |
| Est. FMV on grant date[1]: | $63.49 | $63.49 | $63.49 |
| Discount: | 25% | 25% | 30% |
| Est. Discounted grant price: | $47.62 | $47.62 | $44.44 |
| Est. Total # of CSAs: | 48 | 1,509 | 5,400 |
| *Principal Portion:* | *36* | *1,132* | *3,780* |
| *Discount Portion:* | *12* | *377* | *1,620* |
| *Total Grant Value with Discount:* | *$3,067* | *$95,833* | *$342,857* |

Note:  The number of CSAs has been rounded to the nearest whole number for illustrative purposes only.  The actual grant price for 2007 CSAs will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on December 7, 2007.

---

[1] Based on closing price of Lehman Brothers common stock on November 13, 2007.  Actual grant price will be determined as of December 7, 2007.

2007 CSA

# 2007 Monthly Equity Accrual for Production-Based Employees

As an example, below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2006 to November 2007 (paid January to December 2007) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|--------------|--------------------|---------------|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| Step 2 | Calculate projected award from 2007 Equity Award Schedule. | $1,932 | $1,932 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,932 x 8.33%) - $0 | $161 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| Step 5 | Calculate projected award from 2007 Equity Award Schedule. | $2,070 | $2,070 |
| Step 6 | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($2,070 x 16.67%) - $161 | $184 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|-----------|---------------------|------------------|------------------------|------------------------|--------------|---------------------|-------------------------|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,932 | 8.33% | $161 | $161 |
| 2 | February | 8,000 | 15,000 | 90,000 | 2,070 | 16.67% | 345 | 184 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,300 | 25.00% | 575 | 230 |
| 4 | April | 7,500 | 32,500 | 97,500 | 2,243 | 33.33% | 748 | 173 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,355 | 41.67% | 981 | 234 |
| 6 | June | 7,000 | 49,000 | 98,000 | 2,254 | 50.00% | 1,127 | 146 |
| 7 | July | 7,500 | 56,500 | 96,857 | 2,228 | 58.33% | 1,300 | 173 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,335 | 66.67% | 1,556 | 257 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,300 | 75.00% | 1,725 | 169 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,314 | 83.33% | 1,928 | 203 |
| 11 | November | 6,500 | 90,000 | 98,182 | 2,258 | 91.67% | 2,070 | 142 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,300 | 100.00% | 2,300 | 230 |
| | **Total** | | | | | | | **$2,300** |

In the example above, $2,300 is the amount of total compensation accrued by the production-based employee toward the year-end CSA award. For the calculation of the number of CSAs (including principal and discount portion), see example on page 6. *Note that if a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.*

## Termination Provisions

|  | **All Employees** |
|---|---|
| **Voluntary Termination**<br><br>*(but not Full Career)* | Participants will forfeit all 2007 CSAs still subject to full conditions.  Any remaining 2007 CSAs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2012 (the "Share Payment Date") but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination**<br><br>*(but not Full Career)* | **Involuntary Termination without Cause:**  Participants will become entitled to the principal portion of their award, including the principal portion subject to full conditions (provided the employee signs a Firm-standard release agreement).  The discount portion will be forfeited.  Shares for the principal portion will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date.<br><br>**Involuntary Termination with Cause:**  Participants will forfeit 100% of the principal and discount portions of CSAs. |
| **Full Career Termination** | **A termination is "Full Career" if:**<br><br>• The participant has at least 20 years of service; <u>or</u><br><br>• The participant is at least 45 years old and has at least 10 years of service; <u>or</u><br><br>• The participant is at least 50 years old and has at least 5 years of service.<br><br>**Voluntary Termination:**  Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date.  2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2012.<br><br>**Involuntary Termination**:  Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date.   2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2012. |
| **Termination due to Death or Disability** | Entire principal and discount portions will immediately become unconditional, and shares will be delivered 30 days following the termination date.  "Disability" means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act. |

# Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2007 CSAs (and related dividend reinvestment) if you engage in Competitive Activity (for Full Career employees) or Detrimental Activity or if you commit an act constituting Cause prior to your termination of employment.

