**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, New York  10022
(212) 705-7000

Attorneys for the JPM Funds

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------ ) | |
| **In re**                                            ) | **Chapter 11 Case No.** |
| ) | |
| **Lehman Brothers Holdings Inc., et al.,**   ) | **08-13555 (JMP)** |
| **Debtors.**     ) | |
| ) | **(Jointly Administered)** |
| ------------------------------------------------------ ) | |

**THE JPM FUNDS' RESPONSE TO**
**LEHMAN BROTHERS HOLDINGS INC.'S AND**
**CREDITORS COMMITTEE'S TWO HUNDRED TWENTY-NINTH**
**OMNIBUS OBJECTION TO JPMORGAN'S ASSET MANAGEMENT FUND**
**CLAIMS (NO LIABILITY, MISCLASSIFIED AND DUPLICATIVE CLAIMS)**

Each of the fund claimants listed on Exhibit A hereto (collectively, the "JPM Funds"), by and through their undersigned attorneys, submit this response (the "Response") to Lehman Brothers Holdings Inc.'s and Creditors Committee's Two Hundred Twenty-Ninth Omnibus Objection to JPMorgan's Asset Management Fund Claims (No Liability, Misclassified and Duplicative Claims) (the "Objection")[1] to the JPM Funds' proofs of claim (the "Claims"), and in support of the Response state as follows:

---

[1] All capitalized terms not defined herein shall have the definitions ascribed to them in the Objection.

A/74653275.1

## PRELIMINARY STATEMENT

1.      The JPM Funds and the Objectors have a dispute about the meaning of the term "affiliate" in the September Agreements.  Under the applicable Claims Hearing Procedures, the Objectors have challenged the "legal sufficiency" of the Claims based on the Objectors' proffered definition of the term.[2]  In this regard, the Objectors acknowledge that contract terms are to be given their "plain and ordinary" meanings. (Objection, p. 21.)

2.      The Objectors ultimately request, however, that this Court hold -- as a matter of law -- that the term "affiliate" in the September Agreements can only mean parent, subsidiary and sibling entities that are part of the same corporate ownership structure.  Based upon their view of the "overarching purpose" or "essential concern" (Objection, pp. 3, 4) of the September Agreements, the Objectors would have the Court rule as a matter of law that only these entities can count as "affiliates."  Such a ruling would not be appropriate.  The Objectors' argument rests upon issues of fact that could only be determined with the benefit of an evidentiary hearing.  The JPM Funds submit that, for the reasons set forth below, the Court should overrule the Objection based on the plain and ordinary meaning of the term "affiliate" or, in the alternative, schedule an evidentiary hearing to determine the meaning of the term "affiliate" as used in the September Agreements.

---

[2]  *See* "Claims Hearing Procedures" annexed as Exhibit A to the Court's April 19, 2010 Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors (the "Procedures Order"), p. 2, requiring a "Notice of Merits Hearing" before discovery and an evidentiary hearing can take place.  The Objectors have not served a Notice of Merits Hearing on the JPM Funds and accordingly have challenged only the "legal sufficiency" of the Claims.

2

3.      The definition of the term "affiliate" centers on the concept of control. Two commonly cited dictionary definitions illustrate this point.  First, the Black's Law Dictionary definition -- the very authority that the Objectors argue applies here (*see* Objection, pp. 21-22) -- defines "affiliate" as follows:

> 1.  A corporation that is related to another corporation by shareholdings **or other means of control**; a subsidiary, parent, or sibling corporation . . . .
>
> 2.  Securities.  One who **controls, is controlled by, or is under common control** with an issuer of a security . . . .

*Black's Law Dictionary* (9th ed. 2009) (emphasis added).  Similarly, Webster's Third New International Dictionary defines "affiliate" as "a company effectively **controlled** by another or associated with others under common ownership **or control**."  *Webster's Third New International Dictionary* 35 (2002) (emphasis added).  As described below, applicable case law also supports the idea that affiliate status hinges on control.  The Objectors' attempt to use rules of construction to rewrite the dictionary definition of the term so that the definition includes only control resulting from share ownership fails because rules of construction cannot change the plain meaning of a term -- indeed, where a term has a plain meaning, rules of construction are not to be consulted.

4.      The "control test" makes the JPM Funds affiliates of JPMorgan Bank. JPMorgan Bank, or one of its affiliates, controls the operations of each of the JPM Funds, either as trustee of the Fund in question (a "Trust-Organized Fund"), or as the Fund's investment adviser (an "Advised Fund").  This control is evident from the face of the Funds' formation documents.  Satisfaction of the "control test" justifies the Court overruling the Objection now.

A/74653275.1

5.      However, should the Court find extrinsic evidence to be necessary to determine the meaning of the term "affiliate" as used in the September Agreements, the JPM Funds request that the Court set the Objection for an evidentiary hearing, to be held following appropriate discovery.  Under the Claims Hearing Procedures and the Local Bankruptcy Rules, the January 26 hearing will not be evidentiary.[3]

6.      The standard to be applied to the Claims at the January 26 hearing will be "equivalent to the standard applied by the Court on a motion to dismiss for failure to state a claim" -- i.e., with all inferences to be drawn in the JPM Funds' favor.  *See* Claims Hearing Procedures, p. 2.  This is appropriate because the JPM Funds have so far been precluded by the Procedures Order and the Claims Hearing Procedures from conducting discovery on the Objection.[4]  Under the motion to dismiss standard, the JPM Funds respectfully submit that they have plainly "state[d] a claim."

