**EXHIBIT "1B"**

**COMMONWEALTH OF THE BAHAMAS**

New Providence

# CONTRACT OF SALE

This CONTRACT OF SALE (this "Agreement") is made as of this 11th day of February 2011 (the "Effective Date"), between GENWOOD NASSAU LTD., a company incorporated under the laws of the Commonwealth of the Bahamas ("Seller") and BENISASIA INVESTMENT AND PROPERTIES LTD. a company also incorporated under the laws of the Commonwealth of the Bahamas ("Purchaser").

WITNESSETH:

A. WHEREAS, Seller is seised of the fee simple estate in possession of all of the hereditaments (hereinafter called the "Property") more particularly described in Section 1 (a) herein which said Property is subject to a DEBENTURE AND LEGAL MORTGAGE to Lehman Brothers Holding Inc. and intends to sell the Property to Purchaser on the terms and conditions set forth herein.

B. WHEREAS, this Agreement is supplemental to and conditional upon the completion a Contract of Sale dated the 11th day of February, 2011 and made between Genwood Paradise Ltd. and the Purchaser for property situated in Paradise Island and known as Paradise Island Harbour Resort in accordance to the terms thereof.

C. WHEREAS, Purchaser has agreed to purchase subject to the provisions of Section 6 hereof the Property in its "AS-IS, WHERE-IS, WITH ALL FAULTS" condition and acknowledges that, except as expressly set forth in this Agreement, Seller has made no representations or warranties to Purchaser regarding the Property.

NOW, THEREFORE, in consideration of ten ($10.00) Dollars and the mutual covenants and agreements hereinafter set forth, and intending to be legally bound, the parties agree as follows:

1. **Agreement to Sell and Purchase.** Seller as BENEFICIAL OWNER agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, on the terms and conditions set forth in this Agreement, the following (which sometimes hereafter are together referred to as "the Property"):

   (a) all of the fee simple estate in possession in and to (i) firstly a parcel of land containing 1.349 acres and (ii) secondly a parcel of land containing 1.069 acres, on West Bay Street, Nassau, Bahamas, together with the 181-room Nassau Palm Resort along with all of its amenities (restaurant and bar, pools, etc. ( the "Land"), all as more particularly described on the plan dated 15th May, 2006 as prepared by Chee-A-Tow & Company Limited, (a copy of which is attached hereto as Exhibit A) together with the buildings and other improvements, on the Land (the "Improvements"; and together with the Land the "Real Property");

(b) all of Seller's right, title and interest, as lessor, in and to all leases and occupancy agreements in effect as of Closing (as hereinafter defined) pursuant to which any person has a right to use and occupy any portion of the Real Property that are listed on **Exhibit B** annexed hereto and made a part hereof (collectively, the "Leases"), as well as Seller's right, title and interest in any refundable security deposits made pursuant to the Leases which are in the possession of Seller, to be adjusted for new deposits (including advance deposits for guest rooms) collected by Seller, deposits refunded or paid by Seller or deposits used and applied by Seller in accordance with Seller's rights under the Leases, less any administrative fees to which Seller is entitled pursuant to the Leases or applicable law, if any (collectively, the "**Security Deposits**");

(c) all of Seller's right, title and interest, if any, in and to (i) all other equipment, machinery and other tangible personal property installed in, located at, situated on, or used in connection with all or any part of the Real Property or the development, construction, ownership, use or operation thereof, all furniture, fixtures and furnishings, equipment, inventories, appliances, wall and floor coverings, all merchandise, supplies and inventories and other items that are used for the operation and maintenance of Nassau Palm Resort, (the "**Resort**") and (ii) all china, silverware, office supplies, stationary, brochures, sales, advertising, marketing and promotional materials and linens (the "**Personal Property**");

(d) all of Seller's right, title and interest, if any, in and to the contracts and agreements pertaining to the Real Property that are listed on **Exhibit C** annexed hereto and made a part hereof (the "**Service Contracts**") to the extent same are assignable by Seller and are to be assumed by Purchaser; and

(e) all of Seller's right, title and interest, if any, in and to all assignable contract rights and intangible property pertaining to the Real Property and/or the development, construction, ownership, use or operation thereof (excluding the Service Contracts), including, without limitation: (i) all guaranties and warranties, (ii) all designs, plans, specifications, engineering drawings and prints, and surveys, (iii) all development rights, entitlements, permits, licenses, approvals and agreements, (iv) all consents, variances, waivers, licenses, permits, registrations, notifications, comfort letters, reliance letters, estoppels, certificates, authorizations and other approvals and all applications for any of the foregoing, (v) all Nassau Palm Resort brochures, trade names, trademarks, service marks, copyrights, telephone numbers, websites, email addresses, domain name and content and goodwill to the extent same are used exclusively for the Property and (vi) the dock licenses (collectively, "**Intangibles**").

2. **Purchase Price.** The purchase price for the Property (the "**Purchase Price**") shall be Three Million Two Hundred and Fifty Thousand 00/100 UNITED STATES DOLLARS (US$3,250,000.00). Purchaser shall pay the Purchase Price to Seller, as follows:

(a) ONE HUNDRED SIXTY TWO THOUSAND FIVE HUNDRED 00/100 UNITED STATES DOLLARS (US$162,500.00) of the Purchase Price (the "**Deposit**"), to be paid by Purchaser two (2) business day (time being of the essence) following execution of this Agreement by both parties, by wire transfer of immediately available federal funds of the United States of America to the following account maintained by Escrow Agent (as hereinafter defined): International Data Management, Inc. ("IDM") SUNTRUST BANK SOUTH FLORIDA, 12870

2

Forest Hill Blvd., Wellington Fl. 33414, Account No. 1000001102135 ("**Escrow Agent's Account**"). Notwithstanding anything contained herein to the contrary, this Agreement shall not be deemed fully delivered for purposes of creating a valid and binding agreement on all parties until Escrow Agent receives the Deposit. Receipt of the Deposit is a material inducement to Seller to enter into this Agreement, and as such shall be returned to Purchaser only if Seller defaults in its obligation to consummate this Agreement; and

(b) The balance of the Purchase Price (subject to adjustment by reason of adjustments and apportionments made pursuant to the provisions hereof) shall be paid to Seller at the Closing (as hereinafter defined) by wire transfer of immediately available federal funds of the United States of America.

