**Hearing Date and Time: January 11, 2012 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: January 4, 2012 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
In re                                          :
                                               :    Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :    08-13555 (JMP)
                                               :
                        Debtors.               :    (Jointly Administered)
                                               :
------------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION PURSUANT
### TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY
### CODE FOR AUTHORITY TO EXERCISE RIGHT OF FIRST OFFER
### REGARDING SECURITIES OF ARCHSTONE TRUST

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Lehman Brothers Holdings Inc., Lehman Commercial Paper Inc., Luxembourg Residential

Properties Loan Finance S.á.r.l. and their affiliated debtors in the above-referenced chapter 11

cases, as debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a) and

363(b) of title 11 of the United States Code for authorization to exercise a right of first offer and

purchase the "Transferred Securities" from affiliates of Bank of America, N.A., including Banc

of America Strategic Ventures, Inc. (together "Bank of America"), and affiliates of Barclays

Capital Real Estate Inc. ("Barclays"), all as more fully described in the Motion, will be held

before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green,

New York, New York 10004 (the "Bankruptcy Court"), on **January 11, 2012 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), and shall be filed with the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; and served upon (i) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Jacqueline Marcus, Esq., attorneys for the Debtors; (ii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., Elisabetta G. Gasparini, Esq.; and (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be so filed and received by no later than **January 4, 2012 at 4:00 p.m. (Prevailing Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: December 20, 2011
      New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                           :
                                                                :   **Chapter 11 Case No.**
                                                                :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :   **08-13555 (JMP)**
                                                                :
                      **Debtors.**                              :   **(Jointly Administered)**
                                                                :
-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY**
**CODE FOR AUTHORITY TO EXERCISE RIGHT OF FIRST OFFER**
**REGARDING SECURITIES OF ARCHSTONE TRUST**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc.

("LCPI"), Luxembourg Residential Properties Loan Finance S.á.r.l. ("Luxco") and their

affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (collectively,

the "Debtors" and, together with their non-debtor affiliates, "Lehman"), submit this motion (the

"Motion"), and respectfully represent:

**Preliminary Statement**

1.       In 2007, certain of the Debtors and their non-Debtor affiliates made

certain equity investments and loans in connection with the leveraged buyout of the publicly-

traded real estate investment trust, Archstone Trust (formerly known as Archstone Smith

Operating Trust and, together with its subsidiaries and controlled affiliates, "Archstone").  In total, the acquisition of Archstone was financed by more than $16 billion in secured financing either assumed or provided by affiliates of Lehman, affiliates of Bank of America, N.A., including Banc of America Strategic Ventures, Inc. (together "Bank of America"), and affiliates of Barclays Capital Real Estate Inc. ("Barclays," and, collectively with Lehman and Bank of America, the "Co-Sponsors") and certain third party lenders.  The Co-Sponsors invested approximately $4.8 billion in the aggregate in the common equity of Archstone, with approximately $2.4 billion attributable to the Debtors' indirect interests.  The secured financing provided by the Co-Sponsors was comprised of certain term loans, revolving loans, mezzanine loans and a development loan (the "Acquisition Financing").

2.      In January 2009, the Court authorized LBHI and LCPI to commit, along with Bank of America and Barclays (together, the "Other Co-Sponsors"), an additional aggregate amount of $485 million, plus available letters of credit, as new priority financing (the "Priority Financing") to provide Archstone with customary operating liquidity (the "Initial Modification Order") [ECF No. 2677].[1]  The majority of the Acquisition Financing and the Priority Financing was extended by the Co-Sponsors to an Archstone entity (the "Archstone Borrower") and guaranteed by the Archstone Borrower's direct and indirect parents.  As a result, such debt is primarily secured by the equity value of the Archstone Borrower rather than specific properties. As of September 30, 2010, Debtors LCPI, Luxco and their affiliates collectively held a beneficial interest in the Acquisition Financing provided to Archstone in the aggregate principal amount of

---

[1] The Priority Financing, among other things, was approved by this Court's *Order Granting The Debtors' Motion Pursuant To Sections 105(a), 363(b) And 365(a) Of The Bankruptcy Code And Bankruptcy Rules 6004 And 6006 For Authorization to (I) Assume, As Modified, Certain Loan Agreements, And (II) Consummate Related Loans to be Made by Lehman Commercial Paper Inc. and Other Lenders to Archstone*, dated January 28, 2009 [ECF No. 2677].

approximately $2.6 billion, inclusive of certain corporate loans made to Archstone (the "Cutoff Period Loans") in the aggregate principal amount of approximately $65 million.

