WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO SELL EQUITY INTERESTS IN WILTON RE HOLDINGS LIMITED

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105 and 363 of title 11 of the United States Code for authority to sell the interests in Wilton Re Holdings Limited, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **January 11, 2012** at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Lori R. Fife, Esq., and Maurice Horwitz, Esq. attorneys for the Debtors; (iii) the Office of the United States Trustee for the Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta Gasparini, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq. and Dennis O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) Wilton Re Holdings Limited, 187 Danbury Road, Riverview Building, 3rd Floor, Wilton, Connecticut 06897, Attn: Mark R. Sarlitto, Esq., attorney for Wilton Re Holdings Limited, so as to be so filed and received by no later than **January 4, 2012, at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  December 21, 2011
      New York, New York

                    /s/ Lori R. Fife
                    Lori R. Fife

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re                                     :      Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :      08-13555 (JMP)
                                          :
                       Debtors.           :      (Jointly Administered)
-------------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO SECTIONS
105 AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION
TO SELL EQUITY INTERESTS IN WILTON RE HOLDINGS LIMITED**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

       Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), file this Motion and respectfully represent:

**Preliminary Statement**

       1.     Wilton Re Holdings Limited ("Wilton Re") is a reinsurance holding company.  Through its operating reinsurance subsidiaries, Wilton Re acquires life insurance risks through (i) traditional life reinsurance products and (ii) "runoff solutions."  Through its traditional life reinsurance products, Wilton Re reinsures new issues of term and permanent individual life and annuity products written in the United States.  Wilton Re's runoff solutions products are designed to provide insurers reliable, secure exits from blocks of life insurance

business that are no longer core to their businesses.  Through runoff solutions transactions, Wilton Re acquires closed blocks of business or entire companies through indemnity reinsurance and stock acquisitions.

2.       In October 2006, LBHI committed to acquire up to $300 million of Wilton Re's common stock at a per share price determined based on Wilton Re's book value per share, subject to certain adjustments, as set forth in the Amended and Restated Subscription Agreement, dated as of October 20, 2006 (the "Subscription Agreement").  Pursuant to this agreement, LBHI initially acquired an interest in Wilton Re in 2008 and invested $100 million at $52.50 per share, and an additional $78 million at $59.45 per share.  Following the commencement of LBHI's chapter 11 case, LBHI was able to negotiate improved terms for the funding of the remaining commitment.  Pursuant to Amendment No. 1 to the Subscription Agreement (the "Amendment"), the remaining commitment of approximately $122 million was effected at a per share price of $50, representing a 9% discount to, *i.e.*, 91% of, the then current adjusted book value per share.  Pursuant to this Court's order, dated January 21, 2009, ECF No. 2589 (the "Investment Order"), LBHI obtained approval from this Court to assume the Subscription Agreement, execute and deliver the Amendment, and subsequently to fund the remaining $122 million.  After investing a total of approximately $300 million, LBHI now owns 5,655,627 voting Class A common shares of Wilton Re (the "LBHI Shares"), representing approximately 25% of the outstanding shares of Wilton Re.

3.       Over the past two years, Wilton Re has accumulated considerable excess capital, but market conditions have limited its ability to identify suitable and attractive investment opportunities in which to invest this capital.  In light of the foregoing, Wilton Re initiated discussions with LBHI in September 2011 regarding the repurchase by Wilton Re of the

LBHI Shares. Wilton Re and LBHI then commenced negotiations of the purchase price for the LBHI Shares and subsequently agreed to a purchase price of $69 per share (the "Per Share Amount"), *i.e.*, $390,238,263 in aggregate proceeds to LBHI (the "Purchase Consideration"). The Per Share Amount represents 104% of Wilton Re's adjusted book value per share as of September 30, 2011 and implies 100% of Wilton Re's estimated adjusted book value per share as of December 31, 2011. In addition, the Purchase Consideration represents a 1.30x multiple of invested capital.

4.       A sale of the LBHI Shares to Wilton Re for the proposed purchase price is manifestly in the best interests of LBHI and its economic stakeholders and should be approved. As more fully explained below and in the declaration of Jack D. McCarthy Sr. dated December 21, 2011 (the "McCarthy Decl."), LBHI's interest in Wilton Re is a highly illiquid asset, the transfer of which is subject to approval by Wilton Re's Board of Directors, and certain rights of first refusal and "tag-along rights." *See* McCarthy Decl. at ¶ 7. A sale back to Wilton Re is the best and most efficient method for LBHI to maximize the value of its investment. Based on current market comparables, LBHI has concluded that it is unlikely that a better offer for LBHI's interest in Wilton Re will materialize through an alternative process.

5.       In addition, Wilton Re's offer of $69 per share is significantly above market. Insurance companies typically trade at some multiple of book value, adjusted book value and earnings. As stated in the declaration of David Descoteaux dated December 21, 2011 (the "Descoteaux Decl."), the price per share offered by Wilton for the LBHI Shares is significantly higher than the trading multiples of Reinsurance Group of America Inc. ("RGA") (the only publicly-traded U.S. life reinsurance company), and significantly above the median and mean of the trading multiples of selected publicly-traded U.S. life insurers. *See* Descoteaux

Decl. ¶ 8. This opportunity exists at this time because of Wilton Re's desire to make immediate use of its current excess capital.

6.          LBHI is willing to accept higher or better offers for the LBHI Shares up until the deadline to object to this Motion.  However, given that comparable companies are currently trading at lower multiples, it is unlikely that LBHI will identify a superior alternative to Wilton Re's current offer for the LBHI Shares, through an auction process or otherwise. Moreover, if market conditions improve or if different investment opportunities otherwise arise, LBHI believes that Wilton Re may elect to use its excess capital for other opportunities such that an offer at this price would no longer be available.  It is in LBHI's best interest to act promptly on the opportunity and the transaction negotiated between LBHI and Wilton Re.  By selling the LBHI Shares to Wilton Re, LBHI would divest itself of this highly illiquid asset and realize a substantial return on its original investment at a time when initial distributions to creditors will be made.  The proposed transaction will enable greater initial distributions to creditors, is in the best interests of LBHI and its creditors, and should be approved.

### Background

7.          Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.        On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

9.        On September 1, 2011, the Debtors filed their Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 19628 (the "Third Amended Plan"), and the Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, ECF No. 19629 (the "Disclosure Statement").  The Court approved the Disclosure Statement and voting procedures with respect to the Third Amended Plan later that day, ECF No. 19631.  On September 15, 2011, the Court entered an order approving a modification to the Disclosure Statement, ECF No. 20016.

10.       On December 5, 2011, the Debtors filed their Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 22931 (the "Plan").  On December 6, 2011, the Court entered an order confirming the Plan, ECF No. 23023.

11.       Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Disclosure Statement.

### Jurisdiction

12.       This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

**Relief Requested**

13.        Pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, LBHI seeks authority to enter into any and all agreements and consummate any and all transactions in connection with the sale of the LBHI Shares to Wilton Re pursuant to that certain Share Purchase Agreement dated as of December 20, 2011, by and between Wilton Re and LBHI (the "SPA"), attached hereto as Exhibit A.

**Wilton Re's Current Shareholders**

14.        In December 2004, Wilton Re raised $628 million of committed equity capital from various institutional investors, including Trident III (a $1.1 billion private equity fund managed by Stone Point Capital LLC), Vestar AIV Holdings A L.P., and Freidman Fleischer & Lowe Capital Partners II L.P.  LBHI subsequently invested $300 million in three stages.  Prior to the commencement of LBHI's chapter 11 case, LBHI invested $100 million at $52.50 per share, and an additional $78 million at $59.45 per share.  In January of 2009, pursuant to the Investment Order, LBHI invested an additional $122 million at $50 per share.

15.        In 2009, Wilton Re marketed an additional round of financing to more than forty (40) parties.  Ultimately, this robust financing process resulted in investment funds affiliated with Kelso & Company ("Kelso") agreeing to contribute $200 million for 15% of Wilton Re's outstanding shares.  Kelso purchased these shares for a purchase price that equated to 100% of Wilton Re's then current adjusted book value.

16.        After investing approximately $300 million, LBHI currently owns the LBHI Shares – approximately 25% of the outstanding shares of Wilton Re.  As stated, Wilton Re has offered to purchase the LBHI Shares and, after extensive and robust negotiations with Wilton Re, LBHI has agreed to sell on the terms described below.

## The Proposed Transaction[1]

17.      LBHI worked closely with its advisors in negotiating the SPA at arm's-length with Wilton Re.  Pursuant to the terms of the SPA, LBHI will sell, and Wilton Re will purchase, on the Closing Date (as defined in the SPA), the LBHI Shares for the Per Share Amount free and clear of all liens or encumbrances (except for any liens created by Wilton Re).  LBHI will sell all of its LBHI Shares for an aggregate amount equal to the Purchase Consideration.

18.      The sale of the LBHI Shares is subject to certain closing conditions, including:

> (a)      All consents, authorizations, approvals, registrations or waivers required in connection with the consummation of the transactions from the Minnesota Department of Commerce, the United States Bankruptcy Court for the Southern District of New York and the Bermuda Monetary Authority have been received and are in full force and effect; and

> (b)      Wilton Re is satisfied in its reasonable discretion with the feedback obtained from the rating agencies concerning any adverse ratings' commentary, actions or other consequences in connection with consummating the transaction.

19.      The SPA contains certain termination rights, *inter alia*, either party may terminate the SPA if the closing shall not have occurred on or before 5:00 p.m. New York time on March 31, 2012.

## The Relief Requested Is Warranted And In The Best Interests of LBHI

20.      LBHI believes, in its sound business judgment, that the sale of its interest in Wilton Re in accordance with the SPA is in LBHI's best interests and represents the best

---

[1]      This summary is qualified in its entirety by the terms set forth in the SPA and is intended to be used for information purposes only.  It shall not, in any way, affect the meaning or interpretation of the SPA, which, in the event of any conflict or inconsistency, shall govern.

means of maximizing the value of LBHI's investment in Wilton Re for the benefit of LBHI's creditors.

21.    Section 363 of the Bankruptcy Code provides, in relevant part, "that a debtor, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."    11 U.S.C. § 363(b)(1).    Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or disposition of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that the transaction be based upon the sound business judgment of the debtor.    *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).    It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."    *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).    If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."    *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).    The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.    *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).    Once a court is satisfied that there is a sound business justification for the proposed use or sale, the court must then determine whether (i) the debtor

has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See*, *e.g.*, *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

22.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See*, *e.g.*, *In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re International Wire Group, Inc., et al.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc.* (*In re Pritam Reality, Inc.*), 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met).

23.    In LBHI's business judgment, the sale of the LBHI Shares to Wilton Re pursuant to the terms of the SPA represents the optimal means for LBHI to monetize its investment in Wilton Re. As mentioned above, Wilton Re has accumulated considerable excess capital, but market conditions have limited its ability to identify suitable and attractive investment opportunities in which to invest this capital. This opportunity exists at this time because of Wilton Re's desire to make immediate use of its current excess capital. If market conditions improve or if different investment opportunities otherwise arise, LBHI believes that

Wilton Re may elect to use its excess capital for other opportunities such that a transaction with Wilton Re at this price would no longer be available. The sale of the LBHI Shares to Wilton Re for the Purchase Consideration will yield 1.30x LBHI's $300 million investment in Wilton Re. *See* McCarthy Decl. at ¶ 6. In addition, and as more fully described below, the Per Share Amount represents an attractive opportunity for LBHI, in a market environment where other means of monetizing its investment in Wilton Re are uncertain or less attractive. *See* McCarthy Decl. at ¶ 7. Notably, another significant institutional investor in Wilton Re, as well as an individual stockholder and board member, have each elected to sell their shares back to Wilton Re in connection with the repurchase of the LBHI Shares at the same Per Share Amount. For this reason alone, the sale of the LBHI Shares to Wilton Re pursuant to the SPA is manifestly in LBHI's best interests and should be approved.

24.     LBHI has consulted with Lazard to evaluate Wilton's offer. Lazard conducted a range of analyses, as more fully set forth in the Descoteaux Decl., and concluded, *inter alia*, that the price per share offered by Wilton for the LBHI Shares represents an offer that is (i) significantly higher than the trading multiples of the only publicly-traded U.S. life reinsurance company (RGA), and (ii) significantly above the median and mean of the trading multiples of other selected publicly-traded U.S. life insurers. *See* Descoteaux Decl. at ¶ 8. Based on this analysis, LBHI has concluded that the Per Share Amount negotiated by LBHI for its highly illiquid, minority stake in Wilton Re is substantially above market. In addition, in light of current market comparables, LBHI does not believe that a higher or better offer could be obtained for its minority stake in Wilton Re. *See* McCarthy Decl. at ¶ 7.

25.     LBHI also considered the relative costs and benefits of holding its investment until other options for monetizing its investment materialize, such as a strategic sale

of Wilton Re as a going concern to a third party, or an initial public offering. LBHI has no influence or governance rights related to initiating or forcing any such sale or initial public offering of Wilton Re, and therefore any such transaction would be subject to the timing and terms of the other large institutional investors. In addition, (i) in the context of a sale of Wilton Re, the most likely strategic buyers for a company such as Wilton Re are public companies that are unlikely to pay an above-market price, and (ii) in the context of an initial public offering of Wilton Re, the public company comparables currently trade at a discount to the valuation represented by the Per Share Amount. Thus, LBHI concluded that a timely sale or initial public offering of Wilton Re at a valuation higher than the Per Share Amount was unlikely to occur. Accordingly, Wilton Re's offer to purchase the LBHI Shares at the Per Share Amount constitutes an attractive opportunity for LBHI to monetize its investment today – just as LBHI prepares to make distributions to creditors – at an above-market valuation.

26.     Although LBHI will consider any higher or better offers for the LBHI Shares, LBHI has concluded that a private sale to Wilton Re is the most efficient means of maximizing the value of the LBHI Shares. Based on Wilton's book value as of September 30, 2011, the Per Share Amount equates to a slight premium to Wilton's adjusted book value per share (excluding accumulative other comprehensive income). *See* Descoteaux Decl. at ¶ 8. As stated above, the Per Share Amount represents 104% of Wilton Re's adjusted book value per share as of September 30, 2011 and implies 100% of Wilton Re's estimated adjusted book value per share as of December 31, 2011. *See* McCarthy Decl. at ¶ 7. Given the current valuation multiples of market comparables, LBHI has concluded that Wilton Re is currently the only potential buyer willing to purchase the LBHI Shares at a premium to Wilton's book value. In addition, a sale of the LBHI Shares to any party other than Wilton Re will require the approval of

Wilton Re's Board of Directors and also trigger a right of first refusal for Wilton Re and any other shareholders of Wilton Re.  This Board approval and right of first refusal, in addition to the lack of any material governance or consent rights (other than LBHI's right to appoint two of eleven current positions on Wilton Re's Board of Directors) are likely to act as significant barriers to any third-party who would already be competing with an above-market offer from Wilton Re.  *See id.*  Furthermore, any sale to a third party would trigger "tag-along" rights for the other shareholders of Wilton Re which, if and to the extent exercised, may diminish the number of shares that such third party would be required to purchase from LBHI.  The SPA requires Wilton Re to acquire 100% of the LBHI Shares without regard to whether other parties exercise their "tag-along" rights.  *See id.*

27.    For all the foregoing reasons, LBHI has concluded, in its sound business judgment, that the sale of the LBHI Shares pursuant to the terms of the SPA constitutes the optimal means of realizing maximum value from the LBHI Shares.  The proposed transaction is manifestly in the best interests of LBHI and its economic stakeholders, and should be approved.

**Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

28.    The LBHI Shares will be sold free and clear of any interest of any entity. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable nonbankruptcy law permits the sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1) – (5).  Because section 363(f) of the

Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the LBHI Shares "free and clear" of liens and interests." *See In re Dura Automotive Sys., Inc.*, 2007 Bankr. LEXIS 2764, *264 (Bankr. D. Del. Aug. 15, 2007). Although LBHI does not believe that the LBHI Shares are subject to any liens, claims or encumbrances in favor of any third-parties, LBHI believes that they satisfy one or more of the conditions set forth in section 363(f). *See* McCarthy Decl. at ¶ 9.

### The Sale of the LBHI Shares Contemplated By the SPA<br>Will Be the Product of Good Faith and Provides for Fair Consideration

29.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

30.      The proposed sale of the LBHI Shares to Wilton Re is the product of arm's-length, good faith negotiations between LBHI and Wilton Re.  Each party was represented in connection with the negotiations by independent counsel.  Accordingly, Wilton Re is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.  *See* McCarthy Decl. at ¶ 9.

### Waiver of Fourteen Day Stay

31.      Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  LBHI submits that cause exists for the Court to exercise its discretion and abrogate the 14-day stay provided for by Rule 6004(h).  The SPA presents LBHI with an exceptional opportunity to monetize its interests in Wilton Re.  It is unclear, however, how long this opportunity will remain available.  Wilton Re has approached LBHI with an offer to repurchase LBHI's shares only because of the limited business opportunities otherwise exist for Wilton Re's significant excess capital.  However, market conditions could change, and it is LBHI's understanding that Wilton Re continues to search for new business opportunities that would be preferable to a share buyback.  *See* McCarthy Decl. at ¶ 8.  This factor makes the timing of the proposed transaction particularly of the essence.

### Notice

32.      No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all other parties

entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases, ECF No. 9635. The Debtors submit that no other or further notice need be provided.

33.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  December 21, 2011
        New York, New York

                            /s/ Lori R. Fife
                            Lori R. Fife

                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York 10153
                            Telephone: (212) 310-8000
                            Facsimile: (212) 310-8007

                            Attorneys for Debtors
                            and Debtors in Possession

## EXHIBIT A

**SPA**

EXECUTION VERSION

## SHARE PURCHASE AGREEMENT

This SHARE PURCHASE AGREEMENT (this "Agreement") is dated as of December 20, 2011, by and between Wilton Re Holdings Limited, a Bermuda exempted company (the "Company") and Lehman Brothers Holdings Inc., a Delaware corporation (the "Seller").

### R E C I T A L S

WHEREAS, the Seller owns as of the date hereof 5,655,627 voting Class A Common Shares, par value US$1.00 per share ("Class A Common Shares"), of the Company (the "Seller Shares"); and

WHEREAS, on the terms and subject to the conditions of this Agreement, the Company desires to purchase from the Seller the Seller Shares, and the Seller desires to sell to the Company the Seller Shares.

NOW THEREFORE BE IT RESOLVED, in consideration of the representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, the Company and the Seller hereby agree as follows:

## ARTICLE I

## PURCHASE OF THE SELLER SHARES

1.1     Purchase of the Seller Shares.

(a)     Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Seller shall sell, transfer, convey, assign and deliver to the Company, and the Company shall purchase, acquire and accept from the Seller, in each case, in accordance with the Companies Act 1981 of Bermuda, as amended (the "Companies Act"), the Seller Shares in exchange for the payment to the Seller of US$390,238,263.00 (the "Purchase Consideration"), free and clear of any and all Liens (as hereinafter defined), except for Permitted Liens (as hereinafter defined) (the "Transaction").

(b)     The closing of the purchase of the Seller Shares (the "Closing") shall occur at 10:00 a.m., New York City time, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 on (i) the third (3rd) Business Day following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Article V and Article VI hereof (other than those conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver thereof), or (ii) such other date and time as shall be mutually agreed upon in writing by the parties, subject to the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Article V and Article VI hereof (other than those conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver thereof).    The date on which the Closing occurs shall be referred to as the "Closing Date."    "Business Day" means any day other than a Saturday or

Sunday that is not a legal holiday or a day on which banks are generally authorized or obligated by law or regulation to close in Bermuda or the City of New York.

(c)    On the Closing Date, (i) the Company shall (A) pay to the Seller in cash an amount equal to the Purchase Consideration by federal funds wire transfer to the account specified in writing by the Seller no later than two (2) Business Days prior to the Closing, and (ii) the Seller shall deliver to the Company certificate(s) representing the Seller Shares accompanied by a share transfer instrument in the form set forth in Section 12.1 of the Company's amended and restated bye-laws (the "<u>Bye-laws</u>") completed, dated and duly executed (the "<u>Transfer Instrument</u>").

## ARTICLE II

## <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

The Company represents and warrants to the Seller as of the date hereof and as of the Closing as follows:

2.1    <u>Organization</u>.    The Company is an exempted company duly organized, validly existing and in good standing under the laws of Bermuda.

2.2    <u>Power and Authorization</u>.    The Company has the right, power, capacity (legal or otherwise) and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.    The execution and delivery of this Agreement by the Company, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by the Company's board of directors (the "<u>Board</u>") and all other necessary corporate action by the Company and no other corporate actions on the part of the Company are necessary to authorize, execute and deliver this Agreement, perform its obligations hereunder or to consummate the transactions contemplated hereby.

2.3    <u>Validity</u>.    This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the Seller, constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

2.4    <u>No Violation</u>.    The execution, delivery and performance by the Company of this Agreement do not, and the consummation by the Company of the transactions contemplated hereby shall not, (a) violate or conflict with any provision of the Bye-laws or Company's memorandum of association (the "<u>Memorandum of Association</u>" and together with the Bye-laws, the "<u>Organizational Documents</u>"), (b)    subject to compliance with Section 2.5 hereof, violate any provision of any statute, law, code, ordinance, treaty, policy, judgment, order, injunction, decree, rule, consent, writ, determination, arbitration award or regulation, including the solvency requirements of the Companies Act (collectively, "<u>Laws</u>"), of or by any federal, state, foreign or other governmental or public body, agency or authority, or subdivision thereof, instrumentality, court, administrative agency, commission, official or other authority of the United States, Bermuda or any other country or any state, province, prefect, municipality,

2

locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority (collectively, "Governmental or Regulatory Entity"), applicable to the Company or any of its properties, assets or businesses or (c) violate, conflict with, result in a breach of or the loss of any benefit under, constitute (with due notice or lapse of time or both) a default under, result in the termination of or a right of termination or cancellation under, result in the creation of a Lien upon the assets of the Company under, or accelerate the performance required by or rights or obligations under, any of the terms, conditions or provisions of any contract, note, bond, lease, loan agreement, mortgage, security agreement, indenture, deed or trust, license, agreement or instrument to which the Company is a party or by which it is bound or to which any of its properties, assets or businesses is subject.

2.5    Approvals and Consents.    Except for (a) the approval of the Transaction by (i) the Minnesota Department of Commerce and (ii) the United States Bankruptcy Court for the Southern District of New York, (b) the approval of the triggering of certain voting share ownership thresholds under the Bermuda Insurance Act 1978, as amended, by certain Members (as hereinafter defined) arising out of, or relating to, the Transaction, by the Bermuda Monetary Authority and (c) compliance with, or waiver of rights under, the tag-along provisions of Section 6 of the Members Agreement (as hereinafter defined), no consents, authorizations, filings, registrations, approvals or waivers from any Governmental or Regulatory Entity or other third party that have not been previously made or obtained are required in connection with the execution and delivery of this Agreement by the Company, the consummation of the transactions contemplated hereby by the Company or the performance by the Company of its obligations hereunder.

2.6    Financial Statements.    The Company has provided copies of, or otherwise made available, to Board representatives of the Seller an unaudited United States generally accepted accounting principles ("U. S. GAAP") balance sheet of the Company and its consolidated subsidiaries as of September 30, 2011 and the related statement of operations for the nine-month period ended September 30, 2011 (collectively, the "U.S. GAAP Financial Statements").    The U.S. GAAP Financial Statements are based on the books and records of the Company, were prepared in accordance with U.S. GAAP and fairly present in all material respects the financial condition of the Company and its consolidated subsidiaries as of the date thereof and the results of operations of the Company and its consolidated subsidiaries for the period then ended (subject to normal recurring year-end adjustments and disclosures with respect to the unaudited U.S. GAAP Financial Statements).

2.7    No Other Representations or Warranties.    Except for the representations and warranties contained in this Article II, neither the Company nor any other person on behalf of the Company makes any other express or implied representation or warranty with respect to the Company or with respect to any other information provided by or on behalf of the Company regarding the transactions contemplated by this Agreement.

3

## ARTICLE III

## <u>REPRESENTATIONS AND WARRANTIES OF THE SELLER</u>

The Seller represents and warrants to the Company as of the date hereof and as of the Closing as follows:

3.1    <u>Organization</u>.    The Seller is duly organized, validly existing, and in good standing under the laws of the State of Delaware.

3.2    <u>Ownership of the Seller Shares</u>.    The Seller is the sole record, legal and beneficial owner of 5,655,627 Class A Common Shares.    The Seller has not entered into nor is it bound by any contracts, commitments, agreements, understandings or arrangements of any kind (contingent or otherwise) constituting or relating to (a) securities convertible or redeemable into, or exercisable or exchangeable for, any of the Seller Shares, (b) options, warrants or other rights to purchase or subscribe for any of the Seller Shares or (c) the issuance, sale or transfer of any of the Seller Shares, other than (i) this Agreement, (ii) the Organizational Documents, (iii) the Second Amended and Restated Members Agreement, dated as of December 4, 2009 (the "<u>Members Agreement</u>"), by and among the Company, the Seller and other members of the Company (collectively, the "<u>Members</u>"), (iv) the Second Amended and Restated Registration Rights Agreement, dated as of December 4, 2009 (the "<u>Registration Rights Agreement</u>"), by and among the Company, the Seller and the other Members and (v) the Subscription Agreement, dated as of October 20, 2006 (the "<u>Subscription Agreement</u>" and together with the Members Agreement and the Registration Rights Agreement, the "<u>Company Agreements</u>"), by and among the Company, the Seller and certain other subscribers of the Company.

3.3    <u>Title to the Seller Shares</u>.    The Seller has good and marketable title to the Seller Shares, and upon approval by the United States Bankruptcy Court for the Southern District of New York of the Transaction, the Seller shall transfer to the Company at the Closing good and marketable title to the Seller Shares free and clear of any and all liens, security interests, mortgages, rights of first refusal, agreements, limitations on voting rights, restrictions, levies, claims, pledges, equities, options, contracts, assessments, conditional sale agreements, demands, charges and other encumbrances or interests of any nature whatsoever, including voting trusts or agreements or proxies (collectively, "<u>Liens</u>"), except for any Liens created by the Company, the Organizational Documents, the Company Agreements or applicable securities Laws ("<u>Permitted Liens</u>").

3.4    <u>Power and Authorization</u>.    The Seller has the right, power, capacity (legal or otherwise) and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.    The execution and delivery of this Agreement by the Seller, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all necessary organizational action by the Seller and no other organizational actions on the part of the Seller are necessary to authorize, execute and deliver this Agreement, perform its obligations hereunder or to consummate the transactions contemplated hereby.

3.5     <u>Validity</u>.    This Agreement has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of this Agreement by the Company, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its terms.

3.6     <u>No Violation</u>.    The execution, delivery and performance by the Seller of this Agreement does not, and the consummation by the Seller of the transactions contemplated hereby shall not, (a) violate or conflict with any provision of the Seller's certificate of incorporation, by-laws or any other organizational documents, (b) violate any provision of any Laws of or by any Governmental or Regulatory Entity applicable to the Seller or any of its properties, assets or businesses or (c) violate, conflict with, result in a breach of or the loss of any benefit under, constitute (with due notice or lapse of time or both) a default under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by or rights or obligations under, any of the terms, conditions or provisions of any contract, note, bond, lease, loan agreement, mortgage, security agreement, indenture, deed or trust, license, agreement or instrument to which the Seller is a party or by which it is bound or to which any of its properties, assets or businesses is subject.

3.7     <u>Approvals and Consents</u>.    Except for the approval of (a) the Transaction by the United States Bankruptcy Court for the Southern District of New York and (b) the triggering of certain voting share ownership thresholds under the Bermuda Insurance Act 1978, as amended, by certain Members arising out of, or relating to, the Transaction, by the Bermuda Monetary Authority, no consents, authorizations, filings, registrations, approvals or waivers from any Governmental or Regulatory Entity or other third party that have not been previously made or obtained are required in connection with the execution and delivery of this Agreement by the Seller, the consummation of the transactions contemplated hereby by the Seller or the performance by the Seller of its obligations hereunder.

3.8     <u>No Other Representations or Warranties</u>.    Except for the representations and warranties contained in this Article III, neither the Seller nor any other person on behalf of the Seller makes any other express or implied representation or warranty with respect to the Seller or with respect to any other information provided by or on behalf of the Seller regarding the transactions contemplated by this Agreement.

## ARTICLE IV

## <u>COVENANTS</u>

4.1     <u>No Sale of Seller Shares</u>.    From the date hereof until the Closing or the termination of this Agreement, the Seller agrees that it shall not, directly or indirectly, transfer, convey, assign or deliver any Seller Shares, except as contemplated under this Agreement.

4.2     <u>Governmental and Regulatory Filings</u>.    The parties hereto shall use their commercially reasonable efforts to obtain as promptly as reasonably practicable any consents, authorizations, approvals, registrations or waivers required in connection with the consummation of the transactions contemplated by this Agreement.    Each of the parties hereto agrees to reasonably consult with the other party and its counsel in seeking such consents,

authorizations, approvals, registrations or waivers, including keeping the other party reasonably apprised of the status of obtaining any such consents, authorizations, approvals, registrations or waivers.    The Seller shall complete, execute and deliver to the Company prior to the Closing a Form W-9 in the form attached hereto.

4.3    <u>Rating Agencies</u>.    The Company agrees to as promptly as reasonably practicable consult with and seek feedback from the rating agencies covering the Company and any of its subsidiaries concerning any adverse ratings' commentary, actions or other consequences that may arise out of, or in connection with, the Transaction.

4.4    <u>Member Rights</u>.

(a)    Notwithstanding the provisions of the Bye-laws (including the definition of "Major Holder" therein) and the Members Agreement, the Seller shall use its commercially reasonable efforts to cause to be delivered at the Closing resignation letters (reasonably acceptable to the Company), which shall be effective at the Closing, of any Seller-designated members then serving on the Board, any board of directors of any subsidiary of the Company or any Board committee or any board of directors' committee of any subsidiary of the Company (collectively, the "<u>Resignation Letters</u>").

(b)    Following the Closing, the Seller shall cease to be a "Member" for all purposes of the Members Agreement, other than solely with respect to the following (i) the Company will continue to provide the Seller with the tax information set forth in Section 10.D of the Members Agreement for the limited purposes set forth in such Section and (ii) Seller (and the Company) shall remain obligated under Sections 12, 28 and 29 of the Members Agreement as if the Seller had remained a "Member" thereunder.

## ARTICLE V

## <u>CONDITIONS TO THE COMPANY'S OBLIGATIONS</u>

5.1    <u>Conditions to the Company's Obligations</u>.    The obligations of the Company under Section 1.1 hereof to purchase the Seller Shares from the Seller are subject to fulfillment as of the Closing of each of the following conditions unless waived by the Company in accordance with Section 7.7:

(a)    <u>No Injunctions or Restraints</u>.    No statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental or Regulatory Entity, or other legal restraint or prohibition shall be in effect preventing the purchase of the Seller Shares.

(b)    <u>Governmental or Regulatory Entity Approvals</u>.    All consents, authorizations, approvals, registrations or waivers required in connection with the consummation of the transactions contemplated hereby from the Minnesota Department of Commerce, the United States Bankruptcy Court for the Southern District of New York and the Bermuda Monetary Authority shall have been received and be in full force and effect.

6

(c)    <u>Rating Agencies</u>.    The Company shall be satisfied in its reasonable discretion with the feedback obtained from the rating agencies in connection with the matters contemplated in Section 4.3 hereof.

(d)    <u>Delivery of Certificates</u>.    The Seller shall have delivered to the Company the certificate(s) representing the Seller Shares accompanied by the Transfer Instrument.

(e)    <u>Resignation Letters</u>.    The Seller shall have delivered to the Company the Resignation Letters.

(f)    <u>Representations and Warranties</u>.    The representations and warranties of the Seller contained in Article III of this Agreement shall be true and correct in all material respects (except that the representations and warranties of the Seller contained in Section 3.2 and Section 3.3 hereof shall be true and correct in all respects), in each case, as of the date of this Agreement and at the Closing with the same effect as though such representations and warranties had been made at the Closing.

(g)    <u>Covenants</u>.    The Seller shall have performed and complied in all material respects with all agreements and covenants contained in this Agreement that are required to be performed or complied with by it at or prior to the Closing.

(h)    <u>Closing Certificate</u>.    The Company shall have received a certificate signed by an officer of the Seller to the effect that the conditions set forth in Section 5.1(f) and Section 5.1(g) have been satisfied.

## ARTICLE VI

## <u>CONDITIONS TO THE SELLER'S OBLIGATIONS</u>

6.1    <u>Conditions to the Seller's Obligations</u>.    The obligations of the Seller under Section 1.1 to sell the Seller Shares to the Company are subject to fulfillment as of the Closing of each of the following conditions unless waived by the Seller in accordance with Section 7.7:

(a)    <u>No Injunctions or Restraints</u>.    No statute, rule, regulation, executive order, decree, temporary restraining order, preliminary or permanent injunction or other order enacted, entered, promulgated, enforced or issued by any Governmental or Regulatory Entity, or other legal restraint or prohibition shall be in effect preventing the purchase of the Seller Shares.

(b)    <u>Governmental or Regulatory Entity Approvals</u>.    All consents, authorizations, approvals, registrations or waivers required in connection with the consummation of the transactions contemplated hereby from the United States Bankruptcy Court for the Southern District of New York and the Bermuda Monetary Authority shall have been received and be in full force and effect.

(c)    <u>Representations and Warranties</u>.    The representations and warranties of the Company contained in Article II of this Agreement shall be true and correct (without regard to the reference to "material" in Section 2.6 hereof) in all material respects as of the date of this Agreement and at the Closing with the same effect as though such representations and warranties had been made at the Closing; <u>provided</u> that the representations and warranties of the Company contained in Section 2.6 shall be deemed to be true and correct (without regard to the reference to "material" in Section 2.6 hereof) in all material respects unless the amounts reflected for shareholders' equity or net income on the U.S. GAAP Financial Statements are materially understated as of such date or for such period, as the case may be, on a U.S. GAAP basis).

(d)    <u>Covenants</u>.    The Company shall have performed and complied in all material respects with all agreements and covenants contained in this Agreement that are required to be performed or complied with by it at or prior to the Closing.

(e)    <u>Closing Certificate</u>.    The Seller shall have received a certificate signed by an officer of the Company to the effect that the conditions set forth in Section 6.1(c) and Section 6.1(d) have been satisfied.

**ARTICLE VII**

**<u>OTHER MATTERS</u>**

7.1    <u>Termination; Survival</u>.

(a)    This Agreement may be terminated prior to the Closing as follows:

(i)    by mutual written consent of the parties; and

(ii)    by either the Company or the Seller if the Closing shall not have occurred at or before 5:00 p.m., New York City time, on March 30, 2012.

(b)    In the event of termination of this Agreement by either party in accordance with Section 7.1(a) of this Agreement, this Agreement shall forthwith become void and have no effect, and none of the parties or any of their respective subsidiaries or affiliates shall have any liability of any nature whatsoever under this Agreement, or in connection with the transactions contemplated by this Agreement, except that Article VII (other than Section 7.5) shall survive any termination of this Agreement; <u>provided</u>, <u>however</u>, that nothing contained in this Section 7.1(b) shall relieve any party hereto from any liability for any willful and material breach of a representation or warranty or any willful and material breach of a covenant or agreement contained in this Agreement.    No termination of this Agreement shall affect the obligations of the parties contained in the Organizational Documents and the Company Agreements, all of which obligations shall survive termination of this Agreement in accordance with their terms.

(c)    In the event the Closing occurs, (i) subject to the proviso to this clause (i), the representations and warranties made in Article II and Article III hereof shall survive (notwithstanding any investigation at any time made by or on behalf of a party)

8

indefinitely or until the latest date permitted by applicable law; provided that the representations and warranties contained in Section 2.6 shall survive only until the forty-fifth (45th) day after delivery to the Seller of the audited financial statements of the Company and its consolidated subsidiaries for the fiscal year ended December 31, 2011, and (ii) the covenants and agreements contained in this Agreement that by their terms apply or are to be performed (A) in whole or in part after the Closing shall survive for the period provided in such covenants and agreements, if any, or until fully performed or (B) in their entirety at or prior to the Closing shall terminate at the Closing.   The Seller acknowledges and agrees that with respect to any breach or alleged breach of Section 2.6 hereof the Seller shall have no demand, action, claim, counterclaim or other recourse and hereby irrevocably releases the same, unless the amounts reflected for shareholders' equity or net income on the U.S. GAAP Financial Statements are materially understated as of such date or for such period, as the case may be, on a U.S. GAAP basis.

   7.2 Expenses. The Company and the Seller shall each bear their own expenses incurred in connection with this Agreement and the consummation of the transactions contemplated hereby; provided, however, that in the event of any dispute, proceeding, action, claim or litigation between the parties relating to or arising from this Agreement, the non-prevailing party, as determined by a final nonappealable order of a court of competent jurisdiction, shall pay all reasonable costs and expenses (including reasonable attorneys' fees) of the prevailing party incurred in connection with such dispute, proceeding, action, claim or litigation.

   7.3 Limitation of Liability. Notwithstanding anything to the contrary contained in this Agreement, (a) (except in the case of fraud or willful and material breach of a representation or warranty or a willful and material breach of a covenant or agreement contained in this Agreement) neither party hereto shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, or loss of business reputation or opportunity relating to the breach or alleged breach of any provision of this Agreement and (b) in no event shall a party hereto be liable to the other party hereto for losses, damages, costs, expenses, or liabilities, of any kind (including reasonable costs of investigation and attorneys' fees) in excess of the Purchase Consideration.

   7.4 Further Assurances. From time to time, at the Company's request and without further consideration, the Seller shall execute and deliver to the Company such documents and take such other action as the Company may reasonably request in order to consummate the transactions contemplated hereby, including entering into one or more written agreements (reasonably acceptable to the Seller) amending the Members Agreement and vote or consent to any amendments to the Bye-laws necessary or appropriate to effectuate the provisions of this Agreement, including Section 4.4.

   7.5 Specific Performance. Nothing herein shall be construed to prevent the Company or the Seller from enforcing, by legal action or otherwise, the terms of this Agreement. The Company and the Seller hereby declare that it is impossible to measure in money the damages that shall accrue to either party by reason of a failure to perform any of the obligations under this Agreement and agree that either party shall be entitled to a decree of specific performance of the terms of this Agreement, which right shall be in addition to any other

remedies available to such party.   If a party hereto institutes any action or proceeding to specifically enforce the provisions hereof, the other party against whom such action or proceeding is brought hereby waives the claim or defense therein that such party has an adequate remedy at law, and such party shall not offer in any such action or proceeding the claim or defense that such remedy at law exists.

7.6    No Third-Party Beneficiaries.    This Agreement is for the sole benefit of the Company and the Seller and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.7    Delays or Omissions.    It is agreed that no delay or omission to exercise any right, power or remedy accruing to either party upon any breach or default of the other party hereto shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.   It is further agreed that any waiver, permit, consent or approval of any kind or character of any breach or default under this Agreement, or any waiver of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing, and that all remedies, either under this Agreement, by law or otherwise, shall be cumulative and not alternative.

7.8    Notices.    All notices and other communications required hereunder shall be in writing and sent by e-mail, delivered personally, delivered by a recognized next-day courier service or mailed by registered or certified mail.   All such notices and communications shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

(a)    if to the Company, to:

Wilton Re Holdings Limited
187 Danbury Road
Wilton, Connecticut   06987
Attention:   Mark R. Sarlitto, Esq.
E-mail:   msarlitto@wiltonre.com

(b)    if to the Seller, to:

Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 38th Floor
New York, NY 10012
Attention:   Ashvin Rao and
                        Faruk Amin
E-mail:   ashvin.rao@lamcollc.com
                 faruk.amin@lamcollc.com

7.9    <u>Entire Agreement; Amendments</u>.    This Agreement contains the entire understanding of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings (oral or written) between the parties with respect thereto.    This Agreement may be amended only by a written instrument duly authorized, executed and delivered by each of the Company and the Seller.

7.10    <u>Assignment</u>.    Neither the Company nor the Seller shall transfer or assign this Agreement or any of its rights, interests, or obligations hereunder, in whole or in part, without the prior written consent of the other party.

7.11    <u>Headings</u>.    The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of any provision of this Agreement.

7.12    <u>Severability</u>.    The invalidity of any term or terms of this Agreement shall not affect any other term of this Agreement, which shall remain in full force and effect.

7.13    <u>Governing Law; Venue</u>.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York, without reference to any principles of conflicts of law thereof, except New York General Obligation Law Section 5-1401. Each party to this Agreement, by its execution hereof, hereby (a) irrevocably submits to the exclusive jurisdiction of the state courts of the State of New York or the United States District Court located in the Southern District of the State of New York for the purpose of any litigation or proceeding between the parties hereto arising in whole or in part under or in connection with this Agreement, (b) waives to the extent not prohibited by applicable Law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such litigation or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such litigation or proceeding brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (c) agrees not to commence any such litigation or any other type of proceeding or action other than before one of the above-named courts.    Notwithstanding the previous sentence a party may commence any litigation or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order, judgment or writ issued by one of the above-named courts.

7.14    <u>WAIVER OF JURY TRIAL</u>.    EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT.    EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO

THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.14.

7.15    Counterparts.    This Agreement may be executed simultaneously in counterparts, both of which shall be deemed an original, but all counterparts so executed shall constitute one and the same agreement.

7.16    Construction; Interpretation.    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.    Further, prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be used as an aide of construction or otherwise constitute evidence of the intent of the parties hereto; and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of such prior drafts.    The words "hereof," "hereunder," "herein," "hereby" and other words of similar import refer to this Agreement as a whole unless otherwise indicated.    Whenever the word "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation." Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate.

7.17    Public Disclosure.    The parties hereto shall not issue any press release or other public statement or communication with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, a party hereto may, without the prior written consent of the other party, issue such press release or other public statement or communication (a) as may be required by applicable Law or a Governmental or Regulatory Entity (or, in the case of Seller, if required (in the Seller's reasonable judgment) to be disclosed in connection with any bankruptcy or insolvency proceeding involving Seller or any of its current or former affiliates) and, if practicable under the circumstances, after reasonable prior consultation with the other party, or (b) to enforce its rights and remedies under this Agreement.

7.18    Non Recourse.    No past, present or future director, officer, employee, incorporator, member, partner, stockholder, affiliate, agent, attorney or representative of the Company, Seller or any of their respective affiliates shall have any liability (whether in contract or in tort) for any obligations or liabilities of the Company or the Seller arising in whole or in part under or in connection with this Agreement or for any claim based on, in respect of, or by reason of, the sale and purchase of the Seller Shares, including any alleged non-disclosure or misrepresentations made by any such persons.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

12

IN WITNESS WHEREOF, this Agreement has been duly executed on behalf of each of the parties hereto as of the day and year first above written.

WILTON RE HOLDINGS LIMITED

By: _____

        Name: Chris C. Stroup

        Title:   Chairman and Chief Executive Officer


LEHMAN BROTHERS HOLDINGS INC.


By: _____

        Name:

        Title:

IN WITNESS WHEREOF, this Agreement has been duly executed on behalf of each of the parties hereto as of the day and year first above written.

WILTON RE HOLDINGS LIMITED

By: _____
      Name: Chris C. Stroup
      Title:   Chairman and Chief Executive Officer

LEHMAN BROTHERS HOLDINGS INC.

By: _____
      Name: William J. Fox
      Title:   Executive Vice President

**<u>PROPOSED ORDER</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                              :    **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :    **08-13555 (JMP)**
                                                   :
                                Debtors.         :    **(Jointly Administered)**
------------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AUTHORIZING THE MONETIZATION OF EQUITY INTERESTS IN WILTON RE HOLDINGS LIMITED

Upon the motion, dated December 21, 2011 (the "Motion"),[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the above referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for authorization to sell the equity interests in Wilton Re Holdings Limited, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the second amended order entered June 17, 2010 governing case management and administrative procedures (ECF No. 9635); and a reasonable opportunity to object or be heard regarding the Motion having been afforded to all such parties; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors and that the legal

---

[1]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, the Debtors are authorized to take all actions contemplated by the SPA attached hereto as <u>Exhibit A</u>; and it is further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the Debtors' right, title, and interest in the LBHI Shares sold in accordance with the SPA shall be sold free and clear of any and all liens, claims, and encumbrances; and it is further

ORDERED that Wilton Re will be a good faith purchaser and is granted the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code and consummation of the this transaction shall not be affected by reversal or modification on any appeal of this Order; and it is further

ORDERED that the Debtors are authorized to, and authorized to cause their non-Debtor affiliates to, (i) provide any consents or waivers in respect of, perform all obligations and enter into any agreements contemplated by the SPA, and (ii) execute such other documents and take such other actions as may be necessary or appropriate to effectuate the SPA and the transactions contemplated thereunder or the provisions of this Order; and it is further

ORDERED that the SPA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; *provided further* that Court approval shall be required for any such modification, amendment or supplement that does have a material adverse effect on the Debtors' estates; and it is further

ORDERED that any stay imposed by Bankruptcy Rule 6004(h) is hereby waived and this Order shall be immediately effective and enforceable; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: January __, 2012
     New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE