**Page 1**

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555-jmp

5     - - - - - - - - - - - - - - - - - - - - -x

6    In the Matters of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10            Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              December 21, 2011

19              10:04 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2      Hearing re:  1. Debtors' Objection to the Claim of Wilmington

3      Trust Company as Indenture Trustee (Claim No. 10082) [ECF No.

4      20510]

5

6      Hearing re:  2. Debtors' One Hundred Thirty-Sixth Omnibus

7      Objection to Claims (Misclassified Claims) [ECF No. 16867]

8

9      Hearing re:  3. Debtors' Motion for Authorization to Implement

10     the Defense Costs Fund [ECF No. 22647]

11

12     Hearing re:  4. Application of the Debtors for Authorization to

13     Employ and Retain Gleacher & Company Securities, Inc. as

14     Financial Advisor Effective as of February 17, 2011 [ECF No.

15     22520]

16

17     Hearing re:  5. Archstone LB Syndication Partner LLC, et al. v.

18     Banc of America Strategic Ventures, Inc. et al. [Adversary Case

19     No. 11-02928] (Hearing on separate transcript)

20

21     Hearing re:  6. Motion for Sanctions [ECF No. 22817]

22

23     Hearing re:  7. Debtors' Seventy-Third Omnibus Objection to

24     Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF

25     No. 13295]

Page 3

1

2    Hearing re:  8. Debtors' One Hundred Eighteenth Omnibus

3    Objection to Claims (To Reclassify Proofs of Claim as Equity

4    Interests) [ECF No. 15666]

5

6    Hearing re:  9. Debtors' One Hundred Thirtieth Omnibus

7    Objection to Claims (To Reclassify Proofs of Claim as an Equity

8    Interest) [ECF No. 16115]

9

10   Hearing re:  10. Debtors' One Hundred Thirty-First Omnibus

11   Objection to Claims (To Reclassify Proofs of Claim as an Equity

12   Interest) [ECF No. 16116]

13

14   Hearing re:  11. Debtors' One Hundred Thirty-Third Omnibus

15   Objection to Claims (To Reclassify Proofs of Claim as an Equity

16   Interest) [ECF No. 16530]

17

18   Hearing re:  12. Debtors' One Hundred Thirty-Fourth Omnibus

19   Objection to Claims (To Reclassify Proofs of Claim as an Equity

20   Interest) [ECF No. 16532]

21

22   Hearing re:  13. Debtors' One Hundred Thirty-Fifth Omnibus

23   Objection to Claims (To Reclassify Proofs of Claim as an Equity

24   Interest) [ECF No. 16808]

25

Page 4

1

2    Hearing re:  14. Debtors' One Hundred Seventy-Sixth Omnibus

3    Objection to Claims (To Reclassify Proofs of Claim as Equity

4    Interests) [ECF No. 19392]

5

6    Hearing re:  15. Debtors' Two Hundred Seventh Omnibus Objection

7    to Claims (To Reclassify Proofs of Claim as Equity Interests)

8    [ECF No. 21083]

9

10   Hearing re:  16. Debtors' Twenty-Eighth Omnibus Objection to

11   Claims (Valued Derivative Claims) [ECF No. 9983]

12

13   Hearing re:  17. Debtors' Thirty-Fifth Omnibus Objection to

14   Claims (Valued Derivative Claims) [ECF No. 11260]

15

16   Hearing re:  18. Debtors' Fortieth Omnibus Objection to Claims

17   (Late-Filed Claims) [ECF No. 11305]

18

19   Hearing re:  19. Debtors' Forty-First Omnibus Objection to

20   Claims (Late-Filed Claims) [ECF No. 11306]

21

22   Hearing re:  20. Debtors' Forty-Second Omnibus Objection to

23   Claims (Late-Filed Lehman Programs Securities Claims) [ECF No.

24   11307]

25

Page 5

1

2    Hearing re:  21. Debtors' Forty-Third Omnibus Objection to

3    Claims (Late-Filed Lehman Programs Securities Claims) [ECF No.

4    11308]

5

6    Hearing re:  22. Debtors' Sixty-Third Omnibus Objection to

7    Claims (Valued Derivative Claims) [ECF No. 11978]

8

9    Hearing re:  23. Debtors' Sixty-Seventh Omnibus Objection to

10   Claims (Valued Derivative Claims) [ECF No. 12533]

11

12   Hearing re:  24. Debtors' Seventy-First Omnibus Objection to

13   Claims (Valued Derivative Claims) [ECF No. 13230]

14

15   Hearing re:  25. Debtors' Eighty-Fourth Omnibus Objection to

16   Claims (Valued Derivative Claims) [ECF No. 13955]

17

18   Hearing re:  26. Debtors' Eighty-Sixth Omnibus Objection to

19   Claims (No Liability Claims) [ECF No. 14440]

20

21   Hearing re:  27. Debtors' Eighty-Seventh Omnibus Objection to

22   Claims (No Liability Claims) [ECF No. 14442]

23

24   Hearing re:  28. Debtors' Eighty-Eighth Omnibus Objection to

25   Claims (No Liability Claims) [ECF No. 14450]

1

2   Hearing re:  29. Debtors' Eighty-Ninth Omnibus Objection to

3   Claims (No Liability Claims) [ECF No. 14452]

4

5   Hearing re:  30. Debtors' Ninetieth Omnibus Objection to Claims

6   (No Liability Claims) [ECF No. 14453]

7

8   Hearing re:  31. Debtors' Ninety-Second Omnibus Objection to

9   Claims (No Blocking Number LPS Claims) [ECF No. 14472]

10

11  Hearing re:  32. Debtors' Ninety-Fifth Omnibus Objection to

12  Claims (Valued Derivative Claims) [ECF No. 14490]

13

14  Hearing re:  33. Debtors' Ninety-Sixth Omnibus Objection to

15  Claims (Duplicative LPS Claims) [ECF No. 14491]

16

17  Hearing re:  34. Debtors' One Hundred Third Omnibus Objection

18  to Claims (Valued Derivative Claims) [ECF No. 15003]

19

20  Hearing re:  35. Debtors' One Hundred Tenth Omnibus Objection

21  to Claims (Pension Claims) [ECF No. 15010]

22

23  Hearing re:  36. Debtors' One Hundred Eleventh Omnibus

24  Objection to Claims (No Liability Claims) [ECF No. 15012]

25

Page 7

1

2    Hearing re:  37. Debtors' One Hundred Twelfth Omnibus Objection

3    to Claims (Invalid Blocking Number LPS Claims) [ECF No. 15014]

4

5    Hearing re:  38. Debtors' One Hundred Seventeenth Omnibus

6    Objection to Claims (No Liability Non-Debtor Employee Claims)

7    [ECF No. 15363]

8

9    Hearing re:  39. Debtors' One Hundred Twentieth Omnibus

10   Objection to Claims (No Blocking Number LPS Claims) [ECF No.

11   16074]

12

13   Hearing re:  40. Debtors' One Hundred Twenty-First Omnibus

14   Objection to Claims (To Reclassify Proofs of Claim as an Equity

15   Interest) [ECF No. 16075]

16

17   Hearing re:  41. Debtors' One Hundred Twenty-Second Omnibus

18   Objection to Claims (No Liability Claims) [ECF No. 16046]

19

20   Hearing re:  42. Debtors' One Hundred Twenty-Ninth Omnibus

21   Objection to Claims (No Liability Derivatives Claims) [ECF No.

22   16114]

23

24   Hearing re:  43. Debtors' One Hundred Thirty-Seventh Omnibus

25   Objection to Claims (Valued Derivative Claims) [ECF No. 16860]

1

2      Hearing re:  44. Debtors' One Hundred Thirty-Eighth Omnibus

3      Objection to Claims (No Liability Derivatives Claims) [ECF No.

4      16865]

5

6      Hearing re:  45. Debtors' One Hundred Fortieth Omnibus

7      Objection to Claims (Duplicative of Indenture Trustee Claims)

8      [ECF No. 16853]

9

10     Hearing re:  46. Debtors' One Hundred Forty-Third Omnibus

11     Objection to Claims (Late-Filed Claims) [ECF No. 16856]

12

13     Hearing re:  47. Debtors' One Hundred Fifty-First Omnibus

14     Objection to Claims (No Liability Claims) [ECF No. 17478]

15

16     Hearing re:  48. Debtors' One Hundred Fifty-Fifth Omnibus

17     Objection to Claims (Valued Derivative Claims) [ECF No. 17468]

18

19     Hearing re:  49. Debtors' One Hundred Fifty-Sixth Omnibus

20     Objection to Claims (No Liability Derivatives Claims) [ECF No.

21     17469]

22

23     Hearing re:  50. Debtors' One Hundred Fifty-Eighth Omnibus

24     Objection to Claims (Late-Filed Claims) [ECF No. 18399]

25

1

2    Hearing re:  51. Debtors' One Hundred Fifty-Ninth Omnibus

3    Objection to Claims (Invalid Blocking Number LPS Claims) [ECF

4    No. 18407]

5

6    Hearing re:  52. Debtors' One Hundred Sixtieth Omnibus

7    Objection to Claims (Settled Derivatives Claims) [ECF No.

8    18444]

9

10   Hearing re:  53. Debtors' One Hundred Sixty-Second Omnibus

11   Objection to Claims (Valued Derivative Claims) [ECF No. 18405]

12

13   Hearing re:  54. Debtors' One Hundred Seventy-Third Omnibus

14   Objection to Claims (No Liability Employee Claims) [ECF No.

15   19399]

16

17   Hearing re:  55. Debtors' One Hundred Seventy-Fourth Omnibus

18   Objection to Claims (To Reclassify Proofs of Claim as Equity

19   Interests) [ECF No. 19390]

20

21   Hearing re:  56. Debtors' One Hundred Seventy-Fifth Omnibus

22   Objection to Claims (No Liability Pension Claims) [ECF No.

23   19391]

24

25

Page 10

1

2    Hearing re:  57. Debtors' One Hundred Seventy-Seventh Omnibus

3    Objection to Claims (No Liability Non-Debtor Employee Claims)

4    [ECF No. 19393]

5

6    Hearing re:  58. Debtors' One Hundred Seventy-Eighth Omnibus

7    Objection to Claims (Misclassified Claims) [ECF No. 19377]

8

9    Hearing re:  59. Debtors' One Hundred Seventy-Ninth Omnibus

10   Objection to Claims (No Liability Derivatives Claims) [ECF No.

11   19378]

12

13   Hearing re:  60. Debtors' One Hundred Eightieth Omnibus

14   Objection to Claims (Invalid Blocking Number LPS Claims) [ECF

15   No. 19396]

16

17   Hearing re:  61. Debtors' One Hundred Eighty-Second Omnibus

18   Objection to Claims (Valued Derivative Claims) [ECF No. 19398]

19

20   Hearing re:  62. Debtors' One Hundred Eighty-Fifth Omnibus

21   Objection to Claims (Compound Claims) [ECF No. 19714]

22

23   Hearing re:  63. Debtors' One Hundred Eighty-Sixth Omnibus

24   Objection to Claims (Misclassified Claims) [ECF No. 19816]

25

1

2    Hearing re:  64. Debtors' One Hundred Eighty-Seventh Omnibus

3    Objection to Claims (Misclassified Claims) [ECF No. 19817]

4

5    Hearing re:  65. Debtors' One Hundred Eighty-Eighth Omnibus

6    Objection to Claims (Duplicative LPS Claims) [ECF No. 19871]

7

8    Hearing re:  66. Debtors' One Hundred Eighty-Ninth Omnibus

9    Objection to Claims (No Liability Repo Claims) [ECF No. 19870]

10

11   Hearing re:  67. Debtors' One Hundred Ninetieth Omnibus

12   Objection to Claims (No Liability Security Claims) [ECF No.

13   19873]

14

15   Hearing re:  68. Debtors' One Hundred Ninety-First Omnibus

16   Objection to Claims (Valued Derivative Claims) [ECF No. 19888]

17

18   Hearing re:  69. Debtors' One Hundred Ninety-Second Omnibus

19   Objection to Claims (Partially Settled Guarantee Claims) [ECF

20   No. 19875]

21

22   Hearing re:  70. Debtors' One Hundred Ninety-Eighth Omnibus

23   Objection to Claims (Late-Filed Claims) [ECF No. 19902]

24

25

1

2   Hearing re:  71. Debtors' One Hundred Ninety-Ninth Omnibus

3   Objection to Claims (No Liability Claims) [ECF No. 19903]

4

5   Hearing re:  72. Debtors' Two Hundredth Omnibus Objection to

6   Claims (No Liability Claims) [ECF No. 19921]

7

8   Hearing re:  73. Debtors' Two Hundred Fifth Omnibus Objection

9   to Claims (Insufficient Documentation Claims) [ECF No. 19936]

10

11  Hearing re:  74. Debtors' Two Hundred Ninth Omnibus Objection

12  to Portions of Claim Nos. 29883 and 29879 Filed by Citibank,

13  N.A. and Citigroup Global Markets, Inc. [ECF No. 20030]

14

15  Hearing re:  75. Debtors' Two Hundred Nineteenth Omnibus

16  Objection to Claims (Valued Derivative Claims) [ECF No. 20787]

17

18  Hearing re:  76. Debtors' Two Hundred Twenty-First Omnibus

19  Objection to Claims (Duplicative of Indenture Trustee Claims)

20   [ECF No. 20860]

21

22  Hearing re:  77. Debtors' Two Hundred Twenty-Fourth Omnibus

23  Objection to Claims (Late-Filed Claims) [ECF No. 20864]

24

25

Page 13

1

2    Hearing re:  78. Debtors' Two Hundred Twenty-Eighth Omnibus

3    Objection to Claims (No Liability Derivatives Claims) [ECF No.

4    20886]

5

6    Hearing re:  79. Debtors' Two Hundred Thirty-Second Omnibus

7    Objection to Claims (Valued Derivative Claims) [ECF No. 21727]

8

9    Hearing re:  80. Debtors' Objection to Proof of Claim No. 66099

10   Filed by Syncora Guarantee, Inc. [ECF No. 20087]

11

12   Hearing re:  81. Debtors' Objection to Proof of Claim Number

13   29702 [ECF No. 20100]

14

15   Hearing re:  82. Cathay United Bank's Response in Opposition to

16   Debtors' Fortieth Omnibus Objection to Claims (Late-Filed

17   Claims) as to Claim No. 35181 and Motion to Have Claim No.

18   35181 Deemed Timely Filed [ECF No. 12037]

19

20   Hearing re:  83. Motion of Pearl Assurance Limited to Deem

21   Proofs of Claim to Be Timely Filed [ECF No. 12072]

22

23   Hearing re:  84. Motion of Pictet & Cie and Bank Julius Baer &

24   Co. Ltd. to Enlarge the Time Period for the Filing of Claim

25   Number 64249 By One Day [ECF No. 21979]

1

2    Hearing re:  85. Motion of Robert Franz Pursuant to Fed. R.

3    Bankr. P. 9024 Incorporating By Reference Fed. R. Civ. P.

4    60(b), and Section 105(a) of the Bankruptcy Code for

5    Reconsideration and Reinstatement of Proof of Claim [ECF No.

6    22665]

7

8    Hearing re:  86. Motion of Caisse Des Dépôts Et Consignations

9    to Permit a Late-Filed Claim Against Lehman Brothers Special

10   Financing Inc. [ECF No. 18039]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Hana Copperman

1

2  A P P E A R A N C E S :

3  WEIL, GOTSHAL & MANGES LLP

4       Attorneys for Debtor

5       767 Fifth Avenue

6       New York, NY 10153

7

8  BY:   MARK BERNSTEIN, ESQ.

9        RICHARD P. KRASNOW, ESQ.

10       RICHARD LEVINE, ESQ.

11       CHRISTINA M. MANTHEI, ESQ.

12       JACQUELINE MARCUS, ESQ.

13

14

15  O'MELVENY & MYERS LLP

16       Attorneys for Olivant Investments Switzerland SA

17       Times Square Tower

18       7 Times Square

19       New York, NY 10036

20

21  BY:   DANIEL S. SHAMAH, ESQ.

22

23

24

25

Page 16

1    OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP

2         Attorneys for Christiane Schuster

3         Park Avenue Tower

4         65 East 55th Street

5         New York, NY 10022

6

7    BY:   JORDANNA L. NADRITCH, ESQ.

8

9

10   QUINN EMANUEL URQUHART & SULLIVAN, LLP

11        Special Counsel to Creditors' Committee

12        51 Madison Ave

13        22nd Floor

14        New York, NY 10010

15

16   BY:   JAMES C. TECCE, ESQ.

17

18

19   DECHERT LLP

20        Attorneys for LBHI Outside Directors

21        1095 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   ADAM J. WASSERMAN, ESQ.

25

Page 17

1

2   ORRICK, HERRINGTON & SUTCLIFFE LLP

3        Attorneys for Barclays

4        51 West 52nd Street

5        New York, NY 10019-6142

6

7   BY:   JOSEPH J. FRANK, ESQ.

8

9   GOODWIN PROCTER LLP

10        Attorneys for Gleacher & Company Securities, Inc.

11        The New York Times Building

12        620 Eighth Avenue

13        New York, NY 10018

14

15   BY:   EMANUEL C. GRILLO, ESQ.

16        BRIAN W. HARVEY, ESQ.

17

18

19   COVINGTON & BURLING LLP

20        Attorneys for Wilmington Trust Company

21        The New York Times Building

22        620 Eighth Avenue

23        New York, NY 10018-1405

24

25   BY:   SUSAN POWER JOHNSTON, ESQ.

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Bank of America

4         2000 Pennsylvania Avenue, NW

5         Washington, DC 20006

6

7   BY:   LAWRENCE B. FRIEDMAN, ESQ.

8         DAVID H. HERRINGTON, ESQ.

9         BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

10

11  THE MICHAELSON LAW FIRM

12         Attorneys for W. Brian Monahan

13         11 Broadway

14         Suite 615

15         New York, NY 10004

16

17  BY:   ROBERT N. MICHAELSON, ESQ.

18

19  DICONZA TRAURIG & MAGALIFF LLP

20         Attorneys for Roger Saks

21         630 Third Avenue

22         7th Floor

23         New York, NY 10017

24

25  BY:   HOWARD P. MAGALIFF, ESQ.

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         One Chase Manhattan Plaza

5         New York, NY 10005

6

7    BY:   DENNIS C. O'DONNELL, ESQ.

8          BRAD FRIEDMAN, ESQ.

9

10

11   SEWARD & KISSEL LLP

12        Attorneys for the Counterparty

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   JACK YOSKOWITZ, ESQ.

17

18

19   WOLLMUTH MAHER & DEUTSCH LLP

20        Special Counsel to the Debtors

21        500 Fifth Avenue

22        New York, NY 10110-0002

23

24   BY: PAUL R. DEFILIPPO, ESQ.

25

Page 20

1

2   TOFEL AND PARTNERS, LLP

3        Attorneys for Charles Diccianni

4        800 Third Avenue

5        New York, NY 10022

6

7   BY:   LAWRENCE TOFEL, ESQ.

8

9

10  LAW OFFICES OF LISA M. SOLOMON

11       Attorneys for Gordon Sweely, Vincent Primiano,

12       Riccardo Banchetti, Giancarlo Sarrone, Harsh Shah,

13       Philippe Dufournie, Charles Spero and Tim Burke

14       305 Madison Avenue

15       Suite 4700

16       New York, NY 10165

17

18  BY:   LISA M. SOLOMON, ESQ.

19

20

21

22

23

24

25

Page 21

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:   SUSAN D. GOLDEN, ESQ.

9

10

11   KAPLAN LANDAU LLP

12        Attorneys for Nine Managing Directors of Neuberger Berman

13        1065 Avenue of the Americas

14        27th Floor

15        New York, NY 10018

16   BY:   EUGENE NEAL KAPLAN, ESQ.

17

18

19   NEUBERGER BERMAN LLC

20        605 Third Avenue

21        36th Floor

22        New York, NY 10158

23

24   BY:   NIKKI A. MARSHALL

25

Page 22

1

2  VINSON & ELKINS LLP

3          Attorneys for Lisa Marcus

4          666 Fifth Avenue

5          26th Floor

6          New York, NY 10103

7

8  BY:   STEVEN M. ABRAMOWITZ, ESQ.

9

10

11  STAMELL & SCHAGER LLP

12          Attorneys for Michael K. McCully

13          One Liberty Plaza

14          35th Floor

15          New York, NY 10006

16

17  BY:   RICHARD J. SCHAGER, ESQ.

18

19  WILMINGTON TRUST COMPANY

20          Trustee, for the Senior Noteholders

21          50 South Sixth Street

22          Suite 1290

23          Minneapolis, MN 55402-1544

24

25  BY:   JULIE BECKER (TELEPHONICALLY)

Page 23

1

2    LAW OFFICE OF A. JAMES BOYAJIAN

3         Attorneys for Creditor Jeffery K. Wardell

4         355 S. Grand Avenue

5         Suite 2450

6         Los Angeles, CA 90071

7

8    BY:   A. JAMES BOYAJIAN, ESQ. (TELEPHONICALLY)

9

10

11   FARALLON CAPITAL MANAGEMENT, L.L.C.

12        One Maritime Plaza

13        Suite 2100

14        San Francisco, CA 94111

15

16   BY:   ANATOLY BUSHLER, ESQ. (TELEPHONICALLY)

17

18

19   DAY PITNEY, LLP

20        Attorneys for Creditor Fabio Liotti

21        One International Place

22        Boston, MA 02110

23

24   BY:   DANIEL CARRAGHER, ESQ. (TELEPHONICALLY)

25

Page 24

1

2   STUTMAN TREISTER & GLATT

3        Attorneys for The Baupost Group, Perry Capital and

4        Elliott Management

5        1901 Avenue of the Stars

6        12th Floor

7        Los Angeles, CA 90067

8

9   BY:   GABRIEL GLAZER, ESQ. (TELEPHONICALLY)

10        MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

11

12   MCCARTHY, JOHNSON & MILLER

13        Attorneys for California Winery Workers Trust Fund

14        595 Market Street

15        Suite 2200

16        San Francisco, CA 94105

17

18   BY:   ANA HALLMON, ESQ. (TELEPHONICALLY)

19

20   REED SMITH LLP

21        Attorneys for Bank of New York

22        225 Fifth Avenue

23        Pittsburgh, PA 15222

24

25   BY:   ERIC A. SCHAFFER, ESQ. (TELEPHONICALLY)

Page 25

1

2    KING STREET CAPITAL MANAGEMENT

3    BY:   MITCHELL SOCKETT, ESQ. (TELEPHONICALLY)

4

5    MONARD - D'HULST HASSELT

6          Attorneys for Roger VanDebroek

7          Gouverneur Roppesingel 131

8          3500 Hasselt

9          The Netherlands

10

11   BY:   THOMAS VANDERSMISSEN, ESQ. (TELEPHONICALLY)

12

13

14   ALSO APPEARING:

15         PAUL NIGEL SHOTTON, PARTY PRO SE

16         DARIAN COHEN, PARTY PRO SE (TELEPHONICALLY)

17         CYNTHIA FLACKMAN, PARTY PRO SE

18         MICHAEL GRAN, PARTY PRO SE

19         RANDALL HUTON, PARTY PRO SE

20         LARS P. JACOBSON, PARTY PRO SE (TELEPHONICALLY)

21         TAL LEV ARI, PARTY PRO SE (TELEPHONICALLY)

22         ARTHUR KENNEY, PARTY PRO SE

23         RODNEY PLASKETT, PARTY PRO SE

24

25

Page 26

1                         P R O C E E D I N G S

2              THE COURT:  Be seated.  Good morning.

3              MR. BERNSTEIN:  Good morning, Your Honor.  Mark

4    Bernstein from Weil, Gotshal & Manges on behalf of Lehman

5    Brothers Holdings Inc. and its affiliated Chapter 11 debtors.

6    We're here today for what was initially scheduled as a claims

7    hearing, but, as you can tell from the crowd, there's a few

8    other matters on.  It turned into a little bit more than just

9    that.

10             However, the first two items on the agenda are

11   uncontested claims matters which I'll be handling and then turn

12   the podium over to some of my colleagues.  The first item on

13   the agenda is the debtors' objection to reduce and allow the

14   claim of Wilmington Trust Company, which was initially heard at

15   the November 30th claims hearing.  The order was granted with

16   respect to the nonstructured securities claims, and Your Honor

17   had asked for additional information and a declaration be filed

18   related to the structured securities claims and the notice that

19   had been provided to the holders regarding the injunction that

20   Wilmington had requested be included in the order.

21             Wilmington did file a declaration including that

22   notice, which specifically notified the holders of that

23   requested protection.  Wilmington's counsel is here today if

24   Your Honor has any further questions on that matter.  If not we

25   respectfully request that be granted on an uncontested basis.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 27

1        THE COURT:  It will be granted on an uncontested

2   basis.  I've reviewed the declaration of Julie Becker and it

3   satisfies all of my questions from November 30.

4        MR. BERNSTEIN:  Thank you, Your Honor.  The second

5   item on the agenda is a carryover item from a prior hearing as

6   well.  This is to the debtors' one hundred thirty-sixth omnibus

7   objection, which seeks to reclassify certain claims that were

8   filed as secured as unsecured.  These claims generally were

9   filed as secured in order for the parties to reserve their

10  rights of setoff that they might have in the future.  We're

11  going forward today with respect to two claims, one the claim

12  of Xanadu Holdings, for which we had extended the objection

13  deadline.  That party has not filed their response.  Their

14  deadline has expired.  And the claim of Olivant Investments

15  Switzerland, who did file a response to the objection.

16  However, their response merely reserves their right to assert

17  that any property is not property of the estate.  They're not

18  objecting to the reclassification of their claim as unsecured,

19  and, as a result, we're seeking to go forward on an uncontested

20  basis and have those two claims reclassified as unsecured and

21  respectfully request Your Honor grant that.

22       THE COURT:  I think counsel wishes to comment.

23       MR. SHAMAH:  Your Honor, Daniel Shamah on behalf of

24  Olivant Investments Switzerland SA.  I just wanted to note my

25  appearance.  We did file a reservation of rights.  It's not on

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 28

1    the agenda, but counsel's description of that reservation is

2    accurate and we do not have any opposition to the relief

3    requested.

4          THE COURT:  Fine.  That is granted on an uncontested

5    basis.

6          MR. BERNSTEIN:  Thank you, Your Honor.  At this point

7    I will cede the podium to Mr. Krasnow to handle the next item.

8          MR. KRASNOW:  Good morning, Your Honor.  Richard

9    Krasnow, Weil, Gotshal & Manges, on behalf of the debtors.

10   Your Honor, the next item on the agenda is item number 3, which

11   is the debtors' motion for authorization to implement the

12   Defense Costs Fund that appears on docket number 22647.  Your

13   Honor, pursuant to this motion the debtors seek authority to

14   use up to, but no more than, two million dollars to provide

15   funding to current directors and one current employee of LAMCO

16   with respect to defense costs that they might incur in

17   connection with pending actions that relate to pre-petition

18   acts as to which, while the debtors are not named in those

19   proceedings, claims have been asserted against the debtors in

20   proofs of claim, either by the plaintiffs or by the defendants

21   in indemnity claims in amounts which -- asserted amounts which

22   are in the hundreds of millions of dollars.

23         Your Honor, the debtors have set forth, both in the

24   motion and in a reply to an objection, the only objection that

25   was filed to the motion, an objection filed by the creditors'

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 29 of 130

Page 29

1   committee as to the business reasons why they believe the

2   establishment of this fund, and it's not a fund, per se, we're

3   just making two million dollars available, is warranted.   In

4   respect of that objection, Your Honor, subsequent to the filing

5   of the objection we engaged in discussions with the creditors'

6   committee and facilitated a resolution of the committee's

7   objections, facilitated based on discussions we had with the

8   respective counsel for the current directors and the current

9   employee of LAMCO.  That resolution, Your Honor, is set forth

10   in a revised order that we filed with the Court yesterday in

11   both clean and blackline formats, and, if I may, Your Honor,

12   just set forth what that resolution is.

13          It's really twofold, Your Honor.  The order makes it

14   clear, or proposed order makes it clear that this two million

15   dollar fund, if you will, will not be replenished, so once

16   exhausted there will be no further funding from the debtors.

17   Secondly, the individuals who would benefit from the

18   establishment of this fund have agreed that to the extent that

19   any of their indemnification claims are allowed their

20   distribution entitlements in respect of those claims would be

21   reduced on a dollar for dollar basis based upon that portion of

22   the two million dollars, if any, which is actually advanced to

23   them or their counsel.  It's our understanding that based upon

24   those resolutions the committee is prepared to withdraw its

25   objection, and assuming that counsel confirms that we would

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 30

1    respectfully request that for the reasons set forth in the

2    motion and in our reply that the relief be granted.

3           Your Honor, unless the Court has any questions perhaps

4    it would make sense to simply turn the podium over to committee

5    counsel.

6           THE COURT:  That's fine.  I'll hear from the

7    committee.

8           MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

9    Tweed, Hadley & McCloy, on behalf of the official committee.

10   Your Honor, Mr. Krasnow's recital of where we are is correct.

11   We did file an objection to the relief requested in the motion,

12   because we do have a long history with this issue in terms of

13   insurance coverage, tail coverage in two instances where the

14   directors and then the approval of the legal defense cost

15   motion back in June.  We thought the circumstances were

16   different there.  We thought the debtors' business judgment was

17   different there.  Here we continued to believe that there was

18   no legal right as originally presented to this type of

19   entitlement for the directors and question the debtors'

20   business judgment.

21          The discussions that Mr. Krasnow alluded to resulted

22   in modifications to the relief being granted, which we think

23   largely address our concerns in terms of the dollar for dollar

24   reduction of any claims that the directors may have on

25   indemnification claims, which would bring the distributions to

Page 31

 1    them closer to those that are being made to all other unsecured

 2    creditors and the commitment that there will be no

 3    replenishment of this fund.

 4          So with those changes we are prepared to withdraw our

 5    objection.

 6          THE COURT:  And you are, in fact, withdrawing the

 7    objection.

 8          MR. O'DONNELL:  We are, in fact, withdrawing our

 9    objection, yes.

10          THE COURT:  Great.  This is approved now as an

11    uncontested matter.  I've reviewed the modified order, which

12    reflects the adjustments just described, and I am pleased that

13    this has been resolved, because this really represented one of

14    the very few times in my recollection that the creditors'

15    committee and the debtor were at odds.

16          MR. KRASNOW:  Yes, Your Honor.  We appreciate the fact

17    that the committee worked with us in resolving this in the

18    manner described.

19          THE COURT:  Okay.  Fine.  It's approved.

20          MR. KRASNOW:  Your Honor, if we may jump on the

21    agenda, because it's my understanding that there is something

22    listed, item number 6 is a contested matter, which is now an

23    uncontested matter, and if I may turn over the podium to my

24    partner, Mr. Levine.

25          THE COURT:  Okay.

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 32 of 130

Page 32

 1        MR. LEVINE:  Good morning, Your Honor.  Richard Levine

 2   from Weil, Gotshal for debtors LBFP.  This was a motion for

 3   sanctions against an ADR counterparty which was not disclosed

 4   in the public record.

 5        THE COURT:  Right.

 6        MR. LEVINE:  Their counsel is here, and I am pleased

 7   to say that based on discussions that --

 8        THE COURT:  Will he be wearing a bag over his head?

 9        MR. LEVINE:  No, it's the mask.  And, obviously, it

10   was disclosed to the Court and the committee and the U.S.

11   Trustee and so forth.  I'm pleased to say that based on

12   discussions that began yesterday afternoon and were resolved

13   with the signing of a stipulation in this courtroom this

14   morning there is an agreement in it by stipulation where the

15   counterparty will be serving an ADR response which responds to

16   these three specific issues raised in the ADR notice, the

17   enforceability of the flip clause in light of the prohibition

18   on ipso facto clauses, the amounts that the debtors claim are

19   due on termination from the two issuers involved, and whether

20   that payment must be made.  The counterparty has agreed that it

21   has full authority to negotiate a settlement on its behalf, and

22   the parties have agreed, notwithstanding the fact that the

23   counterparties, as it has participated previously in good

24   faith, and the debtors have argued that they did not, that the

25   counterparty will participate in the ADR process and mediation

1    in good faith going forward.  And the stip also specifically

2    recognizes that any settlement may include a mechanism which

3    can protect the issuer from claims of noteholders subject,

4    obviously, to notice the noteholders and approval of the Court.

5         So the debtors and the committee, I think, are happy

6    with this resolution.  We expect the ADR to go forward smoothly

7    and hopefully will result in a settlement, or, if not, we will

8    litigate, but we thought it was important that the issues that

9    were raised were resolved either by a Court ruling or by a

10   resolution such as this.

11        THE COURT:  I think I should hear from counsel for the

12   undisclosed counterparty confirming that the arrangements just

13   described are, in fact, acceptable.

14        MR. YOSKOWITZ:  Thank you, Your Honor.  It's Jackie

15   Yoskowitz from Seward & Kissel for the counterparty.  Mr.

16   Levine's description is correct.  When I saw Mr. Levine's reply

17   to our objection to his motion for sanctions I realized parties

18   were, sort of, saying the same things.  Our issue had always

19   been we thought we could negotiate for ourselves, but with

20   respect to the noteholders we had concerns about overpromising

21   at a mediation.  With my discussions with Mr. Levine yesterday

22   and the stipulation that we worked out I think we're of the

23   same mind and we understand that there's a mechanism that we

24   can agree on, hopefully, in the future to get everybody on

25   board with a potential settlement.  So we're comfortable with

Page 34

1    the stipulation.

2            THE COURT:  Good.

3            MR. YOSKOWITZ:  Thank you, Your Honor.

4            THE COURT:  Let's proceed with a successful ADR then.

5            MR. YOSKOWITZ:  Hopefully we will.  Thank you, Your

6    Honor.

7            THE COURT:  Okay.

8            MR. LEVINE:  Thank you, Your Honor.

9            THE COURT:  Okay.  So that stipulation will be

10   submitted in writing for approval.

11           MR. LEVINE:  Your Honor, we had not prepared it for

12   Court approval.  It was just between the parties, but if the

13   Court wants a copy I'm happy to hand it up.

14           THE COURT:  There's no need for that.  It wasn't clear

15   to me procedurally what you had in mind.  If all that's

16   happening is that the motion for sanctions is being withdrawn

17   without prejudice on the assumption that the parties perform in

18   accordance with their separate stipulation that's fine.

19           MR. LEVINE:  That is, in fact, what was going on.  We

20   are going to file the redacted stipulation on the record so

21   that --

22           THE COURT:  But you're not looking for Court approval.

23           MR. LEVINE:  But we're not looking for Court approval.

24           THE COURT:  Fine.

25           MR. LEVINE:  Thank you, Your Honor.

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 35 of 130

Page 35

1          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

2    Marcus, Weil, Gotshal & Manges, on behalf of Lehman Brothers

3    Holdings Inc. and its affiliated debtors.  Flipping back, Your

4    Honor, to number 4 on the agenda, this is the first contested

5    matter.  It's the application of the debtors for authorization

6    to employ and retain Gleacher & Company Securities, Inc. as

7    financial advisor, effective as of February 17, 2011.

8          As reflected on the docket, Your Honor, objections to

9    the application have been filed by the Office of the U.S.

10   Trustee and the creditors' committee.  The debtors filed an

11   omnibus reply in response to the objections as well as the

12   supplemental affidavit of Stephen Hentschel of Gleacher.  Our

13   understanding is that the supplemental affidavit resolves the

14   U.S. Trustee's objection with respect to the disclosure

15   matters.

16         In addition, Your Honor, as described in the debtors'

17   reply, there have been some adjustments made to the engagement

18   agreement which resolved the objections of the U.S. Trustee and

19   the creditors' committee to the nunc pro tunc nature of the

20   engagement.  Specifically, the monthly retainer has been

21   eliminated, and the schedule that sets forth the applicable

22   transaction fee has been revised to increase the transaction

23   fee payable in certain circumstances, subject to the same

24   fifteen million dollar cap.  We filed a revised proposed order

25   last night to reflect those changes, and the revised order has

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 36

1    been reviewed by the U.S. Trustee and counsel to the creditors'

2    committee.  As a result, although the engagement will still be

3    nunc pro tunc to February 17, 2011, the effect of that is

4    limited to the indemnification provided to Gleacher and to

5    Gleacher's right to reimbursement of expenses.

6        I believe that the U.S. Trustee is prepared to forego

7    any further objections at this point, based upon the language

8    in the proposed order regarding the U.S. Trustee's ability to

9    object to the fees payable to Gleacher based on the

10   reasonableness standard set forth in Section 330 of the

11   Bankruptcy Code.

12       We're left, therefore, Your Honor, with the objection

13   of the creditors' committee.  The creditors' committee's

14   remaining concerns relate to the possibility of duplication of

15   services and duplication of transaction fees.  As indicated in

16   the debtors' reply and as can be confirmed by Bryan Marsal, who

17   is here in court today, there's no risk regarding duplication

18   of services, because Lazard has not rendered any services to

19   the debtors regarding Archstone.  Moreover, as set forth,

20   again, in the application and the reply, the debtors believe

21   that Gleacher is uniquely qualified to advise them regarding

22   Archstone matters, and, therefore, have not requested Lazard to

23   render services relating to Archstone.

24       The debtors want their financial advisor for Archstone

25   matters to be a firm that's familiar with the property,

Page 37

1    familiar with the management and familiar with the multifamily

2    unit community, and Gleacher satisfies all of those

3    prerequisites.

4         The creditors' committee, which has been actively

5    involved in the debtors' deliberations with regard to

6    Archstone, knows that Lazard hasn't been involved in any of the

7    Archstone discussion and also knows the extent to which

8    Gleacher has been involved in advising the debtors with respect

9    to Archstone.

10        As far as the risk of duplicate transaction fees is

11   concerned, while the committee is correct that the debtors and

12   Lazard have not agreed to exclude Archstone from the services

13   rendered by Lazard, given that in accordance with the order

14   dated March 22, 2011 granting the debtors' supplemental

15   application with respect to Lazard the Court can review

16   Lazard's compensation under the standards set forth in Section

17   330 of the Code the debtors believe that there is little risk

18   that Lazard will be able to demonstrate that it is entitled to

19   a transaction fee with respect to Archstone.

20        In any event, in light of the extensive services

21   rendered by Gleacher to date and the importance of resolving

22   Gleacher's engagement at this time, in light of all the recent

23   activity pertaining to Archstone, the debtors do not believe it

24   is appropriate to make Gleacher take the risk with respect to

25   approval of its fees.  Rather, Lazard's entitlement to the fee

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 38

1   will be taken up by the Court at a later date if Lazard files

2   an application seeking compensation regarding Archstone.

3           For all of the foregoing reasons, Your Honor, the

4   debtors believe that the engagement of Gleacher on the terms

5   outlined in the application as revised is necessary,

6   appropriate and reasonable, and we request that the Court

7   approve the application.

8           THE COURT:  I have a couple of questions, and I am

9   pleased to see that progress has been made in resolving the

10  objections to this application.  But first is really one that's

11  based on pure curiosity on my part.  Given the sophistication

12  of the parties, how is it possible for Gleacher to have been

13  involved on a consulting basis since February 17 of 2011 and

14  for no application to have been made for approval of that

15  retention?  That just shocks me.

16          MS. MARCUS:  It's very complicated, Your Honor, but we

17  have -- and that's an understatement.

18          THE COURT:  Things in this case usually are

19  complicated.

20          MS. MARCUS:  That's an understatement.  There have

21  been many iterations of the Gleacher engagement.  At certain

22  points in time it was expected that Gleacher would be engaged

23  by the Archstone entity, as opposed to by the debtors.  There

24  were a lot of different alternatives considered, and there have

25  been discussions with Lazard for some period of time in an

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 39

1   effort to resolve this.  To be perfectly frank, the application

2   was drafted many months ago, and we've just been trying to work

3   through it.

4        THE COURT:  You anticipate my second question, which

5   is whether or not Lazard will agree to carve out from any claim

6   it might otherwise make in this case those services that are

7   being performed by Gleacher, thereby eliminating any risk that

8   we have to be involved at some future date in an argument over

9   a claim by Lazard for a right to a transaction fee.

10       MS. MARCUS:  To date they have not been prepared to do

11   that.

12       THE COURT:  Is Lazard represented in court today?

13       MS. MARCUS:  They said they might have somebody here,

14   but apparently not.

15       THE COURT:  That was a wise move on their part, I

16   think, because I would have called whoever that was up to make

17   public inquiry.

18       All right.  Those are my questions.  I'll hear from

19   those who have objected to see whether or not the order as

20   modified satisfies those objection.

21       MS. GOLDEN:  Your Honor, I'll be brief.  Susan Golden

22   for the U.S. Trustee.  Ms. Marcus accurately described the

23   nature of the resolution of the U.S. Trustee's issues.

24   Certainly the Lazard fee is of great concern to the U.S.

25   Trustee, but the U.S. Trustee does have 330 rights from

Page 40

1   Lazard's initial engagement, and with that the U.S. Trustee was

2   satisfied that, if need be, the U.S. Trustee would deal with

3   the Lazard claim for the 17 million dollar transaction fee at

4   the time that Lazard put it an application for it.

5         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

6   Tweed, Hadley & McCloy, again, on behalf of the committee.

7   Your Honor, we are pleased, as well, that there's been some

8   progress towards resolving this.  We've certainly been trying

9   for a long time to resolve the issues relating to this

10  application.  As Ms. Marcus indicated, there has been a long

11  discussion of whether Gleacher should be retained here and how

12  we should deal with Lazard as a result that probably go back to

13  February of this year, so the nunc pro tunc, I think, is easily

14  explainable by that dialogue back and forth.

15        However, we would not be here -- as you observed

16  earlier we -- the committee has rarely objected to the debtors'

17  applications at this stage, when they've actually been before

18  the Court.  We've obviously acted behind the scenes in many

19  instances, but here we just got to a point where we knew we

20  could not see eye to eye on the issue, and the single issue,

21  really, that is the one that's been of most interest to us and

22  why we're here today is the possibility of a duplicate fee with

23  respect to Lazard.

24        I don't think we debate that Lazard has not been

25  involved.  We haven't seen Lazard involved in this situation.

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 41 of 130

Page 41

```
 1    We know Gleacher has been.  However, Lazard does have an

 2    engagement letter that provides that it gets a fee for this

 3    type of transaction.  That letter also provides that that fee

 4    can be waived or they can carve it out.  That has not happened.

 5    And it says that Lazard cannot unreasonably withhold its

 6    consent, and, notwithstanding that, nothing has happened.

 7         There has been a lot of back and forth on the issue,

 8    but we're still here today with an application where the

 9    debtors are seeking to retain and, ultimately, pay Gleacher for

10    something that Lazard has said, has argued it would be entitled

11    to a fee for as well.  And we believe under those circumstances

12    it would be difficult for the Court to grant 328(a) approval

13    here.

14         In terms of the Court needing to make a determination

15    that the fee structure is reasonable, if there is a clear and

16    foreseeable possibility that another professional will assert a

17    claim to this -- assert fees with respect to the same

18    transaction and possibly the debtors would wind up paying twice

19    for the same fees.  Under those circumstances making the 328

20    reasonableness determination is difficult.

21         It also would raise an issue for us in terms of

22    challenging it down the road, because if the Court approves

23    this application pursuant to 328(a) it could only be undone if

24    it was shown to be improvident based on events that could not

25    have been foreseen at the time.  Clearly we, everyone in the
```

Page 42

1    courtroom can foresee at this point that Lazard may, maybe not,

2    but may assert a competing claim here to a fee for the same

3    transaction, and under those circumstances we would not be able

4    to meet the 328(a) standard and could arguably not object to

5    any reduction of the Gleacher fee at that time to take into

6    account a Lazard fee.

7          So our primary issue, remaining issue, is with the

8    need for -- the possibility of a 328(a) approval today.  In

9    terms of whether there has to be an approval today at all, I'm

10   not sure why there has to be.  There's been eleven months of

11   the back and forth.  I think our suggestion is that we go back

12   to the table again and try to get Lazard at the table and try

13   to get this issue resolved and then approve it.  With the

14   monthly fees off the table Gleacher isn't go to see any

15   compensation here until they consummate a transaction, so

16   there's no pressing need, from our perspective, to actually

17   approve this today.  With this issue on the table we need to

18   have Lazard at the table and we need to try to figure out

19   whether we can definitively resolve this issue to avoid a fight

20   down the road.

21         THE COURT:  So that last point surprised me, because

22   my expectation was that I was hearing from the two objectors

23   saying as a result of the revised order we're prepared to

24   accept the engagement.  What I'm hearing you say is that you

25   would prefer that this be deferred to another omnibus hearing

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 43

1    date, perhaps January 11, and that between now and then some

2    effort be made to clarify Lazard's position.  Is that what

3    you're saying?

4         MR. O'DONNELL:  I think if that's said that's,

5    perhaps, a fallback more than -- and I think our initial

6    position here is that to the extent that the Court is going to

7    approve it today it needs to approve it with some clear

8    reservation of rights or clear contingency as to the existence

9    of a Lazard fee.  It can't be a clear-cut 328(a) approval.

10   That would preclude us from challenging Gleacher's fee down the

11   road to reduce it to take into account a Lazard fee.

12        Should the Court not want to go there the other option

13   here, since we all know that the issue is trying to get Lazard

14   to the table, that we adjourn it and try once again to get

15   Lazard to the table and get it done.

16        THE COURT:  Well, I don't think there's going to be a

17   problem getting Lazard to the table, because I am going to

18   direct that to occur, and we're going to have a chambers

19   conference on this sometime before I enter an order.  It may

20   not be required that we have a further hearing on it, but I do

21   want to hear from authorized representatives of Lazard as to

22   what their actual position is with respect to any claims to be

23   made with regard to Archstone.

24        I would expect them to exclude Archstone from any

25   claim they might otherwise make.  If they refuse to do that we

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 44

1    have a problem, and we might as well find out that we have that

2    problem now.

3         I'm available for a conference tomorrow or Friday.  Or

4    anytime next week.  I am actually here throughout the holidays

5    and do not want this to in any way drag.  If it needs to

6    because of holiday plans of parties who need to be at the

7    meeting I am proposing this may end up being put off until

8    January 11, but I view that as a less favorable alternative.

9         So what I am prepared to do is to approve the

10   arrangement subject to there being an acceptable understanding,

11   properly documented, with Lazard concerning Lazard's ongoing

12   claims, if any, with respect to the Archstone transaction, and

13   I am prepared to have a meeting on that tomorrow or Friday.

14        MS. MARCUS:  Your Honor, can I take one more shot?  I,

15   obviously, will do what you've suggested, but in the

16   alternative, I understand your concern about Lazard's position.

17   I guess I would say from Gleacher's perspective they want to

18   get this resolved as soon as possible, and we think that's

19   appropriate.  In fact, they were served, I believe, with --

20        THE COURT:  Tomorrow is not soon enough?

21        MS. MARCUS:  If it can be arranged I'm certainly

22   available.  Everybody from Lehman's side will be available for

23   a conference.  My only point was going to be since any

24   compensation requested by Lazard is ultimately up to Your Honor

25   anyway could we get the Gleacher engagement approved now

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 45

```
 1   without the reservation that Mr. O'Donnell requested, and then
 2   you'll make sure that there is not a duplication of fees at the
 3   appropriate time.
 4            THE COURT:  I can always make sure that there is not a
 5   duplication, but I have had personal experience with 328(a) and
 6   with the Second Circuit's decision in Smart World, and I want
 7   this resolved prior to any formal engagement.  I want to see
 8   Lazard tomorrow in my chambers, and if that can't be done we'll
 9   find another day when it can be done.  The approval of this
10   engagement, and I mean no disrespect to the work that has been
11   done by Gleacher and that will be done by Gleacher, but we
12   can't have clashing titans each claiming that they're entitled
13   to significant fees from this estate and have me be the arbiter
14   only to have an argument that I actually don't have the
15   authority, based upon the form of the order, to tell certain
16   people that they need to go away.
17            MS. MARCUS:  Okay.
18            THE COURT:  So I'm not going to create the problem.
19   I'm going to avoid it.
20            MS. MARCUS:  That's fine, Your Honor.  We'll contact
21   your chambers to schedule a time.
22            THE COURT:  And hopefully that can happen tomorrow.
23            MS. MARCUS:  Okay.
24        (Adversary proceeding heard from 10:33 a.m. to 1:49 p.m.)
25            THE COURT:  Be seated, please.
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 46

1           MR. BERNSTEIN:  Good morning, again, Your Honor.  It's

2    Mark Bernstein of Weil, Gotshal & Manges on behalf of the

3    Lehman Chapter 11 debtors.  The remaining nine items on the

4    agenda are all omnibus objections that were filed by the

5    debtors to claims asserted by former Lehman employees based on

6    restricted stock units or RSUs.  Since the objections are all

7    identical, I think it makes sense if Your Honor agrees to take

8    them all at one time.

9           THE COURT:  I agree.

10          MR. BERNSTEIN:  Okay.  The objections seek to

11   reclassify each of the claims as equity interests in LBHI.

12   Prior to the commencement of these Chapter 11 cases, LBHI

13   granted RSUs to employees as part of their compensation, in

14   order to enable the employees to participate in any increase in

15   value of the Lehman enterprise.

16          The RSUs bear the hallmarks of traditional equity

17   interests.  The holder benefit from the increased value of the

18   corporation, receive dividends and bear the risk if the

19   corporation should fail.  The RSUs has rights to acquire common

20   stock in LBHI, which is all they entitle their holders to

21   receive, followed in the definition of equity security in

22   Section 101-16 of the Bankruptcy Code.

23          A particular telling fact about the nature of the

24   RSUs, Your Honor, is had LBHI delivered to all the holders of

25   the RSUs on the day before bankruptcy the common stock that

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 47 of 130

Page 47

1    they were entitled to receive in exchange for their RSUs, we

2    wouldn't be here today, because all the holders would merely be

3    common stock holders, and which would very clearly be equity

4    interests in the debtors.

5           The terms of the programs under which the RSUs were

6    issued also evidence that the claims should be reclassified as

7    equity interests.  Under the program documents under which the

8    RSUs were issued, at no time did any of the claimants have any

9    right to demand or receive cash in exchange for their RSUs.

10   The program documents all included language to the effect that

11   "Holdings and any of its subsidiaries' obligations with respect

12   to the" -- this one I'm readying from is 2007 -- "the 2007

13   units granted hereunder, is limited solely to the delivery to

14   you of shares of common stock on the date on which such shares

15   are due to be delivered hereunder.  In no way shall Holdings or

16   any subsidiary become obligated to pay cash in respect of such

17   obligations."

18          One of the main contentions that the creditors make in

19   response to these objections is that the RSUs were issued as

20   part of their compensation.  The debtors don't dispute that.

21   As part of either their bonus or if they were commission-based

22   employees, part of their compensation was, in fact, issued in

23   RSUs.  However, compensation and equity interests are not

24   mutually exclusive.  The fact that the equity was issued as

25   part of compensation has no bearing on the classification of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 48

1    these claims or the priority in which they're entitled to

2    recover from LBHI.

3         Two of the program documents, the 2003 and 2004,

4    expressly provided that the claims are to be treated as

5    equivalent with common stock of LBHI.  And pursuant to Section

6    510(a) of the Bankruptcy Code, those subordination provisions

7    in the documents should be held enforceable in these cases.

8         Alternatively, Your Honor, should the RSUs be

9    considered claims against the debtors and not equity interests

10   in the debtors, they must be subordinated as equity interests

11   under Section 510(b) of the Bankruptcy Code, as these claims

12   all arise from the purchase of securities.

13        Section 510(b) has been interpreted very broadly by

14   the courts in this circuit and applied in similar contexts as

15   the facts in this case.  The bankruptcy courts in the Enron and

16   WorldCom case and the Section Circuit in In re Med Diversified,

17   among other courts, have embraced the broad interpretation of

18   "arising from" in the statute and have subordinated claims if

19   there's any nexus or causal relationship between the purchase

20   of the securities and the damages that are being claimed.

21        In this case, the claimants purchased the RSUs with

22   their labor.  It's not -- they didn't actually buy the shares,

23   they didn't exchange cash, but by working for Lehman, they

24   exchanged their labor for these RSUs.  Bankruptcy courts in

25   Enron, WorldCom and U.S. Wireless, have all held that employees

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 49 of 130

Page 49

1    who receive RSUs as part of their compensation or similar

2    instruments, purchased those securities with their labor, for

3    the purchase of 510(b) -- the purchase requirements.  This is

4    settled law in this jurisdiction.

5          Despite their contentions that they had no choice and

6    did not elect to receive the RSUs, by accepting employment for

7    Lehman and going to work every day, they continuously accepted

8    that condition to their employment, which was, part of your

9    compensation will be paid in RSUs.

10         Creditors have asserted a variety of theories and

11   liability against LBHI relating to the RSUs, ranging from the

12   diminution in value of the RSUs, fraudulent statements that

13   were made by LBHI in their financial statements prior to or in

14   connection with the issuance of the RSUs, that led them to hold

15   onto their common stock or these RSUs or induce them not to

16   sell.

17         Other creditors have asserted that the debtors

18   breached their employment agreements by actually issuing these

19   RSUs as opposed to paying them in cash, although no creditor

20   has produced an employment agreement that said your

21   compensation will be paid in cash.  And several of the

22   employment agreements that were attached to the responses or

23   the claims specifically provide that Lehman was entitled to pay

24   part of the compensation in equity awards.

25         Courts have held that claims based on all these types

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1   of theories of damages have been -- can be subordinated,

2   pursuant to 510(b) of the Bankruptcy Code.

3           Certain employees who were commission-based employees

4   have attempted to distinguish the RSUs that they would have

5   received for the year of 2008 from the other RSUs that were

6   actually issued.  When the employees who were commission-

7   based -- each month they received a statement based on their

8   performance about how much equity they had accrued for that

9   month.  But those employees actually did not receive the RSUs

10  until -- typically until the end of the year, November or

11  December, I think is typically how it worked.

12          So these employees have argued that they did not

13  receive their RSUs, and therefore those portions of their

14  claims that were based on their 2008 compensation, should for

15  some reason, be treated differently from the portions of their

16  claim for which they actually do have RSUs.  Because their

17  argument is they haven't received anything in exchange for

18  their labor.

19          However, there's nothing that says they're entitled to

20  cash in any document that they've provided.  And in fact, the

21  way the debtors are proposing to treat those claims is that we

22  will subordinate the entire amount of their claim as equity,

23  not just the portion for which they have issued RSUs.  So had

24  they been issued RSUs on a monthly basis, they would have just

25  had RSUs in the amount of that withheld compensation or that

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 51 of 130

Page 51

1    portion of their compensation which was equity accrual, and

2    they would be treated the exact same way as the debtors are

3    intending to treat them under these objections, which is that

4    portion -- they would have those RSUs, and those should be

5    subordinated.

6         LBHI has put forth facts and law that dispute the

7    claims asserted by these claimants.  And as a result, the

8    burden has shifted back to these claimants to prove by a

9    preponderance of evidence that their claims are valid, based on

10   the law in this jurisdiction.

11        Your Honor, in sum, these employees received exactly

12   what they bargained for when they signed up to work at Lehman.

13   They received the right to acquire common stock in LBHI as part

14   of their compensation.  As part of that, the employees also

15   bargained for the risk that Lehman might potentially fail, and

16   then that common stock would not have any value.

17        These equity awards are just that.  They were equity.

18   And claimants who hold them should not now be able to bootstrap

19   themselves up to general unsecured creditors by asserting

20   different theories of liability.

21        The creditors' committee has filed a statement in

22   support of the subordination pursuant to 510(b), and the

23   debtors respectfully request that each of the claims be

24   classified as subordinated -- as equity interests in LBHI.  And

25   I'm happy to answer any questions Your Honor may have, or it

1    may be proper to hear from some of the respondents, first.

2          THE COURT:  Well, let me share with you the challenge

3    that I had in trying to deal with these various objections to

4    claim disallowance.

5          The debtor filed an omnibus reply.  The omnibus reply

6    deals with all the legal arguments and also includes, as an

7    attachment, a schedule that references the objections of

8    various claimants without identifying them by name.  One of the

9    problems that we had in chambers in attempting to understand

10   the position being advanced was to correlate the position of

11   the debtors with respect to the particulars of each claimant.

12   And that was time consuming and frankly, somewhat burdensome.

13         One of the questions that we still have, however, and

14   I'd like to just understand how we're approaching this, is

15   whether we are dealing today on a claim-by-claim basis, or

16   whether or not we are dealing with all of the claims as if they

17   are part of a class.

18         Judge Gonzalez, in his Enron decision, dealt with

19   somewhat comparable claims that arose in Enron, but that were

20   predicated largely on claims of fraud, but dealt with those

21   claims as one class without going to the specifics of each

22   claimant's assertions.

23         I don't know, as I sit here, how you intend to

24   approach today's hearing.  And there are different arguments

25   that have been made by different former employees arising under

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 53 of 130

Page 53

1    different annual programs.  And I don't know whether or not you

2    intend to approach this as a class-wide issue, which

3    effectively is the creditors' committee's approach, saying you

4    don't have to worry about the specifics; regardless of the

5    particulars, under 510(b) all claims should be treated as

6    equity.

7         So my first question to you is, how am I supposed to

8    get through this thicket?  We have a fairly packed courtroom

9    still and we have people on the telephone.  Are we doing this

10   on a claimant-by-claimant basis?  Are we doing this on a class

11   basis?  Whichever way we do it, I want it to be fair and I want

12   everybody to have an opportunity to be heard.  And in part

13   because of the added omnibus-type matters that we heard this

14   morning that wouldn't ordinarily be heard at the time of a

15   claims hearing, it's now almost lunch time.

16        MR. BERNSTEIN:  Sure.  Let me respond to that.  We

17   believe that the legal issues that relate to each of these

18   claims are identical.  Now, certain creditors, as you stated,

19   raised different type arguments.  But the programs under which

20   these RSUs were issued, they may have slight differences from

21   year to year, but in substance, and the relevant provisions of

22   those program documents, for the purposes of the arguments that

23   we make here today, the programs are identical.

24        And we scheduled all of these omnibus objections which

25   were filed at different times throughout the year, all for one

1    hearing, in the interest of fairness.  Because some of these

2    parties are pro se, some of them do have counsel.  The claims

3    vary in amount.  But we thought it made sense to have all of

4    the issues and all the arguments on the table and to deal with

5    them as a class.  Either the claims -- the claims are, from our

6    view, the same claims.  Reserving the right to -- if certain

7    parties have facts that they assert that are different than

8    others, we can talk about those separately.  But generally, we

9    believe the claims and the nature of these claims are the same,

10   and the legal issues are the same, and are prepared to deal

11   with it as a class, unless there do arise, one-off issues,

12   which we can talk about, I guess, as those arise.

13          THE COURT:  Well, I guess the first thing I'd like to

14   find out is if there is any affected claimant that objects to

15   treating it as a class-wide matter and wishes to be heard

16   separately -- apparently hands are going up everywhere.  So

17   this is going to be not -- according to their wishes, it's not

18   going to be on a class-wide basis.  At some point it may become

19   that.

20          There are basically two ways that this can be

21   approached -- maybe more than two, but two that occur to me.

22   One is for every argument made by every claimant to apply to

23   every claimant in the same class, notwithstanding the fact that

24   we are, by a show of hands, preferring to do this on an

25   individual claimant basis.  I had thought, as I was preparing

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 55

1   for this morning's hearing, that the debtors' response was

2   effectively putting all claims in the same basket, and by doing

3   so, was treating every argument as if it applied to every

4   claimant, and then attempting to defeat each one of those

5   arguments.

6          In some respects, it is fairer to the claimants

7   individually for them to have the benefit of, in effect, every

8   other argument that every other similarly situated claimant has

9   made, whether or not they made that argument, thereby allowing

10  for the possibility that if one argument is a successful

11  argument that applies across the board, that everybody gets the

12  benefit of it, but that if there's an argument that's

13  particular to a particular program or to a particular claimant,

14  obviously that would be personal.

15         I have some concerns just from a case management

16  perspective as to how we deal with all these individuals on

17  this one day.  And it wasn't certainly my choice that employee

18  claims would all be heard at one time in this manner, it was

19  the debtors' choice.  So I'm going to take suggestions as to

20  the most efficient way to deal with this in a manner that also

21  protects the interests of each individual.

22         MR. BERNSTEIN:  Sure.  I mean, I think that we will

23  see when the various claimants do get up to state their

24  arguments, that the issues involved are the same.  They may

25  want to have -- phrase them differently or characterize them

1   differently.  But these claims all arise from identical

2   instruments.  And the facts surrounding their issuance was

3   identical.  They got them as part of their compensation.

4        So I'm not exactly sure what the different creditors

5   are going to say that would result in there being different

6   rulings or there could be different decisions made on a claim-

7   by-claim basis.  And we had thought, as Your Honor, that it was

8   the most fair to allow all of the argu -- any argument made by

9   any claimants to be used for the benefit or by the benefit of

10  any other claimant.  Because these issues really, as we viewed

11  them, these claims are the same.

12       Whether someone raised an argument in their response

13  or not, they have the same rights as any other holder of these

14  RSUs.  And we think they really should be treated the same way,

15  whatever way that ultimately is.  So I think that maybe if we

16  start to hear from the claimants, we will -- it's our belief

17  that we will see that the issues really are the same.  I could

18  be wrong.  But that's where I think this ends up.

19       THE COURT:  Does the creditors' committee have

20  anything to say?

21       MR. O'DONNELL:  Your Honor, on that last point I think

22  we agree as well, that that would be the most efficient way to

23  proceed.  We think the arguments are -- overlap significantly.

24  And if we grant the benefit of each argument to each of the

25  claimants, I think that's a fair way to proceed.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 57

1          Beyond that, I'm just noting that our objection took

2     the position that the 510(b) arguments are the cleanest and

3     most efficient way to decide this.  We wish the circumstances

4     were different.  We realize that these -- you know, the former

5     employees were valuable assets of the Lehman enterprise, pre-

6     petition.  But the bottom line is that they had two types of

7     claims.  They had claims for cash and claims for equity

8     compensation.  And equity compensation brings 510(b) into play.

9     And we don't see how any other result other than that advocated

10    by the debtors and the committee is possible here.

11          THE COURT:  Okay.  I'm going to make a general comment

12    and then I'm going to just take the claimants in turn, and

13    we'll see whether or not these positions begin to clump

14    together.  If they do, fine.  If they don't, we'll deal with

15    it.

16          In anticipation of today's hearing, I reviewed the

17    papers submitted, including the papers submitted by the debtors

18    in omnibus reply.  And it became clear to me that one case in

19    particular was particularly relevant, and that was the case I

20    just referred to earlier, Judge Gonzalez's decision in the

21    Enron matter.

22          It's a very long decision and one that does not, in

23    all respects, apply here.  But it's that decision that, in

24    effect, led to counsel's quotation of the exchange of labor for

25    the consideration of RSUs, because Judge Gonzalez used that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 58

1  terminology in his decision in 2006, I believe or 2003.  I'm

2  not sure of the exact year.  But I did -- if somebody has the

3  year we can correct the record.

4        UNIDENTIFIED SPEAKER:  2006.

5        MR. BERNSTEIN:  2006.

6        THE COURT:  2006?  I was right the first time.

7        The decision treated all of the employee claims with

8  sympathy as part of the same class of claimants and focused on

9  Section 510(b) of the Bankruptcy Code, its legislative history,

10  the role of a Law Review article that was published in 1972 in

11  the New York University Law Review, in which Homer Kripke was

12  one of the authors -- I only remember that because he was a

13  professor of law that I had when I was in law school -- and

14  that shows you how old I am.

15        The rather thoughtful decision pointed out that

16  there's a fundamental policy that is at stake in Section

17  510(b), and it's as fundamental as where stakeholders should

18  rank in the distribution of assets out of a Chapter 11 estate.

19  And without recharacterizing what the Court said in Enron, in

20  effect, Judge Gonzalez concluded that regardless of how these

21  rights to receive stock may be characterized, that they are

22  really governed by Section 510(b), which leads to subordination

23  of the contract right to receive stock to the same level as an

24  equity holder.

25        And I want everybody who's about to speak to know that

Page 59

1    unless you can demonstrate that the instrument governing your

2    right is distinguishable from what was at issue in Enron -- and

3    there's a footnote to the opinion, I think it's footnote 3,

4    where Judge Gonzalez notes it's possible that there may be some

5    way to structure a right to receive restricted stock in a

6    manner that would take it outside the ambit of the 510(b)

7    subordination -- and now I'm paraphrasing -- but I doubt it.

8            In effect, what the footnote says is I'm not ruling

9    for all time, for all purposes, in every example that may come

10   before a bankruptcy court that these stock options are

11   necessarily to be subordinated, but I kind of doubt that it's

12   going to be possible to do that.

13           So I say this so that those who are speaking recognize

14   that what I'm really looking for, if you can tell me, is what

15   it is about your claim that takes it outside of the reasoning

16   that I've reviewed and that I intend to follow.  And those who

17   are represented by counsel may want to have the lawyers speak

18   first, only because this is a fundamentally legal issue, and it

19   may be that you'll be helped by what they have to say.  And if

20   the lawyers don't get up, that's a bad sign.

21           I'll take anybody who wants to come forward.  Now, we

22   have a whole bunch coming forward.  Feel free to come forward

23   and sit in front of the bar of the court, and you can get up in

24   turn and make your arguments.

25           MR. ABRAMOWITZ:  Thank you.  May it please the Court,

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 60 of 130

                                                                        Page 60

1    Steven Abramowitz.  I represent Lisa Marcus.  Lisa Marcus is a

2    commission salesperson.  I do want to distinguish, our claim is

3    very distinguishable from what has been described which is

4    respect of RSUs that have been granted regarding RSU

5    instruments.  What this claim relates to is the following

6    methodology that Lehman employed.

7         Lehman had both commission salespeople and bonus

8    employees.  With respect to bonus employees, they received

9    their money at the end of the year, and it was a simple matter

10   that when Lehman typically issued RSUs at the conclusion of the

11   year, which for this year would have been 2008 -- November 30,

12   2008, they would have simply deducted that from the bonus, and

13   that would have paid for the RSUs.  At the time the RSUs would

14   have been issued, the value of that RSU would have been

15   determined, the number of shares, what the strike price would

16   have been, et cetera.

17        For commission salespeople, like my client, because

18   the draw and their commissions goes up and down in the year,

19   they simply withhold that money from their compensation during

20   the year.  And in the claim we attached a compensation

21   statement produced by Lehman that showed what that deduction

22   was.

23        Lehman, in July 2008, because of all the turmoil that

24   was facing the company, they did decide to issue some of the

25   anticipated November '08 RSUs early.  And some -- so people did

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 61 of 130

Page 61

1    get the benefit of RSUs.  And then my client would have had the

2    benefit of the increase and decrease for that small portion.

3    That portion is not included in the claim that I'm debating.

4    And this claim does not involve any RSUs that were issued.

5         What happened is, compensation was deducted every

6    month from Lisa's commission and draw, and then the bankruptcy

7    intervened.  Because the bankruptcy intervened, a couple of

8    things happened.  Number one, the RSUs were never issued,

9    because a critical event had to have happened.  Lehman's board

10   would have had to have met.  They would have had to approve the

11   RSUs.  They would have had to, importantly, determine what the

12   number each employee would get, and that would have been based

13   on the price.

14        At that point, had the RSUs been issued, Lisa would

15   have been a beneficiary and had the detriment of the increase

16   or decrease in the stock.  But Lehman went into bankruptcy

17   before that could happen.  So I contend that this is simply a

18   case of compensation that was not paid, that is due under the

19   labor law.  It's a right to payment.

20        If anything, the most that Lehman had is, had Lehman

21   not gone into bankruptcy, they would have had the right to have

22   issued RSUs in exchange for that money.  But that right, at

23   most, would have been right that under 365 is not enforceable.

24   This is simply, again -- we're not talking about RSUs that were

25   issued.  We're not talking about the provisions of the various

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 62

1    instruments that say once RSUs are issued they vest under the

2    following circumstances; they're forfeited under the following

3    circumstances; you're not entitled to stock instead of your

4    RSUs.  This strictly relates to deductions from pay for a

5    commissions salesperson that were not received because of the

6    intervening bankruptcy.  And it's not in respect to any RSUs

7    that were issued.

8            So for this amount, there was none of the

9    characteristics that Judge Gonzalez in Enron and that the

10   court, particularly in Med Diversified, where they talk about

11   someone who bears the risk and rewards of shareholding, should

12   bear that risk and be subordinated.  Lisa never got that

13   opportunity, because the stock was never issued.  So she had

14   effect as being treated differently than non-commission

15   salespeople who, you know, they never got that -- they never

16   got the bonus; the bonus was never used for the issuance of

17   RSUs.  This was simply pay that was deducted as security by

18   Lehman for the possible issuance, which issuance never

19   occurred.

20           THE COURT:  Let me ask you how this program worked in

21   one detail that occurs to me that could be of relevance.  Did

22   Lisa or others like her have the option to not buy stock?  In

23   other words, could they right to payment be a right for payment

24   in cash, or was it simply money set aside that could only be

25   used to acquire the RSUs?

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
Pg 63 of 130
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 63

1        MR. ABRAMOWITZ:  I believe that had the board actually

2    acted to issue the RSUs, they could have only been used for

3    RSUs.

4        THE COURT:  So if the money could only be used for

5    RSUs and the RSUs were never issued, how can there be a claim

6    for money?  Because at most, there would have been a claim --

7    assuming they'd been issued -- for the equity which would be

8    subordinated.  I recognize that there's an inequitable aspect

9    to this and that money is reserved and then never paid.  But

10   the money that's reserved and never paid could never be

11   received anyway.

12       MR. ABRAMOWITZ:  I think it's -- well, I mean, it's

13   clear from the statements -- I mean, this is -- these are based

14   on commissions and draw that was earned by the employee.

15   Correct, Lehman had -- it was a part of their compensation

16   scheme to issue RSUs in November.  The plan documents are clear

17   that the amount of that is to be determined at a future time.

18       I think it is decisive, Your Honor, that the

19   bankruptcy intervened.  I believe that had Lehman -- forget

20   about a bankruptcy -- had Lehman done a merger, you know, in

21   the interim; had they terminated the employee; there'd be a --

22   had I represented a client in that context, I would have said

23   this is the money, you never gave me the RSUs, so this is not a

24   question about whether it vests because of a voluntary

25   termination or not.  This is simply pay.

Page 64

```
 1        Normally, in the normal course, the employee is happy;
 2   the company works; and it's understood, we'll get those RSUs.
 3   If the stock price happens to be down, we'll get a lot of RSUs
 4   when they're issued; if the stock price is up, we'll get less.
 5   But we will, at that point, become someone who benefits from or
 6   risks that of being an equity holder.  I don't know if I
 7   answered your question.  I see your perplexed --
 8        THE COURT:  Well, I am perplexed --
 9        MR. ABRAMOWITZ:  -- expression.
10        THE COURT:  -- only because I'm not sure I know how
11   this works --
12        MR. ABRAMOWITZ:  Okay.
13        THE COURT:  -- in practice.  Is there a scheduled
14   deduction that occurs with each commission payment that's
15   otherwise due that is set aside for purposes of purchasing the
16   RSU?  Is that how this works?
17        MR. ABRAMOWITZ:  I don't believe that money is
18   literally put in escrow.  And we're not making a constructive
19   trust fund.  There is, though, a deduction from the
20   compensation amount that is reflected.  In other words, the net
21   cash paycheck that someone gets is net of what the deduction is
22   for, what I'll call, anticipated RSUs.  But the key is that
23   it's anticipated.  And in the normal course, people know that
24   at the end of the year they're going to get -- you know, if the
25   board acts and nothing happens in the meantime, they will get
```

1    those RSUs with the rights and vesting and risks attendant to

2    that.

3            THE COURT:  But that to which there is an entitlement

4    is something which is, if received, is subordinated?

5            MR. ABRAMOWITZ:  If the RSUs were received -- and I'll

6    give deference -- I'm sure other counsel will argue what the

7    rights of an RSU holder are -- but if those RSUs had been

8    issued, we'd be having a different discussion.  I would not --

9    then I either would be arguing or not whether those RSUs

10   themselves are claims.  And I think the argument that counsel

11   for the debtors would made is well, when you got those RSUs, if

12   the stock went up the next day, you benefited; if it went down

13   the next day you didn't benefit.  But I'm not making that

14   argument because they were never issued.

15           THE COURT:  So your distinguishing argument is these

16   are claims based upon RSUs that were never issued, and so they

17   should be treated as claims?

18           MR. ABRAMOWITZ:  Essentially.  But the key point is,

19   it is compensation that Lehman withheld basically as a security

20   device to make sure the money would be there.  So it's really

21   compensation.  But the key distinguishing is, I'm not like the

22   other RSUs, because I never got them.  So I want to make it

23   clear that this is a compensation-related claim.

24           The reason Lehman did the withholding is that they

25   had -- because unlike bonus employees, where they just take it

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 66

1    out of the bonus, for commission employees, they can't do that.

2    They have to do it as the commissions are earned.

3            THE COURT:  Okay.  Thank you.

4            MR. ABRAMOWITZ:  Thank you.

5            UNIDENTIFIED SPEAKER:  I don't mean to be redundant,

6    but Steven Abramowitz and Lisa Marcus are part of this as well.

7    I'm part of their group.  And it is the exact same issue of

8    funds deducted and no RSUs ever granted.  So, I won't take up

9    more of your time.

10           THE COURT:  And do you know what happens to the funds

11   that are deducted?

12           UNIDENTIFIED SPEAKER:  They're withheld.  They were

13   withheld from our paychecks, but they were never remitted to us

14   in any way.  And we were sort of lumped -- according to Weil --

15   as a group that owned RSUs.  We did not ever get RSUs.  The

16   bankruptcy occurred two months before.

17           If you send somebody for a container of milk, and they

18   don't get it, does that mean that you don't get your money

19   back?  You know, nothing was ever purchased.  We were never

20   reimbursed or returned the money that was withheld from us.

21   And -- understood, if you owned the stock, that's an

22   unfortunate thing, and most of us lost everything.  But if you

23   didn't buy the stock, why are you entitled to hold onto that

24   money?

25           THE COURT:  Okay.  I understand the argument.

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 67 of 130

Page 67

1           MR. TOFEL:  Lawrence Tofel of Tofel and Partners for

2      Charles Diccianni.  We had filed papers.  Mr. Diccianni's

3      affidavit -- let me actually -- Mr. Bernstein started, I think

4      with a false premise, and that is, I think the motion starts on

5      the premise of we issued these RSUs and everything then falls

6      from there.  As you've heard from counsel, and my client's in

7      the exact same position, there are no contract documents; there

8      are no contracts signed by Mr. Diccianni at all.  He was never

9      given a choice as to what to do.  They simply take money out of

10     his commissions.

11          They allocate them to something, which they never

12     issue.  And in a court of equity, the debtors' counsel now

13     comes in and says well, if we'd issued the RSUs we wouldn't be

14     standing here.  Okay.  But you didn't.  You took my client's

15     money, you didn't give him anything.  He had no choice, no

16     rights.  And now he's simply relegated to the ranks of a holder

17     of a security that they didn't issue under equitable

18     subordination?

19          I'm not entirely sure that the debtor would be

20     entitled -- or the creditor's committee -- now, I understand

21     their agendas -- would be entitled to invoke any equity when

22     they didn't act equitably.  This is money taken from commission

23     employees, long-term employees who are still there working for

24     Neuberger Berman; monies taken out.  They're told what they're

25     going to get; they don't get it.  It still is simply sitting

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
Pg 68 of 130
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 68

1  there.  I don't know where the money went.  There's no

2  agreement.  There's no understanding between the parties.  It's

3  simply self help when Lehman comes in and takes over Neuberger.

4        So the money is pulled out of his compensation.  And

5  he's left to be told that he is actually an equity holder of a

6  company that he never was offered or actually had equity in?

7  Again, that's the basis of our argument.  So I don't think --

8  to answer Your Honor's direct question -- I don't think Judge

9  Gonzalez's opinion and the progeny of it applies.

10        That is, the debtor is trying to invoke these

11  principles of equitable subordination with respect to

12  securities that they never issued.  There is nothing in this

13  record that Mr. Diccianni ever signed, recognized or anything

14  submitted by the debtor that Mr. Diccianni acknowledge that he

15  was getting stock or agreed to have get stock.  He wouldn't

16  have and he didn't.  That's our argument.

17        THE COURT:  Okay.

18        MR. KAPLAN:  Your Honor, my name is Eugene Kaplan and

19  I'm from the firm of Kaplan Landau.  I represent, in three

20  separate objections, nine managing directors of Neuberger

21  Berman.

22        And their claim here is very different and has not

23  been addressed either by the debtor or by the creditors'

24  committee, because the debtor, in their response says --

25  quoting essentially Judge Gonzalez, "In willingly engaging in

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 69

```
 1    the exchange of labor for equity awards, the respondents

 2    bargained not for cash but to become shareholders."  And as we

 3    observed in our papers, our clients were all managing directors

 4    of Neuberger Berman at the time Neuberger Berman was merged

 5    into Lehman Brothers.

 6            Some of them, at that time, because they were partners

 7    in Neuberger Berman prior to it becoming a public corporation,

 8    were subject to nonsolicitation and noncompete agreements to

 9    begin with.  Others, at the time of the merger, became subject

10    to nonsolicitation and noncompete agreements, and in fact, as

11    substantial shareholders, senior managing directors and the

12    like of Neuberger Berman, as a matter of law, could not have

13    solicited or competed with the Neuberger Berman entity that

14    became part of Lehman Brothers.

15            So my clients found themselves in the position of

16    having developed these tremendous books of business as

17    Neuberger Berman employees, and as Neuberger Berman employees,

18    not being subject to taking half their pay in restricted stock

19    units or the like, and then because of the merger and by no act

20    on their part, being subjected to the Lehman pay structure.

21    And they had no choice but to accept the Lehman pay structure,

22    because had they walked away, they would have forfeited their

23    tremendous books of business and their ability to earn a

24    livelihood, because they had developed -- I mean, as you will

25    see in your papers, some of these people were managing
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 70

1    directors who were in control of six billion dollars worth of

2    business, and by the time Lehman went bankrupt had control of

3    seventeen billion dollars worth of business.

4          And so they never willingly exchanged their labors for

5    Lehman's pay structure, they had no choice in the matter.  They

6    didn't bargain for stock as did the plaintiff or the party --

7    creditor in Med Diversified.  They clearly fall outside of

8    Judge Gonzalez's opinion in Enron and the progeny of Enron.

9    These people never purchased anything.  They never were willing

10   purchasers.

11         They were essentially, because of the merger, put into

12   a pay system that they did not accept, but had no choice --

13   that they had no choice but to accept in order to continue to

14   engage in the business that they had engaged in collectively

15   for the hundred years previously, and which they continue now,

16   now that Neuberger Berman has been spun out of the debtor and

17   is now back as a freestanding entity.  And they continue to do

18   what they do without being subject to a pay structure.

19         It's for the five years or four years that they were

20   merged into Lehman Brothers, that they were compelled to be a

21   part of the pay structure where half of their compensation was

22   withheld and paid in these restricted stock units.  And they

23   have a claim for their compensation.  Whether it's a claim for

24   unjust enrichment or a claim for breach of contract, their

25   claim is that they never voluntarily participated in this pay

Page 71

1    structure; that this was something thrust upon them.  And that

2    distinguishes them quite clearly from the creditor in Med

3    Diversified, the creditors in Enron, and in all the other cases

4    that have been cited by the debtor.  And I think that is a

5    significant difference.

6            THE COURT:  It's a definition of involuntary servitude

7    I've never heard before.

8            MR. KAPLAN:  It's not involu -- well, it is

9    involuntary servitude in a way.  I mean, if you say to someone,

10   you either can work for us --

11           THE COURT:  But isn't this --

12           MR. KAPLAN:  -- or you can start over.  You can give

13   up your life's --

14           THE COURT:  -- isn't this true of --

15           MR. KAPLAN:  -- work and start over --

16           THE COURT:  -- but isn't this true of every -- pretty

17   much every large corporate employer?  Because if you are an

18   employee in a large organization, you necessarily lack

19   individualized bargaining rights.  You get the benefit of the

20   structure that you voluntarily entered as an employee, but with

21   mergers and acquisitions and the evolution of business in the

22   twenty-first century, where you started isn't necessarily where

23   you end up.  And isn't it a voluntary act to stay?

24           MR. KAPLAN:  I would submit it is not, in this

25   instance, where you are -- where your choice is, as a matter of

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 72 of 130

Page 72

1    law and as a matter of contract, you cannot compete and you

2    cannot solicit and you cannot go out and do anything except

3    start as though you had just gotten out of graduate school, and

4    give up the twenty years or thirty years or whatever you had

5    put in at Neuberger Berman.  I would submit that it is not.

6    You don't have that choice.

7         THE COURT:  You suggest this is driven by the

8    noncompete provisions of the employment arrangements?

9         MR. KAPLAN:  In part, yes.  In part -- in the

10   noncompete provisions of the employment arrangements that

11   either occurred at the time of the merger, or in the instance

12   of a number of the claimants, at the time that Neuberger Berman

13   went public, which was long before the merger with Lehman, when

14   they became -- they couldn't compete with Neuberger, so they

15   couldn't compete once Neuberger merged.  And they did not

16   volunteer to become part of this pay structure.  They just

17   became part of the pay structure, because they had no choice in

18   the matter.

19        They could basically retire and give up their life's

20   work or they could accept the pay structure that Lehman thrust

21   upon them.  But they didn't have a choice.

22        THE COURT:  Okay.  I understand your argument.

23        MR. KAPLAN:  Thank you.

24        THE COURT:  Thank you.

25        MS. NADRITCH:  Good afternoon, Your Honor.  I'm

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 73 of 130

Page 73

1     here -- my name is Jordanna Nadritch.  I'm from Olshan

2     Grundman, on behalf of claimant, Christiane Schuster.  She has

3     filed a claim in this matter -- to help Your Honor facilitate

4     the reconciliation, her claim number is 11369.

5            Your Honor, my client was an employee in London in

6     Lehman Brothers in Europe for nine years.  As part of Ms.

7     Schuster's compensation consideration she received three

8     components.  She received cash -- a salary, she received RSUs,

9     and she received stock options.

10           Your Honor, Ms. Schuster's claim does not address the

11    stock options.  Ms. Schuster acknowledges that stock options,

12    as Judge Gonzalez's opinion has explained, are equity and can

13    be reclassified under 510(b) or subordinated under 510(b).  The

14    distinction, Your Honor, is an RSU is not a stock option and

15    the debtors' various plans that they filed with the Court as

16    well the ones that actually govern my client, which were not

17    filed with the Court, distinguished between the RSUs and stock

18    options.

19           They are different vehicles.  An RSU is not equity,

20    Your Honor.  And I could walk you through that and explain to

21    you, you know, why we believe an RSU is not equity and why

22    Judge Gonzalez's opinion in Enron is applicable to stock

23    options, and not to RSUs, necessarily.

24           An RSU, Your Honor -- let me just step back one second

25    to make clear, the debtors reply they filed, I think it was a

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 74

1    few days ago, attaches various agreements.  Those agreements,

2    Your Honor, don't tie to my client's claim.  They have not

3    established how they tie to anybody's claim specifically.

4    There are various agreements, and they've put them forth in the

5    record, but I do have with me today two agreements from my

6    client that I have spoken with last night in Europe that do

7    apply to her claim.  And they are somewhat different, Your

8    Honor, than the agreements filed by the debtors.

9           THE COURT:  Let me just clarify.  Was your client

10   employed by LBIE?

11          MS. NADRITCH:  Yes.  Well, it's Lehman -- it was

12   Lehman Europe, Your Honor.

13          THE COURT:  Lehman Brothers International Europe?

14          MS. NADRITCH:  Yes.  And the way it worked is her RSUs

15   were granted through LBHI.  That's how all the RSUs were

16   granted, as far as I understand.  So her claim resides at LBHI,

17   but her employment was through Lehman Europe.

18          With respect --

19          THE COURT:  So does she have a claim in the SIPA case

20   or does she have a claim in this case?

21          MS. NADRITCH:  In this case, Your Honor.  And, Your

22   Honor --

23          THE COURT:  You'll have to explain this to me.

24          MS. NADRITCH:  Oh.

25          THE COURT:  You have too many affiliates already.

Page 75

```
 1          MS. NADRITCH:  I'm sorry?

 2          THE COURT:  You have too many affiliates already.  I'm

 3     not sure how you have a claim --

 4          MS. NADRITCH:  Well, pursuant to --

 5          THE COURT:  -- in the LBHI case.

 6          MS. NADRITCH:  -- well, pursuant to Ms. Schuster's

 7     employment -- and I don't have the terms of her employment

 8     exactly with me, but I do have her equity bonus award

 9     compensation package with me -- let's say two years, 2005/2006.

10     The equity awards do resemble the -- in similar function,

11     programs filed by the debtors, but they are different.

12          But it's no -- it should be of no issue whether her

13     employment was in Europe or in America.  The way the RSUs were

14     granted, were granted through Lehman Brothers Holding, Inc.

15     They were granted through the U.S. entity.  Her statements came

16     from the U.S. entity.  Her employer happened to have been in

17     London, but her statements came in her -- her RSUs were through

18     the U.S. entity.

19          With respect to the RSUs, Your Honor, I mean, what I

20     was alluding to earlier was that an RSU is different than a

21     stock option.  An RSU is not a grant on the first day.  A stock

22     option is a grant on the first day.  An RSU is a conditional or

23     a contingent grant that vests in five years' time.  And it

24     can't be sold, it can't be pledged, it can't be transferred.

25     The agreements all state that.
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 76

1           And the agreements all distinguish between an RSU and

2       a stock option.  I think the debtors, in their -- even in their

3       reply, tried to carve out -- in their attempt to explain why an

4       RSU was equity, they explained how the exception to equity is a

5       right to convert.  And in explaining how -- the exception to

6       the right to convert, they note that, for instance, a

7       convertible note is the exception, as a convertible note is

8       convertible into equity, it's a right to convert.  And that's

9       an exception to 101-16.

10          Well, I think, Your Honor, an RSU is exactly that.

11      It's exactly a convertible note.  It's the exception to 101-16.

12      It's a right to convert.  Whereas a stock option, actually,

13      Your Honor, is listed in 101-16(c), I believe, where it says

14      it's a right to purchase.  That's not what an RSU is, Your

15      Honor.  It's not what my client held.  They held a right to

16      convert.  And that's why I think, in the first instance, it's

17      completely distinguishable from a stock option and Judge

18      Gonzalez's opinion in Enron.

19          You know, as a second matter, Your Honor, there was

20      opportunity, actually, for the RSUs to be paid in cash.

21      Specifically, upon a friendly change in control, the RSUs could

22      be exchanged for stock or cash.  And I'm not here to argue

23      whether the bankruptcy and the sale of assets to Barclays or

24      whoever else was a change in control -- a friendly change of

25      control -- but there was that ability.

Page 77

1          So despite the debtors' contention that it could never

2     be paid in stock, in fact, my client's agreements do provide

3     upon a change of control -- a friendly change in control, there

4     could be the option to receive the RSUs in cash.

5          You know, separately, Your Honor, my client's

6     agreements don't contain any subordination provisions, unlike

7     some of the other agreements filed by the debtor.  But to

8     really hone in on Your Honor questions, do -- even assuming,

9     arguendo, that 510(b) even -- you were to look at 510(b) in

10    relation to RSUs, assuming you could argue it's a security,

11    which, Your Honor, I don't believe it is a security, because

12    it's excepted under 101-16(c) and 101-49 -- what my client is

13    seeking is not damages.  It's seeking simply compensation.

14         It's not on account of fraud.  In Enron, those

15    particular employees were seeking damages on account of the

16    fraud perpetrated by the company, by Enron, and were seeking

17    damages on account of those stock options.  My client's not

18    alleging fraud; she's not alleging breach of contract claims or

19    tort claims.  She's simply seeking to receive the compensation

20    that she believes she is owed, on account of her employ.  And I

21    think that's a very large distinction between the Enron

22    decision and where we are today.

23         THE COURT:  Okay.  Thank you.

24         MS. NADRITCH:  Thank you, Your Honor.

25         THE COURT:  Before we proceed further -- and I'm not

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 78 of 130

Page 78

1    cutting anybody off -- I'm recognizing that it's 1 o'clock, and

2    there's still a number of people who wish to be heard.  I think

3    we're going to need, at some point, to take a break or to talk

4    about a rescheduled hearing.

5         I think it makes sense before talking about a

6    rescheduled hearing, to take a break and then my suggestion is

7    that we break until 2 o'clock.  As you heard if you were

8    listening this morning, I have a 3 o'clock chambers conference

9    that I've scheduled.  I'm going to take a break at 3 o'clock.

10   Whether I come back at 4 o'clock or we come back another day, I

11   don't know.

12        But this has turned out to be a much longer and, I

13   think, difficult to manage a process than certainly I had

14   contemplated.  I'm going to suggest that debtors' counsel give

15   some thought during the lunch break as to how best to manage

16   what I think has the potential of being an unmanageable day.

17        We'll take a break till 2.

18   (Recess from 1:02 p.m. until 2:06 p.m.)

19        THE COURT:  Be seated, please.

20        MR. BERNSTEIN:  Good afternoon, Your Honor.  Mark

21   Bernstein from Weil Gotshal on behalf of the Lehman debtors.

22   As you suggested, after the morning session, we discussed with

23   the creditors' committee and considered how best to proceed.

24   And we still believe that since there are, we think, mainly

25   common issues, we think we would like, if the Court is willing

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 79 of 130

Page 79

1    to try to get through them before 3:00.  We believe --

2            THE COURT:  Well, here's --

3            MR. BERNSTEIN:  -- at some point, the issues are going

4    to start to be repetitive and --

5            THE COURT:  We're here and I think we should do it.

6    I've given some thought to the presentation thus far.  And I

7    have a thought I'd like to share before we start.

8            It occurs to me that while it's true that the burden

9    has shifted to the claimants as a result of the showings made

10   by the debtors, there's at least in my mind, and I don't know

11   if it's in the mind of others, some confusion as to how the

12   omnibus response applies to each particular claim.  And I think

13   it would be useful, certainly to the Court, if the debtor were

14   to provide an annotated supplement or some further briefing in

15   which the position that is broadly expressed is applied with

16   particularity to individual claimants.

17           I also think that it would be useful for the claimants

18   themselves to have an opportunity to respond.  So what I am

19   suggesting is what amounts to another round of relatively

20   concise supplemental papers on the subject so that arguments

21   such as those that have been made thus far today can be more

22   grounded in the particulars.

23           MR. BERNSTEIN:  Sure.  Happy to work and provide that

24   to the Court.

25           THE COURT:  Okay.  And it seems to me that some

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 80 of 130

Page 80

```
 1    schedule might be worked out where the claimants themselves
 2    that would have a common date for not only your supplemental
 3    pleading but thereafter for those claimants who wish to respond
 4    in writing to have a date when that will occur.  Otherwise,
 5    that opportunity is waived.
 6         MR. BERNSTEIN:  Okay.  We can work into the pleading
 7    and establish a response deadline, a reasonable response
 8    deadline as well.
 9         THE COURT:  Okay.  And I think that some kind of
10    notice should probably go on the claims docket so that for
11    those parties who may be appearing by telephone or may have had
12    to leave because this turned out to be a fairly prolonged day,
13    they'll have a chance to know what you know --
14         MR. BERNSTEIN:  Absolutely.
15         THE COURT:  -- about what I've just said.
16         MR. BERNSTEIN:  Certainly.  We will get that done.
17    One point I wish to just correct for the record and then I'm
18    happy to let -- we can continue with the responses from the
19    various claimants.  The last attorney who spoke, she was the
20    attorney for Christiane Schuster.  She had provided us with
21    additional documents, program documents, which Lehman did not
22    previously have.  We've taken a look at these throughout --
23    during the lunch break.  And just to clarify one thing she
24    said, she implied that there was language in these documents
25    that said that claimants were entitled to get cash or could get
```

Page 81

1    cash in exchange for their RSUs.  The only place this refers to

2    receiving cash is if there's a friendly change of control.  And

3    in that circumstance, it is Lehman's decision whether to pay

4    cash or equity in exchange for those RSUs.  There is no right

5    or entitlement to cash.

6           So, other than that, I'm happy to hold my responses

7    till all the other arguments that have been made until we go

8    through all of them.

9           THE COURT:  Okay.

10          UNIDENTIFIED SPEAKER:  I just want to request that

11   we -- I'm not here as an attorney and you've heard from

12   attorneys.  Could you hear from someone who is a claimant and

13   directly offended?

14          THE COURT:  Oh.  We're going to hear from everybody

15   who wishes to say something assuming we have time.  And if we

16   don't have time and there are people who still wish to be

17   heard, we'll have another hearing date.

18          UNIDENTIFIED SPEAKER (TELEPHONICALLY):  Well, what is

19   the cue for telephonic appearances today?

20          THE COURT:  I'm sorry.  What was that about

21   telephonic --

22          UNIDENTIFIED SPEAKER:  Forgive me, Your Honor.  What

23   is the cue or the order in which you will hear telephonic

24   appearances since we're not there to see the line

25          THE COURT:  Well --

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 82 of 130

Page 82

1          UNIDENTIFIED SPEAKER:  -- of the creditors' attorneys?

2          THE COURT:  -- I think that in order to deal with the

3     people I see before I deal with the people who are unseen,

4     everybody who is in the courtroom will come ahead of everybody

5     who's on the telephone.  And then once we get to those who are

6     appearing by telephone, you're going to have to first identify

7     yourselves in advance.  I'll take down notes as to who's on the

8     phone and we'll determine some appropriate order.

9          UNIDENTIFIED SPEAKER:  Thank you.

10         MR. MICHAELSON:  Good afternoon, Your Honor.  Robert

11    Michaelson.  I represent three claimants:  Morgan Lawrence,

12    Nicole Lawrence and Brian Monahan.  And I have three comments

13    to make and I'll be as brief as possible.  The first one is

14    really procedural.  I represent another claimant who has RSU

15    claims under the 185th omnibus objection which is not being

16    heard today.  His claim is more -- is broader than just the

17    RSUs.  Now I spoke to Mr. Lemons at Weil and he explained that

18    it was only RSU claims today.  If a claim -- if I heard him

19    correctly, the reason other claims are not being heard is

20    because they involved other issues.  However, to the extent

21    that there others besides my client who has RSU claims, it

22    would seem that it's necessary to tie everyone in since they're

23    going to have their say in this as well.  And so, I'm posing

24    that as an issue.  I don't mean to overcomplicate this, but if

25    we're going to be talking about the RSUs, they should be all of

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 83 of 130

Page 83

1    the RSUs not just those people who were noticed for hearing

2    today.

3         THE COURT:  Well, I'm not sure I know what you're

4    requesting.  Are you proposing that there be another hearing at

5    which time everybody that has an RSU claim will have an

6    opportunity to be heard and it will be, in effect, a

7    continuation of today's hearing or are you proposing that to

8    the extent that there is a determination that applies to the

9    class of holders of RSU claims, it will apply to everyone?

10        MR. MICHAELSON:  Well, I would prefer if it didn't

11   apply to everyone, I can only speak for my client.  I would

12   think that someone would want their day in court.  To the

13   extent that a determination is made, it's going to become the

14   law of the case and they'll be effectively precluded from being

15   able to argue their position.  Now with respect to my client,

16   I'm going to be arguing -- making the same arguments for all of

17   them.  So he's not affected by this.  If debtors' counsel tells

18   me he's the only one other than -- who's affected by this,

19   that's one situation.  But if there are others, I would think

20   that we run the risk of having a ruling that people didn't have

21   an opportunity to participate in.

22        THE COURT:  Well, I'm not sure that that's true but I

23   hear what you're saying.  We have a hearing that was noticed

24   with respect to a certain sequence of claims objections that

25   all relate to the RSU claims.  The debtor has filed a single

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 84

1    response applicable to all of the claimants who are in court

2    today or had notice at least that this was happening today.

3    The position of the debtor is that -- and they can certainly

4    speak for themselves but I'm going to repeat my understanding

5    of their position.  Their arguments with respect to entitlement

6    apply to an entire class in much the same way that Judge

7    Gonzales' decision in Enron, by its own terms, applied to an

8    entire class of claimants.  For that reason, there will be

9    issue preclusion and there will be a result that is binding

10   assuming either to determine that there is a proper class-wide

11   disallowance of all of these claims or a subordination of these

12   claims to equity.  So that issue is out there.

13        Whether or not an individual claimant has the ability

14   to distinguish its claim and, in effect, obtain separate

15   treatment, that's what we're doing today.  If someone else that

16   didn't have notice of today's hearing or is subject to a

17   different omnibus claims hearing schedule, presumably that

18   opportunity will exist to present separate and independent

19   argument at that time.  But those arguments may be trumped to

20   the extent that I were to determine in the context of today's

21   proceeding that there is class-wide preclusion.

22        Have I responded?

23        MR. MICHAELSON:  You have, Your Honor.  I'd still be

24   concerned that perhaps there is an attorney representing some

25   claimant out there who has a take on this that the rest of us

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 85

 1    don't have that might be persuasive to the Court and that would

 2    affect the ultimate outcome.  I think that what's represented

 3    here today is probably in all likelihood pretty much the

 4    universe of arguments that would be raised.  But I don't

 5    pretend to know everything.  And I don't think most of the

 6    people here do.  And so, I lay that out as a possibility.

 7    Whether it's real or not, I don't know.  But I just mention it

 8    because I was aware of that situation with my particular client

 9    and I thought it should at least be brought to the attention of

10    the Court.

11            THE COURT:  Thanks for bringing it to my attention but

12    I think what we're going to deal with is what's before us --

13            MR. MICHAELSON:  Okay.

14            THE COURT:  -- instead of what might be out there.

15            MR. MICHAELSON:  I appreciate that, Your Honor.  I

16    will be brief.  Two substantive points.  The first one has to

17    do with the Enron case.  As Judge Gonzales said, that case was

18    limited to the facts presented to the Court.  And one of the

19    facts presented to the Court involved an agreement that was a

20    precursor to employment.  There was also a fraud element but it

21    was a precursor to employment.  In this particular instance, it

22    was not a precursor to employment.  There was no bargain in the

23    sense that that term is used as an equivalent of a sale.  These

24    were well compensated employees who were given what amounted to

25    a take-it-or-leave-it choice.  There was no bargaining whether

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 86

1    in the legal sense or in the generic sense.  They were told

2    that if they wanted to maintain their employment, they had to

3    do this.  Now to the extent that Judge Gonzales has said that

4    his case was limited to its facts, that is a material

5    distinction that I think must be noted.  And in the other

6    cases, most of the other cases, cited by the debtor, there was

7    a prior vesting that would distinguish it.  There was no

8    vesting in this particular case.  These employees were told

9    take it or leave it.

10          Now Your Honor made a very good point which is you can

11   walk.  You can vote with your feet.  You don't have to stay

12   there.  But I would say that that is a very weak bargaining

13   position if it's a bargaining position at all.  And I think

14   this sounds more like a classic contract of adhesion in the

15   sense that everything was set up.  There was no choice.  It

16   was, as I said before, take it or leave it.  Employees were

17   highly compensated.  They did not want to lose the valuable

18   position they had.  And so they were, in essence, tied to this

19   company through this agreement until such time as the vesting

20   occurred and they could realize the gains from the commissions

21   they had that were deferred.

22          So I think that Enron is not controlling in this

23   particular case.

24          THE COURT:  Well, your particular clients, what were

25   there positions with Lehman?

Page 87

1          MR. MICHAELSON:  They were commission salespeople.

2          THE COURT:  Not Neuberger Berman people?

3          MR. MICHAELSON:  They were not Neuberger Berman

4     people.

5          THE COURT:  So they're more like the people described

6     right at the outset of the hearing this morning when we were

7     talking about a commission claim and stock that was not issued

8     because of the intervention of the bankruptcy?  Is that what

9     we're talking about?

10          MR. MICHAELSON:  That is correct.  Essentially, the

11     company came to a crashing halt.  And whatever hope they had of

12     ever realizing on that vanished.  The stock was simply not

13     going to be issued.  Now there are really two components of

14     that.  There was that which was taken prior to 2008.  And then

15     you've heard the arguments before that there was money that was

16     paid over from 2008 and not invested in any particular fashion.

17     And in speaking to my client during the break, he mentioned to

18     me that there were terms and conditions under which money that

19     was withheld during that period before it was invested would be

20     returned to the employee in the form of cash if the employee

21     left the employment before that took place.

22          So that's a distinction as well.  So you have to

23     divide these into two components.  2008, where there was an

24     opportunity and, according to my client, a history of cash

25     being returned to employees under certain circumstances.  And

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 88 of 130

Page 88

1    you have the prior period where you -- money was taken,

2    presumably never actually invested in the stock but merely just

3    taken and held in a form that we've never been clear about.

4        So --

5        THE COURT:  It's very difficult for me to deal with

6    what you just said for purposes of today's hearing.  You're

7    making a hearsay statement as counsel.  I don't know how to

8    deal with it.  It's not evidence of anything yet.  I don't know

9    whether or not you're proposing a declaration of your client to

10   supplement the record with respect to this issue with some

11   specificity as to how it ties to the claim.

12       MR. MICHAELSON:  Yes, I am, Your Honor.  I gave

13   thought to that issue because I realized that my statement or

14   my client's statement is not evidence that this Court can rely

15   on to make a ruling.  But there are two options here.  One is a

16   declaration from my client.  And the second is, in the context

17   of this contested matter, applying the adversary rules and

18   allowing depositions to be taken to determine what money was

19   spent -- how -- where the money was put, under what terms and

20   conditions money may have been released that may have indicated

21   that it was something other than what it might have been

22   labeled or appeared to be.

23       So I think there are legitimate questions about the

24   interaction between the parties.  I think, expanding on that,

25   there's a legitimate question as to this whole issue of whether

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 89 of 130

Page 89

1    a bargain was struck.  We've heard a lot of talk about their

2    having been -- this being bargained for.  And you've heard me

3    say and my client has said and others have said that there was

4    no bargain.  This was a unilateral imposition of a new policy

5    in which they had no say.  The debtor has a slightly different

6    view of that.  Well, that's a factual question that, from the

7    presentations today, I would find it very difficult for the

8    Court to opine on.

9           But this may be fundamental to the very issue that

10   we're talking about in the spirit of what Judge Gonzales said

11   in Enron, that there are -- he said he couldn't imagine that

12   there were circumstances.  But he didn't preclude them.  And he

13   also said that his ruling was limited to those specific facts.

14   I think that we may be in that very narrow range where we have

15   an opportunity here to reach a different conclusion.  But I

16   think that the facts have not been fully investigated and

17   expanded upon and certainly not sufficient to inform the Court,

18   in my view, of what really went on in this case.

19           THE COURT:  Okay.

20           MR. BERNSTEIN:  Thank you.

21           MS. SOLOMON:  Good afternoon, Your Honor.  Lisa

22   Solomon.  I represent eight claimants:  Mr. Gordon Sweely,

23   Vincent Primiano, Riccardo Banchetti, Giancarlo Sarrone, Harsh

24   Shah, Philippe Dufournier, Charlie Spero and Tim Burke.  The

25   individuals that I represent in this case, Your Honor, some of

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
Pg 90 of 130
LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 90

1    them worked in the United States and some of them worked

2    outside of the United States.  So the individuals who worked in

3    the United States have asserted claims under RSUs.  And the

4    individuals who worked outside the United States have asserted

5    similar claims under the contingent stock arrangements.

6          Your Honor, the claims that have been asserted here,

7    and the debtors haven't contested this, are claims for unpaid

8    wages.  They were issued under a stock incentive plan for all

9    of the claimants.  And the claim for unpaid wages arises under

10   Delaware law as well as the Bankruptcy Code.  The stock

11   incentive plan which hasn't been referred to in any of the

12   debtors' documents is a pivotal document here, not necessarily

13   the grant agreements which were issued after the stock

14   incentive plan.  And the stock incentive plan in paragraph 8

15   specifically provides that nothing herein shall give any

16   participant any rights that are greater than those of a general

17   creditor of the company.

18         Your Honor, it's submitted that -- it's acknowledged

19   here that they did have the rights of a general creditor of the

20   company and that they did not -- and that the claimants did not

21   have rights as shareholders.  In fact, that paragraph 8 goes on

22   to provide further that the participants shall not have any

23   rights of a shareholder of the company with respect to shares

24   subject to an award until the delivery of such shares.

25         The claimants have claims for unpaid wages.  And in

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 91

1    fact, Your Honor, it's our position that certain parts of the

2    claim are entitled to priority wage treatment under the

3    Bankruptcy Code and that their wages under Delaware law as

4    well.  Your Honor, it's been submitted that this is very

5    significant here because, as far as I know, there isn't any

6    prior case law that has construed Section 510(b) and, in

7    particular, the Enron case did not address this issue where a

8    claimant was entitled to priority wage treatment and at the

9    same time, it was found that that claimant's claim could be

10   subject to subordination under the Bankruptcy Code under

11   510(b).

12        THE COURT:  What's the basis for asserting that any of

13   your clients are entitled to priority wage treatment?

14        MS. SOLOMON:  Because the RSUs and the CSAs that were

15   issued were on account of services rendered within 180 days of

16   the bankruptcy filing.  That's the basis, Your Honor.  And it's

17   submitted with respect to other case law that has been cited in

18   the debtors' filings dealt with terminated employees not

19   current employees who are continuing to render services.  And

20   that Congress found it appropriate to grant priority status to

21   claimants for their services rendered is significant here.

22        THE COURT:  Well, how do you deal with the distinction

23   between the payment of cash and the payment of the right to

24   receive equity?

25        MS. SOLOMON:  Well, first, I would note also that

Page 92

1    while the debtors were not under an obligation, the debtors

2    reserved the right to pay in equity or cash under the stock

3    incentive plan.  And so, the claimants were not guaranteed just

4    that they would receive equity upon the satisfaction of the

5    conditions.  But it was possible that they would never receive

6    any equity.  And whether or not the debtor was obligated or it

7    was in the discretion of the debtor, I don't consider it to be

8    that significant.  The point is that these claimants did not

9    know at any time that they would be an equity security holder

10    of the company.

11         What we're talking about here, Your Honor, is

12    basically a categorical reordering of a priority claim that was

13    granted by Congress under the Bankruptcy Code.  And I say

14    categorical reordering because it's the same set of facts that

15    give the claimants a priority claim that makes their claim

16    according to the debtors subject to subordination under Section

17    510(b).  And it's submitted that there's no basis for a

18    categorical reordering of their priority claims.

19         The fact that their claim is tied to the price of the

20    stock doesn't change the underlying nature of the claim.  And

21    that is, it's a wage claim for unpaid services, for services

22    that were rendered but that they didn't receive payment on.

23         Your Honor, I would point out also that the factual

24    background with regard to various of the claims is different.

25    And some of my claimants started employment with Lehman --

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 93 of 130

Page 93

1    Lehman Holdings more than twenty years ago.  And at that time,

2    Your Honor, there was no equity package whatsoever.  They were

3    privately owned.  They were owned by American Express.  And

4    over the years, that changed and slowly equity compensation was

5    worked into the formula.  And the portion of their equity

6    compensation was increased over time.  But this isn't a

7    situation, as has been described by the debtors, where, from

8    day one, there was a contract in place and my clients agreed to

9    certain terms.  That's just not what happened here.

10   Eventually, at the end of the day, their compensation was based

11   in part -- was up to the equity comp -- a portion was up to

12   practically forty percent.  But that was very, very different

13   from what it started out at the beginning of time.  And if they

14   were to leave at any point in time, they would therefore have

15   forfeited the prior equity compensation that had been

16   previously earned.  And while, Your Honor, I don't consider

17   that necessarily to be involuntary servitude, I don't, at the

18   same time, consider that to be a fully bargained for agreement.

19        I'd like to point out further, Your Honor, that the

20   terms of the RSUs and the CSAs were universal within Lehman.

21   And this was not a situation where there was a single private

22   agreement reached with one particular claimant.  But this was

23   the universal employment policies of the company.  And I

24   believe that that makes this case very different from any of

25   the prior cases that have been cited dealing with terminated

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 94

1  employees and severance packages that they may have reached

2  with the debtor in those particular cases.  And I would also

3  point out that the claims that have been asserted here are not

4  based on diminution of value of stock.  They're not damage

5  claims for diminution of value of stock.  They're wage claims

6  for the wages that my clients had earned but were not paid

7  because the debtor deferred it and then said I'll pay it in the

8  equity portion down the road.

9       So to the extent that which Cong -- 510(b) is very

10 clear, the debtors have to show that we have a damage claim

11 arising from purchase of a stock.  We don't have that here.

12 It's not based on diminution of value of stock but rather based

13 upon the compensation that my clients earned prior to the

14 bankruptcy filing.

15      I would also point out that, Your Honor, in certain

16 cases there was guaranteed compensation that was put off in

17 terms of the equity compensation.  It was described as

18 guaranteed compensation -- and this is in our papers, Your

19 Honor.  It was described as guaranteed compensation and

20 referred to as guaranteed compensation.  In one or more

21 contracts between my clients and the debtor.  And not only is

22 that compensation now not being paid to them, but they're told

23 that they can't even make a claim and get the same rights as

24 general creditors in the company for that guaranteed

25 compensation.  That's it, Your Honor.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 95

1          THE COURT:  Okay.

2          MS. FLACKMAN:  Good afternoon, Your Honor, and members

3   of the court.  My name is Cynthia Flackman.  I'm representing

4   myself, I'm not a lawyer, in the matter of claim 4709.  And I

5   submitted a response to the 131st objection to my claim.  And I

6   believe I made a number of meritorious statements and stated

7   facts related to certain legal precedent in that filing and the

8   filing of my response.  But I do not want to reiterate that

9   filing because of my respect for your time, Your Honor.

10         I would simply like to state that notwithstanding the

11  fact that the debtors' objection has aptly described the nature

12  of equity securities and related instruments that may be

13  broadly categorized as equity securities, the debtors' 131st

14  omnibus objection to claims is without merit with regard to my

15  claim because it is entirely based on the intended form of

16  payment and does not address the substance of the liability to

17  me as creditor for unpaid wages.

18         Whereas, as creditor, I adjusted the amount of the

19  RSUs that were published in the LehmanLive RSU summary, and I

20  specifically removed the 2008 grant that was not incorporated

21  in any of my compensation statements, the RSU values that I am

22  categorizing as my compensation were stated as my compensation

23  for the year, salary plus bonus.  There's a footnote about RSUs

24  in the statement and any amount of the bonus that's paid in

25  cash is stated and separated from the equity.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1           But whereas the compensation total was presented in

2      this way, regardless of the categorization of equity and the

3      kinds of -- the types of precedents that deal with these types

4      of securities, I don't think it really addresses the other side

5      of the balance sheet, my claim.  The consideration that would

6      be offered to settle my claim and whatever that consideration

7      is, it has a variety of financial characteristics but I don't

8      think it settles my claim.  And because I made this adjustment,

9      I feel I have distinguished my compensation claim from the

10     generalities of RSUs.

11          I would also like to state that it was somewhat

12     painful to see references to Enron and WorldCom.  Excuse me,

13     Your Honor.  I find Lehman as an entity that I always felt

14     tried to do the right thing.  And legal precedents can be set

15     that are either good or bad.  And sometimes we can rely on bad

16     precedent and come out with bad laws or bad decisions.  But

17     there always was a remedy starting with Magna Carta and the

18     foundation of our laws was a remedy, equitable remedy.  And I

19     would like to respectfully petition the Court to grant an

20     equitable remedy to me in full settlement of my claim.

21          My claim was part of reasonable compensation.  It's

22     not millions of dollars.  If you were to look at the

23     compensation that a person would be paid for the job and the

24     hours that I worked, I feel my claim was very reasonable.  And

25     I would like to ask for an equitable remedy.  And I have

Page 97

```
 1    brought paperwork which I'd like to approach the bench with to

 2    submit my request for an equitable remedy which I think

 3    distinguishes me from the other claimants.

 4          THE COURT:  Before you hand that to me, I just want to

 5    make sure that the debtor knows what it is that you're handing

 6    me.

 7          MS. FLACKMAN:  Oh, yes.  I have it for them also.  And

 8    I have it for the --

 9          THE COURT:  Okay.  I'll take a look at it.

10          MS. FLACKMAN:  Sorry.

11          THE COURT:  Okay.  Thank you.

12          MR. KENNEY:  Your Honor, my name is Arthur Kenney.  I

13    am not a lawyer.  I was a twenty-five year salesman at Lehman

14    Brothers and a commissioned salesman at that.  Similar to the

15    first couple of colleagues who -- or representatives who spoke,

16    again, I was a commissioned salesperson.  And like my

17    colleagues, a portion of that commission was accrued to

18    purchase RSUs at the end of the year when the price would be

19    set.  That was similar to what I think of it as a convertible

20    debt obligation with the conversion price to be determined at

21    the end of the year.  On the first of July, 2008, twenty

22    percent of the accrual was used to purchase, in my case,

23    1416.06 RSUs at a price of 20.96.

24          My claim, as my colleague who just preceded me,

25    consists of the accrued commissions minus the amount of the
```

1    commissions that were granted in RSUs for that July 1st

2    purpose.  So my claim is the net outstanding accrued earned

3    commissions that I argue should not be reclassified as equity.

4    I assert that these owed commissions are -- remain as debt as

5    convertible debt which cannot be converted.  So that's the

6    claim that I am making.

7              THE COURT:  Okay.  Thank you.

8              MR. KENNEY:  Thank you for your time.

9              MR. PLASKETT:  Good afternoon, Your Honor.  I'm Rodney

10   Plaskett.  I'm one of the claimants.  I actually did practice

11   law for twenty years -- for ten years.  For the last nineteen,

12   I've been an institutional equity research salesperson.

13             I was going to ask for your indulgence if you might

14   read back the first couple of sentences of your statement that

15   you had earlier today.

16             MR. BERNSTEIN:  I'm not exactly sure what you're --

17             MR. PLASKETT:  Just the first couple of --

18             THE COURT:  What is it you're asking for?

19             MR. BERNSTEIN:  What are you trying to --

20             MR. PLASKETT:  I'm trying to recall your first couple

21   of statements which I did not feel were at all true.

22             MR. BERNSTEIN:  "The objection seeks to reclassify the

23   claims as equity interests.  Part of the commencement, LBHI

24   granted RSUs to employees as part of their compensation in

25   order to enable employees to participate in the increased value

Page 99

1    of Lehman by enabling them to receive common stock.  The RSUs

2    bear the hallmarks of equities.  The holders' benefit an

3    increased value of the corporation, receive dividends and bear

4    the risk of failure of the corporation.

5        MR. PLASKETT:  Thank you.  The compensation I'm

6    seeking today is a defined amount.  It's about 60,000 dollars.

7    And that was not compensation to me.  That was -- that Lehman

8    gave to me.  That was commissions that I earned.  I was not a

9    salaried employee receiving a bonus.  Okay, Rodney, you did a

10   great job this year.  On top of your salary, we're going to

11   give you X dollars.  No.  Every day I come in, it's zero.  And

12   then I earn X; I'm paid Y.  And out of that Y is taken a

13   portion.  It's called a holdback.  That holdback can be used

14   for whatever the employer deems fit.  If I have a bad trade

15   that goes against me, they can take some of that money.  If I

16   misstate how a trade should be executed, they can take that

17   money.  If I do a deal and there's a penalty bid -- a penalty

18   bid is when one of my clients decides to flip a hot stock.

19   They can take that money.

20       So Lehman goes bankrupt and I get my monthly

21   statement.  And I see I have made X.  And there's another line

22   that's got 60,000 dollars in it.  And that 60,000 dollars is

23   definable as cash and as a holdback.  It's my compensation.

24   Every single commissioned salesperson on that desk can point to

25   a number that was still cash.

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 100 of 130

Page 100

1          Lehman goes under.  We get an e-mail from Barclays:

2     accept or decline employment.  We accept employment.  We go to

3     our management.  Okay, guys.  We realize the RSUs may be zero

4     but where's our defined commissioned money we saw on our last

5     statements?  I don't know.  Don't ask us about it.  So, I mean,

6     why?  None of the management changed.  They just changed from

7     being Lehman management to Barclays management.  Where was that

8     sum of money?  It's definable; it's in writing.  I submitted it

9     with my petition and I would really love to get it because I

10    could have lost it for trading errors, for penalty bids, for

11    whatever Lehman -- if Lehman wanted to give me Hess trucks for

12    Christmas, they could have said, well, that's what we bought

13    with that money.  But that money was definable compensation,

14    definable commission revenue.

15          RSUs were not part of the bargain of my working at

16    Lehman.  As a commissioned salesperson, once again, you started

17    at zero and you earned your commissions every day, every month.

18    If I had been let go without cause, I'm willing to state that,

19    Rodney, we're going to scale back this month.  So here's the

20    money we were holding back from you because it's not time to

21    deliver RSUs.  Thank you very much, Lehman management.  That's

22    fair.  I earned it.  You see it.  It's right there.  It's not

23    time for RSUs so it must be in cash.

24          THE COURT:  Can I ask you a question about --

25          MR. PLASKETT:  Yes, sir.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 101

1          THE COURT:  -- at least how your situation with Lehman

2     was documented?  Was there a set of procedures or terms and

3     conditions of your employment as a commissioned salesman that

4     laid out what Lehman could do with funds that were held back

5     from your salary?

6          MR. PLASKETT:  No.  It was the opportunity that maybe

7     we'll give you RSUs.  But other than that, no.  So any monies

8     that I earned, they could have used in any manner they desired.

9     That's the power of that man -- of any management, often.  But,

10    no.  There was no contract other than you may have a -- you'll

11    have a holdback, could go with the RSUs, could be used if you

12    screw up, if you blow a trade.  And those things did happen.

13         THE COURT:  Okay.  So do I understand that, at least

14    in your experience, and perhaps this is similar to the

15    experience of other commissioned sales personnel, that there

16    was a separate accounting sheet that was created on a monthly

17    or quarterly basis that laid out what you had earned in

18    commissions and that set aside a certain amount which was

19    disclosable on the form that showed what was being held back.

20    Is that correct?

21         MR. PLASKETT:  Yes, sir.

22         THE COURT:  And was it ever the practice of Lehman, to

23    the best of your knowledge, for the funds being held back to be

24    paid to the commissioned salesperson in cash at the end of a

25    year?  Was it ever a fund that you could tap into?

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 102 of 130

Page 102

1          MR. PLASKETT:  I could not tap into it.

2          THE COURT:  You did not?

3          MR. PLASKETT:  I could not --

4          THE COURT:  You could not.

5          MR. PLASKETT:  I could not tap into it.

6          THE COURT:  And is it true that no one could?

7          MR. PLASKETT:  No.  Management could tap into it.

8          THE COURT:  No.  But none of the commissioned

9    salespeople had a right to tap into the fund?

10          MR. PLASKETT:  Correct --

11          THE COURT:  Okay.

12          MR. PLASKETT:  -- to the best of my knowledge.

13          THE COURT:  All right.  Thank you.

14          MR. PLASKETT:  So I stand here once again, reiterating

15    my claim for a definable amount of cash that was earned

16    commission, that was income that I feel has been, first of all,

17    channeled to import -- to incentivize the management that was

18    retained by Barclays as commissioned salespersons, none of us

19    received retention bonuses.  There were two sales forces at

20    Lehman.  One which I was in was Little Markets; and another

21    which was called Portfolio Sales.  They were supposed to cover

22    the top 200 accounts in the country.  And they were on salary

23    plus bonus.  Many of those individuals received retention

24    bonuses.  None of us in commission sales received a dime.

25          So, in other words, I do feel as though I've been

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 103 of 130

Page 103

1    defrauded because the amount of money is quite clear has been

2    with my file.  I don't have the financial wherewithal at this

3    time to retain counsel.  I have to act as my own.  But I do

4    hope that as you review the many commission salespersons'

5    complaints that you will look at them from the standpoint of

6    those who did hire counsel to extract favorable case law.  And

7    at least for those of us who decided to take the time to put in

8    a claim, to give it the benefit of some of those common

9    filings.

10           I believe that really does sum up what I had to say

11   here today and I really thank you for your time.

12           THE COURT:  Okay.  Thank you very much.  Before I hear

13   from the next individual, based upon what I've heard to this

14   point, I'm concerned about the lack of a formal evidentiary

15   record here.  And I don't think we're going to solve the

16   problem this afternoon.  It seems to me that this is taking on

17   a character that's somewhat similar to a matter that I recently

18   decided in a totally different context in the LBI SIPA case

19   that involved -- and it's a reported decision, claims with

20   respect to so-called TBA contracts.  And I'm thinking of it

21   because, in that setting, I at least had a record because the

22   parties stipulated that certain declarations and attachments to

23   the declarations could be accepted as reliable and authentic

24   evidence that I could refer to for purposes of decision making.

25   And what I am finding as a result of this hearing up to this

Page 104

1    point, and we're not done, is that there are issues of fact

2    that are being referenced in a very credible way by individuals

3    who are not under oath, who are not subject to cross-

4    examination and who are in a position to influence the Court.

5         So I'm troubled by where we are right now in this

6    proceeding just as a pure matter of case management and

7    administration.  I haven't opened up this envelope which was

8    handed to me but I will.  But I'm not sure what I'm supposed to

9    do with it once I read it.

10        I think, as a result, that we need to do a better job

11   managing this process so that I can make some judgments about

12   particular claimants within what previously has been

13   characterized as a class.  And it seems to me that I have

14   already heard enough to know that there are subclasses within

15   the class and that one subclass would be commissioned

16   salespeople who had funds held back and accounted for but, as

17   just stated, did not have the ability to access those funds but

18   nonetheless those funds represented what they could, with a

19   straight face, characterize as earned commissions.

20        I also have heard just before the lunch break from an

21   attorney who represents individuals who had been working at

22   Neuberger Berman before the acquisition and presumably are

23   still with Neuberger Berman and who explained their terms and

24   conditions of employment were changed as a result of the

25   acquisition by Lehman but that by virtue of the economic

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 105 of 130

Page 105

1    reality of their practices, were held captive by economic

2    coercion.  It wasn't anything that willful; it was just

3    circumstantial.

4          I think that both of these examples, and I'm not

5    limiting the field to these examples, raise some questions as

6    to what the facts actually are.  And it further raises a

7    question in my mind as to whether we can deal with this in so

8    undifferentiated a way as we have started to deal with it this

9    afternoon.  So that's my mid-course reaction to what I've heard

10   so far in terms of whether or not we're in a position to make

11   some decisions.  And I don't mean to cut anybody off.  I think

12   that we've reached just about five minutes to 3.  And I'm going

13   to have to take a break for the chambers conference which will

14   be starting at about 3:00.  Is there someone --

15            UNIDENTIFIED SPEAKER:  Yes.  Your --

16            THE COURT:  I see someone standing --

17            UNIDENTIFIED SPEAKER:  Right.

18            THE COURT:  -- in reference to --

19            UNIDENTIFIED SPEAKER:  Your Honor, that chambers

20   conference -- the parties are talking and then respectively

21   talking to their business principals --

22            THE COURT:  Could you come forward --

23            UNIDENTIFIED SPEAKER:  Sure.

24            THE COURT:  -- only because I can barely hear you.

25            UNIDENTIFIED SPEAKER:  Your Honor, the parties are

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1    talking among themselves.  We started talking about twenty

2    minutes ago.  And now they're respectively reaching out to

3    their business principals to see if we can get some kind of

4    framework to present to Your Honor at 3.  And given that

5    ongoing discussion, we wondered if we could postpone it ten or

6    fifteen minutes if that works for Your Honor.

7              THE COURT:  You can postpone it for a half hour.

8              UNIDENTIFIED SPEAKER:  Okay.

9              THE COURT:  You can postpone it for forty-five

10   minutes.  I don't really care.

11             UNIDENTIFIED SPEAKER:  I don't think we need more

12   than, say, twenty minutes.  So if you want to say a half hour

13   to be safe.

14             THE COURT:  Let's call it 3:30.

15             UNIDENTIFIED SPEAKER:  Okay.

16             THE COURT:  And are you gathering in the conference

17   room across from my chambers?

18             UNIDENTIFIED SPEAKER:  We can do that.  We are in the

19   hall right now.

20             THE COURT:  Why don't you ask my courtroom deputy to

21   open up the conference room which is across the hall.  You can

22   gather in there and I'll join you there at about 3:30.

23             UNIDENTIFIED SPEAKER:  Okay.  Great.  And where can I

24   find your courtroom deputy?

25             THE COURT:  Just walk into the door that says

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 107 of 130

Page 107

1     "Chambers Entrance".

2          UNIDENTIFIED SPEAKER:  Okay.  Thank you, Your Honor.

3        (Pause)

4          THE COURT:  Okay.  We've just been given a half hour.

5     I think we should continue to hear from those individuals who

6     are gathered here now and who wish to be heard.

7          MR. KENNEY:  If I could just put an addendum to my

8     colleague, Mr. Rodney?  You asked if there was a statement

9     that's an example of a statement that -- and may I show it to

10    you?  And you see there are --

11         THE COURT:  I appreciate that there is such a

12    statement and that only serves to further emphasize in my mind

13    the procedural concern that I have which is that we don't have

14    an established evidentiary record to deal with some of the

15    ancillary materials that are being present.  And we're going to

16    need to do that before I can do anything with the information

17    that's being developed.

18         MR. SCHAGER:  Good afternoon, Your Honor.  Richard

19    Schager for claimant, Michael McCully.  And I'm just going to

20    make a very quick point 'cause I'm quite happy with the

21    procedure Your Honor outlined about subsequent sequential

22    papers to be filed before the next hearing.

23         I thought the fatal flaw in omnibus motion 130 was the

24    way it glossed together and glossed over differences among

25    different plans including stock option plans, the contingent

Page 108

1    stock awards and the restricted stock units all of which are

2    significantly different.  I think virtually everything that has

3    been said today has dealt with RSUs.  I thought I heard one

4    reference to a stock option plan but it wasn't clear to me.  So

5    I was going to ask the Court to -- I was going to ask the Court

6    respectfully to clarify whether the Court's knowledge the

7    130th omnibus motion still deals with stock option plans and

8    contingent stock awards as well as RSUs or has the relief been

9    granted for everything except the restricted stock units, the

10   RSUs?

11           THE COURT:  We'll have to ask debtors' counsel for

12   that --

13           MR. SCHAGER:  And if they can't be addressed today

14   then I think it has -- I would just flag that I think it's

15   something that has to be addressed in the papers.

16           THE COURT:  We'll have to ask debtors' counsel to

17   clarify that.

18           MR. BERNSTEIN:  Your Honor, the -- it was not entirely

19   clear to us from the proofs of claim if parties were claiming

20   for stock options, contingent stock awards or RSUs.  They

21   generally attached -- generally, statements were attached that

22   said how many RSU units they held whether they acquired those

23   through the equity awards program, the contingent stock award

24   program.  I think the end result is the same.  They end up with

25   RSUs.  So the objection addressed everything that was included

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 109 of 130

Page 109

1      on the proof of claim attached to those -- included in those

2      proofs of claim.  So if there were stock options included on

3      those and the party had ended up with RSUs, those obviously

4      were included.  And if they had something different, that was

5      also included in the objection.  So no relief yet has been

6      granted here today but those -- all of those items on those

7      proofs of claim were intended to be subject to the objection.

8              MR. SCHAGER:  Okay.  While I'm -- subject to making

9      one brief point, Your Honor, I'd say I'd wait until the next

10     round of briefing.  But I think there are -- the Court is going

11     to find that there are, in fact, significant differences

12     between stock options that are granted which represents a real

13     physical act and a restricted stock unit that just, by way of

14     one example, a stock option has a tax consequence.  And it

15     might not be taxable at the time of the grant but that's

16     subject to provisions of the Internal Revenue Code.  Restricted

17     stock units were never taxed.  And it's not clear that there

18     was anything that transpired that would constitute taxable

19     compensation.  I think that's going to be the type of

20     difference in these types of plans that has to be addressed.

21     Having said that, though, I'm happy to wait until the next

22     round of briefing.

23              THE COURT:  Okay.

24              MR. SCHAGER:  Thank you.

25              MR. SHOTTON:  Thank you very much, Your Honor.  My

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1   name's Paul Shotton.  I'm here representing myself as a former

2   Lehman Brothers employee.  The offer letter of employment which

3   constitutes the only employment contract I've had with the firm

4   guaranteed a total compensation amount as a dollar figure for

5   the first year of employment.  The letter went on to explain

6   that in subsequent years the figure would be variable but

7   referencing the figure for that first year to establish a run

8   rate.  And it said that solely at the firm's discretion, part

9   of the compensation made be paid in the form off conditional

10  equity awards.  It went on to describe those as being RSUs or

11  stock  options or of a conditional equity award pursuant to the

12  employee equity award program then in effect.

13       Now the terms of the program including the proportion

14  of conditional equity changed from year to year solely at the

15  firm's discretion.  I was never consulted nor asked to approve

16  that.  And bonus amounts and amounts of equity which were

17  determined at the end of each fiscal year were fixed in dollar

18  amounts not as a particular fixed number of shares and,

19  likewise, when stock actually vested, tax which was due to the

20  Internal Revenue -- to the Treasury -- taxes withheld at source

21  automatically by the firm.

22       So it's quite clear from the contract letter that the

23  firm viewed the conditional equity awards, cash salary and cash

24  bonuses as being completely fungible quantities.  And the

25  deferred equity portion was used solely or principally as an

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 111 of 130

Page 111

1    employer retention device.

2        The equity awards programs make clear that the RSUs as

3    counsel admits they are immediately convertible into cash

4    albeit at the behest of the firm in the event of a change of

5    control.  So I believe that the argument that RSUs are only

6    classifiable as equity is fundamentally incorrect.

7        And in summary, I'm pursuing a wage claim seeking just

8    compensation for services rendered to the firm in good faith.

9        THE COURT:  Okay.  Thank you.

10       MR. HUTTON:  Good afternoon.  My name is Randall

11   Hutton.  I'm not an attorney.  My claim number is 14023 which I

12   initially filed in September 2009.

13       I filed a response on May 16th of this year to the

14   debtors' 118th omnibus objection to reclassify my proof of

15   claim to equity interest.  In doing so, I reduced the amount of

16   the initial claim that I had to only reflect deferred

17   compensation under an employment contract that I had with the

18   debtor.  Per my amended claim, I disagree with the debtors'

19   assertion and their objection that the conditional equity

20   awards I earned in 2006 an 2007 under the employment contract

21   is security under Section 510(b) Bankruptcy Code.

22       I further disagree with the debtors' omnibus reply

23   filed on December 15th to the general omnibus responses as it

24   failed to address my specific claim and my response.  As a way

25   of background, I had signed an employment contract on December

Page 112

1    10th, 2004 with the debtor which I had included in Exhibit A of

2    my response.  The contract specifies a consideration and

3    compensation for my services throughout its term which was

4    calculated annually through a defined formula.  Per the

5    contract, Lehman had the discretion to pay a portion of

6    compensation in the form of conditional equity awards which is

7    the amount of my amended claim.  The debtor had filed for

8    bankruptcy before any of these were paid to me.

9         The employment contract called for an exchange of my

10   services for a calculated dollar amount of compensation in 2006

11   and 2007.  Given this was a contractual obligation for a

12   calculated dollar amount and only a calculated dollar amount,

13   the conditional equity portion I received was in form of

14   compensation only, not necessarily ultimate value.  My contract

15   states in Section 3 that a portion of my compensation could be

16   paid in the form -- and underline "form" -- of conditional

17   equity awards.  This could be interpreted to referring to the

18   deferral investing aspects related to conditional equity but

19   not necessarily its ultimate value.  In other words, Lehman was

20   not contractually obligated to hold a certain number of shares

21   to me but rather, needed to provide the amount of stock when

22   vested to contractually fulfill the calculated dollar amount

23   owed under the contract.

24        To illustrate this point, assume that Lehman did not

25   file for bankruptcy but instead its stock increased in value

08-13555-mg    Doc 23741    Filed 12/27/11    Entered 12/27/11 13:53:19    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 113 of 130

Page 113

1    substantially.  When the conditional equity was due to be

2    delivered to me pursuant to the terms of the contract, Lehman

3    could limit the amount of shares delivered to me to the

4    contracted amount of compensation in my claim.  Even though the

5    market value that those shares -- may be much higher, Lehman

6    could argue that under contract and general contract

7    principles, it is only responsible for a contracted amount and

8    not the higher equity market value amount.  Thus, I did not

9    necessarily have the upside of an equity investor.  Given that

10   the conditional equity I received under the contract was capped

11   under a contract amount and under general contract law

12   principles, it does not meet the Bankruptcy Code definition of

13   "security" as defined in Section 501(b) as the debtor alleges.

14        The case law is, I think, the similar Enron court

15   opinion regarding employee claims filed on May 2nd, 2006 where

16   Judge Gonzales describes the absolute priority rule in saying

17   that "In return for the right to share in the profits of the

18   corporation, securities holders must also accept the risk of

19   insolvency and therefore precluded from sharing in the

20   distribution of the estate until all general creditors have

21   been satisfied.  Security holders thus accept greater risk in

22   return for the opportunity of a greater reward whereas general

23   creditors' bear less risk commensurate with the fixed nature of

24   their award.

25        Given the conditional equity that I had under my

Page 114

```
 1   contract was contractually capped at a calculated amount, it

 2   compromised any right to share in profits in Lehman.  Per these

 3   reasons, the conditional equity amount should not be considered

 4   a security per Section 510(b) as the debtor alleges but should

 5   be a general unsecured claim against the debtor.  Thus, I

 6   respectfully petition the Court to deny the debtors' request to

 7   reclassify the claim as an equity interest.

 8            THE COURT:  Thank you.

 9            MR. HUTTON:  Thank you.

10            THE COURT:  Is there anyone else in the courtroom who

11   wishes to be heard?  All right.  That means that those of us

12   who are still on the telephone will have a chance to express

13   themselves.  But the first thing that I'm going to ask is that

14   you at least identify yourself by name if you wish to be heard

15   at this time.

16            MR. BOYAJIAN (TELEPHONICALLY):  Yes.  Hello?

17            THE COURT:  Listening.

18            MR. BOYAJIAN:  Yes.  This is James Boyajian, law

19   office of A. James Boyajian in Los Angeles on behalf of Jeffrey

20   Wardell, claim number 24545.

21            THE COURT:  All right.  You're on the list.  Anybody

22   else?

23            MR. CARRAGHER (TELEPHONICALLY):  Yes.  This is Dan

24   Carragher for claimant, Fabio Liotti, L-I-O-T-T-I.  And I would

25   like to be heard.  It's claim number 25895.
```

1          THE COURT:  I have -- that's two.  Is there anybody

2     else on the line who wishes to be heard?

3          MR. COHEN (TELEPHONICALLY):  Darian Cohen from Los

4     Angeles representing myself.  The claim number is 16153.

5          THE COURT:  Could I have your name again, please?

6          MR. COHEN:  Sure.  It's Darian, D-A-R-I-A-N, Cohen,

7     C-O-H-E-N.

8          THE COURT:  Anybody else?

9          MR. JACOBSON:  Lars Jacobson, L-A-R-S,

10    J-A-C-O-B-S-O-N, claim number 24335.

11         THE COURT:  So far I have four.  Anybody else?  Okay.

12         MR. GRAN (TELEPHONICALLY):  This is Michael Gran.

13         THE COURT:  Michael -- what's your last name?

14         MR. GRAN:  G-R-A-N --

15         THE COURT:  I couldn't hear your last name.

16         MR. GRAN:  G-R-A-N, as in November.

17         THE COURT:  And are you a lawyer or speaking for

18    yourself?

19         MR. GRAN:  For myself.  Claim number 23900.

20         THE COURT:  Okay.  Do we have a complete list of five?

21    Apparently so.  We'll go in the order in which people spoke up.

22    The first is the attorney who represents Mr. Wardell.

23         MR. BOYAJIAN:  Thank you, Your Honor.  The Code aims

24    to protect employees as priority creditors.  Jeffrey Wardell

25    was a broker in LBHI's San Francisco office who has a 507(a)

1    priority claim for $50,638.80 for the extent admissible under

2    the 507 priority status and for the rest of it by general

3    unsecured claim.  These amounts are for unpaid wages, benefits

4    and compensation.  The money was taken out of his paycheck by

5    debtor LBHI in anticipation of issuing restricted stock units

6    at the end of November of 2008 under the 2008 equity award

7    agreement.  The RSUs ultimately could not be issued and do not

8    exist.  He got no cash and no RSUs.

9         We ask the Court to deny debtors' objection because

10    this claim is valid for the following two reasons.  Despite

11    Your Honor's mention of the shifting of burden earlier, we

12    believe that debtors' objection does not refute the essential

13    allegations about this claim and therefore does not shift the

14    burden to prove validity of the claim.

15         And secondly, even if the burden has shifted to us,

16    this claim is valid based on the preponderance of evidence

17    because it arises out of unpaid compensation and requires

18    restitution.

19         First, the debtors failed to shift the burden because

20    they cite no relevant authority to refute this claim.  The case

21    turns, as Your Honor mentioned earlier, on whether not granted

22    RSUs are equity securities.  None of the cases cited in the

23    objection or the reply briefs are relative to this issue.  In

24    re Enron deals with stock options and phantom stock.  To posit

25    three other examples, in the matter of Baldwin-United Corp.

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 117 of 130

Page 117

1    deals with stock option claimants; Curreri v. Jopps (ph.) deals

2    with preferred stock warrants; and Einstein Noah Bagel Corp.

3    deals with puts.

4            None of these cases as cited by debtors deal with

5    RSUs.  RSUs are a completely different animal, Your Honor.

6    They're not equity securities as defined in Section 101,

7    paragraph 16.  Even had they issued and invested because RSUs

8    are different from stocks, puts, warrants, phantom stocks and

9    stock options, all of these equity interests give a present

10   right to the risks and benefits of equity ownership.  RSUs give

11   only a conditional right to convert to an equity interest at a

12   later point in time and not a present equity interest.

13           Also, unlike these other equity securities, RSU

14   holders do not enjoy the hallmarks of equity ownership

15   including benefiting increases in entity value, building rights

16   or transferability.

17           To quote directly from the 2008 LBHI equity award

18   program, RSUs are defined on page 16 as "the conditional rights

19   received one share of Lehman Brothers common stock three years

20   after the grant date on November 30, 2011.  Generally, RSUs

21   cannot be sold, traded, pledged or transferred during that

22   three year period."

23           Unlike most securities, RSUs are easily forfeitable

24   and unvested rights to buy stock many years later only if

25   several contingencies on the -- and as we have heard earlier

Page 118

1    this morning, Lehman reserved the right to pay out cash instead

2    of issuing those RSUs.  So it's not even certain whether they -

3    - whether the employees will be getting the benefit of RSUs or

4    future common stock if converted.  Therefore, Section 510(b)

5    does not mandate that this claim have the same priority as

6    common equity in LBHI.

7         Not to get to your question, Your Honor, and to the

8    heart of the matter, the Enron case and all of the other cases

9    cited in support of mandatory 510(b) subordination should be

10   distinguished from this claim because they involved stocks and

11   options that had vested.  As to footnote 3 in Enron, it is

12   clear that this opinion applies only to stock options.  And I

13   quote from that footnote:  "To the extent that stock options

14   necessarily implicate the purchase or sale of a security, it is

15   doubtful that any stock options can be so denied."

16        As you can see, RSUs are not stock options and Enron

17   has nothing to do with RSUs.  Even a phantom stock, which is

18   also at issue in Enron, that was not delivered was a present

19   equity interest with expectation of sharing in profits and

20   losses albeit with a deferred date of receipt for tax purposes.

21   In contrast, since respondent never received RSUs and knew of

22   the high risk of forfeiture, he did not expect to participate

23   in the firm's profits and losses.

24        Your Honor, the only two cases that are on point as to

25   the issue of whether RSUs are equity or whether they are debt

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
Pg 119 of 130
LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 119

 1   are FleetBoston out of the district of Massachusetts and Diab

 2   v. Textron out of the eastern district of Michigan both of

 3   which are cited in my response brief.  These cases effectively

 4   state that RSUs are not equity like common stock shares or

 5   stock options.  A conditional promise to grant a possible

 6   equity stake in the future is not a present equity interest.

 7          Moreover, debtors do not cite any contract provisions

 8   which require subordination under 510(a).  On pages 8 and 9 of

 9   their reply brief, the debtors mistakenly suggest that the 2008

10   equity agreement contains a subordination agreement to treat

11   the RSUs as "arising from the purchase or sale of a security

12   like common shares in LBHI in the case of a bankruptcy".  This

13   term appears only in the 2003 and 2004 equity agreements.  It

14   does not appear in the 2008 equity award agreement which

15   governs the amount disputed in this claim.  Nothing in the 2003

16   and 2004 agreements is incorporated by reference into the 2008

17   agreement.  The 2008 agreement that debtors attached in Exhibit

18   B of their reply brief does not even mention the word

19   "bankruptcy".  The fact that this language was removed

20   altogether from the 2008 agreement goes to indicate that the

21   parties agreed they would no longer subordinate RSUs as equity

22   in the case of a bankruptcy.

23          This brings me to my final point, Your Honor.  And

24   I'll keep it a quick one.  As to my second point, this

25   arises -- this claim itself arises out of unpaid compensation

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 120 of 130

Page 120

1   and not for fraud or breach of contract damages arising out of

2   a purchase or sale of the security that was at issue in Enron.

3   There will be no other recourse to seek these unpaid

4   compensations other than by allowing these claims to proceed.

5   The evidence is clear, Your Honor, Jeffrey Wardell's sworn

6   affidavit and his compensation earnings statement show that

7   this money was withdrawn monthly and held in accrual.  He had

8   no cash and no RSUs which begs the question, where is the

9   money.  Can LBHI simply take cash out of an employee's paycheck

10  and keep it in return for worthless common stock that was never

11  bargained for and may have never been received through

12  conversion of the RSUs?  If LBHI could not possibly issue the

13  RSUs, they owe to their employees to pay them cash back that

14  they withheld under the state labor laws of Delaware as well as

15  New York as well as under the equitable doctrine of

16  restitution.

17       My client was -- my client's money was withheld as

18  the -- it was money that was consideration for the waiver that

19  he rendered as a broker for the San Francisco office of LBHI.

20  He therefore has a legal and equitable right to payment under

21  Section 101, paragraph 5.  As such, it is a valid claim.  Your

22  Honor, in summary, we respect ask this Court to use its Section

23  105 equitable powers to cancel and set aside the 2008 equity

24  award agreement due to impossibility because it could not be

25  performed during the voluntary bankruptcy.  The Bankruptcy Code

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 121 of 130

Page 121

1    strongly prefers that employee claims such as Mr. Wardell's

2    remain a 507(a) priority claim.  Thank you, Your Honor.

3         THE COURT:  Thank you.  The next is the attorney

4    representing Fabio Liotti.

5         MR. CARRAGHER:  Thank you, Your Honor.  This is Dan

6    Carragher from Day Pitney in Boston.  I'll keep my remarks

7    brief and will avoid pretty much in the way of factual

8    recitation because I think, in light of Your Honor's comments

9    about keeping the record clear, that's probably better provided

10   in the form of a declaration to be considered at a future

11   hearing.

12        But by brief introduction, Mr. Liotti was employed in

13   London.  He holds claims under RSUs that were issued in 2004,

14   5, 6 and 7 in consideration of over three million dollars of

15   compensation.  And he also has asserted a claim which I'd like

16   to speak to today for 2008 compensation that wasn't paid and

17   was withheld and for which he did not receive -- in his case it

18   was CSAs because he was overseas and not in the United States.

19   And that accounts for approximately 950,000 dollars.

20        What I'd like to focus on is the debtors' argument in

21   their response, point 10 of their Appendix A, the statement

22   that the employees bargained for and willingly accepted a

23   compensation package that included the risks and benefits

24   attended to equity awards in exchange for their labor.  And

25   it's true that the employees accepted certain risks, apart from

08-13555-mg   Doc 23741   Filed 12/27/11   Entered 12/27/11 13:53:19   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 122 of 130

Page 122

1    some of the arguments made, but there were risks of future

2    decline in value, there were risks of forfeiture of the units

3    if there was a cessation of employment and there were risks

4    because the CSAs were not registered securities with the

5    benefits that would entail.  They could not be sold, assigned

6    or traded.

7         But there were other risks that the employees did not

8    accept.  They did not accept a risk that when the time came for

9    the issuance of the CSAs in November of 2008 that Lehman would

10   arbitrarily change the bargain under which they had earned

11   their commission income to, for example, issue CSAs of what's

12   half of what they intended or some percent or zero.  They did

13   not accept a risk that they would completely forego and waive

14   any right to compensation for the percent of their commissions

15   that was withheld which, in my client's case, was capped at

16   thirty-six percent of the annual income.

17        Getting right to the point here, they did not accept a

18   risk that in the event it became impossible for LBHI to honor

19   its part of the bargain by issuing equity awards that the

20   employees would be held to theirs.  And echoing Mr. Boyajian's

21   comments, I think it's appropriate under the doctrines of

22   impossibility and frustration that the Court should fashion a

23   remedy to protect those employees.  We know the remedy will be

24   an imperfect one because LBHI's in bankruptcy and creditors

25   aren't being paid in full.  But the fair resolution here should

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 123

1    be to allow a claim for the portion of the commissions earned

2    but which no compensation was ever provided in any form

3    including the issuance of CSAs.  For that kind of claim,

4    there's no statutory or equitable basis to subordinate it and

5    we believe it should be allowed in full.  Thank you, Your

6    Honor.

7            THE COURT:  Thank you.  Mr. Cohen?

8            MR. COHEN:  Thank you, Your Honor.  I'll be brief and

9    try not to go over any of the ground that has already been

10   covered.  I think, based on what the first speaker said, it's

11   hard to deny that the money was held in 2008 was never invested

12   in anything that could appreciate or depreciate in value, that

13   that didn't happen until November 30th, 2008.  And, of course,

14   that never existed because of the bankruptcy.

15           THE COURT:  I'm going to break in just to ask you to

16   speak up because I think your voice is fading and it may not be

17   picked up on the record.

18           MR. COHEN:  Oh, I'm sorry.  Is that better?

19           THE COURT:  Just speak up the entire time and we'll

20   see what happens.

21           MR. COHEN:  Okay.  So the 2008 money that was withheld

22   clearly was never invested or theoretically invested in

23   anything that could appreciate or depreciate.  So that should,

24   as the first speaker said, be treated as a priority claim.

25   However, with regard to the monies that were withheld in the

1    prior years, it says in the plan documents that the plan is to

2    remain unfunded -- and I'm not going to read the whole

3    paragraph, but it says it constitutes an unfunded plan for

4    long-term incentive compensation.  And with respect to any

5    payments not yet made to a participant by the company, nothing

6    herein made shall give the participant any right that are

7    greater than those of a general creditor.  It has no right --

8    we have no right as a shareholder.

9           But the point is, those plans are rather common.  In

10   fact, the company I work at now has a similar plan but you can

11   invest in whatever you want.  And in this case, for instance,

12   the company I work in now, if I participated in the plan, if

13   whatever I invested went up a lot -- I work for Deutsche Bank

14   now -- if Deutsche Bank were to go bankrupt, the debtors would

15   not be giving me any value of what my nonqualified plan

16   appreciated to.  I would be an unsecured creditor of Deutsche

17   Bank and getting the twenty or thirty cents on the dollar that

18   everyone else gets because the money is never really invested

19   in anything.  If it was, it would be like a pension plan and it

20   wouldn't be tax deferred.  Part of the reason that they're tax

21   deferred is you are an unsecured creditor of the company that

22   you work for.

23          So nothing is ever purchased.  It's just money that's

24   set aside in an escrow account and that's how it fits as a

25   nonqualified plan.  I mean, if I had invested -- if they gave

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 125

```
 1   us a choice of what to invest in and I invested in Apple

 2   computer and it went up ten to one, would the debtors then --

 3   I'm sure would then claim, hey, you don't get the value of

 4   Apple, you just get -- you're just an unsecured creditor for

 5   the value of the money that was taken out.

 6          So it does need to be consistent in that regard.  But

 7   I see -- that's really the only point I'd make that there are

 8   two separate things, the money in '08 and the money prior.

 9   However, none of it was ever set aside in any kind of separate

10   account.  It was just a general fund of Lehman.  And come

11   November 30th of every year, they would issue stock based on a

12   formula of where the stock was then.  Thank you.

13          THE COURT:  Thank you.  Mr. Jacobson?

14          MR. JACOBSON:  Thank you, Your Honor.  Claim 24335.  I

15   think Mr. Cohen covered everything I was going to say so I

16   won't repeat anything.  So thank you very much for your time.

17          THE COURT:  Okay.  Mr. Bran (sic), you're the last

18   one.

19          MR. GRAN:  Well, seeing that I was only last, I -- and

20   also that I think that I concur with many of the other comments

21   being made is something I would say is that I definitely agree

22   with statements that have been made in theory talking about

23   RSUs --

24          THE COURT:  Mr. Bran -- Mr. Bran, I don't mean to

25   break in.  I'm having a very hard time following what you're
```

Page 126

1   saying.  Something is being lost in transmission.  And I don't

2   know where you're calling from or what your telephone service

3   is but you're not coming through loud and clear.

4        MR. GRAN:  Sorry.  I'm actually calling from Jordan,

5   using the land lines here.  So I am sorry I'm not on the best

6   of lines but hopefully this is better now that I don't have you

7   on speaker.

8        THE COURT:  That's a lot better and I suggest that you

9   speak up.

10        MR. GRAN:  Okay.  I was only saying that I definitely

11   concur with those comments made earlier specifically those that

12   are related to the idea that the RSU is not a purchase of a

13   security.  The economic value and the way we look at an RSU

14   economically is completely different from an equity security,

15   is a contingent payment of wages that are earned which over

16   time eventually you would be getting essentially a vested

17   interest in your -- in stocks which will eventually be paid to

18   you as stock most likely and then many people would sell those

19   stocks and then your compensation on an annual basis would

20   match what people would say -- what the company would say is

21   your annual compensation for a given year.

22        So it's a great way for companies to manage cash

23   flows, to reduce tax and to work on employee retention, but it

24   has nothing to do with giving an economic interest in the

25   company over the period invested in those RSUs.  It was a way

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 127

1    of deferring compensation which had an economic benefit to the

2    actual shareholders not to mention the debt holders of the

3    company.

4            THE COURT:  Okay.

5            MR. GRAN:  And I'll save any other comments for

6    whenever we get to the next stage.

7            THE COURT:  Okay.  Thank you very much.  Is there

8    anyone I've left out who wishes to be heard?  Good.  I think

9    that this has been an extremely useful process of shared

10   education.  I've learned some things and I suspect that the

11   debtor learned some things as well.

12           I think it would be useful for us to follow the plan

13   that I laid out at the beginning of this afternoon's hearing.

14   But by no means am I suggesting that that's the only way for us

15   to proceed.  And if upon further reflection, the parties are

16   able to develop a more efficient or productive means to get to

17   the same end, I'm certainly open to suggestions.  But I'm going

18   to at least reiterate, first, that there be an annotation or

19   restatement of the debtors' omnibus reply.  I'm not suggesting

20   that there be a reply to today's hearing.  In other words, I'm

21   not suggesting that you have an opportunity for rebuttal.  I

22   presume that at some point you will have that opportunity.  I

23   think that the claimants who wish to comment with respect to

24   the statements that are currently on the record by the debtor

25   should have that opportunity once they recognize each and every

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 128

```
 1    part of the omnibus statement of the debtor that applies to
 2    their claims.
 3         I then think it would be useful for the debtor to
 4    engage in a dialogue particularly with but not exclusively
 5    limited to those claimants who are represented by counsel for
 6    purposes of developing a set of procedures so that we can have
 7    a record here.  I am not in a position to decide the matters
 8    before the Court without competent evidence.  And at the
 9    moment, while I have suggestions as to what the facts may be, I
10    do not have admissible evidence at this point.  The evidence
11    can be admissible by virtue of stipulations, declarations,
12    depositions or perhaps a formal evidentiary hearing to be
13    scheduled on notice.
14         To the extent that the parties wish an opportunity to
15    further brief the issues in anticipation of that evidentiary
16    hearing or that evidentiary submission, I'm going to request
17    that the debtor take the lead in proposing a schedule for that.
18    There'll be no need to repeat everything that has already been
19    said.  But I think there will be a need to deal with the
20    specifics of what I heard today which, frankly, differs from
21    some of what I've read in preparation for today.
22         With that, I'm going to adjourn today's hearing and go
23    into my chambers conference.  And I wish you all a good
24    holiday.
25         (Whereupon these proceedings were concluded at 3:35 p.m.)
```

1

2                                    **I N D E X**

3

4                                      RULINGS

5                                                        Page      Line

6      Granting of Debtors' Objection to the Claim       27        2

7      of Wilmington Trust Company as Indenture

8      Trustee (Claim No. 10082)

9

10     Granting of Debtors' One Hundred Thirty-Sixth  28        4

11     Omnibus Objection to Claims

12

13     Granting of Debtors' Motion for Authorization  31        10

14     to Implement the Defense Costs Fund

15

16     Granting of Application of the Debtors for      44        9

17     Authorization to Employ and Retain Gleacher &

18     Company Securities, Inc. as Financial Advisor

19     Effective as of February 17, 2011 Subject to

20     Understanding with Lazard

21

22

23

24

25

Page 130

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a true and accurate record of the proceedings.

Hana
Copperman

Digitally signed by Hana Copperman
DN: cn=Hana Copperman, o, ou,
email=digital1@veritext.com, c=US
Date: 2011.12.27 11:00:05 -05'00'

_____

HANA COPPERMAN

AAERT Certified Electronic Transcriber CET**D 487

Also Transcribed by:

LISA BAR-LEIB
    AAERT Certified Electronic Transcriber CET**D-486
PENINA WOLICKI
    AAERT Certified Electronic Transcriber CET**D-569

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  December 25, 2011