

B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

### Southern District of New York

In re Lehman Brothers Holdings Inc., et al.          ,          Case No.  08-13555 (JMP)

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| OFI ASSET MANAGEMENT | KALLISTA MASTER FUND LTD |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:
 1 rue Vernier 75017 PARIS FRANCE

Court Claim # (if known):  19662
Amount of Claim:  17,969,792.42$
Date Claim Filed:  09/18/2009

Phone:  + 33 1 40 68 18 17
Last Four Digits of Acct #:  1753

Phone:  + 33 1 40 68 18 17
Last Four Digits of Acct. #:  Q047

Name and Address where transferee payments should be sent (if different from above):
 C/O SG Paris Elysees Entrepr (03392)
 FR76 3000 3033 9200 0203 1175 338

Phone: +33 14068 1817
Last Four Digits of Acct #:

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____          Date: 12/06/2011
Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

**OFI ASSET MANAGEMENT**
**GÉRARD BOURRET**
**DIRECTEUR GÉNÉRAL**

**OFI ASSET MANAGEMENT**
1 RUE VERNIER - 75017 PARIS
Tél +33 (0)1 40 68 17 17 - Fax +33 (0)1 40 68 17 18

# Assignment Agreement

between

**KALLISTA MASTER FUND LIMITED**

(as the « **Assignor** » or the « **Company** »)



**OFI ASSET MANAGEMENT**

(as the « **Assignee** »)

in the presence of **KALLISTA CB ARBITRAGE FUND LIMITED**

(as the « **the Feeder Fund** »)

**Relating to the transfer of all the Assignor's interests in the estimated claim amounts payable to it** (as the « **Claim Amounts** »)



# CONTENTS

1.  Interpretation ................................................................................................. 3

2.  Assignment of the Lehman Claims and Other Claims ...................................... 6

3.  Authority and relevant claims Enforcement ...................................................... 7

4.  Purchase price of the Claim Amounts ............................................................. 7

5.  Claw-Back Provision ...................................................................................... 8

6.  Limitation of duties towards the Lehman Claim Beneficiaries and the Other Claims Beneficiaries and/or the Assignor ....................................................... 9

7.  Acknowledgements, Representations, Warranties and Covenants of the Assignor ........... 9

8.  Acknowledgements, Representations, Warranties and Covenants of the Assignee ........ 11

9.  Responsibility and Indemnification ................................................................ 11

10.  No Licence ................................................................................................ 12

11.  Confidentiality ........................................................................................... 12

12.  Survival and transferability .......................................................................... 12

13.  Notices ..................................................................................................... 13

14.  Reservation of rights .................................................................................. 14

15.  Whole Agreement ...................................................................................... 14

16.  Amendments ............................................................................................. 14

17.  Severability ............................................................................................... 14

18.  Counterparts ............................................................................................. 14

19.  No Partnership .......................................................................................... 15

20.  Conflicts of interests - Multiple interests ...................................................... 15

21.  Consent and Waiver ................................................................................... 15

22.  Governing Law - Jurisdiction ...................................................................... 15

Schedule 1: Details of the calculation of the Claim Amounts ................................ 16

Schedule 2 : Notice to the Debtor's Administrators ............................................. 23

Schedule 3 : List of Beneficiaries of the potential recovery arising from Lehman Claim Amount and Other Claims Amounts .................................................................... 26

Schedule 4: Draft letter to the Lehman Claim Beneficiaries and to the Other Claims Beneficiaries .................................................................................................. 27

**THIS AGREEMENT** is dated **16 February 2011** and made

**BETWEEN:**

(1)   **KALLISTA MASTER FUND LIMITED**, a company incorporated in the Cayman Islands whose registered address is PO Box 309, Ugland House, George Town, Cayman Islands, Cayman Islands (the « **Assignor** » or the « **Company** » or the « **Master Fund** », as the context requires); and

(2)   **OFI ASSET MANAGEMENT**, a company incorporated in France, whose registered address is at 1 rue Vernier, 75017 Paris, France (the « **Assignee** » or the « **Investment Manager** », as the context requires);

a « **Party** » or the « **Parties** ».

In the presence of **KALLISTA CB ARBITRAGE FUND LIMITED**, a company incorporated in the Cayman Islands whose registered address is PO Box 309, Ugland House, George Town, Cayman Islands, Cayman Islands (the « **the Feeder Fund** »)

**BACKGROUND:**

(A)   The Company and the Feeder Fund have appointed the Investment Manager to act as their investment manager pursuant to an investment management agreement entered into between the Company, the Feeder Fund, Kallista Management Limited and the Investment Manager on the 1st of December 2009, as amended from time to time.

(B)   Kallista CB Arbitrage Fund Limited is organised as a "feeder" fund and all of the Feeder Fund's assets (to the extent not retained in cash) represented by Shares of the Feeder Fund are invested in the ordinary Master Fund Shares.

For the sake of clarity, the Master Fund has an alleged unsecured claim against LBIE (guaranteed by LBHI) (here the "**Lehman Claim**") arising from the Loss (including direct cost along with the hedging cost, the replacement cost and the opportunity cost and without prejudice to reasonable out-of-pockets expenses) in respect of the termination of each Transaction in accordance with provisions of Section 6 (e)(i)(4) of the applicable ISDA Master Agreement mentioned below. The Master Side Pocket Shares have been created expressly for the purpose of being attributed to interests in the Lehman Claim which had been declared by the Directors of the Company in their discretion as being, in their opinion, an investment that is illiquid and whose realisation would be prejudicial to Shareholders, as defined as Illiquid Assets in the prospectus of the Feeder Fund. Accordingly, Fund Side Pocket Shares are invested in the Master Side Pocket Shares.

The Parties acknowledge that the Lehman Claim is valued at 0 by the Master Fund. For the avoidance of doubt, the Net Asset Value per share of the Master Side Pocket Shares has taken into account a valuation of the Lehman Claim against the Debtors at USD 0.

(C)     The Applicable ISDA Master Agreement has been entered into between the Assignor and LBIE on 15th October 2002. A guaranty agreement (the "**Guaranty Agreement**") has been entered into between the Assignor and LBHI pursuant to which LBHI guaranteed to the Assignor LBIE's performance and satisfaction of its obligation pursuant to the Applicable ISDA Master Agreement.

On the date of 15th September 2008:-

(i)     Administration orders were made in respect of Lehman Brothers International Europe (here "LBIE") under Rules 2.47(3)(a) of the UK Insolvency rules 1986. Having been appointed as joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann, Michael John Andrew Jervis and/or Derek Anthony Howell (as applicable) each a partner at PricewaterhouseCoopers LLP assumed responsibility for LBIE's affairs (from the date of 9th December 2008);

(ii)    Lehman Brothers Holdings Inc. (here "LBHI") announced that it has filed for Chapter 11 bankruptcy protection in the US. Thus, LBHI is debtor in the Chapter 11 bankruptcy proceedings in the US bankruptcy Court for the Southern District of New York captioned in re Lehman Brothers Holdings Inc., et al., Chapter 11 Case number 08-13555 (JMP);

together the "**Proceedings**".

The Assignor has duly exercised the reasonable remedies available to it to date and has sent default and valuation notices to LBIE and LBHI in order to protect its interests. The Administrators' website has been duly contacted and a law firm appointed by the Assignor has sent notices to LBHI.

The bar date has been determined for LBHI as of the 22nd of September 2009. The bar date has been determined for LBIE as of the 31st of December 2012.

The Assignor has filed a proof of claim against LBHI and a proof of debt against LBIE.

(D)     The Company has also two other alleged claims (here the "**Other Claims**"):

- a claim against Countrywide Financial corporation, Angelo R. Mozilo, David Sambol and Eric P. Sieracki (here the "Defendants"); a complaint for violations of the federal securities laws and California State law has been filed for alleged material misrepresentations made by the Defendants. The law firm (Entwistle & Cappucci) appointed to represent the interests of the Company is currently trying to settle this complaint;

- and a claim regarding potential physical settlement arising from derivative financial instruments held by the Company on C NORTHERN ROCK PL 64 03/08 A BClear (quantity 500) and on C NORTHERN ROCK PL 72 03/08 A BClear (quantity -500).

The Parties acknowledge that the Other Claims are valued at 0 by the Master Fund. For the avoidance of doubt, the Net Asset Value per share of the ordinary Master Fund Shares dated as of the 30th of November 2010 has taken into account a valuation at USD 0 of the Other Claims (it being understood that the related Redemption Price per ordinary Master Fund Share, as defined in the Prospectus, has incorporated the Other Claims valued at zero into the calculation because the Other Claims have been and are still considered as illiquid assets which cannot be realized and converted into cash).

(E)    Given the illiquidity of the Lehman Claims and with a view to facilitating the expected liquidation of the Master Fund and of the Feeder Fund on a voluntary basis, once all assets, including the side pocket, are in cash, and to ensuring the protection of the identified shareholders of the Fund Side Pocket Shares (here the **"Feeder Fund Side Pocket Shareholders"**), the Board of Directors has decided to transfer to the Assignee all of the Assignor's right, title and interest in and to the Lehman Claims subject to the terms and conditions mentioned in this Agreement.

Given the illiquidity of the Other Claims and with a view to facilitating the expected liquidation of the Master Fund and of the Feeder Fund on a voluntary basis, once all assets, including the side pocket, are in cash, and to ensuring the protection of the identified shareholders of the Shares of the Feeder Fund (here the **"Feeder Fund Shareholders"**), the Board of Directors has decided to transfer to the Assignee all of the Assignor's right, title and interest in and to the Other Claims subject to the terms and conditions mentioned in this Agreement.

(F)    This Agreement has been approved by the Board of Directors of the Company and by the Board of Directors of the Feeder Fund, both dated as of the 15 February 2011 (the **"Resolutions"**). The Company shall duly inform the Feeder Fund Side Pocket Shareholders and Feeder Fund Shareholders of the execution of this Agreement and, in this respect, shall explain this scheme to them, by using the draft letter attached in **Schedule 4**. The Company shall briefly describe the terms of the benefit from **the Claw-Back Provision provided for in Article 5** which enables the Feeder Fund Side Pocket Shareholders and the Feeder Fund Shareholders to receive payments from the Assignee (after the deduction of expenses) corresponding to payments (if any) received by the Assignee in respect of the Lehman Claim and the Other Claims.

For the avoidance of doubt:

- only Feeder Fund Side Pocket Shareholders shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Lehman Claim subject to (i) the prior and full reimbursement of the Advance Cash Amount (as defined below) paid by the Investment Manager to the Company and to (ii) the prior and full deduction of costs and expenses defined in Article 5 of the Agreement;

- only Feeder Fund Shareholders shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Other Claims subject to the prior and full deduction of costs and expenses defined in Article 5 of the Agreement.

The Parties hereto agree as follows:-

1.    **Interpretation**

1.1    In this Agreement, unless the context otherwise requires, the following words have the following meanings:-

**"Administrators"**        means the joint administrators of LBIE;

**"Advance Cash Amount"**        means the amount of cash equal to **EUR 95,950** paid by the Investment Manager to the Company for the benefit of Master Ordinary Shares and corresponding to the reimbursement of the notional Loan made by the Master Ordinary Shares to the LBIE Master Side Pocket Shares (for the payment of its administrative expenses).

of the Committee of the Board appointed pursuant to written resolutions of the Board dated 1 April 2009;

| | |
|---|---|
| **"Agreement"** | means this agreement, whose purposes are (i), in compliance with Section 7 of the Applicable ISDA Master Agreement, to transfer all of the Assignor's interest in the Early Termination Amount payable to it by the Debtor under Section 6(e) of the Applicable ISDA Master Agreement (i.e. the Lehman Claim), and (ii) to transfer all of the Assignor's interest in the Other Claims; |
| **"Applicable Rules"** | means all applicable law and regulations; |
| **"Applicable ISDA Master Agreement"** | means the 1992 ISDA Master Agreement entered into between LBIE and the Assignor dated as of 15th October 2002, as amended and supplemented from time to time; |
| **"Articles"** | means the memorandum and articles of association of the Company; |
| **"Board of Directors"** | means the board of the directors of the Company; |
| **"Business Day"** | means any day that it is not (i) a Saturday, (ii) a Sunday or (iii) any other day on which commercial banks are authorised or required by Law to be closed in New York, Paris or London; |
| **"Claim Amounts"** | means the Lehman Claim Amount plus the Other Claims Amount as described in **Schedule 1**. |
| | For the avoidance of doubt: |
| | - only Feeder Fund Side Pocket Shareholders shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Lehman Claim subject to (i) the prior and full reimbursement of the Advance Cash Amount (as defined above) paid by the Investment Manager to the Company and to (ii) the prior and full deduction of costs and expenses defined in Article 5 of the Agreement; |
| | - only Feeder Fund Shareholders shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Other Claims subject to the prior and full deduction of costs and expenses defined in Article 5 of the Agreement; |
| **"Debtors"** | means LBIE and its guarantor or credit support provider, LBHI; |
| **"LBHI"** | means LBHI Lehman Brothers Holdings Inc.; |
| **"LBIE** | means Lehman Brothers International (Europe); |
| **"Lehman Claim Amount"** | means the amount allegedly owed by LBIE to the Company regarding terminated ISDA transactions (i.e. an amount whose assessed value is **USD 16,794,457.50 (i.e. GBP 9,363,024.75 as laid down in the attached proof of debt according to the relevant FX rate determined by the Administrators)** together with interest from and including the termination date at the applicable rate as defined in the |

| | |
|---|---|
| | ISDA Master Agreement, as well as all related rights as described in Article 2.2 below); *it is understood and agreed that the potential recovery of this amount is contingent upon various considerations;* |
| **"Lehman Claim Beneficiaries"** | means the Feeder Fund Side Pocket Shareholders, being those listed in **Schedule 3 A**, who will have agreed *in fine* to benefit from the Claw-Back Provision A and will accordingly participate to the distribution of the net proceeds of the Lehman Claim Amount; |
| **"November NAVPS"** | means the November 2010 net asset value per share of the Master Fund and accordingly of the Feeder Fund; |
| **"Notice of Assignment"** | means the notice to the Administrators in compliance with **Schedule 2**; |
| **"Other Claims Amount"** | means an amount whose assessed value is **USD 2,724,978.54** and arising from the claim against Countrywide Financial corporation (2,724,978.54 USD) and the claim regarding potential physical settlement arising from derivative financial instruments held by the Company on C NORTHERN ROCK PL 64 03/08 A BClear (quantity 500) and on C NORTHERN ROCK PL 72 03/08 A BClear (quantity - 500) (undetermined value of the assets potentially physically settled). *It is understood and agreed that the potential recovery of this amount is contingent upon various considerations;* |
| **"Other Claims Beneficiaries"** | means the Feeder Fund Shareholders, being those listed in **Schedule 3 B**, who will have agreed *in fine* to benefit from the Claw-Back Provision B and  will accordingly participate to the distribution of the net proceeds of the Other Claims Amount; |
| **"Prospectus"** | means the prospectus relating to the Company as the same may be modified or amended from time to time; and |
| **"Purchase Price"** | means the amount as set forth in **Article 4.1.** |

1.2   References to statutory provisions, regulations, Applicable Rules or notices shall include those provisions, regulations or notices as amended, extended, consolidated, substituted or re-enacted from time to time.

1.3   Unless a term is otherwise defined in or pursuant to this or other Articles, the terms defined in the Applicable Rules shall bear the same meaning herein.   References to Articles are to clauses of this Agreement and headings are inserted for convenience only and shall not affect the construction of this Agreement.

1.4   Unless the context otherwise requires and except as varied or otherwise specified in this Agreement words and expressions contained in this Agreement shall bear the same meaning as in the Prospectus or the Articles provided that any alteration or amendment of the Prospectus or the Articles shall not be effective for the purposes of this Agreement unless both Parties shall by endorsement hereon or otherwise have assented thereto and provided that if there is any conflict between words defined in the Articles and the Prospectus, the Articles shall prevail.

1.5   References herein to a Party are to any Party or together the Parties to this Agreement.

1.6    References in this Agreement to the singular include references to the plural and vice versa and a reference to the masculine includes a reference to the feminine and neuter and reference to a person shall include a reference to any company as well as to any legal or natural person.

1.7    The Schedules to this Agreement form part of it.

2.    **Assignment of the Claim Amounts**

2.1    The Assignor, with full title guarantee, hereby sells, assigns and transfers to the Assignee all of Assignor's right, title and interest in and to the Claim Amounts, and warrants that it has exercised the remedies under the applicable agreements and, to the best of its knowledge and belief, that:-

(A)    the Lehman Claim Amount arising pursuant to the Applicable ISDA Master Agreement has been estimated at **USD 16,794,457.50** (this Lehman Claim Amount is guaranteed by LBHI pursuant to a Guaranty Agreement attached to the abovementioned ISDA Master Agreement (the "**LBHI Guaranty**"); and

(C)    the Other Claims Amount has been estimated at **USD 2,724,978.54** subject to further analysis and information which is not yet available.

Such sale, assignment and transfer being designated as the "**Assignment**".

2.2    To the extent such an Assignment would not be so permitted, the Assignor agrees to hold on trust the Claim Amounts for the Assignee absolutely.

2.3    The Claim Amounts include all rights of the Assignor relating to the Claim Amounts including without limitation the Assignor's rights to receive any interest, penalties and fees relating to the Lehman Claim and to the Other Claims, all cash, securities, instruments and other property which with may be paid or issued by Debtors in satisfaction of the Lehman Claim, any legal rights or claims against any third party with respect thereto and all rights arising from any and all proofs claims (formal and informal) that might be filed with respects to the Lehman Claim and to the Other Claims, and including without limitation all of Assignor's right, title, interest pursuant or with respect to the Applicable ISDA Master Agreement, the LBHI Guaranty and any and all claims arising thereunder,

2.4    The assignment of the Claim Amounts shall be an absolute and unconditional sale, assignment and transfer of the Claim Amounts and shall not be deemed to create a security interest.

2.5    A purpose of this Agreement is to enable the Assignor to deal with the expected liquidation of the Master Fund and of the Feeder Fund on a voluntary basis, once all assets, including the side pocket, are in cash, and to strengthen the protection of the interests of the Lehman Claim Beneficiaries and of the Other Claims Beneficiaries thanks to the claw-back mechanism described in **Article 5**.

2.6    If the Assignor receives any interest, dividend or other payments which is for the account of the Assignee, the Assignor shall promptly (and, in any event, within 2 Business Days of receipt) pay the same to the Assignee. Pending such payment, the Assignor shall hold that amount on trust for the Assignee. If any interest, dividend or other payments are settled in favour of the Assignor by way of a Non-Cash Distribution, the Assignor shall hold such Non-Cash Distribution as agent of the Assignee and, as soon as practicable thereafter, have such Non-Cash Distribution registered in the name of the Assignee (or such other name or names as the Assignee may reasonably and lawfully require) and/until

it does so, the Assignor shall account to the Assignee for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Assignee.

2.7    Completion of the Assignment and establishment of the trust, in each case pursuant to **Articles 2.1** and **2.2** above, shall take effect (without any further formality) on the Settlement Date on payment by the Assignee of the Purchase Price.

## 3.    Authority and relevant claims Enforcement

3.1    The Assignor hereby irrevocably appoints the Assignee as its true and lawful attorney and authorizes the Assignee to act in the Assignor's stead, in connection with any act or thing required to be done by the Assignor under this Agreement. Furthermore, the Assignee shall be entitled, without reference to the Lehman Claim Beneficiaires or to the Other Claims Beneficiaries or to the Assignor, to demand, sue for, compromise and recover all such amounts as now are, or thereafter might become, due and payable for or on account of the Lehman Claim or the Other Claims.

3.2    The Assignee shall have full authority to do all things necessary to enforce the Lehman Claim and the Other Claims including, without limitation, the right to file amended and restated proofs of claim (or proofs of debt) in the Proceedings or any other necessary or appropriate indicia of the Lehman Claim and of the Other Claims and the Assignee's ownership and control of, and rights in and to the Lehman Claim and the Other Claims, provided that the Assignee may, if it so elects, decline to take any relevant action in respect of the Lehman Claim and the Other Claims unless it is indemnified to its satisfaction by the Assignor and/or by the Lehman Claim Beneficiaires or the Other Claims Beneficiaires.

3.3    The Assignee may accept a bid price offered by a third party to purchase the Lehman Claim Amount if the latter is considered by the Assignee as fair and satisfactory in its opinion and according to the information available at that time. The Assignee may also accept a bid price offered by a third party to purchase the Other Claims Amount (the claim against Countrywide Financial corporation and/or the claim arising from the derivative financial instruments on C NORTHERN ROCK), if the latter is considered by the Assignee as fair and satisfactory in its opinion and according to the information available at that time.

3.4    The powers granted to the Assignor pursuant to this **Article 3** are discretionary in nature, and the Assignee may exercise or decline to exercise such powers at the Assignee's sole option.

3.5    The Assignor shall do all such acts and things as may be necessary or desirable to give effect to the assignment and transfer in Article 2.1 above. The Assignor will accordingly in good faith take all necessary or appropriate actions at its own expense to effect such assignment and transfer, including without limitation the delivery of all appropriate agreements, instruments or documents requested by the Assignee and the execution of appropriate transfer powers, corporate resolutions, consents and transfer notices.

## 4.    Purchase price of the Claim Amounts

4.1    The purchase price of the Claim Amounts is **USD 100** (the "**Purchase Prise**").

4.2    The Parties agree that the Purchase Price has been determined after taking into account the Claw Back Provision, as described in **Article 5**.

4.3     On the Settlement Date the Assignee shall pay to the Assignor the Purchase Price.

5.      **Claw-Back Provision**

5.1     ***Claw-Back Provision A:*** **if and when the Assignee receives any recovery in respect of the Lehman Claim Amount, it shall pay a corresponding amount (a "Claw-Back Amount A") to the Lehman Claim Beneficiaries, after deducting the full reimbursement of the Advance Cash Amount to the Investment Manager and all and any costs and expenses, including legal fees and administration fees not duly compounded and claimed by the administrator (if any), incurred in connection with such recovery. For such purposes, a "recovery" shall include, without limitation, any proceeds of sale of the Lehman Claim Amount, and any relevant distribution received from the Debtors or their successors or affiliates, in respect of the Lehman Claim Amount. For the avoidance of doubt, any recovery relating to the Lehman Claim will be subject to (i) the prior and full deduction of the Advance Cash Amount owed by the Master Side Pocket Shares (and accordingly the Lehman Claim Beneficiaries) to the Investment Manager and (ii) any other costs and expenses in accordance with Article 5.5 of the Agreement.**

        ***Claw-Back Provision B:*** **If and when the Assignee receives any recovery in respect of the Other Claims Amount, it shall pay a corresponding amount (a "Claw-Back Amount B") to the Other Claims Beneficiaries, after deducting all and any costs and expenses, including legal fees, incurred in connection with such recovery. For such purposes, a "recovery" shall include, without limitation, any proceeds of sale of the Other Claims Amount, and any relevant distribution received in respect of the Other Claims Amount. For the avoidance of doubt, (i) any recovery relating to the potential settlement of the complaint against Countrywide Financial corporation, Angelo R. Mozilo, David Sambol and Eric P. Sieracki will be subject to the prior and full deduction of the fees owed to the appointed law firm, Entwistle & Cappucci (please refer to the attached retention letter) and (ii) any recovery relating to the Other Claims Amount shall be subject to the prior and full deduction of the costs and expenses in accordance with Article 5.5 of the Agreement.**

5.2     The Assignee undertakes to comply with this **Article 5** and the Assignor, acting in the interests of the Lehman Claim Beneficiaries and the Other Claims Beneficiaries, accordingly agrees to the Purchase Price.

5.3     The Assignee shall not be liable to the Lehman Claim Beneficiaries and the Other Claims Beneficiaries or the Assignor for recoveries (or the absence of recoveries) giving rise to a Claw-Back Amount A or a Claw-Back Amount B, and will act in good faith and in a reasonable manner in order to assert the Claim Amounts, subject to Article 4 above.

        Parties acknowledge and agree that the Assignee is authorized to give up, at its sole discretion, the actions and proceedings relating to the complaint against Countrywide Financial corporation, Angelo R. Mozilo, David Sambol and Eric P. Sieracki. For instance, should the expected settlement of this complaint fail, the Assignee shall be free to give up all actions and proceedings against the Defendants.

5.4     The Assignee gives no guarantee in whole or part or in part regarding the distribution of the Claw-Back Amount A or of the Claw-Back Amount B and the Claw-Back Amount A and B themselves.

5.5     Pursuant to Article 5.1, the Assignee may reduce Claw-Back Amount A and/or Claw-Back Amount B in order to take into account the expenses and costs incurred by the Assignee in order to assert the related claims. The Assignee shall, without prejudice to Article 3.2 and Article 5.1 above, seek the prior approval of all of the Lehman Claim Beneficiaries to

the extent that relevant costs and/or expenses give rise to, constitute or result in an amount which is in excess of USD 200,000 (without taking into account the Advance Cash Amount). The Assignee shall, without prejudice to Article 3.2 and Article 5.1 above, seek the prior approval of all of the Other Claims Beneficiaries to the extent that relevant costs and/or expenses give rise to, constitute or result in an amount which is in excess of USD 100,000 (without taking into account the fees owed to the appointed law firm, Entwistle & Cappucci).

For the avoidance of doubt, Parties acknowledge and agree that no prior approval of all of the Lehman Claim Beneficiaries or any of the Lehman Claim Beneficiaires shall be requested to deduct the reimbursement of the Advance Cash Amount owned to the Investment Manager from any recovery in respect of the Lehman Claim Amount.

5.6    For the purposes of this Agreement, the Assignee shall be entitled to treat the Assignor as the agent of the Lehman Claim Beneficiaries and the Other Claims Beneficiaries.

6.    **Limitation of duties towards the Lehman Claim Beneficiaries and the Other Claims Beneficiaries and/or the Assignor**

6.1    The Assignee does not assume any fiduciary duty or responsibility in respect of the Lehman Claim Beneficiaries and the Other Claims Beneficiaries and/or the Assignor apart from its gross negligence or its wilful misconduct.

6.2    The Assignee does not guarantee or otherwise assume any responsibility for Claw-Back Amount A or Claw-Back Amount B or the absence of Claw-Back Amount A or Claw-Back Amount B and shall incur no liability to anyone upon any signature, instrument, statement, notice, resolution, request, direction, consent, order, certificate, report, opinion, or other document, paper or data reasonably believed by it to be genuine and reasonably believed by it to be properly authorised, executed, issued or signed by the proper party or parties.

6.3    The Assignee shall not have any liability to the Lehman Claim Beneficiaries and the Other Claims Beneficiaries and/or the Assignor arising from its inability to assert in whole or part the rights of the Lehman Claim and/or the Other Claims resulting from a cause beyond its reasonable control and which directly and indirectly makes it impracticable or impossible, including but not limited to force majeure or suspension, unavailability for use, breakdown, failure or damage (however caused) of any communication equipment essential for the Assignor to communicate with the Administrators or any other involved agent or entity, strike or other industrial action.

7.    **Acknowledgements, Representations, Warranties and Covenants of the Assignor**

7.1    The Assignor acknowledges, represents and warrants to the Assignee that:-

(A)    it is validly existing, duly empowered and authorised to execute, deliver and perform this Agreement and to give effect to the transactions contemplated hereby;

(B)    this Agreement constitutes a valid and legally binding agreement enforceable against it and is enforceable in accordance with its terms except insofar as enforcement may be limited by bankruptcy, insolvency or other laws relating to or affecting enforcement of creditors' rights or general principles of equity;

(C)    it has complied with and will continue to comply with all laws, rules and regulations or court and governmental orders by which it is bound or to which it is subject in connection with the execution and performance of this Agreement;

(D)     the Lehman Claim is based on estimated amounts owed to the Assignor by LBIE pursuant to the Applicable ISDA Master Agreement, the Lehman Claim has not been disputed by LBIE and the LBHI Guaranty is attached to the Applicable ISDA Master Agreement and that the Lehman Claim is an allowable unsecured claim;

(E)     no payment has been received by the Assignor or by any third party claiming through the Assignor, in full or partial satisfaction of the Claim Amounts;

(F)     it has not previously assigned, sold, factored, transferred, participated or pledged the Claim Amounts to any third party in whole or part;

(G)     it has delivered to the Debtors all notices, claims forms, calculations and other documents or materials necessary or required pursuant to the Applicable ISDA Master Agreement and/or the LBHI Guaranty in order for the Assignor to assert and maintain its claims pursuant to the Applicable ISDA Master Agreement and the LBHI Guaranty underlying the Lehman Claim and to provide LBIE with an estimated amount payable to the latter, including without limitation, the notice of the termination of the Applicable ISDA Master Agreement and the related notice of calculation;

(H)     notwithstanding the reduction of expenses and costs incurred by the Assignee in order to assert the rights of the Lehman Claim, the amount of recoveries distributed in the Proceedings may differ from the Lehman Claim Amount;

(I)     notwithstanding the reduction of expenses and costs incurred by the Assignee in order to assert the rights of the Other Claims, the amounts of recoveries relating to the Other Claims may differ from the Other Claims Amount;

(J)     except as set forth in this Agreement, neither OFI Asset Management (both in its capacities as Assignee and Investment Manager of the Assignor) nor any agent or representative of OFI Asset Management and more generally OFI Group has made any representation whatsoever to the Assignor, agent or representative of the Assignor or to the Lehman Claim Beneficiaries regarding the status of the Proceedings, the conditions of the Debtors (financial or otherwise) or any other matter relating to the Proceedings, the Debtors, the Lehman Claim or the Lehman Claim Amount;

(K)     except as set forth in this Agreement, neither OFI Asset Management (both in its capacities as Assignee and Investment Manager of the Assignor) nor any agent or representative of OFI Asset Management and more generally OFI Group has made any representation whatsoever to the Assignor, agent or representative of the Assignor or to the Other Claims Beneficiaries regarding the status of the Other Claims (financial or otherwise) or any other matter relating to the Other Claims or the Other Claims Amount;

(L)     it has adequate information concerning the condition of the Debtors and the status of the Proceedings to make an informed decision regarding the sale of the Lehman Claim Amount and that the Assignor, the Board of the Directors of the Assignor and the Feeder Fund independently and without reliance on the Assignee have made their own analysis and decisions to approve this Assignment;

(M)     it has adequate information concerning the status of the Other Claims to make an informed decision regarding the sale of the Other Claims Amount and that the Assignor, the Board of the Directors of the Assignor and the Feeder Fund independently and without reliance on the Assignee have made their own analysis and decisions to approve this Assignment;

(N)  the Board of Directors or, in the case of a subsequent winding-up of the Company, entities in charge of this winding-up will do their best efforts to resolve any issue raised by the contestation of LBIE relating to the free assignment of the Lehman Claim by the Assignor to the Assignee ; and,

(O)  if at any time during the term of this Agreement the Assignor discovers any fact or omission, or any event or change of circumstances has occurred which would make any of the Assignor's acknowledgements, representations or warranties herein inaccurate or incomplete in any material respect, the Assignor shall provide immediate written notification to the Assignee of any such fact, omission, event, change or circumstance, and the fact related thereto, and it is agreed that the failure to provide such notification or the failure to continue to be in compliance with the foregoing acknowledgements, representations and warranties during the term of this Agreement shall entitle the Assignee to immediately terminate this Agreement upon written notice to the Assignor.

(P)  it will duly notify (i) the Debtors about the assignment of the Lehman Claim in accordance with the Notice of Assignment included in Schedule 2 and (ii) the relevant agents or intermediaries about the assignment of the Other Claims.

## 8.  **Acknowledgements, Representations, Warranties and Covenants of the Assignee**

8.1  The Assignee acknowledges, represents and warrants to the Assignor that:-

(A)  it is validly existing, duly empowered and authorised to execute, deliver and perform this Agreement and to give effect to the transactions contemplated hereby;

(B)  this Agreement constitutes a valid and legally binding agreement enforceable against it and is enforceable in accordance with its terms except insofar as enforcement may be limited by bankruptcy, insolvency or other laws relating to or affecting enforcement of creditors' rights or general principles of equity;

(C)  it has complied with and will continue to comply with all laws, rules and regulations or court and governmental orders by which it is bound or to which it is subject in connection with the execution and performance of this Agreement; and

(D)  without prejudice to Article 3 and Article 5 of this Agreement, it will do its best efforts and will act in good faith and with reasonable care and judgment in order to assert the rights related to the Claim Amounts.

## 9.  **Responsibility and Indemnification**

9.1  Each Party is only responsible for the performance of its obligations under this Agreement. The liability of each Party is excluded for any other matter.  As a result, and without prejudice to **Article 2** above and **Articles 9.4 and 9.5** below, neither the Assignee nor the Assignor is liable (pursuant to this Agreement) if their breach of the Agreement was the result of the actions or omissions of any other party provided that the Assignee or the Assignor (as the case may be) (i) was not directly or indirectly the cause of any such act or omission and/or (ii) did not directly or indirectly participate in such breach.

9.2  The Assignee will not be responsible to the Assignor or otherwise for any direct or indirect or consequential loss including but not limited to loss of opportunity whereby the value of the Claim Amounts could have been increased or for any decline in the value of the Claim Amounts howsoever except to the extent that such loss or decline is due to the Assignee's gross negligence, wilful misconduct, bad faith, reckless disregard or fraud, or that of any of

(N)     the Board of Directors or, in the case of a subsequent winding-up of the Company, entities in charge of this winding-up will do their best efforts to resolve any issue raised by the contestation of LBIE relating to the free assignment of the Lehman Claim by the Assignor to the Assignee ; and,

(O)     if at any time during the term of this Agreement the Assignor discovers any fact or omission, or any event or change of circumstances has occurred which would make any of the Assignor's acknowledgements, representations or warranties herein inaccurate or incomplete in any material respect, the Assignor shall provide immediate written notification to the Assignee of any such fact, omission, event, change or circumstance, and the fact related thereto, and it is agreed that the failure to provide such notification or the failure to continue to be in compliance with the foregoing acknowledgements, representations and warranties during the term of this Agreement shall entitle the Assignee to immediately terminate this Agreement upon written notice to the Assignor.

(P)     it will duly notify (i) the Debtors about the assignment of the Lehman Claim in accordance with the Notice of Assignment included in Schedule 2 and (ii) the relevant agents or intermediaries about the assignment of the Other Claims.

## 8.    **Acknowledgements, Representations, Warranties and Covenants of the Assignee**

8.1    The Assignee acknowledges, represents and warrants to the Assignor that:-

(A)     it is validly existing, duly empowered and authorised to execute, deliver and perform this Agreement and to give effect to the transactions contemplated hereby;

(B)     this Agreement constitutes a valid and legally binding agreement enforceable against it and is enforceable in accordance with its terms except insofar as enforcement may be limited by bankruptcy, insolvency or other laws relating to or affecting enforcement of creditors' rights or general principles of equity;

(C)     it has complied with and will continue to comply with all laws, rules and regulations or court and governmental orders by which it is bound or to which it is subject in connection with the execution and performance of this Agreement; and

(D)     without prejudice to Article 3 and Article 5 of this Agreement, it will do its best efforts and will act in good faith and with reasonable care and judgment in order to assert the rights related to the Claim Amounts.

## 9.    **Responsibility and Indemnification**

9.1    Each Party is only responsible for the performance of its obligations under this Agreement. The liability of each Party is excluded for any other matter. As a result, and without prejudice to **Article 2** above and **Articles 9.4 and 9.5** below, neither the Assignee nor the Assignor is liable (pursuant to this Agreement) if their breach of the Agreement was the result of the actions or omissions of any other party provided that the Assignee or the Assignor (as the case may be) (i) was not directly or indirectly the cause of any such act or omission and/or (ii) did not directly or indirectly participate in such breach.

9.2    The Assignee will not be responsible to the Assignor or otherwise for any direct or indirect or consequential loss including but not limited to loss of opportunity whereby the value of the Claim Amounts could have been increased or for any decline in the value of the Claim Amounts howsoever except to the extent that such loss or decline is due to the Assignee's gross negligence, wilful misconduct, bad faith, reckless disregard or fraud, or that of any of its directors or employees

9.3     The Assignee will not be liable for any loss arising from errors of fact or judgement or any action taken (or omitted to be taken) by it howsoever arising except to the extent that any such error or action (or the omission thereof) is due to the Assignee's gross negligence, wilful misconduct, bad faith, reckless disregard or fraud, or that of any of its directors or employees. No liability is given by the Assignee as to the recovery of the Claim Amounts or any part of it. No liability is given by the Assignee as to the potential give up of actions and proceedings relating to the complaint against Countrywide Financial corporation, Angelo R. Mozilo, David Sambol and Eric P. Sieracki in accordance with Article 5.3. of the Agreement.

9.4     The Assignor shall indemnify and keep indemnified the Assignee and the directors, employees, officers and agents of the Assignee from and against any and all liabilities, obligations, losses, damages, suits, expenses and costs (including reasonable attorney fees) (together the **"Losses"**) which may be incurred by or asserted against the Assignee in relation to the Claims or this Agreement other than those resulting from the Assignee's gross negligence, wilful misconduct, bad faith, reckless disregard or fraud, or that of any of its directors or employees and other than expenses incurred by the Assignee for which it is responsible hereunder.

9.5     The Assignee shall indemnify and keep indemnified the Assignor and its directors from and against any and all liabilities, obligations, losses, damages, suits, expenses and costs (including reasonable attorney fees) which may be incurred by or asserted against the Assignor in relation to the Claims or this Agreement other than those resulting from the Assignor's gross negligence, wilful misconduct, bad faith, reckless disregard or fraud, or that of any of its directors and other than expenses incurred by the Assignor for which it is responsible hereunder.

9.6     The Assignor shall in no case admit any claim, procedure or suit (the **"Suit"**) which could give rise to Losses or make any compromise, settlement or carry out any other form of negotiation in relation to such Suit without the prior written consent of the Assignee (irrespective of whether or not the Assignor is or may become a party to the relevant claim) provided that the Assignor may make any settlement pursuant to which the Assignee is irrevocably cleared of any liability to the relevant Suit.

## 10.     <u>No Licence</u>

10.1    The Assignor and the Assignee each acknowledge for the benefit of the other that:-

(A)     no provision of this Agreement grants either of them any rights, except as contained herein, in any intellectual property belonging to or developed by any of the Parties; and

(B)     this Agreement does not constitute a licence in respect of any such intellectual property.

## 11.     <u>Confidentiality</u>

11.1    The Parties shall at all times respect and protect the confidentiality of information acquired in consequence of this Agreement except pursuant to any right or obligation to or by which the Assignee or the Assignor (as the case may be) may be entitled or bound to disclose information or under compulsion of law or pursuant to the requirements of competent regulatory, tax or other authority authorities.



11.2   Nothing in this **Article 11** shall prevent the disclosure of information by either Party to its auditors, legal or other professional advisers where reasonably required for the proper performance of their duties.

11.3   Neither of the Parties hereto shall do nor commit any act, matter or thing which would or might prejudice or bring into disrepute in any manner the business or reputation of another Party or any director of such Party.

## 12:   <u>Survival and transferability</u>

12.1   The terms of this Agreement shall be binding upon and shall inure to the benefit of the Assignor, the Assignee and their respective successors and assigns. For the avoidance of doubt, the commitments of the Assignee towards the Lehman Claim Beneficiaries and the Other Claim Beneficiaries shall survive the liquidation of the Assignor.

12.2   The Assignor hereby acknowledges that at any time the Assignee may resign the Claim Amounts, or all or any part thereof or right or interest therein together with all right, title and interest of the Assignee in, to and under this Agreement.

12.3   All representations, warranties, covenants, indemnities and agreements made in this Agreement shall survive the execution of delivery of this Assignment and any such reassignment by the Assignee.

## 13.   <u>Notices</u>

13.1   All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, sent by fax, sent by recognised overnight courier or sent by registered or certified mail, postage prepaid, and properly addressed as follows:-

    To the Assignor:-                    Kallista Master Fund Limited
                                         PO Box 309
                                         Ugland House
                                         Grand Cayman
                                         KY1-1104
                                         Cayman Islands
                                         Attention: Alain Reinhold

    To the Assignee:-                    OFI Asset Management
                                         1 rue Vernier
                                         75017 Paris
                                         France
                                         Attention: Nicolas Gomart

13.2   In the case of a subsequent winding-up of the Assignor, all notices, requests, demands and other communications under this Agreement intended to be addressed to the Company shall instead be properly addressed or as follows:-

    To the Lehman Claim Beneficiaries: contact details to be provided by each entity.

    And/or to the Other Claims Beneficiaires: contact details to be provided by each entity.

13.3   Notices given by hand or facsimile shall be deemed to have been given when delivered or despatched. Notices given by pre-paid airmail or first class post as appropriate shall be deemed to have been given seven days after posting.  Evidence that the notice was properly addressed, stamped and put in the post shall be conclusive evidence of posting.

Evidence that the facsimile was duly despatched to a current facsimile of the addressee shall be conclusive evidence

13.4    Either Party may from time to time change its address for the purpose of notices to that Party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the other Party.

13.5    All notices and other communications required or permitted under this Agreement which are addressed as provided in this Article, shall be effective upon delivery.

## 14.    Reservation of rights

14.1    The rights, powers, privileges and remedies provided in this Agreement are cumulative and are not exclusive of any rights, powers, privileges or remedies provided by Law or otherwise.    No failure to exercise nor any delay in exercising by either Party to this Agreement of any right, power, privilege or remedy under this Agreement shall impair or operate as a waiver thereof in whole or in part.    No single or partial exercise of any right, power, privilege or remedy under this Agreement shall prevent any further or other exercise thereof or the exercise of any other right, power, privilege or remedy.

## 15.    Whole Agreement

15.1    This Agreement, together with the Schedules and any documents referred to in it, constitutes the whole agreement between the Parties relating to its subject matter and supersedes and extinguishes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature, whether in writing or oral, relating to such subject matter.

## 16.    Amendments

16.1    No variation of this Agreement shall be effective unless made in writing and signed by the Parties hereto.

16.2    The consent of the Lehman Claim Beneficiaires and/or the Other Claims Beneficiaires shall not be required to any amendment to this Agreement.

## 17.    Severability

17.1    In the event that any term, condition or provision of this Agreement is held to be in violation of any applicable law, statute or regulation the same shall be deemed to be deleted from this Agreement and shall be of no force and effect and this Agreement shall remain in full force and effect as if such term, condition or provision had not originally been contained in this Agreement.    Notwithstanding the foregoing in the event of such deletion, the Parties shall negotiate in good faith in order to agree the terms of a mutually acceptable and satisfactory alternative provision in place of the provision so deleted.

## 18.    Counterparts

18.1    This Agreement may be executed in any number of counterparts, which shall be an original but so that such counterparts shall together constitute one Agreement.    Either Party may enter into this Agreement by signing any such counterpart.

19.    **No Partnership**

19.1    Nothing in this Agreement shall constitute or be deemed to create any constitute a partnership, joint venture or similar relationship between the Parties and/or any other person nor, except as expressly provided, shall it constitute, or be deemed to constitute, either party the agent of the other party for any purpose.

20.    **Conflicts of Interests - Multiple interests**

20.1    The Parties and any person acting on their behalf may act in multiple capacities. In that event, each of them shall act in the interest of the Beneficiaries.

20.2    The Assignee has multiple interests. In consideration of its capacity as Investment Manager of the Assignor, the Assignee shall act in the sole interest of the Lehman Claim Beneficiaries and of the Other Claims Beneficiaries. The Assignee agrees to assert the rights of the Lehman Claims and of the Other Claims for the sole benefit of respectively the Lehman Claim Beneficiaries and the Other Claims Beneficiaries in accordance with the terms of the Agreement and in good faith and with reasonable care and judgement, in a manner which is consistent with practices and procedures.

21.    **Consent and Waiver**

21.1    The Assignor hereby acknowledges and consents to all terms of this Agreement and waivers its right to raise any objection thereto and its rights to receive notice to the US Rule 3001 of the Rules of Bankruptcy Procedure.

22.    **Governing Law - Jurisdiction**

22.1    This Agreement shall be governed by and construed in accordance with English law.

22.2    In relation to any legal action or proceedings arising out of or in connection with this Agreement (**"Proceedings"**), each of the parties irrevocably submits to the exclusive jurisdiction of the Paris courts and waives any objection to Proceedings in such courts on the grounds of venue or on the grounds that Proceedings have been brought in an inappropriate forum.

**IN WITNESS** whereof the Parties hereto have caused this Agreement to be signed as a deed as of the day and year first above written.

**KALLISTA MASTER FUND LIMITED**
Represented by:
Alain Reinhold (Director)                                    Simon Brock (Director)
                        Signature                                              Signature

**OFI Asset Management**
Represented by:
Thierry CALLAULT (Deputy CEO)    FAO Thierry CALLAULT
Gérard BOURRET    Signature
CEO
**In the presence of:**
**KALLISTA CB ARBITRAGE FUND LIMITED**
Represented by:
Alain Reinhold (Director)                                    Simon Brock (Director)
                        Signature                                              Signature

## SCHEDULE 1: DETAILS OF THE CALCULATION OF THE CLAIM AMOUNTS

### 1) Lehman Claims

**USD 16,794,457.50 (i.e. GBP 9,363,024.75 as laid down in the attached proof of debt according to the relevant FX rate determined by the Administrators)** together with interest from and including the termination date at the applicable rate (as defined in the ISDA Master Agreement) **(see the attached documents and the Proof of Debt).**

### 2) Other Claims

### *2.1) Countrywide Financial Corporation*

(Series A: 1,581,014.42) + (Series B: 1,143,964.12) = **2,724,978.54 USD** (see details below).

*It is understood and agreed that the potential recovery of this amount of 2,724,978.54 USD is contingent upon various considerations. The potential recovery of the latter amount is indeed uncertain and is notably subject to (i) the achievement of the current proposed settlement or litigations and to (ii) the potential legal costs, fees of the appointed law firm, Entwistle & Cappucci, (see the attached confidential retention letter) and other expenses.*

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B Fl Rt Conv Sen Deb Due 2037: CUSIP 22237 2AM6 AP9
Class Period: May 16, 2007 - November 21, 2007

| | | |
|---|---|---|
| Class Period Beginning: | | 5/16/2007 |
| Class Period End: | | 11/21/2007 |
| "Lookback Period" Beginning: | | 11/21/2007 |
| "Lookback Period" End: | | 11/21/2007 |
| Days in "Lookback Period": | | 1 |
| "Lookback Period" Average Closing Price: | | 76.6046% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | $ | - | | | | | | | | |
| **1A. Pre-Class Period Holdings Sold Through End of Class Period** | | | | | | | | | | | |
| Pre-Class Period Holdings | | | | | | | | | | 0 | |
| **1A. Total** | | $ | - | | | | | $ | - | $ | - | 0 |

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B Fl Rt Conv Sen Deb Due 2037: CUSIP 22237 2AM6 AP9
Class Period: May 16, 2007 - November 21, 2007

| | | |
|---|---|---|
| Class Period Beginning: | | 5/16/2007 |
| Class Period End: | | 11/21/2007 |
| "Lookback Period" Beginning: | | 11/21/2007 |
| "Lookback Period" End: | | 11/21/2007 |
| Days in "Lookback Period": | | 1 |
| "Lookback Period" Average Closing Price: | | 76.6046% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Pre-Class Period Holdings Sold During "Lookback Period"** | | | | | | | | | | | |
| Pre-Class Period Holdings | | | | | | | | | | 0 | |
| **1B. Total** | | $ | - | | | | | $ | - | $ | - | 0 |

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B FI Rt Conv Sen Deb Due 2037: CUSIP 222372AM6/AP9
Class Period: May 16, 2007 - November 21, 2007

| | |
|---|---|
| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 76.6046 |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1C. Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | |
| Pre-Class Period Holdings | | $ - | | | | | | | | | 0 |
| **1C. Total** | | $ - | | | | | | | $ - | - | |

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B FI Rt Conv Sen Deb Due 2037: CUSIP 222372AM6/AP9
Class Period: May 16, 2007 - November 21, 2007

| | |
|---|---|
| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 76.6046 |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2A. Class Period Purchases Sold Prior to End of Class Period** | | | | | | | | | | | |
| Purchase | 09/13/2007 | $0.980 | 1,000,000 | $ 980,000.00 | Sale | 09/13/2007 | $0.983 | 1,000,000 | $ 983,327.00 | 0 | $ 3,327.00 |
| Purchase | 09/13/2007 | $0.980 | 1,500,000 | $ 1,470,000.00 | Sale | 09/13/2007 | $0.983 | 1,500,000 | $ 1,475,140.50 | 0 | $ 5,140.50 |
| Purchase | 09/13/2007 | $0.980 | 3,000,000 | $ 2,940,000.00 | Sale | 09/13/2007 | $0.985 | 3,000,000 | $ 2,953,530.00 | 0 | $ 13,530.00 |
| Purchase | 09/13/2007 | $0.980 | 1,000,000 | $ 980,000.00 | Sale | 09/13/2007 | $0.974 | 1,000,000 | $ 974,448.94 | 0 | $ (5,551.06) |
| Purchase | 09/13/2007 | $0.980 | 2,000,000 | $ 1,960,000.00 | Sale | 09/13/2007 | $0.971 | 2,000,000 | $ 1,941,132.22 | 0 | $ (18,867.78) |
| Purchase | 09/13/2007 | $0.980 | 2,000,000 | $ 1,960,000.00 | Sale | 09/13/2007 | $0.971 | 2,000,000 | $ 1,942,944.22 | 0 | $ (17,055.78) |
| Purchase | 09/13/2007 | $0.980 | 2,000,000 | $ 1,960,000.00 | Sale | 09/13/2007 | $0.959 | 2,000,000 | $ 1,918,125.33 | 0 | $ (41,874.67) |
| Purchase | 09/13/2007 | $0.980 | 1,500,000 | $ 1,470,000.00 | Sale | 09/13/2007 | $0.959 | 1,500,000 | $ 1,438,052.50 | 0 | $ (31,947.50) |
| Purchase | 09/13/2007 | $0.985 | 1,500,000 | $ 1,478,032.50 | Sale | 09/13/2007 | $0.959 | 1,500,000 | $ 1,438,052.50 | 0 | $ (39,980.00) |
| Purchase | 09/13/2007 | $0.978 | 2,000,000 | $ 1,956,402.22 | Sale | 09/13/2007 | $0.959 | 2,000,000 | $ 1,917,403.33 | 0 | $ (38,998.89) |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| **2A. Total** | | | $ 17,500,000 | $ 17,154,434.72 | | | | $ 17,500,000 | $ 18,982,156.54 | 0 | $ (172,278.18) |

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B FI Rt Conv Sen Deb Due 2037: CUSIP 222372AM6/AP9
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 76.6046% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) [2] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1B. Class Period Purchases Sold During "Lookback Period" | | | | | Maximum of Actual Price or Average Daily TRACE VWAP from 11/21/2007 Through Date of Sale | | | | | | |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| 1B. Total | | $ — | $ — | | | $ — | $ — | | 0 | $ — | |

---

Kallista Fund CB Arbitrages
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B FI Rt Conv Sen Deb Due 2037: CUSIP 222372AM6/AP9
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 76.6046% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1C. Class Period Purchases Held At End of "Lookback Period" | | | | | | | | | | | |
| Purchase | 09/13/2007 | $0.941 | 1,000,000 | $ 941,194.38 | | | | | | 1,000,000 | $ (175,148.09) |
| Purchase | 09/13/2007 | $0.926 | 1,000,000 | $ 926,194.38 | | | | | | 1,000,000 | $ (160,148.09) |
| Purchase | 09/13/2007 | $0.882 | 2,000,000 | $ 1,764,961.25 | | | | | | 2,000,000 | $ (252,868.60) |
| Purchase | 09/13/2007 | $0.876 | 3,500,000 | $ 3,054,683.13 | | | | | | 3,500,000 | $ (383,521.10) |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| Purchase | | | | | | | | | | 0 | $ — |
| 1C. Total | | $ | 7,500,000 | $ 6,717,033.14 | | | $ — | $ | | 7,500,000 | $ (971,685.94) |



**Kallista Fund CB Arbitrage**
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series B FI Rt Conv Sen Deb Due 2037: CUSIP 222372A356/APP
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
|---|---|
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 76.5046% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | | | $ 25,000,000 | $ 23,871,457.96 | | | | $ 17,500,000 | $ 16,982,156.84 | 7,500,000 | $ (1,143,964.12) |
| Grand Total | | | $ 25,000,000 | $ 23,871,457.96 | | | | $ 17,500,000 | $ 16,982,156.84 | 7,500,000 | |

Less: Offset for Pre-Class Period Holdings Sold Through End of "Lookback Period": $ -

Total Including Offset for Pre-Class Period Holdings Sold Through End of "Lookback Period": $ (1,143,964.12)

---

**Kallista Fund CB Arbitrage**
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series A FI Rt Conv Sen Deb Due 2037: CUSIP 222372AL8/AN4
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
|---|---|
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 73.2370% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Class Period Holdings | | | $ - | | | | | | | | |

1A. Pre-Class Period Holdings Sold Through End of Class Period

| Pre-Class Period Holdings | | | | | | | | | | 0 | |
| 1A. Total | | | $ - | | | | | $ - | $ - | 0 | |

---

**Kallista Fund CB Arbitrage**
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series A FI Rt Conv Sen Deb Due 2037: CUSIP 222372AL8/AN4
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
|---|---|
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 73.2370% |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1B. Pre-Class Period Holdings Sold During "Lookback Period" | | | | | | | | | | | |
| Pre-Class Period Holdings | | | | | | | | | | 0 | |
| 1B. Total | | | $ - | | | | | $ - | $ - | 0 | |



**Kallista Fund CB Arbitrage**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Countrywide Financial Corporation Series A F1 Rt Conv Sen Deb Due 2037: CUSIP 222372AL8:AN4**
**Class Period: May 16, 2007 - November 21, 2007**

| | |
|---|---|
| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 73.2570's |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1C. Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | |
| Pre-Class Period Holdings | | $ | - | | | | | | | | 0 |
| **1C. Total** | | $ | - | | | | $ | - | $ | - | 0 |

---

**Kallista Fund CB Arbitrage**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**Countrywide Financial Corporation Series A F1 Rt Conv Sen Deb Due 2037: CUSIP 222372AL8:AN4**
**Class Period: May 16, 2007 - November 21, 2007**

| | |
|---|---|
| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | 1 |
| "Lookback Period" Average Closing Price: | 73.2570's |

| Transaction Type | Trade Date | Price % of Par | Face Value | Total Cost | Transaction Type | Trade Date | Price % of Par | Face Value | Total Proceeds | Face Value Retained @ 11/21/2007 | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2A. Class Period Purchases Sold Prior to End of Class Period** | | | | | | | | | | | |
| Purchase | 05/17/2007 | $0.993 | 1,500,000 | $ 1,489,077.00 | Sale | 05/17/2007 | $0.988 | 1,500,000 | $ 1,481,730.00 | 0 | $ (7,347.00) |
| Purchase | 05/17/2007 | $0.990 | 1,000,000 | $ 989,603.00 | Sale | 05/17/2007 | $0.988 | 1,000,000 | $ 987,823.00 | 0 | $ (1,783.00) |
| Purchase | 05/17/2007 | $0.990 | 1,000,000 | $ 989,603.00 | Sale | 07/17/2007 | $0.969 | 1,000,000 | $ 969,008.33 | 0 | $ (20,594.67) |
| Purchase | 05/17/2007 | $0.990 | 1,000,000 | $ 989,603.00 | Sale | 07/18/2007 | $0.967 | 1,000,000 | $ 967,393.34 | 0 | $ (22,209.67) |
| Purchase | 05/17/2007 | $0.939 | 1,000,000 | $ 988,752.00 | Sale | 07/18/2007 | $0.967 | 1,000,000 | $ 967,393.34 | 0 | $ (31,358.67) |
| Purchase | 05/17/2007 | $0.983 | 1,500,000 | $ 1,473,750.00 | Sale | 07/24/2007 | $0.954 | 1,500,000 | $ 1,431,114.00 | 0 | $ (42,636.00) |
| Purchase | 05/17/2007 | $0.983 | 1,000,000 | $ 982,500.00 | Sale | 08/15/2007 | $0.842 | 1,000,000 | $ 841,860.00 | 0 | $ (140,640.00) |
| Purchase | 05/17/2007 | $0.982 | 1,000,000 | $ 982,500.00 | Sale | 08/15/2007 | $0.859 | 1,000,000 | $ 859,308.33 | 0 | $ (123,191.67) |
| Purchase | 05/17/2007 | $0.982 | 2,500,000 | $ 2,456,250.00 | Sale | 08/15/2007 | $0.866 | 2,500,000 | $ 2,164,033.00 | 0 | $ (292,225.00) |
| Purchase | 05/17/2007 | $0.982 | 1,000,000 | $ 982,500.00 | Sale | 08/16/2007 | $0.794 | 1,000,000 | $ 784,350.00 | 0 | $ (188,140.06) |
| Purchase | 05/17/2007 | $0.983 | 1,000,000 | $ 982,500.00 | Sale | 08/20/2007 | $0.882 | 1,000,000 | $ 881,963.33 | 0 | $ (100,536.67) |
| Purchase | 05/17/2007 | $0.983 | 1,000,000 | $ 982,500.00 | Sale | 08/27/2007 | $0.915 | 1,000,000 | $ 914,825.00 | 0 | $ (67,675.00) |
| Purchase | 05/17/2007 | $0.982 | 1,000,000 | $ 982,500.00 | Sale | 08/27/2007 | $0.915 | 1,000,000 | $ 916,075.00 | 0 | $ (66,425.00) |
| Purchase | 05/17/2007 | $0.983 | 1,000,000 | $ 982,500.00 | Sale | 08/29/2007 | $0.910 | 1,000,000 | $ 910,083.33 | 0 | $ (72,416.67) |
| Purchase | 05/18/2007 | $0.993 | 500,000 | $ 496,250.85 | Sale | 08/29/2007 | $0.910 | 500,000 | $ 455,041.67 | 0 | $ (41,209.17) |
| Purchase | 05/18/2007 | $0.993 | 1,000,000 | $ 992,501.67 | Sale | 09/06/2007 | $0.908 | 1,000,000 | $ 907,945.00 | 0 | $ (84,556.67) |
| Purchase | 07/02/2007 | $0.978 | 2,255,000 | $ 2,199,990.00 | Sale | 09/06/2007 | $0.908 | 2,250,000 | $ 2,042,876.25 | 0 | $ (157,113.75) |
| Purchase | 07/02/2007 | $0.978 | 250,000 | $ 244,483.33 | Sale | 09/13/2007 | $0.903 | 250,000 | $ 225,825.67 | 0 | $ (18,616.67) |
| Purchase | 08/23/2007 | $0.952 | 500,000 | $ 476,110.83 | Sale | 09/13/2007 | $0.903 | 500,000 | $ 451,653.33 | 0 | $ (24,457.50) |
| Purchase | 08/23/2007 | $0.952 | 1,000,000 | $ 951,221.67 | Sale | 09/13/2007 | $0.903 | 1,000,000 | $ 903,306.67 | 0 | $ (48,915.00) |
| Purchase | 08/23/2007 | $0.942 | 1,000,000 | $ 942,273.33 | Sale | 09/13/2007 | $0.903 | 1,000,000 | $ 903,306.67 | 0 | $ (38,966.00) |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| Purchase | | | | | | | | | | 0 | $ - |
| **2A. Total** | | | $ 25,000,000 | $ 22,447,929.66 | | | | $ 22,000,000 | $ 20,976,915.24 | 0 | $ (1,581,014.42) |



Kallista Fund CB Arbitrage
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series A F1 R1 Conv Sen Deb Due 2037: CUSIP 222372AL8:AN4
Class Period: May 16, 2007 - November 21, 2007

| | | | | | | | | | | Face Value | |
| Transaction | Trade | Price | Face | Total | | Transaction | Trade | Price | Face | Total | Retained | Gain |
| Type | Date | % of Par | Value | Cost | | Type | Date | % of Par | Value | Proceeds | @ 11/21/2007 | (Loss) |

| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | |
| "Lookback Period" Average Closing Price: | 73.2370% |

2B. Class Period Purchases Sold During "Lookback Period"        Maximum of Actual Price or Average Daily TRACE VWAP from 11/21/2007 Through Date of Sale

| Transaction | | | | | | | | | Face Value Retained | Gain |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| 2B. Total | | $ | - | $ | - | | | $ | - | $ | - | 0 | $ | - |

Kallista Fund CB Arbitrage
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series A F1 R1 Conv Sen Deb Due 2037: CUSIP 222372AL8:AN4
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | |
| "Lookback Period" Average Closing Price: | 73.2370% |

| | | | | | | | | | | Face Value | |
| Transaction | Trade | Price | Face | Total | | Transaction | Trade | Price | Face | Total | Retained | Gain |
| Type | Date | % of Par | Value | Cost | | Type | Date | % of Par | Value | Proceeds | @ 11/21/2007 | (Loss) |

2C. Class Period Purchases Held At End of "Lookback Period"

| Transaction | | | | | | | | | Face Value Retained | Gain |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| Purchase | | | | | | | | | 0 | $ | - |
| 2C. Total | | $ | - | $ | - | | | $ | - | $ | - | 0 | $ | - |

Kallista Fund CB Arbitrage
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
Countrywide Financial Corporation Series A F1 R1 Conv Sen Deb Due 2037: CUSIP 222372AL8:AN4
Class Period: May 16, 2007 - November 21, 2007

| Class Period Beginning: | 5/16/2007 |
| Class Period End: | 11/21/2007 |
| "Lookback Period" Beginning: | 11/21/2007 |
| "Lookback Period" End: | 11/21/2007 |
| Days in "Lookback Period": | |
| "Lookback Period" Average Closing Price: | 73.2370% |

| | | | | | | | | | | Face Value | |
| Transaction | Trade | Price | Face | Total | | Transaction | Trade | Price | Face | Total | Retained | Gain |
| Type | Date | % of Par | Value | Cost | | Type | Date | % of Par | Value | Proceeds | @ 11/21/2007 | (Loss) |

| | Face Value | Total Cost | | | Face Value | Total Proceeds | Retained | Gain (Loss) |
|---|---|---|---|---|---|---|---|---|
| Class Period Purchase Total | $ 23,000,000 | $ 22,557,929.66 | | $ 23,000,000 | $ 20,976,915.24 | 0 | $ (1,581,014.42) |
| Grand Total | $ 23,000,000 | $ 22,557,929.66 | | $ 23,000,000 | $ 20,976,915.24 | 0 | |

Less: Offset for Pre-Class Period Holdings Sold Through End of "Lookback Period":        $ -

Total Including Offset for Pre-Class Period Holdings Sold Through End of "Lookback Period":        $ (1,581,014.42)

### 2.2) C NORTHERN ROCK PL

C NORTHERN ROCK PL 64 03/08 A BClear (quantité 500)
C NORTHERN ROCK PL 72 03/08 A BCLEAR (QUANTITÉ -500)

These options (i.e. derivative financial instruments) are valued at 0 since December 2007.

Physical settlement of the underlying assets is uncertain.

The value of the assets potentially physically settled is undetermined.

**SCHEDULE 2 : NOTICE TO THE DEBTOR'S ADMINISTRATORS AND THE DEBTOR**

To: the Joint Administrators named below, of **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (the « **Debtor** ») in administration

The Joint Administrators are:
Anthony Victor Lomas,
Steven Anthony Pearson,
Dan Yoram Schwarzmann,
Michael John Andrew Jervis
Derek Anthony Howell

Fax. : + 44 (0) 20 7212 6598

counterparties@lbia-eu.com
uk.terminationnoticesqueries@ lbia-eu.com

Date: the 17th of February 2011

**From: « KALLISTA MASTER FUND LIMITED » (the "Assignor") and OFI Asset Management (the "Assignee")**

Dear Sirs

1. We refer to the ISDA Master Agreement dated as of the 15th October 2002 between the Assignor and the Debtor (the "Master Agreement"). Terms defined in the Master Agreement have the same meanings when used in this notice.

**2. We hereby notify you that as of the 16th February 2011 the Assignor has assigned to the Assignee its claims against the Debtor under the applicable Master Agreement, in the sum of GBP 9,363,024.75 + the applicable interest rate + out-of-pockets expenses. *Please refer to the attached copy of the relevant filed proof of debt.***

3. According to Section 7 of the Master Agreement, we, as Non-defaulting Party and Assignor, are entitled to transfer our interest in any amount payable to us from the Debtor as Defaulting Party under Section 6(e).

4. The administrative details of the Assignee are as follows:

**Address for Notices:**

**OFI ASSET MANAGEMENT**

**Attn. : Legal Department and General Management**

sgrasset@ofi-am.fr / ngomart@ofi-am.fr / clepitre@ofi-am.fr / jlmalafosse@ofi-am.fr

**1 rue Vernier 75017 PARIS**

**FRANCE**

**Bank Account Details:**



| RELEVE D'IDENTITE BANCAIRE |
| :---: |

Titulaire
**OFI ASSET MANAGEMENT**

Domiciliation
**SG PARIS ELYSEES ENTREPR (03392)
91 AV CHAMPS ELYSEES
75008 PARIS**

Référence bancaire

| Code banque | Code guichet | N° compte | Clé RiB |
| :---: | :---: | :---: | :---: |
| 30003 | 03392 | 03820311753 | 19 |

IBAN : FR76 3000 3033 9203 8203 1175 319
BIC-ADRESSE SWIFT : **SOGEFRPP**

5. Please acknowledge this notice by signing and returning to the Assignee the attached acknowledgement.

ASSIGNOR:                                          ASSIGNEE:

Signature:                                          Signature:

FAO Thierry CALLAULT

Name: **Alain REINHOLD**                    Name: Thierry CALLAULT
                                                    Gérard BOURRET
Title: Director, duly authorized to execute this notice     Title: Deputy CEO
                                                    CEO
Phone: + 33 1 40 68 17 17                    Phone: + 33 1 40 68 17 17

Acknowledgement of Receipt
of Notice of Assignment

By Facsimile / Facsimile No.: + 33 1 40 68 17 72

Email : sgrasset@ofi-am.fr / cdimi@ofi-am.fr

**For the attention of:**

**ADI – Alternative Investments**

**Attn. : Legal Department**

**1 rue Vernier 75017 PARIS**

**FRANCE**

…………… February 2011

Dear Sirs:

**Re. : The Sale by « KALLISTA MASTER FUND LIMITED » (the "Assignor") to OFI Asset Management (the "Assignee") of the amount payable to it pursuant to the ISDA Master Agreement dated as of 15th October 2002 between the Assignor and Lehman Brothers International (Europe), in the sum of GBP 9,363,024.75 (plus the applicable interest rate and plus out-of-pockets expenses) (the "Assigned Claim").**

We hereby acknowledge receipt of a copy of the Notice of Assignment between Assignor and Assignee dated the 17th of February 2011 regarding the Assigned Claim referred to above.

We note the sale, assignment and transfer of the Assigned Claim to **OFI Asset Management** and that **OFI Asset Management** is entitled to any and all amounts payable from the Administration proceeding with regard to the Assigned Claim

The Joint Administrators

for and on behalf of **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in administration)

## SCHEDULE 3: LIST OF BENEFICIARIES OF THE POTENTIAL RECOVERY ARISING FROM LEHMAN CLAIM AMOUNT AND OTHER CLAIMS AMOUNTS

### Schedule 3 A: list of Lehman Claim Beneficiaries:

| Shareholder Name | Shares |
|---|---|
| **MATMUT** | **75,519.89** |
| **BNP PARIBAS SECURITIES SERVICES / CARDIF** | **71,933.34** |
| **LAVEDRINE F&S** | **13,056.94** |
| **UNION MUTUALISTE RETRAITE** | **64,046.47** |

### Schedule 3 B: list of Other Claims Beneficiaries:

| SHAREHOLDER NAME | TRANSACTION TYPE | NUMBER OF SHARES |
|---|---|---|
| UNION MUTUALISTE RETRAITE (via SGBT) --> A/c 2100051 | REDEMPTION | 64,046.47 |
| SGBT LUX/FCP MATMUT ALPHA DRIVE MAX | REDEMPTION | 12,713.79 |
| SGBT LUX/OFI ALTERNATIVE MANDATES - OFI SEED | REDEMPTION | 25,427.46 |
| SGBT LUX/ALPHA DRIVE GLOBAL CONVERTIBLE | REDEMPTION | 8,362.60 |
| SGBT LUX/ OFI FG ALTERNATIF | REDEMPTION | 15,848.10 |
| CACEIS BANK FOR ADI MATMUT CONVERTIBLE | REDEMPTION | 16,951.64 |
| BNP PARIBAS SECURITIES SERVICES / CARDIF | REDEMPTION | 71,933.34 |
| LAVEDRINE FINANCE & STRATEGIE | REDEMPTION | 13,056.94 |



### SCHEDULE 4: DRAFT LETTER TO THE LEHMAN CLAIM BENEFICIARIES AND TO THE OTHER CLAIMS BENEFICIARIES


**CB ARBITRAGE FUND LIMITED**

**For the attention of: the Lehman Claim Beneficiaries and the Other Claims Beneficiaries**

*By email and registered mail*

CAYMAN ISLANDS, the 18th of February 2011

**Object: KALLISTA CB ARBITRAGE FUND Ltd**

Dear Sirs,

*Capitalized terms used and not otherwise defined in this letter shall have the meanings ascribed to them in the last updated version of the Memorandum of Association of KALLISTA MASTER FUND LIMITED (the "Company" or the "Master Fund"), in the last updated version of the Prospectus of KALLISTA CB ARBITRAGE FUND LIMITED (the "Feeder Fund"), or in the attached copy of the Assignment Agreement (the "Agreement").*

▪ The Master Fund has an alleged unsecured claim against Lehman Brothers International Europe[1] (guaranteed by Lehman Brothers Holdings Inc) (here the "**Lehman Claim**") arising from the Loss (including direct cost along with the hedging cost, the replacement cost and the opportunity cost and without prejudice to reasonable out-of-pockets expenses) in respect of the termination of each Transaction in accordance with provisions of Section 6 (e)(i)(4) of the applicable ISDA Master Agreement.

Master Side Pocket Shares have been created expressly for the purpose of being attributed to interests in the Lehman Claim which had been declared by the Directors of the Company in their discretion as being, in their opinion, an investment that is illiquid and whose realisation would be prejudicial to Shareholders, as defined as Illiquid Assets in the prospectus of the Feeder Fund. Accordingly, Fund Side Pocket Shares are invested in the Master Side Pocket Shares.

The Lehman Claim has been assessed at USD 16,794,457.50 (i.e. GBP 9,363,024.75 as laid down in the attached proof of debt according to the relevant FX rate determined by the Administrators) together with interest from and including the termination date at the applicable rate as defined in the ISDA Master Agreement.

This Lehman Claim is valued at 0. For the avoidance of doubt, the Net Asset Value per share of the Master Side Pocket Shares has taken into account a valuation of the Lehman Claim against the Debtors at USD 0.

---

[1] We remind you that the Company and LBIE had entered into a 1992 ISDA master agreement dated 15th of October 2002 (the "ISDA Master Agreement"). On the 15th of September 2008, administration orders were made in respect of LBIE under Rule 2.47(3)(a) of the UK Insolvency Rules 1986. Having been appointed as joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann, Michael John Andrew Jervis and/or Derek Anthony Howell (as applicable) each a partner at PricewaterhouseCoopers LLP assumed responsibility for LBIE's affairs (as at 9th December 2008).
On the 15th of September 2008, LEHMAN BROTHERS HOLDING INC. ("LBHI") announced that it has filed for Chapter 11 bankruptcy protection in the US. Thus, LBHI is debtor in the Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the Southern District of New York captioned In re Lehman Brothers Holdings Inc., et al., Chapter 11 Case Number 08-13555 (JMP).

- The Company has also two other alleged claims (here the **"Other Claims"**):

- a claim against Countrywide Financial corporation, Angelo R. Mozilo, David Sambol and Eric P. Sieracki (here the "Defendants"); a complaint for violations of the federal securities laws and California State law has been filed for alleged material misrepresentations made by the Defendants. The law firm appointed to represent the interests of the Company is currently trying to settle this complaint;

- and a claim regarding potential physical settlement arising from derivative financial instruments held by the Company on C NORTHERN ROCK PL 64 03/08 A BClear (quantity 500) and on C NORTHERN ROCK PL 72 03/08 A BClear (quantity -500).

These Other Claims are valued at 0. For the avoidance of doubt, the Net Asset Value per share of the ordinary Master Fund Shares dated as of the 30th of November 2010 has taken into account a valuation at USD 0 of the Other Claims (it being understood that the related Redemption Price per ordinary Master Fund Share, as defined in the Prospectus, has incorporated the Other Claims valued at zero into the calculation because the Other Claims have been and are still considered as illiquid assets which cannot be realized and converted into cash).

- Given the illiquidity of the Lehman Claim and of the Other Claims and with a view to facilitating the expected liquidation of the Master Fund and of the Feeder Fund on a voluntary basis, once all assets, including the side pocket, are in cash, and to ensuring the protection of the Feeder Fund Side Pocket Shareholders (i.e. the **"Lehman Claim Beneficiaries"**) and of the Feeder Fund Shareholders (i.e. the **"Other Claims Beneficiaries"**), the board of directors of the Company (the "Board of Directors") has decided to transfer all of the Company's right, title and interest in and to the Lehman Claim and the Other Claims subject to certain conditions as described hereunder to OFI Asset Management (or "OFI AM"), the Investment Manager of the Company, by a way of an assignment agreement approved by the Board of Directors at a meeting held on the 15th of February 2011 (the "Resolution"). The board of directors of the Feeder Fund has also approved this assignment at a meeting held on the same date.

- Indeed, to the best of its knowledge and belief, the Board of Directors had considered that it was in the best interest of Lehman Claim Beneficiaries and of the Other Claims Beneficiaries, subject to their own personal status, to assign the related claims to OFI AM (the **"Assignee"**) subject to a commitment of the Assignee to repay the relevant recoveries to the Lehman Claim Beneficiaries and to the Other Claims Beneficiaries pro rata according to the terms and conditions mentioned in the enclosed copy of the Agreement.

- For the avoidance of doubt:

- **Claw-Back Amount A:** only **Lehman Claim Beneficiaries** shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Lehman Claim subject to (i) the prior and full reimbursement of the Advance Cash Amount (as defined in the Agreement) paid by the Investment Manager to the Company and to (ii) the prior and full deduction of costs and expenses defined in Article 5 of the Agreement;

- **Claw-Back Amount B:** only the **Other Claims Beneficiaries** shall be entitled to receive payments from the Assignee corresponding to payments (if any) received by the Assignee in respect of the Other Claims subject to the prior and full deduction of costs and expenses defined in Article 5 of the Agreement;

Each claw-back amount scheme (Claw-Back Amounts A and B) is described more precisely in Article 5 of the Agreement.

- You have been identified as:

☐ a Lehman Claim Beneficiary

*and/or*

☐ an Other Claims Beneficiary

- The Board of Directors had considered different organisations to monitor the Lehman Claim and the Other Claims and to recover monies accordingly, and concluded that such assignment to the Assignee with the insertion of the Claw-Back Provision A and the Claw-Back Provision B in the Agreement was in the best interest of the Lehman Claim Beneficiaries and of the Other Claims Beneficiaries.

- Accordingly the enclosed copy of the Agreement has been approved by the Resolution of the Board of Directors and duly executed.

- Thus, the Assignee agrees to repay :

- to the Lehman Claim Beneficiaries, all of the recoveries distribution from (i) LBIE, (ii) its successors or affiliates on account of the Lehman Claim or (iii) in the event of transfer of the Lehman Claim, which distribution or bid price shall be transferred to the Lehman Claim Beneficiaries. Please note that the Assignee agrees to repay all of the recoveries with deduction of amounts defined in Article 5 of the Agreement.

- to the Other Claims Beneficiaries, all of the recoveries distribution from (i) the Other Claims  or (iii) in the event of transfer of the Other Claims , which distribution or bid price shall be transferred to the Other Claims Beneficiaries. Please note that the Assignee agrees to repay all of the recoveries with deduction of amounts defined in Article 5 of the Agreement.

- As mentioned in the Agreement, the Assignee expressly undertakes to comply with the Claw-Back Provisions A and B but shall not be responsible for the amount of recoveries or the absence of recoveries and will act in good faith and in a reasonable manner in order to assert the rights of the Lehman Claim and of the Other Claims. **The Assignee does not, will not, and its undertaking under the Agreement does not purport to give an express or implied guarantee, in whole or in part, regarding the distribution of recoveries and the amount of recoveries.**

- **The Board of Directors and the Assignee consider that each and every Lehman Claim Beneficiaries and Other Claims Beneficiaries should seek and obtain professional tax, financial and legal advice as to the merits of receiving its part of recoveries according to the relevant Claw-Back Provision for itself and disclaim accordingly any and all liabilities as to the potential impact of receiving the proceeds of the implementation of the relevant Claw-Back Provision and its direct or indirect consequences.**

- For convenience purposes only, the Board of Directors would be grateful for your view on this scheme and your intention to benefit *in fine* from the relevant Claw-Back Provision. To the extent that you already intend to benefit from this Claw Back, could you please provide us with a copy of the attached Agreement by affixing the signature of your duly authorised representative together with these two phrases above the signature of the authorised representative: "In my capacity as a former shareholder in the Feeder Fund who had redeemed its shares in the Feeder Fund on the basis of the November 2010 Net Asset Value Per Share of the Feeder Fund Shares [and/or in my capacity as former Feeder Fund Side Pocket Shareholder; *please select the right*

Each claw-back amount scheme (Claw-Back Amounts A and B) is described more precisely in Article 5 of the Agreement.

- You have been identified as:

☐ a Lehman Claim Beneficiary

*and/or*

☐ an Other Claims Beneficiary

- The Board of Directors had considered different organisations to monitor the Lehman Claim and the Other Claims and to recover monies accordingly, and concluded that such assignment to the Assignee with the insertion of the Claw-Back Provision A and the Claw-Back Provision B in the Agreement was in the best interest of the Lehman Claim Beneficiaries and of the Other Claims Beneficiaries.

- Accordingly the enclosed copy of the Agreement has been approved by the Resolution of the Board of Directors and duly executed.

- Thus, the Assignee agrees to repay :

- to the Lehman Claim Beneficiaries, all of the recoveries distribution from (i) LBIE, (ii) its successors or affiliates on account of the Lehman Claim or (iii) in the event of transfer of the Lehman Claim, which distribution or bid price shall be transferred to the Lehman Claim Beneficiaries. Please note that the Assignee agrees to repay all of the recoveries with deduction of amounts defined in Article 5 of the Agreement.

- to the Other Claims Beneficiaries, all of the recoveries distribution from (i) the Other Claims or (iii) in the event of transfer of the Other Claims , which distribution or bid price shall be transferred to the Other Claims Beneficiaries. Please note that the Assignee agrees to repay all of the recoveries with deduction of amounts defined in Article 5 of the Agreement.

- As mentioned in the Agreement, the Assignee expressly undertakes to comply with the Claw-Back Provisions A and B but shall not be responsible for the amount of recoveries or the absence of recoveries and will act in good faith and in a reasonable manner in order to assert the rights of the Lehman Claim and of the Other Claims. **The Assignee does not, will not, and its undertaking under the Agreement does not purport to give an express or implied guarantee, in whole or in part, regarding the distribution of recoveries and the amount of recoveries.**

- **The Board of Directors and the Assignee consider that each and every Lehman Claim Beneficiaries and Other Claims Beneficiaries should seek and obtain professional tax, financial and legal advice as to the merits of receiving its part of recoveries according to the relevant Claw-Back Provision for itself and disclaim accordingly any and all liabilities as to the potential impact of receiving the proceeds of the implementation of the relevant Claw-Back Provision and its direct or indirect consequences.**

- For convenience purposes only, the Board of Directors would be grateful for your view on this scheme and your intention to benefit *in fine* from the relevant Claw-Back Provision. To the extent that you already intend to benefit from this Claw Back, could you please provide us with a copy of the attached Agreement by affixing the signature of your duly authorised representative together with these two phrases above the signature of the authorised representative: "In my capacity as a former shareholder in the Feeder Fund who had redeemed its shares in the Feeder Fund on the basis of the November 2010 Net Asset Value Per Share of the Feeder Fund Shares [and/or in my capacity as former Feeder Fund Side Pocket Shareholder; *please select the right*

wording], I acknowledge that I have received a copy of this Assignment Agreement and I intend to benefit from the Claw-Back Provision A [and/or from the Claw-Back Provision B; *please select the right wording*] (subject to the terms and conditions of the latter agreement). I have carefully reviewed and understood the terms and conditions of this Assignment Agreement and I expressly acknowledge to the Company, its Board of Directors and OFI AM that neither of them gives any express or implied guarantee, in whole or in part, regarding the distribution of any amount under the relevant Claw-Back Provision".

▪   To the extent that you refuse *in fine* to receive the proceeds from the applicable Claw-Back Provision, the Assignee will consider that you waive your right to benefit from the relevant Claw-Back scheme. Please note that the only consequence attached to this refusal is that you will not be in a position to benefit from the Agreement and accordingly you will not be in a position to benefit from the applicable Claw-Back Provision. Only the Lehman Claim Beneficiaries and/or the Other Amounts Beneficiaries who will have agreed to benefit from the related Claw-Back Provision will participate to the distribution of the net proceeds of the relevant claims.

▪   Given the fact that the Board of Directors has approved the Agreement and executed it, the Investment Manager is organizing the transfer of the Lehman Claim and of the Other Claims from the Company to the Assignee.

▪   The net proceeds of the Lehman Claim will be distributed to the accepting Lehman Claim Beneficiaries on a *prorata basis* based on their holdings in the Feeder Fund Side Pocket Shares, subject to Article 5 of the Agreement.

▪   The net proceeds of the Other Claims will be distributed to the accepting Other Claims Beneficiaries on a *prorata basis* based on their holdings in the Feeder Fund Shares at the date of November NAVPS, subject to Article 5 of the Agreement.

▪   In the event that there is no accepting identified shareholders regarding Lehman Claim and/or Other Claims *in fine*, the net proceeds of the relevant claims will be paid to the holder of the Founder Share of the Company.

▪   We would be grateful if you could arrange for the Assignee to be informed of any event which could prejudice in any manner the ability to identify you in the future. Moreover, we would appreciate you arrange for any of your successor/assignee or transferee to provide us with its contact details and a document evidencing that such event occurred.

Yours sincerely,

**KALLISTA CB ARBITRAGE FUND LIMITED**

*Enclosed.*

Alain REINHOLD
Director



**OFI**

**ASSET MANAGEMENT**

1 rue Vernier – 75017 PARIS
Capital 9 878 530 €
RCS PARIS B 384 940 342

## <u>LIST OF AUTHORIZED SIGNATURES</u>

| FULL NAME / TITLE | CAPACITY | SPECIMEN SIGNATURE |
|---|---|---|
| **Gérard BOURRET**<br><br>CEO | Singly | |
| **Thierry CALLAULT**<br><br>Deputy CEO | Singly | |
| **Jean-Luc MALAFOSSE**<br><br>Secretary-General | Singly | |
| **Christophe LEPITRE**<br><br>Executive Vice President / COO | Singly | |

The persons above are duly authorized to sign on behalf of the company.

Gérard BOURRET, being duly authorized signatory of OFI ASSET MANAGEMENT, confirm that the abovementioned persons have been duly elected and appointed and the signatures appearing above opposite their names are genuine. Thus, I confirm that the abovementioned persons are duly authorized signatories.

Gérard BOURRET

2010-02-09

Certifié conforme
à l'original

To: the Joint Administrators named below, of **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (the « **Debtor** ») in administration

The Joint Administrators are:
Anthony Victor Lomas,
Steven Anthony Pearson,
Dan Yoram Schwarzmann,
Michael John Andrew Jervis
Derek Anthony Howell

Fax. : + 44 (0) 20 7212 6598

counterparties@lbia-eu.com
uk.terminationnoticesqueries@lbia-eu.com

Date: the 17th of February 2011

**From: « KALLISTA MASTER FUND LIMITED » (the "Assignor") and OFI Asset Management (the "Assignee")**

Dear Sirs

1. We refer to the ISDA Master Agreement dated as of the 15th October 2002 between the Assignor and the Debtor (the "Master Agreement"). Terms defined in the Master Agreement have the same meanings when used in this notice.

2. We hereby notify you that as of the 16th February 2011 the Assignor has assigned to the Assignee its claims against the Debtor under the applicable Master Agreement, in the sum of <u>GBP 9.363.024.75</u> + the applicable interest rate + out-of-pockets expenses. *Please refer to the attached copy of the relevant filed proof of debt.*

3. According to Section 7 of the Master Agreement, we, as Non-defaulting Party and Assignor, are entitled to transfer our interest in any amount payable to us from the Debtor as Defaulting Party under Section 6(e).

4. The administrative details of the Assignee are as follows:

Address for Notices:

**OFI ASSET MANAGEMENT**

**Attn. : Legal Department and General Management**

<u>sgrasset@ofi-am.fr</u> / <u>ngomart@ofi-am.fr</u> / <u>clepitre@ofi-am.fr</u> / <u>jlmalafosse@ofi-am.fr</u>

**1 rue Vernier 75017 PARIS**

**FRANCE**



**Bank Account Details:**



| RELEVE D'IDENTITE BANCAIRE |
| --- |

Titulaire
**OFI ASSET MANAGEMENT**

Domiciliation
**SG PARIS ELYSEES ENTREPR (03392)
91 AV CHAMPS ELYSEES
75008 PARIS**

Référence bancaire

| Code banque | Code guichet | N° compte | Clé RIB |
| --- | --- | --- | --- |
| 30003 | 03392 | 03020311753 | 19 |

IBAN : FR76 3000 3033 9203 8203 1175 319
BIC-ADRESSE SWIFT : SOGEFRPP

5. Please acknowledge this notice by signing and returning to the Assignee the attached acknowledgement.

**ASSIGNOR:**

Signature:

Name: **Alain REINHOLD**

Title: Director, duly authorized to execute this notice

Phone: + 33 1 40 68 17 17

**ASSIGNEE:**

Signature:

OFI ASSET MANAGEMENT
GÉRARD BOURRET
DIRECTEUR GÉNÉRAL
FAO Thierry CALLAULT

Name: Thierry CALLAULT
Gérard BOURRET
Title: Deputy CEO
CEO
Phone: + 33 1 40 68 17 17

**OFI ASSET MANAGEMENT**
1 RUE VERNIER - 75017 PARIS
Tél +33 (0)1 40 68 17 17 - Fax +33 (0)1 40 68 17 18

Acknowledgement of Receipt
of Notice of Assignment

By Facsimile / Facsimile No.: + 33 1 40 68 17 72

Email : sgrasset@ofi-am.fr / cdimi@ofi-am.fr

**For the attention of:**

**ADI – Alternative Investments**

**Attn. : Legal Department**

**1 rue Vernier 75017 PARIS**

**FRANCE**

…………….. February 2011

Dear Sirs:

**Re. : The Sale by « KALLISTA MASTER FUND LIMITED » (the "Assignor") to OFI Asset Management (the "Assignee") of the amount payable to it pursuant to the ISDA Master Agreement dated as of 15th October 2002 between the Assignor and Lehman Brothers International (Europe), in the sum of GBP 9,363,024.75 (plus the applicable interest rate and plus out-of-pockets expenses) (the "Assigned Claim").**

We hereby acknowledge receipt of a copy of the Notice of Assignment between Assignor and Assignee dated the 17th of February 2011 regarding the Assigned Claim referred to above.

We note the sale, assignment and transfer of the Assigned Claim to **OFI Asset Management** and that **OFI Asset Management** is entitled to any and all amounts payable from the Administration proceeding with regard to the Assigned Claim

The Joint Administrators

for and on behalf of **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in administration)





**ASSET MANAGEMENT**

1 rue Vernier – 75017 PARIS
Capital 9 878 530 €
RCS PARIS B 384 940 342

## LIST OF AUTHORIZED SIGNATURES

| FULL NAME / TITLE | CAPACITY | SPECIMEN SIGNATURE |
|---|---|---|
| Gérard BOURRET<br><br>CEO | Singly | |
| Thierry CALLAULT<br><br>Deputy CEO | Singly | |
| Jean-Luc MALAFOSSE<br><br>Secretary-General | Singly | |
| Christophe LEPITRE<br><br>Executive Vice President / COO | Singly | |

The persons above are duly authorized to sign on behalf of the company.

Gérard BOURRET, being duly authorized signatory of OFI ASSET MANAGEMENT, confirm that the abovementioned persons have been duly elected and appointed and the signatures appearing above opposite their names are genuine. Thus, I confirm that the abovementioned persons are duly authorized signatories.

Gérard BOURRET                                                    2010-02-09

Linklaters LLP/18/03/2011

Dated 28 June 2011



Certifié conforme
à l'original

# LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)

and

# OFI ASSET MANAGEMENT

# CLAIMS DETERMINATION DEED

**Linklaters**

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Telephone (+44) 20 7456 2000
Facsimile (+44) 20 7456 2222

Ref: L-179880/TB/RH/JM

This Claims Determination Deed (this "**Deed**") Is made on ~~28 June~~ 2011 between:

(1)     **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (IN ADMINISTRATION)**, a company incorporated in England and Wales with registered number 2538254, whose registered address is Level 23, 25 Canada Square, Canary Wharf, London E14 5LQ, United Kingdom, acting by its joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, each a partner of PwC, Plumtree Court, London EC4A 4HT, United Kingdom (the "**Company**"); and

(2)     **OFI ASSET MANAGEMENT**, a limited liability company *(société anonyme)* organised under the laws of France with registered number B384 940 342, whose registered office is at 1 rue Vernier, 75017 Paris, France (the "**Creditor**").

**Background:**

(A)     Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis and Dan Yoram Schwarzmann, each a partner of PwC, were appointed to act as joint administrators of the Company on the Administration Date pursuant to the Administration Order. On 30 November 2009, Derek Anthony Howell, a partner of PwC, was appointed to act as an additional joint administrator of the Company.

(B)     Pursuant to the Assignment Agreement dated 16 February 2011, the Original Creditor assigned to the Creditor its claims against the Company under the ISDA Master Agreement dated as of 15 October 2002.

(C)     In consideration of the Company and the Creditor agreeing that those claims which were assigned by the Original Creditor to the Creditor, as set out in Recital B, are limited to the Agreed Claim Amount, the Creditor wishes to release and discharge the Company from any other Claims which were Transferred from the Original Creditor to the Creditor and any and all other losses, costs, charges, expenses, demands, actions, causes of action, liabilities and obligations arising in respect of, or in connection with, such other Claims.

**It is agreed** as follows:

**1       Definitions and Interpretation**

**1.1     Definitions**

In this Deed, unless inconsistent with the subject or context, the following expressions bear the following meanings:

| | |
|---|---|
| "**Administration**" | the administration of the Company under the Administration Order; |
| "**Administration Date**" | 15 September 2008; |
| "**Administration Order**" | the order of the Court dated 15 September 2008 made under paragraph 12 of Schedule B1 of the Insolvency Act under which Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis and Dan Yoram Schwarzmann were appointed as joint administrators of the Company; |
| "**Administrators**" | the persons from time to time serving as administrators of the Company who, as at the date of this Deed, are |

Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, each a partner of PwC, Plumtree Court, London EC4A 4HT, United Kingdom;

**"Admitted Claim"** — a Claim of a creditor of the Company which qualifies for dividends from the estate of the Company available to its unsecured creditors pursuant to the Insolvency Rules and the Insolvency Act (or, if applicable, as amended or replaced pursuant to the terms of, *inter alia*, a scheme of arrangement or a company voluntary arrangement);

**"Agreed Claim"** — the Creditor's Claim (or Claims, as the case may be) under the Creditor Agreement and for the avoidance of doubt the **"Agreed Claim"** shall include any Client Money Claim arising under or in connection with the Creditor Agreement, but shall exclude any Trust Asset Claims (if any) whether or not arising under and/or in connection with the Creditor Agreement;

**"Agreed Claim Amount"** — USD 13,027,877.00;

**"Assigned/Waived Client Money Claim"** — has the meaning given to it in Clause 3.2.2;

**"Assignment Agreement"** — the assignment agreement dated 16 February 2011 between the Original Creditor and the Creditor;

**"CAPCO"** — Customer Asset Protection Company, an insurance company licensed by the state of Vermont, United States of America;

**"CASS Rules"** — the rules set out in Chapter 7 of the FSA's Client Assets Sourcebook and (if applicable) Chapter 7A of such Sourcebook;

**"Change of Address"** — has the meaning given to it in Clause 23.2;

**"Claim"** — a claim in law or in equity of whatsoever nature:

(i)    including any and all claims, actions, liabilities, rights and obligations for breach of contract, tort, statute, restitutionary claims and breach of trust;

(ii)   whether arising by reason of, amongst other things, insolvency or the termination, whether voluntary or for cause, of any contractual obligation or for any failure of a person to perform any contractual, legal or regulatory obligation or otherwise; and

(iii)  for, amongst other things, the enforcement of any right to, or any liability in respect of a right to:

(a)    seek or enforce judgment;

(b)    exercise any remedy (for damages or

otherwise), indemnity and contribution, whether for losses (including consequential loss, economic loss, loss of bargain, loss of value, or other losses computed by reference to value which may have been available had an obligation been duly performed in a timely manner, or otherwise), costs and expenses of any nature; or

(c) apply any set-off, netting, withholding, combination of accounts or retention or similar rights in respect of any claim or liability whatsoever,

and "to Claim" shall be construed accordingly;

**"Client Money"**

money which is client money held by or on behalf of the Company pursuant to and as defined in the FSA Rules;

**"Client Money Claim"**

any Claim by the Creditor in relation to Client Money, including:

(i) any Claim by the Creditor, whether against the Company or any other person, for or in respect of Client Money held by the Company on the Statutory Trust (or for or in respect of the proceeds of, or any substitute for, such money or any assets over which a trust, charge or other proprietary right exists in respect of such money), including, without limitation:

(a) any entitlement against the Company to a distribution from the Client Money Pool;

(b) any Claim to Client Money held at the Time of Administration outside of the Client Money Pool; and

(c) any Client Money received after the Time of Administration;

(ii) any Claim or entitlement (including any discretionary entitlement) of the Creditor against any compensation scheme, insurer or other person in respect of Claims to or loss of Client Money;

(iii) any right to waive, compromise, dispose of or otherwise deal with any of the foregoing;

**"Client Money Distribution"**

(i) a distribution of Client Money under the Statutory Trust; or

(ii) a distribution of the proceeds of, or any substitute for, Client Money or a distribution of any assets over which a trust, charge or other proprietary right exists in respect

of Client Money (whether such amounts or assets are held and/or distributed by the Company or a third party); or

(iii) a distribution by a compensation scheme, insurer or other person in respect of Claims to or loss of Client Money (save in respect of Claims by the Creditor under insurance or other arrangements entered into with a person unconnected with the Company by the Creditor for its own benefit);

**"Client Money Payments"**  has the meaning given to it in Clause 3.3.2 provided that Client Money Payments shall not, in any circumstance, exceed an amount equal to the Agreed Claim Amount;

**"Client Money Pool"**  the pool of Client Money (as defined in the FSA Rules) created pursuant to CASS Rule 7.9.6R(1) (as in force at the Time of Administration);

**"Court"**  the High Court of Justice in England and Wales;

**"Creditor Agreement"**  ISDA Master Agreement entered into between the Original Creditor and the Company dated as of 15 October 2002;

**"Current Process Agent"**  has the meaning given to it in Clause 23.3;

**"Exchange Rate"**  the "official exchange rate" set out in Rule 2.86(2) of the Insolvency Rules which for the purpose of converting U.S. dollars to pounds sterling shall mean the following exchange rate $1.79370:£1 and, for the purpose of converting the currencies specified in Appendix C of the Administrators' fourth statutory progress report (dated 14 October 2010) to pounds sterling shall mean the rates set out in Appendix C thereof;

**"First Admitted Claim"**  has the meaning given to it in Clause 3.2.2;

**"First Admitted Claim Amount"**  has the meaning given to it in Clause 3.2.2;

**"FSA"**  the Financial Services Authority of the United Kingdom (or any successor body as relevant);

**"FSA Rules"**  the rules and guidance of the FSA;

**"Insolvency Act"**  Insolvency Act 1986;

**"Insolvency Rules"**  Insolvency Rules 1986;

**"Liquidation Event"**  either an order by the Court to compulsorily wind up the Company or the commencement of a creditors' voluntary winding-up in respect of the Company (both pursuant to the Insolvency Act and the Insolvency Rules);

**"New Process Agent"**  has the meaning given to it in Clause 23.3;

| | |
|---|---|
| **"No Client Money Confirmation"** | has the meaning given to it in Clause 3.2.1; |
| **"Original Claims"** | any and all Claim(s) against the Company and/or the Administrators Transferred from the Original Creditor to the Creditor pursuant to the Assignment Agreement including the Agreed Claim, any Client Money Claim(s) and any Trust Asset Claims; |
| **"Original Creditor"** | Kallista Master Fund Limited, an investment fund organised under the laws of the Cayman Islands; |
| **"Partial Assignment/Waiver"** | has the meaning given to it in Clause 3.2.2; |
| **"Party"** | the Company or the Creditor or both (as applicable); |
| **"Proceeding"** | any process, demand, action, legal or other proceeding or suit, including any administrative, judicial or quasi-judicial proceeding, any regulatory process, arbitration, alternative dispute resolution, mediation, expert determination, judicial review, adjudication, forfeiture, re-entry, seizure, distraint, execution, enforcement of judgment or award or otherwise howsoever and/or any other step taken for the purpose of creating or enforcing a lien; |
| **"PwC"** | PricewaterhouseCoopers LLP, a limited liability partnership registered in England (number OC 303525), with its registered office at 1 Embankment Place, London, England, WC2N 6RH; |
| **"Relevant Persons"** | the Company, the Administrators and their firm, members, partners, directors, officers, employees, agents, advisers and representatives; |
| **"Statutory Trust"** | the statutory trust created by the CASS Rules; |
| **"Time of Administration"** | 7.56 a.m. (London time) on the Administration Date; |
| **"Transfer"** | in relation to any Claim, asset or liability, the assignment, novation, sale or any other form of transfer (including by way of any succession in title arising by operation of insolvency or any other law), whether directly or indirectly, legally or beneficially, which is effective to transfer the title to, rights of and obligations under such Claim, asset or liability, as the case may be, from one person to another and **"Transferred"** shall be construed accordingly; |
| **"Transfer Notice"** | has the meaning given to it in Clause 4.3; |
| **"Transferee"** | has the meaning given to it in Clause 4.2; |
| **"Transferor"** | has the meaning given to it in Clause 4.2; |
| **"Trust Asset Claim"** | with respect to an asset in the possession and/or custody of, held in the name of, or otherwise held to the |

order of, the Company, a Claim, against the Company and/or the Administrators:

(i) that the Creditor is the legal and/or beneficial owner of that asset (whether or not it is subject to any prior ranking security interest or encumbrance of any kind whatsoever (including whether legal, equitable and/or possessory)); and/or

(ii) for delivery and/or transfer of such asset to (or to the order of) the Creditor in order to convey all rights, title and interest in the asset,

and for the avoidance of doubt, a reference to "asset" within this definition includes present and future properties, revenues and rights of every description, but excludes money and specifically Client Money;

## 1.2  Interpretation

In this Deed, unless the context otherwise requires or unless otherwise expressly provided:

1.2.1   references to any specified provision of this Deed shall be construed as references to that provision subject to any modification, addition or condition approved or imposed pursuant to Clause 14 (*Modification*);

1.2.2   references to a "**person**" include any company, unincorporated association or partnership, whether or not having separate legal personality, and references to a company include any company, corporation or body corporate, wherever incorporated;

1.2.3   references to any person shall be construed so as to include its successors in title, permitted assignees and permitted transferees;

1.2.4   a reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any person who from time to time is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Administrators;

1.2.5   references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

1.2.6   references to any document, agreement or instrument is a reference to that document, agreement or instrument as amended, novated, supplemented, extended, restated or replaced from time to time;

1.2.7   words importing the plural shall include the singular and vice versa and words importing one gender shall include all genders;

1.2.8   headings are for ease of reference only and shall not affect the interpretation of this Deed;

1.2.9   references to Clauses, sub-clauses and Appendices are to Clauses and sub-clauses of, and Appendices to, this Deed;

1.2.10   references to time are to London time;

1.2.11  in the event of a conflict or inconsistency between the provisions of this Deed, the Insolvency Act, the Insolvency Rules and/or the FSA Rules, for the purposes of this Deed, and to the extent such acts and/or rules permit, the provisions of this Deed shall prevail;

1.2.12  the language which governs the interpretation of this Deed is the English language. All notices to be given by any parties and all other communications and documentation which are in any way relevant to this Deed or the performance of this Deed shall be in the English language;

1.2.13  references to (i) "£" and "**pounds sterling**" are to the lawful currency for the time being of the United Kingdom of Great Britain and Northern Ireland and (ii) "$" and "**U.S. dollars**" are to the currency of the United States of America;

1.2.14  the words "**include**" and "**including**" are to be construed without limitation;

1.2.15  a reference to "**indebtedness**" includes any obligation (whether incurred as principal or surety or otherwise) for the payment or repayment of money, whether present or future, actual or contingent;

1.2.16  a reference to a "**judgment**" includes any order, injunction, determination, award or other judicial or arbitral measure in any jurisdiction; and

1.2.17  a reference to a "**law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure, in each case of any jurisdiction whatever (and "**lawful**" shall be construed accordingly).

## 2    Claims Agreement

2.1    The Creditor, the Company and the Administrators confirm that the proof of debt submitted by the Original Creditor (to the extent relevant to the Agreed Claim) shall stand as the Creditor's proof of debt.

2.2    The Company and the Creditor irrevocably and unconditionally agree that, notwithstanding the terms of any contract (including the Creditor Agreement), the Agreed Claim shall be limited to, and in an amount equal to, the Agreed Claim Amount, and save in respect of the Agreed Claim:

2.2.1  the Creditor, the Company and the Administrators are hereby each irrevocably and unconditionally released and forever discharged from any and all losses, costs, changes, expenses, Claims (including all Claims for interest, costs and orders for costs and any and all Trust Asset Claims and Client Money Claims (if any), demands, actions, causes of action, liabilities, rights and obligations including those which arise hereafter upon a change in the relevant law) to or against each other and howsoever arising, whether known or unknown, whether arising in equity or under common law or statute or by reason of breach of contract or in respect of any tortious or negligent act or omission (whether or not loss or damage caused thereby has yet been suffered) or otherwise, whether arising under the Creditor Agreement or not, whether in existence now or coming into existence at some time in the future, and whether or not in the contemplation of the Creditor and/or the Company and/or the Administrators on the date hereof); and

2.2.2    the Creditor will not take any steps to prove for, or to Claim for, any debt in the Administration (or other insolvency process) of the Company, or otherwise bring any Claim, action, demand or issue (or continue) any Proceedings against the Company and/or the Administrators (or any of them) in any jurisdiction in respect of any and all Claims and matters as are referred to in Clause 2.2.1 above.

2.3    The irrevocable release and discharge set out in Clause 2.2.1 shall not prohibit the Creditor from asserting that all or part of the Agreed Claim constitutes a Client Money Claim.

## 3    Entitlement to an Admitted Claim

3.1    Save as set out in Clauses 3.2 and 3.3 below, the Agreed Claim shall not be accepted (in whole or in part) as an Admitted Claim.

3.2    Where the Creditor has (to the satisfaction of the Company (in its absolute discretion)) either assigned to a nominee (nominated by the Company in its absolute discretion) or waived (the decision as to assignment or waiver to be taken by the Company in its absolute discretion):

3.2.1    any and all Client Money Claims (if any) it may have under or in connection with the Creditor Agreement (a **"No Client Money Confirmation"**), then the Agreed Claim, at the Agreed Claim Amount, converted (to the extent not already denominated in pounds sterling) to pounds sterling at the Exchange Rate, shall be accepted as an Admitted Claim; or

3.2.2    any part of any Client Money Claim (in an amount less than the Agreed Claim Amount) it may have under or in connection with the Creditor Agreement (the **"Assigned/Waived Client Money Claim"**) (such an assignment or waiver being a **"Partial Assignment/Waiver"**), then the Creditor shall have an Admitted Claim (the **"First Admitted Claim"**) at an amount equal to the amount of the Assigned/Waived Client Money Claim, converted (to the extent not already denominated in pounds sterling) to pounds sterling at the Exchange Rate (the **"First Admitted Claim Amount"**).

3.3    Where a No Client Money Confirmation has not been provided to the Company in accordance with Clause 3.2.1 and:

3.3.1    all issues regarding the existence and validity of, and any rights and remedies for or in respect of, all potential Client Money Claims (if any) under or in connection with the Creditor Agreement; and

3.3.2    the amounts (or, if applicable, assets) (if any) which the Creditor shall recover in respect of any such Client Money Claim(s) by way of Client Money Distributions (the **"Client Money Payments"**),

have been finally determined by the Company, in its capacity as statutory trustee of the Statutory Trust, and the Client Money Payments have been made to, or recovered by, the Creditor, then:

(a)    where the Creditor has agreed to a Partial Assignment/Waiver pursuant to Clause 3.2.2, the Creditor shall have an Admitted Claim (in addition to the First Admitted Claim) in an amount equal to the Agreed Claim Amount less (i) the First Admitted Claim Amount and (ii) the value of the Client Money Payments;

(b)     where the Creditor has not agreed to a Partial Assignment/Waiver pursuant to Clause 3.2.2, the Creditor shall have an Admitted Claim in an amount equal to the Agreed Claim Amount less the value of the Client Money Payments,

and in each case, such amount being converted (to the extent not already denominated in pounds sterling) to pounds sterling at the Exchange Rate.

## 4    Transfer

4.1     Subject to Clause 4.2, the Creditor may not Transfer the whole or any part of the Agreed Claim and/or the whole or any part of its right to (i) receive a dividend in respect of the Agreed Claim; and/or (ii) receive any Client Money Payments.

4.2     Subject to Clauses 4.3 and 4.4, the Creditor (the "**Transferor**") may assign the whole (but not part) of its Agreed Claim together with the whole (but not part) of its right to (i) receive any and all dividends in respect of the Agreed Claim; (ii) receive any and all Client Money Payments, notwithstanding any provision to the contrary in the Creditor Agreement, to another person (the "**Transferee**").

4.3     Any Transfer in accordance with Clause 4.2 shall not be valid and the Administrators and the Company shall not be bound to recognise, nor to deal with, the Transferee (in respect of such Transfer) in substitution for, and in place of, the Transferor unless and until the Transferor and Transferee sign and deliver to the Company (in accordance with Clause 19 (*Notices*)) the letter agreement substantially in the form set out in the Appendix (*Form of Transfer Notice*) (a "**Transfer Notice**") and the Company countersigns such Transfer Notice and serves the same on the Transferor (in accordance with Clause 19 (*Notices*)) and the Transferee (such service being deemed effective by sending the same to the Transferee's postal or email address specified in the Transfer Notice), provided that such countersignature and service shall not be unreasonably withheld or delayed. For the avoidance of doubt, the Company may only refuse to countersign the Transfer Notice for any legal, compliance and/or regulatory reason.

4.4     Notwithstanding the provisions of this Clause 4 and in respect of any Transfer by the Creditor of the Agreed Claim only:

4.4.1     If the Company serves any notices on, or the Company or the Administrators make any payment to, or to the order of, the Transferor before the Company has served a countersigned Transfer Notice on the Transferor and Transferee (in accordance with Clause 4.3), this shall constitute a valid discharge of the Company's and the Administrators' obligations notwithstanding any Transfer; and

4.4.2     where the countersigned Transfer Notice is served after any notice of declaration of a dividend to creditors with Admitted Claims but before the actual payment of that dividend, payment to, or to the order of, the Transferor shall constitute a valid discharge of the Company's and the Administrators' obligation to pay the declared dividend.

4.5     The Creditor represents and warrants to the Company and the Administrators, on the date that it executes the Transfer Notice, and immediately before the Effective Date (as defined therein) that it has not Transferred or purported to Transfer the whole or any part of its Agreed Claim, its right to receive (i) any dividend in respect of the Agreed Claim; and/or (ii) any Client Money Payments, to any person.

**5        Representations and Warranties**

The Creditor makes the representations and warranties set out in this Clause 5 to the Company and the Administrators on the date of this Deed.

**5.1      Basic representations**

5.1.1    It is duly organised and validly existing under the laws of its jurisdiction of incorporation or organisation and, if relevant under such laws, in good standing.

5.1.2    It has the power to execute, deliver and perform its obligations under this Deed (and any Transfer Notice to which it is party) and has taken all necessary action to authorise such execution, delivery and performance and the signatory or signatories (as applicable) are properly authorised to execute this Deed (and any such Transfer Notice) on its behalf.

5.1.3    The execution, delivery and performance of its obligations under this Deed (and any Transfer Notice to which it is party) do not and will not conflict with any law or regulation applicable to it, its constitutional documents, any agreement or instrument binding on or affecting it or any of its assets.

5.1.4    Its obligations under this Deed (and any Transfer Notice to which it is party) constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms.

**5.2      No insolvency proceedings**

5.2.1    No petition for insolvency proceedings in respect of it or its assets has been filed or is threatened to be filed.

5.2.2    It is not unable to honour its obligations as they fall due and the value of its assets is not less than its liabilities (taking into account contingent and prospective liabilities).

**5.3      No agency**

It is acting as principal and not as agent in entering this Deed and in respect of the Agreed Claim, the Creditor Agreement and all transactions and trades thereunder.

**5.4      Agreed Claim**

5.4.1    The Agreed Claim was validly Transferred in accordance with all applicable laws to it from the Original Creditor with effect from and including 16 February 2011.

5.4.2    It is the legal and beneficial owner of the Agreed Claim.

5.4.3    It has not received any amount or benefit in relation to the Agreed Claim.

**5.5      Original Claims**

Save as set out in Clause 2.2, it has not Transferred the benefit of, waived, compromised or otherwise disposed of all or part of the Original Claims and/or any (direct or indirect) benefit or right or title, interest, action or cause of action deriving from the Original Claims.

**5.6      Accuracy of information**

To the best of its knowledge and belief, and having made reasonable enquiries, any proof of debt and any substantiating documents submitted by, or on behalf of, the Creditor (as

referenced in rule 2.72 of the Insolvency Rules) in respect of the Agreed Claim are, as at the date of this Deed, true, accurate and complete in every material respect.

## 6    Undertakings

The Creditor undertakes to do all such acts and things as will be reasonably necessary and execute and deliver any further documents and give any further assurances as may be requested by the Company in order to give full effect to this Deed (and the terms of any further documents shall exclude any personal liability of the Administrators such exclusion to be substantially in the form contained in Clause 11 (*Exclusion of Administrators' Liability*)).

## 7    Confidentiality

### 7.1    Confidentiality of this Deed

**7.1.1**    No announcement or circular in connection with the existence or the subject matter of this Deed shall be made or issued by or on behalf of the Creditor.

**7.1.2**    The Creditor shall treat as strictly confidential and not disclose (whether in writing, verbally or in electronic form or by any other means) to any party the negotiations relating to this Deed and/or this Deed (and/or any part thereof) save as provided in Clause 7.1.3.

**7.1.3**    The Creditor may disclose this Deed (or any part thereof) to:

(i)    its affiliates, directors, officers and employees;

(ii)    its advisers and auditors(on terms that such professional advisers undertake to comply with the provisions of Clause 7.1.1 and 7.1.2 in respect of such information as if they were a party to this Deed); and/or

(iii)    any Transferee and/or any person whom the Creditor considers, acting in good faith, to be a potential Transferee and/or any adviser or affiliate of a potential Transferee (in each case, on terms that such Transferee and/or potential Transferee undertakes to comply with the provisions of Clause 7.1.1 and 7.1.2 in respect of such information as if they were a party to this Deed (where they are not otherwise bound by Clause 7.1.1 and 7.1.2.).

**7.1.4**    The provisions of Clause 7.1.2 shall not restrict :

(i)    any disclosure required by law or by any court of competent jurisdiction, the rules and regulations of any regulatory body or stock exchange on which the Creditor's shares are listed or quoted; and/or

(ii)    any disclosure or use for the purpose of any enquiry or investigation by any governmental, official or regulatory body which is lawfully entitled to require any such disclosure or use; amd /or

(iii)    any disclosure or use for the purpose of any Proceedings arising out of this Deed or any agreement entered into under or pursuant to this Deed or disclosure to a taxation authority in connection with taxation affairs of a Party or in respect of any matters which are the subject or, or arise as a result of, the implementation and operation of this Deed,

provided that, so far as it is lawful and practical to do so prior to such disclosure, the Creditor shall promptly notify the Company of such requirement or event for the purpose of which such disclosure would be made, with a view to providing the opportunity for the Company to contest such disclosure or otherwise to agree the timing and content of such disclosure.

**7.2    Waiver of confidentiality by Creditor**

The Creditor hereby waives, to the maximum extent permitted by law, any breach of confidentiality arising from the operation of this Deed and authorises the Company and/or the Administrators to disclose to any other person any information which the Company and/or the Administrators are required to disclose or consider to be necessary or desirable to disclose to enable this Deed to be administered effectively and/or for the purposes of disclosure as set out in Clause 7.3 (*Disclosure of Information by Company and Administrators*).

**7.3    Disclosure of Information by Company and Administrators**

The Creditor consents to the disclosure or use of information by the Company and/or the Administrators in the following circumstances:

7.3.1    any disclosure or use required by law or by any court of competent jurisdiction, the rules and regulations of any regulatory body or stock exchange;

7.3.2    disclosure or use for the purpose of any enquiry or investigation by any governmental, official or regulatory body which is lawfully entitled to require such disclosure or use;

7.3.3    any disclosure to CAPCO of any information received or generated by the Company and/or the Administrators pursuant to the submission of a proof of debt, information related thereto and this Deed to the extent that such information is requested or required by CAPCO;

7.3.4    any disclosure by the Administrators to any subsequent supervisor, liquidator or other officeholder of the Company;

7.3.5    any disclosure or use by the Company and/or the Administrators for the purpose of any Proceedings arising out of this Deed or any agreement entered into under or pursuant to this Deed or disclosure to a taxation authority in connection with the taxation affairs of a Party or in respect of any matters which are the subject of, or arise as a result of, the implementation and operation of this Deed; and/or

7.3.6    any disclosure or use required in the exercise of the statutory duties of the Administrators or to the extent required by current insolvency practice or to enable the Administrators to properly carry out the duties of their office.

**8    Survival of Deed upon a Liquidation Event**

8.1    If the Company shall become subject to a Liquidation Event, this Deed shall not terminate and shall continue in full force and effect, and, unless the context otherwise requires, all references to the Administrators shall be construed as references to the liquidators of the Company from time to time.

8.2    In the event of any inconsistency between the provisions of this Deed and the Insolvency Act or the Insolvency Rules as they apply to the Company following a Liquidation Event in

accordance with this Clause 8, for the purposes of this Deed, the provisions of this Deed shall prevail to the maximum extent that the law allows.

## 9   Non-reliance on Information Ancillary to this Deed

9.1   So far as permitted by law and except in the case of fraud, the Relevant Persons shall not be liable in respect of anything done or suffered by a Creditor in reliance on any information provided or communications or announcements made to the Creditor in connection with this Deed.

9.2   The Creditor has made its own independent decision to enter into this Deed and as to whether this Deed is appropriate or proper for it based upon its own judgement and upon advice from its own independent advisers, as it has deemed necessary. The Creditor is not relying on any communication and/or announcement (written or oral) of or from any Relevant Person as a recommendation or an inducement to enter into this Deed, it being understood that information and explanations relating to this Deed in any communication and/or announcement will not be relied upon or treated as a recommendation or an inducement to enter into this Deed.

9.3   No person has been authorised in connection with transactions contemplated by this Deed to give any information or make any representations other than those contained in this Deed and any such information or representation shall not be relied upon as having been authorised by the Company and/or the Administrators.

## 10   No Expense Claim

For the avoidance of doubt, no amount, liability or obligation in relation to this Deed shall be payable out of or charged on the property of the Company under paragraph 99(3) or 99(4) of Schedule B1 to the Insolvency Act and, if the Company becomes subject to a Liquidation Event, any and all such amounts, liabilities and obligations shall not rank as an expense of the Company's liquidation under Rule 4.218 of the Insolvency Rules.

## 11   Exclusion of Administrators' Liability

The Administrators have entered into and signed this Deed as agents for and on behalf of the Company and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Deed. The exclusion of liability set out in this Clause 11 shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any Claims in tort as well as under the laws of contract.

## 12   Contracts (Rights of Third Parties) Act 1999

12.1   A person who is not a Party has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of, or enjoy any benefit under, this Deed, except to the extent set out in this Clause 12.

**12.2**   A subsequent supervisor, liquidator or other officeholder of the Company may enforce and rely on any Clause of this Deed to the same extent as if it were a Party.

**12.3**   The Administrators, their firm, members, partners, directors, officers, employees, agents, advisers and representatives may enforce and rely on Clause 2 (*Claims Agreement*), Clause 4 (*Transfer*), Clause 5 (*Representations and Warranties*), Clause 6 (*Undertakings*), Clause 7 (*Confidentiality*), Clause 9 (*Non-reliance on Information Ancillary to this Deed*), Clause 11 (*Exclusion of Administrators' Liability*), this Clause 12, Clause 22 (*Governing Law and Jurisdiction*) and Clause 23 (*Appointment of Process Agent*) to the same extent as if they were a Party.

**12.4**   Any term of this Deed may be amended or waived without the consent of any person named or described in Clauses 12.2 and, other than in respect of the Administrators, 12.3.

## 13   Whole Agreement

**13.1**   This Deed contains the whole agreement between the Company and the Creditor relating to the subject matter of this Deed at the date of this Deed to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Company and the Creditor in relation to the matters dealt with in this Deed.

**13.2**   The Creditor acknowledges that it has not been induced to enter this Deed by any representation, warranty or undertaking not expressly incorporated into it.

## 14   Modification

No amendment, modification or waiver in respect of this Deed (or any agreement supplemental to it) shall be effective unless in writing and previously approved in writing by both the Company and the Creditor.

## 15   Costs

**15.1**   Except as expressly provided in this Deed and subject always to Clause 15.2, the Parties shall bear their own costs in connection with the preparation, negotiation, entry into and performance of this Deed.

**15.2**   The Creditor shall bear the cost of all stamp duty, stamp duty reserve tax or stamp duty land tax, any notarial fees and all other taxes and duties or their equivalents in all jurisdictions where such fees, taxes and duties are payable as a result of the transactions contemplated by this Deed. The Creditor shall be responsible for arranging the payment of such stamp duty, stamp duty reserve tax or stamp duty land tax and all other such fees, taxes and duties, including fulfilling any administrative or reporting obligation imposed by the jurisdiction in question in connection with the payment of such taxes and duties.

## 16   Invalidity

**16.1**   If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of that provision under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision of this Deed under the law of that jurisdiction shall in any way be affected or impaired thereby.

16.2    Subject to Clause 16.1, if any provision in this Deed shall be held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties.

16.3    Subject to Clause 16.1, to the extent it is not possible to delete or modify the provision, in whole or in part, under Clause 16.2, then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Deed and the legality, validity and enforceability of the remainder of this Deed shall, subject to any deletion or modification made under Clause 14 (*Modification*), not be affected.

## 17   Modification of Foreign Law Contracts

Where this Deed purports to modify any contract which is governed by a law other than English law, the modification will be effective to the maximum extent permitted under the proper law of the contract. The Creditor undertakes to the Company to take all actions that the Company requests (including executing such instruments or entering into such agreements, in each case governed by the relevant proper law) to perfect any modifications to such contracts in order to ensure that such modifications are effective to the fullest extent possible under such governing law.

## 18   Waivers

No waiver by or on behalf of the Company of any requirement of or any rights under this Deed shall release the Creditor from the full performance of its remaining obligations under this Deed. No single or partial exercise or failure or delay in exercising, on the part of the Company, any right, power or remedy under this Deed or the granting of time by the Company shall prejudice, affect or restrict the rights, powers and remedies of the Parties under this Deed, nor shall any waiver by the Company of any breach of this Deed operate as a waiver of or in relation to any subsequent or any continuing breach of this Deed.

## 19   Notices

### 19.1   General

Any notice, information, or other communication to be given, or document to be sent pursuant to or in connection with this Deed:

19.1.1    by the Creditor to the Company and/or the Administrators shall be in writing in English and shall be delivered by both:

(i)    prepaid post or airmail to, or by courier using an internationally recognised courier company only to Lehman Brothers International (Europe) (in administration), Level 23, 25 Canada Square, London, E14 5LQ, United Kingdom (for the attention of "Tony Lomas / In House Legal Team"), (or to such other postal address as may be notified (in accordance with this Clause 19) to the Creditor from time to time) in accordance with Clause 19.2 (*Notices by post*); and

(ii)    electronic mail to claimsdeed@lbia-eu.com (or to such other electronic mail address as may be notified (in accordance with this Clause 19) to the Creditor from time to time) in accordance with Clause 19.3 (*Notices by electronic mail*); and

19.1.2    by the Company and/or the Administrators to the Creditor, either by:

    (i)    prepaid post or airmail to, or by courier to, OFI Asset Management, 1 rue Vernier, 75017 Paris, France (for the attention of Sébastien Grasset, Head of Legal Unit)  (or to such other postal address as may be notified (in accordance with this Clause 19) to the Company and/or the Administrators from time to time) in accordance with Clause 19.2 (*Notices by post*); or

    (ii)    electronic mail to sgrasset@ofi-am.fr, cc: cdimi@ofi-am.fr (or to such other electronic mail address as may be notified (in accordance with this Clause 19) by the Creditor to the Company and/or the Administrators from time to time)) in accordance with Clause 19.3 (*Notices by electronic mail*).

## 19.2    Notices by post

19.2.1    Any notice, information or communication given or document sent by the Creditor by registered post or courier shall be effectively served on and received by the Company and/or the Administrators upon receipt by the Company and/or the Administrators (if sent in accordance with Clause 19.1.1(i)) and shall be deemed to have been received by the Company at the time of delivery to the relevant address specified in Clause 19.1.1(i).

19.2.2    Any notice, information or communication given or document sent by registered post or courier by the Company and/or the Administrators shall be sufficiently served by sending the same to the relevant address set out in Clause 19.1.2(i).

## 19.3    Notices by electronic mail

19.3.1    Any notice, information or communication given or document sent by electronic mail shall be sufficiently served by sending the same by electronic mail to the address specified in Clause 19.1.1(ii) or 19.1.2(ii) (as appropriate).

19.3.2    Any notice, information or communication given or document sent by electronic mail shall be deemed to have been received, at the time recorded on the computer of the person to whom the electronic mail is addressed.

## 19.4    Accidental omission

The accidental omission by the Company and/or the Administrators to send any notice, communication or document in accordance with this Clause 19, or the non-receipt of any such notice, communication or document by the Creditor, shall not affect the provisions of this Deed.

## 20    Authority to Sign Notices and Documents

In the case of this Deed and any notice, communication or other document in connection with this Deed, which is signed on behalf of the Creditor, neither the Company nor the Administrators shall be required to make enquiry as to the authority of the signatory of that Deed, notice, communication or document to sign such Deed, notice, communication or document on behalf of such Creditor.

**21      Counterparts**

This Deed may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party may enter into this Deed by executing any such counterpart.

**22      Governing Law and Jurisdiction**

**22.1**   This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

**22.2**   The Creditor hereby agrees that the courts of England shall (save as otherwise provided in Clause 22.4) have exclusive jurisdiction to hear and determine any dispute or Proceedings arising out of or in connection with this Deed or the operation of this Deed, and that accordingly any Proceedings arising out of or in connection with this Deed (save as otherwise provided in Clause 22.4) shall be brought in such courts.

**22.3**   The Creditor hereby submits to the exclusive jurisdiction of the courts of England for the purposes of Clause 22.2. The Creditor also waives any objections to Proceedings in the courts of England that may arise that are based on the grounds of the venue or that the Proceedings have been brought in an inconvenient forum.

**22.4**   Notwithstanding Clauses 22.2 and 22.3, which are for the benefit of the Company and the Administrators, the Administrators and the Company retain the right to bring Proceedings, in the name of the Company or otherwise, in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

**23      Appointment of Process Agent**

**23.1**   The Creditor hereby irrevocably appoints as its agent to accept service of process in England in any legal action or Proceedings arising out of this Deed, service upon whom shall be deemed completed whether or not forwarded to or received by the Creditor, Petershill Secretaries Limited, PricewaterhouseCoopers Legal LLP, Company Secretary Department, (Ref: AK/CoSec/Ep6/ext31292), 1 Embankment Place, London, WC2N 6DX, United Kingdom.

**23.2**   The Creditor agrees to inform the Company in writing of any change of address of such process agent (a **"Change of Address"**) within 14 days of such change (in accordance with the provisions of Clause 19 (*Notices*)).

**23.3**   If such process agent (the **"Current Process Agent"**) ceases to be able to act as such or to have an address in England, the Creditor irrevocably agrees to appoint a new process agent acceptable to the Company (a **"New Process Agent"**) and to deliver to the Company within 14 days a copy of a written acceptance of appointment by the New Process Agent together with the address of the New Process Agent (in accordance with the provisions of Clause 19 (*Notices*)).

**23.4**   In the event of a Change of Address or the appointment of a New Process Agent, the Creditor agrees that any service of process in England in any legal action or Proceedings arising out of this Deed shall be deemed valid service upon the Creditor if service is effected:

(a)      to the address specified in Clause 23.1 (or to any subsequent address notified to the Company in accordance with Clause 23.2); or

(b)    to the Current Process Agent,

prior to notification by the Creditor to the Company of such Change of Address or of the written acceptance of appointment by the New Process Agent and the address of the New Process Agent (in accordance with Clauses 23.2 and 23.3, respectively) (as appropriate) and notwithstanding any such Change of Address or appointment of a New Process Agent (as appropriate).

23.5    Nothing in this Deed shall affect the right to serve process in any other manner permitted by law.

**This Deed has been delivered on the date stated at the beginning of this Deed.**

**SIGNED as a DEED** for and on behalf of **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in administration)** by one of the Administrators acting as its agent and without personal liability

..................................................

In the presence of:

Witness's signature:          ..................................................

Name:

Address:

Occupation:

**SIGNED** as a **DEED** by **OFI ASSET MANAGEMENT,** a *société anonyme* organised under the laws of France, by

..................................................

**Name Gérard Bourret**

OFI ASSET MANAGEMENT    Title: CEO
GÉRARD BOURRET
DIRECTEUR GÉNÉRAL

..................................................

Name: Jean-Luc Malafosse

Title: Secretary General

and

**OFI ASSET MANAGEMENT**
1 RUE VERNIER - 75017 PARIS
Tél. +33 (0)1 40 68 17 17 - Fax +33 (0)1 40 68 17 18
SA AU CAPITAL DE 3 257 163 EUROS
RCS 384 940 342 PARIS - APE 6630Z

11

19

**This Deed has been delivered on the date stated at the beginning of this Deed.**

**SIGNED** as a **DEED** for and on behalf of **LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in administration)** by one of the Administrators acting as its agent and without personal liability

In the presence of:

Witness's signature:

Name: *Huw Merriman*

Address: 25 Canada Square Canary Wharf London, E14 5LQ

Occupation: *Lawyer*

**SIGNED** as a **DEED** by **OFI ASSET MANAGEMENT,** a *société anonyme* organised under the laws of France, by

................................................

Name Gérard Bourret

Title: CEO

................................................

Name: Jean-Luc Malafosse

Title: Secretary General

and

# APPENDIX
# FORM OF TRANSFER NOTICE

To:    Lehman Brothers International (Europe) (in administration) (the "**Company**")
Level 23
25 Canada Square
London
E14 5LQ
United Kingdom

**And by email:** *[Insert email address]*

Att:    Tony Lomas / In House Legal Team

From:   *[Name of Transferor]* (the "**Transferor**")

*[Address of Transferor]*

From:   *[Name of Transferee]* (the "**Transferee**")

*[Address of Transferee]*

*[Email Address of Transferee]*

*[Telephone number of Transferee]*

*[GAC Code of Transferee if Transferee has a GAC Code]*

*[Insert date]*

Dear Sirs

**Transfer Notice in respect of Transfer of Agreed Claim**

1    [Subject to paragraph 2 of this letter deed,] the terms of this letter deed shall be effective
on the date upon which the Company serves a countersigned copy of this letter deed on
the Transferor or Transferee (whichever is later) in accordance with paragraph 9 of this
letter deed (the "**Effective Date**"), provided that paragraphs 2, 3, 4.1 and paragraphs 8 to
13 inclusive of this letter deed shall become effective on the date of this letter deed.

2    [If the Effective Date does not occur on or before *[Transferor & Transferee to insert
date]* (or such later date as may be agreed in writing between the Company, the Transferor
and the Transferee), this letter deed shall lapse and the terms of this letter deed shall
cease to have any effect other than this paragraph 2 and paragraphs 3, 10, 11 and 13
which shall remain in full force and effect[1].]

3    Unless otherwise defined herein, terms defined in the Claims Determination Deed between
the Company and *[the Transferor / state name of original party to the deed if different
to the Transferor]* dated [●] (the "**Deed**"), shall have the same meaning in this letter deed.

4    The Transferor and Transferee agree that:

---

[1]    *[Transferor and Transferee to note that if this paragraph 2 is not included, consequential amendments in
respect of cross-referencing will need to be made.]*

**4.1**    subject to paragraph 2 of this letter deed, the terms of this letter deed may not be revoked or amended without the prior written consent of the Company;

**4.2**    the whole of the Agreed Claim and the whole of the Transferor's right to receive (i) any and all dividends in respect of the Agreed Claim; and (ii) any and all Client Money Payments, shall be unconditionally and immediately assigned to the Transferee;

**4.3**    the proof of debt and accompanying information lodged by or on behalf of the Transferor shall (to the extent relevant to the Agreed Claim) stand as the Transferee's proof of debt;

**4.4**    Client Money Payments or dividends paid (as applicable), and/or any other benefit given in lieu thereof, by the Company and/or Administrators to (or at the direction of) the Transferee shall constitute a good discharge by the Company and the Administrators of their obligations in respect of the Agreed Claim;

**4.5**    subject to the provisions of the Deed, the Transferor confirms that the Transferee may agree, compromise, settle, waive, release, discharge, Transfer (by way of assignment, novation, sale or otherwise) or otherwise dispose of the whole or any part of the Agreed Claim (and/or any direct or indirect benefit, right , title, interest, action or cause of action deriving from the Agreed Claim, including any right to receive (i) dividends in respect of the Agreed Claim; and/or (ii) Client Money Payments) and to the extent that the Transferor's consent is required for the Transferee to take such action, the Transferor hereby consents to the Transferee taking any such action;

**4.6**    the Company and/or the Administrators may communicate solely with the Transferee in relation to the Agreed Claim; and

**4.7**    the terms of this letter deed shall not prevent the Company and/or the Administrators from making further requests for information from the Transferor and/or the Transferee in due course.

**5**      The Transferor agrees that:

**5.1**    the Company and/or the Administrators shall be permitted to disclose to the Transferee and the Transferee's partners, directors, employees, officers, agents, advisers and representatives (together the **"Transferee's Representatives"**) any and all documentation and/or information submitted by the Transferor, or on its behalf, to the Company and/or the Administrators in support of the Agreed Claim (including but not limited to any proof of debt and any substantiating documents (as referenced in rule 2.72 of the Insolvency Rules 1986)); and

**5.2**    the Transferee and the Transferee's Representatives shall be permitted to rely on and utilise all such information.

**6**      The Transferee:

**6.1**    agrees that, subject to paragraph 7 of this letter deed, the rights and obligations of the Transferor under or in connection with the Deed constitute legal, valid and binding rights and obligations of the Transferee and that for the purpose of Clause 19.1.2 of the Deed, the postal address and the email address of the Transferee set out in this letter deed shall replace the postal address and the email address set out at Clause 19.1.2(i) and 19.1.2(ii) (respectively) of the Deed; and

6.2    makes the representations set out in Clause 5 of the Deed to the Company and the Administrators on the Effective Date [provided that the Transferee shall not be required to make the representations set out in Clause 5.4.1 of the Deed].

7    For the avoidance of doubt, following a Transfer (pursuant to Clause 4 of the Deed), the discharge and release set out in Clause 2.2.1 of the Deed shall not apply to any Claims or other matters or causes of action (whether contractual, proprietary or otherwise arising) other than those Claims and other matters and causes of action released and discharged by the Transferor by operation of Clause 2.2.1 immediately before the Transfer (pursuant to Clause 4 of the Deed).

8    Each person signing this letter deed on behalf of the Transferor and Transferee (as appropriate) represents that they are an authorised signatory executing this letter deed for and on behalf of, and with authority to bind, the Transferor and Transferee (as applicable) to this letter deed and each such person acknowledges that the Company and/or the Administrators reserve the right to require evidence of power and authority and/or any supporting documentation or supplementary information from any person who purports to execute this letter deed on behalf of each of the Transferor and Transferee (as appropriate).

9    The acknowledgement of receipt shall be sent by the Company to the Transferor in accordance with Clause 19 (*Notices*) of the Deed (and Clause 19.2.2 of the Deed shall govern the effective service thereof) and to the Transferee by sending such communication to the postal address or the email address of the Transferee as set forth in this letter deed and such acknowledgement shall be deemed to be sufficiently served on the Transferee by sending the same to the Transferee's postal or email address.

10    The Transferor and Transferee agree that the administrators of the Company (the "**Administrators**") have countersigned this letter deed and agree to be bound by the terms of this letter deed as agents for and on behalf of the Company and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the Company; or in respect of any failure on the part of the Company to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this letter deed. The exclusion of liability hereunder shall arise and continue notwithstanding the termination of the agency of the Administrators and shall operate as a waiver of any and all claims (including, but not limited to, claims in tort, equity and common law as well as under the laws of contract).

11    Any person who is not a party to this letter deed shall have no right (whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise) to enforce or enjoy the benefit of any term of this letter deed provided that the Administrators shall be entitled to rely on paragraph 4, paragraph 5, paragraph 7, paragraph 8, paragraph 10 and this paragraph 11 of this letter deed and the Administrators' firm, members, partners, directors, officers, employees, agents, advisers and representatives shall be entitled to rely on paragraph 10 and this paragraph 11 of this letter deed, as if they were a party to it.

12    This letter deed may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any party may enter into this letter deed by executing any such counterpart.

*[Transferor/Transferee to delete/amend execution blocks as appropriate]*

*[If the Transferor is a company incorporated in England and Wales, use the following execution block.]*

**SIGNED** as a **DEED** by *[insert name of Transferor]* by *[insert name of director]*

...............................................................
**Director**

In the presence of:

Witness's signature:                                       ...............................................................

Name:

Address:

Occupation:

*[If the Transferor is a company not incorporated in England and Wales, the following execution block may suffice. [N.B. Liaise with foreign counsel to ensure that this broad execution block satisfies local law requirements.]*

**SIGNED** as a **DEED** by *[insert name of Transferor]*, a company incorporated in *[territory]*, by *[insert name of authorised signatory]*

...............................................................
**[Authorised Signatory]**

and *[name of authorised signatory]*

...............................................................
**[Authorised Signatory]**

*[If the Transferee is a company incorporated in England and Wales, use the following execution block.]*

**SIGNED** as a **DEED** by *[insert name of Transferee]* by *[insert name of director]*

..................................................

**Director**

In the presence of:

Witness's signature:                                    ..................................................

Name:

Address:

Occupation:

*[If the Transferor/Transferee is a company not incorporated in England and Wales, use the following execution block]*

**SIGNED** as a **DEED** by *[insert name of Transferee]*, a company incorporated in *[territory]*, by *[insert name of authorised signatory]*

..................................................

**[Authorised Signatory]**

and *[name of authorised signatory]*

..................................................

**[Authorised Signatory]**

*[N.B. Liaise with foreign counsel to ensure that this broad execution block satisfies local law requirements.]*

**Acknowledged and agreed by**

Administrator

for and on behalf of **Lehman Brothers International (Europe) (in administration)** acting as its agent and without personal liability

Date:

Certifié conforme
à l'original

**19.    No Partnership**

19.1    Nothing in this Agreement shall constitute or be deemed to create any constitute a partnership, joint venture or similar relationship between the Parties and/or any other person nor, except as expressly provided, shall it constitute, or be deemed to constitute, either party the agent of the other party for any purpose.

**20.    Conflicts of Interests - Multiple interests**

20.1    The Parties and any person acting on their behalf may act in multiple capacities. In that event, each of them shall act in the interest of the Beneficiaries.

20.2    The Assignee has multiple interests. In consideration of its capacity as Investment Manager of the Assignor, the Assignee shall act in the sole interest of the Lehman Claim Beneficiaries and of the Other Claims Beneficiaries. The Assignee agrees to assert the rights of the Lehman Claims and of the Other Claims for the sole benefit of respectively Lehman Claim Beneficiaries and the Other Claims Beneficiaries in accordance with the terms of the Agreement and in good faith and with reasonable care and judgement, in a manner which is consistent with practices and procedures.

**21.    Consent and Waiver**

21.1    The Assignor hereby acknowledges and consents to all terms of this Agreement and waivers its right to raise any objection thereto and its rights to receive notice to the US Rule 3001 of the Rules of Bankruptcy Procedure.

**22.    Governing Law - Jurisdiction**

22.1    This Agreement shall be governed by and construed in accordance with English law.

22.2    In relation to any legal action or proceedings arising out of or in connection with this Agreement ("**Proceedings**"), each of the parties irrevocably submits to the exclusive jurisdiction of the Paris courts and waives any objection to Proceedings in such courts on the grounds of venue or on the grounds that Proceedings have been brought in an inappropriate forum.

**IN WITNESS** whereof the Parties hereto have caused this Agreement to be signed as a deed as of the day and year first above written.

**KALLISTA MASTER FUND LIMITED**
Represented by:
Alain Reinhold (Director)                                                                    Simon Brock (Director)
                            Sign...

**OFI Asset Management**
Represented by:
Thierry CALLAULT (Deputy CEO)    FAO Thierry CALLAULT
Gérard BOURRET :one...
CEO
**In the presence of:**
**KALLISTA CB ARBITRAGE FUND LIMITED**
Represented by:
Alain Reinhold (Director)                                                                    Simon Brock (Director)