WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re**                                                         :   **Chapter 11**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                      :   **Case No. 08-13555 (JMP)**
                                                                  :
                        **Debtors.**                              :   **(Jointly Administered)**
                                                                  :
------------------------------------------------------------------x

**DECLARATION OF JEFFREY FITTS IN SUPPORT
OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND
363(b) OF THE BANKRUPTCY CODE FOR AUTHORITY TO EXERCISE
RIGHT OF FIRST OFFER REGARDING SECURITIES OF ARCHSTONE TRUST**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey Fitts, declare:

1.      I am over the age of eighteen (18) years and make these statements of my own personal knowledge and/or based upon my consultation with employees of Lehman (as hereinafter defined). If called to testify, I could testify to the truth of the matters set forth herein.

2.      I am a Managing Director with Alvarez & Marsal Real Estate Advisory Services ("A&M"). I submit this declaration (the "Declaration") in support of the *Debtors' Motion Pursuant to Sections 105(a) and 363 (b) of the Bankruptcy Code for Authority to Exercise Right of First Offer Regarding Securities of Archstone Trust* (the "Motion") [ECF No. 23620] filed in the above-referenced chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc. ("LCPI"), Luxembourg Residential Properties Loan

Finance S.á.r.l. and their affiliated debtors, as debtors in possession (collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman").

3.  I have twenty-two (22) years of experience in assisting insolvent and troubled companies, with a focus on operational and financial restructuring efforts. Prior to joining A&M, I was a Managing Director with GE Commercial Finance ("GE"), where I led GE's Distressed Debt and Alternative Investment Group and managed complex distressed credits. Before joining GE, I was with the Corporate Workout Division (IRM) of Citicorp, where I spent three years managing investment grade and middle market corporate workouts. I began my career in 1990 as a workout officer and, later, an asset manager with Citicorp Real Estate, where I managed more than $1 billion of office, retail, and industrial projects. I received a bachelor's degree from the University of Delaware in 1988.

4.  I was assigned to the representation of Lehman in September 2008. I currently serve as the Co-Head of Lehman's real estate group (the "Real Estate Group"). My primary responsibility as Co-Head of the Real Estate Group is day-to-day management and oversight of Lehman's real estate portfolio, including management and oversight of the real estate, real estate finance and related activities that are the subject of the Motion and this Declaration. As Co-Head of the Real Estate Group, I oversee a number of Lehman employees who have been actively involved in finalizing the terms of the transactions described in this Declaration and in the Motion.

5.  I have reviewed a copy of the Motion, and I adopt the representations contained therein, as if set forth in full and at length in this Declaration.

6.  Pursuant to the terms set forth in the Bridge Equity Agreement,[1] the Debtors have a finite period of time to decide whether or not they will exercise the ROFO and purchase the Transferred Securities. Although the terms of the ROFO and, consequently, the amount of the Banks' ROFO Price are the subject of the Adversary Proceeding, it is my business judgment that the best way to maximize and preserve the value of the Debtors' sizeable investments in Archstone is for the Debtors to exercise the ROFO and pay the Banks' ROFO Price, each as interpreted by the Court in the Adversary Proceeding, in order to acquire the Transferred Securities.

7.  After analyzing various alternatives, the Debtors determined that exercising the ROFO and purchasing the Transferred Securities provides the best framework for preserving their interests in Archstone. Acquiring the Transferred Securities will (i) preserve the Debtors' ability to monetize their substantial investment in Archstone at the time and in the manner in which they deem most appropriate, and (ii) prevent a competitor from entering the equation and making it more difficult for the Debtors to liquidate their interests in Archstone on favorable terms as well as to approve any fundamental changes or make major decisions with respect to Archstone. By ensuring that Equity Residential does not acquire the Transferred Securities, the Debtors can avoid being forced into a contentious partnership that they believe will inevitably impair the value of Archstone.

8.  As the Court is aware, the Archstone enterprise is one of the largest assets of the Debtors' estates. After numerous internal discussions and consultation with Gleacher & Company Securities, Inc., the Debtors' financial advisor, the Debtors concluded that the price to be paid by Equity Residential for the Transferred Securities, which only reflects an offer to

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

purchase approximately 26.5% of Archstone's equity, reflects a substantial discount to the underlying asset value of the Archstone enterprise. Unlike other potential acquirors, Equity Residential, which has its own management and operations platform, ascribes little or no value to Archstone's operating platform. Indeed, they have publicly stated that the retention of Archstone's management would be redundant. Given the current market value for Archstone's assets and the value of the Archstone platform, the Debtors believe that Equity Residential's offer materially undervalues Archstone; a net asset valuation of Archstone would suggest at least an additional $1 billion of value over the implied value for the entire Archstone enterprise reflected by the Banks' ROFO Price.

9. In selling the Transferred Securities at a discount to a potentially hostile third party, the Other Co-Sponsors have placed the Debtors in the untenable position of having to exercise the ROFO in order to prevent Archstone's competitor, Equity Residential, from acquiring an approximately 26.5% stake in Archstone. Under Archstone's governance documents, Equity Residential's potential acquisition would endow it with the power to veto major financing and external growth decisions, formation and approval of budgets, and, importantly, any Lehman exit strategy. Equity Residential would effectively have the ability to significantly impact the value of the Archstone enterprise, single-handedly drive down the value of Archstone and hinder the Debtors' ability to exit their investment in Archstone. Further, should the Debtors desire to exit Archstone, Equity Residential's position in the enterprise would make the Debtors' interests significantly less appealing to potential third party purchasers, further diminishing the value of the Debtors' Archstone interests. Given this landscape, obtaining authority to exercise the ROFO is critical.

10. The Debtors' exercise of the ROFO and purchase of the Transferred Securities is also advantageous because it would result in the Debtors owning approximately 73.5% of Archstone's ownership interests.[2] The change in ownership interests resulting from the Debtors' exercise of the ROFO will result in the Debtors being able to unilaterally block all Major Matters. The Debtors' ability to at least exercise an effective veto right is of significant value. Additionally, the Debtors could unilaterally effect all actions not constituting a Major Matter or Special Matter because a majority voting interest could be accomplished with just the Debtors' consent.

11. The Debtors anticipate that through a combination of equity partnerships, financing structures, select asset sales, joint ventures or recapitalizations, the vast majority of whatever estate funds are used in connection with the exercise of the ROFO will be repatriated. I estimate that such funds will be available for distribution to creditors in accordance with the Plan within approximately twelve (12) months of the closing in respect of the ROFO. Thus, the exercise of the ROFO will delay the distribution of only a modest percentage of the cash currently held by LBHI and LCPI, and has the potential to preserve or even enhance the value of a very substantial asset.

12. As Co-Head of the Real Estate Group, I have concluded, in my considered business judgment and based on my review of pertinent documents and discussions with my colleagues involved with the Debtors' interests in Archstone, that the Debtors' exercise of the ROFO is in the best interests of their respective estates.

---

[2] In the Adversary Proceeding, the Debtors claim that the ROFO should apply to the Purchase Agreement and the rights under the Other Interest Agreement. In the event that the Court determines in the Adversary Proceeding that the Banks' ROFO Notice applies to all of the Other Co-Sponsors interests in Archstone, the Debtors will have virtually full ownership of Archstone.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 30th day of December, 2011.

_____
Jeffrey Fitts