Paul M. Basta
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Ross M. Kwasteniet
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to Lehman Brothers Real Estate Partners, L.P.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| LEHMAN BROTHERS | ) Case No. 08-13555 (JMP) |
| HOLDINGS INC., *et al.,* | ) |
|  | ) |
| Debtors. | ) Jointly Administered |
|  | ) |

**NOTICE OF WITHDRAWAL OF PROOFS OF**
**CLAIM NUMBERED 28920 AND 28921 FILED BY**
**LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P.**

1.     On  or  after  September  15,  2008,  Lehman  Brothers  Holdings  Inc.
("**LBHI**") and certain of its subsidiaries (collectively with LBHI, the "**Debtors**")
commenced voluntary cases under chapter 11 of title 11 of the United States Code.  The
Debtors had set September 22, 2009 as the date by which prepetition claims against them
had to be filed.

2.     Lehman  Brothers  Real  Estate  Partners  L.P.  ("**Claimant**")  timely  filed  a
proof of claim against LBHI [Claim No. 28921] (the "**LBHI Claim**"), a copy of which is

attached hereto as **<u>Exhibit A</u>**.  Additionally, Claimant also timely filed a proof of claim

against Lehman Brothers Special Financing Inc., a Debtor in these chapter 11 cases

[Claim No. 28920] (the "**LBSF Claim**," and together with the LBHI Claim, the

"**Claims**"), a copy of which is attached hereto as **<u>Exhibit B</u>**.

       3.      PLEASE TAKE NOTICE that Claimant hereby withdraws the Claims.

Dated: January 5, 2012              **KIRKLAND & ELLIS LLP**
       New York, New York

*/s/ Ross M. Kwasteniet*
Paul M. Basta
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Ross M. Kwasteniet
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

## **Exhibit A**

**LBHI Claim**

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Brothers Holdings Inc. | 08-13555 |

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000028921

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Lehman Brothers Real
Estate Partners, L.P.
1271 Avenue of the Americas, 38th Floor
New York, New York 10020
Attn: Judy Turchin
Ji Yeong Chu
Tel: 212-526-3075

(with a copy to)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Paul M. Basta
Cindy Y. Chen
Tel:  212 446-4800
Email: paul.basta@kirkland.com
cindy.chen@kirkland.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Lehman Brothers Real
Estate Partners, L.P.
1271 Avenue of the Americas, 38th Fl.
New York, New York 10020

Telephone number:            Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ See attachment
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*
*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See attachment
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** N/A
3a. Debtor may have scheduled account as: N/A
(See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☑ Other
Describe:  Setoff, including amount of claims of Debtors
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
Amount of Secured Claim: $4,070,744.00  Amount Unsecured: $ unknown

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See attachment and to-be completed online questionnaire

FOR COURT USE ONLY

FILED / RECEIVED
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LL...

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|
| 9/21/2009 | Rodolpho Amboss  Authorized Signatory |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| LEHMAN BROTHERS | ) Case No. 08-13555 (JMP) |
| HOLDINGS INC., *et al.*, | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ATTACHMENT TO PROOF OF CLAIM OF
## LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P.

**A.    General Background**

1.    On or after September 15, 2008 (the "**Petition Date**"), Lehman Brothers Holdings Inc. ("**LBHI**") and certain of its subsidiaries (collectively with LBHI, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Pursuant to the order dated July 2, 2009 (the "**Bar Date Order**"), the Debtors have set September 22, 2009 as the date by which claims against them have to be filed (the "**Bar Date**"). Additionally, the Debtors have set October 22, 2009 as the date by which parties must complete an on-line questionnaire with respect to certain prepetition "Derivative Claims" and "Guarantee Claims," as such terms are defined in the Bar Date Order.

2.    This attachment (this "**Attachment**") is filed by Lehman Brothers Real Estate Partners, L.P. (the "**Claimant**"), as a supplement to the Claimant's written proof of claim and the to-be submitted on-line questionnaire (together, the "**Proof of Claim**") against LBHI.    All statements and assertions made in the Proof of Claim are incorporated herein by reference.

**B.    Basis for Claim**

3.    Claimant and LBSF are parties to that certain Master Agreement, dated as of May 19, 2003, including the Schedule dated as of May 19, 2003 (collectively, the "**Swap**

**Agreement"**). The Schedule to the Master Agreement is annexed as **Exhibit A** hereto. Pursuant to the Swap Agreement, the parties thereto entered into one or more transactions.

4.      Additionally, in connection with transactions entered into under the Swap Agreement, Claimant provided $4,070,744.00 in cash collateral (the **"Cash Collateral"**) to LBSF, an amount which LBSF has not returned to Claimant. Pursuant to that certain Guarantee of LBHI, annexed as **Exhibit B** hereto, LBHI unconditionally guaranteed the obligations of LBSF arising out of the Swap Agreement.

5.      Based on the foregoing, Claimant asserts a secured, unliquidated claim against LBHI in connection with any amounts that may be due and owing pursuant to the Swap Agreement. Furthermore, Claimant reserves the right to setoff any claims brought against Claimant in connection with transactions under the Swap Agreement by the amount of the Cash Collateral.

**C.      Reservation of Rights**

6.      Claimant reserves its right to seek any and all interest that it may be entitled to, including default interest, accrued and accruing, as well as any and all fees, costs, and expenses that it may seek reimbursement for, including attorneys' fees and costs related to the Proof of Claim against the Debtors and the chapter 11 cases. Furthermore, Claimant reserves the right to assert any and all counterclaims and defenses, including, but not limited to, setoff of the Cash Collateral.

7.      The filing of this Attachment and the Proof of Claim (including any documents or attachments submitted in connection therewith) does not constitute a concession or admission by Claimant of liability, of any facts, or as to whether all or a portion of the claims are prepetition or postpetition in connection with any claim that has been or may be asserted against Claimant or against the Debtors and their estates.

2

8.    Claimant has filed this Attachment and Proof of Claim (including any documents or attachments submitted in connection therewith) under compulsion of the Bar Date Order entered in the Debtors' chapter 11 cases and to protect Claimant from forfeiture of its claims against the Debtors by reason of the dates established thereby.  Claimant reserves the right to amend and/or supplement this Attachment and the Proof of Claim at any time, including after the Bar Date, in any manner, and/or to file additional proofs of claim for any additional claims that may be based on the same or additional documents or grounds of liability or to assert that such claims are entitled to rights and priorities afforded under sections 365, 503 or 507 of the Bankruptcy Code.

9.    The filing of this Attachment and the Proof of Claim are not and shall not be deemed or construed as:  (a) a waiver or release of Claimant's rights against any person, entity, or property, or a waiver of the right to compel the Debtors to return property of Claimant currently in the possession of the Debtors; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Claimant to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de*

3

hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

10.     All notices regarding this Attachment and the Proof of Claim should be sent to Lehman Brothers Real Estate Partners, L.P., 1271 Avenue of the Americas, 38th Floor, New York, New York 10020, Attn: Judy Turchin and Ji Yeong Chu, with copies to Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Paul M. Basta, Esq. and Cindy Y. Chen, Esq.

## Exhibit A

**Schedule to the Master Agreement**

(Multicurrency-Cross Border)

SCHEDULE
to the
MASTER AGREEMENT

dated as of 19 May, 2003

between

Lehman Brothers Special Financing Inc     and     Lehman Brothers Real Estate Partners, L.P.
      ("Party A")                                    ("Party B")

**PART 1**

**Termination Provisions and Certain Other Matters**

(1)      "**Specified Entity**" means, in relation to Party A, for the purpose of:

        Section 5(a)(v), none;

        Section 5(a)(vi), none;

        Section 5(a)(vii), none; and

        Section 5(b)(iv), none;

            and, in relation to Party B, for the purpose of:

        Section 5(a)(v), none

        Section 5(a)(vi), none

        Section 5(a)(vii), none; and

        Section 5(b)(iv), none.

(2)      "**Specified Transaction**" will have the meaning specified in Section 14.

(3)      The "**Cross-Default**" provisions of Section 5(a)(vi) will apply to Party A, and Party B, and for such purpose:

      (a)    "**Specified Indebtedness**" will have the meaning specified in Section 14, except that such term shall not include obligations in respect of deposits received in the ordinary course of such party's banking business.

319179:v01

(b)   "**Threshold Amount**" means, with respect to Party A, means the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency)and with respect to Party B, the lesser of USD25,000,000, or the equivalent thereof in any other currency or currencies, and an amount equal to two percent (%) of the shareholders' equity of Party B plus any uncalled capital commitments of the partners of Party B.   A party's shareholders' equity shall be determined in accordance with generally accepted accounting principles in the United States of America ("GAAP"), consistently applied, as at the end of such party's most recently completed fiscal year.

(c)   Section 5(a)(vi) of this Agreement will be deemed to be amended to include the following Clause "(3)":

"or (3) a default, event of default, or other similar condition or event (however described) occurs and is continuing which entitles any person or entity to terminate its commitment under any agreement to lend or advance or make available funds to a party (or any applicable Specified Entity) in respect of an aggregate amount in excess of the Threshold Amount."

(4)   The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker"  REFERS TO , (i) with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Lehman Brothers Holdings Inc., as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investor's Services, Inc. and BBB- as determined by Standard & Poor's Corporation, and (ii) with respect to Party B, that the creditworthiness of Party B (or the resulting, surviving or transferee entity of Party B) and its credit support parties taken as a whole is materially weaker. In the event of a split rating, the lower rating shall be determinative.

(5)   The "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A or Party B.

(6)   **Payments on Early Termination**.  For the purpose of Section 6(e):

(i)   Market Quotation will apply.

(ii)   The Second Method will apply.

(7)   "**Termination Currency**" means United States Dollars.

**Part 2: Tax Representations**

(a)   **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party

319179:v01                                2

under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.** Not Applicable.

## PART 3

### Agreement to Deliver Documents

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Annual Report of Party B containing consolidated financial statements certified by independent certified public accountants and prepared in accordance with GAAP. | As soon as available and in any event not later than 120 days after the end of each fiscal year of Party B | Yes |
| Party B | Unaudited consolidated financial statements of Party B for a fiscal quarter prepared in accordance with GAAP. | As soon as available and in any event not later than 60 days after the end of each of the first three fiscal quarters of Party B | Yes |
| Party B | Certified copies of all corporate or partnership, as the case may be, authorizations and any other documents with respect to the execution, delivery and performance of this Agreement | Upon execution and delivery of this Agreement | Yes |

| Party B | The certificate of the chief financial officer of Party B, certifying on the date thereof that Party B is in compliance with the covenants and agreements set forth in this subparagraph (14) of Part 5 of the Schedule to this Agreement (and including a calculation of the figures used to make such certification). | Upon execution and delivery of this agreement and thereafter upon Party A's request therefor. | Yes |
|---|---|---|---|
| Party B | A guarantee of the Funds in the form of Exhibit II to this Schedule | Upon execution and delivery of this Agreement | No |
| Party A | A guarantee of Holdings in the form of Exhibit III to this Schedule. | Upon execution of this Agreement | No |
| Party A and Party B | Certificate of authority and specimen signatures of individuals executing this Agreement, Confirmations and each Credit Support Document (as applicable) | Upon execution and delivery of this Agreement and thereafter upon request of the other party | Yes |
| Party A and Party B | Credit Support Annex | Upon execution and delivery of this Agreement | Yes |

## PART 4

### Miscellaneous

(1)    **Address for Notices**. For the purpose of Section 12(a) of this Agreement:

Address for notice or communications to Party A:

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019

<u>Attention</u>:    Documentation Manager
Telephone No.: (212) 526-7187
Facsimile No.:  (212) 526-7672

For all purposes.

In the case of Party B, a guarantee of Party B's obligations hereunder in the form annexed hereto as Exhibit III to this Schedule and the Credit Support Annex annexed hereto.

(7)     **Credit Support Provider**.

Credit Support Provider means in relation to Party A: Holdings.

Credit Support Provider means in relation to Party B: The Funds

(8)     **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(9)     **Netting of Payments**. Section 2(c)(ii) of this Agreement will apply.

(10)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement.

## PART 5

### Other Provisions

(1)     **Set-off**. Section 6 of the Agreement is hereby amended by adding a new subsection (f):

Set-off. Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), or in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount) will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this provision.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

319179:v01                              6

Address for notice or communications to Party B:

Lehman Brothers Real Estate Partners, L.P.
Attention: Edward Williams
One Broadgate, Ground Floor
London EC 2M 7HA
Facsimile No.: 44-207-256-4223

Cc Rodolpho Amboss
Lehman Brothers Real Estate Partners, L.P.
399 Park Avenue
8th Floor
New York
10022
Facsimile 001 646 758 4373

Cc Jeffrey Bailey
Lehman Brothers Real Estate Partners, L.P.
399 Park Avenue
8th Floor
New York
10022
Facsimile 001 646 758 2818

(2)    **Process Agent**. For the purpose of Section 13(c):

Party A appoints as its Process Agent:  Not applicable.
Party B appoints as its Process Agent:  Not applicable.

(3)    **Offices**. The provisions of Section 10(a) will apply to this Agreement.

(4)    **Multibranch Party**. For the purpose of Section 10 of this Agreement:

Party A is not a Multibranch Party

Party B is not a Multibranch Party.

(5)    **Calculation Agent**. The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(6)    **Credit Support Documents**.

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit II to this Schedule and the Credit Support Annex annexed hereto.

319179:v01

5

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other party when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(2)    **Waiver of Jury Trial**. Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this Section.

(3)    **Further Representation/Eligible Contract Participant**. Each party represents to the other party (which representation will be deemed to be repeated by such party on each date on which a Transaction is entered into) that it is an "eligible contract participant", as defined in the Commodity Futures Modernization Act of 2000.

(4)    **Relationship Between Parties**. The following representation shall be inserted as a new Section 3(g) of this Agreement:

"(g)    **Relationship Between Parties**. Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)    **Non-Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    **Assessment and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

319179:v01                                    7

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

(5)    <u>Additional Party B Representation</u>: Party B represents to Party A (at all times until termination of this Agreement) that:

(i) Any derivatives or foreign exchange transaction entered into by Party B with Party A or with any other derivatives or foreign exchange dealer shall be solely for hedging purposes and not for speculation.

(6)    <u>ISDA Definitions</u>. Reference is hereby made to the 2000 ISDA Definitions (the "2000 Definitions") and the 1998 FX and Currency Option Definitions (the "FX Definitions") (collectively the "ISDA Definitions") each as published by the International Swaps and Derivatives Association, Inc., which are hereby incorporated by reference herein. Any terms used and not otherwise defined herein which are contained in the ISDA Definitions shall have the meaning set forth therein.

(7)    <u>Scope of Agreement</u>. Notwithstanding anything contained in this Agreement to the contrary, any transaction which may otherwise constitute a "Specified Transaction" for purposes of this Agreement which has been or will be entered into between the parties shall constitute a "Transaction" which is subject to, governed by, and construed in accordance with the terms of this Agreement, unless any Confirmation with respect to a Transaction entered into after the execution of this Agreement expressly provides otherwise.

(8)    <u>Inconsistency</u>. In the event of any inconsistency between any of the following documents, the relevant document first listed below shall govern: (i) a Confirmation; (ii) the Schedule and an ISDA Credit Support Annex (as applicable); (iii) the ISDA Definitions; and (iv) the printed form of ISDA Master Agreement and ISDA Credit Support Annex (as applicable). In the event of any inconsistency between provisions contained in the 2000 Definitions and the FX Definitions, the FX Definitions shall prevail.

(9)    **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(10)    **Transfer.** Notwithstanding Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate.

(11)    **Notices.** For the purposes of subsections <u>(iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a

Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(12)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(13)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between Party A and Party B shall be subject to the terms hereof

(14)    <u>**Further Agreements of Party B.**</u>

(i)    Party B's Net Worth (as hereinafter defined) shall at all times be more than the greater of (A) four times the sum of the Recourse Indebtedness (hereinafter defined) of Party B, and (B) $250 Million.

The term **"Net Worth"** shall mean, at any time (without duplication) the sum of the total assets as reflected on the balance sheet of Party B and the Funds, plus any uncalled capital commitments of the partners of Party B and the Funds, less total liabilities as reflected on the balance sheets of Party B and the Funds.

(ii)    Recourse Indebtedness incurred by Party B shall not be more than $250 Million.

The term **"Recourse Indebtedness"** shall mean and include at all times (without duplication): (A) all indebtedness and liabilities of Party B and the Funds for borrowed money or for the deferred purchase price of property or services, as reflected on the balance sheets of Party B and the Funds, (B) all obligations of Party B and the Funds in respect of any capital lease as reflected on the balance sheet of Party B and the Funds prepared in accordance with GAAP, (C) net obligations of Party B and the Funds related to interest rate and foreign currency hedging agreements (including but not limited to the marked-to-market exposure of Party B and the Funds reflected on the applicable balance sheet), and (D) all contingent obligations of and guarantees issued by Party B and the Funds to the extent required to be reflected on the balance sheet of Party B and the Funds, including the notes thereto, prepared in accordance with GAAP, but shall not include indebtedness secured by uncalled capital commitments of the partners of Party B and the Funds.

(iv)    Party B shall report to Party A, on a quarterly basis, the net mark-to-market positions of Party B and the Funds (separated by currency and type of transaction), and the amount of any credit line available to Party B from other derivative and foreign exchange dealers.

(v)    Party B agrees with Party A that any derivatives or foreign exchange transaction entered into by Party B with Party A or with any other derivatives or foreign exchange dealer shall be solely for hedging purposes and not for speculation.

319179:v01                              9

(vi)   Party B shall provide to Party A, together with each financial statement required under Part 3 hereof, a certificate of the chief financial officer of Party B and the Funds, certifying on the date thereof that Party B is in compliance with the covenants and agreements set forth in this subparagraph (14) of Part 5 of the Schedule to this Agreement (and including a calculation of the figures used to make such certification).

(15)   **Additional Definition.**   Section 14 is hereby amended by adding the following definition:

"**Funds**" shall mean Lehman Brothers P.A. LLC Delaware, USA; Lehman Brothers Partnership Account 2000/2001, L.P. Delaware, USA; Lehman Brothers Offshore Partnership Account 2000/2001, L.P. Bermuda; Lehman Brothers Real Estate Partnership (General Partnership) Delaware, USA; Lehman Brothers/PSERS Real Estate, L.P. Delaware, USA; Lehman Brothers Real Estate Pension Partners, L.P. Delaware, USA; Lehman Brothers Real Estate Fund, L.P. Delaware, USA; Lehman Brothers Offshore Real Estate Fund, L.P. Bermuda; Lehman Brothers Offshore Real Estate Partners, L.P. Bermuda; Lehman Brothers Real Estate Capital Partners I, L.P. Delaware , USA; Lehman Brothers Offshore Real Estate Capital Partners I, L.P. Bermuda; Lehman Brothers Offshore (Europe 1) Real Estate Partners, L.P. Bermuda; Lehman Brothers (Europe 2) Real Estate Partners, L.P. Delaware, USA; Lehman Brothers Offshore (Europe 3) Real Estate Partners, L.P. Bermuda and Lehman Brothers Offshore (Europe 4) Real Estate Partners, L.P. Bermuda.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)   **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i)   Incorporation of 1998 FX and Currency Option Definitions.   The 1998 FX and Currency Option Definitions (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)   Amendment of 1998 FX and Currency Option Definitions.   The following amendments are made to the 1998 Definitions:

(1) Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

(b)  **Currency Obligation.**  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(2) The following provision is hereby added to Section 3.4:

(c)  **Remedies in Event of Non-Payment.**  If a Premium is not received on the Premium Payment Date, the Seller may elect: (i) to accept a late payment of such Premium; (ii) to give written notice of such non-payment and, if such payment

shall not be received within two (2) Local Business Days of such notice, treat the related Currency Option Transaction as void; or (iii) to give written notice of such non-payment and, if such payment shall not be received within two (2) Local Business Days of such notice, treat such non-payment as an Event of Default under Section 5(a)(i). If the Seller elects to act under clause (i) of the preceding sentence, the Buyer shall pay interest on such Premium in the same currency as such Premium from the day such Premium was due until the day paid at the Default Rate; if the Seller elects to act under clause (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and actual damages incurred in connection with such unpaid or late Premium in the same currency as such Premium at the then prevailing market rate and any other costs or expenses incurred by the Seller in covering its obligations (including, without limitation, a delta hedge) with respect to such Currency Option Transaction.

(3) Section 3.6(a) is hereby amended by deleting in its entirety the final sentence thereof and adding in its place the following:

"A Currency Option Transaction may be exercised in whole or in part. If a Currency Option Transaction is exercised in part, the unexercised portion shall not be extinguished thereby but shall remain a Currency Option Transaction to the extent of such unexercised portion until the earlier of: (i) the expiration of the Currency Option Transaction; or (ii) an exercise of the Currency Option Transaction that leaves no remaining unexercised portion thereof."

(b) **Confirmations.** Any confirmation in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement even where not so specified in such confirmation and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as modified therein. Without limitation of the foregoing, where an FX Transaction or Currency Option Transaction is confirmed by means of exchange of electronic messages on an electronic messaging system or by means of facsimile or telex (whether manually or automatically generated) or other document or confirming evidence exchanged between the parties confirming such Transaction, such messages, facsimile transmission, document or evidence shall constitute a Confirmation for the purposes of this Agreement even where not so specified therein. FX Transactions and Currency Option Transactions shall be promptly confirmed by the parties by Confirmations exchanged by mail, telex, facsimile or other electronic means. Unless either party objects to the terms of an FX Transaction or Currency Option Transaction contained in any Confirmation within three (3) Local Business Days of receipt thereof, the terms of such Confirmation shall be deemed correct and accepted absent manifest error, unless a corrected Confirmation is sent by a party within such three-day period, in which case the party receiving such corrected Confirmation shall have two (2) Local Business Days after receipt thereof to object to the terms contained in such corrected Confirmation.

(c) **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

(i)   Netting, Offset and Discharge with Respect to Currency Options. The following

319179:v01                                          11

provisions shall apply to Currency Option Transactions:

(1)     If, on any date, and unless otherwise mutually agreed by the parties, Premium would otherwise be payable hereunder in the same currency between a pair of Offices of the parties, then, on such date, each party's obligation to make payment of any such Premium will be automatically satisfied and discharged and, if the aggregate Premium(s) that would otherwise have been payable by such Office of one party exceeds the aggregate Premium(s) that would otherwise have been payable by such Office of the other party, replaced by an obligation upon the party by whom the larger aggregate Premium(s) would have been payable to  pay the other party the excess of the larger aggregate Premium(s) over the smaller aggregate Premium(s).

(2)     If, on any date, and unless otherwise mutually agreed by the parties, amounts other than Premium payments would otherwise be payable hereunder in the same currency between a pair of Offices of the parties, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by such Office of one party exceeds the aggregate amount that would otherwise have been payable by such Office of the other  party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay the other party the excess of the larger aggregate amount over the smaller aggregate amount.

(3)     Unless otherwise agreed, any Call or any Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Option Transactions; provided that such termination and discharge may only occur in respect of Currency Option Transactions:

(A)     each being with respect to the same Put Currency and the same Call Currency;

(B)     each having the same Expiration Date and Expiration Time, and with respect to Bermuda Style Options, each having the same Specified Exercise Dates;

(C)     each being of the same style, i.e., either both being American Style Options or both being European Style Options or both being Bermuda Style Options;

(D)     each  having the same Strike Price;

(E)     neither of which shall have been exercised by delivery of a Notice of Exercise;

(F)     which are entered into by the same Offices of the parties; and

319179:v01                                12

(G)   which are otherwise identical in terms that are material for the purposes of offset and discharge;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transactions or, as the case may be, parts thereof so terminated and discharged. In the case of a partial termination and discharge (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction which is partially discharged and terminated shall continue to be a Currency Option Transaction for all purposes of this Agreement.

(ii)   <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

(1)   Unless otherwise agreed to by the parties hereto, whenever an FX Transaction is entered into between a pair of Netting Offices of the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between such Netting Offices, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation determined as follows:  (A) if the canceled Currency Obligations evidence an undertaking by the same party to deliver the underlying currency, the new Currency Obligation shall equal the aggregate of the canceled Currency Obligations, and (B) if the canceled Currency Obligations evidence an undertaking by each party to deliver the underlying currency, the amount of the underlying currency to be delivered by each party under the canceled Currency Obligations shall be compared, and the new Currency Obligation shall equal the amount by which the Currency Obligation of the party having the greater obligation with respect to such currency exceeds the Currency Obligation of the party having the lesser obligation with respect to such currency.  Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(2)   The provisions of Part 6(c)(ii)(1) above shall apply notwithstanding that either party (A) may fail to send out a Confirmation, (B) may not on its books treat the Currency Obligations as canceled and simultaneously replaced by a new Currency Obligation as provided herein, or (C) may send out a Confirmation that incorrectly states any term of a Currency Obligation.

(3)   If on any Settlement Date, and unless otherwise mutually agreed by the parties, Currency Obligations (which are not subject to the provisions of Part 6(c)(ii)(1) hereof) for the delivery of the same currency shall exist between a pair of Netting Offices of the parties, then on such Settlement Date, each party's Currency Obligation to deliver that currency will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been delivered by such Netting Office of one party exceeds the aggregate amount that would otherwise have been delivered by such Netting Office of the other party, replaced by a Currency Obligation upon the party by whom the larger aggregate amount would have been deliverable to deliver to the other

319179:v01

13

party the excess of the larger aggregate amount over the smaller aggregate amount.

(4)    For the purposes of this Part 6(c), "Netting Offices" means (i) with respect to Party A, New York; and (ii) with respect to Party B, New York. The Netting Office with respect to a party may be modified from time to time pursuant to notice given in accordance with the terms of Section 12.

(d) **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name: _____
ZDENKA S. GRISWOLD
Title: _____
Authorized Signatory
LEHMAN BROTHERS
SPECIAL FINANCING INC.

LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P., a Delaware limited partnership

By:    LEHMAN BROTHERS REAL ESTATE ASSOCIATES, L.P., a Delaware limited partnership, its general partner

By:    PROPERTY ASSET MANAGEMENT INC., a Delaware corporation, its general partner

By: _____

Name: _____
Title: _____
Rodolpho Amboss
Authorized Signatory

319179:v01                             14

**Exhibit B**

**Guarantee of LBHI**

EXHIBIT III to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P. ("Party B") have entered into a Master Agreement dated as of 19 May 2003 (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is

7

rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New York 10022 USA (Facsimile No. 212-520-0176) with a copy to Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

_____

Name:

Title:

Date:

8

H
A
N
D

D
E
L
I
V
E
R
Y

**FILED / RECEIVED**

SEP **2 2** 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

_____
RECEIVED BY:

_____
DATE

_____
TIME

**<u>Exhibit B</u>**

**LBSF Claim**

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Special Financing Inc. | 08-13888 |

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000028920

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side).

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Lehman Brothers Real
Estate Partners, L.P.
1271 Avenue of the Americas, 38th Floor
New York, New York 10020
Attn: Judy Turchin
     Ji Yeong Chu
Tel: 212-526-3075

(with a copy to)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Paul M. Basta
     Cindy Y. Chen
Tel: 212 446-4800
Email: paul.basta@kirkland.com
      cindy.chen@kirkland.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
    (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Lehman Brothers Real
Estate Partners, L.P.
1271 Avenue of the Americas, 38th Fl.
New York, New York 10020

Telephone number: _____    Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.    Amount of Claim as of Date Case Filed:** $ See attachment

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:** See attachment
      (See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** _____N/A_____
      3a. Debtor may have scheduled account as: _____N/A_____
         (See instruction #3a on reverse side.)

**4.    Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☑ Other

Describe:  Setoff, including amount of claims of Debtors

Value of Property: $ _____   Annual Interest Rate _____ %
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____   Basis for perfection: _____

Amount of Secured Claim: $4,070,744.00   Amount Unsecured: $ unknown

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____**
      (See instruction #6 on reverse side.)

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ _____

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:
See attachment and to-be completed online questionnaire

Date:
9/21/2009

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Rodolpho Amoroso
**Authorized Signatory**

**FOR COURT USE ONLY**

FILED / RECEIVED
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEHMAN BROTHERS | ) Case No. 08-13555 (JMP) |
| HOLDINGS INC., *et al.*, | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ATTACHMENT TO PROOF OF CLAIM OF**
**LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P.**

**A.    General Background**

1.      On or after September 15, 2008 (the "**Petition Date**"), Lehman Brothers Holdings Inc. ("**LBHI**") and certain of its subsidiaries (collectively with LBHI, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Pursuant to the order dated July 2, 2009 (the "**Bar Date Order**"), the Debtors have set September 22, 2009 as the date by which claims against them have to be filed (the "**Bar Date**"). Additionally, the Debtors have set October 22, 2009 as the date by which parties must complete an on-line questionnaire with respect to certain prepetition "Derivative Claims" and "Guarantee Claims," as such terms are defined in the Bar Date Order.

2.      This attachment (this "**Attachment**") is filed by Lehman Brothers Real Estate Partners, L.P. (the "**Claimant**"), as a supplement to the Claimant's written proof of claim and the to-be submitted on-line questionnaire (together, the "**Proof of Claim**") against Lehman Brothers Special Financing Inc. ("**LBSF**"), a Debtor in these chapter 11 cases.  All statements and assertions made in the Proof of Claim are incorporated herein by reference.

**B.    Basis for Claim**

3.    Claimant and LBSF are parties to that certain Master Agreement, dated as of May 19, 2003, including the Schedule dated as of May 19, 2003 (collectively, the "**Swap Agreement**"). The Schedule to the Master Agreement is annexed as <u>**Exhibit A**</u> hereto. Pursuant to the Swap Agreement, the parties thereto entered into one or more transactions.

4.    Additionally, in connection with transactions entered into under the Swap Agreement, Claimant provided $4,070,744.00 in cash collateral (the "**Cash Collateral**") to LBSF, an amount which LBSF has not returned to Claimant.

5.    Based on the foregoing, Claimant asserts a secured, unliquidated claim against LBSF in connection with any amounts that may be due and owing pursuant to the Swap Agreement. Furthermore, Claimant reserves the right to setoff any claims brought against Claimant in connection with transactions under the Swap Agreement by the amount of the Cash Collateral.

**C.    Reservation of Rights**

6.    Claimant reserves its right to seek any and all interest that it may be entitled to, including default interest, accrued and accruing, as well as any and all fees, costs, and expenses that it may seek reimbursement for, including attorneys' fees and costs related to the Proof of Claim against the Debtors and the chapter 11 cases. Furthermore, Claimant reserves the right to assert any and all counterclaims and defenses, including, but not limited to, setoff of the Cash Collateral.

7.    The filing of this Attachment and the Proof of Claim (including any documents or attachments submitted in connection therewith) does not constitute a concession or admission by Claimant of liability, of any facts, or as to whether all or a portion of the claims are prepetition or

2

postpetition in connection with any claim that has been or may be asserted against Claimant or against the Debtors and their estates.

8.    Claimant has filed this Attachment and Proof of Claim (including any documents or attachments submitted in connection therewith) under compulsion of the Bar Date Order entered in the Debtors' chapter 11 cases and to protect Claimant from forfeiture of its claims against the Debtors by reason of the dates established thereby. Claimant reserves the right to amend and/or supplement this Attachment and the Proof of Claim at any time, including after the Bar Date, in any manner, and/or to file additional proofs of claim for any additional claims that may be based on the same or additional documents or grounds of liability or to assert that such claims are entitled to rights and priorities afforded under sections 365, 503 or 507 of the Bankruptcy Code.

9.    The filing of this Attachment and the Proof of Claim are not and shall not be deemed or construed as: (a) a waiver or release of Claimant's rights against any person, entity, or property, or a waiver of the right to compel the Debtors to return property of Claimant currently in the possession of the Debtors; (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Claimant to a jury trial in a Bankruptcy Court or any other court in any proceeding as to any and all matters herein or in any case, controversy, or proceeding related

3

hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding that may be commenced in this case against or otherwise involving Claimant; or (g) an election of remedies.

10.    All notices regarding this Attachment and the Proof of Claim should be sent to Lehman Brothers Real Estate Partners, L.P., 1271 Avenue of the Americas, 38th Floor, New York, New York 10020, Attn: Judy Turchin and Ji Yeong Chu, with copies to Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Paul M. Basta, Esq. and Cindy Y. Chen, Esq.

**Exhibit A**

**Schedule to the Master Agreement**

(Multicurrency-Cross Border)

SCHEDULE
to the
MASTER AGREEMENT

dated as of 19 May, 2003

between

Lehman Brothers Special Financing Inc     and     Lehman Brothers Real Estate Partners, L.P.
        ("Party A")                                                            ("Party B")

**PART 1**

**Termination Provisions and Certain Other Matters**

(1)     "**Specified Entity**" means, in relation to Party A, for the purpose of:

Section 5(a)(v), none;

Section 5(a)(vi), none;

Section 5(a)(vii), none; and

Section 5(b)(iv), none;

          and, in relation to Party B, for the purpose of:

Section 5(a)(v), none

Section 5(a)(vi), none;

Section 5(a)(vii), none; and

Section 5(b)(iv), none.

(2)     "**Specified Transaction**" will have the meaning specified in Section 14.

(3)     The "**Cross-Default**" provisions of Section 5(a)(vi) will apply to Party A, and Party B, and for such purpose:

    (a)     "**Specified Indebtedness**" will have the meaning specified in Section 14, except that such term shall not include obligations in respect of deposits received in the ordinary course of such party's banking business.

319179:v01

(b) "**Threshold Amount**" means, with respect to Party A, means the lesser of (i) USD 40 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency)and with respect to Party B, the lesser of USD25,000,000, or the equivalent thereof in any other currency or currencies, and an amount equal to two percent (%) of the shareholders' equity of Party B plus any uncalled capital commitments of the partners of Party B. A party's shareholders' equity shall be determined in accordance with generally accepted accounting principles in the United States of America ("GAAP"), consistently applied, as at the end of such party's most recently completed fiscal year.

(c) Section 5(a)(vi) of this Agreement will be deemed to be amended to include the following Clause "(3)":

"or (3) a default, event of default, or other similar condition or event (however described) occurs and is continuing which entitles any person or entity to terminate its commitment under any agreement to lend or advance or make available funds to a party (or any applicable Specified Entity) in respect of an aggregate amount in excess of the Threshold Amount."

(4) The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" REFERS TO , (i) with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Lehman Brothers Holdings Inc., as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investor's Services, Inc. and BBB- as determined by Standard & Poor's Corporation, and (ii) with respect to Party B, that the creditworthiness of Party B (or the resulting, surviving or transferee entity of Party B) and its credit support parties taken as a whole is materially weaker. In the event of a split rating, the lower rating shall be determinative.

(5) The "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A or Party B.

(6) **Payments on Early Termination.** For the purpose of Section 6(e):

(i) Market Quotation will apply.

(ii) The Second Method will apply.

(7) "**Termination Currency**" means United States Dollars.

**Part 2: Tax Representations**

(a) **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party

under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.** Not Applicable.


## PART 3

## Agreement to Deliver Documents

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Annual Report of Party B containing consolidated financial statements certified by independent certified public accountants and prepared in accordance with GAAP. | As soon as available and in any event not later than 120 days after the end of each fiscal year of Party B | Yes |
| Party B | Unaudited consolidated financial statements of Party B for a fiscal quarter prepared in accordance with GAAP. | As soon as available and in any event not later than 60 days after the end of each of the first three fiscal quarters of Party B | Yes |
| Party B | Certified copies of all corporate or partnership, as the case may be, authorizations and any other documents with respect to the execution, delivery and performance of this Agreement | Upon execution and delivery of this Agreement | Yes |

| Party B | The certificate of the chief financial officer of Party B, certifying on the date thereof that Party B is in compliance with the covenants and agreements set forth in this subparagraph (14) of Part 5 of the Schedule to this Agreement (and including a calculation of the figures used to make such certification). | Upon execution and delivery of this agreement and thereafter upon Party A's request therefor. | Yes |
| Party B | A guarantee of the Funds in the form of Exhibit II to this Schedule | Upon execution and delivery of this Agreement | No |
| Party A | A guarantee of Holdings in the form of Exhibit III to this Schedule. | Upon execution of this Agreement | No |
| Party A and Party B | Certificate of authority and specimen signatures of individuals executing this Agreement, Confirmations and each Credit Support Document (as applicable) | Upon execution and delivery of this Agreement and thereafter upon request of the other party | Yes |
| Party A and Party B | Credit Support Annex | Upon execution and delivery of this Agreement | Yes |

## **PART 4**

### **Miscellaneous**

(1)    **Address for Notices**. For the purpose of Section 12(a) of this Agreement:

Address for notice or communications to Party A:

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attention:    Documentation Manager
Telephone No.: (212) 526-7187
Facsimile No.: (212) 526-7672

For all purposes.

In the case of Party B,  a guarantee of Party B's obligations hereunder in the form annexed hereto as Exhibit III to this Schedule and the Credit Support Annex annexed hereto.

(7)    **Credit Support Provider**.

Credit Support Provider means in relation to Party A: Holdings.

Credit Support Provider means in relation to Party B: The Funds

(8)    **Governing Law**.  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(9)    **Netting of Payments**. Section 2(c)(ii) of this Agreement will apply.

(10)    "**Affiliate**" will have the meaning specified in Section 14 of this Agreement.

## PART 5

### Other Provisions

(1)    **Set-off**.  Section 6 of the Agreement is hereby amended by adding a new subsection (f):

Set-off.  Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), or in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount) will be discharged promptly and in all respects to the extent it is so set-off).  X will give notice to the other party of any set-off effected under this provision.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

319179:v01                                          6

Address for notice or communications to Party B:

Lehman Brothers Real Estate Partners, L.P.
Attention: Edward Williams
One Broadgate, Ground Floor
London EC 2M 7HA
Facsimile No.: 44-207-256-4223

Cc Rodolpho Amboss
Lehman Brothers Real Estate Partners, L.P.
399 Park Avenue
8th Floor
New York
10022
Facsimile 001 646 758 4373

Cc Jeffrey Bailey
Lehman Brothers Real Estate Partners, L.P.
399 Park Avenue
8th Floor
New York
10022
Facsimile 001 646 758 2818

(2)    **Process Agent**.  For the purpose of Section 13(c):

Party A appoints as its Process Agent:  Not applicable.
Party B appoints as its Process Agent:  Not applicable.

(3)    **Offices**.  The provisions of Section 10(a) will apply to this Agreement.

(4)    **Multibranch Party**.  For the purpose of Section 10 of this Agreement:

Party A is not a Multibranch Party

Party B is not a Multibranch Party.

(5)    **Calculation Agent**.  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(6)    **Credit Support Documents**.

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit II to this Schedule and the Credit Support Annex annexed hereto.

319179:v01                              5

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other party when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(2)    **Waiver of Jury Trial**. Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this Section.

(3)    **Further Representation/Eligible Contract Participant**. Each party represents to the other party (which representation will be deemed to be repeated by such party on each date on which a Transaction is entered into) that it is an "eligible contract participant", as defined in the Commodity Futures Modernization Act of 2000.

(4)    **Relationship Between Parties**. The following representation shall be inserted as a new Section 3(g) of this Agreement:

"(g)    **Relationship Between Parties**. Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)    **Non-Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    **Assessment and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

        (iii)    **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

(5)    **Additional Party B Representation**: Party B represents to Party A (at all times until termination of this Agreement) that:

    (i) Any derivatives or foreign exchange transaction entered into by Party B with Party A or with any other derivatives or foreign exchange dealer shall be solely for hedging purposes and not for speculation.

(6)    **ISDA Definitions.** Reference is hereby made to the 2000 ISDA Definitions (the "2000 Definitions") and the 1998 FX and Currency Option Definitions (the "FX Definitions") (collectively the "ISDA Definitions") each as published by the International Swaps and Derivatives Association, Inc., which are hereby incorporated by reference herein. Any terms used and not otherwise defined herein which are contained in the ISDA Definitions shall have the meaning set forth therein.

(7)    **Scope of Agreement.** Notwithstanding anything contained in this Agreement to the contrary, any transaction which may otherwise constitute a "Specified Transaction" for purposes of this Agreement which has been or will be entered into between the parties shall constitute a "Transaction" which is subject to, governed by, and construed in accordance with the terms of this Agreement, unless any Confirmation with respect to a Transaction entered into after the execution of this Agreement expressly provides otherwise.

(8)    **Inconsistency.** In the event of any inconsistency between any of the following documents, the relevant document first listed below shall govern: (i) a Confirmation; (ii) the Schedule and an ISDA Credit Support Annex (as applicable); (iii) the ISDA Definitions; and (iv) the printed form of ISDA Master Agreement and ISDA Credit Support Annex (as applicable). In the event of any inconsistency between provisions contained in the 2000 Definitions and the FX Definitions, the FX Definitions shall prevail.

(9)    **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(10)    **Transfer.** Notwithstanding Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate.

(11)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a

Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(12)    **Service of Process.**  The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(13)    **Outstanding Specified Transactions.**  Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between Party A and Party B shall be subject to the terms hereof

(14)    <u>**Further Agreements of Party B.**</u>

(i)    Party B's Net Worth (as hereinafter defined) shall at all times be more than the greater of (A) four times the sum of the Recourse Indebtedness (hereinafter defined) of Party B, and (B) $250 Million.

The term **"Net Worth"** shall mean, at any time (without duplication) the sum of the total assets as reflected on the balance sheet of Party B and the Funds, <u>plus</u> any uncalled capital commitments of the partners of Party B and the Funds, <u>less</u> total liabilities as reflected on the balance sheets of Party B and the Funds.

(ii)    Recourse Indebtedness incurred by Party B shall not be more than $250 Million.

The term **"Recourse Indebtedness"** shall mean and include at all times (without duplication): (A) all indebtedness and liabilities of Party B and the Funds for borrowed money or for the deferred purchase price of property or services, as reflected on the balance sheets of Party B and the Funds, (B) all obligations of Party B and the Funds in respect of any capital lease as reflected on the balance sheet of Party B and the Funds prepared in accordance with GAAP, (C) net obligations of Party B and the Funds related to interest rate and foreign currency hedging agreements (including but not limited to the marked-to-market exposure of Party B and the Funds reflected on the applicable balance sheet), and (D) all contingent obligations of and guarantees issued by Party B and the Funds to the extent required to be reflected on the balance sheet of Party B and the Funds, including the notes thereto, prepared in accordance with GAAP, but shall not include indebtedness secured by uncalled capital commitments of the partners of Party B and the Funds.

(iv)    Party B shall report to Party A, on a quarterly basis, the net mark-to-market positions of Party B and the Funds (separated by currency and type of transaction), and the amount of any credit line available to Party B from other derivative and foreign exchange dealers.

(v)    Party B agrees with Party A that any derivatives or foreign exchange transaction entered into by Party B with Party A or with any other derivatives or foreign exchange dealer shall be solely for hedging purposes and not for speculation.

(vi)    Party B shall provide to Party A, together with each financial statement required under Part 3 hereof, a certificate of the chief financial officer of Party B and the Funds, certifying on the date thereof that Party B is in compliance with the covenants and agreements set forth in this subparagraph (14) of Part 5 of the Schedule to this Agreement (and including a calculation of the figures used to make such certification).

(15)    **Additional Definition.**   Section 14 is hereby amended by adding the following definition:

"**Funds**" shall mean Lehman Brothers P.A. LLC Delaware, USA; Lehman Brothers Partnership Account 2000/2001, L.P. Delaware, USA; Lehman Brothers Offshore Partnership Account 2000/2001, L.P. Bermuda; Lehman Brothers Real Estate Partnership (General Partnership) Delaware, USA; Lehman Brothers/PSERS Real Estate, L.P. Delaware, USA; Lehman Brothers Real Estate Pension Partners, L.P. Delaware, USA; Lehman Brothers Real Estate Fund, L.P. Delaware, USA; Lehman Brothers Offshore Real Estate Fund, L.P. Bermuda; Lehman Brothers Offshore Real Estate Partners, L.P. Bermuda; Lehman Brothers Real Estate Capital Partners I, L.P. Delaware , USA; Lehman Brothers Offshore Real Estate Capital Partners I, L.P. Bermuda; Lehman Brothers Offshore (Europe 1) Real Estate Partners, L.P. Bermuda; Lehman Brothers (Europe 2) Real Estate Partners, L.P. Delaware, USA; Lehman Brothers Offshore (Europe 3) Real Estate Partners, L.P. Bermuda and Lehman Brothers Offshore (Europe 4) Real Estate Partners, L.P. Bermuda.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)    **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i)    <u>Incorporation of 1998 FX and Currency Option Definitions</u>.   The 1998 FX and Currency Option Definitions (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>.   The following amendments are made to the 1998 Definitions:

(1)    Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

(b)    **Currency Obligation.**   "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(2)    The following provision is hereby added to Section 3.4:

(c)    **Remedies in Event of Non-Payment.**   If a Premium is not received on the Premium Payment Date, the Seller may elect: (i) to accept a late payment of such Premium; (ii) to give written notice of such non-payment and, if such payment

shall not be received within two (2) Local Business Days of such notice, treat the related Currency Option Transaction as void; or (iii) to give written notice of such non-payment and, if such payment shall not be received within two (2) Local Business Days of such notice, treat such non-payment as an Event of Default under Section 5(a)(i). If the Seller elects to act under clause (i) of the preceding sentence, the Buyer shall pay interest on such Premium in the same currency as such Premium from the day such Premium was due until the day paid at the Default Rate; if the Seller elects to act under clause (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and actual damages incurred in connection with such unpaid or late Premium in the same currency as such Premium at the then prevailing market rate and any other costs or expenses incurred by the Seller in covering its obligations (including, without limitation, a delta hedge) with respect to such Currency Option Transaction.

(3) Section 3.6(a) is hereby amended by deleting in its entirety the final sentence thereof and adding in its place the following:

"A Currency Option Transaction may be exercised in whole or in part. If a Currency Option Transaction is exercised in part, the unexercised portion shall not be extinguished thereby but shall remain a Currency Option Transaction to the extent of such unexercised portion until the earlier of: (i) the expiration of the Currency Option Transaction; or (ii) an exercise of the Currency Option Transaction that leaves no remaining unexercised portion thereof."

(b) **Confirmations.** Any confirmation in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement even where not so specified in such confirmation and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as modified therein. Without limitation of the foregoing, where an FX Transaction or Currency Option Transaction is confirmed by means of exchange of electronic messages on an electronic messaging system or by means of facsimile or telex (whether manually or automatically generated) or other document or confirming evidence exchanged between the parties confirming such Transaction, such messages, facsimile transmission, document or evidence shall constitute a Confirmation for the purposes of this Agreement even where not so specified therein. FX Transactions and Currency Option Transactions shall be promptly confirmed by the parties by Confirmations exchanged by mail, telex, facsimile or other electronic means. Unless either party objects to the terms of an FX Transaction or Currency Option Transaction contained in any Confirmation within three (3) Local Business Days of receipt thereof, the terms of such Confirmation shall be deemed correct and accepted absent manifest error, unless a corrected Confirmation is sent by a party within such three-day period, in which case the party receiving such corrected Confirmation shall have two (2) Local Business Days after receipt thereof to object to the terms contained in such corrected Confirmation.

(c) **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

(i) Netting, Offset and Discharge with Respect to Currency Options. The following

provisions shall apply to Currency Option Transactions:

(1)    If, on any date, and unless otherwise mutually agreed by the parties, Premium would otherwise be payable hereunder in the same currency between a pair of Offices of the parties, then, on such date, each party's obligation to make payment of any such Premium will be automatically satisfied and discharged and, if the aggregate Premium(s) that would otherwise have been payable by such Office of one party exceeds the aggregate Premium(s) that would otherwise have been payable by such Office of the other party, replaced by an obligation upon the party by whom the larger aggregate Premium(s) would have been payable to pay the other party the excess of the larger aggregate Premium(s) over the smaller aggregate Premium(s).

(2)    If, on any date, and unless otherwise mutually agreed by the parties, amounts other than Premium payments would otherwise be payable hereunder in the same currency between a pair of Offices of the parties, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by such Office of one party exceeds the aggregate amount that would otherwise have been payable by such Office of the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay the other party the excess of the larger aggregate amount over the smaller aggregate amount.

(3)    Unless otherwise agreed, any Call or any Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, written by the other party, such termination and discharge to occur automatically upon the payment in full of the last Premium payable in respect of such Currency Option Transactions; provided that such termination and discharge may only occur in respect of Currency Option Transactions:

(A)    each being with respect to the same Put Currency and the same Call Currency;

(B)    each having the same Expiration Date and Expiration Time, and with respect to Bermuda Style Options, each having the same Specified Exercise Dates;

(C)    each being of the same style, i.e., either both being American Style Options or both being European Style Options or both being Bermuda Style Options;

(D)    each having the same Strike Price;

(E)    neither of which shall have been exercised by delivery of a Notice of Exercise;

(F)    which are entered into by the same Offices of the parties; and

319179:v01                                    12

(G)     which are otherwise identical in terms that are material for the purposes of offset and discharge;

and, upon the occurrence of such termination and discharge, neither party shall have any further obligation to the other party in respect of the relevant Currency Option Transactions or, as the case may be, parts thereof so terminated and discharged. In the case of a partial termination and discharge (i.e., where the relevant Currency Option Transactions are for different amounts of the Currency Pair), the remaining portion of the Currency Option Transaction which is partially discharged and terminated shall continue to be a Currency Option Transaction for all purposes of this Agreement.

(ii)    <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

(1)     Unless otherwise agreed to by the parties hereto, whenever an FX Transaction is entered into between a pair of Netting Offices of the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between such Netting Offices, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation determined as follows:  (A) if the canceled Currency Obligations evidence an undertaking by the same party to deliver the underlying currency, the new Currency Obligation shall equal the aggregate of the canceled Currency Obligations, and (B) if the canceled Currency Obligations evidence an undertaking by each party to deliver the underlying currency, the amount of the underlying currency to be delivered by each party under the canceled Currency Obligations shall be compared, and the new Currency Obligation shall equal the amount by which the Currency Obligation of the party having the greater obligation with respect to such currency exceeds the Currency Obligation of the party having the lesser obligation with respect to such currency.  Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(2)     The provisions of Part 6(c)(ii)(1) above shall apply notwithstanding that either party (A) may fail to send out a Confirmation, (B) may not on its books treat the Currency Obligations as canceled and simultaneously replaced by a new Currency Obligation as provided herein, or (C) may send out a Confirmation that incorrectly states any term of a Currency Obligation.

(3)     If on any Settlement Date, and unless otherwise mutually agreed by the parties, Currency Obligations (which are not subject to the provisions of Part 6(c)(ii)(1) hereof) for the delivery of the same currency shall exist between a pair of Netting Offices of the parties, then on such Settlement Date, each party's Currency Obligation to deliver that currency will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been delivered by such Netting Office of one party exceeds the aggregate amount that would otherwise have been delivered by such Netting Office of the other party, replaced by a Currency Obligation upon the party by whom the larger aggregate amount would have been deliverable to deliver to the other

319179;v01                                    13

party the excess of the larger aggregate amount over the smaller aggregate amount.

(4)     For the purposes of this Part 6(c), "Netting Offices" means (i) with respect to Party A, New York; and (ii) with respect to Party B, New York. The Netting Office with respect to a party may be modified from time to time pursuant to notice given in accordance with the terms of Section 12.

(d) **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:  _____
Name:      ZDENKA S. GRISWOLD
Title:       Authorized Signatory
              LEHMAN BROTHERS
              SPECIAL FINANCING INC.

LEHMAN BROTHERS REAL ESTATE PARTNERS, L.P., a Delaware limited partnership

By:     LEHMAN BROTHERS REAL ESTATE ASSOCIATES, L.P., a Delaware limited partnership, its general partner

    By:     PROPERTY ASSET MANAGEMENT INC., a Delaware corporation, its general partner

        By:  _____
        Name:
        Title:       Rodolpho Amboss
                     Authorized Signatory

H
A
N
D

D
E
L
I
V
E
R
Y

**FILED / RECEIVED**

**SEP 2 2 2009**

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY: _____ DATE _____ TIME _____