**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **LEHMAN BROTHERS HOLDINGS, INC.,** | ) | **Case No. 08-13555 (JMP)** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| ———————————————————— | ) | |


# MEMORANDUM OF LAW OF MIDFIRST BANK IN OPPOSITION TO DEBTORS' TWO HUNDRED FORTY-FIFTH OMNIBUS OBJECTION TO CLAIMS


Dated:  January 11, 2012


SUTHERLAND ASBILL & BRENNAN LLP

Paul B. Turner (*pro hac vice*)
1001 Fannin Street, Suite 3700
Houston, Texas  77002
Tel:  (713) 470-6105

Mark D. Sherrill (*pro hac vice*)
1275 Pennsylvania Avenue, NW
Washington, DC  2004
Tel:  (202) 383-0100

*Counsel to MidFirst Bank*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT …………………………………………    1

II.     FACTUAL BACKGROUND …………………………………………..    2

III.    PROCEDURAL BACKGROUND ………………………………………    5

IV.     ARGUMENT ………………………………………………………..    6

    A.    MIDFIRST IS PERMITTED TO PROVE THE CONTENTS
        AND EXISTENCE OF THE LBHI GUARANTY, WHICH
        HAS BEEN LOST …………………………………………………    6

    B.    THE MERCHANTS EXCEPTION TO THE STATUTE OF
        FRAUDS APPLIES …………………………………………………..    9

    C.    THE QUALIFIED FINANCIAL CONTRACT EXCEPTION
        TO NEW YORK'S STATUTE OF FRAUDS APPLIES ………    11

    D.    IN THE ALTERNATIVE, THE STATUTE OF FRAUDS
        SHOULD NOT APPLY BECAUSE LBHI WAS
        ON NOTICE OF ITS OBLIGATION …………………………..    12

        1.    The Master Agreement and the LBHI Guaranty Should
            Be Considered One Transaction…………………………    13
        2.    To the Extent Necessary, LBSF and LBHI Should
            Be Treated as One Entity……………………………….    14

    E.    IF NO WRITTEN CONTRACT EXISTS BETWEEN LBHI
        AND MIDFIRST, THEN OKLAHOMA LAW APPLIES AND
        PERMITS THE EXISTENCE OF AN ORAL GUARANTY …..    15

    F.    IF NO WRITTEN CONTRACT EXISTS BETWEEN LBHI
        AND MIDFIRST, THEN MIDFIRST IS ENTITLED TO RELIEF
        UNDER ANY OF SEVERAL EQUITABLE THEORIES………    16

        1.    MidFirst Is Entitled to Relief under a
            Theory of Promissory Estoppel…………………………    16

        2.    MidFirst Is Entitled to Relief under a
            Theory of Unjust Enrichment……………………………    18

        3.    MidFirst Is Entitled to Relief under an
            Implied in Fact Contract …………………………………    21

V.      CONCLUSION …………………………………………………….....    22

# TABLE OF AUTHORITIES

## *Cases*

*In re Atkins*, 139 B.R. 39 (Bankr. M.D. Fla. 1992) …………………………………….. 13

*Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113 (N.Y. 1989)…………………… 10

*Bourke v. Western Bus. Prods. Inc.*, 120 P.3d 876 (Okla. Civ. App. 2005) …………… 21

*Central Ill. Light Co. v. Consolidated Coal Co.*, 349 F.3d 488 (7th Cir. 2003)………... 8

*Citibank, N.A. v. United Subcontractors, Inc.*, 581 F.Supp. 2d 640 (S.D.N.Y. 2008)…. 9 -10

*City of Tulsa v. Bank of Oklahoma, N.A.*, 2011 WL 4790939 (Okla. Oct. 11, 2011)….. 18

*Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289 (7 th Cir. 2003) …………………………… 8

*Copeland Corp. v. Choice Fabricators Inc.*, 345 Fed. Appx. 74 (6th Cir. 2009)………. 8

*Crossvilee v. Kemper Design Ctr.*, 758 F.Supp. 517 (M.D. Tenn. 2010)……………… 21

*Davis v. Caldwell*, 445 N.Y.S.2d 63 (N.Y. 1981)……………………………………… 16

*Drumright Hotel Co. v. Frates Co.*, 53 P.2d 1127 (Okla. 1936) ……………………….. 15

*Greenwood Place, LP v. Huntington Nat'l Bank*,
2011 WL 304727 (S.D. Ind. Jan. 25, 2011) …………………………………………… 13

*I.G. Second Generation Partners, L.P. v. Duane Reade*,
793 N.Y.S.2d 379 (N.Y. App. Div. 2005)……………………………………………… 21

*Kwon v. Yun*, 606 F.Supp.2d 344 (S.D.N.Y. 2009)…………………………………….. 16

*Louis Price Paper Co. v. Federation Employment & Guidance
Serv., Inc.*, 1994 WL 116649 (N.Y. Sup. Ct. Feb. 28, 1994) ………………………….. 9, 10

*Lacy v. Wozencraft*, 105 P.2d 781 (Okla. 1940) ………………………………………. 17

*Leibowitz v. Cornell Univ.*, 584 F.3d 487 (2d Cir. 2009)……………………………… 18

*Love v. Spector*, 627 N.Y.S.2d 87 (N.Y. App. Div. 1995) ……………………………... 7

*Moore v. Dirt Motorsports, Inc.*, 2009 WL 2997077 (W.D. Okla. Sept. 15, 2009)……. 15

*Posner v. Rosenbaum*, 270 N.Y.S. 849 (N.Y. App. Div. 1934) ………………………… 8

*Read v. Price*, [L.R. 1909] 2 K.B. 724 …………………………………………………... 8

*Russel v. Board of County Commissioners, Carter County*
952 P.2d 492 (Okla. 1940)……………………………………………………………… 17

*Super v. Abdelazim*, 527 N.Y.S.2d 591 (N.Y. App. Div. 1988)………………………… 22

*Taft v. Equitable Life Assurance Soc'y*, 569 N.Y.S.2d 660 (N.Y. App. Div. 1991)……. 7

*Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011) …………………. 13

*Weinreb v. Hospital for Joint Diseases Orthopaedic*
*Inst.*, 404 F.3d 167 (2d Cir. 2005)……………………………………………………    17

*Wells Fargo Bank, N.A. v. Sharma*, 642 F.Supp.2d 242 (S.D.N.Y. 2009) …………....    9

## Statutes

N.Y. Gen. Oblig. Law § 5-701 …………………………………………………………....6, 11

N.Y. Uniform Commercial Code § 2-104 …………………………………………………    9

Okla. Stat. tit. 15 § 2 …………………………………………………………………....    15

## Secondary Authorities

"Freddie Mac Announces Resignation of Bruce Witherell as
Chief Operating Officer," Standard & Poor's Daily News (Feb. 10, 2011)……………    2

Jeff Clabaugh, "Freddie Mac COO Bruce Witherell Resigns,"

Wash. Bus. J. (Feb. 9, 2011) …………………………………………………………..    2

"Movers & Shakers," Daily Deal, (Feb. 11, 2011)………………………………………    2

N.Y. Jur.2d *Contracts*, § 521 …………………………………………………………..    21

N.Y. Jur.2d *Estoppel*, § 51 ……………………………………………………………    16

N.Y. Jur.2d *Frauds, Stat. of* § 326 …………………………………………………..    7

Restatement (Second) of Contracts, § 132 (1981)………………………………    13

Substantially contemporaneously herewith, MidFirst Bank ("MidFirst") has filed its Response to Debtors' Two Hundred Forty-Fifth Omnibus Objection to Claims (the "Response"), and in connection, it files this Memorandum of Law in Opposition to Debtors' Two Hundred Forty-Fifth Omnibus Objection to Claims (the "MidFirst Brief") and respectfully states as follows:

## I. PRELIMINARY STATEMENT

Nearly ten years before the Lehman bankruptcy, MidFirst entered into a master agreement governing interest-rate swap transactions with Lehman Brothers Special Financing Inc. ("LBSF"). The overall transaction included a requirement that LBSF's ultimate parent, Lehman Brothers Holdings Inc. ("LBHI" and collectively with LBSF and other debtor affiliates, the "Debtors"), issue a guaranty to MidFirst of all of LBSF's payment obligations.

When LBHI and LBSF filed their bankruptcy petitions, MidFirst exercised its right to terminate its derivative transactions with LBSF. At that time, the underlying transactions were valued in LBSF's favor, but in an amount less than the collateral held by LBSF. LBSF had various contractual obligations to return the posted collateral, but did not do so. MidFirst therefore asserted claims against LBSF and LBHI in this bankruptcy.

The Debtors now claim that LBHI never issued the parent company guaranty that was promised long ago. MidFirst disputes that the guaranty was never issued, and believes that it may have been issued and subsequently lost. MidFirst seeks to have the Court treat the guaranty in a manner consistent with other lost contracts under New York law, or alternatively, to allow the parties to engage in discovery to determine the whereabouts of the guaranty. Even if the Court is unwilling to allow MidFirst to assert its lost guaranty claims, MidFirst has ample means

to recover on its claim against LBHI under either an oral guaranty or any of several equitable theories.

## II.  FACTUAL BACKGROUND

On January 20, 1999, MidFirst entered into that certain ISDA Master Agreement (the "Master Agreement") with LBSF.  The Master Agreement includes several component parts:  a form ISDA Master Agreement, a Schedule negotiated by LBSF and MidFirst (the "Parties"), a form Credit Support Annex (the "CSA") and a Paragraph 13 to the CSA negotiated by the Parties.

The Master Agreement was signed by Bruce M. Witherell for LBSF and Tim Tackett for MidFirst.  Multiple media reports indicate that Mr. Witherell previously was an employee of LBHI.[1]

MidFirst's practice was to obtain credit support and signed guaranties when it traded with subsidiaries of Wall Street banks.  Consistent with that approach, the Master Agreement included the following provisions (the "LBHI Provisions"):

(a)     Part 4(g) of the Schedule lists LBHI as the Credit Support Provider to LBSF;

(b)     Part 4(f) indicates that a guaranty (the "LBHI Guaranty") by LBHI of LBSF's payment obligations under the Master Agreement would be delivered to MidFirst;

(c)     Exhibit A to the Schedule was an unsigned, but written "Guarantee of Lehman Brothers Holdings Inc.";

(d)     Part 1(c) of the Schedule provides a Threshold Amount for LBHI;

(e)     Part 3(b) of the Schedule requires LBSF to provide financial documentation for LBHI;

(f)     Part 3(b) requires the delivery of the LBHI Guaranty, and LBSF represents that the LBHI Guaranty is "true, accurate and complete in every material respect."

---

[1]    *See* "Movers & Shakers," <u>Daily Deal</u>, (Feb. 11, 2011) (stating "[b]efore joining Morgan [Stanley] in 2006, Witherell spent 15 years at Lehman Brothers Holdings Inc."); "Freddie Mac Announces Resignation of Bruce Witherell as Chief Operating Officer," <u>Standard & Poor's Daily News</u> (Feb. 10, 2011); Jeff Clabaugh, "Freddie Mac COO Bruce Witherell Resigns," <u>Wash. Bus. J.</u> (Feb. 9, 2011).

On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code, commencing the above-captioned bankruptcy case (the "Bankruptcy Case").  On October 3, 2008 (the "LBSF Petition Date"), LBSF filed its own bankruptcy petition under chapter 11 of the Bankruptcy Code.

Each of the bankruptcy filings constituted an Event of Default under Section 5(a)(vii) of the Master Agreement.  On September 22, 2008, MidFirst exercised its contractual right to terminate all outstanding transactions under the Master Agreement due to the Event of Default triggered by LBHI's filing by sending a Notice of Termination (the "Termination Notice") to LBSF.  The Termination Notice established September 22, 2008 as the Early Termination Date of the Master Agreement.

By letter dated October 28, 2008, MidFirst provided to LBSF its calculations (the "Calculations Notice") pursuant to Section 6(e) of the Master Agreement.  The Calculations Notice indicated that the settlement amount of the terminated transactions under the Master Agreement was $2,860,394 in favor of LBSF.

On January 29, 2009, the Debtors held their first meeting of creditors (the "341 Meeting"), pursuant to section 341 of the Bankruptcy Code.  At the 341 Meeting, LBHI Chief Executive Officer Bryan Marsal commented to the effect that LBHI had guarantied everything that wasn't nailed down.[2]

MidFirst subsequently revised its Section 6(e) calculations, and provided the revisions in its proofs of claim filed in the Bankruptcy Case.  Under the revised calculations, the settlement amount of the terminated transactions under the Master Agreement was modified to $3,990,703.50 in favor of LBSF.

---

[2]    Mr. Marsal's comments are paraphrased according to the recollection of counsel to MidFirst.  In the event that any issue arises over the content of Mr. Marsal's statement, MidFirst will review the audiotape of the United States Trustee from the 341 Meeting.

At all relevant times, LBSF has held $7,509,000 (excluding any Interest Amount) in posted collateral (the "Posted Collateral").  Under the terms of the Master Agreement, LBSF was obligated to hold the Posted Collateral in a separate account for the benefit of MidFirst.  Pursuant to Paragraph 8(b)(iii) of the CSA, LBSF was obligated to return the Posted Collateral immediately upon the filing of the LBHI bankruptcy petition.

In addition, five payments in the aggregate amount of $499,889.92 (the "Failed Payments") were due from LBSF to MidFirst in the time between the LBHI Petition Date and the LBSF Petition Date, but were never made.

On September 1, 2011, the Court entered an amended Order approving the Debtors' Disclosure Statement for Third Amended Joint Chapter Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement").   In their discussion of the settlement and compromise related to substantive consolidation issues, the Debtors made the following statements in the Disclosure Statement:

(a)      "Lehman[3] was operated and managed as a group along business lines";

(b)      "The same group of employees was responsible for the accounting of the books and records of all entities";

(c)      "The Debtors shared administrative and back-office functions";

(d)      "Derivative Contracts entered into by Lehman entities permitted Lehman to transfer the rights and obligations under such contracts to any other Lehman entity without the consent of the counterparty";

(e)      "Most employees in the United States were employees of LBI, which acted as a paymaster for Lehman";

(f)      "With a few exceptions, subsidiaries of LBHI did not have audited financial statements.  All reporting was done on a consolidated basis";

(g)      "The directors of LBHI's subsidiaries were appointed by LBHI.  Very few of LBHI's subsidiaries had independent directors";

---

[3]      The Disclosure Statement does not define "Lehman," but the term appears to be used to denote the entire Lehman Brothers enterprise.

(h)     "Excess cash from the subsidiaries was moved to LBHI at the end of each day";

(i)     "LBHI's board of directors and executive committee had responsibility for Lehman's firm-wide strategy, risk, funding, liquidity, operations and products. One investment committee existed for all Lehman's transactions";

(j)     "Lehman entities shared offices and operated from the same premises";

(k)     "Certain Debtors or subsidiaries had no employees or premises";

(l)     "A majority of the factors [addressing substantive consolidation] indicate that Lehman operated as a centralized business enterprise"; and

(m)     "Facts in support of the argument that creditors relied on the Lehman enterprise operating as a single unit include:

    (i)     generally, creditors of subsidiaries of LBHI did not have access to financial statements of such entities, but rather only access to consolidated financial statements was available;

    (ii)    most subsidiaries of LBHI did not have individual credit ratings or bank accounts;

    (iii)   Lehman presented itself as "Lehman Brothers," a single integrated enterprise;

    (iv)    counterparties to derivative contracts were generally not given a choice of entities with which to transact, [and] did not exhibit any concern in that respect; rather Lehman booked the transaction to an entity of its choice based on the type of transaction; and

    (v)     LBHI's guarantee of the obligations of its subsidiaries under derivative contracts was given as a matter of course and did not need to be requested or negotiated."

Disclosure Statement, pp. 53-57.

### III.   PROCEDURAL BACKGROUND

On September 21, 2009, MidFirst filed two proofs of claim:  (a) number 24664 (the "LBSF Claim"), asserting a general unsecured claim against LBSF in the amount of $4,018,186.42; and (b) number 24663 (the "LBHI Claim"), asserting a general unsecured claim against LBHI in the amount of $4,018,186.42.

On December 31, 2009, MidFirst and LBSF reached a settlement of the outstanding issues concerning the LBSF Claim. On March 23, 2010, MidFirst filed proof of claim number 66417 (the "Amended LBSF Claim"), asserting a general unsecured claim against LBSF in the amount of $3,850,000.00. The Amended LBSF Claim amended and superseded the LBSF Claim.

On December 12, 2011, the Debtors filed their Two Hundred Forty-Fifth Omnibus Objection to Claims (the "Claim Objection"). Exhibit A to the Claim Objection included MidFirst's LBHI Claim. The Claim Objection asserts that "LBHI has no liability for the [LBHI Claim and similarly situated claims] because they are based on Guarantees that have not been issued by and therefore cannot be enforced against LBHI." Claim Objection, ¶ 11.

## IV. ARGUMENT

MidFirst disputes the contentions in the Claim Objection and requests that the Court enter an Order allowing the LBHI Claim, number 24663. To the extent necessary, MidFirst requests a full evidentiary hearing – and the corresponding opportunity to take discovery – on the issues presented herein.

The Claim Objection is predicated entirely upon (a) the application of the New York version of the Statute of Frauds, N.Y. Gen. Oblig. Law 5-701, and (b) the assertion that the LBHI Guaranty was never executed. For the reasons discussed below, MidFirst contests several of the Debtors' contentions and conclusions, including the applicability of the Statute of Frauds.

### A.    MIDFIRST IS PERMITTED TO PROVE THE CONTENTS AND EXISTENCE OF THE LBHI GUARANTY, WHICH HAS BEEN LOST

As discussed above, numerous LBHI Provisions in the Master Agreement demonstrate that the parties intended for LBHI to issue the LBHI Guaranty. The text of the Master Agreement goes far beyond a mere mention of the LBHI Guaranty. It includes provisions that

integrate the guaranty into the mechanics of the Master Agreement.  For example, the Master Agreement includes a representation and warranty from LBSF that the LBHI Guaranty is "true, accurate and complete in every material respect."  Master Agreement, Schedule, Part 3(b).  Similarly, LBHI itself is interwoven into the Master Agreement.  Not only does it serve as a Credit Support Provider, which triggers its involvement in defaults and termination events, but LBHI also provides the basis for the "Threshold Amount" for determining the occurrence of a "Cross Default."  *See* Master Agreement, § 5(a)(vi); Schedule, Parts 1(c), 4(g).  Indeed, the Master Agreement included the written form of the LBHI Guaranty at issue.

In addition, Mr. Marsal's comments indicate that LBHI issued guaranties to substantially all of the Debtors' counterparties.  Likewise, the Disclosure Statement states that LBHI issued guaranties to derivatives counterparties "as a matter of course."  In light of those facts, it is reasonable to infer that the LBHI Guaranty was issued and now has been lost.

Under New York law, the Statute of Frauds "may not be invoked to bar a party to an allegedly lost contract from proving the existence and contents of the writing by parol and circumstantial evidence."  N.Y.Jur. 2d *Frauds, Stat. of* § 326.  In *Love v. Spector*, 627 N.Y.S.2d 87 (N.Y. App. Div. 1995), the court considered whether the Statute of Frauds prevented an action for royalties under a lost recording contract.  The court held:  "The instant action is not barred by the Statute of Frauds, since the plaintiff is entitled to the opportunity to prove, if she can, the existence and the contents of the lost writing 'by parol and circumstantial evidence.'"  *Id.* 627 N.Y.S.2d at 88 (citing *Taft v. Equitable Life Assurance Soc'y of U.S.*, 569 N.Y.S.2d 660 (N.Y. App. Div. 1991)).

Similarly, *Posner v. Rosenbaum*, 270 N.Y.S. 849 (N.Y. App. Div. 1934), cites to

Williston on Sales and a number of older English and New York cases to reach the same result.

Quoting from *Read v. Price*, [L.R. 1909] 2 K.B. 724, *Posner* notes:

> You may prove the existence of the writing by the ordinary law of evidence, and when the writing is lost, and the proof of the loss is satisfactory to the Court, you may give secondary evidence of the contents of the lost document, just as in cases where writing is required under the Statute of Frauds you can always prove the existence of the writing by parol evidence, if proof is given of the loss of the written document.

*Posner*, 270 N.Y.S. at 852 (quoting *Read*, 2 K.B. at 730).

The principle prohibiting the use of the Statute of Frauds in the context of lost contracts

makes sense from a policy perspective.  "The purpose of the statute of frauds is to prevent

unfounded oral contract claims."  *Copeland Corp. v. Choice Fabricators Inc.*, 345 Fed. Appx.

74, 77 (6th Cir. 2009).  Under the framework outlined in *Posner*, the party seeking to enforce the

contract must prove the existence and content of the writing.  Therefore, no oral contract is at

issue.  In other words, the intent of the statute of frauds "is to protect against the uncertainty of

oral testimony, and if there is no possible uncertainty there is no work for the statute to do."

*Central Ill. Light Co. v. Consolidated Coal Co.*, 349 F.3d 488, 491 (7th Cir. 2003) (Posner, J.).

Here, there is no uncertainty involved about the contents of the LBHI Guaranty.  The

contents of the writing are plain.  The only issue is whether the writing was signed by LBHI.

The  Seventh Circuit has noted:

> The purpose of the statute of frauds is to prevent a contracting party from creating a triable issue concerning the terms of the contract – or for that matter concerning whether a contract even exists – on the basis of his say-so alone.  That purpose does not require a handwritten signature, especially in a case … in which there is other evidence, and not merely say-so evidence, of the existence of the contract."

*Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2003) (Posner,  J.).  In this case, there is

a significant amount of other evidence in favor of the existence of the LBHI Guaranty, and none

of it is mere "say-so evidence."

As demonstrated in *Love* and *Posner*, the law requires that MidFirst be given the opportunity to prove the existence of LBHI Guaranty.  One aspect of MidFirst's ability to do so is for it to take discovery from the Debtors concerning the LBHI Guaranty.  Accordingly, MidFirst respectfully requests that the Court set an evidentiary hearing on this matter pursuant to Rule 9014-2 of the Local Rules of Bankruptcy Procedure, and enter a Scheduling Order providing for the opportunity for the parties to take discovery.

### B.   THE MERCHANTS EXCEPTION TO THE STATUTE OF FRAUDS APPLIES EVEN IF THERE WERE NOT A SIGNED GUARANTY

The Claim Objection quotes to section 5-701 of the New York General Obligations Law. That provision gives the general rule of the Statute of Frauds.  It is, however, subject to several exceptions and qualifications.  Among the exceptions that apply to the present facts is the "merchant's exception."

New York law provides:  "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."  *Louis Price Paper Co. v. Federation Employment & Guidance Serv., Inc.*, 1994 WL 116649, * 2 (N.Y. Sup. Ct. Feb. 28, 1994).

A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction."  *Id.* (quoting N.Y. Uniform Commercial Code 2-104(1)).  In New York, courts have applied the Uniform Commercial Code to matters concerning derivatives trades documented under the ISDA Master Agreement.  *See, e.g., Wells Fargo Bank, N.A. v. Sharma*, 642 F.Supp.2d 242, 251 (S.D.N.Y. 2009).  *Cf. Citibank, N.A. v. United Subcontractors,*

*Inc.*, 581 F.Supp.2d 640, 648 (S.D.N.Y. 2008). It follows that the Debtors and MidFirst constitute merchants, because they have knowledge and skills peculiar to the trading of such derivatives. *See also Louis Price Paper*, 1994 WL 11649 at *2 (noting "cases which give a broad definition of the term 'merchant'").

The special treatment afforded to merchants facilitates business practices and the flow of commerce. "Special merchant rules are sprinkled throughout article 2 of the Uniform Commercial Code, distinguishing the obligations of business people from others," notes the Court of Appeals of New York. *Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 121 (N.Y. 1989).

> Among the suggested motivations was to state clear, sensible rules better adjusted to the reality of what commercial transactions were (or should be), thereby promoting predictable, dependable, decent business practices… Section 2-201(2) recognized the common practice among merchants … to enter into oral sales agreements later confirmed in writing by one of the parties. Absent such a provision, only the party receiving the confirmatory writing could invoke the Statute of Frauds, giving that party the option of enforcing the contract or not, depending on how advantageous the transaction proved to be.

*Id.*

A similar policy is served here. MidFirst entered into the Master Agreement with the credit threshold amounts for LBSF contained in the CSA based on the promise of the LBHI Guaranty, which was a negotiated component of the larger transaction. Indeed, requiring such a parent guaranty was MidFirst's practice when trading with subsidiaries of Wall Street banks. In addition, the parties agreed in the Master Agreement that they intended to be bound by orally communicated transactions. *See* Master Agreement, § 9(e).

Now, the trades under the Master Agreement have settled in LBSF's favor. Because LBSF has failed to return collateral that it is contractually obligated to return, however, LBHI

retains some liability under the LBHI Guaranty.  The Debtors seek to have all of the benefits of

including the LBHI Guaranty in the original transaction, but without the attendant liabilities.

### C.    THE QUALIFIED FINANCIAL CONTRACT EXCEPTION TO NEW YORK'S STATUTE OF FRAUDS APPLIES

A second exception to New York's general Statute of Frauds rule is known as the

Qualified Financial Contract exception, found in section 5-701(b) of the New York General

Obligations Law.  It provides:

> An agreement, promise, undertaking or contract, which is valid in other respects and is otherwise enforceable, is not void for lack of a note, memorandum or other writing and is enforceable by way of action or defense provided that such agreement, promise, undertaking or contract is a qualified financial contract     … and (a) there is … sufficient evidence to indicate that a contract has been made, or (b) the parties thereto, by means of a prior or subsequent written contract, have agreed to be bound by the terms of such qualified financial contract from the time they reach agreement … on those terms.

N.Y. Gen. Oblig. Law § 5-701(b).

First, the parties to the Master Agreement agreed that it was a "qualified financial

contract."  Master Agreement, Schedule, Part 5(c).  In addition, New York law defines "qualified

financial contract" to include an agreement "for a rate swap, basis swap, forward rate transaction,

or an interest rate option."  N.Y. Gen. Oblig. Law § 5-701(b)(2)(f).  The parties entered into the

Master Agreement for the purpose of entering into interest-rate swaps.  *See generally* Master

Agreement.

Moreover, the definition also includes "an agreement which involves any other similar

transaction relating to a price or index."  N.Y. Gen. Oblig. Law § 5-701(b)(2)(h).  The LBHI

Guaranty is an agreement that involves the Master Agreement.  Accordingly, to the extent that it

is not incorporated into a single transaction, the LBHI Guaranty is also a "qualified financial

contract."

Thus, the application of the qualified financial contract exception turns on whether there is (a) sufficient evidence to indicate that a contract has been made, or (b) the parties have agreed to be bound by the terms of the qualified financial contract.  MidFirst wishes to take discovery of the Debtors on these questions, in part to analyze electronic communications to determine whether they contain evidence sufficient to indicate that a contract was made.   Separately, however, the parties have agreed to be bound, as evidenced in the LBHI Provisions of the Master Agreement.

**D.     IN THE ALTERNATIVE, THE STATUTE OF FRAUDS SHOULD NOT APPLY BECAUSE LBHI WAS ON NOTICE OF ITS OBLIGATION**

Even if the Court were to determine that the LBHI Guaranty was never executed and neither the merchants nor the qualified financial contracts exception to the Statute of Frauds should apply, MidFirst is nevertheless entitled to legal relief because (a) the Master Agreement and the LBHI Guaranty should be considered one transaction, and/or (b) LBSF and LBHI should be treated as one entity.

By demonstrating either proposition, MidFirst effectively proves that LBHI was on notice of its payment obligation, which obviates the purpose of the Statute of Frauds.  Indeed, MidFirst is able to demonstrate both propositions, because LBHI and the LBHI Guaranty were so fully integrated into the negotiation of the Master Agreement (and indeed, into the negotiation of all LBSF transactions).  The result is not only to obviate the *purpose* of the Statute of Frauds, however.  The consolidation of LBSF and LBHI, combined with the consolidation of the Master Agreement and the LBHI Guaranty into one transaction, also leads to the conclusion that MidFirst already has a binding signature for the LBHI Guaranty.

1.    **The Master Agreement and the LBHI Guaranty
Should Be Considered One Transaction[4]**

Numerous Statute of Frauds cases suggest that the Court should interpret the LBHI

Guaranty as being a part of the larger transaction embodied in the Master Agreement. "This

interpretive principle 'has particular force where the initial document requires execution of

another to accomplish the purpose of the first' or when one party's rights depend on interpreting

a series of transactions between other entities." *Weingarten Realty Investors v. Miller*, 661 F.3d

904, 911 (5th Cir. 2011). *See also Greenwood Place LP v. Huntington Nat'l Bank*, 2011 WL

304727 (S.D. Ind. Jan. 25, 2011); RESTATEMENT (SECOND) OF CONTRACTS, § 132 (1981) (stating

a contract "may consist of several writings if one of the writings is signed and the writings in the

circumstances clearly indicate that they relate to the same transaction").

Here, the Master Agreement plainly required LBHI to provide the LBHI Guaranty. That

provision of the Master Agreement was negotiated by the parties, and was essential to MidFirst

in its evaluation of the credit risks involved in the transaction. Likewise, the rights of MidFirst

in the transaction depend on the interpretation not only of the Master Agreement but of the LBHI

Guaranty as well.

"To incorporate a separate writing for purposes of the statute of frauds, one document

must refer to the other." *Greenwood Place, LP*, 2011 WL 304727, at *5. *See also In re Atkins*,

139 B.R. 39, 40 (Bankr. M.D. Fla. 1992) (stating "[s]everal writings, one signed, may be

aggregated to form an enforceable contract for Statute of Frauds purposes. However, the signed

writing must in some way refer to the unsigned documents"). In the event that MidFirst is

unable to locate the lost LBHI Guaranty, then the unsigned version that was attached to the

---

[4]    To the extent applicable, MidFirst repeats and realleges throughout the MidFirst Brief its arguments that
(a) the LBHI Guaranty and the Master Agreement should be regarded as one larger transaction, and (b) LBSF and
LBHI should be treated as one entity.

Master Agreement should also suffice.  The Master Agreement refers repeatedly to the LBHI Guaranty, which therefore must be incorporated into the larger transaction.

### 2.    To the Extent Necessary, LBSF and LBHI Should Be Treated as One Entity

MidFirst is aware of the substantive consolidation issues that arose in this bankruptcy case, and the manner of resolution of those issues.  MidFirst does not seek to reinitiate those issues.

For purposes of the analysis of the transaction between the Debtors and MidFirst, however, there is ample evidence to conclude that the parties treated LBSF and LBHI as one-and-the-same.  The numerous factors listed in the Disclosure Statement[5] and quoted above weigh heavily in favor of a finding that MidFirst transacted with "Lehman Brothers" generally and not with any one entity.

The facts surrounding the Debtors' signatory, Mr. Witherell, also point in favor of a single "Lehman Brothers" enterprise.  The signature block of the Master Agreement indicates that Mr. Witherell was a Managing Director, but it is unclear whether he was a Managing Director of LBSF or of LBHI.  Articles from the press suggest the latter.  *See* note 1, *supra*.

As with certain issues discussed above, MidFirst is entitled – at minimum – to take discovery to learn the answers to such questions before having its claim summarily resolved. More important, however, the presently available evidence demonstrates that LBSF and LBHI should be considered one integrated entity.  If LBSF and LBHI are considered one entity, then LBSF's signature on the Master Agreement is sufficient to bind LBHI to its guaranty

---

[5]    To the extent necessary, MidFirst requests that the Court take judicial notice of the contents of the Disclosure Statement and any other pleadings on the docket of the Bankruptcy Case that relate to the substantive consolidation issues that arose earlier in the case.

obligations – particularly in light of the legal principles discussed above, requiring the Master Agreement and the LBHI Guaranty to be considered one transaction.

### E. IF NO WRITTEN CONTRACT EXISTS BETWEEN LBHI AND MIDFIRST, THEN OKLAHOMA LAW APPLIES AND PERMITS THE EXISTENCE OF AN ORAL GUARANTY

The Debtors' arguments in the Claim Objection are entirely based on New York law. MidFirst agrees that New York law governs the Master Agreement between LBSF and MidFirst. New York law also governs the LBHI Guaranty.  If, however, the Court were to determine that the LBHI Guaranty does not exist and that LBHI must be treated as a separate entity from LBSF (*see supra*), then there is no contractual basis for the application of New York law.  Under such circumstances, the law of MidFirst's domicile, Oklahoma, should apply.

Numerous Oklahoma cases have recognized the validity of an oral guaranty.  *See, e.g., Drumright Hotel Co. v. Frates Co.*, 53 P.2d 1127, 1129 (Okla. 1936); *Thomas v. Williams*, 49 P.2d 557, 562 (Okla. 1935); *Fischer v. Bachwitz*, 5 P.2d 356, 358 (Okla. 1931).  The elements of an oral contract are the same as those of a written contract, less a writing.  "To establish the existence of a binding oral contract, [a party] must establish that 1) the parties were capable of contracting; 2) they consented to the terms; 3) the contract had a lawful object; and 4) there was sufficient consideration."  *Moore v. Dirt Motorsports, Inc.*, 2009 WL 2997077, *11 (W.D. Okla. Sept. 15, 2009) (citing Okla Stat. tit. 15 § 2 (1991)).

Here, the Debtors were capable of entering into a binding contract.  The LBHI Provisions in the Master Agreement (and the terms of the unsigned guaranty) demonstrate that there was a meeting of the minds with respect to LBHI's guaranty of LBSF's payment obligations; MidFirst can therefore prove that the parties consented to the terms.  There was nothing unlawful about the contract.

Finally, MidFirst provided consideration to the Debtors, both in the transactions underlying the Master Agreement and in the negotiated aspects of the Schedule to the Master Agreement. *See generally* Master Agreement, preamble. As discussed more fully below, that consideration flowed either directly to LBHI (if the company was run as a single enterprise) or indirectly to LBHI (in its role as ultimate parent of LBSF). Accordingly, MidFirst can demonstrate that a valid, binding oral guaranty existed under Oklahoma law from LBHI to MidFirst.

### F.  IF NO WRITTEN CONTRACT EXISTS BETWEEN LBHI AND MIDFIRST, THEN MIDFIRST IS ENTITLED TO RELIEF UNDER ANY OF SEVERAL EQUITABLE THEORIES

MidFirst believes that it is entitled to relief – or, at minimum, entitled to the use of the discovery process to determine further whether it is entitled to relief – based on the LBHI Guaranty. If, however, the Court determines that there is no written contract in existence between LBHI and MidFirst, then several equitable theories would become available to MidFirst. *See, e.g., Kwon v. Yun,* 606 F.Supp. 2d 344, 368 (S.D.N.Y. 2009); *Davis v. Caldwell*, 445 N.Y.S.2d 63, 65 (N.Y. 1981). If there is no written contract, then MidFirst would be able to demonstrate the applicability of promissory estoppel, unjust enrichment and an implied in fact contract under both Oklahoma and New York law.

### 1.  MidFirst Is Entitled to Relief under a Theory of Promissory Estoppel

"[P]romissory estoppel arises out of a breached promise in circumstances under which it is fair to hold the promisor to the terms of his or her promise." 57 5N.Y.Jur. 2d, *Estoppel*, § 51. The facts of this case perfectly fit that description, because of the LBHI Provisions in the Master Agreement.

Under New York law, promissory estoppel requires:  "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Weinreb v. Hospital for Joint Diseases Orthpaedic Inst.*, 404 F.3d 167, 172 (2d Cir. 2005). Oklahoma law provides that the "elements necessary to establish promissory estoppel are:  (1) a clear and unambiguous promise, (2) foreseeability by the promisor that the promisee would rely on it, (3) reasonable reliance upon the promise to the promisee's detriment and (4) hardship or unfairness can be avoided only by the promise's enforcement." *Russell v. Board of County Commissioners, Carter County*, 952 P.2d 492, 503 (Okla. 1997). *See also Lacy v. Wozencraft*, 105 P.2d 781, 783 (Okla. 1940).

Here, there can be little question that there was a promise.  The LBHI Provisions in the Master Agreement make clear that the Debtors promised to deliver the LBHI Guaranty to MidFirst.  *See, e.g.*, Master Agreement, Schedule, Part 3(b) ("Other documents to be delivered are … A guarantee of Holdings in the form of Exhibit A to this Schedule.")  Moreover, the degree of entanglement between LBSF and LBHI indicate that LBHI was surely aware of that promise.

MidFirst relied on the Debtors' promise in analyzing the credit risk associated with the Master Agreement.   The Debtors' Disclosure Statement acknowledges that "creditors of subsidiaries of LBHI did not have access to financial statements of such entities, but rather only access to consolidated financial statements was available."  Disclosure Statement, p. 57.  It was therefore difficult for counterparties such as MidFirst to evaluate the credit risk of a transaction with LBSF alone.  The addition of LBHI as a guarantor allowed MidFirst to perform a more thorough review of its counterparty's creditworthiness.  Moreover, LBHI was a publicly-held corporation, and therefore subject to more stringent accounting and securities-based regulations.

In short, the involvement of LBHI in the transaction placed an *imprimatur* on the transaction for MidFirst. Indeed, when dealing with Wall Street banks, MidFirst's practice is to require the involvement of the parent company bank, either as a direct trading counterparty or as a guarantor.

MidFirst's reliance was both foreseeable and reasonable. The Debtors surely knew of the desirability of the LBHI Guaranty, because they regularly issued parent company guaranties to derivatives counterparties. *See* Disclosure Statement, p. 56. In addition, as a sophisticated player in derivatives markets, the Debtors very likely relied on parent company guaranties with certain of their other counterparties.

MidFirst has been injured by its reliance on the Debtors' promise. Based on the assurances made by the Debtors, MidFirst expected to have a backstop against an LBSF default. The Debtors now threaten to back away from that promise, and to exacerbate the losses incurred by MidFirst from LBSF's failure to return its posted collateral (as described in more detail below). If the promise contained in the LBHI Provisions of the Master Agreement is not enforced, then injustice will ensue. It will be unjust for MidFirst to suffer greater losses. But moreover, it will also be unjust for LBHI to reap a windfall from its failure to satisfy the Debtors' promises. Accordingly, MidFirst can establish all of the criteria for promissory estoppel.

### 2. MidFirst Is Entitled to Relief under a Theory of Unjust Enrichment

For relief under a theory of unjust enrichment, New York law requires "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009). Similarly, Oklahoma law requires "enrichment to another, coupled with a resulting injustice." *City of Tulsa v. Bank of Oklahoma, N.A.*, 2011 WL 4790939, *5 (Okla. Oct. 11, 2011).

Here, LBHI has benefitted in two ways.  It received a direct benefit from the Master Agreement, because the Debtors ran their business as a single business entity, with no clear lines delineating between LBSF revenue and LBHI revenue.  *See* Disclosure Statement, pp. 53-55 (stating operating company revenue was moved to LBHI at end of each day, and certain operating companies had no dedicated employees or office space).  Moreover, because the cash of all Lehman subsidiaries was swept to LBHI on a daily basis, it is likely that the cash that rightfully belonged to MidFirst resided in an LBHI account at the time of the LBHI bankruptcy filing (which occurred in the early morning hours of a Monday).

In essence, any transaction with any of the Lehman entities was a transaction with "Lehman Brothers," the single enterprise.  *See* Disclosure Statement, p. 56 ("A majority of the factors [addressing substantive consolidation] indicate that Lehman operated as a centralized business enterprise").  The Disclosure Statement also illustrates the many ways in which the Debtors operated as a single business organization – for example, certain Lehman Brothers "subsidiaries had no employees or premises."  *Id.*

Because of the integrated nature of the Lehman Brothers enterprise, LBHI received a direct benefit from the MidFirst transaction, because LBHI and LBSF were essentially one and the same.  Even if that were not true, however, LBHI would have also received an indirect benefit from the income flowing from LBSF up to its ultimate parent, LBHI.

In the more pertinent time frame, LBHI benefits if the LBHI Guaranty does not exist, because it allows LBHI to retain a payment to MidFirst that it would otherwise be obligated to make.  Even more specifically, it allowed LBHI to retain the collateral that MidFirst had posted to LBSF during the overnight period leading up to the LBHI Petition Date.

That benefit to LBHI is necessarily a detriment to MidFirst, which is projected to receive 27.9 percent of its allowed claim against LBSF.  An allowed claim under the LBHI Guaranty would defray the attendant losses.  Moreover, MidFirst is further harmed because if its collateral had not been swept to LBHI, then MidFirst would have been legally permitted to attempt to recover its excess collateral during the period between the LBHI Petition Date and the LBSF Petition Date.

Furthermore, in weighing the equities, the Court may find it relevant that MidFirst's losses arise out of a failure to recover collateral – *i.e.*, property belonging to MidFirst – that was posted with LBSF.  When the Master Agreement was terminated, MidFirst was out of the money, but it had posted an amount of collateral to LBSF that was greater than LBSF's mark-to-market exposure.  Upon the termination of the Master Agreement, LBSF was contractually obligated "immediately to Transfer all Posted Collateral and the" interest thereon to MidFirst. Master Agreement, CSA, ¶ 8(b).  Even if LBSF did not make the immediate transfer of the posted collateral, the Master Agreement also required it to return to MidFirst any collateral "remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable." *Id.*, ¶ 8(c).

In addition, under the terms of the Master Agreement, LBSF was obligated to "exercise reasonable care to assure the safe custody of all Posted Collateral." *Id.*, ¶ 6(a).  Despite the contractual obligations described above, LBSF did nothing to return the posted collateral to MidFirst or to exercise its duty of care.

In light of the facts and circumstances of this case, there can be little question that good conscience demands restitution to MidFirst.  Accordingly, because MidFirst can establish each of the three requirements, it is entitled to relief under a theory of unjust enrichment. *See Crossville,*

*Inc. v. Kemper Design Ctr., Inc.*, 758 F.Supp. 517, 532 (M.D. Tenn. 2010) (finding sufficient evidence to support unjust enrichment claim where pre-existing guaranties did not extend to more recent payment obligations).

### 3.  MidFirst Is Entitled to Relief under an Implied Contract

Similar to the theory of unjust enrichment is a contract implied in law or in fact.  "In order to infer the existence of a contract from the actions of the parties, it must appear they actually intended to form a contract.  A contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intentions of the parties as indicated by their conduct."  22A N.Y. Jur. 2d, *Contracts* § 521.  *See also I.G. Second Generation Partners, L.P. v. Duane Reade*, 793 N.Y.S.2d 379, 382 (N.Y. App. Div. 2005); *Bourke v. Western Bus. Prods., Inc.*, 120 P.3d 876, 887 (Okla. Civ. App. 2005).

Here, there are ample facts to support an inference that the parties intended to create the LBHI Guaranty.  The Master Agreement repeatedly indicates that LBHI would issue the LBHI Guaranty.  Moreover, as demonstrated by the Debtors' own admission in the Disclosure Statement, the Lehman business model was run such that the same employees made decisions for various Lehman entities.  Indeed, the facts suggest that LBSF's signatory, Mr. Witherell, was in fact an employee of LBHI or some other parent company of LBSF's.[6]

The conduct between the parties also implies that there was a contract.  MidFirst required a parent company guaranty as a matter of course when transacting with a subsidiary of a Wall Street bank.  Likewise, the Debtors issued such a guaranty from LBHI as a matter of course.  *See Disclosure Statement*, p. 57 ("LBHI's guarantee of the obligations of its subsidiaries under

---

[6]      The Disclosure Statement also acknowledges: "Certain Debtors had certain overlapping directors and officers." Disclosure Statement, p. 55.  Therefore, even if Mr. Witherell was in fact an officer of LBSF, he may have had an overlapping role with LBHI, which would further support the idea that the two entities should be treated as one for purposes of the present issues.

derivatives contracts was given as a matter of course and did not need to be requested or negotiated").  Both the Debtors and MidFirst therefore acted as though the LBHI Guaranty was in place.

Similarly, a contract implied in law "presupposes unjust enrichment.  Under this theory a contract is implied by law where none in fact exists to prevent the unjust enrichment of one party and to render as much as deserved (quantum meruit) to the other party in the interest of equity." *Super v. Abdelazim*, 527 N.Y.S.2d 591, 592 (N.Y. App. Div. 1988).  Under the present facts, a contract implied in law would be appropriate as well.  If the Court determines that no written contract exists, then a contract should be implied by the facts or the law to render justice in favor of MidFirst.

## V.  CONCLUSION

MidFirst respectfully requests that the Court enter an Order (a) overruling the Claim Objection as it pertains to MidFirst's LBHI Claim; (b) allowing the LBHI Claim in full; and (c) granting MidFirst such further relief as the Court deems just.

Dated:     January 11, 2012
           Houston, Texas

SUTHERLAND ASBILL & BRENNAN LLP

By:  /s/ Paul B. Turner
     Paul B. Turner (*pro hac vice*)
     1001 Fannin Street, Suite 3700
     Houston, Texas 77002
     Tel:  (713) 470-6100
     Fax:  (713) 654-1301

     Mark D. Sherrill (*pro hac vice*)
     1275 Pennsylvania Avenue, NW
     Washington, DC  20004
     Tel:  (202) 383-0100
     Fax:  (202) 637-3593

COUNSEL TO MIDFIRST BANK