Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case Nos. 08-13555(JMP)(Jointly Administered),

5            08-01420(JMP)(SIPA)

6  - - - - - - - - - - - - - - - - - - - - -x

7  In the Matter of:

8  LEHMAN BROTHERS HOLDINGS, INC., et al.,

9              Debtors.

10 - - - - - - - - - - - - - - - - - - - - -x

11 In the Matter of:

12 LEHMAN BROTHERS INC.,

13              Debtor.

14 - - - - - - - - - - - - - - - - - - - - -x

15

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              November 16, 2011

21              10:09 AM

22

23 B E F O R E:

24 HON. JAMES M. PECK

25 U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re Motion of Colorado Plaintiffs Authorizing 2004

3    Examination of Debtors [ECF No. 15200]

4

5    HEARING re Motion of Colorado Plaintiffs for Relief from the

6    Automatic Stay  [ECF No. 15201]

7

8    HEARING re Debtors' Motion to Establish Procedures for the

9    Consensual Amendment and Assumption of Certain Non-Terminated

10   Prepetition Derivatives Contracts [ECF No. 21297]

11

12   HEARING re Debtors' Motion Pursuant to Section 105(a) of the

13   Bankruptcy Code and Bankruptcy Rule 9019 for Approval of a

14   Settlement and Compromise with Danske Bank A/S [ECF No. 21298]

15

16   HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

17   James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

18   to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

19   of the Federal Rules of Bankruptcy Procedure (i) for

20   Authorization and Approval of a Stock Purchase Agreement

21   Regarding the VEBA and (ii) for Authorization and Approval of a

22   Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

23   and Case No. 08-01420, ECF No. 4654]

24

25

Page 3

1

2    HEARING re The Providence Funds' Motion for an Order Settling

3    Hearing Date and Establishing Discovery and Briefing Schedule

4    or, in the Alternative, for a Status Conference [LBI ECF No.

5    4678]

6

7    HEARING re Joint Motion of Lehman Brothers Holdings Inc. and

8    James W. Giddens, as Trustee for Lehman Brothers Inc., Pursuant

9    to Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

10   of the Federal Rules of Bankruptcy Procedure (i) for

11   Authorization and Approval of a Stock Purchase Agreement

12   Regarding the VEBA and (ii) for Authorization and Approval of a

13   Settlement Regarding the Same [Case No. 08-13555, ECF No. 21109

14   and Case No. 08-01420, ECF No. 4654]

15

16   HEARING re Uvino v. Lehman Brothers Holdings Inc. [Case No. 10-

17   05428]

18

19   Adjourned Matters:

20   Motion of Official Committee of Unsecured Creditors for

21   Reconsideration of Court's September 17, 2008 Interim Order (i)

22   Authorizing Debtor to Obtain Post-petition Financing Pursuant

23   to Sections 363 and 364 of Bankruptcy Code and (ii) Granting

24   Liens and Superpriority Claims to Postpetition Lenders Pursuant

25   to Section 364 of Bankruptcy Code [ECF No. 434]

Page 4

1

2    Motion of Fativa, Inc., et al. to Compel Immediate Payment of

3    Postpetition Administrative Expense Claims [ECF No. 7102]

4

5    Motion of Fidelity National Title Insurance Company to Compel

6    Compliance with Requirements of Title Insurance Policies [ECF

7    No. 11513]

8

9    Motion of Jason T. Taylor for Relief from the Automatic Stay

10   [ECF No. 14377]

11

12   Motion of Phillip Walsh for Relief from the Automatic Stay [ECF

13   No. 14571]

14

15   Motion of Giants Stadium LLC for Leave to Conduct Discovery of

16   the Debtors Pursuant to Federal Rule of Bankruptcy Procedure

17   2004 [ECF No. 16016]

18

19

20

21

22

23

24

25   Transcribed by:  Sharona Shapiro

```
 1

 2   A P P E A R A N C E S :

 3   WEIL, GOTSHAL & MANGES LLP

 4           Attorneys for Debtors

 5           767 Fifth Avenue

 6           New York, NY 10153

 7

 8   BY:   JACQUELINE MARCUS, ESQ.

 9         RICHARD KRASNOW, ESQ.

10         ERIKA DEL NIDO, ESQ.

11         LAWRENCE J. BAER, ESQ.

12

13

14   BROWN RUDNICK LLP

15           Attorneys for Providence Funds

16           Seven Times Square

17           New York, NY 10036

18

19   BY:   DAVID J. MOLTON, ESQ.

20         HOWARD STEEL, ESQ.

21

22

23

24

25
```

Page 6

```
 1   CHAPMAN & CUTLER, LLP

 2          111 West Monroe Street

 3          Chicago, IL 60603

 4

 5   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

 6          FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)

 7

 8

 9   HUGHES HUBBARD

10          Attorneys for SIPA Trustee

11          One Battery Park Plaza

12          New York, NY 10004-1482

13

14   BY:   MICHAEL E. SALZMAN, ESQ.

15          JEFFREY S. MARGOLIN, ESQ.

16

17

18   THE LAW OFFICES OF AVRUM J. ROSEN, PLLC

19          Attorneys for Wendy Uvino

20          38 New Street

21          Huntington, NY 11743

22

23   BY:   AVRUM J. ROSEN, ESQ.

24

25
```

Page 7

1    LEVIN LEE LLP

2         Attorneys for SIPA Trustee

3         570 Lexington Avenue, 16th Floor

4         New York, NY 10022

5

6    BY:   KENNETH E. LEE, ESQ.

7

8

9    LINKLATERS LLP

10        Attorneys for Lehman Brothers International (Europe)

11        1345 Avenue of the Americas

12        New York, NY 10105

13

14   BY:   JAMES R. WARNOT, JR., ESQ.

15

16

17   MILBANK, TWEED, HADLEY & MCCLOY LLP

18        Attorneys for Official Committee

19        One Chase Manhattan Plaza

20        New York, NY  10005

21

22   BY:   EVAN R. FLECK, ESQ.

23        GRACE M. GILLIGAN, ESQ.

24

25

Page 8

1   STUTMAN TREISTER & GLATT

2          Attorneys for Creditor, Elliot

3          1901 Avenue of the Stars, 12th Floor

4          Los Angeles, California 90067

5

6   BY:   MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

7          JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

8          MARINA FINEMAN, ESQ. (TELEPHONICALLY)

9

10

11   U.S. DEPARTMENT OF LABOR

12          Office of the Solicitor

13          200 Constitution Avenue, NW

14          Room N 4611

15          Washington, DC 20210

16

17   BY:   LEONARD H. GERSON, ESQ.

18

19

20

21

22

23

24

25

Page 9

1    VENABLE LLP

2         Attorneys for the Deutsche Bank A/S London Branch

3         Rockefeller Center

4         1270 Avenue of the Americas

5         Twenty-Fifth Floor

6         New York, NY 10020

7

8    BY:   CAROLLYNN H.G. CALLARI, ESQ.

9

10

11   ALSO PRESENT TELEPHONICALLY:

12   ANATOLY BUSHLER, Farallon Capital Management

13   BARBARA ROTH, In Pro Per/Pro Se

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1                    P R O C E E D I N G S

2           THE COURT:  Be seated.  Good morning.

3           MS. MARCUS:  Good morning, Your Honor.  Jacqueline

4    Marcus of Weil Gotshal & Manges on behalf of Lehman Brothers

5    Holdings Inc. and its affiliated debtors.

6           Items number 1 and 2 on the agenda this morning are

7    related to each other.  They are the motions of the Colorado

8    plaintiffs for Rule 2004 examinations and for relief from the

9    automatic stay.  The debtors objected to both motions several

10   months ago and since then have been trying to reach a

11   consensual resolution.

12          The Colorado plaintiffs are involved in litigation in

13   state court in Colorado.  They allege that they have claims

14   relating to the design, construction or maintenance of a golf

15   course owned by debtor LB Rose Ranch LLC.

16          The debtors and the Colorado plaintiffs have entered

17   into a stipulation, subject to the approval of the Court, which

18   provides as follows -- I have a copy of it, Your Honor, if I

19   may approach.

20          THE COURT:  Please approach.  Thank you.

21          MS. MARCUS:  The automatic stay in the cases of LBHI

22   and Rose Ranch will be modified solely to permit the Colorado

23   plaintiffs to assert any and all claims relating to the design,

24   construction or maintenance of the golf course and prosecute

25   such claims against LBHI, Rose Ranch and/or their insurers in

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 11 of 111

Page 11

```
 1    order to recover damages from the insurance policies and

 2    proceeds.

 3             They will also be granted relief to settle the

 4    Colorado litigation with the insurers for LBHI or Rose Ranch,

 5    and to execute or collect upon any judgment rendered in their

 6    favor in the Colorado litigation against the insurance policies

 7    and proceeds without further court approval.

 8             The automatic stay with respect to PAMI Statler

 9    remains unmodified, and the Colorado plaintiffs have agreed not

10    to assert any claims against LBHI or recover any amounts in

11    excess of the insurance proceeds from LBHI.

12             There is, however, a reservation of rights pursuant

13    to which the Colorado plaintiffs reserve their right to seek to

14    assert claims in the Rose Ranch case, to the extent that their

15    claims are not satisfied from the insurance.  And Rose Ranch

16    reserves its right to object to any claim for any reason,

17    including the fact that the bar date has passed.

18             Counsel to the creditors' committee has been provided

19    with a copy of the stipulation prior to today's hearing.  The

20    debtors believe that the terms of the stipulation are

21    reasonable.  And if the Court has no questions we'd request

22    that the Court so order the stipulation.

23             THE COURT:  This has been pending for a long time and

24    has been adjourned on numerous occasions.  I have no interest

25    in upsetting a settlement.  One question, how does this impact
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 12

1    the request for 2004 examinations?

2          MS. MARCUS:  My understanding is that that request

3    will be withdrawn, Your Honor.

4          THE COURT:  I'd like that confirmed on the record.

5          MS. MARCUS:  I'm not sure if counsel -- I don't think

6    they're here.  I don't know if they're on the phone but I

7    can -- how would you like me to handle that?

8          THE COURT:  I'm going to treat the fact that it's not

9    covered in the stipulation as an indication that the motion is

10   withdrawn without prejudice.

11         MS. MARCUS:  That's fine, Your Honor.

12         THE COURT:  All right.  The stipulation will be

13   approved.

14         MS. MARCUS:  Thank you, Your Honor.

15         The next item, Your Honor, is the debtors' motion to

16   establish procedures for the consensual amendment and

17   assumption of certain nonterminated pre-petition derivatives

18   contracts.  The debtors filed the declaration of Daniel Ehrmann

19   of Alvarez & Marsal in support of the motion.

20         Just a little bit of background, Your Honor.  In light

21   of the upcoming confirmation hearing, the debtors have been

22   engaged in a massive review of all of their executory

23   contracts, and in particular their huge portfolio of

24   derivatives contracts.  In making decisions regarding

25   assumption or rejection of such contracts the debtors realized

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 13

1    that there was a group of derivatives contracts as to which the

2    debtors might be able to pay a small sum in order to obtain

3    substitute performance by a third party and thereby obtain the

4    counter-parties' consent to assumption and assignment of in the

5    money contracts.

6           Specifically, the motion seeks authority for the

7    debtors to amend and assume any derivatives contract, determine

8    the applicable cure amount under such contract, and satisfy all

9    cure amounts and pay any fees associated with securing

10   substitute performance without further order of the Court but

11   subject to the approval of the creditors' committee and the

12   applicable counter-party.

13          We received two responses to this motion, although my

14   understanding is there's a third one that's not reflected on

15   the agenda.  The statement of Asbury Atlantic, Inc. and Asbury

16   Solomons, Inc. and the reservation of rights of Bank of

17   Montreal; I understand that U.S. Bank filed a similar

18   reservation of rights.  The responses are similar and can be

19   dealt with by the clarification on the record.

20          Asbury Atlantic and Asbury Solomons state that they

21   are filing their reservation in order to, quote, "make clear

22   that nothing in any order granting the motion shall be

23   construed as authority for the debtors to take any unilateral

24   action to amend the Asbury swaps", close quote.

25          Bank of Montreal, and I suppose U.S. Bank, state that

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 14

1    they filed their reservation of rights to preserve their

2    position that the motion does not apply to their master

3    agreement which it contends has been terminated, and to

4    preserve its right to insist upon full compliance with the

5    terms of the Bankruptcy Code.

6             As I indicated, Your Honor, we think our motion was

7    very clear, but these are only consensual agreements and

8    therefore we don't view either reservation of rights as, in

9    effect, an objection to the motion.  I'm happy to make the

10   clarification again that we're only talking about consensual

11   resolutions here.

12            THE COURT:  That's how I read the motion.

13            MS. MARCUS:  Thank you, Your Honor.

14            I would like to note that the motion does indicate

15   that the debtors reserve all their rights should it become

16   necessary at some point down the road to assume these contracts

17   over the opposition of counter-parties, but that's not the

18   subject of this motion at all.  And with that, Your Honor, we'd

19   request that the Court approve the motion.

20            THE COURT:  I'm prepared to do that but I'm going to

21   ask whether or not any of the parties that filed reservation of

22   rights wish to be heard.

23            MR. PRICE:  Good morning, Your Honor.  Craig Price

24   from Chapman and Cutler.  I'm here on behalf of both the Bank

25   of Montreal and U.S. Bank.  We filed reservation of rights and

Page 15

1    we're fine with the clarification that this only applies to

2    nonterminated agreements.

3            THE COURT:  Okay.  No one else seems to want to say

4    anything.  It's approved.

5            MS. MARCUS:  Thank you, Your Honor.

6            Item 4 on the agenda is the debtors' motion pursuant

7    to sections 105(a) and 363 of the Bankruptcy Code and Rule 9019

8    for approval of a settlement and compromise with Danske Bank.

9    The debtors have filed a declaration of Daniel Ehrmann in

10   support of this motion as well.

11           The settlement resolves claims filed against LBHI and

12   LCPI by Danske relating to a 1996 master repurchase agreement.

13   Danske filed claims against LBHI and LCPI in the amount of not

14   less than approximately 699 million which the motion defines as

15   the deficiency claims.  In addition, Danske filed additional

16   claims against LBHI and LCPI in the amount of 40 million

17   dollars.

18           The settlement provides that Danske will have a

19   nonpriority general unsecured claim against each of LCPI and

20   LBHI in the amount of 580 million dollars.  Danske will also

21   waive and release the additional claims with prejudice.  Danske

22   will also cause its wholly owned subsidiary to assign a loan

23   that we've called the Playa Pelicano loan in the original

24   amount of 33 million dollars to LCPI.  And LBSF shall waive any

25   claims it may have against Danske under certain documents.

Page 16

```
 1    There are certain Danske excluded claims which are not being

 2    released under the terms of the settlement agreement.  And LBHI

 3    and LCPI on the one hand and Danske on the other hand, release

 4    each other from all claims under the master repurchase

 5    agreement, the deficiency claims, the guarantees and related

 6    documents.

 7          Contemporaneously with entering into the settlement

 8    agreement, Danske entered into a plan support agreement.  As

 9    indicated on the agenda, no objections to the Danske settlement

10    have been filed with the Court.  For the reasons set forth in

11    the motion and the Ehrmann declaration, the debtors believe

12    that the Danske settlement is fair and equitable and in the

13    best interests of the debtors' estate, and we request that the

14    Court approve it.

15          THE COURT:  I'm prepared to do that.  It's

16    uncontested.  I would be comforted to hear that the creditors'

17    committee has reviewed this and has no issue.

18          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

19    Tweed, Hadley & McCloy on behalf of the official committee of

20    unsecured creditors.

21          Yes, Your Honor, the committee has, as was the case

22    with the Lehman Re, the State Street, the Swedbank settlements,

23    which were very similar and all part of the whole, you know,

24    repo to the street program that Lehman had engaged in for a

25    period of time.  We have reviewed the amount of the deficiency
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 17

1    claim, in particular.  Our real estate financial advisors have

2    independently looked at the competing expert reports that went

3    into the mediation here and have compared the values ultimately

4    agreed to to their own underwriting of these properties, and

5    believe that in light of the litigation risks involved in going

6    further with a litigation on these fronts that the numbers that

7    we came out with here, 580 million, with all the other issues

8    thrown in are a fair settlement for the debtors.

9            THE COURT:  Fine.  The settlement is approved.

10           MS. MARCUS:  Thank you, Your Honor.

11           My partner Richard Krasnow will handle item number 5

12   on the agenda.

13           May I be excused, Your Honor?

14           THE COURT:  Okay.

15           MS. MARCUS:  Thanks.

16           MR. KRASNOW:  Will Your Honor bear with me for one

17   minute?  We may have resolved one of the objections.  I just

18   need to, if I may, consult?

19           THE COURT:  You may consult.

20       (Pause)

21           MR. KRASNOW:  Your Honor, Richard Krasnow, Weil

22   Gotshal & Manges on behalf of the Chapter 11 debtors.

23           I appreciate the Court's indulgence.  It will be

24   rewarded, Your Honor; we have resolved one of the objections.

25           Your Honor, the next matter on the calendar in the

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 18 of 111

Page 18

1    Chapter 11 cases is the joint motion of LBHI and the SIPA

2    trustee seeking approval or authority to consummate a stock

3    purchase agreement relating to shares of Aceso, a wholly owned

4    subsidiary of LBI, and for authority for the SIPA trustee and

5    LBHI to compromise and settle disputes that they have or may

6    have with respect to Aceso and a VEBA that is controlled by

7    Aceso.

8            Your Honor, the item is item number 5 on the LBHI or

9    the debtors' agenda and item number -- I'm sorry, Your Honor --

10   number 6 on the SIPA agenda.  I assume Your Honor will consider

11   that together.

12           THE COURT:  It's item 7 on the SIPA agenda.

13           MR. KRASNOW:  I misspoke, Your Honor.

14           Your Honor, pursuant to this motion we are seeking

15   very limited relief, which is to say, Your Honor, that if the

16   Court were to be inclined to grant the relief sought in the

17   motion then that relief would be limited to a transaction

18   pursuant to which the SIPA trustee will sell and LBHI will buy

19   the shares of Aceso which are owned by the trustee for a very

20   limited purchase price of 1,885 dollars.  And LBHI would agree

21   to reduce a claim that it has asserted against LBI relating to

22   funding that had been provided by LBHI to LBI on September 12,

23   2008 of 125 million dollars of which 90 million dollars was

24   used by LBI to fund a VEBA which is controlled by Aceso.

25           Additionally, LBHI and the SIPA trustee on behalf of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 19

1    LBI, pursuant to that agreement, would be exchanging neutral

2    releases relating to claims which are property of their

3    respective estates, no more but no less, but only claims that

4    are property of their respective estates that pertain to the

5    VEBA.  That is the only relief that we and the SIPA trustee are

6    seeking today.

7         Your Honor, there were three groups of objections that

8    were filed to the motion, one of which was filed by the

9    Department of Labor, which was the objection as to which I

10   requested the Court's indulgence to engage in a discussion with

11   the representative with the Department of Labor.  We believe we

12   have resolved that objection.

13        We have done it and will do it in two ways, the first

14   of which we've already done.  That first step was to revise the

15   order, and the blackline copy of the revised order was attached

16   to our response to the objections so that the order is even

17   clearer that the only relief that the Court would be granting

18   to us and the only approval that the Court would be granting to

19   us, if the Court is inclined to grant the motion, would be to

20   approve the sale, the transfer of the shares which I've

21   described, and the compromising settlement which is part and

22   embedded in the releases.

23        What the Department of Labor has asked that we do is

24   to revise the order further to make it clearer, although we

25   think it's clear anyway, but to make it clearer that the only

Page 20

1    claims that are being released here are claims which are

2    property of the respective estates, that is to say, LBHI and

3    LBI.  Now while it's our view that we can only release claims

4    that are property of our estate, in light of the fact that if

5    we amend the order as I've so described, that apparently will

6    satisfy the Department of Labor so we do not need to consider

7    any further the objection it filed.  We're prepared to do that

8    and we believe that the SIPA trustee is similarly prepared to

9    amend the order in that regard.

10            In light of -- well, Your Honor, perhaps the

11    Department of Labor may want to speak so we can see if I am

12    accurate in that regard, and then we can deal with the other

13    objections that have been filed, if that's acceptable to the

14    Court.

15            THE COURT:  That is acceptable.  I'd first like to

16    confirm that the SIPA trustee agrees with what you have just

17    said so at least the parties to the transaction are on the same

18    page.

19            MR. KRASNOW:  Yes, Your Honor.

20            MR. LEE:  Good morning, Your Honor.  Kenneth Lee from

21    Levine Lee representing the SIPA trustee, James Giddens.

22            I would like to echo Mr. Krasnow's remarks.  The SIPA

23    trustee is in agreement with the proposed revisions to the

24    order to further clarify it that have been requested by the

25    Department of Labor, and we are in favor of granting the relief

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 21

1     sought.

2              THE COURT:  Okay.

3              MR. LEE:  Thank you, Your Honor.

4              THE COURT:  I'll hear now from counsel for the

5     Department of Labor.

6              MR. GERSON:  Good morning, Your Honor.  Leonard Gerson

7     for the U.S. Department of Labor.

8              We are in agreement with the proposed revisions that

9     Mr. Krasnow described to the Court.  We appreciate the effort

10    that's been made to clarify the order.

11             THE COURT:  If you could just explain to me what your

12    concern was and how that concern has been resolved by virtue of

13    the language change.

14             MR. GERSON:  Under ERISA, unlike bankruptcy, there's

15    this concept of two hats.  You wear a hat with respect to

16    whatever allocations you have to your employer, the

17    corporation.  You also have separate obligations to an ERISA

18    plan if you're a fiduciary to an ERISA plan.  Part of those

19    obligations can be bringing an action if there is a violation

20    of ERISA.  That action would not be property of the estate

21    because it wouldn't be for the benefit of the estate,

22    nevertheless you have an obligation to bring that action.  So

23    we wanted it to be clear that what was not being released was

24    any obligation that LBHI or LBHI employees or officers had to

25    bring an ERISA action if there was a violation --

1          THE COURT:  Understood.

2          MR. GERSON:  -- with respect to the plans.

3          THE COURT:  Thank you for the clarification.

4          MR. GERSON:  You're welcome.

5          THE COURT:  And I take it you're satisfied that the

6    language being added to the order --

7          MR. GERSON:  Right.

8          THE COURT:  -- will resolve this to at least the

9    Department's satisfaction.

10          MR. GERSON:  That's correct, Your Honor.  Of course it

11    wasn't just this language that was added this morning, it was

12    the earlier language that the debtors and the SIPA trustee

13    added to make it clear that all the Court was approving was the

14    transfer of the stock and the limited release in the stock

15    purchase agreement rather than any future actions that will be

16    taken by the debtors once they own the stock, and furthermore,

17    their statement in their papers that any further actions they

18    take will be in compliance with ERISA.

19          THE COURT:  All right.

20          MR. GERSON:  Thank you, Your Honor.

21          MR. KRASNOW:  Your Honor, now just to turn to the two

22    categories with remaining objections before I get into some of

23    the details of the motion which, if you will, deal with some of

24    the issues raised in the objection.

25          In addition to the formal objection that was filed by

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 23 of 111

Page 23

```
 1    the Department of Labor which has been just been resolved,

 2    there was something which I will style as a formal objection

 3    filed by a Ms. Wendy Uvino.  As reflected in that document, Ms.

 4    Uvino has no economic stake whatsoever with respect to this

 5    motion.

 6            THE COURT:  But she was, at least at one time

 7    according to the objection, trustee of the VEBA.

 8            MR. KRASNOW:  She was at one time, but currently --

 9            THE COURT:  That's what I said.

10            MR. KRASNOW:  -- and currently is not a trustee of the

11    VEBA.  She also was, as the Court may be aware in light of the

12    pending litigation with Ms. Uvino, an officer of LBHI involved

13    with HR.  And indeed she, in that capacity, assisted the

14    debtors and their professionals in the due diligence and

15    analysis of the group benefit plan, particularly with respect

16    to retirees in connection with the ultimate termination of the

17    plan as it relates to the retirees that occurred over two years

18    ago.

19            THE COURT:  If I could just interject, and I don't

20    want to in any way deflect you from your chosen rounds of going

21    through the various objections, but I have reviewed each of the

22    objections, including the objections that were not formally

23    docketed, submitted in written form by a member of former

24    Lehman employees, some of whom are, by their own description,

25    elderly and infirm, who have expressed deep-seated concerns
```

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 24 of 111

Page 24

1   about this motion, whether or not there has been sufficient

2   time to respond to the motion and the potential impact that the

3   motion may have upon ongoing health care and retiree benefits

4   to which these individuals may be entitled.

5         If I understand correctly what you have represented at

6   the outset as to the limited nature of the relief being sought,

7   and if I understand what the Department of Labor's counsel has

8   said in reference to the limited nature of the releases being

9   exchanged, at least in respect of possible claims arising under

10  ERISA, is there anything for the Court to deal with in

11  reference to the pending objections?  Because it's my strong

12  sense, but I want to discuss it with you, that the relief being

13  sought is so limited that read literally it does not have any

14  direct or indirect impact upon the rights of any individual

15  beneficiary of the VEBA, although it is conceivable that if

16  future acts as suggested in the motion take place, there could

17  be an adverse impact.  But I'm not approving that now.  Do I

18  understand that all correctly?

19        MR. KRASNOW:  Your Honor took my presentation out of

20  my mind and into your own statements.  Absolutely.  That was

21  precisely the point that we attempted to make in our response

22  and I intended to address here today.

23        The concerns that have been expressed by the retirees,

24  concerns that we're very sympathetic about, one could say that

25  it's one thing for a creditor in a commercial transaction to

Page 25

1    lose money as a consequence of a bankruptcy, but that's not the

2    same as retirees, as a consequence of the failure of a business

3    losing or potentially losing medical benefits.  So we're very

4    sympathetic to that.  And there is nothing that the Court would

5    be doing today that directly affects that.

6              In the motion, out of a desire to be as transparent as

7    possible, not only from the perspective of advising the Court

8    and the creditors, but more importantly the retirees, we felt

9    that the right thing to do is to advise the retirees as to the

10   source of payments to them with respect to medical benefits

11   which are not now covered by a debtors' sponsored group plan,

12   and what action we may or may not be taking in the future, in

13   part based upon what the Department of Labor may or may not do

14   with respect to an application that we have not yet filed with

15   respect to the use of certain of the VEBA funds, which funds

16   will only be used consistent with the terms of the VEBA, and

17   whatever exemption we may get from the VEBA to reimburse the

18   estate for certain monies that they expended with respect to

19   benefits.  But as far as the relief that we are seeking today

20   from the Court, were the Court to grant it, it doesn't deal at

21   all with respect to potential future events.

22             THE COURT:  Let me just ask this question because I

23   don't want to predict what may be in the minds of the

24   individual objectors who are concerned about the consequences

25   of future acts.  But how will these individuals ever know

Page 26

1   what's going on with respect to the VEBA and will they have an

2   opportunity to be heard, to the extent that they have an

3   objection?

4           MR. KRASNOW:  Well, Your Honor, I'll try to answer

5   that as best I can because I'm not sure what the future events

6   will be.  To be clear, Your Honor, the VEBA was formed prior to

7   the commencement of the case, prior to any knowledge that there

8   would be a case, but with full knowledge that things were

9   somewhat in distress at Lehman.  There was a concern --

10          THE COURT:  So this was a lifeboat created for -- this

11  was a lifeboat --

12          MR. KRASNOW:  Absolutely.

13          THE COURT:  -- created for the benefit of certain

14  present and former employees to protect employee benefits at a

15  time of financial uncertainty?

16          MR. KRASNOW:  If I can -- the answer to that is yes,

17  but if I can rephrase that slightly because it becomes --

18          THE COURT:  You don't like the term lifeboat?

19          MR. KRASNOW:  Lifeboat I will accept because that's

20  accurate.  It was to try to ensure that those who were then

21  covered by the LBHI group benefit plan were assured that no

22  matter what happened there would be sufficient monies available

23  to cover what was then estimated to be six months worth of

24  medical benefits.  And those individuals who were covered by

25  that plan, generally speaking -- the plan itself, the terms of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 27

1    the plan govern so in case I misstate I'm not intending to

2    expand the universe or decrease it -- were active employees of

3    U.S. Lehman equities, some of which, but relatively few of

4    which were employed by LBHI, most were employed by LBI and

5    maybe subsidiaries -- then subsidiaries of LBI, employees who

6    were on long-term disability and retirees.

7             At that time all medical expenses were self insured by

8    Lehman.  There was no insurance plan per se.  So in furtherance

9    of that, as I noted earlier, LBHI advanced, provided funding to

10   LBI of 125 million, of which 90 million went into this health

11   benefit trust which is the VEBA we've referred to.

12            We all know what events occurred on September 15th and

13   September 19th of 2008 with respect to LBHI and LBI and

14   thereafter for other Lehman entities.  Notwithstanding those

15   filings, health benefits were covered and were paid by the

16   VEBA.  No monies were expended by LBHI for anybody in that

17   regard because the VEBA, consistent with its terms, covered

18   those expenses.  Asiko (sic) or Aceso -- I constantly

19   mispronounce  that -- Aceso was under the control --

20            THE COURT:  Does that term have any meaning,

21   incidentally?

22            MR. KRASNOW:  If it does, Your Honor --

23            THE COURT:  You don't know it.

24            MR. KRASNOW:  -- I am completely unaware of what it

25   is.

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 28 of 111

Page 28

1           THE COURT:  All right.  So it's just a made-up word?

2           MR. KRASNOW:  Maybe.  I don't know whether it was

3      intended to stand for something.

4           But that was a wholly owned and continues today to be

5      a wholly owned subsidiary of LBI, and therefore under the

6      control of the SIPA trustee.

7           Between September and March the payments were made

8      from the VEBA as was contemplated and provided for under VEBA,

9      but in March of '09 the SIPA trustee caused the VEBA to suspend

10     all payments.  As a consequence, LBHI had to immediately step

11     in and start covering, if you will, medical expenses for its

12     active employees, and since the group benefit plan covered as

13     well retirees, the retirees as well.

14          However, given the nature of the Lehman case, we are

15     disposing of assets.  It was clear to the debtors that at least

16     as to retirees they could not, consistent with their fiduciary

17     duties to their stakeholders, continue to make those payments

18     ad infinitum.  And so in or about June or thereabouts, after

19     some thinking and analysis it was concluded that as it relates

20     to the retirees LBHI would have to take appropriate steps to

21     terminate those health benefits.

22          The question was what steps were to be taken, the

23     timing of the implementation, and what, if anything, could be

24     afforded to the retirees to cushion what could be a devastating

25     blow.  This was not going to be an action similar to that which

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 29 of 111

Page 29

1    LTV in its first Chapter 11 did, which was to just terminate

2    the medical benefits and to see the kind of stories that

3    appeared when that happened some decades ago, in terms of the

4    impact on employees.

5            And so we dual tracked.  The first was, while it had

6    no obligation to do so, to explore whether or not we could

7    provide to these retirees, at their own expense, some

8    alternative.  So when we announced to them we intended to

9    terminate, we could similarly announce to them something that

10   would be available to them for medical benefits, to pay medical

11   benefits that would be a cheaper alternative than either having

12   to look to themselves or to have to themselves purchase medical

13   insurance.

14           At the same time, an analysis was undertaken, in light

15   of the provisions of the group benefit plan, that allowed for,

16   by their terms, a termination of all or any portion of the plan

17   to any of the beneficiaries, as to whether or not there were

18   any parties who had vested benefits, because it was our view,

19   based on the case law in this district, that in light of the

20   terms of those benefit plans we could terminate them without

21   having to go through the 1114 process, as to those individuals

22   who did not have vested benefits.  If somebody had vested

23   benefits we could not terminate those benefits outside of 1114.

24   And so while we were looking for alternatives, we undertook as

25   extensive a due diligence process as we thought we could, which

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 30

```
 1    was overseen by Ms. Uvino.  And at the conclusion of that due
 2    diligence process, we determined that it did not appear that
 3    there were any documents that afforded to anybody any vested
 4    rights for medical benefits.
 5             Concurrently with that, based on discussions that we
 6    had with Aetna, we were able to afford to employee -- retirees
 7    a non-LBHI-sponsored plan -- a plan which, at least
 8    colloquially speaking, was an Aetna plan -- which employee --
 9    the retirees could avail themselves of, cheaper premiums than
10    they would otherwise have and some sort of bridge, if you will.
11             We determined that this was not something which we
12    would give thirty days' notice to or sixty days' notice to
13    employees -- or retirees.  And so, in October, we sent notices
14    out advising these retirees that we would be terminating the
15    plan as to them, effective December 31, and gave them notice of
16    this Aetna plan, if you will.
17             Notices were given to approximately 1,100 retirees.
18    There were numerous inquiries, as one would expect, in response
19    to that.  I can't characterize all of them, but my
20    understanding is many of them had indicated an expectation that
21    it was going to happen, in light of where Lehman was, and an
22    appreciation for the fact that we actually expended time and
23    effort to see whether we could at least facilitate offering to
24    them this Aetna plan.  In none of the communications that we
25    received from these parties at that time did anyone indicate
```

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 31 of 111

Page 31

1    that they had any vested benefits.  The group benefit plan was

2    terminated as of December 31.

3           As I previously indicated, Your Honor, the group

4    benefit plan -- or the VEBA, rather, by its terms, was to be

5    used for the benefit of beneficiaries of the plan.  Therefore,

6    effective December 31 -- or January 1, I may be off by a day --

7    that VEBA could not, by its terms, be used for anyone other

8    than active employees and those with long-term disabilities who

9    were going to be going on to a COBRA because they, too, got

10   notices, but they had COBRA available to them -- couldn't be

11   used for them either, excuse me.  I don't think it could be

12   used for COBRA.

13          In January of 2010, the SIPA trustee decided to cause

14   the VEBA to be amended so that it would include the retirees.

15   And he had the ability to cause that to happen because Aceso

16   was under his jurisdiction.

17          I should note, Your Honor, that, as reflected in the

18   motion, we have made a commitment to the trustee because he

19   made it a condition of this deal that the VEBA would continue

20   to be used for those purposes -- that is, to cover the

21   retirees -- so long as there are funds there.  We have

22   indicated that we will not only do that, but continue to use

23   the VEBA for the remaining purposes for which it exists, which

24   is to cover active employees.  And we would cover COBRA

25   payments with respect to those with long-term disabilities.  It

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 32 of 111

Page 32

1   is our intention to use the VEBA for those purposes, as we set

2   forth in the motion.

3           There is something else we are going to try to do, and

4   we made it clear in the motion papers.  As a result of the

5   trustee's suspension of the VEBA in March of 2009, as I

6   indicated, we had to take on all of those expenses.  And while

7   the VEBA was amended in January 2010 to cover the retirees as

8   well as others, the SIPA trustee only allowed the VEBA funds to

9   be used for the retirees.  He did not allow it to be used to

10  cover the LBHI active employees, even though they were clearly

11  within the then group benefit plan and today's group benefit

12  plan.

13          LBHI was required, therefore, to expend monies that

14  should have been covered by the VEBA and would have been

15  covered by the VEBA, but for the actions taken by the SIPA

16  trustee.  We believe it is appropriate to seek reimbursement --

17  not a reversion, but reimbursement -- of that which LBHI

18  expended and that should have been covered by the VEBA.

19          While I understand there may be a debate as to whether

20  or not we need an exemption from the Department of Labor in

21  order to be able to do that, we are -- it is our intention to

22  seek such an exemption.  That's not something before the Court.

23  If we obtain that exemption, then there will be the

24  reimbursement of approximately twenty-five million dollars.  If

25  the exemption is not obtained, then we will not have the

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 33 of 111

Page 33

1    reimbursement and we will have to evaluate what the then uses

2    of those monies will be, consistent with the terms of the VEBA

3    and applicable law, including ERISA.

4         Now, all of that ultimately has an effect on the

5    retirees, but lest we forget, this is a limited fund in any set

6    of circumstances.  It will end.  When it will end, vis-a-vis

7    the retirees, I cannot stand here and tell you.  We believe

8    that no matter what happens, it will continue at least through

9    2012.  Whether it continues much beyond that I can't really

10   say.  But while we understand why the retirees would prefer

11   that the VEBA be used only for their benefit, the fact of the

12   matter is that the VEBA was created for the benefit of others

13   as well.  And we intend to, as we should, use it for those

14   purposes as well.

15        THE COURT:  Well, my understanding, which has been

16   clarified now on multiple occasions during this morning's

17   hearing, is that today's motion does not directly or even

18   indirectly implicate what happens in the future with respect to

19   the reimbursement claim.

20        MR. KRASNOW:  Correct, Your Honor.

21        THE COURT:  And so there's nothing in today's motion

22   that directly or indirectly impacts the rights of those who

23   have objected in their capacity of beneficiaries of the VEBA.

24        However, by virtue of the fact that the motion

25   provides reasonable transparency into the debtors' thought

Page 34

1    process with respect to a claimed entitlement to reimbursement

2    of up to twenty-five million dollars and inasmuch as effecting

3    such reimbursement reduces the funds within the VEBA available

4    to pay ongoing benefits to retirees and others, I understand

5    the reason that so many parties have chosen to be heard by

6    submitting letters to me and filing those letters on the

7    docket.

8             Which brings me back to the question I asked you about

9    fifteen minutes ago --

10            MR. KRASNOW:  Sorry, Your Honor.

11            THE COURT:  I appreciate the long explanation; it's

12   very helpful.  But the question is in what manner, if at all,

13   will these individuals and others similarly situated know about

14   what's going on with respect to the VEBA?

15            MR. KRASNOW:  We will have to -- I can't speak to what

16   is required under ERISA, but if we determine that, within a

17   reasonable period of time, the VEBA funds will not be available

18   because they will have been depleted, we will give notice to

19   the retirees because, presumably, the Aetna plan will still be

20   there.  And in order for them to avail themselves of that, they

21   will have to start making the premium payments.

22            It would not seem, to me, appropriate to give someone

23   notice of that of thirty days.  So we will give them reasonable

24   notice based upon whatever the circumstances may be at the

25   time, including an analysis of where we -- are we on the

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 35 of 111

Page 35

1    twenty-five million and what we envision the future uses will

2    be.  I cannot speak, Your Honor, to what rights, if any, the

3    retirees will have, once we give them the notice, under

4    applicable law.  But whatever rights they may have, whatever

5    notices LBHI is required to give, it will give.

6            As I noted earlier, Your Honor, it's not clear we had

7    to give ninety days' notice when we decided to terminate the

8    plan as it related to them, but we thought it was the right

9    thing to do.  I would like to think, Your Honor, that that

10   approach will continue even after our emergence from Chapter

11   11.

12           I hope I've been responsive to Your Honor.

13           THE COURT:  You have been responsive, although I

14   suspect anybody who's listening to this won't really understand

15   what, if any, notice they're going to be able to get.  And I

16   think that's probably because you don't know.

17           MR. KRASNOW:  You're absolutely right, Your Honor.

18           THE COURT:  Okay.

19           MR. KRASNOW:  I've tried to explain it as best I can.

20           THE COURT:  Now, I do have a fundamental question that

21   I just don't know the answer to on the basis of looking at the

22   papers, which is whether or not the change in equity control of

23   Aceso, A-C-E-S-O, will lead to any change in ongoing management

24   of the VEBA in terms of the identity of the trustee, the

25   decision process with respect to the VEBA and the management of

Page 36

1    its assets.

2              MR. KRASNOW:  I think the answer is we don't believe

3    there will be any.  In fact, I don't want to speak for the SIPA

4    trustee, but I think one of the motivations that the SIPA

5    trustee had in agreeing to this transaction was that we were in

6    a better position to manage the VEBA than, frankly, the SIPA

7    trustee is.  They have a different focus than we have had.

8              I don't believe that today there is a view that there

9    will be a change in who is the trustee --

10             THE COURT:  Who is the trustee now?

11             MR. KRASNOW:  Carol Rado, I think is the trustee, who

12   is an employee of either LBHI or LAMCO.

13             UNIDENTIFIED SPEAKER:  LBHI.

14             MR. KRASNOW:  Of LBHI, Your Honor.

15             So there has been an LBHI employee who has been a

16   trustee of the VEBA since the commencement of the Chapter 11

17   case.  So that's -- there -- to that extent, LBHI, if you will,

18   has been involved -- certainly has been aware.  So we do not

19   envision, as of today, any change.

20             THE COURT:  Okay.  Is there anything more you wish to

21   add at this point?

22             MR. KRASNOW:  Your Honor, for the reasons set forth in

23   the motion and on the record, and I also would refer to the

24   declaration of Mr. Hershan, which was filed with the motion, we

25   believe that the proposed transaction is in the best interest

Page 37

1    of LBHI, its creditors, and should be approved.

2         THE COURT:  Before asking if any of the objectors who

3    are on the phone or present in court wish to be heard, I'm

4    going to ask counsel for the SIPA trustee to explain, from his

5    perspective, why this transaction makes sense.

6         MR. LEE:  Your Honor, Ken Lee, for the SIPA trustee.

7         The transaction makes sense from the perspective of

8    the SIPA trustee, Your Honor, because it was our conclusion,

9    after doing extensive fact investigation as to the purposes

10   behind the creation of the VEBA and the purposes for which it

11   was intended that the funds had a very limited purpose and

12   could not be really directed to the benefit for any claimants

13   in the SIPA proceeding -- any customer claims or other non-

14   customer claims -- and that, in addition to that, it was

15   requiring the trustee to expend some amount of time and

16   attention on managing an entity over which it didn't actually

17   have full control since the -- as explained, the VEBA has its

18   own trustee.  And LBHI is involved with respect to various

19   benefit plans and administering benefits to current and former

20   employees.

21        In addition to that, there were a number of disputes

22   between LBI and LBHI concerning the funding of the VEBA and as

23   to whether there were claims going in both directions for those

24   sums of money.  And this proposed transaction resolves all of

25   those claims and, therefore, settles a significant matter that

1   is open between LBI and LBHI.

2          So for those reasons, we believe that it is in the

3   best interest of the LBI estate as well.

4          THE COURT:  Okay.

5          MR. LEE:  Thank you, Your Honor.

6          THE COURT:  You wish to be heard on behalf of the

7   committee?

8          MR. O'DONNELL:  Dennis O'Donnell, Milbank, Tweed,

9   Hadley & McCloy, on behalf of the official committee.

10         Just to note that we have had extensive discussions

11  with the debtors about this motion as well and believe that in

12  its narrow form, the form presented to the Court today, in

13  terms of the two components, it should be granted.  Obviously,

14  based on Mr. Krasnow's presentation, there are lots of issues

15  that will need to be dealt with after this transaction is

16  consummated.  And we're simply reserving our rights with

17  respect to how all those should turn out.

18         THE COURT:  All right.  I'll now hear from anybody who

19  is in court, either as an individual or through counsel or by

20  telephone, who have lodged objections to the requested relief.

21  You can come forward if you wish.

22         Please identify yourself for the record.

23         MR. DELANEY:  Yes, sir.  Judge, first of all, thank

24  you very much for letting me come here.  My name is Steve

25  Delaney.  I am a retiree from Lehman Brothers.  I worked there

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 39

1    for about twenty-four years and retired in 2006.

2          I raise this just because I heard about standing.  I

3    thought it'd be good if I could just explain what the program

4    was that I was involved with.  I don't know anything about the

5    disabled programs, the COBRA programs or what have you.  But

6    when I went to work at Lehman Brothers, part of the procedure

7    and part of the policy indicated that if you stayed at Lehman

8    Brothers -- and this is back in 1983 -- and retired from Lehman

9    Brothers at fifty-five, you would have lifetime retiree health

10   benefits.

11         You had to do some things.  First of all, you had to

12   be an employee, I think, before 1990.  So the universe is

13   fairly small with regard to that.  Second thing is you had to

14   retire at age fifty-five, so you had to have longevity.  And

15   the accumulation of your age and time in service had to be

16   seventy-five pts.  In --

17         THE COURT:  Can I ask you, was fifty-five viewed as

18   regular retirement or early retirement?

19         MR. DELANEY:  I don't know the answer to that, Judge.

20   I know at fifty-five, you qualify for all the retirement

21   benefits.  There was no mandatory retirement --

22         THE COURT:  This is what bankrupted Greece, you know.

23         MR. DELANEY:  It probably may have bankrupted -- I

24   don't think this bankrupted Lehman Brothers.  I'm pretty sure

25   of that.

Page 40

```
1                THE COURT:  All right.

2                MR. DELANEY:  So as far as standing, that's where I

3     am.  I am a retiree.  I've been receiving the benefits.

4                I heard today from counsel that this program was

5     terminated at one point in time, somewhere in 2009.  It may

6     have been terminated in the back rooms with other people

7     discussing, but the reality of it is, for the retirees, when

8     they would notify of a termination of this program, what do

9     they all do?  They all call human resources.  I called human

10    resources.  This is important benefit, what is going on?  The

11    response was not that you're not going to have health coverage.

12    The response is very simply do not worry, it's going to be

13    taken care of, you're going to continue to have your health

14    coverage and it's still going to be the same program,

15    administered by Aetna, and you'll still pay the same

16    coverage -- I have the same -- paying the same premium.

17                THE COURT:  Who made the --

18                MR. DELANEY:  So the reality of it was --

19                THE COURT:  Excuse me, just -- who made these

20    representations to you?

21                MR. DELANEY:  Human resources at Lehman Brothers HI.

22    And it wasn't so much the representations.  It was because

23    after they announced to us that we were going to get this

24    coverage and it was going to be through LBHI, we proceeded to

25    get our quarterly bill from Aetna which was the same insurance
```

Page 41

1   coverage for the exact same amount and we had the same

2   coverage.

3          And I've been having that coverage for the last two-

4   and-a-half years.  And I think it's absolutely great.  I get a

5   bill every quarter from Aetna under the term Lehman Brothers

6   Holdings, Inc.  Special program -- special statement for my

7   health insurance.

8          So as far as what I knew and what other retirees -- I

9   can't speak for them -- knew, there was no termination.  We

10  continue to have the same coverage for the same amount for the

11  period of time that we're into bankruptcy.

12         Now, I really didn't understand -- I hate to

13  apologize -- the machinations that went on before in terms of

14  what was really being asked for.  When I read the document, I

15  literally viewed this as two things: one, the holding company

16  wants to end retiree health benefits and, two, they got a pot

17  of gold of thirty-seven million dollars and they want to take

18  twenty-five million and turn that over to LBHI to pay for the

19  employee health benefits while they continue to work at Lehman

20  Brothers after the bankruptcy.

21

22  Now I can understand looking at this that the money was put

23  aside for the benefit of retirees and other people.  At some

24  point in time, there becomes an important decision as who are

25  we working for.

Page 42

```
 1              In my letter, I indicated that as of the filing of
 2    bankruptcy, the Lehman creditors, really, were the only party
 3    in interest as far as what was left of the estate.  If Lehman
 4    Brothers at that point in time had been dissolved or liquidated
 5    within six months, the creditors would have gotten X cents on
 6    the dollar.  I think at the CDS auction -- I don't know -- who
 7    knows -- the price was somewhere around eight and a half, nine
 8    cents on the dollar.  A decision was made at the holding
 9    company to keep this in operation.  Why?  For the benefit of
10    the creditors.  And it was a very good benefit, because if we
11    look at the benefits to the creditors, the value of their bonds
12    which were in CDS at eight or nine cents on the dollar, are now
13    trading -- at least on the bid side, at twenty-four, which
14    means they're probably worth a lot more.
15              So by keeping this entity alive for two and a half
16    years, what I understand from press releases, there's 160 of
17    billion of debt out there, at 18 points, keeping Lehman alive
18    has resulted in a benefit to the creditors of about 22 billion
19    dollars.  Having received that benefit, which can be totally
20    liquidated right now in the market, but I think they'll all
21    hang on for the recovery, now we have LBHI coming back to a pot
22    and saying we want twenty-five million out of that to pay for
23    the health benefits for individuals who were employed to
24    increase the value of the holdings of the creditors.  Which
25    they did.  And it's great.  And I don't begrudge, you know, the
```

Page 43

1   creditors getting their piece of the action out of this.  But

2   we have a trust that may have come to an end in terms of health

3   benefits for LBHI in seven months; they're now trying to milk

4   this for another two and a half years while they reap the

5   benefit of this.

6          As I look through the Bankruptcy Rule -- because I've

7   got to admit I only used Google for this, so probably not the

8   most extensive coverage, there are two things that I saw about

9   benefits; one, has anyone been appointed to represent us?  I

10  don't know.  The only thing I got was that notice in the mail

11  to which I filed an objection.  It talks in terms of what's

12  fair and equitable for all parties; the debtor, the creditor,

13  retirees, whatever they may be.  The -- I understand that what

14  you did today certainly didn't impact us directly.  But I

15  think --

16          THE COURT:  I haven't done anything yet.

17          MR. DELANEY:  oh, I'm sorry, Judge.  But --

18          THE COURT:  I'm just --

19          MR. DELANEY:  -- it sounded like --

20          THE COURT:  I'm just listening.

21          MR. DELANEY:  Okay.  But it seems to me, looking at

22  what has gone on over this period of time -- it's been three

23  and a half years.  I honestly do not know what benefits I have

24  under any statute, bankruptcy or risk or anything like that.

25  We've got a million lawyers here and not one of them can tell

Page 44

1    me just what my benefits are?

2         I don't want to rabble rouse, but I'd like to know

3    where we stand and I'd like to know why can't we have someone

4    appointed to represent us?  We're spending a lot of money in

5    this case for lawyers sitting around and doing things that may

6    be beneficial or not beneficial.  We have a statute that seems

7    to convey some sort of interest to the retirees in this case,

8    and if it's recognized, why can't we have someone speak on our

9    behalf who is knowledgeable?  I certainly am not knowledgeable

10   in this area.

11        And the other things -- I'm requesting is one, I'd

12   like to have someone appointed to make sure that we are fully

13   versed in what our rights are.  Second of all, I think the

14   twenty-five million payments which may not be on the floor

15   today but was certainly raised by those -- the motion should be

16   denied.  I don't know whether I'm going to around to get

17   notice.  As time goes on, the universe of these retirees gets

18   smaller and smaller.  As I say, you had to be you had to be

19   retired at fifty-five and be employed at Lehman before 1990.

20   So it's a smaller and smaller group and they're not around --

21   it would seem to that to protect these people to the extent

22   they are entitled to protection under the statute, that someone

23   should be appointed to oversee what's going on.  And I

24   definitely think it's not fair in assessing the value to all

25   parties that LBHI reap the gain of another twenty-five million

Page 45

1   while the retirees are losing health benefits.

2            THE COURT:  Okay --

3            MR. DELANEY:  Okay?

4            THE COURT:  Thanks for your --

5            MR. DELANEY:  Thank you very much.

6            THE COURT:  -- presentation, Mr. Delaney.

7            Is there anyone else who wishes to be heard?

8            You may come forward.

9            MS. RASMUSSEN:  Thank you, Your Honor.  My name is

10  Marianne Rasmussen.  I'm a beneficiary of the trust but also I

11  had been chief human resources officer at Lehman from 1994 to

12  2001 and I had twenty-nine years of experience with the firm

13  and then prior to that, Shearson Lehman and American Express,

14  so it was all bridged.

15           A few things that were said today -- just doing math,

16  when we talk about if the VEBA comes down to only twelve

17  million, my calculation is that that would probably be only,

18  like, maximum five months left.  The reason I say that is

19  because if we do the math, we've gone through almost fifty

20  million dollars of the fund so far.  So if we take away that --

21  I'm sorry; maybe it's -- 150 -- but the 12 million dollars left

22  would probably be substantially taken by year end because many,

23  many people hold all their bills and they send them and submit

24  them all at once.  So that's one part of it, so it's usually a

25  significant portion that eats up all that money at that point.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 46

1    And even if we have twelve million, it's probably four to five

2    months left.

3            Also, there are a couple of things that were raised in

4    counsels' response that I'd like to address.  They talked

5    about -- only about a dozen people responding.  I talked to a

6    number of people that I know.  Three of the six people said

7    they didn't even receive that one letter and the other three

8    people that I spoke to -- well, I submitted an objection letter

9    and so did Antoinette LaBelle.  Other people just feel like

10   they don't have the expertise and the ability to do it, so we

11   do it as laypeople.  But, also, Wendy Uvino's letter that was

12   sent to the Court, even though it said an objection letter, I

13   think it was more like an amicus friend of the Court letter

14   that she was trying to do because she certainly had lots of

15   experience.  Some of the things that counsel said that she had

16   to do -- well, she was employed by the firm so of course she

17   had to go through this extensive research.

18           They also said there was only some response to the

19   October 16th, 2009 letter that was Exhibit B.  I happen to know

20   that I personally tried to call and I was asked to call back

21   several times because they had so many phone calls about that.

22           Then, it was also said that people didn't really call

23   too much after -- between that two-year period of time.  Well,

24   I guess the question is why would they if they received a

25   January 11th, 2010 letter which said, in bold, "No increase in

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 47

1  your cost, new plan design applies, assuming arrangements for

2  the health care trust to pay premiums are finalized.  Your plan

3  costs for 2010 will not increase over 2009 cost and therefore

4  you will not be responsible for the full cost of coverage."  So

5  it's literally telling us it's going back to the way it was

6  three months prior to when we received that October 2009

7  letter.

8          So people -- of course they didn't respond because

9  they thought everything had been taken care of.  Again, most of

10  the people that we're talking about are not sophisticated

11  people.  Forgetting about the percentage of people that are

12  investment bankers and the traders.  Seventy percent of the

13  people were paid an average amount for their job.  They were

14  operations people, they were technology people, they were

15  secretaries, et cetera.  So when they receive a letter like

16  this, they are confused and they probably don't know what to

17  do.

18          Many of the trust beneficiaries are the old Shearson

19  people.  When I say old, I mean they're equivalent to almost

20  our parents' age.  I believe that many of them did have defined

21  vested rights because many of them had the old Shearson wording

22  and they have nothing else.  And those did not -- those summary

23  plan descriptions did not say anything about the company had

24  the right to mend (sic), change or terminate.  That was prior

25  to 1994, prior to the IPO and many of these people have been

Page 48

1    retired for many, many years.  These -- some of these people

2    that are being affected are eighty-five, ninety year old

3    people.  And, as I said before, these people also -- not only

4    are they aged people, but they also probably also lack the

5    resources -- both the ability and the finance to really address

6    some of these issues.

7            And with that, I thank the Court very much for your

8    time.

9            THE COURT:  Thank you, Ms. Rasmussen.

10           Is there anyone else in court who wishes to be heard

11   on this issue?

12           Mr. Gerson?

13           MR. GERSON:  Yes.  I -- the statements of the retirees

14   just reinforces our view in our papers that Section 1114

15   doesn't apply and even in the Delphi case, where Judge Drain

16   decided it wasn't applicable where there was an absolutely

17   right to modify, he still appointed a committee to represent

18   the interests of the retirees with respect to the open issues.

19   I think that leave exists in this case.

20           THE COURT:  Well, I hear what you said and before

21   commenting further, I'd like to ask if there are any other

22   affected retirees or objectors who wish to be heard who may be

23   on the telephone, rather than present in court?

24           MR. GERSON:  Of course, Your Honor.  Thank you.

25           THE COURT:  Okay.  I hear --

Page 49

```
 1            MS. ROTH:  If it please Your Honor --

 2            THE COURT:  Please identify yourself.

 3            MS. ROTH:  Yes, good morning, Your Honor.  My name is

 4    Barbara Roth (ph.), I.D. 45606260 --

 5            THE COURT:  You're going to have to speak up because

 6    you're coming through in a somewhat soft way.

 7            MS. ROTH:  I'm sorry, Your Honor.  Good morning, Your

 8    Honor, Judge James Peck.  My name is Barbara Roth, ID number

 9    4600260.  I'm calling from Clearwater, Florida and wanted to

10    thank you for the opportunity to present my case to you today

11    regarding the notice of motion and settlement agreement

12    regarding Lehman health care trust.

13            I submitted (sic) documentation from you with regard

14    to the motion which was received via mail on October 25th at 6

15    p.m. in route to the emergency room and I was admitted to the

16    hospital from 10/25 and released this past weekend which did

17    not give me the opportunity to present myself in New York.  I

18    believe that this motion was not given enough allocation (sic)

19    for me get a legal representation.  While I was in the hospital

20    I had the benefit of contacting your office, Mary Lopez, the

21    case administrator, and Epiq and also the debitors (sic) for

22    Lehman Brothers Holding, Inc. with regard to how I need to file

23    the motion.

24            According to Ms. Lopez, the lawyers filed -- excuse

25    me, Your Honor, Weil, Gotshal & Manges, a former firm that I
```

Page 50

1    worked with, with Lehman, left out documentation with regard to

2    how to file, where to file and the case number was missing

3    because there were sub cases with each motion.  Furthermore,

4    per this letter, I contacted Lehman's hotline and left a voice

5    mail message to find out how I can utilize forwarding this

6    motion to you and I did not receive a response that was

7    favorable until I was specifically told we don't represent you,

8    we're not at liberty to disseminate any information.  And I

9    explained to her my scenario of being in the hospital was --

10   that I told to you --

11          THE COURT:  Excuse me for breaking in.  But I wonder

12   if you could, rather than going through the background, tell me

13   what your objection is.  Just tell me what it is in plain

14   language.

15          MS. ROTH:  Well, my objection to you is I did not

16   leave the do -- receive the documation (sic) in time to hire a

17   lawyer.  I also thought that I was vested in the company.  I

18   worked with Lehman Brothers from 1993 to 1995.  I'm on

19   disability and I've never seen any information with regard to

20   the plan being terminated.  I had various conversations with

21   Carol Rado when they notified me that it was going to be seized

22   and then I received a phone call which I had on tape stating

23   that there's no need to worry, everything will be reinstated,

24   there'll be no charges for insurance and you'll be covered.

25          THE COURT:  Okay.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 51

1          MS. ROTH:  And so there was a lot of confusion and --

2          THE COURT:  I think I understand what you're saying as

3    follows.

4          MS. ROTH:  I have been with the company --

5          THE COURT:  If I could just -- if I could just break

6    in for a moment because --

7          MS. ROTH:  Yes, sir.

8          THE COURT:  -- I'm sympathetic to your situation but I

9    have a docket that I need to move through.  I need to find out

10   if there are other objectors and we need to move forward with

11   this morning's calendar.

12         It seems to me from what I've heard that you complain

13   that you did not have adequate notice of today's hearing, that

14   you want an opportunity to be able to express your opposition

15   to the relief being requested in a more formal way in which you

16   believe that it is unfair for you to be deprived of ongoing

17   benefits under the plan that is before the Court.

18         Did I fully summarize your position?

19         MS. ROTH:  Yes, you did.

20         THE COURT:  Okay.

21         MS. ROTH:  And I was under the assumption since I

22   started at the very beginning with Lehman Brothers Kuhn, Loeb,

23   Inc. and went through every merger and acquisition, that I

24   still have documents here saying I'm covered until I'm sixty --

25         THE COURT:  I think I understand the nature of your

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 52 of 111

Page 52

1    concern and I'm going to ask if there's anyone else who's on

2    the phone who wishes to be heard, to express something

3    different.

4          MS. ROTH:   Thank you, Your Honor.

5          THE COURT:   Thank you.

6          Is there anyone else who wishes to be heard on this

7    point?

8          MS. ROTH:   If I may add just one other issue?  I think

9    it would be fair and justice (sic) to have some type of Lehman

10   representative set up to answer questions and I guess further

11   explain the process and policies because there's so much

12   documentation that's conflicting.  And whomever I have called

13   has -- have no assistance whatsoever.

14         THE COURT:   Okay.  I understand -- I understand the

15   nature of your complaint.  Thank you very much.

16         I'm going to give the debtor through counsel an

17   opportunity to comment with reference to the individual

18   objections that have been lodged, but only if counsel feels

19   there's a need to comment.

20         MR. KRASNOW:   No, Your Honor.  We can't help but feel

21   sympathetic for some of the concerns that have been expressed,

22   but unfortunately, Lehman is where it is and we are not seeking

23   relief today that really goes to the issues that these people

24   have addressed and raised.  but to make one thing clear in

25   terms of one comment that was made, Your Honor, the -- there's

Page 53

1    nothing that we are doing nor that we currently contemplate

2    doing -- we -- and it's not our plan, but that we contemplate

3    doing with respect to the Aetna plan which is really the basis

4    for which or through which these medical payments are being

5    satisfied.

6              That's it, Your Honor.  We rest on our papers.

7              THE COURT:  Okay.

8              Counsel for the Department of Labor made a comment

9    that no one has responded to yet that perhaps this is a

10   situation in which a committee should be formed to represent

11   the interests of beneficiaries of the group benefit plan.  At

12   this juncture in this extraordinarily protracted and complex

13   bankruptcy case which is heading next month toward a

14   confirmation hearing, it is too late -- especially by oral

15   request to be forming any kind of formal committee.  But, I am

16   concerned, particularly in reference to the written statements

17   that have been filed with the Court and the statements that

18   have been made by Mr. Delaney and Mr. -- Ms. Rasmussen in open

19   court today, that this is a confusing situation for the

20   individuals who are affected.  Health care in the United States

21   is a subject that the Supreme Court will be addressing next

22   year.  Courts of appeals throughout the United States have been

23   addressing the Health care law; it's a very controversial

24   subject and a subject that's politically grounded.

25             Here, we are talking about the private rights of

1    individuals who don't fully understand, even the sophisticated

2    ones, precisely what their rights are.  Notwithstanding the

3    fact that it has been represented forcefully and credibly in

4    court that appropriate correspondence went out to notify

5    parties who are beneficiaries of the VEBA as to the termination

6    of benefits and the continuation of coverage that was

7    substantially similar under what has been described as the

8    Aetna plan.

9         As I said at the outset and as Mr. Krasnow confirmed,

10   the relief that is being sought today is fairly surgical and

11   benign in relative terms.  All that is happening, as I

12   understand it, is that from a structural perspective, control

13   of the entity that in turns controls the VEBA is being

14   transferred from the trustee of LBI to LBHI and certain limited

15   releases -- limited in a manner acceptable to the Department of

16   Labor, are being exchanged.  nothing in today's motion directly

17   or indirectly affects the rights of any beneficiaries of the

18   VEBA, however, it is clear from a fair reading of the motion

19   and from the statements made by debtors' counsel that at some

20   point in the future, it is foreseeable that LBHI will be taking

21   steps, if permitted, under applicable law -- which is not

22   bankruptcy law, to reimburse itself up to twenty-five million

23   dollars from funds that are currently held by the VEBA in

24   respect of certain health care payments made directly by LBHI

25   to cover individuals who are otherwise subject to the

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 55 of 111

Page 55

1    protection of the group benefit plan.

2          It is really that twenty-five million dollar

3    reimbursement that has been proposed but that is not part of

4    the motion itself that I believe has generated most of the

5    objections that we have heard today.  Additionally, I believe

6    that the objections are motivated by a profound sense of fear

7    and insecurity as to what will happen to particularly

8    vulnerable individuals who are dependent upon the health care

9    benefits that are funded by the VEBA.

10          I am extremely sympathetic to the objections that have

11    been raised and I recognize that counsel for the debtor has

12    also expressed sympathy.  In effect, however, those are hollow

13    words because expressing sympathy does not provide any

14    significant relief nor does it provide the information that the

15    individuals appear to require.

16          I will grant the relief requested but I'm going to

17    condition that relief upon something that may or may not be

18    within my powers.  I do not know whether or not I have any

19    ability to direct that the trustee of the VEBA or those working

20    at LBHI who are in control of the VEBA through Aceso, but I

21    would like the individuals who are in a position to make a

22    difference, to provide meaningful information to all of the

23    beneficiaries, both current employees, retirees and those on

24    disability, as to precisely what is going on, when action is

25    going to be taken, it may affect their rights, and provide them

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 56 of 111

Page 56

1     with what amounts to a funded lawyer; a lawyer that can

2     represent the interests of the classes of affected

3     beneficiaries so that those separate classes can be advised in

4     a thoughtful and understandable way as to what their rights

5     are.  And it seems to me -- and I may not have every class

6     clearly in mind, but the three classes that may need separate

7     representation; by (sic) those who are current employees, those

8     who are retirees and those who are on disability.  It may be

9     that those who are on disability and those who are retirees

10    fall into the same category.  But I am not satisfied simply at

11    proving what amounts to a benign transaction in a setting that

12    includes so much obvious pain and concern on the part of those

13    who are looking to the VEBA as a source of Health care

14    coverage.

15          Now, having said what I've said, I do not mean to

16    overstep my prerogatives and jurisdiction.  For that reason,

17    I'm conditioning this on not an order from the Court, but a

18    strong suggestion with a request for voluntary compliance.  I

19    won't enter the order unless and until I hear a report as to

20    whether or not what I have suggested can be arranged.  If it

21    can't be, for good reason, I'll reconsider the conditions I've

22    imposed.

23          If there's anyone who wishes to say anything in

24    response to what I've said, this is the time to do it.

25    Otherwise, we're going to move on to the next agenda item.

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 57 of 111

Page 57

1          MR. KRASNOW:  Thank you, Your Honor.  Your Honor, I

2    believe the -- we've concluded the Chapter 11 debtors' portion

3    of the agenda, so I will turn it over to the representatives

4    for the SIPA trustee.

5          MR. SALZMAN:  Good morning, Your Honor.  My name is

6    Michael Salzman.  I'm from Hughes, Hubbard & Reed and I am here

7    for the SIPA trustee.  And my part of the activity today

8    concerns the motion that the Providence funds made for a

9    schedule to proceed with litigation and I believe, therefore,

10   that Mr. Molton, on behalf of Providence, would be the

11   proponent of the motion and, therefore, it occurs to me that

12   Mr. Molton would be next up.

13         THE COURT:  He is, in fact, on his way.

14         MR. MOLTON:  Thank you, Mr. Salzman.  Good morning,

15   Your Honor.  David Molton of Brown Rudnick here with Howard

16   Steel for the four Providence funds which I'll call the funds.

17   Your Honor, I'm going to be brief.  I think our papers

18   adequately set forth our situation.  I'm going to -- I know, as

19   Your Honor knows, since the commencement of this case three

20   years ago, the funds have been persistent in asking for prompt

21   progress and determination of their disputed customer status.

22         We're not being told, reading my friend Mr. Salzman's

23   papers, that we have to, according to them, wait until sometime

24   in 2013 before our issue is even teed up, until there's a

25   determination of a disputed house claim by LBIE which may

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 58 of 111

Page 58

1    implicate, arguably, some of our securities and then, possibly

2    thereafter, later in 2013, second quarter, where the omnibus

3    claim, to the extent it does not get resolved, is teed up.  I

4    think, Your Honor -- and I'll get to it in a minute -- our

5    situation is wholly independent of those issues.

6         But in any event, Your Honor, that's too long and

7    those proceedings, as I'm going to contend and submit, are

8    irrelevant.  We're asking, Judge, that this argu -- that our

9    motion or our dispute as to customer status be teed up

10   relatively quickly.  I know certain people objected to our

11   proposal for an early 2012 tee up. Needless to say, we're

12   willing to work with our friends on the other side in terms of

13   a schedule but it would be a prompt schedule.

14        I'm not going to get into the merits of the argument,

15   Your Honor.  They've got their position, we've got ours.  Your

16   Honor's seen it, Your Honor has seen it last year, Your Honor

17   saw it a couple of years ago when I stood up here.  Suffice it

18   to say there's a dispute.  That dispute is one that we believe

19   can be -- is mostly a legal dispute and one that can be

20   resolved relatively quickly on an accelerated hearing schedule.

21        We don't have any other remedy, Judge, but to come

22   here three years now.  And I know Your Honor has seen me

23   intermittently in that time asking, on occasion, for the same

24   thing.  But we have no other remedy other than to come here and

25   ask for Your Honor's intervention in this in order to compel

Page 59

1    the trustee to tee up this motion concerning folks who has a

2    contractual relationship with them and argument is we're

3    customers of LBI.

4            THE COURT:  Mr. Molton, let me just break in --

5            MR. MOLTON:  Yes.

6            THE COURT:  -- and ask you a fundamental question.

7    This is really a request to jump ahead of some other matters

8    that are on the LBI docket in a manner that, at least the

9    trustee argues, in fundamentally inefficient because many of

10   the  same issues that you're concerned with are tied up in the

11   LBI house claim.  And my question to you is why is it efficient

12   to do what you're proposing?  I understand your clients are

13   impatient and you have a job to do.  Why does that mean that I

14   should do anything special for you?

15           MR. MOLTON:  Well, first of all, Judge, we're not

16   asking -- we don't think it's special for us.  We think that,

17   pursuant to the way Your Honor's case managed this case, an

18   omnibus hearing can be teed up that would affect all alleged

19   300s similarly situated, folks who are like us.  Indeed, a year

20   and a half ago, we submitted, on their request, a stipu -- a

21   proposed stipulation of uncontested facts that would guide that

22   hearing to resolve these legal situations.

23           But let me get to the crux and the gist of your

24   matter, Judge.  We don't believe that these issues are tied up

25   in the other claims.  We believe SIPA, first of all, requires

Page 60

1    them to timely adjudicate our customer status.  The

2    finalization of that status, Your Honor is -- affects issues

3    that are wholly independent from the adjudication of the house

4    claim or the omnibus claim.  First of all, it will affect our

5    right to get advances from SIPA which may be one of the reasons

6    why they want to deny us customer status.  Because if they just

7    hold LBIE to be the customer and not these 300 other folks who

8    we argue also enjoy customer status --

9           THE COURT:  You said you weren't getting to the

10   merits, Mr. Molton.

11          MR. MOLTON:  Okay.  Put it aside.  I'll get it aside.

12   But it affects our distribution right.  To the extent there are

13   interim debtors, which we hope there are, it would affect our

14   clients right to those interim distributions to have

15   finalization as to the adjudication of our status.  It affects

16   how we deal, Your Honor, with the ongoing LBIE proceedings and

17   the allegations or the position that were found in that matter.

18   To have finalization and adjudication of our customer status

19   will allow our clients to finally understand their rights in

20   this proceeding and make decisions as to how they will go

21   forward to resolve situations globally across the board.

22          We think we're entitled to it under the statute, Your

23   Honor.  We don't believe, as our friends from the committee put

24   in their paper, that there's any connection between the

25   resolution of the LBIE claims, whether it be the house claim or

Page 61

1    the omnibus claim, in connection with the resolution of what we

2    believe, again, Your Honor, will be a very legally oriented

3    decision by this Court on pretty well undisputed facts.  We're

4    not asking for preferential treatment, we're not asking to be

5    put ahead of anyone, Your Honor.  We're asking that our claim

6    be adjudicated.  We're asking Your Honor to include all of

7    those similarly situated.

8            First of all -- and in light of what I said, Your

9    Honor, for the trustee who has fiduciary duties to timely and

10   promptly pursue and adjudicate and resolve customer claim

11   status -- customer claims -- disputed customer claims, to say

12   the resolution of our claim would be meaningless, is just, from

13   our perspective, a frivolous argument.  And we're very

14   concerned, Judge, that we're being strung along, that to some

15   extent we find ourselves between a rock and a hard place, that

16   we're being a pinball between the various self-motivated claims

17   of these two brokers, one in the United States and one in

18   England, who are using us and delaying the adjudication of our

19   claim to our detriment for whatever their negotiating, as

20   they've been negotiating for now over three years to resolve

21   claims between them.

22           Again, I think that's it, Judge, unless Your Honor has

23   any further questions, I'll rely on our papers and really ask

24   that we have our day in court.

25           THE COURT:  Okay.

Page 62

1          MR. MOLTON:  Thank you.

2          THE COURT:  Thank you.

3          MR. SALZMAN:  Michael Salzman again.  The fundamental

4    premise that Mr. Molton puts forth, that his claim is wholly

5    independent of the LBIE omnibus claim is false on its face.

6    It's the same exact property.  The omnibus claim was made by

7    LBIE precisely on behalf of Mr. Molton's clients and 299 other

8    funds.  And we've spent the last three years with LBIE

9    reconciling positions to come to where we are. It's not the end

10   of the road and we're very sorry that it's not the end of the

11   road and we recognize the responsibility to move to the end of

12   the road.

13          But we've gotten to the place we are by dint of

14   comparing the LBIE books and records with the LBI books and

15   records.  There were almost 200,000 different claims that had

16   to be dealt with in Lehman week.  We've dealt with them.  We're

17   now in the process of taking, really, I would say, two

18   important steps that are going on simultaneously.  One is to

19   litigate the remaining legal issues with LBIE if they cannot be

20   agreed upon and, at the same time, as our papers indicate, we

21   have started, I want to say, trialogues, three way discussions

22   with people such as Mr. Molton's clients, other of those funds

23   that are direct claimants into LBIE and on behalf of whom LBIE

24   has made the omnibus claim to us, to give those people an

25   understanding of what's involved and to make sure that they are

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 63 of 111

Page 63

1   satisfied, to the extent they can be, with -- that the books

2   and records accurately show what occurred and if they have any

3   differences to let us know and work that out.

4           But it is fundamentally wrong to say that this case

5   can progress in any meaningful way by separately working in

6   this court and having discovery and litigation with these 300

7   different claimants.  And it would -- as LBIE agrees with us on

8   this point, if you saw their paper filed yesterday.  The issues

9   are -- they say intertwined; I would say they're largely the

10  same, not just intertwined, as to was particular security here

11  or there?  And I submit, Your Honor, that it would be a

12  profound mistake to get us off track now with these 300 other

13  people.

14          THE COURT:  Well, okay, let me just break in and ask

15  you a question that's relatively straightforward.  It's simply

16  about timing.  I view the motion being pressed by Mr. Molton as

17  primarily growing out of a strong sense of frustration that

18  this process has been dragging on for too long and that unless

19  he, for the benefit of his clients and others who may be

20  similarly situated, jumps in and says to me please do something

21  about this, this is going to go on indefinitely and he has no

22  control over his fate, his client's fate.  What do you say to

23  that?  And a subpart; why can't this be carved out of the LBIE

24  claim?  Why can't there be some separate determination that all

25  of these 300 or so hedge funds that have the same kind of

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 64

```
 1    contractual relationship, both with LBIE and LBI, can have at
 2    least their customer status issues resolved?  What's wrong with
 3    that?
 4         MR. SALZMAN:  The omnibus claim -- the allowance of
 5    the omnibus claim gives these people what they're entitled to
 6    insofar as they could have customer status.  We think it's
 7    clear by definition, according to the books and records,
 8    they're 056 accounts.  That means they were customers of LBIE,
 9    not of LBI.
10         THE COURT:  Is that really determinative?  I mean, I
11    know I saw that in your papers and I know that, from an
12    internal perspective, that kind of coding may be significant
13    but does it really determine that ultimate legal question?
14         MR. SALZMAN:  I think it's not, by itself -- it's not
15    a hundred percent but it's close to a hundred percent.  And
16    beyond that, where we've been going these last three years in
17    working with LBIE to reconcile the positions would be a
18    futility, frankly, if these people were now going to start over
19    and press direct claims.  We think that the way -- the fastest
20    way home, frankly, is to resolve the LBIE, LBI issue.  At that
21    point, the 8.3 billion dollars that's up on the table will be
22    allocable.  If it's more or less, based on whatever Your Honor
23    decides, so be it.
24         And at that point, we believe -- and we believe that
25    almost all of the other 300 people -- and I think it's notable
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 65

 1    that, to this point at least, only Providence is on this motion

 2    today -- that these other people recognize that if we work with

 3    them, LBIE takes up the cudgels for them, to the extent there's

 4    a disagreement, that that will get us home and that the 300

 5    other people who have all -- most of whom have made direct

 6    claims in this court, did so largely for protective reasons; we

 7    won't have to litigate any of those things.  And we're

 8    anticipating, as Mr. Kobak put in the interim report recently,

 9    that instead of having these 300 people in court here

10    litigating, that once the omnibus claim in done, that we're

11    done.

12             THE COURT:  Okay.  Well, you've just said something

13    that makes it sound pretty simple.  Once it's done, we're done.

14    Well, what's the process for getting that done?  That's an

15    enormously protracted, fact-specific process that, I think,

16    runs out over something like eighteen months.

17             MR. SALZMAN:  But the reality, Your Honor, is that

18    getting a short answer test question answer to the question do

19    the --

20             THE COURT:  Does this mean that this group has to wait

21    eighteen months before they can do anything?  Because if that's

22    what you're saying, I suspect they're going to be saying in

23    response that's awfully long to have to wait, isn't it?

24             MR. SALZMAN:  It's --

25             THE COURT:  And we have issues that we assert are

Page 66

```
 1    separate and apart from this distracting other issue.  We just
 2    want to know whether we're customers and why can't we do that
 3    now?  What's the answer to that?
 4              MR. SALZMAN:  Well, the most direct answer, without
 5    being flip in any way and being respectful, is that --
 6              THE COURT:  Respectful of whom?
 7              MR. SALZMAN:  Of both Your Honor and of these people
 8    and their interests.  Is that knowing the answer to that
 9    question does not advance the ball.  The omnibus claim --
10              THE COURT:  But it may advance the ball for them.  I
11    think what they're saying is we understand that the trustee is
12    focused on the LBIE claim, big numbers there, and believes that
13    if they can resolve that, since we're included in that
14    universe, that this will all go away more neatly.  I think they
15    understand the argument you've made but they're saying
16    something else.  They're saying we're customers and have rights
17    in the LBI case.  And we want to have those rights determined
18    and vindicated and we don't want to wait for what we say is a
19    collateral issue.  I think that's their argument.  Don't you
20    think that's their argument?
21              MR. SALZMAN:  I do think that's their argument.
22              THE COURT:  So why -- what's wrong with that argument?
23              MR. SALZMAN:  What's wrong is that it does not advance
24    the ball in terms of their getting anything.  We still have to
25    determine the omnibus claim.  It's the same exact CUSIPs, it's
```

1   the same exact positions, it's the same exact cash and it's

2   illogical to do anything with them and give them anything,

3   promise them anything, represent anything to them until that

4   issue is resolved.

5          When Mr. Molton refers to -- criticizes us for saying

6   it would be meaningless, I think what we're trying to convey is

7   that there is a process, it is systematic, it's going to -- it

8   deals with their property and we're going to get it to them.

9   But having separate discovery as to -- their contention, for

10  example -- and Province is one of some people but not a

11  majority of people who are saying well, we really did business

12  in New York.  We don't recognize the fact that we -- this other

13  contract with LBIE has anything to do with it.

14         To get a trial on that subject is collateral.  To have

15  discovery about that is collateral.  It's not something that

16  can be addressed in a paper without discovery.  They themselves

17  acknowledge that they're asking for discovery and so on.

18         THE COURT:  I think they say limited discovery.

19         MR. SALZMAN:  Yes.  But the books and rec -- I mean,

20  where we are right now is the books and records say 056,

21  London, they got account statements from London and trying the

22  issue of to what extent beyond the, let's say, ninety-nine

23  percent that the books and records and those account statements

24  are determinative, just takes us spinning way out from the

25  process that'll actually get us to getting them their property.

Page 68

```
 1              THE COURT:  I understand that to be your position.  I

 2   want to hear from Mr. Molton on something.

 3              MR. SALZMAN:  Thank you.

 4              MR. MOLTON:  Your Honor.

 5              THE COURT:  Having heard what I just heard --

 6              MR. MOLTON:  Yes.

 7              THE COURT:  -- how are you and your clients benefitted

 8   in a meaningful way by having a separate litigation over your

 9   customer status as to LBI when the very same CUSIPs, as I

10   understand it, are tied up in another proceeding altogether

11   which has a long timeline to resolve?

12              MR. MOLTON:  I'll answer that, Your Honor.  And I'm

13   going to answer it by referring to the fact that one thing my

14   friend Mr. Salzman didn't say is at the end of this long

15   process, we'll treat you as customers in this proceeding.  He

16   doesn't say that for a reason.  Because it's not their intent

17   to ever try and concede that issue.  What they intend to do --

18   and if you listen to it carefully, it's not the vindication of

19   our rights in this proceeding or it's not even a timely

20   adjudication of our status in this proceeding but it's

21   adjudicating what the LBIE omnibus claim is and go over there.

22   That's where you belong.  Not that we have rights in this

23   proceeding.

24              And what he doesn't say is it's not apples and apples.

25   I'm not an English lawyer but I understand that in the LBIE
```

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 69 of 111

Page 69

1    proceeding, because LBIE hypothecated immediately before the

2    insolvency and their filing, a good deal of all of these

3    securities, whether or not there were margin balances or not,

4    we would be treated over there as general unsecured creditors

5    which is something that I think LBIE would like.

6            Here, we have preferred customer status, if Your Honor

7    decides we're a customer.  And our whole point the last three

8    years has been to say we believe the statute contemplates this

9    too.  There could be two customers regarding the same disputed

10   property.  Indeed, Section 78fff-3(a)(5), as Your Honor

11   knows -- and I think Judge Lifland commented about that statute

12   recently regarding the feeder funds in the Madoff proceeding

13   which he said because they weren't broker-dealers or bankers,

14   that doesn't apply.  But we're accorded customer status in this

15   proceeding under that provision, entitled to advances from

16   SIPA, notwithstanding that we may have been also a customer at

17   LBIE.

18           So it's significant to me, when you actually peel back

19   the layers of what they're saying, to look at what they're not

20   saying.  They're never going to concede -- they don't say hey,

21   at the end of their dance with LBIE, you know, we're going to

22   give you customer status but everything's going to be resolved.

23   They don't say that.  Because that's not what their position is

24   going to be.  We want -- we're entitled per the statute to

25   have, as Your Honor said, our rights vindicated here.  We're

Page 70

```
 1    asking for a determination of status.  I think that that's a

 2    separate, distinct issue, recognized by the statute -- and

 3    indeed, if Your Honor -- I don't want to get into merits but I

 4    think the Second Circuit's decision in Madoff and what it

 5    defines as customer, touches a number of undisputed facts here

 6    that pulls us into that status.  But I'm not going to go there;

 7    just responding to my friend's point.

 8            But that's the reason why, Judge.  What they're doing

 9    vis-a-vis LBIE and its claims and the house claim concerns

10    arguably their property and also the house claims to the extent

11    the house claim includes hypothecated securities that are ours

12    and the trustee wins on the denial of that claim in this

13    proceeding?  Which means that they're regulated to general

14    unsecured creditors vis-a-vis that claim in this proceeding.

15    They're probably going to get no distribution.  We don't have a

16    remedy.  If that's where our property is.  And we don't know

17    that.  We say well, they speculate that it is, they speculate

18    that it isn't, nobody's told us yes or no.

19            And I just want to put up the fact that every time I

20    appear here -- well, we're talking to people.  We're talking to

21    people like you.  Yes.  Sometimes they call us.  You know, Mr.

22    Warnot, who I know, has had my papers for a number of weeks.

23    I've seen him on other matters.  I got his paper yesterday

24    where he says I'd be glad to call Mr. Molton and talk to him.

25    The bottom line, Judge, is we're entitled to have, as Your
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1    Honor said, our rights vindicated in this proceeding.  We don't

2    believe it's going to be -- in the scheme of the resources that

3    have been allocated to attorneys in this case, it's de minimis.

4    And I think Your Honor can get on with it, can make that

5    determination and I think that the determination of those 300

6    customers who have this situation, which can be done on an

7    omnibus fashion, will facilitate these guys talking to each

8    other and coming to some resolutions.

9         In any event, that's all I have to say unless Your

10   Honor has any other questions.

11        THE COURT:  Okay.  Is there more from anybody?

12        MR. WARNOT:  Your Honor, may I be heard?  I'm from

13   LBIE.

14        THE COURT:  Of course.

15        MR. WARNOT:  James Warnot from Linklaters for LBIE.  I

16   do agree with one thing that Mr. Molton said, that this is

17   taking way too long.  But most of the other things he said I

18   disagree with.  In fact, the funds are LBIE customers.  They've

19   put claims into the LBIE proceeding, they've entered into a

20   claims resolution agreement which is a very, very complicated

21   document as to how their claims will be dealt with, including

22   the impact of any recovery in this proceeding, we have asserted

23   claims on their behalf in the omnibus proceeding and so, in

24   fact, we think that's where the merits would ultimately come

25   out.

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
Pg 72 of 111
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 72

1           To respond to one of the questions that you posed

2      earlier, I don't think it's quite as simple or that all 300 are

3      similarly situated, such that a preliminary determination could

4      be made of their customer status, whether they're LBI

5      customers.  Frankly, if they're LBI customers and they want to

6      drop their claim against us, then maybe that's okay.  But

7      you've got to look at the suite of contracts which are not the

8      same for all 300.  In fact, even the versions changed over

9      time.  You've got to look at some of these internal procedures

10     that Mr. Salzman alluded to, how the accounts are designated,

11     where the account statements go and you've got a whole course

12     of dealing as to how these clients dealt with Lehman over the

13     years.  And we think it's clear that that points to LBIE

14     customers for the very vast, vast majority of them.

15          So you can't say that our omnibus claim, which is

16     asserted solely on behalf of these 300 or so hedge funds and as

17     to which the recoveries will go to those customers, are not

18     related with the claims that these 300 are trying to assert.

19     And we just don't see how you can litigate those two things at

20     the same time.  We are pushing for as fast a schedule as is

21     possible with LBI.  We filed our objection on the 31st of

22     October.  We're negotiating a litigation schedule now.

23          But with re -- one thing that could advance the ball

24     with respect to many of these individual customers, including

25     Mr. Molton's customers, are to talk about it.  To understand

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 73

1    precisely what their claim is into LBIE, what their claim is

2    into LBI, what they owe LBIE under the margin lending agreement

3    that will cover many of the issues that Mr. Molton is referring

4    to and what is in the omni claim on their behalf.  So for all

5    those reasons, we believe that the relief requested by Mr.

6    Molton doesn't simplify things but, in fact, overly complicates

7    them.

8            THE COURT:  Okay.  Does the committee have anything to

9    say on this?

10           MR. O'DONNELL:  Of course, Your Honor.  Your Honor,

11   Dennis O'Donnell, Milbank Tweed Hadley & McCloy.  We did file a

12   statement in support of Mr. Molton's motion.  We did so because

13   I think approximately three years ago, on October 13th of '08,

14   we filed a pleading in opposition to the first motion that was

15   made for discovery here.  I felt strongly at the time that all

16   of things that have been said by the LBI trustee and by the

17   LBIE trustee here made sense; that there was a process that

18   should unfold here.

19           But it is three years later and I think what Your

20   Honor has said as well, we agree with entirely which is that

21   there are separate issues here.  I've heard it said several

22   different ways here but I -- from a very basic -- you know,

23   without -- with limited visibility and to all the facts and

24   circumstances here, but from a very basic perspective here.  It

25   would appear that there are, in fact, two sets of contractual

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 74 of 111

Page 74

1    relationships here.  They can be dealt with separately.  They

2    should be evaluated separately.

3              The LBI trustee has issues letters of determination

4    with respect to all of the LBI claims and there are -- there's

5    a process for objecting to that -- whatever the

6    determination -- and having it decided by that court.  And I

7    think what Mr. Molton is saying is that that process, which

8    affects only this Court, should be allowed to play out in this

9    Court.

10             THE COURT:  Mr. O'Donnell, let's me just ask you

11   something very basic.  This would appear to be a matter as to

12   which the committee does not have a dog in the fight.  Why are

13   you here?

14             MR. O'DONNELL:  Your Honor, we're here as we have been

15   before on other LBI related matter because, as I think Your

16   Honor said very early in the case, that there is a semi-

17   permeable membrane between the LBIE case and the LBI --

18             THE COURT:  But how is the committee affected by this

19   question of how to deal with --

20             MR. O'DONNELL:  The committee --

21             THE COURT:  -- the interests of these hedge funds.

22             MR. O'DONNELL:  The committee is affected by who winds

23   up being a customer and not a customer in the LBI case and we

24   had, for the most part, ninety-nine percent of the time, been

25   on the same page as the LBI trustee as to how to handle the

Page 75

1   treatment of customer claims.  We, a few weeks ago, filed a

2   statement in support of their approach to the TBD claims -- TBA

3   claims, rather, and have worked with -- you know, worked

4   constructively with the LBI trustee.  Because we view the LBHI

5   estate as a beneficiary of -- a residual beneficiary of that

6   estate which would benefit our creditors.  So I think we do

7   have -- we have had all along that interest is how things

8   develop at LBH -- at LBI and view this as a situation where we

9   just disagree as to how the treatment should be -- how these

10  claims should be treated.

11          THE COURT:  Okay.  Thank you.  Is there more?

12          The fallback relief requested in the Providence motion

13  is that we conduct a status conference under Section 105(d).

14  And I'm prepared to do that sometime after the confirmation

15  process has run its course in the LBHI case.  I don't know what

16  the right date is for scheduling that status conference but for

17  discussion purposes only, let's say that next omnibus hearing

18  after whenever a confirmation order is entered, assuming one is

19  entered.

20          If a confirmation order is not entered, we'll have it,

21  say, in February of 2012 with the understanding that between

22  now and then -- and the holidays are upon us; that probably

23  means in January -- the parties will endeavor, through good

24  faith meet and confer sessions, to achieve something

25  approaching light if not heat, with respect to the possible

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 76 of 111

Page 76

1    acceleration of the determination of customer status, in a

2    manner that will not complicate or delay resolution of the

3    omnibus claim but by LBIE.

4            I have heard all of these arguments.  I've reviewed

5    the papers that have been filed.  There is a level of

6    complexity to this that I'm not sufficiently fluent at this

7    point to address with the kind of thoughtfulness that it

8    deserves.  It troubles me that there's an even split here with

9    two respected lawyers saying we can do this and two respected

10   lawyers saying we can't do this.  Or at least we can't do it

11   efficiently.  I don't have a sufficient clarity of vision at

12   this point as to who's right.

13           And so I would like the parties to try to see if they

14   can persuade the other side, perhaps, either that there is

15   merit to waiting to merit to bifurcating.  And you can provide

16   me with a status report and I can provide you with some

17   comments when next we're together on this subject.  It seems to

18   me that it would be useful, to me, if the parties could submit

19   position papers, with respect to the matters that have been

20   discussed, that can be in the form of simple correspondence

21   that is docketed, sometime prior to the status conference.  I'm

22   not setting a date.  A day or two before.  Thereby giving me

23   some advanced notice as to what the issues have turned out to

24   be.

25           Mr. Krasnow, you've returned to the room.  Does that

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 77 of 111

Page 77

1   signify anything?

2           MR. KRASNOW:  Your Honor, it simply signifies, I

3   think, that we may be at the conclusion of this morning's

4   agenda.

5           THE COURT:  That's a good thing.  We're adjourned

6   until 2 o'clock.

7         (Recess from 12:07 p.m. until 2:06 p.m.)

8           THE COURT:  Be seated, please.  Good afternoon.

9           MR. ROSEN:  Thank you, Your Honor.

10          THE COURT:  I think the only matter on this afternoon

11   is the motion to dismiss in Uvino v. Lehman, so let's proceed

12   with that.

13          MR. BAER:  Good afternoon, Your Honor, Lawrence Baer,

14   Weil, Gotshal & Manges, on behalf of Lehman Brothers.  Your

15   Honor, I will assume familiarity with background facts in this

16   case based upon the prior motion practice and the Court's May

17   decision.  Just like to add a couple of highlights of our --

18   the arguments set forth in our papers.

19          The quantum meruit argument that plaintiff makes in

20   this case is, essentially, unchanged from the quantum meruit

21   argument that was made in the original complaint.  In fact,

22   it's striking from a comparison of the blackline that I ran

23   between the original complaint and the amended complaint there

24   were no changed allegations with respect to quantum meruit.  On

25   its face, the quantum meruit allegations apply to the

1    commitment letter.  That is a claim that this Court has

2    previously dismissed; that is a -- the work of plaintiff,

3    covered by the original commitment letter, which expired on

4    December 31, 2009.

5           Plaintiff, in response to our motion to dismiss, said,

6    well, you know, we'll stipulate that the -- this new quantum

7    meruit claim set forth in the amended complaint applies only to

8    that period covered by the renewal commitment letter, that

9    being January 1st, 2010 to June 2010.  The fact of the matter

10   is the complaint says what the complaint says, and it is

11   improper to amend one's pleadings through a brief.

12          THE COURT:  I saw that.  But it's apparent to me that,

13   perhaps, through inartful pleading, perhaps, through lack of

14   diligence, perhaps, through error, there was a failure to do

15   that which the previous decision and order required.  But

16   you're not prejudiced.  And I'm not going to make that the

17   reason for dismissal, so you --

18          MR. BAER:  Well --

19          THE COURT:  -- shouldn't spend a lot of time there.

20   I'm going to deem the complaint amended so that it complies

21   totally with the Court's earlier decision.  It can't be

22   otherwise.

23          MR. BAER:  As the Court is aware, the simple -- the

24   procedural argument is not our only argument with respect to

25   the quantum meruit count set forth in the amended complaint.

Page 79

1    What is clear based upon the established case law in New York

2    and as construed by the federal courts is that in order to

3    succeed on a claim for quantum meruit, the plaintiff must have

4    a reasonable expectation of increased compensation:  not merely

5    an expectation, a hope, a subjective belief that is

6    unreasonable, but a reasonable expectation of increased

7    compensation.  Here it's undisputed, as pled in the amended

8    complaint, that, certainly, as of December 3rd at the latest,

9    2009, when Lehman Brothers presented to Ms. Uvino the proposed

10   amended -- or excuse me, the proposed renewal commitment

11   letter, that the terms of her compensation were set going

12   forward.

13         The plaintiff attempts to argue in its opposition

14   papers based upon lots of back and forth that took place in

15   2009 preceding the presentation of the renewal commitment

16   letter, the handwritten comment on the original commitment

17   letter about the review and a potential for bonus potential.

18   But all that's irrelevant because as of December 3rd, 2009 when

19   Ms. Uvino received the renewal commitment letter, there was no

20   doubt whatsoever based upon the pleadings that there was no

21   reasonable expectation of increased compensation.  And indeed,

22   she said, well, if that's the case, I'm going to leave; I'm

23   going to get another job.  So for the reasons set forth in our

24   brief and as I've just highlighted, that essential element of

25   the quantum meruit is lacking --

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 80 of 111

Page 80

1           THE COURT:  Let me ask you --

2           MR. BAER:  -- in the amended complaint.

3           THE COURT:  Let me ask you a question as to how as a

4    purely intellectual matter one gets to the conclusion that that

5    element is lacking on a motion to dismiss as opposed to

6    following a period of discovery, which includes the testimony

7    of the people who were involved in the actual negotiation and

8    drafting of the commitment letter; as well as the state of mind

9    testimony of the plaintiff herself.  If you're talking about

10   reasonable expectation, it's not clear to me how that is

11   inferred in the absence of any record.

12          MR. BAER:  Your Honor, first of all, the negotiation

13   with respect to the original commitment letter, I would submit,

14   respectfully, is irrelevant.  What we're talk -- that -- the

15   Court has already dismissed that claim.  What we're talking

16   about is the period subsequent to the expiration of the

17   original commitment letter, which is January 2010 to --

18          THE COURT:  Forget the period of time for a moment

19   because what we're talking about is an element of the cause of

20   action of quantum meruit.  And you said in your papers and

21   you're saying now that, in effect, there is no plausible cause

22   of action that can be asserted for quantum meruit because under

23   no set of facts could this plaintiff have a reasonable

24   expectation of additional compensation, correct?

25          MR. BAER:  Yes, Your Honor.

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 81 of 111

Page 81

1          THE COURT:  That's my question to you purely as a

2     intellectual proposition.  Forget the case law; forget the

3     timeline.

4          MR. BAER:  Okay.

5          THE COURT:  We're talking now about the element of a

6     cause of action.  How is it possible to conclude on a motion to

7     dismiss where I must accept as true everything that has been

8     pleaded in the complaint that this plaintiff had no reasonable

9     expectation?  How do I do that as a matter of law?

10          MR. BAER:  Your Honor, you may rely on the plaintiff's

11     own words.  In the amended complaint at paragraph 50, she says

12     that on or about November 30th, 2009 she reviewed -- I'm

13     extrapolating because it's not the actual words -- Hershan also

14     reviewed -- Mr. Hershan was her boss -- also reviewed with

15     plaintiff the renewal terms of a second commitment period

16     beyond December 31, 2009.  On or about December 3rd, 2009,

17     Hershan hand delivered to plaintiff a renewal commitment

18     letter, a copy of which is annexed to the complaint, which sets

19     forth the terms of compensation going forward.

20          Plaintiff did not sign the commitment letter because

21     she continued to disagree with the compensation.  Now, she also

22     states in her papers that she said, well, if you're not going

23     to increase my compensation, I'm going to leave.  She knew as

24     of December 31 that it was a done deal.

25          The -- she had pled her case throughout 2009 as set

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 82 of 111

Page 82

1    forth in the pleadings.  I'm not asking Your Honor to guess

2    what was going on here.  There is -- can be no other reasonable

3    interpretation of the facts as pled by this plaintiff.

4         She went back and forth with her boss.  She pled with

5    him that she was underpaid, that the terms of the job had

6    changed, whatever her reasons were for trying to get additional

7    compensation.  Her boss ultimately sat down with her, gave her

8    her review, said, "That's all very well and good, but I'm not

9    going to give you more money.  Here are the terms going

10   forward."

11        She continued to work under those terms.  I mean

12   quantum meruit is not a doctrine where every employee who

13   believes he or she should be paid more gets to, you know, after

14   termination try to rejigger the numbers or renegotiate the

15   deal; otherwise, every employee at will would be doing that.

16   It's only where the plaintiff for this -- and in particular for

17   this period of time had any sort of reasonable belief, was lead

18   to believe, that she would get more.  She had pled her case.

19   She was told no more.  She was not only told no more, she was

20   given a piece of paper that said no more, these are the terms.

21        THE COURT:  But she didn't sign the continuation

22   commitment letter.

23        MR. BAER:  She didn't sign.  That's correct.  If --

24        THE COURT:  So couldn't she have -- and this is really

25   the proposition that I'm discussing with you now.

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 83 of 111

Page 83

1           MR. BAER:  Yes, Your Honor.

2           THE COURT:  Couldn't she have the reason of:  "Well, I

3    didn't sign this.  I'm doing work that's well beyond what was

4    originally contemplated.  This group I'm now working for has

5    grown in size because of the needs of the reorganization."

6           "My responsibilities are significantly greater than

7    they used to be.  I'm not signing this.  I'm going to look for

8    another job, and I'm going to pursue claims for quantum

9    meruit."  Couldn't she have that subjective intent?

10          MR. BAER:  Her subjective intent is only a relevant

11   consideration for the Court to the extent it was a reasonable

12   subjective intent.

13          THE COURT:  Well, how do I -- that's really what I'm

14   dealing with here.

15          MR. BAER:  Yes.

16          THE COURT:  My question to you is the same question.

17   It's a motion to dismiss.

18          MR. BAER:  Yes.

19          THE COURT:  There's no discovery.  You don't have

20   anything that you're relying on to say, see, this is what she

21   said in her deposition.  You're looking at her complaint,

22   something that presumably Mr. Rosen prepared.  It's not as if

23   this is a state court pleading; this is a federal pleading.

24          MR. BAER:  I understand, Your Honor.  We --

25          THE COURT:  So, just as a purely theoretical

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 84

1    proposition, how do I get to where you want me to be by

2    determining under no set of reasonable circumstances could she

3    have believed that she had the possibility of getting

4    additional compensation for her work?

5            MR. BAER:  Your Honor, not just relying on the

6    complaint, but the documents attached to the complaint.

7            All right.  The renewal commitment letter, which is

8    admitted --

9            THE COURT:  But she didn't sign it.

10           MR. BAER:  She didn't sign it, correct.  From that

11   point forward, she continued to show up to work.  She -- if she

12   wanted to, and this is what quantum meruit was all -- is all

13   about, she could quit, say:  "You know what, I've been asking

14   for more money all year long."

15           "I didn't get it.  You now are trying to re-up me for

16   a renewal period.  I've asked for more money for the renewal

17   period.  I'm leaving."

18           And in fact, that's what she did do.  She began a job

19   search at least as alleged.  And if she began a job search,

20   that itself is evidence that she had no expectation.

21           THE COURT:  No, it's not.  It's evidence that she

22   wanted to get out; it's not evidence that she had no

23   expectation that while she was there she might earn more money.

24           MR. BAER:  The fact of the matter is, Your Honor, as

25   pled -- I'll come back to that.  I just want to address one

Page 85

1    other point that was addressed -- or that was made or implied

2    in the Court's question about the larger job.  There's no

3    allegation in the complaint that the job changed between the

4    end of December 2009 and January to June 2010.

5          The argument about the increased responsibilities, and

6    it was more than she bargained for; and it was going to be a --

7    you know, a none event liquidating a debtor with, you know, for

8    a short period of time, no employees, no HR functions, all of

9    that occurred in the period before December 31st, 2009.  That

10   was covered by the commitment letter not the renewal commitment

11   letter.  So her job didn't really change at all from December

12   31st to January 1st.

13         So her -- the expectation that she would get -- be

14   paid more based upon increased responsibilities under the

15   renewal commitment letter is also unreasonable because the job

16   responsibilities under the renewal -- under the commitment

17   letter, which -- with which she was clearly not satisfied,

18   didn't change in the renewal period.  There were the same

19   larger jobs -- larger responsibilities, more than she had

20   bargained for, I mean, assuming all of the facts as pled are

21   true.

22         THE COURT:  Okay.  Let's just assume all the facts

23   pled are true --

24         MR. BAER:  Yes.

25         THE COURT:  -- and we run through the timeline that

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 86 of 111

Page 86

1    you've just given me.

2              MR. BAER:  Yes.

3              THE COURT:  She has greater responsibilities than she

4    had bargained for.  She had a signed commitment letter.  The

5    commitment letter expires.

6              She is asked to sign a renewal.  She doesn't sign the

7    renewal.  She doesn't sign the renewal because she believes the

8    terms of employment set forth in the document do not fairly

9    reflect the compensation and remuneration that someone doing

10   her job should get in the market.  "I'm not signing that," she

11   says to herself and to others.

12             MR. BAER:  Right.

13             THE COURT:  But she proceeds to continue as a good

14   professional to do her job because Lehman's reorganization, in

15   part, depends on that.  She does her job, but she feels she's

16   being unfairly treated.  She may believe because she's doing a

17   good job and had good performance reviews that she has a

18   reasonable basis, not having signed the document, not that

19   she's a lawyer, but she's been dealing with employment-related

20   issues for most of her career, to at least put in a claim "for

21   what I think I'm worth."  How do I know based upon the

22   complaint that that's not one reasonable way to read the

23   complaint?

24             We're back at the same point.  You're arguing

25   emphatically that I must find based upon this record, and there

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 87 of 111

Page 87

1    is no record except for the complaint and some documents

2    attached to it, that she had no reasonable expectation.  I have

3    rather easily, I think, demonstrated that it's possible that

4    she had such an expectation.  You're still free to argue it's

5    not reasonable.

6              MR. BAER:  And indeed, Your Honor, that is the essence

7    of my argument.  I have no reason to doubt that Ms. Uvino had a

8    hope, believed that she should have been paid more.  I mean

9    that's demonstrated by the record in this case.  She, you know,

10   way back when is --

11             THE COURT:  So how do I determine reasonableness with

12   respect to a cause of action for quantum meruit in a setting

13   where there is no discovery?  There are no smoking guns yet.

14   There are no admissions against interest yet.

15             There's nothing that you can point to or that I can

16   point to.  Why should I grant this motion to dismiss as to this

17   aspect of the complaint?

18             MR. BAER:  Well, the --

19             THE COURT:  I don't see it yet.

20             MR. BAER:  The cases that I cite to Your Honor in

21   connection with this matter relied on various factors to

22   determine reasonableness.  In one case, somebody was one of --

23   the plaintiff was told, "I'm paying you too much.  I'm not

24   going to pay you X amount going forward."

25             The appellate division of the state of New York found

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 88 of 111

Page 88

1    in that case -- I don't recall the plaintiff's name, but Liza

2    Minnelli was the defendant in that case -- that once told,

3    "Listen, you are not -- I can't afford to pay you the amount,

4    and I'm cutting your salary in half," there's no reasonable

5    expectation going forward that you would be paid any more than

6    half the amount.  Here the objective facts, I mean, Wendy

7    Uvino, I -- you know, I hate to be folksy, but my mother used

8    to say, you know, it's like banging your head against the wall

9    sometimes when she was -- talked to me as a child, all right.

10           Wendy Uvino could ask multiple times of Rob Hershan,

11   you know, "I'd like more money.  I'd like more money.  I'd like

12   more money. I'd like more money," put it in writing, "Here's

13   some metrics for other professionals in the field.  Look this

14   shows I'm entitled to more money," and I believe as Ms. Uvino

15   says in her amended complaint, Mr. Hershan ignored those

16   metrics and told her she wouldn't be paid any additional money.

17   At what point does it become unreasonable?  It seems to me

18   we're -- this isn't even -- isn't close.

19           And I understand, Your Honor, that you are -- you've

20   characterized my argument as emphatic because I truly believe

21   that there is no interpretation other than Ms. Uvino was being

22   unreasonable if she actually believed -- and I doubt she did,

23   quite frankly, as of December 2009, if she believed that she

24   was going to get more money after that.  She'd been asking for

25   over a year.  She provides data that says, "See, I'm entitled

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 89

```
 1    to more."  They say --

 2          THE COURT:  You've just proven to me the opposite of

 3    the point you're trying to prove because you've demonstrated

 4    that one way to read the complaint is that the plaintiff

 5    believed that she was entitled to more compensation.  And it

 6    wasn't simply a belief based upon a fanciful notion; it was

 7    based upon metrics.  She had actually gone out and found

 8    comparables as to what this position should be worth on the

 9    market.

10          One could conclude, not necessarily conclusively

11    conclude, that it would not be unreasonable for a human

12    resources professional who has not signed a contract to believe

13    that she might enjoy a claim under quantum meruit for what

14    people who did this work in comparable settings might be paid

15    greater than the amount offered.  Now, that's not to say that

16    she would win.  That's not to say that following discovery this

17    isn't a case acceptable to motion for summary judgment based

18    upon established facts, but everything that you're presenting

19    in this argument is hypothesis.

20          MR. BAER:  Your Honor, what is not a hypothesis is

21    that when she presented the metrics, they were rejected.

22          THE COURT:  So what?  Nothing was signed.  We have an

23    unreasonable employer and a reasonable employee.  That's one

24    possibility:  an employer who was trying to save as much as

25    possible on cost to the administration.  That's a perfectly
```

Page 90

```
 1   honorable goal for a reorganization such as this or any other
 2   reorganization.  If you can get somebody to work for less that
 3   might be entitled to more, you've saved money.
 4           MR. BAER:  Your Honor --
 5           THE COURT:  But if that person leaves, well, I guess
 6   you have to replace that person or do without the spot.
 7           MR. BAER:  Right.  Your Honor, respectfully, this
 8   motion, and I recognize that this is a motion to dismiss, is
 9   not about whether Ms. Uvino, whether there's an argument that
10   could be made she's entitled to more money based upon the
11   metrics and the value to the estate.  I'm not attempting to go
12   there.  What --
13           THE COURT:  This is about whether she has a reasonable
14   basis to believe that she can get more money.  I don't know
15   how, which is my opening proposition, that can be conclusively
16   determined on a motion to dismiss.
17           MR. BAER:  Your Honor, when your -- when you
18   repeatedly ask your boss, "I want more money," and your boss
19   tells you, "I understand that.  I'm not going to give you more
20   money," to say that, notwithstanding, my boss' unequivocal
21   remarks and unequivocal conclusion, and --
22           THE COURT:  Tell me --
23           MR. BAER:  -- a writing --
24           THE COURT:  Tell me where in the record with respect
25   to the unsigned commitment letter everything that you have just
```

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 91 of 111

Page 91

1    said was said can be found.

2         MR. BAER:  Yes, Your Honor, it's all in the amended

3    complaint.  All right.  As I said, in the allegations

4    supporting the quantum meruit claim, Ms. Uvino, and it does

5    begin around paragraph 14 of the amended complaint and run

6    through paragraph 57, she details a course of history both

7    under the renewal -- under the original commitment letter and

8    the time leading up to the renewal commitment letter a desire

9    to have increased compensation.

10        Indeed, she writes an e-mail that is attached to the

11   amended complaint in March to Mr. Hershan setting forth all the

12   reasons that she thinks she's entitled to more money, and what

13   she gets back is -- what she -- what happens next is she has a

14   meeting with Mr. Hershan in November.  They go over the review.

15   He --

16        THE COURT:  That's in the complaint?

17        MR. BAER:  Yes, at paragraph 50.

18        THE COURT:  What does it say?

19        MR. BAER:  On November 30th, Hershan also reviewed

20   with plaintiff the renewal terms of a second commitment period

21   beyond December 31, 2009.  So that clearly sets forth, Your

22   Honor, that on November 30th plaintiff and Mr. Hershan

23   discussed the terms of employment covering the January 1st

24   period and prospectively after January 1st, so the time that

25   would have been covered by the renewal commitment letter.  As a

Page 92

1    follow on to that November 30th meeting, three days later on

2    December 3rd Mr. Hershan hand delivers to plaintiff the renewal

3    commitment letter, a copy of which is attached to the

4    complaint, which sets forth the terms of employment going

5    forward from January 1st prospectively.

6             There's no doubt what those terms are.  They were

7    discussed with her on November 30th.  They were presented to

8    her in writing on December 3rd.

9             THE COURT:  We don't know what was discussed on

10   November 30th.  We only have a bald allegation of the most

11   general nature.  We don't know what she said to him or what he

12   said to her.

13            MR. BAER:  On -- I can only take the complaint as it

14   comes, Your Honor.  The allegations on their face say that they

15   discussed the terms, the renewal terms, of a second commitment

16   period.  The very next sentence, "On December 30th, Hershan

17   hand delivered to plaintiff a renewal commitment letter, a copy

18   of which is attached as Exhibit G.  The plaintiff did not sign

19   the renewal commitment letter because she continued to disagree

20   with the terms of the compensation."  All right.

21            THE COURT:  How does this lead to dismissal?

22            MR. BAER:  Because --

23            THE COURT:  I think there's a limit to how much time

24   we should spend on this point.  I have -- what I think you have

25   already concluded is a fundamental disagreement with the

Page 93

1    conclusions that can be reasonably reached from the complaint

2    on this critical element of quantum meruit.  I don't think it's

3    there on the motion to dismiss; I think as an intellectual

4    matter it can't be done absent something more.

5           MR. BAER:  Your Honor, I know it's improper for me to

6    pose this question to the Court and I won't.  But as a -- as

7    you've put it, as a purely intellectual matter, at one -- at

8    what point does it become unreasonable in the face of continued

9    refusals both orally and in writing to give her any more money?

10   At what point does it become unreasonable for Ms. Uvino to

11   believe that she would get more money?

12          It just -- it seems to me --

13          THE COURT:  After you take --

14          MR. BAER:  -- we're well beyond that point.

15          THE COURT:  After you take a bunch of depositions in

16   this case, maybe you'll be able to prove that point.  You can't

17   prove it on a motion to dismiss to my satisfaction.

18          MR. BAER:  Very good, Your Honor.  I'd like to address

19   the second point if I may.

20          THE COURT:  Sure.

21          MR. BAER:  Second point is for a breach of contract

22   based upon the terms of the original commitment letter, and in

23   particular the handwritten entry on the commitment letter

24   during -- which sets forth in sum and substance that a review

25   will be held by June 30th, and at that time the possibility of

Page 94

1   consideration of a potential increase in bonus potential --

2   very conditional statement -- would be considered.  As Your

3   Honor pointed out in your decision in May, that statement does

4   not include an enforceable promise to increase anyone's

5   compensation; it merely sets forth a time by which a review

6   would be conducted and a subject matter would be considered.

7   It is black letter law that in order to have a claim for breach

8   of contract, one must have damages and the damages must be

9   beyond merely speculative.

10       Here in response to our arguments and a case that's

11  really on all fours where a plaintiff -- the Hudson case, where

12  a plaintiff said, "Well, I didn't get my review after 90 days,

13  and therefore I'm entitled to a breach of contract claim and

14  I'm damaged thereby," the Court said, "Well, no, all you had

15  was a definite promise for a review.  You didn't have a

16  definite promise for an increase in compensation.  It's

17  entirely too speculative to go there.  No one can really tell

18  whether or not you would get the increase, so I'm going to

19  dismiss the cause of action as a matter of law."

20       Here, first of all, the Hudson case is unaddressed and

21  for that reason alone as a matter of law the claims should be

22  dismissed.  But secondly, the reasoning offered by plaintiff's

23  counsel or plaintiff is that she has damages because she would

24  have been looking for a job earlier, and she -- you know, but

25  let's assume she would have gone out and searched for a job.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 95

1    We don't know what the timing of that would have been.  We

2    certainly don't know what -- when she would have received an

3    offer.  We certainly don't know what the terms of compensation

4    would have been had she gone out and gotten another job.  And

5    indeed, she might be making more, in which case there would be

6    no damage as a result.

7            So I mean we're really beyond the realm of speculation

8    here, Your Honor, when it comes to this issue of whether or not

9    Ms. Uvino would have had increased compensation as a result of

10   a review being conducted on or about June 30th, 2009, and

11   therefore I would ask that the Court dismiss that claim.

12           THE COURT:  Okay.  Mr. Rosen, let me hear from you.

13           MR. ROSEN:  Thank you, Your Honor.  Your Honor, first,

14   by brief defense of myself on the first cause of action, I read

15   your decision to say that I was only to amend the last cause of

16   action, and that's the instruction I gave to my associate.  So

17   when they raised it -- because I deemed it the first cause of

18   action amended by your decision, which is my -- because you

19   hadn't allowed us to re-plea it -- that, we would not ever

20   filed an amended pleading.  It would have just been deemed

21   amended by your decision.  That was my read on it.  If it

22   caused confusion, that's why I immediately offered, stipulated

23   to do it.

24           On the second issue, Your Honor, I'm not going to go

25   there because you've gotten -- you've said everything that I

Page 96

```
 1    was going to say in terms of the issue.  The only other thing I

 2    would point out on that, that cause of action to dismiss the

 3    quantum meruit claim is the exact cause of action that you

 4    already ruled on and that motion should not even have been made

 5    again.  They never appealed it:  they never saw -- came back to

 6    you in any way; they just remade the exact same motion in front

 7    of you.

 8            Going to the contract cause of action, and Your Honor,

 9    one of the things that counsel has done as a good lawyer,

10    opposing counsel, is he's parsed things that shouldn't

11    necessarily be parsed out.  When that meeting took place and on

12    the breach of contract when that meeting -- when the meeting

13    took place, and they've acknowledged that the meeting did not

14    take place until November 30th and the performance review was

15    not given until December 2nd, my client was still under the --

16    as she is today, under the position that under the contract

17    that already passed that she had damages because they had

18    breached their agreement and that she certainly wasn't going to

19    sign a new contract that was going to let them off the hook on

20    that.

21            And to reinforce that, the Court has to remember

22    something very important:  by not signing the renewal contract,

23    she lost, and it's part of our damages which is where they're

24    also wrong on the breach -- she lost $50,000 dollars worth of

25    her bonus because there was a holdback on the bonus of 20%,
```

Page 97

1    which would be $50,000 in this case, if you didn't sign the

2    renewal contract.  So she clearly had an expectation that she

3    was entitled to more because, otherwise, if she thought she

4    wasn't, she would have just signed it and then gotten another

5    job.  So, she had -- she most certainly had a higher

6    expectation of that, and she wasn't going to waive any of her

7    damages.

8           Let me address the Hudson case head on, all right,

9    because, first of all, it's not a mandatory authority to you.

10    Secondly, it's about a one or two line scribbled on this, and

11    it contains additional elements that are not present here.  It

12    was an oral promise to give an increase and it was an oral

13    promise to give a performance review, which never took place.

14           Here we have a written a contract with a written

15    promise to conduct a performance review by a finite period of

16    time which they clearly breached -- there is no -- there's no

17    dispute over that -- by five months -- no, six months.  I'm

18    sorry, by six months.  They breached that agreement, and it

19    said that that review was specifically to consider an enhanced

20    bonus.

21           And then what happens, that performance review

22    actually takes place.  Out of a scale of one to five, my client

23    gets a one with a one being the highest for a review, and she

24    gets no enhanced bonus whatsoever.  She gets the same 10% that

25    you got -- increase if you signed on for anyhow no matter how

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 98 of 111

Page 98

1    good or bad a job review you got.  If you were asked back, you

2    got a 10% increase.

3            So we have a very different situation.  So, the issue

4    that we have here on that agreement, we said the first time

5    that they point to your footnote in the decision; but when we

6    were here the last time, you also said that language has to

7    mean something.  My client negotiated it.  She was told it's

8    already been approved by the Court; you can't change this, but

9    we can put some language in here.  She said I want more money.

10   This is before she knew she was going to have another 500

11   people to supervise, all right, but she said, "I want more

12   money.  I'm not satisfied with this."

13           "Okay.  We will sit down and look at it in six

14   months."  All right.  "In sum and substance, we will sit down

15   and look at -- give you a performance review."

16           What's in there in the terms of that, there is a

17   language and a written agreement that promises something, and

18   the mechanism is clearly not set forth.  But Judge, that's not

19   a motion to dismiss; that's the parol evidence rule, all right,

20   and that's why we need discovery in this case.  We need to find

21   out what Mr. Hershan said to my client at that point, what my

22   client said, what the expectation.

23           We have an ambiguity in a written document.  It's

24   contracts 101.  Under that circumstance, the negotiations come

25   in --

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 99 of 111

Page 99

1          THE COURT:  What's ambiguous about this?

2          MR. ROSEN:  What -- under -- what's ambiguous --

3          THE COURT:  What's ambiguous about that handwritten

4    note?  It seems to me to be pretty clear.

5          MR. ROSEN:  Well, Your Honor, the question that's in

6    there would be in terms of what would be the standards to be.

7    Well, if it's clear, I mean it's clear to me in terms of the

8    fact that she was to get an enhanced bonus if she got a good

9    review after six months.

10          THE COURT:  Where does it say that?

11          MR. ROSEN:  Well, that, I think, is the inference of

12    it; otherwise, what does it mean, Your Honor?

13          THE COURT:  It means you'll get a performance review;

14    it doesn't mean anything more than that.  That's what it says.

15    How can it mean more than what it says?

16          MR. ROSEN:  Well, Your Honor, I think, to consider,

17    the answer is if you're going to have a performance review and

18    you get an excellent on it, is there no -- one of the things,

19    was there not an expectation between the parties there that

20    there would then be an increase in the bonus?

21          THE COURT:  Well, she may have been induced into

22    signing the original agreement by virtue of that handwritten

23    extra, and she may have had a state of mind that said, "You

24    know what this means to me?  This means I'm going to get a

25    performance review.  I'm going to do a great job, and I'm going

Page 100

1    to qualify for more money."  She may have thought that, but

2    that's not what it said.

3              MR. ROSEN:  Well, it says that she was going to get

4    the review, Judge.  So at the very least, to address their

5    damages issue because -- and this is the absolute minimal on --

6    minimum on damages, she was entitled.  There is no doubt that

7    as minimal as you may think or you may -- or take the position

8    that that language is as to what the debtor's representative

9    was --

10             THE COURT:  Well, let's --

11             MR. ROSEN:  -- required to do --

12             THE COURT:  Why don't we look at the language

13   together?  Do you have it handy?

14             MR. ROSEN:  It's in ten different places.  Let me get

15   it.  My stuff keeps sliding off this podium, Your Honor.

16             Yes, I do, Your Honor.

17             THE COURT:  Because --

18             MR. ROSEN:  "The parties agree to engage in a

19   performance review no later than 6/30/09 for consideration of a

20   potential increase in bonus potential."

21             THE COURT:  Okay.

22             MR. ROSEN:  All right.

23             THE COURT:  And that didn't happen --

24             MR. ROSEN:  So --

25             THE COURT:  -- on the date that it --

Page 101

1              MR. ROSEN:  It did not happen --

2              THE COURT:  -- was supposed to happen?

3              MR. ROSEN:  -- Your Honor.  And to point out something

4      else on that, my client in March, which is attached to the

5      complaint, the e-mail that counsel was talking about sent in

6      March before that in preparation for that what her expectations

7      were.  She sent a proposal.  She sent a rubrics.  She went

8      through -- she gave them the analysis of what people in her

9      position made, and she sent it to them.  And you do not have

10     anything back from Mr. Hershan other than, "I will look at

11     this," thus further include -- inducing her to think that this

12     was relevant in some way to the review.  And then you don't

13     have anything from him until August putting off having a

14     meeting because somebody -- I'm not sure who -- was going away

15     that day.  And then in November, six months after the review is

16     due, he gives her an excellent review, all right, and gives her

17     no raise --

18             THE COURT:  Well, see --

19             MR. ROSEN:  -- or no increased bonus.

20             THE COURT:  If that handwritten note had said, "If the

21     employee obtains an excellent review, she shall qualify without

22     further ado for a bonus computed in the following manner,"

23     you'd have a good claim.

24             MR. ROSEN:  Well, what's -- Your Honor, if I --

25             THE COURT:  The problem is that that's not there.

Page 102

```
 1              MR. ROSEN:  Well, I guess the question for that is,
 2     what is the understanding?
 3              And I do think parol evidence comes in because the
 4     question is, what's the definition of a performance review?
 5              All right.  What was in each person's mind when they
 6     were sitting down for a performance review?
 7              I think if you get -- when we get -- when and if we
 8     get into it, the review is going to be -- a performance review
 9     is, "I sit down -- with me.  And if I've done a good job, I get
10     an increase."  Otherwise, all right, why would my client ask
11     for a performance review, or why would they then agree to give
12     it?
13              And traditionally, in this organization, one of the
14     things that would become relevant -- or in the business world
15     of what happens in a performance review?  Do you turn -- and
16     one of the other things that would become relevant, Your Honor,
17     would be in a performance review under all of this, what
18     happened to the other people in this case who were from Lehman
19     who got performance reviews and got ones?
20              All right.  If all of the other ones of them got
21     enhanced bonuses -- and there's a pattern in practice here, and
22     there's a course of dealing issue.  So I don't think it's as
23     simple as saying the words should have been clearer to say you
24     get this if everyone's expectation in the industry is that's
25     what happens at this meeting.
```

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 103 of 111

Page 103

1        THE COURT:  Well, the thing that makes it difficult to

2    talk about pattern in practice is that this is a handwritten

3    addition to a standard form agreement that was, I expect,

4    written into the document to induce your client to sign it.  It

5    may be of some significance to know what the parties were

6    saying to each other around the time that this happened, but

7    the language itself is fully integrated.  And it's probably not

8    the sort of language that one would find ordinarily because it

9    was written in.

10        One of the things that also makes this a more

11    challenging situation, frankly, for you is the position your

12    client held within the organization.  She was not

13    unsophisticated in matters of the employment relationship.

14        MR. ROSEN:  But we addressed that one, Your Honor.

15    Because she was told that this was a form agreement that had

16    already been approved by the Court, and this was the only place

17    this change could be made, was back here.  So I normally -- and

18    having known my client now, represented her for two and a half

19    years, in normal circumstances, I would agree with you, but I

20    think that's part of the inducement issue of what went on here.

21    It was kind of this is the best we can possibly give you to

22    protect you, and that's one of -- another reason why it's not

23    appropriate on a motion to dismiss.

24        Maybe it is a motion for summary judgment when we find

25    out exactly what was said.  But at this point, it's not

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 104 of 111

Page 104

1   appropriate.  Your Honor -- and Your -- as I said before --

2   well, I'm not -- hang on one second -- see if I covered all of

3   what I wanted to say, Your Honor.

4          No, Your Honor, that's all I have to say.

5          THE COURT:  Okay.

6          MR. ROSEN:  I think that covers it.

7          THE COURT:  Anything more?

8          MR. BAER:  Yes, Your Honor, a couple of points.

9   Number one, plaintiff's counsel has not addressed at all the

10  speculative nature of the damages here.  I agree with Your

11  Honor:  this is a fully integrated document.  There is an

12  integration clause.  It says this is it:  the four corners of

13  the document is all one looks at.  And the document on its face

14  doesn't guarantee any compensation.  It just -- it guarantees a

15  discussion and a potential increase in bonus potential, nothing

16  more.  I'm not going to belabor that point.

17         Your Honor, I would just like to revisit, if I may,

18  the first point.  Your Honor had said that -- had cited the

19  Conley standard on motion to dismiss.  No set of facts that

20  this plaintiff could plead that would give rise to this cause

21  of action.  But the Conley standard and in fact the relevant

22  law is set forth in --

23         THE COURT:  We don't have to go to Iqbal.  I know what

24  Iqbal says.

25         MR. ROSEN:  Iqbal says plausible --

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 105 of 111

Page 105

1            THE COURT:  If you're talking about plausible, it's --

2     for reasons that I'll incorporate by reference from an earlier

3     colloquy, I myself posited a set of plausible explanations that

4     I think could be used to blunt your motion to dismiss in terms

5     of the complaint as drafted.  So I hear you, but I'm unmoving

6     on that point.

7            MR. BAER:  All right.

8            THE COURT:  You're losing on that motion without

9     prejudice.

10           MR. BAER:  Well, like any good lawyer, I know when to

11    sit down.  Thank you, Your Honor.

12           THE COURT:  Okay.

13           MR. ROSEN:  Your Honor, may I address the speculative

14    issue briefly?

15           THE COURT:  You can although it's a tough point for

16    you.

17           MR. ROSEN:  I know it is, Your Honor.  And let me --

18    Your Honor, first of all, it's a standard rule of construction,

19    and I've recently had to deal with this a lot in another case

20    that just went up to the 2nd Circuit on a related matter.  The

21    speculative issue as to damages is removed when the speculation

22    is caused by the other party's breach.

23           In this case, one of our arguments, there are several

24    elements of damages.  One is the fact that she could have gone

25    out -- had they sat down with her on May 30th and said exactly

1   what they said to her in November, okay, at that point she

2   could have started her job search and gotten another job.  And

3   she would have been in some place probably, all right, in time

4   to be there for the bonus season at the end of the year.  She

5   lost that because of this, all right.

6           But the other thing that happened there is -- and yes,

7   we don't know what job we would have got, but she had given

8   them the rubrics and there is -- this is not previously in

9   March.  This is -- it is easy to determine in this case, to

10  have expert testimony, as to what someone in her range could

11  have made.  They don't get off the hook by stalling for six

12  months and then saying, "Well, we stalled you for six months

13  before we told you, so we don't know what job you would have

14  gotten during that period.  So it's speculative," because that

15  uncertainty was caused by their breach.  And I think if you --

16  and I think that's part of the problem I have in terms of that.

17  So that's one way I try to get over my very tough road that I

18  have with you on this issue, is to realize that they caused

19  that issue, all right.

20          The other simple element of damages I have, as I said,

21  their breach on that condition, all right, excused her further

22  performance, and she's entitled to the $50,000 dollar holdback

23  that they kept from her out of the bonus for not resigning the

24  agreement because they did not give her the review when she

25  should have.  And even if she had gotten the review when she

08-13555-mg    Doc 24223    Filed 01/11/12    Entered 01/12/12 09:32:37    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 107 of 111

Page 107

1    should have, that bonus was supposed to kick in six months

2    earlier, so she would have been entitled to some portion on

3    that.  So there are elements here in terms of a -- yes, on a

4    proof burden.  Maybe I have some issues in terms of getting it

5    in here, or maybe we have a battle of the experts.  But I do

6    not think that, again, it meets the standard that it's so

7    speculative at this point in time that it can't go forward,

8    especially since the only case they rely on for that, the one

9    they made is the one I said before which dealt with a very,

10   very different set of circumstances.

11          And the reality is, as you said, this is not a job

12   that you leave tomorrow and find another one.  It takes -- you

13   know, she found another job in six months, which was pretty

14   good under the circumstances for a search of this time.  And as

15   we all know, during this period of time, the economy was only

16   getting worse when all of this was going on, so six months

17   could have made a big difference.  All of which, as I said, was

18   caused by them not doing the review when they were supposed to,

19   which is the one thing she bargained for.

20          Whether you want to argue whether or not there was a

21   promise of payment or whatever, she bargained to know on May

22   30th if she was going to get more money, all right, and she

23   didn't get that.  Thank you.

24          THE COURT:  Okay.  I'm denying the motion to dismiss

25   without prejudice to renewing it as a motion for summary

08-13555-mg   Doc 24223   Filed 01/11/12   Entered 01/12/12 09:32:37   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 108 of 111

Page 108

1    judgment after the completion of some discovery.  The quantum

2    meruit issue that we talked about does not need further

3    elaboration at this point.  I think I've expressed myself fully

4    during the argument.

5         The breach of contract element here is right at the

6    edge of dismissal.  This is highly speculative, and I don't

7    think it would be an abuse of discretion on my part were I to

8    dismiss that element of the complaint now.  But I'm going to

9    give the plaintiff an opportunity to explore the potential to

10   demonstrate any provable damages that may flow from a failure

11   to have conducted the performance review as specified in the

12   handwritten notation in the agreement.

13        I believe it to be wildly speculative.  And while I

14   hear what Mr. Rosen has said in his last argument, it's

15   possible that a rational person in the plaintiff's position

16   would immediately start looking for another job the moment that

17   there was a failure on the part of the employer to perform in

18   accordance with the terms of that agreement, but I don't know

19   what's going on within the organization at this time.  No

20   depositions have been taken of either Mr. Hershan or Ms. Uvino.

21        The amount in controversy makes the notion of a battle

22   of the experts borderline preposterous in terms of the expenses

23   of going forward.  So while I heard Mr. Rosen's comment about

24   that, it seems to me that there is a role of practicality that

25   ultimately will rule the case, and I strongly encourage the

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 109

1    parties to stop jockeying for position here and to start

2    thinking about whether there is a sensible business solution to

3    this spat.  We're adjourned.

4              MR. BAER:  Thank you, Your Honor.

5              MR. ROSEN:  Thank you, Your Honor.

6          (Whereupon these proceedings were concluded at 2:56 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 110

1

2                          I N D E X

3

4                          RULINGS

5                                              Page      Line

6    Stipulation between Debtors and Colorado     12        12

7    plaintiffs  approved

8    Debtors' motion to establish procedures for  15        4

9    the consensual amendment and assumption of

10   certain nonterminated prepetition

11   derivatives contracts approved

12   Debtors' motion for approval of a settlement 17        9

13   and compromise with Danske Bank approved

14   Joint motion of LBHI and the SIPA trustee    55        17

15   granted but conditioned with a strong

16   suggestion for voluntary compliance

17   as set forth on the record

18   Providence Funds' Motion - status            75        13

19   conference to be held sometime after

20   confirmation in the LBHI case or

21   possibly in February 2012 if

22   confirmation isn't achieved.

23   Defendant's Motion to Dismiss Amended        107       25

24   Adversary Complaint, Denied

25

Page 111

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a

true and accurate record of the proceedings.

Sharona Shapiro

Digitally signed by Sharona Shapiro
DN: cn=Sharona Shapiro, o, ou,
email=digital@veritext.com, c=US
Date: 2012.01.11 14:23:55 -05'00'

_____

SHARONA SHAPIRO

AAERT Certified Electronic Transcriber CET**D 492


Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  November 17, 2011