WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | |
|---|---|
| In re | : Chapter 11 Case No. |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.* | : 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |

------------------------------------------------------------------x

**DECLARATION OF ZACHARY TRUMPP IN**
**SUPPORT OF DEBTORS' MOTION PURSUANT TO**
**SECTION 8.4 OF THE MODIFIED THIRD AMENDED**
**JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS**
**HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND**
**SECTIONS 105(a), 502(c) AND 1142(b) OF THE BANKRUPTCY CODE**
**TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE**
**TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE-**
**BACKED SECURITIES OR PURPOSES OF ESTABLISHING RESERVES**

Pursuant to 28 U.S.C. §1746, I, Zachary Trumpp, declare:

1.  I am over 18 years of age and have personal knowledge of all of the facts set forth in this declaration and if called upon to testify as a witness, I could testify to the truth of the matters set forth herein.

2.  I submit this Declaration in support of the *Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities For Purposes of Establishing Reserves*, (the "Motion").[1]

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

US_ACTIVE:\43899507\04\58399.0008

3. I am currently employed by LAMCO LLC ("LAMCO"), a wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("LBHI"). I was previously employed by LBHI, and before that, by Aurora Loan Services LLC ("Aurora").

4. As the Vice President of Loss Management at Aurora, one of my responsibilities was the development and establishment of a department that was responsible for identifying residential mortgage loans with the potential for breaches, having the potential breaches reviewed either internally or externally by a forensic due diligence provider, determining which breaches were material and adverse, and pursuing remedies on claims on behalf of Aurora and LBHI against third-party residential mortgage loan sellers and originators. This work was performed on LBHI's whole loan portfolio and the universe of residential mortgage backed securitizations developed by the Debtors. During my tenure in this position, my team reviewed thousands of loans and resolved several billion dollars worth of claims on behalf of Aurora, LBHI, and Debtor developed securitizations. As such, I have direct and personal knowledge of the claims universe and remediation thereof within the Lehman residential mortgage platform.

5. In my role at LBHI and now LAMCO, I am responsible for the validation of the claims against the Debtors' estate as well as the pursuit and resolution of downstream claims against the entities that sold loans to LBHI. In this role, I have continued to develop first-hand experience with the nature and quality of loans that LBHI purchased or originated, the types of breaches that exist in the loans, and the ultimate success that Lehman experiences in resolving these claim.

6. I am familiar with the approximately 300 claims that have been filed against LBHI and Structured Assets Securities Corporation ("SASCO") asserting claims in the aggregate amount of approximately $37 billion (the "Claims"). The asserted amount of the Claims greatly

exceeds the probable liability of LBHI and SASCO for the Claims.  I participated in the development of the methodology described herein for the calculation of the estimates of the amounts of the Claims for reserve purposes under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "<u>Plan</u>").

### The Claims

7. The Claims are based on alleged breaches of representations and warranties related to the origination and delivery of residential mortgage loans to securitization trusts.  In connection with the transfer of the loans by SASCO to the securitization trusts, LBHI and/or SASCO made certain representations and warranties regarding the nature and quality of certain of the loans and the delivery of the loans into the securitization.  The loan purchase agreements and trust agreements pursuant to which the trusts acquired the loans (the "<u>Governing Agreements</u>") from SASCO typically provide that the trustee may seek a contractually defined "Repurchase Price" in the event there are breaches of representations and warranties.  In order to assert a claim for the "Repurchase Price," the Governing Agreements require the trustee to establish that (a) a breach of a representation and warranty exists; (b) the breach was material; (c) the breach adversely impaired the value of the mortgage loan; and (d) the trustee provided prompt notice of the breach to the Debtors.

8. The asserted amounts of the Claims are drastically overstated for several reasons: (a) in most cases, the Indenture Trustees filed duplicate claims against LBHI and SASCO on behalf of the same securitization; (b) the Claims largely do not identify breaches of representations and warranties with respect to certain loans, nor do they set forth any of the other elements of contractual liability of the Debtors; (c) the Claims are asserted in amounts that bear no correlation to existing or expected breaches and resulting damages; (d) the Claims fail to

US_ACTIVE:\43899507\04\58399.0008                3

distinguish between Debtors' direct representations and warranties and representations and warranties by third-party sellers for which the Debtors are not liable; and (e) there is no basis for the Claims to be secured claims.

9. Prior to the Commencement Date, the Debtors and their subsidiaries acquired residential mortgages that were ultimately sold to securitization trusts in three ways: (a) loans were originated by subsidiaries of LBHI ("Lehman Originated Loans"), (b) subsidiaries of LBHI acquired loans from small banks or mortgage lenders on an ongoing basis pursuant to standardized loan purchase and broker agreements ("Bank Originated Loans"), and (c) loans were acquired by LBHI or its subsidiaries from large mortgage lenders in bulk purchases of a pool of loans ("Transferor Originated Loans"). Loans originated or acquired by subsidiaries were typically transferred to LBHI which subsequently transferred these loans to SASCO. SASCO then securitized such loans and transferred loans to various securitization trusts.

10. In connection with the transfer of loans to the securitization trusts, LBHI typically made certain representations or warranties regarding the nature or quality of the loans. While in some instances LBHI may have made a very limited number of representations and warranties for Transferor Originated Loans to the trusts, LBHI also assigned all of the representations and warranties that the originator or initial seller made when it sold the loans to a subsidiary of LBHI – which mirrored those limited number of representations and warranties made by LBHI on those same set of loans. In my experience, when a representation and warranty was made by both LBHI and the initial seller, the trust's sole recourse was to the initial seller, not LBHI. Approximately 70% of the loans in the securitization trusts subject to the Claims are Transferor Originated Loans.

11. SASCO also made representations and warranties that the loan files contained

certain documents and information. SASCO may have potential liability if the loan files were missing required documents. While some Trustees have provided certain "document exception" reports that may be evidence of document deficiencies in certain loan files, the Trustees have not (a) stated a claim based on document deficiencies, (b) identified which loans in these reports have the kind of deficiencies that would entitle the trusts to a remedy, or (c) otherwise complied with the contractual requirements necessary to force a cure or repurchase of any of the loans.

### The Estimated Reserve Amount

12.  LAMCO has determined a reasonable methodology for calculating the estimated liability of LBHI and SASCO under the Claims. The Debtors propose to apply the methodology uniformly to all of the Claims. Generally, the methodology estimates the liability of LBHI and SASCO based on assumptions regarding the percentage of loans that will ultimately default, the recovery rates on the loans that default, the percentage of defaulted loans for which a potential breach of a representation and warranty exists, and the percentage of loans for which the trustee will be able to establish that such breach is valid and materially affects the value of the mortgage loan. I have worked with the Debtors to develop the factors, assumptions and percentages included in the methodology based on (a) my and my co-workers' extensive experience reviewing loans and breaches of representations and warranties and seeking to affirmatively collect from third parties for their breaches of representations and warranties as detailed in Paragraphs 3 and 4 above, (b) review of internal data on residential mortgage loan default rates, recovery rates, breach rates and validation rates for loans similar to the loans held by the securitization trust, and (c) internal models developed by the Debtors. In order to calculate the reserve estimates, and given the variability of actual loan performance and potential liability for the Claims, the Debtors calculated the reserve estimates using a range of assumptions.

13. Below is a description of the methodology utilized by the Debtors to calculate the Estimated Reserve Amounts. The below description includes certain assumptions that result in reaching the Debtors' high end estimates (the "High Estimate") of the Claim amounts:

14. Step 1: In order to calculate the Estimated Reserve Amounts for each Claim, the Debtors began with the aggregate unpaid principal balance of the loans held by each securitization trust as of September 25, 2011 (the "UPB"). This amount represents the maximum potential liability of the Debtors. The Debtors obtained this information from various sources, including Intex, which is a subscription based securitization data source. If Intex did not contain the UPB for a particular deal, the Debtors then looked to the monthly trustee remittance statements.

15. Step 2: The Debtors multiplied the UPB for each securitization trust by 45% which, for the High Estimate, represents the assumption regarding the percentage of loans that have or will incur a default.

16. Step 3: The result from Step 2 is multiplied by the "severity factor" which takes into account the estimate of losses on the loans that are currently delinquent or will go delinquent in the future. This step is necessary because a default on a loan does not mean that the securitization trust will not recover any amounts from a sale of a defaulted loan, a foreclosure or other remedial action. The severity factor that is used for the High Estimate is a 55% loss rate.

17. Step 4: The cumulative losses that have already been incurred for the loans in each securitization are added to the result of Step 3. This adds the current and existing losses to the amount of future losses estimated by this methodology. The Debtors obtained the cumulative losses for each securitization trust from Intex or the monthly trust remittance reports.

18. Step 5: The result of Step 4 is multiplied by the percentage of the UPB for each

securitization trust that relates to Lehman-Originated Loans and Bank-Originated Loans. This calculation is necessary because as discussed above, the trusts should be seeking recourse against the originator or initial seller, and not LBHI, for the Transferor Originated Loans. Therefore this portion of the calculation excludes from the estimated liability any losses that relate to the Transferor Originated Loans. The Debtors were unable to identify the number of Lehman Originated Loans and Bank Originated Loans for 19 of the more than 400 securitizations subject to the Claims. For the purposes of these calculations, an estimate of 30% was used for those deals. This represents a close approximation to the average of Lehman-Originated Loans and Bank-Originated Loans in SASCO-issued securitizations.

19.    Step 6: Not all defaults and losses are the result of breaches of representations and warranties. In many cases when a default occurs with respect to a loan there are not breaches of representations and warranties. To account for such scenario, the calculation of the High Rate assumes that 35% of the losses are caused by a breach of a representation or warranty. Therefore the result of Step 5 is multiplied by 35%.

20.    Step 7: Based upon my historical experience reviewing loans and my experience both pursuing and defending representation and warranty claims in my various positions of employment since 2005, following the identification of a breach of a representation or warranty, the rate of breached loans that are "validated," meaning they meet every element required for repurchase and/or indemnification under the Governing Agreements, is approximately 40% for the High Rate. Under the Governing Agreements, the elements required for repurchase and/or indemnification are that such a breach was material, that the trustee provided notice of the breach to the Debtors, that the trust suffered damages as a result of the breach, and that the trust could seek recourse against LBHI. See Trust Agreement, § 2.04. Therefore, the result from Step 6 is

multiplied by 40%.  **The result of Step 7 represents the High Rate, which the Debtors propose to use at the Estimated Reserve Amount for each Claim.  The aggregate amount of the Estimated Reserve Amounts using the High Rate is approximately $2.4 billion.**

21.    As indicated, the above calculations take into account certain assumptions.  The Debtors believe that such rates included in the High Rate are on the high-end of probable results and are thus conservative.  Therefore, the Debtors also calculated the reserve amounts using lower rates, which may ultimately be closer to the ultimate default, severity, breach and validation rates.  For the low-end of the Debtors' estimates of the range of potential liability for the Claims, the Debtors utilized a 25% default rate, 45% severity rate, 30% breach rate and 30% validation rate.  **The aggregate amount of the Estimated Reserve Amounts using the Low Rate is approximately $1.1 billion.**

22.    For securitizations issued prior to January 1, 2003, the Debtors do not believe LBHI or SASCO have any liability for breaches of representations and warranty.  This conclusion is based on advice of counsel that there is six year statute of limitations in the State of New York for asserting claims of this type.

23.    The methodology described above is one that we have used consistently the past several years for estimating the potential breaches in any particular securitization on behalf of LBHI and SASCO.

24.    LBHI and SASCO made separate and distinct different types of representations and warranties to the securitization trusts.  LBHI typically made representations and warranties relating to the origination and quality of the loans, while SASCO typically made representations and warranties relating to the delivery of a complete loan file including any and all collateral documents (e.g., promissory notes, mortgages/deeds of trusts, title insurance policies).  It is

significantly more likely that there would be breaches of the type of representations and warranties made by LBHI than of the type made by SASCO. If SASCO did breach representations regarding the delivery of documents, typically, the breaches are cured with non-monetary remedies such as re-executing certain documents and/or providing affidavits, rather than paying monetary damages. As discussed above, the Indenture Trustees generally filed a claim against both LBHI and SASCO relating to each securitization trust. As a result, the Debtors' have allocated the estimates for reserve for the claim of each securitization trust as between LBHI and SASCO, with 95% allocated to LBHI and 5% to SASCO. If a Claim for a particular securitization was filed only against LBHI and not SASCO, the Estimated Reserve Amount was allocated entirely to the Claim against LBHI. Conversely, if a Claim for a particular securitization was filed only against SASCO and not LBHI, the Estimated Reserve Amount was allocated entirely to the Claim against SASCO.

25. In my business judgment, the above methodology and all assumptions included therein represents a reasonable and fair basis to estimate the potential liability of LBHI and SASCO under the Claims. The above methodologies provide for a range of liability for LBHI from $1,103,992,894 to $2,283,140,539 and for SASCO allocation is $58,387,327 to $119,044,871. The Debtors have selected the conservative estimate on the high end of the range for the purposes of establishing the reserve amounts for the Claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: January 12, 2012

/s/ Zachary Trumpp
Zachary Trumpp