Hearing Date: January 26, 2012, 10:00 a.m.
Objection Deadline: January 19, 2012, 4:00 p.m.

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Robert B. Krakow (admitted *pro hac vice*)
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

*Attorneys for PricewaterhouseCoopers AG, Zurich,*
*as Bankruptcy Liquidator of*
*Lehman Brothers Finance AG in Liquidation,*
*a/k/a Lehman Brothers Finance SA en liquidation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                                  :
In re                                             :          **Chapter 11**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,      :          **Case No. 08-13555 (JMP)**
                                                  :
                        **Debtors.**              :          **Jointly Administered**
                                                  :
                                                  :
---------------------------------------------------------------------x

**OBJECTION TO MOTION PURSUANT TO SECTION 8.4 OF THE**
**MODIFIED THIRD AMENDED CHAPTER 11 PLAN OF LEHMAN BROTHERS**
**HOLDINGS INC. AND ITS AFFILIATED DEBTORS TO ESTIMATE THE AMOUNT**
**OF DISPUTED CLAIMS FILED BY LEHMAN BROTHERS FINANCE AG IN**
<u>**LIQUIDATION FOR PURPOSES OF ESTABLISHING RESERVES**</u>

## <u>Table of Contents</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ......................................................................... 1

II.   BACKGROUND RELATING TO LBF ............................................................ 3

    A.   Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA ................... 3

    B.   The Swiss Proceedings ....................................................................... 4

    C.   Role of PwC As Bankruptcy Liquidator ............................................ 5

    D.   The U.S. Chapter 11 and Chapter 15 Proceedings............................. 6

    E.   LBF's Claims Against the Debtors .................................................... 7

    F.   LBHI's Claim Against LBF ............................................................... 9

III.  ARGUMENT ................................................................................................. 10

    A.   The Court Has No Authority To Estimate Disputed Claims Under Section 502(c) ................................................................................... 10

    B.   If the Court Were To Conduct an Estimation Hearing, the Hearing Would Necessarily Be an Evidentiary Hearing and Should Not Take Place Until a Fair Opportunity Has Been Given to Take Discovery ......................................... 14

        i.   The Motion Is Predicated on Vague and Conclusory Allegations.......... 14

        ii.  Estimation of LBF's Claims Will Require Resolution of Numerous Issues of Fact and Law.................................................................. 16

            a.   The LBHI Guarantees are Valid and Enforceable ...................... 16

            b.   LBHI's Claims Against LBF Cannot be Set Off Against LBF's Claims Because they will be Treated as Equity Under Swiss Law ................................................................. 18

IV.   CONCLUSION.............................................................................................. 24

i

## Table of Authorities

**Page(s)**

**Cases**

*Atchison County Farmers Union Co-op Ass'n v. Turnbull (Turnbull)*,
  241 Kan. 357, 736 P.2d 917 (1987) ............................................................. 21

*Audre, Inc. v. Casey (In re Audre, Inc.)*,
  216 B.R. 19 (B.A.P. 9th Cir. 1997), *overruled on other grounds as stated in Lopez v.
  Emergency Serv. Restoration, Inc. (In re Lopez)*, 367 B.R. 99 (B.A.P. 9th Cir. 2007) ........... 10

*FDIC v. Bank of Am. Nat'l Trust & Sav. Assn.*,
  701 F.2d 831 (9th Cir. 1983) ................................................................... 21, 22

*FDIC v. Jesus Velez*,
  678 F.2d 371 (1st Cir. 1982) ........................................................................ 22

*FDIC v. Texarkana Nat'l Bank*,
  874 F.2d 264 (5th Cir. 1989) ....................................................................... 22

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
  414 F.3d 325 (2d Cir. 2005) ........................................................................ 21

*In re Adelphia Business Solutions, Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ..................................................... 11, 12, 15

*In re Chemtura Corp.*,
  448 B.R. 635 (Bankr. S.D.N.Y. 2011) ......................................................... 14, 15

*In re Continental Airlines*,
  981 F.2d 1450 (5th Cir. 1993) ...................................................................... 10

*In re Enron Corp.*,
  No. 01-16034 (AJG), 2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) ........................ 15

*In re Ford*,
  967 F.2d 1047 (5th Cir. 1992) ...................................................................... 14

*In re Golden Gem Growers, Inc.*,
  No. 6:01–bk–09028–ABB , 2010 WL 745476 (Bankr. M.D. Fla. Mar. 2, 2010) ................... 21

*In re Harnischfeger Indus.*,
  293 B.R. 650 (Bankr. D. Del. 2003) ................................................................ 21

*In re Keene Corp.*,
  171 B.R. 180 (Bankr. S.D.N.Y. 1994) .............................................................. 11

*In re Lambert Oil Company, Inc.*,
  B.R. 508 (Bankr. W.D. Va. 2006) .................................................................. 22

*In re Wallace's Bookstores, Inc.*,
  317 B.R. 720 (Bankr. E.D. Ky. 2004) .............................................................. 11

*In re Windsor Communications Group, Inc.*,
  79 B.R. 210 (E.D. Pa. 1987) ................................................................................................... 23

*Lines v. Bank of America Nat'l Trust & Sav. Ass'n*,
  743 F. Supp. 176 (S.D.N.Y. 1990) ......................................................................................... 23

*Marta Group, Inc. v. County Appliance Co., Inc.*,
  79 B.R. 200 (E.D. Pa. 1987) ................................................................................................... 22

*Oneida Ltd. v. Pension Benefit Guar. Corp. (In re Oneida Ltd.)*,
  383 B.R. 29 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 562 F.3d 154 (2d Cir.
  2009) ........................................................................................................................................ 11

*Wingate v. Orchard*,
  75 Fed. 241 (9th Cir. 1896) .................................................................................................... 21

PricewaterhouseCoopers AG, Zurich ("**PwC**"), in its capacity as duly authorized Bankruptcy Liquidator and foreign representative of Lehman Brothers Finance AG in Liquidation, also known as Lehman Brothers Finance SA in Liquidation, a Swiss corporation ("**LBF**"), hereby files this objection to the *Motion Pursuant to Section 8.4 of the Modified Third Amended Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors to Estimate the Amount of Disputed Claims Filed By Lehman Brothers Finance AG (In Liquidation) For Purposes of Establishing Reserves* [Docket No. 24253] (the "**Motion**").

## I.    PRELIMINARY STATEMENT

1.      LBF has filed claims in this case against LBHI and LBSF totaling approximately $16.0 billion.  To date, no objection has been filed as to any of LBF's claims.  In light of indications that the Debtors intended eventually to object to LBF's claims, over the past several months, counsel for LBF and counsel for the Debtors have had a number of discussions concerning a possible consensual agreement as to a reserve amount for the claims.

2.      On January 5, 2012, counsel for LBF sent to counsel for the Debtors a confidential analysis of the reserve-related issues in furtherance of the discussions regarding a consensual reserve agreement.  Counsel for LBF also proposed to counsel for the Debtors that the parties obviate the entire reserve process by taking the claims determination issues to mediation.  The Debtors never responded either to the reserve analysis or the claims mediation proposal.  Instead, they have filed their Motion, providing LBF with four business days to respond to a request that no reserve be established for LBF's $15.4 billion claim against LBHI and that LBF's $553 million claim against LBSF be estimated at a mere $63 million.  Somewhat remarkably and disingenuously in light of the mediation proposal, the Debtors represented that

they had "no choice but to request the relief herein" because the parties "have been unable to resume meaningful settlement negotiations" since October 2010.  (Motion ¶ 11.)

3.      The Debtors' Motion is ill-conceived for a variety of reasons.  To begin with, the Debtors bring their Motion under section 502(c) of the Bankruptcy Code, but that section only authorizes the estimation of contingent or unliquidated claims.  Here, the claims of LBF are neither contingent nor unliquidated.  The claims are purportedly disputed by the Debtors, though no claim objection has been filed to date.  In any event, the plain language of section 502(c) (as confirmed in numerous rulings by various courts) makes clear that claims that are merely disputed cannot be estimated.

4.      Even if the claims of LBF were contingent or unliquidated (which they are not), the Debtors would also be required to show that the fixing or liquidation of the claims would unduly delay the administration of the case.  The Debtors have made no such showing.  In fact, it is the Debtors who are delaying matters—declining to engage in mediation that could resolve all disputes as to the claims of each side and electing to present this estimation Motion to the Court rather than filing their claims objections and seeking a hearing for a final determination of the claims.

5.      Moreover, even assuming the Court is legally authorized to consider the Debtors' request to estimate, the Motion as presented is premature and plainly designed to deny LBF its due process rights.  Nothing can be more fundamental to a bankruptcy proceeding than ensuring that each of the Debtors' creditors receives its fair allocation of the assets available to resolve unpaid claims.  Having failed to file any objections to LBF's claims, the Debtors nevertheless seek to evade their obligation to set aside sufficient reserves to ensure that LBF can ultimately recover the full amount of its allowed claims.  And they are making this request through a

2

motion containing nothing but vague and conclusory assertions that they seek to rush to hearing on fourteen days' notice without any opportunity for discovery.  No hearing of this magnitude should take place without a full opportunity for discovery and full presentment of relevant evidence to the Court.

6.        Finally, even if estimation were legally authorized and consideration of the Motion at this time were appropriate, the Debtors' contentions concerning the respective claims of the parties are both legally and factually erroneous, and they grossly distort the likely outcome of the claims resolution process, all in an effort to cause this Court to rush to underestimate the reserves necessary to allow LBF a full recovery on its claims.  As shown below, the Debtors' superficial analysis of the claims greatly exaggerates the possibility that LBF's claims will not be allowed in full while altogether ignoring the significant likelihood that the Debtors' corresponding claims against LBF will be treated as equity *without any right of setoff*.

## II.        BACKGROUND RELATING TO LBF

7.        The basic background facts pertaining to these chapter 11 cases are well known to the Court and will not be repeated here.

### A.        Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA

8.        LBF is a Swiss corporation and registered with the Commercial Register as both Lehman Brothers Finance AG in Liquidation and Lehman Brothers Finance SA en liquidation. The dual names arise from the local practice in Switzerland, a country in which both French and German are official languages, to designate LBF's corporate status both in the German nomenclature (*Aktiengesellschaft* (AG)) and the French nomenclature (*Société anonyme* (SA)).

9.        LBF is a wholly-owned subsidiary of LBHI.  Since January 22, 2001, the principal purpose of LBF has been to provide financial and financial intermediary services, including structuring, issuing and entering into derivative transactions, and other related

3

activities.  Prior to the commencement of the Swiss Bankruptcy (discussed below), LBF's

primary business was to engage in foreign (i.e., non-U.S.) derivative transactions.

10.    LBF maintains its registered office in Zurich, Switzerland.  LBF has no offices or

employees in the United States.  While LBF has business relationships with several U.S.-based

Lehman Brothers entities and a number of other U.S. counterparties, the bulk of LBF's debtor-

creditor relationships involve entities that are not based in the United States, including Lehman

Brothers International (Europe).

**B.    The Swiss Proceedings**

11.    By order dated September 30, 2008, the Swiss Federal Banking Commission (the

"***Swiss Commission***")[1] assumed regulatory authority over LBF, as a financial intermediary.   By

the same order (the "***Observation Order***"), the Swiss Commission appointed PwC as the

Observer of LBF and directed PwC to investigate LBF's finances and other affairs.  The

Observation Order prohibited LBF's board of directors and officers from causing LBF to take

any legal actions without PwC's approval, and tasked PwC to protect LBF's creditors and

marshal its assets.

12.    On October 17, 2008, PwC issued a report to the Swiss Commission pursuant to

the Observation Order recommending the liquidation of LBF.  On October 29, 2008, the Swiss

Commission issued an order (the "***Wind-Up Order***") appointing PwC as Liquidator of LBF with

sole authority to act on LBF's behalf, and prohibiting LBF's board of directors and officers from

---

[1]    Effective January 1, 2009, the Swiss Commission and other regulatory bodies were merged
into the Swiss Financial Market Supervisory Authority ("***FINMA***"), which now regulates
LBF and is responsible for supervising the Swiss Bankruptcy (discussed below) pursuant to
the same rules and authorities previously administered by the Swiss Commission.  FINMA
and the Swiss Commission, as applicable, are referred to hereinafter as the Swiss
Commission.

taking any legal actions on the company's behalf.  The Wind-Up Order also commenced the

liquidation—i.e. the orderly winding up—of LBF pursuant to (i) article 23 quinquies of the

Swiss Federal Act on Banks and Savings Banks; (ii) article 36a of the Swiss Federal Act on

Stock Exchanges and Securities Dealers; and (iii) article 739, *et seq*., of the Swiss Federal Code

of Obligations.  In addition, the Wind-Up Order provided that the wind-up could be converted to

a bankruptcy proceeding upon a finding that there was no possibility of restructuring LBF.

13.    In its capacity as Liquidator, PwC, after conducting an initial investigation of

LBF's affairs, determined in late November 2008 that LBF was very likely to be insolvent and

that a restructuring was unlikely.  PwC informed the Swiss Commission of these findings and, on

December 2, 2008, requested that the wind-up be converted to a bankruptcy proceeding.  On

December 19, 2008, the Swiss Commission issued an order (the "***Swiss Order for Relief***")

commencing a Swiss "*Bankenkonkurs*," or bank/security dealer bankruptcy proceeding (the

"***Swiss Bankruptcy***") for LBF pursuant to Swiss law, specifically (i) article 33, *et seq*., of the

Swiss Federal Act on Banks and Savings Banks; (ii) the Swiss Commission's Ordinance on

Bankruptcy of Banks and Securities Dealers; (iii) article 36a of the Swiss Federal Act on Stock

Exchanges and Securities Dealers; and (iv) the Swiss Federal Debt Enforcement and Bankruptcy

Act (the "***Swiss Governing Laws***"),[2] and appointing PwC as Bankruptcy Liquidator of LBF.

**C.    Role of PwC As Bankruptcy Liquidator**

14.    Pursuant to the Wind-Up Order, PwC as Liquidator took over most functions, and

in particular, all operational functions, of LBF's board of directors.  On December 22, 2008,

---

[2] The Swiss Commission has held that LBF is subject to the Swiss laws governing the
bankruptcy and liquidation of banks and securities dealers, which incorporate by reference
the general provisions of the Swiss insolvency law.

which was the effective date of the Swiss Order for Relief, PwC became the Bankruptcy

Liquidator of LBF.  Thus, since October 29, 2008, by authority of the Swiss Commission, PwC

has operated LBF to a large extent independently of prior management, and has been and

remains obligated to protect the interests of LBF's creditors and equity holders. PwC is tasked

with investigating LBF's affairs, preserving assets for the benefit of creditors and equity holders,

and collecting receivables and liquidating the assets of LBF for the benefit of all creditors and

equity holders.

**D.      The U.S. Chapter 11 and Chapter 15 Proceedings**

15.      On October 3, 2008, the Chief Restructuring Officer of LBHI authorized the filing

of a chapter 11 petition in the Court on behalf of LBF (under the name Lehman Brothers Finance

SA).[3]  However, neither the board of directors of LBF nor PwC, which had before such date

been appointed as Observer of LBF (with the right to approve any such filing) in the proceedings

then pending in Switzerland, approved the filing of a chapter 11 case in the United States.

16.      Given LBF's limited connections to the U.S., PwC believed that the Swiss

Bankruptcy would be the most efficient and appropriate forum for the administration of LBF's

assets, and that dismissal of the chapter 11 case was in the best interests of LBF and its

stakeholders.  Thus, PwC filed a motion to dismiss the chapter 11 case and, concurrently, a

petition (the "***Chapter 15 Petition***") seeking (i) recognition of the Swiss Bankruptcy as a

"foreign main proceeding," and of PwC as the "foreign representative" of LBF under chapter 15

of the Bankruptcy Code; and (ii) additional relief under section 1521 of the Bankruptcy Code.

---

[3]  The chapter 11 case was pending in this Court as Case No. 08-13887 (JMP).

17.     This Court granted the motion to dismiss the chapter 11 case and entered an

*Order Granting Recognition of Foreign Main Proceeding and Related Relief Under Chapter 15*,

dated March 12, 2009 (Case No. 09-10583, Docket No. 24) (the "**Chapter 15 Order**").  For

nearly three years, PwC and others involved in the Swiss Bankruptcy have been relying on the

Chapter 15 Order's recognition of the Swiss Bankruptcy as the "foreign main proceeding" and

directive that PwC be "entrusted with the administration, realization and distribution of all of

LBF's assets located within the territorial jurisdiction of the United States, along with LBF's

other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)."  Chapter 15 Order ¶¶ 2, 6.

**E.     LBF's Claims Against the Debtors**

18.     LBF has two types of claims against the Debtors: (1) direct claims resulting from

LBF's trading and general business relationship with the Debtors; and (2) guarantee claims

resulting from various LBHI guarantees of the obligations of its affiliates, which run in LBF's

favor.  Prior to the deadline to file its proofs of claim, on November 2, 2009, PwC filed ten

proofs of claim on LBF's behalf with respect to these claims (the "**Initially Filed Claims**").[4]

When the Initially Filed Claims were filed, there was still a great deal of uncertainty regarding

the amounts of LBF's claims because at that time PwC had not yet been able to perform a full

reconciliation of LBF's books and records with those of the Debtors and the Debtors' other

affiliates.  Thus, as a protective measure, the Initially Filed Claims reflected the gross amounts

due to LBF.  In the two years following the filing of the Initially Filed Claims, PwC engaged in

---

[4]  The Initially Filed Claims were assigned claim numbers 63454, 63455, 63456, 63457, 63458,
63459, 63460, 63461, 63462, and 63847.  Claim number 63462 was subsequently withdrawn.
In the Motion, the Debtors attribute claim numbers 19596 and 19597 to LBF.  However,
these claims were not filed by LBF and were instead filed by Lehman Brothers International
(Europe), Zurich Branch, an entirely separate legal entity.

extensive efforts to reconcile the books and records of LBF with those of the other Lehman

entities, all in accordance with the Cross-Border Insolvency Protocol for the Lehman Brothers

Group of Companies (the "*Global Protocol*").  As a result of those efforts, PwC was able to

determine with greater certainty the total amount of net claims held by LBF against the Debtors.

Consequently, and in accordance with the Global Protocol, PwC filed amended proofs of claim

with respect to eight of the nine remaining Initially Filed Claims (the "*Amended Claims*," and

together with claim number 63461, the "*Claims*") to reflect the net amounts owed by the Debtors

to LBF.[5]  In large part because the Amended Claims reflect the amounts owed to LBF on a net

basis whereas the Initially Filed Claims reflected the amounts owed to LBF on a gross basis, the

filing of the Amended Claims had the effect of substantially reducing the total amount of LBF's

Claims.  A chart showing the Claims and their amounts is set forth below:[6]

| Debtor | Claim Number | Type of Claim | Amount of Claim |
|---|---|---|---|
| Lehman Brothers Holdings Inc. (08-13555) | 67792 | Direct | $652,183,136.95 |
| Lehman Brothers Holdings Inc. (08-13555) | 67800 | Guarantee | $14,608,906,300.49 |
| Lehman Brothers Holdings Inc. (08-13555) | 67798 | Guarantee | $132,079,209.73 |
| Lehman Brothers Holdings Inc. (08-13555) | 63461 | Guarantee | $37,456,398.98 |

---

[5] The Initially Filed Claims that were subsequently amended are the subject of a pending motion to expunge in light of the fact that they were amended.  *See Debtors' Two Hundred Forty-Eighth Omnibus Objection to Claims (Amended and Superseded Claims)* [Docket No. 24104] (the "*Expungement Motion*").  LBF does not object to the relief requested in the Expungement Motion.

[6] This chart is being provided for the convenience of the Court only, and is qualified in its entirety by the Claims.  The chart is not intended to limit any claims LBF may have that are not reflected herein or otherwise impair LBF's ability to recover any amounts owed by LBHI, even if such amounts are materially higher than the amounts set forth herein.

| | | | |
|---|---|---|---|
| Lehman Brothers OTC Derivatives Inc. (08-13893) | 67796 | Direct | $386,290,347.92 |
| Lehman Brothers Commercial Corp. (08-13901) | 67797 | Direct | $150,321,706.19 |
| Lehman Brothers Commercial Paper Inc. (08-13900) | 67794 | Direct | $0.00 |
| Lehman Brothers Commodity Services Inc. (08-13885) | 67793 | Direct | Undetermined |
| Lehman Brothers Special Financing Inc. (08-13888) | 67795 | Direct | $552,816,931.19 |
| **Total** | | | **$16,520,054,031.45** |

With the exception of the Claim filed against Lehman Brothers Commodity Services Inc., which is not included in the total amount of claims in any event, the Claims are neither contingent nor unliquidated. In addition, the Debtors have not objected to any of the Claims.

**F.    LBHI's Claim Against LBF**

19.    In the aggregate, LBHI has filed claims against LBF in the Swiss Bankruptcy in the amount of $14,129,335,478.32.[7]  The claim is "primarily on account of intercompany funding." (Motion ¶ 18.)  As discussed in more detail below, under applicable Swiss law such intercompany funding by LBHI to its subsidiary, LBF, was in fact an equity investment in LBF that can only be paid after all of LBF's creditors are paid.

20.    The procedure in Switzerland is that PwC, as Bankruptcy Liquidator, must finalize its assessment of all claims that have been filed against LBF (subject to certain specific

---

[7]  In their Motion, the Debtors make much of the fact that LBSF has asserted a cross-claim against LBF in the Prudential adversary proceeding (Adv. Pro. Case No. 09-01423).  LBF has filed a motion to dismiss the cross-claim and does not believe that it has any merit for the reasons set forth in LBF's *Memorandum In Support of Its Motion to Dismiss Cross-Claims of Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc.* [Adv. Pro. Docket No. 18] and related filings.  In any event, the Liquidator has no record of the filing of any claim by LBSF in the Swiss Bankruptcy on account of the Prudential cross-claim.

exemptions).  Once PwC has finalized the assessment of claims, it will publish a schedule of

claims (literally, a "Kollokationsplan") (the "*LBF Schedule of Claims*") and send a final

decision regarding the claims to each of LBF's creditors.  This is expected to occur later this

year.  Creditors will then be entitled to file a motion with the Swiss court to have their claims

allowed at all or in an amount different from the amount allowed in the LBF Schedule of Claims.

Because LBHI's "claim" against LBF results from its equity infusions into LBF, LBF's Schedule

of Claims will list LBHI's claim as being "mit Rangrücktritt belastet," which means that it will

be treated similarly to the way preferred stock might be treated in the U.S.—being paid after

creditors but before holders of common stock.

## III.    ARGUMENT

### A.    The Court Has No Authority To Estimate Disputed Claims Under Section 502(c)

21.     The Debtors' Motion flies in the face of the plain meaning of section 502(c),

which provides, in pertinent part, that "[t]here shall be estimated for purposes of allowance under

this section…any contingent or unliquidated claim, the fixing or liquidation of which…would

unduly delay the administration of the case…."  As numerous courts have held, however, "in

cases where a claim is neither contingent nor unliquidated, estimation is 'simply inappropriate.'"

*In re Cont'l Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993) (citation omitted).  "Resorting to

§ 502(c) is only appropriate when the claim is either contingent or unliquidated. …  If the debt

does not fit this definition, estimation is inappropriate."  *Audre, Inc. v. Casey (In re Audre, Inc.)*,

216 B.R. 19, 30 (B.A.P. 9th Cir. 1997), *overruled on other grounds as stated in Lopez v.

Emergency Serv. Restoration, Inc. (In re Lopez)*, 367 B.R. 99 (B.A.P. 9th Cir. 2007).

22.     Courts in this district are in agreement.  "In order for the estimation process of

§ 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail

undue delay in the administration of justice."  *Oneida Ltd. v. Pension Benefit Guar. Corp. (In re*

*Oneida Ltd.)*, 383 B.R. 29, 38 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 562 F.3d 154 (2d

Cir. 2009).  "Under 11 U.S.C. § 502(c), the court can estimate a claim if it is contingent or

unliquidated, and cannot be fixed and liquidated without unduly delaying the administration of

the case. A non-final judgment claim—which is neither contingent nor unliquidated—cannot be

estimated." *In re Keene Corp.*, 171 B.R. 180, 185 n.3 (Bankr. S.D.N.Y. 1994).

23.    The Debtors do not assert, nor can they, that the LBF Claims are either contingent

or unliquidated.  Instead, they deem them to be disputed because they were not allowed pursuant

to Section 6.5 of the Debtors' Plan, and assert that they can be estimated pursuant to Section 9.3

of the Plan.  Section 9.3 merely provides that this Court may be asked to "estimate any

contingent, unliquidated or Disputed Claim, ***to the extent permitted by the Bankruptcy Code***

***and Bankruptcy Rules***."  (Emphasis added.)  By its terms, Section 9.3 does not purport to alter

or expand upon what is permitted under 502(c).

24.    Neither of the two cases cited by the Debtors supports their contention that the

Court may estimate claims that are merely disputed.  In *In re Wallace's Bookstores, Inc.*, the plan

of reorganization included a provision permitting the estimation of disputed claims that, unlike

the Plan here, did not restrict its limits to what is permitted under the Code and Rules.  In

response to arguments made by the creditor as to why estimation should not be permitted under

§ 502(c), the Court noted:  "The answer to all of these arguments is that § 502(c) does not

control; rather, the Liquidating Supervisor's right to estimation of Disputed Claims is governed

by Section 7.4 of the Plan, which expands considerably on § 502(c)."  317 B.R. 720, 724 (Bankr.

E.D. Ky. 2004).  No such expansion can be found in the Plan in this case.

25.    The Debtors' reliance on *In re Adelphia Business Solutions, Inc.* is mystifying.  In

that case, Judge Gerber held as follows <u>in declining to estimate</u> an administrative claim relating

to repayment of a DIP loan that was liquidated in amount: "I cannot agree that any time one disputes an otherwise liquidated claim, or asserts a counterclaim, that makes the claim unliquidated. When it comes time to determine the allowance of the DIP claim, we'll have to do it the normal way, which is by litigation of a contested matter." 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003).

26.    Section 502(c)(1) also contains another requirement that the Debtors cannot satisfy. It only authorizes the estimation of contingent or unliquidated claims, "the fixing of which, as the case may be, would unduly delay the administration of the case." The only contention made by the Debtors that even arguably goes to the administration of the case issue is the conclusory assertion that establishing a reserve for LBF's Claims "would substantially diminish the distributions that LBHI and LBSF can make to creditors with Allowed Claims…." (Motion ¶ 24.)

27.    Establishing a reserve for LBF's Claims will have no impact on the administration of the case. The Plan has been confirmed and the Debtors' ability to continue administering and winding up their estates—a process that is likely to drag on for years after the allowed amounts of LBF's Claims have been determined by this Court—will not be affected by setting a reserve. And, while reserving for LBF's Claims may reduce the initial distributions to other creditors by a small percentage, the Debtors have presented no evidence as to the actual impact on such distributions if they reserve in full for LBF's Claims. Indeed, while the amount of LBF's Claims is a significant number in the abstract, in the context of this bankruptcy that amount represents a very small percentage of all claims. Based on the information contained in the Debtors' Disclosure Statement, reserving for LBF's Claims in full will reduce the initial distribution percentage to other creditors by less than one percent. But, as discussed below, even if this

reduction were to exceed one percent, it would only be a temporary reduction as any excess

funds reserved for LBF's Claims that are ultimately disallowed would merely be redistributed to

holders of allowed claims in one of the many contemplated subsequent distributions under the

Plan.

28.     The Debtors also argue at the very end of their Motion that Section 8.4 of the Plan

authorizes a creditor whose Disputed Claim becomes an Allowed Claim in excess of the amount

reserved for the claim to "catch up" on later distributions.  But, argue the Debtors, "[n]o similar

provision would allow the creditors of LBHI and LBSF to 'catch up' in the same way, even if the

LBF Claims are ultimately allowed in lower amounts, or disallowed entirely."  (Motion ¶ 28.)

29.     This argument is completely backwards, and deliberately misconstrues Section

8.4.  The Debtors can give no assurance that adequate assets will remain for a full distribution to

LBF whenever its Claims might be finally determined.  Only a full reserve can ensure a full

distribution.  In fact, if a reserve is not established, the Debtors can effectively deny LBF the

opportunity for a meaningful distribution by continuing to delay consideration of the ultimate

allowance of LBF's Claims.  On the other hand, were more to be reserved than was ultimately

necessary to pay the LBF Claims, the excess would then become available for further

distributions to other creditors pursuant to the plain terms of Section 8.4.  In relevant part, it

states: "To the extent that a Disputed Claim against a Debtor is disallowed by Final Order or

becomes an Allowed Claim in an amount less than the amount retained with respect to such

Claim pursuant to this provision, the amount that would have been distributed on account of such

Disputed Claim, or the excess amount of the Available Cash that would have been distributed on

account of such Disputed Claim over the amount of Available Cash actually distributed on

account of such Disputed Claim, shall become Available Cash for Distributions to holders of Allowed Claims."

30.    The bottom line is that a desire to get more money faster to other creditors is not a legitimate basis for ignoring the plain reading of section 502(c).  As one court remarked:  "We recognize that our holding today appears to frustrate section 502(c)(1)'s goal of accelerated payout to creditors.   It is clear, however, that in cases such as the one before us where a claim… is neither 'contingent' nor 'unliquidated,' estimation pursuant to section 502(c)(1) is simply inappropriate. The Bank, as well as all other creditors of this estate, must await payout on its claim until resolution of the trustee's suits against the other co-makers for contribution."  *In re Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992).

31.    Likewise here, the attempted use of section 502(c) to estimate claims that are neither contingent nor unliquidated is not permissible.  To paraphrase Judge Gerber in the *Adelphia* case, when it comes time to determine the allowance of LBF's Claims, we'll have to do it the normal way, which is by litigation of a contested matter.

**B.    If the Court Were To Conduct an Estimation Hearing, the Hearing Would Necessarily Be an Evidentiary Hearing and Should Not Take Place Until a Fair Opportunity Has Been Given to Take Discovery**

**i.    The Motion Is Predicated on Vague and Conclusory Allegations**

32.    The Court must be particularly cautious when estimating a claim for the purpose of establishing a plan reserve because, while a reserve set too high may temporarily delay a portion of the distributions to other creditors, a reserve that is set too low runs the risk that, in the event the claim ultimately is allowed, the claimant will not be able to recover at all as remaining funds may be insufficient to satisfy the claim.  As stated in *In re Chemtura Corp.*, "when estimation is undertaken for the purpose of setting a claims reserve, and value can leave the estate to the extent that it hasn't been held back as a reserve, the creditor whose claim was

estimated can be prejudiced if an appellate court later concludes that a claim would be allowed in

an amount greater than the amount upon which the reserve was established." 448 B.R. 635, 669

(Bankr. S.D.N.Y. 2011) (notwithstanding the court's belief that the claim ultimately would not

be allowed, court declined to estimate claim at zero); *cf. In re Enron Corp.*, No. 01-16034 (AJG),

2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) (establishing a zero claim reserve where the

court had already conducted a hearing and concluded that the claims were not valid).

33.    Furthermore, as held in the *Adelphia* case, given the impact that estimation may

have on a claimant's ability to recover, in determining whether estimation procedures are proper,

courts should evaluate whether the procedures meet general due process requirements. 341 B.R.

at 422-23. Establishing a *de minimis* claims reserve in the instant case based on LBHI's

"intention" to object to LBF's claims in the future and the bald assertion that LBHI would be

successful would be a clear violation of LBF's due process rights.

34.    Indeed, the Debtors' motion contains virtually no substantive information

supporting its contentions. To cite just a few examples:

- The bulk of the LBF Claims arise from LBHI corporate guarantees set forth in corporate resolutions. In the motion, the Debtors state that "LBHI has serious concerns as to whether the Corporate Resolutions are enforceable contacts at all." (Motion ¶ 17.) The nature of those concerns or the legal and factual bases for them? Not specified anywhere in the Motion.

- With respect to LBF's $15.4 billion of claims against LBHI, the Debtors assert that "[b]ased on LBHI's own review of Lehman's books and records and all other available information…the Debtors estimate that the maximum total liability of LBHI could not exceed $9.7 billion." (Motion ¶ 18.) The underlying support or explanation for this reduction of close to $6 billion? Nowhere to be found in the Motion.

- As for LBF's acknowledged defense to LBHI's claims in the Swiss Bankruptcy that the LBHI claims should be treated as equity, the Debtors proclaim that they "vigorously dispute[] this assertion." (Motion ¶ 19.) The basis for this proclamation? Unspecified "advice from Swiss counsel."

35.     Even if $16 billion in claims were not at issue, it would be totally inappropriate

for a creditor to have to guess what the Debtors ultimately intend to present to the Court.

Particularly given the vague and conclusory allegations here, it is critical that LBF be given a fair

opportunity to conduct discovery in advance of any estimation hearing on the Motion, should the

Court overrule the objection that these Claims cannot be estimated as a matter of law.

### ii.     Estimation of LBF's Claims Will Require Resolution of Numerous Issues of Fact and Law

36.     At this point in time, and subject to further amplification of the issues through

additional filings by the Debtors and discovery, there appear to be two primary issues with

respect to the LBF Claims.  First, are the guarantees executed by LBHI legally enforceable

against LBHI?  Second, is any claim that LBF might have against LBHI subject to setoff against

LBHI's claim against LBF in Switzerland?  Both questions implicate numerous issues of fact and

law.

### a.     The LBHI Guarantees are Valid and Enforceable[8]

37.     In October 1995, LBF as lender entered into a subordination agreement with

Lehman Brothers Inc. ("**LBI**") whereby LBF agreed to subordinate its rights to repayment of

monies loaned to LBI to the right of payment of LBI creditors not so subordinated.  Concurrent

therewith, LBHI signed a document entitled "GUARANTEE" in which it "unconditionally and

irrevocably" agreed to pay in full to LBF any amount due from LBI that was not paid on account

---

[8] In addition to the guarantees discussed in detail below, LBHI issued various other guarantees that guaranteed certain specific obligations owed by or to LBF.  Since the obligations guaranteed by those other guarantees are also covered by the guarantees discussed herein and because LBHI has not challenged the validity of those other guarantees, they are not discussed in detail.

of the subordination agreement.  A true and correct copy of the GUARANTEE is attached hereto

as Exhibit 1.

38.    On June 9, 2005, by way of a Unanimous Written Consent of the Executive

Committee of the Board of Directors of LBHI, LBHI noted that it had previously issued full and

partial guarantees to various subsidiaries, that it "now wishes to expand such partial guarantees

to full guarantees," and that LBHI management "believes it would facilitate the conduct of the

Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their

entirety with [a] single document."  Accordingly, LBHI, through its Board of Directors, resolved

that,

> …the Corporation hereby fully guarantees the payment of all liabilities
> obligations and commitments of the subsidiaries set forth on Schedule A hereto,
> each of which shall be a Guaranteed Subsidiary for purposes of the [Corporation's
> Code of Authorities].

The Guaranteed Subsidiaries listed on Schedule A[9] include LBF and several affiliates against

which LBF has direct claims.  LBF's direct claims against these other affiliates form the basis of

LBF's Claims based on the guarantee expressly set forth in the Unanimous Written Consent.  A

true and correct copy of the Unanimous Written Consent is attached hereto as Exhibit 2.

39.    By way of the Motion, LBHI seeks to avoid its clearly-stated legal obligations.  In

the Motion, LBHI argues that LBF's claim pursuant to the Unanimous Written Consent is

---

[9]  The Guaranteed Subsidiaries are Lehman Brothers Asia Holdings Limited; Lehman Brothers
Bankhaus A.G.; Lehman Brothers Commercial Bank; Lehman Brothers Commercial
Corporation; Lehman Brothers Commercial Corporation Asia Limited; Lehman Brothers
Equity Finance (Cayman) Limited; Lehman Brothers Finance S.A.; Lehman Brothers
Holdings Plc; Lehman Brothers International (Europe); Lehman Brothers Japan Inc.; Lehman
Brothers (Luxembourg) Equity Finance S.A.; Lehman Brothers Luxembourg) S.A.; Lehman
Brothers OTC Derivatives Inc.; Lehman Brothers Securities Asia Limited; Lehman Brothers
Securities N.V.; Lehman Brothers Special Financing Inc.; Lehman Brothers Treasury Co.
B.V.; and Lehman Re Limited.

"particularly susceptible to challenge, because applicable law generally requires the purported

beneficiary of a guarantee to demonstrate both knowledge of and reliance upon, a guarantee.

LBF has demonstrated neither."  (Motion ¶ 17.)  Nowhere do the Debtors identify what

"applicable law" contains these purported requirements, and given the fact that the Debtors have

failed to object to the LBF Claims, it is not clear exactly when or why the Debtors expected LBF

to demonstrate compliance with such unidentified legal requirements.   Should evidence of

knowledge and/or reliance be required, LBF is in possession of clear documentary evidence of

both and is prepared to present it to the Court.  Moreover, LBF suspects that, should it have the

opportunity to conduct discovery from the Debtors and affiliated entities, even more of such

evidence will be found.  At a minimum, there are significant factual issues that must be

considered by the Court in order to assess the probability that LBHI has any likelihood of

challenging LBF's guarantee-based claims.[10]

> **b.    LBHI's Claims Against LBF Cannot be Set Off Against LBF's Claims Because they will be Treated as Equity Under Swiss Law**

40.    LBHI's presumed ace-in-the-hole argument is setoff.  LBHI states that LBF

maintains that LBHI's claim should be subordinated, but LBHI argues that even if subordinated,

under applicable U.S. law, LBHI could still use its entire $14.2 billion claim against LBF as a

setoff against any allowed claim of LBF.  (Motion ¶ 25.)   The overwhelming likelihood is to the

contrary.  LBHI misunderstands the nature of its claims under applicable Swiss law.  As shown

below, LBHI's purported "loans" to its inadequately capitalized subsidiary will most likely be

---

[10]  In addition, the Debtors' conclusory statement that, based upon a review of the books and
records, its maximum total liability could not exceed $9.7 billion, as opposed to the $15.4
billion claimed by LBF, presents an inherently factual issue, requiring discover and then
presentment of evidence to the Court.

treated as equity infusions, and not as loans.  Regardless of whether the correct choice of law for

the setoff analysis is the U.S. or Swiss, setoff would be improper under either nation's laws once

LBHI's "claim" is properly characterized.

41.    The balance sheet of a Swiss company includes on the liability side both debt and

equity.  *See* Art. 663a para. 3 of the Swiss Code of Obligations.  Under certain circumstances,

debt provided by a shareholder to the company may be treated similar to equity to protect the

interests of other creditors in the bankruptcy of the company.  *See* Swiss Federal Supreme Court

decision in BGer May 25, 2010 5A.175/2010, consideration 3.3.3.  For instance, this would be

the case if a parent company does not provide its subsidiary with adequate equity in relation to

the subsidiary's business model and balance sheet volume, but instead finances the subsidiary via

shareholder loan and, concurrently, extracts the commercial benefits such subsidiary receives in

the course of its business activities instead of redeeming the loan.  The denomination of the

funding is irrelevant, if it was in fact intended to be an equity investment.

42.    The evidence strongly implies that it was always LBHI's and LBF's intention to

utilize the intercompany funding to provide equity to LBF.   Putting aside the "loaned" funds, at

all relevant times LBF would have been grossly underfunded, with a nominal share capital ratio

of about 99 to 1 at best.  Such nominal share capital would have been far below the regulatory

minimum equity requirements for a banking institution.   In order to provide its wholly-owned

subsidiary with sufficient funding for its operations, in lieu of direct capital infusions, LBHI

loaned billions of dollars to LBF and issued guarantees of LBF's obligations, including the

guarantee set forth in the Unanimous Written Consent.  Further evidence of the intent to treat the

"loans" like equity is that, rather than redeem the loan, LBF's earnings were mostly transferred

to other affiliates under the control of LBHI.  Thus, there was at a minimum an implied

understanding that the loans from LBHI were being provided in lieu of equity.

43.    If a shareholder loan is treated like equity, this has a number of consequences

under Swiss law.  For example, such a claim—having the nature of equity—ranks below all

other third-party creditors (but before the shareholder's entitlement to its share) in any possibly

remaining liquidation surplus.  *See* Swiss Federal Supreme Court decision in BGer May 25, 2010

5A.175/2010, consideration 3.3.5.  In addition, when a shareholder loan is treated like equity,

this results in a prohibition to collect principal or interest on the claim until third parties are paid

(BGE 129 III 129, 132) and a deferral of principal (and interest) payments (BGE 129 III 129,

132).

44.    Most significantly, it also operates as *a waiver of any setoff right*.  *See* Swiss

Federal Supreme Court decision in BGE 129 III 129, 132; *see also* Art. 213, para. 4 of the Swiss

Federal Act on Debt Enforcement and Bankruptcy (stating that unpaid capital contributions

cannot be set off).  The reason is that permitting the setoff of a lower-ranking claim before all

regular (higher ranking claims) have been satisfied would be to the detriment of the higher-

ranking creditors and render the priority order futile. Thus, LBHI as the shareholder of LBF,

having provided equity funding to LBF, has in fact no "claim" that is susceptible to setoff.  *See*

Swiss Federal Supreme Court decision in BGer May 25, 2010 5A.175/2010, consideration 3.3.3

(in the original French, "l'actionnaire n'est titulaire d'aucune créance au moyen de laquelle

exercer la compensation " ; or, literally "the shareholder is not a holder of any claim by means of

which to exercise the compensation").

45.    The Debtors attempt to side step this result by baldy asserting that U.S. law is

applicable to determine LBHI's setoff rights.  The better-reasoned view is that Swiss law applies.

*See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336-39 (2d Cir. 2005) (rejecting LBSF's argument that New York setoff law should apply where the relevant counterparty was in an insolvency proceeding in Thailand and instead applying Thai setoff law); *In re Harnischfeger Indus.*, 293 B.R. 650, 661, 663 (Bankr. D. Del. 2003) (holding that the internal affairs doctrine applied to choose the relevant setoff law where the "central issue" was "whether [certain] monetary advances from Beloit to Beloit Austria, either direct or indirect, constitute[d] an equity investment" and choosing the setoff law of the subsidiary's nation of incorporation).  Nonetheless, the choice of law question may itself involve resolution of intricate questions of fact and law.

46.     Even under U.S. law, setoff would not be permitted on the facts of this case. Under applicable U.S. law, equity claims such as those held by LBHI against LBF cannot be used to set off debt claims because there is no mutuality.  *See, e.g.*, *FDIC v. Bank of Am. Nat'l Trust & Sav. Ass'n.*, 701 F.2d 831, 835 (9th Cir. 1983) ("Surely, if Bank of America had bought stock of Banco Credito, common or preferred, it could not offset its obligation to Banco Credito for the latter's deposits against its investment in the stock."); *Wingate v. Orchard*, 75 Fed. 241, 242-43 (9th Cir. 1896) (stockholder in a national bank, whose stock had been assessed by the comptroller of the currency, not permitted to set off against the assessment the amount of his deposit in the bank); *In  re Golden Gem Growers, Inc.*, No. 6:01–bk–09028–ABB , 2010 WL 745476 at *7 (Bankr. M.D. Fla. Mar. 2, 2010) ("Courts have uniformly held capital equity credits in an agricultural cooperative association do not constitute an indebtedness of the cooperative, but constitute ownership interests in the cooperative and cannot be used as a setoff against a member's indebtedness."); *Atchison County Farmers Union Co-op Ass'n v. Turnbull (Turnbull)*, 241 Kan. 357, 736 P.2d 917 (1987) (cooperative member not permitted to set off his

equity credits against an open account due the cooperative because the debts were not presently

due).

47.    The Debtors ignore this fundamental principle and instead cite to cases in which

courts allowed a subordinated claim to be set off against a non-subordinated claim.  Notably, in

each of the cases the Debtors cite the claim in question was subordinated by operation of federal

law.  Indeed, in *In re Lambert Oil Company, Inc.*, the court specifically distinguished cases

where subordination is pursuant to state law or contractual agreement.  347 B.R. 508, 518-19

(Bankr. W.D. Va. 2006) (stating it was "significant" that the claim was not subordinated under

state law).  In contrast, where claims are subordinated pursuant to state law or where there is

contractual subordination, courts have held that the subordinated claims cannot be set off.  *See,*

*e.g.*, *FDIC v. Bank of Am. Nat'l Trust and Sav. Co.*, 701 F.2d 831 (9th Cir. 1983) (claim

subordinated under Puerto Rican law cannot be set off and to do so would violate public policy);

*Marta Group, Inc. v. County Appliance Co., Inc.*, 79 B.R. 200 (E.D. Pa. 1987) (mutuality lacking

where claim subordinated under Pennsylvania state statute).  *See also FDIC v. de Jesus Velez*,

678 F.2d 371 (1st Cir. 1982) (no mutuality where claim was contractually subordinated); *FDIC*

*v. Texarkana Nat'l Bank*, 874 F.2d 264 (5th Cir. 1989) (same).

48.    It is also worth noting that setoff is restricted by both legal and equitable

principles:

> [T]he doctrine of set-off, which allows mutual debts between a creditor and a
> debtor's estate to be set-off against one another, *see In re Bohack Corp.*, 599 F.2d
> 1160, 1164-65 (2d Cir. 1979); *see generally* Collier on Bankruptcy para. 553.04
> (15th ed. 1989), is "restricted in its application by both legal and equitable
> principles."  *Windsor Communications*, *supra*, 79 Bankr. at 215; *see Brunswick*
> *Corp. v. Clements*, 424 F.2d 673, 675 (6th Cir. 1970), *cert. denied*, 400 U.S. 1010,
> 1013, 91 S. Ct. 569, 27 L. Ed. 2d 623 (1971); *see also Federal Deposit Ins. Corp.*
> *v. Bank of America*, 701 F.2d 831, 836-37 (9th Cir.) ("set-off will not be
> permitted when it would be inequitable or contrary to public policy to do so"),
> *cert. denied*, 464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 343 (1983). Courts

therefore have uniformly held that a creditor who obtains a debtor's property wrongfully is not entitled to set off their liability for that wrongful conduct against a claim that the creditor holds against the debtor. *See, e.g.*, *Brunswick Corp.*, *supra*, 424 F.2d at 676; *Fore Improvement Corp. v. Selig*, 278 F.2d 143, 148 (2d Cir. 1960) (Friendly, J., concurring); *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 29-31, 106 N.E. 753, 754 (1914); *Windsor Communications*, *supra*, 79 Bankr. at 216; *Ducker v. Lohrey*, 33 Bankr. 973, 976 (Bankr. S.D. Ohio 1983).

*Lines v. Bank of America Nat'l Trust & Sav. Ass'n*, 743 F. Supp. 176, 182-83 (S.D.N.Y. 1990).

That court went on to hold that "because set-off is an equitable principle it must be denied in a situation where it would be inequitable to allow it. *See, e.g.*, *Brunswick*, *supra*, 424 F.2d at 675; *Windsor Communications*, *supra*, 79 Bankr. at 216. Since [claimant]'s action in this circumstance unjustly allowed it to obtain a preference over other creditors its application here would be both inappropriate and inequitable." *Id.* at 183.

49.    The court in *In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215-216 (E.D. Pa. 1987), cited extensively by the Southern District of New York in the *Lines* case above, held as follows:

We begin our analysis by noting that the right of setoff expressed in § 553 is restricted in its application by both legal and equitable principles. *In re Lessig Construction, Inc.*, 67 B.R. 436, 441 (Bankr.E.D.Pa.1986). Furthermore, it is appropriate in the context of a bankruptcy to narrowly construe setoff so as not to run counter to the fundamental principle of bankruptcy law that creditors of the same class should share equally in any distribution from the debtor. *Id.* at 441. Denial of setoff in the case *sub judice* is in harmony with this principle.

50.    Assuming as we do that the Swiss court is likely to find that LBHI's "loans" to its wholly-owned, inadequately funded, subsidiary should be regarded as equity, no authority exists in the U.S. for the proposition that LBHI's equity claim can be set off against its own debt obligation to LBF.  Moreover, however the LBHI claim might be technically treated, it would plainly be inequitable for LBHI to be relieved of its guarantee obligations, which stood in lieu of proper capitalization of LBF.

23

51.     LBF believes that there is no likelihood that LBHI will be able to recover on its claims against LBF in Switzerland.  Accordingly, it would be inappropriate for this Court to factor in a setoff amount against the proper amount of LBF's claims when establishing a reserve. At a minimum, the issues surrounding the proper classification of LBHI's claims—intent of the parties, adequacy of the capitalization—are inherently factual.  The Court will need to consider evidence, after appropriate discovery, in order to assess the likelihood that LBHI will ultimately have any claim in Switzerland that it can set off against LBF's claim here.

## IV.    CONCLUSION

For the reasons set forth above, this Court should deny the Motion because no authority exists under section 502(c) to estimate disputed claims that are neither unliquidated nor contingent.  But should the Court permit the Motion to be considered, the Court should continue the Motion for a period of at least 60 days to enable the parties to engage in necessary discovery and to more fully present their legal and factual arguments to the Court.  And regardless of whether or not the Court finds that it can conduct an estimation hearing, LBF respectfully suggests that the Court refer the parties to mediation to attempt to reach a consensual resolution of the allowed amounts of LBF's Claims.

Dated:    New York, New York
          January 19, 2012

**GIBSON, DUNN & CRUTCHER LLP**

By:  /s/ Michael A. Rosenthal
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 715-8000

Robert B. Krakow (admitted *pro hac vice*)
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75209
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2934

*Attorneys for PricewaterhouseCoopers AG, Zurich, as*
*Bankruptcy Liquidator of Lehman Brothers Finance AG*
*in Liquidation, a/k/a Lehman Brothers Finance SA en*
*liquidation*