HEARING DATE AND TIME: January 26, 2012 at 10:00 a.m. (Eastern Time)
RESPONSE DEADLINE: January 20, 2012 at 4:00 p.m. (Eastern Time)

FAEGRE BAKER DANIELS LLP
Stephen M. Mertz (admitted pro hac vice)
Michael M. Krauss (MK-9699)
Michael F. Doty
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

ATTORNEYS FOR WELLS FARGO
BANK, NATIONAL ASSOCIATION,
IN ITS CAPACITY AS TRUSTEE
PURSUANT TO VARIOUS TRUST
AGREEMENTS

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
: 
In re                                              : Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       : 08-13555 (JMP)
                                                   :
            Debtors.                               : (Jointly Administered)
                                                   :
                                                   :
-------------------------------------------------------------------x

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, IN ITS
CAPACITY AS TRUSTEE PURSUANT TO VARIOUS TRUST AGREEMENTS, TO
THE DEBTORS' MOTION PURSUANT TO SECTION 8.4 OF THE MODIFIED
THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS
HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND SECTIONS 105(a), 502(c)
AND 1142(b) OF THE BANKRUPTCY CODE TO ESTIMATE THE AMOUNTS OF
CLAIMS FILED BY INDENTURE TRUSTEES ON BEHALF OF ISSUERS OF
RESIDENTIAL MORTGAGE-BACKED SECURITIES
<u>FOR PURPOSES OF ESTABLISHING RESERVES</u>**

Wells Fargo Bank, National Association, in its capacity as trustee pursuant to various trust agreements ("Wells Fargo"), by and through its undersigned attorneys, hereby submits this objection to the Debtors' Motion, Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings, Inc. and Its Affiliated Debtors and Sections 105(a), 502(c), and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves ("Motion"). Through the Motion, Lehman Brothers Holdings Inc. ("LBHI") and Structured Assets Securities Corporation ("SASCO" and together with LBHI and their affiliated debtors in the above-captioned cases, the "Debtors") seek to estimate and limit billions of dollars in claims filed by Wells Fargo and other trustees. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Motion.

First, Wells Fargo objects to the Motion because the Motion dramatically underestimates the Debtors' liability for repurchase claims, and contains no factual basis for these estimates. In particular, calculations the Debtors use to determine LBHI and SASCO's potential liability for repurchase claims are wholly inadequate and dramatically understate their potential liability. Instead of facts, the Debtors offer unsupported conclusory statements in support of their proposed Estimated Reserve Amounts.

Second, the Debtors have not shown why estimation of Wells Fargo's claims on 14-days notice is necessary to avoid unduly delaying the Debtors' cases. This is especially true given the semi-annual nature of distributions under the Debtors' plan of reorganization, and the fact that the Debtors anticipate the distribution process to last at least three years.

2

Finally, as a practical matter, the Motion may prevent the trusts for which Wells Fargo acts as trustee from recovering the full value of their claims.

In support of its objection, Wells Fargo respectfully states and represents as follows:

**<u>Background</u>**

The Motion seeks to estimate, for purposes of establishing a claims reserve, the value of hundreds of claims filed by trustees on behalf of hundreds of securitization trusts. The claims arise because certain of the Debtor entities sold, assigned, or otherwise conveyed mortgage loans secured by residential real properties (each such loan a "<u>Mortgage Loan</u>" and collectively, the "<u>Mortgage Loans</u>") to various securitization trusts (the "<u>Trusts</u>"). Wells Fargo acts as trustee for a number of the Trusts whose claims are affected by the Motion (such trusts, the "<u>Wells Fargo Trusts</u>").[1]

As the Debtors indicate in the Motion, LBHI typically acquired the Mortgage Loans in three ways: (i) certain of the Mortgage Loans were originated by LBHI subsidiaries ("<u>Lehman Originated Loans</u>"), (ii) LBHI subsidiaries acquired loans from third-party banks and mortgage lenders on an ongoing basis ("<u>Bank Originated Loans</u>"); and (iii) LBHI or one of its subsidiaries acquired the loans from third-party mortgage lenders in bulk purchases ("<u>Transferor Originated Loans</u>"). In each instance, LBHI sold or conveyed the Mortgage Loans to SASCO through a Mortgage Loan Sale and Assignment Agreement or similar agreement (each a "<u>Mortgage Loan Sale and Assignment Agreement</u>" and collectively, the "<u>Mortgage Loan Sale and Assignment Agreements</u>"). SASCO then sold the Mortgage Loans to the Trusts.

---

[1] As discussed below, two of the trusts identified in the Motion as Wells Fargo Trusts are commercial mortgage-backed securitizations and should not be subject to the Debtors' valuation methodology, as the Motion seeks to estimate claims using a methodology that is applicable to residential mortgage-backed securitizations.

3

When LBHI transferred the Mortgage Loans to SASCO for inclusion in the Trusts, it made various representations and warranties regarding the nature and quality of the Mortgage Loans.  Breaches of these representations and warranties trigger various repurchase obligations under the Mortgage Loan Sale and Assignment Agreements.  SASCO then sold the Mortgage Loans to the Trusts, and in doing so, it assigned to the Trusts all of the representations and warranties LBHI made with respect to the Mortgage Loans in the Mortgage Loan Sale and Assignment Agreements.  Typically, breaches of LBHI's representations and warranties under a Mortgage Loan Sale and Assignment Agreement trigger repurchase obligations under the Trust Agreement (the "Trust Agreement") governing the related Trust.

In selling the Mortgage Loans to the Trusts, SASCO made certain representations and warranties relating to the Mortgage Loans as well.  Most of these representations and warranties relate to the completeness of each Mortgage Loan file (e.g. that the file contained the original note, the original mortgage, original copies of any modifications or assumptions, copies of title insurance policies, etc.).  Typically, SASCO's failure to deliver a complete Mortgage Loan file will trigger a repurchase obligation on the part of the original seller if the missing Mortgage Loan documents cause the Trust to incur a loss.  However, SASCO is also liable for the repurchase obligation if the original seller fails to repurchase the Mortgage Loan.

Under the Trust Agreement for each of the Wells Fargo Trusts, Wells Fargo, as Trustee, is entitled to assert these repurchase claims on behalf of the Wells Fargo Trusts. The Motion seeks to estimate the total value of these repurchase claims for purposes of establishing a claims reserve, which the Debtors assert is necessary to allow them to make a

4

distribution under their Modified Third Amended Plan of Reorganization [D.I. 23023] (the "Plan").

## Objection

### I. Incorporation of Arguments Made in Other Objections

To the extent not otherwise incorporated herein, Wells Fargo hereby incorporates, restates, adopts, and joins in the arguments set forth in the Objection to the Motion filed by US Bank National Association, as Trustee, and the Objections to the Motion filed by the other trustees of the Trusts (collectively, the "Trustees").

### II. Debtors Ignore LBHI's Liability for Transferor Originated Loans

In the Motion, the Debtors assume that LBHI is not liable for *any* breaches of representations and warranties that LBHI made with respect to the Transferor Originated Loans. (Motion at ¶ 20.) As described below, LBHI has provided nothing to support this assumption, and the discount that appears in step six of the valuation methodology attached to the Motion as Exhibit B (the "Valuation Methodology"), is simply inappropriate.

#### A. Debtors' Calculations Assume LBHI's Representations and Warranties Are Co-Extensive With The Related Transferor's

In making the assumption that LBHI has no liability for any breaches of representations and warranties that it made on account of Transferor Originated Loans, the Debtors claim the Trust Agreements "clearly provide that the trustee's sole recourse is to the initial seller, not LBHI." (*Id.*) But this is not what the Trust Agreement says. The relevant provision of the Trust Agreement is as follows:

> "To the Extent that any fact, condition or event with respect to a Mortgage Loan constitutes a breach of *both* (i) a representation or warranty of the applicable Transferor under the applicable Transfer Agreement *and* (ii) a representation of [LBHI] under the Mortgage Loan Sale [and Assignment]

5

>Agreement, the only right or remedy of the Trustee or of any Certificateholder shall be the Trustee's right to enforce the obligations of the applicable Transferor under any applicable representation or warranty by it."

(Motion at Ex. C (emphasis added).) Under the terms of the Trust Agreements, the "Transferor" is the originator of the related Mortgage Loan, and the "Transfer Agreement" is the agreement pursuant to which LBHI purchased the Mortgage Loan from the Transferor. Thus, the exception on which LBHI relies is wholly dependent on the assumption that the representations and warranties provided by LBHI in the Mortgage Loan Sale and Assignment Agreements are co-extensive with the representations and warranties of the Transferor, but the Debtors have provided nothing to support this assumption.

### B. Debtors Have Failed to Provide Wells Fargo with the Relevant Transfer Agreements

LBHI did not provide copies of the Transfer Agreements to Wells Fargo when the securitization deals closed. Wells Fargo has repeatedly requested copies of the Transfer Agreements from LBHI. However LBHI persistently, and without any explanation, refused to provide copies of the Transfer Agreements to Wells Fargo. Finally, on January 9, 2012, LBHI provided Wells Fargo with access to Transfer Agreements for one of the Wells Fargo Trusts. As of the date of this Objection, LBHI has made Transfer Agreements available for two of the Wells Fargo Trusts. LBHI has failed to provide the Transfer Agreements for <u>any</u> of the remaining Wells Fargo Trusts. Moreover, LBHI has failed to offer any explanation for its failure to provide the Transfer Agreements. On January 19, 2012, after receiving a copy of the Motion, Wells Fargo served discovery requests on LBHI and SASCO, and requested that LBHI produce copies of the Transfer Agreements and documents defending the Valuation Methodology.

As of the date of this Objection, LBHI has not produced the Transfer Agreements. Instead, LBHI simply wants Wells Fargo and this Court to assume that the representations and warranties made by the Transferors in the related Transfer Agreements are identical to the representations and warranties made by LBHI in the Mortgage Loan Sale and Assignment Agreements. LBHI has offered nothing to prove that this is a viable defense. LBHI's failure to do so is even more bizarre given that it should be able to produce the Transfer Agreements with minimal effort, and if what LBHI claims is true, the Transfer Agreements would absolve LBHI from substantial liability. However despite this, LBHI has repeatedly and unjustifiably refused to deliver copies of the Transfer Agreements to Wells Fargo. The Court should not estimate the claims related to the Wells Fargo Trusts based on an unsupported statement that that the Transfer Agreements *might* provide LBHI with a defense to the repurchase claims, especially where LBHI can conclusively resolve the issue by simply producing the Transfer Agreements.

### C. Even If LBHI's Representations and Warranties Overlap With the Transferor's Representations and Warranties, LBHI Has Original Obligations With Respect to Certain Representations and Warranties

In many instances, LBHI has original liability for breaches of representations and warranties – even if a non-Lehman entity originated the Mortgage Loan, and made the same representations and warranties with respect to the Mortgage Loan. For example, LBHI has identified the First Franklin Mortgage Trust Series 2006-FFA ("<u>First Franklin 2006-FFA</u>") as a securitization in which there are no Lehman Originated Loans, or Bank Originated Loans. However, Section 2.03(b) of the First Franklin 2006-FFA Trust Agreement provides, in relevant part, that:

7

> "The Trustee acknowledges that, *except as otherwise provided in the Mortgage Loan Sale [and Assignment] Agreement*, [LBHI] shall not have any obligation or liability with respect to any breach of a representation or warranty made by it with respect to the Mortgage Loans sold by it if the fact, condition or event constituting such breach also constitutes a breach of a representation or warranty made by the Transferor in the Transfer Agreement…"

(emphasis added). A copy of the relevant provisions of the First Franklin 2006-FFA Trust Agreement is attached to the Declaration of William Fay dated as of January 20, 2012 ("<u>Fay Declaration</u>") as <u>Exhibit A</u>. In addition, Section 1.04(b) of the First Franklin 2006-FFA Mortgage Loan Sale and Assignment Agreement (the "<u>First Franklin MLSA</u>") provides, relevant part, that:

> "The representations made by [LBHI] pursuant to Sections 1.04(b)(xiii) through (xvii) *shall be direct obligations of [LBHI]*. [SASCO] acknowledges and agrees that the representations and warranties of [LBHI] in this Section 1.04(b) (*except in the case of those representations and warranties made pursuant to 1.04(b)(xiii) through (xvii)*) are applicable only to facts, conditions or events that do not constitute a breach of any representation or warranty made by the Transferor in the Transfer Agreement.

(emphasis added). Thus, even if LBHI's representations and warranties are co-extensive with the representations and warranties of the Transferor, LBHI still has original liability for substantial portions of the representations and warranties that it made.[2] A copy of the First Franklin MLSA is attached to the Fay Declaration as <u>Exhibit B</u>. First Franklin 2006-FFA is not unique in this respect. Under most of the Mortgage Loan Sale and Assignment

---

[2] Liability for these representations and warranties is likely to be substantial due to the breadth of the related representations and warranties. For example, in Section 1.04(b)(xiii) of the First Franklin 2006-FFA Mortgage Loan Sale and Assignment Agreement, LBHI represents and warrants that "[e]ach Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws." (Fay Declaration, Ex. B at p. 8.) Under the deal documents, LBHI retains liability for this representation and warranty, regardless of any similar representation or warranty in the Transfer Agreement.

8

Agreements, LBHI retains original liability for a portion of the representations and warranties – even if the related Mortgage Loans are Transferor Originated Loans.

Despite retaining original liability for a substantial number of representations and warranties, the Estimated Reserve Amount the Debtors propose for First Franklin 2006-FFA is $0. (Motion at Ex. A.) This is wholly inadequate, as LBHI clearly has broad potential liability under the documents.

### D. LBHI is liable for breaches that occur during the "gap period."

In addition to the carve-outs in the Mortgage Loan Sale and Assignment Agreements that impose original liability on LBHI for breaches of certain representations and warranties, LBHI also has liability for any breaches of representations and warranties that occurred between the date of the related Transfer Agreement and the date of the related Mortgage Loan Sale and Assignment Agreement.

For example, the First Franklin MLSA references a Transfer Agreement dated as of April 1, 2005. (Fay Declaration Ex. B at p. 2.) But the First Franklin MLSA is dated as of October 1, 2006. (*Id*. at p. 1.) Section 1.04(b) of the First Franklin MLSA provides that "[t]he representations and warranties of the Transferor with respect to the Mortgage Loans in the Transfer Agreement were made *as of the date of the Transfer Agreement*." (emphasis added) (*Id*. at p. 4.) Thus, even if LBHI made substantially the same representations and warranties as the Transferor, it made them at different times. A representation or warranty made on April 1, 2005, might have been true – however that same representation and warranty might not be true when LBHI made it on October 1, 2006. For example, Section 1.04(b)(ix) of the First Franklin MLSA provides that:

9

> "[t]here are no mechanics' liens or similar liens or claim which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage."

(Fay Declaration, Exhibit B at p. 7.) If the Transferor made this same representation and warranty on April 1, 2005 and a mechanics' lien arose on August 15, 2006, LBHI would have original liability for breaching this representation and warranty, because the condition giving rise to the breach does not also give rise to a breach of the Transferor's obligations under the Transfer Agreement.

**III.    Debtor's Calculations Inappropriately Assume That the Responsible Parties Will Fail to Pursue Their Claims.**

In Step 7 of the Valuation Methodology, the Debtors assume that the responsible parties will simply fail to prove their claims. Indeed, Step 7 assumes that, even where losses have occurred with respect to the Mortgage Loans, and LBHI or SASCO have breached representations or warranties with respect to those Mortgage Loans, that Wells Fargo will only be able to "validate" 40% of the resulting claims. Essentially, the Debtors assume that Wells Fargo will not be able to provide the documentation necessary to support its claims, even for cases in which LBHI or SASCO breached a representation or warranty, the Mortgage Loan gave rise to a loss, and the Debtors admit that they would otherwise be liable for the loss.

The Debtors offer no justification for this assumption, and ask this Court to discount the estimated value of Wells Fargo's claims for purposes of establishing a reserve based on the idea that Wells Fargo will simply fail to document its claim. Such a discount is simply

10

inappropriate where the Debtors have not alleged any facts that would support Step 7 of the Valuation Methodology.

IV. **Debtors Cannot Show that the Failure to Estimate the Trusts' Claims on 14-Days Notice Will Unduly Delay the Administration of Their Bankruptcy Cases.**

The Debtors have failed to show that a failure to estimate the Trusts' claims on 14-days notice and before having an opportunity to take limited discovery, or have a full evidentiary hearing, will unduly delay the administration of their bankruptcy cases.  While the Debtors allege that having to establish reserves for the "excessively overstated Claims would limit LBHI's and SASCO's ability to make meaningful distributions to other creditors for an extended period of time" the Debtors do not, and cannot allege that permitting the parties to engage in limited discovery and waiting an additional 30 to 60 days to estimate Wells Fargo's claims will unduly delay the Debtors' bankruptcy cases.  (Motion at pp. 11-12.)

Wells Fargo does not suggest that claims estimation is inappropriate in this case. Rather, given the long timeline in which the Debtors have to make distributions, it is simply inappropriate to conclude that a failure to estimate Wells Fargo's claims by January 26, 2012, will unduly delay the Debtors' cases.  This is especially true where the Plan provides for semi-annual distributions on March 30 and September 30, and the wind-down period is expected to last for at least three years.  (Plan Sections 8.3, 7.6.)  Thus granting the parties additional time to conduct limited discovery before estimating the amount of Wells Fargo's claims will at most affect a single distribution under the Plan and will not unduly delay the administration of the Debtors' bankruptcy cases.

11

## V. The Motion Does Not Contain Information Sufficient to Make a Reasonable Estimate of Wells Fargo's Claims.

Additional time to conduct limited discovery and fully brief these issues is also necessary because the Court does not have "sufficient evidence on which to base a *reasonable estimate* of the claim[s]" before it. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982) (emphasis added). This is not to say that claims estimation requires absolute certainty – by their very nature estimates are uncertain. But in similar fashion the formulation of a reasonable estimate, by its very nature, requires that the Court determine likely outcomes after examining relevant law and facts. *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 419 (Bankr. S.D.N.Y. 2003)

This is especially true where the amounts at stake are admittedly quite large, even in the context of one of the largest bankruptcy filings in history, and where the Debtors have persistently failed to provide the documents necessary to support their unsubstantiated claim that LBHI has no liability for breach claims relating to Transferor Originated Loans. Moreover, other aspects of the Debtors' Valuation Methodology are unsupported as well. For instance, the assumption in Step 7 of the Valuation Methodology – that Wells Fargo will not be able to "validate" 60% of the breach claims where LBHI admits that it breached a representation or warranty that it made in connection with a particular Mortgage Loan, and where the related Wells Fargo Trust incurred a loss in connection with the Mortgage Loan, has no factual support. The Motion does not provide a sufficient basis for a reasonable estimate of Wells Fargo's claims, and Wells Fargo requires additional information in order to support its own estimates – including responses to its discovery requests and copies of the Transfer Agreements. Setting a final evidentiary hearing for a later date in order to give

12

Wells Fargo, and the Court, the opportunity to determine if there is any basis for the Debtors' calculations will not unduly delay the Debtors' bankruptcy cases, and is absolutely necessary before this Court can make any reasonable estimate of the amount of Wells Fargo's claims.

Courts have wide discretion in determining what form claims estimation proceedings take, and have employed methods "including summary trial, full-blown evidentiary hearing[s], and a review of pleadings and briefs followed by oral argument of counsel." *In re Chemtura Corp.*, 448 B.R. 635, 650 (Bankr. S.D.N.Y. 2011) (citing *In re Baldwin-United Corp.*, 55 B.R. 885, 899 (Bankr. S. D. Ohio 1985); *In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 65 (Bankr. E.D. Va. 1982); and *In re Lane*, 68 B.R. 609, 612-13 (Bankr. D. Haw. 1986)).

However, in *Chemtura Corp.*, and each of the cases it cites in support of this proposition, the court had substantially more information available upon which to base its estimation. For example, in *Chemtura*, a related motion for summary judgment was pending before the court, and the court had the benefit of the submissions that were made on summary judgment motions – "including the documentary exhibits and statements of undisputed facts, and responses, that are required under Local Bankruptcy Rule 7056-1(b)." *Chemtura Corp.*, 448 B.R. at 640. In *Nova Real Estate*, the court held a full-blown evidentiary hearing and heard 8 days of testimony in connection with a claims estimation motion. *Nova Real Estate*, 23 B.R. at 69. In *Lane*, the court held a hearing on a claims estimation motion, entertained supplemental memoranda after the hearing, and undertook a "close examination of the underlying facts and circumstances" before estimating the claim. *Lane*, 68 B.R. at 609, 613. But importantly, in *Lane*, two years before the debtor filed its motion to estimate the creditor's claim, the creditor had a default judgment entered against it in state court in a suit involving its claims against the debtor. *Id.* Obviously fewer facts are

necessary to form a reasonable estimate of the amount of a claim when the claim in question has already been disposed of by another court.

In contrast to *Chemtura*, *Nova Real Estate*, and *Lane*, the Court has virtually no evidence before it other than the unsupported allegations in the Motion. Similarly, unlike the previous litigation and default judgment in *Lane*, there are no extrinsic factors that can help the Court estimate Wells Fargo's claims. Yet, despite this paucity of supporting evidence, the Debtors ask the Court to estimate claims that, in the aggregate, are several orders of magnitude larger than the $16.3 million claim at issue in *Chemtura*. *Id*. at 639.

Additional information is doubly important in this instance because the Motion seeks to estimate claims for purposes of setting reserves for distribution. The reserve amount can have substantial practical effect on the ultimate distribution to the Wells Fargo Trusts. Accordingly, the Court should take a more "nuanced approach" in setting the amount of the claims reserve. *Chemtura*, 448 B.R. at 651. Such a nuanced approach is simply impossible without more evidence.

**VI. The Motion Offers No Explanation as to Why the Debtors Do Not Believe LBHI or SASCO have any Liability for Trusts that Closed before January 1, 2003**

In the Valuation Methodology, the Debtors assume, without any supporting facts, allegations, or analysis, that LBHI and SASCO have no liability for securitizations issued before January 1, 2003. The Debtors appear to base this assumption "on advice of counsel that there is a six year statute of limitations in the State of New York for asserting claims of this type." (Decl. of Zachary Trumpp at ¶22; Motion, Ex. B at p. 3.) Consistent with this assumption, the Debtors propose Estimated Reserve Amounts of $0 for securitizations issued before January 1, 2003. (Motion, Ex. A.)

14

The Debtors do not even address this issue in the body of the Motion. The sole basis for their legal conclusion is in the statement given by Zachary Trumpp in his declaration in support of the Motion, and even that statement is based solely on advice of unknown counsel. (Trumpp Decl. at ¶ 22.) Even if one assumes that his statement is not inadmissible hearsay, and that Mr. Trumpp based the statement on his own personal knowledge, the statement would still be an inadmissible opinion on a legal issue. *U.S. v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2nd Cir. 1994) ("experts are not permitted to present testimony in the form of legal conclusions.")

## VII. The Motion May Prevent the Trusts from Recovering on The Full Value of their Claims.

The Motion claims that it is without prejudice to Wells Fargo's rights "in any respect." (Motion at ¶ 37.) However, the Debtors ignore the simple fact that the Estimated Reserve Amount amounts to less than 8% of the total realized losses suffered by the Trusts whose claims are affected by the Motion. Indeed, the entire $2.4 billion Estimated Reserve Amount does not even equal 50% of the realized losses that Wells Fargo has identified on the Wells Fargo Trusts alone. (*Infra* at Section VII.) The Motion does not disclose the amounts the Debtors plan to distribute in their initial distribution, or how much value will remain in the Debtors' estates after the initial distribution. Indeed, the Motion does not even allege that sufficient amounts will actually be available to make "catch-up" distributions in the future if the claims reserve is insufficient. The threat of establishing an insufficient reserve is quite real. Courts recognize that, in contrast to estimations for purposes of voting and plan confirmation, claims estimates for purposes of establishing distribution reserves can impair

15

the ability of a claimant to receive distributions on account of its claims, and Courts must apply a more nuanced approach to compensate for this risk. *Chemtura*, 448 B.R. at 651.

As discussed above, it is likely that the Valuation Methodology will ultimately prove to be wildly inaccurate, and given the amounts at stake there simply may not be sufficient funds available for distribution to make the catch-up payments provided for in Section 8.4 of the Plan. Thus the relief sought in the Motion is likely to significantly prejudice the rights of Wells Fargo as well as the rights of the other Trustees named in the Motion. The Court should not grant the relief sought in the Motion without first requiring LBHI to provide information sufficient to apply a more nuanced approach to setting the amount of the claims reserve.

**VIII.  To the Extent the Court Grants the Motion Without Permitting Additional Discovery and Allowing Further Briefing, the Appropriate Estimated Reserve Amount for Wells Fargo's Claims is $6,921,360,430.26**

To the extent that the Court decides to grant the Motion without permitting any additional discovery, or allowing supplemental briefing, the appropriate Estimated Reserve Amount for the Wells Fargo Trusts' portion of the claims should be $6,921,360,430.26.[3]

This amount is based on the following methodology:

**Step 1:** Wells Fargo begins with the aggregate unpaid principal balance of the Mortgage Loans held by the Wells Fargo Trusts as of December 1, 2011 ($13,558,039,176.28)[4]. Wells Fargo obtained this number from its own books and records. (Fay Declaration at ¶ 5.)

---

[3] This amount is likely to be understated, as it does not include any reserve for the Wells Fargo CMBS Trusts (as that term is defined below).
[4] This amount is exclusive of the unpaid principal balance of the Mortgage Loans held by the Wells Fargo CMBS Trusts.

**Step 2:** Wells Fargo multiplied this balance by the likely percentage of loans that have, or will incur, a default. An expert retained by the Trustees will testify that, based on current market conditions, the likely default rate for the Mortgage Loans is 50%.

**Step 3:** Wells Fargo multiplied the result from Step 2 by the "severity factor." An expert retained by the Trustees will testify that, based on current market conditions (including rising default rates, continued erosion of residential real estate prices, and increasingly lengthy foreclosure timelines), and the historical loss severity suffered by the Trusts, a reasonable estimate of the severity factor is 68.3%.

**Step 4:** Wells Fargo adds the cumulative losses that have already been incurred for the loans on each of the Wells Fargo Trusts ($5,257,587,378.82)[5] to the results of Step 3. (Fay Declaration at ¶ 6.) Wells Fargo obtained this number from its own books and records.

**Step 5:** As discussed above, because the Debtors have repeatedly declined to provide copies of the Transfer Agreements that allegedly exculpate LBHI from liability for breaches of the representations and warranties that it made in the Mortgage Loan Sale and Assignment Agreements, and because the Debtors have produced no evidence to show that they are not liable for such breaches, Wells Fargo does not apply any discount to the results of Step 4 to account for LBHI's alleged lack of liability on account of Transferor Originated Loans.

**Step 6:** It is unlikely that LBHI and SASCO have breached a representation or warranty in connection with every Mortgage Loan that has suffered a loss. To account for this, Wells Fargo multiplies the results of Step 5 by a 70% breach rate. An expert retained by the Trustees will testify that the 35% breach rate the Debtors use in the Valuation Methodology is an arbitrary

---

[5] As discussed in the Fay Declaration, this number does not contain the cumulative losses incurred by the Lehman Asset Backed Securitization Trust, Series 2004-2 because, as of the date of this Objection, Wells Fargo has not identified the cumulative losses incurred by this trust. Similarly, this amount is exclusive of the losses that have been incurred by the Wells Fargo CMBS Trusts.

17

number, that the real rate of breaches is much higher, and that a 70% breach rate is reasonable for establishing the claims reserve.

**Step 7:** There is no basis for applying a "validation" percentage to the results of Step 6. While the Debtors believe that Wells Fargo and the other Trustees will fail to validate a substantial majority of the breach claims for which LBHI would otherwise be liable, there is no evidence to indicate that Wells Fargo cannot or will not be able to validate any portion of the Wells Fargo Trusts' claims.

Application of these factors yields a reserve estimate of $6,921,360,430.26. However, this amount is likely to be understated, as it does not take into account the potential losses incurred by CFSB 2005-CND2 and LB-UBS 1999-C2, two Wells Fargo Trusts that are commercial mortgage-backed securitizations (the "<u>Wells Fargo CMBS Trusts</u>"). The purpose of both the Valuation Methodology, and the analysis above, is to estimate breach claims arising out of residential mortgage-backed securitizations. Accordingly, it would simply be inappropriate to estimate a claims reserve for the Wells Fargo CMBS Trusts using these analyses.

Finally, the foregoing analysis should apply to the Trusts regardless of the date the Trust closed – as the Debtors have shown no basis for their assertion that LBHI and SASCO are not liable for claims arising from securitizations that closed prior to 2003.

## Relief Requested

WHEREFORE, for the reasons set forth herein, Wells Fargo requests that this Court: (A) deny the Motion to the extent that it seeks entry of an order allowing the Debtors to estimate Wells Fargo's claims without first permitting the parties to engage in limited discovery and holding a final evidentiary hearing; (B) in the alternative, if this Court grants

the Motion without further opportunity for discovery or a final hearing, the Court should require the Debtors to reserve at least $6,921,360,430.26 on account of Wells Fargo's claims; and (C) grant such other and further relief as the Court shall deem just.

January 20, 2012

/s/ Michael M. Krauss
Stephen M. Mertz (admitted pro hac vice)
Michael M. Krauss (MK-9699)
Michael F. Doty
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

ATTORNEYS FOR WELLS FARGO BANK, NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE PURSUANT TO VARIOUS TRUST AGREEMENTS