**HEARING DATE AND TIME: January 26, 2012 at 10:00 a.m. (Eastern Time)**
**RESPONSE DEADLINE: January 20, 2012 at 4:00 p.m. (Eastern Time)**

HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA  02109
Telephone: (617) 345-9000
Facsimile: (617) 345-9020
Jennifer V. Doran, Esq. (*admitted pro hac vice*)
Counsel for Wilmington Trust Company, in its capacity as trustee

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | CASE NO.  08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF WILMINGTON TRUST COMPANY TO THE MOTION PURSUANT TO SECTION 8.4 OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND SECTIONS 105(A), 502(C) AND 1142(B) OF THE BANKRUPTCY CODE TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE BACKED SECURITIES FOR PURPOSES OF ESTABLISHING RESERVES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Wilmington Trust Company ("WTC"), not individually but in its capacity as trustee,

hereby submits this Objection (the "Objection") to the Debtors' Motion Pursuant to Section 8.4

of the Modified Third Amended Plan of Lehman Brothers Holdings Inc. And Its Affiliated

Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code To Estimate the

Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-

Backed Securities For Purposes of Establishing Reserves [D.E. 24254] (the "Motion")[1].  In support of this Objection, WTC respectfully submits as follows:

## I.    INTRODUCTION

1.      WTC, as indenture trustee, filed two (2) proofs of claim against the Debtors that are addressed herein.[2]  The WTC Claims arise out of the securitization of tens of thousands of residential mortgage loans and, more specifically, out of the obligations of one of the Debtors (Lehman Brothers Holdings, Inc.) as the seller and the obligations of another Debtor (Structured Assets Securities Corporation) as the depositor in connection with those transactions.  The WTC Claims are contingent or unliquidated in certain respects.

2.      In the Motion, the Debtors seek to estimate the WTC Claims for distribution purposes, as well as claims against the Debtors (collectively, the "Claims") filed by other similarly-situated trustees.   Certain of these trustees, Citibank, N.A., U.S. Bank National Association, Deutsche Bank National Trust Company, Wells Fargo Bank, N.A. and WTC (collectively in this Objection, the "Trustees"), have engaged a consultant and are collectively working with the Debtors to agree upon a claims reserve and allowance process, and certain of the information contained in this Objection is a result of these collective efforts.

3.      WTC has been informed that certain of the Trustees have served discovery requests related to relief requested in the Motion on the Debtors.  WTC intends to obtain information voluntarily from the Debtors relevant to the issues raised in the Motion and to serve discovery requests related to the relief requested in the Motion on the Debtors, if needed.

---

[1] Capitalized terms used but not defined herein shall have, for purposes of this Objection, the meaning assigned to such terms in the Motion.
[2] The proofs of claim filed by WTC and addressed by the Motion and this Objection are numbered 22766 and 22773 (the "WTC Claims").

#50507561.6

4.    WTC hereby incorporates the *Declaration of James Burke in Support of Objections of Various Indenture Trustees to the Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves* (the "Burke Declaration"), filed on the docket in these cases on or about January 20, 2012.

5.    The Claims are multi-billion dollar claims, which the Debtor seeks to estimate on very limited notice, and with little real factual support for the Debtors' calculations.  The Motion will adversely affect investors in the residential mortgage-backed RMBS Trusts for which the Trustees serve as trustee (the "RMBS Trusts") holding more than one million residential mortgage loans.  The aggregate value of all the Claims filed by all of the Trustees is approximately $37 billion, and by WTC, as Trustee, is approximately $4.162 billion.  In the Motion, the Debtors seek an order of this Court estimating the aggregate Claims of all the Trustees for distribution purposes only at $2.4 billion (the "Debtors' Estimate").

6.    WTC believes that the assumptions underlying the Debtors' Estimate are not nearly conservative enough and notes that, in the Debtors' Disclosure Statement, which was approved only recently, the Debtors estimated residential mortgage backed security claims at over $10,000,000,000.  The Debtors' Estimate is again a fraction of this amount.  WTC objects to the relief sought by the Debtors because the Debtors' Estimate is based on faulty and/or unsupported methodology that grossly undervalues the Claims.

7.    The methodology being applied by the Trustees in their collective discussions, described in more detail herein, shows that a more accurate estimation of the claims for

#50507561.6

distribution purposes should be approximately $15,000,000,000[3] in the aggregate for the Claims filed by all of the Trustees (the "Trustees' Estimate").  As noted in the Motion, the Debtors and the Trustees have been and are currently engaged in discussions in an attempt to reach a resolution on a protocol to address these very complex claims, including the retention of a consultant by the Trustees.  This process ought to be given time to permit a resolution of these Claims, rather than placing reliance on the Debtors' fallible estimation process.  In the event, however, that this Court decides to approve the Motion and estimate the Claims, WTC asks this Court to increase the proposed reserve for the Claims to adequately account for the lack of precision in the Debtors' Estimate.

8.    Being that the Debtors are not asserting substantive objections to the WTC Claims at this time, the only purpose of the Motion is to maximize the initial Distributions to other creditors.  (See, e.g., Mot. ¶¶ 2, 37.)  While WTC appreciates the Debtors' desire to maximize initial Distributions, the Motion does not need to be granted at this time in order to maximize initial Distributions.  The Plan provides that the initial Distributions of Available Cash shall occur "[o]n the Effective Date, or as soon thereafter as practicable . . . ."  (See Plan § 8.3.)  The Debtors have indicated that the Effective Date of the Plan likely will not occur until sometime in March 2012.  Thus, there is no reason to consider the Motion at this time.  There are at least five weeks before any initial Distribution will be made.  This time could and should be used to continue the negotiations regarding reserve amounts among the Debtors and the Trustees; to allow the Debtors to respond to the discovery requests served (or to be served) by the Trustees; to allow the Trustees to review the documents and information produced by the Debtors in response to such discovery requests; and to resolve the deficiencies in the Debtors' Proposed

---

[3] If the Trustees disregarded the Debtors' questionable assumption that they are responsible for losses attributable to Lehman-originated loans, the projected losses attributed to the Debtors more than triples to approximately $51 billion.  See Burke Declaration.

Methodology. Given the substantial length of time before any initial Distributions will be made, and the productive activities to which such time could be devoted if the Motion is not granted at this time, WTC requests that the Court deny the Motion without prejudice at this time or adjourn the hearing on the Motion to a later date.

9.      Moreover, as described more fully in the Burke Declaration and this Objection, the Proposed Methodology is deficient in several material respects. These deficiencies result in the Debtors underestimating the probable value of the Claims by billions of dollars. (See Burke Decl. ¶¶ 51-53; Burke Decl. Ex. A.) Accordingly, WTC requests that the Court deny the Motion without prejudice at this time or adjourn the hearing on the Motion to a later date because the Proposed Methodology is materially deficient and drastically underestimates the probable value of the WTC Claims.

10.     WTC and the Trustees would likely suffer an irreparable harm if the Motion is granted. If the Motion is granted in its present form, it is likely that the reserve amounts to be established for the Claims will be grossly inadequate. If James Burke's highest current estimate of projected losses is accurate,[4] the reserve amounts will be one sixth as large as they need to be to make the Distributions required under the Plan. (See Burke Decl. Ex. A.) The aggregate deficiency of the reserve amounts could amount to billions of dollars. Given that the Debtors' stated purpose in filing the Motion is to maximize initial Distributions, and that future infusions of cash into the Debtors' estates is speculative, it is unclear how the Debtors could ensure that they could remedy a potential multi-billion dollar deficiency in payments owed to affected RMBS Trusts. Indeed, the Debtors do not offer any explanation for how they might correct such a deficiency in their Motion. Accordingly, WTC requests that the Court deny the Motion

---

[4] This assumes that the Debtors are correct that they are only liable for 30% of the claims on loans in the affected trusts. WTC and the Trustees do not concede this assumption. Consequently, the amount of the estimate would more than triple if the Debtors are responsible for claims arising out of 100% of the loans.

without prejudice at this time or adjourn the hearing on the Motion to a later date because granting the Motion at this time could prejudice and irreparably harm the WTC trusts and the other affected securitization trusts by establishing inadequate reserve funds, and the Debtors have not explained how they could correct any ultimate deficiencies.

## II.    SUMMARY OF WTC'S OBJECTIONS

WTC objects to the Motion on the basis that the methodology (the "Debtors' Methodology") used to determine the Debtors' Estimate is fundamentally flawed in a number of respects for the following reasons:

(a)    **Types of Loans:**  The RMBS Trusts contain loans of varying loan types (i.e, fixed rate, ARMS, hybrid ARMS, etc.), loan quality (i.e., prime, subprime home loans, Alt-A home loans, etc.) and lien position (first or second liens).  The Debtors' Methodology does not take into consideration the differing risk profile of each category of these loans, such that the Debtors' Methodology itself lacks merit and precision and should be discounted entirely.

(b)    **Vintage:**  The RMBS Trusts consist of loans located throughout the United States and which were originated as early as 2002, and include loans that were originated as late as 2008.  The quality of the loans that were originated later is generally worse than the quality of loans originated earlier.  The Debtors' Methodology does not take into consideration either the different vintages of loans or the geographic location of the loans and should be discounted entirely.

(c)    **Default Rate:**  The Trustees believe that the default rate used in the Debtors' Methodology to determine the number of currently performing loans that will go into default is too low due to the facts that: (i) home prices are still declining; (ii) the Trustees' consultant estimates that 32.4% of the loan balances outstanding are currently in some stage of delinquency; (iii) servicers are under pressure to modify delinquent loans, which are then re-classified as current loans, but because of high recidivism rates, these modified loans have higher than average default rates; and (iv) many borrowers owe more under their respective loans than the homes securing the loans are worth.  As a result, the default rate may be 50% or higher.

(d)    **Loss Severity:**  Using historical data from the 1990's or early 2000's to project current loss severity is inappropriate under the current economic circumstances.  Home prices have already fallen 30-35% on average since the housing peak, and as a result, loss severities on typical 2006-2007 subprime deals currently range from 70-85%.  Moreover, as home prices continue to decline and

-6-

liquidation timelines are expected to increase, loss severities are expected to rise in the near future. Also, given the backlog in the process of exercising remedies from filing foreclosure proceedings, prosecuting foreclosure proceedings, selling a large inventory of foreclosed property, and declining home prices, the severity rate should be in a range of approximately 68.3%. Applying a higher severity rate should markedly increase the estimated Claims above the Debtors' Estimate.

(e)    **Loans for which the Debtors Claim No Responsibility:** The Debtors' Methodology is premised on the fact that the Debtors believe they are only responsible for breaches of representations and warranties for approximately 30% of the loans in the RMBS Trusts. This position is premised on the notion that if a third party originator was responsible for certain representations and warranties, one or more of the Debtors are not. The burden is on the Debtors to demonstrate that they are not liable. However, the Debtors have not met their burden of proof in establishing that they have no liability for 70% of the loans. Further, the Debtors' Methodology applies the 30% rate across all RMBS Trusts, without regard to the actual number or percentage of third party originated loans in any particular RMBS Trust, and, therefore, it is not possible for WTC to determine which percentage of loans allocable to the WTC Claims are loans for which the Debtors may have no responsibility. If the Debtors are responsible for all the loans, as WTC, the other Trustees, and the Court must assume until the Debtors produce documents establishing otherwise, the Debtors' Estimate would need to increase by several times its current amount.

(f)    **The Default Rate in Step 6 of the Debtors' Methodology is Too Low:** The percentage of loans containing a breach of a representation or warranty is also understated in Step 6 of the Debtors' Methodology in light of the practices and procedures employed in the industry prior to the collapse of the residential real estate market. The actual default rate may be as high as 70%.

(g)    **A "Validation" Rate Should Not Be Employed:** Step 6 of the Debtors' Methodology provides that the "High Rate" assumes that 35% of the losses are caused by a breach of one or more of the Debtors' representations or warranties. The analysis should stop there. The elements of Step 7 address the same issue by making unsupported assumptions about whether the Debtors' breaches in Step 6 are material. Further, the Debtors' Methodology inappropriately assumes that the Trustees will fail or not be able to prove up breach claims with respect to a larger percentage of loans in the RMBS Trusts. It is inappropriate to reduce the estimated Claims based upon an unwarranted assumption that the Trustees will not be able to prove a claim 60% of the time.

(h)    **Certain Transactions Excluded From the Analysis:** The Debtors' Methodology excludes all Claims for RMBS Trusts prior to 2003. The Debtors state that breach of representation and warranty claims are time barred prior to this date by the statute of limitations. Repurchase claims for transactions prior to 2003 are not time barred because the Trustees are only required to notify

-7-

#50507561.6

the Debtors they have knowledge of a breach, and the Debtors have a continuing obligation to repurchase the loans. Any applicable statute of limitations would not begin to run until a repurchase obligation arises under the applicable contract. Thus, the date of the RMBS Trust does not determine whether a breach claim is time-barred. Generally, repurchase claims are not discovered when the RMBS Trust is established. Instead, most repurchase claims are discovered at the earliest when the related mortgage loan goes into default. The applicable statute of limitations begins to run when the WTC has actual knowledge of a repurchase claim, not when the RMBS Trust transaction closes.

> **(i)   Mortgage File Issues:**   As the foreclosure rate has skyrocketed, courts in foreclosure proceedings have become increasingly particular about insisting that the foreclosing party possesses appropriate documentation for loans supporting the right to foreclose. Historical rates with respect to documentation problems are not relevant to the current foreclosure landscape. The Debtors' Methodology does not take into consideration these recent judicial developments with respect to the foreclosure process, which developments may make it increasingly difficult for a lender to foreclose on its security.

### III.   BACKGROUND FACTS

The Motion relates to hundreds of residential mortgage loan RMBS Trusts sponsored by Structured Assets Securities Corporation ("SASCO") and Lehman Brothers Holdings Inc. ("Lehman"). In short, a Lehman affiliate originated residential mortgage loans or purchased residential mortgage loans originated from various third party originators. These mortgages were then sold to RMBS Trusts in exchange for proceeds received from third party investors in the RMBS Trusts. As will be noted below, a number of important representations and warranties were made with respect to the residential mortgage loans, the manner in which the mortgage loans were underwritten as well as the contents of the mortgage loan files themselves. As noted in a variety of public sources and in the Examiner's Report in this case, during the years immediately prior to the filing of the petitions in the Debtors' bankruptcy cases, activity in the residential mortgage industry substantially increased, underwriting standards were routinely ignored, and mortgage files lacked significant amounts of required documentation.

The Motion, and the assumptions in the Debtors' Methodology, comes in the context of grossly deteriorating market conditions, making reliance on averages and past history impossible for purposes of estimating a claim. Many of the assumptions underlying the Debtors' Methodology need to be far more conservative, which would increase the Debtors' Estimate by a significant amount.

### A.    *A Typical Residential Mortgage Loan Securitization Transaction*

WTC serves as trustee under certain trust agreements by and between SASCO, as Depositor, and the relevant Trustee (the "Trust Agreements"), with respect to the relevant RMBS Trusts. The RMBS Trusts are residential mortgage loan trusts that were formed to purchase and hold residential mortgage loans that were (a) either originated by the Debtors or an affiliate thereof, or (b) purchased by the Debtors from third party originators. After originating or purchasing the loans, the Debtors sold or assigned the residential mortgage loans to the RMBS Trusts. Under the terms of the Trust Agreements, these residential mortgage loans were purchased by the RMBS Trusts using funds obtained from investors through the issuance of certificates. The types of loans in the RMBS Trusts are not all the same. Different RMBS Trusts include varying levels of conventional mortgage loans, adjustable rate mortgages, riskier subprime loans, Alt-A loans and home-equity loans. These different types of loans have different aging experiences and risk characteristics - it is inappropriate to compare a portfolio of traditional mortgage loans to a portfolio of subprime loans, or a portfolio of Alt-A loans.

The residential mortgage loans giving rise to the Claims filed in these proceedings were originated either by a Lehman affiliate or by various third parties (collectively, the "Originator"). These loans were purchased by Lehman Brothers Bank F.S.B., LBHI, or another affiliate thereof (the "Initial Purchaser") under the terms of loan purchase and warranty agreements (or similar

-9-

agreements) (the "Purchase Agreement").[5]    Thereafter, the Initial Purchaser, if not LBHI,

assigned these loans for value to LBHI (the "Seller"), who thereafter transferred the loans for

value to SASCO (the "Depositor") under the terms of Mortgage Loan Sale and Assignment

Agreements (the "Mortgage Loan Sale Agreements").    In exchange for the proceeds from the

issuance of certificates, the Depositor transferred and conveyed the loans to the Trustees for the

benefit of the holders of the certificates issued pursuant to the terms of the Trust Agreements.    In

addition, each Trustee was assigned all of the Depositor's rights under the Mortgage Loan Sale

Agreements.

Under the terms of the Trust Agreements and the Mortgage Loan Sale Agreements, the

Depositor and Seller made certain representations and warranties with respect to the loans to or

for the benefit of the RMBS Trusts.    These types of representations and warranties primarily

focused on the nature, quality, and characteristics of the loan.    In the event of a breach, LBHI

would, in certain circumstances, be required to repurchase the loans or pay the repurchase price

to the applicable Trustee.    In addition, the Depositor made representations and warranties with

respect to the documents in the loan files, and was required to cure these deficiencies or in

certain circumstances repurchase the loans.

**B.    *Breaches of Representations and Warranties***

Pursuant to the Trust Agreements, one or both of SASCO or LBHI made certain

representations, warranties and covenants about the residential mortgage loans that were

subsequently acquired by the RMBS Trusts.    If a breach of a representation, warranty or

covenant with respect to a loan sold to a RMBS Trust materially adversely affects the value of

such loan or the interest of the holders of the certificates therein, the relevant Debtor must

---

[5] Typically, Lehman did not provide copies of the transfer agreements to the Trustees.    Lehman retains those agreements.

-10-

repurchase (or replace) that loan.  Under the terms of a typical Mortgage Loan Sale Agreement between LBHI and the Depositor, in the event of a breach of representation or warranty:

> It is understood and agreed that the representations and warranties … shall survive the Closing Date.  Upon discovery by either [LBHI] or the Depositor of a breach of any of the foregoing representations and warranties … the party discovering such breach shall give prompt written notice to the other party ….  Within 60 days of the discovery of any such breach, [LBHI] shall either (a) cure such beach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof from the Depositor at the applicable Purchase Price or (c) within the two-year period following the Closing Date substitute a Qualifying Substitute Mortgage Loan for the affected Mortgage Loan.

Mortgage Loan Purchase and Sale Agreement, at ¶1.4.  The agreements provide that the parties were obligated to notify each other "upon discovery."  In some (but not all) cases where a third party originator sold loans that ultimately were purchased by LBHI, LBHI could rely upon an exception:

> The representations and warranties of the Transferor [the non-Lehman originator] with respect to the Transferred Mortgage Loans in the applicable Transfer Agreement were made as of the date of such Transfer Agreement.  To the extent that any fact, condition or event with respect to a Transferred Mortgage Loan constitutes a breach of both (i) a representation or warranty of the Transferor under the applicable Transfer Agreement and (ii) a representation or warranty of [LBHI] under this Agreement, the sole right or remedy of the Depositor with respect to a breach by [LBHI] of such representation and warranty (other than a breach by the Seller of the representations and warranties made pursuant to [certain excepted sections]) shall be the right to enforce the obligations of such Transferor under any applicable representation or warranty made by it.  The representations made by [LBHI] pursuant to [the excepted sections] … shall be direct obligations of [LBHI].   The Depositor acknowledges and agrees that the representations and warranties of [LBHI] ...  (other than the representations and warranties made pursuant to [certain excepted sections]) are applicable only to facts, conditions or events that do not constitute a breach of any representation or warranty made by the Transferor in the applicable Transfer Agreement.  [LBHI] shall

-11-

have no obligation or liability with respect to any breach of a representation or warranty made by it with respect to the Transferred Mortgage Loans if the fact, condition or event constituting such breach also constitutes a breach of a representation or warranty made by the Transferor in such Transfer Agreement, without regard to whether the Transferor fulfills its contractual obligation in respect of such representation or warranty;

LBHI's obligations under the Mortgage Loan Sale Agreements were assigned to WTC. A similar provision is contained in the Trust Agreement[6]. However, based on the wording of these Agreements, the Debtors have the burden of establishing that the exception exists. The transfer transactions were sponsored by the Debtors, who drafted the various agreements. The Trustees generally were not provided with copies of the original Transfer Agreements as part of their closing documents. The Trustees have no way of knowing what, if any, representations a third party made regarding the mortgage loans. As a result, regardless of the exact wording, the Debtors have the burden to show that another party is responsible for breaches of representations and warranties.

Further, it should be noted that such limited liability would only apply to those mortgages that were expressly included within the definition of "Transferred Mortgage Loans" and sold by a party contained within the definition of "Transferor." To the extent that the documents do not include any mortgage in the definition of "Transferred Mortgage Loans" or a party within the definition of "Transferor", due to a drafting error or any other reason, any liability with respect to such mortgage would not be limited as a result of the above quoted language.

It is unlikely that all breached mortgage loans have been identified at this time because breached mortgage loans may become known only after the individual borrower fails to make

---

[6] While certain agreements between WTC and the Debtors may preclude a contractual claim for breaches of representations and warranties, various insurers or investors may have claims against one or more of the Debtors if the Debtors made representations and warranties to such investors or insurers with respect to any due diligence the Debtors may have conducted with respect to contributed loans, or with respect to the quality of such loans.

#50507561.6

payments in accordance with the terms of the relevant mortgage loan.  A forensic analysis or re-underwriting of mortgage loans by an expert based on the original loan files is often needed to definitively identify all loans in which there were breaches of representations or warranties made at the time of the transfer to the Trust.

## C.    *Obligation to Cure Documentary Exceptions.*

In addition to the foregoing, the Debtors also made representations and warranties regarding the quality of each loan file relating to a Mortgage Loan.  Typically, trustees do not have possession of the loan files; rather, the loan files are in the hands of the various document custodians hired by the Trusts.  Under the terms of the Trust Agreements, the custodians are charged with reviewing the loan files and advising all of the parties of any deficiencies based upon a provided list of expected documents.  The Seller and/or Depositor are then required to "cure" these deficiencies.  Some of these deficiencies are material and may lead to losses for the portfolio.  In fact, courts overseeing foreclosure proceedings have been much more demanding in documentation requirements when remedies are taken with respect to a residential mortgage loan.  Deficiencies in the mortgage files may render it problematic or impossible for a loan to be foreclosed upon.  The following cases show the increasing vigilance of foreclosure courts with respect to documentation.  In re Foreclosure Cases, 521 F.Supp.2d 650 (S.D. Ohio 2007); In re Parker, 445 B.R. 301 (D. Vt. 2011); In re Martinez, 455 B.R. 755 (Bankr. D. Kan. 2011); Novastar Mortg., Inc. v. Snyder, 2008 WL 4560794, at *1 (N.D. Ohio October 10, 2008) (Unreported); *Deutsche Bank Nat. Tr. Co. v. Mitchell*, 27 A.3d 1229 (N.J. Super. Ct. App. Div. 2011); *Landmark Nat. Bank v. Kesler*, 216 P. 3d 158 (Kan. 2009); *U.S. Bank Nat'l Assoc. v. White*, 880 N.Y.S.2d 227 (N.Y.Sup. Ct. 2009) (Table); *Deutsche Bank Nat'l Trust Co. v. Bialobrzeski*, 3 A.3d 183 (Conn. App. Ct. 2010); *Lasalle Bank Nat'l Ass'n v. Ahearn*, 875

N.Y.S.2d 595 (N.Y.App.Div.2009); *Deutsche Bank Nat. Trust, Co. v. Parisella* 2010 WL 4567694 (Vt. Super. Ct. October 25, 2010) (Trial Order).

WTC believes that there is some population of mortgage loan files that have not been identified as having deficiencies by the custodians. It is highly probable that many of the documentation defects will impair the value of the mortgage loans. Therefore, the WTC Claims were filed in an amount up to the lesser of the full principal amount of these mortgage loans or the outstanding balance of the certificates (set forth by each applicable WTC RMBS Trust). Any formula used for claims estimation of claims related to these document exceptions must also take into consideration the reality that courts administering foreclosure proceedings are increasingly stringent with respect to documentation requirements.

### D.    The WTC Claims

The WTC Claims relate to approximately twenty-five (25) RMBS Trusts. The Debtors allege that the various Trustees have asserted aggregate claims in the approximate amount of $37 billion dollars and that the aggregate Claims are overstated. In preparing the WTC Claims, WTC attempted to identify and quantify all breach of representation and warranty claims that the applicable Servicers may have identified to WTC.

## IV.    APPLICABLE LAW

In relevant part, § 502(c) of the Bankruptcy Code provides:

There shall be estimated for purpose of allowance under this section—

> (1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; ...

11 U.S.C. § 502(c). The Bankruptcy Code and Federal Rules of Bankruptcy Procedure do not provide guidelines or procedures for claim estimation, but cases interpreting § 502(c) have

-14-

generally found that a bankruptcy court has wide discretion to estimate claims. See *In re Chemtura Corp.*, 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011). A court "may use whatever method [for claim estimation] that is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and efficiently." *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003). Claims estimation allows a court to achieve reorganization and/or distribution without awaiting the results of lengthy legal proceedings. See *In re Chemtura Corp.*, 448 B.R. at 649-50. "[T]he lodestar [of claims estimation] being the efficient and quick resolution of [the] bankruptcy proceedings". *In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y. 1996).

By its terms, § 502(c) only applies to "contingent" or "unliquidated" claims. *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. at 424 (Bankr. S.D.N.Y. 2003) (claims, however, may be bifurcated into liquidated and unliquidated amounts for estimation purposes and asserting a counterclaim or disputing an otherwise liquidated claim does not make the claim unliquidated and subject to estimation). Estimating claim amounts is not proper under § 502(c) unless awaiting final resolution would "unduly delay the administration of the case". *In re Bellucci*, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990).

Claims estimation may be properly utilized for purposes of setting distribution reserves. *See In re Chemtura Corp.*, 448 B.R. at 649 & n.45 (dispute at issue was the amount of the reserve). However, claim estimation for distribution reserves involves two considerations: (a) failure to maintain an adequate reserve may leave the estate with insufficient funds, thereby prejudicing the ability of claimants to recover the full amount of the claim ultimately allowed, and (b) other stakeholders of the debtors may also be prejudiced if the reserve is overestimated

-15-

by being required to wait longer than appropriate to receive value. *See id.*, at 669. Although some courts take an all-or-nothing approach to estimating claims, courts in the Southern District of New York reject this method except in the simplest cases and choose instead "to estimate the expected value of a claim based on the probability of the success of the various potential outcomes if decided on the merits." *In re Chemtura Corp.*, 448 B.R. at 650 (rejecting the all-or-nothing approach set forth in *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 134 (3rd Cir. 1982)). With respect to disputed fact components of an estimation process,

> An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all ... Recognizing that the magnitude of recovery is to a large extent dependent upon the individual backgrounds of the triers of the facts, what we are given to deal with is a range of possible awards which we must first turn into a range of probable awards running from zero to the full amount of the claim. An expected value can then be found by multiplying a number of possible recovery values by the probability of their occurrence and taking the sum of these products.

*In re Chemtura Corp.*, 448 B.R. at 650; see also *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. at 521; *In re Thomson McKinnon Securities, Inc.*, 191 B.R. at 989-90. For legal issues, "the parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law." *In re Chemtura Corp.*, 448 B.R. at 651. Furthermore, because the size of a reserve can have a practical effect on the size of the ultimate recovery, not only should a court evaluate the parties "correctness as a matter of law" but also recognize the possibility of different conclusions at the appellate level and estimate the probability thereof when the application of the law is at least debatable. See *id.* at 651, 669.

WTC is concerned that any estimation of the WTC Claims, as well as the Claims of the other Trustees, will unduly prejudice the holders of certificates in the RMBS Trusts by severely underestimating the Claims based on inappropriate historical and unsupported assumptions.

-16-

Given the need to resolve the Claims, and the ongoing efforts of the Trustees and Debtors to negotiate an agreed upon reserve amount and associated claims allowance process, the Debtors' Estimate should be rejected in favor of a more conservative estimate upon the terms and for the reasons outlined in this Objection.

## V.    OBJECTIONS

The manner in which the Debtors' Methodology significantly understates the Debtors' potential liability for the Claims by failing to take into consideration the following factors, any of which might materially increase the estimate of the Claims.

### A.    *Incorporation of Arguments Made in Other Objections*

To the extent not otherwise incorporated herein, WTC hereby incorporates, restates, adopts, and joins in the arguments set forth in the Objection filed by US Bank National Association, as Trustee, and the Objections filed by the other trustees.  Further, WTC specifically relies on the facts set forth in the Burke Declaration.

### B.    *Types of Loans.*

The different RMBS Trusts contain a number of different loan products including home equity loans, conventional rate mortgages, adjustable rate mortgages, subprime mortgage loans and Alt-A loans.  The Debtors' Methodology does not take into consideration the differing issues relating to each category of these loans, and each type of loan has a significantly different risk profile.  As a result, the Debtors' Methodology set forth in Exhibit B to the Motion is fundamentally flawed and should not be relied upon to estimate the Claims.

### C.    *Vintage.*

The RMBS Trusts specific to WTC contain loans originated as early as 2002, and include loans that were originated as late as 2008.  The quality of the loans that were originated later is

generally worse than loans originated earlier.  As the housing market started to bubble in the

2000's, the cost of a home became an increasingly large percentage of a borrower's income,

hence the increase in the need to use Alt-A and subprime loans for financing.  Portfolios with

older, more conventional mortgage loans have a lower risk profile than portfolios of newer loans.

Loans originating in 2006 and 2007 have been particularly problematic, incurring far greater

default rates and suffering from higher severity rates than loans of other vintages.  The Debtors'

Methodology does not take into consideration the different vintages of loans.  As a result, the

Debtors' Methodology is fundamentally flawed and should not be relied upon to estimate the

Claims.

### D.    *Default Rate.*

The default rate used in the Debtors' Methodology to determine the number of currently

performing loans that will go into default is too low due to the often poorer quality of the later

loans, and the fact that given the current economic crisis with respect to residential real estate,

resulting in substantial losses of market value, many borrowers are "underwater".  Defaults are

exacerbated by "underwater" mortgages.  The term "underwater" mortgage describes a loan

made to a borrower that has a loan balance that is greater than the value of the home securing

payment of the loan, such that the loan to value ratio of the loan exceeds 100%.  In other words,

if a borrower sold its home today (or if the lender foreclosed, received full value and paid no

expenses), the borrower would owe the lender money because the proceeds from the sale of the

home would not cover the loan owed on the home. Many homeowners are suffering from

"underwater" mortgages that are preventing them from refinancing into a more affordable loan

payment owing more under their respective loans than the house is worth.  This has been caused

by the rapid deterioration in home prices engendered by the housing bubble that burst in late

2007 and early 2008.  As noted earlier, home values have declined by almost a third since their peak.

The default rate on "underwater" mortgages is likely to be significantly higher, particularly with respect to subprime loans, because an increasing number of borrowers are struggling to make payments in connection with an effectively valueless asset.  Faced with a choice of making payments on an underwater mortgage or making a different housing choice, many borrowers are deciding to walk away from their mortgages and start over.  The Trustees believe that a default rate of 50% or more is appropriate given the nature of the loans in these portfolios.

### E.    Loss Severity.

Using historical data for loss severity is inappropriate under the economic circumstances as they exist today.  Lenders currently are suffering greater losses because they have to hold underperforming property for longer and sell at significantly reduced prices.  A significant backlog of foreclosures and a "shadow inventory" of residential units both increase the costs of lender foreclosure proceeding and decrease the proceeds received on completion of a foreclosure proceeding.  In many locations throughout the country, lenders are walking away from residential collateral altogether because of the lack of value in the collateral.

Delay in exercising foreclosure rights and remedies creates a situation where a lender does not collect any payments on a mortgage loan while at the same time paying the costs of maintaining the property and paying real estate taxes and other fees and costs to preserve the collateral.  Many courts have extensive backlogs in their foreclosure dockets, further extending the time a lender must wait to obtain a foreclosure judgment.  Once the lender receives the judgment, the slow, arduous, and expensive process of realizing upon the collateral begins.  Not only does it take a significant amount of time to dispose of foreclosed real estate, causing the

#50507561.6

lender to continue to pay the costs of continuing to maintain the property, but also the overabundance of foreclosed properties has likewise significantly reduced the proceeds received by lenders upon sale. In some cases, the sale produces no net recovery. Standard & Poors Rating Services recently assessed the severity rates for closed defaults at 64%.

Depending on the exact loan composition range of the affected trusts, the loss severity rate could be approximately 68.3%. If such a severity rate were used, rather than the rates used in the Debtors' Methodology, the estimated Claims would be significantly higher.

**F.    *Loans for Which the Debtors Claim No Responsibility.***

The Debtors' Methodology is premised on the Debtors' belief that they are only responsible for breaches of representations and warranties for approximately 30% of the loans. This position is premised on the notion that if a third party originator was responsible for certain representations and warranties, the Debtors are not. The allocation of the proposed estimated reserve per transaction reflects some transactions for which no reserve is to be established because the Debtors assert that they are not responsible. However, (a) there are some breaches of representations and warranties for which the Debtors are liable for, regardless of whether a third party originator is responsible, and (b) the Debtors have not met their burden of proving that a third party originator is, in fact, responsible for other breaches. The Debtors have not met the burden of proving that they have no liability for 70% of the loans. Further, the Debtors' Methodology indicates that the Debtors' applied the 30% rate to all of the RMBS Trusts in which the Debtors contributed loans, without regard to whether Lehman or its affiliates contributed all, or only a portion of the loans in those RMBS Trusts. Finally, the Debtors' Methodology ignores the possibility that in certain transactions, independent assurances may have been made with

-20-

respect to LBHI's review of the underlying characteristics and quality of loans originated by third parties.

If the Debtors are responsible for breaches of representations and warranties on all of the loans because they are unable to demonstrate that someone else is responsible, or if another theory of liability is applicable, the estimated claim would increase by multiple times the Debtors' Estimated Claim.

### G.    *Breach of Representation Default Rate.*

The Debtors assert, without any support, that in cases where there is a loss on a loan, "35% of the losses are cause by a breach of a representation or warranty."  However, given the extreme default rates that have been experienced with respect to loans of recent vintage, the likelihood is extremely small that 65% of losses could be due to negative "life events" (such as death, divorce, sickness and the like).  Rather, it is more reasonable to believe that the breach of representation default rate is much higher - perhaps as high as 70%.  Doubling this default rate would double the estimated Claims amount.

### H.    *The Validation Rate Should Not Be Used In Connection With the Estimation Motion (Step 7).*

The Trustees assert that for purposes of the Motion, the validation rate should be 100%.  First, the validation rate appears to be, in part, duplicative of the default rate established in Step 6.  In Step 6, the Debtors assert that, where there is a loss on a loan, "35% of the losses are caused by a breach of a representation or warranty."  In Step 5, the Debtors assert that the Debtors are responsible for only 30% of the loans.  Step 6 determined the rate at which defaulted loans were caused by breaches of the representations and warranties for which the Debtor are liable.  In Step 7, the Debtors assert, in part, that the validation rate takes into consideration whether the breach was "material."  However, if the "losses are caused by a breach of a

-21-

representation or warranty" for which the Debtors are liable, the breach by definition, is material,

otherwise it would not have "caused" the loss.  Further, it is inappropriate to reduce the Claims

based upon the Debtors' unsupported assumption that WTC and the other Trustees will not be

able to prove the Claims with respect to breaches of representations of loans for which the

Debtors admit they are liable.

## I.      Certain Transactions Excluded From the Analysis.

Debtors' Estimated Claim does not include transactions prior to 2003 on grounds that

breaches of representation and warranty claims are time-barred prior to that date.  The Debtors

do not offer any support for their argument.  Rather, the Debtors have a continuing responsibility

under the applicable transaction documents to repurchase loans in breach.   Any statute of

limitations begins to run at the earliest when a breach of a representation or warranty becomes

known.  As such, the Debtors' blanket exclusion of transactions prior to 2003 inappropriately

reduces the value of the WTC Claims.  The Debtors' proposed categorical elimination of liability

for repurchase claims for loans originated prior to 2003 must be rejected.

## J.      Mortgage File Issues.

As the foreclosure rate has skyrocketed, courts in foreclosure proceedings have become

increasingly demanding regarding appropriate documentation for loans subject to foreclosure

proceedings.  Historical rates with respect to documentation problems are no longer relevant to

the current foreclosure landscape.  Foreclosure courts are increasingly vigilant with respect to

loan documentation.  WTC and the other Trustees may not be able to foreclose on collateral

securing the mortgage loans if the Debtors have failed to provide the loan documentation in

accordance with the Mortgage Loan Agreements, thereby leading to losses for the loan

portfolios.

#50507561.6

## VI.    CONCLUSION – THE DEBTORS' ESTIMATE SHOULD BE REJECTED

The Debtors have provided little, if any, support for the assumptions underlying the Debtors' Methodology, and they have not met their burden under § 502(e) to estimate the Claims at this time.  For the reasons outlined above, an underestimation of the Claims will be prejudicial to the investors in these vehicles who constitute a significant creditor constituency in these proceedings.  WTC respectfully requests that these estimation proceedings should be deferred to permit adequate discovery on the basis for the assumptions and to allow WTC, along with the other Trustees, and the Debtors to continue their discussions in an effort to arrive at a mutually agreeable estimated claim and claims allowance procedure.   In the event that the Court determines that the Claims must be estimated at this time, WTC respectfully requests that the Claims of the Trustees be estimated in the aggregate amount of approximately $15 billion and not on an individual RMBS Trust claim basis.  The Trustee's estimate of the Claims is based on the methodology, industry and historical information provided in this Objection and provides a more realistic estimate of the value of the Claims.

[Signature page follows]

WHEREFORE, Wilmington Trust Company respectfully requests that the Court (1) deny the relief requested in the Motion and defer the estimation of the Claims, or, in the alternative, (2) estimate the Claims in the aggregate amount of approximately $15 billion and not on an individual RMBS Trust claim basis.

Respectfully submitted,

WILMINGTON TRUST COMPANY, solely in its capacity as trustee

By its counsel,

_____
Jennifer V. Doran (*pro hac vice*)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
Tel: (617) 345-9000
Fax: (617) 345-9020
Email: jdoran@haslaw.com

#50507561.6