HEARING DATE AND TIME: January 26, 2012 at 10:00 a.m. (Eastern Time)
RESPONSE DEADLINE: January 20, 2012 at 4:00 p.m. (Eastern Time)

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)

-and-

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000
Craig M. Price (CP-9039)

*Attorneys for U.S. Bank National Association, as Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | CASE NO. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, TO THE MOTION PURSUANT TO SECTION 8.4 OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND SECTIONS 105(A), 502(C) AND 1142(B) OF THE BANKRUPTCY CODE TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE BACKED SECURITIES FOR PURPOSES OF ESTABLISHING RESERVES**

## TABLE OF CONTENTS

SUMMARY OF OBJECTIONS ..................................................................................................3

BACKGROUND FACTS ........................................................................................................5

    A.   A TYPICAL RESIDENTIAL MORTGAGE LOAN SECURITIZATION
        TRANSACTION ..................................................................................6

    B.   BREACHES OF REPRESENTATIONS AND WARRANTIES ..................................8

    C.   OBLIGATION TO CURE DOCUMENTARY EXCEPTIONS ..................................11

    D.   EARLY PAYMENT DEFAULT ......................................................................12

    E.   THE TRUSTEE'S PROOFS OF CLAIM ...........................................................12

APPLICABLE LAW ...........................................................................................................13

OBJECTIONS .....................................................................................................................15

    A.   TYPES OF LOANS .....................................................................................16

    B.   VINTAGE ..................................................................................................17

    C.   DEFAULT RATE ........................................................................................18

    D.   LOSS SEVERITY .......................................................................................19

    E.   LOANS FOR WHICH DEBTORS CLAIM NO RESPONSIBILITY .......................20

    F.   BREACH OF REPRESENTATION DEFAULT RATE ..........................................21

    G.   THE VALIDATION RATE SHOULD NOT BE USED IN CONNECTION WITH
        THE ESTIMATION MOTION. (STEP 7)......................................................21

    H.   CERTAIN TRANSACTIONS EXCLUDED FROM THE ANALYSIS .....................22

    I.   MORTGAGE FILE ISSUES ..........................................................................22

THE CLAIMS SHOULD NOT BE ESTIMATED AT THIS TIME .............................................23

## TABLE OF AUTHORITIES

**Cases**

*Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134 (3rd Cir. 1982) .................................................. 14

*In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003) ................................ 13

*In re Bellucci*, 119 B.R. 763 (Bankr. E.D. Cal. 1990) ................................................................. 14

*In re Chemtura Corp.*, 448 B.R. 635 (Bankr. S.D.N.Y. 2011) ........................................ 13, 14, 15

*In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771 (Bankr. S.D.N.Y. 1996) .......................... 15

*In re Thomson McKinnon Sec., Inc.*, 191 B.R. 976 (Bankr. S.D.N.Y. 1996) ........................ 13, 15

*In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ..................... 15

**Statutes**

11 U.S.C. § 502(c) ........................................................................................................................ 13

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES U.S. Bank National Association, not individually but as Trustee ("*U.S. Bank*" or the "*Trustee*") for certain residential mortgage-backed RMBS Trusts (the "*U.S. Bank RMBS Trusts*"), by and through its counsel, Chapman and Cutler LLP, to object (the "*Objection*") to Debtors' Motion Pursuant to Section 8.4 of the Modified Third Amended Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves (the "*Motion*"). In support of its Objection,[1] the Trustee states as follows:

Pursuant to the Motion, Debtors seek to estimate billions of dollars of claims filed by the Trustee and other similarly situated trustees (collectively, the "*Claims*"), on very limited notice, and with little real factual support for Debtors' calculations. The Motion will adversely affect investors in residential mortgage-backed RMBS trusts for which the Trustees serve as trustee (collectively, the "*RMBS Trusts*") holding more than one million residential mortgage loans. The U.S. Bank RMBS Trusts alone have suffered cumulative losses totaling more than $21,000,000,000, much of which was incurred during a period of declines in house values averaging more than 30 percent below their values in mid-2006. Debtors concede the aggregate cumulative losses on all of the RMBS Trusts as of today exceed $38,000,000,000 (and acknowledge that these cumulative losses will continue to increase) for all of the Claims. Despite this fact, pursuant to the Motion, Debtors now seek an order of this Court estimating the

---

[1] This Objection is being filed in conjunction with objections filed by the following other Trustees: Wilmington Trust Company, as Trustee, Wells Fargo Bank, National Association, as Trustee, Citibank, as Trustee and Deutsche Bank, as Trustee (collectively, the "*Trustees*").

Claims for distribution purposes at only $2.4 billion (the "*Debtors' Estimate*") or less than 8 percent of the losses on account of the Claims.

The Trustee believes that the assumptions underlying Debtors' Estimate are not nearly conservative enough, fail to take into account numerous important factors. Furthermore, the Trustee notes that in the Disclosure Statement, which was approved recently, Debtors' estimated residential mortgage backed security claims at over $10,000,000,000. Debtors' Estimate is a fraction of this amount (less than 25 percent) and they offer no explanation for their recent deviation from their previously disclosed amount. The Trustees have filed the Declaration of James Burke in Support of Objections of Various Indenture Trustees to the Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage Backed Securities For Purposes of Establishing Reserves (the "*Burke Declaration*").

Furthermore, as noted in the Motion, Debtors and the Trustees have been actively attempting to reach a resolution regarding a protocol to address these very complex Claims. This process ought to be given additional time to permit a resolution of these Claims rather than placing reliance on a fallible estimation process. In the event, however, this Court decides to estimate the Claims, the Trustee asks this Court to increase the proposed reserve for the Claims to adequately account for the lack of precision in Debtors' Estimate. The Trustees are concerned that an estimate which is too low will prejudice investors in the RMBS Trusts since there is no guarantee that proceeds available for future distributions will be sufficient to make up the difference. A more conservative estimate for the estimation of these claims is included in the Burke Declaration, which, using the Debtors' methodology, estimates the Claims at approximately $15 billion.

Finally, if the Court is inclined to estimate the Claims, the Trustee believes it is improper to estimate the Claims on an individual RMBS Trust basis as proposed by Debtors. Rather, if the Court is going to estimate the Claims, it should be done on an aggregate Claims basis for all of the RMBS Trusts, if at all.

**SUMMARY OF OBJECTIONS**

The Trustee objects to the Motion on the grounds that the methodology (the *"Debtors' Methodology"*) used to determine Debtors' Estimate is fundamentally flawed in a number of respects for the following reasons:

> **(a).  Types of Loans:**  The RMBS Trusts contain loans of varying loan types (i.e. fixed rate, adjustable rate mortgages (*"ARMS"*), hybrid ARMS), quality (i.e. prime, subprime and Alt-A loans), and lien positions (first or second liens). Debtors' Methodology does not take into consideration the differing issues relating to each category of these loans. As a result, Debtors' Methodology lacks merit and precision and should be discounted entirely.

> **(b).   Vintage:**  The RMBS Trusts consist of loans located throughout the United States that were originated as early as the 1990s, and include loans that were originated as late as 2008. The quality of the loans originated later is generally worse than the quality of loans originated earlier. Debtors' Methodology does not take into consideration either the different vintages of loans or the geographical location of the loans and should be discounted entirely.

> **(c).  Default Rate:**  The Trustee believes that the default rate used in Debtors' Methodology to determine the number of currently performing loans that will go into default is too low due to the facts that:  (i) home prices are still declining; (ii) the Trustee's consultant estimates that 32.4 percent of the loan balances outstanding are currently in some stage of delinquency; (iii) servicers are under pressure to modify delinquent loans, which are then reclassified as current loans, but because of high recidivism rates, these modified loans have higher than average default rates; and (iv) many borrowers owe more under their respective loans than the homes securing the loans are worth. As a result, the default rate likely exceeds 45 percent and could approximate 50 percent. In his Declaration, Jim Burke believes that an appropriate default rate would be 50 percent or higher (Burke Declaration at ¶ 24-26), with some RMBS Trusts reaching as high as 60-70 percent depending upon their composition.

**(d). Loss Severity:** Using historical data from the 1990s or early 2000s to project current loss severity is inappropriate under the current economic circumstances. Home prices have already fallen 30-35 percent on average since the housing peak, and as a result, loss severities on typical 2006-2007 subprime deals currently range between 70-85 percent. Moreover, as home prices continue to decline and liquidation timelines increase, loss severities are expected to rise in the near future. Also, given the backlog in filing foreclosure proceedings, prosecuting foreclosure proceedings, selling a large inventory of foreclosed property, and continued declining home prices, the severity rate should be in a range of at least 70-85 percent. Based upon an initial review of the portfolios, the average severity rate appears to be 68.3 percent. (Burke Declaration, ¶ 32). This exceeds the amount used in Debtors' Methodology and applying such a higher severity rate will markedly increase the value of the Claims above Debtors' Estimate.

**(e). Loans for which Debtors Claim No Responsibility:** Debtors' Methodology is premised on the fact that Debtors believe they are only responsible for breaches of representations and warranties for approximately 30 percent of the loans in the RMBS Trusts. This position is premised on the notion that if a third party originator was responsible for certain representations and warranties, one or more of Debtors is not. However, the burden under the relevant documents is on Debtors to demonstrate that they are not liable. Debtors have not met their burden of proof in establishing that they have zero liability for 70 percent of the loans. Further, Debtors' Methodology applies the 30 percent rate across all RMBS Trusts, without regards to the actual number or percentage of third party originated loans in any particular RMBS Trust. If Debtors are responsible for all breaches, as the Trustee and Court must assume until Debtors produce documents establishing otherwise, Debtors' Estimate would need to increase by more than three times its current amount.

**(f). The Default Rate in Step 6 of Debtors' Methodology is Too Low:** The percentage of loans containing a breach of a representation or warranty also is understated in Step 6 of Debtors' Methodology in light of the practices and procedures employed in the industry prior to the collapse of the residential real estate market. The actual default rate may be as high as 70 percent. For purposes of determining an alternative range of potential liability for the Debtors in connection with the RMBS Trusts, the Trustees' expert used a rate of 70 percent. (Burke Declaration, ¶ 52).

**(g). A "Validation" Rate Should Not Be Employed:** Step 6 of Debtors' Methodology provides that the "High Rate" assumes that 35 percent of the losses are caused by a breach of one or both of Debtors' representations or warranties. The analysis should stop there. The elements of Step 7 discount the same issue by making unsupported assumptions about whether the Debtors' breaches in Step 6 are material. Further, Debtors' Methodology inappropriately assumes that the Trustees will fail or not be able to prove up breach claims with

respect to a large percentage of loans in the RMBS Trusts. It is inappropriate to reduce the estimated Claims based upon an unwarranted assumption that the Trustees will not be able to prove a Claim 60 percent of the time.

**(h).    Certain Transactions Excluded From the Analysis:** Debtors' Estimate does not include transactions prior to 2003. Debtors state that breach of representation and warranty claims are time barred prior to this date. Repurchase claims for transactions prior to 2003 are not time barred because the trustees are only required to notify Debtors when a claim arises, and Debtors have a continuing obligation to repurchase loans. Generally, repurchase claims are not discovered when the transaction closes. Instead, most repurchase claims are discovered at the earliest when the related mortgage loan goes into default.

**(i).    Mortgage File Issues:** As the foreclosure rate has skyrocketed, courts in foreclosure proceedings have become increasingly particular about insisting that the foreclosing party possesses all of the particular documentation for loans supporting the right to foreclose. Historical rates with respect to documentation problems are not relevant to the current foreclosure landscape. Debtors' Methodology does not take into consideration these recent judicial developments with respect to the foreclosure process, which developments make it increasingly difficult for a lender to foreclose on its security. To date, the Trustee has identified over 250,000 loan files exceptions in the U.S. Bank RMBS Trusts alone, some of which may be determined to be material, although the Trustee is not positioned to make such determinations.

BACKGROUND FACTS

1.    The Motion relates to hundreds of residential mortgage loan RMBS Trusts sponsored by the Structured Assets Securities Corporation (*"SASCO"*) and Lehman Brothers Holdings Inc. (*"Lehman"* or *"LBHI"*). In short, a Lehman affiliate originated residential mortgage loans, or purchased residential mortgage loans originated by a third party. These mortgages were then sold to the RMBS Trusts in exchange for proceeds received from third-party investors in the RMBS Trusts. As will be noted below, a number of important representations and warranties were made with respect to the residential mortgage loans, including but not limited to, the manner in which the mortgage loans were underwritten and the contents of the loan files. As noted in the Declaration of Jim Burke, during the years immediately prior to the filing of Debtors' petitions, activity in the residential mortgage industry

substantially increased, underwriting standards were often ignored, and mortgage files had a number of exceptions.

2.    The Motion, and the assumptions in Debtors' Methodology, comes in the context of challenging market conditions, making reliance on averages and past history impossible for purposes of estimating a claim.  Many of the assumptions underlying Debtors' Methodology need to be far more conservative, which would significantly increase Debtors' Estimate. However, even if the Trustee is only correct with regards to one of two of the assumptions contained in Debtors' Methodology, given the size of the amounts involved, such an increase would require a drastically increased reserve.

## A.    A TYPICAL RESIDENTIAL MORTGAGE LOAN SECURITIZATION TRANSACTION

3.    The Trustee serves as trustee under certain trust agreements by and between SASCO, as Depositor, and the Trustee (the "*Trust Agreements*"), with respect to the relevant U.S. Bank RMBS Trusts.  In a typical RMBS transaction, the RMBS Trusts are residential mortgage loan trusts that were formed to purchase and hold residential mortgage loans that were (a) either originated by Debtors or an affiliate thereof, or (b) purchased by Debtors.  After originating or purchasing the residential mortgage loans, Debtors sold and/or assigned such loans to the RMBS Trusts.  Under the terms of the Trust Agreements, these residential mortgage loans were purchased by the RMBS Trusts using funds obtained from investors through the issuance of certificates.  The types of loans in the RMBS Trusts are not identical.  Different RMBS Trusts include varying levels of conventional mortgage loans, while others hold ARMs, subprime loans, and/or Alt-A loans, or some combination thereof.  Other RMBS Trusts may even include home-equity loans.  These different types of loans have different aging experiences and characteristics

— it is inappropriate to compare a portfolio of traditional mortgage loans to a portfolio of subprime, or Alt-A loans.

4.    The residential mortgage loans giving rise to the Claims were originated either by a Lehman affiliate or by various third parties (collectively, the "*Originator*").  These loans were purchased by Lehman Brothers Bank F.S.B., LBHI or another affiliate thereof (the "*Initial Purchaser*") under the terms of loan purchase and warranty agreements (or similar agreements) (the "*Purchase Agreement*").[2]  Thereafter, the Initial Purchaser, if not LBHI, assigned these loans for value to LBHI (the "*Seller*"), who thereafter transferred the loans for value to SASCO (the "*Depositor*") under the terms of Mortgage Loan Sale and Assignment Agreements (the "*Mortgage Loan Sale Agreements*").   In exchange for the proceeds from the issuance of certificates, the Depositor transferred and conveyed the loans to the Trustee for the benefit of the holders of the certificates issued pursuant to the terms of the Trust Agreements.  In addition, the Trustee was assigned all of the Depositor's rights under the Mortgage Loan Sale Agreements.

5.    Pursuant to the Trust Agreements, one or both of SASCO or LBHI made certain representations, warranties and covenants about the residential mortgage loans that were subsequently acquired by the RMBS Trusts.   If a breach of a representation, warranty or covenant with respect to a loan that was sold to a RMBS Trust materially adversely affects the value of such loan or the interest of the holders of the certificates therein, the relevant Debtor must repurchase (or replace) that loan.   Under the terms of a typical Mortgage Loan Sale Agreement between LBHI and SASCO, as Depositor, LBHI made the representations and

---

[2]    Typically, Lehman did not provide copies of the transfer agreements to the Trustees.  Instead, Lehman retained those agreements.

warranties set forth on Exhibit A.  In addition, the Depositor made the representations and warranties set forth on Exhibit B with respect to the documents in the loan files, and was required to cure these deficiencies or in certain circumstances repurchase the loans.

**B.    BREACHES OF REPRESENTATIONS AND WARRANTIES**

6.    In the event of a breach of representation or warranty:

> It is understood and agreed that the representations and warranties
> . . . shall survive the Closing Date.  Upon discovery by either
> [LBHI] or the Depositor of a breach of any of the foregoing
> representations and warranties . . . the party discovering such
> breach shall give prompt written notice to the other party . . . .
> Within 60 days of the discovery of any such breach, [LBHI] shall
> either (a) cure such breach in all material respects, (b) repurchase
> such Mortgage Loan or any property acquired in respect thereof
> from the Depositor at the applicable Purchase Price or (c) within
> the two-year period following the Closing Date substitute a
> Qualifying Substitute Mortgage Loan for the affected Mortgage
> Loan.

Mortgage Loan Purchase and Sale Agreement, ¶ 1.04.  It is important to note that these agreements also provide that the parties were obligated to notify one another "upon discovery" of any such breach.

7.    In some (but not all) cases where a third-party Originator sold loans that ultimately were purchased by LBHI, LBHI could rely upon an exception:

> The representations and warranties of the Transferor [the non-
> Lehman originator] with respect to the Transferred Mortgage
> Loans in the applicable Transfer Agreement were made as of the
> date of such Transfer Agreement.  To the extent that any fact,
> condition or event with respect to a Mortgage Loan constitutes a
> breach of both (i) a representation or warranty of the Transferor
> under the applicable Transfer Agreement and (ii) a representation
> or warranty of [LBHI] under this Agreement, the sole right or
> remedy of the Depositor with respect to a breach by [LBHI] of
> such representation and warranty (except in the case of a breach by
> the Seller of the representations made by it pursuant to [certain

excepted sections]) shall be the right to enforce the obligations of such Transferor under any applicable representation or warranty made by it. The representations made by [LBHI] pursuant to [the excepted sections] shall be direct obligations of [LBHI]. The Depositor acknowledges and agrees that the representations and warranties of [LBHI] . . . (except in the case of those representations and warranties made pursuant to [certain excepted sections]) are applicable only to facts, conditions or events that do not constitute a breach of any representation or warranty made by the related Transferor in the applicable Transfer Agreement. [LBHI] shall have no obligation or liability with respect to any breach of a representation or warranty made by it with respect to the Mortgage Loans . . . if the fact, condition or event constituting such breach also constitutes a breach of a representation or warranty made by the related Transferor in such Transfer Agreement, without regard to whether the Transferor fulfills its contractual obligation in respect of such representation or warranty; . . .

*Id.*, ¶ 1.04(b). A similar provision is contained in the Trust Agreements, pursuant to which representations and warranties are made directly to the Trustee.[3] However, based on the wording of the various agreements, the burden of showing that the exception to liability exists rests upon Debtors. In addition, these transactions were sponsored by Debtors, which drafted the various agreements and the Trustees were generally not provided with copies of the original transfer agreements as part of their closing documents. Therefore, the Trustees have no way of knowing what, if any, representations a third party made regarding the mortgage loans. As a result, Debtors have the burden to show that another party is responsible for breaches of the representations and warranties.

8.      Further, it should be noted that such limited liability would only apply to those mortgages that were expressly included within the definition of a "Transferred Mortgage Loans"

---

[3]      While the Trustees' contract with Debtors may preclude a contractual claim for breaches of representations and warranties, various insurers or investors may have claims against one or more of Debtors if Debtors made representations and warranties to such investors or insurers with respect to any due diligence Debtors may have conducted with respect to contributed loans, or with respect to the quality of such loans.

and sold by a party contained within the definition of "Transferor." To the extent that the documents do not include mortgages within the definition of "Transferred Mortgage Loans" or the actual party transferring the Mortgage Loan within the definition of "Transferor," any liability with respect to such mortgage would not be limited as a result of the above-quoted language. The Trustee has identified a number of transactions where, due to the language of the governing documents, LBHI may in fact be liable where a third party Transferor has made representations and warranties.

9.      As of the date of the filing of the Proofs of Claim by the Trustee, the Trustee was advised that Debtors' representations, warranties and/or covenants with respect to some of the residential mortgage loans contained in the U.S. Bank RMBS Trusts were incorrect or untrue. Such breaches materially and adversely affect the value of such loans and the interest of the holders of the certificates therein. For each of these breaches the total outstanding principal balance of such loans was provided in the Proofs of Claim.

10.      Debtors have since requested additional information with respect to the Claims. The Trustee with respect to its legacy U.S. Bank RMBS Trusts has provided information to Debtors with respect to nearly 900 loans based upon information provided to it by either the servicer or the master servicer. Residential mortgage loans with breaches of representations and warranties generally become known only after a default, typically when the individual borrower fails to make payments in accordance with the terms of the relevant loan. It is therefore possible, if not highly likely, that latent repurchase claims exist. For the most part, the Trustee does not have any role in monitoring any of the mortgage loans in the U.S. Bank RMBS Trusts. Generally, the servicers (the entity charged with making collections and conducting remedies on a individual mortgage loan basis), or the master servicers (the entity charged with overseeing the

servicer(s) on behalf of the relevant RMBS Trust) are the entities that possess information concerning the ongoing performance of the loans, and identify breaches of representations and warranties regarding the subject loans. The Trustee has been advised by certain servicers that the servicers do not actively review loan files for breaches of representations or warranties when an originator or sponsor, such as the Debtors, files for bankruptcy, as a result of the expense involved in the review and the uncertainty of recovery on the claim. As a result, the servicers have not identified residential mortgage loans with breaches of representations and warranties since the filing of Debtors' petition. Therefore, not all loans with existing breaches of representations or warranties have been identified at this time. Rather, only a small percentage have.

## C.   OBLIGATION TO CURE DOCUMENTARY EXCEPTIONS

11.     In addition to the foregoing, Debtors also made representations and warranties regarding the content of each loan file relating to a Mortgage Loan. As noted above, a typical loan file is required to have the items listed on the attached Exhibit B. The Trustee does not have possession of the loan files; rather, the loan files are in the hands of the various custodians.

12.     In preparing the Proofs of Claim, the Trustee sought information from the custodians regarding any loan file exceptions that remain unresolved as of the petition date. The custodians identified loan files that had other document exceptions. As a prophylactic matter, the Trustee asserted a claim up to the lesser of the full principal amount of these mortgage loans or the outstanding balance of the certificates of the U.S. Bank RMBS Trusts. The Trustee has provided this information at least with respect to its legacy RMBS Trusts relating to the exceptions to Debtors for their review. These document exception reports relate to over 250,000

residential mortgage loans. The reports have been provided to Debtors along with certain certificates indicating that these reports were provided to Debtors in the ordinary course of the administration of the loans. Any formula or estimation of claims related to these document exceptions must take into consideration the heightened evidentiary requirements that some courts have instituted in foreclosure proceedings.

## D.    EARLY PAYMENT DEFAULT

13.    If a mortgage loan contributed to a RMBS Trust is delinquent or goes into default within a certain period of time, such delinquency or default constitutes an Early Payment Default. Upon an Early Payment Default, the Depositor and/or the Seller are required to repurchase the respective mortgage loan from the relevant RMBS Trust. The Trustee also asserted these types of claims in its Proofs of Claim.

## E.    THE TRUSTEE'S PROOFS OF CLAIM

14.    The Trustee filed Proofs of Claim for approximately 400 RMBS Trusts. Debtors allege that the Trustees have asserted aggregate Claims in the approximate amount of $37 billion, and that these Claims are overstated.

15.    In preparing its Proofs of Claim for its legacy RMBS Trusts, the Trustee identified and quantified all breach of representation and warranty claims that servicers identified to the Trustee. In addition, for its legacy RMBS Trust claims, the Trustee reviewed the custodial claims and asserted a claim in the full dollar amount for the mortgage loans with document exceptions. In this sense, the dollar amount ascribed to those claims is likely overstated. However, to assert those claims of breaches of representations and warranties of which the Trustee was not aware, each Proof of Claim also noted that the claim was being filed as an

12

unliquidated claim.  The $37 billion aggregate claim that Debtors advise has been asserted by the

Trustees, at least in the case of the Trustee's claims, does not include loans that have breaches of

representations and warranties that have not been identified to the Trustee.

### APPLICABLE LAW

16.    Section 502(c) of the Bankruptcy Code provides, in part, that:

> There shall be estimated for purpose of allowance under this section—
>
> > (1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; . . .

11 U.S.C. § 502(c).  The Bankruptcy Code and Federal Rules of Bankruptcy Procedure do not

provide guidelines or procedures for claim estimation, but cases interpreting § 502(c) generally

have found that a bankruptcy court has wide discretion to estimate claims.  *See In re Chemtura*

*Corp.*, 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011).    A court "may use whatever method [for

claim estimation that] is best suited to the contingencies of the case, so long as the procedure is

consistent with the fundamental policy of Chapter 11 that a reorganization 'must be

accomplished quickly and efficiently.'"  *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422

(Bankr. S.D.N.Y. 2003) (citation omitted).    Claims estimation allows a court to achieve

reorganization and/or distribution without awaiting the results of lengthy legal proceedings.  *See*

*Chemtura*, 448 B.R. at 649-50.    "[T]he lodestar [of claims estimation] being the efficient and

quick resolution of [the] bankruptcy proceedings."    *In re Thomson McKinnon Sec., Inc.*, 191

B.R. 976, 979 (Bankr. S.D.N.Y. 1996).

17.    By its terms, § 502(c) only applies to "contingent" or "unliquidated" claims.

*Adelphia*, 341 B.R. at 424 (noting, however, claims may be bifurcated into liquidated and

13

unliquidated amounts for estimation purposes and asserting a counterclaim or disputing an otherwise liquidated claim does not make the claim unliquidated and subject to estimation). Estimating claim amounts is not proper under § 502(c) unless awaiting final resolution would "unduly delay the administration of the case." *In re Bellucci*, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990).

18.    Claims estimation may be properly utilized for purposes of setting distribution reserves. *See Chemtura*, 448 B.R. at 649 & n.45 (dispute at issue was the amount of the reserve). However, claim estimation for distribution reserves involves two considerations: (a) failure to maintain an adequate reserve may leave the estate with insufficient funds, thereby prejudicing the ability of claimants to recover the amount of the full claim that is ultimately allowed, and (b) other stakeholders of Debtors may also be prejudiced if the reserve is overestimated by being required to wait longer than appropriate to receive value. See *id*. at 669. Although some courts take an all-or-nothing approach to estimating claims, courts in the Southern District of New York reject this method except in the simplest cases and choose instead "to estimate the expected value of a claim based on the probability of the success of various potential outcomes if decided on the merits." *Id*. at 650 (rejecting the all-or-nothing approach set forth in *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 134 (3rd Cir. 1982)). With respect to disputed fact components of an estimation process,

> An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all . . . Recognizing that the magnitude of recovery is to a large extent dependent upon the individual backgrounds of the triers of the facts, what we are given to deal with is a range of possible awards which we must first turn into a range of probable awards running from zero to the full amount of the claim. An *expected value* can then be found by multiplying a number of

14

possible recovery values by the probability of their occurrence and taking the sum of these products.

*Id*. (emphasis in original); *see also In re Windsor Plumbing Supply Co*., *Inc*., 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994); *Thomson McKinnon Secs*., 191 B.R. at 989-90. For legal issues, "the parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law." *Chemtura*, 448 B.R. at 651 (*quoting In re Ralph Lauren Womenswear, Inc*., 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996)). Furthermore, because the size of a reserve can have a practical effect on the size of the ultimate recovery, not only should a court evaluate the parties "correctness as a matter of law" but also recognize the possibility of different conclusions at the appellate level and estimate the probability thereof when the application of the law is at least debatable. *Id*. at 651, 669.

19.     As noted below, Debtors' Estimate unduly prejudices the holders of certificates in the RMBS Trusts by severely underestimating the Claims based on inappropriate historical data and unsupported assumptions. Given the need to resolve the Claims, the large magnitude of the claims impacted, the possible irreparable harm to the claims asserted by the Trustees if the reserve proves to be too low, and the ongoing efforts of the Trustees and Debtors to negotiate an agreed upon reserve amount and associated claims allowance process, the parties should be allowed more time to explore the possibility of reaching a consensual resolution to this issue, or alternatively, Debtors' Estimate should be rejected in favor of a more conservative estimate upon the terms and for the reasons outlined in this Objection.

## OBJECTIONS

20.     The manner in which Debtors' Methodology significantly understates Debtors' potential liability for the Claims by failing to take into consideration the following factors, any of which might materially increase the estimate of the Claims.

## A.    TYPES OF LOANS

21.    The different RMBS Trusts contain a number of different loan products including home equity loans, conventional mortgages, ARMs, subprime mortgage and Alt-A loans. Debtors' Methodology does not take into consideration the differing issues relating to each category of loans, and each type of loan has a significantly different risk profile.  Home equity loans, for example, are loans secured by the residual value in a residence after the payment in full of a first mortgage.  The loans generally have a second lien position with respect to the residential collateral.

22.    Subprime loans were generally made to borrowers who would not ordinarily qualify for credit under customary underwriting standards.  To offset the increased risk of default, lenders charge higher interest rates than those offered to creditworthy borrowers and assess additional fees.  While subprime rates vary from lender to lender, the Federal Reserve defines a subprime loan as one that carries an interest rate at least three percentage points higher than the rate on a U.S. Treasury bond that has the same term as the loan.  In addition to the lack of credit worthiness, the higher interest rate likewise has an adverse effect on default rates.

23.    Alt-A mortgages are a classification of mortgage in which the borrowers' credit is somewhere between a prime credit rating and a sub-prime rating.  Mortgage ratings are based on the credit category of the borrower.  Homeowners with the top credit ratings and scores are prime credit borrowers.  Individuals with less than a top credit score are subprime borrowers. The Alt-A category was developed for borrowers who had acceptable credit scores but were unable to provide full documentation concerning employment or income when applying for a mortgage.  Alt-A mortgage borrowers pay a higher rate of interest on their home loans than prime borrowers.  During the housing bubble years of 2004 to 2006, many homebuyers and

16

home refinances were done using Alt-A loans.  The borrowers did not have to show proof of income to justify the loan payments, allowing many homebuyers to purchase more expensive homes than they could have purchased using a prime rate mortgage.  Alt-A loans represented a very small percentage of loans prior to 2004, but became increasingly prevalent in the period from 2004 to 2007.

24.    Given that each of these types of loans has different risk profiles, it is inappropriate to analyze these loans as if they were identical.  Debtors' Methodology does not differentiate between these loan types, and given the increasing prevalence of Alt-A and subprime loans as the residential mortgage market began to expand, data based upon a more traditional mix of loans is not indicative of performance in a portfolio more heavily laden with loans with greater risk attributes.  As a result, Debtors' Methodology set forth in Exhibit B to the Motion is fundamentally flawed and should not be relied upon to estimate the Claims.

## B.    VINTAGE

25.    The RMBS Trusts contain loans originated as early as the 1990s, as well as that were originated as late as 2008.  The quality of the loans that were originated later is generally worse than loans originated earlier.  As the housing market started to bubble in the 2000s, the cost of a home became an increasingly larger percentage of a borrower's income, hence the increase in the need to use Alt-A and subprime loans for financing.  Thus, portfolios with older, more conventional mortgage loans have a lower risk profile than portfolios of newer loans.  Loans originated in 2006 and 2007 have been particularly problematic, incurring far greater default rates and suffering from higher severity rates than loans of other vintages.  Debtors'

Methodology does not take into consideration the different vintages of loans, and as a result is fundamentally flawed and should not be relied upon to estimate the Claims.

## C.    DEFAULT RATE

26.    The default rate used in Debtors' Methodology to determine the number of currently performing loans that will go into default is too low due to the often poorer quality of the later loans, and given the current economic crisis, many borrowers are "underwater."

27.    The term underwater mortgage describes a loan made to a borrower that has a loan balance that is greater than the value of the home securing payment of the loan, such that the loan to value ratio of the loan exceeds 100 percent.  In other words if a borrower sold its home today (or if the lender foreclosed, received full value and paid no expenses), the borrower would owe the bank money because the proceeds from the sale would not cover the loaned amount owed on the home.  Many homeowners are suffering from underwater mortgages that are preventing them from refinancing into a more affordable loan payment because they owe more under their respective loans than the house is worth.  This has been caused by the rapid deterioration in home prices engendered by the housing bubble that burst in late 2007 and early 2008.  Defaults are exacerbated by underwater mortgages.  As noted earlier, home values have declined by almost a third since their peak.

28.    The default rate on underwater mortgages is likely to be significantly higher than other mortgages, particularly with respect to subprime loans, because borrowers are faced with struggling to make payments in connection with an asset that is effectively valueless.  Faced with a choice of making payments on an underwater mortgage or making a different housing choice, many borrowers are deciding to walk away from their homes and mortgages.  Based on an initial

18

valuation by the expert retained by the Trustees, the Trustee believes that a default rate of 50 percent or more is more appropriate given the number of underwater mortgages in these portfolios.  (Burke Declaration, at ¶ 24-26).

### D.    LOSS SEVERITY

29.    Using historical data for loss severity is inappropriate under the economic circumstances as they exist today.  Lenders currently are suffering greater losses because they have to hold underperforming property for longer and sell at significantly reduced prices.  A significant backlog of foreclosures and a "shadow inventory" of residential units both increase the costs of foreclosure proceedings and decrease the net proceeds received on completion thereof.  In many locations throughout the country, lenders are walking away from residential collateral altogether because of the lack of value in the collateral.

30.    Furthermore, unavoidable delays in exercising foreclosure rights and remedies creates a situation where a lender does not collect any payments on a mortgage loan while at the same time paying the costs of maintaining the property and paying real estate taxes and other fees and costs to preserve the collateral.  Many courts have backlogged foreclosure dockets, further extending the time in which a lender can obtain a foreclosure judgment.  Once the lender receives the judgment, the slow, arduous and expensive process of realizing upon the collateral begins.  Not only does it take a significant amount of time to dispose of foreclosed real estate, causing the lender to continue to pay the costs to maintain the property, but also the overabundance of foreclosed properties has likewise significantly reduced the proceeds received by lenders upon sale.  In some cases, the sale produces no net recovery.  Standard & Poor's Rating Services recently assessed the severity rates for closed defaults at 64 percent.

31. Depending on the exact loan composition of the affected trusts, the severity rate could be in a range of 70-85 percent. The Trustees' expert, based on an initial review, determined that the average severity rate for the RMBS Trusts for which he could obtain information was 68.3 percent. Portfolios with subprime loans, however, are likely to have a much higher severity rate. (Declaration of Burke, ¶ 31). If these severity rates were used, rather than the lower rates used in Debtors' Methodology, the estimated Claims would be significantly higher.

**E. LOANS FOR WHICH DEBTORS CLAIM NO RESPONSIBILITY**

32. Debtors' Methodology is premised on Debtors' belief that they are only responsible for breaches of representations and warranties for approximately 30 percent of the loans. This position is premised on the notion that if a third party originator was responsible for certain representations and warranties, Debtors are not. The allocation of the proposed estimated reserve per transaction reflects some transactions for which no reserve is established because Debtors assert that they are not responsible. However, (a) there are some representations and warranties for which Debtors are liable in all transactions and (b) Debtors have not met their burden of proving that a third party originator is responsible for other breaches. Debtors have not met the burden of proving that they have no liability for 70 percent of the loans. Further, Debtors' Methodology indicates Debtors applied the 30 percent rate to all of the RMBS Trusts in which Debtors contributed loans, without regard to whether Lehman or its affiliates contributed all, or only a portion of the loans in those Trusts. Finally, Debtors' Methodology ignores the possibility that in certain transactions, independent assurances may have been made with respect to LBHI's review of the underlying characteristics and quality of loans originated by third parties. In some transactions, investors or insurers have directed the Trustees to assert that the

entirety of the portfolio of loans should be repurchased due to fundamental problems with the underwriting process.  One insurer has asserted that all loans in a $600,000,000 portfolio should be repurchased.  If Debtors are responsible for breaches of representations and warranties on all of the loans, because they are unable to demonstrate that someone else is responsible, or if another theory of liability is applicable, the estimated Claims would increase by 3.3 times Debtors' Estimate.

### F.    BREACH OF REPRESENTATION DEFAULT RATE

33.    Debtors assert, without any support, that in cases where there is a loss on a loan, "35% of the losses are caused by a breach of a representation or warranty."  However, given the extreme default rates that have been experienced with respect to loans of recent vintage, the likelihood is extremely low that 65 percent of losses, particularly those attributable to Early Payment Defaults, could be due to negative "life events" (such as death, divorce, sickness, and the like).  Rather it is more reasonable to believe that the breach of representation default rate might be much higher — perhaps as high as 70 percent because the incidence of negative life events should be somewhat uniform over time.  (Burke Declaration, ¶ 52).  Doubling this default rate would double the estimated Claim amount.

### G.    THE VALIDATION RATE SHOULD NOT BE USED IN CONNECTION WITH THE ESTIMATION MOTION. (STEP 7)

34.    The Trustee believes that for purposes of Step 7, the validation rate should be 100 percent.  First, the validation rate is duplicative of the default rate established in Step 6.  In Step 6, Debtors assert that, where there is a loss on a loan, "35% of the losses are caused by a breach of a representation or warranty."  In Step 5, Debtors assert that Debtors are responsible for only 30 percent of the loans.  So Step 6 determined the rate at which defaulted loans were caused by

21

breaches of representations and warranties for which Debtors are liable. In Step 7, Debtors assert, in part that the validation rate takes into consideration whether the breach was "material." However, if the "losses are caused by a breach of a representation or warranty" for which Debtors are liable, the breach, by definition, is material, otherwise it would not have "caused" the loss. (Declaration of Burke, ¶¶ 42, 45-47).

35.     Further, it is inappropriate to reduce the Claims based upon Debtors' unsupported assumption that the Trustee will not be able to prove the Claims with respect to breaches of representation of loans for which Debtors admit they are liable.

## H.    CERTAIN TRANSACTIONS EXCLUDED FROM THE ANALYSIS

36.     Debtors' Estimate also does not include transactions prior to 2003 because Debtors allege that breaches of representation and warranty claims are time barred prior to this date. Debtors do not offer any support for this argument. Rather, Debtors have a continuing responsibility under the applicable transaction documents to repurchase loans in breach. As such, Debtors' blanket exclusion of transactions prior to 2003 inappropriately reduces the value of the Claims. Debtors' proposed categorical elimination of liability for repurchase claims for loans originated prior to 2003 must be rejected.

## I.    MORTGAGE FILE ISSUES

37.     As noted above, as the foreclosure rate has skyrocketed, courts in foreclosure proceedings have become increasingly particular about certain documentation for loans subject to foreclosure proceedings. Historical rates with respect to documentation exceptions are not relevant to the current foreclosure landscape. The ability to foreclose on behalf of the trusts may

be compromised if Debtors have failed to provide loan documentation that a court requires in connection with a foreclosure action.

## THE CLAIMS SHOULD NOT BE ESTIMATED AT THIS TIME

38.    Debtors have provided little, if any, support for the assumptions in Debtors' Methodology, and they have not met their burden under § 502(e) to estimate the Claims at this time.  For the reasons outlined above, an underestimation of the Claims will be prejudicial to the investors in the various RMBS Trusts who constitute a significant constituency in these proceedings.  The Trustee respectfully requests that these estimation proceedings be deferred to permit adequate discovery regarding the basis for the assumptions contained in Debtors' calculations and allow the Trustee and Debtors to arrive at a mutually agreeable estimated Claim and/or a Claims allowance procedure that benefits the interests of both parties.  In the event that the Court determines than the Claims must be estimated at this time, the Trustee requests that the Claims of the Trustee be estimated more conservatively based on the estimate determined by Jim Burke using the Debtors' Methodology of $15 billion.  The Trustee's estimate of the Claims is based on the methodology, including industry and historical information, provided in this Objection that provides a more realistic estimate of the value of the Claims.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Trustee respectfully requests that the relief requested in the Motion be denied, or in the alternative that the Court estimate the Claims in an aggregate amount in accordance with the more conservative estimates proposed by the Trustees' expert and not on an individual RMBS Trust claim basis.

Dated: January 20, 2012
      New York, New York

                      Respectfully submitted,

                      U.S. Bank National Association, as Trustee

                      By    s/ Craig M. Price
                              One of Its Attorneys

                      CHAPMAN AND CUTLER LLP
                      111 West Monroe Street
                      Chicago, Illinois  60603
                      Telephone:  (312) 845-3000
                      James E. Spiotto (admitted *pro hac vice*)
                      Ann E. Acker (admitted *pro hac vice*)
                      Franklin H. Top, III (admitted *pro hac vice*)

                      -and-

                      CHAPMAN AND CUTLER LLP
                      330 Madison Avenue, 34th Floor
                      New York, New York  10017-5010
                      Telephone:  (212) 655-6000
                      Craig M. Price (CP-9039)