CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

-and-

330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000
Craig M. Price

*Attorneys for U.S. Bank National Association, as Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Lehman Brothers Holdings Inc., *et al.,* | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------x

**DECLARATION OF JAMES BURKE IN SUPPORT OF OBJECTIONS OF VARIOUS INDENTURE TRUSTEES TO THE MOTION PURSUANT TO SECTION 8.4 OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND SECTIONS 105(A), 502(C) AND 1142(B) OF THE BANKRUPTCY CODE TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE BACKED SECURITIES FOR PURPOSES OF ESTABLISHING RESERVES**

Pursuant to 28 U.S.C. § 1746, I, James Burke, declare as follows:

1. I am over 18 years of age and have personal knowledge of the all the facts set forth in this declaration. If called upon to testify as a witness, I could testify to the truth of the matters set forth herein.

2.   I submit this declaration in support of the objections (the "Objections") of various Trustees (defined below) to the *Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves* (Docket No. 24254; the "Motion").

3.   I am currently the Managing Director of the Structured Credit Group at Cowen and Company, LLC ("Cowen"). Cowen is the broker-dealer segment of Cowen Group, Inc. ("Cowen Group"). Prior to joining Cowen, I headed up the advisory business for Ramius, LLC ("Ramius"), which purchased Cowen Group and successfully completed the combination of their businesses on November 2, 2009.

4.   I head up the trading of structured finance assets for Cowen as well as its collateralized debt obligation ("CDO") liquidation business. I also oversee the management of two legacy asset backed securitization ("ABS") CDOs, which are vehicles that are backed entirely by non-agency residential mortgage backed securities ("RMBS"), as well as a legacy portfolio of subordinate tranches of prime RMBS.

5.   My team and I value, analyze, and monitor structured finance assets, primarily non-agency RMBS, for clients and for the internal portfolio of Ramius. Over the last four years, I have overseen the evaluation and analysis of approximately $20 billion worth of structured finance assets, primarily non-agency RMBS backing CDOs.

6.   Prior to joining Ramius, I oversaw a team that managed approximately $20 billion of assets, primarily subprime and Alt-A RMBS, for Structured Asset Investors LLC, a wholly-

2

owned subsidiary of Wachovia Corp., and I have been employed in the interest rate, derivatives, CDO, and fixed income markets since 1989.

7. Accordingly, I am familiar with all aspects of evaluating non-agency RMBS, particularly determining appropriate default and severity rates for subprime and Alt-A RMBS. In connection therewith, I have valued many different types of residential loans, including the following:

> a. <u>Home equity loans</u> are secured by the residual value in a residence after payment in full of a first mortgage. Home equity loans generally have a second lien position with respect to the residential collateral.
>
> b. <u>Prime residential loans</u> are generally (i) secured by first lien rights on the underlying property, (ii) made to borrowers with high credit scores, and (iii) fully documented (e.g., with documents demonstrating the borrower's regular source of income). Due to these factors, lenders generally charge a lower rate of interest to prime borrowers than to, e.g., subprime borrowers.
>
> c. <u>Subprime residential loans</u> are generally made to borrowers who would not ordinarily qualify for credit under customary underwriting standards, for example due to the borrower's lower credit score or a higher loan-to-value ratio.[1] To offset the increased risk of default, lenders charge higher interest rates than those offered to more creditworthy borrowers and assess additional fees. Subprime loans generally suffer from a higher rate of default than prime loans due both to the borrower's lower credit-worthiness and to the higher payments resulting from the higher interest rate.
>
> d. <u>Alt-A residential loans</u> are loans made to borrowers whose credit falls somewhere between a prime rating and a subprime rating. Alternatively, some Alt-A loans are made to borrowers with high credit scores but who cannot provide full documentation concerning employment or income when applying for the mortgage. Accordingly, the interest rates (and fees) charged fall somewhere between those charged to prime and subprime borrowers. During the housing bubble years of 2004 to 2006, many home buyers and home refinances were done using alt-A loans. Some borrowers did not have to show proof of income to justify the loan payments, allowing many home buyers to purchase more expensive homes than they could have purchased using a prime rate mortgage. Alt-A loans represented a very small percentage

---

[1] The loan-to-value ratio is the ratio between the outstanding amount of the loan against the value of the collateral securing the loan. A higher loan-to-value ratio indicates a lower equity cushion. A larger equity cushion protects the lender against decreases in the value of the underlying collateral and increases the likelihood that the lender will be able to recover the full amount of the loan in a foreclosure if there is an uncured default. Accordingly, a higher loan-to-value ratio (i.e., a *lower* equity cushion) represents a higher level of risk to the lender.

3

of loans prior to 2004, but became increasingly prevalent in the period from 2004 to 2007.

8. After the Debtors filed the Motion, Cowen was retained by U.S. Bank National Association, on behalf of itself and certain other similarly situated indenture trustees (collectively, the "Trustees") for certain securitization trusts (collectively, the "Trusts"), to provide consulting services, analysis, and insight in connection with determining an appropriate reserve amount for the Trusts' repurchase claims against Lehman Brothers Holdings Inc. ("LBHI") and Structured Assets Securities Corporation ("SASCO" and together with LBHI and their affiliated debtors and debtors in possession, the "Debtors") and to provide consulting services in connection with analyzing, evaluating, and ultimately resolving such claims.

9. As described more fully below, Cowen has identified numerous deficiencies in the methodology proposed in the Motion for estimating claims reserves, and Cowen has identified certain data that should be provided by the Debtors so that we can evaluate the accuracy of certain assertions and assumptions on which the methodology is based. We understand that at least one of the Trustees has requested this data from the Debtors. However, given the recency of our retention and identification of the required data, we have not yet received the data that we need in order to fully vet the Debtors' Proposed Methodology (defined below). Additional time is necessary to allow us a full and fair opportunity to receive and review this data.

**Preliminary Considerations Relevant to the Motion**

10. The current mortgage crisis is unprecedented in the United States' modern history. Rapid price appreciation and depreciation, new mortgage products and deteriorating underwriting standards are all factors that contributed to the collapse of the housing market in the period from 2006 through 2008. After interest rates declined in late 2001, housing prices in

4

many areas of the country appreciated at unsustainable levels. Adjusting for inflation, in the period from 2000 to 2005, United States housing prices increased 34%, which is more than double the increase in any previous five-year period over the last thirty years.[2] Prices in specific regions of the country appreciated at a much faster rate. Housing prices in Miami, Los Angeles, Los Vegas and West Palm Beach, for example, increased by 20% or more in 2004 alone.[3]

11.    Many homeowners in rapidly appreciating regions accessed this increased equity through new mortgage products that that were intended to be refinanced after a short period of time.[4] Interest-only adjustable rate mortgages ("ARMs"), ARMs with teaser rates, option ARMs, and other similar mortgage products with a short-term focus, became increasingly popular.[5] Subprime mortgages increased from approximately seven to eight percent of the market from 2000 to 2003 to approximately eighteen to twenty percent of the market from 2004 to 2006.[6] The market share of ARMS, interest-only, and similar mortgage products with a short-term focus also increased dramatically in the same period.[7] Delinquency rates, however, initially remained low, as borrowers were able to refinance as long as home prices continued to increase.[8] Mortgage underwriting standards deteriorated.[9] As one writer explained:

> Both ex-ante information about changes in loan characteristics over time and ex-post loan performance suggest that loan quality was relatively stable or improving from 2000 to 2003, and then deteriorated sharply from 2004 to 2007.

---

[2] See Darryl E. Getter, Mark Jickling, Marc Labonte, and Edward V. Murphy, Government and Finance Division, CRS Report for Congress, *Financial Crisis? The Liquidity Crunch of August 2007*, at 1, Congressional Research Service (Sept. 21, 2007), available at http://assets.opencrs.com/rpts/RL34182_20070921.pdf ("CRS Report").
[3] See id.
[4] See id., at 2.
[5] See id., at 2-3.
[6] See Michael Simkovic, *Competition and Crisis in Mortgage Securitization*, at p. 15 (Oct. 8, 2011 rev. Jan. 12, 2012), available at http://ssrn.com/abstract=1924831 (visited Jan. 17, 2012).
[7] See id.
[8] See CRS Report at 3
[9] See id.

5

> Evidence of deteriorating underwriting standards in 2004 to 2007 includes a dramatic shift away from relatively safe loan categories to relatively risky loan categories. The origination market product mix shifted from relatively safe mortgages—including conventional conforming mortgages typically sold to the GSEs, FHA and VA loans, and private Jumbo loans which were generally high quality but were above the GSEs maximum loan limits—toward riskier mortgages, including subprime loans, Alt-A (or low documentation) loans, and second lien home equity loans.[10]

12. When housing value appreciation eventually slowed in 2007 and began to decline, subprime borrowers and borrowers using mortgage products that had a short-term focus had difficulty refinancing.[11] Traditionally, mortgage default and delinquency rates were tied to local economic conditions, but that link was broken during the ongoing housing crisis.[12] Rapidly declining housing prices made it more difficult for mortgagees to exit a troubled mortgage by selling the property.[13] As the examiner appointed in these cases explained:

> Late in the second half of 2006, the first signs of weakness in the subprime residential mortgage market were apparent. For example, delinquency rates on subprime loans, which had hovered near 10% in 2004 and 2005, reached 13% by the end of 2006. In addition, after peaking in mid-2006, housing prices began to decline steeply. This decline in prices threatened the subprime mortgage market because the market's health depended on continued price appreciation in housing. As a result, beginning in November 2006, significant widening of spreads on non-investment grade tranches of home equity loans was evident. By the spring of 2007, the crisis had advanced to the point that several major subprime lenders had gone bankrupt or been acquired by stronger partners.[14]

13. Home prices fell at a record annual rate of 18% nationwide as of October 2008.[15] The housing crisis is not yet over and the mortgage loan market continues to be in turmoil. As

---

[10] See Simkovic at 13.
[11] See CRS Report at 1, 3.
[12] See id. at 3-4.
[13] See id. at 3.
[14] *Report of Anton R. Valukas, Examiner* (Docket No. 7531) at 78-79.
[15] See Ruth Mantell, *Home Prices off Record 18% in Past Year, Case-Shiller Says*, MarketWatch (Dec. 30, 2008), available at http://www.marketwatch.com/story/home-prices-off-record-18-in-past-year-case-shiller-says.

of October 2011, nationwide home prices were down approximately 32.1% from their mid-2006 peak.[16]

### The Motion and the Proposed Methodology

14. In connection with Cowen's retention, I have reviewed the Motion. The Motion proposes a methodology (the "Proposed Methodology") to estimate the total allowed claims held by the Trusts against LBHI and SASCO for the purpose of establishing reserves under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (Docket No. 23023; the "Plan").

15. I have also reviewed the *Declaration of Zachary Trumpp in Support of Debtors Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities or Purposes of Establishing Reserves* (Docket No. 24255; the "Trumpp Declaration").

16. The Proposed Methodology is described in Exhibit B to the Motion and in the Trumpp Declaration. In addition, I have participated in a discussion with the Debtors and their professionals regarding the Proposed Methodology.

17. Based on my discussion with the Debtors, information contained in the Motion, and other information provided to the Trustees by the Debtors, I have prepared a chart (the "Summary Chart"), which summarizes the calculations utilized by the Debtors to determine their "Low Case" and "High Case" estimated reserve amounts. A copy of the Summary Chart is submitted herewith as Exhibit A.

---

[16] See Kevin Quealy & Jeremy White, *Housing Rise and Fall in 20 Cities*, New York Times (Dec. 27, 2011), available at http://www.nytimes.com/interactive/2011/05/31/business/economy/case-shiller-index.html#city/IND20.

7

18. The Proposed Methodology generally "estimates the liability of LBHI and SASCO based on assumptions regarding the percentage of loans that will ultimately default, the recovery rates on the loans that default, the percentage of defaulted loans for which a potential breach of a representation and warranty exists, and the percentage of loans for which the trustee will be able to establish that such breach is valid and materially affects the value of the mortgage loan." (Trumpp Decl. ¶ 12.) Each of the foregoing percentages is stated in the Proposed Methodology, which describes the application of the percentages and certain other calculations as a series of steps. (<u>See</u> Mot. Ex. B; Trumpp Decl. ¶¶ 13-20.)

19. As described more fully below, each percentage utilized by the Proposed Methodology is arbitrary, and the Debtors have not provided evidence to support these arbitrary percentages. Moreover, I have been working on behalf of the Trustees to negotiate consensual reserve amounts with the Debtors. I believe that consensual reserve amounts could be negotiated if the parties were given additional time and if the Debtors provided additional information to the Trustees.

<u>**Step 1**</u>**: Calculation of Aggregate Unpaid Principal Balance**

20. The Proposed Methodology begins "with the aggregate unpaid principal balance of the loans held by each securitization trust as of September 25, 2011 (the '<u>UPB</u>')." (Trumpp Decl. ¶ 14.) "The Debtors obtained this information from various sources, including Intex, which is a subscription based securitization data source." (<u>Id.</u>)

21. The Debtors have not provided the underlying information they used to calculate the UPB to Cowen or the Trusts. Cowen has attempted to verify the UPB for the 432 deals listed in the Motion but the eighteen deals listed below could not be found in either Intex or Bloomberg. In addition, Cowen could not verify the exact deal names on another 35 deals listed in the Motion.

8

<u>Trusts Not Found in Intex or Bloomberg</u>
Accredited Mortgage Loan Trust 2002-BC1
Contingent Claim4
CSFB 2005-CND27
Encore 2003-1
GSMC 2007-GG10
LABS 2002-A
LABS 2004-22
LABS 2007-1
LABS MH 2001-B
LB-UBS 1999-C25
Resmae 2007-17
RLT 2008-23
SASC 2007-RNP1
SASC FHA/VA 1998-RF1
SASC FHA/VA 1998-RF2
SASC FHA/VA 1998-RF3
SASC FHA/VA 1998-RF4
SLH 1989-1

22. Accordingly, since the Debtors have not provided a valid trust name (including a CUSIP for a bond issued by that trust) that is recognized by Intex or Bloomberg, Cowen cannot determine the accuracy of the UPB Amount.

**Step 2: Application of Default Rate**

23. "The Debtors multiplied the UPB for each securitization trust by 45% which, for the High Estimate, represents the assumption regarding the percentage of loans that have or will incur a default." (Trumpp Decl. ¶ 15.)

24. The Debtors admit that their 45% default rate is merely an assumption. They provide no rationale whatsoever for the use of this particular rate. Their choice is completely arbitrary. Cowen attempted to analyze the 432 deals listed in the Motion. Since we could not locate 18 of these deals in either Bloomberg or Intex, these eighteen deals were excluded from our analysis. On another 35 deals where we could not find the exact deal name in Intex or Bloomberg, an analyst had to make an assumption about which we she thought it might be. For example, "SASC 2003-42" is not recognized by either Intex or Bloomberg but Cowen used

9

"SASC 2003-4", a recognized deal in Bloomberg, as a proxy. According to Bloomberg, 32.40% of the outstanding loans (with a current collateral balance of $92.4 billion) are currently in some stage of default, which for purposes of this analysis we define as any loan that is either delinquent, in foreclosure or REO. This percentage, however, does not account for loans that are current but that may still default. A recent research report from Goldman Sachs estimates that approximately 50% of outstanding subprime loans have been modified by the servicer.[17] When a defaulted loan is modified by a servicer it is re-classified as being current even though the recidivism rate (the rate at which modified loans re-default) is very high. In fact, a recent research report from Amherst securities found that the 12-month re-default rate (i.e., the recidivism rate) of modified loans is 49%.[18] That means that it is possible that another 17% of the outstanding loans could default. This means that a more appropriate default rate could be 50% or higher, depending on the exact loan composition of the 432 deals. The default rate increases even further if one accounts for the fact that many borrowers currently have significant negative equity and, as a result, are incentivized to default strategically.

25.    Rather than merely choosing a default rate seemingly at random, it would be more appropriate to examine each of the Trusts,[19] determine the current percentage of loans in default, and apply generally acceptable methodologies for predicting future defaults.

26.    Given additional time and additional information from the various loan servicers, Cowen could provide an estimated default rate, which would be more reliable than the bare assumption made by the Debtors. The short response timeline established by the Debtors'

---

[17] Goldman Sachs, *Non-Agency RMBS: RMBS Commentary*, at 20 (Dec. 2011). To the extent that this report or any other report or commentary referenced in the declaration is not publicly available, the Debtors will provide electronic copies of the same upon request

[18] Amherst Mortgage Insight, *Modifications and Re-Modifications – Recent Developments*, at 4 (Dec. 1, 2011).

[19] Any such representative sample would need to account for differences in anticipated default rates for prime, Alt-A, and subprime loans. In general, subprime loans are more likely to default than Alt-A loans, which in turn are more likely to default than prime loans. Accordingly, the default rate should be adjusted based on the relative concentrations of outstanding prime, Alt-A, and subprime loans in the Trusts.

Motion precludes such an analysis. However, based on my initial review of available information and familiarity with default rates on other, similar deals, I believe the applicable default rate may be as high as 60-70% for certain Trusts, depending on their loan composition.

27.     Accordingly, the default rate chosen by the Debtors is completely arbitrary, and the Debtors have not even attempted to justify it. Additional time and information is required to determine an appropriate default rate.

### Step 3: Application of Severity Factor

28.     The next step in the Proposed Methodology is to multiply the product of the UPB and the default rate by the "'severity factor' which takes into account the estimate of losses on the loans that are currently delinquent or will go delinquent in the future." (Trumpp Decl. ¶ 16.) The Debtors chose a severity factor of 55% for their High Estimate. (Id.)

29.     As with their choice of a default rate, the Debtors choice of a severity factor is completely arbitrary. The Debtors offer no explanation or justification for why they chose 55% instead of 75% or even 95%.

30.     While Cowen does not currently have sufficient data to estimate a severity factor for the particular loans composing the Trusts – and the short response deadline would likely preclude such an estimate in any event – publicly available information suggests that the applicable severity factor should be much higher than 55%. For example, Standard & Poor's Ratings Services ("S&P") reported that the loss severity rate for closed defaults increased to 64% at the end of the third quarter of 2011, despite a decrease in active defaults during that quarter.[20] This confirms earlier predictions from Fitch Ratings ("Fitch"), which had forecast that loss severities would increase in 2011 to somewhere between 49% and 54% for prime loans, between

---

[20] Melodie Warner, *UPDATE: US Residential Mortgage Loan Defaults Showed Signs of Stabilizing In 3Q –S&P*, W.S.J., Nov. 15, 2011, available at http://online.wsj.com/article/BT-CO-20111115-712760.html.

11

64% and 69% for Alt-A loans, and between 80% and 85% for subprime loans.[21] The Debtors have not indicated that they even considered the composition of the various trusts in making their assumptions about a severity factor. If substantial portions of the Trusts' collateral packages are composed of subprime loans, for example, the applicable severity factor would be substantially higher than 55%.

31.    Moreover, it is likely that severities will increase in the near future. A recent mortgage credit outlook issued by an arm of Citigroup Global Markets ("Citi") concluded that home prices will continue to decline in 2012.[22] It is reasonable to anticipate that severities will continue to rise as home prices continue to decline due to further increases in loan-to-value ratios. The same Citi report ultimately concluded that loss severities will continue to increase due to other factors, such as the deterioration of vacant properties, longer foreclosure timelines, and increased tail risk due to an accumulation of loans from judicial foreclosure states.[23]

32.    Although the Debtors have not yet provided sufficient information to allow a full reconciliation, Cowen has attempted to determine a preliminary estimate of an appropriate severity factor for the securitization trusts listed in the Motion. Cowen was able to collect information on loss severities for 379 of the securitizations listed in the Motion from Intex and Bloomberg. For an additional 35 securitizations, Intex and Bloomberg indicated that no such deal existed, but a Cowen analyst was able to find a deal with a similar name that the analyst believed was the securitization referenced in the Motion. Eighteen of the securitizations listed in the Motion could not be identified in either Intex's or Bloomberg's systems. The 414 securitizations identified by Cowen had an average loss severity of 68.3% over the last twelve

---

[21] Jon Prior, *Higher loss severities on foreclosures will push servicers to short sales in 2011: Fitch*, HousingWire, Dec. 16, 2010, available at http://www.housingwire.com/2010/12/16/higher-loss-severities-on-foreclosures-will-push-servicers-to-short-sales-in-2011-fitch.
[22] Markets Quantitative Analysis, *2012 Mortgage Credit Outlook*, at 2-14 (Dec. 16, 2011).
[23] Id. at 30-32.

12

months (weighted by the amount of early payment defaults[24] nine months after deal closing).[25] This preliminary estimate is in line with the third quarter 2011 severities calculated by S&P and the predictions for 2011 made by Fitch. Although additional time and information would be necessary to perform a full reconciliation, this initial estimate suggests that the Debtors have severely underestimated the severity factor.

33. The Debtors' arbitrary choice of a severity rate is completely unsupported by any rationale or data. Indeed, publicly available information and Cowen's own initial reconciliation indicate that even the "High Case" severity factor chosen by the Debtors is unrealistically low.

### Step 4: Addition of Cumulative Losses

34. "The cumulative losses that have already been incurred for the loans in each securitization are added to the result of Step 3. . . . The Debtors obtained the cumulative losses for each securitization trust from Intex or the monthly trust remittance reports." (Trumpp Decl. ¶ 17.) The Debtors claim to have identified $38,301,240,595 in cumulative losses. (See Summary Chart.)

35. The Debtors have not yet provided the underlying information they used to calculate the current cumulative losses to Cowen or the Trustees.

36. Information regarding the current cumulative losses is maintained by various servicers. In order to verify that the information used by the Debtors is accurate, the Trustees

---

[24] Early payment defaults ("EPDs") occurring within the first year after a loan is originated are a good indicator of losses that are likely predicated on a failure in application of underwriting standards. While there are many legitimate reasons for a default – including negative life events (such as loss of a job, illness, divorce, or death) or as a result of a reset in the initial rate of interest on an adjustable rate mortgage, which makes future mortgage payments unaffordable – the probability of a large number of legitimate defaults occurring within the first year in the same deal is extremely low if proper underwriting standards are followed. (Indeed, since nearly all interest rate resets in adjustable rate mortgages occur after the first year, the likelihood of a legitimate default due to an interest rate reset within the first year is effectively zero.) Accordingly, any concentration of EPDs in a particular securitization strongly suggests that there was a defect in the due diligence or underwriting process of the subject mortgage loans.

[25] Loss severity was calculated based solely on information available from Bloomberg. If information regarding loss severity was not available from Bloomberg for a particular securitization, that particular securitization was excluded from the calculation.

13

would need to request corresponding information as of September 25, 2011, from these servicers or attempt to collect it from other sources. Due to the extremely short period between the service of the Motion and the objection deadline associated with the Motion, the Trustees do not have sufficient time to request information regarding cumulative losses from the relevant servicers or to find such information elsewhere. Even if the Trustees did receive such information, since the Debtors have not yet provided the underlying information they used to calculate the cumulative losses, the Trustees might be unable to verify its accuracy during the short time period allowed to respond to the Motion.

37.     Although the Debtors have not yet provided sufficient information to allow a full reconciliation, Cowen has attempted to determine current cumulative losses for the securitization trusts listed in the Motion on a preliminary basis. Cowen was able to collect information on cumulative losses for 379 of the securitizations listed in the Motion from Intex and Bloomberg. For an additional 35 securitizations, Intex and Bloomberg indicated that no such deal existed, but a Cowen analyst was able to find a deal with a similar name that the analyst believed might be the securitization referenced in the Motion. Eighteen of the securitizations listed in the Motion could not be identified in either Intex's or Bloomberg's systems. The 414 securitizations identified by Cowen had a collateral balance of $96.5 billion as of September 30, 2011, as compared to a $101.7 billion estimate by the Debtors of all collateral balances as of September 25, 2011 (see Summary Chart; Trumpp Decl. ¶ 14.) Nevertheless, cumulative losses of $40.73 billion were identified by Intex and Bloomberg as of December 2011 on eighteen fewer securitizations with a lower aggregate collateral balance, as compared to the approximately $38.3 billion of cumulative losses apparently identified by the Debtors (see Summary Chart).

38. Accordingly, since the Debtors have not yet provided the information underlying their calculation of cumulative losses, it is impossible to determine the accuracy of their calculation. Moreover, due to the compressed time period established by the Debtors for responding to the Motion, it is extremely unlikely that the Court, the Trustees, or any other party in interest could acquire corresponding information from the various servicers (or other sources) in order to verify the Debtors' calculation of cumulative losses even if they had provided the underlying information. A preliminary investigation into the cumulative losses for the securitizations listed in the Motion indicates that the Debtors may have undervalued such cumulative losses.

**Step 5: Allocation of Losses Based on Percentage of "Lehman-Originated Loans"**

39. "The result of Step 4 is multiplied by the percentage of the UPB for each securitization trust that relates to Lehman-Originated Loans and Bank-Originated Loans. This calculation is necessary because, as discussed above, the trusts should be seeking recourse against the originator or initial seller, and not LBHI, for the Transferor Originated Loans." (Trumpp Decl. ¶ 18.)

40. The Debtors reveal that they "were unable to identify the number of Lehman Originated Loans and Bank Originated Loans for 19 of the more than 400 securitizations subject to the Claims." (Trumpp Decl. ¶ 18.) Accordingly, they propose to allocate 30% of the UPB of the loans on these nineteen trusts to LBHI for purposes of establishing a reserve.[26] The Debtors have explained neither how they were able to identify particular Lehman-Originated Loans within a particular Trust nor why they were unable to identify particular Lehman-Originated Loans in nineteen of the Trusts. In any event, since the Debtors have not yet provided the

---

[26] As described more fully below, this assumption is also questionable.

15

background information that they used to make their conclusions, we have been unable to verify the accuracy of the Debtors' conclusions and assumptions.

41.  Accordingly, since the Debtors have not yet provided the information underlying their allocation of cumulative losses, it is impossible to determine the accuracy of their allocation.

### Step 6: Application of Breach Rate

42.  "Not all defaults and losses are the result of breaches of representations and warranties." (Trumpp Decl. ¶ 19.) "To account for such scenario, the calculation of the High Rate assumes that 35% of the losses are caused by a breach of a representation or warranty." (Id.) Accordingly, the Debtors' Proposed Methodology reduces their assumed liabilities by multiplying the amount from Step 5 by a 35% "breach rate." (See id.)

43.  Like their choice of default rate and severity factor, the Debtors' choice of a breach rate is completely arbitrary, and they do not offer any rationale or justification whatsoever for their choice of a 35% breach rate. Given that the Debtors were apparently able to identify more than $38 billion worth of current actual losses (see Summary Chart), it is curious that the Debtors apparently could not identify whether or what percentage of these losses were actually attributable to breaches of representations or warranties.

44.  Accordingly, the Debtors' arbitrary choice of a breach rate is completely unsupported by any rationale or data. Given the poor performance of mortgage loans in general and the widespread decline in underwriting standards in the years leading up to the housing crisis, it is likely that the actual breach rate is much higher than the arbitrary number chosen by the Debtors.

**Step 7: Application of Validation Rate**

45. "Based upon my historical experience reviewing loans and my experience both pursuing and defending representation and warranty claims . . . the rate of breached loans that are 'validated,' meaning they meet every element required for repurchase and/or indemnification under the Governing Agreements, is approximately 40% for the High Rate." (Trumpp Decl. ¶ 20.)

46. In other words, the Debtors believe that, despite their admitted liability (based on their assumptions through Step 6) for certain losses, the Trustees will be unable to prove the Debtors' liability. The Debtors' application of the breach rate in Step 6 is intended to remove losses for which the Debtors are not actually responsible. Thus, Step 7 must be intended to estimate losses for which the Debtors *are actually liable*. It is inappropriate to reduce the amount of the estimated claims further based on the theory that, while the Debtors are actually liable for certain losses and claims, the Trustees will not be able to prove that liability.

47. In addition, the Debtors have provided no information to corroborate Mr. Trumpp's hunch that the Trustees will only be able to prove the Debtors' liability for 40% of the losses for which they are actually liable. Mr. Trumpp himself provides no corroborating evidence other than a reference to his "historical experience." Accordingly, this 40% figure is ultimately as unsupported and arbitrary as the Debtors' choice of default rates, severity factors, and breach rates.

48. If this single inequitable and arbitrary step were removed from the Proposed Methodology, the amount of the projected losses would more than double.

**Additional Flaws with the Proposed Methodology**

49. <u>Types of loans</u>. The Debtors' Proposed Methodology apparently fails to account for the varying characteristics of the loans in each of the Trusts. The loans may vary based on

17

interest type (e.g., fixed rate, adjustable rate, hybrid adjustable rate), loan quality (e.g., prime, subprime, Alt-A), and lien position (e.g. first, second). Each characteristic would modify the applicable default rate, severity factor, and breach rate. This apparent failure to account for varying characteristics of loans in the Trusts is a fundamental flaw in the Proposed Methodology.

50. <u>Vintage</u>. The Trusts consist of loans originated as early as the 1990s and include loans originated as late as 2008. The quality of the loans that were originated in later years is generally worse than the quality of loans originated in earlier years. As the housing market bubble began to form in the early 2000s, the cost of a residence became an increasingly large percentage of a borrower's income. This increased the need to use Alt-A and subprime loans for financing. Thus, while portfolios with older, more traditional mortgage loans have lower relative risk profiles, loans originated in 2006 and 2007 have incurred greater default rates and suffered from higher severity rates than loans of other vintages. The Proposed Methodology does not appear to take into consideration the impact of various vintages of loans on projected losses. This is a fundamental flaw in the Proposed Methodology, and the Proposed Methodology should not be relied upon to estimate losses.

**Revising the Debtors' Proposed Methodology With More Reasonable Percentages**

51. Although we believe that the Debtors' Proposed Methodology is fundamentally flawed, it would yield results that are more reasonable if assumptions that are more realistic were made regarding the default rate, severity factor, and breach rate. Similarly, I believe that any reasonable analysis would eliminate the Debtors' concept of a validation rate, which essentially serves to reduce the Debtors' projected liability for claims for which they implicitly admit they are liable.

52. The Summary Chart includes an application of the Debtors' Proposed Methodology using assumptions that are more reasonable. As indicated above, I believe that a

18

default rate and severity rate of 50% and 68.3%, respectively, are more appropriate. I also assume a breach rate of 70%. Since I do not yet have access to the Debtors' records regarding which loans were originated by the Debtors, I have adopted the 30% origination assumption proposed by the Debtors (see Trumpp Decl. ¶ 18).[27]

53.    Based on these adjustments, the Debtors' Proposed Methodology yields projected losses attributable to the Debtors of approximately $15 billion.[28] (See Summary Chart.)

### Conclusion

54.    Based on the foregoing, I do not believe that the Debtors' Proposed Methodology represents a reasonable or fair basis to estimate the potential liability of LBHI and SASCO to the Trusts. In my business judgment, the Proposed Methodology drastically undervalues the potential liability of LBHI and SASCO. In my professional opinion, it would be more appropriate to apply a more rigorous and widely accepted methodology, such as the early payment default methodology. However, if certain assumptions in the Proposed Methodology are corrected, the projected losses attributable to the Debtors increase by billions of dollars.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: January 20, 2012
    New York, New York

_____
James Burke

---

[27] The Trustees do not concede that the Debtors are responsible only for losses attributable to Lehman-Originated Loans.
[28] If the analysis ignored the Debtors' questionable assumption that they are only responsible for losses attributable to Lehman-Originated Loans, the projected losses attributable to the Debtors more than triples to approximately $51 billion. (See Summary Chart.)