**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:  (212) 849-7000
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.<br><br>                   Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |

**LEHMAN BROTHERS HOLDINGS INC.'S AND CREDITORS COMMITTEE'S REPLY**
**BRIEF IN SUPPORT OF THE TWO HUNDRED TWENTY-NINTH OMNIBUS**
**OBJECTION TO JPMORGAN'S ASSET MANAGEMENT FUND CLAIMS**
**(NO LIABILITY, MISCLASSIFIED AND DUPLICATIVE CLAIMS)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

Lehman Brothers Holdings Inc. ("LBHI") and the Official Committee of Unsecured

Creditors (the "Committee", and together with LBHI, the "Objectors") respectfully represent as

follows:

**Preliminary Statement**

1.      In defense of their claim, the investment funds (the "Funds") assert that the

September Guaranty and September Security Agreement cover losses borne by investors in the

Funds because the Funds are "affiliates" of JPMorgan Chase Bank N.A. ("JPMorgan Bank")

given they receive investment advice or trustee services from JPMorgan Bank or some other

subsidiary of JPMorgan Chase & Co.

2.      This is not a plausible interpretation of the term "affiliates" in the context of this

guaranty.  Even according to the dictionary definitions relied upon by the Funds, affiliates are

related by shareholdings or means of control along the lines of a subsidiary, parent, or sibling—

not someone who is contracted to provide investment advisory services.  For one thing, control

must be over the entity itself—such as through ownership—not just the type of control one gives

a service provider to make choices on how to invest money.  Indeed, every case that the Funds

cite to where a corporation is deemed an affiliate under the plain meaning of that term looks to

corporate ownership control—not control of activities by a contractual service provider.  The

Funds have not cited to a single case holding that an investment advisor or trustee is an affiliate

of the entity they serve under the plain meaning of that term.  Nor do the Funds attempt to

distinguish cases cited in the Objection that find a contractual service relationship is insufficient

to render someone an affiliate.

1

3.      More importantly, the Court must construe the term "affiliates" in the context of the September Agreements and in light of their overarching purpose.  It is entirely appropriate, and indeed required, to look at how a word is used in a contract in construing the term.  In so doing, the Court may also appropriately consider the words surrounding the term "affiliates" without looking to extrinsic evidence.  In this contract, those surrounding words—"subsidiaries, successors and assigns"—all concern entities that either are part of the JPMorgan corporate family sharing a corporate ownership relationship and common risk of loss or succeed directly to JPMorgan Bank's rights under the September Agreements.  The Funds' contractual service relationship with JPMorgan, however, bears no resemblance to JPMorgan's relationship with its "subsidiaries, successors and assigns" and thus does not fit into any reasonable interpretation of the term "affiliates" as it is used in the September Agreements.  Finally, any reading of the September Agreements that would include the Funds as "affiliates" would lead to the absurd result that LBHI provided a guaranty against the losses of all of the thousands of entities that had contracted with JPMorgan for discretionary investment advice or other managerial services.  Furthermore, this interpretation would also result in JPMorgan's customers holding subordinated debt being paid ahead of senior debt holders in violation of the specific terms of the actual indenture.  No extrinsic evidence is needed to determine that such an interpretation cannot stand as a matter of law.

4.      Moreover, the Funds do not even meet their own asserted definition of "affiliate." The only Funds that are even alleged to have a direct relationship of any kind with JPMorgan Bank are the so-called Trust-Organized Funds, which are simply commingled accounts that JPMorgan Bank manages solely as trustee.  Putting aside whether a trustee who performs account management services, but is precluded from sharing in the trust's profits and losses and

08-13555-mg    Doc 24513    Filed 01/23/12    Entered 01/23/12 13:05:22    Main Document
Pg 4 of 27

has no ownership interest in the trust itself, is an affiliate under any definition of the term, the Trust-Organized Funds cannot be "affiliates" of JPMorgan Bank because they are not corporate entities, and even the Funds' purported definition of affiliates requires a relationship between two corporations. A trust is simply a legal fiduciary relationship with respect to property and, in this case, the so-called Trust-Organized Funds are simply a traditional banking service used to commingle assets of trusts whose assets are already managed by JPMorgan Bank. A trust is not the affiliate of its trustee by virtue of that relationship under any definition. Nor do the Funds' other cases support extending the meaning of affiliates to cover trusts in any manner.

5.      As to the so-called Advised Funds, the Funds mischaracterize their own relationship with their investment adviser. The investment advisory agreements relied upon by the Funds contradict their own argument that a JPMorgan entity controls each of the Advised Funds. Instead, those agreements clearly show that the JPMorgan entity that acts as investment advisor is merely an independent contractor or agent for the Funds for the limited purpose of investment advisory services and lacks any right to ultimately control the Funds. Such a relationship does not support a claim that a JPMorgan entity "controls" the Advised Funds even under the Funds' purported interpretation of "affiliates." Moreover, the Funds do not even assert that JPMorgan Bank itself has any control relationship with any of these Funds. Instead, the Advised Funds receive investment advice from other subsidiaries of JPMorgan Chase & Co.— not JPMorgan Bank. The Funds have therefore not alleged any facts establishing any direct relationship between JPMorgan Bank and the Advised Funds that would make them affiliates of JPMorgan Bank under even their own definition of "affiliates."

6.      Thus, the Court may decide without any discovery that losses borne by customers of Funds receiving investment advice or trustee services from a JPMorgan entity are not covered

3

by the September Guaranty and September Security Agreement, and thus the Funds' claim against LBHI as guarantor fails. Regardless of whether those agreements are ultimately upheld, they unambiguously do not cover the losses to JPMorgan's investment customers.

## Argument

### I.    No Plausible Interpretation of "Affiliate" Extends to the Funds in Light of the Dictionary Definitions and the Purpose, Words, and Context of These Agreements,

7.    The Funds fail to state a viable claim against LBHI under the September Guaranty and Security Agreement because losses to the customers of Funds advised by or receiving trustee services from JPMorgan are simply not covered by the plain language of those agreements.

8.    The Funds' entire argument rests on an interpretation of two dictionary definitions, specifically Black's Law Dictionary: "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation," *Black's Law Dictionary* 67 (9th ed. 2009); and Webster's dictionary: "a company effectively controlled by another or associated with others under common ownership or control." *Webster's Third New International Dictionary* 35 (2002).[1] Response ¶ 3. Specifically, the Funds

---

[1]    Later in the Funds' objection, they also refer to the statutory definition as set forth in Section 23A of the Federal Reserve Act, as implemented by Federal Reserve Regulation W. Response ¶ 37. However, the definition of "affiliate" in both Regulation W and the securities laws expressly applies only to those regulations. *See* 12 C.F.R. § 223.2(a) (2011) ("For purposes of this part . . . , 'affiliate' with respect to a member bank means . . ."); 17 C.F.R. § 230.144(a)(1) (2009) (defining "affiliate" and noting that the "definitions shall apply for the purposes of this section"). Courts do not apply statutory definitions to contracts absent language in the contract invoking that statute. *See e.g., Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219, 760 N.Y.S.2d 140 (1st Dep't 2003) ("Clear and unambiguous terms should be understood in their plain, ordinary, popular and nontechnical meaning."). Moreover, there is good reason for the definition of "affiliates" in a regulatory context to be far broader than standard contracts—not to mention a parent-level guaranty. As the Funds themselves note, Section 23A and Regulation W are designed to regulate transactions between the bank and certain related parties that could present a danger of unfairness. Response ¶ 39. Thus, those sections broadly define the term "affiliate" to prevent "unsafe and unsound banking practices," including "bank purchases of low quality assets from affiliates." *Nw. Nat'l Bank v. U.S. Dep't of Treasury*, 917 F.2d 1111, 1118-19
(continued...)

4

argue that the so called "Trust-Organized Funds" are affiliates of JPMorgan Bank because JPMorgan Bank serves as a trustee to those Funds, owns the assets as Trustee for the benefit of the Trust, and as Trustee has the power to "invest and reinvest moneys of the Fund in any property" and make other investments and transactions on behalf of the Trustees.  Response ¶ 20.  Separately, the Funds argue that the so called "Advised Funds" are affiliates of JPMorgan Bank because they receive investment advice pursuant to service contracts from other subsidiaries of JPMorgan Chase & Co., which the Funds refer to as "affiliate[s]" of JPMorgan Bank.  *See, e.g.*, Response ¶ 23 ("With respect to the Advised Funds, an affiliate of JPMorgan Bank is appointed investment adviser with unlimited discretionary trading authority and sole responsibility for all trading operations of such Funds.").

9.      But under any reasonable reading of the dictionary definitions, and interpreting the term "affiliates" as it must be within the context of this contract and its surrounding words, these Funds are not affiliates of JPMorgan Chase Bank and losses to the Funds' customers were not intended to be guaranteed and secured by the September Agreements.

### A.      Affiliates Do Not Include Service and Trustee Account Management Under Any Fair Reading of the Dictionary Definitions

10.     Although, as discussed below, dictionary definitions must not be interpreted in a vacuum, even a close look at the dictionary definitions contradicts the Funds' position that an affiliate relationship can be based on "controlling" investment decisions pursuant to a service

---

(8th Cir. 1990) (noting that "Congress meant to throw a wide net indeed" in establishing Section 23A and Section 23B).  Similarly, Congress broadly defined "affiliate" in the federal securities laws to regulate the conduct of, and impose liability on, a broad cross-section of parties involved in securities offerings.  *Cf. Byrnes v. Faulkner, Dawkins & Sullivan*, 413 F. Supp. 453, 470 (S.D.N.Y. 1976) (noting that the Securities Exchange Act should be interpreted broadly in light of its purpose as remedial legislation).  As discussed below, unlike the broad scope of the conduct regulating frameworks of the banking and securities laws, guaranties are to be narrowly construed.

5

contract.  Under these definitions, there must be some level of control over the entity itself.  *See Black's Law Dictionary* 67 (9th ed. 2009) (including the phrase "related to another corporation by shareholdings or other means of control"); *Webster's Third New International Dictionary* 35 (2002) (including the phrase "or associated with others under common ownership or control"); *see also* Response ¶ 3 ("a company effectively controlled by another").

11.    But the job of managing investments for an entity is not control over the entity itself—it is control over certain investment decisions.  After all, clearly not just any control related to an entity will suffice to make that entity an affiliate.  For example, control of computer purchase decisions, control over 401-K investments, control over tax filings, control over marketing decisions, or control over a host of things regularly contracted out to service providers do not make those service providers affiliates of an entity.  Instead, control must be over the entity itself, such as through shareholdings or other ownership.

12.    The fact that "control" in the corporate affiliate context means ownership or control over the Fund itself, including the economic attributes of ownership (*e.g.*, shared economic risk of profits and losses) is clear from the dictionary definition of the term "affiliate." The example of the type of control set forth in Black's Law Dictionary is "shareholdings," which is not present with the Funds.[2]  *Black's Law Dictionary* 67 (9th ed. 2009).  Moreover, the definition spells out precisely the types of corporations that constitute affiliates: "a subsidiary parent or sibling corporation."  *Id.*  As noted in the Objection, subsidiary, parent and sibling

---

[2]    The Funds assert in cursory fashion that "JPMorgan Bank or one of its affiliates also owns a material interest in a number of the Advised Funds, and in one case a majority interest." Response ¶ 51.  However, the Funds do not provide any factual support for this assertion, nor do they state whether the ownership interest is a beneficial interest or merely as nominee for other third-party investors/customers.  In fact, JPMorgan Bank and any of its affiliates are prohibited from investing in the Trust-Organized Funds. *See, e.g.*, Objection ¶ 80 (citing 12 C.F.R. § 9.18(b)(8)(i)).

6

corporations are all related by controlling *ownership* (Objection ¶ 53), a relationship that the Funds do not (and cannot) assert they share with JPMorgan Bank.

13.    Moreover, no case supports the Funds' interpretation of the definition of affiliate—in any context.  None of the cases cited by the Funds finds that a trustee or a contract service provider is an affiliate of a company to which it provides its services.  On the contrary, as mentioned in the Objection, courts have found that a service or trustee relationship cannot be considered an affiliate.  *See, e.g.*, *Travelers Indem. Co. v. United States*, 543 F.2d 71, 76 (9th Cir. 1976) (analyzing a waiver provision in an insurance contract and holding that a United States government agency was not "affiliated or associated" with a private power company, despite entering into a joint venture and service contract between them); *McNeely v. Spry Funeral Home of Athens, Inc.*, 724 So. 2d 534, 539 (Ala. Civ. App. 1998) (holding that contractual service provider was not an "affiliate" in part based on "persuasive authority from other states hold[ing] that the term 'affiliate' does not include parties with whom the principal releasee has an arm's-length contractual relationship") (citing cases); *Preston Trucking Co., Inc. v. Carolina Cas. Ins. Co.*, 712 F. Supp. 1208, 1212 (W.D. Pa. 1989) (finding that "arms length contractual relationship" between a lessor and a lessee did not create "affiliate" relationship under insurance policy).

14.    Recently, the District Court of New Mexico confronted the issue of determining the plain meaning of the term "affiliates" in a contract, and held that contractual service providers that purportedly operated and managed an LLC were not affiliates of that LLC under the plain meaning of that term.  *See THI of N. M. at Hobbs Ctr., LLC v. Patton*, No. CIV 11-537 LH/CG, 2012 WL 112216, at *13 (D.N.M. Jan. 3, 2012).  Specifically, in *THI*, a health care center (Hobbs Center, LLC), its sole member company (THI-NM), and two limited liability

7

companies that purportedly operated and managed Hobbs Center (FAS and FCC) , each sought

to compel arbitration in a tort action based upon an arbitration agreement entered into in favor of

Hobbs Center and, among others, its affiliates, parents, subsidiaries, successors and assigns. *Id.*

at *2-3.   The court held that "[b]ecause THI-NM is the sole member of Hobbs Center, it

constitutes an affiliate of Hobbs Center," and therefore is covered by the arbitration agreement.

*Id.* at *12.   However, as to FAS and FCC, the court held that they merely had "contractual

service relationship[s] with Hobbs Center," and thus did not qualify as "affiliates" and were not

covered by the agreement.   *Id.* at *13.   Moreover, the court recognized that even though both

FAS and FCC also had an indirect ownership relationship with Hobbs Center, that relationship

was "indirect and too attenuated and unclear for the parties to have contemplated FCC [and FAS]

to be covered by the contract."  *Id.*

15.     In contrast, courts do find an affiliate relationship when there is ownership

control.  This is clear from the cases the Funds cite.  *See, e.g., Grunley Walsh U.S., LLC v. Raap*,

No. 1:08-cv-446, 2009 WL 1298244, at *9-10 (E.D. Va. May 6, 2009), *aff'd* 386 F. App'x 455

(4th Cir. 2010) (corporations and the corporation they owned and controlled were affiliates)

(cited at Response ¶ 19); *Lombardo's Ravioli Kitchen, Inc. v. Ryan*, 815 A.2d 302, 306-08 (Conn.

Super. Ct. 2002), *aff'd* 842 A.2d 1089 (Conn. 2004) (corporations owned by same principal were

affiliates under Connecticut statute) (cited at Response ¶ 19); *Eckland Consultants, Inc. v. Ryder,

Stilwell Inc.,* 176 S.W.3d 80, 88 (Tex. App. 2004) (corporation was affiliate with limited

partnership whose general partner was a wholly-owned subsidiary of the corporation) (cited at

Response ¶ 19).   Indeed, this ownership relationship is what courts commonly look to when

finding an affiliate relationship.  *See, e.g., Kanoff v. Better Life Renting Corp.*, No. CIV A 03-

2363 (FLW), 2008 WL 442145, at *4 (D.N.J. Feb. 14, 2008) (explaining that "[w]hile an

affiliation between two corporations depends partly on control, having common ownership satisfies such requirement" and dismissing plaintiff's claims because that defendant was commonly owned with a party to an arbitration agreement and was thus affiliated with that party and covered by the agreement); *Ferguson v. Gale Indus., Inc.*, No. CV01-151SMHW, 2005 WL 1593597, at *4 (D. Idaho Jul. 1, 2005) (finding that a "wholly owned subsidiary" was an "affiliate" with its corporate parent under an indemnification agreement and was therefore covered by the agreement).[3]

16.     Thus, according to any reasonable reading of the dictionary definitions of "affiliate" and case law interpreting those dictionary definitions, the Funds are not affiliates of JPMorgan Bank and losses to the Funds' customers do not state a claim against LBHI under the September Agreements.

**B.     The Language and Context of These Contracts Demonstrate Beyond Question that Losses to the Funds' Customers Are Not Covered by the September Agreements**

17.     As described above, the Funds attempt to squeeze themselves into the definition of "affiliates" by pointing solely to dictionary definitions and arguing that it is at least ambiguous whether providing investment advice or trustee account services can qualify as an affiliate relationship under those dictionary definitions.

18.     But not only is there no ambiguity as to the dictionary definition of "affiliate," there is also no ambiguity with respect to how that term is used in the September Agreements. According to settled principles of contractual interpretation, the Court must look beyond

---

[3]     As mentioned in the Objection, the fact that "affiliate" has an ordinary and customary meaning of being part of a corporate family is supported by the deposition testimony of JPMorgan's own Associate General Counsel Robert Macallister.  Objection ¶ 54, n.15 (citing testimony from Mr. Macallister that his common understanding of the affiliates of JPMorgan Bank are its "sister companies, the parent company and the subsidiaries . . . .").

dictionary definitions to the context and language of the contract itself to determine if the meaning of the term as used in the contract is unambiguous, before turning to extrinsic evidence. *See, e.g.*, *Rosenthal v. Quadriga Art, Inc.*, 69 A.D.3d 504, 508-09, 894 N.Y.S.2d 32, 36 (1st Dep't 2010) (rejecting plaintiff's assertion that the court must follow the dictionary definition of "termination," and instead finding that "[t]he plain meaning of the language 'in the event of termination' and the word 'termination' may be clearly ascertained from examining the context in which these words are used," and that the term was not ambiguous); *see also Corman v. United States*, 26 Cl. Ct. 1011, 1015 (1992) (granting partial summary judgment on the plaintiff's contract claim and noting that "the defendant cites to Black's Law Dictionary.  However, the dictionary can provide only a general, out of context, definition, and this court has consistently held that in interpreting contract terms, the context and intention of the parties are more meaningful than the dictionary definition") (citations omitted); *Mirpad, LLC v. Cal. Ins. Guarantee Ass'n*, 132 Cal. App. 4th 1058, 1069 (2005) (reversing lower court's decision in favor of insured because policy coverage for "person" did not include an "organization," and explaining that "while most words, when considered in isolation, may have more than one definition or usage, in construing a contract the court's function is not merely to import all of the possible definitions or even the broadest definition, but to glean the meaning of the words *from the context and usage of the words in the contract itself*") (emphasis in original); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 58-59 (Del. Super. Ct. 1995) (finding that despite different dictionary definitions of the term "sudden," in the context of the contract the word was "clear and unambiguous" and explaining "[a]lthough dictionaries are helpful finding the ordinary meaning of a term, they are imperfect yardsticks of ambiguity") (citation omitted); *Upjohn Co. v. N.H. Ins. Co.*, 476 N.W.2d 392, 398 n.8 (Mich. 1991) (rejecting the dissent's

10

argument that "the term 'sudden' is ambiguous because it is defined in a variety of ways in the

dictionary and is thus susceptible to more than one reasonable interpretation. . . . Most, if not all,

words are defined in a variety of ways in each particular dictionary, as well as being defined

differently in different dictionaries"); *Sprangers v. Greatway Ins. Co.*, 514 N.W.2d 1, 7 (Wis.

1994) ("The mere fact that a word has more than one dictionary meaning, or that the parties

disagree about the meaning, does not necessarily make the word ambiguous if the court

concludes that only one meaning applies in the context and comports with the parties' objectively

reasonable expectations.").

19.    Furthermore, looking to the context of the entire agreement is appropriate in a

motion to dismiss and does not require an examination of extrinsic evidence.[4] *Am. Auto. Ins. Co.

v. Rest Assured Alarm Sys., Inc.*, 786 F. Supp. 2d 798, 804 (S.D.N.Y. 2011) (granting motion to

dismiss negligence claims against fire alarm lessor based upon unambiguous meaning of

exculpatory clause when read in the context of the entire agreement); *First Serv. Fin. Inc. v. City

Lights at Queens Landing, Inc.*, No. 08-CIV-3312, 2009 WL 750190, at *3 (S.D.N.Y. Mar. 20,

2009) (dismissing the plaintiff's breach of contract claim alleging it was entitled to compensation

because "[r]ead both by its own terms and in the context of the contract as a whole, the fourth

paragraph of the Agreement does not create a right of compensation for 'assistance'"); *Crane Co.

v. Coltec Indus. Inc.*, No. 98-CIV-8838 (BSJ), 1999 WL 38251, at *5 (S.D.N.Y. Jan. 28, 1999)

---

[4]    *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir.
2010), cited by the Funds does not, as they assert, stand for the proposition that an examination
of context is impermissible because it "would require consideration of extrinsic evidence at an
evidentiary hearing."  Response ¶ 17 n.7.  The case says no such thing.  Instead, *Law Debenture*
merely stands for the proposition that the Court may not use extrinsic evidence of what a party
asserts really was intended to contradict or alter the terms of the contract. *Law Debenture*, 595
F.3d at 466.  Indeed, the Second Circuit in *Law Debenture* held that a court should consider the
context when determining whether a term is unambiguous.  *Id.* at 467-68.

(granting motion to dismiss and noting that plaintiff's "interpretation requires that I read clauses one through three in isolation, while it is axiomatic that, in contract construction, words and clauses must be read in their context"), *aff'd*, 171 F.3d 733 (2d Cir. 1999).

### C.    "Affiliates" in the Context of a Guaranty Do Not Include Losses to Customers

20.    Looking at the language of this specific contract, moreover, it is clear that the term "affiliates" does not extend the scope of the Guaranty to cover losses of investors in the Funds.    As an initial matter, as explained in the Objection, the word "affiliates" must be construed in the context of a parent-level guaranty and security agreement.    Objection ¶ 60. Moreover, a guaranty, and more specifically liability of a guarantor under a guaranty, must be narrowly construed.  *Kleet Lumber Co., Inc. v. Quail Homes of Long Island, Inc.*, 129 A.D.2d 564, 565, 514 N.Y.S.2d 60 (2d Dep't 1987) ("The liability of a guarantor is to be narrowly construed . . . ."); *see also Symbol Techs., Inc. v. Voicenet (Aust.) Ltd.*, No. CV-03-6010 (SJF) (ARL), 2008 WL 89626, at *2 (E.D.N.Y. Jan. 4, 2008) ("A court must interpret a guaranty in the strictest manner, in favor of the guarantor.") (citations omitted).  It does not require any extrinsic evidence to understand that the general purpose of such a guaranty is to protect the beneficiary from losses incurred by it and entities with which it is economically related—such as parent, subsidiary, and sibling corporations.  Here, there can be no doubt that the ones who suffered the loss—the investors in the Funds—are not JPMorgan's affiliates in terms of sharing profits and losses; they are simply JPMorgan customers.  Thus, affiliates in the context of the September Agreements clearly means companies in the JPMorgan corporate family, who share ownership, profits and losses with JPMorgan Bank.  And it does not encompass Funds that receive investment advice or traditional fiduciary banking services from a JPMorgan entity.

**D.**    **The Words Surrounding "Affiliates" in the September Agreements Confirm That It Refers to Corporate Family**

21.    The Funds wish to ignore the fact that the word "affiliates" appears within this contract among a list of terms including "subsidiaries, successors and assigns."  As explained in the Objection, the items in this list all share the characteristic of being in the same corporate family or being vested with the rights of such a corporation.  Objection ¶ 58.  According to the settled rules of construction of *noscitur a sociis* (words grouped in a list should be given related meaning) and *ejusdem generis* (a general term takes on the limitations in the meanings of the specific items in a descriptive list) the term "affiliates" should be interpreted with a meaning consistent with the other items in the list, *i.e.*, a part of the same corporate family.

22.    These two principles of interpretation do not rely on any extrinsic evidence and are simply a way of looking at the context of the term or phrase in question within the four corners of the September Agreements themselves.  Thus, there is no distinction between looking to the context of the words—which, as noted above, is appropriate—and applying these canons of construction.  For this reason, courts have applied these canons of interpretation to determine the unambiguous meaning of both statutes and contracts.  *See Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 341 (1998) (affirming grant of defendant bank's partial summary judgment because provision of rental agreement permitting a gem dealer to store "valuable papers" in the box excluded cash, currency, or legal tender, relying on "[t]he principle of ejusdem generis (of the same kind) [which] instructs that 'valuable papers' in this context should be given a limited interpretation"); *Holy Angels Acad. v. Hartford Ins. Grp.*, 127 Misc. 2d 1024, 1025-26, 487 N.Y.S.2d 1005, 1006-07 (Sup. Ct. Erie County 1985) (granting insured's motion for summary judgment that it was entitled to policy coverage and rejecting defendant's contention that the contract's exclusions for "earth movement," "settling," or "cracking" precluded coverage for

damage caused by nearby construction because "these words must be read in context with those that surround them (*ejusdem generis*) and, therefore, are limited in application to natural phenomena"); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486-87 (2006) (applying the principle that "a word is known by the company it keeps" in determining unambiguous meaning of a statute) (citations omitted); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (same).

23.    In response, the Funds argue that these contextual rules of interpretation do not apply here because the plain meaning of the word "affiliate" is already apparent from the dictionary definition.[5] As discussed above, it is far from apparent from the dictionary definitions that "affiliate" includes Funds advised by or receiving trustee account services from an entity.

---

[5]    Notably, none of the cases cited by the Funds support the proposition that *ejusdem generis* and *noscitur a sociis* may not be used to determine the meaning of an unambiguous term. For example, *City of New York v. Permanent Mission of India to United Nations* rejected a particular application of *ejusdem generis*, but said nothing about the general applicability of that principle to an unambiguous term.  618 F.3d 172, 180-84 (2d Cir. 2010).  At issue in that case was the meaning of the term "benefit" in the Foreign Missions Act.  *Id.*  The Act specifically defined that term via a list of seven examples followed by the phrase "such other benefits as the Secretary may designate."  *Id.* at 180.  While the plaintiff acknowledged that the first part of the definition was "illustrative rather than exhaustive," it nevertheless urged the court to apply *ejusdem generis* to restrict the scope of the term "other benefits" to conform with the preceding examples.  *Id.* at 183.  The court rejected this application, finding that the context of the statute as a whole made clear that Congress intended to leave the final phrase of the definition—"other benefits"—purposefully broad as a catch-all.  *Id.* at 184 ("[W]e are especially reluctant to use the principle of *ejusdem generis* to narrow the interpretation of 'benefit' under the FMA.  For doing so would risk reading judicial limits into a term Congress seems deliberately to have sought to leave open-ended . . . .").  By contrast, "affiliates" is part of an exhaustive, rather than illustrative list, and the Funds have not pointed to anything in the context of the September Guaranty that indicates the term "affiliates" was deliberately left open-ended.

    In addition, the Funds cite to *La Salle Bank National Ass'n v. CIBC Inc.*, which refused to apply *noscitur a sociis* to create an ambiguity in the face of the term's already plain and clear meaning.  No. 08-Civ-8426 (WHP), 2011 WL 4943341, at *4 (S.D.N.Y. Oct. 17, 2011).  But *La Salle* and the cases upon which it relies stand only for the unsurprising proposition that a party may not use *noscitur a sociis* to contradict the otherwise plain meaning of a term.  *Id.*  Nowhere does the court in *La Salle Bank* hold that *noscitur a sociis* may never be used to aid in determining the plain meaning of a term.

Moreover, as noted above, courts have held that it is appropriate to look at these rules of interpretation to determine the plain meaning of a contractual term in the context of a contract. *See, e.g.*, *In re Motors Liquidation Co.*, 447 B.R. 142, 148-49 (Bankr. S.D.N.Y. 2011) (granting debtor's motion for a determination that it was not responsible for coverage under a contract covering "accidents or incidents" where claimant's construction of the word "incidents" was "violative of noscitur a sociis" because the doctrine required that the meaning of "accidents" and "incidents" "be conceptually related").

24.    Thus, the term "affiliates" must be interpreted in accordance with the "company it keeps," especially the term "subsidiaries" which, as noted in the Objection, is part of the corporate family and shares a close financial relationship marked by controlling ownership, common economic risk of loss, and often consolidated financial reporting.  Objection ¶¶ 53, 58.[6]

### E.    The Funds' Interpretation Should Be Rejected Because It Leads to Absurd Results

25.    The Funds' definition of "affiliate" should also be rejected in the context of the September Agreements because it would lead to absurd results.  It is inconceivable that the parties to the September Agreements expected that LBHI was providing a guaranty against the losses of all of the thousands of entities that had contracted with JPMorgan for discretionary investment advice or other managerial services.  Moreover, including the Funds as "affiliates" of JPMorgan Bank would result in JPMorgan's customers holding in excess of $80 million of subordinated debt to be paid ahead of senior debt holders in violation of the specific terms of the actual indenture.

---

[6] The Funds assert that consolidated financial reporting is meaningless to the inquiry. Response ¶ 51, n. 14.  Objectors, however, reference consolidated financial reporting not as a technical matter, but because it is common among corporate families and reflects the shared profits and losses that corporate families bear through common ownership.

26.    Under New York law, "[a] court may not adopt a reading of a contract that would 'produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'"  *Diamond Glass Co., Inc. v. Twin City Fire Ins. Cos.*, 06-CV-13105 (BSJ) (AJP), 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008) (quoting *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003)) (granting defendant's motion to dismiss in part because the plaintiff's interpretation of the contract at issue would yield an absurd result); *see also Saffire Corp. v. Newkidco, LLC*, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003) (explaining that "[u]nder traditional contract interpretation rules, a provision may not be interpreted in a manner which would render it an absurdity," and holding that a payment default under a contract was the equivalent of a termination sufficient to trigger an early termination clause and that any other reading of the early termination clause would lead to absurd results). This rule of construction is used by courts in ruling on a motion to dismiss.  *See Diamond Glass Co.*, 2008 WL 4613170, at *4-5; *Towl v. Estate of Block*, 145 Misc. 2d 433, 435, 546 N.Y.S.2d 924, 925 (Sup. Ct. Erie County 1989) (granting motion to dismiss and explaining that "[t]o begin our analysis, we note that the words of a contract should be given their ordinary meaning (so long as nothing in the contract suggests a different meaning), and no unreasonable or absurd results should result from the interpretation"); *see also, e.g.*, *Tex. Instruments, Inc. v. Hyundai Elecs. Indus. Co., Ltd.*, 42 F. Supp. 2d 660, 675 (E.D. Tex. 1999) (applying New York law to grant summary judgment and noting that "[a]lthough this Court must disregard extrinsic evidence during its interpretation of the License Agreement, it may not simply turn a blind eye to the logical implications of the interpretation it makes").

27.    The Funds' interpretation of JPMorgan Bank's "affiliates" as including entities that receive trustee account management services or investment advisory services, through a

16

contractual service arrangement, from an affiliate of JPMorgan Bank would lead exactly to those absurd results. Response ¶¶ 20-24; *id.* ¶ 23 (arguing that the Advised Funds are affiliates of JPMorgan Bank because "an affiliate of JPMorgan Bank is appointed investment adviser with unlimited discretionary trading authority and sole responsibility for all trading operations of such Funds"). After all, various subsidiaries of JPMorgan provide investment advising services for thousands of clients. As stated in the Objection, one JPMorgan entity alone—JPMorgan Investment Management, Inc.—provided discretionary asset management services to thousands of accounts totaling more than $600 trillion of discretionary assets as of December 31, 2010. Objection ¶ 85.

28.    Indeed, as noted in the Objection, the absurd results that arise from the application of the Funds' definition of "affiliates" may best be exemplified by proofs of claim filed by certain of the Funds on account of subordinated notes issued by LBHI. *Id.* ¶ 36. The plain terms of the indentures covering the LBHI subordinated notes make explicit that senior debt holders are to be paid in full prior to any payment on account of subordinated debt. However, the Funds filed proofs of claim alleging that their subordinated notes, which are in excess of $80 million, issued pursuant to those same indentures, are secured under the September Guaranty. While this result is consistent with the position asserted by the Funds that they are "affiliates" under the September Guaranty, the absurdity of finding that some subordinated note holders are now secured and entitled to payment in full, not only when other holders of the same notes under the same indentures are not paid at all, and when the senior debt holders are not paid in full, is clearly evident.

29.    Thus, it is clear from dictionary definitions, the purpose of these contracts, the other words in the contracts, and rules of construction that must be used before resorting to

extrinsic evidence, that "affiliates" does not cover losses to investors in the Funds.  The Funds'

claim has not asserted any true affiliate relationship.   The Funds are not in the JPMorgan

corporate family, are not controlled by JPMorgan entities in terms of ownership or

shareholdings, and do not have any relationship like parents, subsidiaries, or assigns.  Instead

they are related to JPMorgan through contractual service, or trustee account management, neither

of which make them affiliates of JPMorgan Bank.

## II.     The Funds Do Not Meet Their Own Definition of an Affiliate

30.     Even putting aside the question of whether the Funds have proposed an

interpretation with any support in the contract or law, their claim should be rejected because the

Funds have not alleged facts making them an affiliate of JPMorgan Bank even under their own

interpretation.

### A.     The Trust Advised Funds Cannot Be Affiliates Under Even the Funds' Proposed Interpretation Because They Are Not Corporations

31.     The Trust-Organized Funds cannot be affiliates under even the Funds' purported

interpretation of that term for the additional reason that they are not corporations, or indeed any

type of corporate entity that is considered an affiliate of another corporate entity.  According to

Black's Law Dictionary, an affiliate is "[a] corporation that is related to another corporation by

shareholding or other means of control; a subsidiary, parent, or sibling corporation."  *Black's*

*Law Dictionary* 67 (9th ed. 2009).  As described in the Objection, common law trusts are not

corporations.  Instead trusts are fiduciary relationships where an independent person or entity

cares for the assets of another person or entity.  Objection ¶¶ 78-79.  Specifically, in the case of

the Trust-Organized Funds, they are merely "devices . . . by which a bank commingles the assets

of individual trusts and invests those assets collectively," *i.e.*, accounts used to combine assets of

individual trusts that JPMorgan already manages as fiduciary for its clients' accounts.  Objection

18

¶ 79 (quoting *Inv. Co. Inst. v. Conover*, 790 F.2d 925, 928 (D.C. Cir. 1986)).  To say that the Trust-Organized Funds are affiliates of JPMorgan Bank is akin to saying an account can be a corporate affiliate of a bank—and that Lehman guaranteed all losses to any accounts managed at JPMorgan Bank—a result that is clearly incorrect.

32.     The Funds cite to cases supposedly holding that limited partnerships, joint ventures, and ERISA plans were held to be affiliates in certain circumstances.  But none support the contention that a trust is considered an affiliate of the entity that serves as its trustee. Response ¶ 19 n.8.  Specifically, the Funds cite to *Texas Molecular Ltd. Partnership v. American International Specialty Lines Ins. Co.*, 424 F. App'x 354 (5th Cir. 2011), for the proposition that entities not strictly called "corporations"—here a limited partnership—can be affiliates, too. Response ¶ 19 n.8.  However, in *Texas Molecular*, the Fifth Circuit noted that "the plaintiffs failed to argue to the district court that the entities were not affiliates," and that "[a]rguments not made before the district court are waived and will not be considered on appeal." *Tex. Molecular*, 424 F. App'x at 357.  Moreover, *Texas Molecular* was decided under Texas law, where, "[f]or most purposes a partnership is a legal entity separate from its partners," and thus satisfies Black's Law Dictionary's definition of corporation.  *ISO Prod. Mgmt. 1982, Ltd. v. M & L Oil & Gas Exploration, Inc.*, 768 S.W.2d 354, 355 (Tex. App. 1989); Objection ¶ 78 (citing Black's Law Dictionary's definition of "corporation" as "an entity (usu. a business) having authority under law to act as a single person distinct from the shareholders who own it and having rights to issue stock and exist indefinitely; a group or succession of persons established in accordance with legal rules into a legal or juristic person that has a legal personality distinct from the natural persons who make it up, exists indefinitely apart from them, and has the legal powers that its constitution gives it.").  In contrast a common-law trust is simply a legal relationship regarding

property, "charging the person with title to the property with equitable duties to deal with it for another's benefit."  Objection ¶ 79 (quoting Black's Law Dictionary's definition of "trust").

33.    The Funds' other two cited cases are also unavailing.  First, in *Harkins v. CA 14th Investors, Ltd.*, 544 S.E.2d 744 (Ga. Ct. App. 2001), contrary to the Funds' assertion, a joint venture was <u>*not*</u> held to be an affiliate and was in fact had been dismissed from the case because it was not a legal entity.  *Id.* at 745 ("In fact, under Georgia law, a joint venture is not a distinct legal entity separate and apart from the parties composing it.") (citation omitted).  Finally, in *In re Motorola Securities Litigation*, the Seventh Circuit applied the securities-law definition of "affiliate."  644 F.3d 511, 519 (7th Cir. 2011) (noting that its analysis of the term "affiliate" was based "[o]n this securities-law understanding of 'affiliate' and the concept of 'control'").  The securities law definition of "affiliate," is not limited to "corporations," but applies to any "person."  *See e.g.*, 17 C.F.R. § 230.144(a)(1) (2009).  As described *supra* note 1, the meaning of "affiliate" in the securities context does not apply to the plain language definition in this contract and indeed was made broader to achieve the conduct-regulating goals of Congress and federal regulators.

34.    Notably, the Funds fail to point to any case holding that a trust is an affiliate of its trustee, or that a trust is considered a corporate entity at all.  On the contrary, as described in the Objection, the District Court for the Northern District of Illinois applied the Black's Law dictionary definition of "affiliate" to hold a trust *cannot* be an affiliate precisely because it was not a corporation.  Objection ¶ 78 (citing *Chillmark Partners, LLC v. MTS, Inc.*, No. 02 C 5339, 2003 WL 1964408 at *4 (N.D. Ill. Apr. 25, 2003) ("[A]ffiliates are *corporations* that are related to other corporations.  The trust and individual Defendants are not corporations.") (emphasis in

original)).  The Funds thus have no basis to extend a guaranty that was in favor of JPMorgan

Bank's affiliates to losses born by accounts for which it served as trustee.

### B.    The Advised Funds Are Not Controlled by Any JPMorgan Entity According to the Funds' Own Documents Relied on in Support of the Objection

35.    The Advised Funds also fail to meet even the Funds' own purported interpretation

of the dictionary definition of "affiliate," because a JPMorgan entity in fact does not "control"

the Funds.

36.    In asserting that the Advised Funds are affiliates of JPMorgan Bank, the Funds

rely solely on investment advisory agreements between the relevant JPMorgan entity acting as

investment advisor and the Advised Funds.  Response ¶ 23.  However, those agreements, on their

face, show that the investment advisor does not control the Advised Funds, and their only

relationship is as agent or independent contractor for the limited purposes of investment advisory

services.  The Court may consider the Investment Advisory Agreements at this stage because

they are integral to the Funds' claim, as the Funds rely solely on those agreements for their

assertion that the so-called Advised Funds are "affiliates" of JPMorgan Bank.  *See* Response

¶ 23; *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 748

(S.D.N.Y. 2008) ("In deciding a motion to dismiss, th[e] court may consider the full text of

documents that are quoted in the complaint or documents that the plaintiff either possessed or

knew about and relied upon in bringing the suit."); *see also, e.g., Karmilowicz v. Hartford Fin.*

*Servs. Grp.*, No. 11 CIV 539 (CM) (DCF), 2011 WL 2936013, at *5 (S.D.N.Y. July 14, 2011)

(granting defendant's motion to dismiss and explaining that "in deciding a motion to dismiss,

[the] Court may consider the full text of documents . . . that the plaintiff either possessed or knew

about and relied upon in bringing the suit.").

21

37.    First, the Funds selectively (and misleadingly) quote from the JPM Fixed Income Management Agreement, saying that "[t]he Investment Advisor shall . . . be solely responsible for all trading operations of the Fund . . . ."  Response ¶ 23.  Yet, the Funds entirely omit a key part of that provision, which provides that "[t]he Investment Advisor shall, *subject to the policies and control of the Board of Directors of the Fund* . . . , be solely responsible for all trading operations of the Fund . . . ."  JPM Fixed Income Management Agreement, attached as Exhibit G to the Objection, at § 2 (emphasis added to indicate omitted phrase).  Thus, the Investment Advisor does not control the Funds—the Board of Directors does.

38.    Moreover, as quoted by the Funds, the JPM Fixed Income Management Agreement provides that "the Fund . . . hereby appoints the Investment Advisor as its *agent* and *attorney-in-fact* to act as investment adviser with unlimited discretionary trading authorization . . . .").  Response ¶ 23 (quoting JPM Fixed Income Management Agreement) (emphasis added).  Under New York law,[7] an agent is controlled by its principal with respect to the matters entrusted to the agent.  *See e.g., William Stevens, Ltd. v. Kings Vill. Corp.*, 234 A.D.2d 287, 288, 650 N.Y.S.2d 307, 308 (2d Dep't 1996) ("The basic tenet of a principal-agent relationship is that the principal retains control over the conduct of the agent with respect to matters entrusted to the agent, and the agent acts in accordance with the direction and control of the principal."); *Semmler v. Naples*, 166 A.D.2d 751, 752, 563 N.Y.S.2d 116 (3d Dep't 1990) ("The relationship of an attorney-in-fact to his principal is that of agent and principal.").  Thus, contrary to the Funds' assertion (Response ¶ 24), for the purpose of investment authority, the Fund, as principal, controls the activities of the investment advisor -- not the other way around.  This is further

---

[7]    The agreement explicitly provides that New York law applies.  *See* JPM Fixed Income Management Agreement, at § 21.

supported by the fact that, as noted in the Objection, the agreement also explicitly provides that the "investment adviser shall, for all purposes of this Agreement, be deemed an _independent contractor_ . . . and, except as otherwise expressly provided herein, shall have no authority to act for or to represent the Fund . . . ."  Objection ¶ 67, n.20 (citing JPM Fixed Income Management Agreement, at § 11) (emphasis added).

39.    Thus, the Funds' sole argument with respect to the Advised Funds is directly contradicted by the very agreement upon which they rely in support of their claim.  The Funds have made no other argument that the Advised Funds are "affiliates" of JPMorgan Bank, nor could they.  Thus their claims do not assert any plausible basis for relief and simply cannot survive as a matter of law.  _See, e.g._, _In re DJK Residential LLC_, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) (dismissing proofs of claim under a motion to dismiss standard and noting that "[t]he Claimant must assert enough facts to state a claim to relief that is plausible on its face") (citations omitted).

C.    **The Funds Also Fail to Even Assert a Direct Relationship Between JPMorgan Bank and the Advised Funds**

40.    Finally, the Funds fail to assert facts that would support an affiliate relationship for the so-called Advised Funds even under their own definition, because there is no direct relationship between the Advised Funds and JPMorgan Bank.  _See THI of N.M._, 2012 WL 112216, at *13.  Importantly, the September Agreements only apply to affiliates of JPMorgan Chase Bank, N.A.  _See, e.g._, September Guaranty at 1 ("Guaranty . . . in favor of JPMORGAN CHASE BANK, N.A., and its affiliates, subsidiaries, successors and assigns (. . . collectively and individually as the context may require, the 'Bank'")).  Thus, the Funds must be affiliates specifically of JPMorgan Chase Bank N.A.—not just any JPMorgan Chase & Co. subsidiary.

23

41.    Nowhere do the Funds allege, nor can they, that JPMorgan Bank itself has any direct "control" relationship with the Advised Funds.[8]  Instead, the Funds only allege that "an *affiliate* of JPMorgan Bank is appointed investment adviser . . . ."  Response ¶ 23 (emphasis added).  However, the Funds never explain how these investment advisory agreements create any relationship or affiliation between JPMorgan Bank and the Advised Funds.

42.    Thus, even accepting the Funds' far-reaching interpretation of affiliate and construing all alleged facts in favor of the Funds, the Advised Funds have no direct relationship whatsoever with JPMorgan Bank itself, as is required by any interpretation of the September Agreements.  This is not just a technicality.  This fact demonstrates just how distant the claimed losses are from JPMorgan Bank.  In order to justify a supposed "affiliate" relationship, the Funds must argue that the parties intended to extend a guaranty to JPMorgan Bank in order to protect against losses to customers in Funds advised by certain affiliates of JPMorgan Bank.  No interpretation of "affiliates" can reasonably and in good faith stretch so far under any definition of the word.

43.    Thus, the Funds' claims against LBHI as purported guarantor under the September Guaranty should be dismissed because they have failed to allege facts that would render their customer losses fully secured by the September Guaranty and September Security Agreement.  For the foregoing reasons, no discovery is needed to make this determination.  Nonetheless, the

---

[8]    Exhibit 21.1 to JPMorgan's 2008 10K (referenced in the Objection) shows that the Funds are simply wrong when they assert that J.P. Morgan Investment Management Inc. ("JPMIM")—one of the contractual service providers to the Funds—is a wholly owned subsidiary of JPMorgan Bank.  Response ¶ 51.  JPMIM is a wholly-owned subsidiary of JPMorgan Asset Management Holdings Inc., which is a wholly-owned subsidiary of JPMorgan Chase & Co.  Thus JPMIM is a sibling of JPMorgan Bank.

Objectors submit that discovery would only serve to confirm what is obvious from the contract –

that investment fund customers are not affiliates under the September Agreements.

[*Remainder of Page Intentionally Left Blank*]

## Conclusion

**WHEREFORE**, the Objectors respectfully request that the Court enter an Order granting

their claim objection in full.


Dated:  January 23, 2011
       New York, New York

                                        **QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP**
                                        By:  ____/s/ John B. Quinn_____
                                        John B. Quinn
                                        Erica Taggart
                                        Matthew Scheck
                                        865 South Figueroa Street, 10th Floor
                                        Los Angeles, California 90017-2543
                                        (213) 443-3000

                                        Susheel Kirpalani
                                        Andrew J. Rossman
                                        James Tecce
                                        51 Madison Avenue, 22nd Floor
                                        New York, New York 10010-1601
                                        (212) 849-7000
                                        *Counsel for the Official Committee of
                                        Unsecured Creditors of Lehman Brothers
                                        Holdings Inc.*

                                        **CURTIS, MALLET-PREVOST,
                                        COLT & MOSLE LLP**

                                        By:  ____/s/ Joseph D. Pizzurro_____
                                        Joseph D. Pizzurro
                                        L.P. Harrison 3rd
                                        Michael J. Moscato
                                        Nancy E. Delaney
                                        Peter J. Behmke
                                        Cindi Eilbott Giglio
                                        101 Park Avenue
                                        New York, New York 10178-0061
                                        (212) 696-6000

                                        *Counsel for Debtor Lehman Brothers
                                        Holdings Inc*