Hearing Date and Time: **January 26, 2012 at 10:00 a.m.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re                                                                      :   Chapter 11 Case No.
                                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :   08-13555 (JMP)
                                                                               :
                          Debtors.                                :   (Jointly Administered)
                                                                               :
---------------------------------------------------------------x

**REPLY TO OBJECTIONS OF U.S. BANK NATIONAL
ASSOCIATION, CITIBANK, N.A., AND WILMINGTON TRUST
COMPANY TO MOTION PURSUANT TO SECTION 8.4 OF THE
MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN
BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND
SECTIONS 105(a), 502(c) AND 1142(b) OF THE BANKRUPTCY CODE
TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE
TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE-
BACKED SECURITIES FOR PURPOSES OF ESTABLISHING RESERVES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Structured Assets Securities Corporation ("SASCO"), as debtors and debtors in possession, file this reply (the "Reply") to the objections (the "Objections") filed by U.S. Bank National Association, Citibank, N.A, and Wilmington Trust Company (the "Trustees") on January 20, 2012, ECF Nos. 24491, 24484 and 24485 to the *Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and Sections 105(a), 502(c)*

*and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities for Purposes of Establishing Reserves*, filed on January 11, 2012, ECF No. 24254 (the "Motion").[1]  The Debtors have withdrawn, without prejudice, the Motion as it relates to claims asserted by Wells Fargo Bank, National Association and Bank of America, N.A. and have adjourned the hearing on the Motion as it relates to the claims asserted by Deutsche Bank National Trust Company, HSBC Bank USA, N.A., and Wilmington Trust Company proofs of claim numbers 20420, 21103, 21104, 21105, 21106, 21107, 21108, 21109, 21110, 21111, 21112, 21113, 21114, 21115, 21116, 21117, 21118, 21119, 21120, 21121, 21122, 21123, 21124, 21125, 21126, 21127, 21129, 21130, 21131, 21132, 21133, 21134, 21135, 21136, and 66525, which are subject to the objection filed by Alston & Bird LLP.  The hearing on the Motion as it relates to Wilmington Trust Company's proofs of claim numbers 22766 and 22773, which are subject to the objection filed by Hinckley, Allen & Snyder LLP, has not been adjourned and are subject to this Reply.

**Preliminary Statement**

1.    The Trustees' assertion that the Court should establish a briefing schedule and hold an evidentiary hearing before estimating the amount of the Claims for reserve purposes is out of proportion to, and not necessary for the Court to grant, the relief requested in the Motion.  The Trustees' Objections are consistent with their overall approach in this case of delaying the administration of the Claims.  In the Motion, the Debtors are merely seeking an estimation of the Trustees' Claims for reserve purposes.  All that is required in these circumstances is an estimation hearing pursuant to section 502(c) of the Bankruptcy Code – not a hearing on the merits of the Claims.  The Trustees are inappropriately seeking an evidentiary

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

US_ACTIVE:\43907217\05\58399.0008      2

hearing, which is only required for a final determination of the Trustees' Claims. The relief that LBHI and SASCO have sought in the Motion will have no effect on the allowance of the Trustees' Claims, and will not prejudice the Trustees in any way. However, the effect of maintaining full reserves for the Trustees' overstated Claims will have a substantial adverse effect on the initial distributions to all other creditors of LBHI and SASCO. If the Debtors are unable to establish reasonable reserves for the Trustees' Claims, the reserves that the Debtors will be required to maintain on account of such claims will be significant, and will certainly impact the cash that is available for initial distributions to the Debtors' creditors.

2. Citibank N.A., U.S. Bank National Association and Wilmington Trust Company, generally filed proofs of claim based on the unpaid principal balance of all loans in each of their deals.[2] These amounts bear no correlation to the actual claim amounts. The Estimated Reserve Amounts set forth in the Motion are conservative estimates of the probable claims amounts. The Court has broad discretion to estimate contingent and unliquidated claims for reserve purposes and should exercise such discretion in connection with the Trustees' Claims.

**Estimation Pursuant to Section 502(c) of The Bankruptcy
Code Does Not Require Discovery or An Evidentiary Hearing**

3. By the Motion, LBHI and SASCO are not objecting to the Trustees' Claims and are not seeking a determination of their merits. LBHI and SASCO intend to continue to negotiate a consensual protocol with the Trustees and to share adequate information in order to resolve and allow the Trustees' Claims. LBHI and SASCO are merely seeking a determination that the Estimated Reserve Amounts are reasonable estimates of the amounts of the Trustees' Claims solely for establishing reserves under the Plan. "[C]ourts needn't make

---

[2] Citibank N.A., U.S. Bank National Association and Wilmington Trust Company asserted claim amounts against LBHI and SASCO totaling approximately $36,957,798,146 and by the Motion, LBHI and SASCO seek to reserve approximately $1,715,961,731.60 with respect to the Trustees' Claims.

traditional findings of fact in connection with estimation hearings; they need only decide the probability of each side's success before a traditional trier of fact." *In re Chemtura*, 448 B.R. at 640. "By reason of the nature of...any estimation procedure, there are limits on the ability of the Court to find facts. In large measure, the Court instead considers likely outcomes." *In re Adelphia Business Solutions, Inc.*, 341 B.R. at 419.

4. It is not necessary for this Court to conduct a full-blown evidentiary hearing merely to find that the Estimated Reserve Amounts are fair. This Court need not delve into underlying contracts for each of the more than 400 securitizations and more than 1 million loans in order to estimate the Trustees' Claims. Consequently, the Trustees' request for all documents that the Debtors have relating to the underlying RMBS is not a prerequisite to an estimation hearing. In fact, the document requests turn the burden of establishing a claim on its head, as the Trustees incorrectly assert that the Debtors need to disprove the claims as opposed to the Trustees supporting their Claims. The Debtors were compelled to file the Motion by the Trustees' unwillingness and inability, to date, to liquidate and support their Claims.

## The Estimated Claim Amounts Are Reasonable and Fair

5. The Court has broad discretion when estimating contingent and unliquidated claims for reserve purposes. The Debtors have proposed a methodology that results in reasonable and fair Estimated Reserve Amounts. The Debtors' chapter 11 cases are more than 3 years old, the Trustees filed their claims more than 2 years ago, and the Debtors have repeatedly requested that the Trustees justify and support their claims for more than a year. The Trustees have largely not supported their Claims due to the alleged burden and commercial difficulty of reviewing their transactions for breaches. Although the Trustees could have hired any of a number of third party vendors in the business of reviewing portfolios of loans and

identifying breaches, but elected not to do so. Finally, in the past two weeks, only after the Debtors filed the Motion, the Trustees engaged a third-party advisor to assist in the valuation of their Claims.

6. The Trustees acknowledge and accept the Debtors' methodology for calculating the Estimated Reserve Amounts, but question certain of the Debtors' assumptions. The Trustees' advisor, James Burke, proposes to calculate the Estimated Reserve Amounts using assumptions that result in higher estimated claim amounts. Mr. Burke's assumptions represent his opinion of appropriate assumptions regarding the performance of residential mortgage loans in the overall market based on general market data. However, Mr. Burke's assumptions are heavily qualified, not based on specific knowledge, and do not correlate to, the performance of the Lehman Originated Loans typically securitized by LBHI and SASCO prior to the Commencement Date. It is inappropriate to equate the default rate or breach rate of loans in the general market to the Lehman Originated Loans specifically securitized by the Debtors. In addition, the Trustees and Mr. Burke question the source or accuracy of the unpaid principal balances utilized by the Debtors in their estimates. As part of their role as trustees, the Trustees or their agents prepare periodic reports setting forth the unpaid principal balances in each of their deals and such reports were utilized by the Debtors. As evidence of the lack of effort and diligence of the Trustees to liquidate their Claims, the Trustees appear unwilling to even look at their own reports.

7. The Debtors' assumptions on the other hand, are based specifically on the Debtors' experience with the Lehman securitization programs and review and remediation of breaches of representation and warranty claims in connection with the Lehman securitized loans. Specifically, the Debtors' declarant, Mr. Trumpp, created and oversaw Aurora Loan Services,

LLC's master servicing Loss Management Department, and, since 2005, manages Lehman's on-going repurchase litigation campaign against originators who sold Lehman defective mortgage loans on the secondary market. Mr. Trumpp's data comes directly from this litigation experience as well as information provided by Aurora Loan Services, LLC which is master servicer for the vast majority of the securitizations at issue. The Trustees have equal access to information from Aurora Loan Services, LLC, Bloomberg and Intex and could have obtained the same key estimation metrics at any time.

   8. The following assumptions made by Mr. Burke's differ from the Debtors' assumptions, and are inappropriate for the following reasons:

  a. *50% default rate.* Mr. Burke notes that the current outstanding default rate on all residential mortgage loans is 32.4%. The default rate on the loans included in the securitizations subject to the Claims is less than 35%. The Debtors used a conservative 45% default rate in the calculation of the Estimated Reserve Amounts. Mr. Burke's estimate of 50% is based estimated default rates for loans originated by subprime issuers, which may be higher than default rate on Lehman-Originated Loans.

  b. *68.3% Severity Rate.* Mr. Burke concedes that he does not have sufficient data to estimate a severity factor for the particular loans in the securitizations subject to the Claims. The 55% severity rate used by the Debtors is above the severity rates for the actual loans in the securitizations subject to the Claims. The Debtor's severity rate was developed based on information provided directly by Aurora Loan Services, LLC. The Trustees have access to this same information.

  c. *70% Transferor-Originated Loan Rate.* The Trustees incorrectly believe that the Debtors assumed that each securitization is made up of 70% Transferor-Originated Loans for which the Debtors have no liability. However, the Debtors reviewed each securitization and determined the actual percentage of the loans in each securitization that are Transferor-Originated Loans and accounted for such percentage in the calculation of the Estimated Reserve Amount for each deal. Only for 19 deals for which the Debtors were unable to determine the percentage of Transferor-Originated Loans did the Debtors estimate that 70% of the loans are Transferor-Originated Loans. For most of the almost 400 deals, the Transferor-Originated Loans is not an assumption or estimation but a matter of fact.

  d. *70% Breach Rate.* Debtors' estimated breach rate is based on their extensive experience reviewing loans and identifying breaches. The declarant was

   responsible for managing a department that reviewed nearly 30,000 loans in Lehman securitizations.

  e. *100% Validation Rate*. The Trustees' rejection of the Debtors' proposed validation rate misunderstands the governing agreements and ignores the reality of litigation.  The governing agreements provide the trusts a remedy not only where they identify a breach, but where, in addition, they give prompt notice of the breach to the seller, and the breach materially and adversely impairs the value of the mortgage loan.  These contractual elements of liability must have independent meaning and cannot be conflated into a finding of breach alone, as the Trustees' methodology suggests.  Further, the Debtors' repurchase litigation experience reveals that even where all elements of repurchase liability are present and pleaded, defendants nevertheless mount defenses.  Other settlements of similar claims in the industry have included similar provisions to the Debtors' validation rate.

  9. Mr. Burke does not challenge the allocation of liability as between LBHI and SASCO of 95%/5%.  Such concession reflects agreement that the Claims are largely duplicative.

  10. The Debtors' methodology for estimating claims results in a claim amount that is approximately 11 times greater than the actual number of breaches identified by the Trustees in this case to date.

  11. Despite the Trustees' contentions, the Debtors estimate of RMBS claims that will ultimately be allowed has not varied from the estimates included in the Debtors' Disclosure Statement.  The approximately $10 billion estimate of allowed amount of RMBS claims in the Disclosure Statement relates to various claims in addition to the Trustees' Claims subject to the Motion, including, among other claims, approximately $19 billion of claims asserted by Fannie Mae, which have been reserved for at $5 billion, and the claims asserted by Freddie Mac in the amount of approximately $847 million.

**The Trustees Will Not be Harmed by the Estimation of The Claims**

12. When estimating the amount of contingent and unliquidated claims for reserve purposes the Court should consider the impact on all creditors. The Trustees have consistently asserted that they do not know the actual amount of their claims, therefore, it would be inequitable to all other creditors for the Debtors to have to reserve based on the protective and overstated claims filed by the Trustees. The Debtors have been preparing and continue to expend significant efforts in anticipation of the effective date of the Plan and an initial distribution to creditors in the first quarter of 2012. Contrary to the Trustees' statements in the Objections, the Motion cannot be delayed for 4-5 weeks. Such a delay would prevent the Debtors from considering the results of a hearing on the Motion in connection with a distribution in the anticipated time frame. With more than 67,000 filed claims, preparing the distribution model and related administrative mechanics of such a large distribution cannot be completed or modified overnight. Given the Trustees' deliberate pace throughout this case in determining the amount of their claims, it would be irrational to expect that the Debtors would be able to finally settle the allowed amount of the Trustees' Claims prior to the initial distribution.

13. Estimating the Trustees' Claims at the Estimated Reserve Amounts will not harm the Trustees or the investors in the RMBS that underlie the Trustees' Claims. If the Trustees' Claims are ultimately allowed in amounts in excess of the Estimated Reserve Amounts, the Plan provides that the Debtors will make catch-up payments on such claims. As described in the Debtors' Disclosure Statement, many of LBHI's assets are illiquid, and it is estimated that the final disposition of LBHI's assets will take years. Exhibit 7 of the Disclosure Statement sets forth LBHI's estimated cash flows through 2014. The Debtors estimate that LBHI will collect approximately $3 billion of assets in 2013 and 2014. This estimate makes it clear that LBHI will

have ample assets to make catch-up payments, if any, on the Claims if they are determined in the next two years. Such delayed monetization of LBHI's assets provides the Debtors and the Trustees with sufficient time to resolve the Claims in full.

### Conclusion

14. As this Court is aware, the Debtors are generally willing and able to reach consensual resolutions with their creditors with respect to difficult issues. The Debtors have been able to settle many of the largest claims asserted against them and to stipulate to substantially reduced reserves with respect to more than approximately $35 billion of claims thus far, including the RMBS claims asserted by Fannie Mae. These creditors recognize that they will not be disadvantaged, and see no need to litigate the issue before this Court. Unfortunately, the Trustees do not recognize this fact, and worse still, the Trustees have asserted some of the largest disputed claims in these cases, and have been unwilling, or unable, to liquidate and support their Claims. Absent the relief sought in the Motion, the incremental impact of maintaining reserves for the Trustees' Claims (and the disputed claims of other creditors) will diminish initial distributions to the Debtors creditors, and unfairly prejudice all of them. Particularly given the probability that LBHI and SASCO will not need such large reserves for the Trustees' Claims, their thousands of creditors should not be penalized now, merely because the Trustees insist on the maintenance of inordinately high reserves for their Claims.

15. The Debtors believe the actual amount of the Trustees' Claims to significantly less than the Estimated Reserve Amounts. The Estimated Reserve Amounts are

conservative estimates and provide for more than adequate reserves for the Claims.

WHEREFORE the Debtors respectfully request that the Court (i) overrule the Objections and (ii) grant the relief requested in the Motion and such other and further relief as it deems just and proper.

Dated: New York, New York
January 24, 2012

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession