Hearing Date and Time: **January 26, 2012 at 10:00 a.m.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,                      :    08-13555 (JMP)
                                                            :
                        Debtors.                            :    (Jointly Administered)
                                                            :
                                                            :
------------------------------------------------------------x
```

**REPLY TO OBJECTION TO MOTION PURSUANT TO SECTION 8.4
OF THE MODIFIED THIRD AMENDED CHAPTER 11 PLAN OF LEHMAN
BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS TO ESTIMATE
THE AMOUNT OF DISPUTED CLAIMS FILED BY LEHMAN BROTHERS
FINANCE AG (IN LIQUIDATION) FOR PURPOSES OF ESTABLISHING RESERVES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special

Financing Inc. ("LBSF"), as debtors and debtors in possession, file this reply to the objection

(the "Objection") filed by LBF[1] on January 19, 2012, ECF No. 24421 to the *Motion Pursuant To*

*Section 8.4 of The Modified Third Amended Chapter 11 Plan of Lehman Brothers Holdings Inc.*

*And Its Affiliated Debtors To Estimate The Amount of Disputed Claims Filed By Lehman*

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

*Brothers Finance AG (In Liquidation) For Purposes of Establishing Reserves*, filed on January 11, 2012, ECF No. 24253 (the "Motion").

### Preliminary Statement

1. LBF's allegation that this Court lacks the authority to enforce section 8.4 of the Plan is hopelessly without merit.  Section 8.4 of the Plan clearly grants this court authority to determine the proper amounts that the Debtors should reserve in respect of Disputed Claims, as defined in the Plan, and permits the Court to make this determination pursuant to the relevant provisions of the Bankruptcy Code and Bankruptcy Rules.  Provisions such as Section 8.4 of the Plan are commonplace in this and other districts, and courts routinely enforce them.  LBF's alternative argument, demanding a full-blown evidentiary hearing and discovery, is out of all proportion.  The Debtors are merely seeking an estimation of the LBF Claims for reserve purposes.  All that is required in these circumstances is an estimation hearing pursuant to section 502(c) of the Bankruptcy Code – not a hearing on the merits of the LBF Claims.  The relief that LBHI and LBSF have sought in the Motion will have no effect on the allowance of the LBF Claims, and will not prejudice LBF in any way.  However, the effect of maintaining full reserves for all Disputed Claims under the Plan, including the LBF Claims, will be substantial on other creditors.

2. To date, the Debtors have made every effort to reach agreements with their creditors on reserve amounts that are reasonable in the circumstances.  The Debtors have entered into stipulations with respect to some of the largest priority claims asserted in these cases, by the United States Internal Revenue Service and Fannie Mae, which resulted in a total reduction of $28.4 billion in reserves, and substantially increased the initial distributions that

they will be able to make to creditors with Allowed Claims (as defined in the Plan) in the coming months.

3. The LBF Claims are among the largest Disputed Claims that have been asserted against the Debtors. The LBF Holdings Claim represents more than 20% of the difference between the asserted amounts of Disputed Claims against LBHI and the amounts that the Debtors estimate will ultimately be allowed with respect to such Disputed Claims against LBHI. To the extent that the Debtors cannot agree on appropriate reserves with their creditors, including LBF, it is critical that the Debtors be able to avail themselves of the provisions of the Plan that allow them to seek estimation of Disputed Claims for reserve purposes.

4. The Debtors have been in discussions with LBF for more than two years. They have proposed multiple settlement structures to LBF, all of which have been rejected. The discussions have been fruitless to date – and yet the Debtors have settled with virtually every other foreign administrator. To LBHI's knowledge, LBF has settled with none. The Debtors declined LBF's proposal for mediation over reserves because mediation will take too long and unnecessarily complicate the issue. The Debtors have nevertheless attempted to reach an agreement with LBF on reserves. In fact, the Debtors had previously advised LBF that they would file a motion to be heard on January 26, 2012 if a consensual reserve could not be established. All efforts to move forward on a consensual basis have been unsuccessful. For this reason, the Debtors have filed this Motion. If the Debtors are unable to establish reasonable reserves for Disputed Claims pursuant to section 8.4 of the Plan, incrementally, the reserves that the Debtors will be required to maintain on account of these Disputed Claims will significant, and will certainly impact the cash that is available for initial distributions to the Debtors' creditors.

**This Court Has The Authority To Determine Reserve Amounts
Pursuant to Section 8.4 of The Plan By Means of An Estimation Hearing**

5.  Section 8.4 plainly permits this court to determine the amount of cash that LBHI should be required to reserve for the LBF Claims. Such a determination must be made "to the extent permitted by the Bankruptcy Code and Bankruptcy Rules," *i.e.*, the Court must make its determination by estimating the claims for reserve purposes pursuant to section 502(c) of the Bankruptcy Code. Courts in this district and others routinely estimate disputed claims pursuant to section 502(c) of the Bankruptcy Code, when a debtor's confirmed plan provides for the estimation of disputed claims. *See*, *e.g.*, *In re Chemtura Corp.*, 448 B.R. 635, 648-49 (Bankr. S.D.N.Y. 2011) (estimating claims for reserve purposes "in accordance with a provision in the Debtors' Plan of Reorganization" and pursuant to section 502(c)); *In re Enron Corp.*, 2006 WL 544463 (Bankr. S.D.N.Y. 2006) (estimating disputed claims for reserve purposes where plan provision "authorizes the Court to estimate claims pursuant to § 502(c)); *JPMorgan Chase Bank v. U.S. Nat'l Bank Assoc'n (In re Oakwood Homes Corp.)*, 329 B.R. 19 (D. Del. 2005) (holding that Bankruptcy Court's decision to set reserve at $0 for a disputed claim pursuant to a provision of the plan "was not erroneous"); *In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 724 (Bankr. E.D. Ky. 2004) (applying estimation under § 502(c) to disputed claims pursuant to provision of the plan).

6.  In each of the cases cited above, a plan provision authorizes the estimation of disputed claims, and directs the Bankruptcy Court to section 502(c) and the case-law thereunder to set the parameters of the court's estimation process and methods. Such is the case here. As the court in *Chemtura* states, "Claims estimation under Section 502(c)(1)…can be used for a variety of purposes, including…setting claim distribution reserves." *In re Chemtura*, 448 B.R. at 649. The purpose of estimation in this context is "to permit distributions to creditors and

other stakeholders with undisputed claims and interests, to avoid prejudice to them resulting from having to wait for distributions that otherwise could be materially delayed by residual litigation on the disputed claims…" *Id.* at 649 n. 45.

7.  Rather than read the clause "to the extent provided by the Bankruptcy Code and Bankruptcy Rules" as qualifying the sentence in which it appears, LBF argues that section 8.4 of the Plan has been drafted to irreducibly contradict itself. This is an erroneous interpretation of section 8.4 of the Plan. LBF ignores the fact that when courts in this and other districts estimate disputed claims pursuant to similar plan provisions, they do so pursuant to section 502(c) of the Bankruptcy Code. It is also not unprecedented to include a reference to section 502 in the plan provision itself. *See In re Enron Corp*, 2006 WL 544463 at \*2 (authorizing the court to estimate disputed claims in "the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code"). Rather than reading section 502(c) to produce the nonsensical reading proposed by LBF, these courts look to section 502(c) for guidance on how to apply the relevant plan provision. *See Id.* at \*3 – 4 (determining the method for estimating disputed claims based on the purpose of 502(c) and citing *O'Neill v. Continental Airlines, Inc. (In re Continental Airlines)*, 981 F. 2d 1450 (5th Cir. 1993)); *In re Chemtura*, 448 B.R. at 648-51 (discussing relevant case-law on approaches to estimation). Section 8.4 of the Plan is no different from other plan provisions that permit the estimation of disputed claims for reserve purposes. Like the relevant provision in the plan discussed by *Wallace's Bookstores*, the effect of section 8.4 of the Plan is that it "expands on § 502(c), expressly providing for the estimation of 'Disputed Claims.'" *See In re Wallace's Bookstores, Inc.*, 317 B.R. at 724.[2]

---

[2] LBF had adequate notice of section 8.4 of the Plan, as well as the Plan's definition of Disputed Claims, and did not object to either. It is well settled that "[w]here, as here, a part is notified of a plan's contents and fails to

8. Not one of the cases cited by LBF contradicts the cases cited above or supports LBF's reading of section 8.4 of the Plan. LBF has not cited to a single case to support the proposition that this Court may not determine the amounts that LBHI must reserve for Disputed Claims pursuant to section 8.4 of the Plan by means of an estimation hearing pursuant to section 502(c) of the Bankruptcy Code. Instead, LBF has merely quoted several courts either reciting or paraphrasing the statutory language of section 502(c), outside the context of a related plan provision. Not one of these courts was confronted with a provision similar to section 8.4 of the Plan and considered whether a determination of reserves for disputed claims could be made by estimation pursuant to section 502(c) of the Bankruptcy Code. Indeed, the cases cited by LBF are totally inapposite to the facts of this case.

- In *Continential* the Fifth Circuit vacated the Bankruptcy Court's order estimating unliquidated claims because the bankruptcy judge "should have stood recused from the case" – and on no other grounds. *See* 981 F.2d 1450, 1461.[3]

- Before the Fifth Circuit in *Ford* was the fact-specific question of whether or not the debtor's joint and several liability as co-maker of a note constituted a "contingent" claim within the meaning of section 502(c)(1). *See In re Ford*, 967 F.2d 1047 (5th Cir. 1992). LBHI has not asked the Court to determine that the LBF Claims are contingent.

- In *In re Audre Inc*, the debtors argued that a claim was unliquidated because the judgment giving rise to the claim was on appeal. The court disagreed, and on those grounds, declined to estimate the claim pursuant to section 502(c). *See Audre, Inc. v. Casey (In re Audrey, Inc.)*, 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997). LBHI has not asked the Court to determine that the LBF Claims are unliquidated.

---

object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate." *See United Student Aid Funds, Inc. v. Espinosa*, --- U.S. ---, ---, 130 S.Ct. 1367, 1380 (2010); *see also In re Burnett*, 646 F.3d 575, 581 (8th Cir. 2011) ("a confirmed plan is given *res judicata* effect even when it violates the Code."). Having failed to object to these provisions of the Plan, pursuant to section 1141 of the Bankruptcy Code, LBF is now bound by them, and precluded from objecting to them. *See* 11 U.S.C. 1141(a).

[3] As noted above, the court in *In re Enron Corp* also cites to *Continental* when discussing the purpose of section 502(c) as it applies to a plan provision authorizing a court to estimate disputed claims for reserve purposes.

- In *Oneida Ltd. v. Pension Benefit Guar. Corp. (In re Oneida Ltd.)*, the Bankruptcy Court was asked to determine whether a termination premium on a pension plan constitutes a "claim" under the Bankrutpcy Code. No party was seeking to estimate a claim in that case – the court merely cites section 502(c) in remarking that certain claims may be contingent, and therefore "it may be necessary for the Court…to determine the probability that the contingency will occur. . .However, there can be no dispute that contingent claims are 'claims' as defined in the Bankruptcy Code." *See Oneida Ltd. v. Pension Benefit Guar. Corp. (In re Oneida Ltd.)*, 383 B.R. 29, 38 (Bankr. S.D.N.Y. 2008).

- Similarly, in *In re Keene Corp.*, the court granted a judgment creditor's request for relief from the automatic stay to permit prosecution of the debtor's appeal of the judgment. In granting the motion, the court notes that the judgment is a "fact of life" that cannot be ignored, and has been "fixed and liquidated for bankruptcy purposes" and "cannot, therefore, be liquidated or estimated." In a *footnote* to this sentence, the court references section 502(c) entirely in passing, to note that the court could estimate the claim if it were unliquiated. As in *In re Oneida*, no request for estimation was before the court in *In re Keene*.

9. LBF argues that the court in *Adelphia*, one of the cases cited in the Motion, declined to estimate a disputed administrative claim. Objection at ¶ 25. This is only partially true. The *Adelphia* court declined to estimate a *portion* of an administrative claim because it was based on the balance of the debtor's DIP loan, and the amount of which could not possibly be in dispute – it was "an obligation for $15 million in principal plus about another $1.8 million in interest." *See re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 425 (Bankr. S.D.N.Y. 2003). However, the court held that it "can, and will, estimate" the remainder of the administrative claim, which was filed in a liquidated amount and based on "a variety of asserted post-petition obligations." *See id.* As here, those obligations, and the amounts asserted, were disputed by the debtor, and the court exercised its discretion to estimate those amounts for purposes of determining feasibility of the debtor's plan.

10. LBF correctly cites the *Adelphia* court as holding that the assertion of a counterclaim does not, by itself, render a claim "disputed." Objection at ¶ 25. LBHI does not

disagree. However, the LBF Claims are Disputed Claims by the terms of the Plan, which is binding on LBF. LBF also neglects to point out that the *Adelphia* court nevertheless held that for purposes of estimation "the [debtor] will succeed in asserting set-offs with respect to both the DIP financing claim and other asserted set-offs" and thus "there is not a material concern that [the debtor] would be required to make outlays. . .for repayment of the $16.8 million in connection with the DIP." *Id.* at 429. Similarly, LBHI has requested that this court consider LBHI's offsetting claims in conjunction with its estimation of the LBF Claims in determining, pursuant to section 8.4 of the Plan, the reserves that LBHI should be required to maintain for the LBF Claims.

11.     Irrespective of section 8.4 of the Plan, the Court has the authority to consider LBHI's offsetting books and records claim against LBF. As stated in the Motion, these books and records have been relied upon by the fiduciaries of eighty seven of the Debtors' Foreign Affiliates who executed the Bilateral Settlements with the Debtors. Merely for the purposes of determining reserves, the Court should adopt the pragmatic approach of the court in *Adelphia* and permit LBHI to limit its reserves on account of the LBF Holdings Claim to the difference between the LBF Holdings Claim, as asserted, and the LBHI Claim. Nevertheless, LBHI maintains that this Court is authorized to also estimate the amounts of LBF Holdings Claim at approximately 90% of its asserted amount, in addition to giving LBHI credit for its offsetting claim, thus requiring LBHI to reserve $0 for the LBF Holdings Claim.

### An Estimation Pursuant to Section 502(c) of The Bankruptcy Code Does Not Require Discovery or An Evidentiary Hearing

12.     By the Motion, LBHI and LBSF are not objecting to the LBF Claims and are not seeking a determination of their merits. LBHI and LBSF are merely seeking a determination that, based on an estimate of probabilities and a consideration of their offsetting

claims, they are only required to reserve for the LBF Claims in the Estimated Reserve Amounts. "[C]ourts needn't make traditional findings of fact in connection with estimation hearings; they need only decide the probability of each side's success before a traditional trier of fact." *In re Chemtura*, 448 B.R. at 640. "By reason of the nature of. . .any estimation procedure, there are limits on the ability of the Court to find facts. In large measure, the Court instead considers likely outcomes." *In re Adelphia Business Solutions, Inc.*, 341 B.R. at 419.

13. It is unnecessary for this Court to conduct a full-blown evidentiary hearing merely to find that the Estimated Reserve Amounts are fair. As stated in the Motion, in order to arrive at a $0 reserve for the LBF Holdings Claim, this Court need only determine that LBHI has a 10% probability of success in an objection to the LBF Holdings Claim, and a plausible offsetting claim against LBF. *See* Motion at ¶ 19. Given that there is an inherent degree of risk in any litigation, a 10% probably of success may even be assumed as given. Moreover, as stated above and in the Motion, the fiduciaries of eighty-seven of the Debtors' Foreign Affiliates have entered into the Bilateral Settlements and agreed to reduce the *allowed* amount of many of their claims based on the litigation risks that they perceived in claims based on the Corporate Resolutions. Given the massive reductions in claims that these administrators agreed to in recognition of the litigation risks attendant to the Corporate Resolutions, a assumed 10% degree of risk for the LBF Holdings Claim is highly conservative. Furthermore, the fact that the Bilateral Settlements were premised on the reliability of the Global Close (and parties did not reduce intercompany claims based on the Global Close) should give this Court adequate grounds to find, as the court did in *Adelphia*, that for the purposes of estimation, LBHI will likely be able to offset the LBHI Claim against the LBF Holdings Claim.

14. Also, estimating the LBF Claims at the Estimated Reserve Amounts will not harm LBF. If the LBF Claims are ultimately allowed in amounts in excess of the Estimated Reserve Amounts, the Plan provides that the Debtors will make catch-up payments on such Claims. Particularly with respect to the LBF Holdings Claim, there will be ample distributable value to allow LBF to catch up in the event that the LBF Holdings Claim is allowed in amount greater than $0 in the next few years. As described in the Debtors' Disclosure Statement, many of LBHI's assets are illiquid, and it is estimated that the final disposition of LBHI's assets will take years. Exhibit 7 of the Disclosure Statement, sets forth LBHI's estimated cash flows through 2014. The Debtors estimate that LBHI will collect approximately $3 billion of assets in 2013 and 2014. Such delayed monetization of certain of LBHI's assets provide LBHI and LBF with sufficient time to resolve the LBF Holdings Claim in full.

15. This Court does not need to delve into the merits of LBF's allegations with respect to the LBHI Claim and LBHI's right of setoff under Swiss law. Nevertheless, with respect to the foregoing, LBF is wrong on the law and the facts. First, the setoff is governed by New York law. The basis of each of the LBF Claims – the purported guarantees, the relevant documents at issue in the Prudential Adversary, and the LBSF Cross-Claims – are all either governed by New York law, or originate in decisions and actions that occurred in New York, and the LBHI Claim is based on LBHI's books and records, *i.e.*, electronic systems that are based and were historically kept by Lehman in New York (and that formed the basis of the Bilateral Settlements with eighty-seven (87) of the Debtors' Foreign Affiliates). Second, LBF was not subject to any minimum share capital requirement beyond what is required under Swiss corporate law, which requires a minimum share capital of CHF 0.1 million. Even if LBF qualified under Swiss law as a "securities dealer" – which it did not – the required minimum

share capital would have been CHF 1.5 million. Prepetition, LBF on average had a fully paid-in share capital of CHF 6 million, well in excess of any requirement. Furthermore, as stated in LBF's audited financial statements for 2007, attached hereto as Exhibit A, LBF was neither under-capitalized nor over-indebted prior to the LBF Bankruptcy. Indeed, the interim report to FINMA of PricewaterhouseCoopers AG, Zurich ("PwC"), dated October 17, 2008 recommended the orderly wind-up of LBF instead of a bankruptcy proceeding (Objection at ¶ 12) – such a recommendation would only have been made if PwC concluded that LBF was not under-capitalized or over-indebted. It was only in late November 2008 that PwC concluded that LBF "was very likely to be insolvent" and that "the wind-up be converted to a bankruptcy." *See* Objection at ¶13.

    16. As long as a corporation is neither under-capitalized nor over-indebted, there exists no statutory authority or case-law in Switzerland to support subordination of intercompany loans or recharacterization of such loans as equity.[4] Even in the case of an over-indebted debtor, the Swiss Federal Supreme Court has explicitly rejected the doctrine of substitute equity loans referenced by the Objection (Objection at ¶ 40) holding that "the doctrine of substitute equity loans is not compatible with the current Swiss Law." *See* Swiss Federal Supreme Court decision in BGer March 2, 2006 5C.226/2005, consideration 3. LBF cites to the Swiss Federal Supreme Court, dated May 25, 2010 5A.175/2010, in support of its argument that the LBHI Claim could be treated as equity. However, in that case, the court essentially declared a setoff between a company and its majority shareholder void on the grounds of piercing the

---

[4]  There is also no statutory authority, and only dubious precedent, for subordination of claims where a court makes certain findings, including over-indebtedness or under-capitalization, neither of which is present here.

corporate veil.[5]  The case has nothing to do with theories of equitable subordination or recharacterization, and is wholly inapposite and distinguishable.  Thus, LBF's allegation that the LBHI Claim would "most likely be treated as equity" has no basis in Swiss law.

## Conclusion

17.    As this Court is aware, the Debtors are generally willing and able to reach consensual resolutions with their creditors with respect to difficult issues.  The establishment of reserves under the Plan, however, should not qualify as difficult or controversial.  It should come as no surprise that the Debtors have been able to stipulate to reduced reserves with respect to some of the largest Disputed Claims thus far; these creditors recognize that they will not be disadvantaged, and see no need to litigate the issue before this Court.  Unfortunately, LBF does not recognize this fact, and worse still, LBF has asserted some of the largest Disputed Claims in these cases.  Absent the relief sought in this Motion, the incremental impact of maintaining reserves for LBF's Disputed Claims (and the Disputed Claims of other creditors) will diminish initial distributions to the Debtors' creditors, and unfairly prejudice them. Section 8.4 of the Plan was drafted to avoid this inequitable result and enable the Debtors' creditors to reap the well deserved reward of speeding these cases to confirmation through the many settlements and compromises incorporated in the Plan. Particularly given the probability that LBHI and LBSF will not need such large reserves for the LBF Claims, their thousands of creditors should not be

---

[5]    In this case, the majority shareholder of a company – who was also the director – granted loans to the company of up to CHF 12.3 million from 2000 and 2001.  In December of 2001, to avoid needing to place the company in bankruptcy, the shareholder agreed to voluntarily subordinate CHF 6.5 million of the loans in accordance with Art. 725 para 2 Swiss Code of Obligation.  In July 2002, the company submitted a bill to the shareholder in the amount of CHF 1.3 million for work that the company performed for the shareholder in 2000 and 2001. This bill was set off against the shareholder's loan to the company.  On July 30, 2002 the Company was declared bankrupt.  In considering this case, the Swiss Federal Supreme Court discussed the doctrine of piercing the corporate veil and abuse of right – these are the paragraphs cited by LBF in the Objection.  *See* Objection ¶¶41-44. The court ultimately held that the company and shareholder could not be regarded as two separate persons, and that therefore, the funds loaned to the company by the shareholder were actually funds of the company.  Lacking two mutual claims, the setoff was therefore void.

penalized now, merely because LBF insists on the maintenance of inordinately high reserves for its Disputed Claims.

WHEREFORE the Debtors respectfully request that the Court (i) overrule the Objection and (ii) grant the relief requested in the Motion and such other and further relief as it deems just and proper.

Dated: New York, New York
January 24, 2012

/s/ Alfredo R. Pérez
Lori R. Fife
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession