**Page 1**

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555-jmp

5    - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., ET AL.,

9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            January 26, 2012

19            10:05 AM

20

21    B E F O R E:

22    HON. JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

Page 2

1   Debtors' Two Hundred Thirty-Seventh Omnibus Objection to Claims

2   (Amended and Superseded Claims)

3

4   Motion Pursuant to Section 8.4 of the Modified Third Amended

5   Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

6   Affiliated Debtors to Estimate the Amount of Disputed Claims

7   filed by Lehman Brothers Finance AG (In Liquidation) for

8   Purposes of Establishing Reserves

9

10   Motion Pursuant to Section 8.4 of the Modified Third Amended

11   Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

12   Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of

13   the Bankruptcy Code to Estimate the Amounts of Claims filed by

14   Indenture Trustees on Behalf of Issuers of Residential

15   Mortgage-Backed Securities for Purposes of Establishing

16   Reserves

17

18   Debtors' Ninety-Second Omnibus Objection to Claims (No Blocking

19   Number LPS Claims)

20

21   Motion of Robert Franz Pursuant to Fed. R. Bankr. P. 9024

22   Incorporating By Reference Fed. R. Civ. P. 60(b), and Section

23   105(a) of the Bankruptcy Code for Reconsideration and

24   Reinstatement of Proof of Claim

25   Transcribed by:  Dena Page

Page 3

1

2  A P P E A R A N C E S :

3  WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8  BY:   ROBERT J. LEMONS, ESQ.

9

10

11  WEIL, GOTSHAL & MANGES LLP

12         Attorneys for Debtors

13         200 Crescent Court, Suite 300

14         Dallas, TX 75201

15

16  BY:   ERIN D. ECKOLS, ESQ.

17

18

19  WEIL, GOTSHAL & MANGES LLP

20         Attorneys for Debtors

21         700 Louisiana, Suite 1600

22         Houston, TX 77002

23

24  BY:   ALFREDO R. PEREZ, ESQ.

25

Page 4

1

2    REILLY POZNER LLP

3          Attorneys for Aurora

4          1900 Sixteenth Street

5          Suite 1700

6          Denver, CO 80202

7

8    BY:   MICHAEL A. ROLLIN, ESQ.

9

10

11   ALSTON & BIRD LLP

12          Attorneys for Wilmington Trust

13          90 Park Avenue

14          New York, NY 10016

15

16   BY:   J. WILLIAM BOONE, ESQ.

17

18

19   CHAPMAN AND CUTLER LLP

20          Attorneys for U.S. Bank National Association as Trustee

21          111 West Monroe Street

22          Chicago, IL 60603

23

24   BY:   FRANKLIN H. TOP, III, ESQ.

25

Page 5

1

2    HINCKLEY, ALLEN & SNYDER LLP

3         Attorneys for Citibank and Wilmington Trust Company

4         28 State Street

5         Boston, MA 02109

6

7    BY:   JENNIFER V. DORAN, ESQ.

8

9

10   OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP

11        Attorneys for Christiane Schuster

12        65 East 55th Street

13        New York, NY 10022

14

15   BY:   ADAM H. FRIEDMAN, ESQ.

16

17

18   MILBANK, TWEED, HADLEY & MCCLOY LLP

19        Attorneys for Creditors' Committee

20        One Chase Manhattan Plaza

21        New York, NY 10005

22

23   BY:   EVAN R. FLECK, ESQ.

24        DENNIS O'DONNELL, ESQ.

25        BRADLEY SCOTT FRIEDMAN, ESQ.

Page 6

WHITE AND WILLIAMS LLP

     Attorneys for Robert Franz

     250 West 34th Street

     Suite 4110

     New York, NY 10119


BY:  SEDGWICK M. JEANITE, ESQ.


NIXON PEABODY LLP

     Attorneys for Deutsche Bank as Trustee

     100 Summer Street

     Boston, MA 02110


BY:  RICHARD C. PEDONE, ESQ.



GIBSON, DUNN & CRUTCHER LLP

     Attorneys for LBF

     200 Park Avenue

     New York, NY 10166


BY:  MICHAEL A. ROSENTHAL, ESQ.

     ROBERT B. KRAKOW, ESQ.

1

2   GIBSON, DUNN & CRUTCHER LLP

3         Attorneys for LBF

4         2100 McKinney Avenue

5         Suite 1100

6         Dallas, TX 75201

7

8   BY:   JEREMY L. GRAVES, ESQ.

9

10

11   FAEGRE BAKER DANIELS

12         Attorneys for Wells Fargo

13         2200 Wells Fargo Center

14         90 South Seventh Street

15         Minneapolis, MN 55402

16

17   STEPHEN M. MERTZ, ESQ.

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Good morning.

3            MR. LEMONS:  Good morning, Your Honor.  Robert Lemons

4    from Weil, Gotshal & Manges on behalf of Lehman Brothers

5    Holdings Inc. and its affiliated Chapter 11 debtors.

6            Your Honor, I'm here this morning just on the first

7    agenda item and then I'll cede the podium to my colleagues.

8            THE COURT:  Okay.

9            MR. LEMONS:  So I'm here, Your Honor, to provide the

10   Court with a brief status update regarding the debtors' 73rd,

11   118th, 130th, 131st, 133rd, 134th, 135th, 176th, and 207th

12   omnibus objections to claims.  These are the debtors'

13   objections to the restricted stock unit, or RSU claims of the

14   former Lehman employees.

15           THE COURT:  Correct.

16           MR. LEMONS:  Consistent with the Court's instruction

17   at the December claims hearing, on Tuesday, January 24th, the

18   debtors filed a supplemental annotated reply two responses to

19   the omnibus objections.  That reply is docketed at number

20   24591.

21           As directed by the Court, the supplemental reply does

22   not contain new arguments by the debtors in response to

23   arguments raised by the claimants at the December hearing, but

24   rather tries to map each of the debtors' earlier arguments to

25   each of the responses received by the debtors.  I hope this

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 9 of 107

Page 9

1   will prove to be helpful to the Court and to respondents in

2   sorting through the different arguments.

3          The reply was served, along with a notice, on each of

4   the responding claimants, and the notice establishes February

5   14th as the deadline for claimants to respond to the

6   supplemental reply.  That gives them three full weeks to file a

7   response.

8          The next step, Your Honor, that we see after receiving

9   the responses from the claimants will be to reach out to the

10  claimants who respond to the supplemental reply, as well as to

11  any who appeared at the December hearing, if they don't respond

12  to the supplemental reply, to discuss what evidentiary record

13  needs to be established and the most efficient way to do it.

14         We, of course, would prefer to do this in the least

15  contentious and time-consuming manner possible, and in that

16  vein, it's our hope that the debtors will be able to take a

17  first shot at drafting a set of stipulated facts to circulate

18  to the respondents to try to agree on either all or the vast

19  majority of the facts so as not to burden the Court with an

20  extensive evidentiary hearing.  I realize that, based on the

21  transcript of the last hearing, that there may be significant

22  disagreement over the interpretation and characterization of

23  some of the facts, but I'm hoping that the facts, themselves,

24  we can reach agreement on.  Of course, we won't know whether

25  this will be possible until we see the responses and engage in

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 10

```
 1    discussions with the respondents.
 2            After completing this process to narrow as much as
 3    possible any disputes over the evidentiary record, we intend to
 4    establish a new hearing date, notice of which, of course, will
 5    be provided to all of the claimants who are subject to these
 6    objections.
 7            And finally, Your Honor, as contemplated by the Court
 8    at the last hearing, the debtors will likely want to file at
 9    some point before that hearing a reply to the responses
10    received to the supplemental reply.
11            That's really it, Your Honor.  That's my report, and
12    I'm happy to answer any questions the Court might have.
13            THE COURT:  Just a very minor procedural point.  When
14    you contemplate another hearing date, are you contemplating
15    having this listed on one of the omnibus claims dates or are
16    you contemplating requesting a separate hearing date for what
17    amounts to the evidentiary hearing with respect to all of these
18    contested matters?
19            MR. LEMONS:  Your Honor, to be honest, we hadn't
20    discussed that internally, but based on the number of parties
21    who are involved in this and the different arguments they're
22    all making, if the Court would indulge us, I think it might be
23    better to have a separate hearing date for this matter.
24            THE COURT:  I think it would be better, too.
25            MR. LEMONS:  Okay.
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 11

 1            THE COURT:  And I'm not even sure that one day is

 2    going to be enough.

 3            MR. LEMONS:  We'll do our best.

 4            THE COURT:  Okay.

 5            MR. LEMONS:  So that's the end of my presentation,

 6    Your Honor.  My colleague, Erin Eckols, will handle the next

 7    item on the agenda.  And since I don't have any other matters

 8    on the agenda, may I be excused from the courtroom?

 9            THE COURT:  Yes, you may be excused.  Thank you.

10            MR. LEMONS:  Thank you, Your Honor.

11            MS. ECKOLS:  Good morning, Your Honor.  Erin Eckols

12    with Weil Gotshal for the debtors.  I will be handling

13    uncontested agenda item 2, and then be turning the podium over

14    to my colleagues to start the contested portion of today's

15    agenda.

16            Agenda item number 2 is the debtors' 237th omnibus

17    objection which seeks to disallow and expunge claims that were

18    amended and superseded by subsequently filed claims.  Today, we

19    are proceeding uncontested as to all claims on the objection.

20            There is a change to the language of the order that we

21    wanted to inform Your Honor of.  The proposed order submitted

22    with the 237th omni contained language instructing Epiq to

23    reinstate any claim expunged as amended and superseded if the

24    surviving claim were later expunged as an improper amendment to

25    that original claim.  Counsel for Golden State Tobacco

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 12

1   Securitization Trust, the holder of claims 22066, 22067, 22068

2   and 22069, which are identified on the objection as claims to

3   be disallowed and expunged as having been amended by claims

4   67684, 67685, 67686, and 67687, which are the surviving claims.

5   Golden State was concerned that one of its surviving claims

6   would subsequently be disallowed for a procedural defect not

7   present in the original claim that was disallowed as being

8   amended and superseded, and that in that instance, they would

9   be left with no claim on the claims register.

10          After discussion, the parties negotiated adding

11   certain language to the order to the effect that if the

12   surviving is disallowed due to a nonsubstantive violation of

13   the bar date order or a nonsubstantive procedural defect not

14   present in the original claim, that the original claim would be

15   reinstated.

16          Your Honor, I've got a redline copy of the order

17   showing addition of the language, if I may approach.

18          THE COURT:  Yes, you may approach.  Thank you.

19          MS. ECKOLS:  The addition of that language is the only

20   substantive change to the order.  And as we are proceeding on

21   an uncontested basis, the debtors respectfully request that the

22   Court grant the 237th omnibus objection.

23          THE COURT:  The 237th omnibus objection is granted.

24          MS. ECKOLS:  Thank you.  And I am now going to turn

25   the podium over to Alfredo Perez.

Page 13

1          MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

2    on behalf of the debtors.

3          THE COURT:  Good morning.

4          MR. PEREZ:  Your Honor, I have the next two matters:

5    the LBF estimation motion and the RMBS estimation motion.  And

6    let me start with LBF, as stated in the calendar.

7          First of all, Your Honor, let me tell you what we're

8    not trying to do.  We're not trying to establish their claim

9    for all purposes.  We're not trying to litigate their claim at

10   this point.  We're not trying to obtain allowance of our claim

11   in their proceedings.  We're not trying to effect our claim

12   against them at all.

13         Your Honor, we think that at the end of the day, when

14   all is said and done, we will have an affirmative claim against

15   them and we will be a net creditor of that estate and we will

16   obtain a recovery.  But again, that's not the subject of today.

17         Your Honor, the claims that they filed originally were

18   grossly excessive.  The claims that they -- the amended claims

19   are still, I believe, grossly excessive.

20         Now, the focus of the objection, Your Honor, is that

21   we don't have the right to estimate these claims under 8.4.  In

22   essence, Your Honor, LBF would have us read both 8.4 and 9.3

23   out of the plan, just render the words in there totally

24   superfluous.  They would just basically have us -- there is

25   certainly case law in this circuit which says -- in this

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 14 of 107

Page 14

1    courthouse which says that if the plan provides for estimation

2    of disputed claims, you can do that.

3          So Your Honor, I don't even think that the Court has

4    to reach the issue of the applicability of 8.4 because, in

5    essence, we have a setoff claim.  And we have a setoff claim

6    just like every other setoff claim we had against eighty-seven

7    other administrators.  So Your Honor, if I may, LBF has now --

8    let me talk about LBHI first, as opposed to talking about LBSF,

9    which I'll get to later.  But as it relates to LBHI, LBF has

10   filed a 15.4 billion dollar claim.  We have filed a 14.2

11   billion dollar claim in their estate.  That claim has never

12   been objected to.  Nothing's actually gone on with that claim

13   since -- to date.  So in essence, they're -- for normal

14   purposes for distribution, at a minimum, I should be able to

15   reserve only the difference between those two claims, which is

16   1.4.  Their response, Your Honor, is well, under Swiss debtor-

17   creditor law, this claim would be treated as a subordinated

18   claim or as equity; therefore, you can't setoff.

19          Well, let me say a couple of things to that.  Number

20   one, we disagree totally with the facts and we don't believe

21   the facts will bear that.  The last audited financial

22   statement, as of November 30, 2007 recognized this as a claim,

23   as an affiliate claim.

24          But having said all of that, Your Honor, what we're

25   really looking is for what this Court needs to do for the

1    purposes of determining what reserve we need for their claim.

2    And even if this claim is subordinated or reclassified under

3    Swiss law, Your Honor, the cases say that you can, for purposes

4    of setoff, use subordinated claims.  So again, we don't have --

5    the Court doesn't have to decide that.

6         And just so the Court -- I mean, just so it's very

7    clear what we're asking you to do, we're not asking the Court

8    to do anything -- absolutely nothing different than what was

9    done with respect to the 87 other administrators where we

10   reduced the claims from 327 to 64.

11        And furthermore, Your Honor, let's assume that our

12   claim is not 14.2 but it's 13.  There is a provision in 8.4

13   where they can come back at any time and seek to readjust that.

14   This case isn't going to be over in the first quarter of 2012,

15   as much as everyone would like that.  This case is going to

16   take a while.  So Your Honor, they are fully protected, and

17   under the case law, and particularly the setoff case law, Your

18   Honor, we should be able to, for distribution purposes,

19   reserve, at a minimum, the 1.2 difference.  That's without

20   getting into any, any, any at all litigation reserve, and we

21   take a ten percent litigation reserve on their corporate res

22   guarantees.  We had an eighty percent reduction in the other

23   cases.  So ten percent litigation reserve is not in the least

24   bit extraordinary.  So I don't believe, Your Honor, that we're

25   asking the Court to take any sort of a leap of faith in order

1    to set this reserve.

2           Your Honor, as it relates to LBSF, they reduced their

3    claims from almost 3 billion to about 550 million (ph.).  We

4    believe, at the end of the day, that they will be a net

5    creditor; we believe, at the end of the day, that they probably

6    have claims around 360 million dollars assuming that our

7    counterclaim that's asserted in the Prudential litigation isn't

8    upheld; that's pending before the Court, Your Honor.  So if the

9    Court were to use the same sort of setoff rationale for that,

10   then the reserve for LBSF would be sixty-three million dollars.

11          So for those reasons, Your Honor, we would request

12   that the Court set the reserve for LBHI at zero and the reserve

13   for LBSF at sixty-three million.  And even if the Court is not

14   inclined to use the litigation risk ten percent that the Court,

15   at a minimum, set the reserve at 1.2 billion dollars for LBHI.

16          THE COURT:  Mr. Perez, I have a few questions that are

17   on my mind, and I'm just going to voice them now, because as I

18   reviewed the papers in preparation for this morning, I found

19   this to be a very complicated problem, even though, as you are

20   articulating it, it sounds so very simple.

21          There is an unmistakable split between the language of

22   8.4 and the language of 502(c).  And the only way to reconcile

23   that split is to conclude that what 8.4 is really saying to the

24   reader is that regardless of the literal application of 502(c)

25   to disputed claims, the Court will have the ability to estimate

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 17 of 107

Page 17

1    disputed claims using the procedures that are outlined in

2    502(c) and related case law.  And that's how I read it.  In a

3    more perfect world, 502(c) would, in addition to mentioning

4    contingent and unliquidated claims, would also mention disputed

5    claims in those instances where a plan provides for the

6    estimation of disputed claims.  But it actually doesn't say

7    that.  I'm going to read it that way, however.  And for that

8    reason, the argument that has been made by LBF concerning my

9    capacity to estimate, I'm effectively overruling even before

10   argument because I don't want that to be the focus of today's

11   hearing.

12          However, this is not a simple matter.  As I read the

13   papers, there are arguments being made that the offset is one

14   that, under applicable Swiss law, if I were to apply it, is one

15   that I couldn't make anyway because it would be deemed equity

16   under their principles of recharacterization.  I don't know

17   whether or not Swiss law applies.  I don't know whether or not

18   a case can be made under applicable U.S. law for

19   recharacterization.  And here's my biggest question:  What

20   makes LBF different from everybody else in the global close,

21   everybody else in the foreign affiliate community that the

22   debtors so successfully managed to reach agreements with?  And

23   this is really a problem for LBF.  You have, I think, rather

24   successfully painted them into a corner in which they appear to

25   be incredibly unreasonable in every way, by filing grotesquely

1    overstated claims to begin with, and then after spending some

2    time under the protocol working cooperatively, becoming a

3    renegade.  They're going to have to explain themselves when

4    it's their turn.  But I have this problem which I'd like you to

5    help me with:  Are they or are they not like everybody else?

6            If they are like everybody else, then presumably,

7    their recharacterization claim is a claim that the debtors

8    dealt with each and every time you were dealing with the global

9    close and seeking to reconcile claims back and forth between

10   the U.S. entities and foreign affiliates.

11           If, however, Swiss law is unique in some respect,

12   relative to, say, the Netherlands or Germany or some other

13   country that might be governing the question if their law were

14   to apply, well, then, LBF may be in a unique and particular

15   situation.  And if that's true, then your history in dealing

16   with each of the other foreign affiliates becomes

17   distinguishable.

18           So my question to you is -- and that's a kind of a

19   long preamble -- are they like everybody else, in which case,

20   you're probably going to prevail, or are they, if you think

21   about it, different and distinct because of their reading of

22   applicable Swiss law, assuming that law applies?

23           MR. PEREZ:  I think, Your Honor, that was a -- you

24   asked a lot of questions, and I want to answer all of your

25   questions, and I want to prevail.  So let's put that aside.

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 19 of 107

Page 19

1          THE COURT:  Okay.

2          MR. PEREZ:  But Your Honor, as far as we are

3    concerned, they are like -- their claims -- their claims are

4    like everybody else's claims.  And Your Honor, I don't believe

5    that you have to make any assessment of Swiss law either there

6    or here.  What we're talking about is advances just like every

7    other advance we made to every other affiliate to fund their

8    operations.  That's what we're talking about.  That's money

9    that came out of LBHI that all of the other creditors here

10   assumed was money.  It was on their balance sheet; it was on

11   our balance sheet.  It was on our balance sheet as debt.  There

12   is no -- regardless of whether I'm entitled to an affirmative

13   recovery over there because under their debtor-creditor law,

14   somehow, they can recharacterize it.  That doesn't affect the

15   money that I put out here in the United States like I put out

16   for LBIE, like I put out for LBT.  I mean, we just -- one of

17   the matters that I brought before the Court was 22,000 claims

18   for LBT where we said, yeah, we -- we're liable; we advanced

19   the money; we're liable.  So Your Honor, it's not a situation

20   where they're different.

21          Now, I'm sure they'll argue that under these theories

22   of Swiss law, they're going to prevail.  They may well prevail.

23   I'm not a Swiss lawyer.  I don't think they're going to

24   prevail.  There's an audited financial statement that -- on

25   November 30th, 2007 that says it's debt.  So they're going to

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 20

1    have to basically blow that aside.

2         But having said all of that, I don't think the Court

3    needs to reach that.  I don't think the Court needs to reach

4    either Swiss law there or here.

5         THE COURT:  Well, here's where I think I may disagree

6    with you as to whether I need to reach it.  And I guess we get

7    to the question of what do we mean by "reach".  For purposes of

8    estimating a reserve, I have an obligation, as I understand the

9    applicable law, not to have a full-blown evidentiary hearing --

10   so that's going to be off the table; we're not doing that --

11   but certainly to be able to exercise reasonable judgment based

12   upon a reasonable record as to what the likelihood is, and as a

13   result of assessing the likelihood that a claim is going to be

14   allowed within a certain range, set an appropriate reserve.

15        If, in fact, the offset that you say with a ten

16   percent litigation wiggle should result in a zero estimated

17   claim for reserve purposes turns out not to be a dollar-for-

18   dollar offset but, in fact, something you can't offset, then

19   instead of talking about 1.2 billion dollars or zero, we're

20   talking about a much larger number.  So I think I need to get

21   my mind around the question of whether or not your offset claim

22   is, in fact, reasonably good.

23        MR. PEREZ:  Okay.  Well, Your Honor, number one, the

24   ten percent really only applies to the difference between 1.2

25   and zero.  So the ten percent wiggle doesn't apply to get to

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 21

1    1.2 because 1.2 is what our books and records, based on the

2    global close, show is owed as debt from LBF to us.  So --

3            THE COURT:  But that reflects a full offset, doesn't

4    it?

5            MR. PEREZ:  A full offset against their claims against

6    us, yes.

7            THE COURT:  Exactly.  So the 1.2, in effect, already

8    offsets a claim that they say you have no right to offset.

9            MR. PEREZ:  Well, let -- can I just step back one

10   minute before -- to answer one of your prior questions?  You

11   asked --

12           THE COURT:  I have no recollection of what my

13   questions were so --

14           MR. PEREZ:  Okay.

15           THE COURT:  -- so if you're able to --

16           MR. PEREZ:  And if I don't respond right now, I'll

17   forget, too.

18           THE COURT:  -- if you're able to piece it together,

19   that's great.

20           MR. PEREZ:  Okay.

21           THE COURT:  Okay, so we're just having a conversation.

22           MR. PEREZ:  All right.  So Your Honor, you said, what

23   do I need for my record.  Okay?  And that's a legitimate point.

24   What do you need for your record?  I think what you need for

25   your record is what amount was shown on the debtors' books and

1    records that was the subject of the global close as the amount

2    owing to LBI.  I think that's all you need to know because the

3    issue of whether a setoff will ultimately be allowed, once the

4    two claims are allowed, I think that's irrelevant because even

5    in the subordination cases, Your Honor, in the subordination

6    cases, there was still a net recovery.  You were still able to

7    subordinate even though you weren't getting an affirmative

8    recovery.  So even though I may not end up getting an

9    affirmative recovery in Switzerland, I'm still -- I can still

10   defend on the basis of a subordinated claim to pay out here.

11   That's the crux of it.

12          So the record, Your Honor, in my mind, is what did the

13   debtors' books and records show.  And I think it's undisputed

14   that the debtors' books and records show 14.2.  That's what the

15   global close; that was the basis of the claims.

16          And we're not talking -- I mean, first of all, I don't

17   want a setoff now.  Okay?  Please.  That's not what I'm asking

18   for.  I'm asking for a reserve.  I'm not asking for any

19   predetermination of either their claims here or my claims

20   there.

21          THE COURT:  But Mr. Perez, I understand all you're

22   asking for is an estimation, and in estimating, I am not making

23   any determination that is binding and preclusive as to future

24   claims litigation that may arise either here or in Switzerland.

25   But in order to come up with a rational estimation, I need to

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 23 of 107

Page 23

1    assess the reasonableness of the parties' relative arguments

2    concerning the right of offset.

3            MR. PEREZ:  Correct, Your Honor, and I guess I'm not

4    answering sufficiently for the Court.  But I really do believe

5    that the inquiry is, is there a 14.2 billion dollar claim on

6    the debtors' books and records that would be the subject of a

7    setoff.  I really think that's the inquiry because once you

8    decide that's the inquiry, whether under Swiss law we get an

9    affirmative recovery or not or whether -- that's not before the

10   Court.  Now, it may be too simplistic, but --

11           THE COURT:  Well, let's go back to an earlier question

12   that I do remember because it's really one of the major

13   concerns that I have in all of this.  And that is, what makes

14   LBF different from everybody else who is a foreign affiliate

15   that you were able to work things out with.  And it may be that

16   the answer is they're not different, or the answer may be they

17   are different.  I don't know enough yet to make that judgment;

18   maybe I'll know more after we have discussion this morning.

19   But books and records take you only so far as it relates to

20   consensual agreements that Lehman and its foreign affiliates

21   have come to and they're accepted as valid and true as of the

22   global close, and they are treated, for purposes of working out

23   bilateral settlements, as if they are dollar-for-dollar

24   offsets, that gets you to a certain place.

25           But in an estimation proceeding, such as the one that

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 24 of 107

Page 24

1    you've initiated and that we're hearing at the moment, I think

2    the books and records become just one piece of data.  An

3    important piece, but -- something that I look at, but it's a

4    starting point.

5         And so where I want to go with this is to understand

6    if there is anything in the debtors' estimation about its

7    relationship with LBF that distinguishes LBF from other foreign

8    affiliates, particularly as it relates to the

9    recharacterization risk, because the recharacterization risk is

10   what this is all about.

11        MR. PEREZ:  Well, Your Honor, I understand that the

12   Court -- I think that the subordinated setoff cases would

13   indicate that the recharacterization risk is a factor but it's

14   not the determinative factor.  But if the Court doesn't read

15   them that way, I understand that.  But I do think that some of

16   those cases which say even if you have a subordinated claim,

17   you can still set it off against a nonsubordinated claim, that

18   in essence, that would be sufficient to do that.

19        But again, Your Honor, the basis of their so-called

20   recharacterization equity claim has to do with whether this was

21   properly capitalized.  At least, that's what I read in the

22   papers.  We have an audit which showed -- as of November '07,

23   which showed that it was properly capitalized; we put that in

24   our reply papers.  We have an audit that shows that they had

25   significant debt shown as foreign affiliates.  But again, if we

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 25 of 107

Page 25

1    are -- if the Court -- we don't believe that the Court has to

2    make a determination as to whether things get recharacterized

3    because we're not requesting anything having to do with the

4    affirmative recovery there.

5           But having said that, I believe that there aren't any

6    different -- yes, there may be an issue under Swiss law about

7    this.  And remember, this is for -- this would be for the

8    benefit of the other creditors of LBS estate.  So in essence

9    what we're doing is -- and just so we're all clear -- what

10   we're doing is we're preferring the creditors of LBF estate to

11   the detriment of the creditors of the LBHI estate, if in fact

12   that's the way this is done and we're not allowed to offset

13   because the money going out was the exact same money going out

14   to all of the other foreign affiliates.  It didn't change.  LBF

15   was capitalized; it did have share capital.  It had sufficient

16   share capital and it had sufficient reserves.  That's not what

17   we're talking about.  We're not saying that we want to make --

18   that we want to say the money that we put in as share capital,

19   that we want to make that debt.  That's not what we're talking

20   about here, Your Honor.

21          THE COURT:  Okay, let's hearken back to the plan that

22   was confirmed on December 6th, which included a compromise of

23   substantive consolidation risk at twenty percent.  And let's

24   use that as an example of how uncertain legal issues can be

25   resolved by parties by, in effect, picking arbitrary numbers,

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 26 of 107

Page 26

1      twenty percent being an example of such an arbitrary number,

2      but one that worked well because everybody said yes when they

3      ultimately came to confirmation.

4              MR. PEREZ:  Um-hum.

5              THE COURT:  Is there a percentage greater than zero

6      which the debtor would acknowledge represents the

7      recharacterization risk that has been asserted by LBF?  Because

8      for purposes of determining a reserve, I either have to

9      determine that there is no risk, which would be zero, or some

10     risk, which might be ten percent, fifteen percent, twenty

11     percent -- just hypothetical examples of that risk factor for

12     purposes of setting a reserve, and it frankly bothers me that

13     this has gotten to the level of a major contested matter and

14     that the parties have been unable to come up with what amounts

15     to some equitable judgment as to a fair percentage split.

16             MR. PEREZ:  Your Honor, it bothers us tremendously.  I

17     mean, we have had innumerable meetings with that, and it's

18     frankly not for lack of trying on our part, and frankly not for

19     lack of trying on Mr. Rosenthal's part.  I can't -- I don't

20     blame him at all.

21             Can I speak to Mr. Ehrmann for a second?

22             THE COURT:  Do you want more than a second?  We can

23     take a longer break, if you would like.

24             MR. PEREZ:  Two minutes?  Two minutes.

25             THE COURT:  Do you want to go in the hall?

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 27 of 107

Page 27

1              MR. PEREZ:  Yes, we can go in the hall.  Thank you,

2      Your Honor.  Excuse me.

3              THE COURT:  You know what we're going to do?  We're

4      going to take a five-minute break because I don't want to sit

5      here and have everybody staring at me.

6              We'll take a five-minute break.

7          (Recess from 10:38 a.m. until 10:44 a.m.)

8              THE COURT:  Be seated, please.

9              MR. PEREZ:  Thank you, Your Honor.

10             I had an opportunity to consult with Mr. Ehrmann, and

11     I have a couple of things to say.  But in response to your

12     direct point, Your Honor, while we believe that the possi --

13     the probability or likelihood of recharacterization is properly

14     less than ten percent, there's extensive case law in the United

15     States which we looked at, it wouldn't happen, there's

16     virtually no case law in Switzerland that would tell you --

17     we're -- for purposes of this hearing, we're willing to say

18     that that risk is twenty percent.

19             Having said that, we're only looking at one side of

20     the equation.  Okay?  Because we're only looking as to our

21     claim in.  With respect to the claims coming -- our claim into

22     LBF.  With respect to the claims coming into us, with respect

23     to every other foreign administrator, those claims were reduced

24     by eighty percent based on what the filed claims were.

25             So it's somewhat unfair, if you're not doing any

Page 28

1    discount on this side, to do a discount on that side.  And if

2    you do the similar discount that we did with respect to the

3    other foreign administrators, then we're still a net claimant.

4    But again, for purposes of the hearing, you know, we're still a

5    net claimant, because then you would apply eighty percent to

6    the incoming claim and a twenty percent going out.

7            THE COURT:  I hear you, but --

8            MR. PEREZ:  And they're fundamentally different

9    claims, Your Honor.  I apologize.

10           THE COURT:  I hear what you're saying.  But there's

11   nothing that I've ever looked at that tells me how it came to

12   pass that foreign administrators, as a general proposition,

13   agreed to reduce their claims in the name of peace in our time

14   at eighty percent.  I don't know if there is a common principle

15   that applied to all that led to that; and if so, I'd like to

16   know what it is.

17           MR. PEREZ:  Well, Your Honor, I believe that that was

18   the basis based on the analysis of the legal position with

19   respect to the corporate res.  But having said that, we

20   understand that, Your Honor, it's not before the Court, and the

21   Court asked us a very specific question.

22           THE COURT:  No, what you've put before the Court is an

23   estimation motion.  It wasn't a claim objection.  It was an

24   estimation motion.  And the guidance is pretty loose when it

25   comes to what a bankruptcy court judge is supposed to do under

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 29 of 107

Page 29

1    these circumstances.  And in the ordinary course of most

2    bankruptcy cases, you are not dealing with matters quite as

3    complicated as this, because we're talking about the risk of

4    recharacterization under Swiss law with respect to the funding

5    by LBHI and its U.S. affiliates of operations of the Swiss

6    affiliate.  That may or may not be comparable to the

7    relationships that existed between the U.S. headquarters and

8    other foreign affiliates, which is, in effect, the question I'm

9    trying to address.

10            You put this in front of the Court.

11            MR. PEREZ:  Correct, Your Honor.

12            THE COURT:  And you can't take away from me my ability

13   to exercise reasoned judgment in estimating the claim.  It

14   doesn't come out of thin air.

15            MR. PEREZ:  Understood.

16            THE COURT:  And so I need something more than your

17   good arguments.

18            MR. PEREZ:  Understood, Your Honor.  And as I said, in

19   response to your question, for purposes of the hearing, I think

20   we're willing to agree that there's a twenty percent

21   recharacterization risk.

22            THE COURT:  If you were to agree to that, what would

23   be the proposed reserve?

24            MR. PEREZ:  Your Honor, it would be approximately 3

25   billion dollars instead of the 1.2 Your Honor.

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 30 of 107

Page 30

 1          THE COURT:  Sounds like a lot of money.

 2          MR. PEREZ:  It is a lot of money, Your Honor.

 3          THE COURT:  All right.

 4          MR. PEREZ:  Thank you, Your Honor.

 5          THE COURT:  Doesn't it sound like a lot of money to

 6   you?

 7          MR. KRAKOW:  Everything in this case sounds like a lot

 8   of money, Your Honor.  Robert Krakow for LBF.

 9          Your Honor, you've indicated your ruling on the issue

10   of the Court's authority.  And while we respectfully disagree,

11   we do respect it, and I won't waste your time --

12          THE COURT:  Fine.

13          MR. KRAKOW:  -- on that point.

14          Let me get to the heart of the question I think you're

15   asking about:  is LBF different?  And I want to also address,

16   and not simply to clarify the record, but also because I think

17   it's important in terms of some of what we have to say this

18   morning to discuss this, what the actual history has been

19   that's brought us to this point, because I think there's been

20   an understandable effort to portray my clients in a certain

21   light that I don't think is reasonable here.

22          Is LBF different?  Sure it's different.  The nature of

23   its operations were very different from other entities.  But

24   that's only part of the equation here.  We're really talking

25   about two issues -- two principal issues.  One, the

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 31 of 107

Page 31

1    enforceability of the corporate guarantee; and second is

2    whether the debt should be recharacterized as equity.

3        Both of those issues are, by their inherent nature,

4    unique to every entity.  The debtors' position on the corporate

5    guarantees is not that they weren't issues, not that there

6    aren't documents that read as guarantees.  They say that the

7    primary issues deal with knowledge and reliance.  Well,

8    that's -- those are issues that are going to be very specific

9    to each entity.  I have no idea what evidence other entities

10   had on that issue.  I know what our evidence shows, and we feel

11   that we're in very good position if we get to an evidentiary

12   hearing on that issue.

13       I also don't know what the size of the corporate

14   guarantees were in other cases, and ours is a very large number

15   and very significant to our ultimate liquidation in

16   Switzerland.  And depending on the size of that number and

17   other factors in a negotiation, you might be placing more or

18   less emphasis on any particular issue.

19       On the recharacterization of the debt as equity, that

20   issue is inherently subject to the particulars of each entity,

21   if the issue is were they adequately capitalized; as well as

22   the fact that it would be subject to the law in any country

23   where that was an issue.  I don't know if that was an issue in

24   other negotiations.  I have no idea.  All I know is what our

25   issues are and how we see them.

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 32 of 107

Page 32

1         Now, the debtors in their papers have said two

2    seemingly contradictory things.  In their opening brief they

3    said they had to file this estimation motion, because there's

4    been no meaningful settlement negotiation since October 2010;

5    the parties were at an impasse; they have no choice but to

6    file.  In their reply brief they said words to the effect of,

7    we've been negotiating with LBF for more than two years, and

8    we've made multiple proposals, and we haven't gotten anywhere.

9         The truth is actually somewhere in between.  There

10   clearly were any number of negotiations along the way.  Our

11   records indicate the last of those was in April of last year,

12   after which the debtors were understandably focused on

13   confirming their plan.  No settlement obviously was reached up

14   to that point in time.

15        But it's significant that the Court understand,

16   because this relates to a way, in our view, out of this whole

17   estimation proceeding that is worthy of consideration, that on

18   January the 5th, a week before the motion was filed, in

19   furtherance of a number of discussions that Mr. Perez and Mr.

20   Rosenthal had had in a general way about the reserve issue, Mr.

21   Rosenthal forwarded a detailed analysis that had come from our

22   client as to what we think an agreed reserve amount should be.

23   I won't get into the particulars; that was a settlement

24   discussion.  But that was sent.  It was intended to further

25   discussions and try to get to an agreed number.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 33

1          In that same e-mail, Mr. Rosenthal said, as an

2    alternative to worrying about this reserve issue, we propose

3    that we go to mediation on the claims allowance issue.  Let's

4    see if we can get to the bottom of this and obviate the need

5    for a reserve at all.

6          We never received a substantive response to either

7    one, and we were frankly surprised to see in the papers this

8    suggestion that there's no meaningful negotiations; we're at an

9    impasse.  We believe that the best way to deal with these

10   complex issues is to see if we can resolve them.  And we would

11   respectfully submit that one course Your Honor might consider

12   is to direct the debtors to get their objections on file, send

13   the parties to mediation, and to give that mediation the best

14   possible chance to succeed, set an evidentiary hearing date in

15   say June or July on the objections.  So if we can't resolve

16   things consensually, you'll hear them.  But hopefully, we can

17   get to a point where we have a consensual resolution.

18          Either way, that whole process could be completed, and

19   you could have ruled, if you needed to, well in advance of the

20   second proposed distribution date of September 30.  So we think

21   that would be a better use of everyone's time than trying to

22   create the record that I think the Court's going to need to

23   determine the estimation issues.

24          THE COURT:  Let me ask you a question about the

25   proposal you've just put forth.  Would you, as part of this,

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 34 of 107

Page 34

1    agree to estimate your claim at zero for purposes of the

2    initial distribution?

3            MR. KRAKOW:  Well, we believe the more appropriate way

4    to deal with that issue is not to estimate but to reserve in

5    full.

6            THE COURT:  Well, they're not going to do that, and

7    I'm not going to let them do that.  So you're somewhere between

8    your position which I view as unreasonable and their position

9    which you view as unreasonable.  I think you need to talk right

10   now, actually --

11           MR. KRAKOW:  Okay.

12           THE COURT:  -- with each other to try to come up with

13   an approach.  And I've thought about this quite a lot.  And I

14   realize that you're also involved in a rehabilitation effort.

15   I'm going to give you a full opportunity to rehabilitate your

16   client.  But the papers that have been presented would lead an

17   observer to conclude that LBF is not acting reasonably under

18   the circumstances.  What you've just said to me is, au

19   contraire, we've been making a series of proposals to try to

20   avoid the fight we're now having, and we haven't received much

21   in the way of response on the other side.

22           That doesn't really answer the question, though, why

23   LBF is the outlier here relative to the other foreign

24   affiliates.  I don't understand that, and I'd like you to

25   explain that to me.

1          MR. KRAKOW:  Okay.  I may have to turn over to Mr.

2    Rosenthal at some point, because he's been involved in those

3    discussions.  But I don't believe, Your Honor, it's for lack of

4    an interest in reaching an agreement.  I think the

5    negotiations, as I understand them, went to a certain point and

6    then fell off.

7          And there were probably, as in most negotiations, any

8    number of reasons on both sides for that.  Frankly, I think

9    some of the issues and one of the reasons we think mediation

10   would be useful, have to do with our particular client's

11   familiarity or lack thereof of American jurisprudence and how

12   things work here.  I think other issues are sort of unique to

13   the debtors and how they viewed this case.  I think a lot of it

14   has to do with the very different views we -- both sides had

15   about the corporate guarantee.  They haven't seen our evidence.

16   We never really got to that discussion.

17          So I think they were -- based on other negotiations,

18   they had a view as to what we should agree to that's not

19   consistent with how we see that issue based on the evidence

20   specific to us.  I think all of these things and the

21   complexities of the setoff and recharacterization issue make --

22   I can't speak to the other negotiations; I wasn't part of

23   them -- make these negotiations complex, but also ripe for a

24   neutral third person to be there to help the parties work

25   through them.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 36

1          THE COURT:  Okay.  Mr. Rosenthal, do you want to add

2     anything or are you perfectly happy sitting there?

3          MR. ROSENTHAL:  Your Honor, I would just add that

4     we -- it is a very complicated situation.  Not only are the

5     facts complicated, the parties are complicated; the Swiss

6     procedure is a different procedure than we have in the United

7     States.

8          In our particular case, the negotiations are really

9     about -- they're not so much about the numbers, although a lot

10    of time was spent trying to reconcile the numbers.  The numbers

11    were difficult.  And some of the global close numbers were not

12    correct, and we actually both agreed on that in some instances.

13    The particular issues that we were trying to work on that were

14    involved here, were the ones we were talking about right now,

15    the corporate resolution guarantee, the validity of it, the

16    likelihood of success of it; the subordination argument, the

17    validity of it, likelihood of success.  And those are the

18    issues --

19          THE COURT:  But isn't that what every other foreign

20    affiliate did when it reached an agreement with the debtor?

21          MR. ROSENTHAL:  Well, I'm not sure they had the same

22    issues?  We had --

23          THE COURT:  Why?

24          MR. ROSENTHAL:  -- as far as I know, we had far and

25    away the largest corporate resolution issue because of the

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 37

1    nature of what this entity, LBF, did.  LBF did not issue debt

2    and take in money.  It existed to put -- take hedge positions

3    with respect to debt issuances by other entities.  So in and of

4    itself, LBF really didn't have any particular asset base.  It

5    owed all of its funding to Mama-Lehman, to LBHI.

6         So it was a different entity.  It was created in a

7    jurisdiction that had fewer regulatory restrictions.  It was

8    created, sort of, to be the intermediary to issue those

9    obligations.  And that, we believe, and PwC believes, in

10   Switzerland, made it different and gave us a different look, if

11   you will.  And that's why view the corporate resolution

12   guarantee claim as a more important and stronger position than

13   perhaps others did, and why it was important in our situation

14   to be able to rely on that corporate resolution guarantee,

15   which we knew about and had in our financials.

16        On the subordination side, I don't know what the other

17   entities had.  But for the very reason I've just -- I just

18   mentioned to you, it seemed to us and it seemed to the Swiss

19   lawyers that looked at it and that are advising LBF on the

20   Swiss side, that the nature of the entity made the

21   subordination -- the recharacterization argument in

22   Switzerland, a particularly powerful, strong argument.

23        Now, I mean, you can ask me why are we different from

24   Hong Kong or whatever.  I don't know what Hong Kong's situation

25   was.  I really don't.  And I don't know exactly the process

08-13555-mg  Doc 24756  Filed 01/27/12  Entered 01/30/12 10:07:08  Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 38 of 107

Page 38

1   they went through.  And I don't know whether they had ten

2   issues that they resolved as opposed to two main ones that are

3   being discussed.

4        I will tell you, and I think I told you when you sent

5   us to mediation on the Millennium matter -- if you remember --

6   a very complicated matter, that I thought it was enormously

7   valuable for the parties and my client to be able to get into a

8   setting where a mediator could provide input.  And I think

9   that's why in early this year, I did make the proposal to Mr.

10  Perez, when I sent him an analysis of what we thought might be

11  an appropriate reserve, why don't we just get around this and

12  go straight to an allowance determination, and start by trying

13  to mediate it.

14       And I have a very strong sense that my client and

15  others in Switzerland think that's the right way to resolve

16  this.  I don't think -- I heard the Court's position about the

17  zero reserve or the maximum reserve.  I don't actually -- I

18  mean, I understand the Court's position that you think it's

19  unreasonable to reserve in full for this claim.  But if we're

20  talking about -- in the context of talking about something that

21  we're proposing and agreeing could be handled on an expedited

22  basis, so that you can actually make this determination -- if

23  we can't resolve it consensually, you can actually make this

24  determination in time so perhaps -- so that the second

25  distribution would have a resolution of this.

1          In the scheme of things, I know it's a big case; I

2     know this is a big amount, but in the scheme of things, Your

3     Honor, respectfully, I think the right thing to do is to

4     reserve for the full amount of the claim, send the parties --

5     instruct the debtor to file a disallowance motion, instruct the

6     parties they need to go to mediation with one of your

7     mediators, set a schedule, set a hearing, bring us back here if

8     we can't reach a resolution.

9          THE COURT:  Okay.  I hear your suggestion.

10         MR. FLECK:  Your Honor, if I may, very briefly?  Evan

11    Fleck on behalf of -- of Milbank Tweed on behalf of the

12    creditors' committee.

13         It probably comes with no surprise to the Court that

14    this is an important issue for the creditors' committee, as

15    it's very important and bears upon recoveries to creditors.

16    And that has been the focus -- it's our mandate -- the focus of

17    our attention; really what brought so many, many parties to the

18    table to make the kind of sacrifices that the Court recognized

19    in connection with confirming the plan.

20         I don't want to go through -- I'm sure the Court

21    doesn't need to hear it from us -- the legal arguments.

22    Suffice it to say, from the posi -- from the perspective of the

23    creditors' committee, we support the legal positions that are

24    set forth in the debtors' papers, and we go through some of

25    those in our papers as well.

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 40 of 107

Page 40

1          But I rise just to speak to a few points from a

2     different perspective, that will hopefully be helpful to the

3     Court.  And I say it's from a different perspective, because

4     we're the creditors' committee.  LBF, to the extent it has

5     allowed claims, is part of the committee's constituency. So we

6     grapple with these issues all the time throughout the case when

7     we're dealing with a claim of a member of our constituency.

8     And it requires additional scrutiny when we take issue with the

9     position that a member of the committee's constituency is

10    taking vis-a-vis the debtor or another party in the case.  But

11    that's what the committee is doing here, because we think it's

12    appropriate.

13         The issue that has been part of the colloquy this

14    morning has been whether LBF is different and why has LBF not

15    been able to reach an agreement when other parties have.  We

16    were there, Your Honor.  Personally, I was there.  But the

17    committee was there in person or in direct dialog during the

18    course of the discussions with many, many of the foreign

19    affiliates.  We also are aware of the discussions with LBF.

20         What happened in the protocol room, obviously, is

21    confidential.  I'm not interested in -- I'm not going to breach

22    that.  We're comfortable with the debtors' characterization of

23    what has gone on in the negotiations with LBF.

24         But the committee feels very strongly and wants the

25    Court to be aware that from the committee's perspective, the

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 41

1    issues are not unique here.  The board resolution is something

2    that the creditors of the estate, through the committee, have

3    spent a lot of time on -- a lot of money of the creditors

4    analyzing these issues.  And rest assured, Your Honor, many,

5    many of the affiliates viewed this as an extremely important

6    issue.  They felt they had the best case.  They felt they could

7    prove knowledge and reliance better than anybody else.

8             We looked at their files.  We talked about the legal

9    arguments.  Particularly it was the legal arguments.  And they

10   had very able counsel, counsel that appear very often before

11   this Court.  And they reached a conclusion that a compromise

12   was appropriate.  We, the committee, agree with the principles

13   that the debtors set out for how you look at the corporate

14   resolution and what the relevant legal standard is.

15            That's also true for the issue of subordination in

16   other jurisdictions.  I'm not a Swiss lawyer; I'm not going to

17   speak about what the law is there.  We've looked at it.  We've

18   read the analysis by Swiss lawyers.  But the issue of whether

19   the intercompany claims should be treated as equity is not new.

20   And it was definitely a relevant consideration, if not the most

21   relevant consideration, in some of the discussions that

22   ultimately resulted in settlements when reasonable people came

23   together.

24            And as Your Honor noted at the confirmation hearing,

25   extreme -- I'm not going to -- not a direct quote, but

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 42 of 107

Page 42

 1    extremely difficult issues that would have led to litigation --

 2    prolonged litigation, but the parties decided that under the

 3    facts and circumstances, given their assessments of risk, they

 4    should settle.  And this is one of the issues that they

 5    settled.  And they settled it very much in favor and consistent

 6    with what the debtors' position is here today.

 7            So the issue of subordination, as well as the issue of

 8    whether a subordinated claim could be the subject of set-off,

 9    that's an issue that we spent quite a bit of time on with many

10    of the affiliates.  And again, ultimately, those affiliates

11    determined that in the context of a settlement -- there was a

12    risk assessment, but I'll also say without divulging anything

13    of those discussions, that again, we're comfortable with the

14    position that the debtors have articulated here and set forth

15    in their papers.

16            Finally, Your Honor -- and we put this in the

17    committee's pleading -- LBF is not at risk here.  Obviously,

18    everyone -- and the parties are asking the Court to make best

19    efforts to estimate for purposes of distributions.  But there

20    is a catch-up mechanism.  If we're wrong about this -- and no

21    one's taking this lightly -- our judgments about what the claim

22    should be, as Mr. Perez said, this is not an ultimate

23    determination of the claim.  But if we're wrong for purposes of

24    estimation, there's a protection within the plan.  That's what

25    people negotiated for.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 43

1          This provision just didn't appear within the plan.

2     This was heavily negotiated among the parties.  It was, in

3     fact, an important issue that I believe brought creditors to

4     the table, and among all of the other provisions and

5     protections in the plan, was something that they were

6     comfortable with, so that other parties realized -- and these

7     claims were known to other major creditors in the case --

8     realized that their distributions were not going to be held up

9     on account of inflated claims filed by parties like LBF, but

10    specifically LBF.  Because the creditors in this case are fully

11    aware of what has taken place over the course of these cases in

12    terms of the dialog with LBF.

13          So from the committee's perspective, it is a

14    reasonable expectation of the unsecured creditors of these

15    estates who have allowed claims or have taken reasonable

16    positions with respect to reserves that have been approved by

17    this Court.  And stipulations are -- plenty of them are on the

18    record, that they are entitled to have an appropriate initial

19    distribution that is not inappropriately reduced as a result of

20    the claims that have been asserted here by LBF.  Thank you,

21    Your Honor.

22          THE COURT:  Thank you.

23          MR. PEREZ:  Your Honor, I have five very, very, very

24    quick points.

25          First of all, Your Honor, unlike, for instance, the

Page 44

1    plan in Enron in which the estimation served as a cap on any

2    recovery, here we have this catch-up mechanism built in right

3    into 8.4.  So there's no issue with that there.

4         Second, Your Honor, both Mr. Krakow and Mr. Rosenthal

5    make much about the corporate res.  For purposes of this

6    estimation motion, I'm saying, you know, your 15.6 is your

7    15.6.  I'm not really debating that.  Okay?  I'm saying, you

8    know, that's for a different day.  I mean, that was a second

9    point that I tried to make after I came back on the twenty

10   percent.  But I'm not really debating that.

11        And so -- and the real issue, Your Honor, is -- and I

12   just want to emphasize this -- is that while their claims

13   against us are corporate res, our claims against them are for

14   monies advanced.

15        Your Honor, this -- LBF was very, very, very similarly

16   situated to LBSF.  There were derivatives.  They did -- I

17   believe LBF did equity derivatives; LBSF did other types of

18   derivatives.  But they're really basically -- one entity was in

19   the United States, the other entity was less regulated and was

20   overseas.

21        And, Your Honor, in connection with the plan

22   compromises, one of the plan compromises is a twenty-percent

23   recharacterization risk on the affiliates.  Now, it was only

24   with the affiliates that were controlled by the debtor, but

25   there was a twenty-percent recharacterization risk with the

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 45

1    affiliates controlled by the debtors.

2         So, Your Honor, we're happy to agree to an expedited

3    proceeding to mediate the claims on a final basis.  But, Your

4    Honor, in the interim, we believe that a reserve -- even if you

5    use the twenty percent -- a reserve for both claims of three

6    billion dollars is more than adequate for them during this time

7    period, Your Honor.

8         THE COURT:  Okay.  We're throwing around numbers, but

9    they're all in billions.  And when you think about the paucity

10   of the actual record that is before the Court, at a time when

11   I'm being asked to estimate a claim that notionally is 15.6

12   billion dollars, I'm frankly feeling a little uncomfortable

13   that the loose standards applicable to estimation are being

14   applied now to such enormous claims.

15        I've read the papers and thought about them and have

16   listened carefully to the arguments.  Unless the parties

17   otherwise agree, it's really my job to decide the motion.  And

18   in effect, as a result of the back-and-forth colloquy that has

19   occurred this morning, the debtor had modified its position as

20   to what it would assert would be a reasonable number for

21   purposes of reserve at three billion dollars.

22        LBF's counsel has not commented one way or the other

23   as to whether or not that would be an acceptable starting

24   point, although counsel for LBF, in argument, has for all

25   practical purposes acknowledged that the second distribution

Page 46

1    scheduled for September 30, 2012, may be the date when

2    regardless of the amount of the reserve, there's an opportunity

3    for catch-up, adjustment, and reconciliation.

4            In part because of the structure of the plan, in part

5    because of Mr. Ehrmann's supplemental declaration that notes

6    the relatively long timeline for monetization of presently

7    illiquid assets, this is not a situation in which LBF stands to

8    be prejudiced, provided that the parties are able to expedite

9    some kind of claims resolution that decides this on the merits

10   as to what the true claim amount should be.

11           Given the circumstances, I'm going to estimate the

12   claim at three billion dollars for purposes of the reserve.

13   That is, I might note, a completely arbitrary number.  I do not

14   believe that LBF will be prejudiced in having the number fixed

15   at that level, and I also believe that other creditors are

16   benefited by virtue of fixing the claim for initial

17   distribution purposes at a level that does not unfairly dilute

18   distributions that would otherwise go to other creditors.

19           Now, there is a matter that has been discussed that's

20   really not before the Court in a formal way, which is the

21   Rosenthal request for expedited mediation.  I'm not ruling on

22   that.  I believe that the parties are sophisticated,

23   represented by sophisticated counsel, fully familiar with the

24   underlying facts and the legal principles that govern those

25   facts, and are capable, if they're willing to act rationally

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 47

```
1    and reasonably, to reach an agreement.  I don't believe that a

2    mediation at this point necessarily advances the ball.

3           I'm mindful of a comment that was made during argument

4    about the relative familiarity of the liquidators in

5    Switzerland with U.S. bankruptcy practice and procedure and the

6    degree to which that lack of familiarity may be a detriment to

7    reaching some kind of consensual resolution.  I would note that

8    every foreign administrator, trustee, and liquidator, is in the

9    exact same position as PricewaterhouseCoopers Switzerland in

10   terms of relative familiarity.  And they've been able to reach

11   agreements.

12          Nothing that I'm saying compels a party to reach an

13   agreement.  It's simply something that parties should actively

14   consider.  To the extent that they are unable to reach an

15   agreement, the parties obviously have recourse here.

16          In that respect, it occurs to me that it may be of

17   value for the debtors, sooner rather than later, to file formal

18   objections to the LBF claims that gives me and others,

19   including the creditors' committee, an opportunity to assess

20   the actual strength of the arguments that might lead to

21   disallowance.  Furthermore, the pendency of such a motion that

22   could lead to coercive relief, might be a very helpful

23   motivator to Gibson Dunn's clients.

24          I would suggest, however, that before unleashing the

25   resources to prepare such papers, that the parties might
```

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 48 of 107

Page 48

1   actually consider a two-week period of intense negotiation to

2   start now, before incremental expenses have been incurred on

3   either side.  The two-week period that I suggest is purely

4   arbitrary.  It could be ten days; it could be three weeks.  But

5   that the parties get back to the table and consider the history

6   that has led to bilateral agreements with other affiliates as

7   important precedent.

8          That's my ruling.

9          MR. PEREZ:  Thank you, Your Honor.  And we'll take the

10  Court's ruling to heart and we'll start to schedule

11  negotiations immediately.  I'll work with Mr. Rosenthal with

12  respect to the form of order to present to the Court.

13         Your Honor, I'm handling the next motion, and I really

14  need a drink of water.  Would it be possible to take a two-

15  minute break?

16         THE COURT:  Well, it's --

17         MR. PEREZ:  The next one's the easy one, Your Honor.

18         THE COURT:  Well, I've read those papers.  It's not so

19  easy.

20         MR. PEREZ:  Oh, Your Honor, it is easy.  It is easy.

21  This was the hard one.

22         THE COURT:  Okay.  We're going to take, actually, a

23  break until 11:30, not two minutes.  And those parties who wish

24  to be excused because they're not interested in the rest of the

25  calendar, can obviously leave.  Those who are interested and

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 49

1    wish to come back are welcome at 11:30.

2            MR. PEREZ:  Thank you, Your Honor.

3        (Recess from 11:22 a.m. until 11:33 a.m.)

4            THE COURT:  Be seated, please.  Okay.

5            MR. PEREZ:  Good morning, Your Honor.

6            THE COURT:  We've all had a break and some people

7    left.

8            MR. PEREZ:  A few.  Good morning, Your Honor.  Alfredo

9    Perez on behalf of the debtors.

10            Your Honor, before you now is the debtors' motion to

11    estimate some of the RMBS claims.  And subsequent to filing the

12    motion, Your Honor, we withdrew the motion as against Wells

13    Fargo, one of the trustees, and we have adjourned the motion as

14    it relates to Deutsche Bank, HSBC, and a portion of Wilmington

15    Trust's claims.  The two remaining claims of Wilmington Trust

16    that are the subject of this hearing are claim number 22766 and

17    22773.  So we're going forward vis-a-vis three of the trustees:

18    Citibank, U.S. Bank, and Wilmington, as it relates to those two

19    proofs of claim.

20            Your Honor, as the Court is aware, the debtors

21    objected to these claims way back.  The Court held a hearing.

22    At that hearing, the Court basically instructed the parties to

23    continue further discussions.  Those discussions have continued

24    and are continuing.  There -- we're scheduled to have ongoing

25    conversations.

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 50 of 107

Page 50

1          This is a very complicated matter to figure out how to

2     finally resolve these claims.  I don't think anybody disputes

3     that.  We're not talking about -- we're talking about things

4     that are going to occur over time, and we're -- you know, we

5     have a million loans.  So this is an ongoing -- so those

6     discussions are ongoing.

7          We have the practical problem, Your Honor, of trying

8     to make a distribution in the first quarter.  And it's very

9     important to us.  And so we've -- what we've done is we've

10    tried to create a methodology that allows us to estimate the

11    claims to give the trustees protection that once the claims are

12    allowed -- and it's conceivable that we would enter into a

13    protocol where they would have a much longer time period to

14    assert claims than kind of the estate.  So we would, in

15    essence, fund a trust or something like that.  Those are among

16    the discussions that have been -- so that they wouldn't be

17    forced to assert a claim if, in fact, a claim hasn't matured

18    until a later date.  So those are ongoing discussions.

19         But having said all of that, Your Honor, we're talking

20    about approximately thirty-six billion dollars of claims that

21    have been filed.  We believe that as it relates to Citibank,

22    U.S. Bank and Wilmington with respect to their two claims, the

23    range of possible outcomes is between 1.1 billion and 2.4

24    billion.  So we have requested, just to be on the safe side, a

25    2.4 billion dollar reserve.

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 51 of 107

Page 51

1          Generally, Your Honor, the claims were filed at face

2     amount.  They were also filed in a duplicative fashion.  So in

3     other words, they were filed a hundred percent against LBI, a

4     hundred percent against SASCO.  Thankfully, Mr. Burke's

5     affidavit has really done a lot of good.

6          So their starting position right now is at 15 billion

7     and the delta is 15 to 2.4.  We think it's 2.4.  And I'm going

8     to spend most of my time -- and I do think it is much simpler,

9     Your Honor, than the other one.  Because I'm going to --

10    because we do have numbers, and we do have the amounts that we

11    can play with as opposed to, you know, guesses, Your Honor.

12         But I'm going to spend most of my time talking about

13    the annex to Mr. Burke's affidavit which talked about the

14    various default rates and the application of the various

15    takeaways, if you will.

16         Let me start by saying, number one, these were filed

17    as duplicative claims.  So right then, I think you cut them

18    down in half.  Second, Your Honor, as we indicated in our

19    motion, the only asserted, identifiable loans with breaches

20    have been about 200 million dollars'-worth -- 208 million

21    dollars.  Those are the only loans that have asserted breaches.

22    Now, obviously, there's a tail.  And -- but to date, that's

23    what we're talking about.

24         Your Honor, we submitted the affidavit of Mr. Zach

25    Trumpp.  Mr. Trumpp has, since 2005, been the person, first at

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 52 of 107

Page 52

1    Aurora and now at the estate, that has been managing, in

2    essence, the claims asserted in connection with the reps and

3    warranties.  He has supervised -- he's not a lawyer, but he's

4    supervised the filing of over a hundred lawsuits where they've

5    made affirmative claims against -- and Mr. Michael Rollin is

6    here from the Reilly Pozner firm, who is the person who in

7    essence prosecutes those claims on behalf of the estate and has

8    prosecuted those claims.  So to that extent, we're here.

9          So this -- the information that he put in his

10   affidavit is actually based on his personal knowledge and the

11   debtors' actual experience, with one exception that I'll talk

12   about, to date.  So we're not guessing here.  And the range --

13   the range that we put in includes a delta above the actual

14   experience.

15         The methodology that he used in terms of starting with

16   the unpaid balance and then taking the various discounts, Your

17   Honor, again, that's totally standard.  Mr. Burke adopted that.

18   If you look at any number of analyst report, they adopt that

19   methodology.

20         So the key issue, Your Honor, and why I believe that

21   the motion is so compelling, is because Mr. Trumpp knows and

22   knew -- and that information is available to the trustees --

23   what the actual default rate is, what the actual severity rate

24   is, and what the actual breach rate is.  So those are knowns,

25   and those can be obtained from Aurora or other sources.

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 53 of 107

Page 53

 1   They're not unknowns.

 2           What -- the number that is probably the one that's the

 3   subject of most dispute, is the validation rate.  And in

 4   connection with that, Your Honor, the validation rate is -- we

 5   can think of that as a situation where just because I file a

 6   lawsuit doesn't mean somebody's going to send me a check by

 7   return mail.  And his range of thirty to forty is based on his

 8   experience of the more than a hundred claims that he's

 9   prosecuted to see once you file a claim that asks for X, what

10   is the likelihood of you actually being able to prove your

11   breach and that the breach was material and that the

12   materiality led to damages.

13           Because it's not -- this is not a strict liability.

14   Just because there is a breach, assuming that somebody said

15   that their income was 2,000 dollars less than it should have

16   been, that might constitute a breach.  But if they're still

17   within the income guidelines and everything else, the fact that

18   there's a breach doesn't then cause the damage to be done.  And

19   that's what -- and that's what validation is.

20           And every other entity that does it, you can -- some

21   people call validation success rate in the litigation; some

22   people call validation the amount of provable rep and warrant

23   claims, depending on how you look at it.  We call it

24   validation, Your Honor, because it's claims coming into the

25   estate that we're trying to validate.

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 54

1         So the information in the affidavit, the range that we

2    put in there, is based on basically seven years of experience

3    handling these very issues in these very trusts, for the most

4    part -- not exclusively -- in these very trusts, during that

5    time period.  And we think that applying these numbers, which

6    we think are on the conservative side, allow for that.

7         Now, as it relates to the default rate -- and let me

8    give the Court -- may I approach and give a copy of the --

9         THE COURT:  Yes.

10        MR. PEREZ:  All right.  So, Your Honor, let me --

11        THE COURT:  Before we go through the chart, I just

12   have a fundamental question as to where we're going.  I

13   reviewed the Burke declaration and I reviewed the Trumpp

14   declaration.  That's Trumpp with two Ps, not to be confused

15   with the other Trump.  And there's obviously a disagreement as

16   to what the right percentages are, what the risk factors are.

17   And there's an indication by Mr. Burke that some of what he has

18   done is preliminary, because he was brought in late in the game

19   and he's still studying the matter.

20        So a question that I have is whether or not this is

21   all ripe for determination today?

22        MR. PEREZ:  Your Honor, it's a fair question.  We

23   actually thought you were going to ask that question.  And --

24        THE COURT:  Am I that predictable?

25        MR. PEREZ:  Um --

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 55 of 107

Page 55

1          THE COURT:  Apparently the answer is yes.

2          MR. PEREZ:  Absolutely not, Your Honor.  It would have

3     never crossed my mind.

4          Having said that, Your Honor, I do think it's ripe for

5     determination.  And let me tell you why.  I think that the

6     debtor, when it comes to an estimation, can use its actual

7     experience to determine whether to set the reserves.  And we're

8     not talking about something that just happened yesterday.  Mr.

9     Trumpp's been managing this for seven years.  So -- and it's

10    based on not two, not three, not five, not ten -- it's based on

11    a hundred lawsuits, forty of which are currently active.

12         So they are -- there are situations where yes, if you

13    got one expert saying X, we've got one expert saying Y.  We're

14    not trying to prove what's correct here or not.  And I want to

15    understand that.  We're not -- the process of them -- you know,

16    we've objected to their claims.  The process of them -- in

17    essence, the burden has shifted -- them proving their claim,

18    that's ongoing.

19         But for purposes of this motion, I don't believe that

20    you've got to determine whether Mr. Burke is correct or whether

21    we're correct.  So long as the debtor can put forth a

22    reasonable interpretation -- a reasonable position vis-a-vis

23    what it intends to do and how it intends to estimate, I think

24    that that's a legitimate way to proceed.

25         And turning to the chart just for a minute, the

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 56 of 107

Page 56

1    default --

2           THE COURT:  But before we get to the chart -- this is

3    the second time I'm interrupting your --

4           MR. PEREZ:  Efforts to go to the chart?

5           THE COURT:  -- desire to have me look at this chart.

6    On the question of ripeness, Mr. Burke's declaration makes

7    clear that he has more work to do and that the parties are

8    engaged in an ongoing process of attempting to work out a

9    protocol for purposes of estimating the actual exposure

10   associated with the securitization pools.

11          Why do we need to decide this today?  And that's

12   really the ripeness question.

13          MR. PEREZ:  Right.  Well, Your Honor, okay.  First of

14   all, Your Honor, they've agreed that under any circumstances,

15   it shouldn't be more than 15.3 billion.  So this is probably

16   the single largest impact on the distributions, this claim,

17   this 37 billion dollar claim.  It's probably the single largest

18   impact on distribution.

19          And so, that's the reason why we need to estimate.

20   And to the extent that we, as a result of the ongoing

21   discussions, come up with a different number, then we'll adjust

22   it.  Nothing's going to happen between now and the next

23   distribution or the distribution after that that is going to in

24   any way prejudice their rights.  But this is the single largest

25   claim that we need to -- and the biggest delta, I might add,

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 57 of 107

Page 57

```
 1    from 37 to 2.4.

 2            THE COURT:  Okay.  Mr. Trumpp estimates the exposure

 3    for reserve purposes at 2.4 billion.  Mr. Burke estimates the

 4    exposure for reserve purposes at 15.3 billion.  You're telling

 5    me that I should simply accept Mr. Trumpp's number.  Is that

 6    right?

 7            MR. PEREZ:  Your Honor, I'm not -- I would like for

 8    you to do that.  But I don't -- I mean, Your Honor, I think

 9    that when you come down to it, the -- his biggest issue is the

10    hundred-percent validation rate.  I think it's a flaw in his

11    methodology.  So once you apply any reasonable valid --

12    validation rate, then you come with a number that much, much,

13    much smaller; much, much smaller.

14            THE COURT:  Go ahead.  Use the chart.  I've --

15            MR. PEREZ:  Okay.

16            THE COURT:  -- I've interrupted you enough.

17            MR. PEREZ:  Thank you, Your Honor.  Your Honor, as it

18    relates to default severity and the breach rate, which are

19    three of the four variables, the numbers that we use, the range

20    that we use; twenty-five percent to forty-five percent for the

21    default rate, forty-five percent, fifty-five percent for the

22    severity rate, and thirty percent to thirty-five percent for

23    the breach rate.  Those are all based on actual experience.

24            The numbers -- the actual experience that LBHI has

25    experienced that -- objective numbers that are available to the
```

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 58 of 107

Page 58

1   trustee just like they're available to us are within those

2   rages.  Okay?  We took the top end of the rages, but the

3   numbers are within those ranges.  So those should be a given.

4          And so, really, in my mind, what's left is the

5   validation rate.  We say the validation rate is between thirty

6   and forty percent, and he basically says once you file a

7   lawsuit you're going to get a check by return mail.  That's

8   what a hundred percent validation means, and that just can't be

9   right.  That just cannot be right.  There are any number of

10  reports out there by companies, both in -- that have originated

11  mortgages, that have -- and for instance, J.P. Morgan issued a

12  report on -- in Jan -- in November of 2010, which they said

13  that their validation rate, which they called a repurchase rate

14  because they were looking at it what's the exposure to J.P.

15  Morgan.

16         And they said their low was twenty percent.  Their

17  high was fifty percent, so out number is in there.  Even if you

18  use the fifty percent validation rate that we're talking about,

19  you're still only talking about a 3 billion dollar -- you raise

20  it by 600 million dollars.  You raise it from -- instead of

21  using a high-end forty percent validation rate to a high end

22  fifty percent validation rate, you're still only talking about

23  a three-billion-dollar reserve, not a thirty-six-billion-dollar

24  reserve.

25         And Your Honor, I think that based the actual

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 59 of 107

Page 59

1    experience and Mr. Trumpp's declaration that this is the actual

2    experience for this portfolio that that's a reasonable basis of

3    making the reserve estimation, Your Honor.  So while we agree

4    that Mr. Burke has put different numbers, his numbers have been

5    not from the actual experience of this portfolio.  His numbers

6    have been from numbers that he -- he's picked up in other areas

7    and with respect to other studies, not as it relates to this

8    portfolio.

9            And Your Honor, he does said that he was only recently

10   retained.  That's true.  It's unfortunate.  He should have been

11   retained a year ago.  It's not like we didn't file an objection

12   to these claims over -- almost a year ago.  It's not like the

13   Court hasn't heard it.  And this is something that's been

14   ongoing.  We've known all along that we've -- that we're going

15   to have to deal with these claims because they're the single

16   largest ones out there, collectively.  And so, the -- I think

17   it should be no surprise that we're here while at the same time

18   we're running a parallel path on the actual objection.

19           And Your Honor, I recognize that Mr. Burke hasn't done

20   the work, but it's really not the debtors' fault that the

21   trustees hadn't retained him and have had been done the work

22   and use the actual numbers going back.  So with that said, Your

23   Honor, we would request that the claims be estimates for

24   reserve purposes.

25           THE COURT:  What happened to the Wells Fargo

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 60 of 107

Page 60

1    objection?

2            MR. PEREZ:  We withdrew it, Your Honor.

3            THE COURT:  And why is that?

4            MR. PEREZ:  Your Honor, after reviewing the claim and

5    thinking about it further, we wanted to wait a little bit

6    longer to decide whether we were going to do that or try to

7    sell it consensually.  The other two that we've adjourned,

8    we've actually -- we think we've settled and will be

9    submitting.

10            THE COURT:  One thing I didn't quite understand, and

11    this relates to Wilmington Trust.  Wilmington Trust appears to

12    be represented by separate law firms with respect to separate

13    securitization trusts.  One matter involving Alston & Bird was

14    adjourned.

15            MR. PEREZ:  Correct.

16            THE COURT:  The other was not.  My reaction to that

17    was what's this about.

18            MR. PEREZ:  Well, Your Honor, I believe that -- and

19    counsel can speak more clearly -- the Wilmington Trust, the two

20    proofs of claim that we continued that are the subject of this

21    hearing --

22            THE COURT:  Aren't the issues identical?  Well, why

23    are they not identical?

24            MR. PEREZ:  Well, they are -- they may be identical,

25    but resolution of them may be easier with some rather than

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 61 of 107

Page 61

1    others.  The issues are identical.

2             THE COURT:  But -- and --

3             MR. PEREZ:  And by the way --

4             THE COURT:  -- here's my -- you're kind of playing

5    into my hand right now.  If it's true that you can adjourn some

6    of these to another date in February, why do we have to decide

7    these today?

8             MR. PEREZ:  Because for reserve purposes, Your Honor,

9    this is thirty-six out of the thirty-seven billion; these three

10   entities.  The other ones are less than a billion.

11            THE COURT:  Oh, so this is just a pure numbers

12   games --

13            MR. PEREZ:  Exactly

14            THE COURT:  -- from your perspective.

15            MR. PEREZ:  Well, it's not just a pure numbers games,

16   but it is -- these are the vast majority.

17            THE COURT:  I understand that.  But if it's true that

18   for reserve purposes you can take certain similarly situated

19   claims and put them off a month, why can't you put all of them

20   off for a month, give Mr. Burke and Mr. Trumpp and the advisors

21   more of an opportunity to work together to come with a

22   consensual and fair number since all we're trying to do is some

23   up with a fair reserve?

24            MR. PEREZ:  Your Honor, I mean, obviously, if the

25   Court's inclined to do that we would ask that the reserve be

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 62 of 107

Page 62

1    set at the fifteen-billion, not at the full face amount of

2    claims, which is what Mr. Burke had right now.  But that has

3    significant -- that will have a significant impact on the first

4    distribution.  That's all I can say.  I --

5              THE COURT:  Are you saying that the first distribution

6    cannot accomplished unless --

7              MR. PEREZ:  No.

8              THE COURT:  -- this significant amount is estimated

9    today?

10             MR. PEREZ:  No, I am not saying that, Your Honor.  And

11   I didn't --

12             THE COURT:  What --

13             MR. PEREZ:  -- say that.

14             THE COURT:  -- are you saying?

15             MR. PEREZ:  Huh?

16             THE COURT:  What are you saying?

17             MR. PEREZ:  What I am saying is, is that it's the hope

18   of the debtor to have a distribution in the first quarter and

19   that the amount -- and that we -- I mean, there's no question

20   in our mind that these claims are way over inflated.

21   Putting -- let's put that aside, and that they're clo -- a lot

22   close to the two-billion-dollar number than they are to the

23   fifteen --

24             THE COURT:  There's no question in my mind that

25   they're way overinflated too, so you don't have a major burden

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 63 of 107

Page 63

1    of advocacy to get me to that point.  The question is what's

2    the fair reserve number for purposes of the initial

3    distribution, and do I have a sufficient record to make an

4    informed judgment as to what that right number should be.

5    That's effectively my concern.  It's somewhat similar to the

6    concern raised in connection with LBF earlier today.

7         And since so much of the variable goes to the

8    validation rate --

9         MR. PEREZ:  But the validation rate, Your Honor, is a

10    matter -- that's not the subject of what the validation is;

11    whether a hundred is appropriate or forty is appropriate --

12         THE COURT:  Whether to use it or not.

13         MR. PEREZ:  Whether to use it or not, and we think

14    that's more of a legal issue than it is a factual

15    determination.  I mean, if you assume a hundred percent

16    validation rate, I would be a rich man because I would be able

17    to go to court and file a lawsuit and get a check in the return

18    mail.  That's what a hundred percent validation rate means.

19    That's exactly what it means, Your Honor.  That's can't be

20    correct.  Just because somebody has a breach does not mean I

21    recover money.  And when you look at J.P. Morgan and their

22    analysis, which they put out to the public, you're talking a

23    range between twenty-two and fifty.

24         So even -- let's assume you say fifty percent

25    validation rate so that every time I file a lawsuit I get fifty

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 64 of 107

Page 64

1    cents back on every dollar, that's it.  That's a legal issue.

2    The other stuff, I think, is -- are known numbers that they

3    should have had.

4              THE COURT:  Okay.

5              MR. PEREZ:  Thank you, Your Honor.

6              THE COURT:  I understand your point.

7              MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

8    Tweed Hadley & McCloy, on behalf of the committee.

9              Very briefly.  I won't reiterate what Mr. Flack said

10   the last time.  But we, as with this motion as with the LBF

11   motion, believe that it is imperative that the Court seek to

12   estimate now to facilitate a distribution here that would be

13   larger than it would otherwise be.  The creditors voted for

14   this plan on the assumption that some of these issues would be

15   dealt with before this first distribution, and postponing it

16   isn't necessary because as we've indicated before they are

17   protected.

18             Even if you estimated a number that was lower than it

19   might otherwise be or that might be adjusted to be in the

20   future, there is a catch up mechanism that would protect them.

21   We think the record in this case -- I think there's more of a

22   record here than you had with respect to LBF in terms of being

23   able to make a decision as to whether the debtors have a

24   reasonable basis for estimating the claims in the amount

25   proposed.  With those brief remarks, that's all we have to say,

1       Your Honor.

2               THE COURT:  Okay.

3               MR. TOP:  Good morning, Your Honor.  Frank Top from

4       Chapman and Cutler.  I'm here on behalf of U.S. Bank National

5       Association.  U.S. Bank National Association is the

6       securitization trustee for well over a million loans and

7       hundreds of trusts.

8               And I think one of the things that -- when you're

9       focusing the chart that you ought to focus is the huge number

10      of cumulative losses in these portfolios over the years.  I

11      think right now we're at close to forty billion dollars of

12      cumulative losses, and I think both sides agree that those

13      numbers are only going to go higher.  And so, we're really

14      talking about a large number of loans that have problems in

15      these portfolios.

16              I am not going to dwell too much on some of the

17      factors that were talked about at the last hearing in

18      connection with estimation.  We are very, very concerned, of

19      course, with irreparable harm.  There really isn't anything in

20      the motion that allows us to determine how one particular

21      estimation over another might affect distribution down the

22      road.  All that, as far as we're concerned, is speculation.

23      And so, we are very, very concerned that at the end of the day

24      if these claims are in fact determined to be much higher than

25      they are being estimated that some of these investors and these

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 66 of 107

Page 66

1      trusts are going to lose out.

2            And so, we do have that concern.  But because it's

3      already been a major focus of the hearing today, I'm not going

4      to dwell on that too much.  And rather, I will focus -- spend a

5      lot of time focusing on these numbers and why we think some of

6      these numbers are softer than the debtors alleged -- allege to

7      you.

8            And I guess the first thing I'll start off with, just

9      going in no particular order, is this concept of a default

10     rate.  And of course, the debtors have come up with a range of

11     thirty to forty-five percent.  And they do state that there

12     reported default rates in literature that you can -- with

13     respect to this particular portfolio.  And the point I want to

14     make, though, with respect to that particular default rate is

15     that is significantly underdefaults really the true defaults in

16     these portfolios.  What has happened in a lot of these

17     portfolios as loans default, servicers have been very -- have

18     been encouraged to try to rework these loans with various

19     borrowers.

20           And those loans are being reworked, and then not

21     longer are being recorded as in default when in fact there are

22     lots of studies out there that prove that the recidivism rate

23     in terms of default on loans that have been reworked in these

24     portfolios is somewhere close to fifty percent.  I think forty-

25     nine percent was the number that a particular study has

Page 67

1   recently held.  And so, to say that the default rate's thirty-

2   two percent, that is -- that may in fact be the reported

3   default rate.  But the reason they're using a range of twenty-

4   five to forty-five is because that default rate is not right.

5   And we believe that the default rate could be fifty percent or

6   more in connection with these transactions.

7          And let me talk about the numbers the debtors are

8   using as well because frankly we are not clear from the

9   trustee's perspective how current these averages and ranges

10  are.  It is true that having looked at Mr. Trumpp's resume

11  online that he has spent a lot of time working out these loans

12  at Aurora, but he no longer works at Aurora.  He works for the

13  estate.  He currently works for LAMCO and doesn't have -- while

14  he may have access to raw data in connection with these loans,

15  he's not actively engaged day-to-day in Aurora's loan files

16  taking a look at these breaches of representations and

17  warranties.

18         And I know Your Honor has reviewed much of the

19  examiner's report, and the examiner's report has a very large

20  section on the origination of loans by the Lehman estate in

21  2006 and 2007 and the fact that those loans had a lot more risk

22  involved in them than loans over current periods.  If someone's

23  not really looking at those files after 2008, you're not going

24  to get the uptick that other people have seen in the market as

25  it relates to default rates and severity rates.  So we're very,

1     very concerned that those numbers are historical and probably

2     are understated for that reasons as well.

3             And so, that gets us to the severity rate, which the

4     debtors believe is fifty-five percent.  We assert it's 68.3

5     percent.  Again, one of the problems here these average

6     severity rates, though, is they don't really -- it's an average

7     of all the loans and all the securitization transactions.

8     There are conventional mortgages in these transactions, which

9     have a much less severity rate.  There are these Alt-A loans,

10    which were a hot product towards the end of these -- the big

11    securitization age.  There's also a lot of subprime loans in

12    these particular securitizations.  Again, most of them

13    originated -- or a lot of them on a percentage basis originated

14    towards the periods right before Lehman's filing for

15    bankruptcy.

16            And the point with all of that is, is that these

17    riskier loans now are going into default; increasing the

18    severity rate.  And we -- Mr. Burke has taken a look at the

19    various severity rates for different types of products.  For

20    subprime loans, he believes that the severity rate might be as

21    high as eighty-five percent.  For home equity loans that

22    generally have second liens, it might a hundred percent.

23            And so, I guess the point of all this is even the

24    press -- there's all sorts of studies online too that report

25    that the severity rate as a whole is increasing.  This has been

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 69

1    reported by S&P, which has a severity rate somewhere in the

2    sixties.  Fitch has also reported a severity rate for loans

3    overall in the sixty-percent range.  And so, with respect to

4    those two items, we just think, frankly, that the debtors

5    understate those two issues.

6             The breach rate is probably ever more difficult,

7    though, than those two because in order to really determine the

8    breach rate you have to actually look at the mortgage loan

9    files.  This particular breach rate here relates to -- you have

10   a defaulted loan, and you're taking action with respect to the

11   defaulted loan.  And then, you're looking at that loan that's

12   in default to determine whether or not there were breaches of

13   representations and warranties with respect to that particular

14   loan.  Frankly, if you had to try to determine all the breaches

15   of representations and warranties and be actually precise about

16   it, you would have to look at more than one million mortgage

17   loan files.

18            And of course, that's an extremely large task, and I

19   think it would not make any sense for either the debtors or the

20   trustees to go through that effort.  We do have to come up with

21   some kind of a way to try to harmonize those two.  But frankly,

22   particularly since we're dealing with loans of more later

23   vintage, so they're going to default and because the products

24   were riskier products, we believe that the breach rate for

25   Lehman is probably higher than thirty-five percent.  What we're

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 70 of 107

Page 70

1    talking about here is there's all sorts of reasons why people

2    go into default on their loans.

3            I mean, sometimes people lose their job.  Sometimes,

4    people get ill or things like that.  But when you have such a

5    spike in the default rate as we have seen over the last several

6    years, and it becomes more likely, at least in our view it

7    becomes more likely, that the increase in the default rate

8    relates more to the representations and warranties issues

9    relating to the loan than it does with some kind of a change, a

10   life event in somebody's life.  It may be right.  It may be

11   wrong, but I think that's our belief.  And I think that's the

12   belief of others in the industry.

13           So we believe that the breach rate really should be

14   higher than the thirty-five percent rate that they espouse, and

15   Mr. Burke has come up with seventy percent for that.  But

16   again, that really, to make a fine point on that, really

17   requires someone to go loan-by-loan to take a look at those

18   breaches of representation and warranties.

19           And then, the final part in all of these steps is this

20   notion of a validation rate.  And frankly, we don't think a

21   validation rate for purposes of estimation is appropriate.  We

22   shouldn't -- our liability shouldn't be -- of the estate

23   shouldn't be determined based upon whether they believe the

24   trustee is able to prove up a claim in connection with this.

25           But in any event, we believe that a lot of the

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 71 of 107

Page 71

1    validation rate is duplicative of other items that are already

2    in this chart.  For example, whether the breach is material is

3    already covered by step 6 when it determines whether or not a

4    breach of a representation and warranty of the debtor caused a

5    particular default.  That's already covered in step 6.

6              Whether you can assert the claim against LBHI is

7    really covered in step 5.  We've already taken into

8    consideration whether or not Lehman has originated that

9    particular claim.  The only criteria that remains in there, at

10   least the criteria that are set forth in the methodology that

11   was provided is whether or not the trustee has provided

12   adequate notice of that particular breach.  And of course, in

13   many of these cases, the trustee, frankly, doesn't know whether

14   or not a particular loan has been breached until it's brought

15   to its attention.  And so we believe that the validation rate

16   ought be excluded for these purposes altogether.  But if you do

17   use a validation rate, it should be much, much higher than the

18   forty percent that's being espoused by the debtors in this

19   case.

20             THE COURT:  Do you have any reasoned basis to identify

21   an appropriate validation rate that would be acceptable from

22   your perspective?

23             MR. TOP:  I personally do not.  You know, obviously --

24             THE COURT:  Because does Mr. Burke?

25             MR. TOP:  We could ask him, Your Honor.

```
 1              THE COURT:  You've never asked him?

 2              MR. TOP:  Well, again, we have asked him about the

 3      validation rate.  And his opinion was it should not be included

 4      at all; it should be a hundred percent.  So we have asked

 5      him --

 6              THE COURT:  I understand, but that's not going to fly.

 7      Something that's based upon a reasoned assessment of actual

 8      risk as opposed to maximum protection for the trustees will be

 9      what we're going to be doing here, so I think it's necessary to

10      ask that question and for Mr. Burke to be -- is he here, by the

11      way?

12              MR. TOP:  Yeah, Mr. Burke is here in the courtroom.

13              THE COURT:  So you can ask him now but not on the

14      public record; but you can certainly take a break and have a

15      conversation with him and with Mr. Trumpp.  Is Mr. Trumpp here?

16              MR. PEREZ:  Yes, he is, Your Honor.  He's right here.

17              THE COURT:  Okay.  Mr. Trumpp raised his hand.  Let me

18      see who Mr. Burke is.  Okay, you're sitting in opposite corners

19      of the courtroom.

20              I think it might be valuable for there to be some

21      dialogue between Mr. Burke and Mr. Trumpp to deal with these

22      percentages, and risk factors, and steps as opposed to having

23      lawyers talk about it, trying to interpret their views.  I

24      recognize that the experts who are engaged have a job to do,

25      and they're trying to obtain a result that's optimal from the
```

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 73

1   perspective of the clients represented.  But if this is left to

2   me to estimate, it won't be optimal from anybody's perspective,

3   so there's some value in there being a conversation it seems to

4   me.

5           Do you have more in your argument?

6           MR. TOP:  I do have a couple of more points, Your

7   Honor, and one is in terms of the actual claims that have been

8   asserted.  First of all, it's our understanding that once

9   Lehman -- the Lehman entities filed for bankruptcy, and this

10  might be true of any originator of mortgage loans and the like,

11  that the servicers really stop actively looking for breaches of

12  representations and warranties because, frankly, in a lot of

13  cases it's just not worth their while.  I mean they're

14  trying -- they're relying upon getting repaid for doing this

15  work and things like that.

16          So while the debtors cite a lot of times for the fact

17  that we've only provided them with evidence of X million

18  dollars of claims in connection with that, that is true, but

19  one of the reasons for that is because they just -- the

20  servicers have not actively been looking for them as they might

21  do in the ordinary course of business.  And so part of this

22  estimation proceeding needs to take that into consideration as

23  well.  I'm not suggesting that that's not included in this

24  chart; all I'm suggesting is that's the reason why there isn't

25  a large number as you might ordinarily expect for breaches that

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 74 of 107

Page 74

1    have been made known to the trustee and passed on to these

2    particular servicers.

3         THE COURT:  Can you provide me with an update as to

4    where you are in terms of developing a protocol for coming up

5    with a fair valuation of the real risk here?

6         MR. TOP:  Well, we have -- we actually have weekly

7    conversations with representatives of the debtors to try to

8    come up with that, and we've -- we had a meeting in late

9    December to try to talk about this.  We also have committed

10   with them to regularly scheduled in-person meetings to try to

11   hash out these issues.  We have scheduled a meeting for next

12   week to try to talk about a final resolution of all of these

13   claims, and the expectation is that we would at least have bi-

14   weekly meetings.  And frankly, if it's more appropriate to have

15   more frequent meetings, I think people would be open to that as

16   well.  Part of it will relate to, though, information flow.  I

17   mean it's great to have meetings, but also you need to have

18   meetings that are meaningful as well.  And so I think part of

19   that will determine what the exact schedule will be.  But as it

20   stands today, we are scheduled to meet with them next week to

21   try to talk about this.

22        And we also have -- you know, this, again, is not the

23   only method of estimating claims, and some of the methods we've

24   been talking about in terms of protocol to finally determine

25   the claims aren't the only methods to use, either.  We have

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 75

1    floated some other ideas:  for example, using early payment

2    defaults as, perhaps, another proxy for those types of claims.

3    And then there are other servicers that might be able to

4    provide some information as to some of the aspects of loans

5    that tend to be -- I don't want to use the word "fraudulent,"

6    but "misrepresentation".  For example, if -- you know, if a

7    borrower takes out a loan and makes a representation that they

8    are the resident of that home, and then they find out that they

9    really have three homes and they're trying to flip these two, I

10    mean that's a breach of one of the representations and

11    warranties generally with these things.  And there are ways

12    that you can go about finding those types of things in public

13    records.  And that might be a way that we go about trying to

14    solve this.  But again, it's a very, very complex and technical

15    way to claims to try to resolve.  This is not the only

16    bankruptcy case where it's taken quite, you know, some time to

17    try to get a handle on the best method of trying to resolve

18    those particular claims.

19         And then I guess the other one thing I will add is

20    that, you know, frankly, I was surprised that some of these --

21    this motion was adjourned as to some.  And you know, I don't

22    know the reasons why that was done in the manner it was done:

23    maybe it was about claims and things like that, but I suspect

24    that the determination of this particular matter is going to

25    have an impact on those that are not before the Court and for

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 76 of 107

Page 76

1    better or for worse -- and just raise that for whatever it's

2    worth.

3            THE COURT:  Okay.  Thank you.

4            MS. DORAN:  Good afternoon, Your Honor, Jennifer

5    Doran, Hinckley, Allen & Snyder, representing Citibank and also

6    part of Wilmington Trust.  I'm not going to take up the Court's

7    time and repeat Mr. Top's presentation.  Just wanted to bring

8    to the Court's attention the fact that we do have a concern

9    with the way that these claims have been split up and the fact

10   that the debtor is just going forward with respect to,

11   essentially, two and a small subset of Wilmington while leaving

12   the rest of Wilmington and the other trustees to be resolved at

13   a later date or to be part of whatever resolution is reached

14   today without actually appearing before this Court.

15           We believe that it would be more appropriate to

16   continue this hearing to allow the parties to potentially reach

17   an agreement but in any event to make this a global resolution

18   because all of these are similarly situated trustees.  We're

19   all working together with the debtor, and we believe that we

20   should have a uniform result for estimation purposes.  Thank

21   you.

22           THE COURT:  Thank you.

23           Anyone else?

24           MR. BOONE:  Good morning, Your Honor, Bill Boone of

25   Alston & Bird.  I'm one of the unlucky ones that got put off,

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 77 of 107

Page 77

1    and there is, obviously, a concern.  It came to us as little

2    bit of a surprise --

3            THE COURT:  It seems to me if you were put off, that

4    makes you lucky.

5            MR. BOONE:  Well, I always like to join the fray, Your

6    Honor.

7            THE COURT:  All right.  Well, here you are.

8            MR. BOONE:  Our only point is that there is a concern

9    for various reasons.  There were separate counsel for

10   Wilmington Trust, but it is the same entity.  And there's

11   concern that, you know, Wilmington Trust is kind of being split

12   up here.

13           The other item that was of some concern is that, as

14   already been indicated over the last several months, the

15   trustee as a group, I think, have come together in an effort to

16   try to realize that we all have common grounds with all these

17   RMBS-type claims.  We, at least five or six of us have been

18   together.  We have all collectively gone to Mr. Burke,

19   realizing we need to have a similar voice.  We are here trying

20   to, you know -- understanding the purposes of the estimation

21   that it just is an estimate and it's a balancing act, not

22   really a trial to get into the details, if you will.  But at

23   the same time, it's got to be in a fairer level based upon at

24   least reasonable sufficient information for the Court to make a

25   meaningful decision, given the different tensions and

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 78 of 107

Page 78

1    recognizing that you're not going to go into all the details of

2    a full evidentiary hearing.  But given that, the trustees,

3    frankly, didn't hire Mr. Burke until the motion was actually

4    filed because we're conscious we have beneficiaries to report

5    to; we didn't want to incur monies unnecessarily; we were

6    trying to really focus on the protocol itself.  We actually

7    have a draft that we've been working on, which Mr. -- I mean

8    Mr. Top alluded to, and so we will be continuing that effort.

9            But I do think there is some validity to the Court's

10   earlier suggestion to debtors' counsel that perhaps, you know,

11   putting this off until the 14th or 15th, the next hearing date

12   to which they've adjourned me and some of the others does make

13   sense.  It would give us, Mr. Burke, and Mr. Trumpp an

14   opportunity for us all to sit down and see if we can narrow at

15   least some of the differences with respect to where our

16   estimation is.  We're not here asking anywhere close to the

17   thirty billion dollars that was originally put in those -- in

18   the proofs of claims.  And frankly, that's a false number, Your

19   Honor.  That number -- some of those -- some of the trustees

20   out of an abundance of caution put in the full unpaid principal

21   balance amount of their loans.  None of the trustees are

22   being -- taking the unreasonable position that, you know, our

23   claim is going to be anywhere close to that.  But as Mr. Top

24   indicated, they've already been actual losses of over forty

25   billion.  We're not asking anywhere close to that; we're asking

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 79 of 107

Page 79

1    only a small, relatively less than fifty percent percentage of

2    that as an estimation.  So we have gotten the outside

3    expertise, Mr. Burke.  He obviously, given his short amount of

4    time he's had to address this, I think, frankly, has done a

5    remarkable job to come up with what he has to give guidance to

6    the trustees.

7          So my suggestion is because the five or six trustees

8    had been working collectively together and cooperatively with

9    the debtor up to this point, we don't see any reason why we

10   ought to be -- it may be just a strategy or something,

11   obviously, on the debtors' part for divide and conquer, but we

12   don't think that's really necessary for the purposes of this

13   estimation hearing; and that I think there's a lot of logic,

14   and rationale, and prudence to allow us until the next hearing

15   to see if we can't narrow those differences before the ultimate

16   decision is forced upon this Court.  Thank y'all.

17          THE COURT:  Okay.  Thank you.

18          MR. MERTZ:  Good afternoon, Your Honor, Stephen Mertz,

19   Faegre Baker Daniels on behalf of Wells Fargo.  Your Honor, I

20   was one of the -- represent one of the trustees that has

21   between seventy-five and eighty securitization trusts here

22   where the motion actually was withdrawn as to Wells Fargo.  And

23   I have no doubt in my mind that should the Court decide to rule

24   today, even though I'm no longer a party as such in these

25   proceedings, that whatever the Court would decide to rule today

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 80 of 107

Page 80

1      would have an impact on the claims and any potential future

2      estimation of the claims against Wells Fargo.

3              As Mr. Boone just indicated, many of the trustees did

4      file their claims in the full, unpaid principal balance of the

5      trust related to their claims.  Other trustees did something

6      similar to what Wells Fargo did, and which is we filed these

7      claims knowing they would come up but we had know idea what

8      they were going to be; so we filed them in an unknown,

9      unliquidated, contingent amount.  My understanding what the

10     debtors are doing for purposes of establishing their reserves

11     is they're treating those as zero dollar amounts.  If there's

12     not a dollar amount attached to the claim, they're treating

13     them as zero, as if there's not going to be distribution, so --

14     or at least they're not going to reserve anything for those,

15     which I also don't think is appropriate.  So I think resolution

16     of this ultimately is important.

17             I do echo the sentiments of my colleagues here that I

18     believe this should be put off so the parties can continue to

19     try to negotiate an appropriate reserve.  As the debtors have

20     indicated, not establishing the reserve today would -- does not

21     prevent them from making an initial distribution.  It may make

22     the initial distribution smaller than they would like to make,

23     but it doesn't prevent this plan from becoming effective and it

24     does not prevent them from making an initial distribution in

25     this quarter.

1        Certainly, by the next distribution date, there's no

2    doubt in my mind by next distribution date in September at a

3    minimum if -- even if we don't have a full-blown claims

4    protocol that will be agreed to, that there will be a -- an

5    agreed reserve amount, so I think this ought to be put off.  We

6    are in active negotiations.  Frankly, the debtors' counsel and

7    experts were in Minneapolis a few weeks ago with all the

8    trustees.  We're meeting with them here next week in New York

9    in person with all the trustees.  We are having weekly

10   conference calls.  And progress has been made, perhaps, slower

11   than the debtors would like, but this is a very complicated

12   case.  And I don't think that the Court should rush to judgment

13   on these estimation issues.  Thank you, Your Honor.

14           THE COURT:  Thank you.

15           MR. PEDONE:  Good afternoon, Your Honor, Richard

16   Pedone representing Deutsche Bank as trustee.  We're, too, one

17   of the trustees that had been adjourned, and I'd like to join

18   Mr. Boone's comments and suggest that keeping this as a group

19   together and allowing a fully-developed record, including

20   discovery that's been served now that it's taken a turn for a

21   contested matter is, in fact, the appropriate method of

22   resolving --

23           THE COURT:  Okay.

24           MR. PEDONE:  -- this.  Thank you.

25           THE COURT:  Thank you.

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 82 of 107

Page 82

1         This is very interesting.  I've heard from counsel as

2    to a matter that's been withdrawn and I've heard from two

3    lawyers as to matters that have been adjourned, and everybody

4    seems to be singing from the same sheet of music.  They want

5    this adjourned.

6         MR. PEREZ:  Yes, Your Honor.  And we really don't want

7    it adjourned.  And Your Honor, if you go back to what Mr. Top

8    said, I mean we are arguing about the numbers and the fact that

9    this has been going on for a long time.

10        We objected to these claims.  They didn't have to wait

11   until we filed the estimation motion which they knew was

12   coming, which we told them was coming if we couldn't get a

13   resolution to hire an expert to do this.  They didn't have to

14   do that and then use that to get a continuance because that's

15   what's happened:  using that to get a continuance.  And under

16   any reasonable scenario, the validation rate, it's not a

17   hundred percent; it just can't be, Your Honor.

18        THE COURT:  Okay.  This was the one that Mr. Perez

19   said was going to be easy.  One of the things that makes this

20   actually very difficult is that we're dealing with claims that

21   are theoretical in nature as opposed to dollars of the sort

22   that we have been describing in the earlier estimation dispute

23   with LBF.  In that area case, you're dealing with real money,

24   dollars that actually were advanced or owed; here we are

25   dealing with some attempt to develop a rational basis for

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 83

1    estimating claims that have not yet been asserted with respect

2    to underlying mortgages that are held by securitization trusts.

3    And the trustees for these trusts with an obvious desire to

4    protect their investors but also themselves are approaching

5    this in a very conservative manner.

6         There are real parties in interest who are affected by

7    this, however, and those are the creditors, many of whom voted

8    on the plan who are looking to a flow of funds that assumes

9    that their allowed claims will receive distributions this

10   quarter.  The fixing of the reserve amount will have an impact

11   upon what's left to distribute to these creditors who are

12   awaiting their distributions.  For the reason stated, I

13   recognize that there are economic interests in play here that

14   require prompt resolution, but it can't happen today.

15        The Burke summary chart which has been adverted to

16   throughout this morning's argument is a helpful summary of

17   steps that are listed with percentages next to them and real

18   numbers attached to those percentages.  On a bottom line basis,

19   the debtors' estimate at the high level is approximately 2.4

20   billion dollars.  Mr. Burke's estimate admittedly based upon an

21   analysis that has been performed with less than the amount of

22   time that he would prefer to have to address the subject is

23   15.3 billion dollars.  The spread between the two is a very

24   significant spread.

25        In effect, what the debtors argue is that Mr. Trumpp,

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 84 of 107

Page 84

1    who created the seven step model and who applied various

2    percentages to come up with the 2.4 billion dollar estimate of

3    what would be a fair reserve amount should be accepted as

4    reasonable, as based upon actual experience, and as having been

5    prepared by the individual who has the greatest familiarity

6    with the underlying experience within the mortgage pool both in

7    his experience at a Aurora Bank and later at LAMCO.  Based on

8    the declarations alone and the argument that has been made, I

9    am simply not in the position today to decide that 2.4 billion

10   dollars is the right estimate.  It may be, but in effect I have

11   another declarant who appears to be an expert in the field, who

12   criticizes some of the assumptions, and who comes up with a

13   much higher estimate.

14        I think it would be inappropriate for me to simply

15   look at the spread and divide it in half and say that's an

16   estimate.  That may be rough justice, but it's much too rough.

17   I need a reasoned basis to conclude that either 2.4 billion

18   dollars is the right estimate of the projected loss, that 15.3

19   billion dollars is the right estimate of the projected loss, or

20   that some number in between is, in fact, the right number.  I'm

21   going to put this off until the next omnibus claim hearing with

22   the admonition to the parties that they endeavor, if they can,

23   to reach an agreement before that date.  The reason that I hope

24   they can do that is that the amount of the reserve impacts

25   other creditors in a material way.  If it is possible to reach

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 85 of 107

Page 85

1   an agreement concerning a fair and appropriate estimate for

2   these claims sooner rather than later, everybody is benefited.

3   If it can't be done within the less than thirty days between

4   now and the next hearing, I would expect the next hearing to

5   include at least an opportunity for examination and cross-

6   examination of both Mr. Trumpp and Mr. Burke.  To the extent

7   that there are other experts, they should be identified in a

8   hurry.  I view their declarations as the equivalent of their

9   direct testimony, but neither side has had an opportunity for

10   cross-examination.

11         Also, from my perspective as someone who is being

12   asked to come up with an estimate, I would like to assess the

13   creditability of each of the witnesses, the reasonableness of

14   the assumptions used in developing the analysis, and the fudge

15   factors that no doubt are included on both sides, particularly

16   as it relates to the validation rate.  I'll simply note in

17   passing that a hundred percent validation rate appears to be

18   without justification, and even Mr. Top indicated in his

19   remarks some willingness to consider an adjustment that would

20   take that number down, perhaps, closer to the forty percent

21   percentage used by Mr. Trumpp.  I suspect that all of this is

22   much more art than it is science; that there is no one clearly

23   correct estimate of a future that hasn't yet unfolded; and that

24   from the trustees' perspective they want to be as conservative

25   as possible and form the debtors' perspective with the support

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 86 of 107

Page 86

1    of the committee, they wish to be as reasonable as possible

2    consistent with the goal not of disadvantaging the trustees but

3    coming up with a reserve that reflects to the greatest extent

4    possible recognized exposure.  I hope that that parties working

5    with their consultants will be able to come up with some agreed

6    number between now and our next hearing; and if not, I will

7    endeavor to do that for you.

8         MR. PEREZ:  Your Honor, would the Court entertain an

9    interim order which would reduce it to the 15.3 that they have

10   said as a -- as the maximum number because that, in and of

11   itself, helps tremendously.

12        THE COURT:  If the trustees will agree that Mr.

13   Burke's work product takes the number down to 15.3 billion and

14   that the claims estimate for purposes of a reserve will be no

15   greater than that and that helps the debtor, that's fine; but

16   I'm not going to impose that without their agreement.  They

17   don't have to agree on the public record; they can reach that

18   agreement with you during the lunch break.  I think you have a

19   lot of work to do, ladies and gentlemen, so go ahead and do it.

20        MR. PEREZ:  Thank you, Your Honor.

21        MR. TOP:  Thank you, Your Honor.

22        THE COURT:  We haven't completed our agenda for the

23   day, however.

24        MR. TOP:  No, we haven't.  Your Honor, may I --

25        THE COURT:  That completes the matter that involves

Page 87

1    many of you, and so I'm going to give those of who are in a

2    position to pack up your bags and leave that opportunity right

3    now.  But we're going to continue with --

4              IN UNISON:  Thank you, Your Honor.

5              THE COURT:  We'll continue with the contested claims

6    matters.  We'll just give everybody a chance to move out of the

7    courtroom.

8              MS. ECKOLS:  Good afternoon, Your Honor.  I'll be

9    handing -- handling agenda items 5 and 6, Erin Eckols for the

10   debtors.  Agenda item number 5 is a carryover item from the

11   debtors' ninety-second omnibus objection which seeks to

12   disallow and expunge claims for failure to obtain a blocking

13   number in violation of this Court's bar date order.  Today we

14   are proceeding as to one claim, claim 9491 of Christina Kim.

15             As you may recall, the debtors proceeded on a

16   contested basis at the November 30th, 2011 claims hearing as to

17   certain claims appearing on three of the debtors' no blocking

18   number omnis.  Those were omnis 92, 120, and 170.  After

19   argument from several parties, the Court reserved judgment as

20   to the ten claims that the debtors were moving on that day and

21   instructed the debtors to confer with the claimants regarding a

22   potential resolution.  In particular, the Court directed the

23   debtors to explore whether the claimants had or could provide

24   extrinsic evidence that would mitigate the debtors' concerns

25   regarding invalid or duplicative distributions if the blocking

08-13555-mg  Doc 24756  Filed 01/27/12  Entered 01/30/12 10:07:08  Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 88 of 107

Page 88

1      number requirement were waived.

2            And in accordance with Your Honor's instructions, the

3      debtors did undertake additional review of the materials those

4      claimants had already provided and sought additional materials

5      to the extent necessary.  As a result, the debtors have been

6      resolve the objection as to seven of those claims and are

7      reviewing additional material submitted as to two of those

8      claims.  Today were are moving as to Christina Kim's claim 9491

9      on the ninety-second omni.

10           Ms. Kim is the only claimant that was the subject of

11     the November 30th hearing that failed to respond to debtors'

12     request for additional information.  The debtors' position

13     regarding enforcement of the blocking number requirement was

14     set forth at length in the debtors' ninety-second omni at

15     docket 14472 and the debtors' omnibus reply at docket 22677.  I

16     will not repeat those arguments but will briefly discuss the

17     facts surrounding Ms. Kim's claim and why those facts require

18     enforcement of the blocking number requirement and disallowance

19     of her claim.

20           Ms. Kim's claim was filed on August 27th, 2009 after

21     the entry of the bar date order and the pronouncement of the

22     blocking number requirement, notice of which was widely

23     disseminated.  It is undisputed that Ms. Kim's claim seeks to

24     recover for a Lehman program security and that does not contain

25     the required clocking number.  As Your Honor is aware, the

Page 89

1   blocking number requirement was designed to validate claims

2   based on Lehman program securities and prevent invalid or

3   duplicative distributions.  Ms. Kim did not submit any account

4   statements or other materials with her claim or her response to

5   the ninety-second omni that would allow the debtors to confirm

6   her ownership of the security and prevent invalid or

7   duplicative distributions.

8            In accordance with the Court's instruction, the

9   debtors requested via a letter dated December 9th, 2011 that

10  Ms. Kim provide two things:  one, proof of ownership of the

11  security at issue from the time that she filed the claim

12  through the securities program bar date; and two, the identity

13  of the custodian or broker that held those securities for her

14  and whether said custodian broker obtained a blocking number or

15  filed a claim on her behalf.  Your Honor, I have a copy of the

16  request that we sent to Ms. Kim if you would like to see, it if

17  I can approach.

18            THE COURT:  I would like to see it.  Thank you.

19            MS. ECKOLS:  In the letter, the debtors notified Ms.

20  Kim that if she did not provide the requested information by

21  January 26, 2012 that the debtors would proceed with the

22  ninety-six omnibus objection as to her claim at today's

23  hearing.  Ms. Kim did not respond to the debtors' request not

24  by January 6 or otherwise.  To date we still have not heard

25  from her.  As a result, the debtors cannot confirm that Ms. Kim

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 90 of 107

Page 90

1    owned the Lehman program security for which she is seeking to

2    recover or that her claim is not duplicative of others filed

3    for that same security.  Thus, Ms. Kim not only failed to

4    comply with the blocking number requirement but also failed to

5    provide the debtors with any extrinsic evidence that they could

6    rely upon in lieu of the blocking number.  For these reasons,

7    the blocking number requirement should be enforced and the

8    ninety-second omnibus objection granted as to Ms. Kim's claim

9    9491.

10             THE COURT:  Let me inquire if Christina Kim is in the

11   courtroom, or if she's on the telephone, or if anyone acting on

12   her behalf is in the courtroom or on the telephone.

13             There's no response.  I'm going to grant your

14   requested relief as to Ms. Kim's claim and grant the relief

15   that you seek with respect to the ninety-second omnibus

16   objection based on the lack of a blocking number with this

17   qualification:  I note that Christina Kim appears to reside in

18   Australia --

19             MS. ECKOLS:  Yes, Your Honor.

20             THE COURT:  -- and that the letter notifying her the

21   requirement to provide additional information and of the

22   scheduling of this matter for hearing today is a letter which

23   went to Australia at a time when I happened to know many people

24   in Australia go on vacation.  They take their summer holidays

25   in the period from December through the end of January.  I have

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 91 of 107

Page 91

1    no idea what situation applies as to Ms. Kim and whether or not

2    she actually received this letter and may have some explanation

3    for her failure to respond.  It may have nothing to do with her

4    vacation plans; it may have something to do with an illness in

5    the family, with an inability to deal with business affairs for

6    whatever reason.  Accordingly, the objection is granted without

7    prejudice to Ms. Kim complying with the request within thirty

8    days, and I would suggest that you provide her with notice that

9    the relief has been granted with that qualification and will be

10   revisited if, in fact, she provides you with the information

11   that your letter solicits.

12       MS. ECKOLS:  Thank you, Your Honor.  Moving to agenda

13   item 6 that is a motion by Robert Franz for reinstatement of

14   his claim, and I'm going to turn the podium to Sedgwick

15   Jeanite, counsel for Robert Franz.

16       THE COURT:  Okay.

17       MR. JEANITE:  Good afternoon, Your Honor.  My name is

18   Sedgwick Jeanite.  I represent Robert Franz.  I'm coming from

19   the law firm of White and Williams.

20       As you can tell, the basis of our motion is to -- is

21   for this Court to reconsider its March 31st order expunging Mr.

22   Franz's claim and to reinstate his claim based on the fact that

23   he never received a copy of the ninety-second omni objection of

24   the debtors.  We've made our motion pursuant to rule 60(b)(1),

25   and rule 60(b)(6), and rule 10 -- and section 105 of the

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 92

1    Bankruptcy Code.  I can go through the rules, Your Honor, for

2    purpose of the record and just state that rule 60(b) provides

3    that on a motion and just terms the Court may relieve a party

4    or its legal representative from a final judgment order or

5    proceeding for the following reasons:  mistake, inadvertence,

6    surprise, or excusable neglect.

7            Rule 60(b) provides that on a motion and just terms,

8    the Court may relieve a party also from a final judgment order

9    or proceeding pursuant to subsection 6 for any other reason

10   that justifies relief.  Properly applied, rule 60(b) allows the

11   Court to serve a balance between the ends of justice and the

12   finality of judgments.  It's intended to strike a proper

13   balance between conflicting principles that litigation must be

14   brought to an end and that justice must be done.

15           In this case, Your Honor, my client never received a

16   copy of the ninety-second omnibus objection.  He never had an

17   opportunity to respond to the debtors' objection to his proof

18   of claim.  It's a two million dollar -- the claim exceeds two

19   million dollars, and all we ask, Your Honor, is that it wasn't

20   until the end, some time around June, when he was conducting a

21   random Google search that he even learned that one of his -- he

22   had filed two proofs of claims in this action.  In June, he

23   learned that one of his proofs of claims was the subject of the

24   140th omnibus objection.  He promptly retained counsel.  We

25   filed a response to the objection, and that was resolved.  He

Page 93

1     later learned that his -- another proof of claim was subject to

2     the ninety-second omnibus objection.  But at that time, the

3     response period had already expired; the Court had already

4     issued an order expunging his claim; and he sought counsel from

5     Lehman as to what could he do.  Lehman provided him no counsel,

6     and then he came to us and he's asked us to file this motion

7     for reconsideration and requesting --

8                 THE COURT:  Let me ask you a question that's unrelated

9     to the procedural posture.  My understanding is that Mr.

10    Franz's original claim that is the subject of your motion for

11    reconsideration and reinstatement was the subject of an omnibus

12    objection based upon the lack of a blocking number, correct?

13                MR. JEANITE:  That is correct, Your Honor.

14                THE COURT:  If he had notice and if he had shown up

15    for a hearing, what would he have said in reference to the lack

16    of a blocking number?

17                MR. JEANITE:  He would have explained his efforts to

18    obtain, his diligent efforts to obtain a blocking number prior

19    to the deadline, prior to him filing his proof of claim.  He

20    tried on his own to obtain the blocking number.  He called his

21    broker, which is listed in the papers as Ariel, and they also

22    couldn't obtain a blocking number.  And so out of an abundance

23    of caution, he filed a proof of claim with the Court.

24                THE COURT:  But he had knowingly filed a proof of

25    claim that lacked a blocking number.  He knew about the

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 94 of 107

Page 94

1    obligation to obtain a blocking number.  And in fact, your

2    statement indicates that he endeavored to comply with it and he

3    filed a knowingly deficient claim.

4        MR. JEANITE:  My client is an investor.  He's an

5    individual investor, Your Honor.  He did not know what the

6    process was like.  He was overwhelmed.  And he just out of an

7    abundance of caution filed a proof of claim.  And he has

8    attempted several times afterwards to obtain a blocking number.

9    Even as of late -- as of December, he contacted his broker

10    again and explained the situation.  And because when we were

11    going to file the motion for reconsideration, we were going to

12    at least attach the blocking number to the proof of claim so

13    that debtors' counsel would at least be satisfied that he was,

14    in fact, the actual owner of the bonds at the time the proof of

15    claim was filed and that he has owned them, more or less,

16    consistently throughout the time period.

17        THE COURT:  Do you have any explanation for the fact

18    that your client moved but failed to provide the claims

19    representatives here with notice of the new address?

20        MR. JEANITE:  Again, Your Honor, my client is an --

21        THE COURT:  Just his neglect?

22        MR. JEANITE:  Just his oversight, Your Honor.  He's an

23    individual investor not familiar with the bankruptcy process.

24    I don't think he ever expected that sometime almost two years

25    after he had to file his first proof of claim that he would be

Page 95

1    the subject of an omnibus objection.  I believe that he thought

2    that at the time he filed his proof of claim, he'd hear from

3    the Court well before 2011.

4         THE COURT:  Okay.  Do you have anything more?

5         MR. JEANITE:  Other than the fact that, Your Honor, we

6    note that several other parties have filed their proof of

7    claims without blocking numbers.  There were several parties

8    listed on the ninety-second omnibus objection that also -- that

9    had -- that received notice and timely responded and

10   objected -- and filed a response to the ninety-second

11   objection.  To this date, debtors' counsel is continuously

12   attempting to resolve those omnibus objections, those

13   responses, and those proofs of claims which were filed without

14   blocking numbers.  All we ask is for an opportunity to also

15   respond, and to also be heard, and to possibly explain, as Ms.

16   Kim, and provide extrinsic evidence that we own those Lehman

17   bonds.

18        Your Honor, my client owned those bonds before the

19   time of the filing, before the bankruptcy filing, at the time

20   of the filing, at the time he filed his proof of claim.  And to

21   date right now, he can provide proof that he is the owner of

22   those bonds.  We feel that if the Court doesn't reconsider the

23   March 31st order and at least reinstate his proof of claim so

24   that he can file a response to the ninety-second omnibus

25   objection, undue harm will be experienced by Mr. Franz, Your

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 96 of 107

Page 96

1    Honor, far exceeding what any inconvenience would be

2    experienced by the debtors' counsel, especially since the fact

3    as of today we know that there are still approximately twenty

4    parties that were subject to the ninety-second omnibus

5    objection that are still in the process of resolving that

6    objection with the debtors' counsel.  All we ask is for an

7    opportunity to be heard, Your Honor:  an opportunity to not

8    have a two million dollar proof of claim expunged solely based

9    on the fact that --

10        THE COURT:  Okay.  I understand that this is an

11    individual and that this is probably a matter of great

12    significance to Mr. Franz, but in what respect is 60(b)

13    satisfied?

14        MR. JEANITE:  Your Honor, to the extent that it was a

15    mistake on his part for not alerting the claims agent that he

16    had moved; to the extent that excusable neglect could

17    possibly -- he could fall -- his conduct could fall within the

18    excusable neglect, Your Honor; and if it doesn't fall, then to

19    the extent that it could fall into any other reason that

20    justifies relief for an individual investor who is not familiar

21    with the bankruptcy process, who just had no idea that two

22    years later his claim would be subject to an omnibus objection;

23    one who thought that maybe at this time Lehman may have

24    overlooked the fact that he filed his proof of claim without a

25    valid blocking number, without a blocking number at all, Your

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 97 of 107

Page 97

1      Honor.

2              THE COURT:  Okay.

3              MR. JEANITE:  And I just want to also say that

4      debtors' counsel concede in their motion papers in footnote 3

5      that to the extent that this Court would reinstate the claim,

6      the Court should reinstate only the none-transferred portion

7      of the claim and as it existed, and then force my client to

8      file a response to the omnibus objection.  Your Honor, we don't

9      think that it will be a significant burden on debtors' counsel

10     to -- if they have to address my client's response to the

11     ninety-second objection.  We think the harm to him far

12     outweighs the inconvenience to debtors' counsel, Your Honor,

13     and we request that the Court exercise its broad discretion

14     either under 60(b)(1), 60(b)(6), or section 105 of the

15     Bankruptcy Code, and reconsider its March 31st order, and

16     reinstate his claim.  And I do note, Your Honor, the last

17     exhibit to our papers, a similar confusion -- Exhibit H -- a

18     similar confusion took place with a prior -- another claimant

19     in this action.  And that claimant was subject to the sixty-

20     third omnibus objection.  And for reasons which I can't tell

21     from the record, clearly, there was a problem with his address

22     as well.  And maybe he contacted debtors' counsel, and they

23     agreed to submit an order to the Court, a supplemental order,

24     reinstating his claim, allowing him also to timely respond to

25     the -- at the time the sixty-third omnibus objection.  That's

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 98 of 107

Page 98

1    all we seek, Your Honor.  We just seek that opportunity to --

2    for our claim to be reinstated and to give us an opportunity to

3    respond to the ninety-second objection to possibly show that we

4    were the owner of the bond and to protect our interest, protect

5    our proof of claim.

6              THE COURT:  Okay.  Thank you.

7              MR. JEANITE:  Thank you, Your Honor.

8              MS. ECKOLS:  Your Honor, Erin Eckols for the debtors,

9    at the outset, the debtors would like to note that Mr. Franz is

10   seeking reinstatement of a two million dollar claim which he

11   doesn't even own the entire portion of the claim anymore.  He

12   only owned at -- and especially at the time of the ninety-

13   second omni when it was filed, he only owned 1.5 million

14   dollars of it.  So if anything is going to be reinstated if he

15   has standing to seek any sort of relief, it should only be as

16   to the 1.5 million dollars that he actually owned at the time

17   of the objection.

18             Your Honor, the debtors' arguments opposing Mr.

19   Franz's motion are set forth at length at the debtors' response

20   at docket number 24362.  I don't -- I will not repeat all those

21   arguments but want to briefly touch on a few points that go to

22   the heart of the matter and establish that Mr. Franz is not

23   entitled to the reinstatement of his claim because the

24   disallowance and expungement was due to his own negligence in

25   failing to update his address on the claims register.

Page 99

1    Moreover, this is not as simply a matter of one claim, and I'll

2    explain why.  But the relief requested by Mr. Franz if granted

3    could potentially impact tens of thousands of claims in these

4    bankruptcy cases.

5            The facts here are simple.  In September 2009, Mr.

6    Franz filed his claim 13065 seeking to recover for several

7    Lehman program securities and listed his address at 81 Dixon

8    Avenue in Boonton, New Jersey.  The claim did not, as Mr. Franz

9    concedes, include the blocking numbers required under the bar

10   date order.

11           In July 2010, Mr. Franz moved to 6 Bear Lane also in

12   Boonton, New Jersey but didn't update his address on the claims

13   register.  Mr. Franz's mail forwarding to his new address

14   stopped in November of 2010.  In February 2011, the debtors

15   filed their ninety-second omnibus objection seeking to disallow

16   and expunge Mr. Franz's claim.  The debtor sent notice to the

17   address Mr. Franz had provided on claim 13065, which was the

18   address listed on the claims register, his old address 81 Dixon

19   Avenue.  Mr. Franz alleges that he never received that notice

20   presumably because it was sent to his old address and his mail

21   forwarding to the new address had expired.

22           Mr. Franz did not respond to the ninety-second omnibus

23   objection.  And on March 31st, 2011, Mr. Franz's claim was

24   disallowed on -- and expunged on an uncontested basis.  Nearly

25   eight months later, Mr. Franz filed his motion to reinstate his

Page 100

1    claim on the basis that he was unaware of the ninety-second

2    omnibus objection.

3         The sole issue before the Court today is whether Mr.

4    Franz has satisfied his burden to show his claim should be

5    reinstated under rules 60(b)(1), or 60(b)(6), or under section

6    105(a) of the Bankruptcy Code.  It is not whether Mr. Franz

7    should be required to comply with the blocking number

8    requirement, whether his claim would otherwise be valid, or the

9    merits of the ninety-second omnibus objection.  Those are

10   issues to be addressed if and only if the Court determines Mr.

11   Franz has carried his burden under rule 60(b) or section 105(a)

12   for reinstatement of his claim.

13        And Mr. Franz cannot carry his burden because the

14   disallowance and expungement of his claim resulted from his own

15   negligence and circumstances entirely within his control.  It

16   is well established that carelessness or ignorance do not

17   provide grounds for relief under rule 60(b).  Mr. Franz's

18   situation or the sole reason he did not reason he did not

19   receive notice of the ninety-second omni was due to his own

20   negligence, and not updating his address epitomizes

21   carelessness.

22        Moreover, reinstatement of Mr. Franz's claim will

23   hinder the ability of the debtors and this Court to move these

24   Chapter 11 cases forward.  More than thirty thousand claims had

25   been disallowed, reduced, and/or reclassified by hundreds of

LEHMAN BROTHERS HOLDINGS INC.; ET AL.

Page 101

1    orders of this Court after claimants failed to respond to

2    objections, notice of which were properly served at the

3    addresses provided by the claimants to the debtors' claims

4    agent.  Allowing reinstatement of claims for individuals that

5    failed to respond because they were allegedly unaware of the

6    objection as a result of their own negligence will add

7    uncertainty to the claims resolution process and potentially

8    subject hundreds of orders of this Court to challenge.

9         It is not, as Mr. Franz alleges, a matter of one claim

10   but has much broader implications for the tens of thousands of

11   claims that need to be reconciled in this case.  For this

12   reason and because this situation was entirely his own fault,

13   Mr. Franz has not satisfied his burden under section 105(a).

14        Your Honor, I want to address the reinstatement of the

15   claim on omnibus objection 63 that Mr. Jeanite referenced in

16   his argument, and that was an entirely different situation from

17   the one at hand.  The supplemental order on omnibus objection

18   63 reinstated a claim which was claim number 14329 because the

19   claimant, China Development Ind. Bank reportedly never received

20   notice of it.  With regard to the claim reinstated, the notice

21   issue resulted from an error on the part of the debtors' claims

22   agent when it mailed out the notice.

23        On claim 14329, the creditor listed its address as

24   being in the Republic of China:  in other words, Taiwan.

25   However, the affidavit of service reflects that when Epic

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 102 of 107

Page 102

1    mailed the notice, it listed the creditor's country as China:

2    in other words, mainland China.  Thus, the address that Epic

3    mailed the notice of the sixty-third omnibus objection to was

4    different from the address that the claimant had provided on

5    its proof of claim form.  And Your Honor, I've got copies of

6    that claim and the affidavit of service if Your Honor would

7    like to see it.

8         THE COURT:  That's all right.  I can accept your

9    recitations.

10        MS. ECKOLS:  In that particular situation, to the

11   extent that the claimant did not receive notice, it was due to

12   an error by the claims agent, which was why the debtors sought

13   to have it reinstated.  This is in stark contrast to Mr.

14   Franz's situation which resulted from his own negligence, and

15   thus the situation under omnibus objection sixty-three is an

16   apposite and does not support Mr. Franz's position.

17        Your Honor, I also want to note although Mr. Franz

18   asserts that he sought to obtain a blocking number based on his

19   affidavit, it appears as though he didn't request -- seek to

20   request a blocking number until the summer of 2011, which is

21   well outside the time frame in which one could seek the

22   blocking number.  And if -- unless Your Honor has any

23   questions?

24        THE COURT:  No, I have no other questions.

25        MS. ECKOLS:  Thank you.

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 103 of 107

Page 103

1            THE COURT:  Is there anything more?

2            MR. JEANITE:  Your Honor, I just want to note that the

3    reference to Mr. Franz attempting to seek a blocking number

4    this summer is because he thought that maybe he could convince

5    Lehman that he did, in fact, own the bonds at the time he filed

6    his proof of claim.  And with respect to reconsideration and

7    possibly several other parties raising their argument, Your

8    Honor, this Court has been issuing omnibus -- has -- debtors

9    have been filing omnibus objections, and the Court has been

10   issuing orders for the last year and a half.  To date there

11   have been, to my knowledge, very few parties which have filed

12   motions for reconsideration based on the fact that they did not

13   receive a copy of the notice of omnibus objection.

14           To my knowledge, my client is the only party who is

15   similarly situated to the fact where he has moved and he has --

16   he didn't receive notice, and his claim has been expunged, and

17   he has now come to Court seeking relief.  We don't think that

18   you'll have several other parties or thousands of other

19   claimants who will also make this similar -- or have the

20   ability to make this similar motion for reconsideration.  So we

21   respectfully request that that point of counsel's argument,

22   Your Honor, be denied.

23           THE COURT:  Okay.  I hear you.

24           This is actually a very narrow question, but it does

25   have broad potential implications for the management of the

08-13555-mg   Doc 24756   Filed 01/27/12   Entered 01/30/12 10:07:08   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 104 of 107

Page 104

1   case.  And I agree with debtors' counsel that we have issued a

2   great many orders granting relief with respect to omnibus

3   claims objections that have resulted in the significant

4   reduction in the number of claims against the estate.  And it

5   would be troublesome as a matter of case administration for

6   parties that have defaulted with respect to claims objections

7   to be able to come into Court months or years later under the

8   authority of 60(b) seeking what amounts to reconsideration;

9   nonetheless, each claimant has that right now regardless of

10  what I do with respect to Mr. Franz's application for relief

11  under rule 60(b).  And each such motion for relief needs to be

12  considered on its own merits; I do think, however, that it is a

13  fair observation that if I were to grant Robert Franz's motion,

14  it would be viewed by third parties as an encouraging sign and

15  might lead them to follow suit.  It's pure speculation,

16  however, at this juncture as to how many such claimants might

17  be so bold as to now attempt to argue that they didn't have

18  notice and as a result should have a reinstated claim and an

19  opportunity to be heard.

20          Fundamentally, the question is whether Mr. Franz in

21  his motion has satisfied the standards of rule 60(b) and the

22  broad provisions of section 105(a) of the Bankruptcy Code,

23  essentially throwing himself on the mercy of the Court.  It's

24  an unfortunate circumstance.  Mr. Franz filed a timely claim.

25  And then because he moved and the forwarding notice expired for

08-13555-mg    Doc 24756    Filed 01/27/12    Entered 01/30/12 10:07:08    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 105 of 107

Page 105

1      his mail and because he didn't provide notice to the claims

2      agent of his new address, he never received actual notice of

3      the omnibus objection that lead to the disallowance of his

4      claim for lack of blocking number.  But I agree with debtors'

5      counsel this is solely a matter within Mr. Franz's control and

6      is a sign of his own negligence.

7              I don't know what Mr. Franz's circumstances are, but a

8      two million dollar claim is certainly large enough for most

9      individual investors to pay close attention to.  It's no doubt

10     ordinary negligence:  it's oversight, but it's his fault.  And

11     cause has not been shown for the extraordinary relief of

12     reopening what amounts to a final order that has been

13     outstanding for more than eight months.  The motion is denied,

14     and we're adjourned.

15             MS. ECKOLS:  Thank you, Your Honor.

16             MR. JEANITE:  Thank you, Your Honor.

17         (Whereupon these proceedings were concluded at 1:05 PM)

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                              RULINGS

5                                                Page      Line

6    Debtors' 237th omnibus objection is granted   12        23

7    Claim of LBF is estimated at three billion     46        11

8    dollars for purposes of the reserve

9    Relief requested in ninety-second omnibus      90        13

10   objection granted with qualification re:

11   Ms. Kim as noted on the record

12   Mr. Franz's motion for reconsideration        105        13

13   and reinstatement of proof of claim denied

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1

2                    C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7                                    Digitally signed by Dena Page
                                     DN: cn=Dena Page, o, ou,
     Dena Page                       email=digital1@veritext.com,
8                                    c=US
                                     Date: 2012.01.27 16:02:15
9    _____   -05'00'

10   DENA PAGE

11   AAERT Certified Electronic Transcriber CET**D-629

12

13   Also transcribed by:

14   PENINA WOLICKI, CET**D-569

15   ALIZA CHODOFF, CET**D-634

16   SHELIA WATKINS, CET**D-645

17

18   Veritext

19   200 Old Country Road

20   Suite 580

21   Mineola, NY 11501

22

23   Date:  January 27, 2012

24

25