Objection Deadline: February 15, 2012 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: February 22, 2012 at 10:00 a.m. (Prevailing Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :    Case No. 08-13555 (JMP)
                                              :
                    Debtors.                  :    (Jointly Administered)
                                              :
-------------------------------------------------------------------x

## NOTICE OF OMNIBUS APPLICATION OF (I) INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND (II) INDENTURE TRUSTEES PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D) AND 503(b)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

PLEASE TAKE NOTICE that a hearing on the annexed omnibus application (the "Application") of individual members of the Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc. and each of its affiliated debtors in possession (collectively, the "Debtors") and the indenture trustees in the above-referenced chapter 11 cases, for an order pursuant to section 1129(a)(4) or, alternatively sections 503(b)(D)(3) and 503(B)(4) of title 11 of the United States Code (the "Bankruptcy Code") for payment of fees and reimbursement of expenses, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on February 22, 2012 at 10:00 a.m. (prevailing Eastern Time) (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Application shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Harvey Miller, Esq., attorneys for the Debtors; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys to the official committee of unsecured creditors appointed in these cases; (iv) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Tracy Hope Davis, Esq. and Susan D. Golden, Esq.; (v) Covington & Burling LLP, the New York Times Building, 620 Eighth Avenue, New York, New York 10018-1405, Attn: Michael B. Hopkins, Esq., counsel for Wilmington Trust Company, as member of the Committee and indenture trustee; (vi) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attn: Mark A. Speiser, Esq., counsel for Mizuho Corporate Bank, Ltd., as member of the Committee; (vii) Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, New York, New York 10112, Attn: Russell L. Reid, Jr., Esq., counsel for the Bank of NY Mellon, as member of the Committee and indenture trustee; (viii) Kleinberg, Kaplan, Wolff & Cohen, P.C., 551 Fifth Avenue, 18th Floor, New York, New York 10176, Attn: Matthew J. Gold, Esq., counsel for Elliott Management Corp., as member of the Committee; (ix) Metropolitan Life Insurance Co., 10 Park Avenue, P.O. Box 1902, Morristown, New Jersey 07962-1902, Attn: Thomas Pasuit, as member of the Committee; (x) Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts 02109, Attn: Richard Hiersteiner, Esq. and Jeanne P. Darcey, Esq., counsel for U.S. Bank National Association, as member of the Committee and indenture trustee; (xi) Arent Fox LLP, 1675 Broadway, New York, New York 10019, Attn: David Dubrow, Esq., counsel for The Vanguard Group, as member of the Committee; (xii) Vinson & Elkins LLP, 666 Fifth Avenue, New York, New York 10103-0040, Attn: Dov Kleiner, Esq., counsel for Shinsei Bank, Limited, as former member of the Committee; and (xiii) all parties who have requested notice in these chapter 11 cases, so as to be so filed and received by no later than **February 15, 2012 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

   **PLEASE TAKE FURTHER NOTICE** that if an objection to the Application is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

   **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: January 30, 2012
New York, New York

**COVINGTON & BURLING LLP**

By: /s/ Michael B. Hopkins

Michael B. Hopkins
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone:      (212) 841-1064
Fax:                (646) 441-9064
Counsel for Wilmington Trust Company, as member
of the Committee and indenture trustee

**STROOCK & STROOCK & LAVAN LLP**

By: /s/ Mark A. Speiser

Mark A. Speiser
180 Maiden Lane
New York, NY  10038-4982
Phone:   (212) 806-5400
Fax:       (212) 806-6006
Counsel for Mizuho Corporate Bank, Ltd., as member
of the Committee

**SHEPPARD MULLIN RICHTER & HAMPTON
LLP**

By: /s/ Russell L. Reid

Russell L. Reid, Jr.
30 Rockefeller Plaza
New York, NY 10112
Phone:   (212) 653-8700
Fax:       (212) 653-8701
Counsel for the Bank of NY Mellon, as member of
the Committee and indenture trustee

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: /s/ Matthew J. Gold

Matthew J. Gold
551 Fifth Avenue, 18th Floor
New York, New York 10176
Phone:          (212) 986-6000
Fax:            (212) 986-8866
Counsel for Elliott Management Corp., as member of the Committee

**METROPOLITAN LIFE INSURANCE CO., as member of the Committee**

By: /s/ Thomas Pasuit

Thomas Pasuit
10 Park Avenue
P.O. Box 1902
Morristown, New Jersey 07962-1902
Phone:          (973) 355-4581
Fax:            (973) 355-4230

**SULLIVAN & WORCESTER LLP**

By: /s/ Richard Hiersteiner

Richard Hiersteiner
One Post Office Square
Boston, MA 02109
Phone:          (617) 338-2800
Fax:            (617) 338-2880
Counsel for U.S. Bank National Association, as member of the Committee and indenture trustee

**ARENT FOX LLP**

By: /s/ David Dubrow

David Dubrow
1675 Broadway
New York, NY 10019
Phone :   (212) 484-3957
Fax:       (212) 484-3990
Counsel for The Vanguard Group, as member of the
Committee

**VINSON & ELKINS LLP**

By: /s/ Dov Kleiner

Dov Kleiner
666 Fifth Avenue
New York, New York  10103-0040
Phone :   (212) 237-0000
Fax:       (212) 237-0100
Counsel for Shinsei Bank, Limited, as former
member of the Committee

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1069
Counsel for Wilmington Trust Company,
as member of the Committee and indenture trustee

**METROPOLITAN LIFE INSURANCE CO.,**
**as member of the Committee**
10 Park Avenue
P..O. Box 1902
Morristown, New Jersey 07962-1902
(973) 355-4581

**STROOCK & STROOCK & LAVAN LLP**
180 Maiden Lane
New York, NY 10038-4982
(212) 806-5400
Counsel for Mizuho Corporate Bank, Ltd.,
as member of the Committee

**SULLIVAN & WORCESTER LLP**
One Post Office Square
Boston, MA 02109
(617) 338-2880
Counsel for U.S. Bank National Association,
as member of the Committee and indenture
trustee

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700
Counsel for the Bank of NY Mellon,
as member of the Committee and indenture trustee

**ARENT FOX LLP**
1675 Broadway
New York, NY 10019
(212) 484-3957
Counsel for The Vanguard Group,
as member of the Committee

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**
551 Fifth Avenue, 18th Floor
(212) 986-6000
New York, New York 10176
Counsel for Elliott Management Corp.,
as member of the Committee

**VINSON & ELKINS LLP**
666 Fifth Avenue
New York, New York  10103-0040
(212) 237-0000
Counsel for Shinsei Bank, Limited,
as former member of the Committee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                                               :
In re:                                                         :      Chapter 11 Case No.
                                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,                         :      08-13555 (JMP)
                                                               :
                        Debtors.                               :      (Jointly Administered)
                                                               :
-------------------------------------------------------------- x

**OMNIBUS APPLICATION OF (I) INDIVIDUAL MEMBERS OF**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND**
**(II) INDENTURE TRUSTEES PURSUANT TO SECTION**
**1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D) AND**
**503(b)(4) OF BANKRUPTCY CODE FOR PAYMENT OF**
**FEES AND REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

The Bank of NY Mellon ("BNYM"), Elliott Management Corp., Mizuho

Corporate Bank, Ltd., Metropolitan Life Insurance Co., Shinsei Bank, Limited, U.S. Bank

National Association ("US Bank"), The Vanguard Group, and Wilmington Trust Company

("Wilmington"), each in its capacity as a current or former member (in such capacities, the

"Committee Members") of the Official Committee of Unsecured Creditors (the "Committee") of

Lehman Brothers Holding, Inc. ("LBHI") and the other above-captioned debtors (together with

LBHI, the "Debtors"); and Wilmington, BNYM, and US Bank, each in its capacity as indenture

trustee for various notes issued by LBHI (in such capacities, the "Indenture Trustees" and,

together with the Committee Members, the "Applicants") hereby submit this omnibus

application (the "Application"), pursuant to section 1129(a)(4) and/or sections 503(b)(3)(D) and

503(b)(4) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as

amended, the "Bankruptcy Code"), for approval of the payment by the Debtors of the fees and

expenses of each Applicant incurred in connection with the above-captioned chapter 11 cases

(the "Chapter 11 Cases").  In support of the Application, the Applicants respectfully represent as

follows:

## PRELIMINARY STATEMENT

      1.     On December 6, 2011, this Court confirmed a chapter 11 plan for the

Debtors (the "Plan") that was predicated on a series of interconnected settlements (the "Plan

Settlements") that resolved virtually all of the contested issues that had arisen in the Chapter 11

Cases and garnered the support of close to 100% of the Debtors' voting creditors.  So

unprecedented a level of creditor consensus was – as the Court acknowledged at the confirmation

hearing – made possible through the efforts of the many constituents and their professionals who

worked, as both adversaries and allies over a three-year period, to resolve the various aspects of

these cases.  Most prominent among such constituents were the Applicants, whose tireless efforts

in connection with every aspect of the Chapter 11 Cases, culminating in the consummation of the

Plan Settlements and the confirmation of the Plan, resulted in the Debtors' commitment to pay all the reasonable fees and expenses, including attorneys' fees, incurred by the Applicants in connection with the Chapter 11 Cases (the "Fees and Expenses").

2.      This commitment is memorialized in Section 6.7 of the Plan (the "Fee Payment Provision").[1] Plan provisions regarding the payment of legal expenses of key participants in the plan process are quite common and, in this case, the Fee Payment Provision was an integral element of the Plan Settlements, included in the Plan in recognition of the extraordinary burdens imposed on the Applicants and their institutions in the course of addressing – on a daily basis over a more than a three-year period – the many obstacles to consensual resolution in these largest bankruptcy cases in the history of the United States.

3.      The payments contemplated by the Fee Payment Provision remain subject to the approval of this Court, which should be granted under the "reasonableness" standard of section 1129(a)(4) of the Bankruptcy Code – the appropriate standard of review for the relief requested herein.  Based upon the summaries set forth herein and the time and expense records annexed hereto, the Court should have little difficulty concluding that the Fees and Expenses are "reasonable."  The Fees and Expenses were incurred by the Applicants in the course of meeting the extraordinary demands the Chapter 11 Cases have made on their time and efforts, and are clearly within the scope of the fees and expenses contemplated by the Fee Payment Provision.

---

[1]      Section 6.7 of the Plan provides that "[s]ubject to entry of the Confirmation Order, the reasonable fees and expenses (including attorneys fees) of (a) the indenture trustee for the Senior Notes and the Subordinated Notes and (b) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustee or members of the Creditors' Committee, respectively, shall, (i) to the extent incurred and unpaid by a Debtor prior to the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors in accordance with the Debtor Allocation Agreement upon application to and subject to approval of the Bankruptcy Court, and (ii) to the extent incurred after the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors on a monthly basis upon the submission of fee statements without further order of the Bankruptcy Court."  (Plan § 6.7.)

4.     Despite the urging by the United States Trustee (the "UST"), there is no reason to subject the Fees and Expenses to the "substantial contribution" standard of section 503(b) of the Bankruptcy Code, or to any other fee review standard more stringent than that set forth in section 1129(a)(4).  Section 503(b) applies only to compensation requests that are not otherwise agreed to by a debtor or provided for in a plan, and are, thus, nonconsensual in nature.  Moreover, nothing in section 503(b) dictates that it is the only mechanism for approval of costs of this nature, leaving courts free to look to other potentially applicable provisions of the Bankruptcy Code, including section 1129(a)(4), which, by its plain language, is directly applicable to consensual payments made "in connection with [a] plan and incident to [a] case." 11 U.S.C. § 1129(a)(4).  Looking solely to section 1129(a)(4) and the Fee Payment Provision – which has been accepted as an integral component of the Plan Settlements by close to 100% of the Debtors' voting creditors – the Court should approve the payment of the Fees and Expenses as Administrative Expense Claims[2] payable on the Effective Date of the Plan, or as soon thereafter as practicable.

5.     Finally, in the alternative, the Court should grant the Application because, under the extraordinary circumstances of the Chapter 11 Cases, the Applicants should be found to have made a "substantial contribution" to the success of such cases within the contemplation of sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

## FACTUAL BACKGROUND

6.     Creditors' Committee.  On September 17, 2008, the Office of the United States Trustee for the Southern District of New York appointed the Committee.  Since February 9, 2010, the Committee has consisted of the Committee Members.

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

7.    <u>Confirmation of the Plan</u>.  On September 1, 2011, after lengthy and vigorous negotiations among the Debtors, the Committee and various creditor groups, particularly the Debtors' foreign affiliates – and following the filing of competing plans of reorganization by two different creditor constituencies – the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "<u>Third Amended Plan</u>") [Docket No. 19627] and the related Disclosure Statement [Docket No. 19629]. On November 29, 2011, in response to certain objections interposed to the confirmation of the Third Amended Plan, the Debtors filed the Plan [Docket No. 22737].  On December 6, 2011, after the resolution of the single objection outstanding at the outset of the confirmation hearing, the Court entered an Order confirming the Plan [Docket No. 23023].[3]

<strong><u>JURISDICTION AND VENUE</u></strong>

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicate for the relief sought herein is section 1129(a)(4) and/or sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

<strong><u>APPLICATION</u></strong>

9.    By this Application, each Applicant seeks, pursuant to Section 6.7 of the Plan and section 1129(a)(4) of the Bankruptcy Code (or, alternatively, sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code), approval of the payment by the Debtors of the fees and

---

[3]    The UST filed an objection to the confirmation of the Plan (the "<u>UST Objection</u>"), in which the UST argued, among other things, that the payment of the fees and expenses under Section 6.7 of the Plan violated the Bankruptcy Code.  The UST agreed to withdraw the UST Objection only upon a reservation of its rights with respect to "the appropriate legal standard for such applications, and any objection that payment of such fees is unauthorized under the Bankruptcy Code and the Bankruptcy Rules." (Confirmation Order ¶ 74; the "<u>UST Reservation of Rights</u>".)

expenses of the Applicants, including the fees and expenses of counsel to each Applicant,

incurred in connection with the Chapter 11 Cases during the period between LBHI's petition date

(the "Petition Date") and December 31, 2011.

## A.    Fee Payment Provision Is Properly Included In the Plan Pursuant to Section 1123(b)(6)[4]

10.    The Fee Payment Provision was properly included in the Plan because

section 1123(b)(6) of the Bankruptcy Code permits plan proponents to include in a chapter 11

plan any "appropriate provision not inconsistent with the applicable provisions of [the

Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  The Fee Payment Provision is both "appropriate"

and not "inconsistent" with the Bankruptcy Code, and thus satisfies this standard.

11.    In a case of first impression in this District, Judge Gerber found that a plan

provision should be deemed "appropriate" for the purpose of section 1123(b)(6), so long as it

does not violate (i) any federal statute other than the Bankruptcy Code; (ii) relevant case law; or

(iii) important policy considerations.  In re Adelphia Commc'ns Corp., 441 B.R. 6, 17 (Bankr.

S.D.N.Y. 2010).  The Adelphia court also determined that plan provisions for the payment of

legal expenses of non-fiduciaries, such as the Fee Payment Provision, do not violate statutory or

case law, are not plainly contrary to public policy, and are, thus, "appropriate" for inclusion

among the "nearly infinite types of provisions that can go into a chapter 11 plan [pursuant to

which debtors] may distribute and allocate the value of [their] estates by a broad array of

means."  Id. at 14.  The same conclusion is warranted here.

12.    The Fee Payment Provision is also not "inconsistent" with any provision

of the Bankruptcy Code.  While the UST contended in the UST Objection that the Fee Payment

---

[4]    Since the Plan – accepted by almost 100% of the Debtors' creditors – has already been confirmed by the Court, the Applicants only address the propriety of the inclusion of the Fee Payment Provision in the Plan on account of the UST Reservation of Rights and in anticipation of the UST making similar arguments in response to this Application.

Provision violates section 503(b) of the Bankruptcy Code, Judge Gerber concluded in <u>Adelphia</u>

that, while section 503(b) generally applies to the payment of fees of "nonfiduciary creditors," it

"does not provide, in words or substance, that it is the **only** way by which fees of this character

may be absorbed by the estate." <u>Id.</u> at 12 (emphasis in original).[5]  If there are other bases for

approval of the Fee Payment Provision, such as section 1129(a)(4) of the Bankruptcy Code, there

can be no inconsistency with section 503(b) or any other provision of the Bankruptcy Code.

       13.    Accordingly, the Fee Payment Provision is both "appropriate" and not

"inconsistent" with any provision of the Bankruptcy Code, and was properly included in the

Plan.

## B.    Court Should Approve Fees and Expenses <br>     <u>Under Section 1129(a)(4) Standard</u>

       14.    The Fees and Expenses are appropriately subject to approval solely under

section 1129(a)(4) of the Bankruptcy Code.  Section 1129(a)(4) is directly applicable to

"payments," such as those contemplated in the Fee Payment Provision, that are made "in

connection with [a] plan and incident to [a] case," and should control this Court's evaluation of

this provision and the payments contemplated thereby. 11 U.S.C. § 1129(a)(4).

       15.    This was the conclusion reached by Judge Gerber in the <u>Adelphia</u> case.

Having determined that a fee payment provision was properly included in the <u>Adelphia</u> plan

pursuant to section 1123(b)(6), and that section 503(b) of the Bankruptcy Code was not

---

[5]    Contentions by the UST notwithstanding, the Fee Payment Provision is not an "end run-around" other purportedly applicable provisions of the Bankruptcy Code.  While it is true that the Committee Members, *qua* members of the Committee, could not have **compelled** the Debtors to pay their legal expenses under section 503(b)(3)(F), this does not mean that the Committee Members could never be entitled to the payment of such fees.  For example, the Committee Members, *qua* "creditors" making substantial contribution to the Chapter 11 Cases above and beyond those generally expected of official committee members, would qualify to have their reasonable legal expenses paid under section 503(b)(3)(D).  Neither is it relevant that had the Indenture Trustees sought to **compel** the payment of their expenses, they would have been entitled to proceed under section 503(b)(5).  The Applicants, however, are not seeking to **compel** the Debtors to make such payment, but rather they seek the Court's approval for the Debtors' **consensual** commitment to do so.

applicable to the analysis of requests for the payment under such plan provision, Judge Gerber

held that courts may "look to other provisions of the [Bankruptcy] Code that might also

authorize payment," including section 1129(a)(4), which, by its plain language, "expressly

**contemplates** that payments may be made in connection with a reorganization plan –

presumably, consensually." Id. at 13 (emphasis added).

16.    In Adelphia, fourteen *ad hoc* committees and individual creditors (the

"Adelphia Applicants") sought reimbursement for their legal fees and other professional

expenses under the debtors' plan of reorganization (the "Adelphia Plan").  Like the Fee Payment

Provision, Section 6.2(d) of the Adelphia Plan authorized the payment of the Adelphia

Applicants' professional fees as administrative claims subject to reasonableness and without the

requirement of demonstrating a "substantial contribution" under section 503(b)(3)(D).[6]

17.    After extensive consideration of the applicable statutory language,

available case law, and the competing policy arguments, the Adelphia court concluded that

"under the existing Code and caselaw (to the extent the latter exists), reasonable fees [of entities

other than case fiduciaries] may be paid where . . . the provision for fees is an element of a

chapter 11 reorganization plan." Id. at 9.  The Adelphia court further determined that the policy

benefits of approving such provisions outweighed any perceived policy detriments.  Making note

of the potential for "abuse" and the "material increase in costs" such provisions may impose on

the chapter 11 process, Judge Gerber nonetheless deemed them permissible because they

"maintain[] the necessary flexibility for plan proponents," and, most importantly, because "the

---

[6]    Section 6.2 of the Adelphia Plan provided that the Adelphia Applicants "shall receive reimbursements of
their reasonable fees and expenses incurred in connection with the Chapter 11 Cases as Administrative
Claims . . . [and] shall comply with any procedures required by the Bankruptcy Court in connection with
seeking reimbursement."  (Adelphia Plan § 6.2(d)(ii)(B).)

ability to pay objecting or settling parties facilitates fiduciaries' ability to settle or otherwise resolve controversies." Id. at 17-19.

18.     The Fee Payment Provision should be viewed by the Court as an indispensable element of the Plan and the Plan Settlements and deemed appropriate for all the same reasons that the comparable fee payment provision was approved in Adelphia.[7]  The Applicants and their professionals were indispensable participants in every aspect of the Chapter 11 Cases and with respect to every significant transaction, adversary proceeding, contested matter and court application that the Debtors undertook over a more than three-year period. Most significantly, the Applicants were key players in the complex Plan Settlement negotiations among numerous constituents with widely divergent interests that spanned many months and were critical to the Plan's ultimate success.  The Applicants devoted, in the aggregate, thousands of hours to the preservation and recovery of the Debtors' assets, the sale of certain of those assets after diligent evaluation of available options, and the pursuit of the global consensus that, alone, could assure a speedy resolution of the Chapter 11 Cases.

19.     Given that the Debtors, in the exercise of their fiduciary duties, determined that their "ability to settle or otherwise resolve controversies" in connection with the Plan Settlements would be "facilitated" by committing to pay the reasonable legal expenses incurred by the Applicants, the Court should approve the Fee Payment Provision under section 1129(a)(4) of the Bankruptcy Code.

---

[7]     The Fees and Expenses requested by the Committee Members raise none of the "behavioral" issues addressed in Adelphia because no party has alleged that any of the Applicants has engaged in any of the "outrageous" conduct that was identified as potentially "unreasonable" by Judge Gerber.  Adelphia, 441 B.R. at 19.  To the contrary, the Applicants have worked tirelessly, through the Committee and on their own, to advance the Debtors' Chapter 11 Cases and consummate an almost fully consensual chapter 11 plan in the largest chapter 11 case ever filed, thereby maximizing the value of the Debtors' estates for the benefit of all creditors, instead of simply attempting to enlarge their share of the "pie."  Id.

C.    **Fees And Expenses Are "Reasonable" Under Section 1129(a)(4) Standard**

20.    The only requirement for approval under section 1129(a)(4) of plan-related payments is that such payments be "reasonable."  11 U.S.C. § 1129(a)(4).  The Fees and Expenses requested by the Applicants, as evidenced in the attached declarations (Exhibit B-1 to B-8; the "Declarations") and the time and expense records annexed thereto ("Time and Expense Records") for each Applicant, are reasonable.[8]

21.    At least one commentator has suggested that the section 1129(a)(4) "reasonableness" standard should be construed "liberally," such that if the fees at issue are "reasonable" under any relevant line of inquiry, the lowest applicable standard should control.  7 Collier on Bankruptcy ¶ 1129.02[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). For instance, a court may approve a payment under a plan if "it is reasonable in relation to other costs incurred in the case, reasonable in relation to other cases, or reasonable in relation to the fee structure of the individual or entity requesting payment."  In re Congoleum Corp., No. 03-51524, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010) (quoting Collier on Bankruptcy).  This test is disjunctive: a plan provision for the payment of fees need only meet one of the above standards to be deemed reasonable under section 1129(a)(4).  7 Collier on Bankruptcy ¶ 1129.02[4].

22.    Applying this liberal standard, the Court should conclude that the Fees and Expenses are reasonable.  Given the complexity of the Chapter 11 Cases and the amount of work performed by the Applicants and their legal advisors, the Applicants respectfully submit that the amount of the Fees and Expenses, aggregating to $24.3 million (as set forth on Exhibit A hereto),

---

[8]    Due to the voluminous nature of the Time and Expense Records, these materials are not being filed with the Application, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

while not insubstantial, is reasonable in relation to other costs in these Chapter 11 Cases, which,

at this juncture, exceed $1.5 billion, as well as the total value of the Debtors' assets and likely

distributions to creditors.  Thus, the Fees and Expenses are clearly reasonable under the

Congoleum standard.

23.     In addition, the "reasonableness" standard in the context of section

1129(a)(4) is very fact-specific, and its application "will clearly vary from case to case and,

among other things, will hinge to some degree upon who makes the payments at issue, who

receives those payments, and whether the payments are made from assets of the estate." Mabey

v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.), 150 F.3d 503, 517 (5th Cir. 1998),

cert. denied, 526 U.S. 1144 (1999); see also In re Journal Register Co., 407 B.R. 520, 537

(Bankr. S.D.N.Y. 2009) ("[D]etermination whether a payment is reasonable under § 1129(a)(4)

requires an analysis of the issue of reasonableness based on the facts and circumstances of the

payments.").  Here, such reasonableness must be evaluated against the background of the largest

and most complex bankruptcy in the United States history.

24.     The Debtors tumbled precipitously into bankruptcy in September 2008,

and the Committee has been involved in the orderly liquidation of the Debtors' complex and far-

flung assets and the resolution of claims asserted against the Debtors' estates ever since.  Unlike

other large chapter 11 cases – where an operational restructuring is contemplated and most of the

debtor's pre-petition personnel continues to run the business during the restructuring – the

Debtors' bankruptcy has been a liquidation from day one.  Within a week of LBHI's chapter 11

filing, all but a handful of the Debtors' employees had been terminated or moved to Barclays as

part of the sale of the broker/dealer business.  The task of running the remaining businesses,

pending their ultimate liquidation, fell, by force of circumstance, to the Debtors' restructuring professionals and the Committee and its professional advisors.

25.     Thus, from the very beginning, the circumstances required the Applicants to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases.  In a more typical chapter 11 case, an official creditors' committee would generally meet at most once a week and address a fairly predictable list of case administration issues.  The Chapter 11 Cases have proven far more complex.  For most of the first year of the pendency of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times a week, sometimes late into the night and on weekends.

26.     In addition, due to the sheer volume of issues that needed to be addressed by the Committee, at the outset of these Chapter 11 Cases, the Committee established eight subcommittees to review and evaluate issues and transactions with respect to specific asset/claim categories: Derivatives, Real Estate, Private Equity/Principal Investments, Loan Book, Domestic Banks, Tax, Fee Committee, and Litigation.  The Committee has also established an EMTN Valuation Working Group.  Each of these subcommittees has also met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that arose in connection with the asset/claim categories within their purview.  The aggregate result has been that the Committee Members, many of whom serve on more than one subcommittee, have often been required to attend meetings five or more days a week, in addition to reviewing voluminous background materials and engaging in the post-meeting deliberations necessary to effectively carry our their fiduciary duties.

27.     Due to the highly sophisticated nature of the Debtors' businesses, the Committee Members would not have been able to undertake the foregoing responsibilities

without the assistance of individual counsel, even given the competent guidance from the Committee's professionals.  Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions to banking and broker-dealer activities subject to regulatory oversight around the world.  While being unquestionably sophisticated creditors, none of the Applicants possessed the expertise required to address all of these issues without significant input from its own professionals.  Resolution of many of these issues involved spirited and sometimes contentious debate in which the respective positions of Committee Members were informed by the legal and ethical analyses of their individual counsel. Hence, each of the Committee Members and the Indenture Trustees has relied extensively on its own (inside or outside) counsel for assistance in reviewing and evaluating the hundreds of transactions, pleadings and strategic issues the Committee has had to address.

28.     The Committee Members' counsel were required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input from colleagues at their own organizations with expertise on the many kinds of relevant transactions, and attend the Committee and subcommittee meetings convened to address these matters.  All of the foregoing activities were necessary for the Committee Members to fulfill their fiduciary responsibilities to the Debtors' unsecured creditors.

29.     In addition, counsel for the Applicants participated in vigorous and substantial intra-Committee debates concerning the difficult and often unprecedented issues that arose in the Chapter 11 Cases, including complex intercompany matters that required the Committee Members to evaluate the competing interests of the creditors of the Debtors' many Debtor and non-Debtor affiliates.  This allowed the Committee to engage in more sophisticated

analyses of these issues, as well as to better appreciate the interests of different creditor

constituents.

30.     In light of all of the foregoing, under the circumstances of the Chapter 11

Cases, the Fees and Expenses are unquestionably reasonable.

**D.     "Substantial Contribution" Standard Is Not
         Appropriate For Evaluation of Fees and Expenses**

31.     There is absolutely no reason for the Court to impose the section 503(b)

"substantial contribution" standard on its evaluation of the Application.  Contrary to the

assertions of the UST in the UST Objection, section 503(b) of the Bankruptcy Code has no

application to the Fees and Expenses because, by its own terms, section 503(b) applies only to

compensation requests *that are not otherwise agreed to by a debtor and provided for in a plan*.

32.     Indeed, as Judge Gerber observed in <u>Adelphia</u>, section 503(b) is

"nonconsensual in nature."  441 B.R. at 12.  In other words, section 503(b) governs situations in

which a party seeks to impose its costs on a bankruptcy estate, generally over the objection of

other parties in interest, in consideration for value such party allegedly has provided to the estate.

However, as the <u>Adelphia</u> court has pointed out, "section 503(b) isn't the only source for

authority to pay legal fees under a plan.  If it were, there would be no need to impose the

reasonableness requirement twice.  Applying section 503(b) in accordance with its terms would

already have skinned the cat.  [Thus,] [s]ection 1129(a)(4) suggests . . . that there may be other

payments by the debtor, 'for costs and expenses in or in connection with the case,' beyond those

expressly permitted by section 503(b)."  <u>Id.</u> at 13-14.

33.     Accordingly, the <u>Adelphia</u> court held that "to the extent that the requested

fees are reasonable, and the requirements of section 1129(a)(4) . . . are complied with, [the plan

provision authorizing payment of such fees] is permissible, and the Code permits the [Adelphia]

Applicants' reasonable fees to be recovered under that provision *without showing compliance with sections 503(b)(3) or (4)*." Id. at 19 (emphasis added); see also In re Trans World Airlines, Inc., 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995) (approving chapter 11 plan provision reimbursing indenture trustees' and creditor committees' attorneys' fees as administrative claims, pursuant to section 1123(b)(6) of the Bankruptcy Code, without undertaking a substantial contribution analysis). Thus, a plain reading of the applicable Bankruptcy Code provisions, as well as their detailed analysis by the Adelphia court, support the conclusion that, so long as the Fees and Expenses are "reasonable," the Court should approve them without any further analysis.

34.     Here, where the Fee Payment Provision was consensually negotiated at arms' length among sophisticated parties, and was included in the Plan (which was overwhelmingly approved by an affirmative vote of almost 100% of the Debtors' creditors) as an indispensible element of the Plan Settlements, there is absolutely no reason to review the Application under any additional or heightened standard.

E.     **Alternatively, Fees and Expenses Should Be Approved Under Section 503(b)(3)(D)**

35.     Alternatively, the Applicants should be found to have made the requisite "substantial contribution," within the contemplation of section 503(b) of the Bankruptcy Code, to the success of the Chapter 11 Cases, the Plan Settlements, and the Plan.

36.     Section 503(b)(3)(D) of the Bankruptcy Code is available to an individual committee member that makes a substantial contribution to the case "as a creditor or equity security holder, independent of the work of the committee" for seeking administrative expense status for [such committee member's] professional fees." 4 Collier on Bankruptcy ¶503.11[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011); see In re Energy Partners, Ltd., 422

15

B.R. 68, 92 (Bankr. S.D. Tex. 2009) (member of official committee of equity holders was

entitled to reasonable attorneys' fees for providing "substantial contribution" to case).

37.     Although the Bankruptcy Code does not define "substantial contribution,"

bankruptcy courts in the Southern District of New York generally consider the following factors

in determining whether a substantial contribution has been made:  (i) whether the services were

provided to the benefit of the estate itself or all parties in the bankruptcy case; (ii) whether the

services conferred a direct, significant and demonstrably positive benefit upon the estate; and

(iii) whether the services were duplicative of services performed by others.  In re Best Prods.

Co., 173 B.R. 862, 865-66 (Bankr. S.D.N.Y. 1994) (citations omitted); In re Granite Partners,

L.P., 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997) (compensation for substantial contribution is

"limited to those extraordinary actions . . . that lead to an actual and demonstrable benefit to the

debtor's estate, the creditors, and to the extent relevant, the stockholders.") (citations and internal

quotations omitted).

38.     Courts also consider whether the services performed by the movant served

to "foster and enhance - rather than retard or interrupt - the progress of the reorganization" and

whether "the creditor took an active role in facilitating the negotiation and successful

confirmation of the plan."  In re Granite Partners, 213 B.R. at 446.

39.     Here – based upon the same facts and circumstances proffered in support

of the approval of the Fees and Expenses under section 1129(a)(4) – the Court should conclude

that the services provided by the Committee Members and their individual counsel have

benefited all of the Debtors' creditors and that such services conferred a direct, significant and

demonstrably positive benefit upon all estates.  Above and beyond the extraordinary burdens

these cases have imposed on the Applicants, each has taken "an active role in facilitating the negotiation and successful confirmation of the plan." In re Granite Partners, 213 B.R. at 446.

40.    In addition, the services rendered by counsel to individual Committee Members, while overlapping in some ways with those rendered by counsel to the Debtors and the Committee, are in no way duplicative of efforts undertaken by these professionals. To the contrary, the premise of the Fee Payment Provision is that the Applicants' counsel provided significant and incremental value to the Debtors' estates, having enabled the Applicants and the Committee's professionals to more efficiently, comprehensively, and appropriately address matters of great significance to the Debtors, their estates and their creditors.

41.    From the very outset, the circumstances have required the Applicants to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. In a more typical chapter 11 case, as stated above, an official creditors' committee would generally meet once a week, or less, and address a fairly predictable list of case administration issues. The Chapter 11 Cases have proven far more complex. For most of the first year of the pendency of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times a week, sometimes late into the night and on weekends. Thus, the Applicants have rendered services to the Debtors' estates above and beyond the call of duty, and these extraordinary efforts in conjunction with the equally extraordinary results they have helped to bring about provide a more than adequate basis for the Court to conclude that (i) the Applicants have made a "substantial contribution" to the Chapter 11 Cases within the meaning of section 503(b)(3)(D); and (ii) the Fees and Expenses are compensable under section 503(b)(4).

## APPROVAL OF PAYMENTS

42.    The services rendered by the Applicants (aided by their individual counsel) have required a high degree of competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by the Applicants.  The services rendered by the Applicants were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

43.    The Applicants seek approval of the payment by theDebtors, as reflected in the Time and Expense Records, of (i) $24,316,829.55 in fees for services rendered from the Petition Date through December 31, 2011; and (ii) $236,308.00 in expenses incurred in connection with rendering such services during the same period—for a total award of $24,553,137.39.[9]  Such amounts would be payable on the Effective Date, or as soon thereafter as practicable.

44.    The Declarations, which are annexed hereto as Exhibits B-1 to B-8, each provide additional detail as to the nature of the particular Applicant's claim, such as the capacity in which it is seeking payment, its length of service on the Committee, its specific role in the Committee process, its subcommittee appointments, the identity and credentials of its counsel, the general scope of services provided by such counsel, and the most significant Chapter 11 Case-related achievements.  The Time and Expense Records, in turn, detail the services rendered and costs incurred by each Applicant and its respective counsel.

---

[9]    The Applicants request herein approval of the Fees and Expenses incurred on or before December 31, 2011.  They intend to submit additional fee applications for any fees and expenses incurred between December 31, 2011 and the Effective Date of the Plan.

## NOTICE

45.    Notice of this Application has been provided to (a) the Debtors;

(b) counsel for the Debtors; and (c) the UST.

## CONCLUSION

WHEREFORE, each Applicant respectfully requests that the Court (i) enter an

Order, substantially in the form of the Order annexed hereto as Exhibit C, authorizing and

directing the Debtors to pay the Fees and Expenses incurred by the Applicants from the Petition

Date through and including the December 31, 2011; and (ii) granting such other and further relief

as is just.

Dated:  New York, New York
       January 30, 2012

**COVINGTON & BURLING LLP**

By: /s/ Michael B. Hopkins

Michael B. Hopkins
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone:      (212) 841-1064
Fax:               (646) 441-9064
Counsel for Wilmington Trust Company, as member
of the Committee and indenture trustee


**STROOCK & STROOCK & LAVAN LLP**

By: /s/ Mark A. Speiser

Mark A. Speiser
180 Maiden Lane
New York, NY  10038-4982
Phone:   (212) 806-5400
Fax:       (212) 806-6006
Counsel for Mizuho Corporate Bank, Ltd., as member
of the Committee

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: /s/ Russell L. Reid

Russell L. Reid, Jr.
30 Rockefeller Plaza
New York, NY 10112
Phone:   (212) 653-8700
Fax:       (212) 653-8701
Counsel for the Bank of NY Mellon, as member of the Committee and indenture trustee


**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: /s/ Matthew J. Gold

Matthew J. Gold
551 Fifth Avenue, 18th Floor
New York, New York 10176
Phone:           (212) 986-6000
Fax:               (212) 986-8866
Counsel for Elliott Management Corp., as member of the Committee


**METROPOLITAN LIFE INSURANCE CO., as member of the Committee**


By: /s/ Thomas Pasuit

Thomas Pasuit
10 Park Avenue
P.O. Box 1902
Morristown, New Jersey 07962-1902
Phone:           (973) 355-4581
Fax:               (973) 355-4230

**SULLIVAN & WORCESTER LLP**

By: /s/ Richard Hiersteiner

Richard Hiersteiner
One Post Office Square
Boston, MA 02109
Phone:            (617) 338-2800
Fax:              (617) 338-2880
Counsel for U.S. Bank National Association, as
member of the Committee and indenture trustee

**ARENT FOX LLP**

By: /s/ David Dubrow

David Dubrow
1675 Broadway
New York, NY 10019
Phone :  (212) 484-3957
Fax:       (212) 484-3990
Counsel for The Vanguard Group, as member of the
Committee

**VINSON & ELKINS LLP**

By: /s/ Dov Kleiner

Dov Kleiner
666 Fifth Avenue
New York, New York  10103-0040
Phone :  (212) 237-0000
Fax:       (212) 237-0100
Counsel for Shinsei Bank, Limited, as former
member of the Committee

**<u>EXHIBIT A</u>**

**Summary of Fees and Expenses**

**SUMMARY OF FEES AND EXPENSES IN CONNECTION WITH OMNIBUS APPLICATION OF (I) INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND (II) INDENTURE TRUSTEES PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D) AND 503(b)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES**

| Committee Member | Fees | Expenses | Total Fees and Expenses |
|---|---|---|---|
| Wilmington Trust Company | $2,569,577.50 | $0 | $2,569,577.50 |
| Wilmington Trust Company – Loeb & Loeb, LLP | $394,029.00 | $8,208.25 | $402,237.25 |
| Wilmington Trust Company – Covington & Burling | $7,788,744.00 | $68,759.56 | $7,857,503.56 |
| Wilmington Trust Company – Citibank | $96,000.00 | $0 | $96,000.00 |
| The Bank of NY Mellon – Administration Fee | $490,740.00 | $0 | $490,740.00 |
| The Bank of NY Mellon – Sheppard Mullin | $4,054,024.45 | $35,519.86 | $4,089,544.31 |
| Mizuho Corporate Bank, Ltd. – Stroock & Stroock & Lavan | $2,863,196.00 | $17,742.29 | $2,880,938.29 |
| Metropolitan Life Insurance Co. | $254,402.50 | $0 | $254,402.50 |
| The Vanguard Group | $1,346,234.50 | $21,221.17 | $1,367,455.67 |
| U.S. Bank National Association – Shipman & Goodwin, LLP | $111,232.50 | $1,217.06 | $112,449.56 |
| U.S. Bank National Association – Edwards Angell Palmer & Dodge, LLP | $64,796.00 | $2,721.33 | $67,517.33 |
| U.S. Bank National Association – Sullivan Worcester, LLP | $1,752,369.00 | $12,928.39 | $1,765,297.39 |
| Elliott Management Corp – Greenberg Traurig, LLP | $1,308,655.60 | $53,841.86 | $1,362,497.46 |
| Elliot Management Corp – Kleinberg, Kaplan, Wolff & Cohen, P.C. | $1,151,368.50 | $12,534.01 | $1,163,902.51 |
| Shinsei Bank, Limited | $71,460.00 | $1,614.06 | $73,074.06 |
| **Grand Total** | $24,316,829.55 | $236,308.00 | $24,553,137.39 |

## EXHIBIT B

**Fees and Expenses**

# <u>EXHIBIT B-1</u>[*]

---

[*] Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re:                                                  :          Chapter 11 Case No.
                                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,                  :          08-13555 (JMP)
                                                        :
                                      Debtors.          :          (Jointly Administered)
                                                        :
-------------------------------------------------------- x

## DECLARATION OF JOHN GUILIANO IN SUPPORT OF THE BANK OF NY MELLON'S APPLICATION PURSUANT TO SECTION 1129(A)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(D)(3) AND 503(B)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

JOHN GUILIANO declares under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.      I am employed as a Vice President in the Default Administration Group of
The Bank of NY Mellon ("BNYM"), a member of the Official Committee (the "Committee") of
Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors").
Except as otherwise provided herein, the facts set forth in this declaration are based upon my
personal knowledge. I am competent to testify to these facts.

2.      I make this declaration in support of the Omnibus Application of
Individual Members Of Official Committee of Unsecured Creditors and Indenture Trustees
Pursuant To Section 1129(a)(4), Or, Alternatively, Sections 503(b)(D)(3) and 503(b)(4) of
Bankruptcy Code For Payment of Fees and Reimbursement of Expenses (the "Application").

3.      More specifically, I make this declaration to summarize (i) the nature of
BNYM's claims against the Debtors; (ii) its status as trustee for a variety of transactions

involving Lehman Brothers Holdings, Inc. or one of its Debtor or non-Debtor affiliates,[1]

including as indenture trustee for more than $10.7 billion in securities issued by LBHI and

certain other Debtors (the "Notes"); (iii) the length of its service on the Committee; (iv) its

subcommittee appointments; (v) the identity and qualifications of its individual counsel; (vi) the

general scope of services provided by its individual counsel; and (vii) the contributions made by

BNYM as a member of the Committee, with the assistance of its counsel.

A.    **Nature of BNYM's Claims**

4.    BNYM serves in various trust capacities in a substantial number of

collateralized loan obligation issues, collateral debt obligation issues and other transactions

involving one or more of the Debtors or their affiliates.  In addition, BNYM serves as successor

trustee under (i) the Indenture, dated as of February 1, 1996 (as amended, supplemented, or

modified, the "LBHI Indenture"), between LBHI and Chemical Bank (as original trustee), and

(ii) the Indenture, dated as of March 1, 1996 (as amended, supplemented, or modified, the "LBI

Indenture", and together with the LBHI Indenture, the "Indentures"), between Lehman Brothers

Inc. and The First National Bank of Chicago (as original trustee).  On September 21, 2009,

BNYM filed proofs of claim (collectively, the "BNYM Global Proofs of Claim") (Claim Nos.

21797, 21798, 21799, 21800, 21801, 21802, 21803, 21804, 21805, 21806, 21807, 22122 and

22123) on behalf of itself and the holders of the securities issued under the Indentures.  The

BNYM Global Proofs of Claim encompass only claims that arise under, or in connection with,

the Indentures.

B.    **Status as Indenture Trustee**

5.    Since BNYM serves as both a Committee member and an indenture

---

[1] BNYM is involved in hundreds of transactions involving the Debtors, including corporate and municipal bond issues, collateralized debt obligations, collateralized loan obligations, various swap transactions, collateralized bond obligations, mortgage securitization transactions and other structured finance transactions.

trustee, it is seeking to recover the legal expenses it incurred as both Committee member and an indenture trustee. As a "double fiduciary," it had separate duties with respect to these two roles and, albeit using the same counsel, incurred separate legal costs in the performance of these respective duties. To the extent possible, all fees and expenses incurred by BNYM in its capacity as an indenture trustee are separately tallied and summarized in this Application.

**C.    Service on the Committee**

6.    BNYM was appointed to the Committee on September 17, 2008, and has served continuously since that date for a period of more than forty (40) months.

**D.    Subcommittee Appointments**

7.    Over the course of the three years since the Petition Date, BNYM has served on the following Subcommittees: (i) the Derivatives Subcommittee; and (ii) the Private Equity Subcommittee.

8.    Service on each of these Subcommittees has imposed significant additional duties on BNYM, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**E.    Identity and Qualifications of Counsel**

9.    In connection with its service on the Committee and as an indenture trustee, BNYM retained Sheppard Mullin Richter & Hampton LLP ("Sheppard Mullin"), as its outside counsel.

10.    Sheppard Mullin is an international law firm with offices in Beijing, Brussels, Century City, Del Mar, London, Los Angeles, New York, Orange County, Palo Alto, San Diego, San Francisco, Santa Barbara, Shanghai, and Washington, D.C. Sheppard Mullin represents clients in all types of regional, national, and cross-border insolvency matters, ranging

in size and complexity from out-of-court loan workouts and financial restructurings to bankruptcy proceedings in multiple jurisdictions, creditors' rights litigation, and distressed acquisitions. Its clients include secured lenders, debtors, bank groups, ad hoc and official creditors' committees, indenture trustees, loan servicers, equity holders, real property and equipment lessors, bankruptcy trustees, and buyers. With particular relevance to these cases, Sheppard Mullin's expertise encompasses the restructuring of investments in defaulted public, private, and secured and unsecured bonds, the workout of investments in CDOs and other structured investment vehicles; and the enforcement and/or termination of swaps and other derivative instruments on account of bankruptcy or reorganization. Recent engagements have included American Airlines, Frontier Airlines, General Motors, Kaupthing Bank hf., Landsbanki Islands hf., TerreStar Networks, Vectrix Corp., and Washington Mutual.

## F.    Scope of Services Provided by Counsel

11.    The magnitude of the burdens imposed on BNYM by its service on the Committee cannot be overstated. The Chapter 11 Cases are the largest and most complex chapter 11 cases in the United States history. The Committee has been involved in the orderly liquidation of the Debtors' assets and adjudication of claims against their estates ever since September 2008.

12.    Unlike other large chapter 11 cases – where an operational restructuring is contemplated and most of the debtor's pre-petition personnel continues to run the business during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of running the remaining businesses, pending their ultimate liquidation, was left, by force of

circumstance, to the Debtors' restructuring professionals and the Committee, the Committee Members, and their respective professional advisors.

13.    From the beginning of the Chapter 11 Cases, these circumstances have required BNYM, like the other Committee Members, to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved, official committees have generally met once a week, or less often, and addressed a fairly predictable list of case administration issues. This case has proven far more complex. For most of the first year of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times per week, sometimes late into the evening and on weekends.

14.    Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established, at the outset of the Chapter 11 Cases, several subcommittees to review and evaluate issues and transactions with respect to seven asset/claim categories – Derivatives, Real Estate, Private Equity, Loan Book, Domestic Banks, Tax, and Litigation. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

15.    BNYM has, as indicated above, served on two of these Subcommittees, and, as a result, has often been required to attend Committee or Subcommittee meetings five or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.

16.    Due to the highly sophisticated nature of the Debtors' businesses, BNYM would not have been able to undertake any of the foregoing responsibilities without the

assistance of counsel. Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world. No one at BNYM possessed the legal expertise required to address all these issues without input from its outside professionals or to inform its judgment of the legal and fiduciary implications of each decision, which vary among Committee members. Hence, BNYM relied extensively on its outside counsel, Sheppard Mullin, for assistance in reviewing and evaluating the hundreds of transactions and motions the Committee has addressed since the Petition Date.

17.    BNYM's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings. On a separate track, Sheppard Mullin was also required to assist BNYM in responding to discovery requests served on the Committee Members in connection with various litigations in which the Committee had intervened. These services were necessary for BNYM to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

**G.    Most Significant Achievements**

18.    A full list of the Chapter 11 Case-related achievements in which BNYM, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein. At the top of any such list, however, would be some or all of the following:

- **Sale to Barclays.** The Committee worked with its advisors to review the sale of the assets of Lehman Brothers Inc. ("LBI"), the Debtors' North American

capital markets business, to Barclays Capital, Inc. ("Barclays"). Following approval of the LBI sale, the Committee continued to work with its advisors to (i) ensure that the rights of the unsecured creditors of each of the Debtors were protected to the fullest extent possible, and (ii) review and monitor performance under the transition services agreement with Barclays, the effective implementation of which, given the interrelatedness of the Debtors' operations, was of particular importance to the Committee. The Committee commenced litigation against Barclays contending (albeit unsuccessfully) that Barclays had received more value in the sale than it was entitled to under the asset purchase agreement.

- **Sale of Neuberger Berman.** The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman. The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors. The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.** The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code. Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution. On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.** The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the

Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Bank of America Litigation.** In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the Committee) against Bank of America ("BofA"), directing BofA to return $501.8 million plus interest to the Debtors. The Court held that BofA's seizure of the collateral violated the automatic stay, and that BofA was not entitled to a setoff. On May 20, 2011, the Court entered final judgment (i) against BofA on all counts of its complaint and (ii) in favor of LBHI on its counterclaim. As a result of extensive discussions and negotiations, the parties ultimately came to a settlement agreement. A stipulation of dismissal of appeal was filed on November 16, 2011 after the Court approved the settlement on October 19, 2011.

- **Swedbank Litigation.** The Committee and its advisors worked closely with the Debtors to respond to Swedbank AB's ("Swedbank") claim that it had the right to set off LBHI's prepetition debts against the funds the Debtors had on deposit with Swedbank, including funds that were deposited postpetition. The Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the post-petition funds. The Court granted the Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal. Swedbank appealed from the Court's decision. The Committee and filed an appellate brief in support of the Debtors' position. The United States District Court for the Southern District of New York affirmed the Court's decision.

- **Success of the Derivatives ADR Process.** The Committee and its advisors worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations. Such efforts have been instrumental in helping the Debtors achieve settlements in 152 matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of more than $924 million.

- **Preservation and Planned Sale of Banks.** The Committee analyzed issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's subsidiaries which are subject to oversight by the Office of Thrift Supervision and the Federal Deposit Insurance Company (collectively, the "Regulators"). Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i)

improve the capital levels at each of the Banks to satisfy regulatory requirements, (ii) avoid potential seizures and liquidation by the Regulators, (iii) permit the resumption of depository functions at the Banks to preserve and maximize value; and (iv) facilitate the winding down of Woodlands' operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.** Innkeepers USA Trust and certain of its affiliates (collectively, "<u>Innkeepers</u>"), which filed for chapter 11 bankruptcy protection in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("<u>Lehman ALI</u>") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Disposition of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("<u>Archstone</u>"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "<u>SunCal Debtors</u>") in the United States Bankruptcy Court for the Central District of California (the "<u>SunCal Cases</u>") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

**H.    Reimbursement of Fee and Expenses Requested**

19.    The professional services rendered by BNYM and Sheppard Mullin, as counsel to BNYM in connection with Committee services and as indenture trustee for the Notes, respectively, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by BNYM, in both its Committee member and indenture trustee capacities.  The services rendered by BNYM and Sheppard Mullin were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

20.    BNYM submits the Application to seek approval of payments to be made to BNYM to fund the payment, or reimburse it for the past payment, of (a) $490,740.00 in fees and expenses of BNYM as a Committee member and as indenture trustee from the Petition Date through December 31, 2011, as reflected in the records annexed hereto as Exhibit A-1; and (b) $4,089,544.31 in fees and expenses of Sheppard Mullin for professional services rendered to BNYM in these capacities from the Petition Date through December 31, 2011, as reflected in the records annexed hereto as Exhibit A-2—for a total award of  $4,580,284.31.


[Remainder of Page Intentionally Left Blank]

21.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of January, 2012

John Guiliano

# **EXHIBIT B-2**[*]

---

[*]   Due to their voluminous nature, the Time and Expense Records annexed to the attached
Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the
Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                      :

In re:                                   :            Chapter 11 Case No.
                                        :

LEHMAN BROTHERS HOLDINGS INC., et al.,    :            08-13555 (JMP)
                                        :

                  Debtors.                 :            (Jointly Administered)
                                        :

------------------------------------------------------- x

### DECLARATION OF DIDRIC CEDERHOLM IN SUPPORT OF ELLIOTT'S APPLICATION PURSUANT TO SECTION 1129(A)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(D)(3) AND 503(B)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

         DIDRIC CEDERHOLM declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

         1.      I am employed as a Portfolio Manager of Elliott Management Corp. ("Elliott"), a member of the Official Committee (the "Committee") of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors"), and have served as one of Elliott's Committee Personnel. Except as otherwise provided herein, the facts set forth in this declaration are based upon my personal knowledge. I am competent to testify to these facts.

         2.      I make this declaration in support of the Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees Pursuant to Section 1129(a)(4), Or, Alternatively, Sections 503(b)(D)(3) and 503(b)(4) of Bankruptcy Code For Payment of Fees and Reimbursement of Expenses of Their Respective Counsel (the "Application").

         3.      More specifically, I make this declaration to summarize (i) the nature of Elliott's claims against the Debtors; (ii) the length of its service on the Committee; (iii) its subcommittee

appointments; (iv) the identity and qualifications of its individual counsel; (v) the general scope of services provided by its individual counsel; and (vi) the contributions made by Elliott as a member of the Committee, with the assistance of its counsel.

### A.    Nature of Elliott's Claims

4.    Elliott serves as an investment adviser on behalf of certain client accounts that beneficially own securities or other claims or interests in the Chapter 11 Cases.

### B.    Service on the Committee

5.    Elliott was appointed to the Committee on February 9, 2010, and has served continuously since that date for a period of more than 23 months.

### C.    Subcommittee Appointments

6.    Over the course of almost two years since Elliott was appointed to the Committee, Elliott has served on the following Subcommittees: (i) the Derivatives Subcommittee; (ii) the Real Estate Subcommittee; (iii) the Private Equity Subcommittee; (iv) the Loan Book Subcommittee; (v) the Tax Subcommittee; and (vi) the Litigation Subcommittee. Elliott also served on the EMTN Valuation Working Group.

7.    Service on each of these Subcommittees has imposed significant additional duties on Elliott, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

### D.    Identity and Qualifications of Counsel

8.    In connection with its service on the Committee, Elliott retained two law firms – (i) Kleinberg, Kaplan, Wolff & Cohen, P.C. ("Kleinberg Kaplan"), as general counsel; and (ii) Greenberg Traurig, LLP ("Greenberg Traurig"), as special counsel with respect to selected matters.

2

9.      Kleinberg Kaplan's Bankruptcy/Workout group represents clients in their capacities as secured and unsecured creditors, debtors, equity holders, lenders, landlords, investors and buyers of distressed companies in connection with chapter 11 reorganizations and out-of-court workouts.  The practice spans both transactional and litigation work.  Transactional work includes the negotiation of agreements such as plans of reorganization, lock-up agreements, investment and purchase agreements and participation in section 363 sale processes.   Litigation work includes representation of clients in adversary proceedings and contested matters in chapter 11, chapter 7 and chapter 15 cases, such as avoidance actions, adequate protection disputes, confirmation objections and claim disputes.

10.      Kleinberg Kaplan's Corporate Group provides legal representation for a variety of ISDA and non-ISDA documented derivatives such as credit default swaps (both single issuer and indices), total return swaps, equity swaps and interest rate swaps.   In this capacity, it has reviewed and negotiated master agreement schedules, special annexes and confirmations from all leading in U.S. and international dealers.  It structures and drafts derivatives to address issuer needs in a variety of contexts including achieving optimal tax, investment and regulatory consequences.  It has also negotiated master repurchase agreements for clients in connection with their repo trades.

11.      Kleinberg Kaplan's Real Estate Practice is sophisticated and national in scope.  It represents national and local developers, owners, lenders, joint ventures and tenants in capital raising, development, acquisition, financing, joint ventures and leasing of large-scale commercial, office, retail, industrial and mixed-use projects.  It also provides guidance on related environmental, insurance, corporate and bankruptcy issues.

MGOLD\200353.3 - 01/25/12

12.    Greenberg Traurig's Business Reorganization & Financial Restructuring Practice represents all of the parties to bankruptcies and restructurings, both in court and out of court, including debtors, official and ad hoc committees of creditors, investors and purchasers of assets, debt instruments or equity of troubled companies, secured and unsecured creditors and DIP lenders, boards of directors and board committees, and trustees, receivers, examiners, indenture trustees and other fiduciaries.  Its attorneys have played critical roles in many recent complex bankruptcies and restructurings, including those of AbitibiBowater Inc., Ashton Woods USA LLC, Atlantis Plastics, Inc., Bank United Financial Corporation, Calpine Corp., Chem Rx Corp., Chesapeake Corporation, DBSI, Inc., Conseco Finance Company, Extended Stay Hotels, Inc., Fontainebleau Las Vegas, General Growth Properties, General Motors Corp., Global Crossing, Kmart Corp., Lake Las Vegas, LandSource Communities Development LLC, Mirant Americas Generation, LLC, Montgomery Ward, Northwest Airlines, Satélites Mexicanos S.A. de C.V., Southeast Banking Corporation, Sportsman's Warehouse, Inc., TH Agriculture and Nutrition L.L.C., TOUSA, Inc., TransContinental Airlines, Inc., Tropicana Entertainment, LLC, Ultimate Escapes Holdings, United Airlines, US Airways Group, Inc., and Werner Holding Co. (DE), Inc.

**E.    Scope of Services Provided by Counsel**

13.    The magnitude of the burdens imposed on Elliott by its service on the Committee cannot be overstated.  The Chapter 11 Cases are the largest and most complex chapter 11 cases in United States history.  The Committee has been involved in the orderly liquidation of the Debtors' assets and adjudication of claims against their estates ever since September 2008.

14.    Unlike other large chapter 11 cases – where an operational restructuring is contemplated and most of the debtor's pre-petition personnel continue to run the business during the restructuring – the Debtors' bankruptcy has been a liquidation from day one.  Within a week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been terminated or

4

moved to Barclays as part of the sale of the broker/dealer business. The task of running the remaining businesses, pending their ultimate liquidation, was left, by force of circumstance, to the Debtors' restructuring professionals and the Committee, the Committee Members, and their respective professional advisors.

15.    Since Elliott was appointed to the Committee, these circumstances have required Elliott, like the other Committee Members, to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved, official committees have generally met once a week and addressed a fairly predictable list of case administration issues. This case has proven far more complex. The Committee has often met twice a week and, at times, three or more times per week, sometimes late into the evening and on weekends.

16.    Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established several subcommittees to review and evaluate issues and transactions with respect to seven asset/claim categories – Derivatives, Real Estate, Private Equity/Principal Investments, Loan Book, Domestic Banks, Tax, and Litigation, as well as the EMTN valuation working group. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

17.    Elliott has, as indicated above, served on six of these Subcommittees since its appointment to the Committee, and, as a result, has often been required to attend Committee or Subcommittee meetings five or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.

18.    Due to the highly sophisticated nature of the Debtors' businesses, Elliott would not have been able to undertake any of the foregoing responsibilities without the assistance of counsel.  Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world.  No one at Elliott possessed the expertise required to address all these issues without input from its outside professionals.  Hence, Elliott relied extensively on its outside counsel, Kleinberg Kaplan and Greenberg Traurig, for assistance in reviewing and evaluating the hundreds of transactions, motions and the strategic issues Committee has addressed since the Petition Date.

19.    Elliott's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings.  On a separate track, Kleinberg Kaplan was also required to assist Elliott in responding to discovery requests served on the Committee Members in connection with the Barclays litigation.  These services were necessary for Elliott to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

20.    In addition, Elliott's counsel, along with counsel for other Committee Members, participated in vigorous and substantial intra-committee debate concerning the difficult and often unprecedented issues that arose during the Chapter 11 cases.  This allowed the Committee and its advisors to reach more sophisticated analyses of the issues involved, as well as to consider the viewpoints of different creditor interests.

MGOLD\200353.3 - 01/25/12

### F.    Most Significant Achievements

21.    A full list of the Chapter 11 Case-related achievements in which Elliott, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein. At the top of any such list, however, would be some or all of the following:

- **Sale of Neuberger Berman.**  The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman.  The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors.  The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.**  The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code.  Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution.  On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Bank of America Litigation.**  In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the Committee) against Bank of America ("BofA"), directing BofA to return $501.8 million plus interest to the Debtors.  The Court held that BofA's seizure of the collateral violated the automatic stay, and that BofA was not entitled to a setoff.  On May 20, 2011, the Court entered final judgment (i) against BofA on all counts of its complaint and (ii) in favor of LBHI on its counterclaim.  As a result of extensive discussions and negotiations, the parties ultimately came to a settlement

agreement.  A stipulation of dismissal of appeal was filed on November 16, 2011 after the Court approved the settlement on October 19, 2011.

- **Swedbank Litigation.**  The Committee worked closely with the Debtors to respond to Swedbank AB's claim that it had the right to set off LBHI's prepetition debts against the funds the Debtors had on deposit with Swedbank, including funds that were deposited postpetition.  The Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the post-petition funds.  The Court granted the Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal.  Swedbank appealed from the Court's decision.  The Committee filed an appellate brief in support of the Debtors' position.  The United States District Court for the Southern District of New York affirmed the Court's decision.

- **Success of the Derivatives ADR Process.**  The Committee worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations.  Such efforts have been instrumental in helping the Debtors achieve settlements in 152 matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of more than $924 million.

- **Preservation and Planned Sale of Banks.**  The Committee analyzed issues related to Woodlands Commercial Bank and Aurora Bank FSB, LBHI's subsidiaries that are subject to oversight by the Office of Thrift Supervision and the Federal Deposit Insurance Company.  Throughout the Chapter 11 Cases, the Committee sought to (i) improve the capital levels at each of Aurora and Woodlands to satisfy regulatory requirements, (ii) avoid potential seizures and liquidation by the regulators, (iii) permit the resumption of depository functions at Aurora and Woodlands to preserve and maximize value; and (iv) facilitate the winding down of Woodlands' operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.**  Innkeepers USA Trust and certain of its affiliates, which filed for chapter 11 bankruptcy protection in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan.  The Committee carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

8

- **Sale of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust, a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, Lehman Commercial Paper, Inc. ("LCPI"), and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among

9

other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

**G.**    **Reimbursement of Fee and Expenses Requested**

22.    The professional services rendered by Kleinberg Kaplan and Greenberg Traurig, as counsel to Elliott, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by Elliott, in its Committee Member capacity. The services rendered to Elliott were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

23.    Elliott submits the Application to seek approval of payments to be made to Elliott to fund the future payment, or reimburse it for the past payment, of (a) as reflected in the time records annexed hereto as Exhibit 1 $2,450,763.26 in fees paid to Kleinberg Kaplan and Greenberg Traurig for the professional services rendered to Elliott from the date that Elliott was appointed to the Committee through December 31, 2011; and (b) as reflected in the expense records annexed hereto in Exhibit 1, $65,267.55 in expenses incurred by Kleinberg Kaplan and Greenberg Traurig in connection with such services—for a total award of $2,516,030.81.

MGOLD\200353.3 - 01/25/12

10.    I declare under penalty of perjury that the foregoing is true and correct to the best
of my knowledge.

Executed this <u>24th</u> day of January, 2012


<u>/s/  Didric Cederholm</u>
Didric Cederholm

11

# EXHIBIT B-3[*]

---

[*] Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                    :

In re:                     :        Chapter 11 Case No.
                      :

LEHMAN BROTHERS HOLDINGS INC., et al.,  :       08-13555 (JMP)
                      :

          Debtors.       :       (Jointly Administered)
                      :

-------------------------------------------------------------- x

**DECLARATION OF DAVID G. YU IN SUPPORT OF
METLIFE'S APPLICATION, PURSUANT TO SECTION
1129(A)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(3)(D)
AND 503(B)(4) OF BANKRUPTCY CODE, FOR PAYMENT
OF FEES AND REIMBURSEMENT OF EXPENSES**

DAVID G. YU declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am employed as a Director in the Distressed Investments Group of Metropolitan Life Insurance Company ("MetLife"), a member of the Official Committee (the "Committee") of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors"). Except as otherwise provided herein, the facts set forth in this declaration are based upon my personal knowledge. I am competent to testify to these facts.

2.      I make this declaration in support of the Omnibus Application Of Individual Members Of Official Committee Of Unsecured Creditors And Indenture Trustees Pursuant To Sections 1129(A)(4), Or, Alternatively, Sections 503(b)(3)(D) And 503(b)(4) Of Bankruptcy Code For Payment Of Fees and Reimbursement Of Expenses Of Their Respective Counsel (the "Application").

3.      More specifically, I make this declaration to summarize (i) the nature of MetLife's claims against the Debtors; (ii) the length of its service on the Committee; (iii); its

subcommittee appointment; (iv) the identity and qualifications of its individual counsel; (v) the

general scope of services provided by its individual counsel; and (vi) the contributions made by

MetLife as a member of the Committee, with the assistance of its counsel.

## A.    Nature of MetLife's Claim

4.    As of the Petition Date, MetLife (including any and all of its affiliates)

owned or controlled the following claims against and debt and/or equity securities of the various

Debtors:  (i) senior unsecured public bonds issued by the Debtors in the approximate amount of

$242,000,000; (ii) senior unsecured public bonds guaranteed by the Debtors in the approximate

amount of $87,000,000; (iii) subordinated unsecured public bonds issued by the Debtors in the

approximate amount of $197,500,000; (iv) preferred equity securities issued by the Debtors in

the approximate amount of $780,000; (v) perpetual hybrid securities issued by the Debtors in the

approximate amount of $22,000,000; (vi) secured notes guaranteed by the Debtors in the

approximate amount of $878,000,000; and (vii) derivatives claims against the Debtor in the

approximate amount of $30,000,000.

## B.    Service on the Committee

5.    MetLife was appointed to the Committee on September 17, 2008, and has

served continuously since that date for a period of more than forty (40) months.

## C.    Subcommittee Appointment

6.    Over the course of the three years since the Petition Date, MetLife has

served on (i) the Private Equity subcommittee; and (ii) the Fee Committee Subcommittee of the

Committee.

7.      Service on these Subcommittees has imposed significant additional duties on MetLife, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**D.      Identity and Qualifications of Counsel**

8.      In connection with its service on the Committee, MetLife relied on the services of a dedicated member of its in-house legal team.  MetLife's Law Department is comprised of more than 260 attorneys in over 15 offices throughout the United States, Europe, Latin America and Asia.  Its Debt Transactions Unit has extensive experience in all aspects of insolvency and bankruptcy law, both foreign and domestic, having represented MetLife's interests as secured and unsecured creditor, equityholder, lessor, lessee and other party-in-interest in non-judicial consensual restructurings and formal insolvency proceedings across the world.  Recent bankruptcy matters have included the following:   Borders Group. Inc., Washington Mutual, Capmark Financial, Quebecor, and Woodside.

**E.      Scope of Services Provided by Counsel**

9.      The magnitude of the burdens imposed on MetLife by its service on the Committee cannot be overstated.  The Chapter 11 Cases are the largest and most complex chapter 11 cases in the United States history.  The Committee has been involved in the orderly liquidation of the Debtors' assets and adjudication of claims against their estates ever since September 2008.

10.      Unlike other large chapter 11 cases – where an operational restructuring is contemplated and most of the debtor's pre-petition personnel continues to run the business during the restructuring – the Debtors' bankruptcy has been a liquidation from day one.  Within a week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been

3

terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of running the remaining businesses, pending their ultimate liquidation, was left, by force of circumstance, to the Debtors' restructuring professionals and the Committee, the Committee Members, and their respective professional advisors.

11.    From the beginning of the Chapter 11 Cases, these circumstances have required MetLife, like the other Committee Members, to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved, official committees have generally met once a week and addressed a fairly predictable list of case administration issues. This case has proven far more complex. For most of the first year of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times per week, sometimes late into the evening and on weekends.

12.    Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established, at the outset of the Chapter 11 Cases, several subcommittees to review and evaluate issues and transactions with respect to eight asset/claim categories – Derivatives, Real Estate, Private Equity, Loan Book, Domestic Banks, Tax, Fee Committee, and Litigation. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

13.    MetLife has, as indicated above, served on two of these Subcommittees, and, as a result, has often been required to attend Committee or Subcommittee meetings five or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.

14.    Due to the highly sophisticated nature of the Debtors' businesses, MetLife would not have been able to undertake any of the foregoing responsibilities without the assistance of counsel.  Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world.  No one on the business side of the MetLife team possessed the expertise required to address all these issues without input from its in-house professionals.  Hence, MetLife relied extensively on its in-house counsel for assistance in reviewing and evaluating the hundreds of transactions and motions the Committee has addressed since the Petition Date.

15.    MetLife's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings.  On a separate track, MetLife's in-house counsel was also required to assist MetLife in responding to discovery requests served on the Committee Members in connection with the Barclays litigation.  These services were necessary for MetLife to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

F.    **Most Significant Achievements**

16.    A full list of the Chapter 11 Case-related achievements in which MetLife, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein.  At the top of any such list, however, would be some or all of the following:

- **Sale to Barclays.**  The Committee worked with its advisors to review the sale of the assets of Lehman Brothers Inc. ("LBI"), the Debtors' North American

5

capital markets business, to Barclays Capital, Inc. ("Barclays"). Following approval of the LBI sale, the Committee continued to work with its advisors to (i) ensure that the rights of the unsecured creditors of each of the Debtors were protected to the fullest extent possible, and (ii) review and monitor performance under the transition services agreement with Barclays, the effective implementation of which, given the interrelatedness of the Debtors' operations, was of particular importance to the Committee. The Committee commenced litigation against Barclays contending (albeit unsuccessfully) that Barclays had received more value in the sale than it was entitled to under the asset purchase agreement.

- **Sale of Neuberger Berman.** The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman. The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors. The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.** The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code. Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution. On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.** The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the

6

Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Bank of America Litigation.** In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the Committee) against Bank of America ("BofA"), directing BofA to return $501.8 million plus interest to the Debtors. The Court held that BofA's seizure of the collateral violated the automatic stay, and that BofA was not entitled to a setoff. On May 20, 2011, the Court entered final judgment (i) against BofA on all counts of its complaint and (ii) in favor of LBHI on its counterclaim. As a result of extensive discussions and negotiations, the parties ultimately came to a settlement agreement. A stipulation of dismissal of appeal was filed on November 16, 2011 after the Court approved the settlement on October 19, 2011.

- **Swedbank Litigation.** The Committee and its advisors worked closely with the Debtors to respond to Swedbank AB's ("Swedbank") claim that it had the right to set off LBHI's prepetition debts against the funds the Debtors had on deposit with Swedbank, including funds that were deposited postpetition. The Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the post-petition funds. The Court granted the Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal. Swedbank appealed from the Court's decision. The Committee and filed an appellate brief in support of the Debtors' position. The United States District Court for the Southern District of New York affirmed the Court's decision.

- **Success of the Derivatives ADR Process.** The Committee and its advisors worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations. Such efforts have been instrumental in helping the Debtors achieve settlements in 152 matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of more than $924 million.

- **Preservation and Planned Sale of Banks.** The Committee analyzed issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's subsidiaries which are subject to oversight by the Office of Thrift Supervision and the Federal Deposit Insurance Company (collectively, the "Regulators"). Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i)

7

improve the capital levels at each of the Banks to satisfy regulatory requirements, (ii) avoid potential seizures and liquidation by the Regulators, (iii) permit the resumption of depository functions at the Banks to preserve and maximize value; and (iv) facilitate the winding down of Woodlands' operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.** Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers"), which filed for chapter 11 bankruptcy protection in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Sale of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

## G.    Reimbursement of Fee and Expenses Requested

17.    The professional services rendered by MetLife's in-house counsel have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by MetLife, in its Committee Member capacity. The services rendered to the business side of the MetLife team were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

18.    MetLife submits the Application to seek approval of payments to be made to MetLife to fund the future payment, or reimburse it for the past payment, of $254,402.50 in fees incurred by MetLife's in-house counsel and charged to MetLife's Distressed Investments Unit from the Petition Date through December 31, 2011, as reflected in the time records annexed hereto as Exhibit A,.

19.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of January, 2012

_____/s/ David G. Yu_____
David G. Yu

# EXHIBIT B-4[*]

---

[*]    Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------- x
                                            :
In re:                                      :          Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :          08-13555 (JMP)
                                            :
              Debtors.                      :          (Jointly Administered)
                                            :
----------------------------------------------------------- x
```

**DECLARATION OF NOEL P. PURCELL IN SUPPORT OF MIZUHO'S
APPLICATION PURSUANT TO SECTION 1129(A)(4), OR,
ALTERNATIVELY, SECTIONS 503(B)(D)(3) AND 503(B)(4) OF
BANKRUPTCY CODE FOR PAYMENT OF FEES AND
REIMBURSEMENT OF EXPENSES OF THEIR RESPECTIVE COUNSEL**

NOEL P. PURCELL declares under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.      I am employed as a Senior Vice President of Mizuho Corporate Bank, Ltd.
("Mizuho"), which serves as a member of the Official Committee (the "Committee") of
Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors").
Except as otherwise provided herein, the facts set forth in this declaration are based upon my
personal knowledge.  I am competent to testify to these facts.

2.      I make this declaration in support of the Omnibus Application Of
Individual Members Of Official Committee Of Unsecured Creditors And Indenture Trustees
Pursuant To Section 1129(A)(4), Or, Alternatively, Sections 503(B)(D)(3) And 503(B)(4) Of
Bankruptcy Code For Payment Of Fees and Reimbursement Of Expenses Of Their Respective
Counsel (the "Application").

3.      More specifically, I make this declaration to summarize (i) the nature of
the Mizuho's claim, as agent, against LBHI; upon which it was appointed to the Committee, (ii)

the length of its service on the Committee; (iii) its specific role in the Committee process; (iv);

its subcommittee appointments; (v) the identity and qualifications of its individual counsel; (vi)

the general scope of services provided by its individual counsel; and (vii) the contributions made

by Mizuho as a member of the Committee, with the involvement and guidance of its counsel.

**A.**     **Nature of Mizuho's Claim**

4.     Mizuho is Agent under that certain Credit Agreement dated as of

May 31, 2007 (the "Credit Agreement") among LBHI, as Borrower, the lenders named in the

Credit Agreement and their successors and assigns, Mizuho Corporate Bank, Ltd. as Mandated

Lead Arranger, and Lehman Brothers Japan Inc., as Joint Arranger, pursuant to which the lenders

extended to LBHI a JPY 35,000,000,000 seven-year term loan (the "Loan"). In addition,

Mizuho holds a significant derivative claim against LBSF, with a related guaranty claim against

LBHI, and several of its affiliates hold substantial derivative and structured securities claims

against various Lehman debtors.

**B.**     **Service on the Committee**

5.     Mizuho was appointed to the Committee on September 17, 2008, in its

capacity as agent under the Loan Agreement, and has served continuously since that date for a

period of more than forty (40) months. Mizuho's position as a creditor of Lehman Brothers

Special Financing, Inc. as well was disclosed to the U. S. Trustee and may have been a factor in

the U. S. Trustee's determination that the interests of the various Lehman creditor constituencies

were well represented by the one Official Committee.

3

**C.    Role in Committee Process**

6.    On the same date that it was appointed to the Committee, Mizuho was

elected, together with Wilmington Trust Company, as Co-Chair of the Committee, and has

continued to serve in this capacity through the date hereof.

7.    Service as a Co-Chair of the Committee has imposed on Mizuho a

separate set of duties that were incremental to its role as a Committee member.  These duties

have required it to (i) participate in separate Co-Chair meeting(s) each week with the

Committee's counsel and financial advisors to address pressing matters of significance and set

the agenda for full Committee calls; (ii) interact, on a one-on-one basis, with the Debtors'

management regarding material developments and potential disputes between the Committee and

the Debtors; and (iii) liaise with the other members of the Committee and the Committee's

advisors regarding issues under consideration and, in the process, seek to achieve consensus as to

decisions relating to material developments and issues.

**D.    Subcommittee Appointments**

8.    Over the course of the three years since the Petition Date, Mizuho has

served on the following Subcommittees:  (i) the Loan Book Subcommittee; (ii) the Tax

Subcommittee; (iii) the Real Estate Subcommittee; (iv) the Derivatives Subcommittee; (v) the

Domestic Banks Subcommittee; (vi) the Fee Committee Subcommittee; (vii) the Litigation

Subcommittee, and, during its limited existence; (viii) the Plan Discovery Subcommittee.  In

addition, Mizuho participated in the structured securities working group of the Committee, and

as a representative of the Committee, was appointed to the Director Selection Committee

charged with selecting the new Boards of Directors of the Lehman entities to head the

companies, upon their emergence from chapter 11.

4

9.     Service on each of these Subcommittees and assuming these additional functions has imposed yet further duties on Mizuho, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**E.     Identity and Qualifications of Counsel**

10.     In connection with its service on the Committee, Mizuho retained Stroock & Stroock & Lavan LLP ("Stroock") as its outside counsel.

11.     Stroock is a leading full service law firm with a diverse client base, with more than 300 attorneys in offices in New York, Los Angeles and Miami. Its nationally recognized financial restructuring and bankruptcy practice represents individuals and groups of creditors, investors, purchasers, committees and debtors in bankruptcy proceedings and out-of-court restructurings. Stroock has extensive experience in the financial restructuring arena as well as expertise in relevant practice areas including derivatives and taxation. Select financial restructuring engagements have included representation of the following: Co-Chair of Unsecured Creditors' Committee of Calpine Corporation, the Official Creditors' Committees of Citadel Broadcasting Corporation and W. R. Grace & Co., respectively, the Ad Hoc Committee of Senior Secured Noteholders of Trump Entertainment Resorts, Inc., the Ad Hoc Committee of Noteholders of the Great Atlantic & Pacific Tea Company, Inc., and Owens Corning Corporation, respectively.

**F.     Scope of Services Provided by Counsel**

12.     The magnitude of the burdens imposed on Mizuho by its service on the Committee - as the only Official Creditors' Committee - cannot be overstated. The Chapter 11 Cases are the largest and most complex chapter 11 cases in the United States history. The

5

Committee has been involved in the orderly liquidation of the Debtors' assets and adjudication of

claims against their estates ever since September 2008.

13.       Unlike other large chapter 11 cases – where an operational restructuring is

contemplated and most of the debtor's pre-petition personnel continues to run the business

during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a

week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been

terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of

running the remaining businesses, pending their ultimate liquidation, was left, by force of

circumstance, to the Debtors' restructuring professionals and the Committee, the Committee

Members, and their respective professional advisors.

14.       From the beginning of the Chapter 11 Cases, these circumstances have

required Mizuho, like the other Committee Members, to dedicate an extraordinary amount of

time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved,

official committees have generally met once a week and addressed a fairly predictable list of

case administration issues. This case has proven far more complex. For most of the first year of

the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and,

at times, three or more times per week, sometimes late into the evening and on weekends.

15.       Further, due to the sheer volume of issues that needed to be addressed by

the Committee, the Committee established, at the outset of the Chapter 11 Cases, several

subcommittees to review and evaluate issues and transactions with respect to eight asset/claim

categories – Derivatives, Real Estate, Private Equity/Principle Investments, Loan Book,

Domestic Banks, Tax, Fee Committee and Litigation. Each of these subcommittees has met on a

6

weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

16.    Mizuho has, as indicated above, served on eight (8) of these Subcommittees, and, as a result, has often been required to attend Committee or Subcommittee meetings five or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.  Service as a Co-Chair of the Committee has, as also indicated above, imposed on Mizuho a separate set of duties that were incremental to its role as a Committee and Subcommittee member, and its participation in the structured securities working group and on the Director Selection Committee, have required additional significant efforts.

17.    Due to the highly sophisticated nature of the Debtors' businesses and the fact that one Creditors' Committee was charged with representing the interest of the creditors of all the Chapter 11 debtors, Mizuho would not have been able to undertake any of the foregoing responsibilities without the active involvement and guidance of counsel.  Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world.  No one at Mizuho possessed the expertise required to address all these issues without input from its outside professionals.  Hence, Mizuho relied extensively on its outside counsel, Strook, for assistance in reviewing and evaluating the hundreds of transactions and motions the Committee has addressed since the Petition Date as well as for guidance in formulating positions on significant intercompany and intercreditor issues.

18.     Mizuho's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings as well as meetings of the co-chairs with representatives of the Debtors to discuss plan and other significant issues.  On a separate track, Stroock was also required to assist Mizuho in responding to discovery requests served on the Committee Members in connection with the Barclays litigation and to represent Mizuho in connection with my deposition as a member of the Committee, in the course of such litigation.  These services were necessary for Mizuho to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

19.     Once these cases began to develop, the priority for Mizuho and its counsel was to press for a business plan for each of the asset classes and, at the same time, to analyze the major intercompany and intercreditor issues that could define the outcome of the proceedings. Well before the formulation of the Debtors' plan, Mizuho and its counsel worked diligently with the Committee's advisors and the other Committee members in assessing probability of success on various legal issues such as substantive consolidation and enforceability of guarantees and in considering various recovery scenarios.

20.     Those efforts substantiated Mizuho's belief that a settlement plan was in the best interest of the estates and its creditors.  On Mizuho's behalf, Stroock played a significant role in working with the Committee's professionals to advance proposals for consensual

resolution of the issues which, in fact, served as the underpinnings of the now confirmed Chapter 11 plan.

21.     Indeed, Mizuho and counsel, together with the rest of the Committee were instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, as set forth above, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, the senior subordinate debt issues and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another. These efforts avoided protracted and costly litigation which would have yielded uncertain results.

22.     Mizuho also relied on its counsel for guidance in determining that procedures and protocols proposed by the Debtors were fair to the various creditor constituencies. For example, Stroock played a major role in the overhaul of the claims bar date process initially proposed by the Debtors to ensure that it provided clear and sufficient notice and took into account the myriad of foreign retail claimants. As a result, in large part, of these efforts, a separate bar date process was instituted for structured securities claimants. Moreover, Stroock played a significant role in assisting the Committee and its professionals in formulating the procedures for allowance of structured securities claims.

9

23.    At Mizuho's request, Stroock served a similar function in refining the ADR process for resolution of derivative based claims, as well as in reviewing the valuation and resolution process for claims based upon structured securities. Those efforts again resulted in a more fair and equitable process vis-à-vis the affected creditors.

24.    On behalf of the Committee, Mizuho has been instrumental in the fee review process from the beginning of the proceedings, and necessarily relied heavily on Stroock for assistance inasmuch as the Committee professionals were subject to this review as well and thus could not opine.

25.    In addition to the responsibilities as Committee member, I was also asked to represent the Committee on the Director Selection Committee ("DSC") along with other creditor representatives. Stroock provided counsel in this matter as well, in terms of the DSC's scope and functioning. Mizuho also relied upon Stroock's expertise not only in the bankruptcy arena but with respect to derivatives, taxation and corporate governance, which all played a significant part in these proceedings.

### G.    Additional Significant Achievements

26.    A full list of the specific additional Chapter 11 Case-related achievements in which Mizuho, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein. At the top of any such list, however, would be some or all of the following:

- **Sale to Barclays.** The Committee worked with its advisors to review the sale of the assets of Lehman Brothers Inc. ("LBI"), the Debtors' North American capital markets business, to Barclays Capital, Inc. ("Barclays"). Following approval of the LBI sale, the Committee continued to work with its advisors to (i) ensure that the rights of the unsecured creditors of each of the Debtors were protected to the fullest extent possible, and (ii) review and monitor performance under the transition services agreement with Barclays, the effective implementation of which, given the interrelatedness of the Debtors'

operations, was of particular importance to the Committee. The Committee commenced litigation against Barclays contending (albeit unsuccessfully) that Barclays had received more value in the sale than it was entitled to under the asset purchase agreement.

- **Sale of Neuberger Berman.** The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman. The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors. The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.** The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code. Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution. On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.** The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Bank of America Litigation.** In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the

Committee) against Bank of America ("BofA"), directing BofA to return
$501.8 million plus interest to the Debtors. The Court held that BofA's
seizure of the collateral violated the automatic stay, and that BofA was not
entitled to a setoff. On May 20, 2011, the Court entered final judgment (i)
against BofA on all counts of its complaint and (ii) in favor of LBHI on its
counterclaim. As a result of extensive discussions and negotiations, the
parties ultimately came to a settlement agreement. A stipulation of dismissal
of appeal was filed on November 16, 2011 after the Court approved the
settlement on October 19, 2011.

- **Swedbank Litigation.** The Committee and its advisors worked closely with
  the Debtors to respond to Swedbank AB's ("Swedbank") claim that it had the
  right to set off LBHI's prepetition debts against the funds the Debtors had on
  deposit with Swedbank, including funds that were deposited postpetition. The
  Debtors filed a motion to enforce the automatic stay and to compel Swedbank
  to return the post-petition funds. The Court granted the Debtors' motion,
  ordered Swedbank to immediately release the administrative freeze and to
  return the funds to LBHI, and denied Swedbank's motion for a stay pending
  appeal. Swedbank appealed from the Court's decision. The Committee and
  filed an appellate brief in support of the Debtors' position. The United States
  District Court for the Southern District of New York affirmed the Court's
  decision.

- **Success of the Derivatives ADR Process.** The Committee and its advisors
  worked closely with the Debtors to review and respond to the counterparty
  notices filed under the Alternative Dispute Resolution Procedures Order for
  Affirmative Claims of Debtors Under Derivatives Contracts [Docket No.
  5207], to evaluate settlement proposals under the alternative dispute resolution
  process, and to participate in mediations. Such efforts have been instrumental
  in helping the Debtors achieve settlements in 152 matters involving 162
  counterparties, as of November 11, 2011, resulting in the recovery of more
  than $924 million.

- **Preservation and Planned Sale of Banks.** The Committee analyzed issues
  related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank
  FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's
  subsidiaries which are subject to oversight by the Office of Thrift Supervision
  and the Federal Deposit Insurance Company (collectively, the "Regulators").
  Throughout the Chapter 11 Cases, the Committee and its advisors sought to
  (i) improve the capital levels at each of the Banks to satisfy regulatory
  requirements, (ii) avoid potential seizures and liquidation by the Regulators,
  (iii) permit the resumption of depository functions at the Banks to preserve
  and maximize value; and (iv) facilitate the winding down of Woodlands'
  operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.** Innkeepers USA Trust and certain of its affiliates
  (collectively, "Innkeepers"), which filed for chapter 11 bankruptcy protection

12

in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Sale of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all

13

proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

## H.    Reimbursement of Fee and Expenses Requested

27.    The professional services rendered by Stroock, as counsel to Mizuho, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by Mizuho, in its capacity as Co-Chair of the Committee and a Committee Member. The services rendered to Mizuho were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates. Mizuho strongly believes that the involvement of Stroock contributed greatly to Mizuho's effective role on the Committee, as well as to the global consensual resolution achieved in these cases, the fair treatment of creditors throughout the process and the thorough and appropriate review of legal issues affecting the creditors and these estates.

28.    Mizuho has annexed as Exhibit A Stroock's invoices through December 31, 2011, inclusive of time records, as well as a schedule of the fees and expenses detailed therein. Mizuho submits the Application to seek approval of payments to be made to Mizuho to fund the future payment, or reimburse it for the past payment, of $2,863,196.00 in fees and $17,742.29 in expenses incurred by Stroock for an aggregate amount of $2,880,938.29 in professional services rendered to Mizuho as Committee member from the Petition Date through December 31, 2011, without prejudice to Mizuho's right to seek payment from the estates of amounts incurred after December 31, 2011.

14

29.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _26th_ day of January, 2012

_____

Noel P. Purcell

# EXHIBIT B-5[*]

---

[*]  Due to their voluminous nature, the Time and Expense Records annexed to the attached
Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the
Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                      :

In re:                                :             Chapter 11 Case No.
                                        :

LEHMAN BROTHERS HOLDINGS INC., et al.,   :             08-13555 (JMP)
                                        :

               Debtors.                    :             (Jointly Administered)
                                        :

------------------------------------------------------------ x

**DECLARATION OF EDWARD P. GILBERT IN SUPPORT**
**OF SHINSEI'S APPLICATION PURSUANT TO SECTION**
**1129(A)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(D)(3)**
**AND 503(B)(4) OF BANKRUPTCY CODE FOR PAYMENT**
**OF FEES AND REIMBURSEMENT OF EXPENSES**

        EDWARD P. GILBERT declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, as follows:

        1.      I am employed as a General Manager of the Principal Transactions Sub-

Group of Shinsei Bank, Limited, ("Shinsei"), a former member of the Official Committee (the

"Committee") of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the

"Debtors"). Except as otherwise provided herein, the facts set forth in this declaration are based

upon my personal knowledge. I am competent to testify to these facts.

        2.      I make this declaration in support of the Shinsei's Application Pursuant To

Section 1129(A)(4), Or, Alternatively, Sections 503(B)(D)(3) And 503(B)(4) Of Bankruptcy

Code For Payment Of Fees and Reimbursement Of Expenses  (the "Application").

        3.      More specifically, I make this declaration to summarize (i) the nature of

Shinsei's claims against the Debtors; (ii) the length of its service on the Committee; (iii) its

specific role in the Committee process; (iv); its subcommittee appointments; (v) the identity and

qualifications of its individual counsel; (vi) the general scope of services provided by its

individual counsel; and (vii) the contributions made by Shinsei as a member of the Committee,

with the assistance of its counsel.

**A.      Nature of Shinsei's Claim**

          4.      Shinsei is chartered as an "ordinary bank" under the banking law of Japan.

Shinsei (i) serves as an investment adviser on behalf of certain client accounts that beneficially

own securities or other claims or interests in the Chapter 11 Case and/or (ii) beneficially owns

such securities, in its own name or in the name of one or more funds or accounts.  Shinsei is a

creditor of Sunrise Finance Co., Ltd., a Japanese affiliate, and indirect subsidiary, of LBHI, for

approximately 25 billion JPY (roughly, $262 million) under the Ginko Torthiki Yakujyo-sho

(Agreement on Bank Transactions) dated December 25, 2003, and the Uncommitted Revolving

Credit Facility Agreement, dated December 25, 2003, as amended thereafter, between Shinsei

and Sunrise Finance Co., Ltd.

**B.      Service on the Committee**

          5.      Shinsei was appointed to the Committee on October 3, 2008, and served

for a period of more than fourteen (14) months thereafter.

**C.      Subcommittee Appointments**

          6.      Since its appointment to the Committee, Shinsei has served on the

following Subcommittees:  (i) Real Estate; and (ii) Bank Loans.

          7.      Service on each of these Subcommittees has imposed significant

additional duties on Shinsei, requiring it and its counsel, as set forth more fully below, to review

materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**D.**     <u>**Identity and Qualifications of Counsel**</u>

         8.      In connection with its service on the Committee, Shinsei retained

Vinson & Elkins LLP ("<u>Vinson & Elkins</u>"), as its outside counsel.

         9.      Vinson & Elkins is an international law firm with offices in Abu Dhabi,

Austin, Dallas, Houston, New York, Washington, Beijing, Dubai, Hong Kong, London, Palo

Alto, Riyadh, Moscow, Shanghai and Tokyo.  Vinson & Elkins' Restructuring and

Reorganization practice involves the representation of all key restructuring and reorganization

constituencies and encompasses complex loan workouts in both bankruptcy and non-bankruptcy

settings, exchange offers and prepackaged chapter 11 plans of reorganization, pre-negotiated

chapter 11 plans of reorganization, representation of lender groups, secured creditors and

creditors' committees in chapter 11 bankruptcy cases, representation of trustees in chapter 11 and

chapter 7 bankruptcy cases, all phases of bankruptcy and lender liability litigation, all phases of

foreclosure and major collection work, and documentation and administration of complex and

multi-bank credit facilities in restructuring and reorganizations.

**E.**     <u>**Scope of Services Provided**</u>

         10.      The magnitude of the burdens imposed on Shinsei by its service on the

Committee cannot be overstated.  The Chapter 11 Cases are the largest and most complex

chapter 11 cases in the United States history.  The Committee has been involved in the orderly

liquidation of the Debtors' assets and adjudication of claims against their estates ever since

September 2008.  It has also navigated and helped resolve a myriad of intercreditor issues

involving such matters as substantive consolidation (domestically and internationally), the

validity of various types of guaranties, valuing intercompany claims and similar matters.

         11.      Unlike other large chapter 11 cases – where an operational restructuring is

3

contemplated and most of the debtor's pre-petition personnel continues to run the business during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of running the remaining businesses, pending their ultimate liquidation, was left, by force of circumstance, to the Debtors' restructuring professionals and the Committee, the Committee Members, and their respective professional advisors.

12. Since Shinsei was appointed to the Committee, these circumstances have required Shinsei, like the other Committee Members, to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. I have been informed by others that in other chapter 11 cases, official committees generally meet at most once a week and address a fairly predictable list of case administration issues. This case has proven far more complex. For most of the first year of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times per week, sometimes late into the evening and on weekends.

13. Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established, at the outset of the Chapter 11 Cases, several subcommittees to review and evaluate issues and transactions with respect to eight asset/claim categories – Derivatives, Real Estate, Private Equity/Principle Investments, Loan Book, Domestic Banks, Tax, Fee Committee, and Litigation. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

14. Shinsei has, as indicated above, served on two of these Subcommittees,

4

and, as a result, has often been required to attend Committee or Subcommittee meetings, in person or by telephone, four or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.

15.    Due to the highly sophisticated nature of the Debtors' businesses and complex intercreditor issues, both domestically and internationally, Shinsei would not have been able to undertake any of the foregoing responsibilities without the assistance of counsel. Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world. No one at Shinsei possessed the expertise required to address all of these issues without input from outside professionals. Hence, Shinsei relied extensively on Vinson & Elkins for assistance in reviewing and evaluating the hundreds of transactions and pleadings the Committee has addressed since the Petition Date.

16.    Shinsei's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firm with expertise on the many kinds of transactions the Committee had to evaluate, and attend certain of the Committee and Subcommittee meetings. These services were necessary for Shinsei to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

**F.    Most Significant Achievements**

17.    A full list of the Chapter 11 Case-related achievements in which Shinsei, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein. At the top of any such list, however, would be some or all of the following:

5

- **Sale of Neuberger Berman.** The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman. The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors. The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.** The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code. Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution. The Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.** The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Success of the Derivatives ADR Process.** The Committee and its advisors worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations. Such efforts have been instrumental

in helping the Debtors achieve settlements in 152 matters involving 162
counterparties, as of November 11, 2011, resulting in the recovery of more
than $924 million.

- **Preservation and Planned Sale of Banks.** The Committee analyzed issues
  related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank
  FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's
  subsidiaries which are subject to oversight by the Office of Thrift Supervision
  and the Federal Deposit Insurance Company (collectively, the "Regulators").
  Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i)
  improve the capital levels at each of the Banks to satisfy regulatory
  requirements, (ii) avoid potential seizures and liquidation by the Regulators,
  (iii) permit the resumption of depository functions at the Banks to preserve
  and maximize value; and (iv) facilitate the winding down of Woodlands'
  operation and the soon-to-be consummated sale of Aurora.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman
  ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt
  financing for the SunCal projects totaling over $2 billion. As a result of its
  financial difficulties, SunCal and several affiliates became debtors in
  possession (collectively, the "SunCal Debtors") in the United States
  Bankruptcy Court for the Central District of California (the "SunCal Cases")
  and the Debtors filed a proof of claim against certain of the SunCal Debtors.
  The Committee monitored and evaluated a wide variety of issues arising in the
  SunCal Cases, including (i) the ability of the SunCal Debtors to pursue
  equitable subordination of the Debtors' claims without violating the automatic
  stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the
  auction for certain of the SunCal properties and the results of the auction, and
  (iii) the formulation and funding of the SunCal Debtors' plans of
  reorganization.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its
  advisors spent considerable time working with the Debtors and the
  administrators (the "Foreign Administrators") appointed in the numerous
  proceedings (the "Foreign Proceedings") initiated by or against the Debtors'
  affiliates outside of the U.S. that culminated with the adoption of the Cross-
  Border Insolvency Protocol for the Lehman Brothers Group of Companies
  (the "Protocol"). The Protocol was designed to facilitate the coordination of
  the Chapter 11 Cases with the Foreign Proceedings, and to enable the
  respective courts and administrators to cooperate in the administration of all
  proceedings. The Protocol signatories engaged with certain Foreign
  Administrators to, among other things, (i) discuss issues regarding the Plan;
  (ii) reach consensual resolutions of contested issues; and (iii) ultimately
  conclude a series of intercompany settlement that were critical to the success
  of the Plan.

7

**G.**   **Reimbursement of Fee and Expenses Requested**

18.   The professional services rendered by Vinson & Elkins, as counsel to Shinsei, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by Shinsei, in its capacity as a Committee Member.  The services rendered to Shinsei were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

19.   Shinsei submits the Application to seek approval of payments to be made to Shinsei to fund the future payment, or reimburse it for the past payment, of (a) as reflected in the time records annexed hereto as Exhibit 1, $71,460 in fees paid to Vinson & Elkins for the professional services rendered to Shinsei from the date that Shinsei was appointed to the Committee through December of 2009 when Shinsei resigned from the Committee; and (b) as reflected in the expense records annexed hereto as Exhibit 1, $1,614.06 in expenses incurred by Vinson & Elkins in connection with such services—for a total award of $73,074.06.

20.   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of January, 2012

_____
Edward P. Gilbert

8

# **<u>EXHIBIT B-6</u>**[*]

---

[*] Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
In re:                                                       :    Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :    08-13555 (JMP)
                                                             :
            Debtors.                                         :    (Jointly Administered)
                                                             :
------------------------------------------------------------ x

### DECLARATION OF LAURA L. MORAN IN SUPPORT OF US BANK'S APPLICATION FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

LAURA L. MORAN declares under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.      I am employed as a Vice President in the Corporate Trust Services

Division of U.S. Bank National Association ("US Bank"), a member of the Official Committee

(the "Committee") of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively,

the "Debtors").  Except as otherwise provided herein, the facts set forth in this declaration are

based upon my personal knowledge.  I am competent to testify to these facts.

2.      I make this declaration in support of US Bank's Application Pursuant To

Sections 1129(A)(4), Or, Alternatively, Sections 503(B)(D)(3) And 503(B)(4) Of Bankruptcy

Code For Payment Of Fees and Reimbursement Of Expenses (the "Application").

3.      More specifically, I make this declaration to summarize (i) the nature of

US Bank's claims against the Debtors; (ii) its status as trustee for a variety of transactions

involving Lehman Brothers Holdings, Inc. ("LBHI") or one of its Debtor or non-Debtor

affiliates,[1] including as indenture trustee for more than $1.475 billion in MCAPS Bonds (as defined below) issued or guaranteed by LBHI ; (iii) the length of its service on the Committee; (iv) its subcommittee appointments; (v) the identity and qualifications of its individual counsel; (vi) the general scope of services provided by its individual counsel; and (vii) the contributions made by US Bank as a member of the Committee, with the assistance of its counsel.

A.     **Nature of US Bank's Claim**

4.     US Bank serves in various trust capacities in hundreds of collateralized loan obligation issues, collateral debt obligation issues and other transactions involving one or more of the Debtors or their affiliates, holding claims against one or more of the Debtors in the tens of billions of dollars.  In addition, US Bank serves as successor to Chemical Bank, as indenture trustee, for (i) the 5.707% Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Eleventh Supplemental Indenture, dated as of May 17, 2007, in the original outstanding principal amount of $1,000,000,000; and (ii) the Floating Rate Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Twelfth Supplemental Indenture, dated as of May 17, 2007, in the original outstanding principal amount of $475,000,000.  Each of the 5.707% and the Floating Rate Remarketable Junior Subordinated Debentures were issued in connection with LBHI's Mandatory Capital Advantaged Preferred Securities program (collectively, the "MCAPS Bonds").

B.     **Status as Indenture Trustee**

5.     Since US Bank serves as both a Committee member and an indenture trustee, it is seeking to recover the legal expenses it incurred as both Committee member and an

---

[1]     US Bank believes that they are involved in more than eight hundred transactions involving Lehman, including corporate and municipal bond issues, collateralized debt obligations, collateralized loan obligations, various swap transactions, collateralized bond obligations, mortgage securitization transactions and other structured finance transactions.

indenture trustee. As a "double fiduciary," it had separate duties with respect to these two roles and incurred separate legal costs in the performance of these respective duties. Upon its appointment to the Committee in February 2010, US Bank retained Richard Hiersteiner and Jeanne P. Darcey, then partners with the law firm of Edwards Angell Palmer & Dodge LLP ("EAPD"). In March, 2010, Hiersteiner and Darcey became partners of the law firm of Sullivan & Worcester LLP ("Sullivan"), and US Bank thereupon retained Sullivan as its counsel for all matters relating to its service on the Committee. Previously, at the beginning of the Debtors' chapter 11 cases, US Bank had retained the law firm of Shipman & Goodwin LLP ("Shipman") to represent it with respect to its role as indenture trustee of the MCAPS Bonds, for such services as issuing notices of default, filing proofs of claim and other bankruptcy-related actions related to the MCAPS Bonds. To the extent possible, all fees and expenses incurred by US Bank in its capacity as indenture trustee for the MCAPS Bonds (including legal fees and expenses) are separately tallied and summarized in this Application.

## C.    Service on the Committee

6.    US Bank was appointed to the Committee on February 9, 2010, and has served continuously since that date for a period of more than twenty-three (23) months.

## D.    Subcommittee Appointments

7.    Over the course of almost two years since US Bank was appointed to the Committee, US Bank has served on the following Subcommittees: (i) the Loan Book Subcommittee; (ii) the Tax Subcommittee; (iii) the Real Estate Subcommittee; (iv) the Derivatives Subcommittee; (v) the Private Equity/Principal Investments Subcommittee; (vi) the Domestic Banks Subcommittee; and (vii) the Litigation Subcommittee.

8.    Service on each of these Subcommittees has imposed significant

additional duties on US Bank, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**F.       Identity and Qualifications of Counsel**

9.       As set forth above, in connection with its service on the Committee, US Bank retained Sullivan as its outside counsel.  Sullivan is a national law firm with offices in Boston, New York City and Washington D.C., as well as international alliances in Europe, Asia and the Middle East.  Its Bankruptcy and Restructuring Group offers legal services in all aspects of bankruptcy, restructuring, creditors' rights and commercial law.  Sullivan's practice focuses on issues faced by financial institutions and investors in financial transactions involving one or more distressed entities, including advice concerning the enforcement of remedial rights; restructuring of investments in defaulted public, private, and secured and unsecured bonds; workout of investments in CDOs and other structured investment vehicles; and enforcement of termination of swaps and other derivative instruments on account of bankruptcy or reorganization.  Recent engagements have included the following:  American Airlines, Northwest Airlines and United Air Lines; Vitro S.A.B. de C.V., Terrestar, General Motors, Station Casinos, Visteon, Nashville Senior Living; American Refining Group, Inc. (ARG); Integrated Health Services Inc., Mariner Post-Acute, Inc., Sun Healthcare Group, Inc.; and Lernout & Hauspie N.V, Dictaphone Corporation and L&H Holdings.

10.       Shipman's Bankruptcy and Creditors' Rights Group represents a variety of clients including institutional and corporate creditors and business debtors, in bankruptcy, commercial litigation and workout matters.  Its group has represented clients in numerous high profile chapter 11 cases and business restructurings, including American Airlines, Chrysler LLC,

Enron, U.S. Airways, Mirant, Kmart, Global Crossing, LTV, Macy's and Dow Corning matters.

Its group regularly represents secured and unsecured creditors, financial institutions, insurance

companies, health care providers, corporations, partnerships, various state and local agencies,

software companies, real estate entities, retailers, and suppliers in bankruptcy proceedings

throughout the United States. Its group also plays an active role on creditors' committees and

regularly negotiates plan of reorganization provisions in chapter 11 cases.

**F.**    **Scope of Services Provided by Counsel**

11.    The magnitude of the burdens imposed on US Bank by its service on the

Committee cannot be overstated. The Chapter 11 Cases are the largest and most complex

chapter 11 cases in the United States history. The Committee has been involved in the orderly

liquidation of the Debtors' assets and adjudication of claims against their estates ever since

September 2008.

12.    Unlike other large chapter 11 cases – where an operational restructuring is

contemplated and most of the debtor's pre-petition personnel continues to run the business

during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a

week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been

terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of

running the remaining businesses, pending their ultimate liquidation, was left, by force of

circumstance, to the Debtors' restructuring professionals and the Committee, the Committee

Members, and their respective professional advisors.

13.    Since US Bank was appointed to the Committee, these circumstances have

required US Bank, like the other Committee Members, to dedicate an extraordinary amount of

time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved,

official committees have generally met once a week, or even less often, and addressed a fairly
predictable list of case administration issues. This case has proven far more complex. The
Committee has often met twice a week and, at times, three or more times per week, sometimes
late into the evening and on weekends.

14.    Further, due to the sheer volume of issues that needed to be addressed by
the Committee, the Committee established several subcommittees to review and evaluate issues
and transactions with respect to eight asset/claim categories – Derivatives, Real Estate, Private
Equity, Loan Book, Domestic Banks, Tax, Fee Committee, and Litigation. Each of these
subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad
issues that have arisen in connection with these distinct asset/claim categories.

15.    US Bank has, as indicated above, served on seven (7) of these
Subcommittees since its appointment to the Committee and, as a result, has often been required
to attend Committee or Subcommittee meetings five or more days a week, in addition to
reviewing the materials and engaging in the post-meeting deliberations necessary to effectively
carry our its fiduciary duties.

16.    Due to the highly sophisticated nature of the Debtors' businesses, US
Bank would not have been able to undertake any of the foregoing responsibilities without the
assistance of counsel. Lehman's transactional mix ran the gamut from complex derivatives
trades to multi-billion dollar real estate transactions documented with file rooms full of
mortgages to banking and broker-dealer activities subject to regulatory oversight around the
world. No one at US Bank possessed the legal expertise required to address all these issues
without input from its outside professionals or to inform its judgment of the legal and fiduciary
implications of each decision unique to US Bank. Hence, US Bank relied extensively on its

outside counsel, Sullivan, for assistance in reviewing and evaluating the hundreds of transactions

and motions the Committee has addressed since the Petition Date.

17.    US Bank's counsel was required to analyze materials received from the

Debtors, review and comment on analyses and recommendation memoranda prepared by

Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms

with expertise on the many kinds of transactions the Committee had to evaluate, and attend the

Committee and Subcommittee meetings.  On a separate track, Sullivan was also required to assist

US Bank in responding to discovery requests served on the Committee Members in connection

with various litigations in which the Committee had intervened.  These services were necessary

for US Bank to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors'

estates and make informed decisions regarding the multitude of issues that have arisen in the

Chapter 11 Cases.

## G.    Most Significant Achievements

18.    A full list of the Chapter 11 Case-related achievements in which US Bank,

working side-by-side with its fellow Committee Members, played a role would be too long to set

forth herein.  At the top of any such list, however, would be some or all of the following:

- **Sale of Neuberger Berman.**  The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman.  The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors.  The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Bank of America Litigation.**  In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the

Committee) against Bank of America ("<u>BofA</u>"), directing BofA to return
$501.8 million plus interest to the Debtors. The Court held that BofA's
seizure of the collateral violated the automatic stay, and that BofA was not
entitled to a setoff. On May 20, 2011, the Court entered final judgment (i)
against BofA on all counts of its complaint and (ii) in favor of LBHI on its
counterclaim. As a result of extensive discussions and negotiations, the
parties ultimately came to a settlement agreement. A stipulation of dismissal
of appeal was filed on November 16, 2011 after the Court approved the
settlement on October 19, 2011.

- **<u>Swedbank Litigation</u>.** The Committee and its advisors worked closely with
  the Debtors to respond to Swedbank AB's ("<u>Swedbank</u>") claim that it had the
  right to set off LBHI's prepetition debts against the funds the Debtors had on
  deposit with Swedbank, including funds that were deposited postpetition. The
  Debtors filed a motion to enforce the automatic stay and to compel Swedbank
  to return the post-petition funds. The Court granted the Debtors' motion,
  ordered Swedbank to immediately release the administrative freeze and to
  return the funds to LBHI, and denied Swedbank's motion for a stay pending
  appeal. Swedbank appealed from the Court's decision. The Committee and
  filed an appellate brief in support of the Debtors' position. The United States
  District Court for the Southern District of New York affirmed the Court's
  decision.

- **<u>Success of the Derivatives ADR Process</u>.** The Committee and its advisors
  worked closely with the Debtors to review and respond to the counterparty
  notices filed under the Alternative Dispute Resolution Procedures Order for
  Affirmative Claims of Debtors Under Derivatives Contracts [Docket No.
  5207], to evaluate settlement proposals under the alternative dispute resolution
  process, and to participate in mediations. Such efforts have been instrumental
  in helping the Debtors achieve settlements in 152 matters involving 162
  counterparties, as of November 11, 2011, resulting in the recovery of more
  than $924 million.

- **<u>Preservation and Planned Sale of Banks</u>.** The Committee analyzed issues
  related to Woodlands Commercial Bank ("<u>Woodlands</u>") and Aurora Bank
  FSB ("<u>Aurora</u>" and, together with Woodlands, the "<u>Banks</u>"), LBHI's
  subsidiaries which are subject to oversight by the Office of Thrift Supervision
  and the Federal Deposit Insurance Company (collectively, the "<u>Regulators</u>").
  Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i)
  improve the capital levels at each of the Banks to satisfy regulatory
  requirements, (ii) avoid potential seizures and liquidation by the Regulators,
  (iii) permit the resumption of depository functions at the Banks to preserve
  and maximize value; and (iv) facilitate the winding down of Woodlands'
  operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.** Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers"), which filed for chapter 11 bankruptcy protection in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Disposition of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies

(the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

I.     **Reimbursement of Fee and Expenses Requested**

19.     The professional services rendered by Sullivan (and, for a brief period, by EAPD), and by Shipman, as counsel to US Bank in connection with, respectively, its service on the Committee and as indenture trustee for the MCAPS Bonds, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by US Bank, in both its Committee Member and indenture trustee capacities. The services rendered to US Bank were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

20.     US Bank submits the Application to seek approval of payments to be made to US Bank of (a) $1,051,412.50 in fees earned by U.S. Bank as an indenture trustee serving as a member of the Committee, as reflected in the records annexed hereto as Exhibit

"A"; (b) $64,796.00 in fees and $2,721.33 in expenses of EAPD and $1,752,369.00 in fees and

$12,928.39 in expenses of Sullivan, for professional services rendered to US Bank in

connection with its services as a member of the Committee, as reflected in the time records

annexed hereto as Exhibit "B"; and (c) $54,000.00 in annual administration fees earned by U.S.

Bank as indenture trustee for the MCAPS Bond and $58,449.56 in fees and expenses of

Shipman incurred by US Bank, as indenture trustee for the MCAPS Bonds, as reflected in the

time records annexed hereto as Exhibit "C" — for a total award of $2,996,676.78.

21.    I declare under penalty of perjury that the foregoing is true and correct to

the best of my knowledge.

Executed this 27th day of January, 2012

_Laura L. Moran_
Laura L. Moran

# EXHIBIT B-7*

---

\*      Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                :
In re:                           :          Chapter 11 Case No.
                                  :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :          08-13555 (JMP)
                                  :
                  Debtors.        :          (Jointly Administered)
                                  :
------------------------------------------------------------- x

### DECLARATION OF STUART HOSANSKY IN SUPPORT OF VANGUARD'S APPLICATION PURSUANT TO SECTION 1129(A)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(D)(3) AND 503(B)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

         STUART HOSANSKY declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

         1.      I am employed as a Principal/Senior Analyst of The Vanguard Group Inc. ("Vanguard"), a member of the Official Committee (the "Committee") of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors").  Except as otherwise provided herein, the facts set forth in this declaration are based upon my personal knowledge.  I am competent to testify to these facts.

         2.      I make this declaration in support of the Omnibus Application Of Individual Members Of Official Committee Of Unsecured Creditors And Indenture Trustees Pursuant To Section 1129(A)(4), Or, Alternatively, Sections 503(B)(D)(3) And 503(B)(4) Of Bankruptcy Code For Payment Of Fees and Reimbursement Of Expenses Of Their Respective Counsel (the "Application").

3.      More specifically, I make this declaration to summarize (i) the nature of

Vanguard's claims against the Debtors; (ii) the length of its service on the Committee; (iii) its

specific role in the Committee process; (iv) its subcommittee appointments; (v) the identity and

qualifications of its individual counsel; (vi) the general scope of services provided by its

individual counsel; and (vii) the contributions made by Vanguard as a member of the Committee,

with the assistance of its counsel.

## A.      Nature of Vanguard's Claim

4.      Certain Vanguard-related funds and investment vehicles filed proofs of

claim in the aggregate of not less than (i) $769,782,190 in direct general unsecured claims

against Lehman Brothers Holdings, Inc. arising pursuant to notes issued by Lehman Brothers

Holdings, Inc., (ii) $7,493,943 in direct general unsecured claims against Lehman Brothers

Special Financing Inc. relating to certain derivatives transactions, and (iii) $7,493,943 in

guarantee claims against Lehman Brothers Holdings, Inc. based on guarantees issued by Lehman

Brothers Holding, Inc. of derivative contracts between the Vanguard-related funds and

investment vehicles and Lehman Brothers Special Financing Inc.

## B.      Service on the Committee

5.      Vanguard was appointed to the Committee on October 3, 2008, and has

served continuously since that date for a period of more than thirty-nine (39) months.

## C.      Subcommittee Appointments

6.      Over the course of the three years since its appointment to the Committee,

Vanguard has served on the following Subcommittees:  (i) the Private Equity/Principal

Investments Subcommittee; (ii) the Real Estate Subcommittee; (iii) the Domestic Bank

Subcommittee; and (iv) the Fee Committee Subcommittee.

7.      Service on each of these Subcommittees has imposed significant additional duties on Vanguard, requiring it and its counsel, as set forth more fully below, to review materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

## D.      Identity and Qualifications of Counsel

8.      In connection with its service on the Committee, Vanguard retained Arent Fox LLP ("Arent Fox"), as its outside counsel.

9.      Arent Fox is a national law firm with offices in New York, Washington, D.C. and Los Angeles.  Its Bankruptcy and Financial Restructuring Group handles financial restructurings, recapitalizations, bankruptcy-related and strategic litigation, and distressed assets and corporate acquisitions through the country.  Arent Fox represents creditors' committees, indenture trustees, bondholders, secured creditors, lenders and financing syndicates and providers of financing in bankruptcy proceedings in a wide range of industries, including health care, airline, life sciences, manufacturing, retail, telecommunications, sub-prime lending, e-commerce, energy, restaurant, hotel and hospitality, medical technology, pharmaceuticals, construction, real estate, and equipment leasing and financing.  Recent engagements have included the following:  Contessa Premium Foods, Inc.; Planet Hollywood International; Dynegy Holdings LLC; Washington Mutual, Inc.; TOUSA, Inc.; Dana Corporation; and Exide Technologies Inc.

## E.      Scope of Services Provided by Counsel

10.      The magnitude of the burdens imposed on Vanguard by its service on the Committee cannot be overstated.  The Chapter 11 Cases are the largest and most complex chapter 11 cases in the United States history.  The Committee has been involved in the orderly

3

liquidation of the Debtors' assets and adjudication of claims against their estates ever since

September 2008. It has also navigated and helped resolve a myriad of intercreditor issues

involving such matters as substantive consolidation (domestically and internationally), the

validity of various types of guaranties, valuing intercompany claims and similar matters.

11.     Unlike other large chapter 11 cases – where an operational restructuring is

contemplated and most of the debtor's pre-petition personnel continues to run the business

during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a

week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been

terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of

running the remaining businesses, pending their ultimate liquidation, was left, by force of

circumstance, to the Debtors' restructuring professionals and the Committee, the Committee

Members, and their respective professional advisors.

12.     Since Vanguard's appointment to the Committee, shortly after the Petition

Date, these circumstances have required Vanguard, like the other Committee Members, to

dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. I have been

informed by others that in other chapter 11 cases, official committees have generally met once a

week and addressed a fairly predictable list of case administration issues. This case has proven

far more complex. For most of the first year of the Chapter 11 Cases and for extended periods

thereafter, the Committee met twice a week and, at times, three or more times per week,

sometimes late into the evening and on weekends.

13.     Further, due to the sheer volume of issues that needed to be addressed by

the Committee, the Committee established, at the outset of the Chapter 11 Cases, several

subcommittees to review and evaluate issues and transactions with respect to eight asset/claim

4

categories – Derivatives, Real Estate, Private Equity/Principle Investments, Loan Book, Domestic Banks, Tax, Fee Committee, and Litigation. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

14.    Vanguard has, as indicated above, served on four (4) of these Subcommittees, and, as a result, has often been required to attend Committee or Subcommittee meetings four or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties.

15.    Due to the highly sophisticated nature of the Debtors' businesses and complex intercreditor issues, both domestically and internationally, Vanguard would not have been able to undertake any of the foregoing responsibilities without the assistance of counsel. Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world. No one at Vanguard possessed the expertise required to address all these issues without input from its outside professionals. Hence, Vanguard relied extensively on its outside counsel, Arent Fox, for assistance in reviewing and evaluating the hundreds of transactions and motions the Committee has addressed since the Petition Date.

16.    Vanguard's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings. These services were necessary for Vanguard to fulfill

its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make

informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

F.    **Most Significant Achievements**

17.    A full list of the Chapter 11 Case-related achievements in which

Vanguard, working side-by-side with its fellow Committee Members, played a role would be too

long to set forth herein.  At the top of any such list, however, would be some or all of the

following:

- **Sale of Neuberger Berman.**  The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman.  The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors.  The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.**  The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code.  Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution.  On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.**  The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of

6

Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Bank of America Litigation.** In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the Committee) against Bank of America ("BofA"), directing BofA to return $501.8 million plus interest to the Debtors. The Court held that BofA's seizure of the collateral violated the automatic stay, and that BofA was not entitled to a setoff. On May 20, 2011, the Court entered final judgment (i) against BofA on all counts of its complaint and (ii) in favor of LBHI on its counterclaim. As a result of extensive discussions and negotiations, the parties ultimately came to a settlement agreement. A stipulation of dismissal of appeal was filed on November 16, 2011 after the Court approved the settlement on October 19, 2011.

- **Swedbank Litigation.** The Committee and its advisors worked closely with the Debtors to respond to Swedbank AB's ("Swedbank") claim that it had the right to set off LBHI's prepetition debts against the funds the Debtors had on deposit with Swedbank, including funds that were deposited postpetition. The Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the post-petition funds. The Court granted the Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal. Swedbank appealed from the Court's decision. The Committee and filed an appellate brief in support of the Debtors' position. The United States District Court for the Southern District of New York affirmed the Court's decision.

- **Success of the Derivatives ADR Process.** The Committee and its advisors worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations. Such efforts have been instrumental in helping the Debtors achieve settlements in 152 matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of more than $924 million.

- **Preservation and Planned Sale of Banks.** The Committee analyzed issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's

7

subsidiaries which are subject to oversight by the Office of Thrift Supervision and the Federal Deposit Insurance Company (collectively, the "Regulators"). Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i) improve the capital levels at each of the Banks to satisfy regulatory requirements, (ii) avoid potential seizures and liquidation by the Regulators, (iii) permit the resumption of depository functions at the Banks to preserve and maximize value; and (iv) facilitate the winding down of Woodlands' operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.** Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers"), which filed for chapter 11 bankruptcy protection in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Sale of Archstone.** In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.** Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally

8

permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.** The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

## G.    Reimbursement of Fee and Expenses Requested

18.    The professional services rendered by Arent Fox, as counsel to Vanguard, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by Vanguard, in its capacity as a Committee Member. The services rendered to Vanguard were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

9

19.     Vanguard submits the Application to seek approval of payments to be made to Vanguard to fund the future payment, or reimburse it for the past payment, of (a) as reflected in the time records annexed hereto as Exhibit A, $1,346,234.50 in fees paid to Arent Fox for the professional services rendered to Vanguard from the date that Vanguard was appointed to the Committee through December 31, 2011; and (b) as reflected in the expense records annexed hereto as Exhibit A, $21,221.17 in expenses incurred by Arent Fox in connection with such services—for a total award of $1,367,455.67.

20.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of January, 2012

_____
Stuart Hosansky

# EXHIBIT B-8[*]

---

[*]    Due to their voluminous nature, the Time and Expense Records annexed to the attached Declaration are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                              :          Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,              :          08-13555 (JMP)
                                                    :
                          Debtors.                  :          (Jointly Administered)
                                                    :

------------------------------------------------------------ x

### DECLARATION OF JULIE J. BECKER IN SUPPORT OF WILMINGTON TRUST'S APPLICATION PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(B)(D)(3) AND 503(B)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES

JULIE J. BECKER declares under penalty of perjury, pursuant to 28 U.S.C. §

1746, as follows:

1.      I am employed as a Vice President in the Corporate Client Services Group

of Wilmington Trust, N.A., an affiliate of Wilmington Trust Company ("Wilmington Trust"), a

member of the Official Committee (the "Committee") of Unsecured Creditors of Lehman

Brothers Holdings Inc., et al. (collectively, the "Debtors"). Except as otherwise provided herein,

the facts set forth in this declaration are based upon my personal knowledge. I am competent to

testify to these facts.

2.      I make this declaration in support of the Omnibus Application of

Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees

Pursuant to Section 1129(a)(4) or, Alternatively, Sections 503(b)(D)(3) and 503(b)(4) of the

Bankruptcy Code For Payment of Fees and Expenses (the "Application").

3.      I summarize below (i) Wilmington Trust's claim against the Debtors; (ii)

its status as an indenture trustee for more than $48 billion in bonds issued by Lehman Brothers

NY: 734580-2

Holdings Inc. ("LBHI"); (iii) the length of its service on the Committee; (iv) its specific role in the Committee process; (v); its subcommittee appointments; (vi) the identity and qualifications of its individual counsel; (vii) the general scope of services provided by its individual counsel; and (viii) the contributions made by Wilmington Trust to the Chapter 11 Cases as a member of the Committee, with the assistance of its counsel.

## A.   Nature of Wilmington's Claim

4.     Wilmington Trust serves as the successor indenture trustee under the Indenture, dated as of September 1, 1987 (as amended, supplemented, or modified, the "Indenture"), between LBHI and Wilmington Trust (as successor to Citibank, N.A. ("Citibank")).   Wilmington Trust succeeded to Citibank, as Indenture Trustee under the Indenture pursuant to Sections 610 and 611 of the Indenture and the Agreement of Resignation, Appointment and Acceptance, dated as of May 14, 2008, by and among LBHI, Wilmington Trust, as Successor Trustee, and Citibank, as Resigning Trustee.   Citibank retained the roles of Paying Agent, Securities Registrar, and Authenticating Agent under the Indenture.   On September 2, 2009, as authorized under the Indenture, Wilmington Trust filed a proof of claim (the "Proof of Claim") against LBHI on behalf of the senior noteholders (the "Senior Noteholders") of the senior unsecured notes issued pursuant to the Indenture (the "Senior Notes").

5.     The Proof of Claim encompassed 791 separate securities, each identified by an individual CUSIP  number, that fell within three categories of securities:  (1) simple interest bearing notes; (2) zero coupon notes; and (3) complex structured securities in which the return to the investor was based upon the performance or price of an index, commodity or stock (the "Structured Notes").

2

6.    The Proof of Claim was filed in an undetermined total amount because, at the time, claim amounts were unknown for certain of the Senior Notes, including the Structured Notes. As stated in the Proof of Claim, based on information available at the time, Wilmington Trust believed that the total claim amount fell within the range of $49,214,955,480.71 (based on information provided by the predecessor trustee) and $73,162,259,495.49 (based on information provided by the Debtors on their Master List of Securities with respect to the original issuance amounts of the Senior Notes).

7.    Pursuant to agreement with the Debtors, and to Orders entered on December 1 and 22, 2011, the Proof of Claim was allowed in the amount of $48,783,940,671.27.

**B.    Status as Indenture Trustee**

8.    Wilmington Trust seeks to recover the legal expenses it incurred as both Committee member and an indenture trustee. As a "double fiduciary," it had separate duties with respect to these two roles and incurred separate legal costs in the performance of these respective duties.

9.    As indenture trustee, Wilmington Trust is a fiduciary for the holders of one of the largest unsecured claims against the LBHI estate and, to my knowledge, one of the largest and most complex claims filed by an indenture trustee in any bankruptcy case. The Senior Notes, including the Structured Notes, are held by thousands of beneficial holders, many of whom are "retail" investors who purchased the notes in relatively small amounts, rather than large institutions or wealthy individuals. These small holders are typically not organized to take positions in this case and thus look to Wilmington Trust for information regarding the case and to protect their interest, consistent with Wilmington Trust's duties as an indenture trustee.

10.    Determining the allowed claim amounts for the Structured Notes

3

presented novel and complex issues that Wilmington Trust had to analyze and resolve in negotiation with other parties, including the Committee and the Debtors. The terms and conditions of the Senior Notes are set forth in various documents in addition to the Senior Indenture. These documents include notes, prospectuses, prospectus supplements, product supplements, pricing supplements, underlying supplements, and term sheets (collectively, the "Related Documents" and together with the Senior Indenture, the "Senior Note Documents").

11.    Covington created an electronic database to facilitate and expedite the review of the Senior Note Documents. A team of Covington attorneys and paraprofessionals gathered, reviewed, indexed and analyzed several thousand Related Documents, comprising tens of thousands of pages of documents in connection with filing and reconciling the Proof of Claim and responding to Senior Noteholders inquiries. Citibank worked with Wilmington Trust and Covington to provide necessary documentation and information with respect to the terms and amounts outstanding for the individual CUSIP numbers.

12.    Wilmington Trust and Covington worked diligently to understand and address the legal arguments related to the Structured Notes both as an indenture trustee and as a Committee member. Wilmington Trust participated in the Committee's EMTN Valuation Working Group, a subset of the Committee's members and professionals who worked with the Debtors to develop and improve the methodology (the "Valuation Methodology") the Debtors were seeking to apply to determine allowed claim amounts for those securities identified as "structured securities," including the Structured Notes. Based on the Debtors' classification of the Senior Notes pursuant to the Valuation Methodology, the aggregate amount of the Structured Notes is approximately $5 billion relating to over 500 CUSIP numbers.

4

13.    The reconciliation and allowance of the Proof of Claim was the result of vigorous work and cooperation among Wilmington Trust, Covington and the Debtors and their counsel, and required Wilmington Trust and Covington to review each of the 791 CUSIPS and supporting documentation to ensure that they were classified and valued consistent with the Valuation Methodology. The allowed Proof of Claim represents the outcome of this labor and reflects: (1) the elimination of certain amounts included in the Master List of Securities due to significant reductions in the principal amount outstanding on many of the Senior Notes since the initial issuances, or corrections to the current outstanding amounts; (2) the adjustment of principal amounts and interest outstanding for certain Senior Notes resulting from calculations preformed and reconciliations between the Debtor, Wilmington Trust and Citibank; and (3) the determination of the allowed claim amounts for the Structured Notes pursuant to the Valuation Methodology (as defined below).

14.    Wilmington Trust and Covington spent significant time keeping the Senior Noteholders informed about the status of the cases and issues that effected their rights. Wilmington Trust sent seven notices to the Senior Noteholders about substantive developments in the Debtors' bankruptcy cases. Wilmington Trust provided notice to the Senior Noteholders through three mechanisms: (a) it transmitted each notice to the Depository Trust Company[1] with instructions to forward the notice on to its DTC Participants, (b) it mailed each notice to the 23,000 individual beneficial holders or brokers who provided Wilmington Trust with their contact information (which Wilmington Trust collected into the "Noteholder Mailing Matrix"), and (c) it posted each notice on a website that Wilmington Trust maintained

---

[1] The Senior Notes are generally held in "street name" meaning that the notes themselves are registered in the name of Cede & Company as the nominee for the Depository Trust Company.

(www.wilmingtontrust.com/lehman) to provide the Senior Noteholders with information about the Senior Notes and these cases.

15.    Unlike many other Committee members, Wilmington Trust has thousands of constituents, many of whom call or e-mail on a regular basis.    Wilmington Trust and Covington have received and responded to over 4,000 calls, as well as numerous emails and other forms of correspondence, from Senior Noteholders since the beginning of these cases.

16.    As noted above, Citibank retained the role of security registrar and paying agent for LBHI under the Indenture.    In these roles, Citibank provided crucial information and documentation and performed necessary interest calculations to enable Wilmington Trust and LBHI to reconcile the Proof of Claim.    Citibank also responded to inquiries from the Senior Noteholders, Covington and LBHI's counsel with respect to the Senior Notes throughout these cases.

## C.    <u>Service on the Committee</u>

17.    Wilmington Trust was appointed to the Committee on September 17, 2008, and has served continuously since that date for a period of more than forty (40) months.

## D.    <u>Role in Committee Process</u>

18.    On the same date that it was appointed to the Committee, Wilmington Trustee was elected, together with Mizuho Corporate Bank Ltd., a Co-Chair of the Committee, and has continued to serve as Co-Chair through the date hereof.

19.    Wilmington Trust's role as Co-Chair imposed an additional set of duties that were incremental to its role as a Committee member.    These duties have required it to (i) participate in separate Co-Chair meeting(s) each week with the Committee's counsel and financial advisors to address pressing matters of significance and set the agenda for full

Committee calls; (ii) interact, on a one-on-one basis, with the Debtors' management regarding material developments and potential disputes between the Committee and the Debtors; and (iii) liaise with the other members of the Committee and the Committee's advisors regarding issues under consideration and, in the process, seek to achieve consensus as to decisions relating to material developments and issues.

**E.    Subcommittee Appointments**

20.    Over the course of the three years since the Petition Date, Wilmington Trust has served on the following Subcommittees: (i) the Derivatives Subcommittee; (ii) the Domestic Bank Subcommittee; (iii) the Loan Book Subcommittee; (iv) the Tax Subcommittee; (v) the Fee Committee Subcommittee; and (vi) the Litigation Subcommittee. Additionally, Wilmington Trust was a member of the EMTN Valuation Working Group and Plan Discovery Working Group.

21.    Service on each of these Subcommittees and Working Groups has imposed yet further duties on Wilmington Trust, requiring it and its counsel, as set forth more fully below, to review often voluminous materials, participate in meetings, and engage in deliberations regarding a vast array of issues.

**F.    Identity and Qualifications of Counsel**

22.    In connection with its service on the Committee and as an indenture trustee, Wilmington Trust retained two law firms – (i) Covington & Burling LLP ("Covington"), as general counsel; and (ii) Loeb & Loeb ("Loeb"); as conflicts counsel, primarily with respect to matters related to J.P. Morgan Chase.

23.    Covington is an international law firm with offices in Beijing, Brussels, London, New York, San Diego, San Francisco, Silicon Valley, and Washington. Its Bankruptcy

7

and Corporate Restructuring Group handles all facets of bankruptcy and restructuring practice, from non-judicial consensual restructurings to contentious bankruptcy proceedings. Covington represents debtors, financial creditors, trade creditors, indenture trustees, and official committees in Chapter 11 cases. Representative engagements have included the following: A&P, Ahern Rentals, Armstrong World, Charter Communications, Congoleum, Eastman Kodak, FiberMark Inc., General Growth Properties, Isuzu, LTV Steel, Lyondell, Lear, Nortel Networks, OPTI Canada, Owens Corning, Polaroid and Southaven.

24.    Loeb is a multi-service law firm with more than 300 attorneys in five offices in the U.S., including Los Angeles, New York, Chicago, Nashville and Washington, DC, as well as a representative office in Beijing that services Asian clients. The firm's Bankruptcy, Restructuring and Creditors' Rights Practice Group has experience in all aspects of insolvency and bankruptcy law, including representation of the interests of secured and unsecured creditors, lessors and lessees, agents for lending groups, indenture trustees and equity and debt holders in complex debtors' and creditors' rights matters, pre-bankruptcy planning, reorganizations, liquidations and other bankruptcy alternatives; insolvency planning and loan workouts, including advice regarding lender liability, mortgage company insolvencies, commercial mortgage foreclosures, enforcement of notes and guarantees and realization of collateral, and litigation in bankruptcy and non-bankruptcy forums. Recent engagements have included the following: Ownit, ResMAE, American Home Mortgage, People's Choice, New Century, Refco, Maxicare, Washington Mutual, Corus Bancshares, Abitibi Bowater, Borders, Ion Medi and MedPartners.

## G.    Scope of Services Provided by Counsel

25.    The magnitude of the burdens imposed on Wilmington Trust by its service on the Committee cannot be overstated. The Chapter 11 Cases are the largest and most complex

8

chapter 11 cases in the United States history. The Committee has been involved in the orderly liquidation of the Debtors' assets and adjudication of claims against their estates since September 2008.

26.     Unlike other large chapter 11 cases – where an operational restructuring is contemplated and most of the debtor's pre-petition personnel continues to run the business during the restructuring – the Debtors' bankruptcy has been a liquidation from day one. Within a week of LBHI's chapter 11 filing, all but a handful of the Debtors' employees had been terminated or moved to Barclays as part of the sale of the broker/dealer business. The task of running the remaining businesses, pending their ultimate liquidation, was left, by force of circumstance, to the Debtors' restructuring professionals and the Committee, the Committee Members, and their respective professional advisors.

27.     From the beginning of the Chapter 11 Cases, these circumstances have required Wilmington Trust, like the other Committee Members, to dedicate an extraordinary amount of time and effort to the Chapter 11 Cases. In other chapter 11 cases in which I have been involved, official committees have generally met once a week, or less often, and addressed a fairly predictable list of case administration issues. This case has proven far more complex. For most of the first year of the Chapter 11 Cases and for extended periods thereafter, the Committee met twice a week and, at times, three or more times per week, sometimes late into the evening and on weekends. Co-Chair meetings occurred at least once a week as well.

28.     Further, due to the sheer volume of issues that needed to be addressed by the Committee, the Committee established, at the outset of the Chapter 11 Cases, several subcommittees to review and evaluate issues and transactions with respect to eight asset/claim categories – Derivatives, Real Estate, Private Equity/Principle Investments, Loan Book,

9

Domestic Banks, Tax, Fee Committee, and Litigation. Each of these subcommittees has met on a weekly, and sometimes more frequent, basis to discuss the myriad issues that have arisen in connection with these distinct asset/claim categories.

29.    Wilmington Trust has, as indicated above, served on six of these Subcommittees, and, as a result, has often been required to attend Committee or Subcommittee meetings five or more days a week, in addition to reviewing the materials and engaging in the post-meeting deliberations necessary to effectively carry out its fiduciary duties. Service as a Co-Chair of the Committee has, as also indicated above, imposed on Wilmington Trust a separate set of duties that were incremental to its role as a Committee and Subcommittee member.

30.    Due to the highly sophisticated nature of the Debtors' businesses, Wilmington Trust would not have been able to undertake any of the foregoing responsibilities without the assistance of counsel. Lehman's transactional mix ran the gamut from complex derivatives trades to multi-billion dollar real estate transactions documented with file rooms full of mortgages to banking and broker-dealer activities subject to regulatory oversight around the world. No one at Wilmington Trust possessed the legal expertise required to address all these issues without input from its outside professionals or to inform its judgment of the legal and fiduciary implications of each decision, which vary among Committee members. Hence, Wilmington Trust relied extensively on its outside counsel, Covington and Loeb, for assistance in reviewing and evaluating the hundreds of transactions and motions the Committee has addressed since the Petition Date.

31.    Wilmington Trust's counsel was required to analyze materials received from the Debtors, review and comment on analyses and recommendation memoranda prepared

by Milbank and the Committee's financial advisors, solicit the input of colleagues at their firms with expertise on the many kinds of transactions the Committee had to evaluate, and attend the Committee and Subcommittee meetings. Wilmington Trust also requested its counsel to attend the monthly omnibus hearings to ensure that Wilmington Trust was informed about the proceedings in the case. I viewed this as essential to my ability to discharge my duties as a Committee member, as Co-Chair and as indenture trustee to the Senior Noteholders, one of the largest unsecured creditor constituencies. In addition, Covington and Loeb were also required to advise Wilmington Trust with respect to and assist it in responding to discovery requests served on it as a result of its status as a Committee Member, in connection with the various litigations in which the Committee had intervened. These services were necessary for Wilmington Trust to fulfill its fiduciary responsibilities to unsecured creditors of each of the Debtors' estates and make informed decisions regarding the multitude of issues that have arisen in the Chapter 11 Cases.

### H.    Most Significant Achievements

32.    A full list of the Chapter 11 Case-related achievements in which Wilmington Trust, working side-by-side with its fellow Committee Members, played a role would be too long to set forth herein. At the top of any such list, however, would be some or all of the following:

- **Sale to Barclays.** The Committee worked with its advisors to review the sale of the assets of Lehman Brothers Inc. ("LBI"), the Debtors' North American capital markets business, to Barclays Capital, Inc. ("Barclays"). Following approval of the LBI sale, the Committee continued to work with its advisors to (i) ensure that the rights of the unsecured creditors of each of the Debtors were protected to the fullest extent possible, and (ii) review and monitor performance under the transition services agreement with Barclays, the effective implementation of which, given the interrelatedness of the Debtors' operations, was of particular importance to the Committee. The Committee commenced litigation against Barclays contending (albeit unsuccessfully) that

11

Barclays had received more value in the sale than it was entitled to under the asset purchase agreement.

Sale of Neuberger Berman. The Committee was involved in all significant developments in the negotiations relating to the agreement reached between the Debtors and Neuberger Berman Group LLC ("Neuberger Berman") to monetize the Debtors' investment in Neuberger Berman. The Committee fully analyzed and evaluated the terms of the transaction on a stand-alone basis and in relation to the *status quo* projections and various other potential options, ultimately concluding that the transaction with existing management was in the best interests of the Debtors' creditors. The subsequent sale of most of the Debtors' remaining interests for $1.3 billion – or almost twice what it would have received under the Bain Capital deal rejected by the Committee – proved the wisdom of staying the course on this issue.

- **Flip Clause Litigation.** The Debtors commenced an adversary proceeding against the Bank of New York Mellon Corporate Trustee Services Limited contending that certain provisions in the relevant trust documents that purported to subordinate Lehman Brothers Special Financing Inc.'s ("LBSF") right to payment solely as a result of the Debtors' bankruptcy filings constituted unenforceable *ipso facto* clauses, which did not fall within the limited "safe-harbor" of section 560 of the Bankruptcy Code. Recognizing the significance of this litigation, the Committee intervened in this adversary proceeding and was instrumental in its successful prosecution. On January 25, 2010, the Court granted summary judgment for LBSF, agreeing with the arguments first advanced by the Committee that: (i) the disputed provisions were unenforceable *ipso facto* clauses; (ii) the *ipso facto* protections of the Bankruptcy Code applied irrespective of whether the "triggering" event was LBHI's or LBSF's bankruptcy; (iii) any attempt to enforce these provisions would violate the automatic stay; and (iv) the safe harbor under section 560 of the Bankruptcy Code does not apply to provisions affecting payment priorities.

- **Metavante Litigation.** The Committee was instrumental in the Debtors obtaining a favorable ruling on their motion to compel the performance of Metavante Corporation ("Metavante") under a prepetition swap agreement pursuant to which Metavante owed the Debtors approximately $6.6 million plus accrued interest (the "Metavante Motion"). The Court granted the Metavante Motion, thereby not only compelling Metavante's performance, but also setting an important precedent with respect to the necessity of continued performance under prepetition derivative contracts which has compelled many other counterparties to reach settlements favorable to the Debtors.

- **Bank of America Litigation.** In 2010, the Court issued a decision granting motions for summary judgment filed by LBHI and LBSF (and joined by the Committee) against Bank of America ("BofA"), directing BofA to return

$501.8 million plus interest to the Debtors.  The Court held that BofA's seizure of the collateral violated the automatic stay, and that BofA was not entitled to a setoff.  On May 20, 2011, the Court entered final judgment (i) against BofA on all counts of its complaint and (ii) in favor of LBHI on its counterclaim.  As a result of extensive discussions and negotiations, the parties ultimately came to a settlement agreement.  A stipulation of dismissal of appeal was filed on November 16, 2011 after the Court approved the settlement on October 19, 2011.

- **Swedbank Litigation.**  The Committee and its advisors worked closely with the Debtors to respond to Swedbank AB's ("Swedbank") claim that it had the right to set off LBHI's prepetition debts against the funds the Debtors had on deposit with Swedbank, including funds that were deposited postpetition. The Debtors filed a motion to enforce the automatic stay and to compel Swedbank to return the post-petition funds.  The Court granted the Debtors' motion, ordered Swedbank to immediately release the administrative freeze and to return the funds to LBHI, and denied Swedbank's motion for a stay pending appeal.  Swedbank appealed the Court's decision.  The Committee and filed an appellate brief in support of the Debtors' position.  The United States District Court for the Southern District of New York affirmed the Court's decision.

- **Success of the Derivatives ADR Process.**  The Committee and its advisors worked closely with the Debtors to review and respond to the counterparty notices filed under the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [Docket No. 5207], to evaluate settlement proposals under the alternative dispute resolution process, and to participate in mediations.  Such efforts have been instrumental in helping the Debtors achieve settlements in 152 matters involving 162 counterparties, as of November 11, 2011, resulting in the recovery of more than $924 million.

- **Preservation and Planned Sale of Banks.**  The Committee analyzed issues related to Woodlands Commercial Bank ("Woodlands") and Aurora Bank FSB ("Aurora" and, together with Woodlands, the "Banks"), LBHI's subsidiaries which are subject to oversight by the Office of Thrift Supervision and the Federal Deposit Insurance Company (collectively, the "Regulators").  Throughout the Chapter 11 Cases, the Committee and its advisors sought to (i) improve the capital levels at each of the Banks to satisfy regulatory requirements; (ii) avoid potential seizures and liquidation by the Regulators; (iii) permit the resumption of depository functions at the Banks to preserve and maximize value; and (iv) facilitate the winding down of Woodlands' operation and the soon-to-be consummated sale of Aurora.

- **Sale of Innkeepers.**  Innkeepers USA Trust and certain of its affiliates (collectively, "Innkeepers"), which filed for chapter 11 bankruptcy protection

13

in July 2010, owned 71 hotel properties throughout the U.S. Lehman ALI, Inc. ("Lehman ALI") had provided a $367,658,725 financing to Innkeepers that was later bifurcated into a $250,000,000 floating rate first mortgage loan and a $117,658,725 floating rate mezzanine loan. The Committee and its advisors carefully evaluated the strategic options available to the Debtors, reviewing a plan term sheet, a plan support agreement, a debtor in possession financing agreement, and the sale of 64 of Innkeepers' hotels to Cerberus Series Four Holdings LLC and Chatham Lodging Trust, which provided a substantial payout to the Debtors' estates.

- **Disposition of Archstone.**  In 2007, certain of the Debtors and their non-Debtor affiliates made equity investments and loans in connection with the leveraged buyout of Archstone-Smith Trust ("Archstone"), a publicly traded real estate investment trust. Because Archstone was unable to generate revenues or property sales sufficient to meet its various liabilities, the Committee and its advisors reviewed, researched, and analyzed potential options for unwinding the Debtors' investment in Archstone, specifically analyzing whether to pursue a private sale or take the company public through an initial public offering.

- **Resolution of the SunCal Bankruptcy.**  Prior to the Petition Date, Lehman ALI, LCPI, and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal projects totaling over $2 billion. As a result of its financial difficulties, SunCal and several affiliates became debtors in possession (collectively, the "SunCal Debtors") in the United States Bankruptcy Court for the Central District of California (the "SunCal Cases") and the Debtors filed a proof of claim against certain of the SunCal Debtors. The Committee monitored and evaluated a wide variety of issues arising in the SunCal Cases, including (i) the ability of the SunCal Debtors to pursue equitable subordination of the Debtors' claims without violating the automatic stay in the Chapter 11 Cases, (ii) the Debtors' request to credit bid at the auction for certain of the SunCal properties and the results of the auction, and (iii) the formulation and funding of the SunCal Debtors' plans of reorganization. Most significantly, the Committee was instrumental in bringing about a settlement with the former owners of Sun Cal that finally permitted confirmation of chapter 11 plans for the Sun Cal Debtors in October 2011.

- **Development of Cross-Border Insolvency Protocol.**  The Committee and its advisors spent considerable time working with the Debtors and the administrators (the "Foreign Administrators") appointed in the numerous proceedings (the "Foreign Proceedings") initiated by or against the Debtors' affiliates outside of the U.S. that culminated with the adoption of the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"). The Protocol was designed to facilitate the coordination of the Chapter 11 Cases with the Foreign Proceedings, and to enable the

respective courts and administrators to cooperate in the administration of all proceedings. The Protocol signatories engaged with certain Foreign Administrators to, among other things, (i) discuss issues regarding the Plan; (ii) reach consensual resolutions of contested issues; and (iii) ultimately conclude a series of intercompany settlement that were critical to the success of the Plan.

- **Development of Plan.** The Committee was instrumental in developing, together with the Debtors, a chapter 11 plan construct that is fair and equitable to all the diverse constituents in the Chapter 11 Cases, and assuring, through the numerous settlements integrated into the Plan, that the Plan garnered the support of most of the Debtors' creditors. The Committee, with the assistance of its advisors, evaluated the claims, factual contentions, and legal theories of all key constituencies in the Chapter 11 Cases. The Committee also developed its own legal theories and strategies regarding, among other matters, the appropriate allocation of value distributable under the Plan to various classes of creditors. In that connection, the Committee reviewed and analyzed such issues as substantive consolidation, intercompany claims recharacterization, and the enforceability of guarantees, all of which had the potential effect of reallocating value from one group of creditors to another.

## I.    Reimbursement of Fee and Expenses Requested

33.     The professional services rendered by Covington and Loeb, as counsel to Wilmington Trust, have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by Wilmington Trust, in both its Committee member and indenture trustee capacities. The services rendered by Wilmington Trust and its counsel were performed efficiently, effectively and economically, and the results obtained have benefited the unsecured creditors of each of the Debtors' estates.

34.     Wilmington Trust submits the Application to seek approval of payments of (a) $3,266,526.64 in fees and expenses of Wilmington Trust as a Committee member and as indenture trustee from the Petition Date through December 15, 2011, as reflected in the time and expense records attached as Exhibit 1; (b) $96,000.00 in fees of Citibank from the Petition Date through December 31, 2011 as reflected in the invoice attached as Exhibit 2; (c)

15

$7,857,503.56 in fees and expenses of Covington for the professional services rendered to Wilmington Trust from the Petition Date through December 31, 2011, as reflected in the time and expense records attached as Exhibit 3; and (d) $402,237.25 in fees and expenses of Loeb for the professional services rendered to Wilmington Trust from the Petition Date through December 31, 2011 as reflected in the time and expense records attached as Exhibit 4, —for a total award of $11,622,267.45.

35.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of January, 2012

Julie J. Becker

# **EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                          :

In re                         :     **Chapter 11 Case No.**
                          :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :     **08-13555 (JMP)**
                          :

              **Debtors.**     :     **(Jointly Administered)**
------------------------------------------------------------------x

## ORDER GRANTING OMNIBUS APPLICATION OF (I) INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND (II) INDENTURE TRUSTEES PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D) AND 503(b)(4) OF BANKRUPTCY CODE FOR <u>PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES</u>

Upon consideration of the Omnibus Application of (i) Individual

Members of Official Committee of Unsecured Creditors and (ii) Indenture Trustees Pursuant to

Section 1129(A)(4), or, Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>") for Payment Of Fees And Reimbursement Of

Expenses (the "<u>Omnibus Application</u>"); and after due notice pursuant to the second amended

order dated June 17, 2010 governing case management and administrative procedures [ECF No.

9635]; and there being no objections to the allowance of the amounts set forth on <u>Schedule A</u>;

and after due consideration and upon all of the proceedings had before the Court, and sufficient

cause appearing therefor, it is hereby

          ORDERED, that the Omnibus Application is granted in entirety; and it is further

          ORDERED, that the Debtors are authorized and directed to pay the Fees and

Expenses[1] incurred by the Applicants from the Petition Date through and including

---

[1]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Omnibus Application.

December 31, 2011, as Administrative Expense Claims and in the amounts set forth in <u>Schedule A</u> hereto; and it is further

ORDERED, that such payments be made on the Effective Date of the Plan, or as soon thereafter as practicable; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated:  February ___, 2012
      New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## SCHEDULE A

**SUMMARY OF FEES AND EXPENSES IN CONNECTION WITH OMNIBUS APPLICATION OF (I) INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND (II) INDENTURE TRUSTEES PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D) AND 503(b)(4) OF BANKRUPTCY CODE FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES**

| Committee Member | Fees | Expenses | Total Fees and Expenses |
|---|---|---|---|
| Wilmington Trust Company | $2,569,577.50 | $0 | $2,569,577.50 |
| Wilmington Trust Company – Loeb & Loeb, LLP | $394,029.00 | $8,208.25 | $402,237.25 |
| Wilmington Trust Company – Covington & Burling | $7,788,744.00 | $68,759.56 | $7,857,503.56 |
| Wilmington Trust Company – Citibank | $96,000.00 | $0 | $96,000.00 |
| The Bank of NY Mellon – Administration Fee | $490,740.00 | $0 | $490,740.00 |
| The Bank of NY Mellon – Sheppard Mullin | $4,054,024.45 | $35,519.86 | $4,089,544.31 |
| Mizuho Corporate Bank, Ltd. – Stroock & Stroock & Lavan | $2,863,196.00 | $17,742.29 | $2,880,938.29 |
| Metropolitan Life Insurance Co. | $254,402.50 | $0 | $254,402.50 |
| The Vanguard Group | $1,346,234.50 | $21,221.17 | $1,367,455.67 |
| U.S. Bank National Association – Shipman & Goodwin, LLP | $111,232.50 | $1,217.06 | $112,449.56 |
| U.S. Bank National Association – Edwards Angell Palmer & Dodge, LLP | $64,796.00 | $2,721.33 | $67,517.33 |
| U.S. Bank National Association – Sullivan Worcester, LLP | $1,752,369.00 | $12,928.39 | $1,765,297.39 |
| Elliott Management Corp – Greenberg Traurig, LLP | $1,308,655.60 | $53,841.86 | $1,362,497.46 |
| Elliot Management Corp – Kleinberg, Kaplan, Wolff & Cohen, P.C. | $1,151,368.50 | $12,534.01 | $1,163,902.51 |
| Shinsei Bank, Limited | $71,460.00 | $1,614.06 | $73,074.06 |
| **Grand Total** | $24,316,829.55 | $236,308.00 | $24,553,137.39 |