# EXHIBIT  A

(Multicurrency-Cross Border)



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

### FOR OVER-THE-COUNTER FULLY-COVERED EQUITY OPTION AND FORWARD TRANSACTIONS

dated as of April 19, 2007

**LEHMAN BROTHERS OTC**         and         **EDWARD J. AGOSTINI LIVING**
**DERIVATIVES INC.**                                **TRUST dated May 12, 2000 as amended**
**and restated in its entirety on April 3,**
**2007**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td>

**LEHMAN BROTHERS OTC DERIVATIVES INC.**

*(Name of Party A)*

By: _____

Name:    Scott Sefton

Title:    Vice President

Date:    6/12/07

</td><td>

**EDWARD J. AGOSTINI LIVING TRUST dated May 12, 2000 as amended and restated in its entirety on April 3, 2007**
*(Name of Party B)*

By: _____

Name:    Edward J. Agostini

Title:    Trustee

Date:    23 APR 07

By: _____

Name:    Sylvia Agostini

Title:    Trustee

Date:    4/23/07

</td></tr>
</table>

(Multicurrency-Cross Border)



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

## FOR OVER-THE-COUNTER FULLY-COVERED EQUITY OPTION AND FORWARD TRANSACTIONS

dated as of April 19, 2007

**LEHMAN BROTHERS OTC**              and       **EDWARD J. AGOSTINI and SYLVIA**
**DERIVATIVES INC.**                                    **AGOSTINI as Joint Tenants with Rights**
                                                                        **of Survivorship**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be
governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other
confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified
for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other
provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the
provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail
for the purposes of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and
all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the
parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject
to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the
account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely
transferable funds and in the manner customary for payments in the required currency.  Where settlement is
by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the
manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or
elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent that no
Event of Default or Potential Event of Default with respect to the other party has occurred and is
continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant
Transaction has occurred or been effectively designated and (3) each other applicable condition precedent
specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS OTC DERIVATIVES INC. | EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of Survivorship |
|---|---|
| *(Name of Party A)* | *(Name of Party B)* |
| By: *S. Sefto* | By: |
| Name: | Name:  Edward J. Agostini |
| Scott Sefton | Date:  23  APR  2007 |
| Title:  Vice President | |
| Date:  6/12/07 | By: |
| | Name:  Sylvia Agostini |
| | Date:  4/23/07 |

18

# EXHIBIT   B

(Multicurrency-Cross Border)



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

## FOR OVER-THE-COUNTER FULLY-COVERED EQUITY OPTION AND FORWARD TRANSACTIONS

dated as of November 9, 2007

**LEHMAN BROTHERS OTC**     and     **DECLAN KELLY**
**DERIVATIVES INC.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

　　　(i)    in the same currency; and

　　　(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

　　　(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

　　　　　(1)    promptly notify the other party ("Y") of such requirement;

　　　　　(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

　　　　　(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

　　　　　(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

　　　　　　　(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

　　　　　　　(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2                                    **ISDA® 1992**

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                                                                                        **ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                                    ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) **Calculations.**

(i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    **Events of Default.** If the Early Termination Date results from an Event of Default: —

(1) **First Method and Market Quotation.** If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) **First Method and Loss.** If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) **Second Method and Market Quotation.** If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    ***Termination Events***. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    ***Adjustment for Bankruptcy***. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    ***Pre-Estimate***. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.   Notices**

(a)   *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

>    (i)   if in writing and delivered in person or by courier, on the date it is delivered;

>    (ii)   if sent by telex, on the date the recipient's answerback is received;

>    (iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

>    (iv)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

>    (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)   *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.   Governing Law and Jurisdiction**

(a)   *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

>    (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

>    (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)   *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.     Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


**LEHMAN BROTHERS OTC DERIVATIVES INC.**
*(Party A)*

By: _Jacqueline M. Didier_
Name: Jacqueline M. Didier
Title: Vice President
Date:


**DECLAN KELLY**
*(Party B)*

By: _Declan Kelly_
Name: Declan Kelly
Title:
Date: 11/20/07


18

# EXHIBIT   C

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
**For Over-the-Counter Fully-Covered Equity Option and Forward Transactions**
dated as of April 19, 2007
between
**LEHMAN BROTHERS OTC DERIVATIVES INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**EDWARD J. AGOSTINI LIVING TRUST dated**
**May 12, 2000 as amended and restated in its entirety on April 3, 2007 ("Party B")**
a revocable trust organized under the laws of
the State of Florida.

**Part 1: Termination Provisions**

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

> Section 5(a)(v).     Not applicable.
> Section 5(a)(vi),    Not applicable.
> Section 5(a)(vii),   Not applicable.
> Section 5(b)(iv),    Not applicable.

and in relation to Party B for the purpose of:-

> Section 5(a)(v),     Not applicable.
> Section 5(a)(vi),    Not applicable.
> Section 5(a)(vii),   Not applicable.
> Section 5(b)(iv),    Not applicable.

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement, except that "Specified Transaction" shall be expanded to include forward purchase transactions, prepaid forward purchase transactions and variable prepaid forward purchase transactions.

(c)     The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:-

"Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and USD zero in the case of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers

19

Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)     The "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)     "**Termination Currency**" means United States Dollars ("USD").

(h)     **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event with respect to which Party B shall be the Affected Party:

   (i)     The occurrence of an event of default, termination event, breach, or failure by, or in respect of, Party B or any Affiliate thereof under any agreement, instrument, or document with Party A or any Affiliate thereof other than this Agreement which, following the giving of any applicable notice or the lapse of any applicable grace period, has resulted in the early termination of or in respect of, the acceleration of any obligations under, or the exercise of any rights or remedies under, such other agreement, instrument, or document.

   (ii)    Any circumstances arise which give reasonable grounds in the opinion of Party A for the belief that: (a) Party B may not (or may be unable to) perform or comply with its obligations owed to Party A or to any Affiliate thereof or (b) a material adverse change has occurred in respect of the financial condition of Party B.

   (iii)   The Trust Agreement establishing the "Edward J. Agostini Living Trust dated May 12, 2000 as amended and restated in its entirety on April 3, 2007" (the "Trust Agreement") is revoked, terminated or modified.

   (iv)    Edward J. Agostini or Sylvia Agostini ceases to be a Trustee for Party B and the successor trustee is not acceptable to Party A in its sole discretion.

**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

   (i)     Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware.

(ii)     Party B represents that it is a revocable trust duly organized and validly existing under the laws of the State of Florida.

(c)     **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)     Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | No |
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Promptly upon execution of this Agreement. | No |
| Party B | A copy of the annual report of Party B containing audited consolidated financial statements for each fiscal year that any Transaction is outstanding between Party A and Party B certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon request. | Yes |
| Party B | A copy of the unaudited financial statements of Party B for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied. | Upon request. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A certified copy of the Trust Agreement, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |

**Part 4: Miscellaneous**

(a)   **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

Address:        Lehman Brothers OTC Derivatives Inc.
                c/o Lehman Brothers Inc.
                Corporate Advisory Division
                Transaction Management Group
                745 Seventh Avenue
                New York, NY 10019

Attention:      Documentation Manager
Telephone No.:  (212) 526-7187
Facsimile No.:  (212) 526-7672

                For all purposes.

Address for notices or communications to **Party B**:

Address:        20 Sutton Place South, #7D
                New York, NY 10022

Attention:      Edward J. Agostini and Sylvia Agostini
Telephone No.:  (305) 393-8616

                For all purposes.

(b)   **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:      Not applicable.

Party B appoints as its Process Agent:      Not applicable.

(c)   **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)   **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   **Calculation Agent.** The Calculation Agent is Party A.

(f)   **Credit Support Document.**

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

22

In the case of Party B, the Credit Support Annex annexed hereto.

(g)     **Credit Support Provider.**

Credit Support Provider means in relation to Party A:   Holdings.

Credit Support Provider means in relation to Party B:   Not applicable.

(h)     **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)     **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions (in each case starting from the date of this Agreement).

(j)     **Affiliate** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)     **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.


**Part 5: Other Provisions**

(a)     **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)     *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)     *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)     *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)     *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)     *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)     **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)     *Set-off.*

(i)     In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without

23

prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)    **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(d)    **Notices.** For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)    **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.** <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(i)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(j)    **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early

24

termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(k)    **Confirmations.** Party A shall send to Party B its standard form of Confirmation for each Transaction entered into hereunder, the terms of which shall be deemed to be agreed to by Party B unless, within three Local Business Days of Party B's receipt thereof, Party B notifies Party A of any disagreement thereto.

(l)    **No-Exposure Transactions.** Party A and Party B intend to enter into Transactions under which, at no time during the term thereof, will Party A's Exposure (as such term is defined in the Credit Support Annex hereto) to Party B be greater than USD--0-- ("No-Exposure Transactions"). Party A and Party B agree that the only Transactions that shall be entered into hereunder shall be No-Exposure Transactions.

(m)    **Scope of Agreement.** For the purposes of this Agreement, the term "Transactions" shall refer solely to Option Transactions (as defined in Section 1.2 of the 1996 ISDA Equity Derivatives Definitions) and Forward Transactions. Party A and Party B agree that the only Transactions that shall be entered into hereunder shall be Option Transactions or Forward Transactions.

(n)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(o)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(p) **Additional Representations of Party B.** Party B represents to Party A (at all times until termination of this Agreement) that:

    (i)    It understands that the Transactions contemplated hereunder are subject to complex risks which may arise without warning, may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

    (ii)    It is a sophisticated investor able to evaluate the terms, conditions and risks of the Transactions contemplated hereunder and accepts such terms, conditions and risks.

    (iii)    This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with the portfolio management, asset, risk, and liability management and hedging activities of Party B.

    (iv)    It is and will comply in all respects with all applicable laws and with rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

    (v)    It has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement delivered to Party B by Party A.

    (vi)    Party B represents to Party A (at all times until termination of this Agreement) that Party B's net worth (total assets minus total liabilities) is in excess of USD 5,000,000 and its liquid net worth is in excess of USD 2,000,000.

    (vii)    Each of Edward J. Agostini and Sylvia Agostini is a Trustee of Party B and will have full power and authority to make all investment decisions for and on behalf of Party B, including without limitation executing and delivering this Agreement, entering into Transactions hereunder, executing and delivering Confirmations hereunder, and performing obligations hereunder.

(q) **Transactions.** With respect to each Option Transaction, Party B represents to Party A (at all times until termination of this Agreement) that Party B:

    (i)    understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof;

    (ii)    understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

    (iii)    agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

    (iv)    understands that each Confirmation may bear a legend to substantially the following effect: The securities represented by the Confirmation have been acquired for investment and have not been registered under the United States Securities Act of 1933, as amended, or any other United States federal or state securities laws; and such securities may not be sold or otherwise transferred in the absence of appropriate registration under such securities laws or except in a transaction exempt from or not subject to the registration requirements of such securities laws.

(r) **Additional Provisions.**

    (i)    Party A hereby notifies Party B that, with respect to collateral delivered to Party A by Party B pursuant to this Agreement: (1) except as otherwise agreed in writing between Party A and Party B, Party A may repledge or otherwise use such collateral in Party A's business; (2) in the event of Party A's failure, Party B will likely be considered an unsecured creditor of Party A as to such collateral; (3) the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa through 78lll) does

not protect Party B; and (4) such collateral will not be subject to the requirements of Rules 8c-1, 15c2-1, 15c3-2 or 15c3-3 under the Securities Exchange Act of 1934, as amended.

(ii)    Party A is not, and is not required to be, a member of the Securities Investor Protection Corporation.

(s)    **Recording of Conversations.**  Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(t)    **Reliance on Trustee.**  Pursuant to the Trust Agreement, Party B has granted the Trustee full discretionary power and authority to make investment decisions for, in the name of, and on behalf of, Party B, including without limitation the power and authority to enter into Transactions as the agent for the account of Party B and to advise and direct Party B to enter into this Agreement and Transactions and to execute and deliver this Agreement and all Confirmations in connection herewith. In connection with Party B's entering into this Agreement and any Transactions hereunder, Party A will be entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document furnished to Party A by an employee or agent of the Trustee which Party A reasonably believes to be genuine in connection with this Agreement and the Transactions as though such request, instruction, certificate, opinion, or other document was given by Party B, until such time that Party B affirmatively revokes, terminates, qualifies, amends, or modifies the Trust Agreement.

(u)    **Notice of Certain Events.**  Party B agrees with Party A (so long as Party A or Party B has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party) that it will provide Party A, promptly upon becoming aware of the same, with written notice of: (1) any proposed action, change, or modification to the Trust that may have an adverse effect on Party B's ability to perform its obligations under the Agreement or any Transaction; or (2) the Trustee's impending resignation or termination as trustee to Party B, or any other facts or developments that may adversely affect the status of Party B or the Trustee with respect to this Agreement.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS OTC DERIVATIVES INC.**

*(Name of Party A)*

By: _S. Sefton_ _____

Name: _____

Title: _____
Scott Sefton
Vice President

Date: _6/12/07_

**EDWARD J. AGOSTINI LIVING TRUST dated May 12, 2000 as amended and restated in its entirety on April 3, 2007**

*(Name of Party B)*

By: _____

Name:    Edward J. Agostini

Title:    Trustee

Date: _4/23/07_

By: _____

Name:    Sylvia Agostini

Title:    Trustee

Date: _4/23/07_

27

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
**For Over-the-Counter Fully-Covered Equity Option and Forward Transactions**
dated as of April 19, 2007
between
**LEHMAN BROTHERS OTC DERIVATIVES INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**EDWARD J. AGOSTINI and SYLVIA AGOSTINI**
**as Joint Tenants with Rights of Survivorship ("Party B").**

**Part 1: Termination Provisions**

In this Agreement:-

(a)    "**Specified Entity**" means in relation to Party A for the purpose of:-

|                      |                 |
|----------------------|-----------------|
| Section 5(a)(v),     | Not applicable. |
| Section 5(a)(vi),    | Not applicable. |
| Section 5(a)(vii),   | Not applicable. |
| Section 5(b)(iv),    | Not applicable. |

and in relation to Party B for the purpose of:-

|                      |                 |
|----------------------|-----------------|
| Section 5(a)(v),     | Not applicable. |
| Section 5(a)(vi),    | Not applicable. |
| Section 5(a)(vii),   | Not applicable. |
| Section 5(b)(iv),    | Not applicable. |

(b)    "**Specified Transaction**" will have the meaning specified in Section 14 of this Agreement, except that "Specified Transaction" shall be expanded to include forward purchase transactions, prepaid forward purchase transactions and variable prepaid forward purchase transactions.

(c)    The "**Cross Default**" provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:-

"**Specified Indebtedness**" will have the meaning specified in Section 14 of this Agreement.

"**Threshold Amount**" means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and USD zero in the case of Party B (or its equivalent in any other currency).

For purposes hereof, "**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)    The "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors

19

Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)    The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will not apply to Party A and will not apply to Party B.

(f)    **Payments on Early Termination.**  For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)    **"Termination Currency"** means United States Dollars ("USD").

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event with respect to which Party B shall be the Affected Party:

    (i)    The occurrence of an event of default, termination event, breach, or failure by, or in respect of, Party B or any Affiliate thereof under any agreement, instrument, or document with Party A or any Affiliate thereof other than this Agreement which, following the giving of any applicable notice or the lapse of any applicable grace period, has resulted in the early termination of or in respect of, the acceleration of any obligations under, or the exercise of any rights or remedies under, such other agreement, instrument, or document.

    (ii)    Any circumstances arise which give reasonable grounds in the opinion of Party A for the belief that: (a) Party B may not (or may be unable to) perform or comply with its obligations owed to Party A or to any Affiliate thereof or (b) a material adverse change has occurred in respect of the financial condition of Party B.

    (iii)    Party B dies or an Incompetency Event (as hereinafter defined) occurs. "Incompetency Event" means the declaration by a court of competent jurisdiction that Party B is incompetent due to a physical, mental, or emotional condition resulting from injury sickness, disease or other cause.

    (iv)    Party B is incarcerated.

## Part 2: Tax Representations

(a)    **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e), 6(d)(ii) and 6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, <u>provided</u> that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.**  For the purpose of <u>Section 3(f)</u> of this Agreement, Party A and Party B make the representations specified below, if any:

    (i)    Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware.

(ii)    Party B represents that he/she is a resident of the United States of America.

20

(c)    **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

Address:    Lehman Brothers OTC Derivatives Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Attention:    Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672

For all purposes.

Address for notices or communications to **Party B**:

Address:    20 Sutton Place South, #7D
New York, NY 10022

Attention:    Edward J. Agostini and Sylvia Agostini
Telephone No.:    (305) 393-8616

For all purposes.

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:    Not applicable.

Party B appoints as its Process Agent:    Not applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

21

(d)   **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   **Calculation Agent.** The Calculation Agent is Party A.

(f)   **Credit Support Document.**

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B, the Credit Support Annex annexed hereto.

(g)   **Credit Support Provider.**

Credit Support Provider means in relation to Party A:   Holdings.

Credit Support Provider means in relation to Party B:   Not applicable.

(h)   **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)   **Netting of Payments.**   Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions (in each case starting from the date of this Agreement).

(j)   **Affiliate** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)   **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

(a)   **Representations.**   Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)   *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

    (k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)    Set-off. Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f)    *Set-off.*

    (i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

    (ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

    (iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

    (iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)    **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(d)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(i)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(j)   **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

    (v)   *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

        (1)   defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

        (2)   defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

        (3)   defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

        (4)   disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(k)   **Confirmations.** Party A shall send to Party B its standard form of Confirmation for each Transaction entered into hereunder, the terms of which shall be deemed to be agreed to by Party B unless, within three Local Business Days of Party B's receipt thereof, Party B notifies Party A of any disagreement thereto.

(l)   **No-Exposure Transactions.** Party A and Party B intend to enter into Transactions under which, at no time during the term thereof, will Party A's Exposure (as such term is defined in the Credit Support Annex hereto) to Party B be greater than USD--0-- ("No-Exposure Transactions"). Party A and Party B agree that the only Transactions that shall be entered into hereunder shall be No-Exposure Transactions.

(m)   **Scope of Agreement.** For the purposes of this Agreement, the term "Transactions" shall refer solely to Option Transactions (as defined in Section 1.2 of the 1996 ISDA Equity Derivatives Definitions) and Forward Transactions. Party A and Party B agree that the only Transactions that shall be entered into hereunder shall be Option Transactions or Forward Transactions.

(n)   **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not

released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(o)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair their respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(p)    **Additional Representations of Party B.** Party B represents to Party A (at all times until termination of this Agreement) that:

   (i)    It understands that the Transactions contemplated hereunder are subject to complex risks which may arise without warning, may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

   (ii)    It is a sophisticated investor able to evaluate the terms, conditions and risks of the Transactions contemplated hereunder and accepts such terms, conditions and risks.

   (iii)    This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with the portfolio management, asset, risk, and liability management and hedging activities of Party B.

   (iv)    It is and will comply in all respects with all applicable laws and with rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

   (v)    It has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement delivered to Party B by Party A.

   (vi)    Party B represents to Party A (at all times until termination of this Agreement) that Party B's net worth (total assets minus total liabilities) is in excess of USD 5,000,000 and its liquid net worth is in excess of USD 2,000,000.

(q)    **Transactions.** With respect to each Option Transaction, Party B represents to Party A (at all times until termination of this Agreement) that Party B:

   (i)    understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof;

   (ii)    understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

   (iii)    agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

   (iv)    understands that each Confirmation may bear a legend to substantially the following effect:
   The securities represented by the Confirmation have been acquired for investment and have not been registered under the United States Securities Act of 1933, as amended, or any other United States federal or state securities laws; and such securities may not be sold or otherwise transferred in the absence of appropriate registration under such securities laws or except in a transaction exempt from or not subject to the registration requirements of such securities laws.

(r)    **Additional Provisions.**

    (i)    Party A hereby notifies Party B that, with respect to collateral delivered to Party A by Party B pursuant to this Agreement: (1) except as otherwise agreed in writing between Party A and Party B, Party A may repledge or otherwise use such collateral in Party A's business; (2) in the event of Party A's failure, Party B will likely be considered an unsecured creditor of Party A as to such collateral; (3) the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa through 78lll) does not protect Party B; and (4) such collateral will not be subject to the requirements of Rules 8c-1, 15c2-1, 15c3-2 or 15c3-3 under the Securities Exchange Act of 1934, as amended.

    (ii)    Party A is not, and is not required to be, a member of the Securities Investor Protection Corporation.

(s)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

<table>
<tr>
<td>

**LEHMAN BROTHERS<br>OTC DERIVATIVES INC.**

*(Name of Party A)*

By: _____

Name: _____<br>         Scott Sefton

Title: _____<br>       Vice President

Date: _____<br>       6/12/07

</td>
<td>

**EDWARD J. AGOSTINI and SYLVIA<br>AGOSTINI as Joint Tenants with Rights of<br>Survivorship**

*(Name of Party B)*

By: _____

Name: Edward J. Agostini

Date: _____4/23/07._____

By: _____

Name: Sylvia Agostini

Date: _____4/23/07_____

</td>
</tr>
</table>

# EXHIBIT  D



## ISDA®

*International Swaps and Derivatives Association, Inc.*

## CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

**For Over-the-Counter Fully-Covered Equity Option and Forward Transactions**

dated as of April 19, 2007

**between**

| | |
|---|---|
| **LEHMAN BROTHERS OTC DERIVATIVES INC.** | **EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of Survivorship** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

### Paragraph 1. Interpretation

(a)    *Definitions and Inconsistency*. Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor*. All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

### Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.



# ISDA®

*International Swaps and Derivatives Association, Inc.*

## CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

**For Over-the-Counter Fully-Covered Equity Option and Forward Transactions**

dated as of April 19, 2007

between

**LEHMAN BROTHERS OTC DERIVATIVES INC.**

**EDWARD J. AGOSTINI LIVING TRUST dated May 12, 2000 as amended and restated in its entirety on April 3, 2007**

*Party A*

*Party B*

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)    *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

# EXHIBIT  E

# ISDA®

*International Swaps and Derivatives Association, Inc.*

## CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

**For Over-the-Counter Fully-Covered Equity Option and Forward Transactions**

dated as of November 9, 2007

between

| **LEHMAN BROTHERS OTC DERIVATIVES INC.** | **DECLAN KELLY** |
|:---:|:---:|
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)      *Definitions and Inconsistency*.  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor*.  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder.  Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)      *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)      *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)      *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)      *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)      *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

**(d)**   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**ISDA®1994**

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA®1994

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

# EXHIBIT F

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of April 19, 2007
between
**LEHMAN BROTHERS OTC DERIVATIVES INC.**
(hereinafter referred to as either "Party A" or "Secured Party")
and
**EDWARD J. AGOSTINI LIVING TRUST dated**
**May 12, 2000 as amended and restated in its entirety on April 3, 2007**
(hereinafter referred to as either "Party B" or "Pledgor")

**Paragraph 13. Elections and Variables**

(a)    **Security Interest for "Obligations".** The term **"Obligations"** as used in this Annex includes the following additional obligations: None.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a).

        (2)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (3)    **"Credit Support Amount"** has the meaning specified in Paragraph 3; provided, however, that in the event that the sum of the Independent Amounts applicable to Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor.

    (ii)    **Eligible Collateral.** The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party B | Valuation Percentage |
|---|---|---|
| (A)  Assets acceptable to the Secured Party as provided in a Confirmation. | [X] | To Be Determined. |

    (iii)    **Other Eligible Support.** The following items will qualify as **"Other Eligible Support"** for the party specified: Not applicable.

    (iv)    **Thresholds.**

        (1)    **"Independent Amount"** shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

        (2)    **"Threshold"** means, with respect to Party B, USD zero.

        (3)    **"Minimum Transfer Amount"** means, with respect to Party B, USD 50,000, and with respect to Party A, USD 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Pledgor has occurred and is continuing, then the Minimum Transfer Amount with respect to Pledgor shall be USD zero.

        (4)    **Rounding.** The Delivery Amount and the Return Amount shall be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

    (i)    **"Valuation Agent"** means Party A.

    (ii)    **"Valuation Date"** means any Local Business Day.

11

(iii)   "**Valuation Time**" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)   "**Notification Time**" means 3:00 p.m., New York time, on a Local Business Day.

(d)   **Conditions Precedent and Secured Party's Rights and Remedies.** The following Termination Events will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party B |
|---|---|
| Illegality | [X] |
| Tax Event | [X] |
| Tax Event Upon Merger | [X] |
| Credit Event Upon Merger | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule. | [X] |

(e)   **Substitution.**

(i)   "**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

(ii)   **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)   **Dispute Resolution**

(i)   "**Resolution Time**" means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii)   **Value.** For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

(iii)   **Alternative.** Paragraph 5 will apply.

(g)   **Holding and Using Posted Collateral.**

(i)   **Eligibility to Hold Posted Collateral; Custodians.**

Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

(1)   Party A is not a Defaulting Party.

(2)   The Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party A is: Not applicable.

(ii)   **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A. Party A and Party B intend that the Secured Party's use of Posted Collateral consisting of securities pursuant to the provisions of Paragraph 6(c) shall constitute a transfer of securities by the Pledgor to the Secured Party pursuant to an agreement meeting the requirements of Section 1058 of the U.S. Internal Revenue Code of 1986, as

12

amended (the "Code"), and Pledgor agrees to take all reasonable steps necessary to ensure that any such transfer will qualify for nonrecognition treatment pursuant to such Section 1058.

(h) **Distributions and Interest Amount.**

    (i) **Interest Rate.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

    (ii) **Transfer of Interest Amount.** The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii) **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i) **Additional Representation(s).** Not applicable.

(j) **"Other Eligible Support and Other Posted Support."**

    (i) **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

    (ii) **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k) **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l) **Addresses for Transfers.** As agreed between the parties from time to time.

(m) **Other Provisions.**

    (i) **No Disposition.** Without the prior written consent of Secured Party, Pledgor agrees that it will not sell, assign, transfer, exchange or otherwise dispose of, or grant any right with respect to, Posted Collateral, nor will it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any of the Posted Collateral, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Annex.

    (ii) **Agreement as to Single Secured Party and Pledgor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, (a) the term *"Secured Party"* as used in this Annex means only Party A, (b) the term *"Pledgor"* as used in this Annex means only Party B, (c) only Party B makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party B will be required to make transfers of Eligible Credit Support hereunder.

    (iii) **Local Business Day.** For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

    (iv) **Events of Default.** Paragraph 7(i) is hereby amended by deleting the word "two" and inserting in lieu thereof the word "one".

    (v) **No offset.** The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

        (c) *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

13

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| **LEHMAN BROTHERS OTC DERIVATIVES INC.** | **EDWARD J. AGOSTINI LIVING TRUST dated May 12, 2000 as amended and restated in its entirety on April 3, 2007** |
|---|---|
| *(Name of Party A)* | *(Name of Party B)* |

By: _S. Sefton_

Name:

Title:

Date:

Scott Sefton
Vice President
6/12/07

By: _____

Name: Edward J. Agostini

Title: Trustee

Date: 23 APR. 2007

By: _____

Name: Sylvia Agostini

Title: Trustee

Date: 4/23/07

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of April 19, 2007
between
**LEHMAN BROTHERS OTC DERIVATIVES INC.**
(hereinafter referred to as either "Party A" or "Secured Party")
and
**EDWARD J. AGOSTINI and SYLVIA AGOSTINI**
**as Joint Tenants with Rights of Survivorship**
(hereinafter referred to as either "Party B" or "Pledgor")

**Paragraph 13. Elections and Variables**

(a)    **Security Interest for "Obligations".**  The term "**Obligations**" as used in this Annex includes the following additional obligations: None.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    "**Delivery Amount**" has the meaning specified in Paragraph 3(a).

        (2)    "**Return Amount**" has the meaning specified in Paragraph 3(b).

        (3)    "**Credit Support Amount**" has the meaning specified in Paragraph 3; provided, however, that in the event that the sum of the Independent Amounts applicable to Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor.

    (ii)    **Eligible Collateral.**  The following items will qualify as "**Eligible Collateral**" for the party specified:

| Collateral Type | | Party B | Valuation Percentage |
|---|---|---|---|
| (A) | Assets acceptable to the Secured Party as provided in a Confirmation. | [X] | To Be Determined. |

    (iii)    **Other Eligible Support.**  The following items will qualify as "**Other Eligible Support**" for the party specified: Not applicable.

    (iv)    **Thresholds.**

        (1)    "**Independent Amount**" shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

        (2)    "**Threshold**" means, with respect to Party B, USD zero.

        (3)    "**Minimum Transfer Amount**" means, with respect to Party B, USD 50,000, and with respect to Party A, USD 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Pledgor has occurred and is continuing, then the Minimum Transfer Amount with respect to Pledgor shall be USD zero.

        (4)    **Rounding.**  The Delivery Amount and the Return Amount shall be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

    (i)    "**Valuation Agent**" means Party A.

    (ii)    "**Valuation Date**" means any Local Business Day.

11

(iii) "Valuation Time" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) "Notification Time" means 3:00 p.m., New York time, on a Local Business Day.

(d) **Conditions Precedent and Secured Party's Rights and Remedies.** The following Termination Events will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party B |
| --- | --- |
| Illegality | [X] |
| Tax Event | [X] |
| Tax Event Upon Merger | [X] |
| Credit Event Upon Merger | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule. | [X] |

(e) **Substitution.**

(i) "**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

(ii) **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f) **Dispute Resolution**

(i) "**Resolution Time**" means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii) **Value.** For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

(iii) **Alternative.** Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral.**

(i) **Eligibility to Hold Posted Collateral; Custodians.**

Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) The Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party A is: Not applicable.

(ii) **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A. Party A and Party B intend that the Secured Party's use of Posted Collateral consisting of securities pursuant to the provisions of Paragraph 6(c) shall constitute a transfer of securities by the Pledgor to the Secured Party pursuant to an agreement meeting the requirements of Section 1058 of the U.S. Internal Revenue Code of 1986, as

12

amended (the "Code"), and Pledgor agrees to take all reasonable steps necessary to ensure that any such transfer will qualify for nonrecognition treatment pursuant to such Section 1058.

(h)   **Distributions and Interest Amount.**

    (i)   **Interest Rate.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

    (ii)   **Transfer of Interest Amount.** The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii)   **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i)   **Additional Representation(s).** Not applicable.

(j)   **"Other Eligible Support and Other Posted Support."**

    (i)   **"Value"** with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

    (ii)   **"Transfer"** with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

(k)   **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l)   **Addresses for Transfers.** As agreed between the parties from time to time.

(m)   **Other Provisions.**

    (i)   **No Disposition.** Without the prior written consent of Secured Party, Pledgor agrees that it will not sell, assign, transfer, exchange or otherwise dispose of, or grant any right with respect to, Posted Collateral, nor will it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any of the Posted Collateral, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Annex.

    (ii)   **Agreement as to Single Secured Party and Pledgor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, (a) the term *"Secured Party"* as used in this Annex means only Party A, (b) the term *"Pledgor"* as used in this Annex means only Party B, (c) only Party B makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party B will be required to make transfers of Eligible Credit Support hereunder.

    (iii)   **Local Business Day.** For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

    (iv)   **Events of Default.** Paragraph 7(i) is hereby amended by deleting the word "two" and inserting in lieu thereof the word "one".

    (v)   **No offset.** The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

        (c)   *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| | |
|---|---|
| **LEHMAN BROTHERS OTC DERIVATIVES INC.** | **EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of Survivorship** |
| *(Name of Party A)* | *(Name of Party B)* |

By: _____

Name:

Title:          **Scott Sefton**

Date:           **Vice President**

6/12/07

By: _____

Name:    Edward J. Agostini

Date:    23 APR. 2007.

By: _____

Name:    Sylvia Agostini

Date:    4/23/07

# EXHIBIT  G

# LEHMAN BROTHERS

**Transaction**

Date:  7 May, 2007

To:  Ed Agostini Living Trust dated 5/12/2000
20 Suttor Place S # 7D
New York, NY 10022

From:  Lehman Brothers, Inc acting as Agent
Lehman Brothers OTC Derivatives Inc., acting as Principal
Andrew Yare - Confirmations Group
Facsimile:  (+1) 646-885-9546 (United States of America)
Telephone:  212-526-9986

Ref. Numbers: Risk ID: N0705▮▮ / Effort ID: N135▮▮ / Global Deal ID: 303▮▮

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers OTC Derivatives Inc. ("Party A") and Ed Agostini Living Trust dated 5/12/2000 ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. **Lehman Brothers OTC Derivatives Inc. is not a member of the Securities Investor Protection Corporation.** This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 19 April, 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions", in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which t is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Lehman Brothers
745 SEVENTH AVENUE,
NEW YORK NY 10019

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | May 2, 2007 |
| Seller: | Party B |
| Buyer: | Party A |
| Shares: | The common stock of United Parcel Service CL-B (the "Issuer"); Ticker symbol: UPS |
| Number of Shares: | 13,513 |
| Prepayment: | Applicable |
| Prepayment Amount: | USD753,429.18 |
| Prepayment Date: | May 7, 2007 |
| Variable Obligation: | Applicable |
| Forward Floor Price: | USD70.13318 |
| Forward Cap Price: | USD84.15982 |
| Exchange(s): | New York Stock Exchange |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The close of trading on the Exchange, without regard to extended trading hours. |
| Valuation Date: | May 2, 2011 |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method Election: | Applicable |
| Electing Party: | Seller |
| Settlement Method Election Date: | April 27, 2011 |

| | |
|---|---|
| Default Settlement Method: | Physical Settlement |
| **Cash Settlement Terms:** | |
| Cash Settlement: | Applicable, provided that Party B (i) delivers written notice of such election to Party A on or prior to the Settlement Method Election Date and (ii) pays the Election Amount in immediately available funds on the Settlement Method Election Date. For the avoidance of doubt, Physical Settlement shall apply should Party B not provide such notice and pay the Election Amount as described herein. |
| | If Cash Settlement applies, then Party B will pay the Cash Settlement Amount *minus* the Election Amount received on the Settlement Method Election Date to Party A on the Cash Settlement Payment Date. If the Election Amount exceeds the Cash Settlement Amount, then Party A will pay the excess to Party B on the Cash Settlement Payment Date. |
| Settlement Currency: | USD |
| Settlement Price: | The official closing price per Share quoted by the Exchange at the Valuation Time on the Valuation Date. |
| Cash Settlement Payment Date: | Three (3) Currency Business Days after the Valuation Date |
| Election Amount: | USD Cash equal to the lesser of (i) 50% *multiplied by* the Number of Shares *multiplied by* the Forward Floor Price or (ii) 150% *multiplied by* the Number of Shares *multiplied by* the closing price per Share quoted by the Exchange on the Exchange Business Day immediately preceding the Settlement Method Election Date at the Valuation Time, without regard to extended or after hours trading. |
| **Physical Settlement Terms** | |
| Physical Settlement: | Applicable |
| **Dividends:** | |
| Dividend Amount: | Ex-Amount minus USD0.42 per Share (the "Expected Dividend"), including the Relevant Rate of Return. For purposes of this definition, "gross cash dividends" shall include all cash dividends. |
| Dividend Period: | Second Period |

| | |
|---|---|
| Relevant Rate of Return: | The return that may be earned on an investment of the Ex-Amount minus the Expected Dividend at the Relevant Rate for the number of days from and including the ex-dividend date to and including the final day of the Dividend Period. The "Relevant Rate" means the prevailing overnight USD-Federal Funds-H.15 rate. |
| Dividend Adjustment: | On each related ex-dividend date, if the Dividend Amount is greater than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by subtracting the Dividend Amount from each. On each related ex-dividend date, if the Dividend Amount is less than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by adding the absolute value of the Dividend Amount to each. |
| Excess Dividend Amount: | The sum of all Dividend Amounts multiplied by the Number of Shares |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Cancellation and Payment |
| | (Calculation Agent Determination) |
| Share-for-Combined: | Modified Calculation Agent Adjustment |

Tender Offer:    Applicable

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| New Shares: | The definition of "New Shares" in Section 12.1 of the Equity Definitions shall be amended by deleting subsection (i) in its entirety and replacing it with the following: "(i) publicly quoted, traded or listed on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market and" |

| | |
|---|---|
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| Modified Calculation Agent Adjustment: | For greater certainty, the definition of "Modified Calculation Adjustment" in Sections 12.2 and 12.3 of the Equity Definitions shall be amended by adding the following italicized language after the stipulated parenthetical provision: "(including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) *from the Announcement Date to the Merger Date (Section 12.2) or Tender Offer Date (Section 12.3),*" |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |
| | (Calculation Agent Determination) |
| Delisting: | The definition of "Delisting" in Section 12.6 of the Equity Definitions shall be deleted in its entirety and replaced with the following: "'Delisting' means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market" |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Failure to Deliver: | Applicable |
| Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen (15) days of the |

Risk ID: N0705███ / Effort ID: 135██ / Global Deal ID: 3033███

institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| | |
|---|---|
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Increased Cost of Stock Borrow: | Applicable. Section 12.9(a)(viii) of the Equity Definitions shall be deleted in its entirety and replaced with the following: |

"Increased Cost of Stock Borrow" means that the Hedging Party would earn a Stock Collateral Rate that is less than the Initial Stock Loan Rate. For greater certainty, the Stock Collateral Rate will be deemed to be less than the Initial Stock Loan Rate if the spread below the applicable floating rate increases.

Section 12.9 (b)(v) of the Equity Definitions is amended by deleting all references to "a rate equal to or less than the Initial Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Initial Stock Loan Rate".

"Stock Collateral Rate" means the rate of return on collateral posted in connection with any Shares borrowed in connection with a Transaction, net of any costs or fees (including, for greater certainty, any lender's borrow fees).

| | |
|---|---|
| Initial Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent and as adjusted by the Calculation Agent to reflect any subsequent Price Adjustment due to an Increased Cost of Stock Borrow |
| Loss of Stock Borrow: | Section 12.9(a)(vii) and Section 12.9(b)(iv) of the Equity Definitions are amended by deleting all references to "a rate equal to or less than the Maximum Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Minimum Stock Loan Rate." For greater certainty, the Stock Collateral Rate will be deemed to be greater than the Minimum Stock Loan Rate if the spread below the applicable floating rate decreases. |

| | |
|---|---|
| Minimum Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent |
| Hedging Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |
| Determining Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| Additional Provision: | If a Merger Date or Tender Offer Date is scheduled to be after the Expiration Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Valuation Date or the Final Averaging Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect. |
| Collateral: | Party B shall Transfer the Independent Amount to Party A on the Trade Date (which Independent Amount shall constitute Eligible Collateral with respect to Party B). "Independent Amount" means, with respect to Party B for this Transaction, an amount of Shares equal to the Number of Shares. The Independent Amount shall include all Distributions with respect to all Posted Collateral. Upon four Business Days notice, Party B may, in accordance with the terms of the Credit Support Annex, Transfer Equivalent Collateral as Substitute Credit Support. The parties agree that the transfer of the Independent Amount constitutes a delivery of Shares subject to the Representation and Agreement set forth in Section 9.11 of the Equity Definitions. The parties agree that Party B's Exposure (as defined in the Credit Support Annex) under this Transaction shall be zero. The parties agree that Party A's Exposure under this Transaction shall be zero upon Party B's transfer to Party A of the Independent Amount with respect to Party B. Notwithstanding any provision to the contrary in the Credit Support Annex, the |

Independent Amount shall be delivered by Party B without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until all of Party B's obligations with respect to this Transaction have been satisfied.

"Equivalent Collateral" means Collateral of a type and in an amount satisfactory to Party A, in its sole discretion.

Party A and Party B agree that, notwithstanding any provision to the contrary in the Agreement (including, but not limited to, Paragraph 6(c)(i) of the Credit Support Annex, if any), Party A may not rehypothecate any Shares constituting Posted Collateral and the Independent Amount delivered to Party A by Party B pursuant to this Transaction. For the avoidance of doubt, this provision shall not limit Party A's right to pledge all or a portion of the Shares to third parties.

## Miscellaneous:

Additional Provision:

The Agent will furnish Party B upon written request a statement as to the source and amount of any remuneration received or to be received by the Agent in connection with the Transaction evidenced hereby.

Additional Representations and Warranties of Party B

(i) Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(ii) neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction.

(iii) Party B (A) is not an "affiliate" of the Issuer, as such term is defined in Rule 144 under the Securities Act of 1933, as amended (the "1933 Act"), (B) nor is it a counterparty entering into this Transaction on behalf of the Issuer or any affiliate thereof, (C) nor is it required to file reports with respect to the Shares or the Issuer pursuant to Sections 13(d) or 16(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act");

(iv) Party B shall notify Party A immediately of its intention to take any action that could reasonably be

expected to result in Party B becoming (A) an "affiliate" of the Issuer, within the meaning of Rule 144 under the 1933 Act, or (B) an "insider" of the Issuer within the meaning of Section 16 under the 1934 Act. Party B shall not take any such action without Party A's permission. Failure to notify Party A or to obtain Party A's permission in connection with any action taken in violation of this provision shall constitute an Additional Termination Event with respect to which Party B shall be the sole Affected Party;

(v) Party B is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

(vi) Party B's entry into this Transaction, any sale of Shares hereunder and Party A's exercise of all rights and remedies hereunder complies with and is not in any way limited by (A) any trading or "blackout" policies of the Issuer or (B) any other conditions or restrictions imposed by the Issuer on the sale, transfer, loan, pledge, disposition or other use by its employees of any Shares.

**Calculation Agent:**                    Lehman Brothers, Inc

THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,

**Lehman Brothers OTC Derivatives Inc.**

By:
Name: Anatoly Kozlov
Title:  Authorized Signatory

Accepted and agreed to:

**Ed Agostini Living Trust dated 5/12/2000**

By:
Name:
Title:

I xecution time will be furnished upon C sunterparty's written request.

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 7 May, 2007 |
| To: | Sylvia Agostini Living Trust dated 5/12/2000 |
| | 20 Sutton Place S # 7D |
| | New York, NY 10022 |
| From: | Lehman Brothers, Inc acting as Agent |
| | Lehman Brothers OTC Derivatives Inc., acting as Principal |
| | Andrew Fare - Confirmations Group |
| | Facsimile:    (+1) 646-885-9546 (United States of America) |
| | Telephone:    212-526-9986 |
| Ref. Numbers: | Risk ID: N0705███ / Effort ID: N135█ / Global Deal ID: 303█ |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers OTC Derivatives Inc. ("Party A") and Sylvia Agostini Living Trust dated 5/12/2000 ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. **Lehman Brothers OTC Derivatives Inc. is not a member of the Securities Investor Protection Corporation.** This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 19 April, 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Lehman Brothers
745 SEVENTH AVENUE,
NEW YORK NY 10019

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | May 2, 2007 |
| Seller: | Party B |
| Buyer: | Party A |
| Shares: | The common stock of United Parcel Service CL-B (the "Issuer"); Ticker symbol: UPS |
| Number of Shares: | 24 087 |
| Prepayment: | Applicable |
| Prepayment Amount: | USD1,342,991.84 |
| Prepayment Date: | May 7, 2007 |
| Variable Obligation: | Applicable |
| Forward Floor Price: | USD70.13318 |
| Forward Cap Price: | USD84.15982 |
| Exchange(s): | New York Stock Exchange |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The close of trading on the Exchange, without regard to extended trading hours. |
| Valuation Date: | May 2, 2011 |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method Election: | Applicable |
| Electing Party: | Seller |
| Settlement Method Election Date: | April 27, 2011 |

| | |
|---|---|
| Default Settlement Method: | Physical Settlement |
| **Cash Settlement Terms:** | |
| Cash Settlement: | Applicable, provided that Party B (i) delivers written notice of such election to Party A on or prior to the Settlement Method Election Date and (ii) pays the Election Amount in immediately available funds on the Settlement Method Election Date. For the avoidance of doubt, Physical Settlement shall apply should Party B not provide such notice and pay the Election Amount as described herein. |
| | If Cash Settlement applies, then Party B will pay the Cash Settlement Amount *minus* the Election Amount received on the Settlement Method Election Date to Party A on the Cash Settlement Payment Date. If the Election Amount exceeds the Cash Settlement Amount, then Party A will pay the excess to Party B on the Cash Settlement Payment Date. |
| Settlement Currency: | USD |
| Settlement Price: | The official closing price per Share quoted by the Exchange at the Valuation Time on the Valuation Date. |
| Cash Settlement Payment Date: | Three (3) Currency Business Days after the Valuation Date |
| Election Amount: | USD Cash equal to the lesser of (i) 50% *multiplied by* the Number of Shares *multiplied by* the Forward Floor Price or (ii) 150% *multiplied by* the Number of Shares *multiplied by* the closing price per Share quoted by the Exchange on the Exchange Business Day immediately preceding the Settlement Method Election Date at the Valuation Time, without regard to extended or after hours trading. |
| **Physical Settlement Terms** | |
| Physical Settlement: | Applicable |
| **Dividends:** | |
| Dividend Amount: | Ex-Amount minus USD0.42 per Share (the "Expected Dividend"), including the Relevant Rate of Return. For purposes of this definition, "gross cash dividends" shall include all cash dividends. |
| Dividend Period: | Second Period |

| | |
|---|---|
| Relevant Rate of Return: | The return that may be earned on an investment of the Ex-Amount minus the Expected Dividend at the Relevant Rate for the number of days from and including the ex-dividend date to and including the final day of the Dividend Period. The "Relevant Rate" means the prevailing overnight USD-Federal Funds-H.15 rate. |
| Dividend Adjustment: | Or each related ex-dividend date, if the Dividend Amount is greater than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by subtracting the Dividend Amount from each.. On each related ex-dividend date, if the Dividend Amount is less than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by adding the absolute value of the Dividend Amount to each. |
| Excess Dividend Amount: | The sum of all Dividend Amounts multiplied by the Number of Shares |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Cancellation and Payment |
| | (Calculation Agent Determination) |
| Share-for-Combined: | Modified Calculation Agent Adjustment |

| | |
|---|---|
| Tender Offer: | Applicable |

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| New Shares: | The definition of "New Shares" in Section 12.1 of the Equity Definitions shall be amended by deleting subsection (i) in its entirety and replacing it with the following: "(i) publicly quoted, traded or listed on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market and" |

| | |
|---|---|
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| Modified Calculation Agent Adjustment: | For greater certainty, the definition of "Modified Calculation Adjustment" in Sections 12.2 and 12.3 of the Equity Definitions shall be amended by adding the following italicized language after the stipulated parenthetical provision: "(including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) *from the Announcement Date to the Merger Date (Section 12.2) or Tender Offer Date (Section 12.3),*" |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |
| | (Calculation Agent Determination) |
| Delisting: | The definition of "Delisting" in Section 12.6 of the Equity Definitions shall be deleted in its entirety and replaced with the following: "'Delisting' means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market" |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Failure to Deliver: | Applicable |
| Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen (15) days of the |

institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| | |
|---|---|
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Increased Cost of Stock Borrow: | Applicable. Section 12.9(a)(viii) of the Equity Definitions shall be deleted in its entirety and replaced with the following: |

"Increased Cost of Stock Borrow" means that the Hedging Party would earn a Stock Collateral Rate that is less than the Initial Stock Loan Rate. For greater certainty, the Stock Collateral Rate will be deemed to be less than the Initial Stock Loan Rate if the spread below the applicable floating rate increases.

Section 12.9 (b)(v) of the Equity Definitions is amended by deleting all references to "a rate equal to or less than the Initial Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Initial Stock Loan Rate".

"Stock Collateral Rate" means the rate of return on collateral posted in connection with any Shares borrowed in connection with a Transaction, net of any costs or fees (including, for greater certainty, any lender's borrow fees).

| | |
|---|---|
| Initial Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent and as adjusted by the Calculation Agent to reflect any subsequent Price Adjustment due to an Increased Cost of Stock Borrow |
| Loss of Stock Borrow: | Section 12.9(a)(vii) and Section 12.9(b)(iv) of the Equity Definitions are amended by deleting all references to "a rate equal to or less than the Maximum Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Minimum Stock Loan Rate." For greater certainty, the Stock Collateral Rate will be deemed to be greater than the Minimum Stock Loan Rate if the spread below the applicable floating rate decreases. |

| | |
|---|---|
| Minimum Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent |
| Hedging Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |
| Determining Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| Additional Provision: | If a Merger Date or Tender Offer Date is scheduled to be after the Expiration Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Valuation Date or the Final Averaging Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect. |
| Collateral: | Party B shall Transfer the Independent Amount to Party A on the Trade Date (which Independent Amount shall constitute Eligible Collateral with respect to Party B). "Independent Amount" means, with respect to Party B for this Transaction, an amount of Shares equal to the Number of Shares. The Independent Amount shall include all Distributions with respect to all Posted Collateral. Upon four Business Days notice, Party B may, in accordance with the terms of the Credit Support Annex, Transfer Equivalent Collateral as Substitute Credit Support. The parties agree that the transfer of the Independent Amount constitutes a delivery of Shares subject to the Representation and Agreement set forth in Section 9.11 of the Equity Definitions. The parties agree that Party B's Exposure (as defined in the Credit Support Annex) under this Transaction shall be zero. The parties agree that Party A's Exposure under this Transaction shall be zero upon Party B's transfer to Party A of the Independent Amount with respect to Party B. Notwithstanding any provision to the contrary in the Credit Support Annex, the |

Independent Amount shall be delivered by Party B without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until all of Party B's obligations with respect to this Transaction have been satisfied.

"Equivalent Collateral" means Collateral of a type and in an amount satisfactory to Party A, in its sole discretion.

Party A and Party B agree that, notwithstanding any provision to the contrary in the Agreement (including, but not limited to, Paragraph 6(c)(i) of the Credit Support Annex, if any), Party A may not rehypothecate any Shares constituting Posted Collateral and the Independent Amount delivered to Party A by Party B pursuant to this Transaction. For the avoidance of doubt, this provision shall not limit Party A's right to pledge all or a portion of the Shares to third parties.

**Miscellaneous:**

Additional Provision:

The Agent will furnish Party B upon written request a statement as to the source and amount of any remuneration received or to be received by the Agent in connection with the Transaction evidenced hereby.

Additional Representations and Warranties of Party B

(i) Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(ii) neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction.

(iii) Party B (A) is not an "affiliate" of the Issuer, as such term is defined in Rule 144 under the Securities Act of 1933, as amended (the "1933 Act"), (B) nor is it a counterparty entering into this Transaction on behalf of the Issuer or any affiliate thereof, (C) nor is it required to file reports with respect to the Shares or the Issuer pursuant to Sections 13(d) or 16(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act");

(iv) Party B shall notify Party A immediately of its intention to take any action that could reasonably be

expected to result in Party B becoming (A) an "affiliate" of the Issuer, within the meaning of Rule 144 under the 1933 Act, or (B) an "insider" of the Issuer within the meaning of Section 16 under the 1934 Act. Party B shall not take any such action without Party A's permission. Failure to notify Party A or to obtain Party A's permission in connection with any action taken in violation of this provision shall constitute an Additional Termination Event with respect to which Party B shall be the sole Affected Party;

(v) Party B is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

(vi) Party B's entry into this Transaction, any sale of Shares hereunder and Party A's exercise of all rights and remedies hereunder complies with and is not in any way limited by (A) any trading or "blackout" policies of the Issuer or (B) any other conditions or restrictions imposed by the Issuer on the sale, transfer, loan, pledge, disposition or other use by its employees of any Shares.

**Calculation Agent:**                                       Lehman Brothers, Inc

**THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,

**Lehman Brothers OTC Derivatives Inc.**

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title: Authorized Signatory

Execution time will be furnished upon Counterparty's written request.

Accepted and agreed to:

**Sylvia   Agostini   Living   Trust   dated 5/12/2000**

By:
Name:
Title:

# LEHMAN BROTHERS

## Transaction

Date:        7 May, 2007

To:          EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of
             Survivorship
             20 Sutton Place S # 7D
             New York, NY 10022

From:        Lehman Brothers, Inc acting as Agent
             Lehman Brothers OTC Derivatives Inc., acting as Principal
             Andrew Yare - Confirmations Group
             Facsimile:     (+1) 646-885-9546 (United States of America)
             Telephone:     212-526-9986

Ref. Numbers: Risk ID: N00705 ███ / Effort ID: N135 ███ / Global Deal ID: 303 ███

---

Dear Sir and Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers OTC Derivatives Inc. ("Party A") and EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of Survivorship ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. **Lehman Brothers OTC Derivatives Inc. is not a member of the Securities Investor Protection Corporation.**

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 19 April, 2007, as amended and supplemented from time to time, between Party A and Party B (the "Agreement"). All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("LBI") is acting as agent on behalf of Party A and Party B for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | May 2, 2007 |
| Seller: | Party B |
| Buyer: | Party A |
| Shares: | The common stock of United Parcel Service CL-B (the "Issuer"); Ticker symbol: UPS |
| Number of Shares: | 12,400 |
| Prepayment: | Applicable |
| Prepayment Amount: | USD691,372.89 |
| Prepayment Date: | May 7, 2007 |
| Variable Obligation: | Applicable |
| Forward Floor Price: | USD70.13318 |
| Forward Cap Price: | USD84.15982 |
| Exchange(s): | New York Stock Exchange |
| Related Exchange(s): | All Exchanges |
| Disrupted Day: | The definition of "Disrupted Day" in Section 6.4 of the Equity Definitions shall be amended by adding the following sentence after the first sentence: "A Scheduled Trading Day on which a Related Exchange fails to open during its regular trading session will not be a Disrupted Day if the Calculation Agent determines that such failure will not have a material impact on Party A's ability to unwind any related hedging transactions." |

**Valuation:**

| | |
|---|---|
| Valuation Time: | The close of trading on the Exchange, without regard to extended trading hours. |
| Valuation Date: | May 2, 2011 |

**Settlement Terms:**

| | |
|---|---|
| Settlement Method Election: | Applicable |

| | |
|---|---|
| Electing Party: | Seller |
| Settlement Method Election Date: | April 27, 2011 |
| Default Settlement Method: | Physical Settlement |

**Cash Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable, provided that Party B (i) delivers written notice of such election to Party A on or prior to the Settlement Method Election Date and (ii) pays the Election Amount in immediately available funds on the Settlement Method Election Date. For the avoidance of doubt, Physical Settlement shall apply should Party B not provide such notice and pay the Election Amount as described herein. |
| | If Cash Settlement applies, then Party B will pay the Cash Settlement Amount *minus* the Election Amount received on the Settlement Method Election Date to Party A on the Cash Settlement Payment Date. If the Election Amount exceeds the Cash Settlement Amount, then Party A will pay the excess to Party B on the Cash Settlement Payment Date. |
| Settlement Currency: | USD |
| Settlement Price: | The official closing price per Share quoted by the Exchange at the Valuation Time on the Valuation Date. |
| Cash Settlement Payment Date: | Three (3) Currency Business Days after the Valuation Date |
| Election Amount: | USD Cash equal to the lesser of (i) 50% *multiplied by* the Number of Shares *multiplied by* the Forward Floor Price or (ii) 150% *multiplied by* the Number of Shares *multiplied by* the closing price per Share quoted by the Exchange on the Exchange Business Day immediately preceding the Settlement Method Election Date at the Valuation Time, without regard to extended or after hours trading. |

**Physical Settlement Terms**

| | |
|---|---|
| Physical Settlement: | Applicable |

**Dividends:**

| | |
|---|---|
| Dividend Amount: | Ex-Amount minus USD0.42 per Share (the "Expected Dividend"), including the Relevant Rate of Return. For purposes of this definition, "gross cash dividends" shall include all cash dividends. |
| Dividend Period: | Second Period |

Relevant Rate of Return:

The return that may be earned on an investment of the Ex-Amount minus the Expected Dividend at the Relevant Rate for the number of days from and including the ex-dividend date to and including the final day of the Dividend Period. The "Relevant Rate" means the prevailing overnight USD-Federal Funds-H.15 rate.

Dividend Adjustment:

On each related ex-dividend date, if the Dividend Amount is greater than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by subtracting the Dividend Amount from each.. On each related ex-dividend date, if the Dividend Amount is less than zero, then both the Forward Cap Price and the Forward Floor Price shall be adjusted by adding the absolute value of the Dividend Amount to each.

Excess Dividend Amount:

The sum of all Dividend Amounts multiplied by the Number of Shares

**Share Adjustments:**

Method of Adjustment:

Calculation Agent Adjustment

**Extraordinary Events:**

**Consequences of Merger Events:**

Share-for-Share:

Modified Calculation Agent Adjustment

Share-for-Other:

Cancellation and Payment

(Calculation Agent Determination)

Share-for-Combined:

Modified Calculation Agent Adjustment

Tender Offer:

Applicable

**Consequences of Tender Offers:**

Share-for-Share:

Modified Calculation Agent Adjustment

Share-for-Other:

Modified Calculation Agent Adjustment

Share-for-Combined:

Modified Calculation Agent Adjustment

New Shares:

The definition of "New Shares" in Section 12.1 of the Equity Definitions shall be amended by deleting subsection (i) in its entirety and replacing it with the following: "(i) publicly quoted, traded or listed on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market and"

| | |
|---|---|
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| Modified Calculation Agent Adjustment: | For greater certainty, the definition of "Modified Calculation Adjustment" in Sections 12.2 and 12.3 of the Equity Definitions shall be amended by adding the following italicized language after the stipulated parenthetical provision: "(including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) *from the Announcement Date to the Merger Date (Section 12.2) or Tender Offer Date (Section 12.3),*" |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |
| | (Calculation Agent Determination) |
| Delisting: | The definition of "Delisting" in Section 12.6 of the Equity Definitions shall be deleted in its entirety and replaced with the following: "'Delisting' means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on the New York Stock Exchange, the American Stock Exchange or the NASDAQ Global Select Market or the NASDAQ Global Market" |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Not Applicable |
| Failure to Deliver: | Applicable |
| Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen (15) days of the |

institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| | |
|---|---|
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Increased Cost of Stock Borrow: | Applicable. Section 12.9(a)(viii) of the Equity Definitions shall be deleted in its entirety and replaced with the following: |

"Increased Cost of Stock Borrow" means that the Hedging Party would earn a Stock Collateral Rate that is less than the Initial Stock Loan Rate. For greater certainty, the Stock Collateral Rate will be deemed to be less than the Initial Stock Loan Rate if the spread below the applicable floating rate increases.

Section 12.9 (b)(v) of the Equity Definitions is amended by deleting all references to "a rate equal to or less than the Initial Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Initial Stock Loan Rate".

"Stock Collateral Rate" means the rate of return on collateral posted in connection with any Shares borrowed in connection with a Transaction, net of any costs or fees (including, for greater certainty, any lender's borrow fees).

| | |
|---|---|
| Initial Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent and as adjusted by the Calculation Agent to reflect any subsequent Price Adjustment due to an Increased Cost of Stock Borrow |
| Loss of Stock Borrow: | Section 12.9(a)(vii) and Section 12.9(b)(iv) of the Equity Definitions are amended by deleting all references to "a rate equal to or less than the Maximum Stock Loan Rate" and replacing them with "a Stock Collateral Rate that is equal to or greater than the Minimum Stock Loan Rate." For greater certainty, the Stock Collateral Rate will be deemed to be greater than the Minimum Stock Loan Rate if the spread below the applicable floating rate decreases. |

| | |
|---|---|
| Minimum Stock Loan Rate: | The Stock Collateral Rate on the Trade Date, expressed as a floating reference rate plus or minus a spread, as determined by the Calculation Agent |
| Hedging Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |
| Determining Party: | Party A. For the avoidance of doubt, Party A shall be the Determining Party where applicable in connection with any Extraordinary Event. |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| Additional Provision: | If a Merger Date or Tender Offer Date is scheduled to be after the Expiration Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Valuation Date or the Final Averaging Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect. |
| **Collateral:** | Party B shall Transfer the Independent Amount to Party A on the Trade Date (which Independent Amount shall constitute Eligible Collateral with respect to Party B). "Independent Amount" means, with respect to Party B for this Transaction, an amount of Shares equal to the Number of Shares. The Independent Amount shall include all Distributions with respect to all Posted Collateral. Upon four Business Days notice, Party B may, in accordance with the terms of the Credit Support Annex, Transfer Equivalent Collateral as Substitute Credit Support. The parties agree that the transfer of the Independent Amount constitutes a delivery of Shares subject to the Representation and Agreement set forth in Section 9.11 of the Equity Definitions. The parties agree that Party B's Exposure (as defined in the Credit Support Annex) under this Transaction shall be zero. The parties agree that Party A's Exposure under this Transaction shall be zero upon Party B's transfer to Party A of the Independent Amount with respect to Party B. Notwithstanding any provision to the contrary in the Credit Support Annex, the |

Independent Amount shall be delivered by Party B without regard to the Minimum Transfer Amount and Party A shall have no obligation to return the Independent Amount to Party B until all of Party B's obligations with respect to this Transaction have been satisfied.

"Equivalent Collateral" means Collateral of a type and in an amount satisfactory to Party A, in its sole discretion.

Party A and Party B agree that, notwithstanding any provision to the contrary in the Agreement (including, but not limited to, Paragraph 6(c)(i) of the Credit Support Annex, if any), Party A may not rehypothecate any Shares constituting Posted Collateral and the Independent Amount delivered to Party A by Party B pursuant to this Transaction. For the avoidance of doubt, this provision shall not limit Party A's right to pledge all or a portion of the Shares to third parties.

**Miscellaneous:**

Additional Provision:

The Agent will furnish Party B upon written request a statement as to the source and amount of any remuneration received or to be received by the Agent in connection with the Transaction evidenced hereby.

Additional Representations and Warranties of Party B

(i) Party B represents to Party A (at all times until termination of this Transaction) that it is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(ii) neither Party A nor any of its affiliates has advised Party B with respect to any legal, regulatory, tax, accounting or economic consequences arising from this Transaction, and neither Party A nor any of its affiliates is acting as agent (other than LBI as dual agent if specified above), or advisor for Party B in connection with this Transaction.

(iii) Party B (A) is not an "affiliate" of the Issuer, as such term is defined in Rule 144 under the Securities Act of 1933, as amended (the "1933 Act"), (B) nor is it a counterparty entering into this Transaction on behalf of the Issuer or any affiliate thereof, (C) nor is it required to file reports with respect to the Shares or the Issuer pursuant to Sections 13(d) or 16(a) of the Securities Exchange Act of 1934, as amended (the "1934 Act");

(iv) Party B shall notify Party A immediately of its intention to take any action that could reasonably be

expected to result in Party B becoming (A) an "affiliate" of the Issuer, within the meaning of Rule 144 under the 1933 Act, or (B) an "insider" of the Issuer within the meaning of Section 16 under the 1934 Act. Party B shall not take any such action without Party A's permission. Failure to notify Party A or to obtain Party A's permission in connection with any action taken in violation of this provision shall constitute an Additional Termination Event with respect to which Party B shall be the sole Affected Party;

(v) Party B is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

(vi) Party B's entry into this Transaction, any sale of Shares hereunder and Party A's exercise of all rights and remedies hereunder complies with and is not in any way limited by (A) any trading or "blackout" policies of the Issuer or (B) any other conditions or restrictions imposed by the Issuer on the sale, transfer, loan, pledge, disposition or other use by its employees of any Shares.

**Calculation Agent:**                                      Lehman Brothers, Inc

**THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9546 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Lehman Brothers OTC Derivatives Inc.

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title: Authorized Signatory

Accepted and agreed to:

**EDWARD J. AGOSTINI and SYLVIA AGOSTINI as Joint Tenants with Rights of Survivorship**

By: _____
Name: Edward Agostini

By: _____
Name: Sylvia Agostini

execution time will be furnished upon Counterparty's written request.

# EXHIBIT  H



Print Page | Close Window

# Dividend History



**Dividends Declared (Per Share)**

2003: $0.92
2004: $1.12
2005: $1.32
2006: $1.52
2007: $1.68
2008*: $1.80
2009: $1.80
2010: $1.88
2011: $2.08 Annualized

## 2011

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 11/03/11 | 11/09/11 | 11/14/11 | 11/30/11 | $.52 | U.S. Currency |
| 08/11/11 | 08/18/11 | 08/22/11 | 09/07/11 | $.52 | U.S. Currency |
| 05/05/11 | 05/12/11 | 05/16/11 | 06/01/11 | $.52 | U.S. Currency |
| 02/03/11 | 02/10/11 | 02/14/11 | 03/02/11 | $.52 | U.S. Currency |

## 2010

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 11/04/10 | 11/10/10 | 11/15/10 | 12/01/10 | $.47 | U.S. Currency |
| 08/05/10 | 08/12/10 | 08/16/10 | 09/01/10 | $.47 | U.S. Currency |
| 05/06/10 | 05/12/10 | 05/17/10 | 06/02/10 | $.47 | U.S. Currency |
| 02/04/10 | 02/11/10 | 02/16/10 | 03/03/10 | $.47 | U.S. Currency |

## 2009

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 11/05/09 | 11/12/09 | 11/16/09 | 12/03/09 | $.45 | U.S. Currency |
| 08/13/09 | 08/20/09 | 08/24/09 | 09/09/09 | $.45 | U.S. Currency |
| 05/07/09 | 05/14/09 | 05/18/09 | 06/03/09 | $.45 | U.S. Currency |
| 02/11/09 | 02/19/09 | 02/23/09 | 03/10/09 | $.45 | U.S. Currency |

**Total of Dividends Paid in 2009: 1.8000**

## 2008

| Declared | Ex-Date | Record | Payable | Amount | Type |
|----------|---------|--------|---------|--------|------|
| 11/06/08 | 11/13/08 | 11/17/08 | 12/03/08 | $.45 | U.S. Currency |
| 08/14/08 | 08/21/08 | 08/25/08 | 09/09/08 | $.45 | U.S. Currency |
| 05/08/08 | 05/15/08 | 05/19/08 | 06/03/08 | $.45 | U.S. Currency |
| 01/31/08 | 02/07/08 | 02/11/08 | 03/04/08 | $.45 | U.S. Currency |
| 11/08/07 | 11/15/07 | 11/19/07 | 01/03/08 | $.42 | U.S. Currency |

**Total of Dividends Paid in 2008: 2.2200**

## 2007

| Declared | Ex-Date | Record | Payable | Amount | Type |
|----------|---------|--------|---------|--------|------|
| 08/29/07 | 09/06/07 | 09/10/07 | 09/17/07 | $.42 | U.S. Currency |
| 05/10/07 | 05/17/07 | 05/21/07 | 06/05/07 | $.42 | U.S. Currency |
| 02/08/07 | 02/15/07 | 02/20/07 | 03/06/07 | $.42 | U.S. Currency |
| 11/16/06 | 11/22/06 | 11/27/06 | 01/04/07 | $.38 | U.S. Currency |

**Total of Dividends Paid in 2007: 1.6400**

## 2006

| Declared | Ex-Date | Record | Payable | Amount | Type |
|----------|---------|--------|---------|--------|------|
| 08/10/06 | 08/17/06 | 08/21/06 | 09/06/06 | $.38 | U.S. Currency |
| 05/04/06 | 05/11/06 | 05/15/06 | 05/31/06 | $.38 | U.S. Currency |
| 02/09/06 | 02/16/06 | 02/21/06 | 03/07/06 | $.38 | U.S. Currency |
| 11/16/05 | 11/23/05 | 11/28/05 | 01/04/06 | $.33 | U.S. Currency |

**Total of Dividends Paid in 2006: 1.4700**

## 2005

| Declared | Ex-Date | Record | Payable | Amount | Type |
|----------|---------|--------|---------|--------|------|
| 08/11/05 | 08/18/05 | 08/22/05 | 09/07/05 | $.33 | U.S. Currency |
| 05/05/05 | 05/12/05 | 05/16/05 | 06/01/05 | $.33 | U.S. Currency |
| 02/09/05 | 02/17/05 | 02/22/05 | 03/09/05 | $.33 | U.S. Currency |
| 11/18/04 | 11/24/04 | 11/29/04 | 01/04/05 | $.28 | U.S. Currency |

**Total of Dividends Paid in 2005: 1.2700**

## 2004

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 08/12/04 | 08/19/04 | 08/23/04 | 09/08/04 | $.28 | U.S. Currency |
| 05/06/04 | 05/13/04 | 05/17/04 | 06/02/04 | $.28 | U.S. Currency |
| 02/12/04 | 02/19/04 | 02/23/04 | 03/09/04 | $.28 | U.S. Currency |
| 11/13/03 | 11/20/03 | 11/24/03 | 01/05/04 | $.25 | U.S. Currency |

**Total of Dividends Paid in 2004: 1.0900**

## 2003

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 08/14/03 | 08/21/03 | 08/25/03 | 09/09/03 | $.25 | U.S. Currency |
| 05/07/03 | 05/15/03 | 05/19/03 | 06/03/03 | $.21 | U.S. Currency |
| 02/13/03 | 02/20/03 | 02/24/03 | 03/11/03 | $.21 | U.S. Currency |
| 11/13/02 | 11/21/02 | 11/25/02 | 01/06/03 | $.19 | U.S. Currency |

**Total of Dividends Paid in 2003: 0.8600**

## 2002

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 08/14/02 | 08/22/02 | 08/26/02 | 09/10/02 | $.19 | U.S. Currency |
| 05/15/02 | 05/23/02 | 05/28/02 | 06/07/02 | $.19 | U.S. Currency |
| 02/14/02 | 02/25/02 | 02/27/02 | 03/08/02 | $.19 | U.S. Currency |
| 11/15/01 | 11/23/01 | 11/27/01 | 01/04/02 | $.19 | U.S. Currency |

**Total of Dividends Paid in 2002: 0.7600**

## 2001

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 08/15/01 | 08/24/01 | 08/28/01 | 09/07/01 | $.19 | U.S. Currency |
| 05/16/01 | 05/25/01 | 05/30/01 | 06/08/01 | $.19 | U.S. Currency |
| 02/20/01 | 02/22/01 | 02/26/01 | 03/09/01 | $.19 | U.S. Currency |
| 11/16/00 | 11/22/00 | 11/27/00 | 01/05/01 | $.17 | U.S. Currency |

**Total of Dividends Paid in 2001: 0.7400**

## 2000

| Declared | Ex-Date | Record | Payable | Amount | Type |
|---|---|---|---|---|---|
| 08/18/00 | 08/24/00 | 08/28/00 | 09/08/00 | $.17 | U.S. Currency |

| 05/18/00 | 05/25/00 | 05/30/00 | 06/09/00 | $.17 | U.S. Currency |
| 02/18/00 | 02/24/00 | 02/28/00 | 03/27/00 | $.17 | U.S. Currency |
| 11/18/99 | 11/24/99 | 11/29/99 | 01/07/00 | $.30 | U.S. Currency |

**Total of Dividends Paid in 2000: 0.8100**

\* 2000 dividend payment of $0.81 includes a semi-annual dividend declared in November 1999. Dividend payments
were changed to quarterly in February 2000.

# EXHIBIT    I

Broadcast Report

P  1
07/15/2011 16:17
Serial No.   57AE32080
TC:  1714388

| Destination | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| 1*16468859546 | 07-15 16:08 | 00:01:24 | 003/003 | OK | |
| 1*12123108007 | 07-15 16:12 | 00:00:43 | 003/003 | OK | |
| 1*12125267672 | 07-15 16:16 | 00:00:56 | 000/003 | No Ans | |

Note    TMR: Timer, POL: Poll, ORG: Original, FME: Frame Erase TX,
        MIX: Mixed Original, CALL: Manual Communication, CSRC: CSRC, FWD: Forward, PC: PC-FAX,
        BND: Bind, SP: Special Original, FCODE: F-Code, RTX: Re-Tx, RLY: Relay, MBX: Confidential,
        BUL:Bulletin, SIP:SIP-Fax, IPADR:IP Address Fax, I-FAX:Internet Fax

Result  OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
        TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
        Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full,
        LOVR:Receiving length Over, POVER:Receiving page Over, FIL:File Error,
        DC:Decode Error, MDN:MDN Response Error, DSN:DSN Response Error.



885 Third Avenue, 20th Floor
New York, NY 10022-4834
Tel (212) 209-3050
Fax (212) 371-5500

DATE:    July 15, 2011

| | | | | | |
|---|---|---|---|---|---|
| TO: | Lehman Brothers OTC Derivatives Inc. c/o Lehman Brothers Inc. Corporate Advisory Division Transaction Management Group | FAX: | 212.526.7672 | PHONE: | |
| CC: | Confirmations Group Robert J. Lemons, Esq. | FAX: | 646.885.9546 212.310.8007 | PHONE: | 212.526.9986 |
| FROM: | Craig J. Albert | FAX: | 212.371.5500 | PHONE: | 212.209.3061 |

Please see attached, which is transmitted on behalf of Sylvia Agostini Living Trust dated 5/12/2000, Edward Agostini Living Trust dated 5/12/2000 and Edward Agostini and Sylvia Agostini (JTWROS).

NO. PAGES:    2   + cover
REF NO.:    5554.01

This message is intended only for the use of the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately at 212 209-3050.



REITLER KAILAS & ROSENBLATT LLC

885 Third Avenue, 20th Floor
New York, NY 10022-4834
Tel (212) 209-3050
Fax (212) 371-5500

DATE:    July 15, 2011

| | | | | |
|---|---|---|---|---|
| TO: | Lehman Brothers OTC Derivatives Inc. c/o Lehman Brothers Inc. Corporate Advisory Division Transaction Management Group | FAX: | 212.526.7672 | PHONE: |
| CC: | Confirmations Group Robert J. Lemons, Esq. | FAX: | 646.885.9546 212.310.8007 | PHONE: 212.526.9986 |
| FROM: | Craig J. Albert | FAX: | 212.371.5500 | PHONE: 212.209.3061 |

Please see attached, which is transmitted on behalf of Sylvia Agostini Living Trust dated 5/12/2000, Edward Agostini Living Trust dated 5/12/2000 and Edward Agostini and Sylvia Agostini (JTWROS).

NO. PAGES:    __2__ + cover
REF NO.:    5554.01

This message is intended only for the use of the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately at 212 209-3050.

Edward J. Agostini
Sylvia Agostini
6365 Collins Ave., Apt. 3603
Miami Beach, FL 33143

July 15, 2011

**BY FACSIMILE (212) 526-7672**
Lehman Brothers OTC Derivatives Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Re:    Risk ID: N0705███ / Effort ID: N135███ / Global Deal ID: 303███
       Risk ID: N0705███ / Effort ID: N135███ / Global Deal ID: 303███
       Risk ID: N0705███ / Effort ID: N135███ / Global Deal ID: 303███

Ladies and Gentlemen:

We write on behalf of ourselves (as joint tenants) and as trustees of the Sylvia Agostini Living Trust dated 5/12/2000 and the Edward Agostini Living Trust dated 5/12/2000 in reference to the above-numbered transactions, and with respect to the associated ISDA Master Agreements, Credit Support Annexes and Confirmations (the "Derivative Contracts").

The Valuation Date for each of the Derivative Contracts has now passed.  Kindly perform the calculations required to be performed by the Calculation Agent and by the Valuation Agent, including calculation of the Return Amount under Paragraph 3(b) of the Credit Support Annexes, retain the amounts obligated to be delivered by us to Lehman Brothers OTC Derivatives Inc. ("LOTC") in respect of physical settlement, net of the amounts owed by LOTC to us, and deliver to us the balance in the form of United Parcel Service Class B Common Shares.  The foregoing balance is not property of any bankruptcy estate; it is our property.

Please be advised that this Notice is being given solely to preserve our rights under the aforementioned documents, and is not intended to request or to require the performance of any act that could be deemed to violate the automatic stay that is in effect with respect to the Chapter 11 case of LOTC or any other Lehman entity.  To the extent that your ability to perform your obligations does not require an order of the Bankruptcy Court, we request that you do so.

Please note, for your records, our change of address for purposes of notices given under the Derivative Contracts. Our address is 6365 Collins Ave., Apt. 3603, Miami Beach, FL 33143. Our telephone number is 305 790 3948.

Please direct all correspondence regarding this matter to my attorney, Craig J. Albert, Esq., Reitler Kailas & Rosenblatt LLC, 885 3rd Avenue, 20th Floor, New York, NY 10022; Tel. (212) 209-3061.

Very truly yours,

Edward J. Agostini
Individually and as Trustee of
Edward Agostini Living Trust dated
5/12/2000

Sylvia Agostini
Individually and as Trustee of
Sylvia Agostini Living Trust dated
5/12/2000

# EXHIBIT   J

| | JOINT ACCOUNT | SA TRUST | EA TRUST | Notes & References |
|---|---|---|---|---|
| Forward Floor Price | $70.13318 | $70.13318 | $70.13318 | 2002 ISDA Equity Derivatives Definitions § 4.1(b); Confirmation, p.2 |
| Forward Cap Price | $84.15982 | $84.15982 | $84.15982 | 2002 ISDA Equity Derivatives Definitions § 4.1(c); Confirmation, p.2 |
| Adjusted Forward Floor Price | $69.49318 | $69.49318 | $69.49318 | Confirmation, p.4 (Dividend Adjustment) |
| Adjusted Forward Cap Price | $83.51982 | $83.51982 | $83.51982 | Confirmation, p.4 (Dividend Adjustment) |
| Valuation Date | 5/2/2011 | 5/2/2011 | 5/2/2011 | 2002 ISDA Equity Derivatives Definitions § 6.2; Confirmation, p.2 |
| Settlement Price | $74.30 | $74.30 | $74.30 | Market data (closing price on Valuation Date); see Confirmation, p.3 |
| Posted Collateral (number of shares) | 12,400 | 24,087 | 13,513 | Credit Support Annex ¶ 12; Confirmation, p.2 |
| Number of shares to be delivered by Seller | 11,509 | 22,357 | 12,542 | 2002 ISDA Equity Derivatives Definitions § 9.5 |
| **Number of shares to be returned by LOTC to Seller** | **891** | **1,730** | **971** | |
| | | | | |
| Dividends not yet forwarded by LOTC to Agostini (during Forward Contract term) | $57,660.00 | $112,004.55 | $62,835.45 | Dividends attributable to all Posted Collateral, from date of Chapter 11 Petition to Valuation Date |
| Dividends not yet forwarded by LOTC to Agostini (after Forward Contract term) | $1,389.96 | $2,698.80 | $1,514.76 | Dividends attributable to shares required to be returned, from Valuation Date to present |
| minus Excess Dividend Amounts | ($6,696.00) | ($13,006.98) | ($7,297.02) | 2002 ISDA Equity Derivatives Definitions § 10.7; Confirmation, p.4 |
| minus Relevant Rate of Return | ($351.10) | ($682.03) | ($382.61) | Confirmation, pp.3-4 |
| **Cash to be paid by LOTC to Sellers** | **$52,002.86** | **$101,014.34** | **$56,670.58** | |