Exhibit 1

Excerpt of Credit Agreement, schedules and exhibits deleted

**EXECUTION COPY**

$1,350,000,000

CREDIT AGREEMENT

among

BLUE JAY ACQUISITION CORPORATION

BLUE JAY MERGER CORPORATION
as the Initial Borrower,

SEQUA CORPORATION
as the Surviving Borrower

The Several Lenders from Time to Time Parties Hereto,

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and Collateral Agent,

LEHMAN BROTHERS INC.,

CITIGROUP GLOBAL MARKETS INC.

and

J.P. MORGAN SECURITIES INC.,
as Syndication Agents,

C.I.T. LEASING CORPORATION,
HSBC BANK plc,
as Documentation Agents,

JPMORGAN CHASE BANK, N.A.,
as Issuing Lender

and

LEHMAN BROTHERS INC.,

CITIGROUP GLOBAL MARKETS INC.

and

J.P. MORGAN SECURITIES INC.
as Joint Lead Arrangers and Joint Bookrunners

Dated as of December 3, 2007

NY1:#3465828

## TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS .................................................................................................... 1

    1.1    Defined Terms ............................................................................................ 1
    1.2    Other Definitional Provisions .................................................................. 39
    1.3    Currencies; Currency Equivalents; Euro ................................................ 39

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS ................................................ 40

    2.1    Term Commitments .................................................................................. 40
    2.2    Procedure for Term Loan Borrowing ...................................................... 40
    2.3    Repayment of Term Loans ....................................................................... 41
    2.4    Revolving Commitments .......................................................................... 41
    2.5    Procedure for Revolving Loan Borrowing .............................................. 41
    2.6    Swingline Commitment ............................................................................ 42
    2.7    Procedure for Swingline Borrowing; Refunding of Swingline Loans ..... 43
    2.8    Repayment of Loans ................................................................................ 44
    2.9    Commitment Fees, etc. ............................................................................ 45
    2.10   Termination or Reduction of Revolving Commitments ........................... 45
    2.11   Optional Prepayments .............................................................................. 45
    2.12   Mandatory Prepayments .......................................................................... 46
    2.13   Conversion and Continuation Options .................................................... 47
    2.14   Minimum Amounts and Maximum Number of Eurocurrency Tranches .... 48
    2.15   Interest Rates and Payment Dates ........................................................... 48
    2.16   Computation of Interest and Fees ........................................................... 49
    2.17   Inability to Determine Interest Rate ........................................................ 49
    2.18   Pro Rata Treatment and Payments .......................................................... 50
    2.19   Requirements of Law ............................................................................... 52
    2.20   Taxes ........................................................................................................ 53
    2.21   Indemnity ................................................................................................. 54
    2.22   Illegality ................................................................................................... 55
    2.23   Change of Lending Office......................................................................... 56
    2.24   Replacement of Lenders .......................................................................... 56
    2.25   Incremental Loans .................................................................................... 56

SECTION 3.    LETTERS OF CREDIT ...................................................................................... 57

    3.1    L/C Commitment ...................................................................................... 57
    3.2    Procedure for Issuance of Letter of Credit .............................................. 58
    3.3    Fees and Other Charges ........................................................................... 58
    3.4    L/C Participations ..................................................................................... 58
    3.5    Reimbursement Obligation of the Borrower ........................................... 59
    3.6    Obligations Absolute ............................................................................... 60
    3.7    Letter of Credit Payments ........................................................................ 60
    3.8    Applications .............................................................................................. 60

SECTION 4.    REPRESENTATIONS AND WARRANTIES ................................................................. 60

    4.1    Financial Condition ...................................................................................... 61
    4.2    No Change ................................................................................................... 61
    4.3    Existence; Compliance with Law ................................................................ 61
    4.4    Corporate Power; Authorization; Enforceable Obligations ......................... 62
    4.5    No Legal Bar ............................................................................................... 62
    4.6    No Material Litigation ................................................................................. 62
    4.7    No Default ................................................................................................... 62
    4.8    Ownership of Property; Liens ...................................................................... 62
    4.9    Intellectual Property .................................................................................... 63
    4.10   Taxes ........................................................................................................... 63
    4.11   Federal Regulations ..................................................................................... 63
    4.12   ERISA ......................................................................................................... 63
    4.13   Investment Company Act ............................................................................. 64
    4.14   Subsidiaries ................................................................................................. 64
    4.15   Environmental Matters ................................................................................ 64
    4.16   Accuracy of Information, etc. ...................................................................... 64
    4.17   Security Documents ..................................................................................... 65
    4.18   Solvency ...................................................................................................... 65

SECTION 5.    CONDITIONS PRECEDENT ............................................................................. 65

    5.1    Conditions to Initial Extension of Credit .................................................... 65
    5.2    Conditions to Each Revolving Loan Extension of Credit After Closing Date .................. 67

SECTION 6.    AFFIRMATIVE COVENANTS ........................................................................... 68

    6.1    Financial Statements ................................................................................... 68
    6.2    Certificates; Other Information .................................................................... 69
    6.3    Payment of Taxes ........................................................................................ 70
    6.4    Conduct of Business and Maintenance of Existence, etc.; Compliance ........ 70
    6.5    Maintenance of Property; Insurance ............................................................ 70
    6.6    Inspection of Property; Books and Records; Discussions ............................ 70
    6.7    Notices ........................................................................................................ 71
    6.8    Additional Collateral, etc. ........................................................................... 71
    6.9    Further Assurances ...................................................................................... 74
    6.10   Use of Proceeds ........................................................................................... 74
    6.11   Post-Closing Undertakings .......................................................................... 74

SECTION 7.    NEGATIVE COVENANTS ................................................................................. 74

    7.1    Consolidated Senior Secured Leverage Ratio .............................................. 74
    7.2    Indebtedness ................................................................................................ 75
    7.3    Liens ............................................................................................................ 79
    7.4    Fundamental Changes .................................................................................. 81
    7.5    Dispositions of Property .............................................................................. 82
    7.6    Restricted Payments .................................................................................... 84
    7.7    Investments .................................................................................................. 86
    7.8    Optional Payments and Modifications of Certain Debt Instruments ............ 88
    7.9    Transactions with Affiliates ........................................................................ 89

7.10    Sales and Leasebacks ................................................................................. 89
7.11    Changes in Fiscal Periods ........................................................................... 90
7.12    Negative Pledge Clauses ............................................................................ 90
7.13    Clauses Restricting Subsidiary Distributions ............................................. 91
7.14    Lines of Business ....................................................................................... 91
7.15    Limitation on Hedge Agreements ............................................................... 92
7.16    Changes in Jurisdictions of Organization; Name ....................................... 92
7.17    Limitation on Activities of Holdings .......................................................... 92

SECTION 8.    EVENTS OF DEFAULT ............................................................................. 92

SECTION 9.    THE AGENTS ......................................................................................... 95

9.1    Appointment .............................................................................................. 95
9.2    Delegation of Duties .................................................................................. 96
9.3    Exculpatory Provisions .............................................................................. 96
9.4    Reliance by the Agents .............................................................................. 96
9.5    Notice of Default ....................................................................................... 96
9.6    Non-Reliance on Agents and Other Lenders ............................................... 97
9.7    Indemnification .......................................................................................... 97
9.8    Agent in Its Individual Capacity ................................................................ 97
9.9    Successor Agents ....................................................................................... 98
9.10    Authorization to Release Liens and Guarantees ........................................ 98
9.11    Documentation Agents and Syndication Agent .......................................... 98

SECTION 10.    MISCELLANEOUS .................................................................................. 98

10.1    Amendments and Waivers ......................................................................... 98
10.2    Notices ...................................................................................................... 99
10.3    No Waiver; Cumulative Remedies ............................................................ 101
10.4    Survival of Representations and Warranties .............................................. 101
10.5    Payment of Expenses; Indemnification ..................................................... 101
10.6    Successors and Assigns; Participations and Assignments .......................... 102
10.7    Adjustments; Set-off ................................................................................ 104
10.8    Counterparts ............................................................................................ 105
10.9    Severability .............................................................................................. 105
10.10    Integration ............................................................................................... 105
10.11    **GOVERNING LAW** ........................................................................... 105
10.12    Submission to Jurisdiction; Waivers ........................................................ 105
10.13    Acknowledgments .................................................................................... 106
10.14    Confidentiality ........................................................................................ 106
10.15    Release of Collateral and Guarantee Obligations; Subordination of Liens ...... 107
10.16    Accounting Changes ................................................................................. 108
10.17    **WAIVERS OF JURY TRIAL** ............................................................. 108
10.18    USA PATRIOT ACT ................................................................................ 108
10.19    Delivery of Lender Addenda ..................................................................... 108
10.20    Judgment Currency .................................................................................. 108

SCHEDULES:

| | |
|---|---|
| 1.1(a) | Excluded Subsidiaries |
| 1.1(b) | Existing Joint Ventures |
| 2.1 | Commitments |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.8A | Excepted Property |
| 4.8B | Owned Real Property |
| 4.14 | Subsidiaries |
| 4.17 | UCC Filing Jurisdictions |
| 6.11 | Post-Closing Undertakings |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.7 | Existing Investments |
| 7.12 | Existing Negative Pledge Clauses |

EXHIBITS:

| | |
|---|---|
| A | Form of Guarantee and Collateral Agreement |
| B | Form of Compliance Certificate |
| C | Form of Closing Certificate |
| D | Form of Assignment and Assumption |
| E | Form of Legal Opinion of Latham & Watkins LLP |
| F | Form of Exemption Certificate |
| G | Form of Solvency Certificate |
| H | Form of Joinder Agreement |
| I | [INTENTIONALLY OMITTED] |
| J | Form of Prepayment Option Notice |

CREDIT AGREEMENT, dated as of December 3, 2007, among BLUE JAY ACQUISITION CORPORATION, a Delaware corporation ("Holdings"), BLUE JAY MERGER CORPORATION, a Delaware corporation (the "Initial Borrower"), SEQUA CORPORATION, a Delaware corporation into which the Initial Borrower shall be merged ("Sequa" or the "Surviving Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN COMMERCIAL PAPER INC., as Administrative Agent and Collateral Agent, LEHMAN BROTHERS INC., CITIGROUP GLOBAL MARKETS INC. and J.P. MORGAN SECURITIES INC., as syndication agents (collectively, in such capacity, the "Syndication Agents"), C.I.T. LEASING CORPORATION and HSBC BANK plc, as documentation agents (in such capacity, collectively, the "Documentation Agents"), JPMORGAN CHASE BANK, N.A., as Issuing Lender and LEHMAN BROTHERS INC., CITIGROUP GLOBAL MARKETS INC. and J.P. MORGAN SECURITIES INC., as Joint Lead Arrangers and Joint Bookrunners.

The parties hereto hereby agree as follows:

## SECTION 1.    DEFINITIONS

1.1 Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. For purposes hereof: "Prime Rate" means the prime lending rate as set forth on the Reuters Screen RTRTSY1 Page (or such other comparable page as may, in the reasonable opinion of the Administrative Agent, replace such page for the purpose of displaying such rate), as in effect from time to time. Any change in the ABR due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"ABR Loans": Loans denominated in Dollars the rate of interest applicable to which is based upon the ABR.

"Accounting Changes": as defined in Section 10.16.

"Acquisition": as defined in the definition of "Permitted Acquisition".

"Administrative Agent": Lehman Commercial Paper Inc., as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns.

"Affiliate": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly to direct or cause the direction of the management and policies of such Person, in either case whether by contract or otherwise.

"Agents": the collective reference to the Collateral Agent and the Administrative Agent, and for purposes of Sections 10.13 and 10.14, the Joint Lead Arrangers.

"Aggregate Exposure": with respect to any Lender at any time, an amount equal to (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's Term Loans,

(ii) the aggregate amount of such Lender's Revolving Dollar Exposure and/or Revolving Multicurrency Exposure or, if the Revolving Commitments of any Class have been terminated, the amount of such Lender's Revolving Extensions of Credit of such Class then outstanding and (iii) the aggregate amount of such Lender's New Loan Commitments then in effect, or if such New Loan Commitments have been terminated, the amount of such Lender's New Loans.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the total Aggregate Exposures of all Lenders at such time.

"Agreed Foreign Currency": Euros or Pounds Sterling and any other Foreign Currency that the Borrower may from time to time request that is acceptable to the Revolving Lenders that is freely convertible into Dollars and readily available in the London interbank market.

"Agreed Foreign Currency Equivalent": with respect to any amount in Dollars, the amount of any Agreed Foreign Currency that could be purchased with such amount of Dollars using the reciprocal of the foreign exchange rate(s) specified in the definition of the term "Dollar Equivalent", as reasonably determined by the Administrative Agent.

"Agreed Purposes": as defined in Section 10.14.

"Agreement": this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"AHYDO Payments": AHYDO "catch-up" payments in respect of any Indebtedness (including the Senior Interim Loans and/or the Refinancing Notes, any Permitted Subordinated Indebtedness and any Indebtedness incurred pursuant to Section 7.2(w)) the incurrence of which is not otherwise prohibited hereunder to the extent such Indebtedness provides for the payment of interest on all or any portion of the principal amount of such Indebtedness by adding such interest to the principal amount thereof.

"Annual Operating Budget": as defined in Section 6.2(c).

"Applicable Margin" or "Applicable Commitment Fee Rate": for any day, with respect to the Loans (including any Swingline Loan) and the commitment fee payable hereunder, the applicable rate per annum determined pursuant to the Pricing Grid; provided that from the Closing Date until the next change in the Applicable Margin or Applicable Commitment Fee Rate in accordance with the Pricing Grid (a) the Applicable Margin shall be 2.25% with respect to ABR Loans and Swingline Loans denominated in Dollars and 3.25% with respect to Eurocurrency Loans and Swingline Loans denominated in Agreed Foreign Currencies and (b) the Applicable Commitment Fee Rate shall be 0.50%.

"Application": an application, in such form as the relevant Issuing Lender may specify from time to time, requesting such Issuing Lender to open a Letter of Credit.

"Approved Fund": as defined in Section 10.6(b).

"Asset Sale": any Disposition of Property or series of related Dispositions of Property (a) under Section 7.5(e), (p) or (q) or (b) not otherwise permitted under Section 7.5, in each case (other than Dispositions pursuant to Section 7.5(p)), which yields Net Cash Proceeds to the Borrower or any of its Domestic Subsidiaries that are Restricted Subsidiaries (valued at the initial principal amount thereof in the

case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $10,000,000.

"Assignee": as defined in Section 10.6(b).

"Assignment and Assumption": an Assignment and Assumption, substantially in the form of Exhibit D.

"Available Amount": as at any date, the sum of, without duplication:

(a) the aggregate cumulative amount, not less than zero, of the greater of: (i) (A) Excess Cash Flow for each fiscal year ending on or after the Closing Date and on or prior to such date multiplied by (B) 100% minus the Excess Cash Flow Percentage for the relevant fiscal year and (ii) 50% of Consolidated Net Income for each fiscal quarter ending after the Closing Date; provided that for the fiscal year ending December 31, 2007, the results obtained for clauses (i) and (ii) above shall be increased only by the proportionate share of the amounts referred to in clauses (i) and (ii) based on the number of days elapsed since the Closing Date and a fiscal year of 365 days;

(b) the Net Cash Proceeds received after the Closing Date and on or prior to such date from any Equity Issuance by, or capital contribution to, Holdings or the Borrower (which in the case of any such Equity Issuance by the Borrower, is not Disqualified Capital Stock) which, in the case of any such Equity Issuance by, or capital contribution to, Holdings, have been contributed in cash as common equity to the Borrower;

(c) the aggregate amount of proceeds received after the Closing Date and on or prior to such date that (i) would have constituted Net Cash Proceeds pursuant to clause (a) of the definition of "Net Cash Proceeds" except for the operation of any of (A) the second proviso thereof, (B) the Dollar threshold set forth in the definition of "Asset Sale" and (C) the Dollar threshold set forth in the definition of "Recovery Event" or (ii) constitutes Declined Proceeds;

(d) the aggregate principal amount of any Indebtedness of the Borrower or any Restricted Subsidiary issued after the Closing Date (other than Indebtedness issued to a Restricted Subsidiary), which has been converted into or exchanged for Capital Stock in Holdings or any Parent Company;

(e) the amount received by the Borrower or any Restricted Subsidiary in cash (and the fair market value (as determined in good faith by the Borrower) of Property other than cash received by the Borrower or any Restricted Subsidiary) after the Closing Date from any dividend or other distribution by an Unrestricted Subsidiary;

(f) in the event any Unrestricted Subsidiary has been redesignated as a Restricted Subsidiary and become a Subsidiary Guarantor or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Borrower or any Subsidiary Guarantor, the fair market value (as determined in good faith by the Borrower) of the Investments of the Borrower or any Restricted Subsidiary in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable);

(g) an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in cash or

-3-

Cash Equivalents by the Borrower or any Restricted Subsidiary in respect of any Investments made pursuant to Section 7.7(f)(ii), (h)(i)(B) or (w)(ii); and

(h) the aggregate amount actually received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any existing Joint Venture that is not a Subsidiary or in any Unrestricted Subsidiary, in each case, to the extent of the Investment in such Joint Venture or Unrestricted Subsidiary.

in each case, that has not been previously applied pursuant to Section 7.6(b), Section 7.7(f)(ii), (h)(i)(B) or (w)(ii) or Sections 7.8(a)(ii)(B) and 7.8(a)(ii)(C). Notwithstanding the foregoing, it is hereby understood and agreed that, as of any date of determination, in no event shall the aggregate amount of the JV Distribution Amount and the amount by which the Available Amount is increased as a result of any distribution from a joint venture exceed the aggregate amount of such distributions as of such date.

"Available Revolving Commitment": as to any Revolving Lender with respect to its Revolving Commitment of any Class at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment of such Class then in effect (including any New Loan Commitments which are Revolving Commitments) over (b) such Lender's Revolving Extensions of Credit of such Class then outstanding; provided that in calculating any Revolving Lender's Revolving Extensions of Credit under its Revolving Commitment for the purpose of determining such Revolving Lender's Available Revolving Commitments of such Class pursuant to Section 2.9(a), the aggregate principal amount of Swingline Loans then outstanding shall be deemed to be zero.

"Benefited Lender": as defined in Section 10.7(a).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the Board of Directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower": (a) at any time prior to the consummation of the Merger Transactions, the Initial Borrower and (b) upon and at any time after the consummation of the Merger Transactions, the Surviving Borrower.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Business": the business activities and operations of Sequa and/or its Affiliates.

"Business Day": a day (a) other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, (b) with respect to notices and determinations in connection with, and payments of principal and interest on, Eurocurrency Loans, such day is also a day for trading by and between banks in deposits in the relevant Currency in the

-4-

interbank eurocurrency market, (c) with respect to notices and determinations in connection with, and payments of principal and interest on, Eurocurrency Loans denominated in Pounds Sterling, such day is also a day on which commercial banks and the London foreign exchange market settle payments in the Principal Financial Center for such Foreign Currency and (d) with respect to notices and determinations in connection with, and payments of principal and interest on, Eurocurrency Loans denominated in euro or any other Agreed Foreign Currency, such day is also a day on which the Trans-European Automated Real-time Gross Settlement Express Transfer payment system (or any successor settlement system as determined by the Administrative Agent) or any other relevant exchange or payment system, as applicable, is open for the settlement of payments in euro or any other Agreed Foreign Currency, as applicable.

"Capital Expenditures": for any period, with respect to any Person, the aggregate of all cash expenditures by such Person for the acquisition or leasing (pursuant to a capital lease but excluding any amount representing capitalized interest) of fixed or capital assets, computer software or additions to equipment (including (a) replacements, capitalized repairs and improvements during such period and (b) customer acquisition costs and incentive payments, conversion costs and contract acquisition costs) which are required to be capitalized under GAAP on a balance sheet of such Person; provided that in any event the term "Capital Expenditures" shall exclude: (i) any Permitted Acquisition and any other Investment expressly permitted pursuant to Section 7.7; (ii) any expenditures to the extent financed with any Reinvestment Deferred Amount; (iii) expenditures for leasehold improvements for which such Person is reimbursed in cash; and (iv) capital expenditures to the extent they are made with the proceeds of equity contributions (other than in respect of Disqualified Capital Stock) made to the Borrower after the Closing Date.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, and any and all equivalent ownership interests in a Person (other than a corporation).

"Cash Equivalents": (a) securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition, (b) certificates of deposit, time deposits and eurodollar time deposits with maturities of 24 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 24 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $250,000,000, (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above, (d) commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's and, in each case, maturing within 24 months after the date of acquisition and Indebtedness and Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition, (e) readily marketable direct obligations issued by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 24 months or less from the date of acquisition, (f) marketable short-term money market and similar securities having a rating of at

-5-

least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 24 months after the date of creation or acquisition thereof, (g) Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's (h) instruments equivalent to those referred to in clauses (a) to (g) above denominated in euro or pound sterling or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Restricted Subsidiary organized in such jurisdiction including, without limitation, certificates of deposit or bankers' acceptances of, and bank deposits with, any bank organized under the laws of any country that is a member of the European Economic Community or Canada or any subdivision thereof, whose short-term commercial paper rating from S&P is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof, in each case with maturities of not more than 24 months from the date of acquisition and (i) investment in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in clauses (a) through (h) of this definition.

"Certificated Security": as defined in the Guarantee and Collateral Agreement.

"Change of Control": as defined in Section 8(j).

"Chattel Paper": as defined in the Guarantee and Collateral Agreement.

"Class": (a) when used in reference to any Revolving Loan or borrowing, refers to whether such Revolving Loan, or the Revolving Loans constituting such borrowing, are Dollar Revolving Loans or Multicurrency Revolving Loans; (b) when used in reference to any Swingline Loan, refers to whether such Swingline Loans are Dollar Swingline Loans or Multicurrency Swingline Loans; (c) when used in reference to any Lender, refers to whether such Lender is a Dollar Revolving Lender or a Multicurrency Revolving Lender; and (d) when used in reference to any Revolving Commitment, refers to whether such Revolving Commitment is a Dollar Revolving Commitment or Multicurrency Revolving Commitment. The "Class" of a Letter of Credit refers to whether such Letter of Credit is a Dollar Letter of Credit or a Multicurrency Letter of Credit.

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived and the Term Loans hereunder shall have been funded, which date is December 3, 2007.

"Closing Date Material Adverse Effect": any event, circumstance, development, change or effect that (i) is, individually or in the aggregate with all other events, circumstances, developments, changes and effects, materially adverse to the assets, business, liabilities, condition (financial or otherwise) or results of operations of Sequa and its Subsidiaries, taken as a whole, other than any change, circumstance, event or effect described in clause (i) resulting primarily from any of the following: (A) the announcement of the execution of the Merger Agreement, or the pendency of consummation of the Merger (as defined in the Merger Agreement), (B) changes in general economic conditions, or in the industries in which Sequa operates, or financial markets as a whole so long as such conditions do not adversely affect Sequa or its Subsidiaries in a materially disproportionate manner relative to other similarly situated participants in the industries, geographies or markets in which they operate (other than any such changes that result from war or other hostilities (except for the current conflicts in Iraq or Afghanistan), or the occurrence of any military or terrorist attacks), (C) any change in any applicable Law (as defined in the Merger Agreement), rule or regulation or GAAP or interpretation thereof by any Governmental Authority (as defined in the Merger Agreement) after the date of the Merger Agreement, or

-6-

(D) the matters set forth on Section 9.03 of the Company Schedules (as defined in the Merger Agreement), or (ii) would reasonably be likely to prevent the consummation of the Merger (as defined in the Merger Agreement) or prevent Sequa from performing its obligations under the Merger Agreement.

"Closing Date Stock Certificates": Collateral consisting of stock certificates representing the Capital Stock of the Domestic Subsidiaries that are Restricted Subsidiaries (and not Immaterial Subsidiaries) of the Borrower for which a security interest can be perfected by delivering such stock certificates.

"Closing Date UCC Filing Collateral": Collateral for which a security interest can be perfected by filing a UCC financing statement.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": the meaning assigned to such term in the Guarantee and Collateral Agreement and shall also include the Mortgaged Properties.

"Collateral Agent": Lehman Commercial Paper Inc., in its capacity as collateral agent for the Secured Parties under the Security Documents and any of its successors and permitted assigns.

"Commitment": as to any Lender, the sum of the Term Commitments, the Revolving Commitments and the New Loan Commitments (if any) of such Lender.

"Committed Reinvestment Amount": as defined in the definition of "Reinvestment Prepayment Amount".

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with Holdings within the meaning of Section 4001 of ERISA or is part of a group that includes Holdings and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Commonly Controlled Plan": as defined in Section 4.12(b).

"Company Reorganization": the series of transactions described in the "Project Cyclone Restructuring Steps", dated as of December 3, 2007, prepared by PriceWaterhouseCoopers LLP, as amended, supplemented or otherwise modified from time to time, provided that any such amendments, supplements or modifications that are, when taken as a whole, materially adverse to the Lenders, shall be reasonably acceptable to the Administrative Agent.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B.

"Confidential Information": as defined in Section 10.14.

"Consolidated Current Assets": at any date, all amounts (other than (a) cash and cash equivalents, (b) deferred financing fees and (c) payments for deferred taxes so long as such items described in clauses (b) and (c) are not cash items) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date plus in the event that a Permitted Receivables Financing is accounted for off balance sheet, (x) gross accounts receivable comprising part of the

-7-

receivables and other related assets subject to such Permitted Receivables Financing minus (y) collections against the amounts sold pursuant to clause (x).

"Consolidated Current Liabilities":  at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date, but excluding (a) the current portion of any Indebtedness of the Borrower and its Restricted Subsidiaries, (b) without duplication, all Indebtedness consisting of Revolving Loans, L/C Obligations or Swingline Loans, to the extent otherwise included therein and (c) payments for deferred taxes so long as such items described in this clause (c) are not cash items.

"Consolidated EBITDA":  of any Person for any period, Consolidated Net Income of such Person and its Restricted Subsidiaries for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of:

(a) provisions for taxes based on income, profits or capital, including federal, foreign, state, franchise, excise and similar taxes and foreign withholding taxes of such Person paid or accrued during such period;

(b) Consolidated Net Interest Expense and, to the extent not reflected in such Consolidated Net Interest Expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including commitment, letter of credit and administrative fees and charges with respect to the Facilities and the Refinancing Notes (and, if applicable, the Senior Interim Loan Facility));

(c) depreciation and amortization expense (including deferred financing fees and capitalized software expenditures, customer acquisition costs and incentive payments, conversion costs, contract acquisition costs and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits);

(d) amortization or impairment of intangibles (including goodwill) and organization costs;

(e) any extraordinary, unusual or non-recurring expenses or losses (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, losses on sales of assets outside of the ordinary course of business and accruals and payments for amounts payable under executive employment agreements in connection with the Transactions);

(f) any other non-cash charges, expenses or losses (except to the extent such charges, expenses or losses represent an accrual of or reserve for cash expenses in any future period or an amortization of a prepaid cash expense paid in a prior period), including in relation to earn-outs and similar obligations, pension expenses or charges and any non-cash expenses resulting from the revaluation of inventory (including any impact of changes to inventory valuation policies or methods and changes in capitalization of variances);

(g) restructuring and integration costs or reserves, including any severance costs, costs associated with office and facility openings or closings and consolidation, relocation or

integration costs and other non-recurring business optimization and restructuring charges and expenses (including costs relating to initiatives aimed at profitability improvement);

(h) stock-option based and other equity-based compensation expenses;

(i) transaction costs, fees, losses and expenses (including those relating to the Merger Transactions, the transactions contemplated hereby and by the Senior Interim Loan Documents or Refinancing Notes (including any amendments or waivers of the Loan Documents, the Senior Interim Loan Documents or the Refinancing Notes), and those payable in connection with the sale of Capital Stock, the incurrence of Indebtedness permitted by Section 7.2, transactions permitted by Section 7.4, Dispositions permitted by Section 7.5, Restricted Payments permitted by Section 7.6, or any Permitted Acquisition or other Investment permitted by Section 7.7 (in each case whether or not successful));

(j) all fees and expenses paid pursuant to the Management Agreement;

(k) proceeds from any business interruption insurance (in the case of this clause (k) to the extent not reflected as revenue or income in such statement of such Consolidated Net Income);

(l) the amount of cost savings and other operating improvements and synergies projected by the Borrower in good faith and certified in writing to the Administrative Agent to be realized as a result of any acquisition (including the Merger Transactions) or Disposition (including the termination or discontinuance of activities constituting such business) of business entities or properties or assets, constituting a division or line of business of any business entity, division or line of business that is the subject of any such acquisition or Disposition, including any synergies and cost savings (calculated on a pro forma basis as though such cost savings and other operating improvements and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions to the extent already included in the Consolidated Net Income for such period, provided that (i) the Borrower shall have certified to the Administrative Agent that (A) such cost savings are reasonably anticipated to result from such actions, (B) such actions are taken or committed to be taken within 18 months after such acquisition or Disposition and (iii) no cost savings shall be added pursuant to this clause (l) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (g) above and clause (p) below with respect to such period;

(m) cash expenses relating to earn-outs and similar obligations;

(n) to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with the Merger Transactions, a Permitted Acquisition or any other acquisition permitted by Section 7.7(h) or (w);

(o) losses recognized and expenses incurred in connection with the effect of currency and exchange rate fluctuations on intercompany balances and other balance sheet items;

(p) the amount of cost savings and other operating improvements and synergies reasonably expected to result from any operational change taken or committed to be taken during such period (calculated on a pro forma basis as though such cost savings and other operating improvements and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions to the extent already included in the Consolidated Net Income for such period, provided that no cost savings shall be added

-9-

pursuant to this clause (p) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clauses (l) and (g) above with respect to such period;

(q) the non-cash portion of straight-line rent expense;

(r) costs of surety bonds in connection with financing activities of such Person and its Restricted Subsidiaries;

(s) the amount of loss on sale of receivables and related assets to a Restricted Subsidiary that was established in connection with and solely for the purpose of a Permitted Receivables Financing, in connection with such a Permitted Receivables Financing;

(t) accretion of asset retirement obligations in accordance with SFAS No. 143, Accounting for Asset Retirement Obligations and FASB Interpretation No. 47, and any similar accounting in prior periods;

(u) other non-operating expenses; and

(v) costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and Public Company Costs;

minus, to the extent reflected as income or a gain in the statement of such Consolidated Net Income for such period, the sum of:

(a) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business);

(b) any other non-cash income or gains (other than the accrual of revenue in the ordinary course), but excluding any such items (i) in respect of which cash was received in a prior period or will be received in a future period or (ii) which represent the reversal in such period of any accrual of, or cash reserve for, anticipated cash charges in any prior period where such accrual or reserve is no longer required, all as determined on a consolidated basis;

(c) cash payments in connection with "straight-line" rent expense which exceed the amount expensed in respect of such rent expense; and

(d) gains realized and income accrued in connection with the effect of currency and exchange rate fluctuations on intercompany balances and other balance sheet items;

provided that for purposes of calculating Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for any period, (A) the Consolidated EBITDA of any Person or Properties constituting a division or line of business of any business entity, division or line of business, in each case, acquired by the Borrower or any of the Restricted Subsidiaries during such period and assuming any synergies, cost savings and other operating improvements to the extent certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within 18 months following such acquisition), or of any Subsidiary designated as a Restricted Subsidiary during such period, shall be included on a pro forma basis for such period (but assuming the consummation of such acquisition and the incurrence or assumption of any Indebtedness in connection therewith or such designation, as the case may be, occurred on the first day of such period), (B) the Consolidated EBITDA of any Person or

-10-

Properties constituting a division or line of business of any business entity, division or line of business, in each case, Disposed of by the Borrower or any of the Restricted Subsidiaries during such period, or of any Subsidiary designated as an Unrestricted Subsidiary during such period, shall be excluded for such period (assuming the consummation of such Disposition and the repayment of any Indebtedness in connection therewith or upon such designation, as the case may be, occurred on the first day of such period) and (C) the Consolidated EBITDA generated by a Qualified Contract that has been entered into by the Borrower or any Restricted Subsidiary during such period will be given pro forma effect for such periods as if such Qualified Contract had been entered into on the first day of such period; provided that such Consolidated EBITDA shall be certified by the Borrower as having been determined in good faith to be the Consolidated EBITDA reasonably anticipated to be realizable during the first 12 months following the date such Qualified Contract is entered into.  Notwithstanding the forgoing, Consolidated EBITDA shall be calculated without giving effect to the non-cash effects of purchase accounting or similar adjustments required or permitted by GAAP in connection with the Transactions, any Investment (including any Permitted Acquisition) and any other acquisition or Investment.  For purposes of determining compliance with the financial covenant set forth in Section 7.1 only (and not any other provision of this Agreement, including any such other provision that utilizes a calculation of Consolidated EBITDA), (i) any cash common equity contribution or (ii) any other equity contribution on terms reasonably acceptable to the Administrative Agent (that does not constitute Disqualified Capital Stock), in each case made by Holdings or any of the other direct or indirect equityholders of the Borrower to the Borrower, on or after the first day of any fiscal quarter and prior to the day that is 10 Business Days after the day on which financial statements are required to be delivered for such fiscal quarter (it being understood that each such contribution shall be credited with respect to only one fiscal quarter; provided that such credit shall be effective as to such fiscal quarter for all periods in which such fiscal quarter is included) will, at the request of the Borrower, be deemed to increase, dollar for dollar, Consolidated EBITDA for such fiscal quarter for the purposes of determining compliance with such financial covenant at the end of such fiscal quarter and applicable subsequent periods (any such equity contribution so included in the calculation of Consolidated EBITDA, a "Specified Equity Contribution"); provided that (a) in each four fiscal quarter period there shall be a period of at least two fiscal quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Loan Parties to be in compliance with the financial covenant set forth in Section 7.1 and (c) all Specified Equity Contributions shall be disregarded for purposes of determining any baskets or other amounts with respect to any other covenants contained in this Agreement.  For purposes of determining Consolidated EBITDA under this Agreement, Consolidated EBITDA for the fiscal quarter ended March 31, 2007 shall be deemed to be $67,300,000, Consolidated EBITDA for the fiscal quarter ended June 30, 2007 shall be deemed to be $71,900,000, and Consolidated EBITDA for the fiscal quarter ended September 30, 2007 shall be deemed to be $78,000,000.  Unless otherwise qualified, all references to "Consolidated EBITDA" in this Agreement shall refer to Consolidated EBITDA of the Borrower.

"Consolidated Net Income":  of any Person for any period, the consolidated net income (or loss) of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided that in calculating Consolidated Net Income of the Borrower and its consolidated Restricted Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Borrower or any of its Subsidiaries and (b) subject to Section 1.2(e), the income (or deficit) of any Person (other than a Restricted Subsidiary) in which Holdings, the Borrower or any of its Restricted Subsidiaries has an ownership interest (including any Permitted Joint Venture), except to the extent that any such income is actually received by Holdings, the Borrower or such Restricted Subsidiary in the form of dividends or similar distributions (which dividends and distributions shall be included in the calculation of Consolidated Net Income).  Notwithstanding the forgoing, for purposes of calculating Excess Cash Flow and the Available Amount, Consolidated Net Income shall not include:  (i) extraordinary gains for such period, (ii) the cumulative effect of a change in accounting principles during

-11-

such period, (iii) any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, investment, recapitalization, asset disposition, issuance or repayment of debt, issuance of equity securities, refinancing transaction or amendment or other modification of any debt instrument (in each case, including any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction and (iv) any income (loss) for such period attributable to the early extinguishment of Indebtedness or Hedge Agreements.  Unless otherwise qualified, all references to "Consolidated Net Income" in this Agreement shall refer to Consolidated Net Income of the Borrower.  There shall be excluded from Consolidated Net Income for any period the purchase accounting effects of adjustments to inventory, Property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries), as a result of the Transactions, any consummated acquisition whether consummated before or after the Closing Date, or the amortization or write-off of any amounts thereof.

"Consolidated Net Interest Expense":  of any Person for any period, the sum, without duplication, of (a) consolidated interest expense of such Person and its Restricted Subsidiaries for such period (including amortization of original issue discount, noncash interest payments (other than imputed interest as a result of purchase accounting), commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, the interest component of Capital Lease Obligations, net payments (if any) pursuant to interest rate obligations with respect to Hedge Agreements, but excluding amortization of deferred financing fees or expensing of any bridge or other financing fees) plus (b) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, minus (c) interest income actually received in cash for such period.  Unless otherwise qualified, all references to "Consolidated Net Interest Expense" in this Agreement shall refer to Consolidated Net Interest Expense of the Borrower.

"Consolidated Net Senior Secured Debt":  at any date, the aggregate principal amount of all Funded Debt of the Borrower and its Restricted Subsidiaries that is secured by a Lien on Property of the Borrower or any of its Restricted Subsidiaries (including all Capital Lease Obligations) (other than a Lien ranking junior to any other Lien) at such date, minus cash and Cash Equivalents held by the Borrower and its Restricted Subsidiaries on such date, in each case determined on a consolidated basis in accordance with GAAP.

"Consolidated Senior Secured Leverage Ratio":  as at the last day of any period of four consecutive fiscal quarters of the Borrower, the ratio of (a) Consolidated Net Senior Secured Debt on such day to (b) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for such period.

"Consolidated Total Assets":  the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.1(a) or (b).

"Consolidated Total Leverage":  at any date, the aggregate principal amount of all Funded Debt of the Borrower and its Restricted Subsidiaries on such date, minus cash and Cash Equivalents held by the Borrower and its Restricted Subsidiaries on such date, in each case determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Leverage Ratio":  as at the last day of any period of four consecutive fiscal quarters of the Borrower, the ratio of (a) Consolidated Total Leverage on such day to (b) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for such period.

-12-

"Consolidated Working Capital": at any date, the difference of (a) Consolidated Current Assets on such date minus (b) Consolidated Current Liabilities on such date, provided that, for purposes of calculating Excess Cash Flow, increases or decreases in Consolidated Working Capital shall be calculated without regard to changes in the working capital balance as a result of non-cash increases or decreases thereof that will not result in future cash payments or receipts or cash payments or receipts in any previous period, in each case, including, without limitation, any changes in Consolidated Current Assets or Consolidated Current Liabilities as a result of (i) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent and (ii) the effects of purchase accounting.

"Continuing Directors": the directors of Holdings on the Closing Date and each other director of Holdings, if, in each case, such other director's nomination for election to the Board of Directors of Holdings is recommended by at least 51% of the then Continuing Directors or such other director receives the vote of the Sponsor and/or its Affiliates (excluding any operating portfolio companies of the Sponsor) in his or her nomination or election by the shareholders of Holdings.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Currency": Dollars or any Agreed Foreign Currency.

"Declined Proceeds": the amount of any prepayment declined by the Required Prepayment Lenders or any Term Lender, as applicable, in accordance with Sections 2.12(a), 2.12(b), 2.12(c) or 2.12(e), as the case may be.

"Default": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Derivatives Counterparty": as defined in Section 7.6.

"Differential Amount": as defined in Section 7.5(l).

"Disposition": with respect to any Property, any sale, sale and leaseback, assignment, conveyance, transfer or other effectively complete disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock": Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof, in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of clauses (a), (b) and (c), prior to the date that is 91 days after the final scheduled maturity date of the Loans (other than (i) upon payment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) or (ii) upon a "change in control"; provided that any payment required pursuant to this clause (ii) is subject to the prior repayment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) that are accrued and payable and the termination of the Commitments); provided further, however, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees

-13-

of the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because they may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Documentation Agents": as defined in the preamble hereto.

"Dollar Amount": in respect of any amount, the sum of (a) the portion thereof denominated in Dollars (if any), plus (b) the Dollar Equivalent of the portion thereof denominated in any Foreign Currency (if any).

"Dollar Equivalent": with respect to any amount denominated in any Agreed Foreign Currency, the amount of Dollars that would be required to purchase such amount of such Agreed Foreign Currency on the date two Business Days prior to such date (or, in the case of any determination made under Section 2.12(f) or the last sentence of Section 2.18(g), on the date of determination or redenomination therein referred to), based upon the spot selling rate at which the Administrative Agent offers to sell such Agreed Foreign Currency for Dollars in the London foreign exchange market at approximately 11:00 A.M., London time, for delivery two Business Days later.

"Dollar L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired face amount of the then outstanding Dollar Letters of Credit and (b) the aggregate amount of drawings under Dollar Letters of Credit that have not then been reimbursed. The Dollar L/C Obligations of any Lender at any time shall be its Dollar Revolving Percentage of the total Dollar L/C Obligations at such time.

"Dollar Letter of Credit": Letters of Credit that utilize the Dollar Revolving Commitments.

"Dollar Revolving Commitments": as to any Dollar Revolving Lender, the obligation of such Lender, if any, to make Dollar Revolving Loans and participate in Dollar Swingline Loans and Dollar Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Dollar Revolving Commitment" opposite such Lender's name on Schedule 2.01, or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Dollar Revolving Commitments is $100,000,000.

"Dollar Revolving Extensions of Credit": as to any Dollar Revolving Lender at any time, an amount equal to the sum of, without duplication (a) the aggregate principal amount of all Dollar Revolving Loans held by such Lender then outstanding, (b) such Lender's Dollar Revolving Percentage of the Dollar L/C Obligations then outstanding and (c) such Lender's Dollar Revolving Percentage of the aggregate principal amount of Dollar Swingline Loans then outstanding.

"Dollar Revolving Lender": each Lender that has a Dollar Revolving Commitment or that holds Dollar Revolving Loans.

"Dollar Revolving Loans": as defined in Section 2.4(a).

"Dollar Revolving Percentage" as to any Dollar Revolving Lender at any time, the percentage which such Lender's Dollar Revolving Commitment then constitutes of the aggregate Dollar Revolving Commitments or, at any time after the Dollar Revolving Commitments shall have expired or terminated, the percentage which the Dollar Amount of the aggregate principal amount of such Dollar

-14-

Revolving Lender's Dollar Revolving Loans then outstanding constitutes of the aggregate principal amount of the Dollar Revolving Loans then outstanding, <u>provided</u> that in the event that the Dollar Revolving Loans are paid in full prior to the reduction to zero of the Dollar Revolving Extensions of Credit, the Dollar Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Dollar Revolving Extensions of Credit shall be held by the Dollar Revolving Lenders on a comparable basis.

"<u>Dollar Swingline Loans</u>":  as defined in Section 2.6(a).

"<u>Dollars</u>" and "<u>$</u>":  dollars in lawful currency of the United States.

"<u>Domestic Subsidiary</u>":  any direct or indirect Restricted Subsidiary organized under the laws of any jurisdiction within the United States.

"<u>Environmental Laws</u>":  any and all applicable laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including, without limitation, common law) of any international authority, foreign government, the United States, or any state, provincial, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, natural resources or human health and safety as it relates to Releases of Materials of Environmental Concern, as has been, is now, or at any time hereafter is, in effect.

"<u>Environmental Liability</u>":  any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to:  (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release of any Materials of Environmental Concern or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Issuance</u>":  any issuance by Holdings, the Borrower or any Subsidiary Guarantor of its Capital Stock in a public or private offering.

"<u>ERISA</u>":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>euro</u>":  the single currency of Participating Member States of the European Union, which shall be an Agreed Foreign Currency and a Foreign Currency under this Agreement.

"<u>Eurocurrency Base Rate</u>":  with respect to each day during each Interest Period pertaining to a Eurocurrency Loan denominated in any Currency, the rate per annum determined on the basis of the rate for deposits in the relevant Currency for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the Screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period, as the Eurocurrency Rate for deposits denominated in such Currency with a maturity comparable to such Interest Period.  In the event that such rate does not appear on the Screen at such time for any reason, then the "<u>Eurocurrency Base Rate</u>" shall be determined by reference to such other comparable publicly available service for displaying eurocurrency rates in such Currency as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered deposits in the relevant currency at or about 11:00 A.M., London time, two Business Days prior to the beginning of such

Interest Period in the interbank eurocurrency market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurocurrency Loans": Loans the rate of interest applicable to which is based upon the Eurocurrency Rate or the Eurocurrency Reference Rate, as applicable.

"Eurocurrency Rate": with respect to each day during each Interest Period pertaining to a Eurocurrency Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{(i)}\qquad\text{Eurocurrency Base Rate}}{\text{(ii)}\qquad 1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurocurrency Reference Rate": means, for any day and for any Eurocurrency Loan denominated in any Currency, the one month rate per annum determined on the basis of the rate for deposits in the relevant Currency appearing on the Screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period.

"Eurocurrency Reserve Requirements": for any day as applied to a Eurocurrency Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurocurrency Tranche": the collective reference to Eurocurrency Loans denominated in the same Currency under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8; provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Amount": as defined in Section 7.4(c) and Section 7.5(m)(ii)(C).

"Excess Cash Flow": for any fiscal year of the Borrower, the difference, if any, of (a) the sum, without duplication, of (i) Consolidated Net Income of the Borrower for such fiscal year, (ii) the amount of all non-cash charges (including depreciation, amortization and deferred tax expense) deducted in arriving at such Consolidated Net Income and cash receipts included in clause (i) through (iv) of the definition of "Consolidated Net Income" and excluded in arriving at such Consolidated Net Income, (iii) the amount of the decrease, if any, in Consolidated Working Capital for such fiscal year and (iv) the aggregate net amount of non-cash loss on the Disposition of Property by the Borrower and its Restricted Subsidiaries during such fiscal year (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income; minus (b) the sum, without duplication (including, in the case of clauses (ii) and (viii) below, duplication across periods (provided that all or any portion of the amounts referred to in clauses (ii) and (viii) below with respect to a period may be applied

-16-

in the determination of Excess Cash Flow for any subsequent period to the extent such amounts did not previously result in a reduction of Excess Cash Flow in any prior period)) of:

(i) (A) the amount of all non-cash gains or credits included in arriving at such Consolidated Net Income (including, without limitation, credits included in the calculation of deferred tax assets and liabilities) and cash charges excluded in clauses (i) through (iv) of the definition of "Consolidated Net Income" and included in arriving at such Consolidated Net Income and (B) the net income of any Person (other than a Restricted Subsidiary) in which Holdings, the Borrower or any of its Restricted Subsidiaries has an ownership interest, to the extent that any such income was included in arriving at such Consolidated Net Income and not actually received by Holdings, the Borrower or such Restricted Subsidiary in cash in the form of dividends or similar distributions;

(ii) the aggregate amount (A) actually paid by the Borrower and its Restricted Subsidiaries in cash during such fiscal year on account of Capital Expenditures and Permitted Acquisitions and (B) committed during such fiscal year to be used to make Capital Expenditures or Permitted Acquisitions which in either case have been actually made or consummated or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such fiscal year (in each case under this clause (ii) other than to the extent any such Capital Expenditure or Permitted Acquisition is made (or, in the case of the preceding clause (B), is expected to be made) with the proceeds of new long-term Indebtedness or an Equity Issuance or with the proceeds of any Reinvestment Deferred Amount);

(iii) the aggregate amount of all regularly scheduled principal payments or prepayments of Indebtedness (including, without limitation, the Term Loans, the Refinancing Notes and, if applicable, the Senior Interim Loans) of the Borrower and its Restricted Subsidiaries made during such fiscal year (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder and other than to the extent any such prepayments are the result of the incurrence of additional indebtedness and other than optional prepayments of the Term Loans and optional prepayments of Revolving Loans and Swingline Loans to the extent accompanied by permanent optional reductions of the Revolving Commitments);

(iv) the amount of the increase, if any, in Consolidated Working Capital for such fiscal year;

(v) the aggregate net amount of non-cash gain on the Disposition of Property by the Borrower and its Restricted Subsidiaries during such fiscal year (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income;

(vi) fees and expenses incurred in connection with the Transactions;

(vii) purchase price adjustments paid or received in connection with the Merger Transactions, any Permitted Acquisition or any other acquisition permitted under Section 7.7(h) or (w);

(viii) (A) the net amount of Investments made during such period pursuant to paragraphs (d), (f), (h), (l), (w) and (y) of Section 7.7 or committed during such period to be used to make Investments pursuant to Section 7.7 which have been actually made or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such period (but

-17-

excluding Investments among the Borrower and its Restricted Subsidiaries) and (B) permitted Restricted Payments made in each case by the Borrower during such period and permitted Restricted Payments made by any Restricted Subsidiary to any Person other than Holdings, the Borrower or any of the Restricted Subsidiaries during such period, in each case, to the extent permitted by Section 7.6 (except to the extent made with amounts available in respect of the Available Amount under Section 7.6(b));

(ix) the amount (determined by the Borrower) of such Consolidated Net Income which is mandatorily prepaid or reinvested pursuant to Section 2.12(b) (or as to which a waiver of the requirements of such Section applicable thereto has been granted under Section 10.1) prior to the date of determination of Excess Cash Flow for such fiscal year as a result of any Asset Sale or Recovery Event;

(x) the aggregate amount of any premium or penalty actually paid in cash that is required to be made in connection with any prepayment of Indebtedness;

(xi) cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Subsidiaries other than Indebtedness;

(xii) the aggregate amount of expenditures actually made by the Borrower and its Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period and are not deducted in calculating Consolidated Net Income;

(xiii) cash expenditures in respect of Hedge Agreements during such period to the extent not deducted in arriving at such Consolidated Net Income;

(xiv) the amount of taxes (including penalties and interest) paid in cash in such period or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period;

(xv) the amount of cash payments made in respect of pensions and other post-employment benefits in such period; and

(xvi) payments made in respect of the minority equity interests of third parties in any non-wholly owned Restricted Subsidiary in such period, including pursuant to dividends declared or paid on Capital Stock held by third parties in respect of such non-wholly-owned Restricted Subsidiary.

"Excess Cash Flow Application Date": as defined in Section 2.12(c).

"Excess Cash Flow Percentage": 50%; provided that the Excess Cash Flow Percentage shall be reduced to (a) 25% if the Consolidated Senior Secured Leverage Ratio as of the last day of the relevant fiscal year is not greater than 3.25 to 1.00 and (b) to 0% if the Consolidated Senior Secured Leverage Ratio as of the last day of the relevant fiscal year is not greater than 2.25 to 1.00.

"Excluded Capital Stock": (a) any Capital Stock with respect to which, in the reasonable judgment of Administrative Agent (confirmed by notice to the Borrower), (i) the cost of pledging such Capital Stock in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom or (ii) would result in adverse tax consequences, (b) solely in the case of any pledge of Capital Stock of any Foreign Subsidiary or any Foreign Subsidiary

-18-

Holding Company to secure the Obligations, any Capital Stock of any class of such Foreign Subsidiary or such Foreign Subsidiary Holding Company in excess of 65% of the outstanding Capital Stock of such class (such percentage to be adjusted by mutual agreement (not to be unreasonably withheld) upon any change in law as may be required to avoid adverse U.S. federal income tax consequences to the Borrower or any Subsidiary), (c) any Capital Stock to the extent the pledge thereof would violate any applicable Requirement of Law, (d) the Capital Stock of any Permitted Receivables Subsidiary, any Immaterial Subsidiary (for so long as such Subsidiary remains an Immaterial Subsidiary) or any Unrestricted Subsidiary and (e) in the case of any Capital Stock of any Subsidiary that is subject of a Lien permitted under Section 7.3(g) securing Indebtedness permitted under Section 7.2(t) or (u) any Capital Stock of each such Subsidiary to the extent that (i) a pledge thereof to secure the Obligations is prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code) or (ii) any Contractual Obligation prohibits such a pledge without the consent of the other party; provided that this clause (ii) shall not apply if (A) such other party is a Loan Party or a wholly-owned Subsidiary or (B) consent has been obtained to consummate such pledge and for so long as such Contractual Obligation or replacement or renewal thereof is in effect or (iii) a pledge thereof to secure the Obligations would give any other party to a Contractual Obligation the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law); provided that this clause (iii) shall not apply if such other party is a Loan Party or a wholly-owned Subsidiary.

"Excluded Collateral": as defined in Section 4.17(a).

"Excluded Real Property": (a) any Real Property that is subject to a Lien expressly permitted by Section 7.3(g) or 7.3(aa), (b) any Real Property with respect to which, in the reasonable judgment of Administrative Agent (confirmed by notice to the Borrower) the cost of providing a mortgage on such Real Property in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (c) any Real Property to the extent providing a mortgage on such Real Property would (i) result in adverse tax consequences as reasonably determined by the Administrative Agent, (ii) violate any applicable Requirement of Law, (iii) be prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code) or (iv) give any other party (other than a Loan Party or a wholly-owned Subsidiary) to any contract, agreement, instrument or indenture governing such Real Property the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law).

"Excluded Subsidiary": (a) each Domestic Subsidiary which is an Immaterial Subsidiary as of the Closing Date and listed on Schedule 1.1(a) and each future Domestic Subsidiary which is an Immaterial Subsidiary, in each case, for so long as such Subsidiary remains an Immaterial Subsidiary, (b) each Domestic Subsidiary that is not a wholly-owned Subsidiary on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of Section 6.8(c) (for so long as such Subsidiary remains a non-wholly-owned Restricted Subsidiary), (c) any Foreign Subsidiary Holding Company, (d) each Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (e) each Unrestricted Subsidiary, (f) each Domestic Subsidiary to the extent that (i) such Domestic Subsidiary is prohibited by any applicable Contractual Obligation or Requirement of Law from guaranteeing the Obligations, (ii) any Contractual Obligation prohibits such guarantee without the consent of the other party or (iii) a guarantee of the Obligations would give any other party to a Contractual Obligation the right to terminate its obligation thereunder; provided that clauses (ii) and (iii) shall not be applicable if (A) such other party is a Loan Party or a wholly-owned Subsidiary or (B) consent has been obtained to provide such pledge and for so long as such Contractual Obligation or replacement or renewal thereof is in effect, (g) any Permitted Receivables Subsidiary or (h) any other Domestic Subsidiary with respect to

-19-

which, in the reasonable judgment of the Administrative Agent (confirmed by notice to the Borrower) the cost of providing a guarantee is excessive in view of the benefits to be obtained by the Lenders.

"Existing Joint Ventures":  collectively, the joint ventures of the Borrower listed on Schedule 1.1(b).

"Existing JV Indebtedness":  Guarantee Obligations of the Borrower or any Restricted Subsidiary existing as of the date hereof in respect of Indebtedness of the Existing Joint Ventures and any Permitted Refinancing thereof.

"Facility":  each of (a) the Term Commitments and the Term Loans made thereunder (the "Term Facility"), (b) any New Loan Commitments and the New Loans made thereunder (a "New Facility"), (c) the Dollar Revolving Commitments and the extensions of credit made thereunder (the "Dollar Revolving Facility") and (d) the Multicurrency Revolving Commitments and the extensions of credit made thereunder (the "Multicurrency Revolving Facility" and, together with the Dollar Revolving Facility, the "Revolving Facility").

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Payment Date":  commencing on December 31, 2007, (a) the third Business Day following the last day of each March, June, September and December and (b) the last day of the Revolving Commitment Period.

"Foreign Currency":  at any time, any Currency other than Dollars.

"Foreign Subsidiary":  any Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Foreign Subsidiary Holding Company":  any Restricted Subsidiary of the Borrower which is a Domestic Subsidiary substantially all of the assets of which consist of the Capital Stock of one or more Foreign Subsidiaries.

"Funded Debt":  with respect to any Person, all Indebtedness of such Person of the types described in clauses (a), (b) and (e) of the definition of "Indebtedness".

"Funding Office":  for each Currency, the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office in respect of such Currency by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority":  any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities

-20-

exchange and any self regulatory organization (including the National Association of Insurance Commissioners).

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A, as the same may be amended, supplemented or otherwise modified from time to time.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets or any Investment permitted under this Agreement. The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"Guarantors": the collective reference to Holdings and the Subsidiary Guarantors.

"Hedge Agreements": all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by the Borrower or any Restricted Subsidiary.

"Holdings": as defined in the preamble hereto.

"Holdings IPO": the issuance by Holdings or any Parent Company of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act whether alone or in connection with a secondary public offering.

"Immaterial Subsidiary": on any date, any Subsidiary of the Borrower (i) that has had less than 5% of Consolidated Total Assets and 5% of annual consolidated revenues of the Borrower and

-21-

its Restricted Subsidiaries as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such date and (ii) (other than with respect to determining whether an Event of Default under Sections 8(f) or 8(h) has occurred and is continuing) that is listed on Schedule 1.1(a) as of the Closing Date or has been designated as such by the Borrower in a written notice delivered to the Administrative Agent (other than any such Subsidiary as to which the Borrower has revoked such designation by written notice to the Administrative Agent); *provided* that at no time shall all Immaterial Subsidiaries have in the aggregate Consolidated Total Assets or annual consolidated revenues (as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such time) in excess of 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries.

"Increased Amount Date": as defined in Section 2.25.

"Indebtedness" of any Person: without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person for the deferred purchase price of Property or services, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) all payments that such Person would have to make in the event of an early termination, on the date Indebtedness of such Person is being determined in respect of outstanding Hedge Agreements (such payments in respect of any Hedge Agreement with a counterparty being calculated subject to and in accordance with any netting provisions in such Hedge Agreement), (g) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Credit Agreement) and (ii) in respect of bankers' acceptances; *provided* that Indebtedness shall not include (A) trade and other ordinary course payables, accrued expenses and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset or (D) earn-out obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof.

"Indebtedness for Borrowed Money": to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments, (ii) Capital Lease Obligations and (iii) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations); *provided* that the Obligations shall not constitute Indebtedness for Borrowed Money.

"Initial Borrower": as defined in the preamble to this Agreement.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Instrument": as defined in the Guarantee and Collateral Agreement.

-22-

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, domain names, patents, patent licenses, trademarks, trademark licenses, trade names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date": (a) commencing on March 31, 2008, as to any ABR Loan (other than any Swingline Loan), the third Business Day following the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurocurrency Loan (other than any Swingline Loan) having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurocurrency Loan (other than any Swingline Loan) having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period, (d) as to any Loan (other than any Revolving Loan that is an ABR Loan and any Swingline Loan), the date of any repayment or prepayment made in respect thereof and (e) as to any Swingline Loan, the third Business Day following the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan.

"Interest Period": as to any Eurocurrency Loan (other than any Multicurrency Swingline Loan), (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurocurrency Loan and ending one, two, three or six or (if available from all Lenders under the relevant Facility) nine or twelve months thereafter, as selected by the Borrower in its notice of borrowing or notice of continuation or conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurocurrency Loan and ending one, two, three or six or (with the consent of each affected Lender under the relevant Facility) nine or twelve months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 1:00 P.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)  if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)  any Interest Period that would otherwise extend beyond the scheduled Revolving Termination Date or beyond the date final payment is due on the Term Loans shall end on the Revolving Termination Date or such due date, as applicable; and

(iii)  any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Investments": as defined in Section 7.7.

"Issuing Lenders": with respect to each Class of Revolving Commitments (a) JPMorgan Chase Bank and (b) any other Revolving Lender of such Class from time to time designated by the Borrower as an Issuing Lender for such Class with the consent of such other Revolving Lender in its sole discretion.

-23-

NY1:#3465828

"Joinder Agreement": an agreement substantially in the form of Exhibit H.

"Joint Lead Arrangers": the collective reference to Lehman Brothers Inc., Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., in their respective capacities as joint lead arrangers and joint bookrunners.

"JV Distribution Amount": at any time, 50% of the aggregate amount of all cash dividends or distributions received by the Borrower or any of its Restricted Subsidiaries as a return on an Investment in a Permitted Joint Venture during the period from the Closing Date through the end of the fiscal quarter most recently ended immediately prior to such date for which financial statements are internally available (provided that the Borrower or any Restricted Subsidiary is not required to reinvest such dividends or distribution in the Permitted Joint Venture).

"L/C Commitment": $50,000,000.

"L/C Obligations": at any time, the sum of (a) the Dollar L/C Obligations and (b) the Multicurrency L/C Obligations.

"L/C Participants": with respect to Letters of Credit of a Class, the collective reference to all the Revolving Lenders of such Class other than the applicable Issuing Lender.

"LCPI": Lehman Commercial Paper Inc.

"Lenders": as defined in the preamble hereto.

"Letters of Credit": as defined in Section 3.1(a).

"Lien": any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing). For the avoidance of doubt, it is understood and agreed that the Borrower and any Restricted Subsidiary may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by, or licensed to, such entity. For purposes of this Agreement and the other Loan Documents, such licensing activity shall not constitute a "Lien" on such Intellectual Property. Each of the Administrative Agent and each Lender understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may limit the ability of the Administrative Agent to utilize, sell, lease, license or transfer the related Intellectual Property or otherwise realize value from such Intellectual Property pursuant hereto.

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": the collective reference to this Agreement, the Security Documents and the Notes (if any) and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties": Holdings, the Borrower and each Subsidiary Guarantor.

"Local Time": with respect to any Loan denominated in or any payment to be made in any Currency, the local time in the Principal Financial Center for the Currency in which such Loan is denominated or such payment is to be made.

-24-

"Majority Facility Lenders":  with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Revolving Extensions of Credit, as the case may be, outstanding under such Facility (or, in the case of the Revolving Facility, prior to any termination of the Revolving Commitments under such Facility, the holders of more than 50% of the Revolving Commitments under such Facility).

"Majority Revolving Facility Lenders":  the Majority Facility Lenders in respect of the Revolving Facility.

"Majority Term Facility Lenders":  the Majority Facility Lenders in respect of the Term Facility.

"Management Agreement":  the Management Agreement, by and between the Borrower and T.C. Group V, L.L.C., as in effect on the Closing Date and as modified from time to time with the consent of the Administrative Agent.

"Mandatory Prepayment Date":  as defined in Section 2.12(e).

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, property or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, or (b) the validity or enforceability of the Loan Documents or the material rights and remedies of the Administrative Agent and the Lenders thereunder, in each case, taken as a whole.

"Material Disposition":  the Disposition by the Borrower and/or any Subsidiary of one or more lines of Business (and/or any assets relating thereto) disclosed in a schedule to be provided to the Administrative Agent and the Joint Lead Arrangers prior to the Closing Date.

"Material Real Property":  any Real Property located in the United States and owned in fee by a Loan Party on the Closing Date having an estimated fair market value (in the good faith judgment of such Loan Party) exceeding $5,000,000 (including in any event the Real Property identified on Schedule 4.8B as "Subject to a Mortgage") and any after-acquired Real Property located in the United States owned by a Loan Party having a gross purchase price exceeding $5,000,000 at the time of acquisition.

"Material Subsidiary":  any Subsidiary that is not an Immaterial Subsidiary.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined as hazardous or toxic under any Environmental Law, that are regulated pursuant to any Environmental Law.

"Merger Agreement":  the Agreement and Plan of Merger, dated as of July 8, 2007, by and among Blue Jay Acquisition Corporation, Blue Jay Merger Corporation and Sequa.

"Merger Documents":  collectively, the Merger Agreement and all schedules, exhibits, annexes and amendments thereto, in each case, as amended, supplemented or otherwise modified from time to time.

"Merger Transactions":  the transactions contemplated by the Merger Agreement.

-25-

NY1:#3465828

"Moody's": Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgaged Properties": all Real Property that shall be subject to a Mortgage that is delivered pursuant to the terms of this Agreement.

"Mortgage": any mortgage, deed of trust, hypothec, assignment of leases and rents or other similar document delivered on or after the Closing Date by any Loan Party in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, with respect to Mortgaged Properties, each substantially in form and substance reasonably acceptable to the Administrative Agent and the Borrower (taking into account the law of the jurisdiction in which such mortgage, deed of trust, hypothec or similar document is to be recorded), as the same may be amended, supplemented or otherwise modified from time to time.

"Multicurrency L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired face amount of the then outstanding Multicurrency Letters of Credit and (b) the aggregate amount of drawings under Multicurrency Letters of Credit that have not then been reimbursed. The Multicurrency L/C Obligations of any Lender at any time shall be its Multicurrency Revolving Percentage of the total Multicurrency L/C Obligations at such time.

"Multicurrency Letter of Credit": Letters of Credit that utilize the Multicurrency Revolving Commitments.

"Multicurrency Revolving Commitments": as to any Multicurrency Revolving Lender, the obligation of such Lender, if any, to make Multicurrency Revolving Loans and participate in Multicurrency Swingline Loans and Multicurrency Letters of Credit in an aggregate principal and/or face Dollar Amount not to exceed the amount set forth under the heading "Multicurrency Revolving Commitment" opposite such Lender's name on Schedule 2.01, or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original Dollar Amount of the Multicurrency Revolving Commitments is $50,000,000.

"Multicurrency Revolving Extensions of Credit": as to any Multicurrency Revolving Lender at any time, an amount equal to the Dollar Amount of the sum of, without duplication, (a) the aggregate principal amount of all Multicurrency Revolving Loans held by such Lender then outstanding, (b) such Lender's Multicurrency Revolving Percentage of the Multicurrency L/C Obligations then outstanding and (c) such Lender's Multicurrency Revolving Percentage of the aggregate principal amount of Multicurrency Swingline Loans then outstanding.

"Multicurrency Revolving Lender": each Lender that has a Multicurrency Revolving Commitment or that holds Multicurrency Revolving Loans.

"Multicurrency Revolving Loans": as defined in Section 2.4(b).

"Multicurrency Revolving Percentage": as to any Multicurrency Revolving Lender at any time, the percentage which such Lender's Multicurrency Revolving Commitment then constitutes of the aggregate Multicurrency Revolving Commitments or, at any time after the Multicurrency Revolving Commitments shall have expired or terminated, the percentage which the Dollar Amount of the aggregate principal amount of such Lender's Multicurrency Revolving Loans then outstanding constitutes of the Dollar Amount of the aggregate principal amount of the Multicurrency Revolving Loans then outstanding, provided that in the event that the Multicurrency Revolving Loans are paid in full prior to the

-26-

reduction to zero of the Multicurrency Revolving Extensions of Credit, the Multicurrency Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Multicurrency Revolving Extensions of Credit shall be held by the Multicurrency Revolving Lenders on a comparable basis.

"Multicurrency Swingline Loans": as defined in Section 2.6(b).

"Multiemployer Plan": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds": (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) received by any Loan Party, net (i) of attorneys' fees, accountants' fees, investment banking fees, consulting fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred by any Loan Party in connection therewith; (ii) taxes paid or reasonably estimated to be payable by any Loan Party as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); (iii) the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (ii) above) (A) associated with the assets that are the subject of such event and (B) retained by the Borrower or any of the Restricted Subsidiaries, provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such event occurring on the date of such reduction and (iv) the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or any Domestic Subsidiary as a result thereof; provided that, other than in respect of the proceeds of a Material Disposition, at any time during the period following an Asset Sale and prior to the Reinvestment Prepayment Date, if, on a pro forma basis after giving effect to such Asset Sale and the application of the proceeds thereof, the Consolidated Total Leverage Ratio is less than 5.00 to 1.00, up to $20,000,000 of such proceeds in the aggregate shall not constitute Net Cash Proceeds and (b) in connection with any Equity Issuance or other issuance or sale of debt securities or instruments or the incurrence of Funded Debt, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"New Facility": as defined in the definition of "Facility".

"New Lender": as defined in Section 2.25.

"New Loan Commitments": as defined in Section 2.25.

"New Loans": any loan made by any New Lender pursuant to this Agreement.

"New Revolving Loans": as defined in Section 2.25.

"New Term Lender": a Lender that has a New Term Loan.

"New Term Loans": as defined in Section 2.25.

-27-

"Non-Excluded Subsidiary": any Subsidiary of the Borrower which is not an Excluded Subsidiary.

"Non-Excluded Taxes": as defined in Section 2.20(a).

"Non-Guarantor Subsidiary": any Subsidiary of the Borrower which is not a Subsidiary Guarantor.

"Non-Recourse Debt": Indebtedness (a) no default with respect to which would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of Holdings, the Borrower or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity and (b) as to which the lenders or holders thereof will not have any recourse to the capital stock or assets of Holdings, the Borrower or any of its Restricted Subsidiaries.

"Non-US Lender": as defined in Section 2.20(d).

"Note": any promissory note evidencing any Loan.

"Obligations": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Administrative Agent, the Collateral Agent or to any Lender (or, in the case of Specified Hedge Agreements of the Borrower or any of its Subsidiaries to the Administrative Agent, the Collateral Agent, any Lender or any affiliate of any Lender), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise; provided that (a) obligations of the Borrower or any of its Subsidiaries under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Company": any direct or indirect parent of Holdings.

"Participant": as defined in Section 10.6(c).

"Participating Member State": any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union.

-28-

"Payment Amount": as defined in Section 3.5.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Acquisition": (a) any acquisition (including, if applicable, in the case of any Intellectual Property, by way of license) approved by the Required Lenders, (b) any acquisition made solely with the Net Cash Proceeds of any Equity Issuance (other than Disqualified Capital Stock) or Net Cash Proceeds which have increased the Available Amount or (c) any acquisition of a majority controlling interest in the Capital Stock, or all or substantially all of the assets, of any Person, or of all or substantially all of the assets constituting a division, product line or business line of any Person (each, an "Acquisition"), if such Acquisition described in this clause (c) complies with the following criteria:

(a)    no Event of Default shall be in effect immediately prior or after giving effect to such Acquisition; and

(b)    if the total consideration in respect of such Acquisition exceeds $50,000,000, the Borrower shall have delivered to the Administrative Agent a certificate of the Borrower signed by a Responsible Officer to such effect, together with all relevant financial information for such Subsidiary or assets including one-year financial projections in respect of the Person, division, product line or business line acquired in such Acquisition.

"Permitted Additional Sale Leaseback": as defined in Section 7.10(v).

"Permitted Asset Swap": the substantially concurrent purchase and sale or exchange of Related Business Assets between the Borrower or any of its Restricted Subsidiaries and another Person.

"Permitted Business": the Business and any services, activities or businesses incidental or directly related or similar to any line of business engaged in by the Borrower and its Subsidiaries as of the Closing Date or any business activity that is a reasonable extension, development or expansion thereof or ancillary thereto.

"Permitted Investors": the collective reference to the Sponsor and its Affiliates (but excluding any operating portfolio companies of the foregoing), directors and the members of management of Holdings and its Subsidiaries that have ownership interests in Holdings (for so long as the ownership interests held by such directors or members of management are less than the ownership interests held by the Sponsor).

"Permitted Joint Venture": with respect to any specified Person, a joint venture with any other Person engaged in the Business of which at least 40% of the outstanding Capital Stock of such other Person is at the time owned directly or indirectly by the specified Person.

"Permitted Joint Venture Investment": with respect to any specified Person, Investments in any Permitted Joint Venture.

"Permitted Receivables Financing": as defined in Section 7.2(x), which shall include, for the avoidance of doubt, any financing in connection with: (i) that certain Amended and Restated Receivables Purchase Agreement dated as of April 30, 2004 among Sequa Receivables Corp., Sequa, any commercial paper conduit purchaser, committed purchaser and funding agent party thereto and The Bank of Nova Scotia and (ii) that certain Amended and Restated Purchase and Sales Agreement dated as of

-29-

April 30, 2004 among the originators named therein, Sequa Receivables Corp. and Sequa, in each case, as amended, supplemented or otherwise modified from time to time.

"Permitted Receivables Subsidiary": a direct or indirect Subsidiary of the Borrower (including Sequa Receivables Corp.) established in connection with a Permitted Receivables Financing for the acquisition of receivables assets or interests therein, and which is organized in a manner intended to reduce the likelihood that it would be substantively consolidated with the Borrower or any of the Subsidiaries (other than other Permitted Receivables Subsidiaries) in the event the Borrower or any such Restricted Subsidiary becomes subject to a proceeding under the U.S. Bankruptcy Code (or other insolvency law).

"Permitted Refinancings": with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness provided that (a) there is no increase in the principal amount (or accrued value) thereof (excluding accrued interest, fees, discounts, premiums and expenses), (b) the weighted average life to maturity of such Indebtedness is greater than or equal to the shorter of (i) the weighted average life to maturity of the Indebtedness being refinanced and (ii) the weighted average life to maturity that would result if all payments of principal on the Indebtedness being refinanced that were due on or after the date that is one year following the Term Maturity Date were instead due one year following the Term Maturity Date, (c) if the Indebtedness being refinanced, refunded, modified, renewed or extended is subordinated in right of payment to the Obligations, such refinancing, refunding, modification, renewal or extension is subordinated in right of payment to the Obligations (A) on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being refinanced, refunded, modified, renewed or extended, (B) on terms consistent with the then-prevailing market terms for subordination of comparable Indebtedness or (C) on terms to which the Administrative Agent shall agree, (d) the terms and conditions (including, if applicable, as to collateral) of any such refinanced, refunded, renewed or extended Indebtedness are not materially less favorable to the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended, (e) no Default or Event of Default shall have occurred and be continuing at the time thereof or no Default or Event of Default would result from any such refinancing, refunding, modification, renewal or extension and (f) with respect to any such Indebtedness that is secured, neither the Borrower nor any Restricted Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, refundings, renewals or extensions except to the extent that such Person was such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, refunded, renewed or extended.

"Permitted Subordinated Indebtedness": unsecured, senior subordinated or subordinated Indebtedness of the Borrower or any Restricted Subsidiary (including guarantees thereof by the Borrower or any Guarantor, as applicable), provided that (a) no scheduled principal payments, mandatory prepayments, redemptions or sinking fund payments of any Permitted Subordinated Indebtedness shall be required prior to the date at least 180 days following the Term Maturity Date (or, such later date that is the latest final maturity date of any incremental extensions of credit hereunder), (b) the covenants and events of default of such Permitted Subordinated Indebtedness (i) shall be, taken as a whole, customary for Indebtedness of a similar nature as such Permitted Subordinated Indebtedness or (ii) shall otherwise not have been objected to by the Administrative Agent, after the Administrative Agent shall have been afforded a period of five Business Days to review such terms of such Permitted Subordinated Indebtedness, (c) the terms of subordination applicable to any Permitted Subordinated Indebtedness shall be (i) taken as a whole, customary for unsecured subordinated high yield debt securities issued by any Affiliates of the Sponsor or (ii) shall otherwise not have been objected to by the Administrative Agent, after the Administrative Agent shall have been afforded a period of five Business Days to review such terms of such Permitted Subordinated Indebtedness and (d) no Default or Event of Default shall have occurred and be continuing at the time of incurrence of such Indebtedness or would result therefrom.

-30-

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which Holdings, the Borrower or any of its Restricted Subsidiaries is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Securities": as defined in the Guarantee and Collateral Agreement.

"Pledged Stock": as defined in the Guarantee and Collateral Agreement.

"Prepayment Amount": as defined in Section 2.12(e).

"Prepayment Option Notice": as defined in Section 2.12(e).

"Pricing Grid": the table set forth below:



Changes in the Applicable Margin with respect to Loans or the Applicable Commitment Fee Rate resulting from changes in the Consolidated Senior Secured Leverage Ratio shall become effective on the date on which financial statements are delivered to the Lenders pursuant to Section 6.1 and shall remain in effect until the next change to be effected pursuant to this paragraph. If any financial statements referred to above are not delivered within the time periods specified in Section 6.1, then, at the option of (and upon the delivery of notice (telephonic or otherwise) by) the Administrative Agent or the Required Lenders, until such financial statements are delivered, the Consolidated Senior Secured Leverage Ratio as at the end of the fiscal period that would have been covered thereby shall for the purposes of this definition be deemed to be greater than 3.00 to 1.00. In addition, at all times while an Event of Default

set forth in Section 8(a) or 8(f) shall have occurred and be continuing, the Consolidated Senior Secured Leverage Ratio shall for the purposes of the Pricing Grid be deemed to be greater than 3.00 to 1.00.

"Prime Rate": as defined in the definition of "ABR".

"Principal Financial Center": in the case of any Currency, the principal financial center where such Currency is cleared and settled, as reasonably determined by the Administrative Agent.

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"Public Company Costs": costs relating to compliance with the provisions of the Securities Act and the Exchange Act, as applicable to companies with equity securities held by the public, the rules of national securities exchange companies with listed equity securities, directors' compensation, fees and expense reimbursement, shareholder meetings and reports to shareholders, directors and officers' insurance and other executive costs, legal and other professional fees, and listing fees, in each case incurred or accrued prior to the Closing Date and that will not continue to be incurred after the Closing Date.

"Qualified Capital Stock": any Capital Stock that is not Disqualified Capital Stock.

"Qualified Contract": any contract for the sale, manufacture and/or distribution of aero engine parts or repairs and related services by the Borrower or any of its Restricted Subsidiaries so long as (i) an officer of the Borrower has certified to the Administrative Agent that the revenues directly generated by such contract would exceed $5,000,000, (ii) such contract has a stated term of at least three years, (iii) it is reasonably expected that the Borrower or its Restricted Subsidiaries will be responsible for substantially all parts supplied under such contract and (iv) such contract includes specified pricing levels.

"Real Property": collectively, all right, title and interest of the Borrower or any other Subsidiary in and to any and all parcels of real property owned or operated by the Borrower or any other Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Recovery Event": any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Domestic Subsidiary that is a Restricted Subsidiary, in an amount for each such event exceeding $10,000,000.

"Reference Period": the period of four fiscal quarters most recently ended immediately prior to the date of any specified event for which financial statements have been delivered pursuant to Section 6.1.

"Refinancing Notes": (a) any debt securities of the Borrower to be issued after the Closing Date (i) upon the conversion or exchange of the Senior Interim Loans for such debt securities, or (ii) to refinance in whole or in part the Senior Interim Loans or any debt securities issued to refinance or upon the conversion or exchange of any Senior Interim Loans; provided that, in the case of clause (ii), no scheduled principal payments or sinking fund payments (excluding, for the avoidance of doubt, any AHYDO Payments) of any such debt securities shall be required prior to the date at least 90 days following the Term Maturity Date, and (b) any substantially similar Refinancing Notes (whether registered under the Securities Act or otherwise) that have been exchanged for any such other Refinancing Notes; in each case as any such Refinancing Notes may be amended, supplemented or otherwise modified from time to time to the extent not prohibited by this Agreement.

-32-

"Refinancing Notes Indenture": any indenture governing any Refinancing Notes, as the same may be amended, supplemented or otherwise modified from time to time to the extent applicable to the extent not prohibited by this Agreement.

"Refunded Swingline Loans": as defined in Section 2.7(b).

"Register": as defined in Section 10.6(b)(iv).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse an Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit issued by such Issuing Lender.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Loan Party for its own account in connection therewith that are not applied to prepay the Term Loans pursuant to Section 2.12 as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Asset Sale or Recovery Event in respect of which a Loan Party has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice signed on behalf of any Loan Party by a Responsible Officer stating that such Loan Party (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire assets useful in the Business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount contractually committed by the applicable Loan Party (directly or indirectly through a Subsidiary) to be expended prior to the relevant Reinvestment Prepayment Date (a "Committed Reinvestment Amount"), or actually expended prior to such date, in each case to acquire assets useful in the Business.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (i) the date occurring 15 months after such Reinvestment Event and (ii) with respect to any portion of a Reinvestment Deferred Amount, the date on which any Loan Party shall have determined not to acquire assets useful in the Business with such portion of such Reinvestment Deferred Amount.

"Related Business Assets": assets (other than cash or Cash Equivalents) used or useful in a Permitted Business; provided that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"Release": any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

-33-

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by the PBGC in accordance with the regulations thereunder.

"Representatives": as defined in Section 10.14.

"Required Lenders": at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Revolving Extensions of Credit then outstanding.

"Required Prepayment Lenders": the Majority Facility Lenders in respect of the Term Facility.

"Requirement of Law": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer": the chief executive officer, president, chief financial officer (or similar title) controller or treasurer (or similar title) of Holdings or the Borrower, as applicable, or (with respect to Section 6.7) any Restricted Subsidiary and, with respect to financial matters, the chief financial officer (or similar title), controller or treasurer (or similar title) of Holdings or the Borrower, as applicable.

"Restricted Payments": as defined in Section 7.6.

"Restricted Subsidiary": any Subsidiary of the Borrower which is not an Unrestricted Subsidiary.

"Revolving Commitment Period": the period from and including the Closing Date to the Revolving Termination Date.

"Revolving Commitments": collectively, the Dollar Revolving Commitments and the Multicurrency Revolving Commitments.

"Revolving Dollar Exposure": with respect to any Dollar Revolving Lender, the sum of the outstanding principal amount of such Lender's Dollar Revolving Loans (including its Dollar Revolving Percentage of any Dollar Swingline Loans) and its portion of the Dollar L/C Obligations at such time made or incurred under the Dollar Revolving Commitments.

"Revolving Extensions of Credit": collectively, the Dollar Revolving Extensions of Credit and the Multicurrency Revolving Extensions of Credit.

"Revolving Facility": as defined in the definition of "Facility".

"Revolving Lender": each Dollar Revolving Lender and each Multicurrency Revolving Lender.

"Revolving Loans": collectively, the Dollar Revolving Loans and the Multicurrency Revolving Loans.

-34-

"Revolving Multicurrency Exposure": with respect to any Multicurrency Revolving Lender, the sum of the Dollar Amount of the outstanding principal amount of such Lender's Multicurrency Revolving Loans (including its Multicurrency Revolving Percentage of any Multicurrency Swingline Loans) and its portion of the Multicurrency L/C Obligations at such time made or incurred under the Multicurrency Revolving Commitments.

"Revolving Percentage": collectively, the Dollar Revolving Percentage and the Multicurrency Revolving Percentage.

"Revolving Termination Date": the sixth anniversary of the Closing Date.

"S&P": Standard & Poor's Ratings Group, Inc., or any successor to the rating agency business thereof.

"Screen": for any Currency, the relevant display page for the Eurocurrency Rate for such Currency (as reasonably determined by the Administrative Agent) on Reuters Screen LIBOR01; provided that if the Administrative Agent determines that there is no such relevant display page or otherwise in Reuters for the Eurocurrency Rate for such Currency, "Screen" means such other comparable publicly available service for displaying the Eurocurrency Rate for such Currency (as reasonably determined by the Administrative Agent).

"SEC": the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Secured Parties": collectively, the Lenders, the Administrative Agent, the Collateral Agent, the Swingline Lender, any Issuing Lender, any other holder from time to time of any of the Obligations and, in each case, their respective successors and permitted assigns.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security": as defined in the Guarantee and Collateral Agreement.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement and all other security documents (including any Mortgages) hereafter delivered to the Administrative Agent or the Collateral Agent purporting to grant a Lien on any Property of any Loan Party to secure the Obligations.

"Senior Interim Facility Indebtedness": Indebtedness incurred under the Senior Interim Loan Facility.

"Senior Interim Loan Agreement": the Senior Interim Loan Credit Agreement, dated as of the Closing Date, among the Borrower, the lenders party thereto, Lehman Commercial Paper Inc., as administrative agent, as such agreement may be amended, supplemented or otherwise modified from time to time or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time to the extent not prohibited by this Agreement (whether in whole or in part, whether with the original administrative agent and lenders or other agents and lenders or otherwise, and whether provided under the original Senior Interim Loan Agreement or other credit agreements, indentures or otherwise, unless such agreement or instrument expressly provides that it is not intended to be and is not a Senior Interim Loan Agreement hereunder).

-35-

"Senior Interim Loan Documents": the Loan Documents as defined in the Senior Interim Loan Agreement or any other documentation evidencing any Senior Interim Loan Facility, as the same may be amended, supplemented or otherwise modified, extended, renewed, refinanced or replaced from time to time to the extent not prohibited by this Agreement.

"Senior Interim Loan Facility": the collective reference to the Senior Interim Loan Agreement, any Senior Interim Loan Documents, any notes issued pursuant thereto and any guarantee agreement, and other guarantees and other instruments and documents, executed and delivered pursuant to or in connection with any of the foregoing, in each case as the same may be amended, supplemented or otherwise modified from time to time, or refunded, refinanced, restructured, replaced, renewed, repaid, increased or extended from time to time (whether in whole or in part, whether with the original agent and lenders or other agents and lenders or otherwise, and whether provided under the original Senior Interim Loan Agreement or other credit agreements, indentures (including any Refinancing Notes Indenture) or otherwise, unless such agreement expressly provides that it is not intended to be and is not a Senior Interim Loan Facility hereunder).

"Senior Interim Loans": any loan made pursuant to the Senior Interim Loan Agreement.

"Sequa": as defined in the preamble hereto.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent": with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured and (iii) except as otherwise provided by applicable law, the amount of "contingent liabilities" at any time shall be the amount thereof which, in light of all the facts and circumstances existing at such time, can reasonably be expected to become actual or matured liabilities.

"Specified Equity Contribution": as defined in the definition of "Consolidated EBITDA".

"Specified Hedge Agreement": any Hedge Agreement (a) entered into by (i) the Borrower or any of its Subsidiaries and (ii) any Lender or any affiliate thereof at the time such Hedge Agreement was entered into, as counterparty and (b) that has been designated by such Lender and the Borrower, by notice to the Administrative Agent, as a Specified Hedge Agreement. The designation of any Hedge Agreement as a Specified Hedge Agreement shall not create in favor of the Lender or affiliate thereof that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Guarantee and Collateral Agreement. For the avoidance of

-36-

doubt, all Hedge Agreements in existence on the Closing Date between the Borrower or any of its Subsidiaries and any Lender shall constitute Specified Hedge Agreements.

"Specified Representations": (a) the representations made by Sequa in the Merger Agreement, but only to the extent that the Borrower has the right to terminate its obligations under the Merger Agreement in the event that any such representations are not true and (b) the representations and warranties set forth in Sections 4.2(a), 4.4(a), 4.4(c), 4.11 and 4.13.

"Sponsor": The Carlyle Group and any Affiliates thereof (but excluding any operating portfolio companies of the foregoing).

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; provided that any Permitted Joint Venture that is not required to be consolidated with the Borrower and its consolidated Subsidiaries in accordance with GAAP shall not be deemed to be a "Subsidiary" for purposes hereof.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantors": each (a) Subsidiary other than any Excluded Subsidiary and (b) any other Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.

"Swingline Commitment": the obligation of the Swingline Lender to make Swingline Loans pursuant to Section 2.6 in an aggregate principal amount at any one time outstanding not to exceed $20,000,000.

"Swingline Lender": (a) with respect to each Class of Swingline Loans, Lehman Commercial Paper Inc., in its capacity as the lender of Swingline Loans or (b) upon the resignation of Lehman Commercial Paper Inc. as a Swingline Lender, any Revolving Lender of the applicable Class from time to time designated by the Borrower as the Swingline Lender with respect to such Class (with the consent of such other Revolving Lender (in its sole discretion)).

"Swingline Loans": collectively, the Dollar Swingline Loans and the Multicurrency Swingline Loans.

"Swingline Participation Amount": as defined in Section 2.7(c).

"Syndication Agents": as defined in the preamble hereto.

"Term Commitment": as to any Lender, the obligation of such Lender, if any, to make a Term Loan to the Borrower in a principal amount not to exceed the amount set forth under the heading "Term Commitment" opposite such Lender's name on Schedule 2.01, or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto.  The original aggregate amount of the Term Commitments is $1,200,000,000.

"Term Facility": as defined in the definition of "Facility".

"Term Lender": each Lender that has a Term Commitment or that holds a Term Loan.

-37-

"Term Loans":  the term loans made to the Borrower on the Closing Date pursuant to Section 2.1.

"Term Maturity Date":  the seventh anniversary of the Closing Date.

"Term Percentage":  as to any Term Lender at any time on the Closing Date (but prior to the initial funding of the Term Loans), the percentage which the sum of such Lender's Term Commitments then constitutes of the aggregate Term Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term Loans then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding).

"Tranche":  as defined in Section 2.25.

"Transaction Documents":  the Merger Agreement, the Loan Documents, the Refinancing Notes and the Refinancing Notes Indenture and, if applicable, the Senior Interim Loan Documents.

"Transactions":  collectively, (a) the transactions to occur pursuant to the Transaction Documents and (b) the Company Reorganization.

"Transferee":  any Assignee or Participant.

"Type":  (i) as to any Loan denominated in Dollars, its nature as an ABR Loan or Eurocurrency Loan, and (ii) as to any Loan denominated in an Agreed Foreign Currency, its nature as a Eurocurrency Loan.

"United States":  the United States of America.

"Unrestricted Subsidiary":  (i) any Subsidiary of the Borrower designated as such and listed on Schedule 4.14 on the Closing Date and (ii) any Subsidiary of the Borrower that is designated by a resolution of the Board of Directors of the Borrower as an Unrestricted Subsidiary, but only to the extent that, in the case of each of clauses (i) and (ii), such Subsidiary: (a) has no Indebtedness other than Non-Recourse Debt; (b) is not party to any agreement, contract, arrangement or understanding with Holdings, the Borrower or any Restricted Subsidiary unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to Holdings, the Borrower or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of Holdings or the Borrower; (c) is a Person with respect to which neither Holdings, the Borrower nor any of the Restricted Subsidiaries has any direct or indirect obligation (x) to subscribe for additional Capital Stock or warrants, options or other rights to acquire Capital Stock or (y) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and (d) does not guarantee or otherwise provide credit support after the time of such designation for any Indebtedness of Holdings, the Borrower or any of its Restricted Subsidiaries, in the case of clauses (a), (b) and (c), except to the extent not otherwise prohibited by Section 7. If, at any time, any Unrestricted Subsidiary would fail to meet the foregoing requirements as an Unrestricted Subsidiary, it shall thereafter cease to be an Unrestricted Subsidiary for purposes hereof. Subject to the foregoing, the Borrower may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary or any Restricted Subsidiary to be an Unrestricted Subsidiary; provided that (i) such designation shall only be permitted if no Default or Event of Default would be in existence following such designation, (ii) any designation of an Unrestricted Subsidiary as a Restricted Subsidiary shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of any outstanding Indebtedness of such Unrestricted Subsidiary, (iii) any designation of a Restricted Subsidiary as an Unrestricted Subsidiary shall be deemed to be an Investment in an Unrestricted Subsidiary and shall reduce amounts available for Investments in Unrestricted

-38-

Subsidiaries permitted by Section 7.7 in an amount equal to the fair market value of the Subsidiary so designated and (iv) in no event shall any Restricted Subsidiary that is the subject of a Material Disposition be designated as an Unrestricted Subsidiary; provided that the Borrower may subsequently redesignate any such Unrestricted Subsidiary as a Restricted Subsidiary so long as the Borrower does not subsequently re-designate such Restricted Subsidiary as an Unrestricted Subsidiary for a period of the succeeding four fiscal quarters.

"Vehicles": all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state or province.

1.2 Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b) As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c) The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Annex, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d) The term "license" shall include sub-license. The term "documents" includes any and all documents whether in physical or electronic form.

(e) With respect to each Subsidiary that is not a wholly-owned Subsidiary or any Permitted Joint Venture, for purposes of calculating Consolidated EBITDA, the amount of income attributable to such Subsidiary or Permitted Joint Venture, as applicable, that shall be counted for such purposes shall equal the product of (x) the Borrower's direct and/or indirect percentage ownership of such Subsidiary or Permitted Joint Venture and (y) the aggregate amount of the applicable item of such Subsidiary or Permitted Joint Venture, as applicable, except to the extent the application of GAAP already takes into account the non-wholly owned subsidiary relationship.

The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

1.3 Currencies; Currency Equivalents; Euro. At any time, any reference in the definition of the term "Agreed Foreign Currency" or in any other provision of this Agreement to the Currency of any particular nation means the lawful currency of such nation at such time whether or not the name of such Currency is the same as it was on the date hereof. Except as provided in Section 2.12(f) or the last sentence of Section 2.18(g), for purposes of determining (i) whether the amount of any borrowing or Letter of Credit under the Multicurrency Revolving Commitments, together with all other borrowings and Letters of Credit under the Multicurrency Revolving Commitments then outstanding or to be borrowed at the same time as such borrowing, would exceed the total Multicurrency Revolving Commitments, (ii) the aggregate unused amount of the Multicurrency Revolving Commitments and (iii) the outstanding

-39-

aggregate principal amount of borrowings and Multicurrency L/C Obligations, the outstanding principal amount of any borrowing or Multicurrency Letter of Credit that is denominated in any Foreign Currency shall be deemed to be the Dollar Equivalent of the amount of the Foreign Currency of such borrowing or Letter of Credit determined as of the date of such borrowing or Letter of Credit. Wherever in this Agreement in connection with a borrowing, Loan or Letter of Credit an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such borrowing, Loan or Letter of Credit is denominated in a Foreign Currency, such amount shall be the relevant Agreed Foreign Currency Equivalent of such amount (rounded to the nearest 1,000 units of such Foreign Currency).

Each obligation hereunder of any party hereto that is denominated in a Currency of a country that is not a Participating Member State on the date hereof shall, effective from the date on which such country becomes a Participating Member State, be redenominated in euro in accordance with the legislation of the European Union applicable to the European Monetary Union; provided that if and to the extent that any such legislation provides that any such obligation of any such party payable within such Participating Member State by crediting an account of the creditor can be paid by the debtor either in euro or such Currency, such party shall be entitled to pay or repay such amount either in euro or in such Currency. If the basis of accrual of interest or fees expressed in this Agreement with respect to an Agreed Foreign Currency of any country that becomes a Participating Member State after the date on which such currency becomes an Agreed Foreign Currency shall be inconsistent with any convention or practice in the interbank market for the basis of accrual of interest or fees in respect of the euro, such convention or practice shall replace such expressed basis effective as of and from the date on which such country becomes a Participating Member State; provided that with respect to any borrowing or Letter of Credit denominated in such currency that is outstanding immediately prior to such date, such replacement shall take effect at the end of the Interest Period therefor. Without prejudice to the respective liabilities of the Borrower to the Lenders and of the Lenders to the Borrower under or pursuant to this Agreement, each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time reasonably specify to be necessary or appropriate to reflect the introduction or changeover to the euro in any country that becomes a Participating Member State after the date hereof.

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1 Term Commitments. Subject to the terms and conditions hereof, each Term Lender severally agrees to make a term loan (a "Term Loan") in Dollars to the Borrower on the Closing Date in an amount which will not exceed the amount of the Term Commitment of such Lender. The Term Loans may from time to time be Eurocurrency Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.13.

2.2 Procedure for Term Loan Borrowing. The Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 1:00 P.M., New York City time, on the day of the anticipated Closing Date) requesting that the Term Lenders make the Term Loans on the Closing Date and specifying the amount to be borrowed. The Term Loans made on the Closing Date shall initially be ABR Loans unless the Joint Lead Arrangers and the Administrative Agent otherwise agree. Upon receipt of such notice the Administrative Agent shall promptly notify each Term Lender thereof. Not later than 3:00 P.M., New York City time, on the Closing Date each Term Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Term Loan or Term Loans to be made by such Lender. The Administrative Agent shall credit the account designated in writing by the Borrower to the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by the Term Lenders in immediately available funds.

NY1:#3465828

2.3 <u>Repayment of Term Loans</u>.  The Term Loan of each Term Lender shall be payable in equal consecutive quarterly installments, commencing on March 31, 2008, on the last Business Day of each of December, March, June and September following the Closing Date in an amount equal to one quarter of one percent (0.25%) of the Term Loans funded on the Closing Date (as adjusted to reflect any prepayments thereof), with the remaining balance thereof payable on the Term Maturity Date.

2.4 <u>Revolving Commitments</u>.  (a) Subject to the terms and conditions hereof, each Dollar Revolving Lender severally agrees to make revolving credit loans ("<u>Dollar Revolving Loans</u>") in Dollars to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which when added to such Lender's Revolving Percentage of the sum of (i) the Dollar L/C Obligations then outstanding and (ii) the aggregate principal amount of the Dollar Swingline Loans then outstanding, does not exceed the amount of such Lender's Dollar Revolving Commitment.  During the Revolving Commitment Period, the Borrower may use the Dollar Revolving Commitments by borrowing, prepaying the Dollar Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.  The Dollar Revolving Loans may from time to time be Eurocurrency Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.13.

(b) Subject to the terms and conditions hereof, each Multicurrency Revolving Lender severally agrees to make revolving credit loans ("<u>Multicurrency Revolving Loans</u>") in Dollars or in any Agreed Foreign Currency to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which when added to such Lender's Multicurrency Revolving Percentage of the sum of (i) Multicurrency L/C Obligations then outstanding and (ii) the aggregate principal amount of the Multicurrency Swingline Loans then outstanding, does not exceed the amount of such Lender's Multicurrency Revolving Commitment.  During the Revolving Commitment Period, the Borrower may use the Multicurrency Revolving Commitments by borrowing, prepaying the Multicurrency Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.  The Multicurrency Revolving Loans denominated in Dollars may from time to time be Eurocurrency Loans or ABR Loans as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.13 and the Multicurrency Revolving Loans denominated in any Agreed Foreign Currency shall be Eurocurrency Loans.

(c) The Borrower shall repay all outstanding Revolving Loans made to it on the Revolving Termination Date.

2.5 <u>Procedure for Revolving Loan Borrowing</u>.  The Borrower may borrow under the Revolving Commitments of either Class during the Revolving Commitment Period on any Business Day; <u>provided</u> that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent (i) in the case of Eurocurrency Loans, prior to 1:00 P.M., New York City time, three Business Days prior to the requested Borrowing Date or (ii) in the case of ABR Loans, prior to 1:00 P.M., New York City time, one Business Day prior to the requested Borrowing Date), specifying (v) whether such borrowing is to be made under the Dollar Revolving Commitments or the Multicurrency Revolving Commitments, (w) the amount, the Currency (in the case of Multicurrency Revolving Loans) and Type of Revolving Loans to be borrowed, (x) the requested Borrowing Date, (y) in the case of Revolving Loans denominated in Dollars, whether such Revolving Loan is to be an ABR Loan or a Eurocurrency Loan and (z) in the case of Eurocurrency Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor.  Any Revolving Loans made on the Closing Date shall initially be ABR Loans unless the Joint Lead Arrangers and the Administrative Agent otherwise agree, and the aggregate principal Dollar Amount of all Revolving Loans made on the Closing Date shall not exceed $35,000,000 (which amount, for the avoidance of doubt, shall not include the face amount of any outstanding Letters of Credit).  Each borrowing by the Borrower under

-41-

the Revolving Commitments of either Class shall be in an amount equal to (x) in the case of ABR Loans, $500,000 or a whole multiple of $50,000 in excess thereof (or, if the then aggregate Available Revolving Commitments of the respective Class are less than $500,000, such lesser amount) and (y) in the case of Eurocurrency Loans, $1,000,000 or a whole multiple of $250,000 in excess thereof; provided that the Swingline Lender may request, on behalf of the Borrower, borrowings under the Revolving Commitments that are ABR Loans in other amounts pursuant to Section 2.7(a). Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender of the applicable Class thereof. Each Revolving Lender of such Class will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 2:00 P.M., Local Time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by such Revolving Lenders and in like funds as received by the Administrative Agent.

If no election as to the Class of Revolving Loans is requested, and the Loans requested are in Dollars, such election shall be deemed to be made under the Dollar Revolving Commitments. In the case of Multicurrency Revolving Loans, if no election as to the Currency of such Loan is specified, then the requested Loan shall be denominated in Dollars. If no election as to the Type of a Revolving Loan is specified, then the requested Loan shall be an ABR Loan, unless an Agreed Foreign Currency has been specified, in which case the requested Loan shall be a Eurocurrency Loan denominated in such Agreed Foreign Currency. If no Interest Period is specified with respect to any requested Eurocurrency Loan, (i) if the Currency specified for such Revolving Loan is Dollars (or if no Currency has been so specified), the Borrower shall be deemed to have selected a Revolving Loan in Dollars with an Interest Period of one month's duration, and (ii) if the Currency specified for such Loan is an Agreed Foreign Currency, the Borrower shall be deemed to have selected an Interest Period of one month's duration.

2.6 Swingline Commitment. (a) Subject to the terms and conditions hereof, the Swingline Lender with respect to the Dollar Revolving Commitments agrees to make a portion of the credit otherwise available to the Borrower under the Dollar Revolving Commitments from time to time during the Revolving Commitment Period by making swing line loans ("Dollar Swingline Loans") in Dollars to the Borrower; provided that (i) the aggregate principal amount of Swingline Loans outstanding at any time shall not exceed the Swingline Commitment then in effect (provided that the Swingline Loans outstanding at any time, when aggregated with the Swingline Lenders' other outstanding Revolving Loans, may exceed the Swingline Commitment then in effect) and (ii) the Borrower shall not request, and the Swingline Lender shall not make, any Dollar Swingline Loan if, after giving effect to the making of such Dollar Swingline Loan, the aggregate amount of the Available Revolving Commitments under the Dollar Revolving Commitments would be less than zero. During the Revolving Commitment Period, the Borrower may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. Dollar Swingline Loans shall be ABR Loans only.

(b) Subject to the terms and conditions hereof, the Swingline Lender with respect to the Multicurrency Revolving Commitments agrees to make a portion of the credit otherwise available to the Borrower under the Multicurrency Revolving Commitments from time to time during the Revolving Commitment Period by making swing line loans ("Multicurrency Swingline Loans") in Dollars or any Agreed Foreign Currency to the Borrower; provided that (i) the aggregate principal amount of Swingline Loans outstanding at any one time shall not exceed the Swingline Commitment then in effect (provided that the Swingline Loans outstanding at any time, when aggregated with the Swingline Lenders' other outstanding Revolving Loans, may exceed the Swingline Commitment then in effect) and (ii) the Borrower shall not request, and such Swingline Lender shall not make, any Multicurrency Swingline Loan if, after giving effect to the making of such Multicurrency Swingline Loan, the aggregate amount of

-42-

the Available Revolving Commitments under the Multicurrency Revolving Commitments would be less than zero.  During the Revolving Commitment Period, the Borrower may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. Multicurrency Swingline Loans shall be Eurocurrency Loans only.

   (c) The Borrower shall repay to the Swingline Lender of the applicable Class the then unpaid principal amount of each Swingline Loan on the Revolving Termination Date.

   2.7  Procedure for Swingline Borrowing; Refunding of Swingline Loans.  (a)  Whenever the Borrower desires that the Swingline Lender make Swingline Loans it shall give the Swingline Lender of the applicable Class and the Administrative Agent irrevocable written notice (which notice must be received by the Swingline Lender and the Administrative Agent not later than (x) in the case of Dollar Swingline Loans, 12:00 Noon, New York City time, on the proposed Borrowing Date or (y) in the case of Multicurrency Swingline Loans, 5:00 P.M., New York City time, on the day immediately prior to the proposed Borrowing Date), specifying (i) the amount and Currency to be borrowed, (ii) the requested Borrowing Date (which shall be a Business Day during the Revolving Commitment Period) and (iii) whether such borrowing is to be made under the Dollar Revolving Commitments or the Multicurrency Revolving Commitments. Each borrowing under the Swingline Commitment shall be in an amount equal to $100,000 or a whole multiple of $50,000 in excess thereof (or, in the case of Swingline Loans denominated in an Agreed Foreign Currency, the Agreed Foreign Currency Equivalent thereof as determined by the Swingline Lender from time to time). Not later than 3:00 P.M., New York City time, on the Borrowing Date specified in a notice in respect of Swingline Loans, the Swingline Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of the Swingline Loan to be made by the Swingline Lender.  The Administrative Agent shall make the proceeds of such Swingline Loan available to the Borrower on such Borrowing Date by depositing such proceeds in the account of the Borrower with the Administrative Agent or as otherwise directed by the Borrower on such Borrowing Date in immediately available funds. If no election as to the Class of Swingline Loans is requested, and the Swingline Loans requested are in Dollars, such election shall be deemed to be made under the Dollar Revolving Commitments.  In the case of any Multicurrency Swingline Loan, if no election as to the Currency of such Multicurrency Swingline Loan is specified, then the requested Multicurrency Swingline Loan shall be denominated in Dollars.

   (b) The Swingline Lender with respect to each Class, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs such Swingline Lender to act on its behalf), on one Business Day's notice given by such Swingline Lender no later than (i) in the case of any Dollar Swingline Loan, 12:00 Noon, New York City time or (ii) in the case of any Multicurrency Swingline Loan, 5:00 P.M., New York City time, request each Revolving Lender of the applicable Class to make, and each such Revolving Lender hereby agrees to make, a Revolving Loan, in an amount equal to such Revolving Lender's Dollar Revolving Percentage or Revolving Lender's Multicurrency Revolving Percentage, as applicable, of the aggregate amount of the Swingline Loans (the "Refunded Swingline Loans") outstanding on the date of such notice, to repay such Swingline Lender. Each Revolving Lender of the applicable Class shall make the amount of Revolving Loans available to the Administrative Agent at the Funding Office in immediately available funds, not later than 10:00 A.M., New York City time, one Business Day after the date of such notice. The proceeds of such Revolving Loans shall be immediately made available by the Administrative Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Loans.

-43-

(c) If prior to the time a Revolving Loan would have otherwise been made pursuant to Section 2.7(b), one of the events described in Section 8(f) shall have occurred and be continuing with respect to the Borrower or if for any other reason, as determined by the Swingline Lender of the applicable Class in its sole discretion, Revolving Loans may not be made as contemplated by Section 2.7(b), each Revolving Lender of the applicable Class shall, on the date such Revolving Loan was to have been made pursuant to the notice referred to in Section 2.7(b), purchase for cash an undivided participating interest in the then outstanding Swingline Loans of the applicable Class by paying to the Swingline Lender an amount in the relevant Currency (the "Swingline Participation Amount") equal to (A) such Revolving Lender's Dollar Revolving Percentage or Revolving Lender's Multicurrency Revolving Percentage, as applicable, times (B) the sum of the aggregate principal amount of Swingline Loans of the applicable Class then outstanding that were to have been repaid with such Revolving Loans.

(d) Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Lender's Swingline Participation Amount with respect to any Swingline Loans, the Swingline Lender receives any payment on account of such Swingline Loans, the Swingline Lender will distribute to such Lender its Swingline Participation Amount with respect thereto (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all such Swingline Loans then due); provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

(e) Each Revolving Lender's obligation to make the Loans referred to in Section 2.7(b) and to purchase participating interests pursuant to Section 2.7(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such Revolving Lender or the Borrower may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower or any other Loan Party, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.8 Repayment of Loans. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Lender or Term Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Loan of such Revolving Lender made to the Borrower outstanding on the Revolving Termination Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8) and (ii) the principal amount of each outstanding Term Loan of such Term Lender made to the Borrower in installments according to the amortization schedule set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 8). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

NY1:#3465828

(c) The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(b)(iv), and a subaccount therein for each Lender, in which shall be recorded (i) the amount and Currency of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount and Currency of any principal, interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount and Currency of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d) The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(c) shall, to the extent permitted by applicable law, be presumptively correct absent manifest error of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.9 <u>Commitment Fees, etc.</u> (a) The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender a commitment fee for the period from and including the Closing Date to the last day of the Revolving Commitment Period, computed at the Applicable Commitment Fee Rate on the average daily amount of the Available Revolving Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on each Fee Payment Date; provided that for purposes of calculating any fees owing in accordance with this Section 2.9(a), the Swingline Lender shall not be entitled to receive any commitment fee in respect of any outstanding Swingline Loans.

(b) The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent.

2.10    <u>Termination or Reduction of Revolving Commitments</u>. The Borrower shall have the right, upon not less than two Business Days' notice to the Administrative Agent, to terminate the Revolving Commitments of any Class or, from time to time, to reduce the amount of the Revolving Commitments of such Class; provided that no such termination or reduction of Revolving Commitments of a Class shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans of such Class made on the effective date thereof, the total Revolving Extensions of Credit of such Class would exceed the total Revolving Commitments of such Class. Any such partial reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Commitments of such Class then in effect.

2.11    <u>Optional Prepayments</u>. The Borrower may at any time and from time to time prepay the Revolving Loans, the Swingline Loans or the Term Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 1:00 P.M., Local Time, three Business Days prior thereto, in the case of Eurocurrency Loans, and no later than 1:00 P.M., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify (i) the date and amount of prepayment, (ii) whether the prepayment is of Revolving Loans or Term Loans, and if such prepayment is of Revolving Loans, the Class of Revolving Loans to be prepaid and (iii) whether the prepayment is of Eurocurrency Loans or ABR Loans; provided that if a Eurocurrency Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (provided that such notice may be conditioned on receiving the proceeds of any refinancing), together

-45-

with (except in the case of Revolving Loans that are ABR Loans and Swingline Loans denominated in Dollars) accrued interest to such date on the amount prepaid.  Partial prepayments of Term Loans and of Revolving Loans of a Class shall be in an aggregate principal amount of (i) $1,000,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of ABR Loans) or (ii) $1,000,000 or a whole multiple of $500,000 in excess thereof (in the case of prepayments of Eurocurrency Loans), and in each case shall be subject to the provisions of Section 2.18 (or, in the case of Eurocurrency Loans in an Agreed Foreign Currency, approximately equivalent amounts in such Agreed Foreign Currency as determined by the Administrative Agent from time to time).  Partial prepayments of Swingline Loans of a Class shall be in an aggregate principal amount of $50,000 or a whole multiple of $50,000 in excess thereof (or, in the case of Swingline Loans denominated in an Agreed Foreign Currency, the Agreed Foreign Currency Equivalent).

        2.12    Mandatory Prepayments.  (a) Unless the Required Prepayment Lenders shall otherwise agree, if any Indebtedness (excluding any Indebtedness incurred in accordance with Section 7.2 other than Indebtedness in respect of (i)  Permitted Receivables Financings in excess of $75,000,000 to the extent required to be applied to mandatory prepayments pursuant to Section 7.2(x) and (ii)  Permitted Additional Sale Leasebacks) shall be incurred by the Borrower or any Domestic Subsidiary that is a Restricted Subsidiary, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in Section 2.12(d).

        (b) Unless the Required Prepayment Lenders shall otherwise agree, if on any date the Borrower or any Domestic Subsidiary that is a Restricted Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale or Recovery Event then, unless a Reinvestment Notice shall be delivered to the Administrative Agent in respect thereof, such Net Cash Proceeds shall be applied on such date toward the prepayment of the Term Loans as set forth in Section 2.12(d); provided that, notwithstanding the foregoing, (i) on each Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in Section 2.12(d) by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event, (ii) on the date (the "Trigger Date") that is one year after any such Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in Section 2.12(d) by an amount equal to the portion of any Committed Reinvestment Amount with respect to the relevant Reinvestment Event not actually expended by such Trigger Date and (iii) notwithstanding anything herein to the contrary, all Net Cash Proceeds of each Material Disposition in excess of any amount equal to 10% of the Net Cash Proceeds received in connection therewith shall be applied on the date of receipt thereof by the Borrower or any Subsidiary Guarantor toward the prepayment of the Term Loans as set forth in Section 2.12(d).

        (c) Unless the Required Prepayment Lenders shall otherwise agree, if, for any fiscal year of the Borrower commencing with the fiscal year ending December 31, 2008, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply an amount equal to (i) the Excess Cash Flow Percentage of such Excess Cash Flow minus (ii) the aggregate amount of all prepayments of Revolving Loans and Swingline Loans during such fiscal year to the extent accompanied by permanent optional reductions of the Revolving Commitments and all optional prepayments of the Term Loans during such fiscal year, in each case other than to the extent any such prepayment is funded with the proceeds of new long-term Indebtedness, toward the prepayment of the Term Loans as set forth in Section 2.12(d).  Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than ten days after the date on which the financial statements referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Lenders.  Notwithstanding the foregoing, all mandatory prepayments pursuant to this Section 2.12(c) shall be limited to the extent that the Borrower reasonably determines that such mandatory prepayments would result in adverse tax consequences related to the repatriation of funds in connection therewith by

-46-

Foreign Subsidiaries; <u>provided</u> that any amount so excluded from any such mandatory prepayment pursuant to the operation of this sentence shall not increase the Available Amount pursuant to clause (a) of the definition thereof.

(d) Amounts to be applied in connection with prepayments pursuant to this Section 2.12 shall be applied to the prepayment of the Term Loans in accordance with Section 2.18(b) until paid in full. The application of any prepayment pursuant to this Section 2.12 shall be made, <u>first</u>, to ABR Loans and, <u>second</u>, to Eurocurrency Loans. Each prepayment of the Term Loans under this Section 2.12 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e) Notwithstanding anything to the contrary in Section 2.12(d) or 2.18, with respect to the amount of any mandatory prepayment pursuant to this Section 2.12 that is allocated to Term Loans (which, for avoidance of doubt, includes any New Term Loans) (such amounts, the "<u>Prepayment Amount</u>"), at any time when Term Loans remain outstanding, the Borrower will, in lieu of applying such amount to the prepayment of Term Loans as provided in paragraph (d) above, on the date specified in this Section 2.12 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Term Lender (which, for avoidance of doubt, includes each New Term Lender) a notice (each, a "<u>Prepayment Option Notice</u>") as described below. As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Term Lender a Prepayment Option Notice, which shall be in the form of Exhibit J (or such other form approved by the Administrative Agent), and shall include an offer by the Borrower to prepay, on the date (each a "<u>Mandatory Prepayment Date</u>") that is ten Business Days after the date of the Prepayment Option Notice, the relevant Term Loans of such Lender by an amount equal to the portion of the Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans. Each Term Lender may reject all or a portion of its Prepayment Amount by providing written notice to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York time) one Business Day after such Term Lender's receipt of the Prepayment Option Notice (which notice shall specify the principal amount of the Prepayment Amount to be rejected by such Lender); <u>provided</u> that that any Term Lender's failure to so reject such Prepayment Amount shall be deemed an acceptance by such Lender of such Prepayment Option Notice and the amount to be prepaid in respect of Term Loans held by such Term Lender. On the Mandatory Prepayment Date, the Borrower shall pay to the relevant Term Lenders the aggregate amount necessary to prepay that portion of the outstanding relevant Term Loans in respect of which such Lenders have (or are deemed to have) accepted prepayment as described above; <u>provided</u> that, upon the making of such prepayment, any amount remaining unapplied shall be returned to the Borrower.

(f) If as of the last Business Day of each fiscal quarter of the Borrower (computed by the Administrative Agent using the current exchange rate as of such Business Day and promptly notified to the Multicurrency Revolving Lenders and the Borrower) the Dollar Amount of the aggregate outstanding principal amount of the Revolving Extensions of Credit shall exceed 105% of the aggregate Revolving Commitments, the Borrower shall, within five Business Days after the Borrower's receipt of such notice, prepay the Multicurrency Revolving Extensions of Credit in such amounts as shall be necessary so that after giving effect thereto the aggregate outstanding principal amount of such Revolving Extensions of Credit does not exceed the Revolving Commitments as of such Business Day.

2.13    <u>Conversion and Continuation Options</u>. (a) The Borrower may elect from time to time to convert Eurocurrency Loans made to the Borrower to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 1:00 P.M., New York City time, on the second Business Day preceding the proposed conversion date; <u>provided</u> that (i) a borrowing of a Class of Revolving Loans may only be continued or converted into a borrowing of the same Class of Revolving Loans, (ii) a borrowing denominated in one Currency may not be converted to a borrowing of a different

-47-

Currency, (iii) no Eurocurrency Loan denominated in an Agreed Foreign Currency may be converted to a borrowing of a different Type and (iv) if any Eurocurrency Loan is so converted on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21.  The Borrower may elect from time to time to convert ABR Loans made to the Borrower to Eurocurrency Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 1:00 P.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided that (i) a borrowing denominated in one Currency may not be converted to a borrowing of a different Currency and (ii) no ABR Loan under a particular Facility may be converted into a Eurocurrency Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b) Any Eurocurrency Loan may be continued as such by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 and no later than 1:00 P.M., New York City time, on the third Business Day preceding the proposed continuation date, of the length of the next Interest Period to be applicable to such Loans; provided that (i) a borrowing of a Class of Revolving Loans may only be continued or converted into a borrowing of the same Class of Revolving Loans, (ii) a borrowing denominated in one Currency may not be continued as a borrowing of a different Currency, (iii) no Eurocurrency Loan denominated in a Foreign Currency may be continued if, after giving effect thereto, the Revolving Multicurrency Exposure would exceed the aggregate Multicurrency Revolving Commitments and (iv) if any Eurocurrency Loan is so continued on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21; provided, further, that no Eurocurrency Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations; and provided, further, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph such Eurocurrency Loans shall be automatically continued as Eurocurrency Loans of the same currency having an Interest Period of one month's duration on the last day of such then-expiring Interest Period and (ii) if such continuation is not permitted pursuant to the preceding proviso, such Eurocurrency Loans denominated in Dollars shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If the Borrower is not permitted to continue a Eurocurrency Loan which is denominated in a Foreign Currency pursuant to this Section 2.13(b), such Eurocurrency Loan shall automatically be redenominated in Dollars on the last day of the applicable Interest Period in an amount equal to the Dollar Equivalent thereof.

2.14    Minimum Amounts and Maximum Number of Eurocurrency Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurocurrency Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that (a) after giving effect thereto, the aggregate principal amount of the Eurocurrency Loans comprising each Eurocurrency Tranche shall be equal to a minimum of $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than fifteen Eurocurrency Tranches shall be outstanding at any one time.

2.15    Interest Rates and Payment Dates.  (a) Each Eurocurrency Loan (other than any Multicurrency Swingline Loan) shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurocurrency Rate determined for such day plus the Applicable Margin.  Each Eurocurrency Loan that is a Multicurrency Swingline Loan shall bear interest for each day

-48-

at a rate per annum equal to the Eurocurrency Reference Rate determined for such day plus the Applicable Margin.

(b) Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c) (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.15 plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to ABR Loans under the Revolving Facility plus 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Facility plus 2% (or, in the case of any such other amounts that do not relate to a particular Facility, the rate then applicable to ABR Loans under the Revolving Facility plus 2%), in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d) Interest shall be payable by the Borrower in arrears on each Interest Payment Date; provided that interest accruing pursuant to paragraph (c) of this Section 2.15 shall be payable from time to time on demand.

2.16    Computation of Interest and Fees. (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurocurrency Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a) and Section 2.15(b).

2.17    Inability to Determine Interest Rate. If prior to the first day of any Interest Period for any Eurocurrency Loan (the Currency of such Loan herein called the "Affected Currency"):

(a) the Administrative Agent shall have determined (which determination shall be presumptively correct absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurocurrency Rate for the Affected Currency for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that by reason of any changes arising after the date of this Agreement the Eurocurrency Rate for the Affected Currency determined or to be determined

-49-

for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (i) if the Affected Currency is Dollars (x) any Eurocurrency Loans denominated in Dollars under the relevant Facility requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans denominated in Dollars under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurocurrency Loans shall be continued as ABR Loans and (z) any outstanding Eurocurrency Loans denominated in Dollars under the relevant Facility shall be converted, on the last day of the then-current Interest Period with respect thereto, to ABR Loans or (ii) if the Affected Currency is an Agreed Foreign Currency, any Eurocurrency Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be ineffective. Until such notice has been withdrawn by the Administrative Agent (which action the Administrative Agent will take promptly after the conditions giving rise to such notice no longer exist), no further Eurocurrency Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurocurrency Loans. If the Borrower is not permitted to continue a Eurocurrency Loan which is denominated in a Foreign Currency pursuant to this Section 2.17, such Eurocurrency Loan shall automatically be redenominated in Dollars on the last day of the applicable Interest Period in an amount equal to the Dollar Equivalent thereof.

2.18    Pro Rata Treatment and Payments. (a) Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Revolving Commitments of a Class shall be made pro rata according to the respective Term Percentages or Revolving Percentages of the respective Class, as the case may be, of the relevant Lenders. Each payment (other than prepayments) in respect of principal or interest in respect of the Term Loans and each payment in respect of fees payable hereunder shall be applied to the amounts of such obligations owing to the Term Lenders, pro rata according to the respective amounts then due and owing to such Lenders.

(b) Each optional prepayment and mandatory prepayment of the Term Loans shall be applied to the remaining installments thereof as specified by the Borrower. Amounts repaid or prepaid on account of the Term Loans may not be reborrowed.

(c) Each payment (including prepayments) to be made by the Borrower on account of principal of and interest on the Revolving Loans of a Class shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans of such Class then held by the Revolving Lenders of such Class. Each payment in respect of Reimbursement Obligations in respect of any Letter of Credit of such Class shall be made to the Issuing Lender that issued such Letter of Credit.

(d) All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 2:00 P.M., Local Time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Funding Office, in immediately available funds. The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurocurrency Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurocurrency Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding

-50-



Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e) Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be presumptively correct in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any defaulting Lender.

(f) Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(g) Each obligation of the Loan Parties under the Loan Documents related to any Loans or Letter of Credit denominated in Dollars shall be paid in Dollars. Each obligation of the Loan Parties related to any Loans denominated in an Agreed Foreign Currency shall be paid in such Agreed Foreign Currency; provided that fees payable pursuant to Section 3.3 shall be payable in Dollars. All commitment fees payable pursuant to Section 2.9 shall be calculated and payable in Dollars. Notwithstanding the foregoing, if the Borrower shall fail to pay any principal of any Loan when due (whether at stated maturity, by acceleration, by mandatory prepayment or otherwise), the unpaid portion of such Loan shall, if such Loan is not denominated in Dollars, automatically be redenominated in Dollars on the due date thereof (or, if such due date is a day other than the last day of the Interest Period therefor, on the last day of such Interest Period) in an amount equal to the Dollar Equivalent thereof on the date of such redenomination and such principal shall be payable on demand (provided that no Event of Default shall occur until the expiration of applicable grace periods); and if the Borrower shall fail to pay any interest on any Loan that is not denominated in Dollars, such interest shall automatically be redenominated in Dollars on the due date therefor (or, if such due date is a day other than the last day of the Interest Period therefor, on the last day of such Interest Period) in an amount equal to the Dollar Equivalent thereof on the date of such redenomination and such interest shall be payable on demand (provided that no Event of Default shall occur until the expiration of applicable grace periods).

-51-

2.19    Requirements of Law. (a) Except with respect to Taxes, which are addressed in Section 2.20, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the date hereof:

> (i)  shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurocurrency Rate hereunder; or

> (ii)  shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurocurrency Loans or issuing or participating in Letters of Credit (in each case hereunder), or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within thirty Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.19, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b) If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c) A certificate prepared in good faith as to any additional amounts payable pursuant to this Section 2.19 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of manifest error. Notwithstanding anything to the contrary in this Section 2.19, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.19 for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that if the circumstances giving rise to such claim have a retroactive effect, then such 180-day period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section 2.19 shall survive the termination of this Agreement and the payment of the Obligations.

-52-

NY1:#3465828

2.20    Taxes. (a) Except as otherwise provided in this Agreement, all payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income taxes, levies, imposts, duties, charges, fees, deductions, withholdings or Other Taxes, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding (i) net income taxes, net profits or capital taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document) and (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located. If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable by the Borrower to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after deduction or withholding of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of paragraph (d) or (e), as applicable, of this Section 2.20 or (ii) that are United States withholding taxes imposed on amounts payable under this Agreement to such Lender at the time such Lender becomes a Lender, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph.

(b) In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof if such receipt is obtainable, or, if not, such other evidence of payment as may reasonably be required by the Administrative Agent or such Lender. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes that the Borrower is required to pay pursuant to this Section 2.20 (or in respect of which the Borrower would be required to pay increased amounts pursuant to Section 2.20(a) if such Non-Excluded Taxes or Other Taxes were withheld) when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any payments by them of such Non-Excluded Taxes or Other Taxes and for any incremental taxes, interest or penalties that become payable by the Administrative Agent or any Lender as a result of any such failure within thirty days after the Lender or the Administrative Agent delivers to the Borrower (with a copy to the Administrative Agent) either (a) a copy of the receipt issued by a Governmental Authority evidencing payment of such Taxes or (b) certificates as to the amount of such payment or liability prepared in good faith.

(d) Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "Non-US Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Borrower and to the Lender from which the related participation shall have been purchased) (i) two accurate and complete copies of IRS Form W-8ECI or W-8BEN, or, (ii) in the case of a Non-US Lender claiming exemption from United States federal

-53-



withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F and two accurate and complete copies of IRS Form W-8BEN, or any subsequent versions or successors to such forms, in each case properly completed and duly executed by such Non-US Lender claiming complete exemption from, or a reduced rate of, United States federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-US Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).  In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender.  Each Non-US Lender shall (i) promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose) and (ii) take such steps as shall not be disadvantageous to it, in its reasonable judgment, and as may be reasonably necessary (including the re-designation of its lending office pursuant to Section 2.23) to avoid any requirement of applicable laws of any such jurisdiction that the Borrower make any deduction or withholding for taxes from amounts payable to such Lender.  Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Non-US Lender is not legally able to deliver.

(e)  Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "US Lender") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, or any subsequent versions or successors to such form and certify that such lender is not subject to backup withholding.  Such forms shall be delivered by each US Lender on or before the date it becomes a party to this Agreement.  In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender.  Each US Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(f)  If the Administrative Agent or any Lender determines, in good faith, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.20, it shall promptly pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.20 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority; provided, further, that the Borrower shall not be required to repay to the Administrative Agent or the Lender an amount in excess of the amount paid over by such party to the Borrower pursuant to this Section 2.20.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.  The agreements in this Section 2.20 shall survive the termination of this Agreement and the payment of the Obligations.

2.21    Indemnity.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (other than lost profits, including the loss of Applicable Margin) that such Lender may actually sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurocurrency Loans after the Borrower has

-54-

NY1:#3465828

given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurocurrency Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment, conversion or continuation of Eurocurrency Loans on a day that is not the last day of an Interest Period with respect thereto. A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this Section 2.21 submitted to the Borrower by any Lender shall be presumptively correct in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22    Illegality. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the date hereof, shall make it unlawful for any Lender to make or maintain Eurocurrency Loans as contemplated by this Agreement, such Lender shall promptly give notice thereof (a "Rate Determination Notice") to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make Eurocurrency Loans, continue Eurocurrency Loans as such and convert ABR Loans to Eurocurrency Loans shall be suspended during the period of such illegality, (b) such Lender's Loans then outstanding as Eurocurrency Loans denominated in Dollars, if any, shall be converted automatically to ABR Loans denominated in Dollars on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law and (c) (i) such Lender's Loans then outstanding as Eurocurrency Loans denominated in any Agreed Foreign Currency, if any, shall be converted automatically on the respective last days of the then current Interest Periods with respect to such Loans (an "Affected Interest Period") to Eurocurrency Loans denominated in such Agreed Foreign Currency having the next shortest Interest Period which is not affected by such adoption of or change in any Requirement of Law and (ii) if all Interest Periods are Affected Interest Periods in respect of such Eurocurrency Loans denominated in any Agreed Foreign Currency, during the 30-day period following any such Rate Determination Notice (the "Negotiation Period") the Administrative Agent and the Borrower shall negotiate in good faith with a view to agreeing upon a substitute interest rate basis which shall reflect the cost to the applicable Lenders of funding such Loans from alternative sources (a "Substitute Basis"), and if such Substitute Basis is so agreed upon during the Negotiation Period, such Substitute Basis shall apply in lieu of the Eurocurrency Rate to all Interest Periods for the Eurocurrency Loans denominated in such Agreed Foreign Currency of the applicable Lenders commencing on or after the first day of an Affected Interest Period, until the circumstances giving rise to such Rate Determination Notice have ceased to apply. If a Substitute Basis is not agreed upon during the Negotiation Period, each affected Lender shall determine (and shall certify from time to time in a certificate delivered by such Lender to the Administrative Agent setting forth in reasonable detail the basis of the computation of such amount) the rate basis reflecting the cost to such Lender of funding its Eurocurrency Loan denominated in such Agreed Foreign Currency for any Interest Period commencing on or after the first day of an Affected Interest Period, until the circumstances giving rise to such Rate Determination Notice have ceased to apply, and such rate basis shall be binding upon the Borrower and such Lender and shall apply in lieu of the Eurocurrency Rate for the relevant Interest Periods. If a Rate Determination Notice has been given, then until such Rate Determination Notice has been withdrawn by the Administrative Agent, no Eurocurrency Loans of the applicable Lenders denominated in such Agreed Foreign Currency shall have an Interest Period having a duration equal to an Affected Interest Period. The Borrower may elect to prepay the Eurocurrency Loans denominated in such Agreed Foreign Currency of the applicable Lenders pursuant to Section 2.11 at any time; provided that if the Borrower elects not to prepay such Eurocurrency Loans and the Borrower is not permitted to continue such Eurocurrency Loan pursuant to this Section 2.22, such Eurocurrency Loan shall automatically be redenominated in Dollars on the last day of the applicable Interest Period in an amount equal to the Dollar Equivalent thereof.

-55-

If any such conversion of a Eurocurrency Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

       2.23    Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.19, 2.20(a) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage and; provided, further, that nothing in this Section 2.23 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a) or 2.22.

       2.24    Replacement of Lenders. The Borrower shall be permitted to replace with a financial institution or financial institutions any Lender that (a) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority pursuant to Section 2.19, 2.20 or 2.21 (to the extent a request made by a Lender pursuant to the operation of Section 2.21 is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to Section 2.22, (b) defaults in its obligation to make Loans hereunder or to comply with its obligations under Section 3.4, (c) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required Lenders; or (d) becomes the subject of a bankruptcy or insolvency proceeding; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) the replacement financial institution or financial institutions shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (iii) the Borrower shall be liable to such replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (iv) the replacement financial institution or financial institutions, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such replacement financial institution of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to Section 10.6(b)(i)(B), (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6, (vi) the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated, (vii) if applicable, the replacement financial institution or financial institutions shall consent to such amendment or waiver and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

       2.25    Incremental Loans. (a) The Borrower may by written notice to the Administrative Agent elect to request the establishment of one or more new term loan or revolving commitments (the "New Loan Commitments") hereunder, in an aggregate amount for all such New Loan Commitments not in excess of the lesser of (i) $200,000,000 and (ii) the amount that could be incurred such that after giving effect to such New Loan Commitment and to the making of any Tranche of New Loans pursuant thereto and after giving effect to any Permitted Acquisition consummated in accordance therewith (as if such Indebtedness had been incurred on the first day of Reference Period), the Consolidated Senior Secured Leverage Ratio shall not exceed 3.75 to 1.00. Each such notice shall specify the date (each, an "Increased Amount Date") on which the Borrower proposes that the New Loan Commitments shall be effective, which shall be a date not less than 10 Business Days after the date on which such notice is delivered to the Administrative Agent; provided that any Lender offered or

-56-

approached to provide all or a portion of any New Loan Commitments may elect or decline, in its sole discretion, to provide such New Loan Commitment.

(b) Such New Loan Commitments shall become effective as of such Increased Amount Date; provided that (i) no Default or Event of Default shall exist on such Increased Amount Date before or after giving effect to such New Loan Commitments and to the making of any Tranche of New Loans pursuant thereto and after giving effect to any Permitted Acquisition consummated in accordance therewith; (ii) the proceeds of any New Loans shall be used for general corporate purposes of the Borrower and its Subsidiaries (including Permitted Acquisitions and Investments permitted under Section 7.7); (iii) the New Loans shall share ratably in the Collateral; (iv) the New Loans that are term loans ("New Term Loans") shall share ratably in any mandatory prepayments of the existing Term Loans; (v) in the case of any New Term Loans, the maturity date thereof shall not be earlier than the Term Maturity Date and the weighted average life to maturity shall be equal to or greater than the weighted average life to maturity of the Term Loans that are not New Loans; (vi) in the case of any New Loans that are revolving loans or commitments ("New Revolving Loans") the maturity date or commitment termination date thereof shall not be earlier than the Revolving Termination Date and such New Revolving Loans shall not require any scheduled commitment reductions prior to the Revolving Termination Date; (vii) the New Revolving Loans shall share ratably in any mandatory prepayments of the existing Revolving Loans; (viii) all terms and documentation with respect to any New Loans which differ from those with respect to the Loans under the applicable Facility shall be reasonably satisfactory to the Administrative Agent; (ix) such New Term Loans or New Loan Commitments shall be effected pursuant to one or more Joinder Agreements executed and delivered by the Borrower, the Administrative Agent and one or more New Lenders; and (x) the Borrower shall deliver or cause to be delivered any customary legal opinions or other documents reasonably requested by Administrative Agent in connection with any such transaction, including any supplements or amendments to the Security Documents providing for such New Loans to be secured thereby. Any New Loans made on an Increased Amount Date that have terms and provisions that differ from those of the Term Loans or Revolving Loans, as applicable, outstanding on the date on which such New Loans are made shall be designated as a separate tranche (a "Tranche") of Term Loans or Revolving Loans, as applicable, for all purposes of this Agreement, except as the relevant Joinder Agreement otherwise provides. For the avoidance of doubt, (i) the New Loan Commitments shall not be subject to any "most favored nation" pricing provisions (unless otherwise agreed to by the Borrower and the applicable New Lenders and set forth in the applicable Joinder Agreement) and (ii) the rate of interest and the amortization schedule (if applicable) of any New Loan Commitments shall be determined by the Borrower and the applicable New Lenders and shall be set forth in the applicable Joinder Agreement.

(c) On any Increased Amount Date on which any New Loan Commitments become effective, subject to the foregoing terms and conditions, each lender with a New Loan Commitment (each, a "New Lender") shall become a Lender hereunder with respect to such New Loan Commitment.

(d) The terms and provisions of the New Loan Commitments of any Tranche shall be, except as otherwise set forth in the relevant Joinder Agreement, identical to those of the applicable Loans and for purposes of this Agreement, any New Loans or New Loan Commitments shall be deemed to be Term Loans, Revolving Loans or Revolving Commitments, as applicable. Each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.25.

## SECTION 3.    LETTERS OF CREDIT

3.1 L/C Commitment. (a) Subject to the terms and conditions hereof, each Issuing Lender of a Class, in reliance on the agreements of the other Revolving Lenders of such Class set forth in

NY1:#3465828

Section 3.4(a), agrees to issue letters of credit ("Letters of Credit") under the Revolving Commitment of such Class for the account of the Borrower or any Guarantor on any Business Day during the Revolving Commitment Period in such form as may be approved from time to time by such Issuing Lender; provided that no Issuing Lender shall have any obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations of both Classes taken together would exceed the L/C Commitment or (ii) the aggregate amount of the Available Revolving Commitments of such Class would be less than zero. Each Letter of Credit shall (i) be denominated, in the case of Dollar Revolving Commitments, in Dollars, or, in the case of Multicurrency Revolving Commitments, in Dollars or in any Agreed Foreign Currency and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is three Business Days prior to the Revolving Termination Date; provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b) No Issuing Lender shall at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause such Issuing Lender to exceed any limits imposed by, any applicable Requirement of Law.

3.2 Procedure for Issuance of Letter of Credit. The Borrower may from time to time request that the relevant Issuing Lender of a Class issue a Letter of Credit of such Class by delivering to such Issuing Lender at its address for notices specified to the Borrower by such Issuing Lender an Application therefor, with a copy to the Administrative Agent, completed to the reasonable satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may reasonably request. Upon receipt of any Application, the relevant Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event without the consent of the applicable Issuing Lender shall any Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower. Such Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof. Each Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the relevant Revolving Lenders, notice of the issuance of each Letter of Credit issued by it (including the amount thereof).

3.3 Fees and Other Charges. (a) The Borrower will pay a fee on each outstanding Letter of Credit of each Class requested by it, at a per annum rate equal to the Applicable Margin then in effect with respect to Eurocurrency Loans under the Revolving Facility (minus the fronting fee referred to below), on the face amount of such Letter of Credit, which fee shall be shared ratably among the Revolving Lenders of such Class and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrower shall pay to each Issuing Lender for its own account a fronting fee on the aggregate face amount of all outstanding Letters of Credit issued by it to the Borrower of 0.125% per annum, payable quarterly in arrears on each Fee Payment Date after the issuance date.

(b) In addition to the foregoing fees, the Borrower shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit requested by the Borrower.

3.4 L/C Participations. (a) Each Issuing Lender of a Class irrevocably agrees to grant and hereby grants to each L/C Participant of such Class, and, to induce such Issuing Lender to issue

-58-

Letters of Credit of such Class, each L/C Participant of such Class irrevocably agrees to accept and purchase and hereby accepts and purchases from such Issuing Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Dollar Revolving Percentage or Multicurrency Revolving Percentage, as the case may be, in such Issuing Lender's obligations and rights under and in respect of each Letter of Credit of the applicable Class issued by it and the amount of each draft paid by such Issuing Lender thereunder. Each L/C Participant of a Class agrees with each Issuing Lender of such Class that, if a draft is paid under any Letter of Credit of such Class issued by it for which such Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to the Administrative Agent for the account of such Issuing Lender upon demand an amount equal to such L/C Participant's Dollar Revolving Percentage or Multicurrency Revolving Percentage, as the case may be, of the amount of such draft, or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against any Issuing Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the financial condition of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b) If any amount required to be paid by any L/C Participant to the Administrative Agent for the account of any Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is paid to the Administrative Agent for the account of such Issuing Lender within three Business Days after such payment is due, such L/C Participant shall pay to the Administrative Agent for the account of such Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Administrative Agent for the account of the relevant Issuing Lender by such L/C Participant within as of the date such payment is due, such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans under the Revolving Facility. A certificate of the relevant Issuing Lender submitted to any relevant L/C Participant with respect to any amounts owing under this Section 3.4 shall be presumptively correct in the absence of manifest error.

(c) Whenever, at any time after any Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a) such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to the Administrative Agent for the account of such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to the Administrative Agent for the account of such Issuing Lender the portion thereof previously distributed by such Issuing Lender to it.

3.5 Reimbursement Obligation of the Borrower. The Borrower agrees to reimburse each Issuing Lender on the Business Day following the date on which such Issuing Lender notifies the Borrower of the date and amount of a draft presented under any Letter of Credit issued by such Issuing

NY1:#3465828

Lending at the Borrower's request and paid by such Issuing Lender for the amount of (a) such draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment (the amounts described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "Payment Amount"). Each such payment shall be made to such Issuing Lender at its address for notices specified to the Borrower and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at a rate equal to (i) until the second Business Day next succeeding the date of the relevant notice, the rate applicable to ABR Loans under the Revolving Facility and (ii) thereafter, the rate set forth in Section 2.15(c).

        3.6  Obligations Absolute.  The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person.  The Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of such Borrower against any beneficiary of such Letter of Credit or any such transferee, or any other events or circumstances that, pursuant to applicable law or the applicable customs and practices promulgated by the International Chamber of Commerce, are not within the responsibility of such Issuing Lender, except for errors or omissions resulting from the gross negligence or willful misconduct of such Issuing Lender or its employees or agents.  No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions resulting from the gross negligence or willful misconduct of such Issuing Lender or its employees or agents.  The Borrower agrees that any action taken or omitted by any Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct and in accordance with the standards or care specified in the Uniform Commercial Code of the State of New York, shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower.

        3.7  Letter of Credit Payments.  If any draft shall be presented for payment under any Letter of Credit, the relevant Issuing Lender shall promptly notify the Borrower of the date and amount thereof.  The responsibility of such Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit issued by such Issuing Lender shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

        3.8  Applications.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Agreement or any other Loan Document, the provisions of this Agreement or such other Loan Document shall apply.

<div align="center">SECTION 4.    REPRESENTATIONS AND WARRANTIES</div>

        To induce the Agents and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, Holdings (to the extent applicable) and the Borrower hereby jointly represent and warrant (as to itself and each of its Restricted Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date (to the extent relating to Holdings or the Initial Borrower, immediately before giving effect to the Merger

Transactions and to the extent relating to Holdings, the Surviving Borrower or any Restricted Subsidiary, immediately after giving effect to the Merger Transactions) and on the date of each borrowing of Loans or issuance of a Letter of Credit hereunder that:

4.1 Financial Condition. (a) The audited consolidated balance sheet of Sequa and its Subsidiaries as at December 31, 2004, December 31, 2005 and December 31, 2006, and the related statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from KPMG LLP, present fairly in all material respects the financial condition of Sequa and its Subsidiaries as at such date, and the results of, their operations, their cash flows and their changes in stockholders' equity for the respective fiscal years then ended. The unaudited consolidated balance sheet of Sequa and its Subsidiaries as at March 31, 2007, June 30, 2007 and September 30, 2007, and the related unaudited consolidated statements of income and cash flows for the three-month, six-month and nine-month periods, respectively, ended on such date, present fairly in all material respects the consolidated financial condition of Sequa and its Subsidiaries as at such respective dates, and the consolidated results of their operations and their combined cash flows for the three-month, six-month and nine-month periods, respectively, then ended (subject to absence of footnotes and normal year-end audit adjustments). All such financial statements, including the related schedules and notes thereto and year end adjustments, have been prepared in accordance with GAAP (except, as otherwise noted therein and, in the case of such unaudited financial statements, subject to the absence of footnotes).

(b) The pro forma consolidated balance sheet of the Borrower and its Subsidiaries as of September 30, 2007 has been prepared in good faith based on assumptions that are believed by the Borrower to be reasonable at the time made (it being understood that such assumptions are based on good faith estimates with respect to certain items and that the actual amounts of such items on the Closing Date is subject to variation)), (ii) accurately reflects all adjustments necessary to give effect to the Transactions and (iii) presents fairly, in all material respects, the pro forma financial position of the Borrower and its Subsidiaries as of September 30, 2007, as if the Transactions had occurred on such date; provided that such pro forma balance sheet has been prepared without giving effect to purchase accounting or similar adjustments.

4.2 No Change. (a) As of the Closing Date, there has been no event, circumstance, development, change or effect that has had a Closing Date Material Adverse Effect since the date of the Merger Agreement.

(b) At any time after the Closing Date as of which this representation and warranty is made or deemed made, there has been no event, development or circumstance since December 31, 2006 that has had or will have a Material Adverse Effect.

4.3 Existence; Compliance with Law. Each of Holdings, the Borrower and its Restricted Subsidiaries (other than any Immaterial Subsidiaries) (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where if applicable, the equivalent status in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, (ii) has the corporate or organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or limited liability company and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not have a Material Adverse Effect.

-61-

4.4 <u>Corporate Power; Authorization; Enforceable Obligations</u>. (a) Each Loan Party has the corporate power and authority to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow or have Letters of Credit issued hereunder. Each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.

(b) No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority is required in connection with the extensions of credit hereunder or the execution, delivery, performance, validity or enforceability of this Agreement or any of the other Loan Documents, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect or the failure to obtain which would not reasonably be expected to have a Material Adverse Effect and (ii) the filings referred to in Section 4.17.

(c) Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms (<u>provided</u> that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries, only to the extent enforceability of such obligation with respect to which Capital Stock is governed by the Uniform Commercial Code), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing.

4.5 <u>No Legal Bar</u>. The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of the Loan Parties, (b) except as would not have a Material Adverse Effect, violate any Requirement of Law or any Contractual Obligation of Holdings, the Borrower or any of its Restricted Subsidiaries or (c) except as would not have a Material Adverse Effect, result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens permitted by Section 7.3).

4.6 <u>No Material Litigation</u>. No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, likely to be commenced within a reasonable time period against the Borrower or any of its Restricted Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect.

4.7 <u>No Default</u>. No Default or Event of Default has occurred and is continuing.

4.8 <u>Ownership of Property; Liens</u>. Except as set forth in Schedule 4.8A, each of the Borrower and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all its Real Property, and good title to, or a valid leasehold interest in, all its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Property is subject to any Lien except as permitted by the Loan Documents. Schedule 4.8B lists all Real Property which is owned or leased by any Loan Party as of the Closing Date.

-62-

4.9 Intellectual Property. Each of the Borrower and its Restricted Subsidiaries owns, or has a valid license to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. To the Borrower's knowledge, no holding, injunction, decision or judgment has been rendered by any Governmental Authority and neither the Borrower nor any of its Restricted Subsidiaries has entered into any settlement stipulation or other agreement (except license agreements in the ordinary course of business) which would limit, cancel or question the validity of the Borrower's or any Restricted Subsidiary's rights in, any Intellectual Property in any respect that would reasonably be expected to have a Material Adverse Effect. To Borrower's knowledge, no claim has been asserted or threatened or is pending by any Person challenging or questioning the use by the Borrower or its Restricted Subsidiaries of any Intellectual Property or the validity or effectiveness of any Intellectual Property, except as would not reasonably be expected to have a Material Adverse Effect. The use of Intellectual Property by the Borrower and its Restricted Subsidiaries does not infringe on the rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect. The Borrower and its Restricted Subsidiaries take all reasonable actions that in the exercise of their reasonable business judgment should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.10    Taxes. Holdings, the Borrower and its Restricted Subsidiaries (i) has filed or caused to be filed all federal, state, provincial and other tax returns that are required to be filed and (ii) has paid all taxes shown to be due and payable on said returns and all other taxes, fees or other charges imposed on it or any of its Property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the Borrower or such Restricted Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.11    Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the regulations of the Board. If requested by any Lender (through the Administrative Agent) or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

4.12    ERISA. (a) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412(a) of the Code or Section 302(a)(2) of ERISA) has occurred during the five-year period prior to the date on which this representation is made with respect to any Plan, and each Plan has complied with the applicable provisions of ERISA and the Code; no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period; the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits; none of Holdings, the Borrower or any of its Restricted Subsidiaries has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; none of Holdings, the Borrower or any of its Restricted Subsidiaries would become subject to any liability under ERISA if the Borrower or such Restricted Subsidiary were to withdraw completely from all Multiemployer Plans as of the valuation date

-63-

most closely preceding the date on which this representation is made; and no Multiemployer Plan is in Reorganization or Insolvent.

(b) Holdings, the Borrower and its Restricted Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any plan within the meaning of Section 3(3) of ERISA which is subject to Title IV of ERISA that is maintained by a Commonly Controlled Entity (other than Holdings, the Borrower and its Restricted Subsidiaries) (a "Commonly Controlled Plan") merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect and result in a direct obligation of Holdings, the Borrower or any of its Restricted Subsidiaries to pay money.

4.13    Investment Company Act. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

4.14    Subsidiaries. (a) The Subsidiaries listed on Schedule 4.14 constitute all the Subsidiaries of the Borrower at the date of this Agreement (and after giving effect to the Merger Transactions and, to the extent applicable, the Company Reorganization). Schedule 4.14 sets forth as of the Closing Date the name and jurisdiction of incorporation of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and the designation of such Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary.

(b) As of the Closing Date (and after giving effect to the Merger Transactions and, to the extent applicable, the Company Reorganization), except as set forth on Schedule 4.14 or as otherwise contemplated by the Merger Agreement, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to officers, employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any of its Restricted Subsidiaries.

4.15    Environmental Matters. Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, none of the Borrower or any of its Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any Environmental Liability.

4.16    Accuracy of Information, etc. No statement or information (excluding the projections and pro forma financial information referred to below) contained in this Agreement, any other Loan Document or any certificate furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents when taken as a whole, contained as of the date such statement, information, or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not materially misleading. The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

-64-



4.17    Security Documents. (a) The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (including any proceeds of any item of Collateral); provided that for purposes of this Section 4.17(a), Collateral shall be deemed to exclude any Property expressly excluded from the definition of "Collateral" as set forth in the Guarantee and Collateral Agreement (the "Excluded Collateral"). In the case of (i) the Pledged Securities described in the Guarantee and Collateral Agreement (other than Excluded Capital Stock) when any stock certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent and (ii) the other Collateral described in the Guarantee and Collateral Agreement (other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified on Schedule 4.17 (which financing statements have been duly completed and executed (as applicable) and delivered to the Collateral Agent) and such other filings as are specified on Schedule 3 to the Guarantee and Collateral Agreement are made, the Collateral Agent shall have a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (including any proceeds of any item of Collateral) (to the extent a security interest in such Collateral can be perfected through the filing of financing statements in the offices specified on Schedule 4.17 and the filings specified on Schedule 3 to the Guarantee and Collateral Agreement, and through the delivery of the Pledged Securities required to be delivered on the Closing Date), as security for the Obligations, in each case prior and superior in right to any other Person (except (i) in the case of Collateral other than Pledged Securities, Liens permitted by Section 7.3 and (ii) Liens having priority by operation of law) to the extent required by the Guarantee and Collateral Agreement.

(b) Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to Section 6.8(b) or 6.11, such Mortgage shall be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on the Mortgaged Property described therein and proceeds thereof; and when such Mortgage is filed in the recording office designated by the Borrower, such Mortgage shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (other than Liens permitted by Section 7.3 or other encumbrances or rights permitted by the relevant Mortgage).

4.18    Solvency. The Loan Parties are (on a consolidated basis), and after giving effect to the Transactions will be, Solvent.

## SECTION 5.    CONDITIONS PRECEDENT

5.1 Conditions to Initial Extension of Credit. The agreement of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction (or waiver), prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Credit Agreement; Security Documents. The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Collateral Agent, Holdings, the Borrower, the Joint Lead Arrangers, the Lenders party hereto and the Issuing Bank, (ii) the Guarantee and Collateral Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor and (iii) (subject to the last paragraph of this Section 5.1) with respect to each Material Real Property owned by a Loan Party as of the Closing Date, a Mortgage executed and delivery by such Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties, covering such Real Property (together with such other documents relating thereto consistent with the requirements of Section 6.8(b)).

-65-

(b) <u>Senior Interim Loan Facility or Refinancing Notes</u>. The Administrative Agent shall have received evidence that the Senior Interim Loan Agreement or the Refinancing Notes Indenture, as applicable, has been executed and delivered by all Persons stated to be a party thereto in their respective forms then most recently delivered to the Administrative Agent, and the Senior Interim Loans shall have been made or the Refinancing Notes shall have been issued.

(c) <u>Transaction, etc.</u> The following transactions shall be consummated:

(i) <u>Merger</u>. The Merger Transactions shall be consummated concurrently with the initial funding of the Loans on the Closing Date (A) in accordance with the Merger Agreement and the related disclosure schedules and exhibits thereto, without waiver or amendment thereof (other than any such waivers or amendments (including, without limitation, with respect to any representations and warranties in the Merger Agreement) as are not materially adverse to Lenders as of the Closing Date or the Joint Lead Arrangers) unless consented to by the Joint Lead Arrangers (which consent shall not be unreasonably withheld or delayed) or (B) on such other terms and conditions as are reasonably satisfactory to the Joint Lead Arrangers.

(ii) <u>Equity Financing</u>. The Permitted Investors shall have made equity contributions to, or purchased for cash equity of, Holdings in an aggregate amount that constitutes not less than 25% of the Borrower's <u>pro forma</u> consolidated capitalization (after giving effect to the Transactions), and Holdings shall have contributed in cash such amount as a common equity contribution to the Initial Borrower and the Initial Borrower shall have used such equity contribution to consummate the Merger Transactions.

(d) <u>Solvency Certificate</u>. The Administrative Agent shall have received a solvency certificate signed by the chief financial officer on behalf of Holdings, substantially in the form of Exhibit G.

(e) <u>Lien Searches</u>. The Collateral Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no liens on any of the assets of the Loan Party, except for Liens permitted by Section 7.3 or liens to be discharged on or prior to the Closing Date.

(f) <u>Closing Certificate</u>. The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments.

(g) <u>Legal Opinions</u>. The Administrative Agent shall have received an executed legal opinion of Latham & Watkins LLP, counsel to the Loan Parties, substantially in the form of Exhibit E.

(h) <u>Pledged Stock; Stock Powers</u>. The Collateral Agent shall have received the certificates, if any, representing the shares of Capital Stock held by a Loan Party pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof.

(i) <u>Filings, Registrations and Recordings</u>. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Security Documents to be filed, registered or recorded in order to create in favor of the Collateral Agent for the benefit of

NY1:#3465828

the Secured Parties, a first priority perfected Lien on the Collateral described therein, shall have been delivered to the Collateral Agent in proper form for filing, registration or recordation.

(j)  Insurance.  The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 6.5(c).

(k)  Pro Forma Balance Sheet; Financial Statements; Financial Plan.  The Joint Lead Arrangers shall have received, (i) audited consolidated financial statements of Sequa and its Subsidiaries for each of the fiscal years ending December 31, 2004, December 31, 2005 and December 31, 2006, (ii) interim unaudited consolidated financial statements of Sequa and its Subsidiaries for each quarterly period ended after December 31, 2006 and (iii) the unaudited pro forma consolidated balance sheet dated as of September 30, 2007 of the Borrower and its Subsidiaries (the "Pro Forma Balance Sheet") giving effect (as if such events had occurred on such date) to (A) the Transactions, including the Loans and the Senior Interim Loans and/or the issuance of the Refinancing Notes, to be made on the Closing Date and the use of the proceeds thereof and (B) the payment of fees and expenses in connection with the foregoing, and any other material acquisitions effected during or subsequent to such period (including adjustments as are consistent with recent financings for companies owned by the Sponsor and are otherwise reasonably satisfactory to the Administrative Agent).

(l)  USA Patriot Act:  The Lenders shall have received from each of the Loan Parties documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act.

(m)  Specified Representations:  The Specified Representations shall be true and correct in all material respects.

Notwithstanding anything in any Loan Document to the contrary, (i) other than with respect to any Closing Date UCC Filing Collateral or Closing Date Stock Certificates, to the extent any guarantee or collateral is not provided on the Closing Date after the Borrower's use of commercially reasonable efforts to do so, the delivery of such guarantee and/or collateral shall not constitute a condition precedent to the availability of the Loans on the Closing Date, (ii) with respect to perfection of security interests in the Closing Date UCC Filing Collateral, the Borrower's sole obligation shall be to deliver, or cause to be delivered, necessary UCC financing statements to the Administrative Agent or to irrevocably authorize or cause the applicable Guarantor to irrevocably authorize the Administrative Agent to file necessary UCC financing statements and (iii) with respect to perfection of security interests in Closing Date Stock Certificates, the Borrower's sole obligation shall be to deliver to the Administrative Agent the Closing Date Stock Certificates as and to the extent they are delivered to the Borrower by Sequa pursuant to the Merger Agreement, in each case, duly endorsed in blank.

5.2  Conditions to Each Revolving Loan Extension of Credit After Closing Date.  The agreement of each Lender to make any Loan or to issue or participate in any Letter of Credit hereunder on any date after the Closing Date is subject to the satisfaction of the following conditions precedent:

(a)  Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects, in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

-67-

(b)  No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

Each borrowing by and issuance of a Letter of Credit on behalf of the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

## SECTION 6.    AFFIRMATIVE COVENANTS

The Borrower (on behalf of itself and each of the Restricted Subsidiaries) hereby agrees that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding (that has not been cash collateralized or backstopped) or any Loan or other amount is owing to any Lender or any Agent hereunder (other than (i) contingent or indemnification obligations not then due and (ii) obligations in respect of Specified Hedge Agreements), the Borrower shall, and shall cause each of the Restricted Subsidiaries to:

6.1  Financial Statements.  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on Intralinks):

(a)  within 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2007, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

(b)  (i) as soon as available, but in any event not later than 60 days after the end of the first full fiscal quarter of the Borrower ending after the Closing Date and (ii) as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the first fiscal quarter ending June 30, 2008, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the lack of notes);

all such financial statements to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in clause (b), for customary year-end adjustments and the absence of footnotes).

Documents required to be delivered pursuant to this Section 6.1 may be delivered by posting such documents electronically with notice of such posting to the Administrative Agent and each Lender and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

-68-

6.2 <u>Certificates; Other Information</u>. Furnish to the Administrative Agent for delivery to each Lender, or, in the case of clause (g), to the relevant Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants in customary form reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a Compliance Certificate of a Responsible Officer on behalf of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) to the extent not previously disclosed to the Administrative Agent, a description of any new Subsidiary and of any change in the jurisdiction of organization of any other Loan Party and a listing of any material Intellectual Property filings by any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date);

(c)    as soon as available, but in any event not later than 60 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending on December 31, 2007), a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income (collectively, the "Annual Operating Budget");

(d)    promptly after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities (except for Permitted Investors) and, promptly after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC, in each case to the extent not already provided pursuant to Section 6.1 or any other clause of this Section 6.2;

(e)    promptly upon delivery thereof to the Borrower and to the extent permitted, copies of any accountants' letters addressed to its Board of Directors (or any committee thereof);

(f)    promptly upon delivery thereof under the relevant agreement, notice of any default or event of default under the Senior Interim Loan Facility or the Refinancing Notes, and, prior to the effectiveness thereof, copies of substantially final drafts of any proposed material amendment, supplement, waiver or other modification with respect to the Senior Interim Loan Facility or the Refinancing Notes; and

(g)    promptly, such additional financial and other information as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request.

Documents required to be delivered pursuant to this Section 6.2 may be delivered by posting such documents electronically with notice of such posting to the Administrative Agent and each Lender and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or to provide a link thereto on the Borrower's website or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

-69-

6.3 <u>Payment of Taxes</u>. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Restricted Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

6.4 <u>Conduct of Business and Maintenance of Existence, etc.; Compliance</u>. (a) Preserve, renew and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 or except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law except to the extent that failure to comply therewith would not reasonably be excepted to have a Material Adverse Effect.

6.5 <u>Maintenance of Property; Insurance</u>. (a) Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b) Take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office or the United States Copyright Office, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(c) Maintain insurance with financially sound and reputable insurance companies on all its material Property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business. All such insurance shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) (i) provide that no cancellation thereof shall be effective until at least 10 days after receipt by the Administrative Agent of written notice thereof and (ii) name the Administrative Agent as insured party or loss payee.

(d) With respect to any Mortgaged Properties, if at any time the area in which the Premises (as defined in the Mortgages, if any) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Collateral Agent may from time to time reasonably require, and otherwise to ensure compliance with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

6.6 <u>Inspection of Property; Books and Records; Discussions</u>. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all material financial dealings and transactions in relation to its business and activities, (b) permit representatives of any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon reasonable notice and during normal business hours (<u>provided</u> that such visits shall be coordinated by the Administrative Agent, and such visits shall be limited to no more than one such visit per calendar year, in each case, except during the continuance of an Event of Default), (c) permit representatives of any Lender to have reasonable discussions regarding the

-70-

business, operations, properties and financial and other condition of the Borrower and its Restricted Subsidiaries with officers and employees of the Borrower and its Restricted Subsidiaries and (d) permit representatives of the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Restricted Subsidiaries with its independent certified public accountants; provided that a Responsible Officer of the Borrower shall be present during such discussions and any such discussions with the Borrower's independent certified public accountants shall be coordinated by the Administrative Agent, and such visits shall be at the Lender's expense and shall be limited to no more than one such visit per calendar year, in each case, except during the continuance of an Event of Default.

6.7 Notices. Promptly upon a Responsible Officer of the Borrower or any Subsidiary Guarantor obtaining knowledge thereof, give notice to the Administrative Agent (who shall promptly notify each Lender) of:

(a)    the occurrence of any Default or Event of Default;

(b)    any litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Restricted Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)    the following events, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, as soon as possible and in any event promptly after the Borrower or any Subsidiary Guarantor knows thereof: (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, (ii) the institution of proceedings or the taking of any other action by the PBGC or Holdings or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan or (iii) the occurrence of any similar events with respect to a Commonly Controlled Plan, that would reasonably be likely to result in a direct obligation of the Borrower or any of its Restricted Subsidiaries to pay money;

(d)    any development or event that has had or would reasonably be expected to have a Material Adverse Effect; and

(e)    the acquisition of any Property after the Closing Date in which the Collateral Agent does not already have a perfected security interest and in which a security interest is required to be created or perfected pursuant to Section 6.8.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower or the relevant Restricted Subsidiary proposes to take with respect thereto.

6.8 Additional Collateral, etc. (a)  With respect to any Property (other than Excluded Collateral) located in the United States having a value, individually or in the aggregate, of at least $5,000,000 acquired after the Closing Date by any Loan Party (other than (x) any interests in Real Property and any Property described in paragraph (c) or paragraph (d) of this Section 6.8, (y) any Property subject to a Lien expressly permitted by Section 7.3(g) or 7.3(aa) and (z) Instruments, Certificated Securities, Securities and Chattel Paper, which are referred to in the last sentence of this paragraph (a)) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly (i) give notice of such Property to the Collateral Agent and execute and deliver

-71-

to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Collateral Agent reasonably requests to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in such Property and (ii) take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent for the benefit of the Secured Parties a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in such Property (with respect to Property of a type owned by a Loan Party as of the Closing Date to the extent the Collateral Agent for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $5,000,000 payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security, Security or Chattel Paper (or, if more than $5,000,000 in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments, Certificated Securities, Securities or Chattel Paper), such Instrument, Certificated Security, Security or Chattel Paper shall be promptly delivered to the Collateral Agent indorsed in a manner reasonably satisfactory to the Collateral Agent to be held as Collateral pursuant to this Agreement.

(b) With respect to any fee interest in any Material Real Property acquired after the Closing Date by any Loan Party (other than Excluded Real Property), (i) give notice of such acquisition to the Collateral Agent and, if requested by the Collateral Agent execute and deliver a first priority Mortgage (subject to liens permitted by Section 7.3) in favor of the Collateral Agent for the benefit of the Secured Parties, covering such Real Property (provided that no Mortgage nor survey shall be obtained if the Administrative Agent determines in consultation with the Borrower that the costs of obtaining such Mortgage or survey are excessive in relation to the value of the security to be afforded thereby), (ii) if reasonably requested by the Collateral Agent (A) provide the Lenders with a lenders' title insurance policy with extended coverage covering such Real Property in an amount at least equal to the purchase price of such Real Property (or such other amount as shall be reasonably specified by the Collateral Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate unless the title insurance policy referred to above shall not contain an exception for any matter shown by a survey (except to the extent an existing survey has been provided and specifically incorporated into such title insurance policy), each in form and substance reasonably satisfactory to the Collateral Agent, (B) use commercially reasonable efforts to obtain any consents or estoppels reasonably deemed necessary by the Collateral Agent, in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Collateral Agent and (C) provide to the Administrative Agent evidence of flood hazard insurance if any portion of the improvements on the owned Property is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the improvements; provided, however, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended and (iii) if requested by the Collateral Agent deliver to the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Collateral Agent.

(c) Except as otherwise contemplated by Section 7.7(p), with respect to any new Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary that becomes a Non-Excluded Subsidiary) by any Loan Party, promptly (i) give notice of such acquisition or

-72-

NY1:#3465828

creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent for the benefit of the Secured Parties a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary that is owned by such Loan Party, (ii) deliver to the Collateral Agent the certificates, if any, representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of such Loan Party, and (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and (B) to take such actions necessary or advisable to grant to the Collateral Agent for the benefit of the Secured Parties a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in the same type of Collateral as of the Closing Date), including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Collateral Agent. Without limiting the foregoing, if (i) the aggregate Consolidated Total Assets or annual consolidated revenues of all Subsidiaries designated as "Immaterial Subsidiaries" hereunder shall at any time exceed 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such time) or (ii) if any Subsidiary shall at any time cease to constitute an Immaterial Subsidiary under clause (i) of the definition of "Immaterial Subsidiary" (as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), the Borrower shall promptly, (x) in the case of clause (i) above, rescind the designation as "Immaterial Subsidiaries" of one or more of such Subsidiaries so that, after giving effect thereto, the aggregate Consolidated Total Assets or annual consolidated revenues, as applicable, of all Subsidiaries so designated (and which designations have not been rescinded) shall not exceed 7.5% of Consolidated Total Assets or annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (as reflected on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), as applicable, and (y) in the case of clauses (i) and (ii) above, to the extent not already effected, (A) cause each affected Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Subsidiary to take such actions to pledge such Capital Stock to the extent required by, and otherwise in accordance with, the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Capital Stock.

(d) Except as otherwise contemplated by Section 7.7(p), with respect to any new first tier Foreign Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date by any Loan Party, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement as the Collateral Agent deems necessary or reasonably advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary (other than any Excluded Capital Stock) that is owned by such Loan Party and (ii) deliver to the Collateral Agent the certificates, if any, representing such Capital Stock (other than any Excluded Capital Stock), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of such Loan Party, and take such other action as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect or ensure appropriate priority the Lien of the Collateral Agent thereon.

<div align="center">-73-</div>

(e) Notwithstanding anything in this Section 6.8 to the contrary, neither the Borrower nor any of its Restricted Subsidiaries shall be required to take any actions in order to perfect the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties under the laws of any jurisdiction outside the United States.

6.9 <u>Further Assurances</u>. Maintain the security interest created by the Security Documents as a perfected security interest having at least the priority described in Section 4.17 (to the extent such security interest can be perfected through the filing of UCC-1 financing statements, the Intellectual Property filings to be made pursuant to Schedule 3 of the Guarantee and Collateral Agreement or the delivery of Pledged Securities required to be delivered under the Guarantee and Collateral Agreement), subject to the rights of the Loan Parties under the Loan Documents to dispose of the Collateral. From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Collateral Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the ratable benefit of the Secured Parties, has a perfected Lien pursuant hereto or thereto, including, without limitation, filing any financing or continuation statements or financing change statements under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby. Notwithstanding anything in this Section 6.9 to the contrary, neither the Borrower nor any of its Restricted Subsidiaries shall be required to take any actions in order to perfect the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties under the laws of any jurisdiction outside the United States.

6.10    <u>Use of Proceeds</u>. The proceeds of the Term Loans shall be used to effect the Merger Transactions, the refinancing of existing Indebtedness and to pay related fees and expenses. The proceeds of the Revolving Loans, the Swingline Loans and the Letters of Credit shall be used to finance a portion of the Merger Transactions (including purchase price adjustments), to finance Permitted Acquisitions and Investments permitted hereunder and for other general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement.

6.11    <u>Post-Closing Undertakings</u>. Within the time period specified on Schedule 6.11 (or such later date to which the Administrative Agent consents), comply with the provisions set forth in Schedule 6.11.

<div align="center">SECTION 7.    NEGATIVE COVENANTS</div>

The Borrower (on behalf of itself and each of the Restricted Subsidiaries) hereby agrees that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding (that has not been cash collateralized or backstopped) or any Loan or other amount is owing to any Lender or any Agent hereunder (other than (i) contingent or indemnification obligations not then due and (ii) obligations in respect of Specified Hedge Agreements), the Borrower shall not, and shall not permit any of the Restricted Subsidiaries to:

7.1 <u>Consolidated Senior Secured Leverage Ratio</u>. Permit the Consolidated Senior Secured Leverage Ratio of the Borrower as at the last day of any period of four consecutive fiscal quarters of Holdings ending on or after any of the dates set forth below (the "applicable date") and prior to the next occurring date set forth below to exceed the ratio set forth below opposite the applicable date:

NY1:#3465828

| Period | Consolidated Senior Secured Leverage Ratio |
|---|---|
| March 31, 2008 | 5.25 : 1.00 |
| June 30, 2008 | 5.25 : 1.00 |
| September 30, 2008 | 5.00 : 1.00 |
| December 31, 2008 | 5.00 : 1.00 |
| March 31, 2009 | 4.75 : 1.00 |
| June 30, 2009 | 4.75 : 1.00 |
| September 30, 2009 | 4.50 : 1.00 |
| December 31, 2009 | 4.50 : 1.00 |
| March 31, 2010 | 4.25 : 1.00 |
| June 30, 2010 | 4.00 : 1.00 |
| September 30, 2010 | 4.00 : 1.00 |
| December 31, 2010 | 4.00 : 1.00 |
| March 31, 2011 and thereafter | 3.50 : 1.00 |

7.2 <u>Indebtedness</u>. Create, issue, incur, assume, or permit to exist any Indebtedness, except:

(a)   Indebtedness of the Borrower and any Restricted Subsidiary pursuant to any Loan Document or Hedge Agreement;

(b)   Indebtedness (i) of the Borrower to any of its Restricted Subsidiaries or Holdings or of any Subsidiary Guarantor to Holdings, the Borrower or any Restricted Subsidiary, <u>provided</u> that any such Indebtedness owing to a Restricted Subsidiary that is not a Subsidiary Guarantor is expressly subordinated in right of payment to the Obligations pursuant to the Guarantee and Collateral Agreement or otherwise and (ii) of any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary;

(c)   Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed the greater of (i) $50,000,000 and (ii) 17.5% of Consolidated EBITDA as of the end of any Reference Period at any one time outstanding;

(d)   (i) Indebtedness outstanding on the date hereof and listed on Schedule 7.2(d) and any Permitted Refinancing thereof, (ii) Indebtedness incurred in connection with the Company Reorganization and (iii) Indebtedness otherwise permitted under Section 7.10;

(e)   Guarantee Obligations (i) by the Borrower or any of its Restricted Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred and (ii) by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary;

(f)   Indebtedness of the Borrower or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Restricted Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)   (A) Indebtedness of any joint venture or Non-Guarantor Subsidiary owing to any Loan Party and (B) Guarantee Obligations of the Borrower or any Subsidiary Guarantor of

NY1:#3465828

Indebtedness for Borrowed Money of any joint ventures or Non-Guarantor Subsidiaries, to the extent such Indebtedness and Guarantee Obligations are permitted as Investments by Section 7.7(h), (k), (m) or (w);

(h)    Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting or other similar arrangements and other contingent obligations in respect of acquisitions or Investments permitted by Section 7.7 (both before or after any liability associated therewith becomes fixed);

(i)    (i) Indebtedness of the Borrower in respect of (A) the Senior Interim Loan Agreement providing gross cash proceeds not to exceed $700,000,000 less the amount of any Indebtedness outstanding under clause (i)(B) below and (B) the Refinancing Notes providing gross cash proceeds not to exceed $700,000,000 and, in each case, any Guarantee Obligations of the Borrower and Subsidiary Guarantors with respect thereto plus any accrued pay-in-kind interest, capitalized interest, accrued interest, fees, discounts, premiums and expenses, in each case, in respect thereof, (ii) Guarantee Obligations of any Subsidiary Guarantor in respect of such Indebtedness, interest, fees, discounts, premiums and expenses; provided that, in each case, in the case of any guarantee of Indebtedness in respect of the Senior Interim Loan Agreement or the Refinancing Notes, as applicable, by any Restricted Subsidiary that is not a Subsidiary Guarantor, such Restricted Subsidiary becomes a Subsidiary Guarantor under this Agreement at or prior to the time of such guarantee, and (iii) any Permitted Refinancing thereof;

(j)    additional Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate principal amount (for the Borrower and all Restricted Subsidiaries) not to exceed $100,000,000 at any one time outstanding;

(k)    Indebtedness of Non-Guarantor Subsidiaries in respect of local lines of credit, letters of credit, bank guarantees, factoring arrangements, sale/leaseback transactions and similar extensions of credit in the ordinary course of business, in an aggregate principal amount at any one time outstanding not to exceed the greater of (i) $75,000,000 and (ii) 25% of Consolidated EBITDA as of the end of any Reference Period at any one time outstanding;

(l)    Indebtedness of the Borrower or any of its Restricted Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid and surety bonds and completion guaranties, in each case in the ordinary course of business;

(m)    Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries arising from agreements providing for indemnification related to sales of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary;

(n)    Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit;

(o)    Indebtedness issued in lieu of cash payments of Restricted Payments permitted by Section 7.6; provided that such Indebtedness is subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent;

NY1:#3465828

(p)   Permitted Subordinated Indebtedness in an aggregate principal amount not to exceed $50,000,000 at any one time outstanding and any guarantees incurred in respect thereof;

(q)   Indebtedness of the Borrower or any Subsidiary Guarantor as an account party in respect of trade letters of credit issued in the ordinary course of business;

(r)   Indebtedness owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business;

(s)   (i) Guarantee Obligations made in the ordinary course of business; provided that such Guarantees are not of Indebtedness for Borrowed Money and such Guarantee Obligations would not otherwise in the aggregate reasonably be expected to have a Material Adverse Effect and (ii) Guarantee Obligations in respect of Indebtedness of Permitted Joint Ventures; provided that the aggregate amount of any such Guarantee Obligations under this sub-clause (ii) shall not exceed $35,000,000;

(t)   Indebtedness of any Person that becomes a Restricted Subsidiary after the Closing Date as part of an acquisition, merger or consolidation or amalgamation or other Investment not prohibited hereunder (a "New Subsidiary"), which Indebtedness exists at the time of such acquisition, merger or consolidation or amalgamation or other Investment, and Permitted Refinancing thereof; provided that (A) such Indebtedness exists at the time such Person becomes a Restricted Subsidiary and is not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such Person becoming a Restricted Subsidiary), (B) the aggregate principal amount of Indebtedness permitted by this clause (t) and Section 7.2(u) shall not at any one time outstanding exceed (i) 50% of the aggregate amount of the increase in Consolidated EBITDA since the Closing Date, measured as of the end of the most recently ended Reference Period plus (ii) $75,000,000 and (C) neither the Borrower nor any Restricted Subsidiary (other than the applicable New Subsidiary) shall provide security therefor;

(u)   Indebtedness incurred to finance any acquisition or other Investment permitted under Section 7.7 in an aggregate amount for all such Indebtedness together with the aggregate principal amount of Indebtedness permitted by Section 7.2(t) not to exceed (i) 50% of the aggregate amount of the increase in Consolidated EBITDA since the Closing Date, measured as of the end of the most recently ended Reference Period plus (ii) $75,000,000 as at any one time outstanding;

(v)   other secured Indebtedness so long as (i) after giving effect to the incurrence of such secured Indebtedness (as if such secured Indebtedness had been incurred on the first day of the most recently completed period of four consecutive fiscal quarters of the Borrower ending on or prior to such date), the Consolidated Senior Secured Leverage Ratio would be less than or equal to 3.75:1.00, (ii) no Default or Event of Default shall have occurred and be continuing at the time of incurrence of such secured Indebtedness or would result therefrom and (iii) the terms of such secured Indebtedness provide for covenants and events of default (A) that are, taken as a whole, customary for Indebtedness of a similar nature as such secured Indebtedness or (B) to which the Administrative Agent has not objected, after being afforded a period of five Business Days to review the terms of such secured Indebtedness;

(w)   other unsecured Indebtedness so long as (i) after giving effect to the incurrence of such unsecured Indebtedness (as if such unsecured Indebtedness had been incurred on the first day of the most recently completed period of four consecutive fiscal quarters of the Borrower

-77-

ending on or prior to such date), the Consolidated Total Leverage Ratio would be less than or equal to 5.50:1.00, (ii) no Default or Event of Default shall have occurred and be continuing at the time of incurrence of such unsecured Indebtedness or would result therefrom; and (iii) the terms of such unsecured Indebtedness (x) do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the date at least 180 days following the Term Maturity Date (or such later date that is the latest final maturity date of any incremental extension of credit hereunder) and (y) provide for covenants and events of default (A) that are, taken as a whole, customary for Indebtedness of a similar nature as such unsecured Indebtedness or (B) to which the Administrative Agent has not objected, after being afforded a period of five Business Days to review the terms of such unsecured Indebtedness.

(x)    receivables sales or financings or factoring arrangements in the ordinary course of business (any such arrangements shall be referred to herein as "Permitted Receivables Financing"), provided that with respect to any amount outstanding under any such Permitted Receivables Financing in excess of $75,000,000 at any one time, the Borrower shall apply the Net Cash Proceeds of such excess amount as a mandatory prepayment in accordance with Section 2.12(a);

(y)    the Existing JV Indebtedness;

(z)    (i) Indebtedness representing deferred compensation to employees of the Borrower or any Restricted Subsidiary incurred in the ordinary course of business and (ii) Indebtedness consisting of obligations of the Borrower or any Restricted Subsidiary under deferred compensation or other similar arrangements incurred in connection with the Merger Transactions and any Investment permitted hereunder;

(aa)    Indebtedness consisting of the deferred purchase price of notes issued by Borrower or any Restricted Subsidiary to the officers, directors and employees of Holdings, Borrower or any Restricted Subsidiary, in lieu of or combined with cash payments, in each case, to the extent permitted by Section 7.6(e);

(bb)    Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(cc)    (i) Indebtedness of the Borrower or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in the ordinary course of business and (ii) Indebtedness of the Borrower or any Restricted Subsidiary to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including in respect of intercompany self-insurance arrangements) of the Borrower and its Restricted Subsidiaries; and

(dd)    all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (cc) above.

-78-

7.3 <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)   Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings; <u>provided</u> that adequate reserves with respect thereto are maintained on the books of the Borrower or its Restricted Subsidiaries, as the case may be, to the extent required by GAAP;

(b)   landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings;

(c)   pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)   deposits and other Liens to secure the performance of bids, trade contracts (other than for borrowed money), leases, subleases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)   easements, zoning restrictions, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(f)   Liens (i) in existence on the date hereof listed on Schedule 7.3(f) (or to the extent not listed on such Schedule 7.3(f), where the fair market value of the Property to which such Lien is attached is less than $5,000,000), (ii) securing Indebtedness permitted by Section 7.2(d) and (iii) created after the date hereof in connection with any refinancing, refundings, or renewals or extensions thereof permitted by Section 7.2(d); <u>provided</u> that no such Lien is spread to cover any additional Property of the Borrower or any Restricted Subsidiary after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)   Liens securing Indebtedness of the Borrower or any Restricted Subsidiary incurred pursuant to Sections 7.2(c), 7.2(g), 7.2(k), 7.2(r), 7.2(s), 7.2(t), 7.2(u), 7.2(v), 7.2(x) and 7.2(y); <u>provided</u> that (i) in the case of any such Liens securing Indebtedness incurred pursuant to Sections 7.2(c) or 7.2(u) to the extent incurred to finance Acquisitions or Investments permitted under Section 7.7, (x) such Liens shall be created substantially concurrently with, or within 90 days after, the acquisition of the assets financed by such Indebtedness and (y) such Liens do not at any time encumber any Property of the Borrower or any Restricted Subsidiary other than the Property financed by such Indebtedness and the proceeds thereof, (ii) in the case of any such Liens securing Indebtedness pursuant to Sections 7.2(g)(A), 7.2(k) or 7.2(y), such Liens do not at any time encumber any Property of the Borrower or any Subsidiary Guarantor, (iii) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(r), such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance and (iv) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(t), such Liens exist at the time that the relevant Person becomes a Restricted Subsidiary and is not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary;

(h)   Liens created pursuant to the Security Documents;

-79-

(i)    any interest or title of a lessor under any lease entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business and covering only the assets so leased, and any financing statement filed in connection with any such lease;

(j)    Liens arising from judgments in circumstances not constituting an Event of Default under Section 8(h);

(k)    Liens on Property or assets acquired pursuant to an acquisition permitted under Section 7.7 (and the proceeds thereof) or assets of a Subsidiary Guarantor in existence at the time such Subsidiary Guarantor is acquired pursuant to an acquisition permitted under Section 7.7 and not created in contemplation thereof;

(l)    (i) Liens on Property of Non-Guarantor Subsidiaries securing Indebtedness or other obligations not prohibited by this Agreement to be incurred by such Non-Guarantor Subsidiaries and (ii) Liens securing Indebtedness or other obligations of the Borrower or any Subsidiary in favor of any Loan Party;

(m)    receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(n)    Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(o)    Liens arising out of consignment or similar arrangements for the sale by the Borrower and its Restricted Subsidiaries of goods through third parties in the ordinary course of business;

(p)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with an Investment permitted by Section 7.7;

(q)    Liens deemed to exist in connection with Investments permitted by Section 7.7(b) that constitute repurchase obligations;

(r)    Liens upon specific items of inventory or other goods and proceeds of the Borrower or any of its Restricted Subsidiaries arising in the ordinary course of business securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(s)    Liens on cash deposits securing any Hedge Agreement permitted hereunder;

(t)    any interest or title of a lessor under any leases or subleases entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(u)    Liens on cash or cash equivalents used to defease or to satisfy and discharge Indebtedness, provided that such defeasance or satisfaction and discharge is not prohibited hereunder;

(v)    (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business

-80-

of the Borrowers and the Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) other Liens securing cash management obligations (that do not constitute Indebtedness) in the ordinary course of business;

(w)  Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(x)  Liens on Capital Stock in joint ventures securing obligations of such joint venture;

(y)  Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents;

(z)  Liens securing obligations in respect of trade-related letters of credit permitted under Section 7.2 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof; and

(aa)  other Liens with respect to obligations that do not exceed an amount equal to the greater of (i) $30,000,000 and (ii) 10% of Consolidated EBITDA as of the end of the most recently ended Reference Period at any one time outstanding.

7.4  <u>Fundamental Changes</u>.  Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

(a)  (i) any Restricted Subsidiary may be merged, amalgamated or consolidated with or into the Borrower (<u>provided</u> that the Borrower shall be the continuing or surviving corporation) or (ii) any Restricted Subsidiary may be merged, amalgamated or consolidated with or into any Subsidiary Guarantor (<u>provided</u> that (x) a Subsidiary Guarantor shall be the continuing or surviving corporation or (y) simultaneously with such transaction, the continuing or surviving corporation shall become a Subsidiary Guarantor and the Borrower shall comply with Section 6.8 in connection therewith);

(b)  any Non-Guarantor Subsidiary may be merged or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary that is a Restricted Subsidiary;

(c)  any Restricted Subsidiary may Dispose of all or substantially all of its assets upon voluntary liquidation or otherwise to the Borrower or any Subsidiary Guarantor; <u>provided</u> that, with respect to any such Dispositions by any Non-Guarantor Subsidiary to the Borrower or any Subsidiary Guarantor for consideration in excess of the fair value of such assets (such excess, an "<u>Excess Amount</u>"), the sum of, without duplication, (A) the aggregate amount of all such Excess Amounts in this clause (c) and in Section 7.5(m)(ii)(C) and (B) the aggregate amount of all Differential Amounts in respect of Dispositions made pursuant to Section 7.5(l), shall not at any time while this Agreement is in effect exceed the sum of (i) $45,000,000 <u>plus</u> (ii) the Available Amount;

(d)  any Non-Guarantor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary;

-81-

(e)  Dispositions permitted by Section 7.5 and any merger, dissolution, liquidation, consolidation, investment or Disposition, the purpose of which is to effect a Disposition permitted by Section 7.5 may be consummated;

(f)  any Investment expressly permitted by Section 7.7 may be structured as a merger, consolidation or amalgamation;

(g)  the transactions contemplated under the Transaction Documents; and

(h)  any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interest of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Loan Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 7.4 or 7.5 or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Loan Party after giving effect to such liquidation or dissolution.

7.5  Dispositions of Property.  Dispose of any of its owned Property (including, without limitation, receivables) whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)  (i) the Disposition of surplus, obsolete or worn out Property in the ordinary course of business, (ii) the sale of defaulted receivables in the ordinary course of business, (iii) abandonment, cancellation or disposition of any Intellectual Property in the ordinary course of business and (iv) sales, leases or other dispositions of inventory determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business;

(b)  (i) the sale of inventory in the ordinary course of business, (ii) the cross-licensing or licensing of Intellectual Property, in the ordinary course of business and (iii) the contemporaneous exchange, in the ordinary course of business, of Property for Property of a like kind, to the extent that the Property received in such exchange is of a value equivalent to the value of the Property exchanged (provided that after giving effect to such exchange, the value of the Property of the Borrower or any Subsidiary Guarantor subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

(c)  Dispositions permitted by Section 7.4;

(d)  the sale or issuance of (i) any Subsidiary's Capital Stock to the Borrower or any Subsidiary Guarantor; provided that the sale or issuance of Capital Stock of an Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary is otherwise permitted by Section 7.7, (ii) any Non-Guarantor Subsidiary that is a Restricted Subsidiary to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary and (iii) any Subsidiary that is an Unrestricted Subsidiary to any other Subsidiary that is an Unrestricted Subsidiary, in each case, including, without limitation, in connection with any tax restructuring activities not otherwise prohibited hereunder;

(e)  the Disposition of other assets for fair market value not to exceed $150,000,000 in the aggregate; provided that (i) either (A) the aggregate amount of such Dispositions that are in the form of Permitted Asset Swaps or the total consideration for which is not cash or Cash Equivalents shall not exceed $25,000,000 in the aggregate or (B) at least 75% of the total consideration for any such Disposition (other than Dispositions permitted under sub-clause (i) of

NY1:#3465828

this clause (e)) received by the Borrower and its Restricted Subsidiaries is in the form of cash or Cash Equivalents and (ii) the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

(f)    (i) any Recovery Event; provided that the requirements of Section 2.12(b) are complied with in connection therewith and (ii) any event that would constitute a Recovery Event but for the Dollar threshold set forth in the definition thereof;

(g)    the leasing, occupancy agreements or sub-leasing of Property that would not materially interfere with the required use of such Property by the Borrower or its Restricted Subsidiaries;

(h)    the transfer for fair value of Property (including Capital Stock of Subsidiaries) to another Person in connection with a joint venture arrangement with respect to the transferred Property; provided that such transfer is permitted under Section 7.7(h);

(i)    the sale or discount, in each case without recourse and in the ordinary course of business, of overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(j)    transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(k)    the Disposition of any Immaterial Subsidiary or any Unrestricted Subsidiary;

(l)    the transfer of Property (including Capital Stock of Subsidiaries) for less than fair value (such difference, the "Differential Amount") of the Borrower or any Guarantor to any Non-Guarantor Subsidiary; provided that the sum of, without duplication, (A) the aggregate amount of all such Differential Amounts and (B) the aggregate amount of all Excess Amounts in respect of Dispositions made pursuant to Section 7.4(c) and Section 7.5(m)(ii)(C), shall not exceed the sum of (i) $45,000,000 plus (ii) the Available Amount; provided, further, that any sale or issuance of Capital Stock of an Unrestricted Subsidiary to the Borrower or a Subsidiary Guarantor is otherwise permitted by Section 7.7;

(m)    the transfer of Property (i) by the Borrower or any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor or (ii) from a Non-Guarantor Subsidiary to (A) the Borrower or any Subsidiary Guarantor for no more than fair market value, (B) any other Non-Guarantor Subsidiary that is a Restricted Subsidiary or (C) the Borrower or any Subsidiary Guarantor for more than fair market value (such excess, an "Excess Amount"), the sum of, without duplication, (A) the aggregate amount of all such Excess Amounts in this clause (m)(ii)(C) and Section 7.4(c) and (B) the aggregate amount of all Differential Amounts in respect of Dispositions made pursuant to Section 7.5(l), shall not at any time while this Agreement is in effect exceed the sum of (i) $45,000,000 plus (ii) the Available Amount; provided that any sale or issuance of Capital Stock of an Unrestricted Subsidiary to the Borrower or any Subsidiary Guarantor is otherwise permitted by Section 7.7;

(n)    the sale of cash or Cash Equivalents in the ordinary course of business;

-83-

(o) (i) Liens permitted by Section 7.3, (ii) Restricted Payments permitted by Section 7.6, (iii) Investments permitted by Section 7.7, (iv) payments permitted by Section 7.8, (v) sale and leaseback transactions permitted by Section 7.10 and (vi) the purchase and sale or other transfer of Property (including by capital contribution) pursuant to, or in connection with, Permitted Receivables Financings;

(p) the Material Dispositions; provided that (i) at least 90% of the total consideration for such Disposition received by the Borrower and its Restricted Subsidiaries is in the form of cash or Cash Equivalents and (ii) the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

(q) Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture parties set forth in, joint venture arrangements and similar binding arrangements; provided that the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith; and

(r) Dispositions of Property between or among the Borrower and/or its Restricted Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (q) above.

7.6 <u>Restricted Payments</u>. Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of the Borrower or any Restricted Subsidiary, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "<u>Derivatives Counterparty</u>") obligating the Borrower or any Restricted Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock (collectively, "<u>Restricted Payments</u>"), except that:

(a) (i) any Restricted Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b) provided that (x) no Default or Event of Default is continuing or would result therefrom and (y) the Consolidated Total Leverage Ratio for the most recently ended period of four consecutive fiscal quarters of the Borrower shall not exceed 4.50:1.00 for such period immediately before and immediately after giving effect to such Restricted Payment, the Borrower may make Restricted Payments in an aggregate amount not to exceed an amount equal to (i) (A) $25,000,000 plus (B) the Available Amount minus (ii) the aggregate amount of Investments made pursuant to Section 7.7(y);

(c) the Borrower may make Restricted Payments to Holdings, to permit Holdings to pay (i) any taxes which are due and payable by Holdings or any Parent Company, the Borrower and the Restricted Subsidiaries as part of a consolidated group (or shareholders of Holdings, to the extent such taxes are attributable to Holdings, the Borrower and the Restricted Subsidiaries), (ii) customary fees, salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, their current and former officers and employees and members of their Board of Directors, (iii) ordinary course corporate operating expenses and other fees and expenses required to maintain its corporate existence, (iv) fees and expenses to the extent permitted under clause (i) of the second sentence of Section 7.9 and (v) reasonable fees and expenses incurred in connection

-84-

with any unsuccessful debt or equity offering by Holdings or any Parent Company to the extent
that the proceeds thereof were intended to be used for the benefit of the Borrower and its
Subsidiaries;

(d)    the Borrower may make Restricted Payments in the form of Capital Stock of the
Borrower;

(e)    the Borrower or any Subsidiary may make Restricted Payments to, directly or
indirectly, purchase its Capital Stock from present or former officers, directors, consultants,
agents or employees (or their estates, family members or former spouses) of Holdings, the
Borrower or any Subsidiary upon the death, disability, retirement or termination of the applicable
officer, director, consultant, agent or employee or pursuant to any equity subscription agreement,
stock option or equity incentive award agreement, shareholders' or members' agreement or
similar agreement, plan or arrangement; provided that the aggregate amount of payments under
this clause (e) in any fiscal year of the Borrower shall not exceed the sum of (i) (A) at any time
prior to a Holdings IPO, $12,500,000 plus (B) any unutilized portion of such amount in the
immediately preceding fiscal year (but not exceeding $25,000,000 in the aggregate for any such
fiscal year under this clause (A)) and (B) at any time after a Holdings IPO, $20,000,000 plus (B)
any unutilized portion of such amount in immediately preceding fiscal year (but not exceeding
$35,000,000 in the aggregate for any such fiscal year under this clause (B)), plus (ii) any proceeds
received from key man life insurance policies, plus (iii) the amount of any bona fide cash bonuses
otherwise payable to members of management, directors or consultants of Holdings, any Parent
Company, the Borrower or its Restricted Subsidiaries in connection with the Transactions that are
foregone in return for the receipt of Capital Stock the fair market value of which is equal to or
less than the amount of such cash bonuses; provided that any Restricted Payments permitted (but
not made) pursuant to this clause (e) in the any prior fiscal year may be carried forward to any
subsequent calendar year, and provided, further, that cancellation of Indebtedness owing to the
Borrower or any Restricted Subsidiary by any member of management of Holdings, any Parent
Company, the Borrower or its Restricted Subsidiaries in connection with a repurchase of the
Capital Stock of Holdings or any Parent Company will not be deemed to constitute a Restricted
Payment for purposes of this Section 7.6;

(f)    noncash repurchases of Capital Stock deemed to occur upon exercise of stock
options or similar equity incentive awards if such Capital Stock represent a portion of the exercise
price of such options or similar equity incentive awards;

(g)    the Borrower and its Restricted Subsidiaries may make Restricted Payments to
consummate the Transactions (including, any Restricted Payments contemplated by the Merger
Agreement);

(h)    the Borrower may make Restricted Payments to allow Holdings or any Parent
Company to make payments in cash, in lieu of the issuance of fractional shares, upon the exercise
of warrants or upon the conversion or exchange of Capital Stock of any such Person;

(i)    Restricted Payments to make payments provided for in the Management Agreement;

(j)    to the extent constituting Restricted Payments, the Borrower and its Restricted
Subsidiaries may enter into and consummate transactions expressly permitted by any provision of
Sections 7.4, 7.5, 7.7 and 7.9; and

NY1:#3465828

(k)    provided that no Default or Event of Default is continuing or would result therefrom, after a Holdings IPO, the Borrower may make Restricted Payments to Holdings so that Holdings may make Restricted Payments to its equity holders in an aggregate amount not exceeding 6.0% per annum of the Net Cash Proceeds received by the Borrower from such Holdings IPO; provided that the Available Amount shall be reduced by a corresponding amount of any such Restricted Payments.

7.7    Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other investment in, any other Person (all of the foregoing, "Investments"), except:

(a)    (i) extensions of trade credit in the ordinary course of business and (ii) purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business, to the extent such purchases and acquisitions constitute Investments;

(b)    Investments in Cash Equivalents and Investments that were Cash Equivalents when made;

(c)    Investments arising in connection with (i) the incurrence of Indebtedness permitted by Sections 7.2 to the extent arising as a result of Indebtedness among Holdings, the Borrower or any Restricted Subsidiary and Guarantee Obligations permitted by Section 7.2 and payments made in respect of such Guarantee Obligations, (ii) the forgiveness or conversion to equity of any Indebtedness permitted by Section 7.2 and (iii) Guarantees by any Borrower or any Restricted Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(d)    loans and advances to employees, consultants or directors of Holdings, the Borrower or any of its Restricted Subsidiaries in the ordinary course of business in an aggregate amount (for Holdings, the Borrower and all Restricted Subsidiaries) not to exceed $5,000,000 (excluding (for purposes of such cap) travel and entertainment expenses, but including relocation expenses) at any one time outstanding;

(e)    Investments (other than those relating to the incurrence of Indebtedness permitted by Section 7.7(c)) by the Borrower or any of its Restricted Subsidiaries in the Borrower or any Person that, prior to such Investment, is a Subsidiary Guarantor or is a Domestic Subsidiary that becomes a Subsidiary Guarantor at the time of such Investment;

(f)    (i) Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a Subsidiary Guarantor or a part of the Borrower or any Subsidiary Guarantor or becomes (whether or not such Person is a wholly owned Subsidiary) a Subsidiary Guarantor in the manner contemplated by Section 6.8(c) and (ii) other Permitted Acquisitions in an aggregate purchase price (other than purchase price paid through the issuance of equity by Holdings or any Parent Company with the proceeds thereof, including (x) whether or not any equity is issued, capital contributions (other than relating to Disqualified Capital Stock) and (y) equity issued to the seller) in an aggregate amount not to exceed $100,000,000 plus, in the case of clause (ii), an amount equal to the Available Amount;

(g)    loans by the Borrower or any of its Restricted Subsidiaries to the, employees, officers or directors of Holdings, the Borrower or any of its Restricted Subsidiaries in connection

-86-

with management incentive plans; provided that such loans represent cashless transactions pursuant to which such employees, officers or directors directly invest the proceeds of such loans in the Capital Stock of Holdings;

(h)  (i) Investments by the Borrower and its Restricted Subsidiaries in joint ventures or similar arrangements and by the Borrower or any Subsidiary Guarantor in any Non-Guarantor Subsidiary in an aggregate amount (for the Borrower and all Restricted Subsidiaries), not to exceed (together with any Indebtedness outstanding under Section 7.2(g)), the sum of (A) the greater of (1) $50,000,000 and (2) 18.5% of Consolidated EBITDA as of the end of the most recently ended Reference Period plus (B) an amount equal to the Available Amount and (ii) Permitted Joint Venture Investments not to exceed the sum of (A) $50,000,000 plus (B) the JV Distribution Amount, subject to the last sentence of the definition "Available Amount", and provided, further, that any Investment made for the purpose of funding a Permitted Acquisition permitted under Section 7.7(f) shall not be deemed a separate Investment for the purposes of this clause (h);

(i)  Investments (including debt obligations) received in the ordinary course of business by the Borrower or any Restricted Subsidiary in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising out of the ordinary course of business;

(j)  Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(k)  Investments in existence on, or pursuant to legally binding written commitments in existence on, the Closing Date and listed on Schedule 7.7 and, in each case, any extensions or renewals thereof, so long as the amount of any Investment made pursuant to this clause (k) is not increased at any time above the amount of such Investment set forth on Schedule 7.7;

(l)  Investments of the Borrower or any Restricted Subsidiary under Hedge Agreements permitted hereunder;

(m)  Investments of any Person in existence at the time such Person becomes a Restricted Subsidiary; provided that such Investment was not made in connection with or in anticipation of such Person becoming a Restricted Subsidiary;

(n)  Investments arising as a result of payments permitted by Section 7.8(a);

(o)  consummation of the Merger Transactions pursuant to the Merger Agreement and the Company Reorganization;

(p)  Subsidiaries of the Borrower may be established or created, if (i) to the extent such new Subsidiary is a Domestic Subsidiary, the Borrower and such Subsidiary comply with the provisions of Section 6.8(c) and (ii) to the extent such new Subsidiary is a Foreign Subsidiary, the Borrower complies with the provisions of Section 6.8(d); provided that, in each case, to the extent such new Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to an acquisition permitted by this Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such merger transactions, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective merger transaction shall be

-87-

required to so comply within ten Business Days or such longer period as the Administrative Agent shall agree);

(q)    Investments arising directly out of the receipt by the Borrower or any Restricted Subsidiary of non-cash consideration for any sale of assets permitted under Section 7.5; provided that such non-cash consideration shall in no event exceed 25% of the total consideration received for such sale (or such lesser percentage thereof required under Section 7.5(p));

(r)    Investments resulting from pledges and deposits referred to in Sections 7.3(c) and (d);

(s)    Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other persons;

(t)    any Investment in a Foreign Subsidiary to the extent such Investment is substantially contemporaneously repaid in full with a dividend or other distribution from such Foreign Subsidiary;

(u)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(v)    Investments arising as a result of, or in connection with, Permitted Receivables Financings;

(w)    additional Investments so long as the aggregate amount thereof outstanding at no time exceeds the sum of (i) the greater of (x) $60,000,000 and (y) 20% of Consolidated EBITDA as of the end of the most recently ended Reference Period plus (ii) an amount equal to the Available Amount;

(x)    advances of payroll payments to employees, or fee payments to directors or consultants, in the ordinary course of business; and

(y)    provided that the Borrower would be permitted to make a Restricted Payment to Holdings pursuant to Sections 7.6(b), (c), (e), (h) and (k), Investments constituting loans or advances by the Borrower to Holdings in an amount not to exceed the amount of such Restricted Payment permitted pursuant to Sections 7.6(b), (c), (e), (h) and (k).

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this Section 7.7, such amount shall deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested).

7.8    Optional Payments and Modifications of Certain Debt Instruments.  (a) Make any optional or voluntary payment, prepayment, repurchase or redemption of, or otherwise voluntarily or optionally defease (i) any Senior Interim Facility Indebtedness or Refinancing Notes then outstanding or (ii) the principal of or interest on, or any other amount owing in respect of any Permitted Subordinated Indebtedness or any Indebtedness incurred pursuant to Section 7.2(w); provided that (A) Holdings, the Borrower or any Restricted Subsidiary may prepay or exchange, as applicable, any Senior Interim Facility Indebtedness using the proceeds from the issuance of the Refinancing Notes, (B) the Borrower or any Restricted Subsidiary may prepay any Senior Interim Facility Indebtedness or the Refinancing Notes (or

-88-

any Permitted Refinancing thereof) with amounts constituting the Available Amount, (C) the Borrower or any Restricted Subsidiary may prepay any Permitted Subordinated Indebtedness or any Indebtedness incurred pursuant to Section 7.2(w) (or any Permitted Refinancing thereof) with amounts constituting the Available Amount, (D) the Borrower or any Restricted Subsidiary may refinance, replace or extend any Senior Interim Facility Indebtedness or Refinancing Notes; Permitted Subordinated Indebtedness or any Indebtedness incurred pursuant to Section 7.2(w) to the extent permitted by Section 7.2 and (E) the Borrower or any Restricted Subsidiary may convert any Permitted Subordinated Indebtedness or any Indebtedness incurred pursuant to Section 7.2(w) (or any Permitted Refinancing thereof) to the Capital Stock of Holdings or any Parent Company and (F) the Borrower may prepay the Senior Interim Facility Indebtedness or Refinancing Notes (or any Permitted Refinancing thereof) in an aggregate principal amount not to exceed $100,000,000 at any time if the Consolidated Senior Secured Leverage Ratio is equal to or less than 3.00 to 1.00 as of the end of the most recently ended Reference Period. Notwithstanding the foregoing, nothing in this Section 7.8 shall prohibit any AHYDO Payments in respect of the Senior Interim Facility Indebtedness or the Refinancing Notes, any Permitted Subordinated Indebtedness or any Indebtedness incurred pursuant to Section 7.2(w) or, in each case, any Permitted Refinancing thereof.

(b) Amend, modify or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any Permitted Subordinated Indebtedness, Senior Interim Loan Document, any Refinancing Notes or any Refinancing Notes Indenture in any manner that is materially adverse to the Lenders without the prior consent of the Administrative Agent (with the approval of the Required Lenders); provided that nothing in this Section 7.8(b) shall prohibit the refinancing, replacement, extension or other similar modification of the Permitted Subordinated Indebtedness, the Senior Interim Facility Indebtedness or the Refinancing Notes to the extent otherwise permitted by Section 7.2.

7.9    Transactions with Affiliates.    Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than Holdings, the Borrower or any Restricted Subsidiary) unless such transaction is (a) otherwise not prohibited under this Agreement and (b) upon fair and reasonable terms no less favorable to the Borrower or such Restricted Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate. Notwithstanding the foregoing, the Borrower and its Restricted Subsidiaries may (i) pay to the Sponsor and its Affiliates fees, indemnities and expenses pursuant to the Management Agreement and/or fees and expenses in connection with the Merger and disclosed to the Administrative Agent prior to the Closing Date; (ii) enter into any transaction with an Affiliate that is not prohibited by the terms of this Agreement to be entered into by the Borrower or such Restricted Subsidiary with an Affiliate; (iii) make any Restricted Payments contemplated by the Merger Agreement; and (iv) without being subject to the terms of this Section 7.9, enter into any transaction with any Person which is an Affiliate of Holdings only by reason of such Person and Holdings having common directors. For the avoidance of doubt, this Section 7.9 shall not apply to employment , bonus, retention and severance arrangements with, and payments of compensation or benefits to or for the benefit of, current or former employees, consultants, officers or directors of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business.

7.10    Sales and Leasebacks.    Enter into any arrangement with any Person providing for the leasing by the Borrower or any Restricted Subsidiary of real or personal Property which is to be sold or transferred by the Borrower or such Restricted Subsidiary (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or such Restricted Subsidiary, except for (i) any such arrangement entered into in the ordinary course of business of the Borrower and its Subsidiaries, (ii) sales or transfers by the

-89-

Borrower or any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor, (iii) sales or transfers by any Non Guarantor Subsidiary to any other Non Guarantor Subsidiary that is a Restricted Subsidiary, (iv) any such arrangement to the extent that the fair market value of such Property does not exceed $35,000,000 in the aggregate for all such arrangements and (v) any other such arrangement (a "Permitted Additional Sale Leaseback") to the extent that the proceeds thereof are applied as a mandatory prepayment in accordance with Section 2.12(a).

        7.11    Changes in Fiscal Periods. Permit the fiscal year of the Borrower to end on a day other than December 31.

        7.12    Negative Pledge Clauses. Enter into any agreement that prohibits or limits the ability of the Borrower or any of its Restricted Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement, other than:

        (a)  this Agreement and the other Loan Documents and the Senior Interim Loan Documents, the Refinancing Notes and the Refinancing Notes Indenture;

        (b)  any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and the proceeds thereof);

        (c)  software and other Intellectual Property licenses pursuant to which the Borrower or such Restricted Subsidiary is the licensee of the relevant software or Intellectual Property, as the case may be, (in which case, any prohibition or limitation shall relate only to the assets subject of the applicable license);

        (d)  Contractual Obligations incurred in the ordinary course of business and on customary terms which limit Liens on the assets subject of the applicable Contractual Obligation;

        (e)  any agreements regarding Indebtedness of any Non-Guarantor Subsidiary not prohibited under Section 7.2 (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

        (f)  prohibitions and limitations in effect on the date hereof and listed on Schedule 7.12;

        (g)  customary provisions contained in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

        (h)  customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

        (i)  customary restrictions and conditions contained in any agreement relating to any Disposition of Property not prohibited hereunder;

        (j)  any agreement in effect at the time any Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary;

        (k)  restrictions imposed by applicable law;

NY1:#3465828

(l) restrictions contained in any document with respect to any Permitted Receivables Financing;

(m) restrictions imposed by any Permitted Subordinated Indebtedness (i) that are consistent with the definition thereof or otherwise consistent with prevailing market practice for similar types of Indebtedness at the time such restrictions are incurred or (ii) to which the Administrative Agent has not objected after having been afforded a period of at least five Business Days to review such restrictions;

(n) restrictions in respect of Indebtedness secured by Liens permitted by Sections 7.3(g) and 7.3(aa) relating solely to the assets or proceeds thereof secured by such Indebtedness to the extent required to be so limited by such Sections; and

(o) customary provisions restricting assignment of any agreement entered into in the ordinary course of business.

7.13    Clauses Restricting Subsidiary Distributions.  Enter into any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any Restricted Subsidiary or (b) make Investments in the Borrower or any Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, the Refinancing Notes, the Refinancing Notes Indenture and the Senior Interim Loan Documents, (ii) any restrictions with respect to such Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary, (iii) customary net worth provisions contained in Real Property leases entered into by the Borrower and its Restricted Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Restricted Subsidiaries to meet their ongoing obligations, (iv) any restrictions contained in agreements related to Indebtedness of any Non-Guarantor Subsidiary not prohibited under Section 7.2 (in which case such restriction shall relate only to such Indebtedness and/or such Non-Guarantor Subsidiary and its Restricted Subsidiaries) or Indebtedness secured by Liens permitted by Sections 7.3(g) and 7.3(aa), (v) any restrictions regarding licenses or sublicenses by the Borrower and its Restricted Subsidiaries of Intellectual Property in the ordinary course of business (in which case such restriction shall relate only to such Intellectual Property), (vi) Contractual Obligations incurred in the ordinary course of business which include customary provisions restricting the assignment of any agreement relating thereto, (vii) customary provisions contained in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business, (viii) customary provisions restricting the subletting or assignment of any lease governing a leasehold interest, (ix) customary restrictions and conditions contained in any agreement relating to any Disposition of Property not prohibited hereunder, (x) any agreement in effect at the time any Person becomes a Restricted Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary, (xi) restrictions with respect to the related Permitted Receivables Subsidiary contained in any document with respect to any Permitted Receivables Financing and (xii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business.

7.14    Lines of Business.  Enter into any business, either directly or through any of its Restricted Subsidiaries, except for the Business or a business reasonably related thereto or that are reasonable extensions thereof.

NY1:#3465828

7.15    Limitation on Hedge Agreements.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes.

7.16    Changes in Jurisdictions of Organization; Name.  Other than pursuant to the Transactions, in the case of any Loan Party, change its name or change its jurisdiction of organization, in either case except upon prompt written notice to the Collateral Agent and delivery to the Collateral Agent, of all additional executed financing statements, financing change statements and other documents reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests provided for in the Security Documents.

7.17    Limitation on Activities of Holdings  In the case of Holdings only, notwithstanding anything to the contrary in this Agreement or any other Loan Document, Holdings shall not, so long as the Commitments remain in effect, any Letter of Credit remains outstanding (that has not been cash collateralized or backstopped) or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due):  conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than (i) those incidental to its ownership of the Capital Stock of the Borrower and the Subsidiaries of the Borrower and those incidental to Investments by or in Holdings permitted hereunder, (ii) activities incidental to the maintenance of its existence and compliance with applicable laws and legal, tax and accounting matters related thereto and activities relating to its employees, (iii) activities relating to the performance of obligations under the Loan Documents, the Refinancing Notes Indenture, the Refinancing Notes and the Senior Interim Loan Documents to which it is a party or expressly permitted thereunder, (iv) the making of Restricted Payments to the extent of Restricted Payments permitted to be made to Holdings pursuant to Section 7.6, (v) the receipt and payment of Restricted Payments permitted under Section 7.6, (vi) those related to the Transactions and in connection with the Merger Agreement and other agreements contemplated thereby or hereby, (vii) other unsecured financing activities (including Indebtedness issued by Holdings), (viii) to the extent that Section 7 expressly permits the Borrower or a Restricted Subsidiary to enter into a transaction with Holdings, (ix) activities in connection with or in preparation for an initial public offering and (x) activities incidental to the foregoing activities.

SECTION 8.    EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof, (ii) any principal of any Reimbursement Obligation within three Business Days after any such Reimbursement Obligation becomes due in accordance with the terms hereof or (iii) any interest owed by it on any Loan or Reimbursement Obligation, or any other amount payable by it hereunder or under any other Loan Document, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    (i) On the Closing Date, any Specified Representation, and (ii) at any time after the Closing Date, any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document, shall in either case prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)    Any Loan Party shall default in the observance or performance of any agreement contained in Section 6.7(a) or Section 7; or

NY1:#3465828

(d)   Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8), and such default shall continue unremedied for a period of 30 days after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default; or

(e)   Holdings, the Borrower or any of its Restricted Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness for Borrowed Money (excluding the Loans and Reimbursement Obligations) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness for Borrowed Money to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or to become payable; provided that (A) a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $25,000,000, and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate and (B) this paragraph (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other disposition is not prohibited hereunder and under the documents providing for such Indebtedness or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof; or

(f)    (i) Holdings, the Borrower or any of its Material Subsidiaries which are not Unrestricted Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against substantially all of its assets that results in the entry of an order for any

-93-

such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall consent to or approve of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g) (i) Holdings, the Borrower or any of its Restricted Subsidiaries shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of Holdings, the Borrower or any of its Restricted Subsidiaries, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) Holdings, the Borrower or any of its Restricted Subsidiaries shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition (other than one which could not reasonably be expected to result in a violation of any applicable law or of the qualification requirements of the Code) shall occur or exist with respect to a Plan or a Commonly Controlled Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to result in a direct obligation of Holdings, the Borrower or any of its Restricted Subsidiaries to pay money that could have a Material Adverse Effect; or

(h) One or more judgments or decrees shall be entered against Holdings, the Borrower or any of its Material Subsidiaries (which are not Unrestricted Subsidiaries) involving for Holdings, the Borrower and any Material Subsidiaries (which are not Unrestricted Subsidiaries) taken as a whole a liability (not paid or fully covered by insurance or effective indemnity) of $25,000,000 (net of any amounts which are covered by insurance or an effective indemnity) or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i) (i) Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 10.15) to be in full force and effect or shall be asserted in writing by the Borrower or any Subsidiary not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document and to extend to Collateral that is not immaterial to the Borrower and its Subsidiaries on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement or to file UCC continuation statements, (y) such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer or (z) any such loss of validity, perfection or priority is the result of any

-94-

failure by the Collateral Agent to take any action necessary to secure the validity, perfection or priority of the liens or (iii) the Guarantees pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations; or

      (j)   (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or (ii) if neither Holdings' nor any Parent Company's Capital Stock is traded on a nationally-recognized stock exchange, the Permitted Investors shall cease to own, directly or indirectly, at least 50.1% of the Capital Stock of Holdings; or (iii) if Holdings' or any Parent Company's Capital Stock is traded on a nationally-recognized stock exchange, the Permitted Investors shall cease to own, directly or indirectly, at least 35% of the Capital Stock of Holdings and any other shareholder shall own a greater amount; or (iv) at any time after Holdings' or any Parent Company's Capital Stock is traded on a nationally-recognized stock exchange and for any reason whatsoever, a majority of the Board of Directors of Holdings shall not be Continuing Directors (any of the foregoing, a "Change of Control");

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  In the case of all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time deposit in a cash collateral account opened by the Administrative Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit.  Amounts held in such cash collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been backstopped or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents.  After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower then due and owing hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto).  Except as expressly provided above in this Section 8 or otherwise in any Loan Document, presentment, demand and protest of any kind are hereby expressly waived by Holdings and the Borrower.

## SECTION 9.    THE AGENTS

      9.1 Appointment. Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents and each such Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably

NY1:#3465828

incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents.

    9.2 Delegation of Duties. Each Agent may execute any of its duties under the applicable Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

    9.3 Exculpatory Provisions. Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

    9.4 Reliance by the Agents. The Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings), independent accountants and other experts selected by the Agents. The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Agents shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

    9.5 Notice of Default. Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders. The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by

-96-

this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility); provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6 Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

9.7 Indemnification. The Lenders agree to indemnify each Agent and any Issuing Lender in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 9.7 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent or any Issuing Lender in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent or any Issuing Lender under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's or any Issuing Lender's gross negligence or willful misconduct. The agreements in this Section 9.7 shall survive the payment of the Loans and all other amounts payable hereunder.

9.8 Agent in Its Individual Capacity. Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

-97-

9.9 <u>Successor Agents</u>. Any Agent may resign upon 30 days' notice to the Lenders, the Borrower and the other Agent effective upon appointment of a successor Agent. Upon receipt of any such notice of resignation, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(a) or Section 8(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans. If no successor Agent shall have been so appointed by the Required Lenders with such consent of the Borrower and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lenders and with the consent of the Borrower (such consent not to be unreasonably withheld or delayed), appoint a successor Agent, that shall be a bank that has an office in New York, New York with a combined capital and surplus of at least $500,000,000. After any retiring Agent's resignation as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

9.10    <u>Authorization to Release Liens and Guarantees</u>. The Agents are hereby irrevocably authorized by each of the Lenders to effect any release or subordination of Liens or Guarantee Obligations contemplated by Section 10.15.

9.11    <u>Documentation Agents and Syndication Agent</u>. Neither the Documentation Agents nor the Syndication Agents shall have any duties or responsibilities hereunder in their respective capacities as such.

### SECTION 10.    MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>. Subject to Section 2.25, neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Agents and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Agents, the Swingline Lender, the Issuing Lenders, the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Agents may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided, however,</u> that no such waiver and no such amendment, supplement or modification shall (i) forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date or reduce the amount of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable hereunder (except (A) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective (x) as to each Class of the Revolving Facility, with the consent of the Majority Facility Lenders any (y) as to the Term Facility, with the consent of the Majority Term Facility Lenders and (B) that any amendment or modification of defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly and adversely affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent

-98-

of such Lender; (iii) reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders; (iv) amend, modify or waive any provision of paragraph (a) or (c) of Section 2.18; (v) amend, modify or waive any provision of paragraph (b) of Section 2.18 without the written consent of the Majority Facility Lenders in respect of each Facility adversely affected thereby; (vi) reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility; (vii) amend, modify or waive any provision of Section 9 without the written consent of the Agents; (viii) amend, modify or waive any provision of Section 2.6 or 2.7 with respect to Swingline Loans of any Class without the written consent of the Swingline Lender with respect to such Class; or (ix) amend, modify or waive any provision of Section 3 without the written consent of the Issuing Lenders. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Agents, Holdings and the Borrower (a) to add one or more additional credit facilities to this Agreement (it being understood that no Lender shall have any obligation to provide or to commit to provide all or any portion of any such additional credit facility) and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Extensions of Credit and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and Majority Facility Lenders, as applicable.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Agents, Holdings, the Borrower and the Lenders providing the relevant Replacement Term Loans (as defined below) to permit the refinancing of all outstanding Term Loans ("Refinanced Term Loans") with a replacement term loan tranche hereunder ("Replacement Term Loans"); provided that (a) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans, (b) the Applicable Margin for such Replacement Term Loans shall not be higher than the Applicable Margin for such Refinanced Term Loans, (c) the weighted average life to maturity of such Replacement Term Loans shall not be shorter than the weighted average life to maturity of such Refinanced Term Loans at the time of such refinancing and (d) all other terms applicable to such Replacement Term Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Term Loans than, those applicable to such Refinanced Term Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the Term Loans in effect immediately prior to such refinancing.

10.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of Holdings, the Borrower, the Agents, and as set forth in an administrative

-99-

questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as
may be hereafter notified by the respective parties hereto:

Holdings:                    Blue Jay Acquisition Corporation
                             1001 Pennsylvania Avenue, NW
                             Washington, DC 20004
                             Attention:  Adam Palmer and Elliot Wagner
                             Telecopy: (202) 347 1818
                             Telephone: (202) 729-5626

                             in each case with a copy to:

                             The Carlyle Group
                             1001 Pennsylvania Avenue, NW
                             Washington, DC 20004
                             Attention:  Adam Palmer and Elliot Wagner
                             Telecopy: (202) 347 1818
                             Telephone: (202) 729-5626

With a copy to:              Latham & Watkins LLP
                             555 Eleventh Street, NW
                             Suite 1000
                             Washington, D.C.  20004
                             Attention:  James Ritter
                             Telecopy: (202) 637-2201
                             Telephone: (202) 637-2276

The Borrower:                Blue Jay Merger Corporation
                             200 Park Avenue
                             New York, NY 10017
                             Attention:  Ken Binder and Jim Langelotti
                             Telecopy: (866) 560 1129
                             Telephone: (212) 729-5283

                             in each case with a copy to:

                             The Carlyle Group
                             1001 Pennsylvania Avenue, NW
                             Washington, DC 20004
                             Attention:  Adam Palmer and Elliot Wagner
                             Telecopy: (202) 347 1818
                             Telephone: (202) 729-5626

With a copy to:              Latham & Watkins LLP
                             555 Eleventh Street, NW
                             Suite 1000
                             Washington, D.C.  20004
                             Attention:  James Ritter
                             Telecopy: (202) 637-2201
                             Telephone: (202) 637-2276

NY1:#3465828

Agents:                    Lehman Commercial Paper Inc.
                          745 Seventh Avenue, 5th Floor
                          New York, NY 10019
                          Attention:  Michelle Rosolinsky
                          Telecopy: (646) 758 5015
                          Telephone:  (212) 526 6590

With a copy to:            Lehman Commercial Paper Inc.
                          745 Seventh Avenue, 16th Floor
                          New York, NY 10019
                          Attention:  Diane Albanese
                          Telecopy:  (646) 758 5130
                          Telephone:  (212) 526 4979

provided that any notice, request or demand to or upon the Agents, the Lenders, Holdings or the Borrower shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Agents, Holdings or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses; Indemnification.  Except with respect to taxes which are addressed in Section 2.20, the Borrower agrees (a) to pay or reimburse each Agent and the Joint Lead Arrangers for all their respective reasonable out-of-pocket costs and expenses incurred in connection with the syndication of the Facilities (other than fees payable to syndicate members) and the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification thereto, and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements and other charges of counsel to the Agents (including one primary counsel and such local counsel as the Agents may reasonably require in connection with collateral matters, but no more than one counsel in any jurisdiction) in connection with all of the foregoing, (b) to pay or reimburse each Lender, each Issuing Lender, the Agents and the Joint Lead Arrangers for all their documented out-of-pocket costs and expenses incurred

NY1:#3465828

in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents, including, without limitation, the documented fees and disbursements of counsel (including the allocated fees and expenses of in-house counsel) to each Lender and of counsel to the Agents and each Issuing Lender and (c) to pay, indemnify or reimburse each Lender, each Agent, the Documentation Agents, each Issuing Lender, each Joint Lead Arranger and their respective affiliates, and their respective officers, directors, employees, trustees, advisors, agents and controlling Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including, without limitation, any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against Holdings or the Borrower hereunder (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"); provided that neither Holdings nor the Borrower shall have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of, or breach of this Agreement by, such Indemnitee or its affiliates, officers, directors, employees, agents or controlling Persons. All amounts due under this Section 10.5 shall be payable promptly after receipt of a reasonably detailed invoice therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Borrower at the address thereof set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive repayment of the Obligations.

      10.6    Successors and Assigns; Participations and Assignments. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any affiliate of any Issuing Lender that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

      (b) (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

      (A) the Borrower; provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 8(a) or (f) has occurred and is continuing, any other Person; and

      (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund; and

      (C) in the case of an assignment under a Revolving Facility, each Issuing Lender for such Facility and the Swingline Lender for such Facility.

      (ii) Assignments shall be subject to the following additional conditions:

<div align="center">-102-</div>

(A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of (I) the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or (II) if earlier, the "trade date" (if any) specified in such Assignment and Assumption) shall not be less than (x) $5,000,000, in the case of the Revolving Facility or (y) $1,000,000, in the case of the Term Facility, unless the Borrower and the Administrative Agent otherwise consent; provided that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8(a) or (f) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(C) the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) (i) an entity or an Affiliate of an entity that administers or manages a Lender or (ii) an entity or an Affiliate of an entity that is the investment advisor to a Lender.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.19, 2.20, 2.21 and 10.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.6.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Holdings, the Borrower, the Administrative Agent, the Issuing Lenders, the Swingline Lender and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive for such purposes), notwithstanding notice to the contrary. The Register shall be available for inspection by Holdings, the Borrower, the Issuing Lenders, the Swingline Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the

-103-

Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 10.6 and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant"), but in any event not to certain persons identified to the Administrative Agent by the Borrower prior to the Closing Date, in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Lenders, the Swingline Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant. Subject to paragraph (c)(ii) of this Section 10.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.19, 2.20 and 2.21 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.6.

(ii)  A Participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts. No Participant shall be entitled to the benefits of Section 2.20 unless such Participant complies with Section 2.20(d) or (e), as (and to the extent) applicable, as if such Participant were a Lender.

(d)  Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)  The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Refinancing Notes to any Lender requiring Refinancing Notes to facilitate transactions of the type described in paragraph (d) above.

10.7    Adjustments; Set-off. (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest

-104-

in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b) In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any affiliate, branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration. This Agreement and the other Loan Documents represent the entire agreement of Holdings, the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

10.11    **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

10.12    Submission to Jurisdiction; Waivers. Each of Holdings and the Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

-105-

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 10.12 any special, exemplary, punitive or consequential damages.

10.13    Acknowledgments.  Each of Holdings and the Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Agents nor any Lender has any fiduciary relationship with or duty to either of Holdings or the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on one hand, and Holdings and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings, the Borrower and the Lenders.

10.14    Confidentiality.  The Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished, directly or indirectly, by or on behalf of Holdings or any of its affiliates in connection with this Agreement or the transactions contemplated hereby whether furnished before or after the Closing Date ("Confidential Information"), strictly confidential and not to use Confidential Information for any purpose other than evaluating the Merger Transactions and negotiating, making available, syndicating and administering this Agreement (the "Agreed Purposes").  Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except (1) to its directors, officers, employees, counsel, trustees, affiliates and other representatives (collectively, the "Representatives"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (2) to any pledgee referred to in Section 10.6(d) and prospective Lenders and participants in connection with the syndication (including secondary trading) of the Facilities and Commitments and Loans hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms, (3) upon the request or

NY1:#3465828

demand of any Governmental Authority having or purporting to have jurisdiction over it, (4) in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (5) to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facilities, (6) that has been publicly disclosed other than in breach of this Section 10.14, (7) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (8) to the extent reasonably required or necessary, in connection with the exercise of any remedy under the Loan Documents. Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement. All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

      10.15   Release of Collateral and Guarantee Obligations; Subordination of Liens. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Specified Hedge Agreement or contingent or indemnification obligations not then due) take such actions as shall be required to release its security interest in any Collateral being Disposed of in such Disposition, and to release any Guarantee Obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents. Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to the Borrower or any of its Restricted Subsidiaries) shall no longer be deemed to be repeated once such Property is so Disposed of.

      (b) Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (x) obligations in respect of any Specified Hedge Agreement and (y) any contingent or indemnification obligations not then due) have been paid in full, all Commitments have terminated or expired and no Letter of Credit shall be outstanding that is not cash collateralized or backstopped, upon request of Holdings or the Borrower, the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Specified Hedge Agreements or contingent or indemnification obligations not then due. Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

NY1:#3465828

(c) Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Holdings or the Borrower in connection with any Liens permitted by the Loan Documents, the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to subordinate the Lien on any Collateral to any Lien permitted under Section 7.3.

10.16    Accounting Changes.    In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial ratios, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.    Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial ratios, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

10.17    **WAIVERS OF JURY TRIAL. EACH OF HOLDINGS, THE BORROWER, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

10.18    USA PATRIOT ACT.    Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Loan Parties in accordance with the Act.

10.19    [INTENTIONALLY OMITTED]Judgment Currency.    This is an international loan transaction in which the specification of Dollars or any Agreed Foreign Currency, as the case may be (the "Specified Currency"), and payment in New York City or the country of the Specified Currency, as the case may be (the "Specified Place"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to Loans denominated in the Specified Currency. The payment obligations of the Borrower under this Agreement shall not be discharged or satisfied by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place due hereunder. If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder in the Specified Currency into another currency (the "Second Currency"), the rate of exchange that shall be applied shall be the rate at which in accordance with normal banking procedures the Administrative Agent could purchase the Specified Currency with the Second Currency on the Business Day next preceding the day on which such judgment is rendered. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under any other Loan Document (in this Section 10.20 called an "Entitled Person") shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by such Entitled Person of any sum adjudged to be due hereunder in the Second Currency such Entitled Person may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so

-108-

adjudged to be due; and the Borrower hereby, as a separate obligation and notwithstanding any such judgment, agrees to indemnify such Entitled Person against, and to pay such Entitled Person on demand, in the Specified Currency, the amount (if any) by which the sum originally due to such Entitled Person in the Specified Currency hereunder exceeds the amount of the Specified Currency so purchased and transferred.

[Signature Pages Follow]

NY1:#3465828

JPMORGAN CHASE BANK, N.A.,
as Issuing Lender

By: _____
Name:
Title:        RICHARD C. SMITH
              EXECUTIVE DIRECTOR

NY1 #3465828          SIGNATURE PAGE TO CREDIT AGREEMENT

**C.I.T. LEASING CORPORATION,**
as Lender

By: _____
     Name: ROBERT F JONES
     Title: DIRECTOR

**SIGNATURE PAGE TO CREDIT AGREEMENT**

NY1:#3465828

**C.I.T. LEASING CORPORATION,**
as Documentation Agent

By: _____
Name: ROBERT F. JONES
Title: DIRECTOR

**SIGNATURE PAGE TO CREDIT AGREEMENT**

NY1:#3465828

**LEHMAN COMMERCIAL PAPER INC.**, as
Administrative Agent, Collateral Agent,
Swingline Lender and Lender

By: _____

Name:

Title:     Laurie Perper
           Senior Vice President

LEHMAN BROTHERS INC., as Syndication Agent,
Joint Lead Arranger and Joint Bookrunner

By: _____

Name:
Title:      Laurie Perper
            Senior Vice President

**SIGNATURE PAGE TO CREDIT AGREEMENT**

LEHMAN BROTHERS COMMERCIAL BANK,
as Lender

By: _____

Name:
Title:     Laurie Perper
           Senior Vice President

SIGNATURE PAGE TO CREDIT AGREEMENT

J.P. MORGAN SECURITIES INC., as Syndication
Agent, Revolving Lender, Swingline Lender, Lender,
Joint Lead Arranger and Joint Bookrunner

By:

Name:
Title:        ROBERT ANASTASIO
              VICE PRESIDENT

NY1:#3465828          SIGNATURE PAGE TO CREDIT AGREEMENT

Nov-30-2007  06:11pm  From-CITGROUP                                    212 723 8590          T-375   P.005/005   F-538

CITICORP NORTH AMERICA INC., as Revolving
Lender and Lender

By: _____

Name:
Title:        Arnold Y. Wong
                 Vice President

CITIGROUP GLOBAL MARKETS INC., as
Syndication Agent, Joint Lead Arranger and Joint
Bookrunner

By: _____

Name:            Arnold Y. Wong
Title:            Director

NY1:#3465828            SIGNATURE PAGE TO CREDIT AGREEMENT

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

BLUE JAY ACQUISITION CORPORATION, as
    Holdings

By: _____

Name: John J. Doodling III
Title: Senior Vice President, Legal and Corporate Secretary

**SIGNATURE PAGE TO CREDIT AGREEMENT**

BLUE JAY MERGER CORPORATION, as Initial
Borrower

By:    _____

Name:    Elliot Wagner
Title:    Secretary

SIGNATURE PAGE TO CREDIT AGREEMENT

SEQUA CORPORATION, as Surviving Borrower

By: _____

Name: John J. Dowling III

Title: Senior Vice President, Legal and Corporate Secretary

**SIGNATURE PAGE TO CREDIT AGREEMENT**

NY1:#3465828

Exhibit 2



International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of June 25, 2008

### between

**LEHMAN BROTHERS SPECIAL**                    **SEQUA CORPORATION**
**FINANCING INC.**

…………………………………………………..……… and ……………………………...............…………………

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:---

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

   (i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

   (ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swap and Derivatives Association, Inc.

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

"*Waiting Period*" means:—

(a)       in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)       in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**          **SEQUA CORPORATION**

By: _____          By: _____

Name:   **Scott Sefton**                 Name:   James P. Langelotti
Title:   **Vice President**               Title:   Vice President & Treasurer
Date:   7/17/08                           Date:   JULY 1, 2008



ISDA®

International Swaps and Derivatives Association, Inc.

# SCHEDULE
# to the
# 2002 Master Agreement

dated as of June 25, 2008

between

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**SEQUA CORPORATION** ("Party B"),
a corporation organized under the laws of
Delaware

## Part 1.    Termination Provisions.

(a)    **"Specified Entity"** means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Commercial Corporation |
| | Lehman Brothers Commodity Services Inc. |
| | Lehman Brothers Finance S.A. |
| | Lehman Brothers International (Europe) |
| | Lehman Brothers OTC Derivatives Inc. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B; provided that Section 5(a)(vi) is amended by (i) the deletion of the words "or becoming capable at such time of being declared" and (ii) the addition of the following after the semicolon: "provided, however, that an Event of Default shall not occur under either (1) or (2) above if the default, event of default, or other similar condition or event referred to in (1) or the failure to pay referred to in (2) is (x) caused not by the unavailability of funds but is caused solely due to a technical or administrative error which has been remedied within three (3) Local Business Days after a notice of such failure is given to the party or (y) has been cured or waived pursuant to the relevant agreement or instruments prior to the delivery of a notice designating an Early Termination Event."

The following provisions apply:-

**"Specified Indebtedness"** will have the meaning specified in <u>Section 14</u> of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and USD 25 million, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(v) will apply to Party A and will apply to Party B provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)     The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     **"Termination Currency"** means United States Dollars ("USD").

(g)     **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:

(i)     **Party A as a Secured Party.** At any time (1) Party A is not secured to the same extent and by the same collateral as secures, or guaranteed to the same extent as the guarantee(s) that support, the obligation to pay principal and interest of the Loans under the Credit Agreement (and, for the avoidance of doubt, if there are multiple tranches of Loans, the most senior tranche)), (2) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents (and, for the avoidance of doubt, if there are multiple tranches of Loans, the most senior tranche); (3) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents, or (4) all or substantially all of the Credit Support Providers of Party B are released from their guarantee obligations under the relevant Loan Documents; *provided that* any event described in clauses (3) and (4) shall only constitute an Additional Termination Event if such event occurs without Party A's prior written consent, except that Party A's prior written consent shall not be required if the relevant event does not require any vote or consent of, any Lender (as defined in the Credit Agreement), or any affiliate of any Lender that is a party to any Specified Hedge Agreement pursuant to Section 10.15 of the Credit Agreement; <u>or</u> (5) the obligations and liabilities of Party B under this Agreement become unsecured indebtedness for whatever reason, unless Party B has agreed with Party A to execute a Credit Support Annex, the terms of which shall be in substance and form reasonably acceptable to Party A, and such Credit Support Annex shall have been executed promptly, but not later than the day on which the obligations or liabilities of Party B under this Agreement would otherwise become unsecured indebtedness; *provided that* with respect to the event described in clause (5), all Affected Transactions shall be terminated.

For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)     **Change of Control.** A Change of Control (as defined in the Credit Agreement as of December 3, 2007) has occurred. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii)     **Party B as a Secured Party.** Any of the Credit Support Documents in respect of Party A shall cease, for any reason to be in full force and effect in relation to any Transaction effected prior to such cessation or shall be asserted in writing by Party A not to be a legal, valid and binding obligation of Party A. For the purpose of the foregoing Termination Event, Party A shall be the Affected Party.

Part 2.    **Tax Representations.**

(a)     ***Payer Tax Representations.*** For the purpose of Section 3(e) of this Agreement Party A and Party B each make the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement.  In making this representations, it may rely on (i)the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of Delaware.

(c)     **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

Part 3.    **Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)     Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |

(b)     Other documents to be delivered are:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder (which evidence shall not include any legal opinion). | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, to the extent not already provided to Party A in accordance with the terms of the Credit Agreement, of Party B and its consolidated subsidiaries, in each case, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied (except as disclosed therein). | Within 90 days after the end of each fiscal year. | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, to the extent not already provided to Party A in accordance with the terms of the Credit Agreement, Party B and its Credit Support Providers, in each case, prepared in accordance with generally accepted accounting principles consistently applied (except as disclosed therein and for customary year-end audit adjustments and the absence of footnotes). | As soon as available, but in any event not later than (i), in the case of Party B, 60 days after the end of the fiscal quarter of Party B ending March 31, 2008 and (ii), in case of both parties, 45 days after the end of each of the first three quarterly periods of each fiscal year. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc.<br>c/o Lehman Brothers Inc.<br>Legal Compliance and Audit Group<br>Capital Markets Contracts - Legal<br>1271 Avenue of the Americas, 43rd Floor<br>New York, NY 10020 |
| Attention:<br>Telephone No.:<br>Facsimile No.: | Documentation Manager<br>(212) 526-7187<br>(212) 526-7672 |
| | For all purposes. |

Address for notices or communications to **Party B**:

| | |
|---|---|
| Address: | Sequa Corporation<br>200 Park Avenue<br>New York, NY 10017 |
| Attention:<br>Telephone No.:<br>Facsimile No.: | Ken Binder and Jim Langelotti<br>(212) 729-5283<br>(866) 560 1129 |
| With a copy to: | Chatham Financial Corporation<br>235 Whitehorse LN<br>Kennett Square, PA 19348 |
| Attention:<br>Telephone No.:<br>Facsimile No.: | Ben Lewis<br>(610) 925 3120<br>(610) 925.3125 |
| | For all purposes. |

(b)     **Process Agent.** For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent:            Not applicable.

Party B appoints as its Process Agent:            Not applicable.

(c)     **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)     **Multibranch Party.** For the purpose of Section 10(b) of this Agreement:—

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)     **Calculation Agent.** The Calculation Agent is Party A.

(f)     **Credit Support Document.**

In the case of **Party A**:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B**:

The Security Documents.

(g)     **Credit Support Provider.**

Credit Support Provider means in relation to Party A:     Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:     Other than Party B, each of the Loan Parties party
                                                         to the Loan Documents.

(h)     **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)     **Netting of Payments.** "Multiple Transaction Payment Netting" will apply for the purpose of Section 2 (c) of this Agreement to all Transactions:

(j)     **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however</u>, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc. and, with respect to Party B, such definition shall be understood to only mean each Restricted Subsidiary of Party B.

(k)     **Absence of Litigation.** For the purpose of Section 3(c):—

**"Specified Entity"** means in relation to Party A, not applicable.

**"Specified Entity"** means in relation to Party B, any Affiliate.

(l)     **Jurisdiction.** <u>Section 13(b)</u> is hereby amended by: (i) deleting in the second line of subparagraph (2) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

<u>Miscellaneous:</u>

(a)　**Representations.**　<u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

　　(g)　***No Reliance.*** It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

　　(h)　***Assessment and Understanding.*** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

　　(i)　***Status of Parties.*** The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

　　(j)　***No Agency.*** The provisions of Section 3(g) will apply to this Agreement

　　(k)　***Eligible Contract Participant.*** It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)　**Transfer.** Notwithstanding Section 7 of this Agreement, (A) Party A may assign its rights and obligations under this Agreement, in whole or in part, to any Affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate and (B) Party B may assign its rights and obligations under this Agreement with Party A's consent to a transferee that is a third party investment grade broker dealer with which Party A has an executed ISDA Master Agreement and Credit Support Annex in place.

(c)　**Notices.** For the purposes of <u>subsections (iii)</u>, <u>(v) and (vi)</u> of <u>Section 12(a)</u>, if such notice is sent by electronic means, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(d)　**Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(e)　**Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(f)　**Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(g)　**Accuracy of Specified Information.** <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(h)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(i)    Section 14 is hereby amended by deleting the definition of "Waiting Period" in its entirety and replacing it with the following:

"**"Waiting Period"** means: --

(a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where (i) the relevant payment, delivery or compliance is actually required on the relevant day and (ii) the Credit Support Document is not a guarantee issued by an Affiliate (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that circumstance) following the occurrence of that event or circumstance; and

(b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where (i) the relevant payment, delivery or compliance is actually required on the relevant day and (ii) the Credit Support Document is not a guarantee issued by an Affiliate (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that circumstance) following the occurrence of that event or circumstance."

(j)    **2002 Master Agreement Protocol.** The provisions of Annexes 1-18 to the 2002 Master Agreement Protocol published by the International Swap and Derivatives Association, Inc on 15th July 2003 (the "Protocol") are incorporated into this Master Agreement in their entirety.

(k)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(l)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

08-13555-mg   Doc 24981-1   Filed 02/06/12   Entered 02/06/12 15:46:47   Exhibit
Pg 139 of 191

(m)   **General Conditions.**  Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(n)   **No Violation or Conflict Representation.**  Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the articles of incorporation of Party B, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)."

(o)   **Additional Representations of Party B.**  Party B represents to Party A in accordance with Section 3 of the Agreement that:

    (1)   **Portfolio Management.**  This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in the ordinary course of business of Party B.

    (2)   **Specified Hedge Agreement.**  (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into thereunder) is a Hedge Agreement and a Specified Hedge Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents constitute the Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents.

(p)   **Failure to Pay or Deliver.**  Section 5(a)(i) of this Agreement is hereby amended by deleting the word "first" and inserting in lieu thereof the word "third".

(q)   **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended by deleting in clause (2) thereof the words "one Local Business Day" and inserting in lieu thereof the words "two Local Business Days".

(r)   **Designation Notice**. Party B agrees to deliver a written notice, in a form reasonably acceptable to Party A, to the Administrative Agent designating this Agreement as well as any Transactions entered into between Party A and Party B as Specified Hedge Agreements upon execution of this Agreement and the Confirmations evidencing the Transactions, as applicable.

(s)   **Additional Definitions.**   Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Administrative Agent**" shall have the meaning assigned to such term in the Credit Agreement.

"**Collateral**" shall have the meaning assigned to such term in the Loan Documents and shall in any event include all property which is the relevant security for the Loans, regardless of whether included in the term "Collateral" in the Loan Documents.

"**Credit Agreement**" means the Credit Agreement, dated as of December 3, 2007 (as amended, restated, supplemented, waived or otherwise modified from time to time, including any subsequent or replacement agreement or any refinancing of the same), by and among Party B, Sequa Corporation, a Delaware corporation, the Lenders from time to time party thereto, Lehman Commercial Paper Inc., as administrative agent and collateral agent, Lehman Brothers Inc., Citigroup Global Markets Inc., and J.P. Morgan Securities Inc., as syndication agents, C.I.T. Leasing Corporation, HSBC Bank Plc., as documentation agents, JPMorgan Chase Bank, N.A., as issuing lender and Lehman Brothers Inc., Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners.

"**Hedge Agreement**" shall have the meaning assigned to such term in the Credit Agreement.

"**Holdings**" means Lehman Brothers Holdings Inc.

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

27

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the Credit Agreement, as such documents may from time to time be amended, restated, supplemented or otherwise modified from time to time (including any subsequent or replacement documents).

"**Loan Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" shall have the meaning assigned to such term in the Security Documents.

"**Person**" shall have the meaning assigned to such term in the Credit Agreement.

"**Responsible Officer**" shall have the meaning assigned to such term in the Credit Agreement.

"**Restricted Subsidiary**" shall have the meaning assigned to such term in the Credit Agreement.

"**S&P**" means Standard & Poor's Ratings Services.

"**Secured Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement, as such documents may from time to time be amended, restated, supplemented or otherwise modified from time to time (including any subsequent or replacement documents).

"**Specified Hedge Agreement**" shall have the meaning assigned to such term in the Credit Agreement.

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"**USD**" means United States Dollars.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     <u>Incorporation of 1998 FX and Currency Option Definitions</u>.  The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>.  The following amendments are made to the 1998 Definitions:

        Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

        **Currency Obligation.**  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency

28

Obligation previously entered into by the parties.

(b)    **Confirmations**. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)    **Netting and Related Provisions**. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

   (i)    Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

   Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount; provided that if any such new Currency Obligation is an obligation of Party A, it shall continue to be secured by the Credit Support Document of Party A. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

   (ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions. The following provisions shall apply to Currency Option Transactions:

   Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies**. In the event of any conflict between:

   (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

   (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

   (iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

<table>
<tr><td><strong>LEHMAN BROTHERS<br>SPECIAL FINANCING INC.</strong><br><em>(Name of Party)</em></td><td><strong>SEQUA CORPORATION</strong><br><br><em>(Name of Party)</em></td></tr>
</table>

By: _____

Name:     **Scott Sefton**

Title:     **Vice President**

Date:     7|17|08


By: _____

Name: James P. Lengebill

Title: Vice President & Treasurer

Date: JULY 1, 2008

# LEHMAN BROTHERS

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and SEQUA CORPORATION ("Party B") have entered into a Master Agreement dated as of June 25, 2008, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment in full or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof (including, without limitation, any new Currency Obligation which was created through novation pursuant to Part 6(c)(i) of the Agreement).

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

# LEHMAN BROTHERS

(g)     Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)     Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

     i.      Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

     ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

     iii.    no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

     iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

     v.      the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)     Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

# LEHMAN BROTHERS

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**


By: _____

Name:

Title:

Date:

Exhibit 3

# LEHMAN BROTHERS

### 2nd Revised Transaction

Date:          9 July, 2008

To:            Sequa Corporation
               Attention:      Documentation Unit

From:          Lehman Brothers Special Financing Inc.
               Mandy Lee - Confirmations Group
               Facsimile:      (+1) 646-885-9551 (United States of America)
               Telephone:      646-333-9534

Ref. Numbers:  Risk ID: 1790909L / Effort ID: N1866715 / Global Deal ID: 3613524

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Sequa Corporation ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

**This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 25 June, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement").**  All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation.  In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern.  For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party.  Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives.  Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 29 January, 2008 |
| Effective Date: | 31 March, 2008 |
| Termination Date: | 31 March, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 150,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided that for purposes of this confirmation, the definitions of "USD-LIBOR-BBA" and "USD-LIBOR Reference Banks" in the Definitions are hereby amended by deleting all references in such definitions to "two London Banking Days" and inserting " two New York and London Banking Days" in lieu thereof. |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| Rounding: | All percentages resulting from calculations in Floating Amounts shall be rounded to the nearest one hundredth of a percentage point. |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2008 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 2.932% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |
| **Business Days:** | London; New York |

Risk ID: 1790909L / Effort ID: 1866715 / Global Deal ID: 3613524

**Miscellaneous:**

    Calculation Agent:                Party A

    Office:                        For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**    **Sequa Corporation**

By: _Anatoly Kozlov_

Name: Anatoly Kozlov
Title:  Authorized Signatory

By: _James P. Langelotti_

Name:
Title:  JAMES P. LANGELOTTI
      VICE PRESIDENT & TREASURER

# LEHMAN BROTHERS

## 2nd Revised Transaction

| | |
|---|---|
| Date: | 9 July, 2008 |
| To: | Sequa Corporation |
| | Attention:    Documentation Unit |

From:        Lehman Brothers Special Financing Inc.
             Mandy Lee - Confirmations Group
             Facsimile:      (+1) 646-885-9551 (United States of America)
             Telephone:    646-333-9534

Ref. Numbers: Risk ID: 1790721L / Effort ID: N1866268 / Global Deal ID: 3613479

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Sequa Corporation ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

**This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 25 June, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement").** All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 29 January, 2008 |
| Effective Date: | 31 March, 2010 |
| Termination Date: | 31 March, 2011, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD150,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | Inapplicable |
| Fixed Amount: | Inapplicable |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Cap Rate: | 4.50% per annum |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2010 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided that for purposes of this confirmation, the definitions of "USD-LIBOR-BBA" and "USD-LIBOR Reference Banks" in the Definitions are hereby amended by deleting all references in such definitions to "two London Banking Days" and inserting " two New York and London Banking Days" in lieu thereof. |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| Rounding: | All percentages resulting from calculations in Floating Amounts shall be rounded to the nearest one hundredth of a percentage point. |

**Business Days:** London; New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |

Risk ID: 1790721L / Effort ID: 1866268 / Global Deal ID: 3613479

| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**          **Sequa Corporation**

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title:  Authorized Signatory

By: _[signature]_
Name:
Title: JAMES P. LANGELOTH
       VICE PRESIDENT & TREASURER

# LEHMAN BROTHERS

## 2nd Revised Transaction

| | |
|---|---|
| Date: | 9 July, 2008 |
| To: | Sequa Corporation |
| | Attention:        Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | Mandy Lee - Confirmations Group |
| | Facsimile:        (+1) 646-885-9551 (United States of America) |
| | Telephone:      646-333-9534 |

Ref. Numbers: Risk ID: 1790879L / Effort ID: N1867758 / Global Deal ID: 3613499

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Sequa Corporation ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

**This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 25 June, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement").** All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 29 January, 2008 |
| Effective Date: | 31 March, 2010 |
| Termination Date: | 31 March, 2011, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD150,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party A |
| Fixed Amount Payer Payment Dates: | Inapplicable |
| Fixed Amount: | Inapplicable |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party B |
| Floor Rate: | ✓2.875% per annum |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2010 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided that for purposes of this confirmation, the definitions of "USD-LIBOR-BBA" and "USD-LIBOR Reference Banks" in the Definitions are hereby amended by deleting all references in such definitions to "two London Banking Days" and inserting " two New York and London Banking Days" in lieu thereof. |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| Rounding: | All percentages resulting from calculations in Floating Amounts shall be rounded to the nearest one hundredth of a percentage point. |

**Business Days:**

| | |
|---|---|
| | London; New York |

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |

Risk ID: 1790879L / Effort ID: 1867758 / Global Deal ID: 3613499

Office:                                    For the purposes of this Transaction, Party A is not a
                                           Multibranch Party, and the Office of Party B is its
                                           Head Office.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America),
Attention: Confirmations Group.

Yours sincerely,                           Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**      **Sequa Corporation**

By:    *Anatoly Kozlov*                     By:    _____
Name:  Anatoly Kozlov                       Name:
Title: Authorized Signatory                 Title:  JAMES P. LANGELOTTI
                                                    VICE PRESIDENT & TREASURER

Risk ID: 1790879L / Effort ID: 1867758 / Global Deal ID: 3613499

# LEHMAN BROTHERS

### 2nd Revised Transaction

Date:            9 July, 2008

To:              Sequa Corporation
                 Attention:        Documentation Unit

From:            Lehman Brothers Special Financing Inc.
                 Mandy Lee - Confirmations Group
                 Facsimile:        (+1) 646-885-9551 (United States of America)
                 Telephone:        646-333-9534

Ref. Numbers:  Risk ID: 1794413L / Effort ID: N1872869 / Global Deal ID: 3619254

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Sequa Corporation ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

**This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 25 June, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement").** All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 31 January, 2008 |
| Effective Date: | 31 March, 2010 |
| Termination Date: | 31 March, 2011, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD150,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | Inapplicable |
| Fixed Amount: | Inapplicable |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Cap Rate: | 4.50% per annum |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2010 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided that for purposes of this confirmation, the definitions of "USD-LIBOR-BBA" and "USD-LIBOR Reference Banks" in the Definitions are hereby amended by deleting all references in such definitions to "two London Banking Days" and inserting " two New York and London Banking Days" in lieu thereof. |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| Rounding: | All percentages resulting from calculations in Floating Amounts shall be rounded to the nearest one hundredth of a percentage point. |

**Business Days:**                            London; New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |

Risk ID: 1794413L / Effort ID: 1872869 / Global Deal ID: 3619254

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**

**Sequa Corporation**

By: *Anatoly Kozlov*
Name: Anatoly Kozlov
Title: Authorized Signatory

By: *[signature]*
Name: JAMES P. LANGELOTH
Title: VICE PRESIDENT & TREASURER

# LEHMAN BROTHERS

### 2nd Revised Transaction

Date:        9 July, 2008

To:          Sequa Corporation
             Attention:      Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Mandy Lee - Confirmations Group
             Facsimile:      (+1) 646-885-9551 (United States of America)
             Telephone:      646-333-9534

Ref. Numbers: Risk ID: 1794411L / Effort ID: N1872857 / Global Deal ID: 3619373

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Sequa Corporation ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

**This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 25 June, 2008, as amended and supplemented from time to time, between Party A and Party B (the "Agreement").** All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 31 January, 2008 |
| Effective Date: | 31 March, 2010 |
| Termination Date: | 31 March, 2011, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD150,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party A |
| Fixed Amount Payer Payment Dates: | Inapplicable |
| Fixed Amount: | Inapplicable |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party B |
| Floor Rate: | 3.01% per annum |
| Floating Amount Payer Payment Dates: | The last calendar day of each March, June, September, and December, from and including 30 June, 2010 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA, provided that for purposes of this confirmation, the definitions of "USD-LIBOR-BBA" and "USD-LIBOR Reference Banks" in the Definitions are hereby amended by deleting all references in such definitions to "two London Banking Days" and inserting " two New York and London Banking Days" in lieu thereof. |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |
| Rounding: | All percentages resulting from calculations in Floating Amounts shall be rounded to the nearest one hundredth of a percentage point. |

**Business Days:**

| | |
|---|---|
| | London; New York |

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |

Risk ID: 1794411L / Effort ID: 1872857 / Global Deal ID: 3619373

Office:                                    For the purposes of this Transaction, Party A is not a
                                           Multibranch Party, and the Office of Party B is its
                                           Head Office.


Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America),
Attention: Confirmations Group.


Yours sincerely,                          Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**   **Sequa Corporation**

By: _Anatoly Kozlov_
Name: Anatoly Kozlov
Title:  Authorized Signatory
                                           By: _____
                                           Name:
                                           Title:  JAMES P. LANGELOTTI
                                                   VICE PRESIDENT & TREASURER

Exhibit 4



RECEIVED
OCT 1 4 2011
By_____

## Derivatives ADR Notice

Derivatives ADR Notice No.: 333

Debtor(s):          Lehman Brothers Special Financing Inc. ("LBSF")

Derivatives
Counterparty:  Sequa Corporation ("Sequa")

Derivatives
Contracts:       The 2002 form ISDA Master Agreement ("ISDA Master Agreement"), dated as of
                      June 25, 2008, between LBSF and Sequa (together with all schedules, annexes
                      and exhibits thereto, and all confirmations exchanged pursuant thereto, the
                      "Master Agreement").[1]

Settlement
Demand:         A payment from Sequa to LBSF in the amount of $6,840,894.44 (as of October 6,
                      2011), which consists of:

                      (a)  $4,627,317.83, the unpaid portion of the Early Termination Amount owed to
                            LBSF by Sequa as a result of the early termination of the Transactions under
                            the Master Agreement, derived from the $6,361,271.00 mark-to-market
                            valuation of the Transactions, less the partial payments of $1,753,625 on
                            December 19, 2008 and $30,686.67 on July 15, 2009 by Sequa to LBSF, plus
                            $50,358.50, the payment due to LBSF on September 30, 2008 under the
                            Master Agreement (the "Unpaid Amount"); plus

                      (b)  $2,213,576.61 in interest accruing at the relevant rates as of October 6, 2011
                            on the unpaid portion of the Early Termination Amount and the Unpaid
                            Amount, which interest will continue to accrue until the date of payment in
                            full.

Explanation of Basis for Settlement Demand:

On December 12, 2008, Sequa purported to deliver to LBSF via facsimile a termination notice,
in which Sequa designated December 15, 2008 as a purported early termination date under the
Master Agreement and terminated the three Transactions thereunder (the "Terminated
Transactions"). Sequa did not send the termination notice to the facsimile number prescribed in
the Master Agreement for the delivery of notices to LBSF. See Part 4 of Schedule to Master
Agreement (specifying LBSF's facsimile number as 212-526-7672). Rather, Sequa sent the
facsimile to 646-885-9551, which belonged to a telecopier that had been sold to Barclays in
September 2008, and which was no longer in LBSF's possession, control, or custody. As a
result, LBSF did not receive the termination notice until December 17, 2008, when it arrived by
hand-delivery. Pursuant to the Master Agreement, an early termination date may not be
designated prior to the date that a notice of early termination is effective. See ISDA Master

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to
them in the Master Agreement.

Agreement §6(a).   Applying sections 6 and 12 of the ISDA Master Agreement, Sequa's termination notice was not effective until December 17, 2008, the date on which it was hand-delivered to LBSF.   *See id.* §§ 6(a) & 12(a)(iv).   Therefore, the early termination date under the Master Agreement is December 17, 2008 (the "Early Termination Date"), *not* December 15, 2008.

On December 18, 2008, Sequa delivered a calculation statement to LBSF (the "Calculation Statement"), which contained Sequa's determination of the amount payable to LBSF as a result of the early termination of the Transactions.   In the Master Agreement, the parties agreed that for purposes of determining the amount payable upon an early termination of the Transactions, the Early Termination Amount would be calculated as:

> [A]n amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

ISDA Master Agreement § 6(e)(i).   In calculating the Close-out Amount, Sequa applied an incorrect early termination date of December 15, 2008 and determined that it owed LBSF an Early Termination Amount of $1,736,116.70, which amount was purportedly based on Sequa's valuation of the Terminated Transactions at $1,853,000, with a deduction of $116,883.30 for consulting and legal fees.   Sequa's calculation of the Early Termination Amount was neither made in good faith, nor completed in a commercially reasonable manner to produce a commercially reasonable result, as required by the express terms of the Master Agreement and chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

*First*, Sequa's calculation of the Termination Amount is flawed because it is not based on the Early Termination Date, as required by the Master Agreement and the Bankruptcy Code. Sequa based its calculations on an asserted early termination date of December 15, 2008, two days before the Early Termination Date, when LBSF received Sequa's notice of early termination.   The Master Agreement provides that the Close-out Amounts should be "*determined as of the Early Termination Date* or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."   ISDA Master Agreement § 14 (emphasis added); *see also id.* § 6(e).   Section 562 of the Bankruptcy Code also specifies that a terminated swap contract be valued *as of* the Early ·Termination Date and places the burden on the valuing swap party to show that commercially reasonable determinants of value were not available on that date.   *See* 11 U.S.C. § 562; *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181, 194 (Bankr. D. Del. 2009) (applying a high standard to a counterparty's efforts to avoid the plain-language requirement in section 562 to measure damages "as of" the date of termination), *aff'd* 637 F.3d 246 (3d Cir. 2011).   Further, the Master Agreement requires the party determining the Close-out Amount to "act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result."   ISDA Master Agreement § 14.

Moreover, the single bid that Sequa received (on the wrong day) was not commercially reasonable given the wide difference between it and the intrinsic value of the Transactions based on a discounted future cash flow analysis. Accordingly, Sequa's calculation of the Close-out Amount should be disregarded in favor of objective information taken from relevant market data as of the actual Early Termination Date of December 17, 2008. *See id.* Using an industry-standard mark-to-market valuation of the terminated Transactions as of the Early Termination Date, the value of the Close-out Amount—taking into account the discounted cash flow of expected future payments—was approximately $6,361,270.00, an amount receivable by LBSF under the Master Agreement. After considering Sequa's Calculation Statement and its additional July 15, 2009 partial payment, this results in a payment shortfall of $4,576,958.33 due to LBSF. It follows that Sequa's flawed valuation has provided Sequa with an improper windfall of at least this amount (and more, given the interest that has accrued and is continuing to accrue on this amount).

*Second*, in its Calculation Statement, Sequa improperly sought to deduct $116,883.30 in expenses for consulting and legal fees purportedly incurred. Not only are these expenses explicitly prohibited from inclusion in Close-out Amount under the Master Agreement, they also are not commercially reasonable and greatly exceed the typical expenses incurred in termination and replacement of transactions similar to the Transactions. *See id.* ("legal fees and out-of-pocket expenses . . . *are to be excluded* in all determinations of Close-out Amount") (emphasis added). LBSF will accept up to $50,000 in reasonable expenses for consulting and legal fees purportedly incurred by Sequa.

Pursuant to the Master Agreement, Sequa, as the Non-defaulting Party, is obligated to pay interest on the Early Termination Amount at the Termination Rate (from December 17, 2008 to December 18, 2008) and at the Non-default Rate on the basis of daily compounding and the actual number of days elapsed, and interest on the Unpaid Amount at the Default Rate. *See* Master Agreement §§ 9(h)(ii)-(iii), 14. As of October 6, 2011, such interest amounts to $2,213,576.61. Thus, LBSF is entitled to payment from Sequa as set forth above in the Settlement Demand, with interest continuing to accrue at the relevant rates until LBSF is paid in full.

| | |
|---|---|
| Date of Derivatives ADR Notice: | October 13, 2011 |
| Date of Service: | October 13, 2011 |
| Response Due Date: | November 14, 2011 |
| Debtor Contacts: | Locke R. McMurray<br>Managing Director, Derivatives Legal<br>Lehman Brothers Holdings Inc.<br>1271 Sixth Avenue, 40th Floor<br>New York, NY 10020<br>Telephone Number: (646) 285-9700<br>Email: locke.mcmurray@lamcollc.com |

Lawrence Brandman
Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, NY 10020
Telephone Number: (646) 285-9650
Email: lawrence.brandman@lamcollc.com

Weil Contacts:    David Berz
Sunny J. Thompson
Weil, Gotshal & Manges LLP
1300 Eye Street NW, Suite 900
Washington, DC   20005
Telephone Number: (202) 682-7000
Email: david.berz@weil.com
        sunny.thompson@weil.com

P. Christine Deruelle
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL   33131-2861
Telephone Number: (214) 746-7700
Email: christine.deruelle@weil.com

Doron P. Kenter
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY   10153-0119
Telephone Number: (212) 310-8000
Email: doron.kenter@weil.com

Exhibit 5

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Commercial Paper Inc.** | Case No. of Debtor **08-13900** |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000015940

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

### THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Sequa Corporation
200 Park Avenue
New York, New York 10166
Attn: James P. Langelotti, Vice President and Treasurer
cc: David S. Dantzic, Latham & Watkins LLP, 555 Eleventh Street, NW, Suite 1000, Washington, D.C. 20004-1304

Telephone number: 212-986-5500        Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check this box if you are the debtor or trustee in this case.

Telephone number:        Email Address:

1. **Amount of Claim as of Date Case Filed:** $ Contingent-see attached.
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Credit Agreement
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**
$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED
SEP 18 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/18/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.   VICE PRESIDENT & TREASURER |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re                                                    ) | |
|                                                          ) | Chapter 11 |
| LEHMAN COMMERCIAL PAPER INC., *et*    ) | |
| *al.*                                                  ) | Case No. 08-13900 |
|                                                          ) | |
|                                                          ) | Jointly Administered |
|                          Debtors.          ) | |

## ATTACHMENT TO PROOF OF CLAIM OF
### Sequa Corporation

     1.     Sequa Corporation (the "Claimant") hereby files this proof of claim (the "Proof of Claim") against Lehman Commercial Paper Inc. (the "Debtor") seeking payment on funds guaranteed under that certain Credit Agreement, dated as of December 3, 2007, among the Claimant, Blue Jay Acquisition Corporation, Blue Jay Merger Corporation, as the initial borrower, Lehman Brothers Inc., Citigroup Global Markets Inc., and J.P. Morgan Securities Inc., as syndication agents, C.I.T. Leasing Corporation and HSBC Bank plc, as documentation agents, Lehman Commercial Paper Inc., as administrative agent and collateral agent, Lehman Brothers Inc., Citigroup Global Markets Inc., and J.P. Morgan Securities Inc., as joint lead arrangers and joint bookrunners, and various lenders from time to time party thereto (the "Credit Agreement"). The claim is for all damages, in an amount to be determined, that would be incurred if, and to the extent that, the Debtor fails to fund its obligations in the respect of the revolving facility under the Credit Agreement in the future. Attached as Exhibit A is the Credit Agreement.

     2.     Claimant expressly reserves the right to amend or supplement this Proof of Claim for any purpose whatsoever, including but not limited to the purposes of increasing the amount of its claim hereunder, fixing or liquidating any claims stated herein, specifying claims for ongoing obligations of Debtor that are not expressly described herein, and asserting new claims.

     3.     Claimant may have post-petition administrative expense claims against Debtor. By filing this Proof of Claim, Claimant does not waive any of its post-petition claims against Debtor, and expressly reserves all of its rights in connection with such claims.

     4.     To the best of Claimant's knowledge, no judgment has been rendered on the claims set forth herein.

     5.     To the best of Claimant's knowledge, all payments made by Debtor in connection with the claims asserted herein have been credited and deducted for the purposes of making this Proof of Claim.

     6.     Claimant does not waive any right of action that it has or may have against Debtor or any other person or persons.

7.    In filing this Proof of Claim, Claimant does not submit itself to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim.

8.    The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future defaults or events of default under any agreements between Claimant and Debtor.

9.    All notices and communications concerning this Proof of Claim should be sent to the address(es) listed on proof of claim form.

Exhibit 6

EXECUTION COPY

## AMENDMENT, RESIGNATION, WAIVER, CONSENT AND APPOINTMENT AGREEMENT

This Amendment, Resignation, Waiver, Consent and Appointment Agreement (this "Agreement") is entered into as of October 14, 2011, by and among Lehman Commercial Paper Inc. ("Lehman"), a debtor in possession under chapter 11 of the Bankruptcy Code (defined below) acting alone or through one or more of its branches as the Administrative Agent and Collateral Agent (in such capacities, the "Existing Agent") and as Swingline Lender (in such capacity, the "Existing Swingline Lender") under that certain Credit Agreement (as defined below), the Required Lenders party hereto, the Successor Agent (as defined below), the Successor Swingline Lender (as defined below), Sequa Corporation (the "Borrower") and each other Loan Party. Defined terms in the Credit Agreement have the same meanings where used herein, unless otherwise defined.

## RECITALS

WHEREAS, the Borrower, Blue Jay Acquisition Corporation ("Holdings"), the Lenders, the Existing Agent, Lehman Brothers Inc., Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., as Syndication Agents, C.I.T. Leasing Corporation and HSBC Bank plc, as Documentation Agents, and Lehman Brothers Inc., Citigroup Global Markets Inc. and J.P. Morgan Securities Inc., as Joint Lead Arrangers and Joint Bookrunners, have entered into the Credit Agreement dated as of December 3, 2007 (as amended, restated, supplemented or otherwise modified, the "Credit Agreement");

WHEREAS, on October 5, 2008, the Existing Agent commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Existing Agent desires to resign as Administrative Agent and Collateral Agent and the Existing Swingline Lender desires to resign as Swingline Lender, in each case, under the Credit Agreement and the other Loan Documents;

WHEREAS, the Required Lenders desire to appoint Barclays Bank PLC as successor Administrative Agent and successor Collateral Agent (in such capacities together, the "Successor Agent") under the Credit Agreement and the other Loan Documents and the Borrower desires to ratify such appointment, and the Borrower desires to designate Barclays Bank PLC as successor Swingline Lender (in such capacity, the "Successor Swingline Lender") under the Credit Agreement and the other Loan Documents, and the Successor Agent and the Successor Swingline Lender wish to accept such appointments;

WHEREAS, the Loan Parties party to the Credit Agreement, the Required Lenders and each of the Revolving Lenders wish to amend the provisions of the Credit Agreement relating to the Revolving Credit Loans, as provided herein; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.    Agency Resignation, Waiver, Consent and Appointment.

(a)    As of the Effective Date (as defined below), (i) the Existing Agent hereby resigns as the Administrative Agent and the Collateral Agent as provided under *Section 9.9 (Successor Agents)* of the Credit Agreement and shall have no further obligations under the Loan Documents

in such capacities; (ii) the Existing Swingline Lender hereby resigns as the Swingline Lender under the Credit Agreement and shall have no further obligations under the Loan Documents in such capacity, (iii) the Required Lenders hereby appoint Barclays Bank PLC as successor Administrative Agent and Collateral Agent under the Credit Agreement and the other Loan Documents; (iv) the Borrower and the Required Lenders hereby waive any notice requirement provided for under *Section 9.9 (Successor Agents)* of the Credit Agreement in respect of such resignation or appointment and the requirement in *Section 9.9 (Successor Agents)* that the successor agent must be selected from among the Lenders; (vi) the Borrower and the Required Lenders hereby consent to the appointment of the Successor Agent; (vi) Barclays Bank PLC hereby accepts its appointment as Successor Agent; (vii) the Successor Agent shall bear no responsibility for any actions taken or omitted to be taken by the Existing Agent while the Existing Agent served as Administrative Agent and Collateral Agent under the Credit Agreement and the other Loan Documents and (viii) each of the Existing Agent and Borrower authorizes the Successor Agent to file any Uniform Commercial Code assignments or amendments with respect to the Uniform Commercial Code Financing Statements, mortgages, and other filings in respect of the Collateral as the Successor Agent deems necessary or desirable to evidence the Successor Agent's succession as the Administrative Agent and the Collateral Agent under the Credit Agreement and the other Loan Documents and each party hereto agrees to execute any documentation and to take such other actions as may reasonably be necessary to evidence the resignation and appointment described herein; provided that the Existing Agent shall bear no responsibility for any actions taken or omitted to be taken by the Successor Agent under this clause (viii).

(b)     The parties hereto hereby confirm that (i) the Successor Agent succeeds to the rights and obligations of the Administrative Agent and the Collateral Agent under the Credit Agreement and the other Loan Documents and becomes vested with all of the rights, powers, privileges and duties of the Administrative Agent and the Collateral Agent thereunder, (ii) the Successor Swingline Lender succeeds to the rights and obligations of the Swingline Lender under the Credit Agreement and the other Loan Documents and becomes vested with all of the rights, powers, privileges and duties of the Swingline Lender thereunder, (iii) the Existing Agent is discharged from all of its duties and obligations as the Administrative Agent and the Collateral Agent under the Credit Agreement and the other Loan Documents and (iv) the Existing Swingline Lender is discharged from all of its duties and obligations as the Swingline Lender under the Credit Agreement and the other Loan Documents, in each case, as of the Effective Date.

(c)     The parties hereto hereby confirm that, as of the Effective Date, all of the provisions of the Credit Agreement, including, without limitation, *Section 9 (The Agents)* and *Section 10.5 (Payment of Expenses; Indemnification)*, to the extent they pertain to the Existing Agent and the Existing Swingline Lender, continue in effect for the benefit of the Existing Agent and the Existing Swingline Lender, their respective sub-agents and affiliates in respect of any actions taken or omitted to be taken by any of them while the Existing Agent was acting as Administrative Agent and Collateral Agent and the Existing Swingline Lender was acting as Swingline Lender and inure to the benefit of the Existing Agent and the Existing Swingline Lender.

(d)     The Existing Agent hereby assigns to the Successor Agent each of the Liens and security interests granted to the Existing Agent under the Loan Documents and the Successor Agent hereby assumes all such Liens, for the ratable benefit of the Secured Parties.

(e)     On and after the Effective Date, all possessory collateral held by the Existing Agent for the benefit of the Lenders shall be deemed to be held by the Existing Agent as agent

and bailee for the Successor Agent for the ratable benefit of the Secured Parties until such time as such possessory collateral has been delivered to the Successor Agent. Notwithstanding anything herein to the contrary or the effectiveness of the terms hereof, each Loan Party agrees that all of such Liens granted by any Loan Party shall, unless heretofore released in accordance with the terms of the Loan Documents, in all respects be continuing and in effect and are hereby ratified and reaffirmed by each Loan Party. Without limiting the generality of the foregoing, any reference to the Existing Agent in any publicly filed document, to the extent such filing relates to the liens and security interests in the Collateral assigned hereby and until such filing is modified to reflect the interests of the Successor Agent, shall, with respect to such liens and security interests, constitute a reference to the Existing Agent as collateral representative of the Successor Agent (provided, that the parties hereto agree that the Existing Agent's role as such collateral representative shall impose no duties, obligations, or liabilities on the Existing Agent, including, without limitation, any duty to take any type of direction regarding any action to be taken against such Collateral, whether such direction comes from the Successor Agent, the Required Lenders, or otherwise and the Existing Agent shall have the full benefit of the protective provisions of the Credit Agreement, including, without limitation, *Section 9 (The Agents)* and *Section 10.5 (Payment of Expenses; Indemnification)*, while serving in such capacity). The Successor Agent agrees to take possession of any possessory collateral delivered to the Successor Agent following the Effective Date upon tender thereof by the Existing Agent.

(f)    As of the Effective Date, the Borrower hereby designates Barclays Bank PLC, and Barclays Bank PLC hereby agrees to act, as Successor Swingline Lender under the Credit Agreement. The parties hereto confirm that Barclays Bank PLC as Successor Swingline Lender shall bear no responsibility for any actions taken or omitted to be taken by the Existing Swingline Lender while the Existing Swingline Lender served as the Swingline Lender under the Credit Agreement and the other Loan Documents.

2.    <u>Revolving Credit Commitment Reduction</u>. The Borrower and each of the Revolving Lenders hereby agrees that, on the Effective Date, the Revolving Commitments of Lehman (which, immediately prior to the Effective Date, are in the aggregate principal amount of $7,000,000 and are Multicurrency Revolving Commitments) shall be reduced to zero ($0.00) and the aggregate Revolving Commitments shall correspondingly be reduced to $143,000,000 (the "<u>Revolving Commitment Reduction</u>"). As of the Effective Date, all reimbursement obligations of the Revolving Lenders to the Issuing Lenders with respect to L/C Obligations will be re-allocated to the Revolving Lenders other than Lehman, ratably in proportion to their respective Revolving Percentages after giving full effect to this Agreement and Lehman shall cease to be an L/C Participant. Each of the Revolving Lenders (other than Lehman) hereby agrees that the Revolving Commitment Reduction shall not affect its Revolving Commitment and its Revolving Commitment shall remain the same as its Revolving Commitment immediately prior to the Revolving Commitment Reduction. In the event that, immediately prior to of the Effective Date, Lehman as a Revolving Lender is owed any amounts in respect of accrued interest and/or fees under the Credit Agreement, the Borrower shall pay such amounts to Lehman on the next scheduled payment dates for such interest and fees pursuant to the Credit Agreement until such amounts are paid in full.

3.    <u>Amendment</u>. As of the Effective Date, the Credit Agreement is hereby amended as follows:

(a)    The definition of "LCPI" in *Section 1.01 (Defined Terms)* is hereby deleted in its entirety.

(b)      all references in the Loan Documents to "Lehman Commercial Paper Inc." (other than such references in (i) the definition of "Senior Interim Loan Agreement", (ii) *Section 10.2 (Notices)* of the Credit Agreement and (iii) the signature page of the Credit Agreement) shall be deemed to be references to "Barclays Bank PLC", and, without limiting the foregoing, all references therein to "Lehman Commercial Paper Inc." in its capacity as the Existing Agent shall be deemed to refer to Barclays Bank PLC as the Successor Agent.

(c)      The definition of "Swingline Commitment" in *Section 1.01 (Defined Terms)* is hereby deleted and amended in its entirety to read:

"Swingline Commitment": the obligation of the Swingline Lender to make Swingline Loans pursuant to Section 2.6 in an aggregate amount at any one time outstanding not to exceed $15,000,000. Notwithstanding anything herein to the contrary, so long as Barclays Bank PLC is the Swingline Lender, the Swingline Commitment will be available for Swingline Loans in Dollars only.

(d)      *Section 9.7 (Indemnification)* of the Credit Agreement is hereby amended as follows:

(i) by inserting a new second sentence thereof to read as follows:

"In the case of any investigation, litigation or proceeding giving rise to any liabilities or other amounts that are indemnified under this Section 9.7, this Section 9.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person."

(ii) by inserting the following two new paragraphs at the end thereof to reads as follows:

"Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Administrative Agent in connection with preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights and responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such costs or expenses by or on behalf of the Borrower.

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any U.S. Federal income tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold U.S. Federal income tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, U.S. Federal income tax ineffective or for any other reason, or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all reasonable costs and out-of-pocket expenses (including reasonable fees and expenses of counsel) incurred in connection therewith."

(e)    A new *Section 9.12* (*Administrative Agent May File Proofs of Claim*) shall be inserted at the end of *Section 9* (*The Agents*) of the Credit Agreement to read as follows:

"9.12.   <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under the U.S. Bankruptcy Code (Title 11 of the United States Code entitled "Bankruptcy") or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally or any other judicial proceeding relative to the Borrower, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, all L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders, the Issuing Lenders and the Administrative Agent under Sections 2.9 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.9 and 10.5."

4.    <u>Address for Notices</u>.

(a)    As of the Effective Date, the address of the "Administrative Agent" and "Collateral Agent" for the purposes of *Section 10.2 (Notices)* shall be as follows:

Barclays Bank PLC
745 Seventh Avenue
New York, NY 10019
Attention: Craig Malloy
Telecopy no: (212) 526-7150
E-Mail Address: craig.malloy@barcap.com

with a copy to:

Barclays Capital Services LLC
1301 Sixth Avenue

New York, New York 10019
Attention: Sookie Siew
Telecopy No: (915) 522-0569
E-Mail Address: XraUSLoanOps5@barcap.com

(b)     As of the Effective Date, the Borrower hereby agrees that any payment required to be made to the Successor Agent (whether for its own account or for the account of the Lenders) under the Credit Agreement, including, without limitation, *Section 10.5 (Payment of Expenses; Indemnification)*, shall be made to the address set forth in <u>Section 4(a)</u> hereof.

5.     <u>Representations and Warranties</u>.

(a)     Lehman hereby represents and warrants on and as of the date hereof, and on and as of the Effective Date, that (i) it is legally authorized to enter into and has duly executed and delivered this Agreement and (ii) the execution and delivery by Lehman of this Agreement and the performance of its obligations hereunder have been approved by the Order Pursuant to Sections 105(a), 363(b), and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing Debtor to (A) Continue to Utilize its Agency Bank Account, (B) Terminate Agency Relationships and (C) Elevate Loan Participations, dated October 6, 2008 and entered by the United States Bankruptcy Court for the Southern District of New York, as to which no stay has been ordered and which has not been reversed, modified, vacated or overturned, and that no further notice, consent or order is required.

(b)     Each of the Successor Agent and the Successor Swingline Lender hereby represents and warrants on and as of the date hereof, and on and as of the Effective Date, that it is legally authorized to enter into and has duly executed and delivered this Agreement.

(c)     The Borrower and each other Loan Party hereby represents and warrants on and as of the date hereof, and on and as of the Effective Date, that (i) it is legally authorized to enter into and has duly executed and delivered this Agreement, (ii) no Default or Event of Default has occurred and is continuing, (iii) the representations and warranties set forth in *Section 4 (Representations and Warranties)* of the Credit Agreement and the representations and warranties in each other Loan Document are true and correct in all material respects on and as of (a) the date of this Agreement and (b) the Effective Date with the same effect as though made on and as of the Closing Date (as defined in the Credit Agreement), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date; (iv) <u>Schedule 1</u> hereto contains a complete list of all possessory Collateral and security filings related to the Collateral delivered to the Existing Agent; (v) the actions described in <u>Schedule 2</u> hereto have been performed on or prior to the date hereof; and (vi) all Liens and security interests created under the Loan Documents for the ratable benefit of the Secured Parties under the Loan Documents are valid and enforceable Liens on and/or security interests in the Collateral, as security for the Obligations.

6.     <u>Conditions Precedent to Effectiveness</u>.     For purposes of this Agreement, the term "Effective Date" means the first date on which all of the following conditions have been satisfied:

(a)     Each of the parties hereto shall have executed and delivered this Agreement;

      (b)     The Borrower shall have paid in immediately available funds the reasonable fees and expenses of (i) Weil, Gotshal & Manges LLP, counsel for the Existing Agent and (ii) Milbank, Tweed, Hadley & McCloy LLP, counsel for the Successor Agent (to the extent, in each case, reasonably detailed invoices therefor have been provided to the Borrower);

      (c)     The Successor Agent and the Borrower shall have executed and delivered a fee letter in relation to the annual agency fee paid to the Administrative Agent by the Borrower;

      (d)     The Existing Agent shall have confirmed in writing that it has delivered the items set forth on <u>Schedule 1</u> hereto to the Successor Agent and the Successor Agent shall have confirmed in writing that it has received the items set forth on <u>Schedule 1</u> hereto; and

      (e)     The Successor Agent shall have confirmed in writing that the Existing Agent has completed each of the tasks listed on <u>Schedule 3</u> hereto.

7.     <u>Further Assurances</u>.

      (a)     Without limiting their obligations in any way under any of the Loan Documents, the Borrower and each other Loan Party reaffirms and acknowledges its obligations to the Successor Agent with respect to the Credit Agreement and the other Loan Documents and that the delivery of any agreements, instruments or any other document and any other actions taken or to be taken shall be to the satisfaction of Successor Agent notwithstanding whether any of the foregoing was or were previously satisfactory to the Existing Agent.

      (b)     Each of the Borrower, each other Loan Party and the Existing Agent agrees that, following the Effective Date, it shall furnish, at the Borrower's expense, additional releases, amendment or termination statements and such other documents, instruments and agreements as are customary and may be reasonably requested by the Successor Agent from time to time in order to effect the matters covered hereby.

      (c)     The Borrower shall reimburse the Existing Agent for all reasonable out-of-pocket costs and expenses incurred by the Existing Agent in connection with any actions taken pursuant to this Agreement.

8.     <u>Release</u>.  Each of the Borrower and the other Loan Parties hereby unconditionally and irrevocably waives all claims, suits, debts, liens, losses, causes of action, demands, rights, damages or costs, or expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, which any of them may have or claim to have against Lehman (whether in its capacity as an agent or lender) or its agents, employees, officers, affiliates, directors, representatives, attorneys, successors or assigns (collectively, the "<u>Released Parties</u>") to the extent arising out of or in connection with the Loan Documents (collectively, the "<u>Claims</u>").  Each of the Borrower and the other Loan Parties further agrees forever to refrain from commencing, instituting or prosecuting any lawsuit, action or other proceeding against any Released Parties with respect to any and all of the foregoing described waived, released, acquitted and discharged Claims or from exercising any right or recoupment of setoff that it may have under a master netting agreement or otherwise against any Released Party with respect to Obligations under the Loan Documents.  Each of the Released Parties shall be a third party beneficiary of this Agreement.

9.      Effect of Agreement.  The parties hereto acknowledge that from and after the Effective Date Lehman shall have no obligation to provide any further financial accommodations to or for the benefit of the Borrower or its Affiliates pursuant to the Loan Documents.

10.     Return of Payments.

(a)      As soon as reasonably practicable following the Effective Date, the Existing Agent shall pay to the Borrower in immediately available funds an amount equal to the ratable portion of the annual agency fee heretofore paid to the Existing Agent for the annual period ending on December 3, 2011 pursuant to the fee agreement with the Existing Agent that is attributable to the period from the Effective Date to such date.

(b)      In the event that, after the Effective Date, the Existing Agent receives any principal, interest or other amount owing to any Lender or the Successor Agent under the Credit Agreement or any other Loan Document, the Existing Agent agrees that such payment shall be held in trust for the Successor Agent, and the Existing Agent shall return such payment to the Successor Agent for payment to the Person entitled thereto.

(c)      In the event that, after the Effective Date, the Successor Agent receives any principal, interest or other amount owing to Existing Agent under the Credit Agreement or any other Loan Document, the Successor Agent agrees that such payment shall be held in trust for the Existing Agent, and the Successor Agent shall return such payment to the Existing Agent.

11.     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto.

12.     Limitation.  Each party hereto hereby agrees that this Agreement (i) does not impose on the Existing Agent or the Existing Swingline Lender affirmative obligations or indemnities to which it was not already subject, as of the date of its petition commencing its proceeding under chapter 11 of the Bankruptcy Code, and that could give rise to any administrative expense claims other than claims arising as a result of (x) the failure by Lehman to perform any of its obligations hereunder or (y) any representation or warranty of Lehman set forth herein not being true and correct on and as of the date hereof and on and as of the Effective Date and (ii) is not inconsistent with the terms of the Credit Agreement.

13.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall be one and the same instrument.

14.     Headings.  The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the provisions hereof.

15.     Interpretation.  This Agreement is a Loan Document for the purposes of the Credit Agreement.

16.     Confidentiality.  The information provided by the Existing Agent or its counsel pursuant to Section 6(b) hereof is exclusively for the information of the parties hereto and such information therein may not be disclosed to any third party or circulated or referred to publicly without the prior written consent of Lehman, which consent shall not be unreasonably withheld, delayed or conditioned, except that this Agreement, including such Schedules, may be disclosed, if required, in any legal, judicial or

administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority.

17.     Confirmation of Guaranties.     By signing this Agreement, each Loan Party hereby confirms that (i) the obligations of the Loan Parties under the Credit Agreement as modified hereby and the other Loan Documents (x) are entitled to the benefits of the guarantees set forth in the Guarantee and Collateral Agreement and (y) constitute Obligations, and (ii) notwithstanding the effectiveness of the terms hereof, the Guarantee and Collateral Agreement is, and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects.

18.     APPLICABLE LAW.     THIS AGREEMENT SHALL BE GOVERNED BY, AND BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

<div style="margin-left: 45%;">

**LEHMAN COMMERCIAL PAPER INC.,**
as Existing Agent, Existing Swingline Lender and Lender

By: _____

Name:
Title:      RANDALL BRAUNFELD
            AUTHORIZED SIGNATORY

</div>

**BARCLAYS BANK PLC**,
as Successor Agent, Successor Swingline
Lender and Lender

By: _____

Name:
Title:    Craig Malloy
Director

**SEQUA CORPORATION**,
as Borrower

By: _____
Name: James P. Langelotti
Title: Vice President and Treasurer

**BLUE JAY ACQUISITION CORPORATION**,
**ARC AUTOMOTIVE, INC.**,
**ARC/ASIA, INC.**,
**ATLANTIC RESEARCH CORPORATION**,
**CASCO INVESTORS CORPORATION**,
**CASCO PRODUCTS CORPORATION**,
**CHROMALLOY AMERICAN LLC**,
**CHROMALLOY CASTINGS TAMPA CORPORATION**,
**CHROMALLOY COMPONENT SERVICES, INC.**,
**CHROMALLOY COOPERATIVE HOLDINGS LLC**,
**CHROMALLOY GAS TURBINE LLC**,
**CHROMALLOY POWER SERVICES CORPORATION**,
**CHROMALLOY SAN DIEGO CORPORATION**,
**JET SERVICES (DELAWARE), INC.**,
**SEQUA K&I COMPANY**,
**MIDWEST METAL COATINGS, LLC**,
**PACIFIC GAS TURBINE CENTER, LLC**,
**SEQUA COATINGS LLC**,
**SEQUA FINANCIAL CORPORATION**,
**SEQUA HOLDINGS, INC.**,
**SEQUA INVESTMENTS CORPORATION I**,
**SEQUA MEN'S APPAREL INC.**,
**TPZ CORPORATION**,
each, as a Loan Party

By: _____
Name: James P. Langelotti
Title: Vice President and Treasurer

**SEQUA CAPITAL CORPORATION**,
as a Loan Party

By: _____
Name: James P. Langelotti
Title: Chief Financial Officer and Treasurer

Schedule 1

Collateral

**Notes and Associated Allonges**

| Maker | Holder | Principal Amount | Date of Note | Due date |
|---|---|---|---|---|
| Chromalloy Holland B.V. | Sequa Corporation | $6,159,078.33 | 12/3/2007 | 12/4/2014 |

**Equity Interest Certificates and Associated Transfer Powers[1]**

| Issuer | Grantor | Class | Cert. No. | No. of Interests Issued | Percentage Pledged |
|---|---|---|---|---|---|
| Sequa Corporation | Blue Jay Acquisition Corporation | Common | CS-1 | 100 | 100% |
| ARC Automotive, Inc. | Atlantic Research Corp. | Common | 1 | 100 | 100% |
| ARC/Asia, Inc. | Atlantic Research Corporation | Common | 1 | 100 | 100% |
| Casco Investors Corporation | Sequa Corporation (f/k/a Sun Chemical Corporation) | Common | 1 | 200 | 100% |
| Casco Products Corporation | Casco Investors Corporation | Common | 1 | 10,000 | 100% |
| Chromalloy Castings Tampa Corporation | Chromalloy Gas Turbine LLC (f/k/a Chromalloy Gas Turbine Corporation) | Common | 1 | 1,000 | 100% |
| Chromalloy Component Services, Inc. | Chromalloy Gas Turbine LLC (f/k/a Chromalloy Gas Turbine Corporation) | Common | 1 | 1,000 | 100% |
| Chromalloy Power | Chromalloy Gas Turbine LLC (f/k/a | Common | 1 | 1,000 | 100% |

---

[1] Please note that Schedule 1 does not include pledged equity interests that are not certificated.

| Issuer | Grantor | Class | Cert. No. | No. of Interests Issued | Percentage Pledged |
|---|---|---|---|---|---|
| Services Corporation | Chromalloy Gas Turbine Corporation) | | | | |
| Chromalloy San Diego Corporation (f/k/a Jet Services West, Inc.) | Chromalloy American Corporation (f/k/a Chromalloy American Corporation) | Common | 1 | 150 | 100% |
| Jet Services (Delaware), Inc. | Casco Investors Corporation | Common | 4 | 106 | 100% |
| Kassel & Irons Ltd. (n/k/a Sequa K&I Company) | Sequa Corporation | Common | 1 | 100 | 100% |
| Sequa Capital Corporation (f/k/a Forsun Leasing Corp.) | Sequa Corporation (f/k/a Sun Chemical Corporation)[2] | Common | 1 | 200 | 100% |
| Sequa Financial Corporation | Sequa Corporation | Common | 2 | 1,000 | 100% |
| Sequa Holdings, Inc. | Casco Investors Corporation | Ordinary | 5 | 106 | 100% |
| Sequa Investments Corporation I | Sequa Financial Corporation | Common | 2 | 1,000 | 100% |
| TPZ Corporation | Sequa Financial Corporation | Common | 2 | 1,000 | 100% |
| ARC Automotriz de México, S. de R.L. de C.V. | Atlantic Research Corp. | Quota | 5-A | 1 @ 1 peso | 65% |
| ARC Automotriz Servicios de México, S. de R.L. de C.V. | Atlantic Research Corp. | Quota | 4 | 1 @ 1 peso | 65% |
| ARC Automotriz de México, S. de R.L. de C.V. | ARC Automotive Inc. | Quota | 3 | 1 @ 2,999 pesos | 65% |
| ARC Automotriz Servicios de México, | ARC Automotive Inc. | Quota | 3 | 1 @ 2,999 pesos | 65% |

---

[2] The attached stock power represents Cert No. 1 of 200 Shares of Sequa Capital Corporation owned by Sequa Corporation.

| Issuer | Grantor | Class | Cert. No. | No. of Interests Issued | Percentage Pledged |
|---|---|---|---|---|---|
| S. de R.L. de C.V. | | | | | |
| Atlantic Research Corporation | Bankers Trust New York Corp.[3] | Class A Common | C 28949 | 7 | 100% |
| Atlantic Research Corporation | Chromalloy Gas Turbine LLC (f/k/a Chromalloy Gas Turbine Corporation) | Class B Common | C 28946 | 93 | 100% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | Capital Fijo | 1 | 625 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | Capital Fijo | 2 | 625 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Chris Richardson | Capital Fijo | 3 | 1,250 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Gerald J. Sulaica | Capital Fijo | 4 | 625 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | "A" C.V. Primera Emision | 1 | 51,375 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | "A" C.V. Primera Emision | 2 | 51,375 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Chris Richardson | "A" C.V. Primera Emision | 3 | 102,750 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Gerald J. Sulaica | "A" C.V. Primera Emision | 4 | 51,375 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | "B" C.V. Primera Emision | 1 | 1,000,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | "C" C.V. Primera | 1 | 1,000,000 Acciones | 65% |

---

[3] Certificate says Bankers Trust of New York Corp., but Stock Power says Chromalloy Gas Turbine LLC

| Issuer | Grantor | Class | Cert. No. | No. of Interests Issued | Percentage Pledged |
|---|---|---|---|---|---|
| | | Emision | | | |
| Chromalloy, S.A. de C.V. | Chris Richardson | "D" C.V. Primera Emision | 1 | 1,000,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Gerald J. Sulaica | "E" C.V. Primera Emision | 1 | 1,000,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | "F" C.V. Primera Emision | 1 | 413,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | "F" C.V. Primera Emision | 2 | 413,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Chris Richardson | "F" C.V. Primera Emision | 3 | 174,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | "A" C.V. Segunda Emision | 1 | 600,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | "A" C.V. Segunda Emision | 2 | 600,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Chris Richardson | "A" C.V. Segunda Emision | 3 | 787,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Gerald J. Sulaica | "A" C.V. Segunda Emision | 4 | 1,013,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Martin Weinstein | "A" C.V. Tercera Emision | 1 | 5,010,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Robert Brown | "A" C.V. Tercera Emision | 2 | 5,010,000 Acciones | 65% |

| Issuer | Grantor | Class | Cert. No. | No. of Interests Issued | Percentage Pledged |
|--------|---------|-------|-----------|-------------------------|--------------------|
| Chromalloy, S.A. de C.V. | Chris Richardson | "A" C.V. Tercera Emision | 3 | 5,010,000 Acciones | 65% |
| Chromalloy, S.A. de C.V. | Gerald J. Sulaica | "A" C.V. Tercera Emision | 4 | 5,010,000 Acciones | 65% |
| Chromalloy Dallas Mexico, S.A. de C.V. | Michael Rivera Cabrera | Capital Fijo | 30 | 140 Acciones | 65% |
| Chromalloy Dallas Mexico, S.A. de C.V. | Gerald Hellmund Gutierrez | Capital Fijo | 31 | 80 Acciones | 65% |
| Chromalloy Dallas Mexico, S.A. de C.V. | Michael Rivera Cabrera | Capital Fijo | 32 | 180 Acciones | 65% |
| Silonex, Inc. | Casco Products Corporation | Class A Common | CA-32R | 881,445 | 65% |
| Silonex, Inc. | Casco Products Corporation | Class B Common | CB-21R | 646,211 | 65% |
| Silonex, Inc. | Casco Products Corporation | Class C Common | CC-7R | 28,030 | 65% |
| Chromalloy American LLC | Sequa Corporation | Membership Units | 001 | 100 | 100% |
| Chromalloy Cooperative Holdings LLC | Chromalloy Gas Turbine LLC | Membership Units | 002 | 100 | 100% |
| Chromalloy Gas Turbine LLC | Chromalloy American LLC | Membership Units | 001 | 100 | 100% |
| Midwest Metal Coatings, LLC | Sequa Corporation | Membership Units | 001 | 100 | 100% |
| Sequa Coatings LLC | Sequa Corporation | Membership Units | 001 | 100 | 100% |
| Pacific Gas Turbine Center, LLC | Chromalloy Gas Turbine LLC | Membership Units | 001 | 100 | 100% |

<u>Schedule 2</u>

1.    The Borrower and each other Loan Party to the Agreement is party to the Guarantee and Collateral Agreement.

2.    All outstanding equity interests and promissory notes (with appropriate transfer instruments) owned by or on behalf of each Loan Party and required to be pledged pursuant to the Guarantee and Collateral Agreement have been pledged pursuant to the Guarantee and Collateral Agreement.

3.    All Uniform Commercial Code financing statements and other appropriate documents and instruments required to create and/or perfect the Liens intended to be created and/or perfected under the Guarantee and Collateral Agreement have been filed, registered, recorded or delivered.

4.    All Mortgages, title insurance policies, abstracts, appraisals, legal opinions and other appropriate real estate security documents with respect to all Mortgaged Properties have been filed, registered, recorded or delivered pursuant to the Credit Agreement.

5.    All consents and approvals required to be obtained in connection with the execution and delivery of all Security Documents, the performance of the obligations thereunder and the granting of the Liens thereunder have been obtained.

08-13555-jmp    Doc 24088    Filed 01/05/12    Entered 01/05/12 16:31:53    Main Document
Pg 149 of 197

Schedule 3

The Existing Agent shall have delivered to the Successor Agent:

a)      copies of the Loan Documents existing as of the date hereof, together with all amendments and supplements thereto;

b)      a list of all of the Lenders and their respective commitments as of the close of business on the date of this Agreement;

c)      an executed assignment of mortgage or deed of trust (as applicable and if reasonably necessary) with regard to each of the mortgages and deeds of trust in its capacity as Administrative Agent (provided that neither the Existing Agent nor the Successor Agent shall be responsible for the form, content or filing of any such assignments or the applicable mortgages);

d)      description of any additional documents prepared to transfer, as of record, the security interests, financing statements and all other notices of security interests and Liens previously filed by it in its capacity as Administrative Agent (provided that neither the Existing Agent nor the Successor Agent shall be responsible for the form, content or filing of any such financing statements, instruments or notices);

e)      (i) copies of all of the Existing Agent's books and records concerning the Loans (including without limitation all of those books and records that evidence the amount of principal, interest and other sums due under the Loan Documents), (ii) such other information and data as shall be reasonably necessary for the Successor Agent to establish an IntraLinks website (or substantially similar electronic transmission system) for purposes of general communications with the parties to the Loan Documents; and

f)      an executed assignment of each Intellectual Property Security Agreement in its capacity as Collateral Agent (provided that the Existing Agent shall not be responsible for the form or content of any such assignment).