THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE OF TWO HUNDRED SIXTY-SECOND OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIM(S).

IF YOU HAVE QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL, MATTHIAS KLEINSASSER, AT (214) 746-7700.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                              :     Chapter 11 Case No.
                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,           :     08-13555 (JMP)
                                                   :
                              Debtors.             :     (Jointly Administered)
-------------------------------------------------------------------x

## NOTICE OF HEARING ON DEBTORS' TWO HUNDRED SIXTY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

PLEASE TAKE NOTICE that on February 6, 2012, Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), filed their two hundred sixty-second omnibus objection to claims (the "Two Hundred Sixty-Second Omnibus Objection to Claims"), and that a hearing

(the "Hearing") to consider the Two Hundred Sixty-Second Omnibus Objection to Claims will

be held before the Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601

of the United States Bankruptcy Court for the Southern District of New York, One Bowling

Green, New York, New York 10004, on **March 22, 2012 at 10:00 a.m. (Eastern Time),** or as

soon thereafter as counsel may be heard.

       **PLEASE TAKE FURTHER NOTICE** that any responses to the Two Hundred

Sixty-Second Omnibus Objection to Claims must be in writing, shall conform to the Federal

Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed

with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which

can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing

system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable

Document Format (PDF), WordPerfect, or any other Windows-based word processing format

(with a hard copy delivered directly to Chambers), in accordance with General Order M-182

(which can be found at www.nysb.uscourts.gov), and served in accordance with General Order

M-399, and on (i) the chambers of the Honorable James M. Peck, One Bowling Green, New

York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Robert J. Lemons, Esq. and Mark

Bernstein, Esq.); (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street,

21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini,

Esq. and Andrea B. Schwartz, Esq.); and (iv) attorneys for the official committee of unsecured

creditors appointed in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq.); so as to be so filed and received no later than **March 7, 2012 at 4:00 p.m.**

**(Eastern Time)** (the "Response Deadline").

    **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Two Hundred Sixty-Second Omnibus Objection to Claims or any

claim set forth thereon, the Debtors may, on or after the Response Deadline, submit to the

Bankruptcy Court an order substantially in the form of the proposed order annexed to the Two

Hundred Sixty-Second Omnibus Objection to Claims, which order may be entered with no

further notice or opportunity to be heard offered to any party.

Dated: February 6, 2012
   New York, New York

           /s/ Robert J. Lemons
           Robert J. Lemons

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' TWO HUNDRED SIXTY-SECOND**
**OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS NOTICE OF TWO HUNDRED SIXTY-SECOND OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL, MATTHIAS KLEINSASSER, AT (214) 746-7700.**

---

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent:

**Preliminary Statement**

1.    The proofs of claim listed on Exhibit A attached hereto (the "No Liability Claims") should be disallowed and expunged because the Debtors have no contractual relationship or privity with, or other obligation to, the Note Holders (defined below) and therefore have no liability as to the No Liability Claims.

2.    The No Liability Claims are asserted against Lehman Brothers Special Financing Inc. ("LBSF") by certain holders of notes (the "Note Holders") issued by Saphir Finance Public Limited Company ("Saphir").  Saphir is a special purpose vehicle formed to hold shares in a certain fund and issue notes to investors.  Saphir issued several series of notes (collectively, the "Notes Program"), including the Saphir Finance Public Limited Company Series 2006-7 Notes (the "Series 2006-7 Notes").  Several of the Notes Program series did involve Saphir entering into credit default swap transactions with LBSF, but here, as the Note Holders admit in the No Liability Claims, the Series 2006-7 Notes involved no swap transaction. The holders of the No Liability Claims are seeking to recover from LBSF on account of the Series 2006-7 Notes, but they cannot do so because they have no contractual relationship or privity with, and are owed no obligation by, the Debtors.

**Relief Requested**

3.    The Debtors file this two hundred sixty-second omnibus objection to claims (the "Two Hundred Sixty-Second Omnibus Objection to Claims"), pursuant to section

502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's order

approving procedures for the filing of omnibus objections to proofs of claim filed in these

chapter 11 cases (the "Procedures Order") [Docket No. 6664], seeking the disallowance and

expungement of the No Liability Claims on the grounds that the Debtors have no liability for

said claims.

4.     The Debtors reserve all their rights to object on any basis to any No

Liability Claim as to which the Court does not grant the relief requested herein.

## Jurisdiction

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

6.     Commencing on September 15, 2008, and periodically thereafter, LBHI

and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the

Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The

Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     On September 17, 2008, the United States Trustee for Region 2 (the "U.S.

Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of

the Bankruptcy Code (the "Creditors' Committee").

8.     On January 14, 2010, the Court entered the Procedures Order, which

authorizes the Debtors, among other things, to file omnibus objections to no more than 500

claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and

those additional grounds set forth in the Procedures Order.

       9.    On December 6, 2011, the Court approved and entered an order confirming

the Modified Third Amended Joint Chapter 11 Plan of the Debtors [Docket No. 23023].

### **The No Liability Claims Should Be Disallowed and Expunged**

       10.    The No Liability Claims should be disallowed and expunged because

LBSF has no contractual relationship or privity with, or other obligation to, the Note Holders,

and therefore the Debtors do not have liability on the claims.  Section 502(b)(1) of the

Bankruptcy Code provides that a claim is deemed allowed except to the extent that it is

"unenforceable against the debtor and property of the debtor, under any agreement or applicable

law."  11 U.S.C. § 502(b)(1).  A claim is defined as a "right to payment."  11 U.S.C. § 101(5).

The Note Holders do not have a "right to payment" and thus do not hold valid claims against the

Debtors.

       11.    The Note Holders seek to recover from LBSF on account of the Series

2006-7 Notes, but LBSF neither issued nor guaranteed those notes.  Moreover, there is no swap

agreement in connection with the Series 2006-7 Notes to which LBSF is a party.  The Note

Holders admit this, and the Series Prospectus issued for the Series 2006-7 Notes confirms it.

(*See* Addendums to No Liability Claims ¶ 1 ("All of the note series in the Program *apart from*

*Series 2006-7* . . . involved the Issuer entering into a number of credit default swap transactions

with [LBSF].") (emphasis added); Series Prospectus issued June 29, 2006 at 20, attached hereto

as <u>Exhibit B</u> ("(iii) Swap Agreement (if applicable):  Not applicable").)  Accordingly, LBSF has

no contractual relationship or privity with, or obligation to, the Note Holders, and therefore the

Note Holders have no "right to payment" from the Debtors on the No Liability Claims.

12.    Unless the No Liability Claims are disallowed and expunged, the potential exists for recoveries by parties that do not hold valid claims against the Debtors' estates.  Thus, the Debtors request that the Court enter an order disallowing and expunging the No Liability Claims listed on Exhibit A.

### Notice

13.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Two Hundred Sixty-Second Omnibus Objection to Claims on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) each claimant listed on Exhibit A; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635].  The Debtors submit that no other or further notice need be provided.

14.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated:  February 6, 2012
        New York, New York

                                        /s/ Robert J. Lemons
                                        Robert J. Lemons

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

# EXHIBIT A

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 262: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 1 | CREDIT DISTRESSED BLUE LINE MASTER FUND, LTD. C/O BROWN RUDNICK LLP HOWARD STEEL, ESQ. SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26402 | Undetermined | No Liability Claim |
| 2 | HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD. ATTN: HOWARD STEEL BROWN RUDNICK LLP SVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26401 | Undetermined | No Liability Claim |
| 3 | HARBINGER CAPITAL PARTNERS SPECIAL SITUATIONS FUND L.P. ATTN: HOWARD STEEL, ESQ. BROWN RUDNICK LLP SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26400 | Undetermined | No Liability Claim |
| 4 | VARDE FUND IX, LP, THE C/O BROWN RUDNICK LLP HOWARD STEEL, ESQ SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26371 | Undetermined | No Liability Claim |
| 5 | VARDE FUND IX-A, LP, THE C/O BROWN RUDNICK LLP HOWARD STEEL, ESQ SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26370 | Undetermined | No Liability Claim |
| 6 | VARDE FUND V-B, L.P. , THE C/O BROWN RUDNICK LLP ATTN: HOWARD STEEL, ESQ. SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29233 | Undetermined | No Liability Claim |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 262: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|------|-------------|-------------|------------|---------|---------------------|----------------------------------|
| 7 | VARDE FUND VII, L.P., THE C/O BROWN RUDNICK LLP ATTN: HOWARD STEEL, ESQ. SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29237 | Undetermined | No Liability Claim |
| 8 | VARDE FUND VII-B, L.P., THE ATTN: HOWARD STEEL, ESQ. C/O BROWN RUDNICK LLP SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29244 | Undetermined | No Liability Claim |
| 9 | VARDE FUND VIII LP, THE C/O BROWN RUDNICK LLP HOWARD STEEL SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29401 | Undetermined | No Liability Claim |
| 10 | VARDE FUND, L.P., THE ATTN: HOWARD STEEL, ESQ. C/O BROWN RUDNICK LLP SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29242 | Undetermined | No Liability Claim |
| 11 | VARDE FUND, VI-A, L.P., THE ATTN: HOWARD STEEL, ESQ. C/O BROWN RUDNICK LLP SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29240 | Undetermined | No Liability Claim |
| 12 | VARDE INVESTMENT PARTNERS (OFFSHORE) MASTER, LP C/O BROWN RUDNICK LLP HOWARD STEEL, ESQ SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26369 | Undetermined | No Liability Claim |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 262: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 13 | VARDE INVESTMENT PARTNERS, LP C/O BROWN RUDNICK LLP HOWARD STEEL, ESQ SEVEN TIMES SQUARE NEW YORK, NY 10036 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26373 | Undetermined | No Liability Claim |
| | | | | | TOTAL | $0.00 | |

# EXHIBIT B

# SAPHIR FINANCE PUBLIC LIMITED COMPANY

*(incorporated with limited liability in Ireland)*

### SERIES NO: 2006-7

## £400,000,000 Perpetual Non-Cumulative Securities

### secured over the

## £400,000,000 Series A Fixed/Floating Rate
## Non-Cumulative Callable Preference Shares

of

# NORTHERN ROCK PLC

### issued pursuant to the
### Multi-Issuer
### Secured Obligation Programme

Issue Price: 100 per cent.

JOINT LEAD MANAGERS

BARCLAYS CAPITAL                    LEHMAN BROTHERS

The date of this Series Prospectus is 29 June 2006.

This Series Prospectus (hereinafter, the "**Series Prospectus**") applicable to the issue by Saphir Finance Public Limited Company (the "**Issuer**") of £400,000,000 Perpetual Non-Cumulative Securities (the "**Securities**") should be read in conjunction with the Base Prospectus dated 22 July 2005 (the "**Base Prospectus**") and the Accounts (as defined below) relating to the Multi-Issuer Secured Obligation Programme and the issuance by the Issuer of notes thereunder (the "**Programme**"), which is deemed to be incorporated herein by reference (see "Incorporation by Reference" below).

Terms defined in the Base Prospectus have the same meaning in this Series Prospectus. This Series Prospectus (including the information incorporated by reference herein) once filed with and approved by the Irish Financial Services Regulatory Authority (the "**IFSRA**"), will constitute a prospectus for the purposes of Article 5 of Directive 2003/71/EC (the "**Prospectus Directive**"). This Series Prospectus is to be read in conjunction with all documents which are deemed to be incorporated herein by reference.

The obligations of the Issuer under the Securities will be secured as described in "Security Arrangements" below.

Subject as set out below, the Issuer accepts responsibility for the information contained in this Series Prospectus. To the best of the knowledge and belief of the Issuer, having taken all reasonable care to ensure that such is the case, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

**Extracts from the Collateral Prospectus (as defined herein) are attached in Annex 1 hereto. Annex 1 to this Series Prospectus forms part of, and should be read together with, this Series Prospectus. However, none of the Issuer, the Arranger, Barclays Bank PLC or Lehman Brothers International (Europe) (in its capacity as a Manager) (each a "Manager" and together the "Managers" or "Joint Lead Managers") is responsible for the Collateral Prospectus or any part thereof or any information contained therein and none of them have authorised the contents of the Collateral Prospectus.**

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. In respect of the summary information under the heading "Summary of Collateral Prospectus" below, together with the extracts from the Collateral Prospectus, the Issuer accepts responsibility that such information has been accurately extracted or reproduced from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Collateral Prospectus, no facts have been omitted which would render the reproduced information misleading.

Application has been made to the IFSRA, as competent authority under the Prospectus Directive, for this Series Prospectus to be approved. Application has also been made to The Irish Stock Exchange Limited (the "**Irish Stock Exchange**") for the Securities to be admitted to the daily official list of the Irish Stock Exchange (the "**Official List**") and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

The Securities are expected on issue to be assigned a rating of BBB+ by Standard and Poor's, a division of The McGraw Hill Companies, Inc. ("**S&P**"), a rating of A3 by Moody's Investors Service, Inc. ("**Moody's**") and a rating of A by Fitch Ratings Ltd ("**Fitch**"). However, there is no assurance that the Issuer will be able to obtain such ratings for the Securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the ratings assigned to the Securities may adversely affect the market price of the Securities.

**Purchasers of Securities should note that the Securities are secured over the Collateral (as defined herein). The payment of any amounts of principal, interest or otherwise in respect of the Securities will be dependent on the payment of dividends and other sums under the Collateral from time to time. To the extent that the Issuer does not receive dividends under the Collateral pursuant to their terms in respect of any dividend period, interest for the correlating interest period under the Securities shall not be payable. The dividends on the Collateral will only be paid at the discretion of the Directors of Northern Rock plc (the "Collateral Issuer") and are non-cumulative and, in addition, in certain circumstances such dividends shall not be paid. The Securities will have no maturity. The Securities will be redeemable upon the redemption of the Collateral in accordance with its terms or if certain other events occur in respect of the Collateral or the Collateral Issuer (see "Terms and Conditions of the Securities – 38(ii) Details of any other additions or variations to the Conditions") or if a tax event or event of default occurs in relation to the Issuer. In certain circumstances, the Collateral may be delivered to the Holders of Securities upon redemption. Claims of the Holders of Securities will be limited in recourse to the Mortgaged Property, consisting, inter alia, of the Collateral issued by the Collateral Issuer.**

2

Purchasers of Securities should conduct such independent investigation and analysis regarding the Issuer, the security arrangements and the Securities as they deem appropriate to evaluate the merits and risks of an investment in the Securities. Furthermore, in relation to the issue of the Securities, no representation, warranty or undertaking, express or implied is or will be made and no responsibility or liability to any holder of Securities is or will be accepted by the Collateral Issuer as to the accuracy or completeness of the information contained in this Series Prospectus or any other information provided by the Issuer in connection with the Securities.

The Arranger and the Joint Lead Managers make no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Securities and accept no responsibility or liability therefor.

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Securities or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "**Sterling**" and "**£**" are to the currency of the United Kingdom and references to the "**Managers**" or to a "**Manager**" shall be construed as a reference to "**Dealers**" or to a "**Dealer**" and references to "**Securities**", a "**Security**" and to "**Holders of Securities**" shall be construed as references to "**Notes**", a "**Note**" and "**Noteholders**" respectively for the purposes of the Base Prospectus and the Conditions.

In connection with the issue of the Securities, the Stabilising Managers (or persons acting on behalf of the Stabilising Managers) may over-allot Securities (provided that the aggregate principal amount of Securities allotted does not exceed 105 per cent. of the aggregate principal amount of the Securities) or effect transactions with a view to supporting the market price of the Securities at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilising Managers (or persons acting on behalf of either of the Stabilising Managers) will undertake stabilisation action. Any stabilisation action may begin on or after the date on which adequate public disclosure of this Series Prospectus is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the Issue Date and 60 days after the date of the allotment of the Securities.

**Incorporation by Reference**

This Series Prospectus should be read and construed in conjunction with the following documents which have been previously published or are published simultaneously with this Series Prospectus and that have been approved by the IFSRA or filed with it and shall be deemed to be incorporated in, and form part of, this Series Prospectus:

(1)    the Base Prospectus;

(2)    the audited financial statements of the Issuer for the period from its incorporation on 21 March 2003 to 31 January 2004 and for the financial year ended 31 January 2005 together with the audit reports thereon (the "**Accounts**");

save that any statement contained in any of the documents incorporated by reference in, and forming part of this Series Prospectus shall be deemed to be modified or superseded for the purpose of this Series Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Series Prospectus. This Series Prospectus must be read in conjunction with the Base Prospectus (including the Accounts) and full information on the Issuer and the offer of the Securities is only available on the basis of the combination of the provisions set out within this document and the Base Prospectus (including the Accounts).

The Base Prospectus (including the Accounts) is available for viewing at, and copies may be obtained free of charge from, the office of the Irish Paying Agent specified herein.

4

# TABLE OF CONTENTS

|  | Page |
|---|---|
| SUMMARY | 6 |
| RISK FACTORS | 10 |
| TERMS AND CONDITIONS OF THE SECURITIES | 13 |
| USE OF PROCEEDS | 26 |
| TAXATION | 27 |
| SUMMARY OF COLLATERAL PROSPECTUS | 30 |
| GENERAL INFORMATION | 31 |
| ANNEX 1 – EXTRACTS FROM THE COLLATERAL PROSPECTUS | A-1 |
| ANNEX 2 – PROGRAMME TERMS AND CONDITIONS OF THE SECURITIES | B-1 |

# SUMMARY

*The following summary is an introduction to this Series Prospectus and is qualified in its entirety by the remainder of this Series Prospectus. Any decision to invest in the Securities should be based on a consideration of the Series Prospectus as a whole, including the documents incorporated herein by reference.*

### Summary

The Issuer, Saphir Finance Public Limited Company, is a company incorporated in Ireland. On the Issue Date, the Issuer will issue its Series 2006-7 £400,000,000 Perpetual Non-Cumulative Securities (the "**Securities**") and subscribe for the £400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares (the "**Collateral**") to be issued by Northern Rock plc (the "**Collateral Issuer**") on the Issue Date.

The Securities are direct, secured and limited recourse obligations of the Issuer payable solely out of the assets and/or agreements secured by the Issuer in favour of the Trustee on behalf of the Holders of Securities, consisting, *inter alia*, of the Collateral.

Interest is payable on the Securities on the basis summarised below and as set out in the Conditions of the Securities. To the extent that the Issuer does not receive dividends under the Collateral pursuant to their terms in respect of any dividend period, interest for the correlating interest period under the Securities shall not be payable. Similarly, if the Issuer receives part payment of the dividend payable in respect of the Collateral, the interest payment in respect of the Securities will be reduced accordingly.

The Securities have no stated maturity date. The Securities may be redeemed if certain redemption or other events occur in respect of the Collateral or the Collateral Issuer (as described in "Redemption of the Securities by reason of redemption of the Collateral or events relating to the Collateral Issuer" below). The Securities may also be redeemed following the occurrence of an event of default or tax event in relation to the Issuer. Redemption shall be in certain circumstances by cash settlement and in certain circumstances by physical settlement as described herein.

### Summary Terms of the Securities

The following summary describes the principal terms of the Securities and should be read in conjunction with the full terms and conditions of the Securities which comprise the terms and conditions set out in pages 22 to 51 of the Base Prospectus (a copy of which is set out in Annex 2 of this Series Prospectus), as modified and supplemented by the terms and conditions set out under the heading "Terms and Conditions of the Securities" in this Series Prospectus.

| | |
|---|---|
| Issuer | Saphir Finance Public Limited Company, a company incorporated with limited liability in Ireland. |
| Series of Securities | Series 2006-7 |
| Issue Date | 29 June 2006 |
| Currency of Issue | Sterling (£) |
| Principal Amount of Series | £400,000,000 |
| Issue Price | 100 per cent. |
| Denomination | £50,000. So long as the Securities are represented by a Global Note and the relevant clearing system(s) so permit, the Securities shall be tradeable in minimum principal amounts of £50,000 and integral multiples of £1,000 above £50,000. |
| Interest Commencement Date | 29 June 2006 |
| Interest Rate | In respect of any Interest Accrual Period commencing in the period from (and including) the Interest Commencement Date to (but excluding) 4 July 2016 (the "**Fixed Rate Period End Date**"), the Interest Rate shall be equal to 6.8509 per cent. per annum. |

|  | In respect of any Interest Accrual Period commencing on or after the Fixed Rate Period End Date, the Interest Rate in respect of any Interest Accrual Period shall be equal to the aggregate of 1.66 per cent. per annum and LIBOR (as defined herein). |
|---|---|
| **Interest Payment Dates** | In respect of the period from (and including) the Interest Commencement Date to (but excluding) the Fixed Rate Period End Date, 4 July in each year (unadjusted). The first Interest Payment Date shall be 4 July 2007. |
|  | In respect of the period from (and including) the Fixed Rate Period End Date, 4 January, 4 April, 4 July and 4 October in each year, subject in each case to adjustment in accordance with the Modified Following Business Day Convention. |
|  | An Interest Amount shall only be payable in respect of each Security on an Interest Payment Date to the extent that the Issuer has received on or before such Interest Payment Date, a dividend payment in respect of the Specified Number of Preference Shares which is equal to the Interest Amount that is scheduled to be paid on such Interest Payment Date. |
|  | To the extent that the Issuer receives on or before such Interest Payment Date a dividend payment in respect of the Specified Number of Preference Shares that is less than the Interest Amount that would otherwise be payable on such Interest Payment Date, then the Interest Amount payable in respect of each Security on such Interest Payment Date shall be equal to such lesser dividend payment. |
|  | The Issuer shall as soon as practicable, and in any event within one Business Day after receiving a notification from the Collateral Issuer pursuant to the terms of the Collateral that it has resolved not to pay a dividend on the Collateral, notify the Issuing and Paying Agent which shall in turn notify the Holders of Securities of the same in accordance with Condition 14 (*Notices*). |
|  | "**Business Day**" means a day on which banks in London are open for business and on which foreign exchange dealings may be conducted in London. |
|  | "**Specified Number**" means a number equal to the Denomination divided by £1,000. |
| **First Call Date** | 4 July 2016 |
| **Collateral** | £400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares issued by the Collateral Issuer. The Collateral may be substituted by Qualifying Tier 1 Securities. |
| **Mortgaged Property** | In addition to security over the Collateral, the Issuer has also granted security over its rights under the deed poll made on the Issue Date by the Collateral Issuer in respect of the Collateral and its rights under certain other agreements entered into in connection with the Securities. |
| **Maturity Date** | The Securities have no stated maturity date. |
| **Redemption of the Securities by reason of redemption of the Collateral or events relating to the Collateral Issuer** | The Securities will be redeemed in full if: |
|  | (i)   the Collateral Issuer exercises its option to redeem the Collateral in full on the First Call Date or on any Preference Dividend Payment Date thereafter (as described in the Collateral Prospectus); |

7

(ii)    the Collateral Issuer exercises its option to redeem the Collateral in full at any time prior to the First Call Date upon the occurrence of a Regulatory Event (as described in the Collateral Prospectus);

(iii)   the Collateral Issuer pays a dividend to holders of Junior Obligations or Parity Obligations or cancels, redeems, purchases, reduces or otherwise acquires any Junior Obligations or any Parity Obligations in each case during a Dividend Stopper Period (as described in the Collateral Prospectus);

(iv)   the Collateral Issuer breaches any class right attaching to the Collateral in any other respect which the Trustee declares is in its opinion materially prejudicial to the interests of the Holders of Securities; or

(v)    the winding up of the Collateral Issuer is commenced.

If the Collateral Issuer elects to redeem the Preference Shares in the circumstances described in (i) and (ii) above and does redeem the Preference Shares, the Issuer will be obliged to redeem each Security by cash settlement at its Early Redemption Amount. Where a Security is to be redeemed by cash settlement in the circumstances described in (i) and (ii), the Early Redemption Amount shall be an amount equal to the redemption proceeds received by the Issuer in respect of a Specified Number of Preference Shares (which is expected to be equal to the outstanding principal amount of each Security in the circumstances described in (i) and an amount equal to the product of the Specified Number and the Make-Whole Redemption Price (as defined in the Collateral Prospectus) in the case of the circumstances described in (ii)).

If the Collateral Issuer elects to redeem the Preference Shares in the circumstances described in (i) and (ii) but fails to do so or in the circumstances described in (iii) to (v) above, each Security shall be redeemed at its Early Redemption Amount by physical settlement.

Where a Security is redeemed by physical settlement, it shall be redeemed at its Early Redemption Amount, which will be a Specified Number of Preference Shares less such amount of the Collateral as is required to be liquidated to pay the Redemption Costs (defined herein) (if applicable).

| | |
|---|---|
| **Early Redemption by reason of events relating to the Issuer** | The Securities may also be redeemed in cash if: |

(i)    the Issuer would be required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make the full payment due in respect of the Securities and the Issuer has not arranged the substitution of a company incorporated in another jurisdiction approved by the Trustee as the principal debtor in respect of the Securities;

(ii)   the Issuer fails to pay any interest or principal due on the Securities; or

(iii)   the Issuer fails to perform any of its other obligations under the Securities and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) following notice to the Issuer requiring the same to be remedied;

8

|  | (iv) an administrator, examiner or liquidator is appointed or any resolution is passed for the winding-up or dissolution of the Issuer. |
|---|---|
|  | On an early redemption of the Securities in such circumstances, the Securities shall be redeemed by cash settlement and the Holders of Securities shall receive the Early Redemption Amount in respect of each Security, which shall be an amount equal to such Security's *pro rata* proportion (determined by reference to the Securities being redeemed) of the net realised proceeds of sale of the Collateral by the Disposal Agent acting on behalf of the Issuer together with a proportion of any income received by the Issuer in respect of the Collateral which has not otherwise been distributed as interest to the Holders of Securities equal to such *pro rata* proportion. |
| **Form of Securities** | Bearer |
| **Ratings** | The Securities are expected to be rated by BBB+ by S&P, A3 by Moody's and A by Fitch. A rating is not a recommendation to buy, sell or hold Securities and may be subject to revision, suspension or withdrawal at any time. |
| **ISIN** | XS0259175536 |
| **Arranger** | Lehman Brothers International (Europe) |
| **Joint Lead Managers** | Barclays Bank PLC and Lehman Brothers International (Europe) |
| **Trustee** | J.P. Morgan Corporate Trustee Services Limited |
| **Issuing and Paying Agent** | JPMorgan Chase Bank, N.A. |
| **Account Bank** | JPMorgan Chase Bank, N.A. |
| **Calculation Agent and Disposal Agent** | Lehman Brothers International (Europe) |
| **Irish Paying Agent** | J.P. Morgan (Ireland) plc |
| **Listing** | Application has been made to the Irish Financial Services Regulatory Authority, as competent authority under the Prospectus Directive, for the Series Prospectus to be approved. Application has been made to the Irish Stock Exchange for the Securities to be admitted to the Official List and trading on its regulated market. |
| **Clearing** | Euroclear/Clearstream |
| **Governing Law** | English law |

### RISK FACTORS

*The purchase of Securities may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Securities. Before making an investment decision, prospective purchasers of Securities should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Series Prospectus and in the Base Prospectus.*

*Neither the Issuer nor the Managers represent that the statements below regarding the risks of holding any Securities are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Securities for reasons other than those described below. The Issuer and the Managers disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Series Prospectus or as they change from time to time.*

*The attention of prospective investors is also drawn to the sections headed "Risk Factors" in the Base Prospectus and the Collateral Prospectus (extracts from which are annexed to this Series Prospectus).*

#### Limited recourse nature of Securities

The Securities are secured, *inter alia*, by way of an English law first fixed charge over the Collateral and by an English law assignment of the Issuer's rights in respect of the Collateral and amounts derived therefrom. The Securities are limited recourse obligations of the Issuer payable solely out of the assets and/or agreements secured in respect of the Securities and the Issuer will have no other assets or sources of revenue available for payment of any of its obligations under the Securities. In particular, but without limitation to the foregoing, assets secured in respect of other securities, notes or obligations issued by the Issuer will not be available for payment of obligations in respect of the Securities.

The amount of payments Holders of Securities are entitled to receive in respect of the Securities is therefore dependent on the amounts received by the Issuer in respect of the Collateral and upon all the parties to the Trust Deed, the Agency Agreement and the other agreements relating to the issue of the Securities performing their respective obligations thereunder. Accordingly, Holders of Securities are exposed, *inter alia*, to the creditworthiness of the Collateral Issuer in respect of the Collateral. See the section headed "Risk Factors" in the Collateral Prospectus (extracts from which are annexed to this Series Prospectus) which includes various investment considerations concerning the Collateral. The Securities are not obligations of, or guaranteed in any way by, the Collateral Issuer or any Manager.

#### Securities have no Maturity Date

Holders of Securities should be aware that the Securities have no stated maturity date. The Holders of Securities will receive interest payments under the Securities (subject to the Issuer receiving corresponding payments of dividends under the Collateral from the Collateral Issuer) until there is a mandatory redemption if certain redemption or other events occur in respect of the Collateral (see "Terms and Conditions of the Securities – 38(ii) Details of any other additions or variations to the Conditions") or until there is an early redemption following the occurrence of an event of default or tax event in respect of the Issuer.

#### Redemption of the Securities by reason of redemption of the Collateral or events relating to the Collateral Issuer

Holders of Securities should be aware that there will be a redemption of the Securities in the following circumstances: (i) the Collateral Issuer exercises its option to redeem the Collateral in full on the First Call Date or on any Preference Dividend Payment Date thereafter (as described in the Collateral Prospectus); (ii) the Collateral Issuer exercises its option to redeem the Collateral in full at any time prior to the First Call Date upon the occurrence of a Regulatory Event (as described in the Collateral Prospectus); or (iii) in the other limited circumstances described in Condition 6(c) (see "Terms and Conditions of the Securities – 38 (ii) Details of any other additions or variations to the Conditions").

On mandatory redemption of the Securities, in the circumstances described in (i) and (ii) above where the Collateral Issuer does redeem the Preference Shares, each Security shall be redeemed by cash settlement at its Early Redemption Amount and, in the circumstances referred to in (iii) above, each Security shall be redeemed by physical settlement at its Early Redemption Amount (see "Terms and

Conditions of the Securities – 44 (i) Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)) or the method of calculating the same (if required or if different from that set out in the Conditions)").

### Redemption following an Event of Default or a Tax Event

Holders of Securities should be aware that the Securities may become subject to early redemption in the events described in Condition 6(d)(i) or in Condition 10. On an early redemption of the Securities in such circumstances, the Securities shall be redeemed by cash settlement and the Holders of Securities shall receive the Early Redemption Amount of the Securities (see "Terms and Conditions – 44 (ii) Early Redemption Amount payable on redemption for taxation and other reasons (Condition 6(d)) or pursuant to Condition 10).

### Redemption Costs

Where the Securities are to be redeemed in cash following any of the limited number of events referred to under "Redemption following an Event of Default or a Tax Event" above, the amount receivable by Holders of Securities in respect of each Security shall be equal to the realisation proceeds of sale of the relevant proportion of Collateral net of the costs and expenses of effecting the disposal of such Collateral, including any sum necessary to cover any transfer or other tax or other governmental charge that may be imposed in relation thereto (the "**Redemption Costs**"). Where the Securities are to be redeemed by way of physical settlement in the limited circumstances referred to above, the relevant Collateral to be delivered or transferred in respect of each Security shall be reduced by Collateral with a value equal to the relevant Redemption Costs. In the event of any such redemption, no assurance can be given as to the availability of a liquid secondary market for the Collateral or as to the price at which such Collateral may be sold or as to the relevant Redemption Costs.

### No Recourse against Collateral Issuer

An investment in the Securities is not the same as an investment directly in the Collateral. Investors in the Securities will not have rights in or against the Collateral and will have no recourse against the Collateral Issuer. Investors must recognise that it is likely that the only assets which will be available to the Issuer to meet any claims against it by Holders of Securities will be the assets which comprise the security for the Securities.

Furthermore, if the Collateral Issuer should default in the performance of any of its obligations under the Collateral, no Holder of Securities shall be entitled to proceed against the Collateral Issuer.

### Physical Settlement of the Securities

The Securities may be physically-settled, meaning that, upon the occurrence of certain circumstances, each Security shall be redeemed and the Issuer shall deliver or transfer to the Holders of Securities on the Early Redemption Date a Specified Number of Preference Shares in respect of each Security, less such amount of the Collateral as is required to be liquidated to pay Redemption Costs (if applicable). The physical delivery or transfer of the Preference Shares may be delayed if there is a settlement disruption, or if the Disposal Agent determines that it is impossible or illegal to deliver some or all of the Preference Shares, and in such circumstances an amount in cash equal to the value of such Preference Shares may be paid to the Holders of Securities.

### The Holders of Securities have limited voting rights

The Holders of Securities will only be eligible to give directions in respect of voting at general meetings of the Collateral Issuer in limited circumstances (see "Risk Factors" in the Collateral Prospectus).

### No Guarantee

The Securities will not be guaranteed by the Issuer, the Arranger, the Managers, the Trustee, the Calculation Agent or any of their respective affiliates. Consequently, if the Holders of Securities do not receive any interest payments under the Securities, or if the net realised proceeds or the redemption price of the Collateral are insufficient to make all payments upon redemption of the Securities, investors may incur a loss on their investment.

**Credit Ratings**

Credit ratings are only assigned by S&P, Moody's and Fitch in respect of the timely payment of interest on the Securities. Credit ratings of Securities represent S&P's, Moody's and Fitch's opinions regarding their credit quality and are not a guarantee of quality. S&P's, Moody's and Fitch's attempts to evaluate the safety of interest payments and do not evaluate the risks of fluctuations in market value. Therefore, the ratings assigned to the Securities by S&P, Moody's and Fitch may not fully reflect the true risks of an investment in such Securities. The ratings assigned to the Securities by S&P, Moody's and Fitch are based on, *inter alia*, the credit risk of the Collateral and the credit risk of the Collateral Issuer. There is no assurance that any such ratings will continue for any period of time or that they will not be reviewed, revised, suspended or withdrawn entirely by S&P, Moody's and Fitch as a result of changes in or unavailability of information or if, in S&P's, Moody's or Fitch's judgement, circumstances so warrant. Future events, including without limitation, events affecting the Collateral Issuer could also have an adverse impact on the ratings of the Securities.

**Business Relationships**

The Issuer, the Managers or any affiliate may have existing or future business relationships with the Collateral Issuer and the Managers or any affiliate may have existing or future business relationships with the Issuer (including, but not limited to, lending, depository, risk management, advisory and banking relationships), and will pursue actions and take steps that they deem or it deems necessary or appropriate to protect their or its interests arising therefrom without regard to the consequences for a Holder of Securities.

## TERMS AND CONDITIONS OF THE SECURITIES

The terms of the Securities and additional provisions relating to their issue are as follows. Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Collateral Prospectus, extracts from which are set out in Annex 1 hereto. The Conditions as set out in pages 22 to 51 of the Base Prospectus, to which the following provisions are supplemental, are also set out in Annex 2 hereto. References in the Conditions to "Final Terms" shall be construed as references to these additional provisions. References in the Conditions to "Notes", a "Note" and to "Noteholders" shall be construed as references to "Securities", a "Security" and "Holders of Securities".

| | | |
|---|---|---|
| 1 | Issuer: | Saphir Finance Public Limited Company |
| 2 | Series No: | 2006-7 |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN | XS0259175536 |
| | Common Code | 25917553 |
| 5 | Currency: | Sterling ("£"). |
| 6 | Principal Amount of Securities to be admitted to trading: | £400,000,000 |
| 7 | Issue Date: | 29 June 2006 |
| 8 | Form: | Bearer. |
| 9 | Denomination: | (i) £50,000. |
| | | (ii) Integral multiples of £1,000 above £50,000. |

> *So long as the Securities are represented by a Global Note and the relevant clearing system(s) so permit, the Securities shall be tradeable in minimum principal amounts of £50,000 and integral multiples of £1,000 thereafter. In the event that the Permanent Global Note or Temporary Global Note is exchanged for Definitive Securities, such Definitive Securities shall be issued in the denomination of £50,000 only. Holders of Securities who hold amounts in the relevant clearing system(s) in amounts that are not integral multiples of £50,000, may need to sell or purchase, on or before the date on which the Permanent Global Note or Temporary Global Note is exchanged for Definitive Securities, a principal amount of Securities such that their holding is an integral multiple of £50,000*

| | | |
|---|---|---|
| 10 | Status: | Secured and limited recourse obligations, as described under "Security Arrangements" below. |
| 11 | Interest Commencement Date: | 29 June 2006 |
| 12 | Interest Rate (including after Maturity Date): | In respect of any Interest Accrual Period commencing in the period from (and including) the Interest Commencement Date to (but excluding) 4 July 2016 (the "**Fixed Rate Period End Date**"), the Interest Rate shall be equal to 6.8509 per cent. per annum. |
| | | In respect of any Interest Accrual Period commencing on or after the Fixed Rate Period End Date, the Interest Rate shall be equal to the aggregate of 1.66 per cent. per annum and LIBOR. |

13

For the purposes hereof, "**LIBOR**" means, in respect of any Interest Accrual Period, the offered rate for three month deposits in sterling as at 11.00 a.m. London time on the related Interest Determination Date appearing on the display designated as page "LIBOR01" on the Reuters Service (or such other page or service as may replace it for the purpose of displaying such information) as determined by the Calculation Agent.

"**Interest Determination Date**" means, in respect of any Interest Accrual Period commencing on or after the Fixed Rate Period End Date, the first day of such Interest Accrual Period.

| | | |
|---|---|---|
| 13 | Interest Payment Date(s): | In respect of the period from (and including) the Interest Commencement Date to (but excluding) the Fixed Rate Period End Date, 4 July in each year (unadjusted). The first Interest Payment Date shall be 4 July 2007. |

In respect of the period from (and including) the Fixed Rate Period End Date and thereafter means 4 January, 4 April, 4 July and 4 October in each year, subject in each case to adjustment in accordance with the Modified Following Business Day Convention.

An Interest Amount shall only be payable in respect of each Security on an Interest Payment Date to the extent that the Issuer has received on or before such Interest Payment Date, a dividend payment in respect of the Specified Number of Preference Shares which is equal to the Interest Amount that is scheduled to be paid on such Interest Payment Date. To the extent that the Issuer receives on or before such Interest Payment Date a dividend payment in respect of the Specified Number of Preference Shares that is less than the Interest Amount that would otherwise be payable on such Interest Payment Date, then the Interest Amount payable in respect of each Security on such Interest Payment Date shall be equal to such lesser dividend payment.

The Issuer shall as soon as practicable, and in any event within one Business Day, after receiving a notification from the Collateral Issuer pursuant to the terms of the Collateral that it has resolved not to pay a dividend on the Collateral, notify the Issuing and Paying Agent which shall in turn notify the Holders of Securities of the same in accordance with Condition 14 (*Notices*).

"**Business Day**" means a day on which banks in London are open for business and on which foreign exchange dealings may be conducted in London.

"**Specified Number**" means a number equal to the Denomination divided by £1,000.

| | | |
|---|---|---|
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate Securities): | Not applicable. |

14

| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
|---|---|---|
| 16 | ISDA Determination (Condition 5(c) (i)): | Not applicable. |
| 17 | Margin (if applicable): | Not applicable. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Subject to paragraph 13, the Interest Amount payable in respect of each Security on any Interest Payment Date equals, in respect of the Interest Accrual Period ending on (but excluding) such Interest Payment Date, the product of (i) the Interest Rate (ii) the Day Count Fraction and (iii) the oustanding principal amount of each Security on the relevant Interest Payment Date. The Interest Amount payable on the first Interest Payment Date shall, subject to paragraph 13, be £69.45 per £1,000 principal amount. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | In respect of each Interest Accrual Period commencing in the period from (and including) the Interest Commencement Date to (but excluding) the Fixed Rate Period End Date, means a fraction equal to the actual number of days in the period from (and including) the first day of the relevant Interest Accrual Period to (but excluding) the date on which the relevant interest falls due divided by the actual number of days from (and including) the first day of the relevant Interest Accrual Period to (but excluding) the next following Interest Payment Date.

In respect of each Interest Accrual Period commencing in the period from (and including) the Fixed Rate Period End Date, means a fraction equal to the actual number of days elapsed in the relevant period divided by 365 or, in the case of a payment falling due in a leap year, 366. |
| 25 | Interest Period Date(s) (if applicable): | Not applicable. |
| 26 | Maturity Date: | The Securities have no stated maturity date but may be redeemed in the circumstances set out in paragraph 38 or pursuant to Condition 6(d) or Condition 10. |
| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Redemption (in accordance with Condition 6(c)): | See paragraph 38 below. |

| 31 | Instalment Date(s) (if applicable): | Not applicable. |
|----|-------------------------------------|-----------------|
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Securities and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | London. |
| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
| 37 | Additional Fungible Issues Permitted: | Yes. |
| 38 | Details of any other additions or variations to the Conditions (if applicable): | |

(i)  Condition 4(h) (*Issuer's Rights as Holder of the Mortgaged Property*) shall be amended by the insertion of the words:

"Subject as provided below"

to the beginning of the first sentence thereof and by the addition of the following after the third sentence thereof:

"On any matter in respect of which the Issuer, under the terms of the Collateral is (1) entitled to vote and (2) receives notification of such rights and appropriate voting documentation, such voting documentation will be made available to Holders of Securities at the offices of the Issuing and Paying Agent and Holders of Securities will be notified by or on behalf of the Issuer in accordance with the Conditions of the same. Once notified, Holders of Securities may give instructions in respect of voting on any such matter in accordance with the operating procedures of Euroclear and Clearstream, Luxembourg or such other procedures (if any) as may be specified by or on behalf of the Issuer. Each Holder of Securities shall be entitled to give such instructions in respect of a portion of the Collateral equal in nominal value to the proportion that the principal amount of Securities attributable to such Holder of Securities bears to the aggregate outstanding principal amount of all the Securities. The Issuer shall exercise such voting rights as the Issuer may have in respect of the Collateral or shall arrange for such voting rights to be exercised in accordance with the instructions of the Holders of Securities provided that the Holders of

16

Securities give notice of how they wish such votes to be cast as outlined by or on behalf of the Issuer. If no such instructions are received with respect to a Holder of Securities' *pro rata* share of voting rights, such voting rights will not be exercised."

(ii)  Condition 6(c) (*Mandatory Redemption*) shall be deleted in its entirety and replaced with the following:

"If any of the following events occur:

(i)  the Collateral Issuer exercises its option to redeem the Collateral in full on the First Call Date or on any Preference Dividend Payment Date thereafter (as described in the Collateral Prospectus);

(ii)  the Collateral Issuer exercises its option to redeem the Collateral in full at any time prior to the First Call Date upon the occurrence of a Regulatory Event (as described in the Collateral Prospectus);

(iii)  the Collateral Issuer pays a dividend to holders of Junior Obligations or Parity Obligations or cancels, redeems, purchases, reduces or otherwise acquires any Junior Obligations or any Parity Obligations in each case during a Dividend Stopper Period (as described in the Collateral Prospectus);

(iv)  the Collateral Issuer breaches any class right attaching to the Collateral in any other respect which the Trustee declares is in its opinion materially prejudicial to the interests of the Holders of Securities; or

(v)  the commencement of the winding up of the Collateral Issuer,

then the Issuer shall forthwith give notice thereof to the Trustee and the Holders of Securities (which notice shall be irrevocable) and the Issuer will redeem the Securities in full at their Early Redemption Amount on the date determined in accordance with the Conditions.

For the purposes of Condition 6(c), the commencement of the winding up of the Collateral Issuer means the Collateral Issuer:

(1)  institutes or has instituted against it a proceeding seeking a judgment of insolvency or any other relief under

17

any insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and in the case of any such proceeding or petition, such proceeding or petition:

(A) results in a judgment of insolvency or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(2) has a resolution passed for its winding-up, administration or liquidation (other than pursuant to a consolidation, amalgamation or merger); or

(3) seeks or becomes subject to the appointment of an administrator, provisional liquidator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets."

(iii) Notwithstanding Condition 14, so long as the Securities are represented by a Global Note held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system, notices in respect thereof may be given by their being delivered to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

| 39 | The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Securities are: | **Issuing and Paying Agent and Account Bank** |
|---|---|---|

**Issuing and Paying Agent and Account Bank**

JPMorgan Chase Bank, N.A.
Trinity Tower,
9 Thomas More Street,
London E1W 1YT

**Irish Paying Agent**

J.P. Morgan Bank (Ireland) plc
JP Morgan House
International Financial Services Centre
Dublin 1
Ireland

**Calculation Agent and Disposal Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Listing Agent**

A&L Listing
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**Security Arrangements**

40    Mortgaged Property:

    (i)    Collateral:

£400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares (the "**Preference Shares**").

At any time, the Collateral Issuer may at its option upon not less than 30 nor more than 60 days' notice, subject to the English Companies Act 1985 and all other laws and regulations applying to the Collateral Issuer, to the articles of association of the Collateral Issuer and to the FSA having indicated that it has no objection to such substitution, substitute Qualifying Tier 1 Securities (as defined in the Collateral Prospectus) for the Preference Shares comprising the Collateral. The substitution of the Preference Shares which comprise the Collateral shall be effected in such manner as may be authorised or permitted by law and as the board of directors of the Collateral Issuer shall from time to time determine, including by mandatorily applying any redemption proceeds of the Preference Shares to the subscription or purchase on behalf of the holders of the Preference Shares of Qualifying Tier 1 Securities, provided that the Collateral Issuer has first delivered to the registrar of the Collateral Issuer a certificate signed by two members of the board of directors of the Collateral Issuer certifying that the securities to be issued in substitution for the Preference Shares are, and that an independent investment bank agrees that they are, Qualifying Tier 1 Securities. In such circumstances, the Qualifying Tier 1 Securities issued in substitution for the Preference Shares comprising the Collateral shall become the Collateral for the purposes of the Securities and the Issuer may, without the prior consent of Holders of Securities, make such amendments to the Conditions of the Securities in connection with such substitution as the Trustee agrees are not materially prejudicial to the interests of such holders.

The Collateral will be held by the Issuer subject to the security interest created pursuant to the Trust Deed.

    (ii)    Security (order of priorities):

The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following

order of priorities:

Noteholder Priority.

(iii)   Swap Agreement (if applicable):    Not applicable.

**Provisions relating to Redemption**

41    Call Option (Condition 6(e)):    Not applicable.

42    Put Option (Condition 6(f)):    Not applicable.

43    Redemption Amount:    Not applicable.

44    (i)    Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)) or the method of calculating the same (if required or if different from that set out in the Conditions):

If the Collateral Issuer elects to redeem the Preference Shares in the circumstances described in Condition 6(c)(i) and 6(c)(ii) and does redeem the Preference Shares (as determined by the Calculation Agent), the Issuer will be obliged to redeem each Security by cash settlement at its Early Redemption Amount provided that, in the event that this amount exceeds the outstanding principal amount of the relevant Security, such excess shall be treated as additional interest. The date fixed for redemption for the purpose of such redemption shall be the date of redemption of the Preference Shares and shall be specified in the notice given by the Issuer pursuant to Condition 6(c).

If the Securities are to be redeemed by cash settlement pursuant to Condition 6(c)(i) or (ii), the "**Early Redemption Amount**" in respect of each Security is an amount equal to the redemption proceeds received by the Issuer in respect of a Specified Number of Preference Shares (which is expected to be equal to the outstanding principal amount of each Security in the circumstances described in (i) and an amount equal to the product of the Specified Number and the Make-Whole Redemption Price (as defined in the Collateral Prospectus) in the case of the circumstances described in (ii)) together with a proportion of any income received by the Issuer in respect of the Collateral which has not otherwise been distributed as interest to the Holders of Securities equal to the proportion that the principal amount of the Security bears to the aggregate principal amount of all Securities outstanding immediately prior to the date set for redemption (the "**Relevant Proportion**").

If (i) the Collateral Issuer elects to redeem the Preference Shares under Condition 6(c)(i) and (ii) but fails to do so; or (ii) any of the events described in Condition 6(c)(iii)(iv) or (v) occurs, the Issuer shall redeem each Security by physical settlement at its Early Redemption Amount on such date as the Issuer may specify in the notice given pursuant to Condition 6(c) falling not less than 15 Business Days nor more than 20 Business Days after the date on which the Preference Shares were required to be

redeemed (in the case of the events described in Condition 6(c)(i) and (ii)) or after the giving of such notice (in the case of the events described in Condition 6(iii), (iv) or (v)).

If the Securities are to be redeemed by physical settlement, the Early Redemption Amount in such case in respect of each Security will be a Specified Number of Preference Shares less such amount of the Collateral as is required to be liquidated to pay the Redemption Costs (if applicable).

The "**Redemption Costs**" mean the costs and expenses of effecting delivery or transfer of the Early Redemption Amount, including any sum necessary to cover any tax, including transfer tax, or other governmental charge that may be imposed in relation thereto.

If any Security falls to be redeemed by physical settlement, any delivery or transfer of the Early Redemption Amount shall be in accordance with applicable securities laws. In order to obtain delivery or transfer of the Early Redemption Amount as calculated above (the "**Asset Amount**"), an Asset Transfer Notice substantially in the form set out in the Supplemental Trust Deed and Drawdown Agreement (the "**Asset Transfer Notice**") must be delivered by or on behalf of each Holder of Securities to the Issuing and Paying Agent via Euroclear or Clearstream, Luxembourg as the case may be, by such method of delivery as Euroclear or Clearstream, Luxembourg as the case may be, shall have approved.

After delivery of an Asset Transfer Notice, no transfers of the Securities specified therein represented by a Global Note will be effected by Euroclear and/or Clearstream, Luxembourg.

Upon receipt of a duly completed Asset Transfer Notice, the Issuer will via the Issuing and Paying Agent request Euroclear or Clearstream, Luxembourg to verify that the person specified therein as the accountholder(s) is/are the holder(s) of the Securities referred to therein according to its books.

The Asset Amount will be delivered or transferred at the risk of the relevant Holder of Securities(s) on the due date for redemption of the Securities, provided that the Asset Transfer Notice is delivered not later than the close of business in London on the day (the "**Notice Cut-off Date**") which is seven Business Days before the due date for redemption of the Securities. If the Asset Transfer Notice is delivered after the Notice Cut-off Date, the due date for redemption shall be postponed until seven Business Days after the Asset Transfer

21

Notice is delivered. The Disposal Agent shall liquidate in respect of each Security an appropriate proportion of Collateral such that the net realised proceeds of such liquidation are sufficient to meet the Redemption Costs. If the Disposal Agent is unable to liquidate sufficient Collateral as aforesaid, the Issuing and Paying Agent shall be entitled to refuse to deliver or transfer the Early Redemption Amount to the relevant Holder of Securities until the Redemption Costs in respect of delivery or transfer to such Holder of Securities are paid in full.

If the relevant Holder of Securities or, as the case may be, the duly authorised representative of the relevant Holders of Securities fails to deliver an Asset Transfer Notice in the manner set out herein or delivers an Asset Transfer Notice on any day falling after the day that is 180 calendar days after the date notice has been given by the Issuer, the Issuer shall be discharged from its obligation in respect of such Security and shall have no further obligation or liability whatsoever in respect thereof.

If, prior to delivery or transfer of the Asset Amount, the Disposal Agent determines that delivery or transfer of the Asset Amount is not practicable by reason of a Settlement Disruption Event (as defined below) having occurred and continuing on the due date for delivery or transfer then that date shall be postponed to the first following Business Day in respect of which there is no such Settlement Disruption Event; provided, however, that, subject as provided below, in no event shall delivery or transfer be made later than the eighth Business Day after the originally scheduled date. If in respect of such eighth Business Day the delivery or transfer of the Asset Amount is not practicable by reason of a Settlement Disruption Event, then in lieu of physical settlement the Issuer may satisfy its obligations in respect of the relevant Security in cash on the third Business Day following such eighth Business Day notwithstanding any other provision hereof.

If the Asset Amount is delivered or transferred later than the originally scheduled due date for delivery or transfer, until delivery or transfer of the Asset Amount, the Issuer shall continue to be the legal owner of the Collateral. None of the Issuer, its affiliates, the Issuing and Paying Agent and any other person shall (i) be under any obligation to deliver or transfer or procure delivery or transfer to such Holder of Securities or any subsequent transferee any letter, certificate, notice, circular or any other document or payment whatsoever received by

22

that person in its capacity as the holder of the Collateral, (ii) be under any obligation to exercise or procure exercise of any or all rights (including voting rights) attaching to the Collateral until the date of delivery or transfer or (iii) be under any liability to such Holder of Securities or any subsequent transferee in respect of any loss or damage which such Holder of Securities or subsequent transferee may sustain or suffer as a result, whether directly or indirectly, of that person being the legal owner of the Collateral until the date of delivery.

The Asset Transfer Notice is irrevocable and must:

(i)   specify the number of Securities which are the subject of such notice;

(ii)   (A)   specify the name and number of the Holder of Securities' account at Euroclear or Clearstream, Luxembourg or any other relevant clearance system, as the case may be, to be debited with such Securities; and

(B)   irrevocably instruct and authorise Euroclear or Clearstream, Luxembourg or any other relevant clearance system, as the case may be, to debit the relevant Holder of Securities account with such Securities on the due date for payment in respect of the redemption of the Securities;

(iii)   authorise the production of such notice in any applicable administrative or legal proceedings; and

(iv)   provide details required for the delivery or transfer of the Collateral.

Failure properly to complete and deliver an Asset Transfer Notice may result in such notice being treated as null and void. Any determination as to whether such notice has been properly completed and delivered as provided in these Conditions shall be made by the Disposal Agent in its sole and absolute discretion and shall be conclusive and binding on the relevant Holder of Securities.

For the purposes of this Condition, "**Settlement Disruption Event**" means an event beyond the control of the Disposal Agent as a result of which the Disposal Agent cannot make delivery or transfer of the Asset Amount.

(ii)   Early Redemption Amount payable on redemption for taxation and other reasons (Condition 6(d)) or pursuant to Condition 10:

If the Securities are to be redeemed pursuant to Condition 6(d) or Condition 10, the "Early Redemption Amount" shall be, in respect of each Security, an amount equal to a proportion

23

of the net realised proceeds of sale received upon the sale of the Collateral (or such proportion of the Collateral as is being sold) by the Disposal Agent acting on behalf of the Issuer equal to the proportion that the outstanding principal amount of one Security bears to the aggregate principal amount of those Securities that are being redeemed immediately prior to the date fixed for redemption (the "**Redemption Proportion**") (provided that, in the event that this amount exceeds the outstanding principal amount of the relevant Security, such excess shall be treated as additional interest), together with a proportion of any income received by the Issuer in respect of the Collateral which has not otherwise been distributed as interest to the Holders of Securities equal to the Redemption Proportion.

For the purposes of determining the net realised proceeds of sale, any costs and expenses incurred by or on behalf of the Disposal Agent or the Issuer in effecting the sale of the Collateral shall be deducted, including any sum necessary to cover any tax, including transfer tax, or other governmental charge that may be imposed in relation thereto.

**Provisions applicable to Global Securities**

| 45 | Securities to be represented on issue by: | Temporary Global Note. |
|---|---|---|
| 46 | Applicable TEFRA exemption: | D Rules. |
| 47 | Global Note exchangeable for Definitive Securities at the request of the holder: | No. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Securities**

| 49 | | Details of any additions or variations to the selling restrictions: | Not applicable. |
|---|---|---|---|
| 50 | (i) | Listing and Admission to trading: | Application has been made to IFSRA, as competent authority under the Prospectus Directive, for the Series Prospectus to be approved. Application has been made to the Irish Stock Exchange for the Securities to be admitted to the Official List and to be admitted to trading on its regulated market. |
| | | | Where notices are given by or on behalf of the Issuer in accordance with these Conditions, such notice shall, to the extent required by the Irish Stock Exchange, also be given to the Companies Announcements Office of the Irish Stock Exchange. |
| | (ii) | Estimate of total expenses related to admission to trading: | All such expenses are to be met by the Arranger and will not be deducted from the net proceeds of the issue of the Securities. |
| 51 | | Method of issue of Securities: | Syndicated Issue. |

24

| 52 | The following Managers are subscribing the Securities: | (i) | Barclays Bank PLC of 5 The North Colonnade, Canary Wharf, London E14 4BB, United Kingdom; and |
| | | (ii) | Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom. |
| 53 | Stabilising Managers | (i) | Barclays Bank PLC; and |
| | | (ii) | Lehman Brothers International (Europe). |
| 54 | Rating: | | As of the Issue Date, ratings of BBB+, A3 and A are expected to be assigned to the Securities by S&P, Moody's and Fitch, respectively. The Issuer does not make any representation or undertaking as to the ratings of the Securities at any time. |

### USE OF PROCEEDS

The net proceeds of the issue of the Securities will be applied by the Issuer to purchase the Collateral (as described in "Summary of the Collateral Prospectus") on the Issue Date.

# TAXATION

## REPUBLIC OF IRELAND

*The following is a summary based on the laws and practices currently in force in Ireland regarding the tax position of investors beneficially owning their Securities and should be treated with appropriate caution. Particular rules may apply to certain classes of taxpayers holding Securities. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Securities should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Securities and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile.*

### Withholding Tax

In general, tax at the standard rate of income tax (currently 20 per cent), is required to be withheld from payments of Irish source interest. However, an exemption from withholding on interest payments exists under Section 64 of the Taxes Consolidation Act, 1997 (the "**1997 Act**") for certain securities ("**quoted Eurobonds**") issued by a body corporate (such as the Issuer) which are interest bearing and quoted on a recognised stock exchange (which would include the Irish Stock Exchange).

Any interest paid on such quoted Eurobonds can be paid free of withholding tax provided:

1    the person by or through whom the payment is made is not in Ireland; or

2    the payment is made by or through a person in Ireland, and either:

   2.1    the quoted Eurobond is held in a clearing system recognised by the Irish Revenue Commissioners (Euroclear and Clearstream, Luxembourg are so recognised), or

   2.2    the person who is the beneficial owner of the quoted Eurobond and who is beneficially entitled to the interest is not resident in Ireland and has made a declaration to a relevant person (such as an Irish paying agent) in the prescribed form.

So long as the Securities are quoted on a recognised stock exchange and are held in Euroclear and/or Clearstream, Luxembourg, interest on the Securities can be paid by the Issuer and any paying agent acting on behalf of the Issuer without any withholding or deduction for or on account of Irish income tax.

If, for any reason, the quoted Eurobond exemption referred to above ceases to apply, the Issuer can still pay interest on the Securities free of withholding tax provided it is a "qualifying company" (within the meaning of Section 110 of the 1997 Act) and provided the interest is paid to a person resident in a "relevant territory" (i.e. a member state of the European Union (other than Ireland) or in a country with which Ireland has a double taxation agreement). For this purpose, residence is determined by reference to the law of the country in which the recipient claims to be resident. This exemption from withholding tax will not apply, however, if the interest is paid to a company in connection with a trade or business carried on by it through a branch or agency located in Ireland.

In certain circumstances, Irish tax will be required to be withheld at the standard rate from interest on any quoted Eurobond, where such interest is collected by a bank in Ireland on behalf of any Holder of Securities who is Irish resident.

### Taxation of Holders of Securities

Notwithstanding that a Holder of Securities may receive interest on the Securities free of withholding tax, the Holder of Securities may still be liable to pay Irish income tax. Interest paid on the Securities may have an Irish source and therefore be within the charge to Irish income tax and levies. Ireland operates a self assessment system in respect of income tax and any person, including a person who is neither resident nor ordinarily resident in Ireland, with Irish source income comes within its scope.

However, interest on the Securities will be exempt from Irish income tax if the recipient of the interest is resident in a relevant territory provided either (i) the Securities are quoted Eurobonds and are exempt from withholding tax as set out above (ii) in the event of the Securities ceasing to be quoted Eurobonds, if the Issuer is a qualifying company within the meaning of Section 110 of the 1997 Act, or if the Issuer has ceased to be a qualifying company, the recipient of the interest is a company.

Notwithstanding these exemptions from income tax, a corporate recipient that carries on a trade in Ireland through a branch or agency in respect of which the Securities are held or attributed, may have a liability to Irish corporation tax on the interest.

Interest on the Securities which does not fall within the above exemptions may be within the charge to Irish income tax.

### Capital Gains Tax

A holder of Securities will be subject to Irish tax on capital gains on a disposal of Securities unless such holder is neither resident nor ordinarily resident in Ireland and does not carry on a trade in Ireland through a branch or agency in respect of which the Securities are used or held.

### Capital Acquisitions Tax

A gift or inheritance comprising of Securities will be within the charge to capital acquisitions tax if either (i) the disponer or the donee/successor in relation to the gift or inheritance is resident or ordinarily resident in Ireland (or, in certain circumstances, if the disponer is domiciled in Ireland irrespective of his residence or that of the donee/successor) or (ii) if the Securities are regarded as property situate in Ireland. Bearer securities are generally regarded as situated where they are physically located at any particular time, but the Securities may be regarded as situated in Ireland regardless of their physical location as they are secured over Irish property, and they themselves secure a debt due by an Irish resident debtor. Accordingly, if such Securities are comprised in a gift or inheritance, the gift or inheritance may be within the charge to tax regardless of the residence status of the disponer or the donee/successor.

### Stamp Duty

No stamp duty or similar tax is imposed in Ireland on the issue (on the basis of an exemption provided for in Section 85(2)(c) to the Stamp Duties Consolidation Act, 1999 provided the proceeds of the Securities are used in the course of the Issuer's business), transfer or redemption of the Securities.

### EU Savings Directive

On 3 June, 2003 the Council of the European Union (ECOFIN) adopted a directive regarding the taxation of interest income. Each EU Member State must implement the directive by enacting legislation that requires paying agents (within the meaning of the directive) established within its territory to provide to the relevant competent authority details of interest payments made to any individual and certain intermediate entities resident in another EU Member State or a territory being a dependent or associated territory of a Member State (**Reportable Territory**). The competent authority of the EU Member State of the paying agent (within the meaning of the directive) is then required to communicate this information to the competent authority of the Reportable Territory of which the beneficial owner of the interest is a resident.

Austria, Belgium and Luxembourg may opt instead to withhold tax from interest payments within the meaning of the directive.

Member States must apply the respective provisions with effect from 1 July 2005. Ireland has implemented the directive into national law. Any Irish paying agent making an interest payment on behalf of the Issuer to an individual, and certain residual entities defined in the 1997 Act, resident in another Reportable Territory will have to provide details of the payment to the Irish Revenue Commissioners who in turn will provide such information to the competent authorities of the Reportable Territory of residence of the individual or residual entity concerned.

### UNITED KINGDOM

*The following is a summary based on the laws and practices currently in force in the United Kingdom relating to United Kingdom stamp duty or stamp duty reserve tax and the Securities. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Securities should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Securities and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile.*

No United Kingdom stamp duty or stamp duty reserve tax is payable on the issue of the Securities or on transfers of, or agreements to transfer, Securities held in Euroclear/Clearstream.

28

No United Kingdom stamp duty is payable on written instruments of transfer of Securities which are executed outside the United Kingdom and remain at all times outside the United Kingdom.

## SUMMARY OF COLLATERAL PROSPECTUS

*The following information relating to the Collateral is a summary only of certain terms and conditions of such Collateral and has, save as provided below, been extracted from the Prospectus relating to the Collateral dated 26 June 2006 extracts from which are annexed hereto. None of the Issuer, the Arranger, the Managers, the Trustee, the Agents has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Securities should make their own independent investigations and enquiries into the Collateral and the Collateral Issuer.*

| | |
|---|---|
| **Collateral Issuer** | Northern Rock plc |
| **Registered Address** | Northern Rock House, Gosforth, Newcastle Upon Tyne |
| **Country of incorporation** | England and Wales |
| **Nature of business** | The Collateral Issuer is a specialised mortgage lender whose core business is the provision of residential mortgages in the United Kingdom funded in the retail, wholesale, covered bonds and securitisation markets. The Collateral Issuer, together with its subsidiaries and associated companies, also engages in secured commercial lending, personal unsecured lending and distribution of third party insurance products. |
| **Collateral** | £400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares of the Collateral Issuer, each with a liquidation preference of £1,000. |
| **Preference Dividends** | If declared, non-cumulative preferential dividends will accrue on the Collateral at a rate of 6.8509 per cent. per annum on a principal amount equal to £1,000 per Preference Share from (and including) the Issue Date of the Preference Shares to (but excluding) the First Call Date and will be payable on 4 July 2007 and thereafter annually in arrear in sterling on 4 July in each year in the period from (and including) the Issue Date to (but excluding) the First Call Date. |
| | In respect of the period from (and including) the Issue Date to (but excluding) the first dividend payment date, the dividend shall be £69.45 per Preference Share. |
| | From (and including) the First Call Date and thereafter, non-cumulative preferential dividends will accrue on the Collateral at a rate, reset quarterly, of 1.66 per cent. per annum above the LIBOR on a principal amount equal to £1,000, and will be payable in quarterly instalments in arrear in sterling on 4 January, 4 April, 4 July and 4 October in each year from (and including) the First Call Date. |
| **Listing** | The Preference Shares have been admitted to the official list of the UK Listing Authority and admitted to trading on the London Stock Exchange's gilt edged and fixed interest market. Information in relation to the London Stock Exchange is available on the website of the London Stock Exchange, which can be found on www.londonstockexchange.com. On the Issue Date, the Issuer will subscribe the Collateral which will then be held by the Issuer, as described herein. The Collateral comprise all the Preference Shares issued by the Collateral Issuer on the Issue Date. Accordingly, it is not envisaged that trading in the Preference Shares will take place while such shares are held by the Issuer or that information in relation to the price of the Preference Shares will be published regularly. |
| **Maturity Date** | The Collateral are perpetual securities. |
| **Governing law** | English |

30

| | |
|---|---|
| **Method of origination/creation** | The Collateral were issued pursuant to the Prospectus dated 26 June 2006 (the "**Collateral Prospectus**"). Copies of the Collateral Prospectus are available during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent and the Irish Paying Agent. |

## GENERAL INFORMATION

1.  Application has been made to IFSRA, as competent authority under the Prospectus Directive, for this Series Prospectus to be approved. Application has also been made to the Irish Stock Exchange for the Securities to be admitted to the official list of the Irish Stock Exchange and to be admitted to trading on the regulated market of the Irish Stock Exchange. There can be no assurance that such applications will be successful.

2.  From the date of this Series Prospectus and for so long as the Securities remain outstanding, the following documents will be available for inspection in physical format during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) for inspection at the Issuer's registered office and the specified offices of the Irish Paying Agent. Copies of the documents referred to below may be obtained free of charge from the specified offices of the Irish Paying Agent:

    (1)  this Series Prospectus; and

    (2)  the Supplemental Trust Deed and Drawdown Agreement in relation to the Securities.

3.  The issue of the Securities was authorised by a resolution of the board of directors of the Issuer passed on 26 June 2006.

4.  Except as disclosed in this Series Prospectus, the Issuer has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the 12 months preceding the date of this Series Prospectus which may have or have had in the recent past significant effects, in the context of the issue of the Securities, on the financial position or profitability of the Issuer.

5.  Save as discussed in *"Subscription and Sale"* in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Securities has an interest material to the offer.

6.  Except as disclosed in this Series Prospectus, there has been no material adverse change in the financial position or prospects of the Issuer since the date of its last published audited financial statements, being those for the financial year ended 31 January 2005.

## ANNEX 1 – EXTRACTS FROM THE COLLATERAL PROSPECTUS

Set out in this Annex 1 are extracts only from the Prospectus relating to the Collateral.

## TABLE OF CONTENTS

INCORPORATION BY REFERENCE .......................................................................... A-5
EXTRACTS FROM PROSPECTUS SUMMARY ........................................................ A-6
RISK FACTORS ........................................................................................................... A-11
DESCRIPTION OF THE PREFERENCE SHARES ...................................................... A-14
NORTHERN ROCK....................................................................................................... A-23
BOARD OF DIRECTORS............................................................................................... A-27
UNITED KINGDOM TAXATION ................................................................................. A-28

# northern rock

## NORTHERN ROCK PLC

*(incorporated with limited liability in England and Wales under the Companies Act 1985, registered number 3273685)*

£400,000,000 Series A Fixed/Floating Rate
Non-Cumulative Callable Preference Shares

Issue Price: 100 per cent.

The £400,000,000 in aggregate value of Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares (the Preference Shares) of Northern Rock plc (the Bank) will be issued fully paid for in cash. Dividends will accrue on a principal amount equal to £1,000 per Preference Share at a rate of 6.8509 per cent. per annum in respect of the period from (and including) 29 June 2006 (the Issue Date) to (but excluding) 4 July 2016 (the First Call Date) and thereafter at a rate reset quarterly equal to 1.66 per cent. per annum above the London interbank offered rate for three-month sterling deposits (LIBOR). The first dividend will, if declared, be paid on 4 July 2007. From (and including) 4 July 2007 to (but excluding) the First Call Date, dividends, if declared, will be paid annually in arrear on 4 July in each year. From (and including) the First Call Date, dividends, if declared, will be paid quarterly in arrear on, subject as provided herein, 4 January, 4 April, 4 July and 4 October in each year. See *"Description of the Preference Shares – Dividends"*.

The Preference Shares are redeemable (at the option of the Bank) in whole, but not in part only, on the First Call Date and on each dividend payment date thereafter. The Preference Shares are also redeemable (at the option of the Bank) in whole, but not in part only, at a make-whole redemption price at any time prior to the First Call Date if the Preference Shares no longer qualify as tier 1 capital for the purposes of the then applicable capital adequacy regulations. Under existing requirements of the Financial Services Authority (FSA), the Bank may not redeem, purchase or substitute any Preference Shares unless the FSA, having been notified by the Bank, has confirmed that it has no objection to such redemption, purchase or substitution.

The Preference Shares will rank (i) in priority to ordinary shares in the capital of the Bank and (ii) equally among themselves and with the most senior ranking non-cumulative preference shares of the Bank.

An investment in the Preference Shares involves certain risks. For a description of certain matters that prospective investors should consider carefully prior to an investment in the Preference Shares, see *"Risk Factors"* on pages 11 to 13 of this Prospectus.

Applications have been made to the FSA in its capacity as competent authority (the UK Listing Authority) under the Financial Services and Markets Act 2000 (the FSMA) for the Preference Shares to be admitted to the official list of the UK Listing Authority (the Official List) and to the London Stock Exchange plc (the London Stock Exchange) for the Preference Shares to be admitted to trading on the London Stock Exchange's gilt edged and fixed interest market.

The Preference Shares are expected to be assigned, on issue, a rating of BBB+ by Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc., a rating of A3 by Moody's Investors Service, Inc. and a rating of A by Fitch Ratings Ltd. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the relevant rating organisation.

JOINT LEAD MANAGERS

BARCLAYS CAPITAL                                                 LEHMAN BROTHERS

26 June 2006

This Prospectus comprises a prospectus for the purposes of Article 5.4 of Directive 2003/71/EC (the **Prospectus Directive**).

The Bank accepts responsibility for the information contained in this Prospectus. To the best of the knowledge and belief of the Bank (which has taken all reasonable care to ensure that such is the case), the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

This Prospectus is to be read in conjunction with all documents which are deemed to be incorporated herein by reference (see *"Incorporation by Reference"* below). This Prospectus shall be read and construed on the basis that such documents are so incorporated and form part of this Prospectus.

In connection with the offering of the Preference Shares, no person is authorised to give any information or to make any representation not contained in this Prospectus and neither the Bank nor the Managers (as defined under *"Subscription and Sale"*) accept responsibility for any such information or representation. This Prospectus does not constitute an offer of, or an invitation to subscribe for, the Preference Shares.

Investors should satisfy themselves that they understand all the risks associated with investing in preference shares. The Preference Shares are only suitable for financially sophisticated investors who are capable of evaluating the risks involved in investing in the Preference Shares.

The Managers have not independently verified the information contained herein. Accordingly, no representation, warranty or undertaking, express or implied, is made and no responsibility or liability is accepted by the Managers as to the accuracy or completeness of the information contained in this Prospectus or any other information provided by the Bank in connection with the issue of the Preference Shares.

Neither this Prospectus nor any other information supplied in connection with the issue of the Preference Shares (i) is intended to provide the basis of any credit or other evaluation or (ii) should be considered as a recommendation by the Bank or any of the Managers that any recipient of this Prospectus or any other information supplied in connection with the issue of the Preference Shares should purchase any Preference Shares. Each investor contemplating purchasing any Preference Shares should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Bank. Neither this Prospectus nor any other information supplied in connection with the issue of the Preference Shares constitutes an offer or invitation by or on behalf of the Bank or any of the Managers to any person to subscribe for or to purchase any Preference Shares.

Neither the delivery of this Prospectus nor the offering, sale or delivery of any Preference Shares shall in any circumstances imply that the information contained herein concerning the Bank is correct at any time subsequent to the date hereof or that any other information supplied in connection with the Prospectus is correct as of any time subsequent to the date indicated in the document containing the same.

This Prospectus does not constitute an offer to sell or the solicitation of an offer to buy any Preference Shares in any jurisdiction to any person to whom it is unlawful to make the offer or solicitation in such jurisdiction. The distribution of this Prospectus and the offer or sale of Preference Shares may be restricted by law in certain jurisdictions. Neither the Bank nor the Managers represents that this Prospectus may be lawfully distributed, or that Preference Shares may be lawfully offered, in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating any such distribution or offering. In particular, no action has been taken by the Bank or the Managers which would permit a public offering of any Preference Shares or distribution of this Prospectus in any jurisdiction where action for that purpose is required. Accordingly, no Preference Shares may be offered or sold, directly or indirectly, and neither this Prospectus nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations. Neither the Bank nor the Managers have authorised, nor do they authorise, the making of any offer of Preference Shares through any financial intermediary, other than offers made by the Managers which constitute the final placement of Preference Shares contemplated in this Prospectus. Persons into whose possession this Prospectus or any Preference Shares may come must inform themselves about, and observe, any such restrictions on the distribution of this Prospectus and the offering and sale of the Preference Shares. In particular, there are restrictions on the distribution of this Prospectus and the offer or sale of

A-3

Preference Shares in the European Economic Area (EEA) and in the United States (see *"Subscription and Sale"* below).

The Preference Shares have not been, and will not be, registered under the U.S. Securities Act of 1933 (the **Securities Act**) and are subject to United States tax law requirements. Subject to certain exceptions, the Preference Shares may not be sold or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. persons (see *"Subscription and Sale"* below).

In this Prospectus, all references to "£" are to pounds sterling and "€" are to euro.

## INCORPORATION BY REFERENCE

The audited consolidated financial statements of the Bank for the years ended 31 December 2004 and 31 December 2005 and the Memorandum & Articles of Association of the Bank are incorporated by reference in this Prospectus. Copies of documents incorporated by reference in this Prospectus can be obtained from the Bank's registered office and, in the case of the audited consolidated financial statements, from the Bank's website at www.northernrock.co.uk

# SUMMARY

*This summary must be read as an introduction to this Prospectus and any decision to invest in the Preference Shares should be based on a consideration of this Prospectus as a whole, including the documents incorporated by reference. Civil liability in respect of this summary will attach to the Bank in any Member State of the European Economic Area in which the relevant provisions of the Prospectus Directive have been implemented but only if this summary, including any translation thereof, is misleading, inaccurate or inconsistent when read together with the other parts of this Prospectus. Where a claim relating to information contained in this Prospectus is brought before a court in such a Member State of the European Economic Area, the claimant may, under the national legislation of that Member State, be required to bear the costs of translating this Prospectus before the legal proceedings are initiated.*

Capitalised terms used in this section have the meanings given in "**Description of the Preference Shares**".

| | |
|---|---|
| **Issuer:** | The Bank is a public limited company incorporated and registered in England and Wales under the Companies Act. |
| | The Bank is a specialised mortgage lender whose core business is the provision of residential mortgages in the United Kingdom funded in the retail, wholesale, covered bonds and securitisation markets. The Bank, together with its subsidiaries and associated companies, also engages in secured commercial lending, personal unsecured lending and distribution of third party insurance products. At 31 December 2005, the Bank and its subsidiaries and associated undertakings (the **Group**) had statutory total assets of £82.7 billion. |
| **The Offering:** | £400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares of the Bank, each with a liquidation preference of £1,000. |
| **Issue Price:** | 100 per cent., i.e. £1,000 per Preference Share. |
| **Preference Dividends:** | If declared, non-cumulative preferential dividends will accrue on the Preference Shares at a rate of 6.8509 per cent. per annum on a principal amount equal to £1,000 per Preference Share from (and including) the Issue Date to (but excluding) the First Call Date and will be payable annually in arrear in sterling on 4 July in each year in the period from (and including) 4 July 2007 to (but excluding) the First Call Date. |
| | In respect of the period from (and including) the Issue Date to (but excluding) the first dividend payment date, the dividend shall be £69.45 per Preference Share. |
| | From (and including) the First Call Date and thereafter, non-cumulative preferential dividends will accrue on the Preference Shares at a rate, reset quarterly, of 1.66 per cent. per annum above LIBOR on a principal amount equal to £1,000 per Preference Share, and will be payable in quarterly instalments in arrear in sterling on, subject as provided herein, 4 January, 4 April, 4 July and 4 October in each year from (and including) the First Call Date. |
| **First Call Date:** | 4 July 2016. |
| **Declaration of Preference Dividends:** | Subject to and notwithstanding the availability of distributable profits and distributable reserves, any Preference Dividend is payable only when, as and if declared by the Board. |
| | If the Board in its sole and absolute discretion resolves prior to any Preference Dividend Payment Date that the Preference Dividend, or part thereof, shall not be paid on that Preference Dividend |

Payment Date, then, as resolved by the Board, none or, as described under "**Partial Payments**" below, the Relevant Proportion only of such Preference Dividend shall be paid.

The Board shall not be bound to give its reasons for exercising such discretion.

If, in the opinion of the Board, the payment of any Preference Dividend would breach or cause a breach of capital adequacy requirements from time to time applicable to the Bank under the UK capital adequacy regime, then none of such Preference Dividend shall be declared or paid.

**Ranking for Dividends:** Holders of the Preference Shares will rank as regards participation in the profits of the Bank *pari passu* with each other, in priority to holders of the ordinary shares of the Bank and *pari passu* with Parity Obligations.

**Partial Payments:** If on any Preference Dividend Payment Date Preference Dividends are not paid in full on the Preference Shares or dividends or other distributions are not paid in full on any Parity Obligations of the Bank, but the Board determines that there are sufficient distributable profits and distributable reserves so as to allow payment in part, the Board may determine to pay the Relevant Proportion of any such Preference Dividend.

To the extent that any payment of the Relevant Proportion of a Preference Dividend or of the distribution or dividend on any Parity Obligation would otherwise exceed the amount of distributable profits and distributable reserves immediately before such payment, such Relevant Proportion shall not be payable.

**Dividend and Capital Restriction:** In the event that less than the full amount of any Preference Dividend is paid on any Preference Dividend Payment Date, the Bank will not declare and pay any distribution or dividend on any Junior Obligation until the then applicable Dividend Stopper Period has expired.

In the event that no Preference Dividend is paid on any Preference Dividend Payment Date, during the then applicable Dividend Stopper Period, the Bank will not declare and pay any distribution or dividend on, and will procure that no distribution or dividend is declared and paid on, any Parity Obligation.

In the event that the Relevant Proportion of a Preference Dividend is paid on a Preference Dividend Payment Date, during the then applicable Dividend Stopper Period, the Bank will not declare and pay an amount exceeding, and will procure that no amount is declared and paid exceeding, the Relevant Proportion (subject as set out under "**Partial Payments**" above) of any distribution or dividend on any Parity Obligation.

In the event that no Preference Dividend, or less than the full amount of any Preference Dividend, is paid on any Preference Dividend Payment Date, then until the end of the Dividend Stopper Period the Bank will not cancel, redeem, purchase, reduce or otherwise acquire any Junior Obligation or any Parity Obligation.

**Redemption:** The Preference Shares are perpetual securities and have no maturity date. However, the Preference Shares are redeemable in whole, but not in part only, at the option of the Bank, if the FSA has indicated that it has no objection to such redemption, on the First Call Date or any Preference Dividend Payment Date thereafter at a price per Preference Share equal to the aggregate of £1,000 per Preference Share and any Preference Dividends accrued since the immediately preceding Preference Dividend Payment Date.

A-7

| | |
|---|---|
| **Redemption for regulatory reasons:** | If, at any time prior to the First Call Date, a Regulatory Event occurs, the Bank may, at its option, redeem the Preference Shares in whole, but not in part, at the Make-Whole Redemption Price, only if the FSA has indicated that it has no objection to such redemption. |
| **Substitution:** | The Bank may substitute, at any time, Qualifying Tier 1 Securities for the Preference Shares, including by mandatorily applying any redemption proceeds of the Preference Shares to the subscription or purchase on behalf of the holders of the Preference Shares of Qualifying Tier 1 Securities, only if the FSA has indicated that it has no objection to such substitution. |
| **Winding-up:** | On a winding-up or other return of capital, a holder of Preference Shares will rank in the application of the assets of the Bank available to shareholders (1) equally in all respects with the rights against the Bank in such circumstances in respect of Parity Obligations and (2) in priority to the holders of ordinary shares of the Bank and any other Junior Obligations. |
| | Subject to such ranking, in such event, holders of the Preference Shares will be entitled equally with each other to receive out of the assets of the Bank available for distribution to shareholders, liquidating distributions in the amount equal to the aggregate of £1,000 per Preference Share and any Preference Dividends accrued for the then current Dividend Period to the date of the commencement of the winding-up or other such return of capital. |
| **No Senior Tier 1 Capital:** | For so long as the Preference Shares are outstanding, the Bank will not (i) issue any further non-cumulative preference shares or preferred securities or other instruments which by their terms are capable of counting as Tier 1 Capital or (ii) enter into any guarantee or other contractual support undertaking in respect of any non-cumulative preference shares or preferred securities of a subsidiary or other instruments which by their terms are capable of counting as Tier 1 Capital, which, in either case, purport to rank in priority to the Preference Shares as regards participation in the profits and assets of the Bank, unless either three-quarters in nominal value of the holders of the Preference Shares consent in writing to such issue or an extraordinary resolution is passed at a meeting of such holders of the Preference Shares consenting to such issue. |
| **Meetings of Preference Shareholders:** | The rights, privileges, limitations or restrictions attaching to the Preference Shares may not be varied, altered or abrogated without the consent in writing of the holders of three-quarters in nominal value of the Preference Shares in issue or without the sanction of an extraordinary resolution passed at a separate meeting of the holders of the Preference Shares. |
| | Any separate meeting of holders of Preference Shares shall be convened and conducted in all respects as nearly as possible in the same way as an extraordinary general meeting of the Bank, except as specifically provided by the Articles. The quorum at any such meeting shall be two persons holding or representing by proxy at least one-third of the total nominal value of the Preference Shares in issue. At any adjourned meeting a quorum shall be one member holding Preference Shares. |
| **Voting Rights:** | Holders of Preference Shares shall only be entitled to receive notice of and to attend any general meeting of the shareholders of the Bank: |

|  | (a) | if the Preference Dividend on the Preference Shares has not, at the date of the notice of the general meeting, been paid in full in respect of one Dividend Period ending before the First Call Date or four Dividend Periods ending after the First Call Date, in which case the holders of the Preference Shares shall be entitled to speak and/or vote upon any resolution proposed at that general meeting; or |
|--|-----|----|
|  | (b) | if a resolution is proposed at the general meeting: |

           (i)    for, or in relation to, the winding-up of the Bank; or

           (ii)   varying, altering or abrogating any of the rights, privileges, limitations or restrictions attached to the Preference Shares,

in which case the holders of the Preference Shares will be entitled to speak and/or vote only upon such resolution.

At any general meeting of which holders of Preference Shares are entitled to receive notice and at which they may attend, every holder of Preference Shares who is present in person and entitled to vote shall have one vote on a show of hands. On a poll, each holder of Preference Shares present in person or by proxy and entitled to vote shall have one vote in respect of each Preference Share.

| **Listing:** | Applications have been made to the UK Listing Authority for the Preference Shares to be admitted to the Official List and to the London Stock Exchange for the Preference Shares to be admitted to trading on the London Stock Exchange's gilt edged and fixed interest market. |
|--|--|
| **Form:** | The Preference Shares will be issued in definitive registered form. |
| **Taxation:** | The terms of the Preference Shares do not contain any grossing up provision. |
| **Risk Factors:** | Deferral or waiver of payment on any Parity Obligations may prevent both the payment by the Bank of Preference Dividends on, and the redemption or purchase by the Bank of, the Preference Shares. |

Preference Dividends on the Preference Shares are discretionary and will only be declared or paid if the Board so resolves in respect of any Dividend Period.

Dividends on the Preference Shares are non-cumulative.

If the Bank is wound up, distributions to holders of the Preference Shares will be subordinated to the claims of creditors. The claims of holders of the Preference Shares will rank equally with each other and with the claims of holders of Parity Obligations.

There is no limitation on issuing senior debt securities or Parity Obligations.

The Preference Shares have limited voting rights.

The Preference Shares are perpetual securities.

The Preference Shares may be redeemed or substituted at the option of the Bank if the FSA has indicated that it has no objection to such redemption or substitution.

Payments of dividends in respect of, and transfers of, Preference Shares may give rise to certain United Kingdom taxes.

A-9

|  | There is no prior public market for the Preference Shares. |
|--|--|
|  | The Bank's business activities are dependent on the level of economic activity in the UK. |
|  | As a result of its business activities, the Bank is exposed to a variety of risks, the most significant of which are credit risk, market risk, operational risk and liquidity risk. Failure to control these risks could result in adverse effects on the Bank's financial performance and reputation. |
| **Governing law:** | English. |

## RISK FACTORS

*Prospective investors in the Preference Shares should carefully consider the following information in conjunction with the other information included in this Prospectus.*

### Risk factors associated with the Preference Shares

***Deferral or waiver of payment on any Parity Obligations may prevent both the payment by the Bank of Preference Dividends on, and the redemption or purchase by the Bank of, the Preference Shares.***

The Bank's outstanding £300,000,000 Reserve Capital Instruments and its outstanding £200,000,000 Tier One Notes are Parity Obligations and contain provisions to the effect that the deferral or waiver of payment on such Parity Obligations will result in the Bank being subject to a restriction so that, while the restriction is in effect, the Bank may not pay Preference Dividends on, or redeem or purchase, any of the Preference Shares.

The terms of Parity Obligations issued or entered into from time to time in the future by the Bank may also include terms restricting payments relating to the Preference Shares, including restrictions on the payment of Preference Dividends on the Preference Shares, and on redemptions, purchases, reductions or other acquisitions of Preference Shares, in circumstances such as a deferral or non-payment of a dividend on such Parity Obligations.

***Preference Dividends on the Preference Shares are discretionary and will only be declared or paid if the Board so resolves in respect of any Dividend Period.***

The Board of the Bank may resolve, in its absolute discretion, on or before any Preference Dividend Payment Date not to pay in full, or at all, the Preference Dividend on the Preference Shares for the Dividend Period to which that Preference Dividend Payment Date relates.

In any event under English company law the Bank may pay dividends on the Preference Shares only if payment can be made in full out of the profits and reserves of the Bank available for distribution and permitted to be distributed.

***Dividends on the Preference Shares are non-cumulative.***

The dividends on the Preference Shares are non-cumulative. Accordingly, to the extent that any Preference Dividend or any part thereof is on any occasion not declared and paid for any reason, holders of Preference Shares will not have a claim in respect of the Preference Dividend accrued for the relevant Dividend Period or for interest on the Preference Dividend, whether or not Preference Dividends on the Preference Shares are declared for any future Dividend Period. However, the Bank will be subject to a dividend and capital restriction in such circumstances, see *"Description of the Preference Shares – Dividends – paragraph 2(xii)"*.

***If the Bank is wound up, distributions to holders of the Preference Shares will be subordinated to the claims of creditors. The claims of holders of the Preference Shares will rank equally amongst themselves and with the claims of holders of Parity Obligations.***

On a winding-up of the Bank, whether voluntarily or involuntarily and whether in connection with insolvency proceedings or otherwise, holders of Preference Shares will be entitled to distributions in liquidation only after the claims of creditors, except as provided in the next paragraph, of the Bank and its subsidiaries have been satisfied.

Claims in respect of Parity Obligations rank *pari passu* with the claims of the holders of the Preference Shares.

***No limitation on issuing senior debt securities or Parity Obligations.***

There is no restriction on the amount of debt which the Bank may incur which ranks senior to the Preference Shares or on the amount or terms of securities which the Bank may issue or guarantee which obligations rank *pari passu* in some or all respects with the Preference Shares. The issue of any such debt or creation of such obligations may reduce the amount recoverable by holders of the Preference Shares on a winding-up or other return of capital of the Bank or may increase the likelihood of a suspension of distributions in respect of the Preference Shares.

***The Preference Shares have limited voting rights.***

The holders of the Preference Shares will only be eligible to vote at general meetings of the Bank in limited circumstances (see *"Description of the Preference Shares – Voting – paragraph 9"*).

*The Preference Shares are perpetual securities.*

The Bank is under no obligation to redeem the Preference Shares at any time and the holders of the Preference Shares have no right to call for their redemption.

*The Preference Shares may be redeemed or substituted at the option of the Bank.*

If the FSA has indicated that it has no objection to such redemption or substitution and subject to compliance with English company law requirements as to the manner of financing any redemption or substitution of redeemable shares, the Preference Shares may be redeemed at the option of the Bank, in whole but not in part only, on any Preference Dividend Payment Date falling on or after the First Call Date or substituted at the option of the Bank at any time by Qualifying Tier 1 Securities. Any redemption of the Preference Shares at that time shall be at a price equal to the aggregate of £1,000 and any Preference Dividends accrued since the immediately preceding Preference Dividend Payment Date.

The Preference Shares are also redeemable in whole, but not in part, at the option of the Bank, if the FSA has indicated that it has no objection to such redemption, at any time if a Regulatory Event occurs at a price per Preference Share equal to the Make-Whole Redemption Price.

*Payments of dividends in respect of, and transfers of, Preference Shares may give rise to certain United Kingdom taxes.*

Payments of dividends in respect of, and transfers of, Preference Shares may give rise to certain United Kingdom tax obligations. See "*United Kingdom Taxation*".

*There is no prior public market for the Preference Shares.*

The Preference Shares constitute a new issue of securities by the Bank. Prior to this issue, there will have been no public market for the Preference Shares. Although applications have been made for the Preference Shares to be admitted to the Official List and to trading on the London Stock Exchange, there can be no assurance that an active public market for the Preference Shares will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The Preference Shares shall on issue be represented by a single certificate. The value of the Preference Shares can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Bank and the Group and other factors that generally influence the value of securities.

### Risk factors relating to the Bank

*Economic Activity in the UK*

The Bank's business activities are dependent on the level of banking, finance and financial services required by its customers. In particular, levels of borrowing are heavily dependent on customer confidence, employment trends, the state of the economy and market interest rates at the time. As the Bank currently conducts the majority of its business in the UK, its performance is influenced by the level and cyclical nature of business activity in the UK, which is in turn impacted by both domestic and international economic and political events. There can be no assurance that a weakening in the UK economy will not have a material effect on the Bank's future results.

*Risk Associated with Strategic Decisions Regarding Organic Growth and Cost Control*

The Bank's strategy relies upon the continued organic growth of its assets coupled with controlling related expenses. The strategy also involves operating as a single segment business concentrating on UK residential mortgage lending. No assurance can be given that profitability would not be impacted in the event conditions in the UK residential mortgage market deteriorated significantly or the Bank was otherwise unable to succeed in its growth strategy or in continuing to control related expenses.

*Access to Wholesale Funding, Securitisation and Covered Bonds Markets*

A substantial amount of the Bank's funding depends upon access to wholesale funding sources, including accessing the institutional debt market in the United States, Europe and in Asia as well as accessing the global securitisation and covered bonds markets as an additional source of wholesale funding. The continued ability of the Bank to access such funding sources on favourable economic terms is dependent on a variety of factors, including a number of factors outside its control, including general market conditions. There can be no assurance that the Bank will continue to be able to access such funding sources on favourable terms in the future.

***Impact of Regulatory Changes***

The Bank is subject to financial services laws, regulations, administrative actions and policies in each location that the Bank operates. Changes in supervision and regulation, in particular in the UK, could materially affect the Bank's business, the products and services offered or the value of its assets. Although the Bank works closely with its regulator and continually monitors the situation, future changes in regulation, fiscal or other policies can be unpredictable and are beyond the control of the Bank.

## DESCRIPTION OF THE PREFERENCE SHARES

*The allotment of preference shares is permitted under the Articles. The terms of, and rights attaching to, the Preference Shares are summarised below.*

**1.    General**

The Preference Shares will have a nominal value of £0.25 each and will be issued fully paid for cash. The Preference Shares will be issued in definitive registered form. The Preference Shares will rank *pari passu* and rateably without any preference or priority among themselves and with Parity Obligations and will rank in priority to the ordinary shares of the Bank and other Junior Obligations.

**2.    Dividends**

(i)    Each Preference Share shall entitle the holder thereof to receive out of the profits and reserves of the Bank available for distribution and permitted by law to be distributed a non-cumulative preferential dividend (the **Preference Dividend**).

The Preference Shares shall carry no further right to participate in the profits and reserves of the Bank other than the declared Preference Dividend or, subject to paragraph (ix), declared Relevant Proportion.

(ii)    Holders of the Preference Shares will rank as regards participation in the profits of the Bank:

- *pari passu* with each other and with Parity Obligations; and

- in priority to holders of the ordinary shares of the Bank and any other Junior Obligations.

(iii)    If it shall subsequently appear that any Preference Dividend which has been paid to holders of Preference Shares should not have been so paid, then provided the Board shall have acted in good faith, the Directors shall not incur any liability for any loss which any shareholder may suffer in consequence of such payment having been made.

(iv)    In respect of the period from (and including) the Issue Date to (but excluding) the First Call Date, the Preference Dividend shall accrue at a rate of 6.8509 per cent. per annum on the principal amount equal to £1,000 in respect of each Preference Share, which Preference Dividend will be payable, subject as provided below, annually in arrear in sterling on 4 July in each year when, as and if declared by the Board.

In respect of the period from (and including) the Issue Date to (but excluding) the first Preference Dividend Payment Date, the Preference Dividend shall be £69.45 per Preference Share. This represents Preference Dividends accruing from (and including) the Issue Date to (but excluding) 4 July 2007.

The amount of Preference Dividend accruing in respect of any period commencing prior to the First Call Date will be calculated on the basis of (a) the actual number of days in the period from (and including) the date from which such Preference Dividend begins to accrue (the **Accrual Date**) to (but excluding) the date on which it falls due, divided by (b) the actual number of days from (and including) the Accrual Date to (but excluding) the next following Preference Dividend Payment Date.

(v)    From (and including) the First Call Date and thereafter, the Preference Dividend shall accrue at a rate, reset quarterly, equal to the aggregate of 1.66 per cent. per annum and LIBOR in respect of the relevant Dividend Period on the principal amount equal to £1,000 in respect of each Preference Share, which Preference Dividend will be payable in quarterly instalments in arrear in sterling on each Preference Dividend Payment Date when, as and if declared by the Board.

The amount of Preference Dividend accruing in respect of any period commencing on or after the First Call Date will be calculated on the basis of the actual number of days elapsed in the relevant period divided by 365 or, in the case of a payment falling due in a leap year, 366.

The Paying Agent shall, upon determining the rate at which the Preference Dividend will accrue pursuant to this paragraph (v), cause such rate, subject to the provisions of paragraphs (vi) to (ix), and the amount payable in respect of the relevant Dividend Period on each Preference Share, to be notified to any stock exchange on which the Preference Shares are listed and give notice in accordance with "*Notices*" below as soon as possible after the Dividend Determination Date, but in no event later than the fourth Business Day thereafter.

A-14

(vi) If, on any Preference Dividend Payment Date, the distributable profits and distributable reserves of the Bank are together insufficient to enable payment to be made of the instalment of the Preference Dividend payable on that date and, if applicable, of any payment payable on such date on any Parity Obligations of the Bank, then the Board shall resolve that none of the said instalments shall be paid or, if sufficient distributable profits and distributable reserves are available and the Board so resolves, the Relevant Proportion of such instalments shall be paid.

(vii) Subject to and notwithstanding the availability of distributable profits and distributable reserves as provided in paragraph (vi), any Preference Dividend is payable only if the Board shall resolve to make payment of such instalment.

If the Board in its sole and absolute discretion resolves prior to any Preference Dividend Payment Date that the Preference Dividend, or part thereof, shall not be paid on that Preference Dividend Payment Date, then, as resolved by the Board, none, or as described under (viii) below the Relevant Proportion only, of such Preference Dividend shall be paid.

The Board shall not be bound to give its reasons for exercising such discretion.

(viii) If, whether by reason of paragraph (vi) or (vii) above or any equivalent article or term of any Parity Obligation, on any Preference Dividend Payment Date Preference Dividends are not paid in full on the Preference Shares or dividends or other distributions are not paid in full on any Parity Obligation, but the Board determines that there are sufficient distributable profits and distributable reserves so as to allow payment in part, the Board may determine, subject to paragraph (ix) to pay the Relevant Proportion of any such Preference Dividend.

(ix) To the extent that any payment of the Relevant Proportion of a Preference Dividend or of the distribution or dividend on any Parity Obligation would otherwise exceed the amount of distributable profits and distributable reserves immediately before such payment, such Relevant Proportion shall not be payable.

(x) If, in the opinion of the Board, the payment of any Preference Dividend would breach or cause a breach of capital adequacy requirements from time to time applicable to the Bank under the UK capital adequacy regime, then none of such Preference Dividend shall be declared or paid.

(xi) If less than a full Preference Dividend is to be paid, the Bank will notify any stock exchange on which the Preference Shares are listed and give notice in accordance with "*Notices*" below by no later than the tenth Business Day before the relevant Preference Dividend Payment Date. Such notification will specify the amount, if any, of the Preference Dividend that will be paid on such Preference Dividend Payment Date.

The Preference Shares shall carry no further right to participate in the profits and reserves of the Bank other than the declared Preference Dividend or, subject to paragraph (ix), declared Relevant Proportion. If on any occasion an instalment of the Preference Dividend is not paid for the reasons described above in this section "*Dividends*", the holders of the Preference Shares shall have no claim in respect of such instalment.

(xii) In the event that less than the full amount of any Preference Dividend is paid on any Preference Dividend Payment Date, the Bank will not declare and pay any distribution or dividend on any Junior Obligation until the then applicable Dividend Stopper Period has expired.

In the event that no Preference Dividend is paid on any Preference Dividend Payment Date, during the then applicable Dividend Stopper Period, the Bank will not declare and pay any distribution or dividend on, and will procure that no distribution or dividend is declared or paid on, any Parity Obligation.

In the event that the Relevant Proportion of a Preference Dividend is paid on a Preference Dividend Payment Date, during the then applicable Dividend Stopper Period, the Bank will not declare and pay an amount exceeding, and will procure that no amount is declared and paid exceeding, the Relevant Proportion (subject to paragraph (ix) above) of any distribution or dividend on any Parity Obligation.

In the event that no Preference Dividend, or less than the full amount of any Preference Dividend, is paid on any Preference Dividend Payment Date, then, until the end of the Dividend Stopper Period, the Bank will not cancel, redeem, purchase, reduce or otherwise acquire any Junior Obligation or any Parity Obligation.

A-15

(xiii) Any Preference Dividend unclaimed after a period of 12 years from the date when it became due for payment shall be forfeited and shall revert to the Bank and the payment by the Board of any unclaimed Preference Dividend or other sum payable on or in respect of a Preference Share into a separate account shall not constitute the Bank a trustee in respect of it.

(xiv) No Preference Dividend or other moneys payable on or in respect of the Preference Shares shall bear interest as against the Bank.

### 3.    Capital

On a winding-up of the Bank or other return of capital by the Bank, the assets of the Bank available to holders of Preference Shares shall be applied:

(a)    equally in all respects with the rights against the Bank in such circumstances in respect of Parity Obligations; and

(b)    in priority to any payment to the holders of ordinary shares of the Bank and any other Junior Obligation, in payment to the holders of the Preference Shares of a sum equal to the aggregate of £1,000 per Preference Share and Preference Dividends accrued for the then current Dividend Period to the date of the commencement of the winding-up or other such return of capital.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of the Preference Shares will have no right or claim to any of the remaining assets of the Bank and will not be entitled to any further participation in such winding up or return of capital.

### 4.    Redemption

The Bank may, subject to the Companies Act, to the Articles, to the terms and conditions of the Deed Poll and to the FSA having indicated that it has no objection to such redemption, upon not less than 30 nor more than 60 days' notice, redeem the Preference Shares in whole, but not in part, on the First Call Date and on any Preference Dividend Payment Date thereafter. There shall be paid on each Preference Share so redeemed the aggregate of an amount equal to £1,000 and Preference Dividends accrued from (and including) the immediately preceding Preference Dividend Payment Date to (but excluding) the Redemption Date.

The Bank may, subject to the Companies Act, to the Articles and to the FSA having indicated that it has no objection to such redemption, at any time prior to the First Call Date if a Regulatory Event occurs, upon not less than 30 nor more than 60 days' notice, redeem the Preference Shares in whole, but not in part. The Make-Whole Redemption Price shall be paid on each Preference Share so redeemed. Prior to the publication of any notice of redemption pursuant to the foregoing, the Bank shall deliver to the Paying Agent a certificate signed by two Directors of the Bank that a Regulatory Event has occurred.

In the event that payment of the redemption price in respect of any Preference Share is improperly withheld or refused, the Preference Dividend on such Preference Share shall continue to accrue, at the then applicable rate, from the Redemption Date to the date of payment of such redemption price.

If the due date for payment of any amount of redemption moneys is not a Business Day, then payment of such amount will be made on the next succeeding Business Day, without any interest or payment in respect of such delay, unless such day shall fall within the next calendar month, whereupon such payment will be made on the preceding Business Day.

The Bank shall as soon as reasonably practicable deliver, or shall procure the delivery of, a copy of the Deed Poll to any holder of Preference Shares and/or any Manager who requests the same.

### 5.    Substitution for Qualifying Tier 1 Securities

The Bank may, subject to the Legislation, to the Articles and to the FSA having indicated that it has no objection to such substitution, at its option, at any time, upon not less than 30 nor more than 60 days' notice, substitute Qualifying Tier 1 Securities for the Preference Shares. Substitution of the Preference Shares shall be effected in such manner as may be authorised or permitted by law and as the Board shall from time to time determine, including by mandatorily applying any redemption price in respect of Preference Shares redeemed in order to effect such substitution to the subscription or purchase on behalf of the holders of the Preference Shares of Qualifying Tier 1 Securities, provided that the Bank has first delivered to the Registrar a certificate signed by two members of the Board certifying that the securities to be issued in substitution for the Preference Shares are, and that an independent investment bank agrees that they are, Qualifying Tier 1 Securities.

**6.    Purchases**

The Bank may at any time purchase, or cause to be purchased for its account, all or any of the Preference Shares, subject to the provisions of the Companies Act, the Articles and the applicable rules of any stock exchange or exchanges on which any of its Preference Shares are listed from time to time, at any price. No purchase of Preference Shares will be made by or on behalf of the Bank without the FSA having indicated that it has no objection to such purchase.

**7.    Form and Transfer**

The Preference Shares will be in definitive registered form. Title to the Preference Shares will, subject to and in accordance with the Articles, pass by transfer and registration on the Register. Each exchange or registration of transfer of Preference Shares will be effected by entry on the Register kept by the Registrar at its office in the UK.

No fee shall be charged on the registration of any instrument of transfer or other instrument relating to or affecting the title to the Preference Shares, but the person requesting such registration will be required to pay any related taxes, stamp duties or other governmental charges.

The Bank will only be affected by, or recognise, a current and absolute right to whole shares. The fact that any share, or part of a share, may not be owned outright by the registered owner is not of any concern to the Bank, for example if a share is held in any kind of trust. The only exception is for any right which is expressly given by the Articles or which the Bank has a legal duty to recognise.

If a shareholder acquires more Preference Shares, he is entitled, without charge, to another certificate for the extra shares. If a shareholder transfers part of his shares covered by a certificate, he is entitled, free of charge, to a new certificate for the balance. The Bank does not have to issue more than one certificate for any share, even if that share is held jointly. When the Bank delivers a certificate to one joint shareholder, this is treated as delivery to all of the joint shareholders. The Bank can deliver a certificate to a broker or agent who is acting for a person who is buying the shares, or who is having the shares transferred to him.

Share certificates can be signed by one or more Directors, sealed with the seal and/or printed in any way with a copy of the seal or with a copy of the signature of one or more Directors.

A share certificate will state the number and class of shares and distinguishing numbers (if any) to which it relates and the amount paid up on those shares.

The time limit for the Bank to provide a share certificate under the Legislation is: two months after the allotment of the Preference Shares (or any longer period provided by its terms of issue); two months after a transfer of Preference Shares is presented for registration.

If a shareholder has two or more share certificates for shares of the same class, he can ask the Bank for these to be cancelled and replaced by a single new certificate. The Bank must comply with such request.

A shareholder can ask the Bank for a new certificate if the original is damaged or defaced or said to be lost, stolen, or destroyed. If a certificate has been damaged or defaced, the Bank can require the certificate to be delivered to it before issuing a replacement. If a certificate is said to be lost, stolen or destroyed, the Bank can require satisfactory evidence, and an indemnity, before issuing a replacement. The Directors can require the shareholder to pay the Bank's exceptional out of pocket expenses for issuing any replacement share certificates. Any one joint shareholder can request replacement certificates.

**8.    Payments**

Preference Dividends may be paid by the Bank by crediting any account which the shareholder, or in the case of joint shareholders, the shareholder whose name stands first in the register, has with the Bank, whether in the sole name of such shareholder or the joint names of such shareholder and another person or persons, unless the Bank has received not less than one month's notice in writing from such shareholder or joint shareholders directing that payment be made in another manner permitted by the Articles.

Any such Preference Dividend may also be paid by cheque or warrant sent by post addressed to the shareholder at his registered address or, in the case of joint shareholders, addressed to the shareholder whose name stands first in the register in respect of the shares at his address as appearing in the

register or addressed to such person and at such address as the shareholder or joint shareholders may in writing direct.

Any such dividend may be paid by any bank or other funds transfer system or, if agreed by the Bank, such other means and to or through such person as the holder or joint holders may in writing direct.

Payment in respect of any Preference Dividend into any such bank account shall be made on the relevant Preference Dividend Payment Date. If the due date for payment of any amount of Preference Dividend or redemption moneys is not a Business Day, then payment of such amount will be made on the next succeeding Business Day, without any interest or payment in respect of such delay.

Payment on redemption will be against presentation and surrender of the relative certificate at the place or at one of the places specified in the notice of redemption.

Payments in respect of amounts payable by way of Preference Dividend and on redemption of the Preference Shares will be subject in all cases to any applicable fiscal or other laws and other regulations.

## 9.   Voting

Holders of Preference Shares shall only be entitled to receive notice of and to attend any general meeting of the shareholders of the Bank:

(a)   if the Preference Dividend on the Preference Shares has not, at the date of the notice of the general meeting, been paid in full in respect of one Dividend Period ending before the First Call Date or four Dividend Periods ending after the First Call Date, in which case the holders of the Preference Shares shall be entitled to speak and/or vote upon any resolution proposed at that general meeting; or

(b)   if a resolution is proposed at the general meeting:

  (i)   for, or in relation to, the winding-up of the Bank; or

  (ii)   varying, altering or abrogating any of the rights, privileges, limitations or restrictions attached to the Preference Shares,

  in which case the holders of the Preference Shares will be entitled to speak and/or vote only upon such resolution.

At any general meeting of which holders of Preference Shares are entitled to receive notice and at which they may attend, every holder of Preference Shares who is present in person and entitled to vote shall have one vote on a show of hands. On a poll, each holder of Preference Shares present in person or by proxy and entitled to vote shall have one vote in respect of each Preference Share.

## 10.   Further Issues; No Senior Ranking Preference Shares or Preferred Securities, etc.

The Bank may from time to time create and issue further preference shares or preferred securities ranking as regards participation in the profits and/or assets of the Bank *pari passu* with the Preference Shares and so that any such further preference shares or preferred securities may be denominated in any currency.

For so long as the Preference Shares are outstanding, the Bank will not (i) issue any further non-cumulative preference shares or preferred securities or other instruments which by their terms are capable of counting as Tier 1 Capital or (ii) enter into any guarantee or other contractual support undertaking in respect of any non-cumulative preference shares or preferred securities of a subsidiary or other instruments which by their terms are capable of counting as Tier 1 Capital, which, in either case, purport to rank in priority to the Preference Shares as regards participation in the profits and assets of the Bank, unless either:

(a)   three quarters in nominal value of such holders of Preference Shares consent in writing to such issue; or

(b)   an extraordinary resolution is passed at a meeting of such holders of Preference Shares consenting to such issue.

## 11.   Variation of Rights

The rights attaching to the Preference Shares may, whether or not the Bank is being wound up, be varied or abrogated with the consent in writing of the holders of three-quarters in nominal value of

A-18

the Preference Shares in issue, or with the sanction of an extraordinary resolution passed at a separate meeting of the holders of the Preference Shares.

To every such separate meeting the provisions of the Articles relating to general meetings shall apply but so that the necessary quorum shall be two persons holding or representing by proxy at least one-third of the total nominal value of the Preference Shares in issue. At any adjourned separate meeting such a quorum will be one member or his proxy holding Preference Shares. Any Preference Shareholder present in person or by proxy may demand a poll.

The rights attached to the Preference Shares shall be deemed to be varied by:

(a)    the reduction of the capital paid up on the Preference Shares otherwise than by a purchase, redemption or cancellation by the Bank; and

(b)    the allotment of another share ranking in priority for payment of a dividend or in respect of capital or which confers on its holder voting rights more favourable than those conferred by the Preference Shares,

but shall not be deemed to be varied by:

(c)    the creation or issue of another share ranking equally with, or junior to, the Preference Shares or by the purchase or redemption, without prejudice to paragraph 2(xii), by the Bank of its own shares; or

(d)    the Bank permitting, in accordance with the Uncertificated Securities Regulations 2001, the holding and transfer of title to the Preference Shares of any other class in uncertificated form by means of a relevant system.

## 12.   Notices

Notices given by the Bank will be given by the Registrar on its behalf unless the Bank decides otherwise. A notice may be given by the Bank to any holder by sending it by post to the holder's registered address. Service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing the notice, and to have been effected on the day after the letter containing the same is posted. Where a holder's registered address is outside the United Kingdom, all notices shall be sent to him by air mail post.

A notice may be given by the Bank to the joint holders of a Preference Share by giving the notice to the joint holder first named in the Register.

A notice may be given by the Bank to the extent permitted by the Legislation and the UK Listing Authority by electronic communication, if so requested or authorised by the holder, the holder having notified the Bank of an e-mail address to which the Bank may send electronic communications, and having agreed to receive notices and other documents from the Bank by electronic communication. If a holder notifies the Bank of an e-mail address, the Bank may send the holder the notice or other document by publishing the notice or other document on a website; and notify the holder by e-mail that the notice or other document has been published on the website. The Bank must also specify the address of the website on which it has been published, the place on the website where the notice may be accessed and how it may be accessed, and where the notice in question is a notice of a meeting, the notice must continue to be published on that website throughout the period beginning with the giving of that notification and ending with the conclusion of the meeting, save that if the notice is published for part only of that period then failure to publish the notice throughout that period shall not invalidate the proceedings of the meeting where such failure is wholly attributable to circumstances which it would not be reasonable to have expected the Bank to prevent or avoid.

In addition, for so long as the Preference Shares are listed and admitted to trading on any stock exchange, notices shall be given in accordance with any requirements of such exchange.

## 13.   Registrar and Paying Agent

The Bank's company secretarial department will maintain the Register and the Bank will act as Registrar and Paying Agent.

## 14.   Governing Law

The creation and issue of the Preference Shares and the rights attached to them are governed by, and shall be construed in accordance with, English law.

A-19

## 15. Definitions

**Articles** means the articles of association of the Bank, as in effect from time to time.

**Bank** means Northern Rock plc.

**Board** means the directors of the Bank or any of them acting as the board of directors of the Bank.

**Business Day** means a day on which banks in London are open for business and on which foreign exchange dealings may be conducted in London.

**Companies Act** means the Companies Act 1985.

**Deed Poll** means the deed poll granted by the Bank in relation to redemption of the Preference Shares dated on or about 26 June 2006.

**Dividend Determination Date** means, in relation to each Dividend Period commencing on or after the First Call Date, the first day of such Dividend Period.

**Dividend Period** means the period from (and including) a Preference Dividend Payment Date (or the Issue Date) to (but excluding) the next succeeding Preference Dividend Payment Date.

**Dividend Stopper Period** means, with respect to any Preference Dividend Payment Date or the equivalent term in respect of any Parity Obligation, one calendar year from and including the earlier of the date (i) on which a full instalment of Preference Dividends is not paid or (ii) on which a full scheduled dividend or distribution on any Parity Obligation has not been paid.

**First Call Date** means 4 July 2016.

**FSA** means the Financial Services Authority and any successor regulatory authority that may succeed to the bank regulatory functions of the Financial Services Authority.

**Issue Date** means 29 June 2006.

**Junior Obligations** means:

(i)    the ordinary shares of the Bank; or

(ii)    any other series of preference shares issued by the Bank ranking junior as to dividends with the Preference Shares; or

(iii)    any security issued by a subsidiary of the Bank which benefits from a guarantee or other contractual support undertaking of the Bank which guarantee or contractual support undertaking ranks junior as to dividends or other income distributions with the Preference Shares; or

(iv)    any other instrument issued by the Bank ranking junior as to dividends or other income distributions with the Preference Shares.

**Legislation** means the Companies Act 1985 and all other laws and regulations applying to the Bank.

**LIBOR** means, in relation to a Dividend Period, the offered rate for three month deposits in sterling as at 11.00 a.m. London time on the related Dividend Determination Date appearing on the display designated as page "LIBOR01" on the Reuters Service (or such other page or service as may replace it for the purpose of displaying such information) as determined by the Paying Agent.

**Make-Whole Redemption Price** means, in respect of each Preference Share, (a) £1,000 or, if redemption occurs before the First Call Date and this is higher, (b) the price, expressed as a percentage (rounded to four decimal places, 0.00005 being rounded upwards), at which the gross redemption yield (as calculated on the basis set out by the United Kingdom Debt Management Office in the paper **Formulae for Calculating Gilt Prices from Yields** page 4, Section One: Price/Yield Formulae Conventional Gilts; Double-dated and Undated Gilts with Assumed (or Actual) Redemption on a Quasi-Coupon Date (published 8/6/1998)) on the Preference Shares, if they were to be purchased at such price on the third dealing day prior to the Redemption Date, would be equal to the gross redemption yield on such dealing day of the Reference Bond plus 0.75 per cent. on the basis of the middle market price of the Reference Bond prevailing at 11.00 a.m. (London time) on such dealing day as determined by a leading investment or commercial bank appointed by the Bank for such purpose, together in the case of (a) or (b) with any Preference Dividends accrued since the immediately preceding Preference Dividend Payment (or Issue Date if no Preference Dividend Date has occurred).

**Manager** means each of Barclays Bank plc and Lehman Brothers International (Europe).

**Parity Obligations** means:

(i)     any other series of preference shares issued by the Bank ranking *pari passu* as to dividends with the Preference Shares; or

(ii)    any security issued by a subsidiary of the Bank which benefits from a guarantee or other contractual support undertaking of the Bank which guarantee or contractual support undertaking ranks *pari passu* as to dividends or other income distributions with the Preference Shares; or

(iii)   any other instrument issued by the Bank ranking *pari passu* as to dividends or other income distributions with the Preference Shares.

**Paying Agent** means the Bank or any other entity appointed by it and notified by the Bank to the holders of the Preference Shares to perform the function of Paying Agent in respect of the Preference Shares.

**Preference Dividend** has the meaning set out in paragraph 2(i) above.

**Preference Dividend Payment Date** means 4 July in each year from (and including) the Issue Date to (and including) the First Call Date and thereafter means 4 January, 4 April, 4 July and 4 October in each year, save where any quarterly Preference Dividend Payment Date would otherwise fall on a day which is not a Business Day, it shall be postponed to the next day which is a Business Day unless it would then fall into the next calendar month, in which event the Preference Dividend Payment Date shall be brought forward to the immediately preceding Business Day.

**Preference Shares** means the £400,000,000 in aggregate value of Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares issued on the Issue Date.

**Qualifying Tier 1 Securities** means securities, whether debt, equity or otherwise, issued directly or indirectly by the Bank that:

(i)     in the reasonable opinion of an independent investment bank appointed by the Bank, have terms not materially less favourable to a holder of Preference Shares than the terms of the Preference Shares, provided that they shall:

(1)     include a ranking at least equal as to dividends or other income distributions and as to participation in assets to that of the Preference Shares,

(2)     have the same dividend or distribution rate or rate of return and dividend payment dates from time to time as those applying to the Preference Shares,

(3)     have the same redemption dates as the Preference Shares,

(4)     be issued in an amount at least equal to the total number of the Preference Shares each in a principal amount of £1,000,

(5)     comply with the then current requirements of the FSA in relation to non-innovative Tier 1 Capital, and

(6)     preserve any existing rights under the Preference Shares to any accrued Preference Dividend which has not been paid in respect of the period from (and including) the Preference Dividend Payment Date last preceding the substitution date to (but excluding) the substitution date; and

(ii)    are listed on a recognised investment exchange (as defined in the Financial Services and Markets Act 2000).

**Redemption Date** means the date on which the Preference Shares are called for redemption in accordance with paragraph 4 above.

**Reference Bond** means, in relation to any calculation of the Make-Whole Redemption Price, the United Kingdom's 4.75 per cent. Treasury Stock due September 2015, or if such security is no longer in issue or is no longer used in the pricing of bonds with a maturity falling near the First Call Date, such other United Kingdom government security as the Bank may, with the advice of the Reference Dealers, determine to be appropriate for determining the Make-Whole Redemption Price.

**Reference Dealers** means three brokers of gilts and/or gilt-edged market makers selected by the Bank, or such other three persons operating in the gilt-edged market as are selected by the Bank.

**Register** means the Bank's register of members.

**Registrar** means the Bank or any other entity appointed by it and notified by the Bank to the holders of the Preference Shares to perform the function of Registrar in respect of the Preference Shares.

**Regulatory Event** means a decision by the FSA that securities of the nature of, and including, the Preference Shares can no longer qualify as Tier 1 Capital.

**Relevant Proportion** means in relation to any partial payment of a Preference Dividend on a Preference Share, a fraction of which the numerator is an amount set at the absolute discretion of the Board being no more than distributable profits and distributable reserves as of the most recently available audited accounts for the previous financial year of the Bank or interim accounts for the previous half year of the Bank on the first day of the relevant Dividend Stopper Period and the denominator is the sum of (i) the amount originally scheduled to be paid on the Preference Shares during the Dividend Stopper Period (on the basis for any period following the First Call Date that LIBOR will remain unchanged during such period) and (ii) the aggregate of distributions or dividends originally scheduled (also disregarding for such purpose possible movements in interest rates or any other fluctuating benchmark used in calculating such distribution or dividend) to be payable in respect of Parity Obligations during the Dividend Stopper Period, converted where necessary into sterling.

**seal** means the common seal of the Bank and includes any official seal kept by the Bank by virtue of section 39 and 40 of the Companies Act.

**Tier 1 Capital** has the meaning given to it in the FSA's Integrated Prudential Sourcebook (as amended from time to time) or any successor publication replacing such guide or is issued capital of the Bank regardless of name or designation which is otherwise treated as tier 1 capital by the FSA.

## NORTHERN ROCK

### Introduction

The Bank is a public limited company incorporated and registered in England and Wales under the Companies Act 1985. The Bank is a specialised mortgage lender whose core business is the provision of residential mortgages in the United Kingdom funded in the retail, wholesale, covered bonds and securitisation markets. The Bank, together with its subsidiaries and associated companies, also engages in secured commercial lending, personal unsecured lending and distribution of third party insurance products. At 31 December 2005, the Group had statutory total assets of £82.7 billion.

The Bank is the sixth largest mortgage lender in the United Kingdom based upon loans outstanding and has consistently been one of the top UK mortgage lenders based on net new loans originated. In the UK mortgage market, the Bank achieved a market share of 14.5 per cent. on the basis of net residential lending during 2005 of £13.4 billion and a market share of 8.1 per cent. on the basis of gross residential lending during 2005 of £23.6 billion.

The Bank was originally a building society (a mutual form of organisation existing under English law which engages primarily in residential mortgage lending and deposit taking) prior to its conversion to a public limited company. The Bank was incorporated as a public limited company on 30 October 1996 (with registration number 3273685) and the conversion became effective as of 1 October 1997. The Bank currently has the following two principal subsidiaries, each of which is wholly-owned by the Bank: Northern Rock Mortgage Indemnity Company Limited, a Guernsey limited liability company providing mortgage indemnity services to the Bank, and Northern Rock (Guernsey) Limited, a Guernsey limited liability company engaging in retail deposit taking. In connection with its securitisation programme, the Group has established a number of special purpose entities for the purpose of issuing securitised loan notes. As at 31 December 2005, 21 material special purpose entities had been established for the purpose of issuing securitised loan notes. In addition, Whinstone Limited has been established for the purpose of the issue of credit-linked loan notes following the transfer of around 80 per cent. of the reserve risk fund element of pre 2005 securitisation transactions.

The Bank's ordinary shares have been admitted to trading on the London Stock Exchange's market for listed securities and were admitted to the Official List of the UK Listing Authority from 1 October 1997. The registered and principal executive office of the Bank is at Northern Rock House, Gosforth, Newcastle upon Tyne NE3 4PL, United Kingdom (telephone number +44 845 600 8401). The Bank's internet address is www.northernrock.co.uk.

References to the "Group" are to the Bank and its subsidiaries and associated undertakings.

### Overview

The 2005 results have been prepared using International Financial Reporting Standards ("IFRS") as approved by the International Accounting Standards Board that, under European Union Regulations, are effective or available for early adoption at the Group's first reporting date under IFRS, 31 December 2005, and which differ significantly from UK GAAP used in the preparation of previously reported financial statements.

Analysis of the results is complicated as a result of certain IFRS only having been applied from 1 January 2005. This means that the revised 2004 statutory results only include the impact of certain of the IFRS used in the preparation of the 2005 results. As a consequence, the Bank has included in comparisons set out below, 2004 results prepared on a proforma basis, incorporating the impact of IFRS where it can be determined what the impact would have been if the accounting changes had been effective in 2004. This impact includes the treatment of interest income and fees and the reclassification of certain funding instruments from debt to non shareholders' equity but excludes the effects of accounting for derivatives under IFRS which differs from that applied under UK GAAP.

As a consequence of the introduction of IFRS, the 2005 balance sheet and income statement are subject to a certain amount of volatility particularly from the accounting for hedges deemed under IFRS rules to be ineffective, plus volatility arising from fair value movements on derivatives taken out in respect of certain financial liabilities and instruments included in non shareholders' equity which themselves are not subject to fair value treatment. Where appropriate, such volatility is excluded in the discussion below to enable management's view of underlying performance to be separately identified.

The Bank specialises in lending to individuals with a core business of providing residential mortgage loans, funded in the retail, wholesale, covered bonds and securitisation markets. The Bank has achieved rapid growth with total assets, rising from £11.6 billion at the end of 1995 to £82.7 billion (statutory) and £81.1 billion (underlying) at 31 December 2005. During 2005 on a statutory basis total assets grew by 27.5 per cent. and underlying total assets grew by 24.9 per cent. Management have set a strategic target of annual growth in assets of 15 per cent. to 25 per cent. per annum.

Reported statutory profit before taxation for the year increased by 13.5 per cent. to £494.2 million with profit attributable to equity shareholders decreasing by 2.8 per cent. to £300.7 million. On the same basis, return on equity was 19.3 per cent. (2004 – 21.6 per cent.) and the return on mean risk weighted assets 1.22 per cent. (2004 – 1.45 per cent.).

Based upon 2005 underlying results and the 2004 proforma results, profit before taxation increased by 14.3 per cent. to £504.6 million with profit attributable to equity shareholders increasing by 13.6 per cent. to £308.1 million. On the same basis return on equity was 20.8 per cent. (2004 – 20.9 per cent.) and the return on mean risk weighted assets 1.26 per cent. (2004 – 1.29 per cent.).

The Bank is one of the lowest cost providers in its core business. The Bank's underlying cost to income ratio (defined as recurring administrative expenses divided by total income) was 29.8 per cent. for the year ended 31 December 2005. The Bank's cost advantage is derived from a combination of factors: focus on its core business, a cost efficient distribution network and its geographical base in the North East of England.

Developments in the Group's distribution network have focused on cost efficiency, achieving volume growth of lending and supporting the Group's retail funding objectives. Approximately 90 per cent. of residential mortgage lending is generated through intermediaries with the remainder split evenly between branches and direct business via telephone and e-commerce.

**Lending**

*Residential Mortgage Lending*

At 31 December 2005, the Bank had £62.4 billion of advances secured on residential property, including £38.4 billion of securitised mortgages. Residential lending represents the Bank's core activity and accounted for 77 per cent. of underlying total assets at that date.

During 2005, total net residential lending amounted to £13.4 billion, a market share of 14.5 per cent. compared to a share of outstanding total UK balances of 6.4 per cent. as at 31 December 2005. A strong year end pipeline of uncompleted lending awards of £5.0 billion will benefit lending in 2006.

The Group's residential mortgage assets are spread geographically throughout the UK. Residential mortgage lending is focused primarily on customers with a credit history and conservative income multiples and loan to value ratios. The quality of the portfolio is good with only 0.39 per cent. of all balances more than three months or more in arrears, significantly below the UK average of 0.96 per cent. as at 31 December 2005.

*Commercial Lending*

The Bank has a commercial loan portfolio which comprises two elements:

(a) commercial loans secured on residential investment properties amounting to £814 million as at 31 December 2005. These are included in the £62.4 billion of advances secured on residential property for reporting purposes; and

(b) other commercial loans which are all secured on non-residential property and mainly represent loans to individuals or corporations to support investment in properties for retail, office or industrial use. At 31 December 2005 such lending amounted to £1,523 million of which £780 million is securitised.

Commercial loans provide a diversification of assets and enhance interest margin for the Group. The Bank intends to continue to grow its commercial loan portfolio while maintaining credit quality throughout the portfolio. At 31 December 2005, only 0.42 per cent. of commercial loans with balances outstanding of £5.8 million were three months or more in arrears.

*Personal Unsecured Lending*

The Group also engages in personal unsecured lending, both on a stand-alone basis and via credit bundled products called "together". The "together" range comprises a combined secured residential mortgage and unsecured loan which benefits credit quality and enhances product retention. At

31 December 2005, unsecured lending balances were £5.8 billion of which 40 per cent. were "together" unsecured advances. At 31 December 2005, only 0.98 per cent. of personal unsecured loans were three months or more in arrears. Only 0.84 per cent. of "together" unsecured loans were three months or more in arrears.

### General Insurance and Life Assurance Distribution

The Bank distributes a limited range of household insurance and payment protection products primarily to residential mortgage and personal unsecured loan customers, via third party providers. Under arrangements with third party providers, the Bank receives a commission from policies sold and does not take any underwriting risk. Life assurance products are supplied to the Bank's customers through a relationship with Legal & General where the Bank introduces the customer to the insurer and receives a commission for doing so. These products provide a valuable source of other income.

### Funding

The Bank has developed a diversified range of funding sources comprising on-shore and off-shore retail funding, wholesale funding, securitisation and covered bonds.

Retail funding deposits amounted to £20.1 billion at 31 December 2005 representing 26 per cent. of the Bank's total funding. The UK retail funding market has been particularly competitive in recent years as a result of new entrants, and the introduction of internet based accounts, which has affected the flow and price of retail deposits. The Bank has aimed to maintain its retail franchise and achieved an increase in retail deposits in 2005 of £2,809 million. The Bank operates a wide range of retail deposit vehicles including branches, postal, telephone, internet and off-shore.

Wholesale funding has become increasingly important to the Bank and at 31 December 2005 amounted to £22.3 billion or 29 per cent. of total funding. During 2005, net new wholesale funds amounted to £2.3 billion. The diversification of sources of funding available to the Group will continue with particular emphasis on Europe and the United States.

Securitisation is the third arm of the Bank's funding strategy. From 1999 to 31 December 2005, the Bank has raised £42.6 billion through the issue of residential mortgage backed securities, of which £12.9 billion (excluding £0.4 billion from the Whinstone transaction (see below)) was raised in 2005. In the same period the Bank has also issued two commercial mortgage backed securities transactions totalling £1.1 billion of which £0.7 billion was outstanding at 31 December 2005.

At 31 December 2005, outstanding securitised notes amounted to £31.2 billion (including the Whinstone transaction) representing 40 per cent. of total funding. Securitisation is expected to remain a significant source of funding for the Bank, supporting incremental volume growth and capital efficiency. Diversification of investors will continue with issuance in Continental Europe and the United States, as well as in the UK. To date in 2006, a further £9.0 billion issue of residential mortgage backed securities has been completed.

During 2004, the Bank established a €10 billion Global Covered Bonds Programme. The inaugural issue of €2 billion covered bonds was followed in 2005 by two further issues amounting to €3.5 billion. To date in 2006, a further €2.0 billion issue of covered bonds has been completed.

### Capital

At 31 December 2005, total capital amounted to £3.2 billion, resulting in a total capital ratio of 12.3 per cent. Tier 1 capital was £2,033 million and the Tier 1 ratio 7.7 per cent.

£300 million of Reserve Capital Instruments ("RCIs") were issued by the Bank in 2000 and 2001. The RCIs are eligible for inclusion in Tier 1 capital up to a maximum of 15 per cent. of total Tier 1 capital, with any surplus being eligible for inclusion in Upper Tier 2 capital.

The Bank also issued £200 million of Tier One Notes in 2002, the full amount of which is eligible for inclusion in Tier 1 capital.

In November 2005, the Bank completed its first Whinstone transaction transferring around 80 per cent. of the reserve fund risk relating to pre 2005 residential mortgage securitisations to third party investors, therefore reducing the potential exposure to downturn credit risk. The transaction reduces the level of core capital required under credit rating assessments of required capital as well as the regulatory capital deduction in respect of the reserve funds, thereby enhancing capital efficiency and more closely aligning regulatory and credit rating capital; an important step in advance of Basle II.

By retaining a small portion of the first loss, the Bank continues to align the interests of securitisation investors and the Bank and demonstrates its confidence in the credit performance of the mortgage portfolios.

**The Northern Rock Foundation**

The establishment of The Northern Rock Foundation (the "**Foundation**") on conversion to a public limited company was intended to express the Bank's commitment to its mutual history and to the region from which the business has drawn much of its strength. The Foundation has as its primary objective helping to improve the conditions of people disadvantaged by age, infirmity, poverty or other circumstances. It receives 5 per cent. of the annual consolidated profit before tax of the Bank, paid under deed of covenant. The Foundation has received non-voting and non-dividend-paying Foundation shares which would convert into almost 15 per cent. of the ordinary share capital of the Bank only in certain circumstances, principally involving a change in control of the Bank, in which event the deed of covenant would terminate.

## BOARD OF DIRECTORS

The Directors of the Bank as at the date of this Prospectus are:

| Name (and date of birth) | Date of appointment | Business occupation | Principal external directorships |
|---|---|---|---|
| Directors | | | |
| Dr. Matthew White Ridley (7 February 1958) Chairman | 13 November 1996 | Company Director | Northern Investors Company plc Northern 2 VCT plc PA Holdings Limited |
| Adam John Applegarth (3 August 1962) Chief Executive | 30 October 1996 | Chief Executive | Persimmon plc |
| David Frank Baker (2 May 1953) Deputy Chief Executive | 30 October 1996 | Deputy Chief Executive | The Newcastle Employment Bond Limited |
| Robert Frederick Bennett (30 May 1947) Group Finance Director | 13 November 1996 | Group Finance Director | Greggs plc |
| Keith McCallum Currie (18 July 1956) Executive Director | 5 January 2005 | Company Director | None |
| Andy Menze Kuipers (24 December 1957) Executive Director | 5 January 2005 | Company Director | None |
| Adam Fenwick (20 October 1960) Non-Executive Director | 12 November 2003 | Company Director | Fenwick Limited John Swire and Sons Limited |
| Sir Ian Gibson (1 February 1947) Senior Independent Director | 10 September 2002 | Company Director | GKN plc Greggs plc Trinity Mirror plc |
| Nichola Pease (3 April 1961) Non-Executive Director | 10 February 1999 | Company Director | JO Hambro Capital Management Limited |
| Michael James Queen (27 September 1961) Non-Executive Director | 5 January 2005 | Company Director | 3i Group plc |
| Rosemary Anne Radcliffe (9 October 1944) Non-Executive Director | 1 March 2005 | Company Director | NIAL Holdings plc Newcastle International Airport Limited Guernsey Financial Services Commission |
| Sir Derek Wanless (29 September 1947) Non-Executive Director | 1 March 2000 | Company Director | Northumbria Water Group plc |

The business address of the Directors is Northern Rock House, Gosforth, Newcastle upon Tyne, NE3 4PL, England.

No potential conflicts of interest exist between the duties to the Bank of each of the members of the Board of Directors of the Bank and his/her private interests or other duties.

## UNITED KINGDOM TAXATION

*The following is a summary of the current United Kingdom taxation treatment of the Preference Shares. It is not exhaustive. It relates only to the United Kingdom taxation position of persons who are the absolute beneficial owners of the Preference Shares who are resident in the United Kingdom for tax purposes unless otherwise indicated and may not apply to certain classes of holders, such as dealers in securities, collective investment schemes, investment managers or certain investors. Further, this summary does not constitute tax or legal advice. Holders who are in any doubt as to their tax position or who may be subject to tax in a jurisdiction other than the United Kingdom should consult their professional advisers.*

### Taxation of Dividends

The Bank will not be required to withhold tax at source when paying a dividend.

Subject to the paragraph under the sub-heading "Finance (No. 2) Act 2005" below, corporate holders of Preference Shares (other than share dealers) who are within the charge to UK corporation tax will not normally be liable to UK corporation tax on any dividend received from the Bank.

Holders of Preference Shares who are resident outside the UK for tax purposes will not generally be able to claim repayment of any part of the UK tax credit (equal to 1/9th of the amount of the cash dividend) attaching to dividends paid by the Bank, although this will depend on the existence and terms of any applicable double tax treaty between the UK and the country in which the holder of the Preference Shares is resident for tax purposes. In most cases, the amount that can be paid to non-UK resident holders of Preference Shares in respect of any dividend payment will be reduced to nil as a result of the terms of the relevant double taxation treaty. A holder of Preference Shares resident outside the UK may also be subject to foreign taxation on dividend income under local law. A holder of Preference Shares who is not resident in the UK should consult his own professional adviser concerning his tax liabilities on dividends received from the Bank.

### Taxation of Capital Gains

The sale, or other disposal, of Preference Shares may give rise to the realisation of a chargeable gain or allowable loss for the purposes of UK taxation of chargeable gains.

Subject to the paragraph under the sub-heading "Finance (No.2) Act 2005" below, a corporate holder of Preference Shares who is resident in the UK for tax purposes and who realises such a gain, may be liable to UK corporation tax on chargeable gains, depending on the holder's circumstances and subject to any available exemption or relief.

A holder of Preference Shares who is not resident in the UK for tax purposes and who carries on a trade in the UK through a branch or agency or, in the case of a company, a permanent establishment, may be subject to UK capital gains tax or corporation tax (as the case may be) on a disposal of Preference Shares which are used, held, or acquired for the purposes of the branch, agency, or permanent establishment, subject to any available exemption or relief.

### Finance (No. 2) Act 2005

Under certain provisions of the Finance (No. 2) Act 2005, it is possible that a holder of Preference Shares subject to UK corporation tax would be taxed on a fair value income basis, and the positions outlined in the preceding paragraphs under sub-headings "Taxation of Dividends" and "Taxation of Capital Gains" would not apply. These provisions would not apply where the holder does not hold its Preference Shares for an "unallowable purpose".

### UK Stamp Duty and Stamp Duty Reserve Tax (SDRT)

#### Issue of the Preference Shares

Provided that the Preference Shares are not issued (a) to, or to a nominee or agent for, a person whose business is or includes the provision of clearing services or (b) to, or to a nominee or agent for, a person whose business is or includes issuing depositary receipts, no stamp duty or SDRT should be payable on the issue of the Preference Shares.

#### Agreements to transfer, and transfers of, the Preference Shares

Any subsequent transfer on sale of a Preference Share will be liable to ad valorem stamp duty, generally at the rate of 0.5 per cent. (rounded up to the next multiple of £5.00) of the consideration paid. UK stamp duty is normally the liability of a purchaser or transferee of the Preference Shares.

An unconditional agreement to transfer a Preference Share will normally give rise to SDRT, at the rate of 0.5 per cent. of the amount or value of the consideration paid for such Preference Share, but the liability will be cancelled, or any SDRT paid refunded, if the agreement is completed by a duly stamped transfer within six years of the agreement to transfer having become unconditional. SDRT is normally the liability of the purchaser or transferee of the Preference Shares.

If the Preference Shares are transferred (a) to, or to a nominee or agent for, a person whose business is or includes the provision of clearing services of (b) to, or to a nominee or agent for, a person whose business is or includes issuing depositary receipts, stamp duty or SDRT will be payable at a higher rate of 1.5 per cent. of the amount or value of the consideration payable, or in certain circumstances, the value of the Preference Shares so transferred.

**BANK**

**Northern Rock plc**
Northern Rock House
Gosforth
Newcastle upon Tyne
NE3 4PL

**REGISTRAR AND PAYING AGENT**

**Northern Rock plc**
Northern Rock House
Gosforth
Newcastle upon Tyne
NE3 4PL

**JOINT LEAD MANAGERS**

| | |
|---|---|
| **Barclays Bank PLC** | **Lehman Brothers International (Europe)** |
| 5 The North Colonnade | 25 Bank Street |
| Canary Wharf | London E14 5LE |
| London E14 4BB | |

**LEGAL ADVISERS**

*To the Bank as to English law*

| | |
|---|---|
| **Freshfields Bruckhaus Deringer** | **Allen & Overy LLP** |
| 65 Fleet Street | One New Change |
| London EC4Y 1HS | London EC4M 9QQ |

*To the Managers as to English law*
**Linklaters**One Silk Street
London EC2Y 8HQ

**AUDITORS**

**PricewaterhouseCoopers LLP**
89 Sandyford Road
Newcastle upon Tyne NE3 1PL

A-30

## ANNEX 2 – PROGRAMME TERMS AND CONDITIONS OF THE SECURITIES

*The following is the text of the terms and conditions that, subject to completion and amendment and as supplemented or varied in accordance with the provisions of the relevant Final Terms in relation to a particular Series of Notes, shall be applicable to the Notes in definitive form (if any) issued in exchange for the Global Note(s) representing each Series. Either (i) the full text of these terms and conditions together with the relevant provisions of the Final Terms or (ii) these terms and conditions, as so completed, amended, supplemented or varied (and subject to simplification by the deletion of non-applicable provisions), shall be endorsed on such Bearer Notes or on the Certificates relating to such Registered Notes. All capitalised terms that are not defined in these Conditions will have the meanings given to them in the Principal Trust Deed and/or the relevant Supplemental Trust Deed. Those definitions will be endorsed on the Definitive Notes or Certificates, as the case may be. References in the conditions to "Notes" are to the Notes of one Series of a relevant Issuer only, not to all Notes that may be issued under the Programme and references to the "Issuer" are to the Specified Company that is stipulated as such in the relevant Final Terms.*

*These Conditions may be amended, modified, or varied in relation to any Series of Notes by the terms of the relevant Supplemental Trust Deed in relation to such Series. Italicised text set out herein does not form part of the Conditions and is set out for information purposes only.*

The Notes are constituted and secured by a relevant supplemental trust deed (the "**relevant Supplemental Trust Deed**"), dated the date of issue of the Notes (the "**Issue Date**"), between the Issuer, J.P. Morgan Corporate Trustee Services Limited (the "**Trustee**", which expression shall include all persons for the time being the trustee or trustees under the Trust Deed (as defined below)) as trustee for, *inter alia*, the Noteholders (as defined below) and, if applicable, the persons specified therein as a Swap Counterparty (as defined in Condition 3(a)). The relevant Supplemental Trust Deed is supplemental to a principal trust deed dated 10 October 2002 as amended and restated on 22 July 2005 and made between Dante Finance plc (the "**First Issuer**") and the Trustee (the "**Principal Trust Deed**", which expression shall include any amendments or supplements thereof and together with the relevant Supplemental Trust Deed, the "**Trust Deed**"). These terms and conditions include summaries of, and are subject to, the detailed provisions of the Trust Deed, which includes the form of the Bearer Notes, Certificates, Receipts, Coupons and Talons referred to below. An agency agreement dated 10 October 2002 as amended and restated on 22 July 2005 has been entered into in relation to the Notes between the First Issuer, the Trustee, JPMorgan Chase Bank, N.A. as, *inter alia*, initial issuing and paying agent and as custodian and the other agents named in it (as amended or supplemented as at the Issue Date, the "**Agency Agreement**"). The issuing and paying agent, the custodian, the paying agents, the registrar, the transfer agents and the calculation agent(s) for the time being (if any) are referred to below respectively as the "**Issuing and Paying Agent**", the "**Custodian**", the "**Paying Agents**" (which expression shall include the Issuing and Paying Agent), the "**Registrar**", and the "**Transfer Agents**" (which expression shall include the Registrar). A Programme Agreement dated 10 October 2002 as amended and restated on 22 July 2005 has been entered into in relation to the Notes between the First Issuer and Lehman Brothers International (Europe) as Dealer (the "**Dealer**") and where appropriate as Arranger (the "**Arranger**") in relation to a particular series, the Trustee, the Issuing and Paying Agent and Registrar (the "**Programme Agreement**"). The Issuer (save for the First Issuer) has acceded to the Principal Trust Deed, the Agency Agreement and the Programme Agreement pursuant to a Deed of Accession dated on or before the Issue Date. Copies of the Principal Trust Deed, the Agency Agreement and the Programme Agreement are available for inspection during usual business hours, at the principal office of the Trustee (presently at Trinity Tower, 9 Thomas More Street, London E1W 1YZ) and at the specified offices of the Paying Agents and the Transfer Agents.

The Noteholders, the holders (the "**Couponholders**") of the interest coupons (the "**Coupons**") appertaining to interest bearing Bearer Notes and, where applicable in the case of such Notes, talons for further Coupons (the "**Talons**") and the holders of the receipts for the payment of instalments of principal (the "**Receipts**") relating to Bearer Notes of which the principal is payable in instalments are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and are deemed to have notice of those provisions applicable to them of the Agency Agreement and the Programme Agreement.

Under the Principal Trust Deed the Issuer may also borrow under, buy, sell or enter into other secured obligations in the form of loans ("**Loans**"), options ("**Options**"), schuldscheine

("**Schuldscheine**") or swaps ("**Swaps**") (each, including the obligations under the Notes, an "**Obligation**").

References in these Conditions to "Mortgaged Property" are to the assets and agreements comprising the mortgaged property upon which the Notes are secured as described in the Final Terms.

Full details of the relevant Mortgaged Property will be set out in the relevant Final Terms.

If so specified in the relevant Supplemental Trust Deed, the Issuer has, in relation to the Notes, entered into one or more interest rate and currency exchange transactions confirmed in a Swap Agreement (as defined in Condition 3(a)) with a Swap Counterparty with an effective date as of the Issue Date.

### 1.    Form, Denomination and Title

The Notes are issued in bearer form ("**Bearer Notes**", which expression includes Notes that are specified to be Exchangeable Bearer Notes), in registered form ("**Registered Notes**") or in bearer form exchangeable for Registered Notes ("**Exchangeable Bearer Notes**") in each case in the denomination(s) shown thereon provided that in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a Prospectus under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent in any other currency as at the date of issue of those Notes).

All Registered Notes shall have the same denomination. Where Exchangeable Bearer Notes are issued, the Registered Notes for which they are exchangeable shall have the same denomination as the lowest denomination of Exchangeable Bearer Notes.

*So long as the Notes are represented by a temporary Global Note, permanent Global Note or Global Certificate and the relevant clearing system(s) so permit, the Notes shall be tradeable only in principal amounts of at least the denomination shown (or if more than one denomination, the lowest denomination) provided hereon and integral multiples of the Tradeable Amounts provided in the relevant Final Terms.*

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Notes that do not bear interest in which case references to interest (other than in relation to interest due after the Maturity Date (as defined in the relevant Final Terms)), Coupons and Talons in these Conditions are not applicable. Any Bearer Note the principal amount of which is redeemable in instalments is issued with one or more Receipts attached.

Registered Notes are represented by registered certificates ("**Certificates**") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Receipts, Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "**Register**"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Receipt, Coupon or Talon shall be deemed to be and may be treated as its absolute owner for all purposes whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "**Noteholder**" means the bearer of any Bearer Note and the Receipts relating to it or the person in whose name a Registered Note is registered (as the case may be), "**holder**" (in relation to a Note, Receipt, Coupon or Talon) means the bearer of the Bearer Note, Receipt, Coupon or Talon or the person in whose name a Registered Note is registered (as the case may be) and capitalised terms have the meanings given to them herein, the absence of any such meaning indicating that such term is not applicable to the Notes.

### 2.    Exchanges of Exchangeable Bearer Notes and Transfers of Registered Notes

#### (a)   Exchange of Exchangeable Bearer Notes

Subject as provided in Condition 2(f), Exchangeable Bearer Notes may be exchanged for the same aggregate principal amount of Registered Notes at the request in writing of the relevant Noteholder and upon surrender of each Exchangeable Bearer Note to be exchanged, together with all unmatured Receipts, Coupons and Talons relating to it, at the specified office of any

Transfer Agent; provided, however, that where an Exchangeable Bearer Note is surrendered for exchange after the Record Date (as defined in Condition 7(b)) for any payment of interest, the Coupon in respect of that payment of interest need not be surrendered with it. Registered Notes may not be exchanged for Bearer Notes. Bearer Notes of one denomination may not be exchanged for Bearer Notes of another denomination. Bearer Notes that are not Exchangeable Bearer Notes may not be exchanged for Registered Notes.

##### (b) *Transfer of Registered Notes*

One or more Registered Notes may be transferred upon the surrender (at the specified office of the Registrar or any Transfer Agent) of the Certificate representing such Registered Notes to be transferred, together with the form of transfer endorsed on such Certificate duly completed and executed and any other evidence as the Registrar or Transfer Agent may reasonably require. In the case of a transfer of part only of a holding of Registered Notes represented by one Certificate, a new Certificate shall be issued to the transferee in respect of the part transferred and a further new Certificate in respect of the balance of the holding not transferred shall be issued to the transferor.

##### (c) *Exercise of Options or Partial Redemption in Respect of Registered Notes*

In the case of an exercise of an Issuer's option in respect of, or a partial redemption of, a holding of Registered Notes represented by a single Certificate, a new Certificate shall be issued to the holder to reflect the exercise of such option or in respect of the balance of the holding not redeemed. In the case of a partial exercise of an option resulting in Registered Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent.

##### (d) *Delivery of New Certificates*

Each new Certificate to be issued pursuant to Conditions 2(a), (b) or (c) shall be available for delivery within five business days of receipt of the request for exchange, form of transfer or Exercise Notice or surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Registrar or of the Transfer Agent (as the case may be) to whom delivery or surrender of such request for exchange, form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant request for exchange, form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the Registrar or Transfer Agent the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "**business day**" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar.

##### (e) *Exchange Free of Charge*

Exchange and transfer of Notes and Certificates on registration, transfer, exercise of an option or partial redemption shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

##### (f) *Closed Periods*

No Noteholder may require the transfer of a Registered Note to be registered or an Exchangeable Bearer Note to be exchanged for one or more Registered Note(s) (i) during the period of 15 days ending on the due date for redemption of, or payment of any Instalment Amount (as defined in the relevant Final Terms) in respect of, that Note, (ii) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 6(e), (iii) after any such Note has been called for redemption or (iv) during the period of seven days ending on (and including) any Record Date. An Exchangeable Bearer Note called for redemption may, however, be exchanged for one or more Registered Note(s) in respect of which the Certificate is simultaneously surrendered not later than the relevant Record Date.

**3.    Status and Non applicability**

*(a)    Status*

The Notes are secured, limited-recourse obligations of the Issuer, ranking *pari passu* without any preference among themselves, which are secured in the manner described in Condition 4 and recourse in respect of which is limited in the manner described in Condition 11. In connection with the issue of the Notes there may be executed one or more interest rate and/or currency exchange agreements (each a "**Swap Agreement**") between the Issuer and one or more swap counterparties (each a "**Swap Counterparty**") and one or more credit enhancement agreements (each a "**Credit Enhancement Agreement**") as further described in the relevant Supplemental Trust Deed.

*(b)    Non applicability*

Where no reference is made in the relevant Supplemental Trust Deed to any Swap Agreement or Credit Enhancement Agreement, references in these Terms and Conditions to any such document or agreement and to any Swap Counterparty, as the case may be, shall not be applicable.

**4.    Mortgaged Property, Realisation of Mortgaged Property and Restrictions**

*(a)    Mortgaged Property*

The Notes will be secured pursuant to the relevant Supplemental Trust Deed. The form of the Mortgaged Property may comprise some or all of the assets and assignments set out below.

*(b)    Secured Assets*

The obligations of the Issuer under the Trust Deed, the Notes and the Coupons are secured by a first fixed charge over certain bonds, warrants, notes, receivables or equity securities of any form, denomination, type or issuer, monoline guarantees, options, swaps, loans or any other financial obligations assigned to or assumed by the Issuer or any other agreed assets owned by the Issuer as specified in the relevant Supplemental Trust Deed (the "**Collateral**") and a first fixed charge on all funds held from time to time by the Custodian and/or by the Issuing and Paying Agent and/or the Registrar for payment of principal and interest on the Notes or of amounts due under the Swap Agreement. If so specified in the relevant Supplemental Trust Deed, the obligations of the Issuer under any Swap Agreement are also secured by a first fixed charge over the Collateral. Unless otherwise specified in the relevant Supplemental Trust Deed, the Collateral is held by the Custodian on behalf of the Issuer subject to the charges set out in the Trust Deed. If so specified in the relevant Supplemental Trust Deed, under the terms of the Swap Agreement the Swap Counterparty may require all or part of the Collateral to be transferred to it as security for the performance of the Issuer's obligations to the Swap Counterparty under the terms of the Swap Agreement on terms that the Swap Counterparty will be required to return equivalent collateral or the market value thereof to the Issuer on or before the termination of the Swap Agreement (subject to any enforcement of such security). In such circumstances the security over the Collateral in respect of the Issuer's obligations under the Trust Deed, the Notes and the Coupons will be over the Issuer's rights against the Swap Counterparty in relation to the Collateral as aforesaid.

If so specified in the relevant Supplemental Trust Deed, the Issuer's obligations under the Trust Deed, the Notes and the Coupons are also secured by an assignment by way of security of the Issuer's rights under the Swap Agreement and/or the Credit Enhancement Agreement in favour of the Trustee for itself and for the benefit of the holders of the Notes, Coupons and Receipts.

Additionally, the obligations of the Issuer may be secured pursuant to a security document other than the Trust Deed (an "**Other Security Document**") as specified in the relevant Supplemental Trust Deed.

The Trustee shall (subject to the provisions of the relevant Supplemental Trust Deed and to sub-Clause 6.3 of the Principal Trust Deed) apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any relevant Other Security Document:

(i)  if "*Swap Counterparty Priority*" is specified in the relevant Supplemental Trust Deed:

   (A)  first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

   (B)  secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

   (C)  thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

   (D)  fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

   (E)  fifthly, in payment of the balance (if any) to the Issuer,

provided that, if the "**Swap Counterparty Priority**" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)  if "*Pari Passu Ranking*" is specified in the relevant Supplemental Trust Deed:

   (A)  first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

   (B)  secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

   (C)  thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement and the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

   (D)  fourthly, in payment of the balance (if any) to the Issuer.

(iii)  if "*Noteholder Priority*" is specified in the relevant Supplemental Trust Deed:

   (A)  first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

   (B)  secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent;

(C)  thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(D)  fourthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(E)  fifthly, in payment of the balance (if any) to the Issuer.

*(iv)  if "Other Priority" is specified in the relevant Supplemental Trust Deed and Final Terms, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms.*

*The applicable priority and ranking provisions in respect of each Series of Notes will be disclosed in the Final Terms.*

*To the extent that a Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement, the Issuer would be unable to meet its obligations when due in respect of the Notes. In such event the Swap Agreement would be terminated and the Notes would become repayable together with interest accrued in accordance with Condition 10.*

**(c)  Shareholdings**

*Details of the issued shares and the shareholders of the Issuer are as set out in the Issuer Disclosure Annex.*

If specified in the relevant Supplemental Trust Deed, the Issuer has entered into one or more Swap Agreements with the Swap Counterparty under which:

(i)  the Issuer will (subject to the terms thereof) make payments to the Swap Counterparty, on receipt by the Issuer of sums receivable by the Issuer on the Mortgaged Property; and

(ii)  the Swap Counterparty will make payments towards or equal to the obligations of the Issuer in respect of amounts due on the Notes.

*The terms of each Swap Agreement will, if applicable, be set out in the relevant Final Terms.*

*Swap Agreements may provide that the Swap Counterparty may transfer its rights and obligations under a Swap Agreement, as described in the relevant Supplemental Trust Deed, provided that, in relation to Notes that are rated by a rating agency, such transfer shall not adversely affect any existing rating of the Notes of that Series as confirmed in writing by the appropriate rating agency. The Trust Deed provides that, subject as provided therein, the Trustee shall agree to a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement and shall agree to any amendment to such Swap Agreement to allow such transfer in such circumstances.*

**(d)  Disposal Agent**

If so specified in the relevant Supplemental Trust Deed, the Disposal Agent will act as disposal agent in relation to the disposal of the Collateral. Unless otherwise provided in the relevant Supplemental Trust Deed, the Disposal Agent may itself make an offer to purchase the Collateral.

**(e)  Realisation of the Mortgaged Property upon Enforcement**

In the event of the security over the Mortgaged Property constituted under the relevant Supplemental Trust Deed or by an Other Security Document becoming enforceable either in whole or in part, the Trustee may at its discretion and shall if so required in writing by the holders of at least one fifth in aggregate principal amount of the Notes then outstanding (as defined in the Trust Deed) or if so directed by an Extraordinary Resolution (as defined in the Trust Deed) of the holders of the Notes, or, if sums are due to any Swap Counterparty (except in the case where action may be taken against any Swap Counterparty), if so directed in writing by any such Swap Counterparty, but without liability as to the consequence of such action on individual holders of Notes, Receipts or Coupons enforce the security. To do so it may, in its discretion, realise all or a part of the Collateral in a proportion equal to the proportion of the principal amount of the Notes which are subject to such acceleration, terminate any Swap Agreement *pro rata* in accordance with its terms and exercise any rights under a Credit Enhancement Agreement, provided that the Trustee shall not be required to take any action that

would involve the Trustee in personal liability or expense unless indemnified to its satisfaction. On being so directed by the Trustee, the Disposal Agent shall use its reasonable endeavours to solicit offers from third parties to purchase the Collateral in accordance with the terms of the relevant Supplemental Trust Deed.

**(f)  *Application of Proceeds***

The Trust Deed requires that the net proceeds of the security, after deduction of the Trustee's expenses and remuneration and other amounts due to the Trustee and the Paying Agents and/or the Custodian and/or the Transfer Agent and/or the Calculation Agent and/or the Disposal Agent and any taxes required to be paid prior to any such application, be applied in meeting claims of any Swap Counterparty and of the holders of the Notes, Receipts and Coupons, as specified in the relevant Supplemental Trust Deed.

**(g)  *Shortfall after Application of Proceeds***

If the net proceeds of realisation of the Mortgaged Property becoming enforceable under paragraph (f) above are not sufficient for the Issuer to make all payments due in respect of the Notes and the Coupons and for the Issuer to meet its obligations in respect of the termination of any Swap Agreement, the other assets of the Issuer will not be available for payment of any shortfall arising therefrom. Any such shortfall shall be borne by the holders of Notes, Coupons and Receipts and any Swap Counterparty as specified in the relevant Supplemental Trust Deed. The Issuer will not be obliged to make any further payment in excess of the net proceeds and accordingly no debt shall be owed by the Issuer in respect of any such shortfall remaining after realisation of the Mortgaged Property and application of the proceeds in accordance with the Trust Deed. None of the Trustee or any Swap Counterparty or any Noteholder may take any further action to recover such shortfall.

Failure to make any payment in respect of any such shortfall shall in no circumstances constitute an Event of Default under Condition 10.

**(h)  *Issuer's Rights as Holder of the Mortgaged Property***

The Issuer may, with the prior written consent of the Trustee or as directed by an Extraordinary Resolution of the Noteholders, (i) take such action in relation to the Mortgaged Property as it thinks expedient and (ii) exercise the rights incidental to the ownership of the Mortgaged Property. In particular, the Issuer may exercise (without responsibility for such exercise) any voting rights in respect of such property and all rights to enforce it. The Issuer will not exercise any rights with respect to the Mortgaged Property unless it has the Trustee's consent or is directed by an Extraordinary Resolution of the holders of the Notes and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

**(i)  *Restrictions on Further Issues and Transactions***

The Issuer shall be at liberty from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) to issue further bonds and notes (which may be consolidated and form a single series with the Notes if issued in accordance with paragraph (j) of this Condition) and to borrow under, buy, sell or enter into other secured Obligations in the form of Loans, Options, Schuldscheine or Swaps. Such further bonds, notes and other secured Obligations (other than those obligations that are not, in the opinion of the Trustee, material in the context thereof and in respect of which another party has made arrangements to discharge the Issuer from claims related thereto) must be secured (save in the case of (i) such further bonds or notes forming a single series with the Notes or other existing bonds, notes or other secured Obligations and (ii) Obligations which, at the time of their issue or effective date, provide that other Obligations may be secured upon the same assets as those on which such Obligations are secured) on assets of the Issuer other than the Mortgaged Property or the assets on which such other Obligations of the Issuer are secured or the Issuer's share capital and on terms in substantially the form contained in these Conditions and that provide for the extinction of all claims in respect of such bonds, notes and related Obligations after application of the proceeds of enforcement of the security over the assets on which such further bonds, notes and related Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a like result). Any further securities forming a single series with the outstanding securities of any series (including the Notes) constituted and secured by the Trust

Deed or any deed supplemental and/or any Other Security Document to it shall, and any other securities may (with the prior written consent of the Trustee), be constituted and secured by the Trust Deed and/or any Other Security Document. The Trust Deed contains provisions for convening a single meeting of the Noteholders and the holders of securities of other series where the Trustee so decides.

*(j)    Restrictions on Fungible Issues*

The Issuer, if permitted under the Conditions, may from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) issue further bonds and notes that have, when issued, the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest thereon and any amendments made pursuant to (iii) below) and that are consolidated and form a single series with the Notes; provided that (unless otherwise approved by an Extraordinary Resolution (as defined in the Trust Deed) of the Noteholders), (i) the Issuer provides additional security for such new bonds or notes that comprises assets that are fungible with, and have the same proportionate composition as, the Mortgaged Property in respect of the relevant existing Notes and that has an aggregate principal amount at least equal to the principal amount of such existing security multiplied by a fraction, the numerator of which is the aggregate principal amount of such new bonds or notes and the denominator of which is the aggregate principal amount of the existing Notes; (ii) the Issuer enters into an additional or supplemental swap agreement or credit enhancement agreement varying the terms of the Swap Agreement or, as applicable, the Credit Enhancement Agreement to take account of the new bonds or notes on terms no less favourable than those of the Swap Agreement or, as applicable, the Credit Enhancement Agreement; and, in relation to Notes which are rated by a rating agency, (iii) in the case of an issue of portfolio credit linked notes, the Issuer amends the terms and conditions of the Notes to preserve the economic effect of a holding of the Notes (including, without limitation, by amending the Reference Entity Notional Amount, the Subordination Amount and, where applicable, by amending any Factor (howsoever such terms are defined in the relevant terms and conditions)) in each case solely so as to preserve the economic effect of a holding of the Notes, such amendments to be determined by the Calculation Agent and notified to the Issuer and (iv) such further bonds and notes shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Upon issue of such new bonds or notes, the Notes and such new bonds or notes shall form a single series and be secured on the Mortgaged Property relating to the Notes and such additional security. Such further bonds or notes shall be constituted and secured by a further relevant supplemental trust deed.

*(k)    Restrictions on Indebtedness*

Save as provided above, so long as any of the Notes remains outstanding, the Issuer, without the prior written consent of the Trustee, shall not incur any other indebtedness for borrowed moneys or engage in any other business (other than acquiring and holding the Mortgaged Property in respect of each Series, creating further Obligations, as provided for in this Condition 4, entering into related transactions, subject to Condition 4(i) and performing any act incidental to or necessary in connection with the foregoing), shall not have any subsidiaries (except in connection with the substitution of the Issuer as principal obligor under the Notes) and shall not dispose of the Mortgaged Property or any part thereof or interest therein (other than in connection with a substitution of the Swap Counterparty).

*(l)    Covenants*

The Issuer has covenanted in the Principal Trust Deed that it will not, without the prior written consent of the Trustee, *inter alia*:

(i)    engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes or issuing further bonds and notes (which may be consolidated and form a single series with the Notes) or creating other Obligations or entering into similar limited-recourse transactions, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(ii)    dispose of the Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (x) the security referred to above or any similar limited-recourse transaction

(whether such limited-recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and the Swap Counterparty as provided below and (y) in connection with a transfer under the Swap Agreement);

(iii) cause or permit the Swap Agreements or Credit Enhancement Agreements or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv) release any party to the Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v) have any subsidiaries (other than in connection with any substitution of the obligor under the Notes and the Trust Deed);

(vi) consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of the Swap Agreements, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or other agreement relating to the issue of the Notes, any relevant documentation entered into in connection with the creation of other Obligations or any related transactions;

(vii) (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii) have any employees;

(ix) (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders;

(x) open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to the Notes or any Mortgaged Property (as will be defined in the Trust Deed), any other Obligation or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of the Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account; or

(xi) (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of the incorporation of the Issuer.

**5.    Interest and Other Calculations**

*(a)  Interest Rate and Accrual*

Each Note bears interest on its outstanding principal amount from the Interest Commencement Date (as defined in the relevant Final Terms) at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

Interest shall cease to accrue on each Note on the due date for redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which event interest shall continue to accrue (as well after as before judgment) at the Interest Rate in the manner provided in this Condition 5 to the Relevant Date. As used in these Conditions, "**Relevant Date**" in respect of any Note, Receipt or Coupon means the date on which payment in respect of it first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which payment in full of the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note (or relative Certificate), Receipt or Coupon being made in accordance with the Conditions, such payment will be made, provided that payment is in fact made upon such presentation.

*(b)  Business Day Convention*

If any date referred to in these Conditions that is specified to be subject to adjustment in accordance with a Business Day Convention would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (i) the Floating Rate Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such date shall be brought

forward to the immediately preceding Business Day and (B) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (ii) the Following Business Day Convention, such date shall be postponed to the next day that is a Business Day, (iii) the Modified Following Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (iv) the Preceding Business Day Convention, such date shall be brought forward to the immediately preceding Business Day.

*(c)* *Interest Rate on Floating Rate Notes*

If the Interest Rate is specified as being Floating Rate, the Interest Rate for each Interest Accrual Period shall be determined in the manner specified hereon and the provisions below relating to either ISDA Determination or Screen Rate Determination shall apply, depending upon which is specified hereon:

*(i)* *ISDA Determination for Floating Rate Notes*

Where ISDA Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent as a rate equal to the relevant ISDA Rate. For the purposes of this sub-paragraph (i), "ISDA Rate" for an Interest Accrual Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent under a Swap Transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(A) the Floating Rate Option is as specified hereon;

(B) the Designated Maturity is a period specified hereon; and

(C) the relevant Reset Date is the first day of that Interest Accrual Period unless otherwise specified hereon.

For the purposes of this sub-paragraph (i), "**Floating Rate**", "**Calculation Agent**", "**Floating Rate Option**", "**Designated Maturity**", "**Reset Date**" and "**Swap Transaction**" have the meanings given to those terms in the ISDA Definitions.

*(ii)* *Screen Rate Determination for Floating Rate Notes*

Where Screen Rate Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent at or about the Relevant Time on the Interest Determination Date in respect of each Interest Accrual Period in accordance with the following:

(A) if the Primary Source for the Floating Rate is a Page, subject as provided below, the Interest Rate shall be:

(x) the Relevant Rate (where such Relevant Rate on such Page is a composite quotation or is customarily supplied by one entity); or

(y) the arithmetic mean of the Relevant Rates of the persons whose Relevant Rates appear on that Page, in each case appearing on such Page at the Relevant Time on the Interest Determination Date;

(B) if the Primary Source for the Floating Rate is Reference Banks or if sub paragraph (A)(x) above applies and no Relevant Rate appears on the Page at the Relevant Time on the Interest Determination Date or if sub paragraph (A)(y) above applies and fewer than two Relevant Rates appear on the Page at the Relevant Time on the Interest Determination Date, subject as provided below, the Interest Rate shall be the arithmetic mean of the Relevant Rates that each of the Reference Banks is quoting to major banks in the Relevant Financial Centre at the Relevant Time on the Interest Determination Date, as determined by the Calculation Agent;

(C) if paragraph (B) above applies and the Calculation Agent determines that fewer than two Reference Banks are so quoting Relevant Rates, subject as provided below, the Interest Rate shall be the arithmetic mean of the rates per annum (expressed as a percentage) that the Calculation Agent determines to be the rates (being the nearest equivalent to the Benchmark) in respect of a Representative Amount of the Relevant

Currency that at least two out of five leading banks selected by the Calculation Agent in the principal financial centre of the country of the Relevant Currency or, if the Relevant Currency is euro, in the Euro-zone as selected by the Calculation Agent (the "**Principal Financial Centre**") are quoting at or about the Relevant Time on the date on which such banks would customarily quote such rates for a period commencing on the Effective Date for a period equivalent to the Specified Duration (x) to leading banks carrying on business in Europe, or (if the Calculation Agent determines that fewer than two of such banks are so quoting to leading banks in Europe) (y) to leading banks carrying on business in the Principal Financial Centre; except that, if fewer than two such banks are so quoting to leading banks in the Principal Financial Centre, the Interest Rate shall be the Interest Rate determined on the previous Interest Determination Date (after readjustment for any difference between any Margin, Rate Multiplier or Maximum or Minimum Interest Rate applicable to the preceding Interest Accrual Period and to the relevant Interest Accrual Period).

**(d)  *Interest Rate on Zero Coupon Notes***

Where a Note the Interest Rate of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Redemption Amount (as defined in the relevant Final Terms) of such Note. As from the Maturity Date, the Interest Rate for any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as set out in Condition 6(b)).

**(e)  *Margin, Maximum/Minimum Interest Rates, Instalment Amounts and Redemption Amounts, Rate Multipliers, and Rounding***

(i)  If any Margin or Rate Multiplier is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Interest Rates, in the case of (x), or the Interest Rates for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with (c) above by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin or multiplying by such Rate Multiplier, subject always to the next paragraph.

(ii)  If any Maximum or Minimum Interest Rate, Instalment Amount or Redemption Amount is specified hereon, then any Interest Rate, Instalment Amount or Redemption Amount shall be subject to such maximum or minimum, as the case may be.

(iii)  For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred thousandth of a percentage point (with halves being rounded up), (y) all figures shall be rounded to seven significant figures (with halves being rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), save in the case of yen, which shall be rounded down to the nearest yen, and in the case of euro, which shall be rounded down to the nearest €0.01. For these purposes "**unit**" means the lowest amount of such currency that is available as legal tender in the country(ies) of such currency.

**(f)  *Calculations***

The amount of interest payable in respect of any Note for any period shall be calculated by multiplying the product of the Interest Rate and the outstanding principal amount of such Note by the Day Count Fraction, unless an Interest Amount (or a formula for its calculation) is specified in respect of such period, in which case the amount of interest payable in respect of such Note for such period shall equal such Interest Amount (or be calculated in accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable in respect of such Interest Period shall be the sum of the amounts of interest payable in respect of each of those Interest Accrual Periods.

**(g)  *Determination and Publication of Interest Rates, Interest Amounts, Redemption Amounts and Instalment Amounts***

As soon as practicable after the Relevant Time on each Interest Determination Date or such other time on such date as the Calculation Agent may be required to calculate any Redemption Amount or Instalment Amount, obtain any quote or make any determination or calculation, it

shall determine the Interest Rate and calculate the amount of interest payable (the "**Interest Amounts**") in respect of each denomination of the Notes for the relevant Interest Accrual Period, calculate the Redemption Amount or Instalment Amount, obtain such quote or make such determination or calculation, as the case may be, and cause the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount or any Instalment Amount to be notified to the Trustee, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 5(b), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made with the consent of the Trustee by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 10, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Interest Rate or the Interest Amount so calculated need be made unless the Trustee otherwise requires. The determination of each Interest Rate, Interest Amount, Redemption Amount and Instalment Amount, the obtaining of each quote and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties. No Noteholders shall (in the absence aforesaid) be entitled to proceed against the Reference Banks, the Calculation Agent, the Trustee or any of them in connection with the exercise or non exercise by them of their powers, duties and discretions under this Condition 5.

**(h)    Determination or Calculation by Trustee**

If the Calculation Agent does not at any time for any reason determine or calculate the Interest Rate for an Interest Period or any Interest Amount, Instalment Amount or Redemption Amount, the Trustee shall do so (or shall appoint an agent on its behalf to do so) and such determination or calculation shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply the foregoing provisions of this Condition, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

**(i)    Definitions**

In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"**Business Day**" means:

(i)    in the case of a specified currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for that currency; and/or

(ii)    in the case of euro, a day on which the TARGET system is open (a "**TARGET Business Day**"); and/or

(iii)    in the case of a specified currency and/or one or more specified financial centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in the specified currency or, if none is specified, generally in each of the financial centres so specified (which, in the case of Australian dollars, shall be Melbourne and Sydney).

"**Day Count Fraction**" means, in respect of the calculation of an amount of interest on any Note for any period of time (whether or not constituting an Interest Period, the "**Calculation Period**"):

(i)    if "**Actual/365**" or "**Actual/Actual ISDA**" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation

Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non leap year divided by 365; provided that no adjustment shall be made for any portion of a Calculation Period falling in a leap year in the case of Notes denominated in Japanese yen or any other currency specified hereon);

(ii)  if "**Actual/365 (Fixed)**" is specified hereon, the actual number of days in the Calculation Period divided by 365;

(iii)  if "**Actual/360**" is specified hereon, the actual number of days in the Calculation Period divided by 360;

(iv)  if "**30/360**", "**360/360**" or "**Bond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30 day months (unless (a) the last day of the Calculation Period is the 31st day of a month but the first day of the Calculation Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30 day month, or (b) the last day of the Calculation Period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30 day month)); and

(v)  if "**30E/360**" or "**Eurobond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30 day months, without regard to the date of the first day or last day of the Calculation Period unless, in the case of a Calculation Period ending on the Maturity Date, the Maturity Date is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30 day month); and

(vi)  if "**Actual/Actual ISMA**" is specified hereon:

    (A)  if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

    (B)  if the Calculation Period is longer than one Determination Period, the sum of:

        (x)  the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

        (y)  the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year

where:

"**Determination Period**" means the period from and including a Determination Date in any year to but excluding the next Determination Date.

"**Effective Date**" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the date specified as such hereon or, if none is so specified, the first day of the Interest Accrual Period to which such Interest Determination Date relates.

"**Euro zone**" means the region comprised of Member States of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

"**Interest**" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 5 or any amendment or supplement to it.

"**Interest Accrual Period**" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Period Date and each successive period beginning on (and including) an Interest Period Date and ending on (but excluding) the next succeeding Interest Period Date.

"**Interest Commencement Date**" means the Issue Date or such other date as may be specified herein.

"**Interest Determination Date**" means, with respect to an Interest Rate and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the first day of such Interest Accrual Period if the Relevant Currency is Sterling or (ii) the day failing two Business Days in London for the Relevant Currency prior to the first day of such Interest Accrual Period if the Relevant Currency is neither Sterling nor euro or (iii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Relevant Currency is euro.

"**Interest Period**" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Payment Date and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

"**Interest Period Date**" means each Interest Payment Date unless otherwise specified hereon.

"**Interest Rate**" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon.

"**ISDA Definitions**" means the 2000 ISDA Definitions (as amended or supplemented from time to time) published by the International Swaps and Derivatives Association, Inc., unless otherwise specified hereon.

"**Page**" means such page, section, caption, column or other part of a particular information service (including, but not limited to, the Reuters Markets 3000 ("**Reuters**") and Telerate ("**Telerate**")) as may be specified for the purpose of providing a Relevant Rate, or such other page, section, caption, column or other part as may replace it on that information service or on such other information service, in each case as may be nominated by the person or organisation providing or sponsoring the information appearing there for the purpose of displaying rates or prices comparable to that Relevant Rate.

"**Principal**" shall be deemed to include any premium payable in respect of the Notes, all Instalment Amounts, Redemption Amounts, Amortised Face Amounts and all other amounts in the nature of principal payable pursuant to Condition 6 or any amendment or supplement to it.

"**Reference Banks**" means the institutions specified as such hereon or, if none, four major banks selected by the Calculation Agent in the inter-bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the Benchmark (which if EURIBOR is the relevant Benchmark, shall be the Euro-Zone).

"**Relevant Currency**" means the currency specified hereon or, if none is specified, the currency in which the Notes are denominated.

"**Relevant Financial Centre**" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the financial centre as may be specified as such hereon or, if none is so specified, the financial centre with which the relevant Benchmark is most closely connected (which, in the case of EURIBOR, shall be the Euro-zone) or, if none is so connected, London.

"**Relevant Rate**" means the Benchmark for a Representative Amount of the Relevant Currency for a period (if applicable or appropriate to the Benchmark) equal to the Specified Duration commencing the Effective Date.

"**Relevant Time**" means, with respect to any Interest Determination Date, the local time in the Relevant Financial Centre specified hereon or, if none is specified, the local time in the Relevant Financial Centre at which it is customary to determine bid and offered rates in respect of deposits in the Relevant Currency in the inter-bank market in the Relevant Financial Centre and for this purpose "local time" means with respect to Euro-Zone, as a Relevant Financial Centre, Central European Time.

"**Representative Amount**" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the amount specified as such hereon as being representative for a single transaction in the relevant market at the time.

"**Specified Duration**" means, with respect to any Floating Rate to be determined on an Interest Determination Date, the duration specified hereon or, if none is specified, a period of time equal to the relative Interest Accrual Period, ignoring any adjustment pursuant to Condition 5(b).

"**TARGET System**" means the Trans European Automated real-time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

*(j)    Calculation Agent and Reference Banks*

The Issuer shall procure that there shall at all times be four Reference Banks (or such other number as may be required) with offices in the Relevant Financial Centre and one or more Calculation Agents if provision is made for them hereon and for so long as any Note is outstanding (as defined in the Trust Deed). If any Reference Bank (acting through its relevant office) is unable or unwilling to continue to act as a Reference Bank, then the Issuer shall (with the prior written approval of the Trustee) appoint another Reference Bank with an office in the Relevant Financial Centre to act as such in its place. Where more than one Calculation Agent is appointed in respect of the Notes, references in these Conditions to the Calculation Agent shall be construed as each Calculation Agent performing its respective duties under the Conditions. If the Calculation Agent is unable or unwilling to act as such or if the Calculation Agent fails duly to establish the Interest Rate for an Interest Period or to calculate any Interest Amount, Instalment Amount or the Redemption Amount or to comply with any other requirement, the Issuer shall (with the prior written approval of the Trustee) appoint a leading bank or investment banking firm engaged in the inter bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the calculation or determination to be made by the Calculation Agent (acting through its principal London office or any other office actively involved in such market) to act as such in its place. The Calculation Agent may not resign its duties without a successor having been appointed as aforesaid.

**6.    Redemption, Purchase and Options**

*(a)    Redemption by Instalments and Final Redemption*

(i)    Unless previously redeemed or purchased and cancelled as provided in this Condition 6, each Note that provides for Instalment Dates and Instalment Amounts shall be partially redeemed on each Instalment Date at the related Instalment Amount specified hereon. The outstanding principal amount of each such Note shall be reduced by the Instalment Amount (or, if such Instalment Amount is calculated by reference to a proportion of the principal amount of such Note, such proportion) for all purposes with effect from the related Instalment Date, unless payment of the Instalment Amount is improperly withheld or refused on presentation of the related Receipt, in which case, such amount shall remain outstanding until the Relevant Date relating to such Instalment Amount.

(ii)    Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Redemption Amount (which, unless otherwise provided herein, is its principal amount) or, in the case of a Note falling within paragraph (i) above, its final Instalment Amount. Notes with no final maturity date will only be redeemable or repayable in accordance with the following provisions of this Condition 6 or Condition 10.

*(b)    Early Redemption of Zero Coupon Notes*

(i)    The Redemption Amount payable in respect of any Note that does not bear interest prior to the Maturity Date, the Redemption Amount of which is not linked to an index and/or a formula, upon redemption of such Note pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 shall be the Amortised Face Amount (calculated as provided below) of such Note.

(ii)    Subject to the provisions of sub paragraph (iii) below, the Amortised Face Amount of any such Note shall be the scheduled Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount equal to the issue price of the Notes if they were discounted back to their issue price on the Issue Date) compounded annually. Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(iii)    If the Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 6(d) or upon it becoming due and payable as provided in Condition 10 is not paid when due, the Redemption Amount due and payable in respect of such Note shall be the Amortised Face Amount of such Note as defined in sub paragraph (ii) above, except that such sub-paragraph shall have effect as though the reference therein to the date on which the Note becomes due and payable were replaced by a reference to the

Relevant Date. The calculation of the Amortised Face Amount in accordance with this sub paragraph shall continue to be made (as well after as before judgment) until the Relevant Date, unless the Relevant Date falls on or after the Maturity Date, in which case the amount due and payable shall be the scheduled Redemption Amount of such Note on the Maturity Date together with any interest that may accrue in accordance with Condition 5(d).

### (c)  Mandatory Redemption

Subject to the terms of the relevant Supplemental Trust Deed, if any of the Collateral becomes repayable prior to its stated date of maturity for whatever reason or (unless the Trustee otherwise agrees) there is a payment default (after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the later of the Issue Date and the date on which such Collateral was issued) in respect of any of the Collateral, a proportion of the principal amount of the Notes outstanding equal to the proportion of the Collateral comprised by the Collateral repaid or in respect of which there is a default will become immediately repayable. The Issuer shall forthwith give not more than 45 nor less than 30 Business Days' prior notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee and the Noteholders (which notice shall be irrevocable) and upon expiry of such notice the Issuer will redeem either, as the case may be, all of the Notes at their Early Redemption Amount together with accrued interest or, in the case of a redemption in part, either (x) some of the Notes at their Early Redemption Amount together with accrued interest (if redemption is to be effected in accordance with Partial Redemption Method A (as specified in the relevant Supplemental Trust Deed)) or (y) all of the Notes on a *pro rata* basis in an aggregate principal amount equal to that of the Collateral repaid or in respect of which there is a default (if redemption is to be effected in accordance with Partial Redemption Method B (as specified in the relevant Supplemental Trust Deed)), failing which all of the Notes shall become repayable and the security constituted by the relevant Supplemental Trust Deed and/or any Other Security Document shall become enforceable and the Trustee will take such action as is provided in Condition 4. In this Condition "**Business Day**" means a day on which commercial banks and foreign exchange markets are open in the cities specified in the relevant Supplemental Trust Deed.

### (d)  Redemption for Taxation and Other Reasons

(i)   If the Issuer, on the occasion of the next payment due in respect of the Notes or Coupons, would not be required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due, the Issuer shall so inform the Trustee, shall use its best endeavours to arrange the substitution of a company incorporated in another jurisdiction approved by the Trustee as the principal debtor (provided that, in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency) and if it is unable to arrange such substitution before the next payment is due in respect of the Notes it shall convene a meeting of the Noteholders at which it shall propose an Extraordinary Resolution amending the Conditions to provide for payment net of withholding tax or for payment net of withholding tax at a rate in excess of the then current rate of withholding, as the case may be. In the event of such Extraordinary Resolution not being passed either at such meeting or at any adjournment thereof, the Issuer shall (not later than the seventh day following such meeting (or any adjournment thereof)) redeem all but not some only of the Notes at their Early Redemption Amount together with interest (if any) accrued to the date fixed for redemption unless the Trustee certifies to the Issuer that, in its absolute discretion, it considers that it is in the best interests of the Noteholders that the Notes not be so redeemed or an Extraordinary Resolution of the Noteholders otherwise directs; or

(ii)  If a Swap Agreement is terminated in whole for any reason then the Issuer shall forthwith give not more than 45 nor less than 15 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee, the Noteholders and the Swap Counterparty (which notice shall be irrevocable), and on the expiry of such notice shall redeem all but not some only of the Notes at their Early Redemption Amount together with any interest accrued to the date fixed for redemption. Such notice shall be given promptly upon the termination of the relevant Swap Agreement and such redemption

made, unless the Trustee shall certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the holders of the Notes that such notice and redemption be delayed or not given or made, as the case may be, or an Extraordinary Resolution of the holders of the Notes shall otherwise direct.

Notwithstanding the foregoing, if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of:

(i)   a withholding or deduction imposed on a payment by or on behalf of the relevant Issuer to an individual required to be made pursuant to European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive; or

(ii)  the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union

then Condition 6(d)(i) shall not apply. The relevant Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed. Any such deduction shall not constitute an Event of Default under Condition 10.

**(e)   Redemption at the Option of the Issuer**

If so specified in the relevant Supplemental Trust Deed, the Issuer may, on giving not more than 45 nor less than 30 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Noteholders and the Trustee (which notice shall be irrevocable) redeem all or, if so provided in the relevant Supplemental Trust Deed, some of the Notes at the Early Redemption Amount on the Issuer's Optional Redemption Date or Dates so provided in the relevant Supplemental Trust Deed. Upon expiration of such notice, the Issuer shall be bound to redeem the Notes at their Early Redemption Amount, together, if appropriate, with interest accrued to, but excluding, such date or dates of redemption.

**(f)   Redemption at the Option of Noteholders**

If so specified in the relevant Supplemental Trust Deed, the Issuer shall, at the option of the holder of any Note, redeem such Note on the date or dates so provided at its Early Redemption Amount together with interest accrued to the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Receipts and Coupons and unexchanged Talons) with any Paying Agent or (in the case of Registered Notes) the Certificate representing such Note(s) with the Registrar or any Transfer Agent at its specified office, together with a duly completed option exercise notice ("Exercise Notice") in the form obtainable from any Paying Agent, the Registrar or any Transfer Agent (as applicable) within the Noteholders' Option Period as specified in the Final Terms. No Note or Certificate so deposited and option exercised may be withdrawn (except as provided in the Agency Agreement) without the prior consent of the Issuer.

**(g)   Early Redemption Amount**

Unless otherwise specified in the relevant Supplemental Trust Deed, the Early Redemption Amount payable upon a redemption of any Note pursuant to Condition 6 (c), (d), (e), (f) and (k) and Condition 10 shall be an amount, determined by the Calculation Agent in its absolute discretion, equal to the Recovery Fraction of the principal amount of the Note (or, if applicable, the part of the Note) being redeemed (the "Early Redemption Amount").

Where:

"Counterparty" means each party (other than the Issuer) to a Credit Enhancement Agreement.

"Credit Enhancement Termination Payment" means the total amount payable to the Issuer by a Counterparty (being a positive number) on the termination of (or as the case may be, the *pro rata* portion of) any related Credit Enhancement Agreement.

"**Recovery Amount**" means the amount received by or on behalf of the Issuer upon the sale of the Collateral (or, if applicable the *pro rata* portion of the Collateral) after the deduction of all costs, fees, charges, taxes and expenses of or incurred by the Issuer or, if applicable, the Disposal Agent in connection with the sale of the relevant Collateral and the early redemption of the Notes plus, if a positive number, the aggregate amount of, or minus, if a negative number, the aggregate amount of the Swap Termination Payment and/or the Credit Enhancement Termination Payment.

"**Recovery Fraction**" means a fraction of which the numerator is the Recovery Amount and the denominator is the aggregate principal amount of the Notes falling due for redemption.

"**Swap Termination Payment**" means the amount payable to the Issuer by the Swap Counterparty (in which case, it shall be a positive number) or by the Issuer to the Swap Counterparty (in which case, it shall be a negative number) on the termination of (or, as the case may be, the *pro rata* portion of) the related Swap Agreement.

(h) *Notice of Redemption and Drawings*

All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition. In the case of a partial redemption if the relevant Supplemental Trust Deed specifies "Partial Redemption Method A", then the notice shall also contain the certificate numbers of the Notes to be redeemed, which shall have been drawn in such place as the Trustee may approve and in such manner as it deems appropriate, subject to compliance with any applicable laws and stock exchange requirements. If the relevant Supplemental Trust Deed specifies "Partial Redemption Method B", then each Note will be redeemed on a *pro rata* basis.

(i) *Purchases*

If the Issuer has satisfied the Trustee that it has made arrangements for the purchase of the Notes and, to the extent that the Notes will be surrendered for cancellation, it has made arrangements for the realisation of no more than the equivalent proportion of the Collateral, which transaction will leave the Issuer with no net liabilities in respect thereof, it may at any time purchase Notes (provided that they are purchased together with all unmatured Coupons and Talons related to them) in the open market or otherwise at any price.

(j) *Cancellation*

The Issuer may, but shall not be obliged to, surrender for cancellation all Notes purchased by or on behalf of it, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Receipts and Coupons and all unexchanged Talons to, or to the order of, the Issuing and Paying Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Receipts and Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Notes shall be discharged.

(k) *Exchange*

If so specified in the relevant Supplemental Trust Deed, any holder may at its option (subject to, if so specified in the Supplemental Trust Deed, the consent of each relevant Counterparty) exchange any or all of its Notes for (i) an amount (the "**Net Asset Amount**") calculated by the Issuer, equal to the then market value of such proportion of the Collateral (the "**attributable Collateral**") or, as the case may be, the Issuer's rights in respect thereof (the "**attributable rights**") or (ii) physical delivery ("**Physical Delivery**") of such proportion of the Collateral itself, in each case as equals the proportion (rounded down to the nearest whole number) which the Notes to be exchanged bears to the total principal amount outstanding of the Notes (less the costs of such valuation) adjusted as appropriate by the value realised or cost incurred, as the case may be, as a result of the termination of any Swap Agreement and/or Credit Enhancement Agreement, or part thereof in accordance with this Condition 6(*k*). To exercise such option, the holder shall, if the Notes are in bearer form, deposit the relevant Notes (together with all (if any) unmatured Coupons or Talons appertaining thereto) or, if the Notes are in registered form, deposit the Certificate representing the Notes at the office of Register, together with written notice that such option is to be exercised and (if the holder has elected for Physical Delivery, where available) a delivery instruction form (a "**Delivery Instruction Form**") substantially in the

form set out in the Agency Agreement (and available upon request from the specified office of any Paying Agent or Transfer Agent during normal office hours). The Issuing and Paying Agent will forthwith notify the Issuer, each Counterparty, each Swap Counterparty, the Custodian, the Disposal Agent, the Registrar and the Trustee of receipt of such written notice. Each Counterparty and each Swap Counterparty shall forthwith notify the Issuer, the Trustee, the Custodian and the Issuing and Paying Agent (who shall then notify the relevant holder) of the net sum payable by such Counterparty and by, or, as the case may be, to such Swap Counterparty on termination of the relevant part of the relevant Credit Enhancement Agreement or Swap Agreement, as appropriate. The part of the relevant Credit Enhancement Agreement or, as the case may be, the relevant Swap Agreement to be terminated will be the *pro rata* amount thereof corresponding to that proportion of the Notes to be exchanged. The calculation of the Net Asset Amount in accordance with this Condition 6(k) shall be binding on the relevant holder(s) in the absence of manifest error. Any such Net Asset Amount shall be payable to the holder at the specified office of any Paying Agent or Transfer Agent at which the relevant Notes were deposited on the twentieth calendar day after such deposit (the "**Delivery Date**") or (if the holder has elected for Physical Delivery) (subject to receipt of a Delivery Instruction form) delivered on, or as soon as practicable after, the Settlement Date to the account at Euroclear Bank S.A./N.V. as operator of the Euroclear System ("**Euroclear**") or Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**" and, together with Euroclear and/or any alternative clearing system agreed by the Trustee, the "**Clearing Systems**") (or in such other manner as shall be provided in the relevant Supplemental Trust Deed) as specified in the relevant Delivery Instruction Form.

Notwithstanding the foregoing provisions of this Condition 6(k), the Issuer may, at its discretion, elect to satisfy the obligations hereunder by delivery to the relevant holder of the attributable Collateral or, as the case may be, by assignment to the relevant holder of the attributable rights even though the holder may not have elected for Physical Delivery. In any such case, the Issuer will procure that, subject to any payment due from the holder to the Swap Counterparty being made, the relevant attributable Collateral is delivered to the holder (or to any other place or account specified in the written notice referred to above) or, as the case may be, the relevant attributable rights are assigned to the holder on the Delivery Date and shall use all reasonable endeavours to procure that any payment being due from the relevant Counterparty and/or relevant Swap Counterparty to the holder on termination of the relevant Credit Enhancement Agreement and/or relevant Swap Agreement or part thereof is duly made.

Accountholders at the Clearing Systems will be required to give an irrevocable instruction to the relevant Clearing System, as the case may be, in respect of such delivery in the form prescribed by the relevant Clearing System (which may be in a form other than that set out in the Agency Agreement), not later than 10.00 a.m. Brussels or Luxembourg time, as the case may be (or, in the case of an instruction to Euroclear via EUCLID or EUCLID 90, 11.00 a.m. Brussels time), on the Clearing Business Day prior to the Delivery Date.

No interest will be payable with respect to Notes deposited for exchange pursuant to this Condition in respect of the period from the date of issue of the Notes (in the case of exchange prior to the first due date for the payment of interest on the Note) or the previous date for the payment of interest on the Note (in any other case) to the date of such exchange.

The relevant Supplemental Trust Deed will contain provisions for the release of the relevant Mortgaged Property for which Notes have been exchanged from the remaining charges upon them.

In these Conditions:

"**Clearing Business Day**" means a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is open for the acceptance and execution of settlement instructions other than a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is scheduled to close prior to its regular weekday closing time.

"**delivered**" means the satisfaction of any obligation of the Issuer to complete all matters necessary to transfer the relevant Net Asset Amount to the relevant Noteholder (or the first-named of joint holders) with full title guarantee. Accordingly, and for the avoidance of doubt, there shall be no obligation on the Issuer to concern itself with any formalities or requirements

that shall be placed on the relevant Noteholder (or the first-named of joint holders) as the transferee of the relevant Net Asset Amount in connection with the acquisition by such Noteholder of the relevant Net Asset Amounts.

"**Recovery Value**" means the value, expressed as a percentage, of a claim against the obligor in respect of the relevant Collateral, as determined by the Swap Counterparty acting in good faith and in a commercially reasonable manner and by way of example but without limitation, the Swap Counterparty may in making this determination, take account of the mean of the market prices of all securities issued by the relevant obligor, disregarding any securities which have a market price which is at an artificially inflated level.

"**Settlement Date**" means the Delivery Date, except and to the extent that (i) a Settlement Disruption Event prevents delivery of the relevant Net Asset Amount on that day, (ii) pursuant to the terms of the relevant Swap Agreement and due to an event (the "**Impossibility Event**") beyond the control of the Swap Counterparty it is impossible (including due to market illiquidity) or illegal for the Swap Counterparty to deliver to the Issuer any Net Asset Amount, in which event the Settlement Date shall be postponed to the next following day after receipt by the Issuer of the relevant Net Asset Amount, provided that if by the 31st calendar day following the original Settlement Date the Impossibility Event is still continuing, the Notes shall become immediately repayable at their Early Redemption Amount and (iii) due to circumstances beyond the control of the Swap Counterparty the market price of any or all Net Asset Amount is at an artificially inflated level, in which event the Swap Counterparty may, in full satisfaction of its obligation to deliver the relevant Net Asset Amount, pay to the Issuer, on the Settlement Date, the True Value of the relevant Net Asset Amount. In the case of (ii) and to such extent, the Settlement Date will be the first succeeding day (if such day is after the Delivery Date) on which settlement of that Net Asset Amount can take place through Euroclear or Clearstream, Luxembourg unless a Settlement Disruption Event prevents delivery in accordance with the relevant Delivery Instruction form on each of the ten (10) Clearing Business Days immediately following that Delivery Date. In that case, (A) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount can be delivered in any other commercially reasonable manner, then the Settlement Date will be the first day on which settlement of a sale of the relevant Net Asset Amount executed on that tenth (10th) Clearing Business Day customarily would take place using such other commercially reasonable manner of delivery, and (B) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount cannot be delivered in any other commercially reasonable manner, then the Settlement Date will be postponed until such delivery can be effected through Euroclear or Clearstream, Luxembourg or, as determined by the Calculation Agent, in any other commercially reasonable manner. If a Settlement Disruption Event applies to a part only of the relevant Net Asset Amount, the Settlement Date shall be postponed, in accordance with the above provisions, in respect of the affected part of the relevant Net Asset Amount only. No additional amounts will be payable by the Issuer by virtue of any delay of the Settlement Date by virtue of a Settlement Disruption Event. In the case of (iii) the determination as to whether the market price of the Collateral is at an "artificially inflated level" will be made by the Swap Counterparty acting in good faith and in a commercially reasonable manner and, by way of example but without limitation, such market price will be considered to be at an artificially inflated level if due to a default or prospect of default by the obligor in relation to the relevant Collateral, there is an increase in demand for the Collateral caused principally by contractual obligations to deliver such Net Asset Amount upon the occurrence of such a default or prospect of default.

"**Settlement Disruption Event**" means an event beyond the control of the Issuer as a result of which the Clearing Systems cannot, in the determination of the Calculation Agent, deliver all or any part of the relevant Net Asset Amount.

"**True Value**" means, in relation to any particular securities, an amount equal to the product of the Recovery Value of the particular securities and the aggregate principal amount of such securities.

7.  **Payments and Talons**

*(a)*  *Bearer Notes*

Payments of principal and interest in respect of Bearer Notes shall, subject as mentioned below, be made against presentation and surrender of the relevant Receipts (in the case of payments of Instalment Amounts other than on the due date for redemption and provided that the Receipt is

presented for payment together with its relative Note), Notes (in the case of all other payments of principal and, in the case of interest, as specified in Condition 7(f)(vi)) or Coupons (in the case of interest, save as specified in Condition 7(f)(vi)), as the case may be, at the specified office of any Paying Agent by a cheque payable in the currency in which such payment is due drawn on, or, at the option of, and on three Business Days' notice from, the holder, by transfer to an account denominated in that currency with, a bank in the principal financial centre for that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(b) *Registered Notes*

(i) Payments of principal (which for the purposes of this Condition 7(b) shall include final Instalment Amounts but not other Instalment Amounts) in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Registrar or of the Transfer Agents and in the manner provided in paragraph (ii) below.

(ii) Interest (which for the purpose of this Condition 7(b) shall include all Instalment Amounts other than final Instalment Amounts) on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "**Record Date**"). Payments of interest on each Registered Note shall be made in the currency in which such payments are due by cheque drawn on a bank in the principal financial centre of the country of the currency concerned and mailed to the holder (or to the first named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date and subject as provided in paragraph (a) above, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a bank in the principal financial centre of the country of that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

(c) *Payments in the United States*

Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, and payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (ii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

(d) *Payments Subject to Fiscal Laws*

All payments are subject in all cases to any applicable fiscal or other laws, regulations and directives, but without prejudice to the provisions of Condition 8. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e) *Appointment of Agents*

The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent initially appointed by the Issuer and their respective specified offices are listed below. The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent act solely as agents of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of the Issuing and Paying Agent, any other Paying Agent, the Registrar, any Transfer Agent, the Calculation Agent or the Disposal Agent and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) an Issuing and Paying Agent, (ii) a Registrar in relation to Registered Notes, (iii) a Transfer Agent in relation to Registered Notes having its specified office in a major European city (which shall be Dublin ), (iv) one or more Calculation Agent(s) where the Conditions so require, (v) a Disposal Agent where the Conditions so require, (vi) a Paying Agent having its specified office in a major European city (which shall be Dublin so long as the Notes are listed on the Irish Stock Exchange) and (vii) such other agents as may

be required by any other stock exchange on which the Notes may be listed, in each case as approved by the Trustee and (viii) a Paying Agent with a specified office in a European Union Member State that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Union Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive.

In addition, the Issuer shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Unmatured Coupons and Receipts and Unexchanged Talons.

*(f)  Unmatured Coupons and Receipts and Unexchanged Talons*

(i)  Unless the Notes provide that the relative Coupons are to become void upon the due date for redemption of those Notes, Bearer Notes should be surrendered for payment together with all unmatured Coupons (if any) appertaining thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Redemption Amount due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 9).

(ii)  If the Notes so provide, upon the due date for redemption of any Bearer Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii)  Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv)  Upon the due date for redemption of any Bearer Note that is redeemable in instalments, all Receipts relating to such Note having an Instalment Date falling on or after such due date (whether or not attached) shall become void and no payment shall be made in respect of them.

(v)  Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(vi)  If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note against presentation of the relevant Note or Certificate representing it, as the case may be.

*(g)  Talons*

On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Issuing and Paying Agent or, as it may direct, in exchange for a further Coupon sheet (and, if necessary, another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 9).

*(h)*  *Non-Business Days*

If any date for payment in respect of any Note, Receipt or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "**business day**" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "**Business Day Jurisdictions**" hereon and:

(i)  (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency; or

(ii)  (in the case of a payment in euro) which is a TARGET Business Day.

## 8.  Taxation

All payments of principal and interest in respect of the Notes and the Coupons shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed thereon. Any such deduction shall not be an Event of Default under Condition 10. In the event of the imposition of such withholding taxes on payments in respect of the Notes, the Issuer will use its best endeavours to arrange for its substitution as principal debtor by a company incorporated in another jurisdiction, subject to and in accordance with Condition 6(*d*).

## 9.  Prescription

Claims against the Issuer for payment in respect of the Notes, Receipts and Coupons (which, for this purpose, shall not include Talons) shall be prescribed and become void unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

## 10.  Events of Default

If any of the following events ("**Events of Default**") occurs, the Trustee at its discretion may, and if so requested by holders of at least one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution shall, give notice to the Issuer that the Notes are, and they shall immediately become, due and payable at their Early Redemption Amount together with accrued interest and the security constituted by the Trust Deed shall become enforceable (as provided in the Trust Deed):

(a)  if default is made for a period of 14 days or more in the payment of any sum due in respect of the Notes or any of them; or

(b)  if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, incapable of remedy, in which case no notice shall be required; or

(c)  if an administrator shall be appointed or any order shall be made by any competent court or any resolution passed for the winding up or dissolution of the Issuer or the appointment of an examiner, liquidator or similar official in relation to the Issuer save for the purposes of amalgamation, merger, consolidation, reorganisation or other similar arrangement on terms previously approved by the Trustee or by an Extraordinary Resolution.

The Issuer has undertaken in the Principal Trust Deed that, on each anniversary of the date of the Principal Trust Deed and also within 14 days after any request by the Trustee, it will send to the Trustee a certificate signed by two Directors of the Issuer to the effect that, since the date of the Principal Trust Deed or, as the case may be, the date of the last such certificate, no Event of Default, Potential Event of Default or other matter required to be brought to the Trustee's attention has occurred.

## 11. Enforcement

At any time after the Notes become due and payable, the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer as it may think fit to enforce the terms of the Trust Deed, the Notes and Coupons, but it need not take any proceedings unless (i) it shall have been so directed by an Extraordinary Resolution or so requested in writing by Noteholders holding at least one fifth in principal amount of Notes outstanding, and (ii) it shall have been indemnified to its satisfaction.

Only the Trustee may pursue the remedies available under the Trust Deed to enforce the rights of the Noteholders and Couponholders and no Noteholder or Couponholder is entitled to proceed against the Issuer unless the Trustee, having become bound to proceed in accordance with the terms of the Trust Deed, fails or neglects to do so and such failure or neglect is continuing. Having realised the security or, in the case of a partial redemption of Notes pursuant to Condition 6(c), part of the security corresponding to the proportion of Notes redeemed, and distributed the net proceeds in accordance with Condition 4, the Trustee may not take any further steps against the Issuer to recover any sum still unpaid and the Issuer will not be obliged to make any further payment in respect of any such sum and accordingly no debt shall be owed by the Issuer in respect of any such sum.

## 12. Meeting of Noteholders, Modification, Waiver and Substitution

### (a) Meetings of Noteholders

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matter affecting their interests, including the sanctioning by Extraordinary Resolution (as defined in the Trust Deed) of a modification of any of these Conditions or any provisions of the Trust Deed or the restructuring of the Notes. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in principal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution shall be two or more persons holding or representing a clear majority in principal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to modify the details of the Mortgaged Property, the maturity of the Notes or the dates on which interest is payable on them, (ii) to reduce or cancel the principal amount of, any premium payable on redemption of, or interest on, or to vary the method of calculating the rate of interest or reducing the minimum rate of interest on, the Notes, (iii) to change the currency of payment of the Notes, (iv) to modify the Events of Default, (v) to modify the provisions concerning the quorum required at a meeting or the majority required to pass an Extraordinary Resolution or (vi) amending (i) to (v) above, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders. A written resolution of the holders of not less than 90 per cent. in principal amount of the Notes for the time being outstanding shall take effect as an Extraordinary Resolution.

### (b) Modification of the Trust Deed

The Trustee may agree, without the consent of the Noteholders or Couponholders, to (i) any modification of any of the provisions of the Trust Deed or any relevant Swap Agreement that is in its opinion of a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed that is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders. Any such modification, authorisation or waiver shall be binding on the Noteholders and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable. In relation to Notes which are rated by a rating agency, the Issuer shall notify the relevant rating agency of any modification made in accordance with this Condition 12(b).

*(c)  Substitution*

The Trust Deed contains provisions permitting the Trustee to agree, subject to such amendment of the Trust Deed and such other conditions as the Trustee may require including the transfer of the Mortgaged Property and subject to the consent of the relevant Swap Counterparty, but without the consent of the Noteholders or the Couponholders, to the substitution of any other company in place of the Issuer, or of any previous substituted company, as principal debtor under the Trust Deed and the Notes provided that, in relation only to Notes which are rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. In the case of such a substitution the Trustee may agree, without the consent of the Noteholders or the Couponholders, to a change of the law governing the Notes, the Receipts, the Coupons, the Talons and/or the Trust Deed provided that such change (i) would not in the opinion of the Trustee be materially prejudicial to the interests of the Noteholders and (ii) in relation only to Notes rated by a rating agency, shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Under the Trust Deed, the Trustee may agree or require the Issuer to procure the substitution as principal debtor under the Trust Deed of a company incorporated in some other jurisdiction in the event of the Issuer becoming subject to any form of tax on its income or payments in respect of the Notes.

*(d)  Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to those referred to in this Condition) the Trustee shall have regard to the interests of the Noteholders as a class and shall not have regard to the consequences of such exercise for individual Noteholders or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder or Couponholder be entitled to claim, from the Issuer any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders or Couponholders.

*(e)  Retirement or Removal of the Trustee*

The Trustee may retire on giving three months' written notice to the Issuer and the Noteholders may remove the Trustee by Extraordinary Resolution. However, if the Trustee is a sole trust corporation then any such retirement or removal shall not be effective until a successor Trustee is appointed.

## 13.  Replacement of Notes, Certificates, Receipts, Coupons and Talons

If a Note, Certificate, Receipt, Coupon or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced, subject to applicable laws, regulations and stock exchange regulations, at the specified office of the Paying Agent in the Republic of Ireland (in the case of Bearer Notes, Receipts, Coupons or Talons) and of the Registrar (in the case of Certificates) or such other Paying Agent, as the case may be, as may from time to time be designated by the Issuer for the purpose and notice of whose designation is given to Noteholders, in each case on payment by the claimant of the fees and costs incurred in connection therewith and on such terms as to evidence, security and indemnity (which may provide, *inter alia*, that if the allegedly lost, stolen or destroyed Note, Certificate, Receipt, Coupon or Talon is subsequently presented for payment or, as the case may be, for exchange for further Coupons, there shall be paid to the Issuer on demand the amount payable by the Issuer in respect of such Notes, Certificates, Receipts, Coupons or further Coupons) and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates, Receipts, Coupons or Talons must be surrendered before replacements will be issued.

## 14.  Notices

Notices to the holders of Registered Notes shall be mailed to them at their respective addresses in the Register and deemed to have been given on the fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices to the holders of Bearer Notes shall be valid if published in a daily newspaper of general circulation in London (which is expected to be the *Financial Times*) and (so long as the Notes are listed on a stock exchange and the rules of that stock exchange so require) in any such other newspaper in which publication is so required by the rules of that stock exchange (which, in the case of Notes listed on the Irish Stock Exchange, is expected to be the *Irish Times*). If in the opinion of the Trustee any such publication is not practicable, notice shall be validly given if published in another leading daily English language newspaper with general

circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made, as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the holders of Bearer Notes in accordance with this Condition.

### 15.   Indemnification and Obligations of the Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility including for the exercise of any voting rights in respect of the Mortgaged Property, for the validity, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property and for taking proceedings to enforce repayment unless indemnified to its satisfaction. The Trustee and any affiliate is entitled to enter into business transactions with the Issuer, any issuer or guarantor (where applicable) of any of the Mortgaged Property, any Swap Counterparty or any of their subsidiary, holding or associated companies without accounting to the Noteholders for profit resulting therefrom.

The Trustee is exempted from liability with respect to any loss or theft or reduction in value of the Mortgaged Property, from any obligation to insure or to procure the insuring of the Mortgaged Property and from any claim arising from the fact that the Mortgaged Property will be held in safe custody by the Custodian or other custodian approved in writing by the Trustee (in each case, if applicable).

The Trust Deed provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

### 16.   Governing Law and Jurisdiction

#### (a)   Governing Law

The Trust Deed, the Notes, the Receipts, the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

#### (b)   Jurisdiction

The Courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons ("**Proceedings**") may be brought in such courts.

#### (c)   Service of Process

The Issuer has irrevocably appointed Lehman Brothers International (Europe) as its agent in England to receive, for it and on its behalf, service of process in any Proceedings in England.

### 17.   Contracts (Rights of Third Parties) Act 1999

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except to the extent (if any) that the Notes expressly provide for such Act to apply to any of their terms.

**REGISTERED OFFICE OF THE ISSUER**

AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

**TRUSTEE**

**J.P. Morgan Corporate Trustee Services Limited**
Trinity Tower
9 Thomas More Street
London E1W 1YT
United Kingdom

**ISSUING AND PAYING AGENT AND ACCOUNT BANK**

**JPMorgan Chase Bank, N.A.**
Trinity Tower
9 Thomas More Street
London E1W 1YT
United Kingdom

**LISTING AGENT**

**A&L Listing**
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**ARRANGER, CALCULATION AGENT AND DISPOSAL AGENT**

**Lehman Brothers International (Europe)**
25 Bank Street
London E14 5LE
United Kingdom

**IRISH PAYING AGENT**

**J.P. Morgan (Ireland) plc**
JPMorgan House
International Financial Services Centre
Dublin 1
Ireland

**LEGAL ADVISERS**

*to the Issuer*
*as to Irish law*

*to the Arranger*
*and the Joint Lead Managers*
*as to English law*

**A&L Goodbody Solicitors**
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**Linklaters**
One Silk Street
London EC2Y 8HQ
United Kingdom

**JOINT LEAD MANAGERS**

**Barclays Bank PLC**
5 The North Colonnade
Canary Wharf
London E14 4BB
United Kingdom

**Lehman Brothers International (Europe)**
25 Bank Street
London E14 5LE
United Kingdom

imprima de bussy — C94249

### Annex

### [Form of Asset Transfer Notice]

**Saphir Finance Public Limited Company**
**Series 2006-7**
**£400,000,000 Perpetual Non-Cumulative Securities**
**secured over the**
**£400,000,000 Series A Fixed/Floating Rate Non-Cumulative Callable Preference Shares**
**of**
**Northern Rock plc (the "Securities")**
**ISIN XS0259175536**

**issued pursuant to Multi-Issuer Secured Obligation Programme**

When completed, this Notice should be delivered in writing to the Issuer (as defined below) with a copy to the Issuing and Paying Agent referred to below at its office specified below.

To:

[Saphir Finance Public Limited Company]
[AIB International Centre
International Financial Services Centre
Dublin 1
Ireland]

Attention:        [The Directors]

Failure properly to complete and deliver this Notice (in the determination of the Issuer in consultation with the Issuing and Paying Agent) may result in this Notice being treated as null and void.

Expressions defined in the terms and conditions of the Securities (the **"Conditions"**) shall bear the same meanings herein.

This Notice comprises an Asset Transfer Notice for the purposes of the Conditions.

I/We *, [the duly authorised representative of] the Holder[s] of Securities specified in 1 below and holder[s] of the number of Securities identified below, hereby irrevocably instruct and authorise Euroclear or Clearstream, Luxembourg [other relevant clearing system] to debit the account identified below with such Securities in connection with the redemption of the Securities by physical settlement in accordance with the Conditions. The account(s) and/or addresses to which any Asset Amount is deliverable upon such redemption by physical settlement shall be as set out below.

1.       **Name and Address of Holder[s] of Securities** and the person from whom the Issuer may obtain details for the transfer of the Asset Amount.

1.      ————————————

---

\* Delete as appropriate.

[     ]

**2.**     **Number of Securities subject to this Notice**

[     ]

**3.**     **Holder[s] of Securities account[s] at Euroclear or Clearstream, Luxembourg [or other relevant clearing system]:**

[     ]

**4.**     **Delivery of Asset Amount**

The account(s) and/or addresses to which any Asset Amount is deliverable are [     ].

**5.**     **Authorisation of production in proceedings**

I/We* on behalf of the Holder[s] of Securities to whom this Notice relates hereby authorise the production of this Notice in any administrative or legal proceedings instituted in connection with the Securities to which this Notice relates.

Delivery Method Details
[
                              ]

DESPATCH BY POST OR COURIER WILL BE MADE AT THE RISK AND EXPENSE OF THE NOTEHOLDER[S].

Date.......................................

Copy:

Paying Agent

[Trinity Tower, 9 Thomas More Street, London E1W 1YT]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                              :        **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       :        **08-13555 (JMP)**
                                                   :
                            **Debtors.**           :        **(Jointly Administered)**
-------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' TWO HUNDRED SIXTY-SECOND OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

Upon the two hundred sixty-second objection to claims, dated February 6, 2012 (the "Two Hundred Sixty-Second Omnibus Objection to Claims"),[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim [Docket No. 6664] (the "Procedures Order"), seeking disallowance and expungement of the No Liability Claims on the grounds that they assert claims for which the Debtors have no liability, all as more fully described in the Two Hundred Sixty-Second Omnibus Objection to Claims; and due and proper notice of the Two Hundred Sixty-Second Omnibus Objection to Claims having been provided to (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for Region 2; (vi) the claimants listed on Exhibit A attached to the Two Hundred Sixty-Second Omnibus Objection to Claims; and (vii) all other parties

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Two Hundred Sixty-Second Omnibus Objection to Claims.

entitled to notice in accordance with the procedures set forth in the second amended order

entered on June 17, 2010 governing case management and administrative procedures for

these cases [Docket No. 9635]; and it appearing that no other or further notice need to be

provided; and the Court having found and determined that the relief sought in the Two

Hundred Sixty-Second Omnibus Objection to Claims is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual

bases set forth in the Two Hundred Sixty-Second Omnibus Objection to Claims establish

just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the relief requested in the Two Hundred Sixty-Second

Omnibus Objection to Claims is granted to the extent provided herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the

claims listed on Exhibit 1 annexed hereto (collectively, the "No Liability Claims") are

disallowed and expunged in their entirety with prejudice; and it is further

ORDERED that this Order supersedes all previous orders regarding the

disposition of the No Liability Claims listed on Exhibit 1 annexed hereto; and it is further

ORDERED that this Order has no res judicata, estoppel, or other effect on

the validity, allowance, or disallowance of, and all rights to object and defend on any

basis are expressly reserved with respect to, any claim listed on Exhibit A annexed to the

Two Hundred Sixty-Second Omnibus Objection to Claims that does not appear on

Exhibit 1 annexed hereto; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to this Order.

Dated: _____, 2012
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE