Stephen Z. Starr
Starr & Starr, PLLC
260 Madison Ave., 17th Fl.
New York, New York 10016
Tel: (212) 867-8165
Fax: (212) 867-8139

-and-

James D. Vail (admission *pro hac vice* pending)
Schneider, Smeltz, Ranney & LaFond, P.L.L.
1111 Superior Avenue, Suite 1000
Cleveland, Ohio 44114
Tel: (216) 696-4200
Fax: (216) 696-7303

Attorneys for Judson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                            :
In re:                                                      :
                                                            :    Chapter 11 Case No.
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                    :
                                                            :    08-13555 (JMP)
                                        Debtors.            :
                                                            :    (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### JUDSON'S BRIEF IN OPPOSITION TO DEBTORS' TWO HUNDRED FORTY-FOURTH OMNIBUS OBJECTION TO CLAIMS

Judson hereby submits this Brief in Opposition to Debtors' Two Hundred Forty–Fourth Omnibus Objection to Claims (the "Objection"). Judson's Proof of Claim is valid and the Objection, as it pertains to Judson, should be overruled.

### Introduction

The Debtors ask this Court to disallow and expunge Judson's claim, arguing incorrectly that Debtors owe Judson nothing in connection with an interest rate swap agreement entered into by Judson and Lehman Brothers Special Finance, Inc. ("LBSF"), whose obligation was

{00172003.DOC}

guaranteed by Lehman Brothers Holdings, Inc. ("LBHI") (hereinafter "Debtors"). In fact, Debtors owe Judson $434,656.17, plus interest thereon, as a result of Debtors' default.

## Burden of Proof & Persuasion

The filing of a proof of claim constitutes prima facie evidence of the validity of the claim. 11 U.S.C. § 502(a). In bringing an objection to a proof of claim the burden then shifts to the objector to produce evidence sufficient to negate prima facie validity. In re Allegheny Int'l Inc., 954 F.2d 167, 173–74 (3d Cir.1992). "Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim." In re Rockefeller Center Properties, 27,2 B.R. 524 (Bankr.S.D.N.Y.2000) (Beatty, J.) "In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant." In re Feinberg, 442 B.R. 215, 221 (Bankr. S.D.N.Y. 2010) (Morris, J.), *citing to* In re Spiegel, Inc., No. 03–11540, 2007 WL 2456626, *15 (Bankr.S.D.N.Y. Aug. 22, 2007).

## Statement of Facts

Judson is an Ohio nonprofit corporation which provides senior living services and housing in Northeast Ohio. It entered into an Interest Rate Swap Agreement (the "Agreement") with LBSF on September 2, 2005[1]. The Agreement consisted of a standard 1992 Local Currency-Single Jurisdiction ISDA Master Agreement (the "Master Agreement"), a schedule

---

[1] The Statement of Facts is supported by the Declarations of Timothy Sheehan, Joanna Stephenson, and Cynthia H. Dunn all filed contemporaneously herewith.

00172003.DOC

thereto (the "Schedule"), a Credit Support Annex to the Schedule, and a Confirmation. The Agreement contained the following pertinent provisions:

1. The initial notional amount of the Agreement was $23,010,000.00 accreting/amortizing per Annex I of the Confirmation.

2. Judson was to pay LBSF a fixed rate of interest of 3.307% on the notional amount.

3. LBSF was to pay Judson a floating rate of interest equal to 67% of three-month USD-LIBOR-BBA on the notional amount.

4. The Swap contained a Credit Support Annex in favor of Judson.

5. The Swap did not contain a Credit Support Annex in favor of LBSF.

6. LBSF was required to provide the guarantee of Lehman Brothers Holdings, Inc.

7. Judson was not required to provide a third-party guarantee.

8. The only covenant required of Judson was to maintain a debt service coverage ratio of 1.2 times; no liquidity covenant was imposed.

9. The Schedule called for the application of "Market Quotation" and "Second Method" for purposes of determining an Early Termination payment.

LBHI filed for bankruptcy protection on September 15, 2008, and LBSF filed for bankruptcy protection on October 5, 2008. Each such filing constituted an Event of Default under the Agreement. Judson served an Event of Default Notice on LBSF on October 20, 2008. The Agreement required Judson to follow the Market Quotation approach to determine the Early Termination payment resulting from a termination of the Agreement. Accordingly, the Event of Default Notice advised LBSF that Judson would solicit bids from Bank of America, CitiBank, DeutscheBank, JPMorgan Chase, Morgan Stanley, US Bank, and Wells Fargo (collectively, the "Market-makers") pursuant to Part 1(f) of the Schedule. It also solicited other Reference Market-makers from LBSF. LBSF did not provide any additional Reference Market-makers or respond to the Event of Default Notice.

3

Judson retained Cain Brothers and Company ("Cain Brothers") to assist it with respect to the impact of the Debtor's bankruptcy on the Agreement. On October 10, 2008, Judson, through Cain Brothers, delivered a Request for Bids to the Market-makers to replace the Agreement. Bids from the Market-makers were to be received by October 17, 2008. None of the Market-makers bid to replace the Agreement. Even after spending considerable time seeking refreshed bids or counterproposals, Judson received no bids from the Market-makers.

Judson terminated the Agreement on November 4, 2008, by hand delivery of its Notice of Termination. Because none of the Market-makers determined to bid on the Agreement, the Master Agreement required Judson to employ the Loss method to value the Agreement. Judson, with the assistance of Cain Brothers, determined the settlement amount of the Agreement to be $434,656.17 favorable to Judson (the "Judson Valuation").

A reasonable method to value the Agreement is:

1. First, determine the mid-market value of the Swap Agreement based upon then-current interest rates;

2. Then, adjust such mid-market value to take into account a) the credit profile of the parties to that Swap Agreement, and b) the contract terms specific to that Swap Agreement. Certain of the terms that may affect the value of a particular Swap Agreement include whether or not either party was required to provide a guarantor of that party's obligations, whether or not a party was required to post collateral, whether or not there were additional termination events ("ATEs") imposed on either party, and any covenants imposed on either party. In determining adjustments to mid-market value based upon a party's credit profile or specific contract terms it was reasonable to consider upon how other, comparable Swap Agreements were then being priced.

Judson, relying upon the advice of Cain Brothers, determined that the mid-market value of the Agreement on the Early Termination Date (to the extent there was a market on November 4, 2008) was $1,423,151.00 and then adjusted the mid-market value by 55 basis points, or $1,876,215 based upon the following:

4

1. The Agreement did not require Judson to post collateral under any circumstance.

2. The Agreement did require LBSF or its successor-in-interest to post collateral.

3. The Agreement did not impose a liquidity covenant on Judson; it merely required compliance with a debt service coverage of 1.20 times.

4. Senior living facilities were unattractive counterparties to providers of swap agreements, including the Market-makers, as of November 4, 2008.

5. Other favorable terms contained in the Swap that Judson was unable to replicate as of the Early Termination Date.

Although Judson was unable to obtain a replacement swap agreement on November 4, 2008, it did enter into a new swap agreement on March 12, 2009 (the "Second Swap Agreement"). The Second Swap Agreement contained terms that were significantly less favorable to Judson than the Swap, including:

1. The Second Swap Agreement required – where the Agreement did not – that Judson Foundation, a Judson affiliate, agree to be jointly and severally liable for Judson's obligations.

2. The Second Swap Agreement required – where the Agreement did not – the inclusion of a call right in favor of Judson that increased the fixed rate of interest required of Judson by about 55 to 60 basis points.

3. The Second Swap Agreement contained a $7,000,000 liquidity covenant whereas the Agreement contained no liquidity covenant.

**Statement of Law**

The Judson Valuation is Commercially Reasonable and Establishes Debtors Owe Judson $434,656.17 Plus Interest.

Judson's determination of the Early Termination payment was reasonable and made in good faith. It retained Cain Brothers, an investment banking firm and financial advisor with substantial experience and expertise in derivative and other interest rate management instruments, particularly in the health care and senior living industries. Cain Brothers advised Judson the Agreement had no value to LBSF; rather that LBSF owed Judson $434,656.17.

5

There can be no dispute that Judson followed the ISDA process, specifically that it properly sought to obtain bids from Market-makers, and then used the Loss method to determine the Early Termination payment. Judson's Valuation is corroborated by the fact that none of the seven Market-makers determined the Swap Agreement had any value to the Debtors on the termination date. If the Agreement had any value to Debtors, then at least one of the Market-makers would have been willing to pay at least one dollar to replace it. As Weeber et al. state:

> "In the case of a derivative that is a liability to the nondefaulting party [Judson] (i.e., an asset to the defaulting party [Debtors]), the reference market-makers would likely offer to pay differing amounts in return for the right to receive future amounts via the agreement. These funds can be used by the nondefaulting party [Judson] to settle the early termination amount due to the defaulting party [Debtors]. If the derivative is an asset to the nondefaulting party [Judson] (i.e., a liability to the defaulting party[Debtors]), the reference market-makers would likely require an up-front payment in order to agree to the same ongoing terms and conditions."

Phil Weeber, Matthew E. Hoffman & Edward S. Robson, *Market Practices for Settling Derivatives in Bankruptcy: Part I*, 28-OCT Am. Bankr. Inst. J. 26, 74 (2009).

Weeber's analysis supports the Judson Valuation, and demonstrates the implausibility of the Debtors' position. The refusal of any one of the seven Market-makers to bid anything for the Agreement is indisputable evidence that the Agreement was not an asset in the hand of the Debtors.

The Judson Valuation is further confirmed by the more onerous terms imposed on it in the Second Swap Agreement. As set forth in the Declaration of Mr. Sheehan, the terms Judson was required to accept in the Second Swap Agreement were much less attractive than those in the Agreement. Having to accept more onerous and expensive terms cost Judson the benefit of the bargain it negotiated with Debtors in the Agreement.

00172003.DOC

In CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A. 2011 Westlaw 4526132 (S.D.N.Y.) (September 29, 2011), the Court upheld the valuation by Wachovia Bank (the non-defaulting party) of a credit default swap. In CDO, as in this matter, the non-defaulting party was unable to obtain sufficient response from market-makers to employ the market quotation approach to value. Wachovia, like Judson, was then required to value the swap agreement pursuant to a "Loss" method, defined as:

> "[A]n amount that the [non-defaulting party] reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement… including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating or obtaining or reestablishing any hedge or related trading position…"

Wachovia determined the settlement amount to be $9,999,000. CDO objected to that determination for several reasons, including that Wachovia relied on only one quotation from the market, that such quotation was not commercially reasonable and that Wachovia could not possibly get an accurate estimate of the value of the trade because there was effectively, no market for default swaps in the subprime sector. The Court upheld Wachovia's valuation, finding that it had met its burden of demonstrating that its Settlement Amount valuation represents the "reasonable determination in good faith…of its total losses and costs". The Court specifically noted that the absence of a trading market for the swap agreement made it difficult to value the agreement based upon Market Quotation, and concluded Wachovia acted in good faith in determining the Settlement Value under the Loss method.

As in Wachovia, Judson was obligated to first use the market quotation method, but that approach did not yield a commercially reasonable result. It was then obligated to use the Loss method, defined essentially identical to the definition in the CDO swap agreement. Judson relied upon experienced investment bankers to assist in valuing the Agreement who did so using

7

methods that were reasonable, and which resulted in a valuation consistent with the failure of the Market-makers to bid on a replacement for the Agreement.  The Debtors cannot establish the Judson Valuation was not a reasonable determination made in good faith, and therefore their Objection should be overruled.

Debtors may argue that the Loss method requires the Early Termination payment to be determined based only upon the mid-market value of the Agreement as of the Termination Date (the "Interest Rate-Only Approach").  But the Agreement does not permit such an approach.  Certainly the drafters of the 1992 ISDA Master Agreement could have specified the Interest Rate-Only Approach if that been their intent.  The error of using the Interest Rate-Only Approach is made obvious if one considers what would have occurred if the Market Quotation process had resulted in a Settlement Amount for the Agreement of, say, $100.  In that event, one of the Market-makers would have paid Judson $100 to replace the Agreement, and Judson would have owed Debtors $100.  LBSF could not object to such an outcome.  But because the Market-makers found the Agreement to be completely worthless to Debtors (and their potential replacements), a party relying on the Interest-Rate Only Approach must claim that the Agreement should somehow magically be transformed from an asset of Judson to an asset of Debtors.  Such an approach cannot be reasonable.

The "Market Quotation" and "Loss" approaches are both designed to measure the value of the Agreement upon an Early Termination.

Market Quotation is defined, in pertinent part, as:

> "an amount determined on the basis of quotations from Reference Market-makers … that would be paid…in consideration of an agreement…that would have the effect of preserving for such party the economic equivalent of any payment or delivery…in respect of such Terminated Transaction…"

8

00172003.DOC

"Loss" is defined, in pertinent part, as:

> "an amount that party reasonably determines in good faith to be its total losses and costs…<u>including any loss of bargain</u>…incurred as a result of its terminating… the Agreement." (emphasis added)

The Market Quotation approach and the Loss approach are alternative methods of determining the value of the Agreement so that the party for whom the agreement has value can be compensated fairly. These alternative valuation methods should produce reasonably consistent results. In this case, the Market Quotation approach evidenced that no Market-maker was willing to pay even $1 to replace the Agreement – that the Agreement would have no value to any such Market-maker (or to Debtors). Judson's good faith application of the Loss method established an Early Termination payment of $434,656.17 to Judson, a value that is <u>consistent</u> with the Market Quotation approach. The Interest Rate-only Approach is <u>inconsistent</u> with the Market Quotation method.

The Loss method requires one to consider "any loss of bargain". The Agreement was a valuable asset to Judson when LBSF defaulted. The market for interest rate swap agreements changed between September 2005 (when the Agreement was executed) and November 4, 2008 (the "Termination Date") - as it had for almost every contract in the capital markets. While the terms contained in the Agreement were readily available to organizations like Judson in September 2005, they were unobtainable in November 2008. The changes in the capital markets converted the Agreement into a valuable asset for Judson. Swap agreements are no different than other contracts; their value increases when they contain advantageous terms that are no longer readily available in the marketplace. Debtors' default caused Judson to lose the benefit of its bargain.

9

The Interest Rate-Only Approach requires one to ignore the creditworthiness of the parties to an interest rate swap agreement and assume that the value of any particular swap agreement according to the Loss method would be the same irrespective of the counterparty – be that a counterparty with a AAA rating or one that is unrated with questionable credit.  That simply cannot be reasonable.  The Master Agreement cannot reasonably be interpreted to first call for an approach that relies heavily on market conditions and credit issues ("Market Quotation"), but then defaults to an analysis that looks only to interest rates and completely ignores the capital and credit markets.  Such an approach requires ignoring not only common sense, but the words "loss of bargain" contained in the definition.  In analyzing the terms of a contract, one "may not by construction add or <u>excise</u> terms, or distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." <u>Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.</u>, 1N.Y. 3d.470, 475 (2004), quoting <u>Reiss v. Financial Performance Corp.</u>, 97N.Y. 2d. 195, 199 (2001).

**Request for Evidentiary Hearing**

In that Local Bankruptcy Rule 9014-2 provides that the first scheduled hearing in a contested matter will not be an evidentiary hearing at which witnesses will testify, Judson specifically requests and reserves its right to request an evidentiary hearing before the Court, inter alia, (a) to present direct testimony in support of Judson's opposition to the Objection, and (b) to cross-examine Gary H. Mandelblatt, the declarant who executed a declaration referenced in the Opposition at n.2 (page 5).

00172003.DOC

For these reasons the Court should find that Judson acted reasonably and in good faith in arriving at the Judson Valuation, and should therefore overrule the Objection as it pertains to Judson.

Dated: New York, New York
     February 8, 2012                    STARR & STARR, PLLC

                                       By:   /s/ Stephen Z. Starr
                                          Stephen Z. Starr
                                  260 Madison Ave., 17th Fl.
                                  New York, New York 10016
                                  Tel: (212) 867-8165
                                  Fax: (212) 867-8139

                                  -and-

                                  James D. Vail(admission *pro hac vice* pending)
                                  Schneider, Smeltz, Ranney & LaFond, P.L.L.
                                  1111 Superior Avenue, Suite 1000
                                  Cleveland, Ohio 44114
                                  Tel: (216) 696-4200
                                  Fax: (216) 696-7303

00172003.DOC