Stephen Z. Starr
Starr & Starr, PLLC
260 Madison Ave., 17th Fl.
New York, New York 10016
Tel: (212) 867-8165
Fax: (212) 867-8139

-and-

James D. Vail (admission *pro hac vice* pending)
Schneider, Smeltz, Ranney & LaFond, P.L.L.
1111 Superior Avenue, Suite 1000
Cleveland, Ohio 44114
Tel: (216) 696-4200
Fax: (216) 696-7303

Attorneys for Judson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
In re:                              :
                                    :    Chapter 11 Case No.
LEHMAN BROTHERS HOLDINGS INC., *et al.*, :
                                    :    08-13555 (JMP)
            Debtors.                :
                                    :    (Jointly Administered)
------------------------------------X

### DECLARATION OF TIMOTHY SHEEHAN IN OPPOSITION TO DEBTORS' TWO HUNDRED FORTY-FOURTH OMNIBUS OBJECTION TO CLAIMS, AS SUCH OBJECTION PERTAINS TO THE CLAIM OF JUDSON

Pursuant to 28 U.S.C. Section 1746, I, Timothy Sheehan, declare:

1.   I am submitting this Declaration in Opposition to the Debtors' Objection to the claim filed by Judson. I have personal knowledge of the facts set forth herein which are known to me to be true and correct, and if called as a witness I could testify thereto.

2.   I am currently employed by Cain Brothers & Company, LLC ("Cain Brothers"). I was employed by Continental Bank from 1985 through 1995 in a capital markets group. From

{00171806.DOC}

1995 through 1998, I worked at B.C. Ziegler and Company where I was the Co-director of its Special Products Group and worked with derivatives and interest-rate management contracts, primarily in the health care industry. I joined Cain Brothers in 1998 as managing director and co-head of the Special Products Group, working with derivatives and interest-rate management agreements solely in the health care field. I held that position in November 2008.

3. I received a Bachelor of Science degree in Agricultural Economics from the University of Kentucky, a Master of Science degree in Agricultural Economics from the University of Illinois, and a Masters in Business Administration from the Wharton School at the University of Pennsylvania.

4. As of November 2008:

- I had been involved in the structuring, analysis and valuation of various types of derivative products including interest rate swap agreements (a "Swap Agreement") for approximately thirteen years.

- I had experience in the process of unwinding, replacing and valuing interest rate Swap Agreements.

- When a Swap Agreement entered into under the 1992 Local Currency – Single Jurisdiction ISDA Master Agreement (the "1992 ISDA") required valuation under the Loss method, it is, in my view, reasonable to value such a Swap Agreement as follows:

    - First, determine the mid-market value of the Swap Agreement based upon then-current interest rates;

    - Then, adjust such mid-market value to take into account (among other potential factors): a) the credit profile of the parties to that Swap

Agreement, and b) the contract terms specific to that Swap Agreement. Certain terms that may affect the value of a particular Swap Agreement include whether either party was required to provide a guaranty of that party's obligations, whether a party was required to post collateral, whether there were additional termination events ("ATEs") imposed on either party, and any covenants imposed on either party. It is also reasonable to consider how other comparable Swap Agreements were then being priced.

- I have applied this approach consistently in valuing interest rate swap agreements in the health care and senior living industries.
- It would seem highly unusual to value such a Swap Agreement without considering the credit profile of the party that is not the affected party or the contract terms specific to such a Swap Agreement.

5. Lehman Brothers Special Financing, Inc. ("LBSF") and Judson entered into an Interest Rate Swap Agreement on September 2, 2005. The transaction was governed by the standard form 1992 ISDA Master Agreement along with a Schedule thereto, a Credit Support Annex to the Schedule, and a Confirmation (collectively, the "Agreement") which are attached hereto as Exhibit A. As these documents reflect, the initial notional amount was $23,010,000, accreting/amortizing per Annex I of the Confirmation. Judson was to pay LBSF a fixed rate of interest of 3.307% on the notional amount. LBSF was to pay Judson a floating rate of interest equal to 67% of the three-month USD-LIBOR BBA on the notional amount.

6. It is my understanding that Lehman Brothers Holdings, Inc. ("LBHI") filed for bankruptcy protection on September 15, 2008 and LBSF filed for bankruptcy protection on

October 5, 2008. As the attached documents reflect, each such filing constituted an Event of Default under the Agreement.

7. Judson engaged Cain Brothers to assist Judson in connection with the implications of said bankruptcy petitions on the Agreement. On October 10, 2008, Cain Brothers, on behalf of Judson, delivered a Request for Bids to replace the Agreement to Bank of America, CitiBank, Deutsche Bank, JP Morgan Chase, Morgan Stanley, U.S. Bank, and Wells Fargo (collectively, the "Market-makers"). A copy of this Request for Bids is attached hereto as Exhibit B.

8. Judson served an Event of Default Notice on LBSF on October 20, 2008, a copy which is attached hereto as Exhibit C. Said notice advised LBSF that Judson would solicit bids from certain reference market-makers pursuant to Part 1(f) of the Schedule. Judson also solicited other reference market-makers from LBSF; however, LBSF did not respond to the Event of Default Notice in any respect.

9. None of the Market-makers identified above submitted a bid in response to the Request for Bids. Even after Cain Brothers, on behalf of Judson, sought refreshed bids or counterproposals, none of the Market-makers submitted a bid to replace the Swap.

10. Judson terminated the Swap on November 4, 2008, by hand delivery of its Notice of Termination, a copy of which is attached hereto as Exhibit D. Cain Brothers caused the Notice of Termination to be hand delivered to LBSF via courier. A copy of the courier service's manifest, attached hereto as Exhibit E, shows the Notice of Termination was delivered in November 4, 2008, at 3:09 pm.

11. Because none of the Market-makers elected to bid on the Agreement, Section 12 of the Master Agreement required Judson to employ the Loss method to determine the "Early Termination payment."

12. Cain Brothers assisted Judson in determining the value of the Agreement. I was the person at Cain Brothers primarily responsible for assisting Judson in this respect.

13. To determine how valuable an asset the Agreement was to Judson, and how great a liability it was to a replacement counterparty, Judson first determined the mid-market value of the Agreement, when the Agreement was terminated, by requesting that Cain Brothers perform a mid-market calculation. Accordingly, I estimated the mid-market value of the Agreement, using industry standard calculations and market data, to be $1,423,151 (the Mid-market Value").

14. In determining the amount of the Early Termination payment under the Loss method, Judson then adjusted the Mid-market Value to take into account the credit profile of Judson and terms of the parties' Agreement. I provided guidance with respect to the size of such adjustment based on Cain Brothers' relevant experience, including similar transactions where at least one market-maker provided an actionable quotation for a replacement swap. Based on that analysis, Judson determined the Loss method (essentially, what Judson would have to pay to have another party replace the Agreement) to result in an Early Termination payment from LBSF to Judson of $434,656.17. Judson served a Calculation Statement reflecting details of such calculation on LBSF on November 21, 2008, a copy of which is attached hereto as Exhibit F.

15. Based upon my experience in health care finance, I observed that senior living facilities were far less attractive counterparties in November 2008 than in 2005, when the parties' Agreement was executed. As a result, in my experience it is reasonable to expect that an interest rate swap agreement executed in 2008 with terms similar to those in the parties'

Agreement would be valued at a greater spread to mid-market for a senior living facility than was the parties' Agreement executed in 2005.

16. The Agreement provides that "Loss" is "an amount that party reasonably determines in good faith to be its total losses and costs…including any loss of bargain…incurred as a result of its terminating…the Agreement." Judson determined that the Loss method calculation resulted in an Early Termination payment due to Judson of $434,656.17. This reflects an adjustment to the Mid-market Value by 55 basis points, or $1,876,215. Judson took the following issues, among others, into account in making such an adjustment.

(i) The Agreement did not require Judson to post collateral.

(ii) The Agreement imposed an Additional Termination Event upon LBSF, but not upon Judson.

(iii) The Agreement did not impose a liquidity covenant on Judson.

(iv) The Agreement required Judson to comply with a modest debt service coverage ratio of 1.2 times.

(v) Senior living facilities were unattractive counterparties to providers of interest rate swap agreements as of November 4, 2008.

These adjustments were reasonable.

17. Under a separate engagement, Cain Brothers assisted Judson in obtaining a replacement interest rate swap agreement on March 12, 2009, (the "Second Swap Agreement"). A copy of the Second Swap Agreement is attached as Exhibit G. Judson was unable to obtain the same advantageous terms in the Second Swap Agreement that LBSF had agreed to in the Agreement, and was required to accept terms that were substantially more unattractive. These less attractive terms include (but are not limited to):

(i) The Second Swap Agreement required – where the Agreement did not – that Judson Foundation, a Judson affiliate, agree to be joint and severally liable for Judson's obligations.

(ii) The Second Swap Agreement required – where the Agreement did not – inclusion of a call right in favor of Judson that increased the fixed rate of interest payable by Judson.

(iii) The Second Swap Agreement contained a seven million dollar liquidity covenant whereas the Agreement contained no liquidity covenant whatsoever.

Other less favorable terms required by the Second Swap Agreement are set forth in Exhibit H.

18. Based on my understanding of the process Judson undertook, the Early Termination payment was determined by Judson in good faith and was reasonable.

[SPACE BELOW INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed on this 7th day of February 2012.

By: _____
    Timothy Sheehan