# CAIN BROTHERS

INVESTMENT BANKERS AND CAPITAL ADVISORS

3500 DePauw Blvd.
Suite 1052
Indianapolis, IN 46268
Tel   317-733-2000
Fax   317-733-2010

## EXPECTED TO PRICE FRIDAY, OCT. 17, 2008 AT 11:00 AM EDT

## REQUEST FOR INTEREST RATE SWAP

**DATE:**          October 10, 2008

**TO:**            Interested Parties

**FROM:**          Timothy Sheehan

**SUBJECT:**       Request for Interest Rate Swaps

On behalf of Judson (the "Corporation"), Cain Brothers is soliciting quotes for a new interest rate swap transaction (the "New Transaction") to replace an existing interest rate swap transaction, attached herewith and summarized below (the "Existing Transaction").  Please provide a bid that represents the total dollar value you would pay the Corporation or would require to be paid from the Corporation to enter into the New Transaction with terms and conditions identical to the Existing Transaction.

### Replacement of Existing Interest Rate Swap (see attached Documentation):

| | |
|---|---|
| **Type:** | Index Interest Rate Swap |
| **Replacement Counterparty:** | *Determined by Bid* |
| **Commitment Date:** | October 17, 2008 |
| **Effective Date:** | October 17, 2008 |
| **Payment Date:** | October 24, 2008 |
| **Documentation:** | The Corporation and the Replacement Counterparty will enter into documentation, including a Confirmation, ISDA Master Agreement, Schedule and Credit Support Annex, with terms and conditions identical to the Existing Transaction (see attached copies of Existing Transaction documentation). |

Page 2
Request for Interest Rate Swap
October 10, 2008

The Replacement Counterparty will provide a first draft of documentation by **Monday, October 20, 2008.**

**Governing Law:**          New York

**Bid Parameters:**          **Pricing Option I:**
The bids will specify the total dollar value to be paid by the Corporation or by the Replacement Counterparty, as applicable, in consideration of entering into the New Transaction, with terms and conditions identical to the Existing Transaction. See Appendix I for a summary of basic structural details. Bids shall be inclusive of all fees and expenses.

**Pricing Option II:**
The bids will specify the Fixed Rate payable by the Corporation in consideration of the Replacement Counterparty entering into the New Transaction with the Replacement Counterparty with terms and conditions identical to the Existing Transaction other than the Fixed Rate payable by the Corporation. Bids submitted under Pricing Option II will not require an upfront payment by either the Corporation or the Replacement Counterparty. Bids shall be inclusive of all fees and expenses.

**All Replacement Counterparties will represent that their bids are submitted with the intent of acting as principal and that they have not solicited other brokers/dealers regarding this transaction.**

The Corporation reserves the right to reject any and all bids and to waive any irregularity in the bid process. The Corporation also reserves the right to negotiate the terms of the Documentation.

**Bid Submittal:**          Bids should be phoned to Joanna Manthei at (317) 733-2000 ext. 100 at **11:00 AM Eastern** on **Friday, October 17, 2008**. The telephone bid should be immediately followed by a facsimile transmission of the Letter of Acceptance *(Appendix II)* to (317) 733-2010. The bids will be deemed firm for ten (10) minutes. The New Transaction is expected to be awarded immediately following review of all bids.

**Fees:**          The Replacement Counterparty will pay a Structuring Agent fee to Cain Brothers on the Payment Date. The Structuring Agent fee is $100,000.

**Disclosure:**          This Request for Interest Rate Swaps ("RIRS") and the submission of a bid by any party does not obligate the Corporation in any

## CAIN BROTHERS

Page 3
Request for Interest Rate Swap
October 10, 2008

manner whatsoever.

The Corporation reserves the right to amend, modify or withdraw
this RIRS; to waive or revise any requirement of the RIRS; to
acquire any supplemental information from any responding party;
to reject any bids submitted hereto in order to obtain a higher bid
than those previously submitted; to accept or reject any or all bids;
or to negotiate or hold discussions with any responding party.

*Appendix I*
Request for Interest Rate Swap
October 10, 2008

## Existing Transaction Summary
### (See Existing Transaction documentation for additional details)

| | |
|---|---|
| Effective Date: | 10/17/2008 |
| Maturity Date: | 11/15/2035 |
| Current Notional: | $30,490,000 |
| Corporation Pays: | 3.307% |
| Counterparty Pays: | 67% 3-month LIBOR |

| Date | Amortization | Notional Amount |
|---|---|---|
| 10/17/2008 | | $30,490,000 |
| 11/15/2008 | $565,000 | 29,925,000 |
| 11/15/2009 | 585,000 | 29,340,000 |
| 11/15/2010 | 600,000 | 28,740,000 |
| 11/15/2011 | 630,000 | 28,110,000 |
| 11/15/2012 | 655,000 | 27,455,000 |
| 11/15/2013 | 695,000 | 26,760,000 |
| 11/15/2014 | 775,000 | 25,985,000 |
| 11/15/2015 | 810,000 | 25,175,000 |
| 11/15/2016 | 845,000 | 24,330,000 |
| 11/15/2017 | 820,000 | 23,510,000 |
| 11/15/2018 | 855,000 | 22,655,000 |
| 11/15/2019 | 890,000 | 21,765,000 |
| 11/15/2020 | 990,000 | 20,775,000 |
| 11/15/2021 | 1,035,000 | 19,740,000 |
| 11/15/2022 | 1,070,000 | 18,670,000 |
| 11/15/2023 | 1,115,000 | 17,555,000 |
| 11/15/2024 | 1,165,000 | 16,390,000 |
| 11/15/2025 | 1,210,000 | 15,180,000 |
| 11/15/2026 | 1,260,000 | 13,920,000 |
| 11/15/2027 | 1,310,000 | 12,610,000 |
| 11/15/2028 | 1,365,000 | 11,245,000 |
| 11/15/2029 | 1,415,000 | 9,830,000 |
| 11/15/2030 | 1,480,000 | 8,350,000 |
| 11/15/2031 | 1,540,000 | 6,810,000 |
| 11/15/2032 | 1,600,000 | 5,210,000 |
| 11/15/2033 | 1,670,000 | 3,540,000 |
| 11/15/2034 | 1,735,000 | 1,805,000 |
| 11/15/2035 | 1,805,000 | - |
| | $30,490,000 | |

CAIN BROTHERS

*Appendix II*
Request for Interest Rate Swap
October 10, 2008

# Judson
# Interest Rate Swap

---

### LETTER OF ACCEPTANCE

---

We hereby confirm our bid and commit to the New Transaction subject to all the terms and conditions stated in the foregoing Request for Interest Rate Swap.

We are providing this bid with the intent of acting as principal in the New Transaction and we have not solicited other brokers/dealers regarding this transaction.

We represent that we are prepared to enter into the New Transaction defined in the foregoing Request for Interest Rate Swap.

| Pricing Option | Total Dollar Value Paid to Corporation (Paid to Replacement Counterparty) |
|---|---|
| I | $_____ |

| Pricing Option | Fixed Rate |
|---|---|
| II | _____% |

Firm: _____        By: _____
                                                              Authorized Representative

Date: _____

# CAIN BROTHERS

SCHEDULE
to the
MASTER AGREEMENT
dated as of July 15, 2005
between

("Party A"),
a corporation organized under the laws of the State of

and

JUDSON ("Party B"),
a non-profit corporation organized under the laws of the State of Ohio

Part 1.  **Termination Provisions.**

In this Agreement:—

(a)  *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not Applicable. |
| Section 5(a)(vi) (Cross Default), | Not Applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not Applicable. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

(b)  *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B. Section 5(a)(vi) is hereby amended by deleting in the seventh line thereof the words ", or becoming capable at such time of being declared,"

The following provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 12 of this Agreement.

*"Threshold Amount"* means, the lesser of (i) $75,000,000 or (ii) two percent (2%) of the Stockholders' Equity of ·               ("            ·            ` or ·        ), in the case of Party A and            ; (or its equivalent in any other currency), and $10,000,000, in the case of Party B.

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B.

(e)  The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)  *Payments on Early Termination.*

    (i)  For the purpose of Section 6(e) of this Agreement:

        (A)  Market Quotation will apply.

        (B)  The Second Method (Full Two-Way Payments) will apply.

    (ii)  Notwithstanding anything in this Agreement to the contrary, in the event (1) of an Event of Default with respect to which one party ("X") is the Defaulting Party or a Termination Event (other than a Voluntary Termination or an Illegality) with respect to which X is the sole Affected Party, and (2) a Market Quotation for each terminated Transaction can be determined, X shall have the option to either:

        (A)  pay to the other party ("Y"), or receive from Y, as the case may be, an amount equal to the highest quotation received, in the case of a payment to Y, or the lowest quotation received, in the case of a payment from Y, each as the Settlement Amount; or

        (B)  assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

- 2 -

(C)    Notwithstanding any other provision of this Agreement, the Reference Market-makers providing a Market Quotation in the events described in this Part 1(f)(ii) shall be selected by the Non-defaulting Party or the non-Affected Party, as the case may be, in accordance with the definition of "Reference Market-makers" specified in Section 12 of this Agreement; provided that in making such selection, the Non-defaulting Party or the non-Affected Party will, in good faith, consider soliciting bids from a particular Reference Market-maker identified by the other party.

(iii)    Notwithstanding anything in this Agreement to the contrary, in the event of (1) a Voluntary Termination or an Illegality with respect to which one party ("X") is the sole Affected Party, and (2) a Market Quotation for each Affected Transaction can be determined, the non-Affected Party ("Y"), shall have the option to either:

(A)    pay to X, or receive from X, as the case may be, an amount equal to the highest quotation received in the case of a payment to X, or the lowest quotation received, in the case of a payment from X, each as the Settlement Amount; or

(B)    require X to assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

(C)    With respect to this Part 1(f)(iii) only, Party A and Party B hereby acknowledge and agree that Party A and Party B shall each have the right to select up to two of the Reference Market-makers providing Market Quotations. All such Reference Market-makers shall meet (in the reasonable judgment of Party A) Party A's then-current credit and legal policies and standard criteria for counterparties in similar transactions.

(g)    *Additional Termination Event* provisions of Section 6(a) will apply to either Party A or Party B. The following shall constitute Additional Termination Events:

(i)    The rating of the long-term unsecured, unenhanced, senior debt of Party A or Party A's Credit Support Provider shall be withdrawn, suspended or reduced below the Threshold Rating by either of the following rating agencies (the "Rating Agencies"): Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Group, a Division of The McGraw-Hill Companies, Inc. ("Standard & Poor's). The "Threshold Rating" shall be "Baa3," in the case of Moody's, and "BBB-," in the case of Standard & Poor's. For the purpose of the foregoing Termination Event, the Affected Party shall be Party A.

(ii)    The Corporation's Debt Service Coverage Ratio falls below 1.2x.

(iii)    Party B provides (i) notice to Party A of its desire to cause the voluntary termination of any or all Transactions hereunder or any portion of any such Transaction(s) and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such voluntary termination shall be paid on the due date thereof. Provision of any such notice and such evidence (a "Voluntary Termination") shall constitute an Additional Termination Event, provided that in the case of a voluntary termination of a portion of a Transaction, such termination shall constitute an Additional Termination Event solely with respect to such portion.    Notice of a Voluntary Termination shall be provided in writing at least five (5) Business Days, and no more than thirty (30) Business Days, prior to the date designated in such notice by Party B (the "Voluntary Termination Date").    If Party B designates a Voluntary Termination Date, Party B shall be the Affected Party and, notwithstanding anything in this Agreement to the contrary, the Affected Transactions shall be solely the Transactions or portions thereof designated by Party B.    Section 6(b)(iii) shall not apply with respect to a Voluntary Termination, and the Voluntary Termination Date shall be the Early Termination Date with respect to the Affected Transactions for the purposes of the applicable provisions of this Agreement.    Following a Voluntary Termination with respect to a portion of a Transaction, the portion of such Transaction not terminated shall constitute a Transaction for purposes of this Agreement, and the parties shall amend any of the documents which constitute this Agreement as may be necessary or appropriate to accurately reflect the terms of such Transaction.

**Part 2.  Agreement to Deliver Documents.**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by the party and any Credit Support Provider of this Agreement, any Credit Support Document and any Confirmation, including, where applicable, certified copies of the resolutions of its Board of directors authorizing the execution and delivery of this Agreement, the relevant Credit Support Document or any Confirmation, . | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |

| Party A and Party B | A copy of the annual report of such party (in the case of Party A, Party A's Credit Support Provider) containing audited consolidated financial statements for each such fiscal year, certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized. | As soon as practicable after the execution of this Agreement and also within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years while there are any obligations outstanding under this Agreement. | Yes |
|---|---|---|---|
| Party A and Party B | Quarterly unaudited financial statements. | Upon request from the other party and to the extent available. | Yes |
| Party A | Credit Support Annex | Upon execution of this Agreement | Yes |
| Party A | A guarantee of Party A's Credit Support Provider. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A, in the form of Exhibit A. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B, substantially in the form of Exhibit A. | Upon execution of this Agreement. | No |
| Party A | Report providing an estimate of the then-current market value of the Transactions as of the relevant date set forth in the column to the right. | Monthly, within five Business Days of the end of each month or at the request from Party B; provided that the failure of Party A to deliver such document shall not result in any Event of Default or Potential Event of Default. | No |

**Part 3. Miscellaneous.**

(a)  *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

    Address for notices or communications to Party A:—

    Address:

            Attention:
            Facsimile No.:
            Telephone No.:

- 5 -

Address for notices or communications to Party B:—

Address:       2181 Ambleside Drive, Cleveland, OH 44106
               Attention:    Hong Chae
               Facsimile No.: 216-791-5595
               Telephone No.: 216-791-2688

               With a copy to:

               Address:      Cain Brothers & Co., LLC
                             360 Madison Avenue, 5th Floor
                             New York, NY 10017
               Attention:    Derivatives Operations
               Facsimile:    212-504-0807
               Telephone:    212-869-5600

(b)  *Calculation Agent.* The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction; provided, however, that in the event of an Event of Default with respect to which Party A is the Defaulting Party or a Termination Event with respect to which Party A is the sole Affected Party, Party B or its agent will be the Calculation Agent.

(c)  *Credit Support Document.* Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A and the Credit Support Annex in the form annexed hereto as Exhibit F.

In the case of Party B, not applicable.

(d)  *Credit Support Provider.*

Credit Support Provider means in relation to Party A:

Credit Support Provider means in relation to Party B: none.

(e)  *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)  **Netting of Payments.** The limitation set forth in Section 2(c)(ii) will apply.

(g)  **Definitions.** Section 12 of this Agreement is hereby amended to add or amend, as applicable, the following definitions in their appropriate alphabetical order:

(i)  **"Affiliate"** will have the meaning specified in Section 12 of this Agreement.

(ii)  **"Business Day"** means a day which is not a Saturday, Sunday or legal holiday on which banking institutions in the State of New York are authorized by law to close.

(iii)  **"Default Rate"** means USD-LIBOR-BBA (with a Designated Maturity of one month) plus 1%. Terms used in this definition shall have the meanings ascribed thereto in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.).

**Part 4. Other Provisions.**

- 6 -

(a)   *Agreements.*

   (i)      The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

   "Each party agrees with the other (or, in the case of Section 4(d) and (e), Party B agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

   (ii)      Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" thereto:—

   "(d)  *Security and Source of Payment of Party B's Obligations.* The obligation of Party B to make payments to Party A under this Agreement and each Transaction will be a general unsecured obligation of Party B, payable from any legally available monies."

(b)   **ISDA Definitions.**  Unless otherwise specified in a Confirmation, this Agreement incorporates, and is subject to and governed by, the 2000 ISDA Definitions (the "2000 Definitions") and the 1992 ISDA U.S. Municipal Counterparty Definitions (the "Municipal Definitions" and, together with the 2000 Definitions, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc.  In the event of any inconsistency between the 2000 Definitions and the Municipal Definitions, the Municipal Definitions will govern.  In the event of any inconsistency between either set of Definitions and the provisions of this Agreement, the provisions of this Agreement will govern.

(c)   **Transfers.**  Other than the transfer rights specified in Section 7 of this Agreement, Party A may otherwise transfer its rights and obligations hereunder, in whole but not in part, to a person not affiliated with Party A only with the prior written consent of Party B, which consent may be withheld in the sole and absolute discretion of Party B.  Party A may transfer its rights and obligations under this Agreement, in whole but not in part, to any Affiliate of Party A provided that (i) the transferee shall assume all of the obligations of Party A hereunder, (ii) the performance of such transferee hereunder is guaranteed by Party A's Credit Support Provider and (iii) such assignment will not give rise to a Termination Event or any Event of Default with respect to either Party B or such transferee of Party A.  Each party may also share any information concerning the other party with any Affiliate.

(d)   **Set-off.**  (i)  Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim, provided however, that upon the designation or deemed designation of any Early Termination Date other than in connection with a Voluntary Termination, in addition to and not in limitation of any other remedy (including any right to set-off, counterclaim or otherwise withhold payment) under applicable law, the Non-defaulting Party or non-Affected Party ("X") may without prior notice to any person set-off any sum or obligation (whether or not arising under this Agreement) owed or due by the Defaulting Party or Affected Party (in either case, "Y") to X against any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured) owed or due by X (the "Original Obligation") to Y, and, for this purpose, may convert one currency into another.  Any such set-off shall automatically satisfy and discharge the Original Obligation to Y and, if the Original Obligation exceeds the sum or obligation to be set off against, the Original Obligation shall be novated and replaced by an obligation to pay to Y only the excess of the Original Obligation over such sum or obligation.

   (ii)  If any obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

- 7 -

(iii) Nothing in this section shall be effective to create a charge or other security interest. This section shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(e)     **Exchange of Confirmations.**  For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation, via telex or facsimile transmission. Party B agrees to respond to such Confirmation within five Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein. Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of the terms contained in such Confirmation, absent manifest error. The parties agree that any such exchange of telexes or facsimile transmissions shall constitute a Confirmation for all purposes hereunder.

(f)     **WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(g)     **Relationship Between Parties.** The following representation shall be inserted as a new Section 3(e) of this Agreement:

"(e)     **Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)     **Non-Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)     **Assessment and Understanding.**  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)     **Status of Parties.**  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

- 8 -

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

By:_____

Title:  Vice President


JUDSON

By:_____

Title: Vice President of Finance/CFO

with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
> > (A) Cash, the amount thereof; and
> >
> > (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

## Paragraph 13. Elections and Variables

(a) *Security Interest for "Obligations".* The term **"Obligations"** as used in this Annex includes the following additional obligations:

> With respect to Party A: Not applicable.
>
> With respect to Party B: Not applicable.

(b) *Credit Support Obligations.*

> (i) *Delivery Amount, Return Amount and Credit Support Amount.*
>
> > (A) *"Delivery Amount"* has the meaning specified in Paragraph 3(a).
> >
> > (B) *"Return Amount"* has the meaning specified in Paragraph 3(b).
> >
> > (C) *"Credit Support Amount"* means, (I) for any Valuation Date as of which Party A's Rated Debt is rated lower than the Trigger Level by either of the Rating Agencies, 105% of the Secured Party's Exposure for that Valuation Date plus (i) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (ii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to Pledgor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of the Credit Support Amount yields an amount less than zero and (II) for any other Valuation Date, zero.
>
> (ii) *Eligible Collateral.* The following items will qualify as **"Eligible Collateral"** for Party A, with a Valuation Percentage equal to the corresponding number:

| Collateral Type | Valuation Percentage |
|---|---|
| 1. Cash, in the form of U. S. Dollars | 105% |
| 2. United States Government Obligations, defined as: non- callable direct obligations of, or obligations the timely payment of the principal of and interest on which are fully guaranteed by, the United States of America. | 100% |
| 3. Evidences of a direct ownership in future interest or principal payments on United States Government Obligations. | 100% |
| 4. Direct obligations of any agency or instrumentality of the United States of America and obligations on which the timely payment of principal and interest is fully guaranteed by any such agency or instrumentality. | 100% |

(iii)   *Other Eligible Support.* The following items will qualify as **"Other Eligible Support"** for the party specified: Not applicable.

(iv)   *Thresholds.*

(A)   *"Rated Debt"* means the long term unsecured debt of: Inc. in the case of Party A, which is rated by both Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Rating Services, A Division of The McGraw-Hill Companies, Inc. ("S&P").

(B)   *"Threshold"* means with respect to Party A:

If the Rated Debt of Party A shall be rated less than the Trigger Level by either of the Rating Agencies, then the Threshold for Party A shall be $100,000. If the Rated Debt of Party A shall be rated at the level of the Trigger Level or above by both of the Rating Agencies, then the Threshold for Party A shall be not applicable.

As used herein, "Rating Agencies" shall mean Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Rating Services, A Division of The McGraw-Hill Companies, Inc. ("S&P") and "Trigger Level" shall mean, with respect to Party A, A3 by Moody's and A- by S&P.

*"Threshold"* means with respect to Party B: not applicable

(C)   *"Minimum Transfer Amount" "* means, with respect to Party A: $100,000, and with respect to Party B: $100,000..

(D)   *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of $1,000.

(c)   *Valuation and Timing.*

(i)   *"Valuation Agent"* means Party A, provided that upon the occurrence and continuance of an Event of Default in respect to Party A as the Defaulting Party or a Termination Event

- 11 -

with respect to which Party A is the sole Affected Party, Party B or its agent shall be the Valuation Agent.

    (ii)    *"Valuation Date"* means the last Business Day of each month.

    (iii)    *"Valuation Time"* means the close of business on each Valuation Date; provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv)    *"Notification Time"* means by 3:00 p.m., New York time, on a Local Business Day.

(d)    ***Conditions Precedent and Secured Party's Rights and Remedies.*** There shall be no "Specified Condition" with respect to either party for purposes of this Annex.

(e)    ***Substitution***

    (i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: Not later than two (2) Local Business Days following the Secured Party's receipt of Substitute Credit Support.

    (ii)    *Consent.* The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    ***Dispute Resolution***

    (i)    *"Resolution Time"* means 1:00 p.m. New York time on the fifth Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 5.

    (ii)    *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Valuation Agent shall calculate the Value of Posted Credit Support by reference to the third party sources it deems reasonable (e.g., Bloomberg Financial Markets and Commodities News), or if such method is not practicable, in accordance with standard market practice.

    (iii)    *Alternative.* Not Applicable.

(g)    ***Holding and Using Posted Collateral.***

    (i)    ***Eligibility to Hold Posted Collateral; Custodians.***

    Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); provided that it is not a Defaulting Party.

    (ii)    *"Use of Posted Collateral"* The provisions of Paragraph 6(c) will apply to Party B.

(h)    ***Distributions and Interest Amount.***

    (i)    *"Interest Rate."* The Interest Rate will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

    (ii)    *"Transfer of Interest Amount."* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii)    *"Alternative to Interest Amount."* Not applicable.

(i)    ***Additional Representation(s).*** Not applicable.

(j)    ***Other Eligible Support and Other Posted Support.***

(i)     *"Value"* with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

(ii)     *"Transfer"* with respect to Other Eligible Support and Other Posted means:  Not applicable.

(k)     ***Demands and Notices.***  All demands, specifications and notices made by a party to this Annex will be made pursuant to the Notices Section of this Agreement.

(l)     *Addresses for Transfers.*

Party A:

(i)     In the case of cash, by wire transfer of immediately available funds for credit to a bank account of Party A to be designated in Party A's demand for the Delivery Amount or Return Amount, as applicable.

(ii)     In the case of securities or obligations that can be paid or delivered by book-entry on the records of U.S. Federal Reserve Banks, delivery to      , for credit to the account of      , as agent for Party A (in telegraphic abbreviation,

Party B:

[indicate delivery instructions]

(m)     ***Other Provisions.***

(i)     **Agreement as to Single Secured Party and Pledgor.**  Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, (a) the term "Secured Party" as used in this Annex means only Party B, (b) the term **"Pledgor"** as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder.

## CONFIRMATION

September 2, 2005

## TRANSACTION

Judson
2181 Ambleside Drive
Cleveland, OH 44106

Global ID: 2250691

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of September 2, 2005 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

Party A:

Party B:                          JUDSON

Notional Amount:                  $23,010,000, which shall reduce on the dates and in the amounts set forth in Annex I hereto. The amount of such reduction in Notional Amount shall be referred to herein as a "Revised Notional Amount."

Trade Date:                       September 2, 2005

Effective Date:                   October 20, 2005

Termination Date:                 November 15, 2035

FIXED AMOUNTS:

Fixed Rate Payer:                                           Party B

Fixed Rate Payer Payment Dates:          Monthly, on the first day of each calendar month, beginning November 1, 2005 up to, and including, the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Fixed Rate  Payer Period End Dates:      Monthly, on the first day of each calendar month, commencing on November 1, 2005. No Adjustment shall apply to Period End Dates.

Fixed Rate:                                               3.307%

Fixed Rate Day Count Fraction:            30/360

FLOATING AMOUNTS:

Floating Rate Payer:                                 Party A

Floating Rate Payer Payment Dates:      Monthly, on the first day of each calendar month, beginning November 1, 2005 up to, and including, the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Floating Rate Payer Period End Dates:   Monthly, on the first day of each calendar month, commencing on November 1, 2005. No Adjustment shall apply to Period End Dates.

Floating Rate:                                           67% of USD-LIBOR-BBA

Designated Maturity:                               Three months

Reset Dates:                                            Monthly, on the first Calendar Day of each month.  No Adjustment shall apply to Reset Dates.

Method of Averaging:                             Inapplicable

Floating Rate Day Count Fraction:         Actual/Actual

3.        *Swap Advisory Fee.*  Party B acknowledges that Party A has paid            to
          ("                    on behalf of Party B, as a swap advisory fee for services
provided to Party B by

2

5.      Payment Instructions:

Payments to Party A:

Payments to Party B:

       U.S. Bank NA
       ABA: 091000022
       BNF: USBANK CT WIRE CLRG
       BNF #: 180121167365
       OBI: Judson 2005A & B Bd Fd
       REF#: 791426000
       Contact: David Johnson x3814

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A.

Yours sincerely,

By: _____
Name:
Title:

Confirmed as of the
date first above written:

JUDSON

By: _____
Name:
Title:

3

ANNEX I
to Confirmation, dated September 2, 2005,
between

and

Judson

| Reduction Date | Notional Amount Reduction | Revised Notional Amount |
|---|---|---|
| 11/15/05 | $0 | $23,010,000 |
| 11/15/06 | ($8,025,000) | $31,035,000 |
| 11/15/07 | $545,000 | $30,490,000 |
| 11/15/08 | $565,000 | $29,925,000 |
| 11/15/09 | $585,000 | $29,340,000 |
| 11/15/10 | $600,000 | $28,740,000 |
| 11/15/11 | $630,000 | $28,110,000 |
| 11/15/12 | $655,000 | $27,455,000 |
| 11/15/13 | $695,000 | $26,760,000 |
| 11/15/14 | $775,000 | $25,985,000 |
| 11/15/15 | $810,000 | $25,175,000 |
| 11/15/16 | $845,000 | $24,330,000 |
| 11/15/17 | $820,000 | $23,510,000 |
| 11/15/18 | $855,000 | $22,655,000 |
| 11/15/19 | $890,000 | $21,765,000 |
| 11/15/20 | $990,000 | $20,775,000 |
| 11/15/21 | $1,035,000 | $19,740,000 |
| 11/15/22 | $1,070,000 | $18,670,000 |
| 11/15/23 | $1,115,000 | $17,555,000 |
| 11/15/24 | $1,165,000 | $16,390,000 |
| 11/15/25 | $1,210,000 | $15,180,000 |
| 11/15/26 | $1,260,000 | $13,920,000 |
| 11/15/27 | $1,310,000 | $12,610,000 |
| 11/15/28 | $1,365,000 | $11,245,000 |
| 11/15/29 | $1,415,000 | $9,830,000 |
| 11/15/30 | $1,480,000 | $8,350,000 |
| 11/15/31 | $1,540,000 | $6,810,000 |
| 11/15/32 | $1,600,000 | $5,210,000 |
| 11/15/33 | $1,670,000 | $3,540,000 |
| 11/15/34 | $1,735,000 | $1,805,000 |
| 11/15/35 | $1,805,000 | $0 |

4