(Local Currency—Single Jurisdiction)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

Dated as of **March 12, 2009**

| | | |
|---|---|---|
| **MORGAN STANLEY CAPITAL SERVICES INC.** | and | **JUDSON and JUDSON FOUNDATION, jointly and severally** |

......................................................................    ......................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions.*   The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*   In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.*   All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)     ***Change of Account.*** Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     ***Netting.*** If on any date amounts would otherwise be payable: —

(i)     in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)     ***Default Interest; Other Amounts.*** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.     Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that: —

(a)     ***Basic Representations.***

(i)     ***Status.*** It is duly organized and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    ***Powers.*** It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this

ISDA₀ 1992
Second Printing

Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)   *No Violation or Conflict.*   Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.*   All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.*   Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)   *Absence of Certain Events.*   No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.*   There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.*   All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.   Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: —

(a)   *Furnish Specified Information.*   It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)   *Maintain Authorisations.*   It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)   *Comply with Laws.*   It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

ISDA© 1992
Second Printing

**5.**    **Events of Default and Termination Events**

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

(i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)  the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.*  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default

ISDA© 1992
Second Printing

by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **_Bankruptcy._** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **_Merger Without Assumption._** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      **_Termination Events._** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below: —

(i)      **_Illegality._** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

ISDA© 1992
Second Printing

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Credit Event Upon Merger.*  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)   *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality.*  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.   Early Termination

(a)   *Right to Terminate Following Event of Default.*  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event.*

(i)   *Notice.*  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   *Two Affected Parties.*  If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)   *Right to Terminate.*  If: —

(1)  an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

ISDA© 1992
Second Printing

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    **Statement.**  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.**  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    **Payments on Early Termination.**  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method".  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply.  The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*  If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the

ISDA© 1992
Second Printing

Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   ***Termination Events.*** If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   ***Adjustment for Bankruptcy.*** In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

ISDA© 1992
Second Printing

(iv)    *Pre-Estimate.*    The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)    *Entire Agreement.*    This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.*    No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*    Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.*    Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.*    A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

ISDA© 1992
Second Printing

(g)     *Headings.*  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.     Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.     Notices

(a)     *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated: —

   (i)     if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)     if sent by telex, on the date the recipient's answerback is received;

   (iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

   (v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.     Governing Law and Jurisdiction

(a)     *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably: —

   (i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

   (ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an

ISDA© 1992
Second Printing

inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.      Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)  in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)  in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)  in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)  in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

ISDA© 1992
Second Printing

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be

ISDA© 1992
Second Printing

obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"Settlement Amount" means, with respect to a party and any Early Termination Date, the sum of: —

(a) the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not in (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant Confirmation.

ISDA© 1992
Second Printing

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before the Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**MORGAN STANLEY CAPITAL SERVICES INC.**

**JUDSON**

By: ...........................................................

By: ...........................................................

Name:

Name: *Cynthia H. Dunn*

Title:

Title: *Pres / CEO*

Date:

Date: *5/14/09*

**JUDSON FOUNDATION**

By: ...........................................................

Name: *Hong S. Chae*

Title: *V.P. OF Finance/ CFO*

Date: *5/14/09*

ISDA® 1992
Second Printing

SCHEDULE
to the
ISDA Master Agreement
dated as of March 12, 2009
between
MORGAN STANLEY CAPITAL SERVICES INC. (**"Party A"**),
a corporation organized under the laws of the State of Delaware

and

JUDSON and JUDSON FOUNDATION (jointly and severally, **"Party B"**),
each a non-profit corporation organized under the laws of the State of Ohio

## Part 1. Termination Provisions

(a)   "**Specified Entity**" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction): | Affiliates |
| Section 5(a)(vi) (Cross Default): | Not Applicable |
| Section 5(a)(vii) (Bankruptcy): | Not Applicable |
| Section 5(b)(ii) (Credit Event Upon Merger): | Not Applicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction: | Not Applicable |
| Section 5(a)(vi) (Cross Default): | Not Applicable |
| Section 5(a)(vii) (Bankruptcy): | Not Applicable |
| Section 5(b)(ii) (Credit Event Upon Merger): | Not Applicable |

(b)   "**Specified Transaction**" means, in lieu of the meaning specified in Section 12, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these

transactions and (c)  any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)     The **Cross Default** provisions of Section 5(a)(vi) will apply to Party A and to Party B; provided, that the following language shall be added to the end of Section 5(a)(vi):

"Notwithstanding the foregoing, a default under subsection (2) hereof shall not constitute an Event of Default if (i) the default was caused solely by error or omission of an administrative or operational nature; (ii) the Defaulting Party has provided the other party with satisfactory evidence that funds were available to enable the party to make the payment when due; and (iii) the payment is made within two Local Business Days of such party's receipt of written notice of its failure to pay."

"**Specified Indebtedness**" will have the meaning specified in Section 12 of this Agreement.

"**Threshold Amount**" means:

(i)      with respect to the Specified Indebtedness of Party A or any applicable Specified Entity, an amount equal to the greater of 2% of Stockholders' Equity as of the end of its most recently completed fiscal year, or its equivalent in any currency, or $10,000,000.

(ii)     with respect to the Specified Indebtedness of Party B or any applicable Specified Entity, an amount equal to $1,000,000.

(d)     The **Credit Event Upon Merger** provisions of Section 5(b)(ii) will apply to Party A and to Party B.

(e)     The **Automatic Early Termination** provisions of Section 6(a) will not apply to Party A or to Party B.

(f)     **Payments on Early Termination**.

(i)      For the purpose of Section 6(e) of this Agreement:

(A)      Market Quotation will apply.

(B)      The Second Method (Full Two-Way Payments) will apply.

(ii)     Notwithstanding anything in this Agreement to the contrary, in the event (1) of an Event of Default with respect to which one party (**"X"**) is the Defaulting Party or a Termination Event (other than a Voluntary Termination or an Illegality) with respect to which X is the sole Affected Party, and (2) a Market Quotation for each terminated Transaction can be determined, X shall have the option to either:

(A)      pay to the other party (**"Y"**), or receive from Y, as the case may be, an amount equal to the highest quotation received, in the case of a payment to Y, or the lowest quotation received, in the case of a payment from Y, each as the Settlement Amount; or

(B)     assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

(C)     Notwithstanding any other provision of this Agreement, the Reference Market-makers providing a Market Quotation in the events described in this Part 1(f)(ii) shall be selected by the Non-defaulting Party or the non-Affected Party, as the case may be, in accordance with the definition of "Reference Market-makers" specified in Section 12 of this Agreement; provided that in making such selection, the Non-defaulting Party or the non-Affected Party will, in good faith, consider soliciting bids from a particular Reference Market-maker identified by the other party.

(iii)     Notwithstanding anything in this Agreement to the contrary, in the event of (1) a Voluntary Termination or an Illegality with respect to which one party (**"X"**) is the sole Affected Party, and (2) a Market Quotation for each Affected Transaction can be determined, the non-Affected Party (**"Y"**), shall have the option to either:

(A)     pay to X, or receive from X, as the case may be, an amount equal to the highest quotation received in the case of a payment to X, or the lowest quotation received, in the case of a payment from X, each as the Settlement Amount; or

(B)     require X to assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

(C)     With respect to this Part 1(f)(iii) only, Party A and Party B hereby acknowledge and agree that Party A and Party B shall each have the right to select up to two of the Reference Market-makers providing Market Quotations. All such Reference Market-makers shall meet (in the reasonable judgment of Party A) Party A's then-current credit and legal policies and standard criteria for counterparties in similar transactions.

(g)  **Additional Termination Event** will apply.  Each of the following shall constitute an Additional Termination Event:

  (i)  The rating of the long-term unsecured, unenhanced, senior debt of Party A's Credit Support Provider shall be withdrawn, suspended or reduced below the Threshold Rating by either of the following rating agencies (the **"Rating Agencies"**): Moody's Investors Service, Inc. (**"Moody's"**) and Standard & Poor's Ratings Group, a Division of The McGraw-Hill Companies, Inc. (**"Standard & Poor's"**).  The **"Threshold Rating"** shall be "Baa3," in the case of Moody's, and "BBB-," in the case of Standard & Poor's.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party A.

  (ii)  (A) Party B fails to maintain a Debt Service Coverage Ratio, tested annually as of the last day of each fiscal year, of at least 1.20 to 1.0 or (B) Party B fails to deliver evidence of its Debt Service Coverage Ratio in the form of the certificate attached hereto as Exhibit B as required in Part 2 hereof, and such failure shall continue for three (3) Local Business Days following written notice to Party B of such failure.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

  (iii)  (A) Party B fails to maintain Unrestricted Cash, tested annually as of the last day of each fiscal year, of at least $7,000,000 or (B) Party B fails to deliver evidence of its Unrestricted Cash in the form of the certificate attached hereto as Exhibit B as required in Part 2 hereof, and such failure shall continue for three (3) Local Business Days following written notice to Party B of such failure.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

  (iv)  Party B provides (i) notice to Party A of its desire to cause the voluntary termination of any or all Transactions hereunder or any portion of any such Transaction(s) and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such voluntary termination shall be paid on the due date thereof. Provision of any such notice and such evidence (a **"Voluntary Termination"**) shall constitute an Additional Termination Event, provided that in the case of a voluntary termination of a portion of a Transaction, such termination shall constitute an Additional Termination Event solely with respect to such portion.  Notice of a Voluntary Termination shall be provided in writing at least five (5) Business Days, and no more than thirty (30) Business Days, prior to the date designated in such notice by Party B (the **"Voluntary Termination Date"**).  If Party B designates a Voluntary Termination Date, Party B shall be the Affected Party and, notwithstanding anything in this Agreement to the contrary, the Affected Transaction shall be solely the Transaction or portion thereof designated by Party B.  Section 6(b)(iii) shall not apply with respect to a Voluntary Termination, and the Voluntary Termination Date shall be the Early Termination Date with respect to the Affected Transactions for the purposes of the applicable provisions of this Agreement.  Following a Voluntary Termination with respect to a portion of a Transaction, the portion of such Transaction not terminated shall constitute a Transaction for purposes of this Agreement, and the parties shall amend any of the documents which constitute this Agreement as may be necessary or appropriate to accurately reflect the terms of such Transaction.

## Part 2.  Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by the party and any Credit Support Provider of this Agreement, any Credit Support Document and any Confirmation, including, where applicable, certified copies of the resolutions of its Board of directors authorizing the execution and delivery of this Agreement, the relevant Credit Support Document or any Confirmation. | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |
| Party A and Party B | A copy of the annual report of such party (in the case of Party A, in respect of Morgan Stanley) containing audited consolidated financial statements for each such fiscal year, certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized. | As soon as practicable after the execution of this Agreement and also within 150 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years while there are any obligations outstanding under this Agreement. | Yes |
| Party A and Party B | Quarterly unaudited financial statements. | In relation to Party B, as soon as practicable after the end of each fiscal quarter in each fiscal year, except the last, and in any event within sixty (60) days thereafter, while there are any obligations outstanding under this Agreement.  In relation to Party A, upon request while there are any obligations outstanding under this | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | Agreement. | |
| Party A | A guarantee of Morgan Stanley in the form attached hereto as Exhibit A. | Upon execution of this Agreement | Yes |
| Party A | Report providing an estimate of the then-current market value of the Transactions as of the relevant date set forth in the column to the right. | Monthly, within five (5) Business Days of the end of each month or of a request from Party B; provided that the failure of Party A to deliver such document shall not result in any Event of Default or Potential Event of Default. | No |
| Party B | A certified copy of the certificate of incorporation or articles of incorporation or similar formation document of Party B. | Upon execution of this Agreement | Yes |
| Party B | A list of the members or directors of the governing board of Party B. | Upon execution of this Agreement | Yes |
| Party B | A correct, complete and executed copy of U.S. Internal Revenue Service Form W-9 (or any successor thereto), including appropriate attachments, that eliminates U.S. federal backup withholding tax on payments under this Agreement. | (i) Upon the execution of this Agreement; (ii) promptly upon reasonable demand by Party A; and (iii) promptly upon learning that any such form previously provided by Party B has become obsolete or incorrect. | Yes |
| Party B | A compliance certificate, in the form attached hereto as Exhibit B executed by officers of Party B, confirming and certifying Party B's compliance with the requirement set forth in Part 1(g)(ii) hereof. Such compliance certificate shall be delivered to Party A by fax at 212-507-0648 or by email at compliancecerts@morganstanley.com | Within 150 days of the end of each fiscal year while there are any obligations outstanding under this Agreement | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | A compliance certificate, in the form attached hereto as <u>Exhibit B</u> executed by officers of Party B, confirming and certifying Party B's compliance with the requirement set forth in Part 1(g)(iii) hereof. Such compliance certificate shall be delivered to Party A by fax at 212-507-0648 or by email at compliancecerts@morganstanley.com | Within 150 days of the end of each fiscal year while there are any obligations outstanding under this Agreement | Yes |
| Party A and Party B | Such other documents as the other party may reasonably request | Upon request | No |

**Part 3. Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of Section 10(a) of this Agreement:

    (i)    Address for notices or communications to Party A:

        For the purpose of Section 10(a) of this Agreement and for notices and communications with respect to Sections 5 and 6 only:

> Morgan Stanley Capital Services Inc
> 1585 Broadway
> New York, New York 10036-8293
> Attention:    Close-out Notices
> With a mandatory copy to:
> Facsimile No.:  (212) 507-4622

        For the purpose of Section 10(a) of this Agreement and for notices and communications with respect to all purposes other than Sections 5 and 6:

> Morgan Stanley Capital Services Inc
> 1585 Broadway
> New York, New York 10036-8293
> Attention:    Miscellaneous Notices
> Facsimile No:   (212) 404-9899

    (ii)    Address for notices or communications (other than with respect to payments) to Party B:

> Judson
> 2181 Ambleside Drive
> Cleveland, Ohio 44106
> Attention:  Cynthia H. Dunn, President/CEO
> Facsimile: (216) 791-5595      Telephone:   (216) 791-2687

With a copy to:

> Judson
> 2181 Ambleside Drive
> Cleveland, Ohio 44106
> Attention: Hong S. Chae, Vice President, Finance/CFO
> Facsimile: (216) 791-5595          Telephone: (216) 791-2688

With a copy to:

> Cain Brothers & Co., LLC
> 360 Madison Avenue, 5th Floor
> New York, NY 10017
> Attention:        Derivatives Operations
> Telephone:        (212) 869-5600
> Facsimile:        (212) 504-0807

(b)  **Notices.** Section 10(a) is amended by adding in the third line thereof after the phrase "messaging system" and before the ")" the words, "; provided, however, any such notice or other communication may be given by facsimile transmission if telex is unavailable, no telex number is supplied to the party providing notice, or if answer back confirmation is not received within one hour from when the telex is sent."

(c)  **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction; provided, however, that in the event of an Event of Default with respect to which Party A is the Defaulting Party, Party B or its agent, which shall be reasonably acceptable to Party A, will be the Calculation Agent.

(d)  **Credit Support Document.** Details of any Credit Support Document:

With respect to Party A, the Guarantee of Morgan Stanley, and with respect to Party B, None.

(e)  **Credit Support Provider.**

(i)   Credit Support Provider means in relation to Party A: Morgan Stanley.

(ii)  Credit Support Provider means in relation to Party B: None.

(f)  **Governing Law; Jurisdiction.** This Agreement will be governed by and construed in accordance with the laws of the State of New York. Section 11(b) is amended by: (1) deleting "non-" from the second line of clause (i); and (2) deleting the final paragraph.

(g)  **Netting of Payments.** The limitation set forth in Section 2(c)(ii) will apply.

(h)  **Definitions.** All capitalized terms used but not otherwise defined in this Agreement shall have the meanings given thereto in the Letter of Credit Agreement. Section 12 of this Agreement is hereby amended to add or amend, as applicable, the following definitions in their appropriate alphabetical order:

(i)   **"Affiliate"** will have the meaning specified in Section 12 of this Agreement, but excludes Morgan Stanley Derivative Products Inc.

(ii)     **"Business Day"** means a day which is not a Saturday, Sunday or legal holiday on which banking institutions in the State of New York are authorized by law to close.

(iii)    **"Debt Service Coverage Ratio"** means the ratio of (i) revenues in excess of expenses, (ii) less amortized entrance fees, unrealized gains of investments and other non-cash revenues and (iii) plus depreciation, amortization, interest expense, unrealized losses on investments, and other non-cash expense and (iv) actual entrance fee revenues collected less refunds, all calculated on a trailing four quarter basis, divided by (v) all current maturities of long-term debt calculated on a trailing twelve (12) month basis, plus trailing twelve (12) month interest expense.

(iv)    **"Default Rate"** means USD-LIBOR-BBA (with a Designated Maturity of one month) plus 1%. Terms used in this definition shall have the meanings ascribed thereto in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.).

(v)     **"Letter of Credit Agreement"** means the Letter of Credit Agreement by and between National City Bank and Judson, dated as of July 1, 2000, as amended from time to time, including the First Amendment to Letter of Credit Agreement dated as of October 1, 2005, the Fourth Amendment to Letter of Credit Agreement dated as of March 9, 2009 and the Fifth Amendment to Letter of Credit Agreement dated as of April 24, 2009.

(vi)    **"Stockholders' Equity"** means with respect to Morgan Stanley, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(vii)   **"Unrestricted Cash"** means operating cash, plus cash from capital reimbursement, plus board designated funds.

## Part 4. Other Provisions

(a)    **Representations.** For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (d) thereof:

"(e)    *Eligible Contract Participant.* It is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. 1a), as amended by the Commodity Futures Modernization Act of 2000.

(f)    *Individual Negotiation.* This Agreement has been subject to individual negotiation by such party.

(g)    *Line of Business.* It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(h)    *No Agency.* It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(i)    **_Full Two-Way Payments._**  It acknowledges that, pursuant to the terms of this Agreement (including, without limitation, Section 6(e) hereof), it may owe a payment to the other party upon the designation of an Early Termination Date hereunder, even in the event such Early Termination Date is the result of an Event of Default with respect to such other party.

(j)    **_ERISA Representation._**  It continuously represents that it is not (i) an employee benefit plan (hereinafter an "ERISA Plan"), as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended, or subject to any other statute, regulation, procedure or restriction that is materially similar to Section 406 of ERISA or Section 4975 of the Code (together with ERISA Plans, "Plans"), (ii) a person acting on behalf of a Plan or (iii) a person any of the assets of whom constitute assets of a Plan.  It will provide notice to the other party in the event that it is aware that it is in breach of any aspect of this representation or is aware that with the passing of time, giving of notice or expiry of any applicable grace period it will breach this representation."

(b)    **Additional Representations of Party B.**  Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B on each date on which a Transaction is entered into) that:

(i)    This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings or investments and not for purposes of speculation.

(ii)    Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has entered into with Party A and/or with any or all other parties do not and will not cause this Agreement, including the relevant Transaction, to violate or exceed any limits or restrictions contained in any authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iii)    This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

(iv)    The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the not-for-profit purposes for which Party B is organized.

(c)    (i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:

"Each party agrees with the other (and, in the case of Section 4(d), Party B agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:"

(ii)     Section 4 of the Agreement is hereby amended by adding the following subsection "(d)" thereto:

"(d)     ***Security and Source of Payment of Party B's Obligations.*** The obligation of Party B to make payments to Party A under this Agreement and each Transaction is a general obligation of Party B payable from all legally available funds."

(d)    **Transfers.** Other than the transfer rights specified in Section 7 of this Agreement, Party A may otherwise transfer its rights and obligations hereunder, in whole but not in part, to a person not affiliated with Party A only with the prior written consent of Party B, which consent may be withheld in the sole and absolute discretion of Party B. Party A may transfer its rights and obligations under this Agreement, in whole but not in part, to any Affiliate of Party A provided that (i) the transferee shall assume all of the obligations of Party A hereunder, (ii) the performance of such transferee hereunder is guaranteed by Party A's Credit Support Provider and (iii) such assignment will not give rise to a Termination Event or any Event of Default with respect to either Party B or such transferee of Party A.   Each party may also share any information concerning the other party with any Affiliate.

(e)    **Setoff.** (i) Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim, provided however, that upon the designation or deemed designation of any Early Termination Date other than in connection with a Voluntary Termination, in addition to and not in limitation of any other remedy (including any right to set-off, counterclaim or otherwise withhold payment) under applicable law, the Non-defaulting Party or non-Affected Party (**"X"**) may without prior notice to any person set-off any sum or obligation (whether or not arising under this Agreement) owed or due by the Defaulting Party or Affected Party (in either case, **"Y"**) to X or any Affiliate of X (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking officer of the obligation) against any sum or obligation owed or due by X or any Affiliate of X (the **"Original Obligation"**) to Y, and, for this purpose, may convert one currency into another.  Any such set-off shall automatically satisfy and discharge the Original Obligation to Y and, if the Original Obligation exceeds the sum or obligation to be set off against, the Original Obligation shall be novated and replaced by an obligation to pay to Y only the excess of the Original Obligation over such sum or obligation.

(ii)  If any obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

(iii)  Nothing in this Part 4(e) shall be effective to create a charge or other security interest.  This Part 4(e) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(f)    **Export of Defaults.** The occurrence or designation of an Early Termination Date on account of an Event of Default or Termination Event with respect to a party hereto (**"X"**) (where X is the Defaulting Party or sole Affected Party) shall constitute a material breach and event of default (howsoever described) under all transactions between X and the other party (**"Y"**) or any Affiliate of Y (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation) (together, the **"Other Transactions"**), whereupon Y or any Affiliate of Y shall have the right to