terminate, liquidate and otherwise close out any such Other Transactions (and X shall be liable for any damages suffered by Y and any Affiliate of Y as a result thereof); provided, that this Part 4(f) shall not apply to (i) transactions between X and Y or any Affiliate of Y entered into prior to the date of this Agreement and (ii) construction funds, debt service funds and debt service reserve funds.

(g)     **Negative Pledge.**  Party B shall not pledge or grant a security interest in any of its revenues or other assets to secure its obligations under any interest rate swap or other derivative transaction without Party A's prior written consent unless a parity pledge or security interest is granted to Party A to secure Party B's obligations under this Agreement

(h)     **Exchange of Confirmations.**  For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation, via telex or facsimile transmission.  Party B agrees to respond to such Confirmation within five Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein.  Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of the terms contained in such Confirmation, absent manifest error.  The parties agree that any such exchange of telexes or facsimile transmissions shall constitute a Confirmation for all purposes hereunder.

(i)     **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(j)     **Relationship Between Parties.**  The following representation shall be inserted as a new Section 3(k) of this Agreement:

"(k)     ***Relationship Between Parties.***  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)     ***Non-Reliance.***  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)     ***Assessment and Understanding.***  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

      (iii)    ***Status of Parties.*** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

(k)    **Recording of Conversations**. Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

(l)    **Grace Periods.** Section 5 of this Agreement is hereby amended as follows:

    (1)    In Section 5(a)(i) the phrase "on or before the third Local Business Day after notice of such failure is given to the party" shall be deleted and replaced with the phrase "on or before the first Local Business Day after notice of such failure is given to the party";

    (2)    In Section 5(a)(v)(2), the phrase "three Local Business Days" in the parenthetical "(or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period)" shall be deleted and replaced with the phrase "one Local Business Day" in such parenthetical; and

    (3)    In Sections 5(a)(vii)(4) and 5(a)(vii)(7) the words "30 days" shall be deleted and replaced with the words "15 days."

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized officers as of the date hereof.

**MORGAN STANLEY CAPITAL SERVICES INC.**

By: _____    _____
Name:
Title:

**JUDSON**

By: _____
Name: CYNTHIA H. Dunn
Title: Pres / CEO

**JUDSON FOUNDATION**

By: _____
Name: HONG S. CHAE
Title: V.p. OF FINANCE / CFO

EXHIBIT A

FORM OF MORGAN STANLEY GUARANTEE

**Date**

**[Address]**

**Ladies and Gentlemen:**

In consideration of that certain ISDA Master Agreement dated as of [date] between Morgan Stanley Capital Services Inc., a Delaware corporation (hereinafter "MSCS") and [counterparty] (hereinafter "Counterparty") (such ISDA Master Agreement, together with each Confirmation exchanged between the parties pursuant thereto, hereinafter the "Agreement"), Morgan Stanley, a Delaware corporation (hereinafter "MS"), hereby irrevocably and unconditionally guarantees to Counterparty, with effect from the date of the Agreement, the due and punctual payment of all amounts payable by MSCS under the Agreement when the same shall become due and payable, whether on Scheduled Payment Dates, upon demand, upon declaration of termination or otherwise, in accordance with the terms of the Agreement and giving effect to any applicable grace period. Upon failure of MSCS punctually to pay any such amounts, and upon written demand by Counterparty to MS at its address set forth in the signature block of this Guarantee (or to such other address as MS may specify in writing), MS agrees to pay or cause to be paid such amounts; provided that delay by Counterparty in giving such demand shall in no event affect MS's obligations under this Guarantee.

MS hereby agrees that its obligations hereunder shall be unconditional and will not be discharged except by complete payment of the amounts payable under the Agreement, irrespective of any claim as to the Agreement's validity, regularity or enforceability or the lack of authority of MSCS to execute or deliver the Agreement; or any change in or amendment to the Agreement; or any waiver or consent by Counterparty with respect to any provisions thereof; or the absence of any action to enforce the Agreement or the recovery of any judgment against MSCS or of any action to enforce a judgment against MSCS under the Agreement; or any similar circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor generally. MS hereby waives diligence, presentment, demand on MSCS for payment or otherwise (except as provided hereinabove), filing of claims, requirement of a prior proceeding against MSCS and protest or notice, except as provided for in the Agreement with respect to amounts payable by MSCS. If at any time payment under the Agreement is rescinded or must be otherwise restored or returned by Counterparty upon the insolvency, bankruptcy or reorganization of MSCS or MS or otherwise, MS's obligations hereunder with respect to such payment shall be reinstated upon such restoration or return being made by Counterparty.

MS represents to Counterparty as of the date hereof, which representations will be deemed to be repeated by MS on each date on which a Transaction is entered into, that:

1.  it is duly organized and validly existing under the laws of the jurisdiction of its incorporation and has full power and legal right to execute and deliver this Guarantee and to perform the provisions of this Guarantee on its part to be performed;

2.  its execution, delivery and performance of this Guarantee have been and remain duly authorized by all necessary corporate action and do not contravene any provision of its certificate of incorporation or by-laws or any law, regulation or contractual restriction binding on it or its assets;

3.    all consents, authorizations, approvals and clearances (including, without limitation, any necessary exchange control approval) and notifications, reports and registrations requisite for its due execution, delivery and performance of this Guarantee have been obtained from or, as the case may be, filed with the relevant governmental authorities having jurisdiction and remain in full force and effect and all conditions thereof have been duly complied with and no other action by, and no notice to or filing with, any governmental authority having jurisdiction is required for such execution, delivery or performance; and

4.    this Guarantee is its legal, valid and binding obligation enforceable against it in accordance with its terms except as enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights or by general equity principles.

By accepting this Guarantee and entering into the Agreement, Counterparty agrees that MS shall be subrogated to all rights of Counterparty against MSCS in respect of any amounts paid by MS pursuant to this Guarantee, provided that MS shall be entitled to enforce or to receive any payment arising out of or based upon such right of subrogation only to the extent that it has paid all amounts payable by MSCS under the Agreement.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York. All capitalized terms not otherwise defined herein shall have the respective meanings assigned to them in the Agreement.

**MORGAN STANLEY**

By: _____
    Name:
    Title:
    Address:    1585 Broadway
                  3rd Floor
                  New York, NY 10036
    Attention:  Derivative Products Group
    Fax No.:    (212) 761-0162

## EXHIBIT B

### FORM OF COMPLIANCE CERTIFICATE

This certificate (the "Compliance Certificate") is submitted to **MORGAN STANLEY CAPITAL SERVICES INC.** (the "Counterparty") in connection with an ISDA Master Agreement, dated as of March 12, 2009 (the "**Agreement**"), which Agreement includes the Schedule and all Confirmations thereto, between **JUDSON and JUDSON FOUNDATION** (jointly and severally, "Party B") and the Counterparty.  Capitalized terms used but not defined herein shall have the meanings given such terms in the Agreement.

The undersigned hereby certifies to the Counterparty that the undersigned is familiar with the following financial information, which has been taken from Party B's books and records which are complete and accurate, and the following statements of the financial events to be provided pursuant to the Agreement are true and correct:

| Required Covenant | Actual | Compliance (*Yes/No*) |
|---|---|---|
| _____ | ____ | _____ |
| _____ | ____ | _____ |

THE UNDERSIGNED FURTHER CERTIFIES THAT: (A) THE UNDERSIGNED IS FULLY AUTHORIZED BY PARTY B TO SUBMIT THIS COMPLIANCE CERTIFICATE TO THE COUNTERPARTY AND (B) PARTY B IS IN COMPLIANCE WITH ALL OF THE COVENANTS CONTAINED IN THE AGREEMENT.

Dated this ___ day of _____, 20___.

By: _____

# Morgan Stanley

Municipal Capital Markets

| | | | |
|---|---|---|---|
| Date: | March 12, 2009 | | |
| To: | Judson and Judson Foundation, jointly and severally | From: | Morgan Stanley Capital Services Inc. |
| Attn: | Hong S. Chae | Contact: | NY Deriv Client Services |
| Fax: | (216) 791-5595 | Fax: | 212-404-4726 |
| Tel: | (216) 791-2688 | Tel: | 212-761-2996 |
| Email: | hchae@judsonretirement.org | Email: | Municonfirms_In@morganstanley.com |

Re: Interest Rate Swap MSCS Ref. No. AUNQT

     The purpose of this letter agreement is to confirm the terms and conditions of the Swap Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the ISDA Master Agreement below.

     The definitions and provisions contained in the 2006 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

     1. This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of March 12, 2009, as amended and supplemented from time to time (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

     2. The terms of the particular Transaction to which this Confirmation relates are as follows:

Party A:        Morgan Stanley Capital Services Inc.

Party B:        Judson and Judson Foundation, jointly and severally

Trade Date:        March 12, 2009

Notional Amount:        USD 29,340,000, amortizing according to Schedule I

Effective Date:        March 15, 2009

Termination Date:        The earlier of (i) November 15, 2035 or (ii) with respect to any cancelled Notional Amount, the applicable Bermuda Option Termination Date, as hereinafter defined, subject to adjustment in accordance with the Following Business Day Convention

Fixed Amounts:

    Fixed Rate Payer:        Party B

    Fixed Rate Payer Payment Dates:        The third Business Day after the 15th calendar day of each month, commencing on April 20, 2009, up to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

# Morgan Stanley

Municipal Capital Markets

| | |
|---|---|
| Fixed Rate Payer Period End Dates: | The 15th calendar day of each month, commencing on April 15, 2009, up to and including the Termination Date, subject to No Adjustment. |
| Fixed Rate: | 3.37% |
| Fixed Rate Day Count Fraction: | 30/360 |

Floating Amounts:

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | The third Business Day after the 15th calendar day of each month, commencing on April 20, 2009, up to and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate Period End Dates: | The 15th calendar day of each month, commencing on April 15, 2009, up to and including the Termination Date, subject to No Adjustment. |
| Floating Rate Option: | Sixty-seven percent (67%) times USD-LIBOR-BBA |
| Designated Maturity: | Three months |
| Floating Rate Day Count Fraction: | Actual/Actual |
| Floating Rate Reset Dates: | The 15th calendar day of each month, subject to No Adjustment. |

| | |
|---|---|
| Business Days: | New York |
| Calculation Agent: | As per the Agreement |

Bermuda Option Termination Provisions:

| | |
|---|---|
| Optional Early Termination: | Applicable |
| Option Style: | Bermuda Option |
| Buyer: | Party B |
| Seller: | Party A |
| Bermuda Option Termination Date(s): | Monthly, commencing on April 15, 2009, up to and including October 15, 2035, subject to adjustment in accordance with the Following Business Day Convention. |
| Procedure for Exercise: | Telephonic Notice by Party B to Party A, to be followed promptly by written confirmation. |
| Exercise Period: | Five (5) New York Business Days prior to the Bermuda Option Termination Date selected by Party B. |

# Morgan Stanley

Municipal Capital Markets

| | |
|---|---|
| Earliest Exercise Time: | 9:00 a.m., New York time |
| Expiration Time: | 11:00 a.m, New York time |
| Multiple Exercise: | Applicable |
| Cash Settlement: | Inapplicable |
| Minimum Notional Amount | USD 100,000 |
| Terms of Payments: | Final Fixed and Floating Amounts, only with respect to the cancelled Notional Amount, shall be accrued to and the net obligation shall be paid on the Bermuda Option Termination Date by the party that has the obligation to pay the larger net amount then due. |
| Additional Payment Provisions: | In the event that Party B exercises its right to cancel this Transaction via Bermuda Option, Party B shall pay:

(a) three percent (3%) if exercised from and including April 15, 2009 to and including October 15, 2013;

(b) one percent (1%) if exercised from and including November 15, 2013 to and including October 15, 2035;

of the cancelled Notional Amount to Party A on the Bermuda Option Termination Date(s). |

### 3. Account Details:

| | |
|---|---|
| Payments to Party A: | As per Standard Settlement Instructions |
| Payments to Party B: | Bank name: National City Bank (PNC)<br>ABA: 041000124<br>Account No.: 657151372 |
| Party A Operations Contact: | Municipal Operations<br>Tel: 410-534-1436<br>Fax: 410-522-5487<br>E-mail: MuniOperations@MorganStanley.com |
| Party B Operations Contact: | Name: Hong S. Chae, CFO<br>Fax: (216) 791-5595<br>Telephone: (216) 791-2688<br>Email: hchae@judsonretirement.org |

4. **Swap Structuring Fee**. Party B hereby directs Party A, upon execution of this Confirmation, to pay to Cain Brothers & Company, LLC ("Cain Brothers") an amount specified by Cain Brothers as a swap structuring fee equal to $182,000 for services that Cain Brothers provided to Party B in connection with this Transaction. This fee is reflected in, and has increased the Fixed Rate payable by Party B hereunder.

# Morgan Stanley

Municipal Capital Markets

Please confirm that the foregoing correctly sets forth the terms of our agreement MSCS Ref. No. AUNQT by executing this Confirmation and returning it to us promptly.

We are delighted to have entered into this Transaction with you and look forward to serving you further in the future.

Best Regards,

**MORGAN STANLEY CAPITAL SERVICES INC.**

By: _____
   Name:  David N. Moore
   Title: Vice President

ACKNOWLEDGED AND AGREED as of the date first written:

**JUDSON**

By: _____
Name:  Cynthia  H. Dunn
Title:  Pres / CEO

**JUDSON FOUNDATION**

By: _____
Name:  Hong S. Chae
Title:  V.P. of Finance / CFO

**SCHEDULE I**
**TO THE CONFIRMATION**
**BETWEEN**
**MORGAN STANLEY CAPITAL SERVICES INC.**
**AND**
**JUDSON AND JUDSON FOUNDATION, JOINTLY AND SEVERALLY**
**(MSCS Ref. No. AUNQT)**

*(Amortizations shall occur on the Floating Rate Payer Period End Date corresponding to each related date, below.)*

| FROM (and including) | TO (but excluding) | NOTIONAL AMOUNT |
|---|---|---|
| Effective Date | November 15, 2010 | USD 29,340,000 |
| November 15, 2010 | November 15, 2011 | 28,740,000 |
| November 15, 2011 | November 15, 2012 | 28,110,000 |
| November 15, 2012 | November 15, 2013 | 27,455,000 |
| November 15, 2013 | November 15, 2014 | 26,760,000 |
| November 15, 2014 | November 15, 2015 | 25,985,000 |
| November 15, 2015 | November 15, 2016 | 25,175,000 |
| November 15, 2016 | November 15, 2017 | 24,330,000 |
| November 15, 2017 | November 15, 2018 | 23,510,000 |
| November 15, 2018 | November 15, 2019 | 22,655,000 |
| November 15, 2019 | November 15, 2020 | 21,765,000 |
| November 15, 2020 | November 15, 2021 | 20,775,000 |
| November 15, 2021 | November 15, 2022 | 19,740,000 |
| November 15, 2022 | November 15, 2023 | 18,670,000 |
| November 15, 2023 | November 15, 2024 | 17,555,000 |
| November 15, 2024 | November 15, 2025 | 16,390,000 |
| November 15, 2025 | November 15, 2026 | 15,180,000 |
| November 15, 2026 | November 15, 2027 | 13,920,000 |
| November 15, 2027 | November 15, 2028 | 12,610,000 |
| November 15, 2028 | November 15, 2029 | 11,245,000 |
| November 15, 2029 | November 15, 2030 | 9,830,000 |
| November 15, 2030 | November 15, 2031 | 8,350,000 |
| November 15, 2031 | November 15, 2032 | 6,810,000 |
| November 15, 2032 | November 15, 2033 | 5,210,000 |
| November 15, 2033 | November 15, 2034 | 3,540,000 |
| November 15, 2034 | Termination Date | 1,805,000 |

SCHEDULE
to the
ISDA Master Agreement
dated as of March 12, 2009
between
MORGAN STANLEY CAPITAL SERVICES INC. (**"Party A"**),
a corporation organized under the laws of the State of Delaware

and

JUDSON and JUDSON FOUNDATION (jointly and severally, **"Party B"**),
each a non-profit corporation organized under the laws of the State of Ohio

## Part 1. Termination Provisions

(a)    "**Specified Entity**" means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction): | Affiliates |
| Section 5(a)(vi) (Cross Default): | Not Applicable |
| Section 5(a)(vii) (Bankruptcy): | Not Applicable |
| Section 5(b)(ii) (Credit Event Upon Merger): | Not Applicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction: | Not Applicable |
| Section 5(a)(vi) (Cross Default): | Not Applicable |
| Section 5(a)(vii) (Bankruptcy): | Not Applicable |
| Section 5(b)(ii) (Credit Event Upon Merger): | Not Applicable |

(b)    "**Specified Transaction**" means, in lieu of the meaning specified in Section 12, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these

transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)     The **Cross Default** provisions of Section 5(a)(vi) will apply to Party A and to Party B; provided, that the following language shall be added to the end of Section 5(a)(vi):

"Notwithstanding the foregoing, a default under subsection (2) hereof shall not constitute an Event of Default if (i) the default was caused solely by error or omission of an administrative or operational nature; (ii) the Defaulting Party has provided the other party with satisfactory evidence that funds were available to enable the party to make the payment when due; and (iii) the payment is made within two Local Business Days of such party's receipt of written notice of its failure to pay."

"**Specified Indebtedness**" will have the meaning specified in Section 12 of this Agreement.

"**Threshold Amount**" means:

(i)      with respect to the Specified Indebtedness of Party A or any applicable Specified Entity, an amount equal to the greater of 2% of Stockholders' Equity as of the end of its most recently completed fiscal year, or its equivalent in any currency, or $10,000,000.

(ii)     with respect to the Specified Indebtedness of Party B or any applicable Specified Entity, an amount equal to $1,000,000.

(d)     The **Credit Event Upon Merger** provisions of Section 5(b)(ii) will apply to Party A and to Party B.

(e)     The **Automatic Early Termination** provisions of Section 6(a) will not apply to Party A or to Party B.

(f)     **Payments on Early Termination**.

(i)      For the purpose of Section 6(e) of this Agreement:

(A)     Market Quotation will apply.

(B)     The Second Method (Full Two-Way Payments) will apply.

(ii)     Notwithstanding anything in this Agreement to the contrary, in the event (1) of an Event of Default with respect to which one party ("**X**") is the Defaulting Party or a Termination Event (other than a Voluntary Termination or an Illegality) with respect to which X is the sole Affected Party, and (2) a Market Quotation for each terminated Transaction can be determined, X shall have the option to either:

(A)     pay to the other party ("**Y**"), or receive from Y, as the case may be, an amount equal to the highest quotation received, in the case of a payment to Y, or the lowest quotation received, in the case of a payment from Y, each as the Settlement Amount; or

(B)    assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

(C)    Notwithstanding any other provision of this Agreement, the Reference Market-makers providing a Market Quotation in the events described in this Part 1(f)(ii) shall be selected by the Non-defaulting Party or the non-Affected Party, as the case may be, in accordance with the definition of "Reference Market-makers" specified in Section 12 of this Agreement; provided that in making such selection, the Non-defaulting Party or the non-Affected Party will, in good faith, consider soliciting bids from a particular Reference Market-maker identified by the other party.

(iii)    Notwithstanding anything in this Agreement to the contrary, in the event of (1) a Voluntary Termination or an Illegality with respect to which one party (**"X"**) is the sole Affected Party, and (2) a Market Quotation for each Affected Transaction can be determined, the non-Affected Party (**"Y"**), shall have the option to either:

(A)    pay to X, or receive from X, as the case may be, an amount equal to the highest quotation received in the case of a payment to X, or the lowest quotation received, in the case of a payment from X, each as the Settlement Amount; or

(B)    require X to assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation in the case of a payment to be made to X, or to the Reference Market-maker that provided the lowest quotation, in the case of a payment received from X, as applicable (provided in either such case that (a) such Reference Market-maker has one or more outstanding issues of rated, long-term, unsecured, unenhanced senior debt or a financial strength rating and such rating is equal to or higher than (i) the Threshold Ratings of two of the Rating Agencies (as such terms are defined in Part 1(g)(i) below) and (ii) the ratings of X by two of the Rating Agencies on the date of such assignment and (b) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker).

(C)    With respect to this Part 1(f)(iii) only, Party A and Party B hereby acknowledge and agree that Party A and Party B shall each have the right to select up to two of the Reference Market-makers providing Market Quotations. All such Reference Market-makers shall meet (in the reasonable judgment of Party A) Party A's then-current credit and legal policies and standard criteria for counterparties in similar transactions.

(g) **Additional Termination Event** will apply.  Each of the following shall constitute an Additional Termination Event:

   (i)   The rating of the long-term unsecured, unenhanced, senior debt of Party A's Credit Support Provider shall be withdrawn, suspended or reduced below the Threshold Rating by either of the following rating agencies (the **"Rating Agencies"**): Moody's Investors Service, Inc. (**"Moody's"**) and Standard & Poor's Ratings Group, a Division of The McGraw-Hill Companies, Inc. (**"Standard & Poor's"**).  The **"Threshold Rating"** shall be "Baa3," in the case of Moody's, and "BBB-," in the case of Standard & Poor's.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party A.

   (ii)  (A) Party B fails to maintain a Debt Service Coverage Ratio, tested annually as of the last day of each fiscal year, of at least 1.20 to 1.0 or (B) Party B fails to deliver evidence of its Debt Service Coverage Ratio in the form of the certificate attached hereto as Exhibit C B as required in Part 2 hereof, and such failure shall continue for three (3) Local Business Days following written notice to Party B of such failure.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

   (iii) (A) Party B fails to maintain Unrestricted Cash, tested annually as of the last day of each fiscal year, of at least $7,000,000 or (B) Party B fails to deliver evidence of its Unrestricted Cash in the form of the certificate attached hereto as Exhibit C B as required in Part 2 hereof, and such failure shall continue for three (3) Local Business Days following written notice to Party B of such failure.  For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

   (iv)  Party B provides (i) notice to Party A of its desire to cause the voluntary termination of any or all Transactions hereunder or any portion of any such Transaction(s) and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such voluntary termination shall be paid on the due date thereof.  Provision of any such notice and such evidence (a **"Voluntary Termination"**) shall constitute an Additional Termination Event, provided that in the case of a voluntary termination of a portion of a Transaction, such termination shall constitute an Additional Termination Event solely with respect to such portion.  Notice of a Voluntary Termination shall be provided in writing at least five (5) Business Days, and no more than thirty (30) Business Days, prior to the date designated in such notice by Party B (the **"Voluntary Termination Date"**).  If Party B designates a Voluntary Termination Date, Party B shall be the Affected Party and, notwithstanding anything in this Agreement to the contrary, the Affected Transaction shall be solely the Transaction or portion thereof designated by Party B.  Section 6(b)(iii) shall not apply with respect to a Voluntary Termination, and the Voluntary Termination Date shall be the Early Termination Date with respect to the Affected Transactions for the purposes of the applicable provisions of this Agreement.  Following a Voluntary Termination with respect to a portion of a Transaction, the portion of such Transaction not terminated shall constitute a Transaction for purposes of this Agreement, and the parties shall amend any of the documents which constitute this Agreement as may be necessary or appropriate to accurately reflect the terms of such Transaction.

## Part 2.  Agreement to Deliver Documents

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by the party and any Credit Support Provider of this Agreement, any Credit Support Document and any Confirmation, including, where applicable, certified copies of the resolutions of its Board of directors authorizing the execution and delivery of this Agreement, the relevant Credit Support Document or any Confirmation. | Upon execution of this Agreement and promptly at the request of the other party upon execution of a Confirmation. | Yes |
| Party A and Party B | A copy of the annual report of such party (in the case of Party A, in respect of Morgan Stanley) containing audited consolidated financial statements for each such fiscal year, certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized. | As soon as practicable after the execution of this Agreement and also within 150 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years while there are any obligations outstanding under this Agreement. | Yes |
| Party A and Party B | Quarterly unaudited financial statements. | In relation to Party B, as soon as practicable after the end of each fiscal quarter in each fiscal year, except the last, and in any event within sixty (60) days thereafter, while there are any obligations outstanding under this Agreement.  In relation to Party A, upon~~Upon~~ request ~~from the other party~~ while there are any obligations outstanding under this | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | Agreement. | |
| Party A | A guarantee of Morgan Stanley in the form attached hereto as Exhibit A. | Upon execution of this Agreement | Yes |
| Party A | Report providing an estimate of the then-current market value of the Transactions as of the relevant date set forth in the column to the right. | Monthly, within five (5) Business Days of the end of each month or of a request from Party B; provided that the failure of Party A to deliver such document shall not result in any Event of Default or Potential Event of Default. | No |
| Party B | A certified copy of the certificate of incorporation or articles of incorporation or similar formation document of Party B. | Upon execution of this Agreement | Yes |
| Party B | A list of the members or directors of the governing board of Party B. | Upon execution of this Agreement | Yes |
| Party B | A correct, complete and executed copy of U.S. Internal Revenue Service Form W-9 (or any successor thereto), including appropriate attachments, that eliminates U.S. federal backup withholding tax on payments under this Agreement. | (i) Upon the execution of this Agreement; (ii) promptly upon reasonable demand by Party A; and (iii) promptly upon learning that any such form previously provided by Party B has become obsolete or incorrect. | Yes |
| Party B | A compliance certificate, in the form attached hereto as Exhibit B executed by officers of Party B, confirming and certifying Party B's compliance with the requirement set forth in Part 1(g)(ii) hereof. Such compliance certificate shall be delivered to Party A by fax at 212-507-0648 or by email at compliancecerts@morganstanley.com | Within ~~60 days after the end of each fiscal quarter except the last and within~~ 150 days of the end of each fiscal year while there are any obligations outstanding under this Agreement | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | A compliance certificate, in the form attached hereto as <u>Exhibit B</u> executed by officers of Party B, confirming and certifying Party B's compliance with the requirement set forth in Part 1(g)(iii) hereof.  Such compliance certificate shall be delivered to Party A by fax at 212-507-0648 or by email at compliancecerts@morganstanley.com | Within ~~60 days after the end of each fiscal quarter except the last and within~~ 150 days of the end of each fiscal year while there are any obligations outstanding under this Agreement | Yes |
| Party A and Party B | Such other documents as the other party may reasonably request | Upon request | No |

**Part 3. Miscellaneous**

(a)    **Addresses for Notices.**  For the purpose of Section 10(a) of this Agreement:

    (i)    Address for notices or communications to Party A:

        For the purpose of Section 10(a) of this Agreement and for notices and communications with respect to Sections 5 and 6 only:

            Morgan Stanley Capital Services Inc
            1585 Broadway
            New York, New York 10036-8293
            Attention:      Close-out Notices
            With a mandatory copy to:
            Facsimile No.:  (212) 507-4622

        For the purpose of Section 10(a) of this Agreement and for notices and communications with respect to all purposes other than Sections 5 and 6:

            Morgan Stanley Capital Services Inc
            1585 Broadway
            New York, New York 10036-8293
            Attention:      Miscellaneous Notices
            Facsimile No:   (212) 404-9899

    (ii)    Address for notices or communications (other than with respect to payments) to Party B:

            Judson
            2181 Ambleside Drive
            Cleveland, Ohio 44106
            Attention:  Cynthia H. Dunn, President/CEO
            Facsimile: (216) 791-5595      Telephone:   (216) 791-2687

With a copy to:

> Judson
> 2181 Ambleside Drive
> Cleveland, Ohio 44106
> Attention: Hong S. Chae, Vice President, Finance/CFO
> Facsimile: (216) 791-5595          Telephone: (216) 791-2688

With a copy to:

> Cain Brothers & Co., LLC
> 360 Madison Avenue, 5th Floor
> New York, NY 10017
> Attention:      Derivatives Operations
> Telephone:      (212) 869-5600
> Facsimile:      (212) 504-0807

(b)    **Notices.** Section 10(a) is amended by adding in the third line thereof after the phrase "messaging system" and before the ")" the words, "; provided, however, any such notice or other communication may be given by facsimile transmission if telex is unavailable, no telex number is supplied to the party providing notice, or if answer back confirmation is not received within one hour from when the telex is sent."

(c)    **Calculation Agent.**   The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction; provided, however, that in the event of an Event of Default with respect to which Party A is the Defaulting Party, Party B or its agent, which shall be reasonably acceptable to Party A, will be the Calculation Agent.

(d)    **Credit Support Document.**  Details of any Credit Support Document:

With respect to Party A, the Guarantee of Morgan Stanley, and with respect to Party B, None.

(e)    **Credit Support Provider.**

    (i)      Credit Support Provider means in relation to Party A: Morgan Stanley.

    (ii)     Credit Support Provider means in relation to Party B: None.

(f)    **Governing Law; Jurisdiction.**    This Agreement will be governed by and construed in accordance with the laws of the State of New York.  Section 11(b) is amended by: (1) deleting "non-" from the second line of clause (i); and (2) deleting the final paragraph.

(g)    **Netting of Payments.**  The limitation set forth in Section 2(c)(ii) will apply.

(h)    **Definitions.**  All capitalized terms used but not otherwise defined in this Agreement shall have the meanings given thereto in the Letter of Credit Agreement.  Section 12 of this Agreement is hereby amended to add or amend, as applicable, the following definitions in their appropriate alphabetical order:

    (i)      **"Affiliate"** will have the meaning specified in Section 12 of this Agreement, but excludes Morgan Stanley Derivative Products Inc.

(ii)     **"Business Day"** means a day which is not a Saturday, Sunday or legal holiday on which banking institutions in the State of New York are authorized by law to close.

(iii)    **"Debt Service Coverage Ratio"** means the ratio of (i) revenues in excess of expenses, (ii) less amortized entrance fees, unrealized gains of investments and other non-cash revenues and (iii) plus depreciation, amortization, interest expense, unrealized losses on investments, and other non-cash expense and (iv) actual entrance fee revenues collected less refunds, all calculated on a trailing four quarter basis, divided by (v) all current ~~the sum of all scheduled~~ maturities of long-term debt calculated on a trailing twelve (12) month basis, plus trailing ~~four quarter~~ twelve (12) month interest expense.

(iv)     **"Default Rate"** means USD-LIBOR-BBA (with a Designated Maturity of one month) plus 1%. Terms used in this definition shall have the meanings ascribed thereto in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.).

(v)      **"Letter of Credit Agreement"** means the Letter of Credit Agreement by and between National City Bank and Judson, dated as of July 1, 2000, as amended from time to time, including the First Amendment to Letter of Credit Agreement dated as of October 1, 2005, ~~and~~ the Fourth Amendment to Letter of Credit Agreement dated as of March 9, 2009 and the Fifth Amendment to Letter of Credit Agreement dated as of April 24, 2009.

(vi)     **"Stockholders' Equity"** means with respect to Morgan Stanley, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(vii)    **"Unrestricted Cash"** means operating cash, plus cash from capital reimbursement, plus board designated funds.

## Part 4.  Other Provisions

(a)   **Representations.**  For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (d) thereof:

"(e)     *Eligible Contract Participant.*  It is an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. 1a), as amended by the Commodity Futures Modernization Act of 2000.

(f)      *Individual Negotiation.*  This Agreement has been subject to individual negotiation by such party.

(g)      *Line of Business.*  It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(h)      *No Agency.*  It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(i)    **_Full Two-Way Payments._**  It acknowledges that, pursuant to the terms of this Agreement (including, without limitation, Section 6(e) hereof), it may owe a payment to the other party upon the designation of an Early Termination Date hereunder, even in the event such Early Termination Date is the result of an Event of Default with respect to such other party.

(j)    **_ERISA Representation._**  It continuously represents that it is not (i) an employee benefit plan (hereinafter an "ERISA Plan"), as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended, or subject to any other statute, regulation, procedure or restriction that is materially similar to Section 406 of ERISA or Section 4975 of the Code (together with ERISA Plans, "Plans"), (ii) a person acting on behalf of a Plan or (iii) a person any of the assets of whom constitute assets of a Plan. It will provide notice to the other party in the event that it is aware that it is in breach of any aspect of this representation or is aware that with the passing of time, giving of notice or expiry of any applicable grace period it will breach this representation."

(b)  **Additional Representations of Party B.**  Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B on each date on which a Transaction is entered into) that:

    (i)    This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings or investments and not for purposes of speculation.

    (ii)    Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has entered into with Party A and/or with any or all other parties do not and will not cause this Agreement, including the relevant Transaction, to violate or exceed any limits or restrictions contained in any authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

    (iii)    This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

    (iv)    The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the not-for-profit purposes for which Party B is organized.

(c)    (i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:

        "Each party agrees with the other (and, in the case of Section 4(d), Party B agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:"

(ii)   Section 4 of the Agreement is hereby amended by adding the following subsection "(d)"
thereto:

"(d)   *Security and Source of Payment of Party B's Obligations.* The obligation of
Party B to make payments to Party A under this Agreement and each Transaction is
a general obligation of Party B payable from all legally available funds."

(d)   **Transfers.** Other than the transfer rights specified in Section 7 of this Agreement, Party A may
otherwise transfer its rights and obligations hereunder, in whole but not in part, to a person not
affiliated with Party A only with the prior written consent of Party B, which consent may be
withheld in the sole and absolute discretion of Party B.  Party A may transfer its rights and
obligations under this Agreement, in whole but not in part, to any Affiliate of Party A provided
that (i) the transferee shall assume all of the obligations of Party A hereunder, (ii) the
performance of such transferee hereunder is guaranteed by Party A's Credit Support Provider and
(iii) such assignment will not give rise to a Termination Event or any Event of Default with
respect to either Party B or such transferee of Party A.  Each party may also share any
information concerning the other party with any Affiliate.

(e)   **Setoff.** (i) Without affecting the provisions of this Agreement requiring the calculation of certain
net payment amounts, all payments under this Agreement will be made without set-off or
counterclaim, provided however, that upon the designation or deemed designation of any Early
Termination Date other than in connection with a Voluntary Termination, in addition to and not
in limitation of any other remedy (including any right to set-off, counterclaim or otherwise
withhold payment) under applicable law, the Non-defaulting Party or non-Affected Party (**"X"**)
may without prior notice to any person set-off any sum or obligation (whether or not arising
under this Agreement) owed or due by the Defaulting Party or Affected Party (in either
case, **"Y"**) to X or any Affiliate of X (whether or not arising under this Agreement, whether or
not matured, whether or not contingent and regardless of the currency, place of payment or
booking officer of the obligation) against any sum or obligation owed or due by X or any
Affiliate of X (the **"Original Obligation"**) to Y, and, for this purpose, may convert one currency
into another.  Any such set-off shall automatically satisfy and discharge the Original Obligation
to Y and, if the Original Obligation exceeds the sum or obligation to be set off against, the
Original Obligation shall be novated and replaced by an obligation to pay to Y only the excess of
the Original Obligation over such sum or obligation.

(ii)  If any obligation is unascertained, X may in good faith estimate that obligation and set off in
respect of the estimate, subject to the relevant party accounting to the other when the obligation is
ascertained.

(iii) Nothing in this Part 4(e) shall be effective to create a charge or other security interest. This
Part 4(e) shall be without prejudice and in addition to any right of set-off, combination of
accounts, lien or other right to which any party is at any time otherwise entitled (whether by
operation of law, contract or otherwise).

(f)   **Export of Defaults.** The occurrence or designation of an Early Termination Date on account of
an Event of Default or Termination Event with respect to a party hereto (**"X"**) (where X is the
Defaulting Party or sole Affected Party) shall constitute a material breach and event of default
(howsoever described) under all transactions between X and the other party (**"Y"**) or any Affiliate
of Y (whether or not arising under this Agreement, whether or not matured, whether or not
contingent and regardless of the currency, place of payment or booking office of the obligation)
(together, the **"Other Transactions"**), whereupon Y or any Affiliate of Y shall have the right to

terminate, liquidate and otherwise close out any such Other Transactions (and X shall be liable for any damages suffered by Y and any Affiliate of Y as a result thereof); provided, that this Part 4(f) shall not apply to (i) transactions between X and Y or any Affiliate of Y entered into prior to the date of this Agreement and (ii) construction funds, debt service funds and debt service reserve funds.

(g)  **Negative Pledge.**  Party B shall not pledge or grant a security interest in any of its revenues or other assets to secure its obligations under any interest rate swap or other derivative transaction without Party A's prior written consent unless a parity pledge or security interest is granted to Party A to secure Party B's obligations under this Agreement

(h)  **Exchange of Confirmations.**  For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation, via telex or facsimile transmission.  Party B agrees to respond to such Confirmation within five Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein.  Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of the terms contained in such Confirmation, absent manifest error.  The parties agree that any such exchange of telexes or facsimile transmissions shall constitute a Confirmation for all purposes hereunder.

(i)  **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(j)  **Relationship Between Parties.**  The following representation shall be inserted as a new Section 3(k) of this Agreement:

"(k)  *Relationship Between Parties.*  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)  *Non-Reliance.*  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)  *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

        (iii)    ***Status of Parties.***  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction."

(k)    **Recording of Conversations**.  Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

(l)    **Grace Periods.**  Section 5 of this Agreement is hereby amended as follows:

    (1)    In Section 5(a)(i) the phrase "on or before the third Local Business Day after notice of such failure is given to the party" shall be deleted and replaced with the phrase "on or before the first Local Business Day after notice of such failure is given to the party";

    (2)    In Section 5(a)(v)(2), the phrase "three Local Business Days" in the parenthetical "(or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period)" shall be deleted and replaced with the phrase "one Local Business Day" in such parenthetical; and

    (3)    In Sections 5(a)(vii)(4) and 5(a)(vii)(7) the words "30 days" shall be deleted and replaced with the words "15 days."

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized officers as of the date hereof.

**MORGAN STANLEY CAPITAL SERVICES INC.**

By: _____
    Name:
    Title:

**JUDSON**

By: _____
    Name: CYNTHIA H. DOWD
    Title: Pres / CEO

**JUDSON FOUNDATION**

By: _____
    Name: HONG S. CHAE
    Title: V.P. OF FINANCE / CFO

EXHIBIT A

FORM OF MORGAN STANLEY GUARANTEE

**Date**

**[Address]**

**Ladies and Gentlemen:**

In consideration of that certain ISDA Master Agreement dated as of [date] between Morgan Stanley Capital Services Inc., a Delaware corporation (hereinafter "MSCS") and [counterparty] (hereinafter "Counterparty") (such ISDA Master Agreement, together with each Confirmation exchanged between the parties pursuant thereto, hereinafter the "Agreement"), Morgan Stanley, a Delaware corporation (hereinafter "MS"), hereby irrevocably and unconditionally guarantees to Counterparty, with effect from the date of the Agreement, the due and punctual payment of all amounts payable by MSCS under the Agreement when the same shall become due and payable, whether on Scheduled Payment Dates, upon demand, upon declaration of termination or otherwise, in accordance with the terms of the Agreement and giving effect to any applicable grace period. Upon failure of MSCS punctually to pay any such amounts, and upon written demand by Counterparty to MS at its address set forth in the signature block of this Guarantee (or to such other address as MS may specify in writing), MS agrees to pay or cause to be paid such amounts; provided that delay by Counterparty in giving such demand shall in no event affect MS's obligations under this Guarantee.

MS hereby agrees that its obligations hereunder shall be unconditional and will not be discharged except by complete payment of the amounts payable under the Agreement, irrespective of any claim as to the Agreement's validity, regularity or enforceability or the lack of authority of MSCS to execute or deliver the Agreement; or any change in or amendment to the Agreement; or any waiver or consent by Counterparty with respect to any provisions thereof; or the absence of any action to enforce the Agreement or the recovery of any judgment against MSCS or of any action to enforce a judgment against MSCS under the Agreement; or any similar circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor generally. MS hereby waives diligence, presentment, demand on MSCS for payment or otherwise (except as provided hereinabove), filing of claims, requirement of a prior proceeding against MSCS and protest or notice, except as provided for in the Agreement with respect to amounts payable by MSCS. If at any time payment under the Agreement is rescinded or must be otherwise restored or returned by Counterparty upon the insolvency, bankruptcy or reorganization of MSCS or MS or otherwise, MS's obligations hereunder with respect to such payment shall be reinstated upon such restoration or return being made by Counterparty.

MS represents to Counterparty as of the date hereof, which representations will be deemed to be repeated by MS on each date on which a Transaction is entered into, that:

1.    it is duly organized and validly existing under the laws of the jurisdiction of its incorporation and has full power and legal right to execute and deliver this Guarantee and to perform the provisions of this Guarantee on its part to be performed;

2.    its execution, delivery and performance of this Guarantee have been and remain duly authorized by all necessary corporate action and do not contravene any provision of its certificate of incorporation or by-laws or any law, regulation or contractual restriction binding on it or its assets;

3.    all consents, authorizations, approvals and clearances (including, without limitation, any necessary exchange control approval) and notifications, reports and registrations requisite for its due execution, delivery and performance of this Guarantee have been obtained from or, as the case may be, filed with the relevant governmental authorities having jurisdiction and remain in full force and effect and all conditions thereof have been duly complied with and no other action by, and no notice to or filing with, any governmental authority having jurisdiction is required for such execution, delivery or performance; and

4.    this Guarantee is its legal, valid and binding obligation enforceable against it in accordance with its terms except as enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights or by general equity principles.

By accepting this Guarantee and entering into the Agreement, Counterparty agrees that MS shall be subrogated to all rights of Counterparty against MSCS in respect of any amounts paid by MS pursuant to this Guarantee, provided that MS shall be entitled to enforce or to receive any payment arising out of or based upon such right of subrogation only to the extent that it has paid all amounts payable by MSCS under the Agreement.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York. All capitalized terms not otherwise defined herein shall have the respective meanings assigned to them in the Agreement.

**MORGAN STANLEY**


By: _____

    Name:
    Title:
    Address:   1585 Broadway
                3rd Floor
                New York, NY 10036
    Attention: Derivative Products Group
    Fax No.:   (212) 761-0162

## EXHIBIT B

### FORM OF COMPLIANCE CERTIFICATE

This certificate (the "Compliance Certificate") is submitted to **MORGAN STANLEY CAPITAL SERVICES INC.** (the "Counterparty") in connection with an ISDA Master Agreement, dated as of March 12, 2009 (the "**Agreement**"), which Agreement includes the Schedule and all Confirmations thereto, between **JUDSON and JUDSON FOUNDATION** (jointly and severally, "Party B") and the Counterparty. Capitalized terms used but not defined herein shall have the meanings given such terms in the Agreement.

The undersigned hereby certifies to the Counterparty that the undersigned is familiar with the following financial information, which has been taken from Party B's books and records which are complete and accurate, and the following statements of the financial events to be provided pursuant to the Agreement are true and correct:

| Required Covenant | Actual | Compliance (*Yes/No*) |
|---|---|---|
| _____ | ____ | _____ |
| _____ | ____ | _____ |

THE UNDERSIGNED FURTHER CERTIFIES THAT: (A) THE UNDERSIGNED IS FULLY AUTHORIZED BY PARTY B TO SUBMIT THIS COMPLIANCE CERTIFICATE TO THE COUNTERPARTY AND (B) PARTY B IS IN COMPLIANCE WITH ALL OF THE COVENANTS CONTAINED IN THE AGREEMENT.

Dated this ___ day of _____, 20___.

By: _____