**Westlaw.**

28-OCT AMBKRIJ 26                                                                                         Page 1
28-OCT Am. Bankr. Inst. J. 26

American Bankruptcy Institute Journal
October, 2009

Feature

## *26 MARKET PRACTICES FOR SETTLING DERIVATIVES IN BANKRUPTCY: PART I

Phil Weeber [FNa1]

Matthew E. Hoffman [FNa1]

Edward S. Robson [FNa1]

Chatham Financial Corp.; Kennett Square, Pa.

pweeber@chathamfinancial.com

Duane Morris LLP; Philadelphia

mehoffman@duanemorris.com

Court of Common Pleas; Philadelphia

erobson@alum.villanova.edu

Copyright © 2009 by American Bankruptcy Institute; Phil Weeber, Matthew E. Hoffman, Edward S. Robson

**Editor's Note:** *This is Part I of a two-part series.*

Derivatives contracts are an integral part of the global financial markets, allowing companies to hedge various types of risk or take speculative positions for gain. With an estimated notional value of $592 trillion as of December 2008, [FN1] derivatives exist for interest rates, currencies, commodities, equities, credit defaults and more. A sharp rise in the use of derivatives since 2003 has paralleled the increase of securitizations, leverage and structured products. Derivatives have also become more complex, both in economic features and legal structures. It is not surprising that the current financial crisis has created unexpected situations involving bankruptcy and the subsequent necessity to unwind derivatives. Since the financial crisis began in 2007, more than 100 financial institutions have failed, [FN2] and business bankruptcy filings increased almost 50 percent by the end of 2008. [FN3] As these trends continue, an increasing number of derivatives contracts must be settled.

This first article will examine the contracts that govern derivatives transactions, the procedure on the insolvency of a party thereto and the courts' interpretation of several key definitions. The second part will describe the treatment of derivatives contracts in bankruptcy and also present examples of calculation methods used in determining early termination amounts.

*Prevalent Use of Derivatives*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

08-13555-mg    Doc 25101-1    Filed 02/08/12    Entered 02/08/12 15:36:59    Exhibit A
Pg 2 of 8                                                                    Page 3 of 9

28-OCT AMBKRIJ 26                                                                  Page 2
28-OCT Am. Bankr. Inst. J. 26

Derivatives have grown in outstanding notional value from $418 trillion in December 2006 to a high of $684 trillion in June 2008. [FN4] The prevalent use of derivatives in financial markets became abundantly evident when Lehman Brothers Holdings Inc. (LBHI) sought bankruptcy relief on Sept. 15, 2008. At LBHI's 341 meeting, its restructuring firm reported more than 900,000 derivatives trades with which counterparties had to contend. In addition, holding companies for banks such as IndyMac Bank FSB and Washington Mutual Inc. had an estimated $1.5 billion and $2.7 billion of derivatives, respectively, when they collapsed. [FN5]

Other nonbanking companies also use derivatives as financial tools to hedge interest rate, currency and commodity risks. Counterparties to such derivatives contracts must also consider the implication of bankruptcy on those agreements. For example, General Growth Properties Inc., which sought bankruptcy relief on April 16, 2009, was party to $1.08 billion of interest rate swaps and more than $2 billion of interest rate caps [FN6] and General Motors Corp., which sought bankruptcy relief on June 1, 2009, was party to interest rate ($4.3 billion), currency ($16.1 billion) and commodity ($45 million) derivatives. [FN7]

*Derivatives and the ISDA Master Agreement*

The International Swaps and Derivatives Association ( ISDA) is a global financial trade organization that represents participants in the privately-negotiated derivatives industry. Over-the-counter (OTC) derivatives contracts are typically governed by an **ISDA master agreement**, which are most commonly used for interest rate, commodity and credit default derivatives. Each **ISDA master agreement** is modified by certain negotiated terms contained in an attached "schedule." A credit support annex (CSA), which defines whether either party must post collateral and in what amounts and methods, can be included as a part of the schedule. A "confirmation" defines the economic terms of each derivatives contract and supplements, forms part of and is subject to the **ISDA master agreement**. Collectively, all of these documents are regularly referred to as the "agreement."

The agreement provides the contractual framework for numerous transactions that occur through time. At each new transaction, the parties agree to the relevant economic terms as well as any trade specific terms. Each derivative position will change in value as the underlying reference (*e.g.*, a floating interest rate index such as three-month LIBOR or the EUR-USD exchange rate) changes. If the derivative is being used as a hedge, then the changes in value should be equally offset by changes in value of an associated risk. If the derivative is a speculative position, then the changes *74 in value represent gains or losses of a certain strategy.

*Settlement Procedure under the ISDA Master Agreement*

The **ISDA master agreement** includes procedures for terminating transactions, and as such, this article will present a general outline of the effects of bankruptcy. The **ISDA master agreement** has been modified several times since **ISDA**'s founding in 1985, and although earlier **versions** exist, parties to derivatives contracts most often use the **1992 ISDA master agreement** (the 1992 agreement) or the **2002 ISDA master agreement** (the 2002 agreement) based on familiarity and preference. [FN8] Although many of the provisions of the two most recent forms of the **ISDA master** are identical, there are certain relevant differences specific to early termination that are discussed below.

*Events of Default and Termination of the ISDA Master Agreement*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Events of default" are contract terms commonly found in financial instruments that give a party certain rights upon the occurrence of a specified event. [FN9] The **ISDA master agreement**, in its nonmodified form, includes a list of events of default, the occurrence of which allow the nondefaulting party to terminate the agreement and calculate the early-termination amount due or payable to the counterparty. [FN10] Unless the schedule is modified, the nondefaulting party becomes the calculation agent responsible for calculating early-termination amounts, fees and expenses.

Filing a petition for bankruptcy relief is an event of default. [FN11] The agreement provides a multistep process for termination: (1) notice of default by the nondefaulting party; [FN12] (2) setting of termination date; [FN13] (3) calculation of loss (or gain); [FN14] (4) setting payment date; [FN15] and (5) payment from one party to the other.

A party does not have to wait for a counterparty to file a petition for bankruptcy relief in order to terminate the agreement and unwind transactions. Market practice permits termination of derivatives at an agreed-upon market value at any mutually agreed-upon time. Further, the **ISDA master agreement** provides for early termination upon the occurrence of certain prebankruptcy events, including failure to make payments, [FN16] breach of the CSA [FN17] or cross-default on obligations negotiated in the agreement. [FN18]

However, there are many prebankruptcy warning signs that do not constitute events of default and will not warrant termination of the agreement following the multistep process. For example, a decline in the credit rating of a counterparty or credit support provider is not grounds for early termination as a nondefaulting party.

*Notice and Setting of a Termination Date*

To proceed with termination of the agreement after the occurrence of an event of default, the nondefaulting party must notify the defaulting party and set an early termination date. [FN19] The nondefaulting party calculates its loss or gain using the method specified by the governing agreement. Since one agreement may govern multiple derivatives transactions, it is important to note that the termination notice will apply to all derivatives between the two parties. Before terminating, the party should ensure that covenants or hedge policies will not be violated.

*Calculation of Loss or Gain*

One of the most significant differences between the 1992 and 2002 agreements is the procedure for calculating loss or gain. As such, calculation of loss or gain under each agreement will be treated separately.

**Calculation of Loss or Gain under the 1992 Agreement**

The 1992 agreement provides two methods for calculating loss. The first method is no longer utilized in practice, was eliminated from the 2002 agreement and will not be discussed. The second method has two devices that can be elected in the schedule to calculate the early termination amount: market quotation and loss. [FN20]

Market quotation requires the nondefaulting party to solicit quotes from at least four "reference marketmakers," derivatives dealers in the relevant market, selected in good faith, to enter into the same agreement that the nondefaulting party originally had with the defaulting party. [FN21] In other words, through market quota-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

08-13555-mg    Doc 25101-1    Filed 02/08/12    Entered 02/08/12 15:36:59    Exhibit A
Pg 4 of 8
Page 5 of 9

28-OCT AMBKRIJ 26
28-OCT Am. Bankr. Inst. J. 26

Page 4

tion, the nondefaulting party asks reference market-makers how much they would charge or pay to step into the shoes of the defaulting counterparty. [FN22]

If the nondefaulting party receives three or more bids, the highest and the lowest bids are eliminated, and the remaining bids are averaged to determine the "early termination amount." In the case of a derivative that is a liability to the nondefaulting party (*i.e.*, an asset to the defaulting party), the reference market-makers would likely offer to pay differing amounts in return for the right to receive future amounts via the agreement. These funds can be used by the nondefaulting party to settle the early termination amount due to the defaulting party. If the derivative is an asset to the nondefaulting party (*i.e.*, a liability to the defaulting party), the reference market-makers would likely require an up-front payment in order to agree to the same ongoing terms and conditions. The nondefaulting party would submit a claim against the defaulting party for the early-termination amount. In the event that the nondefaulting party receives fewer than three bids, the 1992 agreement regards the market-quotation method as unobtainable, and the nondefaulting party must use the loss method, as described below. [FN23]

The market-quotation method assumes a liquid derivatives market that *75 can quickly and efficiently replace any agreements breached by a defaulting counterparty. Until recently, the assumption of liquidity was valid, and reliance on the market-quotation method was appropriate.

The loss method can be specified in the schedule. If market quotation is specified but is inapplicable, either due to an insufficient number of bids or a result that is not "commercially reasonable," the 1992 agreement requires the nondefaulting party to calculate the early termination amount using the loss method. [FN24] The 1992 agreement amorphously defines "loss" as "an amount that [a] party reasonably determines in good faith to be its total losses and costs" and provides a nonexhaustive list of factors that may be considered to calculate loss. [FN25] The interpretation of the requirement to "reasonably determine ... [the amount of loss] in good faith" under current market conditions is not clear, and no U.S. court appears to have addressed the issue.

When a party, as calculation agent, applies the loss method, its goals are to secure (1) an accurate valuation that includes all economic costs of replacement, (2) a calculation obtained in a "commercially reasonable" process and (3) a method that can withstand attack in future litigation. In today's economic climate, it may be difficult to find a replacement party that is willing to enter into identical replacement derivatives. Few leading dealers are willing to enter into off-market transactions. However, if an up-front amount of collateral is posted, a guarantee is signed and/or stricter collateral posting requirements are put in place, then banks may consider entering into an at-market swap.

**Calculation of Loss or Gain under the 2002 Agreement**

The 2002 agreement simplifies loss/gain calculations by eliminating the first method entirely and incorporating the market quotation and loss concepts into the broader, more flexible framework of "closeout amount." The closeout amount is "the amount of the losses [or gains] ... of the [nondefaulting party] that are or would be incurred ... in replacing, or in providing for the [nondefaulting party] the economic equivalent of ... the material terms of that Terminated Transaction." [FN26] The nondefaulting party determines this amount and must use "commercially reasonable" procedures to produce a "commercially reasonable result." [FN27]

Although the 2002 agreement does not provide any specific procedure for calculating the closeout amount, the nondefaulting party may consider several types of information. First, a nondefaulting party may consider

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

08-13555-mg    Doc 25101-1    Filed 02/08/12    Entered 02/08/12 15:36:59    Exhibit A of 9
Pg 5 of 8

28-OCT AMBKRIJ 26                                                                                   Page 5
28-OCT Am. Bankr. Inst. J. 26

market quotations from third parties, including those that account for the creditworthiness of the nondefaulting party. [FN28] By specifically identifying market quotation, the 2002 agreement continues to rely on market liquidity as a useful and objective valuation tool. A nondefaulting party should begin its determination of closeout amount by seeking replacement bids from reference market-makers. Second, a nondefaulting party may consider relevant market data provided by third parties, including relevant rates, prices, yields, yield curves, volatilities, spreads and correlations. [FN29] Finally, the nondefaulting party may use its own information regarding market quotations or relevant market data. [FN30] The closeout amount essentially takes the best practices used under loss calculations from 1992 agreements and incorporates them as a standard.

### *Recent Rulings Regarding Settlement for Events of Default* "Commercially Reasonable" Calculation of Loss and the *Peregrine* Decision

A market-quotation calculation must yield a result that is "commercially reasonable;" [FN31] otherwise the loss method must be employed. The determination of whether a market-quotation calculation is "commercially reasonable" is vague and not widely addressed by courts. While no U.S. court appears to have addressed the issue, a decision from the British High Court may offer some guidance, though not without raising significant is- sues.

In *Peregrine Fixed Income Ltd. (in Liquidation) v. Robinson Department Store Plc.*, [FN32] Peregrine Fixed Income Ltd. defaulted on a swap agreement with Robinson Department Store Plc. by failing to make payments. At the time of default, triggered by Peregrine's insolvency, the swap was an asset to Peregrine. Using the market quotation from the governing 1992 agreement, Robinson determined that it owed Peregrine just over $9.5 million. At the time, Robinson itself was on the verge of insolvency, and because potential market counterparties were bidding on what was essentially an unsecured promise of future payments from Robinson, they discounted their bids heavily to account for the risk that Robinson would eventually default on its obligation. The parties agreed that the loss method would calculate Robinson's liability to be $87.3 million. Peregrine filed suit, arguing that the market quotation was not "commercially reasonable," and the court agreed, reasoning that a market quotation and loss should produce a "broadly similar result" and that the huge difference between methods could therefore not be considered "commercially reasonable." The court held that Peregrine was entitled to require Robinson to use the loss method, which did not take account of Robinson's creditworthiness.

Perhaps the most troubling aspect of *Peregrine* is the possibility that a nondefaulting party may be forced to pay out significantly more money than it could replace with a new derivative. [FN33] It could even create the perverse incentive for an "in-the-money" counterparty to breach the agreement to take advantage of its counterparty's weak credit. [FN34]

### Reference Market-makers and the *Enron Australia* Decision

Parties attempting to unwind ISDA master agreements have long disputed the valuation techniques used by reference market-makers to calculate loss or gain. Court involvement in these disputes has created some troubling issues. One prominent and controversial example is *Enron Australia Finance Pty Ltd. (in Liquidation) v. Integral Energy Australia*, [FN35] where the Supreme Court of New South Wales. Australia, addressed the appropriateness of the industry standard bid-offer valuation method for market-quotation bids. Before its liquidation, Enron Australia Finance entered into a series of electricity swap agreements, governed by a modified 1992 agreement, with Integral Energy Australia. In moving to settle these swap agreements, Integral obtained a mar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

08-13555-mg    Doc 25101-1    Filed 02/08/12    Entered 02/08/12 15:36:59    Exhibit A    Page 7 of 9
Pg 6 of 8

28-OCT AMBKRIJ 26                                                                                                Page 6
28-OCT Am. Bankr. Inst. J. 26

ket quotation by averaging four leading accounting firms' valuations of the swaps.

Three of the four accounting firms valued the swaps utilizing the industry standard "bid-offer spread" approach, determining the prevailing "bid" or *76 "buy" price where Integral was the seller, and the "offer" or "ask" price where Integral was the buyer. This resulted in a valuation significantly greater than the "midpoint approach" of the fourth accounting firm, which used the midpoint between the average bid and offer prices. The "bid-offer spread" approach would force the defaulting counterparty to bear the full cost of replacing the derivative, while the midpoint approach would essentially divide the cost of replacing the derivatives between the two parties.

Enron eventually filed suit against Integral, arguing that the "bid-offer spread" approach would result in a boon to Integral because of the illiquid electricity market in Australia. Enron argued that actual trades--as opposed to quotes used at the commencement of negotiations--in the Australian electricity swaps market were more likely to occur at or near the midpoint. Integral argued that the defaulting party should bear the full cost of replacement. The court ultimately sided with Enron, determining that the market quotation should result in a valuation based on an actual market price (*i.e.*, the price at which both parties would deal), as opposed to the amount of a quotation based on what a party would be willing to accept.

*Enron Australia* contradicts common industry practice and the 1992 agreement, pursuant to which parties thereto do not share the bid-offer spread. The court's holding forces a nondefaulting counterparty to bear the costs of replacing its derivatives, even though it may have done nothing wrong.

*Conclusion*

Derivatives are useful financial instruments for hedging and taking calculated, concentrated risks. The governing agreements for derivatives have established a framework for early settlement in the event of bankruptcy. However, the current financial crisis is straining the application of the termination procedures, especially the calculation of the gain or loss to the nondefaulting party. In Part II, we will discuss the Bankruptcy Code's treatment of financial instruments and give specific examples of calculating market quotation and loss gains/losses.

[FNa1]. *Phil Weeber is a derivatives consultant at Chatham Financial in Kennett Square, Pa. Matthew Hoffman is an associate in the Business Reorganization and Financial Restructuring Practice Group at Duane Morris LLP in Philadelphia. Edward Robson is a recent graduate of the Villanova University School of Law and is clerking for Hon. Howland Abramson of the Court of Common Pleas in Philadelphia.*

[FN1]. See Bank for International Settlements, BIS Quarterly Review (June 2009), available at www.bis.org/statistics/otcder/dt1920a.pdf (last visited on Aug. 25, 2009).

[FN2]. See FDIC Failed Bank List, available at www.fdic.gov/bank/individual/failed/banklist.html (last visited on Aug. 25, 2009).

[FN3]. See "Bankruptcy Filings Over 1 Million for Fiscal Year 2008," available at www.uscourts.gov/Press_Reteases/2008/BankruptcyFilingsDec2008.ctm (last visited on Aug. 25, 2009).

[FN4]. See note 2, *supra*.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

08-13555-mg    Doc 25101-1    Filed 02/08/12    Entered 02/08/12 15:36:59    Exhibit A-3    Page 8 of 9
Pg 7 of 8

28-OCT AMBKRIJ 26                                                                                                          Page 7
28-OCT Am. Bankr. Inst. J. 26

[FN5]. *See* IndyMac Bancorp Inc. Quarterly Report (Form 10-Q), at 82 (filed on May 12, 2008); Washington Mutual Inc. Quarterly Report (Form 10-Q), at 21 (filed on Aug. 11, 2008).

[FN6]. *See* General Growth Properties Inc. Annual Report (Form 10-K), at 53 (filed on Feb. 27, 2009).

[FN7]. *See* General Motors Company Annual Report (Form 10-K), at 27 (filed on March 31, 2009).

[FN8]. The 1987 **ISDA master agreement** is rarely used and thus is not otherwise discussed herein.

[FN9]. "Events of default" are different than "termination events." "Events of default" (*e.g.*, filing a petition for bankruptcy relief) encompass problems within the control of a party to the contract. "Termination events" (*e.g.*, passage of a new law that makes the agreement illegal) are not within a party's control. The **ISDA master agreement** includes both. *See* 1992 agreement, §5(a) and (b); 2002 agreement, §5(a) and (b). Although both termination events and events of default result in the termination of the agreement, the procedure for termination is different for each, This article addresses termination upon the occurrence of events of default.

[FN10]. *See* 1992 agreement, §5(a); 2002 agreement, §5(a).

[FN11]. *See* 1992 agreement, §5(a)(vii); 2002 agreement, §5(a)(vii).

[FN12]. *See* 1992 agreement, §6(a); 2002 agreement, §6(a).

[FN13]. *See id.*

[FN14]. *See* 1992 agreement, §§6(e) and 14; 2002 agreement, §§6(e) and 14.

[FN15]. *See* 1992 agreement, §6(d); 2002 agreement, §6(d).

[FN16]. *See* 1992 agreement, §5(a)(i); 2002 agreement, §5(a)(i).

[FN17]. *See* 1992 agreement, §5(a)(iii)(2); 2002 agreement, §5(a)(iii).

[FN18]. *See* 1992 agreement, §5(a)(vi); 2002 agreement, §5(a)(vi).

[FN19]. Parties sometimes agree on a date at the outset of the agreement, in which case the date is set automatically. *See* 1992 agreement, §6(a); 2002 agreement, §6(a).

[FN20]. *See* 1992 agreement, §§6(e) and 14.

[FN21]. *See* 1992 agreement, §14 (defining reference market-maker and market quotation).

[FN22]. *See id.* (defining market quotation).

[FN23]. *See id.*

[FN24]. *See* 1992 agreement, §14 (defining loss).

[FN25]. *Id.*

[FN26]. 2002 agreement, §14 (defining closeout amount).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

28-OCT AMBKRIJ 26                                                                                          Page 8
28-OCT Am. Bankr. Inst. J. 26

[FN27]. *See id.*

[FN28]. *See id.*

[FN29]. *See id.*

[FN30]. *See id.*

[FN31]. *See* 1992 agreement, §14 (defining settlement amount).

[FN32]. *See* 2000 WL 1027115, O.B.D. (May 18, 2000).

[FN33]. *See* Memorandum to ISDA Members, at 7-8 (May 24, 2000), available at https://www.isdadocs.org/speeches/memopdf/AOPeregrinememo052400.pdf (last visited on Aug. 25, 2009).

[FN34]. *See id.*

[FN35]. 2002 N.S.W. S.Ct. R. 753 (Sept. 3, 2002).
28-OCT Am. Bankr. Inst. J. 26

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.