Westlaw.

Page 1

Slip Copy, 2011 WL 4526132 (S.D.N.Y.)
**(Cite as: 2011 WL 4526132 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CDO PLUS MASTER FUND LTD., Plaintiff,
v.
WACHOVIA BANK, N.A., Defendant.

No. 07 Civ. 11078(LTS)(AJP).
Sept. 29, 2011.

***MEMORANDUM ORDER***
LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff CDO Plus Master Fund Ltd. ("CDO" or "Plaintiff"), an Isle of Jersey exempted corporation,[FN1] brought the above-captioned action against defendant Wachovia Bank, N.A. ("Wachovia" or "Defendant"), a North Carolina corporation, asserting claims for fraud, mistake, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, specific performance and conversion in connection with a transaction in which CDO had agreed to afford Wachovia protection against certain contractually defined Credit Events related to a specified financial instrument (the "Reference Obligation").[FN2] Wachovia asserted a counterclaim for breach of contract. This Court has dismissed all of CDO's claims (Aug. 16, 2010, Memorandum Opinion and Order), and granted summary judgment to Wachovia on the liability aspect of its counterclaim. The Court also determined that Wachovia is "entitled [under the transaction documents] to its reasonable attorneys' fees incurred in prosecuting this action" (Id) The Court instructed the parties to seek to resolve any disputes concerning the amounts payable to Wachovia. Their attempt to do so having failed, the matter is now before the Court on Wachovia's motion for a judgment awarding it damages, prejudgment interest and attorneys' fees and expenses. The Court has subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

> FN1. CDO has changed its name to "VCG Special Opportunities Master Fund Ltd." (Am. Compl. ¶ 1 n. 1.) The Court refers to Plaintiff as "CDO" in this Memorandum Order for consistency with the parties' pleadings and submissions.

> FN2. A Credit Event is defined in the Contract as a failure to pay principal, a writedown, a failure to pay interest, or a distressed rating downgrade.

The Court has reviewed thoroughly the parties' submissions and, for the following reasons, grants Wachovia's motion for an award of the full amount of its claimed damages, attorneys' fees and expenses.

*Background*

The background facts of this case are recounted in the Court's Memorandum Opinions and Orders dated July 13, 2009, and August 16, 2010, familiarity with which is assumed. The following material facts are undisputed.

In May 2007, the parties entered into an agreement ("Agreement") pursuant to which Wachovia paid regular premiums to CDO in exchange for CDO's assumption of the credit risk of an underlying reference obligation with a notional value of $10 million-put otherwise, a credit default **swap**. CDO defaulted on the Agreement by failing to transfer collateral requested by Wachovia. As a result and according to the terms of the Agreement, Wachovia became entitled to a "Settlement Amount." The Parties agree that the Settlement Amount is to be calculated pursuant to a "Loss" measure defined in the **contract** as:

> [A]n amount that [the non-defaulting] party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this **Agreement** ... including any **loss** of **bargain**, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position ....

(Agreement § 14, "Loss.") [FN3] To calculate the Settlement Amount, Wachovia solicited quotations from "Reference Market-makers" of the price that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4526132 (S.D.N.Y.)
**(Cite as: 2011 WL 4526132 (S.D.N.Y.))**

each such party would demand to enter into a transaction that would provide the economic equivalent of the Agreement. Wachovia received a "quotation" from Deutsche Bank of $10,025,000. In addition, Wachovia received "indications" from Citibank at $9,999,000 and from Merrill Lynch at $9,995,000. The difference between a quotation and an indication is that, when a party provides a quotation, it is actually offering to enter into the proposed transaction but, when a party provides an indication, it is providing its estimation of a market price but not stating whether it would enter into a transaction at the quoted price. Wachovia calculated the Settlement Amount as $9,999,000, based on the quotation and indications it received, as well as "relevant rates or prices from leading dealers in the relevant markets" and changes in the market which (Wachovia alleges) would have obligated CDO to pay the $10 million notional amount of the trade if CDO had not already defaulted. After liquidating CDO's collateral and applying the proceeds against the Settlement Amount, Wachovia claims it is owed $1,017,709.66 of the Settlement Amount, plus interest. Wachovia did not hold any position in the underlying Reference Obligation, and thus suffered no actual loss on a transaction involving that security.

> FN3. The Agreement provides for a preferred method of calculating the Settlement Amount—the Market Quotation method—which the parties agree cannot be calculated or would not reach a commercially reasonable result given the state of the market. By the Agreement's terms, the Loss measure applies instead.

**\*2** Wachovia also claims $1,033,255.84 in attorneys' fees and costs. The highest rate that Wachovia was charged by any of its lawyers on this case was $632 per hour.

## DISCUSSION

Here, CDO contracted to provide Wachovia with secured financial protection against contractually defined Credit Events in connection with the Reference Obligation. CDO defaulted on its obligations under the Agreement and, as the Court determined in its August 2010 decision in this case, Wachovia is entitled to recover its damages in the form of the contractual unpaid Settlement Amount, interest and attorneys' fees and expenses. CDO asserts that Wachovia's claim for damages must fail because Wachovia did not have a "long" position in the underlying reference obligation and thus did not experience an actual loss on a transaction involving the Reference Obligation. CDO also asserts that Wachovia's calculation of the Settlement Amount is not sufficiently supported because (i) Wachovia relies on only one quotation; (ii) that quotation is not commercially reasonable, as it would require Wachovia to pay more than the notional amount of the trade for which it is seeking protection; (iii) the indications that Wachovia received are not for actual offers to enter into a trade and therefore should not be relied on as measures of Wachovia's loss; and (iv) Wachovia could not possibly get an accurate estimate of the value of the trade, given that, by December 2007, the market had deteriorated to the point where "there was no transparent trading market for credit default **swaps** in the subprime sector." (Opp.8.)

"The law of New York is clear that once the fact of damage has been established, the non-breaching party need only provide a 'stable foundation for a reasonable estimate [of damages].' " *Tractabel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 111 (2d Cir.2007) (citation omitted). The Agreement provides a specific and binding definition of "Loss" for the purpose of calculating damages. This definition includes "**loss** of **bargain**" and loss incurred "in connection with" the **Agreement**. The contractually agreed upon definition does not require an evaluation of Wachovia's *actual* loss or an evaluation of the success of any Wachovia hedge against actual loss. The absence of an actual loss on a Reference Obligation transaction, thus, is not a barrier to Wachovia's recovery of the expected benefit of its credit default **swap** transaction with CDO.

Nor is Wachovia's claim defeated by the lack of a "transparent trading market" for the Reference Obligation at the time of CDO's default. Wachovia has established a sufficient basis for its calculation of the Settlement Amount. As CDO concedes, "there was no transparent trading market for credit default **swaps** in the subprime sector" at the time of CDO's default, which made it more difficult for Wachovia to acquire market quotations for the transaction in question. Despite this difficulty, Wachovia was able to acquire a quotation and two indications from Reference Market-makers. The Reference Market-makers' responses provide a stable foundation for Wachovia's computa-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4526132 (S.D.N.Y.)
**(Cite as: 2011 WL 4526132 (S.D.N.Y.))**

tion of the Settlement Amount. Contrary to CDO's contentions, the single quotation is not commercially unreasonable simply because it is greater than the notional amount of the trade. As Wachovia points out:

**\*3** [A] quotation above 100% is the only quotation that a wise investor should have made in December 2007 because, as the protection seller, the investor was going to have to return 100% of the notional value of the Trade in less than two months. Any quotation ... that was less than 100% would have lost the quoting party money.

(Def.'s Reply Mem. 4 n. 3.) Wachovia has thus met its burden of demonstrating that its Settlement Amount claim represents the "reasonabl[e] determin[ation] in good faith ... [of] its total losses and costs," as required by the Agreement. The Court will award Wachovia the outstanding portion of the Settlement Amount calculated by Wachovia.

CDO does not dispute that Wachovia is entitled to interest on the Settlement Amount at the London Interbank Offered Rate ("LIBOR") plus 1%, from December 18, 2007, through and including today.

CDO challenges Wachovia's application for attorneys' fees and costs, asserting that Wachovia has failed to provide evidence that its attorney's fees are in line with those prevailing in the market. CDO also asserts that the Court should exclude some of Wachovia's attorneys' fees that stem from billing entries for travel time, entries that CDO characterizes as vague, duplicative or excessive, and entries associated with depositions at which testimony was taken in connection with both the instant matter and a parallel proceeding for injunctive relief. "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." _Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany & Albany Co. Bd. Of Elections,_ 369 F.3d 91, 95 (2d Cir.2004). A reasonable hourly rate is "the rate a paying client would be willing to pay," bearing in mind that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." _Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany & Albany County Bd. of Elections,_ 522 F.3d 182, 190 (2d Cir.2008).

CDO asserts that "Wachovia's application fails to provide evidence that their rates are in line with those prevailing in the community." (Opp.10.) Wachovia's lawyers charged, at most, $632 per hour, which is within the range of what courts have considered reasonable in this district. _See In re Talik, Inc. Sec. Litigation .,_ 576 F.Supp.2d 570, 589 (S.D.N.Y.2008) (finding $700 to $750 per hour to be a reasonable rate); _Silverblatt v. Morgan Stanley,_ 524 F.Supp.2d 425, 433 (S.D.N.Y.2007) (finding $675 per hour to be a reasonable rate); _In re AOL Time Warner Shareholder Deriv. Litigation,_ No. 02 civ. 6302, 2010 WL 363113, \*13 (S.D.N.Y.2010) (finding $175 to $550 for associates and $300 to $850 for partners to be reasonable rates). CDO has not proffered any evidence to suggest, against the background of these precedents, that Wachovia's lawyers' rates were unreasonable and, accordingly, the Court finds no basis for reducing those rates when awarding attorneys' fees.

**\*4** CDO also asks the Court to reject as too vague some of Wachovia's attorneys' billing entries, some of which have been redacted in part to protect privileged information. Courts in this circuit have awarded attorneys' fees despite the redaction of privileged information in attorneys' time records. _See, e.g., RBFC One. LLC v. Zeeks, Inc.,_ No. 02 Civ. 3231, 2005 WL 2105541, at \*1 (S.D.N.Y. Sept.1, 2005); _U.S. Bancorp Oliver–Allen Tech. Leasing v. Hall, Dickler, Kent. Goldstein & Wood, LLP,_ No. 04 Civ. 4986, 2005 WL 1875459, at \*3 (S.D.N.Y. Aug.8, 2005); _Connecticut Hosp. Ass'n v. O'Neill,_ 891 F.Supp. 687, 689–90, 692 (D.Conn.1994). Still, a party seeking attorneys' fees bears the burden of properly documenting the hours worked and that obligation is not satisfied by a vague entry such as "conference with" or "call to" a particular person. _Connecticut Hosp. Ass'n,_ 891 F.Supp. at 690–91 (citing _Hensley v. Eckerhart,_ 461 U.S. 424, 437 n. 12, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The majority of Wachovia's attorneys' billing entries have not been redacted. Of those that have been redacted, the majority remain more than sufficiently detailed to provide support for the fee application. The entries whose redactions are so extensive as to make it impossible to determine the precise nature of the service provided appear nonetheless to be consistent in style with the unredacted entries which provide sufficient information to support the claims for those fees and are too few in number and dollar value relative to the rest of the submission to necessitate in-camera review or denial of the claims.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4526132 (S.D.N.Y.)
**(Cite as: 2011 WL 4526132 (S.D.N.Y.))**

CDO challenges paralegal billing entries as too vague as well. Courts in this district have reduced requested paralegal fee awards, finding too vague billing entries that indicated only "claims project cont'd," "project work" or "further legal research." *In re Nortel Networks Corp. Sec. Litigation,* No. 01 civ. 1855, 2010 WL 3431152, at *3 (S.D.N.Y. Aug.20, 2010). Here, CDO challenges, for example, a billing entry indicating that one hour was spent "assist[ing] Patrick Robson with meet and confer letter in compliance with Judge Swain's IPR and draft notice of motion" and an entry indicating that ninety minutes was spent "evaluat[ing] depositions taken in case to date and determin[ing] which transcripts need to be obtained from court reporter; follow-up with court reporter regarding same." (Sept. 28, 2010, Regan Decl., Exh. A, entries for July 14, 2008, and Dec. 9, 2008.) The challenged entries, which identify the particular tasks on which work was performed and are generally consistent with the overall picture provided by the fee submission of an appropriate division of labor between attorney and paralegal staff, are sufficient to support Wachovia's request for an award of the fees for paralegal services.

Next, CDO challenges billing entries for Joseph Buonanno as duplicative of work done by other attorneys. Buonanno is the co-head of his firm's derivative practice. For this matter, he billed to Wachovia less than a week of time for each year the case was being litigated. Wachovia proffers that he worked on the case occasionally, to provide particularized knowledge gained over 20 years of experience. Such consultation is not duplicative. Neither was it duplicative for Buonanno to review the complaint and otherwise familiarize himself with the facts of the case, as such review is an essential prerequisite to providing informed advice. Wachovia has met its burden of demonstrating that its fee request is reasonable in this regard.

**\*5** CDO also challenges attorneys' fees billed In connection with depositions at which witnesses provided testimony to be used both in the instant case and in a parallel injunction action that was brought by Wachovia to enjoin an arbitration proceeding initiated by CDO. The parties agreed in advance that the depositions could cover testimony for both cases, so the Court will not reduce Wachovia's fee award on account of those depositions' relevance to both cases.

CDO challenges as an expense not reasonable or necessary to litigate the action the creation of a litigation budget, for which Wachovia's attorneys' billed $2,705.50. The Court, finding that the creation of a litigation budget is reasonable and necessary to well-managed litigation, will not deduct fees related to this task from the fee award.

Finally, CDO challenges $5,054.70 in billing entries that CDO interprets as billing for attorney travel time. Wachovia's attorneys have clarified that they have not charged Wachovia for travel time, that the single instance when one of them did mistakenly charge for travel time was conspicuously corrected, and that an entry on November 11, 2008, which indicates "travel to New York and prepare for [depositions]," was for work done while traveling, not for travel time itself. Accordingly, no adjustment is warranted.

*Conclusion*

For the foregoing reasons, Wachovia is hereby awarded a total of **$2,096,138.31,** which is comprised of the Settlement Amount of $1,017,709.66, interest on that Settlement Amount at LIBOR plus 1% from December 18, 2007, to today's date (totaling $75,172.81), and attorneys' fees and costs of $1,033,255.84.

This resolves docket entry number 87. The Clerk of the Court is respectfully requested to enter judgment in accordance with this Memorandum Order and close this case.

SO ORDERED.

S.D.N.Y.,2011.
CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.
Slip Copy, 2011 WL 4526132 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee,
Nashville Division.
Doyle R. MONDAY and Mallory Station Group,
Plaintiffs,
v.
REGIONS BANK, Defendant.

No. 3:08-0789.
March 4, 2010.

Craig Vernon Gabbert, Jr., David P. Canas, Harwell, Howard, Hyne, Gabbert & Manner, P.C., Nashville, TN, for Plaintiff.

Lea C. Owen, Waller, Lansden, Dortch & Davis, LLP, Nashville, TN, Larry B. Childs, Waller, Lansden, Dortch & Davis, LLP, Birmingham, AL, for Defendant.

### *MEMORANDUM AND ORDER*

JOHN T. NIXON, Senior District Judge.

**\*1** Pending before the Court is Defendant Region Bank's ("Defendant") Motion for Judgment on the Pleadings ("Motion for Judgment on the Pleadings") and supporting Memorandum (Doc. Nos. 10 & 11), to which Plaintiffs Doyle R. Monday and Mallory Station Group ("Plaintiffs") filed a Response (Doc. No. 14) and Defendant filed a Reply (Doc. No. 18). Also pending is Defendant's Motion for Summary Judgment ("Motion for Summary Judgment"), supporting Memorandum, Statement of Undisputed Facts, and other supporting papers (Doc. Nos.23-27). Plaintiffs filed a Response in Opposition, supporting Memorandum, Statement of Disputed Material Facts, and other supporting papers (Doc. Nos.30-34) to which Defendant filed a Reply (Doc. Nos.35-37). Plaintiffs filed a Motion for Leave to File Supplemental Response and to Postpone Ruling on Summary Judgment Motion (Doc. Nos. 38, 39, 42, & 43) to which Defendant filed a Response in Opposition (Doc. Nos. 40, 44, 45, & 46). For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Judgment on the Pleadings is **DENIED AS MOOT.**

Also pending is Plaintiffs' Motion to Ascertain Status (Doc. No. 48). With the entry of this Memorandum and Order, Plaintiffs' Motion to Ascertain Status is **GRANTED.**

### I. BACKGROUND[FN1]

> FN1. Unless otherwise noted, all facts are undisputed and taken from Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts Filed in Support of Defendant's Motion for Summary Judgment (Doc. No. 33) and Defendant's Response to Plaintiffs' Statement of Disputed Material Facts (Doc. No. 37).

Plaintiff Doyle Monday is a licensed attorney and real estate appraiser who owns and operates several mini-storage facilities in the Nashville area. Plaintiff Monday's company, Plaintiff Mallory Station Group ("MSG"), owns one of these facilities.[FN2] Defendant Regions Bank is an Alabama banking corporation registered to do business in Tennessee. In March 2005, Regions banker Buddy Cutsinger ("Cutsinger") approached Plaintiff about refinancing two existing commercial Regions loans. Cutsinger suggested Plaintiff refinance with a Regions product called a CaRLA, a Customized Lock Rate Agreement. A CaRLA is a loan agreement in which a derivative [FN3] is used to hedge the risk [FN4] in order to give the borrower a fixed-rate of interest rather than a floating-rate of interest. As with all such products, if the borrower chooses to payoff a CaRLA loan before the end of the term, the bank has to unwind the hedge.

> FN2. Throughout the Order, the Court will refer to Plaintiff Monday as "Plaintiff" and Plaintiffs Monday and Mallory Station Group collectively as "Plaintiffs." Because Plaintiff Monday owns Plaintiff Mallory Station Group, the Court will use Plaintiff when it makes sense in the context of negotiations, etc.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

> FN3. A derivative (short for derivative instrument) is an agreement between parties that can either gain or lose value based on the fluctuation in value of the underlying asset. Unexpected movements in interests rates can adversely affect the value of derivatives. (Doc. No. 25-24, at 3).

> FN4. A hedge is a financial position used to offset investment risk. It is designed to eliminate the possibility of future gain or loss. (Doc. No. 25-24, at 4).

Before entering into the CaRLA loans that are the subject of this dispute, Plaintiff had no experience with and had never entered into a loan agreement with a **swap** or derivative component. Plaintiff expressed interest in the CaRLA, but asked Cutsinger for more information; he was especially concerned about the consequences of an early payoff of the loan. In response, Cutsinger provided Plaintiff with Indicative Term Sheets and a PowerPoint presentation created by Regions Capital Markets FN5 and customized for Plaintiff. (Doc. Nos. 25-9 & 25-10). Through a series of telephone and in-person meetings between Plaintiff, Cutsinger, Regions banker Allan Joiner, and Regions Capital Markets Derivatives Marketer Justin Harp, the Regions representatives presented the CaRLA to Plaintiff and answered Plaintiff's questions about the loan. On May 27, 2005, over a recorded phone line, Plaintiff locked in an interest rate of 5.16% for the Monday CaRLA and the MSG CaRLA. During that call, Regions Capital Markets Derivatives Marketer Justin Harp said to Plaintiff:

> FN5. A capital markets company assists clients in managing risk or raising capital through nontraditional outlets, such as loan syndications and derivatives. (Doc. No. 34-3, at 12-13). Regions Capital Markets has no direct relationship with, but is a part of the same holding company as, Regions Bank. (*Id.,* at 10-11).

**\*2** [T]he last thing we really need to go over with you, Mr. Monday, is that these transactions are being hedged in order to give you this fixed rate. If you should choose at any point in time to prepay a portion and/or all of the transactions, you will be subject to that provision, which basically says that prepayment will reduce those cash flows. And at that point in time, I will have to go in the market and replace them. If I'm able to do so at a rate higher than we're at today, there's going to be economic benefit because it takes less capital at the higher rate to produce those cash flows. But if that rate should be lower, it's going to be an economic cost because I will need more capital at the lower rate to produce the same cash flows.

On June 6, 2005, Plaintiff signed the CaRLA loan agreements.

The prepayment provision of the CaRLA provides:

> In the event of (i) a prepayment of all or any part of the Loan or (ii) an acceleration of the Loan, the amount to be paid by the Borrower to the Lender will be adjusted by an amount equal to the Loss determined by the Lender in respect of the principal amount of the Loan being prepaid or accelerated. For such purposes, "Loss" means the amount that the Lender reasonably determines in good faith to be its total losses and costs (or gain, in which case Loss shall be expressed as a negative number) in connection with the Loan (of affected portion thereof), including any loss of bargain, cost of funding, or, at the election of the Lender but without duplication, loss or cost incurred as a result of its terminating, liquidating, or obtaining, or re-establishing any hedge or related trading position (or any gain resulting from any of them). If such amount is a positive number, the Borrower shall pay such amount to the Lender on the date of such prepayment or acceleration; if such amount is a negative number, such amount shall be applied against the amount to be paid by the Borrower to the Lender. The Lender may, but need not, determine Loss by reference to quotations of relevant rates or prices from one or more leading dealers in relevant markets.

(Doc. Nos. 1-5, at 2 & 1-6, at 1).FN6 The PowerPoint provided to Plaintiff contained this explanation for the unwinding of the hedge:

> FN6. The pre-payment provisions of the Monday CaRLA and the MSG CaRLA are identical. (Doc. Nos. 1-5, at 2 & 1-6, at 1).

If a client elects to prepay a CaRLA, Regions must unwind the hedge transaction in the capital markets

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

at prevailing market rates. This may result in a gain or loss on the hedging transaction. Any economic impact to Regions when a transaction is unwound is passed on to the client. Therefore, CaRLA documents contain a "make whole" prepayment provision that stipulates an additional amount may be due to Regions in case of prepayment. However, the make-whole provision is considered "two-way" because the client will recognize either a benefit or cost in the event of prepayment.

To determine any additional amount due, Regions will compare the Fixed Interest Rate with the rate for a replacement transaction in the market based on the remaining principal repayment schedule and term to maturity. If the replacement rate is higher than the Fixed Interest Rate, the client make recognize a benefit; conversely, if the replacement rate is equal to or less than the Fixed Interest Rate, the client may incur an additional cost.

**\*3** (Doc. No. 25-10, at 4). The Indicative Term Sheets provided to Plaintiff, labeled "for discussion purposes only," also contained the text of the prepayment provision, along with a prepayment calculation explanation that is almost identical to one contained in the PowerPoint.[FN7]

> [FN7.] The Indicative Term Sheet Prepayment Calculation language reads: "To determine any additional amount due, Regions will compare the Fixed Interest Rate with a *replacement rate* in the market based on the remaining principal repayment schedule and term to maturity. If the replacement rate is higher than the Fixed Interest Rate the client make recognize a benefit; conversely, if the replacement rate is equal to or less than the Fixed Interest Rate, the client may incur an additional cost." (Doc. 25-9, at 3) (emphasis in original).

The Indicative Term Sheets contain a section titled "Sensitivity Analysis" with a table described as "provid[ing] an example of what the *hypothetical* economic impact of interest rate changes may be based on the loan amount, terms, and rate stated above." (Doc. No. 25-9, at 3) (emphasis in original). The table, entitled "Benefit/Cost of Interest Rate Movements" is further qualified: "[f]hese figures assume a parallel shift in the yield curve. Any actual benefit or cost may vary from these calculations and will be subject to changes in market conditions." (*Id.*). On one axis the chart shows "time from today," on the other the rise or fall of interest rates by .5%, with the economic impact of those changes on the total amount of the loan. (*Id.*).

In early 2008, interest rates had dropped from their 2005 levels and Plaintiff began to explore refinancing options for the two loans at issue. On January 24, 2008, Allan Joiner, who in the meantime had left Regions Bank and joined Avenue Bank, provided Plaintiff a refinancing quote for a loan with different terms from Avenue Bank. On January 29, 2008, Regions provided Plaintiff with prepayment calculations for the Monday and MSG CaRLAs, plus two additional CaRLAs entered into by Plaintiff after the loans at issue here. (Doc. No. 25-14). The unwind for the Monday CaRLA was $129,598.80 and the unwind for the MSG CaRLA was $149,264.75. Plaintiff was shocked by the prepayment calculation-he believed the prepayment amount was too high and had not been calculated as indicated by the PowerPoint. For approximately one month, Plaintiff repeatedly contacted Phil McCutchan, Regions Bank Vice President, and Tom Curl, head of the Regions real estate group, regarding the prepayment calculation. On March 4, 2008, Plaintiffs' attorneys sent a letter to Regions demanding that the prepayment be recalculated "under the loan agreements consistent with the methodology presented to Mr. Monday and agreed to at the inception of the loans." (Doc. No. 34-9, at 2). On March 25, 2008, Plaintiff again requested a recalculation of the prepayment amount. Regions provided such information using the same methods as the January prepayment calculation. On July 14, 2008, Plaintiffs brought the instant action.

**II. STANDARD OF REVIEW**

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Generally, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Moses v. Providence Hosp. & Med. Ctr.,* 561 F.3d 573, 578 (6th Cir.2009) (quoting Fed R. Civ. P. 56(c)). A genuine issue of material fact is "evidence such that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*4** The moving party has the burden of showing the absence of a genuine issue of material fact as to at least one essential element of the non-moving party's case, *Celotex v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and that the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson.* 477 U.S. at 251-52. Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *See id.*

**III. ANALYSIS**

**A. Breach of Contract**

Plaintiffs assert that Defendant breached the express terms of the CaRLA by failing to reasonably determine in good faith its total loss for prepayment purposes when Plaintiff requested the unwind calculation in January 2008. In the alternative, Plaintiffs argue that the January 2008 prepayment calculation constitutes repudiation or anticipatory breach. Defendant responds that Plaintiffs have failed to show nonperformance amounting to breach, and point to their expert's testimony and Plaintiff's own admission that Defendant met or exceeded the standards, customs, and practices of the banking industry in communicating about and ultimately calculating the prepayment penalty. For the following reasons the Court finds that no genuine issue of material fact remains concerning a breach of contract here.

For a breach of contract claim, a plaintiff must demonstrate: "(1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of the contract." *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d 671, 676-77 (Tenn.Ct.App.2007) (quoting *ARC LifeMed, Inc. v. AMC-Tenn., Inc.,* 183 S.W.3d 1, 26 (Tenn.Ct.App.2005)). Neither Party argues that the Monday and MSG CaRLAs are not enforceable contracts. Rather, Plaintiffs assert nonperformance. The dispute centers on the prepayment **provision** regarding "loss" for unwind purposes:

> "Loss" means the amount that the Lender reasonably determines in good faith to be its total losses and costs (or gain, in which case Loss shall be expressed as a negative number) in connection with the Loan (of affected portion thereof), including any **loss** of **bargain**, cost of funding, or, at the election of the Lender but without duplication, loss or cost incurred as a result of its terminating, liquidating, or obtaining, or re-establishing any hedge or related trading position (or any gain resulting from any of them)."

(Doc. Nos. 1-5, at 2 & 1-6, at 1). Plaintiffs claim that in January 2008 the amount proffered by Defendants for the prepayment amount was not reasonably determined in good faith to be its total losses and costs for unwinding the hedge.

Parties to a contract owe each other a duty of good faith and fair dealing in performance of that contract. *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.,* 195 S.W.3d 637 (Tenn.Ct.App.2006). The extent of the duty to perform in good faith depends upon the individual contract. *TSC Indus., Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). "In construing contracts, courts look to the language of the instrument and to the intention of parties, and impose a construction which is fair and reasonable." *Id; see also, Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn.Ct.App.1986). The question of the parties' intent is "generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.,* 78 S.W.3d 885, 890 (Tenn.2002) (citing Joseph M. Perillo. *Corbin on Contracts,* § 24.30 (rev. ed.1998)).

**\*5** A central tenant of contract construction is "the intent of the contracting parties at the time of executing the agreement should govern." *Id.* (quoting *Empress Health & Beauty Spa. Inc. v. Turner,* 503 S.W.2d 188, 1990 (Tenn.1973)). The intent of the parties is presumed to be that specifically expressed in the body of the contract. *Id.* If clear and unambiguous, the literal meaning of the language controls, provided such language does not conflict with any rule of law, good morals, or public policy. *Id.* (quoting 17 *Am.Jur.*2d). When faced with a contract construction

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

question, a court's initial task is to determine whether the language of that contract is ambiguous. *Id.* If the language of the contract is found to be ambiguous, the court applies established rules of construction to determine the parties intent. *Id.* If ambiguity remains, then the legal meaning of the contract becomes a question of fact for the jury. *Id.*

The language contained within the prepayment provision is not ambiguous. It states that the prepayment loss will be "the amount that the Lender reasonably determines in good faith to be its total losses and costs ... in connection with the Loan" (Doc. Nos. 1-5, at 2 & 1-6, at 1). The parties intended that Defendant calculate in good faith its cost to unwind the hedge in the market. This intent is clearly shown.

However, Plaintiff disputes that the prepayment amount presented to him in January 2008 was calculated in good faith. In Tennessee, a question of good faith or reasonableness is often considered a question of fact. *See Safeco Ins. Co. of Am. v. Criterion Inv. Corp.,* 732 F.Supp. 834, 841 (E.D.Tenn.1989) ( "What is 'good faith' depends, it is obvious, upon the facts and circumstances of each case.") (citing Tenn.Code Ann. § 47-2-201: " 'Good faith' ... means honesty in fact in the conduct or transaction concerned."). However the existence of a fact determination does not necessarily preclude summary judgment. 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure § 2725* (3d ed. 2009) ("The fact that difficult questions of law exist or that the parties differ on the legal conclusions to be drawn from the facts is not in and of itself a ground for denying summary judgment ..."); *Tomlinson v. Kelley,* 969 S.W.2d 402, 405 (Tenn.1997). Summary judgment may be appropriate on a question of good faith or reasonableness where there is no dispute as to material facts and the movant is entitled to judgment as a matter of law. *Old Republic Sur. Co. v. Eshaghpour,* No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *8 (Tenn.Ct.App., Nov.30, 2001) (upholding grant of summary judgment on question of good faith dealing).

Defendant's expert stated, and Plaintiff has admitted, that Defendant met or exceeded the standards, customs and practices of the banking industry in communications with Plaintiff in regard to the prepayment amount calculation and in calculating that amount. (Doc. 25-11, at 3-4 (Moore Declaration); Doc. No. 33, at 7, 13, 15). In their Response to Defendant's Statement of Undisputed Material Facts Filed in Support of Defendant's Motion for Summary Judgment, Plaintiffs admitted as undisputed for the purposes of the summary judgment motion the following statements: "Regions calculates the gain or loss under the two-way make whole provision of a CaRLA loans [*sic* ] using a method that is industry standard for calculating make whole amounts for interest rate derivatives" and "Regions [*sic* ] calculation of the unwind followed industry standard for such calculations." (Doc. No. 33, at 7, 15). There is no question that Regions calculated the prepayment amount according to industry standards.

**\*6** According to Black's Law Dictionary, one definition of "good faith" is "observance of reasonable commercial standards of fair dealing in a given trade or business." *Black's Law Dictionary* (8th ed.2004). Courts in this Circuit have used industry standards to determine good faith compliance under contract. *See Lichtenberg Const. & Dev., Inc. v. Paul W. Wilson, Inc.,* 2001 WL 1141236, at *2-3 (Ohio App. 1 Dist., Sept.28, 2001) (applying industry practice to question of good faith negotiations); *United Magazine Co. v. Prudential Ins., Co.,* 877 F.Supp. 1076, 1083 (S.D.Ohio, 1995) (noting lack of evidence of industry standards for good faith determination); *Pezzillo v. Gen. Tel. & Elec. Info. Sys., Inc.,* 414 F.Supp. 1257, 1270 (D.C.Tenn., 1976) (applying industry standards to determination of good faith in employment practices). No reasonable jury could find that Regions acted in bad faith by calculating the prepayment amount according to industry standards. In providing the January 2008 prepayment amount to Plaintiffs, Regions did not breach or repudiate the CaRLA agreements.

Because the Court does not find a genuine issue of material fact remains regarding breach, it will not assess Plaintiffs' damages arguments contained in the original or supplemental briefing (Doc. Nos.30-34, 38, 39). *See* 477 U.S. 317 at 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 ("The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

**B. Plaintiffs' Claims Under the Tennessee Consumer Protection Act**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

Plaintiffs also claim that Defendant engaged in unfair and deceptive practices in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn.Code Ann. § 47-18-104, by: (1) misrepresenting the calculation of the prepayment amount in order to induce Plaintiffs to enter into the CaRLAs; (2) "failing to use the originally presented prepayment 'loss' calculation formula"; (3) failing to disclose that Morgan Keegan would be involved in the **swap** transaction contained in the CaRLAs; and (4) by including "the interest rate in the CaRLA loans [that] was not market-derived." (Doc. No. 1-1, at 10). Defendant moves for summary judgment, arguing that Plaintiffs' claims are barred as a matter of law under Tenn.Code Ann. § 47-18-111(a)(3), or, in the alternative, that Plaintiffs cannot show deceptive conduct or damages, and therefore Plaintiffs' claims fail.

The TCPA prohibits [u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn.Code Ann. § 47-18-104(a). The Act further defines "trade," "commerce," or "consumer transaction" as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn.Code Ann. § 47-18-103(11). Plaintiffs do not specify a subsection of the TCPA in their complaint; however, in this briefing they identify section 47-18-104(b)(27) of the Tennessee Code which prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" as applicable. (*See* Doc. No. 31, at 10).

**\*7** Defendant argues that no cause of action by a borrower against a lender, with regard to any lending transaction, exists under the TCPA. For this absolute bar, Defendant points to section 47-18-111 and *Kleto v. AmSouth Bank,* No. 3:04-cv-243, 2005 WL 2573379 (E.D.Tenn. Oct.12, 2005). Section 47-18-111 defines activities exempted from the Consumer Protection Act, including, "(3) [c]redit terms of a transaction which may be otherwise subject to the provisions of this part, except insofar as the Tennessee Equal Consumer Credit Act of 1974 ... may be applicable." Tenn.Code Ann. § 47-18-111(a)(3). In *Kleto.* plaintiffs sued a bank when an oral promise to extend a loan for a condo purchase did not result in an actual loan. The district court granted summary judgment on plaintiffs' TCPA claim of misrepresentation by applying section 47-18-111(a)(3) and stating: "Thus, where a party would otherwise have a claim under the TCPA based upon a deceptive act or practice of a bank in connection with a credit transaction, such claims fall outside the scope of the Act .... Plaintiffs have cited to no authority, and the court has found none, to support their proposition that such a claim may be brought under the TCPA." 2005 WL 2573379, at *6. The court in *Kleto* does read section 47-18-111(a)(3) as a broad bar against claims based upon "credit transactions;" however, other recent cases and the plain meaning of the statute suggest a narrower exemption.

In *Laporte v. Wells Fargo Bank, N.A.,* the Eastern District of Tennessee recently rejected a similar absolute bar argument in the context of a motion to dismiss. No. 3:08-cv-376, 2009 WL 2146324, at *3-4 (E.D.Tenn. July 14, 2009). Plaintiffs asserted that agents of defendant fraudulently induced them to buy property financed via defendant bank's loans. After determining that the TCPA applied to transactions involving the sale of real property, the court found plaintiffs' claims did not relate to the credit terms of the transaction-the "actual terms of the loans" on the property-but rather "to the allegedly fraudulent inducement by agents of defendant to purchase the properties in the first place." *Id.* at *4. Similarly, other courts in our district have examined lender conduct in the context of the TCPA. *See Beard v. Worldwide Mortgage Corp.,* 354 F.Supp.2d 789, 815 (W.D.Tenn.2005) (denying motion to dismiss TCPA claim where plaintiff pled "fraudulent and/or deceptive business transactions" induced her to refinance her mortgage); *Terry v. Cmty. Bank of N. Va.,* 255 F.Supp.2d 817, 823-24 (W.D.Tenn.2003) (finding "allegations regarding misrepresentations made during the course of extending loans sufficient to plead a cause of action for violation of the TCPA"); *Honeycutt v. First Fed. Bank,* 278 F.Supp.2d 893, 896-97 (W.D.Tenn.2003) (applying TCPA to loan pre-approval letter without discussion of exemption provision, found language not to be deceptive under the Act).

**\*8** The exemption itself reads "[c]redit terms of a transaction which may be otherwise subject to the provisions of this part," not "credit transaction." Tenn.Code Ann. § 47-18-111(a)(3). The case law discussed *supra* further indicates that misrepresentations during credit transactions may fall within the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

purview of the TCPA. Therefore, the Court reads the exemption narrowly, as applying only to the *credit terms* of a transaction otherwise subject to the provisions of the TCPA.

The TCPA allows for a private right of action. Tenn. Code Ann. § 47-18-109. To recover under the TCPA, a plaintiff must prove: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value however situated.' " *Tucker v. Sierra Builders,* 180 S.W.3d 109, 115 (Tenn.Ct.App.2005) (quoting Tenn.Code Ann. § 47-18-109(a)(1)). Defendant argues that Plaintiff cannot show deceptive conduct or damages, as required by the TCPA. Plaintiffs argue that the representations made by Defendant regarding the prepayment amount calculation were grossly over-simplified and misleading, and therefore deceptive and induced Plaintiffs to enter into the CaRLAs. FN8

> FN8. Neither Plaintiffs nor Defendant present Plaintiffs' three remaining TCPA claims in their briefs. The Court notes, however, that "failing to use the originally presented prepayment 'loss' calculation formula" is a "credit term" under section 47-18-111(a)(3) and therefore not covered by the TCPA as a matter of law. Similarly, although Plaintiff does not specify which interest rate they are referring to in TCPA claim four, the market-derived nature or not of that interest rate would also qualify as a "credit term" under section 47-18-111(a)(3). Finally, there is no evidence in the record to suggest that Morgan Keenan was a counter-party to the **swap** transaction. (*See* Doc. No. 34-3, at 11 (No relationship between Regions Capital Markets and Morgan Keegan besides being part of the same company) and Doc. No. 34-3, at 28-29, 33-35 (Capital Market trader places risk generated by **swap** transaction into the market, deponent did not know exactly where that risk was specifically placed)).

Defendant presented Plaintiff with information regarding the existence of the prepayment amount, the method of calculating the prepayment amount, and charts showing the hypothetical economic impact of interest rate changes on the prepayment amount in the PowerPoint Presentation, the Indicative Term Sheets, telephone and in-person discussions with Plaintiff, and in the text of the CaRLA agreements themselves. Plaintiffs claim that because the sensitivity analyses-the charts showing cost/benefits of interest rate movements on the CaRLA by year-were constructed using a parallel shift in the yield curve these analyses were deceptive and misrepresented the potential real cost to unwind the hedge. However, Plaintiffs have also admitted that Defendant met or exceeded the standards, customs and practices in the banking industry in its communications with Plaintiff regarding the CaRLA product, including its prepayment provision. (*See* Doc. No. 33, at 13). Following the practices of the banking industry in communications with the customer regarding a loan product is not a deceptive practice.

The Plaintiff's assertions that he misunderstood the methods used to calculate the rate do not create a genuine issue of material fact regarding the nature of these communications. Although complicated, the information presented in the documents and via conversations with Plaintiff presented the replacement rate in the market as contingent on changes in market conditions and something Regions Capital Markets, not the banker representatives, would calculate while looking to variables throughout the remainder of the life of the loan. Discussions of the London Interbank Offered Rate ("LIBOR") appear only in connection with how the fixed interest rate to be locked in for the CaRLA will be calculated, as well as trends in interest rates generally. The examples of prepayment amounts are clearly marked as hypothetical and variable, and pegged to interest rate movements, not specifically LIBOR. Plaintiff's misunderstanding does not create a deceptive act out of Defendant's industry standard communications. A claim under the TCPA may be asserted if a defendant acted intentionally or negligently. *See Holladay v. Speed.* 208 S.W.3d 408, 416 (Tenn.Ct.App.2005) (an unfair or deceptive act under the TCPA may be intentional or negligent). Plaintiff has shown no evidence of intentional misrepresentation and Defendant's adherence to industry standards is not negligence. *See Timoshchuk v. Long of Chattanooga Mercedes-Benz,* 2009 WL 3230961, at *6-7 (Tenn.Ct.App.2009) (seller's reliance on industry standard documentation not negligent under TCPA). Plaintiffs seem to be arguing that derivatives and **swap**-based products demand a higher level of con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 753327 (M.D.Tenn.)
**(Cite as: 2010 WL 753327 (M.D.Tenn.))**

sumer disclosure than is currently banking industry standard. However, no genuine issues of material fact remain in dispute regarding Plaintiffs' specific claims, therefore summary judgment is GRANTED.

**IV. CONCLUSION**

\*9 For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Judgment on the Pleadings is **DENIED AS MOOT.** The case is hereby **DISMISSED with prejudice.**

It is so ORDERED.

M.D.Tenn.,2010.
Monday v. Regions Bank
Slip Copy, 2010 WL 753327 (M.D.Tenn.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.