**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Turner P. Smith
L. P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178
*Counsel for Lehman Brothers Holdings Inc., Lehman Brothers*
*Special Financing Inc., Lehman Brothers Commodity Services Inc.,*
*and Lehman Brothers Commercial Corp.*

      -and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Special Counsel for Proposed Intervenor-Plaintiff, Official Committee*
*of Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | |
| | : | |
| Debtors. | : | |

---------------------------------------------------------------------- X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP., and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | Adversary Proceeding |
| INC., *et al.* | : | No.: 12-        (JMP) |
|     Plaintiffs and Proposed | : | |
|     Plaintiff Intervenor, | : | |
| | : | |
|     -against- | : | |
| | : | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | **COMPLAINT AND** |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | **CLAIMS OBJECTION** |
| CITIGROUP ENERGY INC. and CITI CANYON LTD. | : | |
| | : | |
|     Defendants. | : | |

---------------------------------------------------------------------- X

Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Commercial Corp.

("LBCC"), Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Commodity

Services ("LBCS"; collectively, with their affiliates, "Lehman") and the proposed plaintiff

intervenor, the Official Committee of Unsecured Creditors of LBHI and its affiliated debtors and

debtors in possession in the above captioned chapter 11 cases (the "Committee"; together with

the named Lehman entities, "Plaintiffs"), for their Complaint and Claims Objection against

Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd. ("Citigroup Global"), Citigroup

Financial Products Inc. ("Citigroup Financial"), Citigroup Energy Inc. ("Citigroup Energy") and

Citi Canyon Ltd. ("Citi Canyon"; collectively, "Defendants") respectfully state as follows:

## SUMMARY OF ACTION

1.      Plaintiffs bring this action to recover approximately $2.5 billion in cash

transferred to Citibank in the months leading up to LBHI's chapter 11 filing, to recover hundreds

of millions of dollars owed by Defendants to Lehman, and to reduce or disallow over $2 billion

of inflated and legally unsupported claims asserted by Defendants against the named Lehman

estates.

2.      Citibank is wrongfully withholding $2 billion of LBHI cash and has taken

the position that it may setoff and apply that $2 billion to pay itself dollar-for-dollar on billions

of dollars in claims that would otherwise be unsecured – all in violation of the Bankruptcy Code,

state law and the parties' understanding regarding the allowed purpose and usage of those funds.

The claims asserted by Citibank and the other Defendants against the Lehman estates are

themselves overstated or invalid, including over $2 billion of miscalculated claims purportedly

arising under the parties' derivatives contracts.  Defendants have also: (i) refused to return $500

million of LBHI cash that LBHI transferred to the account of its broker-dealer subsidiary at

Citibank hours before the LBHI bankruptcy filing; (ii) refused to pay hundreds of millions of dollars owed to Lehman under the parties' derivatives contracts; and (iii) refused to pay more than $200 million owed to LBCC under the parties' clearance agreement. Defendants should be required to pay over these amounts to the Lehman estates, and Defendants' claims should be reduced or disallowed, for the reasons set forth herein.

3.      As described in more detail below, on the morning of June 12, 2008, Citibank made a rushed demand that LBHI transfer $3-5 billion into an account held at Citibank, to give Citibank "comfort" that funds would be available in the Citibank system to cover potential overdrafts that might in the future be incurred in the trading accounts of certain LBHI subsidiaries using Citibank's clearing and settlement services.

4.      In response, LBHI agreed that same day to segregate $2 billion from its general purpose account at Citibank and transfer it to a separate, special purpose account at Citibank. LBHI agreed to make the transfer only on the condition that Citibank would have no setoff rights, nor any lien or other security interest, with respect to the $2 billion. Citibank accepted the segregation of the $2 billion on those terms.

5.      In the days and weeks that followed, Citibank embarked on a campaign to improve its position with respect to the $2 billion. Because Citibank recognized it did not have any right to unilaterally apply those LBHI funds against obligations of LBHI subsidiaries, or even to set off those funds against obligations of LBHI, in July 2008 Citibank requested that the parties negotiate and execute a pledge agreement that would give Citibank those enhanced rights. No agreement was ever reached.

6.      Instead, on September 9, 2008, Citibank demanded that LBHI execute an amendment to a pre-existing guaranty (the "September Amendment") that purportedly granted to

Citibank the right to apply all or a portion of the $2 billion to the clearance-related obligations of LBHI's subsidiaries, including LBHI's primary broker-dealer subsidiary, Lehman Brothers Inc. ("LBI"). Citibank insisted that it have the new guaranty in-hand prior to LBHI's earnings call scheduled for the next morning, September 10, 2008. It backed that demand by reducing Lehman's credit lines dramatically and threatening to cease clearing Lehman's trades altogether. Having no choice, LBHI delivered the executed September Amendment on the evening of September 9, 2008.

7.      On Sunday, September 14, 2008, hours before LBHI filed for bankruptcy, at Citibank's insistence and direction, LBHI transferred $500 million to an LBI account held at Citibank. LBHI was responsible for managing the Lehman firm's overall liquidity and transferring funds to subsidiaries as needed for their operations. However, LBHI received no consideration from LBI for the last hour transfer. Later that week, Citibank set off $1 billion of LBI obligations against funds held in the LBI account, including the $500 million transferred by LBHI.

8.      Following the Lehman bankruptcy filings, LBHI requested that Citibank return the $2 billion to the estate so that it could be available for the benefit of all creditors. At that time, Citibank had already terminated its clearing services, and the agreed-upon purpose for the $2 billion was extinguished. Moreover, the parties understood that Lehman had left the $2 billion in a segregated account at Citibank only on the condition that it not be subject to any right of setoff, lien or other security interest. Nonetheless, Citibank refused LBHI's request for return of the $2 billion and locked down the funds for itself, claiming that Citibank could now use them to pay itself dollar-for-dollar on any and all claims against LBHI, across the entire range of business between the firms.

9.     For example, Defendants assert over $1.9 billion of claims purportedly arising under derivatives (or "swap") contracts between Citibank and the Lehman entities.  In their proofs of claim, Defendants contend that their rights to terminate and liquidate their derivatives positions were triggered by the LBHI bankruptcy filing.  However, Defendants miscalculated their claims based on improper methodologies that, for example: (i) include over $1 billion of opportunistic charges that are both inflated and have no relationship to any actual loss suffered by Citibank; (ii) fail to net offsetting risk positions as required by the contracts; and (iii) rely on incorrect mid-market prices.  The correct calculation of the termination amounts owed under these derivatives contracts demonstrates that Defendants' claims are inflated by over $1 billion, and that on certain of those contracts Defendants actually owe the Lehman entities hundreds of millions of dollars.

10.     Ordinarily, Defendants' derivatives contract claims would be unsecured, or secured only to the extent of the collateral exchanged pursuant to the underlying derivatives contracts themselves.  Yet Citibank has asserted that it may pay itself dollar-for-dollar on at least $1.7 billion of its derivatives claims using the $2 billion of LBHI funds that the parties agreed would be segregated and left at Citibank solely to provide comfort in connection with Citibank's provision of clearing and settlement services.  Citibank further asserts that it is entitled to apply the remainder of the $2 billion to a host of other purported LBHI obligations, including those based on the avoidable September Amendment.  The $2 billion is not available to satisfy those claims, and Citibank's position is otherwise contrary to the Bankruptcy Code and state law.  Those funds should be returned immediately to the LBHI estate for distribution to creditors.

11.     Citibank has also refused to pay the LBCC estate over $200 million that it owes in connection with the parties' clearance relationship.  Citibank does not dispute that it

owes this amount, and it can articulate no legitimate basis for withholding this payment in

violation of the parties' contract.  Citibank should be ordered to pay over this amount as well.

12.     This action seeks to remedy the harm perpetrated as a result of Citibank's

efforts to elevate its position against the Lehman estates over similarly situated creditors.

Citibank should be ordered to return to the LBHI estate the approximately $2.5 billion that it is

improperly withholding, and Defendants should be ordered to pay the hundreds of millions of

dollars they owe to the Lehman entities under the parties' contracts.  This action also seeks to

reduce or disallow the claims filed by Defendants against the named Lehman entities, to the

extent those claims: (i) assert rights to LBHI's $2 billion held by Citibank; (ii) rely on the

avoidable September Amendment; or (iii) are based on commercially unreasonable calculations

of amounts owed under the parties' derivatives contracts, or otherwise have no basis in the

parties' contracts or applicable law.

## **PARTIES**

13.     LBHI is a Delaware corporation with its former principal business address

at 745 Seventh Avenue, New York, New York 10019, and its current principal business address

at 1271 Avenue of the Americas, New York, New York 10020.  On September 15, 2008, LBHI

filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as

amended, 11 U.S.C. §§ 101-1532.  LBHI continues to operate its business and manage its

property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy

Code.

14.     LBCC is a Delaware corporation with its former principal business

address at 745 Seventh Avenue, New York, New York 10019, and its current principal business

address at 1271 Avenue of the Americas, New York, New York 10020.  On October 5, 2008,

LBCC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  LBCC

continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

15.     LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.  LBSF continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

16.     LBCS is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

17.     The Committee is a statutory committee appointed by the Office of the United States Trustee under Section 1102 of the Bankruptcy Code in the above-captioned chapter 11 cases on or about September 16, 2008.

18.     Citibank is a national banking association chartered under the laws of the United States, with its principal place of business in New York, New York.

19.     Citigroup Global is organized under the laws of United Kingdom with its principal place of business in London, United Kingdom.

20.     Citigroup Financial is organized under the laws of Delaware with its principal place of business in New York, New York.

21.     Citi Canyon is organized under the laws of the Cayman Islands.

22.     Citigroup Energy is organized under the laws of Delaware with its principal place of business in Houston, Texas.

## VENUE AND JURISDICTION

23.     Plaintiffs bring this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seek relief under Sections 2201 and 2202 of title 28 of the United States Code, Sections 105(a), 502, 541, 542, 544, 548, and 550 of the Bankruptcy Code, and applicable provisions of state law.

24.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (c).  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the Order dated July 10, 1984 Referring to Bankruptcy Judges for this District any or all proceedings under Title 11, this Court may exercise subject matter jurisdiction.  Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

25.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K) and (O).

26.     Defendants, by agreement, have consented to the entry of a final order by the Bankruptcy Court, within the meaning of 28 U.S.C. § 157(b)(1), and appeals, if any, shall be made pursuant to 28 U.S.C § 158(a)(1).

27.     Pursuant to, *inter alia*, 11 U.S.C. 502(a) and Rule 3007(b) of the Federal Rules of Bankruptcy Procedure, joinder of the objections asserted herein with the remaining counts requesting relief is proper.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

28.     Prior to its bankruptcy, Lehman was the fourth largest investment bank in the United States.  It offered an array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity.

29.    Citibank provided clearing and settlement services, including foreign exchange-related services, for Lehman.  One way in which it provided those services was pursuant to a Continuous Linked Settlement ("CLS") Services Amended and Restated Agreement for CLS User Members (the "CLS Agreement"), under which Citibank acted as the Designated Settlement Member for certain LBHI subsidiaries – *i.e.*, LBI, LBCC, LBSF and Lehman Brothers International (Europe) (collectively, the "Trading Subsidiaries").  CLS is a daily cash settlement system and service that is offered by CLS Bank International and is designed to eliminate settlement risk in foreign exchange transactions.  When a foreign exchange transaction is settled under the CLS system, the trading counterparties each pay one currency into the CLS bank and receive a different currency in return.

30.    Because participation in the CLS foreign exchange netting and clearing service is only available by or through a "settlement member," and Citibank was one of only 69 members, the Trading Subsidiaries needed Citibank to effect their foreign exchange trades under the CLS system.  Citibank received tens of millions of dollars in fees from Lehman in exchange for providing that service.

31.    Due to the timing differences in settling currency trades in markets across the globe, the Trading Subsidiaries would occasionally incur overdrafts in their trading accounts in the course of Citibank performing clearing services and settling their currency trades.  When providing clearing services, Citibank permitted the Trading Subsidiaries to incur daylight overdrafts.  The Trading Subsidiaries would, in the ordinary course, reduce their overdrafts to zero at the end of the day, when all trades settled.

32.    Citibank performed CLS settlement and clearing services for Lehman from 2004 through 2008, without any material modification to the parties' respective contractual

obligations.  The clearing services that Citibank provided to Lehman were vital to Lehman's ability to maintain its ordinary business operations.

33.    In addition to foreign exchange trades effected through CLS, which constituted the substantial majority of clearing services provided by Citibank to Lehman, Citibank provided other clearing and settlement services, including cash clearing services in emerging markets and in the United States.  The Trading Subsidiaries also would occasionally incur overdrafts in their trading accounts in the course of Citibank performing those clearing and settlement services.

34.    Pursuant to a Guaranty dated January 7, 2004 (the "2004 Guaranty"), LBHI agreed to guaranty the payment of obligations under extensions of credit from Citibank to certain specifically identified Lehman entities.  The 2004 Guaranty did not provide a guaranty of obligations incurred in connection with Citibank's performance of clearing services, and it did not extend to any obligations of LBI, whether for clearing related overdrafts or broader indebtedness.

## II.    THE $2 BILLION JUNE TRANSFER

35.    During the period of market deterioration that followed the collapse of Bear Stearns in March 2008, Citibank began making inquiries regarding Lehman's cash position and liquidity.

36.    On the morning of June 12, 2008, reacting to what it perceived were negative market signals regarding Lehman, Citibank made a hasty request that LBHI transfer $3-5 billion in cash to an account held at Citibank "to cover intraday exposures" to the Trading Subsidiaries arising out of clearing and settlement activities.  If LBHI did not acquiesce, Citibank would not continue to clear and settle Lehman's trades or provide related extensions of credit to

Lehman.  Citibank did not request the funds in connection with the parties' derivatives contracts, unsecured lines of credit, or any other business conducted between the firms.

37.    After a rushed discussion among top Citibank and LBHI executives, LBHI agreed that same day to segregate $2 billion from its general deposit account held at Citibank into a separate special purpose account.  The contemplated transfer and segregation of the funds would not be made in the ordinary course of LBHI's business.  Unlike LBHI's general deposits with Citibank, the parties understood that LBHI would not withdraw the segregated $2 billion, but would instead leave the cash in the Citibank system.  Citibank subjected the funds to a number of internal controls designed to restrict their release – such that LBHI did not have the ability to withdraw the funds on a unilateral basis.  Citibank internally referred to the $2 billion as "captive funds."

38.    Critically, Citibank knowingly relinquished any rights of setoff with respect to the $2 billion, opting to trade those rights for the prompt receipt and segregation of the funds.  Indeed, LBHI specifically refused Citibank's request for setoff rights with respect to the $2 billion during the discussions on June 12, 2008, and further refused Citibank's request that it be granted a lien or any other security interest with respect to the $2 billion.  Citibank accepted the transfer on those terms.  According to internal Citibank documents, Citibank's purpose was to obtain "comfort" that the funds would be available in its system; its primary goal was "keeping the liquidity within Citibank and being able to control the release of the deposit."

39.    Pursuant to these conditions, on June 13, 2008, Citibank debited $2 billion from LBHI's general demand deposit account at Citibank and transferred those funds to a separate Citibank account in Nassau, Bahamas.

40.    Later, in June 2008, consistent with the limited purpose of the $2 billion, LBHI used $210 million of the $2 billion to avoid an overdraft in one of the Trading Subsidiary's accounts.  LBHI replaced the funds the next business morning.  LBHI never withdrew the segregated $2 billion from the Citibank system, nor accessed those funds for any other purpose.

### III.    CITIBANK'S FAILED ATTEMPT TO OBTAIN A LIEN OR RIGHT OF SETOFF WITH RESPECT TO THE $2 BILLION

41.    Internal Citibank e-mails circulated on June 12, 2008, demonstrate that Citibank recognized it had neither a "clean right of offset" nor a lien on LBHI's $2 billion. Similarly, a June 17, 2008 e-mail from the head of Risk Management at Citibank to his fellow Citibank executives reported that the $2 billion "offers us little protection."

42.    Accordingly, in July 2008, the parties began discussions about entering into a pledge agreement, whereby LBHI would pledge cash or securities to Citibank to secure clearing-related obligations of the Trading Subsidiaries and would grant to Citibank a right of setoff with respect to such cash or securities.

43.    On or about July 18, 2008, Citibank requested that LBHI enable Citibank to retain the $2 billion as security for the overdrafts of the Trading Subsidiaries.  LBHI refused. Instead, the parties explored a potential pledge of investment grade collateral as security for any Trading Subsidiary overdrafts.   In contemplation of reaching such an agreement, Citibank reserved a collateral account at Citibank in the name of "LBHI Pledge to Citibank."

44.    The parties' discussions continued through August 2008.  Ultimately, however, the parties did not reach agreement on the terms of a pledge agreement, nor could they agree on what collateral would be pledged under such an agreement.  Accordingly, the parties never executed a pledge agreement, and one never took effect.  Instead, in September 2008,

Citibank attempted to improve its position with respect to the $2 billion by requiring LBHI to enter into the September Amendment.

### IV.    CITIBANK FORCES LBHI TO EXECUTE THE SEPTEMBER AMENDMENT

45.    As of the morning of September 9, 2008, LBHI intended to release its preliminary earnings report for the third fiscal quarter of 2008 on September 17, 2008.  However, because news in the marketplace of the collapse of talks between Lehman and the Korea Development Bank (which had been considering an equity investment in Lehman) and analysts' estimates of losses caused a sharp drop in LBHI's stock price on September 9, 2008, senior management of LBHI decided to release the preliminary earnings report earlier, on Wednesday, September 10, 2008, at 7:30 a.m.

46.    In response to these events, Citibank acted swiftly to improve its position over the $2 billion at the expense of other similarly situated creditors.  On September 9, 2008, Citibank presented LBHI with a draft amendment to the 2004 Guaranty (*i.e.*, the September Amendment) and demanded that it be executed that evening.  The draft amendment purported to add LBI and other Lehman subsidiaries as entities whose obligations would be subject to the 2004 Guaranty, and further purported to expand the scope of obligations subject to the 2004 Guaranty to include, for the first time, trading obligations arising under the CLS Agreement.  In Citibank's view, the September Amendment would finally allow Citibank to set off the $2 billion against the trading obligations of LBI and the other newly added Lehman subsidiaries.

47.    To force LBHI to accede to its demands, Citibank reduced the Trading Subsidiaries' clearing lines significantly, some to zero.  Citibank further threatened that "we will not open you [Lehman] in Asia" unless LBHI agreed to guaranty the obligations of all entities as proposed by Citibank.  Citibank's threat, if carried out, would have resulted in Lehman's Asian

subsidiaries publicly defaulting on their trading obligations in the early morning of September

10, 2008, New York time, and only hours before Lehman's life-or-death earnings call scheduled

for 7:30 a.m. on September 10, 2008. As a practical and commercial reality, LBHI had no

choice but to provide the requested September Amendment with its core terms intact.

48.      The September Amendment provided no new rights or any other

consideration to LBHI. At the time it was executed, LBHI was insolvent and/or undercapitalized

and, on information and belief, LBI was insolvent and only days away from an insolvency

proceeding. As such, LBHI could not (and did not) obtain reasonably equivalent value in return

for entering into the September Amendment.

## V.      THE $500 MILLION TRANSFER TO LBI'S ACCOUNT AT CITIBANK

49.      In the evening of September 14, 2008, at Citibank's insistence and

direction, LBHI transferred $500 million from LBHI's general deposit account at Citibank to

LBI's general deposit account at Citibank. LBHI itself would file for bankruptcy protection only

hours after the transfer was executed.

50.      LBHI received no consideration for this $500 million transfer to LBI.

Further, at the time of the transfer, LBHI was insolvent and/or undercapitalized, and on

information and belief, LBI was insolvent. Accordingly, LBHI did not receive reasonably

equivalent value in exchange for the $500 million transfer to LBI.

51.      LBHI filed for protection under chapter 11 of the Bankruptcy Code in the

early morning of September 15, 2008.

52.      Later that week, Citibank applied $1 billion of funds in LBI's account,

which included LBHI's $500 million, to $1 billion of claims purportedly owed by LBI to

Citibank.

## VI.    DEFENDANTS FILE INFLATED AND INVALID CLAIMS AGAINST THE LEHMAN SUBSIDIARIES

53.    In addition to the clearing relationship, Defendants and Lehman engaged in a range of business relationships prior to the Lehman bankruptcy filing, including through derivative (or "swap") contracts between Defendants and various Lehman subsidiaries.  As described below, Defendants have filed over $1.9 billion in inflated and invalid claims against the Lehman entities under these contracts.

### A.    <u>The Swap Agreements with LBSF</u>

54.    LBSF is a party to numerous derivatives contracts with Defendants, including: an ISDA Master Agreement with Citibank dated as of May 14, 1992 (the "<u>LBSF-Citibank Agreement</u>"); an ISDA Master Agreement with Salomon Brothers International Limited, predecessor in interest to Citigroup Global, dated as of February 16, 2000 (the "<u>LBSF-Global Agreement</u>"); an ISDA Master Agreement with Salomon Brothers Holding Company Inc., predecessor in interest to Citigroup Financial, dated as of August 15, 1989 (the "<u>LBSF-Financial Agreement</u>"); and an ISDA Master Agreement with Citi Canyon dated as of October 6, 2005 (the "<u>LBSF-Canyon Agreement</u>"; together, the "<u>LBSF Swap Agreements</u>").

55.    On the same day that LBHI filed for bankruptcy, September 15, 2008, Citibank terminated all outstanding transactions under the LBSF-Citibank Agreement.  Citibank calculated the termination amount owed by LBSF under the agreement as approximately $1.7 billion.  However, Citibank's calculations are the product of improper methodologies that violate the terms of the swap agreement, the Bankruptcy Code and state law, and inflate Citibank's claim by more than $1 billion.  Among other things, Citibank's calculations include charges that are not allowed under the contract, fail to net offsetting risk positions as required by the contract, and rely on incorrect mid-market prices.  Citibank subsequently filed proof of claim number

67733 against LBSF seeking payment on this inflated $1.7 billion claim, and proof of claim

number 67736 seeking payment of this same amount from LBHI as purported guarantor under

the LBSF-Citibank Agreement.

56.    Also on September 15, 2008, Citigroup Global terminated all outstanding

transactions under the LBSF-Global Agreement.  Citigroup Global calculated the termination

amount owed by LBSF under that agreement as approximately $222 million.  That claim is

overstated by tens of millions of dollars.  Citibank Global subsequently filed proof of claim

number 29881 against LBSF seeking payment of the $222 million, and proof of claim number

67735 seeking payment of this same amount from LBHI as purported guarantor under the LBSF-

Global Agreement.

57.    On September 15, 2008, Citigroup Financial also terminated all

outstanding transactions under the LBSF-Financial Agreement.  Based on Citibank Financial's

erroneous calculations, LBSF purportedly owes Citigroup Financial approximately $21 million.

Citigroup Financial filed proof of claim number 17926 against LBSF seeking payment on this

claim and proof of claim number 29637 seeking payment from LBHI as purported guarantor

under the LBSF-Financial Agreement.  In fact, it is Citigroup Financial that owes LBSF tens of

millions of dollars under that agreement.

58.    On September 17, 2008, Citi Canyon terminated all outstanding

transactions under the LBSF-Canyon Agreement.  On September 18, 2009, Citi Canyon filed

proof of claim number 17895 against LBSF seeking $135,474 under this agreement, and filed

proof of claim number 17913 seeking payment from LBHI as purported guarantor under this

agreement.  In fact, Citi Canyon owes LBSF an amount not less than $59,200 under this

agreement.

### B.    The Swap Agreement with LBCC

59.    LBCC and Citibank are parties to an ISDA Master Agreement dated as of
March 29, 1993 (the "LBCC-Citibank Agreement").  On September 15, 2008, Citibank
terminated all outstanding transactions under the LBCC-Citibank Agreement.  Citibank asserts
that LBCC owes it $18 million under the LBCC-Citibank Agreement.  As with its claim under its
swap agreement with LBSF, Citibank's claim under the LBCC-Citibank Agreement is based on
improper methodologies.  Among other things, Citibank's calculations include charges that are
not allowed under the contract, fail to net offsetting risk positions as required by the contract, and
rely on incorrect mid-market prices.  In fact, it is Citibank that owes tens of millions of dollars to
LBCC under the LBCC-Citibank Agreement.  Notwithstanding, Citibank filed proof of claim
number 67734 against LBCC seeking payment on its $18 million claim and proof of claim
number 67736 against LBHI as purported guarantor under the LBCC-Citibank Agreement.

### C.    The Swap Agreements with LBCS

60.    LBCS and Citigroup Global are parties to an ISDA Master Agreement
dated as of April 17, 2007 (the "LBCS-Global Agreement"), and LBCS and Citigroup Energy
are parties to an ISDA Master Agreement dated as of February 1, 2006 (the "LBCS-Energy
Agreement"; together, "LBCS Swap Agreements").  Claims asserted by these Citibank entities
under the LBCS Swap Agreements are also inflated by millions of dollars, based on erroneous
calculations and improper methodologies contrary to the agreements.

61.    On September 15, 2008, Citigroup Global terminated all outstanding
transactions under the LBCS-Global Agreement.  Citigroup Global asserts that LBCS owes over
$6 million as the termination amount under that agreement.  That calculation is overstated by
millions of dollars.  Citigroup Global subsequently filed proof of claim number 29880 against

LBCS seeking payment on its $6 million claim, and proof of claim number 67735 against LBHI as purported guarantor under the LBCS-Global Agreement.

62.    On September 15, 2008, Citigroup Energy terminated all outstanding transactions under the LBCS-Energy Agreement.  Citigroup Energy claims that LBCS owes over $10 million under the agreement.  In fact, it is Citigroup Energy that owes LBCS millions of dollars under the agreement.  Nonetheless, on September 18, 2008, Citigroup Energy filed proof of claim number 17937 against LBCS seeking payment on its inflated $10 million claim, and proof of claim number 17936 against LBHI as purported guarantor under the LBCS-Energy Agreement.

VII.    CITIBANK REFUSES TO RETURN LBHI'S $2 BILLION, AND ASSERTS CLAIMS UNDER THE SEPTEMBER AMENDMENT

63.    On September 19, 2008, Citibank also terminated the CLS Agreement and other relevant agreements governing Citibank's role as clearing agent for Lehman.  The agreed-upon purpose of the $2 billion was thereby extinguished, and LBHI requested that Citibank return the $2 billion to the estate for distribution to creditors.  Although it had no right to do so, Citibank refused LBHI's request and purported to lock down the $2 billion for itself.

64.    In its proof of claim against LBHI, Citibank asserts rights as a secured creditor on the purported basis that it can now set off the $2 billion against a range of alleged LBHI obligations, including approximately $1.7 billion of claims arising under swap agreements with Lehman subsidiaries.  Ordinarily, such swap agreement claims would be unsecured, or secured only to the extent provided in the swap agreements themselves.  Yet Citibank is now attempting to use the $2 billion of LBHI funds that were transferred and segregated in connection with the parties' clearing relationship, to pay itself dollar-for-dollar on these inflated

swap agreement claims. Specifically, in proof of claim number 67736, Citibank asserts the following claims are secured by the $2 billion:

(i)     $1,640,084,656 under the LBSF-Citibank Agreement;

(ii)    $60,015,440 related to a purported ISDA Master Agreement between Citibank and LBI;

(iii)   $18,017,039 under the LBCC-Citibank Agreement;

(iv)    $2,210,646 under an ISDA Master Agreement between Citibank and LBCS dated as of February 21, 2006; and

(v)     $841,032 under the ISDA Master Agreement between Citibank and Lehman Brothers Commercial Corporation Asia Limited ("LBCCA") dated as of July 12, 2007.

65.     Citibank's attempt to pay itself using LBHI's $2 billion is not limited to its inflated swap agreement claims. The proof of claim asserts over $320 million of other miscellaneous claims against the $2 billion that are also completely unrelated to the parties' clearance and settlement relationship, as follows:

(i)     $281,225,562 under a Revolving Loan Agreement between Citibank and LBCCA;

(ii)    $35,844,833 related to a securities claim primarily against LBCCA;

(iii)   $2,592,932 under the Amended and Restated Principal Paying Agency Agreement between Citibank, LBHI and LB Securities;

(iv)    $175,498 related to fees and expenses under an Undertaking Deed with LBCCA;

(v)     $116,206 related to an overdraft in a Lehman ALI general deposit account; and

(vi)    $85,296 related to an alleged overdraft in the general deposit account of LBCS.

66.     Finally, in the proof of claim, Citibank asserts more than $295 million of additional claims against LBHI purportedly arising under the avoidable September Amendment, as well as a "contingent" $1 billion claim related to the setoff effectuated by Citibank against

-19-

purported LBI obligations, and further claims a right to set off any portion of LBHI's $2 billion

against those claims.  Specifically:

(i)    $1 billion related to LBI's alleged obligations under the CLS
Agreement that would be rendered unpaid if Citibank is ordered to
return to the LBI estate all or any portion of the $1 billion against
which Citibank exercised purported setoff rights, as described above;

(ii)    $260,326,894 related to LBI's alleged obligations under the CLS
Agreement;

(iii)    $12,795,775 related to misdirected wires concerning LBI;

(iv)    $12,199,628 related to an overdraft in an LBI account;

(v)    $8,358,995 related to securities lending activity between Citibank and
LBI;

(vi)    $604,496 related to account fees for an LBI account;

(vii)    $584,897 related to LBSF's alleged obligations under the CLS
Agreement;

(viii)    $207,624 related to a late settlement claim between Citibank and LBI;

(ix)    $199,449 related to custody services between Citibank and LBI; and

(x)    $35,389 related to a check fraud claim concerning LBI.

67.    Citibank has no right to apply any of the $2 billion to the above claims.

The $2 billion should be returned to the LBHI estate for equitable distribution to creditors.

### VIII.    CITIBANK FURTHER REFUSES TO PAY LBCC OVER $200 MILLION OWED UNDER THE CLS AGREEMENT

68.    Citibank is also wrongfully withholding at least a $200 million payment

that it owes to LBCC under the CLS Agreement.  Prior to the Lehman bankruptcy filings, as a

result of LBCC's foreign exchange trades settled in the CLS system, Citibank received over

$200 million on LBCC's behalf.

69.    LBCC requested that Citibank pay that amount to the LBCC estate, as

required under the CLS Agreement.  Although Citibank has acknowledged the funds are owed to

LBCC, Citibank refused to turn over the funds.  Citibank has never articulated a legitimate basis

for withholding the payment, and indeed Citibank's refusal constitutes a violation of the CLS

Agreement.  Those funds should be paid over to the LBCC estate for the benefit of its creditors.

## CAUSES OF ACTION

## COUNT I

### (Breach of Agreement With Respect to LBHI's $2 Billion)

70.    Plaintiffs repeat and reallege each of the allegations contained in

paragraphs 1 through 69 above as if fully set forth herein.

71.    Citibank requested that LBHI transfer the $2 billion to a segregated

account, and to leave those funds at Citibank, to provide Citibank with "comfort" that the funds

would be available in its system.  As a condition for LBHI's agreement to segregate these funds

from its general purpose account, and for the funds to remain "captive" at Citibank, Citibank

agreed to waive any right it may have had to apply the $2 billion, or any portion thereof, to

general obligations of LBHI.

72.    After the various Lehman entities filed for bankruptcy protection, LBHI

requested that Citibank return the $2 billion to the LBHI estate.  Citibank refused.

Notwithstanding the exclusive purpose for the segregation of the $2 billion and its agreement

that the funds would not be subject to setoff, Citibank now asserts in proof of claim number

67736 the right to apply all or a portion of the $2 billion to a host of purported LBHI obligations

that are entirely unrelated to clearing and settling activity, including approximately $1.7 billion

of claims purportedly arising under the parties' derivatives contracts.

73.    Citibank's refusal to return the $2 billion to LBHI, and its attempt to apply

those funds to obligations contrary to the parties' agreement, constitutes a breach of the parties'

agreement.

74.      As a result of the foregoing, LBHI has been damaged in an amount not less than $2 billion.

## COUNT II

### (Promissory Estoppel With Respect to LBHI's $2 Billion)

75.      Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 74 above as if fully set forth herein.

76.      As described above, on June 12, 2008, Citibank agreed that the $2 billion would not be subject to setoff by Citibank and would not otherwise be subject to a lien or other security interest of Citibank.  Citibank made that promise to induce LBHI to transfer the $2 billion from its general deposit account to a segregated account at Citibank, and to not withdraw those funds from Citibank.

77.      LBHI relied on the June 12, 2008 conversation and Citibank's agreement that the $2 billion would not be subject to setoff, a lien or other security interest, when LBHI agreed to transfer the $2 billion from its general deposit account to the segregated account at Citibank.  LBHI continued to rely on that promise in not withdrawing those funds from Citibank subsequent to the initial transfer and segregation of the funds.  LBHI's initial and continued reliance was both reasonable and foreseeable to Citibank.

78.      As a result of relying on Citibank's promise, LBHI has been injured, in an amount not less than $2 billion.  Citibank should be estopped from asserting that it now has any right to set off purported obligations of LBHI against the $2 billion, or from withholding LBHI's $2 billion on that basis.

## COUNT III

### (Conversion of LBHI's $2 Billion)

79.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 78 above as if fully set forth herein.

80.     For all of the reasons discussed above, Citibank has no right to withhold LBHI's $2 billion.

81.     Soon after filing for bankruptcy, LBHI requested that Citibank return the $2 billion to the LBHI estate.  Citibank refused.

82.     As a result of the foregoing, Citibank wrongfully converted $2 billion of LBHI's assets, and LBHI has been damaged thereby.  LBHI is entitled to the return of its $2 billion.

## COUNT IV

### (Declaratory Judgment With Respect to LBHI's $2 Billion)

83.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

84.     For all the reasons discussed herein, Citibank has no right to apply any portion of the segregated $2 billion against obligations allegedly owed by LBHI to Citibank. Among other things, the parties intended for those segregated funds to be held in a special purpose account not subject to setoff by Citibank.

85.     Citibank has taken the position that, notwithstanding the conditions under which LBHI's $2 billion was segregated and maintained in a special purpose account, Citibank is entitled to withhold LBHI's $2 billion and to apply those funds against obligations allegedly owed by LBHI to Citibank.

86.    There is an actual and justiciable controversy regarding the parties' rights and obligations with respect to LBHI's $2 billion.

87.    Plaintiffs are entitled to a declaratory judgment that Citibank has no right to apply any portion of the $2 billion to obligations allegedly owed by LBHI to Citibank, and that the $2 billion is unencumbered property of LBHI's bankruptcy estate available for distribution to creditors.

## COUNT V

### (Turnover of LBHI's $2 Billion Under Section 542 of the Bankruptcy Code)

88.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 87 above as if fully set forth herein.

89.    For the reasons set forth above, Citibank is not entitled to set off amounts it claims LBHI owes to it against LBHI's $2 billion.  Nor does Citibank have any right to otherwise withhold the $2 billion.

90.    Citibank is in possession, custody and/or control of the $2 billion, which is of substantial value and benefit to LBHI's estate and which is property belonging to LBHI that may be used, sold or leased by LBHI.  Citibank should be ordered to turn over the $2 billion to LBHI immediately for the benefit of LBHI's unsecured creditors, pursuant to Section 542 of the Bankruptcy Code.

## COUNT VI

### (Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an Obligation Under Section 548(a)(1)(B) of the Bankruptcy Code)

91.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

92.     The September Amendment constitutes the incurrence of an obligation for the benefit of Citibank.

93.     LBHI received less than reasonably equivalent value in exchange for its entry into the September Amendment.

94.     Upon information and belief, when LBHI entered into the September Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

95.     Upon information and belief, when LBHI entered into the September Amendment, LBI was insolvent.

96.     The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Amendment.

97.     By virtue of the foregoing, pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the September Amendment should be avoided for the benefit of LBHI's estate.

## COUNT VII

**(Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an Obligation Under New York DCL Section 273, 275, 278, and/or 279 and Section 544 of the Bankruptcy Code)**

98.     Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 97 above as if fully set forth herein.

99.     LBHI did not receive fair value in exchange for its entry into the September Amendment.

100.    Upon information and belief, when LBHI entered into the September Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

101.    Upon information and belief, when LBHI entered into the September Amendment, LBI was insolvent.

102.    At all times relevant hereto, there were actual creditors of LBHI holding unsecured claims allowable within the meaning of Bankruptcy Code.

103.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Amendment.

104.    As a result of the foregoing, pursuant to Sections 273, 275, 278, and 279 of the New York Debtor and Creditor Law and Section 544(b) of the Bankruptcy Code, the September Amendment should be avoided for the benefit of LBHI's estate.

## COUNT VIII

**(Avoidance of the September Amendment as an Obligation Incurred With the Actual Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

105.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

106.    LBHI entered into the September Amendment within two years of filing for protection under Chapter 11 of the Bankruptcy Code.

107.    Entry into the September Amendment was an obligation incurred by LBHI to or for the benefit of Citibank.

108.    Entry into the September Amendment was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional

badges of fraud surrounding LBHI's entry into the September Amendment.  Among other things, on September 9, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for its expanded obligations under the September Amendment, and the September Amendment was executed on an exigent basis without any meaningful negotiation between LBHI and Citibank.

109.    In addition, Citibank's intent to hinder, delay or defraud creditors of LBHI may be imputed to LBHI.  As described above, LBHI had no choice but to execute the September Amendment in the face of Citibank's threats to cease clearing and settling Lehman's trades unless Citibank's demand for the September Amendment was satisfied.

110.    As a result of LBHI's entry into the September Amendment, LBHI and its creditors have been harmed.

111.    The September Amendment is avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT IX

### (Recovery of the $500 Million Transfer as Constructive Fraudulent Transfer Under Section 550(a)(2) of the Bankruptcy Code)

112.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 111 above as if fully set forth herein.

113.    The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

114.    LBHI did not receive fair consideration for the $500 million transfer to LBI, nor did it otherwise receive reasonably equivalent value in exchange for that transfer.

115.    At all times relevant hereto, there were actual creditors of LBHI holding unsecured claims allowable within the meaning of the Bankruptcy Code.

116.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBHI was insolvent or became insolvent as a result of the transfer; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

117.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

118.    The $500 million transfer to LBI was a transfer of property in which LBHI has an interest.  LBI is the initial transferee of the $500 million transfer.  Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

119.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the transfer of the $500 million.

120.    By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT X

**(Avoidance of the $500 Million Transfer as a Transfer Made With the Actual Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

121.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

122.    The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

123.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

124.    The $500 million transfer to LBI was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's transfer of those funds.  Among other things, on September 14, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for the $500 million transfer, and the transfer was made at Citibank's insistence and direction without any negotiation only hours before LBHI filed for bankruptcy.

125.    The $500 million transfer to LBI was a transfer of property in which LBHI has an interest.  LBI is the initial transferee of the $500 million transfer.  Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

126.    By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT XI

### (Breach of Agreement With Respect to LBCC's $200 Million)

127.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 126 above as if fully set forth herein.

128.    LBCC is a party to the CLS Agreement with Citibank.  As a result of foreign exchange trades being settled on LBCC's behalf, Citibank received over $200 million that it now owes to LBCC.

129.    The LBCC estate has requested that Citibank transfer those funds to the
LBCC estate.  Citibank refused LBCC's request, in breach of the CLS Agreement.

130.    As a result of the foregoing, LBCC has been harmed in an amount not less
than $200 million.

## COUNT XII

### (Conversion of LBCC's $200 Million)

131.    Plaintiffs repeat and reallege each of the allegations contained in
paragraphs 1 through 130 above as if fully set forth herein.

132.    For all of the reasons discussed above, Citibank has no right to withhold
the more than $200 million that it owes to LBCC.

133.    After filing for bankruptcy, the LBCC estate requested that Citibank turn
over these funds.  Citibank refused.

134.    As a result of the foregoing, Citibank wrongfully converted at least $200
million of LBCC's assets, and LBCC has been damaged thereby.  LBCC is entitled to the return
of not less than $200 million.

## COUNT XIII

### (Turnover of LBCC's $200 Million Under Section 542 of the Bankruptcy Code)

135.    Plaintiffs repeat and reallege each of the allegations contained in
paragraphs 1 through 134 above as if fully set forth herein.

136.    Citibank is in possession, custody and/or control of over $200 million of
LBCC funds, which is of substantial value and benefit to LBCC's estate and which is property
belonging to LBCC that may be used, sold or leased by LBCC.  Citibank should be ordered to

turn over those funds to LBCC immediately for the benefit of LBCC's unsecured creditors,
pursuant to Section 542 of the Bankruptcy Code.

## COUNT XIV

### (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code)

137.    Plaintiffs repeat and reallege each of the allegations contained in
paragraphs 1 through 136 above as if fully set forth herein.

138.    Claims held by Citibank against LBHI or LBCC are subject to
disallowance under Section 502(d) of the Bankruptcy Code unless and until Citibank has turned
over to LBHI or LBCC, respectively, all property transferred, or paid LBHI or LBCC,
respectively, the value of such property, for which Citibank is liable under section 542 of the
Bankruptcy Code.

139.    In the event that the property is recoverable from Citibank under
sections 542 or 550 of the Bankruptcy Code, then all of the claims of Citibank against LBHI or
LBCC should be disallowed unless and until Citibank has turned over to LBHI or LBCC,
respectively, all property transferred, or paid LBHI or LBCC, respectively, the value of such
property, for which it is liable under section 542 of the Bankruptcy Code.

## COUNT XV

### (Objections to the Proofs of Claim Against LBHI)

140.    Plaintiffs repeat and reallege each of the allegations contained in
paragraphs 1 through 139 above as if fully set forth herein.

141.     Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will
not be deemed "allowed" if a party in interest objects thereto.

142.    On November 18, 2011, Citibank filed proof of claim number 67736 against LBHI.  Plaintiffs object to each of the claims asserted by Citibank in that proof of claim to the extent they assert an interest in, or right of setoff with respect to, the $2 billion of LBHI cash at Citibank.

143.    Plaintiffs also object to each of the claims asserted by Citibank in proof of claim number 67736 to the extent they are based on the avoidable September Amendment to the 2004 Guaranty.  In the alternative, Plaintiffs object to Citibank's claim seeking payment from LBHI as purported guarantor under the September Amendment for $25 million in fees allegedly incurred by LBI under the CLS Agreement.  The CLS Agreement does not authorize the payment of such fees.

144.    Plaintiffs further object to each of the claims asserted by Defendants against LBHI in proofs of claim numbers 17913, 17936, 29637, 67735, and 67736 to they extent they seek payment from LBHI as purported guarantor under any of the LBSF Swap Agreements, the LBCC-Citibank Agreement, or the LBCS Swap Agreements.  For the reasons set forth herein, those swap agreement claims are invalid or inflated.

145.    All of the foregoing claims against LBHI should be disallowed and expunged, or reduced and allowed, as appropriate.

146.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XVI

### (Objections to the LBSF Swap Agreements Claims)

147.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 146 above as if fully set forth herein.

148.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be deemed "allowed" if a party in interest objects thereto.

149.    In proof of claim number 67733, Citibank asserts a claim against LBSF allegedly due under the LBSF-Citibank Agreement in the amount of $1,640,084,656.  Citibank's calculation of that claim is based on improper methodologies contrary to the LBSF-Citibank Agreement, as well as standards of commercial reasonableness and Citibank's duty of good faith, and is overstated by at least $1 billion.  The claim is therefore not a valid claim against LBSF.

150.    In proof of claim number 29881, Citigroup Global asserts a claim against LBSF allegedly due under the LBSF-Global Agreement in the amount of $232,423,044.  Citibank Global's calculation of that claim is similarly based on improper methodologies contrary to the LBSF-Global Agreement, as well as standards of commercial reasonableness and Citigroup Global's duty of good faith, and is overstated by tens of millions of dollars.  The claim is therefore not a valid claim against LBSF.

151.    In proof of claim number 17926, Citigroup Financial asserts a claim against LBSF allegedly due under the LBSF-Financial Agreement in the amount of $21,184,614.  Citigroup Financial's calculation of that claim is based on improper methodologies contrary to the LBSF-Financial Agreement, as well as standards of commercial reasonableness and Citigroup Financial's duty of good faith, and is overstated in its entirety.  In fact, it is Citigroup Financial that owes LBSF tens of millions of dollars under the swap agreement.

152.    In proof of claim number 17895, Citi Canyon asserts a claim against LBSF allegedly due under the LBSF-Canyon Agreement in the amount of $135,474.  LBSF does not owe Citi Canyon any amount under the LBSF-Canyon Agreement, and in fact, Citi Canyon owes LBSF no less than $59,200 under that agreement.

153.    The foregoing claims against LBSF should therefore be reduced and allowed, or disallowed and expunged, as appropriate.

154.    Plaintiffs hereby expressly reserve the right to further object to these claims, or any other claims filed by Defendants, on any other basis.

## COUNT XVII

### (Breach of the LBSF Swap Agreements)

155.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 154 above as if fully set forth herein.

156.    As stated above, Citigroup Financial miscalculated the termination amount due under the LBSF-Financial Agreement.  The proper calculation of that termination amount results in tens of millions of dollars being owed from Citigroup Financial to LBSF. Notwithstanding its obligations under their LBSF-Financial Agreement, Citigroup Financial has failed to pay this amount to the LBSF estate.

157.    As stated above, Citi Canyon miscalculated the termination amount due under the LBSF-Canyon Agreement.  The proper calculation of that termination amount results in no less than $59,200 being owed from Citi Canyon to LBSF.  Notwithstanding its obligation under the LBSF-Canyon Agreement, Citi Canyon has failed to pay this amount to the LBSF estate.

158.    As a result of the foregoing breaches by Citigroup Financial and Citi Canyon of their respective LBSF Swap Agreements, LBSF has suffered tens of millions of dollars in damages, in an amount to be determined at trial.

## COUNT XVIII

### (Objection to the LBCC-Citibank Agreement Claim)

159.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 158 above as if fully set forth herein.

160.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be deemed "allowed" if a party in interest objects thereto.

161.    In proof of claim number 67734 Citibank asserts a claim against LBCC allegedly due under the LBCC-Citibank Agreement in the amount of $18,017,039.  Citibank's calculation of that claim is based on improper methodologies contrary to the LBCC-Citibank Agreement, as well as standards of commercial reasonableness and Citibank's duty of good faith. In fact, it is Citibank that owes tens of millions of dollars to LBCC under the LBCC-Citibank Agreement.

162.    The foregoing Citibank claim against LBCC should therefore be disallowed and expunged.

163.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Citibank, on any other basis.

## COUNT XIX

### (Breach of the LBCC-Citibank Agreement)

164.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 163 above as if fully set forth herein.

165.    As described above, as a result of the termination of the LBCC-Citibank Agreement, Citibank owes LBCC tens of millions of dollars under that agreement as a termination amount.  Notwithstanding Citibank's obligations under the LBCC-Citibank Agreement, Citibank has refused to pay this amount to the LBCC estate.

166.     As a result of the foregoing breach of the LBCC-Citibank Agreement,

LBCC has suffered tens of millions of dollars in damages, in an amount to be determined at trial.

## COUNT XX

### (Objections to the LBCS Swap Agreements Claims)

167.     Plaintiffs repeat and reallege each of the allegations contained in

paragraphs 1 through 166 above as if fully set forth herein.

168.     In proof of claim number 29880, Citigroup Global asserts a claim against

LBCS allegedly due under the LBCS-Global Agreement in the amount of $6,217,557.  Citibank

Global's calculation of that claim is based on improper methodologies contrary to the LBCS-

Global Agreement, as well as standards of commercial reasonableness and Citigroup Global's

duty of good faith, and is overstated by millions of dollars.

169.     In proof of claim number 17937, Citigroup Energy asserts a claim against

LBCS allegedly due under the LBCS-Energy Agreement in the amount of $10,714,350.

Citigroup Energy's calculation of that claim is based on improper methodologies contrary to the

LBCS-Energy Agreement, as well as standards of commercial reasonableness and Citigroup

Energy's duty of good faith.  In fact, it is Citigroup Energy that owes LBCS millions of dollars

under the LBCS-Energy Agreement.

170.     The foregoing claims against LBCS should therefore be reduced and

allowed, or disallowed and expunged, as appropriate.

171.     Plaintiffs hereby expressly reserve the right to further object to these

claims, or any other claims filed by Defendants, on any other basis.

## COUNT XXI

### (Breach of the LBCS-Energy Agreement)

172.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 171 above as if fully set forth herein.

173.    As described above, as a result of the termination of the LBCS-Energy Agreement, Citigroup Energy owes LBCS millions of dollars under that agreement as a termination amount.  Notwithstanding Citigroup Energy's obligations under the LBCS-Energy Agreement, Citigroup Energy has refused to pay this amount to the LBCS estate.

174.    As a result of the foregoing breach of the LBCS-Energy Agreement, LBCS has suffered millions of dollars in damages, in an amount to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment:

   a.    Awarding LBHI damages against Citibank in an amount not less than $2.5 billion, or in the alternative, ordering Citibank to return the $2.5 billion of LBHI funds to the estate;

   b.    Avoiding the September Amendment as a fraudulent obligation;

   c.    Disallowing and/or reducing Citibank's claims against LBHI to the extent they assert rights against the $2 billion, are based on the September Amendment, are based on any of the swap agreement claims objected to herein, or seek the payment of $25 million of fees allegedly incurred by LBI under the CLS Agreement;

   d.    Awarding LBCC damages against Citibank in an amount not less than $200 million, or in the alternative, ordering Citibank to turn over not less than $200 million to the LBCC estate;

   e.    Reducing or disallowing Defendants' claims against LBSF purportedly arising under the LBSF Swap Agreements, and awarding LBSF damages against Citigroup Financial and Citi Canyon under their respective LBSF Swap Agreements, in an amount to be determined at trial;

f.   Disallowing Citibank's claim under the LBCC-Citibank Agreement, and awarding LBCC damages against Citibank under that agreement, in an amount to be determined at trial;

g.   Reducing or disallowing Defendants' claims against LBCS purportedly arising under the LBCS Swap Agreements, and awarding LBCS damages against Citigroup Energy under the LBCS-Energy Agreement, in an amount to be determined at trial;

h.   Disallowing the claims of Citibank against LBHI and/or LBCC unless and until Citibank has turned over to LBHI and/or LBCC, respectively, the value of any property recoverable under sections 542 or 550 of the Bankruptcy Code;

i.   Awarding statutory interest, as well as costs and disbursements of this action and attorneys' fees; and

[*Remainder of page intentionally left blank*]

j.    Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York
        February 8, 2012

**CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP**

By: /s/ Turner P. Smith

Turner P. Smith
L. P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178

*Counsel to Plaintiffs Lehman Brothers
Holdings Inc., Lehman Brothers
Commercial Corp., Lehman Brothers
Special Financing Inc., and Lehman
Brothers Commodity Services Inc.*

-and-

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

By: /s/ James C. Tecce

Susheel Kirpalani
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor,
New York, New York 10010

*Counsel to Proposed Plaintiff-Intervenor,
Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.*