Andrew K. Glenn
Matthew B. Stein
KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Attorneys for Plaintiffs

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————————— x
: 
In re: : Chapter 11
:
:
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No.: 08-13555 (JMP)
:
Debtors. :
:
——————————————————————————— x
:
BELMONT PARK INVESTMENTS PTY LTD; :
AMBULANCE VICTORIA; FIRE AND EMERGENCY :
SERVICES SUPERANNUATION BOARD; BELREEF :
HOLDINGS PTY LTD; BROKEN HILL CITY COUNCIL; :
CITY OF SWAN; EUROBODALLA SHIRE COUNCIL; G :
& F YUKICH SUPERANNUATION PTY LTD; :
GIPPSLAND SECURED INVESTMENTS LTD; :
G.JAMES AUSTRALIA PTY LTD; G.JAMES : Adversary Proceeding
SUPERANNUATION PTY LTD; GOSFORD CITY : No.: 12-_____ (JMP)
COUNCIL; GUYRA SHIRE COUNCIL; INDIAN :
PACIFIC LIMITED; LIFEPLAN AUSTRALIA :
FRIENDLY SOCIETY LIMITED; NEWCASTLE CITY :
COUNCIL; ORIENT HOLDINGS PTY LTD; :
PANORAMA RIDGE PTY LTD; PARKES SHIRE :
COUNCIL; SASHIMI INVESTMENTS PTY LTD; :
SOUTHERN FINANCE LIMITED; STATEWIDE :
SECURED INVESTMENTS LTD; THE COOTHARINGA :
SOCIETY OF NORTH QUEENSLAND; AND :
WINGECARRIBEE SHIRE COUNCIL, :
:
Plaintiffs, :
:
:
-against- :

|   |   |
|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC.; and BNY MELLON CORPORATE TRUSTEE SERVICES LIMITED, | : : : : |
| Defendants. | : : : |

_____ x

# COMPLAINT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

Plaintiffs Belmont Park Investments Pty Ltd; Ambulance Victoria; Fire and Emergency Services Superannuation Board; Belreef Holdings Pty Ltd; Broken Hill City Council; City of Swan; Eurobodalla Shire Council; G & F Yukich Superannuation Pty Ltd; Gippsland Secured Investments Ltd; G.James Australia Pty Ltd; G.James Superannuation Pty Ltd; Gosford City Council; Guyra Shire Council; Indian Pacific Limited; Lifeplan Australia Friendly Society Limited; Newcastle City Council; Orient Holdings Pty Ltd; Panorama Ridge Pty Ltd; Parkes Shire Council; Sashimi Investments Pty Ltd; Southern Finance Limited; Statewide Secured Investments Ltd; The Cootharinga Society of North Queensland; and Wingecarribee Shire Council (collectively, the "Plaintiffs"), by and through their undersigned counsel, hereby bring this Complaint against Lehman Brothers Special Financing Inc. ("LBSF") and BNY Mellon Corporate Trustee Services Limited ("BNY" and together with LBSF, the "Defendants").

### PRELIMINARY STATEMENT

1.  This is an action (i) for recognition and enforcement of a judgment of the High Court of Justice in England and Wales (the "High Court") in *Belmont Park Inv. Pty Ltd & Others v. BNY Corp. Trustee Servs. Ltd.*, Claim No. HC09C01931 (the "High Court Action"), affirmed by the Court of Appeal of England and Wales (the "Court of Appeal") and subsequently by the Supreme Court of the United Kingdom, declaring that, as a matter of English law, Plaintiffs

enjoy a priority position against LBSF with respect to shared collateral that secures notes issued to Plaintiffs under the "Dante Programme" created by LBSF and its affiliates (the "High Court Judgment") and (ii) for related declaratory relief.

2. The Dante Programme -- structured and marketed by affiliates of LBSF -- consists of multiple series of synthetic collateralized debt obligations in the form of notes (the "Notes") linked to credit default swaps. The various issuers (the "Issuers") of each series of notes (who also acted as the counterparty to LBSF under the credit default swaps) used the proceeds from the sale of the notes to purchase collateral, which was then pledged to Defendant BNY, as trustee, to secure the Issuers' obligations to, *inter alia*, (i) the relevant noteholders and (ii) LBSF, as counterparty under the credit default swaps.

3. The transaction documents -- all governed by English law and all containing a submission to the jurisdiction of the English courts -- provide for BNY to apply the collateral proceeds in accordance with alternative priorities (as between the noteholders and LBSF) in specified conditions. Under most situations, "Swap Counterparty Priority" would apply, and LBSF would have first priority to the proceeds of the collateral. However, if an event of default occurred under the relevant credit default swaps as a result of, among things, a bankruptcy filing by *either* LBSF or Lehman Brothers Holdings Inc. ("LBHI"), then "Noteholder Priority" would apply, and the noteholders would enjoy a first priority position.

4. LBHI and LBSF filed petitions pursuant to Chapter 11 of the Bankruptcy Code, respectively, on September 15, 2008 and October 3, 2008.

5. Pursuant to the transaction documents, the Issuers terminated the underlying credit default swaps for each series of notes held by the Plaintiffs. Subsequently, on June 9, 2009, in accordance with the parties' contractual submission to the jurisdiction of the English

courts, Plaintiffs commenced the High Court Action seeking to compel BNY to distribute the collateral pursuant to Noteholder Priority. LBSF applied, and was allowed, to intervene in the High Court Action. After extensive briefing and a lengthy hearing on the merits, on July 28, 2009, the High Court issued the High Court Judgment determining that Noteholder Priority applied. Both the Court of Appeal and the Supreme Court of the United Kingdom subsequently affirmed the decision. Nonetheless, BNY has not distributed the collateral in accordance with Noteholder Priority because it is concerned, in the light of the Memorandum Decision of Judge Peck dated January 25, 2010, in a case concerning other series of Notes under the Dante Programme, that it might be exposed to liability in the U.S. or under applicable U.S. law if it were to do so.

6.  Accordingly, Plaintiffs seek to: (i) have recognized and enforced the High Court Judgment; (ii) obtain a declaratory judgment that BNY may cause the collateral for each relevant series to be distributed in accordance with Noteholder Priority without exposing itself to liability in the U.S. or under applicable U.S. law; and (iii) obtain a declaratory judgment that Noteholder Priority is valid, effective and enforceable as a matter of U.S. law.

PARTIES

I.  **Plaintiffs.**

7.  Plaintiff Belmont Park Investments Pty Ltd, a company incorporated under Australian law with its registered office in Brisbane, Queensland, Australia.

8.  Plaintiff Ambulance Victoria, a body corporate established under the *Ambulance Services Act 1986* (Vic) with its registered office in Doncaster, Victoria, Australia.

9.  Plaintiff Fire and Emergency Services Superannuation Board, a body corporate in Australia, established under the *Fire and Emergency Services Superannuation Act 1985* (WA)

and the Fire and Emergency Services (Superannuation Fund) Regulations 1986 (WA) with its principal place of business in Subiaco, Western Australia, Australia. The Fire and Emergency Services Superannuation Board was constituted on November 3, 1986 to administer the Fire and Emergency Services Superannuation Fund.

10.     Plaintiff Belreef Holdings Pty Ltd, a company incorporated under Australian law with its registered office in Stoneville, Western Australia, Australia.

11.     Plaintiff Broken Hill City Council, a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Broken Hill, New South Wales, Australia.

12.     Plaintiff City of Swan, a body corporate in Australia, established under the *Local Government Act 1995* (WA) with its principal place of business in Midland, Western Australia, Australia.

13.     Plaintiff Eurobodalla Shire Council, a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Moruya, New South Wales, Australia.

14.     Plaintiff G & F Yukich Superannuation Pty Ltd, a company incorporated under Australian law with its registered office in Perth, Western Australia, Australia.

15.     Plaintiff Gippsland Secured Investments Ltd, a company incorporated under Australian law with its registered office in Bairnsdale, Victoria, Australia.

16.     Plaintiff G James Australia Pty Ltd, a company incorporated under Australian law with its registered office in Eagle Farm, Queensland, Australia.

17.     Plaintiff G James Superannuation Pty Ltd, a company incorporated under Australian law with its registered office in Eagle Farm, Queensland, Australia.

18.     Plaintiff Gosford City Council a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Gosford, New South Wales, Australia.

19.     Plaintiff Guyra Shire Council a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Guyra, New South Wales, Australia.

20.     Plaintiff Indian Pacific Limited, a company incorporated under Australian law with its registered office in Subiaco, Western Australia, Australia

21.     Plaintiff Lifeplan Australia Friendly Society Limited, a company incorporated under Australian law with its registered office in South Melbourne, Victoria, Australia.

22.     Plaintiff Newcastle City Council, a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Newcastle, New South Wales, Australia.

23.     Plaintiff Orient Holdings Pty Ltd, a company incorporated under Australian law with its registered office in Subiaco, Western Australia, Australia.

24.     Plaintiff Panorama Ridge Pty Ltd, a company incorporated under Australian law with its registered office in Brisbane, Queensland, Australia.

25.     Plaintiff Parkes Shire Council, a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Parkes, New South Wales, Australia.

26.     Plaintiff Sashimi Investments Pty Ltd, a company incorporated under Australian law with its registered office in Brisbane, Queensland, Australia.

27. Plaintiff Southern Finance Limited, a company incorporated under Australian law with its registered office in Warrnambool, Victoria, Australia.

28. Plaintiff Statewide Secured Investments Ltd, a company incorporated under Australian law with its registered office in Kyabram, Victoria, Australia.

29. Plaintiff The Cootharinga Society of North Queensland, a company limited by guarantee incorporated under Australian law with its principal office in Townsville, Queensland, Australia.

30. Plaintiff Wingecarribee Shire Council a body politic in Australia, established under the *Local Government Act 1993* (NSW) with its principal place of business in Moss Vale, New South Wales, Australia.

31. The Notes held by the Plaintiffs and with which these proceedings are concerned were issued in the following series under the Dante Programme (the "Series"): Saphir Finance plc Series 2004-4, Beryl Finance Limited Series 2007-7, Beryl Finance Limited Series 2008-6, Beryl Finance Limited Series 2008-14, Zircon Finance Limited Series 2007-1 Tranche A, Zircon Finance Limited Series 2007-1 Tranche B, Zircon Finance Limited Series 2007-3, Zircon Finance Limited Series 2007-9 Tranche A and Zircon Finance Limited Series 2007-9 Tranche B. These series of Notes have a total face value of AUD 250,230,000 of which the outstanding Notes held by the Plaintiffs have a total face value of AUD 93,450,000.

II. **Defendants.**

32. Defendant LBSF is a debtor in the above-captioned bankruptcy cases. Upon information and belief, LBSF is a Delaware corporation with its former principal place of business at 745 Seventh Avenue, New York, New York 10019 and its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, New York 10020.

33. Upon information and belief, Defendant BNY is a company organized under English law with its principal office in London, England. BNY, as trustee for the Plaintiffs, has submitted to the jurisdiction of this Court by entering a notice of appearance and participating in proceedings before this Court. BNY is an affiliate of Bank of New York Mellon, a Delaware corporation with its principal place of business in New York, New York.

### JURISDICTION AND VENUE

34. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334.

35. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

**I.    The Structure Of The Transactions Under The Dante Programme.**

36. In October 2002, an English affiliate of LBSF, Lehman Brothers International (Europe) ("LBIE") arranged a multi-issuer secured obligation financial product named the "Dante Programme." Under the Dante Programme, LBIE created special-purpose entities to act as Issuers -- including Saphir Finance Public Limited Co., Beryl Finance Limited, and Zircon Finance Limited -- of multiple series of synthetic, credit-linked, collateralized debt obligations ("CDOs") in the form of the Notes. Plaintiffs believe that, by September 2008, the Dante Programme included over 180 such series of Notes.

37. The Notes were sold to investors, including the Plaintiffs, and the Issuers used the sale proceeds to purchase collateral (the "Collateral"). For each of the Series, the Collateral was pledged to BNY acting as a trustee pursuant to a trust deed, dated October 10, 2002 (the "Principal Trust Deed") between itself and Dante Finance Public Limited Company ("Dante") (and to which the relevant Issuer for that Series had acceded by a Deed of Accession) and a

Supplemental Trust Deed for each Series between, *inter alia*, the relevant Issuer, BNY and LBSF.

38. The Issuers also served as parties to the related swap transactions with LBSF. In connection with the issuance of each of the Series, the Issuers entered into a swap agreement pursuant to which LBSF agreed to pay amounts which equaled the interest and principal due under the Notes in exchange for any yield generated by, and the final principal repayment of, the Collateral.[1]

39. The Collateral secured, *inter alia*, the Issuer's obligations to the noteholders under the Notes and the Issuer's obligations to LBSF under the swap agreements. The shared Collateral was one key example of the critical link and interdependence between the swap agreement and the Notes for each of the Series.

40. This interdependence is manifest by the terms of the transaction documents for each of the Series. For each of the Series, the key transaction documents, which are all governed by English law, are (the "Transaction Documents"):

(a) ISDA Master Agreement. An ISDA Master Agreement was entered into between Dante and LBSF on October 10, 2002 (to which the Relevant Issuers subsequently acceded by Deeds of Accession). Attached to and part of the ISDA Master Agreement is a Schedule that further document the relationship between the two parties to the ISDA Master Agreement. References below to the ISDA Master Agreement include references to the Schedule.

(b) Swap Confirmation. The Swap Confirmation for each Series supplements the ISDA Master Agreement.

(c) Principal Trust Deed. The Principal Trust Deed was entered into by Dante and BNY on October 10, 2002 and was amended and restated most recently on July 18, 2008. For each of the Series, the Principal Trust Deed was supplemented and amended by a Supplemental Trust Deed.

---

[1] As part of the transaction, LBHI was the credit support provider and agreed to guarantee LBSF's obligations to pay interest and principal under the swap agreement. LBHI, however, was not a noteholder, swap counterparty or otherwise a creditor of any relevant Issuer.

(d)   Supplemental Trust Deed. The Supplemental Trust Deed is specific to a particular series of Notes and, with the Principal Trust Deed and the ISDA Master Agreement, governs the treatment and distribution of the Collateral.

(e)   Notes. The Notes are governed by the Principal Trust Deed, the Supplemental Trust Deed and the specific Terms and Conditions of the Notes which were set out in a prospectus and offering circular scheduled to the Supplemental Trust Deed.

41.   Specifically, the ISDA Master Agreement incorporates the provisions of the trust documents governing the application and payment of the Collateral. Part 5(g) of the Schedule to the ISDA Master Agreement provides:

> In relation to each Transaction, each party confirms that it is bound by the terms of the Trust Deed and that the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction. Party A [LBSF] agrees that its recourse against Party B [Dante/the Issuer] in respect of the relevant Transaction is limited to the assets on which the liabilities of Party B under the relevant Transaction are secured pursuant to the Trust Deed and that its right to enforce the Security created by Party B over those assets is limited as provided in the Trust Deed. If the net proceeds of realization of the Security are insufficient to meet all claims secured thereon, the obligations of Party B in respect thereof will be limited to such net proceeds and accordingly no debt shall be owed by Party B in respect of any shortfall remaining after realization of the Security and application of the proceeds **in accordance with the Trust Deed**. (emphasis added)

42.   Part 5(a) of the Schedule to the ISDA Master Agreement defines Trust Deed as "the principal trust deed dated 10 October 2002 as amended and restated on 18 July 2008 and as further amended and updated from time to time." The Principal Trust Deed references and incorporates the terms of the Supplemental Trust Deed, including those terms relating to the application and priority of distribution of the Collateral for each particular series of Notes. The Supplemental Trust Deed incorporates the terms of the Principal Trust Deed and references the Notes and provides that they are governed by the Terms and Conditions in the Principal Trust Deed as modified by the Series Prospectus for each of the Series. Special Condition 44 of the

Series Prospectus for each of the Series implements the priority provisions in the Principal Trust Deed and the Supplemental Trust Deed. Thus, the Transaction Documents for each of the Series constitute a single set of integrated agreements, none of which could exist without the other.

43. Clause 6.2 of the Principal Trust Deed (which refers to the Supplemental Trust Deed for each Series) and Clauses 5.5 and 8.3 of the Supplemental Trust Deed for each of the Series set forth the priority of recovery from the Collateral shared by the noteholders and LBSF. These priority provisions are incorporated by reference into the swap agreements through Part 5(g) of the Schedule to the ISDA Master Agreement quoted above. In particular, under Clause 5.5 of the Supplemental Trust Deed for each of the Series: "Swap Counterparty Priority shall apply unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) . . . , in which case Noteholder Priority shall apply." Under "Swap Counterparty Priority," LBSF is entitled to priority over the noteholders. Under "Noteholder Priority," the noteholders are entitled to priority over LBSF (the foregoing priority clauses are referred to herein as the "<u>Priority Clauses</u>").

44. Critically, the commencement of a bankruptcy case by *either* LBSF or LBHI constitutes an event of default under Section 5(a)(vii) of the ISDA Master Agreement for which LBSF is deemed to be the "Defaulting Party".

II. **Events Of Default Under And Termination Of The Swap Agreements.**

45. On September 15, 2008, LBHI filed its Chapter 11 petition, thus automatically triggering an event of default under the swap agreement for each of the Series.

46. Eighteen days later, on October 3, 2008, LBSF also filed its chapter 11 petition, triggering a second event of default under the swap agreement for each of the Series.

11

47. Each filing constituted a separate and independent event of default for which LBSF was the "Defaulting Party" under the provisions of Section 5(a) of the ISDA Master Agreement. Accordingly, each filing was sufficient automatically to trigger Noteholder Priority.

48. Each of these events of default also entitled the relevant Issuers to terminate the relevant swap agreements by designating an early termination date for the swap under the provisions of Section 6(a) of the ISDA Master Agreement.

49. Between November 28, 2008 and December 3, 2008, the Plaintiffs, in respect of each of the Series, except for Beryl 2008-14, gave notice to BNY in exercise of their rights based on the payment defaults under the Notes. The payment defaults had occurred because LBSF had failed to pay the Issuer amounts due to the Issuer under the relevant swaps, leaving the Issuer unable to pay amounts due on the Notes. The noteholders directed BNY to enforce its rights to the mortgaged property (which included the Issuers' rights under the swap agreements) by requesting the relevant Issuer to deliver a notice of termination to LBSF in respect of the relevant swap agreement. In the case of Beryl 2008-14, the relevant Plaintiffs requested a noteholders' meeting to pass noteholder resolutions to the same effect as the request issued for the other Series.

50. On December 22, 2008, BNY caused the Issuer to give notice terminating the swap agreement relating to the Zircon 2007-9B series. On March 24, 2009 for one series and April 16, 2009 for the remaining series of Notes held by the Plaintiffs, BNY caused the respective Issuers to give notice to LBSF terminating corresponding swap agreements.

51. On May 6, 2009, BNY issued notices under Condition 10 of the Notes in respect of each of the Series, except for Beryl 2008-14, declaring the Notes to be due and payable at their "Early Redemption Amount" (as defined in the Notes).

52. On September 27, 2010, the Issuer of Beryl 2008-14 notified holders of those Notes that the date fixed for redemption of the Beryl 2008-14 Notes was April 27, 2009.

53. Accordingly, all swaps have been terminated, the Notes have been accelerated and the only remaining action is for the amount of the payments to be calculated and for the Collateral to be distributed in accordance with Noteholder Priority.

### III. Noteholders Commence Proceedings In England To Enforce Their Senior Rights To The Collateral.

54. The Transaction Documents, as noted above, are governed by English law and provide for the submission of all parties to the jurisdiction of the English courts.

55. On May 13, 2009, Perpetual Trustee Company Limited (a holder of CDOs in two series of Notes issued under the Dante Programme but not owned by Plaintiffs (the "Perpetual Notes" or the "Perpetual Series")) commenced an action in the High Court seeking to: (i) require BNY to distribute the Collateral in respect of the Perpetual Notes pursuant to Noteholder Priority in accordance with the Transaction Documents and (ii) redeem its Notes, which had also been accelerated following a similar process. In a separate action, on June 9, 2009, other noteholders, including Plaintiffs, commenced the High Court Action, seeking substantially the same relief in respect of their Notes.

56. The two sets of proceedings were heard together, and LBSF applied and was permitted to intervene in both sets of proceedings, *inter alia*, to challenge the enforceability of the "Noteholder Priority" provision.

57. By judgment issued on July 28, 2009, the Chancellor of the High Court (who is the most senior judge in the High Court at first instance) issued the High Court Judgment ruling in favor of the noteholders, including the Plaintiffs, and against LBSF. (*Perpetual Tr. Co. Ltd. v. BNY Corp. Tr. Servs. Ltd.*, [2009] EWHC 1912, dated July 28, 2009). The High Court found

13

that: (i) separate events of default under the relevant swap agreements for which LBSF was the Defaulting Party had occurred on September 15, 2008 and October 3, 2008 corresponding to the bankruptcy filings of LBHI and LBSF, respectively; (ii) each Issuer had validly and effectively terminated each swap agreement; (iii) the Priority Clauses were valid, effective and enforceable as a matter of English law; and (iv) in any event, Noteholder Priority had been triggered automatically when LBHI filed for Chapter 11 on September 15, 2008 (which was 18 days before LBSF filed for Chapter 11). The High Court expressly rejected LBSF's arguments (i) that the Priority Clauses (specifically Noteholder Priority) were invalid under English law (because, as LBSF contended, they violated the anti-deprivation principle of English insolvency law) and (ii) that LBSF's subsequent bankruptcy filing had any effect on the parties' rights. The anti-deprivation principle is a principle of English law that contractual terms purporting to dispose of a debtor's property on bankruptcy may be invalid as being "in fraud" or an evasion of the bankruptcy law. A true and correct copy of the High Court Judgment is annexed hereto as Exhibit A and incorporated herein by reference.

58.  By judgment issued on November 6, 2009, the Court of Appeal dismissed LBSF's appeal and affirmed the High Court Judgment.[2] (*Perpetual Tr. Co. Ltd. v. BNY Corp. Tr. Servs. Ltd.*, [2009] EWCA (Civ) 1160, dated November 6, 2009). The Court of Appeal agreed that: (i) the Priority Clauses were valid, effective and enforceable as a matter of English law; and (ii) in any event, LBHI's Chapter 11 filing was a "triggering event" for the application of Noteholder Priority and that this had occurred "automatically" on 15 September 2008, "some 18 days before LBSF filed for chapter 11." A true and correct copy of the Court of Appeal's judgment is annexed hereto as Exhibit B.

---

[2] LBSF did not appeal the High Court's finding that the swap agreements were terminated in accordance with their terms. As a result, under English law, LBSF is bound by such decision and has foregone any right to challenge the finding.

59. By judgment issued on July 27, 2011, the Supreme Court of the United Kingdom affirmed the decision of the Court of Appeal and the High Court Judgment.[3] A true and correct copy of this judgment is annexed hereto as Exhibit C. The English Supreme Court held that: (i) the Priority Clauses were valid, effective and enforceable as a matter of English law and (ii) in any event, LBHI's chapter 11 filing was a triggering event for the application of Noteholder Priority and that this occurred automatically some 18 days before LBSF filed for chapter 11.

60. Pending the disposal of LBSF's appeal to the Court of Appeal and any appeal therefrom to the Supreme Court, the Chancellor of the High Court stayed the remainder of the High Court Action and, in particular, the request that the High Court order BNY to distribute the Collateral in accordance with the Transaction Documents. The High Court has taken no further action since the entry of the judgment of the Supreme Court of the United Kingdom.

## COUNT I
### (*Enforcement Of The High Court Judgment*)

61. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 64, inclusive, of this Complaint as though set forth fully herein.

62. The High Court Action was duly commenced against BNY and by order of the High Court, LBSF, on its own motion, was permitted to intervene.

63. At all relevant times, the Defendants each were represented by counsel of their choice and were afforded substantive and procedural due process rights under English law.

64. After a hearing on the merits, the High Court entered the High Court Judgment in favor of the Plaintiffs and against the Defendants, finding that the Transaction Documents were governed by English law and holding that:

---

[3] On January 10, 2011, LBSF filed a notice of discontinuance in the English proceedings in respect of the series of Notes known as Beryl 2008-4.

    (i)    separate events of default under the relevant swap agreements for which LBSF was the defaulting party had occurred on September 15, 2008 and October 3, 2008 corresponding to the bankruptcy filings of LBHI and LBSF, respectively;

    (ii)    each Issuer validly and effectively terminated each swap agreement;

    (iii)    the Priority Clauses were valid, effective and enforceable as a matter of English law; and

    (iv)    in any event, Noteholder Priority had been triggered automatically when LBHI filed Chapter 11 on September 15, 2008.

65.     On November 6, 2009 and July 27, 2011, respectively, the Court of Appeal and the Supreme Court of the United Kingdom affirmed the High Court Judgment.

66.     The laws of the United States and the United Kingdom as they relate to the recognition and enforcement of foreign judgments are substantially similar.

67.     The English courts are fair and neutral and are highly regarded for impartiality, professionalism, and scrupulous regard for procedural rights. Moreover, the English judicial system is the very foundation of the American judicial system, both of which have parallel procedures and goals.

68.     Accordingly, Plaintiffs request that this Court, on the basis of international comity enter a judgment, recognizing and enforcing the High Court Judgment.

## COUNT II

*(Declaratory Judgment— Noteholder Priority Is Valid, Effective, And Enforceable; Distribution Of Collateral In Accordance With Noteholder Priority Will Not Expose BNY To Liability In The U.S. Or Under Applicable U.S. Law)*

69.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 6468, inclusive, of this Complaint as though set forth fully herein.

70.     Pursuant to Section 5.5 of the Supplemental Trust Deed for each of the Series, "Swap Counterparty Priority shall apply unless (i) an Event of Default (as defined in the Swap

16

Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) . . . , in which case Noteholder Priority shall apply."

71. As the English courts have definitively held, the application of Noteholder Priority is automatic upon the occurrence of an event of default under the swap agreement for which LBSF is "the Defaulting Party"; neither the Supplemental Trust Deed nor any of the other Transaction Documents for each of the Series, require any act by the Issuer to validate Noteholder Priority.

72. The bankruptcy filings by LBHI and LBSF on September 15, 2008 and October 3, 2008, respectively, constituted independent events of default pursuant to Section 5(a)(vii) of the ISDA Master Agreement for which LBSF was the Defaulting Party.

73. The Bankruptcy Code does not prevent the enforcement of Noteholder Priority.

74. First, Noteholder Priority was automatically triggered by the filing of LBHI's Chapter 11 petition eighteen days before the filing of LBSF Chapter 11 petition. Accordingly, LBSF had no right to Swap Counterparty Priority as of the commencement of its Chapter 11 case.

75. Second, as a matter of law, LBHI's September 15, 2008 filing could not trigger Sections 362(a), 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code in respect of the contractual rights of LBSF because LBSF had not filed its bankruptcy petition.

76. Third, even assuming, contrary to the above, that only LBSF's bankruptcy filing triggered Noteholder Priority or that LBHI's filing could in theory trigger Sections 362(a), 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code in respect of contractual rights of LBSF, neither the automatic stay nor the prohibition of the enforcement of *ipso facto* clauses prevent the

enforcement of Noteholder Priority because of the "safe-harbor" provisions of the Bankruptcy Code.

77. The enforcement of Noteholder Priority is exempt from the automatic stay in Section 362(a) of the Bankruptcy Code. Section 362(b)(17) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition "does not operate as a stay" with respect to:

> the exercise by a swap participant or financial participant of any contractual right . . . under any security agreement or arrangement or other credit enhancement forming part of or related to any swap agreement, or of any contractual right . . . to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements.

The Priority Clauses were incorporated by reference into each of the swap agreements through the provisions of Part 5(g) of the Schedule to the ISDA Master Agreement. On that basis, distribution in accordance with Noteholder Priority would be the exercise of a contractual right under a security agreement or arrangement forming part of a swap agreement. Alternatively, distribution in accordance with Noteholder Priority (as provided for in Part 5(g) of the Schedule to the ISDA Master Agreement, Clause 6.2 of the Principal Trust Deed and Clause 5.5 of the Supplemental Trust Deed) would be the exercise of a contractual right under a security agreement or arrangement "related to a swap agreement." Thus, Section 362(b)(17) exempts the enforcement of Noteholder Priority from the automatic stay to the extent that the automatic stay would otherwise preclude enforcement.

78. Further, Section 365(e)(1) of the Bankruptcy Code, which bars application of *ipso facto* clauses, does not prevent enforcement of Noteholder Priority because (i) the Principal Trust Deed is not an executory contract, and even if it were, LBSF is not a party to the contract; (ii) Section 365(b)(1) applies only to *ipso facto* clauses based on the commencement of a Chapter 11 case by the "debtor," but Noteholder Priority was automatically triggered by the filing of a

Chapter 11 petition by LBHI, who is not the "debtor" party to the Transaction Documents; and (iii) even if Section 365(b)(1) does apply, Section 560 of the Bankruptcy Code provides for a safe harbor authorizing the enforcement of *ipso facto* provisions such as those in the Transaction Documents. Section 560 of the Bankruptcy Code provides, in pertinent part, that:

> the exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

79. Section 101(53B) of the Bankruptcy Code provides that the term "swap agreement" extends to and encompasses "any security agreement or arrangement or other credit enhancement related to" a swap agreement. Accordingly, distribution in accordance with Noteholder Priority (under Part 5(g) of the Schedule to the ISDA Master Agreement, Clause 6.2 of the Principal Trust Deed and/or Clause 5.5 of the Supplemental Trust Deed) would be the exercise of a contractual right concerned or connected with or part of causing the liquidation of a swap agreement and/or with or part of causing the termination or liquidation of a security agreement or arrangement or other credit enhancement related to a swap agreement. The enforcement of Noteholder Priority is the exercise of a contractual right of a swap participant that sets forth the "payment amounts" that arises "in connection with the termination, liquidation, or acceleration" of a swap agreement.

80. Accordingly, Plaintiffs request that this Court enter declaratory judgments that (i) Noteholder Priority is valid, effective and enforceable; and (ii) BNY may cause the Collateral to

be distributed in accordance with Noteholder Priority without exposing itself to liability in the U.S. or under applicable U.S. law.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

A. Enter an order recognizing and enforcing the High Court Judgment;

B. Enter a judgment declaring that (i) Noteholder Priority is valid, effective and enforceable; and (ii) BNY may cause the Collateral to be distributed in accordance with Noteholder Priority without exposing itself to liability in the U.S. or under applicable U.S. law;

C. For such other relief as the Court deems just and proper, including costs and attorneys' fees.

Dated: February 8, 2012
New York, New York

Respectfully submitted,

/s/ Andrew K. Glenn
Andrew K. Glenn
Matthew B. Stein
KASOWITZ, BENSON, TORRES
    & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800

*Counsel for Plaintiffs*