SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER
-------------------------------------------------------------------X

GRACE FARRELLY

                              Plaintiff,                    Index No. 11-1309
                                                           Date filed: _____
           -against-

ROBERT HENNESSY, KIM BRASHER,
SCOTT SALIMANDO, DAVID FAULK,
BNC MORTGAGE INC,
AURORA LOAN SERVICES.
                              Defendants.
-------------------------------------------------------------------X

# SUMMONS

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** and required to serve upon the
Plaintiff's attorneys an Answer to the Verified Complaint in this action within 20 days
after the service of this Summons, exclusive of the day of service, or within 30 days after
service is complete if this Summons is not personally delivered to you within the State of
New York. In case of your failure to answer, judgment will be taken against you by
default for the relief demanded in the complaint.

Plaintiffs designates Ulster County as the place of trial, based on her residence at 3295
Route 52, Pine Bush, New York 12566, which is located within the County of Ulster.

Dated: Poughkeepsie, New York
       March 23, 2011
                                        LEGAL SERVICES OF THE
                                        HUDSON VALLEY
                                        Attorneys for Plaintiff
                                        Marian S. Henry, Of Counsel
                                        147 Union St., Suite #101
                                        Poughkeepsie, New York  12601
                                        Tel: (845) 471-0058 ext. 112

                                        **FILED**
                                        3 H 14 M

                                        MAR 2 5 2011

                                        NINA POSTUPACK
                                        ULSTER COUNTY CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER
-------------------------------------------------------------------X

GRACE FARRELLY

                                Plaintiff,                    Index No.  11-1309

        -against-                                             VERIFIED
                                                              COMPLAINT
ROBERT HENNESSY, KIM BRASHER,
SCOTT SALIMANDO, DAVID FAULK,
BNC MORTGAGE INC,
AURORA LOAN SERVICES.
                                Defendants.
-------------------------------------------------------------------X

## PRELIMINARY STATEMENT

Plaintiff, by her attorney, Legal Services of the Hudson Valley, Marian S. Henry,

Of Counsel, respectfully shows, swears to and alleges as follows:

1. This is an action brought by the Plaintiff Grace Farrelly (hereinafter referred to as

the "Plaintiff") seeking certain relief regarding a transaction whereby equity in

her home was wrested from her by the Defendants under the guise of a "reverse

mortgage" in a textbook case of mortgage fraud. If Defendants are successful,

they will have defrauded Plaintiff out of her residential premises at 3295 State Rt.

52 Pine Bush New York (hereinafter referred to at times as the "Subject

Premises") and profited to the extent of more than $150,000.00 from a scam to

"help" the plaintiff with a reverse mortgage.

## FACTS

2. The Plaintiff is a natural person currently residing at 3295 Route 52 Pine Bush

NY 12566.

**FILED**
3 H 14 M

MAR 2 5 2011

NINA POSTUPACK
ULSTER COUNTY CLERK

3.  The Plaintiff has owned and occupied the house and property located at 3295 Route 52 Pine Bush NY 12566 since 1950.

4.  The Plaintiff's date of birth is May 27, 1923. The Plaintiff was 81 years of age in January 2005, when the mortgage loan arranged by the Defendants herein was entered into. (Attached herein and made a part hereof as Exhibit "A" is the mortgage at issue herein.) (Attached herein and made a part hereof as Exhibit "B" is the mortgage loan Note at issue herein.)

5.  The Plaintiff lives alone at her home in the Subject Premises and currently her only source of income is a $941.00 monthly Social Security payment.

6.  In January 2005, Plaintiff's Social Security payment was $813.00.

7.  In January 2005, the Plaintiff owned the Subject Premises which had been free and clear of any mortgage obligation since the Plaintiff purchased the Subject Premises in 1950.

8.  In January 2005, the Plaintiff's total monetary assets were $1,000.00.

9.  The Plaintiff is a High School graduate with no secondary education and no background or experience in finance.

10. Upon information and belief, in January 2005, the Defendant Robert Hennessy (hereinafter referred to as "Hennessy") operated three companies that were owned by his wife, Defendant Kim Brasher (hereinafter referred to as "Brasher") named "Commercial Resources Corporation," "First Equity Funding," and "Commercial Equities Limited" (hereinafter referred to collectively as "Hennessy's Businesses.")

11. Upon information and belief, Hennessey's Businesses engaged in various financial services including, but not limited to, mortgage loan procurement for lenders including BNC Mortgage Inc., a Defendant herein (hereinafter referred to as "BNC Bank"), bullet loans, real estate investments, and stock and derivative trading.

12. In January 2005, Hennessy contacted Plaintiff through a mutual acquaintance Ms. Alice Zis, for the purpose of arranging a reverse mortgage.

13. On January 21, 2005, Hennessey physically met Plaintiff for the first time and held a closing that same evening for a residential home loan mortgage at the home of Alice Zis. Scott Salimando, Esq. (hereinafter referred to as "Salimando"), a Defendant herein and an attorney and agent for BNC Bank, prepared the mortgage loan closing documents but did not attend the closing.

14. Hennessey failed to disclose the true nature of the closing documents to Plaintiff and presented to her that she was closing on what she reasonably believed was a "reverse mortgage."

15. The alleged terms of the fraudulently described "reverse mortgage" stated that Hennessey would pay the Plaintiff approximately $17,000.00 at the time of the closing and then pay her $1,517.00 per month for thirty years constituting the "reverse mortgage" payments. In return, Hennessey required Plaintiff to pay a monthly payment of $982.89 every month to BNC Bank for this alleged "reverse mortgage."

16. Plaintiff received the "reverse mortgage" payments from Hennessy on or about the 15th of every month from February 2005 until in or about March 2009.

3

17. Several months prior to March, 2009, Hennessy's payments to the Plaintiff became sporadic. Lacking recourses and desperate to raise money, in February, 2009, the Plaintiff contacted R.J. Smith, a real estate agent, with the intention of raising money by selling her home. A title search revealed to the Plaintiff for the first time that her home had a traditional mortgage lien against it.

18. Immediately upon discovery of the mortgage lien, Plaintiff contacted New York State Police Investigator Thomas Fortuna in Ellenville, New York. Detective Fortuna commenced a criminal investigation with Investigator Dennis Churns of the Dutchess County New York Attorney General's Investigations Bureau which subsequently led to this action.

19. When the "reverse mortgage" payments stopped, Hennessy also ceased all contact with the Plaintiff and refused to return any of her numerous phone calls.

## FIRST CAUSE OF ACTION

## FRAUD

20. It is well settled law that to establish prima facie case of fraud, a plaintiff must establish: "(1) that defendant made material representations that were false; (2) that defendant knew representations were false and made them with intent to deceive plaintiff; (3) that plaintiff justifiably relied on defendant's representations; and (4) that plaintiff was injured as result of defendant's representations." Giurdanella v. Giurdanella, 640 N.Y.S.2d 211 (N.Y. App. Div. 2d Dept. 1996); See also, Orlando v. Kukielka, 836 N.Y.S.2d 252 (N.Y. App. Div. 2d Dept. 2007); Jablonski v. Rapalje, 788 N.Y.S.2d 158 (N.Y. App. Div. 2d Dept. 2005);

Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc., 453 N.Y.S.2d 750 (N.Y. App. Div. 2d Dept. 1982).

21. Hennessy and BNC Bank, through its agent, Salimando, took advantage of the Plaintiff's financial duress and lack of financial sophistication and education to induce her to enter into a fraudulent "reverse loan" transaction that actually left her with an unconscionable loan agreement that provides her with no benefit and has now put her in jeopardy of losing her home. (attached as Exhibit "C" is a letter from Aurora Loan Services, a Defendant herein, dated February 18, 2011, which threatens the Plaintiff with the loss of her home.)

22. At no time did the Defendants Hennessey or BNC Bank perform even minimal due diligence or investigation, such as procuring a completed loan application from Plaintiff. If they had, they would have immediately noted that the monthly mortgage payment amount of $982.89 exceeded Plaintiff's monthly income of $813.00 that was exclusively from Social Security payments.

23. On the evening of January 21, 2005, the Plaintiff went to the home of Alice Zis for the purpose of getting a reverse mortgage from Hennessey and BNC Bank. Unbeknownst to Plaintiff, the documents she signed the evening of January 21, 2005, were not for a reverse mortgage, as fraudulently represented by Hennessey and BNC Bank though its agent, Salimando, but were for a traditional 30 year mortgage from BNC Bank, for $150,000.00 against the Subject Premises (this transaction is sometimes herein referred to at times as the "Fraudulent Mortgage.")

5

24. Acting as a sales agent for BNC Mortgage, and as a coconspirator with Hennessy, David Faulk, a Defendant herein (hereinafter referred to as "Faulk,") was the mortgage broker for the Fraudulent Mortgage. Salimando was the attorney for BNC Bank and represented the institution with regard to the Fraudulent Mortgage.

25. At the direction of Salimando as agent for BNC Bank, Hennessey completed the Fraudulent Mortgage on January 21, 2005 and distributed funds from the BNC Bank escrow closing account directly into his own business accounts. The funds were distributed as follows: $30,000.00 to Commercial Resources Corporation, (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "D,") $30,000.00 to First Equity Funding, (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "E") and $30,000.00 to Commercial Equities Limited (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "F.") As stated in Paragraph 10 hereinabove, these various entities were owned by Brasher, the wife of Hennessy.

26. $1,069.00 of the Fraudulent Mortgage proceeds were payable to a Chase Platinum Visa account, which was in no way related to the Plaintiff (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "G.")

27. Faulk's business entity, "Finance One Limited," received $15,256.76 as a "broker fee" for the Fraudulent Mortgage (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "H.")

28. The HUD 1 statement (attached herein and made a part hereof as Exhibit "I") for the Fraudulent Mortgage, was prepared by Salimando as agent for BNC Bank and

fraudulently indicates Faulk's disbursement as only $1,500.00 not the $15,256.76 actually disbursed. (Attached hereto and made part hereof as Exhibit "J" is the Notice of Broker Compensation and Good Faith Estimate, included in the closing documents for the home loan transaction herein, which also fraudulently states that the broker's compensation was $1,775.

29. The HUD 1 statement fraudulently indicates total settlement charges of $6,057.24 was paid from the Borrower's funds when actually $19,814.00 was the true amount of settlement charges paid from Borrower's Funds.

30. The HUD 1 statement fraudulently indicates that the Plaintiff, Grace Farrelly, received $141,641.76 when in fact the Plaintiff only received $17,000 (the cancelled check thereof is attached hereto and made a part hereof as Exhibit "K.")

31. There is no note, contract, or anything in writing or otherwise which would justify diverting 90% of the Fraudulent Mortgage proceeds to Hennessy.

32. It was the duty of the attorney for BNC Bank, Salimando, to reconcile the closing statements and ensure the proceeds are distributed according to BNC Bank's instructions. In this case, the HUD 1 statement for this closing (Exhibit "I") is clearly fraudulent when compared with the BNC Mortgage escrow account checks (Exhibits "D, E, F, G, H and K.") The HUD 1 statement fails to show any of the checks to Hennessey's aforementioned businesses. It fraudulently states $141,641.76 "CASH TO BORROWER."

33. All of the checks are signed by Salimando as agent for BNC Bank. All of the checks fraudulently payable to Hennessey and Faulk were cashed by Hennessy and Faulk. Therefore, the fraudulent HUD 1 statement (Exhibit "I") and the actual

disbursement of funds therein were clearly knowingly fraudulent acts by Hennessey, Brasher by and through her agent Hennessey, Salimondo, BNC Bank by and through its agent Salimondo, and Faulk.

34. Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned in this complaint, each of the Defendants has acted as an agent, partner, representative, joint venturer, or employee of each of the remaining Defendants. While engaging in the conduct alleged, the Defendants, and each of them, have acted within the course, scope, and purpose of such agency, partnership, representation, joint venture, or employment, and with the full knowledge, ratification, consent or approval, express or implied, of each of the other Defendants.

35. In justifiable reliance upon the various false representations made by Defendants, both verbal and through false written instruments, Plaintiff unknowingly entered into the Fraudulent Mortgage. Had Plaintiff known the Fraudulent Mortgage was a traditional mortgage and not a "reverse mortgage," as represented by Defendants, she would not have entered into the Fraudulent Mortgage agreement.

36. As a result of Defendants' knowing and willful fraudulent misrepresentations of masking the traditional mortgage as a "reverse mortgage," Plaintiff has been harmed in an amount to be demonstrated at trial but in a sum no less than the amount she paid on the Fraudulent Mortgage.

## SECOND CAUSE OF ACTION

## RESCISSION OF RESIDENTIAL MORTGAGE LOAN

37. The Plaintiff repeats and realleges Paragraphs 1 through 36 hereinabove.

8

38. Even if the Court fails to hold Defendants accountable for mortgage fraud, the mortgage loan itself is a nullity because the loan on its face is designed to default. It is a purported home loan agreement which no reasonably prudent lender would offer.

39. Pursuant to the terms of the Fraudulent Mortgage, the mortgage payment due to BNC Bank were and remain $982.89 per month due the first day of every month beginning on March 1, 2005 and ending on February 1, 2035 when the Plaintiff will be 112 years of age.

40. The $982.89 monthly mortgage payment due Defendant BNC Bank is an unconscionable arrangement because Plaintiff's total monthly income in January 2005 was $813.00. Plaintiff's current monthly income is $941.00 thus leaving Plaintiff with negative resources of minus $41.89 per month for living expenses.

41. The Plaintiff requests this Court to grant a rescission of the residential mortgage loan agreement herein because no reasonably prudent lender would offer a loan that would result in default because the unconscionable payment terms provided for monthly payments which exceed the Plaintiff's monthly income.

THIRD CAUSE OF ACTION

VIOLATION OF HOEPA and TILA

42. The Plaintiff repeats and realleges Paragraphs 1 through 40 hereinabove.

43. Plaintiff asserts that her loan with BNC Bank is a mortgage loan within the definition of 15 U.S.C. § 1602(aa)(1)(B), and thus is subject to the restrictions of the Home Ownership and Equity Protection Act of 1994, as amended (hereinafter referred to as "HOEPA") 15 U.S.C. § 1639.

9

44. Plaintiff seeks relief pursuant to Section 108(c) of the Truth in Lending Act (hereinafter referred to as "TILA"), 15 U.S.C. § 1607(c), to obtain preliminary and permanent injunctive relief, rescission, restitution, reformation, disgorgement, and other equitable relief against the Defendants for engaging in acts or practices in violation of TILA, 15 U.S.C. §§ 1601-1666j, as amended, including HOEPA, as amended, and TILA's implementing Regulation Z, 12 C.F.R. 226, as amended, and for unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as amended (the Truth-in-Lending Statement for the Fraudulent Mortgage transaction herein is attached hereto and made a part hereof as Exhibit "L.")

45. In the course and conduct of offering and making the HOEPA mortgage loan herein, the Defendants herein in numerous instances have violated, and continue to violate, the requirements of HOEPA and Regulation Z by offering such loans without furnishing the following notice to the purchaser or assignee:

> "Notice: This is a mortgage subject to special rules under the federal Truth in Lending Act. Purchasers or assignees of this mortgage could be liable for all claims and defenses with respect to the mortgage that the borrower could assert against the creditor, in violation of Section 131(d)(4) of TILA, 15 U.S.C. § 1641(d)(4), and Section 226.32(e)(3) of Regulation Z, 12 C.F.R. § 226.32(e)(3)."

46. Furthermore, the Plaintiff asserts that the Defendants have also violated HOEPA, 15 U.S.C. § 1639, because the Defendants failed to disclose the terms of the mortgage three (3) business days prior to consummation of the home loan transaction herein in violation of 15 U.S.C. § 1639 (a) & (b). Moreover,

Defendants extended credit without regard to payment ability of consumer in violation of 15 U.S.C. § 1639(h).

47. Plaintiff contends that, due to Defendants' failure to comply with HOEPA, 15 U.S.C. § 1639, she has a right to rescind the mortgage loan transaction pursuant to 15 U.S.C. § 1635(a), and actual and statutory damages pursuant to 15 U.S.C. § 1640.

48. In the course of offering and extending credit to the Plaintiff, the Defendants have violated HOEPA by engaging in an asset-based lending and TILA by failing to disclose loan terms. Specifically, the Defendants' violated the requirements of HOEPA and Regulation Z by extending credit to the Plaintiff based on the Plaintiff's collateral rather than considering the Plaintiff's current and expected income, current obligations, and employment status to determine whether the Plaintiff is able to make the scheduled payments to repay the obligation, in violation of Section 129(h) of TILA, 15 U.S.C. § 1639(h), and Section 226.32(e)(1) of Regulation Z, 12 C.F.R. § 226.32(e)(1).

49. BNC Bank and its agents approved the home loan mortgage without regard to the Plaintiff's ability to repay when prudent underwriting criteria, such as debt-to-income ratio, residual income, and repayment history, would have clearly indicated that the Plaintiff would likely have difficulty repaying the loan. The loan payment consumes more then 100% of the Plaintiff's income, leaving the Plaintiff without any income for living expenses. Thus, the Defendants' action of approving a loan without regard to Plaintiff's ability to repay has exposed Plaintiff to unwarranted risk of default and foreclosure.

11

50. The Defendants' actions were intentional, willful, and were implemented with deliberate disregard for Plaintiff's well being. Thus, Plaintiff has suffered damages as a result of the Defendants' conduct as described herein.

51. Defendants' violations of HOEPA and TILA have injured Plaintiff and, absent injunctive and other relief entered by this court, are likely to continue to injure Plaintiff.

## FOURTH CAUSE OF ACTION

## VIOLATION OF NEW YORK BANKING LAW

52. The Plaintiff repeats and realleges Paragraphs 1 through 51 hereinabove.

53. Plaintiff asserts that the mortgage loan with BNC Bank is a "high cost home loan" within the definition of New York Banking Law Sec. 6-l(1)(e) and thus is subject to the limitations and prohibited practices of New York Banking Law Sec. 6-l(2)(k).

54. Plaintiff asserts that the Defendants have violated New York Banking Law Sec. 6-l by, *inter alia*, procuring a high cost home loan without due regard to Plaintiff's repayment ability in violation of New York Banking Law Sec. 6-1(2)(k).

55. Plaintiff contends that, due to Defendants' failure to comply with New York Banking Law Sec. 6-1, she has the right to seek (a) actual damages pursuant to New York Banking Law Sec. 6-1(7)(a); (b) statutory damages pursuant to New York Banking law Sec. 6-1(7)(b); (c) attorneys' fees and costs pursuant to New York Banking Law Sec. 6-1(8); and (d) rescission of the Fraudulent Mortgage and disgorgement from Defendants of all monies received thereunder or in relation thereto pursuant to New York Banking Law Sec. 6-1(10).

FIFTH CAUSE OF ACTION

VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT

56. The Plaintiff repeats and realleges Paragraphs 1 through 55 hereinabove.

57. Plaintiff asserts that the mortgage loan with BNC Bank is a "federally related mortgage loan" within the definition of 12 UCSC § 2602(1) and thus is subject to the protections of 12 UCSC §§ 2601 *et seq.* (hereinafter referred to at times as "RESPA").

58. Plaintiff asserts that the Defendants have violated RESPA by, *inter alia*, offering or accepting kickbacks or fees relating to the settlement of a federally related mortgage loan, in violation of 12 UCSC § 2607.

59. Defendants, and each of them, violated RESPA intentionally, willfully and with deliberate disregard for Plaintiff's well being.
Plaintiff contends that, due to Defendants' failure to comply with RESPA, she has the right to seek damages and attorneys' fees and costs of suit, pursuant to 12 UCSC § 2607(d).

SIXTH CAUSE OF ACTION

NEGLIGENCE

60. The Plaintiff repeats and realleges Paragraphs 1 through 59 hereinabove.

61. Even if the Court fails to hold Defendants accountable for mortgage fraud, the Defendants are liable to the Plaintiff for injuries she suffered as the result of the Fraudulent Mortgage which was negligently offered to the Plaintiff by the Defendants. It is a purported home loan agreement which no reasonably prudent lender would offer. The Defendants had a duty to explain to the Plaintiff that the

13

Fraudulent Mortgage was a traditional mortgage loan and not a "reverse

mortgage." The Defendants breached their duty to the Plaintiff and the Plaintiff

was injured as a proximate result thereof.

## SEVENTH CAUSE OF ACTION

## BREACH OF CONTRACT

62. The Plaintiff repeats and realleges Paragraphs 1 through 61 hereinabove.

63. Even if the Court fails to hold Defendants accountable for mortgage fraud, the

Defendants are liable to the Plaintiff for injuries she suffered as the result of the

Defendants breach of contract. The Defendants told the Plaintiff she was

receiving a "reverse mortgage" but, through "bait-and-switch," instead offered her

a Fraudulent Mortgage, a purported home loan agreement which no reasonably

prudent lender would offer, and the Plaintiff suffered damages as a consequence

thereof.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff Grace Farrelly respectfully requests that this Court:

1. Declares that Defendants actions constitute a violation of:

    a. the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607;

    b. the Truth in Lending Act, 15 U.S.C. §§ 1601-1666j (including the Home

    Ownership and Equity Protection Act, 15 U.S.C. § 1639); and

    c. New York Banking Law Sec. 6-1 and thereby Orders rescission of the

    mortgage loan transaction at issue herein and termination of any security

    interest created therein under the transaction, pursuant to the complaint;

2. Declares the mortgage loan null and void;

14

3. Awards actual damages in an amount to be determined at trial;

4. Awards statutory damages;

5. Awards punitive damages to the Plaintiff for diminished quality of life, including pain and suffering caused by the illegal acts of Defendants, and in an amount sufficient to punish the Defendants for their acts, practices, misrepresentations and concealments, and to deter them from ever attempting to commit similar acts;

6. Awards ancillary equitable relief in the form of restitution to the Plaintiff for Defendants' unlawful policies and practices;

7. Assesses a civil penalty against the Defendants, in order to vindicate the public interest;

8. Orders the disgorgement of all monies procured by the Defendants through the mortgage transaction;

9. Awards reasonable attorney's fees and costs; and

10. Awards such other and further relief as this Court deems just and proper.

Dated: March 15, 2011
Poughkeepsie, NY

_Marian S. Henry_

Legal Services of the Hudson Valley
Attorneys for the Plaintiff
Marian S. Henry, Of Counsel
147 Union St., Suite #101
Poughkeepsie, NY 12601


VERIFICATION

STATE OF NEW YORK    }
                     }ss:
COUNTY OF ULSTER     }

15.

GRACE FARRELLY, being duly sworn, says that she is the Plaintiff in the above-named proceeding and that the foregoing Complaint is true to her own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters she believes it to be true.

_Grace Farrelly_
Grace Farrelly

3/18/11
(date)

Subscribed and sworn to before me on March 8th, 2011.

_Karen A. Hills_
NOTARY PUBLIC

KAREN A. HILLS
Notary Public, State of New York
No. 01HI6153648
Qualified in Sullivan County
Commission Expires Oct. 10, 2010 2014

16





Ulster County
Albert Spada
County Clerk
Kingston, NY 12401

60 2005 00003100

**Instrument Number: 2005- 00003100**

As

**M01 - Mortgage**

Recorded On: February 03, 2005

Parties: FARRELLY GRACE

To

BNC MORTGAGE INC BY NOM

Billable Pages:        19

Num Of Pages:        19

Recorded By: CMS

Comment:

## ** Examined and Charged as Follows: **

M01 - Mortgage                82.00

Recording Charge:        82.00

| | Amount | Consideration Amount | RS#/CS# | Basic | | | |
|---|---|---|---|---|---|---|---|
| Tax-Mortgage | 1,125.00 | 150,000.00 | CV 12108 | | 750.00 | Special Additional | 375.00 |
| SHAWANGUNK | | | | Additional | 0.00 | Transfer | 0.00 |
| Tax Charge: | 1,125.00 | | | | | | |

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

**File Information:**

Document Number: 2005- 00003100

Receipt Number: 249082

Recorded Date/Time: February 03, 2005 09:44A

Book-Vol/Pg: Bk-M Vl-6954 Pg-23

Cashier / Station: s smat / Cashier Workstation 4

**Record and Return To:**

BNC MORTGAGE INC

1901 MAIN ST

IRVINE CA 92614



*Albert Spada*

ALBERT SPADA, ULSTER COUNTY CLERK

19

Return To: BNC MORTGAGE,
INC.
1901 MAIN ST
IRVINE, CA 92614

Prepared By:

——————————————————[Space Above This Line For Recording Data]——————————————————

# MORTGAGE MIN 100122200001402137

Loan No.: HUN002005

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "Security Instrument." This document, which is dated January .21, 2005
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower." GRACE FARRELLY, A/K/A GRACE GLORIA CLARK.

whose address is 3295 ROUTE 52
PINE BUSH,NY 12566
sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and
existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE,
MERS IS THE MORTGAGEE OF RECORD.
(D) "Lender." BNC MORTGAGE, INC., A DELAWARE CORPORATION

will be called "Lender." Lender is a corporation or association which exists under the laws of
Delaware                                    . Lender's address is 1901 MAIN ST, IRVINE, CA
92614

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3033 1/01

-5A(NY) (0005).00
Page 1 of 17                    Initials:
VMP MORTGAGE FORMS - (800)521-7291

CHECKED   ec
ENTERED   SMM
MARK/OFF  _____

√CMS

(E) "Note." The note signed by Borrower and dated **January 21, 2005**                , will be called the "Note." The Note shows that I owe Lender **one hundred fifty thousand and 00/100**

Dollars (U.S. **$150,000.00**                              )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by **February 1, 2035**.

(F) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I) "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K) "Community Association Dues, Fees, and Assessments." All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L) "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(N) "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O) "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q) "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _____

-6A(NY) (0005).06                    Page 2 of 17                    Form 3033 1/01

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

**DESCRIPTION OF THE PROPERTY**

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at 3295 ROUTE 52                                      [Street]

PINE BUSH                          [City, Town or Village], New York 12566        [Zip Code].
This Property is in ORANGE                                              County. It has the following legal
description: LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS
EXHIBIT A.

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

Initials: _B.F._

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

**COVENANTS**

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

Initials: _____

-6A(NY) (0005).08    Page 4 of 17    Form 3033 1/01

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me; First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3. **Monthly Payments For Taxes And Insurance.**

(a) **Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following Items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

Initials: _B.T._

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. **Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

Initials: _B7_

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5. **Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

Initials: _____

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7. **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) **Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) **Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

Initials: _D.F_

-6A(NY) (0005).05                     Page 8 of 17                     Form 3033 1/01

8. **Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

9. **Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable and appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

Initials: _____

Form 3033 1/01

-6A(NY) (0005).00                    Page 9 of 17

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11. Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

Initials: _B7_

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

(a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

Initials: _____

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

Initials: ⟋⟋

Form 3033 1/01

VMP-8A(NY) (0905).00                    Page 12 of 17

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If

Initials: _[signature]_

Form 3033 1/01

Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

21. **Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. **Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another

Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

   (a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

   (b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

    (1) The promise or agreement that I failed to keep or the default that has occurred;

    (2) The action that I must take to correct that default;

    (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

    (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

    (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

    (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

   (c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. **Borrower's Statement Regarding the Property [check box as applicable].**

   [x] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

   [ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

   [ ] This Security Instrument does not cover real property improved as described above.

Initials: _____

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

_____ (Seal)
GRACE FARRELLY                        -Borrower

_____ (Seal)
a/k/a  GRACE GLORIA CLARK          -Borrower

_____ (Seal)        _____ (Seal)
                                        -Borrower                                                -Borrower

_____ (Seal)        _____ (Seal)
                                        -Borrower                                                -Borrower

_____ (Seal)        _____ (Seal)
                                        -Borrower                                                -Borrower

-6A(NY) (0005).00                     Page 16 of 17                     Form 3033 1/01

STATE OF NEW YORK,                ULSTER                County ss:

On the 21 day of JANUARY 2005 before me, the undersigned, a notary public in and for said state, personally appeared GRACE FARRELLY a\k\a GRACE GLORIA CLARK

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

WALLY DuVAL
Notary Public, State of New York
No. 01DU4078891
Qualified in Suffolk County
Commission Expires Dec. 8, 2006

Tax Map Information:

Initials: _____        Form 3033 1/01

-6A(NY) (0005).05

SCHEDULE A

DESCRIPTION

Title Number: GW04-3276-U

ALL that certain plot, piece or parcel of land situate lying and being in the Town of Shawangunk, County of Ulster, State of New York bounded and described as follows:

BEGINNING at a spike set in the point of intersection of the center of Route 52 and the center line of the road leading from Ulsterville to Route 52 past the house of Ed Wenz and runs from;

THENCE along the center line of Route 52, North 83 degrees 18 minutes West 384.6 feet to a point in the center of Route 52, in the line of lands and being a corner of lands of Albert Mance, Mary Mance and Kenneth Moffitt;

THENCE along the lands of Albert Mance, Mary Mance and Kenneth Moffitt, South 31 degrees 12 minutes West 587.5 feet to an iron pipe set in an old gravel pit;

THENCE along the same South 48 degrees 08 minutes East 579.9 feet to an iron pipe set in the southerly side of a small lake;

THENCE along the same and following generally the lines of said lake the following courses and distances:

South 67 degrees 05 minutes East 100.9 feet to an iron pipe;

North 89 degrees 30 minutes East 233.9 feet to an iron pipe;

North 12 degrees 35 minutes East 200.3 feet to an iron pipe;

South 66 degrees 58 minutes East 74.1 feet to an iron pipe;

North 59 degrees 34 minutes East 163.18 feet to an iron pipe;

THENCE along the same but leaving the lines of the lake North 39 degrees 14 minutes East 397.7 feet to a spike set in the center of the aforementioned road leading from Ulsterville to Route 52;

THENCE along the center of said road North 60 degrees 40 minutes West 661.4 feet to the place of BEGINNING containing 16.46 acres of land be the same more or less.

# B

# NOTE

**January 21, 2005**
[Date]

**Irvine**
[City]

**California**
[State]

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **150,000.00**                    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **BNC MORTGAGE, INC., A DELAWARE CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      **6.850 %**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **March, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **February 1, 2035**                    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **6501 IRVINE CENTER DRIVE,  IRVINE, CA 92618** or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ **982.89**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all monthly payments due under the Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within  **twelve**                    (  **12**    ) months from the date of execution of the Mortgage I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a Prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note.

If Prepayment is made on or after one year from the date of the execution of the Mortgage, no penalty will be imposed.

NEW YORK FIXED RATE NOTE - Single Family -

VMP -105N(NY) (0308)                    8/03
Page 1 of 3                    Initials: _____
VMP Mortgage Solutions (800) 71-7291

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    2 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. APPLICABLE LAW**

This Note shall be governed by the laws of the State of New York. If a law, which applies to this loan and sets maximum loan charges is finally interpreted so that the interest and other charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such interest or other charge shall be reduced by the amount necessary to reduce the interest or other charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment, but in no event will a prepayment charge be assessed if the Note Holder chooses to reduce my Principal balance by applying such excess amounts.

8/03

FOIL 100693  000361

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
                          -Borrower                                           -Borrower
GRACE FARRELLY

_____ (Seal)                    _____ (Seal)
                          -Borrower                                           -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                           -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                           -Borrower

*[Sign Original Only]*

VMP -105N(NY) (0308)                    Page 3 of 3                              8/03

## Interest Rate Disclosure

| | |
|---|---|
| Borrower Name(s):<br>GRACE FARRELLY | Lender:<br>BNC MORTGAGE, INC., A DELAWARE CORPORATION<br>P.O. BOX 19656, IRVINE, CA 92623-9656 |
| | Date:<br>January 21, 2005 |

Property Address:

████ ████ ███  ██████  ██  ██

This disclosure is given in accordance with New York Banking Law Article 1, Section 9-O, which requires that you be informed when the interest rate on your loan will be set.

☐ You may choose when your interest rate will be set.

    ☐ I wish to set my interest rate at the time of application.

    ☐ I wish to set my interest rate at the time of commitment. This disclosure is not a loan commitment.

    ☐ I wish to set my interest rate at the time of closing.

OR

☒ Your interest rate will be set by the lender as indicated below.

    ☐ Your interest rate will be set at the time of application.

    ☐ Your interest rate will be set at the time of commitment. This disclosure is not a loan commitment.

    ☐ Your interest rate will be set at the time of closing. The rate will be set no later than ____ business days before closing.

    ☒ Your interest rate will be set at such other time as determined by the lender:<br>      At final loan approval.

I/We have received a copy of this disclosure at application and acknowledge by signing below that I/we understand its provisions.

| | |
|---|---|
| _____ Date<br>Borrower GRACE FARRELLY | _____ Date<br>Borrower |
| _____ Date<br>Borrower | _____ Date<br>Borrower |
| _____ Date<br>Borrower | _____ Date<br>Borrower |
| _____ Date<br>Borrower | _____ Date<br>Borrower |

-1092 (NY) (0002).02

VMP MORTGAGE FORMS • (800)521-7291

FOIL 100693   000363

# NEW YORK INTEREST RATE LOCK COMMITMENT

Company Name: BNC MORTGAGE, INC., A DELAWARE CORPORATION
Company Address: P.O. BOX 19656, IRVINE, CA 92623-9656
Telephone: (949) 260-6000
Fax: (949) 260-6465

(Items are checked if applicable.)                    DATE: January 21, 2005

BORROWER(S): GRACE FARRELLY

PROPERTY ADDRESS: ███ ██ ████ ██ ████

TYPE OF MORTGAGE:
[x] Fixed Rate        [ ] Adjustable
[ ] Purchase          [x] Refinance

We are pleased to advise you that your application for a mortgage loan on the above-captioned property has been approved subject to the following terms and conditions:

1. **LOAN AMOUNT:** $ 150,000.00                **TERM:** 30   years

   [ ] Your loan has a balloon payment.

2. **INTEREST RATE:** 6.850          (If this is an adjustable rate mortgage, this is your initial interest rate.)

   **ADJUSTABLE RATE MORTGAGES ONLY:**
   Initial Adjustment period:          Initial Adj Cap:        %
   Subsequent Adjustment              Subsequent Adj Cap:        %          lifetime
   period:
   Negative Amortization: [ ] Yes  [ ] No
   Margin:
   Index:
   Index Source:

3a. **ORIGINATION FEE:** The origination fee is $ 599.00          (        0.399 % of the loan amount).

3b. **DISCOUNT POINTS:** The discount points are $ 0.00          (        0.00 % of the loan amount).

4. **TOTAL POINTS:**          0.399 %. These points are to be paid by Borrower at closing.

5. **COMMITMENT FEE:** The commitment fee is $ 0.00          (        0.00 % of the loan amount). This fee [ ] Is [x] is not included in the Origination Fee or Discount Points or the Total Points stated above.

VMP -1082(NY) (0305).01          7/99
VMP Mortgage Solutions (800)521-7291
Page 1 of 5          Initials: _____

# NEW YORK INTEREST RATE LOCK COMMITMENT

Company Name: BNC MORTGAGE, INC., A DELAWARE CORPORATION
Company Address: P.O. BOX 19656, IRVINE, CA 92623-9656
Telephone: (949)260-6000
Fax: (949) 260-6465

6. **MONTHLY PAYMENT OF PRINCIPAL AND INTEREST:** The monthly payment of principal and interest is $ 982.89    (If this is an adjustable rate mortgage, this is your initial monthly payment of principal and interest.)

7. **EXPIRATION DATE:**

The above rate and points are guaranteed until **February 03, 2005**    which is the expiration date of this commitment. If your loan does not close by this date, we have no obligation to honor the terms of this agreement.

[x] If this loan is for the refinance of the mortgage on your primary residence, you will not receive the loan proceeds on the date of your closing. Therefore, your loan must close at least (3) three business days prior to the expiration date stated above or the lender has no obligation to honor the terms of this agreement and this may result in a higher rate or more points being charged on your loan.

8. **MORTGAGE BROKER FEE:**

As compensation for its services, your Mortgage Broker will be paid as checked below:

[ ] We will pay your mortgage broker a fee of _____ % of the loan amount or $_____ . The compensation your mortgage broker will receive from us for its services is included in the rate, points, fees and terms of the loan as quoted by us in this commitment. The maximum points paid, including any premium pricing payable by us to your mortgage broker shall not exceed _____ ( _____ ) points. The basis for the premium pricing payment, if any, is

[x] You will pay your mortgage broker, upon your signed acceptance of this commitment _____ 1.183% of the loan amount or [ ] or at closing [x] , a fee of $1,775.00

[ ] Your mortgage broker [ ] is [ ] may be eligible to receive a lender-paid bonus (cash or non-cash). The basis for such lender-paid bonus, if any, is
See Attachment "A," Mortgage Broker Fee Disclosure, fully incorporated herein.
[ ] This bonus consists of

[ ] You will be notified if this occurs.

Initials: _____

VMP -1082(NY)-(0305)01    Page 2 of 5

FOIL 100693  000365

# NEW YORK INTEREST RATE LOCK COMMITMENT

Company Name: BNC MORTGAGE, INC., A DELAWARE CORPORATION
Company Address: P.O. BOX 19656, IRVINE, CA 92623-9656
Telephone: (949)260-6000
Fax: (949) 260-6465

9.   **MORTGAGE BROKER FEE ACKNOWLEDGMENT:**

You acknowledge that a mortgage broker fee will be paid to your mortgage broker. You further acknowledge that there is no other mortgage broker fee agreement between you and your mortgage broker.

10.   **HAZARD INSURANCE:** Prior to closing, you shall furnish this office with an original hazard insurance policy or a binder agreement satisfactory to us. Hazard Insurance coverage must be for $150,000.00        or contain a "Guaranteed Home Replacement Cost Endorsement," whichever is lower. We cannot require you to obtain a policy which exceeds the guaranteed replacement cost of the improvements securing the loan.

11.   **FLOOD INSURANCE:**

☐   Flood insurance will be required as a condition of this loan.

12.   **PRIVATE MORTGAGE INSURANCE ("PMI"):** PMI ☐ is ☒ is not required as a condition of making this loan.

If private mortgage insurance is required as a condition of making this loan, you may terminate this insurance when the unpaid principal amount of the real estate loan represents 75% or less of the real estate's appraised value at the time the loan was made. However, if your mortgage is on a single family dwelling that is your primary residence, then your loan may be eligible under federal law for earlier termination. A checkmark in the box below denotes whether your loan insurance may be terminated sooner. If so, you will be provided prior to closing with additional information explaining how the federal law may affect your mortgage insurance.

☐   Your loan insurance may be terminated sooner under federal law.

13.   **REAL ESTATE TAX AND HAZARD INSURANCE ESCROWS:**

☐   At closing, an escrow impound account will be established and an initial escrow deposit will be required in accordance with RESPA.

14.   **ASSUMPTION:** Someone buying your house:

☒ MAY NOT ASSUME YOUR LOAN.
☐ MAY ASSUME YOUR LOAN UNDER THE FOLLOWING CONDITIONS:

VMP -1082(NY) (0305).01                    Page 3 of 5                                    Initials: _____

FOIL 100693  000366

# NEW YORK INTEREST RATE LOCK COMMITMENT

Company Name: BNC MORTGAGE, INC., A DELAWARE CORPORATION
Company Address: P.O. BOX 19656, IRVINE, CA 92623-9656
Telephone: (949) 260-6000
Fax: (949) 260-6465

15.   NO ORAL MODIFICATION: This agreement cannot be changed orally.

16.   REFUNDABILITY: N/A

Your Commitment Fee and/or points are non-refundable, except for the following conditions:

A)   If this commitment is conditioned on the approval of a third-party investor or mortgage insurance company and that party rejects the loan.

B)   If this commitment is conditioned upon the property appraisal report and said report is not favorable for the loan for which the commitment was issued.

C)   If this commitment is conditioned upon an initial credit report and said report is not favorable for the loan for which the commitment was issued.

17.   DOCUMENTATION:

The following is a list of information and conditions that we may require you to produce and/or satisfy prior to closing your loan:

[x]   Title report and insurance, property survey, copy of Certificate of Occupancy for use, satisfactory final inspection (if new construction), evidence of appropriate hazard insurance, evidence of flood insurance as appropriate, master policy insurance certificate (if applicable in the case of condominiums), termite inspection report, radon test, well water test report and septic inspection report.

[ ]   Proprietary lease, recognition agreement, pledge of shares of stock, warranty and representation that no outstanding claims against the proprietary lease or stock will exist at closing and a copy of certificate of occupancy and title policy for the entire building if conversion has occurred within the last six (6) months.

18.   OTHER CONDITIONS:
See Final Conditional Loan Approval for Underwriting Conditions.

VMP -1082(NY) (0305).01

Page 4 of 5

Initials: _____

FOIL 100693  000367

# NEW YORK INTEREST RATE LOCK COMMITMENT

Company Name: BNC MORTGAGE, INC., A DELAWARE CORPORATION
Company Address. P.O. BOX 19656, IRVINE, CA 92623-9656
Telephone: (949)260-6000
Fax: (949) 260-6465

19. **PREPAYMENT PENALTY:**
This mortgage contains a prepayment penalty. The amount of, or the formula for calculating, the prepayment penalty is **See Prepayment Penalty Disclosure for formula.**

20. **ACCEPTANCE OF COMMITMENT:**

Please indicate your acceptance of this Commitment by signing it and returning it to us with the Commitment Fee of $ 0.00                    by          **January 28, 2005**
                                                                                                          (date)

BNC MORTGAGE, INC., A DELAWARE CORPORATION

BY: _____     · DATE: January 21, 2005 _____
                    (Lender's Signature)

Its: _____

If you sign this commitment, and you do not close this loan in accordance with the described terms, you may lose some or all of the fees or charges you have paid.

I/We hereby accept this Commitment and all conditions set forth therein and agree to proceed with the closing of the loan. I/We have received a duplicate original of this document.

_____     Date        _____     Date
Borrower GRACE FARRELLY                            Borrower

_____     Date        _____     Date
Borrower                                           Borrower

_____     Date        _____     Date
Borrower                                           Borrower

_____     Date        _____     Date
Borrower                                           Borrower

VMP -1082(NY) (0305).01                    Page 5 of 5

BORROWER(S):  GRACE FARRELLY

PROPERTY ADDRESS: ████████████████

# OCCUPANCY AFFIDAVIT
(Applicable only if box contains an "x")

[X] In order to induce  BNC MORTGAGE, INC., A DELAWARE CORPORATION

("Lender") to make the loan secured by the Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Occupancy Statement, Borrower has represented to Lender that the Property (as defined in the Security Instrument) will be occupied by Borrower within 60 days following recordation of the Security Instrument and during the 12-month period immediately following recordation of the Security Instrument as Borrower's primary residence. Borrower acknowledges (a) that Lender would not have agreed to make the loan evidenced by the Note (as defined in the Security Instrument) or notes secured by the Security Instrument if the Property were not to be owner-occupied, and (b) that the interest rate set forth in the Note and other terms of the loan were determined as a result of Borrower's representation that the Property would be owner-occupied. Borrower further acknowledges that, among other things (i) purchasers of loans (including agencies, associations and corporations created by the federal and state governments for the purchase of loans) typically require that properties securing loans acquired by such purchasers be owner-occupied, and will reject for purchase loans for which security properties are not owner-occupied, (ii) Lender's ability to sell a loan or an interest in a loan (which it often does in the ordinary course of business) will thereby be impaired where a security property is not owner occupied, (iii) the risks involved and the costs of holding and administering a loan on the security of non-owner occupied property, Lender typically makes such a loan on terms different from those of loans secured by owner-occupied properties. Accordingly, in the event that (a) within 60 days following recordation of the Security Instrument the Property is not occupied by Borrower as Borrower's primary residence, or (b) Borrower does not continuously live in the Property for at least 12 months immediately following recordation of the Security Instrument, Lender may declare all sums secured by the Security Instrument to be immediately due and payable. The rights of Lender hereunder shall be in addition to any rights of Lender under the Security Instrument or allowed by law.

# COMPLIANCE AGREEMENT

The undersigned borrower(s) for and in consideration of the above referenced Lender this date agrees, if requested by Lender or Closing Agent for Lender, to fully cooperate and adjust for clerical errors, any or all loan closing documentation if deemed necessary or desirable in the reasonable discretion of Lender to enable Lender to sell, convey, or market said loan to any entity, including but not limited to an investor, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Federal Housing Authority or the Veterans Administration.

The undersigned borrower(s) do hereby so agree and covenant in order to assure that the loan documentation executed this date will conform and be acceptable in the market place in the instance of transfer, sale or conveyance by Lender or its interest in and to said loan documentation.

# FEDERAL EQUAL CREDIT OPPORTUNITY ACT NOTICE

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, handicap, familial status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

The Federal Agency that administers compliance with this law concerning this creditor is:

Office of Thrift Supervision
New Jersey Regional Office
Harborside Financial Center Plaza Five Suite 1600
Jersey City, New Jersey 07311

Acknowledged and agreed.

_____   Date _____
(Signature of Borrower)
GRACE FARRELLY

_____   Date _____
(Signature of Borrower)

_____   Date _____
(Signature of Borrower)

_____   Date _____
(Signature of Borrower)

_____   Date _____
(Signature of Borrower)

_____   Date _____
(Signature of Borrower) 100693   000369

Loan No. ▮▮▮▮▮▮

## SIGNATURE AFFIDAVIT AND AKA STATEMENT

### SIGNATURE STATEMENT

I, **GRACE FARRELLY** _____

certify that this is my true and correct signature

**GRACE FARRELLY** _____       Sample Signature _____

Borrower

### AKA STATEMENT

I  **GRACE FARRELLY** _____   further certify that I am also known as:

Name Variation (Print) _____       Sample Signature (Variation) _____

Name Variation (Print) _____       Sample Signature (Variation) _____

Name Variation (Print) _____       Sample Signature (Variation) _____

Name Variation (Print) _____       Sample Signature (Variation) _____

Name Variation (Print) _____       Sample Signature (Variation) _____

State of   NEW YORK
County of  ORANGE

On _____ , before me,
_____ personally appeared **GRACE FARRELLY**

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

## COMMITMENT EXPIRATION NOTICE

| Borrower Name(s):<br>GRACE FARRELLY | Lender:<br>BNC MORTGAGE, INC., A DELAWARE CORPORATION<br>P.O. BOX 19656, IRVINE, CA 92623-9656 |
|---|---|
| Property Address: ▓▓▓▓ ▓▓▓ ▓ ▓▓ | Loan Number: ▓▓▓▓ |
| | Date:<br>January 21, 2005 |

☐ Your Interest Rate Commitment/Lock-In Period is scheduled to expire on

☒ Your Loan Commitment is scheduled to expire on 02/12/2005

Please contact FINANCE ONE LTD
at (631) 864-2381          Immediately to discuss the conditions precedent to the closing of your loan.

BNC MORTGAGE, INC., A DELAWARE CORPORATION

FINANCE ONE LTD

1084(NY) (9807)          VMP MORTGAGE FORMS - (800)521-7291          7/99

# TAX ESCROW ACCOUNT DESIGNATION OF
# MORTGAGE INVESTING INSTITUTION
# TO RECEIVE TAX BILLS
### (Real Property Tax Law, Sec. 954)

I DESIGNATE THE BANK OR OTHER MORTGAGE INVESTING INSTITUTION LISTED BELOW, ITS AGENTS, SUCCESSORS AND ASSIGNS TO RECEIVE ALL TAX BILLS FOR MY REAL PROPERTY (DESCRIBED BELOW) FOR SO LONG AS THE REAL PROPERTY TAX ESCROW ACCOUNT NOW BEING ESTABLISHED SHALL REMAIN IN EFFECT.

DATE _January 21, 2005_

(1) _GRACE FARRELLY_
          NAME(S)

(2) ████████  ADDRESS OF PROPERTY SUBJECT TO TAX ESCROW ACCOUNT

(3) ████  CITY/TOWN    (4) ██ STATE & ZIP CODE    (5) ████ COUNTY

(6) _____ PROPERTY IDENTIFICATION (AS SHOWN ON TAX BILL OR TAX ROLL)

(7) _____ OWNER'S MAILING ADDRESS (IF DIFFERENT FROM #2, ABOVE)

                                        January 21, 2005
(8) _____ SIGNATURE(S)              (9) DATE

(1) _OPTION ONE MORTGAGE CORPORATION_
          MORTGAGE INVESTING INSTITUTION

(2) _____ TAX SERVICE ORGANIZATION (IF ANY)

(3) _____ MAILING ADDRESS

(4) _____ POST OFFICE   (5) STATE   (6) ZIP CODE

### INSTRUCTIONS
A LEGIBLE, PRINTED OR TYPEWRITTEN ENTRY MUST BE MADE IN EACH BLANK EXCEPT AS INDICATED IN #7.

BY COMPLETING AND SIGNING THIS FORM, AN OWNER OF REAL PROPERTY DESIGNATES A MORTGAGE INVESTING INSTITUTION (MOST COMMONLY A BANK) TO RECEIVE ALL TAX BILLS RELATIVE TO THE REAL PROPERTY WHICH IS SUBJECT TO THE MORTGAGE.

THE MORTGAGE INVESTING INSTITUTION THEN ASSUMES THE RESPONSIBILITY FOR PAYMENT OF REAL PROPERTY TAXES LEVIED ON THE REAL PROPERTY SUBJECT TO THE MORTGAGE ESCROW ACCOUNT.

RP-954 (1/95)

(Approved by the State Board of Real Property Services for use in 2003.)

 -965(NY) (0711).01    VMP Mortgage Solutions (800)521-7291    1/03

Loan No.: ███████

## SMOKE ALARM AFFIDAVIT

STATE OF NEW YORK
COUNTY OF ORANGE                    ss:

being duly sworn, deposes and says:

1.  I am one of the owners of a one or two family residence located at:

    ████████    ████████   ██   ████████

2.  My attention has been called to Section 378 subsection 5 of the Executive Law of the State of New York requiring such dwelling to have installed an operable single station smoke detecting alarm device or devices.

3.  This Affidavit is given in compliance with said subsection knowing that the Lender will rely thereon.

_____     Signature
GRACE FARRELLY

_____     Signature

_____     Signature

_____     Signature

Sworn to before me this          day of

_____     Notary Public

Ⓥ-998(NY) (9708).02          VMP Mortgage Solutions (800)521-7291          8/97

Lender: BNC MORTGAGE, INC., A DELAWARE
CORPORATION

Application No.: ▓▓▓▓▓▓

Applicant: GRACE FARRELLY

## CONSUMER REPORTING DISCLOSURE

In connection with your application for credit, BNC Mortgage, Inc. may request a consumer report which contains information on your credit worthiness, credit standing, personal characteristics and general reputation. If we grant you credit, we (or our loan servicer, or subsequent assignees) may order additional consumer reports in connection with any update, renewal or extension of the credit. If you ask us, we will tell you whether we obtained a consumer report and, if we did, we will tell you the name and address of the consumer reporting agency that gave us the report.

### Acknowledgement:

I/We, the undersigned hereby acknowledge receipt of this Consumer Reporting Disclosure.

_____ Date_____    _____ Date_____
GRACE FARRELLY


_____ Date_____    _____ Date_____


_____ Date_____    _____ Date_____


_____ Date_____    _____ Date_____

NYCRD

FOIL 100693  000374

# REAL PROPERTY INSURANCE ESCROW ACCOUNT DISCLOSURE

| Borrower(s): | Lender: |
|---|---|
| GRACE FARRELLY | BNC MORTGAGE, INC.<br>P.O. BOX 19656, IRVINE, CA 92623-9656 |

Property Address: ███████████  ████████

Loan Number: ████████

The Lender is obligated to make all payments for real property insurance for which the real property insurance escrow is maintained. If any such payments are not timely, the Lender is responsible for making such payments including any penalties and interest and shall be liable for all damages to the mortgagor resulting from its failure to make timely payment.

In the event that a real property insurance premium notice is sent directly to the mortgagor by the insurer, the mortgagor shall have the obligation to promptly transmit such premium notice to the Lender, or Lender's agent as may be designated in writing by the Lender, for payment. Failure to do so may jeopardize the mortgagor's insurance coverage and may excuse the Lender from liability for failure to timely make such real property insurance payments.

The mortgagor is obligated to pay one-twelfth of the real property insurance premiums each month to the Lender for deposit into the real property insurance escrow account, unless there is a deficiency or surplus in the account, in which case a greater or lesser amount may be required.

The Lender must deposit the escrow payments made by the mortgagor in a banking institution or licensed branch of a foreign banking corporation whose deposits are insured by a federal agency.

I/We have read the above disclosure and acknowledge receiving a copy.

| | | |
|---|---|---|
| Borrower GRACE FARRELLY _____ Date | Borrower _____ Date |
| Borrower _____ Date | Borrower _____ Date |
| Borrower _____ Date | Borrower _____ Date |
| Borrower _____ Date | Borrower _____ Date |

New York Banking Law, Section 6-k(2)(f)                    VMP Mortgage Solutions (800)521-7291                    7/03

VMP®-1044(NY) (0307)

FOIL 100693   000375

# NEW YORK
## INSURANCE DISCLOSURE

Loan Number
███████

Borrower
GRACE FARRELLY

Property Address
████████████   █████

Under NY Code of Rules and Regs Section 38.9 the lender is required to advise you of the following at the time of commitment:

1. hazard insurance is required if the loan is approved;
2. replacement cost is the maximum coverage the lender can require.

At the time of title closing, the lender shall accept a binder, issued by an insurer, or an authorized representative of an insurer, as evidence of hazard insurance for the mortgaged property.

Your acknowledgment below signifies that written notice was provided to you pursuant to the state statute.

_____  Date        _____  Date
GRACE FARRELLY

_____  Date        _____  Date

_____  Date        _____  Date

_____  Date        _____  Date

4/02

-1039(NY) (0204)          VMP MORTGAGE FORMS - (800)521-7291

C

Aurora • Loan Services
P.O. Box 1706 • Scottsbluff, NE 69363-1706
www.myAuroraLoan.com

February 18, 2011

55417 004183                    CL700
Grace Farrelly
3295 State Route 52
Pine Bush NY 12566-5419

RE:  Loan No.:         0114941271
     Due Date:         01-01-11
     Property Address:  3295 Rt 52
                        Pine Bush NY 12566

Dear Customer(s):

The above-referenced loan is in default. You have the right to cure
this default. To cure this default, you must remit $ 2005.10
within thirty (30) days of the date of this letter to:

Overnight Delivery Services    or    U.S. Postal Delivery Services
Aurora Loan Services                 Aurora Loan Services
Attn: Cashiering Dept                Attn: Cashiering Dept
10350 Park Meadows Drive             PO Box 5180
Littleton CO 80124                   Denver CO  80217-5180

Any payments, charges, or other fees that become due during this
thirty (30) day time period must be included with the amount provided
above. Only certified funds, money orders, cashier checks or
Western Union funds will be accepted. NO PERSONAL CHECKS WILL BE
ACCEPTED.

If you do not bring your loan current within thirty (30) days of the
date of this letter, Aurora Loan Services may demand the entire balance
outstanding under the terms of your Mortgage/Deed of Trust. This
amount includes, but is not limited to, the principal, interest and all
other outstanding fees and costs. You may be obligated to pay for
reasonable costs of collection, including but not limited to attorneys
fees. Aurora Loan Services may start legal action to foreclose on
the Mortgage/Deed of Trust which may result in the loss of your home
and the sale of the property. Once legal action has begun you may
incur additional attorney fees.

You have the right to bring your loan current after legal action has
begun. You are hereby informed that you have the right to "cure" or
reinstate the loan after acceleration and the right to bring a court
action to assert the non-existence of a default or any other defense
you may have to acceleration and sale. Also, we are required by Section
6050J of the Tax Reform Act of 1984 to report to the IRS information in
connection with abandonment, foreclosure and acquisition of the mortgaged
property.

If arrangements to reinstate your loan were made before you received
this notice, and you fulfill your obligations under those arrangements,
the actions noted in this letter will not be taken (excluding required
property inspections). If you do not fulfill your obligations under
those arrangements, this notice will remain in force.

If you have any questions, please contact one of our Foreclosure
Prevention Specialists at the address above or by calling 800-550-0509.

*2 of these*
*2 more of these*
*next day -*
*&*
*2 more of the same*

P.O. Box 1706 • Scottsbluff, NE 69363-1706
www.myAuroraLoan.com

55080 0000025 001
GRACE FARRELLY
3295 STATE ROUTE 52
PINE BUSH NY 12566-5419

February 8, 2011

RE: Loan Number: 0114941271

## YOU COULD LOSE YOUR HOME
## PLEASE READ THE FOLLOWING NOTICE CAREFULLY

As of 02/08/2011, your home loan is 38 days in default. Under New York State law, we are required to send you this notice to inform you that you are at risk of losing your home. You can cure this default by making the payment of $2968.33 by 03/10/2011.

If you are experiencing financial difficulty, you should know that there are several options available to you that may help you keep your home. Attached to this notice is a list of government approved housing counseling agencies in your area which provide free or very low-cost counseling. You should consider contacting one of these agencies immediately. These agencies specialize in helping homeowners who are facing financial difficulty. Housing counselors can help you assess your financial condition and work with us to explore the possibility of modifying your loan, establishing an easier payment plan for you, or even working out a period of loan forbearance. If you wish, you may also contact us directly at 1-866-521-3828 and ask to discuss possible options.

While we cannot assure that a mutually agreeable resolution is possible, we encourage you to take immediate steps to try to achieve a resolution. The longer you wait, the fewer options you may have.

If this matter is not resolved within ninety (90) days from the date this notice was mailed, we may commence legal action against you (or sooner if you cease to live in the dwelling as your primary residence). If you need further information, please call the New York State Banking Department's toll-free helpline at 1-877-BANK-NYS (1-877-226-5697) or visit the Department's website at http://www.banking.state.ny.us.

Sincerely,

Foreclosure Prevention
Aurora Loan Services

Enclosure: Counseling Agency List Form No. 704-3204-1008

Aurora Loan Services is a debt collector. Aurora Loan Services is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

# D



2407

SCOTT J. SALIMANDO
ESCROW CLOSING ACCOUNT
199 E. MAIN ST.
SMITHTOWN, NY 11787

50-791/214

DATE 1/27/05

PAY
TO THE
ORDER OF  Commercial Resources                    $ 30,000

Thirty Thousand                                    DOLLARS

North Fork Bank
www.northforkbank.com

FOR  Freely

⑈002407⑈ ⑈02140791⑈2⑈              ⑈000 3000000⑈

Branch   Serial 2407   TR 0214-0791   Account▮▮▮   TranCode 82   Amount 30000.00   Sequence▮▮▮   DbCr D   InstID 3
Date 01-31-2005

# E



F



2406

SCOTT J. SALIMANDO
ESCROW CLOSING ACCOUNT
199 E. MAIN ST.
SMITHTOWN, NY  11787

50021631  07  012805

50-791/214

DATE 1/27/05

PAY TO THE ORDER OF _____ Commercial Equitor Ltd. _____ | $ 30,000

_____ Thirty thousand _____ DOLLARS

**North Fork** Bank
www.northforkbank.com

FOR _____ Finely _____

⑊002406⑊ ⑊021407912⑊    ⑊000300000⑊

Branch   Serial 2406   TR 0214-0791   Account ▮▮▮▮   TranCode 82   Amount 30000.00   Sequence ▮▮▮▮   DbCr D   InstID 3
Date 01-31-2005

# G

404

**SCOTT J. SALIMANDO**
ESCROW CLOSING ACCOUNT
199 E. MAIN ST.
SMITHTOWN, NY 11787

DATE 1/26/05

PAY TO THE ORDER OF _Chase USA Platinum Visa_ | $ 1069.00

One Thousand Sixty nine ___ DOLLARS

**North Fork** Bank

FOR Acc #

⑆002404⑆ ⑉0214079120⑈

Branch    Serial 2404    TR 0214-0791    Accoun[ ]    TranCode 82 · Amount 1069.00    Sequence [ ]    DbCr D    InstID 3
Date 02-03-2005

# H



2393

**SCOTT J. SALIMANDO**
ESCROW CLOSING ACCOUNT
199 E. MAIN ST.
SMITHTOWN, NY. 11787

DATE 1/27/05

PAY TO THE ORDER OF ____Finance One____ $ 15,256 76/100

____fifteen thousand two hundred fifty six P 76/100____ DOLLARS

**North Fork** Bank
www.northforkbank.com

FOR ____Farrotes____

⑆00 2393⑆ ⑆02140791⑆ 000 15 256 76⑆

Branch 39   Serial 2393   TR 0214-0791   Account ▮▮▮   TranCode 82   Amount 15256.76   Sequence ▮▮▮   DbCr.D   InstID 3
Date 02-02-2005

I

HUD-1 UNIFORM SETTLEMENT STATEMENT

OMB Approval No. 2502-0265

SETTLEMENT STATEMENT

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| | | 6. File Number: | 7. Loan Number: |
|---|---|---|---|
| 1. FHA | 2. FmHA | | |
| 3. X Conv. Unins. | 4. VA | 5. Conv. Ins. | 8. Mortgage Insurance Case Number: |

NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" are paid outside the closing; they are shown here for informational purposes and are not included in the totals.

NOTE: TIN = Taxpayer's Identification Number

D. NAME AND ADDRESS OF BORROWER:
ACE FARRELLY
K/A GRACE GLORIA CLARK

E. NAME, ADDRESS AND TIN OF SELLER:

F. NAME AND ADDRESS OF LENDER:
BNC MORTGAGE, INC.
1901 MAIN STREET
IRVINE, CA
92614

PROPERTY LOCATION:

H. SETTLEMENT AGENT NAME, ADDRESS AND TIN
SCOTT J. SALIMANDO
74 CARLETON AVE., EAST ISLIP, NY 11730

PLACE OF SETTLEMENT
74 CARLETON AVENUE
EAST ISLIP, NY 11730

I. SETTLEMENT DATE
01/21/2005

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 6,057.24 | 403. | |
| 104. CHASE N.A. | 1,069.00 | 404. | |
| 105. R.E. TAX DUE 1/1/05 TO GATEWAY | 1,232.00 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 8,358.24 | 420. GROSS AMOUNT DUE TO SELLER | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | | 501. Excess deposit | |
| 202. Principal amount of new loan(s) | 150,000.00 | 502. Settlement charges to seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 150,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT FROM/TO SELLER | |
| 301. Gross amount due from borrower (Line 120) | 8,358.24 | 601. Gross amount due to seller (Line 420) | |
| 302. Less amount paid by/for borrower (Line 220) | 150,000.00 | 602. Less reduction in amount due seller (Line 520) | |
| 303. CASH TO BORROWER | 141,641.76 | 603. CASH TO SELLER | |

SELLER'S STATEMENT

Information contained in Blocks E, G, H, I and on line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service (see Seller Certification). If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. You are required to provide the Settlement Agent with your correct taxpayer identification number. If you do not provide the Settlement Agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

(Seller's Signature)                                   (Seller's Signature)

**L. SETTLEMENT CHARGES**

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| TOTAL SALES/BROKER'S COMMISSION based on price $ @ | | |
| Division of Commission (line 700) as follows: | | |
| $ | | |
| $ | | |
| Commission paid at Settlement | | |
| **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| Loan Origination Fee 0.399% $ BNC MORTGAGE, INC. | 599.00 | |
| Loan Discount $ | 275.00 | |
| Appraisal Fee to R. SWIFT | | |
| Credit report to | | |
| Lender's Inspection Fee | 1,500.00 | |
| MTGE. BROKER FEE TO FINANCE ONE, LTD | 70.00 | |
| TAX SERVICE FEE TO BNC MORTGAGE, INC. | 17.00 | |
| FLOOD CERTIFICATION TO BNC MORTGAGE, INC. | | |
| | | |
| | | |
| **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| Interest from 01/26/2005-02/01/2005 @ $28.540 per day | 171.24 | |
| Mortgage Insurance Premium for | | |
| Hazard Insurance Premium for | | |
| | | |
| **8. RESERVES DEPOSITED WITH LENDER** | | |
| 1. Hazard Insurance | | |
| 2. Mortgage Insurance | | |
| 3. City Property Taxes | | |
| 4. County Property Taxes | | |
| 5. Annual assessments | | |
| 6. | | |
| 7. | | |
| 8. Aggregate Accounting Adjustment | | |
| **0. TITLE CHARGES** | | |
| 1. Settlement or closing fee to SCOTT J. SALIMANDO, ESQ. | 750.00 | |
| 2. Abstract or title search to GATEWAY TITLE & ABSTRACT, INC. | 625.00 | |
| 3. Title Examination to WALLY DUVAL | 175.00 | |
| 4. Title insurance binder to | | |
| 5. Document preparation to | | |
| 6. Notary fees to | | |
| 7. Attorney's fees to | | |
| (includes line numbers: | 836.00 | |
| 8. Title Insurance to GATEWAY TITLE & ABSTRACT, INC. | | |
| (includes line numbers: | | |
| 9. Lender's coverage $ 150000.00 | | |
| 10. Owner's coverage $ 0.00 | | |
| 1. ENDORSEMENTS: B.1, WOA, RES., SURVEY TO GATEWAY TITLE & ABSTRACT | 159.00 | |
| 2. | | |
| 3. | | |
| **0. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1. Recording fees: Deed $ Mortgage $ 155.00 Release $ | 155.00 | |
| 2. City/county tax/stamps: Deed $ Mortgage $ 725.00 | 725.00 | |
| 3. State tax/stamps: Deed $ Mortgage $ | | |
| NYS LENDERS MTG TAX ($375.00) POC BY BNC MORTGAGE, INC. | | |
| **0. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1. Survey to | | |
| 2. Pest inspection to | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| **0. TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | 6,057.24 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I received a copy of the HUD-1 Settlement Statement.

_____    Borrower    GRACE FARRELLY
Seller

_____    Borrower    F/K/A GRACE GLORIA CLARK
Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds disbursed or to be disbursed by the undersigned as part of the settlement of this transaction.

_____    _____    01/21/2005
Settlement Agent    SCOTT SALIMANDO, ESQ.    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and

J

Lender: BNC MORTGAGE, INC., A DELAWARE CORPORATION

Applicant(s): GRACE FARRELLY

Application No.: █████████

## NOTICE OF BROKER COMPENSATION

**BROKER COMPENSATION PAID BY THE LENDER:**

Your application for a residential mortgage loan has been submitted to BNC Mortgage, Inc. ("Lender") by FINANCE ONE LTD _____, a mortgage broker.("Broker"), that you have hired to help you find a mortgage loan.

Based upon your Broker's instructions to Lender, and in the event that Lender funds your mortgage loan, a portion of your Broker's compensation as further outlined in the Mortgage Broker Fee Disclosure previously provided to you for your review and signature, will be paid by Lender directly to your Broker, in the amount of $0.00 _____

**BROKER COMPENSATION PAID BY THE APPLICANT(S):**

In addition, based upon the Fee Agreement between the Broker and you, the applicant(s), the following fees and/or points are designated to be paid by you directly to the Broker:

|  |  |
|---|---|
| Points | 1,500.00 |
| Processing | 0.00 |
| Appraisal | 275.00 |
| Credit Report | 0.00 |
| Administration | 0.00 |
|  | 0.00 |
|  | 0.00 |
|  | 0.00 |
|  | 1,775.00 |
| Total |  |

**ACKNOWLEDGMENT:**

I/we hereby acknowledge receiving this New York Prepayment Penalty Disclosure.

_____ Date _____        _____ Date _____
GRACE FARRELLY

_____ Date _____        _____ Date _____

_____ Date _____        _____ Date _____

_____ Date _____        _____ Date _____

NYNOBC  Revised 01/08/02

Lender: BNC MORTGAGE, INC., A DELAWARE CORPORATION          DATE: January 21, 2005
P.O. BOX 19656
IRVINE, CA 92623-9656

## GOOD FAITH ESTIMATE

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates -- the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 OR HUD-1A | | PAYABLE TO | AMOUNT OR RANGE |
|---|---|---|---|
| | | BROKER | 275.00 |
| 803 | Appraisal Fee | BROKER | 1,500.00 |
| 808 | Broker Fee* | LENDER | 70.00 |
| 810 | Tax Service Fee* | LENDER | 17.00 |
| 815 | FLOOD CERTIFICATION* | LENDER | 171.24 |
| 901 | Prepaid Interest for 6 days* | LENDER | 900.00 |
| 1101 | Settlement or Closing Fee* | CLOSING AGENT | 150.00 |
| 1108 | Title Insurance | TITLE COMPANY | 70.00 |
| 1201 | Recording Fees | RECORDING OFFICE | -375.00 |
| 1204 | NY Mortgage Tax | NEW YORK STATE | 599.00 |
| 1308 | ORIGINATION FEE* | LENDER | |

_____    Date          _____    Date
Applicant                                 Applicant
GRACE FARRELLY

_____    Date          _____    Date
Applicant                                 Applicant

_____    Date          _____    Date
Applicant                                 Applicant

                                         _____    Date

_____
Authorized Official

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

Applicants' Name and Address:                    Loan Number: HUN002005
GRACE FARRELLY

3295 ROUTE 52                                    Application Number: HUN002005
PINE BUSH, NY 12566

# K



2403

SCOTT J. SALIMANDO
ESCROW CLOSING ACCOUNT
199 E. MAIN ST.
SMITHTOWN, NY  11787

50-791/214

DATE 1/26/05

PAY TO THE ORDER OF  GRACE FARRELLY                    $ 17,000 00

Sunteen Thousand                                        DOLLARS

North Fork Bank
www.northforkbank.com

FOR  FARRELLY

⑈002403⑈  ⑆0214079120⑈            ⑈0001700000⑈

Branch    Serial 2403   TR 0214-0791   Account          TranCode 82   Amount 17000.00   Sequence          DbCr D   InstID 3
Date 01-31-2005

EXHIBIT

FOIL 10069

# L

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| Preliminary ☐ | Final ☒ |

CREDITOR:
BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

BORROWERS: GRACE FARRELLY

DATE: 01/21/2005
LOAN NO.:
Type of Loan: 30    YEAR FIXED

ADDRESS:
CITY/STATE/ZIP: PINE BUSH, NY 12566
PROPERTY:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.055 (e) % | $ 207,096.24 (e) | $ 146,742.76 (e) | $ 353,839.00 (e) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 359 | 8981.82 | 03/01/2005 | | | |
| 1 | 8981.49 | 02/01/2035 | | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☐ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:

ASSUMPTION: Someone buying this property ☒ cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $70.00

PROPERTY INSURANCE: ☐ Property hazard insurance in the amount of $0.00 with a mortgage clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance ☐ is ☒ is not available through the lender at an estimated cost of $0.00 for a year term.

LATE CHARGES: If your payment is more than 15 days late, you will be charged a late charge of 2.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may ☐ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate. All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    BORROWER/DATE          _____    BORROWER/DATE
GRACE FARRELLY

_____    BORROWER/DATE          _____    BORROWER/DATE

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER
## OF SERVICING RIGHTS

Loan Number ███████

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from BNC MORTGAGE, INC

to OPTION ONE MORTGAGE CORPORATION , effective March 1, 2005

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before this effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. In this case, the present servicer and the new servicer have combined all necessary information in this one notice.

Your present servicer is BNC MORTGAGE, INC., A DELAWARE CORPORATION

If you have any questions relating to the transfer of servicing from your present servicer call our servicing department at (800) 587-0371 - between 8:30 a.m. and 5:30 p.m. Pacific Standard Time on the following days: Monday through Friday. This is a toll-free number.

Your new servicer will be OPTION ONE MORTGAGE CORPORATION
The business address for your new servicer is: 3 ADA, IRVINE, CA 92618
The toll-free or collect call telephone number of your new servicer is 1(800)648-9605
If you have any questions relating to the transfer of servicing to your new servicer call OPTION ONE MORTGAGE CORPORATION at 1(800)648-9605 between 7:30 a.m. and 6:00 p.m. on the following days: Monday through Friday.
The date that your present servicer will stop accepting payments from you is March 1, 2005
The date that your new servicer will start accepting payments from you is March 1, 2005

You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. §2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day, excluding legal public holidays (State or Federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

### BORROWER ACKNOWLEDGEMENT

I/We have read this disclosure form, and understand its contents, as evidenced by my/our loan signature(s) below.

Borrower GRACE FARRELLY                     Borrower

Borrower                                     Borrower

Borrower                                     Borrower

* This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. §2605).

## NOTICE OF ASSIGNMENT, SALE OR TRANSFER
### OF SERVICING RIGHTS

Loan Number: ████

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from BNC MORTGAGE, INC

to OPTION ONE MORTGAGE CORPORATION _____, effective March 1, 2005

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before this effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing. In this case, the present servicer and the new servicer have combined all necessary information in this one notice.

Your present servicer is BNC MORTGAGE, INC., A DELAWARE CORPORATION

If you have any questions relating to the transfer of servicing from your present servicer call our servicing department at (800) 587-0371 - between 8:30 a.m. and 5:30 p.m. Pacific Standard Time on the following days: Monday through Friday. This is a toll-free number.

Your new servicer will be OPTION ONE MORTGAGE CORPORATION
The business address for your new servicer is: 3 ADA, IRVINE, CA 92618
The toll-free or collect call telephone number of your new servicer is 1(800)648-9605
If you have any questions relating to the transfer of servicing to your new servicer call OPTION ONE MORTGAGE CORPORATION at 1(800)648-9605 between 7:30 a.m. and 6:00 p.m. on the following days: Monday through Friday.
The date that your present servicer will stop accepting payments from you is March 1, 2005
The date that your new servicer will start accepting payments from you is March 1, 2005

You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. §2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day, excluding legal public holidays (State or Federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

### BORROWER ACKNOWLEDGEMENT

I/We have read this disclosure form, and understand its contents, as evidenced by my/our loan signature(s) below.

Borrower GRACE FARRELLY _____      Borrower _____

Borrower _____      Borrower _____

Borrower _____      Borrower _____

* This notification is a requirement of Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. §2605).

BNC MORTGAGE, INC., A DELAWARE
CORPORATION

## LOAN SERVICING DISCLOSURE STATEMENT

NOTICE TO MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. READ THIS STATEMENT AND SIGN IT ONLY IF YOU UNDERSTAND ITS CONTENTS.

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. § 2601 et seq.) you have certain rights under that federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

### Transfer Practices and Requirements

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15-day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you under certain limited circumstances, when your servicer is changed abruptly. This exception applies only if your servicer is fired for cause, is in bankruptcy proceedings, or is involved in a conservatorship or receivership initiated by a federal agency.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, the name, address, and toll-free or collect-call telephone number of the new servicer, and toll-free or collect-call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions about the transfer of servicing. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

### Complaint Resolution

Section 6 of RESPA (12 U.S.C. § 2605) gives you certain consumer rights, whether or not your loan servicing is transferred. If you send a "qualified written request" to your loan servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day, excluding public holidays (state or federal), Saturday and Sunday.

### Damages and Costs

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that section.

### Servicing Transfer Estimated by Lender

1. The following is the best estimate of what will happen to the servicing of your mortgage loan: We may assign, sell or transfer the servicing of your loan some time while the loan is outstanding.

2. For all the mortgage loans that we make in the 12-month period after your mortgage is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is between  76 - 100 %
This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. This is our record of transferring the servicing of the mortgage loans we have made in the past:

YEAR PERCENTAGE OF LOANS TRANSFERRED (Rounded to nearest quartile - 0 %, 25 %, 50 %, 75 % or 100 %)

| Year | Percentage |
|------|-----------|
| 2002 | 100.00% |
| 2003 | 100.00% |
| 2004 | 100.00% |

BNC MORTGAGE, INC.                         January 21, 2005
Lender's Authorized Representative          Date

## ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below.

Applicant _____ Date _____    Applicant _____ Date _____
GRACE FARRELLY

Applicant _____ Date _____    Applicant _____ Date _____

NOTICE OF ENTRY

PLEASE take notice that the within is a *(certified)*
true copy of a
duly entered in the office of the clerk of the within
named court on

Dated,

Yours, etc.

To

Attorney(s) for

OF COUNSEL TO
LEGAL SERVICES OF THE HUDSON
*Attorney for Plaintiff*

*Office and Post Office Address*
147 UNION STREET, #101
POUGHKEEPSIE, NEW YORK 12601

NOTICE OF SETTLEMENT

PLEASE take notice that an order
of which the within is a true copy will be presented
for settlement to
One of the judges of the within named Court, at
On
at
Dated,   M.

Yours, etc.
OF COUNSEL TO
LEGAL SERVICES OF THE HUDSON VALLEY
*Attorney for*

*Office and Post Office Address*
147 UNION STREET, #101
POUGHKEEPSIE, NEW YORK 12601

To

Attorney(s) for

FILED
MAR 2 5 2011
NINA POSTUPACK
ULSTER COUNTY CLERK

---

Index No. 11-1309   Year 2011

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ULSTER

GRACE FARRELLY,

Plaintiff,

-against-

ROBERT HENNESSY, KIM BASHER,
SCOTT SALIMANDO, DAVID FAULK,
BNC MORTGAGE, INC., and
AURORA LOAN SERVICES,
Defendants.

VERIFIED COMPLAINT

Signature (Rule 130-1.1a)

Print name beneath   MARIAN S. HENRY

Marian S. Henry, Esq., OF COUNSEL TO
LEGAL SERVICES OF THE HUDSON VALLEY
*Attorney for Defendant Robert Perry Gilson*

*Office and Post Office Address, Telephone*
147 UNION STREET, #101
POUGHKEEPSIE, NEW YORK 12601
TEL (845) 471-0058 ext. 112
FAX (845) 471-0244

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated
Attorney(s) for