Robert N. Michaelson                                   Hearing Date: February 22, 2012
The Michaelson Law Firm                                Hearing Time: 10:00 a.m.
11 Broadway, Suite 615                                 Response Deadline: February 14, 2012
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

*Attorneys for Brian W. Monahan*

**UNITED STATES BANKRUPTCY COURT
SOUNTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re                                                  Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,               Case No. 08-13555 (JMP)

                        Debtors.                       (Jointly Administered)

-----------------------------------------------------------------X

**SUPPLEMENTAL RESPONSE OF BRIAN W. MONAHAN TO DEBTOR'S OMNIBUS REPLY TO DEBTORS' RESPONSE TO ONE HUNDRED AND EIGHTEENTH AND ONE HUNDRED EIGHTY FIFTH OMNIBUS OBJECTION TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM 20774 AND 20775**

**TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:**

Brian W. Monahan ("Claimant") by his undersigned counsel, hereby responds to Debtors' 118th and 185th Omnibus Response to Debtors Omnibus Reply to Response to Debtors' Objection to Claims (To Reclassify Claims as Equity Interests) (the "Objection"). In support thereof, Claimant respectfully states as follows:

**Preliminary Statement**

1. Lehman Brothers Holdings Inc. ("LBHI") and its affiliates object to Claim No. 20774 and 20775 (collectively the "Claims") of Claimant on the grounds that the Claims are based on either restricted stock units, contingent stock awards, stock options, or other equity related compensation, both distributed and not distributed, and vested and unvested, the ownership of

{00002618v1 }                                          }

which constitutes equity interests in a debtor but does not constitute a claim against a debtor's estate. LBHI bases its objections on an overly broad interpretation of Section 510(b) of the United States Bankruptcy Code that does not apply in this case.

2. LBHI also seeks reclassification of RSUs as equity securities because "agreements governing certain Equity Awards allegedly provide that, in the event of a bankruptcy of LBHI, all claims arising from, in connection with, or in any way relating to, any failure of LBHI to deliver shares of common stock shall have the same priority as, and no greater priority than, common stock interests in LBHI". (LBHI is citing 2003 and 2004 Equity Award Program Agreement, ¶ 10) The later versions of Equity Award Program, the 2005 Lehman Brothers Holding Inc. Stock Incentive Plan as amended in 2007, do not contain any language that references bankruptcy consequences. Therefore the reference to earlier agreements governing Equity awards is obsolete and void.

3. Claimant is a former employee of LBHI where he worked as a commissioned broker from 1986 to 2008.

4. As part of its standard practice, Lehman Brothers paid commission based sales people in private equity, asset management and hedge fund departments for particularly large deals in installments over 5 to 6 years on anniversary dates. Thus, all but $169,591.32 of the amount of 20774 claim ($1,479,381.69) represents sales commissions, unrelated to RSUs, earned by Claimant but not paid by LBHI in 3rd and 4th quarters of 2008 and the years of 2009 through 2011.

5. LBHI forced commission based employees to receive wages partially in LBHI Restricted Stock Units ("RSU") (the "RSU Plan",) which had a five year cliff vesting period. Over the years the percentage of earnings that employees had to contribute to the RSU Plan was increased unilaterally to approximately 42% (*See* Exhibit A at p.3, Q3 and A3).

6. Contrary to the position LBHI took in the Supplemental Reply preliminary statement, the RSU Plan forced employees, against their will, to receive deferred non-taxable

{00002618v1}   2

income. The Restricted Stock Units and Contingent Stock Awards did not "bear the hallmarks of equity interest" because LBHI employees did not have any rights in RSUs that typically run "with a purchase of stock" nor did LBHI issue any stock until the end of the five year cliff vesting period. Thus, employees only received "rights" to a future distribution of stock in lieu of already earned commissions.

       7. Furthermore, contrary to the LBHI's statements that employees "willingly engaged in the exchange of their labor for these awards" and that "the Respondents bargained not for cash but to become shareholders of LBHI stock", the employees had no choice but to accept this arrangement if they wished to remain employed. In fact, employees did not have a chance to bargain for the awards as a precondition to their employment. Claimant, for example, already worked for LBHI for over a decade by the time LBHI imposed the RSU program, thus it would not make any sense for him to bargain for receiving his already earned compensation in stock instead of cash at an uncertain future market price with no discount and a 3 year holding period. He would be better off to simply purchase the stock in the open market at that same price without any required holding period. Therefore Equity Awards do not resemble an equity interest to which subordination under section 510(b) is applicable.

       8. The fact that LBHI imposed RSU program also becomes evident from page 4 of the 2008 Equity Awards program (Overview of the 2008 Changes - "3 primary changes to the 2008 program") where the management indicated that LBHI was completely eliminating the equity discount and reducing but still maintaining a required holding period: "Equity Discount: Beginning with the 2008 equity award, employees will no longer be granted RSUs at a discount from their fair market value at the time of the grant. However, RSUs will be subject to a much shorter holding period (3 years)."

9. Employees who chose to leave forfeited the entire unvested portion of RSUs allocated to them. (*See* Exhibit A at p.15, "Voluntary Termination"). Thus, employees who received RSUs instead of cash compensation were restricted by "golden handcuffs". In addition, LBHI kept changing the RSU Plan rules as time went on. At one point LBHI announced that it would buy the RSUs back but it never kept its promise.

10. Following the commencement of the LBHI Chapter 11 proceeding, Claimant filed the Claims which total $3,302,594.70 consisting of (i) unpaid compensation related to unvested RSUs in the amount of $1,653,621 (claim 20775) and $137,057.46 of the claim 20774; (ii) unpaid compensation of $9,605.46 earned in 2008 and withheld in July of 2008 for RSU investment by LBHI but never actually invested. (iii) $22,928.39 related to a refund due to Claimant in cash for withholding more than the maximum amount required by the RSU plan. (iv) $1,479,382.39 related to earned but unpaid commissions.

11. In its omnibus response, however, LBHI continues to lump completely separate unrelated claims and issues as all related to RSUs. The accrued commissions (unpaid wages) claims in no shape or form relate to the RSU agreements - where only a specifically defined percentage of employee wages went to the RSU plan. Anything over and above that percentage amount as well as all separately earned commissions from large deals simply does not qualify for the RSU plan, has nothing to do with any securities, stock or stock related issues, and, therefore, clearly falls outside the scope of 510(b).

### Claimant's Claims

12. As noted, the Claim consists of four very distinct unrelated parts. The first part is based on the withheld compensation actually contributed to the RSU plan but which falls outside the scope and intent of the Section 510 (b) restrictions. The second part consists of unpaid compensation and, therefore, is simply a claim for unpaid wages that does not require

{00002618v1 }    4

any interpretation or application of Section 510(b). The third part is the amount by which LBHI exceeded the maximum withholdings from Claimant's wages required by the RSU plan and consequently is a claim for a cash refund. The fourth part is the amount of commissions earned by Claimant that LBHI never paid, and, therefore, is another claim for unpaid wages. For the reasons stated below, each portion of these 4 very distinct claims should be allowed in their entirety as general unsecured claims.

A. **RSU Plan Contributions**

13. LBHI withheld a total of $1,653,621(claim 20775) and 137,057.46 (claim 20774) from Claimant in lieu of cash compensation and contributed to the RSU Plan. However, LBHI never delivered any shares to Claimant.

14. Section 101(16) of the Bankruptcy Code defines "equity security" either as:

(A) share in a corporation, whether or not transferable or denominated "stock", or similar security (This definition clearly does not apply since no shares were issued or transferred.) or

(B) interest of a limited partner in a limited partnership; or

(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of kind specified in subparagraph (A) or (B) of this paragraph."

15. The unissued non vested RSUs do not fall within a definition of a security in Section 101(16) because Claimant did not have any rights to purchase or sell or subscribe to LBHI stock. He had no rights that typically run with the ownership of an equity security.

16. Relying on the broad interpretation of the definition of equity security adopted by Court *In the Matter of Baldwin-United Corp.,* 52 B.R. 549, 552 (Bankr.S.D.N.Y. 1985) (holding that claims to exercise the stock option portion of a stock option plan are properly classified as equity security interests) LBHI concluded that RSUs are equity securities. LBHI overlooked a substantial factual distinction between *Baldwin* and the Claimant's case. In *Baldwin* "the stock option portion of the plan consist[ed] of a five year right, vested in full from the date of the option".

{00002618v1 }                                              5

Claimant's stock, on the other hand, was not vested.

17. LBHI further relies on *Carrieri v. Jobs.com. Inc.* (holding that shareholders' right to require debtor to repurchase their shares of preferred stock was in nature of "equity security"). LBHI misplaced the facts of this case as well because the stock in *Carrieri* was preferred stock, the shareholders had the rights to redeem preferred stock, and the shareholders had preferred stock warrants issued by Chapter 11 debtor to demand that debtor repurchase warrants at particular price. Claimant, however, did not have preferred stock, did not have redemption rights, did not have warrants, and did not have any rights that typically run with a purchase of security.

18. LBHI further misinterpreted *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506, 508 (Bankr. D. Ariz. 2000) (holding that a nontransferable, non-assignable right "falls squarely within the contours of section 101(16) because such put right does not include a "right to payment" in cash". LBHI overlooked the difference between a put right and RSUs. The Court in *Einsten* characterized the Put Right as Bagel Funding's right to require ENBC (if designated by Bagel Partners) to purchase its Units for ENBC stock. It also can be characterized as ENBC's obligation to issue, or "sell," shares of ENBC to Bagel Funding in exchange for those Units. Claimant's RSUs , on the other hand, lacked all rights attributable to a security.

19. RSUs are substantially different from stock options in that prior to vesting the employee owns nothing and has no right to exercise anything. "Unless otherwise determined by the Committee or as otherwise set forth in any Award Agreement, an Award shall not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of by the Participant otherwise than by will or by the laws of descent and distribution". (see Exhibit A, Lehman Brothers Holding Inc. 2005 Stock Incentive Plan, paragraph 12.)

20. On the grant date, the employee only receives a mere promise of the value of RSUs as of that date in exchange for the already performed responsibilities. That promise is

contingent upon the employee staying with the employer until the vesting point. Thus, Claimant could only become equity holder if, and only if, RSUs vested and, therefore, no "purchase" occurred. Thus, none of the cases that LBHI cited in its omnibus response are on point; Claimant's case presents a fundamentally different set of facts.

21. LBHI essentially held RSUs in escrow until the vesting point, at which time the LBHI transferred the shares to a different account controlled by the employees. Therefore, Claimant was not an equity holder and his claims should not be subordinated because he had no control over the RSUs prior to the vesting point.

22. Claimant, as a former employee, must be regarded as "creditor," rather than "investor", and, therefore, his claim is not subject to subordination as it would be if it were for damages arising from the purchase of stock. The LBHI Prospectus (the "Prospectus") (copy of which is annexed hereto as Exhibit B) states: "The plan is intended to constitute an "unfunded" plan for long - term incentive compensation. With respect to any payments not yet made to a participant, including any Participant - Optionee, by the company, nothing here in contained shall give any Participant any rights that are greater than those of a general creditor of the Company." "No Participant shall have any of the rights of a shareholder of the Company with respect to shares of Common Stock subject to an Award until the delivery of such shares of Common Stock". (Prospectus at p.11).

23. The clause "nothing here in contained shall give any Participant any rights that are greater than those of a general creditor" implies that the drafter's intent was to restrict the rights of a Participant to rights that do not exceed the rights of a general creditor. However, at the same time it does not subordinate the status of a Participant to a general creditor. Rather, it clearly allows a Participant to have rights at least equal to those of a general unsecured creditor. The clause "No Participant shall have any of the rights of a shareholder until the

delivery of such shares of Common Stock" clearly indicates that LBHI did not perceive RSU plan participants as equity holders until LBHI actually delivered stock.

24. Accordingly, the Claim is not an equity claim and Claimant is in form and substance a creditor. Subordinating this claim as "arising from the purchase or sale" of stock would not serve the underlying purposes of subordination under Section 510(b). The Claimant's compensation was not dependent on LBHI's share price at the time of earnings, because he had already earned a set amount of dollars but received RSUs of uncertain future value instead. The past service gave rise to a matured right to payment with a payment simply deferred to later date. Claimant did not pursue greater profits as a shareholder nor did he ever become a shareholder according to the Prospectus, and, therefore clearly falls outside the intended scope of 510(b).

25. Relying on a broad interpretation of Section 510(b) and *In re Enron Corp.,* 341 B.R.141, 62 (Bankr. S.D.N.Y. 2006) the LBHI assumed that the unissued and non-vested RSUs constitute equity interests because "the exchange of an employee's labor for stock options falls under a broad reading of the term "purchase" in section 510(b). *Id. At 149-51. Enron,* however, involved stock options which Enron employees were free to, but chose not to, exercise before filing of the petition. *Enron,* 341 B.R. at 151-52. Furthermore, the bargain for exchange of labor for stock options took place as a pre-condition to employment. Here, however, no bargain as a pre-condition to employment could occur because LBHI forced right-less RSUs on Claimant after over a decade of his employment. Even if the bargain were to take place, the exchange of labor was not for the same type of stock as in Enron's, nor was the exchange voluntary.

26. The facts of the next case regarding the definition of purchase that LBHI cited in its response *In re Int'l Wireless Commc'ns Holding, Inc.*, 279 B.R. 463, 467 (D. Del. 202), aff'd, 68 Fed. Appx. 275 (3d Cir. 2003) are also fundamentally different. *In Int'l Wireless* CEO received a

salary and an equity package consisting of five percent of the shares of subsidiary that he later exchanged for the stock of the parent company and 100,000 warrants. The CEO also entered into an employment and a restricted stock agreement with the subsidiary, and option agreement with the parent company. Thus, the CEO had exchange rights, had common stock, and had warrants for which he bargained in his compensation package prior to his employment. Clearly the facts of that case and hence the consequent conclusion reached by the he court have no bearing on the Claimant's case.

27.     The next case that LBHI cited on the same subject is *In re Touch Am. Holdings, Inc.,* 381 B.R. 95, 104 (Bankr.D.Del.2008). This case is an Erisa 401K retirement fund litigation case where employees put some of their compensation into a deferred stock plan that obviously falls within 510(b). The court in that case actually noted that the language of 510(b) is not limited to any particular type of *claimant,* but, rather, focuses on the type of *claim* possessed. "Nothing ... would require the subordination of a claim simply because the identity of the claimant happened to be a shareholder. Thus, the 510(b) analysis does not hinge on whether the Plaintiffs label themselves as Plan participants or shareholders, but requires consideration of the underlying nature of their claims. The court reasoned that the 401K matching stock contribution was similar to a purchase of stock and thus fit within the framework of 510(b). Clearly no matching stock contribution of retirement funds occurred at LBHI, in fact, no stock was ever issued. Therefore, it is irrelevant what conclusion the courts reached *In Re Touch Am. Holding* or <u>*In re Enron Corp.,*</u> 341 B.R. 141 (Bankr.S.D.N.Y.2006) with regard to defining "purchase of security" because those courts dealt with fundamentally different types of claims. There is no doubt that had Claimant's RSUs actually been stock options acquired prior to employment or were a part of the Erisa retirement stock compensation plan, or were vested stock - then the cases that LBHI cited could apply. But that is not the case and LBHI employees found themselves in unique unprecedented circumstances. Thus,

the issue before this Court is novel as this case presents a fundamentally new set of facts where the shareholders who had no bargaining power unwillingly received RSUs which did not have any traditional qualities of a security. The nature of the underlying claim is that that they received nothing for services already performed.

28. Finally, the unilateral terms of the agreement between LBHI and its employees to participate in the stock plan were unconscionable. LBHI is wrong in asserting that unconscionably terms of a contract by adhesion are legally irrelevant. The Prospectus states that: "The Committee shall have the full and exclusive power and authority to make, and establish the terms and conditions of, any Award to any person eligible to be a Participant, or waive any such terms and conditions at any time. [T]he Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award agreements, and to enter into non-uniform and selective Award agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's employment has been terminated for purposes of the Plan and (iv) any adjustments made to Awards." (Prospectus at p.8). This clause clearly illustrates that no participant had any control over anything that related to issuance or control of stock. Moreover, the entire Award agreement and particularly the bankruptcy clause in the original Equity Award Program make up a classic case of a contract of adhesion and therefore voidable, which does have direct consequences to applicability of section 510(b) because it simply does not apply.

B. <u>Claim for Unpaid Wages</u>

29. Claimant's wages, earned and allocated to the RSU plan in 2008, would normally enter the RSU Plan on December 1, 2008 as deferred compensation. However, in 2008 the $9,605.46 of compensation attributable to Claimant that was supposed to be contributed to the RSU plan simply "disappeared" and is unaccounted for, as evidenced by Claimant's wage statements -- contrary to

LBHI's incredible assertion that it lacks a record thereof. At the very least, this is a subject that needs to be explored through discovery. Accordingly, this portion of the Claim is plainly outside the scope of Section 510(b) and must be treated as a general unsecured claim. Furthermore, if LBHI contends that it does not have a record of these wages to be in escrow for RSU's then this portion of Claimant's wages is simply not allocable to the RSU program and, therefore, it cannot be defined as a "security" or "purchase of a security" and thus cannot logically fit in within the framework of 510(b). Moreover, the fact that LBHI was not able to find any "amounts [held] in escrow, constructive trust, or otherwise for benefit of Respondent in connection with Equity Awards" is alarming.

### C. Claim for Unpaid Cash Refund

30. In 2008 LBHI exceeded the maximum amount of withholdings from Claimant's earnings required by the RSU plan as evidenced by Claimant's compensation statement. (*See* Exhibit C). Accordingly, this portion of the Claim represents the remainder of cash refund in the amount of $22,928.39 that LBHI owed to Claimant. This cash refund is also outside the scope of Section 510(b) since it does not even qualify to be a part of the RSU plan. In other words, if Claimant, for argument sake, actually wished to purchase "extra" RSUs above the maximum percentage set by LBHI, the company would not allow it. Then how could the converse possible apply and qualify for the RSU plan when LBHI erroneously took out more money out of the Claimant's check than the plan allowed? Clearly, this claim is a general unsecured claim.

### D. Claim for Earned Unpaid Cash Commissions

31. As part of a standard practice, LBHI paid commissions on particularly large deals to commission based sales people in private equity, asset management and hedge fund departments over 5 to 6 years on anniversary dates. $1,479,381.69 is the amount of commissions that LBHI owes claimant for completing such deals as evidenced by the records misplaced by LBHI. These

{00002618v1 }                                             11

commissions never had anything to do with the RSU program. As mentioned above, LBHI not only took out the maximum possible amount out of the Claimant's check but actually erroneously exceeded that amount. Accordingly, this portion of the Claim could never be allocable to any RSU related plan. It plainly falls outside the scope of Section 510(b) as it is a claim for unpaid wages and must be treated as a general unsecured claim. Moreover, the fact that LBHI is missing financial records (or LBHI denying having records) warrants discovery.

**WHEREFORE**, Claimant respectfully requests the entry of order allowing the Claims, in its entirety, as general unsecured claims, and providing for such other relief as this Court deems just.

Dated: February 14, 2012

        The Michaelson Law Firm
        11 Broadway, Suite 615
        New York, New York 10004
        Tel: 212.604.0685
        Fax: 800.364.1291

        By: */s/ Robert N. Michaelson*
            Robert N. Michaelson

        *Attorneys for Brian W. Monahan*