Robert N. Michaelson                         Hearing Date: February 22, 2012
The Michaelson Law Firm                      Hearing Time: 10:00 a.m.
11 Broadway, Suite 615                       Response Deadline: February 14, 2012
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

*Attorneys for Henry Morgan Lawrence III and
Nicole S. Lawrence*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
In re                                                        Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,                     Case No. 08-13555 (JMP)

                                    Debtors.                 (Jointly Administered)

-----------------------------------------------------------X

**SUPPLEMENTAL RESPONSE OF HENRY MORGAN LAWRENCE III AND NICOLE
S. LAWRENCE TO DEBTOR'S OMNIBUS REPLY TO DEBTORS' RESPONSE TO
ONE HUNDRED AND EIGHTEENTH AND ONE HUNDRED THIRTIETH
OMNIBUS OBJECTION TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS
EQUITY INTERESTS) RE: CLAIMS 3373 AND 3374**

**TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:**

        Henry Morgan Lawrence III and Nicole S. Lawrence (together, "Claimants")[1] by his

undersigned counsel, hereby responds to Debtors' 118th and 130th Omnibus Response to Debtors

Omnibus Reply to Response to Debtors' Objection to Claims (To Reclassify Claims as Equity

Interests) (the "Objection"). In support thereof, Claimant respectfully states as follows:

<u>**Preliminary Statement**</u>

        1.        Lehman Brothers Holdings Inc. ("LBHI") and its affiliates object to Claim No. 3374

of Mr. Morgan and Claim No. 3373 of Mrs. Morgan (collectively  the "Claims") of Claimants on the

_____
[1] Claimants are husband and wife.

grounds that the Claims are based on either restricted stock units, contingent stock awards, stock options, or other equity related compensation, both distributed and not distributed, and vested and unvested, the ownership of which constitutes equity interests in a debtor but do not constitute a claim against a debtor's estate. LBHI bases its objections on an overly broad interpretation of Section 510(b) of the United States Bankruptcy Code that does not apply in this case.

2.    LBHI also seeks reclassification of RSUs as equity securities because "agreements governing certain Equity Awards allegedly provide that, in the event of a bankruptcy of LBHI, all claims arising from, in connection with, or in any way relating to, any failure of LBHI to deliver shares of common stock shall have the same priority as, and no greater priority than, common stock interests in LBHI". (LBHI is citing 2003 and 2004 Equity Award Program Agreement, ¶ 10)  The later versions of Equity Award Program, the 2005 Lehman Brothers Holding Inc. Stock Incentive Plan as amended in 2007, do not contain any language that references bankruptcy consequences. Therefore the reference to earlier agreements governing Equity awards is obsolete and void.

3.    Claimants are former employees of LBHI where they worked as a commissioned brokers.

4.    LBHI forced commission based employees to receive wages partially in LBHI Restricted Stock Units ("RSU") (the "RSU Plan",) which had a five year cliff vesting period.  Over the years the percentage of earnings that employees had to contribute to the RSU Plan was increased unilaterally to approximately 42% (*See* Exhibit A at p.3, Q3 and A3).

6.    Contrary to the position LBHI took in the Supplemental Reply preliminary statement, the RSU Plan forced employees, against their will, to receive deferred non-taxable income.  The Restricted Stock Units and Contingent Stock Awards did not "bear the hallmarks of equity interest" because LBHI employees did not have any rights in RSUs that typically run "with a purchase of stock" nor did  LBHI issue any stock until the end of the five year cliff vesting period.

2

Thus, employees only received "rights" to a future distribution of stock in lieu of already earned commissions.

7.    Furthermore, contrary to the LBHI's statements that employees "willingly engaged in the exchange of their labor for these awards" and that "the Respondents bargained not for cash but to become shareholders of LBHI stock", the employees had no choice but to accept this arrangement if they wished to remain employed. In fact, employees did not have a chance to bargain for the awards as a precondition to their employment. Claimants, for example, already worked for LBHI by the time LBHI imposed the RSU program, thus it would not make any sense for them to bargain for receiving his already earned compensation in stock instead of cash at an uncertain future market price with no discount and a 3 year holding period.  They would be better off to simply purchase the stock in the open market at that same price without any required holding period. Therefore, Equity Awards do not resemble an equity interest to which subordination under section 510(b) is applicable.

8.    The fact that LBHI imposed RSU program also becomes evident from page 4 of the 2008 Equity Awards program (Overview of the 2008 Changes - "3 primary changes to the 2008 program") where the management indicated that LBHI was completely eliminating the equity discount and reducing but still maintaining a required holding period: "Equity Discount: Beginning with the 2008 equity award, employees will no longer be granted RSUs at a discount from their fair market value at the time of the grant. However, RSUs will be subject to a much shorter holding period (3 years)."

9.    Employees who chose to leave forfeited the entire unvested portion of RSUs allocated to them. (*See* Exhibit A at p.15, "Voluntary Termination"). Thus, employees who received RSUs instead of cash compensation were restricted by "golden handcuffs". In addition, LBHI kept changing the RSU Plan rules as time went on. At one point LBHI announced that it would buy

3

the RSUs back but it never kept its promise.

10.    Following the commencement of the LBHI Chapter 11 proceeding, Mr. Lawrence filed Claim No. 3374 in the amount of $2,843,574.67 consisting of (i) unpaid compensation related to unvested RSUs in the amount of $2,510,120 (ii) unpaid compensation of $333,454.67 earned in 2008 and withheld in July of 2008 for RSU investment by LBHI but never actually invested.  Mrs. Lawrence filed Claim No. 3373 in the amount of $354,008.53 consisting of (i) unpaid compensation relating to unvested RSUs in the amount of $321,210 and (ii) unpaid compensation in the amount of $32,798.53 relating to unpaid compensation earned in 2008 that was never contributed to the RSU plan.

11.    In its omnibus response, however, LBHI continues to lump completely separate unrelated claims and issues as all related to RSUs.  The accrued commissions (unpaid wages) claims in no shape or form relate to the RSU agreements - where only a specifically defined percentage of employee wages went to the RSU plan. Anything over and above that percentage amount simply does not qualify for the RSU plan, has nothing to do with any securities, stock or stock related issues, and, therefore, clearly falls outside the scope of 510(b).

### Claimant's Claims

12.    As noted, the Claim consists of 2 very distinct unrelated parts. The first part is based on the withheld compensation actually contributed to the RSU plan but which falls outside the scope and intent of the Section 510 (b) restrictions. The second part consists of unpaid compensation and, therefore, is simply a claim for unpaid wages that does not require any interpretation or application of Section 510(b). For the reasons stated below, each portion of these 2 very distinct claims should be allowed in their entirety as general unsecured claims.

### A. RSU Plan Contributions

13.    LBHI withheld a total of $2,510,120 (claim 3374) and $321,210 (claim 3373) from

4

Claimants in lieu of cash compensation and contributed to the RSU Plan.  However, LBHI never delivered any shares to Claimants.

14.    Section 101(16) of the Bankruptcy Code defines "equity security" either as:

(A) share in a corporation, whether or not transferable or denominated "stock", or similar security (This definition clearly does not apply since no shares were issued or transferred.) or

(B) interest of a limited partner in a limited partnership; or

(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of kind specified in subparagraph (A) or (B) of this paragraph."

15.    The unissued non vested RSUs do not fall within a definition of a security in Section 101(16) because Claimants did not have any rights to purchase or sell or subscribe to LBHI stock. They had no rights that typically run with the ownership of an equity security.

16.    Relying on the broad interpretation of the definition of equity security adopted by Court *In the Matter of Baldwin-United Corp.,* 52 B.R. 549, 552 (Bankr.S.D.N.Y. 1985) (holding that claims to exercise the stock option portion of a stock option plan are properly classified as equity security interests) LBHI concluded that RSUs are equity securities. LBHI overlooked a substantial factual distinction between *Baldwin* and the Claimant's case. In *Baldwin* "the stock option portion of the plan consist[ed] of a five year right, vested in full from the date of the option". Claimants' stock options, on the other hand, were not vested.

17.    LBHI further relies on *Carrieri v. Jobs.com. Inc.* (holding that shareholders' right to require debtor to repurchase their shares of preferred stock was in nature of "equity security"). LBHI misplaced the facts of this case as well because the stock in *Carrieri* was preferred stock, the shareholders had the rights to redeem preferred stock, and the shareholders had preferred stock warrants issued by Chapter 11 debtor to demand that debtor repurchase warrants at particular price. Claimants, however, did not have preferred stock, did not have redemption rights, did not have warrants, and did not have any rights that typically run with a purchase of security.

18.     LBHI further misinterpreted *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506, 508

(Bankr. D. Ariz. 2000) (holding that a nontransferable, non-assignable right "falls squarely within the

contours of section 101(16) because such put right does not include a "right to payment" in cash".

LBHI overlooked the difference between a put right and RSUs. The Court in *Einsten* characterized

the Put Right as Bagel Funding's right to require ENBC (if designated by Bagel Partners) to

purchase its Units for ENBC stock. It also can be characterized as ENBC's obligation to issue, or

"sell," shares of ENBC to Bagel Funding in exchange for those Units.  Claimants' RSUs, on the

other hand, lacked all rights attributable to a security.

19.     RSUs are substantially different from stock options in that prior to vesting the

employee owns nothing and has no right to exercise anything. "Unless otherwise determined by

the Committee or as otherwise set forth in any Award Agreement, an Award shall not be sold,

transferred, assigned, pledged, hypothecated or otherwise disposed of by the Participant otherwise

than by will or by the laws of descent and distribution".  (see Exhibit A, Lehman Brothers Holding

Inc. 2005 Stock Incentive Plan, paragraph 12.)

20.     On the grant date, the employee only receives a mere promise of the value of

RSUs as of that date in exchange for the already performed responsibilities. That promise is

contingent upon the employee staying with the employer until the vesting point. Thus,

Claimant could only become equity holder if, and only if, RSUs vested and, therefore, no

"purchase" occurred. Thus, none of the cases that LBHI cited in its omnibus response are on

point; Claimants' case presents a fundamentally different set of facts.

21.     LBHI essentially held RSUs in escrow until the vesting point, at which time

LBHI transferred the shares to a different account controlled by the employees. Therefore,

Claimants were not equity holders and their claims should not be subordinated because they

had no control over the RSUs prior to the vesting point.

22.     Claimants, as former employees, must be regarded as "creditors," rather than "investors", and, therefore, their claims are not subject to subordination as they would be if it were for damages arising from the purchase of stock. The LBHI Prospectus (the "Prospectus") (copy of which is annexed hereto as Exhibit B) states: "The plan is intended to constitute an "unfunded" plan for long - term incentive compensation. With respect to any payments not yet made to a participant, including any Participant - Optionee, by the company, nothing here in contained shall give any Participant any rights that are greater than those of a general creditor of the Company." "No Participant shall have any of the rights of a shareholder of the Company with respect to shares of Common Stock subject to an Award until the delivery of such shares of Common Stock". (Prospectus at p.11).

23.     The clause "nothing here in contained shall give any Participant any rights that are greater than those of a general creditor" implies that the drafter's intent was to restrict the rights of a Participant to rights that do not exceed the rights of a general creditor. However, at the same time it does not subordinate the status of a Participant to a general creditor. Rather, it clearly allows a Participant to have rights at least equal to those of a general unsecured creditor. The clause "No Participant shall have any of the rights of a shareholder until the delivery of such shares of Common Stock" clearly indicates that LBHI did not perceive RSU plan participants as equity holders until LBHI actually delivered stock.

24.     Accordingly, the Claim is not an equity claim and Claimants are in form and substance creditors. Subordinating this claim as "arising from the purchase or sale" of stock would not serve the underlying purposes of subordination under Section 510(b). The Claimants' compensation was not dependent on LBHI's share price at the time of earnings, because they had already earned a set amount of dollars but received RSUs of uncertain future value instead. The past service gave rise to a matured right to payment with a payment simply

7

deferred to later date. Claimants did not pursue greater profits as shareholders nor did they ever become shareholders according to the Prospectus, and, therefore clearly fall outside the intended scope of 510(b).

25.    Relying on a broad interpretation of Section 510(b) and *In re Enron Corp.,* 341 B.R.141, 62 (Bankr. S.D.N.Y. 2006) the LBHI assumed that the unissued and non-vested RSUs constitute equity interests because "the exchange of an employee's labor for stock options falls under a broad reading of the term "purchase" in section 510(b). *Id. At 149-51. Enron,* however, involved stock options which Enron employees were free to, but chose not to, exercise before filing of the petition. *Enron,* 341 B.R. at 151-52. Furthermore, the bargain for exchange of labor for stock options took place as a pre-condition to employment. Here, however, no bargain as a pre-condition to employment could occur because LBHI forced right-less RSUs on Claimants after over a decade of his employment. Even if the bargain were to take place, the exchange of labor was not for the same type of stock as in Enron's, nor was the exchange voluntary.

26.    The facts of the next case regarding the definition of purchase that LBHI cited in its response *In re Int'l Wireless Commc'ns Holding, Inc.*, 279 B.R. 463, 467 (D. Del. 202), aff'd, 68 Fed. Appx. 275 (3d Cir. 2003) are also fundamentally different. *In Int'l Wireless* CEO received a salary and an equity package consisting of five percent of the shares of subsidiary that he later exchanged for the stock of the parent company and 100,000 warrants. The CEO also entered into an employment and a restricted stock agreement with the subsidiary, and option agreement with the parent company.  Thus, the CEO had exchange rights, had common stock, and had warrants for which he bargained in his compensation package prior to his employment.  Clearly the facts of that case and hence the consequent conclusion reached by the he court have no bearing on the Claimants' case.

27.    The next case that LBHI cited on the same subject is  *In re Touch Am. Holdings, Inc.,*

381 B.R. 95, 104 (Bankr.D.Del.2008). This case is an Erisa 401K retirement fund litigation case

where employees put some of their compensation into a deferred stock plan that obviously falls

within 510(b). The court in that case actually noted that the language of 510(b) is not limited to any

particular type of *claimant,* but, rather, focuses on the type of *claim* possessed. "Nothing ... would

require the subordination of a claim simply because the identity of the claimant happened to be a

shareholder. Thus, the 510(b) analysis does not hinge on whether the Plaintiffs label themselves as

Plan participants or shareholders, but requires consideration of the underlying nature of their claims.

The court reasoned that the 401K matching stock contribution was similar to a purchase of stock

and thus fit within the framework of 510(b). Clearly no matching stock contribution of retirement

funds occurred at LBHI, in fact, no stock was ever issued. Therefore, it is irrelevant what

conclusion the courts reached *In Re Touch Am. Holding* or *In re Enron Corp.,* 341 B.R. 141

(Bankr.S.D.N.Y.2006) with regard to defining "purchase of security" because those courts dealt with

fundamentally different types of claims. There is no doubt that had Claimants' RSUs actually been

stock options acquired prior to employment or were a part of the Erisa retirement stock

compensation plan, or were vested stock - then the cases that LBHI cited could apply. But that is

not the case and LBHI employees found themselves in unique unprecedented circumstances. Thus,

the issue before this Court is novel as this case presents a fundamentally new set of facts where the

shareholders who had no bargaining power unwillingly received RSUs which did not have any

traditional qualities of a security. The nature of the underlying claim is that that they received

nothing for services already performed.

28.     Finally, the unilateral terms of the agreement between LBHI and its employees

to participate in the stock plan were unconscionable. LBHI is wrong in asserting that

unconscionably terms of a contract by adhesion are legally irrelevant. The Prospectus states

that: "The Committee shall have the full and exclusive power and authority to make, and

establish the terms and conditions of, any Award to any person eligible to be a Participant, or waive any such terms and conditions at any time. [T]he Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award agreements, and to enter into non-uniform and selective Award agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's employment has been terminated for purposes of the Plan and (iv) any adjustments made to Awards." (Prospectus at p.8). This clause clearly illustrates that no participant had any control over anything that related to issuance or control of stock. Moreover, the entire Award agreement and particularly the bankruptcy clause in the original Equity Award Program make up a classic case of a contract of adhesion and therefore voidable, which does have direct consequences to applicability of section 510(b) because it simply does not apply.

### B. Claim for Unpaid Wages

29.    Claimants' wages, earned and allocated to the RSU plan in 2008, would normally enter the RSU Plan on December 1, 2008 as deferred compensation.  However, in 2008 $333,454.67 of compensation attributable to Mr. Lawrence and $32,798.53 of the compensation attributable to Mrs. Lawrence that was supposed to be contributed to the RSU plan simply "disappeared" and is unaccounted for, as evidenced by Claimants' commission sheets contrary to LBHI assertion that it lacks a record thereof. Accordingly, these portions of the Claims are plainly outside the scope of Section 510(b) and must be treated as general unsecured claims. Furthermore, if LBHI contends that it does not have a record of these wages to be in escrow for RSU's then this portion of Claimant's wages is simply not allocable to the RSU program and, therefore, it cannot be defined as a "security" or "purchase of a security" and thus cannot logically fit in within the framework of 510(b). Moreover, the fact that LBHI was not able to find any "amounts [held] in escrow, constructive trust, or otherwise for benefit of Respondent in connection with Equity Awards" is alarming and warrants

discovery.

**WHEREFORE**, Claimants respectfully request the entry of order allowing the Claims, in their entirety, as general unsecured claims and providing for such other relief as this Court deems just.

Dated: New York, New York
February 13, 2012

The Michaelson Law Firm
11 Broadway, Suite 615
New York, New York 10004
Tel: 212.604.0685
Fax: 800.364.1291

By: _/s/ Robert N. Michaelson_
Robert N. Michaelson

*Attorneys for Brian W. Monahan*