Hearing Date and Time:  February 22, 2012 at 10:00 a.m. (Eastern Time)

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Thomas C. Mitchell
Lorraine S. McGowen
Steven J. Fink
51 West 52nd Street
New York, NY  10019-6142
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151

*Attorneys for the Golden State Tobacco*
*Securitization Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
| | |
|---|---|
| **In re:** | : Chapter 11 |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : Rel. ECF No. 24726 |

---------------------------------------------------------------- x

**OBJECTION OF GOLDEN STATE TOBACCO SECURITIZATION CORPORATION TO PLAN ADMINISTRATOR'S MOTION FOR AUTHORITY TO USE NON-CASH ASSETS IN LIEU OF AVAILABLE CASH AS RESERVES FOR DISPUTED CLAIMS**

The Plan[1] confirmed by this Court for the Debtors[2] requires the Debtors to reserve Available Cash for holders of Disputed Claims, potentially including Golden State Tobacco Securitization Corporation ("Golden State"), in accordance with section 1123(a)(4) of the Bankruptcy Code.  Now, three months after confirmation, the Plan Administrator has filed a motion to modify the Plan's protections for holders of Disputed Claims by reserving unspecified

---

[1]   The full title of the Plan is "Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors."  (ECF No. 22973.)

[2]   Capitalized terms not defined herein have the meanings ascribed to them in the Plan or, if not defined therein, in the Motion (as such term is defined herein).

Non-Cash Assets in lieu of Available Cash (the "Motion").[3] The Plan Administrator's proposal subjects holders of unsecured Claims that have not yet been finally allowed to the risk that the Debtors' valuations of the reserved Non-Cash Assets are or will be erroneous and thus fails to provide reasonable assurance that such holders will receive the same Pro Rata Share of Available Cash as other holders of Allowed Claims. Accordingly, Golden State objects to the Motion.

I.   **Relevant Background**

1. Golden State is a special purpose trust established as a not-for-profit corporation by Article 7 (commencing with Section 63049) of Chapter 2 of Division 1 of Title 6.7 of the California Government Code and duly incorporated under the laws of the State of California (the "State") for the purposes of purchasing, from the State, the State's rights to payments from tobacco manufacturers pursuant to a settlement between the tobacco manufacturers and the states, and then issuing bonds secured by such payments.

2. In connection with the issuance of certain bonds, Golden State and LBSF are parties to (a) that certain Reserve Fund Agreement dated January 29, 2003, among Golden State, LBSF, and The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), as successor in interest to BNY Western Trust Company, as Trustee, which agreement was modified by that certain Amendment Agreement executed on March 14, 2007; and (b) that certain Reserve Fund Agreement dated March 14, 2007, among Golden State, LBSF, and BNY Mellon, as successor in interest to The Bank of New York Trust Company, N.A., as Trustee.

3. LBHI guarantees LBSF's obligations under the Reserve Fund Agreements pursuant to three separate guarantees.

---

[3] The full title of the Motion is "Motion of Lehman Brothers Holdings Inc. for Authority to Use Non-Cash Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Chapter 11 Plan." (ECF No. 24726.)

- 2 -

4. On September 1, 2011, LBSF rejected the Reserve Fund Agreements under section 365(a) of the Bankruptcy Code pursuant to this Court's Second Order Granting Motion for Authorization to Reject Certain Executory Contracts. (ECF No. 19642.)

5. On October 12, 2011, Golden State timely filed proofs of claim asserting general unsecured claims against LBSF and LBHI each in the amount of $139,349,138.58 plus interest, fees, and costs in connection with the rejection of the 2003 Reserve Fund Agreement, which proofs of claim have been designated as Claim Numbers 67687 and 67686 on the official claims registry; and proofs of claim asserting general unsecured claims against LBSF and LBHI each in the amount of $49,272,660.68 plus interest, fees, and costs in connection with the rejection of the 2007 Reserve Fund Agreement, which proofs of claim have been designated as Claim Numbers 67684 and 67685 on the official claims registry.

6. To date, the Plan Administrator has not filed any objections to Golden State's Claims. The Plan, however, permits the Plan Administrator to file objections to Claims until the date that is two years after the Effective Date of the Plan, which Effective Date has yet to occur, or until such later date as the Court may order. (Plan § 9.1.) Thus, it remains possible that Golden State's Claims will become Disputed Claims.

## II. Bases for Objection

### A. The Plan Administrator Cannot Modify the Plan Post-Confirmation in a Manner that Causes it to Violate Section 1123 of the Bankruptcy Code.

7. On December 6, 2011, this Court entered an order confirming the Plan. (ECF No. 23023.) Under section 1127(b) of the Bankruptcy Code, the Plan Administrator cannot modify the Plan if the Plan as modified would not comply with section 1123 of the Bankruptcy Code.

8.  The Motion seeks to alter the rights under the Plan of holders of unsecured Claims that have not yet been finally allowed. The Plan currently requires the Plan Administrator to reserve for holders of unsecured Claims that have not yet been finally allowed an amount of Available Cash equal to the Pro Rata Share of Available Cash to which such holders would be entitled if their Claims were finally allowed. (Plan § 8.4.) In contrast, the Plan Administrator proposes to disburse all Available Cash except for a Minimum Cash Reserve to holders of Claims that already have been finally allowed, and reserve primarily unspecified Non-Cash Assets for holders of Claims that have not yet been finally allowed. (Motion ¶¶ 6, 9.)

9.  Because the Plan Administrator's proposal would alter the Plan's protections for holders of Claims that have not yet been finally allowed, the Motion constitutes a request to modify the Plan post-confirmation that is subject to section 1127(b) of the Bankruptcy Code. *See In re Boylan Int'l, Ltd.*, 452 B.R. 43, 47 (Bankr. S.D.N.Y. 2011) (explaining that a post-confirmation application constitutes a request to modify a plan when it seeks "an alteration of the legal relationships among the debtor and its creditors" under the plan) (quotation omitted).

10. The fact that the Plan Administrator predicated the Motion on section 8.4 of the Plan and sections 105(a) and 1142(b) of the Bankruptcy Code does not exempt it from the strictures of section 1127(b) of the Bankruptcy Code. *See Doral Center, Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812, 817 (S.D.N.Y. 1997) ("The equity power of 11 U.S.C. § 105(a) cannot be used to produce a result contrary to the specific provisions of 11 U.S.C. § 1127(b).") (quotation omitted); *see also In re Rickel & Assocs., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) ("A debtor cannot circumvent [section] 1127(b) and change the plan simply by calling its request a motion to modify the confirmation order, or a plan-related document, or another application that nonetheless affects rights under the plan.")

(citations omitted).  While section 8.4 of the Plan permits the Plan Administrator to seek to reserve Non-Cash Assets in lieu of Available Cash, that section also provides that such a request remains "subject to Bankruptcy Court approval."  Because the Plan Administrator's proposal would modify the Plan, the Court's consideration of the Motion must be guided by section 1127(b) of the Bankruptcy Code.  Thus, the Court must deny the Motion if it would cause the Plan to violate section 1123 of the Bankruptcy Code.

      **B.**      **The Plan Administrator's Proposal Would Cause the Plan to Violate Section 1123(a)(4) of the Bankruptcy Code.**

11.    Section 1123(a)(4) of the Bankruptcy Code mandates that a plan "provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . . agrees to a less favorable treatment of such particular claim."  To comply with this requirement, "a debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment" as other allowed claims.  *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986).  Thus, "courts in this and other jurisdictions have required debtors to establish reserves with assets sufficient to pay disputed claims in full to allow creditors full pro rata recovery on their claims."  *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011).  In other words, "[p]lan proponents must take reasonable steps to fund reserves for disputed claims."  *Id.* at 216 (emphasis omitted).

12.    Under the Plan, holders of Allowed unsecured Claims are entitled to receive a Pro Rata Share of the Available Cash of LBSF or LBHI.  (Plan §§ 4.11, 5.21.)  To satisfy section 1123(a)(4) of the Bankruptcy Code, therefore, the Debtors must reserve sufficient Available Cash to ensure that holders of Claims that have not yet been finally allowed will receive a full Pro Rata Share of Available Cash when their Claims are finally allowed.

13. The "Available Cash" to which such holders are entitled includes "all Cash of [the applicable] Debtor realized from its business operations, the sale or other disposition of its assets, the interest earned on its invested funds, recoveries from Litigation Claims or from any other source or otherwise," less amounts necessary to pay certain expenses and Claims with senior priority. (Plan § 1.5.) At this time, however, it is impossible to accurately predict what the total amounts of the Debtors' Available Cash will be once all of their Non-Cash Assets are liquidated. Thus, there is a risk that there will not be sufficient Cash remaining to provide holders of Claims that have not yet been finally allowed with a full Pro Rata Share of the Debtors' total Available Cash once all Non-Cash Assets are liquidated.

14. To eliminate this risk, the Plan currently requires the Plan Administrator to reserve from all interim distributions the Pro Rata Shares of Available Cash to which holders of Claims that have not yet been finally allowed would be entitled if their Claims were finally Allowed. (Plan § 8.4.) This requirement guarantees that holders of Claims that are finally allowed in the future will receive a full Pro Rata Share of the total amounts of the Debtors' Available Cash, regardless of what the final amounts of Available Cash prove to be.

15. The Plan Administrator's proposal in the Motion, in contrast, would provide no such guarantee. If the Court granted the Motion, the Plan Administrator would be permitted to reserve a Minimum Cash Reserve equal to as little as 25 percent of the amount of Available Cash that it is required to reserve under the current Plan. (Motion ¶ 8.) In lieu of reserving Cash equal to the remaining 75 percent of the necessary reserve, the Plan Administrator proposes to reserve unspecified Non-Cash Assets, which Assets apparently would be selected by the Plan Administrator in its discretion. (Motion ¶ 7.) It is impossible to predict whether liquidation of such Non-Cash Assets would generate sufficient Cash to make the required distributions on

Claims that are finally allowed in the future.[4] Thus, reserving such Non-Cash Assets would not guarantee that holders of Claims that have not yet been finally allowed will receive their full Pro Rata Shares of the total amounts of the Debtors' Available Cash.

16. The Plan Administrator nevertheless argues that its proposal satisfies section 1123(a)(4) of the Bankruptcy Code. (Motion ¶ 17.) In support of its argument, the Plan Administrator quotes *Motors Liquidation* for the proposition that section 1123(a)(4) of the Bankruptcy Code "do[es] not require . . . making all of the holders of already allowed claims take lesser distributions so as to accommodate those whose claims are now in dispute." (Motion ¶ 17 (quoting *Motors Liquidation*, 447 B.R. at 216 n.47).) But that quotation is out of context.

17. In *Motors Liquidation*, holders of allowed claims in the relevant class were entitled to receive a pro rata share of stock. 447 B.R. at 203. In accordance with section 1123(a)(4), the plan supporters reserved for holders of disputed claims the full pro rata shares of stock to which they would be entitled if their claims were allowed. *Id.* at 215-216. Concerned that the stock price would decline before its claim becomes allowed, one holder of a disputed claim argued that the debtor should also be required to hold back shares of stock that otherwise

---

[4] Although the Plan Administrator's proposal includes a requirement that the "value" of the reserved Non-Cash Assets be equal to 2.5 times the amount of the unfunded reserve (Motion ¶ 8), the applicable "value" for purposes of this ratio would not be the actual value at which the Non-Cash Assets could be sold, but rather would be the value at which such Non-Cash Assets are carried on the books of the Debtors (Motion ¶ 8 n.5). There is no evidence that this book value bears any relationship to the actual value of the Non-Cash Assets, and there is no evidence (except with respect to intercompany receivables and investments) as to how this book value has been determined. The Plan Administrator apparently will not obtain actual bids, price quotes, or appraisals for the Non-Cash Assets, will not mark the Non-Cash Assets to market, and has no plans to take any action if the Non-Cash Assets decline in value. Bankruptcy courts have seen a multitude of cases where debtors have optimistically overvalued assets, and the hands-off approach proposed by the Plan Administrator makes it almost certain that the Non-Cash Assets will be overvalued to the detriment of unsecured creditors whose Claims have not yet been finally allowed.

would be distributed to holders of allowed claims to ensure that it ultimately would receive the same economic value. *Id.* at 216 n.47. The court rejected that argument, holding that "[e]qual treatment does not require establishing *additional* mechanisms for holders of disputed claims to track the movements of the stock market." *Id.* at 216 (emphasis added). The court based its decision on the principle that section 1123(a)(4) of the Bankruptcy Code requires that holders of disputed claims receive "the same distribution" as holders of allowed claims, not "the same value." *Id.* at 216 n.47. Contrary to the Plan Administrator's suggestion, the court *did not* establish a broader rule that debtors need not reserve assets sufficient to ensure that holders of disputed claims will receive the same distribution as holders of allowed claims.

18.  Here, the Plan Administrator's proposal completely fails to ensure that holders of Claims that have not yet been finally allowed will receive the same distribution—a Pro Rata Share of Available Cash—as other holders of Allowed Claims. Thus, the Plan Administrator's proposal would cause the Plan to violate section 1123(a)(4) of the Bankruptcy Code. Under section 1127(b) of the Bankruptcy Code, therefore, the Motion must be denied.

### III.  CONCLUSION

The Plan Administrator's proposal to substitute unspecified Non-Cash Assets for Available Cash fails to provide the requisite assurance that holders of Claims that are finally allowed in the future will receive the same Pro Rata Share of Available Cash as other holders of Allowed Claims. Accordingly, the Motion should be denied.

Dated: February 15, 2012
      New York, New York

Respectfully submitted,

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

/s/ *Lorraine S. McGowen*

Thomas C. Mitchell
Lorraine S. McGowen
Steven J. Fink
51 West 52nd Street
New York, NY  10019-6142
Telephone:  (212) 506-5000
Facsimile:   (212) 506-5151

*Attorneys for the Golden State Tobacco Securitization Corporation*