HEARING DATE AND TIME: February 22, 2012 at 10:00 a.m. (Eastern Time)
OBJECTION DEADLINE: February 15, 2012 at 4:00 p.m. (Eastern Time)

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000
James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
Scott A. Lewis

-and-

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York  10017-5010
Telephone:  (212) 655-6000
Craig M. Price (CP-9039)

*Attorneys for U.S. Bank National Association, as Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | CHAPTER 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al*., | CASE NO. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,
TO THE MOTION OF LEHMAN BROTHERS HOLDINGS INC. FOR
AUTHORITY TO USE NON-CASH ASSETS IN LIEU OF AVAILABLE
CASH AS RESERVES FOR DISPUTED CLAIMS PURSUANT TO
SECTION 8.4 OF THE DEBTORS' CONFIRMED JOINT CHAPTER 11 PLAN**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES U.S. Bank National Association, not individually but as Trustee ("*U.S. Bank*" or the "*Trustee*"), by and through its counsel, Chapman and Cutler LLP, to object (the "*Objection*") to

3150770.01.16.doc

Lehman Brothers Holdings Inc.'s Motion for Authority to Use Non-Cash Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Chapter 11 Plan (the "*Motion*").  In support of its Objection, the Trustee states as follows:[1]

Pursuant to the Motion, Lehman Brothers Holdings Inc., as Plan Administrator ("*LBHI*"), requests that each of the Participating Debtors be authorized to substitute non-cash assets for a significant portion of the Available Cash required to be reserved for Disputed Claims under Section 8.4 of the Debtors' Modified Third Amended Joint Chapter 11 Plan (the "*Plan*").   Because the relief requested in the Motion is not supported by any Declaration or other evidence and may adversely affect investors in trusts for which U.S. Bank serves as Trustee whose claims have not been fully and finally determined or allowed at this time, the Trustee objects to the Motion.

As set forth in the Motion, LBHI proposes to modify the reserve scheme previously voted on and approved by the Debtors' creditor constituency and confirmed by this Court.  As approved, Section 8.4 of the Plan required the Debtors to hold in reserve from Available Cash an amount equal to the pro-rata share of any distribution that would have been made to each holder of a Disputed Claim if such Claim were an Allowed Claim.[2]  Under the altered protocol advocated in the Motion, LBHI requests that the Plan be modified so that, instead of holding a pro-rata amount of cash in reserve for payment of Disputed Claims, the Debtors will instead hold only 25% of such reserve in cash and 75% of the remaining reserve in non-cash assets (the "*Non-Cash Reserve Protocol*").  The Trustee opposes this alteration of the Plan at this time because the Non-Cash Reserve Protocol improperly transfers all risk regarding valuation and liquidation of non-cash assets to the holders of Disputed Claims.  Because of the

---

[1] Terms not defined herein shall have the meaning ascribed in the Motion or Plan, as applicable.

[2] It is important to note that while Section 8.4 of the Plan allows for modification of the Plan to substitute non-cash assets for Available Cash in certain circumstances and upon notice to creditors and approval of the Court, the Plan itself does not include any specifics for such substitution.  Rather, the Debtors have only now, pursuant to the Motion, provided the details of the proposed substitution.

uncertain value of the Debtors' non-cash assets, the Trustee is unclear as to whether holders of Disputed Claims will receive the same amount in distributions in the future as holders receiving distributions in any initial distribution. In addition, the terms of the Non-Cash Reserve Protocol are ambiguous and inject needless uncertainty into a distribution process that was already agreed to and approved by creditors and this Court.

### Description of the Proposed Non-Cash Reserve Protocol

Specifically, LBHI proposes the following in the Motion:

A.  **Minimum Cash Reserve and Minimum Asset-to-Reserve Ratio.** In order to retain Non-Cash Assets in lieu of Available Cash to satisfy Disputed Claims if such Claims become Allowed Claims for a particular Distribution, on the applicable Distribution Date:

   i.  the Participating Debtor must retain at least 25% of the Reserve Amount in Available Cash (the "*Minimum Cash Reserve*") (other than as may be necessary in accordance with C(ii) and (iii) below); and

   ii. the ratio of (A) the value of the Participating Debtor's Non-Cash Assets to (B) the amount equal to the Reserve Amount minus the Minimum Cash Reserve for such Participating Debtor must be equal to or greater than 2.5:1 (the "*Minimum Asset-to-Reserve Ratio*").

B.  **Interest.** If a Disputed Claim becomes Allowed and would be entitled to interest pursuant to Section 8.4 of the Plan, the holder of such Claim shall receive interest in an amount equal to the amount that would have been earned if the Debtors had maintained the entire Reserve Amount in Cash only and invested the Cash in the same manner as the Debtors invested the Minimum Cash Reserve.

C.  **Disputed Claims Reserves and Distributions.**

   i.  The Minimum Cash Reserve and Available Cash generated from Non-Cash Assets of a Participating Debtor -- i.e., Cash remaining after satisfaction or reserve for administrative, secured, priority and convenience claims, the projected post-Effective Date costs of administration, and any other postpetition reserve requirements - will be pooled for all holders of Disputed Claims against such Participating Debtor, in the first instance.

   ii. Thereafter, on each Distribution Date, the Minimum Cash Reserve and the Available Cash generated from Non-Cash Assets shall be used (A) first, to remit to each holder of a Disputed Claim that has become Allowed, on a

-3-

       pro rata basis, the amount of Distributions, inclusive of interest, that would have been made on account of each such Allowed Claim up to the applicable Distribution Date as if such Claim had been Allowed on the Effective Date (a "*Catch-Up Distribution*"), and (B) then, to fund a Minimum Cash Reserve for any outstanding Disputed Claims, before any further Distributions may be made on account of unsecured, non-priority Allowed Claims that have previously received all Distributions to which they are entitled without any deficiency.

   iii.   To the extent there is insufficient Available Cash on a Distribution Date to remit to each holder of a Disputed Claim that has become Allowed its Catch-Up Distribution in accordance with C(ii)(A) above, the deficiency shall be satisfied on the subsequent Distribution Date(s) from Available Cash generated from Non-Cash Assets on a pro rata basis with (A) any other previously Disputed Claims that became Allowed but did not receive their entire Catch-Up Distribution, and (B) all holders of Disputed Claims that have become Allowed since the last Distribution Date, in each case, up to the amount of each such holder's Catch-Up Distribution, before a Minimum Cash Reserve is funded and further Distributions are made to holders of unsecured, non-priority Allowed Claims that have previously received all Distributions to which they were entitled.

   iv.   If there is any Available Cash remaining on a Distribution Date after all holders of Allowed Disputed Claims have received their entire Catch-Up Distribution and a Minimum Cash Reserve has been funded for outstanding Disputed Claims, such remaining Available Cash shall be distributed to all holders of unsecured, non-priority Allowed Claims in accordance with the Plan.

D.   <u>Exclusion of Plan Adjustment and Subordinated Debt Redistributions</u>. LBHI shall not substitute Non-Cash Assets for, or advance to holders of Allowed Claims, Cash that has been redistributed pursuant to the Plan Adjustment or Section 6.4 of the Plan (subordinated debt redistributions) and is to be retained and reserved for holders of Disputed Claims to the extent such Claims become Allowed Claims and are entitled to receive such Distributions. Such amounts shall be retained in Cash and segregated exclusively for the benefit of holders of Disputed Claims in LBHI Classes 3 and 7 (in the case of Plan Adjustment) and LBHI Classes 3, 4A, 4B and 5 (in the case of subordinated debt redistributions). If a Disputed Claim in LBHI Classes 3, 4A, 4B, 5 or 7 becomes an Allowed Claim, on the first Distribution Date that the holder of such Claim is entitled to receive a Distribution in accordance with Section 8.4 of the Plan, such holder shall receive: (i) in Cash, the redistributed amounts of Plan Adjustment or subordinated debt redistributions, as applicable, retained on account of such Claim equal to the amount of Plan Adjustment or subordinated debt redistributions that would have been distributed under the Plan on account of such Claim if such Claim had been Allowed as of the Effective Date, inclusive of any interest earned on such amount, and (ii) its remaining Catch-Up Distribution in accordance with the above.

E.   <u>Reporting</u>. The post-Effective Date monthly operating report that is filed by the Plan Administrator at least 20 days after a Distribution Date shall include with respect to each Participating Debtor: (i) the aggregate amount of Distributions remitted to holders of Allowed Claims on the immediately preceding Distribution Date, (ii) the Minimum Cash Reserve amount and percentage retained after such Distribution Date, (iii) the Asset-to-Reserve Ratio existing on such Distribution Date, and (iv) the aggregate shortfall of Catch-Up Distributions, if any, that must be satisfied on subsequent Distribution Dates.

Motion, at ¶8.

## OBJECTIONS

### I. The Reserve Protocol Improperly Transfers All Risk Involving the Valuation and Liquidation of Non-Cash Assets to Holders of Disputed Claims

The Debtors previously proposed the Plan, whose terms creditors voted and agreed upon, and which this Court approved after a confirmation hearing. The approved Plan states that LBHI will reserve from Available Cash an aggregate amount equal to the Pro-Rata Share of Distributions in connection with each Disputed Claim in an amount based upon the least of (a) the filed amount of the claim, (b) the amount of the claim as determined by the Court, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules and (c) such other amount as agreed by the parties, or if certain conditions are met, allows the Debtors to substitute an unspecified amount of non-cash assets for reserves of Available Cash. *See* Section 8.4 of the Plan.

Pursuant to the Motion, the Debtors now seek to dramatically alter the Plan to strip away the guarantees provided to holders of Disputed Claims that sufficient Available Cash would be reserved for them and instead substitute assets that are illiquid and have uncertain value. The Debtors have requested approval of this new protocol, even though they have failed to file any affidavits or declarations with the Motion or other appropriate evidence to support their claim that their Non-Cash Reserve Protocol will provide a reserve for the Holders of Disputed Claims that is equivalent to holding Available Cash Reserves. However, it is certain from the Debtors' protocol itself that holding cash does not equal

holding the illiquid and hard to value assets that the Debtors now seek to substitute for such cash. That a cash component is included in the Non-Cash Reserve Protocol and that non-cash assets are substituted at a 2.5 to 1 ratio for 75% of the cash reserves required under Section 8.4 of the Plan support the assertion that LBHI does not believe that holding such non-cash assets as reserves is equivalent to holding cash. As LBHI notes in the Motion, "reasonable measures" must be taken to ensure that Disputed Claims that may be allowed and Allowed Claims of the same class receive equal treatment under the Plan. *See* Motion, at ¶17; *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) ("a debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment"); *In re Motors Liquidation Co.*, 447 B.R. 198, 216 (Bankr. S.D.N.Y. 2011) ("Everyone gets a pro rata share of the New GM Securities, if and when the claims are allowed. That's equal treatment"). The requirement that reasonable measures be taken to ensure equal treatment was the minimum that the Debtors were required to provide in the Plan to support confirmation.

The Non-Cash Reserve Protocol may not, however, provide the required "reasonable measures" to ensure equal treatment for holders of Disputed Claims. In the Non-Cash Reserve Protocol all market and valuation risks related to the non-cash assets fall solely on the holders of Disputed Claims. The Debtors have been in bankruptcy since July 2008. The Debtors state that the majority of remaining non-cash assets consists of commercial and residential real estate, commercial loans, private equity and principal investments, receivables from derivative contracts and intercompany receivables. Motion, at ¶19. These types of non-cash assets of the Debtors are likely illiquid and difficult to value. The additional types of non-cash assets held by the Debtors and the percentage of the Debtors' non-cash assets that those assets represent are not disclosed in the Motion. LBHI further indicates that absent the authority requested in the Motion, "the Debtors would be constrained to dispose of Non-Cash Assets in less favorable circumstances …." *Id.*, at ¶16. Implicit in this statement are the assumptions that the

markets for the Debtors' non-cash assets will improve over time and that the Debtors' "active management" of these assets will add value without adding risk. *See* id. In fact, however, even if well-managed, these assets are subject to substantial market risk, including but not limited to risks that may arise out of the European sovereign debt crisis and other potentially market moving events. In fact, it was, to some degree, the illiquidity of the Debtors' assets and their inability to value such assets that lead the Debtors to commence these chapter 11 cases. If doubt exists as to the liquidity and value of the Debtors' non-cash assets, the Court should err in providing protections to holders of Disputed Claims to ensure equal treatment rather than over-distributing to holders of Allowed Claims in the first instance. See *In re Chemtura Corp.*, 448 B.R. 635, 669 (Bankr. S.D.N.Y 2011).

In the Motion, the Debtors cite the Recovery Analysis and Cash Flow Estimates set forth as Exhibit 4 and Exhibit 7 of the Disclosure Statement to support their statement that holders of Disputed Claims will not be prejudiced by reliance on non-cash assets because "substantial recoveries" will be realized from the liquidation of non-cash assets. Motion, at ¶19 & n.8. The Recovery Analysis, on page 4-1, however, warns that:

- "[a]ctual results may differ from estimated recoveries and could have a material effect on the recovery percentages"; and

- "[I]t is expected that estimates included in the Recovery Analysis will change, potentially in a material respect." *Id*.

Similarity, the introduction to the Cash Flow Estimates states:

> It should be noted that these cases are large, complex and replete with issues that may result in litigation expenses for an extended period of time. Many of the assumptions are subject to significant uncertainties and the Debtors make no representation regarding either the accuracy of the cash flow estimate or the ability of the management to achieve these results. **Therefore, actual results may vary from the cash flow estimates and the variations may be material.**

at p. 7-1. (Emphasis in Original). LBHI also proposes as part of the Non-Cash Reserve Protocol that non-cash assets will be valued for reserve purposes in accordance with the "most recent balance sheet in

the monthly operating report filed prior to the Distribution Date …." Motion, at ¶8n.5.  However, the Debtors' monthly reports also indicate that those reports are unreliable.  The Amended Monthly Operating Report September 2011 - Supplemental, filed on December 27, 2011 (Docket No. 23766), at page 4, states, among other things that:

- "[t]he Balance Sheets [in the monthly operating report] are not meant to be relied upon as a complete description of the Company, its business, condition (financial of otherwise), results of operations, prospects, assets or liabilities." *Id*.

- "The Balance Sheets do not reflect or provide for all of the consequences of the Company's Chapter 11 cases (i) as to assets, including a wide range of legal claims the Company is pursuing or considering pursuing, their realizable values on a liquidation basis or their availability to satisfy liabilities …." *Id*.

- "The Company has prepared the Balance Sheets … based on the information available to the Company at this time; however, such information may be incomplete and may be materially deficient." *Id*.

- "The Balance Sheets are not prepared in accordance with U.S. Generally Accepted Accounting Principles ('GAAP')." *Id*.

- "[T]he financial information herein is subject to change and any such change may be material." *Id*.

- "[F]uture balance sheets may reflect adjustments (including write-downs and write-offs) to the assets and adjustments to the liabilities, which may be material." *Id*.

- "The Balance Sheets … are not audited .…" *Id*. and

- "[A]ctual results could differ from estimates and may have a material effect on the Balance Sheets .…" *Id*. at 5.

The Trustee is not aware of any other reliable liquidation or other valuation of the Debtors' non-cash assets and LBHI does not offer any evidence with the Motion that the 2.5x ratio of non-cash assets to cash equals equivalent treatment for holders of Disputed Claims to allay the Trustee's concern.  The holders of Disputed Claims did not approve the Non-Cash Reserve Protocol when voting on the Plan.  The Debtors should not now be authorized to alter the Court-approved Plan in a way that may harm the

holders of the Disputed Claims without first providing substantial evidence of the impact of such changes. Rather, the Plan itself assured creditors that sufficient reserves of Available Cash would be held and only alluded to the fact that such a reserve scheme could be modified. Because the Debtors fail to provide such evidence, the claimants may be substantially prejudiced by the Debtors' proposed Non-Cash Reserve Protocol. As a result, the Motion should not be approved.

## II.     The Non-Cash Protocol May Unjustly Pressure the Holders of Disputed Claims

Furthermore, the Non-Cash Protocol imposes pressure on holders of Disputed Claims to settle with the Debtors. While the Trustee does not have knowledge of the Debtors' asset disposition plans, it would seem that the non-cash assets of the Debtors that are more liquid and susceptible to valuation are likely to be sold prior to the sale of the Debtors' more risky assets. As such, those holders of Disputed Claims that settle early with the Debtors may be more likely to obtain equivalent distributions from the sale proceeds of those relatively liquid and easier-to-value assets that are included in reserves. However, as time progresses, the last holders to liquidate their claims will only be able to look to the riskier assets that remain on the Debtors' balance sheets for payment, which assets likely will be most difficult to value and sell and may be subject to considerable fluctuation in market value. Once estate assets are distributed, there may be no additional funds to distribute to the final holders of Disputed Claims. Furthermore, it would be incredibly difficult, if not impossible, to claw back distributions from creditors who have already received distributions in order to ensure that all creditors receive equal treatment. The Non-Cash Protocol, if approved, therefore creates a scenario similar to a rush to the courthouse as the last holders of Disputed Claims to settle with the Debtors or liquidate their claims are the most likely to receive unequal treatment. The Debtors should not be allowed to manipulate and alter a Plan that was already voted upon and approved by the Court in a way that pressures the holders of Disputed Claims to settle on the Debtors' terms.

### III. The Debtors Must Prove that the Non-Cash Protocol Provides Equivalent Reserves to Holders of Disputed Claims as Cash Reserves

Because of the relatively short-notice period for the Motion, the Trustee has not had sufficient opportunity to obtain a detailed analysis of the non-cash assets to be included in the Non-Cash Protocol, which is necessary to determine how the protocol will perform under differing scenarios. Information related to the amount of Disputed Claims and the value of non-cash assets is chiefly in possession of the Debtors. The burden to prove that the Non-Cash Reserve Protocol provides equivalent protection to the holders of Disputed Claims as cash reserves is squarely on the Debtors. The Debtors have failed to meet that burden.

However, besides the issues noted previously, the Trustee expresses concern that the Non-Cash Reserve Protocol creates additional ambiguities that prejudice the holders of Disputed Claims. For example, the term "Non-Cash Assets" is defined circularly in the Non-Cash Reserve Protocol as "a Participating Debtor's unencumbered non-cash assets[,]" which is troubling. Motion, at ¶6. In addition, under the Non-Cash Reserve Protocol, the Minimum Cash Reserve is replenished after a distribution from the proceeds of sale of non-cash assets rather than from all Available Cash. Thus, effectively, 100% of later-liquidating Disputed Claims must rely on non-cash assets and the proceeds thereof for distributions. If the estimated proceeds from liquidation of non-cash assets are overstated, the holders of Disputed Claims will suffer unequal treatment under the Non-Cash Reserve Protocol and likely have no recourse. See *In re Chemtura Corp.*, 448 B.R. at 651 (holders of Disputed Claims that are later allowed "will as a practical matter lose any ability to recover on [their claims]" if reserves are inadequate).

In addition, the protocol applies separately to each participating debtor – each of which is likely to give rise to unique issues, depending on the type of non-cash assets held by that specific Debtor and the amount of Disputed Claims ultimately allowed as against that Debtor. LBHI has proposed a uniform protocol that is applicable to all Participating Debtors, which may not be appropriate. Moreover, LBHI

10

has a significant conflict of interest as the Debtors are negotiating or opposing the Disputed Claims while LBHI retains broad rights to modify the protocol reserving for those claims. *See* Motion, at ¶20. Many possible scenarios exist, all of which cannot be foreseen in this volatile marketplace, and the holders of Disputed Claims should not be subject to unknown and unquantifiable risks when the confirmed Plan already sets forth that the holders can rely on cash reserves for equal treatment under the Plan.

### IV.     The Motion Should be Denied

In summation, the Motion should be denied because the Non-Cash Reserve Protocol improperly modifies the Plan in a way that prejudices the holders of Disputed Claims. If the Motion is not denied in its totality, however, LBHI should be required, at a minimum, to prove to the holders and the Court that the Non-Cash Reserve Protocol provides protection to all holders of Disputed Claims equivalent to holding cash reserves, regardless of whether a Disputed Claim is the first or last to liquidate. In addition, along with addressing the other concerns set forth in this Objection, the percentage of the reserve constituting the Minimum Cash Reserve should be significantly increased, along with the Minimum Asset-to-Reserve Ratio. Furthermore, if the Debtors' Non-Cash Reserve Protocol is approved, it should be amended to state that the floor percentage of the Minimum Cash Reserve must be automatically increased and funded with priority with Available Cash as non-cash assets are liquidated and the proceeds distributed.

Dated: February 15, 2012

                                        Respectfully submitted,

                                        U.S. Bank National Association, as
                                            Trustee

                                        By  s/ Craig M. Price
                                            One of Its Attorneys

11

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
James E. Spiotto (admitted *pro hac vice*)
Ann E. Acker (admitted *pro hac vice*)
Franklin H. Top, III (admitted *pro hac vice*)
Scott A. Lewis

-and-

CHAPMAN AND CUTLER LLP
330 Madison Avenue, 34th Floor
New York, New York 10017-5010
Telephone: (212) 655-6000
Craig M. Price (CP-9039)

12