# EXHIBIT 7

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of June 30, 2004

| **LEHMAN BROTHERS** | **EACH ENTITY LISTED ON APPENDIX A** |
|---|---|
| **SPECIAL FINANCING INC.** | **ACTING BY AND THROUGH** |
| | **PRINCIPAL GLOBAL INVESTORS, LLC** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL
FINANCING INC.**

(Name of Party)

By: _____

Name: _____

Title: Allyson M. Carine
Authorized Signatory

**PRINCIPAL GLOBAL INVESTORS, LLC,
as authorized signatory for the Funds indicated
in Appendix A to this Master Agreement**

(Name of Party)

By: _____

Name: *AUTHORIZED SIGNATORY*

Title: _____

By: _____

Name: *AUTHORIZED SIGNATORY*

Title: _____

**PRINCIPAL GLOBAL INVESTORS, LLC,
on its own behalf, with respect to Part 5,
Paragraphs (c)(iv), (e), (n) and (v) of this Schedule**

By: _____

Name: *AUTHORIZED SIGNATORY*

Title: _____

By: _____

Name: *AUTHORIZED SIGNATORY*

Title: _____

**Execution Copy**

**SCHEDULE**

to the Master Agreement

dated as of June 30, 2004

between

**Lehman Brothers Special Financing Inc. ("Party A")**

and

**Each of the entities listed on the attached Appendix "A", under the column "FUND NAME"**

(separately and individually as "Fund" or "Party B")

acting by and through

**PRINCIPAL GLOBAL INVESTORS, LLC**
(the "Investment Manager")

*It is understood and agreed that this Schedule shall constitute a separate agreement between Party A and each Fund listed on Appendix A attached hereto, as if each such Fund had executed a separate document naming only itself as Party B, and that no Fund listed on Appendix A shall have any liability for the obligations of any other Fund so listed. With respect to any one such Fund, (i) only Confirmations of Transactions between Party A and the Fund as Party B shall be part of the Agreement with such Fund and (ii) any references in the Confirmations to the Schedule shall be deemed to refer to the Schedule as prepared for such Fund and any Annex applicable to such Fund, and the term "this Agreement" shall be construed accordingly.*

**Part 1.  Termination Provisions.**

In this Agreement:

(a)     **"*Specified Entity*"** has no meaning in relation to either Party A or Party B.

(b)     **"*Specified Transaction*"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"*Cross Default*"** provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature, or from the general unavailability or nontransferability of the currency in which the Specified Indebtedness is denominated due to governmental action or exchange controls or similar action, or due to a claim which is contested in good faith; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay, or in the case of a disputed claim, within 3 days after the

issuance by a court, tribunal or arbitrator of a final judgment, decision or order requiring payment by such party on account of the disputed claim."

The **"Cross Default"** provisions of Section 5(a)(vi), shall be amended as follows:

Section 5(a)(vi) is hereby amended by deleting in the seventh line thereof the words ", or becoming capable at such time of being declared".

If such provisions apply:

*"Specified Indebtedness"* shall have the meaning specified in Section 14.

*"Threshold Amount"* means:

(i)     with respect to Party A and Lehman Brothers Holdings Inc. ("Holdings"), the lesser of (i) USD 75,000,000 (or its equivalent in any other currencies) or (ii) two percent (2%) of the Stockholders' Equity of Holdings, and,

(ii)    with respect to each Party B, the lesser of (i) USD 75,000,000 (or its equivalent in any other currencies) or (ii) two percent (2%) of the Stockholders' Equity of Party B.

For the purposes of Section 5(a)(vi) of this Agreement, in relation to a party, any Specified Indebtedness denominated in a currency other than the currency in which the financial statements of such party are denominated will be converted into the currency in which such financial statements are denominated at the exchange rate therefor reasonably chosen by the other party as of the date of determination.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B, amended as follows:

The Credit Event Upon Merger provision of Section 5(b)(iv) shall be deleted in its entirety and replaced with the following:

"(iv)    If "Credit Event Upon Merger" is specified as applying to the Party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity (any such party or entity in each case, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) and the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than those of X immediately prior to the occurrence of such Designated Event (and in any event, such party or the successor, surviving or transferee entity, as appropriate, will be the Affected Party). For purposes hereof, (A) a Designated Event with respect to X means that, after the date hereof:

(i)     X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)    any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X.

and (B) the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. fails to maintain a long-term senior unsecured debt rating of at least Baa2 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). In the event of a split rating, the lower rating shall be determinative."

(e)     The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     *"Payments on Early Termination."* For the purpose of Section 6(e) of this Agreement:

   (i)     Market Quotation will apply.

   (ii)    The Second Method will apply.

(g)     *"Termination Currency"* means U.S. Dollars.

(h)     The following *"Additional Termination Events"* will apply:

   (i)     *Termination Upon Downgrade.*

      *(A) Party A Termination Upon Downgrade.* The occurrence of any of the following events specified in this subparagraph (A) shall constitute an Additional Termination Event with respect to Party A, and Party A shall be the sole Affected Party: if: (1) the rating issued by S&P or Moody's with respect to the long-term, senior unsecured, unsubordinated debt securities ("Debt Securities") of Holdings is less than BBB, in the case of S&P, or Baa2 in the case of Moody's or (2) S&P or Moody's ceases to issue a rating with respect to Party A's Debt Securities (and such rating agency continues to be in the business of rating Debt Securities).

      With respect to subparagraph (A) above, if either S&P or Moody's ceases to be in the business of rating Debt Securities and such business is not continued by a successor or assign of such agency (the "Discontinued Agency"), Party A and Party B shall jointly and in good faith (i) select a credit rating agency in substitution thereof and (ii) agree on the rating level issued by such substitute agency that is equivalent to the ratings specified herein of the Discontinued Agency, whereupon such substitute agency and equivalent rating shall replace the Discontinued Agency and the rating level thereof for the purposes of this Agreement. If at any time, not less than all of the agencies specified have become Discontinued Agencies and Party A and Party B cannot agree in good faith on at least one agency and equivalent rating in substitution for the Discontinued Agencies and the applicable rating thereof, then an Additional Termination Event shall be deemed to have occurred with respect to all Transactions governed by this Agreement and with respect to which both parties shall be Affected Parties.

      *(B) Party B Termination Upon Downgrade.* If "Ratings Downgrade" is designated on Appendix A as applying with respect to Party B, then the occurrence of any of the following events specified in this subparagraph (B) shall constitute an Additional Termination Event with respect to Party B and Party B shall be the sole Affected Party, if: (1) the rating issued by S&P or Moody's with respect to the long term senior unsecured, unsubordinated debt securities ("Debt Securities") (or the rating issued by S&P or Moody's with respect to the Financial Strength Rating of Party B if Party B does not have a rating issued with respect to Debt Securities), is less than BBB in the case of S&P or Baa2 in the case of Moody's or (2) S&P or Moody's ceases to issue a rating with respect to Party B's Debt Securities or the rating issued by S&P or Moody's with respect to the Financial Strength Rating of Party B if Party B does not have a rating issued with respect to Debt Securities (and such rating agency continues to be in the business of rating Debt Securities or Financial Strength as applicable).

With respect to subparagraph (B) above, if either S&P or Moody's ceases to be in the business of rating Debt Securities and such business is not continued by a successor or assign of such agency (the "Discontinued Agency"), Party A and Party B shall jointly and in good faith (i) select a credit rating agency in substitution thereof and (ii) agree on the rating level issued by such substitute agency that is equivalent to the ratings specified herein of the Discontinued Agency, whereupon such substitute agency and equivalent rating shall replace the Discontinued Agency and the rating level thereof for the purposes of this Agreement. If at any time, not less than all of the agencies specified have become Discontinued Agencies and Party A and Party B cannot agree in good faith on at least one agency and equivalent rating in substitution for the Discontinued Agencies and the applicable rating thereof, then an Additional Termination Event shall be deemed to have occurred with respect to all Transactions governed by this Agreement and with respect to which both parties shall be Affected Parties.

(ii)  **Intervention.** It shall be an Additional Termination Event with respect to Party B if (x) any regulatory authority takes action to intervene into the active management or business affairs of Party B, including without limitation, the commencement of a rehabilitation, liquidation or delinquency proceeding or the application to a court to commence the same and such action materially and adversely affects Party B's ability to perform its material obligations, or (y) a regulatory authority commences a supervisory proceeding and such action materially and adversely affects Party B's ability to perform its obligations under this Agreement. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(iii)  **Material Amendment.** It shall be an Additional Termination Event with respect to Party B (as the Affected party) if any Operative Document (as hereinafter defined) is amended or modified in a manner which, in the good faith and judgment of Party A exercised in a commercially reasonable manner, shall have a material and adverse effect on the ability or authority of Party B to perform its obligations under this Agreement; provided, however, that if such modification or amendment materially and adversely affects the ability of Party B to perform its obligations under  less than all Transactions under this Agreement, then it shall be an Additional Termination Event only with respect to those Transactions affected by such modification or amendment, and Party A's right to designate an Early Termination Date shall be limited to those Transactions affected under this provision.  It shall be an Additional Termination Event with respect to Party B if the management agreement between Party B and its Investment Manager is amended or modified in a manner which has a material and adverse effect on the ability of Party B to perform its obligations under this Agreement or any Transaction hereunder; provided, however, that if such modification or amendment materially and adversely affects the ability of Party B to perform its obligations under  less than all Transactions under this Agreement, then it shall be an Additional Termination Event only with respect to those Transactions affected by such modification or amendment and Party A's right to designate an Early Termination Date shall be limited to those Transactions affected under this provision. For the purpose of the foregoing Termination Events, Party B shall be the sole Affected Party.

(iv)  **Change in Management or Control.** It shall be an Additional Termination Event with respect to Party B if (A) an event listed in Section 5(a)(vii) occurs with respect to the Investment Advisor; (B) the Investment Advisor has any of its registrations, authorizations, licenses or memberships with any federal or state governmental or regulatory authority revoked, suspended, terminated, limited or qualified or (C) the Investment Advisor ceases to be the investment advisor with respect to Party B and another investment advisor with substantially similar management that is an Affiliate of the Investment Advisor is not appointed as the investment manager, and in each case, another investment manager that is reasonably acceptable to Party A is not simultaneously appointed as the investment manager to Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(v)     **Waiver.** For purposes of Part 1(h)(i),(ii), (iii) and (iv) above, in the event that a party does not designate an Early Termination Date by written notice to the other party within 30 (thirty) New York business days (the "Tolling Period") from acknowledging receipt of notice from an Affected Party of the occurrence of an Additional Termination Event (sent by the Affected Party as required by Section 6(b)(i) of the Agreement) (the "Notice of Termination Event"), then such non-Affected Party's right to declare an Early Termination Date with respect to such Additional Termination Event shall be waived for purposes of that incidence of the event that constituted an Additional Termination Event; provided, that in order for this waiver to be effective, such Notice of Termination Event (a) must be delivered by the Affected Party or its agent to each of the (i) general counsel of the non-Affected Party (ii) head of derivatives trading of the non-Affected Party and (iii) chief credit officer of the non-Affected Party in each case within ten (10) Local Business Days of the occurrence of such Additional Termination Event, and (b) must describe with specificity (I) the Additional Termination Event that has led to such notice being delivered, (II) the non-Affected Party's right to terminate pursuant to the occurrence of such event and (III) the time-frame within which such termination must occur before any waiver hereunder takes effect.    Each Party agrees to acknowledge in writing the receipt of a Notice of Termination under this section promptly upon receipt and in any case no later than 3 Local Business Days following its receipt of such Notice of Termination, after which a verbal acknowledgment may be obtained from the other party. The Notice of Termination Event must be acknowledged as received by the non-Affected Party in order for the Tolling Period to commence. Any waiver effected pursuant to this provision is without prejudice to the non-Affected Party's ability to designate an Early Termination Date as a result of or with respect to the incidence of any other Termination Event under this Agreement, or subsequent incidences of an event that comprised an Additional Termination Event that was waived hereunder, subject in such cases, to the terms of this sub-section (h)(v). In the event that an Additional Termination Event occurs that is waived, a new Tolling Period may begin with respect to the same event if the non-Affected Party acquires new, updated or more comprehensive information with respect to such event that had such information been provided to the non-Affected Party prior to the end of the Tolling Period, the non-Affected Party may have made a decision to designate an Early Termination Date with respect to one or more Transactions with respect to such event rather than allow the waiver of the Additional Termination Event hereunder to take effect.

Notices provided to Party A and Party B under this Waiver provision shall be directed to the attention of the (1) General Counsel, (2) Head of Derivatives Trading and (3) Chief Credit Officer at the following addresses:

Party A: Lehman Brothers Special Financing Inc.
         c/o Lehman Brothers Inc.
         745 Seventh Avenue,
         New York, NY 10019

Party B: Principal Global Investors, LLC
         801 Grand Ave.
         Des Moines, IA  50392-0301

## Part 2. Tax Representations.

(a)     *Payer Tax Representation.* For the purpose of Section 3(e), Party A and Party B hereby make the following representation: It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e)) to be made by it to the other party under this Agreement. In making this representation, it may rely on: (A) the accuracy of any representation made by the other party pursuant to Section 3(f); (B) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii); and (C) the satisfaction of the agreement of the other party contained in Section 4(d); provided

that it shall not be a breach of this representation where reliance is placed on clause (B) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.**

For the purposes of Section 3(f), Party A makes the following representations:

(i)     It is a U.S. person within the meaning of § 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("Code"), as modified by Treas. Reg. § 1.1441-1(c)(8), and its U.S. taxpayer identification number is 11-275-1029; and

(ii)    Party A is a corporation, as defined in Code §7701(a)(3);

For purposes of Section 3(f) of this Agreement, Party B makes the representations specified in Appendix B as applicable with respect to such party.

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Sections 4(a) (i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(i)    **Tax forms, documents or certificates to be delivered are:**

Each party agrees to complete, accurately and in a manner reasonably satisfactory to the other party (or any Specified Entity of the other party), and to execute, arrange for any required certification of, and deliver to the other party (or such Specified Entity) (or to such government or taxing authority as the other party (or such Specified Entity) reasonably directs), any form or document that may be required or reasonably requested in order to allow the other party (or such Specified Entity) to make a payment under this Agreement (or a Credit Support Document of the other party or a Specified Entity thereof) without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, promptly upon reasonable demand by the other party (or such Specified Entity).  Other tax forms, documents or certificates to be delivered are:

| Party required to deliver Document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | With respect to each Transaction that is entered into under this Agreement by Party B (if Party B is a U.S. tax entity) one duly executed and completed U.S. Internal Revenue Service Form W-9 (or successor thereto). | (i) Upon execution and delivery of this Agreement, and (ii) promptly upon reasonable demand by Party A. |
| Party A | With respect to each Transaction that is entered into under this Agreement by Party A one duly executed and completed U.S. Internal Revenue Service Form W-9 (or successor thereto). | (i) Upon execution and delivery of this Agreement; and (ii) promptly upon reasonable demand by Party B. |

(j)    **Other documents to be delivered are:**

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement and each Credit Support Document or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement; and, upon request, at the time of execution of each Confirmation forming a part of this Agreement. | Yes |
| Party A | Secretary's certificate or other evidence reasonably acceptable to Party B of Party A's and Party A's Credit Support Provider's authority to enter into this Agreement and the Credit Support Document, as applicable. | On or before execution of this Agreement; and, upon Party B's request, at the time of execution of each Confirmation forming a part of this Agreement. | Yes |
| Party A and Party B | Credit Support Document(s) described in Part 4(f) of this Schedule. | On or before execution of this Agreement. | No |
| Party B | Excerpts from the Investment Management Agreements for each Party B listed on Appendix A, authorizing Investment Advisor to act as an agent and/or authorized signatory for each Fund. | Immediately upon or before execution of this Agreement. | Yes |
| Party A | Annual audited financial statements and quarterly financial statements (unaudited) of its Credit Support Provider prepared in accordance with generally accepted accounting principles in the country in which Party A is organized. | Promptly after request. | Yes, but solely with respect to audited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party B | Annual audited financial statements of Party B prepared in accordance with generally accepted accounting principles or statutory accounting principles (as applicable to Party B) in the country in which Party B is organized. | Not more than 120 days after the relevant year end or earlier, if available, upon Party A's reasonable request. | Yes, but solely with respect to audited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | A copy of the unaudited financial statements of Party B prepared in accordance with generally accepted accounting principles in the country in which Party B is organized. | Not more than 60 days after the end of the relevant quarter (except the last quarter of each fiscal year) or earlier, if available, upon Party A's reasonable request. | Yes, but solely with respect to unaudited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party B | Operative Documents specified in Part 5(o) of this Schedule. | Upon execution of this Agreement. | Yes |
| Party B | Investment Manager side letter in the form attached hereto as Appendix D to this Schedule. | Upon execution of this Agreement. | No |

**Part 4. Miscellaneous**

(a)    *Addresses for Notices.*  For the purposes of Section 12(a) of this Agreement:

(i) All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for all other purposes including for the purposes of Sections 5 or 6 shall be sent to:

Address:    Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
745 Seventh Avenue, 28th Floor
New York, NY 10019

Attention:    Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672

(ii) All confirmations, notices or communications to Party B shall be sent to the address, or facsimile number reflected below:

Address:    Principal Global Investors, LLC
Investment Accounting – Securities
711 High Street, Des Moines Iowa 50392-096

Attention:    Chris Butler, Investment Accounting – Securities
Facsimile:    515-283-5961
Telephone:    515-247-4957
Email    DLGAMCOMPLIANCE@EXCHANGE.PRINCIPAL.COM

In addition, any amendments to this Agreement, any notices issued pursuant to Sections 5, 6 and 7, and any changes to Party A's address, telephone or facsimile number, must also be sent to:

| | |
|---|---|
| Address: | Principal Global Investors, LLC |
| | 801 Grand Ave, Des Moines, IA  50392-0301 |
| Attention: | Derivatives Counsel |
| Facsimile: | 515-248-0483 |
| Telephone: | 515-247-0990 |

(b)  *Process Agent.*  For the purpose of Section 13(c) of this Agreement:

(i)    Party A appoints as its Process Agent:  Not Applicable

(ii)   Party B appoints as its Process Agent:  Not Applicable

(c)  *Offices*. The provisions of Section 10(a) of this Agreement will apply to Party A and Party B.

(d)  *Multibranch Party.*  For the purpose of Section 10(c) of this Agreement:

(i)    Party A is not a Multibranch Party.

(ii)   Party B is not a Multibranch Party.

(e)  *Calculation Agent.*  The Calculation Agent is Party A, unless an Event of Default or Potential Event of Default or Termination Event under Section 5(b)(iv) has occurred and is continuing with respect to Party A or unless otherwise specified in a Confirmation in relation to the relevant Transaction, in which case Party B shall be entitled to appoint a financial institution which would qualify as a Reference Market-maker to act as Calculation Agent until the earlier of (i) the designation of an Early Termination Event under Section 6(c)(ii), and (ii) the discontinuance of the relevant Event of Default with respect to Party A. All determinations and calculations by the Calculation Agent shall be made in good faith.  If Party B objects to a particular calculation or determination made by the Calculation Agent, then the relevant party will deliver the undisputed amount on the relevant Payment Date as specified in the Confirmation.  If the parties continue to be unable to agree on a particular calculation or determination, the parties will designate a mutually acceptable leading dealer in the relevant market to make the calculation or determination (a "Substitute Calculation Agent"), whose determination shall be binding absent manifest error. If the parties are unable to agree on a leading dealer, then each party shall appoint a leading dealer in the relevant market (that is not an affiliate of either Party A or Party B) and the two appointed dealers shall appoint a third leading dealer (that is not an affiliate of either Party A or Party B or of one of the two appointed dealers) to make the determination or calculation in dispute, whose determination shall be binding absent manifest error.  If the Substitute Calculation Agent agrees with the determination of a party, the costs of the Substitute Calculation Agent shall be borne by the other party. If the Substitute Calculation Agent's determination or calculation is not in agreement with either Party A or Party B, then the cost of the Substitute Calculation Agent shall be born equally by the parties. Interest shall be due and payable on amounts not paid pursuant to any dispute upon resolution in accordance with the terms of the Agreement from the time such payments were due under the Confirmation until such time payments are made in accordance with this provision.

(f)  *Credit Support Document.*  Details of any Credit Support Document:

(i)    *Credit Support Document* with respect to Party A means: the Credit Support Annex and a guarantee of Party A's obligations hereunder attached hereto as Appendix C to this Schedule.

(ii)   *Credit Support Document* with respect to Party B means: the Credit Support Annex.

(g)    *"Credit Support Provider"* means:

(i)    *Credit Support Provider* with respect to Party A means:  Lehman Brothers Holdings Inc.

(ii)    *Credit Support Provider* with respect to Party B means:  Not applicable.

(h)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York.

(i)    *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will not apply, unless designated in a confirmation.

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement; provided however that for purposes of Section 3(c), Affiliate shall mean "None"; and provided further that with respect to Party A, the definition of Section 14 of this Agreement shall exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5.  Other Provisions.**

(a)    *Set-Off.*  Section 6 is hereby amended by adding the following additional provision (f):

"(f)    *Set-Off.*  Any amount (the 'Early Termination Amount') payable to one party (the Payee) by the other party (the Payer) under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) or 5(b)(v) (where all Transactions are Affected Transactions) has occurred, will, at the option of the party ('X') other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the 'Other Agreement Amount') payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of, the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off).  X will give notice to the other party within five (5) Business Days of any set-off effected under this Section 6(f) and shall provide oral details of any set-off immediately upon request by the Defaulting Party or Affected Party.

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest.  This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

For the avoidance of doubt, upon the occurrence of an Event of Default, Credit Event Upon Merger or Additional Termination with respect to Party B Party A may exercise set-off rights under this paragraph only against assets of the relevant Party B.  In no event shall Party A exercise set-off rights against and other assets allocated to any other funds, separate account, or the Investment Advisor, nor against any other assets Party A may hold which do not constitute assets of Party B."

(b)    *Representations*.  Section 3(a) is amended by adding the following paragraphs:

(vi)    *No Agency*.  In the case of Party B, Party B is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(vii)    *Eligible Contract Participant*.  It is an "eligible contract participant" under, and as defined in, the Commodity Futures Modernization Act of 2000 and was not formed solely for the purposes of constituting an "eligible contract participant" (an "ECP").

(viii)    *Trading Excluded Commodities or Exempt Commodities on an Electronic Trading Facility*. (i) In the event that the parties are deemed to have traded any "excluded commodity" (as such term is defined in section 1a(13) of the CEA (7 U.S.C. § 1a(13))) on an "electronic trading facility" ("ETF") (as such term is defined in section 1a(10) of the CEA (7 U.S.C. § 1a(10))), it is an ECP other than solely because it is acting or may act as a broker or perform an equivalent agency function on behalf of a person described in section 1a(12)(A) or (C) of the CEA (7 U.S.C. § 1a(12)(A) and (C)), and otherwise satisfies the terms of section 1a(12)(B)(i) of the CEA (7 U.S.C. § 1a(12)(B)(i)); and (ii) in the event that the parties are deemed to have traded any "exempt commodity" (as such term is defined in section 1a(14) of the CEA (7 U.S.C. § 1a(14))) on an ETF, it is an "eligible commercial entity" (as such term is defined in section 1a(11) of the CEA (7 U.S.C. § 1a(11))).

(ix)    *Compliance with Internal Investment Policies*.  In the case of Party B, each Transaction entered into under this Agreement will be entered into in accordance with, and will at all times comply with, applicable internal investment policies and guidelines from time to time adopted by Party B.

(x)    *Securities Act Representations*.  Each party acknowledges its understanding that the offer and sale of any Transaction with the other party is intended to be exempt from registration under the Securities Act, by virtue of Section 4(2) of the Securities Act or otherwise.  In furtherance thereof, each party represents and warrants to the other party that (i) it has the financial ability to bear the economic risk of its investment, including a loss of its entire investment, and (ii) it is an "accredited investor" as that term is defined under Regulation D under the Securities Act.

(c)    *Relationship Between Parties*.  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that:

(i)    *Non-Reliance*.  It is acting for its own account or as an authorized agent for the funds listed in Appendix A, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)    *Assessment and Understanding*.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

(iii)    *Status of Parties*.  Party A and Party B acknowledge the other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(iv)  **Identification and Acknowledgement of Investment Advisors.** In the case of Party B, Party B represents that Principal Global Investors, LLC ("PGI") is its Investment Advisor, and that such Investment Advisor is duly authorized and empowered by Party B to enter into this Agreement and all Transactions hereunder. Party B and its Investment Advisor, acknowledge that PGI is Party B's investment advisor and except as may be specifically provided herein, is not a party to this Agreement.

(v)  **ERISA Representation.** If the source of Party B's funds is an insurance company account, Party B represents and warrants to Party A that Party B's source of funds is an "insurance company general account" as defined in the United States Department of Labor Prohibited Transaction Class Exemption for Certain Transactions Involving Insurance Company General Accounts, PTE 95-60. Party B further represents and warrants that each Transaction that is within the control of Party B or the Investment Advisor hereunder shall be exempt from the restrictions of Sections 406(a), 406(b) and 407(a) of the Employee Retirement Income Security Act of 1974, as amended, and the taxes imposed by Sections 4975(a), 4975(b) and 4975(c) of the Internal Revenue Code of 1986, as amended.

(vi)  **No Plan Assets.** If the source of the assets of Party B are not an insurance company account, the source of Party B's assets do not and will not constitute "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended, or any successor statute

(d)  **WAIVER OF JURY TRIAL.** EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS AGREEMENT.

(e)  **Consent to Recording.** Party A and Investment Advisor: (i) consent to the recording of all telephone conversations between their trading, operations and marketing personnel, including their Affiliates, in connection with this Agreement or any potential Transaction; and (ii) Party A, Party B and Investment Advisor agree that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(f)  **Scope of Agreement.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to specific Specified Transactions, all Specified Transactions then outstanding or any future Specified Transactions between Offices of the parties listed in Part 4(d) shall be subject to the terms hereof, and each such Specified Transaction shall be a "Transaction" for purposes of this Agreement.

(g)  **ISDA Definitions.** This Agreement, each Confirmation and each Transaction are subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc., (the "2000 ISDA Definitions"). The 1998 FX & Currency Option Definitions (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Trader's Association and the Foreign Exchange Committee (the "1998 FX Definitions") and the 2000 ISDA Definitions (collectively the "ISDA Definitions) are hereby incorporated in their entirety and shall apply to any Foreign Currency Transaction or Currency Option entered into by the parties hereto. Unless otherwise specified in a Confirmation, any capitalised terms used herein and not otherwise defined herein shall have the respective meanings ascribed to them in the ISDA Definitions. In the event of any inconsistency between the provisions of this Agreement and the ISDA Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of the Credit Support Documents, if any, and the ISDA Definitions, the Credit Support Documents will prevail.

(h)     **Tax Event.**  Section 5(b)(ii) of this Agreement is hereby amended by the deletion of "or there is a substantial likelihood that it will," from line four thereof.

(i)     **Transfer.**  Section 7 is hereby amended by adding after the words "written consent" and before the words "of the other party" the words, "which shall not be unreasonably withheld, or delayed"; notwithstanding Section 7 of this Agreement as amended hereby, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the full and unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate provided that (a) Party B receives an executed acceptance and assumption (the "Assumption") by the assignee of the transferred obligations of Party A, (b) Party B receives an executed unconditional guarantee by Holdings of the obligations of the assignee to Party B in the form of Appendix C to the Schedule mutatis mutandis; (c) Party B is notified of such assignment no less than twenty (20) Business Days prior to such assignment, (d) in the Assumption, the assignee agrees to the terms of an ISDA Master Agreement with the same terms as the terms of this Agreement as if such entity had executed such ISDA Master Agreement, and (e) Party B is not required to make any additional payments (as a result of withholding or otherwise) or receive any payment other than what it would have paid or received (under this Agreement) had the transfer not occurred.

(j)     **Inconsistency.**  Section 1(b) of the Agreement shall be amended by the addition of the following sentences at the end thereof:

"Notwithstanding the foregoing, the Confirmation shall not amend the Agreement with respect to Sections 5 or 6 of this Agreement unless such amendment is applicable solely with respect to the Transaction being confirmed by that Confirmation and such Transaction is the sole Affected Transaction.   In the event of an inconsistency between the provisions of the Schedule and the Confirmation with respect to Sections 5 or 6 of the Agreement, as such Sections govern all or some of the Transactions subject to the Agreement, the Schedule shall govern.  In the event of an inconsistency between the provisions of the Schedule and the Confirmation with respect to Sections 5 or 6 of the Agreement, if such modifications in the Confirmation to the Sections govern only the Transaction that is being confirmed by the Confirmation as the sole Affected Transaction, then the Confirmation shall govern."

(k)     **Severability.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction in respect of any Transaction shall, as to such Transaction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement or affecting the validity or enforceability of such provision as to any other jurisdiction or Transaction unless such severance shall substantially impair the benefits of the remaining portions of this Agreement or changes the reciprocal obligations of the parties.   It shall in particular be understood that this Severability clause shall not affect the "single-agreement" concept of provision 1(c) of the Master Agreement.  The parties hereto shall endeavor in good faith negotiations to replace the prohibited or unenforceable provision with a valid provision, the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

(l)     **Confidentiality.**  This Agreement, all Transactions subject to this Agreement,  and any information made available by one party or its Advisors (as defined below) to the other party or its Advisors with respect to this Agreement or any Transaction subject to this Agreement, are confidential (collectively referred to hereafter as "Confidential Information").  Each party shall at a minimum use the same efforts and standard of care with respect to Confidential Information provided by the other party that it uses to preserve its own Confidential Information.  Confidential Information shall not be disclosed by a party or its Advisors (defined below) to any third party (nor shall any public announcement relating to this Agreement be made by either party), except for such information (i) as may become generally available to the public, (ii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, stock exchange reporting requirement or accounting disclosure rule or standard, (iii) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the other party in making such disclosure, or (iv) as may be furnished to that party's auditors, attorneys, affiliates, investors, potential investors or advisors (collectively the "Advisors") who shall be

requested to keep the information that is disclosed in confidence. This provision shall remain in effect two years following the termination of the last Transaction subject to this Agreement. When this provision ceases to be in effect, Party A shall treat the Confidential Information as confidential in accordance with its then current internal procedures.

(m)   *Reference Market-makers.* The definition of "Reference Market-makers" in Section 14 of this Agreement is hereby amended by: (i) deleting "to the extent practicable" from the fourth line thereof, (ii) deleting in the fourth line thereof after the word "dealers" the words "having an office in the same city" and (iii) replacing such words with the words "who enter into transactions similar in nature to such Transactions".

(n)   *Agreements.* Section 4 of this Agreement is hereby amended by the addition of Section 4(f) as follows:

"(f)   *Agent's Liability.* For purposes of clarification, the Fund's Investment Advisor is acting at all times hereunder as agent for Party B and is not a "party" to this agreement except to the extent specifically provided for herein. Investment Advisor's obligations under this Agreement shall not include a guarantee of performance by any Fund, and Party A's remedies hereunder shall not include any rights against, or right of setoff in respect of rights or obligations, if any, of such Investment Advisor arising in other transactions (if any) in which it is acting on its own behalf."

(o)   *Definitions.* Section 14 is hereby amended to include the following definitions in their appropriate alphabetical order:

"*Fund*" For purposes of this Agreement, Party B may be referred to herein as a "Fund." For purposes of clarity, unless otherwise stated, the terms of this Agreement are intended to apply solely to those assets and liabilities of Party B that are subject to an Investment Management Agreement with Principal Global Investors, LLC or a successor or replacement investment advisor. Where the term "Funds" appears, it is intended to mean each Party B in its individual capacity, and not collectively.

"*Operative Documents*" means the excerpts of the investment management agreement between Party B and the Investment Advisor and other constituent documents, investment policies, procedures, restrictions, or guidelines and the then-current disclosure document of Party B to the extent necessary to establish the authority of the investment advisor.

"*Investment Advisor*" or "*Investment Manager.*" Principal Global Investors, LLC or a successor investment manager with substantially similar management that is an Affiliate of the Investment Advisor. As of the date of this Agreement, the Investment Advisor hereunder is Principal Global Investors, LLC, a Delaware limited liability company.

(p)   *Separate Contracts.* Section 1(c) hereof is hereby deleted in its entirety and replaced by the following new Section 1(c):

"(c)   Anything in the Master Agreement to the contrary notwithstanding, all Transactions between Party A and any particular Fund (as such term is defined in the Schedule), and all Confirmations thereof, shall constitute a single business and contractual relationship made in consideration of each other (each such business and contractual relationship, a "Separate Agreement"), separate and apart from all Transactions, Confirmations thereof, between Party A and any other Fund pursuant to this Master Agreement. Each such Separate Agreement shall incorporate and be governed by the terms and provisions of this Master Agreement. With respect to each such Separate Agreement:

(i)   all references herein to "this Agreement" shall be construed solely as references to such Separate Agreement;

(ii)   all references herein to "Party B," or to any Party insofar as they apply to Party B, shall be construed solely as references to the applicable Fund, and not as references to any other fund;

(iii)     the netting provisions in Section 2(c) hereof shall apply solely to Transactions included within such Separate Agreement, and there shall be no netting of payments among Transactions that are included in different Separate Agreements;

(iv)     no default by another fund and no Event of Default or Termination Event with respect to another Separate Agreement shall constitute an Event of Default or Termination Event with respect to such Separate Agreement;

(v)     the provisions of Section 6(c) hereof regarding Payments on Early Termination shall be applied separately to such Separate Agreement, and there shall be no netting of amounts payable pursuant hereto with respect to different Separate Agreements; and

(vi)     The Credit Support Annex attached hereto shall constitute a separate security agreement between Party A and the applicable Fund (each such agreement, a "Security Agreement"); each such Security Agreement shall incorporate and be governed by all the terms and provisions of the Credit Support Annex, but shall constitute a separate contract, all references in the Credit Support Annex to "Party B" or to any Party insofar as they apply to Party B, shall be construed solely as references to the applicable Fund, and not as references to any other fund; all references therein to "this Agreement" shall be construed solely as references to the applicable Separate Agreement; all references herein to "this Annex" shall be construed solely as references to such Security Agreement; and the collateral requirements and other provisions of each such Security Agreement shall apply solely to Transactions included in the applicable Separate Agreement, and no collateral shall be required under any such Security Agreement for Transactions included in any other Separate Agreement.

(q)     **_Additional Representations of Party A and Party B._**  Each party represents to the other party (at all times until termination of this Agreement) that:

(i)     It understands that the Transactions contemplated hereunder are subject to complex risks that may arise without warning, may at times be volatile, and that losses may occur quickly and in unanticipated magnitude.

(ii)     It is a sophisticated investor able to evaluate the terms, conditions, and risks of the Transactions contemplated hereunder and accepts such terms, conditions and risks.

(iii)     It is capable of assuming and assumes, all risks (financial and otherwise) associated with the Transactions contemplated hereunder.

(iv)     With respect to this Agreement and each Transaction, it will maintain, and be in full compliance with, all Operative Documents, and this Agreement and each Transaction is, and will be authorized and permissible transactions and investments thereunder.

(r)     **_Section 3(a)(iii)_** is hereby amended by inserting the words "or investment policies, guidelines, procedures, or restrictions, or investment management agreements.

(s)     **_Obligations Relating to Representations._**  Each party covenants that it will not take any action or fail to take any action during the term of this Agreement that might render any of the material representations and warranties in this Agreement (including this Schedule) made by it or on its behalf untrue, incorrect or incomplete, and if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete,  such party will promptly give written notice thereof to the other party.

(t)     **_Reliance on the Investment Advisor._**  Pursuant to the Trading Authorization, Party B has granted the Investment Advisor authority to make investment decisions for, in the name of, and on behalf of, Party B, including without limitation the power and authority to enter into Transactions as the agent for the account of Party B and to advise and direct Party B to enter into this Agreement and Transactions and to

execute and deliver Confirmations in connection therewith. In connection with Party B's entering into this Agreement and any Transactions hereunder, and except as otherwise provided in this Part 5(t) of this Schedule, at all times prior to the termination of this Agreement and all Transactions hereunder, Party A will be entitled to rely conclusively upon such Trading Authorization as being in full force and effect and Party A will be entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document furnished to Party A by an employee or agent of the Investment Advisor which Party A reasonably believes to be genuine in connection with this Agreement and the Transactions as though such request, instruction, certificate, opinion, or other document was given by Party B, until such time that Party B affirmatively, and upon written notice to Party A, revokes, terminates, or modifies the Trading Authorization.

(u)    ***Compliance with Applicable Policies and Procedures.*** Each party represents and covenants that this Agreement and any Transaction entered into under this Agreement will not violate the provisions of any policies and procedures adopted by such party's Board of Directors and/or filed with any regulatory authority who exercises regulatory oversight over it.


**IN WITNESS WHEREOF** the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____

Name:

Title:    Allyson M. Carine
          Authorized Signatory

**PRINCIPAL GLOBAL INVESTORS, LLC,
as authorized signatory for the Funds indicated
in Appendix A to this Master Agreement**

By: _____

Name:    *AUTHORIZED SIGNATORY*

Title:

By: _____

Name:    *AUTHORIZED SIGNATORY*

Title:


**PRINCIPAL GLOBAL INVESTORS, LLC,
on its own behalf, with respect to Part 5,
Paragraphs (c)(iv), (e), and (n) of this Schedule**

By: _____

Name:    *AUTHORIZED SIGNATORY*

Title:

By: _____

Name:    *AUTHORIZED SIGNATORY*

Title:

# APPENDIX A

## Dated June 30, 2004

| FUND NAME | PLAN ASSET? | Additional Termination Event | Investment Advisor (Sub Advisor) |
|---|---|---|---|
| Principal Life Insurance Company | No | N/a | PGI |
| Principal Financial Services, Inc. | No | N/a | PGI |

# APPENDIX B

### Dated June 30, 2004

### Additional Representations

1.      **Principal Life Insurance Company**

(a) <u>Tax representations</u>:   For the purposes of Section 3(f), Party B makes the following representations:
It is an insurance company duly organized or formed under the laws of the State of Iowa and is not a
foreign company for United States tax purposes.

2.      **Principal Financial Services, Inc.**

(a) <u>Tax representations</u>:   For the purposes of Section 3(f), Party B makes the following representations:
It is a corporation duly organized or formed under the laws of the State of Iowa and is not a foreign
company for United States tax purposes.

## APPENDIX C

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Special Financing Inc. ("Party A") and Each of the entities listed on the attached Exhibit A, (separately and individually as "Fund" or "Party B") acting by and through PRINCIPAL GLOBAL INVESTORS, LLC (the "Investment Manager") have entered into a Master Agreement dated as of June 30, 2004, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor") hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction (collectively the "Obligations") when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable in accordance with the terms of the Agreement. Guarantor's obligation to Party B hereunder shall include, without limitation, the payment of interest on any such unpaid Obligations according to the terms of the Transactions. Guarantor also agrees to pay, on demand, reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorney fees, incurred by the Party B in collection of payments or enforcement of performance hereunder (the "Costs and Fees"), provided, however, that Guarantor shall not be liable for any such Costs and Fees if no payment or performance under this Guarantee is due. All sums payable by Guarantor hereunder shall be made in freely transferable funds.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection, and shall apply regardless of whether recovery of all such Obligations may be or become discharged, or uncollectible in any bankruptcy, insolvency or other proceeding, or otherwise un enforceable.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A, the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding only the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without notice to the Guarantor or the taking of further action by the Guarantor.

(d) Until all Obligations are indefeasibly paid, Guarantor hereby waives all rights of subrogation, reimbursement, contribution, and indemnity from Party A and any collateral held therefor, and Guarantor hereby subordinates all rights under any debts owing from Party A to Guarantor relating to Guarantor's payment of Obligations hereunder, whether now existing or hereafter arising, to the prior payment of the Obligations.

(e) This Guarantee shall remain in full force and effect until 15 days after the date Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(f)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(g)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.  Guarantor represents that it has adequate means to obtain from Party A on a continuing basis information concerning the financial condition of Party A and that it is not relying on Party B to provide such information now or hereafter.

(h)  This Guarantee shall inure to and be binding upon the parties, their representatives, successors and assigns.  This Guarantee shall not be affected by any change in the entity status or business structure of Party A. Guarantor may not assign its rights nor delegate its obligations under this Guarantee in whole or in part, without written consent of Party B, and any purported assignment or delegation absent such consent is void, except for an assignment to a partnership, corporation, trust, or other organization in whatever form that succeeds to all or substantially all of Guarantor's assets and business and that assumes such obligations by contract, operation of law, or otherwise.  Upon any such assignment and assumption of obligations, and, if required, the written consent of Party B, which consent shall not be unreasonably withheld, Guarantor shall be relieved of and fully discharged from all obligations hereunder, whether such obligations arose before or after such assignment and assumption.

(i)  The failure of Party B to enforce any of the provisions of this Guarantee at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same.  All remedies of Party B shall be cumulative.  The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by Guarantor and a duly authorized officer of Party B.

(j)  Guarantor hereby represents and warrants to Party B that the execution, delivery and performance hereof by it are within its corporate powers and have been duly authorized by all necessary corporate action and that this Guarantee constitutes its legal, valid and enforceable obligation, subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity.

(k)  This Guarantee is the entire and only agreement between Guarantor and Party B with respect to the guarantee of the Obligations of Party A by Guarantor.  All representations, warranties, agreements, or undertakings heretofore or contemporaneously made, which are not set forth herein, are superseded hereby.

(l)  Notwithstanding any to the contrary contained herein, this Guarantee and the obligations of Guarantor hereunder shall apply to support the obligations of any Transferee Affiliate (as defined in the Master Agreement) of Party A to which the Master Agreement is assigned or into which Party A is consolidated, amalgamated, merged or had all or substantially all its assets transferred.

(m)  This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.  Guarantor and Party B irrevocably waive any objections which they may have now or hereafter to (i) the personal or subject matter jurisdiction of the Courts of the State of New York, (ii) the venue of any proceedings brought in the Courts of the State of New York, or (iii) that such proceedings have been brought in a non-convenient forum.  Any final judgment (after appeal or expiration of time for appeal) entered by such Court shall be conclusive and binding upon the parties and may be enforced in the courts or any other jurisdiction to the fullest extent permitted by law.

(n)  Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein.  All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New

York 10022 USA (Facsimile No. 212-520-0176) with a copy to Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

Name:

Title:

Date:

**EXHIBIT A**

**Principal Life Insurance Company**

**Principal Financial Services, Inc.**

## APPENDIX D

## [FORM OF INVESTMENT MANAGEMENT SIDE LETTER]

### [Principal Global Investors, LLC' s Letterhead]

[date]

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, NY 10019

Re:  ISDA Master Agreement dated _____ between each of the entities listed on Appendix A to the
ISDA Master Agreement under **"FUND NAME"** (separately and individually as "Fund" or "Party B") and
Lehman Brothers Special Financing Inc. ("Party A") (the "Agreement").

Ladies and Gentlemen:

Principal Global Investors, LLC ("PGI"), as Investment Advisor for each Party B to the Agreement, makes the
following representations in connection with each Agreement:

(a)     Investment Advisor is a financial advisor of Party B pursuant to a management or advisory agreement,
and Investment Advisor has been duly authorized by each Party B to take all requisite action on its behalf to enter
into this the Agreement, Transactions under the Agreement and to execute confirmations of such Transactions on its
behalf.  You may rely on Investment Advisor's assurances that, on the basis of such investigation as Investment
Advisor has deemed appropriate, it is satisfied that the person or persons who signed the management or advisory
agreement were themselves properly authorized by the Fund.

(b)     Investment Advisor understands that the Transactions contemplated hereunder are subject to complex risks
that may arise without warning, may at times be volatile, and that losses may occur quickly and in unanticipated
magnitude.

(c)     Investment Advisor is a sophisticated investment adviser able to evaluate the terms, conditions, and risks
of the Transactions contemplated hereunder and accepts, on behalf of Party B, such terms, conditions and risks.

(d)     With respect to this Agreement and each Transaction, Investment Advisor will maintain, and be in
compliance in all material respects with, the operative documents of the Fund, and this Agreement and each
Transaction is, and will be authorized and permissible transactions and investments thereunder.

(e)     Subject to the terms of any relevant investment management agreement, in the event of any termination
of the investment management or advisory agreement between Party B and Investment Advisor, Investment
Advisor shall not seek termination of nor take action to affect the validity of Transactions entered into by the
Investment Advisor prior to such termination.

(f)     Investment Advisor has conducted appropriate due diligence, including but not limited to, customer
identification and verification obligations, as required under the terms of the USA PATRIOT Act in respect of
Party B to ensure that Party B (i) is not organized, or otherwise sited, in any country designated as a prohibited
country by the Office of Foreign Asset Controls ("OFAC"), a division of the U.S. Department of the Treasury, or
(ii) is not an entity, individual or other organization designated by OFAC as a Designated National or Blocked
Person (both (i) and (ii) as defined and published by OFAC from time to time).

(g)        Investment Advisor will enter all Transactions as authorized agent for Party B as principal.

(h)        In the event the source of Party B's funds includes or is deemed to include ERISA plan assets, Investment Advisor will qualify as a QPAM within the meaning of Prohibited Transaction Class Exemption 84-14 promulgated by the U.S. Department of Labor under Section 408(a) of ERISA, unless or until another prohibited transaction exemption applies.

(i)        Investment Advisor understands and acknowledges that Party A will rely on the foregoing representations, warranties, covenants and agreements when offering to enter into any Transaction with Party B.  Investment Advisor (i) agrees that it will not take any action or fail to take any action during the term of the Agreement that might render any of the representations and warranties untrue and incomplete and (ii) agrees to notify Party A promptly at the address above, if at any time it discovers or learns of facts at variance with the foregoing representations and warranties.

Very truly yours,

**PRINCIPAL GLOBAL INVESTORS, LLC**

By:        _____

Name:        _____

Title:        _____


By:        _____

Name:        _____

Title:        _____

*Execution Copy*

# ISDA

## CREDIT SUPPORT ANNEX

### to the Schedule

### to the Master Agreement

### dated as of June 30, 2004

### between

### Lehman Brothers Special Financing Inc. ("Party A")

### and

### Each of the entities listed on Appendix "A", under the column "FUND NAME"

### (separately and individually as "Fund" or "Party B")

**Paragraph 13.  Elections and Variables**

(a)     *Security Interest for "Obligations."*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None.

With respect to Party B:  None.

(b)     *Credit Support Obligations.*

    (i)     *Delivery Amount, Return Amount and Credit Support Amount.*

        (A)  *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)  *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)  *"Credit Support Amount"* means for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) the Pledgor's Threshold; provided however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

        (D)  *Additions To Paragraph 3.*  The following Subparagraphs (c) is hereby added to Paragraph 3 of this Annex:

           *"(c) No offset.*  On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3 (a) or (ii) each party is required to make a Transfer under Paragraph 3 (b), then the amounts of those obligations will not offset each other."

(ii)    *Eligible Collateral*.  The following items will qualify as *"Eligible Collateral"*:

|   | Eligible Collateral | Valuation Percentage |
|---|---|---|
| (A) | Cash; | 100% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of not more than one year; | 99% |
| (C) | negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than one year but not more than ten years; | 98% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having a remaining maturity of more than ten years; | 97% |
| (E) | Unsecured senior securities issued by government-sponsored enterprises (GSEs); | 90% |
| (F) | single-class mortgage participation certificates ("FHLMC Certificates") in book-entry form backed by single-family residential mortgage loans, the full and timely payment of interest at the applicable certificate rate and the ultimate collection of principal of which are guaranteed by the Federal Home Loan Mortgage Corporation (excluding Real Estate Mortgage Investment Conduit ("REMIC") or other multi-class pass-through certificates, pass-through certificates backed by adjustable rate mortgages and securities paying interest or principal only); | 90% |
| (G) | single-class mortgage pass-through certificates ("FNMA Certificates") in book-entry form backed by single-family residential mortgage loans, the full and timely payment of interest at the applicable certificate rate and the ultimate collection of principal of which are guaranteed by the Federal National Mortgage Association (excluding REMIC or other multi-class pass-through certificates, pass-through certificates backed by adjustable rate mortgages and securities paying interest or principal only); | 90% |
| (H) | single-class fully modified pass-through certificates ("GNMA Certificates") in book-entry form backed by single-family residential mortgage loans, the full and timely payment of principal and interest of which is guaranteed by the Government National Mortgage Association (excluding REMIC or other multi-class pass-through certificates, pass-through certificates backed by adjustable rate mortgages and securities paying interest or principal only); | 90% |
| (I) | Corporate Bonds rated AA or higher by S&P and Aa2 or higher by Moody's. | 80% |

| | Eligible Collateral | Valuation Percentage |
|---|---|---|
| (J) | Corporate Bonds rated A, A+ and AA-by S&P and A2, A1 and Aa3 by Moody's. | 70% |

For purposes of the foregoing:

*"Corporate Bonds"* shall mean any debt securities which meet all of the following:

      (i)     have long term senior debt ratings of "A2" or higher by Moody's and "A" or higher by S&P;

      (ii)     are issued by a U.S. corporation that is not a special purpose vehicle (howsoever described) and that is organized and existing under the laws of one of the 50 states comprising the United States of America.

      (iii)     are in the form of bonds or notes;

      (iv)     are denominated and payable by their terms solely in the lawful currency of the United States of America;

      (v)     are repayable in an amount equal to their outstanding principal balance;

      (vi)     are not repayable in an amount determined by reference to any formula or index;

      (vii)     are not subject to any contingency with respect to repayment;

      (viii)     bear simple interest at either a fixed or floating rate that is paid on a periodic basis and computed on a benchmark interest rate plus or minus a spread, if any;

      (ix)     are transferable to any third party without any restriction (provided that restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended, shall not be considered restrictions);

      (x)     clear through the Depository Trust Company (or its successor).

      (xi)     are part of an issue having an aggregate outstanding principal balance of not less than USD 100,000,000.00; and

      (xii)     have an original maturity of ten years or less;

*provided*, however such security of any one U.S. Corporation shall constitute no more than 5% or $10,000,000 (which ever is less) of any one issue of the Posted Collateral posted by, or on behalf of the Pledgor, and held by, or on behalf of, the Secured Party. Notwithstanding any of the foregoing, a Secured Party may reject as Collateral any Corporate Bond(s) otherwise meeting the requirements set forth herein in its sole discretion exercised in good faith and in a commercially reasonable manner, and if rejected from delivery or scheduled to be returned, Pledgor shall provide Substitute Credit Support pursuant to Paragraph 4(d) within three Business Days of notice of such rejection.

    (iii)    **Other Eligible Support.**  The following items will qualify as "Other Eligible Support" for the party specified: None.

(iv)   ***Thresholds.***

(A) ***"Independent Amount"*** means with respect to Party A:  $0; unless otherwise agreed between the parties and subsequently specified in a Confirmation and to the extent applicable and notwithstanding anything to the contrary contained herein, shall not be subject to the Minimum Transfer Amount.

(B) ***"Independent Amount"*** means with respect to Party B:  $0; unless otherwise agreed between the parties and subsequently specified in a Confirmation and to the extent applicable and notwithstanding anything to the contrary contained herein, shall not be subject to the Minimum Transfer Amount.

(C) ***"Threshold"*** means, with respect to a party at any time, the amount specified as such in the following table opposite the lowest of the ratings at the time in effect with respect to the long-term unsecured, unsubordinated debt securities of that party, or financial strength rating, as applicable. If a party (1) is not rated by either S&P or Moody's or (2) an Event of Default or Specified Condition has occurred with respect to such party, and is continuing, or (3) an Additional Termination Event has occurred and is continuing, then the Threshold with respect to the party subject to such Event of Default, Specified Condition, or Additional Termination Event shall be zero.  As used herein, Moody's means Moody's Investors Service, Inc. (or any successor thereto), and S&P means Standard & Poor's Ratings Service, a division of McGraw-Hill, Inc. (or any successor thereto).

| | | | |
|---|---|---|---|
| AAA | Aaa | USD 30,000,000 | $1,000,000 |
| AA+ to AA- | Aa1 to Aa3 | USD 25,000,000 | $1,000,000 |
| A+ | A1 | USD 20,000,000 | $1,000,000 |
| A /A- | A2/A3 | USD 10,000,000 | $1,000,000 |
| BBB+ and below | Baa1 and below | Zero | $500,000 |

(D) ***"Minimum Transfer Amount"*** means with respect to Party A and Party B, the amount specified as such in the above table opposite the lowest of the ratings at the time in effect with respect to the long-term unsecured, unsubordinated debt securities of that party, or financial strength rating, as applicable; *provided*, that if a party is not rated by either S&P or Moody's or an Event of Default, Specified Condition or Additional Termination Event (with respect to which all Transactions are Affected Transactions) has occurred and is continuing with respect to a party, the Minimum Transfer Amount with respect to such party shall be zero; *provided, further*, that notwithstanding anything to the contrary herein, the Minimum Transfer Amount shall not apply to any Independent Amount.

(E) ***Rounding.***  The Delivery Amount and the Return Amount will be rounded up and down to the nearest integral multiple of $5,000, respectively.

(c)   ***Valuation and Timing.***

(i)  ***"Valuation Agent"*** means Party A.

(ii)  ***"Valuation Date"*** means each Local Business Day.

(iii) *"Valuation Time"* means the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same day.

(iv) *"Notification Time"* means 1:00 p.m. New York time on a Local Business Day.

(d)    *Conditions Precedent and Secured Party's Rights and Remedies.*

For purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party:

| Termination Event | Party A | Party B |
|---|---|---|
| Additional Termination Event | X | X |

*provided* that, a Termination Event that constitutes a Specified Condition shall cease to be a Specified Condition if the non-Affected Party has not designated an Early Termination Date with respect to such Termination Event within ten (10) Business Days of receiving notice of the occurrence of such event from the Affected Party.

(e)    *Substitution.*

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

(ii) *Consent.* If specified here as applicable, then Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): Not Applicable; *provided, however,* that Pledgor must notify the Secured Party by 3:00 P.M. New York time not less than one Local Business Day prior to the date of any substitution.

(f)    *Dispute Resolution.*

(i) *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice of the dispute is given under Paragraph 5.

(ii) *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: (a) Cash: For purposes of Paragraph 5, the face value of Cash Collateral; (b) with respect to Posted Credit Support of the type described in Paragraph 13(b)(ii)(B), (C), (D), (E), (F), (G), and (H) (referred to herein as "Government Obligations") will equal the Valuation Percentage multiplied by the sum of (A) either (1) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations, which market maker shall be selected by the Disputing Party in good faith, or (2) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day next preceding such date, on which such quotations were available, and (B) accrued interest on such Government Obligations (except to the extent included in the applicable price referred to in clause (A) above) and (c) for all other Posted Credit Support, as the Secured Party determines in its commercially reasonable discretion.

(iii) *Alternative.* The provisions of Paragraph 5 will apply, except to the following extent: pending the resolution of a dispute, Transfer of the undisputed Value of Eligible Credit Support or Posted Credit Support involved in the relevant demand will be due as provided in Paragraph 5 if the demand is made at or before the Notification Time but will be due on the second Local Business Day after the demand if the demand is made after the Notification Time.

(iv) *Dispute Resolution.* Paragraph 5(i)(B) of the Annex is amended by replacing the words: "then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and;" with the words: "then the parties will appoint a mutually acceptable leading dealer in the relevant market to make such determination as substitute Valuation Agent and such determination will be used for that Transaction (or Swap Transaction). If the substitute Valuation Agent agrees with the determination of one of the parties, the other party shall bear the cost of the substitute Valuation Agent. If the substitute Valuation Agent does not agree with the determination of either Party A or Party B, then the cost of the Substitute Valuation Agent shall be born equally by the parties. Interest shall be due and payable on amounts not paid pursuant to any dispute upon resolution in accordance with the terms of the Agreement and such interest shall be charged from the time such payments were due until such time payments are made in accordance with this provision.

(g)     *Holding and Using Posted Collateral.*

(i) *"Eligibility to Hold Posted Collateral; Custodians."* As long as the conditions set forth in clause (A) and (B) below are satisfied, either Party A or Party B, through any Custodian for Party A or Party B, shall be entitled to hold Posted Collateral pursuant to Paragraph 6(b). So long as Party A or Party B meets the requirements of clause (A) below, such party may itself act as Custodian with out the need for a tri-party account, it being understood that such account shall nonetheless need to satisfy the criteria in clause (B) below. Subject to Paragraphs 6(c) and 8(a), such Posted Collateral shall at all times be and remain the property of the Pledgor and shall at no time constitute property of, or be commingled with the property of, the Secured Party or the Custodian. All Posted Collateral shall be held by such Custodian in trust and the establishment of such account shall not evidence a debtor-creditor relationship between the bank holding the Posted Collateral and the pledgor thereof.

The Custodian: The Custodian is a bank or trust company located in the State of New York having total assets of at least US $500,000,000 and having capital and surplus funds which equal or exceed $25,000,000 and an unsecured long-term debt rating from S&P of not less than Baa1 from Moody's of not less than BBB+. In the event a Custodian fails to meet the foregoing criteria, the Secured Party shall transfer the Posted Collateral to a Custodian meeting such criteria within thirty (30) Local Business Days of such failure.

(ii) The Posted Collateral shall be deposited with the Custodian in either (i) a segregated account trust account maintained with the corporate trust department of the Custodian and bearing an account title evidencing Pledgor's ownership interest or (ii) (A) a securities account which by its express terms is established with the Custodian in its capacity as a "securities intermediary" or (B) a "deposit account", and in either case  with respect to which the Custodian has agreed not to grant control in favor of any other party (the "Securities Account" or the "Deposit Account").

(iii) If the Secured Party, or any subsidiary or affiliate of Secured Party, is acting as Custodian, the Custodian shall be deemed to make the following representations, which shall be continuing at all times Posted Collateral is held:

(A)     The Custodian hereby agrees that each item of property (whether investment property, financial asset, security, instrument or cash) credited to the Securities Account shall be treated by it as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC.

(B)     The Custodian hereby confirms that (i) the Securities Account is a "securities account" as such term is defined in Section 8-501(a) of the UCC and (ii) the Secured Party is acting as the "securities intermediary" (as such term is defined in Section 8-102(a)(14) of the UCC) with respect to the Securities Account.

(C)     Except for the claims and interest of the Pledgor and Secured Party in the Securities Account and the Deposit Account, the Custodian does not know of any claim to, or interest in, the Securities Account or the Deposit Account or in any cash or other financial asset credited thereto, other than the standard liens imposed by the relevant

clearing agency, if applicable. If any Person asserts any adverse claim against the Securities Account or in any financial asset carried therein, the Custodian will promptly notify Pledgor and Secured Party.

(D)     The financial assets and other items deposited to the Securities Account and the cash deposited to the Deposit Account will not be subject to deduction, set-off, banker's lien, or any other right in favor of any person other than the Secured Party pursuant to this Agreement, except clearing transaction liens.

(E)     The Custodian hereby confirms and agrees that it has not entered into, and until the termination of this Agreement will not enter into, any agreement with any other Person relating to the Securities Account or the Deposit Account and/or any cash or any other financial assets credited thereto pursuant to which it has agreed to comply with entitlement orders of such other Person.

(F)     In the event a Custodian fails to meet the foregoing criteria, the Secured Party shall immediately transfer the Posted Collateral to a Custodian meeting the criteria set forth in paragraph (A) above.

Initially, the Custodian for Party A is: a wholly owned, direct or indirect subsidiary of Lehman Brothers Holdings Inc.

Initially, the Custodian for Party B: Custodian information for Party B shall be supplied on or before the date of initial Transfer hereunder.

(iv)    **"Use of Posted Collateral."**  Unless otherwise agreed between the parties, the provisions of Paragraph 6(c) shall apply with respect to Party A and shall apply with respect to Party B.

(h)     *Distributions and Interest Amount.*

(i) *Interest Rate.*  The *"Interest Rate"* payable by Party A and Party B shall mean the rate per annum equal to the overnight Federal Funds Rate minus fifteen (15) basis points for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii) *Transfer of Interest Amount.*  The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is transferred to a Pledgor pursuant to Paragraph 3 (b).

(iii) *Alternative to Interest Amount.*  The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here.

*Delivery Amount.*  If Transfer of an Interest Amount (or any portion thereof) to a Pledgor on any day would result in or increase a Delivery Amount (treating that day as a Valuation Date, as provided in Paragraph 6(d)(ii)), but the Pledgor would nonetheless have no obligation to make a Transfer pursuant to Paragraph 3(a) on that day if it were a Valuation Date (because the Delivery Amount is lower than the Pledgor's Minimum Transfer Amount or otherwise), the Secured Party will be required to Transfer that Interest Amount (or portion thereof) to the Pledgor, notwithstanding anything to the contrary in Paragraph 6(d)(ii).

(i)     *Additional Representation(s).*  None.

(j)     *Other Eligible Support and Other Posted Support.*

(i) *"Value"* shall have no meaning with respect to Other Eligible Support.

(ii) *"Transfer"* shall have no meaning with respect to Other Eligible Support.

(k)    **Demands and Notices.**  Any demand, specification or notice under this Annex (each, a "Notice"), other than a Notice pursuant to Paragraph 4(d), may be delivered orally, including by telephone.  If such Notice is delivered orally, such oral Notice shall be confirmed promptly in writing (a "Notice Confirmation") by tested telex, facsimile or actual delivery.  Failure to provide that Notice Confirmation will not affect the validity of that oral Notice.  All Notices shall be delivered to the following addresses:

with respect to Party A:

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Inc. |
| | Transaction Management |
| | 745 Seventh Avenue, 28th Floor |
| | New York, NY 10019 |
| | |
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

with respect to Party B:

| | |
|---|---|
| Address: | Principal Global Investors, LLC |
| | 711 High Street |
| | Des Moines, Iowa  50392-0800 |
| Attention: | Investment Accounting – Collateral |
| Facsimile: | 515-248-2643 |
| Telephone: | 515-362-0038 |
| Email: | DLGAMCOMPLIANCE@EXCHANGE.PRINCIPAL.COM |

(l)    **Addresses for Transfers.**  Addresses for Transfers of Collateral for Party B shall be supplied on or before the date of initial Transfer hereunder, and as may be updated from time to time in writing upon reasonable notice; and will respect to Party A mean:

(i)    Cash USD, credit Chase Manhattan Bank New York, ABA # 021-000-021, A/C # 066143543, Lehman Brothers Special Financing Inc., Ref: Collateral.

(ii)    Securities or obligations issued or guaranteed by the government of the United States of America or any of its agencies or instrumentalities, credit Chase NYC/LBRDC, ABA # 021-000-021, Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019.

(iii)    Mortgage-backed securities paid or delivered through a U.S. Federal Reserve Bank, credit Chase NYC/LBRDC, ABA # 021-000-021, Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019.

(iv)    All other types of Eligible Credit Support:  The address supplied by Party A to Party B.

(m)    **Other Provisions.**

(i)    Except as may be specifically set forth in a provision in this Agreement to the contrary, no full or partial failure to exercise and no delay in exercising, on the part of any Party, any right, remedy, power or privilege permitted hereunder shall operate in any way as a waiver thereof by such party, including without limitation any failure to exercise or any delay in exercising to any or to the full extent of such party's rights with respect to transfer timing pursuant to Paragraph 4(b), regardless of the frequency of such failure or delay.

*cc Dael Sisak Geldiy*

Execution copy

# FIRST AMENDMENT AGREEMENT

### Dated May 17, 2005

## to the

# ISDA®

### International Swap Dealers Association. Inc.

## MASTER AGREEMENT
### Dated June 30, 2004

The Master Agreement dated June 30, 2004 between Lehman Brothers Special Financing Inc. (as "Party A") and the various entities listed as Parties B thereto (as listed on the Appendix "A" to the Agreement under the column "Fund Name"; each entity separately and individually a "Fund" or "Party B") is hereby amended to add **Principal Financial Group, Inc.** as an additional Party B, and to provide for certain other amendments to the Agreement.

Further, it is hereby agreed as follows:

1.    Certain Definitions.  Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2.    Part 1(h)(v) of the Master Agreement is hereby amended by deleting and replacing the addresses for notices at the end of Part 1(h)(v) as follows:

"Party A:
Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue,
New York, NY 10019

Party B:
Principal Global Investors, LLC
711 High Street
Des Moines, IA  50392-0301"

3.    Part 4(a) of the Master Agreement is hereby deleted in its entirety and replaced with the following:

"(a) *Addresses for Notices.*  For the purposes of Section 12(a) of this Agreement:

(i) All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for all other purposes including for the purposes of Sections 5 or 6 shall be sent to:

its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied."

6.    Appendix A to the Schedule of the Master Agreement is hereby deleted in its entirety and replaced with Appendix A attached hereto.

7.    Appendix B to the Schedule of the Master Agreement is hereby amended by adding Subsection 3 as follows:

"**3.    Principal Financial Group, Inc.**
(a) Tax representations:  For the purposes of Section 3(f), Party B makes the following representations:  It is a corporation duly organized or formed under the laws of the State of Delaware and is not a foreign company for United States tax purposes."

8.    Appendix C to the Schedule of the Master Agreement is hereby amended by (i) adding the words ",as amended from time to time," in the fourth line before the words (the "Master Agreement")" and (ii) deleting the second sentence of paragraph (n) in its entirety and replacing it with "All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, New York 10022 USA (Facsimile No. 212-520-0176) with a copy to Lehman Brothers Special Financing Inc. c/o Lehman Brothers Inc., Transaction Management Group, Corporate Advisory Division, 745 Seventh Avenue, New York, NY 10019 USA."

9.    Paragraphs 13(b)(ii)(E) and (F) of the Credit Support Annex to the Master Agreement are hereby amended by inserting the words "which are rated Aaa by Moody's and AAA by S&P" after the word "enterprises" in the case of (E) and "certificates" the first time it appears in the case of "F".

10.    Paragraphs 13(c)(iii) of the Credit Support Annex to the Master Agreement is hereby deleted in its entirety and replaced with the following:

" (iii) *"Valuation Time"* means the close of business in the location where the relevant product is traded; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same day."

11.    Paragraphs 13(l) of the Credit Support Annex to the Master Agreement is hereby deleted in its entirety and replaced as follows:

"(l) *Addresses for Transfers.*  As provided by the parties from time to time."

12.    Paragraphs 13(m)(vi) of the Credit Support Annex to the Master Agreement is hereby deleted in its entirety and replaced as follows:

"(vi)    **Local Business Day.**  For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located."

13.    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall be unaffected and shall continue in full force and effect and shall be binding upon the parties in accordance with its terms.

14.    The parties to the Agreement hereby represent(s) and warrant(s) that:

(a)    the representations and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)      the execution, delivery and performance of this Amendment are within each party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

15.      This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

16.      This Amendment shall be construed in accordance with and be governed by the laws of the State of New York.

IN WITNESS WHEREOF, the parties to this First Amendment Agreement ("Amendment") have caused this Amendment to be executed by its respective officers or authorized representatives as of the date and year first above written.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
**(Party A)**

By:_____
Name:
Title:

By:_____
Name:
Title:

**PRINCIPAL GLOBAL INVESTORS, LLC,**
**as authorized signatory for each Party B listed on Appendix A**

By:_____
Name:
Title: *AUTHORIZED SIGNATORY*

By:_____
Name:
Title: *AUTHORIZED SIGNATORY*

**PRINCIPAL GLOBAL INVESTORS, LLC not as a Party, but on its own behalf, with respect to Part 5, Paragraphs (c)(iv), (e) and (n) of the Schedule only.**

By:_____
Name:
Title: *AUTHORIZED SIGNATORY*

By:_____
Name:
Title: *AUTHORIZED SIGNATORY*

# SECOND AMENDMENT

dated as of September 22, 2006

## TO THE ISDA MASTER AGREEMENT

between

## LEHMAN BROTHERS SPECIAL FINANCING INC.
### ("Party A")

and

## EACH OF THE ENTITIES LISTED AS A PARTY B ON THE APPENDIX "A" TO THE AGREEMENT UNDER THE COLUMN "FUND NAME" (EACH ENTITY SEPARATELY AND INDIVIDUALLY A "FUND" OR "PARTY B")

The ISDA Master Agreement dated June 30, 2004 between Lehman Brothers Special Financing Inc. (as "Party A") and the various entities listed as a Party B thereto on the Appendix "A" to the Agreement under the column "Fund Name" (each entity separately and individually a "Fund" or "Party B") (The ISDA Master Agreement, together with the Schedule and Appendixes, as amended, and the Credit Support Annex thereto, each dated as of the same date, and all Confirmations exchanged between the parties confirming Transactions thereunder, the "Agreement") is hereby amended as set forth below.

Party A and Party B wish to amend the Agreement and to have the Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW THEREFORE, in consideration of the mutual agreements contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. *Amendment of the Agreement*

As used in the Agreement, as amended by this Amendment, the terms "ISDA Master Agreement", "Agreement", "this Agreement", "herein", "hereinafter", "hereof", "hereto" and other words of similar import, shall mean the Agreement as amended hereby, unless the context otherwise specifically requires.

Upon execution of this Amendment by both parties, the Agreement shall be and hereby is amended as follows:

(i)      Part 1(c) *"Threshold Amount"* of the Schedule to the Agreement is hereby deleted in its entirety with respect to Party A and replaced with the following:

""Threshold Amount" means:

> (i)      with respect to Party A and Lehman Brothers Holdings Inc. ("Holdings"), the lesser of (i) USD 100,000,000 (or its equivalent in any other currencies) or (ii) two percent (2%) of the Stockholders' Equity of Holdings, and,"

1

(ii)     Part 4(e) of the Schedule to the Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    *Calculation Agent*. The Calculation Agent is Party A, unless an Event of Default, Potential Event of Default or Termination Event has occurred and is continuing with respect to Party A or unless otherwise specified in a Confirmation in relation to the relevant Transaction, in which case Party B shall be entitled to appoint a financial institution which shall be either Merrill Lynch & Co., Morgan Stanley Capital Services Inc., Goldman Sachs Group, Inc., Citibank, N.A., UBS AG, Deutsche Bank AG, JP Morgan Chase Bank, Bear Stearns Credit Products Inc., and Barclays Bank PLC or their respective affiliates and which would qualify as a Reference Market-maker to act as Calculation Agent until the earlier of (i) the designation of an Early Termination Date under Section 6(c)(ii), and (ii) the discontinuance of the relevant Event of Default, Potential Event of Default or Additional Termination Event with respect to Party A. All determinations and calculations by the Calculation Agent shall be made in good faith. If Party B objects to a particular calculation or determination made by the Calculation Agent, then the relevant party will deliver the undisputed amount on the relevant Payment Date as specified in the Confirmation. If the parties continue to be unable to agree on a particular calculation or determination, the parties will designate a mutually acceptable leading dealer in the relevant market to make the calculation or determination (a "Substitute Calculation Agent"), whose determination shall be binding absent manifest error. If the parties are unable to agree on a leading dealer, then each party shall appoint a leading dealer in the relevant market (that is not an affiliate of either Party A or Party B) and the two appointed dealers shall appoint a third leading dealer (that is not an affiliate of either Party A or Party B or of one of the two appointed dealers) to make the determination or calculation in dispute, whose determination shall be binding absent manifest error. If the Substitute Calculation Agent agrees with the determination of a party, the costs of the Substitute Calculation Agent shall be borne by the other party. If the Substitute Calculation Agent's determination or calculation is not in agreement with either Party A or Party B, then the cost of the Substitute Calculation Agent shall be born equally by the parties. Interest shall be due and payable on amounts not paid pursuant to any dispute upon resolution in accordance with the terms of the Agreement from the time such payments were due under the Confirmation until such time payments are made in accordance with this provision."

(iii)    Part 5 of the Schedule to the Agreement is hereby amended by inserting sub-clause (v) as follows:

"(v)    *Escrow Payments*. If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion."

(iv)   **"Part 6: Additional Terms for FX Transactions and Currency Options"** to the Schedule to the Agreement
is hereby added as follows:

> **"Part 6: Additional Terms for FX Transactions and Currency Options**
>
> (a)      **Incorporation and Amendment of 1998 FX and Currency Option Definitions**
>
> (i)      Incorporation of 1998 FX and Currency Option Definitions. The 1998 FX and Currency
> Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"),
> published by the International Swaps and Derivatives Association, Inc., the Emerging Markets
> Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference
> with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998
> Definitions, except as otherwise specifically provided herein or in the Confirmation.
>
> (ii)      Amendment of 1998 FX and Currency Option Definitions. The following amendments
> are made to the 1998 Definitions:
>
> Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):
>
> **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to
> receive or deliver an amount of currency, including a netted Currency Obligation, and including
> any Currency Obligation previously entered into by the parties.
>
> (b)      **Confirmations.** Any confirmation (whether provided by mail, facsimile or other
> electronic means) in respect of any FX Transaction or Currency Option Transaction into which the
> parties may enter, or may have entered into prior to the date hereof, that fails by its terms to
> expressly exclude the application of this Agreement shall (to the extent not otherwise provided for
> in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not
> so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this
> Agreement, and all provisions in this Agreement will govern such Confirmation except as
> expressly modified therein.
>
> (c)      **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency
> Option Transactions. In lieu thereof, the following shall apply:
>
> (i)      Netting, Discharge and Termination of FX Transactions. The following provisions shall
> apply to FX Transactions:
>
> Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the
> parties which creates a Currency Obligation in the same currency and for the same Settlement Date
> as an existing Currency Obligation between the parties, such Currency Obligations shall
> automatically and without further action be netted, individually canceled and simultaneously
> replaced through novation by a new Currency Obligation under which the party having the
> obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the
> excess of such greater aggregate currency amount over such lesser aggregate currency amount.
> Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.
>
> (ii)      Netting, Discharge and Termination with Respect to Currency Option Transactions. The
> following provisions shall apply to Currency Option Transactions: .
>
> Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be
> terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively,
> having the same identical terms, written by the other party; and, upon the occurrence of such
> termination or discharge, neither party shall have any further obligation to the other party in

3

respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies**. In the event of any conflict between:

(i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions**. Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include "Currency Obligations."

(v)    *Thresholds.*  Paragraph 13(b)(iv)(C) of the Credit Support Annex is hereby deleted and replaced in its entirety by the following:

"(C)    **"Threshold"** means, with respect to a party at any time, the amount specified on Appendix E, provided, however, if an Event of Default, Credit Event Upon Merger or an Additional Termination Event has occurred with respect to such party, and is continuing, then the Threshold with respect to the party subject to such Event of Default, Credit Event Upon Merger, or Additional Termination Event shall be zero.

As indicated on Appendix E, if a rating is applicable to the determination of a Threshold with respect to a party at any time, the amount specified on such rating table opposite the lowest of the ratings at the time in effect with respect to the long-term unsecured, unsubordinated debt securities of that party (or in the case of Party A, its Credit Support Provider's), or financial strength rating, as applicable, shall apply.  If a party has a "ratings table" applicable to it in Appendix E, and at any time is not rated by either S&P or Moody's, then the Threshold Amount shall be zero.  For purposes of this Agreement, Moody's means Moody's Investors Service, Inc. (or any successor thereto), and S&P means Standard & Poor's Ratings Service, a division of McGraw-Hill, Inc. (or any successor thereto).

(vi)    *Minimum Transfer Amount.*  Paragraph 13(b)(iv)(D) of the Credit Support Annex is hereby deleted and replaced in its entirety by the following:

"(D)    **"Minimum Transfer Amount"** means, with respect to a party at any time, the amount specified on Appendix E, provided, however, if an Event of Default, Credit Event Upon Merger or an Additional Termination Event has occurred with respect to such party, and is continuing, then the Threshold with respect to the party subject to such Event of Default, Credit Event Upon Merger, or Additional Termination Event shall be zero; provided further, that that notwithstanding anything to the contrary herein, the Minimum Transfer Amount shall not apply to any Independent Amount.

If a rating is applicable to the determination of a Threshold, as indicated on Appendix E, with respect to a party at any time, the amount specified on such rating table opposite the lowest of the ratings at the time in effect with respect to the long-term unsecured, unsubordinated debt securities of that party (or in the case of Party A, its Credit Support Provider's), or financial strength rating, as applicable, shall apply.

(vii)    Paragraph 13(h)(ii) of the Credit Support Annex to the Agreement is hereby deleted in its entirety and replaced with the following:

"(ii) *Transfer of Interest Amount.*  A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month.  A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred."

## 2. *Representations*

Each party represents to the other party that:

(a)    all representations contained in the Agreement, as amended, are true and accurate as of the date of this Amendment and that such representations are deemed to be given or repeated by each party, as the case may be, on the date of this Amendment, and

(b)    the execution, delivery and performance of this Amendment are within each party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

## 3. *Miscellaneous*

(a)    *Definitions.*  Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings specified for such terms in the Agreement.

(b)    *Entire Agreement.*  This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

(c)    *Counterparts.*  This Amendment may be executed and delivered in counterparts (including by facsimile transmission) each of which will be deemed an original.

(d)    *Headings.*  The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Amendment.

(e)    *Governing Law.*  This Amendment will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

4.    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall be unaffected and shall continue in full force and effect and shall be binding upon the parties in accordance with its terms.

**IN WITNESS WHEREOF,** the parties have executed this Amendment on the respective dates specified below with effect from the date specified in this Amendment.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**(Party A)**

By: _____
Name:
Title:   Allyson M. Carine
         Authorized Signatory

By: _____
Name:
Title:

**PRINCIPAL GLOBAL INVESTORS, LLC,**
**as authorized signatory for each Party B listed**
**on Appendix A**

By: _____
Name: Richard Waugh
Title: Managing Director
       *AUTHORIZED SIGNATORY*

By: _____
Name: Roger Kay
Title: Managing Director
       *AUTHORIZED SIGNATORY*

6

**APPENDIX E**
**TO THE SECOND AMENDMENT**
dated as of September 22, 2006
**TO THE ISDA MASTER AGREEMENT DATED JUNE 30, 2004**

1) <u>**Principal Life Insurance Company and Lehman Brothers Special Financing Inc.**</u>:

Threshold Amounts and Minimum Transfer Amounts shall be as follows:

| S&P | MOODY'S | THRESHOLD | MINIMUM TRANSFER AMOUNT |
|---|---|---|---|
| AAA | Aaa | USD 35,000,000 | USD 500,000 |
| AA+ | Aa1 | USD 30,000,000 | USD 500,000 |
| AA | Aa2 | USD 30,000,000 | USD 500,000 |
| AA- | Aa3 | USD 20,000,000 | USD 500,000 |
| A+ | A1 | USD 15,000,000 | USD 500,000 |
| A | A2 | USD 10,000,000 | USD 500,000 |
| A- | A3 | USD  5,000,000 | USD 250,000 |
| BBB+ | Baa1 | Zero | USD 250,000 |
| BBB | Baa2 | Zero | USD 250,000 |
| BBB- and below | Baa3 and below | Zero | USD     1,000 |

2) <u>**Principal Financial Services, Inc. and Lehman Brothers Special Financing Inc.**</u>:

Threshold Amounts and Minimum Transfer Amounts shall be as follows:

| S&P | MOODY'S | THRESHOLD | MINIMUM TRANSFER AMOUNT |
|---|---|---|---|
| AAA | Aaa | USD 5,000,000 | USD  500,000 |
| AA+ | Aa1 | USD 5,000,000 | USD  500,000 |
| AA | Aa2 | USD 5,000,000 | USD `500,000 |
| AA- | Aa3 | USD 5,000,000 | USD  500,000 |
| A+ | A1 | USD 5,000,000 | USD  500,000 |
| A | A2 | USD 5,000,000 | USD  500,000 |
| A- | A3 | USD 5,000,000 | USD  250,000 |
| BBB+ | Baa1 | Zero | USD  250,000 |
| BBB | Baa2 | Zero | USD  250,000 |
| BBB- and below | Baa3 and below | Zero | USD     1,000 |

7

**APPENDIX E**
**TO THE SECOND AMENDMENT**
dated as of September 22, 2006
**TO THE ISDA MASTER AGREEMENT DATED JUNE 30, 2004**

**PAGE 2**

3) **Principal Financial Group, Inc. and Lehman Brothers Special Financing Inc.:**

**Threshold Amounts** and **Minimum Transfer Amounts** shall be as follows:

| S&P | MOODY'S | THRESHOLD | MINIMUM TRANSFER AMOUNT |
|---|---|---|---|
| AAA | Aaa | USD 5,000,000 | USD 500,000 |
| AA+ | Aa1 | USD 5,000,000 | USD 500,000 |
| AA | Aa2 | USD 5,000,000 | USD 500,000 |
| AA- | Aa3 | USD 5,000,000 | USD 500,000 |
| A+ | A1 | USD 5,000,000 | USD 500,000 |
| A | A2 | USD 5,000,000 | USD 500,000 |
| A- | A3 | USD 5,000,000 | USD 250,000 |
| BBB+ | Baa1 | Zero | USD 250,000 |
| BBB | Baa2 | Zero | USD 250,000 |
| BBB- and below | Baa3 and below | Zero | USD    1,000 |