LAW OFFICES OF LISA M. SOLOMON
305 Madison Avenue, Suite 4700
New York, NY 10165
Tel: 212- 471-0067; Fax: 212-980-6965
Lisa M. Solomon, Esq.

*Counsel for Compensation Claimants Riccardo Banchetti,*
*Philippe Dufournier, Anke Parr, Giancarlo Saronne and Harsh Shah*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK                    Objection Deadline: February 21, 2012
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                            Chapter 11
                                                          :      Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS, INC.,
*et al.*,
                                                          :      (Jointly Administered)
                              Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JOINT RESPONSE OF COMPENSATION CLAIMANTS RICCARDO BANCHETTI,
PHILIPPE DUFOURNIER, ANKE PARR, GIANCARLO SARONNE AND HARSH
SHAH TO DEBTORS' SUPPLEMENTAL ANNOTATED OMNIBUS OBJECTION TO
CLAIMS WITH RESPECT TO 118TH AND 130TH OMNIBUS CLAIMS OBJECTIONS
SEEKING TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS**

Riccardo Banchetti, Philippe Dufournier, Anke Parr, Giancarlo Saronne and Harsh Shah

(collectively, "Claimants"), by their undersigned counsel, hereby submit this joint response to

the  Debtors' Supplemental Annotated Omnibus Objection to Claims to Reclassify Claims as

Equity Interests with respect to Debtors' 118th and 130th Omnibus Objections to Claims

(collectively, the "Claims Objection").  In support thereof, Claimants respectfully represent as

follows:

## BACKGROUND

1.        Commencing on September 15, 2008 (the "Petition Date"), Lehman Brothers

Holdings, Inc. (the "Bank" or the "Debtor") and certain of its subsidiaries (collectively, the

1

"Debtors") filed voluntary petitions for relief under title 11 of the United States Code (the

"Code").

2.    Claimants, former employees of Lehman Brothers International Services, Inc.,

Lehman Brothers Limited, and/or Lehman Brothers Overseas (the "Companies"), as Debtors

herein, are creditors of the Debtors.  Prior to the bar date for filing proofs of claim herein,

Claimants each filed a proof of claim against the Debtors on account of deferred compensation

owed to Claimants for services rendered in and outside the United Kingdom under dual

employment contracts (collectively, the "Claims").[1]

3.    As of the date hereof, each of the Claims remains outstanding.  Pursuant to

notices and orders the Debtors have served upon Claimants since filing their 118th and 130th

claims objections, the hearing with respect to the Debtors' objections to the Claims, as well as

other listed claims (collectively, the "Outstanding Claims"), was adjourned to December 21,

2011.  The undersigned appeared on behalf of Claimants at the hearing, and presented legal

arguments against the reclassification of the Claims.  At the hearing, the Court inquired how the

claims of objectors were different from the claims at issue in the *Enron* decision, and voiced

concern with regard to the absence of an evidentiary record. At the close of the hearing, this

Court directed the Debtors to serve an annotated and supplemental omnibus objection with

respect to the Outstanding Claims, and proceed with establishing an evidentiary record.

4.    By this response, Claimants further respond to the Claims Objection.  Here, the

Debtors are not satisfied to make pro rata distributions to Claimants on account of their unpaid

---

[1] Claimants each seek herein general unsecured treatment for the Claims heretofore filed for their unpaid
compensation except for $10,950 of the proofs of claim amount for which they seek priority treatment on account of
services Claimants rendered within 180 days prior to the Petition Date.

compensation claims along with other general unsecured creditors.  Instead, the Debtors seek to:
(i) reclassify the Claims and other Outstanding Claims as equity interests that will receive no
distribution under the Debtors' plan of reorganization; and (ii) in the alternative, mandatorily
subordinate the Claims and other Outstanding Claims pursuant to §510(b) of the Code in effect
to the level of equity.  The Claims Objection also seeks to  subordinate "certain" unidentified
Outstanding Claims on the basis of contractual subordination pursuant to §510(a) of the Code.

## GROUNDS FOR RESPONSE

5.       As of the Petition Date, Claimants were salaried employees of the Debtors.  As of
the Petition Date, the Debtors' compensation arrangement with Claimants and their thousands of
other employees included the requirement, at the sole discretion of the Debtors, that a portion of
employees' deferred compensation as of the end of each work year be paid in the form of
contingent stock awards and stock options that vested over time and were subject to other
substantive  conditions (the "Deferred Compensation Awards").  Deferred Compensation
Awards were calculated as  a percentage of an employee's total compensation according to pre-
set firm wide tables developed by the Debtor on an annual basis. Total compensation for each
employee depended upon the employee's performance and generation of revenue.  Under the
Debtors' rules, the higher the total compensation, the greater the percentage allocated to the
Deferred Compensation Awards.

6.       As of the Petition Date, the Debtor had granted Claimants the aggregate of
1,725,116 contingent stock awards that had not converted to the Bank's common stock, most of
which were also unvested (the "CSA's"), on account of the services Claimants had rendered and
the pay they had earned in and outside the United Kingdom during the years 2003-2008.  Thus,

3

as of the Petition Date, no shares of stock had been issued to Claimants on account of the CSA's, and no shares were due to be delivered to Claimants until various dates in 2008-2013.[2]

7.    Claimants oppose the reclassification of the Claims as equity. *First*, there is no legal basis to reclassify and treat the Claims as equity securities. The Claims are premised upon Claimants' right to deferred compensation already earned that was to be paid through the vehicle of the CSA's that do not have the basic characteristics of equity securities. *Second*, there is no legal basis for subordination of the Claims under §510(b) of the Code.[3] The Debtors do not satisfy the statutory requirements for mandatory subordination for the reason that the Claims do not involve a "security," are not for "damages," arising from the purchase of a "security," nor are the policies of the statute served by subordination here. Granting subordination would also upset the priority scheme granted under the Code for wage claims. *Third*, at a minimum, there are significant issues of fact with respect to the relief the Debtors seek that requires discovery be conducted herein.

### A.  **The Claims Are Not Based Upon Equity Securities But Are for Unpaid Liabilities**

8.    There is no basis to reclassify the Claims as equity securities. Section 101(16) of the Code defines an "equity security" as "(A) share in a corporation, whether or not transferable or denominated 'stock', or similar security; (B) interest of a limited partner in a limited

---

[2] As part of the Deferred Compensation Awards, as of the Petition Date, the Debtor had also granted stock options to Claimants. Claimants are not seeking recovery of any amounts herein on account of any stock options.

[3] Claimants reserve their rights to address any arguments the Debtors subsequently make at such time that the Debtors identify with particularity any claims they assert are subject to contractual subordination under §510(a) of the Code. The Claims Objection the Debtors have now filed does not specifically identify the Claimants or any other Outstanding Claimants as having entered into contractual subordination agreements. The Debtors merely assert that "some" Outstanding Claimants, *albeit* unidentified, are subject to contractual subordination. Claimants submit that to their knowledge, at no time have they agreed to nor executed and delivered contractual subordination agreements with the Debtors. Claimants further note that the 2005 Stock Incentive Plan, a governing document here, does not refer to subordination of the rights of participants but instead refers to "unfunded" creditor obligations.

partnership; or (C) warrant or right, *other than a right to convert,* to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph." (emphasis added).[4] The unsecured contractual rights Claimants had with respect to their unpaid compensation to be paid through the vehicle of the CSA's as of the Petition Date do not fall within the definition of equity security under the Code, but are liabilities of the Debtor because they are an enforceable obligation with a right to payment, and should be treated as claims.

9.      *First*, the purpose and the structure of the CSA's shows that the Debtors had a liability to Claimants whom had a right to payment. The CSA's were a device for the payment of part of thousands of the Debtors' employees' wages, *albeit*, on a deferred basis. A principal aim of the CSA's was to serve as a retention device for the Debtors' benefit. Thus, the contingent stock awards granted a contract right to Claimants, *i.e.*, the Debtors' conditional promise to deliver common stock, or cash in lieu thereof, in the future. The CSA's matured over stated time periods, and employees were *only* eligible to cash them in provided they were still in the Debtors' employ. The CSA's were subject to other substantive conditions that the Debtors unilaterally changed over time following the Debtor's implementation of the CSA program. The CSA's allowed the Debtors to defer the payment of cash compensation, to expense the compensation when paid, and to retain employees in the Debtors' employ until at least the date the CSA's vested. This was their essential economic characteristics. They were not an equity security.

10.      *Second*, the Codes' definition of "equity security" confirms that the CSA's and

---

[4] It is Claimants' position that the CSA's are not a security for purposes of §510(b) of the Code as addressed in point B(1)(b) herein. Plainly, if Claimants are correct and the CSA's are not a security, then they also are not an equity security.

the rights they grant are not equity securities. A CSA, as opposed to a stock option or a warrant, does not give the holder the right to "purchase" or "subscribe to" common stock within the meaning of §101(16). Common stock ultimately issued to CSA holders is granted through vesting upon the satisfaction of the contractual conditions. Thus, the CSA's might be a "right to convert" to common stock if future conditions are satisfied. Even so, a "right to convert" is specifically excluded from the definition of "equity security" under §101(16)(C). The statutory text of §101 is not ambiguous. The statute should be applied according to its terms. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026 (1989).

11.    *Third*, the cases upon which the Debtors rely analyzing the Code's definition of an equity security are inapposite. None of those cases pertain to contingent stock awards, but are limited to instruments of stock, warrants and options that are expressly included within the definition of an equity security. *See e.g., In re Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio)(stock options consisting of five-year right vested in full from grant date were equity); *In re Washington Mut.*, 2012 WL 10189 (Bankr. D. Del. Jan. 3, 2012) (MFW)(warrants were equity); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 520 (5th Cir. 2004)(right of shareholders to redeem stock was equity security); *In re Einstein/Noah Bagel Corp.*, 257 BR. 499, 506 (put right to liquidate equity interest in debtor limited partnership by grant of stock in affiliate debtor or cash at option of debtor where right could be extinguished if stock could not be issued leaving claimant with interest in partnership was equity).

12.    *Fourth*, the Debtors' accounting with respect to the CSA's does not support their position here. The Debtors would expense the CSA's as compensation liability over the relevant service periods, *i.e.*, over the vesting period. The awards were issued as payment for services

6

provided to the Debtors by Claimants, and a deduction would be taken. Similarly, the CSA's would generate taxable income to Claimants, and not capital gains, at the time and to the extent they converted to common stock.

13.  *Fifth*, the CSA's lack any indicia of ownership and the fundamental rights generally associated with an equity interest, such as voting rights, ability to sell, trade or hedge stock, possession of stock certificates and book entry certificates. *See In re Motels of Am.*, 146 B.R. 542 (Bankr. Del. 1992). Claimants were not and did not have the rights of a shareholder.

14.  *Sixth*, the Debtors argue that Claimants' rights under the CSA's do not give rise to a claim under §101(5) of the Code because Claimants are not entitled to a cash payment on account of the CSA's under any circumstances. But Claimants never gave up their rights to receive payment for their unpaid wages that had been earned as of the Petition Date. They retained those rights where, as here, the right to receive stock as of the Petition Date had not matured and the CSA's had not converted to common stock.

**B.  The Claims Are Not Subject to Subordination Under §510(b) of the Code**

15.  The Debtors in the alternative seek to subordinate the Claims under §510(b). Section 510(b) of the Code provides for subordination of claims "for damages arising from the purchase or sale of . . . a security" of the debtor.

16.  The Debtors plainly do not meet the requirements of §510(b). The Debtors do not adequately address the requirement that a claim under §510(b) must arise on account of a "purchase" of a "security" and be one for "damages." The Claims are not based upon the purchase of a security nor for damages, but are based upon a debt for deferred compensation, *i.e.*, wages, that were to be paid subject to the CSAs' temporal and substantive conditions for vesting

7

and conversion. The Debtors also do not address the issue here that subordination of the Claims would upset the priority scheme for wage claims that Congress granted under the Code.

## 1. The Terms of §510(b) are Not Applicable

### a. The Claims Are Not for Damages But Are for Unpaid Wages

17.    In *In re Wyeth Company, Debtor*, 134 B.R. 920 (Bankr. W.D. Mo. 1991), the trustee objected to claims based upon promissory notes given to claimants by the debtor for their shares in the debtor. After the issuance of the notes, the debtor filed for bankruptcy. The court rejected the debtor's request to subordinate the claims as damage claims under §510(b):

> [U]se of the term 'damages' implies more than a simple debt. . . Such a claim must . . . not merely be a claim on a debt.

18.    Similarly, in *Montgomery Ward Holding Corp. v. Scheber (In re Montgomery Ward)*, 272 B.R. 836 (Bankr. Del 2001), the court denied subordination of a claim based upon the debtor's default on a promissory note, holding that "damages" in §510(b) "connotes a recovery broader than a simple claim on an unpaid debt." "'[D]amages' implies a tortious injury, as for example, one suffered from the fraudulent issue, purchase or sale of securities."

19.    More recently, in *In re NationsRent, Inc.*, 381 B.R. 83, 86, 92 (Bankr. D.Del.2008), the court rejected an attack under §510(b) to claims of those who, in exchange for stock, cash, promissory notes, and other deferred consideration (the "Make Whole Payments"), transferred to the debtors their interests in companies the debtors acquired through pre-petition mergers. According to a side letter agreement, the Make Whole Payments were to be calculated based upon the value of the Debtor's common stock on the third anniversary of the acquisition. The claimants argued that their Make-Whole claims were not subject to subordination under §510(b) because they were not premised upon the Debtors' conduct for fraud, securities

violations or damages arising from a breach of contract.  The court agreed, stating:

> The Make-Whole Amounts are not 'damages' arising from or caused by fraud, a
> securities violation or as an obligation which Debtors undertook in connection with the
> issuance of stock. The Court is persuaded that the Make-Whole Amounts are simply that,
> namely, claims to recover payment due under agreements of sale of businesses.  The
> Make-Whole Claimants were not investors, nor were they speculating on the success of
> the Debtors.  Instead, the Make-Whole Amounts exist to provide the seller Claimants
> with their bargained for sales price.  The Make-Whole Amounts are deferred
> compensation with a formula which serves as a damage buffer.

Id. at 92.

20.    Here, as of the Petition Date, the Debtor had a liability to Claimants for their

deferred compensation that were wages, unpaid debts that were to be paid through the vehicle of

the CSA's.  The Claims involve neither loss nor injury based upon a wrongful act of the Debtor,

nor a tort or breach of contract.  They are claims seeking to enforce Claimants' rights based upon

the Debtor's promise to pay them their deferred compensation, their wages.  The Debtor did not

breach or default in its deferred payment obligation to Claimants.  As of the Petition Date, the

Debtor had not breached any of the obligations it undertook under the CSA's.  Claimants are

entitled to their unpaid wages.

21.    The cases upon which the Debtors rely for subordination of the Claims are

inapposite.  Those cases involve damage claims of creditors premised upon pre-bankruptcy

wrongful conduct of the debtor, either tort or breach of contract claims.  *See e.g., In re Med

Diversified, Inc.*, 461 F.3d 251, 254 (2d Cir. 2006)(claim for damages based on debtor's failure

to issue shares of common stock in another company pursuant to employee termination

agreement); *In re Enron, supra* (employee's claim for damages for vested stock options based

upon fraud and breach of contract claims and decline in value of stock); *In re Betacom of

Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001)(damage claim based upon debtor's pre-bankruptcy

failure to deliver promised shares). This case is different. It does not involve damage claims, but a claim for deferred compensation and wages that the Bank had agreed to pay before the Petition Date in the form of CSA's that had not vested or if they had vested, had not converted to common stock.

### (b) The Claims Do Not Implicate a Security

22.    The absence of a security defeats subordination under §510(b). *In re Enron, supra* at 149 ("A preliminary issue that must be addressed is whether a 'security' as that term is used in section 510(b) is implicated in the Stock Option Claims."). Here, there is no "security" for purposes of §510(b) of the Code. Contingent stock awards are not within the items enumerated as a "security" under the Code. *See* 11 U.S.C. §101(49). The CSA's are fundamentally different from stock, warrants and stock options. Those instruments give the holder a present right to make an investment decision and share in the risks and benefits of having an ownership stake in a company. The CSA's here, on the other hand, provide no present ownership stake or power to invest.

23.    For that matter, claims based upon instruments evidencing a debt for unpaid services, such as here, are expressly excluded from the definition of a security. Section 101(49)(B) of the Code provides the term "security" does "*not* include" (emphasis added) a "debt or evidence of an indebtedness for goods sold and delivered or services rendered." The Debtors were indebted to Claimants for the pre-petition services they rendered and the pay they earned, and the CSA's granted to Claimants were evidence of that indebtedness. The CSA's could also be viewed as a loan to the Debtor with respect to Claimants' unpaid compensation. The fact that the ultimate amount to be paid to Claimants turned on the share price of the stock

10

does not take the CSA's outside the ambit of 101(4).  The Debtors fail to address 101(49)(B) in their Claims Objection.

24.    The structure, characteristics and history of the CSA's also show that they are not securities. Here, contingent stock awards and stock options were granted as part of a broad-based compensation package for the thousands of the Debtor's and its affiliates' employees.  On an annual basis, a percentage of Claimants' wages, at the discretion of the Debtors, was reduced at year-end in exchange for contingent stock awards and stock options.  There were significant temporal and substantive conditions that had to be met before the CSA's vested.  Contingent stock awards were forfeited in various scenarios before and after vesting depending upon whether termination was voluntary,  for "cause" or involved "Detrimental Activity, " or whether an employee left for a "Competitor." At various times, contingent stock awards did not convert until years after they had vested.  None of the conditions to the Awards were negotiated by Claimants before or after they started employment with the Debtors.

25.    Further, participation in the program was compulsory, at the discretion of the Debtors. [5]  Claimants submit that they did not bargain or make an affirmative investment

---

[5]  In addition, federal securities caselaw, from which this Court may seek guidance, establishes that a key consideration in determining the existence of a "security" in the context of an employee stock or benefit plan, such as here, is whether the stock or benefit plan is voluntary or mandatory.  *See International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551 (1979) (holding that an interest in a compulsory, noncontributory pension plan is not a 'security.'), *Bauman v. Bish*, 571 F. Supp. 1054, 1064 (N.D.W.Va. 1983) (ESOP plan was method of deferring income and not an investment in securities).

A hallmark of a "security" is an investment decision which can only occur where there is a voluntary employee benefit or stock plan.  *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1363 (D. Minn. 1988).  Specifically, there must be an "individual affirmative decision to give up a particular consideration in return for a financial interest." *See Childers*, 688 F. Supp at 1363 (plaintiffs' participation in plan was incident of employment and their only choice would have been to forego receipt of benefits entirely).

In *Daniel*, the Supreme Court stated, in considering whether an employee's interest in a pension plan was a security, "Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a

decision to accept the CSA's as payment for their services, but made an employment decision concerning their livelihood.  Under the Debtors' program, the firm reserved the right to pay Claimants in cash before and after the grants had been made.  Debtors also reserved the right to make without limitation unilateral changes in the terms of the contingent stock awards, and did so in various significant respects over the years, including the vesting time and the percentage allotment of total compensation.  The vesting and holding periods, which were lengthened over the years, were significantly longer than those of competitors.  In these circumstances, the CSA's were not a security.

26.     The Debtors rely upon *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) to establish that Claimants' unpaid wages must be subordinated.  The CSA's issued to Claimants, which predominantly had not vested and had not converted as of the Petition Date, differ from the stock options and phantom stock at issue in *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006).  In *Enron*, the employee-claimants held actual "securities" in the form of stock options.  The employees argued that they had been fraudulently induced to retain their stock options.  The court ruled that the claims were for damages arising from a purchase of securities for purposes of §510(b).  The Court noted that stock options were expressly within the list of items in the definition of a security under the Code.  The Court also found that the exchange of the stock options for the employees' labor fell within a broad reading of the term "purchase." The court rejected the employees' argument that they had not chosen to exchange their services for the stock options, noting they had accepted the options as a form of compensation prior to

---

livelihood, not making an investment." *Daniel*, 439 U.S. 551, 560. To determine whether or not a participant's interest in a plan was a "security" for federal securities law purposes, the Court in *Daniel* indicated that it was necessary to demonstrate that a participant "chose" to participate in the plan.

12

employment by accepting the terms of their employment arrangement.

27.    Further, with respect to the stock options at issue, the employees in *Enron* had a contractual right to exercise their options but had made an investment decision not to do so.  The one employee claimant whose claim was based on phantom stock also had a contractual entitlement to the delivery of the shares that had vested prior to the petition date but had elected not to sell them.[6]  The court in *Enron* specifically noted in footnote 3 that its conclusion with regard to the stock options in that case applied only to stock options similar to those presented. With regard to the breach of contract claims asserted by the employees, *i.e.*, that the debtor had failed to perform its promise of delivering the options, the court found they were recharacterized fraud claims subject to subordination.

28.    Here, by contrast, there is no security.  Claimants are not seeking payment on a vested stock option or on stock, but on their unpaid compensation that was to be paid through CSA's that granted Claimants an interest in the Debtors' employee stock benefit plan through units that vested over time and were subject to substantive conditions of forfeiture.  Moreover, Claimants have not asserted any fraud or breach of contract claims, only a claim for a debt, Claimants' unpaid wages to be paid at a future date.  Also, contrary to the Debtors' argument, Claimants did not "willingly engage in the exchange of their labor for these awards" or bargain as a pre-condition to their employment.  The CSA's were not a consideration in Claimants' agreement to work for the company.  It is difficult to imagine a "bargain" as to as nebulous as here, and that were constantly changing.  In any event, even if the Court were to find there was a

---

[6] Claimants reiterate that their claims are based upon CSA's and not stock options, although the Debtors consistently refer to claims based upon stock options here.

13

bargained for exchange, there was no security.

29.    The Debtors rely upon other caselaw for their proposition that Claimants' compensation claims are not immune from subordination under §510(b).   In the cited cases, there was no issue, as in *Enron*, that there was a security given n exchange for compensation. *See e.g.*, *In re Med Diversified, Inc., 461 F.3d 251* (2d Cir. 2006)(damage claim  based on debtor's failure to issue shares of stock pursuant to  employee termination agreement); *In re U.S. Wireless Corp.*, 384 B.R. 713 (Bankr. D. Del. 2008)(equity package was  security because both stock and stock options are included in definition); *In re Touch America Holdings, Inc.*, 381 B.R. 95 (Bankr. D. Del. 2008)(breach of fiduciary claims based upon acquisition of high risk stock as matching contribution subject to subordination);  *International Wireless Comm. Holdings Inc.*, 279 B.R. 463 (D. Del. 2002)(compensation claim in form of stock of subsidiary later exchanged for stock of parent company and warrants).

## 2.  Claimants Did Not Bargain to Become Shareholders

30.    In *In re CIT Group Inc.*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011), the court stated that "the existence of a mere 'connection' between the claim and the purchase or sale of a security is not enough to support a finding that the claim 'arises from' the purchase or the sale." The court further stated, "As the Second Circuit held in *In re Med Diversified*, the real question is whether the claimant bargained for the risks and rewards of a holder of equity rather than a holder of debt." *Id.* at 639.

31.    The Claims here arise out of firmly fixed rights under Claimants' employment arrangement as well as Delaware law. The Claims here qualify as "wages" under Delaware's Wage Payment and Collection Act of the State, codified at Delaware Code Annotated at Title 19,

14

Part I, Chapter 11, Sections 1101 to 1115 (the "Wage Act").[7] *See SCOA Indus. Inc. v. Bracken*, 374 A.2d 263 (Del. 1977)(claim for year-end bonus was for wages under Wage Act); *Sietz v. Siegfried Group*, 2001 WL 1198941 (Del. Super. 2001)(deferred compensation earned but not paid based upon services rendered fell within definition of "wages"); *Dept. of Labor Commons v. Green Giant*, 394 A.2d 753, 394 A.2d 753 (Del. Super. 1978)("wages" refers to recurrent compensation for services rendered).[8]

32.    Claimants did not agree to give up their contractual rights as to their unpaid compensation, as well as the  protections afforded their wage claims under Delaware law.  They did not bargain for the status as shareholders, but as wage claimants to be paid through the vehicle of the CSA's that vested over time.

33.    The Debtors argue that the Wage Act does not apply here because the purpose of the Wage Act, to provide a remedy for employees to recover regular direct recurrent wages, has no application here.  The CSA grants, however, were recurrent, they were granted on an annual basis, albeit year-end.  That the unpaid wages were paid year-end does not disqualify them as

---

[7] The Bank that was a party to the 2005 Stock Incentive Plan under which the CSA's were issued is a Delaware corporation.  The 2005 Stock Incentive Plan provides that Delaware law is controlling.

[8] The Wage Act defines "wages" as those that are "determined on a time, task, piece, commission or other basis of calculation."  19 Del. C. §1101(a)(2).  Under Delaware law, Claimants were entitled to various protections granted their wages that were deferred and unpaid.  "Chapter 11 of Title 19 Delaware Code [was] enacted by the General Assembly in 1965 (55 Del. Laws, Ch. 1) to provide for payment of wages and to enforce their collection."  *State Christopher v. Planet Ins.*, 321 A.2d 128 (Del. Super. 1974).  Thus, in a case of a dispute over the amount of wages, §1104 of the Act requires that the employer shall pay without condition all wages or parts thereof conceded by the employer to be due leaving the employee all remedies the employee otherwise might be entitled to under the Wage Act or other applicable law.  As to insolvent corporations, the amount of wages due not exceeding two months have priority to other debts. Title 8, Chapter 1, Subchapter XI, §300.  Section 1107 of the Wage Act forbids an employer to withhold or divert any portion of any employee's wages with the exception of deductions provided by State or Federal law, deductions for medical, surgical or hospital care, or deductions authorized in writing by the employee.  Section 1103(d) of the Wage Act provides that if an employer withholds without reasonable grounds funds to pay an employee wages the employer shall in addition be liable to the employee for liquidated damages as calculated therein.

wages under the Wage Act.

34.    In addition, that the Claims are based upon a variable, the price of the Debtors'

stock, also does mean that Claimants bargained to become or took on the risk of shareholders

The cases establish that the manner in which payments are measured is not the issue for purposes

of §510(b). *See CIT supra* (claim for payments under tax sharing agreement that were variable

not subject to subordination under §510(b)); *In re American Wagering, Inc.*, 493 F.3d 1067 (9th

Cir. 2007)(where compensation was to be valued on basis of debtors' share price, subordination

not appropriate in that it was means of compensation for services performed); *In re NationsRent,*

*supra* (court denied subordination where compensation sought for transfer of company was

based upon price of stock years after merger).

35.    Nor did Claimants speculate on the success of the Debtors in accepting the CSA's

as a form of compensation. They were seeking to recover their unpaid wages. The CSA's were

an exchange for services with the consideration deferred to a later time based upon the price of

the stock. The CSA's were a means to pay Claimants their compensation and to keep Claimants

tied to the company. Claimants never sought to become equity holders. Claimants were not

interested in participating in firm profits through the CSA's. Claimants did not bargain to

become shareholders because payment of part of Claimants' compensation in Deferred

Compensation Awards was at the discretion of the company, the CSA terms after grants had

been made allowed the company to pay Claimants in cash, Claimants might never become

stockholders, and the terms of the CSA's were constantly changing. A bargained for exchange,

*i.e.*, to become a shareholder, cannot be premised upon a transaction, such as here, where there

was no obligation to issue stock, or any promise to issue stock could be fairly described as

16

illusory.

### 3. The Claims Qualify as Priority Wages Under the Code

36.    A portion of each of Claimant's wage claims here is entitled to priority treatment

under §507(a)(4) of the Code, *i.e.*, for services Claimants rendered within 180 days of the

Petition Date, with the remainder of the Claims entitled to general unsecured treatment.  The July

2008 CSA's granted to Claimants were given to Claimants, employees as of the Petition Date, in

part, for their daily services rendered during the 180 days prior to the Petition Date.  A

percentage of Claimants' year-end total compensation was reduced in exchange for the CSA's

which were given in lieu of increased wages.  *See e.g., In re Cardinal Indus, Inc.*, 160 B.R. 83

(Bankr. S.D. Ohio 1993)(focus for purpose of wage priority should be the time individual

performed services which gives rise to the right to bonus or commission, and not when it is

payable or calculated).  The consideration for the July 2008 CSA's was Claimants' services

rendered pre-petition.  The CSA's were not a "perk."[9]  The Debtors argue that it is "irrelevant" to

the analysis here that the CSA's were given for compensation.  It is not irrelevant because

subordinating the Claims would upset the priority to which the Claims are entitled under the

Code.

37.    Statutory wage priorities become fixed on the petition date and travel with the

claim. *See Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 27 S. Ct. 178 (19907)(applying

---

[9] Claimants acknowledge the decision in *In re Baldwin United Corp.*, 52 B.R. 549 (Bankr. S.D. Ohio 1985).
There, the court held that a claim based upon rights arising under a stock option plan did not qualify as
administrative priority or priority wages because the plan was designed as a "perk" to increase the attractiveness of
the employment arrangement, and not in lieu of regular salary. That is distinguishable from this case.  Claimants
further submit that their year-end compensation , labeled as a bonus, was not in fact a bonus but an additional layer
of income to which Claimants were entitled the amount of which was based  in part upon Claimants' generation of
revenues.

507(a)(4)). Congress found it important to compensate employees for their wage-based claims.[10]

Subordinating the Claims here upsets the priority scheme of the Code. The Debtors fail to address

this issue in the Claims Objection.

### 4. In the Drexel Burnham Cases Compensation Claims of Former Employees Were Granted General Unsecured Treatment

38.    In a trilogy of decisions from this District, Debtors' counsel here, Weil Gotshal &

Manges, successfully argued against the subordination of compensation-based claims of

employee-shareholders. *See In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717 (Bankr.

S.D.N.Y. 1992) *("Drexel I"); In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723 (Bankr.

S.D.N.Y. 1992) *("Drexel II");* and *In re Drexel Burnham Lambert Group, Inc.,* 140 B.R. 347

(S.D.N.Y. 1992) *("Drexel III").*   In *Drexel I,* the court ruled on a securities class objection to a

settlement with employee-shareholders and the plan's classification and treatment of their claims

as unsecured claims.

39.    The court overruled the objection to the settlement with the employee-

shareholders whose claims the court noted were based upon a series of statutory and common

law theories, ERISA theories, labor law theories and common law fraud theories.  The

employee-claimants' claims were premised upon Drexel's failure to protect the employees who

pre-bankruptcy had held shares under Drexel's benefit plans.  The objection premised on §510(b)

argued that the claims held by the employee-shareholders could not be treated on a parity with

general unsecured creditors.  The court, rejecting this position, noted that there were multifaceted

issues of law and fact involved in the many separate and distinct claims that had been asserted,

---

[10]   Section 507(a)(4) increased the time period from 90 days to 180 days by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 for all cases commenced after April 20, 2005.

and approved the settlement treating the claims as unsecured. *Drexel I, 1*38 B.R. at 720-721.[11]

40.     The Claims Objection is devoid of any discussion of the *Drexel* decisions.

## 5.  Subordination Here Would Violate the Policies of §510(b)

41.     The Claims do not fall within the policy of §510(b).  The purpose of §510(b) is to place the risk of an unlawful issuance of securities on security holders as opposed to general creditors.  Claims for wages of employees under a broad-based employee compensation program do not depend upon whether the issuance of stock was illegal or whether the company engaged in a breach of contract or other form of wrongdoing.  The claims here and the claims of other former employees are triggered simply by the rendering of services.

42.     The Debtors, relying upon the decision in *Worldcom, Inc., supra*, argue that "The statute applies evenhandedly to swindles both great and small leading to claims for recission or damages by investors both great and small."  But this case is not about a swindle, it is not based upon claims for fraud and it is not about claims for breach of contract.  It is about the claims of employees under a broad-based compensation program and for their promised compensation, that pursuant to the terms of the CSA vehicles, was not due to be paid until various dates in 2008-2013.  This situation involving employees as of the Petition Date for their unpaid wages is

---

[11] *Drexel II* details the confirmation requirements under Bankruptcy Code § 1129(b) and how the debtor's plan satisfied them. The settlement of the employee compensation claims was an integral part of the plan, and the court found the treatment of such claims pursuant to the settlement "fair and equitable" as required by the Code, explaining as follows: "Given the conflicting positions and interests, the risks that some Employee ERISA Compensation Claims may be subject to one or more forms of subordination under § 510 [which includes discretionary subordination due to wrongful conduct], ... the [treatment of the claims] each fall well within a range of reasonableness." *Drexel II,* 138 B.R. at 750.

*Drexel III* is the securities class' appeal of *Drexel I* and *Drexel II* to the district court. In *Drexel III,* the district court affirmed the bankruptcy court's approval of the settlement and affirmed the lower court's approval of the treatment of the employee claims as unsecured. The court rejected the contention that under § 510(b) the employee claims were to be mandatorily subordinated:.

a situation that extends the reach of §510(b) beyond its legislative history and purpose.

WHEREFORE, this Court should deny the Debtors' objection to the Claims, allow the Claims as requested herein, afford priority treatment to $10,950 of the Claims, and grant such other further relief as the Court deems just and proper.

Dated:  New York, New York
        February 17, 2012

LAW OFFICES OF LISA M. SOLOMON

By: _____
      Lisa M. Solomon
      305 Madison Avenue, Suite 4700
      New York, New York 10165
      (212) 471-0067

*Counsel for Compensation Claimants Riccardo Banchetti, Philippe Dufournier, Anke Parr, Giancarlo Saronne  and Harsh Shah*