LAW OFFICES OF LISA M. SOLOMON
305 Madison Avenue, Suite 4700
New York, NY 10165
Tel: 212- 471-0067; Fax: 212-980-6965
Lisa M. Solomon, Esq.

*Counsel for Compensation Claimants Vincent Primiano,
Gordon Sweely, Charles Spero and Timothy A. Burke*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:
                                                                                         :
LEHMAN BROTHERS HOLDINGS, INC.,
*et al.*,
                                                                                         :
                                    Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Objection Deadline: February 21, 2012

Chapter 11
Case No. 08-13555 (JMP)

(Jointly Administered)

**JOINT RESPONSE OF COMPENSATION CLAIMANTS VINCENT PRIMIANO,
GORDON SWEELY, CHARLES SPERO AND TIMOTHY A. BURKE TO DEBTORS'
SUPPLEMENTAL ANNOTATED OMNIBUS OBJECTION TO CLAIMS WITH
RESPECT TO 118TH, 135th AND 207TH OMNIBUS CLAIMS OBJECTIONS SEEKING
TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS**

Vincent Primiano, Gordon Sweely, Charles Spero and Timothy A. Burke (collectively, "Claimants"), by their undersigned counsel, hereby submit this joint response to the Debtors' Supplemental Annotated Omnibus Objection to Claims with respect to Debtors' 118th, 135th and 207th Omnibus Claims Objections (collectively, the "Claims Objection"). In support thereof, Claimants respectfully represent as follows:

**BACKGROUND**

1.  Commencing on September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings, Inc. (the "Bank" or the "Debtor") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code (the

"Code").

2.  Claimants, former employees of the Bank, are creditors of the Debtor. Prior to the bar date for filing proofs of claim herein, Claimants each filed a proof of claim against the Debtor on account of deferred compensation owed to Claimants (collectively, the "Claims").[1]

3.  As of the date hereof, the Claims remain outstanding. Pursuant to notices and orders the Debtors have served upon Claimants since filing their 118th, 135th and 207th omnibus claims objections, the hearing with respect to the Debtors' objections to the Claims, as well as other listed claims (collectively, the "Outstanding Claims"), was adjourned to December 21, 2011. On December 21, 2011, the undersigned appeared on behalf of Claimants at the hearing along with other Outstanding Claimants, and presented legal arguments against the reclassification of the Claims. At the hearing, the Court inquired how objectors' claims were different from the claims at issue in the *Enron* decision, and voiced concern with regard to the absence of an evidentiary record. At the close of the hearing, this Court directed the Debtors to serve an annotated and supplemental omnibus objection with respect to the Outstanding Claims, and proceed with establishing an evidentiary record.

4.  By this response, Claimants further respond to the Claims Objection. Here, the Debtors are not satisfied to make *pro rata* distributions to Claimants on account of their unpaid compensation claims along with other general unsecured creditors. Instead, the Debtors seek to: (i) reclassify the Claims and other Outstanding Claims as equity interests that will receive no

---

[1] Claimants seek general unsecured treatment for the Claims heretofore filed for unpaid compensation except for $10,950 of the proofs of claim amount for which they seek priority treatment on account of services Claimants rendered within 180 days prior to the Petition Date. Claimants' claim numbers are as follows: (i) Vincent Primiano (claim no. 31795); (ii) Gordon Sweely (claim no. 33156); (iii) Charles Spero (claim no. 23799); and (iv) Timothy Burke (claim no. 27925). Vincent Primiano has also filed substantially similar claims for unpaid compensation against each of the other Debtors which proofs of claim are referenced in the Claims Objection.

2

distribution under the Debtors' plan of reorganization; and (ii) in the alternative, mandatorily subordinate the Claims and other Outstanding Claims pursuant to §510(b) of the Code in effect to the level of equity. The Claims Objection also seeks to subordinate "certain" unidentified Outstanding Claims on the basis of contractual subordination pursuant to §510(a) of the Code.

## GROUNDS FOR RESPONSE

5. As of the Petition Date, Claimants were salaried employees of the Debtors. As of the Petition Date, the Debtors' compensation arrangement with Claimants and their thousands of other employees included the requirement, at the sole discretion of the Debtors, that a portion of employees' deferred compensation at the end of each work year be paid in the form of restricted stock units and stock options that vested over time and were subject to other substantive conditions (the "Deferred Compensation Awards"). Deferred Compensation Awards were calculated as a percentage of an employee's total compensation according to pre-set firm wide tables developed by the Debtors on an annual basis. Total compensation for each employee depended upon the employee's performance and generation of revenue. Under the Debtors' rules, the higher the total compensation, the greater the percentage allocated to the Deferred Compensation Awards.

6. As of the Petition Date, the Bank had granted Claimants the aggregate of 690,448 restricted stock units that had not converted to the Banks' common stock, most of which were also not yet vested (the "RSU's"), on account of the services Claimants had rendered in the years 2003-2008 and the pay they had earned. Thus, as of the Petition Date, no shares of stock had been issued to Claimants on account of the RSU's, and no shares were due to be delivered to

Claimants until various dates in 2008-2013.[2]

7. Claimants oppose the reclassification of the Claims as equity. *First*, there is no legal basis to reclassify and treat the Claims as equity securities. The Claims are premised upon Claimants' right to deferred compensation already earned that was to be paid through the vehicles of the RSU's that do not have the basic characteristics of equity securities. *Second*, there is no legal basis for subordination of the Claims under §510(b) of the Code.[3] The Debtors do not satisfy the statutory requirements for mandatory subordination for the reason that the Claims do not involve a "security," are not for "damages" arising from the "purchase" of a "security," nor are the policies of the statute served by subordination here. Granting subordination would also upset the priority granted under the Code for wage claims. *Third*, at a minimum, there are significant issues of fact with respect to the Debtors' requested relief that requires discovery be conducted herein.

A. **The Claims Are Not Equity Securities But Are Based Upon Liabilities**

8. There is no basis to reclassify the Claims as equity securities. Section 101(16) of the Code defines an "equity security" as "(A) share in a corporation, whether or not transferable or denominated 'stock", or similar security; (B) interest of a limited partner in a limited partnership; or (C) warrant or right, *other than a right to convert,* to purchase, sell, or subscribe

---

[2] As part of the Deferred Compensation Awards, as of the Petition Date, the Debtor had also granted stock options to Claimants. Claimants are not seeking recovery of any amounts herein on account of any stock options.

[3] Claimants reserve their rights to address any arguments the Debtors subsequently make at such time that the Debtors identify with particularity any claims they assert are subject to contractual subordination under §510(a) of the Code. The Claims Objection the Debtors have now filed does not specifically identify the Claimants or any other Outstanding Claimants as having entered into contractual subordination agreements. The Debtors merely assert that "some" Outstanding Claimants, *albeit* unidentified, are subject to contractual subordination. Claimants submit that to their knowledge, at no time have they agreed to nor executed and delivered contractual subordination agreements with the Debtor. Claimants further note that the 2005 Stock Incentive Plan, a governing document here, does not refer to subordination of the rights of participants but instead refers to "unfunded" creditor obligations.

to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph." (emphasis added).[4] The unsecured contractual rights Claimants had with respect to their unpaid compensation to be paid through RSU's as of the Petition Date do not fall within the definition of equity security under the Code, but are liabilities of the Debtor because they are an enforceable obligation with a right to payment, and should be treated as claims.

9.  *First*, the purpose and the structure of the RSU's shows that the Debtors had a liability to Claimants whom had a right to payment. The RSU's were a device for the payment of part of thousands of the Debtors' employees' wages, *albeit*, on a deferred basis. A principal aim of the RSU's was to serve as a retention device for the Debtors' benefit. Thus, the restricted stock units granted a contract right to Claimants, *i.e.*, the Debtors' conditional promise to deliver common stock, or cash in lieu thereof, in the future. The RSU's matured over stated time periods, and employees were *only* eligible to cash them in provided they were still in the Debtors' employ. They were subject to other substantive conditions that the Debtors unilaterally changed over time following the Debtors' implementation of the RSU program. The RSU's allowed the Debtors to defer the payment of cash compensation, to expense the compensation when paid, and to retain employees in the Debtors' employ until at least the date the RSU's vested. This was their essential economic characteristics. They were not an equity security.

10. *Second*, the Codes' definition of "equity security" confirms that the RSU's and the rights they grant are not equity securities. An RSU, as opposed to a stock option or a warrant, does not give the holder the right to "purchase" or "subscribe to" common stock within

---

[4] It is Claimants' position that the RSU's are not a "security" for purposes of §510(b) of the Code as addressed in point B(1)(b) herein. Plainly, if Claimants are correct and the RSU's are not a "security," then they also are not an "equity security."

the meaning of §101(16). Common stock ultimately issued to RSU holders is granted through vesting upon the satisfaction of the contractual conditions. Thus, the RSU's might be a "right to convert" to common stock if future conditions are satisfied. Even so, a "right to convert" is specifically excluded from the definition of "equity security" under §101(16)(C). The statutory text of §101 is not ambiguous. The statute should be applied according to its terms. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026 (1989).

11.     *Third*, the cases upon which the Debtors rely analyzing the Code definition of an equity security are inapposite. None of those cases pertain to restricted stock units, but are limited to instruments of stock, warrants, options and similar instruments that are expressly included within the Code's definition of an equity security. *See e.g., In re Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio)(stock options consisting of five-year right vested in full from grant date were equity); *In re Washington Mut.*, 2012 WL 10189 (Bankr. D. Del. Jan. 3, 2012) (MFW)(warrants were equity); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 520 (5th Cir. 2004)(right of shareholders to redeem stock was equity security); *In re Einstein/Noah Bagel Corp.*, 257 BR. 499, 506 (put right to liquidate equity interest in debtor limited partnership by grant of stock in affiliate debtor or cash at option of debtor where right could be extinguished if stock could not be issued leaving claimant with interest in partnership was equity).

12.     *Fourth*, the Debtors' accounting with respect to the RSU's does not support their position here. The Debtors would expense the RSU's as compensation liability over the relevant service periods, *i.e.*, over the vesting period. The awards were issued as payment for services provided to the Debtors by Claimants, and a deduction would be taken. Similarly, the RSU's would generate taxable income (and Social Security wages) to Claimants, and not capital gains,

08-13555-scc   Doc 25551   Filed 02/17/12   Entered 02/17/12 20:15:11   Main Document
Pg 7 of 20

at the time and to the extent they converted to common stock.

13.  *Fifth*, the RSU's lack any indicia of ownership and the fundamental rights generally associated with an equity interest, such as voting rights, ability to sell, trade or hedge stock, possession of stock certificates and book entry certificates.  *See In re Motels of Am.*, 146 B.R. 542 (Bankr. Del. 1992).   Claimants were not and did not have the rights of a shareholder.  Claimants neither qualified as a beneficial owner of a security which includes those who have the power to either vote or dispose of the security.  17 CFR 240.13d-3(a) (1991).

14.  *Sixth*, the Debtors argue that Claimants' rights under the RSU's do not give rise to a claim under §101(5) of the Code because Claimants are not entitled to a cash payment on account of the RSU's under any circumstances. The Debtors' legal premise and their conclusion are both wrong.  Claimants never gave up their rights to receive payment for their unpaid wages that had been earned as of the Petition Date.  They retained those rights where as in this case as of the Petition Date none of the RSU's had  converted to a security, *i.e.*, stock, of the Debtors.

15.  In addition, the RSU's did give Claimants a right to payment in cash under certain conditions.  According to the RSU program documents, amounts were payable in cash upon occurrence of a "change in control" in certain circumstances.  *See e.g.*, 2003 Equity Award Program Brochure for Senior Vice-Presidents. Moreover, the provision the Debtors rely upon in certain of the RSU brochures providing that "in no way shall [the Bank] or any subsidiaries become obligated to pay in cash in respect of such obligation," is not found in the 2008 RSU Plan documents.

B.  **The Claims Are Not Subject to Subordination Under §510(b) of the Code**

16.  The Debtors in the alternative seek to subordinate the Claims under §510(b).

7

Section 510(b) of the Code provides for subordination of claims "for damages arising from the purchase or sale of . . . a security" of the debtor.

17. The Debtors plainly do not meet the requirements of §510(b). The Debtors do not adequately address the requirement that a claim under §510(b) must arise on account of a "purchase" of a "security" and be one for "damages." The Claims are not based upon the purchase of a security nor for damages, but are based upon a debt for deferred compensation, *i.e.*, wages, that were to be paid subject to the RSUs' temporal and substantive conditions for vesting and conversion. The Debtors also do not address the issue here that subordination of the Claims would upset the priority scheme for wage claims Congress granted under the Code.

1. **The Terms of §510(b) are Not Applicable**

    a. **The Claims Are Not for Damages But Are for Unpaid Wages**

18. In *In re Wyeth Company, Debtor*, 134 B.R. 920 (Bankr. W.D. Mo. 1991), the trustee objected to claims based upon promissory notes given to claimants by the debtor for their shares in the debtor. After the issuance of the notes, the debtor filed for bankruptcy. The court rejected the debtor's request to subordinate the claims as damage claims under §510(b), stating:

> [U]se of the term 'damages' implies more than a simple debt. . . Such a claim must . . . not merely be a claim on a debt.

19. Similarly, in *Montgomery Ward Holding Corp. v. Scheber (In re Montgomery Ward)*, 272 B.R. 836 (Bankr. Del 2001), the court denied subordination of a claim based upon the debtor's default on a promissory note, holding that "damages" in §510(b) "connotes a recovery broader than a simple claim on an unpaid debt." "'[D]amages' implies a tortious injury, as for example, one suffered from the fraudulent issue, purchase or sale of securities."

20. More recently, in *In re NationsRent, Inc.*, 381 B.R. 83, 86, 92 (Bankr.

D.Del.2008), the court rejected an attack under §510(b) to claims of those who, in exchange for stock, cash, promissory notes, and other deferred consideration (the "Make Whole Payments"), transferred to the debtors their interests in companies the debtors acquired through pre-petition mergers. According to a side letter agreement, the Make Whole Payments were to be calculated based upon the value of the Debtor's common stock on the third anniversary of the acquisition. The claimants argued that their Make-Whole claims were not subject to subordination under §510(b) because they were not premised upon the Debtors' conduct for fraud, securities violations or damages arising from a breach of contract. The court agreed, stating:

> The Make-Whole Amounts are not 'damages' arising from or caused by fraud, a securities violation or as an obligation which Debtors undertook in connection with the issuance of stock. The Court is persuaded that the Make-Whole Amounts are simply that, namely, claims to recover payment due under agreements of sale of businesses. The Make-Whole Claimants were not investors, nor were they speculating on the success of the Debtors. Instead, the Make-Whole Amounts exist to provide the seller Claimants with their bargained for sales price. The Make-Whole Amounts are deferred compensation with a formula which serves as a damage buffer.

Id. at 92.

21.  Here, as of the Petition Date, the Debtor had a liability to Claimants for their deferred compensation that were wages, unpaid debts that were to be paid through the vehicle of the RSU's. The Claims involve neither loss nor injury based upon a wrongful act of the Debtor, nor a tort or breach of contract. They are claims seeking to enforce Claimants' rights based upon the Debtor's promise to pay them their deferred compensation. As of the Petition Date, the Debtor did not breach any of the obligations it undertook under the RSU's. Claimants are entitled to their unpaid wages.

22.  The cases upon which the Debtors rely for subordination of the Claims are inapposite. Those cases involve damage claims of creditors premised upon pre-bankruptcy

9

wrongful conduct of the debtor, either tort or breach of contract claims. *See e.g., In re Med Diversified, Inc.*, 461 F.3d 251, 254 (2d Cir. 2006)(claim for damages based on debtor's failure to issue shares of common stock pursuant to an employee termination agreement); *In re Enron, supra* (employee's claim for damages for vested stock options based upon fraud and breach of contract claims and decline in value of stock); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001)(damage claim based upon debtor's pre-bankruptcy failure to deliver promised shares). This case is different. It does not involve damage claims, but claims for deferred compensation that the Bank had agreed to pay before the Petition Date through RSU's that had not vested or if they had vested, had not matured.

### (b) The Claims Do Not Implicate a Security

23.     The absence of a security defeats subordination under §510(b). *In re Enron, supra* at 149 ("A preliminary issue that must be addressed is whether a 'security' as that term is used in section 510(b) is implicated in the Stock Option Claims."). Here, there is no "security" for purposes of §510(b) of the Code. Restricted stock units are not one of the items enumerated as a "security" under the Code. *See* 11 U.S.C. §101(49). The RSU's are fundamentally different from stock, warrants and stock options. Those instruments give the holder a present right to make an investment decision and share in the risks and benefits of having an ownership stake in a company. The RSU's here, on the other hand, provide no present ownership stake or power to invest.

24.     For that matter, claims based upon instruments evidencing a debt for services rendered, such as here, are expressly excluded from the Code's definition of a security. Section 101(49)(B) of the Code provides the term "security" does "*not* include" (emphasis added) a

"debt or evidence of an indebtedness for goods sold and delivered or services rendered." The Debtors were indebted to Claimants for the services they rendered and the pay they earned, and the RSU's evidenced that indebtedness. The RSU's could also be viewed as a loan to the Debtor with respect to Claimants' unpaid compensation. The fact that the ultimate amount to be paid to Claimants turned on the share price of the stock does not take the RSU's outside the ambit of 101(49). The Debtors fail to address 101(49)(B) in their Claims Objection.

25.    The structure, characteristics and history of the RSU's also show that they are not securities. Here, restricted stock units and stock options formed no part of employees' compensation packages when Claimants first started working for the Debtor. They were later implemented as part of a broad-based compensation package for the thousands of the Bank's and its affiliates' employees. On an annual basis, at the Debtors' sole discretion, a percentage of Claimants' wages were reduced year-end in exchange for restricted stock units and stock options. There were significant temporal and other substantive conditions that had to be met before the restricted stock units vested. Restricted stock units were forfeited in various scenarios before and after vesting depending upon whether termination was voluntary, was for "cause" or involved "Detrimental Activity," or whether the employee left for a "Competitor." At various times, restricted stock units did not convert until years after they had vested. None of these conditions were negotiated by Claimants.

26.    Further, participation in the program was compulsory, at the discretion of the Debtor.[5] If Claimants wanted to continue working for the firm, they were required to participate

---

[5] Federal securities caselaw, from which this Court may seek guidance, establishes that a key consideration in determining the existence of a "security" in the context of an employee stock or benefit plan, such as here, is whether the stock or benefit plan is voluntary or mandatory. *See International Brotherhood of Teamsters,*

11

in the program. By continuing employment and qualifying for the Debtors' broad-based compensation package, Claimants submit that they did not bargain for nor make an investment decision to accept the RSU's as payment for their services, but made an employment decision concerning their livelihood. The firm reserved the right to pay Claimants in cash before and after the grants had been made. Debtors also reserved the right to make without limitation unilateral changes in the terms of the restricted stock units, and did so in various significant respects over the years, including the vesting time and the percentage allotment of total compensation. The vesting and holding periods, which were lengthened over the years, were significantly longer than those of competitor firms. Consistent with the notion that the RSU's were not an investment, once the RSU's converted to common stock, Claimants regularly and promptly sold the shares to recoup their unpaid wages. In these circumstances, the RSU's are not a security.

27. The Debtors rely upon *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) to establish that the RSU's are a security. The RSU's issued to Claimants, which predominantly were unvested and had not converted to common stock as of the Petition Date, differ from the

---

*Chauffeurs, Warehousemen and Helpers of America v. Daniel*, 439 U.S. 551 (1979) (holding that an interest in a compulsory, noncontributory pension plan is not a 'security.'), *Bauman v. Bish*, 571 F. Supp. 1054, 1064 (N.D.W.Va. 1983) (ESOP plan was method of deferring income and not an investment in securities).

A hallmark of a "security" is an investment decision which can only occur where there is a voluntary employee benefit or stock plan. *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1363 (D. Minn. 1988). Specifically, there must be an "individual affirmative decision to give up a particular consideration in return for a financial interest." See *Childers*, 688 F. Supp at 1363 (plaintiffs' participation in plan was incident of employment and their only choice would have been to forego receipt of benefits entirely).

In *Daniel*, the Supreme Court stated, in considering whether an employee's interest in a pension plan was a security, "Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment." *Daniel*, 439 U.S. 551, 560. To determine whether or not a participant's interest in a plan was a "security" for federal securities law purposes, the Court in *Daniel* looked to whether a participant "chose" to participate in the plan.

stock options and phantom stock in *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006). In *Enron*, the employee-claimants held actual "securities" in the form of stock options. The employees argued that they had been fraudulently induced to retain their stock options. The court ruled that the claims were for damages arising from a purchase of securities for purposes of §510(b). The Court noted that stock options are expressly within the list of enumerated securities under the Code. The Court also found that the exchange of the stock options for the employees' labor fell within a broad reading of the term "purchase." The court rejected the employees' argument that they had not chosen to exchange their services for the stock options, noting they had accepted the options as a form of compensation prior to employment by accepting the terms of their employment arrangement.

28.  Further, with respect to the stock options at issue, the employees in *Enron* had a contractual right to exercise their options but had made an investment decision not to do so. The one employee claimant whose claim was based on phantom stock also had a contractual entitlement to the delivery of the shares but had elected not to sell them. With regard to the breach of contract claims asserted by the employees, *i.e.*, that the debtor had failed to perform its promise of delivering the options, the court found they were recharacterized fraud claims subject to subordination. The court in *Enron* specifically noted in footnote 3 that its conclusion with regard to the stock options in that case applied only to stock options similar to those presented.[6]

29.  Here, by contrast, there is no security. Claimants do not seek payment on a stock option or on stock, but on their unpaid compensation that was to be paid through RSU's which

---

[6] Claimants reiterate that their claims are based upon RSU's and not stock options, although the Debtors consistently refer to claims based upon stock options here.

granted Claimants an interest in the Debtors' employee stock benefit plan through units that vested over time and were subject to substantive forfeiture conditions. Moreover, Claimants have not asserted any fraud or breach of contract claims against the Debtors, only a claim for a debt, Claimants' unpaid wages to be paid at a future date. Also, contrary to the Debtors' argument, Claimants did not "willingly engage in the exchange of their labor for these awards" or bargain as a pre-condition to their employment. Many of the Claimants were employed by the Debtor for more than a decade before the program was implemented, and it is difficult to imagine a "bargain" as to terms as nebulous as here, and that were constantly changing. In any event, even if the Court were to find there was a bargained for exchange, there was no security.

30. The Debtors rely upon other cases for their proposition that Claimants' compensation claims are not immune from subordination under §510(b). In the cited cases, however, there was no issue, as in *Enron*, that there was a security given in exchange for compensation. *See e.g.*, *In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006)(damage claim based on debtor's failure to issue shares of stock pursuant to employee termination agreement); *In re U.S. Wireless Corp.*, 384 B.R. 713 (Bankr. D. Del. 2008)(equity package a security because both stock and stock options are included in definition); *In re Touch America Holdings, Inc.*, 381 B.R. 95 (Bankr. D. Del. 2008)(breach of fiduciary claims based upon acquisition of high risk stock as matching contribution subject to subordination); *International Wireless Comm. Holdings Inc.*, 279 B.R. 463 (D. Del. 2002)(compensation claim in form of stock of subsidiary later exchanged for stock of parent company and warrants).

**2. Claimants Did Not Bargain to Become Shareholders**

31. In *In re CIT Group Inc.*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011), the court stated

that "the existence of a mere 'connection' between the claim and the purchase or sale of a security is not enough to support a finding that the claim 'arises from' the purchase or the sale." The court further stated, "As the Second Circuit held in *In re Med Diversified*, the real question is whether the claimant bargained for the risks and rewards of a holder of equity rather than a holder of debt." *Id*. at 639.

32. The Claims here arise out of firmly fixed rights under Claimants' employment arrangements as well as Delaware law. They qualify as "wages" under Delaware's Wage Payment and Collection Act of the State, codified at Delaware Code Annotated at Title 19, Part I, Chapter 11, Sections 1101 to 1115 (the "Wage Act").[7] *See SCOA Indus. Inc. v. Bracken*, 374 A.2d 263 (Del. 1977)(claim for year-end bonus was for wages under Wage Act); *Sietz v. Siegfried Group*, 2001 WL 1198941 (Del. Super. 2001)(deferred compensation earned but not paid based upon services rendered fell within definition of "wages"); *Dept. of Labor Commons v. Green Giant*, 394 A.2d 753, 394 A.2d 753 (Del. Super. 1978)("wages" refers to recurrent compensation for services rendered).[8]

---

[7] The Bank, Claimants' employer, and a party to the 2005 Stock Incentive Plan, is a Delaware corporation. The Stock Incentive Plan provides that Delaware law is controlling.

[8] The Wage Act defines "wages" as those that are "determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. §1101(a)(2). Under Delaware law, Claimants were entitled to various protections granted their wages that were deferred and unpaid. "Chapter 11 of Title 19 Delaware Code [was] enacted by the General Assembly in 1965 (55 Del. Laws, Ch. 1) to provide for payment of wages and to enforce their collection." *State Christopher v. Planet Ins.*, 321 A.2d 128 (Del. Super. 1974). Thus, in a case of a dispute over the amount of wages, §1104 of the Act requires that the employer shall pay without condition all wages or parts thereof conceded by the employer to be due leaving the employee all remedies the employee otherwise might be entitled to under the Wage Act or other applicable law. As to insolvent corporations, the amount of wages due not exceeding two months have priority to other debts. Title 8, Chapter 1, Subchapter XI, §300. Section 1107 of the Wage Act forbids an employer to withhold or divert any portion of any employee's wages with the exception of deductions provided by State or Federal law, deductions for medical, surgical or hospital care, or deductions authorized in writing by the employee. Section 1103(d) of the Wage Act provides that if an employer withholds without reasonable grounds funds to pay an employee wages the employer shall in addition be liable to the employee for liquidated damages as calculated therein.

33. Claimants did not agree to give up their contractual rights as to their unpaid compensation as well as the protections afforded their wages under Delaware law. They did not bargain for the status as shareholders, but as wage claimants to be paid through the vehicle of the RSU's that vested over time.

34. The Debtors argue that the Wage Act does not apply here because the purpose of the Wage Act, to provide employees a remedy to recover regular direct recurrent wages, has no application. The RSU grants, however, were recurrent, they were granted on an annual basis. That the unpaid wages were paid year-end does not disqualify them as wages under the Wage Act.

35. In addition, that the Claims are based upon a variable, the price of the Debtors' stock, does not mean that Claimants bargained to become or took on the risk of shareholders. The cases establish that the manner in which payments are measured is not the issue for purposes of §510(b). *See CIT supra* (claim for payments under tax sharing agreement that were variable was not subject to subordination under §510(b)); *In re American Wagering, Inc.*, 493 F.3d 1067 (9th Cir. 2007)(where compensation was to be valued on basis of debtors' share price, subordination not appropriate in that it was means of compensation for services performed); *In re NationsRent, supra* (court denied subordination where compensation sought for transfer of company was based upon price of stock years after merger)

36. Nor did Claimants speculate on the Debtors' success in accepting the RSU's as a form of compensation. They were seeking to recover their unpaid wages. The RSU's were an exchange for services with the consideration being deferred to later time based upon the price of

the stock. The RSU's were a means to pay Claimants their compensation and to keep Claimants tied to the company. Here, Claimants never sought to become equity holders. When Claimants were entitled to sell their shares upon vesting and the conversion of the RSU's to a security, *i.e.*, the Debtors' common stock, that is exactly what they did. Claimants also did not bargain to become shareholders because payment of part of Claimants' compensation in Deferred Compensation Awards was at the discretion of the company, the terms of the RSU's allowed the company to pay Claimants in cash, Claimants might never become shareholders, and the terms of the RSU's were constantly changing. A bargained for exchange, *i.e.*, to become a shareholder, cannot be premised upon a transaction, such as here, where there was no obligation to issue stock, or any promise to issue stock by the Debtor could be fairly described as illusory.

### 3. The Claims Qualify as Priority Wages Under the Code

37. A portion of each of Claimant's wage claims here is entitled to priority treatment under §507(a)(4) of the Code, *i.e.*, for services Claimants rendered within 180 days of the Petition Date, with the remainder entitled to general unsecured treatment. The July 2008 RSU's granted to Claimants were given to Claimants, employees as of the Petition Date, in part, for their daily services rendered during the 180 days prior to the Petition Date. A percentage of Claimants' year-end total compensation was reduced in exchange for the RSU's which were given in lieu of increased wages. *See e.g., In re Cardinal Indus, Inc.*, 160 B.R. 83 (Bankr. S.D. Ohio 1993)(focus for purpose of wage priority should be the time individual performed services which gives rise to the right to bonus or commission, and not when it is payable or calculated). The consideration for the July 2008 RSU's was Claimants' services rendered pre-petition. The

RSU's were not a "perk."[9] The Debtors argue that it is "irrelevant" to the analysis here that the RSU's were given for compensation. It is not irrelevant because subordinating the Claims would upset the priority to which the Claims are entitled under the Code.

38.    Statutory wage priorities become fixed on the petition date and travel with the claim. *See Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 27 S. Ct. 178 (19907)(applying 507(a)(4)). Congress found it important to compensate employees for their wage-based claims.[10] Subordinating the Claims here upsets the priority scheme of the Code. The Debtors fail to address this issue in the Claims Objection.

**4. In the Drexel Burnham Cases Compensation Claims of Former Employees Were Granted General Unsecured Treatment**

39.    In a trilogy of published opinions from this District, Debtors' counsel here, Weil Gotshal & Manges, successfully argued for the non-subordination of compensation-based claims of employee-shareholders. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717 (Bankr. S.D.N.Y. 1992) *("Drexel I); In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) *("Drexel II);* and *In re Drexel Burnham Lambert Group, Inc.*, 140 B.R. 347 (S.D.N.Y. 1992) *("Drexel III).* In *Drexel I,* the bankruptcy court judge ruled on a securities class objection to a settlement with employee-shareholders and the plan's classification and

---

[9] Claimants acknowledge the decision in *In re Baldwin United Corp.*, 52 B.R. 549 (Bankr. S.D. Ohio 1985). There, the court held that claims based upon rights under a stock option plan did not qualify as administrative claims or priority wages because the plan was designed as a "perk" to increase the attractiveness of the employment arrangement, and not in lieu of regular salary. That is distinguishable from this case. Claimants further submit that their year- end compensation, labeled as a bonus, was not in fact a bonus but an additional layer of income to which Claimants were entitled the amount of which was based in part upon Claimants' generation of revenues.

[10] Section 507(a)(4) increased the time period from 90 days to 180 days by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 for all cases commenced after April 20, 2005.

treatment of their claims as unsecured claims.

40.     The bankruptcy judge overruled the objection to the settlement with the employee-shareholders whose claims the court noted were based upon a series of statutory and common law theories, ERISA theories, labor law theories and common law fraud theories. The employee-claimants' claims were premised upon Drexel's failure to protect the employees who pre-bankruptcy had held shares under Drexel's benefit plans. The objection premised on §510(b) argued that the claims held by the employee-shareholders could not be treated on a parity with general unsecured creditors. The court, rejecting this position, noted that there were multifaceted issues of law and fact involved in the many separate and distinct claims that had been asserted, and approved the settlement treating the claims as unsecured. *Drexel I, 1*38 B.R. at 720-721.[11]

41.     The Claims Objection is devoid of any discussion of the *Drexel* decisions.

## 5. Subordination Here Would Violate the Policies of §510(b)

42.     The Claims do not fall within the policy of §510(b). The purpose of §510(b) is to place the risk of an unlawful issuance of securities on security holders as opposed to general creditors. Claims for wages of employees under a broad-based employer compensation plan do not depend upon whether the issuance of stock was illegal or whether the company engaged in a

---

[11] *Drexel II* details the confirmation requirements under Bankruptcy Code § 1129(b) and how the debtor's plan satisfied them. The settlement of the employee compensation claims was an integral part of the plan, and the court found the treatment of such claims pursuant to the settlement "fair and equitable" as required by the Code, explaining as follows: "Given the conflicting positions and interests, the risks that some Employee ERISA Compensation Claims may be subject to one or more forms of subordination under § 510 [which includes discretionary subordination due to wrongful conduct], ... the [treatment of the claims] each fall well within a range of reasonableness." *Drexel II,* 138 B.R. at 750.

*Drexel III* is the securities class' appeal of *Drexel I* and *Drexel II* to the district court. In *Drexel III*, the district court affirmed the bankruptcy court's approval of the settlement and affirmed the bankruptcy court's approval of the treatment of the employee claims as unsecured claims. The court rejected the contention that under § 510(b) the employee claims were to be mandatorily subordinated.

breach of contract or other form of wrongdoing. The claims here and the claims of other former employees are triggered simply by the rendering of services.

43. The Debtors, relying upon the decision in *Worldcom, Inc., supra*, argue that "The statute applies evenhandedly to swindles both great and small leading to claims for recission or damages by investors both great and small." But this case is not about a swindle, it is not based upon claims for fraud and it is not about claims for breach of contract. It is about the claims of employees for their promised compensation, that pursuant to the terms of the RSU vehicles, was not due to be paid until some time until various dates in 2008-2013. This situation involving former employees under the Debtors' broad-based compensation plan for their unpaid wages is a situation that extends the reach of §510(b) beyond its legislative history and purpose.

WHEREFORE, this Court should deny the Debtors' objection to the Claims, allow the Claims as requested herein, afford priority treatment to $10,950 of the Claims, and grant such other further relief as the Court deems just and proper.

Dated: New York, New York
February 17, 2012

             LAW OFFICES OF LISA M. SOLOMON

             By: /s/ Lisa M. Solomon
               Lisa M. Solomon
             305 Madison Avenue, Suite 4700
             New York, New York 10165
             (212) 471-0067

             *Counsel for Compensation Claimants Vincent Primiano,*
             *Gordon Sweely, Charles Spero and Timothy A. Burke*