**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) Case No. 08-13555 (JMP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| In re | ) |
| | ) |
| LEHMAN BROTHERS INC., | ) Case No. 08-01420 (JMP) SIPA |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF JPMORGAN'S MOTION TO STRIKE
PORTIONS OF OBJECTION TO PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN
BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC.
<u>REGARDING TRIPARTY REPO-RELATED LOSSES</u>**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for JPMorgan Chase Bank, N.A.*

Dated: February 24, 2012

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 3

    A.    JPMorgan's claims against LBI under the Clearance Agreement ......................... 3

    B.    JPMorgan's claims against LBHI under the August and September
            Agreements ......................................................................................... 4

    C.    The settlement with Barclays................................................................ 5

    D.    JPMorgan's Proofs of Claim................................................................ 7

    E.    The Claims Objection ........................................................................ 8

ARGUMENT .......................................................................................... 8

POINT I        THE STANDARDS GOVERNING THIS MOTION ........................................... 8

POINT II      THE PORTION OF THE OBJECTION RELATED TO THE
                BARCLAYS SETTLEMENT SHOULD BE STRICKEN.................................. 10

    A.    The provisions of the December Settlement Agreement make clear that the
            parties did not intend the release of the Lawsuit to reduce Lehman's
            obligations under the Clearance Agreement ......................................... 11

    B.    The claims against LBHI and LBI are distinct from, and unaffected by, the
            settled dispute over Barclays' failure to refinance the Lehman financing
            that JPMorgan had been providing ...................................................... 13

    C.    The cases cited by the Objectors stand for the undisputed — but inapposite
            — rule prohibiting double payment of a debt.................................... 16

POINT III     THE PORTION OF THE OBJECTION RELATED TO POSTPETITION
                INTEREST SHOULD BE STRICKEN.................................................... 18

    A.    Section 506(b) establishes an unqualified statutory right to postpetition
            interest................................................................................................ 19

    B.    JPMorgan's statutory right to postpetition interest may not be disregarded
            based on "equity."................................................................................ 20

CONCLUSION...................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page**

*Cent. Soya Co.* v. *Epstein Fisheries, Inc.*,
   676 F.2d 939 (7th Cir. 1982) ...................................................................................... 17 n.6

*Coach, Inc.* v. *Kmart Corps.*,
   756 F. Supp. 2d 421 (S.D.N.Y. 2010) ............................................................................ 9

*Equitable Life Assurance Soc'y* v. *Sublett (In re Sublett)*,
   895 F.2d 1381 (11th Cir. 1990) ................................................................................ 21-22

*Estee Lauder, Inc.* v. *Fragrance Counter, Inc.*,
   189 F.R.D. 269 (S.D.N.Y. 1999) ................................................................................... 9

*Fin. Sec. Assurance Inc.* v. *T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) .................................................................................... 19-20

*In re Adelphia Commc'ns Corp.*,
   359 B.R. 54 (Bankr. S.D.N.Y. 2006) ............................................................................ 8-9

*In re Boston & Me. Corp.*,
   719 F.2d 493 (1st Cir. 1983) ........................................................................................ 20

*In re Circuit City Stores, Inc.*,
   426 B.R. 560 (Bankr. E.D. Va. 2010) ......................................................................... 17 n.5

*In re El Paso Ref., Inc.*,
   192 B.R. 144 (Bankr. W.D. Tex. 1996) ....................................................................... 17 n.6

*In re Exec. Office Ctrs., Inc.*,
   96 B.R. 642 (Bankr. E.D. La. 1988) ............................................................................. 15

*In re Lapiana*,
   909 F.2d 221 (7th Cir. 1990) ........................................................................... 22, 22-23 n.9

*In re Pilgrim's Pride Corp.*,
   453 B.R. 691 (Bankr. N.D. Tex. 2011) ........................................................................ 17 n.5

*Jason* v. *Carpet Cleaning, Inc. (In re Jason)*,
   2007 WL 4553608 (Bankr. E.D. Va. Dec. 19, 2007) ..................................................... 17 n.4

*Klos* v. *Polskie Linie Lotnicze*,
   133 F.3d 164 (2d Cir. 1997) ......................................................................................... 12

*Lincoln Sav. Bank, FSB* v. *Suffolk Cnty. Treasurer (In re Parr Meadows Racing Ass'n, Inc.)*,
   880 F.2d 1540 (2d Cir. 1989) ....................................................................................... 19

*Mfrs. Trust Co.* v. *Becker*,
    338 U.S. 304 (1949) .................................................................................. 14

*Mokava Corp.* v. *Dolan*,
    147 F.2d 340 (2d Cir. 1945) ................................................................ 11, 14

*Moore* v. *Driggers (In re Morgan)*,
    2003 WL 1728667 (Bankr. S.D. Ga. Mar. 14, 2003) ............................ 17 n.4

*Norwest Bank Worthington* v. *Ahlers*,
    485 U.S. 197 (1988) .................................................................................. 21

*PNC Bank, Nat'l Ass'n* v. *Park Forest Dev. Corp. (In re Park Forest Dev. Corp.)*,
    197 B.R. 388 (Bankr. N.D. Ga. 1996) .................................................. 17 n.4

*Rake* v. *Wade*,
    508 U.S. 464 (1993) .................................................................................. 21

*Raleigh* v. *Ill. Dep't of Revenue*,
    530 U.S. 15 (2000) .................................................................................... 21

*Resurgent Capital Servs.* v. *Burnett (In re Burnett)*,
    306 B.R. 313 (B.A.P. 9th Cir. 2003) ........................................................ 15

*Specialty Minerals, Inc.* v. *Pluess-Staufer AG*,
    395 F. Supp. 2d 109 (S.D.N.Y. 2005) ......................................................... 9

*Stockholders' Prot. Comm. for Moulded Prods., Inc.* v. *Barry (In re Moulded Prods., Inc.)*,
    474 F.2d 220 (8th Cir. 1973) ............................................................... 14, 15

*United States* v. *Oakland City Apartments, Inc. (In re Oakland City Apartments)*,
    1 B.R. 123 (Bankr. N.D. Ga. 1979) ...................................................... 17 n.5

*United States* v. *Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) ....................................................................... 3, 19, 20, 21

*Vanston Bondholders Protective Comm.* v. *Green*,
    329 U.S. 156 (1946) ............................................................................. 20, 21

*Whalen* v. *Kawasaki Motors Corp.*,
    92 N.Y.2d 288 (1998) ............................................................................ 18 n.7

## **Statutes and Rules**

11 U.S.C. § 547(c)(4) ........................................................................... 17 n.5

11 U.S.C. § 503(b)(9) ........................................................................... 17 n.5

11 U.S.C. § 506(b) ...................................................................................... *passim*

N.Y. Gen. Oblig. Law § 15-108(a) ................................................................................ 18 n.7

Fed. R. Bankr. P. 7012(b) ........................................................................................... 8, 9

Fed. R. Bankr. P. 9014(c) ........................................................................................... 8, 9

Fed. R. Civ. P. 12(b)(6)................................................................................................... 9

Fed. R. Civ. P. 12(f) ....................................................................................................... 9

## **Other Authorities**

7 *Collier on Bankruptcy* ¶ 1111.02[5][i] (16th ed. 2009)................................. 11, 14, 15

9 *Collier on Bankruptcy* ¶ 3001.08[1] (16th ed. 2009)................................................. 14

JPMorgan Chase Bank, N.A. ("JPMorgan"), by and through its undersigned

counsel, respectfully submits this memorandum of law in support of a motion to strike portions

of the *Objection to Portions of Proofs of Claim No. 66462 Against Lehman Brothers Holdings*

*Inc. and No. 4939 Against Lehman Brothers Inc. of JPMorgan Chase Bank, N.A. Regarding*

*Triparty Repo-Related Losses* dated August 31, 2011 (the "Objection") filed by Lehman

Brothers Holdings Inc. ("LBHI") and its official creditors committee (together, the

"Objectors").[1]  Capitalized terms used without definition have the meanings ascribed thereto in

the Objection.  In support of the motion to strike, JPMorgan respectfully states as follows:

## PRELIMINARY STATEMENT

During the week after LBHI filed for bankruptcy, JPMorgan continued to serve as

LBI's primary securities clearing bank and, in that role, extended tens of billions of dollars of

credit each day to LBI under a Clearance Agreement between the parties (the "Clearance

Agreement," Decl. Ex. A).  Following the bankruptcy, JPMorgan was left with unpaid extensions

of credit to LBI of more than $25 billion.

JPMorgan filed proofs of claims against LBI for this amount and against LBHI as

the guarantor of, and grantor of a security interest in collateral to secure, LBI's obligations under

the Clearance Agreement.  Decl. Ex. B.  Immediately following LBI's default, JPMorgan also

put into place a team of professionals that expended massive efforts to liquidate the securities

collateral that LBI had pledged to it.

Despite JPMorgan's efforts — and the extraordinary results it achieved during the

collateral liquidation — the Objectors filed a partial objection to JPMorgan's proofs of claim.

---

[1]    A transmittal declaration of Emil A. Kleinhaus accompanies the motion to strike.
Attached to the declaration are Exhibits A through J, which are referenced in these motion
papers.

The primary argument in the Objection, which JPMorgan will in due course vigorously contest, relates to the commercial reasonableness of JPMorgan's collateral liquidation.  The Objection, however, also includes two legal arguments that are demonstrably meritless and should therefore be stricken from the case now to avoid needless waste of time and resources.

*First*, the Objectors contend that JPMorgan's claims seeking repayment from *Lehman* should be reduced by the consideration that JPMorgan received from its settlement of a dispute with *Barclays*, a settlement that included the release of an unrelated lawsuit that Barclays had brought against an entity that had been acquired by JPMorgan (the "Lawsuit").  Objection ¶¶ 71-82.  The Objectors' argument is without merit.  JPMorgan's settlement agreement with Barclays, to which the LBI SIPA Trustee agreed and which was approved by this Court, contains terms that state unambiguously what amounts are and are not to be allocated to reduce Lehman's obligations under the Clearance Agreement; nowhere does the agreement provide that any value associated with the release of the Lawsuit should be used to reduce Lehman's obligations.

Moreover, the Objectors' basic logic in invoking the Barclays settlement is flawed.  The Objectors' position is that, because *Barclays* released the Lawsuit as part of the consideration for JPMorgan's releasing its claim that Barclays was required to refinance JPMorgan's financing of LBI, the supposed value of the Lawsuit should be deducted from JPMorgan's claims against LBHI and LBI.  The Objectors conflate two independent obligations. The mere fact that JPMorgan was the beneficiary of both (a) Barclays' obligation to refinance JPMorgan's financing and (b) Lehman's obligation to repay that financing does not merge those two separate and independent obligations of separate and independent entities into one obligation so that Lehman may credit the value of the Barclays settlement of its refinancing obligation against Lehman's obligation to pay the loan.

- 2 -

In the analogous context of a claim purchase, it is settled law that the purchase of a claim at a discount — or a breach by a new financing source of an obligation to refinance a loan — does *not* affect the independent obligation of the debtor or a guarantor to repay the lender the full amount of the underlying loan.  Here, LBHI and LBI may not credit the value of the Barclays settlement against their independent obligations to JPMorgan.  Instead, Lehman's repayment obligations remain the same regardless of whether Barclays refinanced JPMorgan's extensions of credit to LBI or left the position with JPMorgan.  There is, therefore, no potential for double payment by LBHI or LBI and no corresponding windfall to JPMorgan.

*Second*, the Objectors claim that "equitable considerations" should override JPMorgan's statutory entitlement to postpetition interest under 11 U.S.C. § 506(b).  Objection ¶¶ 83-89.  But the Objectors' position is contrary to the plain language of section 506(b), which the Supreme Court has held provides an "unqualified" right to postpetition interest when the value of a creditor's collateral exceeds the amount of its claim.  *United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  The portion of the Objection concerning postpetition interest should, therefore, be stricken as a matter of law.

## BACKGROUND[2]

### A.    JPMorgan's claims against LBI under the Clearance Agreement

In June 2000, JPMorgan and LBI entered into a Clearance Agreement under which JPMorgan served as LBI's primary securities clearing bank.  Decl. Ex. A.  Throughout the term of the Clearance Agreement, JPMorgan extended credit to LBI at the start of each trading

---

[2]    The facts in this background section, which are presumed true for purposes of this motion to strike defenses, have been taken from the Objection and other documents of which the Court can properly take notice, such as the December 2008 Settlement Agreement and the JPMorgan proofs of claim.

day to settle (or "unwind") the outstanding triparty repurchase agreements ("repos") by paying to

the triparty repo investors, on LBI's behalf, the repurchase price for those repos.

Contemporaneously with such payments, JPMorgan transferred the repurchased securities from

the triparty repo customers' overnight collateral accounts back into LBI's clearance accounts so

that the securities would be available intraday for LBI's broker-dealer activities.  During the

course of each trading day, JPMorgan also made additional extensions of credit in connection

with the clearance and settlement of LBI's securities trading activities.  Pursuant to section 11 of

the Clearance Agreement, LBI granted JPMorgan a security interest in all of its accounts, all of

the securities, cash and other property in such accounts, and all of the proceeds thereof in order

to secure LBI's obligations to JPMorgan under the Clearance Agreement.

During the week after LBHI commenced its chapter 11 case, JPMorgan continued

to unwind LBI's overnight financings and clear and settle LBI's securities activities, and it

extended tens of billions of dollars of credit to LBI pursuant to the Clearance Agreement each

day.  Following the bankruptcy, JPMorgan was left with $25,279,675,964 of unpaid extensions

of credit to LBI.  JPMorgan then filed proof of claim number 4939 against LBI for that claim

(the "LBI Clearance Claim," Decl. Ex. B, at B-1).

**B.     JPMorgan's claims against LBHI under the August and September Agreements**

On or about August 29, 2008, LBHI executed and delivered to JPMorgan the

August Agreements whereby LBHI guaranteed payment of all obligations owing by LBI to

JPMorgan under the Clearance Agreement and secured such obligations by granting a security

interest in favor of JPMorgan in certain securities collateral.  Decl. Exs. C & D.

On or about September 10, 2008, LBHI executed and delivered to JPMorgan the

September Agreements whereby LBHI, among other things, (a) guaranteed the payment of all

obligations owing by all of LBHI's subsidiaries to JPMorgan and all of its subsidiaries and

affiliates, including LBI's obligations to JPMorgan under the Clearance Agreement, and

(b) secured those obligations by granting a security interest in favor of JPMorgan in all of its

accounts, the securities, cash and other property contained in such accounts, and the proceeds

thereof.  Decl. Exs. E & F.  As a result of the August Agreements and September Agreements,

JPMorgan had a claim against LBHI for the amount of the LBI Clearance Claim, as well as a

security interest in cash and securities collateral posted by LBHI to secure the LBI Clearance

Claim.  JPMorgan filed amended proof of claim number 66462 in LBHI's chapter 11 case for

that claim (the "LBHI Deficiency Claim," Decl. Ex. B).

### C.    The settlement with Barclays

   After LBHI filed its bankruptcy petition, a separate dispute ensued between

JPMorgan and Barclays.  That dispute concerned, among other things, representations made by

Barclays that it would refinance JPMorgan's extensions of credit to LBI under the Clearance

Agreement, including through the rollover of a $15.8 billion overnight repo provided by

Barclays to LBI on September 17, 2008.  JPMorgan and Barclays attempted to settle that dispute

in a September 22, 2008 Services and Settlement Agreement (the "SSA," Decl. Ex. G).

   Section 4 of the SSA, which was later superseded by the December Settlement

Agreement described below, contained a settlement and mutual release between JPMorgan and

Barclays whereby (a) JPMorgan and Barclays released each other with respect to certain

disputes, including Barclays' failure to roll over the $15.8 billion repo, and (b) Barclays agreed

to withdraw the unrelated Lawsuit pending against an entity that had been acquired by

JPMorgan.  Decl. Ex. G § 4.  Section 4 of the SSA was an agreement solely between JPMorgan

and Barclays and did not contain any releases in favor of LBHI or LBI, though LBHI and the

LBI Trustee were parties to the SSA.  *Id.*  Likewise, section 4 did not provide for a reduction of the LBI Clearance Claim or the LBHI Deficiency Claim on account of the release of the Lawsuit. Indeed, no value was attributed to the Lawsuit in the SSA, and nothing in the SSA provides for any application of any supposed value of the Lawsuit to amounts owing by LBI and LBHI to JPMorgan under either the Clearance Agreement or the related guaranty.

As a result of a disagreement that emerged between JPMorgan and Barclays concerning $7 billion that had been deposited into one of LBI's cash accounts, however, the Lawsuit was never dismissed by Barclays pursuant to section 4 of the SSA.  Rather, JPMorgan, Barclays, and the LBI Trustee ultimately entered into a settlement agreement (the "December Settlement Agreement," Decl. Ex. H), that this Court approved by order dated December 22, 2008 (Decl. Ex. I).

Unlike the SSA, the December Settlement Agreement *was* fully consummated in accordance with its terms, which were quite different from those contemplated by the SSA: Under section 1 of the December Settlement Agreement, JPMorgan (with the agreement of the LBI Trustee) transferred to Barclays billions of dollars of securities and cash from LBI's clearance accounts in lieu of the return of the $7 billion in cash that had been sought by Barclays. *See* Decl. Ex. H § 1.

Moreover, section 4(a) of the December Settlement Agreement expressly provided that (i) section 4 of the December Settlement Agreement superseded section 4 of the SSA and (ii) section 4 of the SSA "shall have no further force or effect."  *Id.* § 4(a).  Pursuant to subsections 4(b), 4(c), and 4(e) of the December Settlement Agreement, upon effectiveness of the December Settlement Agreement, Barclays withdrew the Lawsuit and JPMorgan and Barclays released each other from all claims relating to the $7 billion that had been sought by

Barclays, the $45 billion reverse repurchase transaction between Barclays and LBI for the

refinancing of the Federal Reserve Bank of New York's Primary Dealer Credit Facility and other

financings, and the securities delivered by LBI to Barclays on September 18, 2008, as well as

triparty repos relating to LBI.  *Id*. §§ 4(b), (c), (e).

Notably, in section 2 of the December Settlement Agreement, the LBI Trustee

specifically acknowledged and agreed which amounts of securities and cash were and were not

to be applied to reduce the LBI Clearance Claim.  *Id.* § 2.  The December Settlement Agreement

did not, however, provide for the application of any value of the Lawsuit to reduce the LBI

Clearance Claim or the LBHI Deficiency Claim, nor did it attribute any value to the Lawsuit.  *Id*.

Neither LBHI nor the creditors' committee objected to the December Settlement

Agreement on the basis of how the settlement affected the amounts of JPMorgan's claims and

liens against LBI and LBHI and their respective property, even though the LBHI creditors'

committee filed a limited objection to other aspects of the settlement.  Decl. Ex. J.  And the order

approving the December Settlement Agreement recognized that "the approval of the Settlement

Agreement and the authorization for the Trustee to take such action and execute the [December]

Settlement Agreement and such documents as may be necessary or appropriate to effectuate the

Settlement Agreement" would be binding in the LBI SIPA proceeding, the LBHI and other

chapter 11 cases, and any related cases, even though the facts alleged in the motion for approval

and certain accompanying declarations would not.  *See* Decl. Ex. I, Fourth Decretal Paragraph.

**D.      JPMorgan's Proofs of Claim**

On March 31, 2010, JPMorgan filed an amended proof of claim number 4939

against LBI (the LBI Clearance Claim) for the unpaid extensions of credit.  Decl. Ex. B, at B-1.

This claim included a claim for $280,224,670 in postpetition interest, *id*. at § 2.A.I., to which

JPMorgan is entitled pursuant to 11 U.S.C. § 506(b). In calculating this amount, JPMorgan used

a postpetition interest rate of only 0.2% to 2.0% above the Effective Federal Funds rate (which

itself averaged only 0.2388%). On April 1, 2010, JPMorgan filed amended proof of claim

number 66462 in LBHI's chapter 11 case for the same deficiency in recovery as against LBI in

light of LBHI's guarantees of LBI's obligations under the Clearance Agreement and the posting

by LBHI of collateral to secure LBI's obligations (the LBHI Deficiency Claim). Decl. Ex. B.

### E.    The Claims Objection

On August 31, 2011, the Objectors filed a partial objection to JPMorgan's claims.

JPMorgan responded to the Objection on November 15, 2011, and the parties have started to

exchange discovery concerning the Objection. While the Objectors' primary argument is that

JPMorgan failed to liquidate the collateral securing the LBI Clearance Claim in a commercially

reasonable manner — an argument that JPMorgan is confident will be proven wrong —

JPMorgan is making this motion to reduce the burden, time, and expense that would be needed to

address two other arguments that fail as a matter of law.

## ARGUMENT

## POINT I

## THE STANDARDS GOVERNING THIS MOTION

Bankruptcy Rule 9014(c) grants the Court authority to direct that any portion of

Part VII of the Bankruptcy Rules apply to a particular contested matter. To promote efficiency

and economy in the resolution of the complex objections to JPMorgan's proofs of claim,

JPMorgan respectfully submits that this Court should direct that Bankruptcy Rule 7012(b) apply

to this contested matter, so that legally insufficient defenses to JPMorgan's proofs of claim may

be stricken at the threshold. *See In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56 n.5 (Bankr.

S.D.N.Y. 2006) (employing Rule 9014(c) to make Rule 7012(b) applicable to a contested matter

in light of the benefits of using the "procedural mechanism [of Civil Rule 12] to decide some

kinds of contested matter disputes economically, saving litigation costs for the benefit of

creditors and other stakeholders").

Pursuant to Bankruptcy Rule 7012(b), which incorporates by reference Fed. R.

Civ. P. 12(f), "[t]he court may strike from a pleading an insufficient defense." Fed. R. Bankr. P.

7012(b).  In order for a court to strike a defense as insufficient:  "(1) there must be no question of

fact that might allow the defense to succeed; (2) there must be no substantial question of law that

might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of

the defense." *Coach, Inc.* v. *Kmart Corps.*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (quoting

*Specialty Minerals, Inc.* v. *Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111-12 (S.D.N.Y. 2005))

(internal quotation marks omitted).

"In considering the sufficiency of a defense under the first two prongs of the

analysis, courts apply the same standard applicable to a motion to dismiss pursuant to Rule

12(b)(6)." *Id*.  Then, if a court determines that a defense is legally insufficient, "the court must

next determine whether inclusion of the defense would prejudice the plaintiff." *Id*. at 425-26.  In

evaluating what is sufficiently prejudicial to warrant granting a motion to strike, courts have held

that the "inclusion of a defense that must fail as a matter of law prejudices the plaintiff because it

will needlessly increase the duration and expense of litigation." *Id*. at 426 (citing *Estee Lauder,*

*Inc.* v. *Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) (explaining that when

"the defense is insufficient as a matter of law, the defense should be stricken to eliminate the

delay and unnecessary expense from litigating the invalid claim")).

## POINT II

### THE PORTION OF THE OBJECTION RELATED TO THE BARCLAYS SETTLEMENT SHOULD BE STRICKEN.

The Objectors contend that JPMorgan's claims for repayment from LBHI and

LBI should be reduced by any value of the Lawsuit that Barclays agreed to dismiss as part of the

settlement between JPMorgan and Barclays.  The Objectors' argument is contrary to the plain

language of the governing December Settlement Agreement, which states unambiguously what

amounts are and are not to be allocated to reduce LBI's obligations under the Clearance

Agreement, *see* Decl. Ex. H § 2, and nowhere provides that any value associated with the release

of the Lawsuit may be used to reduce those obligations.

The Objectors assume that Barclays was obligated to pay LBI's and LBHI's

obligations to JPMorgan.  That is simply wrong.  The fact that JPMorgan was the beneficiary of

two separate obligations — (a) Barclays' obligation to refinance JPMorgan's financing, and (b)

Lehman's obligation to repay that financing — does not merge those obligations.  As a result, the

Lehman estate has no basis to credit whatever value JPMorgan may have received though the

Barclays settlement against the estate's wholly independent obligation to repay JPMorgan's

advances.

While the context here is unusual, the applicable legal principles are well-settled.

Barclays' failure to refinance JPMorgan's extension of credit to LBI was effectively a failure to

purchase JPMorgan's claim for repayment from LBI.  The putative claim seller (JPMorgan)

asserted that the putative claim purchaser (Barclays) was obligated to purchase the claim from

the seller (JPMorgan); the purchaser (Barclays) denied any obligation to purchase the claim; and

the putative seller (JPMorgan) and purchaser (Barclays) then settled their dispute.  It is well-

established that the purchase of a claim against a debtor at a discount is a transaction independent

- 10 -

of the claim itself and, thus, does not result in a reduction in the allowed amount of the claim against the debtor. *See* 7 *Collier on Bankruptcy* ¶ 1111.02[5][i] (16th ed. 2009); *Mokava Corp. v. Dolan*, 147 F.2d 340, 344-45 (2d Cir. 1945). Thus, any compensation to JPMorgan for Barclays' alleged breach of its refinancing promise (*i.e.*, by dismissal of the Lawsuit) is not a payment on the underlying claim and does not reduce JPMorgan's allowed claim against Lehman. Indeed, here Barclays' obligation is even further removed from Lehman's obligation than in a claim-purchase context, because Barclays agreed to provide a financing that would have been used to replace JPMorgan's claim, not even to purchase the claim itself.

This is also the fair result. There is no potential for double payment by Lehman here, as Lehman's repayment obligation remains the same regardless of whether Barclays refinanced JPMorgan's clearance extensions of credit to Lehman or left the position with JPMorgan. Moreover, Lehman suffered no diminution as a result of Barclays' alleged breach of its obligation owing to JPMorgan, and JPMorgan will suffer an unjustifiable forfeiture if its claim against Lehman is reduced.

**A.      The provisions of the December Settlement Agreement make clear that the parties did not intend the release of the Lawsuit to reduce Lehman's obligations under the Clearance Agreement.**

Under the December Settlement Agreement among Barclays, JPMorgan and the LBI Trustee, JPMorgan transferred to Barclays billions of dollars of securities and cash, while Barclays withdrew the Lawsuit. Decl. Ex. H §§ 1, 4.

Importantly, in section 2 of the December Settlement Agreement, the LBI Trustee acknowledged and agreed with specificity which amounts were and were not to be applied to reduce the LBI Clearance Claim. *Id.* § 2. In particular, this provision detailed what had been and could be applied to reduce "the Advances," which were defined as those Advances "made to

- 11 -

LBI under a clearance agreement." *Id*. §§ D, 2. Section 2 does not provide that any value

JPMorgan received from the release of the Lawsuit may be applied to reduce the Advances made

under the Clearance Agreement. *Id*. § 2.

      Section 2 of the December Settlement Agreement thus dispels any notion that the

parties to that agreement intended that the settlement of the Lawsuit would reduce the amounts

that LBHI and LBI were obligated to repay under the Clearance Agreement and related guaranty.

*Klos* v. *Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) ("When a contract is

unambiguous, the instrument alone is taken to express the intent of the parties."). LBHI is bound

by this agreement of the LBI Trustee. The order approving the settlement recognized that "the

approval of the [December] Settlement Agreement" and the authorization for the LBI Trustee to

effectuate the Settlement Agreement would be binding in the LBI and LBHI cases. Decl. Ex. I,

Fourth Decretal Paragraph. Indeed, the Objectors did not object to how the settlement affected

JPMorgan's claims and liens against LBI and LBHI, even though the committee filed a limited

objection to other aspects of the settlement. Decl. Ex. J. Moreover, because LBHI's liability on

the clearance claim is derivative of LBI's liability, and the security interest granted by LBHI in

its collateral secures JPMorgan's claim against LBI, the LBHI Deficiency Claim must be

determined consistent with the provisions of LBI's court-approved agreement governing the

amount of JPMorgan's claim against LBI.

      The Objectors cannot invoke the earlier SSA to contradict the terms of the

December Settlement Agreement. Objection ¶¶ 25, 73. As an initial matter, section 4 of the

SSA was superseded by the later December Settlement Agreement, as the December Settlement

Agreement expressly states. Decl. Ex. H § 4(a). And in any event, section 5 of the December

Settlement Agreement provides that insofar as the SSA remains in effect, the December

Settlement Agreement "shall control" if the SSA is construed to conflict with it.  *Id*. § 5.

But beyond that, section 4 of the SSA was an agreement solely between

JPMorgan and Barclays and did not contain any release in favor of LBI, did not provide for any

reduction of the LBI Clearance Claim or the LBHI Deficiency Claim, and did not require

application of any amounts to LBI's obligations.  Decl. Ex. G § 4.  As with the December

Settlement Agreement, there is nothing in section 4 of the SSA that suggests that any value

associated with the release of the Lawsuit could reduce JPMorgan's claims against LBHI or LBI.

**B.      The claims against LBHI and LBI are distinct from, and unaffected by, the settled dispute over Barclays' failure to refinance the Lehman financing that JPMorgan had been providing.**

JPMorgan's claim against Lehman is a contract claim that "JPMCB was owed

$25,279,675,964 for extensions of credit for the clearance and settlement of securities

transactions under the Clearance Agreement signed by the debtor [LBI] on June 7, 2000."  Decl.

Ex. B, at B-1 § 2.A.I.  Under the Clearance Agreement between JPMorgan and LBI, LBI was

contractually obligated to repay the financing it had obtained from JPMorgan.  Decl. Ex. A § 4.

Similarly, LBHI guaranteed and secured LBI's obligations under the August and September

Agreements.  Decl. Exs. C, D, E, & F.

Barclays, by contrast, was never obligated under the Clearance Agreement to

repay LBI's financing, as Barclays was not a party to that contract.  Instead, the dispute between

JPMorgan and Barclays (settled in the December Settlement Agreement) concerned, among

other things, representations Barclays allegedly made that it would replace JPMorgan's financing

of Lehman through the continuation of a $15.8 billion repo.  Decl. Ex. H § 4(e).

The JPMorgan-Barclays dispute, accordingly, was in substance a dispute over Barclays' failure to purchase JPMorgan's clearance financing claim against Lehman.  As discussed above, the putative claim seller (JPMorgan) asserted that the putative claim purchaser (Barclays) was obligated to purchase the claim from the seller (JPMorgan).  The purchaser (Barclays) then denied any obligation to purchase the claim, and the putative seller (JPMorgan) and purchaser (Barclays) settled their dispute.  Whatever consideration was ultimately exchanged between the putative buyer and seller in connection with a disputed agreement to purchase a claim does not limit the value of the holder's underlying claim *as against the debtor or its guarantor* (LBI and LBHI).

Functionally, the outcome should be no different from what would have happened if Barclays had actually purchased the JPMorgan financing claim, but had done so at a discount to its face value.  It is well-settled that the amount of consideration paid in connection with the transfer of a claim does not affect what the purchaser of the claim is entitled to recover from the debtor.  As *Collier* summarizes, "the purchaser normally will stand in the shoes of the creditor and will be entitled to recover the face value of the claim, regardless of what the purchaser paid for it."  7 *Collier on Bankruptcy* ¶ 1111.02[5][i] (16th ed. 2009); *see also* 9 *Collier on Bankruptcy* ¶ 3001.08[1] (16th ed. 2009).  Indeed, the Second Circuit has long recognized that "[t]o reduce a creditor's participation in the plan to the amount he paid for his bonds . . . would be harmfully to reduce the value of such bonds to those who previously owned them."  *Mokava*, 147 F.2d at 344-45; *accord, e.g.*, *Mfrs. Trust Co.* v. *Becker*, 338 U.S. 304 (1949) (assigned claims will be allowed at face value, absent a showing of self dealing or bad faith); *Stockholders' Prot. Comm. for Moulded Products, Inc.* v. *Barry (In re Moulded Prods., Inc.)*, 474 F.2d 220, 224 (8th Cir. 1973) ("[W]e can find no reason to limit [the] claim to the amount of consideration

[the holder] paid."); *Resurgent Capital Servs.* v. *Burnett (In re Burnett)*, 306 B.R. 313, 319

(B.A.P. 9th Cir. 2003) ("[T]he amount paid [] to purchase the claims is irrelevant, as a matter of

law, to the allowance of the claims."), *aff'd*, 435 F.3d 971, 973 (9th Cir. 2006); *In re Exec. Office*

*Ctrs., Inc.*, 96 B.R. 642, 649-50 (Bankr. E.D. La. 1988) (collecting decisions from the Second,

Third, Fifth, Seventh, Eighth, Ninth, and Tenth Circuits to establish that courts have repeatedly

refused to limit a creditor's claim to the discounted purchase price it paid).

       The logic of the claims-trading cases compels the same outcome here, where the

"discount" that Objectors now invoke to reduce their liability resulted not from a consummated

purchase of a claim below par, but from a settlement at a discount from par of a dispute between

a lender (JPMorgan) and its replacement financing source (Barclays) over their failed refinancing

transaction.  Just as the payment of the purchase price for a claim does not reduce the

"entitle[ment] to recover the face value of the claim," 7 *Collier on Bankruptcy* ¶ 1111.02[5][i]

(16th ed. 2009), payment of consideration for damages for breach of a purchase agreement is not

payment of the underlying claim and does not reduce that claim, and it presents "no reason to

limit [the] claim to the amount of consideration it paid," *Moulded Products*, 474 F.2d at 224.

       LBHI would receive a windfall at the expense of JPMorgan if the court were to

reduce JPMorgan's claim on account of the Barclays settlement.  To use an example, if a claim

purchaser agrees to purchase a claim for 75% of its allowed amount and then defaults on its

purchase obligation, the holder of the claim will suffer damages to the extent of the difference

between 75% of the allowed amount and the holder's ultimate recovery on the claim (whether

from another claim sale or from estate distributions).  Thus, if after the first purchaser's default

the holder sells the claim to another purchaser for 60% of the allowed amount, the holder's

damages from the default would be 15% of the allowed amount (the difference between 75% and

60%).  Any amount collected by the holder against the defaulting purchaser would obviously not

reduce the amount of the claim against the debtor in the hands of the replacement purchaser;

similarly, if the holder were unable to resell the claim and settled with the defaulting purchaser

before recovering from the debtor, the settlement recovery would not reduce the allowed amount

of the holder's claim against the debtor.  To the contrary, if the allowed amount of the claim

were reduced by the settlement recovery, the estate would obtain a windfall (*i.e.*, reduction of a

claim against it even though it suffered no harm from the defaulting purchaser's breach), while

the holder of the claim would suffer a forfeiture (*i.e.*, reduction of its claim on account of harm

that the holder — rather than the estate — suffered).[3]

### C.    The cases cited by the Objectors stand for the undisputed — but inapposite — rule prohibiting double payment of a debt.

The Objectors cite no case in which a court has concluded that a settlement of a

dispute related to a failed claim refinancing or sale should reduce the amount of the claim itself

as against the debtor.  Instead, the Objectors rely on case law that is entirely irrelevant.  For

example, the Objectors cite three cases for the unremarkable proposition that a creditor is entitled

to only a single satisfaction of its claim; yet each of these cases, unlike this one, concerns

attempts to recover on the *same claim on which an earlier payment was made by the debtor or its*

---

[3]    In the above example, assuming a 75% defaulted purchase price, a 60% ultimate rate of recovery on allowed claims against the estate, and a full recovery from the defaulting purchaser of damages equal to 15% of the claim's allowed amount, the holder should recover through a combination of damages against the defaulting purchaser and distributions from the estate 75% of the allowed amount of the claim (the original purchase price).  But if the holder's claim against the estate is reduced by the amount of its damages recovery against the defaulting purchaser, the holder will recover only 66% of the original allowed amount (15% of the allowed amount as damages, plus a recovery of 60% of 85% of the allowed amount).

*guarantor*.[4] Similarly, the Objectors offer several cases for the rule that double recovery on a single claim would result in an inequitable distribution to creditors; but again, these decisions are beside the point because they concern attempts at multiple recovery on the same claim against a single party.[5] Here, there is no potential for double payment by Lehman, because Lehman's underlying repayment obligation would have been the same regardless of any refinancing with Barclays.

For the same reason, no support can be found for the Objectors' position in the cases they cite concerning a claim against debtor-guarantors in which the primary obligor already received consideration for the same claim.[6] Likewise, the Objection's references to the

---

[4]     *Jason* v. *Carpet Cleaning, Inc. (In re Jason)*, 2007 WL 4553608, at *5 (Bankr. E.D. Va. Dec. 19, 2007) (postpetition partial payment by debtor's bankruptcy trustee of debtor's obligation reduced the remaining amount of that obligation); *Moore* v. *Driggers (In re Morgan)*, 2003 WL 1728667, at *1 (Bankr. S.D. Ga. Mar. 14, 2003) (claims by co-guarantors on a single debt); *PNC Bank, Nat'l Ass'n* v. *Park Forest Dev. Corp. (In re Park Forest Dev. Corp.)*, 197 B.R. 388, 397 (Bankr. N.D. Ga. 1996) (payment of a claim by debtor reduces guarantor's obligation on same claim).

[5]     *See In re Pilgrim's Pride Corp.*, 453 B.R. 691, 695-98 (Bankr. N.D. Tex. 2011) (party's settlement with debtor precluded it from bringing claim for additional damages against debtor on same dispute); *In re Circuit City Stores, Inc.*, 426 B.R. 560, 578-79 (Bankr. E.D. Va. 2010) (temporarily disallowing creditors' administrative expense claim where creditors might "effectively receive payment for the delivery of their goods twice . . . [by] assert[ing] a claim under § 503(b)(9) for goods sold to the debtor and use those same goods as the basis for asserting a new value defense under § 547(c)(4)"); *United States* v. *Oakland City Apartments, Inc. (In re Oakland City Apartments)*, 1 B.R. 123, 124-25 (Bankr. N.D. Ga. 1979) (ordering hearing to determine value creditor received from purchase of foreclosed property to prevent excess recovery by creditor).

[6]     *In re El Paso Ref., Inc.*, 192 B.R. 144, 148-49 (Bankr. W.D. Tex. 1996) (ordering additional proceedings to determine value rendered by primary obligor to creditor prior to determining guarantor's liability on same claim to creditor); *see also Cent. Soya Co.* v. *Epstein Fisheries, Inc.*, 676 F.2d 939, 941-43 (7th Cir. 1982) (same).

law governing joint tortfeasors is similarly misguided, as this too concerns the effect of releasing one party to a single claim against the tortfeasors.[7]

In sum, the Objectors' authorities merely stand for the unremarkable proposition that a creditor cannot collect the same debt twice from a debtor. The Barclays settlement, however, in no way creates a potential double recovery from LBHI or LBI. From Lehman's point of view, Lehman's obligation to repay the advances made by JPMorgan remains the same regardless of whether Barclays refinanced JPMorgan's extensions of credit to Lehman or left the position with JPMorgan. Any consideration that passed between Barclays and JPMorgan would not, in either case, have reduced Lehman's obligation to pay the holder of the claim.[8]

## POINT III

### THE PORTION OF THE OBJECTION RELATED TO POSTPETITION INTEREST SHOULD BE STRICKEN.

The Objectors argue that "equitable considerations" override JPMorgan's statutory entitlement to postpetition interest because the statutory requirement "does not make sense" in this case. Objection ¶¶ 83-89. This argument is precluded by the plain language of 11 U.S.C. § 506(b), as interpreted by the Supreme Court, and has been rejected by multiple Courts of Appeals.

---

[7]    N.Y. Gen. Oblig. Law § 15-108(a); *Whalen* v. *Kawasaki Motors Corp.*, 92 N.Y.2d 288, 292 (1998).

[8]    Given that the December Settlement Agreement and applicable law preclude applying the Lawsuit to LBI's obligations under the Clearance Agreement, the value associated with the release of that suit is not at issue. It should be noted, however, that the Objectors' assertion that the release was worth $400 million to JPMorgan is nothing but a rote transcription of the damages sought in that Lawsuit's complaint, Objection ¶ 82, which JPMorgan vigorously disputed.

A.    **Section 506(b) establishes an unqualified
statutory right to postpetition interest.**

Section 506(b) establishes that, to the extent a claim "is secured by property the

value of which . . . is greater than the amount of such claim, there *shall* be allowed to the holder

of such claim, interest on such claim."  11 U.S.C. § 506(b) (emphasis added).  The Supreme

Court examined section 506(b) in *United States* v. *Ron Pair Enters., Inc.* and made clear that this

statutory right to postpetition interest is "unqualified" and that, "as written," the Bankruptcy

Code directs that postpetition interest be paid on "all" such claims.  489 U.S. 235, 241, 245

(1989).  Based on the plain language of the statute, the Court rejected the argument that this

statutory right to postpetition interest was limited by a reasonableness requirement:

> The task of resolving the dispute over the meaning of § 506(b)
> begins where all such inquiries must begin:  with the language of
> the statute itself.  In this case it is also where the inquiry should
> end, for where, as here, the statute's language is plain, the sole
> function of the courts is to enforce it according to its terms.  The
> language before us expresses Congress' intent — that postpetition
> interest be available — with sufficient precision so that reference
> to legislative history and to pre-Code practice is hardly necessary.

*Id*. at 241 (citations and internal quotation marks omitted).

Applying these principles, the Court concluded that the "natural reading" of

section 506(b) "entitles" the holder of the claim to postpetition interest.  *Id*.  The Second Circuit

has similarly emphasized the "unqualified" nature of the right to postpetition interest in section

506(b).  *Lincoln Sav. Bank, FSB* v. *Suffolk Cnty. Treasurer (In re Parr Meadows Racing Ass'n,*

*Inc.)*, 880 F.2d 1540, 1549 (2d Cir. 1989) ("Recovery of postpetition interest is unqualified"

under *Ron Pair* (internal citations and quotation marks omitted)); *see also Fin. Sec. Assurance*

*Inc.* v. *T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 796-98

(5th Cir. 1997) ("The United States Supreme Court in . . . *Ron Pair* . . . made clear that under

- 19 -

§ 506(b) a creditor is unqualifiedly entitled to postpetition interest. . . .  [U]nder the plain language of § 506(b) there is nothing limiting that right.").

The Supreme Court in *Ron Pair* recognized that Congress drafted section 506(b) precisely in order to repudiate the "balance of equities" approach to postpetition interest that was found in some of the prior case law.  489 U.S. at 248.  As examples of that prior case law, the Court pointed to language from its 1946 *Vanston* decision that "'the touchstone of each decision on allowance of interest in bankruptcy . . . has been a balance of equities'" and to a First Circuit case suggesting that rights to postpetition interest were merely "flexible guidelines" and not "rigid doctrinal categories."  *Id.* (quoting *Vanston Bondholders Protective Comm.* v. *Green*, 329 U.S. 156, 165 (1946) and *In re Boston & Me. Corp.*, 719 F.2d 493, 496 (1st Cir. 1983)).  The Supreme Court recognized that Congress superseded this case law by "enacting a contrary standard" when it adopted section 506(b), because "Congress' stated intent, in enacting the Code, [was] to codify creditor' rights *more clearly than the case law* by defining the protections to which a secured creditor is entitled."  *Id.* at 248 (emphasis in original) (internal quotation marks and alterations omitted).

**B.     JPMorgan's statutory right to postpetition interest may not be disregarded based on "equity."**

The Objectors *concede* that the language of section 506(b) itself precludes the relief they seek when they urge "a departure from the literal language of section 506(b)."  Objection ¶¶ 86-87.  They then assert that this Court should ignore the unequivocal statutory language and instead deprive JPMorgan of postpetition interest based on supposed "[e]quitable considerations."  *Id.*

The Objectors' position is patently without merit.  First, as noted above, *Ron Pair* makes clear that the statutory right to postpetition interest is "unqualified" and "[t]he natural

reading" of section 506(b) entitles the holder of the claim to postpetition interest.  489 U.S. at

241.  This is a statutory right, not a mere "professed entitlement."  Objection ¶ 86.  While the

Objectors suggest the Court should not be "rigid" in its interpretation of section 506(b), *Ron Pair*

made clear that section 506(b) superseded prior case law that had denigrated so-called "rigid

doctrinal categories."  489 U.S. at 248.

Likewise, the Supreme Court has repeatedly reiterated that courts may not invoke

equity to override a creditor's statutory rights established by the Bankruptcy Code.  *See Raleigh*

v. *Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000) ("Bankruptcy courts are not authorized in the

name of equity to make wholesale substitution of underlying law controlling the validity of

creditors' entitlements, but are limited to what the Bankruptcy Code itself provides."); *Rake* v.

*Wade*, 508 U.S. 464, 468 (1993) ("[T]he right to postpetition interest under § 506(b) is

unqualified." (internal quotation marks and alterations omitted)), *superseded by statute on other*

*grounds*; *Norwest Bank Worthington* v. *Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable

powers remain in the bankruptcy courts must and can only be exercised within the confines of

the Bankruptcy Code.").

To the extent there was any ambiguity left by the text of section 506(b) and *Ron*

*Pair*, two Courts of Appeals have squarely addressed — and rejected — the suggestion that

bankruptcy courts may disallow statutory postpetition interest on the basis of ill-defined

"equitable considerations."  In *In re Sublett*, the Eleventh Circuit reversed a bankruptcy court

that had invoked equity to disallow postpetition interest, reasoning that "to the extent that

*Vanston's* equitable analysis suggests a result contrary to the language of the present Bankruptcy

Code, *Vanston* has been superseded" and that "whatever equitable powers remain in the

bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."

- 21 -

*Equitable Life Assurance Soc'y* v. *Sublett (In re Sublett)*, 895 F.2d 1381, 1385-86 (11th Cir.

1990) (internal quotation marks and citations omitted).  Because the bankruptcy court had

invoked equity to disallow the interest, the Court of Appeals concluded that "[i]t therefore

appears that the bankruptcy court's disallowance of [the] claim on the grounds stated in its

opinion was erroneous as a matter of law."  *Id*. at 1386.

        The Seventh Circuit similarly upheld the reversal of a bankruptcy court that had

invoked equity to deny postpetition interest.  *In re Lapiana*, 909 F.2d 221 (7th Cir. 1990).  The

court rejected the bankruptcy court's argument that a creditor "forfeited its rights under the

statute by dragging its feet in collecting the proceeds," because section 506(b) precludes "a free-

for-all equity-balancing act."  *Id*. at 223-24.  The court explained:

> We deprecate flaccid invocations of "equity" in bankruptcy
> proceedings.  Creditors have rights, among them the right of
> oversecured creditors to post-petition interest, and bankruptcy
> judges are not empowered to dissolve rights in the name of equity.
> Flexible interpretation designed to allow the judicial interpolation
> of traditional defenses in a statute silent on defenses is one thing;
> standardless decision-making in the name of equity is another.
> *Ron Pair* makes clear that section 506(b) provides more than
> merely "guidance in the exercise of the bankruptcy court's
> equitable powers."  If the statute were read merely to authorize the
> bankruptcy judge to award post-petition interest as a matter of
> grace, secured creditors would lack a clear idea of what their rights
> would be if the debtor went broke.

*Id*. at 223-24 (internal citation and alterations omitted).[9]  In light of this language, it is difficult to

understand why the Objectors cite this case for the proposition that equitable considerations may

override a creditor's statutory entitlement to postpetition interest.  Objection ¶ 86.

---

[9]      Consistent with *Lapiana*'s rejection of the "free-for-all equity-balancing act" advocated
by the Objectors, 909 F.2d at 223-24, that court insisted on "enforcement of the statute [section
506(b)] according to its terms subject only to well-recognized defenses such as estoppel and
statute of limitations."  *Id*.  Yet the Objectors do not even make the argument that estoppel or a
similarly well-recognized defense applies in this case.  *See* Objection ¶¶ 83-89.  They never

## CONCLUSION

For the foregoing reasons, JPMorgan requests that the Court strike the portions of

the Objection that concern the Barclays settlement, Objection ¶¶ 71-82, and postpetition interest,

Objection ¶¶ 83-89, and grant such other relief as may be appropriate.

Dated: February 24, 2012          WACHTELL, LIPTON, ROSEN & KATZ
      New York, New York

                                   /s/ Harold S. Novikoff
                            Harold S. Novikoff
                            Douglas K. Mayer
                            Ian Boczko
                            Emil A. Kleinhaus

                            51 West 52nd Street
                            New York, NY  10019
                            Telephone:  (212) 403-1000
                            Facsimile:  (212) 403-2000

                            *Attorneys for JPMorgan Chase Bank, N.A.*

---

assert that they have alleged facts that would satisfy the elements of estoppel, or even mention that defense at all.  *Id*.  In all likelihood, the Objectors refrain from raising estoppel because *Lapiana* already rejected a similar argument when it refused to create "a watered-down version of equitable estoppel" for cases where there was an alleged "lack of due diligence" that nonetheless did not satisfy the elements of estoppel.  909 F.2d at 224.