# Exhibit A

## CLEARANCE AGREEMENT

Ladies and Gentlemen:

    We agree to act as your non-exclusive clearance agent for
securities transactions subject to the terms and conditions set
forth below, and to any addenda which may be agreed upon, which
shall constitute a part of this letter agreement, and to open and
maintain a clearance account, as defined below.

    1.    Securities.

    The term "securities" shall include, without limitation,
obligations of the United States Government and its agencies,
bankers' acceptances, certificates of deposit, commercial paper,
and such other certificated and uncertificated securities and
other instruments as may be agreed upon by the parties hereto.

    2.    Accounts.

    We are hereby authorized to agree, and agree pursuant to your
instructions to open and maintain a clearance account, which shall
consist of one or more clearing accounts in which your Securities
and funds will be credited for your benefit and will be segregated
on our books and records and which we will hold as your custodian,
free of our lien, claim or interest (the "Clearing Accounts"), one
or more custody accounts in which your Securities and funds will
be credited for your benefit and will be segregated on our books
and records and which we will hold as your custodian, free of our
lien, claim or interest (the "Custody Accounts"), one or more
demand deposit accounts, and may also consist of one or more
segregated accounts consisting of securities carried by you for
the account of one or more of your customers as listed in Schedule
E hereto, as amended from time to time by you subject to our
approval, which shall not be unreasonably withheld (the
"Segregated Accounts") (all of which accounts together are
sometimes hereinafter referred to as the "Account"). You
authorize us to debit, based upon your instructions, and credit
all transactions to the Account daily.

    3.    Authority.

    We are hereby authorized, as your agent, and agree pursuant
to your instructions, (a) to receive and transfer securities for
any purpose whatsoever, including, without limitation, as a pledge
of collateral; (b) to make payments and collections of monies; (c)

                              1

to permit you to make transfers between the Clearing Account(s),
Custody Account (s) and the Segregated Account(s) or other
accounts, it being understood that we shall only permit transfers
from the Clearing Account (s) to the Custody Account (s) or
Segregated Account (s) to the extent that after such transfer we
remain fully collateralized; have been fully paid with respect to
any securities being transferred into the Segregated Account(s) or
other accounts; and (d) to transfer securities which we hold for
you as such securities may be needed to secure loans with such
entities as you may specify; (e) to receive from such entities as
you may specify securities held as collateral for loans against
the payment of funds required to obtain the release of your
collateral; (f) to perform any other act incidental or necessary
to the performance of the above.

In connection with the performance of our services hereunder,
we hereby agree to provide you with access to, (i) to the extent
you provide us with a location, ten dedicated terminals and one
high speed printer, and (ii) to the extent we provide a location,
terminals and one high speed printer at a New York City location,
to be shared with our other clearance customers, giving due
consideration to your volume of business, at all times on and
after the conversion date, such terminals in both (i) and (ii) to
be connected to a securities transfer system and available to you
in the event of Lehman Brothers, regional or other system outage.
At least once each calendar year, we and you, at our respective
expense, shall jointly participate in disaster recovery testing,
pursuant to a plan to be mutually agreed upon.

4.   Payment and Delivery.

(a)   In the event we have no other reasonable choice we
agree to accept Fed Funds checks as payment if received prior
to 3:00 p.m. New York time, whether certified or not, as the
equivalent of cash and all risks of collectability and credit
responsibility with respect to such checks shall be borne by
you alone. We may accept as correct your specification of the
net proceeds to be paid or collected for any securities, and
we shall have no obligation to verify your computation of
such amount.

(b)   When we are instructed to deliver physical
securities against payment, delivery of the securities and
the receipt of payment may not be completed simultaneously.
Subject to our obligation to attempt to collect payment and
performance of our obligations hereunder; the risk of non-
receipt of payment shall be yours, we shall have no
responsibility or liability therefor, and your risk shall

2

06/07/00

continue until final payment (as defined below) has been
received.

(c)   For all purposes of this Agreement, payment with
respect to a transaction shall not be "final" until we have
received immediately available funds which under applicable
law are irreversible, which are not subject to any security
interest, levy, lien, or other encumbrance, and which funds
are specifically applicable, or are deemed by us to be
specifically applicable, to such transaction.   Any debit of
any account by us which creates an overdraft or, in the case
where securities have been delivered out from the Account,
which does not otherwise result in the receipt by us of
immediately available, irreversible and unencumbered funds,
shall not constitute final payment.

(d)   All credits to the Account in connection with tri-
party repurchase transactions and physical securities,
regardless of how characterized, are conditioned upon the
actual receipt of final payment and may be reversed to the
extent payment is not received.   Without limiting the
generality of the foregoing, in the event that we, as a
matter of bookkeeping convenience, credit the Clearing
Account with the proceeds from the sale, redemption or other
disposition of physical securities or in connection with tri-
party repurchase transactions prior to our actual receipt of
final payment therefor and notwithstanding that such
bookkeeping credits may also be reflected on our books, and
otherwise, as "immediately available" or "same day" funds or
by some similar characterization, all such credits shall be
conditioned upon our actual receipt of final payment and may
be reversed by us, after notice to you, to the extent that
such final payment is not received.   We may in our
discretion, but shall not be obligated to, permit you to use
any such funds prior to final payment.

(e)   Any and all securities which we may now or
hereafter hold in the Account, and which you may instruct us
to deliver against payment, may be delivered by us to the
party designated in such instructions against delivery to us
of the temporary receipt of such party in lieu of actual
payment.   We shall hold such temporary receipt until final
payment is received or the securities are returned to us for
your Account.   We agree to make all such deliveries in
accordance with operating procedures agreed upon from time to
time by you and us.

3

06/07/00

(f)   With   respect   to   any   directions   to   receive
securities at our account at another securities intermediary,
we shall have no duty or responsibility, except upon special
request, to advise you of non-receipt of, or take any steps
to obtain delivery of, securities from brokers or other
agents   or   other   securities   intermediaries   either   against
payment or free of payment.   It is understood that the
Federal Reserve System or any depository used pursuant to
this Agreement is not our agent and we are not responsible
for any error made or loss caused by them or their employees
or agents.

### 5.   Loans and Advances.

We may, solely at our discretion, permit you to use funds
credited to the Account prior to final payment as contemplated by
the second sentence of Section 4(d) hereof or otherwise advance
funds to you prior to final payment.   If we do permit you to use,
or otherwise advance to you, such funds, you shall continue to
bear the risk of non-receipt of final payment, and, to the extent
that final payment for any securities delivered on any day is not
received by the close of business on that day, you shall
immediately upon demand reimburse us for the amount so used or
advanced, plus interest thereon from that date at such reasonable
rates as shall be determined by us.   We are further authorized,
with the receipt of instructions from you, to make other loans to
you of either money or securities.   In the event any Account
maintained by you with us becomes overdrawn, we shall have the
right, solely at our discretion, to lend you an amount equivalent
to cover such overdraft.     All loans, whether of money or
securities, shall be payable on demand and shall bear interest at
such   reasonable   rates   as   shall   be   determined   by   us.
Notwithstanding the fact that we may from time to time make
advances or loans pursuant to this paragraph or otherwise extend
credit to you, whether or not as a regular pattern, we may at any
time decline to extend such credit at our discretion, with notice
and if we are precluded from extending such credit as a result of
any law, regulation or applicable ruling.

### 6.   Listing of Securities.

(a) Business Records.   We will make available to you,
in accordance with the Performance Standards, as set forth in
Schedule A, a daily listing of all securities held by us free
or as collateral to secure any loans or advances of money or
securities made by us to you.  All listings supplied by us to
you shall be conclusively presumed correct unless you notify
us to the contrary by the close of business of the next

4

business day, except that this provision shall not apply in
the event (i) there is a communications failure between you
and us, or (ii) both parties hereto have made an error which
delays discovery of such error.  We shall maintain regular
business records documenting all instructions transmitted to
us in accordance with the terms of Section 7 hereof (or,
where applicable, Section 8 hereof) and any response by us.
Such records shall be determinative of the form, content and
time of all of your instructions and any response from us.
The record of each instruction and any response thereto shall
be retained by us for at least 45 days following the date of
the  instruction.    Any  claim  against  us  for  failure  to
properly follow an instruction transmitted by you must be
made in writing and received by us within 45 days after the
date the instruction was received by us.

     (b)  Equipment. You shall make all site preparations
and provide all facilities on your premises necessary to
connect your computer system to our computer system.  In this
regard, you shall use the equipment, communications lines and
communications protocol identified in Schedule G.  Certain of
the equipment identified in Schedule G shall be located on
our premises and operated by us.  We shall be responsible for
the preparation of our own site and for the use of the
communications protocol identified in Schedule G.

7.   Instructions.

     Other than as specifically set forth herein, you and we have
agreed to act in accordance with and comply strictly with the
Performance Standards set forth in Schedule A hereto (the
"Performance Standards") and security procedures and to act upon
any instructions given in accordance therewith.  You have
authorized us to accept instructions from you via the following
means: (i) CPU, (ii) your on-line terminal, (iii) our on-line
terminal,  (iv) magnetic tape, (v) telephone, and (vi) messenger or
fax; provided, however, that we shall only accept instructions via
method (iii) above if we mutually agree that methods (i) and (ii)
are not available, we shall only accept instructions via method
(iv) above if we mutually agree that methods (i), (ii) and (iii)
are not available, via (v) or (vi) provided (i), (ii), (iii) and
(iv) are not available.  Such instructions, other than telephone,
messenger, or fax instructions, may be transmitted without two
manual signatures of authorized individuals, as set forth on
Schedule F hereto (each an "Authorized Individual").  We hereby
agree to act upon, execute and perform, and shall be protected in
acting upon, any instruction or request (written, electronic or
oral) and any notice, waiver, consent, receipt or other document

#0245 P.006 /043
MAR.11.2008 10:38

which we believe in good faith to be genuine and to have been
given by an Authorized Individual in accordance herewith and with
the Performance Standards and security procedures, as applicable.
When instructions are given orally or in writing, we will confirm
these instructions before acting on said instructions with a
representative designated by you as a confirming representative on
Schedule F hereto (each a "Confirming Representative"). In
addition, you will confirm any oral instructions to us in writing
with two authorized signers or electronically by the close of
business on the day on which they are given. The oral
instructions as understood by us will be deemed to be the
controlling and such proper instructions, unless you are able to
show such instructions were misunderstood by us. If we receive a
subsequent conflicting written or electronic instruction, we shall
be able to rely on the oral instruction as understood by us and we
will notify you promptly. When instructions are received via
magnetic tape, the magnetic tape is to be delivered to a vice
president or higher in our Dealer's Clearance department as listed
on Schedule C, we will confirm receipt of such tape with a
Confirming Representative before acting on the instructions
contained therein.

If you comply with the provisions of this Agreement and the
documentation referred to herein relating to delivery of
instructions, we guarantee delivery of Securities with respect to
each trade to which your instructions relate to within two minutes
after which instructions have been delivered and received for the
Account. If we fail to properly complete a delivery as provided
in this Section or in the Performance Standards after receiving
proper and timely instructions therein, we shall extend to you an
interest free overnight loan if, as a result of such failure, you
elect to finance the Securities. The principal amount of such
loan shall be less than or equal to the full net dollar amount
that you would have received from your counterparty if delivery
had occurred on the related trade.

Notwithstanding the foregoing paragraph, to benefit from the
guaranties contained in this Section and the Performance
Standards, computer instructions must be completed on each
settlement day no later than two minutes prior to the established
deadline of the book-entry wire system maintained by the Federal
Reserve Bank of New York for that settlement day.

In the event of any dispute between or conflicting claims by
you and any other person or persons with respect to the securities
and other property credited to or deposited in the Account, we
shall be entitled, in our best judgement, at our option, to refuse
to comply with any and all claims, demands or instructions with

6

06/07/00

respect to such securities and other property so long as such dispute or conflict shall continue, and we shall not be or become liable in any way for our reasonable failure or refusal to comply with such conflicting claims, demands or instructions. We shall be entitled to refuse to act until either (i) such conflicting or adverse claims or demands shall have been (A) finally determined in a court of competent jurisdiction or (B) settled by agreement between the conflicting parties and we shall have received evidence in writing, satisfactory to us of such agreement, or (ii) we shall have received security or an indemnity satisfactory to us (from a party whose creditworthiness is satisfactory to us) sufficient to keep us harmless against any and all loss, liability or reasonable expense which we may incur by reason of our acting; provided however, that to the extent we are not prohibited by law or court order, we shall allow you to substitute cash or other securities for the securities with respect to which there is a conflict.

8.    Remote Clearance.

(a)   Where   applicable,   in   addition   to   giving instructions as provided in the Agreement, you may give us instructions by inputting instructions directly via a remote terminal located on your premises linked to our premises ("Remote Clearance"). Remote Clearance shall be made only in conformity with any operating manual as supplemented by the Performance Standards and security procedures. Subject to prior consent from you with respect to changes relating to the Performance Standards and security procedures, we reserve the right to prescribe, and make changes in, rules of operation, accessibility periods, authentication procedures, type of terminal equipment, type of system equipment and system programming with respect to Remote Clearance as we deem necessary and appropriate.    Fees relating to Remote Clearance may be set forth on Schedule D hereto, which may be changed prospectively from time to time upon 30 days' advance notice from us to you.

(b)   Equipment.   The remote terminal shall be provided at your expense and must be compatible with our system.   You shall be solely liable for maintenance of such terminal and for any interruption of Remote Clearance due to any problem associated with the terminal not caused solely and directly by us or within our control.    Additional terminals may be added only upon our prior written consent.

(c)   Training and Manuals.   We shall provide training on the Remote Clearance system as we determine to be

7

06/07/00

necessary.  We shall provide to you an operating manual and
notify you of any changes thereto.

(d)  Instructions.

(i)  In order to complete same-day settlements, we
must receive timely Remote Clearance instructions in
accordance with the Performance Standards on the date
of settlement.

(ii)  It is your obligation and responsibility of
all the parties hereto to complete all instructions in
accordance with the procedures prescribed by us from
time to time concerning information required, manner of
delivery and timeliness of delivery.

(iii) It is your obligation and responsibility to
maintain a backup copy of all instructions given to us
via Remote Clearance during the preceding 24 hours and
to deliver such copies to us promptly upon our request.

(iv) In the event we are unable to effect any
instruction via Remote Clearance, we shall be
authorized to receive such instruction via alternate
means, in accordance with Section 7 hereof including
without limitation, telephone, telecopy, or hand
delivery, as may be specified by us as suitable under
the circumstances.

(v)  The security procedure for instructions
issued to you via CPU link is encryption.  To verify
the authenticity of instructions issued via CPU link,
we shall decrypt instructions issued to us in your name
using encryption equipment to be located on our
premises and identified in Schedule G, which shall be
paired with encryption equipment to be located on your
premises and identified in Schedule G.  The parties
agree that encryption is a commercially reasonable
security procedure.  We will not execute instructions
received via CPU link which are not encrypted and
decrypted as described herein unless approved in
writing by two Confirming Representatives.  You shall
be responsible for access to and the security of your
computer system and your transmission facilities.  We
shall be responsible for access to and the security of
our computer system and our transmission facilities.

8

06/07/00

(vi) We shall take such reasonable precautions as we deem appropriate to prevent the loss, destruction or improper access to your information and data transmitted via Remote Clearance in accordance with the security procedures listed on Schedule H hereto (the "Security Procedures"). The parties agree that the Security Procedures are commercially reasonable security procedures. You assume the entire risk and responsibility for the fraudulent or unauthorized use of the hardware and the software on your premises, and you shall implement such security devices and /or procedures, as you deem necessary and appropriate. We may rely upon the genuineness of all information and data communicated to us over the Remote Clearance system and our records, kept in the normal course of business, shall be final and conclusive with respect to all matters involving such information and data provided we have acted in good faith and without negligence and in compliance with the Security Procedures.

(vii) The security procedure with respect to magnetic tape, oral and written instructions are as set forth in Section 7 hereof. The parties agree that the procedures in Schedule H are commercially reasonable security procedures.

(e) Confidentiality and Non-Disclosure. Except as required by applicable law, regulations or judicial or regulatory process, each of the parties hereto shall exercise reasonable care to, hold in confidence and not use for its own benefit or disclose to third parties information which is obtained or received by one of us from the other and which such party has reason to know is confidential or proprietary to the other, each party agreeing to use a standard of care at least equal to the care used to protect its own confidential information. It is agreed that all information pertaining to the performance or evaluation of Remote Clearance is confidential and proprietary to us, including without limitation any manuals or other training or descriptive material supplied to you.

9.   Tri-Party Custodian Services.

Subject to the terms and conditions hereof and effective on the conversion date, you hereby appoint and we agree to act as non-exclusive custodian with respect to your tri-party custody transactions. We agree to perform the services as set forth in

9

the form of tri-party custody agreement attached hereto as Exhibit
A (or other forms of tri-party Custody Agreement which may be
agreed upon from time to time) and act in accordance with and
strictly comply with the performance standards set forth on
Schedule B hereto.  We, as non-exclusive tri-party custodian,
shall accept from you any securities permitted under the terms of
the relevant tri-party custody agreement, which securities may
include physical securities and securities held at the Federal
Reserve Bank of New York, DTC, PTC, First Chicago Clearing Center,
and any other depository or clearing corporation as we may
mutually agree upon.  With respect to tri-party custody
agreements, we are authorized to accept instructions from you via
the means set forth in Section 7 hereof, without regard to the
priority of means itemized therein, and without having to contact
a Confirming Representative.

We hereby agree to enter into tri-party custody agreements
substantially in the form of Exhibit A hereto with such of your
customers which do not have existing tri-party custody contracts
in furtherance of their respective obligations hereunder, subject
to such modifications as we may mutually agreed upon.

Notwithstanding anything herein to the contrary, to the extent
of any conflict between this Agreement and any tri-party custody
agreement, whether now or hereafter existing, the terms of the
tri-party custody agreement will govern.

    10.  <u>Representations and Warranties</u>.

You represent and warrant that (a) upon our making any
advance with respect to any securities delivered to us for your
Account (i) you will own such securities free of any security
interests, liens, claims and encumbrances (other than the security
interest granted to us hereunder) and have the right to
hypothecate or re-hypothecate such securities; (ii) any transfer
of such securities by you for value is effective and rightful;
(iii) such securities are genuine and have not been materially
altered; (iv) you know of nothing which might impair the validity
or transferability of such securities; and (v) such securities are
freely transferable on the books of the issuer in the form
delivered to us; (b) no delivery of securities by you to us, no
instruction of yours with respect to such securities and no loan
or advance secured by such securities will contravene Rule 8c-1,
Rule 15c2-1 or Rule 15c3-3 under the Securities Exchange Act of
1934 and a request by you to transfer securities from a Segregated
Account to the Clearing Accounts shall, with respect to such
securities, be deemed to be a representation and warranty to that
effect;

06/07/00

Each of the parties hereto makes the following continuing respective representations and warranties:

(a)   You and we are duly organized and existing under the laws of the jurisdiction of our respective organizations with full power and authority to execute and deliver this Agreement and to perform all the duties and obligations to be performed by either of us hereunder.

(b)   This Agreement and the performance of all transactions contemplated hereunder have been duly authorized by you and us in accordance with all requisite action.  This Agreement has been duly executed and delivered to you and us and constitutes a valid legal and binding obligation of you and us, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

(c)   The execution, delivery and performance of the Agreement by us does not and will not conflict with or result in a breach, violation of or constitute a default under any agreement, indenture, mortgage or instrument to which we are a party or are bound or to which any of our property is subject nor will such action result in any violation of the provisions of our charter or bylaws or any law, rule, regulation, judgment, order or decree binding on us.

(d)   No consent approval, authorization or order of, or filing, registration or qualification with, any authority is required for the execution, delivery and performance of the Agreement, except for those which have been obtained or made and which continue to be in full force and effect.

(e)   You and we are in material compliance with, and during the term of this Agreement will remain in material compliance with, all applicable laws, rules and regulations of any government, governmental agency or self-regulatory organization having authority or jurisdiction over you and us, respectively, or any transaction or other matter which may involve our performing services for or extending credit to or for you.

(f)   So long as such securities held by us are not, in fact, in a Segregated Account you shall not take any action with

11

06/07/00

respect to such securities which shall in any way affect our security interest therein; (i) you have, and will continue to have during the term of this Agreement, the authority to engage in and perform the transactions contemplated by this Agreement and with respect to such transactions will be in compliance with all applicable laws, rules and regulations (including but not limited to those of any self-regulatory organization having authority or jurisdiction over you); (ii) all credit extended to you hereunder shall be used by you solely and exclusively to facilitate the prompt clearance or settlement of the purchase or sale of readily marketable securities, and each such credit shall, at the time such credit is extended, be secured by readily marketable securities having a market value or principal face amount (whichever shall be less) of not less than the principal amount of such credit, and shall, unless payment thereof shall have previously been demanded in accordance with the provisions of Section 5, be repaid upon the settlement of such purchase or sale; and

(g) Custodian shall maintain and provide evidence of insurance protection for Lehman property and property of Lehman's customers consisting of a Blanket Bond with Fidelity, Premises, Transit, Forgery and Counterfeit coverage's: Computer Crime coverage and Professional Liability coverage. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies acceptable to Lehman.

11. <u>Liens.</u>

In consideration of any advances or loans we may extend to you pursuant to this Agreement (hereinafter the "Obligations"), you hereby:

(a) Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you, now or in the future, maintain with us (except for any Segregated Account containing customer securities or funds) all securities, securities entitlement, instruments, financial assets and other investment property (except for customer securities or funds held in a Segregated Account), now or in the future, maintained or held in, or credited or relating to, any such securities accounts, or in which you have any right, title or interest that is in our possession or

12

06/07/00

control; and all income, profits, collections, distributions
and other proceeds, (both cash and non-cash and including
insurance proceeds thereof) replacements and substitutions of
any thereof (all of the foregoing being hereinafter
collectively referred to as the "Collateral"). The term
"investment property" shall have the meaning set forth in
Section 9-115 of the Uniform Commercial Code as adopted by
the State of New York (the "Code"). The terms securities
account, securities entitlement and financial assets shall
have the meanings set forth in Article 8 of the Code.
"Financial assets" shall consist of the property from time to
time contained in or credited to any of the Clearing
Accounts.

(b) Agree that if any Obligations are outstanding at
the end of the business day (after Fed wire close), we are
authorized, with notice to you, on a best efforts basis, to
carry any Collateral in our general account(s) and to sell,
transfer, assign, pledge and re-pledge, and hypothecate and
re-hypothecate any Collateral separately or together with
securities or other property of any other customer(s) (except
for customer securities held in a Segregated Account),
without retaining in our possession or control a like amount
of similar securities or other property for delivery, to the
extent permitted by Rule 8c-1, Rule 15c2-1 and Rule 15c3-3
under the Securities Exchange Act of 1934.

(c) Agree that if repayment of any advance or loan is
not made, or if any deposit relating to an advance or loan is
not received by us in accordance with the terms hereof, we
shall have the rights and remedies of a secured party under
the Code including the right to sell any of the Collateral on
any securities market, or at public or private sale in a
commercially reasonable manner, which will include notice to
you or prior tender, demand or call upon you. Subject to the
Code, we may purchase all or any part of the Collateral free
from any redemption right, but you will remain liable for any
deficiency, including reasonable brokerage fee commissions.

(d) Agree that notwithstanding anything to the
contrary contained in this Agreement (i) all securities
constituting any part of the Collateral shall be in our
"possession" and under our "control" pursuant to Section 8-
106(e) of the Code, and (ii) we shall not be required to act
in accordance with your instructions (including, but not
limited to, any instruction to transfer a security to or into
a Segregated Account or any other account), and we shall not
be your agent with respect to any financial asset

13

MAR.11.2008 10:39                                                    #0245 P.014 /043

constituting any part of the Collateral unless and until we
have received full and final payment for the Obligations or
we shall have determined, in our sole reasonable discretion,
that the payment and performance of your Obligations will be
adequately secured after giving effect to such instruction.

(e) Agree that nothing contained in this Section shall
be deemed to be inconsistent with, or to deny to us, our
status as a bona fide purchaser of all or any part of the
Collateral, and, in addition to whatever rights we may have
as such a purchaser, and not by way of limitation of such
rights, we shall have all the rights and remedies of a
secured party under applicable law.

(f) That Chase is your securities intermediary (as such
term is defined in Article 8 of the Code) with respect to any
securities accounts that you maintain with us, including
without limitation, the Clearing Accounts, that Chase has a
priority lien over all property maintained in or credited to
such accounts pursuant to Section 8-106(e) of the Code
securing the Obligations.  Nothing contained in the Pledge
and Security Agreements or in any other document or agreement
between us relating to extensions of credit or our respective
rights and obligations in respect thereof shall negate, limit
or impair the security interest automatically granted to
Chase, as your "securities intermediary" pursuant to Section
9-116 of the Code or the priority accorded such security
interest by Section 8-106(e) of the Code.

(g) In addition to the rights and remedies provided to
us pursuant to the Agreement, we shall continue to have all
rights and remedies otherwise available to us under
applicable law, including the rights afforded to financial
intermediaries and secured creditors under the Uniform
Commercial Code.

12.  Acting as Agent.

You hereby irrevocably appoint us as your true and lawful
agent and attorney-in-fact, with full power in your name and on
your behalf, with respect to the execution of all instruments and
the taking of all action necessary or desirable to effectuate the
rights and remedies provided hereunder and by applicable law. We
are acting under this Agreement only as agent, and are not
responsible or liable in any way for the genuineness or validity
of any security or instrument received, delivered or held by us
absent gross and manifest defect apparent on the face of the
certificate held by us in physical form. Notwithstanding the

14

06/07/00

foregoing, the parties agree that we shall not be deemed to be acting as your agent with respect to executing your payment orders.

### 13.   Limited Liability.

Notwithstanding anything to the contrary contained herein, we shall not be liable for any error of judgment or for any act done or omitted by us in good faith, or for any mistake of fact or law, except for our own negligence or willful misconduct or the breach of this Agreement for reasons other than those stated in this Section 13. Without limiting the generality of the foregoing, we shall not be liable for any delay or failure to act as may be required hereunder (including without limitation, any failure to execute or resulting "DK's") when such delay or failure is due to any of the following: an act of God; interruption, malfunction or suspension of any communication or wire facilities or services (other than those under our control); labor difficulties; acts or omissions of third parties; war; emergency conditions; equipment or mechanical failure (including computer or software failure) (other than those under our control); delays or processing delays on the book-entry wire system maintained by the Federal Reserve Bank of New York; your failure to perform any of your Obligations hereunder, including without limitation, your Obligations set forth in Section 8 (d)(i), (ii) and (iii) hereof; or other circumstances beyond our control, provided we exercise such diligence as the circumstances may reasonably require, provided that Chase Manhattan Bank has used due care and has exercised due diligence in anticipating such event and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on Chase Manhattan Bank's performance of its duties and responsibilities hereunder.   IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION.

### 14.   No Duty to Investigate or Advise.

You acknowledge that you are, and will continue to be, solely responsible for making your own independent appraisal of and investigation into the financial condition and creditworthiness of each person to whom or for whose account you direct us to deliver securities, or to whom you request us to make payment and you confirm to us that we are under no obligation to you to assess or review the financial condition or creditworthiness of any such person or to advise you as to the results of any such appraisal or investigation we may have conducted on our own or of any adverse information concerning any such person that may in any way have

15

come to our attention.  Furthermore, you acknowledge that we are
under no duty to supervise, recommend or advise you relative to
the investment, purchase, sale, retention or other disposition of
any property held hereunder.

15.   Fees.

Our fees for services rendered in connection with the service
provided hereunder are as set forth on Schedule D hereto and shall
be invoiced to you to pay such invoice daily, for the prior day's
activity.  You agree to pay such invoice by the close of business
on the day received.  In the event we do not receive payment in
immediately available funds by the end of day, we are authorized
to charge your Account, with the amount of such fees, and if the
Account does not include sufficient funds to cover the amount of
such fees, you will pay such amount upon demand.  All invoices
shall be conclusively presumed correct unless you notify us to the
contrary, in writing, within 30 days of receipt of any invoice
containing a discrepancy.

Our fees for services rendered in connection with the service
provided hereunder are set forth on Schedule D hereto and may not
be increased by us during the term of this Agreement.  No other
compensation or reimbursement of expense shall be payable to us
except as specifically set forth in this Agreement, other than
(i) out of pocket expenses up to $1000 month, incurred by us in
connection with the services provided hereunder, and (ii) out of
pocket expenses that arise from customized or specialized
services provided to certain customers with the prior written
approval of two Confirming Representatives, except that we may
charge you for any new or increased external charge (e.g. DTC
charges) or expense incurred by us in performing this Agreement.
We shall notify you in the event of any such charges or expenses
promptly after the same are incurred by us and, to the extent
practicable, reasonably in advance of the same having been
incurred by us.  It is understood that such notices shall be one-
time notices for each type of charge or expense.

16.   Indemnification.

Except where we are negligent or have engaged in willful
misconduct, or have breached this Agreement for reasons other than
those listed in Section 12 hereof, you will indemnify us and hold
us harmless against any and all losses, claims, damages,
liabilities or actions to which we may become subject, and
reimburse us for any expenses (including reasonable attorneys'
fees and expenses) incurred by us in connection therewith, insofar
as such losses, claims, damages, liabilities or actions arise out

of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct. This indemnification obligation shall survive the termination of this Agreement.

We shall be responsible for performing the services as provided herein. We shall be liable to you for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement for reasons other than set forth in Section 13 hereof, including the terms of any Schedule for Exhibit of failure of our equipment or software. Except as otherwise expressly provided herein, we shall not be liable to you or any third person for any loss, expense or damage suffered by reason of delay or other interruption in receiving Securities or monies through the Federal Reserve's Book Entry or Wire System or from any clearing agent, issuer, broker, dealer or other third party. We shall not be liable for failures to execute or "DK's" due to incorrect, incomplete or untimely instructions or any other failure of you to provide proper instructions, as required by this Agreement.

17.   Termination.

The initial term of this Agreement shall commence on the date hereof and shall end on October 7, 2002. If, by the expiration of the initial term the parties have not entered into a written agreement extending this Agreement for an additional term, this Agreement shall be deemed automatically renewed for an additional one year period on the terms and conditions hereof and for the fees set forth herein. Notwithstanding the foregoing, in the event that we cease to perform the services which are the subject matter of this Agreement for substantially all of our customers, we may terminate this Agreement, provided that we have given you written notice of such termination at least 12 months prior to the effective date of termination. Notwithstanding the foregoing, (i) this Agreement may be terminated by either party, as the case may be, upon written notice if the other files an application for, or consents to, the appointment of any receiver, trustee, custodian, liquidator or similar person for all or any portion of its property, files a petition seeking a reorganization of its financial affairs or taking advantage of any bankruptcy reorganization, insolvency, readjustment or debt, dissolution or liquidation law or statute, or if it takes any corporate action for the purpose of effecting any of the foregoing, (ii) this

17

06/07/00

Agreement may be terminated by either party by written notice to
the other if such other party has failed to comply with any
material provision of this Agreement which failure shall continue
for (30) days after notice of such failure is delivered by the
non-breaching party to the breaching party, but only if the same
has not been cured in all material respects, (iii) this Agreement
may be terminated by either party by written notice to the other
party if any representation or warranty made in this Agreement by
such other party shall have proven to have been at the time made,
false or misleading in any material respect, and (iv) this
Agreement may be terminated by you upon thirty (30) days written
notice to us in the event we charge you for any new or increased
external charge or expense as permitted herein and you reasonably
believe such charge to be excessive, unless we rescind such charge
upon written notice to you prior to the expiration of such thirty
(30) day period.

Upon termination of this Agreement and provided that all the
Obligations have been paid in full, we shall transfer the
Collateral and other property in the Account as follows:

(a)   If not less than five (5) calendar days' prior to
the termination date, you shall have given us written
instructions for the delivery of such securities and
property, including instruction regarding method of delivery
and destination then in accordance with such instructions;

(b)   If no such instructions have been given by you,
then on the termination date, with respect to physical
securities, we shall deliver such physical securities and
other property to you at the address provided below, by
armored car at your reasonable expense, and we may obtain
special insurance policies covering such deliveries and you
will upon demand reimburse us for all reasonable premiums
payable for such policies.   With respect to Fedwire
book-entry securities, we may establish a custody account and
hold such securities in escrow for the benefit of and at your
expense. Any and all cash may be delivered by Fed wire.

18.   Reports and Certificates.

(a)   Unless otherwise instructed by you in writing, we
may assume that we are exempt from filing on your behalf any
certificates of ownership or other reports which are, or may
hereafter be, required by any regulation of the Internal
Revenue Service or other authority of the United States, so
far as the same are required in connection with any property
which now or may hereafter be in our possession hereunder.

18

06/07/00

In the event that we are requested to prepare such reports, your status is to be described as a bank, trust company, financial institution, insurance company, corporation, partnership or otherwise as the case may be. You agree to notify us immediately in writing of any change in such status.

(b)   Whenever it becomes advisable to do so, we are authorized to exchange temporary for definitive certificates, and old certificates for new or overstamped certificates evidencing a change therein.

19.   Notice.

All notices or other communications required by this Agreement to be in writing shall be sufficiently given if mailed by registered mail, postage prepaid, or delivered:

(a)   to us at 4 New York Plaza, New York, New York 10004-2477, Attention:   Brokers and Dealers Clearance Department,

(b)   to you at Lehman Brothers, 101 Hudson Street, 31st floor, Treasury Operations, Jersey City, New Jersey 07302, Attention: Kathryn Bopp Flynn, Senior Vice President or to any other address or addresses of which written notice shall have been given in the foregoing manner by the respective parties.

20.   Assignments.

This Agreement may not be assigned by either party hereto without the prior written consent of the other.

21.   Captions.

The captions of the various sections and subsections of this Agreement have been inserted only for the purposes of convenience, and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

22.   Entire Agreement.

This Agreement together with the Credit Letter among the parties hereto, and the Funds Transfer Agreement among the parties hereto, contains the final, complete and exclusive understanding of, and supersedes all prior or contemporaneous, oral or written, agreements, understandings, representations and negotiations

19

06/07/00

between the parties relating to the subject matter of this Agreement. No amendment of any provision of this Agreement shall be enforceable against us unless in writing and signed by one of our authorized officers. Notwithstanding the foregoing, Schedule F may only be amended in writing executed by two individuals listed as Confirming Representatives on the Schedule F in effect directly before any such amendment. In the event of any conflict between this Agreement and any confirmation, instruction, custodian agreement or any other agreement between the parties, this Agreement shall control except as set forth in Section 8 hereof.

23.   Severability.

If any provision of this Agreement shall be unenforceable, illegal or invalid, it shall not affect the validity of the remaining provisions of this Agreement.

24.   Governing Law.

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of law principles thereof.

Very truly yours,

The Chase Manhattan Bank

By: _____

Name: __ANTHONY ISOLA__
        __VICE PRESIDENT__

Title: _____

Dated: ___6/15/00_____

AGREED AND ACCEPTED:

Lehman Brothers Inc.

By: _Kathryn Bopp Flynn_____

Name: _KATHRYN  Bopp  Flynn___

Title: _Senior Vice President / ASST. Treasurer_

Dated ___6/7/00_____

20

MAR.11.2008 10:40                                                #0245 P.021 /043

EXHIBIT A
Form of Tri-Party Custody Agreement

SCHEDULE A
Clearance Performance Standards

SCHEDULE B
Tri-Party Performance Standards

SCHEDULE C
Dealers Clearance Contact List

SCHEDULE D
Fees

SCHEDULE E
List of Segregated Accounts

SCHEDULE F
List of Authorized Individuals and
Confirming Representatives

SCHEDULE G
Equipment

SCHEDULE H
Security Procedures

06/09/00

## EXHIBIT A

### CUSTODIAL UNDERTAKING IN CONNECTION
### WITH MASTER REPURCHASE AGREEMENT

Reference is made to the Master Repurchase Agreement (the "Repurchase Agreement") between Seller and Buyer, as each are defined on the signature page hereto.

With respect to individual transactions, this Agreement shall only apply to the Lehman entity, i.e. Lehman Brothers Inc. or Lehman Commercial Paper Inc., identified in Lehman's instructions, as provided herein.

Seller and Buyer hereby appoint The Chase Manhattan Bank ("Bank") as non-exclusive custodian, and Bank hereby agrees to act as non-exclusive custodian in connection with Repurchase Transactions described in the Repurchase Agreement, pursuant to the terms hereof. Accordingly, Bank hereby agrees with Seller and Buyer as follows:

1.      Definitions.

(a)      Additional Purchased Securities.  Securities provided by Seller and held by Bank for the benefit of Buyer to satisfy a Margin Deficit.

(b)      Business Day.  Any day, from Monday through Friday, when Bank and Seller are open to transact business.

(c)      Income.  With respect to any Security at any time, any principal thereof then payable and all interest, dividends or other distributions thereon.

(d)      Margin Deficit.  The amount by which the aggregate Margin Value of all Purchased Securities and Additional Purchased Securities held with respect to all Repurchase Transactions is less than the then aggregate Purchase Price.

(e)      Margin Excess.  The amount by which the aggregate Margin Value of Purchased Securities and Additional Purchased Securities held with respect to all Repurchase Transactions shall exceed the then aggregate Purchase Price.

(f)      Margin Percentage.  With respect to each Security, the percentage set forth on Schedule 1 opposite each such Security in the column headed "Margin Percentage."

(g)      Margin Value.  With respect to any Repurchase Transaction, the number obtained by dividing the aggregate Market Value of each Security by the applicable Margin Percentage then adding accrued interest, except in the case of those Securities that are, in the normal course of business, traded without accrued interest, and aggregating such amounts.  Such Margin Value of Securities shall equal or exceed the Purchase Price to be paid by Buyer as provided in Seller's instructions.

(h)      Market Value.  The "bid" price for any Securities as quoted by a recognized pricing service as of the close of business on the immediately preceding Business Day.  If a price as of the close of business is not available, Bank shall be authorized to use the most current price information provided by any recognized pricing service. If no price is available, Bank shall be authorized to price any Security by contacting any dealer designated as a "primary dealer" by the Federal Reserve Bank of New York ("FRBNY") and relying upon any price quoted by such "primary dealer" as if it were quoted by a recognized pricing service.  Banker's acceptances, commercial paper, certificates of deposit and cash shall be valued at face value.

(i)      Purchase Date.  The date on which Purchased Securities are sold to Buyer by Seller.

(j)      Purchase Price.  The price at which Purchased Securities are sold to Buyer by Seller.

(k)      Purchased Securities.  The Securities sold by Seller to Buyer as set forth in the instructions from Seller to Bank.

(l)      Repurchase Date.  The date on which Seller is to repurchase the Purchased Securities from Buyer, which date

06/09/00

shall be the next Business Day after the Purchase Date unless otherwise specified herein.

(m)    Repurchase Price.  The price at which Purchased Securities are to be repurchased on the Repurchase Date.

(n)    Repurchase Transaction.  A transaction whereby Seller sells certain securities to Buyer, subject to Buyer's agreement to resell such securities to Seller at a future date at a stated price plus interest.

(o)    Securities.  Securities identified on Schedule 1 attached hereto.  Securities shall always include cash.

2.    Maintenance of Accounts.  (a) Seller and Buyer hereby instruct Bank, and Bank agrees to establish and maintain a cash collateral account and a Securities custodian account for the benefit of Buyer (collectively, the "Buyer's Account") and a cash account and a Securities custodian account for the benefit of Seller (collectively, the "Seller's Account").  Except as specifically provided herein, Bank shall follow only Seller's instructions with respect to Seller's Account, and shall follow only Buyer's instructions with respect to Buyer's Account.

(b)    Bank shall segregate and separately account on its books and records for all securities held for Buyer, from assets it holds for its own account.  Bank shall maintain and safekeep Purchased Securities and Additional Purchased Securities held for Buyer in Buyer's Account until (i) it shall receive Buyer's instructions to deliver or transfer to Buyer Purchased Securities and Additional Purchased Securities, which instructions shall not conflict with any other provision of this Agreement; (ii) Seller shall substitute Securities (including cash) provided such Securities have a  Margin Value equal or greater than that of the substituted Securities; (iii) Bank shall deliver Purchased Securities and Additional Purchased Securities to Seller as provided in this Agreement; or (iv) this Agreement is terminated.

(c)    Buyer's Account, including Purchased Securities, Additional Purchased Securities and cash therein, shall not be subject to any security interest, lien or right of setoff by Bank, or any third party claiming through Bank.

3.    Valuation of Purchased Securities and Additional Purchased Securities.  At the opening of each Business Day, with respect to Paragraph 4(d) Repurchase Transactions, Bank shall determine the then Margin Value, as defined herein, of all Purchased Securities and Additional Purchased Securities held in Buyer's Account.

4.    Specific Repurchase Transactions.  (a) Upon receipt of instructions from Seller specifying the Seller entity involved in the Repurchase Transaction, Purchased Securities, Purchase Price and Purchase Date, Bank shall on the Purchase Date, debit Buyer's Account in an amount equal to the Purchase Price and credit the Purchase Price to Seller's Account against the simultaneous transfer of Purchased Securities in an amount equal to or greater than the Margin Value from Seller's Account to Buyer's Account.  Upon receipt of instructions from Seller, Bank shall, on the Repurchase Date, transfer the Purchased Securities and any Additional Purchased Securities and/or cash from Buyer's Account to Seller's Account against the simultaneous credit of immediately available funds in an amount specified by Seller to Buyer's Account and the debit of such amount from Seller's Account.

(b)    If Bank is unable to comply with the terms of Section 4(a) above because Seller or Buyer has failed to credit sufficient cash or Securities to Seller's Account or Buyer's Account, as applicable, Bank shall promptly notify Seller and await modification of Seller's instructions or the receipt of further cash or Securities as Seller shall direct.  If Bank has not received modified instructions from Seller or cash prior to the close of the FRBNY's funds transfer wire or additional Securities, Buyer and Seller hereby irrevocably agree and instruct Bank as follows:  (i) on a Purchase Date, if the cash balance in Buyer's Account shall be less than the Purchase Price, the cash balance shall be deemed to be the Purchase Price; (ii) on a Purchase Date, if the Margin Value of Securities in Seller's Account is less than the Purchase Price, Bank shall disburse to Seller cash from Buyer's Account in an amount equal to the Margin Value of Securities available for transfer to Buyer's Account and the remaining cash shall be held in Buyer's Account by Bank and shall be designated cash held in substitution for Purchased Securities; (iii)  on a Repurchase Date, if Seller's Account does not contain sufficient cash available to repurchase all Purchased Securities in Buyer's Account with respect to any Repurchase Transaction, Bank shall immediately notify Seller and Seller shall give Bank instruction identifying which, if any, Purchased Securities are to be repurchased and the applicable portion of the Purchase Price.

(c)    Seller and Buyer may agree that Seller shall be obligated to repurchase the Purchased Securities on a date  other

06/09/00

than the Business Day immediately following the Purchase Date (the "Term Repurchase Date"). In such event, Seller shall notify Bank of its intention to effectuate a Repurchase Transaction with a Term Repurchase Date. Bank, upon receipt of such instruction, shall transfer the Securities in accordance with the terms of this Agreement so that on each Business Day following the Purchase Date (up to but excluding the Term Repurchase Date), Seller and Buyer shall be deemed to enter into a new Repurchase Transaction, on the same terms as the Repurchase Transaction in effect on the previous Business Day.

(d)     Notwithstanding the foregoing, Seller may instruct the Bank (i) not to transfer and retransfer between Buyer's and Seller's Accounts on each Business Day after the Purchase Date cash representing the Purchase Price, and (ii) to hold Securities having a Margin Value equal to or greater than the Purchase Price in Buyer's Account until the Term Repurchase Date, so that the Term Repurchase Date is the only Repurchase Date. If Bank is so instructed, Bank shall not release any Securities in Buyer's Account to Seller except that Seller shall be permitted to (i) substitute Securities of equal or greater Margin Value, and (ii) instruct Bank to transfer Securities having a Margin Value equal to the Margin Excess to Seller. In the event the Margin Value of the Securities in Buyer's Account is less than the Purchase Price, Bank shall provide Seller with notice prior to 12:00 noon, New York City time. On the date of any such notice, Seller shall provide Bank with Additional Purchased Securities having a Margin Value equal to such Margin Deficit, so that Bank can transfer such Additional Purchased Securities to Buyer's Account by the end of the day. If Seller fails to transfer an appropriate amount of Additional Purchased Securities on the date of notice of a Margin Deficit, Bank shall notify Buyer and Seller and await further instructions from Seller.

5.     **Income.** Bank shall credit to Seller's Account all Income paid by or on behalf of issuers in respect of Purchased Securities and Additional Purchased Securities in the event that any such amounts are received by Bank, except in the event Bank is notified by Buyer of an uncured Event of Default (as defined in the Repurchase Agreement) on the part of Seller, in which event such amounts shall be credited to Buyer's Account.

6.     **Bank's Obligation to Hold Purchased Securities.** Until the relevant Repurchase Date or Event of Default declared by Buyer as specified in Paragraph 7 hereof, Bank shall hold the Purchased Securities sold pursuant to any Repurchase Transaction, together with any Additional Purchased Securities and/or cash delivered to satisfy the Margin Deficit, on behalf of Buyer and Buyer shall not sell, transfer, assign, pledge, or otherwise utilize such Securities or cash (except as otherwise agreed to between Seller and Buyer).

7.     **Default.** If either Buyer or Seller shall declare an Event of Default under the Repurchase Agreement, it shall deliver a notice of an Event of Default to Bank. Bank shall notify the defaulting party of the receipt of a notice of an Event of Default but shall have no further obligation or duty to inquire into the nature or validity of the Event of Default set forth in the notice of an Event of Default. At any time that Bank has received a notice of an Event of Default from Buyer, Bank is hereby instructed to (i) cease transferring Securities to Buyer's Account except that Bank shall accept into Buyer's Account cash in substitution of any Securities therein provided such cash has a Margin Value equal to or greater than that of the substituted Securities notwithstanding any other provision to the contrary contained herein and (ii) follow Buyer's instructions with respect to the Securities in Buyer's Account. At any time that Bank has received a notice of an Event of Default from Seller, Bank shall follow Seller's instructions to accept into Buyer's account cash in substitution of any Securities therein provided such cash has a Margin Value equal or greater than that of the substituted Securities notwithstanding any other provision to the contrary contained herein.

8.     **Daily Statement to Seller and Buyer.** Each Business Day on which there is an outstanding Repurchase Transaction, Bank shall provide Buyer and Seller with an information statement reflecting the Seller entity and cash and Purchased Securities and Additional Purchased Securities positions in Buyer's Account. Buyer and Seller shall promptly review all such information statements and shall promptly advise Bank of any error, omission, or inaccuracy in the cash or Purchased Securities or Additional Purchased Securities positions reported. Bank shall undertake to correct any errors, failures, or omissions that are reported to Bank by Buyer or Seller. Any such corrections shall be reflected on subsequent information statements.

9.     **Care of Property; Reliance on Instructions; and Pricing of Securities.**

(a)     Bank shall exercise reasonable care of a Bank custodian with respect to property in Seller's Account and Buyer's Account and with respect to its other obligations pursuant to this Agreement. Bank assumes responsibility for loss to any such

06/09/00

property of Seller or Buyer occasioned by the negligence of, or conversion, misappropriation or theft by Bank or Bank's employees, contractors, agents, correspondent banks, subcustodians, or affiliates, it being understood that the FRBNY, The Depository Trust Company ("DTC") and The Participants Trust Company ("PTC"), and any other clearing corporation is not the Bank's subcustodian or agent. Notwithstanding anything to the contrary contained in this Agreement, in no event shall the Bank be liable for special, consequential, or indirect damages even if the Bank is advised as to the possibility thereof. Bank, at its option, may insure itself against loss from any cause but shall be under no obligation to obtain insurance directly for the benefit of either Seller or Buyer.

(b)    Bank, at any time, without any resulting liability to it, may act hereunder in reliance upon any instructions Bank believes to be genuine; provided, however, that all instructions to Bank from Buyer shall be by a signed writing (via telecopy, or otherwise), by electronic communication or oral communication, including the code which may be assigned by Bank to Buyer from time to time. With respect to instructions from Seller, Bank shall follow the procedures set forth in the Clearance Agreement between Seller and Bank.

(c)    Until written notice to Bank by Buyer to the contrary, the persons listed on Schedule 2 hereto shall be authorized to act on behalf of Buyer, any one of whom shall have authority to purchase, sell, give notices and otherwise act under this Agreement on behalf of Buyer.

(d)    Bank may rely upon a recognized pricing service in determining the Market Value of the Purchased Securities and Additional Purchased Securities, and shall in no circumstances be liable for any errors made by such service.

(e)    All cash payments hereunder shall be in Fed Funds and shall be received by Bank prior to 12:00 noon New York time on the date due. All transfers of Securities and cash between the Buyer and the Bank shall be made to the accounts listed on Schedule 2 hereto, unless otherwise agreed between the Bank and Buyer. All credits, debits or transfers shall be deemed to have been completed at such time as recorded on Bank's books.

(f)    Bank undertakes to perform only such duties as are expressly set forth in this Agreement.

(g)    Buyer and Seller authorize Bank to utilize agents, subcustodians, depositories, correspondent banks and affiliates to process Repurchase Transactions and to hold cash or Securities, and to use any other means legally available to it for the retention, processing or maintenance of cash or Securities. Transfer of Securities to Bank hereunder may be accomplished by crediting the account of Bank with the FRBNY, pledging the securities to the Bank at PTC or DTC, or any other clearing corporation meeting the requirements of this Paragraph as the case may be, or by delivery of physical certificates to Bank in negotiable form. Seller and Buyer agree that Bank's use of the FRBNY, PTC, DTC or any other clearing corporation in connection with the Repurchase Transactions contemplated under this Agreement is authorized and shall fully comply with all terms and conditions of this Agreement regarding Bank's transfer and custody of such Securities. Buyer and Seller acknowledge and understand that all transfers of Securities by the FRBNY, PTC, DTC or any other clearing corporation are subject to the then applicable rules and procedures of the FRBNY, PTC, DTC or other clearing corporation, as applicable. Notwithstanding anything to the contrary contained herein, Bank shall be authorized, in its reasonable discretion, to accept a trust receipt from any financial intermediary, as a Security.

(h)    Bank may rely upon a recognized credit rating service to verify credit ratings of Purchased Securities and Additional Purchased Securities and shall in no circumstances be liable for any errors made by this service. In the event that Bank is unable to verify such ratings in accordance with this Subparagraph (h), Bank shall rely upon Seller to obtain such ratings.

10.    **Compensation.** Seller hereby agrees to pay Bank compensation for the services to be rendered hereunder, based upon rates agreed to between Seller and Bank.

11.    **Indemnification.** Buyer and Seller hereby agree, jointly and severally, to indemnify Bank for, and hold it harmless from and against, any loss, liability or expense in connection with, arising out of or in any way related to the transactions contemplated and relationship established by this Agreement, or any action or omission by Bank in connection with this Agreement, including the reasonable costs, expenses and attorneys fees of attorneys chosen by Bank, incurred in defending any such claim of liability, except that Seller and Buyer shall not be liable for any loss, liability or expense that is

06/09/00

determined to be the direct result of acts or omissions on the part of Bank constituting negligence or willful misconduct. For purposes of this paragraph, all references to Bank shall mean Bank, its officers, directors, employees, agents and affiliated persons.

The indemnification obligations of Buyer and Seller shall be continuing obligations notwithstanding the termination of any Repurchase Transaction, this Agreement, the Repurchase Agreement or all of them.

12.     **Continuing Disputes.** In the event of any dispute or conflicting claims by any of Buyer, Seller and any other person with respect to cash or Securities or any other matter covered by this Agreement, Bank shall promptly notify Buyer and Seller and shall either act on joint instructions or decline to comply with any and all claims, demands or instructions with respect to such cash or Securities so long as such dispute or conflict shall continue, and Bank shall not be liable for failure to act or comply with such claims, demands or instructions. Bank shall be entitled to refuse to act or comply until either (i) such conflicting or adverse claims or demands shall have been determined in a court of competent jurisdiction or settled by agreement between the conflicting parties and Bank shall have received evidence satisfactory to it of the same, or (ii) Bank shall have received security or an indemnity satisfactory to it and sufficient to hold it harmless from and against any and all losses or damages, including counsel fees and expenses, which it may incur by reason of taking any action, except Bank shall accept cash from Seller in substitution of any Purchased Securities and Additional Purchased Securities provided such cash has a Margin Value equal to or greater than that of the Margin Value of the substituted securities. The provisions contained in this Paragraph 12 shall not in any way be deemed to limit or restrict Buyer's, Seller's or Bank's other rights and remedies described in this Agreement.

13.     **Entire Agreement, Modification or Amendment.** This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto. No modification or amendment of this Agreement shall be binding unless in writing and executed by the parties. In the event of conflict between this Agreement and the Repurchase Agreement, this Agreement shall control.

14.     **Termination.** This Agreement shall only terminate upon termination of the Repurchase Agreement or may be terminated by Buyer or Seller, solely, on thirty day's written notice to the other parties; provided, however, that any such termination shall not affect any Repurchase Transaction then outstanding and provided further that the Agreement shall not terminate until Bank has received written notice of the termination of this Agreement from Seller or Buyer.

15.     **Severability.** If any provision of this Agreement is held to be unenforceable as a matter of law, the other terms and provisions hereof shall not be affected thereby and shall remain in full force and effect.

16.     **Rights and Remedies.** Except as otherwise specified herein, the rights and remedies conferred upon the parties hereto shall be cumulative, and the exercise or waiver of any thereof shall not preclude or inhibit the exercise of any additional rights and remedies.

17.     **Headings.** Section headings are for reference purposes only and shall not be construed as a part of this Agreement.

18.     **Counterparts.** This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one instrument.

19.     **Notices.** All notices shall be given to the party entitled to receive such notices at the addresses and telephone numbers listed on Schedule 2 hereto or to such other address and/or telephone numbers as is specified in a notice given pursuant to this Agreement. All notices and instructions shall be deemed given when received.

20.     **Representations of Bank** (which shall be deemed to be made on each day on which a Repurchase Transaction is outstanding).

(i)     Bank is a state chartered bank with its principal office in New York, and maintains a vault facility for the purpose of receiving, safekeeping and delivering physical securities on behalf of its customers and counterparties of Seller.

(ii)    Except to the extent otherwise provided by law, Bank will maintain Buyer's Account as a custody account and shall administer Buyer's Account in the same manner it administers similar accounts established for the same purpose. Bank shall create and maintain the books and records created in connection with Buyer's Account in the State of New York.

21.    **Assignment.** No party shall assign its rights and/or obligations hereunder without the prior written consent of the other parties. Any attempted assignment without such consent shall be null and void.

22.    **Governing Law.** This Agreement shall be governed by and construed in accordance with the substantive laws (and not choice of law rules) of the State of New York. The parties hereto irrevocably consent to the non-exclusive jurisdiction and venue of any federal or state court in the Borough of Manhattan, in the City of New York, in connection with any action or proceeding arising out or of in connection with this Agreement, and the parties hereto irrevocably waive the right to object to the venue of any such court on the ground of inconvenient forum.

06/09/00

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Agreement as of this _____ day of _____, _____.


THE CHASE MANHATTAN BANK


By: _____

Name: _____

Title: _____


LEHMAN BROTHERS INC.
LEHMAN COMMERCIAL PAPER INC.
("Seller")


By: _____

Name: _____

Title: _____


_____
("Buyer")


By: _____

Name: _____

Title: _____


06/09/00

## SCHEDULE 1

| Security Type | Margin Percentage |
|---|---|
| U.S. Treasuries | 2% |
| U.S. Government Agencies or U.S. Government Sponsored Agencies | 2% |
| Private Label Collateralized Mortgage Obligations and Mortgage Backed Pass Through Securities | 5% |
| Asset Backed Securities | 11% |
| Bankers' Acceptances | 2% |
| Certificates of Deposit | 2% |
| Commercial Paper | 2% |
| Corporate Bonds | 5% |
| Municipal Bonds | 10% |
| Cash | 100% |

**SCHEDULE 2**

**Description of Cash Accounts**

| | |
|---|---|
| **A.**    Buyer's Account at Bank | **B.**         Buyer's Delivery Instructions |
| ABA: 021000021 | ABA: _____ |
| CHASE NYC/ | Co. Name: _____ |
| ACCT# 544755022/ | A/C #: _____ |
| DEPT 4004/ | A/C Name: _____ |
| *Customer Name* | Branch: _____ |
| FOR TRI-PARTY WITH | City: _____ |
| LEHMAN BROTHERS | Attn: _____ |

**C.**    Authorized Persons for Buyer:

| Name | Signature | Title |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**D.**    Notice Information:

If to Seller: Lehman Brothers, 3 World Financial Center, 8th Floor, New York, New York  10285-0800, Attn: Robert H. Bing, Central Funding; Phone: (212) 526-8634, Telecopy: (212) 528-6664.

If to Buyer:

_____

_____

_____

Attn: _____

Phone: _____

Telecopy: _____

If to Bank: The Chase Manhattan Bank, 4 New York Plaza, New York, New York  10004, Attn:      Brokers and Dealers Clearance Department, Phone (212) 623-7219, Telecopy: (212) 623-5959.

06/09/00

## SCHEDULE A

### CLEARANCE PERFORMANCE STANDARDS

1. Chase Manhattan Bank agrees to make Lehman an interest free overnight loan in the amount of any transactions Chase Manhattan fails to complete on a same day basis, provided Lehman has, at least two minutes prior to the applicable close of the FEDWIRE (currently scheduled to be 3:00 p.m. daily (i) securities available for delivery in their clearance account, (ii) inputted delivery instructions into the Broker Dealer Automated System, and (iii) activated auto delivery mode.

2. Chase will begin to accept Lehman batch transmission of settling trades at 5:00 a.m.

3. Chase will provide Lehman users access to BDAS at 7:00 a.m. and as late as Lehman requires for processing.

4. Chase will provide Lehman the ability to view on-line and generate a hardcopy "Pending Fail" report, as requested by Lehman.

5. Chase will provide Lehman the ability to view on-line and generate a hardcopy "Projected Position" report, as requested by Lehman.

6. Chase will provide Lehman the ability to view on-line and generate a hardcopy "Projected Short" report, as requested by Lehman.

7. Chase will provide Lehman the ability to view on-line and start to print a hardcopy "Transaction Journal" report, within 60 seconds following the Federal Reserve Book-Entry System reversal close.

8. Chase will provide Lehman the ability to view on-line and start to print a hardcopy "Transaction Summary" within 60 seconds following the Federal Reserve Book-Entry System reversal close.

9. Chase Manhattan Bank will be responsible for communication lines and hardware with a 24 hour/7days per week coverage. In the event of a communication problem with Lehman Brother's site (New York), Chase will provide on-site technical support.

06/09/00

MAR.11.2008 10:42                                                          #0245 P.032 /043

13.Chase will transmit a file to Lehman containing "Collateral Segregation" reports within 2 minutes following execution of a contract collateral segregation, provided Lehman initiates the appropriate command on BDAS.

14.Chase will notify Lehman, by phone, of any non-payment of expected incoming credits by 5:00 p.m. until such time that Chase can provide Lehman notification systematically.

15.Chase will notify Lehman, by phone, of any failed transaction (fail to deliver, or fail to deliver, or fail to receive a security) associated with a Tri-Party Securities Lending Program by 2:00 p.m.

16.Chase will create new customer accounts and code new securities, on the BDAS system, on the same day as specified by Lehman in written notification. Lehman understands that accounts, which require Chase to set a discrete Fed mnemonic, will be completed within 1 business day of Lehman's written request.

06/09/00

**SCHEDULE C**

**DEALERS CLEARANCE CONTACT LIST**

The Chase Manhattan Bank
4 New York Plaza, 21ˢᵗ Fl.
New York, NY 10004-2477

- Anthony Isola
  Ph: 212-623-6446
  Fax: 212-623-5959

- Ray Stancil
  Ph: 212-623-5844
  Fax: 212-623-5959

- Bill Mosca
  Ph: 212-623-7220
  Fax: 212-623-5959

- Kathy Hagany
  Ph: 212-623-7212
  Fax: 212-623-7791

06/09/00

## SCHEDULE E
### SEGREGATED ACCOUNTS

**DEALER GROUP: DG93**
**TITLE: Lehman Brothers Inc.**

DLR
LWF
LWE
LW1
LW2
LW5
LW6
LWR
LW7
LW4
LWA
LWB

**DEALER GROUP: DG08**
**TITLE: Lehman Brothers Derivative Products**

DLR
LD5
LD3
LD4
LWP
LW3

**DEALER GROUP: DG95**
**TITLE: Lehman Brothers Financial Products**

DLR
LW0
LW8
LW9
LF4

06/09/00

## SCHEDULE F
### CONFIRMING REPRESENATIVES

| Name | Telephone Number | Specimen Signature |
|------|------------------|-------------------|
| Anna Garner | 201-524-5105 | |
| Keith Geismar | 201-524-4820 | |
| Leonard Legotte | 201-524-5122 | |
| Michael Maher | 201-524-5335 | |
| Thomas A. Fonte | 201-524-4931 | |
| Daniel Fleming | 201-524-4937 | |
| John Palchynsky | 201-524-4997 | |
| Thomas Rogers | 201-524-5465 | |
| Edward Steffens | 201-524-5085 | |

Schedule F may only be amended in writing, executed by **TWO** authorized signatories as per the Secretary's Certificate for Bank Accounts.

By: _____
(Authorized Officer)

Title: SVP
Date: 6|9|00

By: _____
(Authorized Officer)

Title: AVP
Date: 10/9/00

05/04/00  1:46 PM

## SCHEDULE F
### AUTHORIZED INDIVIDUALS
**(Authorized individuals to instruct settlement activity via phone, fax, or messenger as described in Section 6)**

| Name | Telephone Number | Specimen Signature |
|------|------------------|--------------------|
| Albert Abad | 201-524-5330 | |
| John Arancio | 201-524-5339 | |
| John Bertolotti | 201-524-5108 | |
| Roger Cabrera | 201-524-5336 | |
| Anthony Collura | 201-524-5340 | |
| Tony Da Silva | 201-524-5341 | |
| Sandra Henriquez | 201-524-4995 | |
| David Hughes | 201-524-5338 | |
| Vincent Mennella | 201-524-5121 | |
| Stephen Pisciotti | 201-524-5086 | |
| Bill Ramos | 201-524-5109 | |
| Rob Rodriguez | 201-524-4990 | |
| Chris Visconti | 201-524-5925 | |

Schedule F may only be amended in writing, executed by **TWO** authorized signatories as per the Secretary's Certificate for Bank Accounts.

By: _____
(Authorized Officer)
Title: S U P
Date: 6/9/00

By: _____
(Authorized Officer)
Title: FVP
Date: 6/9/00

05/04/00  4:05 PM

## SCHEDULE G

### 3611 Modems
### EQUIPMENT
### COMMUNICATION LINES
### COMMUNICATION PROTOCOL

## EQUIPMENT

| | |
|---|---|
| 3 | AT&T 3610 Modems |
| 5 | NET SPX-30 Multiplexors |
| 10 | AT&T 3611 Modems |
| 6 | Racal Milgo Datacryptor 64 encryption device |
| 13 | AT&T 361X Modems |

3 Racal Milgo Datacryptors and all 13 AT&T 361X Modems shall be located on Bank's premises :

## COMMUNICATION LINES

| | |
|---|---|
| 13 | 56 KB DDS II Four Wire Leased Lines |
| 14 | Two Wire Dial Tone Leased Lines |

## COMMUNICATION PROTOCOL

LU 6.2 AT 56 KB

## SCHEDULE H

### CHASE MANHATTAN BANK
### BROKER DEALER AUTOMATED SYSTEM (B.D.A.S.)
### SECURITY FEATURES FOR REMOTE CLEARANCE

Levels of Log-on in B.D.A.S.

1. The 'username', or V.M.S. log-on, is a menu-controlled level that allows for running reports, etc., but does not allow modification of data. Typically, a common log-on is used by all operators at a single location. (Although additional accounts can be added, for another user group, typically to segregate management-type functions on a separate menu.)

2. The "application" level allows individual operators to modify data, with varying levels of operator access. This process is under the control of the systems liaison group, who coordinates this process with the customer. At this level, each operator must have a separate account, with a unique I.D. number and password. (This level is also commonly referred to as the "clone" level.)

120 Day Operator Password Disablement:

Any operator who does not log-on to B.D.A.S. within the 120-day period is automatically put into a "disabled" status, and will not be able to access the application. (See separate document on operator passwords.) (Also see "quarterly operator review.")

180 Day Username Password Expiration:

Any account not used for 180 days: The account will be placed in a "disusered" status. If the customer's authorized signer does not contact the systems liaison group within 30 days to be re-activated the account will be deleted.

Quarterly Operator Review:

Each quarter we mail a report listing operator accounts and their current status for verification by the customer's authorized signer. Any changes to their status require that we receive a new "operator access control form". We must be advised if operators indicated as being in a "disabled" status are to be retained or deleted. If we are not advised, we will delete the operator.

"Username" account 'disusered' after 30 days of inactivity:

The systems liaison group will have to be notified by the customer's authorized signer in order for the account to be reactivated.

"Username" Unsuccessful log-on attempts locks out all terminal access:

Any account for which 3 consecutive failed log-on attempts occur, will be locked out of all the terminals at their location. The systems liaison group will have to be notified by the customer's authorized signer in order for the terminals to be re-activated.

Single Terminal Locked Out After 3 Consecutive Unsuccessful Log-On Attempts:

Any operator who has 3 unsuccessful log-on attempts to the "application" level will have their terminal locked out. The customer's authorized signer wold then have to contact the liaison group to re-activate the terminal.

Only 1 operator per terminal at a time allowed to be logged on:

Any operator who is logged-on in B.D.A.S. cannot log on to another terminal at the same time. When logging on to a second terminal is attempted, the first terminal will log out.

06/09/00

Money Transfers ("MTFR") Requires 2 Operators:

Any remote operators that do money transfers on B.D.A.S. will need a separate operator to pend the transfer, and a separate internal Chase operator to settle the transfer.

"MDBT" and "MTFR" Verifications Require 2 Operator to Approve:

The verification of money debits ("MDBT") and money transfers ("MTFR") requires the remote customer to have a separate operator to create the transaction, and a separate operator to verify the transaction, before it can be settled. We require that all remote customers employ this verification to reduce risk.

Free Deliveries Cannot Be Settled Without Passing Credit Review:

Any free deliveries pended in B.D.A.S. will not be able to be settled without passing the credit review calculation in the system. If a transaction does not pass, it will go into "Awaiting Review" status. The Chase account officer will review those transactions, and only approved transactions can be settled.

Option To Require 2 Remote Operators to Verify Free Deliveries:

The customer may choose a system option that will require 2 separate operators to make a free delivery eligible for the settlement. Similar to the "MDBT" and "MTFR" verification, a separate operator would pend, and another would verify. From that point, the same credit review process would take place.

Customer Access Controlled Both By Operator Account I.D. and Terminal I.D.:

B.D.A.S. limits access to any particular customer accounts by both the authorized settings associated with the operator account, and authorization settings associated with the location of each particular terminal.

Unauthorized Access to Privileged Commands by Both Terminal and Operator:

B.D.A.S. system is set up with a privileged authorization mask and each system command is controlled by authorization "bits" set within the mask. Each operator and terminal are set up so operators can access only certain commands they're authorized for on the system.

Password Expiration:

After 90 days, an operator must change their password when prompted with the "CPWD" command. If the operator does not change their password within 30 days, they will be "disabled" and must contact the systems liaison group to "reset" their password. (See separate document on operator passwords).

06/09/00

Broker Dealer Automated System (B.D.A.S.)
Operator Password Procedures for Remote Clearance:

The B.D.A.S. system provides an automated password generation system whereby each operator will be required to create a new password every ninety days. The system will prompt the "CPWD" (change password" command at the ninety day expiration period, and will only accept a password that is valid within certain parameters, e.g. length, alpha-numeric, etc. This command would also be used at any time an operator needs to change their password prior to the ninety day period. First time operators are issued a temporary password by the system liaison group (only after which our system access authorization procedures to initiate their account have been completed), which only allows them to log onto the "CPWD" screen which requires the operator to enter a password unique to themselves. If you are unable to access the system (e.g. forgotten your password) the procedure is to contact the systems liaison group at 212-623-3209. They will call back at the customer's office to "reset" (issue a new temporary password). The liaison group will only "reset" (issue a new temporary password), for an individual known to them.

06/09/00

#0245 P.041 /043

### Amendment to the Clearance Agreement

This Amendment to the Clearance Agreement (the "Amendment") is made by and among Lehman Brothers Inc. ("LBI"), and JPMorgan Chase Bank ("JPMorgan").

WHEREAS, LBI (as successor to Lehman Government Securities Inc. and Lehman Special Securities Inc.), and JPMorgan entered into that certain Clearance Agreement dated as of January 3, 2002 (the "Clearance Agreement");

WHEREAS, LBI, and JPMorgan wish to add Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Bank, FSB ("LBB"), Lehman Brothers Bankhaus AG ("LBBAG") and Lehman Brothers OTC Derivatives Inc. ("LOTC") as an additional parties to the Clearance Agreement, subject to all of the rights and responsibilities of a clearance customer as set forth in such Clearance Agreement;

WHEREAS, LCPI, LBIE, LBB, LBBAG and LOTC wish to become additional parties to, and accepts all of the rights and responsibilities of a clearance customer as specified in the Clearance Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LCPI, LBIE, LBB, LBBAG and LOTC are named as parties to the Clearance Agreement, and that the terms "you" and "your", whenever they appear in the Clearance Agreement shall apply to LBI, LCPI, LBIE, LBB, LBBAG, LOTC or any of them, depending upon the instructions provided by such party or parties with regard to any transaction entered into pursuant to the Clearance Agreement.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Clearance Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

This Amendment shall become effective on the date written below.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of January 30th, 2004, by their respective authorized officers.

| Lehman Brothers Inc. | Lehman Brothers Bankhaus AG | JPMorgan Chase Bank |
|---|---|---|
| By: | By: | By: |
| Name: Heidemarie Echtermann | Name: Daniel Fleming | Name: |
| Title: Senior Vice President | Title: Vice President | Title: ANTHONY ISOLA VICE PRESIDENT |

| Lehman Commercial Paper Inc. | Lehman Brothers OTC Derivatives Inc. |
|---|---|
| By: | By: |
| Name: Heidemarie Echtermann | Name: Heidemarie Echtermann |
| Title: Senior Vice President | Title: Senior Vice President |

Lehman Brothers International (Europe)

By:
Name: Heidemarie Echtermann
Title: Senior Vice President

Lehman Brothers Bank, FSB

By:
Name: Heidemarie Echtermann
Title: Senior Vice President

## SCHEDULE D

### FEES

SECURITY CLEARANCE AND TRIPARTY SERVICES PRICING:

Fed Book-Entry Received and/or Delivers:*

| | | |
|---|---|---|
| - | First 40, 000 monthly movements | $2.50 per movement |
| - | At 40,001 and greater monthly | $1.75 per movement |
| - | FRB transaction fee (Receives and Delivers) | $.85 passed along |

| | |
|---|---|
| Internal Pair-Offs (Receives and Delivers) | $1.75 per item |
| Tri-Party Accounts | .55 basis pts of principal amt daily |
| DTC Collateral Pledge | $.80 per pledge |
| PTC CLF Bulk Transfer | $50 pass through per item |
| Inventory Maintenance | NO CHARGE |

*Same pricing applies to receives and delivers of customer safekeeping positions.*

EQUIPMENT CHARGES:

| | | Monthly Maintenance |
|---|---|---|
| 3 | AT&T 3610 Modems | $729 |
| 5 | NET SPX-30 Multiplexors | 1,088 |
| 10 | AT&T 3611 Modems | 2,310 |
| 6 | Racal Milgo Datacryptor 64 encryption devices | 138 |
| 13 | AT&T 361x Modems | 729 |
| | | $4,994 |

(Effective 11/1/97)

## PHYSICAL OUTSOURCING SERVICES PRICING

| | |
|---|---|
| Receives/Delivers (LBI) | $18.00 |
| Receives/Delivers (LCPI) | $16.00 |
| Transfer Securities** | $12.00 |
| Collections | $12.00 |
| P&I Payments – CMO's | $7.00 |
| Collections – Called Securities | $15.00 |
| Tenders/Exchanges | $25.00 |
| Internal Transfers | $5.00 |
| Set Asides | $5.00 |
| Asset Maintenance (per issue)* | $2.25 |
| Temporary Withdrawal – Transfers** | $12.00 |
| Telephone/Hard Copy Instructions | $10.00 |
| Referral/Reclaim | $25.00 |
| Account Maintenance* | $100.00 |
| TITAN* | $100.00 |
| Special Services Securities Adj.+ | Various |
| Net Settlement Accounting* | $1,500.00 |

\*     *Represents Monthly Fees per Account*

\*\*   *Does not include pass through charges for Shipping and Insurance, and Certificate's fees imposed by Transfer Agents.*

\+    *Syndicates; including representation & pick-up, prepacking, Flip Trackings: $3.00 per. Other services, re-constitutions, closings, research and photocopying, audits, and various fees.*

*R&D charges include all messenger and wire fees.*

(Effective 11/197)

06/09/00