# Exhibit J

| | |
|---|---|
| **QUINN EMANUEL URQUHART OLIVER & HEDGES LLP**<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Susheel Kirpalani<br>James C. Tecce<br>Eric M. Kay | Hearing Date:<br>**December 22, 2008**<br>Objections Due:<br>**December 19, 2008** |

*Special Counsel to the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
In re:                                                                                         : SIPA Proceeding
                                                                                                      : Case No. 08-01420 (JMP)
**LEHMAN BROTHERS INC.**,                                                      :
                                                                                                      :
                                            Debtor.                                         :
-----------------------------------------------------------------------x

**LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
TO SIPA TRUSTEE'S MOTION UNDER 11 U.S.C. §§ 105 AND 363
AND FED. R. BANKR. P. 9019(a) FOR ENTRY OF AN ORDER
APPROVING SETTLEMENT AGREEMENT**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors and debtors in possession (collectively, the "LBHI Debtors"), by and through its undersigned counsel, hereby files this limited objection (the "Limited Objection") to the Motion Under 11 U.S.C. §§ 105 And 365 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement, filed on December 5, 2008 (the "Settlement Motion") in the above-captioned liquidation proceeding (the "SIPA Proceeding") commenced under the Securities Investor Protection Act of 1970 (as amended, the "SIPA") with respect to Lehman Brothers Inc. ("LBI," and, together with LBHI and LB 745 LLC, the "Lehman Sellers")), and respectfully states as follows:

I. **PRELIMINARY STATEMENT**

1. Immediately after the commencement of LBHI's chapter 11 case, LBHI and LBI sold their broker-dealer assets at a frenetic pace. The transaction spanned less than a week, with the parties executing the purchase agreement on Tuesday, September 16, 2008 securing Court approval following a sale hearing on Friday, September 19, and finalizing documentation over the weekend (September 20-21) to consummate the transaction before the markets opened on Monday, September 22. Considering the alacrity with which the Court approved the sale, the Committee advised the Court it could not complete sufficient due diligence to make an informed decision whether to support or oppose the sale and therefore neither objected to, nor affirmatively supported the transaction.

2. Post-closing, the Committee continues to be in the dark with respect to critical aspects of the Sale Transaction. As such, the Committee has been unable even to confirm that the Lehman Sellers received the benefits and consideration they purported to receive. Indeed, the mere filing of the Settlement Motion reveals to the Committee that disputes between the parties linger relating to the Sale Transaction, which is understandable given its complexity and urgency.

3. The Settlement Motion seeks approval of a compromise of disputes among LBI, JPMC and Barclays that arose in connection with the closing of the Sale Transaction. According to the Settlement Motion, Barclays never received certain Fed Portfolio Securities and/or cash that LBI directed JPMC to transfer to Barclays. Instead, JPMC retained the cash and securities, applying them against amounts LBI purportedly owed JPMC under clearing agreements. The parties have agreed to resolve their respective disputes, with JPMC finally transferring the remaining portion of the unliquidated securities (and cash, including cash from liquidations) to Barclays.

2

4. At this time, the Committee opposes the settlement because it seeks the Court's imprimatur of Barclays', the SIPA Trustee's and JPMC's depiction of the facts and circumstances surrounding the Sale Transaction without any documentary support. Those purported facts cannot be verified absent the receipt of final reconciliations from the Sale Transaction's principal parties, i.e., LBHI, the SIPA Trustee, the New York Fed, and Barclays, for each step of the transaction. Such information to date has not been provided to the Committee. Moreover, the Settlement Motion's factual predicate is either incomplete or fails to square with certain representations Barclays and LBHI made to the Committee concerning the Sale Transaction prior to, and in connection with, the closing.

5. The Committee needs complete and accurate information to ensure the Sale Transaction was properly consummated in a manner consistent with the description provided to the Court during the Sale Hearing (and consistent with the Sale Order). To date, the Committee has been unable to review all the facts and circumstances surrounding the transaction (even after the urgency has ended) and accordingly is concerned that any factual findings made, or facts proposed, in connection with the Settlement Motion may not give the Court the full picture and may materially prejudice the Committee's rights.

6. To avoid the potential for an ex post facto agreement on the facts by the settlement counterparties, the Committee submits the Settlement Motion should be adjourned until a full and final reconciliation of all aspects and steps of the Sale Transaction are made available to the Committee and filed with the Court (and a meaningful opportunity to review that information has been given). Indeed, the SIPA

3

Trustee does not allege any exigent circumstances requiring expedited approval.[1] Moreover, learning the facts and circumstances of how billions of dollars in securities and cash moved, or was supposed to move as part of a frenzied closing (and whether the final transaction contained the benefits represented to the Court during the Sale Hearing and purportedly reflected in the Sale Order) should not be done piecemeal.[2]

## II.    BACKGROUND

### A.    BARCLAYS ASSUMES NEW YORK FED'S OBLIGATIONS TO FUND LBI IN CONNECTION WITH SALE TRANSACTION

7.    On or about September 15, 2008, the Federal Reserve Bank of New York (the "New York Fed") extended a collateralized line of overnight financing to LBI.[3] On September 16, the New York Fed advised Barclays Capital, Inc. ("Barclays") that "Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction."[4] Barclays thus agreed to assume the New York Fed's

---

[1]    The Settlement Motion was filed nearly 75 days after the Sale Transaction closed. The SIPA Trustee does not allege any exigency, other than the parties self-imposed deadline of December 22, 2008 for Court approval of the Settlement.

[2]    The Committee, as the fiduciary of the LBHI Debtors' estates, has standing to appear and be heard in connection with the Settlement Motion because, among other things, LBHI is a counterparty to the Purchase Agreement and the Sale Transaction at the heart of the settlement, and because LBHI was intimately involved in the events described in the factual predicate of the Settlement Motion. Moreover, LBHI is likely the largest creditor in the SIPA Proceeding and the holder of a residual interest in LBI (if LBI's creditors are paid in full). See, e.g., In re First Interregional Equity Corp., 218 B.R. 731, 739-40 (Bankr. D.N.J. 1997) (finding official committee of unsecured creditors appointed in chapter 11 case of affiliate of broker-dealer had standing to intervene in SIPA proceeding commenced by broker-dealer: "The [committee] certainly is a party in interest in the resolution of the SIPC [proceeding] as [it] seeks to effectuate the greatest payment of customer claims from the [broker-dealer] estate. Additionally, the existing parties do not adequately represent the [affiliate's] Unsecured Creditors' Committee's interests. Finally, intervention … will not cause undue delay or unduly burden the proceedings").

[3]    Declaration Of Shari D. Leventhal In Support Of Trustee's Motion For Entry Of An Order Approving A Settlement Agreement (the "Leventhal Decl.") at ¶ 6.

[4]    Leventhal Decl. at ¶ 7.

4

obligations to fund LBI, which entailed the New York Fed transferring LBI's securities to Barclays in order to collateralize that obligation (hereinafter, the "Fed Portfolio," and the securities in such portfolio, the "Fed Portfolio Securities").[5]

8.  On or about Tuesday, September 16, 2008, the Lehman Sellers executed the Asset Purchase Agreement (the "Purchase Agreement") with Barclays in connection with its acquisition of certain assets used in the Lehman Sellers' U.S. and Canadian investment and capital markets businesses (hereinafter, the "Sale Transaction"). As originally executed, the Purchase Agreement appeared to include the Fed Portfolio Securities in the definition of "Purchased Assets", defining such assets to include "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')."  Barclays also assumed "all short positions and 'repos' relating to any securities or interests of the types included in the definition of 'Long Positions' with a book value as of the date hereof of approximately $69 billion (collectively, 'Short Positions') ..."[6]  Lastly, Purchased Assets included "50% of each position in the residential real estate mortgage securities."[7]

---

[5] See Tr., Hearing Sept. 19, 2008 at 63:18-22 ("[LEHMAN SELLERS] Yesterday … Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral that Lehman posted in connection therewith") (a copy of the relevant portions of which is attached hereto as Exhibit A).

[6] Purchase Agreement at 12 (§ 2.3(i)) ("Assumption of Liabilities") (the relevant portions of which are attached hereto as Exhibit B).

[7] See Purchase Agreement at 6 ("Purchased Assets" definitions "(d)" and "(e)").

5

B. **SALE HEARING**

9. The hearing to consider approval of the transaction (the "Sale Hearing") commenced on Friday evening, September 19, 2008. At the Sale Hearing, the Lehman Sellers advised the Court of certain changes to the Sale Transactions' terms since executing the Purchase Agreement on September 16 purportedly resulting from dramatic changes in the value of the Fed Portfolio Securities being transferred to Barclays (now $47.4 billion) and liabilities being assumed by Barclays (now $45.5 billion).[8]

10. The Lehman Sellers also advised the Court that the modified transaction now included, as a result of an agreement reached with the Depository Trust Corporation (the "DTC"), the transfer to Barclays of 100% -- not 50% as previously agreed -- of all residential real estate mortgage securities (purportedly valued then at approximately $6 billion). While the securities provided collateral for the DTC to settle trades, the expectation was that as much as $3 billion might be returned to LBI.[9] The

---

[8] See Tr., Hearing, Sept. 19, 2008 at 46:21-47:7 ("In terms of the economic changes, they result largely because of the markets, unfortunately. And from the time that the transaction was actually entered into till now, the markets dropped and the value of the securities dropped as well. So, originally, we were selling assets that had a value of seventy -- approximately seventy billion dollars. And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets").

[9] See id. at 52:8-53:8 ("[DTC:] Originally, the idea for the original transaction was to split those [residential mortgages] fifty/fifty between Barclays and the estate. But in order to facilitate the settlement of these accounts, the additional fifty percent was needed so that the DTC would not be at risk for the settlement …. Now the arrangement is that the whole six billion dollars of residential mortgages will be there and subject to settlement. But the anticipation is that once all these claims settle, the trades that are from Wednesday through Monday settle, there will not be a need for all of that collateral. So what the amendment to the APA says is that the fifty percent will be returned, as long as it's there. If something really terrible happens in the world and the settlements don't work and we have to use that collateral, then there will be nothing to return. But the anticipation is that if the world remains somewhat stable that the fifty percent transferred to Barclays will be transferred back to Lehman. That is the expectation").

6

parties memorialized their agreement regarding the residential mortgages in an amendment to the Purchase Agreement.[10]

11. As noted above, the Committee neither objected to, nor affirmatively supported the Sale Transaction. Given the speed with which it was consummated, the Committee advised the Court it simply lacked sufficient time to conduct the appropriate due diligence needed in order to arrive at an informed position.[11] The Court approved the Sale Transaction in the early-morning hours of September 20.

### C. WEEKEND CLOSING (SEPTEMBER 20, 21)

12. During the weekend following the Sale Hearing, the parties expended considerable efforts to finalize the Sale Transaction with the goal of closing before the markets opened on the following Monday (September 22). In connection with the closing -- after entry of the Sale Order, but before consummation of the Sale Transaction -- Barclays and the Lehman Sellers advised the Committee of certain changes to the Sale Transaction, including:

---

[10] A copy of the First Amendment To Asset Purchase Agreement (the "First Amendment") appears attached hereto as Exhibit C. The First Amendment indicated that $250 million of collateral would be posted and that this $250 million and the value of the 50% of the residential real estate mortgage securities would be returned to the Lehman Sellers in the event that such amounts exceeded the obligations owing to the DTC and guaranteed by Barclays. See ¶ 4.

[11] See Tr., Hearing, Sept. 19, 2008 at 67:9-24 ("[COMMITTEE]: The headline is we are not objecting, Your Honor …. And the reason we are not objecting is really based on the lack of a viable alternative …. We're not affirmatively supporting the transaction [either], Your Honor, because there has been insufficient time for us to really do all the due diligence that we feel should be done to take that next step of saying yes, this is the best deal and we're supportive actively …. [W]e have not had time to test the assumptions and to do all the due diligence we would normally do").

7

- the pre-mark value of the Fed Portfolio Securities was $49.9 billion[12] (though neither the date nor the method of that mark was clear) -- but that value had (based on an updated mark-to-market) declined to between $44 billion and $45 billion;

- to compensate for that decline, LBI would transfer $1.9 billion of additional securities that had not previously been pledged as collateral for the New York Fed/Barclays loan to LBI or that had otherwise not previously been contemplated to be transferred to Barclays;

- the liabilities owing to the New York Fed being assumed by Barclays totaled $45.5 billion;

- Barclays was assuming an additional $4.25 billion in liabilities, representing some unknown combination of additional advances and/or assumed liabilities; and

- a total of $8.55 billion of the Fed Portfolio Securities had not been transferred to Barclays. As a result, LBI was transferring $7.4 billion in cash to Barclays (though neither the date nor the method of the $8.55 billion mark was clear).[13]

D. **SIPA TRUSTEE'S SETTLEMENT MOTION**

13. According to the Settlement Motion, neither the entire Fed Portfolio nor LBI's cash found its way to Barclays -- even though LBI had directed JPMC to deliver both. The Settlement Motion seeks approval of a resolution of disputes among JPMC and Barclays relating to the attempted (but interrupted) transfers and reveals the following additional facts concerning the events taking place on September 18 and in the early morning hours of September 19:

---

[12] At the Sale Hearing, the Lehman Sellers indicated the value of the Fed Portfolio Securities was $47.4 billion. See Tr., Hearing, September 19, 2008 at 46:21-47:7.

[13] See Declaration Of Saul Burian In Support Of Limited Objection Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., Et Al. To SIPA Trustee's Motion Under 11 U.S.C. §§ 105 And 363 And Fed. R. Bankr. P. 9019(a) For Entry Of An Order Approving Settlement Agreement (the "Burian Decl.") at 3 (¶ 10), a copy of which is attached hereto as Exhibit D.

8

- the New York Fed, (a) unwound and terminated its LBI positions (i.e., $46.22 billion of liabilities against $50.62 billion in collateral as of September 17, 2008), (b) "was paid in cash … [and (c) returned to LBI] the securities that [it] … had overnight on September 17th … through its [LBI's] account at [JPMorgan Chase Bank, N.A. ("JPMC")]";[14]

- on September 18, the parties commenced the "Replacement Transaction," pursuant to which Barclays' stepped into the shoes of the New York Fed: Barclays transferred $45.0 billion of cash to LBI (specifically to a JPMC account) to fund LBI overnight and, pursuant to a repurchase agreement between LBI and Barclays, LBI was required to provide Barclays with $49.7 billion worth of the Fed Portfolio Securities as collateral for the $45.0 billion of cash it funded;[15]

- earlier in the day on September 18, the Fed Portfolio Securities were transferred back from the New York Fed to LBI and placed in LBI's JPMC account. At LBI's direction, JPMC began transferring them to Barclays. JPMC began the transfer, but that process was interrupted at approximately 11:00 p.m. on September 18 when Fedwire and the DTC closed;[16]

- at the time the DTC closed, only $42.7 billion worth of Fed Portfolio Securities had been transferred to Barclays from LBI's JPMC accounts;

- in the hours shortly after midnight on Friday, September 19, Barclays and LBI agreed that LBI would direct JPMC to transfer $7 billion in cash to Barclays at an account at JPMC -- but "[t]he expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds [$7 billion] to LBI;"[17]

- JPMC never transferred the $7 billion in cash to Barclays (a fact about which Barclays did not become aware until September 23, 2008) -- and instead applied the $7 billion against funds it alleged LBI owed it under LBI's clearing agreement with JPMC;[18] and

---

[14]  Leventhal Decl. at ¶¶ 8-10. See also Declaration Of Gerard Larocca In Support Of The Trustee's Motion For Entry Of An Order Approving A Settlement Agreement ("Larocca Decl.") at ¶ 5.

[15]  Leventhal Decl. at ¶¶ 11-12; Larocca Decl. at ¶ 6.

[16]  Leventhal Decl. at ¶ 16.

[17]  Leventhal Decl. at ¶ 17.

[18]  Larocca Decl. at ¶¶ 11-13; Settlement Agreement at ¶ D, ¶ 2.

9

- JPMC never transferred the remaining Fed Portfolio Securities, and indeed in the weeks thereafter liquidated some of those securities -- taking the position they were deposited in LBI's account against which JPMC asserts a lien.[19]

14. Pursuant to the Settlement Agreement, LBI, Barclays and JPMC seek to settle their disputes with respect to JPMC's interference with the transfers of the Fed Portfolio Securities and the $7 billion in cash to Barclays (the "Subject Funds").[20] JPMC will transfer to Barclays the remainder of the Fed Portfolio Securities that JPMC had retained but not yet liquidated. In addition, JPMC will pay to Barclays (a) $1.25 billion in cash, purportedly representing the decline in value of the Fed Portfolio Securities since September 19, (b) $14,942,677.88 in respect of principal, interest payments and any other distributions on the Fed Portfolio Securities received by LBI and/or JPMC, and (c) $7,103,500, purportedly representing the proceeds of certain Fed Portfolio Securities that JPMC liquidated. The parties have also executed mutual releases relating to JPMC's application of the $7 billion against advances owing under LBI's clearing agreement, the Replacement Transaction and the Fed Portfolio Securities.

### III. LIMITED OBJECTION

15. The speed with which the Sale Transaction closed prevented the Committee from completing the appropriate diligence, and its review continues to suffer from insufficient access to information. The continuously changing nature of the assets being transferred to, and the liabilities being assumed by Barclays has further complicated and delayed the Committee's ability to conduct a thorough review. Until complete, the rights, claims and defenses of the LBHI Debtors and the Committee in any way relating to this transaction cannot be abridged.

---

[19] Leventhal Decl. at ¶¶ 22-23.

[20] At the Sale Hearing, the Lehman Sellers indicated the transaction did not involve the transfer of any cash. See Tr., Hearing, September 19, 2008 at 53:24-25 ("There is no cash being transferred to Barclays").

10

16.     Moreover, the Court should resist the invitation to accept piecemeal versions of the facts of that frenzied weekend in September. While the Settlement Agreement appears to exclude LBHI, that exclusion provides little comfort because of the potential collateral effect of the Court approving the settlement. The Settlement Motion's factual predicate discusses the transaction and includes statements concerning the alleged value of securities LBI transferred to Barclays and the alleged liabilities Barclays assumed. But the Settlement Motion recounts those facts from the SIPA Trustee's, Barclay's, and JPMC's perspective and is, in certain instances, incomplete in its descriptions. Approval of the Settlement Motion is tantamount to approval of their version of events, yet none of the facts and circumstances on which it rests is capable of review or audit by the Court or parties that may be bound by these factual findings.

17.     As the Court-appointed fiduciary of the LBHI Debtors, it is incumbent on the Committee to thoroughly review the Sale Transaction and all supporting documentation to ensure that it was consummated in the manner represented to the Court and the Committee, that the Lehman Sellers received all the benefits they were promised and that representations concerning value degradation were based on actual facts and not speculation. Thus, approval of the Settlement Motion and any factual findings concerning the Replacement Transaction, the Subject Funds, the Fed Portfolio Securities, the Purchase Agreement and the Sale Transaction should await production of reconciliation data (and its filing with the Court), including, among other things, (a) reconciliations of each step of the transaction (including specific and detailed information relating to the changes made to the transaction between September 19 and the closing on September 22) and (b) supporting schedules of assets transferred (including securities transferred, their mark-to-market values at different dates and information on marking methods) and liabilities assumed.

11

18. The Committee's need for such information is highlighted by certain discrepancies (and the need for additional information) between the terms of the Sale Transaction as the Lehman Sellers and Barclays represented to them to the Committee and the recitation of those terms in the Settlement Motion and its supporting declarations. In support of the Limited Objection, the Committee has submitted its own declaration, the purpose of which is neither to question the veracity of the SIPA Trustee's declarants nor to request that the Court make a different set of factual findings concerning the transaction. Instead, the declaration serves to highlight the existence of different understandings concerning the final terms of the Sale Transaction (identified below) and to stress the need for additional information:[21]

| ISSUE | FACTUAL DEPICTION IN SETTLEMENT MOTION | FACTS RECOUNTED TO COMMITTEE | RELIEF REQUESTED |
|---|---|---|---|
| VALUE OF SECURITIES TRANSFERRED | Fed Portfolio Securities totaling $49.7 billion were to be transferred to Barclays as collateral for funding LBI | The pre-mark valuation was $49.9 billion; the September 21 valuation had declined to between $44 and $45 billion; LBI would transfer an additional $1.9 billion of securities that previously had not been pledged[22] | Schedules of securities, marks (at various dates and steps in the transaction), and methods of marking; explanation of $200mm difference between $49.7 billion and $49.9 billion figures; explanation of change from $47.4 billion (Sale Hearing) to $49.9 billion); identification and amount of additional securities (e.g., $1.9 billion and others) added to reach $49.9/$49.7 billion -- indeed, additional $1.9 billion only brings total to $46.9 billion (based on updated mark of $45 billion) |

---

[21] On reason for the discrepancies among these figures may be that the Settlement Motion reports face values (versus book values) in certain instances.

[22] Compare Leventhal Aff. ¶¶ 12-13, with, Burian Aff. ¶ 10.

12

| ISSUE | FACTUAL DEPICTION IN SETTLEMENT MOTION | FACTS RECOUNTED TO COMMITTEE | RELIEF REQUESTED |
|---|---|---|---|
| **VALUE OF ASSUMED LIABILITIES** | Barclays assumed New York Fed liabilities totaling $45.0 billion | Barclays assumed New York Fed liabilities totaling $45.5 billion and an additional $4.25 of liabilities representing an unknown combination of additional advances and/or assumed liabilities[23] | Final reconciliation of liabilities assumed; explanation for reduction in assumed liabilities of New York Fed by $500mm (i.e., $45.5 billion versus $45.0 billion) and additional liabilities assumed ($4.25 billion) |
| **"INTERRUPTED DELIVERY" OF FED PORTFOLIO SECURITIES** | DTC closed before $7.0 billion in Fed Portfolio Securities was transferred to Barclays | DTC closed before $8.55 billion in Fed Portfolio Securities was transferred to Barclays[24] | Explanation of $1.55 billion discrepancy; dates and methods of marks |
| **"DIVERTED" CASH** | JPMC diverted $7 billion in LBI cash intended for Barclays | JPMC diverted $7.4 billion in LBI cash intended for Barclays[25] | Explanation of $400mm discrepancy |
| **RESIDENTIAL REAL ESTATE MORTGAGE SECURITIES** | At the Sale Hearing, the Debtors and the DTC advised that $6 billion in residential real estate mortgage securities would be transferred to Barclays -- but that $3 billion of those securities might be returned to LBI | Disposition of residential real estate mortgage securities is unclear; also unclear whether any such securities were liquidated by JPMC, transferred to Barclays, or are now included in the securities being transferred as part of the Settlement Agreement[26] | Final reconciliation showing which (and what amount of) residential real estate mortgage securities were/are held as collateral for the DTC, what the obligations owing from LBI to DTC (if any) actually were, and whether such securities have been, or should have been returned to LBI |

---

[23] Compare Leventhal Aff. ¶¶ 7, 9, 11-12 and Larocca Decl. ¶¶ 4-6, with, Burian Aff. ¶ 10.

[24] Compare Leventhal Aff. ¶¶ 14, 17, with, Burian Aff. ¶ 10.

[25] Compare Leventhal Aff. ¶ 15 and Larocca Decl. ¶ 7, with, Burian Aff. ¶ 10.

[26] Compare Tr., Hearing, Sept. 19, 2008 at 52:8-53:8, with, Burian Aff. ¶ 10.

13

19. The Sale Hearing took place through the night of September 19, into the early hours of September 20. Juxtaposed against that backdrop are the transactions involving the Fed Portfolio Securities and the Subject Funds. These events unfolded at a frantic and unprecedented pace for a transaction of this size and complexity. But now, any emergencies that allegedly required expedition have passed, inviting a deliberate and necessary review. Adjournment will not prejudice any party because no exigency in approving the Settlement Motion is alleged -- nor can there be when this dispute has been outstanding for almost three months. Accordingly, denial of the Settlement Motion pending the Committee's (a) receipt of final reconciliation data for various transaction steps and (b) meaningful review of all aspects of the transaction is warranted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

WHEREFORE, the Committee respectfully requests that the Court enter an order denying the Settlement Motion consistent with the relief requested in the Limited Objection and granting such other and further relief that the Court deems appropriate.

Dated: December 19, 2008
       New York, New York

**QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**

By: /s/ James C. Tecce
    Susheel Kirpalani
    James C. Tecce
    Eric M. Kay

51 Madison Avenue
New York, New York 10010
Telephone No.: (212) 849-7000
Facsimile No.: (212) 849-7100

*Special Counsel to Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., et al.*

15