Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              February 22, 2012

19              10:02 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    MOTION Pursuant to Section 8.4 of the Modified Third Amended

3    Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

4    Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of

5    the Bankruptcy Code to Estimate the Amount of Claims filed by

6    Indenture Trustee on Behalf of Issuers of Residential Mortgage-

7    Backed Securities for Purposes of Establishing Reserves [ECF

8    No. 24254]

9

10   MOTION of Lehman Brothers Holdings Inc. for Authority to Use

11   Non-Cash Assets in Lieu of Available Cash as Reserves for

12   Disputed Claims Pursuant to Section 8.4 of the Debtors'

13   Confirmed Chapter 11 Plan [ECF No. 24726]

14

15   DEBTORS' Two Hundred Twenty-First Omnibus Objection to Claims

16   (Duplicative of Indenture Trustee Claims) [ECF No. 20860]

17

18   MOTION of Jeremy R. Kramer for Reconsideration of the

19   Reclassifications of His Compensation Claim as an Equity

20   Interest [ECF No. 25307]

21

22   MOTION of Caisse Des Depots Et Consignations to Permit a Late-

23   Filed Claim Against Lehman Brothers Special Financing Inc. [ECF

24   No. 18039]

25

Page 3

1

2    SYMPHONY ASSET MANAGEMENT LLC's Motions to Deem Proof of Claim

3    Timely Filed {ECF Nos. 12074, 12075, 12076 and 12078] (This

4    matter has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Twenty-Eighth Omnibus Objection to Claims (Valued

7    Derivative Claims) [ECF No. 9983] (This matter has been

8    adjourned to March 22, 2012 at 10:00 a.m.)

9

10   DEBTORS' Thirty-Fourth Omnibus Objection to Claims

11   (Misclassified Claims) [ECF No, 10286] (This matter has been

12   adjourned to April 26, 2012 at 10:00 a.m.)

13

14   DEBTORS' Thirty-Fifth Omnibus Objection to Claims (Valued

15   Derivative Claims) [ECF No. 11260] (This matter has been

16   adjourned to March 22, 2012 at 10:00 a.m.)

17

18   DEBTORS' Fortieth Omnibus Objection to Claims (Late-Filed

19   Claims) [ECF No. 11305] (The hearing on the claims listed on

20   Exhibit 1 has been adjourned to March 22, 2012 at 10:00 a.m.)

21

22   DEBTORS' Forty-First Omnibus Objection to Claims (Late-Filed

23   Claims) [ECF No. 11306] (The hearing on the claims listed on

24   Exhibit 2 is adjourned to March 22, 2012 at 10:00 a.m.)

25

Page 4

1

2    DEBTORS' Forty-Second Omnibus Objection to Claims (Late-Filed

3    Lehman Programs Securities Claims) [ECF No. 11307] (The hearing

4    on the claims listed on Exhibit 3 is adjourned to March 22,

5    2012 at 10:00 a.m.)

6

7    DEBTORS' Forty-Third Omnibus Objection to Claims (Late-Filed

8    Lehman Programs Securities Claims) [ECF No. 11308] (The hearing

9    on the claims listed on Exhibit 4 has been adjourned to March

10   22, 2012 at 10:00 a.m.)

11

12   DEBTORS' Sixty-Third Omnibus Objection to Claims (Valued

13   Derivative Claims) [ECF No. 11978] (This matter has been

14   adjourned to March 22, 2012 at 10:00 a.m.)

15

16   MOTION of John Dmuchowski to Permit Filing of Claims as of

17   September 23, 2009 [ECF No. 12006] (This matter has been

18   adjourned to March 22, 2012 at 10:00 a.m.)

19

20   CATHAY UNITED BANK'S Response in Opposition to Debtors'

21   Fortieth Omnibus Objection to Claims (Late-Filed Claims) as to

22   Claim No. 35181 and Motion to Have Claim No. 35181 Deemed

23   Timely Filed [ECF No. 12037] (This matter is adjourned.)

24

25

Page 5

1

2     MOTION of Pearl Assurance Limited to Deem Proofs of Claim to Be

3     Timely Filed [ECF No. 12072] (This matter is adjourned.)

4

5     DEBTORS' Seventy-First Omnibus Objection to Claims (Valued

6     Derivative Claims) [ECF No. 13230] (This matter has been

7     adjourned to March 22, 2012 at 10:00 a.m.)

8

9     DEBTORS' Eighty-Fourth Omnibus Objection to Claims (Valued

10    Derivative Claims) [ECF No. 13955] (This matter has been

11    adjourned to March 22, 2012 at 10:00 a.m.)

12

13    DEBTORS' Eighty-Sixth Omnibus Objection to Claims (No Liability

14    Claims) [ECF No. 14440] (The hearing on the claims listed on

15    Exhibit 5 is adjourned to May 31, 2012 at 10:00 a.m.)

16

17    DEBTORS' Eighty-Seventh Omnibus Objection to Claims (No

18    Liability Claims) [ECF No. 14442] (The hearing on the claims

19    listed on Exhibit 6 is adjourned to May 31, 2012 at 10:00 a.m.)

20

21    DEBTORS' Eighty-Eighth Omnibus Objection to Claims (No

22    Liability Claims) [ECF No. 14450] (The hearing on the claims

23    listed on Exhibit 7 is adjourned to May 31, 2012 at 10:00 a.m.)

24

25

Page 6

1

2    DEBTORS' Eighty-Ninth Omnibus Objection to Claims (No Liability

3    Claims) [ECF No. 14452] (The hearing on the claims listed on

4    Exhibit 8 is adjourned to May 31, 2012 at 10:00 a.m.)

5

6    DEBTORS' Ninetieth Omnibus Objection to Claims (No Liability

7    Claims) [ECF No. 14453] (The hearing on the claims listed on

8    Exhibit 9 is adjourned to May 31, 2012 at 10:00 a.m.)

9

10   DEBTORS' Ninety-Second Omnibus Objection to Claims (No Blocking

11   Number LPS Claims) [ECF No. 14472] (The hearing on the

12   Objection as to claims listed on Exhibit 10 is adjourned to

13   March 22, 2012 at 10:00 a.m.)

14

15   DEBTORS' Ninety-Fifth Omnibus Objection to Claims (Valued

16   Derivative Claims) [ECF No. 14490] (This matter has been

17   adjourned to March 22, 2012 at 10:00 a.m.)

18

19   DEBTORS' Ninety-Sixth Omnibus Objection to Claims (Duplicative

20   LPS Claims) [ECF No. 14491] (This matter has been adjourned to

21   March 22, 2012 at 10:00 a.m. as to the claim on Exhibit 11

22   attached hereto.)

23

24

25

Page 7

1

2    DEBTORS' Ninety-Seventh Omnibus Objection to Claims

3    (Insufficient Documentation) [ECF No. 14492] (The hearing on

4    the objection to the claims identified on Exhibit 12 has been

5    adjourned to March 22, 2012 at 10:00 a.m.)

6

7    DEBTORS' One Hundred Third Omnibus Objection to Claims (Valued

8    Derivative Claims) [ECF No. 15003] (This matter has been

9    adjourned to March 22, 2012 at 10:00 a.m.)

10

11   DEBTORS' One Hundred Tenth Omnibus Objection to Claims (Pension

12   Claims) [ECF No. 15010] (The Debtors have withdrawn without

13   prejudice their objections as to claim number 5343 Of Edward

14   Lill and claim number 9581 of Richard Locke [ECF No. 25328}.

15   The hearing on the objection to the claims identified on

16   Exhibit 13 has been adjourned to March 22, 2012 at 10:00 a.m.)

17

18   DEBTORS' One Hundred Eleventh Omnibus Objection to Claims (No

19   Liability Claims) [ECF No. 14491] (This matter is not going

20   forward.  The hearing on the objection to the claims identified

21   on Exhibit 14 has been adjourned to March 22, 2012 at 10:00

22   a.m.)

23

24

25

Page 8

1

2    DEBTORS' One Hundred Twelfth Omnibus Objection to Claims

3    (Invalid Blocking Number LPS Claims) [ECF No. 15014] (This

4    matter has been adjourned to March 22, 2012 at 10:00 a.m. as to

5    the claims on Exhibit 15 attached hereto.)

6

7    DEBTORS' One Hundred Seventeenth Omnibus Objection to Claims

8    (No Liability Non-Debtor Employee Claims) [ECF No. 15363] (This

9    matter has been adjourned to March 22, 2012 at 10:00 a.m. as to

10   the claims on Exhibit 16 attached hereto.)

11

12   DEBTORS' One Hundred Twentieth Omnibus Objection to Claims (No

13   Blocking Number LPS Claims) [ECF No. 16074] (The hearing on the

14   Objection as to the Unresolved Response is adjourned to March

15   22, 2012 at 10:00 a.m.)

16

17   DEBTORS' One Hundred Twenty-First Omnibus Objection to Claims

18   (To Reclassify Proofs of Claim as an Equity Interest) [ECF No.

19   16075] (The hearing on the objection to the claims identified

20   on Exhibit 17 has been adjourned to March 22, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 9

1

2    DEBTORS' One Hundred Twenty-Second Omnibus Objection to Claims

3    (No Liability Claims) [ECF No. 16046] (The hearing on the

4    claims listed on Exhibit 18 is adjourned to April 26, 2012 at

5    10:00 a.m.)

6

7    DEBTORS' One Hundred Twenty-Fifth Omnibus Objection to Claims

8    (Insufficient Documentation) [ECF No. 16079] (This matter has

9    been adjourned to March 22, 2012 at 10:00 a.m.)

10

11   DEBTORS' One Hundred Twenty-Ninth Omnibus Objection to Claims

12   (No Liability Derivatives Claims) [ECF No. 16114] (This matter

13   has been adjourned to March 22, 2012 at 10:00 a.m.)

14

15   DEBTORS' One Hundred Thirty-Second Omnibus Objection to Claims

16   (Valued Derivatives Claims) [ECF No. 16117] (This matter has

17   been adjourned to March 22, 2012 at 10:00 a.m.)

18

19   DEBTORS' One Hundred Thirty-Sixth Omnibus Objection to Claims

20   (Misclassified Claims) [ECF No. 16867] (The hearing on the

21   objection to the claims identified on Exhibit 19 has been

22   adjourned to March 22, 2012 at 10:00 a.m.)

23

24

25

Page 10

1

2    DEBTORS' One Hundred Thirty-Eighth Omnibus Objection to Claims

3    (No Liability Derivatives Claims) [ECF No. 16865] (This matter

4    has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' One Hundred Fortieth Omnibus Objection to Claims

7    (Duplicative of Indenture Trustee Claims) [ECF No. 16853] (The

8    hearing on the claims of Banque Safdie (Claim No. 33557) and

9    Glitnir Banki hf (Claim No. 27419) is adjourned to March 22,

10   2012 at 10:00 a.m.)

11

12   DEBTORS' One Hundred Forty-Third Omnibus Objection to Claims

13   (Late-Filed Claims) [ECF No. 16856] (The hearing on the

14   Objection to the claims listed on Exhibit 20 is adjourned to

15   March 22, 2012 at 10:00 a.m.)

16

17   DEBTORS' One Hundred Fifty-First Omnibus Objection to Claims

18   (No Liability Claims) [ECF No. 17478] (The hearing on the

19   claims listed on Exhibit 21 is adjourned to April 26, 2012 at

20   10:00 a.m.)

21

22   DEBTORS' One Hundred Fifty-Fifth Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 17468] (This matter has

24   been adjourned to March 22, 2012 at 10:00 a.m.)

25

Page 11

1

2    DEBTORS' One Hundred Fifty-Sixth Omnibus Objection to Claims

3    (No Liability Derivatives Claims) [ECF No. 17469] (This matter

4    has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Objection to Proofs of Claim Filed by 2138747 Ontario

7    Ltd. and 6785778 Canada Inc. (Claim Nos. 33583 and 33586) [ECF

8    No. 18397] (The hearing on the Objection has been adjourned to

9    March 22, 2012 at 10:00 a.m.)

10

11   DEBTORS' One Hundred Fifty-Eighth Omnibus Objection to Claims

12   (Late-Filed Claims) [ECF No. 18399] (The hearing on the

13   Objection as to the claims of Deborah Focht (Claim Nos. 34381,

14   42915, 42916) has been adjourned to March 22, 2012 at 10:00

15   a.m.)

16

17   DEBTORS' One Hundred Fifty-Ninth Omnibus Objection to Claims

18   (Invalid Blocking Number LPS Claims) [ECF No. 18407] (The

19   hearing on the Objection as to the claim of Corner Banca SA

20   (Claim No. 45218) has been adjourned to March 22, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 12

1

2  DEBTORS' One Hundred Sixtieth Omnibus Objection to Claims

3  (Settled Derivatives Claims) [ECF No. 18444] (The hearing on

4  the Objection as to the claims of HBK Master Fund L.P. (Claim

5  Nos. 19275 and 19276) has been adjourned to March 22, 2012 at

6  10:00 a.m.)

7

8  DEBTORS' One Hundred Sixty-Second Omnibus Objection to Claims

9  (Valued Derivatives Claims) [ECF No. 18405] (This matter has

10  been adjourned to March 22, 2012 at 10:00 a.m.)

11

12  DEBTORS' One Hundred Sixty-Third Omnibus Objection to Claims

13  (No Liability Derivatives Claims) [ECF No. 18409] (This matter

14  has been adjourned to March 22, 2012 at 10:00 a.m.)

15

16  DEBTORS' One Hundred Seventy-Third Omnibus Objection to Claims

17  (No Liability Employee Claims) [ECF No. 19399] (The hearing on

18  the objection to claims identified on Exhibit 22 has been

19  adjourned to March 22, 2012 at 10:00 a.m.)

20

21  DEBTORS' One Hundred Seventy-Fourth Omnibus Objection to Claims

22  (To Reclassify Proofs of Claim as Equity Interests) [ECF No.

23  19390] (The hearing on the objection to the claims identified

24  on Exhibit 23 has been adjourned to March 22, 2012 at 10:00

25  a.m.)

Page 13

1

2    DEBTORS' One Hundred Seventy-Fifth Omnibus Objection to Claims

3    (No Liability Pension Claims) [ECF No. 19391] (The hearing on

4    the objection to the claims identified on Exhibit 24 has been

5    adjourned to March 22, 2012 at 10:00 a.m.)

6

7    DEBTORS' One Hundred Seventy-Seventh Omnibus Objection to

8    Claims (No Liability Non-Debtor Employee Claims) [ECF No.

9    19393] (The hearing on the objection to the claims identified

10   on Exhibit 25 has been adjourned to March 22, 2012 at 10:00

11   a.m.)

12

13   DEBTORS' One Hundred Seventy-Eighth Omnibus Objection to Claims

14   (Misclassified Claims) [ECF No. 19377] (The hearing on the

15   objection to the claims identified on Exhibit 26 has been

16   adjourned to March 22, 2012 at 10:00 a.m.)

17

18   DEBTORS' One Hundred Seventy-Ninth Omnibus Objection to Claims

19   (No Liability Derivatives Claims) [ECF No. 19378] (This matter

20   has been adjourned to March 22, 2012 at 10:00 a.m.)

21

22   DEBTORS' One Hundred Eighty-Second Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 19398] (This matter has

24   been adjourned to March 22, 2012 at 10:00 a.m.)

25

Page 14

1

2    DEBTORS' One Hundred Eighty-Third Omnibus Objection to Claims

3    (No Liability CMBS Claims) [ECF No. 19407] (This matter has

4    been adjourned to June 28, 2012 at 10:00 a.m.)

5

6    DEBTORS' One Hundred Eighty-Fifth Omnibus Objection to Claims

7    (Compound Claims) [ECF No. 19714] (The Debtors have withdrawn

8    without prejudice their objections as to claim number 94952

9    (Anthony Nahum) [ECF No. 25244].  The hearing on the objection

10   to the claims identified on Exhibit 27 has been adjourned to

11   March 22, 2012 at 10:00 a.m.)

12

13   DEBTORS' One Hundred and Eighty-Sixth Omnibus Objection to

14   Claims (Misclassified Claims) [ECF No. 19816] (The hearing on

15   the objection has been adjourned to June 28, 2012 at 10:00

16   a.m.)

17

18   DEBTORS' One Hundred and Eighty-Seventh Omnibus Objection to

19   Claims (Misclassified Claims) [ECF No. 19817] (The hearing on

20   the objection has been adjourned to June 28, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 15

1

2      DEBTORS' One Hundred and Eighty-Eighth Omnibus Objection to

3      Claims (Duplicative LPS Claims) [Docket No. 19871] (This matter

4      has been adjourned to March 22, 2012 at 10:00 a.m. as to the

5      claims on Exhibit 28 attached hereto.)

6

7      DEBTORS' One Hundred and Eighty-Ninth Omnibus Objection to

8      Claims (No Liability Repo Claims) [ECF No. 19870] (The hearing

9      on the Unresolved Responses has been adjourned to March 22,

10     2012 at 10:00 a.m.)

11

12     DEBTORS' One Hundred Ninetieth Omnibus Objection to Claims (No

13     Liability Security Claims) [ECF No. 19873] (The hearing on the

14     Unresolved Response has been adjourned to March 22, 2012 at

15     10:00 a.m.)

16

17     DEBTORS' One Hundred and Ninety-First Omnibus Objection to

18     Claims (Valued Derivatives Claims) [ECF No. 19888] (This matter

19     has been adjourned to March 22, 2012 at 10:00 a.m.)

20

21     DEBTORS' One Hundred Ninety-Second Omnibus Objection to Claims

22     (Partially Settled Guarantee Claims) [ECF No. 19875] (The

23     hearing on the Objection as to the claim of Red River HYPI,

24     L.P. and JP Morgan Chase Bank, N.A. (Claim No. 22276) is

25     adjourned to April 26, 2012 at 10:00 a.m.)

Page 16

1

2     DEBTORS' One Hundred and Ninety-Eighth Omnibus Objection to

3     Claims (Late-Filed Claims) [ECF No. 19902] (The hearing on the

4     Objection as to the Unresolved Responses is adjourned to March

5     22, 2012 at 10:00 a.m.)

6

7     DEBTORS' One Hundred and Ninety-Ninth Omnibus Objection to

8     Claims (No Liability Claims) [ECF No. 19903] (The hearing on

9     the Unresolved Responses is adjourned to April 26, 2012 at

10    10:00 a.m.)

11

12    DEBTORS' Two Hundredth Omnibus Objection to Claims (No

13    Liability Claims) [ECF No. 19921] (The hearing on the

14    Unresolved Responses and the claim of Paul, Weiss, Rifkind,

15    Wharton & Garrison, LLP (Claim No. 14176) is adjourned to March

16    22, 2012 at 10:00 a.m.)

17

18    DEBTORS' Objection to Proof of Claim No. 66099 Filed by Syncora

19    Guarantee, Inc. [ECF No. 20087] (The hearing on the objection

20    to the claim identified above has been adjourned to March 22,

21    2012 at 10:00 a.m.)

22

23    DEBTORS' Objection to Proof of Claim Number 29702 [ECF No.

24    20100] (The hearing has been adjourned to March 22, 2012 at

25    10:00 a.m.)

Page 17

1

2    DEBTORS' Two Hundred Nineteenth Omnibus Objection to Claims

3    (Valued Derivatives Claims) [ECF No. 20787] (This matter has

4    been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Objection to Claim Nos. 22886, 23011, 23024

7    (Duplicative of Indenture Trustee Claims) [ECF No. 20836] (This

8    matter has been adjourned to March 22, 2012 at 10:00 a.m.)

9

10   DEBTORS' Two Hundred Twenty-Fourth Omnibus Objection to Claims

11   (Late-Filed Claims) [ECF No. 20864] (This matter has been

12   adjourned to March 22, 2012.)

13

14   DEBTORS' Two Hundred Twenty-Eighth Omnibus Objection to Claims

15   (No Liability Derivatives Claims) [ECF No. 20886] (This matter

16   has been adjourned to March 22, 2012 at 10 a.m.)

17

18   DEBTORS' Two Hundred Thirty-Second Omnibus Objection to Claims

19   (Valued Derivatives Claims) [ECF No. 21727] (This matter has

20   been adjourned to March 22, 2012 at 10 a.m.)

21

22   DEBTORS' Two Hundred Thirty-Third Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 21727] (This matter has

24   been adjourned to March 22, 2012 at 10 a.m.)

25

Page 18

1

2    DEBTORS' Two Hundred Forty-Seventh Omnibus Objection to Claims

3    (No Liability Claims) [ECF No. 21727] (The hearing on the

4    objection to the claims identified on Exhibit 29 has been

5    adjourned to March 22, 2012 at 10 a.m.)

6

7    DEBTORS' Two Hundred Thirty-Eighth Omnibus Objection to Claims

8    (Late-Filed Claims) [ECF No. 23242] (The hearing on the

9    Objection as to the Unresolved Response is adjourned to March

10   22, 2012 at 10 a.m.)

11

12   DEBTORS' Two Hundred Forty-First Omnibus Objection to Claims

13   (No Liability Claims) [ECF No. 23247] (The hearing on the

14   Objection as to the claims listed on Exhibit 30 has been

15   adjourned to March 26 (sic), 2012 at 10 a.m.)

16

17   DEBTORS' Two Hundred Forty-Sixth Omnibus Objection to Claims

18   (Valued Derivatives Claims) [ECF No. 23253] (This matter has

19   been adjourned to March 22, 2012 at 10 a.m.)

20

21   DEBTORS' Two Hundred Forty-Fifth Omnibus Objection to Claims

22   (No Liability Claims) [ECF No. 23251] (This matter has been

23   adjourned to March 22, 2012 at 10 a.m.)

24

25

Page 19

1

2    DEBTORS' Objection to the Claim of American Investors Life

3    Insurance Co., Inc. (Claim No. 65963) [ECF No. 24110] (The

4    hearing on the Objection has been adjourned to March 22, 2012

5    at 10 a.m.)

6

7    OMNIBUS Application of (I) Individual Members of Official

8    Committee of Unsecured Creditors and (II) Indenture Trustees

9    Pursuant to Section 1129(a)(4), or, Alternatively, Sections

10   503(b)(3) and 503(b)(4) of the Bankruptcy Code for Payment of

11   Fees and Reimbursement of Expenses [ECF No. 24762] (The hearing

12   on the Objection has been adjourned to March 22, 2102 at 10:00

13   a.m.)

14

15   LEHMAN BROTHERS HOLDINGS INC.'s and Creditors' Committee's Two

16   Hundred Twenty-Ninth Omnibus Objection to JPMorgan's Asset

17   Management Fund Claims (No Liability, Misclassified and

18   Duplicative Claims) [ECF No, 21293] (This matter has been

19   resolved.)

20

21   MOTION of Pictet & Cie and Bank Julius Baer & Co. Ltd. to

22   Enlarge the Time Period for the Filing of Claim Number 64249 by

23   One Day [ECF No. 21979} (This matter has been withdrawn.)

24

25   Transcribed by:  Sara Davis

Page 20

1

2   A P P E A R A N C E S :

3   WEIL GOTSHAL & MANGES LLP

4         Attorneys for Debtors and

5          Debtors-in-Possession

6         767 Fifth Avenue

7         New York, NY 10153

8

9   BY:   GARRETT A. FAIL, ESQ.

10        MARK BERNSTEIN, ESQ.

11        LORI R. FIFE, ESQ.

12

13

14  WEIL GOTSHAL & MANGES LLP

15        Attorneys for Debtors and

16         Debtors-in-Possession

17        200 Crescent Court

18        Suite 300

19        Dallas, TX 75201

20

21  BY:   ERIN D. ECKOLS, ESQ.

22        MATTHIAS KLEINSASSER, ESQ.

23

24

25

Page 21

1

2    SILVERMAN ACAMPORA LLP

3         Attorneys for Caisse Des Depots

4          et Consignations

5         100 Jericho Quadrangle

6         Suite 300

7         Jericho, NY 11753

8

9    BY:   JAY S. HELLMAN, ESQ.

10        BRETT S. SILVERMAN, ESQ.

11

12

13   THE MICHAELSON LAW FIRM

14        Attorneys for Morgan Lawrence (ph.),

15         Nicole Lawrence (ph.), Brian Monahan (ph.),

16         Donald Borghuna (ph.)

17        11 Broadway, Suite 615

18        New York, NY 10004

19

20   BY:   ROBERT N. MICHAELSON, ESQ.

21

22

23

24

25

Page 22

1

2   HINCKLEY ALLEN SNYDER LLP

3         Attorneys for Citibank &

4          Wilmington Trust

5         28 State Street

6         Boston, MA 02109

7

8   BY:   JENNIFER V. DORAN, ESQ.

9

10   CHAPMAN & CUTLER LLP

11         Attorneys for U.S. Bank, N.A., as Trustee

12         111 West Monroe Street

13         Chicago, IL 60603

14

15   BY:   FRANKLIN H. TOP III, ESQ.

16         JAMES HEISER, ESQ. (TELEPHONICALLY)

17

18   MILBANK TWEED HADLEY & MCCLOY LLP

19         Attorneys for the Official Committee

20          of Unsecured Creditors

21         One Chase Manhattan Plaza

22         New York, NY 10005

23

24   BY:   EVAN R. FLECK, ESQ.

25

Page 23

1

2   LOEB & LOEB LLP

3        Attorneys for Wells Fargo Bank

4        345 Park Avenue

5        New York, NY 10154

6

7   BY:   WALTER H. CHURCHAK, ESQ.

8

9

10   NIXON PEABODY LLP

11        Attorneys for Deutsche Bank National

12         Trust Co. as Trustee

13        437 Madison Avenue

14        New York, NY 10022

15

16   BY:   CHRISTOPHER M. DESIDERIO, ESQ.

17

18

19   KAPLAN & LANDAU LLP

20        Attorneys for Jeremy Kramer

21        1005 Avenue of the Americas

22        27th Floor

23        New York, NY 10018

24

25   BY:   EUGENE N. KAPLAN, ESQ.

Page 24

1

2   ALVAREZ & MARSAL NORTH AMERICA, LLC

3         Senior Vice-President and Co-Treasurer

4          of Lehman Brothers Holdings Inc.

5         600 Lexington Avenue

6         6th Floor

7         New York, NY 10022

8

9   BY:   STEVEN J. COHN

10

11   GITLIN & COMPANY, LLC

12         Chairman of Fee Committee

13         1 State Street, #1750

14         Hartford, COURT 06103

15

16   BY:   RICHARD A. GITLIN

17

18   STUTMAN TREISTER & GLATT

19         Attorneys for The Baupost Group

20   BY:   MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

21         JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

22

23   GENOVESE JOBLOVE & BATTISTA PA

24         Attorneys for Jamie H. Murcia

25   BY:   ROBERT F. ELGIDELY, ESQ. (TELEPHONICALLY)

Page 25

1

2   AKIN GUMP STRAUSS HAUER & FIELD LLP

3        Attorneys for Sunshine Enterprises, LP

4   BY:   NATALIE E. LEVINE, ESQ. (TELEPHONICALLY)

5

6   CLEARY GOTTLIEB STEEN & HAMILTON LLP

7        Attorneys for Goldman Sachs Bank, USA

8         and Goldman Sachs International, LP

9   BY:   BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

10

11  MONARD-D'HULST ADVOCATEN

12       Attorneys for Roger VanDebroek

13  BY:   THOMAS VANDERSMISSEN, ESQ. (TELEPHONICALLY)

14

15  KING STREET CAPITAL MANAGEMENT LLC

16  BY:   MITCHELL C. SOCKETT, ESQ. (TELEPHONICALLY)

17

18  GSO CAPITAL PARTNERS

19  BY:   ANTHONY BORRECA (TELEPHONICALLY)

20

21  FARALLON CAPITAL MANAGEMENT

22  BY:   ANATOLY BUSHLER (TELEPHONICALLY)

23

24  WATERSTONE CAPITAL MANAGEMENT LLP

25  BY:   DAVID DUBACK (TELEPHONICALLY)

1

2   CANYON PARTNERS

3   BY:   RAJ IYER (TELEPHONICALLY)

4

5   ANGELO GORDON & CO. LP

6   BY:   DANIELLE LEONE (TELEPHONICALLY)

7

8   UBS SECURITIES LLC

9   BY:   DENNIS J. RUGGERE (TELEPHONICALLY)

10

11   CITIGROUP

12        For CitiGroup Global Markets

13   BY:   BILL J. SCHWARTZ (TELEPHONICALLY)

14

15   GRANTHAM MAYO VAN OTTERLOO & CO.

16   BY:   WEI WANG (TELEPHONICALLY)

17

18   VARDE PARTNERS, CREDITOR

19   BY:   SCOTT HARTMAN (TELEPHONICALLY)

20

21   TIMOTHY B. WILKINSON

22        Claimant Pro Se (TELEPHONICALLY)

23

24   MICHAEL BURROW

25        Claimant Pro Se (TELEPHONICALLY)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 27

1                      P R O C E E D I N G S

2           THE COURT:  Be seated.  Good morning.

3           MR. BERNSTEIN:  Good morning, Your Honor.  Mark

4    Bernstein from Weil, Gotshal, Manges on behalf of Lehman

5    Brothers Holdings Inc. and its affiliated Chapter 11 debtors.

6           We have two reserved motion on the agenda this morning

7    and then three contested claims matters.  The first reserved

8    motion is the motion of the debtors to estimate the amount of

9    claims filed by indenture trustees related to residential

10   mortgage-backed securities.  As Mr. Perez reported at the prior

11   hearing, the debtors and the indenture trustees have met and

12   have discussed and have agreed on a reserve for these

13   particular claims of five billion dollars, in the aggregate,

14   for the claims of U.S. Bank, Wilmington Trust, Deutsche Bank

15   and Wells Fargo.

16          Separately, the debtors have agreed on reserves for

17   Bank of America and HSBC.  And those are not included in this

18   order; the five billion just really for those first four

19   trustees.

20          Yesterday, he debtors filed a revised form of order

21   which indicates the five-billion dollar reserve number and

22   allocates it ninety-five percent for the claims against LBHI

23   and five percent for the claims against SASCo.  In addition,

24   the debtors have agreed with the indenture trustees to seek to

25   mediate the amounts -- the allowed amounts of the claims to

Page 28

1   finally resolve the matter altogether.  And that -- there's a

2   paragraph in the order directing the parties to mediate at --

3   with a mediator, either selected by the parties if they can

4   agree or selected by the Court.

5           I'm happy to answer any questions Your Honor might

6   have on this.  Otherwise, this is going forward on an

7   uncontested basis and we respectfully request Your Honor grant

8   the motion estimating the reserve at five billion.

9           THE COURT:  The motion's granted.

10          MR. BERNSTEIN:  Thank you, Your Honor.

11          The next item on the agenda will be handled by my

12  colleague, Mr. Fail.

13          MR. FAIL:  Good morning, Your Honor.  Garrett Fail;

14  Weil, Gotshal for the debtors.

15          The next motion is the motion of Lehman Brothers

16  Holdings Inc. for authority to use non-cash assets in lieu of

17  available cash as reserved for disputed claims.  Of the

18  approximately 11,900 holders of disputed claims that were

19  served with the motion, only five filed responses.  I'm happy

20  to report, Your Honor, that four of the five objections have

21  been resolved.  The debtors have been informed that Mr. Coreth,

22  Golden State Tobacco Securitization Corporation, Commerce Bank

23  and U.S. Bank are no longer prosecuting their objections.

24          The debtors were not able to reach a resolution of the

25  fifth objection which was filed by Mr. Jamie Murcia who holds a

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 77

Page 29

1    1.4 million dollar disputed claim.  LBHI has agreed to adjourn

2    the hearing with respect to Murcia's -- Mr. Murcia's claim only

3    to the March omnibus hearing.  The debtors are hopeful that

4    they will be able to reach a resolution of this objection prior

5    to that date to obviate the need for a contested hearing.  As a

6    result, the motion is going forward uncontested this morning.

7           The approach of this motion was expressly contemplated

8    by Section 8.4 of the Chapter 11 plan confirmed in December.

9           THE COURT:  Let me break in and ask you a question

10   that may be obvious to everybody, but it's not obvious to me.

11   How does it work for Mr. Murcia's opposition to be reserved to

12   another hearing when I'm being asked to approve a procedure

13   that applies across the board?  Is it the position that this is

14   specific to Mr. Murcia and that, at least in respect of his

15   claim as a disputed claim, that his claim, pending resolution,

16   will still be treated as reserved by cash assets?

17          MR. FAIL:  The debtors will reserve 100 percent of the

18   pro rata share of distributions in cash for Mr. Murcia's 1.4

19   mill -- approximate 1.4 million-dollar claim, pending another

20   agreement on a reserve, disallowance of the claim or order of

21   the Court with respect to an ability to substitute non-cash

22   assets for that claim.

23          THE COURT:  So the curiosity, it seems, is that

24   because he has a relatively small claim, he ends up, by virtue

25   of not resolving his objection, with cash reserves while

Page 30

1    everybody else in the case gets non-cash reserves.  That seems

2    bi -- that seems strange to me.

3            MR. FAIL:  A higher percentage of cash reserves.

4    There will be a twenty-five percent -- a minimum of twenty-five

5    percent reserved on an aggregate basis for all of the claimants

6    and that aggregate is pooled.  And it's higher at different

7    subsidiary debtors that -- as set forth in the Cohn

8    declaration, Your Honor.  So that money is pooled.

9            So to the extent that other claims that are currently

10   disputed become subsequently allowed after the first

11   distribution date and before the second, cash will be available

12   for those claimants as it would for Mr. Murcia.  In the

13   interim, though, to avoid a contested fight over what is in

14   this case a relatively small claim, in the unique circumstances

15   of these cases, we thought it best to proceed on a consensual

16   basis.

17           THE COURT:  Okay.  I mean, I was perfectly prepared to

18   deal with everything on a contested basis today.  So we can

19   deal with it in a month.

20           MR. FAIL:  Okay.  Thank you, Your Honor.

21           The debtors believe that using a partial non-cash

22   reserve for disputed claims is a preferred means to accelerate

23   distributions to the thousands of holders of allowed claims.

24   If the motion is approved, the six participating debtors

25   estimate that they will be able to distribute approximately 2.8

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 77

Page 31

1    billion dollars more than they would otherwise to holders of

2    allowed claims in the initial distribution alone.

3              As described in the motion, the relief requested also

4    benefits holders of currently disputed claims that subsequently

5    become allowed because they will benefit -- because they will

6    be entitled to receive a catch-up distribution at the higher

7    percentage paid on the initial distribution.  The procedures

8    established provide adequate, reasonable protection for the

9    holders of disputed claims.  In order to substitute non-cash

10   assets, two conditions must be satisfied on a distribution

11   date:  The applicable debtor must reserve at least twenty-five

12   percent of the required reserve amount in cash so there will be

13   a minimum cash reserve; and the value of the participating

14   debtor's non-cash assets must be at least 2.5 times that amount

15   of the debtor's required reserve not covered by the minimum

16   cash reserve.

17             Non-cash assets will be used first to pay catch-up

18   distributions to holders of disputed claims that become

19   allowed.  And then, to replenish the fund -- replenish and fund

20   the minimum cash reserve before further distributions are made

21   to holders of previously allowed claims.  The motion does not

22   apply to administrative, priority or secured claims.  All

23   disputed claim holders will be entitled to receive the interest

24   earned on their reserve amount as if the entire amount has been

25   reserved in cash.  So there is no change with respect to the

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 77

Page 32

1   interest provision in the plan.

2           Additionally, the plan administrator will evaluate

3   the -- each debtor's assets and claims prior to each

4   distribution date and the plan administrator may establish

5   additional minimum conditions prior to substituting non-cash

6   assets as reserves.  The relief requested is supported by the

7   Cohn declaration.  Mr. Cohn is a managing director with Alvarez

8   & Marsal and a senior vice-president and co-treasurer of Lehman

9   Brothers Holdings Inc.

10          The declaration illustrates the mechanics of the

11  motion, assuming values as of January 27th, 2012, and it

12  provides further support for the protections that are

13  established by the motions for disputed claim holders.  For

14  instance, in the illustrative example set forth on Exhibit D,

15  the asset-to-reserve ratio for LBHI is in excess of 20:1.  And

16  for LCPI, it's 190:1.

17          The other participating debtors will retain a minimum

18  asset-to-reserve ratio of 2.5:1 but a minimum cash reserve

19  significantly greater than twenty-five percent; fifty percent

20  for LBSF, seventy percent for LOTC and ninety percent for LBCS.

21  Mr. Cohen is present in the courtroom today and I would move

22  for the admission of his declaration into evidence.

23          THE COURT:  Is there any objection to that?

24          I hear no objection.  It's admitted.

25  (Steven Cohn's declaration was hereby received into evidence as

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 33 of 77

Page 33

1   a Debtors' Exhibit, as of this date.)

2         MR. FAIL:  Thank you, Your Honor.

3         The motion is also supported by the creditors'

4   committee which filed a statement in support at Docket 25546.

5   On February 20th, we filed a revised proposed order.  The order

6   contained clean-up and technical changes, mainly relating to

7   amounts other than plan adjustment that are reallocated

8   pursuant to settlements incorporated into the plan.  The

9   changes make clear that any reallocated amounts for the LCPI

10  settlement amount, the LBSF settlement amount and the LBSF

11  additional settlement amount that would be reserved for

12  disputed claims in the classes that are allowed to receive a

13  share of those plan settlement reallocations will continue to

14  be reserved in cash.

15        In addition, to resolve one of the objections to the

16  motion, LBHI agreed that it would provide notice of its

17  intention to substitute non-cash assets in compliance with the

18  requirements of the motion and the proposed order in advance of

19  any distribution made, subsequent to the initial distribution.

20  Under the unique circumstances of these cases, the debtors

21  respectfully request that the Court grant the relief requested.

22        THE COURT:  We're proceeding on an unopposed basis, so

23  this becomes easy to do.  But I would like to hear from counsel

24  for the creditors' committee in reference to the statement that

25  was filed, which is have read, because we're dealing with a

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 34 of 77

Page 34

1   fairly significant adjustment in the treatment of disputed

2   claims, fully consistent with Section 8.4 of the plan, but with

3   specifics that were not built into the plan.  And so, I'm

4   particularly interested in hearing what the creditors'

5   committee has to say about its independent review of this

6   process.

7           MR. FAIL:  Thank you, Your Honor.

8           MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

9   Milbank, Tweed -- shouldn't have done that -- on behalf of the

10  official committee.

11          As Mr. Fail noted, and as Your Honor noted, we do

12  support -- the committee supports the relief requested in the

13  motion and we filed a statement on the docket.  When the plan

14  provision was initially contemplated, the committee was

15  supportive of it.  At that time, it was really just a concept

16  that maybe at some time in the future, it will make sense to

17  use some of the non-cash assets of the estates and they're

18  significant, to provide for protection and reserve when

19  distributions ultimately -- when we reach that phase of the

20  case.  And it wasn't until after the plan discussions really

21  took place in earnest and the confirmation process that we

22  thought, together with the debtors, about potentially invoking

23  that provision and coming up with the mechanism that's the

24  subject of the motion.

25          And as with many other motions, we've come up before

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 35

1    the Court and told Your Honor that we took a lot of time and we

2    weren't initially, as a committee, convinced that this was the

3    right way to proceed.  And together with the committee's

4    financial advisors, we spent a great deal of time working with

5    A&M to crunch the numbers and make sure that not only were the

6    and are the allowed claimants protected by the relief requested

7    in the motion, but also those parties who had disputed claims

8    because the committee recognizes that those parties, some of

9    them will ultimately have allowed claims; they are part of the

10   creditors' committee's constituency and the committee owes

11   fiduciary duties to those parties as well.

12          And after taking those analyses into account,

13   ultimately the committee did decide this relief does make sense

14   and protects the interests of all parties.  And, as Your Honor

15   noted, it was contemplated by the plan and ultimately with

16   the -- in connection with the motion, parties were given

17   adequate notice of the relief that was requested.

18          The committee, often, through counsel and financial

19   advisors, we received inquiries from parties in interest in the

20   cases and often their views about relief requested.  In the

21   case of this motion, there were questions raised by creditors

22   but the overwhelming majority of the inquiries that the

23   committee received and that its advisors received was positive.

24   People wanted do know the mechanism by which the catch-up

25   distributions and subsequent distributions would be made and

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 36 of 77

Page 36

1    how'd they be protected, but after they understood the process,

2    there was overwhelming support.

3           The committee -- there are two primary reasons why the

4    committee is supportive of the relief, Your Honor.  First, it's

5    because of the substantial benefits that go to allowed --

6    holders of allowed claims.  I think that's manifest from the

7    motion; distributions are going to be larger.  And as I argued

8    to the Court in connection with the LBF motion a few weeks ago,

9    it's important to the committee that part of the bargain that

10   we think was at issue in this plan settlements that so many

11   creditors in these cases made and the compromises they reached

12   in connection with resolving their claims and not pursuing

13   litigation in these case was that the initial distribution, and

14   all distributions, would be meaningful.  And they would be the

15   largest distributions that were appropriate under the plan.

16   And those creditors were aware that this provision was in the

17   plan, believed it was appropriate and in the committee's view,

18   it was their rational expectation that some of the non-cash

19   assets of these estates would be used for reserve purposes so

20   that the initial distribution could be as large as possible and

21   as appropriate under the circumstances, while still taking into

22   account and protecting the interests of the disputed claim

23   holders.

24           In consultation with counsel and its financial

25   advisors, the committee concluded that the risk to the holders

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 37 of 77

Page 37

1    of disputed claims in this process is remote.  So many things

2    in this case, we've said there's no such thing as a riskless

3    transaction; we think that's true here as well.  But the risks

4    that exist here are reasonable and appropriate under the

5    circumstances.  It's set forth more fully in the declaration of

6    Steven Cohn in support of the motion, but the committee

7    believes that LBHI has proposed reasonable measures to protect

8    the interest of the disputed claim holders.  In the committee's

9    opinion, it will ensure that any potential prejudice to those

10   holders, as I said, is remote.

11          Although LBHI can come back to the Court and propose

12   additional minimum conditions, with respect to the minimum

13   asset-to-reserve ratio, there will -- they would be required to

14   provide due notice to the holders of disputed claims and this

15   Court's approval would be required if LBHI ever seeks to reduce

16   the minimum terms and conditions that are proposed in the

17   motion.  That was a very important component of the process for

18   the committee.

19          Additionally, Your Honor, under the priority scheme

20   for subsequent distributions, the available cash that's

21   generated from non-cash assets will be used first to satisfy

22   the catch-up distributions and then to fund the minimum cash

23   reserve for the outstanding disputed claims.  And in the

24   committee's view, they're comfortable that that will endure

25   that the holders of disputed claims that subsequently become

Page 38

```
 1   allowed claims will receive the pro rata share of distributions
 2   to which they're entitled.  Significantly, the holders of
 3   disputed claims will be -- will continue to be entitled to the
 4   accrual of interest that would have been earned on the entire
 5   amount of the reserves as if they consisted entirely in cash.
 6          And more important to the committee's determination
 7   that the request is reasonable under the circumstances, the
 8   committee's advisors have analyzed all the variables that will
 9   impact the sufficiency of available cash to cover the disputed
10   claim that subsequently become allowed and to fund the minimum
11   cash reserve, and have concluded that there is no risk of
12   insufficient available cash to satisfy catch-up distributions.
13   As we've set forth in the committee's statement, the
14   committee's advisors together with the debtors' advisors have
15   analyzed the outstanding disputed claims; the debtors'
16   projections of the amounts in which such claims may be allowed
17   as well as the committee's own projections; the value of the
18   participating debtors' non-cash assets; the estimated cost of
19   the post-effective date administration of the participating
20   debtors' estate; and the near-term cash events that are
21   expected to generate non-cash assets.  And based upon those
22   analyses, the committee has concluded that a significant
23   cushion will exist for the protection of holders of disputed
24   claims, thereby making the risks that are attendant to the
25   motion remote and appropriate under the circumstances.
```

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 77

Page 39

1          And for those reasons, Your Honor, the committee is

2    supportive of the relief requested and asks that the order be

3    entered.

4          THE COURT:  I appreciate your comments and they're

5    very helpful.  But I, without quibbling, want to ask you about

6    your reference to there being no risk to the inability of the

7    debtor to make catch-up distributions versus what I think was

8    your opening salvo that it's virtually impossible for

9    transactions to made riskless.

10         Is this a remote risk or is there, in the opinion of

11   the committee's professionals, no risk that this set-up will

12   result in a shortfall for any of the disputed creditors in the

13   future?

14         MR. FLECK:  Your Honor, we believe that there's a very

15   remote risk.  I guess that's option number 3, because, as I

16   said, we think that -- we're very comfortable with the

17   committee's analyses with respect to the value of the non-cash

18   assets.  We've tested the debtors' determination and analyses

19   with respect to the valuation of those assets.  We think

20   they're good and they can be relied upon, and they've been

21   relied upon throughout these cases.

22         We can't predict every circumstance that comes up

23   along the way, so therefore --

24         THE COURT:  Your partner seems anxious to say a few

25   words.  And I'm going to let him do that.

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 77

Page 40

1          MR. FLECK:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor, I picked up on how

3    you precisely phrased this in terms of whether there's a remote

4    risk or no risk with respect to a potential shortfall or the

5    inability to make distributions to creditors in the future.

6    And I'm going to answer it two ways.

7          We believe there is no risk that a creditor will bear

8    a permanent risk of non-payment as a result of this.  There is

9    a remote risk that -- and we believe it's a very small risk --

10   that a subsequent distribution date -- there may be

11   insufficient cash assets to true up everybody whose claims have

12   been allowed in the interim, and therefore they would have to

13   wait to the next one when those non-cash assets were

14   liquidated.  But we believe that is extremely remote.  We ran

15   numerous hypotheticals on that and in the, you know, ninety-

16   five-plus percent of cases, there wasn't even the delay of

17   payment.

18          THE COURT:  Okay.  Appreciate that.

19          UNIDENTIFIED SPEAKER:  Thanks.

20          THE COURT:  I also recognize that my question was

21   deliberately designed to get at what risks we're talking about.

22   And I'm satisfied that the difficult question has been

23   answered -- by both of you.

24          I do have a question, though, for Mr. Fail, and

25   perhaps also for Mr. Cohn.  And it has to do with the

Page 41

1    resolution of all objections with the exception of Mr. -- or

2    maybe it's Ms. Murcia's objection which continues.  I'd like to

3    know more about the process that led these various objectors

4    to, in effect, give up and whether or not any concessions were

5    made to them in order to get them to withdraw their objections

6    at this point.

7              MR. FAIL:  Your Honor, Garrett Fail, again.

8              With respect to U.S. Bank and to the extent that any

9    of the parties are present or on the telephone and wish to add,

10   supplement or correct, you know, they should feel free -- with

11   respect to U.S. Bank, our conversations were productive

12   immediately following the filing of the Cohn declaration which

13   was filed after the objection deadline.  So, after parties, I

14   think, after all of the parties had a chance to review the Cohn

15   declaration and we had a chance to explain it and discuss it

16   with them and the committee's statement in support was filed,

17   circulated to them and discussed, I think that's one area that

18   went a very long -- two things that went a long way to resolve

19   the objections.

20             With respect to U.S. Bank, Your Honor, I don't know if

21   I names them originally, but that was -- to resolve that

22   objection, we agreed to -- the debtors agreed to provide

23   advance notice of subsequent applications of the relief

24   required in the motion.  That is the only thing.  In connection

25   with none of these resolutions were any claim settlements

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 77

Page 42

1   reached; no claims allowed; no compromise on the debtors' or

2   any parties in interest's ability to object to these claims

3   which are -- may be disputed.

4         With respect to the remaining three claims, if my math

5   is correct, the debtors entered into reserve stipulations which

6   provided for a minimum cash reserve percentage higher than

7   twenty-five percent, but a floor that would be maintained for

8   each of the claims.  Which, again, in the context of these

9   cases, were each relatively small and in the aggregate,

10  compared to the amount of and the number of and the size of the

11  aggregate pool of disputed claims and the cash that would be

12  required to be reserved, are relatively minimal; it wouldn't

13  have an effect on the -- significant effect on the distribution

14  to creditors.

15        THE COURT:  Okay.  Is there anyone else who wishes to

16  say anything in reference to this inquiry?

17        MR. TOP:  Your Honor, Frank Top on behalf of U.S.

18  Bank.  We did withdraw our objection based upon the statements

19  that the debtors are going to be providing, particularly as

20  part of future distributions.  We were not as concerned about

21  this upcoming distribution, particularly since we're primarily

22  an LBHI creditor and the ratios currently are so large.  But we

23  are, of course, you know, concerned about future distributions

24  and we felt that the -- at least the statement that, you know,

25  the debtors -- that someone's actually looking at these ratios

Page 43

 1   and that these ratios are being complied with in connection

 2   with future distributions will be helpful, not only to U.S.

 3   Bank, but to all creditors of the estates, so that they can

 4   take a look at that and review that in advance of a

 5   distribution and take whatever action they view as appropriate

 6   at that particular point in time.

 7        We also took some comfort with the fact that the plan

 8   administrator doesn't have to use these particular ratios; it

 9   could be more conservative if the plan administrator so

10   chooses.  And so we would hope that, you know, to the extent

11   that market conditions got to the point where, lo and behold,

12   there might be another Lehman event or something like that

13   that's so drastic that the plan administrator would use his

14   discretion appropriately, that -- be a little bit more

15   conservative if that -- those types of events ever occurred.

16        So, no, we don't think that there's no risk, but we

17   think so long as people are provided with information in

18   advance of future distributions to allow them to protect

19   themselves, to a certain extent, and that the plan

20   administrator uses his discretion appropriately, that we got

21   comfortable enough with the motion to withdraw our objection.

22        Thanks.

23        THE COURT:  Okay.  I have a question for Mr. Cohn, if

24   he's present.  It's a very, very -- Mr. Cohn, you can hear the

25   question and then you can stand up and answer.  There's no need

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 44 of 77

Page 44

 1      to be sworn at this point.

 2            It's really -- I guess it's my own inability to fully

 3      appreciate the financial models that are embedded in the

 4      conclusions set forth in your declaration and in the proposal.

 5      I'd like to know a little bit more about how the ratio of 2.5:1

 6      was developed.

 7            I assume that there was a sensitivity analysis of some

 8      sort done and that different ratios may have been tested as

 9      part of the process in coming up with the 2.5.  But, obviously,

10      the 2.5 bears no relationship to the 190:1 ratio that appears

11      at LBHI.  And in part because this structure is so complicated,

12      at least from my perspective, and must have evolved over time

13      with a balancing between maximizing present distributions to

14      allowed claimants and protecting the interests of future

15      claimants that are subject to dispute, I'm just interested in

16      knowing how this process went and how you ended up in the place

17      that has been proposed.

18            MR. COHN:  Sure.  We actually --

19            THE COURT:  You can come to the microphone.

20            MR. COHN:  My name is Steven Cohn.

21            We actually looked at a couple of different options.

22      We looked at roughly 2-and-a-half to 1 and 3:1 and the concept

23      that we used in determining that or looking at this was almost

24      an asset-based lending concept.  In other words, if we -- if

25      the estate were to go out and borrow money based on the assets,

Page 45

1    what kind of advance rate would a bank provide to us in terms

2    of the asset?  Similar to an asset-based loan that uses

3    accounts receivable or inventory as security, you might get

4    eighty percent of the accounts receivable or you might get

5    sixty percent of inventory.  These being a combination of

6    assets that are liquid that actually throw off cash, as in

7    loans, whether they be real estate loans or commercial loans,

8    and assets that don't throw off money such as private equity

9    investments or, you know, other things that we need to wait for

10   to monetize.  So, a combination of things and we thought we

11   needed to be a little bit more conservative than what a bank

12   would actually do on liquid inventory and receivables because

13   that's an on-going business.  So we wanted something somewhat

14   more conservative than that.

15           We looked and two and a half; we looked at three.  We

16   thought that two and a half was a reasonable floor in terms of

17   protection.  As you've noticed from the exhibit, it only

18   applies to the three smaller entities at this point in time.

19   And we would expect that, over time as their assets decline,

20   their actual reserves of cash will increase.  I think at the

21   moment, it's about fifty percent for LBSF.  We would think,

22   actually, by the time of the distribution, it'll actually be a

23   higher percentage cash reserve because their assets continue to

24   come down as cash is collected.  So the two-and-a-half-times

25   number which will be the trigger will actually generate a much

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 77

Page 46

1    higher -- not much, but maybe ten-point higher cash reserve at

2    this point, but the time we get to a distribution.

3         So that was really the thought process.  We thought

4    twenty-five percent on the other side, as a cash reserve, was

5    really kind of the absolute minimum.  In other words, we are

6    conscious of our obligations to disputed claimants as well as

7    allowed claimants and that, really, using something less than

8    twenty-five percent was not prudent.  And we reserved the

9    rights, at least as my understanding goes, that if as the

10   assets decline in the estate or we're not happy with the

11   quality of the assets, to say you know what, our minimum

12   threshold will be thirty-five percent on the second or third or

13   fourth distribution in order to make sure that there is

14   sufficient assets available to pay the disputed claimants as

15   they become allowed.

16        THE COURT:  And I take it that in this process, you

17   had some interaction with the professionals for the committee

18   and shared your work product or at least thinking with them and

19   that they tested it as well?

20        MR. COHN:  Yes.  We spent a considerable amount of

21   time with FTI who are the financial advisors on this piece of

22   the business with -- of the committee.  They took us through

23   their analysis; they asked us to do a little bit more.  We had

24   done some work -- the only thing that's not included were our

25   estimates of cash flow on a go-forward basis, which is really

Page 47

1   what the committee's advisors wanted to understand.  In other

2   words, how much cash would be generated between now and the

3   next distribution date and they made their own estimates and we

4   shared with them whether we thought they were in the ballpark

5   or not.  They were using conservative numbers and they were --

6   and they actually shared with us a preliminary form of the

7   exhibits that they shared with the committee.  So, yes, we had

8   the opportunity both to work with them and to give them some

9   constructive criticism as to how their presentation should go.

10          THE COURT:  Okay.  Thank you very much for that.

11          Anything more?

12          MR. FAIL:  No, Your Honor.

13          THE COURT:  Okay.  This is approved.  I'm satisfied

14   based upon the materials that I've reviewed and the statements

15   that have been made on the record, including the comments of

16   counsel, both counsel for the committee who happen to be

17   present today and Mr. Cohn's statements in response to my

18   questions, that the structure that's been set up here provides

19   what I'll term adequate protection for the disputed claims.

20   And I believe that the process that has been described

21   represents a creative and appropriate balancing of the needs of

22   creditors whose claims have been allowed with those creditors

23   that have claims that are subject to dispute.

24          Candidly, I'm surprised that there is a remaining

25   objection that is being carried and, to the extent that this is

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 77

Page 48

1   being heard as a separate matter in March, I'm frankly loathe

2   to disparately protect one creditor that happens to be

3   unwilling to make concessions in the objections that had been

4   lodged.  Notwithstanding the very persuasive evidence that has

5   been presented concerning adequate protection, such opposition

6   should not result in more favorable treatment.

7           I'm in effect telegraphing what I would do with that

8   objection if it were being heard today.  To the extent the

9   parties wish to be guided by that, that may be helpful.

10          It's approved and I'll enter the order.

11          MR. FAIL:  Thank you very much, Your Honor.  I'll turn

12   the podium over to my colleagues who will continue with the

13   rest of the claims agenda.

14          THE COURT:  Okay.

15          MR. KLEINSASSER:  Your Honor, Matthias Kleinsasser

16   with Weil, Gotshal for the debtors.  I'm going to handling

17   agenda item 3.

18          Your Honor, this item concerns the 221st omnibus

19   objection.  That objection seeks to expunge claims of

20   individual noteholders, each of which is covered by a proof of

21   claim filed by an indenture trustee.

22          Today, Your Honor, we're moving against claim 67675,

23   which is held by Ms. Annetta Pugia.  That claim which, Your

24   Honor, I'm going to call the new claim, is virtually identical

25   to claim 35260 which Ms. Pugia filed on September 28th, 2009.

Page 49

 1    Your Honor, I'm going to refer to the claim 35260 as the

 2    original claim.

 3           The debtors previously identified the original claim

 4    as duplicative of the indenture trustee claim 21805 filed by

 5    Bank of New York Mellon and included the original claim on the

 6    twenty-seventh omnibus objection.  The Court overruled Ms.

 7    Pugia's objection to the twenty-seventh omnibus objection and

 8    the original claim was expunged pursuant to an order of this

 9    Court entered on September 21st, 2010.

10           Ms. Pugia subsequently filed the new claim, Your

11    Honor, on October 3rd, 2011.  The new claim is subject to the

12    221st omnibus objection and the new claim is the one we're

13    moving against now.  The new claim is essentially the same

14    claim as the original claim, Your Honor, and actually purports

15    to amend the original claim.  The asserted amount is almost

16    exactly the same, approximately 23,000 dollars, and it's based

17    on the same security as the original claim.

18           The debtors have identified the new claim as

19    duplicative of indenture trustee claim, 21805, the same

20    indenture trustee claim that covered the original claim.

21    Specifically, Your Honor, the security on which the new claim

22    is based has a QCIP of 52519Y209, which is covered by the

23    indenture trustee claim.

24           Ms. Pugia filed two responses to the 221st omnibus

25    objection; one on October 24th, 2011 at docket number 21560,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 50

1    and an identical response on February 8th, 2012 at docket

2    number 25111.  These responses do not address the merits of the

3    221st omnibus objection.  The bases of these responses is that

4    Ms. Pugia invested money with the debtors who shortly

5    thereafter were found to be financially unsound.

6            The responses request that the Court overrule the

7    objection because the investment made by Ms. Pugia represent a

8    lot of money to her.  Without meaning any disrespect to Ms.

9    Pugia, Your Honor, who I understand to be appearing pro se in

10   this case, the debtors would point out that she has not

11   addressed the merits of the 221st omnibus objection;

12   specifically, that the new claim is duplicative of the

13   indenture trustee claim.

14           Because the security serving as to the basis for the

15   new claim is covered by the indenture trustee claim, we

16   respectfully request that the Court overrule Ms. Pugia's

17   responses and grant the 221st omnibus objection with respect to

18   claim 67675.

19           THE COURT:  Is Annetta Pugia in court or is she

20   present by telephone?

21           I hear no response.  I've reviewed the claimant's

22   written submission and agree with the characterization of

23   counsel that it does not deal with the merits of the objection

24   under the circumstances.  And given the fact that Ms. Pugia is

25   not here to prosecute her response, I'm overruling her

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 77

Page 51

1     objection and granting the omnibus objection to claim with

2     respect to her claim.

3           MR. KLEINSASSER:  Thank you, Your Honor.  I'm now

4     going to turn the podium over to my colleague, Ms. Eckols.

5           Thank you.

6           MR. FAIL:  Your Honor, Garrett Fail again.  Just one

7     scheduling note.  I think there's -- I know there's an item on

8     the calendar today for a status conference in connection with a

9     motion filed by the members of the creditors' committee for

10    reimbursement.  Mr. Gitlin is here, chair of the fee committee,

11    and has a scheduling conflict.

12          So if, at a certain point it pleases the Court, we

13    could adjourn briefly the claims hearing and have the status

14    conference.  Alternatively, if that doesn't work for the Court

15    we'll just proceed with the claims agenda.

16          THE COURT:  Well, I see Mr. Gitlin in the front row.

17    Ordinarily I don't change the order of business to accommodate

18    the needs of one individual, unless there's an extraordinary

19    need for that individual to be present.  And in Mr. Gitlin's

20    case, that's true; he does need to be present for the

21    conference.  If I had been advised of this prior to the

22    commencement of today's hearing, we might have taken the status

23    conference first and avoided the interruption of the calendar.

24          When -- not that his personal business should become

25    public knowledge, but when does Mr. Gitlin need to leave the

Page 52

1    courtroom?

2          MR. GITLIN:  Your Honor, if necessary, I could stay.

3    Unfortunately, I have made serious commitments today in another

4    town.  If I could leave the courtroom about a quarter to 12 or

5    12, I could still make it.

6          THE COURT:  Oh, that won't be a problem.

7          MR. FAIL:  Thank you, Your Honor.

8          MS. ECKOLS:  Good morning, Your Honor.  Erin Eckols

9    for the debtors.  I'm going to be handling the last two

10   contested claims items.  Agenda item 4 is the motion of Jeremy

11   Kramer for reconsideration of the reclassification as an equity

12   interest.

13         I believe Mr. Kramer's counsel is in the courtroom and

14   making his way up to the podium.

15         THE COURT:  Okay.

16         MR. KAPLAN:  Good morning, Your Honor.  Eugene Kaplan

17   for Jeremy Kramer.

18         This is a motion for reconsideration of Mr. Kramer's

19   claim which was reclassified as an equity interest in default.

20   Mr. Kramer --

21         THE COURT:  He voluntarily defaulted.  He knowingly

22   didn't take a position.  How can you possibly come back now?

23         MR. KAPLAN:  Well, I think, first of all the fact

24   that -- even if he voluntarily defaulted, that's not a basis

25   to --

Page 53

```
 1              THE COURT:  Yes, it is.

 2              MR. KAPLAN:  It's one basis.

 3              THE COURT:  He's a sophisticated claimant who,

 4     according to the papers, knew full well that he had an

 5     opportunity to object.  Extended the time with the consent of

 6     the debtor and chose to take a dive.

 7              MR. KAPLAN:  He is a sophisticated investment

 8     professional.  He's not a lawyer.  He's not a bankruptcy

 9     lawyer.

10              THE COURT:  He certainly is in a position to protect

11     his interest.  It's a large claim.  He worked at Neuberger

12     Berman.  He, presumably, knows a lot about what goes on in

13     bankruptcies or is in the position to learn about it.

14              He was in consultation directly with debtors' counsel

15     and made an informed decision, at least informed well enough

16     for his purposes to not take a position.  He could have hired

17     counsel, he chose not to.

18              MR. KAPLAN:  He could have.

19              THE COURT:  He's now hiring counsel too late.

20              MR. KAPLAN:  He hired counsel after he had spoken with

21     his --

22              THE COURT:  He's hiring counsel after he observed that

23     others similarly situated were able to improve their position

24     by fighting.

25              MR. KAPLAN:  But those others were members of the same
```

Page 54

1   group with which he is affiliated at Neuberger Berman, with

2   whom he consulted initially and who expressed no interest in

3   joining with him.

4           THE COURT:  So what?

5           MR. KAPLAN:  And --

6           THE COURT:  So what?

7           MR. KAPLAN:  He did not --

8           THE COURT:  He's an individual.  He's in the position

9   to take a fight if he chooses to.

10          MR. KAPLAN:  He did not know enough --

11          THE COURT:  He chose not to.

12          MR. KAPLAN:  He did not know enough to --

13          THE COURT:  He could have learned.  He could have

14  informed himself, he didn't.

15          MR. KAPLAN:  He could have, that's true.  But even

16  if -- even that being so does not mean that his default cannot

17  be vacated and put him back into the position of litigating his

18  claim.

19          THE COURT:  Well, he has a 60(b) obligation to bear,

20  how does he do that?

21          MR. KAPLAN:  Well, he has demonstrated that the claim

22  has merit.  He has demonstrated, I think quite clearly, that

23  the debtors are not at all prejudiced by restoring his claim.

24  And I think he has demonstrated, certainly, that he did not act

25  in bad faith.  That under 60(b) his -- it certainly wasn't a

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 77

Page 55

1     conscious decision to default, it was a --

2           THE COURT:  Oh, yes, it was.

3           MR. KAPLAN:  I think it was a lackadaisical sort of

4     choice.

5           THE COURT:  But, wait.  But, wait.  We're not talking

6     about somebody who was unconscious.  We're talking about

7     someone who made a knowing decision not to take issue with the

8     omnibus objection that affected his right.  He did that

9     knowingly.  He may not have done it with the advice of counsel,

10    and, presumably, he didn't retain counsel because he didn't

11    think it was worth spending the money to engage counsel to

12    fight the fight.

13          MR. KAPLAN:  No, I don't -- I think he sought out

14    others in the Straus Group to work with him and they, because

15    they had not been named in this objection, for whatever reason

16    the debtor chose not to name them and isolate Mr. Kramer, they

17    decided that there was nothing that they had to deal with at

18    that time.  When they then were served with the next or the

19    118th objection, they went out and got counsel and -- over the

20    course of months they got counsel and proceeded to fight the

21    objection.  He did not have that opportunity.

22          As you will see, Judith Kenney who was not a member of

23    the Strauss Group but who was at Neuberger, she filed pro se

24    papers and then later joined the group that I represent with

25    respect to the 118th objection and joined in.  But putting Mr.

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 77

Page 56

1    Kramer in with his fellows does no more than put him where Ms.

2    Kenny is and the others are, which is giving them a chance to

3    fight for their claims.

4        As I said, the tripartite test by the Second Circuit,

5    under 60(b) is not a win or take all of each element.  It's

6    looking at the totality of the circumstances and here, given

7    that there is some merit to the claim that is going forward,

8    given that the debtor is put in no worse a position with

9    respect to Mr. Kramer's claim then with respect to other claims

10   of the same nature, the only question is the excusability (sic)

11   of the default.

12       And while Mr. Kramer may not have been litigious at

13   the time and may not have thought much of the claim enough to

14   go out and retain counsel at that time.  He has thought about

15   it subsequently.  He has retained counsel.  He's put in a

16   position with everybody else.  It certainly wasn't this, sort

17   of, conscious, deliberate, willful, nasty, sort of, default

18   that Lehman attempts to characterize it as.  He was a pro se

19   who didn't really understand what he was doing and gave up his

20   rights and now thinks better of it.  And given where we are in

21   this process, nobody's really hurt by allowing him to come back

22   and argue his claim.

23       THE COURT:  On the prejudice point, let me press you a

24   little bit because the history of the claims objection docket

25   in this case is one of people just like your client, Mr.

Page 57

1    Kramer, who default -- knowingly default -- receive notice of

2    an omnibus claims objection and who say nothing and do nothing,

3    and these matters go forward on an uncontested basis and

4    billions of dollars in claims have been disallowed as a result

5    of that process.

6          If what you say becomes the law of the case, every

7    single person who made the same kind of decision that Mr.

8    Kramer made can come back into court and restart the process.

9    That's prejudice, not only to the debtors but to me.

10         MR. KAPLAN:  I think that Mr. Kramer presents a

11   special case.

12         THE COURT:  Why?

13         MR. KAPLAN:  Because --

14         THE COURT:  I think he actually presents a case that's

15   less special.  He is a pro se who is sophisticated.  He's a pro

16   se that sophisticated people go to for financial advice.  He's

17   the kind of person who has access to smart advisors.  He could

18   have obtained you earlier and made an economic decision.

19   According to your statements and your pleadings, if he had a

20   group, he would have hired counsel but he didn't want to do it

21   on his own.  That's his choice.

22         MR. KAPLAN:  Going back to what Your Honor started

23   with, which is the prejudice, I think that the instance of

24   these Neuberger claimants that I represent present, as I said,

25   a special case, because they are far different from the

Page 58

1   ordinary Lehman employees who voluntarily joined the Lehman pay

2   scheme.  So I think that for that reason, the number of

3   claimants who could reopen their claims were this to become law

4   of the case, would be a very finite universe and would not

5   reopen the floodgates as the debtor supposes.

6        THE COURT:  I understand your argument, but I

7   disagree.  This is not limited to the Straus Group, what used

8   to be Neuberger Berman.  This is a process that has been

9   ongoing for a very long time with great success, and I believe

10  that you have a very difficult burden in overcoming the

11  prejudice argument associated with your request for

12  reconsideration.  But I'll hear what the debtors have to say --

13  probably not much more than I've already said.

14       MS. ECKOLS:  Your Honor, I'm going to keep it

15  incredibly brief.  The debtors' position is set forth at length

16  in its response at docket number 25377, and I believe most of

17  the key points have already been discussed here.

18       Mr. Kramer's decision not to oppose the

19  reclassification was deliberate and it was willful for purposes

20  of Rule 60(b), and this is fatal to his request for

21  reinstatement.  The key enquiry in the Second Circuit -- it was

22  whether Mr. Kramer made a conscious decision not to respond,

23  and it is clear that his decision was conscious and knowing and

24  intentional.  It is not an issue on the Second Circuit.  It's

25  not a requirement of bad faith or good faith.  That is

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 77

Page 59

1   irrelevant for this.  He admits he received notice.  He admits

2   he received an adjournment.  He admits he consulted with co-

3   workers and attorneys.  He admits that he decided not to retain

4   counsel and ultimately not to oppose the seventy-third omnibus

5   objection.

6          As Your Honor noted, he attempts to paint himself as

7   an unsophisticated pro se creditor, when in reality he is a

8   sophisticated investment advisor that is in charge of managing

9   billions of dollars in investments.  He could have filed a

10  response on his own.  We have dozens, maybe hundreds, of pro se

11  people in these cases who file their own documents.  He didn't

12  even need to retain an attorney in order to oppose the seventy-

13  third omni.  He made a deliberate decision and he should be

14  held to that decision.

15         Briefly, Mr. Kramer has not met his burden of

16  establishing a meritorious defense in lieu of his asserting his

17  own defense to the seventy-third omni.  He attempts to borrow a

18  response filed by certain individuals, allegedly co-workers

19  that are similarly situated to him, in opposing the 118th

20  omnibus objection.  To carry his burden to proffer a

21  meritorious defense, Mr. Kramer must offer his own defense, not

22  point to another's.  He cannot bootstrap his claim onto the

23  response of other claimants to another objection no more than

24  the debtors could seek to expunge claims that are on one

25  objection pursuant to another.

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 77

Page 60

1           And finally, Your Honor, as to the prejudice point,

2    Mr. Kramer cannot carry his burden on this factor.  As Your

3    Honor noted, there are thousands of other claimants whose

4    claims have been disallowed or reclassified because the

5    claimants failed to oppose the debtors' objections.  Granting

6    this motion would encourage others to seek relief whose

7    circumstances are no more sympathetic than Mr. Kramer's at

8    significant cost to the debtors and to this Court.

9           For those reasons, we respectfully request that the

10    motion be denied.

11           THE COURT:  The motion is denied and the reasons, I

12    think, are clear from the colloquy on the record.  Mr. Kramer

13    may be within a class of claimants that currently is contesting

14    reclassification of compensation claims based upon so-called

15    restricted stock units.  The outcome of that litigation is at

16    the moment completely unclear.  But it's too late for Mr.

17    Kramer to join that party.  It has -- as members of its

18    class -- individuals each of whom opposed reclassification.

19    Many of those individuals did so by simply writing letters

20    saying, I oppose reclassification.  All it took to get a ticket

21    of admission to that particular ongoing litigation was

22    something that one could classify as a real objection.  By

23    electing not to object, Mr. Kramer has waived the right to get

24    back in.

25           And I find that there has been a failure to satisfy

08-13555-mg   Doc 25803   Filed 02/23/12   Entered 02/27/12 10:51:09   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 77

Page 61

1   the standards under 60(b), not only because of the knowing

2   decision not to object, but because of the significant

3   prejudice that would arise by reason of allowing parties who

4   have knowingly chosen not to oppose reclassification or

5   disallowance to get back in.  Finality is important in

6   bankruptcy.  The motion is denied.

7          MS. ECKOLS:  Your Honor, moving to agenda item number

8   5, that is the motion of Caisse Des Depots Et Consignations to

9   permit a late-filed claim against Lehman Brothers Special

10  Finance.  I am not sure if their counsel is here --

11         MR. HELLMAN:  Yes.

12         MS. ECKOLS:  You'll forgive me for butchering your

13  client's name.

14         MR. HELLMAN:  That's okay.  I do the same.

15         Good morning, Your Honor, Jay Hellman,

16  SilvermanAcampora.  For ease of reference perhaps we can just

17  call the client CDC.

18         Your Honor, with me is my colleague, Brett Silverman,

19  and before the Court is CDC's motion for the allowance of a

20  late-filed claim in a sum of not less than 3,077,434 dollars.

21         Judge, there are a couple of issues that are not in

22  dispute with respect to the motion.  The first is that there is

23  an ISDA master agreement between the parties and LBHI is a

24  guarantor on that agreement.

25         The question really is in this case what constitutes

Page 62

1   sufficient notice of a bar date to a known creditor.  And I say

2   known creditor because CDC is listed on schedule G of the

3   petition as having an unexpired executory contract.

4           THE COURT:  Mr. Hellman, I've read the papers and I'm

5   familiar with the issues, and I'd like you to deal with

6   response of the debtor that points out that your client

7   received actual notice at two addresses.

8           MR. HELLMAN:  Sure.

9           THE COURT:  You're dealing with a notice provision in

10  an ISDA agreement in treating that as if it governs the

11  obligations of the debtor to provide actual notice of the bar

12  date.  Well, I have a problem with that position and you need

13  to know that now.

14          MR. HELLMAN:  Okay.  I understand, Judge.  The issue

15  though is that any notices with respect to the agreement have

16  to be sent to a specific particular address in France.

17          THE COURT:  So what?

18          MR. HELLMAN:  The reason is --

19          THE COURT:  So what?  I mean, I'm frankly astounded; I

20  read your papers and it's as if inefficiency in France should

21  be elevated to a procedural due process right.

22          MR. HELLMAN:  Well, it's inefficiency on the debtors'

23  side as well, Judge.  There's a contract that governs the

24  relationship of the parties that specifically says notice needs

25  to be sent to a very particular address.  If that notice is not

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 63 of 77

Page 63

1    sent to that very particular address, the chances are --

2    because it's a quasi-governmental agency in France that spans

3    many, many blocks -- they're not going to get that notice.  And

4    the cases that we cite in the reply specifically address issues

5    where there is for example a national union and indemnity

6    agreement that says notice has to be sent to a very particular

7    address.  And there's very good reasons for that and that's

8    what we're expressing in the papers.  Notice to the --

9            THE COURT:  I understand that, but there is a

10   fundamental problem with your position where notice appears to

11   have been actually given at two other addresses, one in New

12   York and one in Paris.  And where the notice address in Paris,

13   but for the back office reference, has led to the rejection of

14   the receipt of mail that, if opened, could have ended up in the

15   right place.  I don't understand how you can take the position

16   you're taking with a straight face.

17           MR. HELLMAN:  With respect to the -- because the case

18   law tells us that when there's a specific notice provision in a

19   contract, we're entitled to notice at that particular address.

20   And, yes, the reason why we had that provision in the agreement

21   is for exactly this reason, because we would not get the

22   notice.  It would wind up getting rejected and we'd wind up in

23   this very position, unfortunately.

24           THE COURT:  What took so long to get here?

25           MR. HELLMAN:  There --

LEHMAN BROTHERS HOLDINGS INC., et al.

1          THE COURT:  This is now 2012.

2          MR. HELLMAN:  Sure.  They're primarily -- first of

3     all, it's, as I said, Judge, it's a quasi-governmental agency.

4     The wheels don't move very quickly, but when they do, we're

5     talking about primarily French-speaking employees.  With --

6          THE COURT:  But they have an office on 57th Street.

7     Wouldn't that -- don't they?

8          MR. HELLMAN:  But they don't.  That office had no

9     dealings with respect to this contract.  But be that as it may,

10    that office was -- the client that exists now, CDC, separated

11    from that office in New York in 2007, so it ceased to exist as

12    a CDC proper, if you will, here today, entity.

13         MR. HELLMAN:  But notice to the New York address under

14    the contract is not sufficient.  Notice to some alternate

15    address in France is not sufficient, specifically because we

16    have this contract that says, if you going to notify us about

17    anything dealing with the ISDA agreement including presumably

18    the notice of the bar date because that's the basis of our

19    claim, then notice has to be sent to a specific address to make

20    sure that we get it.  Otherwise, we're in this very position.

21         THE COURT:  Now are you saying -- and this is actually

22    a fairly interesting question -- that parties can contract

23    around the notice provisions of the bankruptcy rules and that

24    parties can by separate contract impose notice obligations that

25    wouldn't otherwise exist as a matter of law on debtors?

Page 65

1          MR. HELLMAN:  It appears to be that way, Judge.  If

2    you look at the reply that we submitted, there are cases in

3    support of that proposition that the parties had a contract.

4    So even though there are notice provisions under the Bankruptcy

5    Code that may provide for certain due process rights, if the

6    parties have a specific agreement, a specific contract, that

7    says notice has to be sent to that address -- that very

8    specific address -- that's a requirement.  We have to have

9    actual notice to a known creditor in that situation.

10         THE COURT:  But you actually did receive three copies

11   of the bar date notice.  One that was rejected by the mail

12   office, or mailroom of that location, and two that

13   presumptively were received, plus there was publication notice,

14   plus your client terminated the contract promptly after the

15   commencement of the Chapter 11 case, and then completely

16   ignored the fact that there was a bankruptcy that was

17   publicized all over the world including France?

18         MR. HELLMAN:  Let's take that in a couple of pieces.

19   The first part is, yes, there were notices that were sent to

20   other addresses that presumably were not returned.  But we're

21   talking about again a quasi-governmental agency in France that

22   has 73,000 employees and receives thousands of pieces of mail

23   per day.  Hence the requirement in the contract that there's a

24   very, very specific address that has to be complied with and

25   that's where notice has to be sent, and that unfortunately is

1   the one that was returned.

2          With respect to the publication, the case law that we

3   cite in the papers in both the motion and the reply say, if

4   there's a known creditor and you know that address, publication

5   is insufficient.  And with respect to -- really, the bottom

6   line is even though due process may have been satisfied, the

7   point is, is that the contract had a very specific notice

8   provision that they have to comply with and if they don't, then

9   case law provides that we have the ability to file a late

10  claim.

11         I understand from counsel that their position -- even

12  if we get past this sort of tricky issue -- we still have the

13  four-factor Pioneer tests to take a look at that would allow

14  the late-filed claim.  And I understand counsel's position

15  would mostly be, as we saw from the last go-around, the

16  prejudice to the debtor and to the Court for everybody else who

17  may have to come here and want to file a late claim.  I know

18  the Court had a couple of decisions that were rendered in May

19  of 2010, I think it was.  But our situation again is different

20  because we have a very specific contractual obligation on the

21  part of the debtor to provide us with notice.

22         And irrespective of the early termination, that really

23  dealt with -- if we look at the contract carefully -- it really

24  deals with the termination of the transactions and not

25  necessarily the contract.  The contract provisions are still

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 77

Page 67

1     operative.  It's just there's no transactions any longer

2     because of the bankruptcy filing.

3             THE COURT:  Who within your client made the decision

4     to terminate the ISDA agreement?

5             MR. HELLMAN:  I'm sorry, Judge.  Could you repeat?

6             THE COURT:  Who within your client made the decision

7     to terminate?

8             MR. HELLMAN:  That I couldn't answer.  It's a

9     bureaucracy.  It could have been anybody from -- I'm sure it

10    was somebody from a position of authority but I couldn't say

11    who.

12            THE COURT:  Okay.  So, in effect, you argue that

13    because you represent an organization that appears to be

14    inefficiently managed that it should get some kind of special

15    break in this bankruptcy.  Am I misunderstanding your argument?

16            MR. HELLMAN:  Yeah, I don't know that that's

17    necessarily the argument, Judge.  I think that the point is

18    and, yes, it's not effectively managed because of -- well, I

19    can't say it's not effectively managed.  What I can say is,

20    again, it's a quasi-governmental agency with thousands of

21    employees.  And the point that we're making is not that it's

22    not managed properly.  The point we're making is because of the

23    enormity of this agency, the contract had very, very specific

24    mailing requirements for notice.  And if those are not complied

25    with, the mail's going to be rejected and come back and it's

Page 68

1   going to put us in this very position.

2          THE COURT:  Do you know what procedures exist within

3   your client to deal with errant mail, because given the vast

4   number of addresses in Paris and the significant volume of mail

5   that comes, the problem that we're now identifying quite late

6   must happen literally every day.

7          MR. HELLMAN:  I can't -- I have no idea of how they

8   handle errant mail.  Presumably, as in this case, it's returned

9   as undeliverable.  Hence -- and they have every contract or

10  every dealing they have, has specific notice requirements to

11  make sure that it gets to the very right -- the correct

12  address.

13         THE COURT:  With respect to your argument, this seems

14  to me to be undue reliance upon strict compliance by parties

15  you have no control over with respect to a notice provision

16  that may or may not be observed.

17         MR. HELLMAN:  If I can make one other point, Judge,

18  and my colleague reminds me:  The debtor -- it's not that the

19  debtor didn't know of the notice requirements of the address.

20  Our reply contains other correspondence that was sent by the

21  debtor to that very specific address after the bar date notices

22  were sent.  So the debtor is well aware that they have to send

23  information to this particular address in order for us to

24  receive it.

25         THE COURT:  Presumably, information is sent to that

Page 69

1    particular address so that somebody who knows something about

2    this transaction can take action with respect to it?

3              MR. HELLMAN:  Correct.

4              THE COURT:  Do you know who that person is?

5              MR. HELLMAN:  I do not.

6              THE COURT:  Okay.  Thank you.

7              MR. HELLMAN:  Thank you, Your Honor.

8              MS. ECKOLS:  Your Honor, the debtors' position as to

9    CDC's motion is set forth at length in its response at docket

10   number 19314.  I'm not going to address -- repeat all those

11   arguments, but I want to address a few specific points.

12             CDC's due process and excusable neglect arguments boil

13   down to the same question:  Can a sophisticated organization

14   that engaged in complex derivatives transactions with the

15   debtors assert that it did not receive actual notice of the bar

16   date when notice was admittedly delivered to three different

17   addresses.  The answer has to be "no".  The only alleged defect

18   that CDC claims with debtors' service of the bar date notice is

19   that the address that was listed in the debtors' schedules --

20   the address that one of the three notices to CDC was sent to --

21   did not include an attention to the specific department that

22   was provided in the master agreement between the parties.  It's

23   not an issue of whether the street address was incorrect.  The

24   street address was correct, as CDC acknowledges.

25             CDC's entire argument is based on the premise that

08-13555-mg    Doc 25803    Filed 02/23/12    Entered 02/27/12 10:51:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 77

Page 70

1    because it is a large organization with many departments and

2    offices, that it need not conduct any due diligence whatsoever

3    regarding the mail it receives if the sender does not direct it

4    to a specific department within CDC.  The bottom line is that

5    CDC's alleged lack of notice is the result of CDC's internal

6    mail-handling guidelines and its decision not to open the

7    envelope that contained the bar date notice.

8          As set forth in the affidavit accompanying the

9    debtors' response, the debtor served CDC with the bar date

10    notice at three different addresses, two in Paris and one in

11    New York.  Two of those bar date notices were sent to the

12    addresses that were specified in a derivatives contract between

13    CDC and LBSF, one in Paris and one in New York.

14          The address on the bar date notice that was sent to

15    Paris was correct, but it didn't include the attention line

16    that specified that it should be routed within CDC to the Back

17    Office Monetaire.

18          The envelope did, however, contain the following

19    legend:  "Legal documentation enclosed.  Please direct to

20    attention of addressee, president or legal department."  When

21    CDC received this envelope, it did not route it to its legal

22    department or even open it to try to determine what department

23    it should go to.  Instead, CDC stamped it "Return to Sender"

24    without even looking at it.  This was a decision that was

25    entirely within CDC's control.  Having refused to open its

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 71

1    mail, CDC cannot now claim that its refusal to accept the

2    actual notice that the debtors' mailed to the correct street

3    address, deprives it of due process or gives rise to an

4    excusable neglect defense.

5        As to CDC's due process argument, CDC's argument

6    conflates notice that complies with due process with notice

7    that strictly complies with the ISDA.  Due process does not

8    require compliance with those contract provisions.  There are

9    two different standards.  Due process as set forth in Mullane

10   and its progeny requires that notice be reasonably calculated

11   to apprise parties of the pendency of the action.  To satisfy

12   due process, notice does not need to be provided in the way

13   that a creditor prefers or in a way that is specified in a

14   contract.  Taking the movant's argument to its logical

15   conclusion, the debtors could have served a bar date notice on

16   every single office of CDC, but CDC would not be deemed to have

17   received actual notice unless at least one of those notices was

18   addressed to the department listed in the master agreement.

19   Serving CDC with the bar date notice at three separate

20   addresses -- street addresses that CDC does not dispute were

21   correct -- was reasonably calculated to provide CDC with notice

22   and fully complies with the due process.

23        Your Honor, the Drexel decision discussed in the

24   debtors' response is on point.  I don't want to repeat that

25   discussion except to note that the court in Drexel determined

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 72

1    that Barclays received actual notice even though no notice was

2    served on its London office, which was allegedly the proper

3    office for handling the notice.  In that case, the court

4    determined that notice that was served on Barclays' offices in

5    Connecticut, New York, and Australia, was sufficient and that

6    it was the responsibility of Barclays' employees to route the

7    notice to the proper department within the Barclays

8    organization.  Here CDC is not even arguing that the bar date

9    was not sent to the proper office.  Rather, CDC admits that

10   notice was delivered to the proper street address, but it

11   claims that it had no obligation to open the envelope and

12   determine which department should handle it or apparently to

13   forward it to its legal department as directed on the envelope.

14   This argument fails under Drexel and is contrary to Mullane.

15          And, briefly, the case that CDC relies on -- the

16   National Union case -- specifically actually provided that the

17   notice provided by the debtors, despite having not complied

18   with the contractual provisions, did in fact comply with due

19   process.

20          Moving to excusable neglect, it's based on the same

21   facts as CDC's due process argument and falls far short of

22   Pioneer's excusable neglect standard.  As Your Honor is aware,

23   the most important Pioneer factor in the Second Circuit is

24   whether the reason for the delay and the extent to which it was

25   within the reasonable control of the movant.  Here, CDC argues

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 73

1   that the reason for its delay in its filing was entirely the

2   fault of the debtors in not directing the notice to a special

3   department or specific department within CDC.  However, it was

4   CDCs decision to not open the envelope containing the bar date

5   notice, and it was CDC's decision not to direct the notice to

6   the legal department as was directed on the envelope.  It was

7   CDC's decision to simply stamp the envelope "Return to Sender"

8   without conducting any diligence.

9           CDC is a sophisticated party that entered into complex

10  derivative transactions with LBSF.  It should be sophisticated

11  enough to open its mail and direct it within its organization.

12  And CDC's decision whether or not to do so is within its

13  reasonable control under Pioneer.

14          Lastly, as to prejudice, CDC makes the same argument

15  that other claimants have brought before this Court in its

16  claiming excusable neglect.  Specifically, that it's only one

17  claim, that this is a massive bankruptcy, and that in the grand

18  scheme of things this claim will have a negligible impact on

19  the debtors but a major one on CDC.  As Your Honor has noted

20  when dealing with other claimants seeking leniency on the bar

21  date, the prejudice to the debtors cannot be traced to the

22  filing of any one single claim but to the impact of permitting

23  exceptions that risk opening the floodgates.

24          Having failed to carry its burden on excusable neglect

25  and because CDC received notice that complied with due process,

Page 74

1    the motion should be denied.

2         THE COURT:  I agree.  The motion should be denied and

3    that's based upon the present record.  I'm going to deny the

4    motion, however, without prejudice to further presentations

5    that may be made by CDC concerning its internal processes.

6         One of the aspects about this that troubles me is that

7    there is a general statement that CDC needed notice at a

8    particular address in order to function.  I have a hard time

9    accepting that.  I have absolutely no showing that has been

10   made by the movant concerning what CDC is really all about in

11   terms of the way it processes mail, who deals with it, who is

12   responsible for this contract, what that individual did or

13   didn't do in connection with monitoring the contract after

14   termination, what if anything was done by that individual to

15   pay attention to the bankruptcy, to consult with bankruptcy

16   counsel or even think about it after terminating the contract.

17   This appears to be a situation of complete and absolute neglect

18   and inexcusable inefficiency.

19        For that reason, based upon the showing, there's

20   absolutely no basis to grant the motion.  That doesn't mean

21   that it may not be possible at some time -- with great

22   embarrassment, presumably, to the people involved -- to

23   demonstrate why it is that years went by and they did nothing

24   about a claim they now think is significant.

25        The motion is denied without prejudice to being re-

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 75

1   urged if as in when it may be possible to demonstrate good

2   cause.  I see no basis for good cause on the present record.

3          MS. ECKOLS:  Thank you, Your Honor, and I believe that

4   concludes today's contested claims agenda.

5          THE COURT:  Okay.  We're going to clear the courtroom

6   except for those who are going to stay for the chambers

7   conference.  We could go into chambers but I think there are

8   probably too many people involved.

9          So we'll take a five-minute break and then everybody

10  who's involved in the chambers conference can come forward.

11  I'll return in five minutes.

12         MS. ECKOLS:  Thank you, Your Honor.

13       (Whereupon these proceedings were concluded at 11:16 AM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 76

1

2                              I N D E X

3

4                          E X H I B I T S

5    DEBTORS                DESCRIPTION         PAGE

6    No number              Steven Cohn's        32

7                           declaration

8

9                              RULINGS

10                                                Page      Line

11   Debtors' motion to estimate the reserve      28         9

12     at five billion granted

13   Debtors' motion for authority to use non-cash  48       10

14     assets in lieu of available cash granted

15   Ms. Pugia's objection overruled and omnibus   50        25

16     objection to Ms. Pugia's claim granted

17   Motion of Jeremy R. Kramer denied             60        11

18   Caisse Des Depots Et Consignations' motion    74         3

19     denied without prejudice to any further

20     presentations concerning internal processes

21

22

23

24

25

Page 77

1

2                 C E R T I F I C A T I O N

3

4    I, Sara Davis, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

     _____
9

     SARA DAVIS
10
     AAERT Certified Electronic Transcriber CET**D 567
11

12

     ALSO TRANSCRIBED:
13

     PNINA EILBERG
14
     AAERT Certified Electronic Transcriber CET**D 488
15

     SHARON MYER
16
     AAERT Certified Electronic Transcriber CET**D 638
17

18

     Veritext
19

     200 Old Country Road
20

     Suite 580
21

     Mineola, NY 11501
22

23

     Date:  February 23, 2012
24

25