Hearing Date and Time:  March 21, 2012 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  March 13, 2012 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re                                              :      Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, et al.,   :      **08-13555 (JMP)**
                                                   :
                           **Debtors.**            :      **(Jointly Administered)**
-------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT
TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 9019 FOR APPROVAL OF A SETTLEMENT
AGREEMENT WITH LEHMAN RE LTD AND CERTAIN OTHER PARTIES**

      PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of
Lehman Brothers Holdings Inc. and its affiliated debtors in the above-captioned chapter 11
cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105
and 363 of title 11 of the United States Code and Rule 9019 of the Federal Rules of Bankruptcy
Procedure, for authority to enter into a settlement agreement with Lehman Re Ltd., acting by its
Joint Provisional Liquidators Dan Yoram Schwarzmann and Garth Andrew Calow, and certain
other parties, all as more fully described in the Motion, will be held before the Honorable James
M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander
Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004
(the "Bankruptcy Court"), on **March 21, 2012** at 10:00 a.m. (Prevailing Eastern Time) (the
"Hearing").

      PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall
be in writing, shall conform to the Federal Rules of Bankruptcy Procedure, shall set forth the
name of the objecting party, the basis for the objection and the specific grounds thereof, shall be
filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which
can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case
filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable
Document Format (PDF), WordPerfect, or any other Windows-based word processing format
(with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the
chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., Richard A. Morrison, Esq., and Maurice Horwitz, Esq. attorneys for the Debtors; (iii) the Office of the United States Trustee for the Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta Gasparini, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq. and Dennis O'Donnell, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York, 10281, Attn: Gregory Petrick, Esq., attorneys for Lehman Re Ltd., so as to be so filed and received by no later than **March 13, 2012, at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 28, 2012
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, et al., | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 9019 FOR APPROVAL OF A SETTLEMENT**
**AGREEMENT WITH LEHMAN RE LTD AND CERTAIN OTHER PARTIES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

   Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Special Financing Inc. ("LBSF"), and Lehman Brothers Commercial Corporation ("LBCC"), as debtors and debtors in possession (collectively, the "Debtors"), file this Motion and respectfully represent:

**Preliminary Statement**

   1.  This Motion seeks approval of a settlement agreement (the "Settlement Agreement") dated February 16, 2012, between the Debtors and two of their non-debtor affiliates, Lehman ALI, Inc. ("Lehman ALI") and Appalachian Asset Management Corp.

("Appalachian" and, together with the Debtors and Lehman ALI, the "Lehman US Parties"), on

the one hand, and (i) Lehman Re Ltd. ("Lehman Re"), acting by its Joint Provisional Liquidators

Dan Schwarzmann and Garth Andrew Calow, (ii) its subsidiary, Congress Life Insurance

Company ("Congress Life"), and (iii) Lehman Re's creditor, Pulsar Re, Ltd. ("Pulsar" and,

together with Congress Life and Lehman Re, the "Lehman Bermuda Parties"), on the other

hand.[1]    Pursuant to the Settlement Agreement, all asserted claims (with certain express

exceptions) between the Lehman US Parties and Lehman Bermuda Parties will be fully and

finally resolved.

   2.  The Settlement Agreement resolves the claims asserted by Lehman Re

against the Debtors arising primarily in connection with two prepetition agreements:  (i) a Master

Repurchase Agreement dated as of July 9, 1999 (the "MRA") between, among others, LCPI and

Lehman Re, pursuant to which LCPI committed to sell to Lehman Re, and later repurchase,

certain residential and commercial mortgage and mezzanine loans listed on Exhibit A of the

Settlement Agreement (the "MRA Loans"), and (ii) the Net Worth Maintenance Agreement

between LBHI and Lehman Re dated October 26, 2007 (the "NWMA").  Pursuant to the

NWMA, LBHI agreed (i) to cause Lehman Re to have at all times the minimum solvency margin

as is required under the laws of Bermuda, and (ii) to provide Lehman Re with the liquidity

necessary to enable Lehman Re to meet certain of its obligations on a timely manner.

   3.  Lehman Re declared LCPI in default under the MRA on September 17,

2008 and subsequently filed a claim against LCPI in an unliquidated amount for damages arising

from the MRA.  In addition, Lehman Re filed a claim against LBHI in an unliquidated amount

for amounts due under the NWMA.  Over the past two years, the Debtors have devoted

---

[1]  The Settlement Agreement is attached hereto as Exhibit A.

considerable resources to analyzing the terms of both the MRA and NWMA.  With respect to the MRA, LCPI performed rigorous valuations of each of the MRA Loans and, using these valuations as a starting point, has negotiated at arms'-length with Lehman Re to arrive at mutually acceptable valuations that give rise to an agreed claim against LCPI of $490 million, which both parties believe adequately reflects LCPI's obligations to Lehman Re under the MRA. With respect to the NWMA, the Debtors and Lehman Re have consulted extensively with their Bermuda counsel concerning the proper interpretation and application of the NWMA, and have engaged in an extensive analysis of Lehman Re's assets and liabilities in order to arrive at an allowed claim against LBHI of $415 million, which both parties believe adequately reflects LBHI's obligations to Lehman Re under the NWMA.

4.       In addition to Lehman Re's claims against LBHI and LCPI, Lehman Re has asserted claims against LBCC and LBSF arising from certain intercompany cash transfers and derivatives transactions reflected in the books and records of the Debtors and Lehman Re. After nearly two years of careful review and reconciliation of these intercompany transactions, LBCC and LBSF have agreed to allowed claims against LBCC and LBSF of approximately $87.6 million and $25.4 million, respectively.

5.       Pursuant to the Settlement Agreement, the claims of Appalachian against Lehman Re and Congress Life will also be fixed and allowed, as set forth below.

6.       The Settlement Agreement also resolves the respective responsibilities of Lehman Re, on its behalf and on behalf of Congress Life, and of LBHI and LCPI for federal income tax liabilities of the LBHI consolidated federal income tax group (the "LBHI Group") for tax years during which Lehman Re and Congress Life have been, and for any tax years during which they continue to be, members of the LBHI Group.

7.      In addition to the foregoing claims settlements, LCPI will purchase certain loans from Lehman Re which are set forth on Exhibit D to the Settlement Agreement (the "Repurchased Loans") in the aggregate outstanding principal amount of approximately $313 million, free and clear of all liens, claims, and encumbrances, for an aggregate purchase price of $32 million.  The Repurchased Loans are among the MRA Loans that LCPI sold to Lehman Re pursuant to the MRA prior to the commencement of LCPI's chapter 11 case.  These loans are potentially of greater value to LCPI than they are to Lehman Re because LCPI is already invested in the capital structure of many of the assets underlying the Repurchased Loans.  As stated in the Declaration of Jeffrey Fitts dated February 21, 2012 (the "Fitts Decl."), LCPI has carefully analyzed each of the Repurchased Loans and determined that, if afforded the opportunity, LCPI could maximize the value of these loans as a strategic purchaser and realize a significant upside profit if it were to purchase these loans from Lehman Re.  *See* Fitts Decl at ¶ 6.  Accordingly, in its business judgment, LCPI has determined that the purchase of the Repurchased Loans is in the best interests of its estate and will inure to the benefit of its economic stakeholders.

8.      In the aggregate, the Lehman Bermuda Parties have asserted approximately $2.3 billion in claims against the Debtors.  As set forth in the Declaration of Daniel J. Ehrmann dated February 23, 2012 (the "Ehrmann Decl."), pursuant to the Settlement Agreement, and as a result of two years of good faith, arms'-length negotiations, the Debtors have reduced these asserted claims to an aggregate of approximately $1 billion, which in the Debtors' judgment, adequately reflect the Debtors' obligations to Lehman Re.  *See* Ehrmann Decl. at ¶ 4.  In addition, the Debtors will benefit from certain releases from asserted and potential claims by Lehman Re and certain of Lehman Re's creditors and their affiliates.  In the

Debtors' judgment, the Settlement Agreement provides for a fair and final resolution of all outstanding disputes and claims between their estates, Lehman Re, and certain of Lehman Re's largest creditors. The Debtors submit that the Settlement Agreement is fair and reasonable, in the best interests of their estates, and should be approved.

### **Background**

9.      Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

11.      On September 23, 2008, a winding-up proceeding (the "Bermuda Proceeding") was commenced by Lehman Re in the Supreme Court of Bermuda (the "Bermuda Court"). By orders of the Bermuda Court, Dan Yoram Schwarzmann and Garth Andrew Calow have been appointed as joint provisional liquidators of Lehman Re (the "JPLs").

12.      On August 6, 2009, the JPLs on behalf of Lehman Re filed a Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. Section 1521, ECF No. 2, *In re Lehman Re Ltd.*, Case No. 09-14884 (JMP) (Bankr. S.D.N.Y.) (the "Lehman Re Chapter

15 Case"), and on September 24, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief under 11 U.S.C. Section 1521, ECF No. 56 (in the Lehman Re Chapter 15 Case).

13.     On September 1, 2011, the Debtors filed their Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 19628 (the "Third Amended Plan"), and the Debtors' Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, ECF No. 19629 (the "Disclosure Statement").  The Court approved the Disclosure Statement and voting procedures with respect to the Third Amended Plan later that day, ECF No. 19631.  On September 15, 2011, the Court entered an order approving a modification to the Disclosure Statement, ECF No. 20016.

14.     On December 5, 2011, the Debtors filed their Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 22931 (the "Plan").  On December 6, 2011, the Court entered an order confirming the Plan, ECF No. 23023.

15.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Disclosure Statement.

**Jurisdiction**

16.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

**Lehman's Business**

17.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

18.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**The Net Worth Maintenance Agreement**

19.      As stated above, under the NWMA, LBHI agreed to provide Lehman Re with "the liquidity needed to enable Lehman Re to meet its obligations in a timely manner." LBHI also pledged to provide Lehman Re with "the minimum solvency margin as is required under the laws of Bermuda."   LBHI has been informed by its Bermuda counsel that because Lehman Re was registered as a class 4 insurer, the minimum solvency margin for Lehman Re is the greater of (a) $100 million in excess of Lehman Re's equity, (b) 15% of the aggregate of loss expense provisions and other general business reserves, and (c) 50% of the net premiums written in current financial year (or projected to be written on application for registration).

20.        Lehman Re filed a claim against LBHI in an unliquidated amount on account of the NWMA (the "NWMA Claim"), and has asserted, in discussions with LBHI, that LBHI's liability under the NWMA could be as high as approximately $1.124 billion.  The parties have not disputed that LBHI's liability under the NWMA is essentially calculated as Lehman Re's assets less its liabilities, plus $100 million (the requisite minimum solvency margin). However, LBHI and Lehman Re have disputed the proper means of calculating LBHI's liability under the NWMA, and in particular, how Lehman Re's balance sheet should be adjusted for purposes of this calculation.

21.        As a preliminary matter, because Lehman Re has not established a bar date in the Bermuda Proceeding, and has not called upon its creditors to submit proofs of claim, Lehman Re initially calculated its NWMA claim based upon its books and records as of September 14, 2008.  LBHI asserted that Lehman Re's books and records did not accurately reflect its potential third-party liabilities.

22.        At the same time, Lehman Re contended that certain adjustments should to be made to the asset side of its balance sheet to reflect, among other things, estimated recoveries, and the capital expenditures required to maintain certain of Lehman Re's assets.  LBHI asserted that if this approach were taken, Lehman Re should make similar adjustments to its liabilities, taking into account the mitigation thereof.  Lehman Re disagreed, and contended that its liabilities should remain static in the calculation.  In addition to the foregoing issues, LBHI posited that any claims asserted by Lehman Re under the NWMA must take into account the potential risk that Lehman Re could be substantively consolidated with LBHI.

23.        LBHI and Lehman Re have consulted extensively with their Bermuda attorneys with respect to the proper interpretation and application of the NWMA.  While the

NWMA is not itself unique under Bermuda Law, the circumstances that surround the agreement – where *both* parties are subject to separate insolvency proceedings – has created a certain degree of uncertainty with respect to the practical disputes outlined above.  Taking into consideration the risks of litigation concerning these issues, the parties have engaged in arms'-length negotiations in effort to reach a mutually satisfactory claim against LBHI based upon Lehman Re's estimated assets and liabilities.  As a result of these arms'-length negotiations, LBHI has agreed that Lehman Re will have an unsecured affiliate claim under the Plan in LBHI Class 8 arising from the NWMA in the amount of $415 million.

### The Master Repurchase Agreement

24.     Prior to the commencement of LCPI's chapter 11 case, Lehman Re transferred cash to LCPI in exchange for the purchase of certain assets pursuant to the MRA, including the MRA Loans.  On September 17, 2008, Lehman Re declared an Event of Default (as defined in the MRA) and notified LCPI in writing that it was in default under the MRA.  Lehman Re subsequently filed a claim against LCPI in an unliquidated amount arising from LCPI's failure to repurchase the MRA Loans (the "LCPI Repo Claim").

25.     On November 4, 2009, Lehman Re, LBHI, LCPI, and Lehman ALI entered into a settlement agreement (the "MRA Settlement Agreement"), pursuant to which the Lehman US Parties resolved certain disputes relating to the MRA, including a dispute between Lehman Re and the Debtors regarding which parties are liable for the funding obligations under the MRA Loans.  Pursuant to the MRA Settlement Agreement, the Lehman US Parties agreed to execute and deliver to Lehman Re certain assignment documents with respect to each MRA Loan and to confirm that Lehman Re was the sole owner of the MRA Loans since September 17, 2008.  In exchange, Lehman Re agreed, among other things, to assume all future funding

obligations under the MRA Loans from September 17, 2008 and pay $1 million to the Lehman

US Entities, and to grant the Lehman US Entities a right of first offer to purchase certain of the

MRA Loans.    The Court authorized LBHI's and LCPI's entry into the MRA Settlement

Agreement on August 27, 2009, ECF No. 4980.

26.    The MRA Settlement Agreement did not resolve the calculation of the

LCPI Repo Claim.    Initially, LCPI disputed whether the MRA in fact governed the valuation of

the LCPI Repo Claim.    The MRA is based upon a standardized form – specifically, the

September 1996 Version of Master Repurchase Agreement that is promulgated by the Bond

Market Association ("BMA") (now part of the Securities Industry and Financial Markets

Association).    Although the MRA contains a provision for the calculation of damages (MRA §

11(d)), LCPI asserted that this provision was inapplicable to the valuation of mortgage loans

because the MRA was designed to be used as a master agreement for repurchase transactions

involving securities that are traded in a public exchange – *i.e.*, securities for which "a generally

recognized source for prices or bid or offer quotations" exists.    *See* MRA § 11(d).    LCPI also

asserted that no such source of market price information exists for the MRA Loans.    LCPI noted

that after the execution of the MRA, the parties entered into that certain Tri-Party Custody

Agreement by and among Lehman Re, LCPI, and the Bank of New York ("BNY") dated as of

May 5, 2008 (the "Custody Agreement") with respect to the MRA Loans, and deliberately

included in the Custody Agreement a provision (Custody Agreement § 6(b)(iii)) for the valuation

of the MRA Loans that grants LCPI full discretion to value the MRA Loans.    LCPI argued that

this provision overrides the form language of the MRA.[2]

---

[2]    Section 18(e) of the Custody Agreement provides:  "In the event that any provision of this Agreement shall be inconsistent or conflict with any provision of the Repurchase Agreement, with respect to Transactions to be processed under this Agreement, the provisions of this Agreement shall control."

27.        Lehman Re contended that the valuation provisions of the Custody Agreement cease to apply upon an Event of Default under the MRA, and that therefore the provisions of the MRA, together with section 562 of the Bankruptcy Code, should control the determination of damages irrespective of the provisions in the Custody Agreement.  Section 562 of the Bankruptcy Code "establishes the timing for determining the damages" upon the acceleration or rejection of a repurchase agreement, *see In re American Home Mortgage Holdings, Inc.*, 411 B.R. 181, 189 (Bankr. D. Del. 2009), and provides that if the Debtor rejects, or the counterparty accelerates a repurchase agreement, "damages shall be measured as of the earlier of – (1) the date of such rejection; or (2) the date or dates of such liquidation, termination, or acceleration."  *See* 11 U.S.C. § 562(a).  Section 562 provides further that "[i]f there are not any commercially reasonable determinants of value as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  *See* 11 U.S.C. § 562(b).

28.        Both parties took the position that September 17, 2008 was the proper date for the calculation of damages under section 562 of the Bankruptcy Code.  Lehman Re, however, believed that determinants of value existing at that time suggested that the value of the properties underlying the MRA Loans was low.  LCPI disagreed.  The parties also fundamentally disagreed with the proper method of valuing the MRA Loans.  In the weeks following September 17, 2008, LCPI conducted a discounted cash flow analysis of the MRA Loans (the "LCPI DCF Analysis").  LCPI posited that the LCPI DCF Analysis was a commercially reasonable determinant of value and that the LCPI Repo Claim should be calculated based on the LCPI DCF Analysis.  Lehman Re objected to the use of a discounted cash flow analysis primarily because many of the properties underlying the MRA Loans are currently unfinished and not yet generating income.

Consequently, Lehman Re asserted that the proper method for valuing the MRA Loans was to use, among other things, a comparable property analysis. Lehman Re had hired Eastdil Secured L.L.C. ("Eastdil") to perform comparable valuations for loan management and liquidation purposes, and took the position that Eastdil's valuations could serve as a proxy for determining the value of the MRA Loans as of September 17, 2008. LCPI objected to the use of comparables, but more importantly, LCPI believed that Eastdil's valuations improperly took into account data as of December 31, 2008, more than three months after the acceleration date of the MRA.

29.    Over a period of approximately two years, LCPI and Lehman Re have held extensive and, at times, highly contentious discussions regarding disputes summarized above. In addition to addressing the legal questions regarding the appropriate date and methodology for calculating the LCPI Repo Claim, the parties have also challenged the assumptions and underlying models used by both LCPI and Eastdil to prepare their respective valuations, and have conducted rigorous negotiations in an attempt to reconcile their differing valuation approaches. At the same time, LCPI has weighed the risks and potential benefits of objecting to the LCPI Repo Claim, and the delay and expense that would likely result if such an objection progressed to a full-scale trial, involving expert witness testimony and extensive discovery and depositions.

30.    During the course of these negotiations, and as a result of its deep analysis of the MRA Loans, LCPI has also determined that there is considerably more value to LCPI in the Repurchased Loans than there is to Lehman Re, particularly because many of these loans form parts of capital structures in which LCPI already has a significant position. Consequently, in the context of the negotiations over the LCPI Repo Claim – and particularly that portion of the

LCPI Repo Claim that relates to the Repurchased Loans – LCPI concluded that if it could agree on a price that is fair and reasonable with respect to the Repurchased Loans, it would be strategically beneficial for LCPI to purchase the Repurchased Loans, thereby fixing that portion of the LCPI Repo Claim that relates to the Repurchased Loans, and affording LCPI the strategic benefits of maximizing the upside value of these loans.

31.     In this context, LCPI and Lehman Re have agreed that LCPI will repurchase the Repurchased Loans for an aggregate purchase price of $32 million, and that the LCPI Repo Claim will be allowed as an unsecured claim in an aggregate amount equal to $490 million and classified as an affiliate claim under the Plan in LCPI Class 5C.

## Settlement with LBSF

32.     Lehman Re and LBSF were parties to that certain ISDA Master Agreement, dated June 9, 1998 (the "ISDA Agreement"), pursuant to which Lehman Re and LBSF entered into swap transactions. Lehman Re filed a claim against LBSF, Claim No. 28306, in excess of $52 million on account of amounts allegedly due and owing under the ISDA Agreement (the "LBSF Claim"). Over the past two years, LBSF and Lehman Re have engaged in arms'-length discussions regarding the LBSF Claim in an effort to fully reconcile the trades under the ISDA Agreement and arrive at a calculation of damages that is satisfactory to both parties. As a result of these negotiations, the parties have agreed that pursuant to the Settlement Agreement, Lehman Re will have an allowed unsecured claim against LBSF in an amount equal to $25,430,000 and classified as an affiliate claim under the Plan in LBSF Class 5C.

## Settlement with LBCC

33.     Prior to the commencement of LBCC's chapter 11 case, Lehman Re and LBCC entered into certain undocumented foreign exchange transactions. Lehman Re filed a

claim against LBCC in excess of $89.9 million on account of these transactions, Claim No. 28308 (the "LBCC Claim").    The Debtors and Lehman Re have spend considerable time reviewing and reconciling their respective books and records, and have agreed that LBCC Claim should be slightly adjusted.    Accordingly, pursuant to the Settlement Agreement, the LBCC Claim will be allowed as an unsecured claim in the aggregate amount of $87,621,000 and classified under the Plan as an affiliate claim in LBCC Class 5C.

## Tax Settlement

34.    The Settlement Agreement also resolves a dispute among the Debtors, Lehman Re, and Congress Life concerning their tax liabilities to each other as part of a consolidated tax group.    LBHI generally paid income taxes on behalf of the LBHI Group.    Under governing Treasury Regulations, each member of the LBHI Group has several liability for the entire tax liability of the group for all tax years during which it is a member of the group.    For federal income tax purposes, Lehman Re and Congress Life have been members of the LBHI Group and have been included in the consolidated federal income tax return of the LBHI Group since the 2003 taxable year in the case of Lehman Re, and since the 2007 taxable year in the case of Congress Life.

35.    Lehman Re and Congress Life historically have accounted for their income tax liability in accordance with U.S. Generally Accepted Accounting Principles and consistent with the historic income tax sharing principles adopted by several Lehman affiliates within the LBHI Group.    For example, according to LBHI's records, as of September 15, 2008, the balance sheets of both Lehman Re and Congress Life reflect an intercompany payable due to LBHI with respect to pre-2008 tax amounts and a current income tax payable for 2008 tax amounts (totaling approximately $40.6 million and $1.2 million for Lehman Re and Congress

Life, respectively).   However, Lehman Re disputes this amount, and has claimed that, among other things, under historic tax sharing practices, it and Congress Life only have liability to LBHI for tax sharing payments computed on a "separate company" basis, and thus should have no liability to LBHI for tax years 2008 and after as long as they would have had sufficient losses to offset their income in such years had they not been consolidated.   LBHI disagrees with this, arguing, in part, that such treatment is inconsistent with the actual use of losses within a consolidated group for federal income tax purposes.   To resolve this dispute, and in exchange for the other benefits that LBHI and LCPI receive under the Settlement Agreement, the parties have agreed, as set forth below, that Lehman Re, on its behalf and on behalf of Congress Life, will have the right to utilize up to $150 million of net operating losses incurred by LBHI and LCPI, provided that for 2008 onward, except as otherwise provided in the Settlement Agreement, Lehman Re and Congress Life abide by the terms of section 4 of the "Debtor Allocation Agreement" that is incorporated into the Plan (as if they were signatories), which identifies, allocates and sets forth the Debtors' agreed rights and obligations with respect to commonly held tax benefits and obligations.

### The Settlement Agreement

36.      Other than the allowed claims discussed above, the salient terms of the Settlement Agreement are set forth below.[3]

***Closing Date***                      Subject to the conditions set forth in the Settlement Agreement, the
                                              closing of the sale of the Repurchased Loans (the "Closing") will take
                                              place on or before the tenth (10th) business day following the
                                              effective date of the Settlement Agreement (the "Closing Date").

---

[3]      This summary, as well as the other descriptions of the Settlement Agreement contained in the Motion (the "Summary") are qualified in their entirety by the provisions of the Settlement Agreement.  This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the Settlement Agreement.  Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the Settlement Agreement.

| | |
|---|---|
| ***Appalachian Claim*** | Appalachian Asset Management Corp., an affiliate of the Debtors, will be allowed to file a claim against Lehman Re in the Bermuda Proceeding for $1,583,796.17, which claim shall be accepted as a valid claim against Lehman Re thereby entitling Appalachian to participate in a liquidation distribution pari passu with other unsecured creditors of Lehman Re. |
| ***Appalachian Claim Against Congress Life*** | Appalachian's claim against Congress Life will be fixed in the amount of $1,283.00. |
| ***Pulsar Claims*** | The Settlement Agreement recognizes that Pulsar's claim against LBSF, Claim No. 12711, has been compromised, settled and allowed as an unsecured claim against LBSF in the amount of $450,000 pursuant to this Court's *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts*, entered on December 16, 2008. |
| ***Distribution of Residential Cash Flow*** | The $4,772,448.27 net cash payments on account of the residential Mortgage Loans referenced as the "Net Cash" amount for August, 2008 on the Resi Cash Flow Chart annexed to the MRA Settlement Agreement as Exhibit F, together with all earnings thereon, which continue to be held by Aurora Bank in accordance with the provisions of Section 3 of the MRA Settlement Agreement, shall be disbursed to LCPI on the Effective Date (as defined in the Settlement Agreement). |
| ***Repurchase of Certain Mortgage Loans*** | Lehman Re will sell, transfer, assign, convey and deliver to LCPI, and LCPI will accept from Lehman Re, (i) all of Lehman Re's right, title and interest in and to each of the Repurchased Loans free and clear of all liens and encumbrances, (ii) any collateral securing the Repurchased Loans, and (iii) any proceeds in respect of the Repurchased Loans. |
| | Lehman Re will also grant to LCPI an exclusive right of first offer to purchase from Lehman Re, pursuant to, and in accordance with, the procedures set forth on Exhibit C attached to the Settlement Agreement, each of the real estate assets set forth on Exhibit B attached to the Settlement Agreement, that Lehman Re proposes to sell during the ROFO Period (as defined in Exhibit C). |
| ***Pending Litigation*** | In certain pending litigation relating to the Repurchased Loans, Lehman Re will comply with LCPI's instructions (including, without limitation, filing such pleadings and in such form as may be determined by LCPI in its sole discretion).  LCPI will indemnify and hold Lehman Re harmless from any loss or damage (including reasonable attorneys fees and expenses) incurred by Lehman Re and directly resulting from Lehman Re's compliance with any such |

instructions.

**Releases**

Broadway Partners Release

In addition to mutual releases between the Lehman US Parties and Lehman Re and Congress Life, the Settlement Agreement contains certain releases between the parties and the borrowers (the "Broadway Partners") under certain of the MRA Loans. Specifically:

▪ Lehman Re and Congress Life shall deliver to the Lehman US Parties and the Broadway Partners, a mutual release in the form attached to the Settlement Agreement as Exhibit G (the "Mutual Release").

▪ On or before the Closing Date, Lehman Re and each of the Broadway Partners shall have executed and delivered to the Lehman US Parties the Mutual Release.

Pulsar Release

The Settlement Agreement includes a mutual release between the Lehman US Parties and Pulsar. Certain affiliates of Pulsar will retain their asserted claims against the Debtors, and the Debtors will retain all defenses and claim against Pulsar.

**Withdrawal of Adversary Proceedings**

The following adversary proceedings shall be withdrawn within ten (10) business days following the Closing Date with prejudice:

▪ the adversary proceeding commenced on January 26, 2011, in the Bankruptcy Court for the Southern District of New York, captioned *Pulsar Re, Ltd. v. Lehman Brothers Holdings, Inc, and Lehman Commercial Paper Inc.* Adversary Pro No. 11-01283-JMP (the "Pulsar Adversary Proceeding"); and

▪ that certain litigation identified as *D. Geoffrey Hunter and Dan Schwarzmann, as Joint Provisional Liquidators of Lehman Re, Ltd.. v. Broadway Partners Real Estate Fund III, L.P., et al.*, Case No. 09-14884 (JMP), Adv. Proc. No. 10-03279.

In addition, Pulsar will abandon, release and waive its rights under the Order of the Bermuda Court dated September 20, 2011, made by Mr. Justice Kawaley in *In the Matter of Lehman Re Ltd.*, Supreme Court of Bermuda, Commercial Court, Companies (Winding Up), 2008: No. 217 (whereby Pulsar was released from its implied undertaking of confidentiality in respect of discovery obtained in the proceeding); and will covenant that, notwithstanding that portion of the said Order of September 20, 2011, it shall for all purposes treat itself as still bound by the said implied undertaking of confidentiality; and will agree to the withdrawal/abandonment of the appeal by LBHI and LCPI to the Court of Appeal for Bermuda

against the said Order of September 20, 2011, with no order for costs.

*Tax Matters*

▪ Lehman Re and Congress Life will continue to be included as members of the LBHI federal consolidated return for all tax years for which they qualify as members of the LBHI Group.

▪ LBHI will waive any income tax-related payable reflected on its balance sheet, or otherwise due, from Lehman Re or Congress Life related to any tax year ended prior to the date of the filing of the LBHI chapter 11 case, *i.e.*, tax years 2007 and prior.

▪ For tax years 2008 and after, Lehman Re, on behalf of itself and Congress Life, will abide by the material terms of the Debtor Allocation Agreement filed with and approved by the Court in connection with the Plan (which governs as among the Debtors the allocation of any income tax liability of the LBHI Group and the compensation of a member for any use of its tax attributes by other members) as if each was a signatory governed by the agreement, except that Lehman Re and Congress Life will be entitled to utilize without compensation up to $150 million of the allocable net operating loss carryforwards of LBHI and LCPI, in the aggregate, as absorbed in accordance with governing tax regulations.

▪ LBHI will indemnify and hold harmless Lehman Re for any LBHI Group federal income tax liability for which either Lehman Re or Congress Life could be held liable as a member of the LBHI Group, other than any tax liability for 2008 and after for which Lehman Re has responsibility under the Settlement Agreement.

| | |
|---|---|
| **Conditions to Effectiveness** | The Settlement Agreement will become effective upon the last to occur of: (i) entry of a final order by this Court granting the relief requested in this Motion, (ii) entry of an order, in form and substance reasonably satisfactory to both the JPLs and the Debtors by the Bermuda Court approving the Settlement Agreement (the "Lehman Re Bermuda Order"), and (iii) entry of a final order by the Court in the Lehman Re Chapter 15 Case, in form and substance reasonably satisfactory to both the JPLs and the Debtors, authorizing the sale of the Repurchased Loans to LCPI in accordance with the terms of the Settlement Agreement, free and clear of all liens and encumbrances, which order shall no longer be subject to any appeal and as to which the time to file an appeal has expired. |
| | On February 27, 2012, the Bermuda Court entered the Lehman Re Bermuda Order. |

### The Settlement Agreement is Fair and Equitable and Should Be Approved

37.    The Debtors submit that the Settlement Agreement is in each of the Debtors' best interests and should be approved under Rule 9019 of the Bankruptcy Rules. Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a).   This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

38.    Compromises are "a normal part of the process of reorganization." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Compromises may be effected separately during the reorganization proceedings or in the body of

the plan itself. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. at 758. The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). The court's discretion may be exercised "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted). The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

39.     Courts typically consider the following factors in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; (v) the competence and experience of counsel who support the settlement; (vi) the relative benefits to be received by members of any affected class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and (viii) the debtor's informed judgment that the settlement is fair and reasonable. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. at 50.

40.    While a court must "evaluate. . .all. . .factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496.    Moreover, in reviewing a global compromise, the court need not be aware of or decide the particulars of each individual claim resolved by the settlement or "assess the minutia of each and every claim"; rather, the court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness.'"  *Shugrue*, 165 B.R. at 123.  As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate."  *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

41.    In consultation with both its US and Bermuda attorneys, LBHI has concluded that any litigation concerning the proper calculation of the NWMA Claim would be highly uncertain, time-consuming, and expensive.  Litigation over the legal issues summarized above, such as the proper means of determining Lehman Re's assets and liabilities, would require extensive testimony by Bermuda law experts with respect to the proper interpretation and application of the NWMA in the highly unusual circumstances of these cases.  In addition, litigation relating to the proper accounting of Lehman Re's assets and liabilities is likely to be highly fact intensive, requiring extensive discovery concerning each of Lehman Re's assets (and potential realizable value thereof) and liabilities, and the parties respective estimates and projections with respect thereto.  Having considered the relative risks and benefits of pursuing

such litigation, LBHI has determined that negotiated resolution of the NWMA Claim pursuant to the Settlement Agreement is fair and reasonable, and falls well above the lowest point in the range of reasonableness. *See* Ehrmann Decl. at ¶ 5.

42.    Similarly, litigation over the calculation of the LCPI Repo Claim would require extensive litigation over highly uncertain questions of fact and law. Throughout the two years of extensive and highly contentious negotiations concerning the calculation of the LCPI Repo Claim, neither LCPI nor Lehman Re have been able to identify case-law that would offer guidance with respect to the issues involved, with the exception of one case, *In re American Home Mortgage Holdings, Inc.*, 637 F.3d 246 (3d Cir. 2011) ("American Home"). In *American Home*, the United States Court of Appeals for the Third Circuit held that discounted cash flow analysis was a "commercially reasonable determinant" of value for the liquidation of mortgage loans in a repurchase transaction. Distinctions could be made, however, between the mortgage loans at issue in American Home and the MRA Loans – in particular, as Lehman Re has noted, many of the assets underlying the MRA Loans have not been completed and are not yet producing income. In addition, Lehman Re has asserted that the costs of completing the underlying properties should be included as part of the calculation of the LCPI Repo Claim. American Home offers no guidance with respect to these issues, which would be issues of first impression before this court.

43.    Even if this Court were to determine that *American Home* is analogous to the circumstances of this case, and that a discounted cash flow analysis is a commercially reasonable determinant of value, Lehman Re would likely challenge the assumptions and models that underlie LCPI DCF Analysis. LCPI, in turn, would challenge Eastdil's valuations on similar grounds, resulting in fact-intensive litigation over the value of the MRA Loans that would

require extensive discovery, depositions, and expert testimony by LCPI's and Lehman Re's valuation experts. In balancing the risks and benefits of such potentially prolonged and expensive litigation, LCPI has determined that it is in the best interests of its estate and economic stakeholders to allow the LCPI Repo Claim in the amount set forth in the Settlement Agreement. In LCPI's judgment, this allowed claim amount represents a fair compromise that reflects the relative risks and expense of any potential litigation over the LCPI Repo Claim. In addition, by agreeing to allow the LCPI Repo Claim pursuant to the Settlement Agreement, LCPI has also negotiated a fair price for the Repurchased Loans, which, as set forth below, will allow LCPI to fully maximize the value of these loans for the benefit of LCPI's creditors. As such, the Settlement Agreement is manifestly in LCPI's best interests and should be approved.

44.       In addition to the resolving the LCPI Repo Claim and the NWMA Claim, LBSF and LBCC have agreed to allowed amounts with respect to the LBSF Claim and LBCC Claim that they believe fairly reflect their reconciled books and records. As such, the Settlement Agreement achieves and full and final reconciliation of all intercompany claims and disputes between the Debtors and Lehman Re, and arrives at mutual compromises and concessions that are in the best interests of each of the Debtors and their respective economic stakeholders, while avoiding the risks and expense of prolonged litigation over the calculation of claims arising from the both the NWMA and the MRA.

45.       As stated above, the Settlement Agreement resolves disputes concerning the allocation of certain tax benefits and liabilities. Although as part of the settlement, Lehman Re and Congress Life will have the benefit of up to $150 million of net operating losses otherwise allocable to LCPI or LBHI, the Debtors do not believe that this reallocation of net operating losses with have any detrimental or prejudicial effect on them. The Settlement

Agreement also provides for (i) certain releases of the Broadway Partners, which indirectly benefit the Debtors because the Broadway Partners are borrowers under certain of the MRA Loans, and (ii) mutual releases between the Lehman US Parties and Pulsar, together with the withdrawal of the Pulsar Adversary Proceeding, both of which directly benefit the Debtors.

46.    For all the foregoing reasons, each Debtor submits that the Settlement Agreement is fair and reasonable, in the best interests of its estate and all relevant stakeholders, and should be approved.

### The Purchase of the Repurchased Loans Represents An Appropriate Exercise of LCPI's Business Judgment

47.    Ample authority exists for approval of LCPI's purchase of the Repurchased Loans.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

48.    LCPI has determined, in its sound business judgment, that the Repurchased Loans offer substantial value for LCPI's estate and creditors.  LCPI has a strong familiarity and understanding of the value of the Repurchased Loans as a result of the deep and rigorous diligence that LCPI conducted in connection with its analysis of the LCPI Repo Claim.

*See* Fitts Decl. at ¶ 6.  Based on this analysis, and combined with a favorable resolution of the LCPI Repo Claim, the purchase of the Repurchase Loans for a purchase price of $32 million represents a sound exercise of LCPI's business judgment.  Moreover, the purchase of the Repurchased Loans will confer certain strategic benefits to LCPI because LCPI is already invested in the capital structure of many of the assets underlying the Repurchased Loans.  LCPI will therefore have the opportunity to realize a substantial profit through proactive management of the Repurchased Loans.  For all the foregoing reasons, the purchase of the Repurchased Loans pursuant to the terms of the Settlement Agreement represents an exercise of LCPI's sound business judgment, is in the best interest of LCPI's estate and creditors, and all other parties in interest, and should be approved.

## Notice

49.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi)  all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases, ECF No. 9635.  The Debtors submit that no other or further notice need be provided.

50.        No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  February 28, 2012
           New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

**Settlement Agreement**

EXECUTION COPY

## SETTLEMENT AGREEMENT

This settlement agreement ("Agreement") is entered into on this 16th day of February, 2012, among the Debtors[1], Lehman ALI, Inc., a Delaware corporation ("Lehman ALI"); Appalachian Asset Management Corp., a Delaware corporation ("Appalachian"; and together with the Debtors and Lehman ALI, the "Lehman U.S. Parties"); Lehman Re Ltd. ("Lehman Re"), a Bermuda corporation in provisional liquidation, acting by its Joint Provisional Liquidators ("JPLs")[2], Dan Yoram Schwarzmann and Garth Andrew Calow, as agents for Lehman Re and acting solely in that capacity without personal liability; Congress Life Insurance Company, an Arizona insurance company ("Congress Life"); and Pulsar Re, Ltd. ("Pulsar") (the Debtors, Lehman ALI, Appalachian, Lehman Re, Congress Life, and Pulsar may be referred to collectively as the "Parties, and each individually as a "Party").

## RECITALS

WHEREAS, on September 15, 2008 (the "Petition Date"), LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), that is presently pending under Case No. 08-13555 (JMP), and is being jointly administered with the Chapter 11 cases of certain affiliates and subsidiaries of LBHI, including LCPI (collectively, the "Chapter 11 Cases");

WHEREAS, on September 23, 2008, a winding-up proceeding (the "Bermuda Proceeding") was commenced by Lehman Re in the Supreme Court of Bermuda (the "Bermuda Court");

WHEREAS, by orders of the Bermuda Court, Dan Yoram Schwarzmann and Garth Andrew Calow were appointed as joint provisional liquidators of Lehman Re;

WHEREAS, on October 5, 2008, LCPI commenced in the Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code (the "LCPI Petition Date");

---

[1]    As used herein, "Debtors" means Lehman Brothers Holdings Inc. ("LBHI"); Lehman Brothers Special Financing Inc. ("LBSF"); Lehman Commercial Paper Inc. ("LCPI"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc.; Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI Statler Arms LLC.

[2]    As used herein, "JPLs" shall include Dan Yoram Schwarzmann, Garth Andrew Calow, and any preceding provisional liquidators of Lehman Re acting jointly or severally, and any successors to the provisional liquidators, whether provisionally or permanently appointed.

WHEREAS, on August 6, 2009, the JPLs on behalf of Lehman Re filed a Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. Section 1521 [Docket No. 2], *In re Lehman Re Ltd.*, Case No. 09-14884 (JMP) (Bankr. S.D.N.Y.) (the "Lehman Re Chapter 15 Case"), and on September 24, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief under 11 U.S.C. Section 1521 [Docket No. 56 in the Lehman Re Chapter 15 Case];

WHEREAS, LCPI and Lehman Re, among others, are parties to that certain Master Repurchase Agreement dated as of July 9, 1999 (the "MRA"), pursuant to which LCPI committed to sell to Lehman Re, upon the terms as set forth in the MRA, certain residential and commercial mortgage and mezzanine loans, which are listed on the attached Exhibit A (collectively, the "Mortgage Loans");

WHEREAS, pursuant to the MRA, Lehman Re transferred cash to LCPI in exchange for the purchase of certain assets, including, without limitation, the Mortgage Loans.

WHEREAS, on September 17, 2008 (the "Lehman Re Acquisition Date"), Lehman Re (i) declared an Event of Default (as defined in the MRA), (ii) notified LCPI in writing that it was in default under the MRA, (iii) advised The Bank of New York, as Master Custodian (as defined in the MRA) that such an Event of Default had occurred, and (iv) directed The Bank of New York, as Master Custodian, to transfer the Loan Documents then in the possession of the Master Custodian into the name of Lehman Re;

WHEREAS, in accordance with this instruction, the Master Custodian issued written notices to the sub-custodians, instructing them, *inter alia* to follow the instructions of Lehman Re concerning the Mortgage Loans;

WHEREAS, as of the Petition Date, LBHI was no longer an owner of the Mortgage Loans, and, as of the LCPI Petition Date, LCPI was no longer an owner of the Mortgage Loans;

WHEREAS, Lehman Re, LBHI, LCPI, and Lehman ALI have entered into that certain Settlement Agreement (the "2009 Settlement Agreement") dated as of November 4, 2009, pursuant to which the parties thereto have, among other things, resolved certain, but not all, disputes among the Parties with respect to the MRA and the Mortgage Loans;

WHEREAS, by order, dated July 2, 2009 [Docket No. 4271] (the "Bar Date Order"), the Bankruptcy Court established September 22, 2009 as the deadline to file proofs of claim (each a "Proof of Claim") against the Debtors in the Bankruptcy Cases;

WHEREAS, Lehman Re filed Proof of Claim No. 28305 against LCPI (the "LCPI Claim") relating to certain alleged obligations of LCPI under the MRA in an unliquidated amount;

WHEREAS, Lehman Re filed Proof of Claim No. 28306 against LBSF (the "LBSF Claim") relating to, among other things, certain alleged obligations of LBSF under certain derivative contracts and with respect to certain alleged intracompany receivables in an aggregate amount of not less than $52,398,681.71;

WHEREAS, Lehman Re filed Proof of Claim No. 28307 against LBHI (the "LBHI Claim") relating to, among other things, certain alleged obligations of LBHI under that certain Net Worth Maintenance Agreement between LBHI and Lehman Re dated October 26, 2007 (the "NWMA") in an unliquidated amount;

WHEREAS, Lehman Re filed Proof of Claim No. 28308 against LBCC (the "LBCC Claim", and together with the LCPI Claim, the LBSF Claim, and the LBHI claim, the "Lehman Re Claims") relating to, among other things, certain alleged intercompany receivable obligations of LBCC, in the amount of $89,912,687.14;

WHEREAS, Appalachian has asserted a claim against Lehman Re in the amount of  $1,583,796.17 relating to certain alleged intercompany receivable obligations (the "Appalachian Claim");

WHEREAS, Appalachian has asserted a claim against Congress Life in the amount of $1,283.00 relating to certain alleged intercompany receivable obligations (the "Appalachian/Congress Claim");

WHEREAS, Pulsar filed Proof of Claim No. 29770 against LBHI (the "Pulsar LBHI Claim") in an unliquidated amount;

WHEREAS, Pulsar filed Proof of Claim No. 27453 against LCPI (the "Pulsar LCPI Claim") in an unliquidated amount;

WHEREAS, on December 16, 2008, the Bankruptcy Court entered an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (as amended and/or supplemented from time to time, the "Derivatives Order");

WHEREAS, Pulsar filed Proof of Claim No. 12711 against LBSF in the amount of $1,175,000.00 in respect of one or more derivative transactions, which claim has heretofore been compromised, settled and allowed pursuant to the Derivatives Order as an unsecured claim against LBSF in the amount of $450,000.00 (the "Pulsar Allowed LBSF Claim", and collectively with the Pulsar LBHI Claim and the Pulsar LCPI Claim, the "Pulsar Claims");

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 19627;

WHEREAS, on December 5, 2011, the Debtors filed their Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, ECF No. 22931 (as subsequently supplemented, amended, or modified, including by the "Plan Supplement" [as such term is defined in said plan], the "Plan");

WHEREAS, on December 6, 2011, the Bankruptcy Court entered an order confirming the Plan, ECF No. 23023;

WHEREAS, on March 25, 2010, Aetna Life Insurance Company ("Aetna"), a Lehman Re creditor, commenced litigation against Appalachian in the Supreme Court of the State of New York, captioned *Aetna Life Insurance v. Appalachian Asset Management Corp. et al*, Index No. 103913/2010 (N.Y. Sup. Ct.) (the "Appalachian Litigation");

WHEREAS, on June 4, 2010, the JPLs commenced litigation against the Broadway Parties (as defined below) relating to the commercial loan secured by the property commonly known as "237 Park", captioned *D. Geoffrey Hunter and Dan Schwarzmann, as Joint Provisional Liquidators of Lehman Re, Ltd. v. Broadway Partners Real Estate Fund III, L.P., et al.*, Case No. 09-14884 (JMP), Adv. Proc. No. 10-03279 (the "237 Adversary Proceeding"); and

WHEREAS, the Parties have engaged in good faith negotiations for the purpose of reaching a mutually satisfactory agreement for the compromise and settlement of their disputes, which include the resolution of their respective claims and the sale of certain of Lehman Re's assets pursuant to the terms set forth below.

Now, therefore, upon the foregoing recitals, which are incorporated as though fully set forth herein, and in consideration of the mutual covenants, conditions and provisions set forth below, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I

### DEFINITIONS

1.1     In this Agreement (including the recitals hereto) and in the Schedules and Exhibits hereto, except as expressly provided or as the context otherwise requires:

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, such

Person.  A Person will be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise.

"**Agreement**" shall have the meaning assigned to such term in the first paragraph, and shall include all Schedules and Exhibits hereto.

"**Assignment and Assumption**" shall mean with respect to each Repurchased Loan, an Assignment and Assumption in substantially the form of Exhibit E attached hereto.

"**Bankruptcy Code**" means title 11 of the United States Code, as the same may be amended from time to time.

"**Broadway Parties**" means Broadway Partners Fund Manager, LLC; Broadway Partners Fund GP II, L.P.; Broadway Partners Fund GP III, L.P.; and Scott Lawlor.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day that is not a Saturday, Sunday or any other day on which banks in the State of New York are authorized or required by law to close.

"**Closing**" shall have the meaning assigned to such term in Section 5.3 hereof.

"**Closing Date**" shall have the meaning assigned to such term in Section 5.3 hereof.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral Property**" shall mean (a) in the case of any Repurchased Loan which is a mortgage loan, the real property, together with the improvements erected or to be erected thereon and related personal and other property which secures the Repurchased Loan and (b) in the case of any Repurchased Loan which is a mezzanine loan, the pledge of equity interest in the borrower and/or other entities which secures such Repurchased Loan.

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, order, registration, declaration, filing, or notice of, with or to any Person.

"**Effective Date**" has the meaning ascribed to it in Section 16.1 of this Agreement.

"**Escrow Accounts**" means those accounts established and maintained by Lehman Re or any Affiliate of, agent of, or loan servicer or any other Person for the benefit of Lehman Re for the deposit and retention of all collections of taxes, assessments, ground rents, hazard and other insurance and comparable items on account of the Repurchased Loans.

"**Governmental Approval**" means any Consent of or with any Governmental Authority.

"**Governmental Authority**" means any nation or government (foreign or domestic), and any state or political subdivision thereof; any self-regulatory organization acting under color of authority granted under any Legal Requirement; and any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any other nation, or any foreign or domestic, state, county, city or other political subdivision thereof.

"**Legal Requirements**" in respect of any Person means all (i) constitutions, treaties, statutes, laws, ordinances, codes, rules, regulations, standards, judgments, decrees, writs, rulings, injunctions, orders and other requirements of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"**Lien**" means any encumbrance, charge, security interest, mortgage, restriction, pledge, hypothecation, voting trust agreement, option, right of first offer or refusal, proxy or lien, including but not limited to such Liens as may arise under any contracts.

"**Loan Documents**" means collectively, (i) all Notes, Mortgages, pledge agreements, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties, intercreditor agreements, deeds of trust, and all other documents, instruments and agreements evidencing or securing any of the Repurchased Loans, and provided by or on behalf of the Lehman U.S. Debtors to Lehman Re in connection with the MRA and/or the 2009 Settlement Agreement or delivered to Lehman Re by certain custodians with respect to the Repurchased Loans, (ii) any amendments to such documents, entered into, executed and/or delivered by or on behalf of Lehman Re from and after the Lehman Re Acquisition Date, and (iii) any consents, releases, modifications or waivers executed and/or delivered by or on behalf of Lehman Re under or in connection with any of the foregoing documents from and after the Lehman Re Acquisition Date.  In the event any such document also secures or relates to one or more other loans which is not one of the Repurchased Loans, such document shall be deemed a Loan Document, however, only such portion thereof securing or relating to the Repurchased Loan shall be assigned hereunder by the Transferor.  Notwithstanding the foregoing, Loan Documents shall not include any information that is privileged, nor any other Lehman Re internal documents, materials or information created by, and

communicated solely among, Lehman Re, the JPLs, their professional advisors and/or their counsel.

"**Loan Files**" mean collectively, (i) any formal default or other material notices or correspondence with respect to the Repurchased Loans sent or received by Lehman Re or any of its servicers, custodians, agents, or counsel after the Lehman Re Acquisition Date, (ii) any servicing reports, title search updates, environmental or other third party reports (such as appraisals, valuations, environmental and engineering reports) with respect to the Repurchased Loans within Lehman Re's possession or control or in the possession or control of any of Lehman Re's servicers, custodians, agents, representatives, or counsel, and (iii) a current loan servicer report with respect to each of the Repurchased Loans, including the then current balance, applicable interest rate, accrued interest and history of payment activity on a monthly basis for the period from and after the Lehman Re Acquisition Date; provided, however, that notwithstanding the foregoing, Loan Files shall not include any information that is privileged, nor any other Lehman Re internal documents, materials or information created by, and communicated solely among, Lehman Re, the JPLs, their professional advisors and/or their counsel.

"**Losses**" means any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, Taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs).

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities, operating results or financial condition of the applicable party or its assets, or (b) a material adverse effect on the ability of such party to execute and deliver this Agreement or to perform its obligations hereunder.

"**Mortgage**" shall mean the mortgage, deed of trust or other security instrument creating a lien upon the real property described therein, and the improvements located on such real property, which secures a Repurchased Loan.

"**Note**" shall mean the promissory note or similar instrument which evidences a Repurchased Loan.

"**Pacific Point Loan Agreement**" shall mean that certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 16, 2006, made by and between SJD Partners, Ltd., as borrower, and Lehman ALI, as Agent and sole Lender thereunder, as heretofore amended.

"**Pacific Point Loan Documents**" shall mean the Loan Documents, as such term is defined in the Pacific Point Loan Agreement.

"**Pacific Point Project**" shall mean the Project, as such term is defined in the Pacific Point Loan Agreement.

"**Pacific Point Senior Loan**" shall mean that certain loan made by Lehman ALI to SJD Partners, Ltd. in the maximum aggregate principal amount of $125,000,000.00, as evidenced by the Pacific Point Term Note, the Pacific Point Revolving Note and the Pacific Point Loan Agreement.

"**Pacific Point Revolving Note**" shall mean the Revolving Note, as such term is defined in the Pacific Point Loan Agreement.

"**Pacific Point Term Note**" shall mean that certain Secured Term Promissory Note, dated February 16, 2006, in the stated principal amount of $100,000,000.00, made by SJD Partners, Ltd. to the order of Lehman ALI, as endorsed to Lehman Re.

"**Person**" means and includes an individual, corporation, partnership (limited or general), joint venture, association, trust, limited liability company, any other unincorporated organization or entity, or any Governmental Authority.

"**Pleadings**" shall mean the documents listed in Rule 7(a) of the Federal Rules of Civil Procedure and any other document filed with the applicable court or other governmental authority in connection with any Pending Action.

"**Proceeds**" means any consideration received from the sale, exchange, license, lease or other disposition of any specified asset or property, any value received as a consequence of the possession thereof, and any payment received from any insurer or other person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature thereof and shall include (a) all properties or other assets acquired through foreclosure or deed in lieu of foreclosure and (b) all "proceeds" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which the specified asset or property is located.

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, tariffs, charges, duties or other assessments, and all estimated payments thereof, including but not limited to income, excise, property, sales, use, value added, environmental, franchise, payroll, transfer, gross receipts, withholding, social security, and unemployment taxes, imposed by any foreign, federal, state, county or local government, or any subdivision or agency thereof, and any interest, penalty and expense relating to such taxes, charges, fees, levies or other assessments.

"**Transferor**" shall mean Lehman Re.

## ARTICLE II

### SETTLEMENT OF CLAIMS

2.1    LCPI Claim.  On the Effective Date, the LCPI Claim shall be allowed as an unsecured, non-priority affiliate claim against LCPI in the fixed, liquidated

amount of $490,000,000.00 (the "Allowed LCPI Claim").  The Allowed LCPI Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed on the Effective Date without necessity of any further filings or amendments.  The Allowed LCPI Claim shall be classified under the Plan in LCPI Class 5C.

2.2     LBSF Claim.  On the Effective Date, the LBSF Claim shall be allowed as an unsecured, non-priority affiliate claim against LBSF in the fixed, liquidated amount of $25,430,000.00 (the "Allowed LBSF Claim").  The Allowed LBSF Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed without necessity of any further filings or amendments.  The Allowed LBSF Claim shall be classified under the Plan in LBSF Class 5C.

2.3     LBCC Claim.  On the Effective Date, the LBCC Claim shall be allowed as an unsecured, non-priority affiliate claim against LBCC in the fixed, liquidated amount of $87,621,000.00 (the "Allowed LBCC Claim").  The Allowed LBCC Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed on the Effective Date without necessity of any further filings or amendments.  The Allowed LBCC Claim shall be classified under the Plan in LBCC Class 5C.

2.4     LBHI Claim.  On the Effective Date, the LBHI Claim shall be reduced and allowed as an unsecured, non-priority affiliate claim against LBHI in the fixed, liquidated amount of $415,000,000.00 (the "Allowed LBHI Claim").  The Allowed LBHI Claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment, and shall be allowed on the Effective Date without necessity of any further filings or amendments.  The Allowed LBHI Claim shall be classified under the Plan in LBHI Class 8.

2.5     Appalachian Claim.  On or after the Effective Date, in full and complete satisfaction of the Appalachian Claim, Appalachian shall be allowed to file a claim against Lehman Re in the Bermuda Proceeding for $1,583,796.17, which claim shall be accepted as a valid claim against Lehman Re thereby entitling Appalachian to participate in a liquidation distribution pari passu with other unsecured creditors of Lehman Re (the "Accepted Appalachian Claim"), and such claim shall not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset, or recoupment.

2.6     Congress Life Claim.  (a)  Congress Life hereby acknowledges and agrees that (i) with respect to the Appalachian/Congress Claim, Congress Life is indebted to Appalachian in the amount of $1,283.00 and that such amount is currently due and payable by Congress Life to Appalachian, and (ii) as of the date hereof, Congress Life has absolutely no defenses, claims, rights of set-off or counterclaims against Appalachian in connection with or related to the Appalachian/Congress Claim, any and all of which Congress Life hereby expressly waives.

(b)    On the Closing Date, Congress Life shall pay to Appalachian the sum of $1,283.00 by Federal wire transfer of immediately available funds to the account or accounts designated by Appalachian in satisfaction of the Appalachian/Congress Claim.

2.7    Other Claims.  Other than the Allowed LCPI Claim, the Allowed LBSF Claim, the Allowed LBCC Claim, the Allowed LBHI Claim, the Allowed Pulsar LBSF Claim, and the Accepted Appalachian Claim, all other claims asserted or held by Lehman Re and/or Pulsar against the Debtors, and all claims asserted or held by the Lehman U.S. Parties against Lehman Re or Pulsar, shall be deemed expunged.

2.8    Title to Claims.

(a)    Lehman Re represents and warrants that it owns all of the legal and beneficial interest in, and has good, valid title to the LCPI Claim, the Allowed LCPI Claim, the LBSF Claim, the Allowed LBSF Claim, the LBCC Claim, the Allowed LBCC Claim, the LBHI Claim and the Allowed LBHI Claim, free and clear of all liens, claims, setoff rights of third parties, security interests, participations or encumbrances, and Lehman Re has not transferred or assigned to any other person any of the claims or receivables that are the subject of this Agreement, including, without limitation, the Allowed LCPI Claim, the Allowed LBSF Claim, the Allowed LBCC Claim, and the Allowed LBHI Claim, or any interest in any of the foregoing.

(b)    Appalachian represents and warrants that it owns all of the legal and beneficial interest in, and has good, valid title to the Appalachian Claim and the Appalachian/Congress Claim free and clear of all liens, claims, setoff rights of third parties, security interests, participations or encumbrances, and Appalachian has not transferred or assigned to any other person any of the claims or receivables that are the subject of this Agreement, including, without limitation, the Appalachian Claim, the Appalachian/Congress Claim or any interest in any of the foregoing.

(c)    Pulsar represents and warrants that it owns all of the legal and beneficial interest in, and has good, valid title to the Pulsar Claims free and clear of all liens, claims, setoff rights of third parties, security interests, participations or encumbrances, and Pulsar has not transferred or assigned to any other person any of the claims or receivables that are the subject of this Agreement, including, without limitation, the Pulsar Claims or any interest in any of the foregoing.

2.9    Transfer of Claims.

(a)    Unless this Agreement is terminated in accordance with the terms hereof, Lehman Re shall not, anytime prior to the Effective Date, transfer the LCPI Claim, the Allowed LCPI Claim, the LBSF Claim, the Allowed LBSF Claim, the LBCC Claim, the Allowed LBCC Claim, the LBHI Claim and/or the Allowed LBHI Claim, or any interest in any of the foregoing, or any rights or interests arising thereunder, or related thereto, including without limitation any instruments, rights to payments or other

consideration distributed or to be distributed to Lehman Re under the Plan, in whole or in part, and any such transfers shall be null and void and without effect. From the date hereof until the earlier of termination of this Agreement or the Effective Date, Lehman Re shall not grant any proxies, deposit any of the Lehman Re Claims into a voting trust, or enter into a voting agreement or any similar agreement with respect thereto.

(b)    Unless this Agreement is terminated in accordance with the terms hereof, Appalachian shall not, anytime prior to the Effective Date, transfer any of the Appalachian Claim or Accepted Appalachian Claim, or any interest therein, or any rights or interests arising thereunder, or related thereto, including without limitation any instruments, rights to payments or other consideration distributed or to be distributed to Appalachian, in whole or in part, and any such transfers shall be null and void and without effect. From the date hereof, until the earlier of termination of this Agreement or the Effective Date, Appalachian shall not grant any proxies, deposit any of the Appalachian Claim into a voting trust, or enter into a voting agreement or any similar agreement with respect thereto.

(c)    Unless this Agreement is terminated in accordance with the terms hereof, Pulsar shall not, anytime prior to the Effective Date, transfer any of the Pulsar Claims, or any interest therein, or any rights or interests arising thereunder, or related thereto, including without limitation any instruments, rights to payments or other consideration distributed or to be distributed to Pulsar under the Plan, in whole or in part, and any such transfers shall be null and void and without effect. From the date hereof, until the earlier of termination of this Agreement or the Effective Date, Pulsar shall not grant any proxies, deposit any of the Pulsar Claims into a voting trust, or enter into a voting agreement or any similar agreement with respect thereto.

## ARTICLE III

### RESIDENTIAL MORTGAGE LOANS

3.1    <u>Distribution of Residential Net Cash Escrow</u>.  The Parties hereby agree that the $4,772,448.27 net cash payments on account of the residential Mortgage Loans referenced as the "Net Cash" amount for August 2008 on the Resi Cash Flow Chart annexed to the 2009 Settlement Agreement as Exhibit F, together with all earnings thereon, which continue to be held by Aurora Loan Services LLC in accordance with the provisions of Section 3 of the 2009 Settlement Agreement, shall be disbursed to LCPI on the Effective Date.

3.2    <u>Transfer Documentation</u>.  Within ten (10) Business Days following the date hereof, the Lehman U.S. Parties and Lehman Re, as successor in interest of the residential Mortgage Loans, shall provide joint written notice to each of the residential loan servicers currently servicing the residential Mortgage Loans as set forth on Schedule 4 attached hereto confirming that Lehman Re acquired LCPI's interest in such residential Mortgage Loans as of the Lehman Re Acquisition Date. For the avoidance of doubt, this

Section 3.2 shall not be interpreted to supersede or modify any of the Parties' rights and obligations under the 2009 Settlement Agreement.

## ARTICLE IV

### RIGHTS AS TO FUTURE SALE OF CERTAIN REAL ESTATE ASSETS

Lehman Re hereby grants to LCPI an exclusive right of first offer to purchase from Lehman Re, pursuant to, and in accordance with, the procedures set forth on <u>Exhibit C</u> attached hereto, each of the real estate assets set forth on <u>Exhibit B</u> attached hereto that Lehman Re proposes to sell during the ROFO Period (as defined in <u>Exhibit C</u>).

## ARTICLE V

### REPURCHASE OF CERTAIN MORTGAGE LOANS

5.1    <u>Sale</u>.  Upon and subject to the terms and conditions herein set forth, on the Closing Date, Lehman Re shall sell, transfer, assign, convey and deliver to LCPI, and LCPI shall accept from Lehman Re, all of Lehman Re's right, title and interest in and to each of the Mortgage Loans set forth on <u>Exhibit D</u> (the "<u>Repurchased Loans</u>") free and clear of all Liens, together with all Loan Documents and Loan Files, and all right, title, and interest in and to any other documents and instruments evidencing, securing, relating to, or otherwise executed in connection with, the Repurchased Loans. Lehman Re acknowledges and agrees that all claims, causes of action, demands, remedies and all other rights of Lehman Re arising from or under or otherwise relating to the Repurchased Loans or any of the Loan Documents are being assigned to LCPI at Closing. The sale of the Repurchased Loans shall be made without recourse to, and without representation or warranty by Lehman Re, other than as expressly provided in this Agreement.

5.2    <u>Payments</u>.

(a)    Subject to the provision of Section 5.2(b) hereof, on the Closing Date, LCPI will pay to Lehman Re an amount equal to $32,000,000.00 (the "<u>Purchase Price</u>"), payable by wire transfer of immediately available funds to the account or accounts designated by Lehman Re.

(b)    All payments, including any principal, premium or interest payments made by or on behalf of any borrower or any other obligor under any of the Repurchased Loans during the period from and after the date hereof through the Closing Date shall be retained by Lehman Re.  Any payments made by or on behalf of any borrower or any other obligor under any of the Repurchased Loans during the period from and after the date hereof through the Closing Date in reduction of the principal balance of any Repurchased Loan shall be credited against the Purchased Price.  Any and all Proceeds or other payments paid to or otherwise received by or on behalf of Lehman

Re with respect to any of the Repurchased Loans or Collateral Property after the Closing shall belong to LCPI, and all such payments received by or on behalf of Lehman Re shall be held by Lehman Re for the benefit of LCPI and promptly delivered to LCPI by wire transfer to a bank account designated in writing by LCPI.

      5.3    <u>Closing</u>.  Subject to the conditions set forth in this Agreement, the closing of the sale of the Repurchased Loans (the "<u>Closing</u>") will take place on or before the tenth (10th) Business Day following the Effective Date (the "<u>Closing Date</u>").

      5.4    <u>Deliveries at the Closing</u>.  At the Closing:

      (a)    LCPI will deliver to Lehman Re (i) an Assignment and Assumption duly executed by LCPI with respect to each of the Repurchased Loans, and (ii) a Closing Certificate (as hereinafter defined);

      (b)    LCPI will deliver, or cause to be delivered, to Lehman Re, the Purchase Price, in immediately available funds by wire transfer to a bank account designated in writing by Lehman Re;

      (c)    Lehman Re shall deliver to LCPI, as the case may be, the documents, instruments and other items required pursuant to this Article V;

      (d)    Lehman Re shall deliver to LCPI all Loan Documents and Loan Files;

      (e)    Lehman Re shall transfer to LCPI the then-current balance of any and all Escrow Accounts or other amounts held by or on behalf of Lehman Re or its Affiliates, servicers and/or custodians with respect to any of the Repurchased Loans; and

      (f)    Lehman Re and the Broadway Parties shall exchange mutual releases in the form attached hereto as <u>Exhibit G</u>.

      5.5    <u>Covenants</u>.

      (a)    <u>Conduct of Business Prior to the Closing</u>.  From the date hereof to the earlier to occur of (a) the Closing or (b) termination of this Agreement, except as may be consented to in writing by LCPI, Lehman Re shall not:

      (i)    sell, assign, transfer or otherwise dispose of any Repurchased Loan or any interest therein, whether in whole or in part or enter into any agreement to do so;

      (ii)    make any change in accounting methods, principles or practices relating to any Repurchased Loan;

(iii)    amend, modify, terminate or subordinate any Loan Document;

(iv)    encumber any Repurchased Loan or any interest therein;

(v)    waive, modify, alter, cancel, accept a discounted payoff of, or subordinate any Repurchased Loan in any respect, or foreclose or otherwise proceed against the collateral for, accept a deed in lieu of foreclosure of, or compromise or settle any claims with respect to, any Repurchased Loan, or rescind, and the related Collateral Property shall not be released from, the Lien or other encumbrance of, nor shall the mortgagor or pledgor be released from its obligations under, the related Mortgage or pledge agreement, in whole or in part, nor shall any instrument be executed by Lehman Re that would effect any such waiver, modification, alteration, cancellation, discounted payoff, subordination, foreclosure, deed in lieu of foreclosure, compromise or settlement, rescission or release, except as required by law or by the related Loan Documents;

(vi)    take any action which would cause any of the representations or warranties of Lehman Re contained in this Agreement, to be untrue in any material respect; and

(vii)    agree to do any of the foregoing items (i) through (vi) of this Subsection 5.5(a).

(b)    Notices.  From the date hereof to the earlier to occur of (a) the Closing or (b) termination of this Agreement, Lehman Re shall promptly provide LCPI with copies of any of the following documents delivered or received by or on behalf of Lehman Re or its servicers, custodians, agents or counsel on or after the date hereof, (i) any notices of default or non-compliance with Loan Documents delivered by or on behalf of Lehman Re with respect to any Repurchased Loan, (ii) notice of any claims made or asserted by the borrower, any guarantor or any other obligor of any default or breach by Lehman Re under any of the Loan Documents or otherwise relating to any of the Repurchased Loans, (iii) notice of any claims made or asserted by any co-lender (other than a Debtor) of any default by Lehman Re under any of the Loan Documents or otherwise relating to any of the Repurchased Loans, (iv) notice of any claim made or asserted by the mortgagor or any other obligor(s) under any Repurchased Loan or by any other Person obligated to perform under any Loan Documents of any right of rescission, setoff, counterclaim, claim of lender liability, or defense, (v) any written notice, correspondence (whether electronic or otherwise), or other document delivered to or received by or on behalf of Lehman Re to, or received by or on behalf of Lehman Re from, the mortgagor or any other obligor(s) under any Repurchased Loan or any other Person obligated to perform under any Loan Documents, with respect to, in connection with, or in any manner related to any of the Repurchased Loans or their respective Collateral Property, and (vi) any other written notice or correspondence received by or on behalf of Lehman Re in its capacity as lender under any of the

-14-

Repurchased Loans; provided, however, that Lehman Re shall have no obligation to provide any such information or documentation that is privileged or constitutes work product or attorney work product.

(c)    Pending Actions.  From the date hereof to the earlier to occur of (a) the Closing or (b) termination of this Agreement, Lehman Re shall comply with LCPI's instructions (including, without limitation, filing such Pleadings and in such form as may be determined by LCPI in its sole discretion) with respect to any judicial, administrative, or other governmental proceeding involving the Repurchased Loans or Collateral Property (a "Pending Action"); provided however, that Lehman Re shall have the right, without instruction or interference by LCPI, to prosecute that certain filed motion for judgment on the pleadings [Docket No. 347] filed by Lehman Re in the action relating to the Pacific Point Senior Loan, as more particularly described on Exhibit F attached hereto ( the "Pacific Point Litigation"), and LCPI may not instruct Lehman Re to dismiss the 237 Adversary Proceeding prior to Closing.  In any Pending Action, if Lehman Re timely files Pleadings in conformity with the written direction of LCPI, LCPI shall indemnify and hold Lehman Re harmless from any loss or damage (including reasonable attorneys fees and expenses) incurred by Lehman Re and directly resulting from Lehman Re's compliance with any such written direction of LCPI.  LCPI and Lehman ALI also agree that if they are party to any settlement with the plaintiffs in the Pacific Point Litigation with respect to the Pacific Point Senior Loan, LCPI and Lehman ALI shall attempt in good faith to obtain from the plaintiffs a release of Lehman Re on terms similar to any release provided by the plaintiffs to LCPI and Lehman ALI, provided that neither LCPI nor Lehman ALI shall have any obligation to incur any cost or liability in connection therewith.  As provided in Section 5.1 above, upon Closing, LCPI shall succeed to all of Lehman Re's claims, causes of action, demands, remedies and all other rights of Lehman Re arising from, under, or otherwise relating to the Repurchased Loans.  Accordingly, within three (3) Business Days of Closing, (a) Lehman Re and LCPI shall take all actions necessary in any Pending Action to acknowledge and evidence to the relevant court, the transfer and assignment of the Repurchased Loans from Lehman Re to LCPI, and (b) Lehman Re shall transfer to LCPI any and all of Lehman Re's claims against SJD Partners Ltd. and SJD Development Corp. (collectively, "SunCal") in their bankruptcy proceedings, and take any action, or consent to any actions taken by LCPI, pursuant to the Bankruptcy Code or the Bankruptcy Rules, necessary to effectuate the transfer of such claims in the SunCal bankruptcy proceedings.

(d)    Closing Representations and Warranties.  At the Closing, each of the Debtors, Lehman Re and Pulsar shall execute and deliver to each of the other Parties a certificate reaffirming that each of such Party's representations and warranties set forth in Articles XII, XIII or XIV, as the case may be, are true and correct in all material respects as of the Closing Date (the "Closing Certificate"), which representations shall survive the Closing as set forth below.

(e)    Further Assurances.  After the Closing, Lehman Re and Lehman U.S. Parties will promptly execute, acknowledge, and deliver any other

assurances or documents reasonably requested by one another from time to time to satisfy, or in connection with, each Party's obligations hereunder or to accomplish the purposes of this Agreement. After the Closing, Lehman Re and the Lehman U.S. Parties shall furnish to each other such information and assistance as may reasonably be requested in connection with the transactions consummated pursuant to this Agreement, provided, however, that neither Party shall have any obligation to provide any documentation that is privileged or constitutes attorney work product.

(f)    Notices of Material Events. Each Party will give prompt notice to the other Parties of any fact, to the knowledge of such Party, that would, if it were true on the Closing Date, constitute a breach of such Party's representations and warranties in this Agreement. Each party to this Agreement will give prompt written notice to the other Parties of any material development affecting the ability of such Party to consummate the transactions contemplated by this Agreement. No disclosure by any Party to this Agreement pursuant to this Section shall be deemed to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

5.6    Pacific Point Senior Loan.

Lehman Re and Lehman ALI acknowledge that certain work may be required to be performed and/or certain expenditures may need to be made with respect to the Pacific Point Project prior to the Effective Date in order to preserve, protect and maintain the Pacific Point Project including, without limitation, payment of fees relating to project management, the provision of utility services and onsite security, payment of fines to the City of San Juan Capistrano and other governmental agencies for inadequate security, illegal dumping, and other violations, as well as the cost of performing erosion control, providing landscaping maintenance and weed abatement and completing a secondary access road to neighboring property as mandated by the Fire Department and repairing slope failure (collectively, the "Pac Point Work/Expenses"). Lehman Re hereby approves and consents to Lehman ALI making protective advances under the Pacific Point Senior Loan, from and after the date hereof, as the holder of the Pacific Point Revolving Note, in an aggregate amount not to exceed $1.5 million with respect to Pac Point Work/Expenses that Lehman ALI reasonably determines should be made or otherwise paid to preserve, protect and maintain the Pacific Point Project (collectively, the "Authorized Protective Advances") and further agrees that, notwithstanding anything to the contrary in the Pacific Point Loan Documents, Authorized Protective Advances (i) shall be deemed to be Protective Advances (as defined in the Pacific Point Loan Agreement) pursuant to Section 9.2.8 of the Pacific Point Loan Agreement, (ii) shall accrue interest at the Default Rate (as defined in the Pacific Point Loan Agreement) as provided under the Pacific Point Loan Agreement, (iii) shall be repaid to Lehman ALI prior to any other amounts due and payable to the Lenders (as defined in the Pacific Point Loan Agreement) under the Pacific Point Loan Documents; provided, however that the repayment of such Authorized Protective Advances shall be pari passu with the repayment of protective advances in the aggregate amount of $390,640.00 made by Lehman Re as Lender under the Pacific Point Loan Documents, prior to the date hereof,

and (iv) shall be added to the principal amount of the Pacific Point Revolving Note as of the date on which the same are advanced by Lehman ALI.

## ARTICLE VI

### TAX MATTERS

6.1    Income Taxes.

(a)    Lehman Re and Congress Life will continue to file as members of the LBHI federal consolidated income Tax group and any state or local affiliated, consolidated, combined or unitary income Tax group of LBHI or any Affiliate (collectively, the "LBHI Tax Group") for as long as Lehman Re and Congress Life qualify under the relevant provisions of U.S. federal income Tax law or state or local income Tax law, as the case may be. The LBHI Corporate Tax Department will prepare and file all federal consolidated income Tax returns and all applicable state or local affiliated, consolidated, combined or unitary income Tax returns (including amended Tax returns) as well as any extensions and estimated payments required as part of a taxable year's filing process.

(b)    Lehman Re shall, within twenty (20) days of any written request, provide LBHI with such financial information regarding Lehman Re and Congress Life as LBHI shall reasonably request, and Lehman Re and LBHI shall cooperate and provide reasonable access to information to the extent the other reasonably so requests, in connection with the preparation, filing, examination and defense of any Tax returns or other Tax filings (including claims for refund, and in respect of both prior and future Tax returns and other Tax filings) and the resolution of any matters under Section 6.1(g) below.

(c)    For any taxable year ending on or before December 31, 2007, during which Lehman Re and Congress Life were members of the LBHI Tax Group (a "Pre-2008 Period"), Lehman Re and Congress Life shall be permitted to utilize any net operating losses, capital losses and other Tax assets of the LBHI Tax Group (collectively, the "Tax Items"), and shall not owe any amount to LBHI or any other Debtor, any other member of the LBHI Tax Group or any other Person (collectively, a "Lehman Party") (i) for any federal, state or local income Taxes of the LBHI Tax Group (regardless of whether such Taxes are shown as due and payable on a filed Tax return or determined to be due and owing on the basis of a subsequent audit, investigation, litigation or other controversy involving the LBHI Tax Group (a "Tax Controversy")), or (ii) in satisfaction of any contractual obligation that Lehman Re or Congress Life may otherwise have to a Lehman Party to compensate such Lehman Party for any Tax Items utilized by Lehman Re or Congress Life in a Pre-2008 Period. Further, if the LBHI Tax Group has carried back any Tax Items arising in a Pre-2008 Period and received a Tax refund or equivalent credit, Lehman Re, on behalf of itself and Congress Life, shall forgo entitlement to any portion of such refund or credit.

(d)    For any taxable year ending on or after January 1, 2008 (a "Post-2007 Period"), subject to Section 6.1(g) below, Lehman Re, on behalf of itself and Congress Life, shall comply with and be bound by section 4 of that certain Debtor Allocation Agreement that is attached hereto as Exhibit I and that is to be entered by and among the Debtors and certain affiliated non-Debtors as of the effective date of the Plan as if Lehman Re and Congress Life were signatories thereto, and (notwithstanding anything in the Debtor Allocation Agreement to the contrary) shall definitionally be included within the terms "Parties" and "Controlled Subsidiary;" *provided, however,* that (i) Lehman Re, on behalf of itself and Congress Life, shall not be entitled to any payment from or claim against LBHI or any other member of the LBHI Tax Group with respect to the use by any other member of the LBHI Tax Group with respect to the taxable year ending December 31, 2008 of any Tax Items of Lehman Re and/or Congress Life arising during such period; (ii) Lehman Re, on behalf of itself and Congress Life, shall not be entitled to any Tax refund or equivalent credit with respect to the carry back of any Tax Items by the LBHI Tax Group for a taxable year ending on December 31, 2008; and (iii) neither Lehman Re nor Congress Life shall be required to make a payment to LBHI in respect of the use by Lehman Re or Congress Life in a Post-2007 Period of any Tax Items attributable to LBHI or LCPI in accordance with section 4(b)(iii) of the Debtor Allocation Agreement up to (in the aggregate, for both Lehman Re and Congress Life combined) $150,000,000.00 of Tax Items utilized in Post-2007 Periods (for purposes of this Section 6.1(d)(iii), each member's Tax Items that are actually utilized in a given year shall be treated as offsetting an amount of Lehman Re's and Congress Life's taxable income or Tax liability for such year in the same proportion as such member's Tax Items were actually utilized to offset other members' income or liability in such year relative to the Tax Items of other members actually utilized, taking into account any special limitations on the ability of losses or credits to offset certain types of income). In the event that Lehman Re does not otherwise pay any amounts owing to LBHI pursuant to the Debtor Allocation Agreement, LBHI may apply as payment of such amounts any distributions or amounts payable by LBHI or LCPI to Lehman Re pursuant to the Plan or otherwise.

(e)    The Lehman Parties shall indemnify and hold harmless Lehman Re for any income Taxes of the LBHI Tax Group that are paid (or borne) by Lehman Re or Congress Life (whether pursuant to a several liability provision of applicable Tax law or otherwise), other than any such income Taxes for which Lehman Re is liable under Section 6.1(d) above. In connection therewith, the Lehman Parties shall make payment to Lehman Re for any such indemnified amounts within thirty (30) days of any written request therefor.

(f)    At least sixty (60) days prior to the initial due date for the filing of any Tax return of the LBHI Tax Group (determined without regard to any applicable extensions) that will include Lehman Re or Congress Life, Lehman Re shall provide to LBHI a taxable income calculation (including supporting schedules and documentation) for Lehman Re and/or Congress Life, as the case may be, for the applicable taxable year. LBHI shall notify Lehman Re in writing of the actual due date

for the filing of such Tax return (determined taking into account any applicable extensions), and Lehman Re shall provide to LBHI, at least sixty (60) days prior to such due date, a pro forma Tax return (or other similar document) for Lehman Re and/or Congress Life, as the case may be, for the applicable taxable year.  On the filed Tax return of the LBHI Tax Group for the applicable taxable year, LBHI shall not modify the information reflected on the pro forma Tax return (or other similar document) provided by Lehman Re in any manner that could reasonably be expected to materially increase Lehman Re's payment obligations under Section 6.1(d) above; *provided, however*, that all positions taken in such Tax return comply with applicable Tax law and, upon LBHI's request, are supported by a "should" level opinion from a nationally recognized law or accounting firm, in form and substance reasonably satisfactory to LBHI, confirming that the positions on the Tax return comply with applicable Tax law.  LBHI shall inform Lehman Re, at least annually, with respect to the commencement, conduct and resolution of any material Tax Controversy for which Lehman Re could have liability for any Taxes, including several, joint and several or other similar liability, under this Article VI.

(g)    With respect to a Tax return of the LBHI Tax Group for a Post-2007 Period filed prior to the date hereof, LBHI shall consider and discuss with Lehman Re, in good faith, any amended pro forma Tax return (or other similar document), together with any supporting information (collectively, the "Amended Tax Information"), provided by Lehman Re within sixty (60) days after the date hereof, and LBHI shall take such Amended Tax Information into account in calculating (or recalculating) Lehman Re's payment obligations under Section 6.1(d) above; *provided* that LBHI may condition any such action on Lehman Re's delivery by a nationally recognized law or accounting firm of an opinion, in form and substance reasonably satisfactory to LBHI, confirming at a "should" level that the positions contained in the Amended Tax Information comply with applicable Tax law (in which event the 60-day period will be extended for a reasonable period not to exceed an additional (60) day period to obtain the opinion).

6.2    <u>Withholding</u>.  Each Party shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any requirement of any applicable Tax law; *provided*, that, if any Party determines that it must withhold any amount with respect to a payment to be made under this Agreement, the company withholding any such amount shall notify the recipient company in writing at least thirty (30) days prior to the due date for such payment, and such companies shall use reasonable efforts to avoid such otherwise applicable withholding obligation and/or obtain any available refund of withheld Taxes from a Governmental Authority, including pursuant to an applicable income Tax treaty.  Any amount withheld with respect to a payment pursuant to this Agreement shall be treated for all purposes of this Agreement as having been paid to the recipient company in respect of which such deduction and withholding is made.

6.3    Allocation between Principal and Interest.  Except to the extent otherwise required by law, payments made by a Party pursuant to this Agreement on

account of any claim shall be allocated first to the principal portion of such claim and only thereafter, to the extent such principal portion has been satisfied in full, to any portion representing previously accrued but unpaid interest on such claim.

6.4    Priority.  The provisions of this Article VI shall apply and, in the event of any conflict, shall override any contrary agreement (including any provision of the Debtor Allocation Agreement that is not incorporated by reference pursuant to Section 6.1(d) above and any other prior Tax sharing, indemnification or allocation agreement), practice, custom or course of conduct between or involving any of the Parties.  For the avoidance of doubt, that certain Tax Allocation Agreement that is attached hereto as Exhibit J, which agreement was never executed by Lehman Re or Congress Life (or any other party), shall not be binding on Lehman Re or Congress Life.

## ARTICLE VII

### SURVIVING CONTRACTS

The contracts listed on Exhibit H shall survive the execution, consummation, or termination of this Agreement.  All other contracts between the Lehman U.S. Parties on the one hand, and Lehman Re and/or Congress Life on the other, shall be rejected pursuant to Section 365 of the Bankruptcy Code in accordance with the Plan, and/or terminated and of no force and effect as of the date hereof.  Any claims arising from the rejection of such contracts are deemed to be satisfied in full in accordance with this Settlement Agreement.

## ARTICLE VIII

### CONDITIONS TO THE OBLIGATIONS OF THE DEBTORS

The obligations of each of the Debtors required to be performed by them at the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions, each of which following conditions may be waived by the Debtors in their sole and absolute discretion.

8.1    Representations and Warranties; Covenants.  Lehman Re and Pulsar shall each have delivered their respective Closing Certificates in accordance with Section 5.5(d) above and the covenants required by this Agreement to be performed by Lehman Re and Pulsar at or prior to the Closing will have been duly performed in all material respects at or prior to the Closing.

8.2    Authorization and Consents.  All corporate authorizations required on the part of Lehman Re and Pulsar in connection with the transactions contemplated by this Agreement will have been made or obtained.

8.3    <u>Instruments of Transfer</u>.  Lehman Re shall have executed and delivered, or caused to be executed and delivered, to LCPI in form and substance reasonably satisfactory to LCPI, the following with respect to each Repurchased Loan, provided, however, the Parties agree that the forms of such instruments shall, to the extent not attached as exhibits hereto, be reasonable and customary for transactions in the nature of the subject transaction:

(a)    an original allonge endorsement to the Note evidencing each Repurchased Loan;

(b)    the Loan Documents and Loan Files with respect to each Repurchased Loan (including, without limitation, the original note evidencing such Repurchased Loan or, if such original note has been lost, a lost note affidavit and indemnity or equivalent documents);

(c)    an original Assignment of Mortgage in recordable form for each Repurchased Loan secured by a mortgage and an original Assignment and Assumption for each Repurchased Loan;

(d)    Uniform Commercial Code assignments for each Repurchased Loan, assigning to LCPI, Lehman Re's rights as secured party under all financing statements, if any, related to such Repurchased Loan;

(e)    omnibus assignments or other instruments assigning to LCPI all rights of Lehman Re with respect to each Repurchased Loan (each in form reasonably acceptable to LCPI and its counsel), together with all rights of Lehman Re, if any, arising out of or in connection with any other document, instrument, property, title policy, UCC-9 policy, collateral or the like delivered or assigned to Lehman Re in connection with each Repurchased Loan and all rights of Lehman Re arising out of any pending claim or action for amounts due Lehman Re in connection with any of the Repurchased Loans; and

(f)    if required by the applicable Loan Documents, a notice to each borrower of the transfer of the related Repurchased Loan.

8.4    <u>No Adverse Changes</u>.  LCPI shall have determined, in its sole and absolute discretion, that as of the Closing Date (a) there has been no material adverse change to the environmental or state of title to, the Collateral Property securing the Repurchased Loans, in any case, since the date hereof, and (b) there exists no state of facts which, assuming that the knowledge limitations contained in Article XIII and XIV did not apply, would render any such representations and warranties of Lehman Re or Pulsar untrue in any material respect.

8.5     237 Release.  On or before the Closing Date, Lehman Re and each of the Broadway Parties shall have executed and delivered to LBHI a mutual release in the form attached hereto as Exhibit G

8.6     Congress Life Claims.  On or before the Closing Date, Congress Life shall have paid and satisfied the Appalachian/Congress Life Claim in full in accordance with the provisions of Section 2.6 hereof.

## ARTICLE IX

### CONDITIONS TO THE OBLIGATIONS OF LEHMAN RE

The obligations of Lehman Re to be performed by it at the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions, each of which following conditions may be waived by Lehman Re in its sole and absolute discretion.

9.1     Representations and Warranties; Covenants.  Each of the Debtors shall have delivered its respective Closing Certificate in accordance with Section 5.5(d) above and the covenants required by this Agreement to be performed by the Debtors at or prior to the Closing will have been duly performed in all material respects at or prior to the Closing.

9.2     Authorization and Consents.  All corporate authorizations required on the part of the Debtors in connection with the transactions contemplated by this Agreement will have been made or obtained.

9.3     Instruments of Transfer.  LCPI shall have executed and delivered, or caused to be executed and delivered, to Lehman Re the Assignment and Assumption with respect to each Repurchased Loan.

9.4     Instruments of Transfer.  Each of the instruments of transfer to be executed and delivered to Lehman Re in accordance with the provisions of Section 8.3 hereof shall be prepared by LCPI's counsel in form and substance satisfactory to Lehman Re in its sole but reasonable discretion, provided, however, the Parties agree that the forms of such instruments shall, to the extent not attached as exhibits hereto, be reasonable and customary for transactions in the nature of the subject transaction.

9.5     No Adverse Changes.  Lehman Re shall have determined, in its sole and absolute discretion, that as of the Closing Date there exists no state of facts which, assuming that the knowledge limitations contained in Article XII did not apply, would render any such representations and warranties of the Debtors untrue in any material respect.

9.6      237 Release.  On or before the Closing Date, LBHI and the Broadway Parties shall have executed and delivered to Lehman Re a mutual release in the form attached hereto as Exhibit G.

## ARTICLE X

## SURVIVAL AND INDEMNIFICATION

10.1      Survival of Representations and Warranties.  The representations and warranties of the Debtors, Pulsar and Lehman Re set forth herein shall survive the Closing for a period of one (1) year.  For purposes of the foregoing, so long as a written claim identifying with reasonable specificity the nature of the alleged breach is delivered to the alleged breaching Party within the applicable timeframe set forth above, such claim shall be considered timely made and may be enforced subsequent to the expiration of the applicable survival period.

10.2      Lehman Indemnification.

(a)      If the Closing occurs, each of the Debtors hereby severally, but not jointly, indemnify Lehman Re (which for purposes of this Section 10.2, shall include its JPLs, officers, directors, advisors and attorneys) and Pulsar (which for purposes of this Section 10.2, shall include its officers, directors, advisors and attorneys) against and in respect of any and all Losses that are paid, suffered or incurred by Lehman Re or Pulsar, as the case may be, as a result of the breach of any representation or warranty made by such Debtor in Article XII of this Agreement.

(b)      Any claim by Lehman Re or Pulsar for indemnification under this Section 10.2 must be made in writing.

(c)      It is understood and agreed that the obligation of the Debtors set forth in Section 10.2(a) to indemnify Lehman Re and/or Pulsar constitutes the sole remedy of Lehman Re and/or Pulsar under this Agreement if the Closing occurs with respect to a breach of any representation and warranty by any of the Debtors under Article XII of this Agreement.

10.3      Lehman Re Indemnification.

(a)      If the Closing occurs, Lehman Re hereby indemnifies each of the Debtors (which for purposes of this Section 10.3, shall include its officers, directors, advisors and attorneys) against and in respect of any and all Losses that are paid, suffered or incurred by any of the Debtors as a result of the breach of any representation or warranty made by Lehman Re in Article XIII of this Agreement.

(b)      Any claim by any of the Debtors for indemnification under this Section 10.3 must be made in writing.

(c)    It is understood and agreed that the obligation of Lehman Re set forth in Section 10.3(a) to indemnify the Debtors constitutes the sole remedy of the Debtors under this Agreement if the Closing occurs with respect to a breach of any representation and warranty by Lehman Re under Article XIII of this Agreement.

10.4    Pulsar Indemnification.

(a)    If the Closing occurs, Pulsar hereby indemnifies each of the Debtors (which for purposes of this Section 10.4, shall include its officers, directors, advisors, attorneys and Affiliates) against and in respect of any and all Losses that are paid, suffered or incurred by any of the Debtors as a result of the breach of any representation or warranty made by Pulsar in Article XIV of this Agreement.

(b)    Any claim by any of the Debtors for indemnification under this Section 10.4 must be made in writing.

(c)    It is understood and agreed that the obligation of Pulsar set forth in Section 10.4(a) to indemnify the Debtors constitutes the sole remedy of the Debtors under this Agreement if the Closing occurs with respect to a breach of any representation and warranty by Pulsar under Article XIV of this Agreement.

## ARTICLE XI

BOOKS AND RECORDS RELATING TO THE REPURCHASED MORTGAGE LOANS

11.1    Books and Records Required Upon Closing.  At Closing, Lehman Re shall direct each of its servicers, agents, custodians, counsel and similar representatives with respect to the Repurchased Loans to immediately provide LCPI with any Loan Documents in their possession and copies of all Loan Files.

11.2    Additional Books and Records.  From and after the Closing Date to the later of (i) one year, or (ii) the date upon which the liquidation of Lehman Re's estate is concluded in the Bermuda Proceeding, if LCPI makes reasonable requests for additional Loan Documents or Loan Files in the possession, custody or control of Lehman Re, its Affiliates or their respective servicers, agents, custodians, counsel or similar representatives, and provided that (a) the expenses for such search do not exceed a de minimis amount or LCPI agrees to pay any such expenses, and (b) the search does not place an undue burden on Lehman Re, then Lehman Re shall make, or cause to be made, a good faith search for such documents or information, and shall provide LCPI with copies of any additional Loan Documents or Loan Files discovered.

## ARTICLE XII

### REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Each of the Debtors hereby represents and warrants to Lehman Re and Pulsar as follows:

12.1    <u>Organization; Power and Authority</u>.  Such Debtor (a) is a corporation duly organized under the laws of the jurisdiction of its organization and (b) has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

12.2    <u>Authority, Approvals and Consents</u>.  Subject to the issuance of the 9019 Order (as hereinafter defined), such Debtor has the power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by such Debtor, and no other corporate proceedings on the part of such Debtor are necessary to authorize and approve this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by such Debtor and constitutes a valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its terms, except as enforceability may be limited by the principles governing the availability of equitable remedies.  The execution, delivery and performance of this Agreement by such Debtor and the consummation by such Debtor of the transactions contemplated hereby do not and will not:

(a)    contravene or otherwise violate any provisions of the Articles of Incorporation or By-Laws of such Debtor;

(b)    conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which such Debtor is a party or to which it is subject;

(c)    violate or conflict with any Legal Requirements applicable to the business conducted by such Debtor except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to such Debtor; or

(d)    require any Governmental Approval or other Consent except for the 9019 Order and any such Governmental Approvals and Consents which have been obtained prior to Closing.

12.3    <u>Legal Matters</u>.  Such Debtor has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or

in respect of this Agreement which would affect the execution, delivery or enforceability of this Agreement.

       12.4   <u>Released Claims</u>.  Neither the Lehman Released Claims (as hereinafter defined) nor any part of any interest in any claim, contention, demand, or cause of action relating to any Lehman Released Claim or any portion of any recovery or settlement with respect thereto has been sold, granted, transferred, assigned or encumbered by any of the Debtors.

## ARTICLE XIII

REPRESENTATIONS AND WARRANTIES OF LEHMAN RE

       Lehman Re hereby represents and warrants to each of the Debtors and Pulsar as follows:

       13.1   <u>Organization and Good Standing of Lehman Re</u>.  Lehman Re is a corporation duly organized, validly existing and subject to an insolvency proceeding in the jurisdiction of its organization.  Lehman Re has the corporate power and authority to own, lease and operate its property, and the JPLs have the corporate power and authority to conduct Lehman Re's business as it is now being conducted.

       13.2   <u>Authority, Approvals and Consents</u>.  Subject to the issuance of the Lehman Re Bermuda Order (as hereinafter defined) and the Lehman Re Chapter 15 Order (as hereinafter defined), the JPLs have the corporate power and authority, subject to the sanction of the Bermuda Court, to execute and deliver, and Lehman Re has the power to perform, this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by all necessary action on the part of Lehman Re and no other corporate proceedings on the part of Lehman Re are necessary to authorize and approve this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Lehman Re and constitutes a valid and binding obligation of Lehman Re, enforceable against Lehman Re in accordance with its terms, except as enforceability may be limited by the principles governing the availability of equitable remedies.  The execution, delivery and performance of this Agreement by Lehman Re and the consummation of the transactions contemplated hereby by Lehman Re do not and will not:

       (a)   contravene or otherwise violate any provisions of the Articles of Incorporation or By-Laws of Lehman Re;

       (b)   conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment,

understanding or arrangement of any kind to which Lehman Re is a party or to which Lehman Re is subject;

(c)      violate or conflict with any Legal Requirements applicable to Lehman Re or any of its business or property; or

(d)      require any Governmental Approval or other Consent except for the Lehman Re Bermuda Order and the Lehman Re Chapter 15 Order and any such Governmental Approvals and Consents which have been obtained prior to Closing.

13.3    Legal Matters.

(a)      Lehman Re has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in respect of this Agreement which would affect the execution, delivery or enforceability of this Agreement or with respect to any of the Repurchased Loans

(b)      Lehman Re has not received written notice of any non-compliance by Lehman Re with any Legal Requirements governing or affecting its ownership, administration or servicing of any of the Repurchased Loans.

13.4    Loan Documents and Loan Files.  Attached hereto as Schedule 1 is a true, correct, and complete list of the Loan Documents (as the same may have been amended, restated, replaced, supplemented or otherwise modified in writing) and Loan Files delivered to the Lehman U.S. Parties as of the date hereof.  As of Closing, Lehman Re has furnished to LCPI true and correct copies of all of the Loan Documents and Loan Files.  During the period from and after the Lehman Re Acquisition Date, except with respect to Lehman Re's consent to the release by Lehman ALI of a portion of the Collateral Property relating to the Pacific Point Project on or about November, 2011, neither Lehman Re, the JPLs, nor any of their respective agents, advisors, counsel and representatives, has (i) waived in writing, amended, modified or altered, satisfied, cancelled, subordinated or rescinded in any respect the terms of the Loan Documents for each Repurchased Loan, (ii) released, either in whole or in part, the related Collateral Property from the lien or other encumbrance of the Loan Documents in a manner that materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such Collateral Property for the purposes specified in such Loan Documents, nor (iii) released, either in whole or in part, the mortgagor or pledgor under such Repurchased Loan from its obligations under such Loan Documents in a manner that materially interferes with the benefits of the security intended to be provided by any such Loan Documents or the use, enjoyment, value or marketability of such Collateral Property for the purposes specified in such Loan Documents.

13.5    Notices of Default.  Except as set forth on Schedule 3 attached hereto, Lehman Re has not issued any notices of default with respect to any of the

Repurchased Loans and has provided LCPI with copies of each of the notices of default set forth on Schedule 3.

13.6    No Liens by Lehman Re.  From and after the Lehman Re Acquisition Date, Lehman Re has not encumbered or otherwise subjected all or any portion of its interest in the Repurchased Loans to any Liens.

13.7    Interests in the Repurchased Loans.  Immediately prior to, at and as of the Closing, except for the assignment of the Repurchased Loans to LCPI contemplated hereunder, neither Lehman Re nor any of its Affiliates has sold, assigned, transferred or conveyed any direct or indirect interest in any of the Repurchased Loans or entered into, or consented to, any agreement to do so.  Lehman Re has not entered into any agreement that could impair Lehman Re's right to sell and assign the Repurchased Loans to LCPI or could subject the Repurchased Loans to any rights, claims or interest of any other Person.  Lehman Re has not foreclosed or exercised any similar remedies upon any Collateral Property securing any of the Repurchased Loans.  On the Closing Date, Lehman Re will convey to LCPI the same right, title and interest in each of the Repurchased Loans that Lehman Re acquired from LCPI, free and clear of any Liens. Lehman Re has been, and will be, the sole legal and beneficial owner of each of the Repurchased Loans during the period from the Lehman Re Acquisition Date through the Closing Date.

13.8    Loan and Escrow Balances.  Schedule 2 attached hereto accurately identifies, as of February 8, 2012: (a) the outstanding principal balance, (b) the accrued and unpaid interest, (c) the currently applicable interest rate, and (d) the balance of any Escrow Accounts of each Repurchased Loan.  There are no other escrows, impounds, reserves or other cash collateral held with respect to any of the Repurchased Loans.

13.9    No Claims.  Except with respect to the Pacific Point Litigation and the 237 Adversary Proceeding, Lehman Re has no actual knowledge of any claim or right of rescission, setoff, counterclaim, claims of lender liability, claims of any other default by Lehman Re under any of the Loan Documents, or defense by the mortgagor or any other obligor(s) under any Repurchased Loan or by any other Person obligated to perform under any Loan Documents for any such Repurchased Loans.

13.10    Released Claims.  Neither the Lehman Re Released Claims (as hereinafter defined) nor any part of any interest in any claim, contention, demand, or cause of action relating to any Lehman Re Released Claim or any portion of any recovery or settlement with respect thereto has been sold, granted, transferred, assigned or encumbered by Lehman Re.

## ARTICLE XIV

### REPRESENTATIONS AND WARRANTIES OF PULSAR

Pulsar hereby represents and warrants to each of the Debtors and Lehman Re as follows:

14.1    <u>Organization; Power and Authority</u>.  Pulsar (a) is a corporation duly organized and validly existing under the laws of the jurisdiction of its organization and (b) has the corporate power and authority to own, lease and operate its property and to conduct its business as it is now being conducted.

14.2    <u>Authority, Approvals and Consents</u>.  Pulsar has the power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized and approved by Pulsar, and no other corporate proceedings on the part of Pulsar are necessary to authorize and approve this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Pulsar and constitutes a valid and binding obligation of Pulsar, enforceable against Pulsar in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by the principles governing the availability of equitable remedies.  The execution, delivery and performance of this Agreement by Pulsar and the consummation by Pulsar of the transactions contemplated hereby do not and will not:

(a)    contravene or otherwise violate any provisions of the Articles of Incorporation or By-Laws of Pulsar;

(b)    conflict with, result in a breach of any provision of, constitute a default under, result in the modification, acceleration or cancellation of, or give rise to any right of termination in respect of, any contract, agreement, commitment, understanding or arrangement of any kind to which Pulsar is a party or to which it is subject;

(c)    violate or conflict with any Legal Requirements applicable to the business conducted by Pulsar except for such violations and conflicts as have not had and would not be reasonably expected to have a Material Adverse Effect with respect to Pulsar; or

(d)    require any Governmental Approval or other Consent except for any such Governmental Approvals and Consents which have been obtained prior to Closing.

14.3    <u>Legal Matters</u>.  Pulsar has not received written notice of any claim, action, suit, litigation, investigation or proceeding pending or threatened against or in

respect of this Agreement which would affect the execution, delivery or enforceability of this Agreement.

14.4    Released Claims.  Neither the Pulsar Released Claims (as hereinafter defined) nor any part of any interest in any claim, contention, demand, or cause of action relating to any Pulsar Released Claim or any portion of any recovery or settlement with respect thereto has been sold, granted, transferred, assigned or encumbered by Pulsar.

## ARTICLE XV

## RELEASES

15.1    Lehman Re and Congress Life Release.  Upon the occurrence of the Effective Date, and except as to (i) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (ii) the performance of the obligations set forth herein, (iii) the Allowed LCPI Claim, the Allowed LBSF Claim, the Allowed LBCC Claim, and the Allowed LBHI Claim, and (iv) Lehman Re's distribution entitlements under the Plan, and subject to the effectiveness of this Agreement in accordance with Section 16.1 hereof, and in consideration of the foregoing and the Debtors' execution of this Agreement, Lehman Re and Congress Life, on behalf of themselves, their estates, and their successors and assigns, expressly release, discharge and waive, unconditionally and irrevocably, any claims (whether direct or derivative), counterclaims, defenses, rights of setoff, debt, liens, losses, demands, damages (whether general, special or punitive), liabilities, obligations, judgments, executions, debts, costs and causes of action of whatever nature, whether asserted or unasserted, fixed or contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time and whether based on contract, tort, statute or other legal or equitable theory of recovery, unsecured, secured, priority, administrative or otherwise ("Claims"), that Lehman Re or Congress Life may have against any of the Lehman U.S. Parties or any of their respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, or any successors or assigns thereof, including, without limitation, any such Claims arising under, in connection with or relating in any manner to the MRA, the Mortgage Loans, the NWMA, or any of the Lehman Re Claims or any of the documents, instruments agreements or transactions described in or contemplated thereby (collectively, "Lehman Re Released Claims"). Notwithstanding the foregoing, nothing in this Agreement shall constitute a release or waiver of any claims against any obligor on any Mortgage Loan or any claims, defenses, or causes of action Aetna may have (in its own right and not derivative of the rights of any other person or entity) against Appalachian in the Appalachian Litigation. Additionally, nothing in this Agreement shall constitute a release or waiver of any claims Lehman Re may have against the Lehman U.S. Parties under the 2009 Settlement Agreement or any assignment and assumption or other agreements executed in accordance with the 2009 Settlement Agreement.

15.2    <u>Lehman U.S. Parties Release</u>.  Upon the occurrence of the Effective Date, and except as to (i) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (ii) the performance of the obligations set forth herein, and subject to the effectiveness of this Agreement in accordance with Section 16.1 hereof, and (iii) the Accepted Appalachian Claim and in consideration of the foregoing and Lehman Re's and Pulsar's execution of this Agreement, each of the Lehman U.S. Parties on behalf of itself, its estate, and its successors and assigns, expressly releases, discharges and waives, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages (whether general, special or punitive) liabilities, obligations, judgments, executions, debts, costs and causes of action of whatever nature, whether asserted or unasserted, fixed or contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time and whether based on contract, tort, statute or other legal or equitable theory of recovery, unsecured, secured, priority, administrative or otherwise, that the Lehman U.S. Parties may have against Lehman Re, Congress Life, Pulsar, and/or any of Lehman Re's, Congress Life's, or Pulsar's JPLs, officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, participants, or any successors or assigns of any or all of the foregoing, including, without limitation, any such Claims arising under in connection with or relating in any manner to the MRA, the Mortgage Loans, the NWMA, or any of the Lehman Re Claims or any of the documents, instruments agreements or transactions described in or contemplated thereby (collectively, the "<u>Lehman Released Claims</u>").  Notwithstanding the foregoing, nothing in this Agreement shall constitute a release or waiver of (a) any claims against any obligor on any Mortgage Loan, or (b) any objections, challenges, defenses or counterclaims in respect of the Magnetar Claims (as hereinafter defined).  Additionally, nothing in this Agreement shall constitute a release or waiver of any claims the Lehman U.S. Parties may have against Lehman Re under the 2009 Settlement Agreement or any assignment and assumption or other agreements executed in accordance with the 2009 Settlement Agreement.

15.3    <u>Pulsar Release</u>.  Except as to (i) the agreement and performance of the obligations set forth in this Agreement and the documents, instruments and agreements executed in connection herewith, effective from and after the Effective Date, (ii) the Allowed Pulsar LBSF Claim, and (iii) Pulsar's distribution entitlements under the Plan, Pulsar on behalf of itself, its Affiliates, and its successors and assigns, expressly releases, discharges and waives, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages (whether general, special or punitive), liabilities, obligations, judgments, executions, debts, costs and causes of action of whatever nature, whether asserted or unasserted, fixed or contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time and whether based on contract, tort, statute or other legal or equitable theory of recovery, unsecured, secured, priority, administrative or otherwise, that Pulsar or any of its Affiliates or any of their respective successors or assigns may have directly or indirectly, against any of the Lehman U.S. Parties or any of their respective assets, and/or any of their direct or indirect parents, or the respective officers, directors, shareholders,

partners, members, employees, agents, servants, counsel, representatives, participants, or any successors or assigns thereof, including, without limitation, any Claims asserted or that could be asserted, by Pulsar in the adversary proceeding it commenced on January 26, 2011, in the Bankruptcy Court for the Southern District of New York, captioned *Pulsar Re, Ltd. v. Lehman Brothers Holdings, Inc, and Lehman Commercial Paper Inc.* Adversary Pro No. 11-01283-JMP or in any of the documents, pleadings, proofs of claim, instruments agreements or transactions described, referenced or contemplated therein (collectively, the "Pulsar Released Claims").  Notwithstanding the foregoing, the following claims held by Affiliates of Pulsar against LBHI and LBSF, as identified by claimant and claim number, are expressly excluded from the Pulsar Released Claims and are not released, discharged or waived by this Agreement or any of its provisions: (a) *Claims against LBHI*: Magnetar Constellation Master Fund LTD (claim no. 12700), Magnetar Structured Credit Fund LP (claim no. 12714), Magnetar Capital Master Fund LTD (claim no. 12716), Magnetar Capital Master Fund, LTD (claim no. 12717), Magnetar Constellation Master Fund III LTD (claim no. 12719), and Magnetar Constellation Master Fund II, LTD (claim no. 12721); and (b) *Claims against LBSF*: Magnetar Constellation Master Fund, LTD (claim no. 12722), Magnetar Structured Credit Fund LP (claim no. 12713), Magnetar Capital Master Fund LTD (claim no. 12715), Magnetar Constellation Fund III, LTD (claim no. 12718), and Magnetar Constellation Master Fund II LTD (claim no. 12720) (as of the foregoing claims being hereinafter referred to collectively as the "Magnetar Claims").  Further, for the avoidance of doubt, nothing in this Agreement constitutes a release, discharge or waiver of, or other limitation of any kind on, Pulsar's claims against Lehman Re in connection with the winding-up proceeding commenced by Lehman Re in the Supreme Court of Bermuda, including specifically but without limitation Pulsar's proprietary and constructive trust claims pending against Lehman Re and arising from Lehman Re's acquisition of Congress Life.

15.4    To the extent that a borrower or any other party to a Repurchased Loan asserts any claim based on an affirmative act or omission against LBHI, LCPI or Lehman Re in its capacity as lender, or as agent or in any other capacity under any of the Repurchased Loans, LBHI, LCPI or Lehman Re shall cooperate with one another (at no cost or liability to the cooperating party unless reimbursed by the party requesting such cooperation) in the defense of such claim to the extent practical and consistent with applicable fiduciary duties and rules of privilege.

15.5    Nothing in this Agreement is or shall be construed to be an assumption or an assumption and assignment of the MRA, NWMA or any other agreement by any Debtor pursuant to the Bankruptcy Code, including under section 365 thereof.

15.6    Nothing in this Agreement shall constitute a release or waiver of any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured, priority, administrative or otherwise, that any Debtor may have against any other Debtor.

## ARTICLE XVI

### IMPLEMENTATION OF AGREEMENT

16.1    Other than with respect to the provisions of Articles XII, XIII and XIV, and Sections 5.5 and 5.6 hereof which shall become effective upon the execution of this Agreement, this Agreement shall become effective (the "Effective Date") only upon the last to occur of (i) the entry of a final order, by the Bankruptcy Court in the Debtors' Chapter 11 Cases, in form and substance reasonably satisfactory to both the JPLs and the Debtors, authorizing the Debtors to enter into this Agreement and purchase the Repurchased Loans in accordance with the terms hereof, which order shall provide that the Debtors' obligations under this agreement are assumed by the Plan Administrator (as defined in the Plan), Liquidating Trustee (as defined in the Plan), or any other successor or assignee of the Debtors, or administrator or trustee under the Plan, and which order shall no longer be subject to any appeal and as to which the time to file an appeal has expired (the "9019 Order"), (ii) entry of an order, in form and substance reasonably satisfactory to both the JPLs and the Debtors by the Bermuda Court approving this Agreement (the "Lehman Re Bermuda Order"), and (iii) entry of a final order, by the Bankruptcy Court in the Lehman Re Chapter 15 Case, in form and substance reasonably satisfactory to both the JPLs and the Debtors, authorizing the sale of the Repurchased Loans to LCPI in accordance with the terms hereof, free and clear of all Liens, which order shall no longer be subject to any appeal and as to which the time to file an appeal has expired (the "Lehman Re Chapter 15 Order").

16.2    Within twenty (20) Business Days of the date hereof, the Debtors shall file a motion in the Bankruptcy Court seeking entry of the 9019 Order.  The Debtors shall prosecute such motion in good faith.

16.3    Within twenty (20) Business Days of the date hereof, Lehman Re shall file (i) a motion in the Bankruptcy Court seeking entry of the Lehman Re Chapter 15 Order, and (ii) an application in the Bermuda Court seeking entry of the Lehman Re Bermuda Order.  Lehman Re shall prosecute such motion and application in good faith.

16.4    Withdrawal of Adversary Proceedings.  Within ten (10) Business Days following the Closing Date, (i) Pulsar shall withdraw and dismiss with prejudice the adversary proceeding it commenced on January 26, 2011, in the Bankruptcy Court for the Southern District of New York, captioned *Pulsar Re, Ltd. v. Lehman Brothers Holdings, Inc, and Lehman Commercial Paper Inc.*  Adversary Pro No. 11-01283-JMP, and (ii) Lehman Re shall withdraw and dismiss with prejudice all claims, causes of action and defenses with respect to, or arising out of, that certain litigation identified as *D. Geoffrey Hunter and Dan Schwarzmann, as Joint Provisional Liquidators of Lehman Re, Ltd.. v. Broadway Partners Real Estate Fund III, L.P., et al.*, Case No. 09-14884 (JMP), Adv. Proc. No. 10-03279.

16.5    The Bermuda Court's Order of September 20, 2011, Releasing Pulsar From Its Implied Undertaking of Confidentiality.  On the Closing Date, Pulsar

-33-

shall abandon, release and waive its rights under the Order of the Bermuda Court dated September 20, 2011, made by Mr. Justice Kawaley in *In the Matter of Lehman Re Ltd.*, Supreme Court of Bermuda, Commercial Court, Companies (Winding Up), 2008: No. 217 (whereby Pulsar was released from its implied undertaking of confidentiality in respect of all discovery obtained in the proceeding); and will covenant that, notwithstanding that portion of the said Order of September 20, 2011, it shall for all purposes treat itself as still bound by the said implied undertaking of confidentiality; and will agree to the withdrawal/abandonment of the appeal by LBHI and LCPI to the Court of Appeal for Bermuda against the said Order of September 20, 2011, with no order for costs.

## ARTICLE XVII

### TERMINATION

17.1    <u>Debtor's Right to Terminate</u>.  Each Debtor shall have the right, at its election, to terminate this Agreement by written notice to Lehman Re and Pulsar if (a) there is a breach, in any material respect, of the representations, warranties and/or covenants of either Lehman Re or Pulsar hereunder, taken as a whole, and Lehman Re or Pulsar, as the case may be, shall fail to cure such breach within ten (10) days following written notice of such breach from any of the Debtors, (b) the Debtors' motion requesting entry of the 9019 Order is denied with prejudice by final and non-appealable order, (c) the Bermuda Court rejects Lehman Re's application requesting entry of the Lehman Re Bermuda Order, (d) Lehman Re's motion requesting entry of the Lehman Re Chapter 15 Order is denied with prejudice by final and non-appealable order of the Bankruptcy Court, or (e) there shall have been issued a final order, decree, or ruling by any court or governmental body having jurisdiction, that after appeals have been exhausted, restrains or enjoins the consummation of or renders illegal or unenforceable this Agreement or any of the material transactions contemplated by this Agreement.  Notwithstanding anything to the contrary in this Agreement, (i) nothing herein requires any Debtor to breach any fiduciary obligations it has under applicable law; and (ii) to the extent such fiduciary obligations require any Debtor to terminate its obligations hereunder, it may do so without incurring any liability to any creditors.

17.2    <u>Lehman Re's Right to Terminate</u>.  Lehman Re shall have the right, at its election, to terminate this Agreement by written notice to the Debtors if (a) there is a breach, in any material respect, of the representations, warranties and/or covenants of the Debtors hereunder, taken as a whole, and the Debtors shall fail to cure such breach within ten (10) days following written notice of such breach from either Lehman Re or Pulsar; (b) the Debtors' motion requesting entry of the 9019 Order is denied with prejudice by final and non-appealable order of the Bankruptcy Court; (c) the Bermuda Court rejects Lehman Re's application requesting entry of the Lehman Re Bermuda Order; (d) Lehman Re's motion requesting entry of the Lehman Re Chapter 15 Order is denied with prejudice by final and non-appealable order of the Bankruptcy Court, or (e) there shall have been issued a final order, decree, or ruling by any court or

governmental body having jurisdiction, that after appeals have been exhausted, restrains or enjoins the consummation of or renders illegal or unenforceable this Agreement or any of the material transactions contemplated by this Agreement.

       17.3   <u>Pulsar's Right to Terminate</u>.  Pulsar shall have the right, at its election, to terminate this Agreement by written notice to the Debtors if there is a breach, in any material respect, of the representations, warranties and/or covenants of the Debtors to Pulsar set forth in sections 2.7, 5.5(d) and (f), and 12.1 to 12.3, and the Debtors shall fail to cure such breach within ten (10) days following written notice of such breach from either Lehman Re or Pulsar.

       17.4   <u>Effect of Termination</u>.  In the event that this Agreement is terminated in accordance with its terms by any Party, then neither this Agreement, nor any motion or other Pleading filed in the Bankruptcy Court with respect to the approval of this Agreement or confirmation of the Plan, shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed, and the Parties hereto shall be automatically relieved of any further obligations hereunder.  Except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

# ARTICLE XVIII

## MISCELLANEOUS PROVISIONS

       18.1   <u>Expenses</u>.  Except as otherwise expressly provided herein, the fees and expenses incurred by each Party hereto (including the fees of any attorneys fees and expenses) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.

       18.2   <u>Headings</u>.  The Section headings herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.  References to Sections, unless otherwise indicated, are references to Sections of this Agreement.

       18.3   <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

       18.4   <u>Jurisdiction</u>.  The Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any Party bringing such action or

proceeding shall bring such action or proceeding in the Bankruptcy Court.  Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.  If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any other state or federal court located within the County of New York in the State of New York having proper jurisdiction.  Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement with the Bankruptcy Court or with any other state or federal court located within the County of New York in the State of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each Party irrevocably consents to service of process in the manner provided for notices in Section 18 hereof.  Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.

18.5    Governing Law.  This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

18.6    Assignment.  This Agreement and all provisions hereof will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns; *provided, however*, that neither this Agreement nor any right, interest, or obligation hereunder may be assigned by any Party hereto without the prior written consent of the other Parties.

18.7    No Admission of Liability.   Each Party acknowledges that this Agreement effects a settlement of potential claims and counterclaims that are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing.

18.8    Entire Agreement.  This Agreement and the other documents contemplated hereby (which documents are not a part of or incorporated by reference into this Agreement) embody the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto.  The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein

18.9    Waiver or Amendment.  Any waiver, alteration, amendment or modification of this Agreement shall be valid only if made in writing and signed by the

Parties to this Agreement that are affected by such waiver, alteration, amendment or modification.

18.10  Severability.  If any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Agreement will not be affected thereby, and the Parties hereto will use their reasonable efforts to substitute one or more valid, legal and enforceable provisions which insofar as practicable implement the purposes and intent hereof.  To the extent permitted by applicable law, each Party waives any provision of law which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

18.11  Third Person Beneficiaries.  This Agreement is not intended to confer upon any other Person any rights or remedies hereunder, except as provided herein with respect to successors and, if approved by the other Party pursuant to Section 18.6 above, such permitted assigns.

18.12  No Strict Construction.  The Parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  As used within the course of this Agreement, the masculine includes the feminine and the neuter, the single includes the plural and the plural includes the singular.

18.13  Survival.  Subject to the limitations set forth in Section 10.1 above, the provisions of this Agreement shall survive the Closing

18.14  Participation in Chapter 11 Cases.  Nothing in this Agreement shall limit in any way the right of Pulsar or Lehman Re to participate in the Debtors' Chapter 11 Cases; *provided* that such participation does not violate and is not inconsistent with the terms of this Agreement.  If the transactions contemplated by this Agreement, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

18.15  Limitation of Liability.  The JPLs were appointed by the Bermuda Court to manage Lehman Re's affairs, business, and properties as agents and without personal liability.  Additionally, neither the JPLs, nor any agent, advisor, representative, Affiliate, employee, partner, servant, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with the JPLs, nor any agent, advisor, representative, Affiliate, employee, director, partner, member, beneficiary, investor, servant, shareholder, trustee, attorney, or other person acting on behalf of, or otherwise related to or affiliated with Lehman Re shall have any personal liability directly or indirectly, under or in connection with: (a) this Agreement, (b) any agreement made or entered into under or pursuant to the provisions of this Agreement, or (c) any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

Each Party, on behalf of itself and its successors and assigns, hereby waives any right to bring any claims related to this Agreement against individual persons.  This Section 18.15 shall survive the termination of this Agreement.

18.16   <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 18.16 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

18.17   <u>Notices</u>.  All communications under this Agreement shall be in writing and shall be delivered by hand or facsimile or mailed by overnight courier or by registered or certified mail, postage prepaid, to the appropriate Party at the address or facsimile number listed below (or at such other address or facsimile number as Party may have been furnished to the other Parties in writing).  Any notice so addressed shall be deemed to be given: if delivered by hand or facsimile, on the date of such delivery, if a Business Day and delivered during regular business hours, otherwise the first Business Day thereafter; if mailed by courier, on the first Business Day following the date of such mailing; and if mailed by registered or certified mail, on the third Business Day after the date of such mailing:

If to any of the Debtors:

      c/o Lehman Brothers Holdings Inc.
      1271 Avenue of the Americas
      New York, New York  10020
      Facsimile: (646) 758-3071
      Attn: Jeff Fitts
      Facsimile: (646) 758-0541

with copies to:

      Lehman Brothers Holdings Inc.
      1271 Avenue of the Americas
      New York, New York  10020
      Attention: Joelle Halperin
      Facsimile: (646) 834-0874

and:

      Weil, Gotshal & Manges LLP
      1395 Brickell Avenue, Suite 1200
      Miami, Florida 33131
      Attention: Richard A. Morrison, Esq.
      Facsimile: (305) 374-7159

If to Lehman Re:

      Lehman Re Ltd.
      c/o PricewaterhouseCoopers LLP
      7 More London Riverside
      London, SE12RT, United Kingdom
      Attention: Dan Schwarzmann
      Facsimile: +44(0)20 7212 7500

with copies to:

      Lehman Re Ltd.
      c/o PricewaterhouseCoopers, Bermuda
      Dorchester House
      7 Church Street
      Hamilton, Bermuda HM11
      Attention:  Garth Calow
      Facsimile: (441) 295-1242

and:

       Cadwalader, Wickersham & Taft LLP
       One World Financial Center
       New York, New York 10281
       Attention: Gregory Petrick, Esq.
       Facsimile: (212) 504-6666

If to Pulsar:

       Pulsar Re Ltd.
       Williams House, 2nd Floor
       20 Reid Street
       Hamilton HM 11, Bermuda
       Attention:  Michael Carter
       Facsimile: (441) 296-3359

with a copy to:

       Kirkland & Ellis LLP
       300 North LaSalle
       Chicago, IL 60654
       Attention: James Sprayregen, Esq.
       Facsimile: (312) 862-2200

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)


By: _____

Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN RE LTD., a Bermuda corporation in provisional liquidation



By: _____
Dan Schwarzmann, in his capacity as Joint Provisional Liquidator of Lehman Re Ltd., without personal liability

LEHMAN BROTHERS SPECIAL FINANCING INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)



By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN COMMERCIAL PAPER INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)



By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS COMMERCIAL CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)



By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS FINANCIAL PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)



By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN RE LTD., a Bermuda corporation in provisional liquidation

By: _____
Dan Schwarzmann, in his capacity as Joint Provisional Liquidator of Lehman Re Ltd., without personal liability

LEHMAN BROTHERS SPECIAL FINANCING INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN COMMERCIAL PAPER INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS COMMERCIAL CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS FINANCIAL PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

-41-

LEMAN BROTHERS OTC DERIVATIVES INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS COMMODITY SERVICES INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS SCOTTISH FINANCE L.P. as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its general partner Property Asset Management Inc.

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION V LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION IX LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

EAST DOVER LIMITED, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Duly Authorized Officer

LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE S.A.R.L., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Manager

BNC MORTGAGE LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: John Suckow
Title: Authorized Signatory

STRUCTURED ASSET SECURITIES CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB ROSE RANCH LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Authorized Signatory

-43-

LB 2080 KALAKAUA OWNERS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

MERIT LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its Manager Lehman Commercial Paper Inc.

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LB SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LB PREFERRED SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LB 745 LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

PAMI STATLER ARMS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Authorized Signatory

PULSAR RE, LTD.

By: _____
Name:
Title:

LEHMAN ALI, INC.

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LB 2080 KALAKAUA OWNERS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

MERIT LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its Manager Lehman Commercial Paper Inc.

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

LB SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

LB PREFERRED SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

LB 745 LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

PAMI STATLER ARMS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

By:_____
Name: Daniel J. Ehrmann
Title: Authorized Signatory

PULSAR RE, LTD.

LEHMAN ALI, INC.

By: _Michael A. C____
Name: Michael A. Carter
Title: Director

By:_____
Name: Daniel J. Ehrmann
Title: Vice President

-44-

APPALACHIAN ASSET MANAGEMENT
CORP.

By: _____
Name:
Title:

CONGRESS LIFE INSURANCE COMPANY

By: LEHMAN RE LTD., its sole stockholder

By: _____
Dan Schwarzmann, Joint Provisional Liquidator of
Lehman Re Ltd., acting as agent and without personal
liability

US_ACTIVE:\43815662\14\58399.0008

APPALACHIAN   ASSET   MANAGEMENT   CONGRESS LIFE INSURANCE COMPANY
CORP.

By: _____

Name: John Suckow

Title: President

By: _____

Dan Schwarzmann, Joint Provisional
Liquidator of Lehman Re Ltd., acting as agent
and without personal liability

# EXHIBIT A

## MORTGAGE LOANS



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008     LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U92

Investment Amount : $635,000,000.00
Required Amount : $698,500,000.00
Trade Margin % : 10.00

Asset Grade : C
Pricing Service : Seller

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 102 | WE46 | WE46 | 7.7220 | 100.000000 | P | 05/01/2009 | $144,587,888.97 | $144,587,888.97 |
| 102 | WH5857 | 100101522 | 0.0001 | 100.000000 | P | 05/11/2012 | $112,870,183.75 | $112,870,183.75 |
| 102 | WH1085 | WH1085 | 0.0001 | 100.000000 | P |  | $88,123,683.52 | $88,123,683.52 |
| 102 | WH5865 | WH5865 | 12.0000 | 100.000000 | P | 06/01/2009 | $85,712,730.61 | $85,712,730.61 |
| 102 | WH5669 | WH5669 | 5.9710 | 100.000000 | P | 12/01/2009 | $80,000,000.00 | $80,000,000.00 |
| 102 | WH8581 | WH8581 | 1.0000 | 100.000000 | P | 10/18/2008 | $45,219,440.00 | $45,219,440.00 |
| 102 | WH8656 | WH8656 | 1.0000 | 100.000000 | P | 11/01/2009 | $44,070,696.82 | $44,070,696.82 |
| 102 | WH5143 | WH5143 | 6.7210 | 100.000000 | P | 10/31/2008 | $43,820,828.14 | $43,820,828.14 |
| 102 | WH5509 | WH5509 | 5.4712 | 100.000000 | P | 02/27/2009 | $37,739,819.16 | $37,739,819.16 |
| 102 | WH8561 | WH8561 | 1.0000 | 100.000000 | P | 11/10/2010 | $32,525,044.97 | $32,525,044.97 |
| 102 | WH5561 | WH5561 | 14.0000 | 100.000000 | P | 04/01/2009 | $26,627,495.72 | $26,627,495.72 |
| 102 | WH4311 | WH4311 | 15.3125 | 100.000000 | P | 12/29/2009 | $25,421,625.15 | $25,421,625.15 |
| 102 | WE319 | WE319 | 11.5000 | 100.000000 | P |  | $24,904,607.27 | $24,904,607.27 |
| 102 | WE299 | WE299 | 9.2212 | 100.000000 | P | 10/09/2009 | $21,050,193.76 | $21,050,193.76 |
| 102 | WH6529 | WH6529 | 12.0000 | 100.000000 | P | 08/14/2010 | $20,000,000.00 | $20,000,000.00 |
| 102 | WH5741 | WH5741 | 6.7500 | 100.000000 | P | 05/01/2010 | $19,492,870.40 | $19,492,870.40 |
| 102 | WD23 | WD23 | 1.0000 | 100.000000 | P | 02/01/2009 | $16,364,549.11 | $16,364,549.11 |
| 102 | WE223 | WE223 | 5.9000 | 100.000000 | P | 02/09/2009 | $16,138,708.50 | $16,138,708.50 |
| 102 | VX54 | VX54 | 0.0001 | 100.000000 | P | 09/01/2010 | $16,000,000.00 | $16,000,000.00 |
| 102 | VY41 | VY41 | 0.0001 | 100.000000 | P | 10/09/2008 | $15,322,765.63 | $15,322,765.63 |
| 102 | WE72 | WE72 | 15.8090 | 100.000000 | P | 08/09/2009 | $8,400,592.86 | $8,400,592.86 |
| 102 | WH5907 | WH5907 | 9.5000 | 100.000000 | P |  | $7,685,893.00 | $7,685,893.00 |
| 102 | WH6455 | WH6455 | 18.5600 | 100.000000 | P | 07/12/2009 | $7,200,000.00 | $7,200,000.00 |

|  |  |  |  |
|---|---|---|---|
| **Pricing Service Total :** | 23 Assets | $939,279,417.16 | $939,279,417.16 |
| **Grade C Total :** | 23 Assets | $939,279,417.16 | $939,279,417.16 |
| **Total:** | 23 Assets | $939,279,417.16 | $939,279,417.16 |

Required Amount : $698,500,000.00
Excess Amount : $240,779,417.16

A-1



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008        LCPI

Print Date :  09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No :  WLERE
Trade Reference No :  6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % :  20.00

Asset Grade :  B
Pricing Service :  Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | WH6521 | 40005175 | 7.8750 | 104.906250 | P | 02/01/2037 | $873,110.18 | $915,947.15 |
| 108 | WH4517 | 123789471 | 6.0500 | 102.078125 | P | 08/03/2035 | $682,500.00 | $696,683.20 |
| 101 | WH5013 | 33629023 | 6.6250 | 102.078125 | P | 01/01/2037 | $620,599.30 | $633,496.13 |
| 101 | WH8590 | 33683357 | 8.1250 | 106.046875 | P | 01/01/2037 | $570,000.00 | $604,467.19 |
| 101 | WE07 | 32292997 | 7.2500 | 104.906250 | P | 01/01/2036 | $561,750.00 | $589,310.86 |
| 104 | DLFR | 125035033 | 7.0000 | 104.906250 | P | 03/01/2037 | $560,000.00 | $587,475.00 |
| 108 | WH5802 | 123790529 | 9.5000 | 106.046875 | P | 09/20/2033 | $492,654.75 | $522,444.97 |
| 101 | WH6342 | 33664350 | 6.6250 | 103.421875 | P | 12/01/2036 | $492,423.23 | $509,273.34 |
| 101 | WH5013 | 40417735 | 8.2750 | 106.046875 | P | 02/01/2037 | $477,270.95 | $506,130.93 |
| 101 | WH8590 | 33491523 | 6.8750 | 103.421875 | P | 12/01/2036 | $460,000.00 | $475,740.63 |
| 106 | WH8963 | 123930802 | 5.3750 | 99.828125 | P | 03/01/2020 | $471,291.83 | $470,481.80 |
| 101 | UC22 | 30436091 | 6.1250 | 102.078125 | P | 04/01/2035 | $457,340.32 | $466,844.42 |
| 101 | WH8592 | 45010287 | 7.6750 | 104.906250 | P | 02/01/2037 | $443,712.26 | $465,481.69 |
| 101 | WH6521 | 40309304 | 7.7500 | 104.906250 | P | 04/01/2037 | $399,363.55 | $418,957.32 |
| 101 | WE14 | 45464591 | 7.1750 | 104.906250 | P | 03/01/2037 | $395,000.00 | $414,379.69 |
| 108 | WH4517 | 123787095 | 6.7500 | 103.421875 | P | 08/01/2035 | $397,179.55 | $410,770.54 |
| 108 | WH4517 | 123626186 | 6.2500 | 102.078125 | P | 10/01/2034 | $391,739.63 | $399,880.47 |
| 101 | WH6342 | 40151631 | 7.5000 | 104.906250 | P | 03/01/2037 | $376,000.00 | $394,447.50 |
| 101 | WE14 | 32208183 | 6.5000 | 103.421875 | P | 01/01/2036 | $374,898.44 | $387,727.00 |
| 101 | WH5013 | 33671587 | 7.2500 | 104.906250 | P | 01/01/2037 | $363,714.29 | $381,559.02 |
| 104 | DLFR | 124982745 | 8.6250 | 106.046875 | P | 04/01/2037 | $358,701.61 | $380,391.85 |
| 101 | FREP | 111448601 | 6.2500 | 102.078125 | P | 12/01/2032 | $356,622.02 | $364,033.07 |
| 108 | WH5802 | 123790644 | 6.2500 | 102.078125 | P | 08/01/2035 | $352,000.00 | $359,315.00 |
| 101 | UC22 | 32592222 | 6.6250 | 103.421875 | P | 03/01/2036 | $341,116.62 | $352,789.20 |
| 101 | WH6519 | 33760141 | 7.3750 | 104.906250 | P | 01/01/2037 | $335,900.00 | $352,380.09 |
| 108 | WH4517 | 123643249 | 5.7000 | 100.640625 | P | 07/01/2035 | $346,417.78 | $348,837.02 |
| 106 | WH8963 | 123926099 | 5.5000 | 102.234375 | P | 10/01/2019 | $339,591.35 | $347,179.09 |
| 108 | WH5802 | 123788416 | 7.5000 | 106.234375 | P | 04/01/2035 | $324,306.23 | $344,524.70 |
| 101 | WE14 | 36042869 | 5.7500 | 100.640625 | P | 08/01/2035 | $320,000.00 | $322,050.00 |
| 101 | UC22 | 15340474 | 7.8800 | 104.906250 | P | 06/01/2033 | $300,421.77 | $316,161.21 |
| 106 | DLFR | 125117069 | 7.2500 | 104.906250 | P | 08/01/2037 | $299,579.97 | $314,278.11 |
| 101 | WE14 | 38601130 | 8.0000 | 106.046875 | P | 08/01/2036 | $285,000.00 | $302,233.59 |
| 108 | WH5802 | 123787939 | 7.5000 | 106.234375 | P | 12/01/2035 | $284,288.89 | $302,012.53 |
| 108 | WH5802 | 123787533 | 6.0000 | 102.234375 | P | 04/01/2033 | $292,800.11 | $299,342.38 |
| 101 | UC22 | 15302342 | 8.2500 | 103.421875 | P | 04/01/2033 | $286,906.23 | $296,413.54 |
| 101 | UC22 | 15473911 | 9.2500 | 106.046875 | P | 06/01/2033 | $274,782.79 | $291,398.56 |
| 101 | WH6519 | 40014425 | 6.5000 | 102.078125 | P | 02/01/2037 | $271,200.00 | $276,835.88 |
| 101 | WE14 | 32784886 | 7.5000 | 104.906250 | P | 06/01/2036 | $262,914.69 | $275,813.94 |
| 101 | DLFR | 102759313 | 9.3750 | 106.046875 | P | 07/01/2030 | $254,898.14 | $270,311.51 |
| 101 | UC22 | 15050388 | 7.8750 | 104.906250 | P | 03/01/2033 | $254,140.10 | $266,608.85 |
| 101 | DLFR | 33038712 | 13.8750 | 106.046875 | P | 06/01/2036 | $239,863.55 | $254,367.80 |
| 108 | WH4517 | 123722910 | 7.9500 | 104.906250 | P | 09/01/2033 | $242,219.99 | $254,103.91 |
| 101 | UC22 | 31366677 | 6.0000 | 102.078125 | P | 08/01/2035 | $245,227.19 | $250,323.32 |
| 101 | UC22 | 38019598 | 7.0000 | 104.906250 | P | 05/01/2036 | $232,000.00 | $243,382.50 |
| 101 | UC22 | 123191421 | 7.7500 | 104.906250 | P | 11/01/2036 | $229,819.69 | $241,095.22 |
| 108 | WH5802 | 123792137 | 10.1250 | 106.046875 | P | 10/01/2033 | $226,538.31 | $240,236.80 |
| 108 | WH5802 | 123788077 | 10.1250 | 106.046875 | P | 09/01/2036 | $223,521.63 | $237,037.70 |
| 101 | UC22 | 15550617 | 9.6250 | 106.046875 | P | 08/01/2033 | $221,131.43 | $234,502.97 |
| 101 | UC22 | 117817585 | 6.5000 | 103.421875 | P | 09/01/2035 | $221,380.30 | $228,964.97 |
| 104 | DLFR | 124963313 | 7.7500 | 104.906250 | P | 05/01/2037 | $216,498.94 | $227,120.92 |
| 101 | UC22 | 39803382 | 8.6000 | 106.046875 | P | 12/01/2036 | $212,500.00 | $225,349.61 |
| 101 | UC22 | 38630092 | 7.7500 | 104.906250 | P | 08/01/2036 | $210,000.00 | $220,303.13 |
| 101 | UC22 | 38873113 | 7.7500 | 104.906250 | P | 09/01/2036 | $210,000.00 | $220,303.13 |
| 101 | UC22 | 33368846 | 7.5000 | 104.906250 | P | 10/01/2036 | $209,997.43 | $220,300.43 |
| 108 | WH5802 | 123787434 | 6.8750 | 103.421875 | P | 09/01/2035 | $211,998.83 | $215,253.16 |
| 101 | WE334 | 111995882 | 7.3750 | 104.906250 | P | 10/01/2032 | $207,390.00 | $217,565.07 |
| 108 | WH5802 | 123790255 | 6.1500 | 102.078125 | P | 11/01/2035 | $210,147.00 | $214,514.12 |
| 101 | UC22 | 38728887 | 7.6250 | 104.906250 | P | 08/01/2036 | $201,193.79 | $211,064.86 |
| 106 | WH8963 | 123925174 | 4.3750 | 99.640625 | P | 11/01/2019 | $211,201.57 | $210,442.56 |

A-2


THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 108 | WH5802 | 123792335 | 10.1250 | 106.046875 | P | 09/01/2033 | $191,495.17 | $203,074.64 |
| 101 | DLFR | 33187626 | 12.5000 | 104.906250 | P | 09/01/2021 | $191,901.23 | $201,316.38 |
| 106 | DLFR | 125521443 | 7.7500 | 106.234375 | P | 07/01/2032 | $187,865.61 | $199,577.86 |
| 101 | UC22 | 14011712 | 10.3750 | 106.046875 | P | 09/01/2032 | $182,281.85 | $193,304.21 |
| 101 | UC22 | 14011738 | 10.3750 | 106.046875 | P | 09/01/2032 | $182,281.85 | $193,304.21 |
| 101 | UC22 | 14015234 | 10.3750 | 106.046875 | P | 09/01/2032 | $182,281.85 | $193,304.21 |
| 108 | WH4517 | 123716005 | 7.6500 | 104.906250 | P | 03/01/2033 | $183,975.90 | $193,002.22 |
| 101 | UC22 | 11586765 | 7.2500 | 104.906250 | P | 02/01/2032 | $182,767.69 | $191,734.73 |
| 101 | WE334 | 111563391 | 6.5000 | 103.421875 | P | 01/01/2035 | $184,395.54 | $190,705.32 |
| 101 | WH6342 | 33678392 | 6.6250 | 102.078125 | P | 01/01/2037 | $184,990.00 | $188,834.32 |
| 108 | WH5802 | 123782633 | 11.1250 | 104.906250 | P | 02/01/2034 | $178,591.43 | $187,353.57 |
| 101 | WH5013 | 33374273 | 7.6250 | 104.906250 | P | 10/01/2036 | $175,077.50 | $183,667.24 |
| 101 | WH6592 | 38527958 | 9.5000 | 106.046875 | P | 08/01/2036 | $169,932.71 | $180,208.33 |
| 104 | DLFR | 124981507 | 8.0000 | 106.046875 | P | 09/01/2036 | $168,750.00 | $178,954.10 |
| 101 | UC22 | 15681166 | 7.1250 | 104.906250 | P | 07/01/2033 | $170,444.71 | $178,807.15 |
| 108 | WH5802 | 123792483 | 7.1250 | 104.906250 | P | 06/01/2034 | $168,547.94 | $176,817.32 |
| 101 | WE334 | 110912789 | 7.0000 | 104.906250 | P | 02/01/2032 | $166,755.80 | $174,937.26 |
| 101 | UC22 | 38532602 | 7.8750 | 104.906250 | P | 07/01/2036 | $166,000.00 | $174,144.38 |
| 108 | WH4517 | 123667289 | 7.0000 | 104.906250 | P | 09/01/2034 | $165,430.40 | $173,546.83 |
| 101 | WE334 | 107024051 | 7.0000 | 104.906250 | P | 12/01/2033 | $164,337.05 | $172,399.84 |
| 101 | WE334 | 107365561 | 7.5000 | 106.234375 | P | 11/01/2031 | $160,226.00 | $170,215.09 |
| 101 | UC22 | 15058951 | 7.2500 | 103.421875 | P | 04/01/2033 | $164,353.15 | $169,977.11 |
| 101 | WE334 | 110215175 | 6.8750 | 103.421875 | P | 05/01/2032 | $162,556.69 | $168,180.55 |
| 101 | WE334 | 108595018 | 6.2500 | 102.078125 | P | 01/01/2035 | $163,537.07 | $166,935.57 |
| 101 | FREP | 102465440 | 7.0000 | 104.906250 | P | 10/01/2037 | $153,635.38 | $161,173.12 |
| 101 | UC22 | 14774442 | 7.2500 | 104.359375 | P | 01/01/2018 | $152,118.25 | $158,749.65 |
| 108 | WH4517 | 123753642 | 6.5000 | 103.421875 | P | 11/01/2032 | $152,792.92 | $158,021.30 |
| 101 | UC22 | 14341689 | 9.7500 | 106.046875 | P | 10/01/2032 | $148,808.04 | $157,806.28 |
| 101 | WE334 | 108737257 | 7.5000 | 104.906250 | P | 08/01/2028 | $150,199.26 | $157,568.41 |
| 106 | WH8963 | 123924599 | 4.5000 | 99.828125 | P | 04/01/2019 | $157,441.38 | $157,170.78 |
| 101 | WE334 | 108085366 | 7.5000 | 106.234375 | P | 10/01/2031 | $146,535.64 | $155,671.22 |
| 101 | WE334 | 111565560 | 6.8750 | 103.421875 | P | 10/01/2034 | $150,358.20 | $155,503.27 |
| 108 | WH4517 | 123688228 | 6.1900 | 102.078125 | P | 10/01/2034 | $152,242.97 | $155,406.77 |
| 101 | FREP | 107104549 | 7.2500 | 104.906250 | P | 07/01/2033 | $147,404.36 | $154,636.39 |
| 101 | WE334 | 107197519 | 7.5000 | 106.234375 | P | 08/01/2031 | $145,542.92 | $154,616.61 |
| 108 | WH5802 | 123784845 | 5.8750 | 100.640625 | P | 12/01/2035 | $151,565.51 | $152,536.48 |
| 101 | WE334 | 106744386 | 8.0000 | 106.046875 | P | 08/01/2030 | $143,353.30 | $152,021.69 |
| 101 | FREP | 107081424 | 6.7500 | 103.421875 | P | 10/01/2035 | $146,643.04 | $151,660.98 |
| 106 | WH8993 | 125148650 | 6.5000 | 103.421875 | P | 03/01/2032 | $144,900.80 | $149,859.12 |
| 101 | DLFR | 125128009 | 6.7500 | 103.421875 | P | 10/01/2033 | $144,530.63 | $149,476.29 |
| 106 | WH8963 | 123924789 | 4.5000 | 99.828125 | P | 01/01/2020 | $147,073.26 | $146,820.48 |
| 108 | WH5802 | 123783979 | 6.6400 | 103.421875 | P | 09/01/2035 | $141,596.70 | $146,441.96 |
| 106 | WH8993 | 125526921 | 6.5000 | 103.421875 | P | 03/01/2024 | $140,511.51 | $145,319.64 |
| 108 | WH5802 | 123787491 | 10.6000 | 106.046875 | P | 01/01/2035 | $136,831.15 | $145,105.16 |
| 108 | WH4517 | 123695793 | 6.2900 | 102.078125 | P | 09/01/2035 | $140,674.70 | $143,598.10 |
| 106 | WH8993 | 125527275 | 6.8100 | 103.421875 | P | 04/01/2032 | $138,703.97 | $143,450.25 |
| 101 | UC22 | 15810690 | 6.3550 | 102.078125 | P | 08/01/2033 | $140,369.75 | $143,286.81 |
| 101 | FREP | 109590638 | 6.5000 | 104.906250 | P | 07/01/2035 | $138,518.30 | $143,258.22 |
| 101 | WE334 | 108264490 | 7.2500 | 104.906250 | P | 02/01/2032 | $136,302.41 | $142,989.75 |
| 101 | DLFR | 104230206 | 8.5000 | 106.046875 | P | 01/01/2028 | $134,509.78 | $142,643.42 |
| 101 | DLFR | 124826553 | 7.0000 | 104.906250 | P | 06/01/2036 | $135,153.47 | $141,784.44 |
| 101 | WE334 | 108599764 | 7.2950 | 104.906250 | P | 12/01/2035 | $134,944.79 | $141,565.52 |
| 108 | WH5802 | 123788804 | 5.9900 | 100.640625 | P | 07/01/2035 | $140,239.25 | $141,137.66 |
| 101 | UC22 | 11725579 | 8.9050 | 106.046875 | P | 04/01/2032 | $132,920.35 | $140,957.88 |
| 108 | WH5802 | 123790875 | 9.3750 | 106.046875 | P | 10/01/2033 | $132,724.47 | $140,750.15 |
| 108 | WH4517 | 123636425 | 5.8750 | 100.640625 | P | 11/01/2034 | $139,285.71 | $140,178.01 |
| 108 | WH4517 | 123688428 | 7.0850 | 104.906250 | P | 12/01/2033 | $133,616.88 | $140,172.46 |
| 106 | WH8963 | 123928988 | 4.7500 | 99.171875 | P | 04/01/2013 | $141,223.28 | $140,053.77 |
| 101 | FREP | 108078585 | 7.2500 | 104.906250 | P | 12/01/2029 | $133,433.60 | $139,980.19 |

A-3



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | DLFR | 124826751 | 7.2500 | 104.906250 | P | 05/01/2032 | $133,380.83 | $139,924.83 |
| 101 | WH5401 | 38248027 | 8.1250 | 106.046875 | P | 06/01/2036 | $131,800.59 | $139,770.41 |
| 101 | UC22 | 11723863 | 7.6400 | 106.234375 | P | 04/01/2032 | $131,424.05 | $139,617.52 |
| 108 | WH4517 | 123741233 | 7.9900 | 104.906250 | P | 12/01/2033 | $132,969.75 | $139,493.58 |
| 108 | WH5802 | 123787558 | 9.2500 | 106.046875 | P | 08/23/2035 | $131,115.59 | $139,043.99 |
| 101 | WE334 | 111500344 | 7.2500 | 104.906250 | P | 03/01/2032 | $132,459.21 | $138,957.99 |
| 101 | WE334 | 111132468 | 7.3750 | 103.421875 | P | 04/01/2031 | $133,928.51 | $138,511.38 |
| 101 | WH4631 | 123930061 | 4.8750 | 99.828125 | P | 10/01/2020 | $138,685.30 | $138,446.93 |
| 106 | WH8963 | 123930590 | 7.0000 | 104.015625 | P | 06/01/2009 | $132,493.65 | $137,814.10 |
| 108 | WH4517 | 123689689 | 7.4900 | 104.906250 | P | 12/01/2034 | $130,850.80 | $137,270.67 |
| 108 | WH5802 | 123780802 | 7.2900 | 104.906250 | P | 08/01/2035 | $130,356.76 | $136,752.39 |
| 108 | WH5802 | 123783490 | 12.1250 | 106.234375 | P | 08/01/2034 | $128,700.00 | $136,723.64 |
| 106 | WH8963 | 123928525 | 7.6250 | 106.234375 | P | 02/01/2030 | $127,362.45 | $135,302.70 |
| 106 | WH8993 | 125527952 | 8.0000 | 106.046875 | P | 02/01/2031 | $127,402.67 | $135,106.55 |
| 108 | WH5802 | 123785628 | 10.1250 | 106.046875 | P | 11/26/2033 | $127,322.09 | $135,021.10 |
| 101 | WE334 | 109542191 | 7.3750 | 104.906250 | P | 06/01/2031 | $128,575.53 | $134,883.77 |
| 101 | FREP | 108569401 | 7.0000 | 104.906250 | P | 12/01/2031 | $127,908.02 | $134,183.51 |
| 101 | WE334 | 111139234 | 6.7500 | 103.421875 | P | 10/01/2029 | $129,152.49 | $133,571.93 |
| 101 | UC22 | 11591606 | 8.5000 | 102.234375 | P | 02/05/2017 | $130,081.99 | $132,988.51 |
| 101 | FREP | 111471264 | 6.7500 | 103.421875 | P | 02/01/2031 | $127,721.53 | $132,092.00 |
| 101 | UC22 | 15648330 | 7.4000 | 104.906250 | P | 09/01/2032 | $126,792.72 | $131,964.43 |
| 101 | WE334 | 111768768 | 8.7500 | 103.421875 | P | 01/01/2032 | $127,531.95 | $131,895.93 |
| 101 | WE14 | 33237546 | 9.2500 | 106.046875 | P | 09/01/2036 | $123,870.93 | $131,361.25 |
| 101 | WE14 | 33237892 | 9.2500 | 106.046875 | P | 09/01/2036 | $123,870.93 | $131,361.25 |
| 101 | WE14 | 33231275 | 9.2500 | 106.046875 | P | 09/01/2036 | $123,863.76 | $131,353.65 |
| 101 | UC22 | 14495998 | 8.6250 | 106.046875 | P | 11/01/2032 | $123,655.08 | $131,132.35 |
| 106 | WH8963 | 123926196 | 5.1250 | 101.484375 | P | 05/01/2014 | $128,866.14 | $130,768.85 |
| 101 | WE334 | 11617040 | 7.7500 | 106.234375 | P | 04/01/2032 | $122,570.54 | $130,212.05 |
| 101 | UC22 | 14011696 | 9.5000 | 106.046875 | P | 04/01/2037 | $121,761.52 | $129,124.29 |
| 101 | WE334 | 106788417 | 7.0000 | 104.906250 | P | 10/01/2031 | $122,751.82 | $128,774.33 |
| 106 | WH8963 | 123926917 | 9.0000 | 104.015625 | P | 04/01/2015 | $123,730.32 | $128,698.87 |
| 101 | DLFR | 125132688 | 7.0000 | 104.906250 | P | 06/01/2035 | $122,649.65 | $128,667.15 |
| 101 | DLFR | 124826058 | 7.0000 | 104.906250 | P | 06/01/2036 | $121,492.26 | $127,452.97 |
| 101 | FREP | 112503974 | 6.2500 | 102.078125 | P | 06/01/2037 | $124,842.40 | $127,436.78 |
| 101 | UC22 | 11573995 | 8.5000 | 106.046875 | P | 03/01/2032 | $120,126.95 | $127,390.88 |
| 101 | WH6342 | 40276644 | 9.1250 | 106.046875 | P | 04/01/2037 | $119,954.38 | $127,207.87 |
| 108 | WH5802 | 123780059 | 8.0000 | 106.234375 | P | 05/01/2035 | $119,510.28 | $126,961.00 |
| 108 | WH5802 | 123783565 | 9.7500 | 106.234375 | P | 09/09/2034 | $119,233.48 | $126,666.94 |
| 101 | WE334 | 109541839 | 7.2500 | 104.906250 | P | 04/01/2032 | $120,527.78 | $126,441.17 |
| 101 | FREP | 103981932 | 7.3750 | 104.906250 | P | 09/01/2028 | $120,331.02 | $126,234.76 |
| 101 | DLFR | 125132316 | 6.7500 | 103.421875 | P | 06/01/2035 | $120,912.44 | $125,049.91 |
| 108 | WH4517 | 123773566 | 6.1000 | 102.078125 | P | 12/01/2032 | $122,117.93 | $124,655.69 |
| 101 | FREP | 108427212 | 8.0000 | 104.906250 | P | 04/01/2036 | $118,399.66 | $124,208.64 |
| 101 | FREP | 107227324 | 9.0000 | 106.046875 | P | 07/01/2030 | $116,779.15 | $123,840.64 |
| 101 | UC22 | 14683775 | 10.1250 | 106.046875 | P | 12/01/2032 | $116,101.78 | $123,122.31 |
| 101 | WE334 | 105430852 | 7.5500 | 104.906250 | P | 02/01/2037 | $117,265.47 | $123,018.81 |
| 108 | WH4517 | 123704348 | 5.8000 | 100.640625 | P | 12/01/2032 | $122,233.12 | $123,016.18 |
| 101 | WE334 | 110220324 | 7.0000 | 104.906250 | P | 04/01/2031 | $117,163.09 | $122,911.40 |
| 101 | UC22 | 15853500 | 9.1250 | 106.046875 | P | 08/01/2033 | $115,279.32 | $122,290.12 |
| 101 | DLFR | 109675667 | 7.0000 | 104.906250 | P | 03/01/2036 | $116,497.93 | $122,213.61 |
| 106 | DLFR | 125523340 | 7.0000 | 103.421875 | P | 02/01/2029 | $117,918.33 | $121,953.35 |
| 101 | WE14 | 33238015 | 9.2500 | 106.046875 | P | 09/01/2036 | $114,992.92 | $121,946.40 |
| 101 | WE334 | 110924552 | 6.7500 | 103.421875 | P | 05/01/2035 | $117,826.37 | $121,858.24 |
| 101 | DLFR | 125131672 | 6.5000 | 103.421875 | P | 10/01/2035 | $117,710.76 | $121,738.68 |
| 101 | WE334 | 108803057 | 7.3750 | 104.906250 | P | 03/01/2031 | $115,048.72 | $120,693.30 |
| 101 | WE334 | 109541664 | 7.2500 | 104.906250 | P | 10/01/2031 | $114,729.39 | $120,358.30 |
| 101 | WE334 | 113944161 | 6.8750 | 103.421875 | P | 08/01/2032 | $115,820.75 | $119,783.99 |
| 101 | WE334 | 111453676 | 6.5000 | 103.421875 | P | 10/01/2032 | $116,694.19 | $119,653.10 |
| 101 | WE334 | 100484781 | 7.5000 | 104.906250 | P | 07/01/2036 | $113,349.23 | $118,910.43 |

A-4



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 108 | WH4517 | 123709891 | 7.5000 | 106.234375 | P | 06/01/2032 | $111,783.19 | $116,752.17 |
| 101 | UC22 | 11814779 | 9.6250 | 106.046875 | P | 06/01/2032 | $111,234.55 | $117,960.76 |
| 101 | DLFR | 125119172 | 7.2500 | 104.906250 | P | 09/01/2033 | $111,717.63 | $117,198.78 |
| 101 | DLFR | 125121707 | 7.0000 | 104.906250 | P | 03/01/2035 | $111,582.21 | $117,056.71 |
| 106 | WH8993 | 125148635 | 7.5000 | 106.234375 | P | 09/01/2029 | $110,020.24 | $116,879.31 |
| 101 | WE334 | 100065789 | 8.0000 | 106.046875 | P | 08/01/2035 | $109,672.03 | $116,303.76 |
| 101 | DLFR | 125125807 | 7.0000 | 104.906250 | P | 09/01/2034 | $110,771.88 | $116,206.63 |
| 101 | WE334 | 108295593 | 6.7500 | 103.421875 | P | 09/01/2034 | $112,314.55 | $116,157.81 |
| 101 | DLFR | 125145334 | 7.0000 | 104.906250 | P | 10/01/2028 | $109,620.37 | $114,998.62 |
| 106 | WH8993 | 125148668 | 7.0000 | 104.906250 | P | 04/01/2032 | $109,577.88 | $114,954.04 |
| 101 | WE334 | 109117952 | 8.3750 | 106.046875 | P | 10/01/2029 | $108,311.28 | $114,860.73 |
| 101 | WE334 | 111651329 | 8.5000 | 104.906250 | P | 01/01/2034 | $109,219.64 | $114,578.23 |
| 101 | WE334 | 109549337 | 7.8750 | 106.234375 | P | 04/01/2034 | $107,485.62 | $114,186.68 |
| 101 | FREP | 111563672 | 6.7500 | 103.421875 | P | 07/01/2032 | $106,999.49 | $113,763.54 |
| 108 | WH4517 | 123773319 | 6.7000 | 103.421875 | P | 11/01/2032 | $109,898.33 | $113,658.91 |
| 101 | WE334 | 112600028 | 6.7500 | 103.421875 | P | 08/01/2033 | $109,447.18 | $113,192.33 |
| 106 | WH8993 | 125520874 | 8.5000 | 104.906250 | P | 07/01/2024 | $106,454.18 | $111,677.09 |
| 101 | WE334 | 111768537 | 7.5000 | 106.234375 | P | 05/01/2031 | $104,693.69 | $111,220.69 |
| 101 | WE334 | 105470363 | 6.3000 | 103.421875 | P | 06/01/2031 | $107,449.80 | $111,126.69 |
| 101 | WE334 | 113284285 | 6.0000 | 102.078125 | P | 05/01/2033 | $108,832.35 | $111,094.02 |
| 101 | UC22 | 14411854 | 8.9900 | 106.046875 | P | 11/01/2032 | $104,527.64 | $110,848.30 |
| 101 | WE334 | 108083734 | 7.7500 | 106.234375 | P | 08/01/2029 | $104,253.66 | $110,753.22 |
| 101 | FREP | 105606438 | 6.0000 | 102.078125 | P | 01/01/2028 | $108,339.32 | $110,550.75 |
| 101 | WH8993 | 125527994 | 7.5000 | 106.234375 | P | 12/01/2031 | $103,960.11 | $110,441.37 |
| 101 | WE334 | 108265299 | 7.0000 | 104.906250 | P | 04/01/2031 | $105,040.50 | $110,194.05 |
| 106 | WH8963 | 123927212 | 7.5000 | 104.906250 | P | 02/01/2020 | $104,265.10 | $109,380.51 |
| 106 | WH8963 | 123928491 | 7.0000 | 103.421875 | P | 07/01/2026 | $105,157.40 | $108,755.75 |
| 101 | DLFR | 107977548 | 6.3750 | 102.078125 | P | 11/01/2031 | $106,418.54 | $108,630.05 |
| 101 | WE334 | 109603035 | 8.5000 | 106.234375 | P | 06/01/2030 | $101,961.36 | $108,318.01 |
| 108 | WH5802 | 123792392 | 10.9900 | 106.234375 | P | 03/01/2034 | $101,952.68 | $108,308.79 |
| 108 | WH5802 | 123787756 | 9.1250 | 106.046875 | P | 10/01/2035 | $102,052.14 | $108,223.11 |
| 108 | WH5802 | 123790628 | 8.2500 | 106.046875 | P | 05/01/2032 | $101,890.36 | $107,839.45 |
| 106 | WH8993 | 125522771 | 7.5000 | 106.234375 | P | 06/01/2032 | $101,474.17 | $107,800.45 |
| 101 | DLFR | 107333817 | 8.0000 | 106.046875 | P | 08/01/2031 | $101,132.50 | $107,247.86 |
| 108 | WH4517 | 123647331 | 6.7500 | 103.421875 | P | 05/01/2036 | $103,515.87 | $107,058.05 |
| 101 | UC22 | 15357114 | 6.5000 | 103.421875 | P | 05/01/2033 | $103,171.16 | $106,701.55 |
| 101 | FREP | 111992824 | 6.5000 | 103.421875 | P | 07/01/2034 | $102,845.06 | $106,364.29 |
| 101 | WE334 | 106743172 | 8.0000 | 106.046875 | P | 03/01/2029 | $100,276.97 | $106,340.59 |
| 108 | WH5802 | 123784977 | 6.8750 | 103.421875 | P | 08/01/2034 | $102,421.92 | $105,926.67 |
| 101 | WE334 | 110230117 | 6.7500 | 103.421875 | P | 09/01/2032 | $101,826.19 | $105,310.55 |
| 108 | WH5802 | 123780844 | 8.5000 | 106.046875 | P | 08/23/2035 | $99,275.00 | $105,278.04 |
| 108 | WH5802 | 123787194 | 10.0500 | 106.046875 | P | 08/01/2035 | $99,200.16 | $105,198.67 |
| 108 | WH4517 | 123747321 | 7.1000 | 104.906250 | P | 06/28/2034 | $100,110.70 | $105,022.38 |
| 101 | WE334 | 108211227 | 8.5000 | 106.046875 | P | 01/01/2033 | $98,856.55 | $104,834.28 |
| 108 | WH4517 | 123706491 | 8.5000 | 106.046875 | P | 12/26/2032 | $98,645.75 | $104,610.74 |
| 101 | FREP | 105732879 | 7.0000 | 104.906250 | P | 10/01/2028 | $99,588.94 | $104,475.02 |
| 108 | WH5802 | 123785537 | 11.8750 | 106.046875 | P | 08/05/2033 | $97,694.29 | $103,601.74 |
| 101 | WE334 | 110215126 | 6.3750 | 102.078125 | P | 04/01/2034 | $101,014.29 | $103,113.49 |
| 106 | WH8993 | 125141317 | 6.2500 | 102.078125 | P | 12/01/2031 | $101,008.22 | $103,107.30 |
| 106 | WH8993 | 125522219 | 6.5000 | 103.421875 | P | 12/01/2031 | $99,188.91 | $102,583.03 |
| 108 | WH5802 | 123785065 | 9.6250 | 106.234375 | P | 06/01/2034 | $96,454.34 | $102,467.67 |
| 106 | WH8963 | 123926446 | 7.5000 | 106.234375 | P | 04/01/2025 | $96,406.51 | $102,416.85 |
| 108 | WH4517 | 123788507 | 7.0000 | 104.906250 | P | 04/01/2035 | $97,325.70 | $102,100.74 |
| 106 | WH8993 | 125527945 | 8.0000 | 106.046875 | P | 11/01/2030 | $95,833.08 | $101,627.99 |
| 101 | DLFR | 125132506 | 8.5000 | 104.906250 | P | 09/01/2037 | $98,522.32 | $101,257.95 |
| 101 | FREP | 112375084 | 7.5000 | 104.906250 | P | 10/01/2033 | $95,557.32 | $100,245.60 |
| 101 | FREP | 110340213 | 7.0000 | 104.906250 | P | 11/01/2032 | $94,505.14 | $99,141.80 |
| 101 | UC22 | 11522126 | 9.2000 | 106.046875 | P | 01/01/2032 | $93,395.82 | $99,043.35 |
| 101 | WE334 | 108084179 | 8.5000 | 106.046875 | P | 07/01/2030 | $93,193.53 | $96,828.83 |

A-5



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008        LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 106 | WH8993 | 125225675 | 7.0000 | 104.906250 | P | 02/01/2032 | $94,104.15 | $98,721.13 |
| 108 | WH4517 | 123667420 | 6.4000 | 102.078125 | P | 10/01/2035 | $96,558.36 | $98,564.96 |
| 101 | WE334 | 111883369 | 6.8750 | 104.359375 | P | 07/01/2022 | $93,547.54 | $97,625.63 |
| 101 | UC22 | 14047765 | 8.7500 | 106.046875 | P | 08/01/2032 | $91,773.47 | $97,322.90 |
| 101 | UC22 | 14592084 | 9.1250 | 104.906250 | P | 09/01/2037 | $91,855.81 | $96,362.49 |
| 101 | WE334 | 110246600 | 6.7500 | 103.421875 | P | 07/01/2032 | $93,060.14 | $96,244.54 |
| 101 | WE334 | 108092529 | 8.5000 | 106.046875 | P | 08/01/2030 | $90,307.06 | $95,767.82 |
| 101 | FREP | 108812900 | 7.5000 | 106.234375 | P | 08/01/2031 | $89,872.94 | $95,475.96 |
| 106 | WH8963 | 123930901 | 5.8750 | 102.234375 | P | 08/01/2016 | $93,252.43 | $95,336.04 |
| 101 | UC22 | 15291727 | 9.1250 | 103.421875 | P | 05/01/2033 | $92,178.56 | $95,332.80 |
| 108 | WH5802 | 123788069 | 9.5000 | 106.046875 | P | 10/14/2035 | $89,223.48 | $94,618.71 |
| 108 | WH4517 | 123716201 | 5.9900 | 100.640625 | P | 04/01/2033 | $93,916.96 | $94,518.62 |
| 101 | DLFR | 120858535 | 6.0000 | 102.078125 | P | 02/01/2034 | $92,934.77 | $93,946.86 |
| 101 | WE334 | 104241955 | 7.5000 | 104.906250 | P | 07/01/2028 | $89,046.38 | $93,415.22 |
| 106 | WH8993 | 125527986 | 6.5000 | 103.421875 | P | 10/01/2031 | $89,987.79 | $93,067.06 |
| 108 | WH4517 | 123705741 | 7.9500 | 104.906250 | P | 12/01/2032 | $88,556.82 | $92,901.64 |
| 101 | FREP | 111650768 | 7.5000 | 104.906250 | P | 12/01/2033 | $87,854.01 | $92,164.35 |
| 101 | DLFR | 125117390 | 7.5000 | 104.906250 | P | 05/01/2022 | $87,282.87 | $91,565.19 |
| 108 | WH4517 | 123702540 | 8.9900 | 104.906250 | P | 08/08/2021 | $86,807.65 | $91,066.65 |
| 101 | WE334 | 104232707 | 8.5000 | 106.046875 | P | 07/01/2029 | $85,809.43 | $90,786.13 |
| 108 | WH4517 | 123691370 | 5.8750 | 99.828125 | P | 05/01/2020 | $90,623.48 | $90,467.72 |
| 101 | WE334 | 113107502 | 7.8750 | 106.234375 | P | 03/01/2031 | $85,083.01 | $90,387.40 |
| 101 | UC22 | 11402906 | 9.7500 | 106.046875 | P | 11/01/2031 | $85,199.78 | $90,351.70 |
| 101 | WE334 | 104232608 | 8.3750 | 106.046875 | P | 01/01/2033 | $85,197.80 | $90,349.60 |
| 101 | WE334 | 111896122 | 6.2500 | 102.078125 | P | 12/01/2031 | $88,230.92 | $90,064.47 |
| 108 | WH4517 | 123747246 | 6.8000 | 103.421875 | P | 08/01/2034 | $87,000.17 | $89,977.21 |
| 101 | WE334 | 110765377 | 6.0000 | 102.078125 | P | 01/01/2035 | $88,130.39 | $89,961.85 |
| 101 | WE334 | 109395103 | 7.0000 | 103.421875 | P | 03/01/2029 | $86,748.32 | $89,716.74 |
| 101 | FREP | 111560801 | 7.5000 | 106.234375 | P | 05/01/2031 | $84,225.20 | $89,476.11 |
| 108 | WH5802 | 123783821 | 11.6250 | 106.046875 | P | 08/03/2035 | $84,121.64 | $89,206.37 |
| 101 | DLFR | 124824178 | 7.3750 | 104.906250 | P | 07/01/2034 | $84,472.54 | $88,616.97 |
| 101 | UC22 | 15422710 | 9.1250 | 103.421875 | P | 05/01/2033 | $85,512.57 | $88,438.70 |
| 108 | WH5802 | 123785461 | 9.7500 | 106.046875 | P | 07/01/2033 | $83,242.20 | $88,275.75 |
| 108 | WH4517 | 123695157 | 6.9900 | 103.421875 | P | 11/01/2035 | $85,243.17 | $88,160.08 |
| 101 | FREP | 109921684 | 7.8750 | 106.234375 | P | 06/01/2031 | $82,769.83 | $87,930.01 |
| 101 | WE334 | 110945163 | 7.0000 | 104.906250 | P | 11/01/2033 | $83,742.78 | $87,851.41 |
| 108 | WH5802 | 123783318 | 11.8750 | 106.234375 | P | 08/01/2034 | $82,571.66 | $87,719.49 |
| 101 | DLFR | 125117713 | 7.5000 | 104.906250 | P | 05/01/2028 | $83,554.04 | $87,653.41 |
| 101 | WE334 | 105708242 | 8.0000 | 106.046875 | P | 04/01/2031 | $82,567.13 | $87,559.86 |
| 101 | UC22 | 15006836 | 10.3750 | 104.906250 | P | 07/01/2037 | $83,199.55 | $87,281.53 |
| 108 | WH5802 | 123790826 | 9.7500 | 106.046875 | P | 11/01/2033 | $82,151.76 | $87,119.37 |
| 101 | UC22 | 14495576 | 8.0000 | 106.046875 | P | 11/01/2032 | $82,109.86 | $87,074.94 |
| 108 | WH5802 | 123788499 | 9.1250 | 104.906250 | P | 02/01/2036 | $82,083.95 | $87,055.35 |
| 101 | WE334 | 106748395 | 9.0000 | 106.046875 | P | 10/01/2030 | $81,927.00 | $86,881.02 |
| 108 | WH5802 | 123791402 | 9.5000 | 106.234375 | P | 07/01/2034 | $81,193.65 | $86,255.57 |
| 101 | WE334 | 105548143 | 8.3750 | 106.046875 | P | 10/01/2029 | $81,163.52 | $86,071.38 |
| 101 | WE334 | 104907969 | 7.5000 | 106.234375 | P | 05/01/2031 | $80,956.71 | $86,003.85 |
| 101 | WE334 | 110783545 | 7.2500 | 103.421875 | P | 12/01/2028 | $82,928.58 | $85,766.29 |
| 101 | WE334 | 109539791 | 7.2500 | 104.906250 | P | 08/01/2028 | $81,035.22 | $85,011.01 |
| 101 | WE334 | 112632799 | 7.0000 | 104.359375 | P | 09/01/2016 | $81,137.01 | $84,674.08 |
| 101 | FREP | 110364999 | 7.0000 | 104.906250 | P | 09/01/2031 | $80,435.71 | $84,382.09 |
| 108 | WH4517 | 123640195 | 6.5000 | 103.421875 | P | 06/01/2035 | $81,550.25 | $84,340.80 |
| 101 | FREP | 105789962 | 7.3750 | 104.906250 | P | 01/01/2028 | $80,268.31 | $84,206.47 |
| 101 | WE334 | 109395012 | 6.5000 | 103.421875 | P | 01/01/2029 | $81,048.25 | $83,821.62 |
| 101 | WE334 | 105155394 | 8.2500 | 106.234375 | P | 09/01/2030 | $78,780.43 | $83,701.46 |
| 108 | WH5802 | 123788002 | 7.3750 | 104.906250 | P | 09/28/2035 | $79,014.82 | $82,891.48 |
| 106 | WH8993 | 125148544 | 7.5000 | 106.234375 | P | 12/01/2031 | $77,862.27 | $82,716.50 |
| 101 | WE334 | 107198285 | 7.5000 | 106.234375 | P | 09/01/2031 | $77,502.94 | $82,334.76 |
| 101 | FREP | 111132874 | 7.0000 | 104.906250 | P | 09/01/2031 | $78,471.79 | $82,321.81 |



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008        LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | DLFR | 125140467 | 7.5000 | 104.906250 | P | 06/01/2028 | $78,073.87 | $81,904.37 |
| 106 | WH8993 | 125527978 | 7.5000 | 106.234375 | P | 06/01/2031 | $77,077.19 | $81,882.47 |
| 101 | DLFR | 32804833 | 11.2500 | 106.046875 | P | 05/01/2021 | $76,785.10 | $81,428.20 |
| 101 | WE334 | 102456662 | 9.5000 | 106.234375 | P | 04/01/2030 | $76,641.33 | $81,419.44 |
| 101 | FREP | 110672607 | 7.8750 | 106.234375 | P | 12/01/2029 | $76,570.41 | $81,344.10 |
| 101 | FREP | 105722847 | 8.3750 | 106.046875 | P | 01/01/2028 | $76,688.68 | $81,325.95 |
| 106 | WH8993 | 125521211 | 7.1500 | 104.906250 | P | 10/01/2032 | $77,198.12 | $80,985.65 |
| 101 | FREP | 108595539 | 7.5000 | 106.234375 | P | 12/01/2031 | $76,175.50 | $80,924.57 |
| 101 | WE334 | 109598078 | 7.0000 | 104.906250 | P | 06/01/2032 | $77,004.37 | $80,782.40 |
| 106 | DLFR | 125521757 | 6.5000 | 103.421875 | P | 08/01/2032 | $78,059.58 | $80,730.68 |
| 108 | WH4517 | 123664264 | 7.5500 | 103.421875 | P | 04/01/2033 | $77,650.21 | $80,307.30 |
| 101 | WE334 | 108096785 | 7.5000 | 104.906250 | P | 05/01/2028 | $76,478.01 | $80,230.21 |
| 101 | WE334 | 105225007 | 7.5000 | 106.234375 | P | 09/01/2028 | $75,367.69 | $80,066.39 |
| 106 | WH8993 | 125148536 | 7.5000 | 106.234375 | P | 11/01/2031 | $75,205.18 | $79,893.75 |
| 101 | WE334 | 105213623 | 9.0000 | 106.046875 | P | 12/01/2029 | $75,125.76 | $79,668.52 |
| 101 | WE334 | 103820221 | 8.0000 | 106.046875 | P | 10/01/2027 | $75,081.39 | $79,621.47 |
| 106 | WH8993 | 125148643 | 7.0000 | 104.906250 | P | 07/01/2031 | $75,392.64 | $79,091.59 |
| 106 | DLFR | 125526202 | 6.8750 | 103.421875 | P | 08/01/2032 | $76,344.22 | $78,956.62 |
| 101 | DLFR | 125136626 | 6.7500 | 103.421875 | P | 03/01/2029 | $76,145.79 | $78,751.40 |
| 101 | UC22 | 14771729 | 7.0350 | 104.359375 | P | 03/01/2018 | $75,143.32 | $78,419.10 |
| 108 | WH4517 | 123755803 | 7.9900 | 106.234375 | P | 10/08/2032 | $73,698.93 | $78,293.60 |
| 108 | WH5802 | 123782765 | 9.1500 | 106.234375 | P | 03/18/2034 | $73,119.05 | $77,877.57 |
| 101 | WE334 | 106142813 | 6.5000 | 103.421875 | P | 11/01/2028 | $74,909.49 | $77,472.80 |
| 106 | DLFR | 125519801 | 7.0000 | 104.906250 | P | 07/01/2029 | $73,551.46 | $77,160.08 |
| 108 | WH5802 | 123791196 | 13.0500 | 106.234375 | P | 03/01/2034 | $72,207.03 | $76,708.69 |
| 101 | WE334 | 103794772 | 8.5000 | 106.046875 | P | 05/01/2029 | $72,138.69 | $76,500.83 |
| 101 | UC22 | 14124994 | 8.6800 | 104.359375 | P | 10/01/2017 | $73,262.04 | $76,455.81 |
| 101 | WE334 | 109534933 | 7.5000 | 106.234375 | P | 03/01/2029 | $71,960.28 | $76,446.55 |
| 101 | WE334 | 111505939 | 6.2500 | 102.078125 | P | 02/01/2035 | $74,713.89 | $76,266.54 |
| 108 | WH4517 | 123747230 | 7.2500 | 104.906250 | P | 07/16/2034 | $72,667.39 | $76,232.63 |
| 101 | WE334 | 114111461 | 9.0000 | 106.046875 | P | 11/01/2024 | $71,176.76 | $76,480.73 |
| 101 | WE334 | 110142460 | 8.0000 | 106.234375 | P | 06/01/2024 | $70,750.39 | $75,161.13 |
| 108 | WH4517 | 123581744 | 6.8500 | 102.765625 | P | 06/07/2019 | $73,059.61 | $75,080.16 |
| 101 | WE334 | 102723095 | 8.0000 | 106.046875 | P | 10/01/2030 | $70,779.48 | $75,059.43 |
| 108 | WH5802 | 123785719 | 9.0000 | 104.906250 | P | 01/01/2034 | $71,276.31 | $74,773.30 |
| 101 | WE334 | 110123866 | 7.3900 | 104.906250 | P | 10/01/2031 | $71,229.03 | $74,723.70 |
| 108 | WH5802 | 123788374 | 11.4000 | 106.234375 | P | 04/01/2035 | $69,985.09 | $74,348.22 |
| 108 | WH5802 | 123791782 | 11.2500 | 106.234375 | P | 05/25/2034 | $69,595.33 | $73,934.16 |
| 101 | WE334 | 106670045 | 6.8750 | 103.421875 | P | 05/01/2031 | $71,220.65 | $73,668.07 |
| 108 | WH5802 | 123788572 | 9.1250 | 106.234375 | P | 04/26/2035 | $69,272.42 | $73,591.12 |
| 101 | WE334 | 108086778 | 8.7500 | 106.046875 | P | 12/01/2029 | $69,391.00 | $73,586.99 |
| 106 | WH8993 | 125522284 | 7.0000 | 104.906250 | P | 04/01/2031 | $70,132.83 | $73,573.72 |
| 101 | WE334 | 104247580 | 7.5000 | 106.234375 | P | 07/01/2029 | $69,178.43 | $73,491.27 |
| 101 | FREP | 8916041 | 9.0000 | 106.234375 | P | 06/01/2027 | $69,141.00 | $73,451.51 |
| 101 | WE334 | 110946415 | 8.7500 | 106.046875 | P | 11/01/2033 | $69,218.76 | $73,404.33 |
| 106 | WH4631 | 123928483 | 7.6250 | 103.421875 | P | 10/01/2026 | $70,485.70 | $72,897.63 |
| 101 | WE334 | 112989751 | 7.5000 | 104.906250 | P | 03/01/2028 | $69,413.91 | $72,819.53 |
| 101 | FREP | 110263225 | 7.3410 | 104.906250 | P | 04/01/2036 | $68,743.37 | $72,116.09 |
| 101 | WE334 | 108566520 | 7.2500 | 104.906250 | P | 03/01/2032 | $68,478.63 | $71,838.36 |
| 101 | WE334 | 105221477 | 8.0000 | 106.046875 | P | 06/01/2029 | $67,689.37 | $71,782.46 |
| 106 | WH8993 | 125521922 | 6.5000 | 103.421875 | P | 10/01/2032 | $69,276.78 | $71,647.34 |
| 101 | WE334 | 113645493 | 6.5000 | 103.421875 | P | 11/01/2036 | $68,706.40 | $71,057.45 |
| 106 | DLFR | 125525071 | 7.7500 | 106.234375 | P | 07/01/2031 | $66,743.37 | $70,904.40 |
| 101 | WH6519 | 31701998 | 7.8750 | 106.234375 | P | 10/01/2035 | $65,998.30 | $70,112.88 |
| 108 | WH5802 | 123786592 | 9.1250 | 104.906250 | P | 02/01/2035 | $66,578.79 | $69,845.31 |
| 106 | WH8993 | 125524470 | 7.5000 | 106.234375 | P | 06/01/2023 | $65,297.28 | $69,388.16 |
| 101 | WE334 | 105221842 | 8.0000 | 106.046875 | P | 06/01/2029 | $65,129.33 | $69,067.62 |
| 106 | WH8993 | 125520528 | 7.8750 | 104.906250 | P | 12/01/2027 | $65,525.60 | $68,740.45 |
| 101 | DLFR | 125122416 | 8.0000 | 104.906250 | P | 09/01/2037 | $65,515.31 | $68,729.65 |

A-7



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008        LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | FREP | 107194540 | 7.5000 | 106.234375 | P | 05/01/2031 | $64,530.85 | $68,553.95 |
| 101 | WE334 | 110136454 | 8.0000 | 106.234375 | P | 04/01/2024 | $64,518.71 | $68,541.05 |
| 101 | WE334 | 110142189 | 8.0000 | 106.234375 | P | 08/01/2025 | $64,299.58 | $68,308.26 |
| 106 | DLFR | 125521179 | 7.8750 | 106.234375 | P | 01/01/2032 | $64,262.35 | $68,268.71 |
| 101 | WE334 | 110125721 | 8.6250 | 106.046875 | P | 03/01/2030 | $64,270.96 | $68,157.34 |
| 101 | WE334 | 104156450 | 8.5000 | 106.046875 | P | 11/01/2030 | $64,252.87 | $68,138.16 |
| 101 | WE334 | 111649620 | 8.5000 | 106.046875 | P | 11/01/2033 | $64,012.55 | $67,883.31 |
| 101 | FREP | 111992590 | 7.5000 | 106.234375 | P | 06/01/2032 | $63,544.60 | $67,506.21 |
| 101 | WE334 | 107878050 | 7.5000 | 106.234375 | P | 05/01/2035 | $62,911.51 | $66,833.65 |
| 101 | WE334 | 108273103 | 7.5000 | 106.234375 | P | 08/01/2031 | $62,690.42 | $66,598.78 |
| 106 | WH4631 | 123925711 | 6.0000 | 102.078125 | P | 09/01/2028 | $65,143.15 | $66,496.91 |
| 101 | WE334 | 104073234 | 8.0000 | 106.046875 | P | 07/01/2033 | $62,368.89 | $66,140.26 |
| 101 | WE334 | 108079377 | 7.7500 | 106.234375 | P | 11/01/2031 | $62,246.08 | $66,126.73 |
| 106 | WH8993 | 125527960 | 8.0000 | 106.046875 | P | 05/01/2031 | $62,199.40 | $65,960.52 |
| 108 | WH8993 | 125146827 | 7.0000 | 103.421875 | P | 03/01/2029 | $63,377.85 | $65,546.56 |
| 101 | FREP | 103981162 | 7.7500 | 106.234375 | P | 12/01/2029 | $61,422.47 | $65,251.78 |
| 101 | FREP | 109618462 | 7.5000 | 104.906250 | P | 07/01/2037 | $62,035.56 | $65,079.18 |
| 101 | FREP | 105382865 | 8.5000 | 106.046875 | P | 10/01/2029 | $60,749.72 | $64,423.18 |
| 101 | WE334 | 103788493 | 7.5000 | 104.906250 | P | 03/01/2028 | $60,849.24 | $63,834.66 |
| 101 | UC22 | 15302375 | 9.3400 | 106.046875 | P | 04/02/2023 | $60,152.55 | $63,789.90 |
| 101 | UC22 | 11976925 | 7.9900 | 106.234375 | P | 08/01/2032 | $59,847.08 | $63,578.17 |
| 101 | WE334 | 110124039 | 7.1650 | 104.906250 | P | 11/01/2031 | $60,603.29 | $63,576.64 |
| 101 | WE334 | 109534610 | 8.2500 | 106.046875 | P | 01/01/2031 | $59,910.22 | $63,532.92 |
| 101 | WE334 | 111447561 | 6.0000 | 102.078125 | P | 08/01/2032 | $62,136.78 | $63,428.06 |
| 101 | FREP | 108778986 | 7.2500 | 104.906250 | P | 04/01/2028 | $59,329.11 | $62,239.94 |
| 108 | WH5802 | 123787392 | 9.1250 | 106.046875 | P | 07/25/2035 | $58,534.54 | $62,074.05 |
| 101 | DLFR | 124822412 | 8.0800 | 106.046875 | P | 07/01/2030 | $58,478.60 | $62,014.73 |
| 101 | DLFR | 105725782 | 7.5000 | 104.906250 | P | 05/01/2028 | $59,102.65 | $62,002.37 |
| 108 | WH4517 | 123742496 | 9.1500 | 106.234375 | P | 03/17/2034 | $58,074.62 | $61,695.21 |
| 108 | WH5802 | 123792459 | 10.5000 | 106.234375 | P | 05/01/2034 | $57,861.07 | $61,468.35 |
| 101 | WE334 | 108316720 | 6.5000 | 103.421875 | P | 01/01/2032 | $59,272.11 | $61,300.33 |
| 101 | WE334 | 110232469 | 7.5000 | 104.906250 | P | 12/01/2032 | $58,346.96 | $61,209.61 |
| 101 | FREP | 110660123 | 6.2500 | 102.078125 | P | 10/01/2032 | $59,655.65 | $60,895.37 |
| 101 | WH8722 | 102922341 | 8.2500 | 106.046875 | P | 11/01/2027 | $57,221.16 | $60,681.25 |
| 101 | WE334 | 103791273 | 8.0000 | 106.046875 | P | 12/01/2031 | $56,794.14 | $60,228.41 |
| 106 | WH8993 | 125148528 | 7.5000 | 106.234375 | P | 10/01/2031 | $56,571.99 | $60,098.90 |
| 101 | DLFR | 125146888 | 7.2500 | 104.906250 | P | 09/01/2032 | $57,042.08 | $59,840.71 |
| 101 | FREP | 113107627 | 7.8750 | 103.421875 | P | 05/01/2026 | $57,764.24 | $59,740.86 |
| 108 | WH5802 | 123785222 | 13.0000 | 104.906250 | P | 02/01/2033 | $56,923.59 | $59,716.40 |
| 101 | FREP | 111878146 | 7.5000 | 106.234375 | P | 01/01/2032 | $56,161.52 | $59,662.84 |
| 101 | DLFR | 125110171 | 8.0000 | 106.046875 | P | 03/01/2032 | $56,252.09 | $59,653.58 |
| 101 | FREP | 111031399 | 7.5000 | 106.234375 | P | 02/01/2031 | $55,978.44 | $59,468.35 |
| 101 | WE334 | 107877896 | 8.0000 | 104.906250 | P | 03/01/2026 | $56,554.22 | $59,328.91 |
| 106 | WH8963 | 123926826 | 6.5000 | 103.421875 | P | 03/01/2032 | $57,206.07 | $59,163.59 |
| 106 | WH4631 | 123926735 | 7.1250 | 104.906250 | P | 01/01/2032 | $56,275.76 | $59,036.79 |
| 101 | WE334 | 108096280 | 8.7500 | 103.421875 | P | 12/01/2026 | $57,036.56 | $58,988.28 |
| 101 | WE334 | 103987194 | 8.5000 | 106.046875 | P | 08/01/2025 | $55,602.12 | $58,964.31 |
| 106 | WH4631 | 123928475 | 7.3750 | 102.078125 | P | 11/01/2024 | $57,605.19 | $58,802.30 |
| 101 | WE334 | 102462611 | 8.5000 | 106.234375 | P | 08/01/2025 | $55,244.72 | $58,688.88 |
| 101 | WE334 | 105216816 | 7.5000 | 104.906250 | P | 02/01/2028 | $55,876.90 | $58,618.36 |
| 108 | WH5802 | 123793192 | 9.6250 | 104.906250 | P | 02/02/2035 | $55,805.96 | $58,543.94 |
| 101 | WE334 | 106744154 | 8.5000 | 106.046875 | P | 07/01/2029 | $55,044.82 | $58,373.31 |
| 101 | FREP | 110346160 | 8.5000 | 102.078125 | P | 08/01/2024 | $57,079.26 | $58,254.44 |
| 101 | WE334 | 113630681 | 7.2500 | 104.906250 | P | 01/01/2032 | $55,325.86 | $58,040.29 |
| 101 | FREP | 108304882 | 8.2500 | 106.046875 | P | 12/01/2030 | $54,523.85 | $57,820.84 |
| 101 | WE334 | 103775243 | 7.4700 | 102.078125 | P | 11/01/2024 | $56,510.08 | $57,684.43 |

A-8


THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | WE334 | 105472245 | 8.7500 | 106.046875 | P | 02/01/2030 | $54,316.44 | $57,600.89 |
| 101 | WE334 | 111449500 | 7.0000 | 104.906250 | P | 10/01/2032 | $54,906.35 | $57,600.19 |
| 101 | WE334 | 108297003 | 8.8750 | 106.234375 | P | 06/01/2030 | $54,073.39 | $57,444.53 |
| 108 | WH5802 | 123786337 | 11.2500 | 106.234375 | P | 08/01/2034 | $53,965.90 | $57,330.34 |
| 101 | WE334 | 107971360 | 6.8750 | 103.421875 | P | 01/01/2032 | $55,404.03 | $57,299.89 |
| 108 | WH5802 | 123785511 | 12.2500 | 106.046875 | P | 07/03/2033 | $53,836.42 | $57,091.84 |
| 101 | WE334 | 108579665 | 6.5000 | 103.421875 | P | 03/01/2023 | $55,155.12 | $57,042.46 |
| 101 | WE334 | 103781936 | 6.0000 | 102.078125 | P | 10/01/2024 | $55,753.16 | $56,911.78 |
| 108 | WH5802 | 123786444 | 7.4900 | 104.906250 | P | 01/01/2035 | $53,433.64 | $56,055.23 |
| 106 | WH8993 | 125148577 | 7.5000 | 106.234375 | P | 09/01/2032 | $52,654.38 | $55,937.05 |
| 101 | FREP | 110754751 | 8.2500 | 106.046875 | P | 06/01/2031 | $52,497.32 | $55,671.77 |
| 101 | WE334 | 108084587 | 7.0000 | 104.906250 | P | 06/01/2028 | $52,731.52 | $55,318.66 |
| 106 | FREP | 107218356 | 8.5000 | 106.234375 | P | 02/01/2036 | $51,659.35 | $54,879.99 |
| 101 | WE334 | 105710321 | 7.7500 | 106.234375 | P | 08/01/2031 | $51,099.48 | $54,285.21 |
| 101 | FREP | 106744808 | 7.5000 | 106.234375 | P | 10/01/2031 | $50,877.71 | $54,049.62 |
| 101 | WE334 | 105726012 | 7.2500 | 104.906250 | P | 09/01/2028 | $51,500.68 | $54,027.43 |
| 108 | WH4517 | 123768830 | 7.7500 | 101.484375 | P | 11/01/2018 | $52,958.30 | $53,744.40 |
| 106 | WH4631 | 123926677 | 7.2500 | 104.906250 | P | 03/01/2031 | $51,147.85 | $53,657.29 |
| 101 | WE334 | 108084237 | 6.7500 | 103.421875 | P | 09/01/2028 | $51,863.75 | $53,638.46 |
| 101 | DLFR | 21142120 | 9.0000 | 106.234375 | P | 05/01/2027 | $50,067.26 | $53,188.64 |
| 101 | FREP | 109080358 | 8.7500 | 106.234375 | P | 06/01/2025 | $49,824.56 | $52,930.81 |
| 101 | UC22 | 15058431 | 8.9350 | 103.421875 | P | 05/01/2033 | $51,048.85 | $52,795.68 |
| 106 | WH8993 | 123930166 | 7.2500 | 104.015625 | P | 11/01/2020 | $50,259.96 | $52,278.21 |
| 101 | UC22 | 14754568 | 8.8250 | 104.906250 | P | 03/01/2033 | $49,794.07 | $52,237.09 |
| 101 | WE334 | 106701287 | 8.5000 | 106.046875 | P | 02/01/2031 | $49,169.06 | $52,142.25 |
| 106 | WH8963 | 123926222 | 4.5000 | 99.828125 | P | 10/01/2019 | $51,833.22 | $51,744.13 |
| 106 | WH4631 | 123927196 | 8.3750 | 102.765625 | P | 05/01/2019 | $50,304.73 | $51,695.97 |
| 106 | WH8963 | 123929309 | 9.5000 | 102.234375 | P | 12/12/2016 | $50,503.87 | $51,632.32 |
| 101 | FREP | 110798055 | 6.5000 | 103.421875 | P | 11/01/2027 | $49,839.89 | $51,545.35 |
| 106 | WH8993 | 125148619 | 7.5000 | 104.906250 | P | 06/01/2028 | $48,817.72 | $51,212.84 |
| 106 | WH4631 | 123925737 | 6.1250 | 102.078125 | P | 10/01/2029 | $50,104.39 | $51,145.62 |
| 101 | WE334 | 113105225 | 7.0000 | 104.906250 | P | 11/01/2028 | $48,632.61 | $51,018.65 |
| 101 | WE334 | 111040655 | 7.5000 | 103.421875 | P | 10/01/2027 | $49,153.53 | $50,835.50 |
| 101 | DLFR | 33503899 | 10.0000 | 104.906250 | P | 11/01/2021 | $48,184.61 | $50,548.57 |
| 101 | UC22 | 14298202 | 10.3750 | 106.046875 | P | 09/01/2032 | $47,477.65 | $50,348.56 |
| 101 | DLFR | 124639739 | 7.7500 | 103.421875 | P | 04/01/2026 | $48,638.18 | $50,302.52 |
| 101 | WE334 | 111485207 | 7.5000 | 106.234375 | P | 01/01/2032 | $47,318.99 | $50,269.03 |
| 101 | WE334 | 112373964 | 6.7500 | 103.421875 | P | 06/01/2032 | $48,557.48 | $50,219.06 |
| 106 | WH4631 | 123825703 | 6.0000 | 102.078125 | P | 09/01/2028 | $49,123.22 | $50,144.06 |
| 106 | WH8993 | 125148585 | 7.0000 | 104.906250 | P | 09/01/2027 | $47,423.29 | $49,750.00 |
| 101 | WE334 | 102588282 | 9.5000 | 106.046875 | P | 07/01/2030 | $46,609.62 | $49,428.05 |
| 101 | DLFR | 102339488 | 7.5000 | 106.234375 | P | 07/01/2023 | $46,014.87 | $48,883.61 |
| 101 | WE334 | 110136934 | 9.5000 | 106.234375 | P | 07/01/2027 | $45,563.29 | $48,403.88 |
| 101 | FREP | 109105692 | 7.0000 | 104.906250 | P | 11/01/2031 | $45,656.09 | $47,896.09 |
| 106 | WH4631 | 123925091 | 6.6250 | 103.421875 | P | 12/01/2025 | $46,062.43 | $47,638.63 |
| 106 | WH8993 | 125140194 | 7.0000 | 104.906250 | P | 10/01/2023 | $45,347.23 | $47,572.08 |
| 106 | WH4631 | 123929622 | 7.5000 | 104.359375 | P | 11/20/2017 | $45,289.92 | $47,243.41 |
| 101 | DLFR | 102465796 | 8.2500 | 106.046875 | P | 04/01/2028 | $44,350.35 | $47,032.16 |
| 106 | WH4631 | 123928772 | 5.3750 | 99.171875 | P | 11/01/2012 | $47,215.57 | $46,824.57 |
| 101 | WE334 | 104231196 | 7.5000 | 104.906250 | P | 04/01/2028 | $44,546.69 | $46,732.26 |
| 101 | WE334 | 108099730 | 8.5000 | 106.046875 | P | 08/01/2029 | $43,957.37 | $46,615.42 |
| 101 | WE334 | 108087404 | 8.7500 | 106.046875 | P | 12/01/2029 | $43,891.65 | $46,545.72 |
| 101 | FREP | 104159058 | 8.5000 | 104.906250 | P | 06/01/2022 | $44,197.74 | $46,366.19 |
| 101 | DLFR | 125145763 | 7.7500 | 106.234375 | P | 07/01/2029 | $43,390.38 | $46,095.50 |
| 108 | WH4517 | 123733073 | 10.7500 | 104.359375 | P | 06/20/2017 | $43,791.07 | $45,700.09 |
| 101 | WE334 | 102591773 | 8.5000 | 106.046875 | P | 03/01/2028 | $43,040.49 | $45,643.09 |
| 101 | FREP | 112828847 | 7.5000 | 103.421875 | P | 10/01/2027 | $43,659.37 | $45,153.34 |
| 101 | WE334 | 105225169 | 8.0000 | 106.234375 | P | 09/01/2028 | $42,473.21 | $45,121.15 |
| 106 | WH8963 | 123930943 | 6.1250 | 102.765625 | P | 10/01/2016 | $43,880.19 | $45,093.75 |

A-9



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | DLFR | 124821380 | 7.2500 | 104.906250 | P | 05/01/2031 | $42,768.36 | $44,666.68 |
| 101 | WE334 | 108084542 | 9.0000 | 106.046875 | P | 11/01/2030 | $42,028.92 | $44,570.36 |
| 101 | WE334 | 106498405 | 7.5000 | 106.234375 | P | 02/01/2026 | $41,678.75 | $44,277.16 |
| 101 | WE334 | 107107088 | 8.5000 | 106.234375 | P | 08/01/2024 | $41,207.95 | $43,777.01 |
| 101 | WE334 | 109895185 | 6.3750 | 102.765625 | P | 10/01/2022 | $42,382.78 | $43,554.93 |
| 101 | WE334 | 108093675 | 9.5000 | 106.046875 | P | 10/01/2029 | $40,897.80 | $43,370.84 |
| 101 | WE334 | 104161567 | 6.5000 | 103.421875 | P | 05/01/2036 | $41,888.40 | $43,321.77 |
| 101 | WE334 | 103798801 | 9.0000 | 106.234375 | P | 06/01/2025 | $40,406.95 | $42,928.20 |
| 101 | WE334 | 102523081 | 9.5000 | 104.359375 | P | 07/01/2017 | $40,891.34 | $42,673.95 |
| 101 | WE334 | 110913092 | 7.8750 | 106.234375 | P | 06/01/2032 | $39,774.36 | $42,254.04 |
| 101 | WE334 | 103792610 | 8.0000 | 106.046875 | P | 05/01/2029 | $39,797.86 | $42,204.39 |
| 101 | DLFR | 125147256 | 7.3750 | 104.906250 | P | 08/01/2031 | $40,198.37 | $42,170.60 |
| 106 | WH8993 | 125148551 | 7.0000 | 104.906250 | P | 02/01/2032 | $40,060.30 | $42,025.76 |
| 101 | WE334 | 110137833 | 8.0000 | 104.906250 | P | 07/01/2028 | $39,944.80 | $41,904.59 |
| 101 | WE334 | 108598088 | 6.3750 | 102.078125 | P | 04/01/2034 | $41,003.66 | $41,855.77 |
| 101 | WE334 | 113648489 | 7.5000 | 106.234375 | P | 10/01/2028 | $39,213.56 | $41,658.28 |
| 101 | DLFR | 124840570 | 8.5000 | 104.906250 | P | 10/01/2021 | $39,606.44 | $41,549.63 |
| 101 | FREP | 103791802 | 8.0000 | 106.046875 | P | 08/01/2029 | $39,144.72 | $41,511.75 |
| 101 | WE334 | 109338350 | 6.1250 | 102.078125 | P | 11/01/2034 | $40,658.22 | $41,503.15 |
| 106 | WH8993 | 125142737 | 7.5000 | 106.234375 | P | 01/01/2024 | $38,203.16 | $40,584.89 |
| 101 | DLFR | 125145953 | 8.5000 | 106.046875 | P | 11/01/2029 | $38,193.55 | $40,503.07 |
| 106 | WH4631 | 123924102 | 5.2500 | 101.484375 | P | 06/01/2014 | $39,858.81 | $40,450.46 |
| 101 | FREP | 108319013 | 7.0000 | 104.906250 | P | 05/01/2028 | $38,209.45 | $40,084.10 |
| 101 | WE334 | 103797023 | 9.0000 | 106.234375 | P | 07/01/2027 | $37,720.39 | $40,072.02 |
| 106 | DLFR | 125528190 | 7.5000 | 106.234375 | P | 08/01/2023 | $37,700.81 | $40,051.22 |
| 106 | WH8993 | 125523916 | 5.7500 | 98.640625 | P | 10/01/2027 | $40,086.08 | $39,541.16 |
| 101 | DLFR | 9456294 | 10.0000 | 101.484375 | P | 07/01/2020 | $38,916.57 | $39,494.24 |
| 101 | FREP | 104293535 | 8.2500 | 106.234375 | P | 08/01/2025 | $36,875.96 | $39,174.95 |
| 101 | WE334 | 103785184 | 7.5000 | 106.234375 | P | 01/01/2029 | $36,323.40 | $38,587.94 |
| 101 | WE334 | 104050562 | 8.5000 | 103.421875 | P | 05/01/2026 | $37,241.18 | $38,515.53 |
| 101 | WE334 | 111065504 | 6.0000 | 99.296875 | P | 07/01/2026 | $38,216.35 | $37,947.64 |
| 101 | WE334 | 102587631 | 9.0000 | 106.234375 | P | 05/01/2030 | $35,612.43 | $37,832.64 |
| 101 | FREP | 20852547 | 6.5000 | 102.765625 | P | 11/01/2016 | $36,812.02 | $37,830.10 |
| 101 | WE334 | 103819025 | 8.0000 | 106.046875 | P | 10/01/2029 | $35,591.38 | $37,743.55 |
| 106 | WH8963 | 123929341 | 8.5000 | 103.421875 | P | 06/23/2026 | $36,380.04 | $37,624.92 |
| 106 | WH8993 | 125526988 | 7.0000 | 102.765625 | P | 06/01/2019 | $36,384.94 | $37,391.21 |
| 101 | WE334 | 108092800 | 9.0000 | 106.234375 | P | 06/01/2027 | $34,807.99 | $36,978.05 |
| 106 | WH8963 | 123925448 | 5.3750 | 100.109375 | P | 09/01/2013 | $36,707.94 | $36,748.09 |
| 106 | WH8963 | 123929440 | 9.5000 | 106.234375 | P | 11/04/2025 | $34,320.59 | $36,460.26 |
| 106 | WH4631 | 123924227 | 8.3750 | 103.421875 | P | 06/01/2026 | $35,043.51 | $36,242.66 |
| 101 | WH6519 | 31706377 | 8.2500 | 106.046875 | P | 10/01/2035 | $34,123.40 | $36,186.80 |
| 101 | FREP | 107205346 | 9.0000 | 103.421875 | P | 10/01/2026 | $34,665.62 | $35,851.83 |
| 101 | WE334 | 105544787 | 7.5000 | 106.234375 | P | 11/01/2024 | $33,053.10 | $35,113.75 |
| 101 | DLFR | 8568263 | 9.0000 | 106.046875 | P | 11/01/2024 | $32,907.85 | $34,897.75 |
| 101 | FREP | 105382287 | 6.7500 | 103.421875 | P | 08/01/2029 | $33,533.24 | $34,680.71 |
| 101 | WE334 | 108782238 | 9.0000 | 106.046875 | P | 12/01/2027 | $32,458.28 | $34,420.99 |
| 101 | WE334 | 109608601 | 8.5000 | 106.046875 | P | 02/01/2028 | $32,337.09 | $34,292.47 |
| 101 | WE334 | 106693898 | 8.5000 | 103.421875 | P | 11/01/2026 | $32,753.59 | $33,874.38 |
| 101 | WE334 | 105224368 | 8.5000 | 106.046875 | P | 09/01/2023 | $31,939.81 | $33,871.17 |
| 101 | DLFR | 100582709 | 9.5000 | 106.046875 | P | 05/01/2021 | $31,892.41 | $33,820.90 |
| 101 | FREP | 102334745 | 8.5000 | 106.046875 | P | 09/01/2027 | $31,735.33 | $33,654.43 |
| 101 | FREP | 110543014 | 8.0000 | 106.046875 | P | 09/01/2029 | $31,609.57 | $33,520.96 |
| 101 | WE334 | 21190020 | 8.5000 | 106.046875 | P | 03/01/2023 | $30,953.35 | $32,825.06 |
| 106 | WH8993 | 125524827 | 7.1000 | 104.906250 | P | 02/01/2027 | $31,247.13 | $32,780.19 |
| 101 | FREP | 104231279 | 7.7500 | 104.906250 | P | 07/01/2028 | $31,196.21 | $32,726.77 |
| 101 | WE334 | 108092289 | 10.5000 | 102.765625 | P | 05/01/2019 | $31,368.08 | $32,235.60 |
| 101 | FREP | 108195223 | 8.0000 | 106.046875 | P | 05/01/2028 | $30,217.66 | $32,044.88 |
| 106 | WH4631 | 123925604 | 7.0000 | 104.906250 | P | 11/01/2025 | $30,221.85 | $31,704.61 |
| 101 | WE334 | 106742430 | 7.5000 | 106.234375 | P | 12/01/2023 | $29,821.09 | $31,680.25 |



# The Bank of New York
## TRI-PARTY
### Investor Allocation Detail Report
Lehman Commercial Paper Inc.

**Production Run :** 09/17/2008          LCPI

**Print Date :** 09/17/2008 07:32 PM

**Investor Name :** Lehman Re Ltd
**Investor Reference No :** WLERE
**Trade Reference No :** 6V01U72

**Asset Grade :** B
**Pricing Service :** Bloomberg

**Investment Amount :** $80,000,000.00
**Required Amount :** $96,000,000.00
**Trade Margin % :** 20.00

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 106 | WH8963 | 123927725 | 8.5000 | 104.359375 | P | 05/01/2017 | $29,977.32 | $31,284.14 |
| 101 | WE334 | 108094251 | 9.5000 | 104.359375 | P | 05/01/2016 | $29,833.60 | $31,134.16 |
| 106 | WH8963 | 123930927 | 6.3750 | 102.765625 | P | 09/01/2016 | $30,130.10 | $30,963.39 |
| 106 | DLFR | 7585433 | 8.5000 | 104.906250 | P | 05/01/2022 | $29,407.99 | $30,850.82 |
| 101 | WE334 | 108776105 | 10.0000 | 102.765625 | P | 10/01/2016 | $29,947.64 | $30,775.88 |
| 106 | WH8993 | 125143479 | 9.0000 | 102.234375 | P | 01/01/2017 | $30,084.07 | $30,756.26 |
| 101 | DLFR | 124838715 | 7.5000 | 104.906250 | P | 03/01/2028 | $28,864.68 | $30,301.83 |
| 101 | WE334 | 107869661 | 8.2500 | 106.046875 | P | 10/01/2030 | $28,201.06 | $29,907.30 |
| 101 | UC22 | 37335718 | 11.2500 | 106.046875 | P | 01/01/2021 | $28,157.85 | $29,860.52 |
| 106 | WH8963 | 123927667 | 8.5000 | 104.359375 | P | 11/01/2017 | $28,568.48 | $29,813.89 |
| 106 | WH8963 | 123927741 | 8.5000 | 104.359375 | P | 08/01/2016 | $28,414.44 | $29,653.13 |
| 106 | WH8963 | 123927733 | 8.5000 | 104.359375 | P | 10/01/2017 | $28,296.08 | $29,529.61 |
| 106 | WH8963 | 123927683 | 8.5000 | 104.359375 | P | 01/01/2018 | $27,942.58 | $29,160.70 |
| 101 | DLFR | 113840896 | 8.5000 | 106.046875 | P | 09/01/2022 | $27,421.44 | $29,079.58 |
| 101 | WE334 | 108784729 | 7.5000 | 106.234375 | P | 09/01/2023 | $27,242.67 | $28,941.06 |
| 101 | DLFR | 125108993 | 9.0000 | 106.046875 | P | 09/01/2030 | $27,229.00 | $28,875.50 |
| 106 | WH8963 | 123927261 | 9.0000 | 104.359375 | P | 01/01/2018 | $27,527.15 | $28,727.16 |
| 106 | WH8963 | 123928467 | 9.6250 | 104.359375 | P | 08/01/2016 | $27,393.58 | $28,687.77 |
| 106 | WH4517 | 123728578 | 10.9000 | 104.015625 | P | 11/27/2020 | $27,080.56 | $28,168.01 |
| 101 | WE334 | 104460746 | 11.0000 | 101.484375 | P | 06/01/2018 | $27,740.39 | $28,152.16 |
| 101 | FREP | 20432407 | 9.0000 | 104.015625 | P | 09/01/2014 | $26,957.72 | $28,040.24 |
| 106 | WH8963 | 123928038 | 10.3750 | 104.359375 | P | 08/01/2017 | $26,337.83 | $27,485.99 |
| 106 | WH8993 | 125146761 | 7.5000 | 104.015625 | P | 09/01/2012 | $26,248.58 | $27,302.62 |
| 101 | WE334 | 107214942 | 10.0000 | 104.359375 | P | 05/01/2017 | $25,894.01 | $27,022.83 |
| 106 | WH4631 | 123928350 | 9.8000 | 104.015625 | P | 11/01/2015 | $25,908.70 | $26,949.10 |
| 106 | WH8963 | 123927675 | 8.5000 | 104.359375 | P | 05/01/2018 | $25,588.51 | $26,704.01 |
| 101 | DLFR | 125120238 | 8.0000 | 104.015625 | P | 11/01/2014 | $25,363.31 | $26,381.81 |
| 106 | WH8963 | 123928012 | 9.6250 | 102.234375 | P | 03/01/2017 | $25,670.82 | $26,244.40 |
| 106 | WH8963 | 123928004 | 10.2500 | 102.765625 | P | 12/01/2016 | $25,079.98 | $25,773.60 |
| 101 | WE334 | 102565678 | 9.0000 | 106.234375 | P | 05/01/2025 | $24,203.23 | $25,712.15 |
| 106 | WH8963 | 123927865 | 9.1250 | 104.015625 | P | 09/01/2020 | $24,504.00 | $25,487.99 |
| 106 | WH8963 | 123927758 | 8.5000 | 104.359375 | P | 10/01/2017 | $24,233.82 | $25,290.26 |
| 106 | WH8963 | 123927824 | 9.7500 | 101.484375 | P | 08/01/2018 | $24,334.57 | $24,695.79 |
| 106 | WH8963 | 123929580 | 7.5000 | 104.359375 | P | 09/18/2016 | $23,647.82 | $24,678.72 |
| 106 | WH8963 | 123927709 | 8.5000 | 101.484375 | P | 10/01/2018 | $23,863.08 | $24,237.59 |
| 101 | WE334 | 21012786 | 8.5000 | 106.046875 | P | 04/01/2023 | $22,428.12 | $23,784.32 |
| 106 | WH8963 | 123927816 | 9.8750 | 101.484375 | P | 09/01/2018 | $23,095.28 | $23,438.10 |
| 106 | WH8963 | 123928152 | 9.7000 | 104.015625 | P | 07/01/2014 | $22,039.52 | $22,924.54 |
| 106 | WH8963 | 123928293 | 9.8000 | 104.015625 | P | 10/01/2015 | $21,838.58 | $22,715.54 |
| 106 | WH8963 | 123927881 | 8.1250 | 103.421875 | P | 12/01/2021 | $21,676.16 | $22,417.89 |
| 101 | WE334 | 109331819 | 7.5000 | 106.234375 | P | 06/01/2032 | $20,222.33 | $21,483.07 |
| 101 | WE334 | 104227798 | 8.2500 | 106.046875 | P | 06/01/2029 | $20,017.77 | $21,228.22 |
| 106 | WH4631 | 123924615 | 7.8750 | 104.015625 | P | 07/01/2014 | $20,389.69 | $21,208.46 |
| 101 | WH6096D | 124820695 | 7.0000 | 104.906250 | P | 01/01/2024 | $19,864.19 | $20,638.78 |
| 108 | WH4517 | 123663627 | 8.9000 | 104.015625 | P | 06/01/2014 | $19,895.56 | $20,694.49 |
| 108 | WH4631 | 123925646 | 6.8250 | 103.421875 | P | 05/01/2026 | $19,911.14 | $20,592.47 |
| 106 | WH8993 | 125148601 | 8.0000 | 104.359375 | P | 12/01/2017 | $19,435.70 | $20,282.98 |
| 106 | WH8963 | 123926263 | 5.1250 | 101.484375 | P | 09/01/2014 | $19,788.83 | $20,082.57 |
| 106 | WH8963 | 123928459 | 9.6250 | 102.765625 | P | 12/01/2016 | $19,397.88 | $19,934.35 |
| 106 | WH4631 | 123928129 | 9.9700 | 104.015625 | P | 03/01/2014 | $19,134.55 | $19,663.74 |
| 101 | UC22 | 38580536 | 12.0000 | 104.906250 | P | 07/01/2021 | $18,623.68 | $19,537.40 |
| 101 | WE334 | 102345626 | 7.5000 | 100.828125 | P | 09/01/2013 | $18,981.02 | $19,138.21 |
| 106 | WH8963 | 123928178 | 10.9500 | 104.015625 | P | 03/01/2015 | $17,686.95 | $18,397.19 |
| 106 | WH8993 | 125523159 | 9.5000 | 102.234375 | P | 01/01/2017 | $17,977.08 | $18,378.76 |
| 101 | DLFR | 104225891 | 10.5000 | 104.359375 | P | 03/01/2016 | $17,463.13 | $18,224.41 |
| 101 | WH8963 | 123927345 | 7.6250 | 106.234375 | P | 06/01/2024 | $17,113.21 | $18,180.11 |
| 101 | FREP | 7856495 | 8.5000 | 106.046875 | P | 04/01/2023 | $17,136.05 | $18,172.25 |
| 106 | WH4631 | 123928061 | 10.9500 | 102.765625 | P | 11/01/2013 | $17,440.91 | $17,923.26 |
| 106 | WH8963 | 123928442 | 9.8000 | 104.359375 | P | 05/01/2016 | $17,087.47 | $17,832.38 |

A-11



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008        LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Bloomberg

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 101 | FREP | 108802786 | 9.5000 | 104.359375 | P | 08/01/2016 | $17,078.45 | $17,822.96 |
| 106 | WH8963 | 125526434 | 7.0000 | 104.906250 | P | 08/01/2023 | $16,970.17 | $17,802.77 |
| 106 | WH8993 | 125149542 | 8.5000 | 104.359375 | P | 06/01/2017 | $16,683.10 | $17,410.38 |
| 106 | WH4631 | 123928632 | 6.8750 | 102.765625 | P | 12/01/2013 | $15,626.04 | $16,058.20 |
| 101 | DLFR | 102457537 | 8.5000 | 103.421875 | P | 12/01/2026 | $15,211.46 | $15,731.98 |
| 101 | WE334 | 106741945 | 7.0000 | 104.015625 | P | 11/01/2008 | $14,317.50 | $14,892.44 |
| 101 | FREP | 104757694 | 8.0000 | 106.046875 | P | 06/01/2029 | $13,492.31 | $14,308.17 |
| 101 | DLFR | 20739710 | 11.0000 | 104.359375 | P | 08/01/2017 | $13,536.97 | $14,127.10 |
| 106 | WH4631 | 123926529 | 6.5000 | 104.359375 | P | 01/01/2013 | $13,292.71 | $13,872.19 |
| 106 | WH8963 | 123925208 | 5.1250 | 101.484375 | P | 07/01/2011 | $12,755.71 | $12,945.05 |
| 106 | WH4631 | 123926495 | 7.6250 | 104.359375 | P | 01/01/2013 | $11,915.63 | $12,435.08 |
| 108 | WH8963 | 123929168 | 5.5000 | 100.828125 | P | 10/01/2013 | $11,537.03 | $11,632.57 |
| 106 | WH4631 | 123928426 | 9.8000 | 104.015625 | P | 12/01/2015 | $9,744.81 | $10,136.13 |
| 106 | WH8963 | 123927808 | 8.6250 | 104.359375 | P | 04/01/2016 | $9,490.72 | $9,904.46 |
| 106 | WH8963 | 123927790 | 9.3750 | 104.359375 | P | 03/01/2016 | $9,231.39 | $9,633.82 |
| 106 | WH8963 | 123927659 | 9.7500 | 104.906250 | P | 05/01/2020 | $9,021.23 | $9,463.83 |
| 106 | WH8963 | 123927642 | 9.3750 | 104.906250 | P | 12/01/2019 | $8,625.10 | $9,048.27 |
| 106 | WH8963 | 123927634 | 9.3750 | 104.906250 | P | 12/01/2019 | $7,360.72 | $7,721.86 |
| 106 | WH4631 | 123928558 | 6.6250 | 104.359375 | P | 02/01/2009 | $6,799.24 | $7,095.64 |
| 106 | WH8963 | 123927311 | 11.0000 | 104.015625 | P | 11/01/2009 | $5,190.79 | $5,399.23 |
| 101 | FREP | 104235197 | 12.5000 | 104.015625 | P | 12/01/2008 | $3,657.52 | $3,804.39 |
| 101 | FREP | 108784158 | 9.5000 | 104.015625 | P | 10/01/2008 | $916.35 | $953.15 |
| 106 | WH4631 | 123928558 | 9.7500 | 104.015625 | P | 10/01/2008 | $592.65 | $616.45 |
| 106 | WH4631 | 123926438 | 7.3750 | 104.015625 | P | 11/01/2008 | $348.72 | $362.72 |

Pricing Service Total :        614 Assets        $62,329,559.63        $65,119,617.54

Pricing Service : Force Priced

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 106 | WH8963 | 123926214 | 4.5000 | 100.000000 | P | 05/01/2011 | $287,910.85 | $287,910.85 |
| 104 | WH5207 | 124086667 | 6.6538 | 100.000000 | P | 12/01/2046 | $244,551.08 | $244,551.08 |
| 104 | WH5207 | 124092099 | 6.6862 | 100.000000 | P | 01/01/2047 | $244,361.36 | $244,361.36 |
| 104 | WH5207 | 124080622 | 6.6538 | 100.000000 | P | 12/01/2046 | $241,813.99 | $241,813.99 |
| 104 | WH5207 | 124079757 | 6.4862 | 100.000000 | P | 10/01/2046 | $241,812.30 | $241,812.30 |
| 104 | WH5207 | 124083345 | 6.6538 | 100.000000 | P | 12/01/2046 | $240,498.87 | $240,498.87 |
| 104 | WH5207 | 124083668 | 6.4275 | 100.000000 | P | 11/01/2046 | $238,647.16 | $238,647.16 |
| 104 | WH5207 | 124084781 | 6.4275 | 100.000000 | P | 11/01/2046 | $238,263.09 | $238,263.09 |
| 104 | WH5207 | 124079443 | 6.4862 | 100.000000 | P | 10/01/2046 | $238,142.07 | $238,142.07 |
| 104 | WH5207 | 124083165 | 6.4275 | 100.000000 | P | 11/01/2046 | $237,565.32 | $237,565.32 |
| 104 | WH5207 | 124081068 | 6.4862 | 100.000000 | P | 10/01/2046 | $237,200.46 | $237,200.46 |
| 104 | WH5207 | 124084906 | 6.4275 | 100.000000 | P | 11/01/2046 | $236,388.39 | $236,388.39 |
| 104 | WH5207 | 124093097 | 6.6862 | 100.000000 | P | 01/01/2047 | $236,269.69 | $236,269.69 |
| 104 | WH5207 | 124080300 | 6.4862 | 100.000000 | P | 10/01/2046 | $235,458.41 | $235,458.41 |
| 104 | WH5207 | 124088717 | 6.6538 | 100.000000 | P | 12/01/2046 | $234,431.08 | $234,431.08 |
| 104 | WH5207 | 124082680 | 6.4275 | 100.000000 | P | 11/01/2046 | $234,216.84 | $234,216.84 |
| 104 | WH5207 | 124085648 | 6.4275 | 100.000000 | P | 11/01/2046 | $232,978.01 | $232,978.01 |
| 104 | WH5207 | 124086489 | 6.4275 | 100.000000 | P | 12/01/2046 | $232,218.48 | $232,218.48 |
| 104 | WH5207 | 123218539 | 6.1325 | 100.000000 | P | 09/01/2046 | $232,006.14 | $232,006.14 |
| 104 | WH5207 | 124090606 | 6.6538 | 100.000000 | P | 12/01/2046 | $231,052.41 | $231,052.41 |
| 104 | WH5207 | 124087370 | 6.6538 | 100.000000 | P | 12/01/2046 | $227,530.62 | $227,530.62 |
| 104 | WH5207 | 124086364 | 6.4275 | 100.000000 | P | 12/01/2046 | $227,433.59 | $227,433.59 |
| 104 | WH5207 | 124077520 | 6.1325 | 100.000000 | P | 10/01/2046 | $226,484.89 | $226,484.89 |
| 104 | WH5207 | 124091497 | 6.6538 | 100.000000 | P | 01/01/2047 | $225,582.88 | $225,582.88 |
| 104 | WH5207 | 124083866 | 6.4275 | 100.000000 | P | 11/01/2046 | $224,918.61 | $224,918.61 |
| 104 | WH5207 | 124078320 | 6.4862 | 100.000000 | P | 10/01/2046 | $224,888.21 | $224,888.21 |
| 104 | WH5207 | 124078098 | 6.4862 | 100.000000 | P | 10/01/2046 | $224,769.25 | $224,769.25 |
| 104 | WH5207 | 124079567 | 6.4862 | 100.000000 | P | 10/01/2046 | $223,620.92 | $223,620.92 |
| 104 | WH5207 | 124080607 | 6.4862 | 100.000000 | P | 10/01/2046 | $222,952.51 | $222,952.51 |



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Force Priced

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 104 | WH5207 | 123216236 | 6.1325 | 100.000000 | P | 09/01/2046 | $222,470.03 | $222,470.03 |
| 104 | WH5207 | 124085523 | 6.4275 | 100.000000 | P | 11/01/2046 | $221,315.34 | $221,315.34 |
| 104 | WH5207 | 124077603 | 6.4862 | 100.000000 | P | 10/01/2046 | $220,136.85 | $220,136.85 |
| 104 | WH5207 | 124088824 | 6.6538 | 100.000000 | P | 12/01/2046 | $219,159.38 | $219,159.38 |
| 104 | WH5207 | 124090432 | 6.6538 | 100.000000 | P | 12/01/2046 | $219,057.60 | $219,057.60 |
| 104 | WH5207 | 124078700 | 6.4862 | 100.000000 | P | 10/01/2046 | $218,750.05 | $218,750.05 |
| 104 | WH5207 | 124081860 | 6.4275 | 100.000000 | P | 11/01/2046 | $218,439.00 | $218,439.00 |
| 104 | WH5207 | 124086026 | 6.4275 | 100.000000 | P | 11/01/2046 | $217,845.92 | $217,845.92 |
| 104 | WH5207 | 124081712 | 6.4862 | 100.000000 | P | 10/01/2046 | $217,536.48 | $217,536.48 |
| 104 | WH5207 | 124084518 | 6.4275 | 100.000000 | P | 11/01/2046 | $217,056.46 | $217,056.46 |
| 104 | WH5207 | 124086893 | 6.4275 | 100.000000 | P | 12/01/2046 | $217,014.93 | $217,014.93 |
| 104 | WH5207 | 124088703 | 6.4275 | 100.000000 | P | 12/01/2046 | $216,714.82 | $216,714.82 |
| 104 | WH5207 | 124079617 | 6.4862 | 100.000000 | P | 10/01/2046 | $216,454.70 | $216,454.70 |
| 104 | WH5207 | 124084146 | 6.4275 | 100.000000 | P | 11/01/2046 | $216,039.54 | $216,039.54 |
| 104 | WH5207 | 124093055 | 6.6862 | 100.000000 | P | 01/01/2047 | $214,602.89 | $214,602.89 |
| 104 | WH5207 | 124079450 | 6.4862 | 100.000000 | P | 10/01/2046 | $214,107.72 | $214,107.72 |
| 104 | WH5207 | 124091646 | 6.6862 | 100.000000 | P | 01/01/2047 | $213,311.35 | $213,311.35 |
| 104 | WH5207 | 123216400 | 6.6538 | 100.000000 | P | 06/01/2046 | $213,167.41 | $213,167.41 |
| 104 | WH5207 | 124080581 | 6.4862 | 100.000000 | P | 10/01/2046 | $212,791.43 | $212,791.43 |
| 104 | WH5207 | 124090556 | 6.6538 | 100.000000 | P | 12/01/2046 | $212,426.64 | $212,426.64 |
| 104 | WH5207 | 124086414 | 6.4275 | 100.000000 | P | 12/01/2046 | $212,176.61 | $212,176.61 |
| 104 | WH5207 | 124086521 | 6.4275 | 100.000000 | P | 12/01/2046 | $211,271.17 | $211,271.17 |
| 104 | WH5207 | 124082694 | 6.4275 | 100.000000 | P | 11/01/2046 | $210,793.51 | $210,793.51 |
| 104 | WH5207 | 124077777 | 6.4862 | 100.000000 | P | 10/01/2046 | $210,586.90 | $210,586.90 |
| 104 | WH5207 | 124081415 | 6.4862 | 100.000000 | P | 11/01/2046 | $209,389.42 | $209,389.42 |
| 104 | WH5207 | 124084096 | 6.4275 | 100.000000 | P | 11/01/2046 | $209,212.17 | $209,212.17 |
| 104 | WH5207 | 124081522 | 6.4862 | 100.000000 | P | 11/01/2046 | $208,773.40 | $208,773.40 |
| 104 | WH5207 | 124078619 | 6.4862 | 100.000000 | P | 10/01/2046 | $208,142.55 | $208,142.55 |
| 104 | WH5207 | 124078437 | 6.4862 | 100.000000 | P | 10/01/2046 | $207,839.05 | $207,839.05 |
| 104 | WH5207 | 124089434 | 6.6538 | 100.000000 | P | 12/01/2046 | $205,658.89 | $205,658.89 |
| 104 | WH5207 | 124081910 | 6.4275 | 100.000000 | P | 11/01/2046 | $205,628.42 | $205,628.42 |
| 104 | WH5207 | 124084484 | 6.4275 | 100.000000 | P | 11/01/2046 | $204,444.87 | $204,444.87 |
| 104 | WH5207 | 124085804 | 6.4275 | 100.000000 | P | 11/01/2046 | $203,342.21 | $203,342.21 |
| 104 | WH5207 | 124078643 | 6.4862 | 100.000000 | P | 10/01/2046 | $203,033.23 | $203,033.23 |
| 104 | WH5207 | 124085101 | 6.4275 | 100.000000 | P | 11/01/2046 | $203,017.03 | $203,017.03 |
| 104 | WH5207 | 124082439 | 6.4275 | 100.000000 | P | 11/01/2046 | $202,973.38 | $202,973.38 |
| 104 | WH5207 | 124092008 | 6.6862 | 100.000000 | P | 01/01/2047 | $202,752.94 | $202,752.94 |
| 104 | WH5207 | 124085143 | 6.4275 | 100.000000 | P | 11/01/2046 | $202,450.50 | $202,450.50 |
| 104 | WH5207 | 124088279 | 6.6538 | 100.000000 | P | 12/01/2046 | $200,511.34 | $200,511.34 |
| 104 | WH5207 | 124078049 | 6.4862 | 100.000000 | P | 10/01/2046 | $200,445.42 | $200,445.42 |
| 104 | WH5207 | 124091620 | 6.6862 | 100.000000 | P | 01/01/2047 | $200,131.10 | $200,131.10 |
| 104 | WH5207 | 124089624 | 6.6538 | 100.000000 | P | 12/01/2046 | $199,227.12 | $199,227.12 |
| 104 | WH5207 | 124085309 | 6.4275 | 100.000000 | P | 11/01/2046 | $198,519.33 | $198,519.33 |
| 104 | WH5207 | 124077581 | 6.4862 | 100.000000 | P | 10/01/2046 | $196,681.24 | $196,681.24 |
| 104 | WH5207 | 124087974 | 6.6538 | 100.000000 | P | 12/01/2046 | $193,297.13 | $193,297.13 |
| 104 | WH5207 | 124085457 | 6.4275 | 100.000000 | P | 11/01/2046 | $193,136.02 | $193,136.02 |
| 104 | WH5207 | 124081811 | 6.4275 | 100.000000 | P | 11/01/2046 | $193,002.83 | $193,002.83 |
| 104 | WH5207 | 124091844 | 6.6862 | 100.000000 | P | 01/01/2047 | $192,558.55 | $192,558.55 |
| 104 | WH5207 | 124085499 | 6.4275 | 100.000000 | P | 11/01/2046 | $191,974.95 | $191,974.95 |
| 104 | WH5207 | 124086992 | 6.4275 | 100.000000 | P | 12/01/2046 | $191,559.26 | $191,559.26 |
| 104 | WH5207 | 124088188 | 6.6538 | 100.000000 | P | 12/01/2046 | $191,406.28 | $191,406.28 |
| 104 | WH5207 | 124088030 | 6.6538 | 100.000000 | P | 12/01/2046 | $191,053.97 | $191,053.97 |
| 104 | WH5207 | 124089475 | 6.6538 | 100.000000 | P | 12/01/2046 | $190,359.84 | $190,359.84 |
| 104 | WH5207 | 124080128 | 6.4862 | 100.000000 | P | 10/01/2046 | $187,591.88 | $187,591.88 |
| 104 | WH5207 | 124088808 | 6.6538 | 100.000000 | P | 12/01/2046 | $185,434.62 | $185,434.62 |
| 104 | WH5207 | 124084336 | 6.4275 | 100.000000 | P | 11/01/2046 | $185,327.31 | $185,327.31 |
| 104 | WH5207 | 124092685 | 6.6862 | 100.000000 | P | 01/01/2047 | $185,048.25 | $185,048.25 |
| 104 | WH5207 | 124082801 | 6.4275 | 100.000000 | P | 11/01/2046 | $184,874.45 | $184,874.45 |
| 104 | WH5207 | 124080680 | 6.4862 | 100.000000 | P | 10/01/2046 | $184,054.00 | $184,054.00 |



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Force Priced

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 104 | WH5207 | 124081993 | 6.4862 | 100.000000 | P | 11/01/2046 | $184,026.67 | $184,026.67 |
| 104 | WH5207 | 124084658 | 6.4275 | 100.000000 | P | 11/01/2046 | $183,952.52 | $183,952.52 |
| 104 | WH5207 | 124090507 | 6.6538 | 100.000000 | P | 12/01/2046 | $183,186.00 | $183,186.00 |
| 104 | WH5207 | 124089400 | 6.6538 | 100.000000 | P | 12/01/2046 | $182,874.60 | $182,874.60 |
| 104 | WH5207 | 124087099 | 6.4275 | 100.000000 | P | 11/01/2046 | $182,620.83 | $182,620.83 |
| 104 | WH5207 | 124080821 | 6.4862 | 100.000000 | P | 10/01/2046 | $181,398.95 | $181,398.95 |
| 104 | WH5207 | 124090283 | 6.6538 | 100.000000 | P | 12/01/2046 | $181,141.22 | $181,141.22 |
| 104 | WH5207 | 124086588 | 6.4275 | 100.000000 | P | 12/01/2046 | $179,516.33 | $179,516.33 |
| 104 | WH5207 | 124083593 | 6.4275 | 100.000000 | P | 11/01/2046 | $178,999.32 | $178,999.32 |
| 104 | WH5207 | 124089962 | 6.6538 | 100.000000 | P | 12/01/2046 | $178,655.20 | $178,655.20 |
| 104 | WH5207 | 123220063 | 6.1325 | 100.000000 | P | 09/01/2046 | $176,966.77 | $176,966.77 |
| 104 | WH5207 | 124081977 | 6.4862 | 100.000000 | P | 11/01/2046 | $176,574.72 | $176,574.72 |
| 104 | WH5207 | 124089152 | 6.6538 | 100.000000 | P | 12/01/2046 | $176,476.94 | $176,476.94 |
| 104 | WH5207 | 124085341 | 6.4275 | 100.000000 | P | 11/01/2046 | $175,942.01 | $175,942.01 |
| 104 | WH5207 | 124079914 | 6.4862 | 100.000000 | P | 10/01/2046 | $175,120.87 | $175,120.87 |
| 104 | WH5207 | 124085911 | 6.4275 | 100.000000 | P | 11/01/2046 | $174,945.41 | $174,945.41 |
| 104 | WH5207 | 124086109 | 6.4275 | 100.000000 | P | 11/01/2046 | $174,737.43 | $174,737.43 |
| 104 | WH5207 | 124086950 | 6.4275 | 100.000000 | P | 12/01/2046 | $174,674.20 | $174,674.20 |
| 104 | WH5207 | 124084724 | 6.4275 | 100.000000 | P | 11/01/2046 | $172,674.40 | $172,674.40 |
| 104 | WH5207 | 124089830 | 6.6538 | 100.000000 | P | 12/01/2046 | $171,887.41 | $171,887.41 |
| 104 | WH5207 | 124083205 | 6.4275 | 100.000000 | P | 11/01/2046 | $171,650.51 | $171,650.51 |
| 104 | WH5207 | 124092230 | 6.6862 | 100.000000 | P | 01/01/2047 | $170,068.95 | $170,068.95 |
| 104 | WH5207 | 123223620 | 6.4688 | 100.000000 | P | 08/01/2046 | $169,985.31 | $169,985.31 |
| 104 | WH5207 | 124091984 | 6.6862 | 100.000000 | P | 01/01/2047 | $168,376.70 | $168,376.70 |
| 104 | WH5207 | 124078460 | 6.4862 | 100.000000 | P | 10/01/2046 | $167,944.06 | $167,944.06 |
| 104 | WH5207 | 124089608 | 6.6538 | 100.000000 | P | 12/01/2046 | $167,488.91 | $167,488.91 |
| 104 | WH5207 | 124087396 | 6.6538 | 100.000000 | P | 12/01/2046 | $166,552.90 | $166,552.90 |
| 104 | WH5207 | 124079104 | 6.4862 | 100.000000 | P | 10/01/2046 | $166,298.14 | $166,298.14 |
| 104 | WH5207 | 124079889 | 6.4862 | 100.000000 | P | 10/01/2046 | $165,236.14 | $165,236.14 |
| 104 | WH5207 | 124081217 | 6.4862 | 100.000000 | P | 11/01/2046 | $164,381.20 | $164,381.20 |
| 104 | WH5207 | 124088055 | 6.6538 | 100.000000 | P | 12/01/2046 | $164,280.23 | $164,280.23 |
| 104 | WH5207 | 124088832 | 6.6538 | 100.000000 | P | 12/01/2046 | $164,274.45 | $164,274.45 |
| 104 | WH5207 | 124081449 | 6.4862 | 100.000000 | P | 11/01/2046 | $162,295.41 | $162,295.41 |
| 104 | WH5207 | 124077991 | 6.4862 | 100.000000 | P | 10/01/2046 | $161,719.14 | $161,719.14 |
| 104 | WH5207 | 124090440 | 6.6538 | 100.000000 | P | 12/01/2046 | $160,088.14 | $160,088.14 |
| 104 | WH5207 | 124092578 | 6.6538 | 100.000000 | P | 01/01/2047 | $158,000.73 | $158,000.73 |
| 104 | WH5207 | 124077579 | 6.4862 | 100.000000 | P | 10/01/2046 | $157,921.27 | $157,921.27 |
| 104 | WH5207 | 124083395 | 6.4275 | 100.000000 | P | 11/01/2046 | $157,864.06 | $157,864.06 |
| 104 | WH5207 | 124090739 | 6.6538 | 100.000000 | P | 12/01/2046 | $157,492.80 | $157,492.80 |
| 104 | WH5207 | 124084013 | 6.4275 | 100.000000 | P | 11/01/2046 | $157,417.61 | $157,417.61 |
| 104 | WH5207 | 124083544 | 6.4275 | 100.000000 | P | 11/01/2046 | $157,246.71 | $157,246.71 |
| 104 | WH5207 | 124084971 | 6.4862 | 100.000000 | P | 10/01/2046 | $157,029.80 | $157,029.80 |
| 104 | WH5207 | 124080136 | 6.4862 | 100.000000 | P | 10/01/2046 | $156,658.73 | $156,658.73 |
| 104 | WH5207 | 124084617 | 6.4275 | 100.000000 | P | 11/01/2046 | $154,276.39 | $154,276.39 |
| 104 | WH5207 | 124084671 | 6.4275 | 100.000000 | P | 12/01/2046 | $153,390.53 | $153,390.53 |
| 104 | WH5207 | 124078833 | 6.4862 | 100.000000 | P | 11/01/2046 | $152,724.50 | $152,724.50 |
| 104 | WH5207 | 124078908 | 6.4862 | 100.000000 | P | 10/01/2046 | $152,510.18 | $152,510.18 |
| 104 | WH5207 | 124082132 | 5.4862 | 100.000000 | P | 11/01/2046 | $150,830.55 | $150,830.55 |
| 104 | WH5207 | 124085796 | 6.4275 | 100.000000 | P | 11/01/2046 | $150,704.59 | $150,704.59 |
| 104 | WH5207 | 124085010 | 6.4275 | 100.000000 | P | 11/01/2046 | $149,974.32 | $149,974.32 |
| 104 | WH5207 | 124084377 | 6.4275 | 100.000000 | P | 11/01/2046 | $149,775.02 | $149,775.02 |
| 104 | WH5207 | 124080003 | 6.4862 | 100.000000 | P | 10/01/2046 | $149,150.36 | $149,150.36 |
| 104 | WH5207 | 124080037 | 6.4862 | 100.000000 | P | 10/01/2046 | $147,886.16 | $147,886.16 |
| 104 | WH5207 | 124090085 | 6.6538 | 100.000000 | P | 12/01/2046 | $146,456.11 | $146,456.11 |
| 104 | WH5207 | 124085879 | 6.4275 | 100.000000 | P | 11/01/2046 | $145,548.92 | $145,548.92 |
| 104 | WH5207 | 124082363 | 6.4275 | 100.000000 | P | 11/01/2046 | $142,538.61 | $142,538.61 |
| 104 | WH5207 | 124090598 | 6.6538 | 100.000000 | P | 12/01/2046 | $140,774.79 | $140,774.79 |
| 104 | WH5207 | 124088806 | 6.6538 | 100.000000 | P | 12/01/2046 | $140,665.45 | $140,665.45 |
| 104 | WH5207 | 124083650 | 6.4275 | 100.000000 | P | 11/01/2046 | $140,133.97 | $140,133.97 |

A-14



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

Production Run : 09/17/2008          LCPI

Print Date : 09/17/2008 07:32 PM

Investor Name : Lehman Re Ltd
Investor Reference No : WLERE
Trade Reference No : 6V01U72

Investment Amount : $80,000,000.00
Required Amount : $96,000,000.00
Trade Margin % : 20.00

Asset Grade : B
Pricing Service : Force Priced

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 104 | WH5207 | 124081779 | 6.4275 | 100.000000 | P | 11/01/2046 | $139,870.76 | $139,870.76 |
| 104 | WH5207 | 124089590 | 6.6538 | 100.000000 | P | 12/01/2046 | $139,302.81 | $139,302.81 |
| 104 | WH5207 | 124082298 | 6.4275 | 100.000000 | P | 11/01/2046 | $139,284.80 | $139,284.80 |
| 104 | WH5207 | 124087727 | 6.6538 | 100.000000 | P | 12/01/2046 | $138,992.60 | $138,992.60 |
| 104 | WH5207 | 124090416 | 6.6538 | 100.000000 | P | 12/01/2046 | $138,838.83 | $138,838.83 |
| 104 | WH5207 | 124082736 | 6.4275 | 100.000000 | P | 11/01/2046 | $137,724.10 | $137,724.10 |
| 104 | WH5207 | 124089244 | 6.6538 | 100.000000 | P | 12/01/2046 | $136,585.27 | $136,585.27 |
| 104 | WH5207 | 124090424 | 6.6538 | 100.000000 | P | 12/01/2046 | $135,559.48 | $135,559.48 |
| 104 | WH5207 | 124087859 | 6.6538 | 100.000000 | P | 12/01/2046 | $134,048.41 | $134,048.41 |
| 104 | WH5207 | 124080441 | 6.4862 | 100.000000 | P | 10/01/2046 | $133,572.51 | $133,572.51 |
| 104 | WH5207 | 124089285 | 6.6538 | 100.000000 | P | 12/01/2046 | $133,371.89 | $133,371.89 |
| 104 | WH5207 | 124081209 | 6.4862 | 100.000000 | P | 11/01/2046 | $133,180.26 | $133,180.26 |
| 104 | WH5207 | 124078973 | 6.4862 | 100.000000 | P | 10/01/2046 | $133,160.60 | $133,160.60 |
| 104 | WH5207 | 124087958 | 6.6538 | 100.000000 | P | 12/01/2046 | $132,299.45 | $132,299.45 |
| 104 | WH5207 | 124078817 | 6.4862 | 100.000000 | P | 10/01/2046 | $130,898.16 | $130,898.16 |
| 104 | WH5207 | 124088873 | 6.6538 | 100.000000 | P | 12/01/2046 | $130,485.24 | $130,485.24 |
| 104 | WH5207 | 124083163 | 6.4275 | 100.000000 | P | 11/01/2046 | $130,029.77 | $130,029.77 |
| 104 | WH5207 | 124080755 | 6.4862 | 100.000000 | P | 10/01/2046 | $129,289.28 | $129,289.28 |
| 104 | WH5207 | 124091778 | 6.6862 | 100.000000 | P | 01/01/2047 | $128,631.22 | $128,631.22 |
| 104 | WH5207 | 124079484 | 6.4862 | 100.000000 | P | 10/01/2046 | $127,732.18 | $127,732.18 |
| 104 | WH5207 | 124088881 | 6.6538 | 100.000000 | P | 12/01/2046 | $127,312.32 | $127,312.32 |
| 104 | WH5207 | 124090366 | 6.6538 | 100.000000 | P | 12/01/2046 | $126,400.19 | $126,400.19 |
| 104 | WH5207 | 124085762 | 6.4275 | 100.000000 | P | 11/01/2046 | $125,352.17 | $125,352.17 |
| 104 | WH5207 | 124092693 | 6.6862 | 100.000000 | P | 01/01/2047 | $125,002.08 | $125,002.08 |
| 104 | WH5207 | 124092891 | 6.6862 | 100.000000 | P | 01/01/2047 | $124,260.46 | $124,260.46 |
| 104 | WH5207 | 124087503 | 6.6538 | 100.000000 | P | 12/01/2046 | $122,925.12 | $122,925.12 |
| 104 | WH5207 | 124092438 | 6.6538 | 100.000000 | P | 01/01/2047 | $122,740.73 | $122,740.73 |
| 104 | WH5207 | 124079260 | 6.4862 | 100.000000 | P | 10/01/2046 | $122,655.64 | $122,655.64 |
| 104 | WH5207 | 124083825 | 6.4275 | 100.000000 | P | 11/01/2046 | $121,361.03 | $121,361.03 |
| 104 | WH5207 | 124084443 | 6.4275 | 100.000000 | P | 11/01/2046 | $120,908.69 | $120,908.69 |
| 104 | WH5207 | 124090572 | 6.6538 | 100.000000 | P | 12/01/2046 | $120,861.23 | $120,861.23 |
| 104 | WH5207 | 124083106 | 6.4275 | 100.000000 | P | 11/01/2046 | $120,489.02 | $120,489.02 |
| 104 | WH5207 | 124079252 | 6.4862 | 100.000000 | P | 10/01/2046 | $120,461.21 | $120,461.21 |
| 104 | WH5207 | 124087966 | 6.6538 | 100.000000 | P | 12/01/2046 | $119,722.25 | $119,722.25 |
| 104 | WH5207 | 124092081 | 6.6862 | 100.000000 | P | 01/01/2047 | $119,377.50 | $119,377.50 |
| 104 | WH5207 | 124089491 | 6.6538 | 100.000000 | P | 12/01/2046 | $119,305.63 | $119,305.63 |
| 104 | WH5207 | 124083007 | 6.4275 | 100.000000 | P | 11/01/2046 | $118,513.34 | $118,513.34 |
| 104 | WH5207 | 124092909 | 6.6862 | 100.000000 | P | 01/01/2047 | $118,325.03 | $118,325.03 |
| 104 | WH5207 | 124082306 | 6.4275 | 100.000000 | P | 11/01/2046 | $118,043.74 | $118,043.74 |
| 104 | WH5207 | 124084559 | 6.4275 | 100.000000 | P | 11/01/2046 | $117,258.29 | $117,258.29 |
| 104 | WH5207 | 124090648 | 6.6538 | 100.000000 | P | 12/01/2046 | $116,919.74 | $116,919.74 |
| 104 | WH5207 | 124078957 | 6.4862 | 100.000000 | P | 10/01/2046 | $116,914.68 | $116,914.68 |
| 104 | WH5207 | 124080631 | 6.4862 | 100.000000 | P | 10/01/2046 | $116,463.81 | $116,463.81 |
| 104 | WH5207 | 124082892 | 6.4275 | 100.000000 | P | 11/01/2046 | $114,752.00 | $114,752.00 |
| 104 | WH5207 | 124077629 | 6.4862 | 100.000000 | P | 10/01/2046 | $113,855.07 | $113,855.07 |
| 104 | WH5207 | 124089392 | 6.6538 | 100.000000 | P | 12/01/2046 | $113,381.47 | $113,381.47 |
| 104 | WH5207 | 124086810 | 6.4275 | 100.000000 | P | 12/01/2046 | $112,618.58 | $112,618.58 |
| 104 | WH5207 | 124083874 | 6.4275 | 100.000000 | P | 11/01/2046 | $112,035.89 | $112,035.89 |
| 104 | WH5207 | 124092206 | 6.6862 | 100.000000 | P | 01/01/2047 | $110,821.80 | $110,821.80 |
| 104 | WH5207 | 124092529 | 6.6538 | 100.000000 | P | 12/01/2046 | $110,743.81 | $110,743.81 |
| 104 | WH5207 | 124080235 | 6.4862 | 100.000000 | P | 10/01/2046 | $110,446.25 | $110,446.25 |
| 104 | WH5207 | 124089772 | 6.6538 | 100.000000 | P | 12/01/2046 | $110,226.92 | $110,226.92 |
| 104 | WH5207 | 124088691 | 6.6538 | 100.000000 | P | 12/01/2046 | $108,601.44 | $108,601.44 |
| 104 | WH5207 | 124078023 | 6.4862 | 100.000000 | P | 10/01/2046 | $107,248.35 | $107,248.35 |
| 104 | WH5207 | 124085200 | 6.4275 | 100.000000 | P | 11/01/2046 | $106,890.20 | $106,890.20 |
| 104 | WH5207 | 124085697 | 6.4275 | 100.000000 | P | 11/01/2046 | $106,414.87 | $106,414.87 |
| 104 | WH5207 | 124078932 | 6.4862 | 100.000000 | P | 10/01/2046 | $106,350.34 | $106,350.34 |
| 104 | WH5207 | 124079096 | 6.4862 | 100.000000 | P | 10/01/2046 | $106,100.35 | $106,100.35 |
| 104 | WH5207 | 124079823 | 6.4862 | 100.000000 | P | 10/01/2046 | $106,033.78 | $106,033.78 |



THE BANK OF NEW YORK MELLON

**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

**Production Run :** 09/17/2008          LCPI

**Print Date :** 09/17/2008 07:32 PM

**Investor Name :** Lehman Re Ltd
**Investor Reference No :** WLERE
**Trade Reference No :** 6V01U72

**Investment Amount :** $80,000,000.00
**Required Amount :** $96,000,000.00
**Trade Margin % :** 20.00

**Asset Grade :** B
**Pricing Service :** Force Priced

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 104 | WH5207 | 124088915 | 6.6538 | 100.000000 | P | 12/01/2046 | $104,842.33 | $104,842.33 |
| 104 | WH5207 | 124085671 | 6.4275 | 100.000000 | P | 11/01/2046 | $104,356.15 | $104,356.15 |
| 104 | WH5207 | 124085374 | 6.4275 | 100.000000 | P | 11/01/2046 | $104,177.71 | $104,177.71 |
| 104 | WH5207 | 124092388 | 6.6538 | 100.000000 | P | 01/01/2047 | $103,745.76 | $103,745.76 |
| 104 | WH5207 | 124084914 | 6.4275 | 100.000000 | P | 11/01/2046 | $102,060.16 | $102,060.16 |
| 104 | WH5207 | 124091596 | 6.6862 | 100.000000 | P | 01/01/2047 | $101,594.93 | $101,594.93 |
| 104 | WH5207 | 124085929 | 6.4275 | 100.000000 | P | 11/01/2046 | $99,178.61 | $99,178.61 |
| 104 | WH5207 | 123222465 | 6.1325 | 100.000000 | P | 09/01/2046 | $99,058.92 | $99,058.92 |
| 104 | WH5207 | 124081555 | 6.4862 | 100.000000 | P | 11/01/2046 | $95,722.68 | $95,722.68 |
| 104 | WH5207 | 124084351 | 6.4275 | 100.000000 | P | 11/01/2046 | $95,591.25 | $95,591.25 |
| 104 | WH5207 | 124088634 | 6.6538 | 100.000000 | P | 12/01/2046 | $95,536.55 | $95,536.55 |
| 104 | WH5207 | 124079930 | 6.4862 | 100.000000 | P | 10/01/2046 | $95,272.00 | $95,272.00 |
| 106 | WH8963 | 123928780 | 4.8750 | 100.000000 | P | 07/01/2013 | $93,877.09 | $93,877.09 |
| 104 | WH5207 | 124083783 | 6.4275 | 100.000000 | P | 11/01/2046 | $89,150.25 | $89,150.25 |
| 108 | WH4517 | 123709537 | 5.1000 | 100.000000 | P | 08/19/2023 | $79,574.89 | $79,574.89 |
| 106 | WH8963 | 123926248 | 4.6250 | 100.000000 | P | 11/01/2014 | $78,816.27 | $78,816.27 |
| 106 | WH8963 | 123924391 | 4.5000 | 100.000000 | P | 05/01/2011 | $69,858.20 | $69,858.20 |
| 106 | WH4631 | 123930034 | 5.0000 | 100.000000 | P | 09/01/2015 | $59,067.36 | $59,067.36 |
| 101 | WE334 | 110808631 | 5.9500 | 100.000000 | P | 02/01/2025 | $56,591.76 | $56,591.76 |
| 106 | WH4631 | 123925281 | 4.5000 | 100.000000 | P | 08/01/2013 | $50,904.64 | $50,904.64 |
| 106 | WH4631 | 123924128 | 4.7500 | 100.000000 | P | 10/01/2014 | $47,962.22 | $47,962.22 |
| 106 | WH4631 | 123926016 | 4.3750 | 100.000000 | P | 06/01/2013 | $41,502.87 | $41,502.87 |
| 106 | WH8963 | 123924045 | 4.6250 | 100.000000 | P | 04/01/2014 | $41,233.43 | $41,233.43 |
| 106 | WH4631 | 123924300 | 4.8750 | 100.000000 | P | 09/01/2013 | $31,954.77 | $31,954.77 |
| 106 | WH8963 | 123930414 | 5.2500 | 100.000000 | P | 02/01/2016 | $18,245.71 | $18,245.71 |
| 106 | WH4631 | 123925851 | 6.1250 | 100.000000 | P | 02/01/2012 | $16,688.90 | $16,688.90 |
| 106 | WH8963 | 123925877 | 5.8750 | 100.000000 | P | 01/01/2012 | $13,472.34 | $13,472.34 |
| 101 | DLFR | 103796215 | 8.7500 | 100.000000 | P | | $1,122.17 | $1,122.17 |
| 101 | FREP | 103797510 | 9.0000 | 100.000000 | P | | $483.64 | $483.64 |
| 101 | FREP | 109342899 | 7.5000 | 100.000000 | P | | $406.92 | $406.92 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Pricing Service Total :** | | | | **236 Assets** | | | $37,817,034.43 | $37,817,034.43 |
| **Grade B Total :** | | | | **850 Assets** | | | $100,146,594.06 | $102,936,651.97 |
| **Total:** | | | | **850 Assets** | | | $100,146,594.06 | $102,936,651.97 |

**Required Amount :**          $96,000,000.00
**Excess Amount :**          $6,936,651.97

**Status Key**

**A** - Allocated

**P** - Preallocated

This document contains information that is confidential and the property of The Bank of New York. It may not be copied, published or used, in whole or in part for any purpose other than expressly authorized by The Bank of New York  Copyright (c) 2006 The Bank of New York.  All rights reserved.

A-16

# EXHIBIT B

## ROFO ASSETS

1. <u>Rose Island</u>:  Senior loan secured by the property commonly known as "Rose Island", located in Rose Island, Bahamas.

2. <u>Centennial Hills</u>:  Senior loan[3] secured by the property commonly known as "Centennial Hills", located in Las Vegas, Nevada.

3. <u>Cherry Lawn</u>:  Mezzanine loan secured by an equity interest in the owner of the property commonly known as "Cherry Lawn", located in New Rochelle, New York.

4. <u>Pasadena St. Luke</u>:  The property commonly known as "St. Lukes", located in Pasadena, California.

5. <u>Clemson</u>:  The property commonly known as "Clemson", located in Myrtle Beach, South Carolina; provided that the Clemson property shall be exempt from the provisions of Article IV of this Agreement so long as the proposed sale (the "Clemson Proposed Sale") of the Clemson property by Lehman Re, as seller, and Greg Hobbs and/or any affiliates thereof, as purchasers (the "Clemson Purchasers"), is pending or is consummated.  If the Clemson Proposed Sale is validly terminated in accordance with its terms or is otherwise validly terminated by formal notice of either Lehman Re or the Clemson Purchasers, the Clemson property shall be subject to the provisions of Article IV of this Agreement.

6. <u>Molasses Reef</u>:  Senior loan secured by the property commonly known as "Molasses Reef", located in West Caicos, Turks and Caicos, provided that the Molasses Reef loan shall be exempt from the provisions of Article IV of this Agreement so long as the proposed sale (the "Proposed Sale") of the Molasses loan by Lehman Re, as seller, and Jasper Limited, Moonstone Overseas Trading Limited, Apex Asset Limited, and any affiliates thereof, as purchasers (the "Purchasers"), is pending or is consummated.  If the Proposed Sale is validly terminated in accordance with its terms or is otherwise validly terminated by formal notice of either Lehman Re or the Purchasers, the Molasses Reef loan shall be subject to the provisions of Article IV of this Agreement.

---

[3]    The priority of the Centennial loan is currently the subject of lien-priority litigation with a mechanics lienor.

## EXHIBIT C

<u>RIGHT OF FIRST OFFER PROCEDURES</u>

A.       During the ROFO Period (as defined below) applicable to any Mortgage Loan, REO property obtained (whether by foreclosure, power of sale, delivery of a deed or assignment in lieu of foreclosure or otherwise) with respect to or in connection with a Mortgage Loan, or the equity interest in the Lehman Re subsidiary holding such REO property, all as set forth on Exhibit B (each a "<u>Mortgage Loan Asset</u>"), Lehman Re shall provide not less than fifteen (15) days' prior written notice (the "<u>ROFO Notice</u>") to LCPI prior to selling all or any portion of such Mortgage Loan Asset or any direct or indirect interest therein to a third party not affiliated with or related to the applicable original or current mortgage or mezzanine loan borrower thereunder, as the case may be. The ROFO Notice shall set forth all of the material terms of the proposed Mortgage Loan Asset sale (including the identification of the Mortgage Loan Asset (or portion thereof or direct or indirect interest therein) to be sold (the "<u>Offered Loan Asset</u>") and the price payable in cash at which Lehman Re would be willing to sell the Offered Loan Asset, the "<u>ROFO Price</u>").  Upon receipt of a ROFO Notice, LCPI shall have the right to purchase such Offered Loan Asset on the terms set forth in such ROFO Notice, which right may only be exercised with respect to the entire Offered Loan Asset being offered pursuant to the ROFO Notice, exercisable by LCPI by: (i) delivering written notice thereof to Lehman Re (the "<u>Election Notice</u>") within fifteen (15) days after receipt of the applicable ROFO Notice and (ii) closing the purchase within thirty (30) days after delivery of the related Election Notice.  If LCPI fails to timely deliver an Election Notice, LCPI shall be deemed to have waived its rights of first offer to purchase the applicable Offered Loan Asset, subject to the reinstatement of such right of first offer in accordance with the terms hereof.  If LCPI timely elects to purchase a Mortgage Loan Asset pursuant to an Election Notice, LCPI shall, simultaneously with the delivery of such Election Notice, wire to Lehman Re in immediately available funds a non-refundable deposit in an amount equal to five percent (5%) of the ROFO Price (the "<u>Deposit</u>").

B.       If LCPI validly and timely delivers an Election Notice, the closing of the purchase shall be on a date (the "<u>ROFO Closing Date</u>") designated by LCPI which is not more than thirty (30) days after the delivery of the Election Notice and at a place designated in the ROFO Notice (or if the ROFO Notice does not designate a closing place, at such place as may be mutually agreed upon between Lehman Re and LCPI, and otherwise such closing shall be in escrow).

C.       At the closing of each purchase:

(i)       LCPI and Lehman Re shall enter into a deed, bill of sale and other customary real estate transfer documents or an assignment and assumption agreement, as applicable, each in form and substance reasonably acceptable to LCPI and Lehman Re, with respect to the Offered Loan Asset pursuant to which Lehman Re shall sell, transfer and assign the Offered Loan Asset to LCPI; <u>provided</u>, <u>however</u>, such sale, transfer and

assignment by Lehman Re shall be without recourse, representation or warranty whether expressed or implied by Lehman Re other than representations to the effect that Lehman Re has the authority and power to effect the sale, transfer and assignment, the outstanding balance of the Offered Loan Asset loan, if applicable, and that the Offered Loan Asset being transferred and assigned is free from any liens or modifications by Lehman Re;

(ii)    Lehman Re shall deliver to LCPI, at LCPI's sole, but reasonable, cost and expense, all of the applicable documents relating to the Offered Loan Asset, and copies of all other books and records related to the Offered Loan within Lehman Re's possession or control; and

(iii)    LCPI shall pay or cause to be paid the ROFO Price to Lehman Re in immediately available funds.

D.    A Deposit shall only be returned by Lehman Re to LCPI in the event (i) LCPI delivers to Lehman Re, prior to the date that is thirty (30) days after delivery of the related Election Notice, written notice that LCPI has determined during the course of its due diligence that a Material Change (as defined below) has occurred after the Effective Date with respect to the related Mortgage Loan Asset, or (ii) Lehman Re defaults on its obligation to sell the Offered Loan Asset to LCPI as provided herein.

E.    In the event that LCPI purchases any Offered Loan Asset, Lehman Re shall take any and all actions that LCPI shall reasonably request to further evidence or confirm LCPI's ownership interest in the Offered Loan Asset, including, without limitation, notifying each obligor on such Offered Loan Asset loan to make all payments thereon as directed by LCPI, confirming to any lending agent, servicer (whether master or special) and any other similar agent with respect to such Offered Loan Asset loan that LCPI is the owner of such Offered Loan Asset loan, and delivering, assigning or otherwise transferring to LCPI any collateral held by Lehman Re (or any of its agents) securing the obligations of the obligors on such Offered Loan Asset loan.  If LCPI purchases any Offered Loan Asset, Lehman Re hereby authorizes LCPI to execute and file any assignments of Uniform Commercial Code financing statements, or any other documents or instruments that may be required in the applicable local jurisdiction, naming LCPI as a secured party or owner, as applicable, or otherwise confirming and acknowledging that LCPI is the owner of such Offered Loan Asset, and covering all collateral for such Offered Loan Asset loan.

F.    If LCPI waives (or is deemed to have waived) its right to acquire the Offered Loan Asset in a given ROFO Notice, the Offered Loan Asset may be sold by Lehman Re at any time thereafter, not subject to the provisions of this Exhibit C, provided such Offered Loan Asset is sold either (i) for not less than eighty-five percent (85%) of the ROFO Price offered to LCPI set forth in the related ROFO Notice, or (ii) such lower price in the event the cash difference between such sale price and the ROFO Price is not more than One Million and No/100 Dollars ($1,000,000.00).

G.      For purposes of this Exhibit C, the term (i) "ROFO Period" means, with respect to each Mortgage Loan Asset, the period commencing on the ROFO Period Commencement Date (as defined below) and expiring on the date that is twelve (12) calendar months from the ROFO Period Commencement Date; (ii) "Material Change" means either, (a) a change that has a material adverse effect on the use, value and/or condition of the real property directly or indirectly securing the applicable Mortgage Loan, or (b) a change that has a material adverse effect on the use, value and/or condition the applicable Mortgage Loan Asset, and (iii) "ROFO Period Commencement Date" means the earlier to occur of (a) the Effective Date, and (b) the date occurring thirty (30) days after the date of this Agreement.

H.      Any and all rights granted to LCPI in this Exhibit C are solely for the benefit of LCPI and are not transferable by LCPI and may not be assigned by LCPI, by operation of law, or otherwise.

I.      For the avoidance of doubt, any and all rights granted to LCPI and any and all obligations on the part of Lehman Re set forth in this Exhibit C shall not apply, and shall otherwise be inoperable with respect, to the sale of all or any portion of any Mortgage Loan Asset or any direct or indirect interest therein to a third party affiliated with or related to the applicable original or current mortgage or mezzanine loan borrower thereunder, as the case may be.

**EXHIBIT D**

<u>REPURCHASED MORTGAGE LOANS</u>

1.    Pacific Point (Senior)

2.    237 Park (Jr. Mezz)

3.    Golden Sands (Senior)

4.    WSG Indrio (Senior)

5.    W. 37th Street Hudson Yards (Mezz)

## EXHIBIT E

### FORM OF ASSIGNMENT AND ASSUMPTION

### ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "<u>Assignment</u>") is made and effective as of _____ (the "<u>Execution Date</u>"), and is entered into by and between LEHMAN RE LTD. (the "<u>Assignor</u>") and [LEHMAN COMMERCIAL PAPER INC.] (the "<u>Assignee</u>").

### RECITALS

A.    Assignor previously acquired all right, title and interest in and to the Assigned Interest (as defined below) from Assignee.

B.    Assignor and Assignee have executed and delivered that certain Settlement Agreement dated _____, 2012 (the "<u>Settlement Agreement</u>"), pursuant to which Assignor and Assignee have agreed, among other things, to execute and deliver this Assignment.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### AGREEMENT

1.    <u>Certain Capitalized Terms</u>.  The terms ["<u>Administrative Agent</u>,"] "<u>Lender</u>," "<u>Loan</u>," and "<u>Person</u>" as used herein shall have the meanings given to them in the Loan Agreement identified below in Section 6 (the "<u>Loan Agreement</u>").

2.    <u>Standard Terms and Conditions</u>.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

3.    <u>Sale of Assigned Interest</u>.

(a)    The Assignor hereby transfers, sells, assigns, sets-over and conveys to the Assignee all of the Assignor's right, title and interest, if any, in and to the Assigned Interest.  The Assignor and the Assignee also specifically confirm that the sale and assignment by Assignor of the Assigned Interest is without recourse and without representation or warranty express or implied of any kind whatsoever (other than as specifically set forth herein or in the Settlement Agreement).

(b)    The "<u>Assigned Interest</u>" means (i) all rights of the Lender under the Loan Agreement and the other documents, instruments and agreements executed and delivered pursuant thereto or in connection therewith, including, without limitation the documents set forth on <u>Schedule 2</u> attached hereto, to the extent related to the amount and percentage interest identified below (including, without limitation, any letters of credit and/or guarantees to the

extent applicable), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as Lender or otherwise) against any Person whether known or unknown, arising under or in connection with the Loan Agreement or any of the other documents or instruments delivered pursuant thereto or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity, related to the rights sold and assigned described in clause (i) above.

(c)    Nothing in this Assignment shall limit, nullify, affect or waive any claim, suit, cause of action or any other right (i) against any borrower, guarantor, pledgor, endorser or indemnitor or other party directly or indirectly liable under Loan Agreement or any of the other documents, instruments or agreements delivered pursuant thereto or in connection therewith, or any of its affiliates or any of their respective officers, directors, members, partners, shareholders, employees, agents or counsel ("Borrower Parties"), or (ii) against any lender, agent, trustee, servicer or participant other than Lender.

4.    Assumption.  Assignee hereby irrevocably assumes from the Assignor all of the Assignor's duties, obligations and liabilities as a Lender under the Loan Agreement and the other documents and instruments delivered pursuant thereto described on Schedule 2 attached hereto and incorporated herein by reference ("Loan Assumption Documents") arising from and after the Execution Date to the extent related to the amount and percentage interest identified below (the "Assumed Interest"); provided further that Assignee shall not and does not assume any obligation or liability with respect to the Assumed Interest or the Loan Assumption Documents to the extent such obligation or liability arose out of any act, or omission of Assignor, its assigns, lenders, creditors, trustees, agents, servicers, representatives, officers, directors, employees or affiliates which arose or accrued during the period commencing on September 17, 2008 through but not including the Execution Date.

5.    Recourse.  The assignment made pursuant to this Assignment is being made without recourse, representation or warranty to the Assignor except as expressly provided in this Assignment or the Settlement Agreement.

6.    Description of the Loan.

(a)    Assignor:    LEHMAN RE LTD.

(b)    Assignee:    [LEHMAN COMMERCIAL PAPER INC.]

(c)    Borrower:

(d)    [Administrative Agent:]

(e)    Loan Agreement:  The Loan Agreement, dated as of _____, among Assignee acknowledges receipt of a copy of the Loan Agreement.

(f)     Percentage Interest:

| Maximum Original Aggregate Amount of Commitment/Loan for all Lenders | Principal Amount of Commitment/Loan Assigned as of Execution Date | Percentage Assigned of Commitment/Loan |
|---|---|---|
|  |  |  |

**SIGNATURES ON FOLLOWING PAGE**

The terms set forth in this Assignment are hereby agreed to by:

ASSIGNOR:

LEHMAN RE LTD., a Bermuda corporation in provisional liquidation

By:

Name: _____

Title: _____

ASSIGNEE:

LEHMAN COMMERCIAL PAPER INC., a New York corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:

Name: _____

Title: _____

**ANNEX 1 TO ASSIGNMENT AND ASSUMPTION**

**STANDARD TERMS AND CONDITIONS FOR**

**ASSIGNMENT AND ASSUMPTION**

1.      <u>Assignee's Address for Notices, etc</u>.  Attached hereto as <u>Schedule 1</u> is all contact information, address, account and other administrative information relating to the Assignee.

2.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic transmittal shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the principles of conflicts of law that would require the application of the laws of a jurisdiction other than New York.  all payments received after the Execution Date in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) shall be paid to the Assignee whether such amounts have accrued prior to or on or after the Execution Date.

3.      <u>No Third Party Beneficiaries</u>.  This Assignment is made for the sole protection and benefit of the Assignor and Assignee and their respective successors and assigns, and no other person shall have any right of action hereon, right to claim any right or benefit from the terms contained herein, or be deemed a third party beneficiary hereunder.

## SCHEDULE 1 TO ASSIGNMENT AND ASSUMPTION

Notice Address of Assignee:

Lehman Commercial Paper Inc.
1271 Avenue of the Americas, 38th Floor
New York, New York 10020
Attn:   Joelle Halperin
Telephone: (646) 285 -9066
Facsimile: (646) 834-0874

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Richard A. Morrison
Telephone: (212) 310-8853
Facsimile: (212) 310-8007

Wire Instructions of Assignee:

## <u>SCHEDULE 2 TO ASSIGNMENT AND ASSUMPTION</u>

### LIST OF LOAN ASSUMPTION DOCUMENTS

1.

**FORM OF ALLONGE**

**ALLONGE**
**([NAME OF LENDER/LOAN])**

FOR VALUE RECEIVED, the undersigned, as the holder of that certain [Promissory Note], dated as of [_____], made payable by [NAME OF BORROWER], a [_____], to the undersigned, in the stated principal amount of $[_____], and to which this Allonge is affixed (as thereafter amended and/or restated, the "Note") hereby assigns, transfers, endorses, negotiates and sets over to and makes payable to the order of _____, effective as of _____, 2011, without recourse, representation or warranty of any kind or nature whatsoever, the Note and all interest, principal and all other sums due or to become due under the Note.

Dated as of _____, 2011

                    LEHMAN RE LTD.

                    By:
                    Name:
                    Title:

**EXHIBIT F**

PACIFIC POINT LITIGATION

That certain adversary proceeding, Adv No. 8:09-ap-01005-ES (Bankr. C.D. Cal.), pending in the voluntary and involuntary cases filed under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California styled *In Re Palmdale Hills Property, LLC, and its Related Debtors*, all of which cases are being jointly administered under Case Number 8:08-bk-17206-ES.

# EXHIBIT G

## FORM OF 237 RELEASE

This mutual release ("Mutual Release") is made as of the 16th day of February, 2012 by and between Dan Schwarzmann and Garth Andrew Calow, solely in their capacity as Joint Provisional Liquidators (the "JPLs") of Lehman Re Ltd. ("Lehman Re"), on the one hand, and Broadway Partners Fund Manager, LLC; Broadway Partners Fund GP II, L.P.; Broadway Partners Fund GP III, L.P.; Broadway Partners Real Estate Fund III, L.P. ("Fund III"); Broadway Partners Parallel Fund B III, L.P. ("Fund B"); Broadway Partners Parallel Fund P III, L.P. ("Fund P"); and Scott Lawlor (collectively, the "Broadway Parties"), on the other.

1.      Lehman Re Release.  In consideration of the Broadway Parties' release below and that certain settlement agreement (the "Settlement Agreement"), dated February 16, 2012, between Lehman Re and Pulsar Re Ltd., on the one hand, and Lehman Brothers Holdings Inc. ("LBHI") and various affiliates of LBHI, on the other (the "Lehman Settling Parties"), Lehman Re, on behalf of itself, its estate, its affiliates, subsidiaries, and successors or assigns, expressly releases, discharges and waives, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages (whether general, special or punitive), liabilities, obligations, judgments, executions, debts, costs and causes of action of whatever nature, whether asserted or unasserted, fixed or contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time and whether based on contract, tort, statute or other legal or equitable theory of recovery, unsecured, secured, priority, administrative or otherwise, that Lehman Re may have against the Broadway Parties and/or any of their respective affiliates, officers, directors, shareholders, partners, members, subsidiaries, employees, agents, counsel, representatives, participants, successors or assigns of any and all of the foregoing, including, without limitation, any such claims arising under in connection with or relating in any manner to (i) that certain termination agreement (the "Termination Agreement"), dated July 2, 2009, by and among the Broadway Parties and LBHI, or the transactions contemplated thereby, and/or (ii) all claims, causes of action or defenses asserted, or that could be asserted, by or on behalf of Lehman Re in that certain litigation identified as *D. Geoffrey Hunter and Dan Schwarzmann, as Joint Provisional Liquidators of Lehman Re, Ltd.. v. Broadway Partners Real Estate Fund III, L.P., et al.*, Case No. 09-14884 (JMP), Adv. Proc. No. 10-03279 (the "237 Adversary Proceeding"), or in any of the documents, pleadings, proofs of claim, instruments, agreements or transactions described, referenced or contemplated therein.

2.      Broadway Parties Release.  In consideration of Lehman Re's release above, the Broadway Parties, on behalf of themselves and their respective affiliates, subsidiaries, and successors or assigns, expressly release, discharge and waive, unconditionally and irrevocably, any claims, counterclaims, defenses, rights of setoff, debts, liens, losses, demands, damages (whether general, special or punitive), liabilities, obligations, judgments, executions, debts, costs and causes of action of whatever nature, whether asserted or unasserted, fixed or contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time and whether based on contract, tort, statute or other legal or equitable theory of recovery, unsecured, secured, priority, administrative or otherwise, that the Broadway Parties may have against Lehman Re and/or any of its current or former JPLs, affiliates, officers, directors, shareholders,

partners, members, employees, agents, counsel, representatives, participants, successors or assigns of any and all of the foregoing, including, without limitation, any such claims arising under in connection with or relating in any manner to (i) the Termination Agreement, and/or (ii) all claims, causes of action or defenses asserted, or that could be asserted, by or on behalf of the Broadway Parties in the 237 Adversary Proceeding, or in any of the documents, pleadings, proofs of claim, instruments, agreements or transactions described, referenced or contemplated therein.

3.    Condition Precedent.  This Mutual Release shall not become effective unless and until the Closing (as that term is defined in the Settlement Agreement) of the Settlement Agreement between Lehman Re and the Lehman Settling Parties.  Lehman Re shall promptly provide written notice to the Broadway Parties that the Settlement Agreement has closed, including the date of such Closing.

4.    Withdrawal of 237 Adversary Proceeding.  Within ten business days following the Closing Date (as that term is defined in the Settlement Agreement), Lehman Re shall withdraw and dismiss with prejudice all claims, causes of action and defenses arising under, in connection with, or relating in any manner to the 237 Adversary Proceeding.

5.    Entire Agreement.  This Mutual Release embodies the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto.  The parties acknowledge that this Mutual Release is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein.

6.    Modification and Waiver.  No modification of, or amendment to, this Mutual Release shall be valid unless it is in writing and signed by the parties hereto.  No provisions of the Mutual Release may be waived unless in writing, signed by the party to be charged therewith.  Waiver of any one provision shall not be deemed to be a waiver of any other provision.

7.    Execution.  This Mutual Release may be executed in multiple counterparts, and all such counterparts shall constitute one and the same instrument.  The Mutual Release shall be deemed to have been executed and delivered where the parties each execute and exchange counterparts thereof, which may be accomplished by facsimile, other electronic format (including ".pdf") or in person.

8.    Attorneys Fees.  Lehman Re and the Broadway Parties agree to pay their own costs, expenses, and attorneys fees relating to the 237 Adversary Proceeding and this Mutual Release, and neither Lehman Re nor the Broadway Parties will seek from one another any costs, expenses, and/or attorneys fees relating to the 237 Adversary Proceeding and this Mutual Release.

9.    Representations and Warranties of Lehman Re.  Lehman Re hereby represents and warrants to the Broadway Parties that, as of the date hereof:

(a)    This Mutual Release has been duly authorized, executed and delivered by Lehman Re, and Lehman Re has full power and authority to enter into this Mutual Release and to carry out and perform the terms hereof.

G-2

(b)    The execution and delivery of this Mutual Release by Lehman Re and the performance by Lehman Re of its obligations hereunder does not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Lehman Re is a party or by which it is bound, or any order or decree applicable to Lehman Re.

(c)    Lehman Re has not transferred or assigned to any other person any of the claims that are the subject of this Mutual Release.

(d)    Lehman Re, as lender, is the sole and exclusive owner and holder of that certain loan (the "Loan") in the original principal amount of $107,514,501.51 originally made by LBHI, as lender, to 237 Third Junior Mezz LLC ("Borrower"), as borrower, pursuant to that certain Subordinate Bridge Mezzanine Loan Agreement, dated as of July 24, 2007, effective as of July 10, 2007 between LBHI and Borrower, as amended by that certain Agreement, dated as of March 19, 2008, by and between LBHI, 237 Park Second Junior Mezz LLC and Borrower (collectively, the "Loan Agreement"), and Lehman Re has not sold, assigned, pledged, transferred, encumbered or otherwise conveyed its direct or indirect interest in the Loan to any other party, except as the Loan may be transferred to a Lehman Settling Party as provided for in the Settlement Agreement.

10.    Representations and Warranties of the Broadway Parties.  The Broadway Parties hereby represent and warrant to Lehman Re that, as of the date hereof:

(a)    This Mutual Release has been duly authorized, executed and delivered by the Broadway Parties, and the Broadway Parties have full power and authority to enter into this Mutual Release and to carry out and perform the terms hereof.

(b)    The execution and delivery of this Mutual Release by the Broadway Parties and the performance by the Broadway Parties of their respective obligations hereunder does not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which the Broadway Parties are a party or by which they are bound, or any order or decree applicable to the Broadway Parties.

(c)    The Broadway Parties have not transferred or assigned to any other person any of the claims that are the subject of this Mutual Release.

11.    Governing Law.  This Mutual Release and all claims and disputes arising out of or in connection with this Mutual Release, shall be governed by and construed in accordance with the laws of the State of New York and Title 11 of the U.S. Code (the "Bankruptcy Code"), without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

12.    Notwithstanding anything to the contrary contained herein, nothing contained herein shall release or modify any obligations of the Borrower or any of the Broadway Parties under the Loan Agreement or any of the other loan documents executed by Borrower in connection therewith. or any obligations of Broadway Guarantor under the Environmental Indemnity or the Carve-out Guaranty.  As used in this paragraph, (i) "Broadway Guarantor" means, collectively, Fund B, Fund P and Fund III, (ii) "Environmental Indemnity" means that

G-3

certain Environmental Indemnity Agreement (Subordinate Bridge Mezzanine Loan), dated as of July 24, 2007, effective July 10, 2007, from Borrower and Broadway Guarantor to LBHI, and (iii) "Carve-out Guaranty" means that certain Guaranty of Recourse Obligations of Borrower (Subordinate Bridge Mezzanine Loan), dated as of July 24, 2007, effective July 10, 2007, from Broadway Guarantor to LBHI.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, each party by his or its duly authorized representative has executed this Mutual Release as of the date first written above:

**LEHMAN RE**:

LEHMAN RE LTD.,
a Bermuda corporation in provisional liquidation

By: _____
      Dan Schwarzmann, in his capacity as Joint Provisional
      Liquidator of Lehman Re Ltd., without personal liability

[Signatures Continue On Following Page]

**BROADWAY PARTIES:**

BROADWAY PARTNERS REAL ESTATE FUND III, L.P.,
a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P.,
  a Delaware limited partnership, its general partner

  By:  Broadway Partners Fund GP III, LLC, a
    Delaware limited liability company,
    its general partner


    By: _____
      Name: Jason P. Semmel
      Title:   Authorized Signatory


BROADWAY PARTNERS PARALLEL FUND B III, L.P.,
a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P.,
  a Delaware limited partnership, its general partner

  By:  Broadway Partners Fund GP III, LLC, a
    Delaware limited liability company,
    its general partner


    By: _____
      Name: Jason P. Semmel
      Title:   Authorized Signatory



BROADWAY PARTNERS PARALLEL FUND P III, L.P.,
a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P.,
  a Delaware limited partnership, its general partner

  By:  Broadway Partners Fund GP III, LLC, a
    Delaware limited liability company,
    its general partner


    By: _____
      Name: Jason P. Semmel
      Title:   Authorized Signatory

BROADWAY PARTNERS FUND GP III, L.P.,
a Delaware limited partnership

By:  Broadway Partners Fund GP III, LLC,
        a Delaware limited liability company,
        its general partner


        By: _____
              Name: Jason P. Semmel
              Title:   Authorized Signatory


BROADWAY PARTNERS FUND GP II, L.P.,
a Delaware limited partnership

By: Broadway Partners Fund GP II, LLC,
        a Delaware limited liability company,
        its general partner


        By: _____
              Name: Jason P. Semmel
              Title:   Authorized Signatory


BROADWAY PARTNERS FUND MANAGER, LLC,
a Delaware limited liability company


By: _____
      Name:
      Title:


SCOTT LAWLOR, an individual


_____

**EXHIBIT H**

<u>SURVIVING CONTRACTS</u>

1.    The 2009 Settlement Agreement and all assignment and assumption agreements, allonges, and other transfer documentation executed thereunder.

**EXHIBIT I**

<u>DEBTOR ALLOCATION AGREEMENT</u>

This agreement (the "<u>Debtor Allocation Agreement</u>") is entered into as of [ ], 2011, by and among the Debtors[1] and certain of their affiliated Non-Debtors[2] (collectively, the "<u>Parties</u>" and each a "<u>Party</u>").

<u>Recitals</u>

A.    On September 15, 2008 or on various dates thereafter (the "<u>Commencement Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which, together, are being jointly administered under Case Number 08-13555 (JMP) (the "<u>Chapter 11 Cases</u>").

B.    On September 1, 2011, the Debtors filed with the Bankruptcy Court the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (as it may be further amended or modified, the "<u>Plan</u>").

C.    The Parties have agreed that it is appropriate to enter into this Debtor Allocation Agreement with respect to the rights and obligations not otherwise set forth in the Plan for the expenses of administration of the Parties' assets (including the fees and expenses of the indenture trustees and members of the Creditor's Committee Allowed pursuant to Section 6.7 of the Plan), the costs and benefits of Jointly Owned Litigation Claims (as that term is defined in

---

[1]    As used herein, "Debtors" refers to Lehman Brothers Holdings Inc. ("<u>LBHI</u>"); Lehman Brothers Special Financing Inc.; Lehman Commercial Paper Inc.; Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc.; Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; and PAMI Statler Arms LLC.

[2]    As used herein, "Non-Debtors" refers to the non-Debtor parties that are signatories hereto.

the Plan), and commonly held tax benefits and obligations (including those tax benefits and obligations to be allocated pursuant to an order of the Bankruptcy Court, dated May 18, 2011).

<b><u>Agreement</u></b>

1) <u>**Definitions**</u>.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

2) <u>**Expenses of Administration of the Parties' Assets and Liabilities**</u>.

    a) The expenses of the administration of the Parties' assets and liabilities shall be allocated by the Plan Administrator pursuant to one or more agreements that are effectuated subsequent to the Effective Date and that are approved by the respective boards of directors or managers of the relevant Parties.

    b) LBSF shall have an Allowed Administrative Expense Claim against LBHI in the amount of $300 million, which shall be satisfied in accordance with Section 6.3 of the Plan.

3) <u>**Costs and Benefits of Jointly Owned Litigation Claims**</u>.  The costs and benefits of Jointly Owned Litigation Claims shall be allocated by the Plan Administrator pursuant to one or more agreements that are effectuated subsequent to the Effective Date and that are approved by the respective boards of directors or managers of the relevant Parties.

4) <u>**Commonly Held Tax Benefits and Obligations**</u>.  The following comprise the agreements in principle among the Parties relating to their respective rights and obligations with respect to the allocation of any tax liabilities, refunds or readjustments for periods prior to, during and after the Effective Date, and shall be binding on the Parties, subject to any future amendments.[3]

---

[3]     Notwithstanding anything to the contrary herein, (i) Aurora Bank F.S.B. and Woodlands Commercial Bank and their respective Subsidiaries, which have separate tax allocation agreements, shall not be bound by or have the benefit of this Paragraph 4, and (ii) the term "<u>Parties</u>" as used in this Paragraph 4 shall not include any Party that is a foreign entity.  The term "<u>Controlled Subsidiary</u>" wherever used within this Paragraph 4 shall mean any non-Party

I-2

a) *Tax Liabilities and Readjustments for Pre-2009 Taxable Years – Group Taxes.*

    i) <u>Handling of Audits and Other Tax Proceedings.</u>  The Parties acknowledge and agree that LBHI is, and shall continue to be, authorized to undertake any and all actions that are within the scope of LBHI's authority under applicable Treasury Regulations or state or local law, as the common parent of the tax filing group, in connection with any audit, examination or other tax proceeding involving taxes filed on a group basis.

    ii) <u>Allocation of Tax Liabilities and Compensation for Use of Other Member Tax Benefits.</u>  For pre-2009 taxable years, LBHI shall calculate the amount payable (or for which a Claim would otherwise be Allowed, as provided in Paragraph 4(a)(ii)(2) and (3) below) by or to a Party or a Controlled Subsidiary with respect to any group tax liability, and the use of one member's income against another member's losses, credits or other tax benefits, as follows:

        (1) <u>Computation of Tentative Separate Company Tax Liability.</u>

            (a) LBHI has computed, and shall continue to compute (or recompute, in the event of subsequent adjustments, such as due to an amended return, a subsequent audit, an Allowed Claim filed by a taxing authority or otherwise), each member's "Tentative Separate Company Tax Liability."

                (i) As to each group tax (inclusive of interest and penalties), a member's "Tentative Separate Company Tax Liability" shall be equal to the amount that would have been payable (if payment was not impaired by the Debtors' bankruptcy cases or otherwise) by the member to LBHI based on historic tax sharing principles utilized by LBHI with respect to the allocation of group tax liabilities and applicable consolidated return regulations (including, without limitation, the application and absorption of any consolidated net operating loss, capital loss, or credit carried back or forwards consistent with the principles of Treasury Regulation Section 1.1502-79, and payment for the use of another member's tax benefits).

                (ii) In connection with the reallocation and redetermination of a member's liability resulting from the New York State tax settlement approved by the Bankruptcy Court on May 18, 2011, and any other settlement of a group tax, LBHI shall, to the extent that issues were resolved on a collective group and not individual entity basis, equitably determine each member's Tentative Separate Company Tax Liability with respect to such group taxes, taking into account (in the case of the New York State settlement) the manner in which any comparable issue was resolved for New York City tax purposes.

---

domestic direct or indirect subsidiary of a Party that is part of LBHI's federal consolidated tax group or as to which a Party has at least 50% direct or indirect control (excluding, however, LBI, Lehman Re Ltd., and Townsend Analytics Ltd.; it being understood that such companies may still be members of an applicable tax filing group for computational purposes).

---

(b) In a similar manner to that described in subsection (a) above, LBHI has computed, and shall continue to compute (and as applicable, recompute), the amount that would have been payable to a member whose tax benefits were used to offset the income of other members of the group (herein referred to as a member's "Tentative Separate Company Tax Receivable").

(2) Payment of Allowed Priority and Administrative Claims for Group Taxes.  Each Debtor against whom a taxing authority has an Allowed Priority Tax Claim or an Allowed Administrative Expense Claim for a group tax liability for any taxable year, and each non-Debtor Controlled Subsidiary, shall pay over to LBHI as agent (in installments, if applicable) its allocable portion of the outstanding tax liability for such taxable year prior to the due date(s) of such liability, and in turn, LBHI shall pay the collective amount over to the taxing authority.  For this purpose, a member's allocable portion of such outstanding tax liability shall be equal to the ratio that (A) the increase in such member's Tentative Separate Company Tax Liability for the year (resulting from the adjustments giving rise to the additional group liability) bears to (B) the aggregate increase in the Tentative Separate Company Tax Liability of all members for the year (resulting from such adjustments); provided, however, that LBHI shall adjust such allocation as appropriate to take into account any special limitations on the ability of losses or credits to offset certain types of income.

(3) Affiliate Claim and Payment of Remaining Amounts.

(a) LBHI shall have an additional Allowed Affiliate Claim, payable in accordance with the Plan, against each Debtor in the amount by which its Tentative Separate Company Tax Liability exceeds the sum of (x) the amount payable by the Debtor under Paragraph 4(a)(ii)(2) above and (y) any amounts payable already reflected in an Allowed Affiliate Claim of LBHI, or otherwise previously paid to LBHI, with respect to such tax liability.  In the case of a non-Debtor Controlled Subsidiary, such entity shall promptly pay to LBHI the amount by which its Tentative Separate Company Tax Liability exceeds the sum of (x) the amount payable by the Debtor under Paragraph 4(a)(ii)(2) above and (y) any amounts payable already reflected in an intercompany account, or previously paid to LBHI, with respect to such tax liability.

(b) In the case of a Party or Controlled Subsidiary that has a Tentative Separate Company Tax Receivable, such Party or Controlled Subsidiary shall have an Allowed Affiliate Claim against LBHI in the amount by which (x) its Tentative Separate Company Tax Receivable exceeds (y) any amounts receivable already reflected in an Allowed Affiliate Claim against LBHI, or otherwise previously paid by LBHI, with respect to such Tentative Separate Company Tax Receivable.

I-4

iii) <u>Allocation of Cash Tax Refunds</u>.

    (1) Any Cash tax refunds (including any interest received, net of any taxes incurred by LBHI with respect to the receipt of the refund) shall be allocated by LBHI among the Parties and their Controlled Subsidiaries based on (i) the decrease in such member's Tentative Separate Company Tax Liability (expressed as an absolute number) or the increase in such member's Tentative Separate Company Tax Receivable, as applicable, resulting from the adjustments giving rise to the tax refund relative to (ii) the sum of the individual decreases in the Tentative Separate Company Tax Liability of all members resulting from such adjustments (expressed as a positive number) and the individual increases in the Tentative Separate Company Tax Receivable of all members resulting from such adjustments; <u>provided, however</u>, that LBHI shall adjust such allocation as appropriate to take into account any special limitations on the ability of losses or credits to offset certain types of income.

    (2) As soon as practicable following the receipt of the tax refunds, LBHI shall pay such to each Party and Controlled Subsidiary its allocable portion of such tax refund.

iv) <u>Non-Payment of Allocated Tax Liability</u>.  In the event any member of the group (including LBI) does not pay its allocable portion of any Allowed Claim for a group tax liability, whether or not required to pay under this Debtor Allocation Agreement, such liability shall (i) in the case of a non-Debtor Subsidiary (other than LBI and other non-Controlled Subsidiaries), be borne by the Debtor that owns (directly or indirectly, but disregarding any indirect ownership through another Debtor) the stock of such Controlled Subsidiary, and (ii) in all other cases (including any liability unable to be satisfied in accordance with the preceding clause), be borne by the other Debtors that are members of the applicable tax group in accordance with each such Debtor's "Net Distributable Assets" relative to all such Debtors, as reflected in Exhibit 4 to the Disclosure Statement; <u>provided</u>, <u>however</u>, that no member shall be liable under clause (ii) for a liability for which the Debtor did not have joint or several liability under an Allowed Claim.

b) *Filing of Group Returns:  Taxable Years 2009 and After.*

    i) <u>Consent to File</u>.  The Parties acknowledge and agree to continue to join in the filing of federal consolidated income tax returns (a "<u>Consolidated Return</u>") for taxable periods ending after the Effective Date, and to cause all Controlled Subsidiaries to consent, to the extent necessary, in the filing of Consolidated Returns throughout the remainder of the liquidation of the Debtors pursuant to the Plan, absent an amendment to or termination of this Debtor Allocation Agreement.

    ii) <u>Preparation of Returns</u>.  LBHI shall prepare and file all required Consolidated Returns and such applications for extension of time to file such Consolidated Returns. The Parties agree, and shall cause their Controlled Subsidiaries to agree, that LBHI shall be authorized to undertake any and all actions that are within the scope of

LBHI's authority under applicable Treasury Regulations as the common parent of the consolidated group.

iii) <u>Allocation of Tax Liabilities and Compensation for Use of Other Member Tax Benefits</u>.  LBHI shall allocate the federal consolidated tax liability for each taxable year ending after 2008 among the members and determine amounts payable to or by a member with respect to the use of one member's income against another member's losses, credits or other tax benefits as follows:

(1) Subject to subsection (2) below, the consolidated tax liability shall be allocated, and members will be compensated for use of their tax benefits and other members charged for the use of such tax benefits, on the basis of the historic tax sharing principles utilized by LBHI with respect to the allocation of group tax liabilities and applicable consolidated return regulations (including, without limitation, the application and absorption of any consolidated net operating loss, capital loss, or credit carried back or forwards consistent with the principles of Treasury Regulation Section 1.1502-79).  Accordingly, even if the consolidated group has no taxable income on a group basis, a member that has net income will be required to make a tax payment in compensation for use of another member's losses.  All tax payments shall be made to LBHI, and LBHI shall make all compensating payments to the loss member.

(2) With respect to taxable years ending after the Effective Date, a member whose net income is offset by another member's losses shall only be required to make a tax payment equal to 1/3rd of the amount that would otherwise be due in respect of the use of such losses under subsection (1), and shall only be required to make additional tax payment(s) for the remainder if and when such losses would have been used by the loss member; and the loss member shall only be compensated for the use of its losses on a similar ⅓-⅔ basis.

(3) If a consolidated tax liability is adjusted for any taxable period, whether such adjustment is by means of an amended return, claim for refund, examination by the IRS reduced to settlement or otherwise determined, or otherwise, the calculations made under this Paragraph shall be recomputed by giving effect to such adjustments, and true-up payments shall be made as appropriate.  Any interest and/or penalty not specifically allocated to a particular member by the IRS may be allocated to a member upon such basis as LBHI deems just and proper in view of all applicable circumstances.

c) *State and Local Group Taxes.*  To the extent two or more Parties or Controlled Subsidiaries join (or are required to join) together in the filing of a group return for state or local tax purposes for taxable periods ending after the Effective Date, any taxes, refunds and adjustments shall be allocated among the members in accordance with the principles within this Article.  In the event that a Party other than LBHI is the common parent of a state or local tax filing group, the provisions of this Paragraph 4(c) shall apply in accordance with the principles of this Article, substituting such Party for LBHI.

d) *Reservation of Rights.*  Nothing herein shall prejudice or enhance any right that a Party may have to setoff or recoup an amount it owes to another Party against an amount it is owed by such Party, whether pursuant to this Debtor Allocation Agreement or otherwise.

e) *Cooperation; Record Retention.*  The Parties shall each cooperate fully (and each shall cause its respective Controlled Subsidiaries to cooperate fully) with all reasonable requests from another Party in connection with the preparation and filing of returns (including any schedules, consents, elections, information statements or claims for refunds), tax proceedings, and calculations of amounts required to be paid pursuant to this Debtor Allocation Agreement, in each case, related or attributable to or arising in connection with taxes of any of the Parties or their respective Controlled Subsidiaries covered by this Debtor Allocation Agreement and the establishment of any reserve required in connection with any financial reporting.  In furtherance thereof, the Parties shall (i) make available, and shall cause all Controlled Subsidiaries to make available, to LBHI all materials (including, without limitation, all books and records, accounting information, financial statements, returns, supporting schedules, work papers, correspondence, and other documents) relating to the group returns as to which this Paragraph is applicable during regular business hours, and (ii) retain, and shall cause all controlled Subsidiaries to retain, all returns, schedules and workpapers, and all material records or other documents relating thereto in their possession, until sixty (60) days after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such returns and other documents relate or until the expiration of any additional period that any Party reasonably requests, in writing, with respect to specific material records or documents.  Any Party or Controlled Subsidiary intending to destroy any such material records or documents after such period shall provide LBHI with reasonable advance notice and the opportunity to copy or take possession of such records and documents.

f) *Standard of Care; Limited Warranty.*  LBHI shall perform all duties to be performed by it under this Paragraph 4 with a degree of skill, diligence and prudence with which LBHI and its personnel have performed such services for the LBHI consolidated group subsequent to September 15, 2008 and prior to the Effective Date and shall be of substantially equivalent quality.  THE PRECEDING IS THE ONLY WARRANTY CONCERNING THE DUTIES TO BE PERFORMED BY LBHI UNDER THIS DEBTOR ALLOCATION AGREEMENT AND ANY RESULTS, WORK PRODUCT OR PRODUCTS RELATED THERETO, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS EXPRESSED OR IMPLIED.

5) **General Provisions.**

   a) *Effectiveness.* Pursuant to section 6.3 of the Plan, this Debtor Allocation Agreement shall become effective on the Effective Date.

   b) *Successors and Assigns.* This Debtor Allocation Agreement shall bind and inure to the benefit of the respective successors and assigns of the Parties, but no assignment shall relieve any Party's obligations hereunder without the written consent of the other Parties, which shall not be unreasonably withheld.

   c) *Entire Understanding; Amendment.* This Debtor Allocation Agreement contains the entire understanding of the Parties with respect to the subject matter contained herein. This Agreement may not be amended without the written consent of each of the affected Parties. The Parties recognize and acknowledge their intention to enter into additional agreements as contemplated by this Debtor Allocation Agreement.

   d) *Governing Law; Exclusive Jurisdiction.* The validity, interpretation, and performance of this Debtor Allocation Agreement shall be controlled and construed under the laws of the State of New York. The Parties agree that, without limiting any Party's right to appeal to final decision, the appropriate and exclusive forum for resolving any disputes between the Parties arising out of this Debtor Allocation Agreement shall be the Bankruptcy Court, or, if such court will not hear any such suit, the United States District Court for the Southern District of New York, and, the Parties hereto irrevocably consent to the exclusive jurisdiction of such courts, and agree to comply with all requirements necessary to give such courts jurisdiction.

   e) *Notice.* All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to

the Party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next day that is none of a Saturday, Sunday, United States federal holiday, a New York state holiday (each a "Business Day"), (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

To any Party at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020U.S.A.
Attn: Plan Administrator
Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife, Esq.
Facsimile: (212) 310-8007

f) *Counterparts.*    This Debtor Allocation Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Debtor Allocation Agreement to present any copy, copies, or facsimiles signed by the Parties.

g) *Termination.*    This Debtor Allocation Agreement will terminate upon the earlier of the dissolution of all the Parties, or the mutual written agreement of the Parties.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Debtor Allocation Agreement as of the date indicated below.

# EXHIBIT J

## TAX ALLOCATION AGREEMENT

This **AGREEMENT** made effective as of _____, is by and between Lehman Brothers Holdings Inc., a Delaware corporation, (hereinafter referred to as "LBHI") and its operating subsidiaries (hereinafter referred to as "the Subsidiaries"). Collectively, LBHI and its subsidiaries will be referred to as "the Parties".

WHEREAS, LBHI is the parent corporation of an affiliated group of corporations (hereinafter referred to as "the Group") within the meaning of § 1504(a) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "Code"), for purposes of the Agreement, the subsidiaries consist of reporting entities and non-reporting entities.

WHEREAS, it is the desire and intention of the Parties to have federal and state/local tax liabilities allocated to the Subsidiaries in a manner which will preserve the economic rights and privileges of the Subsidiaries as if it would have filed its returns on a separate legal entity basis; and

WHEREAS, it is the desire and intention of the Parties to have the current and deferred tax liabilities or benefits of the Subsidiaries provided for as if the Subsidiaries would have filed its returns on a separate legal entity basis;

WHEREAS, the Parties wish to amend and restate the Tax Allocation Agreement, as provided herein;

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the Parties agree as follows:

### Section 1 – Definitions

1.01 **"Reporting entities"** shall mean those entities that are currently required to provide separate company financial statements. Attached as Exhibit A is a list of reporting entities; all excluded entities are considered non-reporting entities.

1.02 **"Non -Reporting entities"** shall mean those entities that are not reporting entities.

### Section 2 - Agreement to File
### Consolidated Federal Income Tax Returns

2.01 **Agreement to File.** The Parties hereby agree that the subsidiaries will be incorporated into the Group's consolidated U.S. Federal Income Tax Return.

2.02 **Elections.** All elections that are available to the Group or any of its members under the Code and Regulations, relating to the filing of consolidated Federal income tax returns, shall be made by LBHI at its sole discretion in determining the LBHI Group's Tax Liability.

2.03 **Payment of Tax.** LBHI will remit the Group's federal income tax liability to the appropriate government agency, including estimated taxes, on behalf of the Group.

## Section 3 – Agreement to File
## State/Local Income Tax Returns

3.01 **Filing State/Local Income Tax Returns.**  The Parties hereby agree that the LBHI Corporate Tax Department shall determine and dictate the methodology and format for the filing of state and local income or franchise tax returns by the subs, including their inclusion in combined, affiliated or consolidated returns where appropriate.  Such determination shall be made by the LBHI Corporate Tax Department in accordance with the applicable statutes and rules of each particular jurisdiction.

## Section 4 – Allocation of Tax Liability

4.01 **Federal Income Tax Liability/Benefit.**  The current tax liability or benefit of each entity will be computed by multiplying each separate entity's taxable income/loss by 35% (or the applicable federal statutory income tax rate) plus any other adjustments affecting the liability including tax credits.  LBHI's Corporate Tax Department will be responsible for the calculation as well as making all decisions impacting the federal consolidated income tax return of the Group.

4:02 **Unutilized Federal Income Tax Loss/Benefit.**  If an entity has an income tax loss or benefit that could not be utilized either currently or in a carryback year on a separate entity basis,  but which is utilized in whole or part in a current or prior consolidated return, the separate entity's tax liability or benefit will be adjusted currently.

4.03 **Consolidated Federal Alternative Minimum Tax ("AMT") Liability.**  In the event LBHI's consolidated income tax obligation arising from the AMT exceeds its regular tax on a consolidated basis, any allocation of the excess among the members of the Group shall be done consistently and equitably.

4.04 **State/Local Income Tax Liability or Benefit.**  The state/local income tax liability or benefit will be computed based on the separate legal entity taxable income multiplied by the applicable jurisdictions' respective allocation factors and tax rates except for entities that file as part of a combined group required by some states such as New York.  The state/local income tax liability or benefit of entities that are members of a combined return will be computed by applying the group's combined state tax rate to its each entities respective taxable income.   A state/local tax liability based on an alternative tax method will be allocated to  each entity to the extent it has an alternative liability on a separate entity basis.  It is the intent of the parties hereto that the concepts and methods defined in this Agreement for allocation of Federal income taxes be applied in a similar manner to tax liability assessed by state/local taxing jurisdictions where there is combined tax liability between the Parties.

## Section 5 – Deferred Taxes

5.01 **Amount of Deferred Taxes.**

**a.) Reporting Entities** - Deferred taxes, reflected either as an asset or liability, shall be computed by each of the entities on a separate entity basis.

**b.) Non-Reporting Entities** - Each non-reporting entity computes deferred taxes on a separate entity basis. Then, each entities respective deferred tax balance is allocated to the parent.

5.02 **No Payment for Deferred Taxes.** The entities will not tender or accept payment relative to its separately computed deferred tax liabilities/benefits, unless a separate agreement is entered into between parent and subsidiary that specifies that payment of deferred taxes will occur.

## Section 6 – Refund/Payment Policy

6.01 **Payment Policy.** The payment method is dependent upon whether the entity is a reporting entity or non reporting entity. The distinction between the two groups only relates to the timing of income tax payments to LBHI, the common paymaster for the federal return and certain combined and unitary returns.

6.02 **Reporting Entities.** Each reporting entity will pay or receive cash from Holdings periodically and should not exceed the amount which the entity has recorded as its current tax liability or receivable on a separate entity basis. Estimated tax payments paid to LBHI should not be made prior to that time at which the entity would have been required to tender such amount to the appropriate tax authority had it filed as a separate entity. Any refunds shall be tendered to the entity regardless of whether the Group is receiving a refund.

6.03 **Non-Reporting Entities.** Each non-reporting entity will pay or receive cash from Holdings monthly and should not exceed the amount which the entity has recorded as its current tax liability or receivable on a separate entity basis. This will mechanically occur by reflecting each month's payable/receivable in the intercompany account between Holdings and the separate entity.

6.04 **Payment (Refund) of State Tax.** The state and local payment policy is not only effected by whether an entity is "reporting" or "non-reporting," but it is also affected by whether the entity files as part of combined or unitary group.

6.05 **Income Tax Benefit.** LBHI will pay the Subsidiaries for separate company net operating losses, capital loss carryovers, charitable contributions, Section 1231 gains and losses, general business credits, etc., (collectively referred to herein, as "Losses") generated by it, that are used in the consolidated return of the Group to the extent those Losses may be utilized by the Company on a separate return basis. Should the Subsidiaries incur Losses for income tax return purposes that it could utilize currently if it filed its return on a separate entity basis, it will record a current income tax benefit. Within a reasonable time of the date when the subsidiaries would have filed its return utilizing such loss, if it had been on a separate entity filing basis, it will be entitled to receive a refund from LBHI in an amount no less than the amount of such loss. This refund shall be tendered to the Subsidiaries regardless of whether the Group is receiving a refund

J-3

6.06 **No Forgiveness**. LBHI will not, under any circumstances, forgive a tax liability owed to it by each entity.

6.07 **Policy Deviations**. The Treasurer of Holdings may, at his sole discretion, approve requests for payment policy deviations.

### Section 7 – Refund/Payment Policy
### Members of the Combined / Unitary Returns

7.01 **Reporting Entities**. Each reporting entity will pay or receive cash from LBHI periodically and should not exceed the amount which the entity has recorded as its current tax liability or receivable on a separate entity basis. Estimated tax payments paid to LBHI should not be made prior to that time at which the entity would have been required to tender such amount to the appropriate tax authority had it filed as a separate entity. Any refunds shall be tendered to the entity regardless of whether the Group is receiving a refund.

7.02 **Non-Reporting Entities**. Each non-reporting entity will pay or receive cash from LBHI monthly and should not exceed the amount which the entity has recorded as its current tax liability or receivable on a separate entity basis. This will mechanically occur by reflecting each month's payable/receivable in the intercompany account between LBHI and the separate entity.

7.03 **Non- Members**. Non-members will pay cash directly to the specific state and local taxing authority on a periodic basis (or other method prescribed by taxing authority) based on the separate entity's taxable income.

### Section 8 - Recomputations and Adjustments

8.01 **IRS or Other Taxing Authority's Adjustment of Group Tax Liability**. If any item of income, loss, expense, or a credit is changed or adjusted by the IRS or other taxing authority, and such change or adjustment is part of a final determination, then the Parties hereby agree that the calculation of the separate tax of each entity shall be recomputed so as to reflect such revision. Appropriate payments will be tendered by or to the entity, if required as a result of such recomputation. The entity will be charged or credited with interest and/or penalties resulting from such adjustments and recomputations.

8.02 **Other Recomputations.** If there is any change of or adjustment to any item relating to the computation of payments under this AGREEMENT of a type not provided for in Section 6.01 above (such as a recomputation of amounts due hereunder to reflect a carryback of an item of loss or credit, or a correction of any erroneous calculation previously made hereunder), then the entity shall make or receive such payments as may be necessary and appropriate to reflect the intent of this AGREEMENT.

## Section 9 - Miscellaneous Provisions

9.01 **New Members.** Each of the parties to this agreement recognizes that from time to time new subsidiaries may be added to the Parent group. Each of the parties agrees that any new subsidiary that qualifies hereunder as a Subsidiary shall become a party to this agreement, upon signing this agreement, without the express written consent of the other parties, for all purposes of this agreement with respect to taxable periods ending after such subsidiary was added to the Parent Group.

9.02 **Foreign Tax Liabilities**. It is the intent of the parties hereto that the concepts and methods defined herein for allocation of federal, state and local income taxes also be applied in a similar manner to tax liability assessed by foreign taxing jurisdictions where there is a combined tax liability between the Parties.

9.03 **Elections.** Each entity will be bound by the consolidated return elections (e.g., election to credit foreign taxes instead of taking a deduction and the election to forego the carryback of losses) made by Holdings.

9.04 **Successors and Assigns.** This AGREEMENT shall bind and inure to the respective successors and assigns of the parties hereto, but no assignment shall relieve any party's obligations hereunder without the written consent of the other party.

9.05 **Entire Understanding.** This AGREEMENT contains the entire understanding of the parties hereto with respect to the subject matter contained herein. This AGREEMENT may not be amended without the written consent of each of the parties hereto. The parties recognize and acknowledge their intention to enter into additional agreements from time to time with respect to the allocation of taxes not covered by this AGREEMENT.

9.06 **Conflict of Law**. The validity, interpretation, and performance of this AGREEMENT shall be controlled and construed under the laws of the State of Utah.

9.07 **Counterparts.** This AGREEMENT may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this AGREEMENT the day and year indicated.

Lehman Brothers Holdings Inc.

By: _____

List Entities

J-5

**SCHEDULE 1**

| Document Number | Document Title | Document Date |
|---|---|---|
| | **237 Park Avenue Loan** | |
| 1. | Environmental Indemnity Agreement (Subordinate Bridge Mezzanine Loan) | 7/24/07 |
| 2. | Form of Acknowledgement and Consent | 7/10/07 |
| 3. | Guaranty of Payment (Broadway Partners Fund Manager LLC) | 8/15/07 |
| 4. | Guaranty of Payment (Broadway Partners Real Estate Fund III, LP) | 8/15/07 |
| 5. | Guaranty of Recourse Obligations of Borrower (Subordinate Bridge Mezzanine Loan) | 7/24/07 |
| 6. | Monthly Management Report 5/31/10 | 7/2/10 |
| 7. | Monthly Management Report 2/28/10 | 4/14/10 |
| 8. | Monthly Management Report 6/30/09 | 7/22/09 |
| 9. | Monthly Management Report 5/31/09 | 6/24/09 |
| 10. | Monthly Management Report 11/30/09 | 12/16/09 |
| 11. | Monthly Management Report 6/30/10 | 8/3/10 |
| 12. | Notice of Default from Trimont Real Estate Advisors to 237 Park Mezz, L.P. | 10/22/09 |
| 13. | Opinion Letter of Edwards Angell Palmer & Dodge LLP re Non-Consolidation Opinion | 7/24/07 |
| 14. | Opinion Letter from Fried, Frank, Harris, Shriver & Jacobson LLP to LBHI re N.Y.U.C.C. | 9/17/07 |
| 15. | Opinion Letter of Richards, Layton & Finger re 237 Park Third Junior Mezz LLC | 8/22/07 |
| 16. | PayOff Statement | 11/18/11 |
| 17. | Promissory Note (Subordinate Bridge Mezzanine Loan) | 7/10/07 |
| 18. | Pledge and Security Agreement (Subordinate Bridge Mezzanine Loan) | 7/24/07 |
| 19. | Reaffirmation of Guaranty of Recourse Obligations of Borrower (237 Park) | 3/19/08 |
| 20. | Subordinate Bridge Mezzanine Loan Agreement between 237 Park Third Junior Mezz LLC, and LBHI | 7/24/07 |
| 21. | UCC Financing Statement filed 9/11/07 | 9/11/07 |
| 22. | Subordination of Management Agreement  (Subordinate Bridge Mezzanine Loan) | 7/24/07 |
| 23. | Intercreditor Agreement | 7/10/07 |
| 24. | Monthly Management Report 12/31/08 | 1/13/09 |
| 25. | Agreement Among 237 Park Second & Third Junior Mezz and LBHI | 3/19/08 |
| 26. | Amended and Restated Guaranty of Recourse | 3/19/08 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Obligations (Lawlor) | |
| 27. | Amended and Restated Guaranty of Payment (GP Guaranty) | 3/19/08 |
| 28. | Assignment of Title Insurance Proceeds (Subordinate Bridge Mezzanine Loan) | 7/10/07 |
| 29. | Certificate Evidencing Limited Liability Company Interests | Undated |
| 30. | Chicago Title Insurance Company – Policy No. CT1001-14-0700349 | Undated |
| 31. | Letter – Notice of Purchase Option (237 Park) | 6/8/11 |
| 32. | Letter – Notice of Purchase Option (237 Park) | 5/23/11 |
| 33. | Notice of Default and Right to Cure to Subordinate Junior Lenders (237 Park) | 5/12/2011 |
| 34. | Letter from Trimont to Jason P. Semmel re Notice of Default | 10/22/09 |
| 35. | Termination Agreement by and among Broadway Parties, Lawlor and LBHI | 7/2/09 |
| 36. | Release Agreement by and among Broadway Parties, Lawlor, and LBHI | 7/2/09 |
| 37. | Letter from LBHI to Capital One Bank re Broadway B3 Equity LP Account Control Agreement Termination | 7/6/09 |
| 38. | Monthly Management Report 12/31/08 | 1/13/09 |
| 39. | Monthly Management Report 10/31/09 | 11/18/09 |
| 40. | Monthly Management Report 4/30/10 | 6/28/10 |
| 41. | Letter – Notice of Purchase Option (237 Park) | 5/23/11 |
| 42. | Letter – Notice of Purchase Option (237 Park) | 6/8/11 |
| 43. | Notice of Default and Right to Cure to Subordinate Junior Lenders | 7/10/07 |
| 44. | Fax attaching Fidelity National Title Insurance Company - Title No. 09-7406-20941-NYM | Undated |
| | **W. 37th Street, Hudson Yards Loan** | |
| 1. | Certificate Evidencing Limited Liability Company Interests re 37-11 Mezzanine LLC | N/A |
| 2. | Certificate Evidencing Limited Liability Company Interests re 37-11 Development Member LLC | N/A |
| 3. | Certificate Evidencing Limited Liability Company Interests re 37-11 1031 LLC | N/A |
| 4. | Certificate Evidencing Limited Liability Company Interests re 37-11 1031 Mezzanine LLC | N/A |
| 5. | Certificate Evidencing Limited Liability Company Interests re 37-11 1031 Member LLC | N/A |
| 6. | Conditional Guaranty by Atria Builders, L.L.C., David | 5/17/07 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Marx, Jack P. Schleifer and Robert Marx to LBHI in the sum of $7,685,893.00 | |
| 7. | Environmental and Hazardous Substance Indemnification Agreement by 37-11 Mezzanine LLC, 37-11 1031 Mezzanine LLC, Atria Builders LLC, Jack Schleifer and David Marx to LBHI | 5/18/07 |
| 8. | Borrower's Certification (Financial Statements and Equity Contributions) by LBHI to 37-11 Mezzanine LLC and 37-11 1031 Mezzanine LLC | 5/18/07 |
| 9. | Borrower's Certification (Representations and Warranties) by LBHI to 37-11 Mezzanine LLC and 37-11 1031 Mezzanine LLC | 5/18/07 |
| 10. | Borrower's Certification (Purchase Agreement, Project Budget, Material Agreements, Ownership Chart, Personal Property) by LBHI to 37-11 Mezzanine LLC and 37-11 1031 Mezzanine LLC | 5/18/07 |
| 11. | Certification of Sources and Uses of Funds Statement | 5/18/07 |
| 12. | Borrower's Certification (Organizational Documents) and Incumbency | 5/18/07 |
| 13. | Guarantors' Financial Certificate | N/A |
| 14. | Loan Policy of Title Insurance  (Mortgagee) | 5/18/07 |
| 15. | Assignment of Title Insurance Proceeds by 37-11 Development LLC and 37-11 1031 Development LLC to LBHI | 5/18/07 |
| 16. | UCC 9 Loan Insurance Policy | 5/18/07 |
| 17. | Alta Survey | N/A |
| 18. | Pro Forma Owner Title Insurance Policy | N/A |
| 19. | Opinion Letter from R. Yellen and Associates LLP to LBHI and Windels Marx Lane & Mittendorf LLP | 5/18/07 |
| 20. | Certificate (Limited Liability Company Agreement: 37-11 Development LLC) | 5/18/07 |
| 21. | 34-10 Development LLC Articles of Organization | N/A |
| 22. | Limited Liability Company Agreement of 37-11 Development LLC | 5/18/07 |
| 23. | 34-10 Development LLC - Certificate of Publication and filing receipt | N/A |
| 24. | 34-10 Development LLC – Certificate of Existence | N/A |
| 25. | Filing receipt and Certificate of Amendment of the Articles of Organization of 34-10 Development LLC | 4/05/07 |
| 26. | Statement of Organization of the Sole Organizer of 34-10 Development LLC | N/A |
| 27. | 37-11 Development LLC Service Agreement | 5/18/07 |
| 28. | Certified Resolutions of The Sole Member of 37-10 | 5/18/07 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Development LLC | |
| 29. | Certificate (Limited Liability Company Agreement: 37-11 1031 LLC) | 5/18/07 |
| 30. | Limited Liability Company Agreement of 37-11 1031 LLC | 5/18/07 |
| 31. | 37-11 1031 LLC letter re payment of publication fees | 5/21/07 |
| 32. | 37-11 1031 LLC – Articles of Organization | N/A |
| 33. | Certified Resolutions of the Sole Member of 37-11 1031 LLC | 5/18/07 |
| 34. | 37-11 1031 LLC Certificate of Existence | N/A |
| 35. | Certificate (Limited Liability Company Agreement: 37-11 Mezzanine LLC) | 5/18/07 |
| 36. | Limited Liability Company Agreement of 37-11 Mezzanine LLC | 5/18/07 |
| 37. | Certified Resolutions of the Sole Member of 37-11 Mezzanine LLC | 5/18/07 |
| 38. | 37-11 Mezzanine LLC letter re payment of publication fees | 5/23/07 |
| 39. | Certificate (Limited Liability Company Agreement: 37-11 1031 Mezzanine LLC) | 5/18/07 |
| 40. | 37-11 1031 Mezzanine LLC Articles of Incorporation | 5/09/07 |
| 41. | Limited Liability Company Agreement of 37-11 1031 Mezzanine LLC | 5/18/07 |
| 42. | 37-11 1031 Mezzanine LLC Certificate of Existence | N/A |
| 43. | 37-11 1031 Mezzanine LLC letter re payment of publication fees | 5/23/07 |
| 44. | Certified Resolutions of the Sole Member of 37-11 1031 Mezzanine LLC | 5/18/07 |
| 45. | Certificate (Limited Liability Company Agreement: 37-11 Development Member LLC) | 5/18/07 |
| 46. | 34-11 Development LLC – Articles of Incorporation | 3/01/07 |
| 47. | Limited Liability Company Agreement of 37-11 Development Member, LLC | 5/18/07 |
| 48. | 37-11 1031 Member LLC letter re payment of publication fees | 5/21/07 |
| 49. | Statement of Organization of the Sole Organizer of 34-11 Development LLC | N/A |
| 50. | 37-11 Development Member LLC Certificate of Existence | N/A |
| 51. | Limited Liability Company Agreement of 37-11 1031 Member LLC and Certificate Re: Same | 5/18/07 |
| 52. | Certified Resolutions of The Members of 37-11 Development Member LLC | 5/18/07 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 53. | Limited Liability Company Agreement of 37-11 1031 Member LLC | N/A |
| 54. | Certificate of Existence of 37-11 1031Member LLC | N/A |
| 55. | Articles of Organization of 37-11 1031 Member LLC with filing receipt | 5/09/07 |
| 56. | Certified Resolutions of the members of 37-11 1031 Member LLC | 5/18/07 |
| 57. | Consolidated Promissory Note in the sum of $48,036,834.00 by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/07 |
| 58. | Gap Note in the sum of $27,203,068.00 by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/07 |
| 59. | Loan Agreement between 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/07 |
| 60. | | |
| | Recorded Mortgage Modification, Consolidation and Extension Agreement and Security Agreement by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/07 |
| 61. | Recorded Gap Mortgage and Security Agreement by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/2007 |
| 62. | Affidavit of David E. Marx Pursuant to Section 255 of the Tax Law of the State of New York (Mortgage) | 5/17/2007 |
| 63. | Recorded Assignment of Leases and Rents by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/2007 |
| 64. | Affidavit of David E. Marx Pursuant to Section 255 of the Tax Law of the State of New York (Assignment of Leases and Rents) | 5/17/2007 |
| 65. | UCC-1 Financing Statement filed with New York Secretary of State | 5/29/2007 |
| 66. | UCC-1 Financing Statement Filed in City of New York Register – Debtor: 37-11 Development LLC Secured Party: LBHI re Premises 450 11th Avenue, New York, NY | 5/28/2007 |
| 67. | Environmental and Hazardous Substance Indemnification Agreement | 5/18/2007 |
| 68. | Conditional Guaranty by Atria Builders, L.L.C., David Marx, Jack P. Schleifer and Robert Marx to LBHI | 5/18/2007 |
| 69. | Assignment of Permits, Agreements, Licenses, Franchises and Authorizations by 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/18/2007 |
| 70. | Lockbox, Pledge and Security Agreement | 5/18/2007 |
| 71. | Borrower's Certification (Representations and Warranties) | 5/18/2007 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 72. | Borrower's Certification (Financial Statements & Equity Contributions) | 5/18/2007 |
| 73. | Borrower's Certification (Purchase Agreement, Project Budget, Material Agreements, Ownership Chart, Personal Property | 5/18/2007 |
| 74. | Certification of Sources and Uses of Funds Statement | 5/18/2007 |
| 75. | Borrower's Certification (Organization Documents) and Incumbency | 5/18/2007 |
| 76. | Guarantors' Financial Certificate | N/A |
| 77. | Payment Direction Letter to LBHI re $48,036,834.00 loan (the "Senior Loan")  $7,685,893.00 loan (the "Mezzanine Loan") | 5/18/2007 |
| 78. | Assignment of Interest Rate Cap Agreement and Security Agreement between 37-11 Development LLC and 37-11 1031 LLC to LBHI | 5/29/2007 |
| 79. | Escrow Instructions – re Mortgage Loan in the amount of $48,036,834.00 and mezzanine loan in the amount of $7,685,893.00 to finance the purchase and pre-development of real property located at 448-452 11th Avenue, and 556 West 37th Street in New York | 5/18/2006 |
| 80. | Promissory Note in the sum of $7,685,893.00 between 37-11 Mezzanine LLC and 37-11 1031 Mezzanine LLC and LBHI | 5/18/2007 |
| 81. | Mezzanine Loan Agreement between 37-11 Mezzanine LLC and 37-11 1031 Mezzanine LLC ("Borrower") and LBHI ("Lender") | 5/18/2007 |
| 82. | Membership Pledge and Security Agreement (37-11 Mezzanine LLC's Interest As Member of 37-11 Development LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 83. | Membership Pledge and Security Agreement (37-11 Development Member LLC's Interest As Member of 37-11 Mezzanine LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 84. | Membership Pledge and Security Agreement(Jack P. Schleifer's Interest As Member of 37-11 Development Member LLC)  Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 85. | Membership Pledge and Security Agreement (David E. Marx's Interest As Member of 37-11 Development Member LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 86. | Membership Pledge and Security Agreement (Richard L. Yellen's Interest As Member of 37-11 Development Member LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 87. | Membership Pledge and Security Agreement (Robert | 5/18/2007 |

| Document Number | Document Title | Document Date |
|---|---|---|
|  | Marx's Interest As Member of 37-11 Development Member LLC) Loan in the sum of $7,685,893.00 |  |
| 88. | Membership Pledge and Security Agreement (Philip Mendlow As Member of 37-11 1031 Member LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 89. | Membership Pledge and Security Agreement (37-11 1031 Mezzanine LLC's interest as Member of 37-11 1031 Member LLC) Loan in the sum of $7,685,893.00 | 5/18/2007 |
| 90. | UCC-1 Financing Statement – Debtor: 37-11 Development Member LLC and Secured Party: LBHI | N/A |
| 91. | Membership Pledge and Security Agreement (37-11 1031 Member LLC's interest as Member of 37-11 1031 Mezzanine LLC) Loan in the amount of $7,685,893.00 | 5/18/2007 |
| 92. | UCC-1 Financing Statement – Debtor: 37-11 Mezzanine LLC;  Secured Party: LBHI (re 37-11 Development Corp.) | 6/06/07 |
| 93. | UCC-1 Financing Statement – Debtor: 37-11 1031 Member LLC and Secured Party: LBHI | 6/06/07 |
| 94. | UCC-1 Financing Statement – Debtor: David E. Marx and Secured Party: LBHI | 6/06/07 |
| 95. | UCC-1 Financing Statement – Debtor: 37-11 1031 Mezzanine LLC and Secured Party: LBHI | 6/06/07 |
| 96. | UCC-1 Financing Statement – Debtor: Jack P. Schleifer and Secured Party: LBHI | 6/06/07 |
| 97. | UCC-1 Financing Statement – Debtor: Richard L. Yellen and Secured Party: LBHI (37-11 Development Member LLC) | 6/06/07 |
| 98. | UCC-1 Financing Statement – Debtor: Philip Mendlow and Secured Party: LBHI (37-11 1031 Member LLC) | 6/06/07 |
| 99. | UCC-1 Financing Statement – Debtor: Robert Marx and Secured Party: LBHI (37-11 Development Member LLC) | 6/06/07 |
| 100. | 37-11 Development LLC – Certificate Evidencing Limited Liability Company Interests | 5/18/07 |
| 101. | Notice of Default re 37th Street Hudson Yards – Mezzanine Loan | 6/18/09 |
| 102. | Hudson Yards – Key Bank Pay Off Letter | 11/18/11 |
| 103. | Title Report re 450 11th Avenue, New York NY | N/A |
|  | **Golden Sands Loan** |  |
| 1 | Assignment of Agreements, Licenses, Permits and Contracts between WSG 34th Street in favor of LBHI | 11/22/06 |
| 2. | Assignment of Architect Agreement between WSG 34th | 11/22/06 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Street in favor of LBHI | |
| 3. | Consent to Assignment of Architect Agreement between WSG 34th Street in favor of LBHI | 11/22/06 |
| 4. | Pledge and Security Agreement (Erick Sheppard) re 6901 Collins Avenue, Miami Beach, Florida | 11/22/06 |
| 5. | Control Letter from WSG 34th Street, LLC to LBHI | 11/22/06 |
| 6. | UCC-1 Financing Statement – Debtor: Erick Sheppard Secured Party: LBHI | N/A |
| 7. | Assignment of Interests in blank from Eric Sheppard | N/A |
| 8. | Membership Certificate WSG 34th Street, LLC (Eric Sheppard) | 12/15/05 |
| 9. | Control Letter from WSG 34th Street, LLC to LBHI | 11/22/06 |
| 10. | Pledge and Security Agreement (Phillip Wolman) re 6901 Collins Avenue, Miami Beach, Florida | 11/22/06 |
| 11. | UCC-1 Financing Statement – Debtor: Phillip Wolman | 11/22/06 |
| 12. | Assignment of Interests in blank from Phillip Wolman | N/A |
| 13. | Membership Certificate (Philip Wolman) WSG 34th Street, LLC | 12/15/05 |
| 14. | Control Letter from Lifestyle Property LLC to LBHI Re Eric Sheppard | 11/22/06 |
| 15. | Pledge and Security Agreement (Erick D. Sheppard) re 2548 West Desert Inn Road, Las Vegas, NV | 11/22/06 |
| 16. | UCC-1 Financing Statement Debtor Phillip Wolman | N/A |
| 17. | Pledge and Security Agreement (Philip Wolman) re 2548 West Desert Inn Road, Las Vegas, NV | 11/22/06 |
| 18. | Control Letter Lifestyle Property LLC to LBHI Re Philip Wolman | 11/22/06 |
| 19. | UCC-1 Financing Statement Debtor Eric Sheppard | N/A |
| 20. | Borrower's Certification (Representations & Warranties) | 11/22/06 |
| 21. | Borrower's Certification re loan in the amount of $21,000,000.00 from LBHI to WSG 34th Street | 11/22/06 |
| 22. | Certificate of Sources and Uses of Funds by WSG 34th Street LLC | 11/22/06 |
| 23. | Memorandum of Option Agreement (and right of first refusal) by and between WSG 34th Street and LBHI | 11/22/06 |
| 24. | Letter re Escrow Instructions re $21,000,000.00 Mortgage Loan from LBHI to WSG 34th Street, LLC | 11/22/06 |
| 25. | Memorandum of Option Agreement (and right of first refusal) by and between WSG 34th Street and LBHI | 11/22/06 |
| 26. | Payment Direction letter re $21,000,000.00 Mortgage Loan from LBHI to WSG 34th Street, LLC | 11/22/06 |
| 27. | Loan Funding Statement | 11/22/06 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 28. | Assignment of Mortgage to LBHI from United Community Banks, Inc. | 11/20/06 |
| 29. | Post Closing Side Letter re $21,000,000.00 Mortgage loan from LBHI to WSG 34th Street, LLC | 11/22/06 |
| 30. | Allonge to Promissory Note from United Community Banks to LBHI | 11/20/06 |
| 31. | First Amendment to Parking Space Lease Agreement | 11/22/06 |
| 32. | Lenders Commitment for Title Insurance | 6/28/06 |
| 33. | Survey | N/A |
| 34. | Lender's Policy of Title Insurance | N/A |
| 35. | EnF Opinion Letter re $21,000,000.00 Mortgage loan from LBHI to WSG 34th Street, LLC from Berman Rennert | 11/22/06 |
| 36. | Enf Opinion Letter re Golden Sands, 6901 Collins Avenue, Miami Beach, Florida from Fried Frank | 11/22/06 |
| 37. | Organizational Chart | N/A |
| 38. | Zoning Opinion Letter re $21,000,000.00 Mortgage Loan from LBHI to WSG 34th Street, LLC | 11/22/06 |
| 39. | Articles of Organization of WSG 34th Street LLC | 11/08/06 |
| 40. | Fourth Amended and Restated Operating Agreement for WSG 34th Street, LLC | 11/16/06 |
| 41. | Resolution and Incumbency Certificate | 11/21/06 |
| 42. | Certificate of Good Standing re WSG 34th Street, LLC | 11/08/06 |
| 43. | Building Work Permit and Renewal re 6901 Collins Avenue, Miami Beach, Florida | 04/01/09 |
| 44. | Environmental and Hazardous Substance Indemnification Agreement by WSG 34th Street LLC | 11/22/09 |
| 45. | Phase I Environmental Site Assessment re 6901 Collins Avenue, Miami Beach, Florida | 12/17/04 |
| 46. | Forbearance Agreement | 08/29/08 |
| 47. | Fourth Amended and Restated Operating Agreement for WSG 34th Street LLC | 11/16/06 |
| 48. | Title Report – Golden Sands | 6/11/09 |
| 49. | Guaranty of Payment and Performance (Eric D. Sheppard and Philip Wolman to LBHI) | 11/22/06 |
| 50. | Guaranty of Recourse Obligations (Eric D. Sheppard and Philip Wolman to LBHI) | 11/22/06 |
| 51. | Letter re Notice of Default to WSG 34th Street LLC from LBHI | 07/14/08 |
| 52. | Golden Sands Pre-Negotiation Letter | 5/22/09 |
| 53. | Index re Golden Sands Closing Binder re $21,000,000.00 Mortgage Loan from LBHI to WSG 34th Street, LLC | 11/22/06 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 54. | Loan Agreement dated between WSG 34th Street LLC and LBHI | 11/22/06 |
| 55. | Amended and Restated Promissory Note in the amount of $21,000,000.00 | 11/22/06 |
| 56. | Amended and Restated Mortgage | 11/22/06 |
| 57. | UCC-1 Financing Statement Debtor WSG 34th Street LLC – Miami-Dade County, FL | 11/28/06 |
| 58. | UCC-1 Financing Statement Debtor WSG 34th Street LLC –FL. Secretary of State | 11/28/06 |
| 59. | Subordination Agreement re Canyon Sands Venture LLC | 11/21/06 |
| 60. | Absolute Assignment of Leases and Rents by WSG 34th Street, LLC to LBHI | 11/22/06 |
| 61. | Guaranty of Payment of Performance (Eric D. Sheppard and Philip Wolman to LBHI) | 11/22/06 |
| 62. | Environmental and Hazardous Substance Indemnification Agreement | 11/22/06 |
| 63. | Guaranty of Recourse Obligations (Eric D. Sheppard and Philip Wolman to LBHI) | 11/22/06 |
| 64. | Receipt of Payment re Permit Extensions for 6901 Collins Avenue, Miami Beach, FL | 11/03/10 |
| 65. | Email from B. Werner to M. Stroyman re Golden Sands, Miami Beach re Project Net Sales Proceeds | 02/11/10 |
| 66. | Letter from City of Miami - Building Department to G. Stepp re Permit Extension Request | 01/06/10 |
| 67. | Letter from Becker & Poliakoff to WSG Hollywood, LLC re Senate Bill 360 two year extension | 12/09/09 |
| 68. | PNA Letter from Lehman Re Ltd. to WSG 34th Street, LLC re Golden Sands, Miami, FL | 05/22/09 |
| 69. | Letter re Golden Sands - Notice of Default (Maturity Date) re $21,000,000.00 Mortgage Loan from Lehman Re Ltd. to WSG 34th Street, LLC premises located at 6901 Collins Avenue, Miami Beach, Florida | 06/22/09 |
| 70. | Letter re Golden Sands - Notice of Default (Taxes) re $21,000,000.00 Mortgage Loan from Lehman Re Ltd. to WSG 34th Street, LLC premises located at 6901 Collins Avenue, Miami Beach, Florida | 08/28/09 |
| 71. | Letter re Golden Sands – Demand for payment and Reservation of Rights re $21,000,000.00 Mortgage Loan from Lehman Re Ltd. to WSG 34th Street, LLC premises located at 6901 Collins Avenue, Miami Beach, Florida | 09/16/09 |
| 72. | Golden Sands Property – Market and Valuation | 04/10 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Analysis | |
| 73. | Payoff Statement re Key Bank Loan # 10049032 - Golden Sands property, 6901 Collins Avenue, Miami, Florida | 11/18/11 |
| 74. | Draft Amended and Restated Loan Pay-Off Agreement | N/A |
| 75. | Email from J. Wong to W. Beck re termination of discounted loan payoff discussions | 12/01/2011 |
| | **Pacific Point Loan** | |
| 1 | Secured Promissory Note (Term Loan) for Value Received between SJD Partners, Ltd. and Lehman ALI Inc. in the amount of $100,000,000 | 2/16/06 |
| 2. | Debt Subordination Agreement (SunCal) by and Among SJD-1400, Inc. and SJD Partners Ltd. | 2/16/06 |
| 3. | Solvency Certificate | 2/16/06 |
| 4. | Solvency Certificate of Borrower | 2/16/06 |
| 5. | Subordination Agreement from SJD Partners, Ltd. | 2/16/06 |
| 6. | Debto Subordination Agreement (SunCal) by and Among UCP, Inc., SJD Partners, Ltd. and Lehman ALI, Inc. | 2/16/06 |
| 7. | Subordination of Management Fees by SJD Development Corp. and SJD Partners Ltd. | 2/16/06 |
| 8. | Subordination of Management Fees by SJD Development Corp. and SJD Partners Ltd. | 2/16/06 |
| 9. | SunCal Settlement Agreement | Undated |
| 10. | Term Loan and Revolving Line of Credit by Lehman ALI, Inc. to SJD Partners, Ltd. | 2/16/06 |
| 11. | Third Amended Adversary Proceeding Complaint Palmdale Hills Property, LLC | 7/10/09 |
| 12. | UCC Financing Statement Debtor SJD Partners, Ltd. – CA Secretary of State | 2/17/06 |
| 13. | Fidelity National Title Insurance Company – Loan Policy of Title Insurance - Policy No. 27-44-94 | 2/17/06 |
| 14. | UCC Financing Statement Debtor SJD Development Corp – CA Secretary of State | 2/17/06 |
| 15. | UCC Financing Statement Debtor SJD Development Corp [Duplicate] | 2/17/06 |
| 16. | UCC Financing Statement Debtor SJD Partners Ltd. | 2/17/06 |
| 17. | Secured Promissory Note (Term Loan) by and Among SJD Partners, Ltd. and Lehman ALI, Inc. | 2/16/06 |
| 18. | KeyBank - PayOff Statement | 11/18/11 |
| 19. | Term Loan and Revolving Line of Credit by Lehman ALI, Inc. to SJD Partners, Ltd. | 2/16/06 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 20. | California Mechanic's Lien Release – recorded by National Ready Mixed Concrete Company | 11/16/09 |
| 21. | Release of Design Professional's Lien by Bucilla Group Architecture, Inc. | 11/13/09 |
| 22. | Fidelity National Title Company – Preliminary Report | 6/01/09 |
| 23. | Assignment of Developer's Rights from SJD Partners , Ltd. | 2/17/06 |
| 24. | Assignment of Developer's Rights [Duplicate] | 2/17/06 |
| 25. | Homebuilder Contract Assignment, Subordination and Recognition Agreement (Centex Homes/County Parcel) | 2/17/06 |
| 26. | Certificate of SCC Acquisitions, Inc. | 2/16/06 |
| 27. | Homebuilder Contract Assignment, Subordination and Recognition Agreement (Vistas) | 2/16,06 |
| 28. | Certificate of SJD Development Corp. | 2/16/06 |
| 29. | Certificate of SJD Partners, Ltd. | 2/16/06 |
| 30. | Certificate of SJD Partners, Ltd. | 2/16/06 |
| 31. | Guaranty of Completion (Improvements) by SCC Acquisitions in favor of Lehman ALI, Inc. | 2/16/06 |
| 32. | Construction Deed of Trust and Fixture Filing with Assignment of Leases and Rents and Security Agreement (Variable Rate) | 2/16/06 |
| 33. | Debt Subordination Agreement (SunCal) by and Among SCC Acquisitions, Inc., SJD Partners, Ltd., and Lehman ALI Inc. | 2/16/06 |
| 34. | Debt Subordination Agreement (SunCal) by and Among SJD-1400, Inc., SJD Partners, Ltd., and Lehman ALI Inc. | 2/16/06 |
| 35. | Debt Subordination Agreement (SunCal) by and Among UCP, Inc., SJD Partners, Ltd., and Lehman ALI Inc. | 2/16/06 |
| 36. | Construction Deed of Trust and Fixture Filing (with Assignment of Leases and Rents and Security Agreement (Variable Rate) | 2/16/06 |
| 37. | Depositi Account Control Agreement Reserve Accounts | 2/16/06 |
| 38. | Depositi Account Control Agreement Reserve Accounts | 2/16/06 |
| 39. | Environmental Indemnity Agreement (Non-Borrower) | 2/16/06 |
| 40. | Environmental Indemnity Agreement (Borrower) | 2/16/06 |
| 41. | Environmental Indemnity Agreement (Non-Borrower) | 2/16/06 |
| 42. | Environmental Indemnity Agreement (Borrower) | 2/16/06 |
| 43. | Phase I Environmental Site Assessment Report Report prepared by: Gocon Inland Empire Inc. | 3/11/08 |
| 44. | Loan Policy of Title Insurance – Pro Forma | Undated |
| 45. | Certificate of Good Standing California Limited Partnership – SJD Partners, Ltd. | 1/28/06 |

| Document Number | Document Title | Document Date |
|---|---|---|
| 46. | Guaranty of Completion (Improvements) | 2/16/06 |
| 47. | First Amendment to Homebuilder Contract Assignment, Subordination and Recognition Agreement (K. Hovnanian/Vista II) | 2/14/07 |
| 48. | First Amendment to Homebuilder Contract Assignment WL Homes, LLC | 10/12/07 |
| 49. | Limited Guaranty by and among SCC Acquisitions, Inc. and Lehman ALI Inc. | 2/16/06 |
| 50. | Letter - Notice of Default and Acceleration From Lehman ALI Inc. to SJD Partners, Ltd. | 7/10/07 |
| 51. | Notice of Filing of Lis Pendens | 8/4/09 |
| 52. | Opinion Letter from Kronisy Lieb Weiner & Hellman LLP to Lehman ALI Inc. re Term Loan and Revolving Line of Credit Agreement | 2/16/06 |
| 53. | Letter of Interest from SunCal Companies to Lehman Re | 4/6/09 |
| 54. | Opinion Letter re Term Loan and Revolving Line of Credit | 2/16/06 |
| 55. | Pledge Agreement by SJD Development Corp. in favor of Lehman ALI Inc. | 2/16/06 |
| 56. | Pre-Negotiation Agreement made among SJD Partners, Ltd., SCC Acquisitions, Inc. and Lehman ALI Inc. | 7/10/07 |
| 57. | Secured Promissory Note (Revolving Loan) by SJD Partners, Ltd. and Lehman ALI Inc. in the amount of $25,000,000 | 2/16/06 |
| 58. | Restructuring Agreement Among LBHI, Lehman ALI Inc., SCC Acquisitions, LLC, SunCal Communities II, LLC, Bruce Elieff, and SunCal Management, SCC Acquisitions Inc. | 5/23/08 |
| 59. | Debt Subordination Agreement (SunCal) by and Among SCC Acquisitions, Inc. SJD Partners, and Lehman ALI | 2/16/06 |
| 60. | Fidelity National Title Company – Preliminary Report | 4/08/09 |
| 61. | Fidelity National Title Company – Preliminary Report | 6/01/09 |
| 62. | Assignment by Hunsaker & Associates Irvine, Inc. | 7/30/09 |
| | **WSG Indrio Village Loan** | |
| 1. | Letter from Windels Max Lane & Mittendorf, LLP to Wendy Beck, at Berman Rennert Vogel & Mandler, P.A. re Escrow Instructions | 8/30/07 |
| 2. | Letter from Windels Max Lane & Mittendorf, LLP to Ms. Helen Clavel at LBHI re WSG West Palm Beach Loans and Funding of Proceeds | 8/30/07 |
| 3. | Post Closing Letter from WSG West Palm Beach | 8/30/07 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | Development, LLC, WSG Poinsettia, LLC, Indrio Village, LLC to LBHI | |
| 4. | Indrio Village, LLC – Manager's Certificate | 8/30/07 |
| 5. | Indrio Village Mezz, LLC – Manager's Certificate | 8/30/07 |
| 6. | First American Title Insurance Company – Policy of Title Insurance – Policy No. FA-M- 963252 | 9/05/07 |
| 7. | Indrio Village Holdings, LLC – Manager's Certificate | 8/30/07 |
| 8. | Insert Page Indicating – Survey on File with Windels Marx Lane & Mittendorf LLP | Undated |
| 9. | Opinion Letter from Berman Rennert Vogel & Mandler, P.A., to LBHI re Loan from LBHI to Indrio Village, LLC (Florida Enforceability) | 8/30/07 |
| 10. | Opinion Letter from Fried Frank, Harris, Shriver & Jacobson LLP to LBHI. re Loan from LBHI to Dndrio Village, LLC (New York Enforceability) | 8/30/07 |
| 11. | Exclusive Sales Listing Agreement by and between CB Richard Ellis Inc., and Indrio Village, LLC | 9/1/10 |
| 12. | Certificate of Liability Insurance | 9/24/07 |
| 13. | KeyBank PayOff Statement | 11/18/11 |
| 14. | Letter from Lehman Re Ltd, to Eric D. Sheppard at Indrio Village LLC. re WSG Indrio Village, Fort Pierce, Florida | 5/22/09 |
| 15. | Fidelity National Title Insurance Company – Title Report Commitment No. NT09-1856.  File No. 09-7406-20947FL | 6/8/09 |
| 16. | Closing Index of Mortgage Loan docs by LBHI to Indrio Village, LLC | 8/30/07 |
| 17. | Note Consolidation, Renewal, Restatement, Extension and Future Advance Agreement Between Indrio Village, LLC and LBHI | 8/30/07 |
| 18. | Loan Agreement between Indrio Village, LLC and LBHI | 8/30/07 |
| 19. | Consolidated, Amended, and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement and Receipt of Future Advance Between Indrio Village, LLC and LBHI | 8/30/07 |
| 20. | Absolute Assignment of Leases and Rents by Indrio Village, LLC to LBHI | 8/30/07 |
| 21. | Assignment of Agreements, Licenses, Permits and Contracts by Indrio Village, LLC in favor of LBHI | 8/30/07 |
| 22. | Borrowers Certification (Representations & Warranties) in connection with loan made to Indrio Village, LLC | 8/30/07 |
| 23. | Borrowers Certification – in connection with loan made | 8/30/07 |

| Document Number | Document Title | Document Date |
|---|---|---|
| | to Indrio Village, LLC | |
| 24. | Certificate of Sources and Uses of Funds by Indrio Village, LLC | 8/30/07 |
| 25. | Borrowers' Certification (Financial Statements & Equity Contributions) by LBHI and Indrio Village, LLC | 8/30/07 |
| 26. | Guaranty of Recourse Obligations by Eric D. Sheppard and Philip Wolman | 8/30/07 |
| 27. | Guarantors' Financial Certificate (Philip Woman) | 8/30/07 |
| 28. | Guarantors' Financial Certificate (Eric D. Sheppard) | 8/30/07 |
| 29. | Reserve Account Pledge and Security Agreement among LBHI, Trimont Real Estate Advisors, Inc., and Indrio Village, LLC | 8/30/07 |
| 30. | Deposit Account Control Agreement Reserve Account | 8/30/07 |
| 31. | Environmental and Hazardous Substance Indemnification Agreement by Indrio Village, LLC, Eric D. Sheppard, and Philip Wolman in favor of LBHI | 8/30/07 |
| 32. | Memorandum of Option Agreement (and Right of First Refusal) by Indrio Village, LLC and LBHI | 8/30/07 |
| 33. | Option Agreement by Indrio Village, LLC and LBHI | 8/30/07 |
| 34 | Release And Termination of Certain Loan Documents | 8/30/07 |
| 35. | UCC 1 – State of Florida Uniform Commercial Code Financing Statement Form (reserve account) Debtor: Indrio Village, LLC | Undated |
| 36. | Release and Termination of Recorded Loan Documents | 8/27/07 |
| 37. | UCC 1 – Financing Statement (all assets) Florida Secretary of State Indrio Village, LLC | Undated |
| 38. | UCC 1 – Financing Statement (all assets) St. Lucie Indrio Village, LLC | 9/11/07 |
| 39. | Indrio Settlement Statement Indrio Village, LLC Modification of Loan from LBHI | 8/30/07 |
| 40. | Payment Direction Letter from WSG West Palm Beach Development, LLC WSG Poinsettia, LLC, Indrio Village, LLC to LBHI | 8/30/07 |
| 41. | Letter from Lehman Re Ltd. to Indrio Village, LLC re Notice of Default(s) | 8/28/09 |
| | **Escrow Balances** | |
| 1. | Chart listing escrow balances for Pacific Point, Golden Sands, Indrio, 237 Park and Hudson Yards | Undated |

**SCHEDULE 2**

SERVICING DATA

| Borrower | Property | Outstanding Principal Balance | Escrow Balance | Accrued and Unpaid Interest and Fees | Currently Applicable Interest Rate |
|---|---|---|---|---|---|
| WSG 34th Street, LLC | Golden Sands, FL | $25,967,539.65 | - | $9,547,759.40 (Interest) $4,039,395.06 (Default Interest) $467,018.99 (Late Fees) | 11.5% (Interest) 5% (Default Interest) 5% (Late Fees) |
| 37-11 Mezzanine LLC | West 37th Hudson Yard - Mezzan, | $7,685,893.00 | - | $2,334,483.25 (Interest) $1,195,583.36 (Default Interest) $114,188.89 (Late Fees) | 9.5% (Interest) 5% (Default Interest) 5% (Late Fees) |
| Indrio Village, LLC | Indrio Village, FL | $20,000,000.00 | $153,083.54 | $7,260,000.00 (Interest) $2,947,222.22 (Default Interest) $354,666.67 (Late Fees) | 12% (Interest) 5% (Default Interest) 5% (Late Fees) |
| SJD Partners, Ltd. | Pacific Point, CA | $88,123,683.52 | - | $18,480,402.05 (Interest) $15,372,687.01 (Default Interest) $918,345.62 (Late Fees) | 5.7953% (Interest) 5% (Default Interest) 5% (Late Fees) |
| 237 Park Third Junior Mezz LLC | 237 Park Avenue - Mezzanine, NY | $170,739,762.46 | - | $1,650,484.37 | 12% |

**SCHEDULE 3**

NOTICES OF DEFAULT

| Loan | Title | Date |
|---|---|---|
| **Golden Sands** | **Notice of Default (Maturity)** | **June 22, 2009** |
| **Golden Sands** | **Notice of Default (Taxes)** | **August 28, 2009** |
| **Golden Sands** | **Demand for Payment and Reservation of Rights** | **September 16, 2010** |
| **W. 37th Street – Hudson Yards** | **Mezzanine Loan - Notice of Defaults** | **June 18, 2009** |
| **WSG Indrio** | **Notice of Default(s)** | **August 28, 2009** |

**SCHEDULE 4**

FORM JOINT NOTICE TO RESIDENTIAL SERVICERS

[Lehman Re Letterhead]        [Lehman Letterhead]

[Date]

[Servicer Name]
[Servicer Address]

     Re:    [Servicing Agreement]

Dear [      ],

     Please be advised that in accordance with (i) the enclosed Settlement Agreement dated as of November 4, 2009 (the "Settlement Agreement") among Lehman Re Ltd. ("Lehman Re"), Lehman Brothers Holdings, Inc. ("LBHI"), Lehman Brothers Commercial Paper Inc ("LCPI") and Lehman ALI Inc., (ii) the enclosed Assignment and Assumption (Residential Loans) from LBHI to LCPI, dated November 4, 2009, and (iii) the enclosed Assignment and Assumption (Residential Loans) from LBHI to LCPI, dated November 4, 2009, (A) LBHI has confirmed that it has sold, transferred and assigned all of its rights, title and interest with respect to the residential mortgage loans set forth on Exhibit A attached hereto (the "Residential Mortgage Loans") to LCPI, and (B) LCPI has confirmed that it has sold, transferred and assigned all of its rights, title and interest with respect to the Residential Mortgage Loans to Lehman Re all as provided in the attached documents.

     Lehman Re's acquisition of the Residential Mortgage Loans was acknowledged pursuant to the Settlement Agreement, which was approved by the U.S. Bankruptcy Court for the Southern District of New York pursuant to the enclosed order issued on August 27, 2009.

     Therefore, [servicer] shall immediately take all actions necessary to acknowledge Lehman Re's ownership of the Residential Loans and any servicing rights attendant thereto as of such date.

     Lehman Re hereby represents that it has not sold, assigned, transferred or conveyed any of its interests in the Residential Mortgage Loans and continues to be the sole legal and beneficial owner thereof.  Accordingly, any and all notices to [Owner] shall be addressed to:

Lehman Re Ltd.
c/o PricewaterhouseCoopers LLP
7 More London Riverside
London, SE12RT, United Kingdom
Attention: Dan Schwarzmann
Facsimile: +44(0)20 7212 7500

with copies to:

Lehman Re Ltd.
c/o PricewaterhouseCoopers, Bermuda
Dorchester House
7 Church Street
Hamilton, Bermuda HM11
Attention:  Garth Calow
Facsimile: (441) 295-1242

and:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Attention: Gregory Petrick, Esq.
Facsimile: (212) 504-6666

Please acknowledge receipt of this letter and acceptance of its terms by signing and returning to Lehman Re the enclosed duplicate of this letter.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____

Name:  Daniel J. Ehrmann
Title:  Vice President


LEHMAN COMMERCIAL PAPER INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____

Name:  Daniel J. Ehrmann
Title:  Vice President


Enclosures

**AGREED AND ACCEPTED:**

By:_____

Date:_____

LEHMAN RE LTD., a Bermuda corporation in provisional liquidation


By: _____

Dan Schwarzmann, in his capacity as Joint Provisional Liquidator of Lehman Re Ltd., without personal liability

**<u>PROPOSED ORDER</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
In re                                                     :        **Chapter 11 Case No.**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :        **08-13555 (JMP)**
                                                          :
                                     **Debtors.**         :        **(Jointly Administered)**
---------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR APPROVAL OF A SETTLEMENT AGREEMENT WITH LEHMAN RE LTD AND CERTAIN OTHER PARTIES

Upon the motion, dated February 28, 2012 (the "Motion"),[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the above referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, for authorization to enter into a settlement agreement with Lehman Re Ltd., Pulsar Re, Ltd., and Congress Life Insurance Company, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the second amended order entered June 17, 2010 governing case management and administrative procedures (ECF No. 9635); and a reasonable opportunity to object or be heard regarding the Motion having been afforded to all such parties; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of

---

[1]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

the Debtors, their estates, and their creditors and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that, the Court having determined and found that the proposed compromise and settlement set forth in the Settlement Agreement is reasonable and appropriate, and consummation of the transactions contemplated by the Agreement is in the best interests of the Debtors and their estates, the Motion is GRANTED; and it is further

ORDERED that any objections to the Motion that have not otherwise been withdrawn or resolved are overruled; and it is further

ORDERED that pursuant to Bankruptcy Rule 9019, the compromise and settlement described in the Motion and contemplated by and provided for in the Settlement Agreement is approved; and it is further

ORDERED that pursuant to section 502 of the Bankruptcy Code, on the Effective Date, without necessity of any further filings or amendments, Lehman Re's claim against LCPI, Claim No. 28305 shall (i) be allowed as an unsecured, non-priority affiliate claim against LCPI in the fixed, liquidated amount of $490,000,000.00, (ii) be classified under the Plan in LCPI Class 5C, and (iii) not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment; and it is further

ORDERED, that pursuant to section 502 of the Bankruptcy Code, on the Effective Date, without necessity of any further filings or amendments, Lehman Re's claim against LBSF, Claim No. 28306, shall (i) be allowed as an unsecured, non-priority affiliate claim against LBSF in the fixed, liquidated amount of $25,430,000, (ii) be classified under the Plan in LBSF Class 5C, and (iii) not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment; and it is further

ORDERED, that pursuant to section 502 of the Bankruptcy Code, on the Effective Date, without necessity of any further filings or amendments, Lehman Re's claim against LBCC, Claim No. 28308, shall (i) be allowed as an unsecured, non-priority affiliate claim against LBCC in the fixed, liquidated amount of $87,621,000, (ii) be classified under the Plan in LBCC Class 5C, and (iii) not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment; and it is further

ORDERED, that pursuant to section 502 of the Bankruptcy Code, on the Effective Date, without necessity of any further filings or amendments, Lehman Re's claim against LBHI, Claim No. 28307, shall (i) be allowed as an unsecured, non-priority affiliate claim against LBHI in the fixed, liquidated amount of $415,000,000, (ii) be classified under the Plan in LBHI Class 8, and (iii) not be subject to reconsideration, objection, reduction, increase, counterclaim, subordination, offset or recoupment; and it is further

ORDERED, that pursuant to section 365 of the Bankruptcy Code, all contracts between the Lehman US Parties on the one hand, and Lehman Re and/or Congress Life on the other, other than the MRA Settlement Agreement and all assignment and assumption agreements, alonges, and other transfer documentation executed thereunder, shall be rejected in accordance with the Plan, and/or terminated and of no force and effect, and any claims arising from the rejection of such contracts are deemed to be satisfied in full in accordance with the Settlement Agreement; and it is further

ORDERED that pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, the Settlement Agreement is approved and the Debtors are duly to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Settlement Agreement and perform any and all obligations contemplated therein; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and

sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising

from or related to the interpretation or implementation of this Order.

Dated: March __, 2012

New York, New York

_____

UNITED STATES BANKRUPTCY JUDGE