Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555 (JMP)

5  ADV No. 08-01420 (JMP)

6  - - - - - - - - - - - - - - - - - - -x

7  In the Matter of:

8  LEHMAN BROTHERS HOLDINGS INC., ET AL.,

9            Debtors.

10  - - - - - - - - - - - - - - - - - - -x

11  SECURITIES INVESTOR PROTECTION CORPORATION, ET AL.

12                    Plaintiffs.

13         -against-

14  LEHMAN BROTHERS INC.

15                    Defendant.

16  - - - - - - - - - - - - - - - - - - -x

17              United States Bankruptcy Court

18              One Bowling Green

19              New York, New York

20              February 15, 2012

21              10:04 AM

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2    1. Motion of the Debtors and the Committee for Approval  of the

3    Settlement Transaction Resolving the Two Hundred Twenty-Ninth

4    Omnibus Objection to JPMorgan's Asset Management Fund Claims

5    (No Liability, Misclassified and Duplicative Claims) [ECF No.

6    2485]

7

8    2. Motion Pursuant to Section 8.4 of the Modified Third Amended

9    Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

10   Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of

11   the Bankruptcy Code to Estimate the Amounts of Claims Filed by

12   Indenture Trustees on Behalf of Issuers of Residential

13   Mortgage-Backed Securities for Purposes of Establishing

14   Reserves [ECF No. 24254]

15

16   In Re Lehman Brothers Australia Limited [Case No. 12-10063]

17   3. Hearing to Consider Granting Relief Requested in the Chapter

18   15 Petition and the Verified Petition for Recognition of

19   Foreign Proceeding

20

21   Matters to be Heard at 2:00 P.M.

22   4. Margaret Bennett v. Lehman Brothers Holdings Inc. [Adversary

23   Case No. 10-03264] Pre-Trial Conference

24

25

Page 3

1

2    5. Turnberry Centra Sub, LLC, et al. v. Lehman Brothers

3    Holdings Inc. [Adversary Case No. 09-01062] Motion to Dismiss

4    Plaintiffs' Amended Complaint

5

6    6. Lehman Brothers Holdings Inc. v. Fountainbleau Resorts, LLC,

7    et al. [Adversary Case No. 10-02821] Motion to Dismiss

8    Defendants' Amended Counterclaims

9

10   7. Lehman Brothers Holdings Inc. v. Fountainbleau Resorts, LLC,

11   et al. [Adversary Case No. 10-02823] Motion to Dismiss

12   Defendants' Amended Counterclaims

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Aliza Chodoff

Page 4

1

2  A P P E A R A N C E S :

3  WEIL, GOTSHAL & MANGES LLP

4      Attorneys for Debtors and Debtors-in-Possession

5      700 Louisiana

6      Suite 1600

7      Houston, TX 77002

8

9  BY:   ALFREDO R. PEREZ, ESQ.

10      EDWARD R. MCCARTHY, ESQ.

11      LAUREN ZERBINOPOULOS, ESQ.

12

13

14  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

15      Attorneys for Lehman Brothers Holdings Inc.

16      101 Park Avenue

17      New York, NY 10178

18

19  BY:   CINDI M. GIGLIO, ESQ.

20      L.P. HARRISON, III, ESQ.

21

22

23

24

25

Page 5

1

2    BINGHAM MCCUTCHEN LLP

3          Attorneys for JPMorgan Funds

4          399 Park Avenue

5          New York, NY 10022

6

7    BY:   EDWIN E. SMITH, ESQ.

8          JARED R. CLARK, ESQ.

9

10

11   QUINN EMANUEL URQUHART & SULLIVAN LLP

12          Attorneys for Creditors Committee

13          865 South Figueroa Street

14          10th Floor

15          Los Angeles, CA 90017

16

17   BY:   ERICA P. TAGGART, ESQ.

18

19

20

21

22

23

24

25

Page 6

1

2   NIXON PEABODY LLP

3         Attorneys for Deutsche Bank National Trust Company as

4            Trustee

5         437 Madison Avenue

6         New York, NY 10022

7

8   BY:   CHRISTOPHER M. DESIDERIO, ESQ.

9

10

11   HUGHES HUBBARD & REED LLP

12         Attorneys for SIPA Trustee

13         One Battery Park Plaza

14         New York, NY 10004

15

16   BY:   JEFFREY S. MARGOLIN, ESQ.

17

18

19   WACHTELL, LIPTON, ROSEN & KATZ

20         Attorneys for JPMorgan Chase Bank, N.A.

21         51 West 52nd Street

22         New York, NY 10019

23

24   BY:   HAROLD S. NOVIKOFF, ESQ.

25

Page 7

```
 1

 2    KIRKLAND & ELLIS LLP

 3         Attorneys for Liquidators of Lehman Brothers Australia

 4            Limited

 5         601 Lexington Avenue

 6         New York, NY 10022

 7

 8    BY:   DAVID SELIGMAN, ESQ.

 9

10

11    CHAPMAN & CUTLER

12         Attorneys for U.S. Bank

13         330 Madison Avenue

14         34th Floor

15         New York, NY 10017

16

17    BY:   FRANKLIN TOP, ESQ., (TELEPHONICALLY)

18

19

20

21

22

23

24

25
```

Page 8

```
 1

 2    MEISTER SEELIG & FEIN LLP

 3         Attorneys for Fountainebleau Resorts, LLC, et al. and

 4           Turnberry Centra Sub, LLC, et al.

 5         140 East 45th Street

 6         19th Floor

 7         New York, NY 10017

 8

 9    BY:   STEPHEN B. MEISTER, ESQ.

10          REMY STOCKS, ESQ.

11          CHRISTOPHER J. MAJOR, ESQ.

12

13

14    RICHARD & RICHARD, P.A.

15         Attorneys for Fountainebleau Resorts, LLC, et al. and

16           Turnberry Centra Sub, LLC, et al.

17         825 Brickell Bay Drive

18         17th Floor

19         Miami, FL 33131

20

21    BY:   DENNIS A. RICHARD, ESQ.

22

23

24

25
```

Page 9

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Attorneys for Rutger Schimmelpennick, Frederic Verhoeven,

4             Dutch Trustee

5          1177 Avenue of the Americas

6          New York, NY 10036

7

8    BY:   ROBERT N. HOLTZMAN, ESQ.

9

10

11   GABRIEL FISCHBARG, ATTORNEY AT LAW

12          Attorneys for Margaret Bennett

13          401 Fifth Avenue

14          7th Floor

15          New York, NY 10016

16

17   BY:   GABRIEL FISCHBARG, ESQ.

18

19

20   MILBANK, TWEED, HADLEY & MCCLOY LLP

21          Attorneys for Official Committee of Unsecured Creditors

22          One Chase Manhattan Plaza

23          New York, NY 10005

24

25   BY:   DENNIS C. O'DONNELL, ESQ.

Page 10

ALSO PRESENT:

        PHILIP KRUSE, Alvarez & Marsal

        MARCUS AYRES, Lehman Brothers Australia Limited

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 11 of 98

Page 11

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Mr. Perez --

 3              MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.

 4              THE COURT:  -- good morning.

 5              MR. PEREZ:  Mr. Harrison's handling the first matter.

 6              MR. HARRISON:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8              MR. HARRISON:  If it pleases the Court, Lyn Harrison

 9    of Curtis, Mallet-Prevost, Colt & Mosle, counsel for the

10    debtors.

11              Your Honor, this is the hearing on the motion of the

12    debtors and the creditors committee for approval of the

13    settlement transaction resolving the 229th omnibus objection to

14    JPMorgan's asset management funds claims.  Your Honor, on

15    February 1st, 2012, this Court entered an order to show cause

16    in connection with this motion.  The order to show cause

17    permitted the motion to be carried on an expedited basis, and

18    we thank you, Your Honor, for your consideration and the

19    calendar time.

20              Your Honor, by way of background, the 129th omnibus

21    objection challenged the purported right of certain investment

22    funds that received investment advice or other services from

23    subsidiaries of JPMorgan and Company to fully satisfies their

24    claims using collateral JPMorgan received from LBHI the week

25    before its bankruptcy.  JPMorgan applied over 700 million
```

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 12 of 98

Page 12

1    dollars to the fund claims based upon certain agreements

2    entered into in September of 2008.

3         Your Honor, JPMorgan took the position that it could

4    apply this collateral on behalf of the funds because the funds

5    were purportedly affiliates of JPMorgan Bank, as that term is

6    used in the September agreements.  Your Honor, as this Court is

7    aware, the validity of the September agreements is presently

8    being challenged in the adversary proceeding commenced by LBHI

9    and the committee against JPMorgan Chase Bank, N.A.  However,

10   in the 229th omnibus objection, it was the movants' position

11   that even if the September agreements were valid it was an

12   extreme overreach for JPMorgan Bank to attempt to cover losses

13   borne by its investment funds under the color of such

14   agreements; losses, Your Honor, relating to, for example,

15   subordinated debt and prime mortgage.

16        Your Honor, for the reasons -- for those reasons, Your

17   Honor, on October 26th, 2011, the debtors and the committee

18   filed the Lehman Brothers Holdings Inc. and the creditors

19   committee's 229th omnibus objection to the asset management

20   fund claims, where it was argued that the term "affiliate"

21   should be given its plain and ordinary meaning and that the

22   funds were not affiliates of JPMorgan Bank based on the fund

23   documents and other factors considered by the courts in

24   ascertaining whether an entity is an affiliate.

25        Your Honor, movants also argued that the losses to the

Page 13

1    funds were really borne by JPMorgan's customers, not by the

2    bank or anyone in its corporate family.  In mid-December, 2011,

3    Your Honor, the JPMorgan funds responded to the claims

4    objection.  And I believe, Your Honor, in early January of 2012

5    the parties began to engage in negotiations to see if there was

6    a basis for a settlement with respect to the application of the

7    LBHI cash collateral to satisfy the funds claims.

8         Your Honor, thereafter the LBHI and the committee

9    filed a reply at which time discussions began in earnest to try

10   to resolve the claims objection.  Your Honor, today, the

11   movants seek approval of a settlement transaction that resolves

12   the movants' claims objection contesting the purported rights

13   of the funds to fully satisfy their claims using the collateral

14   JPMorgan Bank required LBHI to post before its bankruptcy;

15   collateral which has been in the possession of JPMorgan and

16   thus unavailable to the estate since prior to LBHI's bankruptcy

17   petition.

18        Your Honor, the movants believe that the settlement

19   transaction is commercially reasonable -- a commercially

20   reasonably resolution of the claims objection because the

21   overall value to LBHI is approximately ninety-eight percent of

22   the amount in dispute.  To be clear, Your Honor, the estate

23   believes that it would eventually succeed on the claims

24   objection.  However, given the present value of today's

25   settlement, the total dollar recovery that the estate will

Page 14

1    receive at this time in connection with the settlement exceeds

2    the value that the estate could have received if the litigation

3    went to conclusion and the movants were to succeed.

4         Moreover, Your Honor, the estate creditors will be

5    benefited by the settlement in the near term since the funds

6    being returned to LBHI will be available for the first

7    distribution to creditors.  Of course, the settlement

8    transaction will also benefit the estate by avoiding the cost,

9    delay and litigation risk associated with having to prosecute

10   the issues raised in the claims objection.

11        Your Honor, as set forth in more detail in the motion,

12   the settlement agreement and the related documents in support

13   of the motion provide, among other things, the return of

14   approximately 699 million dollars to LBHI that had previously

15   been provisionally allocated to satisfy the claims filed by the

16   funds pursuant to the collateral disposition agreement or the

17   CDA.

18        And Your Honor, if I could just digress for a second,

19   if you recall, Your Honor, pursuant to the collateral -- Your

20   Honor, pursuant to the collateral disposition agreement, which

21   was approved back in March of 2010, certain cash was

22   provisionally applied to the claims of JPMorgan and its related

23   entities, including the JPMorgan funds.  For this reason, the

24   settlement agreement not only contemplates the disallowance and

25   reclassification of claims, but also results in cash coming

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 15

1   back to the LBHI estate.  In essence, Your Honor, the

2   settlement agreement provides for an unwinding of the CDA as to

3   the claims filed by the JPMorgan funds.

4        For us, the settlement agreement further provides,

5   Your Honor, the funds will retain fifteen million dollars of

6   the collateral posted under the CDA in respect to the funds

7   claims and any interest earned on the collateral posted for the

8   benefit of the funds claims.  The retained cash of any interest

9   earned on the cash, Your Honor, will not be subject to any

10  disgorgement or defeasance.  And the funds shall be freed to

11  allocate the retained cash and interest among one another.  And

12  the funds claims that were assigned to LBHI under the CDA will

13  be reassigned to the funds free and clear of any adverse claims

14  created by or through LBHI.

15        Your Honor, the additional benefits to the estate

16  include the following:  the other JPMorgan entities that are

17  parties to the CDA will waive their rights to the reallocation

18  of the 699 million returned to LBHI and the retained cash.  The

19  funds will also waive a claim for a supplemental 12.5 million

20  dollar payment under the CDA based upon the reversal of a

21  cross-affiliate setoff under certain derivative contracts.

22  LBHI and the funds shall exchange mutual releases relating to

23  the transaction under the September agreements and the CDA, and

24  the funds will agree to waive any claim asserted against LBHI

25  based on any corporate board resolution guarantee or Standard &

Page 16

1    Poor's guarantee issued by LBHI.

2            Your Honor, the movants believe that the settlement

3    agreement is a reasonable resolution of the claim objection

4    because the overall value to LBHI is approximately 711.7

5    million dollars, which is comprised by the fund's waiver of

6    the -- of a 12.5 million dollar claim and a return to LBHI's

7    estate of 692 million dollars, approximately, in cash.  Again,

8    the immediate return of the cash to LBHI will not be tied up or

9    in any way restricted by the terms and conditions of the

10   collateral disposition agreement.  Thus, the settlement

11   agreement is highly beneficial to the estate, particularly at

12   this point when the debtors are anticipating making their first

13   distribution under the confirmed plan.

14           Your Honor, in support of the motion the movants have

15   submitted the declaration of Philip Kruse, a managing director

16   of Alvarez & Marsal.  Mr. Kruse is in the courtroom today if

17   Your Honor had any questions regarding the business judgment

18   utilized in bringing this settlement to fruition.  Your Honor,

19   I will note for the record that there have been no objections

20   filed or received in connection with the motion.  Thus, Your

21   Honor, the estate believes that the movants have met the

22   criteria established in this circuit under Bankruptcy Rule

23   9019, and the settlement does not fall below the lowest point

24   in the res reasonableness.

25           Accordingly, Your Honor, the debtors request the Court

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 17

1    enter an order approving this settlement.  Your Honor, I

2    believe my colleague, Erica Taggart, has comments on behalf of

3    the committee, unless Your Honor has any questions.

4           THE COURT:  I have no questions.

5           MS. TAGGART:  Good morning, Your Honor.  Erica

6    Taggart, from Quinn Emanuel, on behalf of the official

7    committee of unsecured creditors of Lehmans (sic) Holdings.

8           The committee also supports this settlement.  We've

9    been working closely with the estate in this claim objection,

10   as with all matters involving JPMorgan.  The committee co-

11   authored the claim objection and has participated in the

12   settlement negotiations with the funds.  Although we believe

13   the claim objection has substantial merit, we agree that the

14   settlement is a fair resolution in the best interests of the

15   creditors for the reasons Mr. Harrison just explained and as

16   also described in Mr. Kruse's declaration, including that it

17   amounts to a ninety-eight percent recovery of the money that

18   was allocated to this claim.

19          Accordingly, the committee joins the estate in

20   recommending approval of the settlement.

21          THE COURT:  Fine.  Is there anyone else who wishes to

22   be heard?

23          MR. SMITH:  Good morning, Your Honor.  Edwin Smith,

24   Bingham, McCutchen, for the JMP Funds.

25          Of course, there's value for the JPM Funds.  They're

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 18

1    getting their claims back in addition to retaining some of the

2    cash, although ninety-eight percent is going to the estate.

3    But we're pleased to have reached this settlement, Your Honor.

4    Thank you.

5              THE COURT:  I'm pleased that you reached it as well.

6              Mr. Novikoff?

7              MR. NOVIKOFF:  Good morning, Your Honor.  Harold

8    Novikoff, Wachtell, Lipton, Rosen & Katz, on behalf of JPMorgan

9    Chase Bank, N.A. and a number of its subsidiaries.

10              I just wanted to mention in two elements of the

11   transaction that Mr. Harrison did not mention in his summary.

12   They are in the papers that were filed with the Court.  I just

13   want to make sure Your Honor is aware and they're on the record

14   of this hearing.

15              One is that the settlement does not affect the claims

16   of JPMorgan Chase Bank and its other subsidiaries other than

17   these investment funds against the Lehman estate or -- not does

18   it affect the defenses of Lehman with respect to those matters.

19   Also, this contemplates that Lehman will discontinue its

20   pursuit against JPMorgan Chase Bank of the money that the

21   estate's getting back, the 699 million, as well as the 15

22   million that it's agreed that the funds can retain.

23              I don't necessarily agree with the characterization of

24   all of the transactions by Mr. Harrison, but I don't think it

25   benefits anybody to go through all those disagreements right

LEHMAN BROTHERS HOLDINGS INC., ET AL.

1    now.

2            THE COURT:  I agree it doesn't anybody.

3            MR. SMITH:  Okay.  Thank you, Your Honor.

4            THE COURT:  Is there anything more?

5            MR. PEREZ:  No, Your Honor.

6            THE COURT:  This is an uncontested 9019 motion to

7    settle a very significant claim, and the benefits are obvious

8    and manifest.  And regardless of the manner in which Mr.

9    Harrison has characterized the settlement, the papers speak for

10   themselves.  I've reviewed the filing of the settlement

11   agreement on the docket as well as Mr. Kruse's declaration and

12   considered the statements of counsel.  This is approved, and we

13   can move on to the next item.

14           MR. PEREZ:  Your Honor --

15           THE COURT:  If anyone wishes to be excused as a result

16   of this approval, you're free to go.

17           MR. PEREZ:  -- Your Honor, can I approach the bench

18   with the order?  Thank you --

19           THE COURT:  Please.

20           MR. PEREZ:  -- very much.

21           IN UNISON:  Thank you, Your Honor.

22           THE COURT:  Let's just take a moment to allow people

23   to move about the courtroom.

24           MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez,

25   on behalf of the debtors.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 20

1         Your Honor, the next matter is basically a status

2    conference.  It'll be very brief, Your Honor, with respect to

3    our estimation motion on the RMBS trustee.  Your Honor, I'm

4    happy to report that I believe we have reached a settlement --

5         THE COURT:  That's great.

6         MR. PEREZ:  -- with the RMBS trustee.  The -- there --

7    it's in the process of being vetted, so we -- what we would

8    like to do is continue this hearing until the 22nd and

9    hopefully we'll be in a position to present an order at that

10   time.  We're not quite there yet, but I think that we're well

11   on our way to being there.  Counsel for some of the trustees

12   here, not all of them.  And that's basically the report that we

13   have on the record.

14        THE COURT:  Okay.  And -- so it's clear, and without

15   disclosing anything that isn't yet ripe for public disclosure,

16   is it contemplated that the settlement that you believe you

17   have reached in principle will permit a distribution to take

18   place with a reserve that is acceptable to all parties?

19        MR. PEREZ:  That's exactly correct, Your Honor.  And

20   it --

21        THE COURT:  That's --

22        MR. PEREZ:  -- has some other bells and whistles, but

23   that's exactly correct.

24        THE COURT:  Okay.

25        MR. PEREZ:  And we're hoping to have it by the 22nd.

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 21 of 98

Page 21

```
 1              THE COURT:  Great.

 2              MR. PEREZ:  Thank you, Your Honor.  I believe --

 3              THE COURT:   Good luck in getting --

 4              MR. PEREZ:  -- the last matter on the agenda is the LB

 5    Australian.

 6              THE COURT:  Fine.  Good luck in getting that done.  Is

 7    there any other attorney representing a trustee or any party-

 8    in-interest in connection with the matter just described by Mr.

 9    Perez who wishes to be heard?

10              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  Bill

11    Vinn (ph.), on behalf of Wilmington Trust.

12              We have of course about five different trustees

13    involved in this thing.  They have basically given me the

14    authority since we only view this as a status conference to

15    speak on behalf of all.  In essence, Your Honor, the way it has

16    to work out, because we have to give notice out to the

17    beneficial holders, to see if -- it's kind of setting out the

18    proposed agreement with the debtors and see if we get any

19    direction contrary to entering into such a settlement.  And

20    just for the Court's information, all responses from the

21    various beneficial holders is due by this Friday, the 17th.

22              So we will know clearly by the 22nd what kind of

23    responses, if any, we've gotten from the beneficial holders.

24    And then, the trustees will then be in a position hopefully to

25    go ahead and finalize the agreement.  And as you indicated, and
```

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 22 of 98

Page 22

1    as agreed there, it will set a specific reserve amount which

2    will then allow the debtors to make the initial distribution.

3    Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you, Mr. Vinn.

5              Anyone else?  Okay.  We'll move on to LB Australia.

6    For some reason that microphone is acting up today.  I think it

7    needs to be screwed in to its base.

8              MR. SELIGMAN:  Thank you.

9              THE COURT:  Mr. Perez seems to be the handy man.

10             MR. SELIGMAN:  I just call the handy man.  Good

11   morning, Your Honor.  David Seligman, on behalf of the

12   Australian liquidators.

13             We're here this morning, Your Honor, on a petition for

14   recognition of the -- of Lehman Brothers Australia Limited

15   liquidation proceedings in Australia as well as recognition of

16   Mr. Steven Parberry (ph.) and Marcus Ayres as the foreign

17   representatives.  Your Honor, there have been no objections to

18   this petition.  I'd like to give Your Honor a little bit of

19   background, if I may.  I did also want to state, Your Honor,

20   that in support of the petition we did file a number of pieces

21   of paper; a declaration of Mr. Ayres in support of the

22   petition.  That was docket number 2 in this matter; declaration

23   of Mr. Ayres pursuant to Section 11 U.S.C. 1515 with respect to

24   service.  That was docket number 3, and the debtor did also

25   file and serve the notice of commencement of the Chapter 15

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 23 of 98

Page 23

1    proceedings on all the parties required to be served under Rule

2    2002(q).

3           Your Honor, the Australian liquidation proceeding has

4    been pending for quite some time in Australia.  We thought it

5    was appropriate now to come before Your Honor with the Chapter

6    15, and I'm going to get into that in just a moment.  I did

7    want to just, as background, Your Honor, state that the Lehman

8    Australia proceeding has its roots dating back to September

9    26th, 2008 when the board of directors of Lehman Brothers

10   Australia concluded that Lehman Brothers Australia, which I'll

11   refer to as LBA, was or was likely to become insolvent.  And as

12   a consequence of that, the board appointed originally Mr.

13   Parberry and another gentleman, Mr. Singleton, as

14   administrators of the -- of LBA in that role.

15          As voluntary administrators, they did originally work

16   to negotiate a deed of company arrangement with various to the

17   stakeholders.  That was ultimately not approved by the

18   Australia court.  And as a result of that, in October of 2009

19   Mr. Parberry and Mr. Singleton were appointed as liquidators by

20   the Australia court of LBA.  Subsequently, in 2011 Mr.

21   Singleton was replaced by Mr. Ayres in an administrative

22   manner -- as administrative manner as liquidator.

23          The -- we've laid out the assets and liabilities of

24   LBA in the pet -- in our papers.  Essentially, the assets of

25   LBA are cash on hand, some interests in collateralized debt

Page 24

1    obligations with respect to the whole Dante (ph.) matter and

2    various claims that exist in the Chapter 11 proceeding as well

3    as others.  And we've laid out the various claims that have

4    been lodged in the Lehman Brothers Australia petition as well.

5         Your Honor, the -- as we mentioned when we were before

6    you last time, the reason for the Chapter 11 -- for the Chapter

7    15 filing was coincidental all the other matters that we've

8    been appearing in front of Your Honor to date.  The reason for

9    the Chapter 15 now was we knew at some point we were going to

10   have come before Your Honor and seek a Chapter 15 because

11   ultimately the proceedings in Australia were going to have to

12   be wound up and we were kind of waiting for the right moment.

13        There -- the reason now is because one claim that

14   Lehman Brothers Australia had is a claim under certain

15   insurance policies.  And they have been in communication with

16   their insurers and at most, if not all, of the -- those -- of

17   these sets of insurers happened to be located in the United

18   States.  The parties have been in discussions for quite a long

19   period of time involving a number of insurance coverage

20   matters.

21        THE COURT:  What kinds of policies are these?  Are

22   these DNO type policies?

23        MR. SELIGMAN:  Yes, Your Honor.  They're actually

24   investment management insurance policies.  They actually

25   relate -- as we said in the papers, a number of claims have

Page 25

1    been asserted against LBA with respect, I guess you can call

2    it, the mismanagement or wrongful advice with respect a number

3    of investment accounts.  And these are basically insurance

4    claims that would cover that kind of liability.  And so,

5    there's basically been discussions between LBA and this group

6    of insurers for quite some period of time to see if they can

7    resolve those matters.

8            We're pleased that after actually engaging in

9    mediation for quite some period of time we did -- we have

10   reached a settlement in principle on that.  In order to

11   effectuate that settlement and release, it is going to require

12   that there be a partial scheme of arrangement in Australia,

13   which I guess I can describe as sort of a mini plan or

14   reorganization in Australia to effectuate that settlement.

15           Another condition for that -- of the settlement is

16   going to ultimately be that there was -- that the insurers

17   wanted an order authorizing LBA to enter into that settlement

18   here in the United States.  And so, that was -- those were sort

19   of the two principle reasons why we felt now was the right time

20   rather than waiting until the end of the Chapter 15 proceedings

21   to get a Chapter 15 -- we thought it was appropriate to come in

22   now because we knew that we were going to have to get a partial

23   scheme of arrangement, which was going to ultimately need some

24   recognition as well as a requirement that there be some kind of

25   approval here in the United States because there could be

Page 26

1    issues about whether these are claims that reside in the United

2    States or not.

3           But in order to effectuate that settlement, that's --

4    was one of the conditions to the settlement.  So we're not

5    asking for approval of anything today.  We just wanted to set

6    that as background.  We'll ultimately have to come back to Your

7    Honor once we get all the various approvals for that, but we at

8    least wanted to give Your Honor that context or that was the

9    reason for --

10          THE COURT:  I appreciate that.  Just --

11          MR. SELIGMAN:  -- the Chapter 15 now.

12          THE COURT:  -- just a question or two about what

13   you've just said.  You used the term "scheme of arrangement,"

14   which I often associate with an insurance scheme.  Often in the

15   U.K. and in Chapter 15 practice, we occasionally are involved

16   in recognition of foreign insurance schemes involving a runoff

17   of a company.  I gather that's not what you're referring to

18   here, or is it?

19          MR. SELIGMAN:  No, we're talking about a scheme of

20   arrangement in the -- I guess the insolvency con -- not the

21   insurance context, but the --

22          THE COURT:  You're talking about a --

23          MR. SELIGMAN:  -- insolvency --

24          THE COURT:  -- scheme of arrangement as another way of

25   saying a plan of reorganization if it were in the United

Page 27

1    States?

2           MR. SELIGMAN:  Yes, that's correct, yes.  That's

3    correct, Your Honor.

4           THE COURT:  And is that scheme of arrangement to be

5    developed within the LBA case in Australia?

6           MR. SELIGMAN:  Yes.

7           THE COURT:  Okay.  So it's not a separate proceeding

8    that you're talking about?

9           MR. SELIGMAN:  No.  It would be in that context -- and

10   I'm not an expert in the Australian reorganization procedures.

11   but that's my understanding is, is that that would be something

12   that would be brought to the creditors in Australia and then

13   ultimately brought to the Court in Australia but in connection

14   with the pending proceedings that currently exist in the

15   Chap -- in the --

16          THE COURT:  So --

17          MR. SELIGMAN:  -- in Australia.

18          THE COURT:  -- just to talk about this in the broadest

19   outline, you have an agreement in principle with a group of

20   insurers that presumably will produce a fund that will be

21   available for distribution within the LBA proceeding and that

22   in order to obtain approval of the settlement that will produce

23   this fund two things need to happen, at least.

24          one is you need to go through some process in

25   Australia in which creditors get a chance to approve the

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 28 of 98

Page 28

1    settlement and presumable Justice Peter Jacobson and -- of the

2    federal court in Australia will be asked to approve that.  And

3    more or less simultaneously with that approval in Australia,

4    you'll be seeking approval from the bankruptcy court here of a

5    settlement within the confines of the Chapter 15 case as

6    additional comfort to the insurers.  Do I understand it

7    correctly?

8            MR. SELIGMAN:  That's my understanding, yes, Your

9    Honor.

10            THE COURT:  Okay.

11            MR. SELIGMAN:  Your Honor, with that background as to

12   the merits of the petition, we have laid out what we think are

13   the grounds to justify recognition under Chapter 15.  We

14   believe we satisfied all the elements that principally that the

15   Australia proceeding is a foreign proceeding, that the -- that

16   Mr. Ayres and Mr. Parberry are appropriate foreign

17   representatives as defined in the statute.  And then, finally,

18   the Australian proceeding is actually a foreign main proceeding

19   and the COMI of that proceeding and of LBA is in Australia.

20            We would also note that separate from all this we have

21   separately obtained a Chapter 15 in the U.K. recognizing the

22   Chapter -- recognizing the LBA proceedings as well.  That was

23   back in the fall.  And so, Your Honor, unless Your Honor has

24   any questions, we would submit that it -- we believe we've

25   satisfied all the elements for recognition to a Chapter 15 and

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 29 of 98

Page 29

```
 1    we would request Your Honor grant our petition requesting

 2    recognition.

 3           THE COURT:  I'm prepared to do that.  But before

 4    confirming that on the record, I'll simply ask if there's any

 5    party-in-interest who wishes to be heard on this question.

 6           There's no respon -- well -- wait a --

 7           MR. PEREZ:  Not on behalf of the estate, Your Honor.

 8           THE COURT:  Okay.  Who said -- an exciting moment

 9    there when Mr. Perez was standing up.  It's obviously that this

10    is uncontested and consistent with Chapter 15 practice.  And

11    based upon the representations made that this is a Chapter 15

12    that will, among other things, facilitate an important

13    settlement with a group of unnamed insurers, this is approved.

14    And I will entertain an appropriate order.

15           MR. SELIGMAN:  Thank you, Your Honor.  May I approach

16    with an order?

17           THE COURT:  Yes.

18           MR. SELIGMAN:  Okay.  Thank you, Your Honor.

19           THE COURT:  Thank you.  Now, that --

20           MR. PEREZ:  I don't believe there any other matters.

21           THE COURT:  -- that ends the morning calendar.  I was

22    advised through my chambers that there had been a request for a

23    chambers conference to take place at the conclusion of the

24    morning calendar, but it's not at all clear to me who needs to

25    be in attendance at that.
```

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 30 of 98

Page 30

 1            MR. PEREZ:  Your Honor, it would be counsel for the

 2    RNBS trustees, counsel for the committee and myself.

 3            THE COURT:  Okay.  Well, let's clear the courtroom and

 4    maybe we'll have a conference here.

 5        (Recess from 10:33 a.m. until 2:00 p.m.)

 6            THE COURT:  Be seated, please.  Good afternoon.  The

 7    first matter is Bennett v. Lehman.

 8            MR. FISCHBARG:  Yes, Judge.  Your Honor --

 9            THE COURT:  Let's proceed.

10            MR. FISCHBARG:  Judge --

11            THE COURT:  Why isn't this settled?

12            MR. FISCHBARG:  Well, we made an offer lower than

13    the --

14            THE COURT:  Excuse me?

15            MR. FISCHBARG:  This is the amount sued for was the

16    sum served of 142,000, and we did offer --

17            THE COURT:  Can you identify yourself for the record,

18    please?

19            MR. FISCHBARG:  Sorry.  My name is Gabriel Fischbarg

20    for the plaintiff, Margaret Bennett.

21            THE COURT:  This is an incredibly small matter to be

22    taking this long, and I don't understand what's wrong with

23    counsel, frankly.

24            MR. FISCHBARG:  So --

25            THE COURT:  Because I think good counsel would have

Page 31

1   had this settled a while ago.

2          MR. FISCHBARG:  Right.  So what I was saying was --

3   I'm sorry -- is that that it's for a sum served of 142,000.  We

4   did make an offer less than that amount.  We have not really

5   heard a counterclaim that's much lower of the nominal nature,

6   so we haven't -- the sides are far apart.  And we haven't heard

7   anything since.

8          THE COURT:  Why isn't this being result?

9          MR. HOLTZMAN:  Your Honor, Robert Holtzman from Kramer

10  Levin for the estate.

11         We did make an offer.  We made an initial offer

12  shortly after the adversarial proceeding was filed in June of

13  2010.  The response at that time was that plaintiff would not

14  accept a settlement of less than the amount sought on the

15  complaint, which put a stop to discussions at that time.

16         Five months later, they did reduce their demand very,

17  very slightly, but only marginally; about ten percent or so off

18  of the amount demanded.  And that's why we haven't had any

19  reasonable discussions.  The estate does prepare -- does stand

20  prepared to engage in reasonable settlement negotiations, but

21  we haven't seen any movement in that direction.

22         THE COURT:  This isn't a personal injury case.  There

23  are either good defenses or there aren't.  Are there good

24  defenses?

25         MR. HOLTZMAN:  We believe there are, Your Honor, yes.

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 32 of 98

Page 32

1          THE COURT:  And what are they?

2          MR. HOLTZMAN:  This is a breach of contract case; a

3    post-petition employee who's claiming that she was terminated

4    without cause.

5          THE COURT:  Right.

6          MR. HOLTZMAN:  And as a result, would be entitled to

7    continued payment of her base salary, severance and a pro rate

8    bonus.  We believe she was in fact terminated for cause.  She

9    was warned in advance of her termination for various incidents

10   of her engaging in insubordinate behavior, not what doing what

11   her managers asked for her.  And as a result, she falls within

12   the definition of cause in the contract, which is a substantial

13   and continuing failure to perform her employment duties or

14   obligation satisfactorily.

15         That's why she was terminated.  It was a cause

16   termination, so she's not entitled to recovery.

17         THE COURT:  Is the case trial ready?

18         MR. HOLTZMAN:  We're completed with discovery.  Yes,

19   it is, Your Honor.

20         MR. FISCHBARG:  Yes.

21         THE COURT:  Either you settle the case or we'll have

22   an early trial date.

23         MR. FISCHBARG:  Okay.

24         THE COURT:  Is there anything more that needs to be

25   done between now and a trial?

Page 33

```
 1              MR. HOLTZMAN:  No, Your Honor.

 2              MR. FISCHBARG:  No.

 3              THE COURT:  Has there been any consideration in

 4     mediation?

 5              MR. HOLTZMAN:  We offered that early on.  It was

 6     rejected by the plaintiff.

 7              MR. FISCHBARG:  Well, I think it wasn't rejected.  It

 8     was -- we were waiting -- there was no -- I think they wanted

 9     to send it to JAMS mediation, but the plaintiff couldn't --

10     wasn't going to afford half the cost of that.  So if they're

11     willing to come up with some mediation in the courthouse, one

12     of the judges might -- we -- the idea was -- we were floating

13     the idea maybe another judge might be able to listen to the

14     case as a mediator, as is done in other federal courthouses.

15     And so, that was the status of that.  But yeah, the plaintiff

16     is ready to mediate it if nec -- at any time with a neutral

17     party that's -- that there's no expense.

18              THE COURT:  I mean, this -- and I mean no

19     disparagement in saying this; is one of the very few examples

20     of pending litigation in the context of Lehman Brothers that

21     appears to be a nuisance lawsuit in the sense that the amounts

22     are not great.  It has been pending for a very long time.

23     There have been several repeated discovery conferences relating

24     to the scope of electronic discovery; some as long ago as maybe

25     a year ago, with what I can only conclude appears to be
```

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 34 of 98

Page 34

1   unreasonable behavior on the part of plaintiff's counsel.  And

2   I mean no disrespect in saying that.

3            But this is a case that I believe if professionally

4   handled would have been resolved a while ago.  I strongly

5   suggest that the parties endeavor to reach a reasonable

6   compromise of this litigation.  And if not, we'll suggest that

7   we schedule a trial date within the next sixty days.  How much

8   time will be required for trial?

9            MR. FISCHBARG:  I anticipate two or three days at the

10  most.

11           MR. HOLTZMAN:  I would agree with that, Your Honor.

12           THE COURT:  And why will it take as long as even two

13  days?  Why isn't this something that can be tried in an

14  afternoon?

15           MR. FISCHBARG:  It's possible.  But if plaintiff

16  presents their case, and then defendant has to present their

17  case, and then there might be rebuttal.  I was -- that's -- I

18  was thinking three stages, and each stage probably takes half a

19  day.  So if --

20           THE COURT:  What's the evidence that's required at

21  trial?

22           MR. FISCHBARG:  The evidence?  I guess there's the

23  work case.  There's some e-mails and correspondence.  I guess

24  they built up a case file against -- in human resources, they

25  built up a case file against the plaintiff to justify the

Page 35

1    termination, so that's part of the evidence.  And mostly, e-

2    mails and correspondence and some Excel spreadsheets showing

3    the work that they say she didn't do, which she did do.  So I

4    guess the total amount of evidence might be twenty marked

5    items, I think.

6          MR. HOLTZMAN:  Your Honor, there's a limited number of

7    documents that would be necessary on behalf of the estate, her

8    direct manager and his manager, who both participated in the

9    decision making process, would testify and short testimony from

10   an HR person.

11         THE COURT:  Well, it seems to me that if it's going to

12   have to go to trial the parties should endeavor to make it a

13   one-day trial.  Just given the cost of going forward, both

14   parties should see value in limiting their proof so as not to

15   make this a ridiculously expensive proposition for either side.

16   So I have what I suppose are two strong suggestions at this

17   juncture.

18         One is for everybody to get serious about looking at

19   their cases realistically, including an evaluation that's

20   dispassionate as to the risks associated with whatever may be

21   in the files that you have seen.  And since I haven't seen that

22   information, I make no judgment one way or the other as to

23   whether there is or is not a good defense.  But somebody should

24   be able to assess that risk.

25         Secondly, if you're unable to reach a settlement, and

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 36

1   I'm not proposing mediation because frankly the amounts

2   involved here are simply too inconsequential to even justify

3   mediation, that you work on a streamlined time to trial in

4   which the trial will not last more than one trial day and that

5   for purposes of moving this along you get a date from my

6   courtroom deputy now for that trial approximately sixty days

7   from today.

8              MR. HOLTZMAN:  Thank you, Your Honor.

9              MR. FISCHBARG:  Okay.

10             THE COURT:  And good luck in getting this done.

11             MR. FISCHBARG:  All right, thank you.

12             THE COURT:  The next is the Turnberry, Fontainebleau

13   matter.

14             MR. MCCARTHY:  Good afternoon, Your Honor.  My name's

15   Ed McCarthy.  I'm here with Lauren Zerbinopoulos, from Weil

16   Gotshal, on behalf of the lenders in these transactions, LBHI.

17   We're also here on behalf of a third party to these

18   transactions, Lehman Bank, who's a named defendant in the Town

19   Square adversary.

20             THE COURT:  Okay.

21             MR. MCCARTHY:  We have a few client reps with us here;

22   Joelle Halprin (ph.) and Chad DeMartino (ph.).  We're here on

23   my clients' motion to dismiss in three separate adversaries.

24   That's the two Fountainebleau adversaries, 102821 and 2823, and

25   the Town Square adversary, 0910062.

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 37 of 98

Page 37

1        In about twenty minutes I'd like to make three points,

2    if I can, Your Honor.  First I want to describe these deals and

3    the cases because there are important differences in the cases.

4    Second --

5            THE COURT:  Although the papers look almost identical.

6            MR. MCCARTHY:  And that's -- you're absolutely right,

7    Your Honor, because the papers focus on the fraud claim.  And

8    that's what I want to spend my time talking about today.

9            THE COURT:  Okay.

10           MR. MCCARTHY:  The fraud claim is the same in each of

11   the cases, and I wanted to try to help simply why that claim

12   fails at law.  I'd like to talk about what's left too.

13   Assuming we can dismiss these farfetched fraud claims, where

14   does that leave us in this litigation?  Your Honor, there are

15   differences in these cases.  You have the two Fountainebleau

16   cases, which relate to a deal regarding the Fountainebleau

17   Resort and Casino, which has since been sold.  And then, you

18   have the Town Square case, which relates to a shopping mall,

19   and the retail portion of that mall in Nevada is the collateral

20   for that deal.

21           On one side of each of these cases, LBHI is the

22   lender.  Other than that, we have different parties, different

23   properties, different loan documents, different timing and

24   different claims.  For the Fountainebleau Resort, there was

25   originally a mezzanine loan that was funded in June 2007, fully

Page 38

1   funded for eighty-five million by Lehman Brothers Bank.  None

2   of it's been repaid.  And Lehman Brothers LBHI with its co-

3   lenders also funded 163 million, approximately, of a 315

4   million dollar loan before the deal went bankrupt.

5          On the Town Square side, in July 2007, the deal was

6   put together for a loan in the amount of ninety-five million

7   dollars to Jeff Soffer (ph.) and Jackie Soffer (ph.) personally

8   as the borrowers.  It's a big difference too.  There, you have

9   them as the borrowers.  Fountainbleau; you have them as

10  guarantors.  But there, that loan was funded after an extension

11  throughout the period in the tune of seventy-two million

12  dollars before the extended maturity date came.  And LBHI was

13  sued on that day.

14         I bring up these differences in the deals and the

15  complexities because as Your Honor probably saw in the briefing

16  what these developers have tried to do is saying that these

17  deals are substantively identical, that notwithstanding the

18  separate fully integrated agreements at issue; the different

19  timing, all along they thought they were dealing with Lehman.

20  Notwithstanding the separate contracts, the separate timing,

21  they thought all these contracts were really together and that

22  the terms of the deals didn't matter.

23         Your Honor, on both side of the table here you have

24  sophisticated parties that have done many loans and many deals.

25  Each party understood each term and negotiated each term of

Page 39

1    this deal, and that's important here because there is not even

2    an allegation in this case that LBHI was more business savvy or

3    in a better business position when negotiating these deals.

4    This isn't a story of one party using fraud or

5    misrepresentation to take advantage of a less sophisticated

6    party, which happens in most of the cases that are cited in

7    their briefing.

8         What you have here is a sophisticated land developer

9    who asked for and received hundreds of millions of dollars in

10   loans from LBHI.  They took all the benefit from those loans.

11   They poured into their properties, and then the market crashed.

12   And their properties aren't worth what they hoped it to be

13   worth.  And now they're looking for a way out.  They've come to

14   this court as a sophisticated party looking for a do over, but

15   it's really more than a do over, Your Honor, because a do over

16   would be unwinding these deals, repaying the money, having LBHI

17   release the guarantees, releasing the collateral.  They don't

18   want that.

19        What they're asking this Court to do is use this fraud

20   claim that's the same in all the cases so that they can keep

21   the money, keep their consideration and gut the only

22   consideration that went to LBHI.  They're asking to come to

23   this bankruptcy court, use this process to act as if LBHI never

24   lent the money in the first place, and they do that through

25   that fraud claims, which gets to my side of the point, Your

Page 40

1    Honor.

2           Each case includes this same claim of fraud.  It's

3    important to focus on that fraud claim early in this

4    litigation, and the fraud claim just got brought up.  The case

5    has been going on for a while, but it caused a delay because it

6    did just get brought up for the first time late last year.

7    We're trying to focus on it as early as possible because if the

8    developers are right then any party can come to this court and

9    any party who owed any Lehman entity anything can say that they

10   no longer need to repay what was given to them, that they can

11   walk away as if nothing every happened because Lehman concealed

12   its finances leading up to its bankruptcy.  At law, that type

13   of fraudulent concealment claim cannot stand; here specifically

14   for four reasons I'll touch on.

15          First, the fraudulent conduct is not and cannot be

16   pled with particularity.  Second, the duty to disclose, the

17   reasonable alliance, the materiality cannot be pled with

18   particularity.  Third, the fraud improperly relies on a promise

19   to do something in the future.  Here, it improperly relies on

20   Lehman's ability to fund in the future.  And fourth, I won't

21   discuss this today, but our briefing does touch on it, and

22   that's the economic loss rule does bar their claim at law.

23          Your Honor, if we're right on any of those four

24   points, at law, there can be no fraud and no amount of facts

25   can change that analysis.  Under 9(b) --

1        THE COURT:  Are the -- let me just break in and ask

2    you this question.  Are you saying that this is not a function

3    of the manner in which the causes of action have been alleged

4    in the counterclaims or in the complaint, but rather that as a

5    matter of law under no circumstances could a party in the

6    position of these entities ever assert claims that would pass

7    muster?

8        MR. MCCARTHY:  I think it's two parts, if you -- I

9    may, Your Honor, I'll take them in reverse order.  As I see it

10   here, there is no way that these parties, based on the

11   sophisticated nature of them and the terms of this deal, could

12   use the repos and the supposed fraudulent concealment to make

13   out a claim for fraudulent concealment.

14        Now, taking the first part, at minimum, these claims

15   do not meet muster under 9(b), and they are not pled to give

16   Lehman reasonable notice -- fair notice as to what was pled.

17   So -- and as I see it, if Your Honor does give them an

18   opportunity to amend, I think we'll be back here again seeign

19   that they just cannot make out a claim here.  There's no nexus

20   between the fraudulent concealment and this case.

21        THE COURT:  Okay.  So you're looking for dismissal

22   without leave to amend?

23        MR. MCCARTHY:  We are, Your Honor.

24        THE COURT:  Okay.

25        MR. MCCARTHY:  And of course, in the alternative, we

Page 42

1    would ask for the other with the atonement.  But yes, we do

2    believe there is no reason to amend here.  These cases have

3    gone on long enough, and this is too much or a farfetched fraud

4    claim.

5          Your Honor, here, under 9(b), LBHI is not on fair

6    notice of what the claims are.  The Second Circuit clearly

7    requires somebody to point out the who, the what, the where,

8    the when and the why.  Because of having no nexus between this

9    claim, they haven't met of those steps.  All they do is cite to

10   the examiner's report and Lehman's bankruptcy, and they say

11   that Lehman -- again, Lehman, not LBHI or anybody specific to

12   this deal, knew about repurchase agreements going on between

13   2007 and 2008.  The applicable time period here is June 2007

14   for Fountainebleau and July 2007 for the Town Square case.

15   That's when the deals were executed.

16         Anything that happened after that certainly could not

17   have induced these parties to execute an agreement which had

18   already been executed.  There's nothing that happened after

19   that that would have induced them either.  But before June and

20   July 2007, they point to nothing in their complaint that shows

21   that Lehman -- somebody at LBHI said something to them

22   regarding the finances, that they asked LBHI for anything

23   regarding their finances.  There's nothing that points to a

24   who, a what was said, a when it was said, or why what was said

25   or wasn't said could have been fraudulent with respect to this

Page 43

1    deal.

2         All they do is describe that these repos occurred and

3    that certain high level execs at Lehman knew they were

4    occurring and told the examiner that this was the purpose of

5    those repos.  But they don't link any of that; the high exec

6    knowledge with the deal at issue.  And without linking it,

7    there can be no causation.  There can't be materiality.  You

8    don't have any reasonableness of their reliance.

9         One of the biggest points that you'll see in the

10   briefing is that the developers never point to anybody specific

11   at Lehman that made an omission or a statement.  All they say

12   is Lehman, let alone LBHI.  The law specifically forbids this,

13   and we pointed in our briefing to Mosby -- to Millsby Polar

14   Molecular (ph.).  That's 12 F.3d at 1170.  It's a 1993 Second

15   Circuit case.  And there it said 9(b) is not satisfied where

16   all you do is cite two defendants.

17        THE COURT:  I'm sorry, where all you do is cite two

18   what?

19        MR. MCCARTHY:  Defendants, excuse me, Your Honor.  In

20   here, they try to make a distinction saying we're not citing

21   two defendants.  We're just saying -- we're saying Lehman.

22   There's -- that's a distinction without a difference, Your

23   Honor.  They need to put us on notice by saying who was

24   supposed to have said something or who actually did something;

25   otherwise, we're left here to guess.  And the law requires

Page 44

1    more.

2          They also have to make out -- putting aside the who,

3    what, where, when and why, they have to make out a duty to

4    disclose.  Their claim of fraudulent concealment can only exist

5    if somebody at LBHI had a duty to disclose something to these

6    developers with respect to this deal.  They cite nothing for

7    this duty.  They don't ever plead that they requested financial

8    information from LBHI, that they reviewed financial information

9    from LBHI or that they were entitled to review the information.

10   The contracts certainly don't state that they were, and they

11   don't point to any of that in their complaint.

12         Again, we're left to guess, and the law requires more.

13   To avoid this law, what they do is point to a few cases that

14   talk about active concealment.  And what they argue in their

15   briefing is that where you have active concealment you don't

16   need to have a duty to disclose.  The two cases they cite to

17   are the Lombrozzo (ph.) case from 1992 and the Haberman (ph.)

18   from 1975.  Your Honor, these cases are not even close to being

19   on point.  The Lombrozzo case doesn't talk about duty one way

20   or the other.  The Haberman case actually required a duty, and

21   they found that -- in both cases what you have is a home seller

22   going into the home before a seller comes to purchase the home

23   and actively concealing issues with the product being sold; the

24   actual home.

25         And there, the Court found in Haberman, for instance,

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 45

1    that when you do that, when you go into a home -- although the

2    contracts might not say you had a duty to disclose something,

3    when you go in and actually mess with the product as being sold

4    knowing that the seller will want to find out that information,

5    then that puts you on duty to tell them about what you did.

6           Here, the product being sold was a loan.  And they got

7    what they wanted.  And I don't hear any complaining about the

8    hundreds of millions of dollars that they've borrowed.

9    Instead, what they're saying is what Lehman did is hid finances

10   that were unrelated to these loans.  Maybe those cases would be

11   similar if the home seller actually concealed within its

12   finances but then sold the home, and then the buyer's sitting

13   there with a home which its loves but is telling the -- now it

14   doesn't want to pay the seller because the seller had issues

15   with its finances.

16          Your Honor, bottom line for fraudulent concealment,

17   there has to be a duty to disclose the information.  The

18   developers haven't pointed anything that requires LBHI to tell

19   them about their finances.  They aren't stockholders that were

20   investing in LBHI stock.  These were developers that were

21   taking a loan, required to pay back that loan.

22          The reasonable reliance is even easier to see how it

23   could not have been reasonable; them relying on Lehman's

24   finances because you only need to turn to the contracts at

25   issue.  Here, the developers do not allege and they certainly

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 46

1    are not boilerplate take it or leave it contracts.  These are

2    contracts that were negotiated by both sides.  They're the

3    exact type of guarantees and integration clauses that courts in

4    the Second Circuit find bar fraudulent inducement claims like

5    this.  For instance, in Citibank v. Plapinger in 1985.  That's

6    495 NY F2.d 309.  The court faced a large deal with

7    sophisticated parties and guarantees and integration clauses

8    like you have here.

9            Dismissing the fraud claim, the Court said "to condone

10   the defendant's own fraud and deliberately misrepresenting

11   their true intention when putting their signatures on the

12   absolute and unconditional guarantee."  These sophisticated

13   developers, they can't just say we didn't mean it when we said

14   those were fully integrated agreements and that we weren't

15   relying on anything outside of those agreements.  Given these

16   contracts and the way they were negotiated, there was no way

17   LBHI or anybody at LBHI could have known that these developers,

18   assuming they were -- we don't see it in the complaint -- were

19   relying on some financial information that's outside of these

20   contracts.

21           Even if -- even worse is their prior pleadings

22   undercut this whole reasonable reliance argument.  The Court in

23   Emergin in the Southern District in New York in 2001, that's

24   165 F.2d, 615, faced a very similar issue.  And the Court found

25   where your prior pleadings make no mention of the issues raised

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 47

1    for the first time in the fraud claims the plaintiffs are

2    "undercutting its reliance issue."  That's exactly what

3    happened here, Your Honor.  These claims have been outstanding

4    for a long time, as Your Honor knows.  They had original

5    complaints.  They have proof of claims.  None of those claims

6    mention anything to do with Lehman's solvency or Lehman's

7    finances as something they relied on.

8          It wasn't until they saw the examiner's report and the

9    resulting shareholder lawsuits that we heard for the first time

10   late last year that they know believe they were relying on

11   Lehman's finances with respect to entering these deals.  And

12   what they've done isn't plead in the alternative.  In the

13   original complaints and in this complaint to an extent, they

14   say that they were relying on Lehman's ability to fund and its

15   promise to fund in entering into these loans.  Now, the

16   argument is we were relying on Lehman's finances.  That's not

17   pleading in the alternative, Your Honor.  That's making up new

18   facts.

19         Finally, under --

20         THE COURT:  Well --

21         MR. MCCARTHY:  -- 9 --

22         THE COURT:  -- let me just ask you a question then,

23   because I hear what -- I hear all that you're saying.  But

24   isn't there something that amounts an implied representation on

25   the part of every lender, especially a major institution such

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 48 of 98

Page 48

```
 1    as Lehman was in 2007, that it had enormous financial resources

 2    and the capacity to perform with respect to the loans that it

 3    was entering into at that time?  And isn't it also at least

 4    fair to conclude that part of what is being alleged here is

 5    that we relied upon the soundness of the financial institution

 6    with which we were dealing?  It turned out that that was not a

 7    sound financial institution and that one of the reasons that we

 8    ended up in this predicament is that we now know that there

 9    were some transactions that were apparently designed to conceal

10    the true state of Lehman's financial condition?

11          That's effectively what they're saying.  You're saying

12    that does not establish under any stretch of the imagination a

13    cause of action that can get to trial.

14          MR. MCCARTHY:  Your Honor, if I understand what you

15    just made out that that's actually not what they're saying

16    because they cannot argue that Lehman didn't perform under

17    these loans.  You're right.  When Lehman said it was going to

18    perform under these loans, it entered into contracts and said

19    we will perform.  We will give you the money you're asking for.

20    The contracts lay out those duties.  In fact, Lehman did

21    perform under these loans.  It fully funded an eighty-five-

22    million-dollar loan.  It fully funded 163 million with its co-

23    lenders on the Fountainebleau loans with no default called

24    before the Fountainebleau went bankrupt.

25          On the Town Square loan, it fully funded first the --
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 49

1     through the first term, extended, then funded more dollars

2     after the bankruptcy until it looked at the project and made a

3     business decision that this project is going down.  Your Honor,

4     there's nothing in the record to suggest that despite Lehman's

5     issues with its solvency it could not perform and continued to

6     perform.  Even at -- even after its bankruptcy, and on the date

7     of the disclosure statement, Lehman was cash heavy and liquid

8     and could perform on these loans.  In instances it made

9     business decisions not to, and the terms of the contract can

10    cover that, for instance, but that's -- it wouldn't be fraud

11    even if Lehman didn't perform.

12           It would be a breach of contract there.  The fact here

13    is Lehman did perform on the contracts, and that leads right to

14    materiality.  They can't make out a claim for materiality

15    because they can't explain how Lehman's financial condition was

16    material to this deal.  That would have been material to some

17    stockholder who was investing in Lehman, possibly.  Would it be

18    material to someone who was asking for more than the contract

19    stated?  Possibly.  But here, Your Honor, LBHI funded under the

20    loans.

21           The developers weren't investors.  The relationship

22    here, the nexus between Lehman's overall financial status in

23    this deal, is much too remote and tenuous.  The only thing that

24    was material to this deal was LBHI's financial ability to fund

25    the loans.  And it actually did that even after its bankruptcy.

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 50

1    The financial condition of Lehman in general, after seeing

2    that, was not only not material, it wasn't relevant to this

3    deal after you see the funding.

4         THE COURT:  Well, maybe I'm missing something then.

5    What is it about the fraud claims that you're now seeking to

6    dismiss that if they were allowed -- let's just say they

7    weren't dismissed.  They just stayed in the case.  How would

8    they operate to excuse the developers' obligations to Lehman?

9         MR. MCCARTHY:  Well, the developers certainly haven't

10   made that out yet, Your Honor.  But my understanding is what

11   the fraud claims would do is two things.  One:  if you had the

12   fraud, you would wipe out the contracts, right?  The -- if you

13   have fraudulent inducement, the contract no longer exists; the

14   terms of the contract other than perhaps some damages related

15   clauses.

16        THE COURT:  Well -- and you're saying that they're

17   counting on fraudulent inducement here because whatever may

18   have been going on within the accounting at Lehman had

19   absolutely no connection to the relationship that existed

20   between the lenders and the borrowers?

21        MR. MCCARTHY:  Absolutely, Your Honor.  That's why

22   they could never make out the who, what, when, where and why

23   because they can't show a nexus as to -- they can make that

24   repos were occurring and that high execs at Lehman knew the

25   purpose of those.  But they can't show the relationship between

Page 51

```
1    this deal, so I don't know see how they'll ever make out the

2    who; somebody at LBHI that said something with respect to these

3    developers regarding the finances; the what or where that

4    statement or omission took place.  All of their claims have no

5    nexus to this deal.  And for fraudulent inducement, you have to

6    be induced into taking this particular deal.

7            At bottom, Your Honor, even if they were able to make

8    out the 9(b) standard, and it's just not here.  I mean,

9    Lehman -- LBHI is not on fair notice.  The fraud claim fails

10   because they are relying on a statement of the -- of a future

11   promise.  And at law, one cannot base a fraud claim on a

12   promise to perform in the future unless you prove fraudulent

13   intent.  There needs to be a fixed intention not to perform.

14   The claim that LBHI knew when it made the loans that it would

15   never be able to perform.  Here, that claim could never make

16   sense because LBHI did in fact perform.

17           Moreover, even if you looked at it and said there were

18   fundings toward the end where business decisions were made

19   where they weren't performed, they would need to prove that

20   somebody in summer of 2007 at LBHI knew over a year before its

21   bankruptcy, over a year before they all lost their jobs and the

22   market tanked that they would never be able to perform on this

23   loan.  Under Iqbal, it's just not plausible to make that out,

24   Your Honor.  And so, what they try to do is distance themselves

25   from this law.
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 52

1           They now say -- they undercut their whole argument by

2      doing it, but they now say we're not saying it was Lehman's

3      solvency we were concerned of or the promise that -- excuse me,

4      that they wouldn't be able to fund in the future.  All we're

5      saying is that Lehman hid some of its finances, concealed some

6      finances.  And that's enough.  Your Honor, if that's all

7      they're saying, there could never be materiality here.  How

8      could hiding something that -- just some of your finances

9      impact this loan?  The bottom line, even if it was insolvency,

10     it wouldn't impact a loan.  They can't have it both ways.

11          Either they're saying what they argue now; that it was

12     just hiding something about the finances, in which case it

13     fills that law because it can't be material, or they're

14     actually arguing that Lehman should have told them about

15     solvency, which can't make out a claim of fraud, or that Lehman

16     actually made a promise to fund in the future which it failed

17     on; in which case, they cannot prove that unless they have

18     fraudulent intent.

19          The reality here is that as pled, the claim fails for

20     both reasons, and it fails under 9(b).  And that leaves me with

21     what's next.  Assuming we are able to get rid of these

22     farfetched fraud claims that have nothing to do with this deal,

23     where does that leave us?  Your Honor, we submit that removing

24     these claims from this litigation right now is correct under

25     the law.  It makes sense under the law, but it's also -- it

also makes sense under judicial economy. Dismissing the baseless claims now at the outset will allow the parties to focus on the actual transaction, the claims that have something to do with the transaction, the parties that have something to do with the transaction as opposed to everybody at Lehman that knew about repos and the documents that have something to do with the transactions.

Otherwise, we're looking at a discovery schedule that's going to encompass so many things that have nothing to do with these underlying loan documents. Upon dismissal of the fraud claims, we'd be left with three claims. First, the breach of contract claim that's in the Town Square litigation. As of now, we have not moved to dismiss that claim. That claim; it is that LBHI supposedly made an unwritten promise to provide 600 million dollars or so of additional loans under the Town Square deal. We believe there was never any promise there, and we will certainly prove that. Right now, though, we have not moved to dismiss that claim.

You also have an unjust enrichment claim in both cases; the Fontainebleau and the Town Square cases. They're two very separate claims. They fail that law in both instance. For Fountainebleau, the claim relates to fees that LBHI earned with respect to an Aventura mall deal. And Your Honor probably saw the Aventura mall deal in the briefing. That deal is a separate deal, a completed deal, a fully integrated deal that

Page 54

1    relates to property in Florida.  There can no -- there cannot

2    be an unjust enrichment with respect to that deal because both

3    parties agree that there was a valid and enforceable contract

4    that controls that mall, that loan.

5           And both parties will also agree that they both --

6    they both won in that deal.  It was a successful deal for both

7    parties.  But bottom line, unless you can argue that that

8    contract for Aventura, not these contracts here, but the fully

9    integrated contract for Aventura is not valid or not

10   enforceable, you cannot have a unjust enrichment claim with

11   respect to that deal.

12          With respect to Town Square, the claim relates to fees

13   that LBHI earned when it extended the Town Square loan.  And

14   they're right.  LBHI did not move to collect right at the

15   maturity date of the loan.  Instead, LBHI gave these developers

16   time to find a solution.  It extended.  When it extended, of

17   course it got fees.  The reason you can't have unjust

18   enrichment there is because both parties got exactly what they

19   negotiated for in the extension; here, an extension, and to

20   LBHI's fee -- LBHI got fees earned.  You could never have

21   unjust enrichment where both parties at law got exactly what

22   they negotiated for under the terms of a contract.

23          Finally, Your Honor, the third claim that remains is

24   the promissory estoppel claim in Town Square.  Assume the fraud

25   is dismissed, that claim is still there in Town Square.  We

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 55 of 98

Page 55

1    have moved to dismiss that claim.  It relies primarily on the

2    same set of facts of the Bridget contract case.  But instead,

3    it's promissory estoppel; that we should be estopped from

4    collecting damages incurred because we did make this promise

5    for long term financing.  As stated, that promise was never

6    there.  But even if it was, the pro -- we move to dismiss the

7    promissory estoppel claim because promissory estoppel at law

8    has a reasonableness element.

9            And here, the explicit terms of the integration

10   agreements and the guarantees in the loans, when you put that

11   together with having sophisticated parties, you cannot have

12   promissory estoppel at law.  Given the terms of those loans, it

13   was unreasonable for them to rely on any unwritten promise.

14   And you do have -- without a doubt, you have integration

15   clauses and full integration clauses in both of these

16   agreements.

17           Your Honor, in conclusion, for all of the reasons I

18   stated today and in our briefing, I ask that you dismiss the

19   Fountainebleau amended counterclaims in their entirety and

20   dismiss count 1, 3 and 4 in the Town Square amended complaint.

21   Thank you.

22           THE COURT:  Thank you.  Before you start --

23           MR. MEISTER:  Good afternoon, Your Honor.

24           THE COURT:  -- before you start, you may want to screw

25   in that microphone.

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 56 of 98

Page 56

1          MR. MEISTER:  Okay.  Hopefully, this will work.  Good

2     afternoon, Your Honor, Stephen Meister; Meister, Selig & Fein

3     for all the parties adverse Lehman on these two adversary

4     proceedings.  For simplicity's sake, if it's okay with Your

5     Honor, I'll simply refer to them as the Turnberry entities.

6     With me today are Chris Major and Remy Stocks of my office,

7     Dennis Richards, co-counsel and a representative of the client,

8     and in-house counsel, Mario Remi (ph.)

9          THE COURT:  Okay.  There -- I see three adversaries.

10     There's 5, 6 and --

11          MR. MEISTER:  I'm sorry.  There are two on

12     Fountainebleau and one -- I beg your pardon.  So in all three,

13     we're representing -- I'm speaking for all the parties adverse

14     to Lehman.

15          THE COURT:  Okay.

16          MR. MEISTER:  Your Honor, counsel either misapprehends

17     or at the minimum seriously mischaracterizes the gravamen of

18     our claims and counterclaims.  One critical document I'd like

19     to spend a moment on at the outset because it really sets forth

20     in very simply terms the essence of the claims is an affidavit

21     which is attached to the pleadings Bret Ersoff (ph.).  Mr.

22     Ersoff was a high ranking Lehman employee who is deeply

23     involved with the Turnberry account.  He was a managing

24     director and a vice president.

25          In his sworn affidavit, he states that "During my

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
Pg 57 of 98
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 57

1    employment with Lehman, the Turnberry business entities related

2    to the Soffer family" -- that's the family that controls

3    Turnberry -- "were large and valued clients of the firm with

4    whom we did a significant number of transactions, including

5    major loans.  The relationship with these clients and others

6    like them was such that Lehman and Turnberry would quickly

7    agree to the terms of financing on an all or informal basis and

8    documents would be prepared later."

9         Mr. Ersoff goes on to say that in early 2007 "Lehman

10   wanted the financing business of Turnberry's Aventura mall in

11   Florida."  And that's this third property that's different or

12   not either the Town Square property in Las Vegas or the

13   Fountainebleau property in Las Vegas, but a third property

14   owned by the same group of developers.  He goes on, Mr. Ersoff,

15   he says "Other lenders were competing to make the same loan.

16   If Lehman was able to get that business, Lehman could use the

17   loan to anchor a large securitization, sell the securities and

18   make a profit.  This business was a core part of our group.

19   The Aventura mall loan would lift the quality of the entire

20   securitization based on the quality of the assets" -- "a

21   quality of the asset."

22        He then goes on to say "In order to obtain the

23   Aventura mall financing in the amount of 430 million, Lehman

24   offered to and agreed to provide the Aventura loan on a

25   nonrecourse basis and to provide a nonrecourse 625 million

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 58

```
 1   dollar loan on Turnberry's Town Square project in Las Vegas and
 2   to provide 400 million dollars in financing with limited
 3   recourse on the retail component of Turnberry's
 4   Fountainebleau's proj" -- "Fountainebleau's Las Vegas project.
 5   Lehman was given the Aventura mall financing business it wanted
 6   and as planned, placed the loan in a three-billion-dollar
 7   securitization sold by Lehman in the fall of 2007."
 8         "As it promised, Lehman also financed the retail
 9   component of Turnberry's Fountainebleau Las Vegas project.
10   Before making the promised 625 million dollar Town Square loan,
11   Lehman made a temporary 95 million dollar bridge loan secured
12   by direct and indirect interests in the related asset.
13   Although the bridge was made in the names of Jeffrey and
14   Jacqueline Soffer personally, its proceeds were used" -- "its
15   proceeds were for use" -- excuse me -- "in the Town Square
16   project.  And it was understood and agreed by the Soffers and
17   Lehman that the 95 million dollar bridge loan would be repaid
18   by the 625 million dollar nonrecourse permanent loan to the
19   Town Square business entity."
20         He finally goes on to say "Ultimately, Lehman was
21   unable to perform the 625 million dollar loan.  To the best of
22   my recollection, prior to Lehman's bankruptcy, it had never
23   failed to perform a loan transaction it had agreed to do with
24   any of Turnberry's entities."
25         So Your Honor, what I find unusual about this case and
```

Page 59

1   unusual about the motion to dismiss is it's true here we are

2   making a fraud and the inducement claim.  No question.  But

3   here, the promise aspect, if you will, is admitted by Lehman

4   going in.  Here, we have an affidavit attached to the pleadings

5   in which a Lehman employee at the time, a high ranking Lehman

6   employee, is admitting exactly what we're alleging.  So what

7   we're saying in the connection between really the three

8   properties is that there was a three-way deal.

9         The deal was Lehman wanted this low loan to value, 430

10   million dollar Aventura mall refinancing to anchor a three-

11   billion-dollar securitization that we had, that my clients had

12   other offers to finance on that were even superior.  They

13   agreed to give Lehman that financing to enable it to go forward

14   with that securitization, that three-billion-dollar

15   securitization, on condition that Lehman provide an -- a 625

16   million dollar loan on the Town Square mall, which was then

17   substantially toward completion, not fully leased up, and a 400

18   million dollar loan on the retail component of the

19   Fountainebleau Hotel and Casino project, which I think took the

20   form of a 315 million dollar senior loan and an 85 million

21   dollar mezzanine loan.

22         When counsel says the loans were performed, that's an

23   absolutely false statement.  You just saw Mr. -- or heard Mr.

24   Ersoff's statement that the 625 million dollar permanent loan

25   commitment on Town Square wasn't performed.  But in addition,

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 60

1    it's undisputed -- or certainly, it's alleged that of the 400

2    million dollar retail loan on Fountainebleau only 250 or so

3    million dollars, approximately, was funded and 150 million,

4    approximately -- I think it was 147 million was unfunded.  And

5    contrary to counsel's statements, the facts are that it was

6    Lehman who pulled the plug on the Fountainebleau project, and

7    it was Lehman's recanting their 400 million -- the balance of

8    their 400 million dollar commitment which drove that project

9    into bankruptcy -- the Fountainebleau project.

10           The project was sold at a bankruptcy to Mr. Icon

11   (ph.).  And the Town Square project was ultimately lost in

12   foreclosure by the Turnberry entities because of the failure of

13   Lehman to make good on its 625 million dollar loan commitment,

14   which is attested to in Mr. Ersoff's affidavit.  So you grasped

15   exactly correctly, as I heard your words, the essence, the

16   gravamen of our claim.  What we are saying is that in early

17   2007 Lehman cooked its books, fraudulently removed billions of

18   dollars of both assets and liabilities from its balance sheet

19   through these repo transactions, which were clearly loan

20   transactions that Lehman fraudulently booked the sale

21   transactions so that the assets were removed, as the examiner

22   noted, days before the end of a reporting period and then put

23   back on the books days after the end of the reporting period.

24           And the affect of that fraudulent removal of tens of

25   billions of dollars of assets -- of troubled assets, of MBS,

Page 61

1    mortgage backed securities, in a plummeting market was to

2    fraudulently diminish the degree of Lehman's leverage.  And so,

3    while counsel speaks of insolvency and a -- there being no duty

4    to disclose insolvency, in fact, the word "insolvency" doesn't

5    appear anywhere in our claims or counterclaims.

6         We're not alleging that Lehman was insolvent.  What

7    we're alleging is that Lehman was highly unstable at the time,

8    financially unsound if you prefer that terminology, at the time

9    it made these promises to us and that we were misled about its

10   stability because we were reviewing fraudulent accounting

11   statements.  Now, you can go ahead and say that well, how do we

12   know Jeff Soffer or Jackie Soffer read those statements.

13   That's besides the point because, Your Honor, under the Twombly

14   and Iqbal plausibility test, where this Court makes a context,

15   sort of common sense approach, in my lingo, are you kidding me

16   kind of test about the allegations, here you have a financial

17   institution; one of the largest, most respected investment

18   banks in the world at the time which is being judged and

19   watched by Moody's, Standards & Poors (sic), Fitch Ratings and

20   countless stock analysts.

21        And they were all taken in by these fraudulent

22   accounting statements.

23        THE COURT:  You keep that they're fraudulent, and I'm

24   not going to stop you from saying that.  But there's absolutely

25   nothing that's in front of me right now that proves that

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 62 of 98

Page 62

```
 1   assertion.  Instead, there is a general incorporation by

 2   reference of Mr. Valukas' extensive report, which references,

 3   among many other things in the report, the existence of these

 4   so called repo 105 transactions, which I gather is what you're

 5   alluding to.

 6         However, it's also true that in the immediate news

 7   cycle that followed the public disclosure of Mr. Valukas'

 8   report I'm aware that the Wall Street Journal and other news

 9   outlets following what goes on on Wall Street referenced the

10   fact that transactions of this sort were not limited to Lehman

11   Brothers.  And in fact, this kind of creative accounting is

12   something that was not limited by any means to Lehman.

13         I am by no means suggesting that I countenance what

14   was done during that period, not am I making any comment as to

15   whether or not the legal opinions that were issued out of

16   London concerning these transactions sanitized those

17   transactions or may have part of some very concerted effort to

18   create a legal self-harbor for them.  But the assertion of

19   fraud hasn't been established.

20         MR. MEISTER:  Your Honor, I would respectfully point

21   to one word you said a moment ago, and that is you said you

22   don't think I've proved fraud.  Okay?  I'm not required to

23   prove anything at this stage in the proceedings.

24         THE COURT:  I'm not suggesting that you've pro ---

25   that you need to prove anything.  You're just alleging things.
```

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 63 of 98

Page 63

```
 1            MR. MEISTER:  I'm --

 2            THE COURT:  It's just that you're sug -- you're

 3    adverting to documents and suggesting that the facts that the

 4    Valukas report discussed repo 105 transactions amounts to

 5    fraud.

 6            MR. MEISTER:  Let me be more specific, if I may.

 7    Maybe it will be helpful, okay?  If a financial institution

 8    holds ten billion dollars, to pick a number, of financial

 9    assets of some type.  In this case, I think it was mortgage

10    backed securities, and they're dropping in value.  And it goes

11    and it pledges them to borrow money from another financial

12    institution secured by the -- that ten billion dollars of MBS,

13    mortgage backed securities.

14            The booking of that transaction, as I understand it,

15    would be that the ten billion dollars would con -- of

16    securities, although pledged, would continue to be shown as an

17    asset on the balance sheet of Lehman and the loan -- if it got,

18    for argument's sake, a seven-billion-dollar loan against the

19    assets would show up as a liability.

20            In a repurchase transaction, what happens is that the

21    lender says I will buy the asset -- the assets from for seven

22    billion dollars subject to your right to buy them back for

23    seven billion plus interest on a certain date; seven days from

24    now, ten days from now, what have you.  My understanding of

25    gap -- and I concede I am not an accountant, okay, but my
```

Page 64

1    understanding is that that transaction in economic substance,

2    whichever way it's expressed as a -- an outright loan or as a

3    repo or repurchase transaction, is an economic substance alone

4    and that booking it as a sale if fraudulent.

5            Now, I think at this stage of the proceedings if I

6    simply allege it is a fraud I think that is sufficient.  Now,

7    maybe the issues you raise, Your Honor, will come into play at

8    a trial level or perhaps at a summary judgment level, where

9    you -- where this Court tests whether that is indeed a fraud.

10   I would also respectfully submit, given on what's on in the

11   world, I for one am not terribly impressed that other financial

12   institutions besides Lehman engaged in this process.  Perhaps

13   they were all committing fraud.

14           I don't think that my clients' complaint should be

15   thrown out if it in fact is the case that Lehman was one of

16   several investment banks that committed this sort of, I think,

17   fraudulent accounting practice.  It --

18           THE COURT:  Let me break in and ask you a question,

19   though, which is to me critical to this whole argument.  Let's

20   just say for the sake of this discussion that I agree with you

21   that the mere fact that the Valukas report is generally

22   incorporated by reference constitutes some ability on your part

23   to proceed with claims of fraudulent inducement.  What are

24   those claims?

25           MR. MEISTER:  The clai --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 65

1           THE COURT:  Let's just say for the sake of argument

2    that some time prior to June and July of 2007 Lehman in the

3    ordinary course of its accounting practices before quarterly

4    reporting engaged in so called repo 105 transactions.  So what?

5           MR. MEISTER:  The so what is very simple, Your Honor.

6    The so what is -- here is the syllogism of our argument.  It's

7    very simple.  First of all, I want to just be clear about one

8    or two facts that we allege or allegations we make because I

9    think they bear on this.  Contrary to what counsel said, we

10   make very specific allegations that there were fifty-nine

11   billion dollars of repo transactions in the first and second

12   quarters of 2007, and the first quarter begins December 1st,

13   2006 due to Lehman's fiscal year.  And that fifty-nine billion

14   dollars of repo transactions predated all the relevant loan

15   documents and guarantees in these adversary proceedings.

16   That's number one.  So counsel's statement to the contrary is

17   simply incorrect.

18           Number two is there are allegations in the

19   complaint -- there are quotes which are taken from the

20   examiner's report where high ranking individuals at Lehman

21   spoke in disparaging terms about these repo transactions, which

22   I think lends some credibility -- additional credibility to our

23   view that they were fraudulent.

24           THE COURT:  You're talking about the quotes from

25   Martin Kelly?

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 66 of 98

Page 66

1          MR. MEISTER:  One of them is from Martin Kelly, one of

2     them is from a Mr. Jin Tilly (ph.), a CFO who increased the

3     availability or the dollar limits for the repo transactions by

4     three billion dollars.

5          THE COURT:  How does this connect to your claims,

6     however?

7          MR. MEISTER:  The connection, Your Honor, is simple,

8     okay?  I've talked to you about the Ersoff affidavit, and it's

9     very clear that you had a three-way deal.  You had Lehman

10    asking for the 430 million dollar Aventura mall refinancing --

11    don't give it to anyone else -- to anchor a three-billion-

12    dollar securitization.  That's part one.

13         Part two is we will gi -- if you give us that, we,

14    Lehman, will give you, Turnberry, two things.  We'll give you

15    625 million dollars of permanent financing on Town Square, and

16    we'll give you 400 million dollars of retail financing for the

17    retail component of Fountainebleau.  That's the three-way deal.

18         What we're saying is very simple.  What we're saying

19    is that at the time that that handshake was made that Mr.

20    Ersoff attests to the world financial community of stock raters

21    and analysts and credit raters like Moody's and Standards &

22    Poors (sic) had been duped by Lehman's fraudulent accounting

23    practices into having a mistaken impression of the financial

24    stability of Lehman due to an underappreciation of their

25    leverage levels.  And as a result of that, we entered into this

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 67

1    transaction where had they had been honest and reported the

2    repurchase transactions as loan and had the financial community

3    understood that the true degree of their leverage, then the

4    impression of Lehman in the financial community in early 2007

5    would have been much more like it was in mid 2008.

6         And then, we would never have entered into these

7    guarantees because, in other words, on that 95 million dollar

8    advance on the 625 million dollar loan, which was made to the

9    Soffers individually, the contemplation, the clear

10   understanding was that was a pre-advance on what was going to

11   become a 625 million dollar loan.  So it never had to be paid

12   back if they fulfilled their obligation.

13        If we knew at the time that they promised to make the

14   625 million dollar loan that they were so highly leveraged that

15   they might not be able to make the 625 million dollar loan we

16   wouldn't have entered into the transaction with them.  And

17   therefore, we were fraudulently induced into the transaction.

18   That's the connection.  And that is a plausible claim.  That is

19   a plausible claim.

20        Your Honor, I ask you to consider this.  If you had

21   ninety-nine to one leverage on an asset class that drops just

22   two percent in value, which is a very small drop, you are

23   insolvent because now you have ninety-eight dollars for every

24   nine-nine dol -- of value for ninety-nine dollars of debt.  If

25   you have a leverage ratio of seventy to thirty and your asset

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
Pg 68 of 98
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 68

1    class drops twenty-five percent in value, you're solvent

2    because you have seventy-five dollars in value and seventy

3    dollars in debt.  So leverage is crucial.

4          And the reason that -- ask yourself, Your Honor, why

5    did they engage in these repo transactions.  Why did they do it

6    just before the reporting period?  And why did they put the

7    assets and liabilities back on just after the reporting period?

8    Precisely because they knew that if the analysts at Moody's and

9    Fitch and Standards & Poors (sic) saw their leverage levels

10   they would have downgraded them.  And had those -- and they did

11   downgrade them at a later time.  And had those downgrades

12   occurred, we wouldn't have entered into these transactions.

13         So here you have Lehman suing on a ninety-five million

14   dollar loan, a per -- in essence, a guarantee.  It's their

15   makers, legally speaking, that wouldn't gone into place but for

16   my clients having been fraudulently deceived about the

17   stability of Lehman's financial condition.  And ultimately,

18   they didn't fund the 625 million dollar loan.  They didn't fund

19   150 million of the 400 million dollar loan.  And by the way,

20   they didn't fund twenty-four million of the ninety-five-million

21   advance.

22         Your Honor, I would like to tie this back, if I may,

23   to Twombly and Iqbal, the two United States Supreme Court cases

24   that created the so-called plausibility test in a 12(b)(6)

25   motion to dismiss, because I think ultimately --

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 69

1          THE COURT:  You also have a 9(b) problem here too.

2          MR. MEISTER:  And I'm going to address the 9(b) issue,

3     but I'd like to take them in that order quickly, if I may.

4          Iqbal made clear that the test is a two-part test.  In

5     the first instance the Court is charged with determining

6     whether any of the allegations of the complaint are conclusory.

7     If they are conclusory, then they become disentitled to the

8     presumption of truth that otherwise inheres.  In other words,

9     if they are factual or nonconclusory, then you must presume

10    them to be true for purposes of deciding this motion.  Now,

11    regardless, you then take the allegations that are

12    nonconclusory and decide whether those claims make out a

13    plausible claim for relief.  That's the two-part test.

14          So the first thing that I want to point out is that I

15    strenuously disagree and don't, quite frankly, see how one

16    could possibly conclude that the allegations are conclusory.

17    Conclusory means the defendant negligently drove his car into

18    plaintiff's car.  That's a legal conclusion.  Here it might be

19    Lehman fraudulently prepared its books and records.  That's not

20    at all what we say.  We give very specific recitations of the

21    105 and 108 transactions of their effects on the books, not

22    only by reference to the examiner's report, but by restating

23    them in the complaint.

24          And Your Honor, I would point out that under Federal

25    Rule, I think it's 10(c), it says:  "A statement in a pleading

Page 70

1    may be adopted by reference elsewhere in the same pleading or

2    in any other pleading or motion.  A copy of a written

3    instrument that is an exhibit to a pleading is a part of the

4    pleading for all purposes."

5            Now, it's true we didn't attach this voluminous

6    report, but that would have been silly because it's in the

7    court records, so we reference the report.  And I believe under

8    10(c) of the Federal Rules, we are entitled to have this Court

9    deem the statements in the examiner's report as if they were

10   alleged at length in our complaint.

11           THE COURT:  But the examiner's report is not a

12   pleading.

13           MR. MEISTER:  But that doesn't matter.  It's not a

14   pleading, but it's an exhib -- it details the nature of the

15   fraud.  Now, there are statements --

16           THE COURT:  The examiner's report was prepared

17   pursuant to an order of this Court for a set of express

18   purposes to facilitate the reorganization of Lehman Brothers

19   and to provide transparency to parties-in-interest.  It

20   fulfilled that purpose, and it did so very well.  It is not,

21   however, a document of the sort that one can advert to the way

22   you are and say, well, because something is contained in the

23   examiner's report that supports my independent cause of action.

24   In effect, there's no nexus here between what's in Mr. Valukas'

25   report as to what he discovered and what you're alleging.

Page 71

1           MR. MEISTER:  Your Honor, first of all, let me just

2      say, Lehman says repeatedly that the examiner's report is not

3      binding on this Court, which is true, and that it's not

4      evidence, which I agree with.  Okay?  We are not submitting it

5      as evidence and we have no evidentiary burden on us at this

6      time.

7           The only reason we reference it is because the

8      transactions -- the 105 and 108 repurchase transactions are

9      complex transactions.  We are in a -- laboring under a notice

10     pleading system.  And we thought it would be helpful to Lehman,

11     in understanding the nature of our claims, to incorporate that

12     by reference.  That's it.  I don't want to make more of it than

13     it is.

14          I would respectfully submit that within the four

15     corners of our complaint the allegations are more than

16     sufficient.  We explain the repo transactions.  We explain that

17     they're loans and not sales, that they were frauds and that

18     they removed assets and liabilities from the balance sheet,

19     misled readers of the report, and we relied on it and wouldn't

20     have engaged in the transaction, which was a three-legged

21     transaction: the 625 million dollar Town Square loan, the 400

22     million dollar Fontainebleau retail loan, and the Aventura

23     financing, in the absence of that understanding which was

24     fraudulently based as to their financial stability.

25          THE COURT:  I'm going to revert to your earlier

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 72 of 98

Page 72

```
 1    articulation of the Iqbal rule which, in your terms, amounts

 2    to:  Are you kidding me?  Because I have a really hard time, on

 3    pure plausibility grounds, believing, based upon the two

 4    components that your argument rests on, that your clients

 5    seriously considered, in 2007, any issues with respect to the

 6    financial strength of Lehman.  And in fact, in point of fact,

 7    there were no questions in 2007 --

 8              MR. MEISTER:  But Your Honor --

 9              THE COURT:  -- as to the financial strength of Lehman

10    Brothers.  We're talking about a time that pre-dates the advent

11    of the financial crisis which led to the, in effect, end of the

12    world as we know it.

13              And just give me a chance to finish.

14              MR. MEISTER:  Sure.

15              THE COURT:  You have talked about the Ersoff

16    declaration as, in effect, establishing that there is this kind

17    of loose understanding that happens in the finance community as

18    to these borrowers where people would talk about a deal and the

19    deal would then later be documented.  And in that loose

20    environment there was a connection between the Aventura

21    property, which was valuable to Lehman Brothers, and the

22    financing of these two projects in Las Vegas.

23              I have absolutely no doubt that that in fact probably

24    happened.  And in the real estate finance community the parties

25    may have had certain understandings.  That doesn't mean there's
```

Page 73

1    an actual tie-in.  That doesn't mean that these are legally

2    connected transactions.  That doesn't mean that what was in

3    anybody's mind at the time, once documented, controls the

4    documents because of the integration provisions that we're

5    familiar with.

6          And I'm not done.

7          Under these circumstances, I find it truly implausible

8    to believe that your clients had in their minds anything with

9    respect to Lehman's financial standing, considered for a minute

10   anything about Lehman's financial statements or knew anything

11   about what a repo was or might be.  There's nothing to suggest

12   that.  And so I have a very hard time, even if I were to

13   conclude that the Valukas report allegations are somehow

14   properly incorporated in your pleading, that you have alleged

15   anything that amounts to fraud as to these transactions.

16          MR. MEISTER:  Let me see if I can change your mind,

17   Your Honor.  Okay?  So let's take two different pieces.  One is

18   the tie-in and one is my client's perception about Lehman's

19   financial stability.  Okay, let's deal with those two things.

20          First of all, Your Honor, we're at the pleading stage.

21   In point of fact, there is hard evidence of the tie-in.  It's

22   not loose, as you suggest.  Suppose I were to tell you there

23   are e-mails from Lehman that say: "We're doing a three-way

24   deal; if you give us the Aventura loan we will give you this

25   625 million and this 400 million."  Suppose there are a half a

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 74

1    dozen term sheets that are circulated in the 625 million and

2    there are, you know, term sheets on the 400 million, and there

3    are e-mails from Lehman personnel that absolutely tie it in.

4    So Your Honor, respectfully, your rendition of the facts is not

5    correct.

6         THE COURT:  It doesn't matter.  Yesterday the Second

7    Circuit, in a summary order, affirmed a decision that I

8    rendered some time ago that was later affirmed by District

9    Judge Swain, in a case called LH 1440.  In that case, the

10   question was whether certain parts of a related loan

11   transaction were in fact fully integrated or whether or not

12   they were separately transferrable.  And in that particular

13   instance, which involved State Street Bank, there was a repo of

14   one part of what, at least the borrower thought, was a fully

15   integrated loan.  It didn't matter what the borrower thought

16   because the loans were separately transferrable.  It doesn't

17   matter what these e-mails say.  What matters is what the

18   documents say.

19        MR. MEISTER:  Your Honor, if I may.  With respect to a

20   fraud claim, that may be true.  With respect to a fraud in the

21   inducement claim that is not the law of New York.

22        In a Second Circuit decision, Manufacturers Hanover v.

23   Yanakas, the Second Circuit held -- quoted to another decision,

24   and it said, quote, "If a contract recites that all of the

25   parties' agreements are merged in the written document, parol

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 75 of 98

Page 75

1    evidence is not admissible to vary, or permit escape from, the

2    terms of the integrated contract.  Such a general merger

3    clause" -- this is the other case that they're quoting to --

4    "is ineffective, however, to preclude parol evidence that a

5    party was induced to enter into the contract by means of

6    fraud."

7            The Second Circuit continued, quote, "Thus, even when

8    the contract contains an omnibus statement that the written

9    instrument embodies the whole agreement, or that no

10   representations have been made, a party may escape liability

11   under the contract by establishing that he was induced to enter

12   into the contract by fraud."

13           That is to say, sir, that an integration clause,

14   particularly an omnibus generalized, boiler plate integration

15   clause, does not bar, as a matter of law, a claim of fraud in

16   the inducement.  Let's not forget here what we're talking

17   about, for example, in Town Square, is this ninety-five million

18   dollar bridge loan.

19           That document says -- that document has an integration

20   clause that says that -- and I have it quoted here, "This

21   agreement and the other loan documents embody the entire

22   agreement and understanding between the parties with respect to

23   the" -- capital L -- "Loan" -- which is that ninety-five

24   million dollar loan -- "and supersede and cancel all prior loan

25   applications, expressions of interest, commitments, agreements

08-13555-mg    Doc 25876    Filed 02/16/12    Entered 02/29/12 13:47:04    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 76 of 98

Page 76

1    and understandings, whether oral or written, relating to the

2    subject matter hereof" -- which of course is the ninety-five

3    million dollar loan -- "except as specifically agreed to the

4    contrary."

5             That's an omnibus, you know, sort of very generic,

6    boiler plate integration clauses that lawyers use all the time.

7             Here you have a 95 million dollar loan and you have an

8    allegation, supported by a sworn statement of a Lehman

9    employee -- admitted by a sworn statement of a Lehman employee,

10   that there was a 625 million dollar commitment, manifold times

11   the 95 million dollar loan.  It's absurd, I would suggest, to

12   say that an integration clause in the 95 million dollar loan

13   bars a claim with respect to a 625 million dollar loan.  That's

14   just not the law.  It's a fraud in the inducement claim.

15            Your Honor, I would like to take a moment to address,

16   because I do agree, actually, with what you said; I just don't

17   agree it bars my claim.  I think you're absolutely right when

18   you say, Your Honor, that in early 2007 my clients were not

19   fearful of Lehman's financial stability.  I think that's true.

20   I don't know if they know about repurchase transactions.  I

21   wouldn't be surprised, though, if it was true what you said,

22   that they didn't.  Okay?

23            I don't think that bars my claim.  I don't think it

24   renders it implausible.  In fact -- and I don't think it

25   matters that that was a year or a year and a half -- not a year

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 77 of 98

Page 77

1     and a half, a year and change before the collapse.  In fact,

2     what led to the collapse -- what led to the collapse was that

3     the lenders were more highly leveraged than the borrowers even.

4     And there's no question that Lehman was entering into these on

5     and off transactions where they were taking assets and

6     liabilities off of their books just before a reporting period

7     and putting them back on after their books to dupe the

8     financial community.

9              And so I agree with you that my clients weren't

10    worried about Lehman's financial condition when they signed

11    this.  That's exactly the point.  But that doesn't mean it's

12    implausible, facially implausible, such that their claim should

13    be dismissed, because the allegation or the essence of the

14    claim really is that had these fraudulent accounting practices

15    not been employed then the financial community would have had

16    rang the alarm bell, in plain English, earlier.  And had they

17    rung the alarm bell earlier, they wouldn't have engaged in this

18    transaction -- these transactions; they had plenty of other

19    opportunities at that time.  And so I think that it is a

20    plausible claim.

21             With regard to the 9(b) -- I'd like to get to that

22    before concluding -- I don't think we have a problem under the

23    9(b).  It's not who, what, when, where, why; it's who, what,

24    when, where how.  And I think it's absurd, quite frankly, to

25    even discuss the "who" when you're talking about statements

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 78 of 98

Page 78

1     that are contained in published SEC documents, 10-Qs.

2           In other words, the whole point of the who, what,

3     when, where, the particularity that's required in fraud, is

4     because if you allege that so and so made such and such an oral

5     statement at 3 in the morning in a diner on Broadway, well, the

6     defendant's entitled to know who is it exactly that made that

7     statement, where was he when he made that statement, et cetera,

8     okay, and what was the content of that statement.

9           But where the fraud is contained in a published SEC

10    document, that completely evaporates away because there's no

11    question in anyone's mind of what the fraud was.  It's an

12    adopted statement.  So there's no 9(b) problem here.  It's just

13    impossible for there to be a 9(b) problem when the fraud is

14    contained within an SEC filing.

15          I don't think that there is a plausibility problem,

16    even though I agree with you that my clients probably didn't

17    have Lehman's -- not probably, I'm sure didn't have Lehman's

18    financial stability issues in their mind, otherwise they

19    wouldn't have engaged in the transactions.  The question, I

20    think, is it plausible to say that in the absence of the

21    financial fraud, in the absence of them cooking their books,

22    would the financial community have rang the alarm bell earlier

23    and would my clients have not engaged in this transaction.

24    Those are the questions.

25          Why isn't that facially plausible?  Why can't I go

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 79

1    depose an analyst from Moody's, put that statement in front of

2    him and say, "If this had been booked properly and if this

3    repurchase transaction for fifty billion dollars had been

4    booked, you know, would that have changed Lehman's leverage

5    ratio if it had been booked as a loan and would that have

6    caused you to change your rating?"  Okay?  Now, I don't know

7    what the answer is yet, but if he says "Yes, it would have

8    changed my rating," I've made my case, I think; I should be

9    allowed to proceed.

10          The other thing I also want to touch on briefly, Your

11   Honor, is the economic -- I'm sorry, before I get to that.

12   This notion of a duty to disclose is another red herring

13   because, first of all, I'm not alleging insolvency.  I'm

14   alleging that they committed fraudulent accounting practices

15   which hid their true leverage levels, but I'm not alleging they

16   were actually insolvent in early 2007.  I don't know if they

17   were or they weren't.

18          But the point is that it's very clear law in New York

19   that if you have a party that's completely mute and silent on

20   insolvency you have to be able to establish a duty to disclose

21   the insolvency.  But once the party actually makes affirmative

22   statements about its financial condition, if those affirmative

23   statements are misleading or fraudulent, then there's a duty to

24   make the statements complete, fair and not misleading.  So

25   that's a red herring, because they had affirmative statements

Page 80

1    in their 10-Q, and they were misleading.

2              In addition, there's a special facts doctrine in New

3    York which indicates that even in the absence of a fiduciary

4    duty, where there are just contracting parties -- and here of

5    course you have a borrower and a lender, contracting parties --

6    and there are special facts of which one party is aware that

7    would make the transaction unfair in the absence of its

8    disclosure, disclosure is required.

9              So I think, in summary, Your Honor, we do make a

10   plausible claim.  We have tied together the 625, the 400 and

11   the Aventura 430 million dollar refinancing, through admissions

12   by Lehman.  The question -- the difficult question in this case

13   is what would the financial community of raters and analysts

14   have done with noncooked books, with accurate, fair and not

15   misleading, nonfraudulent financial statements?  What would

16   they have done and how would that have affected my client's

17   behavior?  Those are open factual questions.  But we should be

18   allowed to proceed.

19             Also, Your Honor, the Economic Loss Rule has

20   absolutely no application to this case.  It's another red

21   herring.  The Economic Loss Rule says that if I engage an

22   architect to draw plans and the plans are not conforming with a

23   building code and I can't use them, I can't sue him in tort for

24   my money back because I have a bargain, I have a contract for

25   the plans.  But if I build the building and it comes crashing

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 81 of 98

Page 81

1    down because of design defects and there's property injury and

2    personal injury, I can sue in tort for my personal injury and

3    property injury.  I can't have a duplicative tort claim for my

4    economic benefit of the bargain loss.  Aside from the fact that

5    it has no application to this case, in concept, New York courts

6    have repeatedly held it doesn't apply to fraud.  So the

7    Economic Loss Rule doesn't bar the claims either.

8          In conclusion, Your Honor, the allegations of fraud

9    here are pleaded with substantial particularity within the four

10   corners of the complaint without regard to reference to the

11   examiner's report.

12         The plausibility standard is met, for the reasons I've

13   said, because it is possible and it is plausible that the

14   financial community would have re-valued Lehman's stability had

15   the financial statements been done nonfraudulently.  Their

16   statements, because they are particularized, are entitled to

17   the presumption of truth.

18         9(b) does not present a problem because the fraudulent

19   statements are contained within SEC filings.

20         We allege that there are fifty-nine billion dollars,

21   which is very significant in relation to Lehman's market cap at

22   that time, of fraudulent 105 and 108 repurchase transactions

23   prior to entering into these contracts, the ones that are at

24   issue.  That must be assumed to be true; it is true.

25         We don't have to have a duty to disclose because we

Page 82

1    are not basing the case on insolvency.  And in any event, there

2    were affirmative misrepresentations of financial stability

3    which invoked a duty to be accurate when they were describing

4    their own financial conditions.

5         Lehman's reliance based attack is -- which is really,

6    I think, the plausibility argument, is just something that has

7    to be tested on the proof.

8         The Economic Loss Rule doesn't apply to fraud claims.

9         The unjust enrichment claims, Your Honor, are not

10   barred because it's black letter law in New York that when a

11   party seeks, based on a fraudulent inducement claim, to rescind

12   the contracts at issue, then you're allowed to maintain an

13   unjust enrichment claim while those claims are outstanding.

14        The generalized merger clauses, Your Honor, are simply

15   not barred because we're not talking about a representation

16   about the 95 million dollar loan, we're talking about a

17   different transaction, a 625 million dollar transaction, six to

18   seven times the size.  So that generalized merger clause does

19   not bar a claim about a six to seven times larger transaction.

20        We also think we made good claims for punitive damages

21   because we do think that the public interest is affected here.

22        Lastly, Your Honor, I want to mention, before we close

23   today, that it's interesting to me that I'm here defending a

24   motion to dismiss against pleadings that were filed in 2009 and

25   early 2010.  That's quite a long time ago for us to be

Page 83

1   discussing a motion to dismiss.  The reason for that -- and

2   there were many, many, many adjournments, over a dozen, on

3   consent -- the reason for that, Your Honor, is that the parties

4   have been engaged in good faith settlement discussions,

5   substantive settlement discussions.  I don't know all the

6   details because, honestly, I have not been privy to them;

7   they've been handled by Mr. Soffer and various representatives

8   from Lehman.  What really has happened here is that over the

9   course of those discussions Lehman -- the lead negotiator for

10  Lehman I think has changed four times, and obviously it's

11  complex and the new Lehman negotiator has to be brought up to

12  speed.

13        But the point is that we -- the parties have agreed

14  upon search terms and discovery.  They've actually collected

15  all of the documents under those search terms to be produced,

16  and they're ready to produce them and they're ready to conduct

17  the depositions.

18        I think, if you dwell upon the essence of what we

19  discussed today, and I think the most critical essence is the

20  plausibility, the truth of whether the financial community

21  would have re-rated Lehman and whether the Soffers would have

22  acted differently in the absence of these financial frauds.

23  That remains unproven, but we should be allowed to get to that

24  proof.  We shouldn't have these claims dismissed at this stage.

25        The only reason we're here so late is because -- and I

Page 84

1    don't blame Lehman for this, I think it's part of the process;

2    they're in bankruptcy, they're in reorganization proceedings,

3    but there's not quite the longevity to their higher-up

4    employees that there might be in a normal context.

5            Therefore, Your Honor, we ask that the motion be

6    denied in all respects and that stern discovery schedules be

7    set.  And if Lehman wants to test our claims on summary

8    judgment, then that's something else.  And frankly, I think the

9    Court is entitled to the comfort and security of having them

10   tested with that discovery behind us.

11           Thank you, Your Honor.  Unless you have any further

12   questions?

13           THE COURT:  I have lots of thoughts but no other

14   questions at the moment.

15           MR. MEISTER:  Thank you, Your Honor.

16           THE COURT:  I think what I'm going to propose is

17   before you come to the podium to respond, as I expect you're

18   going to, I'd like to take about a five-minute break.  So let's

19   just stretch until 3:30.

20       (Recess from 3:22 p.m. until 3:35 p.m.)

21           THE COURT:  Be seated, please.

22           Please proceed.

23           MR. MCCARTHY:  Your Honor, before I jump into the

24   substance, briefly, I did want to just mention some of the

25   mechanics of the case.  The delay was talked about a little

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 85

1    bit, in discovery, and I do want to just clear up the record.

2    Any delay here as to why we're here on the motion to dismiss

3    today is because these fraud claims were just filed late last

4    year.  I mean, there's been no delay in moving forward in

5    trying to get these fraud claims dismissed.  So --

6              THE COURT:  I also saw the scheduling order which was

7    entered late last year, relating to today's motion, which

8    included setting today as the hearing date.  So I'm generally

9    familiar with the record.

10             MR. MCCARTHY:  Thank you, Your Honor.  As to the

11   remainder of the case, yes, there has been some overturn in

12   Lehman, of course.  But senior management has stayed the same;

13   Ms. Halperin has been on this case since the beginning of this

14   litigation.  Change in management hasn't changed the

15   settlement.  That has not been the delay.  The parties have met

16   together, we have worked together to try to get there.  Bottom

17   line, Lehman has responsibilities to its creditors.  It cannot

18   just walk away from the hundreds of millions of dollars that

19   are outstanding.  That's why we've pushed forward.

20             As to the discovery, again, yes, the parties have

21   worked together and we're continuing to work together, have

22   come close to settling on search terms.  Some of the delay

23   there has been these new claims.  You know, we have to decide

24   what we're going to do with repo-related discovery, discovery

25   that has nothing to do with the transaction.  And we've been

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 86 of 98

Page 86

1    working together to do that, but there is more to be done.

2    We're still trying to work out a schedule for that discovery.

3    We have the documents to review still, so although we've

4    collected them, they still need to be reviewed.  And I think

5    the same is true for opposing side.  Most recently we've

6    exchanged a discovery schedule, and I think we've just been

7    asked to give them a little more time on the discovery piece.

8    We're reviewing that and seeing if we can.

9         As to the substance, I want to let the briefs and the

10   prior arguments speak for themselves on most of the claims, but

11   as to the fraud, what I sat there and was surprised by is what

12   I didn't hear.  And I didn't hear how they make out a claim for

13   fraud.  I didn't hear how the elements of fraud are made out.

14   Instead, what I heard, and what I saw in most of the briefing,

15   is why they're able to avoid the pleading requirements, why

16   this case is so special that they don't need to meet the

17   pleading requirements.

18        Your Honor, we cited case law in our briefs, and I

19   think Your Honor is familiar with it, based on what I heard

20   here today.  They're not -- you can't just incorporate, by

21   reference, a 2,000 plus page examiner's report and say you've

22   put a party on fair notice.  I know we heard today that that

23   was done as a -- you know, to oblige us and help us understand

24   the claims, but it doesn't help anybody have fair notice of

25   what the claims are when you just cite to a 2,000 plus page

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 87 of 98

Page 87

```
 1   report.
             Even if you could do that and you could incorporate,
 2   by reference, this examiner's report, the affidavit of Mr.
 3   Ersoff, and now the new thing we're hearing about today, these
 4   SEC filings, taking a look at those items does not support
 5   their fraud claim.
 6             I'll start with the SEC statements.  Your Honor, where
 7   does it mention the SEC statements in the complaint?  Where
 8   does the complaint or any of the attachments say that anybody
 9   from their side relied on Lehman's finances or looked at
10   Lehman's finances or cared about Lehman's finances?  Counsel
11   stood up here today and talked about SEC filings and why those
12   are so important to this case.  The complaint doesn't make
13   out -- it doesn't even mention SEC filings or anything about
14   what they reviewed as to Lehman's finances or what they wanted
15   to review but didn't.
16             As to the affidavit of Brett Ersoff, I do want to
17   mention that because we heard a lot today about how that's an
18   admission from Lehman.  Your Honor, this is not an admission
19   from Lehman.  Mr. Ersoff is a former employee.  As the case
20   will go on -- you understand, I'm sure, what you need to do for
21   a motion to dismiss.  But taking a step back, as this case goes
22   on, you'll find out that Mr. Ersoff is a former employee who
23   made the statement after he left the company, and the
24   credibility of this statement is in question and will be in
25   question as this case goes on.  He's now affiliated with the
```

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 88

1    Turnberry entities.

2           But in any case, even if you look at this affidavit

3    and say -- take it for the truth of it, where does it say that

4    they relied on finances?  The affidavit has nothing to do with

5    Lehman's finances.  It doesn't talk about them caring about

6    Lehman's solvency.  It doesn't say that they requested it or

7    that anyone from Lehman talked to the Soffers about the

8    finances before these deals.  If anything, this affidavit makes

9    out a claim for a breach of contract with respect to failure to

10   fund the 600 million dollar loan.  And they do have a claim for

11   that.  I'm not saying it's valid, but we don't -- we haven't

12   moved to dismiss that here today.

13          They keep talking about this three-way deal to fund

14   the loans.  Failure to fund a loan is not fraud; it's a breach

15   of contract claim.  They may or may not have that in

16   Fontainebleau.  They haven't set one out in their complaint;

17   they don't have the claim.  In Town Square they do have a

18   breach of contract claim for failure to fund.  Perhaps that

19   makes out a claim for breach of contract.  It comes nowhere

20   close to meeting the pleading requirements for fraud.

21          And then on to the examiner's report.  As we mentioned

22   in our briefing, much of the examiner's report has absolutely

23   nothing to do with the repos or the claims in this case, and

24   much of it would actually support LBHI's position.  If they

25   cared about LBHI being able to fulfill its obligations under

Page 89

1   the contracts -- those are contract claims -- but in any case,

2   if that's what they really cared about, the examiner's report

3   supports, in part, the position that LBHI could fulfill those

4   obligations.  It talks about repos not even ramping up until

5   after these -- long after there loans were executed.  So if

6   they learned about those repos, if you look at the ramp-up

7   statement in the examiner's report, there's reason to believe

8   that they wouldn't even have thought there was an issue there.

9   And the examiner's report certainly talks about Lehman's

10  liquidity, and that liquidity really wasn't an issue.  They had

11  the ability to live up to the contracts that they executed.

12  And the In re Lehman Brothers Security litigation actually

13  supports this too.

14       You know, here today it really does sound like they'd

15  like to put themselves in the same position as the

16  shareholders, that they were investing in Lehman's finances.

17  They're not even close to that, Your Honor.  You know, these

18  were people that were buying a product.  They got the product

19  that they asked for.  If they didn't, perhaps they have a

20  breach of contract claim.  It is not a fraud claim.

21       But the In re Lehman Brothers Security litigation case

22  at 799 F. Supp. 2d., 289, it's from 2011, they actually dismiss

23  claims in that case by shareholders, someone who were in a far

24  superior position for reliance there, those claims that related

25  to liquidity, because the Court stated, quote, "There are no

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 90

1    facts contradicting the statements that Lehman's liquidity

2    position was sufficient to cover its liquidity needs at any

3    time."

4             Your Honor, what they're asking for is so unique, and

5    that's why they can't make out a claim of fraud.  As borrowers

6    they were buyers, and they got what they asked for.  If they

7    didn't, again, let them stand on their Town Square breach of

8    contract claim which makes out the exact same argument we heard

9    today from counsel about this three-way deal.

10            If these developers are right, then any party could

11   bring any claim against Lehman, and really anybody who made out

12   these repos, saying what you gave us is what we asked for, but

13   we don't care anymore, we don't need to pay for it because if

14   we knew that you had concealed something to do with your

15   finances we're allowed to just walk away and act as if you

16   never gave us any consideration in the first place.

17            Your Honor, the most important thing that we didn't

18   hear today was reliance.  You asked counsel, you know, why you

19   didn't see anything in these papers about someone from the

20   developer's side reviewing the finances or caring about the

21   finances or relying on the finances before they entered into

22   the deal.  Your Honor, that's one of the important elements of

23   a claim of fraud.

24            Counsel stood here and admitted that -- he didn't just

25   say perhaps they didn't review it; I believe he said they

LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 91

1    didn't review it.  He would agree with you that they didn't

2    care about the finances going into that.  That is why they

3    cannot make out a claim of fraud here.  That's why they're so

4    very different than an investor in the company of Lehman.  Here

5    they were purchasers who got what they wanted.

6         Your Honor, we ask that you dismiss these fraud claims

7    and dismiss the other claims we've moved to dismiss in our

8    briefing, avoid a long and drawn out, unnecessary litigation

9    with respect to facts that have nothing to do with these

10   contracts or the deals contemplated by these contracts, and

11   allow the parties to focus on the transaction at issue.

12        They do have a breach of contract claim remaining in

13   Town Square, and we will address that with respect to this

14   three-way deal that Mr. Ersoff alludes to in his affidavit and

15   that counsel talked about here today.  But bottom line, the law

16   requires them to plead a claim of fraud with particularity

17   under 9(b) and they have not done that.

18        Thank you, Your Honor.

19        THE COURT:  Thank you.

20        Anything from the committee?

21        MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

22   Tweed, Hadley & McCloy, on behalf of the committee.

23        Very briefly, I think the word that I've heard most

24   often this afternoon is nexus.  Mr. McCarthy just discussed

25   what the plaintiffs -- what the other parties have been able to

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
Pg 92 of 98
LEHMAN BROTHERS HOLDINGS INC., ET AL.

Page 92

1    allege here in terms of nexus, and I don't think it meets

2    anybody's standard.

3             What I think I'm hearing is, again, Mr. McCarthy just

4    alluded to, is some kind of fraud on the market theory that

5    would be appropriate if we were talking about shareholders.

6    We're not talking about shareholders; we're talking about

7    parties who bargained at arm's length for the extension of

8    credit by Lehman.  And we don't think that would support a

9    claim of fraud here.

10            And we are, Your Honor, very concerned that other

11   parties -- other parties have and other parties will, if

12   there's a precedent set here, use the examiner's report and the

13   repo 105 allegations in a context in which they have no

14   application.

15            So for that reason and the absolute failure to plead

16   any nexus here, we think the fraud claim should be dismissed.

17   And I think the other claims which are linked to it, in the

18   ways described by counsel for the Turnberry parties, should

19   also be dismissed.

20            Thank you.

21            THE COURT:  Okay.  Mr. Meister, you have more?

22            MR. MEISTER:  Very, very briefly, Your Honor.  Your

23   Honor, responding to the committee, the nexus here is -- and

24   the reason there isn't the fear, or I don't think there should

25   be, Your Honor, the fear of this avalanche of litigation is if

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 93 of 98

Page 93

1   we had a loan, just the ninety-five million dollar loan, you

2   don't have this issue.  The reason you have the issue is

3   because there was a 625 million dollar term sheet that was

4   never funded that would have taken out the 95 million dollar

5   loan.  Said differently, there would have been 530 million

6   dollars of further funding under the 625 million dollar loan.

7           I don't see any reason why -- so the nexus is that we

8   wouldn't have taken the ninety-five million dollar loan in the

9   absence of having a fraudulently prepared understanding or an

10  understanding pursuant to fraudulently prepared financial

11  statements of Lehman's financial stability.  We wouldn't have

12  taken out the 95 million dollar loan because we would have

13  known of their instability and would therefore have not relied

14  on their ability to fund or promise a 625 million dollar loan.

15  That's the nexus.

16          By the way, I don't understand counsel's remarks about

17  the 10-Q and 10-K not appearing.  They appear in paragraph 14

18  of the Fontainebleau -- it says the 10-K for 2007 and the 10-Q,

19  so they certainly are alleged.

20          There was a statement made, which I don't understand

21  at all, that Mr. Ersoff is affiliated with Turnberry.  That is

22  categorically untrue.  He went to work -- I've forgotten now --

23  for another investment bank where my understanding is he works

24  in a similar capacity to what he did for Lehman, and he has no

25  connection whatsoever, disclosed, undisclosed to Turnberry.

Page 94

 1          THE COURT:  Okay.  I'm taking this under advisement

 2     but I'm going to make some comments that I hope will guide the

 3     parties, pending a formal adjudication, if one is needed.

 4          When I first looked at the pleadings in preparation

 5     for the argument and discovered that there was certainly an

 6     overlap in the legal arguments and apparently an overlap

 7     through the principals with respect to the exposure going back

 8     and forth, my immediate reaction, particularly given the aging

 9     of the cases, was that some kind of alternative dispute

10     resolution approach to this was probably overdue.

11          Mr. Meister made the comment toward the end of his

12     principal argument that the parties have been engaged in

13     substantive negotiations for some time, and without casting

14     stones at Lehman, suggested that one of the problems has been a

15     change in personnel responsible for the negotiations.  It

16     doesn't matter, frankly, what the cause may be for the failure

17     to reach some kind of business understanding here.

18          The fact of the matter is that if we are spending the

19     afternoon dealing with a motion to dismiss and if the parties

20     are looking for a signal from the bench as to how certain

21     issues that may be pivotal to these negotiations may be

22     decided, I'm prepared to give some hints.  I am not today

23     dismissing the fraud claims, but based upon the argument that

24     was presented, these claims are pitifully weak, and in all

25     likelihood will be dismissed.

08-13555-mg   Doc 25876   Filed 02/16/12   Entered 02/29/12 13:47:04   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 95 of 98

Page 95

1          Based upon the argument that has been made by Mr.

2     Meister, and I've listened to it with great care, the theory is

3     so highly speculative as to probably not be consistent with the

4     Iqbal standards of plausibility.  For the parties to spend

5     significant time and effort taking discovery as to what might

6     have been in 2007 is a wasteful frolic and detour.  The parties

7     should deal with the reality of their discussions.

8          I see zero causation between the issues identified in

9     the examiner's report and anything that actually happened or

10    might plausibly have happened in June and July of 2007, based

11    upon disclosure of such transactions.  And this is a litigation

12    tactic that presumably is designed to gain negotiating leverage

13    for the developers.  I'm not going to take away all of that

14    leverage now, but I want you to know that you should count it

15    at pretty close to zero.

16         As far as the remainder of the issues identified in

17    the motion to dismiss, I'll give those arguments further

18    thought as I consider a formal ruling, but I hope a formal

19    ruling is not necessary.  This has gone on far too long, and

20    frankly, it's just about money.  It is critical that litigation

21    of this sort not clog my docket, and there is a whole portfolio

22    of adversary proceeding litigation in the Lehman case that has

23    been stayed so that parties can submit their disputes to

24    alternative dispute resolution.  While this is not litigation

25    in the same category, it's certainly no more important than any

Page 96

1   of that litigation, and in many respects, much simpler, both as

2   to the facts and as to the amounts at issue.

3          If the parties are unable or unwilling to get to yes

4   on their own, I strongly urge that the parties agree to

5   mediation and do so promptly.  This will be carried to the next

6   adversary proceeding omnibus date, not for purposes of a ruling

7   but for purposes of a status report from counsel as to what, if

8   any, progress has been made in getting to a substantive

9   resolution, and if no progress has been made, some indication

10  as to a willingness to mediate.  If there is no stated

11  willingness to mediate I will order it.

12         We're adjourned until next time.

13      (Whereupon these proceedings were concluded at 3:53 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 97

```
  1

  2                          I N D E X

  3

  4                          RULINGS

  5                                          Page      Line

  6     1. Motion of the Debtors and the Committee    19        12

  7     For Approval of the Settlement Transaction

  8     Resolving the Two Hundred Twenty-Ninth

  9     Omnibus Objection to JPMorgan's Asset

 10     Management Fund Claims (No Liability,

 11     Misclassified and Duplicative Claims) [ECF

 12     No. 2485] Granted

 13

 14     3. Hearing to Consider Granting Relief        29        13

 15     Requested in the Chapter 15 Petition and the

 16     Verified Petition for Recognition of Foreign

 17     Proceeding Granted

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 98

```
 1

 2                    C E R T I F I C A T I O N

 3

 4    I, Aliza Chodoff, certify that the foregoing transcript is a

 5    true and accurate record of the proceedings.

 6

 7

 8

 9

10    _____

11    ALIZA CHODOFF

12    AAERT Certified Electronic Transcriber CET**D-634

13    Sharona Shapiro

14    AAERT Certified Electronic Transcriber CET**D-492

15

16    Veritext

17    200 Old Country Road

18    Suite 580

19    Mineola, NY 11501

20

21    Date:  February 16, 2012

22

23

24

25
```