Donald E. Watnick (DW-6019)
LAW OFFICES OF DONALD WATNICK
122 East 42nd Street, Suite 606
New York, New York 10168
(212) 213-6886
dwatnick@watnicklaw.com
*Attorneys for Claimants Heidi L. Steiger and*
*Steiger Associates L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| In re | Chapter 11 |
| **LEHMAN BROTHERS HOLDINGS, INC.**, *et al.*, | Case No.: 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MEMORANDUM OF LAW BY CLAIMANTS HEIDI L. STEIGER AND
STEIGER ASSOCIATES L.P. IN OPPOSITION TO
DEBTORS' 254TH OMNIBUS OBJECTION TO THEIR CLAIMS**

**PRELIMINARY STATEMENT**

Claimants Heidi L. Steiger ("Steiger") and Steiger Associates L.P. ("Associates" and together with Steiger "Claimants" or the "Steiger Claimants"), by their undersigned counsel, hereby submit this memorandum of law in opposition to Debtors' 254th Omnibus Objection to Claims (the "254th Objection"), which includes objections to Claim No. 32379 by Steiger and Claim No. 32380 by Associates (the "Claims").

As set forth below, the Claims should not be reclassified as equity or disallowed because Claimants' stockholdings in Debtors did not arise from voluntary purchases and did not arise out of compensation received from a non-debtor Lehman entity. Rather, the Steiger Claimants were involuntary recipients of stock in Debtors in exchange for their previously held shares in Neuberger Berman, Inc. ("NB") at the time that Debtor Lehman Brothers Holding, Inc.

1

("LBHI") acquired NB. Claimants' shares of stock in NB were converted to shares of stock in LBHI as part of the acquisition agreement between the two entities – an agreement to which Claimants were not parties.

Moreover, more than 99% of the 321,502 LBHI shares of stock owned by Claimants at the time that Debtors filed for bankruptcy were received before LBHI acquired NB, resulting in the conversion of NB shares to LBHI shares. Most of Claimants' shares initially were received by them when NB went public and issued shares of stock to its partners, such as Steiger, in exchange for their previously held partnership interests. Less than one percent of LBHI shares received by Claimants occurred after Steiger's employment with NB ended. Thus, the shares referred to in the Claims had nothing to do with compensation paid by a non-Debtor entity and did not constitute compensation when Claimants received them.

In view of these circumstances, Debtors' stated grounds for subordinating or disallowing the Claims are not sustainable. As a matter of law, the Claims are not subject to subordination because they were not voluntary purchases and thereby their claims do not arise from purchases or sales within 11 U.S.C. §510(b). Further, these claims do not arise from Steiger's employment with a non-Debtor Lehman entity, but are more than 99% traceable to shares the Steiger Claimants received in NB that were involuntarily converted to shares LBHI when it acquired NB.

## FACTS

The following facts are relevant to the Claims and the objection to the Claims by Debtors and are based on the Claimants' Proof of Claims herein and, publicly filed documents annexed to the accompanying Declaration of Donald E. Watnick, Esq. (the "Watnick Dec.") and the annexed declaration of Heidi Steiger (the "Steiger Dec."):

2

1.      NB was a registered investment advisor that provided a wide range of investment services and products, particularly to high net worth individuals.  (See Lehman Rule 425 Filing dated July 22, 2003, relevant pages of which are annexed as Exh. A to the Watnick Dec.)

2.      NB was acquired by LBHI in October 2003 for approximately $2.6 billion (hereinafter, the "Acquisition").  (Id.)

3.      At the time of the Acquisition, Steiger was a founding shareholder of and an Executive Vice President with NB, in charge of NB's lucrative private asset management business.   At all times, Associates was and has been a family limited partnership in which Steiger has been a member.  (See Claimants' Proofs of Claim annexed as Exhs. B and C to the Watnick Dec.)

4.      In 1999, NB, which at the time was a partnership, had an initial public offering (the "IPO").  At the time, Steiger was one of the partners in NB.  Pursuant to the IPO, Claimants' partnership interests in NB, along with those of other partners, were converted to shares of stock in the newly formed NB corporate entity, which were issued to both Steiger and to Associates.  (See copy of the IPO Prospectus at 73, annexed as Exh. D to the Watnick Dec.)   These shares were referred to in public filings by Debtors and NB as "Founders Shares."

5.      At the time of the IPO, Steiger and the other former NB partners, as well as Associates and other family affiliates of such former NB partners, signed a "Stockholders Agreement," dated August 2, 1999, which provided a number of terms and conditions as to the newly issued NB Founders Shares and restrictive covenants for the former NB Partners, many of who, like Steiger, were officers and directors of the newly incorporated NB.  (Id. at 73-76.)  The Stockholders Agreement contained restrictions on the sale of Founders Shares by Steiger and Associates, such that sales generally were limited to no more than 10% annually.  (Id.)  The

3

Stockholders Agreement also contained a voting agreement that provided that all shareholders, including the Steiger Claimants, shall vote his, her or its shares in accordance with a majority of the shares held by all of the principal and affiliates voting in a preliminary vote. (Id.) Lastly, the Stockholders Agreement provided that the Steiger Claimants, and other founding partners, would be required to sell back their Founders Shares to NB for $2 per share if they engaged in "harmful activity," including soliciting clients or prospective clients of NB, employing or soliciting employees of NB, or soliciting or accepting business from any financial intermediary with which she or he had business contact during the year prior to her or his departure from NB. (Id.)

6. In connection with the Acquisition, all NB shares, including those owned by the Steiger Claimants, were converted to LBHI shares. (Watnick Aff., Exh. E, a copy of a Rule 425 Filing filed by Lehman in connection with the Acquisition, at 4-5.)

7. As set forth in the Steiger Claimants' proofs of claim in this case, at the time of the Acquisition, Steiger owned 509,102 NB Founders Shares that were converted to 241,365 shares in LBHI and Associates owned 85,626 NB Founders Shares that were converted to 40,595 shares in LBHI. Additionally, Steiger owned 28,965 NBI Reload shares that were converted to 13,732 LBHI shares and 30,496 NB-144 Control Shares that were converted to 14,458 LBHI shares; and Associates owned 10,000 NBI-144 Control shares that were converted to 4,741 LBHI shares. (See Claimants' Proof of Claims, Watnick Dec., Exhs. B and C.) As set forth in the Steiger proof of claim, approximately 2,200 shares of LBHI were acquired by Steiger after the Acquisition, representing less than 1% of Claimants' LBHI shares at the time that Debtors filed for bankruptcy. (Watnick Dec., Exh. B, Exh. B thereto.)

8. In connection with the Acquisition, Steiger signed an amendment to the Stockholders Agreement (the "Amended Agreement"), which contained new restrictions and

4

restrictive covenants. The Amended Agreement was a pre-condition in the LBHI-NB agreement for the closing of LBHI's acquisition of NB. (Watnick Aff., Exh. F, Form 8-K filed by Lehman on July 22, 2002 at 71). The Amended Agreement restricted Claimants and the other former NB shareholders to selling no more than 10% of their Founder Shares per year, and further provided that if any signatory engaged in "harmful activity," which was defined consistently with the initial Stockholders Agreement, they would be forced to sell their LBHI shares for a discounted price, at substantial financial loss. (A copy of relevant pages from the Amended Agreement are annexed as Exh. G to the Watnick Dec.)

9. In early 2004, after the closing of the LBHI acquisition of NB, Steiger resigned her position with NB, but remained subject to the "harmful activity" restrictions and limits on sale of her LBHI stock, in accordance with the Stockholders Agreement, as amended. (Steiger Dec., ¶2.) Thereafter, due to the "harmful activity" restrictions, Steiger did not pursue a number of potentially lucrative opportunities in the financial services industry, at significant financial loss. (See Proof of Claim, Watnick Dec., Exhs. B and C.)

10. At the time of Debtors' filing for bankruptcy, Steiger owned at least 162,960 shares LBHI shares that were restricted (from sale). (See Steiger Dec., Exh. A.) Based on the Stockholders Agreement annual removal of restrictions on 10% of the number of shareholdings, it is believed that approximately 20,000 of the LBHI shares owned by Associates also were restricted (from sale).[1]

11. Accordingly, the Steiger Claimants received LBHI shares as a consequence of the conversion of their NB shares pursuant to the Acquisition. Additionally, the Steiger Claimants' LBHI shares were not freely and openly subject to being sold but were subject to various

---

[1] Claimants reserve the right to re-state the number of LBHI shares that were restricted based upon further review of applicable records.

5

restrictions from sale. Further, the Steiger Claimants' LBHI shares were subject to forfeiture if Steiger engaged in "harmful activity," and thus effectually served as consideration for Steiger not providing services to other competitors in the financial services industry for which Steiger could have received substantial renumeration.

## ARGUMENT[2]

### I. STEIGER CLAIMANTS' CLAIMS NOT SUBJECT TO SUBORDINATION

One of the basis for Debtors' objection is that the Steiger Claims should be subordinated pursuant to 11 U.S.C. §510(b), which provides for subordination of claims "for damages arising from the purchase or sale . . . of a security [of the debtor]." In re Med Diversified, 461 F.3d 251, 253 (2d Cir. 2006). However, the facts presented here demonstrate that the Claims do not qualify for subordination under the plain language of 11 U.S.C. §510(b) and the policy rationales for subordination are inapplicable to the transactions giving rise to these Claims.

As set forth below, in this Circuit, courts have subordinated claims under 11 U.S.C. §510(b) for damages arising from the purchase or sale of securities. Id. Also relevant to the treatment of claim objections based on subordination is whether the claimant voluntarily took on the risks and expectations of a shareholder, as opposed to a creditor. Id.

### A. Claims Should Not Be Subordinated Under Plain Meaning of §510(b)

The plain meaning of 11 U.S.C. §510(b) provides for subordination of "'a claim arising from the purchase or sale of a security of the debtor or an affiliate of the debtor, [or] for damages arising from the purchase or sale of such a security. . .'" In re Marketxt Holdings Corp., 2008

---

[2] In further support of their opposition to Debtors' objection, Claimants also refer the Court to previously filed papers in opposition to Debtors' 118th Omnibus Objection to Claims by Richard J. Glasebrook II, et al. (Doc. No. 20996) which set forth additional legal reasons why subordination is not appropriate where, as here, the shares were involuntarily acquired.

WL 2164572 at *2 (Bankr. S.D.N.Y. 2008) (quoting 11 U.S.C. §510(b)), aff'd, 2009 WL 3068226 (2d Cir. 2009); see also In re Enron Corp., 341 B.R. 141, 149 (Bankr. S.D.N.Y. 2006).

Importantly, cases in which courts ruled in favor of subordination, in reliance upon the plain meaning of §510, claimants voluntarily entered into transactions that resulted in their receipt of securities of the debtor entities. For example, in In re Enron, 341 B.R. 141, the bankruptcy court held because claimants voluntarily agreed to accept stock options of debtor as part of their compensation arrangements, and their claims were based on damages arising from their receipt of these stock options which lost all value upon Enron's filing for bankruptcy, their claims should be viewed as "arising from" the purchase or sale of securities and subject to subordination under §510(b). See also In re Marketxt Holdings Corp., 2008 WL 2164572 at * 2 (plain meaning of statute covered claim based on sale of claimant's ownership interest in Debtor).[3]

Here, the Steiger Claimants' Claims are materially distinguishable from the foregoing cases. The Claims do not seek damages arising from a purchase or sale of the securities of "Debtors" because the securities acquired were NB shares – not LBHI – at a time when NB was unrelated to LBHI. In further contrast to these cases, the Steiger Claimants did not acquire their LBHI shares directly or as part of a voluntary transfer or transaction – that is, they did not receive these as part of a bilateral agreement between them and Debtors. Rather, Claimants involuntarily received virtually all of these shares as a result of an agreement between LBHI and NB that converted Claimants' NB shares to LBHI shares. The involuntary character of this

---

[3] Notably, in In re Med Diversified, 461 F.3d at 255, the Second Circuit ruled that there was ambiguity as to whether the claim qualified as "arising from" the purchase or sale of a security where claimant was supposed to receive shares of stock in debtors as part of a termination agreement (which shares were not issued prior to debtors' filing for bankruptcy). The Second Circuit held that the phrase "arising from" was susceptible to both the claimant's assertion that it applied to only "claims stemming directly from a purchase, sale, or rescission of the debtor's security," and the trustee's broader claim that it included claims predicated on failure to purchase stock. Id.

7

transaction stands in direct contrast to the foregoing cases, in which the courts expressly ruled in favor of subordination due to the claimants voluntarily acquiring shares of stock of the debtor entities.  See In re Med Diversified, 461 F.3d 251.  For these reasons, In re Enron, In re MarketXT and In re Med Diversified are factually inapposite and do not support subordination here.

Moreover, in In re Enron, the court also noted that its holding applied only to cases involving stock options, stating as follows:

> The Court notes that its conclusions apply only to stock options similar to those presented here.  The Court issues no opinion as to whether stock options might be designed in such a fashion that would result in different treatment under section 510(b).  However, as discussed herein, to the extent that stock options necessarily implicate the purchase or sale of a security, it is doubtful that any stock options can be so designed.

In re Enron, 341 B.R. at 144, fn. 3.  Here, the Claims do not arise from stock options.  Thus, by its own terms, In re Enron is not applicable at all and does not support subordination here.

In sum, under the plain meaning of 11 U.S.C. §510(b), because Claimants did not voluntarily acquire the LBHI stock at issue, the Claims do not arise from a purchase or sale of securities of Debtors and are not subject to subordination.

B.  Policies Underlying §510(b) Do Not Support Subordination of the Claims

In In re Med Diversified, 461 F.3d 251, the Second Circuit subordinated claims based on its finding that the policy rationales underlying §510(b) called for subordination where the claimant had voluntarily opted to take on the risks and expectations of a stockholder in the debtor entity.  The Court explained that even if the plain meaning of §510(b) does not provide for subordination, subordination should occur if: (i) the claimant took on the risks and expectations of a shareholder, as opposed to a creditor, and (ii) the claimant is seeking to recover from an equity pool relied upon by creditors in extending credit to the debtors.  Id. at 256; see also In re

8

CIT Group, 460 B.R. 633, 639 (Bankr. S.D.N.Y. 2011) ("As the Second Circuit held in In re Med Diversified, the real question is whether the claimant bargained for the risks and rewards of a holder of equity rather than a holder of debt.").

Here, in contrast, the Steiger Claimants never bargained to be a LBHI shareholder or voluntarily agreed to take on the risks and expectations of a LBHI shareholder, but involuntarily received LBHI shares as part of LBHI's acquisition of NB. More than 99% of Claimants' LBHI shares were involuntarily received as a result of the Acquisition and most of these shares are traceable not to a compensation arrangement but the IPO in which Claimants' partnership interests were exchanged for newly issued NB shares of stock (i.e., the Founders Shares). In short, Claimants' receipt of the LBHI shares is distinguishable from the situation presented in In re Med Diversified, where the claimant voluntarily agreed to accept debtors' shares of stock as part of an agreement terminating claimant's employment with debtor. Id., 461 F.3d at 253.

Compounding that Claimants involuntarily became LBHI shareholders, a condition of the LBHI-NB Acquisition agreement was that NB Founding Shareholders, such as Claimants, agreed to amend the Stockholders Agreement and accept new restrictions on transferring their stockholdings and on employment by Steiger in the financial services industry. These restrictions, which limited sale of NB Founders Shares converted to LBHI stock to 10% per year, meant that, unlike the holders of vested stock options in In re Enron, Claimants could not freely sell their shares and receive the typical benefits of being a shareholder.

The penalties for "harmful activities" further meant that Claimants did not take on the typical expectations of a stockholder and demonstrate that the character of Claimants' receipt of LBHI shares materially differs from those cases in which claims based on stockholdings were subordinated. By virtue of these penalties for engaging in "harmful activities," LBHI shares

9

were given to Claimants for the purpose of ensuring that Steiger, a senior NB executive who ran NB's private asset management business before the LBHI acquisition, did not compete with LBHI. Provided that Claimants did not do so, Claimants then would receive the value of the NB shares that they previously owned and were entitled to. These terms reinforce that this transaction did not involve Claimants willingly accepting stock in exchange for labor as a form of compensation or being given Debtors' stock in exchange for the possible benefits of a typical equity holder. The removal of restrictions on the LBHI shares owned by Claimants served as consideration for Steiger's providing a service to LBHI in the form of abiding by restrictive covenants and not providing services to competitors. Under these circumstances, Steiger should be treated as any other provider of services to LBHI – that is, as a general creditor.[4]

Finally, courts have rejected subordination where "the 'causal connection' between the purchase or sale of a security was too remote to require subordination of a contract claim when the purpose of the statute was considered." In re CIT Group, 460 B.R. at 643. Here, the causal connection is too remote to require subordination, in view of Claimants' acquiring virtually all of the shares at issue before the Acquisition, including a substantial portion as part of the NB IPO, and the shares serving as consideration for Steiger not competing with Debtors.

II.     CLAIMS NOT BASED ON COMPENSATION
        RECEIVED FROM NON-DEBTOR ENTITY

The second ground put forth by Debtors for disallowing the Claims is that they are based on compensation received from a non-Debtor Lehman entity. That is simply incorrect for three reasons. First, as set forth herein, Steiger never was employed by any "Lehman" entity. She was

---

[4] A second policy rationale for subordination is promoting an equity cushion for other creditors, however, in In Med Diversified, the Second Circuit recognized that "this is a less important rationale." In re CIT Group, 460 B.R. at 643 (quoting In re Med Diversified, 461 F.3d at 256). Moreover, this rationale should be given any weight here in view of the small amount of stock owned by Claimants relative to Debtors' capitalization, and the purpose of giving Claimants stock was not to enhance any equity cushion but to ensure that Steiger would not compete with Debtors.

10

employed by NB through early 2004, for a short transition period after LBHI's acquisition of NB. (See Steiger Dec.) Second, the shares that form the basis for the Claims were not paid to her as compensation by any non-Debtor Lehman entity, including NB. Claimants' received virtually all of these shares from NB prior to LBHI's acquisition of NB, at which time they were converted to LBHI shares. Third, Claimants did not receive substantially all of these shares as compensation. Rather, the largest piece of these shares was Founders Shares issued to Claimants as part of the NB IPO, in exchange for pre-existing partnership interests they owned in NB. (See Watnick Dec., Exh. B, Exh. A thereto.) That exchange had nothing to do with the payment of compensation.

In view of the foregoing, Claimants' shares have virtually no connection to compensation or Debtors and there is no factual basis for disallowing the Claims based on Debtors' argument that they arise from compensation.

III.    CLAIMANTS ARE ENTITLED TO RECOVERY BASED
       ON BREACH OF CONTRACT   AND UNJUST ENRICHMENT

As demonstrated above, Claimants have set forth valid proofs of claims, including based onr breach of contract and unjust enrichment based upon their abiding by a contract that required them not to engage in "harmful activities" to LBHI. Accordingly, LBHI received its bargained for consideration. Having performed its agreement, Claimants should be entitled to recover damages for breach of contract or damages based on the value of the services provided based on unjust enrichment. In short, Claimant should be treated as any other general creditor of Debtors and be paid based on having an unsecured claim, subject to proof of the amount of that claim, and recover the value of the services that they performed, including by not engaging in "harmful activity" as to LBHI for a close to five-year period.

## CONCLUSION

For the reasons set forth above, Claimants Heidi L. Steiger and Steiger Associates L.P. respectfully request that the Court deny the 254th Objection as it relates to their proofs of claim in its entirety and grant Claimants such other relief as this Court deems just and proper.

Dated: New York, New York
March 6, 2012

LAW OFFICES OF DONALD WATNICK

By: _____/s/Donald E. Watnick_____
Donald E. Watnick (DW-6019)
122 East 42nd Street, Suite 606
New York, New York  10168
(212) 213-6886
dwatnick@watnicklaw.com
*Attorneys for Claimants Heidi L. Steiger and Steiger Associates L.P.*