WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  |  |
|---|---|
| | : |
| In re | : Chapter 11 Case No. |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : **08-13555 (JMP)** |
| | : |
| Debtors. | : **(Jointly Administered)** |
| | : |

-------------------------------------------------------------------x

### NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN BROTHERS SPECIAL FINANCING, INC. TO ESTIMATE CLAIMS FILED BY CITADEL EQUITY FUND LTD. FOR PURPOSES OF ESTABLISHING RESERVES

      **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc., as a debtors and debtors-in-possession (together with their affiliated debtors in the above-captioned cases, the "Debtors") to estimate the amount of certain claims filed by Citadel Equity Fund Ltd. for the purposes of establishing reserves in connection with the Plan, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **March 22, 2012 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY, 10153, Attn: Ralph I. Miller, Esq. and Robert J. Lemons, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq. and Andrea B. Schwartz, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v) Teigland-Hunt LLP, 127 West 24th Street, 4th Floor, New York, NY 10011, Attn: Lauren Teigland-Hunt, Esq., attorneys for Citadel Equity Fund Ltd., so as to be so filed and received no later than **March 15, 2012 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Objection Deadline</u>").**

**PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: March 7, 2012
      New York, New York

/s/ Robert J. Lemons
Ralph I. Miller
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
                                                                  :
**In re**                                                         :        **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :        **08-13555 (JMP)**
                                                                  :
                              **Debtors.**                    :        **(Jointly Administered)**
                                                                  :
--------------------------------------------------------------------x

## MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN BROTHERS SPECIAL FINANCING, INC. TO ESTIMATE CLAIMS FILED BY CITADEL EQUITY FUND LTD. FOR PURPOSES OF ESTABLISHING RESERVES

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special

Financing ("LBSF," and together with LBHI and their affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession, the "Debtors"), file this motion and

respectfully represent:

### Preliminary Statement

1.       The Debtors intend to commence distributions to creditors pursuant to the

Debtors' Confirmed Joint Chapter 11 Plan (the "Plan") on April 17, 2012.  Section 8.4 of the

Plan requires the Debtors to maintain distribution reserves for disputed claims in the filed

amount of the claim unless a lower reserve amount is ordered by the Court or agreed to by the

US_ACTIVE:\43928015\11\58399.0003

parties.  For more than eight months, the Debtors have repeatedly requested Citadel Equity Fund

Ltd. ("Citadel") to agree to establish appropriate distribution reserves for duplicative and

contingent derivatives and guarantee claims that have been asserted by Citadel against LBSF and

LBHI in the amounts of approximately $916 million and $1.3 billion, respectively.

Notwithstanding that the derivatives transactions underlying Citadel's claims were novated to

Lehman Brothers International (Europe) ("LBIE") in August 2008, and, therefore, are no longer

obligations of LBSF or LBHI (in its capacity as credit support provider of LBSF), and the

contingencies required to trigger the claims are remotely speculative at best, Citadel has refused

to withdraw such claims or stipulate to appropriate reserve amounts.

        2.       As a result, the Debtors request that the Court exercise its authority,

pursuant to section 502(c) of the Bankruptcy Code and section 8.4 of the Plan, to estimate

Citadel's claims against (i) LBHI in the aggregate amount of $423,036,454, and (ii) LBSF in the

amount of $0, in each case, solely for the purpose of establishing distribution reserves under the

Plan so that LBHI and LBSF can effectuate the administration of the Plan without unnecessarily

diminishing distributions and unfairly prejudicing their other creditors.  Estimation of Citadel's

claims solely for reserve purposes will neither prejudice Citadel's rights to prosecute the claims

nor LBHI's or LBSF's rights to object to the allowance of the claims or seek estimation of the

claims for purposes of allowance.

### Background

        3.       Commencing on September 15, 2008 and periodically thereafter, LBHI

and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the

Bankruptcy Code.  The Debtors' chapter 11 cases were consolidated for procedural purposes

only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The

Debtors were authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.        On December 6, 2011, the Court entered an order confirming the Plan consistent with Section 1129 of the Bankruptcy Code (the "Confirmation Order").[1]  *See* ECF No. 23023.  The Effective Date for the Plan for each of the Debtors occurred on March 6, 2012.

## Jurisdiction

5.        This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334 and Sections 14(c), (e), (j) and (o) of the Plan.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Citadel Transactions

6.        LBSF and Citadel were parties to nineteen (19) credit trades (the "Citadel Transactions") that were governed by a 1992 ISDA Master Agreement, dated June 30, 2008, which included certain schedules, documents and confirmations (collectively, the "LBSF Swap Agreement").  LBHI was designated as the credit support provider of LBSF's obligations under the LBSF Swap Agreement.

7.        On August 25, 2008, LBSF and Citadel novated all of LBSF's rights and obligations with respect to the Citadel Transactions to LBIE (the "Novation"), with the effect that Citadel and LBIE became the counterparties to the Citadel Transactions, which became governed by a preexisting ISDA Master Agreement, dated April 27, 2001, between Citadel and LBIE (the "LBIE Swap Agreement").[2]  LBHI was designated as the credit support provider of

---

[1] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the Plan.

[2] Annexed hereto as Exhibit A is a summary of the Novation filed by Citadel in support of its proof of claim against LBSF (the "Citadel Claim Summary").

LBIE's obligations under the LBIE Swap Agreement. Pursuant to the Novation, LBSF and

LBHI (in its capacity as credit support provider for LBSF) were no longer obligated to Citadel

for the Citadel Transactions, although LBHI remained liable for the Citadel Transactions in its

capacity as credit support provider for LBIE.[3]

8.       In connection with the Novation, Citadel returned to LBSF approximately

$429 million that had been posted by LBSF as collateral for LBSF's obligations under the

Citadel Transactions and LBIE pledged approximately $400 million in collateral to Citadel to

support LBIE's obligations under the LBIE Swap Agreement, including the Citadel

Transactions.

9.       Contemporaneously with the Novation, as they did with many Lehman

counterparties, LBSF and LBIE entered into identical "back-to-back" transactions that passed the

economic risk and benefits of the Citadel Transactions from LBIE to LBSF. The "back-to-back"

transactions between LBSF and LBIE were governed by the terms of a side letter agreement,

dated July 24, 2006 (the "<u>Side Letter</u>").[4] The Side Letter did not establish contractual privity

among Citadel and LBSF or give rise to any liability of LBSF to Citadel for the Citadel

Transactions. The Side Letter was strictly an intercompany agreement among LBSF and LBIE.

**<u>The Citadel Claims</u>**

10.       On September 15, 2008, Citadel terminated all transactions under the

LBIE Swap Agreement, designated an early termination date of September 15, 2008 and

---

[3] The Novation was electronically confirmed through the trade confirmation platform MarkitSERVE, a service that allows users to electronically confirm certain types of transactions, such as novations. Pursuant to the MarkitSERVE Operating Procedures, all novations that are electronically confirmed through MarkitSERVE have the same legal effect as a fully executed agreement evidencing the novation. *See* Appendix L to the MarkitSERVE Operating Procedures, at 12-13, a copy of which is annexed hereto as <u>Exhibit B</u>.

[4] A copy of the Side Letter is attached hereto as <u>Exhibit C</u>.

demanded a termination payment pursuant to section 6(e) of the LBIE Swap Agreement.  Citadel

has asserted two sets of primary and guarantee claims with respect to the Citadel Transactions:

**Claim Set 1:**    (i) a primary claim against LBIE for a termination payment purportedly due under the LBIE Swap Agreement in the amount of $479,352,973, which is calculated as follows:

| | |
|---|---:|
| Mark-to-market value: | $808,711,287 |
| Expenses: | $3,451 |
| Default Interest: | $56,316,519 |
| Collateral Posted to Citadel: | ($374,875,907) |
| Unpaid amounts by Citadel: | ($10,798,927) |
| Total: | $479,352,973 |

(ii) a guarantee claim against LBHI for LBHI's guarantee of LBIE's obligation to make a termination payment to Citadel under the LBIE Swap Agreement in the alleged amount of $479,352,973 (proof of claim number 33633, the "LBIE-Related Guarantee Claim").

**Claim Set 2:**    (i) a contingent claim against LBSF for a termination payment purportedly due under the LBSF Swap Agreement in the amount of $916,336,920 (proof of claim number 33631, the "Contingent LBSF Primary Claim"), which is comprised of:

| | |
|---|---:|
| Mark-to-market value: | $808,711,287 |
| Expenses: | - |
| Default Interest: | $107,655,633 |
| Collateral Posted to Citadel: | - |
| Unpaid amounts by Citadel: | - |
| Total: | $916,366,920 |

(ii) a contingent guarantee claim against LBHI for LBHI's purported guarantee of LBSF's obligation to make a termination payment to Citadel under the LBSF Swap Agreement in the amount of $916,366,920 (proof of claim number 33632, the "Contingent LBSF-Related Guarantee Claim").[5]

11.    In support of these Contingent Claims aggregating almost $2 billion,

Citadel offers a single sentence: "[i]n the event that the novation described above is invalidated

for any reason pursuant to the LBIE Administration, [Citadel] will have a claim against LBSF as

---

[5] The Contingent LBSF Primary Claim and the Contingent LBSF-Related Guarantee Claim shall be referred to as the "Contingent Claims."  The Contingent Claims and the LBIE-Related Guarantee Claim shall be referred to as the "Citadel Claims."

detailed herein." *See* Citadel Claim Summary.  Citadel has provided no legal authority or factual

underpinning to support the Contingent Claims.  Instead, Citadel insists that LBHI and LBSF

maintain full reserves on account of the Contingent Claims to protect Citadel from the entirely

speculative possibility that LBIE might avoid or unwind the Novation, while LBHI's and

LBSF's valid creditors receive correspondingly reduced distributions.

12.    As explained below, it is almost certain that the Contingent Claims will

never be allowed against LBSF and LBHI.  Citadel's avoidance theory ignores the global

settlement entered into among the Debtors and various UK Affiliates, including LBIE, pursuant

to which LBIE's administrators expressly waived all avoidance causes of action against the

Debtors.  Even if such causes of action were not released, the Novation should not be avoided

under English law for the reasons explained below.[6]

13.    In addition, a portion of the LBIE-Related Guarantee Claim against LBHI

seeks recovery of $56,316,519 in default interest that accrued after LBHI's petition date.  In

Citadel's Third Amended and Restated Statement of Calculation, dated August 17, 2009, Citadel

asserted that as of the "Early Termination Date" (designated by Citadel to be September 15, 2008

– the date of LBHI's chapter 11 filing) $423,039,994.68 was due by LBIE to Citadel.  That

amount did not include interest.

14.    Approximately two months later, Citadel filed the LBIE-Related

Guarantee Claim against LBHI asserting $423,039,994.68 for the amounts due by LBIE and

guaranteed by LBHI as of September 15, 2008 plus $56,316,519 in default interest that accrued

after September 15, 2008.  A claim for unmatured interest accrued postpetition is not allowable

---

[6] The Citadel Transactions are governed by the LBIE Swap Agreement, which is governed by English law.  In addition, LBIE is subject to an insolvency proceeding in England and any action that may be brought by LBIE's administrators to avoid the Novation would, by definition, be brought under English law, specifically, the English Insolvency Act 1986 (the "Insolvency Act").

pursuant to section 502(b)(2) of the Bankruptcy Code.  Accordingly, LBHI should not be

required to reserve on account of that portion of the LBIE-Related Guarantee Claim.

### Relief Requested

15.    The Debtors request that the Court exercise its authority, pursuant to

sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code and section 8.4 of the Plan, to

estimate the Citadel Claims, solely for the purpose of establishing distribution reserves under the

Plan, in the following reserve amounts:

- the Contingent LBSF Primary Claim at $0;

- the Contingent LBSF-Related Guarantee Claim at $0; and

- the LBIE-Related Guarantee Claim at $423,036,454 in LBHI Class
  9A, which reflects a reduction of $56,316,519 for default interest that
  accrued after the filing of LBHI's chapter 11 petition.

The Debtors reserve their rights to object to or seek to reduce or disallow the Citadel Claims on

any basis, including, without limitation, to challenge Citadel's mark-to-market value of

approximately $808 million and any other charges included in the Citadel Claims.

### The UK Settlement Agreement Precludes an Avoidance Action Against The Debtors

16.    To restore the privity between LBSF and LBHI and Citadel, and thus give

rise to the Contingent Claims, LBIE would have to successfully prosecute an action against

LBSF and LBHI under the Insolvency Act to avoid the Novation pursuant to which LBIE

assumed liability for the Citadel Transactions.  But all potential causes of action of LBIE to

avoid a transaction with a Debtor have already been released by LBIE as of the Plan's Effective

Date pursuant to the global settlement among the Debtors and LBIE and certain other UK

affiliates (the "UK Settlement Agreement").[7]  The UK Settlement Agreement contains a broad

---

[7] A copy of the UK Settlement Agreement is annexed hereto as Exhibit D.  The UK Settlement
Agreement was approved in the Plan Confirmation Order, ECF NO. 23023.  *See* Confirmation Order

waiver and release of all "Causes of Action" (as defined in the UK Settlement Agreement) of

LBIE against the Debtors, *see* UK Settlement Agreement § 8.01, which LBIE's administrators

expressly acknowledged prohibits them from commencing an avoidance action against any of the

Debtors:

> Section 8.03. *Joint Administrator's Confirmation.* The Joint
> Administrators confirm that, upon the occurrence of the Effective Date,
> and in consideration of the foregoing and each Party's execution of this
> Agreement, they shall not be entitled to commence against any UK
> Affiliate Released Party any action under the English Insolvency Act 1986
> including, any action against any UK Affiliate Released Party in relation
> to transactions undervalue, preferences or transactions to defraud
> creditors.

*See* UK Settlement Agreement § 8.03.

17.    Thus, the Contingent Claims should never be allowed against LBHI and

LBSF and the Court should estimate the Contingent Claims at $0 for reserve purposes.

**The Novation Cannot Be Avoided Under the English Insolvency Act 1986**

18.    Assuming, *arguendo*, that the LBIE administrators had not already

released avoidance causes of action against the Debtors, the Novation cannot be avoided under

English law.[8]  There are three main provisions in the Insolvency Act[9] by which a party may seek

to avoid a transaction: (1) Section 238 ("Transactions at an Undervalue"); (2) Section 239

("Preferences"); or (3) Section 423 ("Transactions Defrauding Creditors").  Only the LBIE

---

¶ 15.  All conditions precedent to the effectiveness of the UK Settlement Agreement have been satisfied, and the UK Settlement Agreement became effective on the Effective Date of the Plan.

[8]  In support of this Motion, the Debtors' cite to various authorities of English law.  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See* Fed. R. Civ. P. 44.1.  For the Court's convenience, Annex 1 includes copies of the authorities of English law cited in this Motion.

[9]  The Insolvency Act is an Act of the Parliament of the United Kingdom that governs issues relating to personal bankruptcy and company insolvency in the United Kingdom.

administrators have standing to bring an action to avoid a transaction under Section 238

("Transactions at an Undervalue") and Section 239 ("Preferences") of the Insolvency Act.[10]

19.    Although, theoretically, any creditor of LBIE (in addition to the LBIE

administrators) could bring an action to avoid the Novation under section 423 of the Insolvency

Act ("Transactions Defrauding Creditors"), it would be highly unusual in an insolvency for a

third party creditor to bring such an action because: (1) a third party would need the leave of the

English court to make such an application[11]; (2) an application is to be treated as made on behalf

of every victim of the transaction[12], and, therefore, it is likely that any order issued by the

English court would be for the benefit of the LBIE estate as a whole, and not merely for the

benefit of the applicant creditor; and (3) any party asserting a claim under Section 423 of the

Insolvency Act would have to satisfy a high burden to prove that LBIE entered into the Novation

for the purpose "of putting assets beyond the reach of a person who is making, or may at some

time make, a claim against it, or of otherwise prejudicing the interests of such a person in

relation to the claim which it is making or may make."[13]

20.    As stated in Bailey & Groves, Corporate Insolvency – Law and Practice,

at 36.183, "this provision is hardly ever used in a corporate context because of the difficulty in

proving intent."  In addition, "[a]s any application is to be treated as being made on behalf of

every victim of the transaction, it is plainly sensible that the court should not give leave without

---

[10] Section 238(2) and Section 239(2) of the Insolvency Act both specify that only "the office-holder" has standing to make an application to the English court for an order under those sections.  "The office-holder" is defined in Section 238(1) of the Insolvency Act as the administrator.

[11] See Section 424(1)(a) of the Insolvency Act.

[12] See Section 424(2) of the Insolvency Act.

[13] See Section 423(3) of the Insolvency Act; see also Hill v Spread Trustee Co Ltd. [2006] EWCA Civ 542, at para 130 ("There can be no doubt but that section 423(3) requires the person entering into the transaction to have a particular purpose.  It is not enough that the transaction has a particular result").

considering the interests of all the debtor's creditors, and ascertaining whether or not the responsible office-holder himself wishes to commence proceedings. The liquidator or administrator will in most cases be the appropriate applicant." *Id.* at 24.15.

The Novation Is Not a Transaction at an Undervalue

21.    In order to avoid the Novation as a "Transaction at an Undervalue," Section 238 of the Insolvency Act requires the party seeking avoidance (here, the LBIE administrators) to prove that LBIE entered into the Novation for consideration, the value of which is significantly less than the value of the consideration given by LBIE. *See* Section 238(4)(b) of the Insolvency Act.[14] Further, an English court will not avoid the Novation as an undervalue if: (1) it believes that LBIE entered into the Novation in good faith and for the purpose of carrying out its business, and that there were at the time reasonable grounds for believing that the Novation would benefit LBIE[15]; or (2) LBIE was unable to pay its debts at the time of the Novation or became unable to pay its debts as a consequence of the Novation.[16]

22.    The Novation should not be avoided as a "Transaction at an Undervalue." The Novation was completed in the ordinary course of LBIE's business, and the Side Letter provided LBIE with a right to recover from LBSF any amounts it would be required to pay to Citadel. Specifically, pursuant to the Side Letter, LBSF and LBIE agreed that any liabilities incurred by LBIE would be passed through to LBSF. If a third-party client, such as Citadel,

---

[14] For the purposes of determining whether a transaction is at an undervalue, section 238 requires that a comparison be made between the value obtained by the company for the transaction and the value of consideration provided by the company: both values must be in money or money's worth and both must be considered from the point of view of the company. *See* Re MC Bacon Ltd [1990] BCLC 324 (Millett, J).

[15] *See* Section 238(5) of the Insolvency Act.

[16] *See* Section 240(2) of the Insolvency Act.

terminated or closed out a derivatives transaction, then the related "back-to-back" transaction

would contemporaneously terminate or close out, resulting in a termination payment due from

LBSF to LBIE equal to the amount of the termination payment due by LBIE to Citadel.  LBIE

and LBSF regularly entered into similar novation agreements to accommodate Lehman clients.

There is no evidence to suggest that LBIE's actions were in bad faith.

23.    In addition, there is no evidence that LBIE did not receive adequate

consideration for the Novation.  Nor is there any evidence that LBIE was insolvent at the time of

the Novation or rendered insolvent thereby.

The Novation Is Not a Preference

24.    In the alternative, LBIE's administrators could, in theory, seek to reverse

the Novation as a preference under Section 239 of the Insolvency Act.  Section 239 of the

Insolvency Act requires LBIE's administrators to demonstrate that: (1) Citadel was a creditor,

surety or guarantor for any of LBIE's debts; (2) the Novation put Citadel into a position which,

in the event of LBIE going into insolvent liquidation, would be better than the position it would

have been in had LBIE not entered the Novation; and (3) LBIE was influenced in deciding to

give a preference to Citadel by a desire to prefer Citadel.  In addition, the LBIE administrators

must demonstrate that LBIE was either unable to pay its debts at the time it gave a preference or

became unable to pay its debts in a consequence of the preference.  *See* Sections 239 and 240(2)

of the Insolvency Act.

25.    The likelihood that LBIE would succeed in satisfying the elements of a

preference under English law is remote.  Although LBIE and Citadel were parties to a

preexisting swap agreement at the time of the Novation, the Novation related to the new Citadel

Transactions.  As such, LBIE's posting of collateral secured its potential forward-looking

obligations under the Citadel Transactions, not a preexisting debt.  Thus, the Novation and

posting of collateral by LBIE did not enhance Citadel's recovery on Citadel's preexisting claims

against LBIE.  There is also no evidence to suggest that LBIE was influenced in deciding to enter

into the Novation by a desire to prefer Citadel at the time of the Novation.

The Novation Is Not a Transaction Defrauding Creditors

26.    Finally, LBIE's administrators or a third party creditor of LBIE (with

leave of the Court) could, in theory, attempt to avoid the Novation under Section 423 of the

Insolvency Act on the ground that the Novation was entered into for the purpose of defrauding

creditors.  Section 423 of the Insolvency Act, like Section 238 addressing transactions entered

into at an undervalue, requires the party seeking avoidance to demonstrate that LBIE entered into

the transaction for a consideration the value of which is significantly less than the value of the

consideration provided by LBIE.

27.    The burden is on the party seeking avoidance to also demonstrate that

LBIE entered into the Novation with the purpose of prejudicing another creditor by putting assets

beyond the reach of a creditor who was or might at some time make a claim against LBIE.  *See*

Section 423(3) of the Insolvency Act; Delaney v Chen [2010] EWCA CIV 1455.  It is the entry

into the transaction not the transaction itself that must hold the necessary purpose.  *See* Hill v

Spread Trustee Co Ltd. [2006] EWCA Civ 542; IRC v Hashmi [2002] EWCA Civ 981(Arden,

LJ) ("The purpose must be a real purpose behind the transaction. Anything less cannot properly

be described as a purpose.").

28.    An action under section 423 of the Insolvency Act is subject to a very high

evidentiary standard of proof and requires the party asserting the action to prove that LBIE

intended for the Novation to prejudice another creditor.  Any allegation that LBIE entered into

the Novation with the intent to defraud another creditor would be entirely speculative and very difficult to prove. In addition, LBIE received consideration for the Novation given the facts set out above.

**The Controlling Legal Standard for Estimation**

29.     The Court should exercise its authority and estimate the Citadel Claims in the amounts requested. Section 8.4 of the Plan authorizes the Court to estimate, for reserve purposes, claims that are disputed. *See* Plan § 8.4; *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP), Tr. of Jan. 26, 2012 Hr'g, at 16:22 – 17:11. In addition, Section 9.3 of the Plan provides that "the Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules." *See* Plan § 9.3.

30.     The Court has broad authority under sections 1142(b) and 105(a) of the Bankruptcy Code over the property of the estate administered under the Plan and to issue any order necessary to implement the provisions of the Plan and the Bankruptcy Code. *See* 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary to the consummation of the plan"); *id.* § 105(a) ("The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."); *see also Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993) (finding that bankruptcy courts retain post confirmation jurisdiction to the extent provided by the plan); *In re Oversight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525, 535 (Bankr. S.D.N.Y. 2008) ("The bankruptcy court retains jurisdiction under 11 U.S.C. § 1142(b)…

and it has 'continuing responsibilities to satisfy itself that the [p]lan is being properly

implemented.'") (internal citations omitted).

31.    Estimation is proper under section 502(c) of the Bankruptcy Code, which

provides as follows:

> (c) There shall be estimated for purposes of allowance under
> this section –
> (1) any contingent or unliquidated claim, the fixing or
> liquidation of which, as the case may be, would unduly delay the
> administration of the case; or
> (2) any right to payment arising from a right to an equitable
> remedy for breach of performance.

11 U.S.C. § 502(c).

32.    Bankruptcy Courts may estimate claims in order "to avoid undue delay in

the administration of bankruptcy proceedings." *Frito-Lay, Inc. v. LTV Steel Co. (In re

Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993).  As such, bankruptcy courts may estimate

claims under section 502(c)(1) of the Bankruptcy Code in order: "1) [t]o avoid the need to await

the resolution of outside lawsuits to determine issues of liability or amount owed by means of

anticipating and estimating the likely outcome of these actions, and 2) . . . to promote a fair

distribution to creditors through a realistic assessment of uncertain claims." *O'Neill v. Cont'l

Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 981 F.2d 1450, 1461 (5th Cir. 1993).  In addition,

estimation of a claim under section 502(c)(1) is appropriate if liquidation of a claim "will take

too long and unduly delay the distribution of the estate's assets." *In re N.Y. Med. Group, P.C.*,

265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001).

33.    Section 502(c) uses the word "shall," and, therefore, estimation is

mandatory rather than permissive if the criteria of section 502(c) are met.  *See, e.g., Int'l Bhd. of

Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1463 (10th Cir. 1986); *Bunn v. Frontier Airlines,*

Inc. (*In re Frontier Airlines, Inc.*), 137 B.R, 811, 814 (D. Colo. 1992). The Court does not need

absolute certainty to estimate a contingent claim; estimation requires only "sufficient evidence

on which to base a *reasonable estimate* of the claim." *Bittner v. Borne Chem. Co.*, 691 F.2d 134,

135 (3d Cir. 1982) (emphasis added); *see also In re Windsor Plumbing Supply Co.,* 170 B.R.

503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims).

### The Court Should Estimate the Citadel Claims in the Amounts Requested

The Contingent Claims Should Be Estimated at $0

34.    Under the facts and circumstances described above, Citadel's Contingent

Claims should be estimated at $0 because it is virtually certain that such claims will never be

allowed against LBHI and LBSF. The LBIE administrators have expressly waived all avoidance

actions against the Debtors. The only possible action that has not been waived is a hypothetical

action that could be brought by a third-party to avoid the Novation as a "Transaction Defrauding

Creditors" under section 423 of the Insolvency Act. As noted above, however, the probability

that a third-party would actually assert, be authorized by the English court to prosecute in lieu of

the LBIE administrators and be successful on such a cause of action is highly remote. In

addition, an avoidance action under section 423 of the Insolvency Act would be subject to a very

high evidentiary standard of proof.

35.    The Court does not need absolute certainty that the Contingent Claims will

never be allowed to estimate them at $0. Rather, estimation requires only sufficient evidence on

which to base a reasonable estimate of the claim. It is reasonable to find that the contingency

identified by Citadel will not occur and the Contingent Claims will not be allowed. Not only

have the LBIE administrators expressly waived all avoidance actions against the Debtors, but in

the more than three years that LBIE has been in administration, no avoidance action has been

brought against Citadel by LBIE or any third-party creditor.  The statute of limitations for such

an action is 6-12 years.  *See* Limitation Act 1980 § § 8, 9.  Adopting Citadel's "wait and see"

approach and awaiting the outcome of a hypothetical litigation to avoid the Novation that will

most likely never be brought would unduly delay the administration of LBHI and LBSF's

chapter 11 cases and unfairly prejudice LBHI's and LBSF's creditors because large distribution

reserves will have to be maintained on account of the Contingent Claims, which will reduce the

Distributions that LBHI and LBSF can make to their creditors.

Citadel Is Not Entitled to a Claim for Default Interest Accrued Postpetition

36.    Under the plain terms of section 502(b)(2), the portion of Citadel's LBIE-

Related Guarantee Claim for unmatured interest in the amount of $56,316,519 is not allowable.

Section 502(b)(2) of the Bankruptcy Code provides "if [an] objection to a claim is made, the

court, after notice and a hearing, shall determine the amount of the claim in lawful currency of

the United States as of the date of the filing of the petition, and shall allow such claim in such

amount, except to the extent that—(2) such claim is for unmatured interest."  11 U.S.C.

§ 502(b)(2); *see also Frito-Lay, Inc. v. LTV Corp. (In re Chateaugay Corp.)*, 156 B.R. 391, 403-

404 (S.D.N.Y. 1993) ("11 U.S.C. § 502(b)(2) bars post-petition interest on a pre-petition

unsecured claim.").

37.    Section 502(b)(2) has been held to preclude a claim for postpetition

interest against a debtor-guarantor even if such interest may have been allowable against the

primary obligor.  *See Steering Comms. of Lake Rd. & La Paloma Project Lenders v. Nat'l

Energy & Gas Transmission, Inc.*, No. 06-766, 2007 WL 2609430, *3 (D. Md. May 10, 2007)

(holding that an unsecured creditor could not recover postpetition interest on its guarantee claim

against the debtor even though such interest had accrued on the direct obligations of the primary

obligors); *see also In re Loewen Group Int'l, Inc.*, 274 B.R. 427, 442 (Bankr. D. Del. 2002) (denying a claim for postpetition interest asserted against the guarantor of two promissory notes pursuant to section 502(b)(2)); *In re Hertz*, 38 B.R. 215, 219 (Bankr. S.D.N.Y. 1984) (reducing a claim asserted against a debtor-guarantor by the amount of postpetition interest included therein).

38.    The $56,316,519 in default interest asserted by Citadel in the LBIE-Related Guarantee Claim accrued after the filing of LBHI's chapter 11 case.  In accordance with the legal authorities set forth above, the Court should not require LBHI to maintain reserves on account of that portion of the LBIE-Related Guarantee Claim.

The Guarantee Claims Against LBHI Are Mutually Exclusive

39.    At the very least, the LBIE-Related Guarantee Claim and the Contingent LBSF-Related Guarantee Claim against LBHI are duplicative and mutually exclusive.  Even assuming Citadel's avoidance theory is plausible, Citadel either has a claim against LBIE that is guaranteed by LBHI (in the amount of approximately $480 million) or a claim against LBSF that is guaranteed by LBHI (in the amount of approximately $916 million), but not both.  Yet Citadel has asserted approximately $1.4 billion against LBHI and has refused to stipulate that LBHI does not need to maintain duplicative reserves, notwithstanding that, even under Citadel's own theory and accepting Citadel's valuation, it could never claim more than $916,366,920 against LBHI.

**Citadel Is Not Prejudiced by the Estimation of Its Claims for Reserve Purposes**

40.    The estimation of the Citadel Claims solely for reserve purposes does not prejudice the substantive rights of Citadel in any respect.  The proposed order preserves Citadel's rights to continue to assert the Citadel Claims and does not preclude LBHI or LBSF from continuing to dispute the validity, amount and priority of such claims.  In the unlikely event that any of the Citadel Claims are ever allowed in amounts greater than the proposed reserve amount,

the Plan provides that such claim is entitled to catch-up payments in the amounts that would have

been distributed on such claim had the claim been allowed as of the Effective Date of the Plan.

### Conclusion

41.    For the reasons set forth in this Motion, the Debtors hereby request that

the Court enter the proposed order annexed hereto and estimate the Citadel Claims in the

amounts requested for purposes of establishing distribution reserves under the Plan.

### Notice

42.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) Citadel; and (vi) all other

parties entitled to notice in accordance with the procedures set forth in the second amended order

entered on June 17, 2010 governing case management and administrative procedures for these

cases, ECF No. 9635.  The Debtors submit that no other or further notice need be provided.

43.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: New York, New York
March 7, 2012

/s/ Robert J. Lemons
Ralph I. Miller
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x
                                            :

In re                                  :        **Chapter 11 Case No.**
                                            :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :        **08-13555 (JMP)**
                                            :

                         **Debtors.**         :        **(Jointly Administered)**
                                            :

--------------------------------------------------------------------x

### ORDER GRANTING MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN BROTHERS SPECIAL FINANCING, INC. TO ESTIMATE CLAIMS FILED BY CITADEL EQUITY FUND LTD. FOR PURPOSES OF ESTABLISHING RESERVES

Upon the motion (the "Motion")[1] dated March 7, 2012, of Lehman Brothers

Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF"), as a debtors and

debtors-in-possession (together with their affiliated debtors in the above-captioned cases, the

"Debtors"), pursuant to sections 105(a), 502(c) and 1142(b) of title 11 of the United States Code

(the "Bankruptcy Code") and section 8.4 of the Plan, to estimate the amount of certain claims

filed by Citadel Equity Fund Ltd. ("Citadel") for the purpose of establishing reserves in

connection with the Plan, as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to

(i) the United States Trustee for Region 2; (ii) the attorneys for the Official Committee of

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; (vi) Citadel; and

(vii) all other parties entitled to notice in accordance with the procedures set forth in the second

amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases, ECF No. 9635; and the relief sought in the Motion is in the best

interests of LBHI and LBSF, and their creditors, and all parties in interest and the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

      ORDERED that the Motion is granted as provided herein; and it is further

      ORDERED that the Contingent LBSF Primary Claim (proof of claim number

33631) is estimated at $0 solely for the purpose of establishing distribution reserves under the

Plan; and it is further

      ORDERED that the Contingent LBSF-Related Guarantee Claim (proof of claim

number 33632) is estimated at $0 solely for the purpose of establishing distribution reserves

under the Plan; and it is further

      ORDERED that the Contingent LBIE-Related Guarantee Claim (proof of claim

number 33633) is estimated at $423,036,454  in LBHI Class 9A solely for the purpose of

establishing distribution reserves under the Plan; and it is further

      ORDERED that the estimation of the Citadel Claims as provided herein is not

deemed to determine or affect in any respect the Citadel Claims for any purpose other than

establishing the reserve amount for the Citadel Claims under the Plan; and it is further

      ORDERED that the estimation of the Citadel Claims is without prejudice to the

rights of Citadel to assert that the allowed amount of the Citadel Claims should be greater than

the estimated reserve amounts; and it is further

ORDERED that the estimation of the Citadel Claims is without prejudice to the

rights defenses and objections of LBHI, LBSF, or the Plan Administrator (as defined in the Plan)

to the merits, amount and priority of the Citadel Claims and that by estimating the Citadel

Claims, all rights of LBHI, LBSF and the Plan Administrator with respect to the Citadel Claims

are fully preserved; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
      [_____], 2012


_____
Honorable James M. Peck
United States Bankruptcy Judge

## Exhibit A

**(Citadel Claims Summary)**

**Citadel Equity Fund Ltd.**
**Derivative Questionnaire**

**Summary of Claim**

Citadel Equity Fund Ltd. ("CEFL") is submitting the following summary in support of its claim.

The transactions underlying CEFL's claim specified in Schedule 1 hereto (the "Transactions") were previously governed by the Amended and Restated ISDA Master Agreement between CEFL and Lehman Brothers Special Financing Inc. ("LBSF") dated June 30, 2008 (the "LBSF ISDA"). Lehman Brothers Holdings Inc. ("LBHI") guaranteed LBSF's obligations under the LBSF ISDA pursuant to a Guarantee dated May 12, 2001 in favor of CEFL.

In August of 2008, LBSF and CEFL agreed that LBSF would novate all its rights and obligations under the Transactions to Lehman Brothers International (Europe) ("LBIE"), such that after the novation CEFL and LBIE were the counterparties to the Transactions and the Transactions were governed by the ISDA Master Agreement between CEFL and LBIE dated April 27, 2001 (the "LBIE ISDA"). LBHI guaranteed LBIE's obligations under the LBIE ISDA pursuant to a Guarantee dated May 12, 2001 in favor of CEFL.

CEFL has uploaded all of the above-referenced documents in support of its claim.

In the event that the novation described above is invalidated for any reason pursuant to the LBIE Administration, CEFL will have a claim against LBSF as detailed herein. CEFL hereby reserves all of its rights and remedies in respect of any other claim made or to be made by it against LBHI and any other Lehman debtor, as well as any claim it may have in the LBIE Administration.

**SCHEDULE 1**

# REDACTED TO PROTECT
# CONFIDENTIAL INFORMATION

**<u>Exhibit B</u>**

**(Appendix L to MarkitSERVE Operating Procedures)**

Rev. 2011-1
(Release Date February 28, 2011)
Appendix L to MarkitSERV Operating Procedures

**TRANSACTION RECORD DESCRIPTION:
SINGLE REFERENCE ENTITY CREDIT DEFAULT SWAP ON MORTGAGE-
BACKED SECURITY AND SINGLE REFERENCE ENTITY CREDIT DEFAULT
SWAP ON LOAN**

This Transaction Record Description relates to the Eligible Product and Eligible Transactions set forth below. It is a part of, and subject in all respects to, the most recent version of the Company Operating Procedures for Automated Confirmation and Matching System, published by MarkitSERV to which it is an Appendix (the "Operating Procedures"). Unless the context otherwise indicates, all terms defined in the Operating Procedures shall have the same meanings in this Transaction Record Description.

**Eligible Product:**       **Single Reference Entity Credit Default Swap on Mortgage-Backed Security and Single Reference Entity Credit Default Swap on Loan**

**Eligible Transactions:**       **New Trades**
**Partial Terminations** (can apply only all Eligible Products, regardless of whether the partially terminated trade was originally confirmed through the System)
**Assignments** (can apply to all Eligible Products, regardless of whether the assigned trade was originally confirmed through the System)
**Increases** (can apply only to Eligible Products where the amended trade was originally confirmed through the System)
**Amendments** (can apply only to Eligible Products where the amended trade was originally confirmed through the System)

*Transaction Record Description for New Trades*

**Replaced Document:**

The Replaced Document for new trades that are single reference entity credit default swaps on mortgage-backed securities or single reference entity credit default swaps on loans shall in all cases be a "Confirmation" (or any similar document not so named) that is referred to (or described) in a standard terms supplement (as described below), and that has been executed by two Users for the purpose of evidencing such new trades between them (each, a "Confirmation"). Related Master Documents shall be:

1

- <u>Master Agreement</u> –identified pursuant to the Transaction Record– consisting of an ISDA Master Agreement (or other applicable type of master agreement described below) that has been executed by the relevant two Users. Any reference in a Transaction Record to a Master Agreement shall be to the Master Agreement as it may have been, and may subsequently be, amended, supplemented or modified by the parties thereto.  All provisions contained in, or incorporated by reference in, the Master Agreement shall govern the Replaced Document except as expressly modified herein or in the applicable Standard Terms Supplement. With respect to such other Master Agreement types:
  - If the Master Agreement Type is "German", the German Master Agreement for Financial Derivatives Transactions (Rahmenvertrag für Finanztermingeschäfte)
  - If the Master Agreement Type is "AFB", the AFB/FBF Convention-cadre relative aux opérations de marché à terme.
  - If the Master Agreement Type is "Swiss", the Swiss Master Agreement for over-the-counter (OTC) Derivatives.

- <u>Standard Terms Supplement</u> –the Users shall be deemed to have incorporated into the Replaced Document the following standard terms supplement (a "Standard Terms Supplement"):
  - (a) if Interest Shortfall Cap is specified as applicable or not applicable in the Transaction Record (unless the Master Document Transaction Type is "EuropeanCMBS" or "EuropeanRMBS"), the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by the International Swaps and Derivatives Association, Inc. ("ISDA") as of the date specified in Master Document Date in the Transaction Record.  With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
    - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
    - if the Step-Up Provisions are specified as applicable or not applicable in the Transaction Record, Distressed Ratings Downgrade shall be deemed to be specified as an Additional Credit Event; otherwise, no Additional Credit Event shall be deemed to be specified; and
    - if the WAC Cap Interest Provision is specified as applicable or not applicable in the Transaction Record, CMBS Convention shall be deemed to be specified for purposes of the Standard Terms Supplement; otherwise Not CMBS Convention shall be deemed to be specified.
  - (b) if Secured List Applicable is specified as applicable or not applicable in the Transaction Record or if "Standard LCDS Bullet" is specified in Master Document Transaction Type, the Syndicated

2

Secured Loan Credit Default Swap Standard Terms Supplement or the Bullet Syndicated Secured Loan Credit Default Swap Standard Terms Supplement, as the case may be, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.

- (c) if "CDSonLeveragedLoans" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Leveraged Loans, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.

- (d) if "EuropeanCMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.

- (e) if "EuropeanRMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - Not CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.

Users agree that data elements specified in certain fields may be overwritten by the System as set forth in these Operating Procedures or other publications of the Company from time to time.

The Company shall not be responsible for a User's failure to properly identify the Master Agreement or relevant Standard Terms Supplement.

Notwithstanding any provision in the related Master Documents, each User agrees that the submission of Transaction Records by it and any other User through the System shall constitute an acceptable method under such Master Documents for evidencing and

3

confirming the terms to be specified in any Confirmation referenced in or to be governed by such Master Documents. Each User further agrees that Confirmed Transaction Records designating the Eligible Product and Eligible Transaction governed by this Transaction Record Description and referencing the relevant Master Documents shall (1) have the same legal effect as a fully executed Replaced Document entered into pursuant to and subject to the terms of such Master Documents and (2) shall evidence a new credit default swap transaction agreed between two Users whose terms and provisions will be set forth in, governed by, construed in accordance with and subject to the Confirmed Transaction Records themselves, such Master Documents and these Operating Procedures, including this Transaction Record Description.

In the event that the features specified in a Transaction Record differ from those specified in the relevant Master Document, the features specified in such Transaction Record shall govern unless otherwise agreed between the relevant Users.

The governing law of the Master Documents shall also govern the obligations created by any Transaction Record.

**<u>Transaction Record Data Elements:</u>**

Each Transaction Record governed by this Transaction Record Description will include the data elements set out in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time. Such data elements shall have the meanings set forth or contemplated in the relevant Master Documents (unless the context clearly indicates an intent to identify product and transaction type, trade reference numbers, a transaction date or the Master Documents themselves), including meanings that may be set forth in the Applicable Publications or any other resource identified in the Master Documents (<u>e.g.</u>, designated ISDA Credit Derivatives Definitions). In the event of any inconsistency between a Transaction Record and the relevant Master Documents, the Transaction Record shall govern (unless otherwise agreed between Users).

The data elements specified in the "Field Parameters" worksheet that are applicable to this Appendix set out information relating to certain data elements that Users will be required to provide. In addition, Users may indicate that the Independent Amount applicable to the Eligible Transaction to which the Transaction Record relates is linked to another transaction confirmed through the System (the "Linked Transaction") by specifying "Linked to [trade id of Linked Transaction]" in the data element "Additional Terms". In the event such Linked Transaction is terminated, novated or otherwise amended, the Independent Amount may be reassessed in the sole discretion of the counterparty to the party with respect to which the Independent Amount applies (the "Independent Amount Determining Party"). Such reassessment shall be effective immediately upon the date of termination, novation or amendment of the Linked Transaction, unless otherwise delayed beyond such date by the Independent Amount Determining Party. The foregoing may be amended in accordance with, and is subject to, any relevant contract between the parties.

4

Actual Transaction Records submitted by Users may be different in terms of appearance and in the manner in which information is to be provided (e.g., data elements may be specified in FpML).   Users should consult the Applicable Publications for further information on the inputting of data.

*Transaction Record Description for Full Terminations*

**From and after May 7, 2009, full termination messages in respect of Eligible Products may no longer be submitted to the System.  A termination in full of a transaction may be submitted through a partial termination message that reduces the notional amount of the transaction to zero.**

**The following shall apply to full termination messages submitted prior to May 7, 2009.**

**Replaced Document and Data Elements:**

The Replaced Document in respect of full terminations shall in all cases be a termination agreement that would have been fully executed between the parties to a transaction in an Eligible Product that is being terminated in full (regardless of whether the Eligible Product was confirmed through the System, outside the System through the use of standard terms supplements and confirmations, or through some other means).  The purpose of the termination agreement would be to evidence: the identity of the transaction being terminated in full, the effective date of the termination in full and the payment, if any, to be made between the parties in connection with the termination.  Notwithstanding any provision in any document evidencing and/or governing any Eligible Product intended to be terminated, each User agrees that the submission of Transaction Records by it and any other User through the System for full termination of such transaction shall constitute an acceptable method under such document(s) for evidencing and confirming the termination of such transaction.  Each User further agrees that Confirmed Transaction Records designating the product and transaction type governed by this Transaction Record Description and relating to the full termination of a transaction in an Eligible Product shall constitute such User's agreement to terminate such transaction as of the Termination Effective Date identified in such Confirmed Transaction Records and to receive or pay the Payment Amount identified in such Confirmed Transaction Records on the Payment Settlement Date identified in such Confirmed Transaction Records, and that following such termination and payment, neither party shall have any obligation to the other under such transaction.

Where the transaction being terminated was originally confirmed through the System, it will be identified by User Trade Reference Numbers for the original transaction, which numbers are recorded by the System for each Confirmed Transaction Record.  Where the transaction being terminated was not originally confirmed through the System, it will be identified by certain data elements set forth in the "Field Parameters" worksheet applicable to this Appendix that contain the designation "Full Termination" and "Full Termination*" in the column named "Applicable Transaction Types".  Users are responsible for assuring that these elements are sufficient to uniquely identify the transaction to be terminated.  **Matching on these elements is for identification purposes only, and shall not be effective to retroactively change the terms of the transaction being terminated.**

*Transaction Record Description for Partial Terminations*

**Replaced Document and Data Elements:**

The Replaced Document in respect of partial terminations shall in all cases be a termination agreement that would have been fully executed between the parties to a transaction in an Eligible Product that is being terminated in part or in full (where the outstanding notional amount of the related transaction is reduced to zero). The purpose of the termination agreement would be to evidence: the identity of the transaction being terminated in part or in full, the effective date of the termination in part or in full, the decrease in the notional amount, the outstanding notional amount after the partial termination or the reduction of the outstanding notional amount to zero after the full termination, and the payment, if any, to be made between the parties in connection with the termination. Notwithstanding any provision in any document evidencing and/or governing any Eligible Product intended to be terminated, each User agrees that the submission of Transaction Records by it and any other User through the System for partial termination of such transaction shall constitute an acceptable method under such document(s) for evidencing and confirming the partial or full termination of such transaction. Each User further agrees that Confirmed Transaction Records designating the product and transaction type governed by this Transaction Record Description and relating to the termination of a transaction in an Eligible Product shall constitute such User's agreement to partially or fully terminate such transaction as of the Partial Termination Effective Date identified in such Confirmed Transaction Records and to receive or pay the Payment Amount identified in such Confirmed Transaction Records on the Payment Settlement Date identified in such Confirmed Transaction Records, and that following such termination and payment, neither party shall have any obligation to the other under such transaction with respect to the portion of the notional amount so terminated (and in cases where as a result of the termination the outstanding notional amount of such transaction is reduced to zero, with respect to such transaction in its entirety).

Where the transaction being partially terminated was originally confirmed through the System, it will be identified by User Trade Reference Numbers for the original transaction, which numbers are recorded by the System for each Confirmed Transaction Record. Where the transaction being terminated was not originally confirmed through the System, it will be identified by certain data elements set forth in the "Field Parameters" worksheet applicable to this Appendix that contain the designation "Partial Termination" and "Partial Termination*" in the column named "Applicable Transaction Types". Users are responsible for assuring that these elements are sufficient to uniquely identify the transaction to be terminated. **Matching on these elements is for identification purposes only, and shall not be effective to retroactively change the terms of the transaction being terminated.**

The transaction that is being partially terminated is terminated only to the extent of the decrease in the notional amount indicated in the relevant Confirmed Transaction Record that corresponds to the data element named "Affected Notional Amount", with the outstanding Notional Amount (if any) effective after the effective date of the partial termination being the amount indicated in the relevant Confirmed Transaction Record that corresponds to the data element named "Outstanding Notional Amount", in each case, specified in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time.

7

*Transaction Record Description for Assignments*

**Replaced Document:**

The Replaced Document for assignments of trades that are single reference entity credit default swaps in an Eligible Product shall in all cases be a "Novation Confirmation" that is in the form of Exhibit C to the 2004 ISDA Novation Definitions (or, if applicable, the form specified in the relevant Standard Terms Supplement) and that confirms the terms and conditions of a novation transaction, or assignment, entered into among three or four Users. Pursuant to such a novation transaction, an existing transaction (which may or may not have been confirmed through the System) (the "Old Transaction") between two Users may be assigned in whole or in part by one or both such Users (each, a "Transferor") to another User or two other Users (each, a "Transferee"), resulting in a new transaction (the "New Transaction") between the Transferee and the remaining party to the Old Transaction (the "Remaining Party") or between two Transferees. The Novation Confirmation permits the parties to a Novation Confirmation to attach an Old Confirmation and a New Confirmation (as such terms are defined in the 2004 ISDA Novation Definitions) to a Novation Confirmation; therefore, the Old Confirmation and New Confirmation are also Replaced Documents. Related Master Documents for Old Transactions shall be:

- <u>Old Master Agreement</u> – identified pursuant to the Transaction Record– consisting of an ISDA Master Agreement (or similar document not so named) that has been executed by the Transferor and the Remaining Party. Any reference in a Transaction Record to a Master Agreement shall be to the Master Agreement as it may have been, and may subsequently be, amended, supplemented or modified by the parties thereto.

- <u>Standard Terms Supplement</u> –as determined in the subheading "Standard Terms Supplement" in the Transaction Record Description for New Trades below.

The Company shall not be responsible for a User's failure to properly identify the Master Agreement or relevant Standard Terms Supplement.

**Related Master Documents for New Transactions shall be:**

- <u>New Master Agreement</u> – identified pursuant to the Transaction Record– consisting of an ISDA Master Agreement (or other applicable master agreement described below) that has been executed by the Transferee and the Remaining Party. Any reference in a Transaction Record to a Master Agreement shall be to the Master Agreement as it may have been, and may subsequently be, amended, supplemented or modified by the parties thereto. All provisions contained in, or incorporated by reference in, the Master Agreement shall govern the Replaced Document except as expressly modified herein or in the applicable Standard Terms Supplement. With respect to such other Master Agreement types:

8

- If the Master Agreement Type is "German", the German Master Agreement for Financial Derivatives Transactions (Rahmenvertrag für Finanztermingeschäfte)
- If the Master Agreement Type is "AFB", the AFB/FBF Convention-cadre relative aux opérations de marché à terme.
- If the Master Agreement Type is "Swiss", the Swiss Master Agreement for over-the-counter (OTC) Derivatives.

- <u>Standard Terms Supplement</u> – the Transferee and the Remaining Party shall be deemed to have incorporated into the Replaced Document a standard terms supplement (a "Standard Terms Supplement") as follows:
  - (a) if Interest Shortfall Cap is specified as applicable or not applicable in the Transaction Record (unless the Master Document Transaction Type is "EuropeanCMBS" or "EuropeanRMBS"), the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by the International Swaps and Derivatives Association, Inc. ("ISDA") as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
    - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
    - if the Step-Up Provisions are specified as applicable or not applicable in the Transaction Record, Distressed Ratings Downgrade shall be deemed to be specified as an Additional Credit Event; otherwise, no Additional Credit Event shall be deemed to be specified; and
    - if the WAC Cap Interest Provision is specified as applicable or not applicable in the Transaction Record, CMBS Convention shall be deemed to be specified for purposes of the Standard Terms Supplement; otherwise Not CMBS Convention shall be deemed to be specified.
  - (b) if Secured List Applicable is specified as applicable or not applicable in the Transaction Record or if "Standard LCDS Bullet" is specified in Master Document Transaction Type, the Syndicated Secured Loan Credit Default Swap Standard Terms Supplement or the Bullet Syndicated Secured Loan Credit Default Swap Standard Terms Supplement, as the case may be, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.
  - (c) if "CDSonLeveragedLoans" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Leveraged Loans, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.

9

- (d) if "EuropeanCMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.
- (e) if "EuropeanRMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - Not CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.

Users agree that data elements specified in certain fields may be overwritten by the System as set forth in these Operating Procedures or other publications of the Company from time to time.

The Company shall not be responsible for a User's failure to properly identify the Master Agreement or relevant Standard Terms Supplement, as applicable.

**Matching Process:**

The Transferor, the Transferee, and the Remaining Party will submit records that collectively identify the Old Transaction, describe the terms of the assignment, and detail the terms of the New Transaction.  Each assignment transaction record submitted is matched against the submissions of the two other parties.  Regardless of the submission order, the Transferor and Transferee records are matched first; then, the Remaining Party record is compared with this matched pair of records.  Only when all three records match is the status of the assignment "Confirmed".  When only the Transferee and Transferor records match, the status of the assignment is "Matched".

Certain Trade Record Data Elements are not shown to all parties to the Novation Transaction.

**Novation Confirmation Items:**

The Transaction Record Data Elements set forth in a Transaction Record cover the items set forth in the Novation Confirmation.  Except as otherwise indicated herein, capitalized terms used herein but not defined herein are used as defined in the Novation Confirmation.  Paragraph numbers indicated below correspond to the paragraph numbers in the Novation Confirmation.

Paragraph 1:

▪ The appropriate ISDA definitional booklet referenced in Item 1 is the 2003 ISDA Credit Derivatives Definitions.

Paragraph 2:

▪ Novation Date is the equivalent of Novation Date in the Transaction Record Data Elements.

▪ Novated Amount is the equivalent of Novated Amount, Currency in the Transaction Record Data Elements.

▪ Where a Transaction Record does not designate a Remaining Party 2, Transferor, Transferee and Remaining Party are the equivalents of Transferor, Transferee and Remaining Party, respectively, in the Transaction Record Data Elements.  Where a Transaction Record does designate a Remaining Party 2, Transferor 1 is the equivalent of the Transferor in the Transaction Record Data Elements; Transferor 2 is the equivalent of the Remaining Party in the Transaction Record Data Elements; Transferee 1 is the equivalent of Transferee in the Transaction Record Data Elements; and Transferee 2 is the equivalent of Remaining Party 2 in the Transaction Record Data Elements.

▪ New Agreement is the ISDA Master Agreement referred to in the applicable Transaction Record.  The Users' obligations to each other under the New Transaction shall be governed by the governing law of the New Master Documents.

Paragraph 3:

In lieu of attaching a copy of the Old Confirmation to the Novation Confirmation, the parties agree to specify the information that would otherwise have been contained in the Old Confirmation by electronically designating both the date of the relevant Standard Terms Supplement and the transaction terms that were (or but for electronic confirmation of the Old Transaction would have been) specified in a related Confirmation (or similar document not so named).

The terms of the Old Transaction are so specified for identification purposes only, and shall not be effective to retroactively change the terms of the Old Transaction being

11

assigned. Users are responsible for assuring that these elements are sufficient to uniquely identify the Old Transaction to be assigned.

As set forth in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time, or in the Applicable Publications, certain Transaction Record Data Elements relating to the Old Transaction are subject to matching for all parties to the Novation Confirmation and certain Transaction Record Data Elements are, when used, subject to matching for the Transferor and Remaining Party only.

Paragraph 4:

In lieu of attaching a copy of the New Confirmation to the Novation Confirmation, the parties agree to specify the information that would otherwise have been contained in the New Confirmation by electronically designating both the date of the relevant Standard Terms Supplement and the transaction terms that would otherwise have been specified in a related Confirmation (or similar document not so named).

As set forth in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time, or in the Applicable Publications, certain Transaction Record Data Elements relating to the New Transaction are subject to matching for all parties to the Novation Confirmation and certain Transaction Record Data Elements are, when used, subject to matching for the Transferor and Remaining Party only.

Paragraph 7:

Given that the Novation Transaction is being confirmed through the System, the parties agree that the Notice Details are not necessary for completion of the Novation Confirmation.

Paragraph 8:

In lieu of Paragraph 8, the parties agree as follows:  The parties confirm their acceptance to be bound by a Novation Confirmation as of the Novation Date by submitting Transaction Records through the System.  The Transferor, by so submitting Transaction Records, agrees to the terms of the Novation Confirmation as it relates to each Old Transaction.  The Transferee, by so submitting Transaction Records, agrees to the terms of the Novation Confirmation as it relates to each New Transaction.

Notwithstanding any provision in the related Master Documents or the Novation Confirmation, each User agrees that the submission of Transaction Records by it and any other User through the System shall constitute an acceptable method under such Master Documents for evidencing and confirming the terms to be specified in any Novation Confirmation referenced in or to be governed by such Master Documents.  Each User further agrees that Confirmed Transaction Records designating the Eligible Product and Eligible Transaction governed by this Transaction Record Description and referencing the relevant Master Documents shall (1) have the same legal effect as a fully executed

12

Replaced Document entered into pursuant to and subject to the terms of such Master Documents and (2) evidence a novation transaction agreed among the Transferor, Transferee and Remaining Party whose terms and provisions will be set forth in, governed by, construed in accordance with and subject to the Confirmed Transaction Records themselves, such Master Documents, Novation Confirmation and these Operating Procedures, including this Transaction Record Description.

In the event that the features specified in a Transaction Record differ from those specified in the relevant Master Document, the features specified in such Transaction Record shall govern unless otherwise agreed between the relevant Users.

**Transaction Record Data Elements:**

Each Transaction Record governed by this Transaction Record Description will include the data elements set out in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time. Such data elements shall have the meanings set forth or contemplated in the relevant Master Documents (unless the context clearly indicates an intent to identify product and transaction type, trade reference numbers, a transaction date or the Master Documents themselves), including meanings that may be set forth in the Applicable Publications or any other resource identified in the Master Documents (e.g., designated ISDA Credit Derivatives Definitions). In the event of any inconsistency between a Transaction Record and the relevant Master Documents, the Transaction Record shall govern (unless otherwise agreed between Users).

The data elements specified in the "Field Parameters" worksheet that are applicable to this Appendix set out information relating to certain data elements that Users will be required to provide. In addition, Users may indicate that the Independent Amount applicable to the Eligible Transaction to which the Transaction Record relates is linked to another transaction confirmed through the System (the "Linked Transaction") by specifying "Linked to [trade id of Linked Transaction]" in the data elements "Additional Terms" or "New Additional Terms". In the event such Linked Transaction is terminated, novated or otherwise amended, the Independent Amount may be reassessed in the sole discretion of the counterparty to the party with respect to which the Independent Amount applies (the "Independent Amount Determining Party"). Such reassessment shall be effective immediately upon the date of termination, novation or amendment of the Linked Transaction, unless otherwise delayed beyond such date by the Independent Amount Determining Party. The foregoing may be amended in accordance with, and is subject to, any relevant contract between the parties.

Actual Transaction Records submitted by Users may be different in terms of appearance and in the manner in which information is to be provided (e.g., data elements may be specified in FpML). Users should consult the Applicable Publications for further information on the inputting of data.

*Transaction Record Description for Increases*

**Replaced Document and Data Elements:**

The Replaced Document in respect of increases shall in all cases be an increase agreement that would have been fully executed between the parties to a transaction in an Eligible Product that is being increased (where the Eligible Product was confirmed through the System).  The purpose of the increase agreement would be to evidence: the identity of the transaction being increased, the effective date of the termination in part, the increase in the notional amount, the outstanding notional amount after the increase, and the payment, if any, to be made between the parties in connection with the increase.  Notwithstanding any provision in any document evidencing and/or governing any transaction in an Eligible Product intended to be increased, each User agrees that the submission of Transaction Records by it and any other User through the System for increase of such transaction shall constitute an acceptable method under such document(s) for evidencing and confirming the increase of such transaction.  Each User further agrees that Confirmed Transaction Records designating the product and transaction type governed by this Transaction Record Description and relating to the increase of a transaction in an Eligible Product shall constitute such User's agreement to increase such transaction as of the Increase Effective Date identified in such Confirmed Transaction Records and to receive or pay the Payment Amount identified in such Confirmed Transaction Records on the Payment Settlement Date identified in such Confirmed Transaction Records.

Where the transaction being increased was originally confirmed through the System, it will be identified by User Trade Reference Numbers for the original transaction, which numbers are recorded by the System for each Confirmed Transaction Record.  Where the transaction being increased was not originally confirmed through the System, (i) if the original transaction has been submitted to the System but is not yet confirmed, Users will be able to input Transaction Record Data Elements regarding the increase into the System, but such Transaction Record Data Elements will not be viewed by counterparties until the original transaction is confirmed through the System, and (ii) if the original transaction has not been submitted to the System, the increase will be rejected by the System.

The transaction that is being increased is increased to the extent of the increase in notional amount indicated in the relevant Confirmed Transaction Record that corresponds to the data element named "Affected Notional Amount", with the outstanding Floating Rate Payer Calculation Amount effective after the effective date of the increase being the amount indicated in the relevant Confirmed Transaction Record that corresponds to the data element named "Outstanding Notional Amount", in each case, specified in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time.

14

*Transaction Record Description for Amendments*

**Replaced Document:**

The Replaced Document for amendments of Eligible Products shall in all cases be a "Confirmation" (or any similar document not so named) that is referred to (or described) in a standard terms supplement, and that has been executed by two Users for the purpose of evidencing such amendments between them (each, a "Confirmation"). Related Master Documents shall be:

- <u>Master Agreement</u> –identified pursuant to the Transaction Record– consisting of an ISDA Master Agreement (or other applicable type of master agreement described below) that has been executed by the relevant two Users. Any reference in a Transaction Record to a Master Agreement shall be to the Master Agreement as it may have been, and may subsequently be, amended, supplemented or modified by the parties thereto. All provisions contained in, or incorporated by reference in, the Master Agreement shall govern the Replaced Document except as expressly modified herein or in the applicable Standard Terms Supplement. With respect to such other Master Agreement types:
  - If the Master Agreement Type is "German", the German Master Agreement for Financial Derivatives Transactions (Rahmenvertrag für Finanztermingeschäfte)
  - If the Master Agreement Type is "AFB", the AFB/FBF Convention-cadre relative aux opérations de marché à terme.
  - If the Master Agreement Type is "Swiss", the Swiss Master Agreement for over-the-counter (OTC) Derivatives.

- <u>Standard Terms Supplement</u> –the Users shall be deemed to have incorporated into the Replaced Document the following standard terms supplement (a "Standard Terms Supplement"):
  - (a) if Interest Shortfall Cap is specified as applicable or not applicable in the Transaction Record (unless the Master Document Transaction Type is "EuropeanCMBS" or "EuropeanRMBS"), the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by the International Swaps and Derivatives Association, Inc. ("ISDA") as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:
    - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
    - if the Step-Up Provisions are specified as applicable or not applicable in the Transaction Record, Distressed Ratings Downgrade shall be deemed to be specified as an Additional

15

Credit Event; otherwise, no Additional Credit Event shall be deemed to be specified; and

- if the WAC Cap Interest Provision is specified as applicable or not applicable in the Transaction Record, CMBS Convention shall be deemed to be specified for purposes of the Standard Terms Supplement; otherwise Not CMBS Convention shall be deemed to be specified.

- (b) if Secured List Applicable is specified as applicable or not applicable in the Transaction Record or if "Standard LCDS Bullet" is specified in Master Document Transaction Type, the Syndicated Secured Loan Credit Default Swap Standard Terms Supplement or the Bullet Syndicated Secured Loan Credit Default Swap Standard Terms Supplement, as the case may be, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.

- (c) if "CDSonLeveragedLoans" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Leveraged Loans, as published by ISDA as of the date specified in Master Document Date in the Transaction Record.

- (d) if "EuropeanCMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:

  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.

- (e) if "EuropeanRMBS" is specified in Master Document Transaction Type, the ISDA Standard Terms Supplement for Use with Credit Derivative Transactions on Mortgage-Backed Security with Pay-As-You-Go or Physical Settlement, as published by ISDA as of the date specified in Master Document Date in the Transaction Record. With respect to such Standard Terms Supplement, the following additional elections and provisions shall apply:

  - the Floating Rate Amount/ Notional Amount specified in the Transaction Record shall be the Initial Face Amount for purposes of the Standard Terms Supplement;
  - Not CMBS Convention shall be applicable; and
  - Distressed Ratings Downgrade shall be an Additional Credit Event.

16

Users agree that data elements specified in certain fields may be overwritten by the System as set forth in these Operating Procedures or other publications of the Company from time to time.

The Company shall not be responsible for a User's failure to properly identify the Master Agreement or relevant Standard Terms Supplement.

Notwithstanding any provision in the related Master Documents, each User agrees that the submission of Transaction Records by it and any other User through the System shall constitute an acceptable method under such Master Documents for evidencing and confirming the terms to be specified in any Confirmation referenced in or to be governed by such Master Documents.   Each User further agrees that Confirmed Transaction Records designating the Eligible Product and Eligible Transaction governed by this Transaction Record Description and referencing the relevant Master Documents shall (1) have the same legal effect as a fully executed Replaced Document entered into pursuant to and subject to the terms of such Master Documents and (2) shall evidence an amended and restated credit default swap transaction agreed between two Users whose terms and provisions will be set forth in, governed by, construed in accordance with and subject to the Confirmed Transaction Records themselves, such Master Documents and these Operating Procedures, including this Transaction Record Description.

In the event that the features specified in a Transaction Record differ from those specified in the relevant Master Document, the features specified in such Transaction Record shall govern unless otherwise agreed between the relevant Users.

The governing law of the Master Documents shall also govern the obligations created by any Transaction Record.

**Amendments Processing:**

Any terms of the original trade may be changed through the amendment process with the exception of the parties to the trade (although the trade direction (i.e., which party is the Buyer and which is the Seller) may be changed).   An amendment Transaction Record includes all the fields of a new trade plus Amendment Trade Date, Amendment Effective Date, and the fields required to describe the payment, if any, associated with the amendment (Payer, Payment Date, and Payment Amount).   The identification of the parties to the trade (submitter or counterparty), but not the trade direction, submitted on an amendment Transaction Record must be the same as the original confirmed trade, or the Transaction Record will be rejected.

Provisions of the transaction as amended are set forth as if a new Confirmation were executed.   Amendment Trade Date sets forth the trade date of the amendment, and Amendment Effective Date sets forth the effective date of the amendment.   Otherwise, the Transaction Record amends and restates the amended trade.   The optional fields that describe the payment specify which party pays the other party.

17

Amendment transactions will only be accepted for transactions that are confirmed in the System.  If an amendment is submitted with a transaction reference number that is not found in the Company's database or is associated in the Company's database with an unconfirmed transaction of any type (including new trades, terminations and assignments), the Transaction Record will be rejected.

**Transaction Record Data Elements:**

Each Transaction Record governed by this Transaction Record Description will include the data elements set out in the "Field Parameters" worksheet applicable to this Appendix, as published by the Company from time to time.  Such data elements shall have the meanings set forth or contemplated in the relevant Master Documents (unless the context clearly indicates an intent to identify product and transaction type, trade reference numbers, a transaction date or the Master Documents themselves), including meanings that may be set forth in the Applicable Publications or any other resource identified in the Master Documents (e.g., designated ISDA Credit Derivatives Definitions).  In the event of any inconsistency between a Transaction Record and the relevant Master Documents, the Transaction Record shall govern (unless otherwise agreed between Users).

The data elements specified in the "Field Parameters" worksheet that are applicable to this Appendix set out information relating to certain data elements that Users will be required to provide.  In addition, Users may indicate that the Independent Amount applicable to the Eligible Transaction to which the Transaction Record relates is linked to another transaction confirmed through the System (the "Linked Transaction") by specifying "Linked to [trade id of Linked Transaction]" in the data element "Additional Terms".  In the event such Linked Transaction is terminated, novated or otherwise amended, the Independent Amount may be reassessed in the sole discretion of the counterparty to the party with respect to which the Independent Amount applies (the "Independent Amount Determining Party").  Such reassessment shall be effective immediately upon the date of termination, novation or amendment of the Linked Transaction, unless otherwise delayed beyond such date by the Independent Amount Determining Party.  The foregoing may be amended in accordance with, and is subject to, any relevant contract between the parties.

Actual Transaction Records submitted by Users may be different in terms of appearance and in the manner in which information is to be provided (e.g., data elements may be specified in FpML).  Users should consult the Applicable Publications for further information on the inputting of data.

**<u>Exhibit C</u>**

**(Side Letter Agreement)**

24th July 2006

Lehman Brothers International (Europe)
25 Bank Street
London
E14 5LE

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

Dear Sirs,

This letter will confirm the agreement between Lehman Brothers International (Europe)
("LBIE") and Lehman Brothers Special Financing Inc. ("LBSF") concerning transactions
between LBIE and LBSF ("Intercompany Transactions") for which LBIE has an offsetting
transaction on identical terms with a client (the "Client Transaction"), leaving LBIE with no
market position risk. In the event that a Client Transaction should terminate or be closed-out
and a settlement amount be calculated in respect of that termination or close-out, LBIE and
LBSF agree that the related, offsetting Intercompany Transaction will also terminate or be
closed-out contemporaneously, and a settlement amount determined as payable by LBIE
under the Client Transaction will become payable by LBSF to LBIE as a settlement amount
under the Intercompany Transaction, and a settlement amount payable to LBIE under the
Client Transaction will become payable by LBIE to LBSF as a settlement amount under the
Intercompany Transaction, but only to the extent LBIE actually receives that settlement
amount from its client under the Client Transaction, it being the intent of LBIE and LBSF that
LBIE should not accept market risk or counterparty credit risk under any Client Transaction,
and that all risks under Client Transactions should be passed to LBSF under the Intercompany
Transactions.

Signed for and on behalf of:
Lehman Brothers International (Europe)

HUW MERRIMAN
AUTHORISED SIGNATORY

Agreed and acknowledged by:
Lehman Brothers Special Financing Inc.

By:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)
25 BANK STREET LONDON E14 5LE TELEPHONE +44 (0)20 7102 1000
REGULATED BY THE FINANCIAL SERVICES AUTHORITY.
MEMBER OF THE LONDON STOCK EXCHANGE AND THE INTERNATIONAL SECURITIES MARKET ASSOCIATION.
REGISTERED IN ENGLAND NO. 2538254 AT THE ABOVE ADDRESS.

**<u>Exhibit D</u>**

**(UK Settlement Agreement)**

**Execution Version**

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is made and entered into as of October 24, 2011, by and among the Debtors,[1] the LBLIS Group Entities,[2] the UK Administration Companies[3] (acting by their joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, collectively, the "**Joint Administrators**"),[4] the UK Liquidation Companies[5] (acting by their joint liquidators Derek Anthony Howell and Ian Oakley-Smith, collectively, the "**Joint Liquidators**")[6] and the Other UK Affiliates[7] (the UK Administration Companies,

---

[1]  As used herein, "**Debtors**" means Lehman Brothers Holdings Inc. ("**LBHI**"); Lehman Brothers Special Financing Inc. ("**LBSF**"); Lehman Commercial Paper Inc. ("**LCPI**"); Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc. ("**LOTC**"); Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc. ("**LBCS**"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited ("**East Dover**"); Luxembourg Residential Properties Loan Finance S.a.r.l.; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC ("**LB 745**"); PAMI Statler Arms LLC.

[2]  As used herein, "**LBLIS Group Entities**" means Lehman Brothers Luxembourg Investments Sarl ("**LBLIS**"), Lehman Brothers Holdings Scottish LP ("**LB Scottish**"), and Lehman Brothers UK Holdings (Delaware) Inc. ("**LB UK Delaware**").

[3]  As used herein, "**UK Administration Companies**" means Lehman Brothers International (Europe) ("**LBIE**"); Lehman Brothers Limited ("**LBL**"); Lehman Brothers Holdings PLC; LB UK Re Holdings Limited ("**UK Re**"); Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited ("**LB UK Holdings**"); LB UK Financing Ltd; LB SF No. 1; Cherry Tree Mortgages Limited; Lehman Brothers Lease & Finance No. 1 Limited; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; LB RE Financing No. 3 Limited; Lehman Brothers (PTG) Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration).

[4]  A reference to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

[5]  As used herein, "**UK Liquidation Companies**" means Eldon Street (Cube) Limited; Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Platform Home Mortgage Securities No. 4 Limited; Platform Commercial Mortgage Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; LBO Investments Limited; LBQ Funding (UK); and LB Lomond Investments (each in liquidation).

[6]  A reference to the Joint Liquidators shall be construed as being to the Joint Liquidators both jointly and severally and to any other person who is appointed as a liquidator in substitution for any liquidator or as an additional liquidator in conjunction with the Joint Liquidators.

acting by their Joint Administrators, the UK Liquidation Companies, acting by their Joint Liquidators, and the Other UK Affiliates, collectively, the "**UK Affiliates**").    The Debtors, the LBLIS Group Entities and the UK Affiliates shall be referred to individually as a "**Party**" and collectively as the "**Parties**"; *provided* that the terms "Party" and "Parties" refer to any of the LBLIS Group Entities solely to the extent set forth in Section 2.13(m) hereof.

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "**Chapter 11 Cases**" and each a "**Chapter 11 Case**");

WHEREAS, on September 15, 2008 and on various dates thereafter, the UK Administration Companies entered English administration proceedings pursuant to the English Insolvency Act 1986 and the UK Liquidation Companies entered liquidation in the UK (collectively, the "**UK Proceedings**");

WHEREAS, the Joint Administrators were appointed as the joint administrators of the Administration Companies and the Joint Liquidators were appointed as the joint liquidators of the Liquidation Companies;

WHEREAS, on August 25, 2011, Thayer Group and Thayer Properties (collectively, the "**Thayer Liquidation Companies**") entered liquidation proceedings in Jersey, United Kingdom and the Thayer Liquidators were appointed as the liquidators of the Thayer Liquidation Companies; and

---

(continued…)

[7]  As used herein, "**Other UK Affiliates**" means Acenden Limited (f/k/a Capstone Mortgage Services Limited); Blue I Real Estate Limited; Eldon Street (Birchin) Limited; Eldon Street (Colbert Orco) Limited; Eldon Street (Fidenza) Limited; Eldon Street (Harley) Limited; Eldon Street (Jefferson) Limited; Harley Property Ventures Limited; LB Holdings Intermediate 1 Limited; LB SF Warehouse Limited; LB Yellow (No. 1) Limited; MBAM Investor Limited; Myra Sarl; Parkmetro Limited; Preferred Group Limited; Preferred Holdings Limited; Preferred Mortgages Limited; Resetfan Limited; SM Funding No. 1 Limited; Southern Pacific Funding 3 Ltd.; Southern Pacific Mortgage Ltd.; Southern Pacific Personal Loans Limited; Southern Pacific Residuals 4 Limited; Stepstone Mortgage Funding Limited; Thayer Group Limited (in liquidation) ("**Thayer Group**") (acting by its joint liquidators, Nick Vermeulen and Mark James, collectively, the "**Thayer Group Liquidators**"); Thayer Properties (Jersey) Limited (in liquidation) ("**Thayer Properties**") (acting by its joint liquidators, Nick Vermeulen and Mark James, the "**Thayer Properties Liquidators**" and together with the Thayer Group Liquidators, the "**Thayer Liquidators**"); and Yellow Real Estate Limited.

2

WHEREAS, the UK Affiliates filed the proofs of claim listed on Schedule 1 attached hereto (collectively, the "**Proofs of Claim**") against certain Debtors on behalf of themselves and/or to preserve the rights of certain other entities with beneficial interests held through certain of the UK Affiliates;

WHEREAS, certain of the Debtors have asserted that they have claims against certain of the UK Affiliates, including claims asserted by LBHI against LBIE and certain other UK Affiliates in respect of intercompany funding (the "**Funding Claims**");

WHEREAS, the Debtors, the UK Administration Companies and the UK Liquidation Companies have entered into that certain tolling and forbearance agreement dated as of September 3, 2010, and the Debtors have entered into certain other tolling agreements with certain of the Other UK Affiliates (collectively, the "**Tolling Agreements**");

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627] (the "**Current Plan**" and as amended, modified or supplemented by the Debtors from time to time, the "**Plan**");

WHEREAS, on September 1, 2011 by amended order of the Bankruptcy Court [Docket No. 19631] (the "**Disclosure Statement Approval Order**"), the Bankruptcy Court approved the Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (such disclosure statement as modified on September 15, 2011 by order of the Bankruptcy Court [Docket No. 20016], the "**Disclosure Statement**");

WHEREAS, on September 13, 2011 certain of the Parties entered into that certain Stipulation and Agreement for Provisional Allowance of Claims Solely for Purposes of Voting [Docket No. 19913] (the "**Voting Stipulation**") setting forth the amounts, if any, in which the UK Affiliates are entitled to vote upon the Plan;

WHEREAS, substantially contemporaneously hereof, certain of the Parties have entered into that certain Claim Reserve Agreement (the "**Claim Reserve Agreement**") attached hereto as Exhibit A; and

WHEREAS, the Debtors and the UK Affiliates desire to resolve all disputes and all other outstanding issues among them (except as expressly excluded herein) and to avoid extensive and expensive litigation thereon.

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

3

ARTICLE 1
DEFINITIONS

SECTION 1.01.    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

"**A&M**" means Alvarez and Marsal North America, LLC, in its capacity as agents of the Debtors.

"**Admitted Claims**" means, collectively, the LCPI/LBIE Claim, the LBCS/LBIE Claim, and the Other Debtor Claims.

"**Affiliate**" has the meaning ascribed to it in section 101(2) of the Bankruptcy Code.

"**Allowed Claims**" means, collectively, the LBIE Guarantee Claim, the LBIE/LBSF Claim, the LBIE/LOTC Claim and the UK Affiliates Claims.

"**Alternative Plan**" means any chapter 11 plan for the Debtors that is neither proposed nor supported (directly or indirectly) by the Debtors.

"**Applicable Class**" means, for any claim of any UK Affiliate against any Debtor, (i) with respect to the Current Plan, the "Class" (as defined in the Current Plan) set forth in Schedule 9 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor" and (ii) with respect to any Plan (other than the Current Plan), the category of claims that each applicable UK Affiliate and the applicable Debtor mutually determine in good faith is most similarly situated to the "Class" (as defined in the Current Plan) set forth in Schedule 9 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

"**Assigned Debtor Interest**" has the meaning ascribed to it in Section 5.04(b).

"**Assigned Debtor/LBIE Assets**" means all LBSF/LBIE Assets, all Assigned LBCS/LBIE Assets, and all LCPI/LBIE Assets, in each case, other than (i) Competing Claims that are waived and released pursuant to Section 2.05(c) and (ii) to the extent relevant, the securities to be transferred in accordance with the Unfunded Notes Settlement Agreement.

"**Assigned LBCS/LBIE Assets**" means all LBCS/LBIE Assets other than the Returned LBCS/LBIE Assets.

4

"**Assigned UK Affiliate Interest**" has the meaning ascribed to it in Section 4.04(b).

"**Bankruptcy Code**" has the meaning ascribed to it in the Recitals.

"**Bankruptcy Court**" has the meaning ascribed to it in the Recitals.

"**Bankhaus**" means Lehman Brothers Bankhaus A.G.

"**Bankhaus Claim**" means LBIE's claim against Bankhaus on account of Client Money deposited with Bankhaus to have recognized a right of separate satisfaction (*Aussonderungsrecht*, Sec. 47 German Insolvency Code) or, in the alternative, to have recognized a general unsecured claim for such Client Money.

"**Bankhaus Claim Litigation**" means the litigation in Germany between LBIE and Bankhaus in respect of the Bankhaus Claim.

"**Bankhaus Non-Trust Claim**" has the meaning ascribed to it in Section 2.01(b).

"**Bankhaus Resolution Date**" means the date on which the Bankhaus Claim Litigation is finally settled or adjudicated.

"**Bankhaus Trust Claim**" has the meaning ascribed to it in Section 2.01(b).

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or the United Kingdom.

"**Causes of Action**" means all manners of action, causes of action, judgments, executions, debts, liabilities, demands, rights, damages, costs, rights, expenses, and claims of every kind, nature, and character whatsoever.

"**Chapter 11 Cases**" has the meaning ascribed to it in the Recitals.

"**Claim Reserve Agreement**" has the meaning ascribed to it in the Recitals.

"**Client Money**" means "Client Money" as defined in the UK Financial Services Authority's rules, and any proceeds thereof.

"**Client Money Tracing Application**" means any application in any court in which LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, seeks direction from a court of competent jurisdiction with respect to Client Money tracing issues.

5

"**Client Money Tracing Claim**" means any claim by LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, against any entity (including any of the Debtors) arising under, related to, or connected with any Proprietary Interest that LBIE, or any beneficiary (other than any Debtor or any Debtor-Controlled Entity) of the Client Money Trust, or their respective successors in title or assignees, has in any asset by reason of an interest as trustee under, or beneficiary of, the Client Money Trust (including any cash in any currency) or the proceeds thereof.

"**Client Money Trust**" means the trust on which LBIE held and holds Client Money pursuant to the UK Financial Services Authority's rules.

"**Competing Claim**" means a claim by a Debtor to a beneficial interest in, or to delivery of, or to the proceeds of or any derived asset or income arising from, any securities or money in LBIE's custody or control, for which LBIE reasonably believes in good faith that its books and records indicate that any UK Affiliate (except LBIE) also has such a claim in relation to the same stockline or money, it being understood that a Security Interest is not such a claim.

"**Compromised Structured Securities**" means those Structured Securities set forth in Schedule 2.

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to LBIE, (i) confirming the Plan pursuant to section 1129 of the Bankruptcy Code; (ii) approving, pursuant to Rule 9019 the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (iii) authorizing the Debtors to take all necessary corporate actions to consummate the transactions contemplated by this Agreement.

"**Current LBLIS Managers**" has the meaning ascribed to it in Section 2.13(a).

"**Current Plan**" has the meaning ascribed to it in the Recitals.

"**Debtor Claim Transferee**" has the meaning ascribed to it in Section 5.04(b).

"**Debtor-Controlled Entity**" means the (i) LBLIS Group Entities and (ii) any Affiliate of the Debtors that is directly or indirectly managed or controlled by a Debtor, either immediately before or at any time after the Execution Date, but is not a Party.

"**Debtor Released Party**" means each UK Affiliate, and each of its Joint Administrators, Joint Liquidators, directors, officers, employees, representatives,

6

agents, financial advisors, accountants, attorneys and representatives, each of the foregoing solely in their respective capacity as such.

"**Debtors**" has the meaning ascribed to it in the Preamble.

"**Disclosure Statement**" has the meaning ascribed to it in the Recitals.

"**Disclosure Statement Approval Order**" has the meaning ascribed to it in the Recitals.

"**East Dover**" has the meaning ascribed to it in the Preamble.

"**Effective Date**" means the earliest date on which each of the following conditions are satisfied (or will be satisfied substantially simultaneously with the occurrence of the Effective Date) or waived by the Parties:

(i)    the Plan (incorporating in full this Agreement) is effective in accordance with its terms; and

(ii)    the LBJ Settlement Agreement is approved by the Bankruptcy Court and effective in accordance with its terms.

"**Existing NDA**" means that certain letter agreement in respect of the treatment of confidential information dated June 30, 2010 by and between LBHI, for itself, its subsidiaries and its controlled affiliates, and certain of the UK Administration Companies and UK Liquidation Companies.

"**Excluded Items**" means, collectively:

(i)    subject to Section 2.12, each Party's rights, obligations, claims and causes of action against any entity (including any Lehman Entity or Extended Lien Claimant) other than the Parties, the Debtor Released Parties and the UK Affiliate Released Parties, and such entities' rights, obligations, claims, defenses and causes of action against any Party;

(ii)    each Party's rights, obligations, claims, defenses and causes of action arising under, related to, or connected with:

(A)    any Surviving Contract;

(B)    subject to Section 2.22 and the proviso in Section 4.04(b), any Trust Claim other than the LBIE Guarantee Claim;

(C)    any funds received by any Debtor after such Debtor's Insolvency Filing Time (i) on behalf of any UK Affiliate

7

or (ii) by way of payment or transfer by any third party in respect of any debt or other obligation owed to any UK Affiliate;

(D)    other than in respect of any RASCALS Assets or any Assigned Debtor/LBIE Assets, any funds received by any UK Affiliate after the earlier of such UK Affiliate's Insolvency Filing Time (where applicable) and the Execution Date (i) on behalf of any Debtor or (ii) by way of payment or transfer by any third party in respect of any debt or other obligation owed to any Debtor;

(E)    subject to Section 2.01(d), Section 2.02(b), Section 2.02(c), Section 2.03(c), Section 2.03(e), Section 2.11(a), Section 2.19, Section 2.21 and Section 2.23, any Extended Lien Claim; or

(F)    subject to Section 2.11 and the provisos in Section 5.04(b), the R3 Claim and the JPM Claim, and all rights in connection thereto, including any rights to any assets in LBIE's custody or control, whether direct or indirect, or held by a sub-custodian or any other party on behalf of LBIE; and

(iii)    subject to Section 2.20, LBIE's rights, obligations, claims and causes of action arising under, related to, or connected with any LBIE Structured Securities.

"**Execution Date**" means the earliest date on which each of the following conditions are satisfied:

(i)    this Agreement is executed and delivered by the Parties; and

(ii)    the Claim Reserve Agreement is executed and delivered by the parties thereto.

"**Extended Lien Application**" means the application dated June 6, 2011 brought by LBIE in respect of Extended Lien Claims and currently before the English High Court.

"**Extended Lien Asia Application**" means the application dated 29 July 2011 brought by Lehman Brothers Securities Asia Limited in respect of Extended Lien Claims and currently before the Hong Kong Courts.

"**Extended Lien Asset**" means any securities or money held on a segregated basis or otherwise by or on behalf of the Holding Affiliate (i) as to which (1) an

8

Ownership Claimant has asserted or could assert a beneficial interest or (2) the Holding Affiliate, based on the information available to it, has concluded that an Ownership Claimant may have a beneficial interest (in each case, either for itself or on behalf of an underlying client of that Ownership Claimant) and in either case an Extended Lien Claimant asserts or could assert an Extended Lien Claim; or (ii) that were so held at the Holding Affiliate's Insolvency Filing Time, and in any case any asset received or receivable by the Holding Affiliate after its Insolvency Filing Time arising out of or derived from any securities or money that was or were an Extended Lien Asset at or immediately before the time at which that other asset was received.

"**Extended Lien Claim**" means any claim that a term of an agreement between a Holding Affiliate and an Ownership Claimant confers a Security Interest in respect of an Extended Lien Asset in relation to debts owed not only by the Ownership Claimant to the Holding Affiliate but also to any other Lehman Entity, including any person claiming through or against such other Lehman Entity.

"**Extended Lien Claimant**" means any Lehman Entity that may assert, and/or have, a Security Interest in Extended Lien Assets held by or on behalf of a Holding Affiliate.

"**Final Order**" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) that is in full force and effect, (ii) is not reversed or vacated and (iii) as to which the time to appeal, petition for certiorari, and move for reargument or rehearing has expired and (1) as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or (2) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been timely sought, such appeal, writ of certiorari, or reargument or rehearing shall have been withdrawn, denied or resolved by the highest court to which such order was appealed or from which certiorari, rehearing or reargument was sought; *provided* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable law, may be filed with respect to such order shall not prevent such order from being a Final Order.

"**Funding Claim**" has the meaning ascribed to it in the Recitals.

"**Holding Affiliate**" means a Lehman Entity that holds or held Extended Lien Assets as to which one or more Ownership Claimants may assert, or have, beneficial ownership claims and as to which one or more Extended Lien Claimants may assert or have an Extended Lien Claim.

"**House Proofs of Claim**" means those claims asserted in the Proofs of Claim other than the Trust Claims.

9

"**Insolvency Filing Time**" means the time at which a Lehman Entity commenced an insolvency, bankruptcy, administration, liquidation, winding-up, receivership or similar proceeding in such Lehman Entity's relevant jurisdiction (or the time at which such a proceeding was commenced in relation to such Lehman Entity), whether by the filing of one or more petitions or papers (including a petition under chapter 11 of the Bankruptcy Code), by the entry of an order for relief, by obtaining an order of a court of competent jurisdiction, or otherwise; *provided* that, in the case of a Lehman Entity in liquidation in the United Kingdom where such liquidation was immediately preceded by an administration, the Insolvency Filing Time for such Lehman Entity shall be the time at which it entered administration where English law so provides in relation to the company in question.

"**ITS**" means the ITS trading system (also known as "International Trading System"), which various Lehman Entities used to record, clear, monitor and settle client and intercompany transactions, depot holdings and securities positions.

"**Joint Administrators**" has the meaning ascribed to it in the Preamble.

"**Joint Liquidators**" has the meaning ascribed to it in the Preamble.

"**JPM Claim**" means all claims for which LBHI is subrogated to a claim of any JPM Entity against LBIE, to the extent of the payments made by LBHI or applied from LBHI's property to such claim of such JPM Entity pursuant to that certain Collateral Disposition Agreement among JPMorgan Chase Bank, N.A. and the Debtors dated March 16, 2010.

"**JPM Claim Proposal**" has the meaning ascribed to it in Section 2.11(b).

"**JPM Entity**" means JPMorgan Chase Bank, N.A. or any of its affiliates.

"**LB 745**" has the meaning ascribed to it in the Preamble.

"**LBCS**" has the meaning ascribed to it in the Preamble.

"**LBCS/LBIE Claim**" has the meaning ascribed to it in Section 2.03(c).

"**LBCS/LBIE Assets**" means any right, title or interest that LBCS may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 3, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LBHI**" has the meaning ascribed to it in the Preamble.

10

"**LBHI Client Money Payment**" has the meaning ascribed to it in Section 2.22(b).

"**LBHI-LB Lux Share**" has the meaning ascribed to it in Section 2.12(a).

"**LBHI/LBIE Assets**" means those assets set forth in Schedule 4.

"**LBIE**" has the meaning ascribed to it in the Preamble.

"**LBIE Extended Lien Asset**" means any Extended Lien Asset in respect of which LBIE is an Ownership Claimant.

"**LBIE Guarantee Claim**" has the meaning ascribed to it in Section 2.01(a).

"**LBIE/LBSF Claim**" has the meaning ascribed to it in Section 2.02(a).

"**LBIE-LB Lux Litigation**" means, collectively, the (i) judicial proceedings that are currently pending before the second chamber of the Luxembourg District Court (*tribunal d'arrondissement*), sitting in commercial matters, registered under the number 135.350, that have been introduced by LBIE by writ of summons served on the liquidators of LB Lux on 19 January 2011, following the rejection by the liquidators of LB Lux of the statement of claim submitted by LBIE in the LB Lux liquidation proceedings and (ii) any other proceedings or Causes of Action that arise from, are based on, connected with, alleged in or related to any of the facts or circumstances at issue in the judicial proceedings referred to in clause (i).

"**LBIE-LB Lux Payment Amount**" has the meaning ascribed to it in Section 2.12(c)(iv).

"**LBIE-LB Lux Share**" has the meaning ascribed to it in Section 2.12(a).

"**LBIE/LOTC Claim**" has the meaning ascribed to it in Section 2.03(a).

"**LBIE Non-Trust Guarantee Claim**" has the meaning ascribed to it in Section 2.01(b).

"**LBIE Structured Securities**" means any Structured Securities other than any Compromised Structured Securities.

"**LBIE Trust Guarantee Claim**" has the meaning ascribed to it in Section 2.01(b).

"**LBJ**" means Lehman Brothers Japan Inc.

11

"**LBJ Settlement Agreement**" means a settlement agreement among LBJ, LBSF, LBHI and LBIE in respect of their respective claims to the rights, title and interests in certain Japanese government bonds, in the form attached as Exhibit B, with such changes as may be agreed by LBSF, LBHI and LBIE.

"**LBL**" has the meaning ascribed to it in the Preamble.

"**LBL Indemnified Person**" has the meaning ascribed to it in Section 2.13(l).

"**LBL Nominated Managers**" has the meaning ascribed to it in Section 2.13(b).

"**LBLIS**" has the meaning ascribed to it in the Preamble.

"**LBLIS Group Entities**" has the meaning ascribed to it in the Preamble.

"**LB Lux**" means Lehman Brothers (Luxembourg) S.A. (in liquidation) or its estate, as applicable.

"**LB Lux/LBIE Assets**" means any assets (together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds) in LBIE's custody or control for which it has been determined by LBIE, acting in good faith, or by a final, non-appealable order of a court of competent jurisdiction that (i) LB Lux is the beneficial owner and (ii) no Lehman Entity has a Security Interest in such assets by virtue of any Extended Lien Claim.

"**LB Scottish**" has the meaning ascribed to it in the Preamble.

"**LBSF**" has the meaning ascribed to it in the Preamble.

"**LBSF Creditor Debtors**" means, collectively, LBHI, LBCS, LCPI, LB 745, and East Dover.

"**LBSF/LBIE Assets**" means any right, title or interest that LBSF may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 5, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LB UK Delaware**" has the meaning ascribed to it in the Preamble.

"**LB UK Holdings**" has the meaning ascribed to it in the Preamble.

"**LCPI**" has the meaning ascribed to it in the Preamble.

12

"**LCPI/LBIE Assets**" means any right, title or interest that LCPI may have in securities (a) in LBIE's custody or control or (b) that are set forth on Schedule 6, in each case, together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds.

"**LCPI/LBIE Claim**" has the meaning ascribed to it in Section 2.03(b).

"**Lehman Entities**" means, collectively, LBHI and each of its Affiliates.

"**LOTC**" has the meaning ascribed to it in the Preamble.

"**LPS Trust Claims**" means (1) those claims in respect of Structured Securities asserted in Proof of Claim number 62783 and (2) those claims in respect of Structured Securities asserted in Proof of Claim numbers 62779, 62780, 62781, 62784, 62785, 62786, 62787, 62788 and 62789 to the extent that the securities to which such claims relate are not beneficially owned by LBIE as of the Execution Date.

"**Other Debtor Claims**" has the meaning ascribed to it in Section 2.05(a).

"**Other UK Affiliates**" has the meaning ascribed to it in the Preamble.

"**Ownership Claimant**" means a person which asserts and/or may have a beneficial interest (other than an interest which arises as a result of a Security Interest) in securities or the proceeds thereof or any asset or money derived therefrom held by or on behalf of any Holding Affiliate at such Holding Affiliate's Insolvency Filing Time.

"**Party**" has the meaning ascribed to it in the Preamble.

"**Plan**" has the meaning ascribed to it in the Recitals.

"**Proofs of Claim**" has the meaning ascribed to it in the Recitals.

"**Proprietary Interest**" means any proprietary interest whatsoever (whether at law or in equity, and whether as trustee, beneficiary, absolute owner or otherwise).

"**R3 Claim**" means all claims assigned to LBHI pursuant to that certain Assignment of Claim entered into as of October 17, 2008, between R3 and LBHI, and for which, prior to the Execution Date, LBHI is subrogated to a claim of R3 against LBIE.

"**R3 Claim Proposal**" has the meaning ascribed to it in Section 2.11(b).

"**R3**" means R3 Capital Partners Master, L.P.

13

"**RASCALS Assets**" means securities (other than, to the extent relevant, the securities to be transferred in accordance with the Unfunded Notes Settlement Agreement) acquired or otherwise received or held by LBIE for the account of any Debtor's trading book that were, at any time, subject to processes known as Regulation and Administration of Safe Custody And globaL (or Local) Settlement, being intra-group processes that purported to and/or served to address, among other things, certain regulatory capital adequacy concerns of LBIE via (i) inter-company secured financing transactions referred to in the RASCALS Decision as "automatic RASCALS" and (ii) the process referred to in the RASCALS Decision as "manual RASCALS" whereby securities settled by LBIE for the account of Lehman affiliates' trading books were subjected to inter-company financing transactions, in each case, including all proceeds thereof, all derived income in respect thereof and all redemption or sale proceeds in respect thereof.

"**RASCALS Decision**" means the judgment handed down by The Honourable Mr. Justice Briggs on November 19, 2010 in Case no. 7942 of 2008 in the English High Court, as reflected in the Order of November 19, 2010 that was sealed on December 23, 2010.

"**Returned LBCS/LBIE Assets**" means those assets set forth in Schedule 7.

"**Security Interest**" means any legal, equitable, contractual or possessory interest (or equivalent under any relevant legal system) of a person in an Extended Lien Asset that is in the nature of a lien, pledge, charge or other right that encumbers or restricts the entitlement of the owner or holder of that Extended Lien Asset until one or more obligations owed to that person are discharged in full.

"**Standstill Entity**" has the meaning ascribed to it in Section 2.09(a).

"**Standstill Termination Date**" has the meaning ascribed to it in Section 2.09(a).

"**Structured Securities**" means, collectively, the certain (i) structured notes issued by Lehman Brothers Treasury Co, B.V., (ii) certificates and warrants issued by Lehman Brothers Securities N.V., (iii) structured notes issued by LBHI, (iv) structured notes issued by Bankhaus, (v) structured securities issued by LB Lux, (vi) certificates issued by Lehman Brothers Finance S.A. (vii) any notes issued by any Lehman Entity under any notes program, including the European Medium Term Note Program and (viii) any securities issued by any Lehman Entity substantially similar to any of the foregoing.

"**Supporting Creditor PSA**" means each plan support agreement that the creditors listed on Exhibit 20 to the Disclosure Statement (as such exhibit may be amended or supplemented to include additional parties) entered into in connection with the Chapter 11 Cases.

14

"**Surviving Contracts**" means all agreements among any of the UK Affiliates and any of the Debtors (i) that were entered into on or after September 15, 2008 (other than any Tolling Agreement) or (ii) are set forth on Schedule 8.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature, including any related penalty or interest.

"**Third-Party Creditor**" has the meaning ascribed to it in Section 20.02.

"**Tax Deduction**" means any deduction or withholding for or on account of Tax.

"**Terminated UK Affiliate**" has the meaning ascribed to it in Section 11.02(b).

"**Thayer Group**" has the meaning ascribed to it in the Preamble.

"**Thayer Group Liquidators**" has the meaning ascribed to it in the Preamble.

"**Thayer Liquidation Companies**" has the meaning ascribed to it in the Recitals.

"**Thayer Liquidators**" has the meaning ascribed to it in the Preamble.

"**Thayer Properties**" has the meaning ascribed to it in the Preamble.

"**Thayer Properties Liquidators**" has the meaning ascribed to it in the Preamble.

"**Tolling Agreements**" has the meaning ascribed to it in the Recitals.

"**Transfer**" means any assignment, conveyance, recovery, payment, right, title, interest, sale, pledge, encumbrance, abandonment, disposition, participation or other transfer (or the proceeds of any of the foregoing) and may be used either as a verb or a noun.

"**Trust Claim**" means (i) the LBIE Guarantee Claim, (ii) any Client Money Tracing Claim and (iii) any LPS Trust Claim.

"**UK Administration Companies**" has the meaning ascribed to it in the Preamble.

"**UK Affiliates**" has the meaning ascribed to it in the Preamble.

"**UK Affiliate Claim Transferee**" has the meaning ascribed to it in Section 4.04(b).

"**UK Affiliates Claims**" has the meaning ascribed to it in Section 2.04.

"**UK Affiliate Released Party**" means A&M, each Debtor and each Debtor's directors, officers, employees, representatives, agents, financial advisors,

15

accountants, attorneys and representatives, each of the foregoing solely in their respective capacity as such.

"**UK Liquidation Companies**" has the meaning ascribed to it in the Preamble.

"**UK Proceedings**" has the meaning ascribed to it in the Recitals.

"**UK Re**" has the meaning ascribed to it in the Preamble.

"**UK Re/LBIE Assets**" means any assets (together with all security entitlements (as such term is defined under Section 8-102 of the New York Uniform Commercial Code) with respect thereto and all proceeds thereof, including derived income and redemption proceeds) in LBIE's custody or control for which it has been determined by LBIE, acting in good faith, or by a final, non-appealable order of a court of competent jurisdiction that (i) UK Re is the beneficial owner and (ii) no Lehman Entity has a Security Interest in such assets by virtue of an Extended Lien Claim.

"**Unfunded Notes Settlement Agreement**" means that certain agreement dated on or prior to the date hereof between LBIE and LBSF, pursuant to which LBIE is to procure the transfer of certain securities to LBSF's order.

"**Voting Stipulation**" has the meaning ascribed to it in the Recitals.

SECTION 1.02.   *Other Definitional and Interpretative Provisions.*   The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.   Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.   Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.   "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.   References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.   References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.   References

16

to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.    References to "third parties" shall be deemed to refer to entities that are not Lehman Entities.

## ARTICLE 2
### SETTLEMENT OF CLAIMS

SECTION 2.01.    *LBIE's Claims Against LBHI.*

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured, senior affiliate guarantee claim against LBHI ("LBHI Class 4B" as described in the Current Plan) in the aggregate amount of $1,008,000,000 (the "**LBIE Guarantee Claim**").

(b)    Solely for determining whether the LBIE Guarantee Claim has been deemed satisfied in full in accordance with Section 8.13 of the Current Plan (or any provision of similar effect in the Plan), (i) Bankhaus shall be deemed the "Primary Obligor" (as defined in the Current Plan) and (ii) the Bankhaus Claim shall be deemed to be the "Primary Claim" (as defined in the Current Plan); *provided* that if a portion and only a portion of the Bankhaus Claim is recognized as a right of separate satisfaction (*Aussonderungsrecht*, Sec. 47 German Insolvency Code) in the Bankhaus insolvency proceedings (any portion recognized as a right of separate satisfaction, the "**Bankhaus Trust Claim**" and any portion not recognized as a right of separate satisfaction, the "**Bankhaus Non-Trust Claim**"), then (x) the LBIE Guarantee Claim shall be deemed to be two allowed claims against LBHI, one of which shall be in an amount equal to the Bankhaus Trust Claim (such allowed claim against LBHI, the "**LBIE Trust Guarantee Claim**") and the other of which shall be in an amount equal to $1,008,000,000 *minus* the amount of the LBIE Trust Guarantee Claim (such allowed claim against LBHI, the "**LBIE Non-Trust Guarantee Claim**") and (y) the Bankhaus Trust Claim shall be deemed the "Primary Claim" (as defined in the Current Plan) for the LBIE Trust Guarantee Claim, and the Bankhaus Non-Trust Claim shall be deemed the "Primary Claim" (as defined in the Current Plan) for the LBIE Non-Trust Guarantee Claim.    It is expressly agreed and understood that LBIE may negotiate, litigate or settle the Bankhaus Claim in its sole discretion.

(c)    LBIE and LBHI agree that prior to the Bankhaus Resolution Date, pursuant to Section 8.13(e) of the Plan, all amounts distributed on account of the LBIE Guarantee Claim under the Plan shall be posted as security with LBHI, and LBHI shall hold such posted amounts in cash for the benefit of LBIE.    Within three Business Days of the Bankhaus Resolution Date, the Debtors shall release such posted amounts and remit to LBIE any distributions to which the LBIE Guarantee Claim is entitled under the Plan from the effective date of such Plan

17

through and including the Bankhaus Resolution Date (for the avoidance of doubt, after giving effect to any adjustment in accordance with Section 2.01(b)), together with any interest that has accrued in respect of such posted amounts.

(d)    The UK Affiliates shall not assert any lien, security interest or Extended Lien Claim over the LBHI/LBIE Assets in respect of any indebtedness owed by LBHI to such UK Affiliate; *provided* that any Extended Lien Claims of any Lehman Entity (other than any UK Affiliate) in respect of the LBHI/LBIE Assets shall be unaffected by this Section 2.01(d).    LBIE agrees to remit, return, transfer, convey, assign or otherwise deliver any remaining LBHI/LBIE Assets to LBHI within ten Business Days after the final resolution of any Competing Claims by UK Re and any Extended Lien Claims with respect to such assets, such ten-Business-Day period subject to LBHI supplying LBIE in a timely manner with adequate settlement information for delivery of such LBHI/LBIE Assets.

SECTION 2.02.    *LBIE's Claims Against LBSF*.

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured affiliate claim against LBSF ("LBSF Class 5C" as described in the Current Plan) in the aggregate amount of $900,000,000 (the "**LBIE/LBSF Claim**").

(b)    If and to the extent that Extended Lien Claimants have enforceable rights in respect of Extended Lien Assets, or a Holding Affiliate has enforceable obligations towards Extended Lien Claimants in respect of Extended Lien Claims, and so as to ensure, as best the parties are able, that the value of the LBSF/LBIE Assets falls to LBIE as agreed in this Agreement, then each LBSF Creditor Debtor, within three Business Days of receipt thereof, shall remit to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction) any Transfer received on account of any Extended Lien Claims against any LBSF/LBIE Assets (or any claims in respect thereof) in connection with claims that such LBSF Creditor Debtor may have against LBSF or obligations that LBSF may owe to such LBSF Creditor Debtor; *provided* that LBIE, in its reasonable discretion, may instruct, and no LBSF Creditor Debtor shall object to any such instruction, any relevant Holding Affiliate to remit any such Transfer directly to LBIE (or if the Holding Affiliate is LBIE to retain the same for itself).    Each LBSF Creditor Debtor agrees (i) not to waive, release or assign any such Extended Lien Claims without LBIE's prior written consent and (ii) upon LBIE's reasonable request, diligently to prosecute any such Extended Lien Claims and reasonably to cooperate with LBIE regarding the same.    For the avoidance of doubt, any remittances to LBIE in accordance with this Section 2.02(b) shall in no way reduce the amount of any of the Allowed Claims.

18

(c)    LBSF agrees with each LBSF Creditor Debtor that any Transfer received by such LBSF Creditor Debtor that is remitted to LBIE in accordance with Section 2.02(b) shall in no way reduce the amount of any claims such LBSF Creditor Debtor may have against LBSF.

(d)    The Debtors represent and warrant to LBIE that no Debtor (other than the LBSF Creditor Debtors) has any claims against LBSF.

SECTION 2.03.    *Claims Between LBIE and Certain Other Debtors.*

(a)    On the Effective Date, LBIE shall have an allowed, non-priority, unsecured affiliate claim against LOTC ("LOTC Class 5C" as described in the Current Plan) in the aggregate amount of $68,000,000 (the "**LBIE/LOTC Claim**").

(b)    On the Effective Date, LCPI shall have a claim against LBIE admitted to rank for dividend purposes as an unsecured claim in the aggregate amount of $28,800,000 (the "**LCPI/LBIE Claim**").

(c)    On the Effective Date, LBCS shall have a claim against LBIE admitted to rank for dividend purposes as an unsecured claim in the aggregate amount of $71,000,000 (the "**LBCS/LBIE Claim**").    LBIE agrees to remit, return, transfer, convey, assign or otherwise deliver the Returned LBCS/LBIE Assets to LBCS, under the simplified regime applicable to what are known as "No Agreement Affiliates" under the control of persons subject to the supervision of a relevant court under the terms of the Extended Lien Application, and LBIE accepts that LBCS is under the control of persons subject to the supervision of a relevant court for such purpose.    For the avoidance of doubt, any recoveries by LBCS in respect of the Returned LBCS/LBIE Assets shall in no way reduce the amount of the LBCS/LBIE Claim.

(d)    Each of LCPI and LBCS acknowledges that it will be required to file a proof of debt that complies with the Insolvency Rules 1986 in LBIE's UK Proceedings in respect of the LCPI/LBIE Claim and the LBCS/LBIE Claim, respectively.    LBIE will not object to any such proof of debt that complies in all material respects with the Insolvency Rules 1986 and references this Agreement as evidence to support such proof of debt.    For the avoidance of doubt, no further evidence, information and/or documents other than this Agreement are required in order to satisfy the requirements for a proof of debt as set out in the Insolvency Rules 1986.    Once such proof of debt has been duly filed, it shall qualify for dividends on the same basis as other admitted claims of unsecured creditors of LBIE under the applicable distribution regimes.

(e)    If and to the extent that Extended Lien Claimants have enforceable rights in respect of Extended Lien Assets, or a Holding Affiliate has enforceable

19

obligations towards Extended Lien Claimants in respect of Extended Lien Claims, then each of LCPI and LBCS, within three Business Days of receipt thereof, shall remit to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction) any Transfer received on account of any Extended Lien Claims against any LBIE Extended Lien Assets (or any claims in respect thereof) in connection with claims that LCPI or LBCS, as applicable, may have against LBIE or obligations that LBIE may owe to LCPI or LBCS, as applicable; *provided* that LBIE, in its reasonable discretion, may instruct, and neither LCPI nor LBCS shall object to any such instruction, any relevant Holding Affiliate to remit any such Transfer directly to LBIE.   Each of LCPI and LBCS agrees (i) not to waive, release or assign any such Extended Lien Claims without LBIE's prior written consent and (ii) upon LBIE's reasonable request, diligently to prosecute any such Extended Lien Claims and reasonably to cooperate with LBIE regarding the same; *provided, further*, that any obligations of LCPI and LBCS under this section Section 2.03(e) shall automatically terminate as soon as the total Transfers received by LCPI or LBCS, individually or in the aggregate, that are remitted to LBIE in accordance with this Section 2.03(e) have a value equal to $33,000,000.   LBIE agrees with each of LCPI and LBCS that any Transfer received by LCPI or LBCS that is remitted to LBIE in accordance with this Section 2.03(e) shall in no way reduce the amount of the LCPI/LBIE Claim or the LBCS/LBIE Claim.

SECTION 2.04.    *The UK Affiliates' (Other Than LBIE's) Claims Against the Debtors.*    On the Effective Date, each applicable UK Affiliate shall have allowed claims against the applicable Debtor in the Applicable Classes and in the aggregate amounts set forth opposite such UK Affiliate's name in the relevant column in Schedule 9 (collectively, the "**UK Affiliates Claims**"). Notwithstanding anything to the contrary in the Plan or this Agreement, with respect to each UK Affiliate Claim for which the Applicable Class is set forth in Schedule 9 as "4B", each applicable UK Affiliate agrees that if at any time such UK Affiliate receives distributions on account of such UK Affiliate Claim, that, combined with any distributions received by such UK Affiliate on account of the relevant Primary Claim (as defined in the Current Plan), exceed the amount of such Primary Claim, such UK Affiliate shall remit from time to time any such excess distributions to LBHI within seven Business Days of receipt thereof, and such remitted excess distributions shall not be subject to reduction, avoidance, recharacterization, reconsideration, recovery, subordination, merger, consolidation, attack, offset, claim, defense, recoupment, deduction, counterclaim or objection, of any kind or nature.

SECTION 2.05.    *The Debtors' Claims Against the UK Affiliates (Other Than LBIE).*

(a)    On the Effective Date, (i) each applicable Debtor shall have an agreed claim against the applicable UK Administration Companies and UK Liquidation Companies in the aggregate amounts set forth opposite such Debtor's name in the relevant column in Schedule 10 and (ii) each applicable Other UK Affiliate hereby acknowledges its indebtedness to the applicable Debtors in the aggregate amount set forth opposite such Debtor's name in the relevant column in Schedule 10, in each case, without defense, counterclaim, offset or reduction ((i) and (ii) collectively, the "**Other Debtor Claims**").

(b)    Each applicable Debtor acknowledges that it will be required to file a proof of debt that complies with the Insolvency Rules 1986 in the applicable UK Administration Company's or UK Liquidation Company's UK Proceedings in respect of the applicable Other Debtor Claims.    Each applicable UK Administration Company and each applicable UK Liquidation Company acknowledges that it will not object to any such proof of debt that complies with the Insolvency Rules 1986 and references this Agreement as evidence to support such proof of debt.    For the avoidance of doubt, no further evidence, information and/or documents other than this Agreement are required in order to satisfy the requirements for a proof of debt as set out in the Insolvency Rules 1986.    Once such proof of debt has been duly filed with the applicable UK Administration Company or UK Liquidation Company, it shall, in relation to LBIE and the UK Liquidation Companies, qualify for dividends on the same basis as other admitted claims of unsecured creditors of those companies under their applicable distribution regime, and, in relation to any other company, shall, upon a notice of intention to distribute to unsecured creditors being filed by the applicable administrators, qualify for dividends on the same basis as other admitted claims of unsecured creditors.

(c)    Each Debtor hereby irrevocably waives and releases and shall be deemed to have hereby irrevocably waived and released, effective as of the Effective Date, automatically and without further action, any Competing Claims other than any Competing Claims that LBHI may have in respect of the LBHI/LBIE Assets.

SECTION 2.06.    *Assigned Debtor/LBIE Assets.*    Each of LBSF, LBCS and LCPI, as applicable, hereby irrevocably assigns to LBIE, and shall be deemed to have irrevocably assigned to LBIE, in each case, effective as of the Effective Date, automatically and without further action, all Assigned Debtor/LBIE Assets and all claims in respect thereof.    If any Debtor obtains any Transfer in respect of any Assigned Debtor/LBIE Assets (or in connection with any claims in respect thereof), including by way of reduction of any obligation whether through setoff

21

or otherwise, such Debtor shall, within three Business Days of receipt thereof, remit such Transfer to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).   For the avoidance of doubt, (i) any recoveries by LBIE in respect of the Assigned Debtor/LBIE Assets shall in no way reduce the amount of any of the Allowed Claims and (ii) this Agreement is without prejudice to any argument, claim or assertion by LBIE that it had, prior to the Effective Date, right, title and/or interest to any Assigned Debtor/LBIE Assets.

SECTION 2.07.   *RASCALS.*   The Parties agree that, as among LBIE and the Debtors: (i) LBIE is the sole legal and beneficial owner of the RASCALS Assets, (ii) none of the Debtors has any claim or cause of action of any kind whatsoever (including in relation to any legal, beneficial or equitable title) to any RASCALS Assets or any assets derived therefrom, whether by way of legal title, beneficial title or otherwise, (iii) if (contrary to the foregoing clauses (i) and (ii) of this Section 2.07) any of the Debtors does have any residual right, title or interest in or to any of the RASCALS Assets or any assets derived therefrom, each of the Debtors hereby irrevocably assigns to LBIE, and shall be deemed to have irrevocably assigned to LBIE, in each case, effective as of the Effective Date, automatically and without further action, all such residual right, title or interest, and all claims in respect thereof, and (iv) the Debtors shall be bound by the RASCALS Decision and none of the Debtors will challenge or assist any third party in challenging the basis or validity of the RASCALS Decision regardless of any judgment that may be given by the English Court of Appeal in any proceeding related to the RASCALS Assets or any other judgment of a court of competent jurisdiction.

SECTION 2.08.   *Reconciliation.*   (a) Each applicable UK Affiliate agrees and (b) each Debtor agrees to use reasonable efforts to cause each applicable Debtor-Controlled Entity, in each case, to in good faith expeditiously reconcile any claims between the Debtor-Controlled Entities, on the one hand, and the UK Affiliates, on the other hand.

SECTION 2.09.   *Standstill.*

(a)      Each Party agrees that, if any UK Affiliate has asserted or, in the future, asserts a claim against a Debtor-Controlled Entity, or any Debtor or Debtor-Controlled Entity has asserted or, in the future, asserts a claim against an Other UK Affiliate or LBLIS, and even if such claim is acknowledged pursuant to Section 2.05 of this Agreement, the applicable Party shall forbear or, if applicable, shall use reasonable efforts to cause its Debtor-Controlled Entity to forbear, from taking any action to enforce any rights or remedies under applicable law in respect of such claim against the relevant Debtor-Controlled Entity or Other UK Affiliate (in either case, the "**Standstill Entity**"), including by demanding

22

payment on account thereof or taking any action (whether pursuant to legal proceedings or self-help) to collect such claim, until the earliest of (i) the date that is 90 days after the delivery of a written notice in accordance with Article 13 by the applicable Party to the Standstill Entity, if the Standstill Entity is an Other UK Affiliate, to LBHI, if the Standstill Entity is a Debtor-Controlled Entity (other than LBLIS), or to LBLIS with a copy (that shall not constitute notice) to LBHI, if the Standstill Entity is LBLIS, (ii) the date that is 90 days after the delivery of a written notice in accordance with Article 13 by the Standstill Entity to the applicable Party, if such Party is an Other UK Affiliate, to LBHI, if the applicable entity is a Debtor-Controlled Entity (other than LBLIS) and to LBLIS with a copy (that shall not constitute notice) to LBHI, if the applicable entity is LBLIS, (iii) the date on which the applicable Standstill Entity commences a case under the Bankruptcy Code, an English administration or liquidation proceeding pursuant to the English Insolvency Act 1986, or any other form of reorganization or liquidation under any bankruptcy, insolvency, or similar law of any jurisdiction, or (iv) the date of any payment or distribution by the applicable Standstill Entity in respect of any equity interests or claims existing prior to September 15, 2008 (with respect to (x) the applicable Party asserting a claim and (y) the applicable Standstill Entity, such earliest date, the "**Standstill Termination Date**").

(b)     So long as the applicable Standstill Termination Date has not occurred, if any Debtor or Debtor-Controlled Entity has asserted a claim against any Other UK Affiliate, then such Other UK Affiliate agrees to provide written notice to LBHI in accordance with Article 13 at least ten Business Days prior to making any payment of the type referred to in clause (iv) of this Section 2.09. So long as the applicable Standstill Termination Date has not occurred, if any UK Affiliate has asserted any claim against a Debtor-Controlled Entity (other than LBLIS), then the Debtors agree to use reasonable efforts to cause such Debtor-Controlled Entity (other than LBLIS) to provide written notice to any such UK Affiliate in accordance with Article 13 at least ten Business Days prior to such Debtor-Controlled Entity (other than LBLIS) making any payment of the type referred to in clause (iv) of this Section 2.09.

(c)     So long as the applicable Party or Debtor-Controlled Entity forbears from enforcing any applicable rights or remedies in accordance with Section 2.09(a), each Standstill Entity hereby agrees that any statute or period of limitations, statutes of repose, or other time-based limitations or defenses, whether at law, in equity, under statute, contract, or otherwise (including the doctrine of laches or waiver) that might be asserted as a time bar and/or limitation to any claims that is or may be asserted by any applicable Party or any applicable Debtor-Controlled Entity pursuant to Section 2.09(a) is tolled from the Effective Date to the applicable Standstill Termination Date.

23

SECTION 2.10.    [Reserved]

SECTION 2.11.    *R3 Claim and JPM Claim.*

(a)    As between LBHI and LBIE, (i) the R3 Claim and the JPM Claim shall be treated as if LBHI were a third party asserting such claims against LBIE, (ii) the R3 Claim and the JPM Claim shall not give rise to any rights of setoff or recoupment against any claims that LBIE may have against LBHI, including the LBIE Guarantee Claim and (iii) LBHI shall not have any Extended Lien Claims in respect of the R3 Claim and the JPM Claim.

(b)    Within 30 days of the Effective Date, LBHI shall deliver to LBIE statements in respect of the R3 Claim and the JPM Claim, which statements shall include all reasonable detail in LBHI's possession that LBHI determines in good faith is relevant to LBIE's undertaking pursuant to Section 2.11(d) to deliver the R3 Claim Proposal and the JPM Claim Proposal, respectively.

(c)    Within 120 days of the Effective Date, LBHI shall file proofs of debt that comply with the Insolvency Rules 1986 in LBIE's UK Proceedings in respect of the R3 Claim and the JPM Claim, respectively.

(d)    So long as LBHI complies with the provisions of Section 2.11(b) and Section 2.11(c), and subject to the proviso in this Section 2.11(d), LBIE shall deliver written proposals to LBHI within 180 days of the Effective Date with respect to the amounts of the R3 Claim and the JPM Claim, and the validity of any claims in respect thereof to any right, title or interest in assets in LBIE's custody and control, or held by a sub-custodian on behalf of LBIE consistent with the methodologies that LBIE employs with third-party claims of a similar type (such proposal in respect of the R3 Claim, the "**R3 Claim Proposal**", and in respect of the JPM Claim, the "**JPM Claim Proposal**"); *provided* that the Debtors and LBIE acknowledge that the timely cooperation of (i) the applicable JPM Entities is required in order for LBIE to deliver the JPM Claim Proposal within such timeframe and (ii) R3 is required in order for LBIE to deliver the R3 Claim Proposal within such timeframe.

(e)    If LBHI does not respond to the R3 Claim Proposal within 30 days of receipt thereof, the R3 Claim Proposal shall be binding on LBHI and LBIE. If LBHI responds to the R3 Claim Proposal within 30 days of receipt thereof, LBHI and LBIE agree to use reasonable efforts to conduct negotiations regarding the same with a view toward concluding such negotiations 60 days after the commencement thereof.    At the end of such 60-day period (or such later date as may be agreed by LBHI and LBIE), LBIE shall either accept the R3 Claim, reject the R3 Claim or accept the R3 Claim in part and reject the R3 Claim in part; *provided* that it is expressly agreed by LBHI that LBIE's obligations in respect of

24

such acceptance or rejection in whole or in part shall not extend to any portion of the R3 Claim that in any way involves any issues related to (i)  any assets or securities underlying the R3 Claim that are not then in LBIE's custody or control or (ii) whether LBHI is a beneficiary of the Client Money Trust in respect of the R3 Claim.

(f)    If LBHI does not respond to the JPM Claim Proposal within 30 days of receipt thereof, the JPM Claim Proposal shall be binding on LBHI and LBIE. If LBHI responds to the JPM Claim Proposal within thirty 30 days of receipt thereof, LBHI and LBIE agree to use reasonable efforts to conduct negotiations regarding the same with a view toward concluding such negotiations within 60 days after the commencement thereof.    At the end of such 60-day period (or such later date as may be agreed by LBHI and LBIE), LBIE shall either accept the JPM Claim, reject the JPM Claim or accept the JPM Claim in part and reject the JPM Claim in part; *provided* that it is expressly agreed by LBHI that LBIE's obligations in respect of such acceptance or rejection in whole or in part shall not extend to any portion of the JPM Claim that in any way involves any issues related to (i)  any assets or securities underlying the JPM Claim that are not then in LBIE's custody or control or (ii)  whether LBHI is a beneficiary of the Client Money Trust in respect of the JPM Claim.

(g)    This Section 2.11 is without prejudice to all rights and defenses of LBIE and LBHI in respect of the JPM Claim and the R3 Claim.

SECTION 2.12.  *LB Lux.*

(a)    Subject to the proviso in Section 2.12(c)(iv), LBHI and LBIE agree to share any distributions made to either of them in respect of LB Lux 45% to LBHI (the "**LBHI-LB Lux Share**") and 55% to LBIE (the "**LBIE-LB Lux Share**").    As part of such arrangement (i) LBHI and LBIE agree to use reasonable efforts to secure acceptance and implementation by LB Lux of distributions to LBHI and LBIE in accordance with the LBHI-LB Lux Share and LBIE-LB Lux Share, respectively and (ii) LBIE shall return any LB Lux/LBIE Assets to LB Lux within ten Business Days of any such assets becoming LB Lux/LBIE Assets, such ten-Business-Day period subject to LB Lux supplying LBIE in a timely manner with adequate settlement information for delivery of such LB Lux/LBIE Assets (it being understood that LBIE and LBHI intend that the value of any such returned LB Lux/LBIE Assets be distributed by LB Lux to LBHI and LBIE in accordance with the LBHI-LB Lux Share and LBIE-LB Lux Share, respectively).

(b)    LBIE (i) agrees that, within 180 days of the Effective Date, LBIE either shall (x) determine whether, subject to any Extended Lien Claims, any assets are LB Lux/LBIE Assets (and, subject to applicable data privacy

restrictions and confidentiality obligations owed to counterparties, shall keep LBHI informed of the status of such determination from time to time, upon reasonable request by LBHI, and promptly inform LBHI of any such determination made by LBIE) or (y) file an application with the English court seeking such a determination, (ii) consents and shall not object to LBHI's filing, upon ten-Business-Days' written notice to LBIE, an application with the English court disputing any determination made by LBIE pursuant to clause (i)(x) of this Section 2.12(b), and (iii) consents and shall not object to LBHI's participation in any application to the English court described in clause (i)(y) of this Section 2.12(b).

(c)    Irrespective of whether LB Lux distributes amounts to LBHI and LBIE in accordance with Section 2.12(a) in whole or in part, as between themselves and subject to the proviso in Section 2.12(c)(iv), LBHI and LBIE agree to share all distributions remitted to them in respect of LB Lux, with the LBHI-LB Lux Share for LBHI and the LBIE-LB Lux Share for LBIE.    In furtherance of the foregoing and subject to the proviso in Section 2.12(c)(iv):

(i)    if on any date the distributions received by LBHI in respect of LB Lux through and including such date *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date exceed the LBHI-LB Lux Share (including, if applicable, after giving effect to any deemed change in the LBHI-LB Lux Share pursuant to the proviso in Section 2.12(c)(iv)), then LBHI shall, within five Business Days of such date, remit cash to LBIE in an amount necessary to cause the distributions received by LBHI in respect of LB Lux through and including such date (after giving effect to the cash remittance to LBIE in accordance with this Section 2.12(c)(i)) *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date to equal the LBHI-LB Lux Share;

(ii)    if on any date the distributions received by LBIE in respect of LB Lux through and including such date *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date exceed the LBIE-LB Lux Share, then LBIE shall, within five Business Days of such date, remit cash to LBHI in an amount necessary to cause the distributions received by LBIE in respect of LB Lux through and including such date (after giving effect to the cash remittance to LBHI in accordance with this Section 2.12(c)(ii)) *divided by* the aggregate distributions received by LBHI and LBIE in respect of LB Lux through and including such date to equal the LBIE-LB Lux Share;

26

(iii)     each of LBHI and LBIE agree to notify the other, promptly upon receipt thereof, of the amount any distributions remitted to it in respect of LB Lux; and

(iv)     LBHI and LBIE agree to use reasonable efforts to secure (x) the stay of the LBIE-LB Lux Litigation and (y) upon the occurrence of the Effective Date, the resolution of the LBIE-LB Lux Litigation in a manner acceptable to LBIE, in its sole discretion; *provided* that notwithstanding any such reasonable efforts by LBHI and LBIE, in the event that LBIE makes any payments or distributions to LB Lux pursuant to any order of a court of competent jurisdiction in respect of the LBIE-LB Lux Litigation or in connection with any other resolution of the LBIE-LB Lux Litigation (the aggregate amount of any such payments or distributions, the "**LBIE-LB Lux Payment Amount**"), then (1) the LBHI-LB Lux Share shall be deemed to be 0% and the LBIE-LB Lux Share shall be deemed to be 100% for purposes of this Section 2.12(b) unless and until the aggregate distributions received by LBIE in respect of LB Lux subsequent to the date that LBIE remits any LBIE-LB Lux Payment Amount equals such LBIE-LB Lux Payment Amount and (2) any distributions received by LBIE as a result of clause (1) of this proviso shall be disregarded for purposes of Section 2.12(c)(i) and Section 2.12(c)(ii).

(d)     LBHI and LBIE agree to use reasonable efforts to work together and with the liquidators of LB Lux to achieve the best recoveries reasonably obtainable by LB Lux in its estate and to secure an expeditious distribution of assets by LB Lux to its creditors.

(e)     If any Debtor (other than LBHI) or any UK Affiliate (other than LBIE) obtains any Transfer in respect of LB Lux (or in connection with any claims in respect thereof), including by way of reduction of any obligation whether through setoff or otherwise, such Debtor or UK Affiliate shall, within five Business Days of receipt thereof, remit such Transfer to LBIE (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).    LBIE shall treat any remittances received in accordance with this Section 2.12(e) as a remittance in respect of LB Lux and subject to the provisions of Section 2.12(b).

SECTION 2.13.    *LBLIS.*

(a)     LBLIS acknowledges that, on the Effective Date, each of its then-current managers (the "**Current LBLIS Managers**") is to resign without any claim for compensation.    LB Scottish, in its capacity as sole shareholder of LBLIS, (i) shall procure such resignation on such terms by the Current LBLIS

27

Managers on the Effective Date and (ii) in the event that the Current LBLIS Managers have not so resigned on the Effective Date, LB Scottish shall pass a shareholder resolution in the form attached hereto as Exhibit C revoking the Current LBLIS Managers, but giving them discharge for their mandate.

(b)     Not later than 14 days prior to the Effective Date, LBL shall provide to LB Scottish a list of three nominees for managers of LBLIS.   On the Effective Date, LB Scottish shall cause such nominees to be elected as managers of LBLIS in replacement of the Current LBLIS Managers who will at the same time obtain a discharge for their mandate, and will thereafter (i) support such managers' re-election and not seek their removal or revocation, (ii) support the election of such supplemental or replacement managers as may be proposed by LBL from time to time (the managers from time to time of LBLIS that are nominated by LBL, collectively, the "**LBL Nominated Managers**") and (iii) not elect or support the election of any persons not nominated by LBL.

(c)     Unless requested to do so by the LBL Nominated Managers, none of any Debtor, LB UK Delaware nor LB Scottish shall take any steps towards putting LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding, whether through the exercise of any contractual or legal rights or in such entity's capacity as shareholder or creditor of LBLIS.

(d)     Prior to the initial election of the LBL Nominated Managers, LBLIS shall not take any steps towards putting LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding, unless required to do so by Luxembourg law.

(e)     To the largest extent permitted by applicable law, none of any Debtor, LB UK Delaware nor LB Scottish shall object to or take any action to prevent any decision by the LBL Nominated Managers to place LBLIS in any insolvency, bankruptcy, winding-up, liquidation or similar proceeding.

(f)     Pending the Effective Date, LBLIS shall, and LB Scottish shall procure that LBLIS shall, operate in the ordinary course of business and shall only make payments or enter into transactions that are within the ordinary course of its business; *provided, however*, that LBLIS shall not, and LB Scottish shall procure that LBLIS shall not, make any payment or distribution to any Debtor or Debtor-Controlled Entity in respect of any equity interests or claims existing prior to September 15, 2008.

(g)     LB Scottish hereby acknowledges the obligations undertaken by LBLIS in this Section 2.13 and shall take no actions or inactions that are inconsistent with such obligations or prevent LBLIS from fulfilling such obligations.

28

(h)    LB UK Delaware hereby irrevocably agrees and shall be deemed to have hereby irrevocably agreed, effective on the Effective Date, that any and all of its claims against LBLIS are subordinated in right of payment to all other creditors of LBLIS, including LBL.

(i)    Unless and until LBL shall have been indefeasibly paid $225,000,000 in respect of its claims against LBLIS, plus any interest accrued thereon in accordance with applicable contract and law, if LB UK Delaware obtains any Transfer in respect of any of its claims against LBLIS, including by way of reduction of any obligation whether through setoff or otherwise, LB UK Delaware shall, within three Business Days of receipt thereof, remit such Transfer to LBL (in the form and amount received or, in the case of an obligation reduction, in cash for the value of such reduction).

(j)    LB UK Delaware and LBHI hereby acknowledge the obligations undertaken by LB Scottish in this Section 2.13 and shall take no actions or inactions that are inconsistent with such obligations or prevent LB Scottish from fulfilling such obligations.

(k)    On or after the Effective Date, to the extent that LBHI (i) is holding any cash for or on behalf of LBLIS, or in which LBLIS has a Proprietary Interest or (ii) is authorized to direct the withdrawal of any cash held in accounts in the name of LBLIS or in which LBLIS has a Proprietary Interest, in each case, LBHI will return such cash to LBLIS within two Business Days after LBLIS's written request to LBHI.

(l)    LBL agrees to indemnify each of LBHI, LB UK Delaware, LB Scottish and each of their and LBLIS' members, partners, directors, officers, employees, agents, advisers or representatives, present and future, (each an "**LBL Indemnified Person**") against any damages or losses actually suffered in connection with any Causes of Action asserted against them (other than any Causes of Action asserted against them by or on behalf of any Debtor or Debtor-Controlled Entity (other than any Causes of Action asserted by LBLIS after the Effective Date)) asserted against such LBL Indemnified Person in relation to the provision of, or otherwise connected with, the performance of the obligations set forth in this Section 2.13; *provided* that this indemnity shall not apply, to the extent it would otherwise apply, in respect of (i) any Causes of Action arising by reason of the Current LBLIS Managers being given a discharge for their mandate except solely to the extent relating directly to their acting or causing LBLIS to act so as to comply with an obligation of LBLIS under this Section 2.13; (ii) any Causes of Action arising from any actions or inactions of the Current LBLIS Managers while in office as managers of LBLIS except solely to the extent that they arise directly as a result of the Current LBLIS Managers (x) acting or failing to act so as to cause LBLIS to comply with its obligations under Section 2.13(f) or

29

(y) resigning in accordance with Section 2.13(a); or (iii) any losses or damages resulting from the willful misconduct, bad faith, fraud or gross negligence of such LBL Indemnified Person.

(m)    Each LBLIS Group Entity is party to this Agreement solely to the extent of the provisions set forth in Section 2.09, Section 2.13, Article 4 (but solely to the extent of any representations or warranties made by LBL thereunder), Article 6, Article 9 through Article 19 and Article 23 through Article 27, and, except in such provisions, each reference to the term "Party" or "Parties" throughout this Agreement shall be deemed to refer to a Party other than any of the LBLIS Group Entities or the Parties other than LBLIS Group Entities, respectively.

SECTION 2.14.    *Claim Allowance Final.*    The Allowed Claims and the Admitted Claims shall not be subject to (a) reduction, avoidance, recharacterization, reconsideration, recovery, subordination, merger, consolidation, attack, offset, claim, defense, recoupment, deduction, counterclaim or objection, of any kind or nature, whether under the Bankruptcy Code or any provision of the Plan or otherwise or (b) disallowance or holdback (other than any posting of security in accordance with Section 2.01(c) in respect of the LBIE Guarantee Claim) under any provision of the Plan or Bankruptcy Code, including section 502(d) thereof, or otherwise.

SECTION 2.15.    *Allowed Claims' Treatment Under the Plan.*

(a)    Except as set forth in Section 2.01(c), the Allowed Claims shall be treated at least as favorably as the most favorably treated guarantee claim or direct claim, as applicable, of any Lehman Entity against the applicable Debtor, including with respect to the timing of distributions thereunder, except to the extent that any UK Affiliate agrees hereunder that its claims will be treated less favorably than other claims in the same class; *provided* that this Section 2.15(a) shall not prohibit the Debtors from (i) treating the Allowed Claims, or any other claims, in any manner that the Debtors determine, in the reasonable exercise of their fiduciary duties, is required by applicable law or required to render the Plan confirmable pursuant to section 1129 of the Bankruptcy Code or (ii) treating any guarantee claim or direct claim of any Lehman Entity more favorably than any Allowed Claims that are in a different class than the applicable Lehman Entity's claim under the Plan, so long as (x) such treatment is not materially more favorable and (y) such classification and treatment comply with applicable law. For the purposes of this Section 2.15(a), each UK Affiliate agrees that it shall not assert that the Current Plan treats the Allowed Claims less favorably than the most favorably treated guarantee claim or direct claim, as applicable, of any Lehman Entity against the applicable Debtor.

(b)     Except as set forth in Section 2.01(b), the Allowed Claims under any Plan shall be unaffected by any allowance or disallowance of any UK Affiliate's claims against any Lehman Entity (other than the Debtors) or the amounts thereof.

(c)     Notwithstanding anything to the contrary in Section 8.13 of the Current Plan (or any provisions of similar effect in any Plan), the Debtors agree that any Allowed Claim shall be deemed (i) satisfied in full or (ii) not entitled to any further distributions from the Debtors, in each case, only if the holder of such Allowed Claim receives distributions from the Debtors on account of such Allowed Claim that combined with any other distributions provided to such holder in respect of the corresponding "Primary Claim" (as defined in the Current Plan) equal the allowed amount of the corresponding "Primary Claim" (as defined in the Current Plan).

(d)     Subject to Section 2.15(c) hereof, Sections 8.10, 8.13(e) (except as explicitly set forth in Section 2.01(c) hereof), 8.14, 8.15 and 13.8 (to the extent Section 13.8 seeks to preserve the Debtors' rights to Causes of Action (as defined in the Current Plan) that are released or waived under this Agreement) of the Current Plan (and any provisions of similar effect in the Plan) shall not apply to the UK Affiliates or the Allowed Claims.    This Section 2.15(d) is without prejudice to any rights of the Debtors under the Plan or otherwise against any entities that are not Parties.

SECTION 2.16.    *Tolling Agreements.*    Each Tolling Agreement shall be deemed terminated as of the Effective Date and be of no further force and effect as between the Debtors and the applicable UK Affiliates.

SECTION 2.17.    *LBJ Settlement Agreement.*    LBSF, LBHI and LBIE shall take all steps reasonably necessary expeditiously to negotiate and execute the LBJ Settlement Agreement and seek approval thereof from the Bankruptcy Court under the Plan.    Each of LBSF, LBHI and LBIE agree that solely vis-à-vis one another, the releases set forth in Article 8 supersede and replace any releases set forth in the LBJ Settlement Agreement.

SECTION 2.18.    *Claim Reserve Agreement.*    The Parties acknowledge that this Agreement is the Settlement Agreement (as defined in the Claim Reserve Agreement).

SECTION 2.19.    *Unfunded Notes Settlement Agreement.*    The Debtors hereby irrevocably waive and release and shall be deemed to have hereby irrevocably waived and released, automatically and without further action, any claims or causes of action they may have against LBIE (including in the Debtors' respective capacities as Extended Lien Claimants) in respect of the transactions contemplated by the Unfunded Notes Settlement Agreement; *provided* that any of

31

LBSF's rights, obligations, claims or causes of action under the Unfunded Notes Settlement Agreement are neither waived nor released pursuant to this Section 2.19.

SECTION 2.20.    *LBIE Structured Securities.*

(a)    LBIE agrees to acquire beneficial ownership of LBIE Structured Securities after the Execution Date only (i) through the exercise of rights or remedies, under contract or applicable law, of any liens or security interests LBIE may have in any LBIE Structured Securities or (ii) in connection with a settlement or other resolution of any contracts or transactions entered into by LBIE with a counterparty (including any Lehman Entity) prior to LBIE's Insolvency Filing Time.

(b)    LBIE and LBHI hereby agree that any claims by LBIE (or any of its permitted transferees, assignees or participants in accordance with Section 2.20(c)) against LBHI arising under LBIE Structured Securities (i) shall be allowed claims (solely for purposes of distributions under the Plan) against LBHI in an amount equal to the amount determined in accordance with the methodology and principles used by the Debtors to value Structured Securities beneficially owned by third parties; *provided* that the Debtors reserve the right to object to the LBIE Structured Securities on the grounds that such claims do not include a blocking number or include an invalid blocking number, are duplicative of other claims, have been amended and superseded, or otherwise do not comply with the provisions of the Bar Date Order (as defined in the Current Plan); (ii) in the case of LBIE Structured Securities that were issued by any Lehman Entity (other than LBHI), shall be classified under the Plan as unsecured, non-priority, senior affiliate guarantee claims against LBHI ("LBHI Class 4B" as described in the Current Plan); *provided* that such claims shall be treated as if they were unsecured, non-priority, senior third-party guarantee claims against LBHI ("LBHI Class 5" as described in the Current Plan); and (iii) in the case of LBIE Structured Securities that were issued by LBHI, shall be classified under the Plan in the same classes, and receive the same treatment under the Plan, as if such Structured Securities had not been acquired by LBIE.

(c)    LBIE agrees to convey, transfer, assign, or participate any of the LBIE Structured Securities after the Execution Date only to any entity that agrees to be bound by LBIE's obligations under Section 2.20(b) and this Section 2.20(c).

SECTION 2.21.    *Extended Lien Applications.*    LBIE shall not object to LBHI's (or any other Debtor's) participation in the Extended Lien Application and/or Extended Lien Asia Application.

32

SECTION 2.22.    *Client Money Tracing Claims.*

(a)    LBIE shall commence a Client Money Tracing Claim against LBHI only if expressly directed to do so by either (i) a court of competent jurisdiction (it being understood that such direction may be in connection with an application commenced by LBIE in such court, including the Client Money Tracing Application) or (ii) the UK Financial Services Authority.

(b)    In the event that a court of competent jurisdiction renders, by a final, unappealable order, a judgment against LBHI in respect of a Client Money Tracing Claim and, as a result thereof, LBHI actually remits to LBIE or any beneficiary of the Client Money Trust, or their respective successors in title or assignees, cash or other property in or towards settlement of such Client Money Tracing Claim (such payment, an "**LBHI Client Money Payment**,") then LBIE shall pay to LBHI an amount equal to the aggregate amount of such dividend or dividends as LBIE would have paid on that portion of any admitted unsecured claim against LBIE that is indefeasibly reduced by the LBHI Client Money Payment at the same time or times as such dividend payments would have been made (and, in the case of any dividends already paid by LBIE to the relevant claimant or claimants, LBIE hereby expressly agrees to use reasonable efforts (i) to recover and (ii) to assist LBHI, to the extent LBHI is seeking to recover, such dividends from the relevant creditor or creditors and, solely to the extent such dividends are recovered by LBIE, agrees to pay such dividends to LBHI within seven Business Days of receipt thereof).

(c)    LBIE hereby expressly agrees (i) to LBHI's participation in any Client Money Tracing Application, and (ii) not to seek any costs from LBHI in respect of participation in such an application.

(d)    Subject to applicable confidentiality and data privacy laws and restrictions, LBIE shall use reasonable efforts, from time to time at LBHI's request, to provide LBHI with information regarding entitlements to protection as Client Money under the Client Money Trust, including (i) creditors who may have such entitlements and (ii) the amounts and natures of such creditors' claims that may give rise to such entitlements; *provided* that, without prejudice to the general applicability of the Existing NDA, LBHI acknowledges that any information provided to it pursuant to this Section 2.22(d) shall be treated as "Confidential Information" (as defined in the Existing NDA).

(e)    Nothing in this Section 2.22 waives or releases any rights or defenses any Party may have in respect of any Client Money Tracing Claim, all of which are expressly reserved.

33

SECTION 2.23.    *UK Re/LBIE Assets.*    LBIE (i) agrees that, within 180 days of the Effective Date, LBIE either shall (x) determine whether, subject to any Extended Lien Claims, any assets are UK Re/LBIE Assets (and, subject to applicable data privacy restrictions and confidentiality obligations owed to counterparties, shall keep LBHI informed of the status of such determination from time to time, upon reasonable request by LBHI, and promptly inform LBHI of any such determination made by LBIE) or (y) file an application with the English court seeking such a determination, (ii) consents and shall not object to LBHI's filing, upon ten-Business-Days' written notice to LBIE, an application with the English court disputing any determination made by LBIE pursuant to clause (i)(x) of this Section 2.23, (iii) consents and shall not object to LBHI's participation in any application to the English court described in clause (i)(y) of this Section 2.23, (iv) confirms (it being understood that such confirmation shall be treated as a statement made in good faith but not constitute a warranty or representation having legal effect) that, on the basis of its books and records as currently reviewed and on the basis of the proprietary claims made against LBIE to date by UK Re, there are no competing ownership claims in respect of assets in LBIE's custody or control that are claimed by UK Re other than Competing Claims by LBHI, (v) agrees that LBIE will not assert any lien over the UK Re/LBIE Assets in respect of any indebtedness owed by UK Re to LBIE and (vi) agrees that, within ten Business Days after the date upon which it has been finally determined that any assets are UK Re/LBIE Assets, LBIE shall remit, return, transfer, convey, assign or otherwise deliver such assets to UK Re, such ten-Business-Day period subject to UK Re supplying LBIE in a timely manner with adequate settlement information for delivery of such UK Re/LBIE Assets.

## ARTICLE 3
### PLAN SUPPORT

SECTION 3.01.    *Plan Supplement.*    The Debtors shall file this Agreement (but not Schedule 2, Schedule 3 or Schedule 5) in the Plan Supplement (as defined in the Plan) on or prior to the deadline set forth in the Disclosure Statement Approval Order for filing the Plan Supplement; *provided* that so long as the Debtors take all steps reasonably necessary to ensure that the contents thereof are not publicly disclosed, Schedule 2, Schedule 3 and Schedule 5 may be (i) filed by the Debtors with the Bankruptcy Court under seal and/or (ii) disclosed on a confidential basis to the Bankruptcy Court, the United States Trustee for the Southern District of New York and the advisors to the official committee of unsecured creditors in the Chapter 11 Cases on a "professionals'-eyes only" basis.

SECTION 3.02.    *PSA Creditor.*    Contemporaneously with filing this Agreement with the Bankruptcy Court in accordance with Section 3.01, the Debtors shall file with the Bankruptcy Court an amendment to Schedule 4 of the

34

Plan, which amendment shall add each UK Affiliate as a PSA Creditor (as defined in the Current Plan).

SECTION 3.03.    *Plan.*    The Debtors shall (a) prosecute the Plan (incorporating this Agreement in full) and seek entry of an order confirming the Plan (incorporating this Agreement in full), (b) provide LBIE with any contemplated amendment, modification or supplement to the Plan or Disclosure Statement as soon as practicable and in any event prior to the filing of such document with the Bankruptcy Court, (c) not amend, modify or supplement the Plan in a manner the effect of which is that this Agreement is not (or is no longer) incorporated in full in the Plan and (d) not propose or support any other chapter 11 plan for the Debtors unless such plan incorporates this Agreement in full; *provided* that clauses (a), (c) and (d) of this Section 3.03 shall not prohibit the Debtors from acting in any manner that the Debtors' determine, in the reasonable exercise of their fiduciary duties, is required by applicable law or required to render the Plan confirmable pursuant to section 1129 of the Bankruptcy Code.

SECTION 3.04.    *Plan Support Obligations.*    So long as (a) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (b) this Agreement has not terminated in accordance with Article 11 and (c) the Plan incorporates this Agreement in full, then, with respect to the Allowed Claims, the Excluded Items, and any other claims that the UK Affiliates have asserted or may assert against any Debtor, (i) provided that the applicable UK Affiliate has been properly solicited in accordance with section 1125 of the Bankruptcy Code, each UK Affiliate shall timely vote to accept the Plan and not thereafter withdraw or change such vote, and LBIE shall file a statement in support of approval and confirmation of the Plan; *provided* that LBIE, acting as "nominee" (as used in paragraph 27 of the Disclosure Statement Approval Order) or as "Voting Nominee" (as used in paragraph 24 of the Disclosure Statement Approval Order), shall be entitled to vote any LPS Trust Claims either to accept or to reject the Plan (or to abstain from voting on the Plan), in each case, as directed by the applicable beneficial holders, (ii) no UK Affiliate shall oppose or object to (or support any objection to) confirmation of the Plan, (iii) subject to Section 3.06, no UK Affiliate shall (x) participate in the formation of, file or prosecute any Alternative Plan, (y) join in or support any Alternative Plan, including, without limitation, express support in writing of, or enter into any form of plan support agreement with respect to any Alternative Plan, or (z) take any action to alter, delay or impede the confirmation and consummation of the Plan.

SECTION 3.05.    *Solicitation Required in Connection with the Plan.* Notwithstanding anything contained in Section 3.04 or elsewhere in this Agreement, this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan pursuant to section 1125 of the Bankruptcy Code, or rejection of any Alternative Plan.    Acceptance of the Plan will not be

35

solicited until the Disclosure Statement and ballots have been transmitted to parties entitled to receive the same in accordance with the Disclosure Statement Approval Order.

SECTION 3.06.    *Alternative Plans.*    So long as (a) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (b) this Agreement has not terminated in accordance with Article 11 and (c) the Plan incorporates this Agreement in full, then, if the Bankruptcy Court allows other parties to solicit acceptances of any Alternative Plans at the same time as the Plan, any UK Affiliate may vote to accept such Alternative Plans only if such Alternative Plan or Alternative Plans provide the applicable UK Affiliate with an equal or greater economic recovery than the Plan; *provided, however*, that such UK Affiliate shall also (i) timely vote to accept the Plan and not thereafter withdraw or change such vote, (ii) comply with the provisions of Section 3.04, and (iii) support approval and confirmation of the Plan, and indicate a preference for the Plan on its voting ballot, if the Plan provides such UK Affiliate with an equal or greater economic recovery compared with any Alternative Plan that such UK Affiliate votes to accept.    So long as (x) the Debtors are not in breach of their obligations hereunder, including in this Article 3, (y) this Agreement has not terminated in accordance with Article 11 and (z) the Plan incorporates this Agreement in full, then, notwithstanding anything contained in this Article 3, the UK Affiliates shall not indicate a preference on their voting ballots for any Alternative Plans; *provided, further*, that if the Bankruptcy Court orders or directs creditors of the Debtors to indicate a preference on their ballots, then the UK Affiliates may indicate a preference on their voting ballots for any Alternative Plans that provide greater economic recovery than the Plan.

SECTION 3.07.    *Other PSA.*

(a)    The Parties intend for this Agreement to be an "Other PSA" as referred to and described in each applicable Supporting Creditor PSA.

(b)    The UK Affiliates shall not file, support or participate in any objections to the claims of any creditor that enters into an Other PSA (as defined in each applicable Supporting Creditor PSA) with the Debtors substantially similar to this Agreement, except with respect to any creditor that files, supports or participates in any objections to the approval of this Agreement by the Bankruptcy Court.

ARTICLE 4
THE UK AFFILIATES' REPRESENTATIONS AND WARRANTIES

In order to induce the Debtors to enter into and perform their obligations under this Agreement, each UK Affiliate hereby represents, warrants and acknowledges as follows:

SECTION 4.01.  *Authority.*   The UK Affiliates have the power and authority to execute, deliver and perform their obligations under this Agreement, and to consummate the transactions contemplated herein, and the execution, delivery and performance by the UK Affiliates of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of the UK Affiliates, and no other proceedings on the part of the UK Affiliates are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

SECTION 4.02.  *Validity.*   This Agreement has been duly executed and delivered by the UK Affiliates and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of the UK Affiliates, enforceable against the UK Affiliates in accordance with its terms.

SECTION 4.03.  *Authorization of Governmental Authorities and Creditors.*   No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the UK Affiliates of their obligations hereunder.

SECTION 4.04.  *Title; No Prior Transfer of Claims.*

(a)     The UK Affiliates (i) own the House Proofs of Claim free and clear of any and all liens, claims, setoff rights, security interests, participations, or encumbrances created or incurred by the UK Affiliates, (ii) are not aware of any third-party rights with respect to the House Proofs of Claim as of the Execution Date, and (iii) have not transferred or assigned to any other person any of the House Proofs of Claim, in whole or in part.

(b)     Other than as expressly set forth in this Agreement, no UK Affiliate may convey, transfer, assign, or participate any of the claims or receivables that are allowed, compromised, settled, waived or released hereunder, or any rights or interests arising under any of the foregoing, in whole or in part; *provided* that after the Effective Date the UK Affiliates may convey, transfer, assign or participate any of the Allowed Claims (in each case, an **Assigned UK Affiliate Interest**"), to any party or parties (in each case, a "**UK Affiliate Claim Transferee**"); *provided, further*, that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides that

37

the terms and provisions of this Agreement shall be binding in all respects upon UK Affiliate Claim Transferees, and any successor transferees, and shall govern their acts.    No such conveyance, transfer, assignment, or participation shall be valid unless (1) the Debtor against which such Assigned UK Affiliate Interest is asserted receives a copy of said written agreement executed by the transferor and the transferee and (2) such Debtor does not object in writing within five Business Days of receipt of said written agreement to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the foregoing provisions; *provided*, *further*, that the foregoing restriction on objections shall not apply with respect to any objections premised on any orders entered in the Chapter 11 Cases relating to the trading of claims.    Any such conveyance, transfer, assignment, or participation shall not relieve the UK Affiliates of any of their obligations under this Agreement.    Notwithstanding the foregoing, the conveyance, transfer, assignment, or participation of any claims, receivables, rights or interest in respect of Excluded Items is not prohibited or restricted by this Section 4.04(b); *provided, however,* that LBIE shall not transfer any Client Money Tracing Claims it holds in its capacity as a fiduciary without the prior written consent of LBHI.

SECTION 4.05.    *No Reliance.*    The UK Affiliates (i) are sophisticated parties with respect to the subject matter of this Agreement, (ii) have been represented and advised by legal counsel in connection with this Agreement, (iii) have adequate information concerning the matters that are the subject of this Agreement, and (iv) have independently and without reliance upon any Debtor or any officer, employee, agent or representative thereof, and based on such information as the UK Affiliates have deemed appropriate, made their own analysis and decision to enter into this Agreement, except that the UK Affiliates have relied upon each Debtor's express representations, warranties and covenants in this Agreement.    The UK Affiliates acknowledge that they have entered into this Agreement voluntarily and of their own choice and not under coercion or duress.

## ARTICLE 5
### DEBTORS' REPRESENTATIONS AND WARRANTIES

In order to induce the UK Affiliates to enter into and perform their obligations under this Agreement, each Debtor hereby represents, warrants and acknowledges as follows:

SECTION 5.01.    *Authority.*

(a)    Subject to the occurrence of the Effective Date, each signatory Debtor has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein,

38

and the execution, delivery and performance by such Debtor of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such Debtor, and no other proceedings on the part of such Debtor are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

SECTION 5.02.    *Validity*.    Subject to the occurrence of the Effective Date, this Agreement has been duly executed and delivered by each Debtor and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of each Debtor, enforceable against each Debtor in accordance with its terms.

SECTION 5.03.    *Authorization of Governmental Authorities*.    Subject to the occurrence of the Effective Date, no action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each Debtor of its obligations hereunder.

SECTION 5.04.    *Title; No Transfer of Claims*.

(a)    Each Debtor (i) owns all claims it may have against any UK Affiliate, including all claims released hereunder, free and clear of any and all liens, claims, setoff rights, security interests, participations, or encumbrances created or incurred by such Debtor, (ii) is not aware of any third-party rights with respect to any such claims as of the Execution Date, and (iii) has not transferred or assigned to any other person any of such claims, in whole or in part.

(b)    Other than as expressly set forth in this Agreement, no Debtor may convey, transfer, assign, or participate any of the claims or receivables that are allowed, compromised, settled, waived or released hereunder, or any rights or interests arising under any of the foregoing, in whole or in part; *provided* that after the Effective Date the Debtors may convey, transfer, assign or participate any of the Admitted Claims (in each case, an "**Assigned Debtor Interest**"), to any party or parties (in each case, a "**Debtor Claim Transferee**"); *provided* that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides that the terms and provisions of this Agreement shall be binding in all respects upon Debtor Claim Transferees, and any successor transferees, and shall govern their acts.    No such conveyance, transfer, assignment, or participation shall be valid unless (1) the UK Affiliate against which such Assigned Debtor Interest is asserted receives a copy of said written agreement executed by the transferor and the transferee and (2) such UK Affiliate does not object in writing within five Business Days of receipt of said written agreement to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the

39

foregoing provisions.   Any such conveyance, transfer, assignment, or participation shall not relieve the Debtors of any of their obligations under this Agreement.   Notwithstanding the foregoing, the conveyance, transfer, assignment, or participation of any claims, receivables, rights or interest in respect of Excluded Items is not prohibited or restricted by this Section 5.04(b); *provided, however*, that if LBHI transfers or assigns all or any portion of the JPM Claim or the R3 Claim, the Parties' obligations with respect to the JPM Claim or the R3 Claim, as applicable, shall automatically terminate; *provided, further*, that LBHI shall only transfer or assign all or any portion of the JPM Claim or the R3 Claim to a third party, and only so long as such third party agrees to be bound by LBHI's obligations under this proviso of Section 5.04(b).

SECTION 5.05.   *No Reliance*.   Each Debtor (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any UK Affiliate or any officer, employee, agent or representative thereof, and based on such information as each Debtor has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that each Debtor has relied upon each UK Affiliate's express representations, warranties and covenants in this Agreement.   Each Debtor acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

## ARTICLE 6
### LBLIS GROUP ENTITIES' REPRESENTATIONS AND WARRANTIES

In order to induce the UK Affiliates to enter into and perform their obligations under this Agreement, each LBLIS Group Entity hereby represents, warrants and acknowledges as follows:

SECTION 6.01.   *Authority.*

(a)    Subject to the occurrence of the Effective Date, each signatory LBLIS Group Entity has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein, and the execution, delivery and performance by such LBLIS Group Entity of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such LBLIS Group Entity, and no other proceedings on the part of such LBLIS Group Entity are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

40

SECTION 6.02.    *Validity*.    Subject to the occurrence of the Effective Date, this Agreement has been duly executed and delivered by each LBLIS Group Entity and, subject to general bankruptcy rules, constitutes the legal, valid and binding agreement of each LBLIS Group Entity, enforceable against LBLIS Group Entity in accordance with its terms.

SECTION 6.03.    *Authorization of Governmental Authorities*.    Subject to the occurrence of the Effective Date, no action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each LBLIS Group Entity of its obligations hereunder.

SECTION 6.04.    *No Reliance*.    Each LBLIS Group Entity (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any UK Affiliate or any officer, employee, agent or representative thereof, and based on such information as each LBLIS Group Entity has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that each LBLIS Group Entity has relied upon LBL's express representations, warranties and covenants in this Agreement.    Each LBLIS Group Entity acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

## ARTICLE 7
### SURVIVING CONTRACTS

The Surviving Contracts shall survive the execution, consummation or termination of this Agreement, and the Debtors shall not reject any Surviving Contracts pursuant to sections 365 or 1123(b)(2) of the Bankruptcy Code.    All pre-petition contracts between any of the Debtors and any UK Affiliate that are not Surviving Contracts shall be rejected under the Plan pursuant to section 365 of the Bankruptcy Code as of the Effective Date.    Any claims that arise from the rejection of such contracts will be deemed to be satisfied in full by the treatment of the Allowed Claims under any Plan as set forth herein or the distributions to be made in respect of the Admitted Claims, as applicable.

## ARTICLE 8
### RELEASES

SECTION 8.01.    *UK Affiliates' Release.*    Upon the occurrence of the Effective Date, except with respect to (1) the Allowed Claims and the Admitted

41

Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein, and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, each UK Affiliate, on behalf of itself, its estate, its successors and assigns (including any liquidators that may be appointed upon or after conversion of any administration of any UK Administration Company into liquidations, and any parties that may succeed to any Causes of Action of any of the UK Affiliates or their estates, or that may seek to bring any Causes of Action on behalf of any of the UK Affiliate's estates, derivatively or otherwise), hereby fully and forever releases, discharges and acquits each UK Affiliate Released Party from all Causes of Action (including in respect of any derivative claim by any third party or representative of any UK Affiliate's estate), whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity or estoppel), statute, regulation, tort or otherwise (excluding fraud in connection with the negotiation of (A) this Agreement or (B) the amounts of the Allowed Claims and the Admitted Claims) accrued or unaccrued, foreseen or unforeseen, foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, certain or contingent, in each case, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including (i) any claims based upon an asserted right of subrogation, indemnification (whether express or implied), contribution or reimbursement, and (ii) all Causes of Action against any UK Affiliate Released Party, arising from, in connection with, or relating to any Causes of Action against any other entity (whether or not a Party) existing as of the date hereof.

SECTION 8.02.    *Debtors' Release.*    Upon the occurrence of the Effective Date, except with respect to (1) the Allowed Claims and the Admitted Claims and any rights and distribution entitlements in respect thereof, (2) the agreements, promises, settlements, representations and warranties set forth in this Agreement, (3) the performance of the obligations set forth herein and (4) the Excluded Items, and in consideration of the foregoing and each Party's execution of this Agreement, each Debtor, on behalf of itself, its estates, its successors and assigns (including any chapter 7 trustees that may be appointed upon or after conversion of any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to any Causes of Action of any of the Debtors or their estates, or may seek to bring any Causes of Action on behalf of any of the Debtors' estates, derivatively or otherwise), hereby fully and forever releases, discharges and acquits each Debtor Released Party, from all Causes of Action (including in respect of any derivative claim by any third party or representative of any Debtors' estate, including the official committee of unsecured creditors appointed in the Chapter 11 Cases), whether at law or in equity, whether based on contract (including quasi-contract, guarantee, indemnity

42

or estoppel), statute, regulation, tort or otherwise (excluding fraud in connection with the negotiation of (A) this Agreement or (B) the amounts of the Allowed Claims and the Admitted Claims), accrued or unaccrued, foreseen or unforeseen, foreseeable or unforeseeable, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, certain or contingent, in each case, that arise from, are based on, connected with, alleged in or related to any facts or circumstances in existence prior to the date hereof, including (i) any Funding Claims, (ii) any Causes of Action under chapter 5 of the Bankruptcy Code or similar actions under applicable state law, (iii) except as explicitly set forth in Section 2.04, any claims based upon an asserted right of subrogation, indemnification (whether express or implied), contribution or reimbursement, including any such claims in connection with distributions to any of the UK Affiliates or any of their creditors based upon a guarantee or similar document by LBHI or any Lehman Entity and (iv) all Causes of Action against any Debtor Released Party, arising from, in connection with, or relating to any Causes of Action against any other entity (whether or not a Party) existing as of the date hereof.   For the avoidance of doubt, this Section 8.02 is without prejudice to any of the Debtors' rights or Causes of Actions against any entity that is not a Debtor Released Party.

SECTION 8.03.   *Joint Administrators' Confirmation.*   The Joint Administrators confirm that, upon the occurrence of the Effective Date, and in consideration of the foregoing and each Party's execution of this Agreement, they shall not be entitled to commence against any UK Affiliate Released Party any action under the English Insolvency Act 1986 including, any action against any UK Affiliate Released Party in relation to transactions at an undervalue, preferences or transactions to defraud creditors.

## ARTICLE 9
### FEES AND EXPENSES

The fees and expenses incurred by each Party (including the fees of any attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, will be paid by such Party.

## ARTICLE 10
### EFFECTIVENESS OF AGREEMENT

Article 1, Section 2.02(d), clause (x) of Section 2.12(c)(iv), Section 2.13(a) through Section 2.13(d), Section 2.13(f), Section 2.13(g), Section 2.13(j), Section 2.13(l), Section 2.13(m), Section 2.15(a), Section 2.17, Section 2.18, Section 2.19,

Section 2.20(a), Section 2.20(c), Section 2.21, Section 2.22(c) through Section 2.22(e), Article 3, Article 4, Article 5, Article 6, Article 10 through Article 20 (other than clause (iii) of Section 20.01) and Article 23 through Article 27 shall be effective upon the Execution Date.    The other provisions of this Agreement shall be effective upon the Effective Date; *provided* that this Agreement has not been terminated in accordance with accordance with Section 11.01, Section 11.02(a) or Section 11.03 prior to the Effective Date.

ARTICLE 11

TERMINATION

SECTION 11.01.    *Automatic Termination.*    This Agreement shall automatically terminate on any date on which the Bankruptcy Court (i) denies the motion seeking the Confirmation Order with prejudice, or (ii) enters an order confirming an Alternative Plan pursuant to section 1129 of the Bankruptcy Code.

SECTION 11.02    *The Debtors' Right to Terminate.*

(a)    Solely prior to the Effective Date, each Debtor, in its sole discretion, shall have the right, at its election, to terminate this Agreement by written notice to LBIE if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of any of the UK Administration Companies and UK Liquidation Companies hereunder, and the relevant UK Administration Company or UK Liquidation Company, as applicable, shall fail to cure such breach within ten days following receipt of written notice of such breach from the Debtors or (b) any of the Admitted Claims against any UK Administration Company or UK Liquidation Company receive materially different treatment than the claims held by other creditors of the applicable UK Administration Company or UK Liquidation Company that are legally and factually similar to such Admitted Claim and that results in such other creditors having a recovery entitlement in respect of such claims that is materially higher than the recovery entitlement in respect of such Admitted Claim.

(b)    Solely prior to the Effective Date, each Debtor, in its sole discretion, shall have the right, at its election, to terminate this Agreement as between the Debtors and any Other UK Affiliate (such Other UK Affiliate, a "**Terminated UK Affiliate**") by written notice to such Terminated UK Affiliate if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of such Terminated UK Affiliate hereunder, and such Terminated UK Affiliate shall fail to cure such breach within ten days following receipt of written notice of such breach from the Debtors or (b) any of the Admitted Claims against such Terminated UK Affiliate receive materially different treatment than the claims held by other creditors of such Terminated UK Affiliate that are legally and factually similar to such Admitted Claim and that

44

results in such other creditors having a recovery entitlement in respect of such claims that is materially higher than the recovery entitlement in respect of such Admitted Claim; *provided* that notwithstanding anything to the contrary in Section 11.04, this Agreement shall remain in full force and effect among, and such termination pursuant to this Section 11.02(b) shall have no effect on the rights and obligations of, the Debtors, the LBLIS Group Entities and the UK Affiliates (other than any Terminated UK Affiliate) vis-à-vis one another.

SECTION 11.03.    *LBIE's Right to Terminate.*    Solely prior to the Effective Date, LBIE, in its sole discretion, (and no other UK Affiliate) shall have the right, at its election, to terminate this Agreement by written notice to the Debtors if (a) there is a breach in any material respect, taken as a whole, of the representations, warranties and/or covenants of any of the Debtors hereunder, and such Debtor shall fail to cure such breach within ten days following receipt of written notice of such breach from LBIE, (b) the Debtors withdraw the Current Plan or the Plan, (c) the Confirmation Order is not entered by the Bankruptcy Court on or before February 29, 2012, (d) the Plan (incorporating in full this Agreement) is not effective in accordance with its terms on or before July 1, 2012, (e) the Debtors propose or support any chapter 11 plan for the Debtors that provides for the substantive consolidation of any of the Debtors with any of the other Debtors or with any other Lehman Entity, (f) any chapter 11 plan for the Debtors that does not incorporate in full this Agreement is confirmed or such order confirming such plan does not approve this Agreement in full, (g) the Debtors amend or otherwise modify the Current Plan, the Plan or the Disclosure Statement, in each case, in a manner that, individually or, in the aggregate together with all other such amendments or modifications, would, if and when the Plan were to be consummated, adversely affect (other than in a *de minimis* manner) the treatment of, estimated recoveries by, or distributions to, or proportionate share of the Debtors' assets that are distributed pursuant to the Plan to, the Allowed Claims, (h) the Debtors or any Debtor-Controlled Entity takes any other action or makes any other agreement (including with respect to claims or with respect to asset transfers or allocations) in each case, that, individually or, in the aggregate together with all other such actions and agreements, would, if and when the Plan were to be consummated, materially and adversely affect the treatment of, estimated recoveries by, or distributions to, or proportionate share of the Debtors' assets that are distributed pursuant to the Plan to, the Allowed Claims or (i) the Plan provides for different treatment (other than in a *de minimis* manner) of claims held by other creditors that are legally and factually similar to the Allowed Claims that results in such other creditors having a recovery entitlement in respect of such claims that is higher (other than in a *de minimis* amount) than the recovery entitlement provided for in the Plan; *provided* that, with respect to clauses (g), (h) and (i) of this Section 11.03, (x) the Debtors do not guarantee, represent, warrant or otherwise commit that any UK Affiliate will receive any specific recovery amount or proportion under the Plan, (y) variations

45

from or modifications to the projected recovery amounts or percentages set forth in the Disclosure Statement due to, or based upon, revised projections of asset values or the amount, enforceability, classification and/or priority of any claims as determined pursuant to an order of the Bankruptcy Court following litigation on the merits of such claim(s) (and not based on a settlement, agreement or stipulation with the Debtors) shall not be taken into account or constitute an adverse effect for the purposes of clauses (g), (h) and (i) of this Section 11.03 and (z) the refusal of the Bankruptcy Court to include in the order confirming the Plan a release and exculpation of any Plan Support Creditor (as defined in the Current Plan) shall not constitute an adverse effect for the purposes of clauses (g), (h) and (i) of this Section 11.03.

SECTION 11.04.    *Effect of Termination.*    In the event that this Agreement is terminated in accordance with Section 11.01, Section 11.02(a) or Section 11.03 by any Party, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement, shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed and the Parties hereto shall be automatically relieved of any further obligations hereunder; *provided* that Article 1, Section 2.18, Section 2.19, Article 10 through Article 18 and Article 23 through Article 27 shall survive any termination of this Agreement.    In the event that this Agreement is terminated as between the Debtors and any Terminated UK Affiliate in accordance with Section 11.02(b) by any Debtor, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement, shall have any *res judicata* or collateral estoppel effect or be of any force or effect as between the Debtors and such Terminated UK Affiliate, each of the Debtors; and such Terminated UK Affiliates' respective interests, rights, remedies and defenses vis-à-vis one another shall be restored without prejudice as if this Agreement had never been executed and the Debtors and such Terminated UK Affiliate shall be automatically relieved of any further obligations hereunder vis-à-vis one another; *provided* that Article 1, Section 2.18, Section 2.19, Article 10 through Article 18 and Article 23 through Article 27 shall survive any termination of this Agreement as between the Debtors and any Terminated UK Affiliate.    Except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties' rights and remedies, and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

46

ARTICLE 12
VENUE AND CHOICE OF LAW

SECTION 12.01.    *Venue.*    To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement, and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court; *provided* that any actions or proceedings arising out of or relating to (i) disputes regarding the amount or validity of Admitted Claims or any other claims against UK Administration Companies or UK Liquidation Companies, (ii) issues that are the subject of any litigation currently pending in the English High Court (including, the Extended Lien Application, the currently pending Client Money Tracing Application and the application in respect of RASCALS Assets) or any applications in the English Courts that arise out of or relate to such currently pending litigation, (iii) Client Money or the Client Money Trust, in each case, other than any Client Money Tracing Claims against any Debtor (*provided, however*, that nothing in this Section 12.01 shall affect the rights of any beneficiary of the Client Money Trust who is not a Party to commence an action or proceeding to pursue a Client Money Tracing Claim in any jurisdiction or affect the rights of the Debtors to object thereto) and (iv) ownership or security interest claims (and asset shortfall claims and claims for short positions) in respect of assets held or settling into depots in LBIE's name or under LBIE's custody or control wherever situated, in each case, shall be within the exclusive jurisdiction of the English High Court, and, in each case, any Party bringing such action or proceeding shall bring such action or proceeding in the English High Court, and the Parties expressly consent and submit to the exclusive jurisdiction of such court in relation to the matters referred to in clauses (i) to (iv) of this proviso; *provided, further*, that any actions or proceedings arising out of disputes regarding the amount or validity of Admitted Claims or any other claims against Other UK Affiliates shall be within the non-exclusive jurisdiction of any court of competent jurisdiction.    Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.    If the Bankruptcy Court refuses or abstains from exercising jurisdiction over any action or proceeding that would have otherwise been within the exclusive jurisdiction of the Bankruptcy Court, such action or proceeding shall be in any court in the State of New York having proper jurisdiction.    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so,  (1)  any objection that it may now or hereafter have to the laying of venue of any such action or proceeding with the Bankruptcy Court or with any other federal court located within the Southern District of New York, or with the English High Court or other court of competent jurisdiction as described above, and  (2)  the defense

47

of an inconvenient forum to the maintenance of such action or proceeding in any such court.    Each Party irrevocably consents to service of process in the manner provided for notices in Article 13 hereof.    Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.    Notwithstanding the foregoing, this Agreement may be put before the English High Court as evidence of the terms and provisions contained herein.

SECTION 12.02.    *Choice of Law.*    This Agreement and all claims and disputes relating to the construction or application of the terms of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

## ARTICLE 13
### NOTICES

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day or (c) when sent by an internationally recognized courier, specifying next day delivery, upon written confirmation of delivery by such courier.    All communications shall be sent:

If to any Debtor or any LBLIS Group Entity at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020
U.S.A.
Attn: Daniel J. Ehrmann
Facsimile: (646) 834-0874
Email: dehrmann@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife and Robert J. Lemons
Facsimile: (212) 310-8007
Email: lori.fife@weil.com and robert.lemons@weil.com

48

<u>If to any UK Affiliate at:</u>

The address(es) set forth in the applicable UK Affiliate's signature page hereto, with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
U.S.A.
Attn: Marshall S. Huebner and Brian M. Resnick
Facsimile: (212) 701-5800
Email: marshall.huebner@davispolk.com and
   brian.resnick@davispolk.com

and

Linklaters LLP
One Silk Street
London
EC2Y 8HQ
United Kingdom
Attn: Richard Holden and Titia Holtz
Facsimile: +44 20 7456 2222
Email: richard.holden@linklaters.com and
   titia.holtz@linklaters.com

or to such other address(es) as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

## ARTICLE 14
### NO ADMISSION OF LIABILITY

Each Party acknowledges that this Agreement effects a settlement of potential claims, counterclaims and factual allegations that are in whole or in part denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing or with respect to any disputed fact.

## ARTICLE 15
### ENTIRE AGREEMENT

This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof.   This Agreement supersedes and replaces any and all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof, and, to the extent of any conflicts or

49

inconsistencies between any confirmed Plan and the terms of this Agreement, the terms of this Agreement shall control.    The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.    For the avoidance of doubt, nothing in this Agreement is intended to or shall supersede the Voting Stipulation or, except as set forth in Section 2.18, the Claim Reserve Agreement.

## ARTICLE 16
### NO ORAL MODIFICATIONS

This Agreement may not be modified or amended orally.    This Agreement may be modified or amended only by a writing signed by a duly authorized representative of each affected Party hereto; provided that this Agreement may be modified or amended without a writing signed by a duly authorized representative of any particular Other UK Affiliate to the extent such amendment or modification does not directly adversely affect such Other UK Affiliate.    Any waiver of compliance with any term or provision of this Agreement on the part of any of the Debtors must be provided in a writing signed by each affected UK Affiliate.    Any waiver of compliance with any term or provision of this Agreement on the part of any of the UK Affiliates must be provided in a writing signed by each affected Debtor.    No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.    No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

## ARTICLE 17
### CONSTRUCTION

This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

## ARTICLE 18
### BINDING EFFECT; SUCCESSOR AND ASSIGNS

Any declaration or statement of any Joint Administrator, Joint Liquidator or Thayer Liquidator shall be made only in his capacity and function as a Joint Administrator, Joint Liquidator or Thayer Liquidator of the applicable UK

50

Affiliate, and shall in no circumstance be construed as being a declaration or statement of such Joint Administrator, Joint Liquidator or Thayer Liquidator on his own and personal behalf.   This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors (including any chapter 7 trustees that may be appointed upon or after conversion of any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to the rights or claims of any of the Debtors or their estates, derivatively or otherwise, and including any liquidators that may be appointed upon or after conversion of any administration of any UK Administration Company into liquidations) and permitted assigns; *provided*, *however*, that no Party may assign its rights or obligations under this Agreement without the written consent of each affected Party, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

## ARTICLE 19
### FURTHER ASSURANCES

The Parties agree to execute any and all further documents, agreements and instruments, and take all further action that may be required under applicable law, or that the Parties may reasonably request, in order to effectuate the terms of this Agreement and, as necessary, to promptly seek Bankruptcy Court approval of any such documents, agreements and instruments.   Without limiting the generality of the foregoing, (i) each Party, in its capacity as a creditor of any UK Affiliate, agrees to not object to the settlements contemplated herein and (ii) each Debtor agrees to use reasonable efforts to cause any Debtor-Controlled Entity (as defined in the Current Plan), in such Debtor-Controlled Entity's capacity as a creditor or entity otherwise economically interested (directly or indirectly) in the assets of any UK Affiliate, to not object to the settlements contemplated herein.

## ARTICLE 20.
### COOPERATION.

SECTION 20.01.   *LBSF's and LBCS's Cooperation.*   Subject to applicable data privacy restrictions and to confidentiality obligations owed to counterparties and to applicable restrictions on LBSF's or LBCS's respective ability to provide market or pricing data supplied to it by third parties, LBSF and LBCS agree (i) to use reasonable efforts to provide LBIE with any information relating to any Assigned Debtor/LBIE Assets (or any claims in respect thereof) that LBIE may reasonably request, (ii) to not object to, or directly or indirectly support any objection to, LBIE's prosecution of any claims in respect of any Assigned Debtor/LBIE Assets and (iii) to execute any release in respect of any Assigned Debtor/LBIE Assets that LBIE in good faith deems necessary in connection with any claims in respect thereof; *provided* that (x) any information

51

supplied on such basis shall be supplied on terms that LBSF and LBCS, as applicable, incur no obligation or liability to LBIE in connection therewith, and (y) such obligation shall not require either LBSF or LBCS, as applicable, to expend any funds which it considers unreasonable or unduly burdensome.   Nothing in this Section 20.01 shall require LBSF or LBCS, as applicable, to act in any manner that it considers, in its sole discretion, to be adverse to its interests or inconsistent with the fiduciary duties of LBSF or LBCS, as applicable.

SECTION 20.02.   *UK Administration Companies' and UK Liquidation Companies' Cooperation.*   Subject to applicable data privacy restrictions, to confidentiality obligations owed to counterparties and to applicable restrictions on each UK Administration Company's and each UK Liquidation Company's ability to provide market or pricing data supplied to it by third parties, each UK Administration Company and each UK Liquidation Company agrees that, upon LBHI's written request and representation that a creditor (other than any Lehman Entity) of such UK Administration Company or UK Liquidation Company, as applicable, has asserted a corresponding guarantee claim against LBHI (each such third-party creditor, a "**Third-Party Creditor**"), such UK Administration Company or UK Liquidation Company, as applicable, shall use reasonable efforts to provide LBHI with:

(a)     information regarding whether such UK Administration Company or UK Liquidation Company, as applicable, and such Third-Party Creditor have resolved any of such Third-Party Creditor's claims against such UK Administration Company or UK Liquidation Company, as applicable;

(b)     to the extent any such claims have been resolved, information regarding the number and amount of such claims that have been admitted or disallowed, and any distributions that have been made on account of any such admitted claims; and

(c)     to the extent any such claims are disputed or otherwise unresolved, any information as the relevant UK Administration Company or UK Liquidation Company, in its sole discretion, may agree

; *provided*, in each case, that (i) without prejudice to the general applicability of the Existing NDA, LBHI acknowledges that any information provided to it pursuant to this Section 20.02 shall be treated as "Confidential Information" (as defined in the Existing NDA); (ii) such UK Administration Company or UK Liquidation Company, as applicable, shall incur no obligation or liability to LBHI in connection with any information supplied in accordance with this Section 20.02, (iii) such obligation shall not involve such UK Administration Company or UK Liquidation Company, as applicable, incurring any cost or suffering any delay that it considers, in its sole discretion, unreasonable or unduly burdensome,

52

(iv) nothing in this Section 20.02 shall give LBHI any right of veto over the terms of any settlement between such UK Administration Company or UK Liquidation Company, as applicable, and any such counterparty and (v) nothing in this Section 20.02 shall require such UK Administration Company or UK Liquidation Company, as applicable, to act in any manner that it considers, in its sole discretion, to be adverse to its interests, inconsistent with the duties of the Joint Administrators or Joint Liquidators, as applicable, or contrary to best insolvency practice in the United Kingdom.

## ARTICLE 21
### FOREIGN EXCHANGE

Notwithstanding the use for convenience of US Dollar amounts throughout this Agreement, any amount agreed to be due under the terms of Section 2.03 or Section 2.05 of this Agreement by a UK Administration Company, a UK Liquidation Company or a Thayer Liquidation Company shall be admitted to rank for dividend or other distribution in Sterling at the exchange rate applicable to such UK Administration Company, UK Liquidation Company or Thayer Liquidation Company in accordance with applicable law or in accordance with such UK scheme of arrangement or company voluntary arrangement as is applicable in the case of the relevant company, applied to each relevant US Dollar amount stated in this Agreement.   Any amount due by LBIE pursuant to Section 2.22(b) shall be payable in Sterling or, if LBIE and LBHI so agree, in US Dollars and in the latter case at such spot rate of exchange as LBIE is able to obtain on or about the day of payment in accordance with normal practice in the foreign exchange market.

## ARTICLE 22
### TAX

SECTION 22.01.   All payments or distributions on account of the Allowed Claims or the Admitted Claims shall be made without any Tax Deduction, unless a Tax Deduction is required by law.

SECTION 22.02.   Each Party shall, upon becoming aware that it must make a Tax Deduction from a payment or distribution to another Party on account of the Allowed Claims or the Admitted Claims (or that there is any change in the rate or the basis of a Tax Deduction) notify such other Party accordingly.

SECTION 22.03.   The Parties shall co-operate in completing any procedural formalities necessary to obtain authorization to make payments or distributions on account of the Allowed Claims or the Admitted Claims without a Tax Deduction.   To the extent that any payments or distributions made on

53

account of the Allowed Claims or the Admitted Claims may be subject to any Tax Deduction by the Debtors or the UK Affiliates, the relevant Debtors and the relevant UK Affiliates shall take all reasonable steps to ensure that:

(a)     such withholding is mitigated as far as permissible; and

(b)     the recipient of such payments is able reclaim any Tax Deduction from a tax authority,

in each case, whether under the terms of an applicable double taxation agreement, local Tax law or practice, or any other applicable law.

SECTION 22.04.   The Parties agree that any payments made on account of the claims and receivables that are the subject of this Agreement shall be allocated for all purposes, including but not limited to US federal income tax and UK tax purposes, first to the principal portion of such claims and receivables, and, only after the principal portion of such respective claims and receivables is satisfied in full, to any portion of such claims and receivables comprising interest (but solely to the extent that interest is an allowable portion of such claims and receivables).

SECTION 22.05.   The Parties shall cooperate with respect to all reasonable information requests from a Party relating to the Party's preparation and filing of tax returns or other tax filings and withholding determinations, and any tax proceedings.

SECTION 22.06.   Nothing in this Article 22 shall require any Party to take any step that in its reasonable opinion would have material adverse consequences for it.

ARTICLE 23
COUNTERPARTS

This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.   The signatures of all of the Parties need not appear on the same counterpart.

ARTICLE 24
NO PERSONAL LIABILITY

The Joint Administrators, the Joint Liquidators, the Thayer Liquidators, and A&M act as agents for and on behalf of the UK Administration Companies, the UK Liquidation Companies, the Thayer Liquidation Companies, and the

54

Debtors, respectively, and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by any of the UK Administration Companies, UK Liquidation Companies, Thayer Liquidation Companies, or Debtors, or in respect of any failure on the part of any of the UK Administration Companies, UK Liquidation Companies, Thayer Liquidation Companies, or Debtors to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant hereto.   The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of any of the Joint Administrators, Joint Liquidators, Thayer Liquidators or A&M and shall operate as a waiver of any claims in tort as well as under the laws of contract and any claims otherwise at law or in equity.   The Joint Administrators', the Joint Liquidators', and the Thayer Liquidators' firm, and A&M, and each of their respective members, partners, directors, officers, employees, agents, advisers and representatives are express third-party beneficiaries hereunder and may enforce and rely on this paragraph, to the same extent as if they or it were a party.   Each Party accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, agents, asset managers, representatives or professional advisors of any other Party and, to the extent any such personal liability existed, each Party explicitly waives any and all potential rights and claims against all of the aforementioned persons.   Any claim by a Party against any of the Joint Administrators, Joint Liquidators, Thayer Liquidators, UK Administration Companies, UK Liquidation Companies, or Thayer Liquidation Companies, arising under, related to, or connected with this Agreement shall be satisfied only out of the assets of the estate of the applicable UK Administration Company, UK Liquidation Company or Thayer Liquidation Company, and any claim by a Party against A&M as agent for a Debtor, or against such Debtor, arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of such Debtor.

## ARTICLE 25
### THIRD-PARTY BENEFICIARIES

Other than (i) the Joint Administrators, Joint Liquidators and Thayer Liquidators (each of whom is an intended beneficiary of all limitations, exclusions, undertakings, covenants, releases and indemnities in their favor contained herein) and (ii) the beneficiaries of the forbearances set forth in Section 2.09 and releases set forth in Article 8 (each of whom is an intended beneficiary of such forbearances and releases), no provision of this Agreement shall create any third-party beneficiary or other rights to any entity other than the Parties.   No LBLIS Group Entity shall have any third-party beneficiary or other rights except in

55

respect of the provisions to which such LBLIS Group Entity is party pursuant to Section 2.13(m).

## ARTICLE 26
### NON-SEVERABILITY

Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

## ARTICLE 27
### WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS ARTICLE 27 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.   THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN COMMERCIAL PAPER INC.,
LEHMAN BROTHERS COMMODITY
SERVICES INC., LEHMAN BROTHERS
SPECIAL FINANCING INC., LEHMAN
BROTHERS OTC DERIVATIVES INC.,
LEHMAN BROTHERS COMMERCIAL
CORPORATION, LB 745 LLC, PAMI
STATLER ARMS LLC, CES AVIATION
LLC, CES AVIATION V LLC, CES
AVIATION IX LLC, LEHMAN SCOTTISH
FINANCE L.P., BNC MORTGAGE LLC, LB
ROSE RANCH LLC, STRUCTURED
ASSET SECURITIES CORPORATION, LB
2080 KALAKAUA OWNERS LLC, LB
PREFERRED SOMERSET LLC, LB
SOMERSET LLC, as Debtors and Debtors in
Possession

By: _____

Name:   John Suckow

Title:   Authorized Signatory


LEHMAN BROTHERS DERIVATIVES
PRODUCTS INC., LEHMAN BROTHERS
FINANCIAL PRODUCTS INC., EAST
DOVER LIMITED, LUXEMBOURG
RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L., as Debtors and Debtors
in Possession

By: _____

Name:   Daniel Ehrmann

Title:   Authorized Signatory


*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Luxembourg Investments
S.À.R.L.

By: _____

Name: Daniel Ehrmann

Title: Manager of category A


By: _____

Name: John Keen

Title: Manager of category B

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Luxembourg Investments
S.À.R.L.

By:        _____

Name:    Daniel Ehrmann

Title:     Manager of category A


By:        

Name:    John Keen

Title:     Manager of category B

Lehman Brothers Holdings Scottish LP

By: _____

Name: William J. Fox

Title: Authorized Signatory

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers UK Holdings (Delaware) Inc.

By: _____

Name:   William J. Fox

Title:   Executive Vice President
and Chief Financial Officer

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

**IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:**

**Lehman Brothers International (Europe)**
**(in administration)**

By: _____

**Anthony V. Lomas, Joint**
**Administrator of Lehman Brothers**
**Europe Limited (in administration),**
**acting as its agent and without**
**personal liability**
**Level 23**
**25 Canada Square**
**London, E14 5LQ**
**United Kingdom**
**Email: tony.lomas@uk.pwc.com**

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Mable Commercial Funding Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Mable Commercial
Funding Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Storm Funding Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Storm Funding
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

LB UK Re Holdings Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of LB UK Re Holdings
Limited (in administration), acting as its
agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Lehman Brothers Europe Limited
(in administration)

By: _____
Dan Y. Schwarzmann, Joint
Administrator of Lehman Brothers
Europe Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers Limited
(in administration)

By:    _M̲ g̲ a̲ a̲ ,̲ c̲ ̲ ̲ ̲
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: mike.jervis@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Cherry Tree Mortgages Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Cherry Tree
Mortgages Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Eldon Street Holdings Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Eldon Street Holdings
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LB Holdings Intermediate 2 Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB Holdings
Intermediate 2 Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

LB RE Financing No. 3 Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB RE Financing
No. 3 Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

LB SF No. 1 (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB SF No. 1
(in administration), acting as its agent
and without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

LB UK Financing Ltd
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of LB UK Financing Ltd
(in administration), acting as its agent
and without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Lehman Brothers Holdings PLC
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Holdings PLC (in administration),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Lehman Brothers Lease & Finance No. 1
Limited (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Lease & Finance No. 1 Limited (in
administration), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Lehman Brothers (PTG) Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
(PTG) Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Brothers UK Holdings Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers UK
Holdings Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Commercial Mortgage Conduit
Limited (in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Commercial
Mortgage Conduit Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Monaco NPL (No. 1) Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Monaco NPL (No. 1)
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Thayer Properties Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Thayer Properties
Limited (in administration), acting as its
agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com


Zestdew Limited (in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Zestdew Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Cube) Limited
(in liquidation)

By: _____

     Ian Oakley-Smith, Joint Liquidator of
     Eldon Street (Cube) Limited
     (in liquidation), acting as its agent and
     without personal liability
     <u>With notice to</u>:
     Derek A. Howell
     Level 23
     25 Canada Square
     London, E14 5LQ
     United Kingdom
     <u>Email</u>: derek.howell@uk.pwc.com

Eldon Street (Raven) Limited
(in liquidation)

By: _____

     Ian Oakley-Smith, Joint Liquidator of
     Eldon Street (Raven) Limited
     (in liquidation), acting as its agent and
     without personal liability
     <u>With notice to</u>:
     Derek A. Howell
     Level 23
     25 Canada Square
     London, E14 5LQ
     United Kingdom
     <u>Email</u>: derek.a.howell@uk.pwc.com

Grace Hotels Limited (in liquidation)

By: _____

     Ian Oakley-Smith, Joint Liquidator of
     Grace Hotels Limited (in liquidation),
     acting as its agent and without personal
     liability
     <u>With notice to</u>:
     Derek A. Howell
     Level 23
     25 Canada Square
     London, E14 5LQ
     United Kingdom
     <u>Email</u>: derek.a.howell@uk.pwc.com

LB Lomond Investments (in liquidation)

By: _____

     Ian Oakley-Smith, Joint Liquidator of
     LB Lomond Investments
     (in liquidation), acting as its agent and
     without personal liability
     <u>With notice to</u>:
     Derek A. Howell
     Level 23
     25 Canada Square
     London, E14 5LQ
     United Kingdom
     <u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Platform Commercial Mortgage Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Platform Commercial Mortgage
Limited (in liquidation), acting as its
agent and without personal liability
<u>With notice to:</u>
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email:</u> derek.a.howell@uk.pwc.com

Platform Home Mortgage Securities No. 4
Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Platform Home Mortgage Securities
No. 4 Limited (in liquidation), acting as
its agent and without personal liability
<u>With notice to:</u>
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email:</u> derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

**LBO Investments Limited (in liquidation)**

By: _MMMMMMM_

Ian Oakley-Smith, Joint Liquidator of
LBO Investments Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

**LBQ Funding (UK) (in liquidation)**

By: _MMMMMMM_

Ian Oakley-Smith, Joint Liquidator of
LBQ Funding (UK) (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

**Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation)**

By: _MMMMMMM_

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

**Lehman Brothers (Indonesia) Limited
(in liquidation)**

By: _MMMMMMM_

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers (Indonesia) Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

      Amany Attia, as Director of Acenden
      Limited (f/k/a Capstone Mortgage
      Services Limited)
      Acenden Limited
      4th Floor
      22-25 Finsbury Square
      London EC2A 1DX
      United Kingdom
      Email: Amany.Attia@acenden.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____
Jeff Lundgren, as Director of Acenden
Limited (f/k/a Capstone Mortgage
Services Limited)
Acenden Limited
4th Floor
22-25 Finsbury Square
London EC2A 1DX
United Kingdom
Email: Jeff.Lundgren@acenden.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Birchin) Limited

By: _____
A J P Brereton, as Director of Eldon
Street (Birchin) Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Colbert Orco) Limited

By: _____
A J P Brereton, as Director of Eldon
Street (Colbert Orco) Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Fidenza) Limited

By: _____
A J P Brereton, as Director of Eldon
Street (Fidenza) Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Eldon Street (Jefferson) Limited

By: _____
A J P Brereton, as Director of Eldon
Street (Jefferson) Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Eldon Street (Harley) Limited

By: _____

A J P Brereton, as Director of Eldon
Street (Harley) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

LB Yellow (No. 1) Limited

By: _____

A J P Brereton, as Director of LB
Yellow (No. 1) Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

LB Holdings Intermediate 1 Limited

By: _____

A J P Brereton, as Director of LB
Holdings Intermediate 1 Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

LB SF Warehouse Limited

By: _____

A J P Brereton, as Director of LB SF
Warehouse Limited
<u>With notice to:</u>
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

MBAM Investor Limited

By: _____
A J P Brereton, as Director of MBAM
Investor Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Parkmetro Limited

By: _____
A J P Brereton, as Director of
Parkmetro Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Preferred Holdings Limited

By: _____
A J P Brereton, as Director of Preferred
Holdings Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Preferred Group Limited

By: _____
A J P Brereton, as Director of Preferred
Group Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Resetfan Limited

By: _____
A J P Brereton, as Director of Resetfan
Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

SM Funding No. 1 Limited

By: _____
A J P Brereton, as Director of SM
Funding No. 1 Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Southern Pacific Residuals 4 Limited

By: _____
A J P Brereton, as Director of Southern
Pacific Residuals 4 Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Southern Pacific Personal Loans Limited

By: _____
A J P Brereton, as Director of Southern
Pacific Personal Loans Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Stepstone Mortgage Funding Limited

By: _____
A J P Brereton, as Director of Stepstone
Mortgage Funding Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Yellow Real Estate Limited

By: _____
A J P Brereton, as Director of Yellow
Real Estate Limited
With notice to:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
Attn: Jeff Drew and Monika Kuzelova
Email: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Preferred Mortgages Limited

By: _____

    Lee Brandon, as Director of Preferred
    Mortgages Limited
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

Southern Pacific Funding 3 Ltd.

By: _____

    Lee Brandon, as Director of Southern
    Pacific Funding 3 Ltd.
    Level 23
    25 Canada Square
    London, E14 5LQ
    United Kingdom
    Email: brandons@talktalk.net

Southern Pacific Mortgage Ltd.

By: _____

    Lee Brandon, as Director of
    Southern Pacific Mortgage Ltd.
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Thayer Group Limited (in liquidation)

By: _____
Nick Vermeulen, Joint Liquidator of
Thayer Group Limited (in liquidation),
acting as its agent and without personal
liability
PricewaterhouseCoopers CI LLP
Twenty Two Colomberie
St Helier
Jersey, JE1 4XA
United Kingdom
Email: nick.vermeulen@gg.pwc.com

Thayer Properties (Jersey) Limited
(in liquidation)

By: _____
Nick Vermeulen, Joint Liquidator of
Thayer Properties (Jersey) Limited
(in liquidation), acting as its agent and
without personal liability
PricewaterhouseCoopers CI LLP
Twenty Two Colomberie
St Helier
Jersey, JE1 4XA
United Kingdom
Email: nick.vermeulen@gg.pwc.com

*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Blue I Real Estate Limited

By: _____
Barry Porter, as Director of Blue I Real
Estate Limited
Lehman Brothers
Level 23
25 Canada Square
London E14 5LQ
Email: Barry.Porter@lbia-eu.com


Harley Property Ventures Limited

By: _____
Barry Porter, as Director of Harley
Property Ventures Limited
Lehman Brothers
Level 23
25 Canada Square
London E14 5LQ
Email: Barry.Porter@lbia-eu.com


Myra Sarl

By: _____
Barry Porter, as Manager of Myra Sarl
With notice to:
Alter Domus
5 rue Guillaume Kroll
L-1882
Luxembourg
Attn: Sandrine Klusa
Email:
Sandrine.Klusa@alterdomus.com


*[Signature page for Settlement Agreement among UK Affiliates and Debtors]*

Schedule 1

**Proofs of Claim**

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 16524 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers OTC Derivatives Inc. |
| 16525 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. |
| 16527 | Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Special Financing Inc. |
| 17067 | Blue I Real Estate Limited | Lehman Brothers Holdings Inc. |
| 14625 | Cherry Tree Mortgages Limited | Lehman Brothers Holdings Inc. |
| 23478 | Eldon Street (Cube) Limited | Lehman Commercial Paper Inc. |
| 42254 | Eldon Street (Cube) Limited | Lehman Brothers Holdings Inc. |
| 23481 | Eldon Street (Raven) Limited | Lehman Brothers Holdings Inc. |
| 14635 | Eldon Street Holdings Limited | Lehman Commercial Paper Inc. |
| 23484 | Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. |
| 14621 | Grace Hotels Limited | Lehman Brothers Holdings Inc. |
| 23567 | Grace Hotels Limited | Lehman Commercial Paper Inc. |
| 17066 | Harley Property Ventures Limited | Lehman Brothers Holdings Inc. |
| 16522 | LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. |
| 16519 | LB Lomond Investments | Lehman Brothers Holdings Inc. |
| 14618 | LB RE Financing No. 3 Limited | Lehman Brothers Holdings Inc. |
| 21520 | LB RE Financing No. 3 Limited | Lehman Brothers Special Financing Inc. |
| 14623 | LB SF No. 1 | Lehman Brothers Special Financing Inc. |

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 21525 | LB SF No. 1 | Lehman Brothers Holdings Inc. |
| 14616 | LB UK Financing Ltd | Lehman Brothers Holdings Inc. |
| 14617 | LB UK Re Holdings Limited | Lehman Brothers Commercial Corporation |
| 21524 | LB UK Re Holdings Limited | Lehman Brothers Holdings Inc. |
| 23566 | LB UK Re Holdings Limited | Lehman Brothers Special Financing Inc. |
| 23570 | LB UK Re Holdings Limited | Lehman Commercial Paper Inc. |
| 17071 | LB Yellow (No. 1) Limited | Lehman Brothers Holdings Inc. |
| 16518 | LBO Investments Limited | Lehman Brothers Holdings Inc. |
| 23483 | LBQ Funding (UK) | Lehman Brothers Holdings Inc. |
| 23563 | Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. |
| 14645 | Lehman Brothers (PTG) Limited | Lehman Commercial Paper Inc. |
| 23475 | Lehman Brothers (PTG) Limited | Lehman Brothers Holdings Inc. |
| 23482 | Lehman Brothers Equity (Nominees Number 7) Limited | Lehman Brothers Holdings Inc. |
| 14614 | Lehman Brothers Europe Limited | LB 745 LLC |
| 14620 | Lehman Brothers Europe Limited | Lehman Brothers OTC Derivatives Inc. |
| 14622 | Lehman Brothers Europe Limited | Lehman Brothers Special Financing Inc. |
| 14640 | Lehman Brothers Europe Limited | Lehman Commercial Paper Inc. |
| 14647 | Lehman Brothers Europe Limited | Lehman Brothers Commodity Services Inc. |
| 21519 | Lehman Brothers Europe Limited | Lehman Brothers Holdings Inc. |

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 23474 | Lehman Brothers Europe Limited | Lehman Brothers Commercial Corporation |
| 14012 | Lehman Brothers Holdings PLC | Lehman Brothers Holdings Inc. |
| 14016 | Lehman Brothers Holdings PLC | Lehman Commercial Paper Inc. |
| 21522 | Lehman Brothers Holdings PLC | Lehman Brothers Special Financing Inc. |
| 21516 | Lehman Brothers International (Europe) | Lehman Brothers Derivative Products Inc. |
| 21518 | Lehman Brothers International (Europe) | LB 745 LLC |
| 21521 | Lehman Brothers International (Europe) | Lehman Brothers Commodity Services Inc. |
| 21526 | Lehman Brothers International (Europe) | Lehman Commercial Paper Inc. |
| 21527 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 21528 | Lehman Brothers International (Europe) | Lehman Brothers OTC Derivatives Inc. |
| 21529 | Lehman Brothers International (Europe) | Lehman Brothers Commercial Corporation |
| 21530 | Lehman Brothers International (Europe) | Lehman Brothers Special Financing Inc. |
| 21532 | Lehman Brothers International (Europe) | Lehman Brothers Financial Products Inc. |
| 62779 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62780 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62781 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |

Schedule 1-3

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 62783 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62784 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62785 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62786 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62787 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62788 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 62789 | Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. |
| 66831 | Lehman Brothers International (Europe) | Merit LLC |
| 14637 | Lehman Brothers Lease & Finance No. 1 Limited | Lehman Brothers Holdings Inc. |
| 14011 | Lehman Brothers Limited | Lehman Brothers Commodity Services Inc. |
| 14014 | Lehman Brothers Limited | LB 745 LLC |
| 14015 | Lehman Brothers Limited | Structured Asset Securities Corporation |
| 14017 | Lehman Brothers Limited | Lehman Brothers Commercial Corporation |
| 14038 | Lehman Brothers Limited | Lehman Brothers Financial Products Inc. |
| 14040 | Lehman Brothers Limited | Lehman Commercial Paper Inc. |
| 14041 | Lehman Brothers Limited | Lehman Brothers Derivative Products Inc. |

Schedule 1-4

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 14388 | Lehman Brothers Limited | CES Aviation LLC |
| 16497 | Lehman Brothers Limited | BNC Mortgage LLC |
| 16498 | Lehman Brothers Limited | Lehman Brothers OTC Derivatives Inc. |
| 21523 | Lehman Brothers Limited | Lehman Brothers Holdings Inc. |
| 23477 | Lehman Brothers Limited | Lehman Brothers Special Financing Inc. |
| 14646 | Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. |
| 14644 | Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. |
| 23480 | Lehman Commercial Mortgage Conduit Limited | Lehman Commercial Paper Inc. |
| 42255 | Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. |
| 14643 | Mable Commercial Funding Limited | Lehman Brothers Holdings Inc. |
| 14641 | Mable Commercial Funding Limited | Lehman Commercial Paper Inc. |
| 14624 | Mable Commercial Funding Limited | Lehman Brothers Special Financing Inc. |
| 16523 | MBAM Investor Limited | Lehman Brothers Holdings Inc. |
| 14636 | Monaco NPL (No. 1) Limited | Lehman Brothers Special Financing Inc. |
| 14619 | Monaco NPL (No. 1) Limited | Lehman Brothers Holdings Inc. |
| 14642 | Monaco NPL (No. 1) Limited | Lehman Commercial Paper Inc. |
| 23569 | Myra Sarl | Lehman Brothers Holdings Inc. |
| 16520 | Platform Commercial Mortgage | Lehman Brothers Holdings Inc. |

Schedule 1-5

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
|  | Limited |  |
| 16521 | Platform Home Mortgage Securities No. 4 Limited | Lehman Brothers Holdings Inc. |
| 16494 | Preferred Mortgages Limited | Lehman Brothers Holdings Inc. |
| 17072 | Resetfan Limited | Lehman Brothers Holdings Inc. |
| 17068 | SM Funding No. 1 Limited | Lehman Brothers Holdings Inc. |
| 17062 | Southern Pacific Funding 3 Ltd. | Lehman Brothers Holdings Inc. |
| 17061 | Southern Pacific Mortgage Ltd. | Lehman Brothers Special Financing Inc. |
| 17073 | Southern Pacific Mortgage Ltd. | Lehman Brothers Holdings Inc. |
| 17069 | Stepstone Mortgage Funding Limited | Lehman Brothers Holdings Inc. |
| 62782 | Storm Funding Limited | Lehman Brothers Holdings Inc. |
| 14639 | Storm Funding Limited | Lehman Brothers Special Financing Inc. |
| 21517 | Storm Funding Limited | Lehman Brothers Holdings Inc. |
| 23473 | Storm Funding Limited | Lehman Commercial Paper Inc. |
| 23485 | Thayer Group Limited | Lehman Brothers Holdings Inc. |
| 23486 | Thayer Properties (Jersey) Limited | Lehman Commercial Paper Inc. |
| 23488 | Thayer Properties (Jersey) Limited | Lehman Brothers Holdings Inc. |
| 23476 | Thayer Properties Limited | Lehman Commercial Paper Inc. |
| 23487 | Thayer Properties Limited | Lehman Brothers Holdings Inc. |
| 17064 | Yellow Real Estate Limited | Lehman Brothers Holdings Inc. |
| 17070 | Yellow Real Estate Limited | Lehman Commercial Paper Inc. |
| 14615 | Zestdew Limited | Lehman Brothers Special Financing Inc. |

Schedule 1-6

| Claim Number | UK Affiliate | Debtor |
|---|---|---|
| 14638 | Zestdew Limited | Lehman Brothers Holdings Inc. |

**Schedule 2**

**Compromised Structured Securities**

REDACTED

**Schedule 3**

**Certain LBCS Assets**

REDACTED

**Schedule 4**

**LBHI/LBIE Assets**

| LBIE's ISIN Record | Position | LBIE's Annotation on Current Competing Claims |
|---|---|---|
| CUSIP - 1US453947 | 990,875 | no |
| FR0010351866 | 10 | yes |
| FR0010368878 | 10 | yes |
| FR0010368894 | 10 | yes |
| FR0010368902 | 10 | yes |
| FR0010368910 | 10 | yes |
| FR0010377341 | 10 | yes |
| FR0010395905 | 10 | yes |
| IE00B0T0GQ85 | 10000 | no |

**Schedule 5**

**Certain LBSF/LBIE Assets**

REDACTED

**Schedule 6**

**Certain LCPI/LBIE Assets**

| LBIE's ISIN Record | Position |
|---|---|
| CUSIP - 0011221D2 | 24,792 |
| CUSIP - 1DE288825 | 5,350 |
| 1NL077863 | 3,500,000 |

Schedule 7

**Returned LBCS/LBIE Assets**

| LBIE's ISIN Record | Position |
|---|---|
| ANN5214T4335 | 75,000 |
| CH0036891189 | 965,000 |
| CH0036891197 | 630,000 |
| CH0036891247 | 556,000 |
| CH0039308678 | 280,000 |
| CH0043088670 | 505,000 |
| CH0043088704 | 815,000 |
| XS0246449440 | 3,390,000 |
| XS0259959962 | 340,000 |
| XS0267460359 | 215,000 |
| XS0272634535 | 100,000 |
| XS0276121307 | 9,330,000 |
| XS0276162327 | 157,000 |
| XS0278983191 | 70,000 |
| XS0280241851 | 50,000 |
| XS0291974664 | 2,300,000 |
| XS0292459327 | 289,000 |
| XS0293964002 | 40,000 |
| XS0295438369 | 1,422,000 |
| XS0296792582 | 2,450,000 |
| XS0299701655 | 450,000 |
| XS0303539273 | 431,000 |
| XS0306096628 | 2,000 |
| XS0308389807 | 183,000 |
| XS0309306651 | 200,000 |
| XS0310309785 | 20,000,000 |
| XS0311769219 | 279 |
| XS0312439556 | 43,000 |
| XS0314479337 | 1,570,000 |
| XS0314918276 | 2,969 |
| XS0320100323 | 400,000 |
| XS0320337685 | 160,000 |
| XS0321124801 | 1,370,000 |
| XS0322064840 | 200,000 |
| XS0323108265 | 949,000 |
| XS0323493584 | 1,391,000 |
| XS0323535418 | 974 |
| XS0323619600 | 10,145,000 |

| LBIE's ISIN Record | Position |
|---|---|
| XS0323619782 | 2,200,000 |
| XS0324841153 | 1,851,000 |
| XS0325477379 | 85,000 |
| XS0326046504 | 2,000,000 |
| XS0327723580 | 400,000 |
| XS0327774732 | 300,000 |
| XS0329715394 | 70,000 |
| XS0330889493 | 250,000 |
| XS0331533173 | 30 |
| XS0331533256 | 905,000 |
| XS0331533330 | 10,000 |
| XS0331566181 | 200,000 |
| XS0332526929 | 490,000 |
| XS0332675338 | 10,000 |
| XS0333420395 | 250,000 |
| XS0334205795 | 1,040,000 |
| XS0334494290 | 353 |
| XS0335137120 | 1,332 |
| XS0337407943 | 200,000 |
| XS0337763576 | 98,000 |
| XS0338071987 | 680,000 |
| XS0338072019 | 80,000 |
| XS0338078131 | 20,000 |
| XS0338483588 | 340,000 |
| XS0338685299 | 1,300,000 |
| XS0339532672 | 300,000 |
| XS0339537390 | 2,422,000 |
| XS0339537804 | 480,000 |
| XS0339538448 | 240,000 |
| XS0340076321 | 1,154 |
| XS0340756898 | 35,000 |
| XS0341730363 | 33,000 |
| XS0342097317 | 200,000 |
| XS0343610530 | 60,000 |
| XS0344537997 | 200,000 |
| XS0344556864 | 581,000 |
| XS0344557839 | 150,000 |
| XS0344583249 | 15,300,000 |
| XS0346007320 | 75,000 |
| XS0346438061 | 4,320,000 |
| XS0346461634 | 130,000 |
| XS0346707903 | 243,000 |

Schedule 7-2

| LBIE's ISIN Record | Position |
| --- | --- |
| XS0347683400 | 100,000 |
| XS0348299180 | 50,000 |
| XS0349166917 | 363 |
| XS0349282151 | 442,000 |
| XS0350390406 | 389,000 |
| XS0351506257 | 100,000 |
| XS0351979587 | 11,000 |
| XS0353289472 | 200,000 |
| XS0353676082 | 103,000 |
| XS0353821860 | 1,170,000 |
| XS0354002577 | 103,000 |
| XS0356499052 | 174,000 |
| XS0357658672 | 660,000 |
| XS0361886699 | 3,000,000 |
| XS0362447558 | 701,000 |
| XS0363582460 | 20,000 |
| XS0365671121 | 2,000,000 |
| XS0366131497 | 10,000 |
| XS0366802964 | 25,000 |
| XS0371015750 | 81,000 |
| XS0373858249 | 57,000 |

**Schedule 8**

**Certain Surviving Contracts**

None.

Schedule 9

UK Affiliate Claims[1]

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| LB SF No. 1 | LBHI | $        353,187 | 4B |
| LB SF No. 1 | LBHI | 2,875,036,779 | 4A |
| LB Holdings Intermediate 2 Limited | LBHI | 302,087,677 | 4B |
| LB Holdings Intermediate 2 Limited | LBHI | 2,683,033 | 4A |
| Lehman Brothers UK Holdings Limited | LBHI | 608,943,967 | 4B |
| Lehman Brothers UK Holdings Limited | LBHI | 10,645 | 4A |
| Lehman Brothers Limited | LBHI | 360,000,000 | 4B |
| Storm Funding Limited | LBHI | 148,127,123 | 4B |
| Storm Funding Limited | LBHI | 795,799,394 | 4A |
| Eldon Street Holdings Limited | LBHI | 28,565,323 | 4B |
| Eldon Street Holdings Limited | LBHI | 611,350,282 | 4A |
| Lehman Brothers Europe Limited | LBHI | 18,898,410 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBHI | 9,454 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBHI | 80,568,540 | 4A |
| Preferred Mortgages Limited | LBHI | 22,896,254 | 4B |
| Preferred Mortgages Limited | LBHI | 42,632,876 | 4A |
| Lehman Commercial Mortgage Conduit Limited | LBHI | 8,314,737 | 4B |
| MBAM Investor Limited | LBHI | 46,568,411 | 4B |
| MBAM Investor Limited | LBHI | 1,214,694 | 4A |
| Southern Pacific Mortgage Ltd. | LBHI | 48,442,147 | 4B |
| Southern Pacific Funding 3 Ltd. | LBHI | 35,450,774 | 4A |

[1] To the extent any pairing of a particular UK Affiliate and a particular Debtor is not set forth on this Schedule 9, such pairing shall be deemed to be included in this Schedule 9 as if such UK Affiliate were listed as the "Applicable UK Affiliate", such Debtor were listed as the "Applicable Debtor" and the relevant "Claim Amount" were listed as $0.

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| Mable Commercial Funding Limited | LBHI | 19,727,757 | 4B |
| Lehman Brothers (Indonesia) Limited | LBHI | 13,011,749 | 4B |
| Lehman Brothers (Indonesia) Limited | LBHI | 613,749 | 4A |
| Thayer Group Limited | LBHI | 7,494,450 | 4A |
| Lehman Brothers Equity (Nominees Number 7) Limited | LBHI | 4,158,067 | 4A |
| Eldon Street (Raven) Limited | LBHI | 2,297,221 | 4A |
| Grace Hotels Limited | LBHI | 3,149 | 4B |
| Grace Hotels Limited | LBHI | 1,649,083 | 4A |
| Zestdew Limited | LBHI | 1,580,988 | 4B |
| LBQ Funding (UK) | LBHI | 819,882 | 4A |
| Resetfan Limited | LBHI | 531,281 | 4A |
| Eldon Street (Cube) Limited | LBHI | 200,925 | 4B |
| Lehman Brothers Limited | LBSF | 3,698,368 | 5C |
| Storm Funding Limited | LBSF | 5,041,731 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LBSF | 16,715 | 5C |
| Zestdew Limited | LBSF | 3,390,693 | 5C |
| Monaco NPL (No. 1) Limited | LBSF | 2,951,633 | 5C |
| Lehman Brothers Holdings PLC | LBSF | 19,366,981 | 5C |
| Lehman Brothers Limited | LOTC | 52,756 | 5C |
| Lehman Brothers Europe Limited | LOTC | 25,642 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | LOTC | 2,193 | 5C |
| Lehman Brothers Limited | LCPI | 2,501,392 | 5C |
| Storm Funding Limited | LCPI | 182,554,645 | 5C |
| Lehman Brothers Europe Limited | LCPI | 4,974,264 | 5C |
| Lehman Commercial Mortgage Conduit Limited | LCPI | 101,984,667 | 5C |
| Eldon Street (Cube) Limited | LCPI | 803,699 | 5C |
| LB UK Re Holdings Limited | LCPI | 8,585,062 | 5C |
| Thayer Properties Limited | LCPI | 13,360 | 5C |
| Lehman Brothers Holdings PLC | LCPI | 2,221,859 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commercial Corporation | 139,764 | 5C |
| Lehman Brothers Limited | LBCS | 659,343 | 5C |

Schedule 9-2

| Applicable UK Affiliate | Applicable Debtor | Claim Amount | Applicable Class |
|---|---|---|---|
| Lehman Brothers Limited | Lehman Brothers Derivative Products Inc. | 44 | 4B |
| Lehman Brothers Limited | Lehman Brothers Financial Products Inc. | 623 | 4B |
| Lehman Brothers Limited | BNC Mortgage LLC | 26 | 4B |
| Lehman Brothers Limited | CES Aviation LLC | 1,556 | 4B |
| Lehman Brothers Limited | Structured Asset Securities Corporation | 61 | 4B |

**Schedule 10**

**Other Debtor Claims[1]**

| Applicable Debtor | Applicable UK Affiliate | Claim Amount |
|---|---|---|
| LBHI | LB UK Financing Ltd | $ 3,768,465,238 |
| LBHI | LB UK Re Holdings Limited | 781,605,210 |
| LBHI | Thayer Properties Limited | 261,674,213 |
| LBHI | Lehman Brothers (PTG) Limited | 269,512,581 |
| LBHI | Lehman Brothers Lease & Finance No. 1 Limited | 192,469,432 |
| LBHI | Monaco NPL (No. 1) Limited | 100,992,542 |
| LBHI | Yellow Real Estate Limited | 88,993,258 |
| LBHI | Lehman Brothers Holdings PLC | 63,893,551 |
| LBHI | Thayer Properties (Jersey) Limited | 15,336,338 |
| LBHI | Platform Commercial Mortgage Limited | 4,781,487 |
| LBHI | SM Funding No. 1 Limited | 4,566,235 |
| LBHI | Cherry Tree Mortgages Limited | 1,192,799 |
| LBHI | Stepstone Mortgage Funding Limited | 987,745 |
| LBHI | Platform Home Mortgage Securities No. 4 Limited | 852,342 |
| LBHI | LBO Investments Limited | 561,348 |
| LBHI | LB Lomond Investments | 79,945 |
| LBSF | LB RE Financing No. 3 Limited | 574,772,981 |
| LBSF | LB SF No. 1 | 1,859,029 |
| LBSF | Lehman Brothers Europe Limited | 694,125 |
| LBSF | Southern Pacific Mortgage Ltd. | 121,133 |
| LBSF | Mable Commercial Funding Limited | 14,566 |
| LBSF | LB UK Re Holdings Limited | 23,991,719 |
| LCPI | Mable Commercial Funding Limited | 3,196,376 |
| LCPI | Thayer Properties (Jersey) Limited | 19,154 |
| LCPI | Grace Hotels Limited | 260,000 |
| LCPI | Lehman Brothers (PTG) Limited | 9,547 |
| LCPI | Monaco NPL (No. 1) Limited | 8,470 |
| Lehman Brothers Commercial Corporation | LB UK Re Holdings Limited | 11,579 |
| LBCS | Lehman Brothers Europe Limited | 5,285,576 |
| LB 745 | Lehman Brothers Limited | 429,883 |

---

[1] To the extent any pairing of a particular Debtor and a particular UK Affiliate is not set forth on this Schedule 10, such pairing shall be deemed to be included in this Schedule 10 as if such Debtor were listed as the "Applicable Debtor", such UK Affiliate were listed as the "Applicable UK Affiliate" and the relevant "Claim Amount" were listed as $0.

**Exhibit A**

**Claim Reserve Agreement**

**Execution Version**

# CLAIM RESERVE AGREEMENT

This Claim Reserve Agreement (this "**Agreement**") is made and entered into as of October 24, 2011 by and among the Debtors,[1]  the UK Administration Companies[2]  (acting by their joint administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell, collectively, the "**Joint Administrators**"),[3]  the UK Liquidation Companies[4]  (acting by their joint liquidators Derek Anthony Howell and Ian Oakley-Smith, collectively, the "**Joint Liquidators**")[5] and the Other UK Affiliates[6]  (the UK Administration Companies, acting by their Joint

---

[1]  As used herein, "**Debtors**" means Lehman Brothers Holdings Inc.; Lehman Brothers Special Financing Inc.; Lehman Commercial Paper Inc.; Lehman Brothers Commercial Corporation; Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc.; Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l.; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; PAMI Statler Arms LLC.

[2]  As used herein, "**UK Administration Companies**" means Lehman Brothers International (Europe); Lehman Brothers Limited; Lehman Brothers Holdings PLC; LB UK Re Holdings Limited; Storm Funding Limited; Mable Commercial Funding Limited; Lehman Brothers Europe Limited; Lehman Brothers UK Holdings Limited; LB SF No. 1; Zestdew Limited; Monaco NPL (No. 1) Limited; Lehman Commercial Mortgage Conduit Limited; Eldon Street Holdings Limited; LB Holdings Intermediate 2 Limited; and Thayer Properties Limited (each in administration).

[3]  A reference to the Joint Administrators shall be construed as being to the Joint Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Joint Administrators.

[4]  As used herein, "**UK Liquidation Companies**" means Eldon Street (Raven) Limited; Lehman Brothers Equity (Nominees Number 7) Limited; Lehman Brothers (Indonesia) Limited; Grace Hotels Limited; and LBQ Funding (UK) (each in liquidation).

[5]  A reference to the Joint Liquidators shall be construed as being to the Joint Liquidators both jointly and severally and to any other person who is appointed as a liquidator in substitution for any liquidator or as an additional liquidator in conjunction with the Joint Liquidators.

[6]  As used herein, "**Other UK Affiliates**" means Acenden Limited (f/k/a Capstone Mortgage Services Limited); MBAM Investor Limited; Preferred Mortgages Limited; Resetfan Limited; Southern Pacific Funding 3 Ltd.; Southern Pacific Mortgage Ltd.; Thayer Group Limited (in liquidation) ("**Thayer Group**") (acting by its joint liquidators, Nick Vermeulen and Mark James, collectively, the "**Thayer Group Liquidators**"); and Thayer Properties (Jersey) Limited (in liquidation) ("**Thayer Properties**") (acting by its joint liquidators, Nick Vermeulen and Mark James, the "**Thayer Properties Liquidators**" and together with the Thayer Group Liquidators, the "**Thayer Liquidators**").

Administrators, the UK Liquidation Companies, acting by their Joint Liquidators, and the Other UK Affiliates, collectively, the "**UK Affiliates**").    The Debtors and the UK Affiliates shall each be referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "**Chapter 11 Cases**" and each a "**Chapter 11 Case**");

WHEREAS, on September 15, 2008 and on various dates thereafter, the UK Administration Companies entered English administration proceedings pursuant to the English Insolvency Act 1986 and the UK Liquidation Companies entered liquidation in the UK (collectively, the "**UK Proceedings**");

WHEREAS, the Joint Administrators were appointed as the joint administrators of the Administration Companies and the Joint Liquidators were appointed as the joint liquidators of the Liquidation Companies;

WHEREAS, on Thayer Group and Thayer Properties (collectively, the "**Thayer Liquidation Companies**") have entered liquidation proceedings in Jersey, United Kingdom and the Thayer Liquidators were appointed as the liquidators of the Thayer Liquidation Companies; and

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 19627] (the "**Current Plan**" and as amended, modified or supplemented by the Debtors from time to time, the "**Plan**");

WHEREAS, pursuant to Section 8.4 of the Current Plan, the Debtors may establish reserves on account of any Disputed Claim (as defined in the Current Plan) based upon an amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator (as defined in the Current Plan); and

WHEREAS, the Parties have reached an agreement in principle resolving claims between the Debtors and the UK Affiliates, and are currently negotiating a Settlement Agreement with respect thereto (the "**Settlement Agreement**");

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01.    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

(a)    "**Alternative Plan**" means any chapter 11 plan filed in the Chapter 11 Cases that is neither proposed nor supported (directly or indirectly) by any of the Debtors.

(b)    "**Applicable Class**" means, for any claim of any UK Affiliate against any Debtor, (i) with respect to the Current Plan, the "Class" (as defined in the Current Plan) set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor" and (ii) with respect to any Confirmed Plan (other than the Current Plan), the category of claims that each applicable UK Affiliate and the applicable Debtor determine in good faith is most similarly situated to the "Class" (as defined in the Current Plan) set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

(c)    "**Bankruptcy Code**" has the meaning ascribed to it in the Recitals.

(d)    "**Bankruptcy Court**" has the meaning ascribed to it in the Recitals.

(e)    "**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York or the United Kingdom.

(f)    "**Chapter 11 Cases**" has the meaning ascribed to it in the Recitals.

(g)    "**Confirmed Plan**" means the Plan or any other chapter 11 plan for the Debtors (other than an Alternative Plan) that is confirmed by the Bankruptcy Court.

(h)    "**Current Plan**" has the meaning ascribed to it in the Recitals.

(i)    "**Debtors**" has the meaning ascribed to it in the Preamble.

(j)    "**Final Order**" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) that is in full force and effect, (ii) is not reversed or vacated and (iii) as to which the time to appeal, petition for certiorari, and move for reargument or rehearing has expired and (1) as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or (2) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been timely sought, such appeal, writ of certiorari, or

3

reargument or rehearing shall have been withdrawn, denied or resolved by the highest court to which such order was appealed or from which certiorari, rehearing or reargument was sought; *provided* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable law, may be filed with respect to such order shall not prevent such order from being a Final Order.

(k)    "**Joint Administrators**" has the meaning ascribed to it in the Preamble.

(l)    "**Joint Liquidators**" has the meaning ascribed to it in the Preamble.

(m)    "**Other UK Affiliates**" has the meaning ascribed to it in the Preamble.

(n)    "**Party**" has the meaning ascribed to it in the Preamble.

(o)    "**Plan**" has the meaning ascribed to it in the Preamble.

(p)    "**Reserve Amount**" means, for any claim of any UK Affiliate against any Debtor, the amount, if any, set forth in Schedule 1 hereto for which such UK Affiliate is designated the "Applicable UK Affiliate" and such Debtor is designated the "Applicable Debtor".

(q)    "**Thayer Group**" has the meaning ascribed to it in the Preamble.

(r)    "**Thayer Group Liquidators**" has the meaning ascribed to it in the Preamble.

(s)    "**Thayer Liquidation Companies**" has the meaning ascribed to it in the Recitals.

(t)    "**Thayer Liquidators**" has the meaning ascribed to it in the Preamble.

(u)    "**Thayer Properties**" has the meaning ascribed to it in the Preamble.

(v)    "**Thayer Properties Liquidators**" has the meaning ascribed to it in the Preamble.

(w)    "**UK Administration Companies**" has the meaning ascribed to it in the Preamble.

(x)    "**UK Affiliates**" has the meaning ascribed to it in the Preamble.

(y)    "**UK Liquidation Companies**" has the meaning ascribed to it in the Preamble.

4

(z)    "**UK Proceedings**" has the meaning ascribed to it in the Recitals.

## ARTICLE 2
### RESERVES

Section 2.01.    Notwithstanding any provision of any Confirmed Plan or any confirmation order with respect thereto, the Debtors shall hold in reserve, under any Confirmed Plan and at all times, an amount not less than the cumulative amount that would have been distributed to each applicable UK Affiliate were each such UK Affiliate to have held allowed claims against each applicable Debtor as of the effective date of such Confirmed Plan (i) in the Applicable Class and (ii) in an amount equal to the applicable Reserve Amount, which reserve shall be available solely for the benefit of the applicable UK Affiliate unless and until (and only to the extent that) it is subsequently determined by Final Order of a court of competent jurisdiction that such UK Affiliate's allowed claims against the applicable Debtor are less than the applicable Reserve Amount.

## ARTICLE 3
### EFFECTIVENESS OF AGREEMENT; TERMINATION

Section 3.01.    This Agreement shall be effective as of the date first written above.

Section 3.02.    This Agreement shall automatically terminate on the earlier of (i) the date that the Settlement Agreement becomes effective in accordance with its terms or (ii) any date on which the Bankruptcy Court enters an order confirming an Alternative Plan pursuant to section 1129 of the Bankruptcy Code.

## ARTICLE 4
### VENUE AND CHOICE OF LAW

Section 4.01.    *Venue.*    To the maximum extent permissible by law, the Parties expressly consent and submit to the jurisdiction of the Bankruptcy Court solely over any actions or proceedings relating to the enforcement or interpretation of this Agreement.    Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding with the Bankruptcy Court or with any other federal court located within the Southern District of New York, and (ii) the defense of an inconvenient forum to the maintenance of such action or

5

proceeding in any such court.    Each Party irrevocably consents to service of process in the manner provided for notices in Article 5 hereof.    Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.

Section 4.02.    *Choice of Law.*    This Agreement and all claims and disputes relating to the construction or application of the terms of this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code.

ARTICLE 5
NOTICES

All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day or (c) when sent by an internationally recognized courier, specifying next day delivery, upon written confirmation of delivery by such courier.    All communications shall be sent:

If to any Debtor at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020
U.S.A.
Attn: Daniel J. Ehrmann
Facsimile: (646) 834-0874
Email: dehrmann@alvarezandmarsal.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife and Robert J. Lemons
Facsimile: (212) 310-8007
Email: lori.fife@weil.com and robert.lemons@weil.com

6

<u>If to any UK Affiliate at</u>:

The address(es) set forth in the applicable UK Affiliate's signature page hereto, with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
U.S.A.
Attn: Marshall S. Huebner and Brian M. Resnick
Facsimile: (212) 701-5800
Email: marshall.huebner@davispolk.com and
        brian.resnick@davispolk.com

and

Linklaters LLP
One Silk Street
London
EC2Y 8HQ
United Kingdom
Attn: Richard Holden and Titia Holtz
Facsimile: +44 20 7456 2222
Email: richard.holden@linklaters.com and
        titia.holtz@linklaters.com

or to such other address(es) as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

ARTICLE 6
NO ADMISSION OF LIABILITY

Each Party acknowledges that this Agreement in part addresses potential claims, counterclaims and factual allegations that are in whole or in part denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing or with respect to any disputed fact. Without limiting the generality of the foregoing, the amount of any Reserve Amount or the failure of any Reserve Amount to be set forth in Schedule 1 hereto for any particular UK Affiliate shall not (i) impair or prejudice the rights, positions, claims or obligations of any Party or (ii) be used as evidence by or against any Party, in each case, in any litigation in connection with the merits of the claims (or the amounts thereof) that the Parties may have against one another.

## ARTICLE 7
### ENTIRE AGREEMENT

This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof.    This Agreement supersedes and replaces any and all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof, and to the extent of any conflicts or inconsistencies between any Confirmed Plan and the terms of this Agreement, the terms of this Agreement shall control.    The Parties acknowledge that this Agreement is not being executed in reliance on any oral or written agreement, promise or representation not contained herein.

## ARTICLE 8
### NO ORAL MODIFICATIONS

This Agreement may not be modified or amended orally.    This Agreement may be modified or amended only by a writing signed by a duly authorized representative of each affected Party hereto.    Any waiver of compliance with any term or provision of this Agreement on the part of any of the Debtors must be provided in a writing signed by each affected UK Affiliate. Any waiver of compliance with any term or provision of this Agreement on the part of any of the UK Affiliates must be provided in a writing signed by each affected Debtor.    No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.    No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

## ARTICLE 9
### CONSTRUCTION

This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

## ARTICLE 10
### BINDING EFFECT; SUCCESSOR AND ASSIGNS

Any declaration or statement of any Joint Administrator, Joint Liquidator or Thayer Liquidator shall be made only in his capacity and function as a Joint Administrator, Joint Liquidator or Thayer Liquidator, as applicable, of the relevant UK Affiliate, and shall in no circumstance be construed as being a

declaration or statement of such Joint Administrator, Joint Liquidator or Thayer Liquidator on his own and personal behalf.    This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors (including any chapter 7 trustees that may be appointed upon or after conversion of any of the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code or any party that may succeed to the rights or claims of any of the Debtors or their estates, derivatively or otherwise, and including any liquidators that may be appointed upon or after conversion of any administration of any UK Administration Company into liquidations) and permitted assigns; *provided*, *however*, that no Party may assign its rights or obligations under this Agreement without the written consent of each other affected Party, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

ARTICLE 11
COUNTERPARTS

This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.    The signatures of all of the Parties need not appear on the same counterpart.

ARTICLE 12
NO PERSONAL LIABILITY

The Joint Administrators, the Joint Liquidators and the Thayer Liquidators act as agents for and on behalf of the UK Administration Companies the UK Liquidation Companies and the Thayer Liquidation Companies, respectively, and neither they, their firm, members, partners, directors, officers, employees, agents, advisers or representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by any of the UK Administration Companies, UK Liquidation Companies or Thayer Liquidation Companies or in respect of any failure on the part of any of the UK Administration Companies, UK Liquidation Companies or Thayer Liquidation Companies to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant hereto.    The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of any of the Joint Administrators, Joint Liquidators or Thayer Liquidators and shall operate as a waiver of any claims in tort as well as under the laws of contract and any claims otherwise at law or in equity.    The Joint Administrators', the Joint Liquidators' and the Thayer Liquidators' firm, members, partners, directors, officers, employees, agents, advisers and representatives are express third-party beneficiaries hereunder and may enforce and rely on this paragraph, to the same extent as if they or it were a party.    Each Party accepts and agrees that this Agreement and

9

all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, agents, asset managers, representatives or professional advisors of any other Party and, to the extent any such personal liability existed, each Party explicitly waives any and all potential rights and claims against all of the aforementioned persons.   Any claim by a Party against any of the Joint Administrators, Joint Liquidators, Thayer Liquidators, UK Administration Companies, UK Liquidation Companies or Thayer Liquidation Companies arising under, related to, or connected with this Agreement shall be satisfied only out of the assets of the estate of the applicable UK Administration Company, UK Liquidation Company or Thayer Liquidation Company, and any claim by a Party against a Debtor arising under, related to, or connected with this Agreement shall only be satisfied out of the assets of such Debtor.

## ARTICLE 13
### NON-SEVERABILITY

Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.   If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties.   Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

## ARTICLE 14
### WAIVER OF JURY TRIAL

EACH OF THE PARTIES HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO

10

THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   EACH OF THE PARTIES IS HEREBY AUTHORIZED TO FILE A COPY OF THIS ARTICLE 14 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.   THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN COMMERCIAL PAPER INC.,
LEHMAN BROTHERS COMMODITY
SERVICES INC., LEHMAN BROTHERS
SPECIAL FINANCING INC., LEHMAN
BROTHERS OTC DERIVATIVES INC.,
LEHMAN BROTHERS COMMERCIAL
CORPORATION, LB 745 LLC, PAMI
STATLER ARMS LLC, CES AVIATION
LLC, CES AVIATION V LLC, CES
AVIATION IX LLC, LEHMAN SCOTTISH
FINANCE L.P., BNC MORTGAGE LLC, LB
ROSE RANCH LLC, STRUCTURED
ASSET SECURITIES CORPORATION, LB
2080 KALAKAUA OWNERS LLC, MERIT
LLC, LB PREFERRED SOMERSET LLC,
LB SOMERSET LLC, as Debtors and
Debtors in Possession

By: _____

Name:   John Suckow

Title:   Authorized Signatory


LEHMAN BROTHERS DERIVATIVES
PRODUCTS INC., LEHMAN BROTHERS
FINANCIAL PRODUCTS INC., EAST
DOVER LIMITED, LUXEMBOURG
RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L., as Debtors and Debtors
in Possession

By: _____

Name:   Daniel Ehrmann

Title:   Authorized Signatory


*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:


Lehman Brothers International (Europe)
(in administration)

By: _____

    Anthony V. Lomas, Joint
    Administrator of Lehman Brothers
    Europe Limited (in administration),
    acting as its agent and without
    personal liability
    Level 23
    25 Canada Square
    London, E14 5LQ
    United Kingdom
    Email: tony.lomas@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Mable Commercial Funding Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Mable Commercial
Funding Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Storm Funding Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Storm Funding
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

LB UK Re Holdings Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of LB UK Re Holdings
Limited (in administration), acting as its
agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

Lehman Brothers Europe Limited
(in administration)

By: _____

Dan Y. Schwarzmann, Joint
Administrator of Lehman Brothers
Europe Limited (in administration),
acting as its agent and without personal
liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: dan.schwarzmann@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers Limited
(in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Limited (in administration), acting as
its agent and without personal liability
7 More London
Riverside, London, SE1 2RT
United Kingdom
Email: mike.jervis@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers UK Holdings Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Brothers UK
Holdings Limited (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Monaco NPL (No. 1) Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Monaco NPL (No. 1)
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Lehman Commercial Mortgage Conduit
Limited (in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Lehman Commercial
Mortgage Conduit Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

Thayer Properties Limited
(in administration)

By: _____
Michael J. A. Jervis, Joint
Administrator of Thayer Properties
Limited (in administration), acting as
its agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Zestdew Limited (in administration)

By: _____

Michael J. A. Jervis, Joint
Administrator of Zestdew Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

**Eldon Street Holdings Limited**
**(in administration)**

By: _____

Michael J. A. Jervis, Joint
Administrator of Eldon Street Holdings
Limited (in administration), acting as its
agent and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

**LB SF No. 1 (in administration)**

By: _____

Michael J. A. Jervis, Joint
Administrator of LB SF No. 1
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

**LB Holdings Intermediate 2 Limited**
**(in administration)**

By: _____

Michael J. A. Jervis, Joint
Administrator of LB Holdings
Intermediate 2 Limited
(in administration), acting as its agent
and without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

**Lehman Brothers Holdings PLC**
**(in administration)**

By: _____

Michael J. A. Jervis, Joint
Administrator of Lehman Brothers
Holdings PLC (in administration),
acting as its agent and without personal
liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Eldon Street (Raven) Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Eldon Street (Raven) Limited
(in liquidation), acting as its agent and
without personal liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

LBQ Funding (UK) (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
LBQ Funding (UK) (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Grace Hotels Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Grace Hotels Limited (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers Equity (Nominees
Number 7) Limited (in liquidation),
acting as its agent and without personal
liability
<u>With notice to</u>:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
<u>Email</u>: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Lehman Brothers (Indonesia) Limited
(in liquidation)

By: _____

Ian Oakley-Smith, Joint Liquidator of
Lehman Brothers (Indonesia) Limited
(in liquidation), acting as its agent and
without personal liability
With notice to:
Derek A. Howell
Level 23
25 Canada Square
London, E14 5LQ
United Kingdom
Email: derek.a.howell@uk.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

Amany Attia, as Director of Acenden
Limited (f/k/a Capstone Mortgage
Services Limited)
Acenden Limited
4th Floor
22-25 Finsbury Square
London EC2A 1DX
United Kingdom
Email: Amany.Attia@acenden.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Acenden Limited (f/k/a Capstone Mortgage
Services Limited)

By: _____

Jeff Lundgren, as Director of Acenden
Limited (f/k/a Capstone Mortgage
Services Limited)
Acenden Limited
4th Floor
22-25 Finsbury Square
London EC2A 1DX
United Kingdom
Email: Jeff.Lundgren@acenden.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Preferred Mortgages Limited

By: _____
    Lee Brandon, as Director of Preferred
    Mortgages Limited
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

Southern Pacific Funding 3 Ltd.

By: _____
    Lee Brandon, as Director of Southern
    Pacific Funding 3 Ltd.
    Level 23
    25 Canada Square
    London, E14 5LQ
    United Kingdom
    Email: brandons@talktalk.net

Southern Pacific Mortgage Ltd.

By: _____
    Lee Brandon, as Director of
    Southern Pacific Mortgage Ltd.
    St. Johns Place
    Easton Street
    High Wycombe, HP11 1NL
    England
    Email: brandons@talktalk.net

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

Thayer Group Limited (in liquidation)

By: _____

    Nick Vermeulen, Joint Liquidator of
    Thayer Group Limited (in liquidation),
    acting as its agent and without personal
    liability
    PricewaterhouseCoopers CI LLP
    Twenty Two Colomberie
    St Helier
    Jersey, JE1 4XA
    United Kingdom
    Email: nick.vermeulen@gg.pwc.com

Thayer Properties (Jersey) Limited
(in liquidation)

By: _____

    Nick Vermeulen, Joint Liquidator of
    Thayer Properties (Jersey) Limited
    (in liquidation), acting as its agent and
    without personal liability
    PricewaterhouseCoopers CI LLP
    Twenty Two Colomberie
    St Helier
    Jersey, JE1 4XA
    United Kingdom
    Email: nick.vermeulen@gg.pwc.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

MBAM Investor Limited

By: _____

A J P Brereton, as Director of MBAM
Investor Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

Resetfan Limited

By: _____

A J P Brereton, as Director of Resetfan
Limited
<u>With notice to</u>:
Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS
<u>Attn</u>: Jeff Drew and Monika Kuzelova
<u>Email</u>: jdrew@reedsmith.com and
mkuzelova@reedsmith.com

*[Signature page for Claim Reserve Agreement among UK Affiliates and Debtors]*

**Schedule 1**

**Reserve Amounts**

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. | $84,007,466 | 4A |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Holdings Inc. | $19,300 | 4B |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers OTC Derivatives Inc. | $2,292 | 5C |
| Acenden Limited (f/k/a Capstone Mortgage Services Limited) | Lehman Brothers Special Financing Inc. | $17,047 | 5C |
| Eldon Street (Raven) Limited | Lehman Brothers Holdings Inc. | $2,300,000 | 4A |
| Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. | $57,130,000 | 4B |
| Eldon Street Holdings Limited | Lehman Brothers Holdings Inc. | $611,400,000 | 4A |
| Grace Hotels Limited | Lehman Brothers Holdings Inc. | $1,650,000 | 4A |
| Grace Hotels Limited | Lehman Brothers Holdings Inc. | $4,500 | 4B |
| Lehman Brothers Equity (Nominees Number 7) Limited | Lehman Brothers Holdings Inc. | $4,200,000 | 4A |
| LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. | $2,309,300,000 | 4B |
| LB Holdings Intermediate 2 Limited | Lehman Brothers Holdings Inc. | $2,700,000 | 4A |
| LB SF No. 1 | Lehman Brothers Holdings Inc. | $505,000 | 4B |
| LB SF No. 1 | Lehman Brothers Holdings Inc. | $2,875,036,779 | 4A |
| LB UK Re Holdings Limited | Lehman Commercial Paper Inc. | $46,940,663 | 5C |
| LBQ Funding (UK) | Lehman Brothers Holdings Inc. | $820,000 | 4A |
| Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. | $18,600,000 | 4B |
| Lehman Brothers (Indonesia) Limited | Lehman Brothers Holdings Inc. | $614,000 | 4A |
| Lehman Brothers Europe Limited | Lehman Brothers Holdings Inc. | $224,162,000 | 4B |
| Lehman Brothers Europe Limited | Lehman Commercial Paper Inc. | $5,000,000 | 5C |
| Lehman Brothers Europe Limited | Lehman Brothers OTC Derivatives Inc. | $26,000 | 5C |
| Lehman Brothers Europe Limited | Lehman Brothers Commercial Corporation | $260 | 5C |

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Lehman Brothers Holdings PLC | Lehman Brothers Holdings Inc. | $2,200,000 | 4B |
| Lehman Brothers Holdings PLC | Lehman Commercial Paper Inc. | $2,222,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Commercial Corporation | $300,000,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc. | $6,090,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc.[7] | $1,008,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers Holdings Inc.[8] | $1,500,000,000 | 4B |
| Lehman Brothers International (Europe) | Lehman Brothers OTC Derivatives Inc. | $75,000,000 | 5C |
| Lehman Brothers International (Europe) | Lehman Brothers Special Financing Inc. | $5,000,000,000 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commercial Corporation | $139,764 | 5C |
| Lehman Brothers Limited | Lehman Brothers Commodity Services Inc. | $888,000 | 5C |
| Lehman Brothers Limited | Lehman Brothers Holdings Inc. | $1,450,100,000 | 4B |
| Lehman Brothers Limited | Lehman Brothers Holdings Inc. | $400,000 | 4A |
| Lehman Brothers Limited | Lehman Brothers OTC Derivatives Inc. | $52,756 | 5C |
| Lehman Brothers Limited | Lehman Brothers Special Financing Inc. | $3,700,000 | 5C |
| Lehman Brothers Limited | Lehman Commercial Paper Inc. | $2,501,392 | 5C |
| Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. | $1,937,900,000 | 4B |
| Lehman Brothers UK Holdings Limited | Lehman Brothers Holdings Inc. | $10,645 | 4A |
| Lehman Commercial Mortgage Conduit Limited | Lehman Commercial Paper Inc. | $101,985,000 | 5C |
| Lehman Commercial Mortgage Conduit Limited | Lehman Brothers Holdings Inc. | $92,100,000 | 4B |
| Mable Commercial Funding Limited | Lehman Brothers Holdings Inc. | $42,190,000 | 4B |
| MBAM Investor Limited | Lehman Brothers Holdings Inc. | $93,137,000 | 4B |
| MBAM Investor Limited | Lehman Brothers Holdings Inc. | $1,214,000 | 4A |
| Monaco NPL (No. 1) Limited | Lehman Brothers Special Financing Inc. | $3,000,000 | 5C |
| Preferred Mortgages Limited | Lehman Brothers Holdings Inc. | $32,709,000 | 4B |
| Preferred Mortgages Limited | Lehman Brothers Holdings Inc. | $42,633,000 | 4A |

---

[7] On account of the guarantee of LBIE's Bankhaus Claim.

[8] On account of LPS Trust Claims.

| Applicable UK Affiliate | Applicable Debtor | Amount | Applicable Class |
|---|---|---|---|
| Resetfan Limited | Lehman Brothers Holdings Inc. | $531,281 | 4A |
| Southern Pacific Funding 3 Ltd. | Lehman Brothers Holdings Inc. | $35,500,000 | 4A |
| Southern Pacific Mortgage Ltd. | Lehman Brothers Holdings Inc. | $69,200,000 | 4B |
| Storm Funding Limited | Lehman Brothers Holdings Inc. | $896,339,000 | 4B |
| Storm Funding Limited | Lehman Brothers Holdings Inc. | $810,903,934 | 4A |
| Storm Funding Limited | Lehman Commercial Paper Inc. | $182,820,000 | 5C |
| Thayer Group Limited | Lehman Brothers Holdings Inc. | $7,500,000 | 4A |
| Thayer Properties (Jersey) Limited | Lehman Brothers Holdings Inc. | $22,663,000 | 4B |
| Thayer Properties Limited | Lehman Commercial Paper Inc. | $13,400 | 5C |
| Zestdew Limited | Lehman Brothers Holdings Inc. | $3,253,000 | 4B |
| Zestdew Limited | Lehman Brothers Special Financing Inc. | $3,391,000 | 5C |

**Exhibit B**

**Form of LBJ Settlement Agreement**

Execution Version

October 24, 2011

Lehman Brothers Japan Inc.
Kishimoto Bldg., 9th Floor
2-2-1 Marunouchi, Chivoda-ku
Tokyo 100-0005
Japan

Lehman Brothers International (Europe) (in administration)
Level 23.25 Canada Square
London E14 5LQ

Re:     Release of Certain Claims in Connection with Certain Japanese Government Bonds

Ladies and Gentlemen:

      This letter agreement (the "Letter Agreement") is made and entered into by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Japan Inc. ("LBJ"), and Lehman Brothers International (Europe) ("LBIE"), each of which shall be referred to individually as a "Party" and collectively as the "Parties." Reference is made to the Japanese government bonds listed on Appendix 1 attached hereto (the "Japanese Government Bonds").

      Prior to the commencement of the chapter 11 cases of LBHI and its affiliated debtors, LBSF financed the purchase of the Japanese Government Bonds via LBJ. There were a series of intercompany transactions among LBSF, LBIE, and LBJ involving the Japanese Government Bonds, which transactions were recorded on the relevant Parties' prepetition books and records (collectively, the "Intercompany Transactions"). As of September 12, 2008, the Parties may hold (i) direct or guarantee claims against one another for the right to recover the Japanese Government Bonds or the full value of the Japanese Government Bonds, including, without limitation, on the basis of actual or constructive trust, lien, or other security interest in the Japanese Government Bonds or any other legal or equitable cause of action that would entitle any Party to recovery of the full value of the Japanese Government Bonds (collectively, the "JGB Claims") and (ii) direct or guarantee claims against one another for other amounts owing which arise under the Intercompany Transactions, including any right to setoff, netting, or recoupment.

      In order to facilitate a resolution and settlement of all of the claims, rights, and defenses against each other, the Parties have agreed that it is in their mutual interest to release any and all JGB Claims they may have against each other Party in accordance with the following terms, provisions, and conditions:

      1.      Upon the Effective Date (as defined below), each Party on behalf of itself, its estate, its successors and assigns, and any other party, person, or entity claiming under

or through it, hereby generally releases, discharges, waives and acquits, unconditionally and irrevocably, each other Party and its respective current and former agents, servants, officers, directors, employees, divisions, branches, units, parents, attorneys, financial advisors, accountants, successors, predecessors, heirs, personal representatives, and assigns (each in their capacities as such) from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether in law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (excluding fraud, bad faith or willful misconduct) or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, that such Party ever had or claimed to have or now has or claims to have presently or at any future date, against each other Party arising under, related to, or in connection with the JGB Claims (the foregoing released claims, the "Released JGB Claims"); provided, however, that each Party expressly reserves, and nothing herein shall impair, all of its rights, actions, defenses, objections, causes of action, and claims it might have against each other Party that are not Released JGB Claims, including, without limitation, (a) the net amounts, as between each relevant pair of LBSF, LBIE, and LBJ, resulting from (i) income arising on the relevant securities during the period of the applicable Intercompany Transaction, (ii) price differential payable under the Intercompany Transaction in accordance with the relevant contract, and (iii) the difference between the value of the collateral subject to the Intercompany Transaction and the cash amount payable thereunder and (b) those monetary amounts as agreed or to be agreed between LBIE and LBJ as owing by LBIE to LBJ under the transactions between LBIE and LBJ pursuant to the Master Agreement Concerning Gensaki Transactions of Bonds, dated April 1, 2002, and any failed transaction or other costs relating thereto; provided, further, that in the case of each Intercompany Transaction, the Japanese Government Bonds are assumed to have been delivered or redelivered, as the case may be, to the relevant party in accordance with the terms of the relevant Intercompany Transaction.

2.        Each Party represents and warrants to each other Party that, subject to Bankruptcy Court approval to the extent necessary, (i) the execution, delivery, and performance by such Party of this Letter Agreement and the releases contemplated under this Letter Agreement are within the powers of such Party and have been duly authorized by all necessary action on the part of such Party, (ii) this Letter Agreement has been duly executed and delivered by such Party and constitutes a valid and binding obligation of such Party, enforceable against such Party in accordance with the terms hereof, (iii) it is not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Letter Agreement, (iv) it has had the opportunity to be represented and advised by legal counsel in connection with this Letter Agreement, which it enters voluntarily and of its own choice and not under coercion or duress, (v) it has made its own investigation of the facts relating to Intercompany Transactions to which it is a party and is relying upon its own knowledge and the advice of its counsel, (vi) it has no expectation that any of the other Parties will disclose facts material to the Letter Agreement to it, and (vii) it knowingly waives any and all claims that entry into this Letter Agreement was induced by any misrepresentation or nondisclosure and knowingly waives

any and all rights to rescind or avoid this Letter Agreement based upon presently existing facts, known or unknown.

3.     This Letter Agreement shall be effective upon the effective date of the chapter 11 plan of LBHI and its affiliated debtors.

4.     This Letter Agreement will be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York (including section 5-1401 of the New York General Obligations Law), without regard to conflicts of laws principles that would require the application of the law of another jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction over any action or proceeding with respect to this Letter Agreement and each Party agrees to submit to such jurisdiction and to waive any defense based on the location or jurisdiction of such court.

5.     This Letter Agreement may only be amended or modified and any of the terms hereof may be waived only by an instrument in writing signed by each of the Parties.

6.     This Letter Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the Parties need not appear on the same counterpart.  Signatures to this Letter Agreement may be exchanged by facsimile transmission and/or electronic mail and shall constitute originals for all purposes.

Kindly acknowledge and confirm your agreement to the foregoing by execution of this Letter Agreement by a duly authorized representative below where indicated and delivery of such representative's signature to LBHI via facsimile or electronic mail.  Each person who executes this Letter Agreement on behalf of a Party represents and warrants that he or she is duly authorized and empowered to execute and deliver this Letter Agreement on behalf of such Party.

Sincerely,

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)


By:_____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING
INC., a Delaware corporation, as Debtor and
Debtor in Possession in its chapter 11 case in the
United States Bankruptcy Court for the Southern
District of New York, Case No. 08-13555 (JMP)


By:_____
Name:
Title:


LEHMAN BROTHERS JAPAN INC.


_____
By: Masaki Kanehyo
Title: Representative Liquidator


LEHMAN BROTHERS INTERNATIONAL
(EUROPE) (IN ADMINISTRATION)


By: _____
Name:
Title:

For the joint administrators, Anthony Victor
Lomas, Steven Anthony Pearson, Michael
John Andrew Jervis, Dan Yoram
Schwarzmann and Derek Anthony Howell
acting for and on behalf of Lehman Brothers
International (Europe) as agents and without
personal liability.

**Exhibit C**

**Form LB Scottish Shareholder Resolution**

**LEHMAN BROTHERS LUXEMBOURG INVESTMENTS S.à r.l.**
*Société à responsabilité limitée*
**L-1273 Luxembourg, 19, rue de Bitbourg**
**Share capital: USD 61,229,600.-**
**R.C.S. Luxembourg B 83966**
**(the "Company")**

**WRITTEN SINGLE SHAREHOLDER'S RESOLUTIONS**
**EFFECTIVE AS OF _____ 2011**

The undersigned being the single shareholder of the Company, agrees that:

The following resolutions are taken (i) in compliance with article 13 of the Company's bylaws stating that *"the single shareholder assumes all powers conferred to the general shareholder meeting"*, and (ii) in accordance with article 200-2, second paragraph, of the amended Law of 10th August, 1915 on commercial companies stating that *"the decisions of the single shareholder which are taken in the scope of the first paragraph* [powers of the general meeting] *are recorded in minutes or drawn-up in writing"*.

**WHEREAS**

(A)   Lehman Brothers Holdings Scottish LP, a limited partnership organized under the laws of England and Wales, having its registered offices at Johnston House, 52-54 Rose Street, Aberdeen AB10 1UD, United Kingdom, registered with the Scottish Register of Commerce (Companies House) under number SL005882, is the single shareholder of the Company (hereinafter the "**Single Shareholder**").

(B)   According to article 12 of the Company's bylaws, the manager(s) may be revoked ad nutum.

(C)   The Single Shareholder intends to (i) revoke, with effect as of today, (x) Mr. Daniel J. Ehrmann and Mr. William J. Fox as managers of category A of the Company and (y) Mr. John S. Keen as manager of category B of the Company and (ii) grant them full and entire discharge for the exercise of their mandates until today.

(D)   [The Single Shareholder intends to appoint new managers with effect on [_____] in replacement of the resigning managers.]

In consideration of the above, the undersigned resolves as follows:

1

## FIRST RESOLUTION

The Single Shareholder decides to revoke, with effect as of today, (i) Mr. Daniel J. Ehrmann and Mr. William J. Fox as managers of category A of the Company and (ii) Mr. John S. Keen as manager of category B of the Company.

## SECOND RESOLUTION

The Single Shareholder (i) decides to grant full and entire discharge to (x) Mr. Daniel J. Ehrmann, (y) Mr. William J. Fox and (z) Mr. John S. Keen for the exercise of their mandates as managers of category A, respectively category B, of the Company until today as far as legally possible and (ii) formally and irrevocable undertakes, for himself and any and all successors, assignees or transferees, to consider and resolve again on such full and entire discharge at the next ordinary single shareholder's meeting resolving on the approval of the annual accounts of the Company.

## [THIRD RESOLUTION

The Single Shareholder resolved to appoint (i) [_____], [_____], born on [_____] at [_____], residing at [_____], as new manager of category [___] with effect on [_____], in replacement of [_____], resigning manager, (ii) [_____], [_____], born on [_____] at [_____], residing at [_____], as new manager of category [___] with effect on [_____], in replacement of [_____], resigning manager and (iii) [_____], [_____], born on [_____] at [_____], residing at [_____],as new manager of category [___] with effect on [_____], in replacement of [_____], resigning manager.]

**********

[remainder of this page intentionally left blank]

For:

**Lehman Brothers Holdings Scottish LP**

By:

Name: Lehman Brothers UK Holdings (Delaware) Inc.

Title: General Partner

_____                    _____

By:

Name:                                             Name:

Title:                                             Title:

[signature page to LEHMAN BROTHERS LUXEMBOURG INVESTMENTS S.à r.l.

written single shareholder's resolutions – revocation managers]

# **ANNEX 1**

# EXTRACTS FROM THE ENGLISH INSOLVENCY ACT 1986

*Adjustment of prior transactions (administration and liquidation)*

✅ Law In Force

### 238.— Transactions at an undervalue (England and Wales).

(1) This section applies in the case of a company where—

[(a)  the company enters administration, or ] [1]

(b)  the company goes into liquidation;

and "the office-holder" means the administrator or the liquidator, as the case may be.

(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—

(a)  the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

(b)  the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

(5) The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied—

(a)  that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and

(b)  that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.

---

**Notes**

[1]    Substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.25 (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Pt VI s. 238: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt VI s. 238(1)-(5)(b): England, Wales

---

✅ Law In Force

### 239.— Preferences (England and Wales).

(1) This section applies as does section 238.



(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if—

(a) that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

(b) the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

(5) The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).

(6) A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5).

(7) The fact that something has been done in pursuance of the order of a court does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.
[1] [2] [3]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

[2]    Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25 Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a) (5)(a), 90, 126(3), Sch. 15 Applied (with modifications) by S.I. 1989/1276, arts. 2, 3

[3]    S. 239 excluded by Companies Act 1989 (c.40), ss. 154, 155, 165(1)(b), 213(2) S. 239 restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 8(1)(b)

**Commencement**

Pt VI s. 239: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt VI s. 239(1)-(7): England, Wales

---



✅ Law In Force

**240.—** **"Relevant time" under ss. 238, 239.**

(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—

(a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below),

(b) in the case of a preference which is not such a transaction and is not so given, at a time in the period of 6 months ending with the onset of insolvency, **[...]**[1]

[(c) in either case, at a time between the making of an administration application in respect of the company and the making of an administration order on that application, and

(d) in either case, at a time between the filing with the court of a copy of notice of intention to appoint an administrator under paragraph 14 or 22 of Schedule B1 and the making of an appointment under that paragraph. ][2]

(2) Where a company enters into a transaction at an undervalue or gives a preference at a time mentioned in subsection (1)(a) or (b), that time is not a relevant time for the purposes of section 238 or 239 unless the company—

(a) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or

(b) becomes unable to pay its debts within the meaning of that section in consequence of the transaction or preference;

but the requirements of this subsection are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolvency is—

[(a) in a case where section 238 or 239 applies by reason of an administrator of a company being appointed by administration order, the date on which the administration application is made,

(b) in a case where section 238 or 239 applies by reason of an administrator of a company being appointed under paragraph 14 or 22 of Schedule B1 following filing with the court of a copy of a notice of intention to appoint under that paragraph, the date on which the copy of the notice is filed,

(c) in a case where section 238 or 239 applies by reason of an administrator of a company being appointed otherwise than as mentioned in paragraph (a) or (b), the date on which the appointment takes effect,

(d) in a case where section 238 or 239 applies by reason of a company going into liquidation either following conversion of administration into winding up by virtue of Article 37 of the EC Regulation or at the time when the appointment of an administrator ceases to have effect, the date on which the company entered administration (or, if relevant, the date on which the application for the administration order was made or a copy of the notice of intention to appoint was filed), and

(e) in a case where section 238 or 239 applies by reason of a company going into liquidation at any other time, the date of the commencement of the winding up. ][3]



## Notes

1   Word repealed subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.26 para.1 (September 15, 2003: repeal has effect as SI 2003/2093 subject to transitional provisions specified in SI 2003/2093 art.3)

2   S.240(1)(c)-(d) substituted for s.240(1)(c) subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.26(2) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

3   S.240(3)(a)-(e) substituted for s.240(3)(a),(aa) and (b) subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.26(4) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

## Commencement

Pt VI s. 240: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

## Extent

Pt VI s. 240(1)-(3)(e): England, Wales

---

☑ Law In Force

### 241.—   Orders under ss. 238, 239.

(1) Without prejudice to the generality of sections 238(3) and 239(3), an order under either of those sections with respect to a transaction or preference entered into or given by a company may (subject to the next subsection)—

    (a)  require any property transferred as part of the transaction, or in connection with the giving of the preference, to be vested in the company,

    (b) require any property to be so vested if it represents in any person's hands the application either of the proceeds of sale of property so transferred or of money so transferred,

    (c)  release or discharge (in whole or in part) any security given by the company,

    (d)  require any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct,

    (e)  provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction, or by the giving of the preference, to be under such new or revived obligations to that person as the court thinks appropriate,

    (f)  provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for the security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction or by the giving of the preference, and

    (g)  provide for the extent to which any person whose property is vested by the order in the company, or on whom obligations are imposed by the order, is to be able to prove in the winding up of the company for debts or other liabilities which arose from, or were released or discharged (in whole or in part) under or by, the transaction or the giving of the preference.

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order—



(a)  shall not prejudice any interest in property which was acquired from a person other than the company and was acquired **[** in good faith and for value **]** [1] , or prejudice any interest deriving from such an interest, and

(b)  shall not require a person who received a benefit from the transaction or preference **[** in good faith and for value **]** [1] to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when he was a creditor of the company.

**[** (2A) Where a person has acquired an interest in property from a person other than the company in question, or has received a benefit from the transaction or preference, and at the time of that acquisition or receipt—

(a) he had notice of the relevant surrounding circumstances and of the relevant proceedings, or

(b)  he was connected with, or was an associate of, either the company in question or the person with whom that company entered into the transaction or to whom that company gave the preference,

then, unless the contrary is shown, it shall be presumed for the purposes of paragraph (a) or (as the case may be) paragraph (b) of subsection (2) that the interest was acquired or the benefit was received otherwise than in good faith.
**]** [2]

**[** (3) For the purposes of subsection (2A)(a), the relevant surrounding circumstances are (as the case may require)—

(a) the fact that the company in question entered into the transaction at an undervalue; or

(b)  the circumstances which amounted to the giving of the preference by the company in question;

and subsections (3A) to (3C) have effect to determine whether, for those purposes, a person has notice of the relevant proceedings.

**[** (3A) Where section 238 or 239 applies by reason of a company's entering administration, a person has notice of the relevant proceedings if he has notice that—

(a) an administration application has been made,

(b) an administration order has been made,

(c) a copy of a notice of intention to appoint an administrator under paragraph 14 or 22 of Schedule B1 has been filed, or

(d) notice of the appointment of an administrator has been filed under paragraph 18 or 29 of that Schedule.

**]** [4]

**[** (3B) Where section 238 or 239 applies by reason of a company's going into liquidation at the time when the appointment of an administrator of the company ceases to have effect, a person has notice of the relevant proceedings if he has notice that—

(a) an administration application has been made,

(b) an administration order has been made,

(c) a copy of a notice of intention to appoint an administrator under paragraph 14 or 22 of Schedule B1 has been filed,

(d) notice of the appointment of an administrator has been filed under paragraph 18 or 29 of that Schedule, or

(e) the company has gone into liquidation.



] $^5$

(3C) In a case where section 238 or 239 applies by reason of the company in question going into liquidation at any other time, a person has notice of the relevant proceedings if he has notice—

> (a) where the company goes into liquidation on the making of a winding-up order, of the fact that the petition on which the winding-up order is made has been presented or of the fact that the company has gone into liquidation;
>
> (b) in any other case, of the fact that the company has gone into liquidation.

] $^3$

(4) The provisions of sections 238 to 241 apply without prejudice to the availability of any other remedy, even in relation to a transaction or preference which the company had no power to enter into or give.

### Notes

[1]  Words substituted by Insolvency (No. 2) Act 1994 c. 12 s.1(1) (July 26, 1994)

[2]  Added by Insolvency (No. 2) Act 1994 c. 12 s.1(2) (July 26, 1994)

[3]  S.241(3), (3A), (3B) and (3C) s.241(3) by Insolvency (No. 2) Act 1994 c. 12 s.1(3) (July 26, 1994)

[4]  Substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.27(2) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

[5]  Substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.27(3) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

### Commencement

Pt VI s. 241: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

### Extent

Pt VI s. 241(1)-(4): England, Wales

---

✅ Law In Force

### 242.—    Gratuitous alienations (Scotland).

(1) Where this subsection applies and—

> (a) the winding up of a company has commenced, an alienation by the company is challengeable by—
>
>> (i) any creditor who is a creditor by virtue of a debt incurred on or before the date of such commencement, or
>>
>> (ii) the liquidator;
>
> (b) [ a company enters administration ] $^1$ , an alienation by the company is challengeable by the administrator.

(2) Subsection (1) applies where—

> (a) by the alienation, whether before or after 1st April 1986 (the coming into force of section 75 of the Bankruptcy (Scotland) Act 1985), any part of the company's property is transferred or any claim or right of the company is discharged or renounced, and
>
> (b) the alienation takes place on a relevant day.



(b) does not have permission under Part IV of the Financial Services and Markets Act 2000 (c. 8) (regulated activities) to accept deposits.

(1A) Subsection (1)(b) shall be construed in accordance with—

(a) section 22 of the Financial Services and Markets Act 2000 (classes of regulated activity and categories of investment),

(b) any relevant order under that section, and

(c) Schedule 2 to that Act (regulated activities).

**]** [2]

(1A) **[…]** [3]

(2) An order under this section may make different provision for different cases and may contain such incidental, supplemental and transitional provisions as may appear to the Secretary of State necessary or expedient.

(3) An order under this section shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

### Notes

[1]   Heading substituted by Financial Services and Markets Act 2000 (Consequential Amendments) Order 2002/1555 Pt 2 art.16(2) (July 3, 2002)

[2]   S.422(1)-(1A) substituted for s.422(1) subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.35 (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

[3]   Repealed by Enterprise Act 2002 (Insolvency) Order 2003/2096 Sch.1(1) para.11 (September 15, 2003)

### Commencement

Pt XV s. 422(1)(a)-(1)(b): December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

Pt XV s. 422(1A): Date not available

Pt XV s. 422(2)-(3): December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

### Extent

Pt XV s. 422(1)-(3): England, Wales, Scotland

# PART XVI

## PROVISIONS AGAINST DEBT AVOIDANCE (ENGLAND AND WALES ONLY)

✅ Law In Force

### 423.—   Transactions defrauding creditors.

(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

(a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;



(b)  he enters into a transaction with the other in consideration of marriage **[** or the formation of a civil partnership **]** **¹** ; or

(c)  he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

(a)  restoring the position to what it would have been if the transaction had not been entered into, and

(b)  protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(a)  of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)  of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or—

(a)  if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b)  if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up

.

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

---

**Notes**

**¹**    Words inserted by Civil Partnership Act 2004 c. 33 Sch.27 para.121 (December 5, 2005)

**Commencement**

Pt XVI s. 423: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt XVI s. 423(1)-(5): England, Wales

---

✅ Law In Force

### 424.—    Those who may apply for an order under s. 423.

(1) An application for an order under section 423 shall not be made in relation to a transaction except—

(a)  in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or **[** is in administration **]** **¹** , by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;



(b) in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the voluntary arrangement or by any person who (whether or not so bound) is such a victim; or

(c) in any other case, by a victim of the transaction.

(2) An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.

---

**Notes**

[1]    Words substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.36 (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Pt XVI s. 424: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt XVI s. 424(1)-(2): England, Wales

---

✅ Law In Force

### 425.—   Provision which may be made by order under s. 423.

(1) Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(a)  require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b)  require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;

(c)  release or discharge (in whole or in part) any security given by the debtor;

(d)  require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e)  provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f)  provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order—

(a)  shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and



(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security.

¹ ²

#### Notes

¹   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

²   S. 425 applied with modifications by S.I. 1986/1999, art. 3, Sch. 1 Pt. II

#### Commencement

Pt XVI s. 425: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

#### Extent

Pt XVI s. 425(1)-(4): England, Wales

# PART XVII

## MISCELLANEOUS AND GENERAL

✅ Law In Force

### 426.—    Co-operation between courts exercising jurisdiction in relation to insolvency.

(1) An order made by a court in any part of the United Kingdom in the exercise of jurisdiction in relation to insolvency law shall be enforced in any other part of the United Kingdom as if it were made by a court exercising the corresponding jurisdiction in that other part.

(2) However, without prejudice to the following provisions of this section, nothing in subsection (1) requires a court in any part of the United Kingdom to enforce, in relation to property situated in that part, any order made by a court in any other part of the United Kingdom.

(3) The Secretary of State, with the concurrence in relation to property situated in England and Wales of the Lord Chancellor, may by order make provision for securing that a trustee or assignee under the insolvency law of any part of the United Kingdom has, with such modifications as may



**BAILEY & GROVES: CORPORATE INSOLVENCY - LAW & PRACTICE 2008**

# Corporate Insolvency
# Law and Practice

Third Edition

**Edward Bailey MA, LLB (Cantab)**
One of Her Majesty's Circuit Judges

**Hugo Groves LLB (Leic), LLM (Lond)**
Barrister, Attorney-at-Law, New York State



LexisNexis®
Butterworths

**Members of the LexisNexis Group worldwide**

| | |
|---|---|
| United Kingdom | LexisNexis Butterworths, a Division of Reed Elsevier (UK) Ltd, Halsbury House, 35 Chancery Lane, London, WC2A 1EL, and London House, 20–22 East London Street, Edinburgh EH7 4BQ |
| Argentina | LexisNexis Argentina, Buenos Aires |
| Australia | LexisNexis Butterworths, Chatswood, New South Wales |
| Austria | LexisNexis Verlag ARD Orac GmbH & Co KG, Vienna |
| Benelux | LexisNexis Benelux, Amsterdam |
| Canada | LexisNexis Canada, Markham, Ontario |
| Chile | LexisNexis Chile Ltda, Santiago |
| China | LexisNexis China, Beijing and Shanghai |
| France | LexisNexis SA, Paris |
| Germany | LexisNexis Deutschland GmbH, Munster |
| Hong Kong | LexisNexis Hong Kong, Hong Kong |
| India | LexisNexis India, New Delhi |
| Italy | Giuffrè Editore, Milan |
| Japan | LexisNexis Japan, Tokyo |
| Malaysia | Malayan Law Journal Sdn Bhd, Kuala Lumpur |
| Mexico | LexisNexis Mexico, Mexico |
| New Zealand | LexisNexis NZ Ltd, Wellington |
| Poland | Wydawnictwo Prawnicze LexisNexis Sp, Warsaw |
| Singapore | LexisNexis Singapore, Singapore |
| South Africa | LexisNexis Butterworths, Durban |
| USA | LexisNexis, Dayton, Ohio |

© Reed Elsevier (UK) Ltd 2007

Published by LexisNexis Butterworths

All rights reserved. No part of this publication may be reproduced in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright owner except in accordance with the provisions of the Copyright, Designs and Patents Act 1988 or under the terms of a licence issued by the Copyright Licensing Agency Ltd, Saffron House, 6–10 Kirby Street, London EC1N 8TS. Applications for the copyright owner's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorised act in relation to a copyright work may result in both a civil claim for damages and criminal prosecution.

Crown copyright material is reproduced with the permission of the Controller of HMSC and the Queen's Printer for Scotland. Parliamentary copyright material is reproduced with the permission of the Controller of Her Majesty's Stationery Office on behalf of Parliament. Any European material in this work which has been reproduced from EUR-lex, the official European Communities legislation website, is European Communities copyright.

A CIP Catalogue record for this book is available from the British Library.

ISBN 978-0-4069-6970-5

9 780406 969705

Typeset by Letterpart Ltd, Reigate, Surrey

Printed and bound in Great Britain by William Clowes Limited, Beccles, Suffolk

Visit LexisNexis Butterworths at www.lexisnexis.co.uk

**24.14**  *Transactions defrauding creditors*

A 'victim' of a transaction is a person who is, or is capable of being prejudiced by it[4]. These words are, intentionally, very wide. Victims who have brought s 423 proceedings include former clients bringing a professional negligence action against an accountant[5], a creditor of an insolvent company in compulsory liquidation[6], a creditor of a company not in liquidation[7], corporate creditor of individuals not in bankruptcy[8], and a bank encountering difficulties in enforcing its security against a customer[9]. There is no need to show that the victim was a person who the transferor contemplated would be prejudiced by the transaction when he entered into it; a victim may indeed be a person of whose existence the transferor was unaware at that time[10].

In *Hill v Spread Trustee Co Ltd*[11] the Court of Appeal acknowledged the possibility that an application might be made under IA 1986, s 423 even though it could not be shown at the date of the application that there was a person who could benefit by a finding that the transaction came within the provisions of IA 1986, ss 423–425.

[1]  IA 1986, s 424(1).
[2]  If no objection is taken by the respondent, the court may deal with the question of leave at the substantive hearing; see eg *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, 313. However, it is essential that leave be obtained before an order can be obtained and it would be unwise for a victim applicant in this situation to proceed without first obtaining leave in the hope that the court will deal with the requirement of leave at a substantive hearing of the application, even though leave may be given retrospectively; see *Re Saunders (a Bankrupt)* [1997] Ch 60. Leave will presumably not be given unless the trustee (or official receiver, liquidator, or administrator) has elected not to bring proceedings himself; compare *Re Crossley* [1954] 1 WLR 1353.
[3]  Where the debtor is being wound up or is in administration (or as an individual is bankrupt) a victim may only make an application with the leave of the court; IA 1986, s 424(1)(a).
[4]  IA 1986, s 423(5); quite plainly it is not restricted to those persons the transferor might have had in mind when he entered into the transaction, and see *Sands v Clitheroe* [2006] BPIR 1000. However, it appears that the 'victim' of a transaction cannot include the 'debtor' as the person entering the transaction; IA 1986, s 423(5).
[5]  *Moon v Franklin* [1996] BPIR 196.
[6]  *Re Ayala Holdings Ltd* [1993] BCLC 256.
[7]  *Pinewood Joinery v Starelm Properties Ltd* [1994] BCC 659, [1994] 2 BCLC 412.
[8]  *Pagemanor Ltd v Ryan* [2002] BPIR 593; *Anglo Eastern Trust Ltd v Kermanshahchi* [2003] EWHC 1939 (Ch), [2003] BPIR 1229.
[9]  *Habib Bank Ltd v Ahmed* [2003] EWHC 1697 (QB), [2004] BPIR 35.
[10]  *Hill v Spread Trustee Co Ltd* [2005] EWCA Civ 542, [2007] 1 All ER 1106 at [101].
[11]  [2005] EWCA Civ 542, [2007] 1 All ER 1106 at [136].

**Leave required by victim**

**24.15**  Leave to commence proceedings is required by any applicant victim where the debtor is a company in liquidation or administration[1]. As any application is to be treated as being made on behalf of every victim of the transaction, it is plainly sensible that the court should not give leave without considering the interests of all the debtor's creditors, and ascertaining whether or not the responsible office-holder himself wishes to commence proceedings. The liquidator or administrator will in most cases be the appropriate applicant. Leave should be sought by an applicant victim as a first step in any application[2], but there is no reason to suppose that the court cannot grant

994

*The Insolvency Act 1986, ss 423–425*    **24.16**

leave retrospectively when appropriate to do so[3]. If proceedings under IA 1986, s 423 are commenced before an individual becomes insolvent, his subsequent bankruptcy does not result in an automatic stay of the proceedings; they continue subject to an application for a stay[4]. The position is otherwise where proceedings have been commenced against a corporate debtor who becomes insolvent, for an automatic stay on the continuing of legal proceedings is imposed on the company entering either administration[5] or liquidation[6].

[1]   IA 1986, s 424(1)(a).
[2]   *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, CA.
[3]   See *Bristol & West Building Society v Saunders & Bearman* [1997] Ch 60, a case on IA 1986, s 285, but stating the general principle that in the absence of clear words prior leave is not an absolute condition precedent to the issue of proceedings. In *National Bank of Kuwait v Menzies* [1993] BCLC 256, Chadwick J gave retrospective leave to the applicant victim to commence proceedings under IA 1986, s 423. Although the grant of leave was reversed in the Court of Appeal, [1994] 2 BCLC 306, this was on the basis that the claim was unsustainable. It would appear (see p 313d per Sir Christopher Slade) that the court was not critical of the Judge agreeing to deal with the question of leave at the hearing of an interim application. In *Dora v Simper* [2000] 2 BCLC 561 at 572, Buckley J was plainly not impressed with counsel's attempt to distinguish *Bristol & West Building Society v Saunders & Bearman*, and while not expressing a considered view, suggested that the jurisdiction to grant leave retrospectively should exist. In the event he did not consider it appropriate to give leave on the merits.
[4]   Under IA 1986, s 285, and see *Noel Godfrey v Torpy and others* (2007) Times, 16 May.
[5]   By IA 1986, Sch B1, para 43; proceedings may be continued with the consent of the administrator or with the permission of the court.
[6]   IA 1986, s 130(2) imposes an automatic stay on the continuation of any proceedings on the making of a winding-up order, although this may be lifted by the court; see 22.16, 22.18.


## Court for applications

**24.16**   An application under IA 1986, ss 423–5 may be brought in any division of the High Court. If there are no existing proceedings in the Companies Court or Bankruptcy Court, the Insolvency Rules will not apply to the application; it will proceed under the CPR[1]. It is in the nature of the jurisdiction that s 423 applications are often made in conjunction with applications under IA 1986, ss 238–241, and such applications have regularly since the commencement of the Act been brought and continue to be brought under the Insolvency Rules[2]. There is here a difficulty in the drafting of the statute. Part 7 Chapter 1 of the Insolvency Rules[3], rule 7.1 provides that Chapter 1 applies 'to any application made to the court under the Act or Rules'[4]. Furthermore, 'insolvency proceedings' are defined[5] as any proceedings under the Act or the Rules. But while applications under IA 1986, ss 423–425 are plainly applications under the Act, the authority under which the Insolvency Rules were made, namely IA 1986, ss 411–412, state expressly that the power to make rules is for the purpose of giving effect to the IA 1986, Parts I to XI inclusive. As ss 423–425 comprise Part XVI of the Insolvency Act 1986, it may be questioned whether the Insolvency Rules can legitimately apply to applications under these sections[6]. If such applications have to be brought by claim form under the CPR, it would be an anomaly which may give rise to no little inconvenience if, as is often the case, an application is brought by a liquidator or administrator who wishes also to make an

[5] This has been subsequently doubted in *Hill v Spread Trustee Co Ltd, Re Nurkowski* [2006] EWCA Civ 542, [2006] BPIR 789.

### Scope of transaction at an undervalue

**36.182**  The reach of the undervalue provision has yet to be fully determined as it has been in force for a comparatively short period. However, it may be said that it has not yet been applied to a foreclosure sale by a receiver or a leveraged buy-out by the management of the company as with similar provisions in the US. Foreclosure sales which do not realise as much as the controllers of the company expect can be attacked if the sale was conducted negligently[1]; however, it would be creating new ground to challenge a properly conducted foreclosure sale under the IA 1986, s 238, assuming that such a sale is a 'transaction'. Leveraged buy-outs present less difficult problems of interpretation in being brought under the scope of s 238, but there are no reported cases on this area.

[1]    *Standard Chartered Bank Ltd v Walker* [1982] 3 All ER 938.

### Transactions defrauding creditors

**36.183**  IA 1986, s 423 also catches transactions at an undervalue which are entered into for the purpose of putting assets beyond the reach of creditors, and it may be employed by a liquidator or administrator. The provision is hardly ever used in a corporate context because of the difficulty of proving intent; IA 1986, s 238 is an easier hurdle to jump for the office-holder. However, there are a number of advantages in using s 423 rather than s 238. First, the 'victim of the transaction'[1] in question may apply as well as the office-holder; secondly, it operates both inside and outside a liquidation or administration; thirdly, the time limits in s 238 do not apply, and it is not necessary to prove that the debtor was insolvent.

[1]    IA 1986, ss 423(5), 424(1)(c). Such a victim is any person who is, or is capable of, being prejudiced by the transaction; see Chapter 24.

### Preferences[1]

**36.184**  IA 1986, s 239 aims to ensure that the company does not prefer a creditor in the run up to the company's liquidation or administration. The temptation for the controllers of the company in the last few months of trading is to prefer some creditors, for instance its bankers, where the directors have guaranteed the company's overdraft.

[1]    See Chapter 23.

### Act of preference

**36.185**  A company gives a preference to a person if that person is one of the company's creditors or a surety or guarantor for any of the company's debts

1421

# HILL V. SPREAD TRUSTEE CO LTD. [2006] EWCA CIV 542

2006 WL 1288358                                                                      Page 1

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

© 2012 Sweet & Maxwell

**Hill v Spread Trustee Co Ltd**

**Also known as:**
**Nurkowski, Re**

**Court of Appeal (Civil Division)**

**12 May 2006**

**Case Analysis**

**Where Reported**        [2006] EWCA Civ 542; [2007] Bus. L.R. 1213; [2007] 1 W.L.R. 2404; [2007] 1 All E.R.
1106; [2006] B.C.C. 646; [2007] 1 B.C.L.C. 450; [2006] B.P.I.R. 789; [2006] W.T.L.R. 1009; Official Tran-
script;

**Case Digest**

**Subject:** Insolvency

**Keywords:** Bankruptcy, Limitation periods, Settlements, Tax evasion, Transactions at an undervalue

**Catchphrases:** transactions at an undervalue, limitation periods, commencement date for limitation period, pur-
pose of transaction

**Abstract:** The appellant trustees (T) appealed against the decision ( [2005] EWHC 336, [2005] B.P.I.R.
842) that a settlement, of which T were the trustees, two legal charges and an assignment in their favour of a
loan account constituted transactions within the Insolvency Act 1986 s.423(3).

The settlement had been created by the owner (N) of two fields, which adjoined a development site, in
favour of his infant daughter. N had gifted one of the fields into the settlement just before planning permission
was given for the adjacent land. A few months later the fields had been sold for £2 million. When the field was
gifted to the settlement N had told the Revenue that it was worth only £35,000. The Revenue did not accept that
valuation and later compromised its claim against N for £160,000. After receiving the sale consideration T had
lent most of it back to N in return for charges in T's favour and the assignment of sums due to N on his loan ac-
count with a company. N could not pay the capital gains tax arising on the sale of the land and had been made
bankrupt on the Revenue's petition. N's trustee in bankruptcy (H) applied for relief under the Insolvency Act
1986 s.423 in respect of the settlement and the charges and assignment. The judge found that one of the pur-
poses in making the settlement had been to evade tax by pretending that there was little difference between the
original cost of the land and its value when gifted into the settlement. The judge held that the claim under s.423
was a specialty subject to a 12 year limitation period under the Limitation Act 1980 s.8(1), that the cause of ac-
tion did not arise before the bankruptcy order was made and that H's application was not statute-barred. T sub-
mitted that (1) the judge had been wrong to find on the facts that one of N's purposes in making the settlement

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

had been to cause the Revenue to value the land at less than its true value at the date of the settlement; (2) the
judge had not been entitled to conclude that the later charges had been given for no consideration within
s.423(1)(a); (3) H's application was statute-barred; (4) N's intention as found by the judge did not amount to a
purpose within s.423(3) and the Revenue was not a victim within s.423(5).

The limitation period in respect of a claim by a trustee in bankruptcy under the Insolvency Act 1986
s.423 ran from the date of the bankruptcy order.

Appeal dismissed. (1) the judge had been entitled to find that N had received an offer of £700,000 for
the field before telling the Revenue it was worth £35,000 and had been entitled to infer that N had had a plan to
make the gift into settlement and hide information from the Revenue to evade tax. (2) The grant of security
could constitute a transaction at an undervalue. Security was not given without consideration where it was given
in exchange for forbearance by the creditor, MC Bacon Ltd (No.1), Re [1990] B.C.C. 78 considered. In the in-
stant case T did not give any consideration in the form of forbearance in respect of the later charges and the as-
signment. (3) The applicable limitation period, whether that was 12 years under s.8(1) of the 1980 Act or six
years under s.9(1) of that Act, started when the bankruptcy order was made, Yates (A Bankrupt), Re [2004]
EWHC 3448 (Ch), [2005] B.P.I.R. 476 considered. The effect of s.424(2) of the 1986 Act was not that there
could be only a single cause of action in respect of one transaction. There was no inherent objection to the no-
tion that there might be separate limitation periods for different applicants under s.423. It was not until a bank-
ruptcy order was made that the trustee was identified as the person entitled to sue. (4) The judge had found that
inducing the Revenue to make a wrong assessment of the capital gains was something that N positively intended
and that was enough to show that N acted with that "purpose" within s.423(3). For a person to be a "victim" of
the transaction there was no need to show that the person who effected the transaction intended to put assets
beyond his reach or prejudice his interests. A person might be a victim even though he had not been within the
purpose of the person entering into the transaction. The court had jurisdiction to make an order under s.423 even
where there was no victim under s.423(5). All that had to be shown was that the person was making or might
make a claim.

Appeal dismissed

**Judges:** Waller, L.J.; Arden, L.J.; Sir Martin Nourse

**Counsel:**    For I :the appellants: Catherine Newman QC, Timothy Evans For I :the respondents: Stephen Dav-
ies QC, Stefan Ramel

**Solicitors:**    For I :the appellants: Osborne Clarke For I :the respondents: Clarke Willmott

## Appellate History

**affirming**

[2006] EWCA Civ 542; [2007] Bus. L.R. 1213; [2007] 1 W.L.R. 2404; [2007] 1 All E.R. 1106; [2006] B.C.C.
646; [2007] 1 B.C.L.C. 450; [2006] B.P.I.R. 789; [2006] W.T.L.R. 1009; Times, July 10, 2006; Official Tran-
script

## Related Cases

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

## Significant Cases Cited

considering
**MC Bacon Ltd (No.1), Re**
[1990] B.C.C. 78; [1990] B.C.L.C. 324; Times, December 1, 1989
Ch D (Companies Ct)

considering
**Yates (A Bankrupt), Re**
[2004] EWHC 3448 (Ch); [2005] B.P.I.R. 476
Ch D

**Letang v Cooper**
[1965] 1 Q.B. 232; [1964] 3 W.L.R. 573; [1964] 2 All E.R. 929; [1964] 2 Lloyd's Rep. 339; (1964) 108 S.J. 519
CA

**Sam Weller & Sons Ltd, Re**
[1990] Ch. 682; [1989] 3 W.L.R. 923; (1989) 5 B.C.C. 810; [1990] B.C.L.C. 80; [1989] P.C.C. 466; (1988) 133
S.J. 1297
Ch D

**Biogen Inc v Medeva Plc**
[1997] R.P.C. 1; (1997) 38 B.M.L.R. 149; (1997) 20(1) I.P.D. 20001; Times, November 1, 1996
HL

**West Riding CC v Huddersfield Corp**
[1957] 1 Q.B. 540; [1957] 2 W.L.R. 428; [1957] 1 All E.R. 669; (1957) 121 J.P. 219; 55 L.G.R. 153; (1957) 101
S.J. 209
QBD

**Benmax v Austin Motor Co Ltd**
[1955] A.C. 370; [1955] 2 W.L.R. 418; [1955] 1 All E.R. 326; (1955) 72 R.P.C. 39; (1955) 99 S.J. 129
HL

**Farmizer (Products) Ltd, Re**
[1997] B.C.C. 655; [1997] 1 B.C.L.C. 589; (1997) 94(8) L.S.G. 27; (1997) 141 S.J.L.B. 45; Times, February 17,
1997; Independent, March 10, 1997
CA (Civ Div)

**Maddever, Re**
(1884) L.R. 27 Ch. D. 523
CA

**Burchell v Bullard**
[2005] EWCA Civ 358; [2005] C.P. Rep. 36; [2005] B.L.R. 330; [2005] 3 Costs L.R. 507; (2005) 155 N.L.J.
593; Independent, April 21, 2005; Official Transcript
CA (Civ Div)

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

**Aylott v West Ham Corp**

[1927] 1 Ch. 30

CA

**Reid v Ramlort Ltd**

[2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985; (2004) 148 S.J.L.B. 877; Official Transcript

CA (Civ Div)

**Stena Rederi AB v Irish Ferries Ltd (Costs)**

[2003] EWCA Civ 214; [2003] R.P.C. 37; (2003) 26(5) I.P.D. 26028; Official Transcript

CA (Civ Div)

**AEI Rediffusion Music Ltd v Phonographic Performance Ltd (Costs)**

[1999] 1 W.L.R. 1507; [1999] 2 All E.R. 299; [1999] C.P.L.R. 551; [1999] E.M.L.R. 335; [1999] R.P.C. 599; (1999) 22(5) I.P.D. 22046; (1999) 96(12) L.S.G. 33; (1999) 143 S.J.L.B. 97; Times, March 3, 1999; Independent, February 24, 1999

CA (Civ Div)

**Alltrans Express Ltd v CVA Holdings Ltd**

[1984] 1 W.L.R. 394; [1984] 1 All E.R. 685; (1984) 81 L.S.G. 430; (1984) 128 S.J. 47

CA (Civ Div)

**Chohan v Saggar**

[1994] B.C.C. 134; [1994] 1 B.C.L.C. 706; [1993] E.G. 194 (C.S.); [1993] N.P.C. 154; Independent, December 27, 1993

CA (Civ Div)

**Elgindata (No.2), Re**

[1992] 1 W.L.R. 1207; [1993] 1 All E.R. 232; [1993] B.C.L.C. 119; (1992) 89(27) L.S.G. 33; (1992) 136 S.J.L.B. 190; Times, June 18, 1992

CA (Civ Div)

**Law Society v Southall**

[2001] EWCA Civ 2001; [2002] B.P.I.R. 336; [2002] W.T.L.R. 1151; Times, January 7, 2002; Official Transcript

CA (Civ Div)

**Buchler v Talbot**

[2004] UKHL 9; [2004] 2 A.C. 298; [2004] 2 W.L.R. 582; [2004] 1 All E.R. 1289; [2004] B.C.C. 214; [2004] 1 B.C.L.C. 281; (2004) 101(12) L.S.G. 35; (2004) 154 N.L.J. 381; (2004) 148 S.J.L.B. 299; Times, March 5, 2004; Official Transcript

HL

**Kiam v MGN Ltd (Costs)**

[2002] EWCA Civ 66; [2002] 1 W.L.R. 2810; [2002] 2 All E.R. 242; [2002] C.P. Rep. 30; [2002] E.M.L.R. 26; Independent, March 25, 2002; Official Transcript

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

CA (Civ Div)

**Reid Minty (A Firm) v Taylor**
[2001] EWCA Civ 1723; [2002] 1 W.L.R. 2800; [2002] 2 All E.R. 150; [2002] C.P. Rep. 12; [2002] C.P.L.R. 1; [2002] 1 Costs L.R. 180; [2002] E.M.L.R. 19; Official Transcript
CA (Civ Div)

**Summit Property Ltd v Pitmans (Costs)**
[2001] EWCA Civ 2020; [2002] C.P.L.R. 97; Official Transcript
CA (Civ Div)

**Budgen v Andrew Gardner Partnership**
[2002] EWCA Civ 1125; [2003] C.P. Rep. 8; [2003] C.P.L.R. 63; (2002) 99(39) L.S.G. 37; Times, September 9, 2002; Independent, November 11, 2002; Official Transcript
CA (Civ Div)

**Priory Garage (Walthamstow) Ltd, Re**
[2001] B.P.I.R. 144; Official Transcript
Ch D (Companies Ct)

**Coburn v Colledge**
[1897] 1 Q.B. 702
CA

**R. v Lucas (Lyabode Ruth)**
[1981] Q.B. 720; [1981] 3 W.L.R. 120; [1981] 2 All E.R. 1008; (1981) 73 Cr. App. R. 159; [1981] Crim. L.R. 624
CA (Crim Div)

**Morris v Bank of India**
[2005] EWCA Civ 693; [2005] B.C.C. 739; [2005] 2 B.C.L.C. 328; [2005] B.P.I.R. 1067; Times, July 19, 2005; Official Transcript
CA (Civ Div)

**Anglo Cyprian Trade Agencies v Paphos Wine Industries**
[1951] 1 All E.R. 873; [1951] W.N. 205; (1951) 95 S.J. 336
KBD

**Cotterell v Price**
[1960] 1 W.L.R. 1097; [1960] 3 All E.R. 315; (1960) 104 S.J. 763
Ch D

**Inland Revenue Commissioners v Hashmi**
[2002] EWCA Civ 981; [2002] B.C.C. 943; [2002] 2 B.C.L.C. 489; [2002] B.P.I.R. 974; [2002] W.T.L.R. 1027; Official Transcript
CA (Civ Div)

**National Bank of Kuwait SAK v Menzies**

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

[1994] B.C.C. 119; [1994] 2 B.C.L.C. 306
CA (Civ Div)

**Johnson v Gore Wood & Co (No.1)**
[2002] 2 A.C. 1; [2001] 2 W.L.R. 72; [2001] 1 All E.R. 481; [2001] C.P.L.R. 49; [2001] B.C.C. 820; [2001] 1 B.C.L.C. 313; [2001] P.N.L.R. 18; (2001) 98(1) L.S.G. 24; (2001) 98(8) L.S.G. 46; (2000) 150 N.L.J. 1889; (2001) 145 S.J.L.B. 29; Times, December 22, 2000; Independent, February 7, 2001; Official Transcript
HL

**Beoco Ltd v Alfa Laval Co Ltd**
[1995] Q.B. 137; [1994] 3 W.L.R. 1179; [1994] 4 All E.R. 464; [1994] C.L.C. 111; 66 B.L.R. 1; (1994) 144 N.L.J. 233; Times, January 12, 1994
CA (Civ Div)

**Peter Buchanan Ltd v McVey**
[1955] A.C. 516 (Note)
Sup Ct (Irl)

**Cunliffe v Goodman**
[1950] 2 K.B. 237; [1950] 1 All E.R. 720; (1950) 66 T.L.R. (Pt. 2) 109; (1950) 94 S.J. 179
CA

**Spice Girls Ltd v Aprilia World Service BV**
[2002] EWCA Civ 15; [2002] E.M.L.R. 27; (2002) 25(4) I.P.D. 25024; Official Transcript
CA (Civ Div)

**Brady v Brady**
[1989] A.C. 755; [1988] 2 W.L.R. 1308; [1988] 2 All E.R. 617; (1988) 4 B.C.C. 390; [1988] B.C.L.C. 579; [1988] P.C.C. 316; [1988] 2 F.T.L.R. 181; (1988) 132 S.J. 820
HL

**Eichholz (No.1), Re**
[1959] Ch. 708; [1959] 2 W.L.R. 200; [1959] 1 All E.R. 166
Ch D

**Lane Fox Ex p. Gimblett, Re**
[1900] 2 Q.B. 508
QBD

**AG Securities v Vaughan**
[1990] 1 A.C. 417; [1988] 3 W.L.R. 1205; [1988] 3 All E.R. 1058; (1989) 21 H.L.R. 79; (1989) 57 P. & C.R. 17; [1988] 47 E.G. 193; [1988] E.G. 153 (C.S.); (1989) 86(1) L.S.G. 39; (1988) 138 N.L.J. Rep. 325; (1988) 132 S.J. 1638; Times, November 11, 1988
HL

**Medcalf v Mardell (Wasted Costs Order)**
[2002] UKHL 27; [2003] 1 A.C. 120; [2002] 3 W.L.R. 172; [2002] 3 All E.R. 721; [2002] C.P. Rep. 70; [2002]

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

C.P.L.R. 647; [2002] 3 Costs L.R. 428; [2002] P.N.L.R. 43; (2002) 99(31) L.S.G. 34; (2002) 152 N.L.J. 1032; (2002) 146 S.J.L.B. 175; [2002] N.P.C. 89; Times, June 28, 2002; Official Transcript
HL

**Collin v Duke of Westminster**
[1985] Q.B. 581; [1985] 2 W.L.R. 553; [1985] 1 All E.R. 463; (1985) 17 H.L.R. 246; (1985) 50 P. & C.R. 380; [1985] 1 E.G.L.R. 109; (1985) 273 E.G. 881; [1985] R.V.R. 4; (1985) 82 L.S.G. 767; (1985) 129 S.J. 116
CA (Civ Div)

**Pratt v Cook Son & Co (St Pauls) Ltd**
[1940] A.C. 437
HL

**Royscot Spa Leasing Ltd v Lovett**
[1995] B.C.C. 502; [1994] N.P.C. 146; Independent, January 23, 1995
CA (Civ Div)

## Cases Citing This Case

**considered**
**Overnight Ltd (In Liquidation), Re**
[2009] EWHC 601 (Ch); [2009] Bus. L.R. 1141; [2010] B.C.C. 787; Times, April 2, 2009
Ch D

**applied**
**Random House UK Ltd v Allason**
[2008] EWHC 2854 (Ch); Official Transcript
Ch D

**considered**
**Nolan v Wright**
[2009] EWHC 305 (Ch); [2009] 3 All E.R. 823; [2009] 2 All E.R. (Comm) 503; [2009] B.P.I.R. 854; (2009) 159 N.L.J. 395; Official Transcript
Ch D

**distinguished**
**Eurocruit Europe Ltd (In Liquidation), Re**
[2007] EWHC 1433 (Ch); [2008] Bus. L.R. 146; [2007] B.C.C. 916; [2007] 2 B.C.L.C. 598; Times, July 16, 2007; Official Transcript
Ch D

**followed**
**Official Receiver for Northern Ireland v Stranaghan**
[2010] NICh 8; [2010] B.P.I.R. 928; Official Transcript
Ch D (NI)

**applied**

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

**Curtis v Pulbrook**
[2011] EWHC 167 (Ch); [2011] 1 B.C.L.C. 638; Official Transcript
Ch D

**Henwood v Barlow Clowes International Ltd (In Liquidation)**
[2008] EWCA Civ 577; [2008] B.P.I.R. 778; [2008] N.P.C. 61; Times, June 18, 2008; Official Transcript
CA (Civ Div)

**Revenue and Customs Commissioners v Begum**
[2010] EWHC 1799 (Ch); [2011] B.P.I.R. 59; Official Transcript
Ch D

**Segal v Pasram**
[2008] EWHC 3448 (Ch); [2008] 1 F.L.R. 271; [2007] B.P.I.R. 881; [2007] Fam. Law 892; Official Transcript
Ch D (Bankruptcy Ct)

**Giles v Rhind**
[2008] EWCA Civ 118; [2009] Ch. 191; [2008] 3 W.L.R. 1233; [2008] Bus. L.R. 1103; [2008] 3 All E.R. 697; [2009] B.C.C. 590; [2008] 2 B.C.L.C. 1; [2008] B.P.I.R. 342; Times, March 25, 2008; Official Transcript
CA (Civ Div)

**Stonham v Ramrattan**
[2011] EWCA Civ 119; [2011] 1 W.L.R. 1617; [2011] B.P.I.R. 518; [2011] 8 E.G. 118 (C.S.); [2011] N.P.C. 19; Official Transcript
CA (Civ Div)

**Giles v Rhind**
[2007] EWHC 687 (Ch); [2007] Bus. L.R. 1470; [2007] 2 B.C.L.C. 531; [2007] B.P.I.R. 713; Official Transcript
Ch D

**Gamlestaden Fastigheter AB v Baltic Partners Ltd**
[2007] UKPC 26; [2007] Bus. L.R. 1521; [2007] 4 All E.R. 164; [2007] B.C.C. 272; [2008] 1 B.C.L.C. 468; Official Transcript
PC (Jer)

**Legislation cited**

Companies Act 1985 (c.6) s.459

Consumer Protection Act 1987 (c.43) Sch.1 para.5

Income and Corporation Taxes Act 1988 (c.1) s.739

Insolvency Act 1986 (c.45) Part 4

Insolvency Act 1986 (c.45) Part 8

Insolvency Act 1986 (c.45) s.214

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

Insolvency Act 1986 (c.45) s.238

Insolvency Act 1986 (c.45) s.32

Insolvency Act 1986 (c.45) s.423

Insolvency Act 1986 (c.45) s.423(1)

Insolvency Act 1986 (c.45) s.423(1)(a)

Insolvency Act 1986 (c.45) s.423(1)(c)

Insolvency Act 1986 (c.45) s.423(2)

Insolvency Act 1986 (c.45) s.423(3)

Insolvency Act 1986 (c.45) s.423(3)(a)

Insolvency Act 1986 (c.45) s.423(3)(b)

Insolvency Act 1986 (c.45) s.423(4)

Insolvency Act 1986 (c.45) s.423(5)

Insolvency Act 1986 (c.45) s.424

Insolvency Act 1986 (c.45) s.424(1)

Insolvency Act 1986 (c.45) s.424(1)(a)

Insolvency Act 1986 (c.45) s.424(1)(c)

Insolvency Act 1986 (c.45) s.424(2)

Insolvency Act 1986 (c.45) s.425

Insolvency Act 1986 (c.45) s.425(5)

Law of Property Act 1925 (c.20) s.136

Law of Property Act 1925 (c.20) s.172

Leasehold Reform Act 1967 (c.88)

Limitation Act 1980 (c.58)

Limitation Act 1980 (c.58) s.28

Limitation Act 1980 (c.58) s.32

Limitation Act 1980 (c.58) s.32(1)

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript

Limitation Act 1980 (c.58) s.8

Limitation Act 1980 (c.58) s.8(1)

Limitation Act 1980 (c.58) s.8(2)

Limitation Act 1980 (c.58) s.9

Limitation Act 1980 (c.58) s.9(1)

Taxes Management Act 1970 (c.9) s.36

**Journal Articles**

**Hill v Spread Trustee Co Ltd: meaning of purpose and victim re transactions defrauding creditors**
Limitation periods, Settlements, Transactions at an undervalue, Trustees in bankruptcy
Co. L.N. 2006, 15, 8

**Legal update**
Consideration, Directors, Liquidation, Loans, Preferences, Repayments, Settlements, Tax evasion, Transactions
at an undervalue, Trustees in bankruptcy
Recovery 2006, Win, 8-10

**Transactions at an undervalue - a new departure?**
Security, Settlements, Transactions at an undervalue, Trustees in bankruptcy
I.L. & P. 2006, 22(6), 222-224

**Section 423 claims - limitation period**
Bankruptcy, Limitation periods, Setting aside, Settlements
T.B. 2006, 76(Oct), 76.3

**Limitation periods and section 423 explained: MC Bacon questioned**
Charges, Limitation periods, Settlements, Transactions at an undervalue, Trustees in bankruptcy
Insolv. Int. 2006, 19(9), 135-137

**Transactions at an undervalue**
Security, Transactions at an undervalue, Trusts
B.J.I.B. & F.L. 2006, 21(8), 368

**Richard Hill (as trustee in bankruptcy of Henry Stanley Nurkowski) v 1. Spread Trustee Company Ltd 2. David John Warr.**
Settlements, Transactions at an undervalue, Trustees in bankruptcy
T.E.L. & T.J. 2006, 79(Sep), 22

**How secure is your security?**
Consideration, Security, Tax evasion, Transactions at an undervalue, Trustees in bankruptcy
S.J. 2006, 150(32), 1078-1079

**Transactions at an undervalue.**

© 2012 Thomson Reuters.

[2006] EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646
[2007] 1 B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript [2006]
EWCA Civ 542 [2007] Bus. L.R. 1213 [2007] 1 W.L.R. 2404 [2007] 1 All E.R. 1106 [2006] B.C.C. 646 [2007] 1
B.C.L.C. 450 [2006] B.P.I.R. 789 [2006] W.T.L.R. 1009 Times, July 10, 2006 Official Transcript


Security, Settlements, Tax evasion, Transactions at an undervalue, Trustees in bankruptcy
P.L.C. 2006, 17(6), 83-84

**Insolvency - transaction at undervalue - transaction for prohibited purpose.**
Bankruptcy, Limitation periods, Settlements, Tax evasion, Transactions at an undervalue, Trustees in bank-
ruptcy
I.L. & P. 2006, 22(3), 111-112

END OF DOCUMENT

© 2012 Thomson Reuters.

**RE MC BACON LTD [1990] BCLC 324 (MILLETT, J)**

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

C

### *78 Re M C Bacon Ltd v

Chancery Division (Companies Court)

J.    Millett

Judgment delivered 30 November 1989

Liquidation—Adjustment of prior transactions—Transactions at undervalue—Preferences—Company gave debenture to bank to secure overdraft when actually or virtually insolvent—Company went into creditors' voluntary liquidation three months later—Liquidator applied to have debenture set aside—Whether directors influenced in deciding to grant debenture by desire to improve bank's position in insolvent liquidation—Whether consideration for debenture was less in money than consideration provided by company—Whether consideration capable of valuation in monetary terms— Insolvency Act 1986, sec. 238(4)(b), (5), 239(4)(b), (5) .

This was an application by the liquidator of **MC Bacon** Ltd ("the company") to have a debenture set aside under sec. 239 of the Insolvency Act 1986 as a preference or under sec. 238 as a transaction at an undervalue.

The company traded profitably until 1986 when it lost its principal customer. The directors considered putting the company into immediate liquidation but, after taking legal advice, decided to continue trading. A substantial number of employees were made redundant, but the company made substantial losses and went into creditors' voluntary liquidation in August 1987, with an estimated deficiency for unsecured creditors of some £329,000.

The company's overdraft then stood at £235,530. It was secured by a debenture given in May 1987

when the company was actually or virtually insolvent and could not have continued without the bank's support.

The liquidator's case was that the directors were influenced, when they acceded to the bank's request for a debenture, by a desire to improve the bank's position in the event of the company's insolvent liquidation within sec. 239(4)(b) and (5) ; alternatively, that the granting of the debenture was a transaction at an undervalue within sec. 238(4)(b) .

*Held* , dismissing the liquidator's application:

1    A transaction would not be set aside under sec. 239 unless the company positively wished to improve the creditor's position in the event of insolvent liquidation. Desire was subjective, but its existence could be inferred from the circumstances of the case. The mere presence of the requisite desire would not be sufficient by itself. It must have influenced the decision to enter into the transaction. That requirement was satisfied if it was one of the factors which operated on the minds of those who made the decision, at the time when the decision was made.

2 In deciding to grant the debenture to the bank the directors were not motivated by any desire except the desire to avoid the calling in of the overdraft and to continue trading. They were not actuated by any desire to improve the bank's position as a creditor in the event of the company's liquidation.

3 Section 238(4)(b) required a comparison to be made between the value obtained by the company for the transaction and the value of consideration provided by the company. Both values had to be measurable in money or money's worth and had to be considered from the company's point of view.

4    The creation of security over the company's

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

assets did not come within sec. 238(4)(b). It did not deplete the assets or diminish their value. Loss of the ability to apply the proceeds of the assets otherwise than in satisfaction of the secured debt was not **\*79** capable of valuation in monetary terms, nor was the consideration the company received in return.

**Representation**

- Mr Geoffrey Vos and Mr David Lord (instructed by William Prior & Co) for the liquidator.
- Mr John Lindsay QC and Mr Anthony Mann (instructed by Wilde Sapte) for the respondents.

**JUDGMENT**

Millett J:

M C Bacon Ltd ("the company") was formed in 1973 as part of a management buy-out by Mr Michael Creal ("Mr Creal"), Mr Sidney Glover ("Mr Glover") and Mr Alec Knight ("Mr Knight"). It carried on business as a bacon importer and wholesaler. Mr Creal and Mr Glover were executive directors and ran the business. Mr Knight was a non-executive director who had helped to finance the buy-out, and his shareholding was eventually bought in by the company.

Traditional bacon was the corner-stone of the business for the first ten years. In 1983, in response to the requirements of its principal customer, Dee Corporation, the company diversified into the supply of pre-packaged manufactured products such as gammon steaks, gammon joints and rashered bacon, and ran down the traditional side of the business. In December 1986 Dee Corporation, which by then was responsible for nearly 60 per cent of the company's turnover, abruptly withdrew its custom. Mr Creal and Mr Glover considered putting the company into immediate liquidation but, after taking legal advice, they decided to continue trading. A substantial number of employees were made redundant and the company attempted to regain sales volume with reduced overheads, but it made substantial losses as well as incurring liability to make redundancy payments in the process. It struggled on for some months but was unsuccessful. It eventually went into creditors' voluntary liquidation on 24 August 1987 with an estimated deficiency as regards unsecured creditors of £329,435.

At the date of liquidation the company's overdraft at the first respondent, National Westminster Bank ("the bank") stood at £235,530. The overdraft was secured by a debenture dated 20 May 1987 granted by the company. On 4 September 1987 the bank demanded payment and on the same day it appointed the second respondent as administrative receiver of the company. The applicant was appointed liquidator of the company at a meeting of creditors on 7 September 1987.

The applicant now claims to have the debenture set aside (1) under sec. 239 of the Insolvency Act 1986 ("the Act") as a voidable preference, or (2) under sec. 238 of the Act as a transaction at an undervalue. Originally the applicant also alleged that from 15 April 1987 onwards the bank was a shadow director of the company and claimed that it had thereby rendered itself responsible for what was alleged to have been the wrongful trading of the company on and after 15 May 1987. These last mentioned allegations were rightly abandoned by the applicant after six days of oral evidence. As a result, I can set out the facts at shorter length and in less detail than would otherwise have been the case.    I.

**The facts**

© 2012 Thomson Reuters.

[1990] B.C.C. 78                                                                                                          Page 3
[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

Up to 24 October 1986, when its financial year ended, the company traded profitably. It was able to keep within its overdraft limits and its account at the bank went into credit from time to time during the year. There was no "hard-core" borrowing. The company successfully resisted all attempts by the bank to obtain a debenture. In January 1986 the bank released the directors from their guarantees. In April 1986 it increased the company's overdraft facilities to £300,000 and offered to reduce the rate of interest if a debenture were provided. In May it conceded the reduction in the rate without requiring a debenture rather than risk the loss of the account to a competitor.**\*80**

Mr Creal and Mr Glover were in their late fifties. They intended to retire when they were 60 and had originally expected to sell the company on their retirement. But Mr Creal's son, Mr Martin Creal (whom I shall call "Martin" in order to distinguish him from his father and without intending any disrespect thereby) joined the company in February 1982 when he was aged 24, and their intentions changed. Martin was appointed a director and was groomed for eventual succession. Mr Glover still intended to retire when he was 60 and sell his shares, but Mr Creal wanted Martin to take over the company when the time was right.

The loss of the company's main customer in December 1986 came as a severe blow. Thirty-six employees were immediately made redundant. Mr Creal was despondent and his first thought was to put the company into liquidation. Martin, however, was keen to continue trading and to try to turn the company round. Mr Creal discussed the position with the company's solicitors and auditors and was advised that liquidation could be an over-reaction. Mr Creal told them that the loss of the Dee Corporation was "a set-back but not a disaster". He said that the company was very solvent, and was advised to monitor the figures carefully for a time to see whether significant trading losses were being incurred, to ensure that the company did not work its way through its reserves.

While Mr Creal and Mr Glover both thought that the company could be pulled round, the loss of the company's major customer and the need to reduce the size of the company hastened their decision to retire and hand the business over to Martin. Mr Creal no longer had the energy or inclination for the task. Mr Glover was 22.5 stone and suffered from arthritis. He was no longer prepared to do manual work, as full involvement in what had once again become a small company would require. They both had financial interests outside the company. Mr Glover in particular was engaged in small-scale property development through a company called Medallion Properties Ltd ("Medallion"), which he owned jointly with a small builder. He and Mr Creal were willing to provide Martin with advice and support but they brought forward the date of their retirement to coincide with the end of the current tax year. Martin for his part was keen to have the opportunity and the responsibility for returning the company to profit.

On 5 January 1987 Mr Glover called on Mr Hill, the manager of the Southwark branch of the bank where the company's account was maintained. He did not tell Mr Hill of the loss of the company's major customer, for he saw no advantage to the company in doing so. But he told Mr Hill that he and Mr Creal wanted to sell their shares to Martin and leave the company. He asked Mr Hill how the bank would react to a request to lend Martin £160,000 in order to buy out Mr Creal and himself. Mr Hill told him that it would not be an acceptable proposition. He also told Mr Glover that Martin had only been with the company for four years, that the bank would want to consider whether it would wish to continue the present facilities with him in charge, and that in those circumstances the bank would certainly be looking for a debenture.

Early in the new year Mr Glover resigned as joint managing director and it was formally agreed that effective management of the company should be transferred to Martin. This made no difference to the way in which the company's affairs were con-

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

ducted in practice. Mr Glover remained a director and continued to be responsible for the company's financial administration and the production of monthly management accounts. Martin continued to spend virtually all his time in the factory and seldom visited the company's office at 192–194 Trundley's Road, Southwark, some 200 yards distant. On 19 January 1987 it was agreed that Mr Creal and Mr Glover would retire on 3 April, that Mr Creal would remain as non-executive unpaid chairman and that Mr Glover should sever his connection with the company.

During the next few weeks Mr Creal and Mr Glover were heavily engaged with the company's solicitors and accountants in arranging the terms on which they would retire. These were carried into effect on Friday 3 April 1987 when:          **\*81**

- (1)          Mr Glover resigned as a director and secretary of the company and was paid a golden handshake of £50,000 of which £25,000 was paid immediately and £25,000 was prudently paid on the Monday following (the first day of the new tax year);

- (2)          Mr Creal resigned as an executive director and accepted the position of unpaid non-executive director and chairman;

- (3)          Martin, now the only executive director, was appointed secretary;

- (4)          Martin bought out Mr Glover's 20 per cent shareholding for £7,500;

- (5)          Mr Creal granted Martin an option to buy out his own shareholding at the same price per share exercisable at any time between 1 May **1990** and 30 April 1992.

It was also agreed that in lieu of the bonus payments to Mr Creal and Mr Glover for the year 1985–86 the company should pay a total of £80,000 into their self-administered joint pension fund, of which they were two of the three trustees. This sum represented pension contributions of £55,000 on behalf of Mr Creal and £25,000 on behalf of Mr Glover.

It has not been alleged that these payments were in any way improper. Mr Creal, Mr Glover and Martin knew that the company was in a difficult financial position and that it needed time to pull it round, but they had no reason to think that it was technically insolvent or that it could not be pulled round. They knew that Martin might not succeed, and they agreed that if he failed they would reimburse him the cost of buying Mr Glover out.

The company's cash position was weak. Its overdraft remained at a low level throughout January, February and most of March but it rose strongly on 25 March to £248,569, still well within the limit of the facility but making it difficult to fund payments totalling £130,000. To ease the pressure on the overdraft, the pension fund made a temporary unsecured loan of £46,000, which was paid into the company's account on 26 March and repaid to the pension fund on 6 April, by which time other receipts had reduced the company's overdraft to £203,350:

To fund Mr Glover's golden handshake, it had already been agreed that Medallion would buy the company's office premises at 192–194 Trundley's Road for £40,000. Unfortunately it transpired that the title to the property was vested not in the company but in a wholly owned subsidiary which had been struck off the register, so that it would be necessary to have the subsidiary restored to the register and the property transferred to the company before Medallion could buy it. All this would take time and, in the event, was not completed when the company went into liquidation on 24 August. In the meantime and in order to assist the company's cash flow, Medallion paid the £40,000 to the company on account of the purchase price. This sum was received by the company on 6 April.

© 2012 Thomson Reuters.

[1990] B.C.C. 78                                                                                                    Page 5
[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989
**(Cite as: [ 1990] B.C.C. 78)**

In order to fund the £80,000 which it paid to the pension fund, the company borrowed the money back from the pension fund on the security of a debenture dated 3 April 1987 which had been prepared by the company's solicitors for execution on that date and which was duly delivered to the registrar of companies for registration (just in time) on 23 April 1987.

On 14 April Mr Craig, the audit partner with the actual conduct of the company's audit, visited the company's offices to discuss the completion of the 1985–86 accounts with Mr Glover. Although Mr Glover had retired and no longer held any official position in the company, he was willing to make himself available to discuss the figures. Mr Craig took the opportunity to review the latest management accounts for the 18 weeks to 27 February 1987 and discussed them with Mr Glover. They showed a loss of £91,000 for the four months, of which £61,000 had been incurred in January and February. **\*82** Mr Glover told Mr Craig that the directors, by which he meant Mr Creal and Martin, had discussed the figures and the possible courses of action available. He indicated that they would make a final decision on the future viability of the company based upon the six months' figures to 30 April, which Mr Craig was told should be available by 12 May. Mr Craig noted that the company would be saving some £80,000 a year in future by not having to pay remuneration to Mr Creal or Mr Glover.

Mr Craig did not attempt a trial balance but Mr Glover recalled his telling him that the company was at or near to insolvency. This was certainly the case. The company's net assets appearing in the draft accounts at 24 October 1986 were £261,000 (or £323,000 if provision for deferred taxation is written back as being no longer necessary) from which £91,000 losses since the year end to the end of February 1987, and £130,000 payments to Mr Creal and Mr Glover would fall to be deducted, leaving only £40,000 (or £102,000). But these figures include plant and machinery valued at over £200,000 on a going-concern basis and take no account of any further losses incurred since the end of February. Clearly the company's viability as a going concern depended on the continued support of the bank, while it would soon become technically insolvent (if it was not so already) if it was unable to stem its continuing trading losses in the relatively near future.

Mr Craig took the opportunity to explain to Mr Glover the provisions of the Act relating to trading while insolvent. I infer that he explained that directors could be made personally liable if they permitted the company to continue to trade when they knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation.

The overdraft rose sharply after 9 April, reaching £299,379 on 14 April. Mr Hill asked Mr Glover to come and see him as a matter of urgency as the overdraft was right up to the limit. Mr Glover saw him on 15 April. In the course of the meeting he told Mr Hill for the first time of the loss of the Dee Corporation's custom, of his own and Mr Creal's retirement, and of the sale of his own shareholding to Martin. He said that although he had resigned as a director he had returned to take control of the company's accounting procedures. He told Mr Hill that there was a meeting of the directors to be held on 21 April, and Mr Hill asked to be provided with a full report following that meeting together with a cash-flow forecast for 1987 and management accounts to 31 March. He also asked for the bank's form showing quick assets and liabilities to be completed and told Mr Glover that he should advise the directors that, with his own departure, and Mr Creal's intending to take a back seat and make Martin managing director, the bank would require a debenture.

Mr Glover told me that well before 3 April he had warned Mr Creal and Martin that:

"The time is going to come when we are going to have to give the bank a debenture. They are going

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

to demand a debenture and when they ask for it we are going to have to give it." This is plausible evidence and I accept it. Mr Hill had already indicated as much in January when he had not known of the loss of the Dee Corporation or of the worsening financial position of the company.

Less plausibly, Mr Glover also told me that it was he himself who first raised the possibility of the bank taking a debenture by saying to Mr Hill: "I think it is time you had a debenture". I reject this evidence. It is not consistent with Mr Hill's note of the interview or his report to his regional office in which he said that he wished to take a mortgage debenture over the company "as a matter of urgency". Mr Glover was much given to reconstruction rather than recollection and was not always consistent. His very first reference to the bank's debenture was in terms of the bank having asked for a debenture, while his claim to have initiated the subject was progressively weakened as he admitted first that he may have been "prodded subconsciously" and later merely **\*83** "prodded". But Mr Hill had no need to "prod" Mr Glover into offering a debenture; he was in a position to demand one, and I am sure that he did. I also doubt that Mr Glover actually said to Mr Hill: "It is time you had a debenture", though he may well have thought it. Mr Glover's evidence is chiefly valuable for the insights which it provides of his thought processes at the time. I accept it only to the extent of finding that, when Mr Hill demanded a debenture, Mr Glover recognised that the time had come when the demand was justified and could not reasonably be resisted.

On the same day (whether before or after the meeting with Mr Hill can no longer be determined) Mr Glover took steps to procure the company to repay the £40,000 which Medallion had paid in anticipation of a contract of purchase of Trundley's Road. In order to fund the repayment the company resolved to borrow the money from the only source of finance available to it, now the bank overdraft was at its limit, namely the pension fund. It borrowed the money on terms that the loan should be repayable on 15 January 1987 and be secured by a debenture. The debenture was dated 15 April. The £40,000 was borrowed from the pension fund and paid out to Medallion on the same day. It was repaid by the company to the pension fund on 30 April by which time the overdraft at the bank had been reduced to below £200,000.

Mr Glover returned to Mr Hill on 21 April with the bank's quick assets/liabilities form duly completed. This showed quick assets £389,000, quick liabilities £640,000 (including bank overdraft £270,000) and fixed assets £362,000. Mr Glover discussed these figures with Mr Hill and assured him that the company could trade within a maximum overdraft of £300,000. Mr Hill warned him that the limit must not be exceeded in any way. In the course either of this or of the previous conversation on 15 April, Mr Glover told him that the pension fund was also proposing to take a debenture, and Mr Hill told him that if there was any attempt by the pension fund to resist the bank having first priority with its debenture, the bank's continued support would not be forthcoming. Mr Glover accepted that. He told me, and I accept, that when he and Mr Creal had taken the pension fund debenture they had recognised that it would have to be subordinated to the debenture which they fully expected the bank would eventually demand.

On the same day (again whether before or after his discussion with Mr Hill can no longer be determined) Mr Glover telephoned the auditors. He was unable to speak to an audit partner and was put through to Mr David Taylor, the taxation partner. There is a dispute as to what Mr Glover actually said. According to Mr Taylor's attendance note made immediately afterwards, Mr Glover "advised that it was now likely the company would go into liquidation". He also mentioned that "beforehand both the bank and the pension fund were executing debentures". Mr Taylor understood, though Mr Glover did not say, that this was "in the hope that

© 2012 Thomson Reuters.

**(Cite as: [ 1990] B.C.C. 78)**

their loans would be secured". In his letter to the company's solicitors written that same day, Mr Taylor said that he believed that they would by now have been advised by Mr Glover that "there is a possibility the company will be put into liquidation". In evidence to me Mr Glover denied that he ever said that the company "would" go into liquidation; he said only that it "could" go into liquidation. That is plainly right. Neither of Mr Taylor's versions suggests otherwise. The difference between them is not whether the company "would" or "could" go into liquidation, but as to the degree of likelihood that it could.

Both parties have invited me to resolve this conflict but I am unable to do so. I do not know what prompted Mr Glover's call. It is possible that he had just completed the management accounts for March and discovered that the company had continued to make heavy losses, but there is no evidence of this. Without knowing what prompted Mr Glover to make the call and whether he was referring to the possibility of the bank withdrawing support and forcing a liquidation or to the possibility of Mr Creal and Martin giving up the struggle, I find it impossible to reach a conclusion. But it is quite **\*84** unnecessary to do so. It is sufficient to find, as I do, that Mr Glover was referring to an insolvent liquidation; that he recognised that there was a distinct possibility of the company going into insolvent liquidation in the near future; and that this was sufficiently likely to warrant putting the auditors on notice of the fact but not to warrant the taking of any further step, for Mr Glover took none. Mr Glover remembered that there was great urgency in getting the pension fund debenture to the registrar of companies and that it had to be biked there on 23 April, but this was due to the imminence of the 21-day deadline for delivery, not to the imminence of liquidation.

Another meeting took place between Mr Glover and Mr Hill on 27 April when Mr Hill suggested that the bank's financial services section should visit the company. Mr Glover welcomed

this; he seems to have thought that the section would provide some kind of management consultancy service. In fact, of course, the bank's main object was to obtain advice whether the directors were likely to be able to pull the company round and restore it to profitable trading. On 30 April Mr Hill wrote confirming the date of the section's forthcoming visit and stated:

"… the prime purpose of the section's involvement is to derive, from available data and discussion with key management, a reliable information base on which the bank can base its response to the future financing requirements of the business. A secondary, but complementary aim, is to highlight to management any areas emerging during the assessment that warrant attention, where appropriate suggesting possible courses of action."

On 5 May Mr Hill wrote again. His letter contained the following passages:

"I write to confirm that subject to certain conditions given below the bank will continue to support your company to the extent of an overdraft maximum of £300,000 pending the outcome of that investigation. I must emphasise however that in view of the serious position in which the company now finds itself, the bank's support from here on is on a day-to-day basis with repayment on demand. The first essential of the bank's continuing support is the provision of a first mortgage debenture over the company's fixed and floating assets including a specific charge over the freehold of 192–194 Trundley's Road. If that property remains in the name of the subsidiary, then it will be necessary for that company to give a charge and guarantee the account of the company",            and so on. Later in the letter:

"You will understand that there can be no question of the pension fund taking a debenture to protect its position on a pari passu basis with the bank and if such a move is contemplated it must be made clear that the bank's continued support as I have outlined is dependent upon its proposed debenture and fixed

[1990] B.C.C. 78    Page 8
[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989
**(Cite as: [ 1990] B.C.C. 78)**

charge over the property having first priority."

Mr Glover and Martin took comfort from this de-
velopment. They persuaded themselves that the
bank had decided that the company was worth sup-
porting at least for the time being and that they
would obtain helpful advice from the section on
how best to restore the company to profitability. If
they had been contemplating the possibility of im-
minent liquidation on 21 April, that possibility had
now receded in their minds.

The company's management accounts for the six
months to 24 April 1987 were ready by 12 May.
They showed a loss of £301,000 for the half year,
and when account is taken of the payments totalling
£130,000 made to Mr Glover and the pension fund,
this means that the company had made a trading
loss of £171,000 in the six months, that is to say a
further trading loss of £80,000 during March and
April. A trial balance as at 24 April showed net as-
sets of £27,000, assuming that a provision for de-
ferred taxation was not required. But the fixed as-
sets included plant and machinery valued at
£232,000 on a going-concern basis. The company
was almost certainly technically insolvent.**85**

Two members of the section attended the com-
pany's premises between 12 and 14 May. Mr
Glover made himself available for questioning. At
the end of their investigation Mr Glover naturally
asked them: "How did we do?" He was told to wait
for the report. He was, however, given to under-
stand that the section would not be recommending
an immediate withdrawal of support by the bank
and he took comfort from this.

On 15 May one of the members of the section tele-
phoned the bank's regional office and reported that
the company appeared to be insolvent, that there
were reasonable grounds for thinking that the com-
pany could recover, that there was an urgent need
for changes and that each of the management had a
different objective.

On 19 May Martin returned to the bank the deben-

ture which had been sent to him by the bank a few
days earlier. It was not properly executed for, in Mr
Creal's absence on holiday, Martin was the only
signatory. The defect was attended to and the docu-
ment re-executed on 29 May. It was dated 20 May.

It is not necessary to rehearse later events at
length. An edited copy of the section's report was
forwarded to the company by Mr Hill on 12 June
under cover of a letter which called for further in-
formation including a business plan and an integ-
rated profit and loss and cash flow forecast and
which continued:

"Whilst the bank awaits this information and the
completion of its existing security, it will grant an
overdraft facility of £250,000 until the middle of
next month, and that should be adequate for the
company's requirements, bearing in mind that Mr
Glover has indicated that the account can work
within a ceiling of £230,000. You will appreciate
that £250,000 will, therefore, be regarded as a strict
maximum from hereon. This facility is, of course,
entirely dependent on the bank satisfactorily con-
cluding its present security, namely a first mortgage
debenture over the company's fixed and floating as-
sets, with the pension fund directors giving the
deed of postponement to the necessary extent in re-
spect of the debenture they have registered, and
giving the deed of satisfaction in respect of the
debenture that has been repaid."

The bank's terms were accepted. A deed of post-
ponement of the £80,000 debenture was executed
by the trustees of the pension fund and a memor-
andum of satisfaction of the £40,000 debenture was
filed. On 17 June Mr Glover, Mr Creal and Martin
met to discuss the section's report. They were dis-
appointed at the lack of practical advice in the re-
port and considered the alternatives of liquidation
or continuing to trade. They decided to continue
trading. The section had recommended that Mr
Glover should take over the role of managing dir-
ector for a short period and that the company
should consider recruiting an outsider. Mr Glover
realised that there was no hope of attracting an out-

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

sider to be managing director and he was unwilling to accept the position himself, but he agreed to accept responsibility "without portfolio". It was agreed that Martin should continue "in the title of managing director but to in fact be directed by" Mr Glover.

By the end of June Mr Glover and Mr Creal realised that their best hope was to sell the company as a going concern. Mr Glover was prepared to sell it for £1. That way he would at least save the pension fund's £80,000. He had always assumed that if the company failed the pension fund's debenture would be worthless, ranking as it did behind that of the bank.

Mr Glover did not produce the information which Mr Hill had requested and eventually Mr Hill realised that there was no one in the company capable of producing it, but, if it were produced, it would not portray an acceptable situation. He had lost all confidence in the company's management. On 30 July his assistant wrote to Martin:
**\*86**

"… our sanctioning authority … confirm that they are prepared to continue to allow the company an overdraft facility of
*£250,000 maximum for a further two months*
, during which period it is hoped that a sale of the company will be concluded. The bank's continued support is, however, subject to the opening of a *separate wages and salaries account* … Finally, it is considered strongly advisable that the directors should seek advice from their legal advisers *as to the provisions of the* Insolvency Act 1986 , given the position portrayed in the recent report by our financial services section."

The bank was no longer supporting an insolvent company to enable the directors to trade out of difficulty but to give them an opportunity to try to find a purchaser. Hence the advice contained in that last passage.

The company had continued to make losses throughout the period and its cash flow came under increasing strain. The auditors visited the company on 20 August and saw the management accounts for July. They recommended immediate liquidation. The company went into liquidation on 24 August.

I am satisfied that at all material times and in particular from 14 April onwards Mr Glover, Mr Creal and Martin knew (1) that the company was actually or virtually insolvent and (2) that if the bank withdrew its support at any time the company would be forced into immediate liquidation. Mr Glover was well aware of the danger that the company might go into insolvent liquidation. I have little doubt that the repayment of £40,000 to Medallion on 15 April was motivated by a desire to avoid the risk of losing it in that event.

Mr Glover assumed that if the company failed the pension fund debenture would be worthless because it would rank behind the bank's debenture, and its existence provided no motive for him to encourage the company to continue to trade unless he believed that it could survive. He was, however, less sanguine than Martin. He was motivated primarily by a sense of loyalty and a desire that Martin should be given a chance to prove himself. But I am satisfied that, like the others, Mr Glover genuinely believed throughout that the company could be pulled round if it was given time. I express no opinion whether that was a reasonable belief for any of them to hold, for that is a question which may fall for decision in other proceedings and is unnecessary to decide in these.

I reject the allegation that Martin was merely a cat's-paw and that Mr Glover's was the controlling mind of the company. The decision to continue trading and not to liquidate, which was a continuing one, and the decision to grant the bank a debenture were made by all three men. Martin and, to a lesser extent, Mr Creal looked to Mr Glover for advice, particularly on financial matters and in relation to the bank, and his influence was very great indeed; but the decisions were the decisions of all of

© 2012 Thomson Reuters.

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

them.II.

**Voidable preference**

**The law**

Section 239 of the Act provides, so far as material:

"(4)For the purposes of this section and section 241, a company gives a preference to a person if–(a)that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and(b)the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.**\*87** (5)The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b)." So far as I am aware, this is the first case under the section and its meaning has been the subject of some debate before me. I shall therefore attempt to provide some guidance.

The section replaces sec. 44(1) of the Bankruptcy Act 1914, which in certain circumstances deemed fraudulent and avoided payments made and other transactions entered into in favour of a creditor "with a view of giving such creditor … a preference over the other creditors".Section 44(1) and its predecessors had been construed by the courts as requiring the person seeking to avoid the payment or other transaction to establish that it had been made "with the dominant intention to prefer" the creditor.

Section 44(1) has been replaced and its language has been entirely recast. Every single word of significance, whether in the form of statutory definition or in its judicial exposition, has

been jettisoned. "View", "dominant", "intention" and even "to prefer" have all been discarded. These are replaced by "influenced", "desire", and "to produce in relation to that person the effect mentioned in subsec. (4)(b)".

I therefore emphatically protest against the citation of cases decided under the old law. They cannot be of any assistance when the language of the statute has been so completely and deliberately changed. It may be that many of the cases which will come before the courts in future will be decided in the same way that they would have been decided under the old law. That may be so, but the grounds of decision will be different. What the court has to do is to interpret the language of the statute and apply it. It will no longer enquire whether there was "a dominant intention to prefer" the creditor, but whether the company's decision was "influenced by a desire to produce … the effect mentioned in subsec. (4)(b)".

This is a completely different test. It involves at least two radical departures from the old law. It is no longer necessary to establish a *dominant* intention to prefer. It is sufficient that the decision was *influenced* by the requisite desire. That is the first change. The second is that it is no longer sufficient to establish an *intention* to prefer. There must be a *desire* to produce the effect mentioned in the subsection.

This second change is made necessary by the first, for without it it would be virtually impossible to uphold the validity of a security taken in exchange for the injection of fresh funds into a company in financial difficulties. A man is taken to intend the necessary consequences of his actions, so that an intention to grant a security to a creditor necessarily involves an intention to prefer that creditor in the event of insolvency. The need to establish that such intention was dominant was essential under the old law to prevent perfectly proper transactions from being struck down. With the abolition of that requirement intention could not remain the relevant

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

test. Desire has been substituted. That is a very different matter. Intention is objective, desire is subjective. A man can choose the lesser of two evils without desiring either.

It is not, however, sufficient to establish a desire to make the payment or grant the security which it is sought to avoid. There must have been a desire to produce the effect mentioned in the subsection, that is to say, to improve the creditor's position in the event of an insolvent liquidation. A man is not to be taken as *desiring* all the necessary consequences of his actions. Some consequences may be of advantage to him and be desired by him; others may not affect him and be matters of indifference to him; while still others may be positively disadvantageous to him and not be desired by him, but be regarded by him as the unavoidable price of obtaining the desired advantages. It will still be possible to provide assistance to a company in financial difficulties provided that the company is actuated only by proper commercial considerations. Under the new regime **\*88** a transaction will not be set aside as a voidable preference unless the company positively wished to improve the creditor's position in the event of its own insolvent liquidation.

There is, of course, no need for there to be direct evidence of the requisite desire. Its existence may be inferred from the circumstances of the case just as the dominant intention could be inferred under the old law. But the mere presence of the requisite desire will not be sufficient by itself. It must have influenced the decision to enter into the transaction. It was submitted on behalf of the bank that it must have been the factor which "tipped the scales". I disagree. That is not what sub-sec. (5) says; it requires only that the desire should have influenced the decision. That requirement is satisfied if it was one of the factors which operated on the minds of those who made the decision. It need not have been the only factor or even the decisive one. In my judgment, it is not necessary to prove that, if the requisite desire had not

been present, the company would not have entered into the transaction. That would be too high a test.

It was also submitted that the relevant time was the time when the debenture was created. That cannot be right. The relevant time was the time when the decision to grant it was made. In the present case that is not known with certainty. It was probably some time between 15 April and 20 May, although as early as 3 April Mr Glover and Mr Creal had resigned themselves to its inevitability. But it does not matter. If the requisite desire was operating at all, it was operating throughout.

**The evidence**

Mr Glover and Martin both gave evidence; Mr Creal did not. I accept Martin as a reliable witness. Mr Glover was far from reliable, but I accept him as an honest witness who tried his garrulous best to help the court. His recollection was poor and much of his evidence consisted of inaccurate reconstruction. It was chiefly valuable for the insights it gave of his own and others' motives. He was defensive in relation to his own responsibility for permitting the company to continue to trade and insisted that after 3 April he had ceased to be a director. I am satisfied that he remained a de facto director and that he was a party to and greatly influenced all decisions of importance in relation to financial matters. In relation to the bank's debenture, however, he did not take sides but gave his evidence fairly and impartially. He had either not worked out that it was in the interests of the pension fund, even if it were only an unsecured creditor, that the bank's debenture should be set aside, or, if he had, he did not allow it to affect his evidence.

I am satisfied that throughout the period from 15 April to 29 May Mr Glover, Mr Creal and Martin knew:

© 2012 Thomson Reuters.

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

- (1)        that the company was probably insolvent and might not be able to avoid an insolvent liquid-ation;

- (2)        that its continuing to trade was entirely dependent on the continued support of the bank;

- (3)        that if the debenture which Mr Hill had asked for were not forthcoming the bank would withdraw its support; and

- (4)        that if the bank withdrew its support the company would be forced into immediate liquida-tion.

I am also satisfied that they had decided to continue trading in a genuine belief that the company could be pulled round. It follows that they had no choice but to accede to the bank's request for a debenture. I accept Martin's evidence:

"It was viewed as a simple decision. Either we gave the bank a debenture or they called in the overdraft."**89**

That sufficiently explains the decision to grant the debenture and there is no justification for inferring any other reason. There is no evidence that either Martin or Mr Creal wanted to improve the bank's position in the event of an insolvent liquidation and there is no reason why they should. I find as a fact that in deciding to grant the debenture to the bank neither of them was motivated by any desire except the desire to avoid the calling in of the overdraft and to continue trading. That, however, is not the end of the matter. They were greatly influenced by Mr Glover's recommendation that the debenture should be granted, and I turn to examine his evidence to see whether he was influenced by a desire to improve the bank's position in the event of a liquidation for, if he was, then, in my judgment, the company's decision was similarly influenced, even though Mr Glover did not communicate any such desire to the others.

Mr Glover's evidence was to the same effect. He knew that if the company was to continue to trade it had no choice but to grant the debenture. He had a further reason for recommending it to the others. He believed that a debenture was not valid unless the company continued to trade for six

months after it was given. Accordingly, he conceived the eccentric notion that if the bank took a debenture it would have to continue to support the company for a further six months. As he put it:

"A. I viewed the bank, that the bank, having got the debenture, would then have to give us credit for a further six months …

Q. What was the point in giving the bank a debenture, in your mind?

A. In the first and foremost, to secure an overdraft of £250,000 for a guaranteed six months."

Mr Vos, who appeared for the applicant, accepted this evidence but claimed that there was another consideration which also operated on Mr Glover's mind, namely a desire to improve the bank's position in the event of the company's insolvent liquidation. He submitted that this was not as idiosyncratic as it might appear, for Mr Glover and Medallion as well as the pension fund all banked at the Southwark branch of the bank; Medallion had an overdraft and anticipated making a request for a further facility in the near future; and Mr Glover would have wanted to keep on the right side of Mr Hill. He even claimed that Mr Glover felt a sense of guilt for having allowed the overdraft to become so high (even though it never exceeded the permitted limit) and so morally responsible for the position in which the bank found itself. Either explanation would lend credence to the otherwise implausible, but as a reason for agreeing to grant the debenture neither is supported by the evidence and neither was put to Mr Glover. I reject both.

© 2012 Thomson Reuters.

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

I am satisfied that throughout the period Mr Glover's relationship with the bank was an arm's length one and that in dealing with the bank on the company's behalf he was not affected by personal financial considerations. It is noteworthy that:

- (1)        he did not tell Mr Hill of the loss of the Dee Corporation for some months because he saw no advantage to the company in doing so;

- (2)        he did not tell Mr Hill of his own or Mr Creal's actual retirement until afterwards, even though he knew that Mr Hill would be sufficiently concerned to demand a debenture in that event;

- (3)        although he learned of the company's probable insolvency on 14 April he would not have gone to see Mr Hill on 15 April if Mr Hill had not summoned him; and

- (4)        on or after 21 April he never warned Mr Hill of the imminence of liquidation or the urgency if a debenture was to be taken in time.

Mr Vos relied on several passages in Mr Glover's evidence in which he equated the bank's debenture with the pension fund debenture, and appeared to be saying that he **\*90** had been concerned to protect the bank's position in the event of the company's liquidation. When asked why he agreed to give the bank a debenture, for example, he replied:

"Because the pension fund was having a – about to have a debenture, or was under way with a debenture. I believe the pension fund was under way with

- (1)        Mr Glover obviously arranged for the pension fund to have a debenture because he desired to improve its position as a creditor in the event of the company's insolvency;

- (2)        he also desired to give the bank a first debenture even if only to avoid the calling in of the overdraft;

- (3)        it follows that he must have desired to put the bank ahead of the pension fund in the event of the company's insolvency;

- (4)        and it follows that he must have desired to put the bank ahead of the unsecured creditors in the event of the company's insolvency.

In fact, priority between the debenture holders was not a matter for the company but for the debenture holders themselves. The bank demanded priority and the pension fund conceded it. But, in any case, in my judgment, the syllogism confuses desire with intention and breaks down at (3). Mr Glover intended the bank to rank ahead of the pension fund but he obviously did not desire it. It was the price he

having a debenture. And it seemed logic that the bank should have a debenture too."

But here Mr Glover was looking at the request from the bank's point of view. He was saying no more than that he recognised that it was reasonable for the bank to ask for a debenture.

Mr Vos submitted that:

had to pay for the bank's continued support.

Mr Vos strongly relied on the following passages in Mr Glover's evidence:

"The debenture for the pension fund was tidied up. I felt it was right and proper that the debenture for the bank should have been tidied up.

© 2012 Thomson Reuters.

[1990] B.C.C. 78                                                                    Page 14
[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times,
December 1, 1989
**(Cite as: [ 1990] B.C.C. 78)**

On the broad sense, I was worried that both the bank and the pension fund had not got a debenture because I considered them my responsibility …

I was charged with protecting the pension fund and the bank. That is how I saw my charge. That was my side of the business.

I was in no way involved with the trading of the company or the suppliers. I was involved with the bank and, secondly, the pension fund. I would have deemed it my responsibility, since I dealt with the bank and the pension fund, to protect them … I never thought about the other creditors of the company … because they were Mike Creal's responsibility. It was not my side of the business."

     Mr Vos placed the strongest reliance on the following answers by Mr Glover when he was dealing with the telephone call to Mr David Taylor on 21 April:

"Q. Who rang?

A. There is no question. I rang David Taylor. And I, for some unknown reason, would have been agitated. I was disturbed. And it is the one thing of all this I cannot – it is a statement to David Taylor where, in my agitation, I would have said to David: 'David, I must get this tidied up because this company could go into liquidation.'

Q. And what did you tell him you were going to get tidied up?

A. It was already in process: a debenture on the – a debenture on behalf of the bank and a debenture on behalf of the pension fund."**91**

This was reconstruction, not recollection, and in relation to the bank's debenture it was nonsense. There was a great deal of excitement on 21 or 22 April in delivering the pension fund debenture to the registrar before the deadline expired, but the bank did not send the form of debenture which it was seeking to the company until 14 May. Mr Glover cannot have been agitated about the need to

deal with the bank's debenture as a matter of urgency on 21 April and, if he had been, he would have rung Mr Hill, not Mr Taylor. Nor is this merely an error of date. There was no time at which Mr Glover's answer can have been true, and he later corrected it by saying that in this conversation he had not been concerned about the bank's debenture.

Despite this, Mr Vos relied on it as betraying an anxiety on Mr Glover's part lest the company should go into liquidation before the bank had obtained a debenture. There could be no explanation for a desire to ensure that the bank had a debenture even though the company went into insolvent liquidation immediately afterwards, it was submitted, except a desire that the bank's position as a creditor should be improved in that event.

     Normally, no doubt, that would be so. In the present case it would sit uneasily with Mr Glover's belief that a debenture was invalid unless the company continued to trade for six months, but then Mr Glover did not always think logically. However, the key to Mr Glover's evidence is to be found in another series of answers to questions from me:

"Q. You thought it was your responsibility to protect the bank, but you did not think it was your responsibility to get the debenture registered?

A. No. No, no.

Q. I do not entirely understand.

A. No, no. No, no. I think we will find that the bank's solicitors are responsible for registering their own charge or debenture."

     He was wrong.

"Q. I only want to understand what you mean by saying you thought you were responsible for protecting the bank, because the bank would not be protected if it was not registered?

A. Ah, well, not to – forgive me. Not in the sense

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

that I would protect the bank in – one would say in the wide legal sense. The bank was somebody I dealt with and therefore, having said that a debenture was given – was to be given – obviously I was going to follow it through to see that a debenture was given."

That, in my judgment, is all it came to. Mr Glover dealt with the bank, it was "his side of the business", and he saw it as his responsibility to ensure that the company did what he had told the bank it would do. He had promised Mr Hill that the company would give the bank a debenture and he would have been upset if the company had gone into liquidation before it had done so. But he was not concerned whether the bank registered the debenture, even though he knew that it would not be valid unless it was registered, because he did not regard that as his responsibility. He was not worried that the company might go into liquidation before the bank obtained a *valid* security. That was a matter of indifference to him. It follows, and I find, that he was not actuated by a desire to improve the bank's position as a creditor in the event of the company's liquidation.

**Conclusion**

I dismiss the applicant's claim to set the debenture aside as a voidable preference.III.

**Transaction at an undervalue**

- (1)    entered into by the company;
- (2)    for a consideration;
- (3)    the value of which measured in money or money's worth;
- (4)    is significantly less than the value;
- (5)    also measured in money or money's worth;
- (6)    of the consideration provided by the company.

It requires a comparison to be made between the value obtained by the company for the transaction and the value of consideration provided by the company. Both values must be measurable in money or money's worth and both must be considered from the company's point of view.

Section 238    of the Act is concerned with the depletion of a company's assets by transactions at an undervalue.    Section 238(4)    of the Act defines a transaction at an undervalue as follows:    **\*92**

"For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if–(a)the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or(b)the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."

The granting of the debenture was not a gift, nor was it without consideration. The consideration consisted of the bank's forbearance from calling in the overdraft and its honouring of cheques and making of fresh advances to the company during the continuance of the facility. The applicant relies therefore on paragraph (b).

To come within that paragraph the transaction must be:

In my judgment, the applicant's claim to characterise the granting of the bank's debenture as a transaction at an undervalue is misconceived. The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph. By charging its assets the company ap-

© 2012 Thomson Reuters.

[1990] B.C.C. 78

[1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989 [1990] B.C.C. 78 [1990] B.C.L.C. 324 Times, December 1, 1989

**(Cite as: [ 1990] B.C.C. 78)**

propriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value.

In the present case the company did not suffer that loss by reason of the grant of the debenture. Once the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the overdraft; had it attempted to do so, the bank would at once have called in the overdraft. By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.

Mr Vos submitted that the consideration which the company received was, with hindsight, of no value. It merely gained time and with it the opportunity to lose more money. But he could not and did not claim that the company ought to have received a fee or other capital sum in return for the debenture. That gives the game away. The applicant's real complaint is not that the company entered into the transaction at an undervalue but that it entered into it at all.

In my judgment, the transaction does not fall within subsec. (4), and it is unnecessary to consider the application of subsec. (5) which provides a defence to the claim in certain circumstances. **\*93** IV.

**Conclusion**

In my judgment, the granting of the debenture to the bank was neither a voidable preference nor a transaction at an undervalue and I dismiss the application. (Application dismissed) **\*94**

END OF DOCUMENT

© 2012 Thomson Reuters.

# DELANEY V. CHEN [2010] EWCA CIV 1455

© 2012 Sweet & Maxwell

**Delaney v Chen**

**Also known as:**
**Chen v Delaney**

**Court of Appeal (Civil Division)**

**16 November 2010**

**Case Analysis**

**Where Reported**      [2010] EWCA Civ 1455;  [2011] B.P.I.R. 39;  Official Transcript;

**Case Digest**

**Subject:** Real property

**Keywords:** Leaseback, Transactions at an undervalue, Sale of property

**Catchphrases:** Sale of property, Transactions at an undervalue, Reasonableness of sale and leaseback transaction

**Abstract:** The appellants (C) appealed against a decision ([2010] EWHC 6 (Ch), [2010] B.P.I.R. 316) that the respondent (D) had not been party to a transaction at an undervalue within the Insolvency Act 1986 s.423(1)(c).

C had obtained a judgment against individuals (X) with whom they had been in partnership. X sold the freehold of their home to D for £210,000 under a leaseback arrangement. The leaseback provided for a fixed rent of £500 per calendar month, was for a term of 21 years and was unassignable. In the courts below, D and X had relied on valuation evidence that the value of the property with the benefit of full vacant possession as at the date of the transaction was in the region of £275,000 and that its value subject to the tenancy agreement was roughly £115,000.

Having regard to the valuation evidence, a sale and leaseback transaction was not a transaction at an undervalue within the Insolvency Act 1986 s.423(1)(c).

Appeal dismissed. If the value of the freehold with vacant possession was £275,000 and the value of the property subject to the lease was £115,000 and the inherent value of the lease itself was assumed to be nil, then there was a marriage value of £160,000. In the absence of any evidence to the contrary, one would split the marriage value of £160,000 equally between the freehold and the leasehold, in which case the lease would be worth £80,000. On that basis, it followed that the lease was worth £80,000. Consequently, on the unchallenged figures, X had received more than the £275,000 which the property was worth, namely £210,000, which was what they were paid, and £80,000, the value of the lease that they received. Once one had the expert's figures, it was im-

[2010] EWCA Civ 1455 [2011] B.P.I.R. 39 Official Transcript [2010] EWCA Civ 1455 [2011] B.P.I.R. 39 Official Transcript

possible to say, in the absence of any contrary evidence, that the sale of the property was at an undervalue. C had asserted that, as a matter of principle, the lease should not be accorded any value for the purposes of s.423(1)(c) because it could not be sold on the open market given that it was unassignable. That argument was wrong as the lease had a surrender value. Quite apart from that, the argument was effectively shut out by the decision in Reid v Ramlort Ltd [2004] EWCA Civ 800, [2005] 1 B.C.L.C. 331, *Reid* followed. Further, the basis of the reasoning in Agricultural Mortgage Corp Plc v Woodward [1994] B.C.C. 688 was inconsistent with C's proposition, *Agricultural Mortgage Corp* considered. It appeared to be plain that for s.423 purposes one looked at the value received from the point of view of the debtor, the person effecting the sale which was sought to be impugned under s.423, MC Bacon Ltd (No.2), Re [1991] Ch. 127 approved. On that basis, albeit that one could well see that from C's point of view the transaction was very unattractive, the fact that X were seeking to protect themselves in their home might be an additional factor to justify what they had done in terms of value (see paras 12-15 of judgment).

Appeal dismissed

**Judges:** Master of the Rolls; Carnwath, L.J.; Sullivan, L.J.

**Counsel:**    For I :the appellants: Alper Riza QC For I :the respondent: Mark Anderson QC

**Solicitors:**    For I :the respondent: Wilkes Partnership

## Appellate History

**refusing application for permission to appeal from**

**affirming**

[2010] EWCA Civ 1455; [2011] B.P.I.R. 39; Official Transcript

[2010] EWHC 6 (Ch); [2010] B.P.I.R. 316; [2010] 1 E.G.L.R. 21; [2010] 12 E.G. 101; [2010] 3 E.G. 103 (C.S.); [2010] N.P.C. 11; [2010] 2 P. & C.R. DG1; Official Transcript

## Related Cases

## Significant Cases Cited

**considering**
**Agricultural Mortgage Corp Plc v Woodward**
[1994] B.C.C. 688; [1995] 1 B.C.L.C. 1; [1996] 1 F.L.R. 226; [1996] 2 F.C.R. 796; (1995) 70 P. & C.R. 53; [1995] 1 E.G.L.R. 1; [1995] 04 E.G. 143; [1996] Fam. Law 149; [1994] E.G. 98 (C.S.); Times, May 30, 1994
CA (Civ Div)

**considering**
**National Bank of Kuwait SAK v Menzies**
[1994] B.C.C. 119; [1994] 2 B.C.L.C. 306
CA (Civ Div)

© 2012 Thomson Reuters.

[2010] EWCA Civ 1455 [2011] B.P.I.R. 39 Official Transcript [2010] EWCA Civ 1455 [2011] B.P.I.R. 39 Official
Transcript

**following**

**Reid v Ramlort Ltd**

[2004] EWCA Civ 800; [2005] 1 B.C.L.C. 331; [2004] B.P.I.R. 985; (2004) 148 S.J.L.B. 877; Official Tran-
script

CA (Civ Div)

**applying**

**MC Bacon Ltd (No.1), Re**

[1990] B.C.C. 78; [1990] B.C.L.C. 324; Times, December 1, 1989

Ch D (Companies Ct)

**approving**

**MC Bacon Ltd (No.2), Re**

[1991] Ch. 127; [1990] 3 W.L.R. 646; [1990] B.C.C. 430; [1990] B.C.L.C. 607; Times, April 12, 1990; Inde-
pendent, May 7, 1990

Ch D (Companies Ct)

**considering**

**Phillips (Liquidator of AJ Bekhor & Co) v Brewin Dolphin Bell Lawrie Ltd (formerly Brewin Dolphin &
Co Ltd)**

[2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] 1 All E.R. 673; [2001] B.C.C. 864; [2001] 1 B.C.L.C. 145;
[2001] B.P.I.R. 119; (2001) 98(12) L.S.G. 43; (2001) 145 S.J.L.B. 32; Times, January 23, 2001; Official Tran-
script

HL

## Cases Citing This Case

### Legislation cited

Housing Act 1988 (c.50) s.15(1)

Insolvency Act 1986 (c.45) s.423

Insolvency Act 1986 (c.45) s.423(1)

Insolvency Act 1986 (c.45) s.423(1)(c)

Insolvency Act 1986 (c.45) s.423(2)

Insolvency Act 1986 (c.45) s.423(3)

### Journal Articles

**Setting aside vulnerable transactions - an update**

Insolvency, Preferences, Transactions at an undervalue

C.R. & I. 2011,4(6), 189-191

END OF DOCUMENT

© 2012 Thomson Reuters.

**EWCA CIV 542; IRC V. HASHMI [2002] EWCA CIV 981**

2002 WL 1446095                                                                                    Page 1

[2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript [2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript

© 2012 Sweet & Maxwell

**Inland Revenue Commissioners v Hashmi**

**Also known as:**
**Hashmi v Inland Revenue Commissioners**

**Court of Appeal (Civil Division)**

**03 May 2002**

**Case Analysis**

**Where Reported**        [2002] EWCA Civ 981; [2002] B.C.C. 943; [2002] 2 B.C.L.C. 489; [2002] B.P.I.R. 974; [2002] W.T.L.R. 1027; Official Transcript;

**Case Digest**

**Subject:** Trusts

**Keywords:** Creditors, Declarations of trust, Dissipation of assets, Objects and purposes, Setting aside, Transactions

**Catchphrases:** declarations of trust, setting aside, creditors, purpose of entering into transaction, statutory purpose

**Abstract:** G had executed a written declaration of trust declaring that he held a property on trust for his son, O, then aged 16. G was engaged in a course of fraudulent conduct whereby he was receiving undeclared profits from his business which he used to purchase properties in Spain and the UK. He was the subject of an Inland Revenue investigation and a settlement was reached. The declaration of trust in favour of G's son had not been revealed and the trust only came to light on G's death. O appealed the setting aside of a deed of trust. O contended that the court had not been entitled to draw the inference that the statutory purpose was G's dominant purpose on the evidence.

The statutory purpose under the Insolvency Act 1986 s.423(3) did not have to be the dominant purpose of a transaction and thus, the court had jurisdiction to set aside a declaration of trust made in favour of H's son.

Held, dismissing the appeal, that the statutory purpose under the Insolvency Act 1986 s.423(3) did not have to be the dominant purpose of a transaction. The distinction between result and purpose had to be clearly borne in mind when considering whether the statutory purpose was satisfied. There was no warrant for excluding a situation where purposes of equal potency were concerned, Pinewood Joinery v Starelm Properties Ltd [1994] B.C.C. 569 approved. It had to be a substantial purpose.

**Judges:** Simon Brown, L.J.; Laws, L.J.; Arden, L.J.

[2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript [2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript

**Counsel:**     For I :O:  Neil Cadwallader.  For I :the Commissioners:  Kate Selway.  For I :H:  Not represented

**Solicitors:**     For I :O:  Emsleys (Leeds).  For I :the Commissioners:  Inland Revenue Solicitor

### Appellate History

**affirming**

[2002] EWCA Civ 981; [2002] B.C.C. 943; [2002] 2 B.C.L.C. 489; [2002] B.P.I.R. 974; [2002] W.T.L.R. 1027; Official Transcript

### Related Cases

### Significant Cases Cited

**approving**
**Pinewood Joinery v Starelm Properties Ltd**
[1994] B.C.C. 569; [1994] 2 B.C.L.C. 412
Ch D (Companies Ct)

**Powell v Streatham Manor Nursing Home**
[1935] A.C. 243
HL

**Brabon, Re**
[2000] B.C.C. 1171; [2001] 1 B.C.L.C. 11; [2000] B.P.I.R. 537; [2000] E.G. 38 (C.S.); [2000] N.P.C. 21; Official Transcript
Ch D

**Edgington v Fitzmaurice**
(1885) L.R. 29 Ch. D. 459
CA

**Royscot Spa Leasing Ltd v Lovett**
[1995] B.C.C. 502; [1994] N.P.C. 146; Independent, January 23, 1995
CA (Civ Div)

**Owner of the Alice v Aberdeen Newcastle & Hull Steam Co (Owners of the Princess Alice)**
(1867-69) L.R. 2 P.C. 245
PC (UK)

**Pehrsson's Trustee, Re**
(1999-2000) 2 I.T.E.L.R. 230
PC (Gib)

**Chohan v Saggar**
[1992] B.C.C. 306; [1991] N.P.C. 111; Times, October 16, 1991
Ch D

© 2012 Thomson Reuters.

[2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Offi-
cial Transcript [2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002]
W.T.L.R. 1027 Official Transcript


## Cases Citing This Case

**applied**
**Curtis v Pulbrook**
[2011] EWHC 167 (Ch); [2011] 1 B.C.L.C. 638; Official Transcript
Ch D


**applied**
**Barnett v Semenyuk**
[2008] B.P.I.R. 1427; [2008] 2 P. & C.R. DG18
Ch D


**applied**
**Beckenham MC Ltd v Centralex Ltd**
[2004] EWHC 1287 (Ch); [2004] 2 B.C.L.C. 764; [2004] B.P.I.R. 1112; Official Transcript
Ch D


**considered**
**Hill v Spread Trustee Co Ltd**
[2005] EWHC 336 (Ch); [2005] B.P.I.R. 842; Official Transcript
Ch D


**applied**
**Papanicola v Fagan**
[2008] EWHC 3348 (Ch); [2009] B.P.I.R. 320; Official Transcript
Ch D


**Gomez v Gomez-Monche Vives**
[2008] EWHC 259 (Ch); [2008] 3 W.L.R. 309; [2008] 1 All E.R. (Comm) 973; [2008] I.L.Pr. 32; [2008]
W.T.L.R. 621; (2007-08) 10 I.T.E.L.R. 956; Official Transcript
Ch D


**Random House UK Ltd v Allason**
[2008] EWHC 2854 (Ch); Official Transcript
Ch D


**4 Eng Ltd v Harper**
[2009] EWHC 2633 (Ch); [2010] B.C.C. 746; [2010] 1 B.C.L.C. 176; [2010] B.P.I.R. 1; [2010] Bus. L.R. D58;
Times, November 6, 2009; Official Transcript
Ch D


**Kubiangha v Ekpenyong**
[2002] EWHC 1567 (Ch); [2002] 2 B.C.L.C. 597; [2003] B.P.I.R. 623; Official Transcript
Ch D


**Dornoch Ltd v Westminster International BV**
[2009] EWHC 1782 (Admlty); [2009] 2 Lloyd's Rep. 420; [2009] 2 C.L.C. 226; [2010] Lloyd's Rep. I.R. 1; Offi-

© 2012 Thomson Reuters.

[2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Offi-
cial Transcript [2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002]
W.T.L.R. 1027 Official Transcript


cial Transcript
QBD (Admlty)

**BBC v Sugar**
[2010] EWCA Civ 715; [2010] 1 W.L.R. 2278; [2011] 1 All E.R. 101; [2010] E.M.L.R. 24; Official Transcript
CA (Civ Div)

**BBC v Sugar**
[2012] UKSC 4; Official Transcript
SC

**Hill v Spread Trustee Co Ltd**
[2006] EWCA Civ 542; [2007] Bus. L.R. 1213; [2007] 1 W.L.R. 2404; [2007] 1 All E.R. 1106; [2006] B.C.C.
646; [2007] 1 B.C.L.C. 450; [2006] B.P.I.R. 789; [2006] W.T.L.R. 1009; Times, July 10, 2006; Official Tran-
script
CA (Civ Div)

**Giles v Rhind**
[2007] EWHC 687 (Ch); [2007] Bus. L.R. 1470; [2007] 2 B.C.L.C. 531; [2007] B.P.I.R. 713; Official Transcript
Ch D

**Habib Bank Ltd v Ahmed**
[2003] EWHC 1697 (QB); [2004] B.P.I.R. 35; Official Transcript
QBD

**Delaney v Chen**
[2010] EWHC 6 (Ch); [2010] B.P.I.R. 316; [2010] 1 E.G.L.R. 21; [2010] 12 E.G. 101; [2010] 3 E.G. 103 (C.S.);
[2010] N.P.C. 11; [2010] 2 P. & C.R. DG1; Official Transcript
Ch D (Birmingham)

**Gomez v Gomez-Monche Vives**
[2008] EWCA Civ 1065; [2009] Ch. 245; [2009] 2 W.L.R. 950; [2009] 1 All E.R. (Comm) 127; [2008] 2 C.L.C.
494; [2009] I.L.Pr. 32; [2008] W.T.L.R. 1623; (2008-09) 11 I.T.E.L.R. 422; (2008) 152(39) S.J.L.B. 32; [2008]
N.P.C. 105; [2009] 1 P. & C.R. DG1; Official Transcript
CA (Civ Div)

### Legislation cited

Insolvency Act 1985 (c.65)

Insolvency Act 1986 (c.45) s.423

Insolvency Act 1986 (c.45) s.423(3)

Insolvency Act 1986 (c.45) s.423(3)(a)

Insolvency Act 1986 (c.45) s.424

© 2012 Thomson Reuters.

[2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript [2002] EWCA Civ 981 [2002] B.C.C. 943 [2002] 2 B.C.L.C. 489 [2002] B.P.I.R. 974 [2002] W.T.L.R. 1027 Official Transcript

Insolvency Act 1986 (c.45) s.432(1)

Law of Property Act 1925 (c.20) s.172

## Journal Articles

**Family property and bankruptcy: some noteworthy decision from 2008**
Ancillary relief, Bankruptcy, Matrimonial home
P.C.B. 2009, 4, 287-293

**C v C: family trouble for trust lawyers?**
Ancillary relief, Disclosure, Divorce, Legal professional privilege, Matrimonial property, Transactions at an undervalue
T.E.L. & T.J. 2007, 87(Jun), 8-10

**Transactions defrauding creditors: the problem of purpose under section 423 of the Insolvency Act**
Companies, Debtors, Fraud, Transactions at an undervalue
Conv. 2003, Jul/Aug, 272-288

**Purpose did not have to be the dominant purpose but a substantial purpose**
Declarations of trust, Dissipation of assets, Equitable interests, Setting aside
E.C.A. 2002, 7(5), 7,

END OF DOCUMENT

© 2012 Thomson Reuters.

# LIMITATION ACT 1980

(4) In this section "promissory note" has the same meaning as in the Bills of Exchange Act 1882.

---

**Notes**

[1]    Act extended by Water Act 1981 (c. 12), s. 6(4)

**Commencement**

Pt I s. 6: May 1, 1981 (1980 c. 58 Pt III s. 41(2))

**Extent**

Pt I s. 6(1)-(4): England, Wales

---

✅ Law In Force

### 7.  Time limit for actions to enforce certain awards.

An action to enforce an award, where the submission is not by an instrument under seal, shall not be brought after the expiration of six years from the date on which the cause of action accrued.

---

**Notes**

[1]    Act extended by Water Act 1981 (c. 12), s. 6(4)

**Commencement**

Pt I s. 7: May 1, 1981 (1980 c. 58 Pt III s. 41(2))

**Extent**

Pt I s. 7: England, Wales

---

*General rule for actions on a specialty*

✅ Law In Force

### 8.—  Time limit for actions on a specialty.

(1) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.

(2) Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.

---

**Notes**

[1]    Act extended by Water Act 1981 (c. 12), s. 6(4)

**Commencement**

Pt I s. 8: May 1, 1981 (1980 c. 58 Pt III s. 41(2))



**Extent**

Pt I s. 8(1)-(2): England, Wales

---

*Actions for sums recoverable by statute*

✅ Law In Force

**9.— Time limit for actions for sums recoverable by statute.**

(1) An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued.

(2) Subsection (1) above shall not affect any action to which section 10 of this Act applies.
[1]

---

**Notes**

[1]    Act extended by Water Act 1981 (c. 12), s. 6(4)

**Commencement**

Pt I s. 9: May 1, 1981 (1980 c. 58 Pt III s. 41(2))

**Extent**

Pt I s. 9(1)-(2): England, Wales

---

✅ Law In Force

**10.— Special time limit for claiming contribution.**

(1) Where under section 1 of the Civil Liability (Contribution) Act 1978 any person becomes entitled to a right to recover contribution in respect of any damage from any other person, no action to recover contribution by virtue of that right shall be brought after the expiration of two years from the date on which that right accrued.

(2) For the purposes of this section the date on which a right to recover contribution in respect of any damage accrues to any person (referred to below in this section as "the relevant date") shall be ascertained as provided in subsections (3) and (4) below.

(3) If the person in question is held liable in respect of that damage—
      (a)  by a judgment given in any civil proceedings; or
      (b)  by an award made on any arbitration;
the relevant date shall be the date on which the judgment is given, or the date of the award (as the case may be).
For the purposes of this subsection no account shall be taken of any judgment or award given or made on appeal in so far as it varies the amount of damages awarded against the person in question.

(4) If, in any case not within subsection (3) above, the person in question makes or agrees to make any payment to one or more persons in compensation for that damage (whether he admits any liability in respect of the damage or not), the relevant date shall be the earliest date on which the