## Cause

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Group Company, failure by a person to devote substantially all business time exclusively to the performance of his duties for Holdings or any Group Company, willful misconduct, dishonesty related to the business and affairs of Holdings or any Group Company, conviction of a felony or of a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any Group Company to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Group Company including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

## Competitive Activity

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any Group Company on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).  ***Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.***  Asset management companies, mortgage-related companies, private equity firms, and hedge funds, along with investment banks, commercial banks, small boutique-type firms and most other financial services companies, are considered competitors of the Firm for purposes of the Equity Award Program.  While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm.  Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

## Detrimental Activity

Detrimental Activity means at any time (i) using information received during a person's employment with Holdings or any Group Company relating to the business affairs of Holdings or any Group Company or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any Group Company to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).

# Tax Considerations

## Tax Treatment of Your 2007 CSAs

Under current tax regulations, you will not be taxed on the value of your CSAs until shares of common stock are delivered.  As a result, your CSAs (including dividend reinvestment CSAs—refer to page 11) appreciate on a pre-tax basis until they convert to shares of common stock.  Provided below is a summary of the taxes related to CSAs that are ultimately due under current law.

**Note**:  Pursuant to current tax law, if you work in more than one tax jurisdiction during the period up to the date that the "full conditions" on the CSAs lapse, you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction.  The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.

| CSAs |
| --- |
| • No taxation on the award date. |
| • Upon delivery of common stock, the fair market value of the shares will be treated as employment income generally based on the closing price of Lehman Brothers Holdings Inc. common stock on the delivery date. |
| • This income will be subject to applicable tax withholding. |
| • Special provisions dealing with capital gains will not apply upon delivery of common stock. |
| • If you retain your shares after delivery, the basis for capital gains is the closing price on the delivery date. |

Consult your personal tax advisor concerning the application of tax laws on your CSAs.

# Change in Control ("CIC") Provisions

Following a CIC, except to the extent that conditions would otherwise lapse earlier, CSAs (both principal and discount portions) will become unconditional on the later of: (i) 18 months following the CIC; or (ii) the end of the fiscal year in the year after the CIC occurs (the "CIC Delivery Date"), provided you remain actively employed through that date. Shares of Lehman Brothers common stock will be delivered on the earlier of the CIC Delivery Date or November 30, 2012, provided you do not engage in Detrimental Activity.

If your employment is terminated involuntarily without Cause following the CIC but prior to the CIC Delivery Date, all CSAs (both principal and discount portions) become immediately subject to limited conditions.

If your employment terminates for any reason (other than for Cause) following a CIC, any CSAs then subject to limited conditions (including those that may become subject to limited conditions by reason of your involuntary termination) will become unconditional and convert to shares and be delivered on the earlier of: (i) the end of the fiscal quarter 1 year following the termination date; (ii) the CIC Delivery Date; or (iii) November 30, 2012, provided you do not engage in Detrimental Activity.

# Dividend Equivalents

Dividend equivalents accrue quarterly on your CSAs and are reinvested as additional CSAs, without a discount. Dividend reinvestment CSAs are subject to the same vesting and forfeiture provisions as the underlying CSAs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than CSAs.

# Voting Rights

Lehman Brothers established a Trust and funded it with shares for your benefit. Through the Trust, you may be able to direct the exercise of voting rights related to your 2007 CSAs. The trustees are required by the Trust to vote those shares as directed by holders of the CSAs who are still employed by the Firm. Voting rights are available to participants in countries where this facility does not accelerate personal income tax on CSAs.

# Other Information

This document is intended as a brief summary of the material terms of the 2007 Equity Award Program. This document does not purport to summarize or describe the terms of equity awards from prior years. In the event of any conflict or discrepancy between the plan documents (including, but not limited to, the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your CSAs become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive, keyword EquityAward, or contact the Compensation Department at 212-526-8346 (8-526-8346) or by e-mail at compensation@lehman.com.



# 2007 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

Agreement Evidencing A Grant of
Restricted Stock Units

## LEHMAN BROTHERS

1. **GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 7, 2007 (the "Date of Grant"), the number of Restricted Stock Units ("2007 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2007 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2007 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2007 fiscal year ended November 30, 2007 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2007, the number of 2007 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2007 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

2. **ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. **VESTING.** Subject to Paragraph 4, 2007 Units awarded to you hereunder shall become vested in accordance with the following vesting schedule

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

|  |  |
|---|---|
| Principal Units: | 50% on November 30, 2010; 50% on November 30, 2012 |
| Discount Units: | 100% on November 30, 2012. |

(b) If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

|  |  |
|---|---|
| Principal Units: | 100% on November 30, 2009 |
| Discount Units: | 100% on November 30, 2012. |

4. **ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2007 Unit that has become vested which you hold on November 30, 2012 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

(b) **Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2007 Units is called for hereunder, all 2007 Units held by you, whether or not vested, shall be terminated, forfeited, and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(c) **Occurrence of Death, Disability While You Are Employed.** Without limiting Paragraphs 4(b), 4(d)(ii), 4(e), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate, shares of Common Stock underlying all of your then outstanding 2007 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

(d) **Effect of Termination.** Notwithstanding Paragraph 3 hereof, in the event of any Termination the following rules shall apply:

   (i) **Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2007 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2007 Units not so terminated.

   (ii) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2007 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

   (iii) **Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) 4(d)(v), and 9, and subject to Paragraphs 4(b), 4(e), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2007 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2012, provided however, that your entitlement to receive freely transferable shares of Common Stock with respect to such unvested outstanding 2007 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect. All then outstanding unvested 2007 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

   (iv) **Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2007 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012. An express condition of your 2007 Units becoming vested and shares of Common Stock underlying such 2007 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and

2

including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2007 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(b), 4(e), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii), and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2007 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v)) shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2007 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2007 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2007 Units, with respect to each then outstanding 2007 Unit you then hold, you shall be credited with a number of additional 2007 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2007 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2007 Units to which they correspond

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the 2007 Units granted

hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2007 Units are to be delivered to you falls on a non-business or non-trading day such shares shall be delivered on the immediately succeeding trading day (i.e., when shares trade regular way on the New York Stock Exchange). Whenever shares with respect to 2007 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** 2007 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2007 Units, the number and kind of shares of Common Stock which may be delivered with respect to 2007 Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.**

(a) **Vesting of Units Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to earlier vesting pursuant to Paragraphs 3 and 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination, all of your then outstanding 2007 Units shall vest upon the later of (x) 18 months following such Change in Control or (y) a date determined by the Committee that is within 15 days of November 30 of the Fiscal Year following the Fiscal Year in which the Change in Control occurs (such later date, the "Change in Control Vesting Date"). Additionally, all of your 2007 Units (including Principal and Discount Units) shall become immediately vested in the event of your involuntary Termination without Cause following the Change in Control but prior to the Change in Control Vesting Date.

(b) **Delivery of Common Stock Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to receive earlier delivery of shares of Common Stock pursuant to Paragraph 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination or by reason of Paragraphs 7 or 14, you shall receive shares of Common Stock in respect of your then outstanding 2007 Units on the Change in Control Vesting Date; provided, however, that in the event of your Termination for any reason other than due to death or Disability following the Change in Control but prior to the Change in Control Vesting Date, you shall receive shares of Common Stock in respect of your then vested 2007 Units upon the earlier of (x) the last day

3

of the fiscal quarter that ends after the first anniversary of the date of your Termination or (y) the Change in Control Vesting Date.

For purposes of this Paragraph 9, the term "Fiscal Year" shall refer to the fiscal year of Holdings.

**10.  AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not your rights are adversely affected).

**11.  BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12.  NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of 2007 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13.  APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14.  WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you arising as a result of the grant, vesting or payment hereunder. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold or satisfy any taxes required by law which are incurred by reason of or are otherwise due as a result of the grant, vesting or the delivery of such shares of Common Stock, and (b) that where determined necessary or appropriate by the Firm in its sole discretion, you direct the sale of any shares of Common Stock delivered in respect of any 2007 Units to satisfy any such amounts in Paragraph 14(a) hereof, and (c) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the

grant or vesting of the 2007 Units or delivery of shares of Common Stock hereunder. If the amount requested for the purpose of satisfying the withholding or other tax obligation is not paid, you hereby direct Holdings to withhold shares of Common Stock and / or related dividend equivalents and to otherwise sell shares of Common Stock delivered hereunder in order to fulfill any such obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary; provided, however, that no such right to deduct or offset shall arise or otherwise be deemed to arise until the date upon which shares of Common Stock are deliverable hereunder.

**15.  CODE SECTION 409A.** It is intended that none of the 2007 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes.  In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code. If you are a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares of Common Stock that are linked to the date of your separation from service shall not be made prior to the date which is six (6) months after the date of your separation from service Holdings and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.

**ANNEX A: DEFINITIONS**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's

4

violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto that are not Principal Units. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, thirty percent (30%) of your 2007 Units as of the date of grant will be Discount Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, twenty-five percent (25%) of your 2007 Units as of the date of grant will be Discount Units.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) the person is at least 50 years old, and the person has at least 5 years of service.

**"Principal Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, seventy percent (70%) of your 2007 Units as of the date of grant will be Principal Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30,

2007, seventy-five percent (75%) of your 2007 Units as of the date of grant will be Principal Units.

**"Share Payment Date"** means November 30, 2012.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2007 Lehman Brothers. All Rights Reserved.



# 2008 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

# LEHMAN BROTHERS

# TABLE OF CONTENTS

**OVERVIEW OF 2008 CHANGES**

Q1   How will the 2008 equity award differ from last year's award?..........................................4

Q2   When will I be granted my 2008 equity award? ...................................................................5

Q3   How will 2008 equity award levels compare to last year? ...................................................5

**JULY AWARD**

Q4   Who is eligible for a July equity award?..............................................................................6

Q5   How was the value of my July equity award calculated?.....................................................6

      Bonus-eligible Employees ..............................................................................................6

      Production-based Employees...........................................................................................6

Q6   How many July CSAs have I been granted? ........................................................................7

Q7   Why is the July equity award only 20% of last year's award?.............................................7

Q8   How were the grant date and grant price for the July award determined?...........................7

Q9   What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

**YEAR-END AWARD**

Q10  Who is eligible for a 2008 Year-end equity award? ...........................................................8

Q11  How will my 2008 Year-end equity award be calculated? ..................................................8

      Bonus-eligible Employees ..............................................................................................8

      Production-based Employees...........................................................................................9

**2008 CONDITIONS AND TERMINATION PROVISIONS**

Q12  When will my 2008 CSAs become subject to Limited Conditions? ...................................9

Q13  When will my 2008 CSAs convert to shares of common stock?.........................................9

Q14  What will happen to my 2008 CSAs if I resign from the Firm?..........................................9

Q15  What will happen to my 2008 CSAs if my employment is terminated?............................10

Q&A CSA 7.01.08

## GENERAL INFORMATION

Q16  Where can I find details regarding my July award and other equity awards?....................10

Q17  Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18  Whom do I contact if I have further questions regarding the Equity Award Program?.....10

## EXHIBITS

Exhibit A:  2007 Equity Award Schedule...................................................................................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees .................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees..............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees..........................14

Exhibit E:  Termination Provisions ..........................................................................................15

Exhibit F:  Glossary of Select Terms ........................................................................................16

# OVERVIEW OF 2008 CHANGES

### Q1    HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1    The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program**:  the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**:  the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

    - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**:  as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Contingent Stock Awards ("CSAs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount**:  Beginning with the 2008 equity award, employees will **no longer be granted CSAs at a discount** from their fair market value at the time of grant.  However, CSAs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Conditions**[1]:  Under the 2008 Equity Award Program, CSAs for all employees will be become subject to both Full and Limited Conditions for the same period, irrespective of corporate title:  **33% of CSAs will become subject to Limited Conditions each year over 3 years** (1/3 on November 30, 2009, 1/3 on November 30, 2010, and 1/3 on November 30, 2011, respectively).

3. **Holding Period**:  In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that 2008 CSAs which become subject to Limited Conditions will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

---

[1] See Glossary of Select Terms for the definition of both "Full Conditions" and "Limited Conditions".

Q&A CSA 7.01.08

**Q2    WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?**

A2    Eligible employees' 2008 equity award will comprise two separate grants on **two dates**:  a) a grant on July 1, 2008 (the "July CSAs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award").  You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive.  The July CSAs and any Year-end Award will become subject to Limited Conditions and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price.  Further information on the July award is provided in the "July Award" section below.

**Q3    HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?**

A3    For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[2] regardless of corporate title and based on total compensation levels.  In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[3] and certain other employees, the schedule will be as previously communicated.  See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[2] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 3 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy.   Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[3] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award.  "Production-based" employees typically do not receive any year-end bonus.  Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion.  If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

                                                    Q&A CSA 7.01.08

# JULY AWARD

### Q4    WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?

A4    Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence. Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries. In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

### Q5    HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?

A5    **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July CSAs was calculated as 20% of the principal portion[4] of the 2007 equity award. In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July CSAs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July CSAs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July CSAs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July CSAs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008). See Exhibit D for examples of how the July equity award was determined.

---

[4] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A CSA 7.01.08

**Q6    HOW MANY JULY CSAs HAVE I BEEN GRANTED?**

A6    To determine the number of July CSAs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July CSAs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July CSAs, then no July CSAs will be granted.**

**Q7    WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7    As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses. Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time. To maintain sufficient flexibility in the determination of pay for 2008—and to minimize the risk that employee cash bonuses are not adversely impacted—the Firm decided that the July award would be based on 20% of the prior year award for most employees. Please bear in mind that a July CSA award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8    HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8    All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors. The July 1 grant date was set by the Committee. The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July CSAs granted to you.

**Q9    WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9    **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July CSAs. If you leave the Firm on or after November 30, 2008, your entitlement to any July CSAs, the same as any Year-end Award, will depend on when you leave, the

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

### Q10  WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?

A10  Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions:  employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries.  Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award.  In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

### Q11  HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?

A11  **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee.  In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A CSA 7.01.08

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 CONDITIONS AND TERMINATION PROVISIONS

### Q12  WHEN WILL MY 2008 CSAs BECOME SUBJECT TO LIMITED CONDITIONS?

A12  The 2008 equity award (including any July CSAs) will become subject to Limited Conditions in 1/3 increments on November 30, 2009, 2010 and 2011.

### Q13  WHEN WILL MY 2008 CSAs SUBJECT TO LIMITED CONDITIONS CONVERT TO SHARES OF COMMON STOCK?

A13  2008 CSAs subject to Limited Conditions (including any July CSAs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

### Q14  WHAT WILL HAPPEN TO MY 2008 CSAs IF I RESIGN FROM THE FIRM?

A14  If you resign, you will forfeit all CSAs that are subject to Full Conditions at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

|  | **% of Total Equity Award Retained** | | |
|---|---|---|---|
|  | *If you resign from the Firm after November 30 of:* | | |
|  | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 CSAs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of:  (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.**  See Exhibit E for termination provisions.

**Q15  WHAT WILL HAPPEN TO MY 2008 CSAs IF MY EMPLOYMENT IS TERMINATED?**

A15  As in prior years, if your employment with the Firm is terminated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) 2008 CSAs still subject to Full Conditions, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity.  Your 2008 CSAs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011.  (If you do not sign a release agreement, you will be eligible to receive only the portion of your award subject to Limited Conditions.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason before November 30, 2008 forfeit any July CSAs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding CSAs.  See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16  WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16  Details of your equity awards can be found on Personal Award Summary of the Equity Award Program section of LehmanLive, which you can access by using keyword **equityaward**.  The number of July CSAs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

**Q17  DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17  No.  The changes outlined here apply only to awards granted in 2008.  These changes will not be retroactive to awards granted in prior years.

**Q18  WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18  If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com.

Q&A CSA 7.01.08

## EXHIBIT A:   2007 EQUITY AWARD SCHEDULE

| | **AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS** | | |
|---|---|---|---|
| Total Compensation Range | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

Q&A CSA 7.01.08

**EXHIBIT B: 2008 EQUITY AWARD SCHEDULE FOR BONUS-ELIGIBLE EMPLOYEES**

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below.   Any Year-end Award will be determined by subtracting any July CSAs from your full-year award, but in no event will your full-year award be less than your July CSAs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | | 1% of 2008 TC | 1% |
| $75,000 - $99,999 | | 2% of 2008 TC | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[5] Subject to a 5-share minimum.

Q&A CSA 7.01.08

# EXHIBIT C:  2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated.  Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July CSAs.

### 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[6] | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

---

[6] Subject to a 5-share minimum.

Q&A CSA 7.01.08

# EXHIBIT D:    2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July CSAs, if any.  The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | <u>$11,960</u> |
| Total 2008 Equity Award: | $14,950 |

Q&A CSA 7.01.08

## EXHIBIT E:   TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination**<br><br>*(but not Full Career)* | Participants will forfeit July CSAs and Year-end CSAs still subject to Full Conditions (together, "2008 CSAs").  Any 2008 CSAs subject to Limited Conditions will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination**<br><br>*(but not Full Career)* | **Involuntary Termination without Cause:**  Participants will become entitled to 100% of their 2008 CSAs, including the portion subject to Full Conditions (provided the employee signs a Firm-standard release agreement).  Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date.<br><br>**Involuntary Termination with Cause:**  Participants will forfeit 100% of their 2008 CSAs. |
| **Full Career Termination** | **Voluntary Termination:**  Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date.  2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011.<br><br>**Involuntary Termination without Cause**:  Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date.   2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011.<br><br>**Involuntary Termination with Cause**:  Participants will forfeit 100% of their 2008 CSAs. |
| **Termination due to Death or Disability** | All Conditions on 2008 CSAs will lapse, and shares will be delivered 30 days following the termination date. |

**NOTE:**  Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July CSAs.  In such cases, "Full Career" treatment does not apply.

Q&A CSA 7.01.08

# EXHIBIT F:   GLOSSARY OF SELECT TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Competitive Activity"** means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Contingent Stock Awards (CSAs)"** A CSA represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011.  Generally, CSAs cannot be sold, traded, pledged or transferred for that three-year period.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).  Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

**"Disability"** means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

**"Full Career Termination"** means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

CSAs which are subject to **"Full Conditions"** are forfeited if the award recipient's employment with the Firm terminates or if the award recipient engages in Detrimental Activity.

CSAs which are subject to **"Limited Conditions"** are forfeited if the award recipient engages in Detrimental Activity.

**"Termination"** means the end of employment with Holdings or a subsidiary.  The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A CSA 7.01.08



# 2008 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

## LEHMAN BROTHERS

# TABLE OF CONTENTS

## OVERVIEW OF 2008 CHANGES

Q1    How will the 2008 equity award differ from last year's award? ........................................4

Q2    When will I be granted my 2008 equity award? ...................................................................5

Q3    How will 2008 equity award levels compare to last year? ...................................................5

## JULY AWARD

Q4    Who is eligible for a July equity award?...............................................................................6

Q5    How was the value of my July equity award calculated?......................................................6

      Bonus-eligible Employees ...............................................................................................6

      Production-based Employees .............................................................................................6

Q6    How many July RSUs have I been granted? .........................................................................7

Q7    Why is the July equity award only 20% of last year's award?.............................................7

Q8    How were the grant date and grant price for the July award determined?..........................7

Q9    What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

## YEAR-END AWARD

Q10   Who is eligible for a 2008 Year-end equity award? ...........................................................8

Q11   How will my 2008 Year-end equity award be calculated? ..................................................8

      Bonus-eligible Employees ...............................................................................................8

      Production-based Employees .............................................................................................9

## 2008 VESTING AND TERMINATION PROVISIONS

Q12   When will my 2008 RSUs vest?.........................................................................................9

Q13   When will my 2008 RSUs convert to shares of common stock?........................................9

Q14   What will happen to my 2008 RSUs if I resign from the Firm?.........................................9

Q15   What will happen to my 2008 RSUs if my employment is terminated?............................10

Q&A RSU 7.01.08

**GENERAL INFORMATION**

Q16  Where can I find details regarding my July award and other equity awards?....................10

Q17  Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18  Whom do I contact if I have further questions regarding the Equity Award Program?.....10

**EXHIBITS**

Exhibit A:  2007 Equity Award Schedule.................................................................................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees.................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees..............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees..........................14

Exhibit E:  Termination Provisions .........................................................................................15

Exhibit F:  Glossary of Select Terms .......................................................................................16

# OVERVIEW OF 2008 CHANGES

### Q1   HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1   The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program**:  the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**:  the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

  - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**:  as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Restricted Stock Units ("RSUs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount**:  Beginning with the 2008 equity award, employees will **no longer be granted RSUs at a discount** from their fair market value at the time of grant.  However, RSUs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Vesting Schedule**:  Under the 2008 Equity Award Program, the vesting schedule for all employees will be the same, irrespective of corporate title:  **33% per year over 3 years** (1/3 vesting on November 30, 2009, 1/3 vesting on November 30, 2010, and 1/3 vesting on November 30, 2011, respectively).

3. **Holding Period**:  In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that vested 2008 RSUs will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

Q&A RSU 7.01.08

**Q2   WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?**

A2   Eligible employees' 2008 equity award will comprise two separate grants on **two dates**:  a) a grant on July 1, 2008 (the "July RSUs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award").  You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive.  The July RSUs and any Year-end Award will vest and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price.  Further information on the July award is provided in the "July Award" section below.

**Q3   HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?**

A3   For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[1] regardless of corporate title and based on total compensation levels.  In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[2] and certain other employees, the schedule will be as previously communicated.  See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[1] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 2 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy.   Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[2] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award.  "Production-based" employees typically do not receive any year-end bonus.  Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion.  If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

Q&A RSU 7.01.08

# July Award

**Q4    WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?**

A4    Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence.  Certain employees will not receive a July award, including, among others:  employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries.  In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

**Q5    HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?**

A5    **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July RSUs was calculated as 20% of the principal portion[3] of the 2007 equity award.  In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July RSUs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July RSUs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July RSUs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July RSUs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008).  See Exhibit D for examples of how the July equity award was determined.

---

[3] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A RSU 7.01.08

**Q6    HOW MANY JULY RSUs HAVE I BEEN GRANTED?**

A6    To determine the number of July RSUs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July RSUs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July RSUs, then no July RSUs will be granted.**

**Q7    WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7    As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses.  Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time.  To maintain sufficient flexibility in the determination of pay for 2008—and to minimize the risk that employee cash bonuses are not adversely impacted—the Firm decided that the July award would be based on 20% of the prior year award for most employees.  Please bear in mind that a July RSU award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8    HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8    All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors.  The July 1 grant date was set by the Committee.  The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July RSUs granted to you.

**Q9    WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9    **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July RSUs.  If you leave the Firm on or after November 30, 2008, your entitlement to any July RSUs, the same as any Year-end Award, will depend on when you leave, the

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

### Q10  WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?

A10  Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions:  employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries.  Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award.  In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

### Q11  HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?

A11  **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee.  In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A RSU 7.01.08

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award. In no event, however, will your full-year award be less than your July Award. Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 VESTING AND TERMINATION PROVISIONS

### Q12  WHEN WILL MY 2008 RSUs VEST?

A12  The 2008 equity award (including any July RSUs) will vest in 1/3 increments on November 30, 2009, 2010 and 2011.

### Q13  WHEN WILL MY 2008 RSUs CONVERT TO SHARES OF COMMON STOCK?

A13  Vested 2008 RSUs (including any July RSUs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

### Q14  WHAT WILL HAPPEN TO MY 2008 RSUs IF I RESIGN FROM THE FIRM?

A14  If you resign, you will forfeit all RSUs that are unvested at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

|  | **% of Total Equity Award Retained** | | |
|---|---|---|---|
|  | *If you resign from the Firm after November 30 of:* | | |
|  | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 RSUs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of: (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.** See Exhibit E for termination provisions.

Q&A RSU 7.01.08

**Q15  WHAT WILL HAPPEN TO MY 2008 RSUs IF MY EMPLOYMENT IS TERMINATED?**

A15  As in prior years, if your employment with the Firm is terminated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) unvested 2008 RSUs, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity.  Your 2008 RSUs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011.  (If you do not sign a release agreement, you will be eligible to receive only the vested portion of your award.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason before November 30, 2008 forfeit any July RSUs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding RSUs.  See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16  WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16  Details of your equity awards can be found on the Personal Award Summary of the Equity Award Program section of LehmanLive, which you can access by using keyword **equityaward**. The number of July RSUs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

**Q17  DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17  No.  The changes outlined here apply only to awards granted in 2008.  These changes will not be retroactive to awards granted in prior years.

**Q18  WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18  If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com.

Q&A RSU 7.01.08

## EXHIBIT A:    2007 EQUITY AWARD SCHEDULE

| | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| Total Compensation Range | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

Q&A RSU 7.01.08

# EXHIBIT B:    2008 EQUITY AWARD SCHEDULE FOR BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below.   Any Year-end Award will be determined by subtracting any July RSUs from your full-year award, but in no event will your full-year award be less than your July RSUs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[4] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | | 1% of 2008 TC | 1% |
| $75,000 - $99,999 | | 2% of 2008 TC | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[4] Subject to a 5-share minimum.

Q&A RSU 7.01.08

# EXHIBIT C:    2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated.  Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July RSUs.

### 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

---

[5] Subject to a 5-share minimum.

Q&A RSU 7.01.08

**EXHIBIT D:    2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES**

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July RSUs, if any.  The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

Q&A RSU 7.01.08

## EXHIBIT E:    TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination** <br><br>*(but not Full Career)* | Participants will forfeit all unvested July RSUs and Year-end RSUs (together, "2008 RSUs"). Any vested 2008 RSUs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** <br><br>*(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs, including the unvested portion (provided the employee signs a Firm-standard release agreement). Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date. <br><br>**Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Full Career Termination** | **Voluntary Termination:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011. <br><br>**Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011. <br><br>**Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Termination due to Death or Disability** | All 2008 RSUs will immediately vest, and shares will be delivered 30 days following the termination date. |

**NOTE:** Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July RSUs. In such cases, "Full Career" treatment does not apply.

Q&A RSU 7.01.08

# EXHIBIT F:   GLOSSARY OF SELECT TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Competitive Activity"** means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

**"Disability"** means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

**"Full Career Termination"** means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

**"Restricted Stock Units (RSUs)"** An RSU represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011.  Generally, RSUs cannot be sold, traded, pledged or transferred during that three-year period.

**"Termination"** means the end of employment with Holdings or a subsidiary.  The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A RSU 7.01.08

# LEHMAN BROTHERS

## 2007 SPECIAL CONTINGENT STOCK AWARDS ("SPECIAL MD CSAs")
### PERSONAL AWARD STATEMENT[1]
### «FIRST_NAME» «LAST_NAME»

| | | |
|---|---|---|
| **Grant Date** | December 7, 2007 | |
| **Grant Price** | Market Price: | $63.47 |
| | Discounted Grant Price: | $44.43 |
| **Amount of 2007 Total Compensation in Special MD CSAs[2]** | **$«Special_Equity»** | |
| **Number of Special MD CSAs Granted** | Principal portion (70%): | «Principal» |
| | Discount portion (30%): | «Discount» |
| | Total | «Total» |
| **Conditions** | 100% of Special MD CSAs (principal and discount) becomes subject to Limited Conditions on November 30, 2009, provided the employee remains actively employed with the Firm through that date. 100% of Special MD CSAs become unconditional on November 30, 2012. | |
| **Share Payment Date** | Shares in respect of unconditional Special MD CSAs will be delivered on November 30, 2012 (the "Share Payment Date"). | |

## TERMINATION PROVISIONS[3]

| | |
|---|---|
| **Voluntary Termination** | All Special MD CSAs still subject to Full Conditions are forfeited. Any Special MD CSAs subject to Limited Conditions become unconditional and convert to shares of common stock and are delivered on the Share Payment Date, provided the employee does not engage in Detrimental Activity through that date. |
| **Involuntary Termination without Cause** | 100% of the principal portion of Special MD CSAs becomes subject to Limited Conditions (subject to the execution of a Firm-standard release agreement). Discount portion still subject to Limited Conditions is forfeited. Shares are delivered on the Share Payment Date, provided the employee does not engage in Detrimental Activity through that date. |
| **Involuntary Termination with Cause** | Participants forfeit 100% of both the principal and discount portions of Special MD CSAs (including any portions no longer subject to Limited Conditions). |
| **Termination due to Death or Disability** | 100% of principal and discount portions immediately vest, and shares are delivered 30 days following the termination date. |

---

[1] This document is informational only. All terms and conditions of the 2007 Special Equity Award for Select MDs are subject to the applicable controlling plan documents, including but not limited to the applicable award agreement (to be finalized in early 2008), the 2005 Stock Incentive Plan and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern. Capitalized terms not otherwise defined above have the meaning assigned to them in the 2007 Equity Award Program. Unless otherwise provided herein, the terms and conditions of the 2007 Equity Award Program will otherwise apply to these 2007 Special Equity Awards for Select MDs.

[2] Calculated as 12% of 2007 Total Compensation (including diversity awards) of **$«LB_TC_Stk_»**. This amount is in addition to amounts awarded under the 2007 Equity Award Program for Managing Directors.

[3] Note that this award has no full career provisions for employees whose employment terminates prior to the date(s) conditions lapse.

X:\DOCUMENTS AND SETTINGS\GERNANDR\DESKTOP\PDF MERGE\SPECIAL MD CSA GRANT AWARD STATEMENT.DOC