7.      Under the Procedures Order, the Claims Hearing Procedures and the Local Bankruptcy Rules, and because the Court has not been presented with a full evidentiary record, on January 26 the Court should not consider any of the piecemeal extrinsic evidence proffered by the Objectors.  At a later evidentiary hearing, should the Court order one, the JPM Funds believe the evidence will support the JPM Funds' reading of the term "affiliate," and will show that the Objectors have, among other things:  (i) omitted deposition testimony that supports the JPM Funds' understanding of the term "affiliate"; (ii) incorrectly alleged (despite the irrelevance of the issue) that JPMorgan has

---

[3]  *See* Claims Hearing Procedures, p. 2, and Local Bankruptcy Rule 9014-2 (precluding the first hearing on an objection from being evidentiary absent circumstances not present here).

[4]  The JPM Funds voluntarily produced certain documents to the Creditors' Committee in response to informal requests issued prior to service of the Objection.  Since service of the Objection, however, the JPM Funds have been enjoined under the Procedures Order and the Claims Hearing Procedures from conducting discovery.  *See* Procedures Order, pp. 2-3, Claims Hearing Procedures, p. 4.

4

no economic interest in common with the JPM Funds; and (iii) cited to Fund formation documents out of context.

8.    The Objectors also go out of their way to characterize the Claims as "overreaching." (*See, e.g.*, Objection, pp. 4, 15.)  This is not a fair characterization.  As the Court is aware, prior to filing its bankruptcy petition Lehman was a highly sophisticated, worldwide financial organization.  It "provided a full array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity to corporations, governments and municipalities, institutional clients and high-net-worth individuals."  Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, Ex. 19, p. 1.

9.    "In addition to its worldwide headquarters in New York and regional headquarters in London and Tokyo, Lehman operated a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region."  *Id.*  "Lehman was a global market-maker in all major equity and fixed income products, and was a member of all principal securities and commodities exchanges in the United States, as well as the Financial Industry Regulatory Authority . . ., and held memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan, Singapore, and Australian stock exchanges."  *Id.*

10.    As of August 31, 2008, Lehman's Capital Markets division alone had reported assets on Lehman's books and records in the aggregate amount of approximately

5

$586 billion.  *Id*. at 2.  In the nine months ended August 31, 2008, Lehman recorded revenues of approximately $16.2 billion just for its Capital Markets division.  *Id*.

11.     This extremely sophisticated financial institution chose, as a fully-informed matter, in its own business interests and represented by skilled counsel, to enter into the September Agreements.  Lehman received the benefit of the September Agreements and should not now be permitted to claim that holding it to its bargain is somehow inequitable.

12.     The Objectors also fail to mention that during the worst financial crisis since the Great Depression, when Lehman was on the brink of the largest corporate default in U.S. history, JPMorgan Bank -- alone among major banks -- took immense risks to continue to support Lehman.  JPMorgan Bank typically extended more than $100 billion in credit each day to Lehman Brothers Inc. for the settlement and clearance of its securities transactions.

13.     The JPM Funds submit that, under these circumstances, the request for collateral by JPMorgan Bank in September of 2008 was hardly overreaching.  Rather, it was part of a transaction between highly sophisticated parties designed to allow the Lehman organization to survive by making the Lehman entities credit worthy to all of their JPMorgan counterparties.

14.     Issues relating to the context of the September Agreements are being litigated extensively in Adversary Proceeding No. 10-03266, and the JPM Funds understand that the Court is quite familiar with the relevant circumstances.  Rather than recite more of that history here (particularly since it is not relevant to the issue at hand),

A/74653275.1

suffice it to say that the JPM Funds vigorously dispute the Objectors' characterization of the Claims.

15.     In sum, the JPM Funds submit that the plain and ordinary meaning of the term "affiliate" as set forth in Black's, Webster's Third and applicable case law mandates that the Objection be overruled.  Should the Court determine that extrinsic evidence is necessary to determine the meaning of the term "affiliate" as used in the September Agreements, however, the JPM Funds request that the Court set the Objection for an evidentiary hearing.[5]

## ARGUMENT

**I.      The Claims Should Be Allowed Because the JPM Funds Fall Squarely Within the Definition of the Term "Affiliate."**

   *A.     The Term "Affiliate" in the September Agreements Is Not Ambiguous.*

16.     The Second Circuit has recently set forth in detail the well-settled law that governs contract interpretation.  The initial question for the court "with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Debenture Trust Co. of N. Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002)); *see, e.g., Beth Medrash Eeyun Hatalmud v. Spellings,* 505 F.3d 139, 146 (2d Cir.2007); *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987).[6]

---

[5]  In the event the Court sets the Objection for an evidentiary hearing, the JPM Funds will coordinate with the Objectors to set an appropriate discovery schedule.

[6]  The JPM Funds note that the *Law Debenture* decision occurred at the summary judgment stage -- not the "motion to dismiss" stage presently applicable to the Objection.

A/74653275.1

17.    "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  *Law Debenture*, 595 F.3d at 466 (quoting *Int'l Multifoods,* 309 F.3d at 83).  "Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized."  *Id.* (citing *Fox Film Corp. v. Springer,* 8 N.E.2d 23 (1937)).[7]

18.    "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  *Id.* at 467 (alteration in original) (internal citations omitted).  "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms without the aid of extrinsic evidence."  *Id.* (alteration in original) (internal citations omitted); *see, e.g., Network Publ'g Corp. v. Shapiro,* 895 F.2d 97, 99 (2d Cir.1990) ("[w]e must consider the words [of a contract] themselves for they are always the most important evidence of the parties' intention") (internal quotation marks omitted).

19.    The definition of the term "affiliate" set forth in Black's and Webster's Third is not inherently ambiguous:  one business entity that is related to another by means of control is an affiliate.  As one court recently noted, the "current edition of Black's Law

---

[7]  As the foregoing quote makes clear, the only "context" that should inform the Court at this stage is that of the written agreement itself, not the situation of the parties, the history of the negotiations, the practices of the industry, etc.  The latter sorts of issues would require consideration of extrinsic evidence at an evidentiary hearing.  *See, e.g., Law Debenture*, 595 F.3d at 466.

A/74653275.1

Dictionary . . . defines affiliate without reference to a hierarchical relationship . . . . Consequently, the ordinary meaning of 'affiliate' encompasses both an understanding of an affiliate as a subsidiary and as a related corporation **regardless of how related**." *Magicon, LLC v. Weatherford Int'l, Inc.*, 2009 WL 7868862, at *14 (S.D. Tex. Aug. 14, 2009) (emphasis added); *see Grunley Walsh U.S., LLC v. Raap*, 2009 WL 1298244, at *8 (E.D. Va. May 6, 2009) (noting that the term "affiliate" "always denotes some significant degree of **control** between two entities," citing Black's Law Dictionary) (emphasis added), affirmed by *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 462 (4th Cir. 2010) (noting the "control-based definition of an 'affiliate'" applied by the district court); *Lombardo's Ravioli Kitchen, Inc. v. Ryan*, 815 A.2d 302, 306 (Conn. Super. Ct. 2002) ("One can discern by these definitions that the essence of the terms 'affiliate' and 'related,' as they apply to corporations, is **control**.") (emphasis added), affirmed by *Lombardo's Ravioli Kitchen, Inc. v. Ryan*, 842 A.2d 1089 (Conn. 2004); *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, 176 S.W.3d 80, 87 (Tex. App. 2004) (applying Black's Law Dictionary and Webster's Third definitions since "affiliate" was not defined in contract, finding company to be the general partner in a limited liability partnership and therefore controlling the business affairs of the partnership, such that company and its corporate parent were affiliates of the limited liability partnership).[8]

---

[8]   This decision also illustrates how, contrary to an argument advanced by the Objectors, it would be inappropriate to limit the concept of "affiliates" solely to "corporations," since other types of entities can clearly be affiliated. *See, e.g., Tex. Molecular Ltd. P'ship v. American Int'l Specialty Lines Ins. Co.*, 424 F. App'x 354, 357 (5th Cir. 2011) (limited partnership as affiliate); *Harkins v. CA 14th Investors, Ltd.*, 544 S.E.2d 744, 746 (Ga. Ct. App. 2001) (joint venture as affiliate); *In re Motorola Sec. Litig.*, 644 F.3d 511, 521 (7th Cir. 2011) (ERISA plan as affiliate); *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2004) ("affiliate" means "an affiliated person or organization").

A/74653275.1

B.    *JPMorgan Bank, or One of Its Affiliates, Clearly Controls the JPM Funds.*

20.    JPMorgan Bank, or one of its affiliates, controls the day-to-day management of the JPM Funds.  With respect to the Trust-Organized Funds, JPMorgan Bank (holding the ownership interest in the Trust-Organized Funds' assets as Trustee) has unfettered and broad powers and control over the Trust-Organized Funds' assets. JPMorgan Bank has the power to, among other things:  invest and reinvest moneys of the Fund in any property; sell, exchange, lend, convey, transfer or dispose of options with respect to any property held by it; purchase, sell, hold and deal with all futures contracts; enter into swap and other derivative transactions; and engage in "short sales" with respect to any property.  *See* Declaration of Trust of Commingled Pension Trust Fund (Core Bond) of JPMorgan Chase Bank, N.A., at § 4.3.[9]

21.    JPMorgan Bank has additional power to, among other things:  acquire, retain, manage, operate, repair, develop, mortgage or lease any property; compromise, compound and settle any debt or obligation; vote in person or by proxy on any stocks, bonds or other securities held by it; make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance; borrow or raise moneys; cause or authorize any investments held by it to be registered in, or transferred into, its name; loan any securities held by it to brokers, dealers or other financial institutions upon such security as it determines; abandon, settle, compromise, modify and release any and all claims; and collect or realize on defaulted investments. *Id*. at § 4.4.

---

[9] The Declaration of Trust is Exhibit M to the Objection.  However, while the Objectors refer to section 2.4 of the Declaration of Trust of Commingled Pension Trust Fund (Core Bond) of JPMorgan Chase Bank, N.A., no such section appears in the Declaration included as Exhibit M.

A/74653275.1

22.    The Trust-Organized Funds have no independent boards of directors. Indeed, all actions on behalf of the Trust-Organized Funds are taken by employees of JPMorgan Bank.  As noted above, ownership of all of the assets in the Trust-Organized Funds vests solely in JPMorgan Bank.  *Id.* at § 4.1 ("The ownership of all of the assets in the Commingled Fund shall be vested solely in the Bank as Trustee and shall be considered as assets held by it as Trustee.").  As such, the Trust-Organized Funds are controlled by JPMorgan Bank.

23.    With respect to the Advised Funds, an affiliate of JPMorgan Bank is appointed investment adviser with unlimited discretionary trading authority and sole responsibility for all trading operations of such Funds.  *See* Management Agreement, dated as of June 1, 2008, between JPMorgan Fixed Income Opportunity Fund, Ltd., JPMorgan Fixed Income Opportunity Master Fund, L.P., and J.P. Morgan Investment Management, Inc. (the "JPM Fixed Income Management Agreement"), at § 1 (". . . the Fund . . . hereby appoints the Investment Advisor as its agent and attorney-in-fact to act as investment adviser with unlimited discretionary trading authorization . . . ."); and § 2 ("The Investment Advisor shall . . . be solely responsible for all trading operations of the Fund . . . [including] among other things, (i) [making] all investment decisions for the Fund and the Portfolio, (ii) [monitoring] the performance of the Fund and Portfolio, (iii) [consulting] with the Administrator with respect to the valuation of the Fund's and Portfolio's assets, (iv) [monitoring] compliance of the Fund and the Portfolio with all regulatory requirements applicable to their operation, (v) [negotiating] the terms of all agreements to be entered into on behalf of the Fund and the Portfolio and (vi) [retaining] brokers, [opening] accounts, [borrowing] funds, [pledging] assets and [entering] into loan

11

facilities and other instruments, including, without limitation, prime brokerage agreements, pledge agreements and ISDA master agreements, for the Fund and the Portfolio.").[10]

24.    Because JPMorgan Bank, or one of its affiliates, controls each of the JPM Funds, the JPM Funds are "affiliates" of JPMorgan Bank under the plain and ordinary meaning of that term.[11]    On this basis, the Court should overrule the Objection.[12]

## II.    The Objectors Cannot Rewrite the Definition of "Affiliate" by Reference to Rules of Construction.

25.    Notwithstanding the plain and ordinary meaning of the term "affiliate," the Objectors attempt to limit the definition of the term to members of the same corporate ownership structure by reference to two rules of construction.  But the Second Circuit has made clear that under New York law, courts should not resort to rules of construction unless the meaning of a term is not clear from the face of a document.  *Int'l Multifoods*, 309 F.3d at 88 n.7 (noting that *contra proferentum* should only be applied **after** the consideration of extrinsic evidence); s*ee also McCostis v. Home Ins. Co.,* 31 F.3d 110, 113 (2d Cir. 1994) (applying rules of contract construction, including *contra proferentum*, only "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent"); *U. S. Fire Ins. Co. v. Gen. Reinsurance Corp.,* 949 F.2d 569, 573 (2d Cir. 1991) (noting that New York law has become increasingly reluctant to apply *contra*

---

[10]   The JPM Fixed Income Management Agreement is Exhibit G to the Objection.

[11]   In addition, J.P. Morgan Investment Management, Inc., through the JPMorgan Distressed Debt Fund, LLC, owns a majority interest in the JPMorgan Distressed Debt Master Fund, Ltd.  This Fund is consolidated with JPMorgan for financial reporting purposes.  Thus, even under the Objectors' improperly limited concept of the term "affiliate," this Fund would qualify.

[12]   The JPM Funds note that the Objectors also purport to challenge whether the JPM Funds in fact are controlled by JPMorgan Bank or its affiliates.  In light of the clear provisions of the fund formation documents supplied to the Objectors, the JPM Funds submit that there should be no dispute on this point. However, should the Court determine that the Objectors have raised a factual issue with respect to the actual control of the JPM Funds, the JPM Funds request an evidentiary hearing on this issue.

A/74653275.1

*proferentum* except "as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument") (internal quotations omitted).

26.    As a result, resorting to *ejusdem generis* and *noscitur a sociis* in order to "support the plain meaning" (Objection, p. 23) of a term is always inappropriate, because those rules of construction do not apply where a term has a plain meaning. *See City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 184 (2d Cir. 2010) (refusing to narrow a dictionary definition by the use of *ejusdem generis*, stating that the rule applies only when confronted with uncertainty); *La Salle Bank Nat. Ass'n v. CIBC Inc.,* 2011 WL 4943341, at *4 (S.D.N.Y. Oct. 17, 2011) (refusing to apply *noscitur a sociis* to a contract term that was unambiguous).

27.    Also, as the Objectors point out, the use of *ejusdem generis* is only appropriate when explaining a general term in the context of several more specific words. (Objection, p. 24.)  Here, though, the term "affiliate" is not a general term -- rather it is equally as specific in its meaning as the terms "subsidiaries," "successors" and "assigns" in the September Agreements.  All these words have independent legal meaning and significance. *See Del Global Techs. Corp. v. Park*, 2008 WL 5329963, at *5 (S.D.N.Y. Dec. 15, 2008) (refusing to apply *ejusdem generis* to a list that contained several specific and significant terms rather than an ambiguous general term).  The Objectors cannot claim that the term "affiliate" is a general "catch-all" term subject to *ejusdem generis* simply because they dislike the meaning of the specific term.  Similarly, because there is no indication that an "assign" needs to be part of the same corporate ownership structure as its assignor, *noscitur a sociis* does not support the reading urged by the Objectors.

13

28.    The doctrine of *contra proferentum* should not be applied here because, as discussed above, there is no proper evidentiary record as to the drafting and negotiation of the September Agreements, and for the additional reason that LBHI and JPMorgan Bank were both extremely sophisticated parties seeking to protect their own respective economic interests.  *See Cummins, Inc. v. Atl. Mut. Ins. Co.*, 867 N.Y.S.2d 81, 83 (N.Y. App. Div. 2008) (declining to apply *contra proferentum* against a party that drafted an agreement with a sophisticated counterparty); *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991) (describing application of the rule as generally inappropriate where both parties are sophisticated).

29.    Finally, the Objectors' proffered reading of the term "affiliate" should be rejected because it would violate a fundamental rule of construction that the JPM Funds respectfully submit carries more weight than *noscitur a sociis* or *ejusdem generis* -- i.e., that a writing is to be interpreted in such a way as to give meaning to all of its terms.  The Second Circuit disfavors "contract interpretations that would render provisions of a contract superfluous." *Int'l Multifoods*, 309 F.3d at 86; *see also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (the court should read the integrated contract "to safeguard against adopting an interpretation that would render any individual provision superfluous"); *Northgate Elec. Corp. v. Barr & Barr, Inc.,* 877 N.Y.S.2d 36, 36 (N.Y. App. Div. 2009) (rejecting the use of *ejusdem generis* where it would result in the word modified by the canon becoming a nullity).

30.    Here, the Objectors' reading of the definition of the term "affiliate" would render the highlighted language in the following clause in the Black's definition -- which definition the Objectors argue should apply here (*see* Opposition, pp. 21-22) --

14

meaningless: "shareholdings **or other means of control**." It would also make a nullity of the highlighted language in the following clause from the Webster's Third definition: "common ownership **or control**." The highlighted language from both definitions clearly indicates that control has a meaning distinct and apart from common ownership. The Court should decline to modify the dictionary definitions of the term "affiliate," and should overrule the Objection accordingly.[13]

### III. Extrinsic Evidence Should Not Be Considered at This Stage, But in Any Event Would Support the JPM Funds' Understanding of the Term "Affiliate."

31.    A court should resort to extrinsic evidence in order to interpret a contractual term in only two circumstances: (1) where the term is ambiguous and the Court needs to understand the parties' intent; and (2) where the term in question is a term of art in a particular industry and the Court needs to understand the custom and usage of the term within the industry in order to interpret the term correctly. *See, e.g., Law Debenture*, 595 F.3d at 466.

32.    The JPM Funds submit that neither of those situations is present here because the term "affiliate" has a plain and ordinary meaning. However, as noted above and set forth in detail in Section IV below, even if the Court finds that -- notwithstanding the plain meaning of the term "affiliate" -- extrinsic evidence must be examined, the Court should not consider extrinsic evidence at the January 26 hearing. Also as set forth in Section IV, the JPM Funds submit that extrinsic evidence of the circumstances surrounding the execution of the September Agreements will support their reading of the term. While the JPM Funds believe custom and usage need not be considered by the

---

[13]  In the event the Court finds that the Black's definition of the term "affiliate" needs to be informed by evidence of custom and usage and/or the parties' intent, the JPM Funds request an evidentiary hearing on this point.

Court at all (since the term "affiliate" does not have an applicable, specialized definition within an industry), should the Court determine otherwise, custom and usage also would support the JPM Funds' position, as explained below.

      A.     *Custom and Usage Are Not Relevant Absent a Specialized Meaning.*

33.     The JPM Funds submit that the definition of the term "affiliate" in Black's and Webster's Third (i.e., including the concept of "control" by means other than share ownership) is a term in sufficiently broad and common usage that evidence of specialized industry custom and practice need not be assessed by the Court. The Second Circuit stated the rule on evidence of custom and practice as follows: "When the parties have used contract terms which are in common use in a business or art and have a definite meaning understood by those who use them, but which convey no meaning to [t]hose who are not initiated into the mysteries of the craft, the parties, in order to have the court construe their contracts, must furnish [the court] with the dictionaries they have used. In such circumstances, the court must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business." *Law Debenture*, 595 F.3d at 466 (alterations in original) (citations omitted).

34.     Having argued strongly that the Court should apply the Black's Law Dictionary definition of the term "affiliate" (Opposition, pp. 21-22), the Objectors would appear to have agreed that Black's Law Dictionary is indeed the "dictionary" that the Court should look to for an understanding of the term. Yet the Objectors also attempt to proffer extrinsic evidence to bolster their argument as to the "essential concern" and "overarching purpose" of a parent guarantee generally. (Opposition, pp. 3, 4.) As discussed below, such evidence would be appropriate only if it could be shown -- at a

later evidentiary hearing -- that the term has a specialized meaning within a particular industry. The JPM Funds submit that the Court need not resort to specialized industry custom and usage, because the term has a common general meaning, as set forth in Black's and Webster's Third. However, as set forth below, should the Court find custom and usage evidence to be necessary to its determination, those factors would support the JPM Funds' understanding of the term "affiliate."

     B.     *Even if Custom and Usage Were Relevant, Those Factors Would Support the JPM Funds' Understanding of the Term "Affiliate."*

35.     "Proof of custom and usage does not mean proof of the parties' subjective intent, for [e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. Rather, proof of custom and usage consists of proof that the language in question is fixed and invariable in the industry in question." *Law Debenture*, 595 F.3d at 466 (alteration in original) (citations omitted).

36.     "The trade usage must be so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto. Thus, the proffered custom or usage must establish that the meaning of the term in question was general, uniform and unvarying. A custom, in order to become a part of a contract, must be so far established and so far known to the parties, that *it must be* supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual, *uniform and not varying, general and not personal,* and known to the parties." *Id.* (internal citations omitted) (emphases in original).

37.     The term "affiliate" has a distinctive meaning for a regulated financial institution like JPMorgan Bank. JPMorgan Bank must conduct its business, and enter

17

into transactions, with the Funds subject to and within a U.S. bank regulatory framework that establishes who is an "affiliate" of JPMorgan Bank. That regulatory framework is set forth in Section 23A of the Federal Reserve Act, as implemented by Federal Reserve Regulation W.

38.     Section 23A and Regulation W provide that, if JPMorgan Bank or an affiliate of JPMorgan Bank sponsors and advises a Fund on a contractual basis, or acts as an investment adviser to a Fund that is an investment company, the Fund is an affiliate of JPMorgan Bank. As the governing and other documents relating to the Funds support, JPMorgan Bank or an affiliate of JPMorgan Bank acts in such capacity in relation to each of the Advised Funds.

39.     The term "affiliate," as used in Section 23A and Regulation W, is designed to capture situations in which relationships between an entity and JPMorgan Bank are so close as to raise the potential that a transaction between JPMorgan Bank and the entity in question might not be conducted on an arm's length basis. Transactions conducted on a less than arm's length basis might subject the bank to abuse and could affect the prudential regulation of the bank as to its safety and soundness. It is the closeness of these relationships that drives what an "affiliate" of JPMorgan Bank is for purposes of regulating transactions between JPMorgan Bank and the "affiliate" under Section 23A and Regulation W.

40.     Likewise, an examination of the use of the term "affiliate" for investment companies, like a number of the Advised Funds, and their advisers would also lead to the conclusion that each of the Funds is an "affiliate" of JPMorgan Bank. It has long been the case that the mere fact that a person is the investment adviser of a fund registered

18

under the Investment Company Act of 1940, controlling the fund's day-to-day decisions,

makes the fund an affiliate of that adviser under the regulatory scheme applicable to

registered investment companies.   As the Securities and Exchange Commission has

stated:

> [T]he investment advisor almost always controls the
> fund. . . . The adviser's controlling influence over his
> advisee does not stem from stock ownership.  It stems from
> the fact that he manages the fund's affairs and that his is
> normally the only audible voice in day-to-day management.

*In re Steadman Security Corp*., SEC Release No. IC-9830 (June 29, 1977).

41.    Accordingly, should the Court determine evidence of custom and usage to

be necessary, the JPM Funds request an evidentiary hearing on this issue.

## IV.    The Objectors Have Failed to Refute the Claims.

42.    Bankruptcy Rule 3001(f) provides:  "A proof of claim filed in accordance

with these rules shall constitute prima facie evidence of the validity and amount of the

claim."   As such, the Objectors bear the burden to refute at least one allegation essential

to the Claims before the burden would shift back to the JPM Funds.  The Objectors have

tried to do this as a purely legal matter based on rules of construction.  As shown above,

such rules cannot avail the Objectors at the January 26 hearing.  The JPM Funds further

submit that, should the Court decline to overrule the Objection now, these rules will not

avail the Objectors at a subsequent evidentiary hearing.

43.    The Objectors also have sought to obscure the plain meaning of the

definitions set forth in Black's and Webster's Third by means of selective reference to

certain testimony and documents.  Such citations, in addition to being inappropriate at

this stage, paint a very incomplete (at best) picture of the situation.

19

44.     Importantly, while the JPM Funds voluntarily produced documents to the Creditors' Committee in response to informal requests issued by the Creditors' Committee prior to service of the Objection, the parties have taken no discovery on the Objection.  Nor could they under the Procedures Order, which provides that:  "upon service of an objection, omnibus or otherwise, to a Proof of Claim filed by a Claimant . . ., the Debtors, [and] each Claimant . . . shall be enjoined from commencing or continuing any action or proceeding, or engaging in any discovery, in any manner or any place, including this Court, seeking to establish, liquidate, collect on, or otherwise enforce any Contested Claims identified in such objection other than (i) through the Claims Hearing Procedures and ADR Procedures or (ii) pursuant to a plan or plans confirmed in the applicable Debtors' chapter 11 cases (the '<u>Temporary Litigation Injunction</u>')."  Procedures Order, pp. 2-3.

45.     The Court-Ordered Claims Hearing Procedures and Alternative Dispute Resolution Procedures provide that a "Claims Hearing" on a "Contested Claim" can be scheduled as either "a non-evidentiary hearing to address the legal sufficiency of the particular claim and whether the Contested Claim states a claim against the asserted Debtor under Bankruptcy Rule 7012 (a '<u>Sufficiency Hearing</u>') . . ." or as an "evidentiary hearing on the merits of a Contested Claim (a '<u>Merits Hearing</u>') . . . ."  Procedures Order, Ex. A, pp. 2-3.  To notice a Merits Hearing, though, the Objectors would have had to serve a Notice of Merits Hearing and negotiate an appropriate discovery schedule with respect to the Objection.  *Id*.  This has not occurred.  The Claims Hearing Procedures accord with Local Bankruptcy Rule 9014-2, which provides that, absent circumstances

not present here, the "first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses may testify."

46.    At a Sufficiency Hearing "[t]he standard of review that will be applied by the Court . . . will be equivalent to the standard applied by the Court on a motion to dismiss for failure to state a claim."  Procedures Order, Ex. A, p. 3.  Black letter law holds that "[o]n a motion to dismiss the court must '. . . draw all inferences in the non-moving party's favor.'"  *Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, 2011 WL 4031203, at *2 (S.D.N.Y. Sept. 12, 2011) (quoting *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009)).

47.    Should an evidentiary hearing later become necessary, and solely for purposes of illustration, the JPM Funds review below some of the factual issues that would need to be addressed.

      *A.    The Objectors Attempt to "Cherry Pick" Deposition Testimony.*

48.    The Objectors cite to certain deposition testimony to support their assertion that the JPM Funds should not be considered "affiliates" of JPMorgan Bank. (Objection, p. 28.)  The Objectors omit deposition testimony, however, that supports the JPM Funds' understanding of the term "affiliate."  By way of example, the following exchange with counsel for the Creditors Committee took place at the April 28, 2011 deposition of Henry E. Steuart, an Executive Director and Credit Analyst, in Adversary Proceeding Number 10-03266-JMP:

Q.    You also mentioned that you dealt with affiliates of JPMorgan.  What's your understanding of -- what did you mean by affiliates?

A.    Affiliates is a term that's defined under Reg. W and is meant to refer to those nonbank entities within a bank family.

Q.    Can you give me some examples of the affiliates of JPMorgan Chase Bank that you had responsibilities for in 2008?

A.    Yes.    JPMorgan Securities, Inc., JPMorgan Ventures Energy Corp. would be two examples.

Q.    Are you familiar with any asset management division that is part of JPMorgan Chase Corp.?

A.    I know that there are such groups.

Q.    Are you aware of certain funds that are advised by any entities that are part of JPMorgan Chase Bank's asset management division?

A.    I'm aware that those exist, yes.

Q.    Do you know if those are funds -- are affiliates of JPMorgan Chase Bank?

      Ms. Wolf:  Object to the form.  I object to your efforts to get the witness to opine for you on a legal issue.

Q.    Do you consider the funds to be affiliates of JPMorgan Chase Bank.

      Ms. Wolf:  The same objection.

A.    The funds are typically affiliates, yes.

Q.    Okay.  What makes you think that?

A.    Well, I know from looking at our ownership tracking system that they're defined by our office of the secretary as that, for one.  And I know also from our policy that that is so.

22

> Q.    Tell me what's this ownership training [sic] system.
> Are you talking about a computer?
>
> A.    It's something accessible via computer.
>
> Q.    And you've seen some sort of screen or information
> that's on that system that lists affiliates?
>
> A.    Yes.
>
> Q.    Okay.  It's your understanding that funds are listed
> as affiliates in that system that's in JPMorgan Chase
> Bank?
>
> A.    That's right.

**B.**    *While the Issue Is Not Relevant, JPMorgan Does in Fact
Have a Shared Economic Interest with the JPM Funds.*

49.    The Objectors make much of their allegation that, absent a shared

economic interest, there can be no affiliate status.  (*See, e.g.*, Opposition, p. 3.)  This

concept is directly contradicted by the definitions set forth in Black's and Webster's

Third and, accordingly, need not be considered by the Court.  However, should the Court

determine evidence on this point necessary, the JPM Funds submit that, contrary to the

Debtors' assertion, JPMorgan does indeed have a shared economic interest in the profits

and losses of the JPM Funds.

50.    First of all, the JPM Funds plainly form a part of the overall JPM brand.

In many cases, the name of the Fund itself makes this clear (e.g., "Commingled Pension

Trust Fund (Intermediate Bond) **of JPMorgan Chase Bank, N.A.**," "**JPMorgan** Core

Plus Bond Fund," "**JPMorgan** Emerging Markets Debt Fund," "**JPMorgan** Total Return

Fund," "Commingled Pension Trust Fund (Emerging Markets Fixed Income) **of**

**JPMorgan Chase Bank, N.A.**") (all emphases added).  Not surprisingly, JPMorgan does indeed have an interest in the performance of the Funds that bear its name.

51.     In addition, as set forth in Section I.B above, JPMorgan Bank also is the owner of the assets held by the Trust-Organized Funds.  Contrary to the Objectors' argument, JPMorgan Bank or one of its affiliates also owns a material interest in a number of the Advised Funds, and in one case a majority interest (*see* footnote 11 above). For all of the JPM Funds, JPMorgan Bank or the adviser to the Fund receives management fees that are calculated as a percentage of the net asset value of the Funds. For certain Advised Funds, the adviser also receives incentive fees that are equal to a portion of the net profits of the Funds.  The adviser to the Advised Fund is an affiliate of JPMorgan Bank, in many cases one of its wholly owned subsidiaries (for instance, J.P. Morgan Investment Management Inc.).  In this way, the profits and losses of the Funds do in fact run directly to JPMorgan Bank or one of its affiliates by the manner in which the management and incentive fees are structured and are paid.[14]

C.     *The Objectors Cite Fund Documents Out of Context.*

52.     The Objectors cite to the definition of the term "Affiliate" in the investment advisory agreement of one -- and only one -- Fund,[15] and assert that this definition controls the meaning of the same term (albeit undefined) in the September Agreements.   (Objection, p. 28.)   The definition in the Absolute Return Fund's investment advisory agreement provides that an "'[a]ffiliate' of any Person means any

---

[14]   The Objectors also make much of certain consolidated financial reporting, or lack thereof.  The JPM Funds respectfully submit that whether entities make joint filings under accounting rules is not informative, let alone dispositive, on the issue of affiliate status any more than whether entities make joint filings under tax rules.  For example, if a wholly owned subsidiary filed tax returns separately from its parent, surely the subsidiary would remain an affiliate.

[15]   The Absolute Return Credit Master Fund Ltd. (the "Absolute Return Fund").

other Person that controls, is controlled by, or is under common control with such Person." *Id*. However, the definition in that agreement further provides an express exclusion stating that, "for purposes of [the Fund's investment advisory agreement], the Fund shall not be considered an Affiliate of the Adviser." The JPM Funds submit that this is the "exception that proves the rule," as described below.[16]

53.    Absent the above-quoted exclusion, the Absolute Return Fund would have fallen within the typical, control-based definition of the term "Affiliate" set forth in its investment advisory agreement. Were this not the case, the express exclusion of the Fund from the definition for purposes of that particular agreement would have been totally superfluous (i.e., no exclusion would be necessary unless the definition would otherwise have included the Fund). As shown in Section II above, contracts are not to be read in ways that render language meaningless.

54.    It therefore follows that the other Funds' documents (and even a different document pertaining to the Absolute Return Fund) -- all of which documents either include a definition that does not contain the exclusion or omit any definition of the term -- do indeed include the JPM Funds within the term "affiliate." *See, e.g.,* Amended and Restated Memorandum and Articles of Association of JPMorgan Absolute Return Credit Master Fund Ltd., adopted by Special Resolution dated 25th July 2007 (the "<u>Absolute Return Articles</u>"), at § 1 ("'Affiliate' means, with respect to any person, a person controlling, controlled by or under common control with, that person, either directly or

---

[16] In addition, because the definition of the term "affiliate" in the September Agreements does not at all depend on the definition of that term in one particular Fund's investment advisory agreement, the express exclusion of the Fund from the definition of the term "affiliate" in its advisory agreement should not exclude even that Fund from the term "affiliate" in the September Agreements.

A/74653275.1

indirectly through one or more intermediaries.")[17] and Amended and Restated Articles of Association of Highbridge Fixed Income Opportunity Fund, Ltd., adopted by Special Resolution dated April 21, 2006 (the "Highbridge Fixed Income Articles"), at § 1 (containing no definition of the term).[18]   The September Agreements also include the JPM Funds within the definition of the term "affiliate" on this basis.

55.    The JPM Funds respectfully submit that the Objectors have not carried their burden to refute as a matter of law a necessary allegation that supports the Claims (i.e., that the JPM Funds are affiliates of JPMorgan Bank), and that the Objection should be overruled accordingly.

## RESERVATION OF RIGHTS

56.    The JPM Funds note that the Schedules to the Objection propose differing treatment for each of the Claims, and sometimes more than one treatment for a given Claim.  The Schedules do not list the portion of each Claim subject to a given treatment. As a result, it is not possible to determine whether the Objectors' proposed treatment of a given claim would be appropriate (e.g., whether the amount of the proposed recharacterization or disallowance has been properly assigned or computed) even assuming the Objectors prevail on the affiliate issue -- which of course the JPM Funds submit that the Objectors should not.

57.    The JPM Funds propose to address the appropriate treatment of each Claim with the Objectors on a Claim-by-Claim basis following a determination by the Court on the issue of affiliate status.  The JPM Funds reserve the right to challenge the proposed treatment of each Claim pending such resolution.

---

[17]   A copy of the Absolute Return Articles is attached hereto as Exhibit B.

[18]   A copy of the Highbridge Fixed Income Articles is attached hereto as Exhibit C.

A/74653275.1

## NOTICE

58.     The JPM Funds have served the Response in accordance with the Debtors'

Notice of Hearing on the Objection and in accordance with the Second Amended Order

Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and

9007 Implementing Certain Notice and Case Management Procedures, and have filed the

Response on the docket electronically.  The JPM Funds submit that this constitutes good

and adequate service of the Response.

## CONCLUSION

59.     For the reasons set forth above, the JPM Funds respectfully request that

this Court overrule the Objection, or in the alternative, should the Court find extrinsic

evidence to be necessary to a determination of the Objection, set the matter down for an

evidentiary hearing to be held following appropriate discovery, and grant such other and

further relief as the Court deems just and proper.

Dated:  December 16, 2011
         New York, New York

                                **BINGHAM McCUTCHEN LLP**

                                By:  /s/Jeffrey S. Sabin
                                     Jeffrey S. Sabin
                                     jeffrey.sabin@bingham.com
                                     Edwin E. Smith
                                     edwin.smith@bingham.com
                                     Jared R. Clark
                                     jared.clark@bingham.com
                                     R. Jeffery Black
                                     jeffery.black@bingham.com
                                     C. Ryan Soots
                                     ryan.soots@bingham.com
                                     399 Park Avenue
                                     New York, New York  10022
                                     (212) 705-7000

                                     Attorneys for the JPM Funds

27

A/74653275.1