3. **Inspection; Testing.**

(a) Within ten (10) days following the Effective Date, the Seller or the Seller's Attorney shall produce or cause to be produced to the Purchaser or its Attorney copies of all of the documents of title in the Seller's possession relating to the said Property all of which are listed in Exhibit I and such other information as the Purchaser and/or its Attorney shall reasonably require to deduce from a good root of title in accordance with the provisions of the Conveyancing and Law of Property Act Chapter 138 of the Statute Laws of the Bahamas, revised edition 2002 (the "**Conveyancing Act**") a good and marketable title in fee simple subject as hereinafter appearing and to the Permitted Exceptions but otherwise free from encumbrances.

(b) Purchaser (i) shall give Seller at least twenty-four (24) hours prior written notice of Purchaser's request to enter the Property, (ii) shall at all times conduct inspections and tests in compliance with applicable law and the Leases, in a manner so as not to cause damage, loss, cost or expense to Seller, the Property or any tenants under the Leases, and without interference with or disturbance of such tenants' use and enjoyment of the Real Property in accordance with their Leases, (iii) shall promptly restore the Real Property to its condition immediately preceding Purchaser's inspections and tests, (iv) shall keep the Real Property free and clear of any mechanic's liens or materialman's liens arising from such inspections and tests, (v) shall at all times be accompanied by a representative of Seller, if Seller so elects, when at the Real Property and shall not contact the tenants at the Real Property without Seller's express written consent, which consent will not be unreasonably delayed or withheld, (vi) shall, if the Closing does not occur for any reason other than Seller's default, provide Seller, at no cost or expense to Seller, with copies of all third party drafts or final engineering and architectural reports, environmental reports and lab analyses, appraisals, construction and renovation estimates commissioned and received by Purchaser in connection with Purchaser's inspections and tests (collectively, the "**Inspection Reports**"), other than documents that are subject to any attorney-client privilege, and (vii) shall keep copies of all Inspection Reports and the contents thereof confidential, except to the extent such information is (x) a matter of public record, (y) provided in other sources readily available to the real estate industry other than as a result of disclosure by Purchaser, or (z) compelled by law or by regulatory or judicial process, to be disclosed or reported, provided, however, that Purchaser may disclose such information to its agents, advisors, consultants, members, affiliates, lenders, advisors, attorneys, accountants, the Government of the Commonwealth of The Bahamas as required in connection with obtaining the

3

Investment Board Approval and the Central Bank Approval (collectively, "**Transaction Parties**"), so long as such Transaction Parties are informed by Purchaser of the confidential nature of such information and are directed by Purchaser to treat such information confidentially and to use such information only in connection with the transaction contemplated by this Agreement. Purchaser's obligations under this Section 3(b) shall survive the termination of this Agreement.

(c) Within five (5) business days following the Effective Date, Purchaser shall apply for and continuously and diligently seek to obtain all approvals required by the Bahamas Investment Authority and the Central Bank of the Bahamas necessary for Purchaser to acquire the Property (the "**Required Approvals**"). It shall be a default under this Agreement if Purchaser shall fail to make a good faith application and continuously and diligently seek to obtain the Required Approvals prior to the Closing Date (as hereinafter defined) and shall fail to cure such failure within five (5) days after Seller delivers written notice to Purchaser that Purchaser has failed to make such good faith application and/or show continuous efforts to seek to obtain the Required Approvals. In the event Purchaser makes a good faith application and continuously and diligently seeks to obtain the Required Approvals prior to the Closing Date (as hereinafter defined), and the applicable governmental authorities deny issuance or fail to issue the Required Approvals by the Closing Date, then this Agreement shall terminate and Purchaser shall be entitled to a return of the Deposit, except, that Seller may unilaterally extend the Closing Date (and such extended date shall become the "Closing Date") by such additional period as Seller deems necessary or appropriate to obtain the Required Approvals, and upon doing so Purchaser shall continue its efforts to obtain the Required Approvals. Seller shall have no obligation (a) to extend the Closing Date (as hereinafter defined) pursuant to this Section, or (b) to satisfy any term, obligation, or condition of any kind or nature whatsoever that may be imposed by the Investments Board, the Central Bank or any other governmental or quasi governmental authority of the Commonwealth of the Bahamas in order to obtain any Required Approval or to allow for consummation of the sale. The Purchaser shall provide the Seller with copies of all applications and correspondence with the Investment Board and the Central Bank of the Bahamas.

(d) Receipt of a liquor license is not a Required Approval. With respect to Purchaser's efforts to obtain a liquor and alcoholic beverage license to operate the bar and restaurants presently located within the Property, Seller shall reasonably cooperate with Purchaser's efforts to obtain such license(s), at Purchaser's sole risk, cost and expense.

(e) Seller shall have no obligation to deliver or make available to Purchaser (i) any information contained in Seller's credit reports, credit authorizations, financial analysis or projections, (ii) materials that are, in the reasonable judgment of Seller or its counsel, subject to an attorney-client or work-product privilege under applicable law, (iii) financial statements of any affiliate of Seller, (iv) any information that Seller is prohibited by law or by regulatory or judicial process from disclosing or (v) any reports, other items or information not specifically set forth in this Agreement.

(f) Except as otherwise provided in Section 3(b), Purchaser shall not, and shall not permit its employees, consultants, engineers and agents to conduct any soil tests or sampling or any boring, digging, drilling or other physical intrusion of the Real Property

4

(collectively, "Testing"), except at reasonable times and with the prior written consent of Seller, which consent shall not be unreasonably withheld or delayed. If Seller consents to any such Testing, then Purchaser or each of Purchaser's consultants shall furnish to Seller, prior to the commencement of such Testing, in form reasonably satisfactory to Seller, a certificate or certificates of insurance, or other satisfactory evidence indicating that Purchaser or each of its consultants have each obtained Commercial General Liability Insurance which includes contractual liability and products and completed operations with limits not less than $1,000,000.00 per occurrence and $3,000,000.00 in the aggregate for bodily injury, including death, and property damage combined. Purchaser shall, upon completion of such Testing and at its sole cost and expense, promptly restore the Real Property to its condition existing prior to such Testing. The consultant's coverage shall include acts and omissions of the consultant's contractors, agents and employees. All such Commercial General Liability insurance shall name Seller and Lehman Brothers Holdings Inc. as an additional insured. In addition, all such certificate(s) or other evidence shall indicate that the coverage described therein is in force as of the date of the commencement of the applicable Testing and that during the term of this Agreement the coverage evidenced thereby shall not be modified or cancelled without at least thirty (30) days prior written notice to Seller. All requirements pursuant to this Section 3(f) with respect to Testing shall be in addition to all other requirements set forth in this Section 3.

(g)     Purchaser hereby agrees to protect, defend, indemnify and hold harmless Seller, its employees, agents, successors and assigns from and against any and all liabilities, actions, suits, mechanics' liens, judgments, losses, costs, damages, expenses (including, without limitation, attorneys' fees and expenses), claims and demands of any nature whatsoever (other than those arising out of a pre-existing condition at the Property) suffered or incurred by or made against Seller, its employees, agents, successors or assigns, arising out of or in any way relating to the acts or omissions of Purchaser or its agents in conducting such inspections, Testing or other activities by or on behalf of Purchaser. The provisions of this Section 3(g) shall survive the Closing (as hereinafter defined) or any earlier termination of this Agreement.

4.     **The Closing.**

(a)     The consummation of the purchase and sale of the Property in accordance with the terms of this Agreement (the "**Closing**") shall occur on the date which is ninety (90) days from the Effective Date, or the next following business day, if such date shall not be a business day (the date of the Closing, as the same may be adjourned by Seller as provided in this Agreement or adjourned by Purchaser as provided in Section 4(b), (the "**Closing Date**").

(b)     If, despite making a good faith application and using continuous and diligent efforts to obtain the Required Approvals, Purchaser has not obtained the Required Approvals, Purchaser shall be entitled to adjourn the date scheduled for Closing one time, to a date no later than forty-five (45) days after the date established for Closing pursuant to Section 4(a) above (and such adjourned date shall become the "**Closing Date**"), or the next following business day, if such date shall not be a business day, by delivering to Seller and Escrow Agent on or prior to the date which is five (5) business days prior to the date established for Closing pursuant to Section 4(a) above, Purchaser's notice of such adjournment setting forth the adjourned date for the Closing (the "**Extension Notice**"), and the Extension Notice shall be accompanied by wire transfer of immediately available federal funds of the United States of

5

America to Escrow Agent's Account, in the amount of ONE HUNDRED TEN THOUSAND AND 00/100 UNITED STATES DOLLARS (US$110,000.00) (the "**Additional Deposit**"), which amount shall be added to and become part of the Deposit hereunder. If within this adjourned period the Purchaser receives the approvals from the Bahamas Investment Authority and the Central Bank of the Bahamas then closing shall take place within five business days after the receipt of the Required Approvals.

(c)     Purchaser acknowledges and agrees that TIME SHALL BE OF THE ESSENCE with respect to the delivery of the Extension Notice, if any, and the performance by Purchaser of its obligations to pay the balance of the Purchase Price and otherwise consummate the transactions contemplated hereby on the Closing Date.

5.     **Closing Documents and Certain Payments.**    Without limiting any other provisions of this Agreement:

(a)     At closing which shall take place at the office of the Seller's Attorney the Seller shall deliver, or cause to be delivered, to Purchaser the following:

(i)     an Indenture of Conveyance, conveying the Real Property from Seller to Purchaser in a form approved by the Purchaser's Attorney (such approval not to be unreasonably withheld) and a draft of which shall be submitted to the Purchaser's Attorney at least seven (7) days before the Closing Date (the "**Deed**"), duly executed by Seller;

(ii)     a Bill of Sale, without any additional warranty from the Seller, conveying the Personal Property, in the form of **Exhibit D** annexed hereto (the "**Bill of Sale**"), duly executed by Seller;

(iii)     an assignment of Seller's interest in and under the Leases and Security Deposits, and an assumption by Purchaser of all of Seller's liabilities and responsibilities thereunder arising on the Closing Date and thereafter, in the form of **Exhibit E** annexed hereto (the "**Lease Assignment**"), duly executed by Seller;

(iv)     an assignment of Seller's interest in and under the Service Contracts and Intangibles, and an assumption by Purchaser of all of Seller's liabilities and responsibilities thereunder arising on the Closing Date and thereafter, in the form of **Exhibit F** annexed hereto (the "**Service Contract and Intangibles Assignment**"), duly executed by Seller; in the event the Purchaser elects not to assume any Service Contract the Purchaser must notify the Seller in writing at least 15 days prior to the initial Closing Date.

(v)     notices to tenants regarding the sale of the Property in substantially the form of **Exhibit G** annexed hereto, or such other form as may be required by applicable law (the "**Tenant Notices**");

(vi)     originals (or, if and to the extent originals are not available, copies) of the Leases that are in effect on the Closing Date;

(vii)     any other document required to be delivered by Seller at the Closing pursuant to the provisions of this Agreement;

6

(viii) such instruments, agreements or other documents as may be necessary or convenient in order to effectuate any of the provisions of this Agreement, or as reasonably requested by Purchaser or the Title Company to consummate the transactions contemplated herein, or to confirm any of the provisions of this Agreement, which shall be executed and, if and to the extent appropriate or required, acknowledged or sworn to by Seller before a notary public;

(ix) a letter of confirmation issued by the National Insurance Board stating that all required national insurance contributions required of it as an employer with respect to the Property to the end of the last completed month prior to Closing have been paid. In the event that the Closing Date is in the middle of a month the contributions for that month will be prorated at Closing;

(x) a written instrument executed by the Seller or the manager of the Property advising Bahamas Telecommunications Company of the sale of the Property and asking them to transfer to Purchaser any telephone numbers (including, but not limited to all "800" numbers) and TWX numbers relating directly and exclusively to the Property;

(xi) originals (or, if and to the extent originals are not available, copies) of all files for the Employees (as hereinafter defined);

(xii) the files for each of the tenants and licencees of any portion of the Property; and

(xiii) a letter and /or Accounts Receivable Inquiry issued by the Department of Valuation stating that all required real property tax has been paid by Seller with respect to the Property. If, however, such letter is not issued by the Department of Valuation as of the Closing, Purchaser shall not have a right or reason not to close hereunder and the requisite amount to satisfy any unpaid taxes shall be held in escrow by the Escrow Agent (as hereinafter defined) for a reasonable period while the Seller attempts to obtain the aforementioned statement from the Department of Valuation and Seller shall indemnify and hold harmless Purchaser from and against all claims, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees) caused by or arising out of any claim by the Department of Valuation that Seller failed to pay its required real property tax with respect to the Property prior to the Closing Date. Notwithstanding the above the Seller could at its sole discretion opt to pay any Real Property Tax amount outstanding from the proceeds of this sale immediately after Closing.

(b) Purchaser shall deliver or cause to be delivered to Seller at the Closing the following:

(i) the payment required on account of the Purchase Price in accordance with the provisions of Section 2(b) of this Agreement (as increased or decreased by reason of net adjustments and apportionments made pursuant to the provisions hereof);

(ii) payments in the amounts and to the appropriate parties as may be required in order to make any other payments due and payable to or on behalf of Seller under this Agreement;

7

(iii) the Lease Assignment and the Service Contract and Intangibles Assignment, each duly executed by Purchaser;

(iv) such instruments, agreements or other documents as may be necessary or convenient in order to effectuate any of the provisions of this Agreement, or as reasonably requested by Seller or the Title Company to consummate the transactions contemplated herein, or to confirm any of the provisions of this Agreement, which shall be executed and, if and to the extent appropriate or required, acknowledged or sworn to by Purchaser before a notary public; and

(v) any other document required to be delivered or payment required to be made by Purchaser at or before the Closing pursuant to the provisions of this Agreement.

6. **Due Diligence**

(a) The Seller hereby grants to the Purchaser a thirty (30) day due diligence period (hereinafter referred to as the "Due Diligence Period") commencing two days following the Effective Date.

(i) During the Due Diligence Period the Seller shall afford the Purchaser its agents, advisors, consultants, members, affiliates, lenders, attorneys, accountants upon twenty-four (24) hour prior notice to the Seller access and the opportunity to conduct at the sole expense of the Purchaser an examination (hereinafter referred to as "the Due Diligence") of the structural makeup and the assets and records of the Property and business and interviews with management.

(ii) The Due Diligence shall include without limitation a review of all existing legal, financial and engineering documentation relating to the Property as well as such reports, operating expenses, licences, contracts, property taxes and other historical financial information, building plans and specifications, surveys maps site plans and title information as may exist and any and all other existing documents in addition to those listed on EXHIBIT I annexed hereto and made a part hereof as the Purchaser may reasonably request.

(iii) The Due Diligence shall be conducted for the purpose of enabling the Purchaser to become appropriately informed as to the said assets and as to the market conditions within which the Property is operated and as to any developments which are relevant and so as to fully satisfy itself as to the state and condition and value of the Property.

(iv) The Seller shall cooperate with the Purchaser in its Due Diligence providing such information and documents and access to the Purchaser as may be required in a timely manner and the Purchaser shall treat all information as they receive in utmost confidence and in all other respects shall protect and not damage the Property or part thereof in the course of its Due Diligence.

(v) The Purchaser shall be responsible for all of its costs arising from the conduct of the Due Diligence. Notwithstanding the foregoing, the Seller shall, during the



8

Due Diligence Period, subject to availability make two (2) rooms available for a maximum of seven (7) nights for use by the Purchaser or its representatives excluding taxes and gratuities.

(b) The Purchaser shall upon the completion of Due Diligence, specify the contracts relating to the operation of the Property the Purchaser wishes to assume. In the event the Purchaser does not wish to assume all of the contacts relating to the operation of the Hotel and Business those contracts not assumed by the Purchaser will be terminated by the Seller within Sixty (60) days of the Closing date provided that the Seller has the right to so terminate by the term of such contract.

(c) The Closing hereunder by the Purchaser shall be conditional upon the Purchaser being itself satisfied in its sole judgment as a result of the Due Diligence as to the state and condition and value of the Property

(d) If the Purchaser has not satisfied itself within the Due Diligence Period and does not wish to complete its purchase hereunder, it shall on or before the expiration of the Due Diligence Period (time being of the essence) deliver a notice to the Seller or its attorney indicating such intent and this Agreement shall thereupon terminate. The Purchaser shall be entitled to demand and receive from the Seller the immediate return of the Deposit and the Purchaser shall return to the Seller all papers belonging to the Seller in its possession in connection with this sale.

(e) If the Purchaser shall not have delivered a notice under Section 6(d) above (time being of the essence) the Seller shall thereupon treat this Agreement as continuing in accordance with the terms

7. **Title.**

(a) Within two (2) days following the Effective Date, Purchaser, at its sole cost and expense, shall request from International Data Management (which had issued a Policy of Title Insurance in the name Driftwood Nassau Limited the immediate predecessor in title) an agent of First American Title Insurance Company (the "**Title Company**") a commitment for the issuance of a standard form of owner's policy of title insurance (the "**Commitment**"), together with copies of all exception documents referred to therein, proposing to insure Purchaser in the amount of the Purchase Price.

(b) Within five (5) business days after receipt of the Commitment, but in no event later than forty-five (45) days after the Effective Date, Purchaser shall be entitled to deliver to Seller a written statement of any objections to Seller's title (the "**Title Objection Notice**"). Any objections to title not made within the said forty-five (45) days (time being of the essence) by Purchaser in the Title Objection Notice shall be deemed waived. In objecting to Seller's title, Purchaser shall be obligated to act reasonably in accordance with its expectations under the Conveyancing Act and agrees not to object to (i) any Permitted Exception (as defined below) or (ii) easements of record and other matters that would not materially affect the operation of the Property in its present use. Notwithstanding the generality of the foregoing, Purchaser shall accept title to the Property at Closing subject to the following (collectively, the "**Permitted**

9

Exceptions"): (i) all matters which could be revealed or disclosed by a physical inspection of the Property and matters affecting the Property which are created by or with the written consent of Purchaser; (ii) the rights of the tenants under the Leases affecting the Property; (iii) all exceptions disclosed by the Commitment, which are approved or deemed approved by Purchaser in accordance with this Section 7; (iv) all applicable laws, ordinances, rules and governmental regulations (including, without limitation, those relating to building, zoning and land use) affecting the development, use, occupancy or enjoyment of the Property; (v) any of the matters set forth on **Schedule 1** annexed hereto and made a part hereof; and (vi) any matter which any reputable title insurance company licensed to do business in the Commonwealth of the Bahamas would be willing to insure Purchaser's title without exception therefore or with affirmative insurance against collection or enforcement thereof.

(c) Notwithstanding the provision of Section Three (3) Subsections Five (5) and Nine (9) of the Conveyancing Act the Seller shall not be obliged to produce an Abstract of Title in respect of the said hereditaments and Purchaser agrees to look solely to the Title Company to produce same.

(d) Seller shall be entitled to one or more adjournments of the Closing for a period not to exceed sixty (60) days in the aggregate for the purpose of curing any objections to title. For purposes of this Agreement, a title objection shall be deemed cured if any reputable title insurance company licensed to do business in the Commonwealth of the Bahamas is induced to remove the item objected to from the Commitment or Purchaser's title insurance policy such that either (i) it no longer appears as an exception therein, or (ii) said title insurance company affirmatively insures Purchaser against collection or enforcement of such title objection.

(e) Notwithstanding anything to the contrary contained herein, Seller shall not be obligated to bring any action or proceeding or make any payments or otherwise incur any expenses or liability in order to eliminate any title defects to satisfy Purchaser's title objections or to obtain affirmative title insurance, except that Seller shall: (i) satisfy any mortgages, debentures and other liens, claims or judgments affecting the Property or Seller which can be satisfied by payment of a liquidated amount; (ii) pay all real property taxes for all periods prior to closing date; (iii) pay all amounts due any Governmental Authority that can become a lien against the Property in connection with the operation of the Property; and (iv) remove any encumbrances intentionally placed of record by Seller subsequent to the Effective Date (the items referred to in clauses (i), (ii) and (iii) above are referred to as the "**Required Exceptions**").

(f) The rights of Purchaser with respect to any uncured objections to title (other than Required Exceptions which Seller is required to pay-off and satisfy at or prior to Closing) which are timely made and with respect to which Seller has been properly notified shall be to either: (i) waive its prior disapproval, in which event said disapproved matters shall be deemed approved by Purchaser and the parties shall proceed to Closing and Purchaser shall accept such title as Seller may be able to convey, without any reduction of the Purchase Price or other liability on the part of Seller, or (ii) terminate this Agreement and receive a full return of the Deposit together with any Additional Deposit paid. Failure to take either one of the actions described in (i) and (ii) above shall be deemed to be Purchaser's election to take the action described in clause (i) above. If Purchaser elects to terminate this Agreement as provided in

10

clause (ii) above, then this Agreement shall automatically terminate upon receipt by Seller of written notice thereof and, except as to any rights and obligations which expressly survive the termination of this Agreement, neither party shall have any further claim against the other under this Agreement.

8. **Operation of Property Until Closing.**

(a) Prior to Closing, the Property shall be operated, managed, maintained, repaired and insured in a manner substantially consistent with historic and customary practice during the last two (2) years.

(b) Seller shall deliver to Purchaser at the Closing possession of the Property subject to the Leases then in effect and the rights of the tenants thereunder. Seller may, but shall not be obligated to, terminate any Lease under which the tenant is in default.

9. **Seller's Representations.** Seller represents and warrants to Purchaser as follows:

(a) The execution, delivery and performance of this Agreement by Seller have been duly authorized by all necessary action on the part of Seller.

(b) There are no pending or, to Seller's actual knowledge (relying strictly on information provided to Seller by the manager of the Property), threatened condemnation or eminent domain proceedings affecting the Property.

(c) To Seller's actual knowledge (relying strictly on information provided to Seller by the manager of the Property), the rent roll attached hereto as **Exhibit H** is true and correct in all material respects as of the date set forth on such rent roll and shall be updated accordingly and correct at Closing.

(d) The execution by Seller of this Agreement and the consummation by Seller of the transaction hereby contemplated does not and on the Closing Date will not to Seller's actual knowledge (i) result in a material breach of or default under any indenture, agreement, instrument or obligation to which Seller is a party, or (ii) to Seller's actual knowledge, constitute a violation in a material respect of any legal requirement.

In the event that either Seller or Purchaser becomes aware prior to Closing that any of Seller's representations or warranties set forth herein are not true on the Effective Date, or become untrue at any time thereafter but prior to Closing, Seller or Purchaser, as the case may be, shall send written notice to the other party identifying such representation or warranty that is untrue or has become untrue. Seller shall correct such untrue representation or warranty prior to the Closing Date. In the event that Seller is unable to render any such representation or warranty true and correct as of the Closing Date, Purchaser may either (i) waive Seller's breach of such untrue representation or warranty and the parties shall proceed to Closing and Purchaser shall not be entitled to recover any damages from the Seller for such breach or any reduction of the Purchase Price, or (ii) terminate this Agreement and receive a return of the Deposit together with any Additional Deposit paid hereunder. Failure to take either one of the actions described in (i) and (ii) above shall be deemed to be Purchaser's election to take the action described in clause (i)

11

above. If Purchaser elects to terminate this Agreement as provided in clause (ii) above, then this Agreement shall automatically terminate upon receipt by Seller of written notice thereof and, except as to any rights and obligations which expressly survive the termination of this Agreement, neither party shall have any further claim against the other under this Agreement. The representations and warranties contained in this Section 8 shall survive the Closing for a period not to exceed six (6) months.

10. **Purchaser's Representations.** Purchaser represents and warrants to Seller as follows:

(a) The execution and delivery of this Agreement by Purchaser and the consummation by Purchaser of the transaction contemplated by this Agreement are within the Purchaser's capacity and all requisite action has been taken to make this Agreement valid and binding on Purchaser in accordance with its terms.

(b) The execution by Purchaser of this Agreement and the consummation by Purchaser of the transaction hereby contemplated does not and on the Closing Date will not to Purchaser's actual knowledge (i) result in a material breach of or default under any indenture, agreement, instrument or obligation to which Purchaser is a party, or (ii) to Purchaser's actual knowledge, constitute a violation in a material respect of any legal requirement.

(c) Neither Purchaser nor any person or entity owning or controlling any interest in Purchaser is acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department Office of Foreign Assets Control (OFAC) as a Specifically Designated National and Blocked person, or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism.

11. **Closing Adjustments.**

(a) The following items shall be apportioned between Seller and Purchaser as of midnight on the day before the Closing Date (to the extent not ascertainable or if a reassessment is made after Closing, Seller and Purchaser shall estimate such prorations and adjustments as of the Closing, and the parties agree to work together after the Closing to promptly resolve all outstanding or continuing prorations and adjustments):

(i) All real property taxes and other taxes and charges if any, including, without limitation, assessments payable in installments, sewer taxes and rents. Apportionments of real property taxes, water rates and charges and sewer taxes and rents shall be made on the basis of the fiscal year for which assessed.

(ii) Rents and other sums, if any, as and when collected, that may be payable under the Leases that are in effect on the Closing Date. If the payment of any rents or other sums due under any such Leases is delinquent on the Closing Date, any amounts thereof received after the Closing Date shall be applied in the following order of priority: first, to rents and other sums that were due for the calendar month in which the Closing Date occurred subject to proration as hereinabove provided; then, to rents or other sums that have theretofore become due for the period following the calendar month in which the Closing Date occurred; and then, to



12

rents and other sums that were due for the period prior to the calendar month immediately preceding the calendar month in which the Closing Date occurred, until the Seller is paid in full all sums owed to Seller pursuant to such Leases. If any such amounts received by Seller or Purchaser are payable to the other party by reason of this allocation, the appropriate sum shall be promptly paid to the other party. If any of such Leases contains obligations on the part of the tenant for utility charges, rent escalation for taxes, labor, operating expenses or other factors, common area maintenance charges, insurance, or other forms of additional rent, and Seller shall have collected any portion of such charges for a period beyond the Closing Date, then the same shall be apportioned, and credit given to Purchaser for such period. If such charges have not been billed, or, if billed, have not been collected by Seller as of the Closing Date, then Purchaser shall in good faith and with due diligence bill and collect such charges, and, when the amount of such additional rent is determined and collected by Purchaser from such tenant, the same shall be apportioned as provided herein, and Purchaser shall promptly remit the same to Seller to the extent required to pay the amounts due to Seller for the period up to the Closing Date. Purchaser shall include in Purchaser's rent billing statements to tenants, for a period of one (1) year after the Closing, a statement indicating such tenant's corresponding arrearages, if any, with respect to any unpaid rents attributable to the period prior to the Closing Date. Seller may pursue collection of any such amounts that were due as of the Closing Date, provided that after the Closing, Seller shall have no right to terminate any lease or any tenant's occupancy under any lease in connection therewith. The provisions of this subparagraph 10(a)(ii) shall survive the Closing.

(iii)    Payments, if any, by Seller under the Service Contracts assumed by Purchaser.

(iv)    Utility charges, including electricity, cable and telephone (other than such charges the payment of which are the direct obligations of tenants under their respective Leases or otherwise), all prorated based upon the most current bill unless actual readings are obtained prior to the Closing Date, in which case such actual readings shall govern.

(v)    Such other items as are customarily prorated at the time of the closing of a sale in transactions similar to the transaction contemplated by this Agreement.

(b)    The Security Deposits shall not be prorated. The Security Deposits not theretofore applied to tenant obligations under the Leases shall be transferred or credited to Purchaser.

(c)    Errors in adjustments and apportionments made hereunder shall be corrected as soon as practicable after the Closing Date. The provisions of this subparagraph 11(c) shall survive the Closing for a period of one year.

(d)    With regard to the renting of Guest Rooms and the provision of other services at the Property, the parties agree that Seller shall be entitled to all of the revenue generated by such operations through and including the night before the Closing Date. Seller shall receive a credit for all accounts receivable with respect to Guest rooms then in occupancy less credit card commissions, or other similar costs to collect such revenue. There shall be no pro-rations of any other accounts receivable due and owing to Seller.

13

(e)     All accrued and unpaid obligations of Seller and its manager under its salary and employee benefits arrangements in place as of the Closing for the Accepted Employees (as hereinafter defined), including without limitation, national insurance contributions, salaries, bonuses, vacation and other similar forms of compensation ("**Employee Benefits**") up to the date of the Closing shall be assumed by Purchaser and credited to Purchaser; provided, however, any sums paid by Seller for Employee Benefits for the Accepted Employees that have not accrued as of the Closing Date, shall be prorated at the Closing.

(f)     At the Closing, Purchaser shall give Seller a credit (the "**Credit Amount**") against the net adjustments and apportionments provided in this Section 11 in favor of Purchaser, if any. If, however, the net adjustments and apportionments provided in this Section 11 are in favor of Seller, then the Credit Amount shall not be applied but rather the entire amount of the Credit Amount shall be paid by Purchaser to Seller at the Closing to reimburse or pay Seller for any closing costs incurred by Seller in connection with this Agreement, including, without limitation, Seller's legal fees (collectively, the "**Closing Costs**"), or if the net adjustments and apportionments are in favor of Purchaser but less than the Credit Amount, then the difference between the Credit Amount and the net adjustments and apportionments in favor of Purchaser shall be paid by Purchaser to Seller at the Closing to reimburse or pay Seller for the Closing Costs.

12.    **Risk of Loss.**

(a)    The Seller will from the date hereof hold the existing policy of insurance on the Property in trust for the Purchaser in case and only in the event that the purchase shall be completed in accordance with this agreement and on the Closing Date the Purchaser shall (if it wishes to maintain the existing policy of insurance) pay an apportioned part of the current premium from the date thereof.

(b)    The Seller shall deliver to the Purchaser within Fourteen (14) days from the date hereof a true copy of the Insurance contract or contracts in existence at the time upon the property.

(c)    If after the Effective Date and prior to the Closing, any condemnation, eminent domain or similar action is instituted for the taking or appropriation of all or any part of the Property or affecting the construction, development, use, ownership or operation thereof (a "**Taking**") or if the Property shall be damaged or destroyed by fire or other casualty (a "**Casualty**"), then promptly following Seller's receipt of notice or knowledge of such Taking or Casualty, Seller shall give notice to Purchaser of such fact, which notice shall set forth Seller's determination as to whether such Taking or Casualty is materially adverse to Purchaser. A Taking or Casualty shall be materially adverse to Purchaser if such Taking or Casualty results in physical damage to the Property that is in excess of US$1,500,000, as reasonably determined by Seller. If the Taking or Casualty is materially adverse to Purchaser, in Seller's sole but reasonable determination, then Purchaser shall have the option to terminate this Agreement by giving notice thereof to Seller within fifteen (15) days after the giving of notice by Seller to Purchaser of such Taking or Casualty, in which event Purchaser shall be entitled to receive a full refund of

14

the Deposit together with any Additional Deposit paid, provided Purchaser is not in default in any of its obligations under this Agreement, and all awards, proceeds and compensation for such Taking or Casualty shall be the property of Seller. Upon such termination, neither party shall have any further rights or obligations hereunder, except as set forth in the preceding sentence and except for rights and obligations that, pursuant to the provisions of this Agreement, are expressly made to survive the termination hereof and Seller alone shall be entitled to receive any and all proceeds from insurance. If Purchaser fails to notify Seller of its election to terminate this Agreement within the aforesaid fifteen (15) day period (time being of the essence), then Purchaser shall be deemed to have waived his right to terminate this Agreement by reason of such Taking or Casualty with respect to which Seller gave Purchaser notice and Purchaser alone shall be entitled to receive any and all proceeds from insurance. In the event of any Taking or Casualty that is not materially adverse to Purchaser, in Seller's sole but reasonable determination (except that actual or threatened street widenings shall be deemed immaterial for purposes hereof), or in the event of a Taking or Casualty with respect to which Purchaser does not elect to terminate this Agreement as a result thereof or has been deemed to have waived its right to terminate this Agreement as provided above, then Seller shall assign and transfer to Purchaser, without any representation or warranty by or recourse whatsoever to Seller, all of Seller's right, title and interest in, and to any sums received or to be received by Seller with respect to, all damages, settlements, awards, proceeds and compensation arising therefrom, including under Seller's casualty insurance policies (and Seller shall give Purchaser a credit at Closing in an amount equal to the deductibles under such casualty insurance policies), of whatsoever kind and nature, less amounts expended by Seller prior to Closing for repairs to the Property from the Taking or Casualty that are required by law to be made or were made by Seller to alleviate an imminent risk of damage to the Property or injury to persons, and Purchaser shall purchase the Property with no reduction in the Purchase Price on account thereof. Notwithstanding anything to the contrary stated herein, if any Casualty shall occur due to hurricane or windstorm and the deductible under the casualty insurance policies shall exceed $1,000,000, Seller shall have the right to terminate this Agreement. The provisions of this Section 11 shall survive the Closing.

13.    Escrow. The term "Escrow Agent" shall mean IDM. Escrow Agent shall hold the Deposit and any interest earned thereon pursuant to the terms and conditions of a separate escrow Agreement to be signed by the Escrow Agent, the Seller and the Purchaser.

(a)    Escrow Agent shall invest the Deposit in an interest-bearing bank account and shall not be liable for any losses suffered in connection with any such investment, except to the extent that such losses are caused by Escrow Agent's gross negligence or willful misconduct. Interest on the Deposit shall be paid to the party to which the Deposit is paid.

(b)    Subject to the provisions of subparagraph 13(c) below, the Deposit shall be the property of and shall be paid over:

(i)    to Seller, at the Closing, in accordance with the provisions hereof, or upon a default by Purchaser in any of its obligations hereunder; or

15



(ii) to Purchaser, if, prior to payment over to Seller as provided in clause (i) above, Purchaser shall be entitled to return of the Deposit pursuant to the terms and conditions of this Agreement; or

(iii) as may otherwise be provided in subparagraph 13(c) below.

(c) Except in connection with the Closing hereunder as provided below, to obtain a payment from the Deposit as provided above, a party (the "Requesting Party") shall give to Escrow Agent and to the other party, in accordance with the provisions of Section 19 hereof, a written notice that Requesting Party is entitled to payment of the Deposit as provided above. After receipt of a copy of such notice from the Requesting Party, Escrow Agent shall deliver a copy of such notice to the other party hereto, in accordance with the provisions of Section 19 hereof. If Escrow Agent does not receive a notice from the other party within seven (7) business days after Escrow Agent's delivery of such notice to such other party, then Escrow Agent shall pay over the Deposit to the Requesting Party. If, within seven (7) business days after the delivery of such notice Escrow Agent shall have received a statement from the other party that the Requesting Party is not entitled to receive the payment that the Requesting Party has requested from the Deposit pursuant to the provisions hereof, and directing Escrow Agent not to deliver to the Requesting Party the payment so requested by it from the Deposit, then Escrow Agent shall, at its sole option, either:

(i) deliver the Deposit to a court of competent jurisdiction and commence an action for interpleader, the costs thereof to be borne by Seller and Purchaser and thereupon Escrow Agent shall be released of any and all liability thereunder; or

(ii) retain the Deposit until one of the following shall have occurred:

(A) There shall have been served upon Escrow Agent an order or judgment duly entered in a court of competent jurisdiction setting forth the manner in which the Deposit is to be paid out and delivered, in which event Escrow Agent shall deliver the Deposit as set forth in such order or judgment; or

(B) The parties shall have delivered to Escrow Agent a statement executed by both of the parties setting forth the manner in which the Deposit is to be paid out and delivered, in which event Escrow Agent shall deliver the Deposit as set forth in such statement.

(d) Escrow Agent shall not be liable to either Seller or Purchaser in connection with its performance as Escrow Agent hereunder other than for its gross negligence or willful misconduct. Purchaser and Seller shall jointly and severally indemnify and hold harmless Escrow Agent from any and all claims, liabilities, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees) arising out of or in connection with the escrow, and any actions of Escrow Agent in connection therewith, other than Escrow Agent's gross negligence or willful misconduct. Seller and Purchaser shall each have the right to make a claim against the other to the extent that either Seller or Purchaser is required to indemnify and hold harmless Escrow Agent as provided above.

16

(e)     The Escrow Agent shall not have any duties or responsibilities except those set forth herein and in the Escrow Agreement and where there is a conflict between the two the latter shall prevail. The Escrow Agent shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by the Escrow Agent to be genuine, and the Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions of this Agreement has been duly authorized to do so.

14.    **Condition of Property.**

(a)     Except as otherwise set forth in this agreement, Purchaser represents, warrants and acknowledges to and agrees with Seller that Purchaser is purchasing the property in an "as-is, where-is" condition "with all faults" and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from or on behalf of Seller. Purchaser acknowledges that Seller is not and will not in any manner be liable for or bound by express or implied warranties, guaranties, promises, statements, representations or information made or furnished by any real estate broker, agent, employee, servant or any other person representing or purporting to represent Seller, except and only to the extent that the same are expressly set forth herein. Purchaser acknowledges that Purchaser has not relied, and is not relying, upon any information, document, sales brochures, rent roll or other literature, maps or sketches, projection, proforma, statement, representation, guarantee or warranty (whether express or implied, or oral or written, or material or immaterial) that may have been given by or made by or on behalf of Seller, except and only to the extent that the same is expressly set forth herein.

(b)     Purchaser hereby acknowledges that it shall not be entitled to rely, and is not relying on Seller as to (i) the quality, nature, adequacy or physical condition of the Real Property including, but not limited to, number and type of guest rooms, the age of the Improvements, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities or the electrical, mechanical, HVAC, plumbing, sewage or utility systems, facilities or appliances at the Property, presence of mold or other fungus, if any; (ii) the quality, nature, adequacy or physical condition of soils, sub-surface support or ground water at the Property; (iii) the existence, quality, nature, adequacy or physical condition of any utilities serving the Property, or access thereto; (iv) the development potential of the Property, its habitability, merchantability or fitness, suitability or adequacy of the Property for any particular purpose; (v) the zoning classification, use or other legal status of the Property; (vi) the compliance of the Property with any applicable codes, laws, regulations, statutes or ordinances (including, without limitation, any rent laws applicable to the Property), covenants, setback requirements, conditions or restrictions of any governmental or quasi-governmental entity or of any other person or entity; (vii) the quality of any labor or materials relating in any way to the Property; or (viii) the condition of title to the Property or the nature, status and extent of any right of way, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction or any other matter affecting title to the Property.

(c)     Except as otherwise set forth in this agreement, Purchaser acknowledges to and agrees with Seller that, with respect to the property, Seller has not, does not and will not make any warranties or representations, express or implied, or arising by operation of law,



17

including, but in no way limited to, any warranty of condition, merchantability, habitability or fitness for a particular use, or with respect to the value, profitability or marketability of the property.

(d) Purchaser acknowledges that seller has not, does not and will not make any representation or warranty with regard to compliance with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements including but not limited to, those pertaining to the handling, generating, treating, storing or disposing of any hazardous waste, material or substance. Without limiting the foregoing, seller does not make and has not made and specifically disclaims any representation or warranty regarding the presence or absence of any hazardous substances, as hereinafter defined, at, on, under or about the property or the compliance or non-compliance of the property with any and all applicable environmental laws of the Commonwealth of the Bahamas or any other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability or standards of conduct concerning any hazardous substances including the laws, ordinances and regulations of the Commonwealth of the Bahamas (collectively the "hazardous substance laws"). The disclaimer set forth herein shall not be affected or limited in any way by any investigation conducted by Seller or any contractor, agent or employee of Seller, or delivery by Seller to Purchaser of copies of any environmental study or report prepared by any environmental testing firm on behalf or at the direction of Seller, Purchaser or any other party. Seller has not conducted any independent investigation or verification of the contents of any such study or report, and makes no representation or warranty with respect to the accuracy or completeness of the information contained therein. For purposes of this Agreement, "**Hazardous Substance**" shall mean and include any flammable or explosive materials, petroleum or petroleum products, oil, crude oil, natural gas or synthetic gas usable for fuel, radioactive materials, asbestos, polychlorinated biphenyls (PCB's), hazardous wastes or substances or toxic wastes or substances, including, without limitation, any substances now or hereafter defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic materials" or "toxic substances" under any applicable legal requirement or any other substance deemed hazardous or subject to regulation under the laws of the Commonwealth of the Bahamas. Hazardous Substances shall also include radon gas. Purchaser further acknowledges that neither Seller, nor any broker(s), nor any agent(s) or representative(s) of Seller has provided any representation or warranty with respect to the existence of asbestos or other Hazardous Substance on the Property. Except as expressly provided for herein, Purchaser shall have no recourse or claim against Seller, any broker or any agent or representative of Seller with respect to any loss or damage claimed or suffered by any third party arising from the condition of the Property, or arising from the existence of any Hazardous Substance on the Property.

(e) Purchaser acknowledges that Purchaser has had an adequate opportunity to make such legal, factual and other inquiries and investigation as Purchaser deems necessary, desirable or appropriate with respect to the Property. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, any leases and contracts pertaining to the Property, the physical components of all portions of the Property, the existence of any wood destroying organisms on the Property, such state of facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions and regulations of the Commonwealth of the Bahamas and any political subdivisions thereof where the Property is located and the value and marketability of the Property.

18



(f)   Except as expressly provided for herein, Seller does not make and has not made and specifically disclaims any representation or warranty regarding the compliance or non-compliance of the Property with any statute, law, ordinance, code, rule, regulation, order or decree applicable to the Property, including, without limitation, any rent laws or decree of the Commonwealth of the Bahamas and any political subdivisions thereof applicable to the property.

(g)   Without in any way limiting the generality of the preceding subparagraphs (a) through (f), Purchaser specifically acknowledges and agrees that it hereby waives, releases and discharges any claim it has, might have had or may have against Seller with respect to the condition of the Property, either patent or latent, its ability or inability to obtain or maintain building permits, either temporary or final certificates of occupancy or other licenses for the use or operation of the Property, and/or certificates of compliance for the Property, the actual or potential income or profits to be derived from the Property, the real property taxes or assessments now or hereafter payable thereon, the compliance with any rent control, environmental protection, pollution or land use laws, rules, regulations or requirements, and any other state of facts which exist with respect to the Property.

(h)   The provisions of this Section 14 shall survive the termination of this Agreement and the Closing.

15.   **Default by Seller.**  If Seller defaults in consummating this Agreement for any reason other than Purchaser's default hereunder or termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy, may either (i) elect to terminate this Agreement and, to the extent such termination is due to Seller's failure to consummate this Agreement or Purchaser's termination of this Agreement pursuant to Sections 7, 9, 12, 15, or under such other provisions permitting Purchaser to terminate this Agreement, have the Deposit returned to Purchaser, or (ii) sue for specific performance of this Agreement from Seller because of such default. Purchaser shall have no right to an action for damages.

16.   **Acceptance of Deed.**  The acceptance of the Deed by Purchaser shall be deemed full compliance by Seller of all of the Seller's obligations under this Agreement except for those obligations, representations and warranties of Seller, if any, which in this Agreement or in any document delivered at the Closing are specifically stated to survive the Closing.

17.   **Default by Purchaser.**  If Purchaser shall fail to consummate this Agreement for any reason other than Seller's default hereunder or termination of this Agreement by Purchaser or Seller pursuant to a right to so act in accordance with the provisions hereof, then Seller shall be entitled to terminate this Agreement and have the Deposit paid to Seller as liquidated damages as Seller's sole and exclusive remedy. Seller shall have no right to an action for specific performance or for money damages or to any other remedy except the payment of such liquidated damage amount, unless Purchaser attempts to frustrate Seller's ability to collect the Deposit, in which case Purchaser shall be liable for all damages and costs incurred by Seller in seeking to enforce this Agreement, including attorneys fees and disbursements. The parties acknowledge that Seller's damages resulting from Purchaser's default hereunder are difficult to ascertain and agree that the amount of the Deposit represents a reasonable estimate of Seller's damages.