3.    The Court approved a more comprehensive restructuring of certain of the financing provided to Archstone by the Co-Sponsors on May 25, 2010, and modifications thereto were approved on November 18, 2010.  As a part of the modified restructuring approved in November 2010, the Co-Sponsors entered into the Second Amended and Restated Bridge Equity Providers Agreement, dated as of December 1, 2010 (the "Bridge Equity Agreement").  Pursuant to the Bridge Equity Agreement, in the event that any Co-Sponsor attempts to "Transfer" [2] its interest in Archstone, including, without limitation, any of its equity or governance voting interests, the other Co-Sponsors will have a right of first offer (the "ROFO") to purchase such interests consistent with the terms of said agreement.

4.    Over the past several months the Other Co-Sponsors have been marketing their combined stake in Archstone to third parties.  In the aggregate, the Other Co-Sponsors have an approximately 53% ownership interest in Archstone.  On Friday, December 2, 2011, well after business hours, the Debtors received a notice of intent to sell interests (the "Banks' ROFO Notice") from each of Bank of America and Barclays stating that together they have entered into an agreement (the "Purchase Agreement") with ERP Operating Limited Partnership, an affiliate of Equity Residential, a Maryland real estate investment trust ("Equity Residential").

---

[2] In accordance with the Bridge Equity Agreement, a Transfer occurs if a "Partnership Interest [or] portion of any Partnership Interest (or the proceeds thereof) . . . [is] directly or indirectly, sold, transferred, assigned, distributed, contributed, pledged, hypothecated or otherwise disposed of, whether by way of transfer of contract or by exit from the Partnership of a transferring Partner and entry by a new Partner to the Partnership or by means of any swap, derivative or similar transaction . . . ."  *Amended and Restated Limited Partnership Agreement of Archstone Multifamily JV LP*, dated March 31, 2009, § 9.01, by and among the Co-Sponsors and Archstone, as amended.

5.      In essence, the Purchase Agreement provides for the Other Co-Sponsors to Transfer approximately 50% of each of their interests in Archstone (approximately 26.5% of the total Archstone ownership) comprised of equity owned, partnership interests, governance interests, membership interests and voting percentages (collectively, the "Transferred Securities") to Equity Residential.  Effectively, Equity Residential would receive a combined ownership stake of 26.5% in Archstone if the transfer contemplated by the Purchase Agreement were to close.  The aggregate purchase price for the Transferred Securities is approximately $1.325 billion, subject to certain adjustments for expenses born by the Other Co-Sponsors (the "Banks' ROFO Price").[3]  In accordance with the rights provided under the Bridge Equity Agreement, the Debtors have the right to purchase the Transferred Securities on the terms set forth in the Banks' ROFO Notice.

6.      The Debtors have concluded that the best way to maximize the value of their investment in Archstone, and to enhance flexibility with respect to an exit strategy, is for them to exercise the ROFO and pay the Banks' ROFO Price to purchase the Transferred Securities.  Accordingly, the Debtors believe that exercise of the ROFO is in their best interests. The Debtors delivered to each of the Other Co-Sponsors a non-binding writing notice indicating the Debtors' intent to exercise the ROFO on December 14, 2011.

7.      The terms of the ROFO and, consequently, the amount of the Banks' ROFO Price are the subject of an adversary proceeding commenced by LBHI, LCPI, Luxco and certain of their affiliates on December 15, 2011, adv. proceeding no. 11-02928 (JMP) (the "Adversary Proceeding").  In the Adversary Proceeding, Lehman seeks, *inter alia*, an order

---

[3] The Banks' ROFO Price will be determined in the Adversary Proceeding (as hereinafter defined).

tolling the running of the fifty (50) day period to deliver a binding election, the date for posting a

deposit and the date to close the transaction, each as set forth in the Bridge Equity Agreement,

until the Court has clarified the scope of the rights to be transferred to Lehman upon the exercise

of the ROFO.

## **Relief Requested**

8.      The Debtors seek authorization, pursuant to sections 105(a) and 363(b) of

title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), to exercise the ROFO in accordance with the

Bridge Equity Agreement, as interpreted by the Court in the Adversary Proceeding, and to pay

the Banks' ROFO Price for the purchase of the Transferred Securities.

## **Background**

9.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11

cases have been consolidated for procedural purposes only and are being jointly administered

pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

10.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

11.      On December 6, 2011, the Court entered an order [ECF No. 23023]

confirming the Modified Third Amended Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors, dated December 5, 2011 (the "Plan").  The Plan has not yet gone effective.

Consequently, the Debtors are continuing to operate as debtors in possession, as to which Court approval is required for transactions out of the ordinary course of business.[4]

## Jurisdiction

12.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Archstone

13.     Archstone specializes in multi-family residential property ownership, acquisition, development and management.  For most of 2007, Archstone was the second largest publicly-traded, multi-family real estate investment trust in the United States.  On October 5, 2007, a joint venture led by a Lehman affiliate and Tishman Speyer Real Estate Venture VII, L.P. took Archstone private through a leveraged buyout in which the Co-Sponsors provided the Acquisition Financing that they intended to resell to other investors.  The Co-Sponsors provided the Acquisition Financing according to the following proportions:  LCPI contributed approximately 47%; Bank of America contributed approximately 28%; and Barclays contributed approximately 25%.  In addition, certain of the Debtors' non-Debtor affiliates have invested approximately $2.39 billion in equity or bridge equity in Archstone.  The Debtors' stake in the various secured loans to Archstone amounted to more than $3 billion.

14.     In order to preserve the value of their debt and equity investments, and Archstone's need for additional liquidity, the Debtors modified the Archstone credit facilities pursuant to the Initial Modification Order.  In accordance with the Initial Modification Order, the Co-Sponsors and their affiliates provided, in part, an additional financing commitment to

---

[4] The Debtors reserve the right to withdraw the Motion if the Plan effective date occurs prior to the hearing on this Motion.

Archstone in an aggregate amount of up to $485 million, plus certain letters of credit, as part of the Priority Financing.  The Initial Modification Order was intended by the Co-Sponsors to provide Archstone with additional time to generate revenues through asset sales, among other things, thereby preserving the Co-Sponsors' sizeable stake in Archstone.

15.      Taking into consideration the decline in the real estate market, on May 25, 2010, the Court approved a restructuring (the "Initial Restructuring") of the investments made in Archstone by the Co-Sponsors, pursuant to the *Order Granting the Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004 and 9019 for Authorization to Restructure Certain Terms of the Archstone Credit Facilities* [ECF No. 9229].  The key terms of the Initial Restructuring involved (i) the conversion of financing provided to Archstone by the Co-Sponsors in the principal amount of approximately $5.2 billion, plus accrued interest, to classes of new equity interests entitled to a preferred return (the "New Equity Interests"), and (ii) the conversion of the Priority Financing to a new revolving credit facility with an extended maturity date (the "Revolver").

16.      On November 18, 2010, the Court authorized the Debtors to modify the Initial Restructuring [ECF No. 12894] (the "Modified Restructuring").  The Modified Restructuring essentially reflected a conversion of the Cutoff Period Loans into New Equity Interests as part of an equity conversion, which ultimately resulted in a further reduction of Archstone's indebtedness.  As a result of the Initial Restructuring and the Modified Restructuring, the Debtors either directly or indirectly own approximately $2.6 billion of face value of preferred equity of Archstone and are committed to fund up to 47% of the Revolver. Additionally, through their non-Debtor affiliates, the Debtors currently hold approximately 47% of the common equity and voting interests in Archstone.

17.     Currently, Lehman requires at least one other Co-Sponsor to effectively approve or block any decision pertaining to, among other things, acquisition of additional assets with a value less than $100 million, initiating or settling litigation, entering into any financing or refinancing for a principal amount under $250 million, making of any loan or the extension of credit, causing any of the Archstone entities to enter into any contract or incur any liability or obligation that involves more than $10 million but less than $50 million in a single transaction or series of related transactions, or the establishment, increase or reduction of any reserves by any of the Archstone entities (collectively, the "Major Matters").  Additionally, the unanimous consent of all the Co-Sponsors is required for any decisions relating to, *inter alia*, a merger, equity recapitalization, reorganization, public or private offering, consolidation, dissolution, liquidation, transfer, issuance of any guaranties, the termination or determination o the terms of employment of the chief executive officer, chief operating officer and chief financial officer of Archstone, selling or issuing any ownership interests in any Archstone subsidiary, and the formation and approval of an annual budget (collectively, the "Special Major Matters").  For all decisions that are not considered a Major Matter or Special Major Matter, Lehman needs at least Bank of America or Barclays to agree to approve or block the decision.

18.     During the late spring of 2011, the markets presented the Co-Sponsors with a potential opportunity to exit their investment in Archstone, while maximizing the value of their investment.  The Co-Sponsors initially explored a sale of all of their interests in Archstone through a mergers and acquisitions process and considered a potential initial public offering ("IPO") or a private sale.  In August 2011 Bank of America and Barclays informed the Debtors that they were no longer willing to pursue an IPO and were only interested in, and exclusively pursuing, a private sale of their interests in Archstone.  While the Co-Sponsors received three

written proposals to acquire all of their equity interests in Archstone, in the Debtors' opinion, none of the offers provided sufficient consideration for the Archstone enterprise given the range of options the Debtors believe exist for its equity interests in Archstone and because the offers contained considerable execution risks.

### The ROFO

19.    Pursuant to the Bridge Equity Agreement, a Transferring Co-Sponsor is required to provide written notice (the "ROFO Notice") to the other Co-Sponsors no less than ten (10) business days prior to effectuating the Transfer. Any such ROFO Notice must set forth all of the material terms of the proposed Transfer, including identification of the interests to be transferred, the aggregate amount of the interests to be transferred and any other economic terms relevant to such proposed Transfer.  Upon receipt of the ROFO Notice, each of the other Co-Sponsors has the right to purchase the interests on the terms set forth in the ROFO Notice. Pursuant to the Bridge Equity Agreement, the time frame for a non-Transferring Co-Sponsor to respond to the ROFO Notice depends on whether or not the Debtors' chapter 11 cases are still pending.

20.    If the Debtors' chapter 11 cases are ongoing, the Debtors, as a non-Transferring Co-Sponsor, must deliver a non-binding written notice indicating their intent to exercise their right of first offer (the "Notice of Intent to Purchase") or the mutually exclusive tag-along right within ten (10) calendar days after receipt of the ROFO Notice. [5]  If a Debtor or one of its affiliates is exercising such right, within ten (10) calendar days of sending the Notice

---

[5]  On December 5, 2011, the Debtors received correspondence from Bank of America and Barclays stating that the applicable ten (10) calendar day period under section 4.02(a) of the Bridge Equity Agreement would not commence running until December 6, 2011.  Consequently, the Debtors' notice of intent to exercise the ROFO was timely.

of Intent to Purchase it must file a motion with the Court seeking authorization to exercise its

right of first offer/tag-along right.  Finally, the non-Transferring Co-Sponsor will have to deliver

a binding notice of its decision to exercise its right of first offer and/or tag-along rights within

fifty (50) days from the receipt of the ROFO Notice and simultaneously deposit an amount equal

to five percent (5%) of the aggregate purchase price for the securities.  The non-Transferring Co-

Sponsor must consummate the transaction within the following two (2) business days.[6]  The

timeline was established to provide sufficient time for the Court to hold a hearing and decide the

motion.

21.    The time restrictions described in the Bridge Equity Agreement were

mutually agreed upon by the Co-Sponsors.  The Debtors believed that such restrictions were

reasonable in light of the fact that the Bridge Equity Agreement also requires that, with respect to

any Transfer by a Co-Sponsor, such Co-Sponsor will provide the others with reports as to

material matters and activities directly related to the marketing of the Transfer.  The Debtors

have asserted, in correspondence to Barclays and Bank of America, as well as in pleadings filed

in connection with the Adversary Proceeding, that each of Barclays and Bank of America has

failed to comply with its obligations under the Bridge Equity Agreement and that, therefore, the

Banks' ROFO Notice is defective.  *See* Complaint filed in the Adversary Proceeding (the

"Complaint"), ¶ 8.  Nevertheless, out of an abundance of caution, the Debtors seek authorization

to exercise the ROFO so they will be able to do so at the appropriate time.

---

[6] In accordance with the Bridge Equity Agreement, if the Debtors' chapter 11 cases are not pending, the non-Transferring Co-Sponsor will have to (i) deliver a written notice of intent to purchase the offered interest within five (5) business days after receipt of the ROFO Notice; (ii) execute and deliver all documentation required by the applicable agreement(s) to be delivered by an assignee for an assignment to be effective under such agreement(s) within five (5) business days after sending their notice of intent to purchase; and (iii) consummate the Transfer within two (2) business days of certain circumstances.

## The Purchase Agreement

22.    Lehman was apprised late in the evening on December 2, 2011, that

Barclays and Bank of America entered into the Purchase Agreement with Equity Residential.

Equity Residential, like Archstone, is an investment vehicle that acquires, owns, and operates

apartment properties.  Equity Residential is the largest publicly traded multi-family real estate

investment trust in the United States.  As of December 31, 2010, Equity Residential directly or

indirectly through investments in title holding entities, owned all or a portion of hundreds of

properties comprising hundreds of thousands of apartment units.  Equity Residential is, therefore,

Archstone's largest competitor.

23.    The salient terms of the Purchase Agreement are as follows:[7]

- Bank of America shall sell 50% of its approximately 28% interest in Archstone, approximately 14% in the aggregate.

- Barclays shall sell 50% of its approximately 25% interest in Archstone, approximately 12.5% in the aggregate.

- The purchase price for Bank of America's portion of the Transferred Securities with respect to the interests held by Banc of America Strategic Ventures, Inc. is calculated at an amount of cash equal to (a) $800,000 minus (b)(i) 0.016% of Banc of America Strategic Ventures, Inc.'s relevant expenses and minus (ii) 50% of any cash distribution or dividend received by Banc of America Strategic Ventures, Inc. after the date of the Purchase Agreement with respect to the equity interests held in any Archstone entity.

- The purchase price for the remainder of Bank of America's portion of the Transferred Securities is calculated as an amount of cash equal to (a) $695,694,004 minus (b)(i) 13.914% of Bank of America's expenses and minus (ii) 50% of any cash distribution or dividend received by Bank of America after the date of the Purchase Agreement with respect to the equity interests held in any Archstone entity.

---

[7] This summary is qualified in its entirety by the provisions of the Purchase Agreement.  The Purchase Agreement will control in the event that there is any inconsistency between this Motion and the Purchase Agreement.

- The purchase price for Barclays' portion of the Transferred Securities is calculated as an amount of cash equal to (a) $628,505,996 minus (b)(i) 12.570% of Barclays' expenses and minus (ii) 50% of any cash distribution or dividend received by Barclays after the date of the Purchase Agreement with respect to the equity interests held in any Archstone entity.

- The Transferred Securities will be Transferred free and clear of all liens, other than restrictions under securities laws, the Bridge Equity Agreement, the voting agreement dated as of March 31, 2009, by and among the Co-Sponsors and Archstone, and certain of the Archstone entities organizational documents.

- After June 2, 2012, either Bank of America, Barclays or Equity Residential may terminate the Purchase Agreement if the closing has not occurred as of that date.

24.    In addition to the Banks' ROFO Notice and accompanying executed Purchase Agreement, Barclays and Bank of America also delivered to the Debtors a copy of an agreement (the "Other Interest Agreement") entered into with Equity Residential on December 2, 2011, that provides Equity Residential with an option to purchase the remaining Other Co-Sponsors' interests should the Debtors exercise their ROFO in accordance with the Banks' ROFO Notice.  The salient terms of the Other Interest Agreement are as follows:[8]

- In the event that Lehman exercises its ROFO with respect to the Transferred Securities, Equity Residential is granted the option to purchase the remaining 50% of Bank of America and Barclays' interest for a purchase price, as determined by Equity Residential in its sole discretion, greater than or equal to $1.325 billion within thirty (30) days after Lehman acquires the Transferred Securities.

- Equity Residential's option to purchase the remaining 50% of the Other Co-Sponsors' interest in Archstone will also be subject to Lehman's ROFO pursuant to the Bridge Equity Agreement.[9]

---

[8] This summary is qualified in its entirety by the provisions of the Other Interest Agreement.  The Other Interest Agreement will control in the event that there is any inconsistency between this Motion and said agreement.

[9] Whether the bifurcation of Equity Residential's purchase that is contemplated by the Purchase Agreement and the Other Interest Agreement violates the Bridge Equity Agreement will be decided by the Court in the Adversary

- In the event that Equity Residential exercises the option to purchase the remaining 50% of the Other Co-Sponsors' interest in Archstone and Lehman again exercises its ROFO, Equity Residential is entitled to a break-up fee equal to (x) $1.00 for each $1.00 of the purchase price in excess of $1.325 billion up to $1.365 billion and (y) $0.50 per dollar of all purchase price amounts in excess of $1.365 billion up to $1.445 billion, subject to certain limitations.

### The Relief Requested Herein is an Appropriate Exercise of the Debtors' Business Judgment and in their Best Interests

25.     The Debtors believe that purchasing the Transferred Securities by exercising the ROFO is an appropriate exercise of the Debtors' business judgment and should be approved.  LBHI and LCPI will each form a special purpose subsidiary to take ownership of the Transferred Securities that correspond with its current stake in Archstone; LBHI will effectively acquire approximately one-quarter of the total Transferred Securities and LCPI will effectively acquire approximately three-quarters.  The Banks' ROFO Price will be allocated between LBHI and LCPI commensurate with their respective interests in Archstone.

26.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

---

Proceeding.  The Debtors' position is that the Banks' ROFO Notice should have included the rights under the Other Interest Agreement.  *See Complaint* ¶ 92.

1063, 1071 (2d Cir. 1983) (same).  Section 105 of the Bankruptcy Code provides, in pertinent

part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).

27.    It is generally understood that "[when] the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"  *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

28.    The Archstone enterprise is one of the largest assets of the Debtors'

estates.  The Debtors, after consultation with Gleacher & Company Securities, Inc.

("Gleacher"),[10] have determined that the price to be paid by Equity Residential for the

Transferred Securities reflects a substantial discount to the underlying asset value of the

Archstone enterprise.  Unlike other potential acquirors, Equity Residential, which has its own

management and operations platform, ascribes little or no value to Archstone's operating

platform.  As a result, although the Debtors do have tag-along rights under the Bridge Equity

---

[10] By application, dated November 22, 2011, the Debtors sought authority to retain Gleacher as their financial advisor, effective as of February 17, 2011 [ECF No. 22520] (the "Gleacher Application").  The Gleacher Application remains *sub judice*.

Agreement, they do not believe that exercising such tag-along rights, and selling a portion of

their Archstone interest to Equity Residential on the terms set forth in the Purchase Agreement,

is in the Debtors' best interests.  The Purchase Agreement is not an offer for 100% of the equity

interests in Archstone and, therefore, it is inappropriate to imply that the purchase price and

terms offered for 26.5% of the equity interests in Archstone would be offered for the entire

enterprise.  Nevertheless, even if the Banks' ROFO Price was extrapolated into an offer for all of

Archstone, the Debtors believe it would be inadequate.  Given the current market value for

Archstone's assets and the value of the Archstone platform, the Debtors believe that Equity

Residential's offer materially undervalues Archstone; a net asset valuation of Archstone would

suggest at least an additional $1 billion of value over the implied value for the entire Archstone

enterprise reflected by the Banks' ROFO Price.

29.     Another alternative available to the Debtors is to not act and forgo

exercising either the ROFO or the tag-along rights provided under the Bridge Equity Agreement.

Should the Debtors do nothing, Equity Residential would acquire a 26.5% interest in Archstone.

Equity Residential would have veto power over major financing and external growth decisions,

including decisions pertaining to capital allocation, which has a significant impact on the value

of the Archstone portfolio.  As a result of Equity Residential acquiring these veto rights over

most material decisions, including formation and approval of budgets, Equity Residential might

drive down the value of the Archstone enterprise.  Further, Equity Residential would have the

ability to veto any Lehman exit strategy which may result in the Debtors' interests in Archstone

being unattractive to third parties.  Consequently, if, as expected, the Debtors sell their interests

in connection with the wind-down of their estates, they might be forced to sell at a discount.

30.     Adding Equity Residential as a significant owner in Archstone could prove destructive to the value of the enterprise in other ways as well.  The Debtors expect that Equity Residential's long term goal would result in the displacement of Archstone's management team which the Debtors believe has done an excellent job managing the business through difficult times.  For example, it appears that Equity Residential's consent may be required for the Other Co-Sponsors to agree to a long term incentive plan for Archstone's management, which Lehman believes is critical to preserving and enhancing the value of Archstone.  On December 7, 2011, Lehman made a formal request that the Other Co-Sponsors approve the long term incentive plan.  Based upon public statements made by Equity Residential, it appears that Equity Residential does not believe that retention of Archstone's management is a high priority.  *See Zell's Archstone Deal Upsets Lehman Plan, Equity Residential Wants All of Firm; Lehman Prefers an IPO*, Wall St. Journal, (Dec. 5, 2011). [11]  Moreover, as an operator and competitor, Equity Residential likely will not have the requisite motivation to sell or transfer Archstone in a suitable time frame to ensure that the Debtors' interests are monetized within the near term and distributions to creditors are maximized.

31.     If the Debtors do not exercise the ROFO and Equity Residential purchases the Transferred Securities, Lehman would need the consensus of at least Barclays, Bank of America or Equity Residential in order to be in a position either to block or to effect any decision pertaining to a Major Matter.  Unanimous consent would be needed from both of the Other Co-Sponsors and Equity Residential for any decisions relating to a Special Major Matter.  For all

---

[11] Indeed, by letter dated December 13, 2011, Lehman was advised that the Other Co-Sponsors do not approve the long term incentive plan.

decisions that are not considered a Major Matter or Special Major Matter, Lehman would need at least Bank of America or Barclays to agree to approve or block the decision.

32.     Even if the Court determines in the Adversary Proceeding that Lehman's ROFO only applies to 26.5% of the equity of Archstone, exercise of the ROFO would be to Lehman's advantage.  If the Debtors exercise the ROFO in accordance with the terms set forth in the Banks' ROFO Notice, the approximate respective interests of the Co-Sponsors will be as follows:

| Entity | Approximate Ownership Interest |
|---|---|
| Lehman | 73.5% |
| Bank of America | 14% |
| Barclays | 12.5% |

33.     The change in ownership interests effected by partial exercise of the ROFO would not only enable the Debtors to realize a greater share of any increase in the value of Archstone, it will also effect a change in corporate governance matters.  The change in ownership interests resulting from the Debtors' exercise of the ROFO will result in Lehman being able to unilaterally block all Major Matters (as well as all Special Major Matters as Lehman has the right to do today).  Additionally, Lehman could unilaterally affect all actions not constituting a Major Matter or Special Matter because a majority voting interest could be accomplished with just Lehman's consent.  Although, subject to the Court's determination in the Adversary Proceeding, Lehman might still need either Bank of America or Barclays to approve Major Matters and unanimous consent to approve Special Major Matters, the Debtors will at least be able to exercise an effective veto right.

34.     Should the Court agree with the Debtors that the ROFO should include the rights under the Other Interests Agreement and approve the Debtors' exercise of the ROFO, the Debtors will have virtually full ownership of Archstone.  The Debtors would have the sole ability to approve Major Matters and Special Major Matters, and, as importantly, to make various strategic plans for maximizing the value of their investments in Archstone.

35.     The Debtors have determined, after analyzing various alternatives, that exercising the ROFO and purchasing the Transferred Securities provides the best framework for preserving their interests in Archstone.  Acquiring the Transferred Securities will (i) preserve the Debtors' ability to monetize their substantial investment in Archstone at the time and in the manner in which they deem most appropriate, and (ii) prevent an additional potentially hostile party from entering the equation and making it more difficult for the Debtors to liquidate their interests in Archstone on favorable terms as well as to approve any fundamental changes or make major decisions with respect to Archstone.[12]  By ensuring that Equity Residential does not acquire the Transferred Securities, the Debtors can avoid being forced into a contentious partnership that they believe will inevitably impair the value of Archstone.

36.     The Debtors anticipate that the vast majority of whatever estate funds are used in connection with the exercise of the ROFO will be repatriated through a combination of equity partnerships, financing structures, select asset sales, joint ventures or recapitalizations and will be available for distribution to creditors in accordance with the Plan within approximately twelve (12) months of the closing in respect of the ROFO.

---

[12]  If the Court approves the exercise of the ROFO with respect to all of the Other Co-Sponsors interests in Archstone, as well as the Debtors' engagement of Gleacher on the terms set forth in the Gleacher Application, the Debtors would likely be required to pay Gleacher a transaction fee in the amount of approximately $7.5 million.

37.    While the exercise of the ROFO may delay the distribution of a modest percentage of the cash currently held by LBHI and LCPI, the Debtors' purchase of the Transferred Securities will afford the Debtors additional time to preserve and enhance the value of their investments in Archstone and effectuate a monetization strategy that would benefit the Debtors, their estates and their creditors.

38.    For the reasons set forth above, and in light of the direct and indirect benefits inuring to the Debtors, their estates and creditors, it is indisputable that the Debtors' purchase of the Transferred Securities is a proper exercise of the Debtors' business judgment and should be granted.

### Relief Under Bankruptcy Rule 6004(h)

39.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  The Bridge Equity Agreement sets forth a strict timeline that the Debtors must comply with in order to exercise any ROFO. Pursuant to the Bridge Equity Agreement failure to exercise any ROFO within the established time frame will be deemed a waiver of that right.[13]  The ROFO is in and of itself a valuable asset and one which the Debtors do not wish to involuntarily waive or be deemed to have waived. Accordingly, the Debtors respectfully request that any order authorizing the Debtors to exercise the ROFO and purchase the Transferred Securities be effective immediately by waiving the 14-day stay.

_____

[13] In the Adversary Proceeding, the Debtors have requested that the Court stay their time to deliver the binding election notice with respect to the ROFO, to make a deposit with respect to the ROFO, and to close the purchase. *See Complaint*, ¶ 103.

## Notice

40.     No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for Bank of America; (vii) the attorneys for Barclays; (viii) the attorneys for Archstone; and (viii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635].  The Debtors submit that no other or further notice need be provided.

41.     The Debtors have conferred with the Creditors' Committee as to the relief requested by in Motion.  The Debtors have been advised that the Creditors' Committee supports the proposed exercise of the ROFO.

42.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  December 20, 2011
        New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                              :
In re                                         :    **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :    **08-13555 (JMP)**
                                              :
                     **Debtors.**             :    **(Jointly Administered)**
                                              :
-------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORITY TO EXERCISE RIGHT OF FIRST OFFER REGARDING SECURITIES OF ARCHSTONE TRUST

Upon the motion (the "Motion"),[1] of Lehman Brothers Holdings Inc., Lehman

Commercial Paper Inc., Luxembourg Residential Properties Loan Finance S.á.r.l. and their

affiliated debtors in the above-referenced chapter 11 cases, as debtors-in-possession

(collectively, the "Debtors"), pursuant to sections 105(a) and 363(b) of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for authorization to exercise a right of first offer and

purchase the Transferred Securities from affiliates of Bank of America, N.A., including Banc of

America Strategic Ventures, Inc. (together "Bank of America"), and affiliates of Barclays

Capital Real Estate Inc. ("Barclays," and together with Bank of America, the "Other Co-

Sponsors"), all as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

and consideration of the Motion and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Application having been provided in accordance with

the procedures set forth in the second amended order entered on June 17, 2010 governing case

management and administrative procedures for these cases [ECF No. 9635], on:  (i) the U.S.

Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) the attorneys for Bank of America; (vii) the attorneys for Barclays;

(viii) the attorneys for Archstone; and (ix) all parties who have requested notice in these chapter

11 cases, and it appearing that no other or further notice need be provided; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors,

their estates and their creditors, and all parties in interest and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Debtors are duly authorized, but not directed, to exercise their right of first offer in

accordance with the terms of the Bridge Equity Agreement and purchase the Transferred

Securities from the Other Co-Sponsors and to take all other actions reasonably necessary to

effectuate the acquisition of the Transferred Securities; and it is further

ORDERED that, except as expressly provided in the Motion or this Order,

nothing contained herein shall be deemed to be a waiver or the relinquishment of any rights,

claims, interests, obligations, benefits or remedies that the Debtors may have or choose to assert

on behalf of their respective estates under any provision of the Bankruptcy Code or any

applicable nonbankruptcy law, including against third parties, and the Debtors are

hereby authorized to execute such further documents to evidence these reservations; and it is

further

ORDERED that this Order shall be effective and enforceable immediately upon

entry and its provisions shall be self-executing and shall not be stayed pursuant to Bankruptcy

Rule 6004; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: January __, 2012
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE